Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants and Counter-
Plaintiffs *Ryder Ripps and Jeremy Cahen*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No.: 2:22-cv-4355-JFW-JEM |
| Plaintiff and Counterclaim Defendant, | **MR. RIPPS AND MR. CAHEN'S OPPOSITION TO YUGA LABS, INC.'S MOTION TO DISMISS** |
| v. | |
| Ryder Ripps, Jeremy Cahen, | Honorable John F. Walter |
| Defendants and Counterclaim Plaintiffs. | Hearing: February 27, 2023 at 1:30 pm |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND .................................................................................. 1

III.  LEGAL STANDARD .......................................................................... 6

IV.  ARGUMENT ....................................................................................... 6

    A.    YUGA'S MOTION MUST BE DENIED IN ITS ENTIRETY AS UNTIMELY ............................................................................ 6

    B.    COUNTER-PLAINTIFFS HAVE STANDING TO ASSERT THEIR 512(F) CLAIM ..................................................................... 7

    C.    COUNTER-PLAINTIFFS' 512(F) CLAIM IS PLED WITH PARTICULARITY ....................................................................... 10

    D.    COUNTER-PLAINTIFFS' 512(F) CLAIM IS OTHERWISE ADEQUATELY PLEAD .................................... 14

    E.    DECLARATORY JUDGMENT IS PROPER FOR THE COPYRIGHT CLAIMS ................................................................ 14

    F.    COUNTER-PLAINTIFFS ALLEGED EXTREME AND OUTRAGEOUS CONDUCT .......................................................... 16

    G.    COUNTER-PLAINTIFFS PLAUSIBLY ALLEGE SEVERE EMOTIONAL DISTRESS. ...................................................... 18

    H.    YUGA OWED A DUTY OF CARE TO COUNTER-PLAINTIFFS ...................................................................................... 20

    I.    DECLARATORY JUDGMENT OF NO DEFAMATION .......... 21

    J.    YUGA'S MOTION TO STRIKE SHOULD BE DENIED .......... 21

V.   CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bass v. Facebook, Inc.*,
  394 F. Supp. 3d 1024 (N.D. Cal. 2019)................................................................9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ...........................................................................................6

*Bly-Magee v. California*,
  236 F.3d 1014 (9th Cir. 2001).........................................................................11

*Cal. Furniture Collection, Inc. v. Harris Adamson Home*,
  LLC, No.19-cv-06254, 2019 WL 7882081 (C.D. Cal. 2019)...........................16

*California Sea Urchin Commission v. Bean*,
  883 F.3d 1173 (9th Cir. 2018)...........................................................................8

*United States v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011).............................................................................23

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010)......................................................................21, 22

*Hung v. City of Los Angeles*,
  601 F. Supp. 2d 1158 (C.D. Cal. 2009).............................................................9

*IP Global Invs. America, Inc. v. Body Glove Ip Holdings, LP*,
  2:17-cv-06189-ODW-AGRE, 2019 WL 121191 (C.D. Cal. Jan. 7,
  2019).................................................................................................................21

*Lenz v. Universal Music Studios*,
  815 F.3d 1145 (9th Cir. 2016).........................................................................10

*U.S. v. Lockheed Missiles & Space Co., Inc.*,
  171 F.3d 1208 (9th Cir. 1999).........................................................................23

*Moonbug Entertainment Ltd. v. Babybus (Fujian) Network Technology
  Co., Ltd.*,
  No. 21-cv-06536-EMC, 2022 WL 580788 (N.D. Cal. 2022) ...........................14

*Principal Life Ins. Co. v. Robinson*,
    394 F.3d 665 (9th Cir. 2005) ................................................................ 14

*Public Service Commission v. Wycoff Co.*,
    344 U.S. 237 (1952) ............................................................................ 14

*Rhoades v. Avon Prods.*,
    504 F.3d 1151 (9th Cir. 2007) .............................................................. 14

*Robins v. Spokeo, Inc.*,
    867 F.3d 1108 (9th Cir. 2017) .............................................................. 10

*Rossi v. Motion Picture Ass'n of America, Inc.*,
    391 F.3d 1000 (9th Cir. 2004) .............................................................. 14

*Sky Billiards, Inc., v. WolVol, Inc.*,
    No. 5:15-cv-02182, 2016 WL 7479428 (C.D. Cal. 2016) ................................ 16

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .............................................................................. 9

*Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*,
    922 F. Supp. 299 (C.D. Cal. 1996) ........................................................... 6

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ................................................................ 11

*Van v. LLR, Inc.*,
    962 F.3d 1160 (9th Cir. 2020) ........................................................... 9, 10

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
    556 F.2d 406 (9th Cir. 1977) .................................................................. 8

*White v. City of Sparks*,
    500 F.3d 953 (9th Cir. 2007) .................................................................. 9

*Wyler Summit Partnership v. Turner Broadcasting System, Inc.*,
    135 F.3d 658 (9th Cir. 1998) .................................................................. 6

**State Cases**

*Cabral v. Ralphs Grocery Co.*,
    248 P.3d 1170 (Cal. 2011).................................................................... 20

*City of Cotati v. Cashman,*
    29 Cal.4th 69 (2002) .......................................................................... 22

*Fletcher v. Western National Life Ins. Co.*
    10 Cal.App.3d 376 (1970) ................................................................ 18

*Hughes v. Pair,*
    46 Cal.4th 1035 (2009) .................................................................... 19

*Ismail v. Montchak,*
    B284163, 2019 WL 2949863 (Cal. Ct. App. 2019) .......................... 19

*Jackson v. Mayweather,*
    10 Cal.App.5th 1240 (2017) ............................................................ 18

*Kisecky v. Carpenters' Trust for So. California,*
    144 Cal.App.3d 222 (1983) .............................................................. 17

*McConnell v. Innovative Artists & Literary Agency, Inc.,*
    175 Cal.App.4th 169 (2009) ............................................................ 22

*Plotnik v. Meihaus,*
    208 Cal.App.4th 1590 (2012) .......................................................... 19

*Potter v. Firestone Tire & Rubber Co.,*
    6 Cal. 4th 965 (1993) .................................................................. 17, 20

*Silk v. Feldman,*
    208 Cal.App.4th 547 (2012) ............................................................ 22

*Wang v. Wal-Mart Real Estate Business Trust,*
    153 Cal.App.4th 790 (2007) ............................................................ 22

