ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff and
Counterclaim Defendant
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC., <br><br> Plaintiff and Counterclaim Defendant, <br><br> v. <br><br> RYDER RIPPS, JEREMY CAHEN, <br><br> Defendants and Counterclaim Plaintiffs. | Case No.: 2:22-CV-04355-JFW-JEM <br><br> **DECLARATION OF JONAH BERGER** |

1  MELISSA L. LAWTON (CSB No. 225452)
   mlawton@fenwick.com
2  FENWICK & WEST LLP
   228 Santa Monica Boulevard
3  Santa Monica, CA 90401
   Telephone: 310.434.4300
4
5  DAVID Y. SILLERS (*admitted pro hac vice*)
   david@clarelocke.com
6  KATHRYN HUMPHREY (*admitted pro hac vice*)
   kathryn@clarelocke.com
7  MEGAN L. MEIER (*admitted pro hac vice*)
   megan@clarelocke.com
8  CLARE LOCKE LLP
   10 Prince Street
9  Alexandria, VA 22314
   Telephone: 202.628.7400
10
11 Attorneys for Plaintiff and
   Counterclaim Defendant
12 YUGA LABS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Jonah Berger declare:

1. I am a Marketing professor at the Wharton School at the University of Pennsylvania. My research focuses on consumer behavior, social media, social influence, and natural language processing. This work examines why people make the choices they do, how they use possessions to communicate identity, and how automated textual analysis (*e.g.*, dictionaries, topic modeling, and machine learning) can help extract behavioral insight from textual data. I have been retained by Fenwick & West LLP, counsel for Yuga Labs, Inc. ("Yuga Labs"), to assess whether the minting and sales of RR/BAYC non-fungible tokens ("NFTs")[1] caused harm to Bored Ape Yacht Club ("BAYC") brand equity. I have firsthand knowledge of the matters stated herein.

2. I submitted an expert report in this case on February 6, 2023, which is attached hereto as **Exhibit 1,** and which has been redacted to preserve confidentiality. My analyses and opinions are based on the materials cited in my report, including documents and data produced in this litigation. A full list of the information and data available to me in forming my opinions are listed in Appendix B of Exhibit 1.

3. The minting and sales of RR/BAYC NFTs using Yuga Labs' marks harmed the brand equity of BAYC for multiple reasons. *See* Ex. 1 at ¶¶ 11, 64–92.

4. First, the introduction of RR/BAYC NFTs increased the perceived

---

[1] An NFT is an ownership record stored on a blockchain; analogous to a conventional proof-of-purchase, but native to the blockchain. Since their introduction in 2014, NFTs have become an increasingly popular way to signify ownership of an asset. While NFTs have mostly been associated with digital items such as artwork, images, or videos, there are notable instances of physical assets being "tokenized" into NFTs as well. *See* "What is an NFT?," *OpenSea Learn*, dated December 24, 2022, https://opensea.io/learn/what-are-nfts; Stephen, Bijan, "Go Read This Story on the Real History of NFTs," *The Verge*, April 2, 2021, https://www.theverge.com/2021/4/2/22364240/nftblockchain- artist-hackathon-kevin-mccoy-anil-dash; "What is Tokenized Real Estate? A Beginner's Guide to Digital Real Estate Ownership," *Cointelegraph*, https://cointelegraph.com/nonfungible-tokens-for-beginners/whatis-tokenized-real-estate.

supply and decreased the perceived exclusivity of authentic BAYC NFTs. The impact of their introduction is thus akin to the negative impact that high-end brands suffer from the introduction of counterfeit goods. *See* Ex. 1 at ¶¶ 11.i, 66–72.

5. Second, there is evidence of marketplace confusion following the minting and sales of RR/BAYC NFTs. The artwork associated with RR/BAYC NFTs look visually identical to authentic BAYC NFTs and the NFTs were named similarly. Thus, it was likely difficult for consumers to tell them apart. *See* Ex. 1 at ¶¶ 11.ii, 73–77.

