ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff and
Counterclaim Defendant
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC.,<br><br>　　　　Plaintiff and<br>　　　　Counterclaim Defendant,<br><br>　　v.<br><br>RYDER RIPPS, JEREMY CAHEN,<br><br>　　　　Defendants and<br>　　　　Counterclaim Plaintiffs. | Case No.: 2:22-CV-04355-JFW-JEM<br><br>**DECLARATION OF LAURA O'LAUGHLIN**<br><br>Date:　　　April 17, 2023<br>Time:　　　1:30 p.m.<br>Courtroom:　7A<br>Judge:　　　Honorable John F. Walter<br><br>Trial Date: June 27, 2023 |

| | |
|---|---|
| 1 | MELISSA L. LAWTON (CSB No. 225452) |
|  | mlawton@fenwick.com |
| 2 | FENWICK & WEST LLP |
|  | 228 Santa Monica Boulevard |
| 3 | Santa Monica, CA  90401 |
|  | Telephone:   310.434.4300 |
| 4 |  |
| 5 | DAVID Y. SILLERS (*admitted pro hac vice*) |
|  | david@clarelocke.com |
| 6 | KATHRYN HUMPHREY (*admitted pro hac vice*) |
|  | kathryn@clarelocke.com |
| 7 | MEGAN L. MEIER (*admitted pro hac vice*) |
|  | megan@clarelocke.com |
| 8 | CLARE LOCKE LLP |
|  | 10 Prince Street |
| 9 | Alexandria, VA  22314 |
|  | Telephone:   202.628.7400 |
| 10 |  |
| 11 | Attorneys for Plaintiff and |
|  | Counterclaim Defendant |
| 12 | YUGA LABS, INC. |

I, Laura O'Laughlin declare:

1. I am a Vice President at Analysis Group, Inc. ("AG") and have extensive experience in the design, development, administration, and analysis of surveys and experiments in a variety of matters, including antitrust, consumer protection, false advertising, trademark infringement, and patent infringement. I have been engaged by counsel for Yuga Labs, Inc. ("Yuga Labs") to provide expert testimony on whether or not consumer confusion exists as a result of Ryder Ripps' and Jeremy Cahen's use of Yuga Labs' Bored Ape Yacht Club trademarks ("BAYC Marks")[1] as alleged in the matter of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*. Specifically, I conducted consumer research to analyze the likelihood of consumer confusion in the market for non-fungible tokens ("NFTs"). I conducted two online consumer surveys, my Foundation Eveready survey and my OpenSea Squirt survey, following best practices for survey research conducted in a litigation context. I have firsthand knowledge of the matters stated herein.

2. I submitted an expert report in this case on February 6, 2023, which is attached hereto as **Exhibit 1,** and which has been redacted to preserve confidentiality. My analyses and opinions are based on documents and other materials provided to me by counsel for Yuga Labs or public sources, including court documents and deposition testimony produced in this litigation, academic articles related to survey design, and publicly available information regarding the NFT market. A list of the sources I relied on in forming my opinions are listed in Appendix B of Ex. 1.

3. Based on my expertise and experience, my review of the relevant materials produced in this matter, and the results of the two likelihood of confusion studies I designed, conducted, and analyzed, I have reached the following opinions. Taken together, my likelihood of confusion studies support Yuga Labs' allegations

---

[1] The BAYC Marks include: BORED APE YACHT CLUB, BAYC, BORED APE, APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and Ape Skull Logo.

of consumer confusion in this matter.  *See* Ex. 1 at ¶¶ 16-17.

**Evidence of Confusion**

4.     There is a meaningful likelihood of confusion for consumers who saw the BAYC Marks used in connection with the at-issue RR/BAYC NFT collection on the Foundation marketplace.  Using an appropriately designed Eveready survey with relevant marketplace context and control stimuli, I find a net confusion rate of 40.4%.  That is, using an experimental design to control for any potential survey noise or bias, I find that 49.2% of respondents in the Bored Ape Yacht Club ("BAYC") Group (test group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club, and 8.8% of respondents in the Chill Gorilla Boat Crew ("CGBC") Group (control group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club.  The net effect demonstrates likelihood of confusion among relevant consumers on the Foundation marketplace.  *See* Ex. 1 at ¶¶ 16a, 45-47.

5.     There is also a meaningful likelihood of confusion for consumers who saw the BAYC Marks used in connection with the at-issue RR/BAYC NFT collection on the OpenSea marketplace.  Using an appropriately designed Squirt survey with relevant marketplace context and control stimuli, I find a net confusion rate of 20.0%.  That is, using an experimental design to control for any potential survey noise or bias, I find that 21.2% of respondents in the BAYC Group (test group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club, and 1.2% of respondents in the CGBC Group (control group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club.  The net effect demonstrates likelihood of confusion among relevant consumers on the OpenSea marketplace.  *See* Ex. 1 at ¶¶ 16b, 73.

6.     With the strong overlap and similarities in Ripps' and Cahen's use of the BAYC Marks and Ripps' and Cahen's claim that NFT consumers are aware of the "satirical" nature of the project, I took additional measures to ensure that my net confusion findings were not an artifact of guessing or weakly held beliefs.  I find the

majority of confused respondents exhibited strongly held beliefs as to the source of the at-issue RR/BAYC NFT collection. Specifically, for my Foundation Eveready survey, approximately 78% of confused respondents in the BAYC Group expressed certainty in their beliefs as to the source of the RR/BAYC NFT collection. *See* Ex. 1 at ¶ 50. Similarly, for my OpenSea Squirt survey, approximately 77% of confused respondents in the BAYC Group expressed certainty in their beliefs that the RR/BAYC collection is from the same or an affiliated or connected source as Bored Ape Yacht Club. *See* Ex. 1 at ¶ 76. These results confirm my findings of a meaningful likelihood of confusion in both the Foundation and OpenSea contexts and undermine Ripps' and Cahen's claims that confusion was "impossible." *See* Ex. 1 at ¶¶ 16c, 50-51, 76-77.

