```
ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
```

*Additional Counsel listed on next page*

Attorneys for Plaintiff and
Counterclaim Defendant
YUGA LABS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC.,<br><br>    Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>RYDER RIPPS, JEREMY CAHEN,<br><br>    Defendants and Counterclaim Plaintiffs. | Case No.: 2:22-CV-04355-JFW-JEM<br><br>**DECLARATION OF LAUREN R. KINDLER**<br><br>Date:      April 17, 2023<br>Time:     1:30 p.m.<br>Courtroom: 7A<br>Judge:    Honorable John F. Walter<br><br>Trial Date: June 27, 2023 |

| | |
|---|---|
| 1 | MELISSA L. LAWTON (CSB No. 225452) |
|  | mlawton@fenwick.com |
| 2 | FENWICK & WEST LLP |
|  | 228 Santa Monica Boulevard |
| 3 | Santa Monica, CA 90401 |
|  | Telephone: 310.434.4300 |
| 4 | |
| 5 | DAVID Y. SILLERS (*admitted pro hac vice*) |
|  | david@clarelocke.com |
| 6 | KATHRYN HUMPHREY (*admitted pro hac vice*) |
|  | kathryn@clarelocke.com |
| 7 | MEGAN L. MEIER (*admitted pro hac vice*) |
|  | megan@clarelocke.com |
| 8 | CLARE LOCKE LLP |
|  | 10 Prince Street |
| 9 | Alexandria, VA 22314 |
|  | Telephone: 202.628.7400 |
| 10 | |
| 11 | Attorneys for Plaintiff and |
|  | Counterclaim Defendant |
| 12 | YUGA LABS, INC. |

I, Lauren Kindler declare:

1. I am a Managing Principal at Analysis Group, Inc. where, for more than 20 years, I have provided financial, economic, and damage quantification consulting services to clients. I have been retained as an economics and damages expert for Yuga Labs, Inc. ("Yuga Labs") in the matter of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*.[1] I have firsthand knowledge of the matters stated herein.

2. I submitted an expert report in this case on February 6, 2023, which is attached hereto as **Exhibit 1**, and which has been redacted to preserve confidentiality. My analyses and opinions are based on legal documents (*e.g.*, the Complaint and interrogatory responses), deposition testimony, data and documents produced by the parties, other expert reports, and data and information independently obtained. A full list of the information and data available to me in forming my opinions are listed in Appendix B of Ex. 1.

3. A summary of damages calculations presented in my expert report is shown in the chart below.[2] *See* Ex. 1 at Figure 7.

|  | Damages |
|---|---|
| **Disgorgement of Defendants' Profits** and Yuga Labs' Lost Profits (as a Proxy) | $1,589,455 |
| **Yuga Labs' Corrective Advertising Expenses** |  |
| Yuga Lab's Corrective Advertising Expenses | $285,977 - $535,977 |
| ▮ | ▮ |
| Defendants' Advertising Expenses (as a Proxy) | $434,233 |

### Disgorgement of Defendants' Profits

4. As of February 1, 2023, Defendants' wrongful conduct is associated with $1,589,455 in profits for the Defendants. These profits were generated by 1)

---

[1] I refer to Mr. Ryder Ripps and Mr. Jeremy Cahen collectively as "Defendants."

[2] Defendants' wrongful conduct in this matter includes both trademark infringement and false advertising. The damages I have calculated would apply if Defendants are found liable for either (or both) claim(s).

DECL. OF LAUREN R. KINDLER 1 Case No. 2:22-cv-04355-JFW-JEM

Defendants' sales of the RR/BAYC NFTs that they minted and began to sell in May 2022, 2) creator fees that Defendants collected from resales of RR/BAYC NFTs on secondary markets, and 3) the value of RR/BAYC NFTs that Defendants hold or did not mint. Profits continue to accrue to Defendants, as resales on secondary markets are ongoing. *See* Ex. 1 at ¶ 9.a. While I understand that Yuga Labs does not have the burden to prove profits or any other deductions from revenues, I calculated Defendants' profits associated with the wrongful conduct, based on available information. *See* Ex. 1 at ¶ 58. Below, I provide additional detail on this calculation. I intend to update these calculations should I be asked by counsel to do so. *See* Ex. 1 at ¶ 61.

