Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>　　　　　Plaintiff and<br>　　　　Counterclaim Defendant,<br><br>　　v.<br><br>Ryder Ripps and Jeremy Cahen,<br><br>　　　　　Defendants and<br>　　　　Counterclaim Plaintiffs. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**MR. RIPPS AND MR. CAHEN'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 149)**<br><br>Judge: John F. Walter<br>Hearing: April 17, 2023, at 1:30 p.m.<br>Discovery Cutoff Date: April 3, 2023<br>Pre-Trial Conference Date: June 9, 2023<br>Trial Date:  June 27, 2023 |

1

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................. 1

II.     ARGUMENT ................................................................................................... 2

     A.      Yuga Is Not Entitled to Summary Judgment of Trademark
         Infringement ........................................................................................... 2

     i.      Yuga Labs Does Not Own the Asserted Marks for NFTs ........................ 2

     ii.     Disputed Issues of Fact Preclude Summary Judgment on Consumer
         Confusion ............................................................................................... 8

     B.      Yuga is Not Entitled to Summary Judgment on its ACPA Claim ........... 14

     C.      Yuga Is Not Entitled to Summary Judgment on the First
         Amendment. ......................................................................................... 15

     i.      The RR/BAYC Project is an Expressive Work ..................................... 15

     ii.     The RR/BAYC project's use of the alleged marks is artistically
         relevant. ................................................................................................ 16

     iii.    The RR/BAYC project did not explicitly mislead as to the source
         of the work ........................................................................................... 17

     D.      Yuga Is Not Entitled to Summary Judgment on Defendants'
         Nominative Fair Use Defense ............................................................... 18

     E.      Yuga Is Not Entitled to Summary Judgment on Defendants'
         Counterclaim Under 17 U.S.C. § 512(f) ................................................ 20

III.    CONCLUSION ............................................................................................. 22

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531 (9th Cir. 1989) ........................11

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)........................8

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986)........................................22

*Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019)................18

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002)..........................................................................................................6, 7

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) .....................................18

*Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709 (9th Cir. 1974)............................................................................................................5

*Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814 (9th Cir. 1996) ............5

*Cool Fuel, Inc. v. Connett*, 685 F.2d 309, (9th Cir. 1982) ...........................................2

*Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134 (C.D. Cal. 2009)............................................................................................................2

*CrossFit, Inc. v. Alvies*, 13-cv-3771-SC, 2014 WL 251760, at *2 (N.D. Cal. Jan 22, 2014)..........................................................................................................25

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ....................3

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC,* 983 F.3d 443 (9th Cir. 2020)............17

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d
1025 (9th Cir. 2010) ........................................................................11

*Freecycle Network, Inc.v. Oey*, 505 F.3d 898 (9th Cir. 2007) .......................................7

*Friel v. Dapper Labs, Inc*. -- F. Supp. 3d --, 2023 WL 2162747 at *22
(S.D.N.Y. 2023)..............................................................................5

*Glow Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962 (C.D. Cal. 2002).......................19

*Gordon v. Drape Creative, Inc*, 909 F.3d 257, 268 (9th Cir. 2018)................15, 16, 17

*Health Net v. U.S.A. Healthnet, Inc.*, No. CV 92-3925 KN, 1993 WL 209558,
(C.D. Cal. May 12, 1993) ...............................................................12

*ISE Entertainment Corp. v. Longarzo*, 2018 WL 1569803 (C.D. Cal. 2018).............20

*Kiva Health Brands v. Kiva Brands, Inc.*, 402 F. Supp. 3d 877 (N.D. Cal. 2019) ........5

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608
(9th Cir. 2005) .............................................................................8

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016)..................................20

*Mattel, Inc. v. MCA Recs., Inc.*, 28 F. Supp. 2d 1120 (C.D. Cal. 1998) .....................16

*Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792  (9th Cir. 2003) ...................18

*Moonbug Entertainment Ltd. v. Babybus (Fujian) Network Technology Co.,
Ltd.*, 2022 WL 580788 (N.D. Cal. 2022) .........................................................21

*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) .......................................................15

*Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 (C.D. Cal. Sept. 17, 2014) ................................................................................... 3

*Punchbowl, Inc. v. AJ Press LLC*, 549 F. Supp. 3d 1061 (C.D. Cal. 2021) ................ 16

*Rearden LLC v. Reardon Com. Inc.*, 683 F.3d 1190 (9th Cir. 2012) ......................... 4, 8

*Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000 (9th Cir. 2004) ................ 21

*S. Cal. Darts Ass'n v. Saffina*, 762 F.3d 921 (9th Cir. 2014) ........................................ 5

*See New Kids on the Block v. News Am. Pub. Inc.*, 971 F.2d 302 (9th Cir. 1992)... 9, 17

*Social Techs. LLC v. Apple Inc.*, 4 F.4th 811, (9th Cir. 2021) ...................................... 4

*Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023 (C.D. Cal. 2013) ................................................................................................................. 13

*Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192 (9th Cir. 2017) .................. 16

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006 (9th Cir. 2013) ............................................................................................................ 20

*Vaughn v. Teledyne, Inc.*, 628 F.2d 1214 (9th Cir. 1980) ........................................... 15

*Watec Co., Ltd. v. Liu*, 403 F.3d 645 (9th Cir. 2005) .................................................... 5

*Worden v. California Fig Syrup Co.*, 187 U.S. 516 (1903) .................................... 19, 20

**Statutes**

17 U.S.C. § 512(f) ........................................................................................................ 20

## I. INTRODUCTION

Plaintiff Yuga Labs, Inc. ("Yuga") seeks partial summary judgment[1] on two claims—infringement and cybersquatting—as well as a handful of defenses and Defendants' counterclaim.  Each of Yuga's arguments is fatally flawed.

***First***, Yuga cannot show trademark infringement without showing both ownership of the asserted marks and confusion.  It can show neither.  Yuga has no trademark registrations, NFTs are not eligible for trademark protection, Yuga conceded that it has not used its asserted marks in commerce, Yuga transferred any rights that it would have had to others, and Yuga's rights were lost through naked licensing and failure to police.  As Yuga's CEO rightly put it: "***We have none of those rights***."[2]  With no trademark rights, Yuga cannot possibly be entitled to summary judgment of on either trademark infringement or trademark cybersquatting.

