1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff and Counterclaim Defendant, | **[PROPOSED] STATEMENT OF DECISION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS** |
| v. | Judge: Hon. John F. Walter |
| Ryder Ripps and Jeremy Cahen, | Hearing: April 17, 2023, at 1:30 p.m. |
| Defendants and Counterclaim Plaintiffs. | Discovery Cutoff Date: April 3, 2023 Pre-Trial Conference Date: June 9, 2023 Trial Date: June 27, 2023 |

The Court has received a motion (Dkt. No. 149) from Plaintiff, Yuga Labs, Inc., ("Yuga") seeking partial summary judgment. Defendants Ryder Ripps and Jeremy Cahen filed a response opposing the motion (Dkt. No. 163). Plaintiff filed a reply (Dkt. No. 193). Having considered all the papers before it, and for the following reasons, the Court DENIES Plaintiff's Motion for Summary Judgment and *sua sponte* GRANTS Summary Judgment in favor of Defendants.

# I.  INTRODUCTION

Yuga seeks partial summary judgment on two of its claims (trademark infringement and cybersquatting), several of Defendants' affirmative defenses (First Amendment, fair use, and unclean hands), and Defendants' first counterclaim (knowing misrepresentation of infringing activity). As explained below, Yuga is not entitled to summary judgment on any of the claims, defenses, or counterclaims on which it has moved. Further, given Yuga's concessions and the undisputed facts, the Court grants summary judgment in Defendants' favor on Yuga's trademark infringement and cybersquatting claims, and on Defendants' counterclaim.

# II.  ARGUMENT

## A.  Yuga Is Not Entitled to Summary Judgment of Trademark Infringement

"In order to prevail on a . . . common law trademark infringement claim, a plaintiff must show that it owns a valid mark, that the mark was used without its consent, and that such unauthorized use is likely to cause confusion, mistake, or deception." *Credit One Corp. v. Credit One Fin., Inc.*, 661 F. Supp. 2d 1134, 1137 (C.D. Cal. 2009). Yuga cannot establish that it owns any valid asserted mark, and thus Yuga is not entitled to summary judgment; rather, Defendants are entitled to summary judgment on Yuga's trademark infringement claim. Additionally, even if Yuga owned any valid asserted mark, disputed issues of fact as to whether Defendants

engaged in any use likely to cause confusion, mistake, or deception preclude entry of summary judgment in Yuga's favor.

### i.   Yuga Does Not Own the Asserted Marks for NFTs

Yuga admits that the goods at issue in its trademark infringement claim are NFTs.  Dkt. 149 ("Mot.") at 2.  And Yuga specifically asserts that the infringed marks are "BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo."  *Id.* at 1 n.1.  Yuga's marks are not registered, and therefore it must prove that it owns valid marks.  Mot. at 3 (asserting "unregistered trademark[s]").  But Yuga does not own valid rights for any of the asserted marks for NFTs.

### a)   NFTs Are Intangible and Thus Ineligible for Trademark Protection

Yuga does not own the asserted marks for NFTs because NFTs are intangible and, therefore, ineligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).  An NFT is not a "tangible good" to which trademark law applies under *Dastar*.  In fact, the Trademark Office itself specifically told Yuga that when it rejected Yuga's attempt to register "BAYC" as a trademark for NFTs: "Applicant [Yuga] should note that a non-fungible token or NFT is not a good in trade.…  NFTs are downloadable units of data stored on a blockchain … that authenticate and prove ownership rights to digital or physical items.  An NFT is not the digital or physical item itself, nor does it contain the digital or physical item; rather, it only contains information about the item.  It is comparable to a certificate of authenticity/ownership for a physical item…" Dkt. 163-1 at ¶-143; ¶-144 (Yuga's expert admitted that "[a]n NFT is an ownership record stored on a

blockchain; analogous to a conventional proof-of-purchase.").  Tellingly, Yuga fails to even address the Trademark Office's rejection.  *See generally* Dkt. 193.

The only supposed "goods" that Yuga has identified in its motion and in its Complaint are NFTs.  *See* Mot. at 2; Dkt. 1("Compl.") ¶¶60-68 (asserting "NFTs" as infringing goods and asserting relevant market as "market for NFTs").  Because an NFT is not a good in trade subject to trademark law, Yuga's trademark infringement claim necessarily fails, and it is not entitled to summary judgment.

