Exhibit B



## HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Laura O'Laughlin

**Date:** March 22, 2023
**Case:** Yuga Labs, Inc. -v- Ripps, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
3                WESTERN DIVISION
4                              x
5   YUGA LABS, INC.,               :
6        Plaintiff and             :
7        Counterclaim Defendant,   : CIVIL ACTION NO.
8        V.                        : 2:22 CV 04355 JFW JEM
9   RYDER RIPPS, JEREMY CAHEN,     :
10  AND DOES 1 10,                 :
11       Defendants and           :
12       Counterclaim Plaintiffs.: 
13                              x
14
15    * HIGHLY CONFIDENTIAL   ATTORNEYS' EYES ONLY *
16    VIDEOTAPED DEPOSITION OF LAURA O'LAUGHLIN
17              CONDUCTED VIRTUALLY
18         Wednesday, March 22, 2023
19                8:57 a.m. EDT
20
21
22  Job No.: 483509
23  Pages: 1   227
24  Reported By:  Monique Vouthouris, CCR, RPR, CRR
25
```

**Page 2**

```
1
2
3
4
5        VIDEOTAPED DEPOSITION OF LAURA O'LAUGHLIN
6   pursuant to notice, conducted virtually via Zoom
7   videoconference, before Monique Vouthouris,
8   Certified Court Reporter, Registered Professional
9   Reporter, Certified Realtime Reporter, and Notary
10  Public in and for the States of New Jersey and
11  New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFF AND
4   COUNTERCLAIM DEFENDANT YUGA LABS, INC.
5       MOLLY MELCHER, ESQ.
6       FENWICK & WEST LLP
7       555 California Street
8       San Francisco, California  94104
9       415.875.2300
10
11  ON BEHALF OF DEFENDANTS AND COUNTERCLAIM
12  PLAINTIFFS RYDER RIPPS AND JEREMY CAHEN:
13       LOUIS TOMPROS, ESQ.
14       ANDREW MELENDEZ, ESQ.
15       WILMER CUTLER PICKERING HALE AND DORR LLP
16       60 State Street
17       Boston, MA  02109
18       617.526.6000
19
20  ALSO PRESENT:
21       JOHN GUGARTY, Planet Depos Videographer
22       MIKE MARTINEZ, Planet Depos Technician
23
24
25
```

**Page 4**

```
1              C O N T E N T S
2   EXAMINATION OF LAURA O'LAUGHLIN          PAGE
3     By Mr. Tompros                           7
4
5
6
7
8
9
10
11              E X H I B I T S
12          Attached to transcript.
13  O'LAUGHLIN DEPOSITION EXHIBITS           PAGE
14    Exhibit 1   Expert Report of Laura        9
15                O'Laughlin, February 6, 2023.
16    Exhibit 2   Tweet by streeto, @streetoshi, 41
17                June 21, 2022, YUGALABS 00015411.
18    Exhibit 3   Tweet by @streetoshi, June 25,  44
19                2022, RIPPSCAHEN00015349.
20    Exhibit 4   Article by  The New York Times,  73
21                Ryder Ripps: An Artist of the
22                Internet, RIPPSCAHEN00000870.
23    Exhibit 5   Article:  Which Method Is for   89
24                You? Not All Surveys Are Made the
25                Same.
```

---

**5**

E X H I B I T S   C O N T I N U E D

Attached to transcript.

O'LAUGHLIN DEPOSITION EXHIBITS                      PAGE

Exhibit 6   Complaint for False Designation    136
            of Origin, False Advertising,
            Cybersquatting, Trademark
            Infringement, Unfair Competition,
            Unjust Enrichment, Conversion,
            and Tortious Interference, Demand
            for Jury Trial.

Exhibit 7   RR/BAYC website pages.             205

Exhibit 8   ApeCoin image from ApeCoin        210
            website.

Exhibit 9   OpenSea web page,  Grandpa Ape     211
            Country Club  Collection,
            RIPPSCAHEN00000759 through 826.

Exhibit 10  OpenSea web page,  Bored Ape       214
            Yacht Club  Bored Ape Yacht
            Precious | OpenSea.

Exhibit 11  OpenSea web page,  #The Bestt      215
            Bored Apee yacht Clubb
            Collection | OpenSea.

---

**6**

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins Media Number 1 in the videotaped deposition of Laura O'Laughlin in the matter of Yuga Labs, Inc., v. Ryder Ripps, et al., in the United States District Court for the Central District of California, Western Division, Case Number 2:22 cv 04355 JFW JEM.

Today's date is March 22, 2023.  The time on the video monitor is 8:58.

The remote videographer today is John Gugarty representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice identify themselves and state whom they represent.

MR. TOMPROS:  Louis Tompros and my colleague Andrew Melendez from Wilmer Cutler Pickering Hale and Dorr LLP on behalf of the defendants.

MS. MELCHER:  Good morning.  Molly Melcher from Fenwick & West for plaintiff, Yuga Labs.

THE VIDEOGRAPHER:  The court reporter today is Monique Vouthouris, also representing Planet Depos.  Would the reporter please swear in the witness.

---

**7**

LAURA O'LAUGHLIN,
being first duly sworn or affirmed by the notary, testifies as follows:

EXAMINATION

BY MR. TOMPROS:

Q   Good morning, Ms. O'Laughlin.

A   **Good morning.**

Q   You have given testimony at depositions before; right?

A   **I have.**

Q   About how many times?

A   **Three times.**

Q   And you've also given testimony at trial before; right?

A   **That's correct.**

Q   How many times?

A   **Once.**

Q   You understand that you have taken an oath to tell the truth here today; right?

A   **I do.**

Q   And are you presently under the influence of any alcohol, medication, or drugs that would impair your ability to testify here today?

A   **I am not.**

Q   Is there any other reason that you cannot

---

**8**

give your best testimony here today?

A   **No reason.**

Q   I'm going to ask you questions.  If there's anything about any of my questions that you don't understand, please let me know.  Okay?

A   **I will.**

Q   And if you answer a question, I'm going to assume that you understood it.  Okay?

A   **Okay.**

Q   At a high level, what were you asked to do in connection with this case?

A   **For that I would like to refer to my report.  I have a clean copy here.**

Q   Sure.

A   **So on page 2 of my report is my assignment.  And my assignment was to provide expert testimony on whether or not consumer confusion exists as a result of Ryder Ripps' and Jeremy Cahen's use of Yuga Labs' Bored Ape Yacht Club trademarks, the BAYC Marks.  More specifically, I was asked to conduct consumer research to analyze the likelihood of consumer confusion in the market for non-fungible tokens.**

Q   Thank you.  And let's go ahead and mark your report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

9

1      MR. TOMPROS:  Can we have tab 1, please.
2 And we can mark that as O'Laughlin Exhibit 1.
3      THE TECHNICIAN:  Give me one second.
4      (O'Laughlin Exhibit 1 marked for
5 identification.)
6      THE TECHNICIAN:  Counsel, you want me to
7 give you control or --
8      MR. TOMPROS:  No, that's okay.
9 BY MR. TOMPROS:
10     Q   So, Ms. O'Laughlin, you're seeing on the
11 screen what has been marked as Exhibit 1, and I know
12 you have a paper copy and I'm perfectly happy for
13 you to use your paper copy, but can you just confirm
14 that this Exhibit 1 is your expert report?
15     A   It is.
16     Q   Okay.  And can you take a look at page 73
17 of your expert report.  I believe that's PDF
18 page 75.
19     A   That's my signature, yes.
20     Q   That was going to be my question.  Your
21 signature appears on page 73 of your expert report?
22     A   It does, yes.
23     Q   You reviewed your report carefully before
24 you signed it; right?
25     A   Yes.

0

1      Q   And at the time you signed your expert
2 report, you believed everything in it was accurate;
3 correct?
4      A   Correct.
5      Q   Is there anything in your report that you
6 want to take back?
7      A   No.
8      Q   Anything that you need to change?
9      A   No, nothing I need to change.
10     Q   And is anything missing or incomplete, to
11 your knowledge?
12     A   Not to my knowledge.
13     Q   Okay.  Now, did you write this report
14 yourself or did somebody else write it?
15     A   I did write the report.
16     Q   You drafted each of the paragraphs?
17     A   I drafted most of the paragraphs.  There
18 were some elements where I asked for assistance in
19 filling in certain things like, you know, the
20 citations or helping with pulling exact quotes,
21 things like that.
22     Q   And are there parts that you can identify
23 that you did not write?
24     A   No.
25     Q   Are there any parts of your report that

9

1 are unimportant?
2      MS. MELCHER:  Objection; vague.
3      A   I'm not sure what you mean by that.
4      Q   Sure.  Did you include anything
5 unimportant in your report?
6      MS. MELCHER:  Objection; vague.
7      A   Not in my opinion.
8      Q   And you didn't include anything
9 superfluous; right?
10     MS. MELCHER:  Same objection.
11     A   I guess I'm not sure what you mean by
12 that.  I included information that I thought
13 relevant to address my assignment.
14     Q   Do you stand by the opinions that are
15 expressed in your report?
16     A   I do.
17     Q   And you're confident in those opinions;
18 correct?
19     A   I am, yes.
20     Q   Are you confident equally in all of the
21 opinions in your report?
22     A   I'm confident in my opinions in my report.
23     Q   Are there some that you're more confident
24 in and some that you're less confident in?
25     MS. MELCHER:  Objection; vague.

2

1      A   No.
2      Q   Okay.  And now did you -- your report
3 includes certain surveys; correct?
4      A   My report includes two consumer surveys.
5      Q   Did you design those surveys yourself?
6      A   I did.
7      Q   Did anyone assist you with the design of
8 those surveys?
9      A   I had some colleagues assist me with the
10 implementation of these surveys.
11     Q   How about the design, did anyone assist
12 you with the design of the surveys?
13     A   The design is pretty standard.  I followed
14 two standard approaches, and these are designs that
15 I've done many times.  So these are -- the design is
16 mine, but of course it's not unique.  The Eveready
17 approach and the Squirt approach have been part of
18 litigation for a long time.  So the implementation
19 for this case was designed by me, but I can't claim
20 authorship of the Eveready or Squirt Surveys.
21     Q   Can you take a look at Appendix B of your
22 report which appears starting on my PDF page 99, and
23 it has the heading "Documents Considered."
24     Do you see that?
25     A   I see it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

4 (13 to 16)

3

1    Q   Is that a complete list in Appendix B of
2  the documents that you considered in forming your
3  opinions?
4    A   I believe so.
5    Q   Who provided you with the documents listed
6  in Exhibit B?
7    A   Can you be more specific as to which ones?
8    Q   Let's go with anybody who provided any of
9  the documents in Exhibit B.  Who provided you with
10 any of these materials?
11    A   Certainly.  So the academic articles and
12  textbooks, these are reference materials that I'm
13  very familiar with, so I know what these materials
14  are and they are publicly available.
15        Articles and websites and other publicly
16  available information, again, are available publicly
17  but are relevant to the case.
18        And then legal documents were provided to
19  me, you know, by -- by counsel for Yuga Labs as part
20  of the case deposition transcripts.  Again, were
21  materials that were generated as part of this
22  litigation.
23        And Bates-stamped documents, they came
24  from -- from the attorneys in this case because I
25  couldn't have obtained them otherwise.

4

1    Q   Are there any materials that you in your
2  preparation for this report -- strike that.  Let me
3  start again.
4        At any point in your preparation of your
5  report, did you ask for any specific documents from
6  Yuga's lawyers?
7    A   So in preparing my report, I asked for
8  materials that related to the creation of the
9  surveys, but, again, some other stuff was available
10  publicly, of course, as well.  I asked for materials
11  that would help provide context around some of my
12  opinions.
13        But in terms of what I requested
14  specifically, I don't remember any sort of specific
15  requests other than what related to my assignment
16  and things that came up as I was creating my report.
17    Q   So who chose which of the materials from
18  the case you would receive?
19    A   Well, I asked for materials, and I assumed
20  I received the materials that -- that fulfilled my
21  requests.
22    Q   And what did you ask for?
23    A   Like I said, I think I just mentioned that
24  a minute ago, I asked for materials that would help
25  support my opinions and that related to -- that

5

1  related to this case, some of them that might have
2  been referred to in some of the legal documents
3  themselves.  It would just depend on my review and
4  any sort of follow-ups I might have as related to my
5  opinion.
6    Q   You asked for material that would support
7  your opinions; correct?
8    A   I asked for materials that were related to
9  my opinions.
10    Q   Okay.  Did you ask for material that was
11  potentially inconsistent with your opinion?
12    A   Like I said, I asked for materials that
13  were related to my opinions, and I did not ask for
14  materials that would support it or refute it.  I
15  asked for materials that would -- that would
16  correspond to assessing my assignment without --
17  without requesting for -- without asking for a
18  document that might be supportive or not supportive.
19  I just wanted stuff that would help me assess my
20  assignment without sort of a bias, if you will.
21        MR. TOMPROS:  Give me just one second
22  here.  I don't seem to have the -- can we -- I don't
23  have the transcript.  Can we go off the record?  The
24  realtime is not working.
25        THE VIDEOGRAPHER:  We are going off the

6

1  record.  The time is 9:10.
2        (Recess 9:10 a.m. - 9:15 a.m.)
3        THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 9:15.
5  By MR. TOMPROS:
6    Q   So, Ms. O'Laughlin, we were looking at
7  Exhibit B to your report which includes the material
8  considered, and can I actually ask you to look in
9  Exhibit B at page -- at page 5 of Exhibit B there's
10  a section entitled "Legal Documents."  Right?
11    A   Yes, there's -- I see that section.
12    Q   And so that begins -- let me ask you this:
13  Where did you get those legal documents?
14        MS. MELCHER:  Objection; asked and
15  answered.
16    A   These were provided to me as part of the
17  documents that I relied upon from counsel.
18    Q   And at what point did you form your
19  opinion that there was consumer confusion?
20    A   In order to have an opinion about consumer
21  confusion, you need to test it.  And so I formed my
22  opinion about confusion after conducting my
23  experiments.
24    Q   So one of the legal documents that you
25  cite in the "Legal Document" section, it's the fifth

7

1  document down is the "Consent Judgment and Order for
2  Permanent Injunction Against Thomas Lehman."
3      Do you see that one?
4      **A  I see that one, yes.**
5      Q  At the time that you reviewed that
6  document, had you already formed your opinion that
7  there was confusion?
8      **A  Yes.**
9      Q  Okay.  So you did not rely on that
10 document in forming your opinion.  Is that right?
11     **A  Well, there's other documents that relate**
12 **to my opinion.  So my opinion on the presence of**
13 **consumer confusion is -- flows from my studies that**
14 **I conduct, and there's other information that**
15 **relates to my opinion or is supportive, and so my**
16 **opinion about the presence of consumer confusion was**
17 **formed after getting the result of my survey and**
18 **analyzing it.**
19     Q  So did that consent judgment affect your
20 opinion one way or the other?
21     MS. MELCHER:  Objection; vague.
22     **A  As I said, my primary source of my opinion**
23 **comes from my surveys, and so while there's other**
24 **information that may be supportive or helpful or**
25 **provide additional context around my opinions --**

8

1      Q  I'm not quite sure -- go ahead.  I'll let
2  you finish.
3      **A  So this document is one of those documents**
4  **that provides additional context.**
5      Q  Okay.  So it provided additional
6  context -- let me ask it this way.  After -- before
7  you read that consent judgment, you already had an
8  opinion; right?
9      MS. MELCHER:  Objection; mischaracterizes
10 testimony.
11     **A  So my assignment, as I mentioned, was to**
12 **assess the potential for consumer confusion.  My**
13 **opinion primarily relies on my studies that I**
14 **conducted in Eveready and a Squirt survey.**
15     Q  Does your opinion rely in any way on the
16 consent judgment and order for permanent injunction
17 against Thomas Lehman?
18     **A  So I would like to refer to my material --**
19 **to part of my report where that might help provide**
20 **some additional context around my -- my use of**
21 **documents.**
22     **So in forming my opinions, I reviewed**
23 **documents and other materials provided to me by**
24 **counsel for Yuga Labs or obtained from public**
25 **sources.  And so as I had recently said, materials**

9

1      **included court documents and deposition testimony,**
2      **different academic articles, and publicly available**
3      **information.  These sources are sources that I rely**
4      **upon.  Some reliance -- I rely upon them in my**
5      **report primarily; however, my opinion relies on the**
6      **result of my studies, and that's where I draw my**
7      **conclusions about the presence of consumer**
8      **confusion.**
9          Q  Does your opinion rely on the consent
10     judgment and permanent injunction against Thomas
11     Lehman?
12         MS. MELCHER:  Objection; asked and
13     answered.
14         **A  As I mentioned, my opinion relies on my --**
15     **on my survey, and then there's some additional**
16     **sources that I rely on in the report as well.**
17         Q  And one of those sources is the consent
18     judgment; correct?
19         MS. MELCHER:  Objection; mischaracterizes
20     testimony.
21         **A  The consent judgment and order is one of**
22     **the documents that -- that are part of the materials**
23     **that were provided to me, and it's in my -- it's in**
24     **the list of sources which I -- which I rely upon in**
25     **the report.**

20

1          Q  And the consent judgment was entered on
2      February 6th, 2023; correct?
3          **A  It was.**
4          Q  The same day you signed your report;
5      right?
6          **A  It was.**
7          Q  So on that very last day, you got that
8      judgment, reviewed that judgment, and incorporated
9      that judgment into your opinions; correct?
10         MS. MELCHER:  Objection; mischaracterizes
11     testimony and the report.
12         **A  As I mentioned, my opinion relies upon my**
13     **surveys, and these are materials that I rely upon.**
14     **And as I mentioned, in paragraph 7 of my**
15     **report, it's also possible to consider other**
16     **documents in the future as well.  So should**
17     **additional relevant documents or information be**
18     **available to me, I may adjust or supplement my**
19     **opinions as appropriate.**
20         **The materials that were in my appendix at**
21     **the time of me signing the report are materials I**
22     **rely upon, but for my opinion I rely upon my**
23     **surveys.**
24         Q  Did you actually read the consent judgment
25     before signing your report?

Transcript of Laura O'Laughlin
March 22, 2023

21

1    A   I did.
2    Q   And so you considered the consent judgment
3  before signing your report; right?
4        MS. MELCHER:  Objection; asked and
5  answered.
6    A   As -- as I've said, this is one of the
7  many materials that were provided to me, and it's
8  listed as one of the reliance materials in my
9  report.
10   Q   So you relied on it; right?
11       MS. MELCHER:  Objection; asked and
12  answered.  Mischaracterizes testimony.
13   A   The report -- this -- this document is one
14  of many documents that is in my documents considered
15  list.
16   Q   Did you rely on it?
17   A   As I mentioned, I wrote:  The sources upon
18  which I rely are identified -- are identified in
19  this report, and the accompanying exhibits are
20  listed in the attached Appendix B.
21       This is one of many documents that is in
22  Appendix B.
23   Q   And those are the sources on which you
24  rely in forming your opinions; right?
25       MS. MELCHER:  Objection; asked and

22

1  answered.
2    A   That's what I said:  "The sources on which
3  I rely are identified in this report and the
4  accompanying exhibits are listed in the attached
5  Appendix B."
6    Q   Got it.  Now, I see you're reading from
7  paragraph 6, and I just want to make sure I
8  understand how paragraph 6 works.  The sources on
9  which you rely are identified in Exhibit -- in
10  Appendix B; right?
11   A   They are.
12   Q   And those are the sources on which you
13  rely, quote, in forming your opinions; correct?
14   A   Yes.  In forming opinions, I reviewed
15  documents and other materials, and that's one of the
16  documents.
17   Q   Okay.  So you relied on, among other
18  things, the consent judgment against Mr. Lehman in
19  forming your opinion; correct?
20       MS. MELCHER:  Objection; mischaracterizes
21  testimony and the report.  Asked and answered.
22   A   As I've mentioned several times, my
23  opinions primarily rely upon the results of my
24  surveys.
25   Q   And in addition to primarily relying on

23

1  the results of your surveys, your opinion relies on,
2  among other things, the consent judgment against
3  Mr. Lehman; correct?
4        MS. MELCHER:  Objection; mischaracterizes
5  testimony and the report.  Asked and answered.
6    A   So as I've mentioned several times, I
7  reviewed documents, other materials.  One of the
8  materials that -- that is this -- is this consent
9  judgment, and it relates to my opinion.  But in
10  terms of forming my opinion, my opinion relies
11  primarily upon the results of my surveys.
12   Q   So you keep dropping in "primarily," which
13  I understand, and I get that your opinion relies
14  primarily on your surveys.  Your opinion does not
15  rely exclusively on your surveys; correct?
16   A   My opinion -- for my opinion to exist, I'd
17  need to test consumer confusion.  So my surveys are
18  a necessary element of my opinion.
19   Q   Oh, I understand that part.  And my
20  question is your opinion does not rely exclusively
21  on your surveys; correct?
22       MS. MELCHER:  Objection; vague.
23   A   My opinion relies on my surveys.  In order
24  to conduct my surveys, I need to look at information
25  that relates to the case, that relates to what needs

24

1  to be tested, that relates to the -- the BAYC marks,
2  that relates to how to conduct the test.  So there's
3  lots of pieces that relate to this survey and relate
4  to my assignment.
5    Q   Okay.  Let's look at the paragraph 6 that
6  you've drawn us to in your report.  It says, "In
7  forming my opinions, I have reviewed documents and
8  other materials provided to me by counsel for Yuga
9  Labs or obtained from public sources."  Right?
10   A   Yes.
11   Q   That is a true statement; correct?
12   A   That is a true statement.
13   Q   And the last sentence of that paragraph
14  says, "The sources on which I rely..."
15       That's where it begins.
16   A   Mm-hmm.
17   Q   Correct?
18   A   Correct.
19   Q   And the sources on which you rely are the
20  sources on which you rely in forming your opinions;
21  correct?
22   A   Yes.
23       MS. MELCHER:  Objection; mischaracterizes
24  testimony and the report.
25   A   So it says, "The sources on which I rely

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

7 (25 to 28)

25

1 are identified in this report and the accompanying
2 exhibits or listed in the attached Appendix B."
3     Q   And those are the sources on which you
4 rely in forming your opinions; correct?
5     A   In forming my opinions, I've reviewed
6 documents. I've labeled this Appendix B "Documents
7 Considered." These are documents that I've
8 considered and reviewed in forming my opinions.
9     Q   And relied on; correct?
10        MS. MELCHER:  Objection; mischaracterizes
11 testimony.
12     A   Like I've said, my opinion -- my opinion
13 primarily relies upon my -- on my -- on my surveys.
14 Part of -- part of constructing surveys and working
15 and taking on this assignment, I had to look at a
16 lot of different materials.  These --
17     Q   So you -- oh, go ahead.
18     A   -- materials are included, as I mentioned,
19 in Appendix B.
20     Q   Okay. So you reviewed various materials
21 in order to help you construct your surveys;
22 correct?
23        MS. MELCHER:  Objection; mischaracterizes
24 testimony.
25     A   Can you repeat the question, please.  I'm

26

1 sorry.
2     Q   Sure. You reviewed various materials in
3 order to help you construct your surveys; correct?
4     A   Yes, I reviewed various materials to help
5 me construct --
6     Q   And you also relied on materials other
7 than your surveys in forming your opinions; correct?
8     A   The --
9        MS. MELCHER:  Objection --
10        THE WITNESS:  Go ahead.  Sorry.
11        MS. MELCHER:  Sorry.
12        Objection; mischaracterizes testimony and
13 the report.
14     A   So as I mentioned, my assignment was to
15 conduct consumer research to analyze the likelihood
16 of consumer confusion.  And so as part of this
17 assignment, I reviewed documents, other materials
18 that come from public sources, that came from this
19 proceeding.  And I reviewed these materials and they
20 helped inform my opinions.
21     Q   Your opinion does not rely exclusively on
22 your survey results; correct?
23        MS. MELCHER:  Objection; asked and
24 answered.  Vague.
25     A   So as I mentioned, my survey isn't --

27

1 isn't off the shelf.  You need to think about the
2 context and what's at issue and review different
3 materials to help analyze the likelihood of consumer
4 confusion in the market for non-fungible tokens.
5 And so I did need to review materials that would
6 help me construct these surveys, these materials
7 listed in Appendix B.
8     Q   Thank you.  Now I'm going to try to ask
9 this as a yes-or-no question, and if you can't
10 answer it yes or no, just say, "I cannot fairly
11 answer that question yes or no."
12        Did you rely on the materials in
13 Appendix B in forming your opinions?
14        MS. MELCHER:  Objection; asked and
15 answered.
16     A   So as I've said, the sources on which I
17 rely are identified in the report, and they are
18 listed in Appendix B.
19     Q   So the answer is yes; correct?
20     A   So as I've said, they're -- it's listed in
21 Appendix B, the materials that I've considered in
22 forming my opinions.
23     Q   I understand what you're saying.  But I
24 want to make sure I get a yes or no answer.  If you
25 can't answer my question yes or no, it's fine.  Just

28

1 say "I cannot fairly answer that question."
2        My question is:  Did you rely on the
3 materials in Appendix B in forming your opinions?
4     A   The materials that are in Appendix B
5 are -- they're listed as documents that I've
6 considered in forming my opinions.
7     Q   So is the answer to my question yes, then?
8        MS. MELCHER:  Objection; mischaracterizes
9 testimony.
10        MR. TOMPROS:  You said it's asked and
11 answered.  You said it mischaracterizes.  I've asked
12 it.  I'm trying to get an answer.
13     Q   Yes or no, did you rely on the materials
14 in Appendix B in forming your opinions?
15        MS. MELCHER:  Same objection.
16     A   So I think I've said this several times.
17 The sources on which I rely are identified in the
18 report, and the accompanying exhibits are listed in
19 the attached Appendix B.
20     Q   Is that your best answer to that question?
21        MS. MELCHER:  Objection; vague.
22 Argumentative.
23     A   As I've said, the sources on which I rely
24 are identified in this report and the accompanying
25 exhibits are listed in the attached Appendix B.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

8 (29 to 32)

**29**

1    Q   Okay.  Let's take a look at your report at
2  page 16, paragraph 19.  Are you there?
3    **A   Almost.  I'm sorry, one second.**
4       **You said paragraph 19?**
5    Q   Yes.  On page 16 of your report.
6    **A   Okay.  I'm there.**
7    Q   It says, "I also observed evidence of
8  'post-sale confusion' among consumers outside the
9  direct purchasing context."
10      Do you see that?
11   **A   I see that.**
12   Q   Your surveys did not provide evidence of
13  post-sale confusion among consumers outside the
14  direct purchasing context; correct?
15      MS. MELCHER:  Objection; mischaracterizes
16  the report.  And objection to the extent it calls
17  for a legal conclusion.
18   **A   So my surveys, they analyze consumer**
19  **confusion in two contexts:  in the context of the**
20  **Foundation marketplace and the OpenSea marketplace.**
21  **Those are the contexts in which I evaluate confusion**
22  **for this case.**
23   Q   Got it.  So do your -- do your surveys --
24  strike that.
25      Are you relying on your surveys as the

**31**

1    Q   Nowhere in paragraph 19 do you cite your
2  surveys; correct?
3    **A   So paragraph 19 is part of my summary of**
4  **opinions -- sorry.  It's not part of my summary.  My**
5  **apologies.**
6       **So part of this is the setup, really, for**
7  **my studies.  So in this section I -- I used this as**
8  **examples of potential confusion in the NFT**
9  **marketplace.  So these are exemplars of potential**
10 **confusion.  And then this is used as part of the**
11 **motivation for -- for assessing whether there is**
12 **likelihood of confusion that stems from Ripps' and**
13 **Cahen's use of the BAYC marks.**
14   Q   Got it.  So paragraph 19 is explaining why
15  you set the survey up the way you did?
16      MS. MELCHER:  Objection; mischaracterizes
17  the report and testimony.
18   **A   That's not what I said.**
19   Q   Okay.  What -- did you observe evidence of
20  post-sale confusion among consumers outside the
21  direct purchasing context?
22   **A   That's what I wrote in paragraph 19.**
23   Q   And you cite various examples of that in
24  paragraph 19; correct?
25   **A   I do.**

**30**

1  source for your conclusion that -- in paragraph 19
2  that there is evidence of post-sale confusion among
3  consumers?
4    **A   So I do refer to my -- to my survey**
5  **somewhat in this, in this paragraph, in that**
6  **consumer confusion in the post-sale context is**
7  **likely higher given that any blockchain details that**
8  **might help dispel confusion are less readily**
9  **available to casual observers than what would be**
10 **expected in the point-of-sale context.  So my -- my**
11 **survey, particularly the Foundation Survey, provides**
12 **information, blockchain details, as I would refer to**
13 **here.  So there is a reference, in a sense, to my**
14 **surveys here.**
15   Q   There's a reference to -- so just to make
16  sure I understand, you read us a section at the end
17  of paragraph 19; right?
