# Exhibit B



**Planet Depos**
We Make It *Happen*™

<span style="color:darkred">**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**</span>

# Transcript of Jonah Berger, Ph.D.

**Date:** March 9, 2023
**Case:** Yuga Labs, Inc. -v- Ripps, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3                  WESTERN DIVISION
4
5
6   YUGA LABS, INC.,          CASE NO.:
7            Plaintiff    22 cv 04355 JFW JEM
8      v.
9
10  RYDER RIPPS, JEREMY CAHEN,
11  DOES  1 10,
12          Defendants.
13
14
15
16  ** THIS TRANSCRIPT IS MARKED HIGHLY CONFIDENTIAL
17        ATTORNEYS' EYES ONLY **
18
19   REMOTE VIDEO DEPOSITION OF JONAH BERGER, Ph.D.
20            LOS ANGELES, CALIFORNIA
21            THURSDAY, MARCH 9, 2023
22
23  REPORTED BY:  LISA BARRETT, RPR, CRR, CRC, CSR
24  JOB NO.:    483919
25
```

**Page 2**

```
1              UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3                  WESTERN DIVISION
4
5
6   YUGA LABS, INC.,          CASE NO.:
7            Plaintiff    22 cv 04355 JFW JEM
8      v.
9
10  RYDER RIPPS, JEREMY CAHEN,
11  DOES  1 10,
12          Defendants.
13
14
15
16
17  REMOTE VIDEO DEPOSITION OF JONAH BERGER, Ph.D.
18  TAKEN ON BEHALF OF THE DEFENDANTS,
19  TAKEN REMOTELY, BEGINNING AT 8:38 A.M.
20  AND ENDING AT 4:10 P.M. ON
21  THURSDAY, MARCH 9, 2023, BEFORE
22  LISA BARRETT, RPR, CRR, CRC, CSR,
23  CERTIFIED SHORTHAND REPORTER
24
25
```

**Page 3**

```
1              A P P E A R A N C E S:
2
3   FOR THE PLAINTIFF, YUGA LABS, INC.:
    FENWICK & WEST, LLP BY:
4      MOLLY MELCHER, ESQ.
5      555 California Street
6      San Francisco, CA 94104
7      Mmelcher@fenwick.com
8      415.875.2378
9
10  FOR THE DEFENDANTS, RYDER RIPPS, JEREMY CAHEN,
11  DOES 1 10:
12      WILMER CUTLER PICKERING HALE AND DORR, LLP
13      BY:  DEREK GOSMA, ESQ.
14      350 South Grand Avenue
15      Suite 2400
16      Los Angeles, California 90071
17      213.443.5300
18      Derek.gosma@Wilmerhale.Com
19       and
20      WILMER CUTLER PICKERING HALE AND DORR, LLP
21      BY:  AMBROISE DECILAP, ESQ.
22      60 State Street
23      Boston, Massachusetts 02109
24      Ambroise.decilap@wilmerhale.com
25
```

**Page 4**

```
1   ALSO PRESENT:
2          Caroline Effland, Remote Technician
3          John Gugarty, Legal Videographer
4
5              I N D E X
6   WITNESS                          PAGE
7   JONAH BERGER
8   EXAMINATION BY MR. GOSMA           7
9
10            E X H I B I T S
11  EXHIBIT NO.      DESCRIPTION      PAGE
12  Exhibit 1    Expert Report of      33
13               Professor Jonah Berger
14               February 6, 2023
15  Exhibit 3    Bored Ape Yacht Club  55
16               Logo image; one page
17  Exhibit 4    Nazi SS logo image; one  57
18               page
19  Exhibit 5    Three logos side by side  63
20               one page
21  Exhibit 7    Results of search on OpenSea  94
22               for search term  Bored Ape
23               Yacht Club .
24
25
```

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 4 of 75   Page ID
#:19960

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

2 (5 to 8)

**5**

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | NY Times article, entitled: Cryptocurrencies Melt Down in a 'Perfect Storm' of Fear and Panic | 131 |
| Exhibit 9 | Article entitled: When, Why, and How Controversy Causes Conversation Authors: Zoey Chen, Jonah A. Berger, University of Pennsylvania | 158 |
| Exhibit 28 | Article Metaverse Post entitled: Bored Apes desecrated a famous piece of New York Graffiti Art. | 256 |

**6**

P R O C E E D I N G S

--- Commencing at 8:38 a.m.

REMOTE TECHNICIAN:  Thank you to everyone for attending this proceeding remotely, which we anticipate will run smoothly.  Please remember to speak slowly and do your best not to talk over one another.

Please be aware that we are recording this proceeding for backup purposes.  Any off-the-record discussions should be had away from the computer.  Please remember to mute your mic for those conversations.

Please have your video enabled to help the reporter identify who is speaking.  If you are unable to connect with video and are connecting via phone, please identify yourself each time before speaking.

I apologize in advance for any technical-related interruptions.  Thank you.

THE VIDEOGRAPHER:  Please stand by.  Here begins media number 1 in the videotaped deposition of Jonah Berger, in the matter of Yuga Labs, Inc. v Ryder Ripps, et al., in the United States District Court for the Central District of California, Western Division, Case Number

**7**

2:22-cv-04355-JFW-JEM.

Today's date is March 9, 2023.  The time on the video monitor is 8:40.

The remote videographer today is John Gugarty, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. GOSMA:  This is Derek Gosma of WilmerHale on behalf of the defendants, Ryder Ripps and Jeremy Cahen.  And with me today is my colleague Ambroise Decilap.

MS. MELCHER:  Good morning, Molly Melcher from Fenwick & West for plaintiff, Yuga Labs.

THE VIDEOGRAPHER:  The court reporter today is Lisa Barrett, also representing Planet Depos.

Would the reporter please swear in the witness.

(Remote oath stipulation agreed by counsel.)

DR. JONAH BERGER was sworn and testified as follows:

EXAMINATION

**8**

BY MR. GOSMA:

Q   Good morning, Dr. Berger.

**A   Good morning.**

Q   Do you understand you are under oath?

**A   I do.**

Q   And are you presently under the influence of any substance or medication that would impair your ability to testify today?

**A   No, I'm not.**

Q   Is there any other reason that you cannot give your best testimony here today?

**A   I don't believe so, no.**

Q   Did you bring any documents with you to the deposition today?

**A   I did not, no.**

Q   Okay.  What did you do to prepare for your deposition?

**A   I went back and read my expert report. I took a look at some of the documents I reference in my expert report, those types of things.**

Q   Did you meet with counsel?

**A   I did not meet with counsel in person but I did talk to counsel over Zoom.**

Q   For about how long?

**A   Probably two or three hours, something**

Case 2:22-cv-04355-JFW-JEM  Document 267-3  Filed 06/05/23  Page 5 of 75  Page ID
#:19961

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

3 (9 to 12)

**9**

1  like that, maybe four.
2      Q   And how long did you spend reviewing
3  the materials in preparation for the deposition
4  today?
5      A   I don't remember exactly how long.
6      Q   All right.  Have you ever been deposed
7  before?
8      A   I have, yes.
9      Q   How many times?
10      A   I think in the last few years at least
11  a dozen, more than that in general, but at least
12  in the last few years at least a dozen or so.
13      Q   Have all of those dozen instances been
14  in cases where you were serving as an expert
15  witness?
16      A   What other capacity?  I'm not sure what
17  other capacity I would be serving.
18      Q   An example, sir, would be a case in
19  which you were a party.
20      A   Oh, yes.  Thank you.  No, only cases in
21  which I was an expert witness.
22      Q   Have you ever testified in court?
23      A   I have, yes.
24      Q   How many times?
25      A   I'm not sure off-hand.  It wasn't in

**1**

1      A   Good to hear.
2      Q   All right.  Now, you're being
3  compensated at $1,100 per hour for your time,
4  correct?
5      A   That is correct, yes.
6      Q   And what are your total billings for
7  this case approximately?
8      A   I don't know off-hand.
9      Q   Can you give me an order of magnitude?
10      A   I've spent certainly more than 10 hours
11  on this case.
12          I don't believe I've spent more than
13  100 hours on this case, so something between 10
14  and 100.  I'm not sure exactly, the exact --
15      Q   Understood, and that's totally
16  understandable.  I appreciate the estimate.
17          Did anyone else assist you with your
18  work in this case?
19      A   Yeah, when I am engaged in matters like
20  this, the ideas are always my own.  In this report
21  I drafted the report, I thought about what content
22  to include in the report, what references to use,
23  what research to conduct, what data to get, what
24  vendors to work with but in my capacity as an
25  expert I often work with Cornerstone Research and

**0**

1  the past few years but probably a handful, half a
2  dozen, something like that.
3      Q   Have you ever been a defendant in a
4  lawsuit?
5      A   I have not, no.
6      Q   Have you ever been arrested?
7      A   I have not, no.
8      Q   Have you ever been accused of any
9  academic wrongdoing?
10      A   I have not -- not that I'm aware of,
11  no.
12      Q   When were you engaged for this case?
13      A   I'm not sure off-hand.
14      Q   Can you give me just a ballpark?  Was
15  it this year?  Was it last year?
16      A   What month are we in?  We're in March.
17  It certainly wasn't this year.  I can't --
18  I believe it was probably last year.
19          I have two young kids so I don't always
20  think in terms of years; I think in terms of
21  months but it definitely wasn't this -- this year.
22      Q   Yes, and my dad tells me that as time
23  goes on, we'll start to reference time based on
24  how old they were and not how old we were.  I have
25  two young kids myself, so I understand.

**2**

1  did I here as well.
2      Q   Just to be clear, members of the
3  Cornerstone team helped to assemble your report,
4  correct?
5      A   They helped me with --
6          MS. MELCHER:  Mischaracterizes
7  testimony.
8          THE WITNESS:  I'm sorry.  I spoke over
9  you.  Please go ahead and then I'll go.
10          MS. MELCHER:  Thanks.  I said
11  objection, mischaracterizes testimony.
12          THE WITNESS:  I think what I said is
13  that, as with other matters, I'm often involved
14  when I've been assisted by the staff of
15  Cornerstone Research and they worked under my
16  direction in pulling things together.
17  BY MR. GOSMA:
18      Q   And how many members of the Cornerstone
19  team participated in that process?
20      A   I'm not sure.
21      Q   About what percentage of your annual
22  income comes from consulting?
23      A   What do you mean by "consulting"?
24          MS. MELCHER:  Objection.
25  BY MR. GOSMA:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

4 (13 to 16)

---

3

1  Q  I mean expert witness litigation
2  consulting.
3  **A  A portion. I wouldn't say -- it is**
4  **certainly not the majority of my income but it is**
5  **a portion of my income.**
6  Q  Okay. Had you heard of Yuga Labs prior
7  to your engagement for this case?
8  **A  I believe so. I certainly had heard of**
9  **BAYC. I believe I'd heard of Yuga, as well.**
10  Q  In what capacity had you heard of them
11  or what context?
12  **A  I don't remember exactly. It may have**
13  **been in the news, it may have been on social**
14  **media. I'm not sure off-hand.**
15  Q  Had you heard of my client Ryder Ripps
16  prior to this case?
17  **A  I don't believe so, no.**
18  Q  As part of your work in preparing to
19  testify in this case, did you do any research into
20  Mr. Ripps?
21  MS. MELCHER: Objection, vague.
22  THE WITNESS: I'm not sure -- I'm not
23  sure what you mean by "research into Mr. Ripps."
24  BY MR. GOSMA:
25  Q  Sure. Did do you anything to

---

4

1  investigate, for example, his art work?
2  **A  That's not the -- his -- him as a**
3  **person or his art work in general is not -- is not**
4  **the focus of my expert report. So no, I did not**
5  **do an in-depth look into him as a person.**
6  Q  Do you have an opinion in this case as
7  to whether Mr. Ripps is an artist or not?
8  MS. MELCHER: Objection, outside the
9  report.
10  THE WITNESS: That's a complicated
11  question in terms of what counts as an artist and
12  what doesn't and that's -- I'm not opining about
13  whether he is an artist or not. So that's outside
14  the scope of my report.
15  BY MR. GOSMA:
16  Q  Okay. So you can't say one way or
17  another, as an expert in this case, whether he's
18  an artist, correct?
19  **A  That's not something I am an expert in.**
20  Q  Now, are you aware of the nature of the
21  criticism that Mr. Ripps has made against
22  Yuga Labs?
23  MS. MELCHER: Objection, vague.
24  THE WITNESS: I'm not sure exactly what
25  you mean.

---

5

1  BY MR. GOSMA:
2  Q  Do you understand that Mr. Ripps has
3  criticized Yuga Labs in the past?
4  MS. MELCHER: Objection, vague.
5  THE WITNESS: In working on this case,
6  I've been -- I've become aware of some things --
7  aware that some things have been said. I have not
8  studied those things in detail and those
9  particular commentary are not the focus of my
10  report.
11  BY MR. GOSMA:
12  Q  Okay. So, sir, you advise companies on
13  branding issues; is that correct?
14  **A  I do, yes.**
15  Q  You've consulted with a number of large
16  companies, correct?
17  **A  I want to be careful. I don't know**
18  **what you mean by "a number" but I have worked with**
19  **various large companies, yes.**
20  Q  Examples are -- an example -- strike
21  that.
22  An example of a client that you've
23  worked with is Apple, correct?
24  **A  Correct, yes.**
25  Q  Another example is Amazon, correct?

---

6

1  **A  Correct.**
2  Q  Google, correct?
3  **A  Correct.**
4  Q  Nike, correct?
5  **A  Correct.**
6  Q  And has that work been litigation
7  consulting or has it encompassed other kinds of
8  consulting as well?
9  MS. MELCHER: Objection, vague.
10  THE WITNESS: I should ask for a little
11  bit more detail about what you're asking.
12  BY MR. GOSMA:
13  Q  Well, I'm asking, you know, an
14  either/or question.
15  **A  Okay.**
16  Q  So on the one hand there is -- we know
17  that you do litigation consulting. Have you done
18  any other kinds of consulting for these companies?
19  **A  Yes.**
20  Q  And what types of consulting have you
21  done for them?
22  **A  A variety of different things.**
23  **Issues related to marketing strategy,**
24  **go to market strategy, product marketing,**
25  **branding, new product introduction, a variety -- a**

---

**Page 7**

1  variety of different things in that general
2  sphere.
3       Q   Thank you.
4           Have you done any crisis management
5  type consulting?
6           MS. MELCHER:  Objection, vague.
7           THE WITNESS:  I'd have to go back and
8  look at my client list.  That's certainly not
9  something my consulting work focuses on.
10          There may at some point -- at some
11 point I may have worked with a client or two in
12 that capacity but that is certainly not the focus
13 of my consulting.
14 BY MR. GOSMA:
15      Q   Have you ever been engaged by a client
16 to help address controversy surrounding their
17 actions or their brand?
18          MS. MELCHER:  Objection, vague.
19          THE WITNESS:  I'm not a hundred percent
20 sure what you mean there.
21 BY MR. GOSMA:
22      Q   Okay.  You know what a controversy is,
23 right, sir?
24      A   I know how it's used colloquially.  I'm
25 not sure exactly how you're using it.

**Page 8**

1       Q   Okay, I'm using it in the colloquial
2  sense.  Companies sometimes get embroiled in
3  controversy, right, sir?
4       A   This seems outside the focus of my
5  expert report.  I want to be helpful here.  I
6  generally agree, as an individual, that companies
7  sometimes deal with controversies of one type or
8  another.  That's not the focus of my consulting
9  work.  My focus of my consulting work is marketing
10 strategy and branding sort of issues more
11 generally so I'm not focused -- that work isn't
12 focused on controversies, per se, but I'm
13 generally aware of the fact that controversies
14 exist and sometimes brands deal with them.
15      Q   Okay, and have you ever advised a
16 client on how to correct a negative association
17 with a brand?
18      A   A good deal of my academic research has
19 focused on those types of questions and so at some
20 points along the way, even though that is not --
21 dealing with negative associations has not been
22 the focus of my consulting work, at points along
23 the way I've certainly talked to clients about
24 those types of issues.
25      Q   Can you recall any specific examples of

**Page 9**

1  those types of cases?
2       A   You know, I've worked with hundreds of
3  consulting clients over the years.
4           Many of the projects that I've done are
5  under nondisclosure agreements so I need to be
6  careful and would need to think about what types
7  of things I can talk about, but I'm happy to say
8  that, in general, I've done some consulting work
9  on these types of issues.
10      Q   Okay.  Have you ever -- well, strike
11 that.
12          Have you ever done brand consulting for
13 an individual as opposed to a corporation?
14      A   I have done some work with individuals,
15 yes.
16      Q   Okay.  Have you ever represented --
17 strike that.
18          Have you ever served as an expert
19 witness for an individual client in litigation?
20      A   Do you mean a client who is an
21 individual, not a company?
22      Q   Yes, sir, that is what I mean, thank
23 you.
24      A   I'd have to go back and look.  I'm not
25 sure off-hand.  I'd have to go back and look.

**Page 20**

1       Q   Have you ever served as an expert
2  witness in a trademark case other than this one?
3       A   I've certainly done work on related
4  issues.  I'd have to go back and look to see which
5  cases specifically but I've certainly done work on
6  issues related to this.
7       Q   Has any of your trial testimony related
8  to a trademark case?
9       A   Again, I believe so.  I'd have to go
10 back and look.  I've certainly done work in cases
11 on these types of issues.  I'd have to go back and
12 look to see which ones in particular but I've
13 certainly done work related to these issues.
14      Q   Sure.  Have you ever represented an
15 accused infringer in a trademark case?
16          MS. MELCHER:  Objection, vague.
17          THE WITNESS:  I'm not a hundred percent
18 sure what you mean there.
19 BY MR. GOSMA:
20      Q   Okay.  Have you ever represented the
21 defendant in a trademark case?
22      A   Again, I've been involved in a number
23 of matters.  I'd have to go back and look, to be
24 sure.
25      Q   Okay.  Now, your expert report, which

Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

---

**2**

1  we'll pull up in a minute, lists your prior
2  consulting work, correct?
3      **A   Could you be a little more precise**
4  **there. I'm not sure exactly what you mean.**
5      Q   Well, there is Appendix A to your
6  expert report, sir?
7      **A   I'm not looking at my expert report yet**
8  **at the moment. I believe there is an appendix. I**
9  **don't remember exactly what's in Appendix A.**
10      MR. GOSMA: All right. Let me see if I
11  can get that pulled up so that we have it.
12      REMOTE TECHNICIAN: I have not yet
13  received the exhibits in my email.
14      MR. GOSMA: Okay. Then, Ambroise, if
15  you could send Caroline just the report for now
16  and then, you know, work on sending the rest of
17  the exhibits while we work. I'll work around this
18  for now.
19  BY MR. GOSMA:
20      Q   So, Dr. Berger, you've served as an
21  expert for JUUL on multiple cases, correct?
22      **A   I believe that's correct.**
23      MS. MELCHER: Objection, lacks
24  foundation.
25      THE WITNESS: I believe that's correct,

---

**23**

1  foundation.
2      THE WITNESS: I want to be a little
3  careful here. That's certainly part of those
4  cases, but not all of those cases -- not all of
5  what those cases are about to be precise, sorry.
6  BY MR. GOSMA:
7      Q   Outside of that, what else were the
8  cases about?
9      **A   As I mentioned, the use of social media**
10  **in general, what the use of social media means,**
11  **the effects of social media, those types of**
12  **things.**
13      Q   And what sort of analysis did you
14  perform in that case?
15      **A   Similar to some of the work I did here.**
16  **I analyzed social media data over time to look at**
17  **what consumers were saying as one of the types of**
18  **analyses I did.**
19      **I also looked at sales data over time**
20  **and a variety of other types of data.**
21      Q   And what was your ultimate opinion in
22  the case about -- or strike that.
23      What opinions did you offer in that
24  case?
25      **A   Again I want to be a little bit careful**

---

**22**

1  yes.
2  BY MR. GOSMA:
3      Q   And JUUL is a manufacturer of
4  electronic cigarettes, correct?
5      **A   I believe so, yes.**
6      Q   What were the allegations against JUUL
7  in the cases in which you represented them?
8      MS. MELCHER: Objection, vague.
9      THE WITNESS: I'm not sure what I'm
10  allowed to talk about and not, so I want to be a
11  little bit careful there. I'm not -- I'm not sure
12  what I'm allowed to talk about, without disclosing
13  things.
14  BY MR. GOSMA:
15      Q   Well, what was the case about, sir,
16  just in general?
17      **A   I believe the cases were about --**
18  **what's a good way to describe it? -- how the use**
19  **of social media -- social media, how social media**
20  **is used, what it means for a company to use social**
21  **media. Those types of questions.**
22      Q   And the allegations in the case related
23  to marketing of e-cigarettes to children, correct,
24  sir?
25      MS. MELCHER: Objection, lacks

---

**24**

1  **here. I'm not a lawyer so I'm not -- I'm not sure**
2  **what things I am allowed to or supposed to say**
3  **about other cases.**
4      **I think in general what I would say,**
5  **some of my opinion was -- is that many companies,**
6  **organizations, use social media, JLI's use of**
7  **social media was not particularly unusual. There**
8  **was not a strong link between JLI's use of social**
9  **media and downstream consequences for consumers.**
10  **Those were some of the parts of my opinion.**
11      Q   Now, sir, JUUL ultimately paid
12  somewhere upwards of $400 million to settle that
13  litigation, correct?
14      **A   I'm not --**
15      MS. MELCHER: Objection, lacks
16  foundation.
17      THE WITNESS: I'm not sure what
18  litigation you are speaking of specifically.
19  BY MR. GOSMA:
20      Q   The litigation in which you represented
21  them.
22      **A   As you mentioned earlier, I've been**
23  **involved in multiple cases with them. I'm not**
24  **sure which one you're speaking of.**
25      Q   I see.

**25**

1    You also served as an expert in the
2 Duramax Diesel litigation; correct?
3    **A   I believe so, yes.**
4       MS. MELCHER:  Objection, lacks
5 foundation.
6       THE WITNESS:  Sorry.  I -- that -- I
7 believe so, yes.
8 BY MR. GOSMA:
9    Q   What were the allegations in that case?
10      MS. MELCHER:  Objection, vague.
11      THE WITNESS:  It's been a little while,
12 so I'd have to go back and look at them but
13 I believe there were questions about marketing
14 communications and the impact of those
15 communications.
16 BY MR. GOSMA:
17   Q   And in particular, the impact -- well,
18 strike that.
19      What were those marketing
20 communications about?
21      MS. MELCHER:  Objection, vague.
22      THE WITNESS:  I would need to go back
23 and look to be sure but I believe they were about
24 heavy duty trucks and a variety of aspects of
25 them.

**26**

1 BY MR. GOSMA:
2    Q   Including their environmental impact,
3 right, sir?
4    **A   I'd have to go back --**
5       MS. MELCHER:  Objection, lacks
6 foundation.
7       THE WITNESS:  -- and look, to be sure.
8 BY MR. GOSMA:
9    Q   So your testimony as you sit here today
10 is that you don't remember whether the
11 environmental impact was a part of that case,
12 correct?
13      MS. MELCHER:  Objection,
14 mischaracterizes testimony.
15      THE WITNESS:  I'm -- I have not worked
16 on that case in quite a bit of time.  I've worked
17 on a number of cases since then as well as a
18 number of projects outside of experting consulting
19 for a number of organizations so the details of
20 that case are not at my fingertips.
21      I believe parts of the case related to
22 communications about the environment but also
23 related to communications about other product
24 attributes.  I'd need to look in -- at specific
25 documents in more detail to be able to better

**27**

1 answer your question.
2 BY MR. GOSMA:
3    Q   Thank you.  Have you ever declined to
4 represent a client because you had a moral
5 objection to their business?
6       MS. MELCHER:  Objection, vague.
7       THE WITNESS:  I have, yes.
8 BY MR. GOSMA:
9    Q   Okay.  In what instance?
10   **A   I'd have to go back and look, to be**
11 **sure.  But in both my expert consulting as well as**
12 **in my outside of expert consulting, so marketing**
13 **strategy consulting, I've turned down clients in**
14 **both cases because of ethical questions in my**
15 **mind.**
16   Q   Okay.  Have you ever advised a crypto
17 technology company?
18      MS. MELCHER:  Objection, vague.
19 BY MR. GOSMA:
20   Q   Yeah, let me rephrase that to be more
21 specific.
22      Have you ever advised a cryptocurrency
23 related company?
24   **A   I've certainly done work in this space**
25 **and given advice to individuals working in this**

**28**

1 **space about their companies.**
2       **That's not the only thing I do, by any**
3 **means, but I have certainly given some advice to**
4 **folks working in this space.**
5    Q   What are some examples of companies
6 that you've worked with in this space, other than
7 Yuga Labs?
8    **A   I'd have to -- I'd have to go and look**
9 **to be sure.  It's not something I'm working on**
10 **currently.**
11   Q   What was the approximate timing of that
12 work?
13   **A   You now, I -- at any one in time -- one**
14 **point in time, I'm working on a number of expert**
15 **legal consulting projects as well as traditional**
16 **consulting projects.**
17      **Every year I work with dozens of**
18 **clients.  I'm not sure off-hand.  I'd have to go**
19 **back and look.**
20   Q   Okay.  Has any of your consulting work
21 in the cryptocurrency space focused on NFTs,
22 specifically?
23   **A   I'd have to go back and look.  I've**
24 **certainly had conversations with individuals**
25 **working in this space about marketing and**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

8 (29 to 32)

**29**

1  marketing strategy, but I'm not sure off-hand.
2  BY MR. GOSMA:
3      Q   Do you personally own any
4  cryptocurrency?
5      A   I do not, no.
6      Q   Have you at any time?
7      A   I have not, no.
8      Q   Do you own any NFTs?
9      A   I do not, unfortunately, no.
10     Q   Do you own any Bored Ape Yacht Club
11 products, whether -- obviously not NFTs, but
12 anything else?
13     A   No, I -- no I don't.
14     Q   Have you ever considered purchasing a
15 Yuga Labs product?
16         MS. MELCHER:  Objection, vague.
17         THE WITNESS:  I'm not sure off-hand.
18 BY MR. GOSMA:
19     Q   Okay.  All right.
20         Have you done any research on the
21 cryptocurrency space as part of your work on this
22 case?
23         MS. MELCHER:  Objection, vague.
24         THE WITNESS:  I'm not sure exactly what
25 you mean by "research" but in an effort to move

**30**

1  things forward, I've certainly, you know, as
2  indicated in the list of documents at the back of
3  my report, considered a wide variety of
4  information in this space in forming my opinion.
5  BY MR. GOSMA:
6      Q   Sure.  And what I mean specifically is:
7  Have you done anything -- because you are not a
8  cryptocurrency owner yourself, as part of your
9  work on this case have you done anything to
10 educate yourself about the cryptocurrency
11 industry?
12         MS. MELCHER:  Vague.
13         THE WITNESS:  I think, as I mentioned
14 already, I have done some work in this space prior
15 to taking this case and have some awareness of the
16 space prior to taking this case, and have also
17 read some things as part of this case, and the
18 ones on which I rely on are listed in the back of
19 my report.
20 BY MR. GOSMA:
21     Q   Okay.  What is an NFT?
22     A   An NFT is a non-fungible token.  In
23 some sense it is kind of like a proof of purchase,
24 a digital proof of purchase.
25     Q   Can an NFT be duplicated?

**3**

1      A   I want to be careful here.  What do you
2  mean by, "Can an NFT be duplicated"?
3      Q   I mean, I have NFT A, of course I can't
4  have it in my hand but I have NFT A in my Ethereum
5  wallet.  Can that token be duplicated?
6      A   Yeah, so --
7          MS. MELCHER:  Objection, incomplete
8  hypothetical.
9          THE WITNESS:  Sorry, could you speak
10 just a little louder.  I didn't catch that.
11 BY MR. GOSMA:
12     Q   Sure.  And I apologize you couldn't
13 hear me.  I'll speak louder.
14         So I have an Ethereum wallet and I have
15 an NFT, which we'll call NFT A, in my wallet; do
16 you follow me?
17     A   I do, yes.
18     Q   Okay.  Can that NFT be duplicated?
19     A   And I'm not looking at my report at the
20 moment and so I'm talking a little bit off the top
21 of my head so I'd appreciate being able to look at
22 my report to speak more cogently but I think what
23 I would say, and that's part of the issues
24 involved in the case, is, can someone duplicate
25 all the parts of that NFT?  Part of what an NFT is

**32**

1  about is the security of it.  Could someone
2  duplicate the image associated with that NFT?  And
3  that's what's at issue here, right?  The image is
4  the external-facing part of the NFT.  That's the
5  part that's easy for people to see.  That's the
6  part that people display and when people buy
7  these, they don't just buy them for the record on
8  the block chain; they buy them for the visible
9  image they can show others.
10         And so part of the issue is that that
11 visible image and many aspects that are visible
12 can be copied, even if the whole NFT itself
13 cannot.
14     Q   Thank you.
15         Caroline, I understand you've received
16 the exhibits now so I'd like to mark a copy of
17 Dr. Berger's report.
18         THE WITNESS:  Is it okay if I go ahead
19 and open it?
20         MR. GOSMA:  Yeah, that would be totally
21 fine.  Let me figure out which tab number it is.
22 It is tab number 1.
23         THE WITNESS:  Give me just a second
24 here.  I'm going to the folders.
25         REMOTE TECHNICIAN:  It is uploading

33

1  now. It might take a second to appear in the
2  folder.
3        THE WITNESS: You guys weren't kidding
4  about the security. It took a good little time.
5        MR. GOSMA: Yeah, it really did take
6  15, 20, 30 minutes, I don't know.
7        THE WITNESS: Somebody, could have just
8  walked it over --
9        MR. GOSMA: Right.
10       REMOTE TECHNICIAN: I can display it on
11  the screen if you'd like, counsel.
12       MR. GOSMA: I don't think we need to do
13  that if Dr. Berger has got himself a copy. We can
14  see how it goes.
15       THE WITNESS: I am -- I'm still waiting
16  to get it here.
17       MR. GOSMA: Let's just wait a second
18  until you've got it.
19       THE WITNESS: If somebody else wants to
20  let me know if they see it, I will hit "refresh" a
21  couple of time -- oh, there we go.
22       I am going to click on this. Give me
23  just a second here. I'm going to open this.
24       Okay, I have it up in front of me.
25       (Exhibit No. 1 was marked for

34

1  identification.)
2  BY MR. GOSMA:
3     Q    Great. You are free to refer to it
4  whenever you would like. I'm still not asking
5  about it specifically right now but, you know,
6  it's available to you.
7     A    Thank you.
8     Q    All right. In the specific preparation
9  for this report did you do any research regarding
10  NFTs or did you rely on only what you knew before?
11    A    I apologize. That's a little bit of a
12  tough question to answer because I don't know
13  exactly what I knew before and exactly what I've
14  gained since working on this case. So I think the
15  best way to answer that is, you know, all the
16  documents that I rely on in forming my opinion are
17  at the back of my expert report. I certainly had
18  some knowledge of the space beforehand.
19       The documents I rely on are in some
20  cases examples of things to make a point. They
21  are not the entire literature available to make
22  that point, but I think that's the best answer I
23  can give at the moment.
24    Q    Okay, thank you.
25       I want to understand the NFT

35

1  marketplace, okay? So the next few questions are
2  going to be about the marketplace where NFTs are
3  bought and sold; do you have that in mind?
4     A    I think so. I think I understand what
5  you mean.
6     Q    And I mean the marketplace at large. I
7  don't mean any specific website. I'm just talking
8  about NFTs in general. Okay?
9     A    Okay.
10    Q    How -- how would you describe that
11  marketplace?
12    A    I'm not --
13       MS. MELCHER: Objection, vague.
14       THE WITNESS: I'm not sure what you
15  mean. Sorry.
16  BY MR. GOSMA:
17    Q    Okay. How does -- well, where are NFTs
18  bought and sold?
19    A    Places like OpenSea, Foundation. I'm
20  not sure what you're asking.
21    Q    Well, that is generally what I'm
22  asking. So NFTs are bought and sold on NFT
23  exchanges, correct?
24       MS. MELCHER: Objection, lacks
25  foundation.

36

1        THE WITNESS: I believe that's one of
2  the places they're sold, yes.
3  BY MR. GOSMA:
4     Q    Where else are they sold?
5     A    I just -- I gave two examples. I want
6  to -- I'm not entirely sure what questions we're
7  asking here, so I want to be a little bit careful.
8  I'm not suggesting the only two places NFTs are
9  sold are OpenSea and Foundation, but I gave
10  examples.
11    Q    Sure. And I'm not trying to trick you
12  here; I'm just trying to, you know, ask about your
13  understanding of the NFT marketplace. As you
14  know, this is a trademark case and the marketplace
15  where the goods are bought and sold is an
16  important factor in this case and so what I'm
17  trying to understand is the types of places where
18  NFTs are bought and sold. So with that, I'll ask
19  another question.
20       You've given examples of NFT exchanges.
21  OpenSea is one of those examples.
22       Can you give an example of another
23  place where NFTs are bought and sold.
24    A    I'm not sure what you mean.
25    Q    Well, sir, let's start from first

37

1 principles. You understand that NFTs can be
2 transferred between wallets, correct?
3    A  Yes.
4       MS. MELCHER: Objection, lacks
5 foundation.
6 BY MR. GOSMA:
7    Q  And those transfers are often in the
8 context of a sales transaction, right, sir?
9    A  I'm not sure --
10      MS. MELCHER: Objection, lacks
11 foundation.
12      THE WITNESS: I'm not sure what you
13 mean by "sales transaction."
14 BY MR. GOSMA:
15   Q  I find that a little -- a little hard
16 to believe that you don't understand what a sales
17 transaction is.
18      Do -- people buy and sell NFTs, right,
19 sir?
20   A  Yes, they buy and sell NFTs.
21   Q  And I'm trying to understand the
22 different places where those sales are conducted.
23      So you've mentioned OpenSea as an
24 example. What are some other examples?
25   A  I think I also mentioned Foundation is

38

1 another place where they are sold.
2    Q  Okay. Are you aware of any other
3 places where NFCs -- NFTs are bought and sold?
4    A  I think those are the two places I talk
5 about most frequently in my report, but I'm not
6 saying those are the only places they're sold.
7    Q  Okay. As you sit here today, are you
8 aware of any other places where they are bought
9 and sold?
10   A  I'm aware they are bought and sold at a
11 number of other places. Those are just two places
12 I mention in my report.
13   Q  Yeah, and I'm asking you if you can
14 give me an example of a third place where they are
15 bought and sold?
16   A  I don't have that -- the name of one at
17 the tip of my tongue, no.
