Exhibit B



Planet Depos
We Make It Happen™

<span style="color:#8B0000">**Highly Confidential - Attorneys' Eyes Only**</span>

# Transcript of Lauren Kindler

**Date:** March 17, 2023
**Case:** Yuga Labs, Inc. -v- Ripps, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                  WESTERN DIVISION
 4
 5
 6   YUGA LABS, INC.,
 7                  Plaintiff,
 8    and Counterclaim Defendant
 9         v.            Case No.:
10   RYDER RIPPS and JEREMY CAHEN,   2:22 cv 04355 JFW JEM
11                  Defendants,
12    and Counterclaim Plaintiffs
13
14
15
16   ** THIS TRANSCRIPT IS MARKED HIGHLY CONFIDENTIAL
17          ATTORNEYS' EYES ONLY **
18
19          DEPOSITION OF LAUREN KINDLER
20                  VOLUME I
21            CONDUCTED VIRTUALLY
22          FRIDAY, MARCH 17, 2023
23
24   REPORTED BY:   NATALIE PARVIZI AZAD, CSR, RPR, RSR
                     CSR NO. 14125
25   JOB NO.:       483508
```

**Page 2**

```
 1            UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF CALIFORNIA
 3                  WESTERN DIVISION
 4
 5
 6   YUGA LABS, INC.,
 7                  Plaintiff,
 8    and Counterclaim Defendant
 9         v.            Case No.:
10   RYDER RIPPS and JEREMY CAHEN,   2:22 cv 04355 JFW JEM
11                  Defendants,
12    and Counterclaim Plaintiffs
13
14
15
16
17    DEPOSITION OF LAUREN KINDLER, VOLUME I
18    TAKEN ON BEHALF OF THE PLAINTIFF
19    REMOTELY VIA ZOOM VIDEOCONFERENCE
20    BEGINNING AT 9:07 A.M. AND ENDING AT 3:17 P.M. PST,
21    ON FRIDAY, MARCH 17, 2023, BEFORE
22    NATALIE PARVIZI AZAD, CERTIFIED SHORTHAND
23    REPORTER NUMBER 14125.
24
25
```

**Page 3**

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF, YUGA LABS, INC.:
 4      FENWICK & WEST, LLP
 5      BY:  ETHAN THOMAS, ESQ.
 6      BY:  MOLLY MELCHER, ESQ.
 7      555 CALIFORNIA STREET
 8      SAN FRANCISCO, CALIFORNIA  94104
 9       415  875 2300
10
11
12   FOR THE DEFENDANTS, RYDER RIPPS, JEREMY CAHEN:
13      WILMER CUTLER PICKERING HALE AND DORR, LLP
14      BY:  DEREK GOSMA, ESQ.
15      BY:  TYLER CARROLL, ESQ.
16      350 SOUTH GRAND AVENUE
17      LOS ANGELES, CALIFORNIA  90071
18       213  443 5300
19
20
21
22   ALSO PRESENT:
23      PARKER SIMPSON, VIDEOGRAPHER
24      HAROLD RODRIGUEZ,  DEPOSITION TECHNICIAN
25
```

**Page 4**

```
 1            I N D E X
 2
 3   WITNESS                        PAGE
 4   LAUREN KINDLER
 5        EXAMINATION BY MR. GOSMA       6
 6
 7            E X H I B I T S
 8   EXHIBIT NO.   DESCRIPTION          PAGE
 9   EXHIBIT 1     EXPORT REPORT OF LAUREN    16
10               KINDLER AND APPENDICES
11
12   EXHIBIT 2     TWEET DATED           82
13               DECEMBER 6, 2021;
14               BATES YUGALABS 00000535
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Attorneys' Eyes Only

Transcript of Lauren Kindler
Conducted on March 17, 2023

---

Page 5

1    LOS ANGELES, CALIFORNIA
2    FRIDAY, MARCH 17, 2023, 9:07 A.M.
3
4         THE VIDEOGRAPHER:  Here begins the
5    videotaped deposition of Lauren Kindler in the
6    matter of  Yuga Labs, Incorporated versus Ryder
7    Ripps, et al.  in the United States District Court,
8    Central District of California, case number
9    2:22 cv 04355 JFW JEM.  Today's date is Friday,
10   March 3rd, 2023.  The time on the video monitor is
11   9:07.
12        The remote videographer for today is
13   Parker Simpson representing Planet Depos.  And I
14   correction   Friday, March 17th.
15        All parties of this video deposition are
16   attending remotely.  Would counsel please voice
17   identify themselves and state whom they represent.
18        MR. GOSMA:  This is Derek Gosma of Wilmer
19   Hale on behalf of the defendants, Ryder Ripps and
20   Jeremy Cahen, and with me today is my colleague
21   Tyler Carroll, also Wilmer Hale.
22        MR. THOMAS:  Good morning, this is Ethan
23   Thomas from Fenwick & West representing the
24   counterclaim defendant, Yuga Labs, Inc.  With me
25   today is my colleague, Molly Melcher.

---

Page 6

1         And just to note at the outset,
2    Ms. Kindler will read and sign the deposition
3    transcript.  And pursuant to the protective order,
4    the deposition will be designated highly
5    confidential, attorneys' eyes only, unless otherwise
6    designated during the allowable time.  And I just
7    wanted to confirm that we agreed prior to the
8    deposition that communications during the break are
9    not discoverable and protected by the
10   attorney client privilege.
11        Does that sound right to you, Derrick?
12        MR. GOSMA:  Yes.  So stipulated.
13        MR. THOMAS:  Thank you.
14        THE VIDEOGRAPHER:  The court reporter
15   today is Natalie Parvizi representing Planet Depos.
16   Would the reporter please swear in the witness.
17        THE CERTIFIED STENOGRAPHER:  Please raise
18   your right hand to be sworn.
19
20        LAUREN KINDLER,
21   having declared under penalty of perjury to tell
22   the truth, was examined and testified as follows:
23
24        EXAMINATION
25   ///

---

Page 7

1    BY MR. GOSMA:
2        Q.  Good morning, Ms. Kindler.
3        A.  Good morning.
4        Q.  You understand you're under oath?
5        A.  Yes.
6        Q.  Are you presently under the influence of
7    any substance that would impair your ability to
8    testify today?
9        A.  No.
10       Q.  Is there any other reason that you cannot
11   give your best testimony today?
12       A.  No.
13       Q.  Have you ever been deposed before?
14       A.  Yes.  Many times.
15       Q.  Always as an expert witness?
16       A.  Yes.
17       Q.  Have you ever been a defendant in a
18   lawsuit?
19       A.  No.
20       Q.  Have you ever been arrested?
21       A.  No.
22       Q.  Have you ever been charged with a crime?
23       A.  No.
24       Q.  You're being compensated at $900 an hour
25   today?

---

Page 8

1        A.  My firm, Analysis Group, is.
2        Q.  Is $900 an hour your standard
3    compensation -- well, strike that.
4            Is $900 an hour the standard compensation
5    rate that Analysis Group charges on your behalf?
6        A.  Yes.
7        Q.  How many hours have you worked on this
8    case?
9        A.  In total through today?
10       Q.  Yes, ma'am.
11       A.  Probably on the order of 40 to 45 hours.
12       Q.  And what percentage of your annual income
13   comes from consulting?
14       A.  Nearly 100 percent.
15       Q.  Staff assisting you are being -- strike
16   that.
17           Did you have staff assisting you in this
18   case?
19       A.  Yes, I had a team.
20       Q.  Okay.  And your team is -- strike that.
21           Analysis Group charges between 375 and
22   $900 an hour for your team members; correct?
23       A.  Yes, that's correct.
24       Q.  How many other team members did you work
25   with?

---

9

1    A.  I think it was five additional team
2  members.
3    Q.  What are the total billings for you and
4  your team on this case as of the last invoice?
5    A.  My understanding is that it's around
6  $500,000.
7    Q.  When were you engaged for this case?
8    A.  I think we were first contacted in
9  November of last year, and I think the retention
10 agreement was executed in December.
11   Q.  How many other matters are you currently
12 retained for as an a expert?
13   A.  Oh, gosh.  Across all my cases?
14   Q.  Yes.
15   A.  I have no idea.  A lot.
16   Q.  Okay.  Had you heard of Yuga Labs prior to
17 your engagement for this case?
18   A.  Yes, I believe I had.
19   Q.  In what context?
20   A.  I think just news, but I didn't have any
21 other understanding other than having recognized the
22 name.
23   Q.  So is it fair to say you've never
24 previously worked with them in an expert witness
25 capacity; correct?

0

1    A.  Correct.
2    Q.  Had you ever heard of my client Ryder
3  Ripps prior to this case?
4    A.  No, I don't believe so.
5    Q.  Had you ever heard of my client Jeremy
6  Cahen prior to this case?
7    A.  No.
8    Q.  You've provided expert opinions many in
9  times in the past, as we already discussed; correct?
10   A.  Yes.
11   Q.  Has a court ever determined that your
12 expert opinion was inadmissible for any reason?
13   A.  So, on -- there's been maybe a few cases
14 where minor pieces of my report have been excluded
15 for reasons like, you know, maybe a license
16 agreement that I discussed in my report was not
17 produced timely or, in one case I'm thinking of, an
18 individual that I had relied on from the company,
19 the ultimate client, the court determined that I
20 couldn't rely on that person for a particular input,
21 but there has never been a situation where my report
22 was excluded such that it ultimately impacted my
23 opinions.  Hopefully that answers your question.
24   Q.  It does, thank you.
25      Have you ever previously advised a

1    cryptocurrency technology company?
2    A.  No.
3    Q.  Okay.  So this is your first case that
4  involves cryptocurrency and NFTs; is that fair?
5    A.  Well, you said advised a cryptocurrency
6  company, so no, I don't think that that means I have
7  never touched a cryptocurrency or NFT case.
8    Q.  Okay.  What matters have you been on that
9  involved cryptocurrency or NFTs?
10   A.  So I've been approached to work on behalf
11 of companies involving cases that involved either
12 cryptocurrency or NFTs.  I ultimately haven't
13 provided any expert opinions in any of those cases,
14 but I've been involved to the extent of having to
15 get up to speed and learn some information about the
16 space.
17   Q.  Okay.  Understood.  So is it fair to say
18 that this is the first case in which you've offered
19 an expert report in a case involving cryptocurrency
20 issues?
21   A.  Yes, that would be accurate.
22   Q.  Okay.  What you been asked to do in this
23 case?
24   A.  I was asked to evaluate the damages
25 associated with the defendants' alleged trademark

2

1  infringement and false advertising.
2    Q.  Your expert report in this case includes
3  analysis of a significant amount of on-chain data;
4  correct?
5        MR. THOMAS:  Objection.  Vague.
6    A.  Yes.  I mean, assuming you -- I think of
7  it as blockchain data, but yes, absolutely.
8    Q.  Okay.  When I say "on-chain data," I mean
9  blockchain data.  And so, I'll ask the question
10 again in a -- using your term.
11      Your expert report in this case includes a
12 significant amount of blockchain data analysis;
13 correct?
14   A.  I think I can agree with that, yes.
15   Q.  Okay.  Now I think you mentioned before
16 that as part of the workup for some of your prior
17 consulting you had done some research into
18 cryptocurrency and NFTs; is that correct?
19   A.  I think that would be an accurate
20 characterization, yes.
21   Q.  Okay.  Do you have any personal experience
22 that is outside the context of your -- of your
23 consulting work with cryptocurrency or NFTs?
24      MR. THOMAS:  Objection.  Vague.
25   A.  Can you explain what you mean by personal

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

4 (13 to 16)

3

1  experience.
2      Q.  Sure.  Do you own any cryptocurrency
3  yourself?
4      **A.  Yes.**
5      Q.  Do you own any NFTs yourself?
6      **A.  No.**
7      Q.  What cryptocurrencies do you own?
8      **A.  Bitcoin.**
9      Q.  And do you -- well, strike that.
10         And did you purchase that yourself or did
11  you do it through a broker or through some other
12  sort of third-party financial -- financial planner?
13     **A.  I purchased it myself through Coinbase.**
14     Q.  Okay.  Thank you.  That's helpful.
15         So as far as your preparation for this
16  case, did you do any research into cryptocurrency
17  issues?
18     MR. THOMAS:  Objection.  Vague.
19     **A.  Yeah, do you mean during the work that I**
20  **did in performing my -- or forming my opinions in**
21  **this case?**
22     Q.  Yes, I do.
23     **A.  Yes.  I mean, me and my team collectively**
24  **did -- did a lot of research, most of which is**
25  **outlined in my report.**

4

1      Q.  What's your understanding of -- strike
2  that.
3         What is a blockchain?
4      **A.  My understanding is that it's -- I think**
5  **they refer to it as a cryptographic ledger, but it's**
6  **a space on the internet where digital transactions**
7  **are stored and managed, and then it's decentralized**
8  **so that it's stored across many different computers**
9  **in a network, and it's all publicly accessible.**
10     Q.  What is an NFT?
11     **A.  An NFT is a non-fungible token, which is a**
12  **type of smart contract that reflects a digital asset**
13  **that is -- can be owned by an individual and**
14  **transferred among individuals.  And those digital**
15  **assets can be things like digital artwork, for**
16  **example.**
17     Q.  So, as you just mentioned, some NFTs refer
18  to digital artwork; correct?
19     **A.  Yes.**
20     Q.  In that case, is an NFT the same thing as
21  digital artwork?
22     MR. THOMAS:  Objection.  Outside the scope
23  of the report.
24     **A.  Yeah, I think that would be outside of my**
25  **area of expertise.**

5

1      Q.  So, you don't have an opinion one way or
2  another in this case about whether an NFT is the
3  same thing as digital artwork; correct?
4      MR. THOMAS:  Objection.  Mischaracterizes
5  testimony.
6      **A.  Yeah, I would say that I have not formed**
7  **an opinion that's directed to that question.**
8      Q.  Can anyone make an NFT?
9      **A.  I believe the answer to that is yes, but**
10  **again, that's probably outside of my expertise.**
11  **But yes, my understanding is that, yes, anyone can**
12  **do that.**
13     Q.  What is an NFT marketplace?
14     MR. THOMAS:  Same objection.  Outside the
15  scope.
16     **A.  My understanding is that there are several**
17  **or many marketplaces that provide secondary markets**
18  **for trading of digital assets, including NFTs.**
19     MR. GOSMA:  I think now would be a good
20  time to refer to your report.  I have tried to
21  upload it.  I'm not sure if it's completed the
22  upload.  I'm going to put it in the chat and send it
23  as well.
24         And folks, do you see the Tab 2 there in
25  the chat?

6

1      **A.  Not yet.**
2      MR. GOSMA:  Hopefully it'll come in a
3  second.
4         (Exhibit 1 marked.)
5  BY MR. GOSMA:
6      Q.  And we'll get this exhibit sorted out,
7  but, Ms. Kindler, you're free to refer to any hard
8  copy -- let me just ask for the record, did you
9  bring a copy of your report with you to the
10  deposition today?
11     **A.  Yes, I did.  I have a clean hard copy of**
12  **my report in addition to a clean hard copy of my**
13  **declaration.**
14     Q.  All right.  So are you seeing that tab pop
15  up in the chat?
16     **A.  No.**
17     MR. GOSMA:  You know what?  It looks like
18  I may be sending it directly to -- so I'm going to
19  try this one more time.
20     **A.  I see it.**
21     Q.  All right.  Learn something new about Zoom
22  every time I get on here.
23     **A.  Got to keep it interesting.**
24     Q.  All right --
25         DEPOSITION TECHNICIAN:  Sorry to

**7**

1  interrupt. This is the remote tech. I haven't
2  received it through my -- through the chat, just so
3  you're aware.
4        MR. GOSMA: I sent it to everyone.
5        DEPOSITION TECHNICIAN: Okay. I got it
6  now. Sorry. Thank you.
7        MR. GOSMA: No problem.
8  BY MR. GOSMA:
9     Q. Okay.
10    A. And I have it downloaded on my end.
11    Q. Okay. Great. You can use whichever
12 version you like. Let's take a look at paragraph 22
13 of your report on page 11.
14    A. I'm there.
15    Q. Okay. This is a subsection labeled "NFT
16 Marketplace."
17       Do you see that?
18    A. Yes.
19    Q. Okay. And you identify a number of
20 marketplaces in this paragraph, one of which is
21 OpenSea; correct?
22    A. Yes.
23    Q. And you also state, "Other prominent NFT
24 marketplaces include Rarible, LooksRare, and
25 Foundation."

**8**

1        Do you see that?
2     A. I do.
3     Q. How did you come to the understanding that
4  those marketplaces are prominent?
5     A. Well, there's, I mean, a source there that
6  discusses the top ten NFT marketplaces, and then
7  separately, with respect to this case and the
8  transactions that are relevant for this case, we can
9  observe in the Etherscan data which marketplaces the
10 transactions are occurring on, and these
11 marketplaces are also showing up in that analysis as
12 well.
13    Q. And I think we covered this before, but
14 just to confirm, you've never used an NFT
15 marketplace yourself; correct?
16    A. Not outside of this litigation, no.
17    Q. Have you used one in the context of this
18 litigation?
19    A. Depends how you define "used." I mean,
20 I've certainly gone to these and looked at them and
21 looked at the that sources we cite to in my report,
22 and that maybe constitutes use. But if you mean
23 transacting, I have not transacted on one of these
24 marketplaces.
25    Q. Okay. That's very helpful.

**9**

1        Can an NFT be copied?
2        MR. THOMAS: Objection. Vague and outside
3  the scope of the report.
4     A. Yeah, I think -- I mean, I don't have any
5  opinions on that, and I know that's an area of
6  potential dispute. And I think it depends on what
7  elements of the NFT you're talking about, but I
8  don't have any opinions on that.
9     Q. What does it mean to mint an NFT?
10    A. My understanding --
11       MR. THOMAS: Objection. Outside the scope
12 of the report.
13    A. Sorry, Ethan.
14       My understanding is that minting means, in
15 a sense -- I think of it as kind of posting it to
16 the blockchain, but basically making it available as
17 a digital asset on the blockchain. I'm sure posting
18 is not the right word, but as a noncrypto person
19 I'll use that word.
20    Q. What is gas in the cryptocurrency context,
21 what does that mean?
22    A. So gas, my understanding of gas is, in a
23 sense, they're transaction fees. So this is the
24 money that is used, I think, to incentivize others
25 on the blockchain to either accept records,

**20**

1  authenticate records, and that ultimately those fees
2  are referred to as gas, and that that's a cost, in a
3  sense, of doing a transaction on the blockchain.
4  And so, there's gas costs for minting and there's
5  gas costs for transacting.
6     Q. At various times in your report you
7  mention something called a token tracker. What is a
8  token tracker?
9     A. I think that is something on the -- on the
10 internet that can track individual tokens, but I
11 don't have any deeper understanding than that.
12    Q. What does it mean to burn an NFT?
13    A. I think that's to get rid of it, so to
14 destroy it.
15    Q. You refer quite a bit in your report to a
16 website called Etherscan. Are you familiar with
17 Etherscan?
18    A. Yes.
19    Q. What is Etherscan?
20    A. My understanding is that that's the
21 analytical tool that allows the general public to
22 access data from the Ethereum blockchain.
23    Q. Okay. Let's ask some more general
24 questions about your report, which is Exhibit 2.
25 You reviewed your report carefully before you signed

**Page 2**

1  it; correct?
2      A.  Oh, absolutely.  Many times.
3      Q.  At the time you signed the report, you
4  believed everything in it was accurate; correct?
5      A.  Yes.
6      Q.  And there was nothing in the report that
7  you're aware of that you'd like to take back at this
8  point; correct?
9      A.  Not take back.  I mean, I don't know what
10  you -- so nothing that rises to the level of, oh, I
11  need to correct something.  But I don't know if
12  you're asking something more narrow than that like
13  did I see a typo.
14      Q.  Yeah, that's my next question.  Is there
15  anything in your report that needs correction?
16      A.  Well, again, I mean, needs, I don't think
17  anything rises to the level of needing to correct,
18  but I did notice a couple of minor things when I was
19  reviewing it again.
20      Q.  What did you notice?
21      A.  I think if we search -- I noticed in the
22  Word copy -- let me see if it's showing up in the
23  PDF or if it somehow found its way into the Word.
24  Yeah, I mean, this is so minor.  Page 32.
25      Q.  Yup.

**Page 22**

1      A.  Paragraph 63.  And then five lines down
2  there's this little bracket after 88, Mr. Cahen sold
3  88.  I don't know what that is.
4      Q.  Okay.
5      A.  The other thing that comes to mind is
6  Laura O'Laughlin, we refer to her as Doctor.  I
7  don't think she's actually a Ph.D., I think she's
8  Ms.  And she is a colleague of mine, so that was
9  just an inadvertent mistake by my team.
10      Q.  Well, most people don't complain when you
11  give them an honorary doctorate.
12      A.  Right.
13      Q.  They won't be too upset.
14      A.  It happens.
15      Q.  Sure.  Okay.  Anything that is above the
16  level of a typographical error that you're aware of
17  that needs correcting?
18      A.  Nothing that I'm aware of, no.
19      Q.  Did you draft your report yourself?
20      A.  Yes.  In combination with the team.  I
21  mean, I certainly -- by the end of the process all
22  of the words are mine and I've signed off on
23  everything in the report, but I obviously have a
24  team helping me and, you know, certain sections
25  would be drafted initially under my direction and

**Page 23**

1  then I review them and comment and edit, and it was
2  a very iterative process.
3      Q.  Sure.  And so, when you refer to your
4  team, do you mean other members of Analysis Group?
5      A.  Yes, absolutely.
6      Q.  Did lawyers from Fenwick & West have any
7  role in drafting portions of your report?
8      A.  No.
9      Q.  Now, you understand that Yuga Labs has
10  retained other experts in this case; correct?
11      A.  Yes.
12      Q.  Did you speak to either of those experts
13  as part of forming your opinions in this case?
14      A.  No.  I just reviewed the reports of
15  Ms. O'Laughlin and Dr. Berger.
16      Q.  So let's turn to appendix B of your
17  report.
18      A.  I'm there.
19      Q.  This is your materials considered;
20  correct?
21      A.  Correct.
22      Q.  Did you review all the materials cited
23  here in appendix B?
24      A.  It would be my team, and then I would
25  review -- I reviewed a subset of these materials,

**Page 24**

1  certainly everything that's cited in my report, but
2  I have a team that assists with the initial review
3  because it's obviously a lot of material.
4      Q.  Sure.  Who provided you with the materials
5  in appendix B?
6      A.  So the first category of Bates Stamp
7  documents, that would have been provided by counsel
8  at Fenwick.  Similarly, the expert reports -- that's
9  the next category on B6, page B6 -- would have been
10  provided by counsel.
11      The rest of the materials would have been
12  information that was independently obtained by my
13  team working under my direction.  And those should
14  be everything that's cited in my report.  So our
15  typical standard practice is anything independently
16  obtained that I cite in my report ends up on
17  appendix B.
18      Q.  Thank you.  As part of your analysis --
19  excuse me.  Strike that.
20      As part of your analysis in this case, did
21  you review any internal e-mails or communications
22  between Yuga Labs employees?
23      A.  I can't recall -- I can't recall right
24  now.
25      Q.  Okay.  But as you sit here, you can't

25

1  think of any; correct?
2      A.  I mean, I could look through my report and
3  see if they're cited there.  In my studying
4  yesterday I reviewed a lot of materials, but I don't
5  think any of them fall under that category.
6      Q.  Okay.  Let's turn to appendix C.
7      A.  I'm there.
8      Q.  All right.  And appendix C is titled
9  "Ethereum Blockchain Data and Calculation of
10  Defendants Profits From Initial Sales and Resales of
11  RR/BAYC NFTs;" correct?
12      A.  Yes.
13      Q.  And in paragraph 2 of appendix C you
14  state, "Ethereum blockchain transaction data was
15  collected using Etherscan, a block explorer and
16  analytics platform for Ethereum."
17          Do you see that?
18      A.  Yes.
19      Q.  Why did you choose to use Etherscan for
20  your analysis?
21      A.  My understanding is that there are other
22  ways to access the data, but the most user friendly
23  is Etherscan.
24      Q.  What was the date rage for the data that
25  you analyzed from Etherscan?

26

1      A.  Well, ultimately, we started the analysis
2  in May 30, 2022, which is the first day that we
3  observe a transaction with one of the RR/BAYC
4  tokens, but I think in -- we arrived at that by
5  looking for all transactions on the blockchain that
6  involved that token.  So I think the start date was
7  a function of the actual transaction data as opposed
8  to us deciding to start on that date.
9      Q.  Okay.  Understood.  And so, your analysis
10  would also have included blockchain data after
11  May 13th, 2022; correct?
12      A.  Yes, I believe we pulled data -- the date
13  February 23rd is coming to mind.  But yeah, we
14  pulled as much data as we could, in terms of
15  chronological data, before issuing my report.
16      Q.  Okay.  So is it fair to say that your
17  analysis included data from Etherscan between at
18  least May 13th, 2022, and February 23rd, 2023?
19      A.  Yeah, actually, now that I'm looking at
20  it, I think it's February 1st, 2023, because we
21  issued the report on February 26, 2023.  But yes, we
22  would -- go ahead.
23      Q.  Just so we have a clear record, it's fair
24  to say that your analysis included data from
25  Etherscan between at least May 13th, 2022, and

27

1  February 1st of 2023; is that correct?
2      A.  That's correct.
3      Q.  Okay.  Now, you used software to perform
4  this -- strike that.
