1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5  YUGA LABS, INC.,                    )
                                       )
6           PLAINTIFF,                 )    CASE NO.
                                       )
7           vs.                        )    CV 22-04355-JFW
                                       )
8  RYDER RIPPS, JEREMY CAHEN,          )
                                       )    PAGES 1 TO 101
9           DEFENDANTS.                )
   _____)

10

11

12

13            REPORTER'S TRANSCRIPT OF
               PRETRIAL CONFERENCE
14            FRIDAY, JUNE 9, 2023
                  8:03 A.M.
15           LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23   _____

24          MIRANDA ALGORRI, CSR 12743, RPR, CRR
            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, SUITE 4455
25             LOS ANGELES, CALIFORNIA 90012
                MIRANDAALGORRI@GMAIL.COM

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         FENWICK & WEST, LLP
          BY:  ERIC BALL
5         BY:  KIMBERLY CULP
          BY:  MOLLY MELCHER
6         BY:  ETHAN M. THOMAS
          BY:  ANTHONY M. FARES
7         801 California Street
          Mountain View, California 94041
8

9    **FOR THE DEFENDANTS:**

10
          WILMER CUTLER PICKERING HALE & DORR, LLP
11        BY:  LOUIS W. TOMPROS
          BY:  DEREK GOSMA
12        60 State Street
          Boston, Massachusetts 02109
13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:03AM | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 08:03AM | 10 |

1           **LOS ANGELES, CALIFORNIA; FRIDAY, JUNE 9, 2023**

2                     **8:03 A.M.**

3                       ---

4

08:03AM   5           THE CLERK:  Calling CV 22-4355-JFW,

6     Yuga Labs, Inc., versus Ripps, et al.

7                 Counsel, please state your appearances.

8           MR. BALL:  Eric Ball for Plaintiff Yuga Labs,

9     Inc.  And with me are my colleagues Molly Melcher,

08:03AM   10    Kimberly Culp, Ethan Thomas and Anthony Fares.

11          MR. TOMPROS:  Good morning, Your Honor.

12    Louis Tompros on behalf of the defendants Mr. Ripps and

13    Mr. Cahen, and with me is my colleague Derek Gosma.

14          THE COURT:  All right.  So you escaped the smoke

08:03AM   15    from back east?

16          MR. TOMPROS:  I did, Your Honor.  I left just

17    early enough to confer with Mr. Ball, which your order allowed

18    me to avoid it entirely.

19          THE COURT:  So you're going back to smoke.  It

08:04AM   20    looks -- on the news last night it just looked terrible.

21          MR. TOMPROS:  Yeah.  It was -- luckily I'm a

22    little north in Boston.  But New York and Washington is in a

23    bad spot, and I'm looking for the best.  But I'm sure you all

24    have more experience in this.  So we can learn, I think, from

08:04AM   25    our California friends.

1          THE COURT:  When we're in the fire season, we

2    have a lot of experience with the smoke.  Hopefully we will

3    avoid fire season this year given the rain that we had although

4    I'm not sure we can.

08:04AM  5          Good morning to all.  This matter is on the

6    Court's calendar for a pretrial conference.  What I want to try

7    to accomplish today is to discuss the remaining claims in light

8    of the Court's grant of summary judgment and then discuss some

9    case management issues with respect to the witnesses that the

08:05AM 10   parties intend to call as well as the continuing issues with

11   respect to the trial exhibits.

12          Let me begin by indicating that I have reviewed

13   all of the pretrial filings by the parties and, as counsel

14   know, I have issued various orders with respect to certain of

08:05AM 15   those pretrial filings.  But in my view, there's still a lot of

16   work to do to prepare this case for trial.

17          What I'm trying to get my arms around is the

18   remaining claims and issues that we're going to be trying in

19   this case.  I want to begin with the Pretrial Conference Order

08:05AM 20   which was filed on May 25th and appears as Docket No. 29 -- I'm

21   sorry -- 229-1.  Specifically, I'm going to refer to

22   Paragraph 7 which are the claims and defenses of the parties.

23          According to the Pretrial Conference Order as

24   well as the memorandum of facts and law that was filed, as to

08:06AM 25   Claim 1, the false designation of origin, as well as Claim 3

1    which is the cybersquatting claim, we're going to be trying the

2    issues with respect to remedies available to the plaintiff.

3              As to Claim 2, which is the false advertising,

4    claim, under 1125(a) of Title 15, because for some reason that

08:07AM  5   maybe the plaintiff can explain to me sometime this morning,

6    did not move for summary judgment.  That claim is going to be

7    tried in its entirety.  And that's the claim that I want to

8    focus on this morning because, in reviewing the Pretrial

9    Conference Order, the key evidence section of the Pretrial

08:07AM 10   Conference Order as well as the memorandum of facts and law, I

11   don't have a clear understanding in terms of what the false

12   advertising -- what the evidence is that supports the false

13   advertising claim.

14             Although I realize that there is a dispute with

08:08AM 15   respect to the jury instruction regarding the false advertising

16   claim, I'm not going to resolve that dispute.  But I'm going to

17   use the plaintiff's proposed Instruction No. 26 which sets

18   forth the five elements for the false advertising claim.  And I

19   will ask counsel for the plaintiff -- lead counsel for the

08:08AM 20   plaintiff to enlighten me in terms of what the evidence is that

21   is going to -- that the plaintiff is going to offer in support

22   of the claim.

23             I don't want to go through each of the elements,

24   but I think the first element is a good place to begin and that

08:08AM 25   is that the defendants made false or misleading representations

1    of fact in commercial advertising or promotion that

2    misrepresents the nature, characteristics, or qualities of

3    their or Yuga Labs' good services or commercial activities.

4              So what are the false statements of fact that

08:09AM  5    plaintiff has evidence of that you intend to produce during the

6    course of this trial?

7              MR. BALL:  Thank you, Your Honor.

8              THE COURT:  Why don't you go up to the lectern.

9              MR. BALL:  Can you hear me okay, Your Honor?

08:09AM 10              THE COURT:  Yes, I can.

11              MR. BALL:  Okay.

12              THE COURT:  We have a wonderful sound system in

13    here as long as you get close to the microphone.

14              MR. BALL:  Not a problem.  Thank you.

08:09AM 15              On the false advertising claim, there's about

16    five to seven different false statements that they made while

17    they were advertising their products, and these were -- part of

18    their statements that they were out there making to entice

19    people to buy their products, one being that they claim it was

08:10AM 20    a version 3 of our product, another being that they claim that

21    they were donating the money --

22              THE COURT:  Where were these seven statements

23    made?  Are these in advertisements or appearing on websites?  I

24    just don't have a good sense because no one has -- obviously

08:10AM 25    there was no Motion for Summary Judgment that was filed on this

1    claim.  So I haven't had a chance to look at any of the

2    underlying evidence, documents to figure out what they -- what

3    the misrepresentations were, where they were made, when they

4    were made.  And then the second element which we will get to is

08:10AM    5    the -- there was actual deception and whether or not the

6    misrepresentation was material.

7              MR. BALL:  So they were made in advertisements.

8    They were made on Twitter.

9              THE COURT:  What kind of advertisements?

08:11AM    10             MR. BALL:  Twitter posts and on their sales

11    website were the main two places we are referring to.

12             THE COURT:  So there is no commercial

13    advertising.  There is no newspaper article taken out, no ad

14    taken out in the NFT -- journal of NFTs.

08:11AM    15             MR. BALL:  No, Your Honor.

16             THE COURT:  This whole case is just -- in any

17    event, I won't comment on the underlying product or good or

18    whatever you want to call it.  Go ahead.

19             MR. BALL:  The NFT market is largely on Twitter,

08:11AM    20    and that's the place where people go to learn about NFTs, where

21    they go to talk to each other, where they go to promote the

22    NFT.  So that is the NFT journal --

23             THE COURT:  Okay.

24             MR. BALL:  -- of where you would put these ads.

08:11AM    25             THE COURT:  So these are Twitter accounts of

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:12AM | 5 |

1   which or both of the defendants?  We have two defendants here.

2           MR. BALL:  Both of the defendants, Your Honor.

3           THE COURT:  Okay.  And you have the -- somewhere

4   in the thousands of trial exhibits, you have these Twitter

08:12AM  5   posts which clearly call out what you are going to tell about

6   are the statements of fact that they were -- which were the

7   subject of their misrepresentations.

8           MR. BALL:  Correct, Your Honor.

9           THE COURT:  Okay.  Go ahead and tell me what

08:12AM  10  these facts are.

11          MR. BALL:  So, again, one, they have -- they

12  claim they were version 3 of our product.

13          THE COURT:  Version 3.

14          MR. BALL:  Yeah.  So it is a BAYC V3.

08:12AM  15          THE COURT:  Okay.

16          MR. BALL:  This is what they are there to buy.

17  That's literally false.

18          THE COURT:  Do they have any pictures or any

19  displays in the tweet with respect to when they say this is

08:12AM  20  version 3 of the BAYC?

21          MR. BALL:  It would say -- generally I think no.

22  But they would -- it would say -- the one I'm thinking of,

23  someone says, what are you buying now?  And it responds with

24  BAYC version 3.  Or they don't say version.  They say V3.

08:13AM  25          THE COURT:  Okay.

1      MR. BALL:  Another being the claim that they were

2  going to donate the money that they made to charity.

3              THE COURT:  What difference does that make?

4              MR. BALL:  It was an enticement -- our position

08:13AM  5  is that was an enticement to get people to buy their infringing

6  products saying, okay, if I'm going to buy your products and

7  it's going to charity, that's a way to get people to buy the

8  products.  That's something similar to what Yuga Labs did.

9  They sold NFTs and donated the proceeds to charity.

08:13AM 10              THE COURT:  All of them?

11              MR. BALL:  Not all of them but a significant

12  portion.

13              THE COURT:  Okay.  So that's a misrepresentation

14  of fact that they -- and there's an entity floating around here

08:13AM 15  which involves the father of Mr. Ripps at live 2000.

16              MR. BALL:  9000.

17              THE COURT:  That's not a charity?

18              MR. BALL:  That is not a charity.

19              THE COURT:  Okay.  What is that?

08:14AM 20              MR. BALL:  It's an entity that they -- that the

21  defendants set up to avoid being sued, according to their own

22  statements.

23              THE COURT:  So they have taken -- that's the

24  other question I have.  These are two individual defendants.

08:14AM 25  There's no entity defendant involved in this case.  So any

1   judgment that's entered in this case is going to be against the

2   individuals personally, personal judgment against them.  So is

3   this Live9000 an entity that was created to take the money that

4   they made in connection with the sale of their products and put

08:14AM   5   it in this entity to avoid what might be a judgment in this

6   case?

7              MR. BALL:  That is part of our position, yes,

8   Your Honor.  And they have stated that they have taken some of

9   the money that they made and put it into the Live9000 entity.

08:15AM   10              THE COURT:  What is the Live9000 entity supposed

11   to be doing?  Are they running a business, or are they just

12   a -- is it a -- what kind of entity is it?  Is it a

13   partnership?  A corporation?

14              MR. BALL:  It's an LLC held by two people,

08:15AM   15   Mr. Ripps and his father Mr. Rodney Ripps.  It is currently --

16   I haven't checked this morning, but the last I checked

17   recently, it was in default status with the Nevada Secretary of

18   State.  So it wasn't even an active LLC anymore.  I will let

19   the defendants state if it is an active LLC at this time.

08:15AM   20              THE COURT:  Well, the expert has profits -- the

21   defendants' profits of a million -- I don't remember the number

22   now.

23              MR. BALL:  1.5 million.

24              THE COURT:  1.5.  How much of that 1.5 ended up

08:15AM   25   in Live9000, or is that all premature right now?

1           MR. BALL:  I think it is a little premature.  We

2    haven't been able to trace all that they have given to

3    Live9000.  Not all of it is in Live9000 is our understanding.

4           THE COURT:  All right.  So the second

08:16AM  5    misrepresentation is that they would donate the money in

6    connection with the sale of their NFTs to charity which you

7    contend is false.  I don't see how that's material to a buying

8    decision, but that's a different issue.

9           Go ahead.  What is the next category of

08:16AM 10    misrepresentations?

11           MR. BALL:  They claim that they own registered

12    trademarks.  They claim that they own a registered trademark in

13    RR/BAYC as well as a market, again, to entice people to buy

14    their products to think that this was a legitimate company that

08:16AM 15    was offering these and a legitimate offering, not effectively a

16    counterfeit or scam product.

17           THE COURT:  In connection with the registered

18    trademark, what you just said, it seems to me that the

19    representation was that their products -- for the court

08:17AM 20    reporter, do you have a list of the names?  Good.  So this is

21    the RRC/BAYC.  So they're representing that their product,

22    their NFT, is trademarked.

23           MR. BALL:  Correct.

24           THE COURT:  Obviously it's not trademarked.

08:17AM 25    What's your theory in terms of why that is false advertising?

|             |    |                                                              |
|-------------|----|--------------------------------------------------------------|
|             | 1  |            MR. BALL:  Again, that's to entice people to       |
|             | 2  | think that they're buying a legitimate product when they     |
|             | 3  | weren't buying a legitimate product.  They were buying a     |
|             | 4  | knockoff of our product.                                     |
| 08:17AM     | 5  |            THE COURT:  Okay.  All right.  What's the next     |
|             | 6  | category?                                                    |
|             | 7  |            MR. BALL:  So the fifth one I think we are on now  |
|             | 8  | is they claim -- again, this is all in their advertising to  |
|             | 9  | entice people to buy their product that Mr. Ripps claimed he |
| 08:18AM     | 10 | was hand minting, that he was personally creating each one of|
|             | 11 | these NFTs.  That, again, is false.  He had others creating the|
|             | 12 | NFTs for him.                                                |
|             | 13 |            THE COURT:  Why is that -- assuming it's false,    |
|             | 14 | why is that material and why does that affect the purchasing |
| 08:18AM     | 15 | decision of the purchaser?                                   |
|             | 16 |            MR. BALL:  Sure, Your Honor.  I don't have the     |
|             | 17 | exact quote in front of me.  But he said something to the    |
|             | 18 | effect to the people to buy these NFTs, it is important that |
|             | 19 | this comes from my hand, that I am hand minting these and that|
| 08:18AM     | 20 | you are buying something that is coming directly from me.  And,|
|             | 21 | therefore, he was enticing people to buy those things that were|
|             | 22 | coming directly from his hand, and it's false.  They weren't |
|             | 23 | coming directly from his hand.  They were coming from others.|
|             | 24 |            THE COURT:  What do you mean by coming from        |
| 08:18AM     | 25 | others?  Weren't they coming from your client?               |

```
 1              MR. BALL:  No.  They were coming from people he

 2    had hired to create them.

 3              THE COURT:  Okay.  So the images that were being

 4    created and being sold by RR/BAYC were created by someone other
08:19AM
 5    than -- who made the representation?  It was Ripps that he was

 6    making -- he was minting those?

 7              MR. BALL:  Correct, Your Honor.

 8              THE COURT:  And who are these individuals?

 9              MR. BALL:  Mr. Ian Garner.
08:19AM
10              THE COURT:  Who else?

11              MR. BALL:  Largely and I think our evidence would

12    show Mr. Ian Garner.

13              THE COURT:  All right.  What's the next category?

14              MR. BALL:  The next category goes back to our
08:19AM
15    Live9000 piece, that they were saying that they were selling

16    these for Live9000.  Our understanding is that's false, that

17    the consumers didn't -- the Live9000 wasn't actually involved

18    in the process other than to shelter money into Live9000.  So,

19    again, just like the registered trademarks, the propping up of
08:19AM
20    a Live9000, another company, made it seem like consumers were

21    buying legitimate products, legitimate NFTs when they weren't.

22    They were buying knockoffs of our products.

23              THE COURT:  When you say knockoffs of your

24    products, what do you mean?
08:20AM
25              MR. BALL:  They took our name, BAYC, and created
```

```
 1    a new token and linked it back to the images, the exact same

 2    10,000 images that Yuga Labs links for its NFTs.

 3                    THE COURT:  Right.  That's why I don't

 4    understand, when you say they were created by others, such

 5    as Mr. Garner, what was he creating if they are just simply

 6    knocking off your client's product?  What's he creating?

 7                    MR. BALL:  He's creating that same token, that

 8    computer -- computer code that links back to our images.

 9                    THE COURT:  Okay.  So monkey No. 1 has the

10    Yuga Labs code, and defendants' monkey No. 1 is a knockoff of

11    Yuga's monkey No. 1, but it has a different code.

12                    MR. BALL:  It has a different token.

13                    THE COURT:  Token.  Same number.

14                    MR. BALL:  Same number.

15                    THE COURT:  Because all of these were related

16    back to the same 1 through 10,000 that apparently Yuga sold.

17                    MR. BALL:  Correct.

18                    THE COURT:  Okay.  All right.  Any other

19    misrepresentations?

20                    MR. BALL:  Those are the core false advertising.

21                    THE COURT:  Okay.  What about the noncore?

22                    MR. BALL:  Excuse me.  The last one I missed was

23    they claim that they had the same commercial rights, that they

24    were giving away commercial rights to consumers similar to what

25    Yuga Labs did, again, to make this seem like it was a
```

        1    legitimate product and make it seem like it was similar or

        2    replacement for our products.

