ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC., <br><br> Plaintiff, <br><br> v. <br><br> RYDER RIPPS, JEREMY CAHEN, <br><br> Defendants. | Case No.: 2:22-cv-04355-JFW-JEM <br><br> **DECLARATION OF LAUREN R. KINDLER** <br><br> Trial Date: July 31, 2023 |

1  MELISSA L. LAWTON (CSB No. 225452)
   mlawton@fenwick.com
2  FENWICK & WEST LLP
   228 Santa Monica Boulevard
3  Santa Monica, CA  90401
   Telephone:   310.434.4300
4
5  DAVID Y. SILLERS (*admitted pro hac vice*)
   david@clarelocke.com
6  KATHRYN HUMPHREY (*admitted pro hac vice*)
   kathryn@clarelocke.com
7  MEGAN L. MEIER (*admitted pro hac vice*)
   megan@clarelocke.com
8  CLARE LOCKE LLP
   10 Prince Street
9  Alexandria, VA  22314
   Telephone:   202.628.7400
10
11 Attorneys for Plaintiff
   YUGA LABS, INC.

I, Lauren R. Kindler, declare:

1. I am a Managing Principal at Analysis Group, Inc. where, for more than 20 years, I have provided financial, economic, and damage quantification consulting services to clients. I have provided expert testimony regarding damages and remedies in intellectual property disputes at deposition and trial in more than 60 matters. I have been retained as an economics and damages expert for Yuga Labs, Inc. ("Yuga Labs") in the matter of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*.[1] I have firsthand knowledge of the matters stated herein.

2. In forming my opinions in this matter, I relied on my expertise and experience, my analysis of transactions on the Ethereum blockchain, and my review of the materials identified in the Offer of Proof and Amended Offer of Proof. *See* Dkts. 268, 287. I submitted a Rule 26 report (JTX-723) in this matter on February 6, 2023 and also relied on the materials cited in my report in forming my opinions. *See* Dkts. 268, 287.

3. I understand that the Court has issued a Summary Judgment Order in this matter, which I have reviewed, finding that "Defendants' use of Yuga's BAYC Marks was likely to cause confusion" and that Yuga Labs has prevailed on its claim for false designation of origin, with remedies being reserved for trial. In forming my opinions, I have assumed that Defendants are liable for false designation of origin as a result of their use of the BAYC Marks in connection with RR/BAYC NFTs (sometimes also referred to by Defendants as just "Bored Ape Yacht Club" NFTs or "Bored Ape Yacht Club V3" NFTs. JTX-1146; JTX-670; JTX-689), which is consistent with the Court's findings.

4. As defined in this litigation, I understand the BAYC Marks are BORED APE YACHT CLUB, BAYC, BORED APE, the BAYC Logo, the BAYC BORED APE YACHT CLUB Logo, and the Ape Skull Logo.

---

[1] I refer to Mr. Ryder Ripps and Mr. Jeremy Cahen collectively as "Defendants."

## Methodology for Collecting and Analyzing Blockchain Data

5. My calculation of Defendants' profits is based on public Ethereum blockchain data, which contains records of all transactions executed on the network.

6. Ethereum blockchain transaction data was collected using Etherscan, which is an analytics platform for Ethereum. Etherscan contains records of all transactions that occur on the Ethereum network, providing public access to information associated with wallet addresses ("wallets"), smart contracts, and tokens that reside on the Ethereum network. Ethereum blockchain transaction data can be viewed on the Etherscan website through a web browser and is available for download through an application programming interface (API). Etherscan's API was used to download the data required for my calculations.

7. In order to calculate Defendants' profits, four datasets were extracted using Etherscan: (1) all transactions associated with Mr. Ripps' and Mr. Cahen's wallets, (2) all transactions associated with RR/BAYC NFTs, (3) all event logs associated with RR/BAYC NFT transactions, and (4) the daily average ETH[2] to United States Dollars (USD) conversion for the time period relevant to my analyses. I included these datasets, along with the computer code used to analyze the data, in the backup produced with my report. These datasets were extracted on February 1, 2023 and contain transactions from May 13, 2022 (when Mr. Ripps began to mint RR/BAYC NFTs) through February 1, 2023.

