ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:   650.988.8500
Facsimile:   650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC., | Case No.: 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **DECLARATION OF JONAH BERGER** |
| v. | |
| RYDER RIPPS, JEREMY CAHEN, | Trial Date:  July 31, 2023 |
| Defendants. | |

FENWICK & WEST LLP
ATTORNEYS AT LAW

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA  90401
Telephone:   310.434.4300

DAVID Y. SILLERS (*admitted pro hac vice*)
david@clarelocke.com
KATHRYN HUMPHREY (*admitted pro hac vice*)
kathryn@clarelocke.com
MEGAN L. MEIER (*admitted pro hac vice*)
megan@clarelocke.com
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA  22314
Telephone:   202.628.7400

Attorneys for Plaintiff
YUGA LABS, INC.

# I.  QUALIFICATIONS

1.       My name is Jonah Berger. I am a Marketing professor at the Wharton School at the University of Pennsylvania. I received my Ph.D. in Marketing from the Graduate School of Business at Stanford University and my B.A. in Human Judgment and Decision Making also from Stanford University.  I have been retained by Fenwick & West LLP, counsel for Yuga Labs, Inc. ("Yuga Labs"), in the matter of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*[1] to assess whether the minting and sales of RR/BAYC non-fungible tokens ("NFTs") caused harm to Bored Ape Yacht Club ("BAYC") brand equity.  I submitted a Rule 26 report (JTX-722) in this matter and relied on the materials cited in my report and listed in my offer of proof (Dkt. 267) in forming my opinions.  If called as a witness, I could testify competently to the facts set forth herein.

2.       My research focuses on consumer behavior, social media, social influence, and natural language processing. This work examines why people make the choices they do, how they use possessions to communicate identity, and how automated textual analysis (*e.g.*, dictionaries, topic modeling, and machine learning) can help extract behavioral insight from textual data. I have published over 60 articles in top-tier academic journals in marketing, consumer psychology, and other disciplines including in the *Journal of Marketing*, *Journal of Marketing Research*, *Journal of Consumer Research*, and *Journal of Consumer Psychology*. I have also written three best-selling books on these topics that have been printed in over 30 different languages. In addition, I currently serve as an Associate Editor at the *Journal of Marketing* and served as an Associate Editor at the *Journal of Marketing Research* from 2012 to 2020.

3.       I have received numerous awards for my research and writing. In 2014, I received the American Marketing Association's Leonard L. Berry

FENWICK & WEST LLP
ATTORNEYS AT LAW

---

[1] I refer to Mr. Ryder Ripps and Mr. Jeremy Cahen collectively as "Defendants."

Marketing Book Award, which is given for a book that has had a significant impact in marketing and related sub-fields. In 2017, I received the *Journal of Marketing Research*'s William F. O'Dell Award for the article that made the most significant, long-term contribution to marketing theory, methodology, and/or practice. I was recognized from 2009 to 2013, in 2017, and again in 2021 by the American Marketing Association as a top five most productive researcher in marketing. The American Management Association named me one of the top 30 leaders in business and Fast Company magazine named me one of the most creative people in business.

4.      In addition to my research, I have extensive experience teaching and consulting on these topics. I have won numerous teaching awards from the Wharton School and have consulted with hundreds of companies, including many Fortune 500 companies and foundations, such as Apple, Amazon, GE, Google, Microsoft, and Nike, and luxury brands such as LVMH and Luxottica Group. This work has focused on issues related to marketing strategy, branding, and go-to-market strategy.

5.      Yuga Labs alleges that Defendants Ryder Ripps and Jeremy Cahen have "flood[ed] the NFT market with [a] copycat NFT collection [that uses] the original Bored Ape Yacht Club images."[2] As a result of the introduction of these RR/BAYC NFTs, Yuga Labs alleges that Defendants created confusion in the marketplace.

## II.     SUMMARY OF OPINIONS

6.      Brand equity refers to the additional value endowed to a company's products and services owing to them being from that particular brand. Brand equity is derived from brand awareness, perceived quality, and brand associations or perceptions that consumers have of that brand. Brand equity is established using significant time, money, and effort. Brand equity can be damaged through negative

---

[2] *See also* JTX-1557; JTX-36; JTX-138, JTX-671; JTX-690; JTX-689.

FENWICK & WEST LLP
ATTORNEYS AT LAW

associations. This is especially true of symbolic goods, or things consumers purchase for their prestige or status, such as BAYC NFTs.

7. Authentic BAYC NFTs are a high-end symbolic good. Their values are derived not just from the artwork and endowed features of each unique NFT, but also from associations with the BAYC brand.

8. The minting and sales of RR/BAYC NFTs using Yuga Labs' marks[3] harmed the brand equity of BAYC for multiple reasons.

 i. First, the introduction of RR/BAYC NFTs increased the perceived supply and decreased the perceived exclusivity of authentic BAYC NFTs. The impact of their introduction is thus akin to the negative impact that high-end brands suffer from the introduction of counterfeit goods.

 ii. Second, there is evidence of marketplace confusion following the minting and sales of RR/BAYC NFTs. The artwork associated with RR/BAYC NFTs look visually identical to authentic BAYC NFTs and the NFTs were named similarly. Thus, it was likely difficult for consumers to tell them apart.

 iii. Third, Defendants' minting and sales of RR/BAYC NFTs led to a shift in discourse regarding the BAYC brand. Specifically, following Defendants' initial minting of RR/BAYC NFTs, discussion of the BAYC brand began to include reference to RR/BAYC NFTs or Mr. Ripps. Automated textual analysis illustrates that consumer attitudes toward the BAYC brand became less positive and more negative during Defendants' minting of RR/BAYC NFTs. Because consumer attitudes are

---

[3] I understand that Yuga Labs' marks include BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and Ape Skull Logo trademarks.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  directly related to brand equity, Defendants' minting of

2  RR/BAYC NFTs likely damages BAYC's brand equity.

3       9.     Harm to BAYC brand equity can reduce BAYC's brand value.

4  Products associated with the BAYC brand account for the vast majority of Yuga

5  Labs' earnings and profit. A decrease in BAYC brand value would likely cause a

6  decrease in Yuga Labs' sales, profits, and future earnings associated with the brand.

7  **III.    BRAND EQUITY IS A VALUABLE ASSET**

8       10.    Brands can create value for companies. To develop brands, companies

9  define brand elements (*e.g.*, name, logo, products, services) that are desirable in the

10  minds of consumers. This includes defining the products and services the brand will

11  offer and developing marketing communications strategy to raise brand awareness,

12  communicate information about products and services, and convey desired

13  attributes. Once a company successfully develops desirable brand associations,

14  these associations can serve as important differentiators from other brands, and the

15  value of this is reflected in brand equity.

16       11.    Brands with high brand equity tend to have various marketplace

17  advantages, including high customer loyalty and the ability to generate price

18  premiums for associated products and services. These advantages confer benefits to

19  the companies that hold high equity brands. Companies holding brands with high

20  brand equity, for example, usually have (i) greater market share, (ii) better chances

21  of expanding these brands into new markets, (iii) better financial performance, and

22  (iv) greater ease in generating successful marketing partnerships. Brand equity is

23  therefore a valuable asset.

24       **A.    The Importance of Brands and Their Marketing**

25       12.    The concept of a "brand" has been around for centuries, and while it is

26  often associated with products and services, it is much broader, encompassing

27  things like political candidates (e.g., Ronald Reagan), ideas (e.g., fair trade), and

28  even countries (e.g., France has a different brand, or associations, than Canada

FENWICK & WEST LLP
ATTORNEYS AT LAW

does). A brand represents a way to distinguish a company's goods or services from those of its competitors. More formally, according to the American Marketing Association, a brand is a "name, term, design, symbol, or any other feature that identifies one seller's goods or service as distinct from those of other sellers."

13.     A brand is also a key component of a company's marketing. To develop and maintain a brand, and ultimately benefit from it, a company utilizes the marketing mix which includes what products or services they offer, how they deliver those products or services to consumers, what and how they communicate about those products and services, and what the company charges for those products or services.

14.     In the subsections that follow, I first provide a high-level overview of brands and branding. I then discuss basic principles of marketing and how brands are marketed.

### 1.     Brands and Branding

15.     A company's brand is among its most valuable and important assets. Since the brand serves as a differentiator between one company's products or services and another's, the brand engenders awareness, reputation, and prominence in the marketplace. As a result, brand is at the heart of a company's marketing strategy.

16.     Brands convey or create differentiation. They "have dimensions that differentiate [a product or service] in some way from other products [or services] designed to satisfy the same need." This differentiation can be tangible (*e.g.*, a brand that makes the fastest computers) or intangible (*i.e.*, what the brand represents, stands for, or is associated with).

17.     Brands are established through a process called branding. Branding includes the development of things like a brand name, logo, or aesthetic that the company wishes to be associated with. Branding allows the company to create a brand identity, and attempt to shape brand perceptions, in an effort to develop and

FENWICK & WEST LLP
ATTORNEYS AT LAW

improve brand equity. Through branding, companies try to shape brand associations or the "brand-related thoughts, feelings, perceptions, images, experiences, beliefs, [and] attitudes" that consumers have with a brand. When someone mentions a car brand like Volvo, for example, consumers may think of safety, and when someone mentions a brand like Honda, they may think of durability or value.