**Federal Statutes**

17 U.S.C. 512(f) ...................................................................... *passim*

DMCA ...................................................................................... *passim*

**State Statutes**

California Civil Code § 1714(a) ............................................................ 20

California Code of Civil Procedure § 527.6 ........................................ 20

California Penal Code § 646.9.............................................................................20, 21

**Other Authorities**

Federal Rules of Civil Procedure Rule 12(b)(6).........................................................6

https://www.copyright.gov/help/faq/faq-special.html...........................................16

L.R. 7-3 ................................................................................................................11

Fderal Rules of Civil Procedure Rule 9(b) .............................................................12

## I.      INTRODUCTION

Counter-Plaintiffs Ryder Ripps and Jeremy Cahen called out Yuga Labs, Inc. ("Yuga") for the racist and alt-right messages embedded in the Bored Ape Yacht Club ("BAYC") NFT collection, and Yuga has done everything it can to try to silence them in response.  That is why Yuga brought this trademark case (against Ripps and Cahen only, not against any of the dozens of other NFT collections that actually do try to profit by using Yuga's asserted trademarks), that is why Yuga deployed its employees to harass Mr. Ripps, Mr. Cahen, and their families, and that is why Yuga launched fraudulent takedown notices under the Digital Millennium Copyright Act.

Yuga's out-of-court actions are what give rise to the well-pled counterclaims that Mr. Ripps and Mr. Cahen have asserted to put an end to Yuga's campaign of harassment.  For the reasons discussed in detail below, those counterclaims should not be dismissed or struck.

But even before reaching the merits, the Court must deny Yuga's motion as untimely.  Counter-Plaintiffs filed and served their counterclaims on December 27, 2022—but Yuga's motion was not filed until January 18, 2023.  Under Rule 12(a)(1)(B), Yuga's motion was untimely, and, as a matter of law, because Yuga has not timely answered Counter-Plaintiffs' allegations and has not made (and cannot make) a motion for an extension for excusable neglect under Rule 6(b)(1)(B), Yuga's motion must be denied.

## II.     BACKGROUND

Counter-Plaintiffs Ryder Ripps and Jeremy Cahen pointed out that Yuga's BAYC NFT collection was rife with dog whistles appealing to the online alt-right community.  In response, Yuga and its agents engaged in a more than year-long campaign in an to attempt to shut them up.  In several instances, Yuga's campaign crossed the line into actionable conduct.

## A.     Ryder Ripps

Ryder Ripps is a well-known artist.  Mr. Ripps's work has appeared in major galleries including the Postmasters Gallery in New York City.  Publications including the *New York Times* and *Forbes* have written about his work.  *See* Counter-Compl. [Dkt. 65] ¶ 9.  His work often critiques modern internet culture. Mr. Ripps also has partnerships with well-known artists and brands including Nike, Tame Impala, and Pusha T.  *Id.* at ¶ 11.  Jeremy Cahen is the co-creator of the RR/BAYC project.

## B.     Counter-Plaintiffs' Criticism of Yuga

Yuga is a major player in the NFT market.  They rode the crypto wave of 2021 to become a $4 billion company.  *See* Counter-Compl. [Dkt 65] ¶ 1.  One of Yuga's major offerings is the Bored Ape Yacht Club NFT collection ("BAYC").  BAYC is a 10,000-piece NFT collection pointing to pictures of apes.  *Id.* at ¶ 24.

Contrary to common misconceptions, an NFT is not a digital image; rather, it is a "token" (computer code) in a digital ledger called a blockchain.  Counter-Compl. [Dkt. 65] at ¶¶ 14-17.  The code operates as a unique entry in the ledger and can reference other content online, such as images.  *Id*.  NFTs by their nature cannot be copied.[1]  *Id*. at ¶¶ 16, 61.

Mr. Ripps noticed that Yuga and BAYC appeared to pay homage to the far-right and neo-Nazism.  For example, he realized that the company name "Yuga" corresponds with the alt-right/Neo-Nazi catchphrase "Surf the Kali Yuga."  *See* Counter-Compl. [Dkt. 65] ¶¶ 35-36.  Mr. Ripps also noticed the use of simianization (depicting members of specific races as monkeys), racist traits in BAYC images, and pseudonyms for the co-founders that reference racial slurs and pedophilia.  *See id.* at ¶¶ 37-38.

Mr. Ripps wanted to publicize his findings to call out Yuga.  Beginning in

---

[1] Beyond that, the BAYC NFT collection was computer generated and the underlying images are not copyright eligible.

December 2021, he took his message to social media sites including Twitter and Instagram.  In January 2022, he created the website gordongoner.com to publicize his findings.  *See* Counter-Compl. [Dkt. 65] ¶39.   In May 2022, Mr. Ripps and Mr. Cahen created the RR/BAYC NFT protest art collection.  This protest collection was a series of verifiably unique entries in the Ethereum blockchain that include the same l inks to metadata which in turn include the same links Yuga used to link to its BAYC images.  *Id.* at ¶¶ 42-43.  The RR/BAYC NFTs expressed that an NFT is not a digital image, which is artistic commentary that is possible only by referencing the same BAYC images that Yuga's NFTs reference.  The RR/BAYC NFTs also recontextualized the BAYC images, acting as a mirror and forcing viewers to contemplate the racist messaging and imagery associated with BAYC NFTs.  *Id.* at ¶ 44.

As explained on Mr. Ripps's Twitter account and rrbayc.com (where the majority of RR/BAYC NFTs were sold), the point of the protest art collection was to raise awareness of the hateful imagery in Yuga's NFT collection and shed light on what it really means to own and NFT.  *Id.* at ¶ 48.

### C.    Yuga's Harassment Campaign

Shortly after Mr. Ripps and Mr. Cahen began criticizing Yuga's use of racist messages and imagery, Yuga commenced a targeted campaign aimed at silencing Mr. Ripps and Mr. Cahen.

When Mr. Ripps spoke out, Guy Oseary, a partner at Yuga, called Mr. Ripps to make threats including, "I can be a nice guy or I can be a not nice guy."  Counter-Compl. [Dkt. 65] at ¶ 58.   Mr. Oseary then attacked Mr. Ripps's livelihood.  He contacted Mr. Ripps's client, Tame Impala, to pressure Tame Impala to fire Mr. Ripps as punishment for his activism.  Counter-Compl. [Dkt. 65] ¶ 59.