6. Third, Defendants' minting and sales of RR/BAYC NFTs led to a shift in discourse regarding the BAYC brand. Specifically, following Defendants' initial minting of RR/BAYC NFTs, discussion of the BAYC brand began to include reference to RR/BAYC NFTs or Mr. Ripps. Automated textual analysis illustrates that consumer attitudes toward the BAYC brand became less positive and more negative during Defendants' minting of RR/BAYC NFTs. Because consumer attitudes are directly related to brand equity, Defendants' minting of RR/BAYC NFTs likely damages BAYC's brand equity. *See* Ex. 1 at ¶¶ 11.iii, 78–92.

**Brand Equity Is a Valuable Asset**

7. A company's brand is among its most valuable and important assets. Since the brand serves as a differentiator between one company's products or services and another's, the brand engenders awareness, reputation, and prominence in the marketplace. As a result, brand is at the heart of a company's marketing strategy. Branding is of particular importance for technology-related products, such as NFTs. A technology product's brand inextricably becomes linked to the technology that it develops, meaning that the consumer develops a long-term, positive association with the firm's technological prowess. *See* Ex. 1 at ¶¶ 18–21.

8. Brand equity refers to the additional value endowed to a company's products and services owing to them being from that particular brand. Brand equity is derived from brand awareness, perceived quality, and brand associations or

perceptions that consumers have of that brand. To develop brands, companies define brand elements (*e.g.*, name, logo, products, services) that are desirable in the minds of consumers. This includes defining the products and services the brand will offer and developing marketing communications strategy to raise brand awareness, communicate information about products and services, and convey desired attributes. Once a company successfully develops desirable brand associations, these associations can serve as important differentiators from other brands, and the value of this is reflected in brand equity. *See* Ex. 1 at ¶¶ 9, 25–26.

9.  Brand equity consists of the effects of marketing that are uniquely attributable to a brand and explains why marketing drives different outcomes for branded products or services as compared to unbranded ones. Because the power of brand depends on consumers' perception of the brand, brand equity is the "differential effect of brand knowledge on consumer response to the marketing of the brand." Consequently, higher brand equity is synonymous with greater brand strength in the eyes of consumers. In contrast, if a brand does not successfully create specific customer associations, the brand is weaker and has lower brand equity. *See* Ex. 1 at ¶ 25.

10. Brands with high brand equity tend to have various marketplace advantages, including high customer loyalty and the ability to generate price premiums for associated products and services. These advantages confer benefits to the companies that hold high equity brands. Companies holding brands with high brand equity, for example, usually have (i) greater market share, (ii) better chances of expanding these brands into new markets, (iii) better financial performance, (iv) greater ease in generating successful marketing partnerships, and (v) greater ability to benefit from licensing agreements with other companies. Brand equity is therefore a valuable asset. *See* Ex. 1 at ¶¶ 14, 27–34.

11. Brand equity can also be influenced by a brand's positioning. Brands can be positioned more functionally (*i.e.*, with dominant associations about product

performance) or more around symbolic meaning (*i.e.*, image, social signaling, or self-expression).  Compared to brands that are positioned more functionally, those that are positioned more around symbolic meaning and, in particular, symbols related to prestige or status, often garner greater brand equity.  *See* Ex. 1 at ¶¶ 35–37.

12. Brand equity is established using significant time, money, and effort.  Brand equity can be damaged through negative associations.  This is especially true of symbolic goods, or things consumers purchase for their prestige or status, such as BAYC NFTs.  *See* Ex. 1 at ¶ 9.

**Yuga Labs' BAYC Brand has the Characteristics of a Brand with High Brand Equity**

13. Authentic BAYC NFTs are a high-end symbolic good.  Their values are derived not just from the artwork and endowed features of each unique NFT, but also from associations with the BAYC brand.  *See* Ex. 1 at ¶ 10.

14. Harm to BAYC brand equity can reduce the BAYC's brand value.  Products associated with the BAYC brand account for the majority of Yuga Labs' earnings and profit.  A decrease in BAYC brand value would likely cause a decrease in Yuga Labs' sales, profits, and future earnings associated with the brand.  *See* Ex. 1 at ¶ 12.