7. In my review of the materials available in this case, I found multiple examples of varying types of forward confusion by consumers, including "initial interest confusion" and "point of sale confusion." *See* Ex. 1 at ¶ 18. I also observed evidence of "post-sale confusion" among consumers outside the direct purchasing context. For example, observers in the NFT marketplace appear to have confused the at-issue RR/BAYC NFT collection as associated with the Yuga Labs BAYC collection. Consumer confusion in the post-sale context is likely higher, given that any blockchain details that might help dispel confusion are less readily available to casual observers, than what would be expected in the point of sale context. *See* Ex. 1 at ¶ 19.

**Survey Design, Fielding, and Analysis**

8. In designing my Foundation Eveready survey and my OpenSea Squirt survey, I adhered to best practices for surveys used in litigation. *See* Ex. 1 at ¶¶ 22, 53. In addition, both the Eveready and Squirt formats are generally accepted by courts as leading approaches for testing likelihood of confusion. *See* Ex. 1 at ¶¶ 20-21.

9. In order to measure confusion directly related to Ryder Ripps' and

Jeremy Cahen's use of the BAYC Marks, my surveys employ a test/control experimental design, which is a reliable method to evaluate causal relationships. *See* Ex. 1 at ¶¶ 22, 53. In an experimental design, respondents are randomly assigned to one of two groups and exposed to stimuli which are identical but for the at-issue characteristic being tested. As a result, any differences in confusion between the two groups can be attributed to the at-issue characteristic. In my surveys, respondents were assigned to either a test or control group and presented with survey stimuli that replicate what a consumer would experience when visiting the Foundation or OpenSea marketplaces to purchase an NFT. *See* Ex. 1 at ¶¶ 23, 56. For both surveys, respondents in the BAYC Group (test group) saw stimuli that included the at-issue RR/BAYC NFT collection, while the CGBC Group (control group) saw modified stimuli with the at-issue RR/BAYC NFT collection, modified to remove references to BAYC. *See* Ex. 1 at ¶¶ 34, 61. Prior to survey fielding, pretests were conducted for both surveys to ensure that questions were clear and unambiguous to respondents. *See* Ex. 1 at ¶¶ 28, 59.

10. In forward confusion cases, the appropriate target population to survey is past and potential buyers of the junior user's goods or services. Accordingly, the target population in both of my surveys are past and potential purchasers of the at-issue RR/BAYC NFTs. As a result, the target population for both surveys includes individuals who (i) have purchased an NFT in the past year using Ethereum, or (ii) are considering purchasing an NFT using cryptocurrency in the next year. Additionally, individuals who either (iii) have purchased digital art as a collectible in the past year, or (iv) are considering doing so in the next year are also part of the target population as they too are likely prospective purchasers of the at-issue RR/BAYC NFTs. *See* Ex. 1 at ¶¶ 29, 60.

11. I relied on Schlesinger Group ("Schlesinger"), a marketing research company, to recruit respondents from a national panel of individuals 18 or older to participate in my survey. Schlesinger managed the inbound sample using answers to

FENWICK & WEST LLP
ATTORNEYS AT LAW

the age, gender, and state questions to track and balance in a manner that matches U.S. Census demographic data. Both of my surveys employ a series of additional screener questions to qualify the appropriate target population before asking the main confusion questions. *See* Ex. 1 at ¶¶ 30-33, 60.

12. The images shown in the Foundation Eveready survey, how they were chosen, how they were shown to participants, and what questions participants were asked can be found in Ex. 1 at ¶¶ 24-27, 34-41. A total of 505 respondents qualified for and completed this survey, with 254 and 251 respondents randomly assigned to the BAYC and CGBC Groups, respectively. *See* Ex. 1 at ¶ 43.

13. The images shown in the OpenSea Squirt survey, how they were chosen, how they were shown to participants, and what questions participants were asked can be found in Ex. 1 at ¶¶ 54-58, 61-70. A total of 505 respondents qualified for and completed my survey, with 250 and 255 respondents assigned to the BAYC and CGBC Groups, respectively. *See* Ex. 1 at ¶ 72.

14. I conducted my analyses following best practices for survey research, including, where appropriate, the use of independent coders who were unaware of the purpose of the survey to ensure that the responses in my survey data were interpreted and analyzed in an unbiased manner. *See* Ex. 1 at ¶ 44. As described above, my findings from my Foundation Eveready survey and my OpenSea Squirt survey are indicative of a meaningful likelihood of confusion due to Ripps' and Cahen's use of the BAYC Marks in those marketplaces. *See* Ex. 1 at ¶¶ 45-47, 73. I further ran additional sensitivities on my analysis related to the certainty of respondent beliefs, elapsed time spent taking the survey, and respondent awareness of any lawsuits related to NFTs. *See* Ex. 1 at ¶¶ 50-52, 76-77. These sensitivities are consistent with my finding of a likelihood of confusion based on Ripps' and Cahen's use of the BAYC Marks in both the Foundation and OpenSea marketplaces.

I declare under penalty of perjury under the laws of the State of California and of the United States that, to the best of my knowledge, the foregoing is true and

Fenwick & West LLP
Attorneys at Law

correct. Executed in Beaupre, Quebec, Canada this 4th day of March, 2023.

_____
Laura O'Laughlin