5. [REDACTED]

6. When NFTs are resold in NFT marketplaces, creator fees can accrue to the creator of that NFT. The RR/BAYC NFTs transaction data indicates that Defendants profited from 3,023 RR/BAYC NFTs resales that occurred in NFT marketplaces. Using the ETH to USD conversion rates as of the date of each resale, these creator fees were approximately $117,309. This estimate does not fully capture the total profits earned by Defendants from resales of RR/BAYC NFTs, and it does not capture ongoing and future profits that would accrue to Defendants as purchasers

buy and sell RR/BAYC NFTs. *See* Ex. 1 at ¶¶ 68-69.

7. Of the 9,546 RR/BAYC NFTs minted, Defendants hold 136 RR/BAYC NFTs in their wallets. I calculate the value of the RR/BAYC NFTs that Defendants hold or have not minted as 65 ETH. Using the ETH to USD conversion rate as of February 1, 2023, this equates to $106,055. *See* Ex. 1 at ¶¶ 71-74.

8. The data and documents I reviewed indicate that $419,733 of these profits accrued to Mr. Thomas Lehman and Mr. Ryan Hickman, developers who assisted Defendants but who are not themselves defendants in this matter. A summary of the calculations presented in my expert report which exclude the profits that accrued to Mr. Lehman and Mr. Hickman are shown in the chart below. *See* Ex. 1 at ¶ 76.

|  | Profits |
|---|---|
| Profits from Initial Sales of RR/BAYC NFTs | $1,366,090 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| Total | $1,589,455 |

9. I understand that Defendants' profits generated by the wrongful conduct can be used as a proxy for Yuga Labs' lost profits through disgorgement. However, Defendants' profits of $1,589,455 likely underestimates Yuga Labs' lost profits. Had Yuga Labs, as opposed to Defendants, minted additional NFTs with its marks, it likely would have earned more profits than Defendants earned from the RR/BAYC NFT collection. Furthermore, Ethereum blockchain data suggests that some consumers have treated RR/BAYC NFTs as replacement goods for BAYC NFTs, indicating that in at least some instances, Defendants' gain came at Yuga Labs' loss. *See* Ex. 1 at ¶¶ 77-78.

**Yuga Labs' Corrective Advertising Expenses**

10. In this matter, there are multiple ways to quantify Yuga Labs' corrective advertising expenses that Yuga Labs would not incur absent Defendants' wrongful conduct.

11. Testimony from Yuga Labs' former CEO and invoices to Yuga Labs indicate that Yuga Labs spent between $285,977 and $535,977 on corrective advertising activities to mitigate the wrongful conduct. These expenses include costs associated with 1) pursuing "takedowns" of the infringing RR/BAYC NFT collection and 2) an advertising campaign in New York City that was launched to combat the Defendants' wrongful conduct. I understand that this range of corrective advertising expenditures likely would understate Yuga Labs' total corrective advertising-related damages. *See* Ex. 1 at ¶ 9.c.i.

12. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████

13. I understand that Defendants' advertising costs can be used as a proxy for Yuga Labs' corrective advertising costs. Blockchain transaction data and deposition testimony indicate that Defendants' costs associated with the accused RR/BAYC NFTs total $434,233, most of which constitute payments to their collaborators, whom I understand were involved in promoting the accused RR/BAYC NFTs. To the extent these are advertising costs, they may serve as a proxy for Yuga Labs' corrective advertising costs. *See* Ex. 1 at ¶ 9.c.iii.

### Additional Damages Caused by Defendants' Conduct

14. In addition to the measures of harm quantified above, Defendants' wrongful conduct caused (and continues to cause) additional types of unjust enrichment to Defendants and harm to Yuga Labs that are significant, yet more

difficult to quantify. *See* Ex. 1 at ¶ 10.

15. Defendants were unjustly enriched in the form of avoided costs, as they were able to "free ride" on investments that Yuga Labs made to develop the marks that the Defendants infringed.

16. The confusion created by the wrongful conduct caused damage to Yuga Labs' business. Evidence of this may manifest in multiple ways, including decreased interest in and sales of authentic BAYC NFTs and BAYC branded merchandise, resulting in loss of creator fees and other revenues for Yuga Labs.