***Second***, there are disputed facts on consumer confusion precluding summary judgment.  None of Yuga's three expert witnesses nor any of its numerous fact witnesses could identify a single person who purchased an RR/BAYC NFT believing it to be made or sponsored by Yuga—ever.  And this makes sense, since the point of the RR/BAYC Project was to critique Yuga, which is precisely why the NFTs were sold with a prominent artist's statement and clear disclaimer.  Yuga's reliance on a flawed survey and out-of-context hearsay statements does not somehow make likelihood of confusion so undisputed as to allow summary judgment.

***Third***, Yuga's cybersquatting claim—like its infringement claim—requires ownership of a valid mark, which it lacks.  It also requires a showing of "bad faith intent"— a quintessentially fact-intensive inquiry inappropriate for resolution at summary judgment.

---

[1] Even if Yuga's motion is granted in full, trial would still be necessary for damages, as Yuga itself concedes.  Mot. at 3 n.2.

[2] Emphasis has been added unless otherwise noted.

1    **Fourth**, the facts on each of the defenses on which Yuga has moved are highly

2    contested.  Whether the RR/BAYC Project was artistic is disputed.  Whether the

3    RR/BAYC Project needed to use the words "BAYC" and "BORED APE" to refer to

4    the collection is disputed.  And whether Yuga's marks obtained any prominence they

5    have from Yuga's illegal undisclosed celebrity endorsements and illegal sales of

6    unregistered investment vehicles is disputed.

7        **Finally**, as to Defendants' counterclaim for misrepresentations under the

8    Copyright Act, Yuga's own motion admits that its copyright takedown notices were

9    "sent out on other bases"—which is precisely what section 512(f) of the Copyright

10   Act precludes.  If anything, Yuga's admissions in its motion and statement of

11   undisputed facts would warrant summary judgment in Defendants' favor.  *See, e.g.*,

12   *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982) ("[C]ourt may *sua*

13   *sponte* grant summary judgment to the non-moving party").

14   **II.    ARGUMENT**

15       **A.    Yuga Is Not Entitled to Summary Judgment of Trademark**
             **Infringement**

16

17       "In order to prevail on a . . . common law trademark infringement claim, a

18   plaintiff must show that it owns a valid mark, that the mark was used without its

19   consent, and that such unauthorized use is likely to cause confusion, mistake, or

20   deception."  *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1137

21   (C.D. Cal. 2009).  Yuga cannot establish that it owns any valid asserted mark, or that

22   Defendants engaged in any use likely to cause confusion, mistake or deception.

23           **i.    Yuga Does Not Own the Asserted Marks for NFTs**

24       Yuga admits that the **goods** at issue in its trademark infringement claim are

25   NFTs.  Dkt. 149 ("Mot.") at 2 (asserting "Defendants' use of the BAYC Marks to sell

26   the same underlying product (NFTs)").  And Yuga specifically asserts that the

27   infringed **marks** are "BORED APE YACHT CLUB, BAYC, BORED APE, BA YC

28

---

-2-

Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo." *Id.* at 1 n.1. Yuga's marks are not registered, and therefore it must prove that it owns valid marks. Mot. at 3 (asserting "unregistered trademark[s]"). Yuga cannot prevail on its trademark infringement claim because it does not own valid rights for NFTs for any of the asserted marks.

### a)   NFTs Are Intangible and Thus Ineligible for Trademark Protection

The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Misrepresentation of the origins of a ***communicative*** work, such as artwork, is a dispute relegated to the confines of copyright law, not trademark. *Id* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").

Here, the "goods" for which Yuga claims trademark rights are NFTs. But an NFT is not a "tangible good" to which trademark law applies under *Dastar*. In fact, the Trademark Office itself specifically told Yuga exactly that when it rejected Yuga's attempt to register "BAYC" as a trademark ***for NFTs***: "Applicant [Yuga] should note that ***a non-fungible token or NFT is not a good in trade***…. NFTs are downloadable units of data stored on a blockchain … that authenticate and prove ownership rights to digital or physical items. An NFT is not the digital or physical item itself, nor does it contain the digital or physical item; rather, it only contains information about the item. It is comparable to a certificate of authenticity/ownership for a physical item…. ***NFTs are not goods in trade*** and are similar to a certificate of ownership and authenticity…." Statement of Genuine Disputes of Material Fact ("SOF")-¶-143;

SOF-¶-144 (Yuga's expert admitted that "[a]n NFT is an ownership record stored on a blockchain; analogous to a conventional proof-of-purchase.")

The only supposed "goods" that Yuga has identified in its motion and in its Complaint are NFTs. *See* Mot. at 2; Dkt. 1("Compl.")-¶¶-60-68 (asserting "NFTs" as infringing goods and asserting relevant market as "market for NFTs"). Because an NFT is not a good in trade subject to trademark law, Yuga's trademark infringement claim necessarily fails, and it is not entitled to summary judgment.

### b)   Yuga Did Not Use the Asserted Marks In Commerce

Even if (contrary to the Trademark Office's determination) NFTs were "tangible goods" subject to trademark law, Yuga—because it lacks any federal registration—must meet the "use in commerce" requirement, namely, that it used its marks "to identify and to distinguish goods or services in commerce." *Rearden LLC v. Reardon Com. Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012). Disputed issues of fact preclude finding that Yuga satisfied this requirement, for three reasons.

*First*, "use in commerce" requires that a mark be "placed in any manner on the goods or their containers or displays associated therewith." *Social Techs. LLC v. Apple Inc.*, 4 F.4th 811, 817 (9th Cir. 2021). Yuga has admitted to the Trademark Office that it has ***not*** used any of the asserted marks in commerce in connection with the sale or advertising of NFTs. Specifically, Yuga originally filed "in-use" trademark applications, but the Trademark Office rejected all of Yuga's specimens of use and held that Yuga failed to show any use of the marks for Yuga's NFTs. SOF-¶-145. In response to those rejections, Yuga gave up on its "in-use" claim and amended its applications to assert only an ***intent*** to use in the future—effectively conceding that Yuga had not actually used any of its marks in commerce in connection with NFTs. SOF-¶-146. And Yuga admits it is not currently offering any Bored Ape Yacht Club NFTs for sale. SOF-¶¶-149-150. Given Yuga's concessions, there is a disputed issue of fact as to whether it can satisfy the "use in commerce" requirement.