### b)      Yuga Did Not Use the Asserted Marks In Commerce

Yuga does not own the asserted marks for NFTs because it fails to meet the "use in commerce" requirement, namely, that it used its marks "to identify and to distinguish goods or services in commerce." *Rearden LLC v. Reardon Com. Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012).

"Use in commerce" requires that a mark be "placed in any manner on the goods or their containers or displays associated therewith." *Social Techs. LLC v. Apple Inc.*, 4 F.4th 811, 817 (9th Cir. 2021).  Yuga cannot satisfy the "use in commerce" requirement.  Yuga originally filed "in-use" trademark applications, but the Trademark Office rejected all of Yuga's specimens of use and held that Yuga failed to show any use of the marks for Yuga's NFTs.  Dkt. 163-1 at ¶-145.  In response to those rejections, Yuga abandoned its "in-use" claim and amended its applications to assert only an ***intent*** to use in the future—effectively conceding that Yuga had not actually used any of its marks in commerce in connection with NFTs.   Dkt. 163-1 at ¶146.  Yuga admits it is not currently offering any Bored Ape Yacht Club NFTs for sale.  Dkt. 163-1 at ¶¶-149-150.

Yuga also cannot establish "that such use has continued to the present," which is another condition of ownership.  *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005); *see Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820-21 (9th Cir. 1996) (continuous use applies to unregistered trademarks).  If the marks were

ever used for NFTs, the usage was not "maintained without interruption" because Yuga has not sold a single BAYC NFT since May 1, 2021.  Dkt. 163-1 at ¶-149; *see Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 712 (9th Cir. 1974).  Notably, Yuga fails to identify any NFT that it has sold under the asserted marks since the conclusion of its BAYC offering.  Dkt. 193-2.

Additionally, Yuga's failure to register BAYC NFTs as securities under 17 U.S.C. § 77e rendered its NFTs illegal goods incapable of trademark protection. Yuga's sale of BAYC NFTs cannot form the basis for a "use in commerce claim" where those sales were illegal and not a lawful use in commerce.  *See Kiva Health Brands v. Kiva Brands, Inc.*, 402 F. Supp. 3d 877, 888 (N.D. Cal. 2019)  ("[O]ne cannot claim first use based on an illegal product"); *S. Cal. Darts Ass'n v. Saffina*, 762 F.3d 921, 931 (9th Cir. 2014) ("[O]nly lawful use in commerce can give rise to trademark priority").  BAYC NFTs were unlawful, unregistered investment vehicles, given evidence of Yuga promising purchasers an expectation of future profits and digital assets with a cumulative value far above $100,000.  Dkt. 163-1 at ¶¶173-181. The court gives no weight to Yuga's conclusory and unsupported statements that its NFTs are not securities and that the evidence Defendants provided is insufficient. Dkt. 193 at 10-11.  The evidence of record shows clearly that BAYC NFTs are unregistered securities.  *See, e.g., Friel v. Dapper Labs, Inc.* -- F. Supp. 3d --, 2023 WL 2162747 at *22 (S.D.N.Y. 2023) (rejecting motion to dismiss claim because an NFT is a security).

### c)    Yuga Transferred All Trademark Rights

Yuga does not own the asserted marks for NFTs because Yuga transferred all trademark rights to NFT purchasers.  As Yuga's CEO admitted, "[a]ll IP rights are actually granted to the member and to the owner.  We have none of those rights." Dkt. 163-1 at ¶-163.  Yuga's terms and conditions for Bored Ape Yacht Club NFTs provide that, when a purchaser buys an BAYC NFT, that purchaser "[o]wn[s] the

NFT" and "own[s] the underlying Bored Ape, the Art, completely." Dkt. 163-1 at ¶-153. Yuga's sale of BAYC NFTs, therefore, transferred all ownership in the NFT, "Bored Ape," and "the Art" "completely" to the purchaser—including any underlying trademark rights in the Bored Ape that Yuga may have owned. Each of the asserted marks is part of one or more of "the NFT," "the underlying Bored Ape" and/or "the Art," the rights to which Yuga transferred. Compl. ¶¶-33-34; Dkt. 163-1 at ¶-153. Thus, because Yuga transferred "[a]ll IP rights" and has "none of those rights" itself, it lacks ownership over the asserted marks.