18   **A   Mm-hmm.**
19   Q   And there's a footnote to that section;
20  right?  That sentence you read us?
21   **A   Yes.**
22   Q   That footnote does not cite your surveys;
23  right?
24   **A   It provides as an example the Lehman**
25  **declaration as a -- as an example.**

**32**

1    Q   What was the purpose of including that
2  paragraph in your report?
3    **A   So as I write in paragraph 18, in my**
4  **review of the materials available in the case, I**
5  **found multiple examples of varying types of forward**
6  **confusion by consumers which include**
7  **initial-interest confusion, point-of-sale confusion,**
8  **and post-sale confusion.**
9    Q   What was the purpose of including
10  paragraph 19?
11   **A   As I just mentioned, when reviewing**
12 **materials in the case, I found different examples of**
13 **different types of forward confusion.  This is an**
14 **example of one of the types of forward confusion.**
15   Q   And you relied on those examples in
16  crafting your -- strike that.
17      Did you rely on those examples in crafting
18  your surveys?
19   **A   My surveys rely on the marketplace**
20 **context, and so this is additional information**
21 **that -- as an example of a type of forward confusion**
22 **that existed in the marketplace and related to this**
23 **case.**
24   Q   So you relied on it in forming your
25  surveys; right?

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

33

1    A   I did not say that.
2    Q   Okay.  Did you rely on the information in
3  paragraph 19 in forming your surveys?
4    A   As I mentioned, I reviewed materials
5  available in the case, and I found different
6  examples of types of forward confusion.  However, my
7  surveys, they are -- so this is an example of a type
8  of marketplace confusion.  It is an example of
9  post-sale confusion.  My surveys, however, test --
10  stands alone.  It's a separate test that is -- that
11  is not -- this is, you know, an example of a type of
12  forward confusion, but my test is separate.  It does
13  not require -- this is -- as I've mentioned several
14  times, this post-sale confusion examples are a type
15  of forward confusion that was existing in the
16  marketplace.  But my test, my surveys, are a
17  contemporaneous test, and this was at the time
18  information.
19    Q   Can you help me understand that?  Your
20  survey is a contemporaneous test, meaning what?
21    A   It means that when one conducts a
22  likelihood-of-confusion survey, you can't go back to
23  time.  And so that -- the surveys that I conducted
24  were conducted in January -- in January 2023, and so
25  this is -- this is simply an example of varying

34

1  types of forward confusion by consumers that
2  existed -- that existed during this dispute.
3       So you can see that some of these tweets
4  are from, you know, May 2022, July 2022, June 2022,
5  and so on.
6    Q   You also rely on the Lehman declaration in
7  paragraph 19; correct?
8       MS. MELCHER:  Objection; mischaracterizes
9  testimony and the report.
10    A   As I mentioned, it's provided as an
11  example.  That's why it says "See, e.g.," see for
12  example.
13    Q   Got it.  And so the Lehman declaration is
14  one of the things that you cite in support of your
15  conclusions in paragraph 19; correct?
16       MS. MELCHER:  Objection; mischaracterizes
17  testimony and the report.
18       MR. TOMPROS:  How does it mischaracterize
19  the report?  It literally is in the footnote, so I
20  think the objection is improper.
21       MS. MELCHER:  It's the "in support of your
22  conclusions."  It's the way you're framing it,
23  Mr. Tompros.
24    Q   Okay.  The Lehman Declaration --
25       MS. MELCHER:  I'm entitled to object.

35

1       MR. TOMPROS:  You're not entitled to
2  coach.
3    Q   The Lehman --
4       MS. MELCHER:  I'm not coaching,
5  Mr. Tompros.
6    Q   The Lehman declaration is one of the
7  things you cite, correct, in paragraph 19?
8    A   It is.
9    Q   Okay.  And you reviewed the Lehman
10  declaration before you wrote paragraph 19; right?
11    A   I'm not sure that I did.  It was -- I
12  think -- my recollection is that it was filed -- it
13  was filed pretty -- pretty late.
14    Q   How did you know that any blockchain
15  details that might help dispel confusion are less
16  readily available to casual observers without
17  reading the Lehman declaration?
18    A   It's pretty obvious in that you -- to see
19  blockchain details sometimes you need to click on
20  links that are part of the NFTs.  And so, as I
21  mentioned here, there's examples, like a Twitter
22  bot, that may sort of scan the internet for
23  information.  And these bullets are further examples
24  of, you know, of -- of this -- of this sort of
25  paragraph.

36

1       So you can see, for example:  Twitter bot
2  OxGem, which reports on NFT transactions, tweeted
3  "New Purchase!  1 Bored Ape Yacht Club bought for
4  5.99 ETH" only to have some Twitter users then
5  identify it as "a Ryder."  One of the Twitter
6  commenters (OxToven) replied to this thread, "...I
7  looked on chain and didn't even realize it was RR."
8       This is an example of that statement in my
9  sentence above.
10    Q   Okay.  So @0xGem is a bot; correct?
11    A   Yes.
12    Q   A bot is not a person; correct?
13    A   Correct.
14    Q   And so you're looking then at @0xToven;
15  correct?
16    A   Amongst others.  I just provided that as
17  one example, yes.
18    Q   Okay.  And you provide other examples in
19  the various other reports; right -- in the various
20  other bullets in this paragraph 19; correct?
21    A   Yes, as well as the same bullet.
22    Q   And you also cite the Lehman declaration
23  in the same paragraph; correct?
24    A   I do.
25    Q   Are you aware of any information as to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

37

1  whether the Lehman declaration was likely coerced or
2  a condition of settlement?
3      MS. MELCHER:  Objection; vague.  Lacks
4  foundation.
5      **A   Sorry, could you repeat your question?**
6      Q   Sure.  Let me slightly rephrase it.
7      Are you aware of any information
8  suggesting that the Lehman declaration was likely
9  coerced or a condition of settlement?
10     MS. MELCHER:  Same objections.
11     **A   I have no information on that.**
12     Q   Did Yuga's lawyers provide you with the
13 court's order yesterday that stated that the
14 declaration, quote, was coerced or was a condition
15 of settlement as seems likely?
16     MS. MELCHER:  Objection; mischaracterizes
17 the order.
18     **A   I have not.  Sorry.  You're saying there**
19 **was something from yesterday?**
20     Q   Yes.  Have you seen any court order from
21 yesterday addressing the Lehman declaration?
22     **A   I have not.**
23     Q   If you were to learn that the Lehman
24 declaration was likely coerced or a condition of
25 settlement, would that affect your analysis?

38

1      **A   No, it wouldn't.  As I mentioned, it says,**
2  **see, for example, Lehman declaration.**
3      Q   So it doesn't matter whether it's coerced;
4  right?
5      MS. MELCHER:  Objection; mischaracterizes
6  testimony.
7      **A   That's not what I said.  I said it does**
8  **not impact my opinion.**
9      Q   It doesn't impact your opinion whether it
10 is coerced or a condition of settlement; correct?
11     MS. MELCHER:  Objection; asked and
12 answered.
13     **A   Sorry, I -- could you ask the question**
14 **again?  Sorry, that was --**
15     Q   Sure.  Well, I think earlier I asked you
16 if you were to learn that the Lehman declaration was
17 likely coerced or a condition of settlement, would
18 that affect your analysis?  And you said it would
19 not.  Is that correct?
20     **A   That's correct.**
21     Q   And if we go back up a paragraph to
22 paragraph 18, what was the purpose of paragraph 18
23 of your report?
24     MS. MELCHER:  Asked and answered.
25     **A   So as I mentioned, paragraph 18 provides**

39

1  some examples, particularly in the bullets, of
2  varying types of forward confusion by consumers,
3  including initial-interest confusion and
4  point-of-sale confusion.
5      Q   And the bullets are tweets; correct?
6      **A   The bullets that are in this -- in this**
7  **paragraph, yes, are tweets.**
8      Q   Now, did you actually look at the tweets
9  on Twitter, or did you look at material that was
10 given to you by the lawyers for Yuga?
11     MS. MELCHER:  Objection; vague.
12     **A   I looked at the -- what I have here is the**
13 **materials that were provided as part of the**
14 **litigation.  So they are tweets that are provided as**
15 **part of the litigation.**
16     Q   All right.  So let's take a look -- let's
17 look at footnote 41.  That's one of the tweets that
18 you relied on:  Tweet from streetoshi,
19 s-t-r-e-e-t-o-s-h-i; right?
20     **A   So, as I mentioned, these are examples of**
21 **types of forward confusion, but in forming my**
22 **opinion about the presence of forward confusion, I**
23 **relied primarily on my surveys.**
24     Q   Oh, no, I understand, and I just wanted to
25 look at the other stuff you're relying -- you

40

1  included these tweets in your report; right?
2      **A   I did.  I did, yeah.**
3      Q   You came by them?
4      **A   And so as I said, it's part of the**
5  **examples of types of confusion.  But I think you had**
6  **said something about --**
7      Q   Do you stand by paragraphs 18 and 19 of
8  your report or no?
9      **A   I do.**
10     MS. MELCHER:  Objection; vague.
11     **A   I do.**
12     Q   Okay.  And you agree that footnote 41 goes
13 to one of the bullets in paragraph 19; right?
14     **A   Paragraph 18.**
15     Q   Sorry.  You're completely right.  Let me
16 try that again.
17     Footnote 41 goes to one of the bullets in
18 paragraph 18; correct?
19     **A   Correct.**
20     Q   And footnote 41 cites a tweet from
21 @streetoshi; correct?
22     **A   Correct.**
23     Q   And there is a number at the end of that
24 footnote that begins "YUGALABS." Right?
25     **A   Correct.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

11 (41 to 44)

---

**4**

1  Q  And that's a production number in
2  association with this case; correct?
3  **A  Correct.**
4  Q  And did you look at the Yuga Labs
5  production of that tweet, or did you actually go on
6  Twitter to take a look at the live version?
7  **A  I looked at the production version in**
8  **my -- I looked at the production version.**
9  Q  Okay.
10  MR. TOMPROS:  Now let's take a look at
11  that.
12  Could I have tab 5 marked as Exhibit 2.
13  (O'Laughlin Exhibit 2 marked for
14  identification.)
15  MR. TOMPROS:  And I'm happy to provide it
16  in the chat as well, if we could maybe do that.
17  THE TECHNICIAN:  Give me one second.
18  MR. TOMPROS:  Sure.
19  Q  Okay.  So, Ms. O'Laughlin, you're looking
20  at Exhibit 2.  That's the version of this tweet that
21  you relied on; right?
22  **A  Yes.**
23  Q  You have no idea who streetoshi is;
24  correct?
25  **A  I do not.**

---

**42**

1  Q  And you can see this is a tweet replying
2  to various people.  Do you see that?
3  **A  I see that.**
4  Q  One of them is @yugalabs; right -- oh, no.
5  Strike that.  It's not.
6  One of them is @ryder_ripps; correct?
7  **A  Yes.**
8  Q  And do you understand that to be
9  Mr. Ripps' Twitter address, or do you not know?
10  **A  I believe that is his Twitter address.**
11  Q  All right.  So this is someone that is
12  replying to a tweet that includes or tags or is
13  written by Mr. Ripps; correct?
14  **A  Yes.**
15  Q  And you don't -- you didn't read the tweet
16  that it was replying to; correct?
17  **A  I didn't.**
18  MS. MELCHER:  Objection; vague.
19  Q  You don't know whether this is a joke;
20  correct?
21  MS. MELCHER:  Objection; vague.
22  **A  Sorry, what is a joke?**
23  Q  Whether this tweet from streetoshi is a
24  joke; correct?
25  **A  I do not know one way or another whether**

---

**43**

1  it is a joke.
2  Q  You don't know one way or another whether
3  it's sarcastic; correct?
4  MS. MELCHER:  Objection; vague.
5  **A  That's correct, and that is precisely why**
6  **I -- why I conducted my surveys in the way I**
7  **conducted them.**
8  Q  You don't know whether it is being tweeted
9  ironically; correct?
10  **A  That's correct, and, again, why I set up**
11  **my surveys in the way I conducted them.**
12  Q  You don't know what streetoshi's actual
13  opinion was; correct?
14  MS. MELCHER:  Objection; vague.
15  **A  I do not know streetoshi, and I do not**
16  **know what their actual opinion is.  So --**
17  Q  You do not know whether streetoshi
18  supports the RR/BAYC project or opposes it; correct?
19  MS. MELCHER:  Objection; vague.
20  **A  I have -- I do not know that, and that is**
21  **exactly why I conducted my surveys in the way I**
22  **conducted them.**
23  Q  Okay.
24  MR. TOMPROS:  Could we have tab 7, and
25  mark that as Exhibit 3.

---

**44**

1  (O'Laughlin Exhibit 3 marked for
2  identification.)
3  THE TECHNICIAN:  Please stand by.
4  Q  You're being shown what has been marked as
5  Exhibit 3, a one-page document with the control
6  number RIPPSCAHEN00015349.  Do you see that
7  document?
8  **A  The document in front of me?**
9  Q  Yes.
10  **A  Yes, I see that.**
11  Q  Okay.  And this is a document --
12  **A  I don't see the control number, however.**
13  Q  So if you look at the bottom left -- maybe
14  we can zoom in on the bottom left below the exhibit
15  stamp -- it says RIPPSCAHEN00015349.  Do you see
16  that?
17  **A  I'm sorry, I still don't see it.**
18  Q  Maybe we can --
19  **A  If you zoomed out -- oh, there we go.**
20  Yeah, now I see that, thank you.
21  Q  Okay.
22  MR. TOMPROS:  And now let's go back to the
23  full page, if we could.
24  Q  You understand that various documents were
25  produced by the parties in this case; correct?

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

12 (45 to 48)

45

1    A    Yes.
2    Q    And do you know what the RIPPSCAHEN
3 document control number prefix refers to?
4    **A    It refers to documents that were provided**
5 **by Mr. Ripps and Mr. Cahen.**
6    Q    Okay.  And so this document was provided
7 by Mr. Ripps and Mr. Cahen to counsel for Yuga;
8 correct?
9    **A    I assume so.**
10    Q    Did counsel for Yuga give it to you?
11    **A    I don't have it in my Bates-stamped**
12 **documents.**
13    Q    And it's a tweet from @streetoshi, the
14 same person we were just looking at it; right?
15    **A    Correct.**
16    Q    And it shows a Bored Ape image on the
17 left; correct?
18    **A    Correct.**
19    Q    And an image of a person on the right;
20 correct?
21    **A    Correct.**
22    Q    And streetoshi tweets, "damn! thats so
23 fucked up!" Correct?
24    **A    That's what that says.**
25    Q    And you did not consider this tweet in

46

1 considering whether -- in considering the impact
2 of -- strike that.
3        You did not consider this tweet when
4 evaluating the other streetoshi tweet that you cite
5 in your report; correct?
6    **A    I did not look at this tweet at -- next to**
7 **the other streetoshi tweet in my report.**
8    Q    Yuga's lawyers did not give you the tweet
9 at Exhibit 3, did they?
10    **A    I don't have that in my reliance**
11 **materials.**
12    Q    And everything that they gave you is in
13 your reliance materials; right?
14    **A    I don't know.  Anything that I've looked**
15 **at is there, yes.**
16    Q    Okay.  So you don't -- do you know whether
17 they gave you have this tweet or not?
18        MS. MELCHER:  Objection; asked and
19 answered.
20    **A    I mean, it's not in my reliance materials,**
21 **so I don't know.**
22    Q    So either they didn't give it to you or
23 they gave it to you and you chose not to look at it;
24 right?
25    **A    So I didn't look at it, so -- I mean,**

47

1 if -- my assumption is that I did not have it.
2    Q    Okay.  We can take that down.
3        And just returning, if we could, to your
4 report, that bullet point in page 15 -- excuse me,
5 page 15 where you cite the streetoshi tweet, you
6 cite that tweet as one of, quote, multiple examples
7 of varying types of forward confusion by consumers;
8 correct?
9    **A    Yes.  And this also, however, relates to**
10 **part of my work in this case to make sure that -- to**
11 **take additional measures to ensure that my net**
12 **confusion findings were not an artifact of, you**
13 **know, guessing or weakly held beliefs or awareness**
14 **of the satirical nature of the project.**
15    Q    Is your opinion that the streetoshi
16 tweet is an example of forward confusion?
17    **A    It is an example of a different type of**
18 **forward confusion.  It's how -- I can't speak to how**
19 **Mr. Streetoshi actually feels or what he had in mind**
20 **when he wrote the tweet, but it's possible that**
21 **others may read it.  It's possible that he was**
22 **confused.  I just don't know.**
23    Q    So you don't know whether he was confused
24 or not; right?
25    **A    No, and that's why --**

48

1        MS. MELCHER:  Objection; mischaracterizes
2 testimony.
3    **A    So as I -- as I mentioned, that's part of**
4 **why I conduct my survey is to assess forward**
5 **confusion amongst relevant consumers.**
6        MR. TOMPROS:  Could we maybe take a
7 five-minute break?
8        THE VIDEOGRAPHER:  We are going off the
9 record.  The time is 9:59.
10        (Recess 9:59 a.m. - 10:09 a.m.)
11        THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 10:09.
13 By MR. TOMPROS:
14    Q    Ms. O'Laughlin, you are an expert in the
15 area of surveys; correct?
16    **A    I am -- survey expertise is one of my**
17 **areas of expertise, yes.**
18    Q    And when you have testified at prior
19 depositions, the topics of those -- that testimony
20 has been surveys generally; correct?
21    **A    It has, yes.**
22    Q    Now, to conduct a survey in a particular
23 market, what do you have to understand about the
24 market?
25    **A    Can you be a bit more specific?**

Transcript of Laura O'Laughlin
March 22, 2023

13 (49 to 52)

49

1    Q   Sure.  So, for example, one of your prior
2  surveys involved drink coolers; correct?
3    A   Can you refresh my mind as to which case
4  you're referring to?
5    Q   Actually, I'm not entirely sure.  I
6  thought I read an article that you had done a drink
7  cooler survey; is that right?
8    A   As an expert, as a testifying expert, my
9  depositions are listed in my appendices.  And, yes,
10  there's -- if you can point me to the article, that
11  might refresh my memory.
12    Q   Do you remember a case about YETI Coolers,
13  Y-E-T-I?
14    A   I believe that is in my -- in my list of
15  experience.  Let me just turn to my CV, please.
16        Yes, YETI Coolers is one of the cases that
17  I worked on, and I helped support a couple different
18  experts on the case.
19    Q   Now, you're not an expert in the drink
20  cooler industry; right?
21    A   Well, yeah, I guess it's not just a drink
22  cooler.  These are kind of the big coolers, I'd call
23  it more like that.
24    Q   Oh, okay.
25    A   That's where I was getting confused.  I'm

50

1  sorry.  It's like a cooler, I think, that you carry
2  around with more than just drinks, also food maybe,
3  too.
4    Q   Fair enough.  Okay.  Do you have to be an
5  expert in the industry about which you're conducting
6  a survey to conduct a survey?
7    A   The expert -- the expertise that the
8  survey expert brings to bear is typically a
9  methodological expertise.  And you need to consider
10  the market, consider identifying the right
11  consumers, think about the right questions, and
12  think about the right way to ask the questions.  But
13  it would depend on -- and how a survey is
14  implemented, of course, would depend on the
15  individual case and facts of the case.
16    Q   Let's take a look at your report, if you
17  don't mind, at that "Assignment" paragraph on pages
18  2 and 3, paragraph 5.
19        Are you with me?
20    A   Page 2?
21    Q   Page 2 going on to page 3 is paragraph 5;
22  right?
23    A   Yes.
24    Q   And if you look at the top of page 3, it
25  says, "Specifically, I have been asked to conduct

5

1  consumer research to analyze the likelihood of
2  consumer confusion in the market for non-fungible
3  tokens ('NFTs')."  Right?
4    A   Yes.
5    Q   So the market you were considering was
6  non-fungible tokens; correct?
7    A   Yes.  I get into more specifics about
8  that, however, in my description of my -- of my
9  survey.
10    Q   Okay.
11    A   But broadly it relates to that
12  marketplace.
13    Q   Got it.  And you were analyzing consumer
14  confusion in the market for NFTs; correct?
15    A   Yes, but I get into more specifics of that
16  later in my report.
17    Q   What is an NFT?
18    A   It's a non-fungible token.
19    Q   And what does it mean for it to be a
20  token?
21    A   So it's a sort of a smart contract that
22  can refer to, you know, a particular asset, like a
23  profile picture, artwork, or maybe virtual land.
24  But it's essentially a smart contract.
25    Q   And what do you mean by "a smart

52

1  contract"?
2    A   So it's a digital contract.
3    Q   Is the token itself a contract?
4    A   I don't -- I don't know.
5    Q   And what does the "non-fungible" in
6  "non-fungible token" mean?
7    A   It refers to the digital nature of the
8  asset.
9    Q   And when you say "the digital nature,"
10  what do you mean?
11    A   So what I mean is that it can be, you
12  know, like I said, a piece of virtual land or a
13  profile picture or some sort of, you know, digital
14  art.
15    Q   Is -- are you familiar with the term
16  "cryptocurrency"?
17    A   I am familiar with the term
18  "cryptocurrency," yes.
19    Q   Is cryptocurrency non-fungible?
20        MS. MELCHER:  Objection; outside the
21  report.
22    A   I'm not sure what you mean by
23  "non-fungible."  Could you define it as you're using
24  it in your question, please.
25    Q   So you've used the term "non-fungible

53

1    tokens" in your report; right?
2        A  Correct.
3        Q  So I want to use "non-fungible" in the way
4    that you're using it and you understand it.  Is
5    cryptocurrency non-fungible?
6        A  Cryptocurrency is a digital asset, and so
7    it's -- cryptocurrency is a currency like the trades
8    in a market, and it can have -- it can have value
9    that's ascribed to it, and you can purchase
10   cryptocurrency with money.
11       Q  So is a cryptocurrency a type of
12   non-fungible token?
13           MS. MELCHER:  Objection; outside the
14   report.
15       A  I don't know.
16       Q  Now, you say that a non-fungible token is
17   a digital asset.  Do I have that correct?
18       A  Yes.
19       Q  And how, if at all, does a non-fungible
20   token relate to an image?
21           MS. MELCHER:  Objection; vague.
22       A  So a non-fungible token can relate to the
23   digital asset of an image.
24       Q  And how?
25       A  I'm sorry, could you be more specific?

54

1        Q  Sure.  You said that "a non-fungible token
2    can relate to the digital asset of an image."  Did I
3    get that right?
4            MS. MELCHER:  Objection; mischaracterizes
5    testimony.
6        Q  Let me back up.  Let me make sure I get it
7    right.
8            Is it your testimony "a non-fungible token
9    can relate to the digital asset of an image"?
10       A  Yes.  So, for example, let's take a look
11   at my -- in my survey scripts.  And I provide NFTs
12   as one of the options there, and I can give you
13   examples there.
14       Q  Sure.  Where in your report are you?
15       A  One moment.  Let me find it.
16           So, for example, in QS11 and QS12 on
17   page 7 of Appendix D.2, which is my Eveready survey
18   script.
19       Q  I'm there.
20       A  It will be quite a few more pages below.
21   So it's -- it's in Appendix D.2.  You'll need to go
22   to maybe page 100 in the PDF.
23       Q  It's page 139 of the PDF.
24           All right.  So you were looking in your --
25   this is just to make sure the record is clear.

55

1        Q  We're looking in your report in Appendix D --
2        A  D.2, D dot 2.
3        Q  -- 2, D.2, QS11 and QS12; right?
4        A  Mm-hmm.
5        Q  Okay.  And my question is how does a
6    non-fungible token relate to the digital asset of an
7    image?
8        A  So an NFT can relate to -- can denote a
9    PFP, which here is a profile picture, or a virtual
10   land, for example.  So the NFT can -- links to an
11   image like a PFP or it links to a piece of virtual
12   land or it links to some sort of digital asset.
13       Q  Is the NFT a computer file?  What's the
14   actual physical NFT?
15       A  So it's -- it denotes a smart contract
16   that relates to the PFP or virtual land, and you can
17   track it using, you know, the address information.
18           So one thing we could do, maybe, is also
19   look at my stimuli to my report for my surveys.  So
20   on page 19, it's just a few pages before QS11,
21   that's in Appendix D.1, I want to say.
22           Actually, let's go to page 9.  That's the
23   original, page 9.  So if you can scroll up a bit.
24           So this is an example of the NFT that was
25   created by Mr. Ripps that resembles the 1956 Bored

56

1    Ape Yacht Club NFT.  And here we can see that the
2    contract that is -- that is associated with this
3    image is in that contract address.  So this is sort
4    of the -- this denotes the NFT.  And you can see
5    that this NFT, you know, changed hands with that
6    transaction history that's associated with this
7    particular -- with this particular ape on 1956.
8        Q  So let me -- just so the record is clear,
9    we're on page 9 of Appendix --
10       A  D.1.
11       Q  -- D.1 of your report; right?  And we're
12   looking at this image, this image of a -- says
13   "Etherscan" at the top; right?
14       A  It says "Etherscan" at the top, yes.
15       Q  And what is Etherscan?
16       A  Etherscan is a sort of program or tracking
17   of different transactions that take place in ETH,
18   the digital currency of ETH.  So anything that's
19   transacted in ETH, whether it's somebody has a
20   wallet that contains ETH, or whether there is an NFT
21   that is sold in ETH or resold in ETH or minted and
22   then sold in ETH, that will be tracked by Etherscan.
23       Q  And just so the record's clear, when
24   you're saying "ETH," that's E-T-H; right?
25       A  Yes, that's E-T-H, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

15 (57 to 60)

57

1    Q    And that's for the Ethereum blockchain;
2  correct?
3    A    Right.  The digital currency Ethereum that
4  is available on the Ethereum blockchain, yes.
5    Q    And so Etherscan looks at the Ethereum
6  blockchain; right?
7    A    Yes.
8    Q    And what are we seeing on this Etherscan
9  page of your report?
10   A    What we're seeing in my -- it's an
11 appendix to my report that -- we're seeing the image
12 of Ryder Ripps' 1956 copy of the Bored Ape Yacht
13 Club NFT.
14   Q    Now, does the actual picture shown on the
15 left, is that -- is that picture part of the token?
16   A    Sorry, there's different elements that are
17 token.  There's a token ID.  There's token trackers.
18 There's contract addresses.  Could you be more
19 specific?
20   Q    Sure.  This is -- well, what is being
21 shown on this page?
22   A    So what is being shown on this page is the
23 transaction history that is associated with the
24 contract, the NFT with the contract address.  It's a
25 really long one.  I'm not going to read it out, but

58

1  it's just below "Owner" in that "Details" tab.
2       And this contract address refers to --
3  also refers to this profile picture digital -- piece
4  of digital -- this digital profile picture that was
5  copied by Mr. Ripps.
6    Q    And so when you refer to the digital
7  profile picture, you're talking about the picture on
8  the left top side of this page; correct?
9    A    Yes, and it's a profile picture because of
10 the sizing, the square nature of the image.
11   Q    So is the contract address, does that
12 correspond to that particular picture, in your
13 understanding?
14   A    It does, yes.
15   Q    Do you know what an Ethereum wallet is?
16   A    I am familiar with -- yes, yes, I do.
17   Q    What is it?
18   A    An Ethereum wallet would be someone who --
19 so for example -- it might be easier to use an
20 example.  So one might be able to click on that
21 owner information and see what they hold in their
22 Ethereum wallet.  And, you know, you don't
23 necessarily -- it would be very difficult to know
24 the name of the person.  I think it's all kind
25 of with these sorts of very long numbers,

59

1  combinations of numbers and letters, but you can see
2  what that owner has in their wallet in terms of
3  currency and in terms of NFTs that they might hold.
4    Q    Do you have an Ethereum wallet?
5    A    I do not.
6    Q    Have you ever had an Ethereum wallet?
7    A    No.
8    Q    And do you know how to use an Ethereum
9  wallet?
10   A    I've never -- I've never used one myself.
11   Q    What is the blockchain?
12   A    So my understanding of the blockchain is
13 that it is a sort of, you know, digital ledger.
14 It's a way of tracking transactions or tracking --
15 tracking information using widely distributed data.
16 Basically "block" and "chain" relate to the fact
17 that it's different blocks of information that are
18 then chained together.
19   Q    Can an NFT be copied?
20        MS. MELCHER:  Objection; calls for a legal
21 conclusion.
22   A    So can you be a bit more specific by what
23 you mean by "NFT"?
24   Q    So you used the word "NFT" in your report;
25 right?