18   Q  Okay. So as you sit here today, you
19 can identify OpenSea and Foundation but you cannot
20 identify any other place where NFTs are bought and
21 sold, correct?
22      MS. MELCHER: Objection,
23 mischaracterizes testimony.
24      THE WITNESS: Give me a second.
25      I'm going to stick with my prior

39

1 answer, which is those are the two marketplaces
2 that I talk about the most in my report.
3       I'm not saying those are the only two
4 places they're sold, but those are the ones that I
5 can think of off the top of my head.
6 BY MR. GOSMA:
7    Q  Understood. So as we sit here today,
8 you can't name any others, correct?
9    A  I think I've already answered your
10 question.
11      MS. MELCHER: Objection,
12 mischaracterizes his testimony.
13      THE WITNESS: I think I've already
14 answered your question.
15 BY MR. GOSMA:
16   Q  Okay. Now, you've done consulting and
17 research on many different -- I'll strike that.
18      Your consulting work has -- strike that
19 again.
20      Your consulting work is not limited to
21 any specific type of good or service, correct?
22      MS. MELCHER: Objection, lacks
23 foundation.
24      THE WITNESS: I am an expert on
25 consumer behavior, how consumers buy things,

40

1 marketing strategy, how branding works, I do not
2 focus on a specific vertical. So my both research
3 and consulting work is more on the behavioral
4 science behind why people do what they do, rather
5 than any specific one vertical.
6 BY MR. GOSMA:
7    Q  Okay. And you mentioned that you've
8 done work in the NFT space previously, right?
9       MS. MELCHER: Objection.
10      THE WITNESS: I've done some work in
11 the space, right.
12 BY MR. GOSMA:
13   Q  Is there anything unique about the NFT
14 space compared to any of the other sectors that
15 you've worked on?
16      MS. MELCHER: Objection, vague.
17      THE WITNESS: I'm not sure what you
18 mean by "unique."
19 BY MR. GOSMA:
20   Q  Well, is there anything about the
21 marketing or branding of NFTs that you've not seen
22 in other sectors of the economy?
23   A  You know, I think what's tough is that
24 every category is unique, but just because they're
25 unique doesn't mean they don't have commonalities

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

11 (41 to 44)

4

1  with other categories.
2       So I've done work in B2B, for example,
3  on aircraft engines.  B2B sales of aircraft
4  engines are certainly different than consumer
5  products.  They are quite different, but there are
6  also a lot of similarities.
7       And so one nice thing about working
8  across categories is you don't only focus on one
9  specific domain, but you see how behavior works
10  across domains.
11     Q    That's helpful.  Thank you.
12          Is there -- are any -- so you mentioned
13  that all marketing segments are unique.  What is
14  unique about the NFT space?
15          MS. MELCHER:  Objection,
16  mischaracterizes testimony.
17          THE WITNESS:  I think what I was saying
18  is that there is a constellation of things.  The
19  exact constellation of things in any category can
20  be different.
21          For example, NFTs are a digital good.
22  They're not -- they're not like a table or a
23  chair.  That said, they're also a symbolic good,
24  which, just like sneakers are a symbolic good,
25  just like cars are a symbolic good, just like

42

1  other physical assets can be a symbolic good, and
2  so just because every category is different and
3  unique in its own way, doesn't mean it doesn't mix
4  a lot of things that are also present in other
5  categories.
6  BY MR. GOSMA:
7       Q    Okay, and that's helpful.
8            What is a symbolic good?
9       A    A symbolic good is something that
10  people don't just buy for what it does but what it
11  means or communicates, what it says about them
12  either to themselves and/or to others.
13      Q    So in your opinion, NFTs are symbolic
14  goods, correct?
15      A    Yes.  To be precise, there's a
16  continuum, right?  We can buy goods only for their
17  functional uses, and we can buy goods only for
18  their symbolic uses.  And it's a continuum, so
19  there are many things in between, but having done
20  a bunch of work on symbolic goods, I would say
21  that NFTs are more on the symbolic end of the
22  spectrum.
23      Q    And what are -- strike that.
24          You gave some examples of some other
25  symbolic goods like sneakers, right?

43

1       A    That was one example I gave, yes.
2       Q    Are handbags symbolic goods?
3       A    For many people, particularly luxury
4  handbags, they can be, yes.
5       Q    I'd like to go to a specific passage in
6  your report, okay?
7            Let's go to paragraph 63 of your
8  report.  It is on page 33.
9       A    Give me just a second.
10          Okay, I believe I'm there.
11      Q    Okay, and in this paragraph you are
12  talking about OpenSea specifically, right, sir?
13      A    Let me just take a quick look at the
14  paragraph.
15      Q    Sure.
16      A    Yes, I am, yes.
17      Q    Okay.  And in the paragraph -- you say
18  that:
19          "Consistent with the notion that
20  authentication of NFTs is a complicated and
21  technical task, OpenSea has 'announced several
22  changes aimed and improving authenticity'."
23          Do you see that, sir?
24      A    I do, yes.
25      Q    What's your understanding of why

44

1  OpenSea implemented these changes?
2       A    I want to be careful here.  I'd have to
3  go -- I believe here this is citing a document
4  from OpenSea that may speak to this in more
5  detail.  And so I don't work for OpenSea.  I have
6  not spoken to the company itself, so I can't -- I
7  can't speculate on their motives but they at least
8  say that they announced several changes aimed at
9  improving authenticity, which I take to mean, as I
10  quote later in this paragraph, they're attempting
11  to identify, remove and prevent instances of
12  copymints.
13          People want to know that what they are
14  buying is authentic and not just authentic but
15  that it's not a copy of something else, attempting
16  to look like something else and so they've
17  announced several changes to try to avoid people
18  not understanding what they're getting.
19      Q    Okay.  And the changes that OpenSea
20  implemented were in -- on May 11th of 2022, or at
21  least the article was published on that date; do
22  you see that?
23      A    I'm not -- I'm not sure where exactly
24  you're --
25      Q    If you look in the footnote.

---

**45**

1    A   Okay.  I see May 11th, there, yes.
2    Q   Okay.  And that is -- right at the
3  start of the timeframe that you analyze in your
4  report, correct?
5        MS. MELCHER:  Objection,
6  mischaracterizes testimony.
7        THE WITNESS:  Can you be a little bit
8  more specific.  I'm not...
9  BY MR. GOSMA:
10   Q   Sure.  So you analyzed some Twitter
11 data as part of the research that you did for your
12 report, right, sir?
13   A   That is correct, yes.
14   Q   And the range of data that you
15 considered began in -- let me see if I can find --
16 strike all that and let me see if I can find the
17 very specific dates that you used.
18        If we could go to footnote 190 on
19 page 47.
20   A   Paragraph 190, did you say?
21   Q   Footnote 190 on page 47.  It is at the
22 very bottom of the page.
23   A   Okay.
24   Q   So the last sentence before the
25 citation block in that footnote reads:

---

**46**

1        "My analysis covers the period one week
2  before through the initial minting through one
3  week after the accelerated minting."
4        Do you see that?
5    A   I do, yes.
6    Q   And in the sentence just before that
7  you identify May 13th, 2022 and June 19th 2022 as
8  sort of the end caps of your analysis, right?
9    A   Those are the points at which the
10 defendants began minting the RR/BAYC NFTs on
11 May 13th and the minting accelerated on
12 June 19th and 20th, and so my analysis wanted to
13 focus on that period and certainly cover that
14 period.
15   Q   All right.  So with that May 13th day
16 in mind, let's go back to paragraph 63 on page 33.
17        OpenSea implemented its authenticity
18 changes prior to the launch of RR/BAYC, correct?
19   A   I'm not sure off-hand.
20   Q   Well, sir, is May 11th, 2022 before
21 May 13th, 2022?
22   A   May 11th is before May 13th, yes.
23   Q   And so if OpenSea announced its changes
24 on May 11th, that was before Mr. Ripps began
25 minting NFTs, correct?

---

**47**

1    A   I want to be careful.
2        I know this article in footnote 139
3  references May 11th.  I don't remember off-hand
4  exactly when OpenSea implemented these changes.
5        I don't know off hand when each change
6  was implemented.  I don't know if they implemented
7  them all at once.  I don't have those dates handy.
8    Q   But it is fair to say that before
9  Mr. Ripps ever minted any RR/BAYC NFTs, OpenSea
10 had already published an article indicating that
11 authenticity on its platform was an issue that it
12 was trying to address, correct?
13   A   I want to be a little bit careful here.
14        If we're going to talk about this
15 article, I'd like to look at this article, remind
16 myself what it says.
17        Also I see the date May 11th, 2022 in
18 footnote 139.  I don't off-hand remember exactly
19 what that means.
20        I've looked at a lot of material for
21 this case.  I didn't particularly study up on the
22 dates of when OpenSea launched or wrote an article
23 about authenticity and so without looking at that
24 article I want to be careful about speaking out of
25 turn.

---

**48**

1    Q   Okay, understood.  But the footnote in
2  your report has May 11th, 2022 associated with
3  that OpenSea article, right, sir?
4    A   I certainly see in footnote 139 that
5  that date is listed.  I don't remember what that
6  date means and so without looking at that article
7  or -- yeah, I don't know what that date means, and
8  so I don't want to speak like I know what that
9  date means without knowing what it means.
10   Q   So you talk in your report about Yuga's
11 customer base, correct?
12        MS. MELCHER:  Objection,
13 mischaracterizes testimony.
14        THE WITNESS:  Can you be a little more
15 specific?
16 BY MR. GOSMA:
17   Q   Sure.  Who are Yuga's customers?
18   A   They are a variety of people interested
19 in the NFT space.
20        There's one -- one of the customer --
21 types of customers or customer segments that might
22 be interested in their offerings.
23   Q   Did you do any research to understand
24 who was buying Yuga NFTs?
25        MS. MELCHER:  Objection, vague.

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

13 (49 to 52)

---

49

1      THE WITNESS:  I'm not sure exactly what
2  you mean.
3  BY MR. GOSMA:
4      Q    Well, sir, what research, if any, did
5  you do into understanding the types of folks that
6  buy Yuga Labs' products?
7      A    I think throughout my report I talk
8  some about the products, what they are.  I talk
9  some about some individuals who have bought them.
10 As we've talked about earlier, though, while the
11 NFT market is certainly a specific market, it has
12 lots of commonalities with other markets and so I
13 have a decent understanding of the types of
14 individuals that buy these types of goods.
15 BY MR. GOSMA:
16     Q    Okay.  Let's just do a very short
17 couple of questions and then we can take our first
18 break for the day.
19         Let's take a look at page 57 of your
20 report here.
21     A    Would you mind giving me a paragraph
22 number just to make sure I am looking at the place
23 you're looking.
24     Q    Oh, yeah, I mean, what I'm really
25 looking at is the signature on the last page.

---

50

1      A    Oh, okay.
2      Q    That is your signature, correct?
3      A    Hold on one second.
4      Q    Sure.
5      A    Yes, that is my signature, yes.
6      Q    And you reviewed your report carefully
7  before you signed it, correct?
8      A    I believe so.  I apologize if there are
9  any errors or typos.  I am rarely perfect but I
10 did review it a number of times, yes.
11     Q    And at the time you signed your report
12 you believed everything in it was accurate,
13 correct?
14     A    Yes, I want to be careful.  I'm aware
15 that I believe in many matters like this,
16 discovery is ongoing and so things may come to
17 light that I didn't know about when I formed this
18 report, but this report was a summary of my
19 opinions when I drafted it and I'm not, at least
20 at the moment, intending to offer other opinions
21 though I retain my ability to do so if things
22 change, if new information becomes available.
23     Q    Sure.  Are you aware of any errors in
24 the report that warrant correction?
25     A    Again, I'm not promising that there

---

5

1  aren't any, but I'm not aware of any.
2      Q    I think you mentioned earlier, but I
3  just want to confirm, did you actually sit down
4  and type this report out yourself?
5          MS. MELCHER:  Objection,
6  mischaracterizes testimony.
7          THE WITNESS:  As I mentioned before, I
8  wrote this report.  All the ideas in this report
9  are mine.  I was assisted by the staff of
10 Cornerstone Research in pulling the report
11 together, but the ideas of this report are all
12 mine.
13 BY MR. GOSMA:
14     Q    Okay.  And about how much time would
15 you say that you spent working on this report?
16     A    I don't know.
17         MS. MELCHER:  Objection, asked and
18 answered.
19 BY MR. GOSMA:
20     Q    And were any portions of this report
21 written by someone other than you?
22     A    I'm not sure what --
23         MS. MELCHER:  Objection, vague.
24         THE WITNESS:  I'm not sure what
25 specific part of the report you're talking about.

---

52

1  BY MR. GOSMA:
2      Q    I'm talking about any part, sir.  Was
3  any part of this report written by someone other
4  than yourself?
5      A    Well, I'll give you an example.
6          In some footnotes there are references
7  to documents associated with this case.
8          Did I write down the number of all
9  those documents?  As I mentioned earlier, in some
10 cases the staff of Cornerstone Research helped me
11 carry out this report and so there may be
12 individual words that I did not write but all the
13 ideas in this report are my own and I -- they
14 assisted me in carrying it out.
15         MR. GOSMA:  Let's take a break.  Let's
16 go off the record if that's okay.
17         THE VIDEOGRAPHER:  Stand by.  We are
18 going off the record, the time is 9:36.
19         (Recess taken from 9:36 a.m. to 9:47 a.m.)
20         THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 9:47.
22 BY MR. GOSMA:
23     Q    Welcome back, Dr. Berger.
24     A    Thanks.
25     Q    Before the break we were talking about

---

53

1 the amount of time that you've spent on this case;
2 do you recall that?
3 **A Generally, yes.**
4 Q Yeah, and I believe you estimated that
5 you'd spent somewhere between 10 and 100 hours on
6 this case; is that a fair statement?
7 **A Ballpark, yes.**
8 Q Okay. So at your hourly rate that's
9 somewhere between $10,000 and $100,000 that you've
10 been paid for your work on this case; is that
11 correct?
12 MS. MELCHER: Objection,
13 mischaracterizes testimony.
14 THE WITNESS: I don't know how much
15 I've been paid and I have not -- I don't believe
16 I've been paid for all the hours that I've put in.
17 BY MR. GOSMA:
18 Q Well, do you have some kind of
19 intention not to invoice those hours that you've
20 spent?
21 **A No, I'm just -- sorry, I'm just trying**
22 **to be precise. You said I've been paid a certain**
23 **amount and I don't -- I both don't know how much**
24 **I've been paid and given where we are in the**
25 **month, I've done work this month that I've yet to**

54

1 **invoice and certainly then yet to be paid for, and**
2 **so I certainly have not been paid for all the work**
3 **that I've done on this case, is what I was trying**
4 **to communicate.**
5 Q Okay. But assuming that you will
6 ultimately be paid for your work on this case, for
7 the work that you've done so far you will be owed
8 somewhere between $10,000 and $100,000, correct,
9 sir?
10 MS. MELCHER: Objection,
11 mischaracterizes testimony.
12 THE WITNESS: I want to be a little bit
13 careful here. Something in that neighborhood
14 generally sounds correct, but I don't know the
15 exact amount.
16 BY MR. GOSMA:
17 Q Okay, understood. And I'm not trying
18 to pin you on an exact dollar amount. Okay.
19 Let's go back to your report, which is
20 Exhibit 1, and I'd like to look at footnote 4,
21 which I will give you the page number in just a
22 moment. Footnote 4 is on page 4.
23 Let me know when you're there.
24 **A I am there, yes.**
25 Q Now, footnote 4 lists the asserted

55

1 trademarks that you understand are the subject of
2 this litigation, correct?
3 **A Correct.**
4 MS. MELCHER: Objection,
5 mischaracterizes testimony.
6 BY MR. GOSMA:
7 Q And you've, as part of your work on
8 this case, looked at BAYC NFTs, correct?
9 **A I even show an image of a BAYC NFT in**
10 **my report, so yes, I've looked at images of BAY**
11 **and NFTs.**
12 Q And you have also looked at the Yuga
13 Labs Ape skull logo, correct?
14 **A I have looked at the logo, yes.**
15 Q Okay. If we could publish tab 3,
16 Caroline, please.
17 (Exhibit No. 3 was marked for
18 identification.)
19 THE WITNESS: Is it okay if I try to
20 download it now?
21 BY MR. GOSMA:
22 Q Yes, of course, and for the remainder
23 of the deposition, it is always okay for you just
24 to go ahead and download it, as soon as it's
25 published.

56

1 **A Different people have different**
2 **opinions sometimes so I just wanted -- just wanted**
3 **to ask.**
4 Q Yeah, and I appreciate you confirming.
5 Not every witness does that either and I
6 appreciate it.
7 REMOTE TECHNICIAN: All righty, it is
8 up loading now. Just give it a brief moment, it
9 should be quick because it is just a single page.
10 THE WITNESS: I don't see it yet but
11 let me know if somebody else sees it and I'll
12 refresh again.
13 MR. GOSMA: And Caroline, while --
14 while that's uploading, you can go ahead and put
15 tabs 4 and 5 in the...
16 REMOTE TECHNICIAN: Sounds good.
17 THE WITNESS: Okay, it looks like tab 3
18 is up. Give me a second just to download it.
19 Okay, I am -- I am looking at tab 3.
20 BY MR. GOSMA:
21 Q This is the Yuga Ape skull logo,
22 correct?
23 **A I want to be really --**
24 MS. MELCHER: Objection, lacks
25 foundation.

57

1     THE WITNESS: Sorry. I want to be
2 really careful here. There are, in this case, a
3 number of things that look similar but are not
4 identical. And so if you are telling me that this
5 is the logo, I believe you but I don't have
6 committed to memory exactly every single visual
7 detail of the logo and so I want to be careful
8 agreeing to something, without knowing what I'm
9 agreeing to, if that makes sense.
10 BY MR. GOSMA:
11    Q  Okay. Well, I'll make the affirmative
12 representation that this is what I think that it
13 is. And so for purposes of this exercise, let's
14 assume that this is the Ape skull logo, okay?
15    **A  Okay.**
16    Q  When -- have you seen this logo before?
17    **A  I have, yes.**
18    Q  And this logo is displayed on Yuga
19 Labs' website, correct?
20    **A  I am not currently looking at Yuga
21 Labs' website so I'm not sure what's on their
22 website at the moment.**
23    Q  Okay. But this is -- nonetheless this
24 is a logo that Yuga uses as part of its business,
25 correct?

58

1    **A  I believe so, yes.**
2    Q  Let's take a look at tab 4 which should
3 be in the exhibit share now.
4    **A  I am not seeing a tab 4 yet, but I will
5 -- I will continue, nope, now I do. Just give me
6 just a second. Okay, let me download this. Okay,
7 I have Exhibit 4 up.**
8     (Exhibit No. 4 was marked for
9 identification.)
10 BY MR. GOSMA:
11    Q  Okay. Have you seen this logo before?
12    **A  I don't believe so, no.**
13    Q  Okay. Do you know what the Nazi SS is?
14    MS. MELCHER: Objection, outside the
15 scope of the report.
16    THE WITNESS: I -- that's not something
17 that I'm an expert on, so I'm going to say that
18 that's outside the scope of my expert report.
19 BY MR. GOSMA:
20    Q  Okay. I understand that your
21 contention is that it's outside the scope of your
22 report, but it is an issue in this case and so I'm
23 asking you whether you know what the Nazi SS is,
24 "yes" or "no"?
25    MS. MELCHER: Vague -- objection.

59

1    THE WITNESS: I'm not sure exactly what
2 you're asking. Could you be a little bit more
3 precise?
4 BY MR. GOSMA:
5    Q  Sure. You know what the Holocaust is,
6 right, sir?
7    **A  I do, yes.**
8    Q  And the Holocaust was perpetrated by
9 the Nazi German regime in the 1930s and '40s,
10 right, sir?
11    **A  I want to be a little bit careful here.
12 It sounds like we are going into an area that is
13 well outside the scope of my expert report, so I'm
14 happy to try to be helpful. I'm not putting my
15 forth -- myself -- forth myself as an expert on
16 the Holocaust or Nazis or Nazi symbolism. I'm not
17 a historian. I don't have expertise on Nazi
18 symbolism.
19    So, I'm aware of the Holocaust. I
20 generally know when it occurred and I generally
21 know what happened, but it is not something that
22 is m -- it's not my area of my expertise.**
23    Q  Sure. And I understand, sir, and to
24 the extent these issues are outside the scope of
25 your expertise and outside the scope of what you

60

1 considered as part of your work in this case,
2 that's fine, but I need to -- if that's the case
3 then I need to know that and that's why I'm asking
4 these questions.
5    **A  No problem. I will do -- I will do my
6 best to answer your questions. I'm just trying to
7 make clear where my expertise is.**
8    Q  Yeah, and I'm trying to make clear my
9 reason for asking them, okay?
10    **A  Thank you.**
11    Q  So this logo on tab 4, you are not
12 familiar with it, correct?
13    **A  Correct.**
14    Q  And it's not something you considered
15 as part of your report, correct?
16    **A  I did not consider this logo as part of
17 my report, no.**
18    Q  Now, I want you to accept the premise
19 that this logo was used by the Nazis during the
20 Holocaust and assuming that's the case --
21    MS. MELCHER: Objection, incomplete.
22 BY MR. GOSMA:
23    Q  Well, let me just ask this question:
24 The Nazis are a morally reprehensible
25 organization, correct, sir?

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

16 (61 to 64)

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 18 of 75   Page ID
#:19974

6

1        MS. MELCHER:  Objection.  Mr. Gosma,
2  this is outside the scope of the report.
3  BY MR. GOSMA:
4        Q    Okay.  Well, Dr. Berger is here to
5  testify in this case.  You know that this is a
6  live issue in this case.
7        If it is outside the scope of his
8  report, he can say so, but you do not need to
9  testify for him on that point.  So he's free to
10 say --
11       MS. MELCHER:  I don't intend to.
12       MR. GOSMA:  So if the court reporter
13 could please read back the question.
14       (Court reporter read back question).
15       MS. MELCHER:  Objection, vague.
16       THE WITNESS:  This is outside the scope
17 of my report.  I certainly, personally, find the
18 Nazis morally reprehensible, but this is not --
19 the history of Nazi logos or symbolism is not
20 something I'm putting myself forth as an expert on
21 in this case.
22 BY MR. GOSMA:
23       Q    Okay.  Now, you understand, sir, that
24 one of the allegations that my clients have made
25 against Yuga Labs is that the Ape skull logo shown

62

1  in Exhibit 2 has similarities to the logo that we
2  are looking at in Exhibit 3.
3        MS. MELCHER:  Objection, vague,
4  objection, outside the scope of the report,
5  objection, incomplete hypothetical.
6        THE WITNESS:  So just to be precise, I
7  don't have an Exhibit 2.  I have an Exhibit 3.  I
8  think that's what you are referencing.  The BAYC
9  logo -- but it is called Exhibit 3 in my system.
10 BY MR. GOSMA:
11       Q    Okay, okay, let me re-ask the question
12 so that we're -- we have a totally clear record.
13       I was going in the numerical sequence
14 in which I marked these but I understand they are
15 being marked by the tab numbers.  So let me ask
16 again.
17       So Dr. Berger, do you understand that
18 one of the allegations that my client has made
19 against Yuga Labs is that the Ape skull logo shown
20 in Exhibit 3 has similarities to the Nazi logo
21 shown in Exhibit 4.
22       MS. MELCHER:  Objection, vague, lacks
23 foundation.
24       THE WITNESS:  I want to be precise
25 here.  I am generally aware of those types of

63

1  allegations.  I am not aware of empirical evidence
2  put forward that speaks to those allegations.  And
3  further, the similarities between this particular
4  picture in Exhibit 3 and the picture that you put
5  up in Exhibit 4 is not something that is the focus
6  of my expert report.
7        The picture in Exhibit 3 may look
8  similar to a variety of other pictures.  I'm not
9  an expert on football, so I want to be careful
10 here, but I believe the Oakland Raiders or now, I
11 guess, the Las Vegas Raiders logo may look
12 somewhat similar to the image in Exhibit 3.
13       But all of this is outside of the
14 content of my expert report.
15 BY MR. GOSMA:
16       Q    Okay.  Let's pull up tab 5.  Let me
17 know when you've got that.
18       **A    Give me one second.  Okay, I have**
19 **tab 5.**
20       (Exhibit No. 5 was marked for
21 identification)
22 BY MR. GOSMA:
23       Q    And tab 5 shows the Bored Ape skull --
24 strike that.
25       Tab 5 shows the Ape skull logo and the

64

1  Nazi logo that I showed you from Exhibit 4
2  side-by-side, right, sir?
3        **A    I want to be careful --**
4        MS. MELCHER:  Objection, lacks
5  foundation.
6        THE WITNESS:  I want to be careful
7  here.  I've never seen the thing.  I have no
8  recollection of seeing the thing in Exhibit 4
9  previously.
10       You have stated that it is a Nazi logo.
11 I heard what you said, but I have never seen it
12 before, but I see that this exhibit combines both
13 the image from Exhibit 3 and Exhibit 4, and as
14 well as an overlay of the two.
15 BY MR. GOSMA:
16       Q    Understood.  So sir, as an expert in
17 this case you did not consider the logo shown in
18 Exhibit 4 in any way, correct?
19       MS. MELCHER:  Objection, asked and
20 answered.
21       THE WITNESS:  As I noted already, there
22 are many other logos that one could look at.  I
23 did not focus on the logo in Exhibit 4 or a
24 variety of other logos that may or may not --
25 someone may or may not allege are similar to the

65

1  BAYC logo.
2      I'm not aware of any quantitative
3  analysis that has looked at the similarity of
4  these two logos you put in front of me or this and
5  other potential logos that may be part of the
6  allegations.
7  BY MR. GOSMA:
8      Q   Move to strike as nonresponsive.
9      Sir, you did not consider the
10 exhibit -- you did not consider Exhibit 4, the
11 logo -- strike that.
12     You did not consider the logo shown in
13 Exhibit 4 as part of your expert report in this
14 case, correct?
15     MS. MELCHER: Objection,
16 mischaracterizes testimony.
17     THE WITNESS: I believe I already
18 answered your question. You asked me if I'd seen
19 Exhibit -- the logo in Exhibit -- the image in
20 Exhibit 4 before. I said I did not believe I had
21 seen that exhibit and I noted that what you are
22 asking seemed outside of the scope of my expert
23 report.
24 BY MR. GOSMA:
25     Q   Okay. So, sticking with now Exhibit 5.

66

1  And I'm focused on the two logos on the left, not
2  the overlay on the right. Sir, both logos are
3  black and white, correct?
4      A   You are completely entitled to ask
5  whatever questions you'd like. As I noted
6  already, I did not -- I had not seen Exhibit 4
7  before. There are many logos that are black and
8  white. I agree that both the images on the left
9  here are black and white, among, I don't want to
10 say dozens because there may be thousands, tens of
11 thousands, millions of other logos that are black
12 and white.
13     Q   But these logos are both black and
14 white, right, sir?
15     A   This feels --
16     MS. MELCHER: Objection, outside the
17 scope of the report.
18     THE WITNESS: Sorry to interrupt --
19 sorry to not give space there.
20     As I was about to say, this feels
21 outside the scope of my expert report.
22 BY MR. GOSMA:
23     Q   So your answer to the question both
24 logos are black and white is that it's outside the
25 scope of your report; is that correct, sir?

67

1      A   No, actually I think what I said the
2  first time you asked this question was that these
3  and thousands of others -- not tens of thousands,
4  hundreds of thousands of logos are black and white
5  but that this is outside the scope of my expert
6  report.
7      Q   Sir, both logos have skulls, correct?
8      MS. MELCHER: Objection, outside the
9  scope of the report.
10     THE WITNESS: This is outside the scope
11 of my expert report.
12 BY MR. GOSMA:
13     Q   Both logos have text in an arc above
14 the skull, correct?
15     MS. MELCHER: Same objection.
16     THE WITNESS: This is outside the scope
17 of my expert report. As I will -- I will try to
18 politely answer to any questions like this,
19 there -- I have not looked at all the logos in the
20 world, I'm not aware that anyone has for this
21 case, whether or not these two logos are similar,
22 the logo on the left may be similar to a variety
23 of other logos. My expert report is not analyzing
24 the similarities of logos.
25 BY MR. GOSMA:

68

1      Q   Okay. And sir, appreciate that I'm
2  asking these questions because I have to make a
3  record for my client, not because --
4      A   I understand, I understand.
5      Q   -- I'm trying to harass you in any way.
6      A   I understand, thank you.
7      Q   Both logos have text in an arc below
8  the skull, right, sir?
9      MS. MELCHER: Same objection.
10     THE WITNESS: This is outside the scope
11 of my expert report.
12     You are allowed to ask these questions.
13 You could point to similarities between these two.
14 You could also point to differences. They use
15 different fonts. One is a human -- what looks
16 like a human skull, one is what looks like an ape
17 skull. There are no bones behind the skull on the
18 one of the left where there are on the right. So
19 anyone -- putting up any two images, it is
20 possible to look for similarities or differences,
21 but this is outside the scope of my expert report.
22 BY MR. GOSMA:
23     Q   Sir, both logos have two letters on the
24 left side of the skull, correct?
25     MS. MELCHER: Objection, outside the

---

69

1    scope of the report.
2         THE WITNESS:  This is outside the scope
3    of my expert report.
4    BY MR. GOSMA:
5         Q   Okay.  And both logos have two letters
6    to the right of the skull, right, sir?
7         MS. MELCHER:  Same objection.
8         THE WITNESS:  I'm not sure where you're
9    seeing letters on the image in the middle, to the
10   right and left, they look like lightning bolts,
11   but this is, again, we are getting into my
12   personal ability to view an image.  This is
13   outside the scope of my report.
14   BY MR. GOSMA:
15        Q   Sure.  And both skulls are facing left,
16   right, sir?
17        MS. MELCHER:  Same objection.
18        THE WITNESS:  This is outside the scope
19   of my report.
20   BY MR. GOSMA:
21        Q   And both skulls have 18 teeth, correct,
22   sir?
23        MS. MELCHER:  Same objection.
24        THE WITNESS:  I actually have no idea
25   how many teeth each of them have, but this is

---

70

1    outside the scope of my report.
2    BY MR. GOSMA:
3         Q   It would be hard to believe that it was
4    a coincidence if both skulls had exactly the same
5    number of teeth, right, sir?
6         MS. MELCHER:  Objection, outside the
7    scope of my report.
8         THE WITNESS:  This is outside the scope
9    of my report.  As I said already, I have no idea
10   how many teeth each of them have.  I have not
11   counted the teeth.
12   BY MR. GOSMA:
13        Q   Sure.  And the border on both logos is
14   not exactly circular, right, sir?
15        MS. MELCHER:  Same objection.
16        THE WITNESS:  This is outside the scope
17   of my expert report.
18   BY MR. GOSMA:
19        Q   Okay.  Are there any other similarities
20   that you notice between the logos?
21        MS. MELCHER:  Objection, outside the
22   scope of the report.
23        THE WITNESS:  This is outside the scope
24   of my expert report.
25   BY MR. GOSMA:

---

7

1         Q   It would be reasonable for someone to
2    look at these two images and at least see some
3    level of similarity, right, sir?
4         MS. MELCHER:  Objection, outside the
5    scope of the report.  Calls for speculation.
6         THE WITNESS:  This is outside the scope
7    of my expert report.
8         As I noted earlier, given any two
9    images, one can look for similarities and one can
10   also look for differences.
11   BY MR. GOSMA:
12        Q   Okay.  Now, sir, turning to a related,
13   but slightly different topic.  You can put the
14   skull image away for now.
15        A   Okay.
16        Q   When a company's branding -- strike
17   that.
18        You are an expert on branding
19   practices, right, sir?
20        A   I certainly have expertise in that
21   area, yes.
22        Q   And when a company's brand is called
23   into question, one thing a company can do is
24   change their brand or attempt to change their
25   brand, right?

---

72

1         MS. MELCHER:  Objection, vague.
2         THE WITNESS:  I'm not -- I'm not sure
3    exactly what you are asking there.
4    BY MR. GOSMA:
5         Q   Well, I think we talked earlier about
6    how one of the focuses of your work is on helping
7    companies navigate their marketing strategy,
8    right?
9         A   I help companies navigate marketing
10   strategy, yes.
11        Q   And that includes trying to control the
12   narrative around their brand, right?
13        A   I want to be a little bit careful here.
14   I don't know if I would use the word "control" or
15   "narrative" but I would say that companies
16   certainly try to shape brand perceptions.
17        Q   Okay.  And so one way in which
18   companies can try to shape brand perceptions is to
19   change the way that they are presenting their
20   brand, correct?
21        A   I'm not sure exactly what you mean
22   by --
23        MS. MELCHER:  Objection, vague.
24        THE WITNESS:  -- changing the way
25   they're presenting their brand.

73

1  BY MR. GOSMA:
2      Q   If an aspect of a company's brand is
3  called into question or criticized, do you have
4  that scenario in mind, a situation where a company
5  might be criticized for something about their
6  brand?
7          MS. MELCHER:  Objection, incomplete
8  hypothetical.
9          THE WITNESS:  You are asking me to do a
10 little bit of speculation here.  I don't entirely
11 understand what you are asking me to speculate
12 about.
13 BY MR. GOSMA:
14     Q   Okay.  Let's take a very specific real
15 world example, okay?  Aunt Jemima syrup, okay --
16 are you familiar with that brand?
17     **A   I am aware of Aunt Jemima syrup, yes.**
18     Q   And you understand that a number of
19 years ago there were some allegations that the
20 name Aunt Jemima and the presentation on, you
21 know, the packaging for that syrup were racist; do
22 you recall that?
23         MS. MELCHER:  Objection, lacks
24 foundation, incomplete hypothetical.
25         THE WITNESS:  I'm generally aware that

74

1  such allegations have been leveled at the brand,
2  yes.
3  BY MR. GOSMA:
4      Q   And in response to those allegations
5  Aunt Jemima changed their packaging, correct?
6      **A   I want -- sorry, go ahead.**
7          MS. MELCHER:  Objection, lacks
8  foundation and vague.
9          THE WITNESS:  I want to be a little bit
10 careful here.  I have -- I'm aware that Aunt
11 Jemima have changed some aspects of their
12 offering.
13         I'm aware that allegations have been
14 made over time about the brand.  I'm not sure why
15 they changed the brand and when, in particular,
16 they did so, what it was a result of.  I can't
17 speak to that.
18 BY MR. GOSMA:
19     Q   And I understand that you can't say,
20 you know, why another person did something.  But
21 you'd agree that there are examples of brands
22 changing -- changing their presentation based on
23 allegations of racism over the past decade,
24 correct?