5          You used software to perform this
6  extraction; correct?
7      A.  Correct.
8      Q.  What software did you use?
9      A.  We used Python.  And so, we -- we used
10  Python to write scripts that would then give
11  direction to Etherscan regarding what parameters of
12  data we wanted to extract from the blockchain.
13      Q.  Let's break that down a little bit.
14  Python is a programming language; correct?
15      A.  Correct.
16      Q.  And your team created a program in Python
17  to conduct the data extraction from Etherscan; is
18  that correct?
19      A.  I think that would be a fair
20  characterization, yes.
21      Q.  Who on your team wrote the code?
22      A.  The Etherscan data extraction and data
23  analysis was largely performed by two individuals on
24  my team.
25      Q.  For the record, who are those individuals?

28

1      A.  So the first one is an associate by the
2  name of -- of Maks -- I'm going the get his last
3  name wrong -- Khomenko or something like that.  And
4  then Quyen Ha was a senior analyst on the team.  And
5  the two of them worked together to do all of the
6  Etherscan data work.
7      Q.  So if I refer to those folks as Maks and
8  Quyen, will you know who I'm referring to?
9      A.  Yes.  And for the record, it's M-A-K-S and
10  Q-U-Y-E-N, I believe.
11      Q.  Okay.  Those are not the spellings that I
12  would have guessed.
13      A.  Right.
14      Q.  So I appreciate the clarification.
15          Okay.  So do Maks and Quyen have
16  experience programming in Python?
17      A.  Yes.
18          MR. THOMAS:  Objection.  Vague.
19      A.  Sorry.  Yes.
20      Q.  Do you yourself have experience
21  programming in Python?
22      A.  I do not.  I have programming experience
23  in other languages but I have not used Python.
24      Q.  What other languages do you have
25  experience programming in?

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

29

1    A.  SAS and Stata.  That was in a past life
2  when I used to do that type of work.
3    Q.  Yeah, I lived a similar past life.
4    A.  Don't ask me to do it now.
5    Q.  Yeah.
6       Now, your report doesn't include the names
7  of the folks that wrote this Python code; correct?
8    A.  That's correct.  And that's a standard
9  procedure for me to not include the names of the
10  members of my team.
11    Q.  And your report similarly doesn't say
12  anything about those folks' credentials; correct?
13    A.  That's correct.
14    Q.  Your report does not explain -- strike
15  that.
16       Your report does not include the software
17  code itself; correct?
18    A.  That's correct.  We separately did produce
19  our data files, and that would include code for the
20  data analysis that we did, but it is not attached to
21  my report.
22    Q.  And your report did not explain how the
23  software code performed the analysis that you
24  undertook; correct?
25    A.  Oh, I disagree with that.  And when you

30

1  say, "analysis that we undertook," are you talking
2  still about the collection of the data or the
3  analysis of the data?
4    Q.  Yeah, that's a fair -- that's a fair
5  pushback, and so, let's separate it out.
6       Okay.  Your report does explain the
7  analysis of blockchain data that you undertook;
8  correct?
9    A.  Yes.
10    Q.  Your report does not explain how the
11  software code extracted the data from Etherscan;
12  correct?
13    A.  I don't know that I agree with that.  I
14  mean, so, we do talk about in appendix C the various
15  data extraction that we did.  So, I'm looking in
16  paragraph 2, for example, and we describe the
17  wallets -- you know, the addresses of the wallets
18  that we used in pulling the data.
19       And so, it's really a -- my understanding
20  is that it's a pretty simple -- if you know Python
21  or know another, you know, programming language that
22  can access the Etherscan data, it's simply giving
23  direction.  I want data over this time period from
24  these addresses, and then specifically we can ask
25  for the RR/BAYC NFT transactions.  And so, it --

3

1  it's literally requesting the data in a language
2  that Etherscan understands.
3    Q.  For the purposes of the analysis that you
4  conducted in your report, you assumed that the
5  software code prepared by your team functioned
6  correctly; correct?
7    A.  Well, I wouldn't say assumed.  I mean, I
8  feel very, very confident that it did because we
9  have very rigorous data auditing protocols.  We also
10  have very, very talented data sciences people that
11  have experience doing this.  And we were able to
12  compare our results with information in the record,
13  and we're very close to the information in the
14  record, which gives me a lot of confidence that the
15  data work that we did is accurate.
16    Q.  You don't have the ability -- strike that.
17       You don't have the technical ability
18  yourself to evaluate whether the code that you
19  relied on for your analysis is functioning
20  correctly; correct?
21    A.  I would disagree that I don't have the
22  technical ability.  I think if I needed to, I could.
23  I don't think it's a very complex procedure, what
24  they wrote to pull it from Etherscan.  But sitting
25  here right now, I would need to spend some time

32

1  doing that.  But I don't think I would need to spend
2  that time because I feel very confident about the
3  data analysis that we did.
4    Q.  Okay.  You said, "I think if I needed to
5  evaluate whether the code you relied on for your
6  analysis was functioning correctly, that I could."
7       Is that a fair characterization of what
8  you just said?
9    A.  Yes, because you said I wouldn't have the
10  ability to, and I presume that's because I said
11  earlier I have not used Python, but that doesn't
12  mean that I couldn't -- that I don't have the
13  ability to, period.  I mean, I know how to interpret
14  code, I know how to write code.  I think, with
15  enough time, I could definitely figure it out.
16       My point is that I didn't feel any need to
17  do that because I very much trust the analysis that
18  we did, given our rigorous auditing protocols that
19  we follow.
20    Q.  Okay.  Okay.  So your testimony is that
21  you -- although you have the ability to determine
22  whether the code was functioning correctly, you did
23  not yourself undertake that analysis; correct?
24       MR. THOMAS:  Objection.  Misstates
25  testimony.

---

33

1      A.  Yeah, that kind of misstates it.  I mean,
2   it wouldn't be the best use of my time and it
3   wouldn't be the most efficient way to get to that
4   answer, and so, we obviously rely on specialists in
5   our firm that know how to do these things so that I
6   don't have to spend time, at $900 an hour, learning
7   Python.  That would not be an effective use of my
8   time.
9      Q.  Okay.  Understood.  And I don't mean to
10  mischaracterize anything that you're saying.
11      So, is it fair to say that for the
12  operation of the code that was used to collect the
13  data that's used in your analysis, you relied on the
14  specialists in your firm and the auditing protocols
15  that you referred to previously?
16      A.  And -- yes.  And like I said, we were able
17  to do some reasonableness checks based on evidence
18  in the record, which gave us comfort with the
19  results that we got.
20      Q.  Okay.  Thank you.  What evidence in the
21  record are you referring to?
22      A.  I refer to it in my report, but for
23  example, there were chats among defendants and their
24  collaborators quantifying both the number of
25  transactions and the ETH, and I think even USD

---

34

1   associated with those transactions at various points
2   in time.
3      I've also seen public information just on
4   the internet talking about what others have found,
5   the total revenues associated with Ryder Ripps'
6   Bored Ape Yacht Club NFTs, and that was also
7   consistent.
8      Q.  Okay.  Thank you.  Let's turn to
9   paragraph 95 of your report.
10      A.  Okay.
11      Q.  And just above paragraph 95 there's a
12  table, Figure 7.
13      Do you see that?
14      A.  I do.
15      Q.  And what, broadly, is shown in Figure 7?
16      A.  That provides a summary of the various
17  damages calculations that I've performed in this
18  case.
19      Q.  There are four or five, depending on your
20  count, but there are four dollar figures shown in
21  Figure 7; correct?
22      A.  Yes.
23      Q.  And just so we're clear, there is a range
24  for corrective advertising expenses; correct?
25      A.  Correct.

---

35

1      Q.  So are each of those amounts intended to
2   be additive with one another?  That is -- well,
3   strike that.
4      You don't sum those numbers at any point
5   in your report; correct?  The four numbers in
6   Figure 7?
7      A.  That's correct.  I do not.
8      Q.  So I -- I'm just trying to understand what
9   each of the numbers represents, so let me ask it
10  this way.  What is the total amount of damages that
11  you contend Yuga should be awarded in this case?
12      MR. THOMAS:  Objection.  Calls for a legal
13  conclusion.
14      A.  Yeah, I think I would -- I would restate
15  it as I have identified four, potentially five, how
16  you -- depending on how you count, potential damages
17  amounts that I determined are available remedies to
18  Yuga Labs.  And if we get to trial, I would intend
19  to present these various options.
20      I do think it's a legal question as to
21  which, if any, of these amounts could be added
22  together, and I have not made that determination.
23      Q.  Okay.  But just to be clear, you're not
24  ruling out that some of the categories could be
25  added together; correct?

---

36

1      MR. THOMAS:  Objection.  Calls for a legal
2   conclusion.
3      A.  I have not ruled that out.  I also haven't
4   affirmatively stated that that would be appropriate.
5   I'm agnostic.
6      Q.  Okay.  So I'd like to understand the time
7   period in which these damages were incurred, and I
8   think in order to do that, it's cleanest if we take
9   them one at a time, so that's what I'll do.  Okay?
10      So the first line item in Figure 7 is
11  "Disgorgement of Defendants' Profits," and for that
12  you identify $1,589,455.
13      Do you see that?
14      A.  Yes.
15      Q.  What is the time period in which those
16  damages were incurred?
17      A.  So that would be starting with May 13th,
18  2022, which is the first mint of an RR/BAYC going
19  through, I believe, February 1st, 2023, and that's
20  just a function of being right before I issued my
21  report.  So, as I state in my report, those profits
22  likely have continued and will continue, but I cut
23  it off on February 21st, 2023.
24      Q.  Okay.  The next line item -- strike that.
25      The next three line items fall under the heading,

---

---

**37**

1 "Yuga's Corrective Advertising Expenses."

2     Do you see that?

3     **A. Yes.**

4     Q. Let's look at the first subline item,

5 "Yuga Labs' Corrective Advertising Expenses," and

6 under that you've identified a range of $285,977 to

7 $535,977.

8     Do you see that?

9     **A. Yes.**

10     Q. What is the time period in which those

11 damages were incurred?

12     **A. Based on the testimony, my understanding**

13 **is that these would have been incurred in 2022 and**

14 **there are -- so, there could be additional ongoing**

15 **corrective expenditures that I would consider if**

16 **additional evidence became available to me, but**

17 **these are the ones that I'm aware of. And I'm**

18 **pretty sure they all occurred in 2022.**

19     Q. So --

20     **A. Well, yeah, during 2022. I'll stop there.**

21     Q. Okay. The next item -- the next line

22 item -- strike all that.

23     The next line item is, "Yuga Labs' Cost to

24 Acquire RR/BAYC," and for that you've identified a

25 dollar value of $1,792,704.

---

**38**

1     Do you see that?

2     **A. Yes.**

3     Q. Okay. This one may be a little different,

4 but let me just ask the question as I've done

5 previously. What is the time frame for the -- in

6 which those damages were incurred?

7     MR. THOMAS: Objection. Mischaracterizes

8 the report and lacks foundation.

9     **A. So this is the amount that, as one option,**

10 **as I describe in my report, to prevent the ongoing**

11 **harm in the market and confusion in the market, Yuga**

12 **Labs could simply purchase all of the -- I'll refer**

13 **to them as the accused NFTs, if that works for you,**

14 **instead of RR/BAYC -- but they could have -- they**

15 **could have gone to the market and tried to purchase**

16 **all of them and controlled them at that point, and I**

17 **used the -- again, based on a function of when I**

18 **issued my report, largely, I think it was the**

19 **beginning of February, and I used the floor price of**

20 **the NFTs at that point in time to do that analysis.**

21     Q. All right. And the last line item in

22 Figure 7 is "Defendants' Advertising Expenses (As a

23 Proxy)," and for that you've identified a dollar

24 amount of $434,233.

25     Do you see that?

---

**39**

1     **A. Yes.**

2     Q. What's the time frame for those damages?

3     **A. I think, consistent with the first item,**

4 **the disgorgement, it would be the expenses that I'm**

5 **aware of that the defendants have incurred since the**

6 **accused NFTs have been in the marketplace. It would**

7 **be -- I don't know the exact start date because part**

8 **of this is the profits or, I guess, the money earned**

9 **by -- or I'm, sorry, the money paid out to the**

10 **collaborators, which would be the profits to the**

11 **collaborators, and I think that would have started**

12 **when the RSVP contract was put in place. And I**

13 **don't have the exact date of that, but it's sometime**

14 **after May 1, 2022, to today.**

15     Q. Okay. Now, your report does not contain a

16 separate schedule that outlines the calculations

17 that you made to reach these dollar figures;

18 correct?

19     MR. THOMAS: Objection. Vague.

20     **A. Yeah, that would be -- well, maybe we**

21 **should take them in order. I mean, some of them you**

22 **don't really need a schedule to do -- to do that. I**

23 **think the only one you might want a schedule would**

24 **be disgorgement, but it's obviously very complex**

25 **data, and so, it's contained within the data files**

---

**40**

1 that we produced.

2     Q. Okay. The body of your report does not

3 include the specific Ethereum blockchain transaction

4 hashes that you considered as part of your analysis;

5 correct?

6     **A. That's correct. That was produced right**

7 **after I issued in the form of -- well, CSV files and**

8 **other data files that were produced to support these**

9 **calculations.**

10     Q. And the same is true -- I'll strike that.

11 Your report does not list the event logs from the

12 Ethereum blockchain that you considered as part of

13 your analysis; correct?

14     MR. THOMAS: Objection. Vague.

15     **A. Yeah, again, that would be in the data**

16 **files that was produced subsequently to issuing the**

17 **report.**

18     Q. Now, in order to understand how the data

19 in those CSV files were used, you need to understand

20 how the software works; correct?

21     **A. I don't think so. Sorry, was there an**

22 **objection?**

23     MR. THOMAS: I was going to object lacks

24 foundation, but go ahead.

25     **A. I don't think so. So part of what we**

---

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

11 (41 to 44)

---

4

1  produced are the actual output files from the
2  software that we ran to perform the analysis. We
3  produced code that walks through all the steps to
4  perform the analysis, and then we produced output
5  files that would contain the results of that
6  analysis.
7      Q.  Now, to understand how the results in
8  those output files were obtained, you would need to
9  understand how the software code works; correct?
10         MR. THOMAS:  Objection.  Lacks foundation.
11     A.  I think that that's probably accurate.
12     Q.  And it's fair to say not everyone can read
13  software code; correct?
14     A.  I would agree with that.  But obviously,
15  we needed to do this in the absence of information
16  provided by your clients regarding these
17  transactions, and I would think your clients would
18  to able to understand that code and also understand
19  the underlying data.
20     Q.  You say, I think your clients would be
21  able to understand that code.
22         What's your basis for that statement?
23     A.  Well, they do a lot of work on Ethereum,
24  so -- and they had -- in their chats, it's clear
25  that they're following the data as well, so, it just

---

42

1  seems like they would have the expertise and the
2  ability to do the same analysis that we did.
3      Q.  Okay.  We haven't been going quite an
4  hour, but I'm getting ready to start a completely
5  new topic, so, why don't we just take a few minutes?
6      A.  Sure.
7         THE VIDEOGRAPHER:  We are going off the
8  record.  The time is 10:00.
9         (Recess.)
10         THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 10:12.
12  BY MR. GOSMA:
13     Q.  Welcome back, Ms. Kindler.
14     A.  Thank you.
15     Q.  All right.  Let's turn to page 3 in
16  paragraph 8 of your expert report.
17     A.  Okay.
18     Q.  It states, "In forming my opinions, I have
19  assumed that the defendants have infringed Yuga
20  Labs' trademarks and made false and misleading
21  advertising claims;" correct?
22     A.  Yes.
23     Q.  So, for purposes of your analysis, you've
24  assumed that there's trademark infringement and
25  false advertising; correct?

---

43

1      A.  Yes.  Although I stated in a footnote
2  elsewhere in my report that my opinions would still
3  hold if it's either one or the other, so, as long as
4  there's a finding of liability with respect to
5  either set of allegations, my opinions would still
6  be applicable.
7      Q.  Yeah, and so, I was going to ask you about
8  that.  In the scenario where only one or the other
9  of those claims was found -- well, strike that.
10         In the instance where the jury only finds
11  that there's trademark infringement but does not
12  find that there's been false advertising, does that
13  have any impact on your damages analysis?
14         MR. THOMAS:  Objection.  Calls for a legal
15  conclusion.
16     A.  No.  Not with respect to my -- with my
17  opinion with respect to the damages suffered by Yuga
18  Labs.  The opinion would still hold.
19     Q.  Okay.  So, regardless of whether only
20  trademark infringement, only false advertising, or
21  both claims were found to be satisfied, the damages
22  number would be the same; is that correct?
23         MR. THOMAS:  Same objection.
24     A.  Yeah, so, again, just -- my opinion with
25  respect to what the damages are would be the same,

---

44

1  and that's, in part, because it's my understanding
2  that the remedies that I've opined on damages for
3  would be applicable under either of those scenarios.
4      Q.  Okay.  Thank you.  So, I want to ask some
5  questions that are limited strictly to trademark
6  infringement.  So, let's set aside the false
7  advertising for a moment.  Can you do that?
8      A.  Sure.
9      Q.  If the jury in this case finds that there
10  is no trademark infringement, then the appropriate
11  damages number for trademark infringement is zero;
12  correct?
13         MR. THOMAS:  Objection.  Calls for a legal
14  conclusion.
15     A.  Correct.  The -- in that world, there
16  would be no damages for trademark infringement.
17     Q.  If the jury finds that any element of
18  Yuga's trademark infringement claim isn't met,
19  there's no trademark infringement; correct?
20         MR. THOMAS:  Objection.  Incomplete
21  hypothetical and calls for a legal conclusion.
22     A.  Yeah, I'm not sure I understand what you
23  mean by "any element."  That sounds more like
24  something legal in nature.
25     Q.  Understood.  Now, you haven't offered any

---

45

1 opinion in this case about whether there has or
2 there has not been trademark infringement; correct?
3 **A. Correct.**
4 Q. You haven't offered any opinions about the
5 likelihood of confusion created by my clients'
6 products; correct?
7 **A. Correct. So, I outline in my report that**
8 **I am assuming that there's a likelihood of**
9 **confusion, and I identify, also, sources of evidence**
10 **for that, and in addition, cite to evidence in the**
11 **record about, you know, what the defendants have**
12 **been saying and their collaborators, I'll call them,**
13 **what they've said with respect to confusion, and**
14 **also the academic research that I've reviewed.**
15 **And so, I guess, just to make sure this is**
16 **clear, I'm assuming that there's a likelihood of**
17 **confusion but I also have evidence that I cite to in**
18 **my report that would be consistent with that**
19 **assumption.**
20 Q. But although you cited evidence that you
21 say is consistent with your assumption, you're not
22 offering the affirmative opinion that there has been
23 likelihood of confusion; correct?
24 **A. Correct.**
25 Q. You understand that likelihood of

46

1 confusion is an element of trademark infringement?
2 MR. THOMAS: Objection. Calls for a legal
3 conclusion and outside the scope of the report.
4 **A. Yes. Obviously, I'm not a legal expert,**
5 **but that's my understanding that that's something**
6 **that needs be demonstrated.**
7 Q. And so, if Yuga Labs does not demonstrate
8 that there has been a likelihood of confusion, the
9 appropriate amount of damages for trademark
10 infringement is zero; correct?
11 MR. THOMAS: Same objections.
12 **A. Yeah, I think -- I don't know if I can go**
13 **that far. That sounds like a -- I don't know if**
14 **that's dispositive with respect to harm. That**
15 **sounds like a legal conclusion.**
16 Q. Okay. Now, let's switch over to talking
17 about the false advertising claim, and let's leave
18 aside the trademark infringement claim.
19 I'm going to ask the same question. If
20 the jury in this case finds that there's no false
21 advertising, then the appropriate damages number for
22 false advertising is zero; correct?
23 MR. THOMAS: Same objections.
24 **A. Yeah, I would agree that there would be no**
25 **damages under that scenario.**

47

1 Q. And you haven't offered any affirmative
2 opinions that there's been false advertising in this
3 case; correct?
4 **A. That's correct.**
5 Q. And you're not an expert on consumer
6 confusion; correct?
7 **A. That's correct.**
8 Q. You're not an expert on trademark
9 infringement; correct?
10 **A. That's correct.**
11 Q. And you're not an expert on branding;
12 correct?
13 **A. Correct.**
14 Q. You're not an expert on advertising;
15 correct?
16 **A. Correct.**
17 Q. And although you have experience with
18 cryptocurrency and NFTs, you're not an expert in
19 those areas; correct?
20 **A. Correct.**
21 Q. You're not offering any opinion in this
22 case about who the typical NFT consumer is; correct?
23 **A. That's correct.**
24 Q. And you're not offering any opinions about
25 the level of sophistication that a typical NFT

48

1 consumer has; correct?
2 **A. I think that's correct. I mean, to the**
3 **extent the academic research that I cited to in my**
4 **report touches on that, you know, that might be**
5 **something that I would be discussing, but I'm not**
6 **opining on that as part of my expert opinion.**
7 Q. You're not an expert in consumer
8 sophistication; correct?
9 **A. Yes, correct.**
10 Q. Okay. Now, let's turn to paragraph 33 of
11 your report.
12 **A. Okay.**
13 Q. I don't know how you keep beating me to
14 the --
15 **A. Sorry, I have my hard copy.**
16 Q. Oh, yeah, you're not spinning the little
17 clicky wheel like I am.
18 **A. Yeah.**
19 Q. All right. So, in this paragraph, you
20 list seven Yuga Labs trademarks; correct?
21 **A. Yes. And just to be clear, that's just my**
22 **understanding from various legal findings. I**
23 **haven't independently determined what their**
24 **trademarks are.**
25 Q. What does Yuga Labs sell?

49

1        MR. THOMAS:  Objection.  Outside the scope
2  of the report.
3        **A.  My understanding is that they obviously**
4  **created the Bored Ape Yacht Club NFT collection and**
5  **other related NFT collections and experiences.  I**
6  **think, beyond that, their mission is around**
7  **entertainment and content and gaming, but I don't**
8  **have any additional insight into what that looks**
9  **like outside of what -- the work that I've done on**
10 **this case for Bored Ape Yacht Club.**
11    Q.  Did you review any Yuga Labs financial
12 information or financial statements as part of your
13 work in this case?
14    **A.  Yes.**
15    Q.  So what are Yuga Labs' largest sources of
16 income?
17       MR. THOMAS:  Objection.  Vague and outside
18 the scope of the report.
19       **A.  I did not evaluate that, but I wouldn't be**
20 **surprised if it's related to the Bored Ape Yacht**
21 **Club collection and the derivative products, I guess**
22 **I'll refer to them as, but I haven't evaluated that.**
23    Q.  Okay.  And this case in particular deals
24 with one specific -- well, strike that.  This case
25 deals with the -- strike that.

50

1        This case involves the Bored Ape Yacht
2  Club NFT collection; correct?
3        **A.  I don't know that I would narrow it that**
4  **far because there are other collections and are**
5  **derivatives of that that are related and under the**
6  **same Bored Ape Yacht Club brand.  I don't think I**
7  **have an opinion one way or the other, but I just**
8  **don't know that I can agree with that question as**
9  **stated.**
10    Q.  Sure.  Let me see if I can say it a little
11 bit differently.  One of the NFT collections at
12 issue in this case is the Bored Ape Yacht Club NFT
13 collection; correct?
14    **A.  Yes.**
15    Q.  Does Yuga Labs currently sell Bored Ape
16 Yacht Club NFTs -- strike that.
17       Does Yuga Labs currently sell NFTs in the
18 original Bored Ape Yacht Club collection?
19       MR. THOMAS:  Objection.  Vague.
20       **A.  Well, I think they were all initially sold**
21 **and they're held by holders of NFT.  I don't know if**
22 **Yuga Labs holds any more, but it was a limited**
23 **offering and they're not minting more, if that was**
24 **your question.  But I -- I just don't know if Yuga**
25 **Labs holds any of the original minted tokens.**

5

1    Q.  All right.  Let's turn to paragraph 41 of
2  your report, which is on page 21.
3    **A.  Okay.**
4    Q.  So in this paragraph, you state, "Academic
5  research suggests certain unique characteristics of
6  NFTs increase the likelihood of confusion relating
7  to their source."
8        Do you see that?
9    **A.  Yes.**
10    Q.  And that academic research is not limited
11 to any specific NFT collection; correct?
12    **A.  That's correct.**
13    Q.  That's referring to NFTs; correct?
14    **A.  Yes.  And I think -- I think even crypto**
15 **as well, but yes, it's not specific to a certain**
16 **collection.**
17    Q.  All right.  Now let's turn to paragraph 53
18 of your report.  It's on page 27.
19    **A.  Okay.**
20    Q.  And then the second sentence there in
21 paragraph 53 states, "Prominent academics and
22 researchers have commented on the complexity of
23 understanding or verifying the origin of
24 cryptocurrency and NFTs during the purchase process
25 and the challenges this presents for consumers

52

1  navigating the process."