        3                THE COURT:  And what were the legitimate rights?

        4                MR. BALL:  That they could use the image that

08:21AM  5    they were linking to to sell other products, so they could use

        6    it to put on a T-shirt, and that's not accurate.  When someone

        7    is buying the knockoff NFTs from Mr. Ripps, they can't use that

        8    image and put it on a T-shirt.

        9                THE COURT:  But they could if they bought your

08:22AM 10    product.

       11                MR. BALL:  Correct.

       12                THE COURT:  That's the issue with respect to the

       13    copyright versus the trademark license which we will get into

       14    later on.

08:22AM 15                MR. BALL:  So, again, from our perspective,

       16    that's a false inducement for someone to buy that product

       17    thinking, if I buy their knockoff product, I'm going to get the

       18    same commercial rights that I would get from Yuga Labs.

       19                THE COURT:  Well, how is the -- how is the

08:22AM 20    purchaser deceived?  I mean, it's pretty clear, is it not, that

       21    all of these advertisements with a little bit of effort, you

       22    can determine that these are simply -- what they are offering

       23    for sale are knockoffs of your client's product?

       24                MR. BALL:  I don't know.  I think people -- the

08:23AM 25    defendants will -- have seen -- they say a lot of people are

```
        1    unsophisticated in this industry, that people believe that the

        2    defendants' misrepresentations are commonly on Twitter.  So I

        3    don't know that it's that easy for people not to be deceived.

        4    When a statement is literally false in the advertisement, you

08:23AM  5    can presume that there is deception.

        6              THE COURT:  All right.  Let's then talk about the

        7    damages.  We have a number of categories of damages that are at

        8    issue in this case.  The first and probably the easiest, at

        9    least conceptually, relates to the -- or the plaintiff's theory

08:24AM 10    that they are entitled to recover the defendants' profits.

       11    Again, there is a dispute with respect to the jury

       12    instructions.  But that jury instruction I will refer to the

       13    one proposed by the plaintiff.  That's jury Instruction No. 30.

       14    Again, I recognize this is disputed.

08:24AM 15              Defendants' profits relate to both the false

       16    designation of origin claim for which I granted summary

       17    judgment and the false advertising claim; correct?

       18              MR. BALL:  Correct.

       19              THE COURT:  So the damages which were calculated

08:25AM 20    by one of the experts, 1,589,455 -- is that Kindler?

       21              MR. BALL:  Correct, Your Honor.

       22              THE COURT:  That's a fairly simple calculation.

       23    I don't know if it's simple because I'm sure the defendants

       24    have evidence that they're going to put on that it wasn't a

08:25AM 25    million, five.
```

1          In any event, the analysis of that -- and I

2    recognize there's the issue of willfulness, but I will discuss

3    that in a moment.  I'm just trying to get through the damages.

4          So the defendants' profits -- and I recognize

08:25AM   5    that there's a question that the defendants argue that there is

6    a -- potentially double recovery and the plaintiffs should be

7    forced to make an election which I don't necessarily agree

8    with.

9          In any event, the defendants' profits, it's

08:26AM   10   fairly straightforward.  You have an expert.  That expert has

11   done whatever is necessary in order to express that opinion,

12   and there isn't anything else with respect to the defendants'

13   profits that the plaintiff is going to put on; correct?

14          MR. BALL:  Largely, no.  I will say the parties

08:26AM   15   are pretty close on the profits number depending on what number

16   the defendants --

17          THE COURT:  I can't believe you're close on

18   anything.

19          MR. BALL:  We actually are on this one, again,

08:26AM   20   depending on what number the defendants put up.  We're not that

21   far apart on that profits number.

22          THE COURT:  Well, whatever it is, it is.  You're

23   going to put on your evidence.  If you stipulate to it, that

24   would be great.  If you can't, you're going to put on your

08:26AM   25   evidence.  The defendants are going to put on his evidence.

1           The next issue, of course, you're going to ask

2    the jury to calculate, based upon the evidence, the amount of

3    the defendants' profits.  But ultimately, because it is an

4    equitable remedy of disgorgement, the Court is going to be

08:27AM   5    making a determination whether it is appropriate under the

6    facts of this case to make whatever the jury comes up with in

7    terms of the number to make a determination as to whether or

8    not that is an appropriate award against these defendants.

9           And reading the cases, I guess -- I know I have a

08:27AM  10    lot of discretion in this area.  I could disagree with the

11    number.  I can go up, and I can go down.  I don't know how I

12    can go up, but in any event, I can certainly go down.

13           So those are the issues with respect to the

14    profits.

08:27AM  15           The next -- and those -- I just want to make

16    sure -- I have read a lot of stuff in the last week.  But the

17    Kindler offer of proof, that -- those profits were generated --

18    the million, five were generated from the sales of the

19    defendants' infringing products which they minted and began to

08:28AM  20    sell in May of 2022.  And then unlike Yuga, there are

21    apparently creator's fees that are associated with the

22    defendants' resales of the infringing NFTs on the secondary

23    market.  And that is also taken into account in this million,

24    five number; correct?

08:29AM  25           MR. BALL:  Correct, Your Honor.

```
 1              THE COURT:  And then there was also a
 2  reduction -- I'm remembering, there was a reduction for two
 3  individuals, Lehman and somebody else who were original
 4  partners of the defendants.  There's like a 15-percent
 5  reduction.  So this number is actually over -- I think it was
 6  over 2 million.  Then she backed out the 15-percent return for
 7  these two -- who is the other individual than Lehman?
 8              MR. BALL:  Mr. Hickman.
 9              THE COURT:  Hickman.
10              Then the third component, the value of infringing
11  NFTs that the defendant held or did not mint, that one I don't
12  understand.
13              MR. BALL:  So a couple points here, if I may,
14  Your Honor, the value of the ones that they held, they didn't
15  sell 500 or so of the NFTs.  They sold 9,500.  I don't have the
16  exact number, but they withheld about 500, and they own another
17  50 or so themselves.  So those ones still have value in the
18  market.  So that is part of the calculation as well.
19              THE COURT:  Okay.  All right.
20              In any event, so the next issue with respect to
21  damages is --
22              MR. BALL:  Your Honor, if I may on profits.
23              THE COURT:  Sure.  Go ahead.
24              MR. BALL:  Two other parts of the
25  profits calculation.
```

08:29AM (line 5)
08:29AM (line 10)
08:29AM (line 15)
08:30AM (line 20)
08:30AM (line 25)

1          THE COURT:  We're not getting into actual damages

2    now.  We're talking about defendants' profit.

3          MR. BALL:  Correct.

4          THE COURT:  I have a lot of questions about the

08:30AM  5    actual damages.

6          MR. BALL:  On profits, the two other parts of

7    that calculation is, one, there's sales separate -- so

8    Mr. Ripps sold them initially, and then Mr. Cahen resold some

9    and made profits off of those sales.  So that's also in that

08:30AM  10   calculation.

11         THE COURT:  The exceptional case determination,

12   that's going to be a determination that the Court makes, and

13   that's going to be done on a post-trial basis.  The plaintiffs

14   are entitled -- argue they are entitled to enhanced damages and

08:31AM  15   an award of attorney's fees.

16         I'm going to make that determination, but I have

17   always -- when you use the enhanced damages and award of

18   attorney's fees, I'm always -- it always raises a question in

19   my mind what are the enhanced damages other than attorney's

08:31AM  20   fees?  You're not seeking any trebling.

21         MR. BALL:  It would be the trebling.

22         THE COURT:  But you're not seeking trebling.

23         MR. BALL:  I think that's part of the profits --

24   when you asked before if you can go up, it is part of the

08:31AM  25   trebling.  You can treble those damages.

| | | |
|---|---|---|
| | 1 | THE COURT:  Okay.  But that's a determination I |
| | 2 | make on an exceptional case. |
| | 3 | MR. BALL:  It's separate from the exceptional |
| | 4 | case.  It's part of the post-trial briefing. |
| 08:32AM | 5 | THE COURT:  I'm sorry.  I don't understand.  If |
| | 6 | I'm going to be asked to make a determination as to whether or |
| | 7 | not this is an exceptional case, that's going to be done |
| | 8 | post-trial. |
| | 9 | MR. BALL:  Correct. |
| 08:32AM | 10 | THE COURT:  And the exceptional case, if I make |
| | 11 | that determination, there are certain items that I can award to |
| | 12 | the plaintiff in connection with my determination that it meets |
| | 13 | the elements of the exceptional case, one of which is the |
| | 14 | attorney's fees, and the other component is a trebling; |
| 08:32AM | 15 | correct? |
| | 16 | MR. BALL:  Correct. |
| | 17 | THE COURT:  And those are all my determinations |
| | 18 | made post-trial. |
| | 19 | MR. BALL:  Correct, Your Honor. |
| 08:32AM | 20 | THE COURT:  So there's nothing for the jury to |
| | 21 | decide. |
| | 22 | MR. BALL:  No, Your Honor. |
| | 23 | THE COURT:  Do you agree with that? |
| | 24 | MR. TOMPROS:  No, Your Honor. |
| 08:32AM | 25 | THE COURT:  Well, I will hear from you later. |

1            MR. TOMPROS:  Thank you.

2            THE COURT:  The final category of damages for the

3    false designation and the false advertisement are the actual

4    damages, and this is a -- again, there is a disputed jury

08:33AM   5    instruction, but that is Instruction 28.  That instruction has

6    five components to it.  The third component, the expense of

7    preventing customers from being deceived and for the cost of

8    future corrective advertising reasonably required to correct

9    any public confusion caused by the infringement and/or false

08:33AM  10    advertising, that, the expert is going to testify -- it seems

11    to me those are both -- 3 and 4 are both the same.  The

12    amount -- there's a range that the experts have determined in

13    that component which is 285 -- and I'm just rounding the

14    numbers -- 285 to 525; is that correct?

08:34AM  15            MR. BALL:  The 285 to 525 is for the corrective

16    advertising portion of it.

17            THE COURT:  What's the expense of preventing

18    customers from being deceived?

19            MR. BALL:  I believe that is the future kind of

08:34AM  20    corrective advertising in the repurchasing of the RR/BAYCs.

21            THE COURT:  Well, the repurchasing, which is

22    element No. 5, is the cost of Yuga Labs to purchase the RR/BAYC

23    NFTs on the secondary market which is a million, seven.  It

24    seems, based upon the amended offer of proof I saw on the

08:34AM  25    docket -- I haven't looked at it yet.  Has that number gone up

1   now?

2          MR. BALL:  It has based on the defendants'

3   actions since the first offer of proof where they are

4   increasing the price of NFT's for repurchase.

08:34AM   5          THE COURT:  I didn't bring it out here with me.

6   I just saw it on the docket.  What's the total cost now at?

7          MR. BALL:  It can go up to hundreds of millions

8   depending on how much they are pushing the current holders to

9   hold out and not sell.

08:35AM   10          THE COURT:  Hundreds of millions?

11          MR. BALL:  Yes.

12          THE COURT:  Okay.

13          MR. BALL:  I don't expect the jury to award that,

14   but that is what they're causing the further harm.  There's

08:35AM   15   been dozens of sales in the last 24 hours after them trying to

16   push the further sales of these products after Your Honor has

17   already found them to be infringing.  They're out there

18   continuing to push the sales, continuing to make money off

19   them, and increasing the cost and harm to us of having to buy

08:35AM   20   them back.

21          THE COURT:  Okay.  So those are the only two

22   components, the advertising and the cost to purchase the NFTs

23   in the secondary market, which I could see or which I could

24   find an actual number that was offered by the experts in this

08:36AM   25   case.

1           The other component which -- again, I'm looking

2    at Instruction No. 28, the injury to plaintiff's reputation,

3    has that been quantified in any -- by any witness?

4           MR. BALL:  There have been witnesses who have

08:36AM  5    said, you know, that they tried to destroy the whole company so

6    it could be up to 4 billion.  Again, that is not a

7    quantification we are seeking or anything.  There is evidence

8    of the amount of advertising that they have done over the years

9    in order to build up the value of their brand that can be used

08:36AM  10   to quantify the goodwill.

11          THE COURT:  What's that number?  If you were

12   holding up your chart to the jury and you have these five

13   components, what number are you going to ask the jury to fill

14   in for No. 1?

08:36AM  15          MR. BALL:  20 million is the amount of

16   advertising.

17          THE COURT:  Okay.  Let me ask it again.  What

18   number are you going to ask from the jury?

19          MR. BALL:  I think a fair number there is at

08:37AM  20   least 30 percent of that number.

21          THE COURT:  Okay.  Then the next element is the

22   injury to the plaintiff's goodwill including injury to the

23   general business reputation which, again, seems to me to be --

24   has that number been quantified?

08:37AM  25          MR. BALL:  It's a similar issue there,

Your Honor.  We have experts who have testified about the harm

to the goodwill, the amounts of -- it's no longer been an

exclusive product.  It used to be a unique product, but now

they have issued 10,000 identical scams, counterfeits

08:37AM   effectively, again, as I say.  Now that is in the market.  With

that being in the market, it is no longer an exclusive or

unique product.

THE COURT:  So what's the number that you assign

to the goodwill?

08:38AM   MR. BALL:  I think, again, it would be a 30 -- it

could be up to 30 percent of the value of the company or

reduction of the value of the company.

THE COURT:  Who's going to testify to that?

MR. BALL:  Ms. Kindler can testify to that.

08:38AM   Mr. Solano can testify to that.

THE COURT:  So far there isn't any offer of proof

that would indicate that's the number that is being bandied

around because I read the report and also read the offer of

proof and I couldn't find any numbers associated with

08:38AM   reputation -- loss of reputation or loss of goodwill.  So these

are numbers they will just come up with while they are on the

stand?

MR. BALL:  I believe we have it in the offer of

proofs.  My colleague is looking.  I thought we did have the

08:38AM   30 percent of Yuga Labs's valuation and the advertising number

1    as well, Your Honor.

2              THE COURT:  Okay.  I didn't see it, but I could

3    have missed it.

4              Then the third category is expense of preventing

08:39AM  5    customers from being deceived.  We just discussed that.  That's

6    a function of the -- it's different from the advertising number

7    of 285 to 525?

8              MR. BALL:  Correct.  That's historical as opposed

9    to forward-looking.

08:39AM  10             THE COURT:  Okay.  What's the quantification of

11   that number?