8. I primarily rely on the RR/BAYC NFT transaction data and the associated event logs for my calculations. I use transactions associated with Defendants' wallets to calculate prices for certain sales for which price information is not available in the RR/BAYC NFT transaction data. I use the ETH to USD conversion to convert revenues and costs in ETH to USD. Except where specifically stated otherwise, I converted all revenue and costs in ETH to USD on a transaction-

---

[2] Ether, or ETH, is the native cryptocurrency of the Ethereum blockchain and the currency used for all transactions of RR/BAYC NFTs included in my analysis.

by-transaction basis, based on the conversion rate of ETH to USD on the date of each transaction.

9.  I provided the data and code used in my analysis to counsel for Yuga Labs, who then produced it to Defendants.

**Transactions Associated with Defendants' Wallets**

10. Defendants identified two wallets belonging to Mr. Ripps and one wallet belonging to Mr. Cahen. Based on a review of the transaction data related to these wallets, one of Mr. Ripps' two wallets is associated with the minting of every RR/BAYC NFT (the "minting wallet"). This finding is consistent with Mr. Ripps' deposition testimony that all RR/BAYC NFTs were minted from a wallet he controls. On Etherscan, Mr. Ripps has named his minting wallet "ryder-ripps.eth." Mr. Ripps' "minting wallet" address is 0x592814ff14e030b51f6087032db0f88f4214f254, according to his discovery responses and my review of Etherscan data. Mr. Cahen's wallet address is 0x7d2550161e8a31d0b9585bb9c88e63e9644af740, according to his discovery responses and my review of the Etherscan data. *See also* Proposed Final Pretrial Conference Order ¶ 6 (Stipulated Facts).

11. The second wallet that Mr. Ripps identified (the "non-minting wallet") is also relevant to my calculations, as it was involved in RR/BAYC NFT transactions after the mint, and as of the date of my report, it held RR/BAYC NFTs. Mr. Ripps' "non-minting wallet" address is 0xbaf287cb2281841d9f5ba929d7dde87048fcaf1b, according to his discovery responses and my review of the Etherscan data. *See also* Proposed Final Pretrial Conference Order ¶ 6 (Stipulated Facts).

12. The transaction data associated with the Defendants' wallets includes information such as a transaction ID (or "hash"), the date and time of the transaction, the address of the other wallet(s) associated with the transaction, and transaction fees (or "gas")[3] associated with the transaction. Each row of the dataset represents a

---

[3] Gas fees are transaction fees collected on the Ethereum blockchain to execute requested operations.

transaction from one address to another, where at least one of the addresses is a Defendant wallet address. For example, in instances in which Mr. Ripps transferred an RR/BAYC NFT to a buyer in exchange for ETH, the data displays one row for the transfer of the RR/BAYC NFT from Mr. Ripps' wallet to the buyer's wallet and another row for the transfer of ETH from the buyer's wallet to Mr. Ripps' wallet.

13. Etherscan was used to extract all transactions associated with the Defendants' wallets.

14. The wallet addresses associated with Thomas Lehman and Ryan Hickman also were used to identify transactions that occur between Defendants and their collaborators.

15. The following wallet addresses belong to Mr. Lehman. JTX-1 (Thomas Lehman Declaration) ¶ 3:

- 0xc650f01eb5b8f267ad3e18282e649afa0158b188;
- 0xc2172a6315c1d7f6855768f843c420ebb36eda97;
- 0xe64f07d9d151ea7286b8470c8f38691baf2c146e; and
- 0x5927b9c6dde237639bc45c08455fa8f6f1072aa0.

16. The following wallet address belongs to Mr. Hickman. JTX-72; JTX-1 (Thomas Lehman Declaration) ¶ 36:

- 0xF9C2Ba78aE44ba98888B0e9EB27EB63d576F261B.

**Transactions Associated with RR/BAYC NFTs**

17. Mr. Ripps testified in his deposition that the RR/BAYC NFT collection was minted on Foundation in mid-May 2022. Ripps Deposition Tr. at 60:21–22 (Yuga Labs' Motion for Summary Judgment Exhibit 38 (Dkt. 149-44)). Consistent with this testimony, Etherscan shows that on May 13, 2022, Mr. Ripps' minting wallet, ryder-ripps.eth, created a smart contract through Foundation. I refer to this contract as the "RR/BAYC minting contract."