18.     Branding is of particular importance for technology-related products, such as NFTs. A technology product's brand inextricably becomes linked to the technology that it develops, meaning that the consumer develops a long-term, positive association with the firm's technological prowess. Recent academic literature describes how companies have developed brands linked to exclusivity, highly engaged communities, and access to special events (live and virtual). As interest in NFTs has grown, so too has interest in using newly minted NFTs to generate interest for a brand, enhance brand value, and tap into the benefits of brand equity described later in this report.

### 2.     Brand Marketing

19.     Companies often develop brand associations through the "marketing mix." Frequently referred to by the mnemonic of the "4Ps," which includes product, place, promotion, and price.

    i.     Product is used to describe a company's products or services (*i.e.*, what it sells) and the consumer's experience with that product or service;

    ii.     Place describes how consumers gain access to that product or service (*i.e.*, whether it is sold in a big box retailer or through the company's website);

    iii.     Promotion refers to marketing communications or how the company informs customers and potential customers about its products or services;

FENWICK & WEST LLP
ATTORNEYS AT LAW

iv.   Price refers to how much the company charges for its products and services.

20.   Each of the 4Ps helps develop consumer associations with a brand, and in turn, contributes to brand equity.

i.   Product: Through the "product" element of the marketing mix, a company can "design, manufacture, market, sell, deliver, and service products in a way that creates a positive brand image with strong, favorable, and unique brand associations." As discussed, these associations may be related to function or performance, or things like prestige, status, or identity signaling. If a company makes a good product that many people like, that company's brand equity should be bolstered. Similarly, if a product or service makes consumers feel special, or makes them look good to their peers, this also bolsters brand equity.

ii.   Place: The "place" element of the marketing mix incorporates all of the ways a company distributes its product or services. This includes direct channels, or those owned by the company themselves (*e.g.*, Nike selling on Nike.com), as well as indirect channels or those owned by others (*e.g.*, Nike selling at a retailer like Foot Locker). Companies often carefully consider how to distribute their products or services based on how it will shape brand equity. Direct channels allow for greater control of how the products and brand are portrayed. When Nike sells its shoes on Nike.com, for example, it controls exactly how the shoes appear, what they appear next to, and the information that appears with them. Indirect channels involve sales through intermediaries (*e.g.*, retailers), and thus the intermediary's brand associations can shape how the product or service's brand is perceived. For

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

example, La Mer sells luxury cosmetics at high-end retailers, such as Sephora or Bluemercury. Relative to other brands that offer skincare products, La Mer's products are priced in a higher bracket (*e.g.*, 1 oz. of Crème de La Mer is approximately $200). Even if a retailer that typically stocks "drugstore" cosmetics, such as Walmart, was willing to sell La Mer products at standard retail prices, La Mer may not want to be associated with the everyday low prices for which the Walmart brand is best known.

iii.   Promotion: The "promotion" element of the marketing mix includes all types of marketing communications such as advertising, salesforce, public relations, and direct marketing. These communications "represent the voice of the brand and are a means by which the brand can establish a dialogue and build relationships with consumers." Advertisements, or other types of marketing communications not only raise awareness of the brand, but they shape how those products or services are perceived. Apple advertisements, for example, not only raise awareness of the Apple brand and showcase its recently released products, but may also attempt to shape how the general public perceives the brand. For instance, Apple may use such advertisements to convey to the public that its products are innovative, compatible with many lifestyles, and high quality.

iv.   Price: Prices not only shape demand, they also shape how brands are perceived. Prices convey perceived value, quality, and even the target segment the company is going after. According to the American Marketing Association, some brands "might raise the price of their products to give the appearance of being a luxury to appeal to an affluent audience." Other brands "might lower the

price of a newer product or offer a discount to entice consumers into buying or trying the product."

21.     To the extent a brand is successful in developing brand associations among consumers through its marketing mix, these brand associations serve as important differentiators and the value of this differentiation is reflected in brand equity. I discuss brand equity and characteristics of brands with high brand equity, in depth below.

**B.      Brand Equity and Characteristics of Brands with High Brand Equity**

**1.      Brands with High Brand Equity Have Marketplace Advantages**

22.     Brand equity consists of the effects of marketing that are uniquely attributable to a brand and explains why marketing drives different outcomes for branded products or services as compared to unbranded ones. Because the power of brand depends on consumers' perception of the brand, brand equity is the "differential effect of brand knowledge on consumer response to the marketing of the brand." Consequently, higher brand equity is synonymous with greater brand strength in the eyes of consumers. In contrast, if a brand does not successfully create specific customer associations, the brand is weaker and has lower brand equity.

23.     To develop brands, companies try to associate various aspects of the brand (e.g., name, logo, products, and services) with things that are desirable in the minds of their consumers or customers. This includes things like generating identifying brand marks (*e.g.*, the Nike swoosh), carefully defining what their products and services offer to consumers, and developing marketing communications to raise brand awareness, communicate information, and convey desired attributes.

FENWICK & WEST LLP
ATTORNEYS AT LAW

24.     As noted, brands with high brand equity (referred to below as "strong brands") confer many benefits to the company. I expand on these aspects of strong brands below.

25.     First, strong brands typically have more loyal consumers. According to Erdem and Swait (1998), this loyalty stems from a strong brand's ability to "signal product positions credibly." This credibility impacts consumer consideration sets as well as what they end up purchasing. Put differently, strong brands have more credibility in the eyes of consumers and these brands "signal[] a certain level of quality so that satisfied buyers can easily choose the product again," enhancing brand loyalty. This benefits the company because "[b]rand loyalty provides predictability and security of demand for the firm, and it creates barriers to entry that make it difficult for other firms to enter the market."

26.     Second, products or services associated with strong brands tend to command a price premium. Given their brand equity, for example, Crest and Colgate are able to charge 25 percent and 21 percent higher prices, respectively, compared to otherwise identical toothpastes. Similarly, Scope and Listerine are able to charge 14 percent and 12 percent higher prices, respectively, compared to otherwise identical mouthwashes. In other words, even when choosing among products or services that satisfy the same need, consumers are willing to pay more for the good or service of a strong brand. Consumers also tend to be less sensitive to price increases for products or services associated with a strong brand and are also less likely to switch to competitors' brands when those brands' products' or services' prices decrease.

27.     Third, strong brands tend to garner higher market shares. In the study of toothpaste and mouthwash described above, for example, Park and Srinivasan (1994) find that there are substantial market share premiums associated with strong brands. The authors find that Colgate's market share is 127 percent higher than it would be "if it had obtained the same [brand] equity as the store brand holding the

FENWICK & WEST LLP
ATTORNEYS AT LAW

equity measures of other brands unchanged." Similarly, Crest's market share is 175 percent higher than it would be if it had the same brand equity as the store brand. That is, brands with strong brand equity achieve higher market shares than do brands with weaker brand equity.

28.     Fourth, the literature recognizes that strong brand equity helps companies expand into new categories or markets. Stronger brands "can extend more successfully into more diverse categories than other brands." For example, the Coca-Cola brand expanded into diet colas (Diet Coke, Coke Zero) as well as into sparkling waters (AHA Sparkling Water), the Bic brand expanded from pens and writing utensils to lighters and razors, and Caterpillar extended from heavy machinery into shoes, clothing, and accessories.

29.     Fifth, stronger brands are more able to benefit from licensing agreements with other companies; in exchange for a fee or royalty, the licensee is able to use the brand's trademarks and charge more for its product because of consumers' association of the trademark with the brand. Market research has established that "[s]hoppers are willing to pay more for licensed products, apparently because of the reassurance famous trademarks give." According to one survey, shoppers were willing to pay 50 percent more for cookware that used the Julia Childs name sold through a licensing agreement compared to otherwise identical cookware that was not sold through this licensing agreement.

30.     Sixth, strong brands are also able to leverage brand equity to create marketing partnerships more generally. Such partnerships may allow the company to leverage brand equity from a partner in a market or target segment where its own brand has lower awareness or equity may be limited. To create a successful marketing partnership, each brand should have adequate brand awareness, sufficiently strong, favorable, and unique associations, and positive consumer judgments and feelings on its own. In fact, Keller (2013) describes as a "necessary condition" for successful marketing partnerships that each brand separately has

FENWICK & WEST LLP
ATTORNEYS AT LAW

strong brand equity. One example of a successful marketing partnership is that which occurred between Disney and McDonald's; from 1996–2006, McDonald's held exclusive global rights within the fast food industry to promote Disney movies, TV shows, and theme parks. McDonald's drew into its restaurants customers interested in the Disney brand, while Disney benefited from the advertising McDonald's customers would see in the fast food chain's restaurants. Companies with lower brand equity might find it harder to find marketing partners or to sustain valuable marketing partnerships.

31.     Finally, strong brands also tend to experience financial benefits. Academic literature, for example, finds that companies with a strong brand will be more highly sought after by equity investors than companies with a lesser-known brand. Firms that develop stronger brands also tend to be more profitable than firms with weaker brands. Put differently, strong brand equity is financially valuable.