Mr. Oseary also launched threats against Mr. Cahen and his family.  Despite

being able to contact Mr. Cahen directly, Mr. Oseary used an agent to contact Mr. Cahen's youngest sister who had just given birth.  Counter Compl. [Dkt. 65] ¶ 60. Mr. Oseary's agent told Mr. Cahen's sister that Mr. Oseary would "come down hard" on Mr. Cahen.  *See id*.

### D.    Yuga's Copyright Takedown Notices

Yuga's misconduct also involved a calculated effort to purge the internet of the RR/BAYC artwork.  Yuga understood the nature of NFTs as unique entries in a ledger which cannot be copied.  Counter-Compl. [Dkt. 65] ¶61.  Yuga also understood that it lacked actionable copyright in the underlying images of the NFT. *Id*. at ¶ 62; *see also* Yuga's Mot. [Dkt. 89] at 23 ("Yuga Labs does not have a registered copyright"); Ball Decl. [Dkt. 89-3] ¶ 23 ("Yuga Labs does not possess any copyright registrations, including any for the Bored Ape images")*.*  Despite that, Yuga filed multiple Digital Millennium ***Copyright*** Act takedown notices with various NFT marketplaces, including the Foundation marketplace.  Counter-Compl. at ¶ 62.  Mr. Ripps and Mr. Cahen had to expend time, energy, and resources to fight off these fraudulent takedown requests.  These requests also resulted in the RR/BAYC collection being delisted, resulting in lost money and time in the market. *Id*. at ¶ 77.

### E.    Yuga's Public Lies

Yuga also engaged in a campaign to distract the public from its racist messaging and imagery by disparaging Mr. Ripps and Mr. Cahen.  Yuga's apparent goal was to falsely portray Mr. Ripps and Mr. Cahen as scammers, liars, racists, and criminals, in an effort to discredit their message calling out Yuga's misconduct. Counter-Compl. [Dkt. 65] ¶ 63.  Some of these accusations include that Mr. Ripps and Mr. Cahen regularly use the n-word, engage in blackmail, and exploit sex workers.  *Id.*  None of those allegations is true, and Yuga, which expended resources on researching Mr. Ripps and Mr. Cahen, had to know they were false

1    when they made them. *Id.*

2    **F.    Yuga's Community and Partnership Lead Spreads Offensive Lies**

3       Ray Illya Fraser, Yuga's Community and Partnerships lead also used his

4 well-followed Twitter account to falsely accuse Mr. Cahen of owning and operating

5 the ENS (Ethereum Name Service) domain n*gger.eth [redacted][2].   Counter-

6 Compl. [Dkt. 65] ¶ 67.   The owner and creator of this address is publicly available,

7 and is not Mr. Cahen.   *Id.*   Mr. Cahen publicly denied this slanderous accusation,

8 but Fraser persisted with the goal of distracting from Yuga's own racist content.

9    **G.    Death Threats**

10       On October 20, 2022, another Yuga employee, Brand Lead Noah Davis,

11 called Mr. Ripps's father, Rodney Ripps.   Counter-Compl. [Dkt. 65] ¶ 69.   On the

12 call, Davis said, "You and your fucked up son are going to die," and "You guys are

13 fucking pieces of shit."   *Id.*   Rodney Ripps, in fear for his life, contacted the police

14 regarding this Davis' threat.   *Id.*

15       Yuga states that Noah Davis made this call in response to "highly insulting

16 statements of Davis' later father."   Yuga's Mot. [Dkt. 89] at 10.   But as Yuga's own

17 motion notes, this supposed "highly insulting statement" was "Father, Mac was a

18 cool singer. RIP."   Ex. 19 to Yuga's Mot. [Dkt. 89-22] at 2.

19    **H.    Effects of Yuga's Campaign**

20       Yuga's campaign had devastating, long-lasting effects on Mr. Ripps and Mr.

21 Cahen.   Both Counter-Plaintiffs experienced extreme fear for their safety and their

22 livelihoods.   Counter-Compl. [Dkt. 65] ¶¶ 89, 95.   They have been in a perpetual

23 state of anxiety and stress **for longer than a year**, which has undermined their

24 ability to function on a day-to-day basis including their ability to sleep and maintain

25 social relations.

26

27

28

[2] Due to the offensive nature of the domain name, we have elected to censor it in this filing.

1

## III.   LEGAL STANDARD

2        "A party must serve an answer to a counterclaim or crossclaim within 21

3   days after being served with the pleading that states the counterclaim or

4   crossclaim." Fed. R. Civ. P. 12(a)(1)(B).  "When an act may or must be done

5   within a specified time, the court may, for good cause, extend the time: (A) with or

6   without motion or notice if the court acts, or if a request is made, before the original

7   time or its extension expires; or (B) on motion made after the time has expired if

8   the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1).

9        In deciding a motion to dismiss, a court must accept as true the allegations in

10  the complaint and interpret those allegations in the light most favorable to the non-

11  moving party. *See* *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*,

12  *135 F.3d 658, 661 (9th Cir. 1998)*.  A dismissal under Rule 12(b)(6) is only proper

13  where there is either a "lack of a cognizable legal theory" or "the absence of

14  sufficient facts alleged under a cognizable legal theory." *Summit Technology, Inc. v.*

15  *High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996)

16  (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).  A

17  complaint does not need to provide detailed factual allegations to survive a motion

18  to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Factual

19  allegations must simply be "enough to raise a right to relief above the speculative

20  level." *Id.*

21  ## IV.   ARGUMENT

22     ### A.    Yuga's Motion Must Be Denied in Its Entirety as Untimely

23        Yuga's motion seeks to dismiss or strike counterclaims that Counter-

24  Plaintiffs brought on December 27, 2022.  Counter-Compl. [Dkt. 65] at 53.  But

25  Yuga's motion was filed on January 18, 2023—twenty-two days after the

26  counterclaims were filed.  Yuga's Mot. [Dkt. 89] at 25.  Because Yuga did not

27  answer within the twenty-one day window of Rule 12(a)(1)(B), its motion is

28

1  untimely and must be denied in full.

2  Of course, Yuga had every opportunity to seek an extension of time, but
3  elected not to do so.  Notably, less than four hours after Yuga filed its untimely
4  motion (January 18, 2023), counsel for Counter-Plaintiffs emailed all counsel of
5  record for Yuga alerting Yuga to the untimeliness of the motion and asking for an
6  explanation for why it was not untimely.  *See* Ex. 2 [January 18, 2023 Email to
7  Counsel for Yuga].  Counsel for Yuga did not respond and, to this day, has never
8  responded or sought any extension.