15. Yuga Labs has leveraged the success of the BAYC NFTs to develop the brand and expand products and partnerships.  The BAYC brand is considered by Yuga Labs to be its focal or "cornerstone brand."  It exhibits the characteristics that are indicative of a brand with high brand equity.  NFTs associated with the brand sell for a premium relative to nearly all other NFTs.  As of February 6, 2023, BAYC NFTs had a floor price (the lowest priced BAYC NFT available for sale) of approximately 62 ETH ($103,000); individual BAYC NFTs have sold for as much as $3.4 million, among the highest of any NFT.  Since their release, BAYC NFTs are among the most sought after NFTs in terms of all-time purchasing volume.  And Yuga Labs' subsequent releases, including Mutant Ape Yacht Club ("MAYC"),

which were built off the BAYC brand, are prized by consumers (as reflected in both the current prices and initial purchase price for each). Price premiums and high volume purchases on NFTs associated with the BAYC brand are both consistent with BAYC constituting a strong brand. Yuga Labs has been able to leverage the BAYC brand in connection with Yuga Labs' website, events, social media pages, and marketing, and to secure marketing partnerships and collaborations, as well as expand its products and services, all due to the strength and popularity of its BAYC brand. *See* Ex. 1 at ¶¶ 41–44.

16. Consistent with the benefits of having a strong brand, the majority of Yuga Labs' revenue is attributable to the BAYC brand. Specifically, Yuga Labs' former CEO, Ms. Muniz testified that a majority of the Yuga Labs' revenue in each of the past two years is related to the BAYC brand, which exemplifies just how important this brand is to the company. *See* Ex. 1 at ¶ 45.

17. Lastly, the BAYC brand has been the subject of notable media interest. In November 2021, for example, BAYC NFT art was featured on the cover of Rolling Stone magazine, in which the related article refers to BAYC as "internet rock stars." Various media companies also covered Yuga Labs' news related to its fundraising and valuation, which included equity investments from well-known venture capital firms, such as Andreessen Horowitz. *See* Ex. 1 at ¶ 46.

## Counterfeit and Imitation Products can Diminish Brand Equity by Changing Brand Perception and Associations

18. Companies often exert a great deal of effort to shape how brands are perceived. Notwithstanding the significant efforts made to maintain ideal brand associations, certain external factors, such as the introduction of counterfeit or imitation goods, can affect how brands are perceived. Brand equity, and thus brand value, can be damaged when consumers' associations of the brand deviate in a negative way. The introduction of counterfeit products is one way that brand associations can be affected. *See* Ex. 1 at ¶¶ 48–49.

19. A large volume of academic literature supports the idea that counterfeiting can damage the brand value of the authentic brand. Green and Smith (2002) describe how counterfeiting may lead to "the erosion of brand equity if consumers are aware that some portion of the available stock of a brand is actually counterfeit." Wilcox et al. (2009) find that "the presence of the counterfeit brand will likely diminish preference for the real brand" and that the presence of counterfeit goods in a luxury market can cause "longer-term erosion in brand equity." Keller (2009) describes that "because of their significant price margins and premiums, luxury brands are vulnerable to much illegal activity in the form of counterfeiting and so on" and, as a result, "[m]arketers must proactively protect their brand in as many ways as possible, as well as vigorously enforce any infractions." As a final example, Grossman and Shapiro (1988) find that counterfeiters endanger the legitimate brand's ability "to offer their customers the prestige associated with a small, select network of users" because "a fringe of imitators allows consumers with less discerning tastes to enter the club." *See* Ex. 1 at ¶ 52.

20. An obvious, yet important reason why counterfeit products may cause marketplace confusion lies in the fact that, by definition, these products are identical or nearly identical to the authentic product and can thus create confusion in the marketplace. Indeed, some counterfeiters rely on such confusion to gain sales at the expense of the counterfeited brand. In doing so, counterfeiters freeride off the brand equity earned by the authentic brands. This, too, is recognized by the literature studying the effects of counterfeit products. *See* Ex. 1 at ¶¶ 53–54.