17. Testimony from Yuga Labs' former CEO indicates that the wrongful conduct likely resulted in Yuga Labs' loss of at least one valuable partnership opportunity with another firm.

18. The wrongful conduct likely harmed Yuga Labs' goodwill.

### Background Information

19. **Blockchain technology**. A blockchain is a cryptographic ledger that records digital transactions. Each additional transaction that occurs is recorded as a "block" of data on the blockchain. Each "block" confirms the precise time and sequence of its associated transaction and is connected to the "blocks" that come before and after it – thereby forming a "chain […] of blocks." *See* Ex. 1 at ¶ 16.

20. In contrast to a regular database stored on a server or a personal device, a blockchain ledger is duplicated on many computers in the network. Computers in the network must "agree" on the content of the digital ledger, such that if any network participant decides to modify, delete, or add records, other participants in the network have an opportunity to reject these changes. Because blockchain records are thus dependent on consensus mechanisms, they are considered to be decentralized and immutable. *See* Ex. 1 at ¶ 17.

21. **Smart contracts and NFTs**. A smart contract is a computer program stored on a blockchain that executes a set of predetermined rules when certain conditions are met. For instance, a smart contract can verify whether the conditions

of an agreement (such as payment terms) have been met, and then self-execute pre-defined actions (e.g., transfer an asset) based on this verification. When a smart contract executes, an additional and immutable record is appended to the blockchain. The transactions executed by smart contracts are permanently stored in the Ethereum network and can be publicly viewed. *See* Ex. 1 at ¶ 18.

22. NFTs are an application of smart contracts. NFTs are recorded on the blockchain and can identify ownership or other rights to unique items, such as digital art or real estate in a metaverse. Unlike a fungible token such as cryptocurrency where each token is interchangeable, each NFT has a unique identification, like a serial number, which distinguishes it from all others. For example, while each ETH is interchangeable with any other ETH, NFTs cannot be exchanged at equivalency. NFTs are added to the blockchain through a process called minting. NFTs are minted and subsequently traded through an underlying smart contract. The smart contract associated with an NFT governs the assignment of that NFT's ownership and even its destruction (or "burning"). *See* Ex. 1 at ¶ 21.

23. **NFT marketplaces**. NFT marketplaces are platforms on which NFTs can be stored, displayed, traded, and in some cases, minted. Prominent NFT marketplaces include OpenSea, Rarible, LooksRare, and Foundation. These marketplaces provide a secondary market for NFTs, serving a similar function as eBay or consignment stores do for physical goods. *See* Ex. 1 at ¶ 22.

24. It is common for creators of NFTs to collect creator fees from resales of their NFTs on NFT marketplaces. Creator fees are collected by NFT creators each time one of their NFTs moves from a seller wallet to a buyer wallet on an NFT marketplace. *See* Ex. 1 at ¶ 23.

### Consumer Confusion

25. Documents and testimony produced in this matter describe how consumers were confused about the origin of the RR/BAYC NFTs, some even mistakenly purchasing RR/BAYC NFTs believing them to be Yuga Labs' BAYC

NFTs. *See* Ex. 1 at ¶¶ 42-45.

26. Defendants also acknowledged the "confusion" the RR/BAYC project was creating for consumers in documents and testimony. *See* Ex. 1 at ¶¶ 47-52.

27. Academic research suggests that it is challenging for most consumers to establish provenance for NFTs, which increases the likelihood of confusion - even in the absence of an intentional campaign to create confusion, such as Defendants'. Prominent academics and researchers have commented on the complexity of understanding or verifying the origin of cryptocurrency and NFTs during the purchase process, and the challenges this presents for consumers navigating the process. *See* Ex. 1 at ¶ 53.

    a. Research from 2022 indicates that "[r]egulators and law enforcement fear that the rapidly growing use of NFTs will present new opportunities for misuse by illicit actors in […] misrepresentation […]."[3]

    b. A paper by Professor Scott Duke Kominers of Harvard Business School notes that "[m]ost crypto technology at the moment is not user friendly to engage with" and that NFTs face similar challenges.[4] It further explains that some NFT projects have "recruited onboarding directors to help first-time NFT consumers navigate the process of purchasing."[5]

---

[3] Mondoh, Brian Sanya et. al., "NFT Legal and Regulatory Compliance: Connoisseurship and Critique," November 12, 2022, at p. 8.