1    ***Second***, Yuga cannot establish "that such use has continued to the present,"

2    another condition of ownership.  *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir.

3    2005); *see Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820-21 (9th

4    Cir. 1996) (continuous use applies to unregistered trademarks).  If the marks were

5    ever used for NFTs, the usage was not "maintained without interruption" because

6    Yuga has not sold a single BAYC NFT since May 1, 2021.  SOF-¶-149; *see Casual*

7    *Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 712 (9th Cir. 1974).

8    ***Third***, Yuga's sale of BAYC NFTs cannot form the basis for a "use in

9    commerce claim," because those sales were illegal and thus not a lawful use in

10   commerce.  *See Kiva Health Brands v. Kiva Brands, Inc.*, 402 F. Supp. 3d 877, 888

11   (N.D. Cal. 2019) ("[O]ne cannot claim first use based on an illegal product"); *S. Cal.*

12   *Darts Ass'n v. Saffina*, 762 F.3d 921, 931 (9th Cir. 2014) ("[O]nly ***lawful*** use in

13   commerce can give rise to trademark priority").  BAYC NFTs were unregistered

14   investment vehicles, with a roadmap (created by Yuga) promising purchasers an

15   expectation of future profits by (1) stating that Yuga was "in this for the long haul"

16   and (2) identifying future benchmarks such liquidity polls that would allow BAYC

17   NFT holders to treat their NFTs as investments.  SOF-¶¶-173-176.  Yuga also

18   regularly dispersed digital assets to BAYC NFT holders that had a cumulative value

19   far above $100,000.  SOF-¶¶-177-181.  These activities make clear that BAYC NFTs,

20   like other similar collections launched around the same time, were unregistered

21   securities.  *See, e.g.*, *Friel v. Dapper Labs, Inc. -- F. Supp. 3d --, 2023 WL 2162747 at*

22   *\*22 (S.D.N.Y. 2023)* (rejecting motion to dismiss claim because an NFT is a security).

23   This is precisely why there are wide reports of an SEC investigation and a securities

24   fraud class action against Yuga.  SOF-¶¶-182-183.  Thus, there is a material dispute as

25   to whether Yuga's failure to register BAYC NFTs under 17 U.S.C. § 77e rendered its

26   NFTs illegal goods incapable of trademark protection.

27

28

1

### c)   Yuga Transferred All Trademark Rights to NFT Purchasers

2

Yuga cannot prove ownership because, as its CEO candidly admitted, "All IP

3

rights are actually granted to the member and to the owner.  ***We have none of those***

4

***rights***."  SOF-¶-163.  Yuga's CEO was correct: Yuga's terms and conditions for

5

Bored Ape Yacht Club NFTs provide that, when a purchaser buys an BAYC NFT,

6

that purchaser "[o]wn[s] the NFT" and "own[s] the underlying Bored Ape, the Art,

7

***completely***."  SOF-¶-153.  Yuga's sale of BAYC NFTs transferred all ownership in

8

the NFT, "Bored Ape," and "the Art" "completely" to the purchaser—including any

9

underlying trademark rights in the Bored Ape that Yuga may have owned.

10

Each of the asserted marks is part of one or more of "the NFT," "the underlying

11

Bored Ape" and/or "the Art," the rights to which Yuga transferred.  The marks

12

BORED APE YACHT CLUB and BORED APE each appear in the token ("the

13

NFT") for each BAYC NFT.  Compl.-¶-33 (image on left at lines 15-20).  Likewise,

14

the marks BAYC, BA YC logo, BA YC BORED APE YACHT CLUB logo, and Ape

15

Skull logo each appear in one or more of the images—"the Art"—the rights for which

16

were transferred to purchasers "completely."  Compl.-¶-34; SOF-¶-153.  Because

17

Yuga indisputably transferred "[a]ll IP rights" and has "none of those rights" itself, it

18

lacks ownership over the asserted marks.

19
20

### d)   Yuga Abandoned All Trademark Rights Through Naked Licensing

21

Naked licensing occurs when a trademark owner grants a license but "fails to

22

exercise quality control over the licensee" resulting in "an involuntary forfeiture of

23

trademark rights."  *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d

24

*589, 595–96 (9th Cir. 2002)*.  This is precisely what Yuga has done.  Yuga's terms

25

and conditions gave away all of Yuga's rights to purchasers.  SOF-¶¶-153-154, 163.

26

BAYC NFT purchasers then created their own brands that prominently featured

27

the asserted marks, with no quality control.  SOF-¶¶-156, 159.  Yuga has conceded

28

that displaying an NFT featuring an asserted mark is use of the asserted marks in commerce (by asserting infringement based on Defendants' use of images).  Compl.-¶-34.  But Yuga failed to exercise quality control over the goods and services provided by many of the third parties using the asserted marks. SOF-¶-159.  Yuga has no say in the type, quality, or means of marketing for any of the goods sold by these numerous third parties. *See id.*  Thus, Yuga is engaged in uncontrolled licensing that has resulted in the asserted marks "ceasing to function as a symbol of quality and controlled source."  *Barcamerica*, 289 F.3d at 595.  At minimum, a material dispute of fact exists as to the degree of Yuga's naked licensing.

### e)   Yuga Abandoned All Trademark Rights Through Failure to Police

Trademarks are abandoned when, "as a result of a trademark owner's failure to police the mark, resulting in widespread usage by competitors leading to a perception of genericness among the public who sees many sellers using the same term." *Freecycle Network, Inc.v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007).  There is a material dispute as to whether Yuga's failure to police resulted in abandonment.