### d)   Yuga Abandoned All Trademark Rights Through Naked Licensing

Yuga also does not own the asserted marks for NFTs because Yuga abandoned all trademark rights through naked licensing, which occurs when a trademark owner grants a license but "fails to exercise quality control over the licensee" resulting in "an involuntary forfeiture of trademark rights." *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595–96 (9th Cir. 2002). BAYC NFT purchasers created their own brands that prominently featured the asserted marks, with no quality control. Dkt. 163-1 at ¶¶-156, 159. Yuga conceded that displaying a BAYC image featuring an asserted mark is use of the asserted marks in commerce (by asserting infringement based on Defendants' use of images). Compl. ¶-34. But Yuga failed to exercise quality control over the goods and services provided by many of the third parties using the asserted marks as they have no say in the type, quality, or means of marketing for any of the goods sold. Dkt. 163-1 at ¶-159. Thus, Yuga is engaged in uncontrolled licensing that has resulted in the asserted marks "ceasing to function as a symbol of quality and controlled source." *Barcamerica*, 289 F.3d at 595.

### e)   Yuga Abandoned All Trademark Rights Through Failure to Police

Yuga also abandoned the asserted marks through its failure to police. Trademarks are abandoned when, "as a result of a trademark owner's failure to police the mark, [there is] widespread usage by competitors leading to a perception of genericness among the public who sees many sellers using the same term." *Freecycle Network, Inc.v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) . Many companies have created brands that used the asserted marks in commerce. Dkt. 163-1 at ¶¶-156-158. This use extended to dozens of NFT collections that have been sold prominently without any action from Yuga for more than a year. Dkt. 163-1 at ¶¶-160, 162. Yuga elected not to stop any of these companies, Dkt. 163-1 at ¶-162, and thereby abandoned its trademarks.

\*      \*      \*

As a result of: (1) the ineligibility of NFTs for trademark protection; (2) Yuga's failure to use the asserted marks in commerce; (3) Yuga's transfer of all IP rights to third parties; (4) Yuga's naked licensing; and (5) Yuga's abandonment, Yuga does not own valid rights for NFTs for any of the asserted marks as required to make out a claim of trademark infringement. Yuga's motion for summary judgment must therefore be denied, and summary judgment must enter in Defendants' favor on Yuga's trademark infringement claim.

### ii.   Disputed Issues of Fact Preclude Summary Judgment on Consumer Confusion

Even if Yuga owned any valid rights in any asserted mark, summary judgment would be inappropriate given disputed issues of fact concerning consumer confusion. The Ninth Circuit has made clear that summary judgment on likelihood of confusion is heavily "disfavored" because of the fact-intensive nature of the *Sleekcraft* inquiry. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 608 (9th Cir. 2005)  (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.

1979)).  Here, there are material disputes with respect to at least *Sleekcraft* factors 2-7 that preclude summary judgment.

**a)    BAYC and RR/BAYC Are Not "the same product" and the Marks Are Not "identical" (*Sleekcraft* factors 2 & 3)**

Whether BAYC and RR/BAYC are the same product or use the same marks is a material dispute.  While Yuga's motion assumes that because RR/BAYC and BAYC are both NFT collections that point to the same images, the NFTs themselves are the "exact same product" and use "the exact same marks," the record reflects many differences.  Mot. at 6.  First, RR/BAYC was launched as a protest against Yuga, which the record shows was closely tied to the RR/BAYC NFTs.  Dkt. 163-1 at ¶¶-197, 201, 203-205, 207 (Defendants' own expert testified that Mr. Ripps' criticism of Yuga was closely tied to the RR/BAYC NFTs).  Second, the website rrbayc.com, where the NFTs were sold, includes an express statement that the project is "appropriation art," criticizes Yuga, and links to GordonGoner.com, which provides a lengthy criticism of BAYC and Yuga.  Dkt. 163-1 at ¶¶-198-200.  Third, before a user could purchase an RR/BAYC NFT, the user had to view and agree to a disclaimer recognizing that RR/BAYC was a parody NFT collection unaffiliated with Yuga.  Dkt. 163-1 at ¶-201.  Fourth, Defendants and their followers on Twitter made numerous posts about the satirical nature of the project.  Mot. at 8; Dkt. 163-1 at ¶¶-202-203.  Given the above, no reasonable consumer would have believed that Defendants' satirical art project was the same as Yuga's BAYC collection.  *See New Kids on the Block v. News Am. Pub. Inc.*, 971 F.2d 302, 309 (9th Cir. 1992).  ("Critical works are much less likely to have a perceived affiliation with the original work.").  Even on secondary marketplaces, the collections were displayed using different names and as originating from different creators.  Dkt. 163-1 at ¶¶-213-214.