60

1    A    Yes.
2    Q    And the market we're dealing with is the
3  market for NFTs; right?
4    A    Yes.
5    Q    Can an NFT be copied?
6        MS. MELCHER:  Same objection.
7    A    So, again, it would depend.  It depends on
8  how we're talking about it.  So the images
9  themselves could be copied, but it would be
10 impossible to copy the contract address, for
11 example.  That's a unique address.  That's a --
12   Q    Now, the -- oh, go ahead.  Sorry.  Go
13 ahead.
14   A    That's a unique address that corresponds
15 to a particular image.
16   Q    Okay.  So the address of an NFT cannot be
17 copied; correct?
18   A    That's correct.
19   Q    Now, focusing on --
20   A    Actually, I would like to revise that.
21 That's at least my understanding, is.
22   Q    Okay.  Focusing on the image, so using
23 your example here in Appendix D.1 of your report on
24 page 9, I think.
25   A    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

6

1    Q   Okay.  Where -- that image is a digital
2  image on the left; right?
3    A   It is, yes.
4    Q   Is that digital -- and that digital image
5  is made up of a file of some type; right?
6        MS. MELCHER:  Objection; vague.
7    A   In this instance it is a digital image and
8  a file of some type, yes, that generates that image.
9    Q   And is that file a part of the NFT?
10   A   I'm sorry, I don't understand what you
11 mean.  Do you mean the image --
12   Q   Sure.
13   A   Is the image part of the NFT?  Is that
14 what you're asking?
15   Q   Sure, is the image part of the NFT?
16   A   The image is part of the NFT, yes.
17   Q   And are the bits that are part of that
18 image stored in the NFT itself?
19       MS. MELCHER:  Objection; vague.
20   A   I don't know.
21   Q   In fact, an NFT contains a link to a
22 separate internet address for the image; correct?
23       MS. MELCHER:  Objection.
24   A   I don't know.
25   Q   Two NFTs can both link to the same image;

62

1  correct?
2    A   I don't know.  I mean, it's possible that
3  the image would be the same, but whether it links to
4  the same exact image under your question, I'm not
5  sure.
6    Q   Do the RR/BAYC NFTs link to the same
7  images as BAYC NFTs?
8        MS. MELCHER:  Objection; vague.
9    A   So my understanding is that Mr. Ripps and
10 Mr. Cahen and their collaborators put -- minted
11 these -- their copies of the BAYC NFTs on
12 Foundation.  And although the images are identical,
13 I believe that the programmatically generated NFTs
14 by Bored Ape Yacht Club could not have been put on
15 Foundation, for example.
16   Q   Just one second here.
17       All right.  When did you first learn of
18 the Bored Ape Yacht Club?
19   A   I read an article about NFTs in the summer
20 of 2022.
21   Q   And did you hear about the Bored Ape Yacht
22 Club in that -- in the summer of 2022 then?
23   A   I did.  It was part of a "New York Times"
24 article, I think, that was covering the general
25 market for NFTs and the popularity of NFTs.

63

1    Q   And when did you first hear about the
2  RR/BAYC project?
3    A   I heard about that in conjunction with my
4  interview for this case.
5    Q   When were you first interviewed in
6  connection with this case?
7    A   I believe it was in December 2022.
8    Q   So about three months ago?
9    A   Yes, I suppose so.
10   Q   Prior to Yuga suing Mr. Ripps and
11 Mr. Cahen, you had not heard of the RR/BAYC project;
12 correct?
13   A   I had not heard of the RR/BAYC project.
14   Q   Let's return, if we could, to your report
15 and go up to the -- back toward the beginning, in
16 the "Background" section in page on page 4.
17   A   I'm there.
18   Q   All right.  You state -- you have this
19 paragraph 8 that begins on page 4; right?
20   A   I do, yes.
21   Q   And all of the footnotes for that
22 paragraph go to the complaint in this case; right?
23   A   They do.
24   Q   And so you relied on the accuracy of the
25 complaint for this paragraph; correct?

64

1        MS. MELCHER:  Objection; misstates the
2  report.
3    A   I take what is in the complaint as -- as
4  accurate for -- that relates to this background
5  section.
6    Q   Okay.  So if the complaint is inaccurate,
7  then the sections that you cite of the report are
8  inaccurate; correct?
9    A   I have no reason to believe that the
10 complaint is inaccurate, but if some of this is in
11 dispute, I can revise my opinions accordingly.
12   Q   Sure.  So, for example, paragraph --
13 sorry, footnote 2 cites paragraph 1 of the
14 complaint; right?
15   A   Footnote 2 cites paragraph 1 of the
16 complaint, yes, that's correct.
17   Q   And you reviewed the 30(b)(6) deposition
18 of Yuga Labs in connection with this case; right?
19   A   Can you refer to which one you're talking
20 about, which deposition you're talking about?
21   Q   Sure.  That was the deposition of
22 Ms. Muniz as the 30(b)(6) witness for Yuga Labs.
23   A   Yes, I did.  Yes, I did.
24   Q   And you're aware that in that corporate
25 deposition, Ms. Muniz agreed that paragraph 1 of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Laura O'Laughlin
March 22, 2023

17 (65 to 68)

65

1 complaint was not accurate; correct?
2 **A   I don't recall.**
3    Q   Okay.  Did you do anything to
4 independently verify the accuracy of any of the
5 statements in the complaint?
6 **A   I took the complaint as being accurate,**
7 **and as I mentioned, I would be happy to revise and**
8 **update as needed, but this is simply background**
9 **information about -- about Yuga Labs.**
10    Q   It's not superfluous, is it?
11 **A   No.  As I said, it's background**
12 **information about Yuga Labs, and it's relevant to my**
13 **report.**
14    Q   Now, in paragraph 8, the first sentence,
15 you state that "Plaintiff, Yuga Labs, is a Delaware
16 corporation that in 2021 created the well-known NFT
17 collection named Bored Ape Yacht Club ('BAYC')."
18 Right?
19 **A   Yes.**
20    Q   Is that sentence accurate in your opinion?
21 **A   To my knowledge it is accurate.**
22    Q   Okay.  So your understanding is that the
23 Bored Ape Yacht Club NFT collection is well known;
24 correct?
25    MS. MELCHER:  Objection; asked and

66

1 answered.
2 **A   Yes.  I mean, the NFT collection named**
3 **Bored Ape Yacht Club is characterized as well known**
4 **in the complaint, yes.**
5    Q   Is it well known?
6 **A   I did not conduct a fame study to assess**
7 **the degree of famousness, but the information I**
8 **reviewed in this report, including media mentions,**
9 **the survey conducted, suggests that it is well**
10 **known.**
11    Q   Now, you could have conducted a fame
12 study; correct?
13 **A   I could have.**
14    Q   And you did not; correct?
15 **A   My assignment, as I had mentioned, was to**
16 **assess the potential for -- sorry, let me repeat**
17 **what my assignment -- I was asked to conduct**
18 **consumer research to analyze the likelihood of**
19 **consumer confusion in the market for non-fungible**
20 **tokens as a result of -- basically whether or not**
21 **consumer confusion -- consumer confusion exists as a**
22 **result of Ryder Ripps' and Jeremy Cahen's use of**
23 **Yuga Labs' Bored Ape Yacht Club trademarks.  That**
24 **was my assignment.  My assignment was not related to**
25 **fame.**

67

1    Q   To be able to determine -- well, strike
2 that.
3    Why did you state in paragraph 8 that the
4 Bored Ape Yacht Club collection was well known?
5 **A   This comes from the complaint.**
6    Q   Why is it relevant to your report?
7 **A   So the -- it's background information that**
8 **relates to my assignment.**
9    Q   And it matters whether the collection is
10 well known when deciding how to conduct your survey;
11 correct?
12    MS. MELCHER:  Objection; vague.
13 **A   That would depend.**
14    Q   You conducted no survey to determine
15 whether or not the Bored Ape Yacht Club collection
16 was well known; correct?
17 **A   That was not -- my assignment was to**
18 **provide expert testimony on whether or not consumer**
19 **confusion exists as a result of Ryder Ripps' and**
20 **Jeremy Cahen's use of Yuga Labs' Bored Ape Yacht**
21 **Club trademarks.**
22    Q   You could have but did not conduct a
23 survey on whether the marks were well known;
24 correct?
25    MS. MELCHER:  Objection; asked and

68

1 answered.  Mischaracterizes testimony.
2 **A   I did not conduct a fame survey.  I did**
3 **not need to to execute my assignment.**
4    Q   Did you review the answer to the
5 complaint?
6 **A   I believe that that is one of the**
7 **materials I cite.  Are you referring to Ryder Ripps'**
8 **and Jeremy Cahen's answers, defenses, and**
9 **counterclaims to complaint?  Is that what you're**
10 **referring to?**
11    Q   Yes.
12 **A   Yes.**
13    Q   And did you take the allegations in the
14 answer, defenses, and counterclaims to be true?
15 **A   I -- I reviewed them, and I relied on them**
16 **in creating my -- in determining how to execute my**
17 **surveys.**
18    Q   But you didn't assume that they were true,
19 did you?
20    MS. MELCHER:  Objection; mischaracterizes
21 testimony.
22 **A   The context in which I used that piece of**
23 **material, that document, doesn't require me to make**
24 **such an assessment.**
25    Q   You took the complaint as being accurate

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

18 (69 to 72)

**69**

1  but did not take the answer as being accurate;
2  correct?
3      **A    That is not what I said.**
4      Q    You did take the complaint as being
5  accurate; correct?
6      **A    I took the materials -- so here we're**
7  **talking about a sentence that says "Plaintiff Yuga**
8  **Labs is a Delaware corporation that in 2021 created**
9  **the well-known NFT collection named Bored Ape Yacht**
10 **Club." I know that the complaint says that there's**
11 **a likelihood of consumer confusion, alleges consumer**
12 **confusion. I test that. I didn't take that as**
13 **granted. So for information that, you know, is**
14 **background information, I -- I rely on the**
15 **complaint.**
16     Q    So earlier today when you testified "I
17 took the complaint as being accurate," is that
18 statement true?
19     **A    I was -- so as I said a few minutes ago,**
20 **it was in relationship to this, this background**
21 **section. I don't assume that I'm going to find a**
22 **likelihood of confusion when I'm conducting a study.**
23 **I conduct a study and I look for the results. So**
24 **here, that's when I was talking about that, what I**
25 **took is assuming to be true in the complaint. It's**

**70**

1  **about the background information that describes Yuga**
2  **Labs and describes what happened in the case that**
3  **caused Yuga Labs to -- to file a lawsuit against**
4  **Mr. Ripps and Mr. Cahen.**
5      Q    Did you take the background information in
6  the answer to be accurate?
7      **A    Could you please refer me to what**
8  **you're -- I don't -- I don't know. I don't recall**
9  **what you might be referring to. If you could point**
10 **me to specific passages, I would be happy to look at**
11 **that.**
12     Q    Sure. Let's take a look at page 5,
13 paragraph 9. At the beginning of that paragraph, it
14 says "Defendant Ryder Ripps, a self-described
15 'conceptual artist'..."
16     **A    Yes.**
17     Q    Do you see that phrase?
18          Did you write that phrase?
19          MS. MELCHER:  Objection; vague.
20     **A    I did.**
21     Q    Why did you include "self-described"?
22     **A    I have no opinion on whether he is an**
23 **artist or not.**
24     Q    Why did you include "conceptual artist" in
25 quotes?

**7**

1      **A    Because I believe it came from a source**
2  **document.**
3      Q    What source document?
4      **A    I'm not sure. It could relate to either**
5  **footnote 7 or footnote 8. I would have to go back**
6  **and look.**
7      Q    So footnote 7 is describing your
8  understanding about another lawsuit; right?
9      **A    Footnote 7 refers to a different lawsuit,**
10 **yes.**
11     Q    Okay. So do you think "conceptual artist"
12 came from that different lawsuit?
13     **A    It could have.**
14     Q    Are you sure those aren't scare quotes?
15          MS. MELCHER:  Objection; vague.
16     **A    I'm not sure I know what you mean by that.**
17     Q    Well, for example, sometimes quotation
18 marks are used to suggest that something is being
19 said in a mocking way, scare quotes. Are you
20 familiar with that phrase?
21     **A    I am not familiar with that phrase.**
22     Q    Okay. But you chose to put "conceptual
23 artist" in quotes; right?
24     **A    I did.**
25     Q    You chose to qualify it as

**72**

1  "self-described." Right?
2      **A    The word "self-described" appears before**
3  **"conceptual artist" in quotes, yes.**
4      Q    Okay. And you're aware that -- let me
5  just take a look real quick.
6          You're aware that in the complaint in this
7  case "conceptual artist" appears in quotes when
8  describing Mr. Ripps; correct?
9      **A    I don't recall, but if that's what you**
10 **say, perhaps it does.**
11     Q    In fact, Yuga describes him as a
12 self-proclaimed conceptual artist; correct?
13     **A    If you can point me to the source document**
14 **that says that, I would be happy to take a look, but**
15 **I don't recall.**
16     Q    Okay. And you don't have a view one way
17 or the other as to whether Mr. Ripps is an artist;
18 correct?
19     **A    I have no opinion on that.**
20     Q    You didn't say that plaintiff Yuga Labs is
21 a self-described Delaware corporation; right?
22          MS. MELCHER:  Objection; vague.
23 Argumentative.
24     **A    I did not say that in my report.**
25     Q    You didn't put "Delaware corporation" in

Transcript of Laura O'Laughlin
March 22, 2023

---

73

1  quotes; right?
2  **A   I did not put "Delaware corporation" in**
3  **quotes.**
4       MR. TOMPROS:  Can we have tab 10, please.
5  While it's coming up, I'm going to grab my glasses
6  here.
7       (O'Laughlin Exhibit 4 marked for
8  identification.)
9   Q   All right.  You're being shown what has
10 been marked as Exhibit 4.  It is a two-page
11 document.  And if we scroll to the bottom of the
12 first page, you can see the control numbers
13 beginning RIPPSCAHEN00000870.
14      Do you see that?
15 **A   I see that, yes.**
16  Q   And if we go back up to the top, it says
17 "The New York Times.  Ryder Ripps:  An Artist of the
18 Internet."
19      Do you see that?
20 **A   I see that, yes.**
21  Q   Did Yuga's lawyers give you this document
22 from this litigation?
23 **A   I did not review this document as part of**
24 **this litigation.**
25  Q   So either they gave it to you and you

---

74

1  didn't read it, or they never gave it to you; right?
2       MS. MELCHER:  Objection; mischaracterizes
3  testimony.
4  **A   I don't know the precise mechanism, but I**
5  **know that anything that I had received, I reviewed,**
6  **and so that was included in my list.**
7       MR. TOMPROS:  Okay.  We can take this
8  down.
9   Q   Returning to your report, on page 5, at
10 the top of page 5, you identify various celebrities.
11 Do you see that?
12 **A   Top of page 5, yes.**
13  Q   Why did you include that list?
14 **A   So as I understand it, this is -- these**
15 **are part of people who have purchased Bored Ape**
16 **Yacht Club NFTs, and it is background information**
17 **that is -- that I took from the complaint.**
18  Q   Why did you consider celebrity ownership
19 in your analysis?
20      MS. MELCHER:  Objection; mischaracterizes
21 testimony and the report.
22 **A   As I've mentioned, my assignment was**
23 **really to provide expert testimony on whether or not**
24 **consumer confusion exists as a result of Ryder**
25 **Ripps' and Jeremy Cahen's use of Yuga Labs' Bored**

---

75

1  **Ape Yacht Club trademarks.  This is background**
2  **information that relates to my assignment.**
3   Q   How?
4  **A   This is background information about Bored**
5  **Ape Yacht Club, and part of this information relates**
6  **to how it's seen in the marketplace and discussion**
7  **around it in the marketplace.**
8   Q   So celebrity ownership is relevant to
9  Bored Ape Yacht Club's position in the marketplace?
10      MS. MELCHER:  Objection.
11 **A   That's not what I said.**
12  Q   I'm asking.  Is celebrity ownership
13 relevant to Bored Ape Yacht Club's position in the
14 marketplace?
15      MS. MELCHER:  Objection; vague.
16 **A   The celebrity ownership is part of --**
17 **it -- some Bored Ape Yacht Club NFTs are owned by**
18 **celebrities, and Bored Ape Yacht Club has entered**
19 **into collaborations with brands like Adidas and**
20 **AriZona Iced Tea.  And that is in the marketplace.**
21  Q   Why is that relevant to your analysis?
22 **A   As I mentioned, it's background**
23 **information that relates to my assignment.**
24  Q   How?
25      MS. MELCHER:  Objection; asked and

---

76

1  answered.
2       MR. TOMPROS:  Asked.
3   Q   How does it relate to your assignment?
4  **A   It's background information about Bored**
5  **Ape Yacht Club.  My assignment addresses whether or**
6  **not consumer confusion exists as a result of Ryder**
7  **Ripps' and Jeremy Cahen's use of Yuga Labs' Bored**
8  **Ape Yacht Club trademarks.  So this background**
9  **information plays into my decision, decisions**
10 **related to my surveys.**
11  Q   You didn't include all background
12 information about Bored Ape Yacht Club; right?
13      MS. MELCHER:  Objection; vague.
14 **A   I included background information about**
15 **Bored Ape Yacht Club, but I did not seek to provide**
16 **an exhaustive list of all background information**
17 **related to Bored Ape Yacht Club, simply information**
18 **that would be helpful in setting up my consumer**
19 **confusion studies.**
20  Q   For example, you are aware that there have
21 been allegations of racism related to Bored Ape
22 Yacht Club?
23 **A   I am aware of those allegations.**
24  Q   You didn't include that; right?
25      MS. MELCHER:  Objection; mischaracterizes

---

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

20 (77 to 80)

77

1  the report.
2      A   As I mentioned, my -- my assignment was to
3  assess whether or not consumer confusion exists as a
4  result of Ryder Ripps' and Jeremy Cahen's use of
5  Yuga Labs' Bored Ape Yacht Club trademarks.
6      Q   And celebrity endorsements relates in some
7  way to that assignment; correct?
8      A   As I mentioned before, it's background
9  information that is related to my assignment.
10     Q   And allegations of racism are not
11 background information related to your assignment in
12 your view; correct?
13         MS. MELCHER:  Objection; mischaracterizes
14 testimony.
15     A   That's not what I said.  What I said was I
16 assessed my assignment about consumer confusion.  It
17 relates to how -- to how Ryder Ripps' and Jeremy
18 Cahen's use of Yuga Labs' Bored Ape Yacht Club in
19 the market for non-fungible tokens.
20     Q   Are you aware that Mr. Ripps has
21 specifically alleged that there are racist elements
22 of the Bored Ape Yacht Club collection?
23     A   I am aware.
24     Q   Are you aware that he has made these
25 allegations in connection with the sale of RR/BAYC?

78

1      A   I am aware that he has a -- has a website
2  that discusses -- that discusses this.
3      Q   And, in fact, the website, one of the
4  websites that you reviewed was rrbayc.com; correct?
5      A   Correct.
6      Q   Rrbayc.com includes a statement from
7  Mr. Ripps; correct?
8      A   At the present day it does.  I'm not sure
9  the timeline of when that statement appeared when I
10 looked at the Wayback Machine.  I don't -- I don't
11 know when that first appeared, but I know that it
12 does currently appear.
13     Q   Did you look at the Wayback Machine for
14 rrbayc.com?
15     A   I did, yes.
16     Q   Were you ever able to find an instance
17 when rrbayc.com did not include the artist statement
18 from Mr. Ripps?
19     A   I am not sure.  It might have been a
20 loading issue, so I can't be certain.  I don't know.
21 I'm not aware.
22     Q   How did Mr. Ripps and Mr. Cahen sell
23 RR/BAYC NFTs?
24     A   So I would like to turn to my report for
25 this.  So I know that Mr. -- since minting the

79

1  RR/BAYC NFTs, they sold the RR/BAYC NFTs through
2  various channels that include Foundation and
3  OpenSea, as well as the website.
4      Q   How do you know that the -- so, okay, so
5  let's sure we got the full list.  So there is the
6  website rrbayc.com was one place in which Mr. Ripps
7  and Mr. Cahen, in your understanding, sold RR/BAYC
8  NFTs; correct?
9      A   That's correct.
10     Q   Another place was Foundation; correct?
11     A   Yes.
12     Q   Another place was OpenSea; correct?
13     A   Yes.
14     Q   How do you know that they sold anything
15 through OpenSea?
16     A   So it's my understanding that -- let me
17 take a look.  I also believe that some of them were
18 available on X2Y2.  I think I have a footnote as
19 well on that, but let's focus on OpenSea for now.
20     Q   It's my understanding that Ripps and Cahen
21 had an OpenSea page.  However, OpenSea can also be
22 used for resale as well.  That's my understanding
23 too.
24     Q   Great.  I just want to make sure I focus
25 on just -- just my question, which is how do you

80

1  know that either Ripps or Cahen sold any RR/BAYCs on
2  OpenSea?
3      A   I haven't conducted such an analysis to
4  confirm that they initially listed NFTs on that
5  platform.
6      Q   So you don't know; right?
7      A   I know that they have an OpenSea page, and
8  I know that there's an OpenSea page that relates to
9  the RR/BAYC NFTs as a collection.  So it's included
10 as a collection, but I don't know whether or not
11 they personally listed any of those NFTs that are
12 included as part of that collection.  But I know
13 that that collection is connected to RR/BAYC.
14     Q   Okay.  What is Foundation?
15     A   Foundation is a marketplace for NFTs.
16     Q   And how is Foundation -- strike that.
17         Does Yuga Labs have a Bored Ape Yacht Club
18 page on Foundation?
19     A   Yuga Labs does not have a Bored Ape Yacht
20 Club page on Foundation.
21     Q   And what's rrbayc.com?
22     A   My understanding, that is Ryder Ripps' and
23 Mr. Cahen's website.
24     Q   And does Yuga Labs sell any BAYCs through
25 rrbayc.com?

8

1    A  Not to my knowledge.
2    Q  Now, can you identify any web page where
3 both Yuga Labs and Mr. Ripps or Mr. Cahen were
4 selling NFTs?
5    A  So both collections appeared side by side
6 on the OpenSea marketplace.
7    Q  Okay. Let's focus on just my question.
8 Can you identify any web page where both Yuga Labs
9 and Mr. Ripps or Mr. Cahen were selling NFTs?
10   A  Sorry. So are you -- can you -- can
11 you -- are you asking me whether or not the -- like,
12 whether the initially minted NFTs appeared in the
13 same place?  Is that the question?
14   Q  No. I'm asking about people selling
15 stuff. Can you identify any web page where both
16 Yuga Labs and Mr. Ripps or Mr. Cahen were selling
17 NFTs?
18   A  So the NFT collections that are associated
19 with Yuga Labs and associated with Mr. Ripps are
20 side by side in -- in the OpenSea marketplace --
21 have appeared side by side in the --
22   Q  And, again, let's focus on just my
23 question. I'm asking about, as I said, people and
24 companies selling things.  Can you identify any web
25 page where both Yuga Labs and Mr. Ripps or Mr. Cahen

82

1 were selling NFTs?
2    A  So when you say "people" or "companies,"
3 that's the part where I -- there are people who are
4 posting these that offer these NFTs for sale that
5 are associated with the names of Yuga Labs and
6 Mr. Ripps on the OpenSea marketplace, but I know
7 that Yuga Labs could not sell its NFTs in the
8 Foundation marketplace and I know that Yuga Labs did
9 not sell anything on the RR/BAYC website either.
10   Q  All right. So then I'll take that part
11 out of my question to see if I can -- I can get you
12 to answer it.
13       Can you identify any web page where both
14 Yuga Labs and Mr. Ripps or Mr. Cahen were selling
15 NFTs?
16   A  My understanding is that the market works
17 largely as a resale function. So to the extent that
18 those names appear, they would appear side by side
19 in sort of a resale market in OpenSea as opposed
20 to -- as opposed to their own websites.
21   Q  Did Mr. Ripps or Mr. Cahen ever sell
22 RR/BAYCs in the same market where Yuga Labs was
23 selling RR/BAYC -- selling BAYC NFTs?
24   A  So I don't know if Mr. Ripps and Mr. Cahen
25 actually listed their NFTs on the OpenSea

83

1 marketplace initially.  But I know that anything
2 that BAYC -- the Bored Ape Yacht Club would be
3 selling on the marketplace would be through --
4 through other sellers, and there would be a tag
5 associated with it that would -- the token tracker
6 that would identify Bored Ape Yacht Club as -- you
7 know, as the -- the term -- so that the -- so I know
8 that the names Bored Ape Yacht Club or Bored Ape
9 Yacht Club that's used by Mr. Ripps would appear on
10 the website, but I don't know if they had personally
11 sold anything side by side, if those entities
12 actually physically minted and put -- offered an NFT
13 for sale on the site side by side together.
14   Q  Can you identify any marketplace where
15 both Yuga Labs and Mr. Ripps or Mr. Cahen were
16 selling NFTs?
17   A  Like I said, I'm not sure about what --
18 how the -- who put those NFTs on the OpenSea
19 marketplace, but I know that NFTs from both
20 companies appeared on the OpenSea marketplace.
21   Q  All right.  Now, you conducted two
22 different types of surveys; correct?
23   A  I did.
24   Q  One is called an Eveready Survey; right?
25   A  That's correct.

84

1    Q  And the other is called a Squirt Survey;
2 correct?
3    A  That's correct.
4    Q  The Eveready Survey is most accepted when
5 the asserted mark is top of mind; correct?
6    A  Yes.
7    Q  And the Squirt Survey is viewed as best
8 when marks are weak; correct?
9    A  It's one reason to use a Squirt.
10   Q  And courts recommend different types of
11 surveys for different types of matters; correct?
12   A  I suppose so.  I don't know if a court
13 specifically prescribes one thing or another, but
14 it's part of the job of the expert as well is to
15 evaluate -- evaluate the case and take a look and
16 see what might be the most appropriate way to test
17 for confusion given a particular context.
18   Q  And which survey is more appropriate for
19 this case, Eveready or Squirt?
20   A  I conducted both, both are appropriate.
21   Q  Eveready Surveys are generally more
22 appropriate for strong brand names; correct?
23   A  Some commentators have said that, that
24 this is for top-of-mind marks.
25   Q  And you agree that Eveready Surveys are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

22 (85 to 88)

85
1 more appropriate when the brand name is strong;
2 correct?
3     A   That is -- that tends to be the way that
4 you would go.  If it's not up there, the brand is
5 top of mind.  But there's not a one-size-fits-all
6 for every -- every case.
7     Q   Squirt Surveys are appropriate when the
8 mark is weak; correct?
9     A   That is one reason to use a Squirt.  Like
10 I said, there's no one-size-fits-all answer.  You
11 need to consider the marketplace context, what's
12 being alleged, and so on.
13    Q   Is -- are the marks at issue in this --
14 strike that.
15        Are the Yuga Labs marks at issue in this
16 case strong or weak?
17        MS. MELCHER:  Objection; vague and to the
18 extent it calls for a legal conclusion.
19    A   What I assessed was forward confusion two
20 ways.  The weakness or strength of a mark might
21 require the use of a fame study to more rigorously
22 assess the strength of mark.  But lots of
23 marketplace evidence suggests that Bored Ape Yacht
24 Club is well known.
25    Q   In fact, Yuga Labs has strong recognition

86
1 for the BAYC marks; correct?
2     A   Based on the results of my survey, I would
3 think so, and based on the -- but it's -- but I did
4 not empirically test that.
5     Q   You didn't test whether it was a strong
6 mark or a weak mark; right?
7     A   I did not conduct a fame study.
8     Q   But you could have; correct?
9     A   I could have but that would not be
10 relevant to my assignment.
11    Q   Had you conducted a fame study, you would
12 know whether to use Eveready or Squirt; correct?
13    A   Not necessarily.
14        MS. MELCHER:  Objection; incomplete
15 hypothetical, calls for speculation.
16    A   I'll repeat my answer.  I'm sorry.
17        Not necessarily.
18    Q   Now, you offered the opinion that Yuga
19 Labs has strong recognition for the BAYC marks;
20 correct?
21    A   Can you point me to where I say that in my
22 report?
23    Q   Sure.  Look at paragraph 10 on page 6.
24 The last sentence of that paragraph says, "As a
25 result of the advertisement and promotion of the

87
1 BAYC marks, Yuga Labs has gained a strong
2 recognition for its products and services."
3 Correct?
4     A   That says -- yes, it says, "Yuga Labs has
5 gained a strong recognition for its products and
6 services.
7     Q   Are the BAYC marks strong?
8        MS. MELCHER:  Objection; asked and
9 answered.