25         MS. MELCHER:  Objection, vague,

75

1  incomplete hypothetical.
2          THE WITNESS:  I am -- I think I
3  answered that question specifically and now you're
4  asking it generally.  I -- without knowing what
5  brand we're talking about and without having
6  insight into why they did what they did, under
7  oath here today I can't speak outside of -- I
8  don't want to speak out of turn about something I
9  can't speak to knowledgeably.
10 BY MR. GOSMA:
11     Q   Sir, you are an expert in this
12 marketing space, right?
13     **A   I think we've tread this ground a**
14 **little bit already, I certainly have expertise in**
15 **marketing, yes.**
16     Q   And so you are aware of general trends
17 in marketing over the last decade, right?
18         MS. MELCHER:  Objection, vague.
19         THE WITNESS:  I'm not sure what you
20 mean by "general trends".
21 BY MR. GOSMA:
22     Q   Well, sir, I'm not using any specific
23 meaning.  I'm talking about trends in the
24 marketing industry; do you keep up with those?
25         MS. MELCHER:  -- (overspeaking) --

76

1      **A   Again, I'm not sure what you mean by**
2  **trend.**
3          (Court reporter clarification)
4          MS. MELCHER:  Sorry.  Same objection.
5  BY MR. GOSMA:
6      Q   Are you aware of any brand in the last
7  10 years that's changed their -- strike that.
8          Are you aware of any company in the
9  last 10 years that's changed their brands in
10 response to allegations of racism?
11     **A   As I answered --**
12         MS. MELCHER:  Objection, vague.
13         THE WITNESS:  As I answered, I think to
14 your prior question, I am generally aware that
15 some brands -- allegations have been made against
16 some brands.
17         I don't know, in particular, why brands
18 that I have not worked with or been deeply
19 involved with, do or did what they did, and so I
20 don't want to say, yes, without knowing what I am
21 agreeing to and without having the knowledge to be
22 precise.
23 BY MR. GOSMA:
24     Q   Understood.  As a general matter, is it
25 a good thing or a bad thing for a company's brand

---

77

1  to be associated with racism?
2  MS. MELCHER: Objection, vague.
3  THE WITNESS: I think as an individual
4  racism is a bad thing and being associated with
5  racism is certainly not desirable.
6  That said, that's outside the scope of
7  my expert report and I don't know what in
8  particular we're talking about.
9  BY MR. GOSMA:
10  Q  Sure. And I'm bringing it to this
11  case. I'm just asking you to -- we're trying to
12  lay some groundwork to talk about the issues in
13  this case, okay? So we've already talked about
14  Aunt Jemima syrup. Are you aware of Uncle Ben's
15  rice?
16  **A  My answers to Uncle Ben's rice would be**
17  **very similar to the answers I gave to Aunt Jemima**
18  **syrup.**
19  Q  Understood. Are you aware of Land
20  O'Lakes butter?
21  MS. MELCHER: Objection, outside the
22  report.
23  THE WITNESS: I'm not sure what you
24  mean by Land O'Lakes butter.
25  BY MR. GOSMA:

---

78

1  Q  Okay. Maybe that one you're not
2  familiar with.
3  And I believe you asked earlier but
4  I'll ask again and surely draw an objection --
5  strike that.
6  You'd agree that my client and others
7  have raised concerns that Yuga's branding, in
8  particularly the Ape skull logo, as racist and
9  have connections to Nazi iconography; do you
10  understand that?
11  MS. MELCHER: Objection, vague, outside
12  the report, mischaracterizes testimony.
13  THE WITNESS: This is outside the scope
14  of my expert report. I am generally aware of
15  allegations.
16  I'm not aware of a lot of specific data
17  behind those allegations. Just because somebody
18  alleges that someone or some organization did
19  something for a particular reason, doesn't mean
20  they did but that's not something I studied as
21  part of this case and so I don't want to speak out
22  of turn.
23  BY MR. GOSMA:
24  Q  Understood. And Yuga Labs has not
25  changed its Ape skull logo in response to that

---

79

1  criticism, right, sir?
2  MS. MELCHER: Objection, outside the
3  report.
4  THE WITNESS: This is outside the scope
5  of my expert report. I can't speak to whether
6  their logo has changed at all over time. I have
7  not studied that and so I don't know.
8  BY MR. GOSMA:
9  Q  Okay. So as you sit here today, you
10  are not aware of any changes that have been made
11  to the Ape skull logo in response to any
12  criticism, right, sir?
13  **A  I want to be careful. I don't think**
14  **that's what I said. I said I'm not aware whether**
15  **the logo has changed or not. I'm also not aware**
16  **whether the criticism that one individual made has**
17  **any merit or not and so -- but in general, this is**
18  **outside the scope of my report.**
19  Q  Okay. And you have not advised Yuga to
20  change its logo or branding in response to that
21  criticism, right, sir?
22  **A  The only context as I worked with Yuga**
23  **is in the context of an expert witness in this**
24  **case. I have not advised them one way or another**
25  **on marketing matters.**

---

80

1  Q  Okay, thank you.
2  All right. Let's turn back to your
3  report, which is Exhibit 1, and let's a look at
4  the table of contents on page 2, okay?
5  Let me know when you're there.
6  **A  I am.**
7  Q  Your report doesn't include a legal
8  standards section, correct?
9  **A  I'm not sure what you mean by a legal**
10  **standards section.**
11  MS. MELCHER: Objection, vague.
12  BY MR. GOSMA:
13  Q  Well, you didn't include any statements
14  in your report about trademark law or the
15  standards, the legal standards that will be
16  applied in this case, right, sir?
17  MS. MELCHER: Objection, vague.
18  THE WITNESS: I'm not a trademark
19  lawyer. I don't know exactly what you're talking
20  about or what you have in mind.
21  BY MR. GOSMA:
22  Q  Well, sir, you've served as an expert
23  in many cases, previously, correct?
24  **A  I've served as an expert in a number of**
25  **cases, yes.**

81

1    Q    And in many cases experts will include
2  a legal standards section where they educate
3  themselves about the law of the case and the law
4  that they'll be applying in the case; have you
5  ever done that yourself?
6        MS. MELCHER:  Objection, lacks
7  foundation.
8        THE WITNESS:  I'm not putting myself
9  forward as a lawyer.  My expertise is in
10 marketing.  I don't remember off-hand what exactly
11 is in different types of reports for different
12 types of cases so I can't -- I don't -- I don't
13 think I have the expertise to answer your
14 question.
15 BY MR. GOSMA:
16   Q    Okay, understood.  But we can agree
17 that for this case you did not include any legal
18 standard section in your report, correct?
19   **A    Again, I am not sure exactly what you**
20 **mean.**
21   Q    Well, sir, there is not a section
22 titled "Legal Standards," correct.
23   **A    That I can agree with, yes, there is**
24 **not a section titled "Legal Standards."**
25   Q    And this is a trademark case, right,

82

1  sir?
2    **A    I believe so, yes.**
3    Q    And Yuga is relying on your opinions in
4  this case as part of its trademark claims against
5  my clients, correct?
6        MS. MELCHER:  Objection, vague.
7        THE WITNESS:  I want to be careful
8  here.  I am not putting myself forward as a
9  lawyer.  I have an expertise in marketing,
10 branding and those types of things.  I don't know
11 exactly what -- how exactly my report is being
12 used.  I can't answer -- I don't know how to
13 answer that question that you asked.
14 BY MR. GOSMA:
15   Q    Okay, understood.
16        So your testimony is that you do not
17 know how your report is being used in this case,
18 correct?
19        MS. MELCHER:  Objection,
20 mischaracterizes testimony.
21        THE WITNESS:  I am no more or less
22 aware of how my report is being used in this case
23 than in any other cases I'm involved in.
24        In cases I'm involved in I'm asked to
25 speak about matters that I have expertise for, as

83

1  I've done in this particular case, but I don't --
2  you're asking some questions about some specific
3  legal aspects that are outside my area of
4  expertise.
5  BY MR. GOSMA:
6    Q    Sir, there are no claims for defamation
7  in this case, correct?
8        MS. MELCHER:  Objection, lacks
9  foundation.
10       THE WITNESS:  I don't believe that my
11 report talks about defamation -- I can look for
12 that word -- and I don't know the legal standards
13 associated with that and I can't speak to anything
14 that might be happening -- I don't know everything
15 that's going on in this case, but my report --
16 that's not the main focus of my report.
17 BY MR. GOSMA:
18   Q    Now, you understand, sir, that there is
19 a difference between trademark infringement and
20 defamation, correct?
21       MS. MELCHER:  Objection to the extent
22 it calls for a legal conclusion.
23       THE WITNESS:  As I think I've said
24 already, I am not aware of all fine-pointed legal
25 distinctions that are out there.

84

1        I have expertise in marketing and
2  branding and that's what my report is focused on
3  in this case.
4  BY MR. GOSMA:
5    Q    Right.  Your report is focused on
6  damage to Yuga Labs' brand, correct?
7    **A    Yes, that is --**
8        MS. MELCHER:  Objection,
9  mischaracterizes testimony.
10       THE WITNESS:  Part of my -- part of
11 what my report focuses on is how the introduction
12 of these copycat NFTs have created confusion in
13 the marketplace and harmed both the brand equity
14 of BAYC as well as the Yuga company as a whole.
15 BY MR. GOSMA:
16   Q    And Yuga is not alleging in this case
17 that Mr. Ripps or Mr. Cahen made damaging false
18 statements about Yuga Labs, correct?
19   **A    I'm not trying to be evasive here, but**
20 **I am going to need to give a similar answer to**
21 **what I gave before.**
22       **I do not, at the tip of my tongue, have**
23 **access, or tip of my mind, have access to**
24 **everything going on in this case.  So I don't want**
25 **to speak -- I am going to try not to speak to**

---

**85**

1  things outside of my report that I don't -- don't
2  have no full knowledge on.
3      **I don't have full knowledge of every**
4  **aspect of the case. I understand the part of the**
5  **case that I have worked on.**
6      Q   Okay. And you don't state in your
7  report anywhere that you have any familiarity with
8  trademark law, correct?
9      MS. MELCHER: Objection, misstates
10 testimony.
11      THE WITNESS: I want to be a little bit
12 careful here.
13      I am not a trademark lawyer, however,
14 I have expertise in issues of consumer confusion
15 around brands and branding and the damage that can
16 cause -- that consumer confusion or confusion in
17 the marketplace can cause for brands and the
18 companies that represent them and so that is what
19 my report focuses on.
20 BY MR. GOSMA:
21      Q   There is no dispute that the damages in
22 this case, if any, have to flow from trademark
23 infringement, correct?
24      MS. MELCHER: Objection, to the extent
25 it seeks a legal conclusion.

**86**

1      THE WITNESS: As I think I've stated
2  already, this is beyond my area of expertise.
3  BY MR. GOSMA:
4      Q   Okay. Now, in your report on page 31
5  which I'll give you a paragraph number for in just
6  a second. I know that you asked for that.
7      **A   Thank you.**
8      Q   Although I think our pagination should
9  be the same and just -- let me make an aside and
10 then I'll ask a new question.
11      When I'm referring to a page number, I
12 will be referring to the actual page number at the
13 bottom of the page and not the PDF page number.
14      They are de-synched a little bit but
15 I'll be referring to the bottom of the page --
16      **A   Thank you.**
17      Q   -- if that makes it easier for you.
18      **A   That's helpful. Yes, thank you.**
19      Q   So I'm on page 31.
20      **A   Okay.**
21      Q   And I'm in paragraph 59.
22      **A   Give me one second. I'm there.**
23      Q   All right, great. I actually want to
24 be in paragraph 58 which is just above paragraph
25 59.

**87**

1      A   Okay.
2      Q   Okay, I'm a mess here. All right.
3      So let's go back onto page 30, the
4  sentence begins on page 30 and it says:
5      "While it is possible to authenticate an
6  NFTs origin using publicly available information
7  on the blockchain, this process is time consuming
8  and requires an understanding of how to navigate
9  the space."
10      Do you see that?
11      **A   I do, yes.**
12      Q   What do you mean by that statement?
13      **A   I think paragraph 59 talks about this**
14  **in detail as does the end of paragraph 58. It --**
15  **while it is theoretically possible to authenticate**
16  **an NFT's origin using the public information,**
17  **publicly-available information, it's not**
18  **necessarily easy to do. It requires time and it**
19  **requires understanding that not all consumers may**
20  **either have or may not devote to doing so.**
21      Q   Crypto and NFTs are not particularly
22  user-friendly, correct?
23      MS. MELCHER: Objection, lacks
24  foundation.
25      THE WITNESS: I want to be a little bit

**88**

1  careful here. I don't know what in relation --
2  user-friendly in relation to what or where that
3  statement came from, so I want to be a bit
4  careful. But as I say in both paragraph 58 and 59
5  it requires time and effort and motivation and not
6  all consumers may be either aware of how to do so
7  or certainly, even if they are aware, actually --
8  actually do so.
9  BY MR. GOSMA:
10      Q   And you would agree that acquiring an
11 NFT requires at least some level of familiarity
12 with cryptocurrency concepts, right?
13      MS. MELCHER: Objection, vague.
14      THE WITNESS: I'm not sure exactly what
15 you are asking there. Many times people may buy
16 things without completely understanding what
17 they're buying or how those things work and so I'm
18 not sure exactly what you're saying but I'm not
19 sure that I agree with that statement.
20 BY MR. GOSMA:
21      Q   Okay. In order to acquire an NFT you
22 need a cryptocurrency wallet, right?
23      **A   I believe so, yes.**
24      Q   And you would need to understand how to
25 use that wallet to interact with the blockchain,

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 25 of 75   Page ID
#:19981
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
23 (89 to 92)

**89**

1  correct?
2       MS. MELCHER:  Objection, vague.
3       THE WITNESS:  I'm not sure what you're
4  getting at.
5  BY MR. GOSMA:
6     Q   I'm just trying to understand generally
7  what's required of a person to go out and buy an
8  NFT, okay?  Because -- and the reason is because
9  it's relevant to who's the -- who are the
10 consumers that you're talking about in your
11 report, right?
12       I want to understand who are the people
13 that perceive Yuga's brand and who are the
14 people -- and, you know, the harm to Yuga's brand
15 flows through those consumers.
16       So I'm trying to understand who those
17 people are and what they need to know in order to
18 acquire an NFT.
19       Do you have that in mind conceptually?
20    A   Generally, yes.
21    Q   Okay.  So I'm trying to understand what
22 do those folks need to know in order to acquire an
23 NFT, okay?  So we've established that you need a
24 wallet, right?
25    A   Yes, I think though -- I'm happy to go

**90**

1  through this exercise, but I think, as I stated
2  earlier, just because someone can buy one of these
3  things, doesn't mean they have complete
4  information, either the knowledge to authenticate
5  an NFT's origin or go through the work to actually
6  do so.  And so just because they can buy something
7  doesn't mean they have a full understanding of
8  what they're buying, as indicated by the consumer
9  confusion that I cite to you later in my report,
10 for example in -- where is this down here --
11 paragraph 74, for example, where I talk about
12 cases of individuals who were clearly confused
13 about the nature of what they purchased -- they or
14 someone else purchased.
15    Q   Sure.  And I understand and appreciate
16 that there are different levels of sophistication
17 and carefulness amongst consumers but what I'm
18 trying to get at, is what is the lowest common --
19 what is the lowest common denominator here, right?
20 What is the absolute minimum that someone has to
21 know in order to acquire an NFT.  Okay?
22       MS. MELCHER:  Objection, vague,
23 incomplete hypothetical.
24 BY MR. GOSMA:
25    Q   Do you understand my question?

**9**

1     A   I generally understand your question.
2  I'm not sure where we're going with this and it's
3  also a bit vague but I generally understand what
4  you're getting at.
5     Q   Okay.  So the question is:  What is the
6  minimum that a person needs to know to acquire an
7  NFT?  Let's just do it that way.
8       MS. MELCHER:  Same objection.
9       THE WITNESS:  I'm sorry, you're
10 asking -- I wasn't aware of what question you were
11 asking me.  Sorry.
12 BY MR. GOSMA:
13    Q   Sure.  The question is:  What is the
14 minimum amount of information that a person needs
15 to know to acquire an NFT?
16    A   I'm not sure what that minimum amount
17 of information is.  There also may be cases where
18 people ask other people to buy something for them,
19 so...
20       It seems like the most minimum
21 information could be that somebody wants something
22 and they either then go out and figure out how to
23 acquire that thing themselves or they ask someone
24 else to do it for them but I'm not sure exactly
25 what you're asking.

**92**

1     Q   All right.  Let's look at page 33 of
2  your report.
3     A   Okay.
4     Q   Footnote 135.
5     A   Okay.
6     Q   And here you refer to a study by Das,
7  et al. from 2022; do you see that?
8     A   I do, yes.
9     Q   And you note that -- in this footnote
10 that that -- the Das study performed:
11       "... an empirical analysis that quantifies
12 the prevalence of the different counterfeit NFT
13 types described above."
14       And that:
15       "Using data from OpenSea, the authors
16 analyze over 12 million NFTs spread across more
17 than 236,000 collections."
18       And you state that:
19       "They found that '322 collection pairs had
20 similar names'..."
21       Do you see that?
22    A   I do, yes.
23    Q   What is a selection pair, or what's
24 your understanding of that?
25    A   I think these are examples like -- as I

93

1    discuss in paragraph 62. It can be an example
2    like CryptoPunks and a clone like CryptoPhunks.
3    It looks quite similar, but is actually different.
4         Q    And among those 322 collection pairs,
5    BAYC knock-off collections were among those,
6    correct?
7         A    I don't remember.
8              MS. MELCHER:  Objection, lacks
9    foundation.
10   BY MR. GOSMA:
11        Q    Well, sir, you are aware that there are
12   dozens of knock-off BAYC collections available on
13   OpenSea, correct?
14             MS. MELCHER:  Objection, lacks
15   foundation.
16             THE WITNESS:  I'm not sure in
17   particular what you are referencing in your
18   comment.
19   BY MR. GOSMA:
20        Q    Well, sir, do you know how many hits a
21   search for Bored Ape Yacht Club returns on
22   OpenSea?
23             MS. MELCHER:  Objection, vague.
24             THE WITNESS:  I don't know how many
25   hits, no.

94

1              MR. GOSMA:  Okay, let's pull up tab 7
2    and Caroline will have to move it over for us.
3              REMOTE TECHNICIAN:  It's uploading now.
4    BY MR. GOSMA:
5         Q    And while that's -- while that's going,
6    let me ask you a question.  There are something
7    like 10,000 Bored Ape Yacht Club NFTs, correct, in
8    the main collection?
9         A    I don't have that number at my
10   fingertips but that sounds generally -- generally
11   correct.
12        Q    And there are only about 9,500 RR/BAYCs
13   in circulation, right?
14        A    I believe that number may be in my
15   report but I don't remember off-hand exactly how
16   many.
17        Q    But if you take those two numbers
18   together, you get something close to 20,000,
19   right, just in the ballpark of 20,000 NFTs, right?
20        A    I agree that if you add 10,000 and
21   9,000 it is close to 20,000 but I don't -- I don't
22   off-hand remember the exact numbers as I said
23   already.
24        Q    Okay.  Do you see tab 7 yet?
25        A    I do.  Yes, I have it open in front of

95

1    me.
2              (Exhibit No. 7 was marked for
3    identification.)
4    BY MR. GOSMA:
5         Q    Okay, great.  So I'll represent to you
6    that this is a search that I went out to OpenSea
7    and ran.  And I searched for the term "Bored Ape
8    Yacht Club".
9              If you look there in the middle just
10   above the photograph that says "Rolling Stone x
11   Bored Ape Yacht Club," there's an indication that
12   that's the search term that was used; do you see
13   that?
14        A    I see that there is that phrase in
15   quotes.
16        Q    Yeah, and right above that is the
17   number of hits that my search returned; do you see
18   that?
19        A    I have not used this search -- I'm not
20   sure exactly what you did and exactly what came
21   back and so I am a little bit uncomfortable
22   agreeing to something I don't completely know
23   about, but I'm happy to try to answer questions
24   that you have about this exhibit you have put in
25   front of me.

96

1         Q    Sure.  And I'll represent to you that I
2    ran the search "Bored Ape Yacht Club" on OpenSea
3    and it returned almost 7 million hits, okay?  Do
4    you have that in mind?
5         A    I heard that you mentioned that number.
6         Q    Yeah, and 7 million is a lot larger
7    than 20,000, right?
8         A    I agree that 7 million is larger than
9    20,000 as numbers.  I'm not sure what you're
10   getting at.
11        Q    Sure.  Did you yourself go out to
12   OpenSea and search for "Bored Ape Yacht Club" or
13   any of the asserted marks in this case?
14             MS. MELCHER:  Objection, vague.
15             THE WITNESS:  It's my understanding
16   that this case is not about how many search
17   results come up when you search for a brand but
18   about consumer confusion around NFTs that visually
19   look identical, if not very close, to a high end
20   symbolic good.
21             The cover of Rolling Stone magazine,
22   I'm not aware of every single NFT in the BAYC
23   collection, but I'm not aware that this picture of
24   Rolling Stone magazine is one of the 10,000 Apes
25   in the collection.  And so just because somebody

97

1 has made something that doesn't look like a BAY
2 NFT that comes up in a search is not necessarily
3 creating consumer confusion and is different than
4 someone making something that looks visually
5 identical to the things that the brand is pointing
6 out.
7 BY MR. GOSMA:
8     Q   Well, sir, the consumer confusion has
9 to relate to the asserted marks, right?
10         MS. MELCHER:  Objection, to the extent
11 it calls for a legal conclusion, vague.
12         THE WITNESS:  I'm not sure exactly what
13 you are asking.
14 BY MR. GOSMA:
15     Q   Well, right, because you didn't educate
16 yourself about trademark law before you offered
17 your opinions in this case, right, sir?
18         MS. MELCHER:  Objection, argumentative.
19         THE WITNESS:  I don't -- I don't feel
20 that that's accurate.  The questions I was asked
21 to address in this case is whether there is
22 consumer confusion and whether such confusion --
23 sorry -- whether there was consumer confusion,
24 whether the minting of these very similar, if not
25 identical-looking items, damaged the brand, and

98

1 how the introduction or minting of this RR/BAYC
2 collection may have impacted consumer perceptions
3 or attitudes towards the brand.  So that's what
4 I've done throughout my report.
5 BY MR. GOSMA:
6     Q   Sure.  And I understand that.  You'd
7 agree with me that all of those questions have to
8 be answered in the context of the broader market
9 place that exists or that existed at the time,
10 correct?
11         MS. MELCHER:  Objection,
12 mischaracterizes testimony.
13         THE WITNESS:  I'm not sure what you
14 mean.
15 BY MR. GOSMA:
16     Q   Well, sir, the questions that you've
17 attempted to answer in your report have to be
18 answered in the context of the marketplace that
19 existed at the time.
20         MS. MELCHER:  Objection, lacks
21 foundation.
22         THE WITNESS:  I'm not sure what
23 question I'm being asked.
24 BY MR. GOSMA:
25     Q   Sure.  Did you consider the impact to

99

1 Yuga's brand by RR/BAYC in a vacuum?
2         MS. MELCHER:  Objection, vague.
3         THE WITNESS:  I'm not sure exactly what
4 you mean.
5 BY MR. GOSMA:
6     Q   Did you consider the existence of other
7 collections that use the asserted marks as part of
8 your analysis of the harm to Yuga's brand in this
9 case?
10         MS. MELCHER:  Objection, lacks
11 foundation.
12         THE WITNESS:  As my analyses show,
13 there seems to be damage that's being done by the
14 RR/BAYCs that are specific to what RR/BAYCs -- or
15 specific to the RR/BAYCs.  When they are minted
16 there is an increase in negative discussion about
17 the BAYC brand.
18         Similarly (inaudible - audio
19 interference) of these items that look almost
20 identical reduces the exclusivity and the scarcity
21 of the BAYC NFTs and so I've discussed all of that
22 in my report.
23 BY MR. GOSMA:
24     Q   Sorry, I had to move locations to
25 connection my computer.  Just a second.

00

1     A   No problem.
2     Q   You didn't consider in your report
3 whether there could be other sources of harm that
4 cause negative associations with the BAYC brand,
5 correct?
6         MS. MELCHER:  Objection, vague.
7         THE WITNESS:  I'm not sure what exactly
8 you mean.
9 BY MR. GOSMA:
10     Q   Your report assumes that all of the
11 harm to BAYC's brand during the period you
12 considered was attributable to RR/BAYC, correct?
13     A   I don't think I made that assumption,
14 no.  I analyzed things over the specific period
15 and as well as outside the period of which the
16 RR/BAYCs were minted, to examine both what
17 happened before they were minted as well as during
18 that period.
19         There may certainly have been other
20 things going on before that period but as I talk
21 about, the analysis that's going on seems to be
22 specific to what's happening here with RR/BAYC.
23     Q   Did your analysis take into account any
24 other potential sources of harm to RR/BAYC during
25 the time period you considered?

Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

**01**

1     MS. MELCHER:  Objection, vague.
2     THE WITNESS:  Well, for example, if
3  something was going on before the RR/BAYCs came
4  out that were already damaging, that would be in
5  the data and so I'm -- my analyses highlight that
6  these results seem to be specific to what happened
7  with the RR/BAYCs.  When -- when, for example, if
8  you look at figure 8 on days where, you know,
9  where more discussion about BAYC references
10  Mr. Ripps or RR/BAYCs there is more negative
11  sentiment towards the RR/BAYC brand and so it's
12  not clear why that would be happening for
13  something going on outside of the RR/BAYC brand.
14  BY MR. GOSMA:
15     Q   So you are not aware of any other
16  reason why a person could be -- well, let me
17  strike that and back up.
18         It is an assumption of your report that
19  if someone is tweeting about Ryder Ripps BAYC and
20  the BAYC collection, and that tweet has a negative
21  sentiment, the negative sentiment is driven by
22  consumer confusion relating to RR/BAYC.
23     MS. MELCHER:  Objection,
24  mischaracterizes testimony.
25     THE WITNESS:  I don't think that's an

**02**

1  assumption, no.  I -- one of the reasons I do
2  statistical analyses in my report is to examine
3  whether things could have happened by chance or
4  whether certain things seem to be associated with
5  one another.
6         And as I note in my report, one, there
7  is consumer confusion; two, the minting of these
8  copycat NFTs reduced the exclusivity and scarcity
9  of the true BAYC NFTs; and three, it seems that
10  when RR/BAYCs were minted, there is negative
11  sentiment and change in consumer attitudes towards
12  the BAYC brand as a result of that occurring.
13  BY MR. GOSMA:
14     Q   Based on your analysis, why did RR/BAYC
15  increase negative sentiment towards Yuga?
16     THE WITNESS:  There could be many
17  reasons that that could occur.  People could be
18  upset because they thought they bought one thing
19  and they actually got something else.
20         They could feel that BAYC is diluting
21  its brand equity by making more of these things
22  available and thus reducing the value of things
23  they bought in the past.  There could be a variety
24  of different reasons that the negative sentiment
25  is increasing.

**03**

1     But regardless of what that specific
2  reason is or if it's a combination of many of
3  those reasons, it is evidence that the brand is
4  being damaged by what RR/BAYC did.
5  BY MR. GOSMA:
6     Q   So you don't offer any opinion in your
7  report about the specific reason why references to
8  RR/BAYC damaged Yuga's brand, correct?
9     MS. MELCHER:  Objection,
10  mischaracterizes testimony.
11     THE WITNESS:  Could you ask that
12  question one more time?
13  BY MR. GOSMA:
14     Q   Sure.  You don't offer any opinion in
15  your report about the specific reason why
16  references to RR/BAYC damaged Yuga's brand,
17  correct?
18     A   I'm a little bit confused here because
19  I feel like I just gave you multiple reasons why
20  it could --
21     Q   You did.
22     A   Yeah.
23     Q   You did and I'm asking you whether you
24  concluded that any specific reason was the driver
25  of the harm or whether your opinion is all of

**04**

1  those things could have caused the harm; do you
2  understand?
3     A   I think so.  I don't mean to suggest
4  that any one single of them is the only reason for
5  the harm.  All of them could be -- all of the
6  things that I stated in my answer a couple of
7  minutes ago could be contributing to the harm,
8  among other things.
9     Q   Could any of the harm to Yuga's brand
10  have been caused by Mr. Ripps' allegations that
11  RR/BAYC was racist or associated with Nazi
12  iconography.
13     MS. MELCHER:  Objection, vague,
14  mischaracterizes testimony, and incomplete
15  hypothetical?
16     THE WITNESS:  Is there a specific
17  allegation made at a specific time that you have
18  in mind?
19  BY MR. GOSMA:
20     Q   Well, I don't believe that Mr. Ripps
21  made this allegation once.  I think the record is
22  clear that he's made these allegations dozens of
23  times, and so I'm referring to not any specific
24  instance of criticism but just the public
25  awareness of that criticism and whether that could

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 29 of 75   Page ID
#:19995
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023                    27 (105 to 108)

05

1  have impacted Yuga's brand?
2       MS. MELCHER: Objection, vague,
3  incomplete hypothetical.
4       THE WITNESS: I believe that those
5  allegations -- the reason I was asking is I
6  believe that those allegations were made before
7  the period that I look at in figure 7, for
8  example. And so if that was damaging the brand,
9  people should already be aware of that
10 information, that damage should have already
11 occurred.
12      The fact that this damage seems to be
13 localized to the period in which the RR/BAYCs were
14 being minted, suggests that that is -- provides
15 evidence that that is what is driving the shift
16 rather than something else.
17 BY MR. GOSMA:
18   Q   You'd agree in general that people's
19 awareness of certain issues can change over time,
20 right? And I'm talking about the public -- the
21 public's awareness of issues. They can be more
22 aware of issues or less aware of issues over a
23 period of time, correct?
24      MS. MELCHER: Objection, vague.
25      THE WITNESS: That's a very broad

06

1  statement that I feel a little bit comfortable --
2  uncomfortable, sorry, agreeing to without knowing
3  exactly what you are getting at.
4  BY MR. GOSMA:
5    Q   Let me see if I can ask a little bit
6  better question.
7       So in your prior answer you said
8  "I believe that those allegations," referring to
9  Mr. Ripps' allegations of relationship to racism
10 and Nazi iconography, "were made before the period
11 that I look at in figure 7"; do you recall that?
12      MS. MELCHER: Objection,
13 mischaracterizes testimony.
14      THE WITNESS: I want to be a little bit
15 careful. I believe I said something like that.
16 Whether I said exactly what you just said I'm not
17 sure, but I said something like that.
18 BY MR. GOSMA:
19   Q   Okay. You'd agree with me that it's
20 possible that as a result of the minting of
21 RR/BAYCs, more people became aware of those
22 allegations.
23      MS. MELCHER: Objection, incomplete
24 hypothetical.
25      THE WITNESS: I think you're asking me

07

1  to speculate here.
2       It is also possible that no more people
3  became aware of those allegations.
4       Further, those allegations don't change
5  the exclusivity or the scarcity of BAYC NFTs, as
6  the minting does of RR/BAYCs.
7       Similarly, it's not clear why those
8  allegations would cause consumer confusion.
9       The only thing that would cause
10 consumer confusion or change in the exclusivity or
11 scarcity, perceived exclusivity or scarcity of the
12 BAYC NFTs, would be the RR/BAYC NFTs, and so
13 whether or not -- and I haven't seen any evidence
14 that the minting of the RR/BAYCs made the
15 allegations, somehow raised awareness of those
16 allegations, that still wouldn't answer the fact
17 that the allegations don't have an effect on
18 exclusivity and scarcity, do not have an effect on
19 the other aspect I just mentioned.
20      It is only the RR/BAYCs that could
21 cause changes in exclusivity and scarcity, as well
22 as changes in consumer confusion. The allegations
23 would not do that.
24 BY MR. GOSMA:
25   Q   Did you do anything to determine

08

1  whether the increased awareness of RR/BAYCs
2  associated with the minting also raised awareness
3  of these issues related to racism and Nazi
4  iconography?
5       MS. MELCHER: Objection, vague,
6  misstates testimony.
7       THE WITNESS: You know, if that was
8  something that the other side thought was
9  important I would have expected from somebody, an
10 expert on the other side to have shown that and
11 I'm not aware of any work that was done by the
12 other side that shows that.
13 BY MR. GOSMA:
14   Q   Yeah, I'm not asking about what some
15 nonexistent expert said; I'm asking what you did,
16 sir, and I'm asking you again, did you in your
17 analysis do anything to determine whether the
18 increased awareness of RR/BAYCs associated with
19 the minting also raised awareness of issues
20 related to racism and Nazi iconography in BAYC?
21      MS. MELCHER: Objection.
22      THE WITNESS: There are many things I
23 could have looked at in my report. I focused on
24 the ones that I thought were most relevant.
25      If the defendants thought that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.

Conducted on March 9, 2023

**09**

1 something was particularly relevant or important I
2 would have expected they would have an expert put
3 that information forward.
4     As I mentioned already, I haven't seen
5 any information that suggests that the minting
6 made people more aware of the allegations that
7 Mr. Ripps made but whether or not that occurred,
8 those allegations do not create consumer
9 confusion. Those allegations can't account for
10 why somebody, as I note, and I forget the
11 paragraph number -- give me a second here. As I
12 discuss in paragraph 74, as I discuss with the
13 news media in figure 4, those allegations would
14 not create confusion in the news media or among
15 consumers.
16     The only thing that would create
17 confusion is the minting of a collection that
18 looks very similar, if not identical.
19 BY MR. GOSMA:
20     Q   Sir, it was an assumption of your
21 report that all of the harm caused to Yuga's brand
22 during the time period you analyzed was due to
23 consumer confusion, correct?
24     MS. MELCHER:   Objection,
25 mischaracterizes testimony.

1 ones that seemed more most pertinent and relevant
2 here.
3 BY MR. GOSMA:
4     Q   Sir, you keep referring to another
5 expert and I think that's pretty telling that
6 here, you did not consider as part of your
7 analysis the amount of harm that was done to
8 Yuga's brand by the criticism as opposed to
9 consumer confusion.
10     MS. MELCHER:   Objection, vague,
11 argumentative.
12     THE WITNESS:   I think you already
13 answer asked this question in different words.
14     As I said already, if -- if that -- I
15 haven't seen any evidence that that allegation,
16 and I don't want to call it baseless, but I'm not
17 aware that that allegation is valid. I've not
18 seen any evidence that that caused harm to the
19 brand.