2        Do you see that?
3    **A.  Yes.**
4    Q.  So the -- what you're saying here that is
5  the NFT purchase process is complex; correct?
6    **A.  I don't think that's quite what this is**
7  **saying.  This is saying -- and again, this is**
8  **summarizing what the literature says, so I'm not**
9  **opining on this, but it's saying that it's complex**
10 **to understand, verify the origin of the**
11 **cryptocurrency during the purchase -- or NFTs during**
12 **the purchase process.**
13    Q.  Let me just ask briefly about your
14 statement "this is summarizing what the literature
15 says."  You cite this literature in your report;
16 correct?
17    **A.  Yes.**
18    Q.  And by citing that literature, are you
19 agreeing with the conclusions of the literature or
20 are they -- are those statements included for some
21 other purpose?
22       MR. THOMAS:  Objection.  Vague.
23       **A.  I mean, I'm citing to portions of the**
24 **literature that describe why consumers of these**
25 **products are more likely to be confused**

53

1 because it is difficult to determine the origin of
2 NFTs. And so, I'm certainly -- I don't have any
3 reason to dispute what the literature is saying with
4 respect to the portions of it that I'm citing in my
5 report.
6      But I'm not -- just to be clear, I haven't
7 evaluated the complexity of the marketplace. I'm
8 summarizing literature that indicates that these
9 particular products are more complex, and it's
10 certainly complex with respect to their origin, and
11 that would be relevant to -- to an evaluation of the
12 likelihood of consumer confusion.
13     Q.  You say it's relevant to an evaluation of
14 the likelihood of consumer confusion. You're not
15 offering any opinion about the likelihood of
16 consumer confusion; correct?
17     A.  That's correct.
18     Q.  So, do you agree or disagree with the
19 statement that the NFT purchase process is complex?
20     A.  I haven't evaluated that. I -- I think it
21 depends how you define -- I mean, anyone can go
22 click click and create an account on Coinbase or --
23 or wherever and buy this stuff. So, I think it
24 depends, but I haven't evaluated that.
25     Q.  All right. So, a little bit further down

54

1 in paragraph 53 you quote literature that says,
2 "Most crypto technology at the moment is not user
3 friendly to engage with;" correct?
4     A.  Yes.
5     Q.  Do you agree or disagree with that
6 statement?
7         MR. THOMAS:  Objection. Outside the
8 scope.
9     A.  I mean, just from my own personal
10 perspective as not being an expert in crypto?
11     Q.  Yes.
12     A.  Yes.
13     Q.  Okay.
14     A.  I should say not relative to other
15 marketplaces. So, in a relative manner, I do think
16 it's -- it can be more confusing.
17     Q.  And you're just speaking in the general
18 sense about crypto and NFTs in general; right?
19     A.  Yeah, I mean, I haven't endeavored to form
20 opinions about how user friendly crypto markets are,
21 but in my own limited use, I think I can agree that
22 it's not user friendly and can be confusing.
23         MR. GOSMA:  I apologize if you can hear
24 the hammering in the background. Of course the one
25 day the contractor was coming was today.

55

1     Q.  Anyway. All right. Let's turn to
2 paragraph 54 of your report.
3     A.  Okay.
4     Q.  And this is on page 29. You state here in
5 the second sentence that, "Purchasing an obvious
6 knockoff on a street corner creates little or no
7 confusion to the purchaser regarding the fact that
8 the trademark is not authentic."
9         Do you see that?
10     A.  Yes.
11     Q.  What's the basis for that statement?
12     A.  I think it's meant as a comparison to
13 or -- or maybe an example of a situation where
14 people typically think of knockoffs occurring, and
15 that to me is just -- the basis of that is just
16 economic intuition. I mean, it's -- if you're on
17 the street corner in New York and you pay $25 for a
18 Louis Vuitton handbag, you know that it's not an
19 authentic Louis Vuitton handbag, but others that see
20 you carrying it around don't know that. But it's
21 meant -- the statement is meant to kind of be a
22 comparison to what is going on in a more complex
23 market, like a digital market of the NFTs.
24     Q.  So you said "a more complex market like a
25 digital market like NFTs." More complex than what?

56

1     A.  Oh, well, compared to the example that I
2 have in my report. In paragraph 54, I talk about
3 either a brick and motor store owned and operated by
4 a well-known brand -- so, for example, you go into a
5 Nike store, there is no confusion about whether
6 that's authentic. And then similarly, purchasing a
7 knockoff on the street at significantly discounted
8 prices, there's no confusion about what you're doing
9 there. And that's just meant to be a comparison
10 or -- yeah, a comparison to a more complex market
11 such as the one we're talking at here.
12     Q.  Okay. So is it fair to say that the
13 market for NFTs is more complex than, say, the
14 market for handbags?
15         MR. THOMAS:  Objection. Lacks foundation
16 and outside the scope of the report.
17     A.  Yeah, so I have not evaluated that, but I
18 have no reason to disagree with that.
19     Q.  A blockchain is a public ledger; correct?
20     A.  Yes.
21     Q.  And all of the transactions conducted on,
22 for example, the Ethereum blockchain are publicly
23 available for anyone to view; correct?
24     A.  That's my understanding, yes.
25     Q.  You made use of blockchain records in your

Highly Confidential - Attorneys' Eyes Only

Transcript of Lauren Kindler
Conducted on March 17, 2023

15 (57 to 60)

57

1  damages analysis; correct?
2      **A.  Correct.**
3      Q.  And you cite blockchain records numerous
4  times in your report; correct?
5      **A.  Yes.**
6      Q.  Those blockchain records were derived from
7  Etherscan; correct?
8      **A.  I would say collected, but yes.**
9      Q.  Okay.  Fair enough.  Those blockchain
10 records were collected from Etherscan; correct?
11     **A.  Yes.**
12     Q.  And Etherscan itself is a public website;
13 correct?
14     **A.  Correct.**
15     Q.  Anyone can go to Etherscan and look at it;
16 correct?
17     **A.  That's my understanding.  I think we did**
18 **purchase a premium monthly subscription to make sure**
19 **we got all the data we needed, but yes.**
20     Q.  I didn't know it had a premium mode.  I'd
21 have to look at that.  Okay.  Let's see.  And just
22 as one example of the way you used Etherscan,
23 collected data in this case, was to determine the
24 defendants' alleged profits; correct?
25     **A.  I mean, yes.  I mean, in my words, I**

58

1  **determined the defendants' profits based on -- in**
2  **large part on transaction data that was collected**
3  **using Etherscan from the Ethereum blockchain**
4  **relating to the accused NFTs and the associated**
5  **wallets.**
6      Q.  Okay.  So, you determined the defendants'
7  profits based in large part on transaction data that
8  was collected using Etherscan from the Ethereum
9  blockchain relating to the accused NFTs and the
10 associated wallets; correct?
11     **A.  Yes.  And like I said before that, that**
12 **was a consistent finding with what the defendants**
13 **and their collaborators were chatting about in the**
14 **normal course of business.**
15     Q.  Now, if someone mints an NFT on Ethereum,
16 you can see the record of that minting transaction
17 on Etherscan; correct?
18     **A.  Yes.**
19     Q.  Sorry.  Let's turn to appendix C in your
20 report.  And let's look at Figure 1, which is on
21 page C4.  Let me know when you're there.
22     **A.  Yeah, it's actually quite small even in**
23 **hard copy, so I'm going to pull it up on the screen**
24 **too.**
25     Q.  I was just thinking the same thing too.

59

1      **A.  Okay.**
2      Q.  It's even worse for me.  I've got it on a
3  split screen and...
4          But you tell me when you're ready to go?
5      **A.  Yes, I'm there.**
6      Q.  Okay.  So, Figure 1 of appendix C of your
7  report shows the RR/BAYC minting contract; correct?
8      **A.  Yes, a minting contract, yes.**
9      Q.  And what's your understanding of the
10 function of this minting contract?
11         MR. THOMAS:  Objection.  Outside the
12 scope.
13     **A.  I mean, my understanding is that this is**
14 **the record of when this particular smart contract or**
15 **RR/BAYC token was created on the Ethereum**
16 **blockchain, and this is the record of that.  So, you**
17 **know, with the creator and the -- you know, the --**
18 **the details around that particular token.**
19     Q.  Okay.  And you've got some red boxes drawn
20 here on this figure; right?
21     **A.  Yes.**
22     Q.  And one of the red boxes is around the
23 contract creator.
24         Do you see that?
25     **A.  Yes.**

60

1      Q.  And the contract creator for this minting
2  contract is Ryder-Ripps.ETH.
3          Do you see that?
4      **A.  Yes.  I refer to this in my report as his**
5  **minting wallet.**
6      Q.  Yeah.  And so, Ryder-Ripps.ETH is -- is a
7  reference to a specific wallet ID on the Ethereum
8  blockchain; correct?
9      **A.  Yes.**
10     Q.  And the name Ryder-Ripps.ETH is a name
11 assigned to that wallet by the Ethereum naming
12 service; correct?
13         MR. THOMAS:  Objection.  Lacks foundation.
14     **A.  Yeah, that part I don't know.  I would**
15 **have imagined Ryder Ripps picked that name, so -- I**
16 **have no idea how that name gets identified.**
17     Q.  That's a conversation for another day.
18     **A.  I would love to know.**
19     Q.  Okay.  All right.  So, there's no dispute
20 that the contract creator says Ryder  Ripps.ETH;
21 right?
22     **A.  Yes.**
23     Q.  All right.  Let's jump down to Figure 2.
24 One thing before we wrap up Figure 1.  Figure 1 is
25 an Etherscan page that's publicly accessible;

6

1  correct?
2      **A.  Yes.**
3      Q.  Okay.  Now, let's look at Figure 2.
4  Figure 2 is also an Etherscan page that is publicly
5  available; correct?
6      **A.  I mean, yes, if you know how to access it.**
7  **But yes, my understanding is it's not restricted.**
8      Q.  All right.  And the title of Figure 2 is
9  "Etherscan Page For Minting Transaction of RR/BAYC
10  NFT Number 1."  Do you see that?
11     **A.  Yes.**
12     Q.  And there are again some red box
13  annotations on this figure; correct?
14     **A.  Correct.**
15     Q.  And there's a box around the "from" field
16  there in the middle of the page.
17         Do you see that?
18     **A.  Yes.**
19     Q.  And the from field points to that same
20  wallet as this Ryder-Ripps.ETH; correct?
21     **A.  Yes.**
22     Q.  If someone wanted to see who minted
23  this -- strike that.  Let me lay some foundation to
24  it.
25         This page is specific to a single minting

62

1  transaction; correct?
2      **A.  Yes, I believe so.**
3      Q.  And it corresponds, as the title suggests,
4  to the Ryder Ripps Bored Ape Yacht Club NFT Number
5  1; correct?
6      **A.  Yes.**
7      Q.  And so, the NFT number 1 in the
8  collection; correct?
9      **A.  Yes.**
10     Q.  Okay.  Now, if someone wanted to determine
11  who minted this NFT, they navigate through this
12  Ethereum page and make that determination; correct?
13         MR. THOMAS:  Objection.  Calls for
14  speculation and incomplete hypothetical.
15     **A.  I think if they knew how to do all of**
16  **that, like I said before, I don't think there's any**
17  **restriction on it.  It's public information, so if**
18  **you knew how to do all the steps to get there, yes.**
19     Q.  And you're not offering any opinion in
20  this case about whether a typical consumer could or
21  could not do that; correct?
22     **A.  No, I mean, that's not part of my opinion**
23  **in this case.  I'm assuming the likelihood of**
24  **confusion, I'm assuming liability.  I have -- I have**
25  **thoughts on that, but no, it's not my opinion.**

63

1      Q.  Okay.  We were talking a little bit ago
2  about the example of handbags that you might either
3  buy in a store or you might buy on a street corner.
4      Do you recall that?
5      **A.  Yes.**
6      Q.  If I buy a handbag, there's no website I
7  can go to that allows me to authenticate the origin
8  of that handbag; correct?
9         MR. THOMAS:  Objection.  Incomplete
10  hypothetical and outside the scope of the report.
11     **A.  Yeah, I -- these days I've been involved**
12  **in cases where there are kind of like RFID, you**
13  **know, and QR codes and things that manufacturers are**
14  **now putting into products like Nike shoes, for**
15  **example.  So, I mean, I -- I can't say one way or**
16  **another.  I think that the world is evolving and**
17  **there are now becoming ways or ways are becoming**
18  **more prevalent of how things can be authenticated to**
19  **prevent knocking off goods, so I just can't say one**
20  **way or the other.**
21     Q.  Okay.  So, as you sit here today, you
22  can't say one way or another whether there's a
23  website that you can go to to validate the
24  authenticity of a handbag; correct?
25         MR. THOMAS:  Objection.  Incomplete

64

1  hypothetical and outside the scope of the report.
2      **A.  I know in the context of some other**
3  **products that there are ways that manufacturers are**
4  **trying to have methods of authentication.  I can't**
5  **say way one or another for handbags.  I mean, I -- I**
6  **haven't seen evidence of a website that would give**
7  **you that ability, so I don't know.**
8      Q.  Let's turn to paragraph 42 of your report.
9      **A.  Okay.**
10     Q.  And there's a subheading here, "Evidence
11  Of Confusion Among RR/BAYC NFT Consumers."
12         Do you see that?
13     **A.  Yes.**
14     Q.  And paragraph 42 states, "Documents and
15  testimony produced in this matter describe how
16  consumers were confused about the origin of the
17  RR/BAYC NFTs, some even mistakenly purchasing
18  RR/BAYC NFTs believing them to be Yuga Labs BAYC
19  NFTs."
20         Do you see that?
21     **A.  Yes.**
22     Q.  So, I know we've already covered this, but
23  you're not offering an opinion in this case about
24  whether consumers were actually confused; right?
25     **A.  That's correct.**

65

1    Q.  So, when you say that the documents and
2  testimony produced in this matter describe how
3  consumers were confused, that's not your expert
4  opinion in this case; correct?
5    **A.  That's correct.  This section, I think --**
6  **I mean, I'd have to go back and reread it, but I**
7  **think this section is meant to summarize facts and**
8  **evidence that -- that I've seen that indicates that**
9  **at least some customers or consumers were confused.**
10    Q.  You said "indicates that customers were
11  confused."  How are you concluding that the evidence
12  indicates that customers were confused if you're not
13  offering an opinion on that issue?
14    MR. THOMAS:  Objection.  Mischaracterizes
15  the report.
16    **A.  Yeah, I don't think I'm concluding that.**
17  **I mean, the evidence speaks for itself.  And so, I'm**
18  **just, in this section, summarizing the information**
19  **that I'm relying on, which indicates that there's**
20  **confusion.  And some of that information is coming**
21  **from the other experts, Ms. Laura O'Laughlin and**
22  **Dr. Berger.  But to be clear, I'm not -- I don't**
23  **plan on providing an opinion that there is consumer**
24  **confusion.  I'm just looking at information**
25  **available in the record to me.**

66

1    Q.  Okay.  Understood.  And I'm just trying to
2  figure out where the summary of the facts ends and
3  where your opinions begin, so I appreciate the
4  clarification.
5    All right.  There's a footnote down below
6  that, footnote 103, and that footnote comes out at
7  paragraph 42 of your report.
8    Do you see that?
9    **A.  I do.**
10    Q.  That's a collection of tweets and social
11  media posts that you assembled; correct?
12    **A.  Yes.  Me and my team.**
13    Q.  And those -- yeah, yeah.  And those posts
14  are cited for the statement, "Consumer statements
15  regarding their confusion were posted on social
16  media."
17    Do you see that?
18    **A.  Yes.**
19    Q.  Did you select those tweets yourself or
20  were they provided to you by the lawyers?
21    **A.  I mean, we would have been provided a**
22  **record of evidence and gone through that and**
23  **selected evidence to support the statements in my**
24  **report.  And in some instances, those would be one**
25  **in the same, and in other instances, it would --**

67

1  **what we cite in my report would be a subset of what**
2  **we received.**
3    Q.  Did you read any tweets or social media
4  posts other than those provided to you by counsel?
5    **A.  I mean, I did go on to Twitter and look at**
6  **Ryder Ripps' page and things like that, but no.  I**
7  **mean, beyond that, every -- and there could be**
8  **things cited in my report that are things we**
9  **independently obtained.  I don't recall if any of**
10  **those are tweets, so I'd want to make sure to**
11  **include that in my answer, but that would be the**
12  **extent of it.**
13    Q.  To be a little bit more specific, did you
14  and your team form an analysis of -- well, strike
15  that.
16    Did you and your team go out on Twitter
17  and review tweets that informed the context around
18  RR/BAYC?
19    MR. THOMAS:  Objection.  Vague.
20    **A.  I mean, I can't tell if you're trying -- I**
21  **don't know what you're trying to ask, but we didn't**
22  **do some systematic review of social media, if that's**
23  **what you're asking.  I can't speak to whether my**
24  **team may have looked at social media to inform**
25  **research.  All I can speak to is what's cited in the**

68

1  **report and my own actions of going on social media**
2  **and looking myself at Ryder Ripps' Twitter page, for**
3  **example.**
4    Q.  Okay.  Let's look at paragraph 47 of your
5  report, which is on page 24.
6    **A.  Okay.**
7    Q.  So, there's a subheading here, "Evidence
8  That Defendants Exacerbated and Sought to Profit
9  From Consumer Confusion."
10    Do you see that?
11    **A.  Yes.**
12    Q.  So, I want to focus on your statement that
13  there is evidence that defendants sought to profit
14  from consumer confusion.
15    Do you have that in mind?
16    **A.  Yes, I think -- so, it's in the title, but**
17  **I think I say it later.  I don't know if you're**
18  **looking at a specific -- I mean, it's also the**
19  **conclusion statement on page 27, but yes.**
20    Q.  Sure.  Let me just look at that just
21  briefly.  Yeah, okay.  Let's look at the last
22  sentence of paragraph 52 there at the top of
23  page 27.  It says, "Defendants' promotional
24  activities appear designed to further exacerbate the
25  confusion in the marketplace and to profit from it."

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

18 (69 to 72)

69

1       Do you see that?
2       A.  Yes.
3       Q.  Were you offering an opinion in this case
4  about my clients' intent in releasing RR/BAYC?
5       A.  No.
6       Q.  So it's not your expert opinion that
7  defendants' promotional activities were designed to
8  confuse the marketplace; right?
9       A.  I think I can agree with that, which is
10  why it says "appear designed."  So, again, this
11  section is putting forward additional evidence that
12  I've seen in the record that defendants not only
13  were aware of the confusion, but sought to gain from
14  the confusion.
15      Q.  All right.  So, throughout this section
16  from paragraphs 47 to 52 of your report, you include
17  citations to, for example, private chats between my
18  clients and their colleagues; correct?
19      A.  Yes.
20      Q.  You've reviewed statements from their
21  private chat room and -- as part of preparing your
22  report in this case; correct?
23      A.  Yes.  I mean, I'm -- obviously not all.  I
24  don't know that we had access to all, but yes, I
25  have reviewed some.

70

1       Q.  But you're not able to say that you
2  reviewed the entire chat from start to finish;
3  correct?
4       A.  I don't have a access to what was produced
5  in its entirety, so I don't know.  All I know is
6  what we've received, and I've reviewed many chats in
7  the materials that we received.  But yes, these
8  would be excerpts, if that's what you're asking.
9       Q.  Sure.  So, you received excerpts from
10  counsel as part of preparing your report; correct?
11      A.  I think that's accurate.
12      Q.  And you reviewed those excerpts, of
13  course, as part of your preparation; correct?
14      A.  Yes.  I mean, my team would have reviewed
15  everything and I would have reviewed, likely, a
16  subset.
17      Q.  Sure.  But there may be other parts of the
18  chat that you didn't review; correct?
19      A.  It's possible.
20      Q.  You don't know one way or another;
21  correct?
22      MR. THOMAS:  Objection.  Calls for
23  speculation.
24      A.  Yeah, I don't think I have -- again, I
25  don't have insights into the volumes of chats that

7

1  were produced or not produced, so I can't answer
2  that.
3       Q.  And just to be clear, you have not spoken
4  to my clients or Mr. Hickman or Mr. Lehman as part
5  of your preparation for this case; correct?
6       A.  Correct.
7       Q.  Let's look at paragraph 52.  We're still
8  there.  And I'm focussed in particular on the
9  statement that follows footnote 125.  It reads,
10  "Defendants built their promotion of RR/BAYC NFTs
11  and Ape Market around their negative commentary
12  about Yuga Labs."
13      Do you see that?
14      A.  Yes.
15      Q.  What is the negative commentary that
16  you're referring to?
17      A.  I mean, there's, I think, been a lot of
18  negative commentary from the defendants relating to
19  Yuga Labs, so I don't have any specific commentary
20  in mind in that statement, but I think there's been
21  a lot.
22      Q.  Okay.  Does that negative commentary
23  include, for example, allegations that the Bored Ape
24  Yacht Club NFT images are racist?
25      MR. THOMAS:  Objection.  Outside the scope

72

1  of the report.
2       A.  Yes, my understanding is that it does.
3       Q.  And does it include commentary -- strike
4  that.
5       Does the negative commentary include
6  allegations that certain of Yuga Labs' logos are
7  associated with Naziism?
8       MR. THOMAS:  Objection.  Outside the scope
9  of the report and lacks foundation.
10      A.  Yes, I've seen those allegations.
11      Q.  And so, your statement in your report that
12  "Defendants built their promotion of RR/BAYC NFT and
13  Ape Market around their negative commentary about
14  Yuga Labs."  And that includes those racist and
15  Naziism allegations; correct?
16      A.  Yeah, I mean, I think it would.
17      Q.  Were defendants' promotional efforts
18  effective in creating a negative narrative around
19  Yuga Labs?
20      MR. THOMAS:  Objection.  Outside the scope
21  of the report.  Lacks foundation.
22      A.  I haven't evaluated that.  I think
23  Dr. Berger evaluated that and found that they have
24  been, but I -- I have not.  That's outside of my
25  assignment.

73

1    Q.  Okay.  One moment.  Continuing with our
2  jumping around in your report, let's go to
3  paragraph 22.  It's on page 11.
4    **A.  Okay.**
5    Q.  We already looked at this earlier.  You
6  mentioned OpenSea, Rarible, LooksRare and
7  Foundation; correct?
8    **A.  Yes.**
9    Q.  And on the sentence that crosses over from
10  pages 11 to 12 you say, "These marketplaces provide
11  a secondary market for NFTs, serving a similar
12  function as eBay or consignment stores do for
13  physical goods."
14    Do you see that?
15    **A.  Yes.**
16    Q.  Can you just elaborate a little bit on
17  what you mean by a secondary market?
18    **A.  So the -- in this context, the primary**
19  **sale would have been when the minting occurs, and**
20  **there are transactions after.  And then these**
21  **platforms provide marketplaces where buyers and**
22  **sellers can transact as a secondary or third or**
23  **fourth or whatever transaction similar to -- like, I**
24  **think about StockX, for example, if you're familiar**
25  **with that platform.**

74

1    Q.  Less my familiarity and more my wife's
2  familiarity with it, but I know what it is.
3    **A.  My son, my -- my 20-year old son.**
4    Q.  Yeah.  All right.  So, are you aware --
5  well, each of the NFT marketplace platforms that you
6  mentioned here can be used for primary mints of
7  NFTs; correct?
8    **A.  Yes.**
9    Q.  So, in essence, they're not secondary
10  markets, they're primary markets; correct?
11    **A.  I mean, they can be.  So, I think -- I**
12  **think many of the accused NFTs were initially minted**
13  **on Foundation, for example, by Mr. Ripps.**
14    Q.  All right.  Let's look at paragraph 24
15  below.  In paragraph 24, you state that -- well, let
16  me back up.
17    Paragraph 24 discusses the NFT market
18  downturn of 2022; correct?
19    **A.  Yes.**
20    Q.  And as part of that downturn, you state
21  that the number of active NFT wallet addresses
22  declined throughout the year; correct?
23    **A.  Yes.**
24    Q.  The volume of transactions on OpenSea hit
25  record lows --

75

1    (Reporter clarification.)
2    Q.  Sure.  Let me just strike that and we'll
3  repeat the question.
4    You also state in paragraph 24 of your
5  report that the volume of transactions on OpenSea
6  hit record lows; correct?
7    **A.  Correct.**
8    Q.  And what do you mean by the volume of
9  transactions?
10    **A.  Just the number of people transacting on**
11  **the platform.**
12    Q.  And you state a little bit further that
13  the decline was as high as 97 percent from the
14  record highs at the beginning of 2022; correct?
15    **A.  Yes.**
16    Q.  And in this next sentence you state that,
17  "NFTs in Yuga Labs' flagship collection, the Bored
18  Ape Yacht Club, continued to demand top prices."
19    Do you see that?
20    **A.  Yes.**
21    Q.  And when you say top prices, you mean top
22  prices relative to the rest of the NFT market;
23  correct?
24    **A.  Correct.**
25    Q.  Okay.  The floor price of the BAYC NFTs

76

1  decreased in 2022; correct?
2    **A.  Correct.**
3    Q.  So although BAYC NFTs demanded top prices,
4  they were generally lower than at the top of the NFT
5  bull run; correct?
6    **A.  Yes.  They also experienced a downturn in**
7  **pricing, but the -- the observation I'm making here**
8  **is that it was -- their collection was more**
9  **resilient to the downturn, likely because of the**
10  **extensive brand name that it had created for itself.**
11    Q.  And stepping back from just NFTs for a
12  moment, cryptocurrency prices overall have declined
13  significantly since late 2020; correct?