12             MR. BALL:  I believe that is what we were talking

13   about before, the repurchasing of the RR/BAYCs.

14             THE COURT:  Which is at the time before the

08:39AM  15   amended offer of proof which was a million, seven.

16             MR. BALL:  And that was on her low end just doing

17   basic math.  It could have gone up based on the holdouts or

18   people increasing the price which we have now seen.

19             THE COURT:  Okay.  So those are the three -- and

08:40AM  20   I'm not going to -- I'm not focusing on any damages with

21   respect to the cybersquatting.  Plaintiff on that claim has

22   elected the statutory damages, and I understand the

23   disagreement there.

24             So those are the three categories of damages.

08:40AM  25   The defendants' profits which is for the jury to calculate and

1    for the Court to make the determination as to whether or not it

2    should ultimately be awarded.  The exceptional case is a

3    determination for the Court post-trial.  And the actual damages

4    is what we have just went through.

08:40AM    5        And what are the -- what's the total of the

6    actual damages that the plaintiff is going to ask the jury to

7    award in this case?

8        MR. BALL:  It can be north of $10 million,

9    especially given the amended offer of proof from the experts.

08:41AM    10       THE COURT:  And that -- those remedies or

11   actually -- and the damages are the same for the infringement

12   claim and the false advertising claim.

13       MR. BALL:  Correct, Your Honor.

14       THE COURT:  And that was, I think, in Kindler's

08:41AM    15   report.

16       So I guess the question that I have for you is

17   why are we going to trial on the false advertising claim when I

18   have already adjudicated liability on the false designation

19   claim and the damages are the same?  It seems to me it's a

08:41AM    20   colossal waste of time and money.  And, more importantly, it --

21   a verdict or a jury determination on the false advertising

22   claim could have potentially a detrimental effect on the

23   summary judgment order that I issued although, based upon what

24   the Supreme Court did yesterday, I'm not sure that's true

08:42AM    25   anymore.

1          So I just don't understand.  We've got

2     hundreds -- we have got thousands of trial exhibits.  We've got

3     issues back and forth which I'm not going to deal with today

4     but in the motion in limine, which I have read all the motions

08:42AM  5     in limine.  I'm certainly going to make rulings on them.

6          I just don't understand why it's necessary to try

7     the false advertising claim.  More importantly, why didn't you

8     move for summary judgment on the false advertisement claim?

9          MR. BALL:  We didn't move for summary judgment on

08:42AM 10     the false advertising claim partially in terms of space,

11     Your Honor.

12          THE COURT:  Space?

13          MR. BALL:  Space in the briefing.  We wanted to

14     address some of their affirmative defenses.  We wanted to

08:43AM 15     address our core important claim on the trademark infringement.

16          THE COURT:  Well, that proves my point that it's

17     silly to go forward with the false advertising claim in this

18     case.  Eliminating the false advertising claim and going

19     forward with the damage case on the false designation claim

08:43AM 20     gets you in the same place, and it avoids numerous issues that

21     have been raised by the parties that are in the motions in

22     limine.

23          I'm certainly -- I will make rulings on the

24     motions in limine, but to me, I keep looking at this case, and

08:43AM 25     I say, why are we doing this?  It just doesn't make any sense.

1        MR. BALL:  Your Honor, you're preaching to the

2    choir on that point.  We have had multiple settlement

3    discussions with counsel.  One of the fundamental issues is we

4    still don't -- Your Honor said that in its order that we were

08:44AM  5    entitled to an injunction and damages.  We have not --

6        THE COURT:  Well, the injunctive relief is going

7    to be from me after trial.  Right now what I'm going to be

8    asked to do is exceptional damages or exceptional case

9    determination and what flows from that determination and the

08:44AM  10    injunctive relief.  And I get to -- I get to move up and down

11    with the defendants' profits.  So I hold all the cards.

12        But in playing those cards, it's not going to be

13    any different if we spend -- more importantly, given the time

14    estimates that you have -- and I will ask the defendants how it

08:44AM  15    intends to put into evidence over 2,000 trial exhibits when we

16    have three days set for trial and we have a day and a half for

17    each side.  I have just finished a number of trials.

18        I have been trying the city council bribery

19    cases, and I have dealt with over 2,000 exhibits in that case.

08:45AM  20    My goal is on a pretrial basis to resolve all the objections to

21    the trial exhibits because it makes the trial go much quicker.

22    Unfortunately for my court reporter we had -- the first day of

23    trial we had admitted 500 exhibits.  600.  Both the clerk and

24    the court reporter.

08:45AM  25        In any event, the amount of exhibits and the

1   issues that are presented by this false advertising claim just

2   to me don't make any sense.  I don't know in terms of the

3   settlement discussions what difference it makes in terms of

4   injunctive relief because that's something that I'm going to

08:46AM  5   decide.

6            So why are we doing this?  It's just -- you know,

7   I put you through the hoops, and there's a lot more hoops to be

8   put through because the way you put this case together is to me

9   not helpful.  I get a pretrial exhibit stipulation which

08:46AM  10  doesn't give me a description of the exhibits.  How I'm

11  supposed to make any determination in terms of what these

12  exhibits are based upon Exhibit 1 through 3000 and, more

13  importantly, not even consistent with respect to the numbers,

14  there's some group of numbers in there that are assigned to the

08:47AM  15  defendant and then you get into the 2000 range.  In any event,

16  I tried to remedy that by sending out a minute order requiring

17  some meaningful description of the exhibits.

18            It's just a monumental amount of work, and

19  there's a monumental amount of work left to go because I'm not

08:47AM  20  going to start this trial unless we have some resolution on

21  some of these -- I will certainly rule on the exhibits, but I

22  can't believe that there are objections to every trial exhibit.

23           Apparently the defendant got the point and

24  withdrew all of its objections or their objections except for

08:47AM  25  two which I think one was the consent to create and the other

1    was the declaration of Mr. Lehman.

2            Then I get a joint statement which is over 500

3    pages which is not very helpful because I don't have the

4    exhibits.  Then I tried to remedy that by asking for the

08:48AM   5    exhibits in connection with the motion in limine which when I

6    came in this morning there were two boxes out there.  So I took

7    a look at them.  And we will get to this in a minute.  But

8    those exhibits that are still at issue with respect to the

9    motions in limine, I started to look at them, and I found that

08:48AM   10   several of the exhibits that were included in the binders as

11   being still in dispute, when I look at the joint pretrial

12   exhibit stipulation, the parties indicate that those objections

13   have been resolved.

14           So I am not going to be sitting down, going

08:48AM   15   through all of these exhibits and then find out that one or

16   more of those exhibits have been agreed to and I have made a

17   determination on an issue that is not a real -- is not a live

18   issue.

19           Same thing with respect to the depositions.  You

08:49AM   20   give me an index of the deposition citations that each side

21   apparently -- I didn't even look at it because it is

22   meaningless to me what you want to put on in terms of

23   deposition testimony.  I can't make any determination on that.

24   I got two boxes of deposition transcripts, and I'm not going to

08:49AM   25   sit there and go through the depositions, each page, and figure

1    out, okay, what's the objection, what's not the objection.

2              And that's why, if you read the Civil Trial Order

3    that I issued yesterday, paragraph 2(b) -- I believe it's

4    2(b) -- has a provision in there in terms of how to present the

08:50AM  5    deposition testimony so I can actually look at the testimony

6    that's being offered, any counter designations, and then I can

7    make a determination -- I can look at the objections and the

8    response to the objections and I can make a determination.

9              So you have helped the Court in terms of

08:50AM 10    preparing this case for trial.  It's taken an enormous amount

11    of my time that I don't have and there's going to be continuing

12    issues with respect to case management issues which I will get

13    into in a moment.

14              We can avoid a lot of this if the plaintiff

08:50AM 15    decides not to go forward with the false advertising claim.

16              MR. BALL:  Thank you, Your Honor.  That is

17    helpful information.

18              I don't have the authority right now to drop the

19    false advertising claim, but it is something I can discuss with

08:51AM 20    our client.  I don't know how many less exhibits that that

21    brings.  Part of it is the defendants -- we have objected to a

22    number of their exhibits.  We didn't object to over 200 of

23    their exhibits.  So they have got plenty that they can put in

24    in a three-day trial.  The majority of them are relating to the

08:51AM 25    MILs.  And for the remaining, you know, semi-handful there are

```
 1    ones that I have --
 2                    THE COURT:  You mean the motions in limine?
 3                    MR. BALL:  Yes.
 4                    THE COURT:  But the motions in limine, if I make
 5    a determination which tend to conclude that mental state is not
 6    an issue except for, if you keep the false advertising claim
 7    in, I'm not sure it becomes an issue then because I don't see
 8    any of these elements in terms of the way you are
 9    characterizing the misrepresentation as allowing the defendants
10    to get on the stand and talk about their artistic endeavors.
11    But certainly it's a -- with that claim in, it's a closer call.
12                    But with respect to the remaining issues that
13    we're going to be trying in this case, the defendants' profits,
14    there is no willfulness requirement for the defendants'
15    profits.  It's an equitable remedy.  It is a disgorgement.
16    This is my view.  I will certainly hear from the defendants.
17    If we have disgorgement and I make that determination, whatever
18    evidence they want to put on they can put on in terms of the
19    calculation of the profits, and they can put on in a post-trial
20    basis whatever evidence they think is relevant in terms of my
21    discretion in terms of the award of profits.
22                    Same thing with the exceptional case
23    determination.  That's purely a question for me, and I don't
24    know what the defendants' mental state has to do -- it has
25    nothing to do, as far as I'm concerned, with the exceptional
```

1    case determination.  And same thing for the injunctive relief.

2            So I disagree with you with respect to the bad

3    acts that are -- the bad act evidence or the inflammatory

4    material that is in Motion in Limine No. 1.  I don't think any

08:53AM    5    of that comes in if the false advertising claim goes out.  It's

6    clearly not relevant to anything in terms of the damage

7    calculation.  Same thing -- Motion in Limine No. 1 and Motion

8    in Limine No. 2, to me, they primarily --

9            MR. BALL:  There are similarities.

08:53AM   10            THE COURT:  -- overlap.  They have purported

11    artistic intent.

12            I'm not going to retry a repackaged effort by the

13    defendant to put on this evidence of -- certainly all the

14    Nazi -- all that evidence is not coming in.  Tentatively I have

08:54AM   15    read the motion in limine, and I'm not sure it qualifies as

16    propensity evidence under 404(b).  To me it is not relevant,

17    and even if it is relevant, 403 -- I will make a determination

18    under 403 that that evidence is not coming in.

19            I don't see that the defendant is really going to

08:54AM   20    seriously offer the majority of those exhibits that are subject

21    to the motion in limine.  There's a delicate balancing issue in

22    terms of what the defendants would be allowed to say.  But that

23    is testimony in connection with the false advertising claim

24    because they're going to want to say, well, false advertising,

08:54AM   25    it wasn't false.  It was a parody or -- whatever they're going

to come up with, they're always going to try through the back

door to get in their defenses that I have already adjudicated.

So I disagree that the nature of the structure of

the case doesn't dramatically change -- and I'm not making any

08:55AM    rulings today.  I'm trying to give you my thoughts ahead of the

game -- with the dismissal of the false advertising claim.

I realize you don't have authority today, but I

have spent time with you.  So let me hear from defense counsel

on some of these issues.

08:55AM    MR. TOMPROS:  Thank you, Your Honor.  I'm happy

to begin right where you ended or whatever order you would

prefer.

THE COURT:  Whatever -- I assume that you would

have no problem with them -- with the plaintiff dismissing the

08:55AM    false advertising claim.

MR. TOMPROS:  We would not.  We actually

suggested it at the earlier pretrial conference as well and

agree that -- you are correct, Your Honor.  You hit the nail on

the head with the fact that the damages are identical.  The

08:56AM    theory is identical.  It involves a number of additional facts,

involves potentially additional witnesses that would make it

unnecessarily complicated.  We have no issue with having it

dismissed.

I would like to start, if you don't mind, right

08:56AM    where you ended which is this idea that the defendants are

|       |    |                                                                       |
|-------|----|-----------------------------------------------------------------------|
|       | 1  | trying to get information in through the back door.  You know,        |
|       | 2  | that is -- honestly, Your Honor, we want some of this key             |
|       | 3  | information as to damages in through the front door of the            |
|       | 4  | damages issues.                                                       |
| 08:56AM | 5 | Here's the issue.  Your Honor has found that             |
|       | 6  | there was confusion, and then the question now becomes, from          |
|       | 7  | the perspective of the jury instructions on both profits and         |
|       | 8  | actual damages, the question is what are the harms attributable       |
|       | 9  | specifically to the confusion as distinct from anything else?        |
| 08:56AM | 10 | And that's the underlying issue as to both their Motion in          |
|       | 11 | Limine No. 1 on the inflammatory material things and their            |
|       | 12 | Motion in Limine No. 2 on intent.                                     |
|       | 13 | Here is the fundamental point.  They definitely          |
|       | 14 | get any portion of the profits that are actually attributable         |
| 08:57AM | 15 | to confusion given the -- assuming the profits -- assuming they     |
|       | 16 | are entitled to any profits at all.  We have to figure out            |
|       | 17 | which are attributable to confusion versus which are                  |
|       | 18 | attributable to something else.                                       |
|       | 19 | THE COURT:  The problem you have is you don't     |
| 08:57AM | 20 | have an expert.                                                       |
|       | 21 | MR. TOMPROS:  That's correct, Your Honor.           |
|       | 22 | THE COURT:  So how are you going to prove that?     |
|       | 23 | MR. TOMPROS:  Cross-examination of their experts   |
|       | 24 | primarily as well as specific statements from our clients.            |
| 08:57AM | 25 | Their experts are missing --                                         |

08:58AM

1          THE COURT:  Specific statements from your client

2   are basically going to be we went out there and made all of

3   these statements with respect to the origin of these images and

4   created the website, put all this information out there, and so

5   any damages or any reputational harm or any -- any other damage

6   like that that was suffered by the plaintiff was a result of

7   our exposing them to -- for what they are.  That's not going to

8   happen.  It's not going to come in.

08:58AM

9          MR. TOMPROS:  And I would say, Your Honor, that

10   that -- that is a part of the reasons that -- that -- are, in

11   fact, the accurate reasons for why Yuga's brand took a hit.

12          During the same time frame that the project was

13   selling NFTs, the project -- there were also all kinds of

14   comments from Mr. Ripps and Mr. Cahen and many, many others

08:58AM

15   attacking Yuga's brand for calling them out on this imagery,

16   and there were also at the same time a significant decline in

17   the NFT market as a whole, and there was also at the same time

18   a whole bunch of other NFT projects that were out there using

19   exactly the same thing they were using, using the BAYC name,

08:59AM

20   using the BAYC logos.

21          So the issue is they have done no apportionment.

22   They are essentially saying all of the harm is attributable to

23   the -- to the BAYC confusion or false advertising.  They have

24   not looked at what portion of the harm was attributable to

08:59AM

25   confusion from somebody else and we should be entitled to

        1    cross-examination.

        2               THE COURT:  What is your evidence of that and of

        3    the million, whatever it is, the million, five, what is your

        4    number that the defendants' profits are attributable to the

08:59AM 5    confusion -- not to the confusion in the marketplace but other

        6    factors?

        7               MR. TOMPROS:  I think the short answer is a

        8    portion that is provable -- that is provably attributed to the

        9    confusion is absolutely de minimis.  So something like a dollar

09:00AM 10   that the --

        11              THE COURT:  One dollar?

        12              MR. TOMPROS:  Yes, Your Honor.  The overwhelming

        13   majority of the confusion -- excuse me -- the overwhelming

        14   majority of the harm that they have identified is directly

09:00AM 15   attributable either to people revolting against them because

        16   they find the imagery troubling or the decline of the NFT

        17   market or confusion as a result of the literally thousands of

        18   other entities selling NFTs and other products using the BAYC

        19   name and logo.