18. The "Token Tracker" field associated with the RR/BAYC minting contract contains the NFT collection name "Bored Ape Yacht Club (BAYC)." While

this token tracker carries the exact same name as Yuga Labs' trademarked BAYC NFT collection, to avoid confusion, I refer to this token tracker as the "RR/BAYC token tracker."

19. The Etherscan page for the RR/BAYC token tracker displays all transactions associated with RR/BAYC NFTs. Etherscan was used to extract all transactions associated with RR/BAYC NFTs. Each of these transactions contains information on the minting, transfer, or burning of an RR/BAYC NFT. I also extracted from Etherscan a dataset of log events associated with RR/BAYC NFT transactions.

20. The transaction records I evaluated include, among other things, the date of the transaction, the name of the token, the smart contract(s) that were "interacted with" during execution of the transaction, the wallet(s) associated with the transaction, and the transaction fee(s) or "gas" costs associated with the transaction.

21. On May 13, 2022, RR/BAYC NFT #1 was minted by the RR/BAYC minting contract and deposited into Mr. Ripps' minting wallet.

22. Documents and testimony in this matter indicate that a second smart contract, created by Mr. Lehman, was also involved in the sale of RR/BAYC NFTs. Consistent with this evidence, Etherscan shows that on May 24, 2022, a smart contract called "RRBAYCRSVP" was created. Mr. Lehman admits he was involved in developing the RRBAYCRSVP contract. JTX-1 (Thomas Lehman Declaration) ¶ 3.

## **Disgorgement of Defendants' Profits**

23. I calculated Defendants' profits associated with the RR/BAYC NFT collection to be $1,589,455. I made this calculation based on transactions as of February 1, 2023. While I understand that Yuga Labs does not have the burden to prove profits or any other deductions from revenues, I calculated Defendants' profits associated with the wrongful conduct, based on available information.

24. Defendants' profits were generated by (1) Defendants' sales of the

RR/BAYC NFTs that they minted and began to sell in May 2022, (2) royalties or creator fees that Defendants collected from resales of RR/BAYC NFTs on secondary markets, and (3) the value of RR/BAYC NFTs that Defendants hold or did not mint.

25. Defendants at many times acknowledged the profitability of their RR/BBAYC NFT collection. *See, e.g.*, JTX-801 at 239 (Mr. Cahen to Mr. Lehman: "You have already made multiple 6 figures Bro!!!"); JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much money on this shit LMFAO").

26. Defendants' profits through February 1, 2023 of $1,589,455 likely underestimate Yuga Labs' economic harm, in terms of lost profits, at least because had Yuga Labs, as opposed to Defendants, minted additional NFTs with its marks, they likely would have sold at higher prices.

**Initial Sales of RR/BAYC NFTs**

27. To calculate profits from initial sales of RR/BAYC NFTs, I relied on the transaction and event logs data associated with RR/BAYC NFTs and transaction data associated with Defendants' wallets.

28. The RR/BAYC NFT transaction data indicates that 9,546 RR/BAYC NFTs were minted through the original Foundation smart contract. The data, as of February 1, 2023, also shows that 50 NFTs were burned (removed from circulation), leaving 9,496 RR/BAYC NFTs in the marketplace. Some of the burned NFTs generated profits for the Defendants before they were burned, and those profits have been included in my analyses.

29. A total of 9,415 RR/BAYC NFTs were transferred from Defendant wallets to non-Defendant wallets. Of these, 1,642 were sold for 0.1 ETH; 7,034 were sold for 0.15 ETH; 529 were given away for free; and 210 were sold at other prices ranging from 0.03 to 2.25 ETH.

30. Prior to Mr. Lehman and Mr. Hickman's involvement, the collection of ETH from RR/BAYC NFT buyers was not automated by a smart contract. In these early sales, buyers manually transferred ETH directly to Defendants' wallets, or the

transaction was completed through a marketplace.

31. Of the 9,415 RR/BAYC NFTs transferred to non-Defendant wallets, 2,387 were transferred to non-Defendant wallets without the use of the RSVP contract. Of these, 650 were sold through NFT marketplaces. The prices, transaction fees, and revenues to the seller for these marketplace transactions are observable in the event log data. The total revenue generated by these 650 RR/BAYC NFT sales is 110 ETH. Total gas cost, which includes minting gas and gas associated with the transfer of these RR/BAYC NFTs, is 5 ETH. The profits generated by these marketplace sales of RR/BAYC NFTs are therefore 105 ETH. NFT marketplaces often collect marketplace fees. These fees have been deducted from this revenue calculation.