### 2.     Brands Associated with Prestige, Luxury, or Status May Have Particularly High Brand Equity

32.     Brand equity can also be influenced by a brand's positioning. Brands can be positioned more functionally (*i.e.*, with dominant associations are about product performance) or more around symbolic meaning (*i.e.*, image, social signaling, or self-expression). Compared to brands that are positioned more functionally, those that are positioned more around symbolic meaning and, in particular, symbols related to prestige or status, often garner greater brand equity. Consumers purchase prestige, status, or luxury brands for their own pleasure and as symbols to convey their success to others. Such brands build brand equity through branding and marketing mix activities that balance these purchase motivations to develop brand awareness and brand image.

Fenwick & West LLP
ATTORNEYS AT LAW

33.     Marketing scholars have tied elements of symbolic brands, particularly those related to prestige, luxury, or social or economic status, to higher brand equity.

    i.    According to O'Cass and Frost (2002), the products of brands associated with status or prestige benefit both customers and the companies behind that brand. The authors conclude that status or prestige as a brand association is a positive determinant of brand equity. They explain that the "importance and benefits of status cannot be overemphasized; with the significant price premiums achieved and economic value of status goods it is important for marketers to understand how consumers create brand symbols and brand images that are status-oriented." They conclude that this understanding "will allow status producers to increase market share, income generation, improve returns on brand investment and [capture] a slice of the billion dollar profits in the marketplace for status goods."

    ii.    Eastman et al. (1999) describes how marketers selling "status symbols" should seek to "endow their brands with the right status image" or convince consumers "that their brand[] ha[s] cachet." The authors conclude that if the brand is successful at developing these brand associations, the brand will likely experience "demand [that] will soar" and an ability to "command premium prices."

    iii.    Jeon (2017) links symbolic brands to "both sensory experience and emotional attachment." The author concludes that these associations "in turn contribute[] significantly to brand equity." Jeon (2017) states that these brands' marketers should strive for consumer emotional attachment in order to enhance brand equity.

FENWICK & WEST LLP
ATTORNEYS AT LAW

34.    Another way that the brand equity premium manifests itself is through brand extensions. Academic research finds that the Rolex brand easily extended itself to different product categories associated with prestige, making grandfather clocks, bracelets, and rings. In contrast, the Timex brand was easily extended to product categories associated with function, such as batteries, stopwatches, and calculators. In other words, it is easier for symbolic brands associated with status or luxury to expand into other prestige verticals than it is for functional brands. This serves to perpetuate the brand equity premium associated with the brand associations of prestige and symbolism in a virtuous circle.

## IV.    YUGA LABS' BAYC BRAND HAS THE CHARACTERISTICS OF A BRAND WITH HIGH BRAND EQUITY

35.    The BAYC brand exhibits the characteristics that the literature identifies as pertaining to strong brands. In the subsections that follow, I first provide a brief overview of my understanding of Yuga Labs and its inaugural NFT collection–the Bored Ape Yacht Club. I then describe how the characteristics of the BAYC brand are indicative of a brand with high brand equity.

36.    Yuga Labs is a web3 product and entertainment content company that was formed in early 2021.[4] In April 2021, the company launched its flagship collection, the BAYC NFTs.[5]

37.    The BAYC NFT collection is limited edition, consisting of 10,000 NFTs, each with a representation of a cartoon ape. Every individual ape in the series has a certain fundamental base character design, such as face, arms, chest, nose, and eyes, plus other adorning constituent parts such as expression, headwear, eyeglasses, jewelry, clothing, and/or other accessories. These constituent parts are referred to as "traits." Concept illustrations of the apes were first drawn by several different artists, who also drew each of the many different traits that any ape might

---

[4] JTX-607.
[5] JTX-607.

FENWICK & WEST LLP
ATTORNEYS AT LAW

have (over 170 traits in total). Creators of the series decided how rare or common the various traits should be in the series by specifying specific probability targets for each trait, to make the series visually interesting with no two images being exactly the same. Those traits were then fed into a computer program, together with the chosen specific probability targets for each trait to generate the initial ape images (much like a paper doll where traits are layered over each other). Those initial outputs were then fixed, re-run and manually pruned by the creators to achieve their creative vision for the final BAYC collection. Each NFT in the BAYC collection can inherit between four and seven traits, with each ape receiving a unique combination of traits. Figure 1, which follows, shows an example of a BAYC NFT.

**Figure 1**

***Example of a BAYC NFT: #5385***



Source: "5385 - Bored Ape Yacht Club," OpenSea,
https://opensea.io/assets/ethereum/0xbc4ca0eda7647a8ab7c2061c2e118a18a936f13d/5385
Note: BAYC NFT depicted is an example of a Bored Ape. Bored Ape #5385 has the features yellow background, wool turtleneck clothes, heart eyes, gray fur, halo hat, and bored mouth.

FENWICK & WEST LLP
ATTORNEYS AT LAW

38.     Consistent with the notion that it was highly desired, the collection sold out within nine days (by May 1, 2021) and quickly gained notoriety among the crypto community, celebrities, and pop culture. Yuga Labs has since leveraged the success of the BAYC NFTs to develop the brand and expand products and partnerships. The BAYC brand is considered by Yuga Labs to be its focal or "cornerstone brand." It exhibits the characteristics that the literature describes as indicative of a brand with high brand equity.

39.     Although there are a variety of use cases for NFTs, perhaps the most obvious is as a form of self-expression. When an online persona's profile picture is a scarce digital image costing many thousands (or millions) of dollars—such as an authentic BAYC—that image speaks to the identity of the persona and what they wish to convey to others. In this way, NFTs can also be status symbols. NFTs can be used to signal wealth or other attributes of the owner, similar to how one may purchase a designer handbag or luxury timepiece.

40.     NFTs associated with the brand sell for a premium relative to nearly all other NFTs. Individual BAYC NFTs have sold for as much as $3.4 million, among the highest of any NFT. Since their release, BAYC NFTs are among the most sought after in terms of all-time purchasing volume. And Yuga Labs' subsequent releases, including Mutant Ape Yacht Club ("MAYC") and Bored Ape Kennel Club ("BAKC"), both of which were built off the BAYC brand,[6] are prized by collectors (as reflected in both the current prices and initial purchase price for each). Price premiums and high volume purchases on NFTs associated with the BAYC brand are both consistent with BAYC constituting a strong brand.

41.     Yuga Labs has been able to leverage the BAYC brand to secure marketing partnerships and collaborations, as well as expand its products, all due to the strength and popularity of its BAYC brand.[7] Of particular note:

---

[6] JTX-607.

[7] JTX-607.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

i.   Since 2021, BAYC has entered into collaborations with well-known brands like Arizona Iced Tea, Gucci, and Adidas.[8]

ii.  The launch of Otherside (in collaboration with others), an innovative, interoperable gaming metaverse where participants can "bring their own NFT character," including a BAYC or MAYC.

iii. The launch of the Dookey Dash video game and skill-based mint, which requires users to have a Sewer Pass NFT. Holders of BAYC and MAYC NFTs will be able to claim a 'Sewer Pass' for free. Players can also purchase a Sewer Pass NFT on the secondary market. These NFTs have a current floor price of approximately 2.6 ETH ($4,280) at present. The game is a skill-based 'endless runner' game similar to Subway Surfers and Temple Run.

iv.  Merchandise featuring the BAYC brand.[9]

v.   Entertainment content such as the Meebits album and "The Fucking Metaverse Podcast."

vi.  An in-person music festival called ApeFest, which has featured music icons such as Snoop Dogg and Eminem.

42.   Consistent with the benefits of having a strong brand, the majority of Yuga Labs' revenue is attributable to the BAYC brand. Yuga Labs' valuation report from November 2022 shows total revenue of approximately $129 million in 2021 and approximately $137 million in 2022. Yuga Labs' former CEO, Ms. Muniz testified that "almost all" of 2021 revenue and 90 percent or "potentially even more" of 2022 revenue is related to the "Bored Ape Yacht Club" brand. The fact that the majority of Yuga Labs' revenue in each of the past two years is related to

---

[8] JTX-1480.

[9] JTX-1233 at 28.

the BAYC brand exemplifies just how important this brand is to the company. Moreover, the fact that Yuga Labs' revenue figures grew year-over- year, despite the significant headwinds in the crypto market, further indicates the strength of its brands, in particular the flagship BAYC brand.

43.     Lastly, the BAYC brand has been the subject of notable media interest. In November 2021, for example, BAYC NFT art was featured on the cover of Rolling Stone magazine, in which the related article refers to BAYC as "internet rock stars." Various media companies also covered Yuga Labs' news related to its fundraising and valuation, which included equity investments from well-known venture capital firms, such as Andreessen Horowitz.

## V.     COUNTERFEIT AND IMITATION PRODUCTS CAN DIMINISH BRAND EQUITY BY CHANGING BRAND PERCEPTION AND ASSOCIATIONS

44.     As noted above, brand equity is comprised of the associations and experiences that consumers have with a brand, as well as general awareness, perceived quality, and loyalty shown to that brand. Brand equity is closely tied to brand value, a term that describes the monetary worth of a brand. Brands with strong positive associations, heightened awareness, and high perceived quality are often those with higher monetary values.

45.     While companies often exert a great deal of effort to shape how brands are perceived, ultimately, brand meaning is determined by consumers, and how they perceive the brand. Brand equity needs to be maintained in order for the brand's value to endure.