9  Under Rule 6(b)(1)(B), the Court may only extend Yuga's time to respond
10  "on motion made after the time has expired if the party failed to act because of
11  excusable neglect."  Here, Yuga made no such motion seeking an extension; it
12  simply filed its untimely motion without even asking the Court's permission.  And
13  even if Yuga were to make a motion under Rule 6(b)(1)(B) now, it could not show
14  excusable neglect where it failed to seek any extension for nearly three weeks after
15  counsel for Counter-Plaintiffs notified Yuga of its missed deadline.  Accordingly,
16  Yuga's motion should be denied in its entirety.[3]

17  **B.    Counter-Plaintiffs Have Standing To Assert Their 512(f) Claim**

18  "In order to have standing, [plaintiffs] must show (1) [they have] suffered an
19  injury in fact that is (a) concrete and particularized and (b) actual or imminent, not
20  conjectural or hypothetical; (2) that the injury is fairly traceable to the challenged
21  action of the defendant; and (3) it is likely, as opposed to merely speculative, that

22

23  [3] Yuga also violated paragraph 5(a) of the Court's Standing Order [Dkt. 14] by
24  noticing its motion for hearing on February 27, 2023.  Yuga's motion was filed and
served on January 18, and the Court's order explains that "No motion shall be
25  noticed for hearing for more than 35 calendar days after service of the motion
unless otherwise ordered by the Court."  Standing Order [Dkt. 14] at 8.  February
26  27, 2023 is ***40 days*** after the January 18, 2023 filing date.  Once again, Yuga failed
27  even to ask the Court's permission (or even Counter-Plaintiffs' consent) before
noticing this out-of-time hearing date.
28

the injury will be redressed by a favorable decision." *California Sea Urchin Commission v. Bean*, 883 F.3d 1173, 1180 (9th Cir. 2018) quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*, 528 U.S. 167, 180-81 (2000). Yuga argues that Counter-Plaintiffs have not alleged an injury in fact. But the allegations in the complaint are more than sufficient.[4]

As an initial matter, Yuga asks the Court to only look at **one** of the instances in which (Yuga concedes) it filed a fraudulent copyright takedown request. But the counterclaims make clear that there were **multiple** such requests. *See, e.g.*, Counter-Compl. [Dkt. 65] ¶ 61 ("Yuga also **repeatedly** filed fraudulent DMCA takedown notice**s** to attempt to purge the internet of the RR/BAYC artworks." (emphases added)). This Court cannot credit—contrary to the allegations—Yuga's assertion that only one takedown request was made pursuant to the DMCA.

Nor can or should the Court credit Yuga's bald assertion—again contrary to the allegations in the Counter-Complaint—that "Yuga Labs' takedowns of the RR/BAYC NFTs were made . . . on the basis of trademark infringement or non-IP issues." Yuga Mot. [Dkt. 89] at 19. Defendants have specifically alleged (and the evidence will show conclusively) that the requests say "DMCA"—"Digital Millennium **Copyright** Act" on their very face. The "C" in DMCA is for "copyright." Where a party like Yuga attempts to improperly leverage the power of the DMCA for non-copyright claims, its attestations under Section 512(f) of the

---

[4] Yuga contends that the burden has shifted to Counter-Plaintiffs to "present affidavits or other evidence necessary to satisfy their burden of establishing subject matter jurisdiction." But the burden only shifts if the evidence presented by Yuga actually demonstrates there is no standing. Instead, even accepting Yuga's affidavits as true, standing still exists. But to the extent the Court were to conclude that the burden has shifted, discovery is necessary, including from third parties who were unable to obtain RR/BAYC NFTs because of Yuga's improper takedown notices, so that Counter-Plaintiffs can demonstrate the requisite jurisdictional facts. *See Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977) (allowing discovery to establish jurisdictional facts).

1     ***Copyright*** Act (that it is asserting copyright infringement in its takedown) are

2     necessarily false.

3            The injury in fact requirement requires plaintiffs to show only that they have

4     suffered "an invasion of a legally protected interest that is concrete and

5     particularized, and actual or imminent, not conjectural or hypothetical. *Spokeo, Inc.*

6     *v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted).  For an injury to

7     be particularized, it must affect the plaintiff in some personal way.  *Id.*  An injury is

8     "concrete" if it exists and is not merely an abstract harm.  *Id.* at 340.  Concreteness

9     is not equivalent with tangibility.  *Id.*  Here, it is beyond dispute that the injury

10     alleged by Counter-Plaintiffs is particularized: the Counter-Complaint fully

11     identifies the injury as happening to Counter-Plaintiffs.  They allege they were

12     personally harmed when their protest art collection was removed from various

13     websites based on numerous DMCA complaints.  Yuga does not challenge that this

14     alleged harm is particularized.

15            Counter-Plaintiffs allege a real, concrete injury beyond a procedural error.

16     The complaint lays out several different injuries suffered by Counter-Plaintiffs

17     because of Yuga's fraudulent DMCA takedown requests including, (1) silenced

18     artistic expression; (2) loss of time associated with dealing in Yuga's fraudulent

19     takedown notices; (3) reputational harm; and (4) financial harm.  *See* Counter-

20     Compl. (Dkt. 65) at 47.  These are all recognized concrete harms.  *See White v. City*

21     *of Sparks*, 500 F.3d 953 (9th Cir. 2007) (deciding case where city barred artist from

22     selling paintings); *Hung v. City of Los Angeles*, 601 F. Supp. 2d 1158 (C.D. Cal.

23     2009) (finding standing to challenge law disrupting expressive activity); *Van v.*

24     *LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (holding that $3.76 in lost money is

25     sufficient for Article III standing because "a loss of even a small amount of money

26     is an injury"), *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1035 (N.D. Cal. 2019)

27     (loss of time, even if less than an hour is sufficient to plead standing); *Robins v.*

28

*Spokeo, Inc.*, 867 F.3d 1108, 1115 (9th Cir. 2017) (reputational harm).  These harms are expressly pled in the Counter-Complaint.[5]

Even if Yuga were right that the Counter-Complaint had asserted only one DMCA takedown, Counter-Plaintiffs adequately allege an injury-in-fact.  Yuga's argument against the single request as being adequate for standing stems from an unfounded belief that only large injuries are cognizable.  *But see Van*, 962 F.3d at 1162 (insignificant amount of money sufficient for standing).  Yuga concedes that Counter-Plaintiffs were unable to sell their collection for multiple hours.  This delay directly implicates at least two injuries (1) money and (2) time.  Therefore, even assuming Yuga's misreading of the Counter-Complaint were accurate, Counter-Plaintiffs would still have standing.