21. Chebat et al. (2015) note that while "[b]rand managers invest huge amount[s] of money and efforts to build unique and [recognizable] brands," counterfeiters aim "to reap the benefit of strong brands without building them." The authors conclude that "there are substantial economic effects related to brand confusion." Mitchell and Papavassiliou (1997) find that "[c]onfusion can make consumers more promiscuous, by weakening store loyalty and disrupting brand-

loyalty." Foxman et al. (1990) describes how "the consumer may be dissatisfied with the product purchased and attribute his or her dissatisfaction to the original brand, never realizing that the brand consumed was an imitator" leading to changes in consumers' product or service choice decisions. Finally, "[c]onfusion can result in potential misuse of a product," reinforcing other deleterious effects of counterfeiting and brand confusion such as "consumer dissatisfaction, lower repeat sales, more returned products, reduced customer loyalty[,] and poorer brand image." *See* Ex. 1 at ¶¶ 53, 57.

22. Confusion among market participants is more likely in a new space, such as NFTs, where transactions occur entirely online. Consumers make online purchases often without spending the time and effort required to make perfectly informed decisions. In other words, consumers often purchase goods with incomplete information, instead relying on pre-existing perceptions of brands and brand equity. While it is possible to authenticate an NFT's origin using publicly available information on the blockchain, this process is time consuming and requires an understanding of how to navigate the space. Even tech savvy consumers may not be aware of the processes available for confirming the authenticity of an NFT, as discussed below. *See* Ex. 1 at ¶ 58.

23. The literature supports the notion that authenticating NFTs is difficult. Das et al. (2022) examines the effects of various fraudulent user activities that take place on NFT exchanges and notes the challenges buyers face amid NFT market abuses and the complex nature of verifying authenticity. The authors recognize that the authenticity of an NFT is "endorsed by the smart contract managing the collection" and that in order to "ensure that the token one is buying is legitimate, buyers are advised to verify the contract address of the collection from official sources." However, as the authors explain: "[u]nfortunately, buyers are not always aware of the existence of counterfeits, or of how they can verify an NFT's authenticity" and instead "rely on the names and visual appearances of the items in

the marketplace." Industry participants likewise acknowledge the difficulty in authenticating NFTs. Pastel, the developer of a "next generation NFT focused blockchain," echoes this sentiment, noting that "look[ing] at the record for a particular NFT to determine when it was minted as well as its ownership history [is] easier said than done." *See* Ex. 1 at ¶ 59.

24. The difficulty authenticating NFTs and the rapid growth of the market are likely some of the reasons that counterfeiting in the space has proliferated. Das et al. (2022) identify *legitimacy* as "one of the big issues with NFTs, as nothing prevents an impostor from 'tokenizing' and selling someone else's art, while the creator remains oblivious to the fraud." Of particular note is the presence of "copycats or parody projects," which "resemble reputable collections and purport to have been created by reputable sources." The authors highlight the early NFT project CryptoPunks as one having "numerous clones, such as CryptoPhunks." *See* Ex. 1 at ¶ 62.

25. Consistent with the notion that authentication of NFTs is a complicated and technical task, OpenSea has "announce[d] several changes aimed at improving authenticity" on its platform, including "[a]n updated account verification and collection badging system that broadens the number of creators eligible for verification," and "[a]n automated system to help identify, remove, and prevent instances of 'copymints' (copies of authentic NFT content)." In my report, I illustrate an example of a "copymint" or counterfeit version of authentic NFT content that OpenSea would target in its approach. Rather than simply displaying the content, OpenSea moved in this direction in May 2022 to make it easier for users to detect counterfeits. *See* Ex. 1 at ¶ 63, Figure 2.

26. The literature shows that counterfeits harm brand equity for high-end products and that these effects are more damaging when the counterfeit product appeals to the same customer base, shares the same product features, and shares the same distribution channel. From these findings, one would expect the minting and

sales of imitation NFTs (such as RR/BAYC NFTs) to have a similar effect on the brand equity of the authentic NFTs upon which the imitations are based (*e.g.*, BAYC). *See* Ex. 1 at ¶ 64.