[4] Kaczynski, Steve, and Scott Duke Kominers, Harvard Business Review, "How NFTs Create Value," November 10, 2021, https://hbr.org/2021/11/how-nfts-create-value ("NFTs also face a number of challenges that are general across crypto entrepreneurship. Most crypto technology at the moment is not user friendly to engage with, requiring interfacing with a number of abstruse cryptocurrency exchanges and wallet providers.").

[5] *Id.* ("NBA Top Shot has benefited tremendously from submerging most of the underlying crypto structure in its NFT market, and enabling users to purchase

    c. In another discussion, Professor Kominers notes that while "[blockchain] technology is technically transparent, it's still very opaque for the average consumer, or even for the very sophisticated consumer."[6]

    d. A 2018 paper on the blockchain revolution by Professor Hanna Halaburda from New York University Stern School of Business – an expert on digital currencies and blockchain technologies[7] – notes that the "technology for the most part is not well understood."[8]

    e. More recently, academic literature from 2022 also acknowledges the "confusing nature of the myriad different NFT projects in existence."[9]

---

moments in fiat with credit cards, rather than requiring people to transact in cryptocurrency. Other projects have recruited onboarding directors to help first-time NFT consumers navigate the process of purchasing.").

[6] Harvard Business School, "The Exchange: The Road Ahead for Crypto," Re: Scott Duke Kominers (Professor of Business Administration (Leave of Absence)); Charles C.Y. Wang (Glenn and Mary Jane Creamer Associate Professor of Business Administration); By: Jen McFarland Flint, August 25, 2022, https://www.alumni.hbs.edu/stories/Pages/story-bulletin.aspx?num=8834/ ("One of the many ways in which this stuff is not yet ready for widespread use is that while the technology is technically transparent, it's still very opaque for the average consumer, or even for the very sophisticated consumer. This shows up in the extent to which even very sophisticated actors are having their crypto assets stolen. And on the onboarding side, it's still very complicated even just to get a crypto wallet.").

[7] New York University Stern School of Business, Faculty Directory, "Hanna Halaburda – Associate Professor of Technology, Operations, and Statistics" (https://www.stern.nyu.edu/faculty/bio/hanna-halaburda, viewed on January 27, 2023).

[8] Halaburda, Hanna, "Blockchain Revolution without the Blockchain," Bank and Canada and NYU, March 2, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3133313 ("The technology behind blockchain has attracted a lot of attention. However, this technology is for the most part not well understood.").

[9] Harsono, Hugh, "Regaining the Technological Competitive Advantage by Supporting NFT Self-Governance," Fletcher Forum of World Affairs, Vol. 46(2),

DECL. OF LAUREN R. KINDLER      8      Case No. 2:22-cv-04355-JFW-JEM

28. In contrast, consumers purchasing through more traditional and established means, such as visiting a brick-and-mortar store owned and operated by a well-known brand, are unlikely to be confused as to whether the goods sold are authentic. Similarly, purchasing an obvious "knock off" product on a street corner creates little or no confusion to the purchaser regarding the fact that the trademark is not authentic, although it may later confuse others who see the knock off product in use or try to purchase it on a secondary market. Because these distinctions do not exist for purchasers in the market for NFTs in obvious ways, the likelihood of confusion from trademark infringement is increased. See Ex. 1 at ¶ 54.

I declare under penalty of perjury under the laws of the State of California and of the United States that, to the best of my knowledge, the foregoing is true and correct. Executed in Los Angeles, CA this 4th day of March, 2023.

_____
Lauren R. Kindler

---

Summer 2022, pp. 155-164, at p. 158 ("The confusing nature of the myriad different NFT projects in existence makes it easy to dismiss the entire NFT and Web 3.0 ecosystem, with many individuals fearful of falling victim to the growing number of NFT-related scams."). See also Das, Dipanjan, et al, "Understanding Security Issues in the NFT Ecosystem," In Proceedings of ACM Conference on Computer and Communications Security, 2022.