Many companies have created brands that used the Asserted Marks in commerce.  SOF-¶¶-156-158.  This use extended to dozens of NFT collections, including some that were uncritical copycat collections.  SOF-¶-160.  Those collections have been sold prominently without any action from Yuga for more than a year.  SOF-¶-162.  Yuga elected not to stop any of these companies; rather, the only project that Yuga has attacked was the RR/BAYC Project—a project that, coincidentally, was also critical of Yuga's racist imagery. *Id*.

### f)   Yuga Lacks Priority to "APE"

It is unclear whether Yuga intends its alleged APE mark to be counted among the asserted marks in its summary judgment motion. *Compare* Mot. at 1 n.1 *with id. at* 14.  In any event, Yuga does not have any rights to APE.  "It is axiomatic in

trademark law that the standard test of ownership is priority of use." *Rearden*, 683
F.3d at 1203.  Months before any public use of APE by Yuga, the ApeSwap was
already using APE in its company name, website domain (apeswap.finance), and
website.  SOF-¶-170; SOF-¶-171 ("apecoin.dev" also used APE before Yuga).  NFT
collections also used APE before the BAYC collection. SOF-¶-172. And Yuga's own
Co-Founder admits that APE was used in crypto years before the BAYC collection.
SOF-¶-169.  And tellingly, Yuga has abandoned its trademark application for the
mark. SOF-¶-168.

### g)  Yuga Transferred Rights to the ApeCoin DAO

There is a further material dispute as to whether Yuga retained any rights (to the
extent it had them) in its asserted Ape Skull logo and the two marks incorporating it
(the BA YC logo and the BA YC BORED APE YACHT CLUB logo) following its
transfer of rights in the Ape Skull logo to a third party, the ApeCoin DAO.  On March
16, 2022, Yuga created an NFT that it gave the ApeCoin DAO depicting the Ape
Skull logo and stating "[t]his NFT conveys along with it *all rights and privileges of
the logo's intellectual property* to the ApeCoin DAO."  SOF-¶¶-164-165.  Yuga does
not claim to control the ApeCoin DAO.  SOF-¶-166.  Thus, an additional dispute of
material fact that precludes summary judgment on those marks.

### ii.  Disputed Issues of Fact Preclude Summary Judgment on Consumer Confusion

The Ninth Circuit has made clear that summary judgment on likelihood of
confusion is heavily "disfavored" because of the fact-intensive nature of the *Sleekcraft*
inquiry.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596,
608 (9th Cir. 2005) (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th
Cir. 1979)).  Here, there are numerous material disputes with respect to *at least
Sleekcraft* factors 2-7.

1              **a)**     **BAYC and RR/BAYC Are Not "the same product" and the Marks Are Not "identical" (*Sleekcraft* factors 2 & 3)**

Yuga's motion assumes that because RR/BAYC and BAYC are both NFT collections that point to the same images, the NFTs themselves are the "exact same product" and use "the exact same marks." Mot. at 6. Not so. The record reflects a multitude of differences. RR/BAYC was launched as a protest against Yuga. SOF-¶¶-197, 201, 203-205. Although Yuga baldly asserts that the sale of the NFTs was separate from Mr. Ripps' artistic statement (Mot. at 16-17), the record reflects the opposite: Defendants' own expert testified that Mr. Ripps' criticism of Yuga was closely tied to the RR/BAYC NFTs. SOF-¶-207 ("Q. And so, your statement in your report that 'Defendants built their promotion of RR/BAYC NFT and Ape Market around their negative commentary about Yuga Labs.' And that includes those racist and Naziism allegations; correct? A. **Yeah**, I mean, **I think it would**.").

The website rrbayc.com, where nearly all of the NFTs were sold, includes an express statement that the project is "appropriation art," criticizes Yuga, and links to GordonGoner.com, which provides a lengthy criticism of BAYC and Yuga. SOF-¶¶-198-200. Before a user could purchase an RR/BAYC NFT, they had to view and agree to a disclaimer recognizing that RR/BAYC was a parody NFT collection unaffiliated with Yuga. SOF-¶-201. As Yuga points out repeatedly in its brief, Defendants and their followers on Twitter made numerous posts about the satirical nature of the project. Mot. at 8 (pointing out Ripps' "criticism of Yuga Labs" on Twitter); SOF-¶¶-202-203. No reasonable consumer would have believed that Defendants' satirical art project was the same as Yuga's BAYC collection. *See New Kids on the Block v. News Am. Pub. Inc.*, 971 F.2d 302, 309 (9th Cir. 1992). ("Critical works are much less likely to have a perceived affiliation with the original work."). Even on secondary marketplaces, the collections were displayed using different names and as originating from different creators. SOF-¶¶-213-214.

RR/BAYC NFTs are also different products in different markets.  As just a few key examples:  RR/BAYCs originated from an Ethereum wallet address called ryder-ripps.eth (SOF-¶-216), the NFTs themselves are distinct tokens on the blockchain sold on different marketplaces,[3] the size of the collections are different (SOF-¶-220), the prices are different by orders of magnitude (SOF-¶¶-195-196), the underlying contracts have different addresses (SOF-¶-219), and the tokens display different names (SOF-¶-236).  These differences are meaningful because, as Yuga's expert admits, they allow differentiation with a "high degree of certainty." SOF-¶-221 ("Q. So in performing your analysis, you were able to identify with a high degree of certainty which NFTs were RR/BAYC NFTs; correct? A. Yes…").

### b) Yuga Has Not Established Likelihood of Confusion (*Sleekcraft* factors 4, 5, & 6)

Yuga's motion relies on a handful of anecdotal social media posts and flimsy survey evidence for its conclusion that consumer confusion is indisputable.  But there are multiple layers of disputes.

Preliminarily, Yuga's motion makes no effort to prove who the typical consumer is, nor what their level of sophistication and familiarity with blockchain technology is (*Sleekcraft* Factor #6).  Those critical issues will be hotly disputed at trial:  Yuga will assert that its own potential customers are gullible fools who fail to take basic steps to verify what they are purchasing.  Defendants will explain that NFT purchasers are almost universally familiar with blockchain technology and the verification tools for NFTs.  SOF-¶-222.  "Whoever's right, the difficulty of trying to determine with any degree of confidence the level of sophistication of [NFT

---

[3] RR/BAYC NFTs were sold directly to Twitter requesters and on RR/BAYC.com (both of which are primary channels that have never sold BAYC NFTs).  SOF-¶-188. Although Yuga's motion suggests that Yuga NFTs and RR/BAYC were both sold on Foundation (Mot. at 7), Yuga's expert testified that BAYC NFTs were never sold on Foundation (SOF-¶-217).