Further, RR/BAYC NFTs and BAYC NFTs are also different products in different markets.  As just a few key examples:  RR/BAYCs originated from an

Ethereum wallet address called ryder-ripps.eth (Dkt. 163-1 at ¶-216), the NFTs themselves are distinct tokens on the blockchain sold on different marketplaces,[1] the size of the collections are different (Dkt. 163-1 at ¶-220), the prices are different by orders of magnitude (Dkt. 163-1 at ¶¶-195-196), the underlying contracts have different addresses (Dkt. 163-1 at ¶-219), and the tokens display different names (Dkt. 163-1 at ¶-236). These differences are meaningful because, as Yuga's expert admits, they allow differentiation with a "high degree of certainty" using free, publicly available tools like etherscan.io. Dkt. 163-1 at ¶-221.

### b) Yuga Has Not Established Likelihood of Confusion (*Sleekcraft* factors 4, 5, & 6)

There is also a dispute over the characteristics of the typical NFT consumer. Yuga's motion makes no effort to prove who the typical consumer is, nor what their level of sophistication and familiarity with blockchain technology is (*Sleekcraft* Factor #6). On the other hand, Defendants argue that NFT purchasers are almost universally familiar with blockchain technology and the verification tools for NFTs. Dkt. 163-1 at ¶-222. "Whoever's right, the difficulty of trying to determine with any degree of confidence the level of sophistication of [NFT purchasers] only confirms the need for this case to be heard by a jury." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010).

Next, whether there has been actual confusion is a material dispute. Notably, Defendants have put forward hundreds of communications written by actual purchasers of RR/BAYC NFTs, showing consumers were not confused. Dkt. 163-1 at ¶-184.

---

[1] RR/BAYC NFTs were sold directly to Twitter requesters and on rrbayc.com (both of which are primary channels that have never sold BAYC NFTs). Dkt. 163-1 at ¶-188. Although Yuga's motion suggests that Yuga NFTs and RR/BAYC were both sold on Foundation (Mot. at 7), there is at minimum a factual dispute about this (Dkt. 163-1 at ¶-217).

In contrast to this overwhelming evidence, Yuga identifies a misleading handful of Twitter posts, from which it asks the court to extrapolate broader confusion in the NFT marketplace.  The court declines to do so.  There is no basis to assume that the Twitter users responsible for the selected posts are representative of the consumers that would buy BAYC NFTs (which is disputed and relevant to *Sleekcraft* Factor #5).  Additionally, the tweets Yuga cites do not even evidence actual confusion (*Sleekcraft* Factor #4).  For instance, Yuga identifies a tweet by "a twitter account that tracks blockchain transactions mistakenly reported that a BAYC NFT was purchased for a low price 5.99 ETH." Mot. 8.  But the fact that an automated bot Twitter account made a tweet does not demonstrate that any human consumer was confused.  The responses to the tweet reflect otherwise—Twitter users quickly identify that the post was erroneous and that the subject NFT was an RR/BAYC NFT.  Dkt. 163-1 at ¶-225.

Similar issues occur with the other evidence Yuga cites to for confusion including a hearsay *Bloomberg* newscast that purportedly shows a "mistaken[] reference to RR/BAYC as 'Bored Ape Yacht Club V3.'"  Dkt. 163-1 at ¶-49.  Preliminarily, the court need not rely on this hearsay evidence.  But the broadcast itself demonstrates that Bloomberg knew that the collections were distinct and reported on them separately.  *Id*.  And whether *Bloomberg* (which is not a consumer) or anyone watching the broadcast was actually confused is a disputed question of fact.  Yuga also points to various statements made by Defendants and other RR/BAYC Project contributors, Mr. Hickman, and Mr. Lehman, during project development.  Each statement is taken out of context in Yuga's motion, and the full context of the discussions reveal that Defendants took steps precisely to ensure that confusion did not occur.  Dkt. 163-1 at ¶¶-229-30.

Additionally, Yuga has conceded that it is unaware of any instance of anyone actually buying one product thinking it was the other and, therefore, it does not cite to any evidence of such confusion.  Dkt. 163-1 at ¶¶-223-224.

Finally, Yuga's passing reliance to a survey analysis performed by its expert, Laura O'Laughlin, is unpersuasive.  Given the asserted deficiencies in her opinion, including contradictory use of two mutually exclusive survey methodologies without any indication of which was appropriate, the court declines to rely on her opinion to grant summary judgment. Dkt. 163-1 at ¶ 237; *see Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1054 (C.D. Cal. 2013) ("In light of Jacoby's objections to the survey and the manner in which it was conducted, the Court finds that the survey results are in dispute and will not consider the survey here.").