10    A   So in this -- like I said, I haven't
11 conducted an empirical test about it, and in this
12 sentence what I say is that there's strong
13 recognition for Yuga Labs' products and services as
14 supported by information in the complaint and from
15 the marketplace discussion of Yuga Labs, as well as
16 some of the results of my survey also suggest that
17 this is true.  However, I did not conduct an
18 empirical study on the strength of the BAYC marks.
19    Q   Is -- are the BAYC marks strong brand
20 names?
21        MS. MELCHER:  Asked and answered.
22    A   As I mentioned, I did not conduct an
23 empirical study to assess the strength of the marks
24 empirically.
25    Q   You are able to determine in certain

88
1 circumstances whether the Eveready Survey or the
2 Squirt Survey would be more appropriate; correct?
3        MS. MELCHER:  Objection; vague.
4     A   Like I said, the use of the survey,
5 there's not a one-size-fits-all approach.  You need
6 to consider the allegations, the marketplace
7 context, the context in which the marks appear.
8 Those are all things that factor into the decision
9 to use an Eveready or a Squirt Survey.
10    Q   And not all surveys are made the same;
11 correct?
12        MS. MELCHER:  Objection; vague.
13    A   Correct.
14    Q   It is important to be able to identify the
15 right survey methodology for a particular matter;
16 correct?
17        MS. MELCHER:  Objection; vague.
18    A   There may be many right survey
19 methodologies for a particular matter.  It would
20 depend again on the marketplace context, the
21 questions being asked, the allegations, the target
22 population.  All of these different elements play
23 into the choice survey or surveys for a particular
24 matter.
25        MR. TOMPROS:  Can we have tab 11?  And we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

23 (89 to 92)

89

1 can probably put it in the chat for download as
2 well.
3          (O'Laughlin Exhibit 5 marked for
4 identification.)
5          THE TECHNICIAN:  Should I drop it in the
6 chat?
7          MR. TOMPROS:  Yes, please, if you could
8 put it in the chat.
9 BY MR. TOMPROS:
10     Q    Okay.  So, Ms. O'Laughlin, you are being
11 shown on the screen and have available in the chat
12 if you want a five-page document, an article titled
13 "Which Method is for You?  Not All Surveys Are Made
14 the Same" by the authors Laura O'Laughlin, Harriet
15 Ho and Duy (Joey) Duong; right?
16     A    Yes.
17     Q    You wrote this article; right?
18     A    I did.
19     Q    And you tried to be accurate when you
20 wrote this article; right?
21     A    I did, yes.
22     Q    All right.  And if you look at the first
23 paragraph, the first sentence says, "As survey
24 evidence has become increasingly common in
25 litigation, it is important to remember that not all

90

1 surveys are made the same."
2          Do you see that?
3     A    Yes.
4     Q    That is true; correct?
5     A    That is true.
6     Q    And the next sentence says, "It's
7 important to be able to identify the right survey
8 methodology for the matter at hand."
9          Do you see that?
10     A    I do.
11     Q    That is also true; correct?
12     A    It is true.
13     Q    What is the right survey methodology for
14 this matter?
15     A    In my opinion, given my assignment -- so,
16 again, you need to weigh a few factors.  So for my
17 assignment, as I mentioned, my assignment was to
18 provide expert testimony on whether or not consumer
19 confusion exists as a result of Ryder Ripps' and
20 Jeremy Cahen's use of Yuga Labs' Bored Ape Yacht
21 Club trademarks.  In my opinion, this usage required
22 me to conduct consumer research.  And to fulfill
23 this assignment, I needed to -- I decided to conduct
24 two online consumer surveys, one that took an
25 Eveready approach and another that took a Squirt

91

1 approach, given the marketplace context in which the
2 marks appeared.
3     Q    Which one was the right survey
4 methodology?
5     A    So I would like to zoom out a little bit
6 on this, this paper.
7          So if you read further in the paragraph,
8 this is an introduction to a review --
9          Sorry, can you not scan around so much?
10 Just it's that first paragraph.  Please hold it
11 right there.  Thank you.
12          So this -- this project related to
13 reviewing a number of cases that presented survey
14 evidence.  And so the right survey methodology isn't
15 just one potential approach.  It could be many
16 approaches.  It could be several approaches.  One
17 could use several surveys for a given matter.  It
18 would depend on the facts.
19          And so here we're simply reviewing 300
20 cases that involve survey evidence and looking at
21 the factors that affect admissibility of survey
22 evidence.  It's important to consider the context in
23 which the sentence appears.
24     Q    Okay.  Which was the right survey
25 methodology for this case?

92

1     A    As I mentioned, the right survey
2 methodology to address my assignment was to conduct
3 two surveys.  Two surveys were required.  One was
4 the Foundation Eveready Survey and another was the
5 OpenSea Squirt Survey.
6     Q    In this paper you don't ever suggest using
7 two surveys, both types, for trademark infringement,
8 do you?
9     A    Can we scan down and read the -- read that
10 section, please?
11     Q    Sure.
12     A    Thank you.
13     Q    Yeah, exactly, if you go to page 1
14 continuing on to page 2.
15     A    Can you scroll down a bit?  And just a
16 tiny bit more, please.  Can you scroll down a bit
17 more as well?  Okay.  So we're at the discussion of
18 the Squirt studies.
19          This is an overview of when courts have
20 decided whether or not one way was more appropriate
21 than the other.  But, I mean, it's not -- it's
22 definitely not unheard of, in fact there are many
23 instances in which experts or parties have decided
24 to go at -- go at it both ways, so to speak.  And
25 I'm using the air quotes to refer to both ways being

93

1  Squirt and Eveready.  In fact, Jerre Swann refers to
2  going at it both ways as an option in, I think,
3  Chapter 4 of the Diamond and Swann edited edition
4  about the surveys.  And I cite to that in my -- in
5  my reliance materials.
6      Q   You have never testified about both an
7  Eveready and a Squirt Survey in the same case
8  before, have you?
9      A   I have not.  I have not.
10     Q   Okay.  Now let's look back at your
11 article.  If we could go back up a bit, right under
12 "Trademark Infringement" at the bottom of page 1,
13 the last sentence on that page says, "Courts
14 generally view trademark strength and marketplace
15 proximity as factors to consider when choosing
16 between Eveready and Squirt."  Right?
17     A   Yes, my sentence says that, and it refers
18 to the discussion that follows in the next two
19 paragraphs.
20     Q   Right.  And so courts are -- as you state
21 in this paragraph, courts choose between Eveready
22 and Squirt; correct?
23         MS. MELCHER:  Objection; mischaracterizes
24 the article.
25     A   So the courts evaluate evidence that is

94

1  put before them.  In this article I'm providing
2  examples of Eveready Surveys and what courts have
3  said about Eveready Surveys or Eveready Surveys
4  vis-à-vis a Squirt Survey.  As I mentioned,
5  there's other articles.  There's a lot of trademark
6  scholarship that's out there.  This isn't even a
7  scratch on the surface of what has been discussed
8  picking Squirt or Eveready or both in a literature.
9  This is intended to be an overview.
10         If you can scroll back up, you can see the
11 motivational paragraph for this -- for this piece,
12 which is -- which is to discuss, you know, different
13 factors that courts consider when they're admitting
14 surveys and how much weight to afford them.
15     Q   You chose the words "choosing between" in
16 this article; correct?
17     A   Can you point to me where I say that?
18     Q   Yeah.  At the bottom, the highlighted
19 sentence, it says "choosing between"; right?
20     A   Yes, it says that.
21     Q   And one way that you could choose between
22 Eveready and Squirt is to assess trademark strength;
23 correct?
24     A   It's possible, but in this case I did not
25 need to do it and it was not appropriate to do so.

95

1      Q   You did not, you could have, but did not
2  conduct a survey to assess the strength of the Bored
3  Ape Yacht Club marks; correct?
4      A   That was not part of my assignment, and it
5  would not have been relevant for my assignment.
6      Q   Yet it could have been used to choose
7  between Eveready and Squirt; correct?
8      A   As I mentioned, in conducting my
9  assignment, I found it important to think about the
10 marketplace context, to think about how the marks
11 appeared, and to create surveys that respected how
12 these marks appear in the marketplace.  And so in
13 order to appropriately assess consumer confusion in
14 this case, there's no one-size-fits-all approach.  I
15 found it important to conduct both an Eveready
16 Survey and a Squirt Survey.
17     Q   Could you have assessed consumer confusion
18 using just one and not the other?
19     A   I could have, but in this instance I found
20 it most appropriate to do both.
21     Q   And you found it appropriate to do both
22 even though you conducted no survey of trademark
23 strength; right?
24     A   There was no need to conduct a survey of
25 trademark strength to fulfill my assignment.

96

1      Q   Notwithstanding the fact that courts
2  generally view trademark strength as one of the
3  factors to consider when choosing between Eveready
4  and Squirt; correct?
5          MS. MELCHER:  Objection; lacks foundation.
6      A   As I mentioned, I did not need to conduct
7  a trademark strength study.
8      Q   Did the lawyers for Yuga ask you to
9  conduct a trademark strength survey?
10     A   I was asked to assessed the likelihood of
11 consumer confusion as a result of the use of these
12 marks.  And in looking at how these marks appeared
13 in the marketplace, it was clear to me that both an
14 Eveready Survey as well as a Squirt Survey would be
15 appropriate in assessing the likelihood of consumer
16 confusion in this case.
17     Q   If you go down to the next page, an
18 Eveready Survey, you say, is "generally more
19 appropriate for 'top-of-mind' marks, e.g., strong
20 brand names."  Correct?
21     A   I'm sorry.  Could you please scroll up?
22     Q   Oh, sorry.  We went right past it.
23     A   Yeah.
24     Q   Go up just a little bit further.  Thank
25 you.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

25 (97 to 100)

**97**

1    And in the paragraph on Eveready studies,
2 you state that the Eveready format is "generally
3 more appropriate for 'top-of-mind' marks, e.g.,
4 strong brand names." Right?
5    **A   Yes, generally more appropriate, yes.**
6    Q   In the next paragraph you say, the Squirt
7 Survey, "courts typically view it as appropriate
8 when the plaintiff's mark is weak." Correct?
9    **A   That's not the full sentence. What the**
10 **sentence says is it "presents respondents with a**
11 **lineup of products" and is typically viewed as**
12 **"appropriate when the plaintiff's mark is weak and**
13 **the defendant's mark is in close proximity to the**
14 **plaintiff's."**
15    Q   And that's an "and." Weak "and" in close
16 proximity; correct?
17    **A   An "and" is written there, yes.**
18    Q   So Eveready for strong, Squirt for weak;
19 right?
20    MS. MELCHER:  Objection; mischaracterizes
21 the article and the testimony.
22    **A   That's not what I said. In here I am**
23 **providing a review of -- it's three short paragraphs**
24 **that deal with --**
25    **If you can scroll back up again.**

**98**

1    **What this -- what this article is**
2 **summarizing, it's --**
3    **Up some more, please. Thank you. Keep**
4 **scrolling up. We can look at the title again.**
5    **So the idea is to give the reader an**
6 **overview of different methods that are used in**
7 **survey analysis that relate to intellectual property**
8 **matters, and there are different factors that courts**
9 **consider. There's no one-size-fits-all. The**
10 **factors are weighed. There's consideration and**
11 **thought that needs to be put into -- to the choice**
12 **of the survey. It's not -- it's not a simple**
13 **if-then statement. You need to think about the**
14 **context. You need to think about how the marks**
15 **appear. You need to think about whether the marks**
16 **appear next to one another in the instance of**
17 **assessing confusion in which -- which is my**
18 **assignment here, consumer confusion.**
19    Q   What are the reasons in this case why an
20 Eveready Survey is appropriate?
21    **A   So I would like to turn to the**
22 **introduction to my Foundation Eveready Survey part.**
23 **I would like to turn to paragraph 20 on page 18 of**
24 **my report.**
25    **So here I'm looking -- I used the Eveready**

**99**

1    **Survey in the Foundation marketplace. Why do I use**
2    **the Eveready Survey for the Foundation marketplace?**
3    **Well, I know that here in this marketplace, this is**
4    **first where Ripps and Cahen initially minted and**
5    **sold the RR/BAYC NFT collection. And I also note**
6    **that they claim that confusion was not possible in**
7    **this marketplace because Foundation did not list**
8    **Yuga NFTs which were programmatically generated.**
9    **And so this is a marketplace where NFT collectors**
10    **would have encountered Ripps' and Cahen's at-issue**
11    **collection and not -- and not Yuga Labs' Bored Ape**
12    **Yacht Club collection.**
13    **So this -- it's appropriate to use the**
14    **Eveready Survey design here because this is where**
15    **only the junior user's use of the senior user's mark**
16    **appears.**
17    MR. TOMPROS:  Okay. Can we take a break?
18 I'm going to change topics.
19    THE VIDEOGRAPHER:  We are going off the
20 record. The time is 11:27.
21    (Recess 11:27 a.m. - 11:40 a.m.)
22    THE VIDEOGRAPHER:  We are back on the
23 record. The time is 11:41.
24 BY MR. TOMPROS:
25    Q   All right. Ms. O'Laughlin, I would like

**00**

1 to dig into your Eveready Survey. If you could go
2 to page 29 of your report.
3    **A   Certainly.**
4    Q   And I want to ask about this pretest
5 process, so in paragraph 28. And you state here
6 that a team under your supervision conducted 10
7 pretests; right?
8    **A   That's correct.**
9    Q   All right. And what were the results of
10 those pretests?
11    **A   So the results of the pretests are**
12 **documented in footnote 72.**
13    Q   And so the footnote 72 describes a
14 modification made to the survey; right?
15    **A   Yes.**
16    Q   And so that shows the steps that you took
17 following the pretests; right?
18    **A   Yes.**
19    Q   What were the actual results of the
20 pretests?
21    **A   The results were that people were to think**
22 **out loud when they take a survey. So I have in**
23 **my -- so Appendix C provides my pretest moderator**
24 **instructions, if we can turn there.**
25    Q   Sure, let's take a look at that. That

**0**

1  begins on page -- I'm trying to find the right page.
2  So these are the -- just to make sure I understand
3  the way that it works, during the pretest,
4  respondents actually complete the survey; correct?
5    A  Yes.
6    Q  And then following the completion of the
7  survey, they are then asked Questions Q1 through Q10
8  of your Appendix C; correct?
9    A  That's correct.
10   Q  And what were the results of the survey
11  that they took before answering those questions?
12   A  I don't know what they answered to the --
13  to the survey itself.  Is that what you're asking?
14  Did I record the answers to the survey?
15   Q  Correct.
16   A  The -- I don't -- I don't know what they
17  answered.
18   Q  Okay.  So it's very possible the
19  pretests -- you don't know one way or the other what
20  the survey respondents said in response to the
21  survey in the pretest; right?
22   A  That does not matter.  It's really about
23  whether or not they had issues taking the survey,
24  whether or not the questions themselves were
25  unclear, whether any of the answer options were

**03**

1  you might kind of generate data in kind of going
2  through that survey multiple times just trying to
3  make sure that it's all working correctly.
4    During that process as well, we have
5  people take the survey as part of this pretest.  But
6  the answers that they have in there are going to be
7  part of that sort of debugging phase.  And there's
8  no way to identify them one way or another, and we
9  simply, you know, remove all those data that come
10  from my debugging, from my team's debugging, and
11  from the pretest.  It's not relevant at all what
12  they answer in the survey, the survey itself.
13   Q  Members of your team do have access to the
14  survey answers, though; correct?
15   A  At this point no one has access to the
16  answers.
17   Q  All right.  At the time -- right after
18  conducting the pretest, members of your team had
19  access to those answers; correct?
20   A  So members of my team, I suppose, could
21  have accessed the data, but they did not administer
22  the -- they did not administer the -- the pretest.
23  So there the person who moderated the pretest had no
24  access to the answers.
25   Q  Members of your team had access to the

**02**

1  unclear.  And of course the Eveready approach is
2  pretty well known at this point so that the
3  questions and -- are pretty baked.  But really the
4  idea is to make sure that people were able to see
5  the survey, they were able to view the images, that
6  they didn't feel like they were being led one way or
7  another, that they were unable to determine the
8  purpose for conducting the survey, and if they had
9  any other comments about the survey.
10   Q  But they also did answer the survey
11  questions; correct?
12   A  They did, yes.
13   Q  And you had access to those answers;
14  correct?
15   A  I did not.
16   Q  Who had access to those answers?
17   A  Those -- those answers we simply -- we
18  don't even -- I don't even look at those answers.  I
19  don't want to look at those answers.  Those answers
20  are removed from the sort of -- so let me take a
21  step back.
22    So when you create a survey, you might go
23  through the survey several times just to take it
24  yourself to make sure that it's making sense, to
25  make sure that the logic flows.  So in doing that,

**04**

1  pretest answers; correct?
2    MS. MELCHER:  Objection; mischaracterizes
3  the testimony.
4    A  So it's possible that they would have had
5  access, just like me, to the answers but would have
6  no way of discerning what belonged to what.
7    Q  And following the pretest, you made
8  changes to the survey; correct?
9    A  I did, I made some minor changes to the
10  survey instrument, yes, I did.
11   Q  And that is reflected in footnote 72 of
12  your report on page 29; correct?
13   A  That's correct.
14   Q  And you said now no one can get the
15  pretest survey responses.  What do you mean?
16   A  Well, what I mean is that before we field
17  the survey, you clean out all of the data that you
18  have from debugging.  I'm not sure what happens on
19  the vendor side, but we say okay, now we're done
20  with debugging, can you please launch the survey?
21  And so perhaps somebody has that information
22  somewhere, but it's not -- I'm not aware of it.
23  It's theoretically possible, I suppose, but I don't
24  know.
25    But either way we tell the vendor, okay,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

27 (105 to 108)

05

1 now we're finished debugging. And my understanding
2 is that they clear the -- clear the data and then
3 field it and then provide us with the data set of
4 the fielded study.
5      Q   So the pretest responses were not provided
6 to -- strike that.
7           You haven't provided the pretest responses
8 to Yuga's lawyers; right?
9      A   No, there's -- I never looked at it. My
10 team couldn't discern what that is. Really what we
11 have here is a pretest that, like I said, is to
12 ensure that the questions are clear and unambiguous
13 and that people are able to see the stimuli and take
14 the survey and understand what the instructions are.
15 It's not about the responses; it's about the
16 questions themselves.
17     Q   After the pretest, you changed the
18 screening questions; correct?
19     A   I did. I did make some minor changes to
20 the -- to the screening question, yes.
21     Q   After the pretest, you changed the
22 screening questions such that more people would
23 qualify for the survey; correct?
24     A   I made adjustments to allow respondents
25 the opportunity to qualify if they were also

06

1 considering purchasing cryptocurrency and an NFT in
2 the future. So this relates to the target
3 population for the study, which is all actual and
4 potential customers of the -- of the NFT.
5      Q   And population for the study matters for
6 your analysis; right?
7      A   The population matters for my analysis,
8 yes.
9      Q   What criteria do you use to determine the
10 appropriate population for a survey?
11     A   So you need to think about what is being
12 studied and what the allegations are in this case.
13 So for this study you need to think about past and
14 potential buyers of the junior user's goods or
15 services. I discuss this in the next paragraph of
16 my report. You can refer to that, if you would
17 like. And so the target population for the survey
18 is past and potential purchasers of RR/BAYC NFTs.
19 And so in order to find these people, these are -- I
20 define the target population as individuals who
21 indicate they have purchased an NFT in the past year
22 using Ethereum or are considering purchasing an NFT
23 using cryptocurrency in the next year, and also I
24 include individuals who indicate that they've either
25 purchased digital art as a collectible in the past

07

1 year or are considering doing so in the next year.
2      Q   And that was -- that criteria was the
3 criteria you set after the pretest; right?
4      A   The criteria that I set after the pretest
5 was to include that --
6           If you can go to paragraph 29, please.
7           MR. TOMPROS:  So go to the next page.
8           Sorry, can we go to the next page, please.
9           There we go.
10          THE TECHNICIAN:  Sorry, it was on pause.
11 Sorry about that.
12     A   Yeah, here we go. So here -- so, sorry,
13 the next page now, too. That's paragraph 29. And
14 so here I say, "Accordingly, the target population
15 for my Foundation Eveready Survey is," and I have an
16 enumerated list using romanettes, that footnote 72
17 relates to romanette ii, are considering purchasing
18 an NFT using cryptocurrency in the future.
19     Q   Okay. So just so I make sure I've got it
20 right, you conduct the pretest -- I want to make
21 sure I have the timeline correct. There was a
22 pretest conducted; correct?
23     A   Yes.
24     Q   At some point members of your staff had
25 access to the pretest results but no longer have

08

1 that access; correct?
2           MS. MELCHER:  Objection; mischaracterizes
3 testimony.
4      A   That's not what I said. What I -- I think
5 part of this is -- this relates to the logic in
6 which people are screened in. And I think that this
7 surface during the pretest is that somebody could be
8 considering purchasing an NFT using cryptocurrency
9 in the next year and -- and made an adjustment to
10 the screener to allow for that possibility.
11     Q   I understand. I just want to make sure
12 I've got the timeline correct. After the pretest,
13 members of your staff had access to the pretest
14 results; correct?
15          MS. MELCHER:  Objection; mischaracterizes
16 testimony.
17     A   So, again, the pretest results that I
18 refer to in my report relate to the information that
19 was gathered from the qualitative questions that are
20 listed in my Appendix C.
21     Q   Okay. I'm not interested in that. And I
22 may be using "results" wrong, so I withdraw that
23 question. Let me try it again.
24          After the pretest, members of your staff
25 had access to the responses of survey participants

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

28 (109 to 112)

09

1  in that pretest; correct?
2     A   During the debugging process, we take the
3  survey many times, and so data are generated in
4  the -- in the files.
5     Q   So the answer is yes; right?
6     A   And part of those -- I haven't finished my
7  answer.
8     Q   I'm sorry.  Go ahead.
9     A   And so part of my data, it would be --
10  would include -- any sort of data that's created in
11  the process could involve me taking the study,
12  somebody else taking the study, taking the study to
13  see how it looks, making sure an adjustment to the
14  sizing looks right, making sure it renders
15  appropriately on a mobile device versus a desktop
16  versus a tablet versus an iPhone versus an Android.
17  There is all sorts of data that are put into --
18  entered into the survey.
19        Part of those data will be 10 pretests
20  that are listed here, but there's no way to identify
21  the data from the pretests separately from the --
22  from the -- from the debugging data, for example.
23     Q   Okay.  So there were pretests conducted
24  that generated data; correct?
25     A   That the pretest people had to take the

0

1  survey during the pretest.  But the data that I
2  consider and that's part of my report is documented
3  in my Appendix C.
4     Q   And after the pretest, you changed the
5  survey to make it easier to qualify; correct?
6        MS. MELCHER:  Objection; mischaracterizes
7  testimony.
8     A   After the pretest, I made a minor
9  modification to update the screening questionnaire
10  to allow respondents to qualify as a potential NFT
11  purchaser.
12     Q   And we don't know whether the survey
13  results in the pretest showed absolutely no
14  confusion or not; correct?
15     A   The results in my pretest, to the extent
16  they were recorded, are entirely irrelevant.  Any
17  sort of data that's generated and recorded in, like,
18  what would be -- what would be the equivalent of my
19  ultimate Excel file for my fielded survey is not
20  something I look at, is not something I can discern,
21  and is not something that I ever look at.
22     Q   And it could be that it showed zero
23  percent confusion in the pretest before you changed
24  the survey; correct?
25        MS. MELCHER:  Objection; calls for

1  speculation, incomplete hypothetical.
2     A   As I mentioned, there are 10 pretests.
3  These 10 pretests are a very low number, and I
4  wanted to make sure that I accurately covered the
5  target population as -- you know, as I mentioned, I
6  think, when I was discussing paragraph 20 of my
7  report -- that's not right.
8        Sorry.  20 is at -- sorry, still at 29,
9  actually.  So like I said, the appropriate target
10  population is past and potential purchasers of
11  RR/BAYC NFTs.  The survey was adjusted to ensure
12  that I had potential purchasers so was able to
13  accurately capture potential purchasers of RR/BAYC
14  NFTs.
15     Q   And you agree that a crucial first step in
16  designing a survey is to identify the target
17  population; correct?
18     A   Yes.
19     Q   And specifically as in your paragraph 29,
20  you are aiming to identify survey participants who
21  were past and potential purchasers of RR/BAYC NFTs;
22  correct?
23     A   Correct.
24     Q   All right.  And now if we look at page 31
25  as paragraph 29 continues --

2

1     A   Yes.
2     Q   -- one of the criteria is someone who has
3  purchased an NFT in the past year using Ethereum;
4  right?
5     A   Yes.
6     Q   And the second criteria is someone who is
7  considering purchasing an NFT using cryptocurrency
8  in the next year; right?
9     A   Yes.
10     Q   And then the next criteria is someone who
11  has purchased digital art as a collectible in the
12  past year; right?
13     A   Yes.
14     Q   What's digital art?
15     A   It would depend on the perspective of the
16  individual, but an NFT could be considered to be
17  digital art by a consumer, and so that is included
18  as a screening criteria.
19     Q   And how many of the survey participants
20  qualified solely because they said yes to the
21  digital art question?
22     A   It's a small percentage.  It's a very
23  small percentage.  We can look at the data if you
24  would like, but it's a very small percentage.
25     Q   And then Question 4 is "considering doing

**3**

1  so in the next year." That's purchasing digital
2  art; correct?
3  **A   Yes.   That's a small percentage.**
4  **When I'm referring to the digital art people, it's a**
5  **small percentage.   If you would like to refer, we**
6  **can refer to my -- my survey script.**
7  Q   Is it possible to purchase an RR/BAYC --
8  **A   Sorry, I didn't finish my answer.**
9  Q   Oh, I'm sorry.
10  **A   Yeah, I would like to finish.**
11  **So if you take a look at my survey script**
12  **which was Appendix D.2, the second page 2, it says**
13  **"No more than 200 completes qualified through QS13**
14  **or QS14."**
15  **I'll wait for you to get there.   It's**
16  **Appendix D.2.   It's probably like in the hundreds in**
17  **the PDF page.**
18  Q   So 200 is how many you said qualified?
19  **A   That was the maximum quota.   200 did not**
20  **qualify.   It didn't even get close to that.**
21  Q   So the maximum number of people that could
22  have clicked the digital art -- one of the digital
23  art buttons was 200; right?
24  **A   Yes, together, together.   So those two**
25  **together.**

**4**

1  Q   And how many total survey participants
2  were there?
3  **A   A target of 500 completes.   I believe I**
4  **have slightly more than that.**
5  Q   Okay.   Now, did you ask any survey
6  participant whether they had an Ethereum wallet?
7  **A   So if we take a look at my survey**
8  **questionnaire, I ask the respondents -- let's get**
9  **there.**
10  Q   What page are you looking for?
11  **A   I'm on my -- I'm still in my Appendix D.2**
12  **survey script.   If you can keep continuing, please,**
13  **to, like, 125 maybe.   We'll see if that gets us**
14  **there.**
15  Q   Which page of the survey script do you
16  want to be on?   I've got it here.
17  **A   I would like to be on page 6.**
18  Q   So it's PDF page 138, and so we're focused
19  on the right question.
20  **A   Thank you.**
21  Q   My question is did you ask any survey
22  participant whether they had an Ethereum wallet?
23  **A   I asked consumers whether they purchased**
24  **any of the following cryptocurrencies in the past**
25  **year, so Ethereum.**

**5**

1  Q   Okay.   And what percentage of survey did
2  you -- what percentage of survey participants had
3  said yes to Ethereum?
4  **A   More people than not qualified through the**
5  **sequence of cryptocurrency.**
6  Q   Okay.   And how do your surveys'
7  demographics compare to the demographics of the NFT
8  market?
9  **A   So I have a footnote about that.   Let me**
10  **find that.   It's footnote 104 on page 42 of my**
11  **report.   That's probably approximately PDF page 42.**
12  Q   Okay.   And if we look at footnote 104, it
13  says, "The demographic characteristics of the final
14  sample are consistent with NFT purchasers."
15  Did I read that right?
16  **A   That's correct.**
17  Q   Okay.   42 percent of your survey
18  participants were over the age of 40; correct?
19  **A   So which -- what table are you referring**
20  **to?**
21  Q   I was looking at the underlying survey
22  results and calculating 42 percent.   Did you do a
23  calculation as to whether the age corresponded to
24  the demographic characteristics?
25  **A   So if we take a look at -- so there's the**

**6**

1  **respondent demographics in Exhibit 2 to my report.**
2  **And, you know, half of the respondents are under 40**
3  **in the CGBC group and more than half are under 40 in**
4  **the BAYC group.   And I compared the age distribution**
5  **to the age distribution that's reported in that**
6  **source document, as well as the relative proportions**
7  **of males and females, and found that it was**
8  **generally consistent with those data.**
9  Q   What do you mean by "generally
10  consistent"?