20     And further, as I mentioned, and as I
21 understand and I asked you, I believe much of
22 those allegations had already been made by the
23 time that Mr. Ripps minted his collection, and so
24 if that was driving changes in attitudes towards
25 the brand, that should have shown up already in

**0**

1     THE WITNESS:   I don't think that's what
2 I said, no.
3 BY MR. GOSMA:
4     Q   Well, sir, you can't quantify, during
5 the period that you analyzed, the amount of harm
6 done to Yuga's brand because of the criticism that
7 Mr. Ripps made, correct?
8     MS. MELCHER:   Objection, vague.
9     THE WITNESS:   I'm not sure what
10 question I'm being asked.
11 BY MR. GOSMA:
12     Q   Okay. Sir, can you quantify for me the
13 amount of harm that was done to Yuga's brand,
14 during the period that you considered, by
15 Mr. Ripps' criticism?
16     MS. MELCHER:   Objection, outside the
17 scope of the report.
18     THE WITNESS:   I'm not aware that anyone
19 has demonstrated that it had any harm. Again, if
20 this was an issue that Mr. Ripps or the defendants
21 thought were important, I would have expected an
22 expert on the other side to examine this question
23 and demonstrate it.
24     There are millions of things I could
25 have looked at in this report. I looked at the

**2**

1 the data.
2 BY MR. GOSMA:
3     Q   But you can't say one way or another
4 whether there was any increase in awareness of the
5 racism allegations as a result of the minting of
6 RR/BAYC, correct?
7     MS. MELCHER:   Objection, vague.
8     THE WITNESS:   Can you ask the question
9 again?
10 BY MR. GOSMA:
11     Q   You can't say one way or another
12 whether there was any increase in awareness of the
13 racism allegations as a result of the minting of
14 the RR/BAYC NFTs.
15     MS. MELCHER:   Objection, vague.
16     THE WITNESS:   As I said already, I
17 haven't seen any evidence that those allegations
18 damaged the brand.
19     In my analysis -- if those allegations
20 were damaging to the brand, that information was
21 already out there and should have had its effect
22 before the specific period.
23     Further, those allegations can't create
24 consumer confusion, either among individuals or
25 the news media, which there is clear evidence for

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

29 (113 to 116)

---

**3**

1 such confusion, and such allegations don't change
2 the scarcity or exclusivity of the initial BAYC
3 NFT collection.
4 BY MR. GOSMA:
5     Q   Understood.  And you say "I haven't
6 seen any evidence that those allegations damaged
7 the brand."
8         What did you do to determine whether
9 those allegations damaged the brand?
10        MS. MELCHER:  Objection, asked and
11 answered.
12        THE WITNESS:  I believe I answered this
13 question.
14 BY MR. GOSMA:
15    Q   Okay, and I'm asking it again so you
16 can answer it again.
17        The question is: I haven't seen any
18 evidence -- or you said, "I haven't seen any
19 evidence that those allegations damaged the
20 brand," and I'm trying to understand from you or
21 just have you say that you didn't do it, what did
22 you do to determine whether the allegations
23 damaged the brand?
24    **A   Well, for example, I think I've asked
25 and -- answered this already but to add even**

---

**4**

1 **further, if you look at figure 7 I've picked data
2 to look at both before and after the collection
3 was minted.**
4         **If the allegations were what were
5 driving things, you would expect that to have
6 already had its impact and I note in the notes
7 under figure 7 that the slope before the
8 collection was minted is different than the slope
9 after the collection was minted, consistent with
10 the notion that something unique is happening once
11 the collection is minted.**
12        **And so that is, again, another example
13 of how I've considered this in my analyses.**
14    Q   So your opinion is that Mr. Ripps'
15 criticism of Yuga's brand had zero negative impact
16 on their brand, correct?
17        MS. MELCHER:  Objection,
18 mischaracterizes testimony.
19        THE WITNESS:  I feel like we're going
20 around in circles here.  You've asked this
21 question a few times.
22        I said if that was important I would
23 have expected the other side to show it.  I have
24 not seen any evidence that it was damaging and,
25 further, my analyses account for that possibility.

---

**5**

1         MR. GOSMA:  Okay.  We can take a break.
2 So let's come back at 8:10 -- 11:10 your time.
3         THE WITNESS:  Sounds good.
4         THE VIDEOGRAPHER:  We are going off the
5 record.  The time is 11:02.
6     (Recess taken from 11:01 a.m. to 11:13 a.m.)
7         THE VIDEOGRAPHER:  We are back on the
8 record.  The time is 11:13.
9 BY MR. GOSMA:
10    Q   Welcome back, Dr. Berger.
11    **A   Thanks.**
12    Q   I just wanted to ask one follow-up on
13 our discussion from before the break.
14        Did you make any attempt to analyze
15 whether there was a relationship between consumer
16 awareness of RR/BAYC on the one hand and consumer
17 awareness of Mr. Ripps' criticisms of BAYC on the
18 other?
19        MS. MELCHER:  Objection, vague.
20        THE WITNESS:  As I said already, I took
21 a number of steps to ensure that the analysis I
22 conducted goes beyond that as a potential
23 explanation.
24        I looked at time before and after the
25 collection was minted, the allegations were made

---

**6**

1 beforehand.  As I note in figure 7 the slope
2 before things were minted and after is different,
3 in addition to the overall decline after they were
4 minted and such allegations can't explain examples
5 of consumer confusion or changes in the
6 exclusivity or the scarcity of the brand, so I did
7 a number of things to ensure that that could not
8 be the explanation for my results.
9 BY MR. GOSMA:
10    Q   Well, respectfully, sir, I feel like
11 you are conflating the existence of the
12 allegations before the period you considered and
13 the intensity of the public awareness of those
14 allegations.
15        So I agree with you that he made the
16 allegations beforehand and they had a level of
17 awareness to them at that time and I'm asking
18 whether the intensity of that awareness could have
19 increased in a correlated way with the awareness
20 of the RR/BAYCs during the time period you
21 considered?
22        MS. MELCHER:  Objection, vague,
23 mischaracterizes testimony, incomplete
24 hypothetical.
25        THE WITNESS:  We've tread this ground a

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 32 of 75   Page ID
#:19998
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023                              30 (117 to 120)

7

1  number of times.  If this is an empirical point
2  that the defendant believes is important, I've
3  already suggested that I don't think that can
4  account for the results that I show.
5       If the defendant believes otherwise I
6  don't -- that would have been great for an expert
7  on the defendant's side to analyze that and show
8  that that is somehow driving things, but I don't
9  believe that's driving things.  I don't believe
10 that's driving my results, and I've done a number
11 of things to test that.
12 BY MR. GOSMA:
13    Q   I don't think that's responsive to the
14 specific question I asked, okay?  I understand --
15 and I'm not trying to ask you to repeat what it is
16 that you did to control.  We're now talking about
17 specifically one of the controls that you say that
18 you implemented, which was, I looked at sentiment
19 data before May and I determined that there is,
20 you know, basically a flat slope, right, or
21 something close to a flat slope in terms of
22 sentiment analysis, and that during the time
23 period the slope started to go -- the sentiment
24 slope started to go down.  Okay?  I'm trying to
25 understand how the control that you implemented

8

1  accounts for the possibility that there was a
2  correlation between the minting of the RR/BAYCs
3  and the awareness of the allegations of racism and
4  Nazi iconography.
5       MS. MELCHER:  Objection --
6  BY MR. GOSMA:
7       Q   So my specific question is: How does
8  the control that you implemented account, if
9  at all, for that correlation?
10      A   No one has provided --
11      MS. MELCHER:  Objection, vague.
12      THE WITNESS:  The other side --
13      -- (overspeaking) --
14      MS. MELCHER:  Mischaracterizes
15 testimony.  Sorry, go ahead.
16      THE WITNESS:  No, go ahead.
17      MS. MELCHER:  Objection, vague,
18 mischaracterizes testimony, asked and answered.
19 Thanks.
20      THE WITNESS:  I think I've answered
21 your question now a number of times.
22      As I've said already, no one has
23 provided any evidence that those things are
24 correlated.  Many things are possible.  If that
25 was something the other side thought was important

9

1  I would have expected the other side to show that.
2       I took a number of steps in my analyses
3  to cast doubt on that possibility as an
4  alternative explanation and as I said already, and
5  I understand that you don't like that answer but
6  that can't drive consumer confusion, right?
7       You know, Mr. Ripps can make whatever
8  allegations he feels like making, that's not
9  creating consumer confusion.  What's creating
10 consumer confusion is creating items that look
11 similar to BAYCs.  That's what is creating the
12 confusion, and so that can't account for any such
13 confusion.
14 BY MR. GOSMA:
15      Q   To be clear, sir, I'm not suggesting
16 that it does account for any confusion but we're
17 talking about negative sentiment towards a brand,
18 and negative sentiment towards a brand can be
19 caused by things other than consumer confusion,
20 right, sir?
21      A   We've talked about this already, yes.
22      Q   Yes, and to be clear, I'm not trying to
23 re-tread old ground.  I'm trying to get an answer
24 to my specific question from before which you, you
25 know, don't seem to want to answer which is how

20

1  the controls that you implemented actually account
2  for potential correlation.
3       And what I hear you saying is that you
4  don't believe that there is a correlation and so
5  you assume that there was no correlation; is that
6  correct?
7       MS. MELCHER:  Objection,
8  mischaracterizes testimony.
9       THE WITNESS:  I know you're entitled to
10 ask a same or similar question many times.  We've
11 reached that point where you've asked the same or
12 similar question many times.  I've told you
13 numerous steps I've taken to cast doubt on this
14 alternative.
15      You've provided no concrete evidence
16 that this alternative exists and neither has
17 anyone on the defendant's side.
18      And I've told you already the number of
19 steps that I took to cast doubt on this as a
20 potential alternative.
21 BY MR. GOSMA:
22      Q   Right, let's turn to paragraph 80 of
23 your report which is Exhibit 1.  Let me know when
24 you're there.
25      A   Paragraph 8-0?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

31 (121 to 124)

---

Page 2

1    Q   Yes, sir.
2    **A   Yeah, I'm there.  Thank you.**
3    Q   Right, let me get there as well.
4        Now, paragraph 80 says that you
5   analyzed how the release of RR/BAYC NFTs impacted
6   attitudes towards the BAYC brand, correct?
7    **A   Uh-huh.**
8    Q   And you state that your analysis
9   started on May 6th of 2022, correct?
10       MS. MELCHER:  Objection,
11  mischaracterizes testimony.
12       THE WITNESS:  Would you mind asking the
13  question again?
14  BY MR. GOSMA:
15   Q   Sure.  And I'm going to ask it a little
16  bit more precisely, to be clear.
17       Your report states that you:
18       "... examined attitudes towards the BAYC
19  brand right before the release of RR/BAYC NFTs
20  (i.e. starting on May 6, 2022) ..."
21       Do you see that?
22   **A   I do, yes.**
23   Q   Why did you choose May 6th, 2022 as
24  your start date?
25   **A   It takes a while to acquire the data to**

---

Page 22

1   **created these analyses.**
2   **        The longer the period you want to**
3   **analyze, the longer it takes to get the data and**
4   **the data vendor can't give you all the data you**
5   **want right away.  It needs to -- it only has a**
6   **gate for the amount it can give you each day.  And**
7   **so I wanted to make sure to have coverage for the**
8   **focal period, which is the point at which**
9   **Mr. Ripps minted the RR/BAYC NFTs, as well as**
10  **through when the accelerated minting occurred.**
11  **And I also wanted to make sure to look at least**
12  **some time prior to that initial minting to, as we**
13  **talked about already, account for other possible**
14  **things that are going on in the market place, and**
15  **so that's why I picked that date of May 6th.**
16   Q   And May 6th is something like five to
17  seven days before the minting of the NFTs started
18  in earnest, right?
19   **A   I believe it's seven days.**
20   Q   Yeah, okay.  And your report says that
21  your analysis concluded in late June of 2022,
22  correct?
23   **A   Are you looking at a particular place?**
24   Q   It's in the same paragraph, if you just
25  read the rest of the sentence we were looking at.

---

Page 23

1    A   Yes, late June, yes.
2    Q   And why did you choose late June as the
3   cut-off date for your analysis?
4    **A   So, again, there was an accelerated**
5   **minting around 6/19 and so I wanted to make sure**
6   **to include that period in the data and then some**
7   **time after that period and so that's -- that's**
8   **where I ended up with.**
9    Q   So your analysis did not include any
10  data after June of 2022, correct?
11   **A   Give me just --**
12       MS. MELCHER:  Objection --
13       THE WITNESS:  Sorry, go ahead.
14       MS. MELCHER:  Objection,
15  mischaracterizes testimony.
16       THE WITNESS:  I think my analysis of
17  Twitter data focuses on that time period.  That is
18  the time period that I focused on in the Twitter
19  analysis.
20  BY MR. GOSMA:
21   Q   So you did not assess whether there was
22  any continuing harm to Yuga's brand after June of
23  2022, correct?
24       MS. MELCHER:  Objection,
25  mischaracterizes testimony.

---

Page 24

1        THE WITNESS:  That seems like a broader
2   question than what we just talked about.
3        What my Twitter analysis does is look
4   at the period at which Mr. Ripps began minting
5   RR/BAYC -- his RR/BAYC collection and the period
6   at which it accelerated and show that damage
7   occurred to the brand over that period.
8        I'm not suggesting that damage did not
9   continue to occur after that period, and does not
10  continue to occur to this day.
11       I merely analyzed the specific period
12  to examine what's going on during that period.
13  BY MR. GOSMA:
14   Q   Understood.  But the specific analysis
15  that you conducted only measured brand harm
16  between May 6th and the end of June 2022, correct?
17       MS. MELCHER:  Objection,
18  mischaracterizes testimony.
19       THE WITNESS:  I don't think that's
20  fair.  My analysis of consumer confusion is
21  broader than just that time period.  My discussion
22  of scarcity and exclusivity will have continued
23  since that time period.  The -- yeah, so I -- if
24  you are talking about specifically the analysis of
25  consumer attitudes towards the brand using Twitter

---

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 34 of 75   Page ID
#:15990

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

32 (125 to 128)

**Page 25**

1  data that I talk about in a part of my report, as
2  I've discussed already, there are certain dates
3  that I focused on for that analysis but I'm not
4  suggesting that the harm is limited to that time
5  period.
6  BY MR. GOSMA:
7      Q   Okay.  And to be clear I'm not
8  suggesting that you are saying that the harm was
9  limited to that time period.
10       However, the only period for which you
11 have conducted an empirical analysis of Twitter
12 data is the period between May 6th, 2022 and
13 June 2022, correct?
14       MS. MELCHER:  Objection,
15 mischaracterizes testimony.
16       THE WITNESS:  That is the period I
17 focus on for this specific analysis.
18 BY MR. GOSMA:
19      Q   And so for example, you did not do any
20 analysis of trends relating to the perception of
21 Yuga's brand between July of 2022 and today,
22 correct?
23       MS. MELCHER:  Objection, vague,
24 mischaracterizes testimony.
25       THE WITNESS:  I'm not sure what you're

**Page 26**

1  asking.  I'm not sure if you're asking about the
2  Twitter analysis, I'm not sure if you're asking in
3  general.  I'm not sure what you're asking.
4  BY MR. GOSMA:
5      Q   Let me be more clear:  You don't have
6  any -- you did not conduct any Twitter analysis
7  that took into account data after June of 2022,
8  correct?
9      A   I focused on the time period that
10 seemed most relevant for this case, so I focused
11 on the time period that we've already talked
12 about.
13      Q   So you don't know, for example, whether
14 you know, tweets about Yuga's brand in July
15 continued to trend at the rate that you saw in
16 your analysis, correct?
17       MS. MELCHER:  Objection, vague,
18 incomplete hypothetical.
19       THE WITNESS:  As I think I've answered
20 before, I focused on a specific time period.  If
21 one was interested in the time period in July they
22 could certainly look at that period.
23       I focused on the time period I've
24 focused on to shed light on the questions I found
25 most relevant.

**Page 27**

1  BY MR. GOSMA:
2      Q   But you didn't look at any other time
3  period for your empirical analysis other than the
4  May 6th to June 2022 timeframe, correct?
5      A   I don't want to get stuck in this
6  again.  I don't know which analysis you are
7  referring to, whether you are referring to just
8  the Twitter analysis, my analyses in general.
9        The Twitter analysis is an example of
10 an analysis somebody could do.  If someone wanted
11 to, they could extend it further on.  I didn't see
12 a need to so I focused on the specific time period
13 but I'm not saying that somehow the harm ended
14 there or that these trends couldn't have
15 continued.
16       It's also, though, worth pointing out
17 that, you know, there may be other positive things
18 that happened in the marketplace outside of this
19 negative association with the RR/BAYC brand, that
20 damaged the brand, that could lead its subsequent
21 conversation about the brand to increase at some
22 point in the future.
23       But what I'm doing here is isolating
24 the time period at which the RR/BAYC collection
25 was minted to examine how that impacted BAYC and

**Page 28**

1  the Yuga brand.
2        MR. GOSMA:  I was having a connection
3  issue there.  Give me just a second.
4        THE WITNESS:  No problem.
5        MR. GOSMA:  Let me see if it will
6  stabilize here.
7        Can everybody hear me okay?
8        THE WITNESS:  I can, at least.  I don't
9  know about others but...
10 BY MR. GOSMA:
11      Q   Okay, good.
12       Now I want to talk about some other
13 things that were going on during the timeframe for
14 your analysis, the May 6th to the end of June.
15       Do you follow the cryptocurrency market
16 at all?
17      A   I can't say that I follow it with a
18 great deal of detail all the time.
19      Q   Okay.  But you're aware that it's
20 considered to be a relatively volatile financial
21 market, correct?
22       MS. MELCHER:  Objection, lacks
23 foundation.
24       THE WITNESS:  I don't know what that's
25 based on.

**29**

1  BY MR. GOSMA:
2      Q   Well, cryptocurrency prices can
3  fluctuate significantly in short periods of time,
4  correct?
5          MS. MELCHER:  Objection, lacks
6  foundation.
7          THE WITNESS:  Go ahead.
8  BY MR. GOSMA:
9      Q   So fair to say that you don't follow
10 cryptocurrency prices in your day-to-day work?
11     **A   I don't follow cryptocurrency prices in**
12 **my day-to-day work.**
13     Q   Okay.  Now, are you aware of a
14 cryptocurrency project called Terra; have you ever
15 heard of that?
16     **A   I don't believe so, no.**
17     Q   Okay.  So when you wrote your report
18 were you aware that in May of 2022 that protocol,
19 the Terra protocol, essentially collapsed and
20 wiped out more than $60 billion of assets; are you
21 aware of those -- that incident?
22         MS. MELCHER:  Objection, lacks
23 foundation.
24         THE WITNESS:  When did this occur?
25 BY MR. GOSMA:

**30**

1      Q   In May of 2022.
2      **A   When in May of 2022?**
3      Q   Well, it was sort of an ongoing thing
4  but it occurred over several -- the first couple
5  of weeks of May of 2022.
6      **A   So when did it start?**
7      Q   It's -- it's hard -- well, I'm
8  asking --
9      **A   I shouldn't be asking questions.**
10     Q   Very good.
11     **A   It's just -- sorry, you're asking me --**
12 **I'll try to give an answer.  You're asking me**
13 **about something that I'm not really aware of and**
14 **you're allowed to ask me whatever you'd like to,**
15 **but I can't really answer that question unless**
16 **I have some more precise details about what**
17 **occurred.**
18     Q   Sure.  Understood.  In May of 2022
19 there was a significant amount of panic in crypto
20 markets, correct?
21     **A   I don't --**
22         MS. MELCHER:  Objection, lacks
23 foundation.
24         THE WITNESS:  I don't know whether
25 that's the case or what that's based on.

**3**

1          MR. GOSMA:  Okay.  Can we mark tab 22,
2  please.
3          THE WITNESS:  Can somebody let me know
4  when that shows up.  I have hit "refresh" now a
5  few times but I haven't seen it yet.
6          REMOTE TECHNICIAN:  Yes, just one
7  second, I'm just going to drop it in the folder.
8          It should be any second.
9          THE WITNESS:  I still am not seeing it.
10 If somebody else could let me know when they
11 see it.
12         Okay, I'm now seeing it.
13         MR. GOSMA:  Let me know when you have
14 it pulled up.
15         THE WITNESS:  Okay, I have it pulled
16 up.
17         (Exhibit No. 22 was marked for
18 identification.)
19 BY MR. GOSMA:
20     Q   Okay.  The date of this article -- so
21 this is -- strike that.
22         This is a New York Times article; do
23 you see that, "The New York Times" in the upper
24 left corner there?
25     **A   I have never seen this document before.**

**32**

1  **I see what is on the screen in front of me.  I**
2  **don't know where it's actually from or the nature**
3  **of this document.  I've never seen it before.**
4      Q   Okay, understood --
5          -- (overspeaking) --
6      **A   Sorry, if there was a question at the**
7  **end of that I didn't hear it.  I'm sorry.**
8      Q   Oh, sure.  It may be my -- maybe my
9  internet is cutting out again, but the question
10 was:  Do you see the words "The New York Times" in
11 the upper left corner of the document?
12     **A   I see those words, yes.**
13     Q   And do you see that on the line just
14 below that, the article reads, "Cryptocurrencies
15 Melt Down in a 'Perfect Storm' of Fear and Panic"?
16     **A   I see those words.**
17     Q   And then below that you see the date of
18 the article is May 12th, 2022?
19     **A   I see those words, yes.**
20     Q   And the first paragraph of the article
21 reads:
22         "The price of Bitcoin plunged to its lowest
23 point since 2020.  Coinbase, the large
24 cryptocurrency exchange, tanked in value.  A
25 cryptocurrency that promoted itself as a stable

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.

Conducted on March 9, 2023

34 (133 to 136)

---

33

1  means of exchange collapsed.  And more than
2  $300 billion was wiped out by a crash in
3  cryptocurrency prices since Monday."
4      Do you see that?
5      **A   I do.**
6      Q   Were you aware that -- well, let me ask
7  a foundational question.  Strike that.
8          May 12th, 2022 is within the period of
9  your Twitter sentiment analysis, correct?
10     **A   Yes, it is.**
11     Q   So were you aware that during the
12  period of your Twitter sentiment analysis that the
13  cryptocurrency market was, quote, "in a perfect
14  storm of fear and panic"?
15     **A   I'm not sure what date this started**
16  **occurring in.  As I note in my analyses, I have**
17  **some data prior to May 12th.**
18         **If something -- I'm sorry, I don't know**
19  **when this trend started, but also regardless of**
20  **what's going on in the broader cryptocurrency**
21  **market, it's not clear that that would damage**
22  **sentiment towards the BAYC brand.  And further,**
23  **even if it was, it's not clear why on days, as I**
24  **show in figure 8, that a greater proportion of**
25  **tweets about BAYC that mention Mr. Ripps or**

---

34

1  **RR/BAYC, which has nothing to do with the broader**
2  **trends in the cryptocurrency market, would exhibit**
3  **more negative sentiment.**
4          **So even if something was going on that**
5  **might be damaging to BAYC as a brand, and I**
6  **haven't seen any data suggesting that actual --**
7  **that that actually occurred, that can't account**
8  **for what's going on in figure 8, which is specific**
9  **to things related to Mr. Ripps and RR/BAYC.**
10     Q   Thank you.  So you said, "regardless of
11  what's going on in the broader cryptocurrency
12  market, it's not clear that that would damage
13  sentiment towards the BAYC brand"; do you recall
14  that?
15     **A   I don't recall exactly what I said, but**
16  **as I said already, even if something was going on**
17  **that damaged the -- was damaging -- even if**
18  **something going on in the broader cryptocurrency**
19  **was damaging for the BAYC brand, which I haven't**
20  **seen any data to suggest that's the case, that**
21  **can't explain what's going on in figure 8.**
22     Q   You didn't consider whether the
23  significant decline in value of other
24  cryptocurrencies had a negative impact on BAYC,
25  correct?

---

35

1      MS. MELCHER:  Objection,
2  mischaracterizes testimony.
3      THE WITNESS:  That's not what I said
4  and even if there was such a trend, that can't
5  explain figure 8, as I've said already.
6  BY MR. GOSMA:
7      Q   And it's your testimony that "it's not
8  clear why on days, as I show in figure 8, that a
9  greater proportion of tweets about BAYC that
10  mention Mr. Ripps or BAYC, which has nothing to do
11  with the broader trends in the cryptocurrency
12  market, would have led to more negative
13  sentiment"; do you recall that?
14     **A   Sorry, you just said a lot of things.**
15         **I'm not sure exactly what you asked me.**
16     Q   Sure.  And I'm just reading your prior
17  testimony from the transcript, so I'll say it
18  again.  You testified that "it's not clear why on
19  days, as I show in figure 8, that a greater
20  proportion of tweets about BAYC that mention
21  Mr. Ripps or BAYC, which has nothing do with the
22  broader trend in the cryptocurrency market, would
23  have led to more negative sentiment"; do you
24  recall that?
25     **A   So what I'm saying is, even if there**

---

36

1  **was a broader trend in the cryptocurrency market,**
2  **and even if that, which you've put a content up in**
3  **front of me which -- I've not seen this specific**
4  **article, I've not seen data that suggests that**
5  **this was damaging to brand perceptions of BAYC,**
6  **but even if it was, the things that are going on**
7  **in figure 8 are suggesting what's going on to the**
8  **BAYC brand is specific to something going on with**
9  **Mr. Ripps and RR/BAYC.**
10         **So if something is going on in the**
11  **broader market, even if that was damaging to the**
12  **brand, that wouldn't explain why on days that**
13  **people are talking about Mr. Ripps and RR/BAYC**
14  **more as part of the discussion around BAYC, that**
15  **sentiment towards the brand is more negative.**
16     Q   You didn't do any specific analysis on
17  what harm the decline in cryptocurrency prices
18  referenced in this article from May 12th, 2022 had
19  on the BAYC brand, correct?
20     MS. MELCHER:  Objection,
21  mischaracterizes testimony.
22     THE WITNESS:  I understand that you are
23  trying to undermine my analyses and I appreciate
24  that, but you haven't put forth any data that's
25  suggesting that this is an issue and further, as

---

---

**37**

1  I -- we already discussed in figure 8 any broader
2  trends in the marketplace, even if they affected
3  the BAYC brand, can't explain what's going on in
4  figure 8.
5  BY MR. GOSMA:
6      Q   Sir, my question was a little bit
7  different than that which -- and I appreciate that
8  you want to continue to refer to the non-existence
9  of some opposing expert in this case but I'm
10  really focused here today on what you personally
11  did and so my question is:  You, Dr.Berger, did
12  not do any specific analysis on what harm the
13  decline in cryptocurrency prices referenced in the
14  article from May 12th, 2022 had on the BAYC brand?
15      MS. MELCHER:  Objection.
16  BY MR. GOSMA:
17      **A   Not whether you accounted for that in**
18  **your model, not whether there's another expert,**
19  **but whether you did that analysis yourself, "yes"**
20  **or "no."**
21      MS. MELCHER:  Objection,
22  mischaracterizes --
23      THE WITNESS:  Go ahead.
24      MS. MELCHER:  Objection,
25  mischaracterizes testimony.

**38**

1      THE WITNESS:  As I already suggested,
2  my analysis accounts (inaudible -- audio drop).
3      (Court reporter clarification)
4      THE WITNESS:  No problem.
5      "... any such trends that might or
6  might not exist."
7  BY MR. GOSMA:
8      Q   How does your model account for events
9  that occurred during the period of your analysis,
10  not things that were existing before but things
11  that occurred during the analysis.
12      **A   It --**
13      Q   Yeah -- that are unrelated to RR/BAYC.
14      **A   If there's some broader marketplace**
15  **trend that's affecting things, that might exist**
16  **and, by the way, no one has shown that that is the**
17  **case but even if that exists, figure 8 shows that**
18  **on days -- it suggests that this is specific to**
19  **Mr. Ripps and RR/BAYC.**
20      **Those broader marketplace trends are**
21  **included in what's going on in figure 8 and even**
22  **controlling for any such broader marketplace**
23  **trends, if at all -- if they exist which -- if**
24  **they exist, that still can't explain why on days**
25  **where a higher proportion of tweets referencing**

**39**

1  **BAYC or Yuga, including Mr. Ripps or RR/BAYC, on**
2  **days when there's more of that, there is more**
3  **negative sentiment towards the brand.**
4      Q   And let's turn to page 47 your report
5  and look at footnote 190, okay.
6      Are you there?
7      **A   I am, yes.**
8      Q   Great.  Okay.  In footnote 190 you say:
9      "In November and December 2021, Ryder Ripps
10  started publicly 'criticizing Yuga Labs and the
11  BAYC NFTs through his Twitter profile."
12      Do you see that?
13      **A   I do, yes.**
14      Q   The word "criticized" is in quotation
15  marks; do you see that?
16      **A   I do, yes.**
17      Q   Why?
18      **A   Because I believe he was criticizing**
19  **the brand.**
20      Q   Well, why if you believe he was
21  criticizing, did you put those words in
22  parentheses?
23      **A   I don't remember off-hand.**
24      Q   So by including those quotation marks
25  did you mean to take a position on the validity of

**40**

1  Mr. Ripps' criticism?
2      **A   I'm not sure which specific criticism**
3  **you are talking about.  All I'm noting here is in**
4  **November and December he started doing something**
5  **that was making negative statements towards the**
6  **brand.**
7      Q   Well, sir, I'm talking about the
8  criticism that you're talking about in your report
9  and that you put in quotation marks.
10      So my question for you is:  Are you
11  taking a position or did you mean to take a
12  position in your report about the validity of the
13  criticism by including those quotation marks?
14      MS. MELCHER:  Objection, vague.
15      THE WITNESS:  I'm not sure what you're
16  asking.  If there is a specific comment of his you
17  are asking me to respond to and a specific legal
18  definition of "criticism" I'm happy to look at
19  that, but otherwise I don't know how to respond to
20  your question.
21  BY MR. GOSMA:
22      Q   Sir, the word "criticism" is in your
23  report -- and these are your words, right?
24      **A   We've already tread this ground, so I**
25  **think you already know the answer.**

**4**

1    Q   Yeah.  These are your words, right,
2  sir, you wrote the report, right?
3    **A   I already said "yes".**
4    Q   And so my question to you, sir, is:
5  Why did you put the word "criticizing" in
6  quotation marks?
7    **A   As we already talked about, because you**
8  **already asked me this question, I told you I don't**
9  **remember exactly why I put the words in quotation**
10 **marks, but if there's a specific criticism that**
11 **you'd like me to speak about, please put it on the**
12 **screen in front of me and I'm happy to talk**
13 **about it.**
14   Q   My question is: Are you taking a
15 position about the validity of, for example, if
16 you need a specific example, the validity of
17 Mr. Ripps' criticism is that the Ape skull logo
18 includes Nazi iconography?
19      MS. MELCHER:  Objection, vague,
20 misstates testimony.
21      THE WITNESS:  I'm not sure of the
22 question that you're asking me.
23      MR. GOSMA:  Could the court reporter
24 please re-read the question.
25      (Court reporter read question.)

**42**

1      THE WITNESS:  I think you asked me this
2  question now a few times and I'm going to give you
3  the same answer.  You seem to be asking a specific
4  legal terminology or detailed question that I am
5  not familiar with enough to answer.
6  BY MR. GOSMA:
7    Q   I am not using any legal terminology;
8  I'm using words from your report.  I'm using the
9  word "criticism" from your report, the words that
10 you wrote, and I'm asking you why, if you're not
11 taking a position on the validity of Mr. Ripps'
12 criticism, as you used that term, why you put the
13 term in quotation marks in your report.
14      MS. MELCHER:  Objection, asked and
15 answered.
16      THE WITNESS:  I think I've answered
17 this question a couple of times.  I don't know
18 what you mean by taking a position.
19      You are using some words and phrases
20 that have meaning, in my understanding, have some
21 legal meaning that I don't completely understand.
22 BY MR. GOSMA:
23   Q   Okay.  Do you have an opinion in this
24 case about whether Mr. Ripps' criticism was valid?
25      MS. MELCHER:  Objection, vague.

**43**

1      THE WITNESS:  If you can ask me a more
2  specific question, I'm happy to do my best to try
3  to answer it.
4  BY MR. GOSMA:
5    Q   Have you assumed for purposes of this
6  case that Mr. Ripps' criticisms, for example of
7  the Ape skull logo, are not valid?
8    **A   Have I assumed that they're not valid?**
9    **My report focuses on not his**
10 **criticisms, whether they are valid or not, but the**
11 **actions he took in releasing the RR/BAYC NFTs, how**
12 **those created consumer confusion in the**
13 **marketplace and how that damaged the BAYC NFT**
14 **brand, the BAYC brand and Yuga Labs.  That's what**
15 **my report focuses on.**
16   Q   Your report does not focus on the
17 underlying moral questions in this case, right,
18 sir?
19      MS. MELCHER:  Objection, vague.
20      THE WITNESS:  I am doing my best to
21 answer your question but you're asking some very
22 broad questions that I don't know what -- I'm not
23 sure what you mean by moral questions.  I'm not
24 sure what specific things you have in mind.  I
25 don't know what you're asking.

**44**

1  BY MR. GOSMA:
2    Q   Okay.  Now, in -- we're still on
3  footnote 190.  In the next sentence you state
4  that:
5      "Note that while I am aware of the context
6  surrounding Mr. Ripps proclaimed 'criticism,' I do
7  not address the allegations made by Mr. Ripps, as
8  they are not germane to my assignment or
9  opinions."
10     Do you see that?
11   **A   I do.**
12   Q   What context are you referring to in
13 this paragraph?
14   **A   I think what I'm referring to, as we**
15 **talked about already, is that Mr. Ripps has made**
16 **some allegations and that's not what I -- I'm not**
17 **focused on the allegations of racism, for example,**
18 **that Mr. Ripps has made.  I'm focused on how the**
19 **BAYC -- the RR/BAYC NFTs, the minting of them, has**
20 **damaged the BAYC brand and Yuga as an**
21 **organization.**
22   Q   Let's turn to paragraph 9 of your
23 report.
24   **A   Yep.**
25   Q   In the second sentence you state that:

---

**45**

1  "Brand equity is derived from brand
2  awareness, perceived equality, and brand
3  associations or perceptions that consumers have of
4  that brand."
5      Do you see that?
6  **A  I do, yes.**
7      Q    And later in that same paragraph you
8  say that:
9      "Brand equity can be damaged through
10  negative associations."
11      Correct?
12  **A  I see that, yes.**
13      Q    So if a brand becomes associated with
14  something that has a negative perception
15  (inaudible) brand equity, correct?
16  **A    That part cut out a little bit.  Can**
17  **you say that one more time?**
18      Q    Sure.
19          If a brand becomes associated with
20  something that has a negative perception, can
21  that -- strike that.  Let me ask a clearer
22  question.