14    **A.  I mean, I haven't evaluated that, but yes,**
15  **I think that's right.**
16    Q.  All right.  Let's look at paragraph 29 of
17  your report.
18    **A.  Okay.**
19    Q.  And in the second sentence there, you
20  state that, "The Fortune article reported that
21  owning a BAYC NFT was," quote, "the epitome of NFT
22  coolness for many."
23    Do you see that?
24    **A.  Yes.**
25    Q.  Do you agree with that statement?

77

1      MR. THOMAS:  Objection.  Outside the scope
2  of the report.
3      **A.  I mean, I haven't formed an opinion.**
4  **That's just an indication of what the market is**
5  **saying and I have no reason to disagree with that.**
6      Q.  Just below that on page 16, you state
7  that, "Celebrities and other public figures such as
8  Stephen Curry, Jimmy Fallon, Snoop Dogg, and Eminem
9  were widely reported to have purchased BAYC NFTs."
10      Do you see that?
11      **A.  Yes.**
12      Q.  As part of your analysis of Etherscan in
13  this case, did you attempt to determine whether any
14  of these celebrities actually purchased BAYC NFTs?
15      **A.  No.  I was --**
16      MR. THOMAS:  Sorry.  Objection.  Outside
17  the scope of the report and irrelevant.
18      **A.  No.  I was focussed on the transactions**
19  **involving the accused RR/BAYC NFTs.**
20      Q.  All right.  This is a good place to take a
21  second break, so why don't we do that.
22      THE VIDEOGRAPHER:  We are going off the
23  record.  The time is 11:09.
24      (Lunch recess.)
25      THE VIDEOGRAPHER:  We are back on the

78

1  record.  The time is 11:31.
2  BY MR. GOSMA:
3      Q.  Welcome back, Ms. Kindler.
4      **A.  Thank you.**
5      Q.  Let's navigate to paragraph 39 of your
6  report on page 20.
7      **A.  Okay.**
8      Q.  Okay.  And this is under a subheading of
9  "False Advertising;" correct?
10      **A.  Correct.**
11      Q.  All right.  In the second sentence of
12  paragraph 39 you state, "For example, authentic BAYC
13  NFTs are widely known to come with license rights to
14  the associated cartoon image."
15      Do you see that?
16      **A.  Yes.**
17      Q.  What license rights are you referring to?
18      MR. THOMAS:  Objection.  Outside the scope
19  of the report.
20      **A.  So my understanding is that -- and I don't**
21  **think that this is unique to the Bored Ape Yacht**
22  **Club NFTs, but when someone acquires an NFT they get**
23  **exclusive right to whatever that NFT reflects.  And**
24  **in this case, it comes along with the cartoon image.**
25  **And there's other things that come with it too, like**

79

1  **membership benefits and things like that, but that's**
2  **what it was referring to.**
3      Q.  Okay.  And you say "an exclusive right."
4  What -- what specific right are you talking about?
5      MR. THOMAS:  Objection.  Calls for a legal
6  conclusion and outside the scope of the report.
7      **A.  Yeah, I don't think I have any opinion on**
8  **what specifically the rights reflect.  I was just**
9  **describing my understanding that if you acquire a**
10  **Bored Ape Yacht Club NFT, that gives you, and only**
11  **you, access to that NFT, which would include, among**
12  **other things, the associated imagery.**
13      Q.  I don't mean to be difficult here, but you
14  referred in your answer to access to that NFT, which
15  would include, among other things, the associated
16  imagery, and I want to be really precise what you
17  mean by that.  So --
18      **A.  I don't think I said exclusive access, no?**
19      Q.  You may have.  It's not reflected --
20      **A.  Okay.**
21      Q.  I'll take you at that and I'll reframe the
22  question and we'll go from there.
23      So you stated in your prior answer that if
24  you acquire a Bored Ape Yacht Club NFT, that would
25  give you, and only you, exclusive access to that

80

1  NFT.
2      Do you recall that?
3      **A.  Yeah, I think that's what I stated.  I**
4  **mean, that's my understanding.  Obviously I don't**
5  **have detailed knowledge of the -- the ownership**
6  **structure among holders of NFTs and purchasers of**
7  **NFTs, but that's just my understanding of the**
8  **statement that you read in my report, which is**
9  **really coming from -- you know, this section is**
10  **about my understanding of the allegations, the legal**
11  **allegations.**
12      Q.  Sure.  Understood.  And if you don't have
13  an opinion about what specific legal rights are
14  conferred, that's fine.  I just want to get that on
15  the record.  Okay?  So --
16      **A.  Oh, I don't have any opinion about that.**
17      Q.  Okay.  So you do not have any opinion
18  about the legal rights conferred by the purchase of
19  a Bored Ape Yacht Club NFT; correct?
20      **A.  Absolutely.  Yeah, I was just providing my**
21  **understanding to try to be responsive.**
22      Q.  Okay.  Understood.  You do understand that
23  there's some conveyance of some right, you just
24  can't say what right it is.
25      Is that fair?

**81**

1    MR. THOMAS:  Objection.  Lacks foundation.
2  Misstates testimony.
3    **A.  I understand that once you acquire an NFT,**
4  **you own that NFT.  Now, what I don't know is if that**
5  **ownership is an exclusive license or if that**
6  **ownership is on outright ownership.  I don't know if**
7  **the original creator of the collection retains any**
8  **rights.  Those are the types of questions I don't**
9  **have answers to.**
10   Q.  Okay.  And earlier we talked about whether
11 an NFT itself is the same as the underlying image,
12 and I believe your testimony was -- and please
13 correct me if I'm wrong, but I believe your
14 testimony was you don't have an opinion about
15 whether an NFT and an -- and the image that it
16 contains are the same thing; is that correct?
17   **A.  Yes.  And I think, as I stated just**
18 **moments ago, I think an NFT can convey more than**
19 **just the image because owners for certain -- like**
20 **the Bored Ape Yacht Club NFTs, owners get access to**
21 **other things and other privileges.**
22   Q.  Thank you.  Now turning back to
23 paragraph 39 of your report, there's a statement
24 there just after footnote 93 that states, "There is
25 evidence that defendants falsely told prospective

**82**

1  buyers of RR/BAYC NFTs that they would receive
2  rights to the image."
3    Do you see that?
4    **A.  Yes.**
5    Q.  And the evidence that you cite in support
6  of that statement is contained in footnote 94; is
7  that correct?
8    **A.  Yes.  But again, just for context, this**
9  **statement is following the first statement in the**
10 **paragraph which is Yuga Labs' contingence, so this**
11 **entire section is meant to be my summary of what I**
12 **understand the allegations to be.**
13   Q.  Understood.
14   **A.  Okay.**
15   Q.  So one of the documents that you cite in
16 footnote 94 is Yuga Labs  00000535.
17   Do you see that?
18   **A.  Yes.**
19   Q.  All right.  If we could mark Tab 8?
20   (Exhibit 2 marked.)
21 BY MR. GOSMA:
22   Q.  And I guess it's fine if you just put it
23 in the chat for everyone.  And if the tech can't do
24 that, I certainly can.  In fact, I think I --
25   DEPOSITION TECHNICIAN:  Counsel, can you

**83**

1  hear me?
2    MR. GOSMA:  Yeah.
3    DEPOSITION TECHNICIAN:  Can you repeat
4  that one more time for me, please?
5    MR. GOSMA:  Yeah.  Could we put Tab 8 in
6  the chat, please.
7    DEPOSITION TECHNICIAN:  Sure.  Stand by,
8  please.  And this will be Exhibit 2; is that
9  correct?
10   MR. GOSMA:  Yeah, that's fine.
11   DEPOSITION TECHNICIAN:  Okay.
12 BY MR. GOSMA:
13   Q.  Okay.  I see it there in the chat, so,
14 Ms. Kindler, if you could just open that up.
15   **A.  Yes, I have it.**
16   Q.  All right.  So for the record, Exhibit 2
17 is a document bearing Bates number Yuga
18 Labs  00000535.
19   Do you see that?
20   **A.  Yes.**
21   Q.  Have you seen this document before?
22   **A.  Yes.**
23   Q.  Okay.  So, this is one of the documents
24 that you cite in footnote 94 of your report;
25 correct?

**84**

1    **A.  Yes.**
2    Q.  And you cite it in support of the
3  statement that Yuga Labs contends that defendants
4  falsely claim that they own -- well, strike.  That
5  you support -- strike all that.
6    You cited this document in support of the
7  statement that, "There is evidence that defendants
8  falsely told prospective buyers of RR/BAYC that they
9  would receive rights to the NFTs."
10   Do you see that?
11   **A.  Yes.**
12   Q.  All right.  Now, the RR/BAYC collection
13 began to be minted in May of 2022; correct?
14   **A.  Correct.**
15   Q.  If we could look at Exhibit 2, what's the
16 date of the tweet in Exhibit 2?
17   **A.  December 2021 -- December 6, 2021.**
18   Q.  And that's approximately five months
19 before the first mint of RR/BAYC NFTs; correct?
20   **A.  Correct.**
21   Q.  All right.  Let's go to page 30 of -- you
22 can put that Exhibit 2 aside.  Let's go to page 30
23 of your report.  And in particular, I'm focussed on
24 footnote 138.  Let me know when you're there.
25   **A.  Okay.  I'm there.**

85

1    Q.  We actually discussed this earlier, but
2  earlier you referred to a footnote about the sort of
3  interchangeability of the damages for either the
4  claim of trademark infringement, false advertising.
5        Do you recall that?
6    **A.  Yeah, I would maybe prefer applicability**
7  **as opposed to interchangeability, but yes.**
8    Q.  Okay.  But this is the footnote that you
9  were referring to earlier; correct?
10   **A.  Yes.**
11   Q.  Okay.  All right.  Let's move on from
12 that.  Let's turn to paragraph 61, which is on the
13 next page, page 31.
14   **A.  Okay.**
15   Q.  In this paragraph, you state that your
16 "calculation of Defendants' profits is for the
17 period May 13, 2022 (when minting of RR/BAYC began)
18 through February 1st, 2023."
19       Do you see that?
20   **A.  Yes.**
21   Q.  Why did you select that specific time
22 period?
23   **A.  Well, as I mentioned earlier, we can**
24 **observe in Etherscan data that that's the first**
25 **date, May 13, 2022, is the first date that an**

86

1  **accused NFT was minted and transacted in the**
2  **Ethereum blockchain.**
3        **And as you know from reading my report,**
4  **what I've quantified with respect to defendants'**
5  **gains from the infringement is related to**
6  **transactions involving the accused NFTs, but I also**
7  **state in my report that there's other ways that the**
8  **defendants have gained that I haven't quantified,**
9  **and therefore, my opinions are, in fact,**
10 **conservative and would understate the true gains**
11 **associated with the infringement.**
12   Q.  Okay.  I want to focus for the next couple
13 questions on initial minting and sales of RR/BAYC
14 NFTs.  Do you have that in mind?
15   **A.  Yes.**
16   Q.  The initial sales of RR/BAYC NFTs
17 concluded some time in June of 2022; correct?
18   **A.  I think that's correct.  You mean initial**
19 **sales from the initial minting?**
20   Q.  I do mean from the initial minting, yes.
21   **A.  I think that's correct.**
22   Q.  And then there were ongoing secondary
23 sales from the first mint onward until today;
24 correct?
25   **A.  Correct.**

87

1    Q.  And that February 1st, 2023, cutoff point,
2  just so we have a clear record, why did you choose
3  that as the end point for your calculations?
4    **A.  I think a matter of timing.  I issued the**
5  **report a few days later.  You know, we could have**
6  **done it the night before but then you've got to**
7  **update all the calculations, and I think it was more**
8  **a function of needing to pick a last date and then**
9  **getting everything finalized for the report,**
10 **recognizing that I might later update or supplement**
11 **my report to capture additional transactions if**
12 **asked.**
13   Q.  Yeah.  I thought that might be the case.
14 Thank you for clarifying.  As you sit here today, do
15 you plan to provide a supplemental report that
16 updates your calculations?
17   **A.  I have not been asked to do so, but I do**
18 **understand that we have a trial date I think**
19 **sometime in June, and so, if I am asked to do that,**
20 **you know, we'd be prepared to do so.**
21   Q.  All right.  Let's turn to appendix C
22 again.  And in particular, let's look at
23 paragraph 15 of appendix C.
24   **A.  Okay.**
25   Q.  Okay.  All right.  And so, in this

88

1  section, you discuss your calculation of defendants'
2  profits from initial sales and resales of the
3  accused NFTs; correct?
4    **A.  Correct.**
5    Q.  So, you state here that you extracted four
6  data sets from Etherscan; correct?
7    **A.  Yes, my -- my team, yes.**
8    Q.  And those data sets were extracted using
9  the Python code that we discussed earlier; correct?
10   **A.  Yes.**
11   Q.  So, the first data set that you extracted
12 is all transactions associated with defendants'
13 wallets?
14   **A.  Correct.**
15   Q.  Correct?  Yeah.
16       How did you make the determination of
17 which wallets to use?
18   **A.  I found them elsewhere, but this is**
19 **information that the defendants provided in the**
20 **litigation.  So, looking, for example, at footnote 4**
21 **of appendix C -- and this is from a response to an**
22 **RFA that Mr. Ripps identified his wallet.  Mr. Cahen**
23 **similarly -- this is in footnote 5.  Footnote 6 has**
24 **Mr. Ripps' minting wallet address.  So, I mean, this**
25 **is information that the defendants and -- provided**

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

23 (89 to 92)

89
1  in the course of the litigation.
2      Q.  Okay.  And so, in looking at those wallet
3  addresses, you were able to identify the accused
4  RR/BAYC NFTs in those wallets; correct?
5      A.  Among other things, but yes.
6      Q.  How were you able to determine which NFTs
7  were the accused RR/BAYC NFTs?
8      A.  So, I think it would be based on one of
9  the fields that you pull the data from.  I mean, you
10 can search, I think, anything that has RR/BAYC in
11 it.  But we also -- when I said among other things,
12 we also looked at transactions that involved
13 purchasers of the accused NFTs as well to look for
14 compensation that would be going into the wallets.
15     Q.  So in performing your analysis, you were
16 able to identify with a high degree of certainty
17 which NFTs were RR/BAYC NFTs; correct?
18     A.  Yes.  And the numbers that we pulled are
19 very consistent with the defendants' own testimony
20 and evidence in the record from chats and what have
21 you.
22     Q.  And you were able to make that
23 determination based on publicly available blockchain
24 information; correct?
25     A.  I mean, as we've discussed, this

90
1  information is public and accessible if you have the
2  tools and the knowledge to be able to access it.
3      Q.  What do you mean by tools?  What tools
4  would you need other than a web browser?
5      A.  Well, we used Python code, for example.
6  So that -- that's a tool that not everyone could
7  easily extract data using.
8      Q.  But to be clear, you did not have to use
9  Python code to extract this data; correct?
10     MR. THOMAS:  Objection.  Lacks foundation.
11     A.  Correct.  I think if -- I mean, it's a
12 systematic way to make sure you get all the data
13 that you're looking for.  I think if you knew this
14 specific data that you were in search of you
15 wouldn't necessarily need to write a script, but
16 you'd have to know that I'm looking for this type of
17 transaction in this wallet on this day, and you'd
18 have to be pretty precise to pull that type of
19 record.
20     Q.  And your analysis of Ethereum blockchain
21 data -- strike that.
22     Your analysis of defendants' wallets
23 focussed on transactions involving RR/BAYC NFTs;
24 correct?
25     A.  Yes.  In addition to what we can observe

91
1  about purchasers of NFTs sending ETH to those
2  wallets.  And that could be a separate -- I'm just
3  describing that because that could be a separate
4  transaction.
5      Q.  You are certain that you did not
6  inadvertently include any Bored Ape Yacht Club
7  original NFTs in your analysis; correct?
8      A.  To best of my ability.  I mean, that would
9  certainly be the intention was to isolate the
10 transactions involving the accused NFTs.
11     Q.  Right.  And you were able to differentiate
12 between RR/BAYCs NFTs and original Bored Ape Yacht
13 Club NFTs as part of your analysis; correct?
14     A.  Oh, I see where you're going.  So yes, if
15 you understand the distinction between the two, then
16 yes, you can certainly include that in your code,
17 and we did.
18     Q.  Okay.  All right.  Let's turn to paragraph
19 8 of appendix C.
20     A.  Okay.
21     Q.  And here you -- oh, excuse me.
22     A.  No, I'm here.
23     Q.  I beat you to it, finally, and I
24 couldn't --
25     A.  I'll let you win occasionally.

92
1      Q.  Let's see.  So, in the second sentence
2  there you say, "Consistent with Mr. Ripps'
3  testimony, Etherscan shows that on May 13th, 2022,
4  Mr. Ripps' minting wallet, Ryder  Ripps.ETH, created
5  a smart contract through Foundation;" correct?
6      A.  Yes.
7      Q.  How did you make the determination that
8  the minting wallet Ryder  Ripps.ETH created a smart
9  contract through Foundation?
10     A.  I mean, we can observe that in the
11 Etherscan data and that is -- there's a snapshot on
12 the next page showing that.  But if you understand
13 how to read the data, and the data we pulled
14 reflects everything relating to this particular
15 collection, then we can observe the earliest date
16 that a customer contract given that designation was
17 created, and it was created on Foundation from Ryder
18 Ripps' minting wallet.
19     Q.  All right.  Let's jump to paragraph 15.
20 Again, this on page 5.
21     A.  Okay.  Okay.
22     Q.  So the penultimate sentence of that
23 paragraph states, "I used transactions associated
24 with the defendants' wallets to calculate prices for
25 certain sales for which price information is not

93

1  available in the RR/BAYC NFT transaction data."
2      Do you see that?
3    A.  Yes.
4    Q.  What sales data were not available in the
5  RR/BAYC NFT transaction data, what are you referring
6  to?
7    A.  So, with respect to the Etherscan data, we
8  can pull the transaction data, and then, separately,
9  we can pull the event log data.  And it's often the
10  case that pricing information and gas costs, things
11  like that are contained in the log data.  But my
12  understanding is that we didn't always observe that
13  for every transaction, so there were certain
14  transactions that that information was not
15  available, but we were able to use the available
16  information from the other wallets to kind of fill
17  in the gaps.
18      I don't think that was -- I don't think
19  that happened a lot, but there were certain
20  instances where we needed to use that second source
21  of information to fill in the gaps by matching all
22  the other inputs to identify the right transaction.
23    Q.  All right.  We'll come back to that.
24  Let's jump to paragraph 19 of appendix C.
25    A.  Okay.

94

1    Q.  And the final sentence of this paragraph
2  says, "Some of the burned NFTs generated profits for
3  defendants before they were burned and those profits
4  have been included in my analysis."
5      Do you see that?
6    A.  Yes.
7    Q.  How did you determine whether an NFT had
8  been burned or not?
9    A.  I think we can observe in the Etherscan
10  data and the -- like I said before that, 50 NFTs
11  were burned or removed from circulation.
12    Q.  And how did you determine whether a burned
13  NFT had generated a profit or not?
14    A.  We can observe the date of the first
15  transaction, and we can observe the price of that
16  transaction and the cost, so we can calculate a
17  profit, and then later, at some subsequent time
18  period, the NFT may have been burned, in these few
19  instances.
20    Q.  And so, your analysis includes the profits
21  from the time it was minted until the time it was
22  burned, but none thereafter; correct?
23    A.  Oh, I would -- so just to be clear, it
24  includes the profits on the date of the transaction.
25  And that's always the case.  I'm not calculating

95

1  ongoing, you know, changes in profits, I'm
2  calculating the profits as of the date of the
3  transaction.  And then the point that I'm stating
4  here is that if later the NFT was burned or maybe,
5  you know, something else happened, I'm still
6  including the profits from the date of the sale
7  because that gain was, in fact, made by the
8  defendants.
9    Q.  And when you refer to the burned NFTs
10  generated profits, what profits are you referring to
11  specifically?
12    A.  Well, it says before they were burned.  So
13  when I'm saying burned NFTs, the NFTs that
14  ultimately were burned, there were still profits
15  associated with those initial transactions, and I've
16  calculated those profits.
17    Q.  Understood.  And what is the -- I'm asking
18  a little bit more specific question, which is what
19  are the sources of those profits.  So, for
20  example -- for example, are they profits associated
21  with the initial sale, are they profits associated
22  with the resales, or both.  That's -- that's sort of
23  what I'm asking.
24    A.  I'd have to look and see.  I don't know
25  that there would be resales, so I mean, it would be

96

1  the profit as of the date of the first transaction
2  of that NFT.
3    Q.  Okay.
4    A.  And if this were subsequent, I don't know
5  that this is -- I'd have to dig to see if this is
6  something that we observed, but if there was a
7  subsequent secondary market transaction, and a
8  creator fee was associated with that, that would
9  also be included until the NFT was actually burned,
10  but I don't know that that occurs.
11    Q.  Did your analysis track whether any of the
12  NFTs that were initially minted were associated with
13  a refund from, for example, Mr. Ripps to the wallet
14  to which it was minted?
15    A.  Yes.  If there were refunds, we would have
16  netted those out.
17    Q.  Can you walk me through how your analysis
18  would have netted out any refunds?
19    A.  So, if we observe a transaction -- and I
20  don't know if you -- we can use a hypothetical
21  direct -- we call it a direct sale, so that would be
22  direct from Ryder Ripps' wallet to some consumer.
23  In that instance, if that had occurred, we would
24  calculate the profit associated with that
25  transaction.

Transcript of Lauren Kindler
Conducted on March 17, 2023

25 (97 to 100)

---

97

1    If, say, a week later, that person wanted
2  a refund and a refund actually occurred -- I think
3  we've seen evidence of people seeking refunds. I
4  don't know that refunds were actually granted. But
5  if it were the case that there was another
6  transaction later where the NFT was returned to
7  Ryder Ripps' wallet and money was returned to the
8  original purchaser, we would also account for that
9  transaction.
10   And now, there could be a difference due
11 to the timing of them because, as you know, we
12 calculate profit based on the conversion of ETH to
13 U.S. dollars on the date of the transaction, so it
14 might not be a complete wash if that conversion rate
15 changed, which it likely did over time, so there
16 could be a small amount that goes in either
17 direction.
18   Does that make sense?
19   Q.  It does make sense.  Let me see if I can
20 break that down slightly.  So, let me think about
21 how I want to ask this.
22   So, if an NFT was returned to Ryder Ripps'
23 wallet after an initial sale, did you assume that in
24 all cases those were refunds?
25   A.  Yeah, I think we would be -- we would

---

98

1  determine that based on what the data shows.  So if
2  there was no money going back, I don't know that we
3  would have deducted it.
4    I'd have to maybe look into that, but --
5  and again, I don't know to what extent that actually
6  occurs.
7    Q.  So, if an NFT was sent back to Mr. Ripps,
8  that's a separate transaction from any ETH that went
9  from Mr. Ripps back to the other wallet; correct?
10   A.  Oh, yes.  Yeah.
11   Q.  So, those were two separate transactions;
12 right?  We've got the first transaction, which is
13 the NFT goes to Mr. -- from Mr. Ripps to the
14 third-party wallet?
15   A.  Right.
16   Q.  And we have a separate transaction that is
17 the third-party wallet sending ETH to Mr. Ripps;
18 right?
19   A.  Right.
20   Q.  If that third-party wallet later sent an
21 NFT -- an RR/BAYC NFT back to Mr. Ripps, that's
22 another transaction; correct?
23   A.  Yes.
24   Q.  And your analysis would have accounted for
25 any ETH that went from Mr. Ripps back to that

---

99

1  third-party wallet; correct?
2    A.  Yes.  What I don't know is if we would
3  have identified the corresponding transaction or if
4  we would have used the offering price at the time.
5  So, as you know, the price changed from .1 ETH to
6  later .15 ETH, so I know that there were instances
7  where we would use that amount if we couldn't
8  observe actual data.  And so, I just don't know, and
9  I'd have to go and investigate with the team if
10 under the scenario you're asking which of those two
11 it is.  I just -- I don't know without digging into
12 it.
13   Q.  Understood.  How did you determine that
14 the transfer of the NFT from one wallet to another
15 in either direction was linked to the transfer of
16 ETH in either direction?  How did you establish that
17 those transactions were related?
18   A.  So, a couple things.  We can observe that
19 there is a corresponding transaction, we can
20 observe -- in terms of ETH, and we can observe -- it
21 might not be clear that it is directly linked, but
22 we can observe the price of that transaction and we
23 know from the testimony of the defendants what price
24 the tokens were offered at various points in time.
25   And I think I state somewhere in here that

---

00

1  if -- if it appeared to be free, we treated that
2  separate, but we always looked for a corresponding
3  ETH transaction between the buyer and the
4  defendants.
5    Q.  So, is it fair to say that it was an
6  assumption in your report that if there was a
7  transaction of either 0.1 ETH or 0.15 ETH from a
8  third-party wallet to Mr. Ripps, that was related to
9  an RR/BAYC NFT purchase?
10   MR. THOMAS:  Objection.  Misstates
11 testimony.
12   A.  I think that's a fair characterization,
13 and I'll just add that that is entirely consistent
14 with how the defendants internally evaluated their
15 revenues and profitability associated with these
16 transactions.  And actually, we're more conservative
17 because I think they always attributed .1 or.15 ETH
18 to each transaction, and we did a more detailed
19 review of the Etherscan data, and sometimes the
20 prices actually varied a little bit from that, but I
21 think -- I think, at a high level, that's a fair
22 characterization.  We observe prices that aren't
23 always .1 or .15.