09:00AM 20              THE COURT:  But that's a different issue.  That

        21   goes to the components of the actual damages because the

        22   defendants -- that analysis has nothing to do with the

        23   defendants' profits.

        24              MR. TOMPROS:  You're right.  That's correct.  So

09:00AM 25   the --

1    THE COURT:  So you're -- so you're at least stuck

2    with -- not stuck with but at least you have an uphill battle

3    on the defendants' profits because I -- I think I understand

4    why the defendants -- why the plaintiffs elected the

09:01AM 5    defendants' profit is because the plaintiff sold out their NFTs

6    in May of 2021 and your folks didn't start creating until May

7    of -- May of -- about a year later.

8    MR. TOMPROS:  Correct, Your Honor.

9    THE COURT:  So the plaintiff did not lose any

09:01AM 10   money in connection with the sale of the NFTs.  Their loss of

11   profits calculation has to include something else which I

12   forgot to ask plaintiff's counsel.  Maybe you know.  What else

13   do they -- what else do they -- what other income do they

14   generate, if it's not from the sales of the NFTs, that would

09:01AM 15   have gone into -- and I realize it's not their calculation, but

16   would have gone into any lost profits analysis?  Because I

17   still have a problem with the jury instruction with respect to

18   some of these elements because I know you argue strongly that

19   actual damages would end up to be -- would be an element of

09:02AM 20   double recovery which I don't necessarily agree with because I

21   think the defendants' lost profits, as long as they're careful

22   in eliminating that from the actual damage instruction can be

23   properly awarded.

24   Again, I'm not make any ruling.  I'm just trying

09:02AM 25   to figure out what this case is about.

1          So your lost profits, that's not what you're

2    talking about.  You're talking about the dollar -- that there

3    should be a dollar awarded because the plaintiff is unable to

4    connect the harm that they suffered with respect to the

09:02AM  5    infringing or the false advertising.

6                MR. TOMPROS:  For all damages, correct,

7    Your Honor.  They cannot trace any harm back to this because of

8    these other factors.

9                For lost profits, it still is the profits

09:03AM 10    attributable to the confusion as opposed to the profits

11    attributable to something else and that --

12                THE COURT:  The defendants' loss profits?

13                MR. TOMPROS:  Correct, Your Honor.

14                THE COURT:  How can that be?

09:03AM 15                MR. TOMPROS:  That is exactly what the jury

16    instructions say and the -- it's the lost profits -- if I may,

17    Your Honor.  The lost profits instruction, even the one

18    proposed by --

19                THE COURT:  No. 30.

09:03AM 20                MR. TOMPROS:  -- by plaintiff specifically says,

21    "You must determine defendants' profits from their infringement

22    of Yuga Labs's marks," and then at the end --

23                THE COURT:  What line are you --

24                MR. TOMPROS:  I'm on their instructions, the

09:03AM 25    document 230 version of their instructions, Instruction No. 30,

page 47, line 6.  "You must determine defendants' profits from

their infringement of Yuga Labs's marks."  Then it goes on

lower down in their instruction at line 24, "Unless you find

that a portion of the profit from the sales of the RR/BAYC NFTs

09:04AM   using the trademarks and/or false advertising is attributed to

factors other than use of the trademarks and/or false

advertising, you should find the total profit as attributable."

So we are entitled, Your Honor, to present

evidence that the sales by us, that the sales were not driven

09:04AM   by confusion or the use of the trademarks or false advertising

but instead driven by people who went to the website, wanted to

buy this as a protest, clicked with absolutely no confusion the

disclaimer that said "I am buying this as a protest" and then

bought it that way.

09:04AM   That's exactly what the -- that is exactly what

the evidence we think will show both, again, through

cross-examination of their experts and through Mr. Ripps's own

testimony.

THE COURT:  What's Ripps going to say?

09:05AM   MR. TOMPROS:  I think what he's going to say is

he has a close community connection with a lot of the

purchasers of his art, he understands them and understands

their motivation.  He will also be able to say that he put a

disclaimer up so that when you wanted to buy one of these, you

09:05AM   actually had to buy it -- you had to click the disclaimer that

09:05AM

said you understand that this is an art project and that is how
the sales went, that he made a number of sales directly by
people contacting him one-on-one to make direct statements, and
that people were buying it not because they were confused but
precisely because they were not confused and they wanted to
protest Yuga.

        That's why the artistic intent, Your Honor, we
think remains relevant even to damages notwithstanding
Your Honor's order on confusion.  It may be that there was some
confusion and they have met the minimum burden as they were
required to do to show some degree of confusion, but that does
not mean that all of the sales are attributable to confusion.
And they have an interrogatory response where they admit that
nobody has ever bought one of theirs thinking it was one of
the -- one of the RR/BAYCs.

        THE COURT:  Well, theirs were sold.

        MR. TOMPROS:  Say that again.

        THE COURT:  All theirs were sold.

        MR. TOMPROS:  But they're still available on the
secondary market.  That is actually how Yuga is making money
from this now as I understand it.  There may have been a
misunderstanding or misconfusion between you and Mr. Ball a few
minutes ago.

        So these things, the way these NFTs work, they're
just an entry in a spreadsheet somewhere that gets moved

1    around.  The way Yuga makes money off of this is there are

2    these crypto exchanges that when you move one of your Yuga NFTs

3    from somewhere -- from one place to another place, Yuga gets a

4    cut of that.  So they are getting profits on the resales of

09:07AM  5    BAYCs on the secondary markets as well.

6              Mr. Ripps and Mr. Cahen will testify that they

7    did not want to do that themselves.  They wanted this just to

8    go out there in the world.  They wanted to make money off of it

9    initially, but they wanted this to go out there in the world

09:07AM  10   and they would not make profits off of secondary sales.

11             Now, there is one exchange that they were not

12   able to prevent that from happening.  So there is still one

13   exchange that automatically gives them profits.  It's called

14   LooksRare.  And as I understand it, they have made about a

09:07AM  15   hundred dollars in profits in the last six months or so from

16   this LooksRare website that they can't get to not give them the

17   money.  But it's very small.

18             For everything else, every time any of the

19   RR/BAYCs are sold, they don't get anything.  So it's the

09:07AM  20   opposite structure.  I think Your Honor may have had that

21   backwards with Mr. Ball earlier.  I think Your Honor may have

22   thought the defendants were making ongoing money.  They are

23   only in the sense of this very minimum LooksRare set of

24   royalties.

09:08AM  25             THE COURT:  Those are the creator fees?

1          MR. TOMPROS:  That's right.  The only creator

2     fees -- they have tried to make the creator fees zero for every

3     website that will let them do that.  They did that from very

4     early on in the project.

09:08AM   5          THE COURT:  How is Yuga able to collect anything

6     when the initial sale they give up all their rights?

7          MR. TOMPROS:  Yuga has arrangements with the

8     exchanges, these companies that do the exchanges.  They have

9     different deals with the exchanges where the exchanges give

09:08AM  10     them a kickback on the sales.

11          THE COURT:  Why would they do that?

12          MR. TOMPROS:  They have contractual agreements

13     with the -- it's kind of like if I were -- I don't know.  If I

14     wanted to sell a book and I had a deal with a library that

09:08AM  15     essentially said, every time anybody takes out the book, you're

16     going to send me $5 and, in fact, it can be a paying library so

17     you can send me $5 off of somebody's membership fee.  They have

18     a separate independent deal with the exchanges where that's how

19     they make money.

09:08AM  20          Mr. Ripps and Mr. Cahen don't have that deal.

21     You can actually bake that deal into the electronics of the way

22     these tokens are exchanged.  They did not do that for their

23     RR/BAYC, so they're not making -- again, with the small

24     exception of the one exchange that won't change it, they're not

09:09AM  25     making any ongoing money from these secondary sales at all.  I

        1    wanted to make sure the point -- the record was clear on that.

        2            The bottom line is, Your Honor, in terms their

        3    profits, the money that Ms. Kindler calculated was primarily

        4    money made on the initial sales of these things.  She did the

09:09AM  5    math on the initial sales.  You can get that information from

        6    the exchanges -- from it's called the block chain, basically

        7    the spreadsheet showing how much money went where.

        8            We do have some concerns with their calculation,

        9    but counsel is right that her calculation of the total amount

09:09AM 10    of profits on the project is -- we're within sort of spitting

       11    distance of each other on that.  But the total amount of

       12    profits on the project is not -- is not under jury

       13    Instruction No. 30, the total amount of profits attributable to

       14    the use of the trademarks or the false advertising.  It is

09:10AM 15    something less than that.

       16            We think Your Honor should award no profits as a

       17    discretionary money anyway.  But the total amount is much lower

       18    than the full amount.  It's definitely not a situation where

       19    100 percent of the money they made was attributable to

09:10AM 20    confusion.  It's pretty close, if not very nearly zero, because

       21    there have been no actual instances of confusion ever in terms

       22    of a purchase of an RR/BAYC.

       23            THE COURT:  So why didn't you get an expert?

       24            MR. TOMPROS:  Because, Your Honor, our clients

09:10AM 25    are individuals and they wanted to spend as little as possible

1  on this and they're trying their best to defend against a much

2  more well-backed adversary.

3          THE COURT:  I guess that was my -- one of the

4  issues that I raised at the outset of the hearing, that these

09:11AM  5  are individuals and the amount of money that's being spent in

6  this case -- assuming -- even assuming that the plaintiff's

7  damage theory goes south, we still have the exceptional case

8  determination.

9          And let me ask the plaintiff.  You don't have to

09:11AM  10  go to the lectern.  What are the attorney's fees that are --

11  you're going to be asking for if we stop today?

12          MR. BALL:  I mean, it would be north of

13  5 million.

14          THE COURT:  You know, I hear what you're saying,

09:11AM  15  and I -- I did have that -- the causal connection between the

16  infringement and the harm suffered by the plaintiff has always

17  been -- has always been an issue and it also comes in in the

18  false advertising.

19          Again, I don't know why this case hasn't settled

09:12AM  20  because the -- if there's an exceptional case determination and

21  we're talking about north of $5 million in attorney's fees, I

22  don't think -- I don't know, but I hope that your client in his

23  artistic endeavors makes a lot of money so he can write a check

24  for $5 million.  The question becomes is it collectible?

09:12AM  25          I don't know what your clients -- in any event,

1    there's a lot of issues that are going to remain between the

2    parties, and it seems to me that this is an appropriate time to

3    come to some resolution of these issues because a trial is

4    going to do nothing but add to the attorney's fees that if I

09:13AM   5    make that determination, that your clients are ultimately going

6    to be -- ultimately going to be responsible for.

7              So I don't know where you are in settlement, but

8    there's a lot more work that's going to be done in this case.

9    Every time I issue one of these minute orders -- at least this

09:13AM  10    week I tried to even the playing field and have you put

11    together an offer of proof in terms of the two -- I can't

12    remember three -- Motion in Limine No. 3 and 5 to see what

13    it -- all this stuff, you just -- I get boxes every morning of

14    these filings, and I read it all.  So I have a pretty good

09:13AM  15    understanding of what the case is, and I still have all the

16    summary judgment exhibits.  In fact, I couldn't understand why

17    we have 3,000 exhibits in this case when the summary judgment

18    exhibits -- I had three binders.

19              That's the other thing.  I will get to the case

09:14AM  20    management issue.  So where are you in terms of trying to

21    settle this case?

22              MR. TOMPROS:  Your Honor, I would say, first, we

23    agree with you completely that this case has no business going

24    to trial, we have said that for some time, and don't think that

09:14AM  25    this case should go to trial.

1          In view of your summary judgment order, we would

2     expect that an injunction would be in place.  So we would

3     assume that is going to happen at some point, that there will

4     be an injunction.  And there have been no sales of RR/BAYCs by

09:14AM  5     either Mr. Ripps or Mr. Cahen for many, many, many months.

6          There is also this concern about the websites.

7     The websites have been taken down at plaintiff's request.  So

8     we would expect there would be an injunction, and we

9     anticipated that for purposes of trying to move on from all of

09:15AM 10     this.

11          And -- so in terms of settlement, the fundamental

12     issue, Your Honor, is we have yet to receive any offer from

13     Yuga that does not include a requirement that Mr. Ripps and

14     Mr. Cahen end their criticism of what they perceive to be

09:15AM 15     Yuga's problematic imagery and content and problematic imagery

16     and conduct.  Their fundamental position is they will not agree

17     to settlement terms that give up their First Amendment rights

18     to criticize Yuga and its officers and its employees.  They

19     started this as a callout to criticize them.  And I understand

09:15AM 20     Your Honor may ultimately disagree that that was the end --

21          THE COURT:  Well, there's another way to approach

22     the cause rather than ripping off someone's trademark.

23          MR. TOMPROS:  Understood, Your Honor.

24          THE COURT:  That's the fundamental flaw in your

09:15AM 25     clients' approach to this.  It's fine to put up the Gordon

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 09:16AM | 5 |

1  whatever the website is called, and it's fine to do all of the

2  stuff they want to do in terms of what they believe is their

3  First Amendment right which, based upon the *Jack Daniels* case,

4  I don't know how much of a First Amendment right they have

5  left.  It's still there because that really just -- the

6  confusion issue is still a live issue in the *Jack Daniels* case.

7  Some poor judge is going to have that come back to him.

8          MR. TOMPROS:  I completely understand,

9  Your Honor.  I think you are right that there is a difference

10  between the criticism and the sales of the product.

11          THE COURT:  Right.

12          MR. TOMPROS:  And to be -- just to make my

13  client's point clear, that they viewed this as part of the same

14  project.  We understand Your Honor did not -- the summary

15  judgment order --

16          THE COURT:  Common sense can tell you it is not.

17  You can criticize someone without ripping off their mark and

18  making $2 million.  It's very simple, and I can't wait to see

19  your two clients get on the stand and testify.  I mean, I

20  respect their ability -- their First Amendment rights.  I'm a

21  firm believer and proponent of the First Amendment.  But the

22  First Amendment has -- they have gone outside the

23  First Amendment.

24          MR. TOMPROS:  Fair enough.

25          THE COURT:  And that's a philosophical

```
 1    discussion.

 2                MR. TOMPROS:  It is.  And Your Honor has already

 3    decided that at summary judgment, and we have our appellate

 4    rights and all of that.  But you are exactly right.

 5                THE COURT:  Speaking of appellate rights, what

 6    happened to the SLAPP motion?

 7                MR. TOMPROS:  It is fully briefed as of May 11th,

 8    and it will be heard -- we don't know.  We don't have an

 9    argument date yet from the 9th Circuit, but it is fully briefed

10    at the 9th Circuit.  Don't yet have a panel.  We would expect

11    sometime in the fall would be a likely paneling date.

12                THE COURT:  We have that -- I won't comment on

13    the scheduling.

14                MR. TOMPROS:  On the settlement, Your Honor,

15    because of that -- the issue -- the fundamental issue that is

16    holding up settlement is Mr. Ripps and Mr. Cahen will not give

17    up their right to criticize, and we have not gotten any kind of

18    a settlement proposal from Yuga that does not include a

19    non-disparagement clause, taking down old criticisms, taking

20    down all of what Mr. Ripps and Mr. Cahen believe is a genuine

21    callout of Yuga's folks.

22                They will absolutely happily agree to not sell

23    any more RR/BAYCs, to not promote.  That's easy to do.  And, in

24    fact, we would expect an injunction that would require that.

25    But they will not agree to something that this Court I don't
```

09:17AM (line 5)
09:17AM (line 10)
09:18AM (line 15)
09:18AM (line 20)
09:18AM (line 25)

1    think would be able to order anyway, which is preventing them

2    from doing a critique.  That's what's holding this up.

3              We would love for there not to be a trial, but

4    our clients can't agree to something that they firmly believe

09:18AM  5    they have the right to be able to do to criticize a company.