32. The remaining 1,737 RR/BAYC NFTs that were transferred to non-Defendant wallets without the use of the RSVP contract were sold directly to buyers, outside of any NFT marketplace. In these transactions, the transfer of ETH to Defendants and the transfer of the RR/BAYC NFT to the buyer were two separate transactions, with no identifier to link them. The price the buyer paid can therefore not be ascertained from the RR/BAYC NFT transaction data alone. To calculate revenue associated with these sales, I also relied on the transaction data associated with Defendants' wallets. I compared the list of wallets that received an RR/BAYC NFT to the list of wallets that sent ETH to Defendants' wallets. In cases where the wallet receiving the NFT had transferred ETH to Defendants, I used a price of 0.1 ETH per an NFT. In cases where no ETH were transferred to Defendants, I assumed the NFT was given to the receiving wallet for free. These prices are consistent with Mr. Ripps' testimony that "the first few were free. And then, maybe 0.1 ETH." Ripps Deposition Tr. at 194:11-12. Finally, I made an exception for RR/BAYC NFTs transferred to non-Defendants Mr. Lehman and Mr. Hickman: I made the conservative assumption that RR/BAYC NFTs transferred to them did not generate revenue for Defendants, even though in some cases Defendants appear to have

received ETH in exchange for these transfers.

33. Of the 1,737 RR/BAYC NFTs transferred without the use of the RSVP contract and outside of any NFT marketplace, I observe in the data that 529 were given away for free. According to Defendants' discussions, some of the RR/BAYC NFTs given away for free were done so for marketing. *See, e.g.*, JTX-803 at 59 ("i think its a great idea to give lauren a budget of 15 apes and see what she can do to help promote this and get the rsvps filled . . . paying in apes legit is free"); *id.* ("karbonbased.eth - this guy is helping promote so far the only guy we are using, he has been tweeting - we owe him 5 apes"); JTX-804 at 30 (Mr. Ripps: "is there a good method of me transferring to people apes [] for promo"). I calculate the revenues associated with the remaining 1,208 NFTs to be 121 ETH. There were no marketplace fees associated with these direct transfers. However, total gas costs, including minting gas and gas associated with the transfer of RR/BAYC NFTs, are 10 ETH. The profits generated by these direct transfers of RR/BAYC NFTs are therefore 111 ETH.

34. Therefore, together, I estimate the revenue from "manual" sales (i.e., sales that went only through the RR/BAYC minting contract but not the RSVP contract) to be 231 ETH. The total gas costs, which include minting gas and gas associated with the transfer of RR/BAYC NFTs, are 15 ETH. The profits generated by these "manual" sales are therefore 216 ETH.

35. While the minting of the RR/BAYC NFTs continued to be handled by the RR/BAYC minting contract, the RSVP contract automated the process of triggering the RR/BAYC minting contract to mint the requested RR/BAYC NFT, transferring the RR/BAYC NFT to the buyer's wallet, and collecting ETH from the buyer.

36. The data shows 7,028 transfers of RR/BAYC NFTs that went through the RSVP contract. Consistent with testimony in this case, the RR/BAYC transaction data shows that the price of NFTs transferred through the RSVP contract was 0.15

ETH. This is also observable in the computer code behind the RSVP contract where the apeSalePrice, which represents the price of each RR/BAYC NFT, is set at 0.15 ETH.

37. I calculate the revenue from these 7,028 RR/BAYC NFTs priced at 0.15 ETH each to be 1,054 ETH. Total gas, including minting gas and gas associated with the transfers of RR/BAYC NFTs, for these sales was 74 ETH. The profits generated by these RSVP contract sales of RR/BAYC NFTs are therefore 980 ETH.

38. I calculate that the total revenue from initial sales totaled 1,285 ETH. This includes the revenue from sales that went only through the RR/BAYC minting contract (231 ETH) and sales that went through the RR/BAYC minting and RSVP contracts (1,054 ETH).