46.     Consequently, notwithstanding the significant efforts made to maintain ideal brand associations, certain external factors, such as the introduction of counterfeit or imitation goods, can affect how brands are perceived. Brand equity, and thus brand value, can be damaged when consumers' associations of the brand deviate in a negative way. The introduction of counterfeit products is one way that brand associations can be affected.

Fenwick & West LLP
Attorneys at Law

47.     Indeed, the literature recognizes the negative effects that counterfeit products can have on authentic luxury brands, specifically how they affect perceived exclusivity and can create confusion in the marketplace. This is particularly true in a new space, such as NFTs, where the authenticity of an NFT is not easily determined.[10]

## C.     Counterfeit Goods Can Harm Brand Equity

48.     From the consumer's perspective, counterfeit (*i.e.*, imitation) goods can be either deceptive or nondeceptive. Deceptive counterfeiting refers to purchases made by consumers who are not aware that they are buying a counterfeit good, meaning the counterfeit has deceived the consumer. In contrast, nondeceptive counterfeiting refers to purchases made by consumers who are aware that they are purchasing a counterfeit good.

49.     A large volume of academic literature supports the idea that both forms of counterfeiting can damage the brand value of the authentic brand.

    i.     Green and Smith (2002) describe how counterfeiting may lead to "the erosion of brand equity if consumers are aware that some portion of the available stock of a brand is actually counterfeit." They explain that brand equity of brands associated with luxury goods may be harmed because of a "potential ero[sion] [of] confidence in the brand and reduc[tion] [in] the status value that is sometimes associated with brand ownership of luxury goods."

    ii.     Wilcox et al. (2009), examines how the presence of counterfeit luxury goods affects the associations that consumers have with the authentic brand. They find that when consumers desire goods that facilitate social interaction and serve as a signal to others, counterfeits may be perceived as more similar to the authentic

---

[10] *See* Section VI.B., below.

FENWICK & WEST LLP
ATTORNEYS AT LAW

good and "the presence of the counterfeit brand will likely diminish preference for the real brand." Furthermore, the authors also find that the presence of counterfeit goods in a luxury market can cause "longer-term erosion in brand equity."

iii. Keller (2009) describes that "because of their significant price margins and premiums, luxury brands are vulnerable to much illegal activity in the form of counterfeiting and so on" and, as a result, "[m]arketers must proactively protect their brand in as many ways as possible, as well as vigorously enforce any infractions."

iv. According to Grossman and Shapiro (1988), counterfeiters endanger the legitimate brand's ability "to offer their customers the prestige associated with a small, select network of users" because "a fringe of imitators allows consumers with less discerning tastes to enter the club."

**D.    Counterfeits Can Create Confusion in the Marketplace**

50.    The presence of counterfeit products can create confusion among consumers. Indeed, some counterfeiters rely on such confusion to gain sales at the expense of the counterfeited brand. In doing so, counterfeiters freeride off the brand equity earned by the authentic brands. This, too, is recognized by the literature studying the effects of counterfeit products. Chebat et al. (2015) note that while "[b]rand managers invest huge amount[s] of money and efforts to build unique and [recognizable] brands," counterfeiters aim "to reap the benefit of strong brands without building them."

51.    An obvious, yet important reason why counterfeit products may cause marketplace confusion lies in the fact that, by definition, these products are identical or nearly identical to the authentic product. Falkowski et al. (2015) explains that such confusion results from the ability of counterfeits to "activate

FENWICK & WEST LLP
ATTORNEYS AT LAW

the[] prototype" consumers have in their minds of the counterfeited brand. This leads consumers to "falsely recognize[]"the "look-alike brands…at a higher rate than original brands."

52.    Unsurprisingly, counterfeit-induced brand confusion has deleterious effects on brand equity of the counterfeited brand. Chebat et al. (2015) concludes that "there are substantial economic effects related to brand confusion." According to the authors, brand confusion "may cause dilution of brand equity" even when "consumers understand that the brand they wanted to buy (but did not because of the confusion) is not responsible for the confusion."

53.    The deleterious effects of counterfeit products manifest through a variety factors. First and foremost, authentic goods may suffer from a loss in sales because confused consumers divert their sales to the counterfeit. According to academic literature, while counterfeited brand may mitigate this loss in sales through corrective marketing or education, lost sales often cannot be entirely abated.

54.    In addition, diminished brand equity is caused by weakened brand loyalty and a diminished brand image. According to Mitchell and Papavassiliou (1997), "[c]onfusion can make consumers more promiscuous, by weakening store loyalty and disrupting brand-loyalty." Counterfeits and the associated confusion also leads to customer dissatisfaction. Foxman et al. (1990) describes how "the consumer may be dissatisfied with the product purchased and attribute his or her dissatisfaction to the original brand, never realizing that the brand consumed was an imitator" leading to changes in consumers' product or service choice decisions. Finally, "[c]onfusion can result in potential misuse of a product," reinforcing other deleterious effects of counterfeiting and brand confusion such as "consumer dissatisfaction, lower repeat sales, more returned products, reduced customer loyalty[,] and poorer brand image."

55. Confusion among market participants is more likely in a new space, such as NFTs, where transactions occur entirely online. Consumers make online purchases often without spending the time and effort required to make perfectly informed decisions. In other words, consumers often purchase goods with incomplete information, instead relying on pre-existing perceptions of brands and brand equity.[11] While it is possible to authenticate an NFT's origin using publicly available information on the blockchain, this process is time consuming and requires an understanding of how to navigate the space. Even tech savvy consumers may not be aware of the processes available for confirming the authenticity of an NFT, as discussed below.

56. The literature supports the notion that authenticating NFTs is difficult. Das et al. (2022) examines the effects of various fraudulent user activities that take place on NFT exchanges and notes the challenges buyers face amid NFT market abuses and the complex nature of verifying authenticity. The authors recognize that the authenticity of an NFT is "endorsed by the smart contract managing the collection" and that in order to "ensure that the token one is buying is legitimate, buyers are advised to verify the contract address of the collection from official sources."[12] However, as the authors explain: "[u]nfortunately, buyers are not always aware of the existence of counterfeits, or of how they can verify an NFT's authenticity"[13] and instead "rely on the names and visual appearances of the items in the marketplace."[14] Industry participants likewise acknowledge the difficulty in authenticating NFTs. Pastel, the developer of a "next generation NFT focused blockchain," echoes this sentiment, noting that "look[ing] at the record for a

---

[11] JTX-109; JTX-110; JTX-630 at 3; JTX-114.
[12] JTX-1119 at p. 9.
[13] JTX-1119 at p. 9.
[14] JTX-1119 at p. 9.

particular NFT to determine when it was minted as well as its ownership history [is] easier said than done."

57.     The Liechtenstein Cryptoassets Exchange (LCX), a fintech company that focuses on tokenization of assets, utility, and advanced trading tools, notes that the "fastest and simplest way to review the authenticity of an NFT is to scrutinize the metadata of an NFT with the utilization of a blockchain explorer, like Etherscan.io." Even with the help of blockchain explorers such as Etherscan, however, the process for authenticating an NFT remains complex.  Essentially, this requires one "to either find the asset on the blockchain or request the wallet address of the person transmitting the asset to make sure it exists and is in their ownership." Specifically:

> i.     "Visit NFT's metadata on the blockchain explorer."
>
> ii.    "Determine the location of the NFT's hash. This will let you know where the NFT is stored on the blockchain."
>
> iii.   "In the blockchain explorer, … enter the hash of the NFT."
>
> iv.    Review the metadata "to identify the NFT as authentic."

58.     Defendants, too, recognize that the process can be "very technical." In response to a question asking "[w]hat is the name of the token for the RR BAYC NFTs," Mr. Cahen responded:

> I would have to check the block explorer to explain to you. I believe it's
> Bored Ape Yacht Club. And when I say "Bored Ape Yacht Club," what
> I'm referring to is very specifically is I believe that the name of the RR
> BAYC NFT contract that this dispute is about is Bored Ape Yacht Club on
> Etherscan.IO, E-T-H-E-R-S-C-A-N, dot IO. On Etherscan.IO, there will
> be what is called a token tracker for a given contract. And that should have
> -- my recollection of that is that the name of that is Bored Ape Yacht Club
> on the Etherscan Ethereum Board Explorer. I'm going to are so if to take
> slow. I take for granted a lot of this stuff is very technical.  But that's you

FENWICK & WEST LLP
ATTORNEYS AT LAW

know – that's what a lot of this is about. We want to educate people about how this stuff functions.

59.     The difficulty authenticating NFTs and the rapid growth of the market are likely some of the reasons that counterfeiting in the space has proliferated.[15] Das et al. (2022) identify *legitimacy* as "one of the big issues with NFTs, as nothing prevents an impostor from 'tokenizing' and selling someone else's art, while the creator remains oblivious to the fraud."[16] Of particular note is the presence of "copycats or parody projects," which "resemble reputable collections and purport to have been created by reputable sources."[17] The authors highlight the early NFT project CryptoPunks as one having "numerous clones, such as CryptoPhunks."[18]

60.     Consistent with the notion that authentication of NFTs is a complicated and technical task, OpenSea has "announce[d] several changes aimed at improving authenticity" on its platform, including "[a]n updated account verification and collection badging system that broadens the number of creators eligible for verification," and "[a]n automated system to help identify, remove,  and prevent instances of 'copymints' (copies of authentic NFT content)." Figure 2, illustrates an example of a "copymint" or counterfeit version of authentic NFT content that OpenSea would target in its approach. Rather than simply displaying the content, OpenSea moved in this direction in May 2022 to make it easier for users to detect counterfeits.