Further, in statutory causes of action, concrete harm may be shown by a violation that causes the plaintiff to suffer the type of harm Congress sought to prevent.  *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1113 (9th Cir. 2017).  Section 512(f) belongs in the family of intentional torts that Congress has recognized as being cognizable because the plaintiff suffered harm.  *See Lenz v. Universal Music Studios*, 815 F.3d 1145, 1157 (9th Cir. 2016).  As a result, courts interpreting the DMCA allow claims for even ***nominal*** damages.  *Id*.  Yuga effectively concedes that Counter-Plaintiffs have at least suffered this harm when they acknowledge that the RR/BAYC collection was taken off the internet for (at least) hours as a result of the DMCA notices that it concedes was improper.  Thus, Counter-Plaintiffs have sufficiently alleged an injury-in-fact.

## C.   Counter-Plaintiffs' 512(f) Claim Is Pled with Particularity

Yuga's argument that Counter-Plaintiffs failed to plead their 512(f) claims with sufficient particularity should likewise be rejected.  As a preliminary matter,

---

[5] Yuga claims that Mr. Ripps somehow invited this injury by quoting his tweets out of context.  *See* Yuga Mot. [Dkt. 89] at 20.  But, public statements of bravado do not render the well-pled harm caused by Yuga non-existent as a matter of law.

1    Yuga did not raise pleading with particularity during the parties' Local Rule 7-3

2    conference of counsel, as the parties' subsequent Joint Statement confirms.  *See*

3    Joint Statement [Dkt. 78] (making no mention of contention that pleading was

4    insufficiently particular).  Had Yuga done so, counsel for Counter-Plaintiffs would

5    have had an opportunity to ask what specific facts Yuga thought were missing, to

6    determine whether any amendment was appropriate.  Because Yuga failed to do so

7    in violation of Section 5(b) of this Court's Standing Order, Yuga's argument should

8    be rejected.

9         In any event, Counter-Plaintiffs made sufficiently particular allegations of

10   their 512(f) claim.  For a claim to be pled with particularity under Rule 9, the

11   allegations must include the "time, place, and specific content of the false

12   representations as well as the identities of the parties to the misrepresentation."

13   *Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007)*.  This requirement is met

14   if the allegations of fraud are "specific enough to give defendants notice of the

15   particular misconduct which is alleged to constitute the fraud charged so they can

16   defend against the charge and not just deny that they have done anything wrong."

17   *Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)*.

18        Counter-Plaintiffs have clearly identified the alleged fraud such that Yuga

19   Labs can defend against them with specificity.  See Counter-Compl. [Dkt. 65] ¶ 62.

20   They allege that Yuga filed numerous Digital Millennium ***Copyright*** Act takedown

21   notices with marketplaces including Foundation and OpenSea, despite knowing it

22   did not own an actionable copyright.  *Id.*  This identifies specifically the type of lie

23   Yuga told, as Rule 9 requires.  Subjectively, Yuga was also obviously on notice of

24   the particular fraud allegations because, in response to this complaint, they concede

25   that they sent at least one such fraudulent DMCA takedown notice.  *See* [Dkt. 86] at

26   22.  Yuga has thus demonstrated the ability to answer beyond simply denying

27   wrongdoing because they are already attacking the underlying facts of the

28

complaint.  This is only possible because their fraud, claiming copyright when they know none exists, was pled with sufficient particularity.[6]

To the extent that the Court finds that Counter-Plaintiffs have failed to plead with sufficient particularity, they should at minimum be granted leave to file the draft Amended Counter-Complaint attached to this opposition brief, which includes the following additional allegations:

- For example, on or about May 17, 2022, Appdetex, which was acting on Yuga's behalf, submitted a DMCA takedown notice to Foundation.app.  In that notice, Yuga accused the RR/BAYC artworks as content that "uses copyrighted materials … produced by Yuga Labs without authorization."

- Yuga also filed fraudulent DMCA takedown notices through its agent Appdetex by co-opting the DMCA takedown process and making attestations under §512(f) of the Copyright Act to assert that the RR/BAYC project used Yuga's trademarks.  For example, on or about June 22, 2022, Appdetex sent a DMCA notice to Foundation.app in which it accused the RR/BAYC project of infringing Yuga's trademarks while at the same time acknowledging that the takedown was being made under the Copyright Act and attesting at "the Infringing Content in the manner described above is not authorized by the copyright owner, Yuga Labs, or its agents, nor is such permitted by law."  Appdetex further attested that "[a]s applicable under 17 U.S.C. 512(f), we acknowledge that we may be subject to liability for damages if we knowingly materially misrepresent that material or activity is infringing."

---

[6] Yuga also conceded that the allegations as to at least one of its false DMCA notices was pleaded with particularity.  *Id.* at 22 ("As to the one DMCA takedown they do allege…").  Although Counter-Plaintiffs have adequately pled more than that one DMCA takedown, Yuga has effectively conceded that Counter-Plaintiffs have met the Rule 9(b) requirements for at least the DMCA takedown that Yuga concedes is identified, which alone requires denial of Yuga's motion.

- On June 22, 2022, Yuga also used its agent, Appdetex, to fraudulently co-opt the DMCA process to take down the webpage rrbayc.com, which was the website that sold the RR/BAYC artwork.  The June 22 notice was titled "Yuga Labs, Inc. Notice under DMCA/rrbayc.com" and sent to namecheap.com.  Yuga attested in the notice that it was making the DMCA notice under the Copyright Act by acknowledging that "the Infringing Content in the manner described above is not authorized by the copyright owner, Yuga Labs, or its agents, nor is such use permitted by law."  Yuga further attested that "As applicable under 17 U.S.C. 512(f), we acknowledge that we may be subject to liability for damages if we knowingly materially misrepresent that material or activity is infringing."  Despite all this, Yuga did not assert that "rrbayc.com" was infringing Yuga's copyright but instead alleged trademark infringement.