**The Minting and Sales of RR/BAYC NFTs Harmed BAYC Brand Equity**

27. Detailed analysis illustrates that, following the introduction and during the continued minting of RR/BAYC NFTs, there were (i) documented instances of confusion among market participants and (ii) a shift in discourse regarding the BAYC brand, which began to include reference to RR/BAYC NFTs or Mr. Ripps, and consumer attitudes toward the BAYC brand became less positive and more negative. Both results are consistent with the findings of the literature described in Exhibit 1. I conclude that the minting and sales of RR/BAYC NFTs harmed BAYC brand equity. *See* Ex. 1 at ¶ 65.

28. Defendants' usage of BAYC trademarks and the brand elements found in the authentic BAYC NFTs created by Yuga Labs becomes readily apparent when the NFTs are viewed side-by-side. Figure 3 in Exhibit 1 shows two listings on OpenSea: the listing on the left is an authentic Yuga Labs BAYC NFT, and the listing on the right is an RR/BAYC imitation, which uses the same artwork and unique identifying number (#1058) as the authentic version. The RR/BAYC NFT collection has been delisted from OpenSea and remains delisted as of the time of this report. Figure 3 in Exhibit 1 is consistent with the "copymints" discussed above (*i.e.*, imitations that look similar to authentic NFTs) that are targeted by OpenSea for removal to improve the user experience and protect consumers from imitation NFTs. *See* Ex. 1 at ¶ 67, Figure 3.

29. This type of imitation is recognized in the literature. Das et al. (2022) describe three types of counterfeit (imitation) NFTs: similar collection names, identical image URLs, and similar images. Similar collection names refer to NFTs that "use the name of the collection or individual piece that resembles the original (victim) one." The authors highlight the fake of "CryptoSpells," which used the

name "Cryptospells," (*e.g.*, the exact same letters, but the counterfeit displays a lowercase "S" instead of a capitalized "S"). Identical image URLs are perhaps more pernicious and further highlight the difficulty in authenticating NFTs. In the case of identical image URLs, the fake NFTs point to existing tokens, simply copying the image_urls of authentic NFTs. The authors use the popular CryptoPunks as an exemplar, noting that "nothing prevents a scammer from deploying her own token contract on the blockchain and mint[ing] tokens that point to CryptoPunks. A buyer who just looks at the appearance of items in a collection will see the CryptoPunks images and mistake the NFTs for the originals." Lastly, similar images simply refer to NFTs that copy a digital asset and then mint an NFT that points to the copy. For example, Defendants are involved in the sale of CryptoPhunks, an NFT collection that uses the same images as CryptoPunks, but face left instead of right. Defendants engaged in a similar imitation of BAYC NFTs, using the similar collection names, same images and similar URLs. *See* Ex. 1 at ¶ 68.

30. While the images and metadata each provide separate points of potential confusion, the potential for such confusion is even greater when factoring in the platforms on which RR/BAYC are sold and the naming conventions used in the underlying contract data. *See* Ex. 1 at ¶ 69.

31. RR/BAYC NFTs were available for purchase across a number of platforms at different points in time. The RR/BAYC collection was originally listed for sale on Foundation, then on Mr. Ripps' website, and also on the secondary market on the same platforms as the original, authentic BAYC NFTs. The fact that market participants were able to view both authentic BAYC and RR/BAYC NFTs on the same platform may have caused additional confusion. *See* Ex. 1 at ¶ 69i.

32. Moreover, the naming conventions used by Defendants were similar to the naming of authentic BAYC NFTs. The RR/BAYC NFT collection is identified on the blockchain as "Bored Ape Yacht Club (BAYC)" without any modification to Yuga Labs' marks. On some NFT marketplaces, like OpenSea, the RR/BAYC NFT

collection merely adds "RR/" to the collection name. *See* Ex. 1 at ¶ 69ii.

33.     Given the identical aspects and other substantial similarities between the two collections, some marketplace participants purchasing NFTs through secondary platforms such as OpenSea were likely confused by the introduction of RR/BAYC NFTs. Indeed, there are documented instances of confusion in the marketplace, both among potential purchasers of NFTs and among crypto reporters. *See* Ex. 1 at ¶¶73–74.

34.     It appears that this type of NFT collection—with identical images and similar (and sometimes identical) naming—was consistent with patterns of general abuses in the NFT market, as shown by Das et al. (2022). Such prevalence of counterfeit NFTs in the secondary market make it more difficult for even sophisticated purchasers to know with certainty that the NFTs they are purchasing are authentic.