1  purchasers] only confirms the need for this case to be heard by a jury." *Fortune*
2  *Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th
3  Cir. 2010).

4       Yuga's anecdotal evidence of supposed confusion likewise cannot support
5  summary judgment. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th
6  Cir. 1989) ("The district court concluded that the evidence presented on the actual
7  confusion issue was anecdotal and too weak to support a finding of actual confusion.
8  This conclusion is not clearly erroneous.").  The record contains hundreds of
9  communications written by *actual* purchasers of RR/BAYC NFTs, showing
10 consumers were not confused.  SOF-¶-184.  In rebuttal to this overwhelming
11 evidence, Yuga identifies a misleading handful of Twitter posts, from which it asks
12 the Court to extrapolate broader confusion in the NFT marketplace.  But Yuga's
13 argument is flawed.

14      *First*, Yuga's citation to hearsay social media posts rather than any definitive
15 evidence of consumer purchase confusion is telling.  If Yuga had any evidence of
16 anyone actually buying one product thinking it was the other, Yuga surely would have
17 cited it in its motion.  In fact, the opposite is true, as Yuga admitted (only after being
18 compelled to do so), it is unaware of any such instance.  SOF-¶¶-223-224.

19      *Second*, Yuga assumes that the Twitter users responsible for the selected posts
20 are representative of the consumers that would buy BAYC NFTs.  But whether
21 Yuga's Twitter users are representative of NFT consumers is in dispute (and relevant
22 to *Sleekcraft* Factor #5).

23      *Third*, the tweets Yuga cites do not even evidence actual confusion (*Sleekcraft*
24 Factor #4).  For instance, Yuga identifies a tweet by "a twitter account that tracks
25 blockchain transactions mistakenly reported that a BAYC NFT was purchased for a
26 low price 5.99 ETH."  Mot. 8.  But the fact that an automated *bot* Twitter account
27 (called "gembot") made a tweet does not demonstrate that any human *consumer* was

28

confused.  The responses to the tweet reflect otherwise—Twitter users quickly
identify that the post was erroneous and that the subject NFT was an RR/BAYC NFT.
SOF-¶-225.  Yuga also cites to a tweet from Twitter user "Streetoshi" that says "I
bought an rr bayc because i thought it was made by yuga."  But Streetoshi is an
enthusiast the RR/BAYC Project and that he often made sarcastic comments (like that
tweet) about the collection.  *See* SOF-¶¶-226-227.  And a similarly fact-intensive
disputes impact each of the handful of tweets Yuga relies on.  *See* SOF-¶-53-56.

Yuga also identifies a hearsay *Bloomberg* newscast that purportedly shows a
"mistaken[] reference to RR/BAYC as 'Bored Ape Yacht Club V3.'"  SOF-¶-49.  But
the broadcast itself demonstrates that Bloomberg knew that the collections were
distinct and reported on them separately.  *Id*.  And whether *Bloomberg* (which is not a
consumer) or anyone watching the broadcast was actually confused is a disputed
question of fact.

Yuga also points to various statements made by Defendants and other
RR/BAYC Project contributors, Mr. Hickman, and Mr. Lehman, during project
development.  Each statement is taken out of context in Yuga's motion, and the full
context of the discussions reveal that Defendants took steps precisely to ensure that
confusion did ***not*** occur.  SOF-¶¶-229-30.  These statements are precisely the kind of
evidence that a factfinder must evaluate, and for which the Court must draw all
reasonable inferences in Defendants' favor.  *Health Net v. U.S.A. Healthnet, Inc.*, No.
CV 92-3925 KN, 1993 WL 209558, at *1 (C.D. Cal. May 12, 1993) (denying motion
for summary judgment because of factual disputes underlying likelihood of
confusion).  Moreover, Yuga's reliance on the declaration of Mr. Lehman is
particularly problematic given, as Judge McDermott explained, that Defendants have
not yet had an opportunity "explore whether the Declaration was coerced or was a
condition of settlement ***as seems likely***."  Dkt. 159 at 2.

Yuga also includes a passing citation to the survey analysis performed by its expert, Laura O'Laughlin.  But as Ms. O'Laughlin's deposition made clear, she conducted **two** surveys, one assuming that Yuga's marks are well known (called an *Everready* survey) and one assuming (contradictorily) that Yuga's marks are **not** well known (called a *Squirt* survey).  Ms. O'Laughlin refused to offer an opinion about which of the two mutually-exclusive survey methodologies was appropriate.  SOF-¶-237.  Likewise, the heart of Ms. O'Laughlin's *Everready* survey involved showing a consumer a page saying, "BORED APE YACHT CLUB" and then counting the respondent as believing Yuga was the source of the survey if the consumer copied the words "BORED APE YACHT CLUB."  SOF-¶-262.  Given these deficiencies, the Court should not rely on Ms. O'Laughlin's survey opinion to grant summary judgment.  *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Cal. 2013) ("In light of Jacoby's objections to the survey and the manner in which it was conducted, the Court finds that the survey results are in dispute and will not consider the survey here.").

### c)   Defendants Did Not Intend for Consumers To Be Confused (*Sleekcraft* factor 7)

Defendants also dispute Yuga's characterization that they "intentionally designed [RR/BAYC] NFTs and sales websites to resemble Yuga Labs' branding as much as possible to confuse consumers and harm Yuga Labs."  Mot. 10.  Not so.  As Defendants will explain at trial, although RR/BAYC link to the same ape images, the similarities ended there.  Defendants' communications concerning the project reflect that they took specific steps to prevent confusion.  SOF-¶¶-229-230.   Those steps include adding a lengthy explanation of the purpose of RR/BAYC on rrbayc.com as well as a disclaimer expressly requiring purchasers to acknowledge the artistic purpose of the project.  SOF-¶¶-201-202.  Moreover, Defendants' online discussion of the project focused on their criticism of Yuga, making clear that their intent was not to

confuse, but rather to educate consumers concerning the nature of NFTs and call-out Yuga's imagery.  SOF-¶¶-203-04.