Overall, the evidence Yuga uses to support likelihood of confusion is precisely the kind of anecdotal evidence that a factfinder must evaluate, and for which the Court must draw all reasonable inferences in Defendants' favor. *Health Net v. U.S.A. Healthnet, Inc.*, No. CV 92-3925 KN, 1993 WL 209558, at *1 (C.D. Cal. May 12, 1993) (denying motion for summary judgment because of factual disputes underlying likelihood of confusion); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989) ("The district court concluded that the evidence presented on the actual confusion issue was anecdotal and too weak to support a finding of actual confusion. This conclusion is not clearly erroneous.").

### c) Defendants Did Not Intend for Consumers To Be Confused (*Sleekcraft* factor 7)

Whether Defendants intended for consumers to be confused is a disputed question of fact.  Defendants' communications concerning the project reflect that they took specific steps to prevent confusion, including adding a lengthy explanation of the purpose of RR/BAYC on rrbayc.com as well as a disclaimer expressly requiring purchasers to acknowledge the artistic purpose of the project. Dkt. 163-1 at ¶¶-201-202, 229-230.  Moreover, Defendants' online discussion of the project focused on their criticism of Yuga, making clear that their intent was not to confuse, but rather to

educate consumers concerning the nature of NFTs and call-out Yuga's imagery.  Dkt. 163-1 at ¶¶-203-04.

*     *     *

As a result of the disputed factual issues surrounding each of the above *Sleekcraft* factors for likelihood of confusion, Yuga is not entitled to summary judgment of trademark infringement.

### B.   Yuga is Not Entitled to Summary Judgment on its ACPA Claim

Yuga's Anti-cybersquatting Consumer Protection Act ("ACPA") claim is based solely on Defendants' registration of "the domain names https://rrbayc.com/ and https://apemarket.com/," which Yuga contends are "confusingly similar" to "BAYC" and "'BORED APE', 'APE', and other 'APE-based' trademarks."  Mot. at 14.  As discussed above, Yuga does not own a valid trademark in "BAYC", "BORED APE", and/or "APE"—and Yuga does not explain why it purportedly has rights in any "other [unnamed] 'APE-based' trademarks."  Because Yuga does not own valid rights for any of the asserted marks as required to make out an ACPA claim, Yuga's motion for summary judgment must be denied, and summary judgment must enter in Defendants' favor on Yuga's ACPA claim.

But even if Yuga had any evidence of ownership, disputed issues of fact would preclude entering summary judgment in its favor.  The ACPA requires a showing that the accused domain name is "identical or confusingly similar to a protected mark."  *Rearden*, 683 F.3d at 1219.  But there is a material question on whether the use of "rrbayc.com" is confusingly similar to "BAYC" or whether "apemarket" is confusingly similar to APE or BORED APE.  Notably, nowhere in any of its expert reports does Yuga provide any survey evidence for confusion between "rrbayc.com" and BAYC.  Likewise, for "apemarket," Yuga provides no evidence of consumer confusion, and there are various other domain registrations using "ape," which at

minimum raises a triable question as to whether "apemarket" is confusingly similar to any asserted mark.  Dkt. 163-1 at ¶-231.

Lastly, cybersquatting requires showing "bad faith intent," *Rearden*, 683 F.3d at 1219, and cannot be found where the defendant "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful," 15 U.S.C. § 1125(d)(ii).  Intent is a fact-intensive inquiry that requires weighing evidence, rendering it inappropriate for summary judgment.  *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) ("Cases where intent is a primary issue generally are inappropriate for summary judgment") (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980)).  This is particularly true here where Yuga's CEO, referring to "[a]ll IP rights," stated that "[w]e have none of those rights."  Dkt. 163-1 at ¶-163.  Thus, Defendants intent is a credibility question for the factfinder.

## C.    Yuga Is Not Entitled to Summary Judgment on the First Amendment.

The *Rogers* test applies in cases like this to safeguard expressive works protected under the First Amendment.  Defendants asserting protection under *Rogers* must "make a threshold legal showing that its allegedly infringing use is part of an expressive work," at which point, the burden shifts and plaintiff must show "that the mark is either not artistically relevant to the underlying work or explicitly misleading as to the source or content of the work."  *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264-65 (9th Cir. 2018).  There are several triable issues regarding whether Defendants have met their low burden to show that the RR/BAYC Project is an expressive work, and whether Yuga can show use of the asserted marks that is not artistically relevant or that is explicitly misleading.