11  **A   Well, there's no one -- so if we were --**
12  **do you have the source document?   It might be**
13  **helpful to compare that source document to my -- to**
14  **my respondent demographics.   But we don't have to go**
15  **there if you would like, but I can -- do you have**
16  **that document?**
17  Q   I'm sure I've got it somewhere.   So let's
18  look at your Exhibit 2.   So if we go to page 78 of
19  your report in the PDF.
20  **A   Mm-hmm.**
21  Q   Your understanding is that your respondent
22  demographics correspond to NFT purchaser respondent
23  demographics; correct?
24  **A   Yeah, it's consistent with the**
25  **demographics of NFT purchasers, yes.   And intenders.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

30 (117 to 120)

7

1 Now, keep in mind that I do have people that are
2 also considering purchasing digital art as well in
3 there. So there may be a slight difference in
4 publicly available information that talk about
5 demographic characteristics of people who have
6 purchased NFTs.
7          This source reports on people who have
8 purchased NFTs. And in the source document, we can
9 see that it generally skews younger and there's
10 generally more men than women, and, indeed, that's
11 exactly what I see in my own data.
12    Q   And the skew that you have is 65 percent
13 men, 35 percent women; correct?
14    A   If we're looking at -- you're looking at
15 the BAYC --
16    Q   I'm looking at the BAYC group; right.
17    A   Yes, that's what I have there, yes.
18    Q   And 59 percent men, 41 percent women in
19 the CGBC group; right?
20    A   Correct.
21    Q   So somewhere between 35 and 40 percent
22 women, according to your survey; correct?
23    A   Yes.
24    Q   All right.
25    A   For either -- yes, exactly. That qualify

8

1 for my survey based on the four criteria that we
2 discussed earlier, yes.
3    Q   And your testimony is that that is
4 consistent with the bitsCrunch source that you cite?
5    A   It's consistent with it, yes.
6    Q   And how close is it?
7    A   So when you -- so it's -- I mean, it's
8 sufficiently close for my purposes. So keep in
9 mind, however, the bitsCrunch source looks at NFT
10 purchasers, as opposed to intenders, as well as
11 digital art collectors. So there may be some
12 differences. But what I'm looking for is: Is this
13 consistent? Do we see more men than women in that
14 source? Do I see more men than women in my data?
15 Do I tend to see more younger people? Yes, I tend
16 to see more younger people.
17          I don't think there's a breakdown by
18 region in that source, and I'm not even sure if that
19 source -- I'm not sure what data they have on
20 location of individuals, but generally
21 demographically I see younger people and I see more
22 men than women, and that is consistent with that
23 source.
24    Q   And that source -- did you consider how
25 many more men than women that source shows?

9

1    A   So if you look at that source, I believe
2 there's a bar chart, and so you need to compare the
3 relative ratios in the bar chart. And I don't see
4 it in front of me, so you would have to open that up
5 if you would like to discuss it in more detail. But
6 it's important to think about the relative ratios
7 and how the qualifying sample was created and so on.
8          But in any case, the outcome that I recall
9 is that more men than women, and that's what I
10 observe, and the relative ratios were about -- about
11 right, and more young people than old people. And,
12 again, the relative ratios were about right.
13    Q   So you considered the relative ratios and
14 you thought they were close enough; right?
15    A   It's consistent with my outcome. But
16 taking into account, of course, that they have --
17 these are NFT purchasers as opposed to people who
18 could be intending to purchase an NFT, people who
19 could be intending or have purchased digital art as
20 well.
21    Q   So you would expect that if we looked at
22 that, we would see that roughly 40 percent or so
23 would be -- of NFT purchasers would be over the age
24 of 40 in the survey -- in the study that you
25 identified; right?

20

1          MS. MELCHER: Objection; mischaracterizes
2 testimony.
3    A   Like I said, it's -- I'm looking for
4 external marketplace evidence on NFTs just to make
5 sure that I got it about right. And what I find is
6 that I think my screening worked appropriately
7 because what I can tell from this source is that
8 people who purchase an NFT, there's more men than
9 women, and it's younger -- it's more -- it's on the
10 younger side, and that's what I see in my data.
11    Q   You designed your Eveready test to mirror
12 purchasing an NFT on foundation; right?
13    A   My Eveready test uses the purchase process
14 that one might encounter if someone were to purchase
15 the NFT on foundation, yes.
16    Q   The foundation requires logging into a
17 cryptocurrency wallet to purchase an NFT; correct?
18    A   It is my -- it's my understanding that
19 yes, that is -- that is required.
20    Q   You did not include that in the purchase
21 flow; correct?
22    A   That step is the very last step, which is
23 that that black box and -- sorry. Let me be more
24 precise here.
25          So if you were to go to Figure 8 on my

Case 2:22-cv-04355-JFW-JEM   Document 265-3   Filed 06/02/23   Page 33 of 59   Page ID
#:19700
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin                    31 (121 to 124)
March 22, 2023

21

1  report, page 37.
2      Q   Okay. I'm there.
3      A   This shows the purchase flow instructions
4  and stimuli. So that very last step of purchasing
5  the NFT would happen by clicking on that black box
6  underneath the -- I think it's 0.88 ETH, where
7  that -- we see the Bored Ape with the rainbow teeth.
8  And it's on the right-hand side of the page in the
9  sort of long black box.
10     One might be better able to see it in the
11 survey stimuli. Maybe we should go to Appendix D.1
12 instead. It might be a bit more visible.
13     So I'm on page 6 of Appendix D.1. And so
14 it's my understanding that that last step of
15 clicking on "buy now" would then link the person --
16 link to a wallet and simply create that transaction
17 at that point. And so that would be the final step
18 of purchasing.
19     Q   And that step was not included in the
20 survey; right?
21     A   It was not included in the survey because
22 it was not appropriate to do so given my target
23 population.
24     Q   All right. I would like to take a look,
25 if we could, at page 21 of your report,

22

1  paragraph 24, and here you're describing the
2  versions of the Bored Ape Yacht Club Foundation
3  collection page that you used. Do you see that
4  paragraph?
5      A   I see that paragraph. Yeah, in this
6  paragraph I found two versions of that foundation
7  page on the Wayback Machine website, yes, and they
8  differ from one another. I ultimately used the
9  June 21st, 2022, version, though.
10     Q   Okay. And are those the only two pages on
11 Foundation where one could purchase an RR/BAYC?
12     A   I'm sorry, the only -- are you talking
13 about the page structure, or are you talking about
14 the NFTs themselves?
15     Q   Yeah. Let me put it this way. So you
16 said you identified two versions of Ripps' Bored Ape
17 Yacht Club Foundation collection page; right?
18     A   Yes.
19     Q   There was also a Foundation collection
20 page that was in a different format under the
21 heading "Ryder Ripps"; correct?
22     A   The collection page that says "Bored Ape
23 Yacht Club" is what I tested. Those are the --
24 that's the -- that's the collection pages that I
25 tested.

23

1      Q   And where did you get that page?
2      A   I got the pages from the Wayback Machine
3  by looking at the -- at the URL which is,
4  unfortunately, hard to see, but I think I have it in
5  the footnote.
6      Q   So just to make it clear, to get -- you
7  had to look for a specific URL on the Wayback
8  Machine; right?
9      A   So the URL, the collection-level URL that
10 I used is on page 3 of my Appendix D.1. It is
11 foundation.app/collection/bayc.
12     Q   Why did you choose that URL?
13     A   Because this is a URL that carried the
14 collection of Bored Ape Yacht Club NFTs.
15     Q   Did you get that URL from Yuga's lawyers?
16     A   It's my understanding that Google searches
17 pointed to this page if you were to --
18         (Simultaneous speaking.)
19     A   I'm sorry, I didn't hear what you said.
20     Q   Sorry. How do you know that?
21     A   So I saw Google searches on -- on the
22 complaint that point to -- that show what the search
23 query was and the results.
24     Q   And when were those Google searches
25 conducted?

24

1      A   I don't recall.
2      Q   Were they conducted when the page that you
3  used actually existed?
4         MS. MELCHER:  Asked and answered.
5      A   I don't recall.
6      Q   Did you read Mr. Ripps' deposition?
7      A   I believe it was in the materials I
8  considered, yes.
9      Q   And did you read the portion where he
10 described his artist Foundation page?
11     A   I don't recall it, but it sounds familiar.
12     Q   Have you taken any steps to review what
13 Mr. Ripps' artist Foundation page looked like at the
14 time that you were considering -- at the time that
15 you -- for the time period in which you generated
16 your survey?
17     A   It's my understanding that Mr. Ripps
18 directed people to this page with his own -- or his
19 collaborators also directed people to this page with
20 his -- with his tweets. So I felt that this page
21 was most appropriate given -- given the assignment
22 of forward confusion and the marketplace context in
23 which these marks appear.
24     Q   What's the basis for the understanding
25 that people were directed to the page that you used?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

32 (125 to 128)

25

1    A  I believe in the complaint there is a
2  tweet from some handle that's, like, BAYC V3, and it
3  points people to that -- to the foundation page, to
4  this foundation page.
5    Q  I'm having a hard time finding that in the
6  complaint.  Do you cite that anywhere in your report
7  that you're basing this Foundation page on a tweet
8  or otherwise?
9    A  So the Foundation page choice is made from
10  numerous factors.  I believe it is -- I believe
11  there is a point to the -- there is a reference to
12  the Foundation app collection in the complaint.  But
13  I don't have the complaint in front of me, so I
14  can't direct you to it without looking at it.
15        But right here, this is a good place to
16  look.  So it's my understanding that -- that
17  Foundation was one of the first places that -- if
18  not the first place, where the RR/BAYC NFTs were
19  offered for sale.  There's a collection, a
20  collection marker that uses the BAYC marks, and it
21  is on this page.  It's my understanding that this is
22  certainly a way that many respondents -- or many
23  actual and potential customers could have and likely
24  encountered the RR/BAYC page on Foundation.
25    Q  So what basis do you have for that

26

1  understanding, that respondents that "many actual
2  and potential consumers likely encountered the
3  RR/BAYC page on Foundation"?
4    A  The basis is that's how one might navigate
5  through this website.  The website is organized by
6  collections.  Collections are one of the ways of
7  exploring the website.  So it's a reasonable -- it's
8  a reasonable way that people would -- would look at
9  NFTs and --
10    Q  Have you -- oh, sorry.  Go ahead.
11    A  And there's also -- you know, there's
12  the -- there's different -- you know, there's the
13  possibility of arriving there through a search,
14  there's a possibility of arriving there through
15  links from tweets, and so on.
16    Q  Can you identify any links from tweets?
17    A  I believe, like I said, there is a link
18  and a tweet that was from the BAYC V3 handle.
19    Q  And whose handle is that?
20    A  I don't know, but it appears to me to
21  refer to -- we would have to look at the context,
22  but there's different -- there's different -- and
23  there's description around it, but it appears to be
24  not Yuga Labs' account.
25    Q  Did you -- did you do any investigation as

27

1  to whether Mr. Ripps or Mr. Cahen has any
2  relationship to the BAYC V3 handle?
3    A  I did not do any investigation of that.
4    Q  Did you read their testimony where they
5  said they did not?
6    A  I don't recall seeing that one way or
7  another.
8    Q  Did you read the deposition testimony of
9  Yuga Labs' witnesses where they could identify no
10  connection between that handle and Mr. Ripps or
11  Mr. Cahen?
12        MS. MELCHER:  Objection; vague,
13  mischaracterizes deposition testimony.
14    A  I don't recall that, but I recall there
15  being a discussion in a Discord chat document that
16  references BAYC V3.
17    Q  That Twitter handle specifically or BAYC
18  V3, the concept?
19    A  I'm sorry, I thought you were talking
20  about the concept of BAYC V3 in general, so that's
21  why I brought that up.  I believe it refers to the
22  concept of that, or it refers to BAYC V3.
23    Q  Did you conduct -- have you been to the
24  Foundation website?
25    A  I have been to the Foundation website.

28

1    Q  And is it organized by collection in your
2  view?
3    A  It's organized in multiple different ways.
4  If you -- you can search for -- in a lot of
5  different ways.  It would depend.  And you can
6  choose how to interact with it and search for it and
7  look for an NFT or look for, perhaps, you know, some
8  other -- any sort of -- there's different items that
9  are offered for sale, essentially, and you can
10  explore, you can search Foundation, you can search
11  by artist, you can search by collection.  There's
12  different ways of searching.
13    Q  Have you searched Foundation for BAYC?
14    A  Yes, but not recently.
15    Q  And what did you find?
16    A  I don't recall.
17    Q  You can search Foundation by artist;
18  correct?
19    A  It's possible, yes.
20    Q  And there are artist pages on Foundation;
21  correct?
22    A  Correct.
23    Q  You chose not to use an artist page in
24  your survey; correct?
25    A  I chose not to use an artist page because

Case 2:22-cv-04355-JFW-JEM   Document 265-3   Filed 06/02/23   Page 35 of 59   Page ID
#:19702
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023
33 (129 to 132)

29

1  it would not be appropriate for the test I was
2  conducting.
3      Q   Why would it not be appropriate?
4      A   It's my understanding that for this case
5  it was most appropriate to use the -- the collection
6  page because the collection page featured the use of
7  the BAYC marks, particularly the ape skull at the
8  top.
9      Q   So you picked the page -- well, you picked
10 the page that featured the marks most prominently.
11 Is that what you did?
12     A   The Eveready study simply tests the junior
13 users' use of the marks.  This was one of the ways
14 in which Mr. Ripps used the BAYC marks.  And so it
15 was certainly an appropriate way to test it given
16 that this was how it appeared in the marketplace.
17     Q   So that's my question, how it appeared in
18 the marketplace.  How do you know that the
19 collection page is how consumers encounter
20 Foundation in the marketplace versus the artist
21 page, the search page or some other format?
22     A   There is many different potential ways
23 that somebody could encounter it, but this is
24 certainly a reasonable way given that there's lots
25 of discussions around collections.  OpenSea is

30

1  organized around collections.  The idea of
2  collections is a common architecture and way that
3  consumers engage with the NFT market, so looking at
4  it from the collections perspective made sense here
5  as well, and it was how it involved Mr. --
6  Mr. Ripps' use of the Bored Ape Yacht Club name and
7  the Bored Ape Yacht Club ape skull logo as well.
8      Q   Now, you just stated that OpenSea is
9  organized around collections.  Foundation is
10 organized around artists; correct?
11     MS. MELCHER:  Objection; mischaracterizes
12 the testimony.
13     A   That's not what I said.  Foundation allows
14 for many different ways of searching Foundation, for
15 looking at Foundation, for -- or arriving at
16 Foundation.  The Google allows one -- if you were to
17 conduct a search for -- for a BAYC NFT, it would
18 direct you to the collection page.
19     So it's -- there's many different ways,
20 and it's not -- it's not one way or another.  There
21 are different paths.  And, you know, given unlimited
22 time, it's certainly possible to test every single
23 possible way that the consumer would possibly
24 encounter the marks.  But this is a plausible common
25 way that consumers who are either considering or

3

1  actual purchasers of NFTs could encounter Mr. Ripps'
2  use of the BAYC marks.
3      Q   Can you identify a single person who ever
4  encountered the Foundation app page in the way that
5  you presented it in your survey?
6      MS. MELCHER:  Objection; vague, outside
7  the report.
8      A   So I believe that the link that I referred
9  to in Twitter points to a collection page.  And so
10 that's certainly at least one version, one person.
11 And the particular page was available and captured
12 on -- on the Wayback Machine.  And the Wayback
13 Machine I think, you know, that's another way of
14 capturing the page as well.  So I'd assume that if
15 it's important enough to be captured by the Wayback
16 Machine, some consumers would have encountered it.
17     Q   But you cannot identify a single one, can
18 you?
19     MS. MELCHER:  Objection; asked and
20 answered.
21     A   So as I mentioned, there may be that
22 Twitter link that I point to, as well as the -- the
23 Wayback Machine indicates that consumers encountered
24 that page.  But I can't personally -- I don't have
25 access to the unique IP addresses nor their

32

1  locations nor the identities of the people who
2  browse on a particular page of the Internet for a
3  particular day.  But it's safe to assume that this
4  is certainly a way that consumers would have
5  encountered the mark.
6      Q   How many RR/BAYCs were sold through
7  Foundation?
8      A   I don't know.
9      Q   Do you know if it's in the -- more than a
10 hundred?
11     MS. MELCHER:  Objection; asked and
12 answered.
13     A   I don't know.
14     Q   It could be zero, for all you know; right?
15     A   I don't think it's --
16     MS. MELCHER:  Objection; asked and
17 answered.
18     A   I don't know.  It could be.
19     Q   Okay.  Now, you mentioned a Twitter link,
20 and I want to make sure that we're all talking about
21 the same thing.  So you think that there was a
22 Twitter link that linked specifically to the
23 collection website for -- on the Foundation app;
24 right?
25     A   I believe so.  I'm not certain, but we

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

33

1  could look at the -- I haven't been able to look at
2  the complaint to verify that one way or another.
3      Q  Let's first just make sure that I've got
4  your -- that that's not -- I want to make sure you
5  don't refer to that link in your report anywhere;
6  right? I'm trying to find it. I honestly don't
7  know. But if you know, I would like to know.
8      A  I would refer to the paragraphs in the
9  complaint that contain that, that image.
10     Q  Okay. And the paragraphs that describe
11 that page are in your report with reference to the
12 URL for the Foundation page; right?
13     A  I'm sorry. Could you please rephrase
14 that?
15     Q  Sure. I just want to make sure I -- I
16 think you testified that you believe that there was
17 a Twitter link to the Foundation page for the
18 collection -- the Foundation page -- let me just do
19 it this way.
20        Let's take a look at your report on
21 page 21, paragraph 23, right, and you say in
22 paragraph 23: For my Foundation Eveready study,
23 respondents were guided through a simulated purchase
24 flow of Foundation web pages, as this replicates
25 what a consumer would experience when purchasing an

34

1  at-issue RR/BAYC NFT on the Foundation website;
2  right?
3      A  That's what I say, yes.
4      Q  And then in paragraph 24 you describe two
5  dates, May 19th and June 21st; correct?
6      A  Yes.
7      Q  And you have a footnote that cites -- two
8  footnotes, 63 and 64, that have links to Wayback
9  Machine URLs for foundation.app/collection/bayc;
10 right?
11     A  Yes.
12     Q  And I have been focused on why it is you
13 thought that somebody would go to
14 foundation.app/collection/bayc to purchase an
15 RR/BAYC, okay? And so would it be in these
16 paragraphs or around these paragraphs where you
17 would have identified this -- why it is that
18 somebody would have gone there?
19     A  So there's a bunch of places that I
20 discuss, and it's not exclusively in that paragraph.
21 And, for example, I discuss in paragraph 20 that the
22 Foundation marketplace is where Ripps and Cahen
23 initially minted and sold the RR/BAYC NFT
24 collection. That relates to Hickman's deposition.
25        There's also different, you know, sources,

35

1  such as the counterclaims. And I'd also, you know,
2  look at the -- when I'm discussing the background of
3  the case, I refer to -- I refer to the complaint as
4  well.
5         So a lot of these elements relate to the
6  choice of -- of the -- of using the Foundation
7  marketplace. So you can see, for example, in the
8  background section on paragraph 12, it discusses the
9  RR/BAYC NFT collection on Foundation. And in some
10 of these instances, it refers to the complaint,
11 counterclaims, publicly available sources, and so
12 on.
13     Q  Okay. And I'm interested specifically in
14 this tweet that you think was out there that pointed
15 people to this collection page. There's no mention
16 of it in your report that we've been able to find;
17 right?
18     A  I referred to the complaint throughout my
19 report. It is one of the materials I considered in
20 forming my opinions. So it's -- it's an example --
21     Q  All right.
22     A  -- of one of the reasons why I picked
23 Foundation, I specifically picked -- I specifically
24 picked the -- the Foundation page.
25        MR. TOMPROS:  Okay. I've just shared in

36

1  the chat this tab S36. Could we mark that as the
2  next exhibit? That's a copy of the complaint.
3         THE TECHNICIAN:  Yeah, I see it. Give me
4  one second.
5         (O'Laughlin Exhibit 6 marked for
6  identification.)
7      Q  Okay. So you have Exhibit 6 in front of
8  you, a copy of the complaint, and you're welcome to
9  download it if you like, and we can search it or do
10 whatever you want. See if you can help me find this
11 tweet that you're referring to.
12     A  Sure. Let's try that. And I apologize.
13 This is up on a very big screen in front of me, so
14 I'll do my best to not close out, but please be
15 patient with me while I try to do this.
16        THE TECHNICIAN:  Can you hear me?
17        MR. TOMPROS:  Yeah, we can hear you.
18        THE TECHNICIAN:  So I'm going to give
19 control to Ms. O'Laughlin so she can scroll up and
20 down. Does that work for you?
21        THE WITNESS:  It's okay. I'm trying to...
22     A  It's not there. That's the 40 -- one
23 second. Right here. So the RR/BAYC points to the
24 foundation.app/collection/bayc. I was incorrect in
25 associating with the V3 account. It's right here

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

35 (137 to 140)

37

1 this --
2    Q   Where are you?
3    A   Can you see my screen?  Right here.  I'm
4 circling this first panel here.
5    Q   Yeah.  Page 20?
6    A   Right.  It says, "Ryder Ripps Bored Ape
7 Yacht Club.  To become a member, buy a RR/Bored Ape
8 or Mutant Ape on foundation.app/collection/bayc."
9    Q   Got it.  And that's the @RR_BAYC account
10 that you've identified there; right?
11   A   Yeah, at RR_BAYC, yes.
12   Q   Okay.  I've got it.  And your
13 understanding is that that is associated with
14 Mr. Ripps in some way; right?
15   A   It's my understanding that at least one
16 person, you know, directed people to this -- this
17 page, this collection.  Somebody must accessed this
18 page in order to get there.  So there's certainly
19 someone whose pointed to the page.
20   Q   Okay.  That makes -- I understand.
21       So have you identified anyone who has
22 actually made a purchase using the
23 foundation.app/collection/bayc link?
24   A   I have not conducted such an analysis.
25   Q   Okay.  So if we could go back to your

38

1 report, your analysis was of the Foundation page as
2 it existed in June of 2022; correct?
3    A   Yes.
4    Q   And for how long was that Foundation page
5 in the form -- available in the form that you used
6 for your survey?
7    A   I don't know.
8    Q   You used a version that was available
9 specifically on June 21st, 2022; correct?
10   A   The version that I based my survey on was
11 based off of the June 21st version that includes the
12 distorted -- what I call the distorted BAYC Bored
13 Ape Yacht Club logo.
14   Q   Okay.  And, specifically, you don't have
15 any evidence one way or the other as to whether it
16 was available before June 21st, 2022; correct?
17   A   This was, I believe, the first instance I
18 was able to find it on the Foundation -- on the --
19 on this Foundation collection URL on the Wayback
20 Machine.
21   Q   Okay.
22   A   So that's why I say by June 21st because
23 this is the first instance I was able to observe on
24 Foundation.
25   Q   Now, could we can return to the complaint,

39

1 which is Exhibit 6.  And maybe pull that up, and if
2 we could go to page 16 of the complaint,
3 paragraph 37.  Wrong document up on the screen right
4 now.  It's the other tab.
5       THE TECHNICIAN:  What's the tab again?
6       MR. TOMPROS:  The complaint, which is the
7 one I put in the chat.  I think it's been marked as
8 Exhibit 6.
9       THE TECHNICIAN:  Okay.  I got it.  So what
10 page do you need?
11      MR. TOMPROS:  Page 16 of the complaint.
12      THE TECHNICIAN:  Got it.
13      MR. TOMPROS:  Thanks.
14 BY MR. TOMPROS:
15   Q   And if you look there in paragraph 37 at
16 line 20, there is a sentence that says, "As of the
17 filing of this Complaint, this page is no longer
18 accessible on Foundation."  Right?
19   A   Yeah, it says that.
20   Q   Okay.  So the version of the Foundation
21 page that was the subject of your survey was not
22 available on Foundation as of the filing of the
23 complaint in this case; right?
24   A   That's correct.
25   Q   And if you go up to the top of this page,

40

1 we can see the complaint was filed on June 6th,
2 2022 -- excuse me, June -- I can't read.  The
3 complaint was filed on June 24th, 2022; correct?
4    A   Yeah, no reason to -- yeah, there it is.
5 I see it, yes.
6    Q   Okay.  So the version of the Foundation
7 page that you surveyed was available from June 21st,
8 2022, to, at the absolute latest, June 24th, 2022;
9 correct?
10      MS. MELCHER:  Objection; misstates
11 testimony and the report.
12   A   That's not what I said.  What I said was
13 the first time I was able to observe it in the
14 Wayback Machine was on June 21st.
15   Q   Okay.  And you know for sure it was a
16 different page as of May 19th, 2022; correct?
17   A   I'm looking for the date in my --
18   Q   Yeah, take a look at page 21 of your
19 report, paragraph 24.
20   A   Yes, May 19th.
21   Q   Okay.  So we know for sure it was
22 different at some point before your June 21st, 2022,
23 date; right?
24   A   I believe so, but I don't -- I believe so.
25   Q   Okay.  And we know it was different after

Case 2:22-cv-04355-JFW-JEM    Document 265-3    Filed 06/02/23    Page 38 of 59    Page ID
#:19705

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

36 (141 to 144)

4

1    June 24th, 2022; correct?
2        A   That's what the complaint says, yes.
3        Q   So the only window for which we know for
4    certain that the page that you survey on Foundation
5    existed was from June 21st, 2022, to June 24th,
6    2022; correct?
7            MS. MELCHER:  Objection; mischaracterizes
8    testimony and the report.
9        A   I don't think that's what I said.  What I
10   said is that that's the date from which I pulled the
11   image from the Foundation page.  The Foundation
12   page -- I picked a Foundation page that used the
13   mark that was altered so as not to be identical to
14   the Bored Ape Yacht Club marks, the distorted -- the
15   distorted version of this ape skull logo that
16   preserves the ape skull but changes the words from
17   "Bored Ape Yacht Club" to "This Logo is Based on the
18   SS Totenkopf" and changes "BAYC" to "18 Teeth."
19       Q   Do you have any evidence that the page
20   that you surveyed was available on Foundation any
21   time other than from June 21st to June 24th?
22       A   I don't know.  It's possible that that
23   could exist in the documents I relied upon
24   somewhere, but that timing is not -- does not have
25   any impact on my opinions.

42

1        Q   Got it.  So your opinions -- you don't
2    have any evidence outside that four-day period that
3    the page that you did the survey on was actually up
4    on Foundation; correct?
5            MS. MELCHER:  Objection; asked and
6    answered.
7        A   I didn't say that.  What I said is I
8    pulled that page from the Foundation -- from the --
9    from the Bored Ape Yacht Club archived page on the
10   Wayback Machine.  And there may be information
11   from -- from the complaint, from some other source
12   that provides an image of that -- of that Foundation
13   page, but I don't have it.  And my choice of using
14   it doesn't -- is really based on the fact that it's
15   an altered image, and so it makes my test more
16   conservative.
17       Q   Okay.  So the -- the actual thing that you
18   tested, we know was available for four days and it
19   may or may not have been available for more than
20   that; correct?
21       A   I don't know that.  That's not what I
22   said.
23       Q   Well, do you have any evidence that the
24   Foundation page that you tested was actually
25   publicly available for any more than four days?

43

1        A   I haven't looked for the evidence.  I may
2    have such evidence in my reliance materials, and so
3    I don't know one way or another.  And so I -- there
4    may be evidence.  I may have it, but I don't -- I
5    don't know right now.
6        Q   Okay.
7            MR. TOMPROS:  I'm going to change topics.
8    Should we take a break?
9            THE WITNESS:  Sure.
10           THE VIDEOGRAPHER:  We are going off the
11   record.  The time is 12:48.
12           (Recess 12:48 p.m. - 1:17 p.m.)
13           THE VIDEOGRAPHER:  We are back on the
14   record.  The time is 1:17 p.m.
15   BY MR. TOMPROS:
16       Q   Ms. O'Laughlin, you relied on a group
17   called the Schlesinger Group in connection with your
18   survey; correct?
19       A   The Schlesinger Group was the market
20   research vendor that we worked with -- that I worked
21   with for the survey, yes.
22       Q   And they assembled the panels for your
23   survey?
24       A   They maintain a panel, and they sample
25   from the panel.  So they don't custom assemble

44

1    panels.  The panels exist, and then they send the
2    surveys out to panel members.
3        Q   And the panel members are paid for their
4    participation; correct?
5        A   Yes, they are compensated for their
6    participation in the surveys.