23          If a brand becomes associated with
24  something that is negatively viewed in society,
25  that can harm brand equity, correct?

**46**

1  **A    I think what you're asking me, as I**
2  **talk about in my report, is, yes, my analyses and**
3  **opinion is that the minting of the RR/BAYCs**
4  **reduced the scarcity and exclusivity of the BAYC**
5  **NFTs, created consumer confusion, and damaged the**
6  **brand through its negative associations.**
7      Q    And so we can generally agree, if
8  Yuga's brand were to become associated with
9  racism, that could be harmful to their brand,
10  correct?
11      MS. MELCHER:  Objection, vague.
12  Hypothetical.
13      THE WITNESS:  I'm not sure how you took
14  my answer and went to this next question.
15          I was -- I was talking about the
16  RR/BAYCs -- I don't -- I don't -- that's what my
17  report has focused on.
18  BY MR. GOSMA:
19      Q    Okay.  I'm moving on to this sort of
20  additional topic; it's not necessarily related to
21  the prior question.
22          The question is:  If Yuga's brand
23  became associated with racism, that could be
24  harmful to their brand, just as a general matter?
25      MS. MELCHER:  Same objection.

**47**

1      THE WITNESS:  It sounds like you're
2  asking me a hypothetical question.
3          I'm not sure -- yeah, so I don't -- I
4  don't feel comfortable speculating about a
5  hypothetical question.
6  BY MR. GOSMA:
7      Q    Okay.  Well, I mean, you're an expert
8  so you can entertain hypotheticals and my
9  hypothetical question is:  If the brand becomes
10  associated with racism or hate speech, that can be
11  negative for the brand, right?
12      MS. MELCHER:  Objection, incomplete
13  hypothetical, vague.
14      THE WITNESS:  I'm not aware that BAYC
15  or Yuga has been associated with racism or hate
16  speech.
17  BY MR. GOSMA:
18      Q    I'm -- my question is not about
19  (inaudible) at this point.  My question is:  As a
20  general matter, if a brand becomes associated with
21  (inaudible) that can be harmful --
22      (Court reporter interjection.)
23      MS. MELCHER:  Yeah, Mr. Gosma, we are
24  having a hard time hearing you.
25      REMOTE TECHNICIAN:  Mr. Gosma, can you

**48**

1  hear us?  Let me go ahead and message him.
2      THE VIDEOGRAPHER:  Counsel, would you
3  like me to read us off the record while we try to
4  recover Mr. Gosma?
5      MS. MELCHER:  Let's do that.  Thank you.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  The time is 11:58.
8      (Recess taken from 11:58 a.m. to 12:06 p.m.)
9      THE VIDEOGRAPHER:  We are back on the
10  record.  The time is 12:06.
11  BY MR. GOSMA:
12      Q    Welcome back, Dr. Berger, I apologize
13  for the technical issues.
14  **A    No problem.**
15      Q    Now, before the break, we were talking
16  about brand associations and in particular, we
17  were focused on paragraph 9 of your expert report;
18  do you recall that?
19  **A    Generally, yes.**
20      Q    Okay.  Are you aware of other brands
21  that have lost value for reasons that were
22  unrelated to consumer confusion?
23      MS. MELCHER:  Objection, vague.
24      THE WITNESS:  I'm not sure exactly what
25  you're asking.

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 40 of 75   Page ID
#:15996

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

38 (149 to 152)

---

**49**

1  BY MR. GOSMA:
2      Q  Well, you're an expert in branding and
3  marketing and so I'm asking you whether you're
4  aware of any examples of brands that have lost
5  value for reasons other than consumer confusion
6  with a counterfeit good?
7      A  Not off-hand, no.
8      Q  Okay.  Are you familiar with Enron?
9      A  I'm not sure what you mean "familiar
10  with Enron".
11     Q  Do you know what Enron is?
12     A  I know that Enron was a company, yes.
13     Q  And you understand that Enron was
14  embroiled in a scandal relating to various
15  financial crimes, right?
16         MS. MELCHER:  Objection, lacks
17  foundation.
18         THE WITNESS:  I -- I don't -- I don't
19  know what happened with Enron.  I'm not familiar
20  with that example.
21  BY MR. GOSMA:
22     Q  Are you familiar with the Weinstein
23  company?
24     A  The what?
25     Q  The Weinstein Company.

---

**50**

1      A  No, I'm not.
2      Q  Do you know who Harvey Weinstein is?
3      A  Generally.
4      Q  Okay.  You know Mr. Weinstein was
5  accused of various sexual misconduct, right?
6         MS. MELCHER:  Objection, lacks
7  foundation.
8         THE WITNESS:  I don't know what
9  Mr. Weinstein was accused of.  I'm not
10  particularly familiar with what's going on with
11  him.
12  BY MR. GOSMA:
13     Q  Okay.  Are you familiar with the
14  My Pillow brand?
15     A  My Pillow?
16     Q  Mm-hmm.
17     A  Not deeply, no.
18     Q  Okay.  Are you familiar with Wynn
19  casinos?
20     A  I know that there's a casino called the
21  Wynn.  I'm not particularly familiar with it, no.
22     Q  Okay.  Are you aware, as an expert in
23  marketing and branding of any instance where a
24  brand has lost value for a reason other than
25  consumer confusion?

---

**51**

1         MS. MELCHER:  Objection, vague.
2         THE WITNESS:  I think you asked me a
3  very similar question a couple of minutes ago and
4  I said I'm not aware of any examples off-hand.
5  BY MR. GOSMA:
6      Q  Okay.  All right.
7         Now, before the break we were talking
8  about the statement in your report that "Brand
9  equity can be damaged through negative
10  associations"; do you see that in paragraph 9?
11     A  Give me a second.
12        I see that in paragraph 9, yes.
13     Q  So if a brand becomes associated with a
14  negative concept like racism that can damage the
15  brand, correct?
16        MS. MELCHER:  Objection,
17  mischaracterizes testimony, incomplete
18  hypothetical.
19        THE WITNESS:  I feel like we already
20  talked about this.  You asked me to speculate
21  beyond my report.  I said I was uncomfortable
22  doing that and I wasn't sure exactly what you were
23  talking about.
24        I think we've already tread this ground
25  at least once, if not a few times already.

---

**52**

1  BY MR. GOSMA:
2      Q  Okay, so your testimony is you that you
3  don't know or won't answer the question of whether
4  being associated with racism can be harmful to a
5  brand, correct?
6         MS. MELCHER:  Objection,
7  mischaracterizes testimony.
8         THE WITNESS:  I think that
9  mischaracterizes my testimony.
10  BY MR. GOSMA:
11     Q  Okay.  Can being associated with racism
12  harm a brand?
13        MS. MELCHER:  Objection, vague,
14  incomplete hypothetical.  Asked and answered.
15        THE WITNESS:  I don't know what brand
16  you're talking about.  I don't know what specific
17  allegations you are talking about.  All of this
18  seems outside the scope of my expert report and
19  I've already answered it a few times.
20  BY MR. GOSMA:
21     Q  So I'd like to go back to your Twitter
22  sentiment analysis, and I'd like to ask:  Did your
23  Twitter sentiment analysis that you performed in
24  your financial report, indicate any increase in
25  engagement with the BAYC brand as an absolute

---

53

1  figure?  So, in other words, did the -- did
2  engagement overall with the BAYC brand increase or
3  decrease during the time period that you analyzed?
4      A  Can you --
5      MS. MELCHER:  Objection, vague.
6      THE WITNESS:  I'm happy to talk about
7  the Twitter analysis.  Can you direct me to the
8  specific paragraph that you are asking me about?
9  BY MR. GOSMA:
10     Q  I'm not asking about a specific
11  paragraph.  I'm just asking just whether your
12  analysis considered or measured the overall
13  engagement with the BAYC brand during the time
14  period or was limited only to instances involving
15  Mr. Ripps?
16     A  My analysis looks at both situations in
17  which consumers mention Mr. Ripps and RR/BAYC when
18  they talk about BAYC or the Yuga brand or
19  situations where they don't mention Mr. Ripps or
20  RR/BAYC.  So it's not limited to cases where they
21  mention RR/BAYC.
22     Q  Okay.  Was there an increase in the
23  absolute value of engagement with the BAYC brand
24  during the period that you analyze?
25     MS. MELCHER:  Objection, vague.

54

1      THE WITNESS:  I'm not sure what you
2  mean by "increase in absolute value of
3  engagement."
4  BY MR. GOSMA:
5      Q  Okay.  Your analysis looked at a
6  sampling of tweets over the period of May 6th
7  through the end of June, correct?
8      MS. MELCHER:  Objection,
9  mischaracterizes testimony.
10     THE WITNESS:  In -- for certain periods
11  it looked at all tweets about the brand but in
12  other cases it used a sample, yes.
13  BY MR. GOSMA:
14     Q  Okay.  And I think in your expert
15  report in Appendix B you explain which periods --
16     A  Yes.
17     Q  -- you sampled 100 percent of the
18  tweets.
19     A  That is correct, yes.  I sampled --
20  5 percent of the tweets in the most important
21  periods, there's a large volume of tweets about
22  the brand and so in other cases I sampled them at
23  a 5 percent rate to allow for enough data to be
24  collected given the data limitations imposed by
25  Brandwatch.

55

1      Q  And so during the period that you
2  analyzed, did you observe an increase in the
3  volume of tweets about BAYC over -- over any other
4  period?
5      A  I don't -- I don't remember off-hand
6  the exact volume in each -- in each particular
7  period.  I don't remember anything noteworthy.  If
8  something noteworthy had happened I would have
9  tried to address it, so I don't remember anything
10  noteworthy occurring, but I don't remember
11  off-hand.
12     Q  Using your report, is it possible to
13  determine the total volume of tweets during the
14  period that you sampled?
15     A  I'm not completely sure what you're
16  asking but one could certainly calculate the
17  volume of tweets over time about the brand.
18  That's certainly possible.
19     Q  Okay.  And my question is: As you sit
20  here today are you aware of any increase in the
21  volume of tweets about BAYC during the period that
22  you performed your Twitter sentiment analysis,
23  May 6th to the end of June 2022?
24     A  Am I aware of what?  What exactly are
25  you asking me if I'm aware of?

56

1      Q  Any increase in overall volume of
2  tweets relating to BAYC during the, you know,
3  during the time period that you analyzed versus
4  the prior time period.  What I'm -- colloquially,
5  sir, what I'm trying to understand is, did you
6  observe an increase in tweets about BAYC during
7  the time that you analyzed, the May to June
8  figure?
9      A  I think I understand what you're asking
10  and I think my answer is basically the same, which
11  is with any brand there is variation over time.
12  From one period to another it may increase, and
13  one period to another it may decrease.
14     However, I'm not aware of any notable
15  change here in a way that would somehow affect my
16  results, otherwise I would have -- if I was aware
17  of such a thing and thought it was problematic I
18  would have addressed it.  So I'm not aware that
19  anything like that here has occurred in a way that
20  would somehow change the results.
21     Q  Okay.  Now, in your prior work you've
22  written about controversy as a force in -- well --
23  strike that.
24     In your prior work you've written about
25  the role of controversy in marketing and branding,

**57**

1  correct?
2      A  I have, I believe, a paper on
3  controversy and conversation so I've looked some
4  at controversy in marketing, yes.
5      Q  Yeah, and in fact that's the paper I'm
6  referring to.
7          And you've written about how
8  controversy can actually increase interest in a
9  particular brand, right?
10     A  That people disagreeing about something
11  can encourage people to talk about that thing.
12     Q  Right.  So an increase in the -- well,
13  strike that.
14         Your paper also acknowledges that
15  discomfort can curb discussion, right?
16     A  It's been a little while since I've
17  looked at the paper but I believe we suggest that
18  strongly uncomfortable issues, like abortion for
19  example, while there is some controversy around
20  it, it may in some cases curb discussion because
21  people don't want to disagree about things that
22  may be felt so strongly.
23     Q  And in your paper you concluded that,
24  essentially, whether controversy increases
25  discussion or decreases discussion depends on the

**58**

1  context, correct?
2      A  I think it's been about 10 years since
3  I published that paper -- I don't remember exactly
4  when it came out -- and I don't remember exactly
5  what it shows and so I don't -- I don't want to
6  agree to some somewhat vague things about that
7  paper.
8          If there is a specific finding or
9  result or sentence in that paper, I'm happy to
10  look at it but I don't -- I want to be a little
11  bit careful about answering general things because
12  I think the paper is about 10 years old.
13     Q  Okay.  Well, I'd be happy to show it to
14  you, so if we can publish tab 9.
15         And you are right.  It was about 10
16  years ago that you published this paper.
17     A  I don't know exactly when, but if it
18  was published 10 years ago we probably worked on
19  it closer to 12 or 15 years ago.  So it's been a
20  little while.
21     Q  Yep.
22     A  Can somebody just let me know when
23  it's -- oh, ah, ah, it is showing up as 9 on mine;
24  is that correct?  It is actually not showing --
25     Q  Yes, it's 9.

**59**

1      A  Okay.  Yeah?
2      Q  So pop that open.
3      A  Okay.
4          (Exhibit No. 9 was marked for
5  identification.)
6  BY MR. GOSMA:
7      Q  So on page 33 of the paper, the page
8  numbers in the upper right of the --
9      A  And just, sorry, a quick question here.
10  This looks like to be a working paper version of
11  this paper.  I don't remember exactly what was in
12  any working paper version versus a final version
13  and so I don't know, looking at this, whether this
14  is the final version of the paper because it may
15  be different or it may not.  I don't remember
16  off-hand.
17     Q  Okay, understood.
18     A  So, sorry, you were saying a particular
19  page?
20     Q  Yeah.  Let me -- give me just a second
21  and I'm going to decide which of these two pages.
22         Actually, if you will go to page 8 of
23  the paper --
24     A  Okay.
25     Q  -- there is a subheading that reads,

**60**

1  "The moderating role of context"; right?
2      A  Yes.
3      Q  And under that heading you and your
4  co-author write:
5      "If controversy increases interest, which
6  increases the likelihood of discussion, and
7  discomfort, which decreases the likelihood of
8  discussion, then controversy's overall impact of
9  likelihood of discussion should depend on the
10  relative strength of these two underlying
11  processes.  We further test our underlying
12  conceptualization by examining the moderating role
13  of situational factors."
14         Do you see that?
15     A  I do, yes.
16     Q  So in understanding the impact that a
17  controversy can have, it is important to
18  understand the context surrounding that
19  controversy, right?
20     A  I think in this paper we specifically
21  look at whether people are talking to friends
22  versus strangers and whether their identify is
23  anonymous or not.
24     Q  Right, and those are examples of
25  context, correct?

**6**

1     A   I'm not sure exactly how you are using
2  the word "context" but these are factors that we
3  believe would moderate the processes that we
4  suggest are driving the link between controversy
5  and likelihood of discussion.
6     Q   Okay.  And I'm only using context in
7  the way that you use it here in the subheading on
8  this page, right, "The moderating role of
9  context".
10     So I'm just trying to establish that as
11 a general matter it is important to understand the
12 context surrounding a situation when you are
13 trying to analyze it, correct?
14     A   So but in that question --
15     MS. MELCHER:  Objection, vague.
16     THE WITNESS:  You just said you are
17 using it the way I'm using it in this paper and
18 the way I'm using it in this paper is specifically
19 whether people are anonymous or not or whether
20 they are talking to friends or strangers.  So that
21 is the role of context that I'm looking at in this
22 paper.
23     So yes, I agree that those two factors,
24 whether someone is talking to friends or strangers
25 and whether someone is anonymous or not, shapes

**62**

1  the impact of controversy on conversation.
2  BY MR. GOSMA:
3     Q   Okay, and you can set that aside now.
4     Now, you also said in your prior work
5  that bad publicity isn't always a bad thing,
6  right?
7     MS. MELCHER:  Objection, lacks
8  foundation.
9     THE WITNESS:  There are some situations
10 in which a negative -- some types of negative
11 publicity can have positive effects.  I've done
12 research on that general question.
13     I want to be careful about going beyond
14 that research to anything specific, without
15 knowing what you have in mind, but in general,
16 there are times where negative publicity can have
17 a positive impact.
18     If the notion is that's what's going on
19 here though, as is -- we've already talked about,
20 there's a demonstrated increase in negative
21 sentiment, discussion about the brand, so that
22 doesn't seem to be what's going on in the case at
23 BAYC.
24 BY MR. GOSMA:
25     Q   Well, I wasn't asking about BAYC.  I am

**63**

1  just asking that in your prior work you've stated
2  that negative publicity can -- bad publicity isn't
3  always a bad thing, right?
4     A   Again, just because negative publicity
5  isn't always negative, doesn't mean it is not
6  negative in a particular situation, and so I would
7  need to know what situation you're talking about
8  before we over-apply that statement.
9     Q   As part of your analyses in this case
10 did you perform any specific analysis on whether
11 there was any positive effect to negative
12 publicity associated with the minting of RR/BAYC?
13     A   Yes, if --
14     MS. MELCHER:  Objection, vague.
15     THE WITNESS:  -- there were positive
16 effects of the minting of RR/BAYCs, one would
17 expect the -- in figure 7, the green line to go up
18 after they're minted rather than down and the red
19 line to go down rather than up, and that's not
20 what we see.
21 BY MR. GOSMA:
22     Q   But the analysis in figure 7 -- let's
23 go to your report at figure 7.  I think it's
24 important that we do that in context.  So figure 7
25 is -- yeah, figure 7 is on page 53 just before

**64**

1  paragraph 89, so if you could go there.
2     A   Okay.
3     Q   Let me know when you're there.
4     A   I'm there.
5     Q   Okay.  Figure 7 only includes data
6  between May 6th, 2022 and June 27th, 2022,
7  correct?
8     A   That's what the figure focuses on, yes.
9     Q   Figure 7 does not include any data for
10 what happened to the BAYC brand after June of
11 2022, correct?
12     A   Sorry, if the notion was that somehow
13 that the minting of RR/BAYCs were benefiting the
14 brand, I'm not clear why we wouldn't see it over
15 this period.  And I'm not clear why in figure 8 --
16 that line, if what you were saying is true, should
17 look the opposite in figure 8 than it does, and so
18 both of those figures go against the notion that
19 the minting of RR/BAYCs are somehow benefiting the
20 BAYC brand.
21     Q   But you didn't do any analysis of any
22 period outside of the May 6th to June 27th, 2022,
23 correct?
24     MS. MELCHER:  Objection,
25 mischaracterizes testimony.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

42 (165 to 168)

65

1    THE WITNESS:  I didn't say I haven't
2  considered anything outside that.
3    As I talked about already, we've tread
4  this ground a few times, the analysis focuses on
5  that period because that's the most relevant time
6  period and the analyses directly contradict the
7  story you just tried to outline.
8  BY MR. GOSMA:
9    Q  But your analysis, at least at the
10  Twitter sentiment that is central to your report,
11  doesn't go beyond June of 2022, correct?
12    A  I've not idea why -- I am not clear of
13  any reason why RR/BAYC would damage the BAYC brand
14  during this period but would somehow magically
15  reverse outside of this time period.  I'm not
16  aware of any reason that would occur.
17    So I don't have any reason to believe
18  that that would be the case.
19    Q  Right, and so you assumed that after
20  this period, that the impact of RR/BAYC continued
21  to be negative, correct?
22    A  I'm not assuming anything.
23    MS. MELCHER:  Objection,
24  mischaracterizes testimony.
25    THE WITNESS:  I'm not assuming

66

1  anything.  You seem to intimate, building on my
2  prior research, that somehow negative publicity
3  would be a good thing in this case that somehow
4  after this time period things would magically
5  reverse and that the RR/BAYC minting would somehow
6  be beneficial for the BAYC brand and I'm saying
7  that I'm not aware of any reason that it would be
8  detrimental during this period but somehow
9  magically reverse outside this period.
10  BY MR. GOSMA:
11    Q  Well, you keep referring to it
12  pejoratively as magically reverse.  What's your
13  basis for suggesting that it couldn't have
14  reversed for some reason?
15    A  I -- I have done a bunch of work in
16  this space and analyzed a bunch of data like this
17  and I have never seen something like that occur.
18    I agree that, you know, the defense
19  might like for that to occur because that fits
20  with their story, but I'm not aware of any reason
21  that would happen and have not seen any similar
22  thing occur before.
23    Q  But you didn't do any empirical
24  research to confirm that belief, correct?
25    MS. MELCHER:  Objection,

67

1  mischaracterizes testimony, asked and answered.
2    THE WITNESS:  I've asked and answered
3  this question.  Based on interaction today, I feel
4  like any time period I would have examined, you
5  would have found a reason why I should have
6  examined a different time period, and I respect
7  that that is your job, but I don't have any
8  evidence to believe, and I have not seen any
9  evidence either in this case or more broadly that
10  would suggest that anything like what you're
11  suggesting would occur.
12  BY MR. GOSMA:
13    Q  All right.  Let's turn to Appendix C of
14  your report.
15    A  Okay.
16    Q  All right.  So in Appendix C you have
17  included some example tweets that you say suggest
18  that there's been confusion in the marketplace; is
19  that accurate?
20    A  I believe so, yes.
21    Q  All right.  And all of these social
22  media posts in Appendix C are from Twitter,
23  correct?
24    A  That's correct, yes.  Well, sorry,
25  sorry.

68

1    Q  I think that's right --
2    A  I would need to look -- I shouldn't
3  speak so cavalierly.  I am not sure whether that
4  is the case.  I would need to look more closely at
5  each individual example.  I know that some of them
6  are Twitter.  I don't remember off-hand.
7    There are a number here.  I don't
8  remember off-hand if all of them are from Twitter.
9    Q  Did you consider posts from social
10  media platforms other than Twitter as part of your
11  analysis in this case?
12    A  I often use Twitter data, both as an
13  academic and in my expert reports.  And when I use
14  Twitter data and have used other datasets I
15  haven't seen large differences between the two
16  when I've looked at them.
17    In this case, I certainly focused on
18  Twitter data for a number of reasons but I'm not
19  aware that things would somehow differ on a
20  different platform.
21    Q  And I hadn't yet suggested that there
22  was any difference.  My question was more simple
23  which is: Did you consider platforms other than
24  Twitter as part of your analysis, "yes" or "no"?
25    A  I'm certain -- sorry.  I imagine if

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 45 of 75   Page ID
#:26001
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023                                          43 (169 to 172)

69
1  I had looked for other examples of confusion on
2  other platforms I would have found a number on
3  other platforms just like I found a number on
4  Twitter.
5      Q   So the answer to my question is that
6  you did not consider data from platforms other
7  than Twitter, correct?
8          MS. MELCHER:  Objection,
9  mischaracterizes testimony.
10         THE WITNESS:  That's not what I said.
11 I said I don't think it's necessary to consider
12 data from other platforms.
13         I'm not sure that the results would
14 differ and I haven't seen any information that
15 suggests that it would.
16 BY MR. GOSMA:
17     Q   And, sir, I still have not suggested
18 that there was anything incorrect about your use
19 of Twitter.  I'm just asking for the fact:  Did
20 you consider anything other than Twitter?  I don't
21 need context about why you did it.  I'm asking the
22 question: Did you consider something other than
23 Twitter, "yes" or "no"?
24     A   I believe so, yes.
25     Q   Okay.  What other social media

70
1  platforms did you consider?
2      A   I used --
3          MS. MELCHER:  Objection, vague.
4          THE WITNESS:  I used examples from the
5  news media, as one I have top of mind that's up
6  there in -- let me go up -- figure 4, for example.
7  That's in the news media.  And also looks like
8  it's on Discord, I believe.
9          So that's one example.
10 BY MR. GOSMA:
11     Q   Okay.  Did your sentiment analysis that
12 we've been talking about, consider data from
13 social media types other than Twitter?
14     A   You've asked me this question at least
15 two or three times already, so my answer is the
16 same as the answers I gave you before.
17     Q   The reason I'm having to ask questions
18 multiple times is because I'm asking you "yes" or
19 "no" questions and you're giving me a paragraph
20 answer every time.
21         So I respect that it's your right to
22 answer the questions how you want to answer the
23 questions, just the same as it's my right to ask
24 the questions, and I'm not trying to be difficult
25 but I do need to get answers to these questions.

7
1          So, in Appendix C -- let's focus on
2  that -- do you know who the owners of any of these
3  social media accounts are?
4      A   I believe --
5          MS. MELCHER:  Objection, vague.
6          THE WITNESS:  I believe their handles
7  are listed with their content.
8  BY MR. GOSMA:
9      Q   Right.  And the handles are associated
10 with actual people, correct?
11         MS. MELCHER:  Objection, vague.
12         THE WITNESS:  I believe so, yes.
13 BY MR. GOSMA:
14     Q   And so my question is not whether you
15 know what their Twitter handles are but whether
16 you know the identity of any of the people that
17 made these posts.
18     A   I'm not sure what you mean if I know
19 their identity.
20         On page -- it's appendix page -- C,
21 page 2, there is a picture of a guy named Jason.
22 So I'm not sure -- I'm not sure what you're
23 asking.
24     Q   Sure, let's just use the example on
25 page 1 of Exhibit [sic] C, which is by a handle

72
1  called streetoshi; do you see that?
2      A   I do.
3      Q   "Streetoshi" is that person's Twitter
4  handle, correct?
5      A   Yes.
6      Q   Do you know who streetoshi is outside
7  of his Twitter handle?
8      A   I don't off-hand, no.
9      Q   And you don't know his first name and
10 last name for example, correct?
11     A   I started this conversation by giving
12 you Jason's name, which is on the next page, but
13 you've picked this first page, probably because
14 you wanted to pick one where the handle doesn't
15 have someone's name in it, but it looks like on
16 the next page there is someone's first name
17 associated with the handle.
18     Q   Right, but --
19     A   As the person who responds to them
20 below, they say, "This isn't real Jason,"
21 suggesting that at least that person also thinks
22 the user they're responding to's name is Jason.
23     Q   Okay.  Do you know for a fact that the
24 person's name is actually Jason in real life?
25     A   I don't know Jason, but it's clear that

---

73

1  that's what they are saying their name is and it's
2  clear that that's who -- the person who is
3  responding to them, thinks their name is as well.
4      Q   The point is that you don't actually
5  know the identities of any of the people in
6  Appendix C, correct?
7          MS. MELCHER:  Objection, vague.
8          THE WITNESS:  I'm not sure what you
9  either mean or exactly what you're getting at.
10 BY MR. GOSMA:
11     Q   Did you have a conversation or
12 otherwise interact with any of the people who
13 tweet -- whose tweets are included in Exhibit --
14 or Appendix C.
15     A   I did not directly talk to these
16 individuals, no.
17     Q   Did you make any effort to research who
18 they are or what kinds of posts they make on
19 Twitter?
20     A   I'm not completely sure why that's
21 relevant and, as we talked about already,
22 figure 4 -- I'll go back up there -- there's a
23 news channel which has a person on it who is going
24 by their real name mistakenly being confused due
25 to the RR/BAYC collection, and so it's clear that

---

74

1  real people, even in mass media channels,
2  Bloomberg, which is a major mass media channel,
3  are confused. So I'm not actually sure what
4  you're getting at.
5      Q   Sure. And I'm not talking about the
6  Bloomberg piece at the moment.
7          I'm talking about the tweets that you
8  chose to include in Appendix C and I'm asking
9  whether you made any effort to research those
10 people's backgrounds or what kinds of posts they
11 make on Twitter.
12         MS. MELCHER:  Objection, vague.
13         THE WITNESS:  And as I responded
14 already, I'm not sure why that's relevant here and
15 I believe I answered the question already.
16 BY MR. GOSMA:
17     Q   Well, respectfully it's not your place
18 here to evaluate whether my questions are
19 relevant. You are under oath and you need to
20 answer my questions.
21         So if the answer is, "I didn't evaluate
22 them," then you can say that. But whether you
23 find it relevant or not is not a basis not to
24 answer the question, so I'm going to ask it one
25 more time.

---

75

1      Q   Did you make any effort to research the
2  people who made the tweets that you included in
3  Appendix C, "yes" or "no"?
4          MS. MELCHER:  Objection, vague.
5          THE WITNESS:  First, just to be clear,
6  sorry, I shouldn't have said what I said a moment
7  ago, I agree you are allowed to ask whatever
8  questions you want to ask and I will -- even if I
9  don't understand why they're relevant I will do my
10 best to answer them. So my apologies.
11         In response to this specific question,
12 I believe I already answered. You asked me if I
13 spoke to these individuals. As I said already, I
14 did not speak to these individuals. These are
15 examples of consumer confusion, as is the one in
16 the mass media.
17         I bring up the one about the mass media
18 because it is an indication of the degree to which
19 consumers and even mass media outlets, who have a
20 responsibility to be as accurate as possible, are
21 confused.
22         I'm not saying these are the only
23 examples of consumer confusion and I did not speak
24 to these specific individuals.
25 BY MR. GOSMA:

---

76

1      Q   Understood. But the tweets that you
2  chose to include in Appendix A aren't the only
3  ones that you included -- strike that.
4          The tweets -- you chose the tweets to
5  include in Appendix C, correct?
6      A   Yes.
7      Q   Okay. And those are the tweets that
8  you chose to rely on as part of your analysis of
9  likelihood of confusion, correct?
10     A   I think as I said a moment ago, these
11 are examples of consumer confusion.
12     Q   Okay. Did you make any effort to
13 determine whether any of the people making the
14 tweets in Appendix C are supporters of Ryder
15 Ripps?
16         MS. MELCHER:  Objection, vague.
17         THE WITNESS:  I'm not sure what you're
18 asking.
19 BY MR. GOSMA:
20     Q   Did you make any effort to determine
21 whether the tweets made -- strike that.
22         Did you make any effort to evaluate
23 whether the tweets included in Appendix C were
24 made sarcastically?
25     A   The content suggests -- of a number of

---

**77**

1     them, including the fact that a major media outlet
2     got this wrong, suggests that -- I mean, the major
3     media outlet is not doing this sarcastically.
4     They didn't come up with this on their own. They
5     came up with this because they are made up of
6     people that must have been confused.
7         You know, I can't imagine what happened
8     to them as a result of this but I imagine their
9     bosses were not happy about this and so it doesn't
10    suggest that they are doing it in a sarcastic way.
11      Q   But you don't know one way or another,
12 at least for the tweets in Appendix C, what the
13 intent of the person that made the tweet was,
14 right?
15       MS. MELCHER: Objection, vague.
16       THE WITNESS: I'm not sure what you're
17 asking me.
18 BY MR. GOSMA:
19      Q   I'm asking you whether you know the
20 intention that the folks that made these tweets
21 had when they made the tweets?
22      A   I think my answer -- I did not speak to
23     specific individuals and these are examples of
24     consumer confusion.
25       I'm not saying these are all the tweets

**78**

1     that are out there but, taken together, this
2     information casts strong doubt on the notion that
3     nobody was confused and somehow everyone was doing
4     it sarcastically. If that was the case, I'm not
5     sure why Bloomberg would have gotten it wrong.
6      Q   I didn't ask whether everyone was doing
7 it sarcastically. I just asked whether you, as
8 you sit here today, are testifying about what
9 these folks meant when they made these tweets?
10     A   Can you ask the last part of that
11    question again. I'm not sure I caught it.
12      Q   Sure. Are you offering an opinion
13 today about what the people intended to convey
14 with their tweets that are included in Appendix C?
15       MS. MELCHER: Objection, vague.
16       THE WITNESS: In my report, in
17 paragraphs 73, 74, 75, in that section of the
18 report, I discuss confusion. I use examples from
19 Twitter, as well as on Bloomberg Crypto, and
20 discuss individuals who clearly seem to be
21 confused. And so that's -- those are examples of
22 me -- sorry, examples for me they suggest that
23 there's confusion in the marketplace.
24 BY MR. GOSMA:
25      Q   How did you decide which tweets to

**79**

1 include in this appendix?
2      A   I don't -- I don't remember off-hand.
3      Q   Did you choose them yourself or did
4 your assistants choose them?
5      A   I believe I answered that question
6     already. I decided to put them in this report. I
7     don't remember, though, how I picked these in
8     particular.
9         But I think, actually, sorry, to add to
10   my prior response, I should have been a little bit
11   more careful, also in paragraph 76 I also discuss
12   confusion in the marketplace about Mr. Lehman's
13   concerns about trademark infringement, and how
14   similar the things are.
15         Mr. Hickman, it looks like, when
16   deposed, said that the RR/BAYC Foundation website
17   looks to be Bored Ape Yacht Club, so it's not
18   just -- I understand that your questions are about
19   some specific tweets, but to me it is the
20   preponderance of evidence across examples of
21   tweets, mass media outlets and other things that I
22   discuss in paragraph 76 that's leading me to reach
23   the conclusion that there is confusion in the
24   marketplace.
25      Q   Okay, I understand. To be clear, I'm

**80**

1 not asking you about just any random tweets; I'm
2 asking you about tweets that you chose to include
3 in your report, but let's just talk about some
4 tweets specifically, okay? Let's -- and let's
5 start with the very first one that you included in
6 Appendix C which is the streetoshi tweet.
7        You've already established that you
8 don't know who streetoshi is, right, other than
9 that he's a person on Twitter named streetoshi,
10 right?
11     A   I think I answered your question when
12   you asked it earlier.
13      Q   And you don't know whether streetoshi
14 is a Ryder Ripps supporter or a Yuga supporter,
15 correct?
16       MS. MELCHER: Objection, vague.
17       THE WITNESS: I don't know what you
18 mean by "supporter".
19 BY MR. GOSMA:
20      Q   Whether he likes Ryder Ripps or he
21 likes Yuga Labs?
22      A   I'm not -- I'm not clear what you're
23   asking.
24      Q   Yeah, so you don't know streetoshi's
25 views on, for example, this lawsuit, right?

Transcript of Jonah Berger, Ph.D.

Conducted on March 9, 2023

---

**8**

1    A   Was this lawsuit made at the time that
2 he made this tweet?
3    Q   No, but you don't know what his stance
4 on it is now, correct?
5    A   I'm sorry, I'm confused.  He couldn't
6 have -- if the lawsuit happened after he made this
7 tweet then the lawsuit could not have impacted his
8 tweet.
9    Q   I'm not suggesting that it did.  Did
10 you do anything to assess whether streetoshi was
11 being serious or sarcastic in his tweet?
12       MS. MELCHER:  Objection, vague.
13       THE WITNESS:  I'm not sure exactly what
14 you mean.  As I mentioned already though, I'm not
15 picking on any one individual tweet.  These are a
16 number of examples.  There are also examples from
17 mass media, where clearly no one is trying to be
18 sarcastic, as well as, I believe, depositions in
19 this case that indicate confusion, and so I'm not
20 relying on one tweet made by one person.  I'm
21 relying on a preponderance of evidence across a
22 variety of different domains.