24   Q.  Okay.  So, just to be clear, you say it's
25 a fair characterization that if there was a transfer

---

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 28 of 53   Page ID
#:20330
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
26 (101 to 104)

0

1  of 0.1 ETH or 0.15 ETH from a third-party wallet to
2  Mr. Ripps, that you assumed that that was related to
3  a an RR/BAYC purchase?
4      A. Yeah, that's not complete. We also have
5  to observe the token going from Ripps to the
6  customer, and we can observe relative timing of
7  those transactions, so there's a lot of things we
8  look at, not just, "Oh, did someone send him money?
9  Oh, it must be related to this token." That's not a
10 fair characterization.
11     Q. Okay. So, I want to understand the -- the
12 full nature of your assumption, so I apologize if it
13 was incomplete in some way.
14     A. Yeah.
15     Q. So, let me see if I can frame this up
16 using the additional information that you provided.
17 If -- for purposes of the Etherscan analysis in your
18 report, you assumed that if there was a transfer of
19 0.1 or 0.15 ETH from a third party to Ryder Ripps'
20 wallet that was close in time to a transfer from
21 Ryder Ripps to this third party of an RR/BAYC NFT,
22 that you assumed that those two transactions were
23 linked. Is that a fair characterization?
24     A. I think that's a fair characterization and
25 is also consistent with the testimony from Mr. Ripps

02

1  with respect to the pricing. And I'm -- I also
2  would just note that there were times when we did
3  not see a corresponding ETH transaction and we
4  treated those as transferring for free. So, we
5  always did look to see if there was a corresponding
6  ETH transaction and if it was close in time coming
7  from a wallet that did receive an RR/BAYC token from
8  Mr. Ripps or from whatever the source is, and had a
9  price associated with it that is consistent with the
10 testimony of, you know, .1 or .15.
11     Q. Okay. And so, a few answers ago you made
12 the statement that you had observed prices that
13 aren't always .1 or .15 ETH.
14        Do you recall that?
15     A. Yes. I don't think it happens frequently,
16 but we did see some of those.
17     Q. How did you treat --
18     A. I should say they were always within the
19 range, so it's not like they're, you know, something
20 way out of whack.
21     Q. I see. So just as a hypothetical, for
22 example -- we used the H word, so I know Ethan is
23 going to object.
24        But as a hypothetical example, you're
25 referring to transactions that included -- that may

03

1  have been like .125 ETH, is that -- is that what
2  you're -- is that a fair hypothetical?
3      A. Yeah, yeah.
4         MR. THOMAS: Objection. Yeah.
5      Q. Fair, fair. Okay. Okay.
6         So how did you -- okay. If you
7  observed -- strike all that.
8         If you observed a transaction that was not
9  exactly .1 or .15 ETH, how did you treat that in
10 your analysis?
11        MR. THOMAS: Objection. Incomplete
12 hypothetical.
13     A. Again, if it met the other criteria;
14 right? So, it's coming from a wallet that received
15 one of the accused NFTs close in time and was within
16 the range of pricing that the defendants have
17 testified to, we included that as a transaction
18 price. I do think that happens relatively
19 infrequently. I think the vast majority of the
20 prices were at the .1 or the.15 pricing.
21     Q. Okay. Understood. Now, we talked about
22 this concept of close in time a couple of times.
23 What defines close in time in your analysis?
24     A. Well, I mean, all of this, frankly, is
25 fairly close in time because we're looking at a

04

1  matter of months, so I'm not sure what parameters
2  were put around it, but I know an investigation was
3  done to make sure that we were capturing
4  transactions that were linked, as opposed to
5  something that wouldn't be. I don't know what exact
6  parameters were put around that. And I'm not sure
7  if parameters would have been necessary because, as
8  you mentioned, all of this happened within the May
9  to June time period, or the vast majority of it.
10     Q. How would your analysis have treated a .15
11 ETH transfer from a third party to Mr. Ripps with a
12 corresponding NFT transfer that occurred a month
13 later? Would it have treated those transactions as
14 related?
15     A. I think we'd be looking for the -- I'd
16 have to ask the team. I'm happy to do that. But I
17 think that we'd be looking at transactions where
18 they were closer in time than that, and the -- so
19 which came first, you said the price was paid to
20 Ripps first in your hypothetical?
21     Q. Yes.
22     A. Yeah, I don't think we observed -- I'd
23 have to double check. We'd have to do -- run some
24 code to see, but I don't think we observed timing
25 that far apart with respect to our transactions that

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 29 of 53   Page ID
#:20331
Highly Confidential Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
27 (105 to 108)

05

1   we're focussed on.
2       Q.   Sure.  Understood.  Understood.  You may
3   not have it right before you, maybe, but as you sit
4   here right now, you do not know what specific
5   parameter you used in terms of the -- the timing of
6   the two transactions; correct?
7       A.   Well, again, I mean, we're talking about
8   May 13th to sometime in June where the vast majority
9   of the transactions occurred, and we -- as I said,
10  we did do investigations to make sure -- in the data
11  to make sure that we weren't inadvertently
12  misattributing a financial transaction to the
13  accused token.
14       And like I said, the data that we
15  ultimately arrived at is very consistent and, in
16  fact, conservative relative to the calculations that
17  the defendants were doing on their own.  So, I feel
18  very good about the data that we've done.  I can't
19  tell you specifically what the code says, but, as I
20  said, I'm not sure that a timing parameter would be
21  required given all the other steps that we took and
22  the short period of time during which the
23  transactions occurred.
24       Q.   Okay.  Understood.  That's very helpful.
25  Is it fair to say that as you sit here now, you do

06

1   not know what the timing parameter, if any, was used
2   in the Python code that was used to conduct your
3   analysis?
4       A.   Well, I -- now I'm getting hung up on
5   Python because Python was what was used to pull the
6   Etherscan.  I'm not sure that was what was used to
7   do the analysis.
8       Q.   Okay.  Let me withdraw the question.  I'll
9   ask a different one.
10       Is it fair that as you sit here right now
11  you don't know what parameter was used in terms of
12  timing to determine whether transactions sending ETH
13  to Mr. Ripps were connected to a transaction sending
14  an RR/BAYC to a particular wallet?
15       A.   Again, I -- sitting here, I don't know
16  that parameters were put in place, and I'm not sure
17  that they would need to be, given the short time
18  period that we're looking at.  But like I said, it's
19  entirely consistent with the defendants' own
20  testimony as to how they priced the NFTs.  And so,
21  we can observe these prices exchanging hands.
22       In the instances where we don't see that
23  price exchange hands, and so, maybe there's no
24  counterpayment from the purchaser, we treat those as
25  being transferred for zero.

07

1       Q.   And so, if an NFT was transferred for
2   zero, that would add zero dollars to your
3   calculation of profits; correct?
4       A.   Maybe negative if there were gas costs,
5   but yes.
6       Q.   All right.  Let's look at paragraph 21 now
7   of appendix C.
8       A.   Okay.
9       Q.   It's on page C10.  So the last sentence of
10  that paragraph states, "Below I separately calculate
11  Defendants' profits from (1) sales of RR/BAYC NFTs
12  that occurred "manually," through only the RR/BAYC
13  minting contract (and marketplace contracts, if
14  applicable), and (2) sales that occurred in a more
15  automated fashion though the RSVP contract and the
16  RR/BAYC minting contract."
17       Do you see that?
18       A.   Yes.
19       Q.   How did you determine which sales fell
20  into category 1 versus which sales fell into
21  category 2?
22       A.   I mean, I think we can observe it in the
23  data, the Etherscan data.  We can see the use of the
24  RSVP contract.
25       Q.   All right.  Let's look at paragraph 23.

08

1       A.   Okay.
2       Q.   Paragraph 3 -- 23 of appendix C, just so
3   we have a totally clear record.
4       Here you say that "2,387 NFTs were
5   transferred before the RSVP contract was put into
6   place."
7       Do you see that?
8       A.   Just one clarification, it's without the
9   use of, because there -- even though there's a point
10  in time when the RSVP contract is put in place, we
11  do see additional transactions occurring outside of
12  that for a period of time.
13       Q.   You're absolutely right.  So, let's ask
14  the question in a way that is correct.  So, here you
15  say that 2,387 NFTs were transferred to nondefendant
16  wallets without the use of the RSVP contract;
17  correct?
18       A.   Yes.
19       Q.   Now, let me back up and ask from a
20  foundation question, what is the RSVP contract?
21       A.   So, my understanding is that initially the
22  transactions were completed manually by Mr. Ripps,
23  and then he brought in what I've been referring to
24  as collaborators, so that would be Mr. Hickman and
25  Mr. Lehman, and part of their job was to automate

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 30 of 53   Page ID
#:20332

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

28 (109 to 112)

09

1  the process. And my understanding is that they
2  refer to that as the RSVP contract is the automated
3  process of purchasing the NFTs.
4      Q. And how did you determine that 2,387 NFTs
5  were transferred before -- without the use of the
6  RSVP contract?
7      A. I mean, I think in the data we can observe
8  which ones were done through the RSVP contract, so
9  the ones that don't have that designation were not
10 done through the RSVP contract. There is also a
11 time element. We know from the testimony that
12 before that was in place, that all of them were done
13 either manually directly or you know, through
14 Foundation or some other platform.
15     Q. And to be clear, when you say "the data,"
16 you mean the publicly available Etherscan data?
17     A. Yes, the Etherscan data.
18     Q. Okay. Later in paragraph 23 you state
19 that 650 NFTs were sold through NFT marketplaces;
20 correct?
21     A. Yes. I think that's of the -- I think
22 that's of the 2,387 that we were just referring to,
23 but yes.
24     Q. And you could determine which NFTs were
25 sold through marketplaces using the Etherscan data;

0

1  correct?
2      A. Correct.
3      Q. You say that the total revenue for those
4  650 RR/BAYC NFT sales is 110 ETH; correct?
5      A. Correct.
6      Q. And to be clear, those 650 NFT sales on
7  marketplaces are sales that you contend were made by
8  the defendants; correct?
9          MR. THOMAS: Objection. Mischaracterizes
10 the report.
11     A. I don't know that I've made that
12 statement. I don't -- yeah, I don't know how -- I
13 don't know I would -- would or would not
14 characterize it as sales made by the defendants.
15 But these are clearly transactions that occurred on
16 NFT marketplaces relating to the RR/BAYC NFTs that
17 were minted by Mr. Ripps.
18     Q. Okay. So, I'm just trying to understand
19 the 650 number. Okay? We know that that 650 is a
20 subset of the 2,387 that were transferred to
21 nondefendant wallets without the use of the RSVP
22 contract; correct?
23     A. Yes.
24     Q. So, as we sit here today, you can't say
25 one way or another who actually made the sales of

2

1  those 650 NFTs through marketplaces; correct?
2      A. So, this is in the section of the initial
3  sales, and so, these would be sales -- the first
4  sale of the minted NFT which, you know, I don't know
5  what the technicality is of it going through a
6  marketplace, that's something that is maybe outside
7  my area of expertise, but I think I am saying that
8  these are defendants' initial sales, and I'm
9  describing what mechanisms were used to accomplish
10 those sales and what marketplaces are not, but I
11 don't know that I would have characterized it any
12 other way than these are -- these are the portion of
13 the initial sales of the accused NFTs that were made
14 to nondefendant wallets through an NFT marketplace.
15     Q. Okay. For these 650 NFTs, you cannot say,
16 as you sit here today, who the seller of those NFTs
17 was; correct?
18         MR. THOMAS: Objection. Mischaracterizes
19 testimony.
20     A. Yeah, I don't know if I need to know that.
21 I know that Mr. Ripps benefited financially from
22 them. That's what I'm calculating is the gain to
23 the defendants from these transactions. And so, if
24 there's a -- you know, a technicality on who the
25 seller is, is the seller Foundation or is the seller

2

1  Ripps, I mean, what matters at the end of the day
2  from an economic perspective is what amount of money
3  is Mr. Ripps and Mr. Cahen getting from these
4  transactions, and what's the I've calculated and
5  provided opinions on.
6      Q. Sure. Understood. And to be clear, I'm
7  not trying to trip you up on some technicality about
8  whether it was their wallet or --
9      A. I can't tell.
10     Q. I'm just asking, can you say one way or
11 another whether Ripps and Cahen received the
12 proceeds of those 650 marketplace sales?
13         MR. THOMAS: Objection. Vague.
14     A. Yes, this is the same conversation we had
15 earlier. We can observe the transactions and we can
16 observe the ETH coming into the wallets.
17     Q. Okay. So, as part of -- and I don't mean
18 to retread old ground. How did you determine
19 specifically, not just -- and I'm asking this at a
20 lower level than just looking at blockchain
21 transaction data; right? I'm just trying to
22 understand how you determined -- for these 650 NFTs
23 that were sold through marketplaces, how you
24 determined that the ETH from those sales flowed to
25 defendants' wallets?

---

**3**

1    A.  I don't think it's any different than the
2  other transactions we've been talking about.  I
3  mean, some of the fees may be different, so some of
4  the gas costs could be different, but it's the same
5  process where we pull the transaction data from
6  Etherscan, we pull the data from the wallets, and we
7  can observe the transaction, we could observe the
8  ETH going from the wallets and ETH -- well, we
9  can't -- I'm sorry, we can observe the ETH coming
10  into the defendants' wallets net of various costs.
11  And then separately, like I said, we can double
12  check that with the defendants' own testimony and
13  own internal records where they are documenting
14  their gains from sales.
15    Q.  Okay.  Thank you.  So we were talking a
16  second ago about the total revenues from those 650
17  marketplace sale NFTs.  That's 110 ETH; correct?
18    A.  Yes.
19    Q.  And if we divide 110 ETH by 650, that's
20  approximately 0.17 ETH; correct?
21    A.  Sure.  I'd have to do the math, probably,
22  but I assume you have.
23    Q.  Yeah, I think I did.  I'll pull my
24  calculator out right now and I'll do it for you just
25  to make sure I'm not telling you a story here.  110

---

**4**

1  divided by 650.  I'll represent to you that it is
2  0.1692.  And so, if you round up, it's 0.17.  Do you
3  accept that representation?
4    A.  Yes.
5    Q.  Okay.  That value, regardless of how you
6  round it, that's higher than 0.15 ETH; correct?
7    A.  Yes.  But just to make sure we're all
8  clear, when we -- this 650 is a portion of those
9  sold using RSVP, and by the time we get to RSVP
10  there was -- the price was .15.  And so, there's no
11  longer a .10 price in play for these transactions.
12    Q.  So, I want to make a clarification about
13  your prior answer because what you just testified
14  was that this 650 is a portion of those using RSVP,
15  and I think you meant the opposite?
16    A.  Oh, without the use of RSVP.  You're
17  right.  I'm sorry.  I totally misread my sentence
18  here.
19    Q.  That's totally fine.  Move to strike
20  the -- the other testimony.
21    A.  Yeah, thank you.
22    Q.  Okay.  All right.  So, let me ask the
23  question again.
24      These 650 NFTs are a subset of the 2,387
25  NFTs transferred to nondefendant wallets without the

---

**5**

1  use of the RSVP contract; correct?
2    A.  Correct.
3    Q.  And the total revenue from those 650 NFTs
4  you calculated as 110 ETH; correct?
5    A.  Correct.
6    Q.  And we determined that if you divide 110
7  ETH divided by 650 NFTs it's something like 0.16 ETH
8  per NFT; correct?
9    A.  Yes.
10    Q.  And this is the greater than the price of
11  0.15 ETH per NFT that you used in your analysis;
12  correct?
13    A.  Well, I didn't use that in my -- I mean,
14  that's the data that we observe a lot of the time.
15  But yes, it is slightly higher than that offering
16  price that Mr. Ripps said that he offered NFTs at
17  starting whenever.
18    Q.  And so, how did you arrive at the 110 ETH
19  revenue from those 650 marketplace sale NFTs?
20    A.  It's the same process that we discussed
21  earlier.  So we can observe the transactions
22  involving the accused NFTs.  We can observe what
23  wallet they're going into.  We can then also observe
24  money in the form of ETH transferring back, probably
25  through the marketplace, but we can see it getting

---

**6**

1  into Mr. Ripps' or -- or Mr. Cahen's wallets.  And I
2  think we did see in the data instances where the
3  price -- like I said before, the price varied, and
4  there were times when the price was higher than the
5  .1 or .15 price which was their original offer
6  price.
7    Q.  Sorry for the pause.  We covered a lot of
8  this, so I don't want to ask you the same questions
9  over and over again.  Why don't we take a short
10  break.  It's been a little over an hour.
11    A.  Sure.
12      MR. GOSMA:  We can go off the record.
13      THE VIDEOGRAPHER:  All right.  We are
14  going off the record.  The time is 12:36.
15      (Recess.)
16      THE VIDEOGRAPHER:  We are back on the
17  record.  The time is 12:47.
18  BY MR. GOSMA:
19    Q.  Welcome back, Ms. Kindler.
20    A.  Thank you.
21    Q.  All right.  I'd like to focus on Figure 4
22  of appendix C, which is just below paragraph 32 on
23  page C14.
24    A.  Okay.
25    Q.  All right.  There are four line items

---

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 32 of 53   Page ID
#:20334
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
30 (117 to 120)

---

**7**

1  above the total corresponding to ETH values.
2      Do you see that?
3      A. Yes.
4      Q. There is a price "other" in the fourth
5  line item.
6      Do you see that?
7      A. I do.
8      Q. What is that referring to?
9      A. A price other than the three values above
10 it.
11     Q. So are those prices that you observed that
12 were higher, lower or both?
13     A. I think it's both.
14     Q. Now, in paragraph 33 below the figure, you
15 state, "I have converted ETH to USD on a transaction
16 by transaction basis using the daily ETH to USD data
17 from Etherscan."
18     Do you see that?
19     A. I do.
20     Q. So just so I understand, for a given day
21 there is an average ETH price in that 24-hour
22 period; correct?
23     A. Yes.
24     Q. And that is the value that you've used for
25 the conversions to dollars in your report; is that

---

**8**

1  correct?
2      A. I think it's -- in Etherscan, there is a
3  daily average conversion that they do, but it is
4  based on the daily average of both ETH and U.S.
5  dollars and it's a conversion rate, and that's what
6  I used.
7      Q. So, it's a value reported by Etherscan
8  about the daily USD price of ETH on a given day; is
9  that correct?
10     A. Yes, yes.
11     Q. Why did you choose to use that value
12 specifically?
13     A. There's two interpretations to that
14 question. Are you asking that daily value as
15 opposed to some other period in time, or are you
16 asking why am I using an average within a day as
17 opposed to something else within the day or
18 something else?
19     Q. I think I mean the former. So, let me ask
20 it more precisely here. Why did you use the daily
21 value as opposed to some other period of time in
22 your analysis?
23     A. Because that is the -- the value of the
24 gain as of the time of the transaction. And of
25 course, as expressed in U.S. dollars, which is what

---

**9**

1  I understand -- that's what I always calculate
2  damages in. I think that's what the jury will be
3  asked to award damages in. In terms of measuring
4  the gain to the defendants at that point in time,
5  then that's based on the data of transaction.
6      Q. Understood. But to be clear, your
7  analysis did not consider when Mr. Ripps or
8  Mr. Cahen -- strike that. Your analysis -- strike
9  that.
10     Your report does not discuss whether
11 Mr. Ripps ever converted the ETH he received into
12 U.S. dollars; correct?
13     A. Well, money is fungible, so I'm not even
14 sure if I had those records that I would know when
15 these particular ETH were converted, but I also
16 don't think that that's the appropriate way to value
17 it. I think it's appropriate, from an economic
18 perspective, to look at the value of the gain as of
19 the time of the transaction.
20     Q. Understood. But your report doesn't
21 discuss whether Mr. Ripps ever converted the ETH
22 into U.S. dollars; correct?
23     A. No. I just -- I valued the transaction
24 based on the value as of the date of the
25 transaction. What he does with the gain at that

---

**20**

1  point this time is -- is an investment decision that
2  I'm not -- that's outside of my assignment.
3      Q. Sure. Understood. So, if Mr. Ripps sold
4  ETH at a lower price at some later point in time,
5  the actual dollar amounts that he received would be
6  lower than what's report in your analysis; correct?
7      MR. THOMAS: Objection. Incomplete
8  hypothetical.
9      A. I guess, two responses: One, unless he
10 only had in that account the ETH associated with the
11 transactions that I'm valuing, it would be hard to
12 know what ETH he's converting. But two, similarly,
13 if he later sold it at a much higher price, I'm also
14 not capturing that additional gain in value either.
15     Q. All right. So, we're going to go back to
16 the main body of your report outside of appendix C,
17 and in particular, Figure 2, which is on page 34.
18     A. Okay.
19     Q. So, there is a column there in Figure 2
20 for "Costs."
21     Do you see that?
22     A. Yes.
23     Q. And the total costs that you calculated
24 were 89 ETH; correct?
25     A. That's correct.

---

Highly Confidential - Attorneys' Eyes Only

Transcript of Lauren Kindler
Conducted on March 17, 2023

31 (121 to 124)

---

2

1      Q.   And you deducted those costs from the
2   total revenues of sales of RR/BAYC NFTs in order to
3   arrive at the profits; correct?
4      **A.   Correct.**
5      Q.   So, the calculation is revenue from
6   RR/BAYCs minus costs equals profits; correct?
7      **A.   Yes.  And just so it's clear for the**
8   **record, this is for the initial sales only.  And**
9   **later I deduct additional costs associated with**
10  **money transfers to the collaborators.**
11     Q.   The costs that are referred to in Figure 2
12  are gas costs; correct?
13     **A.   Yes.**
14     Q.   I doesn't include any other costs;
15  correct?
16     **A.   At this step in Figure 2, that's right.**
17  **These are gas costs.**
18     Q.   So, on the prior page, page 33, there is a
19  footnote 149.
20        Do you see that?
21     **A.   Yes.**
22     Q.   And in this footnote you discuss some
23  additional expenses that the defendants testified
24  that they incurred; correct?
25     **A.   Yes.**

---

22

1      Q.   You did not include those additional
2   expenses in your deduction of costs in Figure 2;
3   correct?
4      **A.   Those are not included, and I'm happy to**
5   **explain why.**
6      Q.   The reason you that give in
7   paragraph 49 -- strike that.
8         The reason that you give in footnote 149
9   of your report is because "Defendants have not
10  provided financial statements or other documentation
11  necessary to accomplish these expenses;" correct?
12     **A.   That's one reason.  There would be others,**
13  **but yes.**
14     Q.   So, in the testimony that's cited there,
15  one of the costs that Mr. Ripps testified that he
16  incurred was to pay his assistant about $3,500;
17  correct?
18     **A.   Correct.**
19     Q.   And you also cite testimony from Mr. Cahen
20  stating that he incurred some travel expenses;
21  correct?
22     **A.   Correct.**
23     Q.   Let's turn to paragraph 87 of your report,
24  which is on page 44.
25     **A.   Okay.**

---

23

1      Q.   This is a discussion of your calculation
2   of defendants' advertising expenses; correct?
3      **A.   Yes.**
4      Q.   And this is one measure of damages that
5   you calculate in your report; correct?
6      **A.   Yes.  As a proxy for Yuga Labs' corrective**
7   **advertising expenses.**
8      Q.   And in this paragraph, in the final
9   sentence you state -- well, the penultimate sentence
10  you state, "Second, in their testimony, Mr. Cahen
11  and Mr. Ripps each provided examples of other
12  expenses that they incurred in the ordinary course
13  of business."
14        Do you see that?
15     **A.   Yes.**
16     Q.   And in footnote 181 in support of that
17  statement you cite the testimony about Mr. Ripps
18  incurring $3,500 for retaining an assistant;
19  correct?
20     **A.   Yes.**
21     Q.   And you cite Mr. Cahen's testimony about
22  travel expenses that you -- that we just discussed;
23  correct?
24     **A.   Yes.**
25     Q.   So, in your calculation of expenses, or

---

24

1   the -- yeah, the expenses.  Strike that.
2         In your calculation of expenses, you
3   excluded Mr. Ripps' and Mr. Cahen's testimony about
4   the expenditures that they incurred; correct?
5      **A.   I think you need to maybe refine that**
6   **question.  Are we back to Figure 2, expenses**
7   **relating to...**
8      Q.   Sure, yes.  Let me refine it a little bit.
9   In Figure 2 in your calculation of defendants'
10  profits for initial sales, you did not include
11  expenses that Mr. Ripps and Mr. Cahen contend that
12  they incurred in connection with the RR/BAYC;
13  correct?
14     **A.   Yes.  And as I stated in my report, it's**
15  **my understanding that it's not my burden to identify**
16  **expenses, so I did my best to identify expenses that**
17  **are clearly directly attributable to the alleged**
18  **infringement.  And to the extent defendants want to**
19  **show that there are other expenses that are**
20  **attributable to the infringement, then it's their**
21  **burden -- my understanding is it's their burden to**
22  **prove those up.**
23     Q.   Understood.  But you did not include them
24  in your calculation of expenses in Figure 2 of your
25  report; correct?

---

25

1    A.  Yes.  For that reason.
2    Q.  However, here in paragraph 87 when you're
3  discussing defendants' advertising expenses as a
4  measure of damages, you did include those very same
5  expenditures in that calculation; correct?