6              THE COURT:  So former Magistrate Judge Segal is

7    your settlement judge in this case?

8              MR. TOMPROS:  Yes, Your Honor.

9              THE COURT:  Have you been back to visit with her?

09:19AM  10              MR. TOMPROS:  We have had phone calls since the

11    initial mediation, but we have not yet had another day with

12    her.  Last night counsel for Yuga did send us another

13    settlement proposal.  Our clients did review it.  From their

14    view, it still included that key term that was a problem for

09:19AM  15    us.  We responded with a settlement proposal just this morning

16    with a counter proposal, and that's where things currently

17    stand.

18              THE COURT:  All right.  Do you have anything else

19    you want to --

09:19AM  20              MR. TOMPROS:  I would like, if you wouldn't mind,

21    Your Honor, to address the willfulness and exceptional case

22    issue.

23              THE COURT:  Sure.

24              MR. TOMPROS:  Here is the fundamental issue.  We

09:19AM  25    agree with you for sure that exceptional case is a question for

1    Your Honor, but willful infringement, intentional infringement

2    is a question for the jury and that we have a jury trial right

3    to --

4                    THE COURT:  I have already determined it was

09:20AM    5    intentional, didn't I?

6                    MR. TOMPROS:  What you determined, Your Honor,

7    was that -- first off, Your Honor determined that at the

8    summary judgment stage you determined that the -- that the use

9    of the marks was intentional and in the absence of competing --

09:20AM   10    let me make sure I have the exact language from Your Honor's

11    order.

12                    THE COURT:  You're not going to quote me now, are

13    you?

14                    MR. TOMPROS:  No.  But I want to make sure we

09:20AM   15    have it right, that we understand where we are.  What we

16    understood Your Honor to do --

17                    THE COURT:  What page are you going to quote --

18                    MR. TOMPROS:  I think Your Honor in your summary

19    judgment order at docket 225 at page --

09:20AM   20                    THE COURT:  I have it in front of me.  What page?

21                    MR. TOMPROS:  Page 12.

22                    THE COURT:  I'm looking at page 12.  I have it

23    underlined.

24                    MR. TOMPROS:  I believe you said, because

09:21AM   25    defendants knowingly and intentionally used Yuga's marks and in

the absence of any contrary evidence you found intentional
confusion, in our brief on this issue we specifically said that
we would explain intent at trial.  Our brief, we said, as
defendants will explain at trial, although RR/BAYC linked to
the same ape images, defendants' communications reflect they
took specific steps to prevent confusion.  And we have the
quote from our brief, quote, "Their intent was not to confuse
but rather to educate consumers concerning the nature of NFTs
and to call out Yuga's imagery."  And then we had a disputed
issue of fact that we specifically identified on this issue.

       Now, we understand that Your Honor inferred,
based on the record at summary judgment, the question of intent
at least as it went to the *Sleekcraft* factors for purposes of
finding of infringement.  We submit, Your Honor, that intent
for purposes of willful infringement and intent for purposes of
damages is different and broader and still must be considered
again.  It's not intent just to use the marks, but it is intent
to actually cause the harm; right.

       And that is very much what is missing, and we
think that they should be able to testify about that and that
willfulness -- they did not -- they moved for summary judgment
of exceptional case.  They moved -- in their motion, they
argued that this is an exceptional case of intentional
infringement, and Your Honor denied the motion as to
exceptional case.

1          THE COURT:  Only because the way that they

2    characterize the -- I never could understand what they were

3    doing, but they basically made all these arguments.  And they

4    said, but we're deferring all the damage issues for trial.  So

09:22AM  5    I'm not going to plow into these issues when the plaintiff who

6    is the moving party tells me that they're going to reserve all

7    these issues for trial.

8          It was ill conceived, and had it been properly

9    presented, I could have made a determination at summary

09:23AM  10   judgment stage in terms of an exceptional case.  But once I'm

11   faced with that in the summary judgment papers, I'm not about

12   to make a ruling -- I suppose I could have made a ruling

13   sua sponte, but knowing how hard fought this case was and

14   everybody is going to be -- that's the other thing.

09:23AM  15         Now your client is on the hook for $125,000 in

16   agreed-upon fees for the SLAPP motion.  You have the

17   9th Circuit appeal.  Whatever happens in this trial, there's

18   going to be an appeal.  I mean, we're talking about hundreds

19   of -- we're talking about millions and millions of dollars.

09:23AM  20         If two individuals that you are representing --

21   and I hope you are getting -- I hope you're not getting paid

22   with NFTs.

23         Go ahead.  I interrupted you.

24         MR. TOMPROS:  No, Your Honor.  So I would say I

09:24AM  25   think, Your Honor -- you are correct.  We face the same problem

1    in trying to oppose the Summary Judgment Motion because it

2    wasn't clear precisely what we were shooting at.  We did, in

3    our statement of facts, try to make as clear as possible that

4    the intent was not to cause confusion, and they took steps not

09:24AM    5    to.

6             And then we have, I think, opened the question of

7    what the intent was for purposes of willfulness.  There's no

8    question that willful infringement is a question for the jury,

9    and there's definitely no question that willful infringement

09:24AM    10   goes to exceptional case.

11            Now, we understand in their pretrial

12   conference -- section of the Pretrial Conference Order Yuga is

13   now saying they don't want a determination of willfulness.  If

14   that's the position, we would say they can do that.  They're

09:24AM    15   definitely allowed to drop their willfulness claim, but then

16   we're entitled to a finding that this was not willful

17   infringement for purposes of exceptional case.

18            Respectfully, Your Honor, there has, as far as we

19   are aware, not been a Lanham Act case where the accused

09:25AM    20   infringer was found to have an exceptional case where there

21   wasn't a finding of willful infringement.

22            So we would submit the proper thing to do is send

23   willfulness to the jury --

24            THE COURT:  I can make that determination.

09:25AM    25            MR. TOMPROS:  Your Honor, we would expect that if

```
        1    you did, it would require a separate bench trial because we

        2    have individual -- individuals whose credibility you would need

        3    to judge and to be able to understand their intent.  And I

        4    think actual willfulness --

09:25AM 5            THE COURT:  They're not afraid of the willfulness

        6    issue because they submitted an instruction on willfulness.

        7    They said, we don't think it applies, but if you want to give

        8    it, here's the instruction.

        9            MR. TOMPROS:  Right.

09:25AM 10           THE COURT:  I don't think they're afraid of it.

       11            MR. TOMPROS:  We would be happy -- that's our

       12    point, Your Honor.  We agree willfulness should go to the jury,

       13    and we would be happy to try willfulness and have a

       14    determination from the jury one way or the other --

09:26AM 15           THE COURT:  What's the evidence you're going to

       16    put on?

       17            MR. TOMPROS:  The testimony of Mr. Ripps and

       18    Mr. Cahen and the testimony of --

       19            THE COURT:  As to what?

09:26AM 20           MR. TOMPROS:  As to their intent when they -- in

       21    both, if false advertising is in play, as to the statements

       22    and, if false advertising is not in play, their intent as to

       23    the specific actions they took to try to prevent confusion in

       24    connection with the RR/BAYC project.

09:26AM 25           THE COURT:  So you would not seek to put on any
```

1    evidence of their, quote, artistic intent or the Nazi -- the

2    inflammatory evidence?

3             MR. TOMPROS:  So the inflammatory evidence -- I

4    guess I would put it this way.  We would need to be able to say

09:26AM    5    that they were trying to call out Yuga.  And I agree with you,

6    Your Honor, this is a hard situation because the project

7    doesn't make any sense unless you see it in the context of what

8    Mr. Ripps was doing before which is he was trying to do this

9    callout art and then he escalated it by doing it in this

09:26AM   10    commercial way with the sale of NFTs.  And it is an escalation,

11    and you're correct it does create a different set of issues

12    because now it is commercial.

13             I would say this.  We have already reached a

14    series of agreements with opposing counsel about some of the

09:27AM   15    theories of Mr. Ripps that they find particularly offensive.

16    We're not going to get into any of those things.  But we think

17    they ought to be able to say this was a criticism of what they

18    perceived to be racist imagery -- we do think they should be

19    able to say this is a criticism of what they perceive to be

09:27AM   20    racist imagery and outright affiliated imagery in the content

21    of the collection and that that was the reason why they started

22    the critique and that people that bought this, right, their

23    intent was to sell these things to people as a form of protest

24    against that, protest against that as a form of callout.

09:27AM   25             THE COURT:  But then we have a mini trial, and

that's exactly under 403 why I tentatively concluded this
evidence is not going to come in because then we've got -- the
amount of evidence that both sides -- just that simple
statement raises a whole laundry list of issues that the
plaintiff is going to want to rebut.  And I'm not going to have
a trial on the helmet of monkey No. 3 being the helmet that
some Nazi soldier wore.  It's just not going to happen.

MR. TOMPROS:  I understand, Your Honor.  I think
we could find a way to simplify it.

THE COURT:  But I would encourage counsel to get
together and try to find a way to simplify that issue because I
am concerned that -- you made the point somewhere in something
that I read that the plaintiff is asking you to or asking me to
prevent you from asking your client why did you do this.

MR. TOMPROS:  Right.

THE COURT:  That's very telling in terms of
preventing defendants, who have a tremendous exposure in this
case, from not putting on the reason why they did it.

It's a delicate balancing.  I'm going to have to
make at some point in time a judgment call.  But I don't know
the case as well as you folks do, and that's something that I
think you -- each side should really sit down and try to come
up with an approach and solve that issue.

MR. TOMPROS:  We did, Your Honor.  In the
pretrial conference order, there are a whole set of topics that

1    we specifically agreed wouldn't come up, some of what Yuga

2    perceives as the more offensive allegations that were made.

3    And we can -- and I think if we can reach some balance there --

4    and just to be clear, Your Honor, we have no intent -- we have

09:30AM   5    no intention of trying to prove the truth of any of this stuff.

6              It does not matter whether these -- you know,

7    whether the monkeys are racist or not.  What matters is that

8    Mr. Ripps and Mr. Cahen believed they were and were calling

9    them out and trying to draw attention to that and that that was

09:30AM   10   the purpose.  And then as a result, that people were buying

11   RR/BAYCs not because they were confused and thought that they

12   were -- thought that they were Yuga Labs's products but because

13   they wanted to support that protest.

14             THE COURT:  That's where I think you're -- that's

09:30AM   15   where I think you have an evidentiary issue because I don't see

16   that coming in without an expert.

17             MR. TOMPROS:  And I wouldn't -- that I think

18   would be the subject of cross-examination of their experts,

19   right, areas that they did not consider when calculating the

09:31AM   20   amounts.

21             THE COURT:  What did they say in their

22   deposition?

23             MR. TOMPROS:  They said they didn't consider it.

24   And I think in one instance one of the experts said it may sort

09:31AM   25   of all be baked into the same thing and this is all part of the

1    advertising.

2              THE COURT:  They didn't consider it because

3    plaintiff's counsel told them not to consider it?

4              MR. TOMPROS:  That I don't know.  I don't

09:31AM   5    remember exactly what they said.  I do know that we have -- we

6    want the ability to cross-examine them, again, not on the

7    truthfulness of any of these allegations but whether the

8    decline in price, whether the harms that they're suffering, the

9    corrective advertising, all of the rest of this is a result of

09:31AM  10    the -- the -- is a result of the confusion or is a result of,

11    among other things, people wanting to protest Yuga Labs because

12    they believed in the accuracy of the callout.

13              The truth of it doesn't matter.  We don't want a

14    mini trial on Naziism for sure.  What we want is to be able to

09:32AM  15    say there are lots of reasons other than confusion that

16    somebody would have bought an RR/BAYC.  That goes to both

17    aspects of damages.  And there are lots of reasons that -- and

18    one of those reasons is that people would have bought it to

19    support this protest that Mr. Ripps was doing.

09:32AM  20              It's very hard for us to do that if we can't

21    say -- if I can't ask Mr. Ripps, what do you do for work?  And

22    he can't say, I'm an artist.  That is what he does.

23              THE COURT:  I'm an artist.  I'm an artist that

24    ripped off the plaintiff's trademark.

09:32AM  25              MR. TOMPROS:  And Your Honor has already found

1    infringement.  So that's not -- that's not the issue.  But I

2    think that -- if he can't explain why he started the project in

3    the first instance, then we're missing a key element of

4    defendants' damages case.

09:33AM    5          THE COURT:  You're a good lawyer.  You can ask

6    him questions other than that direct question.

7          MR. TOMPROS:  I mean, Your Honor, that's why --

8    that's why I worry about this at the motion in limine stage.

9    If there were specific questions -- I agree they should stand

09:33AM   10   up and object if we start -- if anybody starts talking about --

11   ranting about how everybody at Yuga are a bunch of Nazis.  That

12   is clearly inappropriate and shouldn't be done.  But am I

13   allowed to ask, what do you do for work?  That to me seems like

14   a really challenging --

09:33AM   15         THE COURT:  I'm an artist, end of testimony.

16         MR. TOMPROS:  Okay.  Am I allowed to ask him what

17   he does -- why he sold the RR/BAYC NFTs?

18         THE COURT:  Wait for the appropriate objection.

19         MR. TOMPROS:  Okay.

09:33AM   20         THE COURT:  In any event --

21         MR. TOMPROS:  I would say, Your Honor, our view

22   on willfulness, I think we sort -- it is definitely a jury

23   question, and it is one that Yuga needs to either have asked to

24   the jury or in an exceptional case determination needs to --

09:34AM   25   Your Honor must presume that there was no -- that there was no

```
 1   willful intent which I think would effectively -- it doesn't as
 2   a matter of law.
 3                    THE COURT:  I don't need to make a determine as
 4   to willful or not willful for an exceptional case
 5   determination.  That's not the criteria.  There are a number of
 6   factors that I look at.  Willfulness may be one.
 7                    MR. TOMPROS:  Agreed.
 8                    THE COURT:  Pardon me?
 9                    MR. TOMPROS:  Agreed, Your Honor.
10                    THE COURT:  Okay.
11                    MR. TOMPROS:  But willfulness is one.  And so --
12                    THE COURT:  Well, I could choose to rule on the
13   factors other than willfulness.
14                    MR. TOMPROS:  But the lack of willfulness should
15   go into Your Honor's calculation as to whether --
16                    THE COURT:  Okay.  I can conclude that the lack
17   of willfulness did influence my decision and come up with
18   whatever it is.
19                    MR. TOMPROS:  I agree, Your Honor.
20                    THE COURT:  That's the problem you have in the
21   post-trial basis.  I have discretion -- basically I have to
22   follow the law and apply the factors.  And I have never done
23   this before in a -- I have done it once before on a post-trial
24   basis.  But the amount of discretion I have in these Lanham Act
25   cases is -- maybe they should rein us in on the amount of
```

discretion that we have.

MR. TOMPROS:  You are absolutely right.  You have a lot of discretion.  You are supposed to consider the totality of the circumstances.  That's *SunEarth,* the 9th Circuit case that guides this.  It is very clear in all the cases we were able to find where there was a finding of exceptional case against an infringer, those were all instances in which willfulness had been found.

I agree with you under *Romag* it's not a requirement, but, you know, the way that -- the way that it is -- definitely must be considered.  And that is why we would either ask that the jury be allowed to find it one way or the other or ask for a determination of no willfulness if what Yuga is doing is now saying I don't want willfulness evidence in front of the jury and, therefore, it shouldn't have it.

THE COURT:  Well, I don't follow, if I don't instruct on willfulness, why I have to find that there is no willfulness.

MR. TOMPROS:  Because, Your Honor, we are requesting a jury trial on willfulness.  It is an issue --

THE COURT:  So I deny your request for a jury trial on willfulness.  That doesn't mean I don't find willfulness.