39. I calculate that the total gas costs totaled 89 ETH. This includes the gas from sales that went only through the RR/BAYC minting contract (15 ETH) and sales that went through the RR/BAYC minting and RSVP contract (74 ETH).

40. Profits from these initial sales, therefore, were 1,196 ETH in total, broken down as follows:

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] − [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | 0 | 3 | (3) |
| 0.10 ETH | 1,642 | 162 | 10 | 152 |
| 0.15 ETH | 7,034 | 1,055 | 74 | 981 |
| Sold at Other Prices | 210 | 68 | 2 | 66 |
| | | | | |
| **Total** | **9,415** | **1,285** | **89** | **1,196** |

41. I converted revenue and costs in ETH to USD on a transaction-by-transaction basis, based on the conversion rate of ETH to USD on the date of each transaction, broken down as follows:

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] − [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | $0 | $5,611 | ($5,611) |
| 0.10 ETH | 1,642 | $322,536 | $19,404 | $303,132 |
| 0.15 ETH | 7,034 | $1,507,330 | $106,610 | $1,400,720 |
| Sold at Other Prices | 210 | $91,006 | $3,484 | $87,582 |
| **Total** | **9,415** | **$1,920,933** | **$135,109** | **$1,785,823** |

42. The revenues and costs I calculate are consistent with Defendants' and their collaborators' own estimates. In a text exchange between Mr. Lehman and Mr. Cahen on August 31, 2022, Mr. Lehman estimated the revenue associated with the initial sales of RR/BAYC NFTs to be 1,337.9 ETH. JTX-918 at 51. His calculation assumed all RR/BAYC NFTs were sold at either 0.1 or 0.15 ETH. Mr. Lehman's estimate is in line with my revenue calculation of 1,285 ETH, and the minor discrepancy likely stems in part from Mr. Lehman not fully accounting for RR/BAYC NFTs that Defendants gave away for free and RR/BAYC NFTs sold for prices other than 0.1 ETH or 0.15 ETH. In the same text exchange, Mr. Lehman estimated the total gas cost to be 85.5 ETH, which also generally aligns with my gas calculation of 89 ETH.

43. Neither Defendant provided information sufficient to identify any refunds issued to RR/BAYC NFT purchasers. *See* Mr. Ripps' response to interrogatory no. 15; Mr. Cahen's response to interrogatory no. 3. However, I observed in the transaction data that certain transactions were refunded through the RefundIssued and RSVPCanceled functions in the RSVP smart contract.

44. When calculating Defendants' profits, transactions that were refunded through Defendants' RSVP smart contract were omitted. Specifically, transactions that were refunded through the RefundIssued and RSVPCanceled functions in the RSVP smart contract were not included in my calculation of profits. To my knowledge, Defendants have not produced any records of other refunds related to the sale of RR/BAYC NFTs.

**Resales of RR/BAYC NFTs**

45. When NFTs are resold in NFT marketplaces, creator fees can accrue to the creator of that NFT.

46. The transaction data for RR/BAYC NFTs and associated event logs show that 3,023 of the RR/BAYC NFTs were resold on the secondary market and generated creator fees for Defendants. Some of these were resold multiple times. Mr. Ripps acknowledged that he earned creator fees from resales on two NFT marketplaces: LooksRare and Foundation. *See* JTX-1045.

47. While Mr. Ripps testified that "we did not want to accept [creator fees] for RR/BAYC, I didn't think it was in the spirit of the art piece," he has acknowledged that Defendants did earn creator fees. Mr. Ripps testified, "I think it was around 70 ETH from LooksRare royalty of my artwork, RR/BAYC went into my wallet, something like that." Ripps Deposition Tr. at 89:17–19, 90:13–16. He also stated in a tweet: "looksrare is not letting me edit the royalty, neither [is] foundation . . . ." JTX-1045. And, Mr. Lehman stated in his declaration: "It is my understanding that at least Ripps also received royalties from the re-sale of RR/BAYC NFTs through NFT marketplaces Foundation and Looksrare." JTX-1 (Thomas Lehman Declaration) ¶ 37.

48. The RR/BAYC NFTs transaction and event logs data show that Defendants earned 65 ETH in creator fees on LooksRare, and 25 ETH in creator fees on Foundation. In total, Defendants earned 91 ETH from creator fees. Using the ETH to USD conversion rates as of the date of each resale, these creator fees were approximately $117,309.