---

[15] Das et al. (2022) perform an empirical analysis that quantifies the prevalence of the different counterfeit NFT types described above. Using data from OpenSea, the authors analyze over 12 million NFTs spread across more than 236,000 collections. They found that "322 collection pairs had similar names" and that "most of the replica collections were minor modifications of the names of the respective verified collections, for example, pluralizing a noun, adding whitespace at hard-to-notice positions, etc., which indicates a potential intent to mislead." *See* JTX-1119.

[16] JTX-1119, p. 1.

[17] JTX-1119, p. 2.

[18] JTX-1119, p. 2.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**Figure 2**
*Example of Copymint on OpenSea*



Source:  Fauvre-Willis, Anne, "Authenticity on OpenSea: Updates to Verification and Copymint Prevention," *OpenSea*, May 11, 2022, https://opensea.io/blog/announcements/improving-authenticity-on-opensea-updates-to- verification-and-copymint-prevention

## VI.   THE MINTING AND SALES OF RR/BAYC NFTS HARMED BAYC BRAND EQUITY

62.     The literature shows that counterfeits harm brand equity for high-end products and that these effects are more damaging when the counterfeit product appeals to the same customer base, shares the same product features, and shares the same distribution channel.  From these findings, one would expect the minting and sales of imitation NFTs (such as RR/BAYC NFTs) to have a similar effect on the brand equity of the authentic NFTs upon which the imitations are based (*e.g.*, BAYC).

63.     Detailed analysis illustrates that, following the introduction and during the continued minting of RR/BAYC NFTs, there were (i) documented instances of confusion among market participants and (ii) consumer sentiment toward the BAYC brand became less positive and more negative.  Both results are consistent with the findings of the literature described above.  I conclude that the minting and sales of RR/BAYC NFTs harmed BAYC brand equity.

**A.     RR/BAYC NFTs Are Exact Pictorial Imitations of Authentic Yuga Labs BAYC NFTs**

64.     The RR/BAYC NFTs are exact pictorial imitations of Yuga Labs' BAYC NFTs and Mr. Ripps' public intentions were to mint one of each of the 10,000 authentic BAYC NFTs.  In fact, according to Defendants, the metadata associated with the NFTs point to the same externally stored images as the authentic BAYC NFTs.[19]  Mr. Cahen testified that the URI portion of the RR/BAYC NFT is "an image resolver that's part of a token smart contract" and that it points to the same images that BAYC uses.[20]

65.     Defendants' usage of BAYC trademarks and the brand elements found in the authentic BAYC NFTs created by Yuga Labs becomes readily apparent when the NFTs are viewed side-by-side.  Figure 3 shows two listings on OpenSea:  the listing on the left is an authentic Yuga Labs BAYC NFT, and the listing on the right is an RR/BAYC imitation, which uses the same artwork and unique identifying number (#1058) as the authentic version.  The RR/BAYC NFT collection has been delisted from OpenSea and remains delisted as of the time of this report.  Figure 3 is consistent with the "copymints" discussed above (*i.e.*, imitations that look similar to

---

[19] *See* Figure 3.

[20] Dkt. 38-1 at ¶ 8 ("On May 13, 2022, I began creating the artistic project, RR/BAYC.  The project has grown to include a collection of NFTs, each of which uses a unique blockchain entry but includes a link to the same digital image as the corresponding BAYC NFT.").

authentic NFTs) that are targeted by OpenSea for removal to improve the user experience and protect consumers from imitation NFTs.

---

**Figure 3**
*OpenSea listings for BAYC #1058 and RR/BAYC #1058*



Source:  JTX-686.
Note:  Displayed are two listings on OpenSea:  the listing on the left is an authentic, Yuga Labs BAYC NFT, and the listing on the right is an RR/BAYC imitation which is listed under the same name.  The RR/BAYC collection has been delisted from OpenSea.  I note that while this is how each listing was displayed on OpenSea individually, the two listings may not have been displayed side-by-side in this format.

---

66.    This type of imitation is recognized in the literature.  Das et al. (2022) describe three types of counterfeit (imitation) NFTs:  similar collection names, identical image URLs, and similar images.  Similar collection names refer to NFTs that "use the name of the collection or individual piece that resembles the original (victim) one."[21]  The authors highlight the fake of "CryptoSpells," which used the name "Cryptospells," (*e.g.*, the exact same letters, but the counterfeit displays a lowercase "S" instead of a capitalized "S").  Identical image URLs are perhaps more pernicious and further highlight the difficulty in authenticating NFTs.  In the case of identical image URLs, the fake NFTs point to existing tokens, simply copying the image_urls of authentic NFTs.  The authors use the popular CryptoPunks as an exemplar, noting that "nothing prevents a scammer from deploying her own token contract on the blockchain and mint[ing] tokens that point

---

[21] JTX-1119.

to CryptoPunks. A buyer who just looks at the appearance of items in a collection will see the CryptoPunks images and mistake the NFTs for the originals."[22] Lastly, similar images simply refer to NFTs that copy a digital asset and then mint an NFT that points to the copy.[23] For example, Defendants are involved in the sale of CryptoPhunks, an NFT collection that uses the same images as CryptoPunks, but face left instead of right. Defendants engaged in a similar imitation of BAYC NFTs, using the same images and URLs.[24]

67.    While the images and metadata each provide separate points of potential confusion, the potential for such confusion is even greater when factoring in the platforms on which RR/BAYC are sold and the naming conventions used in the underlying contract data.

    i.   RR/BAYC NFTs were available for purchase across a number of platforms at different points in time. The RR/BAYC collection was originally listed for sale on Foundation, then on Mr. Ripps' website, and also on the secondary market on the same platforms as the original, authentic BAYC NFTs. The fact that market participants were able to view both authentic BAYC and RR/BAYC NFTs on the same platform may have caused additional confusion.

    ii.   Moreover, the naming conventions used by Defendants were similar to the naming of authentic BAYC. The RR/BAYC NFT collection is identified on the blockchain as "Bored Ape Yacht Club (BAYC)" without any modification to Yuga Labs' marks.

---

[22] JTX-1119.

[23] JTX-1119.

[24] Dkt. 38-1 at ¶ 8 ("On May 13, 2022, I began creating the artistic project, RR/BAYC. The project has grown to include a collection of NFTs, each of which uses a unique blockchain entry but includes a link to the same digital image as the corresponding BAYC NFT.").

FENWICK & WEST LLP
ATTORNEYS AT LAW

On some NFT marketplaces, like OpenSea, the RR/BAYC NFT collection merely adds "RR/" to the collection name.[25]

68.    I understand from Mr. Ripps' and Mr. Cahen's deposition testimony that the RR/BAYC NFTs were minted using Foundation.  Foundation describes the NFT collections that it hosts as "creator-owned smart contracts that contain your NFTs." There are two "important components" to creating and launching a smart contract on Foundation:  the Collection Name, which is the "title and top- level identity of [the] Collection and its NFTs," and the Collection Symbol, which "acts as a token name on the blockchain for [the] Collection's NFTs."[26]

69.    Foundation warns creators to "take care" when deciding on the Collection name and symbol, as these details "are recorded on the blockchain" and "cannot [be changed] later."[27] The permanency of these components are recognized by Defendants.  In response to a question asking "[h]ave you had any discussions about changing the name of the RR BAYC token tracker?," Mr. Cahen replied, "[m]y understanding is that you cannot change the name of a token tracker because the blockchain is immutable, and that would be immutable data. Meaning that it's locked." Separately, Mr. Ripps, too, noted that he "cannot change the contract information.  The Foundation contract doesn't allow that."  I understand from Mr. Cahen's testimony that the actual name of the RR/BAYC contract as it appears on Etherscan is "Bored Ape Yacht Club."[28]  Additionally, Mr. Thomas Lehman, an individual who "provided input to Defendants on the commercialization" of the RR/BAYC NFTs, explains that Mr. Ripps "created the Ethereum blockchain smart contract" that "hosts the RR/BAYC NFTs," and the contract's name and symbol are "Bored Ape Yacht Club" and "BAYC," respectively.[29]

---

[25] *See* Figure 3.
[26] JTX-603.
[27] JTX-603.
[28] JTX-600; JTX-36.
[29] JTX-1 ¶¶ 7-8.

70.     In sum, Defendants' usage of the BAYC images, metadata, marks, and naming during the minting of the RR/BAYC NFTs resulted in a product that was a clear imitation of authentic BAYC NFTs.

### B.     There Is Evidence of Confusion Among Market Participants Following the Minting and Sales of RR/BAYC NFTs

71.     Given the identical aspects and other substantial similarities between the two collections, some marketplace participants purchasing NFTs through secondary platforms such as OpenSea were likely confused by the introduction of RR/BAYC NFTs.