- On or about June 22, 2022, Yuga also sent a fraudulent DMCA takedown notice to X2Y2.  On information and belief, this was another takedown notice that improperly asserted trademark infringement under the Copyright Act (with a 512(f) attestation) and its corresponding DMCA process.

- On June 28, 2022, Yuga once again used its agent, Appdetex, to fraudulently co-opt the DMCA process to take down the webpage rrbayc.com, which was the website that sold the RR/BAYC artwork.  The June 22 notice was titled "Yuga Labs, Inc. Notice under DMCA/rrbayc.com."  Appdetex further attested in the notice that it was making the DMCA notice under the Copyright Act by acknowledging, "As applicable under 17 U.S.C. 512(f), we acknowledge that we may be subject to liability for damages if we knowingly materially misrepresent that material or activity is infringing."  Despite all this, Yuga did not assert that "rrbayc.com" was infringing Yuga's copyright but instead alleged trademark infringement.

### D.     Counter-Plaintiffs' 512(f) Claim Is Otherwise Adequately Plead

The general elements for a cause of action under Section 512(f) are that the defendant (1) made a material misrepresentation in a takedown notice that led to a takedown, and (2) that the takedown notice was submitted in bad faith. *Moonbug Entertainment Ltd. v. Babybus (Fujian) Network Technology Co., Ltd.*, No. 21-cv-06536-EMC, 2022 WL 580788 at *7 (N.D. Cal. 2022). The bad faith element is satisfied if the defendant acts with "actual knowledge" of the material misrepresentation. *Rossi v. Motion Picture Ass'n of America, Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004). Yuga argues the bad faith element is not adequately pled because the Counter-Complaint lacks allegations of Yuga's actual knowledge of a material misrepresentation. This is incorrect, as the face of the Counter-Complaint makes clear. First, the Counter-Complaint states that Yuga materially misrepresented that it had actionable copyright. *See* Counter-Compl. [Dkt. 65] ¶¶ 46-47. Second, the Counter-Complaint alleges that Yuga submitted DMCA requests despite knowing that it lacked any actionable copyrights. *Id.* at ¶ 46. Yuga's remaining arguments raise factual disputes, which are not amenable to a motion to dismiss.

### E.     Declaratory Judgment is Proper for the Copyright Claims

A declaratory judgment action is proper when "some useful purpose" is achieved by deciding the legal issue presented. *See Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 244 (1952). The action must also present an Article III case or controversy. *See Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). This requires a "real and reasonable apprehension" that the declaratory judgment plaintiff will be subject to liability. In the infringement context, this requires that the plaintiff have a "real and reasonable apprehension that he will be subject to liability If he continues to manufacture his product." *See Rhoades v. Avon Prods.*, 504 F.3d 1151, 1157 (9th Cir. 2007).

This declaratory judgment action serves a useful purpose because Yuga has pursued a pattern and practice of using the Digital Millennium Copyright Act offensively against Counter-Plaintiffs.  Counter-Plaintiffs have good reason to believe this will continue unless a court definitively settles their right to any copyright.  The Central District of California case, *Tine Bak LLC v. Selkatz, Inc.*, no. 20-cv-5065-DSF(SK), 2020 WL 9074806 (C.D. Cal. 2020) is instructive. Like Yuga, the defendant in *Tine Bak* argued that DMCA complaints fail to provide an immediate and real controversy to resolve.  *See id.* at *4.  The Court disagreed and held that a declaratory action was proper because the DMCA complaints called into question the defendant's underlying copyright, and that the complaints could prevent the plaintiff from conducting its business.  Similarly, in *Beyond Blond Productions, LLC v. Heldman*, the Central District also held that DMCA complaints sufficiently led to a live controversy between the parties.  *See Beyond Blond Productions, LLC v. Heldman*, no. 20-cv-5581-DSF-GJSx, 2021 WL 9315215 at *5-6 (C.D. Cal. 2021).  Yuga's blanket assertion that a DMCA complaint cannot form a live controversy directly contradicts the established law in this district.

In this case, given Yuga's pattern and practice of using the DMCA to take down Counter-Plaintiffs' NFT collection, resolving the underlying copyright dispute will go a long way in minimizing future disputes between the parties.  For example, if the court were to declare that Yuga lacked copyright in the Bored Ape Yacht Club NFTs, then Yuga would not be able to prevent Counter-Plaintiffs from exhibiting their NFT collection on OpenSea, Foundation, or any other NFT marketplace based on copyright takedown requests.  It would resolve the propriety of Yuga using DMCA as a tool against Counter-Plaintiffs even though, as they admit, they lack actionable copyrights.

Yuga also improperly argues that Counter-Plaintiffs lack any apprehension of being sued pursuant to the Copyright Act because any copyrights that Yuga has are

unregistered.  *See* Yuga's Mot. [Dkt. 87] at 23.  But having an unregistered

copyright is not an obstacle to suit because it takes ***only five working days*** to

register a copyright through the Copyright Office's special handling process.[7]

Moreover, Yuga grossly misrepresents the holdings in *Cal. Furniture Collection*

and *Sky Billiards*.  These cases did not deny standing due to lack of copyright

***registration*** but instead denied standing because the defendants ***did not own***

***copyrights at all***.  *Cal. Furniture Collection, Inc. v. Harris Adamson Home*, LLC,

No.19-cv-06254, 2019 WL 7882081, at *2 (C.D. Cal. 2019) ("Defendant cannot

sue for infringement of a copyright it does not own."); *Sky Billiards, Inc., v.*

*WolVol, Inc.*, No. 5:15-cv-02182, 2016 WL 7479428, at *4 (C.D. Cal. 2016)

("WolVol cannot sue for infringement of a copyright it does not own…").  Here,

whether Yuga owns copyrights at all is precisely the dispute: in fact, even after

filling its motion to dismiss, Yuga has gone out of its was to state publicly that it

***does*** own the disputed copyrights.  *See* Ex. 3, Kyle Barr, "Yuga Labs Claims Its

Bored Apes Have Copyright, Even if It Never Filed for Protection," *Gizmodo*,

available at https://gizmodo.com/yuga-labs-nfts-bored-apes-copyright-1850042639

("Eric Ball, Partner at Fenwick & West LLP and Counsel to Yuga Labs, said:

'Yuga Labs owns its copyrights. . . .  Copyright registration with the Federal

government is also voluntary and not required.'").  Thus, Yuga fails to provide

valid grounds for dismissing Counter-Plaintiffs' claims for a declaratory judgment

of no copyright.