35.     Together, the findings of the literature and examples of documented BAYC brand confusion described above provide qualitative evidence that the introduction of RR/BAYC NFTs harmed BAYC brand equity. Empirical analyses of BAYC brand discussions and perceptions further substantiate this point by adding quantitative support. The results of these analyses show that as the narrative in the marketplace shifted to include RR/BAYC, negative perceptions associated with BAYC increased. *See* Ex. 1 at ¶ 78.

36.     Using Twitter data obtained from BrandWatch, I examined attitudes towards the BAYC brand right before the release of the RR/BAYC NFTs (*i.e.*, starting on May 6, 2022) all the way through the accelerated minting of the RR/BAYC NFTs in late June 2022. I find that around the time Defendants' initial minting of RR/BAYC NFTs and again during the accelerated minting in June 2022, the proportion of tweets with text associated with the BAYC brand that also include references to Mr. Ripps or RR/BAYC NFTs increased notably. This finding provides evidence of a shift in discourse regarding the BAYC brand; following Defendants'

minting of RR/BAYC NFTs, discussion of the BAYC brand began to include reference to RR/BAYC NFTs or Mr. Ripps. *See* Ex. 1 at ¶¶ 79–82.

37. Not only did the discourse change, but so too did perceptions of the BAYC brand. To assess the potential impact of Defendants' minting of RR/BAYC NFTs on consumer attitudes towards the BAYC brand, I used a pretrained, aspect-based sentiment model that decomposes tweets into pre-specified aspects (or terms of interest) and provides an assessment of the tweet's sentiment (positive, negative, or neutral) toward that aspect. I found that the share of tweets expressing negative sentiment toward BAYC increases around the time Defendants began minting of RR/BAYC NFTs and continues to trend upward through the end of June. I also found that the share of tweets expressing positive sentiment toward BAYC decreased at the same time. Lastly, as further support for this conclusion, I show that a positive correlation exists between the proportion of tweets expressing negative sentiment towards BAYC and days on which a greater share of tweets about BAYC also discuss Mr. Ripps or RR/BAYC NFTs. Taken together, these facts suggest that consumer sentiment toward the BAYC brand became less positive and more negative following the minting and sales of RR/BAYC NFTs. As I discuss above, consumer sentiment is directly related to brand equity. Therefore, the shift in sentiment toward BAYC provides evidence of harm to BAYC brand equity. *See* Ex. 1 at ¶¶ 86–92.

38. Companies go to great lengths to develop their brands and create brand equity. They do so because brand equity is a valuable asset and confers many economic benefits to the company. As I show in Exhibit 1, the BAYC brand has high brand equity and Yuga Labs has benefited from the concomitant advantages that flow from it. Brand equity can be harmed when perceptions of the brand deviate in a negative way. One way in which associations can change is through the introduction of counterfeit or imitation goods. The literature establishes that the brand equity, and thus the brand value of authentic goods, can be damaged by the presence of counterfeit products. Furthermore, counterfeits can cause confusion in the

Fenwick & West LLP
Attorneys at Law

marketplace. The effects can be particularly acute if the products share distribution channels and visual appearance. *See* Ex. 1 at ¶¶ 93–95.

39. Consistent with the findings of the literature, BAYC's brand value appears to be harmed by the minting and sales of RR/BAYC NFTs. The RR/BAYC NFTs are exact pictorial imitations of the authentic BAYC collection, rely on the exact same images, and use other of the BAYC marks. Furthermore, there are documented examples of confusion in the marketplace. Such confusion can result in undesirable associations, undermining a key component of brand equity. Indeed quantitative analyses indicate there was a notable shift in online discourse and that attitudes towards BAYC became less positive and more negative during the minting and sales of RR/BAYC in May and June 2022. The documented confusion, changing discourse, decline in positive sentiment, and increase in negative sentiment all provide strong evidence that BAYC brand equity was harmed by Defendants' actions. *See* Ex. 1 at ¶ 96.

40. I declare under penalty of perjury under the laws of the State of California and of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed in Carrboro, NC this third day of March, 2023.

Jonah Berger