### B.    Yuga is Not Entitled to Summary Judgment on its ACPA Claim

Yuga's Anti-cybersquatting Consumer Protection Act ("ACPA") claim is based solely on Defendants' registration of "the domain names https://rrbayc.com/ and https://apemarket.com/," which Yuga contends are "confusingly similar" to "BAYC" and "'BORED APE', 'APE', and other 'APE-based' trademarks."  Mot. at 14. Preliminarily, as discussed above, there are at minimum disputed questions of fact as to whether Yuga actually owns a valid trademark in "BAYC", "BORED APE", and/or "APE" (*see supra* at 2-8)—and Yuga does not even attempt to explain why it purportedly has rights in "other [unnamed] 'APE-based' trademarks," whatever that means.

Additionally, the ACPA requires a showing that the accused domain name is "identical or confusingly similar to a protected mark."  *Rearden*, 683 F.3d at 1219. But there is a material question on whether the use of "rrbayc.com" is confusingly similar to "BAYC."  Notably, nowhere in any of its three expert reports does Yuga provide any survey evidence for confusion between "rrbayc.com" and BAYC.

There is a similar factual dispute as to whether "apemarket" is confusingly similar to APE or BORED APE.  Yuga again provides no evidence of consumer confusion, and there are various other domain registrations using "ape."  For example, ApeSwap uses "apeswap" in its website domain—without any apparent concern by Yuga.  SOF-¶-231.  The fact that many websites use the generic term "ape" at minimum raises a triable question as "apemarket" constitutes cybersquatting.

Lastly, cybersquatting requires showing "bad faith intent," *Rearden*, 683 F.3d at 1219, and cannot be found where the defendant "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful," 15 U.S.C. § 1125(d)(ii).  Intent is a fact-intensive inquiry that requires weighing

evidence, rendering it inappropriate for summary judgment.  *See Provenz v. Miller,
102 F.3d 1478, 1489 (9th Cir. 1996)* ("Cases where intent is a primary issue generally
are inappropriate for summary judgment") (quoting *Vaughn v. Teledyne, Inc.*, 628
F.2d 1214, 1220 (9th Cir. 1980)).  This is particularly true here where Yuga's CEO
stated, referring to "[a]ll IP rights" that "[w]e have none of those rights."  SOF-¶-163.
Whether Defendants acted in bad faith is a credibility question for the factfinder.

### C.  Yuga Is Not Entitled to Summary Judgment on the First Amendment.

The *Rogers* test applies in cases like this to safeguard expressive works
protected under the First Amendment.  Defendants asserting protection under *Rogers*
must "make a threshold legal showing that its ***allegedly*** infringing use is ***part of*** an
expressive work," at which point, the burden shifts and plaintiff must show "that the
mark is either not artistically relevant to the underlying work or explicitly misleading
as to the source or content of the work."  *Gordon v. Drape Creative, Inc.*, 909 F.3d
257, 264-65 (9th Cir. 2018).  There are several triable issues regarding whether
Defendants have met their low burden to show that the RR/BAYC Project is an
expressive work, and whether Yuga can show use of the asserted marks that is not
artistically relevant or that is explicitly misleading.

### i.  The RR/BAYC Project Is an Expressive Work

Defendant Ripps, a well-known artist, created the RR/BAYC Project as
appropriation art to "hold a mirror up to Yuga's use of hidden racist elements and to
criticize Yuga's offensive conduct" and to educate the public about the nature of
NFTs.  SOF-¶¶-205-207.  Defendants created two websites, GordonGoner.com
(which contained a detailed criticism of Yuga and BAYC) and rrbayc.com (which
contained an artistic statement linking to GordonGoner.com and an interface to mint
RR/BAYC NFTs).  SOF-¶¶-197-200.  rrbayc.com also included a disclaimer
confirming the satirical nature of the RR/BAYC Project.  SOF-¶-201.  And consumers

of RR/BAYC NFTs were well-aware that they were purchasing works of art.  SOF-¶-184 ("I love the protest art and I love everything you've done," "Thank you for your work looking into the reality of BAYC…Wanted to be a part of this so I just reserved RR/bayc #9508….").  Such works of critique are classic forms of protected speech. *See* *Punchbowl, Inc. v. AJ Press LLC*, 549 F. Supp. 3d 1061, 1066 (C.D. Cal. 2021), aff'd, 52 F.4th 1091 (9th Cir. 2022) (*Rogers* test applies to publications of "non-partisan commentary, opinions, and critiques…").

Further, the factual inquiry of whether a work is expressive under the *Rogers* test requires looking at the work itself **and** activity "auxiliary" to the work.  *Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017).  And the *Rogers* test still applies to an expressive work "even though it is carried in a form that is sold for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money." *Mattel, Inc. v. MCA Recs., Inc.*, 28 F. Supp. 2d 1120, 1136 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002).

### ii.    The RR/BAYC Project's Use of the Alleged Marks Is Artistically Relevant.

The Ninth Circuit has held that "even the slightest artistic relevance will suffice" and "courts and juries should not have to engage in extensive artistic analysis." *Gordon v. Drape Creative, Inc.,* 909 F.3d 257, 269 (9th Cir. 2018) (further holding that "the level of relevance must merely be above zero[.]").  The evidentiary record disputes Yuga's conclusion that there is **no** artistic relevance to Defendants use of the marks.  First, the use of the asserted marks—including the collection title "Bored Ape Yacht Club"—allowed Defendants to properly identify the subject of their criticism, and "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d

302, 306–07 (9th Cir. 1992).  The RR/BAYC Project also used modified versions of the alleged marks to criticize the marks themselves for using offensive tropes.  SOF-¶-215 (modified BA YC Logo stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF; 18 TEETH.").  These facts raise a triable question as to whether the artistic relevance of using the alleged marks clears the "above zero" requirement.  *Gordon v. Drape Creative, Inc*, 909 F.3d 257, 268 (9th Cir. 2018).