### i.    The RR/BAYC Project May Be an Expressive Work

While the court allowed this case to proceed at the pleadings stage because Yuga had alleged that the RR/BAYC Project was not expressive, there is a material

dispute whether the RR/BAYC Project is an expressive work that must be resolved at trial.  Defendants provide ample evidence to support such a finding, including evidence that Defendant Ripps is a well-known artist, that the RR/BAYC Project was made as appropriation art to "hold a mirror up to Yuga's use of hidden racist elements and to criticize Yuga's offensive conduct" and to educate the public about the nature of NFTs, and that Defendants created two websites that contained detailed criticism of Yuga and their artistic statement and a disclaimer confirming the satirical nature of the project.  Dkt. 163-1 at ¶¶-197-201, 205-207.  Additionally, evidence shows that consumers of RR/BAYC NFTs were well-aware that they were purchasing works of art.  Dkt. 163-1 at ¶-184 ("I love the protest art and I love everything you've done," "Thank you for your work looking into the reality of BAYC…Wanted to be a part of this so I just reserved RR/bayc #9508….").  Such works of critique are classic forms of protected speech.  *See Punchbowl, Inc. v. AJ Press LLC*, 549 F. Supp. 3d 1061, 1066 (C.D. Cal. 2021), aff'd, 52 F.4th 1091 (9th Cir. 2022) (*Rogers* test applies to publications of "non-partisan commentary, opinions, and critiques…").

Further, the factual inquiry of whether a work is expressive under the *Rogers* test requires looking at the work itself and activity "auxiliary" to the work.  *Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017).  And the *Rogers* test still applies to an expressive work "even though it is carried in a form that is sold for profit, and even though it may involve a solicitation to purchase or otherwise pay or contribute money."  *Mattel, Inc. v. MCA Recs., Inc.*, 28 F. Supp. 2d 1120, 1136 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002).

### ii.     The RR/BAYC Project's Use of the Alleged Marks May Be Artistically Relevant.

The Ninth Circuit has held that "even the slightest artistic relevance will suffice" and "courts and juries should not have to engage in extensive artistic

analysis." *Gordon v. Drape Creative, Inc.,* 909 F.3d 257, 269 (9th Cir. 2018) (further holding that "the level of relevance must merely be above zero[.]").  Again, though the court agreed that Yuga's claim survived the pleading stage, the evidentiary record belies Yuga's conclusion that there is no artistic relevance to Defendants use of the marks.  First, the use of the asserted marks—including the collection title "Bored Ape Yacht Club"—allowed Defendants to properly identify the subject of their criticism, and "it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306–07 (9th Cir. 1992).  The RR/BAYC Project also used modified versions of the alleged marks to criticize the marks themselves for using offensive tropes.  Dkt. 163-1 at ¶-215 (modified BAYC Logo stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF; 18 TEETH.").  These facts raise a triable question as to whether the artistic relevance of using the alleged marks clears the "above zero" requirement. *Gordon v. Drape Creative, Inc*, 909 F.3d 257, 268 (9th Cir. 2018).

### iii.   The RR/BAYC Project did not explicitly mislead as to the source of the work

The Ninth Circuit has held that use of a mark is not explicitly misleading when defendants had "added ... expressive content to the work beyond the mark itself" and that the "the cover conspicuously lists [the defendant] as authors, and [the work] states that it is 'not associated with or endorsed by'" the mark owner in holding that the use of the trademarks was not explicitly misleading.  *Dr. Seuss Enterprises, L.P. v. ComicMix LLC,* 983 F.3d 443, 462–63 (9th Cir. 2020)  (internal cites omitted). Whether Defendants' use of Yuga's alleged marks "added … expressive content to the work beyond the mark itself" and identifies Defendants "as authors" and that the work is "not associated with or endorsed" by Yuga is a factual dispute that requires a factfinder to weigh controverting evidence.

Here, that evidence includes that Defendants altered the logos to identify the problematic symbolism in them and that the RR/BAYC Project adds expressive content beyond the alleged marks through the criticism and commentary Defendants made while using modified versions of the alleged marks. Dkt. 163-1 at ¶¶-201-05, 215. Additionally, like in *Dr. Seuss*, Defendants explicitly made clear that they are not endorsed or associated with Yuga, including through their disclaimer, citations to the website rrbayc.com on platforms for NFT sales, and listing of Ryder Ripps as the creator of the NFT collection. Dkt. 163-1 at ¶¶-201-202, 213, 238. Thus, whether Defendants' use was explicitly misleading is at minimum a question for trial.