7        Q   How much are they compensated?
8        A   I have no idea.
9        Q   Does your company compensate the
10   Schlesinger Group in some way for the panelists?
11       A   We pay a fee for them to program and host
12   the survey.  It's -- you know, I don't know how much
13   this one costs, actually.  I have no idea.  But it's
14   usually, based on other work that I've done, it can
15   depend.  It can be 5,000 or 10,000 or 15,000 to
16   program and then host the survey and collect the
17   data and compensate the respondents.  You know,
18   usually the compensation is in, like, the low
19   single-dollar range for participants, but it will
20   depend on the survey itself.
21       Q   Got it.  So likely less than $10 per
22   participant?
23       A   I would -- I would assume so.  I don't
24   know for sure, but I would assume it's probably less
25   than even $5.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

45

1    Q    And Schlesinger was paid by you all
2  somewhere between 5 and $15,000 to recruit the
3  panelists and such?
4        MS. MELCHER:  Objection; mischaracterizes
5  testimony.
6    **A    Schlesinger was paid to program the**
7  **survey, to take my survey instrument, to take the**
8  **stimuli, to program that up, post it online, send it**
9  **out to their participants, and collect the data and**
10 **then give us the data back.**
11   Q    And how much was that?
12   **A    Like I said, 5 to $15,000 total.**
13   Q    I would like to focus now on some of the
14 results from your Foundation Survey, your Foundation
15 Survey using the Eveready format.  And you concluded
16 ultimately that this survey suggested that there was
17 consumer confusion; correct?
18   **A    Yes.**
19   Q    Now, one of the survey questions that you
20 asked was who or what entity do you believe puts out
21 the NFT collection you saw; right?
22   **A    That's correct.**
23   Q    And a response to that question in your
24 survey, you said that 46.1 percent of respondents
25 were assigned to the BAYC group; right?

46

1    **A    Can you point me to the location where I**
2  **say that?**
3    Q    Yeah.  I'm in paragraph 45 of your report.
4    **A    So I would like to clarify what you just**
5  **said, actually.**
6    Q    Sure.
7    **A    In response to Q4, 46.1 percent of the**
8  **respondents who were assigned to the BAYC group and**
9  **7.2 percent of respondents who were assigned to the**
10 **CGBC group identified Bored Ape Yacht Club, yes,**
11 **that's what --**
12   Q    Sorry.  Okay.  And that's just -- okay.  I
13 see, I see how it's written.
14       Okay.  So in -- when your survey
15 respondents were shown the RR/BAYC Foundation page
16 that you used, 46.1 percent of them identified Bored
17 Ape Yacht Club as the source of that collection;
18 right?
19   **A    That's correct.**
20   Q    And how did you determine that they
21 identified Bored Ape Yacht Club as the source?
22   **A    So these responses were taken by blind**
23 **coders.  You can see that I discuss this coding**
24 **analysis in the preceding paragraph, in**
25 **paragraph 44.  And there is an appendix that**

47

1  **discusses the coding instructions as well, and**
2  **that's in Appendix D.4.  But, essentially, coders**
3  **who knew nothing about the survey, knew nothing**
4  **about the purpose, nothing about the sponsor,**
5  **nothing about who Analysis Group was retained by**
6  **were provided with the instructions and the answers**
7  **and were asked to encode based on the instructions.**
8    Q    All right.  Let's take a look at those
9  instructions.  If you could go to Appendix D.4.
10   **A    Yup.**
11   Q    Let me get there.
12   **A    I'm there.  Probably around PDF page 250**
13 **maybe.**
14   Q    Yeah, that's where I was looking.  It's a
15 little higher than that.  It is PDF page 231.  And
16 so the instructions continue on to pages -- on to
17 page -- well, the instructions begin on page 231 of
18 the PDF.  This is Appendix D.4.  And if we look at
19 page 233 of the PDF, which is Appendix D.4, page 3,
20 at the bottom it says "Q4/Q8," and then it lists the
21 question; right?
22   **A    Mm-hmm.**
23   Q    And then it lists the options that could
24 be -- that would qualify something as -- that each
25 of the various categories for which Q4 and Q8 could

48

1  be coded.  And then Option 1 is "Bored Ape Yacht
2  Club."  That's on page 4 of Appendix D.4; right?
3    **A    Yes.**
4    Q    And the things that you instructed coders
5  to code as Bored Ape Yacht Club included BAYC;
6  right?
7    **A    Yes.**
8    Q    And Bored Ape, Yuga Labs, Mutant Ape Yacht
9  Club, et cetera; right?
10   **A    Yes.**
11   Q    All right.  And so if someone wrote "Yuga
12 Labs" as the source, that was, in your view, the
13 same as writing "Bored Ape Yacht Club" as the
14 source; right?
15   **A    They are classified as being related to**
16 **Bored Ape Yacht Club, yes.**
17   Q    And why did you make that classification?
18   **A    Because Yuga Labs is -- is a company that**
19 **also puts out the Bored Ape Yacht Club.**
20   Q    Now, the phrase "Bored Ape Yacht Club"
21 appeared on your Foundation Survey instrument;
22 correct?
23   **A    Yes, it does, because that's how Mr. Ripps**
24 **put that -- put it in the marketplace.**
25   Q    The phrase "BAYC" appears on that same

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

38 (149 to 152)

49

1   page; right?
2       A   I believe it does, yes, as the token
3   tracker or something like that.
4       Q   And the phrase "Bored Ape" also appears in
5   your survey instrument; correct?
6       A   In the instrument or on the stimuli?
7       Q   In the stimulus for the page.
8       A   Yes, for the page stimulus, yes.
9       Q   Okay.  Yuga Labs does not appear; correct?
10      A   It does not appear, no.
11      Q   How many survey respondents coded any of
12  the -- answer Q4 or Q8 by identifying Yuga Labs?
13      A   I don't recall.  There may have been a
14  few.
15      Q   Fewer than 10; correct?
16      A   That's possible.
17      Q   All right.  So of the categories -- sorry.
18  Strike that.
19          Of the responses that would have led you
20  to categorize someone as associating the foundation
21  page with Bored Ape Yacht Club, all but a few were
22  words that actually appeared in the page themselves;
23  correct?
24      A   Yes, because that is exactly how the page
25  appeared in the marketplace.

50

1       Q   So it's possible that respondents were
2   simply copying words from the page into the answer
3   for what entity they believed puts on the NFT
4   collection; right?
5           MS. MELCHER:  Objection; calls for
6   speculation.
7       A   The respondents were asked, again,
8   according to the survey, to look at -- look at the
9   images that I had provided to them and to answer who
10  they thought made or put out the product that was
11  shown to NFT that was shown.  And I used the
12  Foundation study -- I'm sorry.  The Eveready study,
13  which is my Foundation study as well, uses the mark
14  as it was used by the junior user.  So this is
15  dictated by Mr. Ripps' usage of the -- of the marks,
16  and so I used that page.
17      Q   Well, your categorization of Yuga and
18  Bored Ape Yacht Club together is not dictated by
19  Mr. Ripps' use of the marks, is it?
20      A   That's a separate -- that's a separate
21  analysis.  So, no, I mean, it's -- it's a related
22  entity, so somebody might offer Yuga Labs as a
23  related entity, and that would indicate that they
24  consider -- that they should be classified as
25  somebody who looks -- who identifies Bored Ape Yacht

5

1   Club or Yuga as the source of that, of that NFT.
2       Q   Okay.  So but you were -- the Bored Ape
3   Yacht Club is not an entity; correct?
4       A   So the question says:  "Who or what entity
5   do you believe puts out the NFT collection you saw?"
6   And then, "What other entity or entities do you
7   believe have a business relationship...with whoever
8   put out the NFT collection you saw?"
9           So people could have a -- have any sort of
10  impression as to -- as to what entity that I'm
11  talking about, and that wording is intended not to
12  be suggestive of a particular company or a
13  particular entity.  It's intended to be
14  all-encompassing to allow people to answer with
15  whatever they believe is true without guiding them
16  to a company or anything like that.  It's intended
17  to be pretty, pretty wide so they can answer and
18  feel free to answer whatever they would like for
19  that question.
20      Q   Okay.  But you were the one that chose to
21  categorize the response "Bored Ape Yacht Club" as
22  being a response associated with Yuga Labs; correct?
23      A   Yes.
24      Q   And even though the responses that said
25  "Bored Ape" did not actually write "Yuga Labs";

52

1   right?
2       A   That's correct.
3       Q   Now, you agree that Bored Ape Yacht Club
4   is actually not a company; right?
5       A   Bored Ape Yacht Club is an NFT collection,
6   or is a -- could be who or what entity?  It's an
7   entity.  I did not say anything about it being a
8   company.
9       Q   Okay.  And Bored Ape Yacht Club is not a
10  person; correct?
11      A   Personally, I don't think so, but I don't
12  know what the respondents had in mind when they were
13  answering the question.  I simply raised the
14  question to allow for any sort of response.
15      Q   What if someone just said "yacht club"?
16  Would that have been characterized as Bored Ape
17  Yacht Club?
18      A   I don't remember.  I know I looked at
19  the -- the encoded responses after they were done,
20  and I thought about a couple different sensitivities
21  that one could do, but the results were very stable,
22  and we know for -- thinking about that, you know,
23  maybe reclassifying something here or there, it
24  was -- it was roughly the same, but I don't recall
25  specifically.

Transcript of Laura O'Laughlin

March 22, 2023

53

1    Q   What about NFT, if somebody had put NFT as
2  the source, would that have qualified as Bored Ape
3  Yacht Club?
4    A   I don't think so.  It shouldn't have.
5  Should be --
6    Q   Aren't the Bored Ape Yacht Clubs NFTs?
7    A   They are NFTs, yes.
8    Q   Well, why not characterize NFT as
9  associated with Bored Ape Yacht Club?
10   A   That would be improper.
11   Q   What about Ethereum?
12   A   Again, Ethereum is -- is a larger currency
13 or a blockchain, a way of transacting with NFTs.  So
14 it's an entity that could have a business
15 relationship with -- with Bored Ape Yacht Club, but
16 it is not Bored Ape Yacht Club or Yuga.
17   Q   Why not characterize Ethereum as part of
18 Bored Ape Yacht Club?
19   A   Because it is not part of Bored Ape Yacht
20 Club.  It is not associated with Bored Ape Yacht
21 Club in the sort of confusion that I'm looking for.
22 So as I mentioned in my assignment, you know, the
23 type of confusion that I'm looking to analyze is to
24 see whether or not consumer confusion exists as a
25 result of Ryder Ripps' and Jeremy Cahen's use of

54

1  Bored Ape Yacht Club trademarks.  And so it's
2  analyzing the use of the BAYC marks, and the
3  Ethereum marks and terms are not at issue in this
4  case.
5    Q   Did you conduct any test that excluded the
6  words "Bored Ape Yacht Club" and "BAYC"?
7    A   So my testing control is exactly that.
8  What I do is I take a look at the incidence of
9  people who answer "Bored Ape Yacht Club" when
10 they're exposed to an -- to several pages of several
11 of the Foundation pages with the at-issue BAYC marks
12 and then with them removed.  And that comparison,
13 that test condition where they're exposed to the
14 page as Mr. Ripps had put it on the Foundation
15 website, and then I compare that to a similar
16 version, but instead I remove the at-issue BAYC, the
17 BAYC marks that he used.  And you can look at the --
18 we can look at the comparison, but that's exactly
19 what I do.  That's my testing control.
20   Q   So -- strike that.
21      In the control population, how many people
22 identified Chill Gorilla Boat Crew as the entity
23 that puts forward the NFT?
24   A   I believe I have some information that
25 summarizes that data.

55

1    Q   And where is it?  What's the answer?
2    A   Maybe it's -- you can point me to it.  It
3  could be an exhibit or it would be -- I can
4  certainly -- I can certainly calculate it from the
5  raw data if it's not an exhibit.  One moment.
6    Q   Yeah, I think we had to calculate it from
7  the raw data.  So do you have any sense of what it
8  is?
9    A   So my sense it would be subsumed in the
10 "Other" category on my Exhibit 3.
11   Q   On your Exhibit 3.
12   A   But I'm not, I'm not certain.  Let's see.
13 Other -- outside the -- no, that's true.  So yeah,
14 so -- so if you see footnote 3 in my Exhibit 3, it
15 says:  "Other" refers to answers given by
16 respondents that were other entities outside of
17 Bored Ape Yacht Club and Ryder Ripps.  Respondents
18 who indicated they didn't know or gave unrelated
19 answers are not included in this exhibit.
20   Q   In fact, in the CGBG group, 27 percent
21 identified the source as Chill Gorilla or Chill
22 Gorilla Boat Crew; correct?
23   A   That's possible.
24   Q   And Gorilla Boat group is not a real
25 thing, is it?

56

1    A   The Chill Gorilla Boat Crew is a control
2  that is intended to be as close as possible to the
3  Bored Ape Yacht Club marks without changing the
4  look, presentation, feel, to see what the impact is,
5  what the likelihood of confusion is from Mr. Ripps'
6  use of the BAYC marks on the Foundation web page.
7    Q   Right.  And so when shown a page that said
8  "Chill Gorilla Boat Crew" on it, people thought that
9  the source, at least 27 percent of people thought
10 the source was Chill Gorilla Boat Crew; right?
11   A   Yes.
12   Q   Even though there is no such thing as
13 Chill Gorilla Boat Crew; right?
14   A   Yes.
15   Q   The only possible explanation for them
16 identifying Chill Gorilla Boat Crew in such
17 significant numbers is that they were copying words
18 that they saw on the page that you showed them;
19 correct?
20      MS. MELCHER:  Objection; mischaracterizes
21 the report and testimony.
22   A   That's not what the Eveready test does.
23 What the Eveready test does, takes the junior -- in
24 this instance, if we're looking at forward
25 confusion, it takes the junior user's marketplace

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

40 (157 to 160)

57

1  use of the at-issue marks, the BAYC marks, and
2  changes them in a testing-controlled environment to
3  see whether or not people's impressions of who makes
4  or puts out or other associations at what -- who is
5  the source or what's the -- what's an associated
6  source of this -- of the NFTs.  And my test clearly
7  shows that people believe that Bored Ape Yacht Club
8  is the source of -- of the marks as used by
9  Mr. Ripps.
10     Q   Your test shows that people typed in
11 "Bored Ape Yacht Club" into the survey response;
12 correct?
13     A   My -- my test, like I said, it's a
14 comparison of -- of the testing control where I ask
15 people about their beliefs about:  Who or what
16 entity do you believe puts out the NFT collection
17 you saw?  And then I ask:  What other entity or
18 entities do you believe have a business relationship
19 with whoever puts out the NFT collection you saw?
20     The answers were, you know, text-based
21 data, as is standard for Eveready studies.  It's a
22 very standard approach that I'm using.  And you
23 encode those data and you compare the differences
24 between test and control.
25     The test condition is dictated by the

58

1  junior user's marketplace use of the at-issue marks.
2  And that is what I take, and then I have to control
3  for that, and that is the result that I get.
4      Q   You could have conducted a survey in which
5  only things that mentioned Yuga or Yuga Labs
6  qualified as confusing; correct?
7      A   That would not be appropriate in terms of
8  a classification or categorization because the
9  at-issue marks that Mr. -- Mr. Ripps used were the
10 BAYC marks and --
11     (Simultaneous speaking.)
12     (Court Stenographer clarification.)
13     A   I don't remember what I said, I'm sorry.
14     Q   So my question was just you could have
15 constructed a survey in which you categorized words
16 like "Yuga" or "Yuga Labs" as causing -- as being
17 indicators of confusion but not words like "Bored
18 Ape" that appeared in the prompt; correct?
19     A   That wouldn't be appropriate to do so.
20     Q   You could also have discounted the
21 percentage of people that identified Chill Gorilla
22 Boat Crew as the source from the number -- the
23 percentage that considered Bored Ape Yacht Club as
24 the source to get a fair comparison; correct?
25     A   Again, that would have been inappropriate

59

1  to do so.
2      Q   Do you have any idea where anybody would
3  have ever thought that Chill Gorilla Boat Crew was
4  the source of an NFT?
5      MS. MELCHER:  Objection; calls for
6  speculation, incomplete hypothetical.
7      A   As I've mentioned, this is a very standard
8  approach in Eveready studies.  It's -- sometimes it
9  requires changing -- changing -- in Eveready
10 studies, you might change a word mark, and the word
11 mark that's at issue could be -- I'm going to take
12 my Spindrift can.  I have a can of Spindrift, which
13 is a sparkling water.  And so perhaps somebody's use
14 of Spindrift in a different context could be at
15 issue, and you might change the word to something
16 that does not exist in the marketplace as a control.
17     And so it is very appropriate to change --
18 change the control so as to remove what is at issue
19 in the case, which is the use of the Bored Ape Yacht
20 Club marks, and test whether or not a consumer
21 confusion, as measured by identifying either Bored
22 Ape Yacht Club or associated entities as the source
23 of the NFT.  And I find that my appropriate control
24 does indeed show that there is a strong level, a
25 high level of confusion between Bored Ape --

60

1  between -- that's generated by Mr. Ripps' use of
2  Bored Ape Yacht Club, BAYC, the ape skull, and so
3  on.
4      Q   When marks are not strong, there is a
5  concern that survey participants will simply copy
6  the stimulus; correct?
7      MS. MELCHER:  Objection; lacks foundation.
8      A   Again, it would depend.  This is really --
9  this test is dictated -- the test that I use here,
10 this is where Mr. Ripps used the -- used the marks.
11 And I also have a Squirt study that has very -- has
12 confirmatory consistent results.
13     So I'm very comfortable with the results
14 of my study.  And, in fact, to hedge against the
15 potential that people might have weakly held
16 beliefs, I even asked a follow-up question to
17 confirm that people did believe Bored Ape Yacht Club
18 was the source of the -- of the -- of the NFTs.
19     Q   And how many people strongly believed that
20 Chill Gorilla Boat Crew was the source?
21     A   I don't know.  I don't know.
22     Q   Didn't check that?
23     A   It would have to be lower than 27 percent
24 if what you are telling me is accurate.
25     Q   So I want to go back to my question from

6

1  just a minute ago because I'm not sure I got a clear
2  answer to it. Is it correct that survey
3  participants that -- strike that.
4        Is it correct that an Eveready Survey in
5  which the marks are not strong, survey respondents
6  can simply copy the stimulus?
7    **A  The Eveready Survey that I conducted uses**
8  **Mr. Ripps' marketplace use of the marks. And so I**
9  **conducted a test that follows that marketplace**
10 **context. And this is -- this is his use of the**
11 **marks. So the people answered what they answered**
12 **based on their exposure to the stimuli, and they**
13 **were qualified because they were either in the**
14 **market for NFTs or had purchased an NFT or were**
15 **considering digital art. So I have not -- I don't**
16 **know what belief they had about Bored Ape Yacht**
17 **Club, but I know some of the answers did indicate a**
18 **familiarity with Bored Ape Yacht Club and Yuga.**
19   Q  Can you think of a single reason why a
20 person would have written "Chill Gorilla Boat Crew"
21 in response to a question on your survey other than
22 copying the stimulus?
23      MS. MELCHER: Objection; calls for
24 speculation, incomplete hypothetical.
25   **A  As I said, the test is really about**

62

1  **removing the marks and putting something else there,**
2  **and this -- that is not infringing and that is as**
3  **close as possible to Bored Ape Yacht Club.**
4        **So I believe I succeeded in -- in**
5  **controlling for the marks by changing the marks that**
6  **were shown to the respondents to remove the at-issue**
7  **marks. And so it is possible that some people will**
8  **write "Chill Gorilla Boat Crew" because that's the**
9  **name of the NFT collection and the stimuli. I think**
10 **there's a side-by-side comparison of the different**
11 **changes I made, so it is possible that some people**
12 **would write that. What they had in mind when they**
13 **were writing it, I don't know.**
14   Q  Thank you. I want to make sure that I
15 give you a full opportunity because I am quite
16 confident that I will ask this same question at
17 trial.
18      Can you think of a single reason why a
19 person would write "Chill Gorilla Boat Crew" other
20 than copying the stimulus?
21      MS. MELCHER: Same objection.
22   **A  So the Eveready test tests the marketplace**
23 **context, so they're looking at the stimulus. And,**
24 **you know, some of them answered "Ryder Ripps," some**
25 **of them answered "Chill Gorilla Boat Crew." Both of**

63

1  **those names could be equally familiar or unfamiliar**
2  **or potentially familiar to people who took the**
3  **study.**
4    Q  How would a person in your study be
5  familiar with the Chill Gorilla Boat Crew --
6        (Simultaneous speaking.)
7    **A  There are many -- so the question really**
8  **isn't about putting something that actually exists**
9  **in the marketplace. You have to have, as a control,**
10 **something that could plausibly exist in the**
11 **marketplace. And so this is a plausible name of an**
12 **NFT collection. Different NFT collections are**
13 **launched all the time. There are different**
14 **collections that deal with all different things.**
15 **And there's, you know -- is it a plausible**
16 **collection? And I think yes, it is a plausible**
17 **collection. So that's -- it doesn't matter that it**
18 **doesn't exist. In fact, it shouldn't exist.**
19   Q  What percentage of people who were shown
20 the Bored Ape Yacht Club stimulus wrote "Chill
21 Gorilla Boat Crew"?
22   **A  I think zero percent.**
23   Q  All right. I would like to move now to
24 your other survey, the Squirt Survey. You used the
25 same panel criteria for the Squirt Survey as you did

64

1  for the Eveready Survey; correct?
2    **A  I did.**
3    Q  And you did the Squirt Survey second;
4  right?
5    **A  I did.**
6    Q  So the Squirt Survey used the modified
7  version of the panel criteria that you had after the
8  pretests in the Eveready Survey; correct?
9    **A  That's correct.**
10   Q  If the asserted -- actually, let me back
11 up.
12      Which marks were you testing in these
13 surveys?
14   **A  I was testing the BAYC marks as used by**
15 **Mr. Ripps.**
16   Q  And it's not all of the BAYC marks that
17 are asserted in this case; right?
18   **A  I provide a definition of the BAYC marks**
19 **that are in this case in footnote 1, at least to the**
20 **best of my understanding, and that they include the**
21 **Bored Ape Yacht Club, BAYC, Bored Ape, Ape, BAYC**
22 **logo, BAYC Bored Ape Yacht Club logo, and the ape**
23 **skull logo.**
24   Q  Okay. And did you differentiate between
25 any of them in either of your two surveys?

65

1   A   I'm not sure I understand what you mean.
2   Q   Sure.  Let's say, for example, that the
3 court holds that Yuga Labs has no right to the
4 trademark ape; right?  Your survey included ape as
5 part of the analysis; correct?
6   A   Could you point me to where that's part of
7 the analysis?
8   Q   Sure.  So you just pointed us to
9 footnote 1, the BAYC marks included in -- and you
10 list the marks.  One of them is ape; right?
11   A   Yes, one of them is ape.
12   Q   You tested all the marks together;
13 correct?
14   A   I did.  But I'm not sure if the word "ape"
15 appears separately in my study.  So I would have to
16 look at that very carefully to see where that is.
17   Q   The word "ape" appears in your study;
18 correct?
19   A   Right.  But the word "ape" without "Bored
20 Ape" or "Bored Ape Yacht Club."
21   Q   Does the word "Bored Ape" appear without
22 "Bored Ape Yacht Club"?
23   A   I would have to look at my stimuli again
24 to refresh my recollection.
25   Q   Sure, let's take a look.  Maybe page 25 of

66

1 your report.
2   A   Okay.  I'm on page 25 of my report.
3   Q   All right.  So the word -- there's the
4 symbol at the top left, the skull symbol; right?
5   A   Yes.
6   Q   Which mark is that?
7   A   That's the ape skull logo.
8   Q   Are you sure?
9   A   Sorry, where are we?
10   Q   Yeah, page 25, the top left, the black
11 logo.  What's that black -- go down a little bit.
12 It's page 27 of the -- oh, so you're in, like, the
13 250s there.
14       Let's try this again.  Page 25 of the
15 report, which is page 27 of the PDF.  Okay.
16       So there's, at the top left -- so first
17 off, at the very top left there's a triangle, a
18 circle, and a square; right?
19   A   Very top left, triangle, circle, square,
20 yes, I see that.
21   Q   That has nothing to do with any of the
22 marks at issue in this case; right?
23   A   That's correct.
24   Q   And below that there's a black circle;
25 right?

67

1   A   Black circle, yes.
2   Q   With some material in it.  So what is
3 that?
4   A   So that is Mr. Ripps' -- in this stimuli,
5 it's the distorted -- what I call the distorted ape
6 skull logo.
7   Q   Okay.  Is it the distorted -- you're sure
8 it's the distorted ape skull logo and not some other
9 asserted mark?
10   A   It's the ape skull logo as I understand
11 it.
12   Q   Okay.  And then we've also got on this
13 page "BAYC" under that; right?
14   A   Yes.
15   Q   And under that "Bored Ape Yacht Club";
16 right?
17   A   Yes.
18   Q   All right.  Any other asserted marks
19 anywhere in your stimulus?
20   A   I don't think the images I -- perhaps
21 the -- on the -- the -- on the ape in the lower left
22 side, as well as the ape that has the sailor hat,
23 there's -- there's a logo there as well, and so I
24 wound up changing those two.
25   Q   Okay.  And do you know what logos those

68

1 are, if any, that correspond to any marks involved
2 in the case?
3   A   So the -- the one on the red-hatted ape --
4 I would like to go to my footnotes, if you don't
5 mind, in my appendix.
6   Q   Sure.
7   A   So it's the ape skull on the red shirt and
8 then it's BA YC and the ape skull on the red hat.
9   Q   Okay.  Now, did you test for any -- does
10 your survey test for confusion as to Bored Ape?
11   A   I'm sorry.  Could you explain?  I'm not
12 sure I understand.
13   Q   Sure.  So if you go back to your
14 footnote 1, one of the marks you identify is Bored
15 Ape?
16   A   Yes.
17   Q   Does your survey test for confusion as to
18 Bored Ape?
19   A   So my survey tests for Mr. -- Mr. Ripps'
20 use of the Bored Ape Yacht Club marks in the
21 marketplace context.  So I looked at the at-issue
22 marks, and I looked at how it looked on the page
23 here, and I took out what -- what I thought were
24 the -- was the at-issue marks on this page.
25   Q   Okay.  And so my question is does your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

43 (169 to 172)

69

1  survey test for the mark "Bored Ape"?
2      **A  My survey removes the term "Bored Ape**
3  **Yacht Club."**
4      Q  How about "Bored Ape"?
5      **A  I think it removes the term "Bored Ape**
6  **Yacht Club" all together.  I don't know if there's a**
7  **use where Mr. Ripps has "Bored Ape" alone in the**
8  **stimuli I tested here.**
9      Q  I'm just trying to figure out what we can
10  do with -- so you appreciate that, you know, there's
11  a variety of different marks asserted.  It may be
12  that the court decides, for example, that all of
13  Yuga's marks are invalid except for Bored Ape;
14  right?  And if that's true, then does your survey
15  show confusion as to Bored Ape or would you have to
16  do a different survey?
17      **A  It would depend on the marketplace**
18  **context.  So here I'm using a marketplace context**
19  **stimuli.  So I'm not sure what context would then**
20  **become relevant here.  But here I know that this is**
21  **at issue, Mr. Ripps' use of the Bored Ape Yacht Club**
22  **marks in this context, so I needed to control for**
23  **his use of the marks in this context, and so I had**
24  **to take out Bored Ape Yacht Club.  If Bored Ape**
25  **appeared alone, I would have taken that out as well.**

7

1      **A  It -- the words "Bored Ape Yacht Club"**
2  **appear next to Yuga Labs' actual Bored Ape Yacht**
3  **Club NFT collection.**
4      Q  Okay.  But it doesn't test for any use by
5  Mr. Ripps and Mr. Cahen of Bored Ape Yacht Club;
6  correct?
7      **A  It does not test for the use of Bored Ape**
8  **Yacht Club and Mr. Ripps' use of that term, no.**
9      Q  And it does not test for any use by
10  Mr. Ripps of Bored Ape; correct?
11      **A  The words "Bored Ape" do not appear on**
12  **this -- on this page as associated with Mr. Ripps'**
13  **use of it, yes.**
14      Q  And it does not test for the RR space --
15  strike that.
16      It does not test for the BA YC skull logo;
17  correct?
18      **A  It does not test for the -- so the usage**
19  **here, yeah, does not have the BA YC logo.  It's**
20  **simply the -- what I call the distorted skull and**
21  **the word -- the BAYC.**
22      Q  Okay.  So Squirt Surveys require that the
23  marks have close proximity in the marketplace;
24  right?
25      **A  That is one consideration that the expert**

70

1  **I don't know if it does appear alone.**
2      (Simultaneous speaking.)
3      Q  Okay.  So your survey tests all the marks
4  in combination; correct?