23 BY MR. GOSMA:
24    Q   I understand that you are relying on
25 many sources of evidence, but this is one of the

---

**82**

1 sources of evidence that you relied on so that's
2 why I'm asking you about it.
3       Did you look at any of streetoshi's
4 other tweets?
5    A   I don't -- I don't remember.
6    Q   Okay.  Let's go to the next tweet which
7 is from Jason.ip.  That's on page 2 of Appendix C.
8 Do you have that in front of you?
9    A   I do, yes.
10    Q   So there is a -- the main post is
11 hashtag NewProfilePic and's got a picture of a
12 Bored Ape, right?
13    A   I don't know --
14       MS. MELCHER:  Objection, lacks
15 foundation.
16       THE WITNESS:  It looks like it's a
17 picture of the collection created by Ryder Ripps.
18 I think that's part of what this case is about.
19 It might look like a BAYC, but it's not.  That's
20 the point.
21 BY MR. GOSMA:
22    Q   But you don't know one way or another,
23 which one it is, right?
24    A   Well, the conversation below seems to
25 suggest that he was deceived, but I think part of

---

**83**

1 the problem is nobody can tell whether it's a real
2 one or a fake one.  That's part of what the case
3 is about.
4 BY MR. GOSMA:
5    Q   Is Jason even displaying the ape image
6 as his profile picture?
7       MS. MELCHER:  Objection, vague.
8       THE WITNESS:  I'm -- I'm not sure.
9 He's saying this is his new profile picture.
10 BY MR. GOSMA:
11    Q   The reply that you've got here, from
12 XRPwh4le.eth, that user appears to indicate that
13 they understand that that's not an authentic Bored
14 Ape Yacht Club NFT, correct?
15       MS. MELCHER:  Objection,
16 mischaracterizes the document.
17       THE WITNESS:  I'm not clear what you're
18 asking here.
19 BY MR. GOSMA:
20    Q   Well, he says "this isn't real," right?
21    A   And has a -- it appears that this
22 person isn't sure that it's real.  They are asking
23 a question.  "This isn't real Jason?", and then
24 goes on to say what they go on to say.
25       So it seems like they're not a hundred

---

**84**

1 percent sure that it is not real, but they think
2 it's not real.
3    Q   But you didn't make any attempts --
4    A   And later it goes on to sir --
5       -- (overspeaking) --
6    Q   Sorry, I didn't mean to cut you off.
7    A   No problem.  I paused for too long.
8       Later reached out, it looks like, to
9 Ryder Ripps saying:
10       "... what your doing is deceiving my guy.
11 Not the way."
12       So it seems like at least this
13 individual thinks Jason was deceived and is not
14 seeing the situation positively.
15    Q   Did you make any effort to determine
16 whether Jason was being ironic or sarcastic by
17 posting this picture?
18       MS. MELCHER:  Objection, vague.
19       THE WITNESS:  I totally understand this
20 line of questioning and I appreciate it but it
21 would probably take a long time for us to go
22 through each of these individual tweets and have
23 the same conversation for all of them and I'm
24 happy to do that if you like.
25       As I have said already though, I did

---

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 49 of 75   Page ID
#:26009
HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
47 (185 to 188)

---

85

1  not talk to any of these individual people who
2  tweeted these things but I am not relying on any
3  one individual tweets and I'm also not saying
4  these are the only tweets.  It is clear that the
5  mass media was not being sarcastic, it is clear
6  that the people that were deposed are not being
7  sarcastic, and so I'm happy to go through these
8  set of questions individually for each single
9  tweet.
10      My answer is probably going to be the
11  same:  I'm not relying on any one individual one,
12  but I, again, did not talk to Jason himself.
13  BY MR. GOSMA:
14      Q   Understood.  And I'm not trying to
15  waste your time and I'm trying to be as efficient
16  as I can but I do --
17      A   I understand, I understand.
18      Q   I do feel like I have got to go through
19  some of this stuff, so bear with me.
20      A   I understand.
21      Q   Let's go to the GemBot tweet on page 4.
22      A   GemBot, hold only one second.  Oh,
23  sorry I heard you say "Jim".  GemBot.  Okay, I
24  believe I'm looking at that, yes.
25      Q   Okay.  All right.  Are you aware of

---

86

1  what a bot account is on Twitter?
2      A   Generally, yes.
3      Q   What's a bot account?
4      A   Bots can be used for a variety of
5  different things.  In this one it seems like the
6  bot is buying things, so I'm not sure exactly --
7  sorry, I should be precise.
8      I don't know whether this is a bot or
9  not.  I know what the name of the account is.  It
10  seems like this person has bought -- someone has
11  bought a -- what they thought was a Bored Ape
12  Yacht Club for 5.99 ETH and this is a picture
13  of it
14      Q   Okay.  Does the fact that someone
15  purchased a Ryder Ripps Bored Ape Yacht Club
16  suggest that they thought they were buying a BAYC
17  NFT?  Does the simple fact of the purchase suggest
18  confusion; is that what you are saying?
19      A   I'm not entirely sure I followed the
20  question.  I'm -- there's nothing in the text of
21  this tweet saying that it's a Ryder Ripps BAYC.
22  They are saying that they purchased a Bored Ape
23  Yacht Club for this amount.
24      So it doesn't -- I'm not aware that it
25  announces itself as an RR/BAYC.

---

87

1      Q   Yeah, and what I was getting at is that
2  in your prior answer you made the suggestion that
3  the person who purchased this NFT believed they
4  were buying an authentic Bored Ape Yacht Club and
5  I am asking you whether that's what you meant or
6  whether you were trying to say something slightly
7  different or not?
8      A   I'm only speaking in this particular
9  example here because you said you would like to go
10  through a few of them and so I entirely
11  understand, so I'm trying to be specific to this
12  specific example.
13      There is no information in this initial
14  tweet that says anything about it being an RR/BAYC
15  as far as I can tell.
16      Q   Yeah, I understand that, but you are
17  not offering any opinion that the person who
18  actually purchased the NFT was confused or not,
19  correct?  You don't know that one way or another?
20      MS. MELCHER:  Objection, incomplete
21  hypothetical.
22      THE WITNESS:  Give me a second here.
23      There are also a lot of comments below
24  this, so I am trying to sift through the comments.
25  BY MR. GOSMA:

---

88

1      Q   Sure, and we are going to talk about
2  those in a second.
3      A   Okay, great.
4      Q   It might surprise you to know.
5      A   Yeah.  I will say a couple of things.
6  If this person believes they bought an -- a
7  non-counterfeit original BAYC, they are confused.
8      And if they're not personally confused,
9  they are still putting it out there in the
10  marketplace, like, this is a BAYC, a traditional
11  BAYC bought for a low price, which would
12  undermine, regardless if they personally were
13  confused or not, would undermine other people's
14  perception of the value of actual BAYCs.
15      And so whether or not they themselves
16  are confused or not, this is not good for the BAYC
17  brand.
18      Q   Now, in the comments below there are
19  multiple comments that refer to the RR/BAYC
20  project, right?
21      A   Some do and some don't.  It appears
22  like some people are surprised and thinking why is
23  this thing so cheap.  And other people, some
24  people are noting that it's probably an RR/BAYC,
25  but it doesn't seem like -- sorry, not "doesn't

---

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

48 (189 to 192)

---

89

1  seem," everybody clearly doesn't know that
2  although some people in this chain do.
3      Q   You'd agree, though, that when you see
4  a surprising headline on a social media site, one
5  thing that people often do is go they'll read the
6  comments to get context, right?
7          MS. MELCHER:  Objection, incomplete
8  hypothetical.
9          THE WITNESS:  I appreciate the
10  question.  I can't speak generally about what
11  people do.  I don't know -- there are cases where
12  people read comments.  There are cases where
13  people don't read comments.
14          I'm sure some of the people that saw
15  this post saw some, but not all of the comments,
16  and I'm sure many of the people who saw this post
17  did not see any of the comments.  So I can't speak
18  to exactly what proportion of the people who saw
19  this post read which proportion of the comments.
20  BY MR. GOSMA:
21      Q   Let's turn to Appendix D.
22          Appendix D, we looked at really briefly
23  earlier but it contains sort of the algorithm, as
24  it were, for your Twitter sentiment analysis,
25  correct?

---

90

1      A   It's the -- yeah, it's the data
2  collection processing details of how I conducted
3  that analysis.
4      Q   So for your Twitter sentiment analysis
5  you relied on tweets collected and stored by
6  Brandwatch, right?
7      A   Yes.
8      Q   What is Brandwatch?
9      A   It's like a social media data and
10  consulting firm.  It provides social listening
11  capabilities and access to social media data.
12      Q   Do you personally have any affiliation
13  with Brandwatch?
14      A   I am not sure what you mean by
15  "personal affiliation".  I don't -- I don't -- I'm
16  not -- I don't own Brandwatch.  I am not connected
17  in that way.  I have used their data for research
18  purposes before but that's the only extent of my
19  affiliation with them.
20      Q   Okay.  And what made you choose
21  Brandwatch for this particular exercise?
22      A   I've used them in other cases and
23  academic work.  I'm not aware of another vendor
24  that has better data so I was just looking for the
25  best data I could find and this is, at least up

---

91

1  until this point, the company that has the best
2  data.
3          If that changes I will use a different
4  company.
5      Q   And this is sort of out of curiosity.
6  What's the basis for your conclusion that
7  Brandwatch has the best data?
8      A   For other projects I've done I've
9  looked at multiple vendors and tried to find out
10  what data they have access to, how good that data
11  is, how careful they are with their data, and so
12  in doing that work I found Brandwatch to be the --
13  I should be careful.
14          Nobody is better -- I'm not saying that
15  nobody else has good data or that all the other
16  firms are bad, I'm just saying that Brandwatch is
17  good and in the evaluation I've done it seems like
18  -- it seems to me to be the best -- there isn't a
19  better place to use.
20      Q   Was there a cost associated with using
21  Brandwatch?
22      A   Yes, you have to pay them for access to
23  the data, yes.
24      Q   Approximately how much was the -- did
25  the data cost in this case?

---

92

1      A   I don't -- I don't remember off-hand.
2      Q   Do you have a sense -- I mean, you said
3  you've used them before, can you give me a
4  ballpark for what an analysis like this costs.
5  I'm not asking for the exact figure but I need to
6  understand what it costs.
7      A   I don't -- I don't have a memory of
8  that.
9          MS. MELCHER:  Objection, calls for
10  speculation.
11  BY MR. GOSMA:
12      Q   Okay.
13          Now, the only social media post that
14  you relied on for your Twitter sentiment analysis
15  came from Brandwatch, right?
16      A   I believe we've been over something
17  like this already.  As I state here, Brandwatch is
18  the source for the data of my Twitter analysis.
19      Q   And Twitter was the only platform for
20  which you used Brandwatch data, right?  I believe
21  I asked you that before but I'm asking you again.
22      A   I only used Brandwatch data from
23  Twitter.  That's the -- that's the focus of my
24  analysis, Twitter data focus.
25      Q   Okay.  So you didn't analyze any posts

---

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 51 of 75   Page ID
#:26007

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

49 (193 to 196)

---

93

1  on Reddit, correct?
2      A   As we talked about already --
3          MS. MELCHER:  Observation, vague.
4          THE WITNESS:  -- if somebody on the
5  other side wants to analyze another channel,
6  that's totally fine.  This seemed like the best
7  data to look at for this question.  I don't
8  believe that looking at another channel would lead
9  to different results.
10 BY MR. GOSMA:
11     Q   And your testimony is you don't know
12 what it would cost to conduct an analysis of
13 another channel, correct?
14         MS. MELCHER:  Objection,
15 mischaracterizes testimony.
16         THE WITNESS:  I don't think that's what
17 I said, no.
18 BY MR. GOSMA:
19     Q   Well, you said you didn't know how much
20 it cost to use Brandwatch, right?
21     A   I said I didn't remember in this
22 particular instance how much this data cost.
23     Q   And you don't know exactly how much
24 money you've been paid to conduct this analysis in
25 this case, right?  You only could provide a

---

94

1  ballpark.
2          MS. MELCHER:  Objection,
3  mischaracterizes testimony.
4          THE WITNESS:  I'm not sure that's
5  exactly what I said.  I don't believe that's
6  exactly what I said.
7  BY MR. GOSMA:
8      Q   Sir, you understand that it costs money
9  for a person, especially an individual, to conduct
10 an analysis of social media data, correct?
11         MS. MELCHER:  Objection, vague.
12         THE WITNESS:  I also understand it
13 costs individuals monies to pay lawyers to spend
14 time on things so -- and it costs money for
15 companies to defend themselves against
16 allegations, whether or not those allegations are
17 relevant.  So all these things require resources.
18 BY MR. GOSMA:
19     Q   Right and some companies have more
20 resources than others, right?
21         MS. MELCHER:  Objection, vague.
22         THE WITNESS:  I don't know in
23 particular what you're talking about here.
24 BY MR. GOSMA:
25     Q   All right.  So we know you limited your

---

95

1  brand analysis to Twitter and I know you've
2  offered the opinion that your Twitter analysis was
3  sort of representative but I'd like to understand
4  a little bit better why you believe the Twitter
5  data alone is sufficient to evaluate the entire
6  marketplace and all consumer sentiment, as you
7  appear to have assumed in your report.  So if you
8  could explain that a little bit more I would
9  appreciate it.
10         MS. MELCHER:  Objection,
11 mischaracterizes testimony.
12         THE WITNESS:  There are a number of
13 things you just said I either didn't say or don't
14 agree with, so if you wouldn't mind asking a more
15 specific question, I'm happy to try to answer.
16 BY MR. GOSMA:
17     Q   Sure, I'll try to break it down for
18 you.
19         Why did you limit your brand analysis
20 to Twitter only?
21     A   I didn't say I limited it.  I said that
22 this is an example of an analysis that somebody
23 could conduct and I already said that I don't
24 think a different channel would show different
25 results.

---

96

1      Q   Why would a different channel not show
2  different results?
3      A   Because I've -- in my academic work and
4  other situations, having in some cases examined
5  things across multiple channels, I haven't seen a
6  difference in those instances.
7      Q   Are the user bases of different social
8  media platforms ever different?
9          MS. MELCHER:  Objection, vague,
10 incomplete hypothetical.
11         THE WITNESS:  I'm not sure exactly what
12 you're asking.
13 BY MR. GOSMA:
14     Q   Sure.  Is the user base for Reddit the
15 same as the user base for Twitter?
16     A   I don't know off-hand.
17     Q   Is the user base for Twitter the same
18 as the user base for TikTok?
19         MS. MELCHER:  Objection, lacks
20 foundation.
21         THE WITNESS:  I'm not sure exactly what
22 you mean by "the same".  If there's some
23 particular data you'd like me to look at, please
24 put it in front of me and I'm happy to consider
25 it, but there are many ways in which the people on

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 52 of 75   Page ID
#:26008
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
50 (197 to 200)

97

1  these different platforms are the same and
2  further, this is not just a couple of individuals;
3  this is hundreds of thousands of social media
4  posts from a large number of people over a decent
5  period of time.
6         And so even if there are small
7  differences across platforms on a particular
8  dimension, I have no reason to believe that that
9  would change the conclusion of this analysis.
10 BY MR. GOSMA:
11    Q   Where in your expert report do you
12 attempt to justify your reliance on only Twitter
13 data for your empirical analysis?
14        MS. MELCHER:  Objection,
15 mischaracterizes testimony.
16        THE WITNESS:  I understand you are just
17 doing your job, but whatever analysis I had done
18 you would have said there is another platform.
19        If I had done three platforms you would
20 have said, "Why didn't you do this fourth one?"
21 If I did a fourth one, you would have said, "Why
22 didn't you do this fifth one?"
23        And so there's no number of analyses
24 that someone could not ask, "Why didn't you use
25 this additional platform," when in my own academic

98

1  research, when I publish academic papers, you held
2  up a paper earlier of mine on controversy-causing
3  conversation, I didn't look at every single social
4  media platform in that paper.  I looked at one
5  platform, I believe, in one of the studies and did
6  some experiments.  So this is a standard way of
7  testing things and I haven't seen any data that
8  suggests the conclusions would be different on a
9  different channel.
10 BY MR. GOSMA:
11    Q   And the reason that you haven't seen
12 any data that would suggest that there would be a
13 difference is because you didn't look, right, sir?
14        MS. MELCHER:  Objection,
15 mischaracterizes testimony.
16        THE WITNESS:  That's not correct.
17        MS. MELCHER:  Mr. Gosma, I think we're
18 ready for a break pretty soon.
19        If you want to finish up this line of
20 questioning, we need to take a little break.
21        MR. GOSMA:  Absolutely, Molly.  Let me
22 just see what else I've got on this line.
23        Yeah, we can take a break here.
24        MS. MELCHER:  I don't think we need a
25 long one unless anyone -- Dr. Berger, how are you

99

1  doing --
2         -- (overspeaking) --
3         THE WITNESS:  Just a quick general
4  question:  How much time do we have on the record
5  and another question which is --
6         MS. MELCHER:  Can we go off the record
7  before we --
8         THE WITNESS:  Oh, sorry, I thought we
9  did already.
10        THE VIDEOGRAPHER:  My apologies.  We
11 are going off the record now.  The time is 13:13.
12    (Recess taken from 1:13 p.m. to 1:38 p.m.)
13        THE VIDEOGRAPHER:  We are on the
14 record.  The time is 13:38.
15 BY MR. GOSMA:
16    Q   Welcome back, Dr. Berger.
17        Let's take a look at your report,
18 Exhibit 1, and let's stick with Exhibit --
19 Appendix D, which we were looking at before the
20 break.
21    A   Just to make sure I understand.  Should
22 I be in Appendix D or Exhibit 1?
23    Q   Appendix D of your report, which is
24 Exhibit 1 to this deposition so...
25    A   Oh, ah, got it, okay, sorry.  My

200

1  misunderstanding.  Yeah, thank you, great.  I'm in
2  Appendix D of my report.  Yes, thank you.
3     Q   Okay.  Now, in paragraph 3 you talk
4  about the sampling rates that you used for your
5  Brandwatch analysis; do you see that?
6     A   I do.
7     Q   And in particular you say that:
8         "Due to data limitations imposed by
9  Brandwatch, sampling rates varied based on the
10 time interval and total volume of tweets."
11        Do you see that?
12    A   I do.
13    Q   I think you explained this a little bit
14 before but I want to get that testimony in the
15 context of this, but what are you referring to
16 when you say "data limitations imposed by
17 Brandwatch"?
18    A   Yeah, so Brandwatch in this case has
19 access to all the tweets that match the search
20 criteria but they will only share them with a
21 client like me in this case, a certain amount
22 today.  So I forget how many it is.  It may be
23 10,000, but I don't want to -- treat it as a
24 number X.  They will only give me X tweets a day.
25        And so in a case like this where we

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 53 of 75   Page ID
#:26009
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
51 (201 to 204)

20

1    want to get a large percentage of tweets, a large
2    number of tweets over a large period of time, the
3    number of days working with Brandwatch getting the
4    limited amount each day to get that full amount
5    would be prohibitive.
6          And so in situations like this,
7    particularly if there are periods of time where
8    there's a large amount of tweets, like 12/1/21 to
9    5/5/22, there are 2 million tweets over that
10   period, and so I'm just taking a random sample of
11   5 percent during that period.
12   Q    So who actually did the sampling? Was
13   it Brandwatch, you know, you told -- you said to
14   Brandwatch, "I want 5 percent of the tweets over
15   this time period"? Or how did that work?
16   A    Yes, yeah, so I'd just say I want
17   5 percent of the tweets over that period. That's
18   what I believe happened.
19   Q    Okay. And the date ranges that are
20   listed here in Appendix D, those are all date
21   ranges that you selected as part of your analysis,
22   right?
23   A    Yes, so similar as we talked about
24   before, I wanted to focus on the periods in which
25   Mr. Ripps released or minted the RR/BAYC

202

1    collections, as well as some time before that, and
2    so that's the period on which I focused.
3    Q    Okay. So the period from 12/1/21 to
4    5/5/22, you sample tweets at a 5 percent rate,
5    correct?
6    A    Yes.
7    Q    Why did you select 12/1/21 as the start
8    date for that range?
9    A    I wanted to look back on a number of
10   months prior to the period in which I was going to
11   focus on. I believe that's something around six
12   months prior, something like that.
13   Q    And was there any magic or thought that
14   went into using six months? I'm just trying to
15   understand the reason you picked that date in
16   particular.
17   A    There is no magic, and in Appendix E I
18   wanted to look at -- to see whether a proportion
19   of tweets about BAYC referenced Mr. Ripps or
20   RR/BAYC prior to the point at which the collection
21   was minted. I mean, it doesn't seem like that's
22   the case.
23         So I wanted to be able to look at a
24   large enough window prior to the period to get a
25   sense of whether the brand was only mentioned in

203

1    coordination with Mr. Ripps or RR/BAYC when
2    RR/BAYCs were minted and that's what -- what this
3    figure suggests or somehow they had been connected
4    previously and it doesn't seen like that is the
5    case.
6    Q    I'm not a statistician, but what is the
7    basis for the use of a 5 percent sampling rate?
8    Why is that a statistically significant sample?
9    A    I'm not doing a statistical
10   significances test here. There's no statistical
11   significance test. There are 95,000 tweets.
12   That's more than enough to get a sense of what's
13   going on.
14         An even smaller percentage would be
15   fine. It's a random sample. And so a random
16   sample matches the population and as you can see
17   in Appendix E there's really nothing going on
18   during that period that mentions Mr. Ripps and
19   RR/BAYC. So it didn't need to be that large, but
20   that seemed like a reasonable number.
21   Q    Okay. So just so I have it, you did
22   not conduct a statistical significance analysis
23   for that 5 percent sample, correct?
24         MS. MELCHER: Objection, misstates
25   testimony.

204

1          THE WITNESS: That's not what I said.
2    And I'm not sure what statistical significance
3    test one would need to conduct there.
4          It's a random sample and it serves the
5    purpose it needs to.
6    BY MR. GOSMA:
7    Q    Okay. My question is: Why is a -- I
8    know you, sort of, started to touch on this but I
9    really want to dig into why you felt a 5 percent
10   sampling rate where you get 100,000 out of
11   2 million tweets essentially, why that was a
12   representative sample of the totality of what was
13   being said on Twitter during that five- or
14   six-month timeframe?
15   A    That's what a random sample is.
16   Q    Well, I'm trying to understand why it
17   is that a random sample -- I mean, I understand
18   what a random sample is, and I understand that
19   random samples are used in all kinds of studies,
20   but the amount of, you know, the percentage of
21   sample that you take has something to do with the
22   validity of the sample, right?
23         So if my -- if my sampling rate was
24   0.1 percent and I got 100 out of 2 million tweets,
25   you know, I'm not sure that would be sufficient to

205

1 be able to make a generalized statement about, you
2 know, the totality of what was being talked about
3 at a given time. So how did you decide that
4 5 percent was a sufficient sampling rate?
5 **A You asked this question once already**
6 **and I answered you. I told you that I could have**
7 **done a much smaller rate and that would still have**
8 **been fine, but to be more comprehensive I used a**
9 **larger number that I felt was needed.**
10 Q Well, okay, why is it -- and this is
11 where the disconnect is, why is it that a smaller
12 sampling rate of 5 percent would have been
13 sufficient to make generalizations about the
14 totality of what was going on during that time
15 period?
16 **A As we've talked about already, it is a**
17 **random sample, 95,000 tweets is a large number of**
18 **tweets. There aren't that many time points that**
19 **I'm looking over. This is more than enough data**
20 **to answer the question.**
21 Q And did you put anything in your report
22 to justify that sampling rate or is it just
23 something it -- or are you just saying that it is
24 a sufficient rate?
25 **A I've been an academic for a number of**

206

1 **years now. I understand that your job is to try**
2 **to pick at things. If you want to have a**
3 **statistician look at this, they'll say it's fine.**
4 **So I don't really have anything else to**
5 **say here. This is more than enough sample to**
6 **answer the question that we're answering.**
7 Q Okay. But you, yourself, are not a
8 statistician, correct?
9 **A I have worked on a number of papers**
10 **with statisticians so I'm -- this is more than**
11 **enough data.**
12 Q Okay. Let's look at the next time
13 period which is May the 6th, 2022 to May the 19th,
14 2022. And during this time period you collected
15 all tweets, correct?
16 **A Yes.**
17 Q Why did you decide for that period to
18 collect all tweets?
19 **A We went over this already but as I said**
20 **the times that are most important here are the**
21 **times in which the RR/BAYC things are being**
22 **minted.**
23 **In this case that's -- I forget --**
24 **5/11, 5/13, something like that, so I wanted to**
25 **have as much sample as possible around those time**

207

1 **periods. And so I took all tweets during those**
2 **two time periods, given those are the most**
3 **important time periods and then, given this other**
4 **time period, the first time period isn't as**
5 **important and the middle time period isn't as**
6 **important, I took a smaller percentage during**
7 **those periods to deal with the data limitations**
8 **imposed by Brandwatch.**
9 **But all of these are random samples.**
10 **None of the sampling -- sampling does not affect**
11 **the conclusions and if that's something the**
12 **defense is concerned about, they're more than**
13 **welcome to sample a larger sample and test it**
14 **themselves.**
15 Q But we've already established, sir,
16 that hiring an expert witness to do an analysis is
17 a costly endeavor, right?
18 MS. MELCHER: Objection, misstates
19 testimony.
20 THE WITNESS: I'm not -- I'm not sure
21 what you're asking me.
22 BY MR. GOSMA:
23 Q Let's talk about the exclusions that
24 you applied, just very briefly, and I think I know
25 why you did this but I'd like to get an answer.

208

1 You applied certain strings that were
2 excluded from your analysis. Why did you do that?
3 **A Yeah, so in some cases the tweets are**
4 **not about BAYC, they're about something else. But**
5 **they want to get people's attention. So they**
6 **might include something like BAYC in a tweet**
7 **that's not about the brand with the goal of**
8 **somehow drawing people's attention to it.**
9 **Similarly, there are cases where the**
10 **brand might be mentioned because they're doing a**
11 **giveaway or because they're trying to encourage**
12 **people to like and retweet a post. Those posts**
13 **are not about the brand, per se, there are other**
14 **types of things.**
15 **And so to exclude competitions and**
16 **giveaways which are not about people's attitudes**
17 **towards the brand, they are just about**
18 **competitions and giveaways that happen to mention**
19 **the brand, I use those search strings to clean the**
20 **data as I've done in other similar reports and in**
21 **my academic work.**
22 Q And with respect to tweets from
23 Mr. Ripps and Mr. Cahen, you excluded those tweets
24 from your analysis?
25 **A Yes.**

209

```
1      Q   Why did you do that?
2      A   Well, that isn't consumer attitudes
3  towards the brand; that's those two individuals
4  who are part of this case, its attitudes towards
5  the brand and that might bias the results.
6      Q   So when you say that tweets from those
7  accounts were excluded there is -- strike that.
8          The next paragraph or paragraph 5 on
9  page 2 of Appendix D says:
10         "All engagement types ('tweet,' 'retweet,'
11 'reply,' and 'quote') are considered in the
12 analysis."
13         Do you see that?
14     A   I do.
15     Q   Did your exclusion of tweets from the
16 accounts Ryder Ripps and Pauly0x also exclude
17 retweets, replies and quotes of those accounts by,
18 you know, by accounts that were affiliated with
19 Ryder or Jeremy?
20     A   I believe so, yes.
21     Q   Okay.  So if Mr. Ripps made a post your
22 analysis wouldn't have taken into account the
23 replies to that post, correct?
24     A   Well, let's be careful here.  Replies
25 are only relevant to the degree that they're
```

2

```
1  that tweet?
2      A   I think I already said I don't believe
3  so.  I believe that was my prior answer.
4      Q   Okay.  Well, if that's what you said
5  previously then, great, I did review the
6  transcript to try to ensure that but I don't
7  believe that you did so.  Anyway, we can move on.
8          Let's talk about paragraph 6 of
9  Appendix D.
10     A   Okay.
11     Q   In this paragraph you say you used a
12 pretrained, aspect-based sentiment model to
13 evaluate consumer attitudes towards BAYC and Yuga
14 Labs, correct?
15     A   Yes.
16     Q   For the uninitiated what is a
17 pretrained aspect-based sentiment model?
18     A   The simplest way of explaining it is
19 it's a model that focuses on the sentiment of
20 specific aspects, in this case aspects related to
21 BAYC and Yuga Labs.
22     Q   So is it essentially an algorithm that
23 each tweet is run through and then the algorithm
24 makes a conclusion about the sentiment contained
25 in that tweet?
```

2 0

```
1  talking about the brand and so things are focused
2  on the brand, that's what's relevant here.
3          As I've talked about, I've excluded
4  things from Mr. Ripps and Pauly because those are
5  defendants in this case, and I don't want their
6  opinions, what they say over time, to bias
7  themselves.
8          The goal here, at a high level,
9  stepping back for a second, the goal here is to
10 get a sense of how regular people, attitudes of
11 regular consumers change over time, their
12 attitudes toward the brand.  And so these are
13 standard steps one would take in cleaning such
14 data to make sure it's answering the question of
15 interest.
16     Q   Give me just a moment.
17         Just looking at the answer you just
18 gave, I don't think you answered my specific
19 question which is a technical question but an
20 important one.
21         If Mr. Ripps and Mr. Cahen or Mr. -- or
22 strike that.
23         Let's use just the example of
24 Mr. Ripps.  If Mr. Ripps made a tweet that was
25 about BAYC did your analysis include replies to
```

2 2

```
1      A   That's a generally fair
2  characterization, yes.
3      Q   So the algorithm is trained by human
4  input; is that a fair characterization?  I'm just
5  trying to understand the mechanism by which the
6  analysis was performed.
7      A   These authors built a model that is the
8  most valid model I'm aware of for identifying
9  sentiment associated with particular aspects.
10         In this case I want to know sentiment
11 towards BAYC and Yuga Labs over time and so I used
12 their model to do so.
13     Q   Okay.  So the model that you used was
14 the model that's described by Yang and Li in these
15 two papers cited in paragraph 6 of Appendix D,
16 correct?
17     A   Yes.
18     Q   And how did you select that particular
19 model to use for your analysis?
20     A   I think I just answered that that was
21 the best model I was aware of to do this type of
22 analysis.
23     Q   Sure.  I heard that answer.  How did
24 you determine that it was the best model?
25     A   Well, I've used -- I've done similar
```

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 56 of 75   Page ID
#:26012
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
54 (213 to 216)

2 3

1 types of things to this, in both my academic work
2 as well as my expert witness work over time, and
3 when new things come out that I become aware of I
4 check them out to solve problems and this is the
5 best model I've seen to solve this type of
6 problem.
7     Q    Had you used this model in any
8 pre-analysis prior to this case?
9     A    I believe so, yes.
10     Q    What analyses have you used it for?
11     A    I'd have to go back and look, but
12 I believe I've used it in my research.
13     Q    What research?
14     A    As I said, I'd have to go back and
15 look.
16     Q    Well, I understand that but, you know,
17 I'm asking you here, you know, you chose to use
18 this model in this case and I'm trying to
19 understand why you chose it and your testimony is
20 that you used it before but that as you sit here
21 today, you can't remember for what you used it; is
22 that correct?
23     A    No.
24        MS. MELCHER:   Objection,
25 mischaracterizes testimony.

2 4

1 BY MR. GOSMA:
2     Q    Okay.  So if that's not your testimony
3 then what else have you used it for?
4     A    You already asked me that question and
5 I'll give you the same answer:  I've used it in my
6 academic research.
7     Q    Yes, and academic research on what
8 issue?
9     A    I've used similar things in a variety
10 of different papers.  I'd have to go back and look
11 at the specific paper, I don't remember which
12 paper I used which models for.
13     Q    Is it a -- have you used this model in
14 any of your published work to date?
15     A    I don't know whether the specific paper
16 I've used this in is published or not.  I've used
17 a variety of different sentiment approaches in a
18 variety of different papers of mine over the
19 years.
20        Most of the work I publish these days
21 involves some version of natural language
22 processing.  I've probably published 15 to 20
23 papers on related things in the last couple of
24 years.  I have a similar number of working papers
25 on related things, so I don't remember exactly in

2 5

1 which paper.
2     Q    What analysis did you undertake to
3 validate the effectiveness of this model in
4 identifying consumer sentiment?
5     A    I believe in the papers themselves they
6 engage in a number of exercises to test
7 validation.
8     Q    And you relied on those analyses for
9 the purposes of your report?
10     A    This is the standard way to evaluate
11 models in this type of work.  They often,
12 I believe in at least one if not both of these
13 papers, I'd have to look at them, but provide some
14 measure of validation and fit in both their model,
15 as well as in prior models.
16        And if I remember the paper correctly,
17 I'm pretty sure they show that their model
18 improves fit in relation to other approaches.
19     Q    Okay.  Outside of whatever validation
20 was done by the authors of this paper did you do
21 anything yourself to confirm that the model that
22 they were using would successfully measure
23 consumer sentiment in this case?
24     A    Yes, I believe I looked at a number of
25 tweets and made sure I agreed with the way they're

2 6

1 being coded by the model.
2     Q    How many tweets did you look at?
3     A    I don't remember.
4     Q    Did you include -- are the specific
5 tweets that you analyzed anywhere in your expert
6 report?
7     A    I give examples of them in one of the
8 figures.
9     Q    Which -- which figure are you -- are
10 you referring to?  And it's okay if we have to
11 take a moment to figure that out.
12        Are you referring to --
13     A    Figure 6.
14     Q    -- figure 6?
15     A    Figure 6.
16     Q    Okay.  So there are three tweets listed
17 in figure 6, correct?
18     A    There are, yes.
19     Q    Did you examine any other tweets
20 besides the three tweets in figure 6 as part of
21 your valuation of the Yang and Li model?
22     A    I did.
23     Q    How many?
24     A    You already asked me that question and
25 I said I don't remember.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

55 (217 to 220)

27

1    Q   Can you give me an estimate?
2    A   I said I don't remember.
3    Q   Now, you mentioned that you used
4  different analytical models in some of your other
5  consulting work, correct?
6    A   I want to be careful. These aren't
7  analytical models. So I'm not sure exactly what
8  you mean.
9    Q   Okay. Let me replace the wording
10  "analytical" with "aspect-based sentiment."
11   A   Okay.
12   Q   So my question is: You have used
13  different aspect-based sentiment models in your
14  other expert consulting work; correct?
15   A   I think the best way to say it is, I've
16  used other ways of determining sentiment in both
17  my academic as well as in my expert work.
18       This is an area that's evolving over
19  time so, for example, 10 years ago, probably even
20  12 years ago now in a paper I did, I used one
21  approach. Since then, better approaches have
22  become available and I've adopted those better
23  approaches as they've become available.