6    **A.  Well, two things.  Now we're at my burden**
7  **and so, I did put those in, but I said in that same**
8  **paragraph 87, to the extent they are considered**
9  **advertising and marketing expenses, they would also**
10 **be included in this proxy.  And so, I -- I am**
11 **going -- my intention would be to let the trier of**
12 **fact make that determination based on the facts and**
13 **the evidence, and I've quantified that and it can be**
14 **included or not included.  I did ultimately include**
15 **it in my final table in Figure 7.**
16   Q.  And are you offering the opinion in this
17 case that Mr. Ripps' costs incurred for retaining an
18 assistant are advertising and marketing costs?
19   **A.  I do not have an opinion one way or**
20 **another on that, but to the extent those are**
21 **expenses that are required for him to to engage in**
22 **the wrongful conduct, then they may or may not be**
23 **considered that, but no, I don't have an opinion**
24 **that those are advertising and marketing expenses.**
25   Q.  Okay.  And you similarly have no opinion

26

1  with respect to Mr. Cahen's travel costs; correct?
2    **A.  I think that's accurate, yes.**
3    Q.  Okay.  And you agree it's ultimately a
4  question for the jury to determine whether those
5  expenditures could be treated as advertising and
6  marketing costs; correct?
7      MR. THOMAS:  Objection.  Calls for a legal
8  conclusion.
9    **A.  Yeah, I mean, that's my understanding, but**
10 **I -- I guess there's some state of the world where**
11 **the judge could make that determination outside the**
12 **purview of the jury.  But yes, that would be -- my**
13 **intention would be to present the expenses as I'm**
14 **aware of them and let the jury make the final**
15 **determination.**
16   Q.  Let's turn to paragraph -- well, we're
17 going to go back to appendix C.  Go to paragraph 35.
18   **A.  Okay.**
19   Q.  So, so far today, we've been discussing
20 profits from initial sales of RR/BAYC NFTs.  This
21 section of your report focuses on profits
22 attributable to resales of RR/BAYC NFTs; correct?
23   **A.  Yes.  I mean, just again for the record,**
24 **this is the portion of my technical appendix.  There**
25 **is also another section in my report that similarly**

27

1  covers the same topic.
2    Q.  Okay.  And in the last sentence of the
3  paragraph 35 there you state, "Mr. Ripps
4  acknowledges that he earned creator fees from
5  resales on two NFT marketplaces, LooksRare and
6  Foundation."
7      Do you see that?
8    **A.  Yes.**
9    Q.  Did your analysis confirm whether
10 Mr. Ripps actually received creator fees from either
11 of those marketplaces?
12   **A.  Yes.**
13   Q.  And how did you do so?
14   **A.  It would be the same analysis.  So, we can**
15 **see in the transaction data and the event logs that**
16 **these creator fees were transferred.  And then,**
17 **similarly, we can see the ETH going into Mr. Ripps'**
18 **wallet or Mr. Cahen's.**
19   Q.  Does your analysis include creator fees
20 earned on platforms other than LooksRare and
21 Foundation?
22     MR. THOMAS:  Objection.  Lacks foundation.
23   **A.  I don't -- I don't think so.  I think my**
24 **understanding was that Mr. Ripps disabled the**
25 **ability on the other platforms.  And I think the**

28

1  **only platforms that we observed creator fees being**
2  **generated are these two, LooksRare and Foundation.**
3    Q.  Did your analysis assume that they
4  received a standard royalty fee or did it take into
5  account each transaction and the actual amount
6  incurred -- strike that.
7      Did you -- did you assume a standard
8  royalty fee or did your analysis calculate all --
9  strike that.
10     Did your analysis assume that there was a
11 standard royalty fee?
12     MR. THOMAS:  Objection.
13   **A.  No, I think we observed a standard royalty**
14 **fee of 10 percent of the transaction price, but we**
15 **collected the actual creator fees as denoted in --**
16 **in the logs and as observed in the wallet transfers.**
17   Q.  All right.  Continuing my pattern of
18 jumping around, let's go paragraph 70 of the main
19 body of the report.  I promise this is related.
20   **A.  You got to keep it interesting.**
21   Q.  I mean, that's right.  I mean, I don't
22 want anybody falling asleep.
23   **A.  Okay.  I'm there.**
24   Q.  All right.  So, in this paragraph, you
25 explain that there were 3,023 RR/BAYC NFT resales

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

33 (129 to 132)

---

29

1  which generated profits for defendants; correct?
2      **A.  Yes.**
3      Q.  And you go on to say that there may --
4  strike that.
5          You go on to say that, "There have also
6  been many resales of RR/BAYC NFTs where no creator
7  fees were generated but from which defendants may
8  still benefit."
9          Do you see that?
10     **A.  Yes.**
11     Q.  Okay.  And then you give some examples of
12  other places where RR/BAYC NFT 12/31 was sold;
13  correct?
14     **A.  Yes.**
15     Q.  And in the final sentence of the paragraph
16  you state, "The numerous transactions involving
17  these RR/BAYC NFTs likely indirectly benefit
18  defendants as they create more visibility for the
19  RR/BAYC NFT collection on secondary markets."
20         Do you see that?
21     **A.  Yes.**
22     Q.  Your report does not attempt to quantify
23  that indirect benefit; correct?
24     **A.  Correct.**
25     Q.  How does the sale of RR/BAYC NFTs on other

---

30

1  marketplaces create more visibility for the RR/BAYC
2  NFT collection?
3      **A.  Well, from an economic perspective, that**
4  **shows increased demand for the accused NFTs and that**
5  **by -- by -- almost by definition would mean there's**
6  **increased visibility in the marketplace and likely**
7  **will benefit the defendants in terms of their NFT**
8  **collection being traded more frequently, discussed**
9  **more frequently, that -- that all leads to more**
10  **belief probably around the veracity or the**
11  **authenticity of the -- of the NFTs and -- and just**
12  **more interest in the marketplace.**
13     Q.  Where -- where would that increased
14  visibility manifest?  I'm trying to understand how
15  consumers would become more aware of these NFTs
16  through the sales?
17         MR. THOMAS:  Objection.  Vague.
18     **A.  Increased demand.  And so, then there**
19  **could be increased demand from these secondary sales**
20  **which then lead to additional secondary sales on**
21  **other platforms that the defendants do benefit from.**
22  **But it just reflects increased demand that we can't**
23  **quantify as a direct profit gain to the defendants**
24  **but likely probably does provide additional gain to**
25  **them in terms of their overall program with the**

---

3

1  accused NFT collection.
2      Q.  So, how would a person observe that there
3  was increased value of sales?  Like, you know, would
4  they look at a particular website or is there some
5  metric that they would track somewhere?  How would
6  they be aware of it?
7          MR. THOMAS:  Objection.  Outside the scope
8  of the report and calls for speculation.
9      **A.  Well, the sites that I cite in this -- in**
10  **this paragraph 70, I mean, these are accessible**
11  **sites that people following this market would be**
12  **looking at, and you can observe how often these**
13  **things are transacted and what price they're**
14  **transacted at.**
15     Q.  Right.  Among the sites you identity here
16  in this paragraph are Etherscan, for example?
17     **A.  And I was looking at the NFTGo website**
18  **below that.**
19     Q.  Right.  And those are tools that are
20  available on the public internet for blockchain
21  users to access; correct?
22     **A.  Correct.**
23     Q.  And so, your opinion is that in order to
24  observe this increased demand, that users would need
25  to be able to use these tools to observe that;

---

32

1  correct?
2          MR. THOMAS:  Objection.  Misstates report
3  and testimony.
4      **A.  Yeah, I -- I don't think that's right.**
5  **You can go to this link and see right on the first**
6  **page the transaction data.  But also, this stuff**
7  **gets reported in the news.  So, people follow these**
8  **markets, it gets reported in the news, and to the**
9  **extent these NFTs are frequently traded or traded at**
10  **higher prices, I mean, that gets observed by people**
11  **following the market.  And as I cite somewhere in my**
12  **report, there was the Bloomberg news talking about**
13  **BAYC NFT and got them -- got that confused with**
14  **Ryder Ripps' version.  So the more --**
15     Q.  Did you --
16     **A.  -- transactions in the market, the more**
17  **people are paying attention and following what's**
18  **happening with these NFT collections.**
19     Q.  Did you actually watch that Bloomberg news
20  clip as part of your preparation for your report?
21     **A.  I have not.**
22     Q.  Okay.  Just to close this out though, you
23  talk about the indirect benefit to defendants;
24  correct?  Here in this paragraph 70 of your report;
25  correct?

---

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 36 of 53   Page ID
#:20338
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
34 (133 to 136)

33

1    A.  Yes.
2    Q.  And you didn't attempt to quantify that
3 benefit; correct?
4    A.  I have not quantified that benefit.
5    Q.  And so, therefore, none of the dollar
6 values in your damages calculations are contingent
7 upon this indirect benefit; correct?
8    A.  I would agree with that, yes.
9    Q.  Thank you.  Let's turn to paragraph 71
10 of -- well, it's actually just below where we're
11 already at, so let's look at paragraph 71.  And here
12 you state that of the 9,546 RR/BAYC NFTs, the
13 defendants hold 136 in their wallets; correct?
14    A.  Correct.
15    Q.  And you're able to determine that from
16 on-chain and blockchain data; correct?
17    A.  Correct.
18    Q.  And then further down in the paragraph you
19 state that defendants did not mint the remaining 454
20 RR/BAYC NFTs; correct?
21    A.  Correct.
22    Q.  How did you determine that there were
23 unminted NFTs available in the project?
24    A.  Well, I think looking at the -- there were
25 10,000 BAYC NFTs and Mr. Ripps said he was going to

34

1 make his RR/BAYC available so that anyone that
2 wanted any one of those 10,000 could have it.  And,
3 you know, there's a remaining group of 454 NFTs that
4 were not minted.
5    Q.  And you don't have any evidence one way or
6 the other whether Mr. Ripps and Mr. Cahen intend to
7 mint those additional NFTs; correct?
8    MR. THOMAS:  Objection.  Outside the scope
9 of the report.
10    A.  Yeah, I mean, I don't have insight into
11 their intentions.  My understanding from deposition
12 testimony is that -- I think it was Mr. Ripps
13 described holding onto the ones he thought were the
14 best.  And so, I think that, in combination with
15 Mr. Cahen's testimony about, you know, the value
16 being pretty much the same as when they were
17 originally produced.  So, my intention is -- in my
18 analysis is to state that there are these additional
19 NFTs that they haven't yet minted, they may or may
20 not mint them, but they have some value associated
21 with them and then quantify that value.
22    Q.  All right.  Let's look at paragraph 74.
23 In this paragraph you calculate the value of the
24 RR/BAYC NFTs that defendants hold or have not minted
25 as 65 ETH; correct?

35

1    A.  Correct.
2    Q.  And I believe to reach that number you
3 assume that each RR/BAYC NFT was worth about one
4 or -- strike that.
5    And I believe to reach that number you
6 assume that each RR/BAYC NFT was worth about 0.115
7 ETH; correct?
8    A.  Yes.  Which was the floor price of the
9 collection as of January 27, 2023.
10    Q.  If Mr. Ripps and Mr. Cahen were to
11 hypothetically sell something like 500 NFTs, that
12 would have an impact on the floor price; correct?
13    MR. THOMAS:  Objection.  Calls for
14 speculation and incomplete hypothetical.  And also
15 outside the scope of the report.
16    A.  I mean, which NFTs are we talking?
17    Q.  Let me be more specific.  That was sloppy.
18    So, defendants pulled or have not minted
19 590 RR/BAYC NFTs; correct?  You can see that in
20 paragraph 72 of your report?
21    A.  Yes.
22    Q.  Okay.  My questions are about those 590
23 NFTs.  Okay.  So, if Mr. Ripps and Mr. Cahen were to
24 sell all of those 590 RR/BAYC NFTs, that would
25 affect the floor price; correct?

36

1    MR. THOMAS:  Objection.  Calls for
2 speculation.  Incomplete hypothetical.
3    A.  I think -- yeah, I think it depends.  I
4 don't think I can know one way or the other.
5    Q.  Okay.  So, for purposes of your analysis
6 though, you assume that all of those RR/BAYC NFTs
7 could be sold at the floor price as of January 27,
8 2023; correct?
9    A.  Yes.  Which was really a function, again,
10 of when that analysis was performed before issuing
11 my report.  If and when we get to trial I may or may
12 not be asked update that.  It is, obviously, a
13 number that changes.  But as of the date that I was
14 preparing my damages estimate, that, in my opinion,
15 was a conservative and reasonable price to attribute
16 to those NFTs.
17    Q.  Okay.  Let's now look down at paragraph
18 76, which is in the next section on page 38?
19    A.  Okay.
20    Q.  All right.  You say here that, "Mr. Lehman
21 and Mr. Hickman began to assist defendants with the
22 RR/BAYC NFT project," and that when they did, "A
23 percentage of the profits from the initial sales of
24 RR/BAYC NFTs accrued to Mr. Lehman and Mr. Hickman
25 rather than the defendants;" correct?

Case 2:22-cv-04355-JFW-JEM  Document 268-3  Filed 06/05/23  Page 37 of 53  Page ID
#:20339
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

35 (137 to 140)

37

1    A.  Yes.

2    Q.  What is your understanding of the role
3 that Mr. Lehman performed for RR/BAYC?

4    MR. THOMAS:  Objection.  Outside the scope
5 of the report.

6    A.  Yeah, I think I -- I really have an
7 understanding of them collectively.  I don't know
8 that I have a distinct understanding of what
9 Mr. Lehman's role was versus Mr. Hickman's but I
10 think -- so, I can speak to my understanding of
11 these two together.  I don't -- I can't parse it
12 out.

13    Q.  Okay.  That would be fine.  Let me reask
14 my question in a way that you're more comfortable to
15 answer.  So, what is your understanding of the role
16 that Mr. Lehman and Mr. Hickman collectively
17 performed for RR/BAYC?

18    MR. THOMAS:  Same objection.

19    A.  So, this would be from, I think, testimony
20 in the -- in the record, but my understanding is
21 that these two individuals were brought on to
22 automate -- at least in part automate the
23 transaction process with respect to the accused
24 NFTs.  So, they -- they developed the RSVP contract,
25 for example, and my understanding is that in return

38

1 for their efforts to assist with the project, that
2 they were -- the deal they struck was that they
3 would get 15 percent of those profits on sales that
4 occurred through the RSVP contract process.

5    Q.  Now, in footnote 161 there you state,
6 "Additionally, defendants may have" -- strike that.

7    In 163 you state -- strike that.

8    In footnote 163 you state, "Mr. Lehman and
9 Mr. Hickman each accrued 15 percent of the profits
10 from the initial sales of RR/BAYC NFTs from the
11 RR/BAYC RSVP contract."

12    Do you see that?

13    A.  Yes.

14    Q.  And that amount you calculated as
15 $419,733; correct?

16    A.  Correct.

17    Q.  And you did not get that amount from the
18 total profits that you alleged that the defendants
19 made from RR/BAYC; correct?

20    A.  Correct.

21    Q.  So, can you walk me through the math on
22 the calculation of the $419,733?

23    A.  So, I can't give me the exact numbers
24 because it's done in the files that -- that we sent
25 postproduction of the report, but it should be 15

39

1 percent of the profits on those transactions that
2 occurred using the RSVP contract.  And so, my
3 understanding is that's consistent with the
4 internal documentation we see from defendants in
5 terms of tracking revenues and profits, and it's
6 also what we observed in terms of funds going into
7 both Mr. Lehman and Mr. Hickman's -- or I guess
8 leaving Mr. Ripps' and Mr. Cahen's wallet.

9    So, I had a question around whether it
10 should be 15 percent of everything or 15 percent of
11 the RSVP contract-related transactions.  And based
12 on all the evidence, it appears they're being paid
13 based on the 15 percent of the RSVP-related
14 contracts, and so, that's what we've calculated.

15    Q.  Yeah, and so, you've gotten to where I was
16 going already, which is how did you know that they
17 were awarded 15 percent of the -- only the RSVP
18 contract sales and not the -- the sales pre-RSVP
19 contract?

20    A.  So, we can see it in the data.  I mean, I
21 had this question because if you read the Lehman
22 declaration it reads as if the agreement was
23 15 percent of everything, but what we can see in the
24 data is that so far it appears to be 15 percent of
25 only the RSVP contracts.  And that's -- like I said,

40

1 that's also consistent with internal spreadsheets
2 that we've seen that the defendants have produced
3 where they're allocating the profits among the
4 various individuals.

5    And of course, if, you know, like -- like
6 everything in my report, if the defendants want to
7 put forward evidence that -- that shows otherwise, I
8 mean, these numbers can be updated to reflect
9 whatever monies are being transferred to Mr. Lehman
10 and Mr. Hickman in exchange for their work on the
11 project.

12    Q.  Sure.  So, did the analysis in your report
13 attempt to determine whether the defendants had
14 transferred funds to the other individuals,
15 Mr. Hickman and Mr. Lehman, outside the context of
16 the RSVP contract?

17    MR. THOMAS:  Objection.  Vague.

18    A.  I think we can see the funds leaving their
19 wallets.  So -- so, we can see ETH leaving the
20 wallets and we -- my understanding is that we've
21 been able to observe that that is reflective of only
22 the 15 percent of the RSVP-related contracts and not
23 all contracts.  But like I said, that's also
24 consistent with internal accounting that the
25 defendants appear to be doing as well.

Case 2:22-cv-04355-JFW-JEM  Document 268-3  Filed 06/05/23  Page 38 of 53  Page ID
#:20340
Highly Confidential Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
36 (141 to 144)

4

1    Q.  A little bit ago we talked about the 454
2  NFTs that have not yet been minted.
3       Do you recall that?
4    A.  Yes.
5    Q.  And in your analysis, you assumed that of
6  those 454 NFTs, 100 percent of the assumed value of
7  those would be attributable to defendants; correct?
8    A.  Yes, I did not do any offset or payments
9  made to Mr. Lehman and Mr. Hickman, but again, I
10 mean, as I stated earlier, I've done my best to try
11 to calculate profits to the best of my ability with
12 the available information.  And you know, to the
13 extent the defendants want to put forward evidence
14 to the contrary, I'm happy to update my numbers.
15      But yes, I did not -- we don't know what's
16 going to happen with that -- with those unminted
17 NFTs, if anything.  But right now, they're, I think,
18 within the domain of the defendants.  They haven't,
19 for example, I don't think, been transferred to
20 Mr. Lehman or Mr. Hickman.
21   Q.  Okay.  Understood.  For purposes of your
22 analysis, 100 percent of value of those 454 NFTs was
23 attributed to the defendants; correct?
24   A.  Correct.
25   Q.  Okay.  All right.  Let's turn to

42

1  paragraph 77.  Finally started going in order here.
2       In paragraph 77, you state that -- well,
3  here -- strike that.
4       In paragraph 77, you're talking about
5  disgorgement as a proxy for Yuga Labs' lost profits;
6  right?
7    A.  Correct.
8    Q.  And disgorgement is one of the measures of
9  damages that you assert in Figure 7 down at the end
10 of your report; correct?
11   A.  I mean, I would -- I would not say assert
12 but I would say, yes, that's one measure of -- of
13 damages --
14   Q.  Okay.
15   A.  -- calculated, yeah.
16   Q.  Okay.  Okay.  Language is important, so
17 let me ask it again.
18      Disgorgement is one of the measures of
19 damages that you included in your -- Figure 7 of
20 your report; correct?
21   A.  Yes.
22   Q.  Okay.  So there's that statement there
23 that in paragraph 77 that, "Using defendants'
24 profits as a proxy for Yuga Labs' lost profits may
25 significantly understate Yuga Labs' lost profits."

43

1       Is that a fair characterization?
2    A.  Yes.
3    Q.  You haven't attempted to determine the
4  precise amount of lost profits that Yuga suffered as
5  a result of RR/BAYC; correct?
6    A.  I think I -- I can agree that I have not
7  separately quantified Yuga Labs' lost profits as a
8  result of the defendants' wrongful conduct and
9  instead, with guidance from counsel, and my
10 understanding that disgorgement of defendants'
11 profits can serve as a proxy.  And then I've got,
12 you know, some discussion of why -- from an economic
13 perspective, why that would likely understate the
14 harm to Yuga Labs.  So, I haven't separately
15 quantified it.  But later, as you know, I also
16 describe other potential areas of economic harm to
17 Yuga Labs which would also make this amount
18 understated.
19   Q.  If we jump down to Figure 7 on page 48?
20   A.  Oh.
21   Q.  That first line item reads, "Disgorgement
22 of Defendants' Profits and Yuga Labs' Lost Profits
23 As a Proxy."
24      Do you see that?
25   A.  Yes.

44

1    Q.  And the total value for that line item is
2  1,589,455; correct?
3    A.  Yes.
4    Q.  What portion of that of that $1.5 million
5  number -- well, strike that.  Let me ask a
6  foundation question.
7       There are two different things mentioned
8  in that line item.  There is disgorgement of profits
9  and Yuga Labs' lost profits as a proxy.  Are you
10 with me?
11   A.  Yes.
12   Q.  So are you able to parse out what portion
13 of that $1.5 million is attributable to disgorgement
14 of profits versus Yuga Labs' lost profits as a
15 proxy?
16   A.  I would say --
17      MR. THOMAS:  Objection.  Lacks foundation.
18   A.  -- 100 percent of it.  And again, this is
19 as of the date of my report.  100 percent of that
20 number would reflect disgorgement of defendants'
21 profits.  And then, separately, I would intend to
22 explain why that measure would be a reasonable and
23 conservative proxy for the economic harm to Yuga
24 Labs.  And so, I think the answer would be
25 100 percent of that number would be a reasonable and

---

**45**

1  conservative proxy of the economic harm to Yuga
2  Labs.
3      Q.  I see.  So, in a way, you're sort of
4  trying to triangulate what the damages would be
5  using both of those measures as sort of independent
6  checks; is that fair?
7      A.  Yes, except I would say it's -- the number
8  has its genesis in defendants' profits, obviously,
9  but yes.
10     Q.  Okay.  Understood.  All right.  Let's jump
11  to paragraph 78 on page 39.
12     A.  Okay.
13     Q.  So there's a statement here that says,
14  "Furthermore, Ethereum blockchain data suggests that
15  some consumers have treated RR/BAYC NFTs as
16  replacement goods for BAYC NFTs, indicating that in
17  at least some instances, defendants' gain came at
18  Yuga Labs' loss."
19         Do you see that?
20     A.  Yes.
21     Q.  What is a replacement good?
22     A.  Well, in this context, what I'm saying is
23  that there is evidence in -- and it's footnote 166
24  is the source, but there's evidence that some --
25  that this particular purchaser owned the original

---

**46**

1  and then bought the accused NFT bearing the same
2  image and later sold the original.  So, it looks
3  like one could think that they're saying, "Oh, I can
4  own the same thing for a cheaper price," and so,
5  they're viewing them as interchangeable.
6      Q.  Sure.  So, you correctly identified what I
7  want to ask you about, which is this -- this example
8  that you give.  You don't know the identity of the
9  person who owns that wallet; correct?
10     A.  That's correct.
11     Q.  You don't know why this person sold their
12  BAYC NFT; correct?
13     A.  That's correct.
14     Q.  It's possible -- strike that.
15         Did you make any effort to determine if
16  the person made a profit from their sale of the BAYC
17  NFT?
18     A.  We did not quantify that, no, but we -- we
19  simply observed.  And we did not -- because the data
20  lift was already pretty significant, we did not go
21  do an exhaustive search for examples like this.  It
22  would be very difficult and time consuming to do.
23         But we did identify this example, and it
24  was notable because this wallet owned both NFTs in
25  the exact same image and traded the original Bored

---

**47**

1  Ape Yacht Club image for the RR/BAYC version in the
2  alternative.  And so, that's what we're noting here
3  is that this is an indication that there could be
4  others doing this and it could be potentially taking
5  sales from Yuga Labs to the extent that's happening.
6      Q.  Correct.  But to be fair, you don't know
7  the person's motivation one way or another for doing
8  this; correct?
9      A.  Yes, I can agree with that.  We can just
10  observe the transactions and make some inferences,
11  but I don't have access to that person.
12     Q.  Sure.  Does an RR/BAYC allow a user to
13  participate in the official BAYC chatroom?
14     MR. THOMAS:  Objection.  Outside the scope
15  of the report.
16     A.  I don't believe so.  There's probably
17  other benefits that they get, but I don't think it's
18  the same virtual chatroom, no.
19     Q.  And in paragraph 78, the last sentence,
20  you state, "While I have not quantified the extent
21  of this type of behavior or Yuga Labs' associated
22  damages, it demonstrates that RR/BAYC NFTs have the
23  ability to draw consumers away from Yuga Labs."
24         Do you see that?
25     A.  Yes.

---

**48**

1      Q.  So, to be clear, you have not quantified
2  how many folks may have performed similar
3  transactions; correct?
4      A.  That's correct.
5      Q.  You didn't conduct that analysis as part
6  of your expert report; correct?
7      A.  That's correct.
8      Q.  You didn't have anyone on your team write
9  Python code to make that analysis of the Etherscan
10  data; correct?
11     A.  That's correct.  Like I said, that would
12  be a huge, huge data sciences effort.  But no, we
13  did not do that.
14     Q.  And you haven't made any attempt to
15  quantify the amount of damage that those
16  transactions caused to Yuga Labs; correct?