MR. TOMPROS: I think that's a Seventh Amendment issue, Your Honor.  I do think there is case law --

1          THE COURT:  So you have the 1st and

2    Seventh Amendment in this case.

3          MR. TOMPROS:  We are hanging on to the

4    constitution, Your Honor, on the defendants' case.

09:36AM    5          THE COURT:  We have to close this up because I

6    have some case management issues I need to discuss with

7    counsel.  All these issues I need to resolve, and I appreciate

8    hearing rather than having to read through 50 pages of

9    pleadings.

09:37AM   10          From now on, any dispute in this case that you

11   want to present to the Court is going to be presented in a

12   joint statement, and the joint statement is not to exceed ten

13   pages.  So whatever it is you're fighting about, I'm not going

14   to read 50 pages on each side.  It's going to be a joint

09:37AM   15   statement with a maximum of ten pages.  So each side gets five

16   pages.  It's not ten pages with 150 pages of exhibits and 200

17   pages of declarations.  It is a true ten pages because I

18   just -- I don't have -- I simply don't have the time to read

19   50 pages.

09:37AM   20          Okay.  Let me hear from the plaintiff on some of

21   the issues that you raised.

22          The causal connection between the infringement

23   and the damages is one I have always had concerns about.  Was I

24   correct that the plaintiff didn't elect loss of Yuga's profits

09:38AM   25   because they had sold out before the defendants started to sell

their NFTs?

MR. BALL:  Correct.  That is largely the reason, Your Honor.

THE COURT:  Okay.  What monies does Yuga make now from -- I guess in general?

MR. BALL:  So the BAYC brand is still its cornerstone brand, and they've launched many other entities and products, games, events, clothing that are all connected back to that BAYC brand.  So there's revenue streams that come through of other merchandise and events and gaming.

There is also -- there are still some marketplaces that do have a royalty or creator fee associated with them.  Many marketplaces are going down to a zero percent royalty fee, so there are some percentages there of revenue that they are still getting.  Most of the revenue is coming from many of these other events under the BAYC brand.

THE COURT:  And are those -- go ahead.  What about the willfulness issue?

MR. BALL:  Willfulness is not necessary for anything that is remaining for the jury to decide.  It's not necessary for the false designation claim.  Your Honor has already found intent.  It is not necessary for our exceptional case.  Under *SunEarth* you don't have to find willfulness, but you can in post-trial briefing.  It is not necessary for the jury to decide.  It is not necessary for the false advertising

1    claim.

2            See, I'm talking a little fast and slowing down

3    for the court reporter.

4            It is not necessary for the false advertising

09:40AM  5    claim under *POM Wonderful* and various CD Cal cases, and it is

6    not necessary for our statutory damages which Your Honor can

7    decide statutory damages too.  We have it for the jury.  But it

8    can be something that can be decided by the Court.  As well,

9    there is case law supporting that.  But Your Honor has already

09:40AM  10   found bad faith in the context of cybersquatting.  So we don't

11   need a willfulness finding upon anything.

12           THE COURT:  I guess the reason they want a

13   willfulness instruction is they want to put in the evidence of

14   why they did what they did.  So how do we walk that fine line

09:40AM  15   in terms of allowing the defendant to, in effect -- I don't

16   want to equate this to a criminal case, but letting a defendant

17   get on the stand and telling the jury here I am and here's what

18   I did.  In a criminal case, their liberty is at stake, but in

19   this case there is a tremendous amount of money at stake.  So

09:41AM  20   how do I balance those competing concerns?

21           The whole willfulness instruction, in my view, or

22   the willfulness issue is just a way to allow that testimony to

23   come in.  But even if I decide willfulness is not an

24   appropriate instruction, I still have the issue of how I allow

09:41AM  25   the defendant to -- the defendants to get on the stand and

1  testify to what they did.

2           MR. BALL:  I agree the willfulness is another way

3  they are trying to bring in all this evidence that Your Honor

4  has said is not relevant for this case a few times so far.

09:41AM  5           THE COURT:  Well, they even concede that.

6  They're not going to -- they don't want a Nazi trial.  So I

7  think -- I think everybody shares the same concerns.  It's just

8  a problem of how we get there and allow the defendants to have

9  a fair trial.

09:42AM  10          MR. BALL:  And that's news to us that they won't

11  raise the Nazi issue.  We asked them a number of times during

12  our pretrial conferences and meet and confers, and they refused

13  to say that.

14          THE COURT:  Baby steps every part of the way.

09:42AM  15          MR. BALL:  Baby steps.

16          THE COURT:  Right.

17          MR. BALL:  To your point, you know, our

18  perspective is they weren't doing this to criticize.  They

19  weren't doing this for art.  It was another one of their --

09:42AM  20          THE COURT:  But that's your theory and that --

21  that's fine.  You can cross-examine and put on whatever

22  evidence you have.  But that doesn't go to initially allowing

23  the defendants to explain why they did it.  That's a

24  different -- I mean, you -- I don't necessarily -- I'm not

09:42AM  25  going to take a -- I'm not prepared to take a position today

1    whether or not they truly had that -- I mean, to me, the

2    cross-examination is like Judge Rakoff in the New York case

3    with the purse.  No one believed the infringer on that case.

4    That was the one that had the Rogers -- the Rogers --

09:43AM    5              MR. BALL:  Yep.

6              THE COURT:  He wouldn't grant summary judgment if

7    my memory serves me, but he said it's got to go to trial.  So I

8    don't know if he instructed on willfulness or not, but

9    certainly the jury didn't buy it.  And, quite frankly, given

09:43AM   10    the tenor of what these two defendants have done during the

11    course of this case, I don't think the jury is going to believe

12    them.  And even if they did believe them, it doesn't excuse

13    them going -- involving themselves in a commercial endeavor to

14    enrich themselves.  It doesn't make sense.  It doesn't fly.  So

09:43AM   15    the cross-examination is going to be devastating, and I don't

16    think the jury is going to believe a word they say.

17              Nonetheless, that doesn't answer the question as

18    to whether or not they should be allowed to say and how far

19    could they go in terms of saying it.  That's the question I

09:44AM   20    have.  And I -- given what the 9th Circuit -- especially in

21    criminal cases.  I mean, to infringe upon a -- I understand

22    this is totally different.  But to infringe upon a defendant's

23    right to get on the stand and say whatever he wants to the jury

24    to try to -- to try to win a -- to try to prevail, you just

09:44AM   25    don't -- you just don't take away that right.  It's not the

same in this case, but it's comparable, and the circuit is

going to -- is not going to look kindly on it.

MR. BALL:  Your Honor, my answer to that is they

can get on the stand and say they wanted to compete with

09:44AM   Yuga Labs.  They can get on the stand and say they even wanted

to criticize Yuga Labs.  But criticizing is different from if

you read any of their transcripts.  And we put it in MIL 1

where they then go on a rant for five minutes accusing me,

accusing Yuga -- that's not --

09:45AM   THE COURT:  I understand their conduct is

absolutely horrible, and you know, I don't disagree.  And

didn't they do an NFT of you?  And I'm sure there's going to be

an NFT out there on me some day.  But I understand that.

In any event, it's an issue that we're going to

09:45AM   have to deal with.  It would seem to me that counsel are in the

best position of trying to come up with some parameters in

terms of solving this issue.  If you can't solve it, then I

will rule on it.  It certainly is of a concern.

And the willfulness instruction, you know, if --

09:46AM   you're not afraid of willfulness.  I wouldn't be afraid of

willfulness in this case either because of the nature of the

evidence that's going to come out with respect to these two

defendants.

MR. BALL:  It's really a matter of is that a back

09:46AM   door for them to bring in all that other evidence.  If

 1    Your Honor keeps that out, that's less of an issue on the

 2    willfulness.

 3            THE COURT:  Right.  But that's easy to say.  But

 4    what I'm looking at -- counsel has his view.  You have your

09:46AM  5  view.  I have a view, but I haven't expressed my view yet.  I

 6    just recognize it is an issue we need to deal with and an issue

 7    that should be resolved by counsel.  But if you can't, I will

 8    deal with it because I have to deal with a lot of other issues.

 9    Okay.

09:46AM 10          MR. BALL:  One or two other points, Your Honor.

11    I know you have your case management, and I have a question on

12    that, but we have conferred on one of the case management

13    issues that might come up as well.

14            On damages and they say, you know, their

09:47AM 15  purchasers knew that it was infringing or knew that it was a

16    criticism.  That's no different than saying you're going to

17    the -- the market stall where you know you're buying a

18    counterfeit Rolex.  Just because you are buying a counterfeit

19    Rolex doesn't mean that that counterfeiter can get away with

09:47AM 20  those profits and those ill-gotten gains.  They're still using

21    the mark, and it's about use of that mark and their profits.  I

22    wanted to make that point clear.

23            THE COURT:  I guess all of the purse stores down

24    in -- in any event, go ahead.

09:47AM 25          MR. BALL:  I mean, we disagree on our settlement

positions and their description of our settlement offers, but

we can continue.  I would like to continue those discussions.

            THE COURT:  Well, I don't know where you want to

continue them.  You can go back to Judge Segal and continue

them.  You're both good lawyers, and you both know your case.

I practiced law for many, many years.  And when I was

practicing, the mediators or whatever you call -- they were

just -- there was one guy doing it.  I can't remember his name

now.  I think I was involved in a case where he had one fee if

you went to Maui.

            MR. BALL:  Piazza.

            THE COURT:  Yes.  It was Piazza.  One fee for

Maui and another fee for Los Angeles because he had a ranch up

in Kula.

            In any event, I certainly think that neutrals are

of assistance.  But in a case like this, I'm not sure how much

of assistance it would be because you each know your case.  I

obviously don't have the dynamics of your respective clients.

I certainly don't have any concept of your client.  I have a

concept of the defendants.

            But I encourage you to do whatever is necessary

in the next couple days to try to settle this case because

you're going to be spending additional money on attorney's

fees.  And I'm going to ask you, because I think it's important

in terms of my work going forward, to meet with your client and

          1    make a determination in terms of whether or not you're going to

          2    proceed on the false advertising claim or dismiss the false

          3    advertising claim.

          4                    MR. BALL:  Definitely.

09:49AM   5                    THE COURT:  I'd like to know that answer by

          6    Monday.

          7                    MR. BALL:  For the court reporter, it's Piazza,

          8    like Mike Piazza.

          9                    THE COURT:  Is he still around?

09:49AM  10                    MR. BALL:  Tony Piazza, yeah.  He still has the

         11    Maui split too.

         12                    THE COURT:  Well, I'm sure his rates now are --

         13    my experience with him was probably 30 years ago.  I thought

         14    the rates were high then, but I had a client that really didn't

09:50AM  15    care.  Well, they did care but they could afford it.  Let me

         16    put it that way.  There are two different things in caring and

         17    affording.

         18                    Let's talk about some case management issues.  If

         19    this case is going to go forward, the first issue that I

09:50AM  20    have -- and this is a -- you may think it's a minor issue, but

         21    to me it's a major issue.  That is all the plaintiff's courtesy

         22    copies up to this point in time have not complied with the

         23    Court's Case Management Order.  You don't use the oversized

         24    holes, and you don't spine label.  So when I have all these

09:50AM  25    binders up on a bookcase, I have to pull out each binder to

1    figure out what's in the binder.  I would typically strike and

2    issue orders, but I decided not to because --

3                MR. BALL:  My sincere apologies, Your Honor.  We

4    specifically talked to the individual, and they said that they

09:51AM  5    had your court approved oversized holes.  So that frustrates

6    me.

7                THE COURT:  If you look at all these binders, my

8    secretary has put all the labels on them.  Although this

9    morning something happened.  I thought maybe somebody had

09:51AM  10   actually looked at the binders.  The courtesy copies that were

11   delivered had the large holes and they had spine labels on the

12   exhibits in connection with the motions in limine.  Of course,

13   I only got one copy, and courtesy copy is a defined term which

14   requires two copies.  So I'm shy a copy of those exhibits.

09:51AM  15               In any event, take a look at the standing order

16   and Case Management Order on some of these things because it is

17   very important for me because of the quantity of materials I

18   have to look at and I have to deal with.

19               The witnesses, I have looked at the joint witness

09:52AM  20   summaries, and I have got several questions about those, one of

21   which is -- and I don't remember precisely, but I think there

22   was a dispute with respect to deposition testimony, that

23   someone is objecting to deposition testimony because there is

24   no showing that the -- that the witness -- and I'm not sure if

09:52AM  25   it was a witness or a party that is unavailable.  Has that

1    dispute been resolved?

2                    MR. TOMPROS:  I think the answer is no,

3    Your Honor.  There are two separate disputes along those lines.

4    One is the -- and this may be what you are referring to, the

09:52AM   5    dispute about Mr. Lehman who is the person who signed that

6    statement that we have objected to.

7                    THE COURT:  Right.  I know who he is and what

8    he's going to say.

9                    MR. TOMPROS:  Okay.

09:53AM   10                    THE COURT:  The plaintiff indicated they are

11    going to call him live.

12                    MR. TOMPROS:  Okay.  If they are calling him

13    live -- I thought they were reserving their right to also play

14    his deposition.  If they are calling him live, we don't have

09:53AM   15    any concern.

16                    I think the other is Mr. Aronow who is one of

17    the --

18                    THE COURT:  He's a party.

19                    MR. TOMPROS:  Correct.

09:53AM   20                    THE COURT:  So he's not going to testify by

21    deposition.  My view is under Rule 32 that all parties are

22    testifying live.

23                    MR. BALL:  Mr. Aronow is no longer a party, and

24    he's got a severe health issue.  He has stage 3 heart failure.

09:53AM   25    That's the issue.  He's not allowed to travel and may not be

```
 1    allowed to travel for the trial.  So it's a health issue, not

 2    anything else beyond --

 3                    THE COURT:  Well, it's my view he should be

 4    testifying live, but if he has a health issue, then you can

 5    file something and I will -- it seems to me it is something you

 6    should be able to work out.  If not, file something, and I will

 7    make a determination.  I assume you designated the portions of

 8    his deposition.  Why is he even necessary?

 9                    MR. BALL:  I don't think Your Honor -- if we're

10    relying on your summary judgment order and those findings still

11    stand, I don't think we need Mr. Aronow.  They might use

12    Mr. Aronow's testimony, and then we would counter designate as

13    necessary.

14                    THE COURT:  But certainly -- when did he stop

15    being a Yuga employee or associated with Yuga?

16                    MR. BALL:  January of this year.

17                    THE COURT:  Okay.  So I assume when he was

18    deposed, he was still with Yuga?

19                    MR. BALL:  He might technically have been a

20    director and advisor, but he was not an active day-to-day

21    representative at that point.

22                    THE COURT:  I view him more in the category of a

23    party where certainly, if the defendant wants to use his

24    testimony, they can use his deposition testimony.

25                    MR. TOMPROS:  That's fine with us, Your Honor.
```

```
 1        Our concern was the plaintiff trying to put testimony in

 2   without a specific showing of actual unavailability.  But I

 3   think if they're not doing that, you're right.  We may very

 4   well use it depending on, again, precisely which claims remain

 5   in play.

 6                 THE COURT:  As to the deposition testimony,

 7   the -- as I indicated at the outset, I have received the --

 8   counsel have lodged the deposition transcripts that came in I

 9   think three -- two or three Bankers Boxes.  As I further

10   indicated, the index that counsel had prepared with respect to

11   the designations of the testimony and the objections to the

12   testimony are -- I have a different procedure, and that

13   procedure is set forth in paragraph 2-B of the Court's Civil

14   Trial Order, and I set a deadline of today as to those

15   requests.

16                 Is there any questions about what I want in these

17   deposition designations?

18                 MR. BALL:  Not necessarily a question on what you

19   want, but I will ask the Court's indulgence -- and I met and

20   conferred with counsel.  We are trying to narrow to where you

21   don't get a long list of objections, and we're still in the

22   processing of narrowing.  Your Honor's statements today on

23   MIL 1 and 2 and what may or may not be out is helping us

24   further narrow.  I would like to meet and confer with

25   counsel --
```

```
 1              THE COURT:  I can continue that date.
 2              MR. BALL:  That's the fundamental result of that
 3    is can we --
 4              THE COURT:  All you have to do is be direct.  You
 5    don't have to beat around the bush.
 6              MR. BALL:  I'm saying we're working on it.  We
 7    have not been ignoring the date.
 8              THE COURT:  It's a lot of work.  It's the only
 9    way that -- it's the only way that it makes sense for me
10    because then I have the questions and the answers and the
11    objections and the response.  I can then make a determination
12    before the witness testifies.
13              MR. BALL:  Yeah.
14              THE COURT:  Before the -- before you proposed to
15    put on that deposition testimony.
16              In any event, how much more time -- today is the
17    8th.  How much more time --
18              MR. BALL:  Can we have until Friday of next week?
19    That way we can continue to meet and confer and hopefully
20    reduce this to a much more manageable number.
21              THE COURT:  Sure.  That will be due on June 16th.
22              MR. BALL:  Your Honor, on a related issue to
23    comply with your order, you -- and I'm hearing you, and I
24    understand the reasoning of you wanting the actual testimony
25    excerpts in there.  Some of those excerpts are material that we
```

consider offensive and harassing of our clients or they're

material that's been subject to AEO and confidentiality in

relation to other lawsuits that are at issue.  And we didn't

want to publicly file the information as an objection.