49. As of February 6, 2023, the date of my report, Defendants estimated that they earned 70 ETH from LooksRare creator fees, which is higher than my calculation of 65 ETH. JTX-103.

50. My calculation, which was as February 1, 2023, does not fully capture the total profits earned by Defendants from resales of RR/BAYC NFTs since then,

and it does not capture future potential profits and other benefits that would accrue to Defendants as purchasers continue to buy and sell RR/BAYC NFTs.

### RR/BAYCs Not Transferred to Third Parties

51.  Of the 9,546 RR/BAYC NFTs minted, as of February 1, 2023, Defendants held 136 RR/BAYC NFTs in their wallets.  As of February 1, 2023, Defendants had not minted the remaining 454 RR/BAYC NFTs in the collection, but still had the ability to do so under the smart contract.

52.  While these RR/BAYC NFTs may not have directly generated revenue for Defendants, they still have value.  For example, one of the Defendants, Mr. Cahen, testified that the value of the held RR/BAYC NFTs "is pretty much the same as when they were originally being produced," which is "anywhere between .1 Ethereum and .15 Ethereum." Cahen Deposition Tr. at 255:25–256:7.

53.  I believe 0.1 – 0.15 ETH is a reasonable and conservative estimate of value of these RR/BAYC NFTs for two reasons.

54.  First, the floor price of RR/BAYC NFTs secondary market as of January 27, 2023 was 0.115 ETH, which is consistent with Mr. Cahen's estimate of 0.1 – 0.15 ETH.  JTX-1616.  Were Defendants to sell the 590 RR/BAYC NFTs that they hold or they did not mint on the secondary market at January 27's floor price, they would generate 65 ETH in profits.

55.  Second, Defendants could have sold each one of these RR/BAYC NFTs along with the others they sold. Assuming (1) each held ape had been sold at the time of mint at the price Defendants were charging at that time and (2) each ape they did not mint was sold today for 0.15 ETH, they would generate 79 ETH in profits.

56.  I calculate the value of the RR/BAYC NFTs that Defendants hold or have not minted as 65 ETH, the more conservative of the above two valuations. Using the ETH to USD conversion rate as of February 1, 2023 ($1,641.61 to 1 ETH), this equates to $106,055.

57.  These profit calculations deduct (1) gas costs associated with the

minting of the held RR/BAYC NFTs and (2) estimated gas costs associated with the minting of RR/BAYC NFTs that Defendants have not minted. I estimate the costs associated with each of the 454 apes the Defendants have not minted to be the average minting gas costs of the 9,546 minted RR/BAYC NFTs.

### Defendants' Total Profits

58. Totaling the calculations above, I determined that Defendants earned $2,009,188 from (1) the profits collected from the initial sale of minted RR/BAYC NFTs, (2) the profits collected from resales of RR/BAYC NFTs on the secondary market in the form of creator fees, and (3) the value of RR/BAYC NFTs that Defendants hold or did not mint, broken down as follows:

|  | Profits |
|---|---|
| Profits from Initial Sales of RR/BAYC NFTs | $1,785,823 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| **Total** | **$2,009,188** |

59. Documents and testimony from discovery indicate that Mr. Lehman and Mr. Hickman each accrued 15 percent of profits from the initial sales of RR/BAYC NFTs from the RR/BAYC RSVP contract. JTX-1 (Thomas Lehman Declaration) ¶¶ 33-34; JTX-103. Consistent with this evidence, the source code of the RSVP contract shows that 30 percent of the profits from sales of NFTs that went through the RSVP contract accrued to Mr. Lehman and Mr. Hickman. I calculate their actual earnings to be $419,733. The remaining $1,366,090 accrued to Defendants.

60. After adjusting for payments to Mr. Lehman and Mr. Hickman, Defendants' total profits are $1,589,455, broken down as follows:

|  | Defendants' Profits |
|---|---|
| Profits from Initial Sales of RR/BAYC NFTs | $1,366,090 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| **Total** | **$1,589,455** |

61. Based on my review of evidence produced in this case and blockchain

data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks. RR/BAYC NFTs were reserved on Mr. Ripps' website, rrbayc.com; other RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation, which used the BAYC Marks (JTX-29, JTX-670); and direct sales without the use of either rrbayc.com or an NFT marketplace still involved Defendants' use of the BAYC Marks on the Etherscan token tracker (JTX-1146), in the RR/BAYC smart contract, and in their promotions. The NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market.