72.     Indeed, there are documented instances of confusion in the marketplace, both among potential purchasers of NFTs and among crypto reporters. Exhibits JTX-523, 522, 705, 1030, 1031, 1035, 1055–61, and 710 are a sampling of tweets that indicate market participants were confused about the nature of the RR/BAYC minting.[30]  For example:

i.     On May 16, 2022, shortly after the release of the RR/BAYC collection, Twitter persona Jason.ip (@Jclineshow) tweeted a picture of a Bored Ape with the hashtag "NewProfilePic." In response, XRPwh4le.eth (@Joey_tartz) tweeted "? I'm so confused … this isn't real Jason ? It's a collection of 179 created by @ryder_ripps although it says 'bored ape' its not real dude."[31] Jason.ip also received a direct message from The Dude | OGAC (@thedude_86) asking, "Dude you got a bayc???" to which Jason.ip responded explained that "this is the Ryder Ripps BAYC

---

[30] Platforms have issued features to ensure more secure, verifiable ways for users for display the NFTs they own.  For example, Twitter released a new hexagonal profile picture (or "pfp"), which is available only to users who connect their secure cryptocurrency wallet to the platform.  An account with a hexagonal profile picture signifies that the account owns the associated NFT.
[31] JTX-523.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   on foundation……I wish I could get an ape lol."[32]  Ape is a

2   common reference to a BAYC NFT.

ii.   As another example, in response to a tweet by the Twitter persona

3   GemBot (@0xGem) which indicated a "New purchase!" of "1

4   Bored Ape Yacht Club bought for 5.99 ETH," there were multiple

5   replies that indicated market participants were unsure or confused

6   about the NFT and its authenticity.[33]  At the time, 6 ETH was

7   worth approximately $7,200, well below the price that authentic

8   BAYC NFTs typically sell for. One user replied "shit man I

9   looked on    chain and didn't even realize it was RR."[34]  Another

10   replied, "Is this a Ryder[?]"[35] And yet another stated "What a gold

11   ape sold for 6eth must be a glitch!"[36]  While there are many

12   replies to this tweet, I will highlight just one more–Twitter

13   persona Buffet (@NFTBuffet) tweeted "damn I could have

14   afforded this."[37] This instance does not stand alone:  GemBot

15   posted about sales of RR/BAYC NFTs as "Bored Ape Yacht

16   Club" on at least five other occasions, many of which were met

17   with similar confused reactions.[38]  Adding to the confusion,

18   GemBot also posted legitimate BAYC sales around the same time

19   period that it posted the examples above.[39]

---

[32] JTX-522.

[33] JTX-705.

[34] JTX-1030.

[35] JTX-1030.

[36] JTX-1031.

[37] JTX-1035.

[38] JTX-1057, JTX-1058, JTX-1059, JTX-1060, JTX-1061.

[39] JTX-1055, JTX-1056.

FENWICK & WEST LLP
ATTORNEYS AT LAW

iii.   Others were confused by users on Twitter that displayed ownership of RR/BAYC NFTs as their hexagonal profile pictures on Twitter, mistaking these profile pictures for verified ownership of authentic BAYC NFTs.[40]  A user (@Cryptoverse520) responded to a post by Mr. Ripps criticizing Yuga Labs, "You have a bayc pfp though haha?"[41]

73.   The confusion was not limited to Twitter discussion.  On Bloomberg Crypto, journalists Matt Miller, Kailey Leinz, and Sonal Basak discussed top grossing NFT collections during June 2022.[42]  As shown on their display in Figure 4 below both Bored Ape Yacht Club V3 and Bored Ape Yacht Club were among the top five.  Although it is clear that both collections are at the top of the charts in terms of dollar volume sold, it is not clear from the simple description which collection refers to the authentic Yuga Labs' BAYC NFTs and which refers to Ryder Ripps' RR/BAYC NFTs.[43]  The apparent confusion led to a Discord channel member called NEPTUNE to screenshot the segment and send it to Yuga Labs' community managers.[44]  This further demonstrates not just the confusion present in the marketplace, but also the concern among BAYC holders and consumers about the nature of the confusion.

---

[40] JTX-525.

[41] JTX-710.

[42] JTX-1049.

[43] As noted in Section II, the RR/BAYC collection is also known as BAYC V3.  *See* JTX-689.

[44] *See* JTX-1192.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**Figure 4**

*Bloomberg segment displaying top NFT collections circulated in Bored Ape Yacht Club discord channel*



Source: JTX-1192 (emphasis added)

Note: As noted in Section II, Bored Ape Yacht Club V3 refers to the RR/BAYC NFTs. This is not clear from the basic description listed on Bloomberg's display. The blue box describes the Discord channel in which this message was sent ("Bored Ape Yacht Club"). The yellow boxes highlight the message from user NEPTUNE in which they identified the Bloomberg segment.

75.     In addition, Defendants and others involved in creating and selling RR/BAYC NFTs expressed that the labeling for RR/BAYC NFTs introduced confusion in the market:

        i.    In discussing design options for Ape Market, Mr. Lehman expressed his concerns about trademark infringement to Mr. Cahen, adding: "Like a normal person could be like 'I see where Yuga is coming from, it's confusing how close your logo is to

theirs.'"[45] Furthermore, in discussion with Ben Gross, Mr. Lehman responded to the claim that "some people will buy thinking they are buying originals…[on] the foundation site," with "[a]h true."[46]   Mr. Lehman continues that people should do their research and "[c]heck the chain," elaborating that consumers should check "etherscan" before "buy[ing] the fake ape."[47]

ii.   During his deposition, when Ryan Hickman was asked about the RR/BAYC Foundation website and asked what the website was for, he responded, "Looks to be Bored Ape Yacht Club."

iii.   In discussion with Mr. Cahen, Mr. Lehman noted that the RR/BAYC NFTs need a "new logo and branding direction in light of the trademark thing."[48] He clarifies that when listed near various genuine Yuga Labs' NFT collections, "RR should look very distinct."[49]

iv.   Mr. Lehman explains that he "repeatedly shared" his concern with Defendants that "using the 'BAYC' mark alongside the RR/BAYC NFTs could be confusing on Ape Market," and that they "should not under-estimate" this confusion.[50]   Mr. Lehman clarifies that "[o]n at least one occasion, Defendant Cahen affirmatively agreed" with this concern.[51]

---

[45] JTX-630.
[46] JTX-631.
[47] JTX-631.
[48] JTX-630.
[49] JTX-630.
[50] JTX-1 ¶ 21.
[51] JTX-1 ¶ 22.

FENWICK & WEST LLP
ATTORNEYS AT LAW

76.     The examples highlighted above provide evidence that the presence of RR/BAYC NFTs generated confusion in the marketplace.[52]  Moreover, it appears that this type of NFT collection—with identical images and similar (and sometimes identical) naming—was consistent with patterns of general abuses in the NFT market, as shown by Das et al. (2022).  Such prevalence of counterfeit NFTs in the secondary market make it more difficult for even sophisticated purchasers to know with certainty that the NFTs they are purchasing are authentic.

## C.     The Minting and Sales of RR/BAYC NFTs Are Linked to More Negative Associations with BAYC

77.     As described in Section IV, above, one of the pillars of brand equity is the associations consumers have with the brand.  When these associations deviate from the ideals established by the brand, the brand's equity can be damaged.  While the literature and examples of brand confusion described above provide qualitative evidence of how and why the introduction of RR/BAYC NFTs harmed BAYC brand equity, empirical analysis (described below) provides a quantitative picture of how the introduction of RR/BAYC NFTs changed attitudes toward the BAYC brand.  The results of these analyses show that as the narrative in the marketplace shifted to include RR/BAYC, negative perceptions associated with BAYC increased.  This is evidence that BAYC brand equity was harmed.

78.     To analyze how attitudes toward the BAYC brand shifted following the release of RR/BAYC NFTs,[53] I utilize data from Brandwatch, a digital consumer

---

[52] I understand that, as part of this litigation, Laura O'Laughlin "conduct[ed] consumer research," including "two online consumer surveys," in order "to analyze the likelihood of consumer confusion in the market." I understand that Ms. O'Laughlin concludes that the net confusion rates she computes when analyzing the surveys are "indicative of a likelihood of confusion due to Mr. Ripps' and Mr. Cahen's use of the BAYC Marks" on the Foundation marketplace and OpenSea website. This conclusion regarding confusion is consistent with my review of the evidence in this matter.

[53] To understand the narrative surrounding the BAYC brand, I study the narrative surrounding the BAYC brand and related brand elements through social media data.