### F.   Counter-Plaintiffs Alleged Extreme and Outrageous Conduct

A cause of action for intentional infliction of emotional distress exists when

there is "(1) extreme and outrageous conduct by the defendant with the intention of

causing, or reckless disregard of the probability of causing, emotional distress; (2)

the plaintiff's suffering severe or extreme emotional distress; and (3) actual and

---

[7] *See* https://www.copyright.gov/help/faq/faq-special.html.

proximate causation of the emotional distress by the defendant's outrageous conduct." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993). Conduct is deemed "outrageous" if it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.*

Here, Yuga's campaign of retaliation against Counter-Plaintiffs easily satisfies that definition. For more than a year, Yuga's employees and agents targeted Counter-Plaintiffs in hopes of punishing and harming them for calling Yuga out on its racist imagery and fraudulent activity. Not only have Yuga employees deliberately and systematically spread falsehoods about Counter-Plaintiffs on a podcast with millions of viewers and other public platforms, Yuga's agents threatened the safety of Counter-Plaintiffs and their families. Counter-Compl. [Dkt. 65] ¶¶ 64, 69. On October 20, 2022, one of Yuga's employees—Noah Davis—contacted Rodney Ripps (Counter-Plaintiff's father) and told him "you and your fucked up son are going to die." *Id.* at ¶ 69. The California Court of Appeal has held that explicit threats of this nature amount to outrageous conduct. *Kisecky v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 229 (1983).

In addition to physical threats, Yuga's employees and agents have tried to sabotage Mr. Ripps's career. Yuga contacted Tame Impala, one of Mr. Ripps's business partners, and encouraged the band to stop all business with Mr. Ripps. Counter-Compl. [Dkt. 65] ¶ 61. Yuga and its agents also made false disparaging statements describing Mr. Ripps and Mr. Cahen as criminals, conspiracy theorists, racists, and sex offenders. *Id.* at ¶¶ 63, 65.

Yuga attempts to minimize its unlawful conduct and its impact on Counter-Plaintiffs. First, Yuga equates Counter-Plaintiffs' tweets criticizing Yuga's use of racist imagery—or tweets criticizing Yuga's legal strategies—to the death threats. Death threats are not "garden-variety litigation-related activities, public relations activities, and a handful of other communications incidental to this public dispute

between the parties."  Yuga Mot. [Dkt. 89] at 5.  Likewise, Yuga's attempts to damage Mr. Ripps's business partnerships with Tame Impala, and others, are far from ordinary business activities. Yuga is a $4 billion company attacking two individuals.  The behavior of the two parties in this matter is not remotely equivalent.

Second, Yuga takes individual instances of its harassment of Counter-Plaintiffs and argues that those individual acts each does not arise to "outrageous conduct."  Preliminarily, death threats alone are sufficient.  But in any event, individual instances of Yuga's harassment do not capture the scope and length of their retaliation campaign against the defendants. Yuga has targeted Counter-Plaintiffs for over a year, in a variety of ways, and this full scope of its conduct is what is outrageous.  *See Jackson v. Mayweather*, 10 Cal.App.5th 1240, 1266 (2017), as modified (Apr. 19, 2017) (requiring courts to consider the full scope of conduct when assessing an IIED claim).

### G.    Counter-Plaintiffs Plausibly Allege Severe Emotional Distress.

Yuga incorrectly exaggerates the relevant standard for severe emotional distress.  California courts have recognized that "the requisite emotional distress [for an IIED claim] may consist of any highly unpleasant mental reaction[.]" *Fletcher v. Western National Life Ins. Co.* 10 Cal.App.3d 376, 397 (1970). Examples of mental states sufficient to recover on an IIED claim include "fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Id*.

Counter-Plaintiffs have alleged emotional distress that goes well above the standard set forth in *Fletcher*.  Both Mr. Ripps and Mr. Cahen have experienced extreme fear and anxiety regarding their personal safety and the safety of their families. Counter-Compl. [Dkt. 86] ¶ 95.  Moreover, their state of severe suffering has been lasting for longer than a year, forcing both into a state of chronic

depression and stress.  *Id.*  Counter-Plaintiffs have difficulty with routine tasks like sleeping and have been forced to endure this prolonged suffering without knowing how Yuga's next threat or harassment is going to impact their lives and their families.  *Id*.  Counter-Plaintiffs' chronic experiences of depression, anxiety, and fear satisfy the definition of "severe emotional distress."  *Hughes v. Pair*, 46 Cal.4[th] 1035, 1051 (2009*)*. ("Severe emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'")

California Courts have repeatedly allowed IIED claims to stand based on emotional distress much less severe than what Counter-Plaintiffs have alleged.  For example, in *Plotnik*, a jury verdict finding emotional distress was affirmed because the plaintiff "became scared and began shaking" after the defendant had made various insults and threats.  *Plotnik v. Meihaus*, 208 Cal.App.4[th] 1590, 1598 (2012). And in *Ismail*, the court held that a plaintiff that is "distraught, depressed, anxious, worried, and frantic" along with "loss of work, focus, sleep, and appetite" was enough to survive a special motion to strike.  *Ismail v. Montchak*, B284163, 2019 WL 2949863, at *6 (Cal. Ct. App. 2019).

Further, as discovery progresses, more information is being revealed regarding Counter-Plaintiffs' severe emotional distress.  Both Counter-Plaintiffs were recently deposed, and their severe emotional distress was on full display as they discussed how Yuga's campaign of retaliation has impacted their lives.  To the extent the Court requires more detailed allegations of emotional distress, Counter-Plaintiffs at minimum should be allowed leave to file the Amended Counter-Complaint attached to this opposition brief, which provides further details regarding Mr. Ripps and Mr. Cahen's prolonged and chronic state of extreme stress, anxiety, and fear.

## H.     Yuga Owed a Duty of Care to Counter-Plaintiffs

Counter-Plaintiffs have plausibly alleged that Yuga owed them a duty of care.  The California Supreme Court has clarified that duties of care can be imposed by law.  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 985 (1993) ("The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element.  That duty may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship.").  There are multiple applicable laws that impose a duty on Yuga.

*First*, California Code of Civil Procedure § 527.6 creates a duty to not engage in "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."  Yuga's intimidation campaign has regularly harassed Counter-Plaintiffs violating their legally imposed duty of care.