### iii.     The RR/BAYC Project did not explicitly mislead as to the source of the work

This Circuit has previously held that use of a mark is not explicitly misleading when defendants had "added ... expressive content to the work beyond the mark itself" and that the "the cover conspicuously lists [the defendant] as authors, and [the work] states that it is 'not associated with or endorsed by'" the mark owner in holding that the use of the trademarks was not explicitly misleading. *Dr. Seuss Enterprises, L.P. v. ComicMix LLC,* 983 F.3d 443, 462–63 (9th Cir. 2020) (internal cites omitted).  Whether Defendants' use of Yuga's alleged marks "added … expressive content to the work beyond the mark itself" and identifies Defendants "as authors" and that the work is "not associated with or endorsed" by Yuga is a factual dispute that requires a factfinder to weigh controverting evidence.

Defendants altered the logos to identify the problematic symbolism in them.  SOF-¶-215.  The RR/BAYC Project also adds expressive content beyond the alleged marks through the criticism and commentary Defendants made while using modified versions of the alleged marks and promoting the RR/BAYC Project.  SOF-¶¶-201-05.  Additionally, like in *Dr. Seuss*, Defendants explicitly made clear that they are not endorsed or associated with Yuga, including through their disclaimer: "you understand that this is a new mint of BAYC imagery, re-contextualizing it for educational purposes, as protest and satirical commentary."  SOF-¶¶-201-202.  Platforms for NFT sales also cite the website rrbayc.com, which provides context of

the RR/BAYC Project.  SOF-¶-213.  And Defendants have always listed Ryder Ripps
as the creator of the NFT collection.  SOF-¶-238.  Thus, whether Defendants' use was
explicitly misleading is at minimum a question for the factfinder.

> **D.    Yuga Is Not Entitled to Summary Judgment on Defendants'
> Nominative Fair Use Defense**

Nominative fair use applies when a defendant's use of the mark is "grounded in
the defendant's desire to refer to the plaintiff's product as a point of reference for
defendant's own work." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810
(9th Cir. 2003).  Nominative fair use is expressly permitted for "purposes of
comparison, ***criticism*** [or] point of reference." *Mattel, Inc.* 353 F.3d at 809.  Here, the
purpose of the RR/BAYC Project—and its use of the marks at issue—included
criticism of what Mr. Ripps viewed as the "extensive connections between BAYC and
subversive internet nazi troll culture."  SOF-¶¶-197-200.  Yuga is precluded from
summary judgment on fair use for several reasons.

***First***, Yuga's BAYC NFT collection would not be identifiable as a target of
criticism without using "BAYC," "BORED APE," or "BORED APE YACHT
CLUB"—all three of which Yuga has asserted.  Mot. at 1 n.1.  Yuga's suggestion that
Defendants were required to critique the BAYC NFT collection without using its name
would render the nominative fair use doctrine meaningless, and has been rejected by
the Ninth Circuit.  *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893–
94 (9th Cir. 2019).

***Second***, whether Defendants' used marks only to the extent reasonably
necessary is a classic question for the factfinder.  *Id* at 895; *Cairns v. Franklin Mint
Co.*, 292 F.3d 1139, 1154 (9th Cir. 2002).

***Third***, contrary to Yuga's suggestion, the absolute ***last*** thing Defendants wanted
was any suggestion of "sponsorship" by Yuga.  Mot. at 19.  To the contrary,
Defendants used a prominent disclaimer rrbayc.com to distance themselves from Yuga.

1   SOF-¶¶-201-202.  And far from suggesting sponsorship "on Twitter" as Yuga

2   contends, Defendants repeatedly used Twitter to criticize Yuga's use of offensive

3   tropes.  SOF-¶-203.

4          **E.**    **Yuga Is Not Entitled to Summary Judgment of No Unclean Hands**

5         The unclean hands doctrine bars relief if Yuga's marks "ha[ve] acquired a value

6   with the public by fraudulent misrepresentations in advertisements."  *Worden v.*

7   *California Fig Syrup Co.*, 187 U.S. 516, 528 (1903).  Here, Yuga's marks are

8   unregistered and only protectible if Yuga can show that the public associates the

9   asserted marks with Yuga.  *Glow Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962, 983

10  (C.D. Cal. 2002).  Yuga dirtied its hands in obtaining any such public association: (1)

11  compensating celebrity endorsers to bolster its public recognition, without disclosing

12  that compensation or instructing the celebrities to do so; and (2) selling unregistered

13  securities.

14        ***First***, Yuga obtained celebrity endorsements without revealing that the

15  celebrities owned a stake in Yuga, or without revealing that Yuga had paid those

16  celebrities for endorsement.  Yuga itself conceded that when "major celebrities have

17  publicly announced holding a Bored Ape NFT," that has "[a]dded to the BAYC

18  brand's popularity."  Compl.-¶-21.  One such "major celebrit[y]" is the musician

19  Snoop Dogg (Calvin Broadus).  *Id.*  Snoop Dogg is both a direct investor in Yuga, and

20  an indirect investor through the investment fund Sound Ventures.  SOF-¶¶-251-252.

21  Snoop Dogg publicly bought a BAYC NFT and tweeted about it.  SOF-¶-254.

22  Likewise, Snoop Dogg created a music video featuring a BAYC image and performed

23  at the MTV Video Music Awards in a performance using a BAYC image— ████

24  ████████████████████████████  SOF-¶-253.  But Yuga did

25  not disclose its cash payment to Snoop Dogg for the endorsements, nor did it disclose

26  that Snoop Dogg was a Yuga investor.  SOF-¶-253.  This conduct is the subject of a

27  separate lawsuit (SOF-¶-255) which alleges that Yuga facilitated the violation of 16

28

1  CFR 255.5.  It is, therefore, a question for the factfinder whether these failures to

2  disclose constituted fraudulent misrepresentations that would preclude enforcement.

3  *Worden*, 187 U.S. at 528.