### D. Yuga Is Not Entitled to Summary Judgment on Defendants' Nominative Fair Use Defense

Nominative fair use applies when a defendant's use of the mark is "grounded in the defendant's desire to refer to the plaintiff's product as a point of reference for defendant's own work." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003). Nominative fair use is expressly permitted for "purposes of comparison, criticism [or] point of reference." *Mattel, Inc.* 353 F.3d at 809. Here, the purpose of the RR/BAYC Project—and its use of the marks at issue—included criticism of what Mr. Ripps viewed as the "extensive connections between BAYC and subversive internet nazi troll culture." Dkt. 163-1 at ¶¶-197-200. Yuga is not entitled to summary judgment on fair use for several reasons.

First, Yuga's BAYC NFT collection would not be identifiable as a target of criticism without using "BAYC," "BORED APE," or "BORED APE YACHT CLUB"—all three of which Yuga has asserted. Mot. at 1 n.1. Yuga's suggestion that Defendants were required to critique the BAYC NFT collection without using its name would render the nominative fair use doctrine meaningless, and has been rejected by the Ninth Circuit. *See Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893–94 (9th Cir. 2019).

Second, whether Defendants' used marks only to the extent reasonably necessary is a classic question for the factfinder.  *Id* at 895; *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1154 (9th Cir. 2002) .

Third, contrary to Yuga's suggestion, Defendants did not intend any suggestion of "sponsorship" by Yuga.  Mot. at 19.  To the contrary, Defendants used a prominent disclaimer to distance themselves from Yuga and repeatedly used Twitter to criticize Yuga's use of offensive tropes.  Dkt. 163-1 at ¶¶-201-203.

### E.   Yuga Is Not Entitled to Summary Judgment of No Unclean Hands

The unclean hands doctrine bars relief if Yuga's marks "ha[ve] acquired a value with the public by fraudulent misrepresentations in advertisements." *Worden v. California Fig Syrup Co.*, 187 U.S. 516, 528 (1903).  Here, Yuga's marks are unregistered and only protectible if Yuga can show that the public associates the asserted marks with Yuga.  *Glow Industries, Inc. v. Lopez*, 252 F. Supp. 2d 962, 983 (C.D. Cal. 2002).  Defendants have raised a triable issue of whether Yuga dirtied its hands in obtaining any such public association by: (1) compensating celebrity endorsers to bolster its public recognition, without disclosing that compensation or instructing the celebrities to do so; and (2) selling unregistered securities.

Defendants have put forward sufficient evidence to contend that Yuga obtained celebrity endorsements without revealing that the celebrities owned a stake in Yuga, or without revealing that Yuga had paid those celebrities for endorsement.  Examples of this evidence appears in Defendants' sealed filings.  Dkt. 163-1 at ¶¶-251-254. This conduct is also the subject of a separate lawsuit (Dkt. 163-1 at ¶-255) which alleges that Yuga facilitated the violation of 16 CFR 255.5.  It is, therefore, a question for the factfinder whether these failures to disclose constituted fraudulent misrepresentations that would preclude enforcement.  *Worden*, 187 U.S. at 528.

Additionally, as discussed above, BAYC NFTs were illegal investment vehicles.  And yet Yuga itself based the value of its brand—and thus its right to assert

unregistered trademarks—by use of advertisements and marketing to become "one of the most well-known" NFT collections.  Compl. ¶-1.  Because Yuga does not dispute that it obtained common law trademark rights via such advertisement and promotion, there is a material dispute as to whether Yuga "dirtied its hands" with illegal promotion of unregistered securities.

> **F.    Yuga Is Not Entitled to Summary Judgment on Defendants' Counterclaim Under 17 U.S.C. § 512(f) and the Court *sua sponte* Grants Defendants' Summary Judgment**

Defendants have provided sufficient evidence that Yuga submitted improper takedown notices in violation of copyright law.  The Digital Millennium Copyright Act ("DMCA") applies only to copyright, not trademark.  *ISE Entertainment Corp. v. Longarzo*, 2018 WL 1569803 at *3 (C.D. Cal. 2018).  Under the DMCA, internet service providers can be held liable for copyright infringement if they host copyrighted material, unless they take efforts to qualify for "safe harbor provision." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014-15 (9th Cir. 2013).  To qualify for "safe harbor" protections service providers are required to "respond expeditiously to remove" activity that infringes copyright.  17 U.S.C. § 1512(c)(1)(C).