5      MS. MELCHER:  Objection; mischaracterizes
6  testimony.
7      **A  It tests the marks that were available**
8  **that were used by Mr. Ripps on the Foundation page.**
9      Q  All right.  And now let's go to the Squirt
10  page, the Squirt Survey that you used, and look at
11  which marks are involved there.  And I think
12  probably the easiest thing to look at is page 55 of
13  your report or 50 -- I guess 54 and 55 of your
14  report.
15      **A  Okay.  I'm there.**
16      Q  So on page 54 you have -- what marks are
17  being tested in the Squirt Survey?
18      **A  So the marks that are being tested in the**
19  **Squirt Survey that I alter in the -- between the --**
20  **between the test and control are -- what I'm calling**
21  **the BAYC group and the modified CGBC group, are this**
22  **image, that sort of image that contains the ape**
23  **skull, and the use of BAYC.**
24      Q  Okay.  Your Squirt Survey doesn't test for
25  Bored Ape Yacht Club; right?

72

1  **should think about when employing a Squirt study,**
2  **yes.**
3      Q  One of the other considerations is whether
4  the marks are -- strike that -- whether the products
5  are close in price; correct?
6      **A  I don't know if that's a criteria.  I**
7  **think it's really about marketplace proximity.**
8      Q  Are you aware of any legal cases or
9  otherwise that describe the importance of price
10  proximity for a Squirt Survey?
11      MS. MELCHER:  Objection; vague.
12      **A  I'm not aware of guidance based on**
13  **pricing.  What I'm aware of is guidance for Squirt**
14  **tends to focus on being available in similar**
15  **marketplace contexts.  Maybe there are apps that**
16  **might be similar if you were to type in a search**
17  **result.  Perhaps, you know, one could be a -- maybe**
18  **it's a beverage.  It would depend on what is -- you**
19  **know, what is the marketplace context, and that part**
20  **of that marketplace context.  And thinking about the**
21  **marketplace context and where the marks appear would**
22  **help the survey expert determine whether or not a**
23  **Squirt study is appropriate.**
24      Q  Is price part of marketplace context?
25      **A  It can be.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Laura O'Laughlin
March 22, 2023

44 (173 to 176)

73

1    Q   And did you consider the relative prices
2  of RR/BAYCs and Bored Ape Yacht Club NFTs?
3    **A   The relative prices of Bored Ape Yacht**
4  **Club and RR/BAYC NFTs are provided as they are in**
5  **the marketplace on that day in my stimuli.**
6    Q   And so what are those relative prices?
7    **A   That I would have to look a little bit**
8  **closer. It's kind of blurry on my screen. Let me**
9  **see if I can go somewhere else to see it.**
10   **So I'm looking at my Appendix E.1, the**
11 **"Squirt Survey Stimuli" which simply -- it has a**
12 **better resolution version than that image.**
13   Q   Sure.
14   **A   And so it says the floor price of the**
15 **RR/BAYC NFTs is 1.1, then there's the transactions.**
16 **And I'm having a hard time seeing the -- the logo.**
17 **I think it's the eighth logo, but it's hard to see.**
18 **And it's talking about kind of the volume and**
19 **changes in usage. And the floor price of the Bored**
20 **Ape Yacht Club collection is 91.99.**
21   Q   And that's an ETH; right?
22   **A   Yes.**
23   Q   What does that translate into, into U.S.
24 dollars?
25   **A   I'm not sure what it was at that point in**

74

1  time.
2    Q   Do you have an estimate?
3    **A   I don't know what that was at that point**
4  **in time, I'm sorry.**
5    Q   That's fine. Do you know what one ETH is
6  worth today?
7    **A   I'm not sure.**
8    Q   Do you have an estimate?
9    **A   Maybe a thousand dollars. I don't know.**
10 **I have no idea.**
11   Q   All right. Either way, in -- as presented
12 on OpenSea at the time that you used your -- that
13 you -- that you used for the purpose of your Squirt
14 Survey, the Bored Ape Yacht Club NFTs were, what, a
15 little less than 90 times the price of the RR/BAYCs?
16   **A   Based on the floor prices there, yes.**
17   Q   And if -- if you're right that an ETH is a
18 thousand dollars, give or take, the floor price for
19 these Bored Ape Yacht Club NFTs would be on the
20 order of $900,000; correct?
21   MS. MELCHER:  Objection; misstates
22 testimony.
23   **A   It's -- whatever the relative difference**
24 **is, it's -- you know, it's a hundred times more**
25 **roughly than -- or 90 times more than what the --**

75

1    **Bored Ape Yacht Club is 90 times more than what the**
2    **RR/BAYC is, whatever the amount is. You can do the**
3    **math.**
4    Q   And I apologize if I've asked this --
5  strike that. I think I have asked it before.
6    For how long were RR/BAYCs available on
7  OpenSea?
8    **A   My understanding is they were available**
9  **off and on. I don't know the exact timing, though.**
10   Q   Do you have any reason to believe it was
11 more than a week?
12   **A   I don't know.**
13   Q   Are they -- are RR/BAYCs available on
14 OpenSea right now?
15   **A   I don't think they are.**
16   Q   And do you know why not?
17   **A   I do not know why.**
18   Q   Could you turn to page 50 of your -- I
19 think we're actually there -- of your report,
20 paragraph 55. You write, "In developing my stimulus
21 for the OpenSea Squirt Survey, I found that during
22 the relevant period, the OpenSea homepage typically
23 included a 'Top collections' leaderboard similar to
24 the one from Pauly0x's June 20, 2022 tweet."
25   Do you see that?

76

1    **A   I do.**
2    Q   What's the relevant period?
3    **A   During the time when both of the -- both**
4  **of the NFTs were available on the OpenSea site.**
5    Q   And when was that?
6    **A   Well, there's a -- this is certainly right**
7  **around the same time as the June 21st screen grab**
8  **from Foundation. This is June 20th, 2022. This**
9  **specific tweet is from June 20th, 2022.**
10   Q   And are you aware of any evidence that the
11 RR/BAYCs and Bored Ape Yacht Club NFTs were both
12 available for purchase on OpenSea any day other than
13 June 20, 2022?
14   **A   I'm aware that they were -- they were open**
15 **for sale on other days besides June 20th, yes.**
16   Q   What days?
17   **A   I don't know. But I know that this is one**
18 **date that -- that Pauly0x refers to in a tweet in**
19 **particular.**
20   Q   Were they available on June 19th?
21   **A   I think it's safe to assume so, yes.**
22   Q   Why?
23   **A   Because there should be a baseline from**
24 **which the -- the volume would increase.**
25   Q   How about June 18th?

Case 2:22-cv-04355-JFW-JEM   Document 265-3   Filed 06/02/23   Page 47 of 59   Page ID
#:19714
HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023
45 (177 to 180)

---

77

1    A  I don't know.  But I'm sure there's some
2  information in my report that relates to when these
3  NFTs were -- were put on that platform.
4    Q  If you're sure, let's find it, because I
5  don't see it.
6    A  So I think we would have to look at the
7  source materials that I cited for more information
8  about that.  But I would assume that the materials
9  that I cite in paragraph 13 of my report might
10  provide some additional information about that, but
11  I'm not sure of the precise date without looking at
12  them in more detail.
13    Q  All right.  Let's look at paragraph 13 of
14  your report, which is on page 9.  You cite the
15  "OpenSea Learn" website; right?
16    A  I do.
17    Q  And the OpenSea Learn website is not going
18  to tell us when a particular NFT was for sale on
19  OpenSea; right?
20    A  It would not.
21    Q  And then you cite "How do I sell an NFT"
22  from the OpenSea Help Center; right?
23    A  I see that, yes.
24    Q  That's also not going to tell us when a
25  particular NFT was sold; right?

78

1    A  Yes.
2    Q  You also cite "How do I create a
3  collection" from the OpenSea Help Center; right?
4    A  I see that.
5    Q  That's not going to tell us when a
6  particular open -- when a particular NFT was sold;
7  right?
8    A  I don't think so.
9    Q  And then you cite the complaint at
10  paragraphs 35 and 36; right?
11    A  I do.
12    Q  All right.  Let's take a look at the
13  complaint, which is Exhibit 5, I think.
14        If we can pull that up.
15        THE TECHNICIAN:  For the record, it is
16  Exhibit 6.
17        MR. TOMPROS:  Exhibit 6.  Thank you.
18    Q  All right.  So if we go to paragraph 35,
19  which is on page 15 of the complaint, one of the
20  things you cite says "Yuga Labs" --
21        We were just there.  Down a bit, under the
22  pictures.
23        "Yuga Labs believes, and therefore
24  alleges, that Ripps, Cahen, and Does 1 through 5
25  created sales pages on OpenSea to sell their RR/BAYC

79

1  NFTs."
2        Do you see that?
3    A  Yes.
4    Q  Okay.  And who are Does 1 through 5?
5    A  I don't know.
6    Q  Okay.  And then there's a cite to a URL,
7  "opensea.io/collection/ryder-ripps-bayc." Right?
8    A  Yes.
9    Q  And then it continues, "As of the filing
10  of this Complaint, this page is no longer accessible
11  on OpenSea." Right?
12    A  Yes.
13    Q  So we know that the -- at least as of
14  June 24th, the RR/BAYCs were not available on
15  OpenSea; right?
16        MS. MELCHER:  Objection; mischaracterizes
17  the complaint.
18    A  I believe that that was when it was
19  changed to RR/BAY -- BAYC redacted.  But, yeah, I
20  think that that -- if that's what that says.
21    Q  Is there any information in paragraph 35
22  or 36 about when RR/BAYCs became available for the
23  first time on OpenSea?
24    A  No, but, I mean, I cite to the complaint
25  more generally.  So if the information is in the

80

1  complaint, then that's also a place where I would
2  have -- I can, you know, get an understanding of
3  when and for how long RR/BAYC NFTs were offered on
4  the OpenSea platform as RR/BAYC NFTs.
5    Q  Okay.  So if you knew it was longer, it
6  would be somewhere in the complaint?
7        MS. MELCHER:  Objection; mischaracterizes
8  testimony.
9    A  I'm not saying that.  So what I said is
10  that I know that on June 20th, that tweet documented
11  the trending, the top collections over the last 24
12  hours.  And so the definition of it being a top
13  collection over the last 24 hours would probably
14  imply that it was at least available on the day
15  before.  But there is likely some additional
16  information about when this was available on
17  OpenSea, either in the materials I relied on or in
18  the complaint somewhere.
19    Q  Okay.  Sitting here today, you cannot
20  identify any date other June 19th, 2022, and
21  June 20th, 2022, when RR/BAYCs and BAYCs were both
22  available on OpenSea; correct?
23    A  I'm sure I would be able to identify it if
24  I could look through materials, but on my memory
25  alone, I cannot recall.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin                    46 (181 to 184)
March 22, 2023

8

1    Q   The Squirt Survey requires that the two
2  marks be available in the same marketplace; right?
3    A   That's up for some debate.  I mean, I
4  think that there are some trademark scholars that
5  might argue one way or another, but I think
6  generally speaking, as a general rule, marketplace
7  proximity is one of the factors that experts will
8  consider when deciding to take a Squirt study, to
9  undertake a Squirt study.
10    Q   And the Bored Ape Yacht Club NFTs were not
11  sold on Foundation; correct?
12    A   Bored Ape Yacht Club NFTs were not sold on
13  Foundation.
14    Q   And Bored Ape Yacht Club NFTs were not
15  sold on rrbayc.com; correct?
16    A   That's correct.
17    Q   And what percentage of sales of RR/BAYCs
18  came from OpenSea?
19      MS. MELCHER:  Objection; vague.
20    A   I don't know the precise answer on that,
21  but I know that the NFT market is largely a resale
22  market.  So there's -- the OpenSea is a platform
23  that allows for resale of -- of NFTs, and so it's a
24  very -- it's the top, if not -- amongst the most
25  popular if not the top marketplace for NFTs, so...

83

1  to the report tab, Exhibit 1.  This is in the -- one
2  of the questions in your Squirt Survey.
3    A   Yes.
4    Q   And in this paragraph you say, "Next,
5  respondents were asked the first key confusion
6  question."
7      MR. TOMPROS:  And, I'm sorry, before I ask
8  this, it's not showing up on the screen.  I don't
9  know if we need to refresh the screen to switch over
10  to Exhibit 1.  Thank you.  Page 66, paragraph 65.
11  Down a little bit further.  Sorry, the screen
12  doesn't seem to update.  If you can go down a little
13  bit further.  All right.  We were there.  Up a page.
14  Or maybe down a page.  I don't -- yeah, page 64,
15  paragraph 65.
16      THE WITNESS:  I think it's up one page, at
17  least for my screen.
18      MR. TOMPROS:  Me, too.  Still need to go
19  up on our end here it looks like, unless something
20  hasn't updated.
21      THE WITNESS:  I agree.
22      THE VIDEOGRAPHER:  Counsel, it appears as
23  though the remote tech has dropped from the call.
24      MR. TOMPROS:  That's not great.  All
25  right.  Maybe he'll be back in a minute.

82

1    Q   And we don't know -- strike that.
2      You don't know whether Mr. Ripps himself
3  ever sold any RR/BAYCs on OpenSea; correct?
4    A   I'm not certain about that.  I believe I
5  recall reading something about -- about sales pages
6  being created on the OpenSea website.
7    Q   Okay.  But you don't know whether
8  Mr. Ripps sold any RR/BAYCs on OpenSea; correct?
9    A   I don't know if he personally sold any of
10  the -- of the -- of those -- of the NFTs, but I know
11  that many of the RR/BAYCs were sold on the OpenSea
12  marketplace.
13    Q   You don't know whether Mr. Cahen sold any
14  RR/BAYC NFTs on OpenSea; correct?
15    A   I have not conducted such an analysis.
16  What I know is that the RR/BAYC NFTs were available
17  for sale on the OpenSea marketplace.
18    Q   By somebody; right?
19      MS. MELCHER:  Objection; vague.
20    A   They were -- these NFTs were available on
21  the OpenSea marketplace and organized in a
22  collection, on a collection page that -- that
23  included these NFTs.
24    Q   Can I ask you to look at page 64 of your
25  report.  And this is -- sorry, we've got to go back

84

1  BY MR. TOMPROS:
2    Q   I don't know, Ms. O'Laughlin, do you want
3  to keep going, and I can tell you where I am if
4  you've got the report in front of you?  Is that
5  okay?
6    A   I'm happy to do that.  That's fine by me.
7    Q   If you'd rather take a break, I don't
8  mind.  Whatever works.  I'm easy.  Keep on going?
9    A   I'm on the page.
10    Q   All right.  So we're in your report,
11  page 64, paragraph 65, and you say, "Next,
12  respondents were asked the first key confusion
13  question."  Right?
14    A   Yes.
15    Q   And why is this the first key confusion
16  question?
17    A   Well, this is a filter question, a full
18  filter question, and it asks respondents to look at
19  the NFT collection that is the array of top
20  collections, 15 top collections, and asks them to
21  think about that group of NFT collections and -- and
22  has them determine whether they think each of the
23  NFT collections are made or put out by separate
24  entities that are neither affiliated nor connected
25  or at least two of the NFT collections are made or

Case 2:22-cv-04355-JFW-JEM Document 265-3 Filed 06/02/23 Page 49 of 59 Page ID
#:19716
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023
47 (185 to 188)

85

1 put out by the same entity or from affiliated or
2 connected entities or don't know/unsure.
3     This is what's known as a full-filter
4 question.
5     Q  And what does "connected entities" mean?
6     A  "Affiliated or connected entities" would
7 be entities that are related to one another,
8 affiliated with one another, have some sort of
9 connection.
10     Q  And how would a consumer know whether two
11 entities are connected -- strike that.
12     How would a survey participant know
13 whether two entities are connected?
14     A  They would have a belief that might be
15 informed by -- by their review of the different NFTs
16 in the marketplace.
17     Q  Now, when reviewing -- if we could go back
18 to your report at page 54, your Figure 13, that's an
19 image of the desktop version of the BAYC group
20 stimulus for your Squirt Survey; correct?
21     A  It is part of the stimulus that
22 respondents looked at for the -- and the desktop
23 group, yes.
24     Q  Now, a little while ago you were looking
25 at this in the appendix and were having a hard time

86

1 reading the symbol in front of the 1.1 and the
2 91.99; right?
3     A  Yes.
4     Q  And could -- can you read the text next to
5 RR/BAYC? Strike that.
6     Can you read the text in the logo next to
7 RR/BAYC?
8     A  As printed in my report I can't read it
9 right now, but on my survey I know that respondents
10 were able to read it.
11     Q  How do you know that?
12     A  Because I tested it myself, and I saw
13 high-resolution versions, and I made sure that that
14 was legible and zoomable.
15     Q  And how many survey participants zoomed
16 in?
17     A  I don't know.
18     Q  Do you know whether any did?
19     A  I don't know one way or another. But
20 there was an instruction that was on this -- on
21 the -- on the survey itself. If you look at the
22 survey screenshots, it says, you know, "click in to
23 zoom" and gives people instructions on how to zoom
24 if they would like to zoom.
25     Q  But you don't know whether anybody

87

1 actually did; correct?
2     A  I do not know.
3     Q  And without zooming, you couldn't tell if
4 the text on those two logos is different; right?
5     MS. MELCHER:  Objection; calls for
6 speculation.
7     A  I don't know. It's possible that somebody
8 could have had the -- the desktop version could be
9 large enough for somebody to see. I'm not sure.
10     Q  And what does the text on the RR/BAYC one
11 say?
12     A  The RR/BAYC one says -- forget the exact
13 wording. "This logo is based on the SS Totenkopf,"
14 and I believe it says "18 Teeth."
15     Q  Yeah. And it specifically has a reference
16 to the logo being based on something else; correct?
17     A  That's what that says.
18     Q  Do you have an understanding as to why
19 that logo was used for the RR/BAYC collection?
20     MS. MELCHER:  Objection; based on
21 speculation.
22     A  I don't know. I may have some information
23 that contextualizes this in my report, but I would
24 have to look for it.
25     Q  Are Squirt Surveys effective at

88

1 determining whether a mark is a parody of another
2 mark?
3     MS. MELCHER:  Objection; vague.
4     A  Squirt Surveys assess marketplace
5 confusion and because of the allegations of -- that
6 this is a parody of the Bored Ape Yacht Club marks,
7 I included follow-up questions to assess strength
8 and belief to account for such potential influences.
9     Q  And the strength and belief questions that
10 you asked, asked survey participants how confident
11 they were in their answers essentially; correct?
12     A  That's correct.
13     Q  And going back to your first key confusion
14 question, could a survey participant conclude that
15 two entities were connected if one was a parody of
16 the other?
17     MS. MELCHER:  Objection; calls for
18 speculation.
19     A  I don't know. I believe that the -- my
20 survey, my Squirt Survey in particular is a very --
21 is unbiased and is -- allows for many possible
22 matches and many possible associations amongst the
23 15 NFT array and then asks respondents about how
24 sure they are about their answers. Specifically,
25 the follow-up questions in that survey ask in the

Transcript of Laura O'Laughlin
March 22, 2023

89

1  Squirt, in the OpenSea Squirt Survey, ask people "In
2  a previous question, you said you believed these NFT
3  collections are from the same entity or from
4  affiliated or connected entities.  How likely do you
5  think your answer is correct?"  And then they have
6  four answer options:  "just guessing," "some are
7  likely correct," "very likely correct," and
8  "definitely correct."  And I only took those who
9  answered "very likely correct" and "definitely
10  correct" as indicating certainty.  And --
11      Q   I'm sorry.  Go ahead.  I didn't mean to
12  interrupt.
13      A   I think another thing to note as well is I
14  ask a why question in my Question 7 as well that can
15  also be used to evaluate whether or not people
16  believe that there is a parody or some sort of --
17  some sort of joke or inside joke that they're aware
18  of based on the -- based on their evaluation of
19  the -- of the marks.
20      Q   How many -- so you included a total of 15
21  different marks; correct?
22      A   15 different marks -- NFT collections,
23  yeah.
24      Q   Okay.  And one of the things you changed
25  after the pretest was that people wanted more spaces

90

1  to make more connections; right?
2      A   They did, yes.
3      Q   What was the total error rate, that is,
4  instances in which someone connected to collections
5  that were not related in your survey?
6          MS. MELCHER:  Objection; vague.
7      A   I'm not sure I understand what you're
8  asking.  So, for example, it's possible that people
9  could have many different beliefs.  For example, the
10  Art Blocks Curated looks very similar to the Chromie
11  Squiggle.  The CryptoPunks and the -- V1 and
12  CryptoPunks.  There's -- you know, the Primates is,
13  you know, a non-human primate image that could be
14  connected with other things as well.  And people can
15  have different beliefs, and I allowed them to make
16  any sort of set of beliefs or associations.  I
17  didn't ask about whether or not they were true or
18  false.  So that what I examined was the difference
19  between people picking RR/BAYC and Other -- Bored
20  Ape Yacht Club, Otherdeed for Otherside, and Mutant
21  Ape Yacht Club versus CGBC and Bored Ape Yacht Club,
22  Mutant Ape Yacht Club, and Otherdeed for Otherside.
23      Q   What percentage of participants identified
24  Bored Ape Yacht Club and Primates as connected?
25      A   I don't recall.

9

1      Q   Was it more or less than RR/BAYC?
2          MS. MELCHER:  Objection; asked and
3  answered.
4      A   So it would depend on how you're summing
5  it up.  I don't know if you're looking at this by --
6  across all comparisons or just within the test or
7  just within the control.  I think it's pretty
8  consistent.  The associations, both in between any
9  pairing in the test and any pairing in the control,
10  were pretty consistent except for the selection of
11  RR/CGBC.
12      Q   Oh, and I'm sorry, I want to make -- I'm
13  not trying to compare the control to the test.  That
14  was your experiment.  But my question is -- goes to
15  whether the experiment was correctly constructed.
16  If you compare the number of people that paired
17  RR/BAYC and Bored Ape Yacht Club to the number of
18  people who paired Primates and Bored Ape Yacht Club,
19  which has a higher percentage?
20      A   Are you talking about this in the test
21  cell or in the control cell?
22      Q   Either.
23      A   So you would have to look at it in test
24  versus test first, and you'd also want to look at
25  the difference to know whether it's an experiment

92

1  that's done correctly because you'll need to look at
2  that pairing in both test and control.
3          So what I see is as long as my -- as my
4  pairing of Bored Ape Yacht Club and Primates is
5  consistent in test versus control, which it is, that
6  means that the experiment is well done because I'm
7  holding that constant.
8      Q   Even if a lot of people are getting it
9  wrong?
10          MS. MELCHER:  Objection.
11      A   Like I said, that doesn't matter.  That's
12  not my test.  What I'm trying to do is hold
13  everything else constant, and if that difference,
14  that pairing between Bored Ape Yacht Club and
15  Primates is pretty much the same in test as it is in
16  control, that means that I'm doing a good job on my
17  experiment.
18      Q   Now, in the test version of your Squirt
19  Survey, the letters "BAYC" appeared in the RR/BAYC
20  collection name; right?
21      A   It did.
22      Q   In the control group you used RR/CGBC;
23  right?
24      A   I did.
25      Q   Was there any way for a participant to

49 (193 to 196)

93

1 figure out what "CGBC" stood for in your control
2 group?
3     **A   In this control group, no.  It was simply**
4 **based on the array that they saw in front of them.**
5     Q   So there was no way for them to know
6 whether it was Chill Gorilla Boat Crew or not;
7 right?
8     **A   They did not know.**
9     Q   So they wouldn't make any connections, you
10 know, by something being a monkey or an ape or a
11 primate from just the letters "CGBC"; correct?
12         MS. MELCHER:  Objection; calls for
13 speculation.
14     **A   I don't know.**
15     Q   Okay.
16         MR. TOMPROS:  Can we take a break?
17         THE WITNESS:  Sure.
18         THE VIDEOGRAPHER:  We are going off the
19 record.  The time is 2:40 p.m.
20         (Recess 2:40 p.m. - 2:48 p.m.)
21         THE VIDEOGRAPHER:  We are back on the
22 record.  The time is 2:48 p.m.
23 BY MR. TOMPROS:
24     Q   All right.  So, Ms. O'Laughlin, I would
25 like actually now to turn back to your report to

94

1 paragraph 15, which is on page 11, and this is your
2 understanding of certain of the allegations in the
3 case.
4     **A   Yes.**
5     Q   One of the things you say here is you
6 understand that Ripps and Cahen claim that consumer
7 confusion between Yuga Labs' BAYC NFT collection and
8 the at-issue RR/BAYC NFT collection was "impossible"
9 for various reasons, including the "project's
10 request-to-mint process through Twitter," and then
11 it goes on.
12         Let me ask you first, what do you
13 understand the request-to-mint process through
14 Twitter to be?
15     **A   I understand that that relates to the**
16 **initial issue of some of the NFTs.**
17     Q   And they were requested by reaching out to
18 Mr. Ripps on Twitter?
19     **A   I don't remember specifically.**
20     Q   You then refer to "the reservation and
21 disclaimer process on https://rrbayc.com."
22         Do you see that?
23     **A   Yes, I see that.**
24     Q   And what do you understand the reservation
25 and disclaimer process to be?

95

1     **A   I understand there to be a different way**
2 **of getting the NFTs through the RR/BAYC website, and**
3 **I think the disclaimer is that statement that he had**
4 **on his website.**
5     Q   You did not test for whether someone
6 purchasing a RR/BAYC NFT through the rrbayc.com
7 website would have been confused; correct?
8     **A   That's not what I tested.  What I tested**
9 **was the purchase process on Foundation.**
10     Q   And you did not test whether there would
11 be any confusion in connection with any disclaimer;
12 correct?
13         MS. MELCHER:  Objection; vague.
14     **A   So my --**
15     Q   That's a bad question.  Let me withdraw
16 it.
17         You didn't show anybody in either of your
18 surveys Mr. Ripps' disclaimer; correct?
19     **A   Neither of my surveys included the**
20 **disclaimer as part of the stimuli.**
21     Q   All right.  Now let me ask a couple of
22 questions about your work more broadly in the case.
23         So you work for a company called Analysis
24 Group; right?
25     **A   I do.**

96

1     Q   And you are -- you have a team at Analysis
2 Group; correct?
3     **A   I work with different colleagues for**
4 **different engagements, but it's not a fixed team.**
5     Q   Got it.  And -- strike that.
6         Other staff at Analysis Group also
7 assisted in your work on this case; correct?
8     **A   That's correct.**
9     Q   And for your work on this case, Analysis
10 Group was compensated at $795 per hour for your
11 time; right?
12     **A   That's correct.**
13     Q   And that was by Yuga; right?
14     **A   I don't know.  I mean, I don't know what**
15 **the -- I didn't see the engagement letter, so I**
16 **can't know for certain.**
17     Q   Okay.  It was either by Yuga or their
18 attorneys; correct?
19     **A   I would assume so, but I don't know.**
20     Q   And then others at Analysis Group were
21 paid at rates between $415 per hour to $750 per
22 hour; correct?
23     **A   Correct.**
24     Q   How much total did all of your work, your
25 colleagues' work, and the survey cost?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

50 (197 to 200)

---

97

1    A   I have no idea.
2    Q   Was it more or less than a million
3 dollars?
4    A   I have no idea.
5    Q   So it could have been more than a million
6 dollars for this work; correct?
7    A   I have no idea.
8        MS. MELCHER:  Objection; mischaracterizes
9 the testimony.
10   A   I have no idea what -- what the amount is.
11   Q   Okay.  Is it more or less than a billion
12 dollars?
13   A   I have no idea what the amount is.
14   Q   Okay.  And one of the other experts that
15 Yuga hired in this case -- or Yuga or their lawyers
16 hired in this case is also an Analysis Group expert;
17 correct?
18   A   Yes, I believe so.
19   Q   Analysis Group is in the business of
20 providing expert testimony in litigation; correct?
21   A   That is one of the -- one of the things
22 that we do at Analysis Group is litigation support,
23 including expert witness work, yes.
24   Q   And Analysis Group is often employed by
25 corporations; correct?

---

98

1        MS. MELCHER:  Objection; lacks foundation.
2    A   Again, it would depend on the engagement,
3 but Analysis Group might be engaged for many
4 different things and by many different entities that
5 would include governments or corporations or law
6 firms or you name it.
7    Q   Analysis Group has, for example, served as
8 experts for debt collectors; correct?
9    A   I don't know.
10   Q   College loan enforcement companies;
11 correct?
12   A   I don't know.
13   Q   And have you in your survey work ever
14 produced a survey that did not yield the results
15 that your client expected?
16       MS. MELCHER:  Objection; vague.
17   A   I'm not sure I understand what you're
18 saying.
19   Q   Sure.  So you conduct surveys -- strike
20 that.