24   Q   What makes the approaches better? What
25  makes one approach better than any other approach?

28

1    A   They more accurately categorize the
2  data on the dimensions that matter. In this case
3  they more accurately measure sentiment.
4    Q   What is the measure of accuracy for
5  sentiment?
6    A   I'd have to go back and look at the
7  Yang and Li papers to remember exactly what -- how
8  they measured accuracy but as I mentioned earlier,
9  I believe they have a table that shows better fit
10  in their model compared to others.
11   Q   Better fit to what?
12   A   In some cases it's human perceptions of
13  sentiment. That would be one example.
14   Q   Is there any objective measure of human
15  sentiment?
16   A   Certainly. The standard way of
17  validating models like this -- a standard -- I
18  should be careful -- a standard way of validating
19  them that I've used before as well, is to ask some
20  people what they think of something, ask multiple
21  people, show that there's some reliability in
22  their responses and average across them and test
23  how well the model predicts that training data.
24  But that's a standard way of training or measuring
25  validation in these types of models.

29

1    Q   Would you agree that an assumption
2  inherent in that method of validation is that even
3  among human beings there can be disagreement about
4  what the sentiment behind the statement actually
5  was?
6    MS. MELCHER: Objection, vague.
7    THE WITNESS: No, that's not exactly
8  right. In general, you know, two people -- it is
9  possible that two people will see something
10  slightly differently, but the idea is if across
11  people, people tend to see things in similar ways
12  then there is some signal there that can be picked
13  up and you can examine whether the model can
14  predict that signal but if it was complete noise
15  then there would be no -- there would be no way to
16  -- there would be no correlation between the model
17  and people's perceptions.
18       And so no, I don't -- I don't agree
19  with what was said.
20  BY MR. GOSMA:
21   Q   I actually think we were trying to say
22  close to the same thing which is -- we can agree
23  that two human beings can disagree as to what the
24  intent behind a particular statement was. Can we
25  agree on that?

220

1    A   I want to be careful here because I
2  feel like you're searching for sound bites that
3  you can pull out of what I'm saying. What I'm
4  saying is by looking across enough people and
5  across enough things, there's often -- usually
6  there is a high degree of reliability, while two
7  individuals picked because they differ, may differ
8  slightly. In general, on average, across people,
9  people tend to see things like this similarly, and
10  so their judgments are generally reliable and so
11  the model is compared to these judgments.
12       If people were, you know, completely
13  unreliable, there was no agreement across people,
14  then one, there would be no variation across the
15  data, but two, the model wouldn't be able to
16  predict the variation that's observed.
17   Q   Okay. That's helpful. And I do agree
18  that outside the context of this deposition, we
19  could probably have a very interesting
20  conversation about this issue.
21   A   Happy to have that conversation some
22  time.
23   Q   Sure. Okay. So you performed a
24  sentiment analysis in your prior case for JUUL,
25  correct?

Case 2:22-cv-04355-JFW-JEM   Document 267-3   Filed 06/05/23   Page 58 of 75   Page ID
#:26014
HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

56 (221 to 224)

**221**

1      MS. MELCHER:  Objection,
2   mischaracterizes testimony.
3      THE WITNESS:  I don't remember
4   off-hand.  I'd have to go back and look.
5   BY MR. GOSMA:
6      Q   Okay.  As you sit here today, you can't
7   recall what model you might have used in that
8   prior case; is that right?
9      **A   I can't, off-hand, no.**
10     Q   To your knowledge has the Yang and Li
11  model that you used in your sentiment analysis
12  ever been used to analyze sentiment about a
13  company in the cryptocurrency space?
14     MS. MELCHER:  Objection, vague.
15     THE WITNESS:  The point of models like
16  this and the point of the validation test they
17  engage in are to examine whether they are valid
18  across a wide range of situations.
19     I don't know off-hand exactly whether
20  this model has been used in the -- specifically in
21  the cryptocurrency space before but the point of
22  papers like these is they are validated on
23  datasets that allow them to test whether they are
24  generally, generally useful.
25     And so whether or not someone has used

**222**

1   this particular model in the cryptocurrency
2   industry or not is not a question that is most
3   diagnostic of whether this model is useful.  I
4   would -- I would look to the papers themselves and
5   look at the -- at both the type of data they used
6   as well as the breadth of it to understand the
7   breadth of situations it would be applicable to.
8   BY MR. GOSMA:
9      Q   Now, the sentiment model that you used
10  categorizes tweets into one of three categories,
11  correct?
12     **A   I believe so, yes: positive, negative,**
13  **and neutral.  There's a score, a percentage score**
14  **for each tweet for positive, negative, and**
15  **neutral.**
16     Q   Does the model ever output a result
17  that suggests that it can't conclude one way or
18  another what the sentiment of a tweet is?
19     **A   It is -- it does not output that.  It**
20  **outputs its best estimation for how likely it is**
21  **that a tweet is positive, negative, and neutral.**
22  **And so it is using the broad range of data that it**
23  **has available to make its best guess about how**
24  **likely the tweet is to fall in each of these three**
25  **categories.**

**223**

1      Q   Right.  So it gives a sort of
2   confidence value for its determination; is that
3   accurate?
4      **A   I would be careful to call it**
5   **"confidence" because confidence has a specific**
6   **meaning in psychology literature that is different**
7   **than what's going on here, but it estimates the**
8   **likelihood that the tweet is falling in each of**
9   **these three categories.**
10     Q   Okay, and the -- that value, is it a
11  numerical value?
12     **A   Correct, it is a percentage score.**
13     Q   So the idea would be that if it output
14  a 100 percent confidence -- put out a 100 percent
15  score, the model would be highly confident that it
16  was correct and a lower score would suggest that
17  it was less confident; is that fair?
18     **A   As I mentioned already, I would prefer**
19  **not to use the word "confidence," that the score**
20  **is how likely the model thinks it is that a tweet**
21  **falls in a given bucket.**
22     Q   I don't mean to keep using the word
23  "confidence."  It's kind of, just not -- hard
24  wired up here.
25     **A   No problem.**

**224**

1      Q   Okay.  For the tweets that were
2   considered as part of your sentiment-based
3   analysis in this case, does your report include
4   any data about the average score that the -- that
5   the model outputted for each of the tweets that it
6   analyzed?
7      **A   Can you ask the question there one more**
8   **time?**
9      Q   Sure.  I'm just trying to understand,
10  you know, in the course of, you know, you ran this
11  analysis and I'm trying to understand the score
12  values that came back for each of the, you know,
13  each of the determinations.  Did you -- did you
14  provide any statistics about that score
15  information as part of your report?
16     **A   Sorry, I'm still not sure what you**
17  **mean.**
18     Q   Okay.
19     **A   In my report, I -- in figure -- I'll go**
20  **back up, I think it's figure 7, if I remember**
21  **correctly.  Figure 7 shows the scores over time of**
22  **tweets, and those are -- those are the scores.  So**
23  **I'm not sure what you mean.**
24     Q   Okay.  Let me take a look at figure 7
25  and then I'll ask you a better question.

225

1    A   I think it's figure 7.  Yes, figure 7.
2    Q   So I'm looking at figure 7 and it
3  probably would be helpful if you were also looking
4  at figure 7 on page --
5    A   I am, yes.
6    Q   Okay, it's on page 53.  So the Y axis
7  here is a percentage score which is recorded as
8  proportion, and then the X axis is the date.
9        So do I understand correctly that each
10 of the data points is the proportion of tweets
11 exhibiting either a positive or negative sentiment
12 towards BAYC on that particular date?
13   A   BAYC or Yuga Labs on that particular
14 date, yes.
15   Q   Okay.  So if we just take the very
16 first green dot there on 5/6/22, do you see that
17 one, it's right above the 50 percent mark?
18   A   Mm-hmm.
19   Q   What does that green data point
20 represent in your analysis?
21   A   It says -- it represents the proportion
22 of tweets on 5/6/22 that exhibited positive
23 sentiment towards BAYC or Yuga Labs.
24   Q   Okay.  So on that date the number of
25 positive sentiment tweets was something like

226

1  55 percent; is that fair?
2    A   55 percent of the tweets that day
3  exhibited positive sentiment towards the brand.
4    Q   And there is a red dot on that same day
5  that is something like 15 percent of the tweets
6  were negative; is that fair?
7    A   That's generally fair, yes.
8    Q   Now figure 7 does not include -- well,
9  strike that.
10       So within the tweets that are recorded
11 or reflected here on figure 7, how did you
12 determine which of the analyzed tweets would be --
13 well, strike that.
14       We talked a little bit earlier about
15 not a confidence value but that the model provides
16 a value that reflects how likely a tweet was to be
17 judged as a positive sentiment tweet or a negative
18 sentiment tweet or a neutral sentiment tweet,
19 right?
20   A   I believe so, yes.
21   Q   Was there a threshold level that you
22 used to determine, you know, "This tweet, the
23 model was confident enough for me to include in my
24 analysis but this tweet was too inconclusive and
25 so I didn't consider this one"?

227

1    A   Well, if the -- if the model felt like
2  it was neutral, it was neither positive nor
3  negative, the model would score it as neutral.
4    Q   And so here in figure 7 there are no
5  neutral sentiment posts, correct?
6    A   Neutral is not plotted in figure 7, no.
7    Q   Okay.  And for purposes of your
8  analysis the neutral posts -- you didn't -- you
9  may have considered them but you don't plot them
10 here to draw any conclusions from those neutral
11 posts; is that a fair characterization?
12   A   Well, I mean, the thing I'm interested
13 in is how positive and negative sentiment towards
14 the brand is changing so that's what I analyze.
15   Q   Yes, let me ask in a slightly different
16 way that may be easier for you to answer.
17       What use, if any, did you make of the
18 tweets that were adjudged to be neutral in
19 sentiment?
20   A   What use, if any?
21   Q   Mm-hmm.
22   A   I'm not sure what you mean.
23   Q   Okay.  Did the neutral tweets factor
24 into your analysis in any way?
25   A   As I discuss in Appendix D and

228

1  paragraph 8, if the sentiment is classified as
2  neutral but the positive score is significantly
3  greater than the -- greater than by more than 5
4  than the negative score, it is reclassified as
5  positive, and similarly, if it's reclassified as
6  neutral but the negative score is greater than
7  positive by 5, the sentiment is classified as
8  negative.
9        But if it's neither, if it's, you know,
10 highly neutral, and positive and negative are the
11 same, then it's neutral.  Then it doesn't provide
12 any information about whether positive or negative
13 sentiment is changing.
14   Q   Okay.  So this five percentage point
15 reclassification threshold, we'll call it, okay,
16 how did you decide that five percentage points
17 difference between the positive and the negative
18 score was a sufficient -- was a sufficient
19 percentage to reclassify the tweet?
20   A   It seemed appropriate based on prior
21 work that I've done in this space.
22   Q   So that was just your judgment in your
23 capacity as an expert; is that fair?
24   A   I believe so.  It may also be what I've
25 done in prior papers, I can't remember exactly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.

Conducted on March 9, 2023

58 (229 to 232)

229

1 where, but that's my -- my judgment as an expert
2 is that that is sufficient, yes.
3     Q   So if a tweet, a hypothetical tweet --
4 automatic objection, I'm ready for it -- a
5 hypothetical tweet, we've got a positive sentiment
6 of, say, 30, okay, a 30 percent positive and it's
7 24 percent negative, that tweet would be
8 classified as a positive sentiment; is that
9 correct?
10     MS. MELCHER:  Objection, it's an
11 incomplete hypothetical.
12     THE WITNESS:  I don't know what tweet
13 you're talking about.  I think we've already
14 covered this ground of exactly what I did, but
15 I believe in the example you gave that it would be
16 classified as positive as long as it follows the
17 rules I outlined in paragraph 8.
18 BY MR. GOSMA:
19     Q   Sure.  Okay.  To be clear, I'm just
20 trying to understand exactly how the model works.
21 I'm really not trying to trick you here.
22     You don't say anything in your expert
23 report about the aspect-based sentiment model that
24 you use regarding its ability to classify tweets
25 that contain sarcasm, correct?

231

1 look at their paper to see exactly what they did
2 but authors are aware that sarcasm exists and
3 they, when validating their model, that would be
4 in the validation of their model.  So if this
5 model is better than other models for identifying
6 sentiment, as I believe it is from my reading their
7 paper, although I don't have their paper in front
8 of me, then it would also be the best available
9 option out there for dealing with something like
10 sarcasm.
11     Q   So the contents of your report say
12 nothing about the ability of this model to address
13 sarcasm, correct?
14     MS. MELCHER:  Objection,
15 mischaracterizes testimony.
16     THE WITNESS:  I don't remember exactly
17 every single word that's in my own report.  If you
18 are wondering how well the Yang and Li paper deals
19 with sarcasm, the best thing to do would be to
20 look at the Yang and Li paper.  But as I've said
21 already a couple of times now since you've asked
22 this question a few times, this paper -- this
23 approach is the best approach I'm aware of to deal
24 with sentiment and that includes things like
25 sarcasm.

230

1     MS. MELCHER:  Objection,
2 mischaracterizes testimony.
3     THE WITNESS:  I don't think that's what
4 I said.  The Yang and Li -- both Yang and Li
5 papers talk about exactly what they did.
6 BY MR. GOSMA:
7     Q   Okay.  My question, and I apologize if
8 it got lost, I was not characterizing anything
9 that you've said today.  I'm asking you about the
10 contents of your report.  Do you have that in
11 mind -- just the contents of your report?
12     A   I'm not sure what question you're
13 asking here.
14     Q   I'm just asking if you understand that
15 I'm -- my next question is going to talk about
16 only what's in the content of your report, okay?
17     A   Okay.
18     Q   Does your report say anything about the
19 ability of the model that you use to perform your
20 Twitter sentiment analysis to address sarcasm?
21     A   The point of papers like the Yang and
22 Li papers that they try to measure sentiment
23 across a wide variety of things, including
24 situations like sarcasm.  I don't remember exactly
25 what the Yang and Li paper did, so I'd have to

232

1 BY MR. GOSMA:
2     Q   Now, sarcasm and irony are concepts
3 that researchers have had trouble historically
4 dealing with in these types of sentiment models,
5 correct?
6     MS. MELCHER:  Objection, lacks
7 foundation.
8     THE WITNESS:  I don't know what you're
9 basing that on.
10 BY MR. GOSMA:
11     Q   Well, I'm basing it on my reading of
12 the academic literature and I assume that you are
13 also familiar with the academic literature on the
14 subject.
15     So I'm asking you as an expert in this
16 field whether you are aware that sarcasm and irony
17 have traditionally been difficult for these types
18 of sentiment-based models or aspect-based
19 sentiment models to identify correctly.
20     MS. MELCHER:  Same objection.
21     THE WITNESS:  Yeah, I'm not -- I'm --
22 I'm not aware of that being a problem for
23 aspect-based sentiment models.  If there is a
24 particular paper in mind making a particular
25 point, I'm happy to take a look at it though.

233

1  BY MR. GOSMA:
2      Q  Well, sir, Brandwatch's own materials
3  acknowledges that it is often difficult to
4  differentiate a tweet that's sarcastic from one
5  that isn't; are you aware of that?
6      A  I'm not sure what --
7          MS. MELCHER:  Objection, lacks
8  foundation.
9          THE WITNESS:  I'm not sure what thing
10 you are suggesting said what.  I don't know.
11 BY MR. GOSMA:
12     Q  Sure.  And I'm asking these questions
13 because, you know, I know you are an expert in
14 these fields and I'm trying to understand what you
15 know about these issues.
16         Hold on just a moment.
17         Let's turn to paragraph 79 of your
18 report.  Let me know when you're there.
19     A  I'm there.
20         (Pause)
21         Sorry, I don't know if you could hear
22 me but I said, "I'm there."
23     Q  Oh, yeah, I heard you, Dr. Berger.
24     A  Just making sure.
25     Q  I'm just trying to get my ducks in a

234

1  row, but I appreciate you letting me know.
2          Let's actually look at figure 5 on
3  page 49 of your report.
4      A  Say it one more time.
5      Q  Figure 5 on page 49 of your report,
6  sir.
7      A  Okay.
8      Q  So this is a graph that reflects the
9  "Daily proportion of tweets referencing 'BAYC' or
10 'Bored Ape' that also include a reference to
11 Mr. Ripps or RR/BAYC"; do you see that?
12     A  I do.
13     Q  How did you classify a reference to
14 Mr. Ripps or RR/BAYC in a tweet?  Like, how did
15 you determine that a tweet contained a reference
16 to them?
17     A  I believe I used those search strings.
18     Q  So the search strings would be
19 "Mr. Ripps" or "RR/BAYC"?
20     A  I think it would be his name, "Ryder
21 Ripps," "RR/BAYC" -- give me just a second.  Let
22 me look -- I don't remember the exact search
23 strings.
24     Q  Yeah, I think I see in Appendix D under
25 the sub-bullet (iii), that's what you are going to

235

1  refer me to, right?
2      A  That's exactly where I was.  We are in
3  the same spot, yes.
4      Q  Okay.
5      A  Yes, so paragraph 7 (iii), yep.
6      Q  Okay, got it.
7          All right.  Sticking with figure 5 --
8      A  Okay.
9      Q  -- which, again, is on page 49.
10         So what this graph reflects is that the
11 daily proportion of tweets referencing "BAYC" or
12 "Bored Ape" that also reference "Mr. Ripps" or
13 "RR/BAYC" fluctuated over time, correct?
14     A  They did fluctuate over time.  They
15 particularly saw an increase after Ripps,
16 Mr. Ripps began minting the RR/BAYC collection on
17 5/13 and again when he -- the minting accelerated
18 on 6/19/22.
19     Q  For purposes of your report did you
20 assume that the increase in tweet volume on those
21 dates was attributable to the minting and the
22 accelerated minting respectively?
23     A  Sorry, I'm not assuming anything and
24 I'm not looking at the volume, I'm looking at the
25 proportion.  So the data is showing -- I'm not

236

1  assuming -- the data is showing that the
2  proportion of tweets referencing "BAYC" or "Bored
3  Ape," that also include a reference to "Mr. Ripps"
4  or "RR/BAYC" appear to increase either directly or
5  soon after when Mr. Ripps is minting or
6  accelerating the minting of the RR/BAYC
7  collection.
8      Q  I see.  This graph measures not the
9  absolute value or absolute volume of the tweets
10 but the proportion of the tweets --
11     A  Sorry, for the --
12     Q  -- is that right?
13     A  Sorry, if there was some confusion,
14 yes.  So the Y axis -- (overspeaking) --
15 proportion.  Yes, so, for example, what -- well,
16 I'll be quiet and let you ask your question,
17 sorry.
18     Q  No, I understand and I think that was
19 based on me misreading the chart so -- all right,
20 that's very helpful, it helps me to understand.
21         I believe we covered this before but
22 sometimes my memory isn't the best.  There's no
23 chart in your report that shows the volume of
24 tweets during this same period, the overall volume
25 of tweets during the same period, right?

237

1    A   There is --
2         MS. MELCHER: Objection, vague.
3         THE WITNESS: I don't believe I've
4    plotted the overall volume of tweets in the
5    report.
6    BY MR. GOSMA:
7    Q   Okay. And you did not plot the
8    proportion of tweets referencing "BAYC" or "Bored
9    Ape" in any other search terms, correct?
10        MS. MELCHER: Objection, vague.
11        THE WITNESS: Well, the case is about
12   Mr. Ripps and RR/BAYC so that's where I focus my
13   analyses.
14   BY MR. GOSMA:
15   Q   Sure. And so as a result you did not
16   plot "BAYC" or "Bored Ape" with any other search
17   terms, correct?
18   A   I'm not even aware what other search
19   terms I would want to plot it against given this
20   case. This seemed like the relevant thing to do.
21   Q   Sure. Understood. And I understand
22   why you would take that position, but I'm going to
23   ask a few specific examples of things that you
24   didn't plot and --
25        -- (overspeaking) --

238

1    A   Okay, okay.
2    Q   So you did not plot the daily
3    proportion of tweets referencing "BAYC" or "Bored
4    Ape" and, for example, terms related to racism,
5    correct?
6         MS. MELCHER: Objection, asked and
7    answered, vague.
8         THE WITNESS: No, I do not plot -- I'll
9    just say no.
10   BY MR. GOSMA:
11   Q   Okay. And I'm not trying to be comical
12   or funny here. You know, these are issues that
13   are very important to my client and so that's why
14   I'm asking the question, okay?
15        Now, you didn't measure whether there
16   was an increase in the proportion of tweets that
17   reference "BAYC" and "antisemitism," correct?
18        MS. MELCHER: Same objections.
19        THE WITNESS: I don't want to get stuck
20   in this again but if that was something that the
21   defendant believed was relevant, I would expect
22   that they or an expert associated with them would
23   plot that information.
24        I'm not aware that there is any
25   relevant trend over time and I'm not sure -- and

239

1    to me that's not the most relevant question, as
2    we've already talked about, as anything to do with
3    racism or antisemitism wouldn't explain consumer
4    confusion or changes in exclusivity. So I have
5    focused on the -- most things that I find most
6    relevant here and they're most relevant to the
7    questions I was asked to answer but if the defense
8    thinks that's relevant they are more than welcome
9    to plot whatever they'd like.
10   BY MR. GOSMA:
11   Q   Sure, understood, and I appreciate your
12   position on that. I would refer you again to the
13   fact that those types of analysis are not
14   inexpensive. And they are not always within the
15   reach of an individual.
16        So let's turn to paragraph 15 of your
17   report.
18   A   1-5?
19   Q   Yes, sir.
20   A   Okay.
21   Q   Here you're talking about the concept
22   of a brand, correct?
23   A   Correct.
24   Q   And your statement is that the concept
25   of a brand -- I'm going to paraphrase a little bit

240

1    here, but you feel free to correct me if I say
2    something inaccurately because that's not my
3    intent.
4         But you say in paragraph 15 that the
5    concept of brand is broad; is that fair?
6    A   Yes.
7    Q   And that it encompasses things like
8    political candidates, ideas and even things like
9    countries, right?
10   A   Brands can encompass those sorts of
11   things, yes.
12   Q   Let's turn to paragraph 26. Tell me
13   when you are there.
14   A   I am.
15   Q   In this paragraph you talk about how
16   companies develop brands, correct?
17        MS. MELCHER: Objection,
18   mischaracterizes the testimony.
19        THE WITNESS: This paragraph talks
20   about things that companies try to associate --
21   things that companies do to build brands, part of
22   what it talks about.
23   BY MR. GOSMA:
24   Q   And among those things are generating
25   and identifying brand marks and carefully defining

HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.

Conducted on March 9, 2023

61 (241 to 244)

---

**241**

1  what products and services they offer to
2  consumers, right?
3      **A    That's a quote from my report.  That is**
4  **-- those are among the things that brands do.**
5      Q    And in this case you'd agree that Yuga
6  Labs was careful in how it defined its brand,
7  right?
8      **A    I'm not sure what you -- what you mean.**
9      Q    Well, I'm referring to your statement,
10  which I understand is general in this report, that
11  companies are careful in how they define their
12  products and services offered to consumers, and
13  I'm asking you whether in this case, Yuga was
14  careful in that same way?
15      MS. MELCHER:  Objection, vague.
16      THE WITNESS:  It seems like you're
17  taking about some specific things that Yuga did.
18  I don't know what things you have in mind.
19  BY MR. GOSMA:
20      Q    Well --
21      **A    I'm not -- I'm not opining here about**
22  **what Yuga's founders intended or things along**
23  **those lines.**
24      Q    So you don't have any opinions in this
25  case about whether Yuga was careful or not in the

---

**242**

1  way that it defined its brand; is that fair?
2      MS. MELCHER:  Objection, vague,
3  mischaracterizes testimony.
4      THE WITNESS:  I don't -- I don't
5  believe I'm -- I should be careful here.  I make a
6  number of comments.  Let me go down to a different
7  part of my report -- give me a second.
8      To be able to answer your question
9  better I am going to need a more specific
10  question.  I talk in the report about some things
11  that Yuga has done to -- that indicates that BAYC
12  is a strong brand.  I talk about things that Yuga
13  has done with that brand, so I don't -- I don't --
14  I shouldn't answer your question without
15  understanding more specifically what you mean.
16  BY MR. GOSMA:
17      Q    Okay.  I'm just trying to understand
18  whether you have an opinion in this case about
19  whether Yuga was careful in defining what products
20  and services it offered to its consumers, whether
21  it was, it wasn't or you don't have an opinion.
22      MS. MELCHER:  Objection, vague.
23      THE WITNESS:  I feel like you are
24  trying to get me to agree to something that I'm a
25  little bit uncomfortable agreeing to one way or

---

**243**

1  another.  I talk about things that Yuga did to
2  build its brand.  You seem to be asking me whether
3  it's careful or not and I don't -- I don't know --
4  I would like a more specific question if you'd
5  like me to try to be specific in my answer.
6  BY MR. GOSMA:
7      Q    Okay.  So if I understand your
8  testimony you're uncomfortable agreeing one way or
9  another with the question "Yuga was careful in
10  defining what products and services it offered to
11  its consumers"; is that a fair characterization of
12  your testimony?
13      **A    I think a better way to characterize it**
14  **is, in the report I talk about specific things**
15  **that Yuga did in relation to building and**
16  **extending their brand.  I can't speak to**
17  **everything they did or did not do but I do speak**
18  **to some things they did to help build that brand.**
19      **And so I'm a little bit uncomfortable**
20  **suggesting everything they did was one thing or**
21  **another because I don't know what other things**
22  **we're talking about, but I think I've been pretty**
23  **specific in the report about some specific things**
24  **they did to build their brand.**
25      Q    Okay.  Understood.

---

**244**

1      Let's turn to figure 3 of your report.
2  That is on page 37, just above paragraph 68.
3      **A    Okay.**
4      Q    Figure 3 is -- is a demonstrative image
5  that you created -- oh, strike that.
6      Figure 3 is an image from the
7  complainant in this case, right?
8      **A    Yes.**
9      Q    And on the left side, what's shown is
10  an OpenSea listing for BAYC 1058, correct?
11      **A    Correct.**
12      Q    That is the original BAYC 1058,
13  correct, by Yuga Labs?
14      **A    I believe so, yes.**
15      Q    And on the right is RR/BAYC no. 1058,
16  correct?
17      **A    I believe so, yes.**
18      Q    Do you know whether the image that
19  you've displayed contains the totality of the
20  information a user would see if they navigated to
21  these NFTs on OpenSea?
22      MS. MELCHER:  Objection, vague,
23  incomplete hypothetical.
24      MR. GOSMA:  Ah, let me -- let's strike
25  that and let's start over again just so we have a

---

245

1 very clear record.
2 THE WITNESS: Okay.
3 BY MR. GOSMA:
4 Q Do the images shown in figure 3 display
5 the totality of information that a user would see
6 if they navigated to that NFT on OpenSea?
7 MS. MELCHER: Objection, vague,
8 incomplete hypothetical.
9 THE WITNESS: I'm not sure about the
10 totality of information, but this is certainly a
11 lot of information that looks quite similar if not
12 identical, and so it would be surprising if people
13 were not confused when confronted with this type
14 of information.
15 BY MR. GOSMA:
16 Q Well, let's take a really close look at
17 the image for figure 3, and I'm going to zoom in
18 myself so I can see this. One of the pieces of
19 information that's included in figure 3 is the
20 number of views that each NFT has received on
21 OpenSea.
22 Do you see that?
23 **A Maybe. I'm not sure. Is that the**
24 **thing next to the little -- I think I see that. I**
25 **can't tell for sure but I believe -- I believe I**

246

1 **can see that.**
2 Q Yeah, so there's a little -- I think
3 what you are referring to is that below the number
4 1058 there is a little eyeball and it says "1.2K
5 views"; do you see that?
6 **A I do.**
7 Q And then on the -- and you understand
8 that to be 1.2000 views, correct?
9 MS. MELCHER: Objection, lacks
10 foundation.
11 THE WITNESS: I'm not -- I'm not sure
12 what that reference is.
13 BY MR. GOSMA:
14 Q So your testimony is that you don't
15 understand that piece of information in figure 3
16 of your report?
17 **A No, my testimony is you're asking me**
18 **about something that I didn't focus on in my**
19 **report about a piece of the OpenSea website and**
20 **how it displays information.**
21 **There are two large identical-looking**
22 **images and if you really zoom in on your screen,**
23 **you may be able to see something that's slightly**
24 **different. I don't know what they put there and I**
25 **don't know what that information means. That's**

247

1 **what I'm saying.**
2 Q Okay. So your testimony is that you
3 don't understand what some of the information in
4 figure 3 of your report means, correct?
5 MS. MELCHER: Objection,
6 mischaracterizes testimony.
7 THE WITNESS: I don't -- you seem to be
8 purposely misrepresenting what I said. There's a
9 lot of information in both of these images. I
10 don't know what OpenSea represents in this
11 particular field on their site and further, it is
12 very difficult to see.
13 BY MR. GOSMA:
14 Q Okay. Let's pause there for a second.
15 I am absolutely not trying to intentionally
16 misrepresent what you're saying, okay? I am
17 understanding what you are saying and I'm asking
18 you questions to try and confirm but I am not
19 trying to intentionally misrepresent your
20 statement, okay?
21 If I say something that isn't quite
22 what you said, I want you to correct it, okay, but
23 I want to get your testimony on these issues,
24 okay?
25 So, is it your testimony that you do or

248

1 do not understand what the "1.2K views" in
2 figure 3 of your report means?
3 **A I think I answered this question a few**
4 **times. I'm not sure what OpenSea is representing**
5 **with that field. That was not something that was**
6 **the focus of my report and so I am not sure what**
7 **exactly is recorded there and what exactly it**
8 **means.**
9 Q Okay. Let's look at a different aspect
10 of the image.
11 There is some blue text above the
12 number 1058 in both figures; do you see that?
13 **A I do, yes.**
14 Q Could you read the blue text above the
15 1058 on the figure on the left.
16 **A "Bored Ape Yacht Club."**
17 Q Okay. And on the figure on the right
18 there is similar blue text; what does that say?
19 **A "RR/BAYC."**
20 Q Okay. In the figure on the left there
21 is a data field that reads "Highest offer" and
22 there's a number 205 underneath that, correct?
23 **A I believe so, yes.**
24 Q And in the figure on the right there is
25 no similar number, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

63 (249 to 252)

---

249

1    A   That's correct.
2    Q   In the figure on the left, the number
3  of views is greater than the number of views in
4  the figure on the right, correct?
5    A   I think we just talked about this.  I
6  don't know how they're representing views and I
7  respect the fact that you're identifying only the
8  areas on which these two images differ, rather
9  than focusing on the large ways in which they're
10 similar.
11      I don't know why someone would name a
12 collection and have exactly the same image with
13 exactly the same number, and a name that's a
14 derivative of someone else's, why someone would do
15 that unless they were trying to be somewhat
16 confusing.
17      So I agree that there are some pieces
18 of these two images there are different but the
19 large easily-available things, I had to zoom in on
20 my screen to see exactly what the name is.  I
21 don't have to zoom in on my screen to see what the
22 image is, and the images are, as far as I can
23 tell, identical.
24   Q   Okay.  And there's a note there below
25 figure 3 in your report; do you see that?

---

250

1    A   I do, yes.
2    Q   And there's a statement that says:
3  "Displayed are two listings on OpenSea: the
4  listing on the left is an authentic, Yuga Labs
5  BAYC NFT, and the listing on the right is an
6  RR/BAYC imitation which is listed under the same
7  name."
8      Do you see that?
9    A   I do, yes.
10   Q   What did you mean by "listed under the
11 same name"?
12   A   I don't remember exactly what I -- what
13 I meant by "listed under the same name."
14   Q   Well, let's turn to paragraph 44 of
15 your report.
16   A   Okay.
17   Q   And there's some sub-bullets there and
18 sub-bullet (iii) refers to the launch of the
19 Dookey Dash video game; do you see that?
20   A   I do, yes.
21   Q   Have you played this Dookey Dash game?
22   A   I enjoy saying the name or hearing the
23 name of this game.  I don't have a Sewer Pass NFT.
24 My understanding is you need a Sewer Pass NFT to
25 be able to play this game.  I have not played this

---

25

1  game, but I also don't have a Sewer Pass NFT.
2    Q   Okay.  Now, it's your opinion that
3  Dookey Dash is a part of Yuga's brand, correct?
4    A   I believe so, so, yes.  Sorry -- do you
5  mean the BAYC brand or Yuga's brand or both?
6    Q   Let's take them separately in case the
7  answer is different.
8      So let's -- is it a part of Yuga's
9  brand, Yuga Labs' brand?
10   A   Well, everything that Yuga offers is
11 connected to the brand in one way or another.
12      Given that you have to have a Sewer
13 Pass, which is associated with having either a
14 BAYC or an MAYC, to play Dookey Dash, it is -- can
15 also be associated with BAYC but you don't have to
16 have a BAYC to be able to play so it -- so, yeah.
17   Q   And is Dookey Dash part of the BAYC
18 brand?
19   A   It is certainly associated with the
20 brand, yes.
21   Q   Do you understand what the story
22 premise of the game is?
23   MS. MELCHER:  Objection, vague.
24   THE WITNESS:  I have not played Dookey
25 Dash, so I don't know off-hand what the story

---

252

1  premise is.
2      I know that it's an endless runner
3  game, but I have not played the game.
4  BY MR. GOSMA:
5    Q   And your opinion in your report is that
6  both the Yuga Labs brand and the BAYC brand are
7  luxury brands, correct?
8    A   They are high-end symbolic brands, yes.
9    Q   Okay.  Are you familiar with Yuga's
10 Otherdeed release?
11   A   There was a word in there, I missed.
12      Other "what" release?
13   Q   Otherdeeds.
14   A   Can you -- I'm not completely sure what
15 you're saying.
16   Q   Sure.  I can try and -- I can point you
17 to a place in your report where you talk about
18 this.
19   A   Okay.
20   Q   Oh, your report refers to it, in just
21 the bullet above Dookey Dash.  Otherside.  Are you
22 familiar with the Otherside product that Yuga
23 offered?
24   A   I am a little bit familiar with it; I'm
25 not an expert in every aspect of it.

---

253

1    Q   Sure.  What do you know about it?
2  What's your understanding of what Otherside is?
3    A   Exactly what I --
4       MS. MELCHER:  Objection, vague.
5       THE WITNESS:  Sorry, go ahead.
6       MS. MELCHER:  Sorry, I just said
7  "Objection, vague."
8       THE WITNESS:  I said it's:
9       "... an innovative, interoperable gaming
10 metaverse where participants can 'bring their own
11 NFT character,' including a BAYC or MAYC."
12 BY MR. GOSMA:
13    Q   Okay.  Are you aware of the
14 circumstances surrounding the launch of Otherside?