17     A.  Those specific types of transactions, no,
18  but I would say I have attempted to provide one
19  measure of potential harm to Yuga Labs, but I've not
20  quantified those specific instances, no.
21     Q.  Okay.  Certainly.  All right.  I have no
22  idea how long we've been going.  What's -- could the
23  videographer let us know how long it's been?
24     THE VIDEOGRAPHER:  Yeah, our time on the
25  record is 3:50.

---

Transcript of Lauren Kindler
Conducted on March 17, 2023

**49**

1    THE WITNESS:  5-0 or 1-5?
2    DEPOSITION TECHNICIAN:  5-0.
3    THE WITNESS:  Thank you.
4    THE VIDEOGRAPHER:  You're welcome.
5    MR. GOSMA:  Why don't we just take a short
6 break until 1:50.
7    THE WITNESS:  Okay.
8    THE VIDEOGRAPHER:  All right.  We are
9 going off the record.  The time is 13:41.
10    (Recess.)
11    THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 13:51.
13 BY MR. GOSMA:
14    Q.  All right.  Welcome back, Ms. Kindler.
15    A.  Thank you.
16    Q.  All right.  I'd like to look at
17 paragraph 81 of your expert report.  It's on
18 page 41.
19    A.  Okay.
20    Q.  Well, 40 and 41.  It spans the two pages.
21 Okay.  So, here you're talking about Yuga's
22 corrective advertising expenditures, which is one
23 measure of damages that you identify in your report;
24 correct?
25    A.  Yes.

**50**

1    Q.  All right.  You have some testimony there
2 in paragraph 81 about an agreement Yuga Labs signed
3 with Aptodex.
4    Do you see that?
5    A.  Yes.
6    Q.  And you describe Aptodex as a digital
7 brand protection company; correct?
8    A.  Yes.
9    Q.  And you state that Yuga Labs hired Aptodex
10 to combat the very type of confusion that defendants
11 created in the marketplace; correct?
12    A.  Correct.
13    Q.  What's your understanding of what Aptodex
14 did for Yuga Labs pursuant to this agreement?
15    MR. THOMAS:  Objection.  Lack of
16 foundation.
17    A.  My understanding is that their service is
18 to kind of search the internet for potential use of
19 the brand or misuse of the brand, misuse of the
20 trademarks, and then bring that to Yuga Labs'
21 attention.  And I don't know to what extent they'd
22 be -- they called it takedowns and enforcements.  I
23 don't know to what extent they'd be involved in that
24 process or not.  I think of it as like surveillance
25 or something.

**5**

1    Q.  Okay.  Understood.  Are you aware of any
2 other NFT collections out there that use Yuga Labs'
3 marks but that are not owned by Yuga Labs?
4    A.  I'm aware --
5    MR. THOMAS:  Objection.  Outside the scope
6 of the report.
7    A.  Sorry.  I'm aware that --
8    THE CERTIFIED STENOGRAPHER:  I didn't hear
9 the objection.  You were at the same time.
10    MR. THOMAS:  The objection was outside the
11 scope of the report.  Thanks.
12    A.  I am aware that the defendants claim that
13 there are numerous other people in the market using
14 the marks.  I don't know to what extent the other
15 players are actually using the same marks or some
16 variation of the name.  I mean, that part I have no
17 insight into.
18 BY MR. GOSMA:
19    Q.  So, you haven't conducted an analysis of
20 who else is out in the marketplace using Yuga Labs's
21 marks; is that a fair characterization?
22    A.  Yes, I have not analyzed that.
23    Q.  Okay.  Other than the enforcement action
24 that Aptodex took against RR/BAYC, are you aware of
25 any other enforcement action that it's taken on

**52**

1 behalf of Yuga Labs against any other party?
2    A.  I'm not aware.
3    Q.  Okay.  Now, in paragraph 81, in the
4 penultimate sentence, you state, "Yuga Labs paid
5 Aptodex $250,000 for their services through to
6 2022;" correct?
7    A.  Yes.
8    Q.  So that $250,000 is for the service for
9 the entire year; correct?
10    A.  That's my understanding.
11    Q.  Now --
12    A.  I mean, I think the agreement was entered
13 into in March so, you know, I don't know if it would
14 be just maybe from when the agreement was signed.
15    Q.  RR/BAYC, the accused NFT collection in
16 this case, was created in May of 2022; correct?
17    A.  That was when the first mint had occurred.
18 I think you showed me earlier, I think Mr. Ripps was
19 starting to promote it as early as December of 2021.
20    Q.  Okay.  The first mint of RR/BAYC was in
21 May of 2022; correct?
22    A.  Yes.
23    Q.  You didn't make any attempt to allocate
24 the total payment to Aptodex to the enforcement
25 activity related to RR/BAYC; correct?

Transcript of Lauren Kindler
Conducted on March 17, 2023

---

53

1    A.  That's correct.  So, as I show in
2  Figure 6, I state up to $250,000 and then, of
3  course, that's what ends up giving me my range.  You
4  know, one way I think about these things, though, is
5  in the absence of the wrongful conduct by the
6  defendants, would this type of service be required,
7  I don't know.  So, I think it's possible that a
8  trier of fact could determine that -- if the entire
9  amount should be included as a corrective
10  advertising award, but I also left open the
11  likely -- the -- the potential outcome of there
12  being some portion of that allocated, but I did not
13  perform that allocation.
14    Q.  Now, in this discussion Aptodex is under
15  the heading "Corrective Advertising Expenses;"
16  correct?
17    A.  Yes.
18    Q.  And it's included in Figure 7 in the line
19  item that refers to corrective advertising; correct?
20    A.  In the lower bound, yes.  Or no, I'm
21  sorry, in the upper bound.
22    Q.  In the upper bound, yes.  Okay.  Why, in
23  your opinion, is a service like -- like Aptodex, an
24  enforcement service, as I think you referred to it,
25  how is that corrective advertising?

---

54

1      MR. THOMAS:  Objection.  Calls for a legal
2  conclusion.
3    A.  Yeah, that was what I was going to say.  I
4  think whether or not something is corrective
5  advertising does sound like a legal determination.
6  My -- I view my role as an economist is to identify
7  expenses incurred by, in this case, Yuga Labs
8  relating to combatting the wrongful conduct.  And
9  so, whether or not that is that is, in fact,
10  corrective advertising, I do think that is more of a
11  legal conclusion, but I've done my best to identify
12  expenses that can be attributable to combatting the
13  wrongful conduct.  And that can include identifying
14  the wrongful conduct.  You have to kind of identify
15  it before you can combat it.
16    Q.  Okay.  But for the purposes of your
17  analysis, you included these Aptodex costs in the
18  category of corrective advertising; correct?
19    A.  Correct.
20    Q.  Okay.  Let's turn to paragraph 82 on
21  page 41.  Here you say you that, "Yuga Labs engaged
22  in more traditional corrective advertising efforts
23  in response to defendants' trademark infringement,
24  including a campaign featuring billboards and wall
25  postings in New York City."

---

55

1      Do you see that?
2    A.  I do.
3    Q.  The expenses for that campaign you
4  identify as $285,977; correct?
5    A.  Correct.
6    Q.  And in your analysis, you conclude that
7  that entire amount is attributable to corrective
8  advertising for RR/BAYC specifically; correct?
9    A.  I have attributed that entire amount.  And
10  that's largely based on the testimony in the record
11  as to the rationale behind that effort on behalf of
12  Yuga Labs.
13    Q.  Yeah, let's take a look at that.  The
14  testimony you're referring to is cited in footnote
15  172; correct?
16    A.  Right.  Ms. Muniz.
17    Q.  Right.  So, Ms. Muniz' testimony is the
18  only deposition testimony that you cite in support
19  of your statement in the first sentence of
20  paragraph 82; correct?
21    A.  Yes, that's correct.
22    Q.  Okay.  Let's break it down a little bit.
23  So I'm going the read in the quote from Ms. Muniz.
24  She says, "We did a top" -- which I think she meant
25  to say a ton of advertising?

---

56

1    A.  Yeah, it's -- it's a bad transcript.
2    Q.  Yeah.  "We had to do an out-of-home
3  campaign, so we did an out-of-home campaign in New
4  York City, for instance, which, funnily enough, your
5  client -- and I'm going to curse for two seconds --
6  fucked up and it ended up becoming a huge problem.
7  But yes, we did a lot of competitive corrective
8  advertising."
9      And then she's asked, "what is an
10  out-of-home campaign?"
11      She says, "Billboards, wall postings.  We
12  had nontraditional, so we had engaged an ad company
13  to do, like, stencils across the city."
14      Do you see that?
15    A.  I do.
16      MR. THOMAS:  And I'll just -- sorry, if I
17  can just note for the record, that's an excerpt from
18  the rough transcript, which was what was available
19  at the time.
20      MR. GOSMA:  Sure, understood.
21      THE WITNESS:  Sorry.
22  BY MR. GOSMA:
23    Q.  Yeah.  That's -- yeah.  All right.  So
24  this testimony -- in this testimony, LAUREN KINDLER
25  doesn't say here why Yuga had to do an out-of-home

---

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 42 of 53   Page ID
#:20344
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
40 (157 to 160)

57

1  campaign; correct?
2     A.  Oh, I -- I don't agree with that.  I mean,
3  she says your client and what they were doing was
4  becoming a huge problem.  And then she talks about
5  they did a lot of different advertising.  And she
6  says, for instance, this New York City campaign.
7     So, I -- I interpreted her testimony --
8  and elsewhere I have other testimony from her that
9  she thinks the corrective advertising expenses are
10 significantly greater than what I've quantified.
11 And I selected this one because, based on the
12 testimony, it seemed to be closely related to
13 combatting the wrongful conduct, and that's kind of
14 the threshold that I was looking for.
15    Q.  Okay.  Understood.  So, you interpret this
16 testimony in footnote 172 to be saying that the
17 corrective advertising was directly attributable to
18 RR/BAYC; correct?
19    A.  To what the defendants were doing in the
20 market, which included selling knockoff NFTs and --
21 and creating --
22    Q.  What else did it include?
23    A.  Oh, I mean, there's like we talked about
24 for the negative commentary, but largely
25 misappropriating the trademarks and also the

58

1  associated imagery on the -- on the NFTs.
2     Q.  But you'd agree that some of the
3  advertising at least was responsive to the
4  allegations of racism and Naziism that were being
5  put out on Twitter, for example; correct?
6     MR. THOMAS:  Objection.  Misstates the
7  testimony and lacks foundation.
8     A.  Yeah, I don't -- I think it's possible but
9  I also think all of that happened within the context
10 of the trademark infringement and the false
11 advertising, so I don't know that -- I haven't been
12 asked to disentangle that.  In my mind, those are
13 very closely related, and leveraging the trademarks
14 to make those allegations, that still leverages the
15 trademarks, which is what I've been tasked with
16 evaluating the impact of.
17    Q.  So, in your mind, the trademark
18 infringement is closely bound up with the
19 allegations of racism and -- and Naziism that my
20 clients have made against Yuga Labs; correct?
21    MR. THOMAS:  Objection.  Misstates
22 testimony.
23    A.  Yeah, I haven't evaluated that, but I
24 think that my analysis attempts to isolate the
25 impact -- and this is across all the measures of

59

1  damages that I calculated, but is measuring the
2  impact of the trademark infringement and the false
3  advertising, and it just so happens that along with
4  that there's been this other element of -- of the
5  other allegations of -- coming the other way from
6  the defendants.  But I don't think that that affects
7  my calculation as to what expenses Yuga Labs had to
8  incur to try to correct what was happening in the
9  marketplace by the defendants.
10    Q.  All right.  Turning back to Ms. Muniz'
11 testimony, she does not explain why they chose a
12 billboard campaign in New York City as the venue for
13 their corrective advertising; correct?
14    A.  I mean, not in that quote.  I don't
15 recall -- I mean, I did look at her deposition again
16 recently, but I don't recall if there was some other
17 explanation outside of that excerpt.
18    Q.  And you don't know, based on your review
19 of the record in this case, why Yuga chose New York
20 City as the venue for its billboard campaign;
21 correct?
22    A.  I don't know that that would be relevant.
23 I mean, if there's a reason for choosing it, say,
24 for an event or something like that, that still can
25 be an effort to combat what the defendants are doing

60

1  in the marketplace, so I'm relying on her testimony
2  for the fact that this is an effort and a campaign
3  that Yuga Labs undertook because of the problems
4  being created in the market by the defendants.
5     Q.  You don't know what any of the billboards
6  said; correct?
7     A.  I don't know that I know.
8     Q.  You never looked at them; right?
9     A.  I don't believe so.
10    Q.  Billboards -- the billboard campaign was a
11 physical advertisement that existed in the real
12 world; correct?
13    A.  As she described it, out-of-home, that's
14 what it sounds like.  I mean, I don't have all the
15 details of everything they did, but that's my
16 understanding based on how she described it.
17    Q.  Now, the Bored Ape Yacht Club is an NFT --
18 well, strike that.
19    The Bored Ape Yacht Club NFTs exist on the
20 Ethereum blockchain; correct?
21    A.  Yes.
22    Q.  And they exist -- well, the Ethereum
23 blockchain is part of the greater worldwide
24 Internet; correct?
25    A.

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 43 of 53   Page ID
#:20345
Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023
41 (161 to 164)

6

1    Q.  Sorry, I'm getting a little philosophical
2  here, but --
3    **A.  I'm like, I'm already -- it's like, is it**
4  **the metaverse?  I don't know what we want to call**
5  **it, but sure.**
6    Q.  I'm sure we'll all understand here in
7  about ten years.
8    **A.  Right.**
9    Q.  All right.  And the Internet is a global
10 phenomenon; correct?
11   **A.  Yes.**
12   Q.  Users can access the Internet from
13 anywhere where there's an existing Internet
14 connection; correct?
15   **A.  Yes.**
16   Q.  Do you know any of the details about when
17 the billboard advertising campaign was first
18 planned?
19   **A.  Not sitting here now, no.**
20   Q.  Now, another thing Ms. Muniz says in her
21 testimony was that, quote, "your client -- and I'm
22 going to curse for two seconds -- fucked up and
23 ended up becoming a huge problem."
24       Do you see that?
25   **A.  Yes.**

62

1    Q.  She's referring to her belief that the
2  defendants, quote, "fucked up" the out-of-home
3  campaign; correct?
4        MR. THOMAS:  Objection. Calls for
5  speculation.
6    **A.  Yeah, I don't know that I would agree.  I**
7  **don't know.  I took that as something different.**
8    Q.  Right.  And we talked about your
9  interpretation of the quote a few minutes ago, so I
10 won't ask you about that again.
11       Now, we talked a little bit earlier about
12 how total cost for the campaign is $295,977;
13 correct?
14   **A.  Yes.**
15   Q.  And -- strike that.  I'm going to move on.
16       Let's go to paragraph 87.  So we're still
17 in the section of your report about corrective
18 advertising; correct?
19   **A.  Yes.**
20   Q.  And in this particular paragraph 87,
21 you're discussing defendants' cost to hire
22 Mr. Lehman and Mr. Hickman to assist with the
23 project; correct?
24   **A.  That's correct.**
25   Q.  And you calculate that cost as $419,733;

63

1  correct?
2    **A.  Correct.**
3    Q.  And your conclusion is that those costs
4  are advertising expenses; correct?
5        MR. THOMAS:  Objection. Calls for a legal
6  conclusion.
7    **A.  Yeah, I don't know if that's a fair**
8  **characterization of what I state.  So, I identified**
9  **those costs and say that there were used to create**
10 **and market the NFT collection, and then I say that**
11 **to the extent those payments are considered**
12 **advertising and marketing expenses, they would be**
13 **included in this proxy.**
14   Q.  I see.  That's helpful.  Thank you.  So,
15 you don't have an opinion one way or another about
16 whether they are advertising and marketing expenses,
17 but to extent they are, you believe they should be
18 included in the damages calculation.  Is that a fair
19 characterization?
20   **A.  As one potential measure.  So, it's**
21 **another indication of value attributable to the**
22 **wrongful conduct, this time in the form of the**
23 **expenses incurred by the defendants associated with**
24 **the wrongful conduct.  Alleged wrongful conduct.**
25   Q.  All right.  And as we discussed a little

64

1  bit, paragraph 87 refers to about $15,000 worth of
2  expenditures that the defendants testified that they
3  incurred; correct?
4    **A.  Correct.**
5    Q.  And those are expenses for hiring an
6  assistant, purchasing a new machine and -- and
7  travel; correct?
8    **A.  That's right.**
9    Q.  And you don't have an opinion one way or
10 another whether those expenses are properly -- and
11 strike that.
12       You don't haven't an opinion whether those
13 expenditures are actually advertising and marketing
14 expenses; correct?
15   **A.  So, I think it would be the same answer I**
16 **gave previously, that I endeavored to identify, as**
17 **one measure of value, the expenses incurred by the**
18 **defendants associated with the wrongful conduct.**
19 **And so, based on the evidence in the record, these**
20 **were the expenses that I identified.  I think it**
21 **would be up to the trier of fact to make a**
22 **determination as to whether those expenses are**
23 **reflective of value for purposes of the damages**
24 **award.**
25   Q.  So, in paragraph 88, down a little bit

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

42 (165 to 168)

---

**Page 65**

1  below, I'd like to focus on the last sentence. So,
2  here you repeat this -- well, you give this
3  figure $434,233.
4      Do you see that?
5      **A. Yes.**
6      Q. And that value represents the sum of the
7  amounts paid to Mr. Lehman and Mr. Hickman, as well
8  as the expenditures totaling approximately $15,000
9  that defendants testified to; correct?
10     **A. That's right.**
11     Q. And you state that that figure represents
12 "the lower bound of a range in which Yuga Labs'
13 corrective advertising expenses should be
14 considered;" correct?
15     **A. Correct.**
16     Q. That figure, $434,233, includes all of the
17 expenditures that you are able to quantify that the
18 defendants incurred; correct?
19     **A. I think that's accurate. I would have**
20 **expected the defendants to put forward their own**
21 **measure of expenses, but in the absence of that, I**
22 **did my best to identify the expenses that I could**
23 **from the record.**
24     Q. So, although you included all of the
25 expenditures of which you were aware in this

**Page 66**

1  calculation, you contend that this is the lower
2  bound of the range of advertising expenses; correct?
3      **A. Of the range in which Yuga Labs'**
4  **advertising expenses should be considered. And**
5  **that's because of the other forms of corrective**
6  **advertising that I've quantified, including the cost**
7  **to burn all of the accused NFTs, for example.**
8      Q. So, this is another instance where you're
9  attempting to sort of triangulate the value by using
10 different measures of the damage; is that fair? I'm
11 not trying to be tricky here. I'm just trying to
12 understand.
13     **A. So, this is a little bit different because**
14 **when I think about triangulate, I think about**
15 **considering multiple data points to arrive at one**
16 **data point that the three data points point to, and**
17 **I'm not sure that that applies here. Again, I think**
18 **it's a legal determination as to whether or not any**
19 **of these corrective advertising-related expenditures**
20 **could be additive.**
21     **But I -- I view my job as an economist to**
22 **identify the cost associated -- or the cost that**
23 **Yuga Labs has had to incur or may have to incur to**
24 **combat the wrongful conduct, and so, I've done my**
25 **best to do that based on the money they spent on**

**Page 67**

1  **various campaigns, and then separately, the cost**
2  **that it -- it would take to burn all the NFTs -- the**
3  **minimum cost, so it would likely be higher. And**
4  **then separately, because I understand the law can**
5  **allow the defendants' advertising expenses as a**
6  **measure, I've looked at the expenses in the record**
7  **that the defendants have incurred.**
8      **But I don't know to what extent I would**
9  **characterize that as triangulating. I think I would**
10 **present all of those and then I think it would be up**
11 **to the trier of fact, probably with some instruction**
12 **from the judge, as to what to do with those numbers.**
13     Q. Okay. Thank you. That's very helpful.
14 All right. Let's turn now to paragraphs 85 and 86
15 of your report, which fall under the heading,
16 "Yuga's Cost to Acquire RR/BAYC NFTs At Current
17 Market Prices."
18     Do you see that?
19     **A. Okay. I do.**
20     Q. So, in paragraph 85, the second sentence,
21 you state that this is a hypothetical scenario;
22 correct?
23     **A. Yes. I mean, it hasn't happened, so yes.**
24     Q. And you note in your report that you don't
25 know one way or another whether Yuga would actually

**Page 68**

1  engage in this exercise; correct?
2      **A. I don't know if it would but it's -- it's**
3  **one -- excuse me. One way to think about the cost**
4  **to Yuga Labs of absolving the market of the wrongful**
5  **conduct is to simply acquire those -- those NFTs.**
6  **And I think it's a little unusual in this**
7  **marketplace -- I mean, I'm not sure that this remedy**
8  **or quantification of a potential remedy would apply**
9  **all the time, but in this case we have a limited set**
10 **of -- of NFTs that are accused and they're**
11 **transacted in the public domain, so one possibility**
12 **and one indication of -- of the value to kind of get**
13 **rid of it would be the cost of simply acquiring**
14 **those NFTs and burning them.**
15     Q. So, I want to follow up on one thing you
16 said which is one way to think of the cost to Yuga
17 Labs of absolving the market of the wrongful
18 conduct.
19     Do you have that in mind?
20     **A. Yeah.**
21     Q. Okay. Is it your opinion that if Yuga
22 Labs were to acquire all these NFTs that it actually
23 would have a positive effect on the market?
24     MR. THOMAS: Objection. Outside the scope
25 of the report.

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

---

69

1    A.  Yeah, I don't know what you mean by the
2  market.
3    Q.  Yeah, it wasn't a good question.  I'm
4  going to try and ask it a little bit differently, so
5  I withdraw the question.
6       Is it your opinion that if Yuga Labs were
7  hypothetically to acquire all these NFTs, that it
8  would actually have a positive effect on Yuga Labs'
9  brand?
10      MR. THOMAS:  Objection.  Outside the scope
11 of the report and calls for speculation.
12   A.  Yeah, I haven't formed an opinion one way
13 or another.  If you're -- I thought where you were
14 going is would this make Yuga Labs whole, and I
15 don't think that it would.  I mean, as Dr. Berger
16 has opined, there's been damage to the brand, and
17 simply removing the NFTs from the marketplace isn't
18 fully corrective in that sense.
19   Q.  That's helpful, thank you.  Now, your
20 calculation of this amount that it would cost Yuga
21 Labs to acquire all these NFTs, that includes
22 acquiring all of the RR/BAYC NFTs currently in
23 existence; correct?
24   A.  Correct.
25   Q.  So, does it include the unminted NFTs or

---

70

1  not?
2    A.  I think -- no.  So, I'm looking at
3  footnote 178, and you start with 9,546 that were
4  minted and 50 were burned.  So, you end up with the
5  9,496 existing NFTs that's in paragraph 86.
6    Q.  Okay.  And so, in your calculation of
7  defendants' profits from the initial sales of
8  RR/BAYC NFTs, you included the profits that they
9  made from selling these 9,496 NFTs; correct?
10   A.  Yes.
11   Q.  So, the value of the profits for those
12 NFTs, those are included in the first line item of
13 Figure 7; correct?
14   A.  Well, minus -- you know, we have to
15 share -- it started at 2 million, but then there's
16 the profit sharing that happens with Mr. Hickman and
17 Mr. Lehman to get it down to the 1.6 million.  But
18 yes, that's the resulting profits to defendants.
19   Q.  Right.  So after you net out all the
20 payments to other people and the gas costs, the
21 profits, the pure profits that were obtained from
22 those 9,496 NFTs, those are included in that first
23 line item of Figure 7; correct?
24   A.  Yes.  As of date of my report, yes.
25   Q.  Now, sticking with the calculations in

---

71

1  Figure 4 -- strike that.
2       Sticking with the calculations in
3  Figure 7, the fourth line item, which includes Yuga
4  Labs' cost to acquire RR/BAYC NFTs, includes the
5  cost to, in the future, acquire those same NFTs;
6  correct?
7    A.  I wouldn't say in the future.  I mean,
8  it's based on the current floor price before I
9  issued my report, but yes, it's based on a -- if
10 they were to do it in the future, obviously we don't
11 know the future price, but yes.
12   Q.  So in Figure 7, damages attributable to
13 that same set of 9,496 NFTs are reflected in two
14 separate line items; correct?
15   A.  Not quite.  They're not quite exact
16 because -- my memory is that the first line, I want
17 to say, is 9,514 NFTs because I think we included
18 burned.  There's a slight difference.  But in the
19 spirit of your question, yes, they are largely
20 overlapping, if that is that what you're getting at.
21   Q.  It is.
22   A.  Okay.
23   Q.  All right.  All right.  I still want to
24 talk about Figure 7, but I want to talk about a
25 slightly different issue.  Since we've -- I've asked

---

72

1  you three times, I think.  Figure 7 is -- it
2  contains a number of different measures for the
3  potential damages that Yuga Labs has incurred;
4  correct?
5    A.  Yes.  As of the date of my report, yes.
6    Q.  So I want to revisit this issue of time
7  periods just very briefly.  So let's focus on the
8  first line item for disgorgement of defendants'
9  profits.
10      And I want to focus on the specific time
11 period of June 21st, 2022 until June 25th, 2022.