09:58AM   5          So I don't know if counsel is going to withdraw

those excerpts, but if they don't, I'm asking if we can lodge

the transcripts rather -- lodge those objections rather than

file them publicly.

9          THE COURT:  You mean the notices of designated

09:58AM   10 deposition testimony.

11          MR. BALL:  Correct.

12          THE COURT:  Which is -- that's required by 2(b).

13 So what that simply does is takes the testimony from the

14 deposition, puts it in a document, the objection that was made

09:58AM   15 and the response to the objection.  So you want to file that --

16 I mean, you can file those -- the problem is for the appellate

17 record -- I had this in the Kobe Bryant case.  We had a lot of

18 deposition testimony that -- so what happened was we ended up

19 with -- we ended up filing a -- Shannon, how did we do it?  We

09:59AM   20 filed it under seal and then we -- the normal sealing

21 requirements.  We filed under seal, and then there was a

22 redacted version that was filed for the public.

23          So it was those notices of deposition -- the

24 testimony was actually in the record because Miranda doesn't

09:59AM   25 report -- she doesn't record that.  So we have to have a record

in terms of what that testimony is.

So I can't -- my preference would be just to file courtesy copies and I can work off the courtesy copies, but I can't do that because you're not going to make an adequate record. So unless you have some other suggestion, the -- I think the best way to do it is to redact file under seal and then have a public version.

But my courtesy copies would contain -- that's the other thing. A lot of the expert reports had redactions. I notice when I went back and pulled the expert reports in the Summary Judgment Motion, you provided me with redacted versions of those -- not only were they on the docket, but I couldn't find that any were filed under seal. And my courtesy copies had redactions in them. So there's a lot of black lines.

So I understand the problem, and that's the way that I think you probably would be able to solve it unless you have some other suggestion.

MR. BALL: Sealing other than the procedural time that it takes, that's more than acceptable to us.

The other alternative that's just an idea is it's only what we actually use at trial would be then later submitted and publicly filed. But I think the sealing works just fine.

MR. TOMPROS: Your Honor, it may very well be that this is going to be a moot issue. If we can prioritize

1   exchanging the things that would otherwise need to go under

2   seal, if there are designations -- I am quite confident there

3   is nothing that Mr. Ripps and Mr. Cahen want filed -- would

4   care of their information being filed under seal.  If there's

10:01AM   5   something that we have designated that is Yuga confidential, we

6   can take a careful look at whether we actually need that or

7   not.

8          THE COURT:  Well, that's my suggestion.  I will

9   let you folks work it out.

10:01AM   10          MR. BALL:  As counsel mentioned, we have already

11   marked in those transcripts anywhere where it has been as part

12   of our objection and giving you back and forth.  Thank you,

13   Your Honor, for the extension.

14          THE COURT:  Okay.  Trial exhibits --

10:01AM   15          MR. TOMPROS:  Your Honor, briefly on depositions

16   on trial procedure.

17          THE COURT:  Get to the mic.

18          MR. TOMPROS:  Just a question.  Does Your Honor

19   have a preference -- so there will be -- there are a number of

10:01AM   20   witnesses we are fairly confident are coming live, and then

21   there are also deposition designations for them because they

22   are either, in Mr. Ripps's or Mr. Cahen's case, a party or, in

23   the case of some of the Yuga witnesses, a party representative

24   of one kind or another.

10:02AM   25          Does Your Honor have a preference in how to

```
        1    handle that in the sense of -- I would be more than happy to

        2    cross-examine somebody outside the scope of direct on the

        3    things I would otherwise designate and not have to go through

        4    the time of playing the deposition later.  Same thing with, if

10:02AM 5    we were calling Mr. Ripps and Mr. Cahen, we would be perfectly

        6    happy to put them forward whenever in the course.  So I just

        7    want to make sure --

        8                THE COURT:  It's always my preference to have a

        9    witness get on the stand once.

10:02AM 10               MR. TOMPROS:  That was our concern too.

       11                THE COURT:  I'm not going to make that a rule,

       12    but it always seemed to me from a time standpoint and just that

       13    witness, whatever he's got to say, let's hear it all at once.

       14    And whatever objections you want to make, I mean, beyond the

10:02AM 15   scope is not going to be an appropriate objection.

       16                That's my preference.

       17                MR. TOMPROS:  Thank you, Your Honor.  That helps.

       18                THE COURT:  Okay.  Moving on to the exhibits, I

       19    started to talk about these this morning.  We started out with

10:03AM 20   251 and 252 which I struck.  How did you expect me to

       21    understand these exhibits without a description of the

       22    exhibits?  Even in the Summary Judgment Motion, the exhibits

       23    were described on the docket.  Just putting in numbers, what

       24    good was that?  What was I supposed to glean from that?

10:03AM 25               MR. BALL:  I was trying to have an identifier for
```

1    everybody to be able to find the documents in the trial exhibit

2    binders.  I expected us to have more back-and-forth before we

3    had to have the judge rule on anything.  So my apologies on

4    that description issue.

10:04AM   5    THE COURT:  Then I struck them, and then they

6    were refiled.  We have the joint pretrial exhibit stipulation

7    which is Exhibit 268, and then we had the revised exhibit list.

8    Pursuant to the minute order that I issued, we have the joint

9    statement which is now -- the minute order is 256, and the

10:04AM  10    joint statement is 261.

11    So those are the current -- can somebody explain

12    to me the numbering of this -- of these exhibits?  It looked

13    like -- I'm looking at 258 which was the -- which was the

14    revised joint pretrial exhibit stipulation which listed all the

10:05AM  15    exhibits.  But at some point in time, in the way that I -- the

16    way that these are assembled are -- the plaintiff's exhibits

17    are -- on the top there is an indication on the top left-hand

18    side of this document.  And then the defendants' exhibits -- so

19    the plaintiff's -- yeah.

10:06AM  20    Then on page 62 -- page 61 ends the plaintiff's

21    exhibits with YTX1616, and then page 62 starts with the

22    defendants' exhibits which begin with 201.  They go 201 to 299.

23    And then we pick up --

24    MR. BALL:  Your Honor, if I can --

10:06AM  25    THE COURT:  You know, I look at this stuff, and

1    if you put yourself in my position that I'm not familiar with

2    these and if you give me some kind of a guide or an index or

3    something to tell me, okay, here's what we did with these

4    exhibit numbers.  We should have done 1 through whatever but we

10:07AM   5    didn't because of I don't care why but now the defendant has

6    got Exhibit Nos. 200 through 400 which appear to be part of the

7    plaintiff's exhibits, then I would at least -- it takes me an

8    enormous amount of time just to figure out what you have done

9    in these documents.  They're not user-friendly, and I don't

10:07AM   10    have the time to go through and try to figure these out when

11    we're talking about over 2,000 exhibits.

12               MR. BALL:  The direct answer is the 200, 400s,

13    those are all the deposition exhibits.  So it's kept the same

14    deposition exhibit number.

10:07AM   15               THE COURT:  If you had told me that, then I

16    wouldn't have the question.  In any event --

17               MR. BALL:  Understood, Your Honor.  But that

18    is -- that is -- so -- and then we keep going through the

19    thousands, and then they start at 2000 instead of starting at

10:07AM   20    16 whatever just so when we're all marking, we know that we're

21    not overlapping.

22               THE COURT:  Okay.  There's a provision in the

23    Court's Civil Trial Order for the defendant's pretrial exhibit

24    stipulation.  One of the things I want to include, which I did

10:08AM   25    in one of the other cases that I had, the bribery cases, which

1    was helpful, because I used the pretrial exhibit stipulation

2    when counsel are moving in exhibits, and that is I want the

3    final pretrial exhibit stipulation to have an additional column

4    that's not mentioned in the Civil Trial Order, and that column

10:08AM    5    is the Court's ruling.  So you can put in there the Court's

6    ruling -- it can be as simple as the Court sustained the

7    objection Motion in Limine No. 1 or overruled the objection

8    Motion in Limine No. 1 so I know what the status of my ruling

9    has been so I'm not being inconsistent at the time of trial.

10:09AM    10           And I use that as my guide because one of the

11    other provisions in the Civil Trial Order is that counsel have

12    to identify not only the witness but also the exhibits that are

13    going to be used with that witness.  And so when I get that, I

14    take the final joint pretrial exhibit stipulation together with

10:09AM    15    the witness and the exhibits that are going to be used with

16    that witness prior to the witness testifying so I can become

17    familiar with the exhibits, the witness, the objections, and

18    whether or not there are any other objections.

19           So that column becomes very important.  I don't

10:09AM    20    want a long explanation.  Just give me a snapshot of how I

21    had -- if I had ruled on the exhibit prior to trial.  If not,

22    leave it blank and then I will know it hasn't been ruled on.

23           The way we handle exhibits is that on the first

24    day of trial you will deliver all of your -- you will bring

10:10AM    25    with you all of your trial exhibits, and they will be properly

1    labeled, tagged.  And it's very important they be internally

2    paginated because, when you have a witness on the witness stand

3    who is trying to figure out -- trying to get to page 23, rather

4    than sit there and count 23 pages, it's got to be internally

10:10AM    5    paginated.

6            The original exhibits go over on that table over

7    there, and we don't touch them during the course of the trial

8    unless there's an issue with respect to an exhibit certainly

9    you can use the original.  But we use copies.  We have a bench

10:10AM   10    copy of each of the -- as to each witness, we have a bench copy

11    of the exhibits that you are going to use on direct examination

12    with that witness, and the same for the exhibits you're going

13    to use on cross-examination, have a separate binder or you can

14    do a combined binder for that particular witness.  There is no

10:11AM   15    walking back and forth between the lectern and the witness to

16    show the witness an exhibit.

17            Make sure you read the Court's Criminal {sic}

18    Trial Order and abide by that.  At the conclusion of the trial,

19    as indicated in the Civil Trial Order, there's a post-exhibit

10:11AM   20    list that's prepared, and you work with Shannon on that.  So

21    given the number of exhibits we have in this case -- and you

22    can have your pretrial conference with Shannon when she's

23    available.  What we have done in the past or what Shannon has

24    done in the past is have a representative from each side

10:11AM   25    charged with the responsibility of dealing with the exhibits so

1    at the end of the day Shannon and those individuals can meet

2    and determine what exhibits were admitted into evidence so the

3    post-trial exhibit stipulation that -- list that goes to the

4    jury can be promptly done and submitted to the jury.  Shannon

10:12AM  5    will explain her rules.  She doesn't have them in writing yet,

6    but they are important.

7          The other issue I have with respect to exhibits,

8    as I said, I looked at briefly this morning when I came in the

9    exhibits that were delivered that were still at issue in the

10:12AM  10    motion in limine.  And when I looked at Docket No. 61, I saw

11    that, for example, 210, 213, 214, 264, 265, 2085, 2240, those

12    were all represented to be objections that had been resolved;

13    yet they still ended up to be exhibits that were still at issue

14    in the motions in limine.

10:13AM  15          So someone needs to go through each of those

16    table of contents on the motion -- on the exhibits that remain

17    at issue and the motions in limine and confirm that those are

18    truly at issue because I can tell you I'm not going to be happy

19    if I'm ruling on exhibits that have been resolved because

10:13AM  20    somebody has not taken the time or the effort to go through

21    these exhibits.

22          MR. BALL:  And, Your Honor, I think you have

23    answered part of that question earlier today, but it looks like

24    these are in our -- resolved subject to evidence at trial and

10:13AM  25    subject to some of the MIL issues if I'm looking at some of

```
 1   them.  There are pictures of our individual ape images.  We
 2   don't object to a picture of the ape image, but in and of
 3   itself -- and we have talked with counsel on that.  But if
 4   they're going to put up the picture of an ape image and ask if
 5   the hat is a Nazi-affiliated hat, then, yes, we have an
 6   objection to that.  Otherwise, I don't even think they need to
 7   use that exhibit.  It's meaningless.
 8                 They have only ever used it for an attack on our
 9   client.  That's where the objection lies.  So it's really a
10   tentative resolution.  Again, no objection to an image for an
11   image sake.  Yes, objection if they're using it for a
12   prejudicial and irrelevant purpose.
13                 THE COURT:  So, again, I'm -- you know, I -- it's
14   probably hard for you to believe, but I actually engage in this
15   pretrial exhibit stipulation venture to assist counsel because
16   identifying and moving all these exhibits in at the time of
17   trial just eats away from your trial time.
18                 MR. BALL:  Yes.
19                 THE COURT:  As I said, we had 600 exhibits
20   entered in the first day of trial, and we had probably 800 more
21   during the course of the trial that came in at various points
22   in time.  But it certainly -- in one instance, it was a
23   three-week estimate, and we ended up trying the case in ten
24   days, and that was the result of having issues resolved with
25   respect to these exhibits.
```

            1              If you can't agree and you continue to fight

            2    about these things, then I will just rule on them -- I will

            3    rule on the admissibility of the exhibit at trial.  I can't

            4    deal with we don't have any objection if you use it for this,

10:15AM     5    but if you're not going to use it for this, then -- I mean, if

            6    you get an agreement of counsel that it's not going to be used

            7    for that purpose and then that resolves the objection, that's

            8    one thing.  But all these issues, you're going to be --

            9              MR. BALL:  That's the struggle.  We don't have an

10:16AM    10    agreement of counsel.  They haven't said they wouldn't use it

           11    for that irrelevant and prejudicial purpose, so that's why it's

           12    still on the list.

           13              THE COURT:  I can only urge you to solve those

           14    problems because it's not going to be -- it's not going to be

10:16AM    15    to either side's benefit.

           16              This is just a point that is probably premature

           17    in terms of getting close to trial.  Notwithstanding the no

           18    objection to a particular trial exhibit, I still require

           19    counsel to identify the exhibit with a witness during the

10:16AM    20    course of the trial so we have a clear record in terms of what

           21    the exhibit is and, also, the jury has some understanding of

           22    what the exhibit is.  You can simply say that we're moving

           23    Exhibit No. 2 without objection, and then I will move it.  Or

           24    you can say it has an objection but the objection has been

10:17AM    25    overruled or whatever it is.  And that's why the pretrial

exhibit stipulation is helpful.  But I still require you to go

through the process of identifying the exhibits so we have a

clear record.

                    MR. TOMPROS:  May I ask a quick question on that?

10:17AM             THE COURT:  Sure.