**Additional Unjust Enrichment and Harm Caused by Defendants' Conduct**

62. In addition to the measures of harm quantified above, Defendants' wrongful conduct caused (and continues to cause) unjust enrichment to Defendants and harm to Yuga Labs that are significant, yet more difficult to quantify.

63. The confusion created by the wrongful conduct caused harm to Yuga Labs' business that I have not attempted to quantify. Evidence of this may manifest in multiple ways, including decreased interest in and sales of authentic BAYC NFTs and BAYC branded merchandise, resulting in loss of creator fees and other revenues for Yuga Labs.

64. Testimony from Yuga Labs' former CEO indicates that the wrongful conduct likely resulted in Yuga Labs' loss of at least one valuable partnership opportunity with another firm. Muniz Deposition Tr. at 156:5–18. While I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships, the resulting harm to Yuga Labs would consist of, at a minimum, the loss of business partnerships and the associated profits to Yuga Labs from such partnerships.

65. The wrongful conduct also likely harmed Yuga Labs' goodwill. Assuming that Yuga Labs is similar to other firms, the value of its goodwill could be

up to 30% of its assets. I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill, but directionally, it would decrease the value. *See* JTX-722 (Expert Report of Jonah Berger, PhD) at 4–5 (finding "minting and sales of RR/BAYC NFTs using Yuga Labs' marks harmed the brand equity of BAYC," "[h]arm to BAYC brand equity can reduce BAYC's brand value," and "[a] decrease in BAYC brand value would likely cause a decrease in Yuga Labs' sales, profits, and future earnings associated with the brand").

66. Ethereum blockchain data suggests that some consumers have treated RR/BAYC NFTs as replacement goods for BAYC NFTs, indicating that in at least some instances, Defendants' gain came at Yuga Labs' loss. For example, on June 26, 2022, wallet address 0x4a7e8dcb760c1068bb6a5828c0d0a57a6143daf0 bought an RR/BAYC NFT and later sold an authentic BAYC NFT bearing the exact same image as the RR/BAYC NFT that was purchased. JTX-1039 (image underlying the RR/BAYC NFT as shown on LooksRare); JTX-1040 (image underlying the authentic BAYC NFT as shown on OpenSea); JTX-1041; JTX-1042. These transactions suggest that this individual saw the RR/BAYC NFT as a cheaper replacement good for the authentic BAYC NFT. This type of behavior demonstrates that RR/BAYC NFTs have the ability to draw consumers away from Yuga Labs.

67. Defendants also benefited from their conduct in ways that are not quantified by my profit analysis.

68. Defendants were unjustly enriched in the form of avoided costs, as they were able to "free ride" on investments that Yuga Labs made to develop the marks that the Defendants infringed.

69. In addition to the 3,023 RR/BAYC NFTs resales which generated profits for Defendants, there have also been many resales of RR/BAYC NFTs where no creator fees were generated but from which Defendants may still benefit. For example, I observed that as of February 1, 2023, RR/BAYC NFT #1231 had been

sold 14 times on multiple marketplaces that did not generate creator fees for Mr. Ripps, including OpenSea, X2Y2, SushiSwap, and GemSwap, with prices ranging from 0.1 ETH to 1.6 ETH. Similarly high sales volumes can be observed for RR/BAYC NFT #1332, #1008, #998, and others. As of February 6, 2023, one NFT sales tracker (NFTGO) calculated nearly 6,000 ETH in total sales of RR/BAYC NFTs, which equates to almost $10 million using the ETH to USD conversation rate as of February 1, 2023 ($1,641.61 to 1 ETH). The numerous transactions involving these RR/BAYC NFTs likely indirectly benefit Defendants, as they create more visibility for the RR/BAYC NFT collection on secondary markets and allow Defendants to remain relevant and use engagement to obtain more followers.