FENWICK & WEST LLP
ATTORNEYS AT LAW

intelligence and social media management company.  Brandwatch helps companies understand how consumers view their brands, including on social media.  For example, Brandwatch data can be used to identify how positively or negatively a brand is viewed, and how this changes over time.  Brandwatch collects and stores Twitter posts ("Tweets") and provides access to those Tweets through an online user interface.  Through this interface, Tweets can be queried and extracted for analysis.  For my analyses, I queried Tweets from Brandwatch using the following string search criteria:  ((bayc OR bored*ape) NOT (nftgiveaway* OR current*bag). Tweets that Brandwatch categorized s competitions and giveaways were excluded. Due to data limitations imposed by Brandwatch, sampling rates varied based on the time interval and total volume of Tweets.  For December 1, 2021 through May 5, 2022, Tweets are sampled at a rate of 5% (95,860 of an estimated 1,917,200 total Tweets).  For May 6, 2022 through May 19, 2022, all Tweets are collected, totaling 121,923.  For May 20, 2022 through June 11, 2022, Tweets are sampled at a 50% rate (99,942 of an estimated 199,884 total Tweets).  For June 12, 2022 through June 27, 2022, all Tweets are collected, totaling 167,387.  I applied the following exclusions to these collected Tweets:  "nftgiveaway," "current bag," "rt & like," "like&retweet," "like & retweet," "like/retweet," "tag 3 friends," and "tag + 3 friends."  I also excluded Tweets from @ryder_ripps and @pauly0x.  I also excluded Tweets in which a BAYC-related string appeared solely among three or more consecutive hashtags, and no other place in the Tweet.  All engagement Tweets ("tweet," "retweet," "reply," and "quote") were included.  I then analyzed consumer attitudes toward BAYC and Yuga Labs using a pretrained, aspect-based sentiment model described in academic literature.  Using the population of tweets described above, the data were prepared for the model by tagging aspects of interest. Each aspect is a term of interest for which the model provides an assessment of the tweet's sentiment. A tweet may have multiple aspects and, when that is the case, the model identifies a sentiment associated with each aspect and

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

each is counted. The categories of aspects considered are BAYC, Yuga Labs, and RR/BAYC: (1) BAYC-related aspects: "@boredapeyc," "#bayc," "#bored ape," "#bored ape yacht club," "#boredape," "#boredapeyc," "bayc," "bored ape," "bored ape yacht club," "boredape," "boredapeyc"; (2) Yuga Labs-related aspects: "@yugalabs," "#yuga," "#yuga labs," "yuga," "yuga labs"; (3) RR/BAYC or Ryder Ripps related aspects: "@ryder_ripps," "#rr," "#rr/bayc," "#rrbayc," "#ryder," "#ryderripps," "ripps," "rr," "rr bayc," "rr?bayc," "rr.bayc," "rr/bayc," "rr\bayc," "rr|bayc," "rrbayc," "ryder," "ryder ripps," "ryderripoff," "ryderripps," "ryders." The model analyzed the sentiments within tweets for the aspects related to BAYC and Yuga Labs. When a tweet contains multiple aspects related to BAYC or Yuga Labs, each is counted. The aspect-tagged text from each tweet was used as the input to the pretrained model. For each tweet, the output provides an aspect-level classification along with a percentage score for positive, neutral, and negative. If the sentiment related to a given aspect is classified through the model as neutral, but the positive score is greater than the negative score by more than five percentage points, the sentiment toward that aspect is reclassified as positive. Similarly, if the sentiment related to a given aspect is classified through the model as neutral, but the negative score is greater than the positive score by more than five percentage points, the sentiment toward that aspect is reclassified as negative.

79.    In particular, I analyzed how the release of RR/BAYC NFTs impacted attitudes toward the BAYC brand. To do so, I examined attitudes towards the BAYC brand right before the release of the RR/BAYC NFTs (*i.e.*, starting on May 6, 2022) all the way through the accelerated minting of the RR/BAYC NFTs in late June 2022.[54]

---

[54] In November and December 2021, Ryder Ripps started publicly "criticizing" Yuga Labs and the BAYC NFTs through his Twitter profile. Note that while I am aware of the context surrounding Mr. Ripps proclaimed "criticism," I do not address the allegations made by Mr. Ripps, as they are not germane to my assignment or opinions. At about the same time, Mr. Ripps acquired the domain "apemarket.com" and began creating a negative narrative about Yuga Labs and

80.     To measure consumers' attitudes toward the BAYC brand, I collected Twitter posts ("tweets") from the Brandwatch platform that reference "BAYC" or "Bored Ape."  The data contain nearly 400,000 tweets including such text over the time period.

81.     Before examining attitudes toward the BAYC brand, I start by simply examining how the nature of the discussion about BAYC changed after the release of RR/BAYC NFTs.  Specifically, I examined the daily volume of tweets associated with the BAYC brand, and the share of these tweets that also include a reference to Mr. Ripps or to RR/BAYC NFTs.  As shown in Figure 5, this proportion is zero (or near zero) prior to Defendants' initial minting of RR/BAYC NFTs.  After these imitations initially minted on May 13, 2022, however, the proportion increases over the next couple weeks, up to approximately 22 percent. In June 2022, when the Defendants accelerated the pace of minting RR/BAYC NFTs, the proportion of tweets with text associated with the BAYC brand that also include references to Mr. Ripps or RR/BAYC NFTs continued to exceed pre-May 13, 2022 proportions and reached a maximum of nearly 41 percent on June 21, 2022.  Taken together, this is evidence of a shift in discourse regarding the BAYC brand; following Defendants' minting of RR/BAYC NFTs, discussion of the BAYC brand began to include reference to RR/BAYC NFTs or Mr. Ripps.

---

BAYC NFTs. Approximately six months later (May 2022), Ryder Ripps began minting an NFT collection titled "RR/BAYC." This sequence of events—Mr. Ripps' initial criticisms, registration of "apemarket.com," which I understand was intended to be an NFT marketplace that would compete with other NFT marketplaces, such as OpenSea, and where users could buy and sell RR/BAYC NFTs alongside authentic Yuga Labs NFTs, and finally the minting of RR/BAYC NFTs—is consistent with that of a marketer building a consumer base prior to the launch of a new product. Furthermore, I understand Defendants began minting the RR/BAYC NFTs in earnest on May 13, 2022, and the minting accelerated around June 19–20, 2022. *See* JTX-1 ¶¶ 10-13; JTX-683. My analysis covers the period one week before through the initial minting through one week after the accelerated minting.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**Figure 5**

***Bloomberg segment displaying top NFT collections circulated in Bored Ape Yacht Club discord channel***



Source:  Brandwatch; Yang and Li (2022a); Yang and Li (2022b); JTX-1023; JTX-1024. Note:  Daily proportions are of all tweets referencing "BAYC," or "Bored Ape" that also include a reference to Mr. Ripps or the RR/BAYC collection.

82.    The analysis in Figure 5 illustrates how the discussion of the BAYC brand shifted to include RR/BAYC NFTs.  Next, I examined whether the minting of RR/BAYC NFTs changed consumer attitudes towards the authentic BAYC brand.

83.    To examine if there was prior discussion among the tweets referencing "BAYC" or "Bored Ape" that also include a reference to Mr. Ripps or RR/BAYC NFTs, I conducted this same analysis over the period December 1, 2021 through May 5, 2022. Because this analysis was over an extended time frame, I sampled the data at a lower rate (5%) and aggregated the analysis to the weekly level. I find that for each week in the period, the proportion of tweets referencing "BAYC" or

"Bored Ape" that also reference Mr. Ripps or RR/BAYC NFTs is less than one percent. Therefore, the discussion surrounding the BAYC brand did not incorporate Mr. Ripps until the period in May identified above, as shown in Figure 5(b), below.

**Figure 5(b)**



Source: Brandwatch; Yang and Li (2022a); Yang and Li (2022b)
Note: Weekly proportions are of all tweets referencing "BAYC," or "Bored Ape" that also include a reference to Mr. Ripps or the RR/BAYC collection. References to Mr. Ripps or the RR/BAYC collection are assessed using the aspects explained in more detail in Appendix D. Weeks begin on the Wednesday of every week.

84.     Sentiment analysis tools are often used to measure things like consumer attitudes.  If a consumer says, "Nike makes the best shoes," for example, it is clear this consumer has positive attitudes towards Nike. Alternatively, if a consumer says, "Nike has the worst customer service," this consumer is expressing a negative attitude they hold towards the brand.  Sentiment analysis of text, including posts on social media, allows for tracking brand perceptions.

85.     Sentiment analysis is often used in academic literature to measure consumer attitudes toward a brand, and ultimately, brand equity and brand value. To perform this analysis, more sophisticated analytical tools that are able to parse

language and make determinations on the specific language used are needed.  I
have used a range of automated textual analysis tools in my own work, looking at
what types of language increase customer satisfaction, hold attention, and lead
consumers to share word of mouth.  Brand equity is a function of consumers'
perceptions of a brand, so changes in a brand's equity can be measured through
changes in consumer sentiment.

86.     To assess the potential impact of Defendants' minting of RR/BAYC
NFTs on consumer attitudes towards the BAYC brand, I used a pretrained, aspect-
based sentiment model.  This model decomposes tweets into pre-specified aspects
(or terms of interest) and provides an assessment of the tweet's sentiment (positive,
negative, or neutral) toward that aspect.  A tweet may have multiple aspects and, if
so, the model identifies a sentiment associated with each aspect. Aspects included
in this analysis reflect the BAYC brand and brand elements, such as
"@boredapeyc," "#bayc," or "yuga labs."

87.     Figure 6 below shows examples of tweets that espouse positive,
neutral, and negative attitudes towards the BAYC brand, as categorized by the
model.  The tweet displayed on the left, for example, exhibits positive sentiment
toward the BAYC brand (specifically, the "bored ape," "BAYC," and
"@BoredApeYC" aspects).  The tweet displayed in the top right exhibits neutral
sentiment toward the BAYC brand (specifically, the "bayc" aspect).  Finally, the
tweet displayed in the bottom right exhibits negative sentiment toward the BAYC
brand (specifically, the "BAYC" aspect).