*Second*, "California Law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others."  *Cabral v. Ralphs Grocery Co.*, 248 P.3d 1170, 1172 (Cal. 2011).  This duty is imposed by California Civil Code § 1714(a), which provides that "[e]very one is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his want or ordinary care or skill in the management of his property or person, except so far as the later has, willfully or by want or ordinary care, brought the injury upon himself."  Moreover, the circumstances of this case do not justify creating a new exception to the well-established general duty rule because doing so would excuse corporations from taking reasonable steps to prevent their employees and agents from engaging in unlawful acts such as making death threats and publicly spreading highly offensive lies to millions of people.

*Third*, California Penal Code § 646.9 criminalizes willfully and maliciously

harassing another and making "a credible threat with the intent to place that person in reasonable fear for his or her safety." This section defines harassment as a "knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." Cal. Penal Code § 646.9.

Thus, both California's civil and criminal law recognize an interest in being free from threats and harassment.  Together they imposed a duty on Yuga to restrain from the pattern of threatening conduct in which it engaged.

## I.  Declaratory Judgment of No Defamation

Counter-Plaintiffs acknowledge that there is a split in authority on whether a declaratory judgment claim of no defamation is actionable.  *See IP Global Invs. America, Inc. v. Body Glove Ip Holdings, LP*, 2:17-cv-06189-ODW-AGRE, 2019 WL 121191, at *2 (C.D. Cal. Jan. 7, 2019).  Yuga, in its motion to dismiss, has conceded that, while it considers Counter-Defendants' public statements "vile," it "has not brought a defamation claim."  Yuga Mot. [Dkt. 89] at 16.  Given the split in authority and Yuga's concession, to simplify the issues, Counter-Plaintiffs agree to withdraw their declaratory judgment of no defamation claim, following the same procedure that Yuga used in withdrawing its unjust enrichment claim due to a similar split in authority.  *See* Yuga Opp. [Dkt. 53] at 24.  Counter-Plaintiffs accordingly withdraw their declaratory judgment claim to allow this matter to be more efficiently adjudicated.

## J.  Yuga's Motion To Strike Should Be Denied

A motion to strike made pursuant to California's anti-SLAPP statute only applies to state law causes of action.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010).  In this case, only the emotional distress claims are disputed state law causes of action.  A court determines anti-SLAPP motions using a two-step method.  In the first step, the court determines whether the suit arises from

protected expressive activity.  *City of Cotati v. Cashman*, 29 Cal.4th 69, 77 (2002). In the second step, the court analyzes the complaint asking whether there is any probability of success on the merits crediting the truth of facts pled in the plaintiff's complaint.  *See Hilton*, 599 F.3d at 902.  As explained above, Counter-Plaintiffs' emotional distress claims are sufficiently pled, and Yuga therefore fails to satisfy the second prong.  However, the Court can and should reject Yuga's anti-SLAPP motion on the additional basis that Counter-Defendants emotional distress claims do not involve protected speech activity.

Yuga is wrong to rely on the litigation privilege. The litigation privilege only applies to statements (1) made in a judicial proceeding, (2) by litigants or other authorized participants, (3) aim to achieve the litigation's objects, and (4) have some logical connection or relation to the proceeding.  *Silk v. Feldman*, 208 Cal.App.4th 547, 555 (2012).  The case does not rely on any covered statements.

To arise from protected litigation expression, the alleged expressive activity must be "related to the substantive issues in the litigation" and "be directed to some persons having an interest in the litigation." *McConnell v. Innovative Artists & Literary Agency, Inc.*, 175 Cal.App.4th 169, 179 (2009).  In making this comparison, courts look at "defendants' allegedly wrongful acts" and compare it with "evidence that the plaintiff will need to prove such misconduct."  *Wang v. Wal-Mart Real Estate Business Trust*, 153 Cal.App.4th 790, 806 (2007).  In short, if a plaintiff can state their case without alleging litigation, then the claims do not arise out of expressive litigation activity.

Counter-Plaintiffs' emotional distress claims are not "based on . . . Yuga Labs' filing of this lawsuit and making public statements about it" as Yuga argues. Yuga Mot. [Dkt. 89] at 2.  Rather, the claims rely solely on Yuga "lying about Mr. Ripps and Mr. Cahen on digital media platforms and to the media, and . . . Yuga's employees intimidating and threatening Mr. Ripps, Mr. Cahen, and their families."

Counter-Compl. [Dkt. 65] ¶¶ 87, 92.  No aspect of Mr. Ripps's and Mr. Cahen's emotional distress claims is based on Yuga's filing of this (or any) lawsuit or making statements about this (or any) lawsuit.  To the extent that the Counter-Complaint's background statements about this litigation could somehow be misread as being an aspect of the emotional distress claims, Counter-Plaintiffs should at minimum be granted leave to file the draft Amended Counter-Complaint attached to this opposition brief, which removes those background allegations and alleges specifically that the claims for emotional distress are "not based on communications or speech made in course of this legal proceeding."

Accordingly, this Court should deny Yuga's motion to strike and award Counter-Plaintiff their attorney's fees.  *See U.S. v. Lockheed Missiles & Space Co., Inc.*, 171 F.3d 1208, 1217 n. 11 (9th Cir. 1999) ("If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion.").

## V. CONCLUSION

Counter-Plaintiffs respectfully request that the Court deny Yuga's motion in its entirety and award them their attorneys' fees for responding to the motion.  To the extent that the motion is granted in any part, Counter-Plaintiffs request leave to file the attached Amended Counter-Complaint.  *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) ("The standard for granting leave to amend is generous.").

Dated:  February 6, 2023

By: /s/  *Louis W. Tompros*
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (pro hac vice)
monica.grewal@wilmerhale.com
Scott W. Bertulli (pro hac vice)
scott.bertulli@wilmerhale.com

**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants and Counter-
Plaintiffs *Ryder Ripps and Jeremy
Cahen*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via electronic mail on February 6, 2023, on counsel of record for Yuga Labs, Inc.  I certify under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February 6, 2023                           */s/ Louis Tompros*
                                                  Louis W. Tompros (pro hac vice)

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Jeremy Cahen and Ryder Ripps, certifies that this opposition to the motion to dismiss contains 23 pages complying with the page limit set by court order dated June 30, 2022.

Dated:  February 6, 2023                 By: */s/  Louis W. Tompros*
                                              Louis W. Tompros (*pro hac vice*)