4       ***Second***, as discussed above (*see supra* 5), BAYC NFTs were illegal investment

5  vehicles.  And yet Yuga itself based the value of its brand—and thus its right to assert

6  unregistered trademarks—by use of advertisements and marketing to become "one of

7  the most well-known" NFT collections.  Compl.-¶-1.  Because Yuga does not dispute

8  that it obtained common law trademark rights via such advertisement and promotion,

9  there is a material dispute as to whether Yuga "dirtied its hands" with illegal

10  promotion of unregistered securities.

11       **F.     Yuga Is Not Entitled to Summary Judgment on Defendants'
             Counterclaim Under 17 U.S.C. § 512(f)**

12

13       Yuga submitted improper takedown notices in violation of copyright law.  The

14  Digital Millennium ***Copyright*** Act ("DMCA") applies ***only*** to copyright, not

15  trademark.  *ISE Entertainment Corp. v. Longarzo*, 2018 WL 1569803 at *3 (C.D. Cal.

16  2018).  Under the DMCA, internet service providers can be held liable for copyright

17  infringement if they host copyrighted material, unless they take efforts to qualify for

18  "safe harbor provision."  *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718

19  F.3d 1006, 1014-15 (9th Cir. 2013).  To qualify for "safe harbor" protections service

20  providers are required to "respond expeditiously to remove" activity that infringes

21  ***copyright***.  17 U.S.C. § 1512(c)(1)(C).  This provision strongly incentivizes service

22  providers to remove accused content first, ask questions later.

23       To hedge against abuse of the takedown process, the DMCA imposes liability

24  on those that submit improper takedown notices.  *See* 17 U.S.C. § 512(f).  Otherwise,

25  the DMCA could be used "as a sword to suppress publication of embarrassing content

26  rather than as a shield to protect" intellectual property.  *Lenz v. Universal Music*

27  *Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016).  The elements of the claim for an

28

1    improper takedown under § 512(f) are that the party (1) made a material

2    misrepresentation in a takedown notice that led to a takedown, and (2) that the

3    takedown notice was submitted in bad faith.  *Moonbug Entertainment Ltd. v. Babybus*

4    *(Fujian) Network Technology Co., Ltd.*, 2022 WL 580788 at *7 (N.D. Cal. 2022).

5    The bad faith element requires "actual knowledge" of the material misrepresentation.

6    *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004).

7         In its motion, Yuga misstates Defendant's allegations.  *See* Mot. at 21-22.

8    Defendants allege that Yuga committed two sets of violations of § 512(f).  ***First***, Yuga

9    wrongfully used and approved DMCA takedowns based solely on ***trademark***, not

10   ***copyright***.  SOF-¶-249.  In these requests, Yuga has attested that it was making a

11   ***DMCA*** takedown request and invoked 17 U.S.C. § 512(f) liability.  SOF-¶¶-241-248.

12        Remarkably, Yuga concedes that its requests—which invoked § 512(f) and

13   cited the DM<u>C</u>A—were "sent out on other bases, including trademark infringement."

14   Mot. at 22.  Yuga has thus admitted that each notice made a material

15   misrepresentation: though the notices included an attestation under the ***Copyright***

16   Act's § 512(f) that the "material or activity is infringing" copyright, Yuga had no

17   basis for claiming copyright infringement.  And given Yuga's concession, the bad

18   faith "actual knowledge" standard is met: Yuga does not dispute that it sent "25

19   takedown notices regarding Defendants' RR/BAYC NFT collection" and that "[n]one

20   of the 25 takedown notices identified a copyrighted work."  SOF-¶¶-97-98.  None of

21   the legal authority Yuga cites conflicts with this analysis—none of them involve a

22   notice purporting to be a "DMCA" takedown or including a § 512(f) copyright

23   certification.  Courts have recognized that this kind of misuse of a § 512(f) attestation

24   is sanctionable.  *See, e.g., CrossFit, Inc. v. Alvies*, 13-cv-3771-SC, 2014 WL 251760,

25   at *2 (N.D. Cal. Jan 22, 2014) ("…CrossFit materially misrepresented that Alvies'

26   Facebook page infringed on a copyright, since CrossFit's claims are based only on its

27   asserted trademark rights.").

28

1    ***Second***, as to Yuga's DMCA request that includes a specific allegation of

2    copyright infringement, Yuga now contends that it "owns the copyright in its Ape

3    Skull logo."  Mot. at 21-22.  But Yuga has cited no copyright registration for that

4    logo, and it concedes that a "third party" actually designed it.  SOF-¶-5.  Moreover,

5    throughout discovery, Defendants repeatedly sought to obtain the name of that "third

6    party" so that it could determine whether or not he or she had actually assigned any

7    rights to Yuga.[4]  Yuga refused, claiming that the identity of that mystery third party

8    designer was "irrelevant."  SOF-¶-261.  But absent any evidence of copyright transfer,

9    Yuga cannot claim that it is "undisputed" that it owns any copyright interest in its Ape

10   Skull logo.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986) (citing Fed. R.

11   Civ. P. 56(f)).

12   **III.    CONCLUSION**

13          This Court should deny Plaintiffs' motion.

14

15

16   Dated: March 27, 2023              By: /s/  *Derek Gosma*

17                                          Louis W. Tompros (*pro hac vice*)
                                            louis.tompros@wilmerhale.com
18                                          Monica Grewal (*pro hac vice*)
                                            monica.grewal@wilmerhale.com
19                                          Scott W. Bertulli (*pro hac vice*)
                                            scott.bertulli@wilmerhale.com
20                                          Tyler Carroll (*pro hac vice*)
                                            tyler.carroll@wilmerhale.com
21                                          **WILMER CUTLER PICKERING**
                                              **HALE AND DORR LLP**
22                                          60 State Street
                                            Boston, MA 02109
23                                          Telephone: (617) 526-6000
                                            Fax: (617) 526-5000
24
                                            Derek Gosma (SBN 274515)
25                                          derek.gosma@wilmerhale.com

26   _____

27   [4] Notably, Yuga has a history of claiming that it owns logos that it does not. SOF-¶-

28   260.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's ECF system on March 27, 2023.

By: /s/  *Derek Gosma*

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document is in compliance with the word limit for Points and Authorities set forth in Local Rule 11-6.1.

By: /s/  *Derek Gosma*

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400