To hedge against abuse of the takedown process, the DMCA imposes liability on those that submit improper takedown notices.  *See* 17 U.S.C. § 512(f).  Otherwise, the DMCA could be used "as a sword to suppress publication of embarrassing content rather than as a shield to protect" intellectual property.  *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016).  The elements of the claim for an improper takedown under § 512(f) are that the party (1) made a material misrepresentation in a takedown notice that led to a takedown, and (2) that the takedown notice was submitted in bad faith.  *Moonbug Entertainment Ltd. v. Babybus (Fujian) Network Technology Co., Ltd.*, 2022 WL 580788 at *7 (N.D. Cal. 2022).

The bad faith element requires "actual knowledge" of the material misrepresentation. *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004).

Defendants have shown that Yuga committed two sets of violations of § 512(f). First, Yuga wrongfully used and approved DMCA takedowns based solely on trademark, not copyright. Dkt. 163-1 at ¶-249. In these requests, Yuga has attested that it was making a DMCA takedown request and invoked 17 U.S.C. § 512(f) liability. Dkt. 163-1 at ¶¶-241-248.

Yuga concedes that its requests—which invoked § 512(f) and cited the DMCA—were "sent out on other bases, including trademark infringement." Mot. at 22. Yuga has thus admitted that each notice made a material misrepresentation: though the notices included an attestation under the Copyright Act's § 512(f) that the "material or activity is infringing" copyright, Yuga had no basis for claiming copyright infringement. And given Yuga's concession, the bad faith "actual knowledge" standard is met: Yuga does not dispute that it sent "25 takedown notices regarding Defendants' RR/BAYC NFT collection" and that "[n]one of the 25 takedown notices identified a copyrighted work." Dkt. 163-1 at ¶¶-97-98. None of the legal authority Yuga cites conflicts with this analysis—none of them involve a notice purporting to be a "DMCA" takedown or including a § 512(f) copyright certification. Courts have recognized that this kind of misuse of a § 512(f) attestation is sanctionable. *See, e.g., CrossFit, Inc. v. Alvies*, 13-cv-3771-SC, 2014 WL 251760, at *2 (N.D. Cal. Jan 22, 2014) ("…CrossFit materially misrepresented that Alvies' Facebook page infringed on a copyright, since CrossFit's claims are based only on its asserted trademark rights.").

Given Yuga's admissions of undisputed facts and statements made in their motion, violation of 17 U.S.C. § 512(f) has been established without any outstanding material dispute of fact and summary judgment is warranted in Defendants' favor, which is within this Court's power to grant *sua sponte*. *See, e.g., Cool Fuel, Inc. v.*

*Connett*, 685 F.2d 309, 311 (9th Cir. 1982) ("[C]ourt may *sua sponte* grant summary judgment to the non-moving party").  Accordingly, summary judgment is granted on this claim.

As to Yuga's DMCA request that includes a specific allegation of copyright infringement, Yuga now contends that it "owns the copyright in its Ape Skull logo." Mot. at 21-22.  But Yuga has cited no copyright registration for that logo, and it concedes that a "third party" actually designed it.  Dkt. 163-1 at ¶-5.  Moreover, throughout discovery, Defendants repeatedly sought to obtain the name of that "third party" so that it could determine whether or not he or she had actually assigned any rights to Yuga.  Yuga refused, claiming that the identity of that mystery third party designer was "irrelevant."  Dkt. 163-1 at ¶-261.  But absent any evidence of copyright transfer, Yuga cannot claim that it possesses any copyright interest in its Ape Skull logo.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)  (citing Fed. R. Civ. P. 56(f)).

## III.   CONCLUSION

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS summary judgment for Defendants on Yuga's trademark infringement and cybersquatting claims, and on Defendants' copyright counterclaim under 17 U.S.C. § 512(f).

Dated: _____

_____
Hon. John F. Walter
United States District Judge

**CERTIFICATE OF SERVICE**

     I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's ECF system on April 5, 2023.


By: /s/ *Derek Gosma*
    Derek Gosma (SBN 274515)
    derek.gosma@wilmerhale.com
    **WILMER CUTLER PICKERING**
      **HALE AND DORR LLP**
    350 South Grand Ave., Suite 2400
    Los Angeles, CA 90071
    Telephone: (213) 443-5300
    Fax: (213) 443-5400