21       Have you ever conducted a survey on behalf
22 of a party in litigation that did not come out in a
23 way that was desirable to the party you were working
24 for?
25       MS. MELCHER:  Same objection.

---

99

1    A   Again, I'm not -- I'm not sure I
2 understand what you're asking.
3    Q   Well, let's say this:  Have you ever
4 worked for a trademark owner and conducted a survey
5 that resulted in no likelihood of confusion?
6    A   I don't remember -- I don't remember one
7 way or another.  It would depend -- I've worked on
8 surveys that have found no likelihood of confusion
9 and surveys that have found likelihood of confusion,
10 but I can't remember the precise constellation of
11 who lines up with what and for what reason.
12   Q   Can you identify a single time in which
13 you've worked on a survey for a trademark owner that
14 found no likelihood of confusion?
15   A   I don't remember any, sitting here today.
16   Q   Can you identify a single time in which
17 you worked on a survey on behalf of a trademark
18 defendant that found likelihood of confusion?
19   A   Again, I think the finding of likelihood
20 of confusion is one for the courts to ultimately
21 determine.  So I don't remember the precise context
22 or the precise percentages, but I know I've worked
23 and found on different cases and have found
24 differing levels of confusion.  But I can't
25 attribute it to one side or another.

---

200

1    Q   So I'll come back to that, but have there
2 been times, working on behalf of a trademark
3 defendant, when you conducted a survey and concluded
4 on the basis of that survey that confusion was
5 likely ever?
6        MS. MELCHER:  Objection; vague.
7    A   I don't recall a time.  Personally, this
8 is the first time I've served as an expert witness
9 in a trademark case.
10   Q   So you have never given an opinion on
11 likelihood of confusion that's been accepted by a
12 court; correct?
13       MS. MELCHER:  Objection; mischaracterizes
14 testimony.
15   A   I have been accepted as a survey expert
16 several times, and this is the first time I've
17 worked on a trade -- on a case that specifically
18 assesses trademarks.
19   Q   Is it the first time you've worked on a
20 case that has assessed likelihood of confusion?
21   A   No, it is not.
22   Q   So you've not previously had an opinion
23 accepted by a court on a trademark issue; correct?
24       MS. MELCHER:  Objection; mischaracterizes
25 testimony.

---

20

1    A   That's not what I said.  What I said is
2  this is -- I'm confused.  Can you repeat your
3  question, please?
4    Q   Sure.  You have not previously had an
5  opinion accepted by a court on a trademark issue;
6  correct?
7        MS. MELCHER:  Same objection.
8    A   I've never submitted an expert report --
9  I've never been the author of an expert report on
10 trademark matters.
11   Q   All right.  Now, just a couple of minutes
12 ago, you testified, "I think the finding of
13 likelihood of confusion is one for the courts to
14 ultimately determine."  Correct?
15   A   The court is the -- is the party -- sorry.
16       So it's my understanding that this
17 likelihood of confusion is something that's
18 evaluated by the finder of fact, ultimately.  And my
19 assignment was to assess whether consumer confusion
20 exists and issue a report and provide expert
21 testimony along those lines.  And my test -- I
22 conduct two tests.  I conduct an Eveready Survey and
23 a Squirt Survey, and I find that the test and
24 control differences, there's evidence of likelihood
25 of confusion.

202

1    Q   And is it your opinion that there is a
2  meaningful likelihood of consumer confusion in this
3  case?
4    A   Yes.
5    Q   So you did ultimately come to an opinion
6  on what you say is the issue for the court; correct?
7    A   This is what the expert evidence, expert
8  survey evidence is designed to provide.  It surveys
9  the opinions of relevant consumers and provides that
10 for the consideration of the court.
11   Q   So you are opining on the ultimate issue
12 of likelihood of confusion; correct?
13   A   As I mentioned, I provided evidence.  I
14 provide my opinion, which is supported by two
15 surveys and evaluation of other case facts and
16 marketplace evidence, and conclude that there is a
17 meaningful likelihood of confusion.  But whether or
18 not that -- whether or not -- what happens with this
19 evidence is ultimately for the court to decide.
20   Q   Can I ask you, if you would, to return to
21 your report at page 31.  Actually, it's probably
22 easier to start on page 30.  I want to look at the
23 sentence that goes from pages 30 to 31.  And that
24 sentence says, "It is my understanding that in most
25 circumstances a consumer must use cryptocurrency to

203

1  buy and NFT and Ethereum in particular to purchase
2  an RR/BAYC NFT."
3        Do you see that?
4    A   Yes, I see that.
5    Q   And for that you cite -- you have this
6  footnote 77; right?
7    A   Yes.
8    Q   And then for that you cite an article
9  called "How To Buy NFTs" in "Forbes Advisor"; right?
10   A   Yes.
11   Q   And that's got a web URL that says
12 "investing/cryptocurrency" as part of the URL;
13 correct?
14   A   It says "advisor/investing/cryptocurrency/
15 how-to-buy-nfts."
16   Q   So is the NFT market a part of the
17 cryptocurrency market?
18   A   It could be.
19   Q   Is an NFT an investment?
20       MS. MELCHER:  Objection; vague, outside
21 the scope of the report, and calls for a legal
22 conclusion.
23   A   I don't know.
24   Q   Did you consider when designing -- strike
25 that.

204

1        Did you consider, when selecting survey
2  participants, whether they were interested in NFTs
3  for investment value versus artistic value versus
4  anything else?
5        MS. MELCHER:  Same objection.
6    A   My survey simply identifies respondents
7  based on purchase, past purchase behavior, or
8  purchase intention.  It does not -- it is agnostic
9  as to the motivations for purchase.
10   Q   Did you consider the motivations for
11 purchase of an RR/BAYC specifically?
12   A   My survey, again, is agnostic -- well,
13 actually, no.  Sorry.
14       So the RR/BAYC NFTs, I understand, there
15 is some belief that there's -- you know, that people
16 were in on the joke, in on the joke and in on the
17 joke that Mr. Ripps and Mr. Cahen, you know, said
18 that it was a satirical project.  So my -- my
19 survey -- both of my surveys account for that in the
20 net confusion findings.
21   Q   So you did consider the allegation that it
22 was a satirical project as part of your survey;
23 correct?
24   A   I allowed for the possibility that some
25 respondents might be aware of the -- this alleged

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin
March 22, 2023

52 (205 to 208)

205

1 satirical nature of the project, and so I included
2 certainty questions. But this was not part of my
3 screener. So before you were asking me about my
4 screener, and this does not have an impact on my
5 screening questions.
6     Q    And in what way do certainty questions
7 address the purchaser's intent to buy something for
8 purposes of satire or being in on the joke, as you
9 said?
10    A    So the certainty questions, along with the
11 "Why do you say that" questions, allow me to assess
12 consumer beliefs and the strength of their belief.
13 So -- and if they have a strongly held belief as to
14 whether or not the -- NFT collections are from
15 affiliated or connected entities or from the same
16 entity, they're allowed then to say so. And so if
17 they believe that it's from affiliated or connected
18 or the same entities, they would then say that it's
19 very likely correct or definitely correct in Q8 in
20 my score question, for example.
21        MR. TOMPROS:  Could we take a look at
22 tab 8 and mark that as the next exhibit.
23        (O'Laughlin Exhibit 7 marked for
24 identification.)
25    Q    Tab 8 is an 11-page document, and at the

206

1 bottom left, it says "https://rrbayc.com."
2        Do you see that?
3     A    I see that, yes, the bottom left.
4     Q    And you have visited the rrbayc.com
5 website; correct?
6     A    I have, yes.
7     Q    And did you read the statement that goes
8 on the first two pages of Exhibit 7?
9     A    I did read those pages, yes.
10    Q    At the bottom of the first page, it says,
11 "RR/BAYC uses satire and appropriation to protest
12 and educate people regarding The Bored Ape Yacht
13 Club and the framework of NFTs."
14        Do you see that?
15    A    I see that, yes.
16    Q    And then it continues, "The work is an
17 extension of and in the spirit of other artists who
18 have worked in the field of appropriation art."
19        Do you see that?
20    A    I see that, yes.
21    Q    And what do you understand appropriation
22 art to be?
23    A    I don't have an opinion on that.
24    Q    Are you familiar with the artist Andy
25 Warhol?

207

1     A    I'm familiar with him, yes.
2     Q    Could you conduct a survey to determine
3 whether Mr. Warhol's soup can artwork was perceived
4 to be sponsored or affiliated with Campbell's Soup?
5        MS. MELCHER:  Objection; calls for
6 speculation. Incomplete hypothetical.
7     A    I was not given that assignment, so I
8 would actually have to sit down and think about it.
9 I couldn't give you an answer on the fly right here.
10    Q    And if we look at the top of this, this
11 is -- there's a logo there with the skull in the
12 middle; correct?
13    A    Yes.
14    Q    And this has the text "This logo is based
15 on the SS Totenkopf." Right?
16    A    Yes.
17    Q    Did you include the SS Totenkopf in any of
18 your consumer comparison analyses --
19    A    I'm sorry.
20        (Simultaneous speaking.)
21    Q    -- surveys?
22        MS. MELCHER:  Objection; vague.
23    A    I'm sorry. What do you -- what do you
24 mean by that?
25    Q    Sure. Do you have an understanding of

208

1 what the logo means when it says "This logo is based
2 on the SS Totenkopf"?
3     A    I don't have an opinion on that.
4     Q    Okay. So you haven't done any comparison
5 surveys to determine whether or not there would be
6 confusion as between the SS Totenkopf and any of the
7 logos at issue in this case; right?
8        MS. MELCHER:  Objection to the extent it
9 mischaracterizes the report.
10    A    This logo, I used this logo as part of the
11 stimuli. So I'm not sure what the question is.
12    Q    Sure. Are you familiar with what the
13 SS Totenkopf is?
14    A    I don't know what that is.
15    Q    Okay. There is a -- on the same exhibit,
16 there's a reference in the fourth paragraph down to
17 the website GordonGoner.com. Do you see that?
18    A    Yes. I think you scanned by that, though.
19    Q    It says in the paragraph beginning "Since
20 December of 2021," at the end of that paragraph it
21 says "You can read the findings at
22 http://GordonGoner.com." Right?
23    A    Yes, I see that, yes.
24    Q    And did you review that website in
25 connection with your analysis, the GordonGoner.com

Case 2:22-cv-04355-JFW-JEM   Document 265-3   Filed 06/02/23   Page 55 of 59   Page ID
#:19722
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin                                    53 (209 to 212)
March 22, 2023

209

1  website?
2      A  I don't think I did.
3      Q  Okay.
4      A  I don't remember.  Let me check my -- I
5  mean, I don't think it's in my reliance materials
6  unless it's one of the Bates-stamped documents.
7      Q  In your Squirt Survey, did you do -- did
8  you take into account whether black circle logos
9  with skulls in the middle were commonly used?
10     MS. MELCHER:  Objection; vague.
11     A  In my Squirt Survey, what I controlled for
12 is the use of the -- of the BAYC marks.
13     Q  And you appreciate that consumers may
14 consider -- well, strike that.
15        Did you conduct any surveys -- strike
16 that.
17        Are you familiar with something known as
18 ApeCoin, A-p-e-C-o-i-n?
19     A  Yes.  I believe that is an NFT currency
20 that's been put out by Yuga Labs.  I'm sorry, a
21 cryptocurrency.  My mistake.  Not an NFT currency, a
22 cryptocurrency.  My apologies.
23     Q  Got it.  And do you -- have you looked at
24 the ApeCoin logo?
25     A  I don't recall.

2 0

1      Q  So you don't have an opinion one way or
2  the other -- you did not conduct a survey one way or
3  the other involving the ApeCoin logo; correct?
4      A  The surveys that I conducted test
5  Mr. Ripps' use of the BAYC marks and the materials
6  that I tested which are on the Foundation website
7  and on the trending NFT collections that were
8  re-tweeted by Pauly0x, who I believe is Mr. Cahen.
9      MR. TOMPROS:  Can we take a look at
10 tab 22.
11     (O'Laughlin Exhibit 8 marked for
12 identification.)
13     Q  You're being shown tab 22 which is --
14 sorry.  Strike that.
15        You're being shown what has been marked as
16 Exhibit 8.
17     A  Okay.
18     Q  And there's a -- it's a single-page black
19 on the background with a blue circle image in the
20 middle.  Do you see that?
21     A  I see that, yes.
22     Q  What is that blue image in the middle?
23     MS. MELCHER:  Objection; outside the scope
24 of the report.
25     A  So it's -- so there's a blue circle, but

2

1  at least the way it reads to me on the image, it's a
2  gray skull.
3      Q  And is that skull -- did you consider that
4  skull in the context of your report in any way?
5      MS. MELCHER:  Same objection.
6      A  As I mentioned, I believe that ape
7  skull -- to the extent it's shown on any of the
8  materials that Mr. Ripps used in promoting the
9  RR/BAYC NFTs and either the OpenSea page or the
10 Foundation page, I believe that there's a skull that
11 resembles that, but the skull is as it was used on
12 the -- by Mr. Ripps.
13     Q  Okay.  So this is the -- to clarify, this
14 is the ape skull that you were referring to earlier
15 here in Exhibit 8?
16     MS. MELCHER:  Same objection.
17     A  I don't know.  This wasn't part of my
18 report.
19     MR. TOMPROS:  Okay.  Can we take a look at
20 tab 24?  Oh, wait.  There may not be a tab 24.  Can
21 we take a look at tab 25?
22     (O'Laughlin Exhibit 9 marked for
23 identification.)
24     Q  Tab 25 has now been marked as Exhibit 9.
25 It is a 68-page document with the control number at

2 2

1  the bottom beginning RIPPSCAHEN00000759.  Do you
2  have that in front of you?
3      A  I see that, yes.
4      Q  And this is a -- at the bottom there's a
5  URL for OpenSea.  Do you see that?
6      A  I see that, yes.
7      Q  And at the top it says "Grandpa Ape
8  Country Club."  Do you see that?
9      A  I see that, yes.
10     Q  Did you consider whether there was any
11 likelihood of confusion as between the Grandpa Ape
12 Country Club -- strike that.
13        Is the Grandpa Ape Country Club connected
14 in any way with Yuga Labs?
15     A  I haven't tested that.
16     Q  And if someone had put in "Grandpa Ape
17 Country Club" as one of the -- in response to the
18 questions in your Foundation Survey, would that have
19 qualified as BAYC?
20     A  I do not think so.  But it would have been
21 up to the coders to interpret my instructions, but
22 that was not part of my instructions.
23     Q  Is Grandpa Ape Country Club affiliated in
24 any way with Yuga Labs?
25     MS. MELCHER:  Objection; outside the

23

1  report.
2      A  I don't know.  I don't have any -- I did
3  not test this.
4          MR. TOMPROS:  I think we can take that
5  down.
6      Q  How many collections on OpenSea are there
7  that feature bored apes?
8          MS. MELCHER:  Objection; vague.
9      A  Sorry, I'm not sure I understand the
10  question.  Is it about the Yuga Bored Apes, or is it
11  about non-human primates in general?
12      Q  Well, it's a good question.  How many --
13  how many are there that feature any bored -- any
14  non-human primates on OpenSea?
15      A  I have no --
16          MS. MELCHER:  Objection.
17      A  I have no idea.
18          MR. TOMPROS:  All right.  I'm going to add
19  a couple things to the chat that we can hopefully
20  mark as the next two exhibits.  If we could start
21  with B1, which we can mark as I think -- Exhibit 9,
22  is it?
23      I can't hear if you're talking there.
24  Sorry.
25          THE TECHNICIAN:  Can you hear me now?

24

1          MR. TOMPROS:  Yes.
2          THE TECHNICIAN:  So it's going to be
3  Exhibit 10.  And you want to start with B1?
4          MR. TOMPROS:  Yes, please.
5          (O'Laughlin Exhibit 10 marked for
6  identification.)
7  BY MR. TOMPROS:
8      Q  So you're being shown what has been marked
9  as Exhibit B1, a document from opensea.io.  It says
10  "Bored Ape Yacht Club" at the top.  Do you see that?
11      A  I see "Bored Ape Yacht Club" at the top,
12  "Bored Ape Yacht Club Precious."
13      Q  Is this a Yuga Labs NFT?
14          MS. MELCHER:  Objection; outside the scope
15  of the report.
16      A  I don't know.
17      Q  Is this one of the NFTs that was discussed
18  in one of the depositions you reviewed?
19      A  I don't recall.
20          MS. MELCHER:  Objection; vague.
21      Q  Did you use any Bored Ape Yacht Precious
22  NFTs in any of your -- in either of your surveys for
23  purposes of comparison?
24      A  As I mentioned before, my surveys
25  appropriately test Mr. Ripps' and Mr. Cahen's use of

25

1  the RR/BAYC NFTs and the use of the BAYC marks on
2  the Foundation marketplace and in the context of
3  OpenSea as well.
4      Q  And in OpenSea the Bored Ape Yacht
5  Precious collection was available; correct?
6          MS. MELCHER:  Objection; lacks foundation.
7  Outside the scope of the report.
8      A  So I don't know whether it was available
9  or not.  What I looked -- what I tested on the
10  OpenSea website was the list of the trending
11  collections on a particular date in June 2022.  I
12  don't know one way or another whether this
13  collection was available, but it was not part of the
14  trending collections.
15      Q  Do you have any reason to believe that
16  there are fewer than 100 different Bored Ape Yacht
17  Club collections on OpenSea right now?
18          MS. MELCHER:  Same objections.
19      A  I haven't conducted such an analysis.  I
20  don't know.
21          MR. TOMPROS:  All right.  We can skip B3.
22  Actually, let's take a look at it just in case.
23  Let's mark B3 as the next exhibit.
24          (O'Laughlin Exhibit 11 marked for
25  identification.)

26

1      Q  You're being shown what's been marked as
2  Exhibit 11, a two-page document with an opensea.io
3  URL at the bottom left and the heading:  hash tag
4  The Bestt, with an extra T, Boredd, with an D, Apee,
5  with an extra E, Yacht Clubb, with an extra B.
6      Do you have that in front of you?
7      A  I have it in front of me, yes.
8      Q  Did you consider this NFT collection at
9  all in either your Squirt Survey or Eveready Survey?
10          MS. MELCHER:  Objection; vague.
11      A  As I mentioned before, my surveys test
12  Mr. Ripps' and Mr. Cahen's use of the BAYC marks and
13  their RR/BAYC NFTs on the Foundation marketplace.
14  And in the context of a trending list of the top 15
15  collections in June 20th, 2022, to the extent that
16  this collection was available on OpenSea at the time
17  or not, I don't know.  But it was not part of that
18  list of trending collections.
19      Q  In addition to your expert report, you
20  submitted a declaration in connection with this
21  case; right?
22      A  I did.
23      Q  Are there any opinions in your declaration
24  that are not also expressed in your expert report?
25      I believe it is taken directly from my

Case 2:22-cv-04355-JFW-JEM   Document 265-3   Filed 06/02/23   Page 57 of 59   Page ID
#:19724
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Laura O'Laughlin                              55 (217 to 220)
March 22, 2023

27

1  expert report. I don't think there's anything here
2  there.
3      Q   All right. You are not an expert on
4  trademark law; right?
5      A   I am not an expert on trademark law.
6      Q   And you're not an expert on trademark
7  damages; correct?
8      A   That was not my assignment today.
9      Q   You are not going to offer any opinion
10 about how much in damages Mr. Ripps or Mr. Cahen
11 should have to pay if Yuga prevails in its lawsuit;
12 right?
13     A   That was not part of my assignment.
14     Q   You are not an expert on NFTs; correct?
15     A   I am not an expert on NFTs.
16     Q   You're not going to offer any opinion on
17 how NFTs work, for example; right?
18     A   Only --
19         MS. MELCHER: Objection; mischaracterizes
20 the testimony.
21     A   So only to the extent that an explanation
22 of how NFTs work is needed to introduce my surveys
23 and provide context for the marketplace context that
24 I use for both my Foundation Eveready study and my
25 OpenSea Squirt study.

28

1      Q   All right. Could we go, in your report,
2  to your CV, which I believe is Exhibit 2 of your
3  report.
4      A   Appendix A you mean? Yes.
5      Q   Appendix A, sorry. My fault.
6      A   No problem.
7      Q   I'm looking at it the wrong way. I had it
8  backwards.
9          Appendix A of your report appears on
10 page 91 of the PDF, and specifically Appendix A goes
11 on for seven pages; right?
12     A   It does.
13     Q   And is this CV accurate?
14     A   I believe so. I have a chapter that's
15 forthcoming, but it's not yet published, so that's
16 not on here yet.
17     Q   And what's the chapter about?
18     A   It's about the use of the marketing funnel
19 in litigation cases.
20     Q   Apart from -- a chapter in what?
21     A   It's a forthcoming volume that was edited
22 by Jake Gersen and Joel Steckel. I co-authored it
23 with Catherine Tucker, who is a professor at MIT.
24     Q   And what's the marketing funnel?
25     A   It is a very old framework that's used to

29

1  describe the steps that a consumer takes as they
2  move through the stages of a purchase process. The
3  purchase process can be divided into a bunch of
4  different steps. Commonly it's, you know,
5  awareness, consideration, purchase, and then the
6  post purchase experience, but you can subdivide it
7  further. But in any case, this framework has been
8  around for a very long time, since the late 1800s,
9  and it's a framework that can be used to organize an
10 analysis of consumer behavior and understand how
11 consumers act when they are thinking about making a
12 purchase.
13     Q   Apart from that forthcoming chapter, is
14 your CV otherwise up-to-date?
15     A   I believe so.
16     Q   And there's a list of testifying and
17 consulting experience. Is that list also
18 up-to-date?
19     A   The testifying experience certainly is.
20 The consulting experience is -- it's a selected set
21 of consulting experiences. I've worked on many
22 cases over the course of my 15-year career at
23 Analysis Group. So it's -- it would be impossible
24 for me to list every single matter on this CV.
25     Q   Are there any trademark matters that you

220

1  know are missing?
2      A   Yes, but, again, I'm not sure -- sometimes
3  I need to think -- I need to consider the client and
4  whether or not it's something that I can put on my
5  CV as well. So there's sort of -- I know that there
6  are a few that aren't there that are recent ones,
7  for example, that I've assisted recent experts in
8  working on.
9      Q   You're not going to testify at trial about
10 any experiences that aren't listed here, though;
11 correct?
12     A   The experiences that I -- what I need to
13 rely on is in my report, and it's part of my
14 experience. I don't understand what my
15 background -- my background is my background. It's
16 what I bring --
17     Q   Yeah, I'm not trying to -- I just don't
18 want to be surprised. That is, if there are things
19 that you can't tell me because they're client
20 confidential, that's fine. But then if you come
21 into trial and say, oh, by the way, I just did this
22 incredible trademark thing for this thing that I
23 couldn't tell you about because it's client
24 confidential, then I'm in a bind because I didn't
25 get a chance to ask you about it.

22

1    So my only question is, is the CV, as you
2 presented it with the exception of this chapter, the
3 CV that you're going to present if you testify at
4 trial?
5    A  Yes, I believe so, with an update for
6 depositions.  I have another deposition scheduled
7 next week, but it has nothing to do with trademarks.
8    Q  Fair enough.  Are you a member of any
9 professional associations relevant to the work that
10 you conducted in this report?
11    A  I believe I'm a member of the American
12 Marketing Association, but I don't think this is on
13 here.  I'm also a member of the American Bar
14 Association and the Canadian Bar Association as an
15 affiliate.  So I'm an economist -- economist by
16 training, so it's sort of an affiliate as opposed to
17 an attorney membership.
18    Q  One of -- any other -- strike that.
19    Any other professional associations
20 relevant to the work in the report?
21    A  Not that I know of.  Not that I can
22 recall.
23    Q  You have a colleague by the name of Lauren
24 Kindler; correct?
25    A  I do.

222

1    Q  And did you speak with Ms. Kindler in
2 connection with your report?
3    A  I did not.
4    Q  And did you speak with Ms. Kindler in
5 connection with her report in this case?
6    A  I did not.
7    Q  Did any members of your team speak with
8 members of Ms. Kindler's team?
9    A  It's possible, but I wouldn't know for
10 sure.
11    Q  Do you know a person by the name of Jonah
12 Berger, B-e-r-g-e-r?
13    A  I've heard of him, yes.  He's a professor
14 of marketing, I think, at UPenn.
15    Q  Have you read his report in this case?
16    A  I have not.
17    Q  Did you speak with him in coming up with
18 your opinions in this case?
19    A  I did not.
20    Q  Who have you spoken with -- apart from the
21 members of your own team at Analysis Group, who have
22 you spoken with in connection with the forming of
23 your opinions in this case?
24    A  The members of my team.
25    Q  And did you speak with any attorneys for

223

1 Yuga?
2    A  No, I did not.
3    Q  Have you spoken to someone by the name of
4 Greg Solano?
5    A  I don't know who that is.  I think there
6 was a deposition of him, actually.  The name sounds
7 familiar.
8    Q  Yes, there is a deposition.  But you
9 haven't spoken with Mr. Solano?
10    A  No.
11    Q  Have you spoken with Mr. Wylie Aronow?
12    A  No.
13    Q  Have you spoken with Ms. Nicole Muniz?
14    A  No.
15    Q  Have you spoken with any Yuga Labs
16 employees in forming your opinions?
17    A  I have not.
18    Q  Why not?
19    A  Because it was not relevant to my
20 assignment.  My assignment, as I mentioned, was
21 about assessing the likelihood of consumer confusion
22 through Mr. Ripps' and Mr. Cahen's use of the BAYC
23 marks.  And so my opinion does not -- I don't need
24 talk to them.  If I needed to talk to somebody, I
25 would have asked, but that's not what I needed for

224

1 this case.
2    Q  And in your report you cite a number of
3 tweets, articles, those kinds of things, you know,
4 publicly available materials.  Did you speak with
5 the authors of any of those publicly available
6 materials?
7    A  In connection with writing this report?
8    Q  Correct.
9    A  No.
10    Q  And what did you do to prepare for today's
11 deposition?
12    A  I read my report several times.  I looked
13 at the materials that I provided in support of my
14 report, including the data files, including
15 materials I relied upon.  I met with my colleagues,
16 and I met with -- with Molly as well for -- for two
17 hours, I think, on -- I believe it was Thursday,
18 last Thursday, and then two hours yesterday.
19    Q  I do not mean any offense by these
20 questions.  I promise you that I ask them in every
21 deposition that I take.
22    Have you ever been involuntarily
23 terminated from a job?
24    A  No.
25    Q  Have you ever been accused of academic or

225
1  professional misconduct?
2      **A  No.**
3      Q   And apart from traffic offenses, have you
4  ever been charged with a crime?
5      **A  No.**
6          MR. TOMPROS:  Can we take a break?
7          THE VIDEOGRAPHER:  We are going off the
8  record.  The time is 3:37 p.m.
9          (Recess 3:37 p.m. - 3:45 p.m.)
10         THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 3:45 p.m.
12         MR. TOMPROS:  Ms. O'Laughlin, thank you
13  for your time.  I don't have any further questions.
14         MS. MELCHER:  I don't have any questions.
15  But as we've done for past depositions,
16  Ms. O'Laughlin will read and sign the deposition.
17  And we're marking this "Highly Confidential -
18  Attorneys' Eyes Only" under Section 6.3(b) of the
19  protective order.
20         MR. TOMPROS:  Is there something that's
21  actually confidential?  I just want to make sure
22  because I would like to get this moved along quickly
23  and I don't think -- I think that the full report
24  was filed publicly recently; right?
25         MS. MELCHER:  I think we're going to

226
1  designate it highly confidential - AEO for now, and
2  then, Mr. Tompros, we can address that offline.
3          MR. TOMPROS:  Sure.
4          THE VIDEOGRAPHER:  This concludes the
5  deposition of Laura O'Laughlin.  We are going off
6  the record at 3:46 p.m.
7          (Time noted: 3:46 p.m.)
8
9          *****
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

227
1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3
4          I, MONIQUE VOUTHOURIS, New Jersey License
5  No. 30XI00083400, the officer before whom the
6  foregoing remote deposition was taken, do hereby
7  certify that the foregoing transcript is a true and
8  correct record of the testimony of LAURA O'LAUGHLIN;
9  that said testimony was taken by me stenographically
10  and thereafter reduced to typewriting under my
11  direction; that reading and signing was requested;
12  and that I am neither counsel for, related to, nor
13  employed by any of the parties to this case and have
14  no interest, financial or otherwise, in its outcome.
15          IN WITNESS WHEREOF, I have hereunto set my hand
16  this 3rd day of April 2023.
17
18
19
20      *Monique Vouthouris*
21      Monique Vouthouris, CCR, RPR, CRR
22      Notary Public of the State of New Jersey
23      My commission expires: April 8, 2024
24
25