15 Do you know anything about it?
16       MS. MELCHER:  Objection, vague, lacks
17 foundation.
18       THE WITNESS:  I'm not sure what
19 circumstances you are talking about.
20 BY MR. GOSMA:
21    Q   Okay.  Do you know when Otherside was
22 launched?
23    A   Not off-hand, no.
24    Q   Okay.  Are you aware of any controversy
25 surrounding the release of Otherside?

254

1       MS. MELCHER:  Objection, vague, lacks
2  foundation.
3       THE WITNESS:  I'm not aware of any
4  controversy around the launch of Otherside.
5       MR. GOSMA:  Okay.
6       We've been going a little over an hour,
7  why don't we take a break here?  This is a good
8  spot.  Let's go off the record.
9       THE VIDEOGRAPHER:  We are going off the
10 record.  The time is 15:01.
11    (Recess taken from 3:01 p.m. to 3:13 p.m.)
12       THE VIDEOGRAPHER:  We are back on the
13 record.  The time is 15:13.
14 BY MR. GOSMA:
15    Q   Welcome back, Dr. Berger.
16    A   Welcome back.
17    Q   Before the break we were talking about
18 Otherside which was referred to in your report; do
19 you recall that?
20    A   I do, yes.
21    Q   And I had mentioned before that
22 something called "Otherdeeds"; do you recall that?
23    A   No, I don't.
24    Q   Okay.  Are you familiar, one way or
25 another, with what an Otherdeed is?

255

1    A   I don't believe so, no.
2    Q   Okay.  All right.  Now, Dr. Berger are
3  you aware that Yuga Labs is currently the subject
4  of an investigation by the Securities and Exchange
5  Commission?
6       MS. MELCHER:  Objection, lacks
7  foundation, outside of the report.
8       THE WITNESS:  I don't believe so, no.
9  BY MR. GOSMA:
10    Q   Okay.  Now, are you aware that Yuga
11 Labs in 2022 put on a production called Ape Fest?
12    A   I don't -- I don't -- I don't believe
13 I'm aware of that.  I'd have to check my report to
14 see if I talk about -- yes, I do mention it
15 briefly in paragraph 44 so...
16    Q   Yeah, I was just about to point you
17 there so you're aware of it --
18    A   I'm aware of it in brief but not in
19 great detail.
20    Q   And do you know when Ape Fest occurred
21 in 2022?
22    A   I don't know the exact date off-hand.
23    Q   Okay.  Were you aware that Yuga Labs --
24 well, strike that.
25       Let's mark tab 28, please.

256

1       REMOTE TECHNICIAN:  Stand by, uploading
2  it right now.
3       MR. GOSMA:  Let me know when you've got
4  that.
5       THE WITNESS:  Is it on the share site
6  yet?
7       REMOTE TECHNICIAN:  Yes, it should be
8  appearing any second.  Do you see it?
9       THE WITNESS:  Sorry, I'll refresh it.
10 Is it up there?
11       REMOTE TECHNICIAN:  It should be, yeah.
12       THE WITNESS:  I'm still not seeing
13 anything.
14       REMOTE TECHNICIAN:  Try refreshing one
15 more time.  I do see it on my end on the site.
16       THE WITNESS:  Okay, it looks like it
17 just got up there.  Okay, Exhibit number 28?
18       MR. GOSMA:  Yes, sir.
19       (Exhibit No. 28 was marked for
20 identification.)
21 BY MR. GOSMA:
22    Q   All right.  Have you ever seen this
23 article before?
24    A   I don't believe so, no.
25    Q   Okay.  The text at the top of the page

257

1  reads, "Bored Ape's desecrated a famous piece of
2  New York graffiti art"; do you see that?
3      A  I see those words.
4      Q  And there is a by line just below that,
5  correct?
6      A  I'm not sure what you mean.
7      Q  Okay.  There's the words "By Valeria
8  Goncharenko" below the mBit banner; do you see
9  that?
10     A  I do.
11     Q  And just below that, there's the words
12 "Published: June 16, 2022, at 10:50 a.m."; do you
13 see that?
14     A  I do.
15     Q  And June 16th, 2022 is during the
16 period of your Twitter sentiment analysis in this
17 case, correct?
18     A  Let me just go back to make sure I have
19 my dates straight.  Yes, it is.
20     Q  Okay.
21     A  What date is it?  It looks like --
22     Q  June 16th, 2022.
23     A  Yeah, it looks like it is almost at the
24 end of the period.
25     Q  Okay.  And the article, just below the

258

1  image there, and below there is some tweet text
2  but I'm talking about the written text of the
3  article below the photographs, it reads:
4      "Yuga Labs hired street artists to paint the
5  Bored Ape Yacht Club logo in the streets of New
6  York City.  The company used a guerrilla marketing
7  strategy to gain attention before its ApeFestival
8  which will take place in New York on June 20-23."
9      Do you see that?
10     A  I do.
11     Q  And then in the third paragraph there
12 it reads:
13     "Yuga Labs' painters painted over a
14 historical piece of graffiti art by Nekst (real
15 name Sean Griffin).  The legendary piece is located
16 at 190 Bowery Street aka the old Germania Bank
17 building and in 2016 the building was remodeled
18 completely except for Sean Griffin's tag, which he
19 first painted in 2007 and then refreshed in 2012
20 before his death."
21     Do you see that?
22     A  I see those words, yes.
23     Q  And then just below the image it reads:
24     "Twitter users started a debate.  Some of
25 them claimed that Yuga Labs did not paint the

259

1  image themselves.  BAYC fans also believe that the
2  painter used chalk, and can be wiped off easily.
3  The community then discovered that the painters
4  were supposed to draw on the sidewalks only."
5      Do you see that?
6      A  Uh-hmm.
7      Q  So were you aware of this controversy
8  when you submitted your report for this case?
9      MS. MELCHER:  Objection, vague, lacks
10 foundation.
11     THE WITNESS:  What controversy are you
12 referring to?
13 BY MR. GOSMA:
14     Q  The controversy referred to in the
15 article.
16     A  I don't see the word "controversy" in
17 the article.
18     Q  Okay.  Were you aware of this article
19 with the headline "Bored Apes desecrated a famous
20 piece of New York City graffiti art," when you
21 performed your analysis for this case?
22     A  No, I was not.
23     Q  Okay.  Let's go back to your report and
24 turn to footnote 199, which I'll tell you what
25 page it's on in just a moment.

260

1      It is on page 54 of your report; do you
2  see that?
3      A  Give me just a second.  I do, yes.
4      Q  And in this footnote you discuss an
5  alternative hypothesis that:
6      "... the sentiment associated with BAYC and
7  Yuga Labs was already trending less positive and
8  more negative prior to Defendants' minting of the
9  RR/BAYC collection on May 13, 2022."
10     Do you see that?
11     A  I do.  I think when we had an earlier
12 discussion, I was looking for this and I think I
13 misspoke and thought this was what was in the note
14 of figure 7 but it looks like it is actually in
15 footnote 199.  So apologies if earlier I
16 referenced something that didn't make sense but
17 this is what I was trying to reference.
18     Q  Sure.  And this is what I'd like to
19 talk about and so we may tread a little bit of the
20 same ground but not in the context of this
21 footnote and so I'd like to talk about it in this
22 context.
23     So your report says:
24     "To investigate this alternative, I analyzed
25 whether the share of tweets expressing positive

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023

66 (261 to 264)

---

**26**

1  sentiment toward BAYC was decreasing between May 6
2  ... and May 12, 2022 and whether the share of
3  tweets expressing negative sentiment toward BAYC
4  was increasing between May 6 ... and May 12,
5  2022."
6      Do you see that?
7      A  I do.
8      Q  So that's a seven-day interval,
9  correct?
10     A  I believe so, yes.
11     Q  So to address this alternative
12  hypothesis you considered data from a seven-day
13  interval preceding the mint of RR/BAYC, correct?
14     A  Yes.
15     Q  How did you determine the specific
16  interval to use to conduct your analysis?
17     A  I think we already talked about why I
18  picked this specific time range and so this was,
19  as we talked about before, the range that I picked
20  and as I'm talking about in this analysis that I
21  think speaks to what we talked about before, if
22  the notion is that something was going on prior
23  that's driving -- driving the results, one would
24  expect that to have happened already.
25      If anything, it seems like at least in

**262**

1  this week prior, although it is only a week, but
2  at least in this week prior, things aren't going
3  down, they're going up. So it looks like
4  something that happened around that specific time
5  and continued to happen throughout this period
6  seems to be what's driving the decrease.
7      Q  Sir, you just testified that in this
8  week prior, things aren't going down, they're
9  going up; is that correct?
10     A  The positive -- the positive, the share
11  of positive -- tweets expressing positive
12  sentiment, as I talk into in footnote 199, is
13  actually increasing prior to May 13th, 2022.
14     Q  But as you acknowledge in your report,
15  sir, the slope was statistically -- was not
16  statistically distinguishable from zero, correct?
17     A  Correct.
18     MS. MELCHER:  Objection,
19  mischaracterizes testimony.
20  BY MR. GOSMA:
21     Q  So as a matter of statistics it was
22  neither going up nor going down, correct?
23     A  Well, it's going down in this entire
24  period, as I analyze from five -- let me look at
25  the date here. Give me a second.

**263**

1      Yeah, so, figure 7 looks at the entire
2  period. It's going down over that period, but it
3  doesn't seem like it's going down prior to the
4  13th, and so that's at least inconsistent with the
5  notion that somehow this was happening before
6  the 13th.
7      Q  So I just want to have a clear record
8  here about what your opinion is with respect to
9  footnote 199, okay?
10     As a matter of statistical significance
11  was the share of tweets expressing positive
12  sentiment towards BAYC going up or was it flat
13  during the period of May 6th, 2022 to May 12th,
14  2022?
15     A  I understand that you'd like to get a
16  clear record but you've asked me this question
17  already and I've answered it already and I think
18  the footnote is quite clear about what I found.
19     If the notion is somehow that what was
20  going on beforehand, is what's driving things, one
21  would expect things to look different than they
22  look in the figure. If you look at the tweets
23  between the 6th and the 12th, the share of tweets
24  expressing positive sentiment is actually
25  increasing while the share of negative tweets is

**264**

1  actually decreasing, and so that data is
2  inconsistent with this alternate hypothesis.
3      Q  But neither the increase nor the
4  decrease during the May 6th to May 12th, 2022
5  period was statistically distinguishable from
6  zero, correct?
7      A  You're just reading from my report, as
8  I note in footnote 199, that that is what
9  happened.
10     Q  Now, you referred a few times today to
11  a Bloomberg news cast; do you recall that?
12     A  I believe so, yes.
13     Q  Is this -- what, you're in figure 4?
14     A  I don't think you referred to it
15  specifically as figure 4 but yes, that is what
16  I am talking about.
17     So let's talk about this figure for a
18  moment.
19     So in the image of the news cast that's
20  included there in figure 4 there's a reporter
21  standing in front of a graphic; is that a fair
22  characterization?
23     A  I believe so, yes.
24     Q  Okay. And the graphic has a title "Top
25  NFT collections" and then there are five

265

1 collections listed, correct?
2     A   Uh-huh.
3     Q   In the left column is the name of the
4 collection, correct?
5     A   Give me just a second.
6     Q   Sure.
7     A   Okay, go ahead.
8     Q   In the left column is the name of the
9 collection?
10     A   Give me a second.
11         Well, it's the name that it's being
12 given in the show, the name that's being referred
13 to in the show.
14     Q   And then on the right is the price by
15 volume; do you see that?
16     A   I see that, yes.
17     Q   Okay.  And what do you understand
18 "price by volume" to be referring to?
19     A   I'm not sure off-hand.
20     Q   Okay.  Now, there are -- strike that.
21         There's a reference to "Bored Ape Yacht
22 Club V3," right?
23     A   Mm-hmm.
24     Q   And to be clear, did you actually watch
25 the live version of this news cast as part of your

266

1 preparation for this deposition -- your report?
2     A   I can't remember.
3     Q   Okay.  In the note in figure 4 just
4 below the image you say:
5         "As noted in Section II, Bored Ape Yacht
6 Club V3 refers to the RR/BAYC NFTs."
7         Do you see that?
8     A   Give me just a second.  I want to --
9 I'm just looking at something in my report.  Give
10 me just a second.
11         Okay, sorry, so would you mind asking
12 the question one more time?
13     Q   Sure.  I'd be happy to.  So when
14 looking at figure 4 of your report and there is a
15 note just below the image that reads:
16         "As noted in Section II, Bored Ape Yacht
17 Club V3 refers to the RR/BAYC NFTs."
18         Do you see that?
19     A   I do, yes.
20     Q   What's the basis for that statement?
21     A   I think there's a document right there
22 at the end of that that provides the basis for
23 that statement.
24     Q   Are you referring to the -- well, I'm
25 going to -- what document are you referring to

267

1 specifically just so we can get on the same page?
2     A   I think it's the one in the sentence
3 you just highlighted.
4     Q   Well, the sentence I just highlighted
5 does not have a document number in it so I'm just
6 trying to understand what it is that you're
7 talking about.
8     A   Sorry, didn't you direct my attention
9 to a footnote?
10     Q   Oh, no, not the footnote.  The note
11 that's underneath the image or in figure 4.
12     A   Oh, ah, sorry.  I thought you were
13 talking about the footnote that discusses the
14 image.  What are -- yes, feel free to ask -- go
15 ahead and ask your question.
16     Q   Well, can I ask you which footnote you
17 were referring to just so we can understand one
18 another because I have a feeling we are going to
19 get back to that footnote very shortly?
20     A   Footnote 177 notes that as I note in
21 Section II, the RR/BAYC collection is also known
22 as BAYC V3.
23     Q   Okay.
24     A   And I think -- just give me one second.
25 Sorry.

268

1         In footnote 2 of my report I have a
2 number of documents there that speak to this
3 point.  So there are a number of different
4 documents in footnote 2 that speak to this point
5 as well.
6     Q   Okay.  And as far as you're aware those
7 documents are the only basis for your conclusion
8 that BAYC -- or Bored Ape Yacht Club V3 refers to
9 the RR/BAYC NFTs, correct?
10         MS. MELCHER:  Objection,
11 mischaracterizes testimony.
12         THE WITNESS:  There are a whole bunch
13 of documents.  One, two, three, four, five, six,
14 including Ryder Ripps' deposition, seven, in
15 footnote 2.
16         There's a number of different documents
17 there.
18 BY MR. GOSMA:
19     Q   And all I'm trying to do is identify
20 the complete basis for your statement.  So you've
21 identified the documents in footnote 2 and the
22 document listed in footnote 177.
23         Are there any other documents that
24 you're aware of that support that statement?
25     A   I don't know off-hand whether there are

68 (269 to 272)

269

1 others but those would be the places I would look
2 first.
3    Q   Okay.  All right, let's turn to
4 paragraph 44 of your report.
5    A   Okay.
6    Q   So we've already talked about a couple
7 of the bullet points in this paragraph.  I'd like
8 to focus on number (iv) on page 24 which is about
9 merchandise featuring the BAYC brand; do you see
10 that?
11    A   I do, yeah.
12    Q   Is the merchandise that you are
13 referring to in this paragraph on page 24 of your
14 report is that merchandise made by Yuga Labs or is
15 it merchandise that is made by, for example,
16 licensees of Yuga Labs?
17    A   I don't -- companies often use
18 licensees to make products under their brand
19 names.  Those products are associated with the
20 brands whether or not they are made by licensees
21 or not.  So Gucci doesn't always manufacture its
22 own sunglasses, it often uses licensees, like
23 Luxotica or others, to make the sunglasses.
24        So yeah, I don't know off-hand whether
25 BAYC manufactures that merchandise themselves, but

271

1    Q   Do you know whether Yuga Labs has
2 granted anyone a license to use its trademarks?
3    A   I don't know off-hand but you suggested
4 that they had because they had licensees, is what
5 you said in your last question.
6    Q   Yeah, and I'm asking whether
7 independent of anything I said, whether you're
8 aware of any licenses that Yuga has entered into
9 with anyone else, to use its trademarks?
10    A   Anyone else beyond whom?
11    Q   Anyone else, just period.
12    A   Sorry, I thought you said in your
13 question that they had licensees and you had asked
14 what steps they had taken to ensure that things
15 that were with those licensees is what they agreed
16 upon.
17    Q   Sure.  Let's back up and let me take
18 you through this step-wise, so there is no
19 confusion.
20    A   Okay.
21    Q   And I realize I created a little bit of
22 ambiguity by going out of order.  So let's
23 start -- and I see Molly agreeing, so -- all
24 right.  So, first step: Are you aware of any
25 license rights that Yuga Labs has granted to

270

1 it features the BAYC brand and leverages that
2 brand association.
3    Q   Are you aware of any steps that Yuga
4 Labs has taken to ensure a certain level of
5 quality for the merchandise that its licensees
6 create?
7        MS. MELCHER:  Objection, vague.
8        THE WITNESS:  I'm not sure exactly what
9 you are referring to.
10 BY MR. GOSMA:
11    Q   Well, my question is: Are you aware of
12 steps that Yuga Labs has taken to curate the types
13 of goods that its licensees create, that use its
14 trademarks.
15        MS. MELCHER:  Objection, lacks
16 foundation, vague.
17        THE WITNESS:  Licensees have to have a
18 license.  That's how it works.  And so brands
19 don't give them a license unless they are aware
20 that those individuals are creating something and
21 brands often consider what is being created and
22 how it fits with the brand.
23        So it's not like a licensee can just do
24 whatever they want without the brand knowing.
25 BY MR. GOSMA:

272

1 anyone else to use its trademarks?
2    A   I know that there's merchandise that
3 features the BAYC brand.  I do not know off-hand
4 whether they manufacture themselves or have
5 licensed it to someone else.
6    Q   Okay.  And have you reviewed the Yuga
7 Labs terms and conditions for the BAYC NFT
8 collection?
9    A   The terms and conditions?
10    Q   Yes, sir.
11    A   For the NFTs or for something else?
12    Q   For the NFTs.
13    A   I may have seen it briefly, but I don't
14 remember all the details of the terms and
15 conditions -- but I believe -- well, sorry,
16 actually, I may remember where that is in the
17 report.  Give me a second.
18    Q   Take your time.
19    A   So in footnote 3, I talk about how Yuga
20 Labs' terms of service grant holders license
21 rights under Yuga Labs' intellectual property in
22 the underlying images allowing holders to display
23 them on merchandise they create on Twitter, for
24 example -- on merchandise they create or on
25 Twitter.

273

1  And so my understanding is if
2 individuals have a specific NFT for that specific
3 image of that NFT, the underlying image behind it,
4 they may display them on merchandise that those
5 individuals create or on Twitter. It doesn't give
6 those individuals, is my understanding, a right to
7 the other images in the collection, but it does
8 give them holders' rights to display the NFT --
9 the image they've bought of their specific NFT on
10 merchandise they create.
11  Q  And are you aware of the types of
12 merchandise that Yuga Labs' licensees have created
13 using their BAYC NFTs?
14  MS. MELCHER: Objection, vague.
15  THE WITNESS: Can you be a little more
16 specific when you say "licensees created"; who in
17 particular are you talking about?
18 BY MR. GOSMA:
19  Q  I'm talking about the folks that you
20 just referred to in your last answer, right, which
21 is the owners of the BAYC NFTs that have that
22 license to use the art work in the NFT that they
23 own. As a group are you aware of the types of
24 merchandise that those folks have created?
25  A  I may have seen some examples but I

274

1 don't remember off-hand exactly what's been
2 created.
3  Q  Is your understanding of the Yuga Labs'
4 terms and conditions -- strike that.
5  Do you understand Yuga Labs have placed
6 any limitation on the types of merchandise that
7 its licensees can create?
8  MS. MELCHER: Objection to the extent
9 it seeks a legal conclusion.
10  THE WITNESS: When you say licensees,
11 who are you referring to?
12 BY MR. GOSMA:
13  Q  I am still referring to the folks --
14 the BAYC NFT holders.
15  A  So their individual image that is on
16 their individual NFT and the question was, what
17 about those individual images only for the
18 specific ones that they own?
19  Q  Sure. Is there any limitation on how
20 the holders of those NFTs can use that image?
21  A  I don't remember off-hand. I'd have to
22 review the terms of service.
23  Q  Let's turn to paragraph 41 of your
24 report. Let me know when you're there.
25  A  Okay.

275

1  Q  All right. So in this paragraph you
2 say:
3  "Consistent with the notion that it was
4 highly desired, the collection sold out within
5 nine days (by May 1, 2021) and quickly gained
6 notoriety among the crypto community, celebrities,
7 and pop culture."
8  Do you see that?
9  A  I do, yes.
10  Q  And in footnote 77, just below that,
11 you point to some examples of different
12 celebrities that acquired BAYC NFTs, correct?
13  A  I see that, yes.
14  Q  And the celebrities that you pointed to
15 include Jimmy Fallon, correct?
16  A  Yes.
17  Q  Justin Bieber, correct?
18  A  Yes.
19  Q  And Steph Curry, correct?
20  A  Yes.
21  Q  Did Yuga's brand benefit in any way
22 from association with those celebrities?
23  MS. MELCHER: Objection, vague.
24  THE WITNESS: Can you be a little bit
25 more specific?

276

1 BY MR. GOSMA:
2  Q  Sure. Does being associated with those
3 celebrities that you name in your report, have a
4 positive impact on Yuga's brand?
5  A  It certainly could. I don't know
6 whether it did or not, but it certainly could.
7  Q  Is it fair to say that you did not
8 analyze the question of whether Yuga Labs' brand
9 benefited from its association with celebrities,
10 these celebrities?
11  A  I think what I'm doing in this section
12 is indicating the desirability of the brand. And
13 this is evidence of the desirability of the brand.
14 I'm not looking at, in this section, the
15 consequences of such associations. I'm talking
16 about the collection sold out within nine days,
17 for example, as an example of its desirability.
18  Q  Is there any correlation between the
19 desirability of the brand and its association with
20 celebrities?
21  A  I'm not sure what you're asking.
22  Q  Is there a positive correlation between
23 the association of Yuga Labs' brand and the
24 celebrities listed in footnote 77 of your report?
25  A  Is there a positive correlation between

277

1 the celebrities and the brand?
2    Q   Yeah.
3    A   I think I already answered this
4 question.  I said that association with such
5 celebrities could benefit the brand, but that I'm
6 not sure whether it did or not, but it certainly
7 could benefit the brand.  But I think I already
8 answered that question.
9    Q   Yeah, sure, and we're going around in
10 circles because -- and I'm going to ask you the
11 next question again and hopefully we won't go on
12 the same track again.
13       So is it fair to say that you didn't
14 analyze the question of whether celebrity
15 endorsements had a positive impact on Yuga's brand
16 or not?
17       MS. MELCHER:  Objection and
18 mischaracterizes the testimony.
19       THE WITNESS:  I don't believe that's
20 what I said previously.  I said what I'm doing in
21 this paragraph, and I was pretty specific about
22 what I said I was doing in this paragraph.
23 BY MR. GOSMA:
24    Q   Okay.  Did the association with BAYC
25 with the celebrities listed in footnote 77 of your

278

1 report have a positive impact on Yuga Labs' brand,
2 "yes" or "no"?
3    A   I'm sorry if you don't like my answer
4 but I've already answered this question three or
5 four times.
6    Q   Well, I move to strike your prior
7 answers and I'll ask the question again.
8       Did the association with BAYC -- strike
9 that.
10       Did the association between BAYC and
11 the celebrities listed in footnote 77 of your
12 report have a positive impact on Yuga's brand,
13 "yes" or "no" or "I don't have an opinion"?
14       MS. MELCHER:  Objection, vague.
15       THE WITNESS:  What do you mean by
16 positive association with the brand?
17 BY MR. GOSMA:
18    Q   Did the association between BAYC and
19 the celebrities listed in footnote 77 of your
20 report, increase the value of Yuga's brand, "yes"
21 or "no" or "I don't have an opinion"?
22    A   What do you mean by the value of its
23 brand?
24    Q   I mean increase the brand equity, as
25 you've used that term in your report.

279

1    A   As I think I've said now a couple of
2 times in answer to the same question, I'm sorry if
3 you didn't like the answer I gave, but I'm going
4 to give the same answer which is that it certainly
5 could have benefited or improved Yuga's brand
6 equity, but whether it did or not, I don't know.
7    Q   Okay.
8       All right, let's take a break.  I'm
9 almost done.  I need to go back through my notes
10 so let's take -- let's take five.
11    A   Okay, sounds good.
12       THE VIDEOGRAPHER:  We're going off the
13 record.  The time is 15:54.
14    (Recess taken from 3:54 p.m. to 4:02 p.m.)
15       THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 16:02 p.m.
17 BY MR. GOSMA:
18    Q   Welcome back, Dr. Berger.
19    A   Welcome back.
20    Q   Let's turn to paragraph 40 of your
21 report.
22    A   Okay.
23    Q   And in this paragraph you discuss the
24 BAYC NFT collection, right?
25    A   That's certainly what the first few

280

1 words of the paragraph are.
2    Q   Okay.  And your report says:
3       "Every individual Ape in the series has a
4 certain fundamental base character design ... plus
5 other adorning constituent parts such as
6 expression, headwear," et cetera.
7       That's generally what your report says,
8 right?
9    A   Generally, yes.
10    Q   And it says:
11       "These constituent parts are referred to as
12 'traits'."
13       Do you see that?
14    A   I do, yes.
15    Q   Are you familiar with the concept of a
16 trait in the NFT context?
17       MS. MELCHER:  Objection, vague.
18       THE WITNESS:  Could you share a little
19 bit more detail about what you're asking?
20 BY MR. GOSMA:
21    Q   Sure.  Are traits something that as a
22 concept is unique to BAYC?
23    A   In any sort of collection of things of
24 limited edition or collections in general, there
25 may be variations, so limited edition sneakers,

Transcript of Jonah Berger, Ph.D.
Conducted on March 9, 2023
71 (281 to 284)

---

281

1  for example, may come out in different colors.  So
2  all I'm saying here is these are how the NFTs
3  vary.  That's what I'm saying here.
4      Q   Do other NFT collections other than
5  BAYC have traits?
6      A   Do other -- I don't -- I don't know
7  off-hand.
8      Q   Okay.  In the case of BAYC certain
9  traits are rarer than others, right?
10     A   Yes.
11     Q   And the featured traits of a particular
12 BAYC NFT can impact the exclusivity of that NFT,
13 correct?
14     A   Certainly if an NFT has more -- more
15 infrequent features, people may perceive it as
16 rarer or more exclusive in some way.
17     Q   And that can drive an increase in the
18 value of that particular NFT, correct?
19     A   It can, yes.
20     Q   Now, a little bit down the page in
21 paragraph 40, you note that there are over 170
22 traits in the BAYC collection, correct?
23     A   Yes.
24     Q   Did you review these traits in
25 preparation for your report or for this

---

282

1  deposition?
2      A   I'm aware of what some of the traits
3  are.  I don't know whether I reviewed all 170
4  different ones and how frequent they are, no, I
5  don't know if I reviewed that.
6      Q   Now, still in paragraph 40 but down on
7  page 21 of your report, you state that:
8          "Those initial outputs were then fixed,
9  re-run and manually pruned by the creators to
10 achieve their creative vision for the final BAYC
11 collection."
12         Do you see that?
13     A   I do, yes.
14     Q   What did you mean by "manually pruned"?
15     A   I believe I'm referring to what is
16 discussed in footnote -- let me make sure I see it
17 here -- footnote 75.
18     Q   That's the testimony of Mr. Solano and
19 the deposition of Yuga Labs, that's what's
20 referred to in footnote 75?
21     A   Correct, yes.
22     Q   And who is Mr. Solano?
23     A   I'm not sure what you mean "Who is
24 Mr. Solano?".
25     Q   Who is he?

---

283

1      A   Sorry, I'm not sure what your --
2      Q   Sure.  What's Mr. Solano's role at Yuga
3  Labs.
4      A   I'd have to go back and look at his
5  deposition to be sure.  I don't remember off-hand.
6      Q   Well, I'll represent to you that he's
7  one of the founders of Yuga Labs.
8          So according to Mr. Solano, the rates
9  for the BAYC NFTs were manually pruned, correct?
10     A   I'm --
11         MS. MELCHER:  Objection,
12 mischaracterizes testimony.
13         THE WITNESS:  I think what I said here
14 is that for this statement manually pruning,
15 outputs being fixed, re-run and manually pruned,
16 I'm referring to the Solano deposition and the
17 deposition of Yuga Labs, those two things in
18 footnote 75.
19 BY MR. GOSMA:
20     Q   So is it fair to say that the creators
21 of BAYC intentionally included all of the 170
22 traits that are included in the collection, right?
23         MS. MELCHER:  Objection,
24 mischaracterizes testimony.
25         THE WITNESS:  I'm not sure what you're

---

284

1  getting at, or exactly even what you're saying.
2  BY MR. GOSMA:
3      Q   Okay.  I'm just asking you whether you
4  understand Mr. Solano's testimony that he manually
5  pruned the collection evidences his intent to
6  include the traits in the collection?
7      A   I would need to --
8          MS. MELCHER:  Same objection.
9          THE WITNESS:  I would need to go back
10 and look at specifically what Mr. Solano was
11 saying in this context to refresh my memory about
12 what he was referring to.
13         MR. GOSMA:  All right.  I have no
14 further questions for you, Dr. Berger.
15         THE WITNESS:  Okay, thank you very much
16 for your time.
17         MR. GOSMA:  Yeah, I appreciate yours as
18 well.
19         MS. MELCHER:  I don't have any further
20 questions but as on the record I -- as we've done
21 for past depositions, just want to note that
22 Dr. Berger will read and sign the deposition and
23 that we're marking this Highly Confidential,
24 Attorneys' Eyes Only, under section 6.3 (b) of the
25 Protective Order.

Transcript of Jonah Berger, Ph.D.

72 (285 to 288)

Conducted on March 9, 2023

---

285

1       MR. GOSMA:  Okay.  We can take up the
2  confidentiality designation offline, and I'm
3  fairly certain we are going to object, but we can
4  take that up another day.
5       THE VIDEOGRAPHER:  This concludes the
6  deposition of Jonah Berger.  We are going off the
7  record at 16:10.
8  (Whereupon at 4:10 p.m. the deposition concluded)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

286

1       ERRATA SHEET FOR THE DEPOSITION OF:
2  CASE NAME: YUGA LABS, INC. V RYDER RIPPS
3       JEREMY CAHEN, DOES 1-10
4  CASE NUMBER: 2:22-CV-04355-JFW-JEM
5  DEPO DATE: THURSDAY, MARCH 9, 2023
6  DEPONENT: JONAH BERGER
7            CORRECTIONS
8  PG. LN. NOW READS   SHOULD READ       REASONS
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  SIGNATURE                       DATE
25

---

287

1  STATE OF CALIFORNIA          )
2  COUNTY OF LOS ANGELES        )
3
4       I, JONAH BERGER, HEREBY CERTIFY UNDER
5  PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF
6  CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT
7  EXECUTED THIS_____DAY OF_____2023,
8  AT _____CALIFORNIA
9
0
                _____
2                JONAH BERGER, Ph D
3
4
5
6
7
8
9
20
2
22
23
24
25

---

288

1   CERTIFICATE OF REPORTER - NOTARY PUBLIC
2       I, LISA BARRETT, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me and thereafter
7  reduced to typewriting under my direction; that
8  reading and signing was requested; and that I am
9  neither counsel for, related to, nor employed by
10 any of the parties to this case and have no
11 interest, financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal this 14th day
14 of March, 2023
15
16
17      LISA BARRETT, RPR, CRR, CRC, CSR
18   Certified Court Reporter and Notary Public
19
20
21
22
23
24
25

---

# Deposition of Jonah Berger Errata

## March 9, 2023

| Page | Line | Original | Corrected | Reason |
|---|---|---|---|---|
| 12 | 1 | did I here | I did here | Transcription error |
| 28 | 13 | You now | You know | Transcription error |
| 40 | 2 | So my both research | So both my research | Clarification |
| 55 | 10–11 | BAY and | BAYC | Clarification |
| 59 | 14–15 | my forth -- myself -- forth myself | myself forth | Clarification |
| 74 | 11 | have | has | Transcription error |
| 84 | 23 | tip | top | Transcription error |
| 85 | 2 | no | the | Clarification |
| 97 | 1 | BAY | BAYC | Transcription error |
| 97 | 2 | search is not | search and is not | Transcription error |
| 97 | 3 | confusion and is different than | confusion-- That is different | Clarification |
| 97 | 21 | is | are | Clarification |
| 100 | 15 | period of which | period in which | Clarification |
| 101 | 4 | were | was | Transcription error |
| 107 | 10 | change | a change | Transcription error |
| 108 | 9 | from somebody | somebody | Transcription error |
| 111 | 13 | answer asked | asked | Clarification |
| 112 | 25 | evidence for | evidence of | Clarification |
| 122 | 1 | created | create | Transcription error |
| 123 | 8 | where | what | Clarification |
| 136 | 2 | a content | content | Clarification |
| 136 | 7 | what's going on to | what's going on with | Clarification |
| 137 | 17 | A Not whether | Q Not whether | Transcription error |
| 143 | 9 | on not | not on | Clarification |
| 154 | 20–21 | 5 percent of the tweets in the most periods. There's | 100 percent of the tweets in the most important periods. There's | Transcription error |
| 159 | 10 | This looks I ke to | This looks to | Clarification |
| 160 | 22 | identify | identity | Transcription error |
| 165 | 12 | I've not idea | I have no idea | Clarification |
| 178 | 22 | they | that | Clarification |
| 185 | 3 | individual | individual's | Transcription error |
| 186 | 12 | Club | Club NFT | Clarification |
| 186 | 23 | Club | Club NFT | Clarification |
| 203 | 4 | seen | seem | Transcription error |
| 206 | 5 | more than enough sample | more than enough of a sample | Clarification |
| 206 | 25 | as much sample | as much of a sample | Clarification |
| 228 | 3 | greater than by more than 5 | greater than by more than 5 percentage points | Clarification |
| 228 | 5 | reclassified | classified | Clarification |
| 228 | 7 | positive by 5 | positive by more than 5 percentage points | Clarification |
| 239 | 5 | most things that | things that | Clarification |
| 246 | 19 | report about | report -- about | Transcription error |
| 272 | 4 | manufacture themselves | manufacture that themselves | Clarification |
| 273 | 4 | them | the image | Clarification |
| 273 | 8 | them | the | Transcription error |

_(signature)_

Jonah Berger, Ph.D.

April 12, 2023

Date