12 And you have that five-day period in mind?
13   A.  Yes.
14   Q.  What -- okay.  What percentage of the
15 damages identified in Figure 7 were incurred between
16 June 21st, 2022, and June 25th, 2022?
17      MR. THOMAS:  Objection.  Lacks foundation.
18   A.  Yeah, I haven't evaluated that.  I mean, I
19 think we could do that from the data but I haven't
20 been asked to do that.
21   Q.  As you sit here today, you don't know the
22 specific amount of damages that were incurred in
23 that period; correct?
24      MR. THOMAS:  Objection.  Misstates
25 testimony.

---

---

**73**

1  A.  I mean, I think I could -- it could be
2  determined, but I don't have the number sitting here
3  right now.  But my calculations certainly would
4  allow for that -- that calculation to be done.
5      Q.  Okay.  Do you know whether any damages
6  were incurred between June 21st, 2022, and
7  June 25th, 2022?
8      A.  I would love to know the rationale for
9  these dates.  Maybe I -- there's something I don't
10  know, but are these dates important?  I don't know
11  what they are.  I don't know.  I haven't been asked
12  to evaluate damages during that five-day window.
13      Q.  Okay.  So you weren't asked to calculate
14  damages during that five-day window; right?
15      A.  I mean, it's certainly subsumed within my
16  numbers, but I was not asked specifically to
17  calculate damages in that discrete time period
18  separate and apart from the broader time period.
19      Q.  Sure.  Understood.  Thank you.  Let's take
20  a short break.
21      A.  Okay.
22          THE VIDEOGRAPHER:  We are going off the
23  record.  The time is 14:31.
24          (Recess.)
25          THE VIDEOGRAPHER:  We are back on the

---

**74**

1  record.  The time is 14:45.
2  BY MR. GOSMA:
3      Q.  All right.  Welcome back, Ms. Kindler.
4      A.  Thank you.
5      Q.  So paragraph 33 of your report on page 18
6  is where I'd like to start.
7      A.  Okay.
8      Q.  And here in paragraph 33, as we discussed
9  earlier, you list Yuga Labs' trademarks; right?
10      A.  As I understand them from the legal
11  filings, yes.
12      Q.  Yeah.  And you've personally reviewed the
13  asserted marks; correct?
14          MR. THOMAS:  Objection.  Vague.
15      A.  Yeah, can you be more specific?  Do you
16  mean the actual, like, trademark registrations?
17      Q.  No, let's just -- let me use a specific
18  example.  So the ape skull logo?
19      A.  Yes.
20      Q.  That's one of the trademarks listed in
21  paragraph 33; correct?
22      A.  That's correct.
23      Q.  And you're familiar with what the ape
24  skull logo looks like; correct?
25      A.  Yes.

---

**75**

1      Q.  Okay.  And you've also seen Bored Ape
2  Yacht Club NFTs; correct?
3      A.  Correct.
4      Q.  You've seen the ape images such as they
5  are; correct?
6      A.  That's correct.
7      Q.  Okay.  And we've already discussed that
8  you're aware that my clients have criticized that
9  artwork; correct?
10      A.  Yes.
11      Q.  Both the ape images themselves and the ape
12  skull logo; correct?
13      A.  I think that's accurate, yes.
14      Q.  And you understand that my clients and
15  others believe that the ape images used in the
16  collection are -- are racist; correct?
17          MR. THOMAS:  Objection.  Lacks foundation
18  and outside the scope of the report.
19      A.  My understanding is that that is their
20  position but that Yuga Labs strongly denies that.
21      Q.  Understood.  Have you formed an opinion in
22  this case about the validity of that criticism?
23          MR. THOMAS:  Objection.  Outside the scope
24  of the report and irrelevant.
25      A.  No, it's not -- no.  Not part of my

---

**76**

1  assignment.
2      Q.  Okay.  And we already talked about the ape
3  skull logo.  And you're aware that my clients
4  believe that that logo has similarities to a Nazi
5  logo.  Are you familiar with that?
6          MR. THOMAS:  Objection.  Outside the scope
7  of the report.  Irrelevant.
8      A.  I'm familiar with the allegation just
9  having reviewed the counterclaims.
10      Q.  Sure.  And it's Yuga Labs' position that
11  that claim is not correct; is that your
12  understanding?
13      A.  That's my understanding.
14      Q.  Okay.  And you haven't formed any opinion
15  one way or the other in this case; correct?
16          MR. THOMAS:  Same objections.
17      A.  That's correct.  Not part of my
18  assignment.
19      Q.  Okay.  Were you aware of my clients'
20  criticism prior to signing your engagement agreement
21  in this case?
22          MR. THOMAS:  Same objections.
23      A.  Yes, I was.
24      Q.  Okay.  All right.  Let's turn back to your
25  report.  And I'd like to turn to paragraph 91.

45  (177 to 180)

77

1    A.  Okay.
2    Q.  All right.  In this paragraph you state
3  that, "The floor price of BAYC NFTs declined after
4  the RR/BAYC NFTs were minted;" correct?
5    A.  That's correct.
6    Q.  You also state that, "The timing of the
7  decline makes it likely that the decline was at
8  least in part caused by confusion in the marketplace
9  between the authentic BAYC NFTs and the RR/BAYC
10  NFTs."
11      Do you see that?
12    A.  Yes.
13    Q.  So I'd like to explore that in two ways.
14  First, what is the basis for your statement that the
15  timing of the decline makes it likely that it was
16  caused at least in part by confusion in the
17  marketplace?
18    A.  Well, we can observe that the prices of
19  the authentic BAYC NFT -- or NFTs, I should say,
20  declined and that timing is -- is coincident with
21  the alleged wrongful conduct in this case.  And then
22  we've -- you know, I know that Dr. Berger has opined
23  that there has been harm to the brand, and he's done
24  different analyses to show some market-based data
25  that supports his position that there's been harm to

78

1  the -- to the brand and then subsequently to the
2  products.
3      And so, the position I take here is that
4  at least in part -- I mean, I haven't identified
5  what part and I don't know how significant the
6  portion of that decline is that could be
7  attributable to the wrongful conduct -- but the
8  evidence seems to indicate that at least some part
9  of that is likely caused by the defendants' actions
10  in the market.
11    Q.  And the amount of that harm, that's
12  outside the scope of your report, and you defer to
13  Dr. Berger on that; is that fair?
14    A.  With the one caveat of, as we've talked
15  about, I have put forward an amount that would be a
16  reasonable and conservative proxy for the harm to
17  Yuga Labs, which is based on my unjust enrichment or
18  my disgorgement calculation, and I describe in my
19  report why that would likely understate the harm to
20  Yuga Labs, but -- but to answer your question
21  directly, with respect to this paragraph in 91 and
22  the observed decline in the BAYC NFT prices, I have
23  not quantified what portion of that could be
24  attributable to the wrongful conduct.
25    Q.  And relatedly, you've not made any attempt

79

1  to separate whatever harm was caused by RR/BAYC as
2  opposed to other factors, such as the more general
3  crypto market decline; correct?
4      MR. THOMAS:  Objection.  Vague and outside
5  the scope.
6    A.  So again, within -- I think that's correct
7  within the context of paragraph 91 and the
8  observable decline in the BAYC NFT floor prices.  I
9  don't think I would agree with respect to my proxy
10  for harm, so I -- again, I just want to make that
11  distinction between the disgorgement figure that
12  I'm -- that I'm saying I understand can be used as a
13  proxy for the harm to Yuga Labs.
14    Q.  So the disgorgement figure that you've
15  offered is not related to the floor price of an
16  original BAYC NFT; is that correct?
17    A.  Not directly.  That's correct.  That is my
18  point --
19    Q.  Yes.
20    A.  -- is that that is tied to the profits
21  associated with the RR/BAYC NFTs and not directly
22  tied to BAYC NFTs.
23    Q.  So hypothetically, if the floor price of
24  BAYC NFTs had remained the same from May 2020 until
25  now, your disgorgement analysis would not change; is

80

1  that correct?
2      MR. THOMAS:  Objection.  Incomplete
3  hypothetical.
4    A.  My disgorgement analysis in the context of
5  disgorgement is totally un-impacted.  I mean,
6  it's -- it's a measure of the gains to the
7  defendant -- I mean, yeah, to the defendant.  So --
8  but do you mean as a proxy for Yuga Labs' economic
9  harm or do -- because then I'd have to --
10    Q.  No, I understand that they are separate
11  issues, and so, I want my question to be just about
12  the disgorgement analysis; right?
13    A.  Okay.
14    Q.  So if we are speaking just about the
15  disgorgement analysis, that analysis is not
16  dependent in any way on the floor price of original
17  BAYC NFTs; correct?
18      MR. THOMAS:  Objection.  Misstates
19  testimony.
20    A.  Yeah, so I think I'd be comfortable saying
21  it's not directly tied in any way to that.  That
22  being said, I think that one input into whether --
23  and this is my understanding of -- of legal
24  implications, but one input into whether or not
25  disgorgement is an appropriate remedy can be whether

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

46 (181 to 184)

---

**Page 8**

1  and to what extent there's been economic harm to the
2  owner of the mark.  And so, I think harm to Yuga
3  Labs can be relevant to a finding of disgorgement.
4  Again, that's my understanding of -- of how maybe
5  the courts view it, and it's a legal question, but
6  as an economist, that's just my understanding as to
7  to how those two could be related.
8      Q.  Okay.  But -- and I know we've covered
9  this, but to just to be clear, you're not taking a
10  position on the precise amount of harm that Yuga
11  Labs has incurred as a result of BAYC -- RR/BAYC,
12  excuse me?
13     A.  Not other than my position about their
14  gains being a proxy -- and a conservative proxy --
15  but other than that analysis, I have not separately
16  quantified direct economic harm to Yuga Labs in the
17  form of either lost sales of BAYC NFTs or reduction
18  in value of BAYC NFTs.
19     Q.  Okay.  Thank you.  You could have made
20  that a lot more difficult for me.
21     A.  I'm trying not to, I promise.
22     Q.  Not my -- not my finest, sharpest
23  questions there.
24     A.  I just like to be precise, so sorry.
25     Q.  No, understood.  And I want to be precise

---

**Page 82**

1  because I want us to have a clear record.
2          You don't deny that there are other
3  factors that could have affected the BAYC floor
4  price other than confusion with RR/BAYC; correct?
5      A.  Correct.
6          MR. THOMAS:  Objection.
7      A.  Sorry.
8          MR. THOMAS:  No, it's okay.
9      A.  Yes, that's correct.
10     Q.  All right.  Are you familiar with Yuga
11  Labs' Otherside product?
12     A.  I think I reference it in my report and I
13  remember kind of looking into it at some point but
14  I -- my familiarity is limited.
15     Q.  Do you have a general sense for what it
16  is?
17     A.  I mean, it's another marketplace, I think.
18  Another virtual marketplace where there are digital
19  assets, and I don't know more than that.
20     Q.  Do you know anything about the
21  circumstances around the release of the Otherside,
22  the metaverse?
23         MR. THOMAS:  Objection.  Outside the scope
24  of the report.
25     A.  Do you mind if I search my report?

---

**Page 83**

1      Q.  Not at all.  I would like you to.
2      A.  I remember looking into Otherside.  I
3  probably don't have much in my report.  So I'm
4  looking at page 16, March 2022 announced Otherside,
5  gamified metaverse built in collaboration with an --
6  I don't know how to pronounce this -- Animoca
7  Brands.  Yeah, that -- that's all I have.  I did
8  look at this at one point, but I don't really recall
9  details around it.
10     Q.  Okay.  So is it fair to say that you
11  didn't consider the impact of the Otherside release
12  on Yuga Labs' brand as part of your report; correct?
13     A.  Yeah, I mean, I didn't consider -- I --
14  I'm not a brand expert and didn't value impact to
15  brand, but no, I didn't consider Otherside.
16     Q.  Right.  You didn't consider whether it had
17  a positive or a negative impact on Yuga's brand;
18  correct?
19         MR. THOMAS:  Objection.  Asked and
20  answered.
21     A.  I think that's correct, and that would be
22  outside of the scope of my assignment.
23     Q.  Okay.  Now, are you aware that Yuga Labs
24  is currently the subject of an investigation by the
25  Securities and Exchange Commission?

---

**Page 84**

1          MR. THOMAS:  Objection.  Outside the scope
2  of the report and irrelevant.
3      A.  I think I'm aware of the existence of
4  that.  I haven't reviewed it and don't know details
5  about it.
6      Q.  Okay.  And so it's not something that you
7  considered as part of your forming your opinions in
8  this case; correct?
9      A.  Yes, that's correct.
10     Q.  Okay.  And you're aware that Yuga's also
11  the defendant in a class action lawsuit filed at the
12  end of 2022 relating to celebrity endorsements;
13  correct?
14         MR. THOMAS:  Objection.  Lacks foundation.
15  Outside the scope of the report.  Irrelevant.
16     A.  Yeah, it would be the same answer.  I
17  think I'm aware of the existence of that action, but
18  I haven't reviewed any details about it.
19     Q.  Okay.  And so, you haven't considered that
20  lawsuit as part of your opinions in this case;
21  correct?
22     A.  Correct.
23     Q.  Okay.  So, we've talked a little bit about
24  the decline in floor price for BAYC NFTs from April
25  of 22 until now; do you recall that?

---

Case 2:22-cv-04355-JFW-JEM   Document 268-3   Filed 06/05/23   Page 49 of 53   Page ID
#:20351

Highly Confidential - Attorneys' Eyes Only
Transcript of Lauren Kindler
Conducted on March 17, 2023

47 (185 to 188)

85

1    A.  Yes.
2    Q.  You haven't reviewed any Yuga Labs
3 internal documentation about the reasons for that
4 decline; correct?
5    A.  Nothing is coming to mind.
6    Q.  Okay.  Let's turn to paragraph 92 of your
7 report.
8    A.  Okay.
9    Q.  Now, in this paragraph you are discussing
10 how RR/BAYC NFTs negatively affected Yuga Labs's
11 business partnerships.
12       Do you see that?
13    A.  Correct.
14    Q.  And you refer to a specific instance that
15 LAUREN KINDLER mentioned in her testimony; right?
16 Correct?
17    A.  Correct.
18    Q.  All right.  I don't know if I was trying
19 to say correct or right there.  I think I said both.
20       And this potential partner that she
21 mentioned was a partner in the fashion industry;
22 correct?
23    A.  That's correct.
24    Q.  And she testified that that fashion
25 industry partner was, quote, "Hesitant to consummate

86

1 a business partnership with Yuga Labs;" correct?
2    A.  That's right.
3    Q.  You don't know the identity of that
4 potential partner; correct?
5    A.  That's correct.
6    Q.  You don't know whether the partnership
7 actually moved forward or not; correct?
8    A.  Correct.
9    Q.  And you haven't reviewed any Yuga Labs
10 internal documents about that potential partnership;
11 correct?
12    A.  That's right.
13    Q.  Let's look at paragraph 93.
14    A.  Okay.
15    Q.  And you state that, "Defendants' wrongful
16 conduct likely damaged Yuga Labs' good will;"
17 correct?
18    A.  Yes.
19    Q.  What is good will?  What's your
20 understanding of that term?
21    A.  It's an intangible asset of a company that
22 can encapsulate things like brand value, recognition
23 in the marketplace, you know, things that are -- are
24 hard to quantify, but are important to the overall
25 business.

87

1    Q.  And you state there in the first sentence
2 of paragraph 93 that it was defendants' wrongful
3 conduct that caused the damage to Yuga Labs' good
4 will; correct?
5    A.  Well, I said likely damaged Yuga Labs's
6 good will.
7    Q.  Okay.  Yeah, let me withdraw the question
8 and ask it correctly.  I realized I did that.
9       So you state here that it was defendants'
10 wrongful conduct that likely damaged Yuga Labs' good
11 will; correct?
12    A.  Yes.  And I think that would in part be
13 based on everything in my report in addition to the
14 opinions, for example, of Dr. Berger as the brand
15 and marketing expert.
16    Q.  Sure.  And by the wrongful conduct, you're
17 referring to trademark infringement and false
18 advertising; correct?
19    A.  Yes, in this instance, yes.
20    Q.  And did you assume for the purposes of
21 offering this opinion that all of the harm that Yuga
22 may have suffered to its good will was attributable
23 to confusion between RR/BAYC and the original Bored
24 Ape Yacht Club NFTs?
25       MR. THOMAS:  Objection.  Calls for a legal

88

1 conclusion.
2    A.  Yeah, I don't think I got that far because
3 I didn't ultimately quantify the actual impact to
4 good will, and I think at that point, were I to do
5 that, I would need to tie that harm to the wrongful
6 conduct.  So for my purposes, I'm -- I'm just simply
7 stating that one additional measure of harm that I
8 haven't quantified, which makes my analysis
9 extremely conservative, is harm to Yuga Labs' good
10 will.
11       I mean, Yuga Labs has made a name on this
12 offering, this NFT offering and established a
13 significant market presence.  And then, since then,
14 there's been activity in the market that has harmed
15 its brand and harmed its good will, including the
16 trademark infringement and false advertising.
17    Q.  Okay.  Understood.  And I hear you saying
18 that you haven't quantified the damage to good will,
19 but there are specific figures in paragraph 93.  You
20 offer this range of 0 to 30 percent of Yuga's assets
21 as being its good will.
22       Do you see that there in the second
23 sentence of -- or the first sentence of
24 paragraph 93?
25    A.  Yes.  I mean, it's a wide range based on

89

1    average statistics, but yes.
2        Q.   And you take Yuga's assets as of
3    November 30, 2022, and you state that that is
4    $294 million, citing a Yuga Labs financial
5    statement; correct?
6        A.   Correct.
7        Q.   And you apply that 30 percent figure to
8    allocate the percentage of Yuga's assets that are
9    attributable to its good will; correct?
10       A.   Yeah, I think that's an overstatement.  I
11   mean, the next statement says this is an
12   illustrative and simple calculation, so I would not
13   characterize the 88 million as me having valued Yuga
14   Labs' good will.  I'm using publicly available
15   information to make some inferences as to the
16   magnitude of good will that could be at stake here,
17   and then coupled with the harm, there can be some --
18   you know, some indication of what the magnitude of
19   that impact could be, but I've -- as I've
20   characterized it, it's an illustrative and simple
21   calculation.
22       Q.   I see.  So, although you've put this 88
23   million figure in here, that's not something that
24   you would say is a quantification of the value of
25   Yuga Labs' good will; correct?

90

1        A.   I would agree with that.  I think the
2    purpose of that is to show that it can be
3    significant for a company like Yuga Labs with their
4    given asset value at that point in time.
5        Q.   And so, you're not offering an opinion
6    that 30 percent of Yuga's assets are its good will;
7    correct?
8        A.   That's correct.
9        Q.   Okay.  You're saying that in general, a
10   company's assets as -- strike that.
11       You're saying that in general, as much as
12   30 percent of a company's assets can be in good
13   will; correct?
14       A.   Correct.
15       Q.   Okay.  So you're not suggesting that
16   the -- the wrongful conduct that my clients are
17   alleged of committing caused $88 million in damage;
18   correct?
19       A.   That's correct.  I would not characterize
20   it that way.
21       MR. GOSMA:  Okay.  I'm done.  I have no
22   further questions for you.  Ethan, do you have any
23   yourself?
24       MR. THOMAS:  If I do, it'll be very brief.
25   You mind if we take a quick five-minute break and

9

1    come back on?
2        MR. GOSMA:  No problem.
3        MR. THOMAS:  Thank you.
4        MR. GOSMA:  All right.  We'll see
5    everybody at 3:15.
6        THE VIDEOGRAPHER:  We're going off the
7    record.  The time is 15:10.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are back on the
10   record.  The time is 15:16.
11       MR. THOMAS:  Good afternoon.  I have no
12   questions for redirect.  I just wanted to reiterate
13   in case I didn't say completely the first time that
14   the deposition is highly confidential, attorneys'
15   eyes only under the protective order until the time
16   expires to make designations, and also note that
17   Yuga Labs reserves the right to invoice defendants
18   for Ms. Kindler's fees for her deposition under
19   Rule 26B40.  But that's all for us, nothing further
20   from Yuga Labs.  And just thank you Ms. Kindler and
21   for Planet Depos for their tame.
22       MR. GOSMA:  Yeah, thank you, Ethan.  What
23   I would say is we will object to the designation
24   that the transcript is confidential, but we can take
25   that up offline.  And I also want to reiterate my

92

1    thanks to the folks here, including Ms. Kindler.
2    Thank you very much.  And we can go off the record
3    if Ethan is ready.
4        MR. THOMAS:  All set.  Thanks, Derek.
5        MR. GOSMA:  Yeah.
6        THE VIDEOGRAPHER:  This concludes the
7    deposition of Lauren Kindler.  The time is 15:17.
8    (Deposition concluded at 3:17 PM.)
9            -oOo-
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

93

ERRATA SHEET FOR THE DEPOSITION OF:

2
3    CASE NAME:      YUGA LABS, INC  V RYDER RIPPS,
                     JEREMY CAHEN
4
     CASE NUMBER:    2:22 CV 04355 JFW JEM
5
     DEPO DATE:      FRIDAY, MARCH 7, 2023
6
     DEPONENT:       LAUREN KINDLER
7
8              CORRECTIONS
9    PG  LN  NOW READS  SHOULD READ  REASONS
0    ___ ___ _____ _____ _____
     ___ ___ _____ _____ _____
2    ___ ___ _____ _____ _____
3    ___ ___ _____ _____ _____
4    ___ ___ _____ _____ _____
5    ___ ___ _____ _____ _____
6    ___ ___ _____ _____ _____
7    ___ ___ _____ _____ _____
8    ___ ___ _____ _____ _____
9    ___ ___ _____ _____ _____
20   ___ ___ _____ _____ _____
2    ___ ___ _____ _____ _____
22   ___ ___ _____ _____ _____
23   ___ ___ _____ _____ _____
24
25   SIGNATURE _____ DATE _____

94

     STATE OF CALIFORNIA   )
                           ) SS
2    COUNTY OF LOS ANGELES )
3
4
5        I, LAUREN KINDLER, HEREBY CERTIFY UNDER
6    PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF
7    CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT
8        EXECUTED THIS ____ DAY OF _____,
9    2023, AT _____, CALIFORNIA
0
2
3
4    _____
5            LAUREN KINDLER
6
7
8
9
20
2
22
23
24
25

95

         CERTIFIED STENOGRAPHER'S CERTIFICATE

2    STATE OF CALIFORNIA   )
                           ) SS
3    COUNTY OF LOS ANGELES )
4
5        I, NATALIE PARVIZI-AZAD, HERBY CERTIFY
6        I AM A DULY QUALIFIED CERTIFIED SHORTHAND
7    REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF
8    CERTIFICATE NUMBER CSR  4  25 ISSUED BY THE COURT
9    REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL
0    FORCE AND EFFECT   (BUS & PROF § 80 6)
         I AM NOT FINANCIALLY INTERESTED IN THIS
2    ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY
3    ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES
4    (CIV PROC § 2025 320(A))
5        I AM AUTHORIZED TO ADMINISTER OATHS OR
6    AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL
7    PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING
8    EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER ETH OR
9    AFFIRMATION BY ME  (CIV PROC §§ 2025 320,
20   2025 540(A))
2        I AM THE CERTIFIED OFFICER THAT
22   STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE
23   FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT IS
24   A TRUE RECORD OF THE TESTIMONY GIVEN  (CIV PROC §
25   2025 540(A))

96

         I HAVE NOT, AND SHALL NOT, OFFER OR PROVIDE
2    ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY OR
3    THIRD PARTY WHO IS FINANCING ALL OR PART OF THE
4    ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES OR
5    THEIR ATTORNEYS ATTENDING THE PROCEEDING AND MAKING
6    SAME AVAILABLE AT THE SAME TIME TO ALL PARTIES OR
7    THEIR ATTORNEYS  (CIV PROC § 2025 320(B))
8        I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT
9    CONSISTING OF THE CERTIFIED STENOGRAPHER'S NOTATIONS
0    OR COMMENTS REGARDING THE DEMEANOR OF ANY WITNESS,
     ATTORNEY, OR PARTY PRESENT AT THE PROCEEDING TO ANY
2    PARTY OR ANY PARTY'S ATTORNEY OR THIRD PARTY WHO IS
3    FINANCING ALL OR PART OF THE ACTION, NOR SHALL I
4    COLLECT ANY PERSONAL IDENTIFYING INFORMATION ABOUT
5    THE WITNESS AS A SERVICE OR PRODUCT TO BE PROVIDED
6    TO ANY PARTY OR THIRD PARTY WHO IS FINANCING ALL OR
7    PART OF THE ACTION  (CIV PROC § 2025 320(C))

9    DATED  Ma ch 20, 2023
20
2
22
23   _____
24       NATALIE PARVIZI AZAD  CSR NO  4  5
25

No. 483508

Re:    Deposition of **Lauren Kindler**

       Date: 3/17/2023

       Case: Yuga Labs, Inc. -v- Ripps, et al.

       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |
|      |      |                              |

4/27/2023

(Date)                      (Signature)

No. 483508

Re:   Deposition of **Lauren Kindler**
      Date: 3/17/2023
      Case: Yuga Labs, Inc. -v- Ripps, et al.
      Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT

        I, Lauren Kindler, do hereby acknowledge
that I have read and examined the foregoing
testimony, and the same is a true, correct and
complete transcription of the testimony given by me
and any corrections appear on the attached Errata
sheet signed by me.

        4/27/2023

        (Date)                        (Signature)