                    MR. TOMPROS:  Is Your Honor comfortable with

ranges?  Let's say, for example, with the witness, I don't

know, if we're looking at like the images underlying the NFTs,

please look at Exhibits 103 through 205 --

10:17AM             THE COURT:  Sure.  I have no problem with that

just as long as everybody can understand what we are dealing --

what the -- we make a clear record, I don't have any problem.

                    One thing I want to make sure everybody is aware

of is you don't change exhibit numbers.  These numbers are

10:18AM  frozen.  Same thing with jury instructions.  We're not going to

get to that today.  But do not change the number of the jury

instructions.  So if we have disputed Jury Instruction No. 30,

that disputed jury instruction remains Exhibit 30 so at the end

of the case everybody can look back and know that Exhibit 30

10:18AM  was the disputed jury instruction.  So don't start changing

numbers because otherwise it makes it too complicated.  Same

thing with respect to the exhibits.

                    MR. BALL:  Your Honor, can I ask a question on

the exhibits similar to Mr. Tompros's?  So we have a couple

10:18AM  exhibits that are electronic, that are largely electronic, and

|      |    |                                                                          |
|------|----|--------------------------------------------------------------------------|
|      | 1  | I don't know if you have a process of admitting those into               |
|      | 2  | evidence.  We can have a thumb drive or something that --                |
|      | 3  |       THE COURT:  Print them out and make them hard |

THE COURT:  Print them out and make them hard
copies.  You deliver thumb drives to me, and I'm not going to

10:18AM sit there and go through thumb drives.  Unless it's a paper
copy, as far as I'm concerned, it doesn't exist.

      MR. TOMPROS:  How would Your Honor like to handle
physical exhibit?  There's a few of those.  What we have done
so far is submitted photographs when we have dealt with those,

10:19AM but we have the physical --

      THE COURT:  Physical are fine.  You just bring
those the first day of trial and put them on the table.  And
these photographs, if you need the physical, you can just make
sure that the witness has it on the stand.

10:19AM       MR. TOMPROS:  Thank you, Your Honor.

      MR. BALL:  Just so we're -- it's a -- I don't
know if you guys have printed Ape Market, but it's, you know,
800 pages or so.  That's why we have it as an electronic.

      THE COURT:  You're moving 800 pages?

10:19AM       MR. BALL:  It is one of the exhibits -- it's
their main channel of communication.  Rather than having
50 excerpts of it, that way we can have one exhibit rather than
50 excerpts of one exhibit.

      THE COURT:  I don't know what -- you're not

10:19AM adequately describing it for me to make a description.  So I'm

1    going to default to just print out the pages of an electronic

2    exhibit unless you can convince me or explain to me how we're

3    going to use this because, quite frankly, given what you have

4    been doing so far, I don't trust I'm going to have a decent

10:20AM   5    understanding of what it is.

6         MR. BALL:  Understood, Your Honor.

7         THE COURT:  In order to complete the process of

8    these exhibits, what I typically do at the pretrial conference

9    is I order counsel to deliver bench copies of all the exhibits

10:20AM   10   in the case, and I intend to do that.

11        But I don't -- one of the things I was looking

12   for after you agreed or that the defendant agreed to withdraw

13   all of the objections except the two exhibits that we referred

14   to, I didn't see a revised joint pretrial exhibit stipulation

10:21AM   15   which listed all of the plaintiff's exhibits.  And under the

16   column of objection, there should have been a reference to no

17   objection since plaintiff -- defendant withdrew the objection.

18   I didn't see that.  Did anybody file that?

19        MR. BALL:  No, Your Honor.

10:21AM   20        THE COURT:  Is there a reason why you didn't?

21        MR. BALL:  I think we were hoping to still

22   whittle it down, and we knew that you were going to have

23   another pretrial exhibit stipulation --

24        THE COURT:  You didn't know that until last night

10:21AM   25   or yesterday when I filed the Civil Trial Order.  Don't try to

1 be cute with me.  If there's a reason, there's a reason.  If

2 you just didn't do it, you just didn't do it.  But that's part

3 of making sure that I have everything I need, not only to

4 prepare for trial but on rulings on pretrial matters.  So

10:22AM 5 that's something that should be done.

6     I don't necessarily -- what I want you to do is

7 go back and continue to meet and confer on these trial

8 exhibits, and I'm going to ask you to do that and file a

9 revised joint pretrial exhibit stipulation listing all the

10:22AM 10 exhibits and the status of -- if there's objections, put the

11 objections in, and that way I will have a base document from

12 which I can deal with.

13     Then you can deliver bench copies of all of the

14 exhibits, both the plaintiff's exhibits and the defendants'

10:22AM 15 exhibits, courtesy copies -- courtesy copies is a defined term.

16 I want two copies.  You can deliver those to chambers.

17     When in the grand scheme of things do you -- let

18 me also indicate one final item.  So with respect to the copies

19 of the trial exhibits that are still at issue in the motions in

10:23AM 20 limine, I need the second set.  But I'm going to ask you to

21 deliver on Monday the second set in having gone through there

22 and making sure that you have taken out any of those exhibits

23 that are no longer objected to so I will have next week a set

24 of those exhibits that are truly at issue in the motions in

10:24AM 25 limine.

1          Let me ask the defendant.  Why do you have so

2    many exhibits?  As I indicated before, the Summary Judgment

3    Motion, I had three binders of exhibits which I thought were

4    more than necessary.  I mean, I know that some counsel, when

10:24AM   5    looking at this pretrial exhibit stipulation, they go to their

6    files and basically cull out and dump everything they can

7    because they don't want to be accused of leaving something out.

8    That's obviously not the purpose of this.  I just don't

9    understand why you need so many exhibits.

10:25AM   10         MR. TOMPROS:  Your Honor, I would say it's two

11   things.  It is, quite honestly, partially that which is that we

12   were worried about the risk of waiver by not having something

13   on this list.  Most of them, as you probably saw, were

14   designated as "may use if the need arises."  And with the

10:25AM   15   number of issues in the case, we were concerned about which

16   direction things would go, what opinions would ultimately be

17   delivered, and we wanted to have some flexibility there.  So we

18   did take a broad approach.  I know that's not helpful to the

19   Court, and I understand.

10:25AM   20         The second reason is a lot of these exhibits are,

21   indeed, duplicative and largely, as we understand it, will

22   hinge on Your Honor's resolution of the motions in limine.  So,

23   for example, we have a whole lot of exhibits showing other uses

24   in the market of the marks, right, because there are literally

10:26AM   25   thousands of these and we've got a whole lot of them.  I, of

1    course, am not going to try to put in front of the jury 500

2    different uses.

3              The problem is we first need to get past the

4    question on the motion in limine as to whether those are

10:26AM  5    admissible generally.  But the plaintiff also has a variety of

6    different objections, authenticity type of objections and other

7    things to each of them, and I'm very hesitant to remove any of

8    them from the list for fear that I will pick wrong and pick

9    things they are somehow able to sustain what we would say is a

10:26AM 10    wrong hearsay or authenticity or something else objection.

11              Those are the two main reasons for the overall

12    volume.  We did try to take a path to cull them down, and we

13    can continue to do that.

14              THE COURT:  Well, it's not going to be -- it's

10:27AM 15    not going to be in anybody's benefit to have that many

16    objected-to exhibits because, as I said, you're only going to

17    have three days to try this case.

18              All right.  That leads me to the last item, and

19    that is, in light of the backlog that we have in the criminal

10:27AM 20    cases that we are trying to dig out from COVID and the Court's

21    calendar, I'm not going to be able to try this case on

22    June 27th.  I'm going to have a delay, and we're going to begin

23    the trial on July 7th.  So I wanted to make sure that counsel

24    were aware of that.

10:27AM 25              We have the hearing on the motions in limine next

```
 1   Friday.  I am in the process of working those up.  Whether or

 2   not I actually am going to go forward with the hearing on

 3   Friday is somewhat problematic.  They're on for the 16th.  I

 4   may set that -- I realize that you're all out of -- well,

 5   you're just up in San Francisco.  I may put the -- I may move

 6   the motions in limine from the 16th to sometime during the week

 7   of the -- apparently 19th is a holiday, Shannon?

 8                    THE CLERK:  Yes.

 9                    THE COURT:  So I may move them sometime the

10   following week, but I just have too many criminal matters that

11   I have to deal with.  So I will let you know when I'm going to

12   be able to hear the motions in limine.

13                    All right.  I really sincerely think that counsel

14   need to settle this case, and I can -- it is a case that can be

15   settled and should be settled.  Quite frankly, I think that

16   plaintiff is overreaching.  We will see.  I understand this is

17   hotly contested and that there is no -- the parties are -- the

18   parties are where they are at, and it's been primarily caused

19   by the defendants.  To me some of this conduct is inexcusable,

20   but at some point in time, everybody's got to make their peace

21   and get on with life.

22                    I encourage you to go back to Judge Segal and

23   seek her assistance and come up with some resolution.  In fact,

24   I'm going to order you to go back to Judge Segal for a further

25   settlement conference.  And you're going to let me know by
```

10:28AM (line 5)
10:28AM (line 10)
10:29AM (line 15)
10:29AM (line 20)
10:30AM (line 25)

| | | |
|---|---|---|
| | 1 | Monday on the false advertising claim? |
| | 2 | MR. BALL:  Yes, Your Honor. |
| | 3 | THE COURT:  All right.  Anything else? |
| | 4 | MR. BALL:  If I may, Your Honor, I know it's a |
| 10:30AM | 5 | long hearing for the court reporter and everybody.  A couple |
| | 6 | administrative issues and understanding for trial. |
| | 7 | THE COURT:  Sure. |
| | 8 | MR. BALL:  One, in your pretrial order, it talked |
| | 9 | about jury instructions being read during trial. |
| 10:30AM | 10 | THE COURT:  Right. |
| | 11 | MR. BALL:  I just wanted to make sure I |
| | 12 | understood.  Is that at the beginning of trial, in the middle |
| | 13 | of trial, or is that at the close of evidence? |
| | 14 | THE COURT:  For example, if you have a |
| 10:30AM | 15 | stipulation of fact, that's an instruction during the course of |
| | 16 | trial.  I don't necessarily use those, but I put it in there. |
| | 17 | It's those kind of things that if there is evidence that is |
| | 18 | being offered for a limited purpose, that would be an |
| | 19 | instruction during trial or judicial notice of a document or |
| 10:31AM | 20 | whatever.  Those are the kinds of instructions I'm talking |
| | 21 | about. |
| | 22 | MR. BALL:  Thank you, Your Honor.  That's what I |
| | 23 | assumed.  I just wanted to make sure I understood. |
| | 24 | THE COURT:  Right. |
| 10:31AM | 25 | MR. BALL:  We have presented to you in Exhibit A |

|     |                                                                              |
|-----|------------------------------------------------------------------------------|
| 1   | to our Memo of Contentions of Facts and Law that we think would              |
| 2   | be helpful and narrow the case significantly for the jury for                |
| 3   | them to understand what Your Honor has already found on those                |
| 4   | issues.                                                                      |
| 5   | THE COURT:  And I understand there is a dispute                              |
| 6   | with respect to that.  It is also the subject of a jury                      |
| 7   | instruction which is the prior finding jury instruction.                     |
| 8   | MR. BALL:  Correct, Your Honor.                                             |
| 9   | THE COURT:  All right.                                                       |
| 10  | MR. BALL:  Second one is just electronics.  I                               |
| 11  | know we don't have electronics today.  I know the Court does                 |
| 12  | not like electronics.  I have heard that there is -- you can                 |
| 13  | log your electronics and bring in certain electronics.  I just               |
| 14  | want to understand that process and begin that process.                      |
| 15  | THE COURT:  That is Shannon's pretrial                                       |
| 16  | conference.  To the extent you are going to be displaying                    |
| 17  | exhibits on the screen to the jury --                                        |
| 18  | MR. BALL:  Yep.                                                             |
| 19  | THE COURT:  -- you can have your tech people here               |
| 20  | and should have your tech people here because, if something                  |
| 21  | goes wrong, you need to have somebody fix it because we don't                 |
| 22  | have the ability to fix it.  So, yes, you can meet with                      |
| 23  | Shannon, and she can explain when she will make herself                      |
| 24  | available so you can bring all that stuff in.                                 |
| 25  | MR. BALL:  Great.  The last one is there is an                              |

10:31AM
10:31AM
10:32AM
10:32AM
10:32AM

1 individual that was on their initial disclosures.  He's not on

2 the witness list, but he has made death threats against our

3 clients.  He's made claims against -- it seems like they have

4 had a falling out with him as well, the defendants have.  He is

10:32AM  5 not -- I just want to make sure we have someone here at trial

6 if there is -- if the trial happens on the 7th and there is

7 someone here to protect the Court, protect the jurors, and the

8 like.

9          MR. TOMPROS:  And, Your Honor, this is something

10:33AM  10 we actually did confer about beforehand.  There is a person who

11 earlier in the case had been communicating with our clients and

12 we thought had some relevant information.  He has also made

13 threats against Mr. Cahen and Mr. Ripps.  We absolutely agree

14 that the safety of everyone involved in this case is paramount

10:33AM  15 and would take --

16          THE COURT:  Do you have a photograph of him?

17          MR. BALL:  We can provide the Court with a

18 photograph.

19          THE COURT:  Provide the photograph to Shannon,

10:33AM  20 and I will have a blue coat up here on the 7th so if he enters

21 the courtroom, we can have a blue coat sit next to him.

22          MR. BALL:  Thank you, Your Honor.

23          MR. TOMPROS:  Thank you, Your Honor.

24          I have one other question if I can indulge the

10:33AM  25 Court briefly.

```
 1                    THE COURT:  The court reporter needs --

 2                    MR. TOMPROS:  It will be very quick.

 3                    THE COURT:  Okay.

 4                    MR. TOMPROS:  I know Your Honor has a general

 5    rule that --

 6                    THE COURT:  Don't talk quick.

 7                    MR. TOMPROS:  I know Your Honor has a general

 8    rule that lead counsel should make all arguments.

 9                    THE COURT:  Yes.

10                    MR. TOMPROS:  Counsel and I conferred.  And for

11    the motions in limine, I think both of us have some more junior

12    lawyers that we would like to give an opportunity to speak in

13    court.  I'm happy to do them, but if Your Honor would permit

14    that, we would ask the ability to do that.

15                    THE COURT:  Well, when I rule on motions in

16    limine, basically what I ask counsel is if you have anything

17    that is not in your papers because I'm not going to let counsel

18    just rehash what's in the papers.  So if you have something, I

19    will listen to you, and it takes two minutes, and I make a

20    ruling.

21                    MR. TOMPROS:  So it may not be as good of an

22    experience as --

23                    THE COURT:  Yeah.

24                    MR. TOMPROS:  Thank you, Your Honor.  I

25    appreciate it.
```

```
 1                     THE COURT:  Anything else?

 2                     MR. BALL:  Not today, Your Honor.

 3                     MR. TOMPROS:  Thank you, Your Honor.

 4                     THE COURT:  Let me know what the status of your

 5          arrangements are with Judge Segal and also, if you are able to

 6          settle the case, make sure that you let Shannon know because I

 7          will be working on preparing this case.  If it is settled, I

 8          don't want to -- I have plenty of other cases to work on.

 9                     All right.  Anything else?

10                     MR. BALL:  Not today, Your Honor.

11                     MR. TOMPROS:  Nothing, Your Honor.

12                     THE COURT:  All right.  Thank you very much.

13                     MR. BALL:  Thank you.

14                     (Proceedings concluded at 10:35 a.m.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6    COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7    THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8    PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9    FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10    STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11    ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13    THE UNITED STATES.

14

15                    DATED THIS  12TH  DAY OF JUNE, 2023.

16

17

18              /S/ MIRANDA ALGORRI

19              MIRANDA ALGORRI, CSR NO. 12743, CRR
                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```