70. As another example, Defendants have publicly discussed the RR/BAYC NFT collection on Twitter and other channels, and this discussion has been noticed and picked up by news media. This publicity may have led, or may lead in the future, to additional revenue streams to enrich Defendants, including other NFT sales. *See, e.g.*, JTX-1171, JTX-1567.

71. Even since the beginning of this litigation, Defendants have continued to promote RR/BAYC NFTs, promote their planned Ape Market NFT marketplace, and advertise their sales. *See, e.g.*, JTX-1048, JTX-1315, JTX-1613, JTX-1614, JTX-1615. Defendants have also acknowledged in public posts that their RR/BAYC NFTs have caused irreparable harm to Yuga Labs or that they anticipate their actions will cause the company to fail. *See, e.g.*, JTX-1566, JTX-1568. Further promotion and sales result in yet additional benefits to Defendants and harm to Yuga Labs.

**Economic Infeasibility of Removing RR/BAYC NFTs from the Market**

72. As part of my analysis, I also considered a hypothetical measure Yuga Labs could take to mitigate the harm from Defendants' trademark infringement: to acquire, and then burn, all RR BAYC/NFTs. This hypothetical scenario involves economic uncertainty because some third-party holders of RR/BAYC NFTs (including the Defendants themselves) would hold out for higher prices. Since these

third-party holders cannot be forced to sell, a full buyback would likely be impossible. Nonetheless, I can estimate a "floor" for what a buyback would cost <u>at minimum</u>. To do so, I used the floor price[4] of RR/BAYC NFTs as of February 3, 2023 (approximately 0.115 ETH) and multiplied by the total number of existing RR/BAYC NFTs (9,496) to calculate a low-end market price of the RR/BAYC NFT collection. This calculation resulted in 1,092 ETH or $1,792,704 (based on the ETH to USD exchange rate as of February 1, 2023 ($1,641.61 to 1 ETH).

73. Subsequently, on June 6, 2023, Mr. Cahen posted this estimate to Twitter, which prompted RR/BAYC holders to comment that they would hold out for a price higher than the market value of the RR/BAYC NFTs. JTX-1617. Mr. Ripps retweeted the post to his audience as well. JTX-1620. I reviewed the comments and retweets regarding the hypothetical buyback effort. Twitter users claiming to hold RR/BAYC NFTs posted comments on Twitter in response to Defendants' tweets stating that they would only be willing to sell their RR/BAYC NFTs if offered anywhere between 10 and 120 ETH (between $18,374 and $220,484 at the then-current conversion rate of $1,837.37 per ETH). The price and trading volume of RR/BAYC NFTs also increased immediately following Mr. Cahen's tweet. JTX-1623–JTX-1625 (NFTGO overview and analytics pages for RR/BAYC NFTs as of June 7, 2023); *see also* JTX-1621–JTX-1622 (NFTGO overview and analytics pages for BAYC NFTs as of June 7, 2023), JTX-1626 (OpenSea analytics page for BAYC NFTs as of June 7, 2023).

74. This new evidence confirmed that the floor value for a hypothetical buyback significantly underestimated the actual cost of such an exercise, as I originally opined. Based on these materials and available market data, my assignment was to estimate a "ceiling" for what a buyback would cost. I determined the cost to purchase and destroy all RR/BAYC NTFs could even be higher than

---

[4] A "floor price" is the lowest market price for any NFT in a given NFT collection at a given time.

$797,183,838.  This figure is based on the then-current floor price of authentic BAYC NFTs (45.69 ETH, or $83,949 based on the then-current conversion rate of $1,837.37 per ETH), which was lower than the indicated willingness to accept by at least some holders of RR/BAYC NFTs.  This calculation assumes that holders of RR/BAYC NFTs would be willing to accept a buyback offer at a price equivalent to an authentic BAYC NFT.

75.     The wide range in the floor and the ceiling that I calculated for the hypothetical buyback underscores the economic reality — which is that Yuga Labs cannot force any holder of an RR/BAYC to sell that NFT to Yuga Labs.  Thus, given the behavior and comments following Mr. Cahen's June 6 tweet (and subsequent tweets on this topic), it is my opinion that there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or ensuring that Yuga Labs receives adequate monetary compensation for the harm it has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace, which supports Yuga Labs' position that the harm caused by Defendants' infringing NFTs is irreparable through economic means alone.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on July 16, 2023.

_____
Lauren R. Kindler