**Figure 6**
*Example of tweets and sentiments categorized by aspect-based sentiment model*



Source:  Brandwatch; JTX-1193; JTX-1194, JTX-1195; Yang and Li (2022a); Yang and Li (2022b)

88.     Figure 7 below illustrates how the attitudes toward BAYC changed over time.  For each day from May 6, 2022 to June 27, 2022, I plot, in green, the proportion of all tweets discussing the BAYC brand that express positive sentiment toward the BAYC brand and, in red, the proportion of all tweets discussing the BAYC brand that express negative sentiment toward that brand.  I have also included the "line of best fit" for both series over the period shown.  The line of best fit is a statistical concept that demonstrates the general direction that each series follows.

**Figure 7**

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Daily proportion of tweets exhibiting positive or negative sentiment toward BAYC or Yuga, 5/6/22 – 6/27/22*



Source:  Brandwatch; Yang and Li (2022a); Yang and Li (2022b).
Notes: Data used are all tweets referencing "BAYC" or "Bored Ape" that include an aspect related to BAYC or Yuga Labs.  Each data point corresponds to the proportion of tweets exhibiting positive or negative sentiment toward a BAYC or Yuga Labs aspect on a given day.  More detail on data collection, processing, and the aspect-based sentiment model can be found in Appendix D.  A regression of the daily proportion of tweets exhibiting positive sentiment on dates over the period 5/6/22–6/27/22 produces a slope of -0.0012 and a $p$-value of 0.0497.  A regression of the daily proportion of tweets exhibiting negative sentiment on dates over the period 5/6/22–6/27/22 produces a slope of 0.0015 and a $p$-value of 0.0013.

89.    The red line of best fit in Figure 7 depicts the trend in tweets with a negative sentiment toward BAYC.  During the period shown, the red line slopes upward, meaning that the share of tweets exhibiting negative sentiment toward BAYC increased.  As is evident from the figure, the share of tweets expressing negative sentiment toward BAYC increases around the time Defendants began minting of RR/BAYC NFTs and continues to trend upward through the end of June.

90.    The green line of best fit in Figure 7 depicts the trend in tweets exhibiting a positive sentiment toward BAYC.  For the period over which the minting of RR/BAYC NFTs accelerated, the green line slopes downward,

1   indicating a decline in positive sentiment toward BAYC.  This trend continued

2   through late June 2022.

3   　　　91.　　　Taken together, these facts suggest that consumer sentiment toward the

4   BAYC brand became less positive and more negative following the minting and

5   sales of RR/BAYC NFTs.[55]  As I discuss above, consumer sentiment is directly

6   related to brand equity.  Therefore, the shift in sentiment toward BAYC provides

7   evidence of harm to BAYC brand equity.

8   　　　92.　　　Figure 8 provides further support for this conclusion.  If Defendants'

9   minting of RR/BAYC NFTs hurt BAYC brand equity, I would expect more

10  negative attitudes toward BAYC on days where a greater share of tweets about

11  BAYC also discuss Mr. Ripps or RR/BAYC NFTs.  Figure 8 tests this hypothesis.

12  Each dot on the figure represents a different date between May 6, 2022 and June 27,

13  2022.  The *x*-axis of Figure 8 plots the proportion of the volume of tweets about the

14  BAYC brand that also include references to RR/BAYC NFTs or to Mr. Ripps, by

15  day.  The *y*-axis of Figure 8 plots the proportion of tweets about the BAYC brand

16  that express negative sentiment toward the BAYC brand, by day.[56] The line of best

17  fit slopes upwards, meaning that there is a positive correlation between these two

18  proportions.  On days with a greater share of tweets about the BAYC brand that also

---

[55] One alternative hypothesis could be that the sentiment associated with BAYC and Yuga Labs was already trending less positive and more negative prior to Defendants' minting of the RR/BAYC collection on May 13, 2022. To investigate this alternative, I analyzed whether the share of tweets expressing positive sentiment toward BAYC was decreasing between May 6, 2022 and May 12, 2022 and whether the share of tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022. Specifically, I regressed the share of tweets exhibiting a positive or negative sentiment toward the BAYC or Yuga Labs brand on time and computed the coefficients and associated *p*-values. I found that the share of tweets expressing positive sentiment toward BAYC was actually increasing prior to May 13, 2022, while the share of tweets expressing negative sentiment toward BAYC was actually decreasing prior to May 13, 2022, though neither slope was statistically distinguishable from zero. Therefore, I conclude that the data are inconsistent with this alternate hypothesis.

[56] For this analysis, I measure sentiment toward the BAYC brand and brand elements. That is, I exclude the sentiment associated with any aspects related to Mr. Ripps or the RR/BAYC brand or its brand elements.

FENWICK & WEST LLP
ATTORNEYS AT LAW

discuss Mr. Ripps or RR/BAYC NFTs, sentiment towards the BAYC brand is also more negative.

---

**Figure 8**

***Daily proportion of tweets exhibiting positive or negative sentiment toward BAYC or Yuga Labs vs. daily proportion of tweets referencing "BAYC" or "Bored Ape" that also include a reference to Mr. Ripps or RR/BAYC, 5/6/22 − 6/27/22***



Source:  Brandwatch; Yang and Li (2022a); Yang and Li (2022b).

Note:  Data used to assess the daily proportion of tweets exhibiting negative sentiment towards BAYC or Yuga Labs are all tweets referencing "BAYC" or "Bored Ape" that include an aspect related to BAYC or Yuga Labs.  Each $y$-value corresponds to the proportion of tweets exhibiting negative sentiment toward BAYC or Yuga Labs on a given day.  More detail on data collection, processing, and the aspect-based sentiment model can be found in Appendix D.  Each $x$-value corresponds to the proportion of tweets referencing "BAYC or "Bored Ape" that also include a reference to Mr. Ripps or RR/BAYC.  References to Mr. Ripps or the RR/BAYC collection are assessed using the aspects explained in more detail in in Appendix D.  A regression of the daily proportion of tweets exhibiting negative sentiment toward BAYC or Yuga Labs on the daily proportion of tweets referencing "BAYC" or "Bored Ape" that also include a reference to Mr. Ripps or RR/BAYC produces a slope of 0.2686 and a $p$-value of 0.0002.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

## VII.   CONCLUSION

93.     Brand equity is a valuable asset and is derived from brand strength. Because of its value, companies expend considerable effort to develop their brands and create brand equity.  One way this is accomplished is through the establishment and creation of desirable associations and perceptions among consumers.  The literature establishes the many benefits of brand equity.  These include customer loyalty, pricing power, higher market share, increased profitability, and the ability to expand into new categories or markets.

94.     The BAYC brand has high brand equity and has benefited from the concomitant advantages that flow from it.  For example, NFTs created by Yuga Labs, including the BAYC NFTs, sell for a price premium relative to many other NFTs in the market.  The collection is associated with both a large market share and high trading volume.  Yuga Labs has leveraged the BAYC brand to create additional products and expand into new markets, such as advances in the metaverse, merchandising, and video games.

95.     Adverse associations can harm brand equity.  One way in which associations can change is through the introduction of counterfeit or imitation goods.  The literature establishes that the brand equity, and thus the brand value of authentic goods, can be damaged by the presence of counterfeit products.  Furthermore, counterfeits can cause confusion in the marketplace.  The effects can be particularly acute if the products share distribution channels and visual appearance.

96.     Consistent with the findings of the literature, BAYC's brand value appears to be harmed by the minting and sales of RR/BAYC NFTs.  The RR/BAYC NFTs are exact pictorial imitations of the authentic BAYC collection, rely on the exact same images, and use other of the BAYC marks.  Furthermore, there are documented examples of confusion in the marketplace.  Such confusion can result in undesirable associations, undermining a key component of brand equity.  Indeed

quantitative analyses indicate there was a notable shift in online discourse and that attitudes towards BAYC became less positive and more negative during the minting and sales of RR/BAYC in May and June 2022.  The documented confusion, changing discourse, decline in positive sentiment, and increase in negative sentiment all provide strong evidence that BAYC brand equity was harmed by Defendants' actions.

95.    BAYC is the "cornerstone brand" of Yuga Labs and of considerable importance to the company's current revenue stream.[57]  However, harm to brand equity is not limited to only the current revenue streams.  Future revenue can likewise be adversely affected by a reduction in BAYC brand value, as opportunities to expand Yuga Labs' business operations and BAYC brand presence can be reduced due to confusion in the marketplace.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on July 6, 2023.

Jonah Berger

---

[57] Ms. Muniz testified that Yuga Labs may develop future products and "sell [them] under the Bored Ape Yacht Club brand."  She went on to testify, "[s]o Bored Ape Yacht Club is our – is our cornerstone brand, right?  Like, if you think of this as Disney, it's our Mickey Mouse.  So one, I can't say what we will ever do in the future, right?  Will we?  I don't know.  It's our cornerstone brand.  We – we have content and materials and entertainment and products that we create now and sell and will continue to sell under the Bored Ape Yacht Club brand."; As discussed in Section IV above, a strong brand results in customer loyalty.  Therefore, the value of Yuga Labs' future projects depends, in part, on the value associated with its brands today.