1  ERIC BALL (CSB No. 241327)
   eball@fenwick.com
2  KIMBERLY CULP (CSB No. 238839)
   kculp@fenwick.com
3  FENWICK & WEST LLP
   801 California Street
4  Mountain View, CA  94041
   Telephone:   650.988.8500
5  Facsimile:   650.938.5200

6
   MOLLY R. MELCHER (CSB No. 272950)
7  mmelcher@fenwick.com
   ANTHONY M. FARES (CSB No. 318065)
8  afares@fenwick.com
   ETHAN M. THOMAS (CSB No. 338062)
9  ethomas@fenwick.com
   FENWICK & WEST LLP
10 555 California Street, 12th Floor
   San Francisco, CA  94104
11 Telephone:  415.875.2300

12 *Additional Counsel listed on next page*

13 Attorneys for Plaintiff
14 YUGA LABS, INC.

15

16               UNITED STATES DISTRICT COURT

17               CENTRAL DISTRICT OF CALIFORNIA

18               WESTERN DIVISION – Los Angeles

19

| 20 YUGA LABS, INC., | Case No.: 2:22-cv-04355-JFW-JEM |
| 21            Plaintiff, | **DECLARATION OF LAURA O'LAUGHLIN** |
| 22      v. | |
| 23 RYDER RIPPS, JEREMY CAHEN, | Trial Date:  July 31, 2023 |
| 24            Defendants. | |
| 25 | |

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA  90401
Telephone:   310.434.4300

DAVID Y. SILLERS (*admitted pro hac vice*)
david@clarelocke.com
KATHRYN HUMPHREY (*admitted pro hac vice*)
kathryn@clarelocke.com
MEGAN L. MEIER (*admitted pro hac vice*)
megan@clarelocke.com
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA  22314
Telephone:   202.628.7400

Attorneys for Plaintiff
YUGA LABS, INC.

I, Laura O'Laughlin, declare:

1.     I am a Vice President at Analysis Group, Inc. ("AG").  I am an economist with training in the areas of marketing, market research, and consumer behavior. I have extensive experience in variety of matters, including antitrust, consumer protection, false advertising, trademark infringement, and patent infringement, and in the design, development, administration, and analysis of surveys and experiments.  I have been engaged by counsel for Yuga Labs, Inc. ("Yuga Labs") to provide expert testimony on whether or not consumer confusion exists as a result of Ryder Ripps' and Jeremy Cahen's use of Yuga Labs' Bored Ape Yacht Club trademarks ("BAYC Marks")[1] as alleged in the matter of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*.[2]  Specifically, I conducted consumer research to analyze the likelihood of consumer confusion in the market for non-fungible tokens ("NFTs").  I conducted two online consumer surveys, my Foundation Eveready survey and my OpenSea Squirt survey, following best practices for survey research conducted in a litigation context.  I have firsthand knowledge of the matters stated herein and, if called as a witness, I could testify competently to the facts set forth herein.

2.     Based on my expertise and experience, my review of the relevant materials produced in this matter, and the results of the two likelihood of confusion studies I designed, conducted, and analyzed, I have reached the following opinions. Taken together, my likelihood of confusion studies support Yuga Labs' allegations of consumer confusion in this matter.

---

[1]  The BAYC Marks include: BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and Ape Skull Logo.

[2]  I refer to Mr. Ryder Ripps and Mr. Jeremy Cahen collectively as "Defendants."

FENWICK & WEST LLP
ATTORNEYS AT LAW

**Qualifications**

3.     I have an M.Sc. in economics from the Université de Montréal and a B.A. in international affairs from the University of Colorado.  I have extensive experience in the design, development, administration, and analysis of surveys.  I have served as an expert and have supported experts in designing, administering, and analyzing rigorous surveys to assess consumer understanding, preferences, and behavior.  I have also served as an expert and have supported experts in numerous matters to assess the reliability and validity of survey design and analyses.  I have authored articles and book chapters and spoken on market research studies and consumer behavior, such as in the *Handbook of Marketing Analytics* and for the Canadian and American Bar Associations.

4.     In the course of my career, I have applied an array of complex research methods and economic analyses to both non-litigation and litigation matters, spanning matters such as false advertising, intellectual property, merger review, antitrust litigation, competition policy, labor relations, finance, and valuation.  I have conducted analyses and supported academic experts in a broad range of industries, including media, technology, consumer products, food and beverage products, financial services, and transportation services.

**Materials Considered**

5.     In forming my opinions, I have reviewed documents and other materials provided to me by counsel for Yuga Labs or obtained from public sources.  These materials include, among others, court documents and deposition testimony produced in this litigation, academic articles related to survey design, and publicly available information regarding the NFT market.  I submitted a Rule 26 report in this matter and relied on the materials cited in my report and listed in my offer of proof in forming my opinions. (*See* JTX-721; Dkt. 265).

FENWICK & WEST LLP
ATTORNEYS AT LAW

1

## Yuga Labs' BAYC Marks

2      6.      I understand that Yuga Labs has pending trademark applications for

3   the registration of several marks and/or common law trademark rights, including

4   the BAYC Marks.  It is my understanding that Yuga Labs has used the BAYC

5   Marks since at least April 2021 "in connection with advertising, marketing, and

6   promoting its products and services nationwide and internationally through multiple

7   platforms, including but not limited to the Bored Ape Yacht Club website; NFT

8   markets such as OpenSea; and social media such as Facebook, Instagram, and

9   Twitter."  I understand that, as a result of the advertisement and promotion of the

10   BAYC Marks, Yuga Labs has gained a strong recognition for its products and

11   services.

12      ## Defendants' Use of the Infringing Marks on Foundation and OpenSea

13      7.      Yuga Labs alleges that Ripps deliberately used "the very same

14   trademarks that Yuga Labs uses to promote and sell authentic Bored Ape Yacht

15   Club NFTs" to promote and sell his very own RR/BAYC NFTs, which as a result

16   causes confusion in the marketplace.  Yuga Labs further alleges that Ripps' and

17   Cahen's actions create confusion about whether the RR/BAYC NFTs are connected

18   to, affiliated with, or sponsored by Bored Ape Yacht Club and consequently, Yuga

19   Labs.  Specifically, I understand the alleged confusion stems from Ripps' and

20   Cahen's use of the BAYC Marks alongside the at-issue RR/BAYC NFT collection

21   during the promotion and sale of such NFTs.

22      8.      I understand that Ripps launched his at-issue RR/BAYC NFT

23   collection on the Foundation marketplace.  (*See* JTX-28 (Ryder Ripps Bored Ape

24   Yacht Club Foundation Collections Page)).  Foundation is a web3 site that allows

25   individuals to create their own smart contracts and "mint" their own NFTs (i.e.,

26   create a collection), while also allowing creators to sell their NFTs on the

27   Foundation marketplace.  (*See* JTX-603 ("How to create a Collection and mint an

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

NFT on Foundation," Foundation)).  I understand that when he first launched his collection, Ripps used Yuga Labs' BA YC BORED APE YACHT CLUB Logo, "BAYC" mark, and "Bored Ape Yacht Club" mark. (*See* JTX-28).  Ripps later changed the BA YC BORED APE YACHT CLUB Logo to a distorted version of the BA YC BORED APE YACHT CLUB Logo, but the Foundation sales page continued to use Yuga Labs' BORED APE YACHT CLUB trademark as the title of the page, as well as its BAYC trademark in an unauthorized hyperlink labeled "BAYC" and in the URL of the page (https://foundation.app/collection/bayc).  (*See, e.g.*, JTX-1564).  In addition, when a user hovered over the RR/BAYC NFTs on this Foundation page, the page displayed a miniature version of the distorted BA YC BORED APE YACHT CLUB Logo mark.  Figure 1 below displays a screenshot of the RR/BAYC collection when launched and the later distorted version.

9.      **Figure 1: Comparison of RR/BAYC NFT Collection Pages on Foundation:**





FENWICK & WEST LLP
ATTORNEYS AT LAW

10.     Defendants also created other sales pages on the popular NFT marketplace OpenSea.  OpenSea is the "world's first and largest digital marketplace" for NFTs.  (JTX-1597).  On OpenSea, users are able to buy, sell, and discover NFTs from a wide variety of categories.  (JTX-1597).  I understand that Defendants' first OpenSea page used Yuga Labs' BAYC trademark in the title of the page, in the cover photo of the page, and in the webpage URL (https://opensea.io/collection/ryderripps-bayc).  I further understand that Defendants' subsequent OpenSea page used Yuga Labs' BAYC trademark in the title of the page ('RR/BAYC'), in the cover photo of the page (an image stating 'RRBAYC.com'), and in the webpage URL (https://opensea.io/collection/rrbayc).

11.     I further understand that when Ripps created the smart contract for his RR/BAYC NFT collection, Ripps labeled the collection name "Bored Ape Yacht Club," and the collection symbol "BAYC," which is very similar to Yuga Labs' collection name "BoredApeYachtClub" and identical to the collection symbol "BAYC." (*See* JTX-600, JTX-1595).  I understand that these meta-data are publicly available on Etherscan, a platform that allows consumers to access information within the Ethereum network, as well as other blockchain explorers, which display the marks as a token tracker.  Consumers may use the symbols and labels associated with the token to verify its authenticity.  Regardless of whether a consumer purchases an RR/BAYC NFT on Foundation, OpenSea, or elsewhere, I understand that Etherscan and other blockchain explorers will display the collection name as "Bored Ape Yacht Club" and the collection symbol as "BAYC."

12.     I understand that Ripps and Cahen claim that consumer confusion between Yuga Labs' BAYC NFT collection and the at-issue RR/BAYC NFT collection was "impossible" for various reasons, including the "project's request-to-mint process through Twitter, the reservation and disclaimer process on https://rrbayc.com, and Foundation's exclusion of any Yuga NFTs."  Additionally,

Ripps and Cahen claim that "*ryder-ripps.eth is clearly shown as the creator of the RR/BAYC NFTs (based on the tokens smart contract), which appears next to the token tracker." Ripps and Cahen also claim that "collectors understood the satirical message of the project and that they were not purchasing a BAYC NFT."

### Summary of Opinions

13.    Based on my expertise and experience, my review of the relevant materials produced in this matter, and the results of the two likelihood of confusion studies I designed, conducted, and analyzed, I have reached the following opinions:

a.    There is a meaningful likelihood of confusion for consumers who saw the BAYC Marks used in connection with the at-issue RR/BAYC NFT collection on the Foundation marketplace.  Using an appropriately designed Eveready survey with relevant marketplace context and control stimuli, I find a net confusion rate of 40.4%.  That is, using an experimental design to control for any potential survey noise or bias, I find that 49.2% of respondents in the BAYC Group (test group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club, and 8.8% of respondents in the CGBC Group (control group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club.  The net effect demonstrates likelihood of confusion among relevant consumers on the Foundation marketplace.

b.    There is also a meaningful likelihood of confusion for consumers who saw the BAYC Marks used in connection with the at-issue RR/BAYC NFT collection on the OpenSea marketplace.  Using an appropriately designed Squirt survey with relevant marketplace context and control stimuli, I find a net confusion rate of 20.0%.  That is, using an experimental design to control for any potential survey noise or bias, I find that 21.2% of respondents in the BAYC Group (test group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club, and 1.2% of respondents in the CGBC Group (control group) associated the at-issue RR/BAYC NFT collection with Bored Ape Yacht Club.  The net effect demonstrates

FENWICK & WEST LLP
ATTORNEYS AT LAW

likelihood of confusion among relevant consumers on the OpenSea marketplace.

c.  With the strong overlap and similarities in Ripps' and Cahen's use of the BAYC Marks and Ripps' and Cahen's claim that NFT consumers are aware of the "satirical" nature of the project, I took additional measures to ensure that my net confusion findings were not an artifact of guessing or weakly held beliefs. I find the majority of confused respondents exhibited strongly held beliefs as to the source of the at-issue RR/BAYC NFT collection. Specifically, for my Foundation Eveready Survey, approximately 78% of the respondents in the BAYC Group who showed confusion in response to the survey questions expressed certainty in their beliefs as to the source of the RR/BAYC NFT collection. Similarly, for my OpenSea Squirt survey, approximately 77% of the respondents in the BAYC Group who showed confusion in response to the survey questions expressed certainty in their beliefs that the RR/BAYC collection is from the same or an affiliated or connected source as Bored Ape Yacht Club. These results confirm my findings of a meaningful likelihood of confusion in both the Foundation and OpenSea contexts and undermine Ripps' and Cahen's claims that confusion was "impossible."

14.  Taken together, my likelihood of confusion studies support Yuga Labs' allegations of consumer confusion in this matter.

## Assessment of Likelihood of Consumer Confusion

### Evaluation of Potential Confusion in the NFT Marketplace

15.  As discussed above, Yuga Labs alleges that the at-issue RR/BAYC NFT collection creates a likelihood of forward confusion among consumers shopping for NFTs in the same and adjacent marketplaces. Forward confusion occurs when a new brand or mark enters the marketplace and consumers mistakenly believe it is made by or associated with a pre-existing brand.[3] Testing for a likelihood of forward

---

[3] "'Forward confusion' occurs when the use of a trademark by a second party (a junior user) is likely to lead consumers to mistakenly believe the junior user's goods

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   confusion entails determining whether consumers are likely to be confused that
2   Ripps' and Cahen's (junior user) at-issue RR/BAYC NFT collection come from the
3   same or an associated/related source as the Yuga Labs BAYC NFT collection (senior
4   user).  In my review of the materials available in this case, I found multiple examples
5   of varying types of forward confusion by consumers, including "initial interest
6   confusion" and "point of sale confusion."[4]  (*See* JTX-1043; JTX-713).

7       16.    I also observed evidence of "post-sale confusion" among consumers
8   outside the direct purchasing context.[5]   For example, observers in the NFT
9   marketplace appear to have confused the at-issue RR/BAYC NFT collection as
10  associated with the Yuga Labs BAYC collection.  Consumer confusion in the post-
11  sale context is likely higher, given that any blockchain details that might help dispel
12  confusion are less readily available to casual observers, than what would be expected
13  in the point of sale context.  (*See, e.g.*, JTX-1 at ¶ 25; JTX-705; JTX-1030; JTX-
14  1049; JTX-1192; JTX-1068; JTX-1069; JTX-1070; JTX-1071; JTX-1072; JTX-
15  1073).

16      17.    In assessing whether there is likelihood of confusion stemming from
17  Ripps' and Cahen's use of the BAYC Marks in the point of sale context, I first tested
18  whether there was evidence of confusion as it relates to the Foundation marketplace,
19  which is where I understand Ripps and Cahen initially minted and sold the at-issue
20  RR/BAYC NFT collection.  I also understand that Ripps and Cahen have claimed

FENWICK & WEST LLP
ATTORNEYS AT LAW

---

originate from or are associated with the first (or senior) user of the mark."  (*See* JTX-1125 at p. 23).

[4] Initial interest confusion occurs where there is temporary confusion during the consumer purchase process, and that confusion is dispelled before the purchase is made. Point of sale confusion occurs where there is confusion at the point of sale (where the product's name, logo or other identifying indicia may be available) and the purchase is finalized.  (*See* JTX-1125 at pp. 119-120, 294).

[5]  Post-sale confusion occurs where a prospective purchaser sees a product in a post purchase environment (where the product's name, logo or other identifying indicia may not be available) and is confused.  (JTX-1125 at p. 119).

that confusion was not possible in this marketplace because of "Foundation's exclusion of any Yuga NFTs." Foundation (https://foundation.app) is a popular NFT marketplace where NFT collectors would have encountered Ripps' and Cahen's at-issue RR/BAYC NFT collection. (JTX-1598; JTX-1596; JTX-670).  Even though Yuga Labs does not have, and has not had, a branded collection page on Foundation, I understand that users can make offers on individually held official BAYC NFTs through Foundation.  I test for likelihood of confusion on the Foundation marketplace using an Eveready survey design, described in more detail below as my "Foundation Eveready Survey."[6]

18.    I also understand that the at-issue RR/BAYC NFTs were subsequently sold on the secondary market between individual consumers on various NFT marketplaces.  For example, at various points in time, consumers on the OpenSea website (http://opensea.io), another popular NFT marketplace, would have observed both the Yuga Labs BAYC collection and the at-issue RR/BAYC NFT collection available and even directly next to each other on OpenSea's "Top Collections" leaderboard.  (JTX-1594; JTX-1598; JTX-684).  Because both collections were available in the same marketplace, I also test for likelihood of confusion in this context using a Squirt survey design, which is described in more detail below as my "OpenSea Squirt Survey."[7]

### Foundation Eveready Survey: Design, Stimuli, and Pretesting

19.    In designing my Foundation Eveready survey, I adhered to best practices for surveys used in litigation.[8]  The Foundation Eveready Survey employs

---

[6]   In Eveready format surveys involving forward confusion, respondents are presented with only the allegedly infringing mark and asked open-ended questions to assess confusion.  (JTX-1122 at pp. 56-57).

[7]   In Squirt format surveys involving forward confusion, respondents are presented with both parties' marks and asked closed-ended questions to assess confusion. (JTX-1123 at pp. 72-73).

[8]   Federal Judicial Center's Manual for Complex Litigation, *Federal Judicial Center*, 2004, available at https://www.uscourts.gov/sites/default/files/mcl4.pdf.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

a test/control experimental design, which is a reliable method to evaluate causal relationships. In an experimental design, respondents are randomly assigned to one of two groups and exposed to stimuli which are identical but for the at-issue characteristic being tested. As a result, any differences in confusion between the two groups can be attributed to the at-issue characteristic. In the Foundation Eveready Survey, I tested for differences between two groups, the Bored Ape Yacht Club ("BAYC") Group, who saw stimuli that included the at-issue RR/BAYC NFT collection, and the Chill Gorilla Boat Crew ("CGBC") Group, who saw modified stimuli with the at-issue RR/BAYC NFT collection, modified to remove references to BAYC.[9]

20.    For my Foundation Eveready Survey, respondents were guided through a simulated purchase flow of Foundation webpages, as this replicates what a consumer would experience when purchasing an at-issue RR/BAYC NFT on the Foundation website. Depending on the device used to enter the survey, respondents were presented with either the mobile or desktop version of Foundation webpages.

21.    In my research, I identified two versions of Ripps' Bored Ape Yacht Club Foundation collection page on the Wayback Machine website. On May 19, 2022, the Foundation collection page contained the official BA YC BORED APE YACHT CLUB Logo as the collection marker. (JTX-1557). However, by June 21, 2022, the collection marker was changed to the distorted BA YC BORED APE YACHT CLUB Logo. (JTX-1564). Figure 2 below shows the title section for both

---

[9]   For example, the control version of the Bored Ape Yacht Club Foundation Collection page is exactly the same in all respects to the test version, but for the following: 1) Ripps' distorted BA YC Bored Ape Yacht Club Logo replaced with an image featuring Ripps' own character logo; 2) Collection symbol altered to read CGBC rather than BAYC 3) Collection name changed from "Bored Ape Yacht Club" to "Chill Gorilla Boat Crew."; 4) Ape Skull Logo on Ape #57's sweater replaced with Ripps' own character logo; 5) Design on Ape #1956's hat changed from "BA YC" with the Ape Skull Logo to "CG BC" with Ripps' own character logo; 6.) "bayc" acronym in URL address revised to "cgbc."

1    versions of the collection page as displayed on the Wayback Machine.

2        22.    **Figure 2: Ripps' Bored Ape Yacht Club Foundation Collection as**

3    **of May 19, 2022 and June 21, 2022:**




15        23.    In developing my stimuli, I chose the June 21, 2022 version of Ripps'

16   Bored Ape Yacht Club collection page on Foundation as the beginning of the

17   purchase flow.    This choice is more conservative because the collection marker as

18   of June 21, 2022 is a distorted BA YC BORED APE YACHT CLUB Logo.  In other

19   words, using the June 21, 2022 Foundation collection page will likely result in lower

20   levels of confusion than using the May 19, 2022 version.

21        24.    Given the experimental approach I described above, a modified

22   purchase flow was created for CGBC Group respondents.  In developing the control

23   condition, I followed best practices to ensure that my control stimulus "share[d] as

24   many characteristics with the experimental stimulus as possible, with the key

25   exception of the characteristic whose influence is being assessed." (JTX-1122 at p.

26   210).

27        25.    Accordingly, CGBC Group respondents were guided through an

28

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

identical purchase flow except all mentions of Bored Ape Yacht Club were replaced with "Chill Gorilla Boat Crew," and in the appropriate format.  I chose "Chill Gorilla Boat Crew" as my control because it contains the same number of words as Bored Ape Yacht Club, each word is of similar length, and the combination of words communicates a similar meaning.[10]  In addition, all allegedly infringing logos were replaced with a logo previously used by Ripps on the Foundation website.[11]  To illustrate the modifications, Figure 3 and Figure 5 present reduced size desktop and mobile versions of Ripps' and Cahen's at-issue RR/BAYC NFT collection page as shown on the Foundation website, while Figure 4 and Figure 6 indicate in blue the areas where revisions were made to create the desktop and mobile control versions of same collections pages on Foundation, respectively.  Full sized images containing modifications made to all desktop and mobile purchase flow stimuli are included in Appendix D.1 to my report (*see* JTX-721 (Dkt. 265-1) at 112-132).

---

[10]  "Trademark infringement involves allegations of defendant's mark being likely to cause confusion as a result of its being unacceptably similar in visual appearance, sound, or meaning to plaintiff's mark. When the allegation concerns one of these three factors, it is best to keep the other two factors constant (that is, the same or virtually the same across both test and control) and modify only the third factor." (JTX-1125 at p. 513).

[11]  Ripps' own character logo obtained from "@ryder_ripps Foundation Page."  (*See* JTX-1600).

26.     **Figure 3: BAYC Group: Foundation Collection Page (Desktop):**



Line numbers: 1–28

FENWICK & WEST LLP
ATTORNEYS AT LAW

27. **Figure 4: CGBC Group: Modified Foundation Collection Page (Desktop):**



FENWICK & WEST LLP
ATTORNEYS AT LAW

28.     **Figure 5: BAYC Group: Foundation Collection Page (Mobile):**



FENWICK & WEST LLP
ATTORNEYS AT LAW

29.    **Figure 6: CGBC Group: Modified Foundation Collection Page (Mobile):**



FENWICK & WEST LLP
ATTORNEYS AT LAW

30.     In order to ensure that the questions in my Foundation Eveready Survey were "clear and unambiguous," a team under my supervision conducted 10 pretests on January 19 and January 20, 2023 with respondents from the target population described below.[12]  Independent moderators, unaware of the purpose or sponsor of the survey, conducted pretests via Zoom, by providing respondents with a link to the online questionnaire and requesting that they share the contents of their screen and think out loud when taking the survey.  Moderators asked respondents a series of questions after the survey was completed to assess if the respondent understood all instructions, questions, and answer options that were presented to them during the survey, as well as, whether the respondent was able to see all images clearly.[13]  Based on feedback received from conducting the pretests, I made minor changes to the survey instrument.[14]

**Foundation Eveready Survey:  Target Population, Sample, Screening Criteria**

31.     As discussed in the Federal Judicial Center's *Reference Manual on Scientific Evidence*, a survey's target population "consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent." (JTX-1612 at p. 376).  A crucial "first step[] in designing a survey […] is to identify the target population (or universe)." (JTX-1612 at pp. 376-377).  Here, Yuga Labs alleges forward confusion by arguing that Ripps' and Cahen's

---

[12]  "Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, and some courts have recognized the value of pretests." (JTX-1612 at pp. 388-389).

[13]  Appendix C to my report contains the pretest moderator instructions.  (JTX-721 (Dkt. 265-1) at 108-111).

[14]  The minor modification made to the Foundation Eveready Survey included updating the screening questions to allow respondents to qualify as either a past or potential NFT purchaser. Initially, respondents that indicated that they purchased cryptocurrency in the past, but not an NFT in particular, were terminated from the survey. The adjustments made to the screener allow such respondents the opportunity to instead qualify if they were also considering purchasing cryptocurrency, and in particular an NFT, in the future.

FENWICK & WEST LLP
ATTORNEYS AT LAW

unauthorized use of the BAYC Marks to "promote and sell their RR/BAYC NFTs is likely to cause confusion and mislead consumers into thinking the RR/BAYC NFTs are in some way sponsored, affiliated, or connected with Yuga Labs' Bored Ape Yacht Club." In forward confusion cases, the appropriate target population to survey is past and potential buyers of the junior user's goods or services. Accordingly, the target population in my Foundation Eveready Survey is past and potential purchasers of RR/BAYC NFTs. It is my understanding that in most circumstances a consumer must use cryptocurrency to buy an NFT and Ethereum in particular to purchase an RR/BAYC NFT. It is also my understanding that consumers who collect digital art are also likely to purchase NFTs. Accordingly, the target population for my Foundation Eveready Survey are individuals who indicate that they (i) have purchased an NFT in the past year using Ethereum, or (ii) are considering purchasing an NFT using cryptocurrency in the next year. Additionally, individuals who indicate that they either (iii) have purchased digital art as a collectible in the past year, or (iv) are considering doing so in the next year are also part of the target population as they too are likely prospective purchasers of the at-issue RR/BAYC NFTs. As discussed below, my Foundation Eveready Survey employs a screener to qualify the appropriate target population before asking the main Eveready confusion questions.

32.    I relied on Schlesinger Group ("Schlesinger"), a marketing research company, to recruit respondents from a national panel of individuals 18 or older to participate in my survey. The introduction to my survey instructed respondents to not reference any materials or look up information while taking the survey, and to take the survey on their own without consulting anyone else. (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 134-135 (QS0)). In the next set of questions, respondents were asked to complete a CAPTCHA exercise and to wear eyeglasses or contact lenses for the remainder of the survey if they typically would. (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 135 (QS1-3)). Respondents that did not complete

the CAPTCHA or did not agree to wear eyeglasses or contact lenses for the remainder of the survey were excluded from the survey.

33.     My survey then asked respondents standard demographic questions regarding their age and gender.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 136 (QS4, QS5).   Respondents' answers to the age and gender questions were compared to their panel profile information for verification.   Respondents who provided the incorrect age or gender information were terminated from the survey.   Next, respondents were asked to indicate their state of residence.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 136 (QS6)).   To ensure that the sample for my survey is representative of the target population, Schlesinger used answers to the age, gender, and state question to track and balance incoming sample in a manner that matches U.S. Census demographic data.

34.     As a quality control measure, respondents were then shown a question that instructed them to select the word "Second" from a list of answer options shown in randomly-assigned ascending or descending order.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137 (QS7)).   Respondents that failed to select the correct answer option were excluded.   Next, respondents were asked about the type of company they and their household members have worked for.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137 (QS8)).   Respondents who indicated that they worked for, or anyone in their household worked for, a "Company in the blockchain industry" or a "Market research or advertising agency" were excluded from the survey as they may have specialized knowledge about the subject matter which in turn could bias their responses.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137 (QS8)).

35.     Respondents were next asked a series of questions related to their past purchase behavior and expected future purchases.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137-138 (QS9a and QS9b)).   Figure 7 below illustrates the different pathways that respondents could take to qualify for the survey.   Only respondents

that met one of the following criteria qualified for the main questionnaire:

      a.  Have purchased an NFT in the past year using Ethereum (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137-139 (QS9a, QS10, and QS11));

      b.  Are considering purchasing an NFT using cryptocurrency in the next year (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 138-139 (QS9b and QS12);

      c.  Have purchased digital art as a collectible within the past year (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137, 139 (QS9a and QS13);

      d.  Are considering purchasing digital art collectibles in the next year (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 137-139 (QS9b and QS13).

36.    **Figure 7: Flowchart of Paths for Qualification:**



FENWICK & WEST LLP
ATTORNEYS AT LAW

**Foundation Eveready Survey:  Main Questionnaire**

37.    As described above, I adopted a test/control experimental design for my Foundation Eveready Survey, as such a design allows me to isolate the likelihood of confusion, if any, due to Ripps' and Cahen's use of the BAYC Marks in connection with the at-issue RR/BAYC NFT collection.   Accordingly, qualified respondents were assigned to either the BAYC Group (test group) or CGBC Group (control group) at the beginning of the main questionnaire.   Respondents were provided with instructions (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 140 (Q1)) and taken through a purchase flow comprised of three sets of images with accompanying instructions.   The images presented to respondents were full-sized versions of webpages from the Foundation marketplace website and respondents were able to zoom into the images if desired.   The set of images and accompanying instructions are presented below in Figure 8 and in Appendix D.3a and Appendix D.3b to my report (*see* JTX-721 (Dkt. 265-1) at 151-230).

38. **Figure 8: Purchase Flow Instructions and Stimuli:**

| Q1IMAGE1. Imagine you are looking to purchase an NFT from the collection below. *Please wait for the image to load and scroll down to view the entire image. The continue button can be found at the bottom of the page.* | Q1IMAGE2. Then, you decide on this NFT. *Please wait for the image to load and scroll down to view the entire image. The continue button can be found at the bottom of the page.* | Q1IMAGE3. You decide to click "view on Etherscan" to see more details, before finishing your purchase. *Please wait for the image to load and scroll down to view the entire image. The continue button can be found at the bottom of the page.* |
|---|---|---|

**BAYC Group – Original RR/BAYC NFT Foundation Purchase Flow**

  

**CGBC Group – Modified RR/BAYC NFT Foundation Purchase Flow**

  

39. After reviewing all three images[15], respondents were asked if they were

---

[15] (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 140 (Q1)). Stimuli images were available to respondents in Q3-Q9 as clickable thumbnail images. (*See* JTX-721 at Appendix D.1 (Dkt. 265-1) at 112-132).

able to see the webpage stimuli clearly. (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 148 (Q3)).  If so, they continued to the first key confusion question (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 148 (Q4)) and were also asked a follow up question regarding why they answered the way that they did (*see* JTX-721 at Appendix D.2 (Dkt. 265-1) at 148 (Q5)).

40.     With the strong overlap and similarities in Ripps' and Cahen's use of the BAYC Marks, as well as Ripps' and Cahen's claim that NFT consumers are aware of the "satirical" nature of the project, I asked respondents about the strength of their belief in their response to the source confusion question.  Asking about strength of belief is also helpful in this context as there are numerous NFT collections on Foundation, including some related to apes and other non-human primates, and respondents may be providing a particular answer simply due to the appearance of an ape or other non-human primate within the stimulus. (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 149 (Q6)).

41.     After answering, all respondents were asked the second set of key confusion questions related to whether or not the source of the NFT collection shown has any business relationships with other entities.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 149 (Q7)).  Respondents that selected "Does not have a business relationship…" or "Unsure / No opinion" skipped to QF1.  All other respondents continued.  Respondents that continued were asked what other entity or entities they believed have a business relationship with whoever puts out the NFT collection they saw.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 149 (Q8)).  Respondents that selected "Don't know/Unsure" skipped to QF1.  All other respondents were asked about the strength of their belief.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 150 (Q9)).

42.     After completing the main questionnaire, all respondents were asked a series of follow-up questions, which were included as a quality control measure and

to conduct sensitivity analyses on my results.  (*See* JTX-721 at Appendix D.2 (Dkt. 265-1) at 150 (QF1-QF3)).

### Foundation Eveready Survey:  Data Analysis and Results (*See* JTX-1592)

43.     The Foundation Eveready Survey was administered online from January 23, 2023 to January 31, 2023.  A total of 505 respondents qualified for and completed my survey, with 254 and 251 respondents randomly assigned to the BAYC and CGBC Groups, respectively.[16] Exhibit 1 to my report (JTX-721 (Dkt. 265-1) at 76-77) is a detailed summary of the Foundation Eveready Survey response statistics and Exhibit 2 to my report (JTX-721 (Dkt. 265-1) at 78) provides demographics for the 505 qualified and completed survey respondents.

44.     With my Foundation Eveready Survey, I assessed likelihood of confusion by analyzing respondents' answers to the key confusion questions, Q4 and Q8, both of which reflect open-ended questions.  Because an analysis of open- ended answers requires human review and judgment, I relied on independent coders who were unaware of the purpose of the survey to ensure that the responses in my survey data were interpreted and analyzed in an unbiased manner.  Under my direction, the two coders reviewed and coded responses to open-ended questions Q4, Q5, and Q8 of my survey.  The independent coders were provided with a list of categories for each open-ended question (and could add additional categories as needed) and were responsible for classifying each respondent's answer into such categories.  The coders met after the initial round of coding and settled any disagreements in categorization.  For my analysis, I used the final consolidated coding of the responses, which is contained in Exhibit 3 to my report (JTX-721 (Dkt. 265-1) at 79).  Appendix D.4 (JTX-721 (Dkt. 265-1) at 231-234) includes the set of instructions provided to the independent coders.

---

[16]  Prior to receiving the data, Schlesinger independently reviewed for quality control and removed respondents from the dataset by following a standard data cleaning process.

Fenwick & West LLP
Attorneys at Law

45.     To measure confusion as to the source of the NFT collection shown, I analyzed the coded responses to Q4 ("Who or what entity do you believe puts out the NFT collection you saw?").  In response to Q4, 46.1% percent of respondents assigned to the BAYC Group and 7.2% percent of respondents assigned to the CGBC Group identified Bored Ape Yacht Club as the source of the NFT collection shown.[17] In comparing the results between the experimental groups, I find a net source confusion rate of 38.9% percent.

46.     To measure confusion as to business relationships, I analyzed coded responses to Q8 ("What other entity or entities do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever puts out the NFT collection you saw?").  In response to Q8, 5.9% percent of respondents assigned to the BAYC Group and 2.8% percent of respondents assigned to the CGBC Group identified Bored Ape Yacht Club as having a business relationship with whoever puts out the NFT collection shown.[18]  In comparing the results between the experimental groups, I find a net business relationship confusion rate of 3.1% percent.

47.     To determine the overall likelihood of confusion in my Foundation Eveready Survey, I combined the total number of unique respondents that were confused in Q4 and Q8.  Across the two questions, I identified 49.2% percent of respondents assigned to the BAYC Group and 8.8% percent of respondents assigned

---

[17]   Coders were instructed to categorize "BAYC," "Bored Ape," "Yuga Labs," "Mutant Ape Yacht Club" as mentions of Bored Ape Yacht Club. There are only two instances where respondents indicated that the source of the NFT collection was related to Yuga Labs, and I consider these respondents as also confused as to the source of the RR/BAYC (or RR/CGBC) NFT collection as Bored Ape Yacht Club.

[18]   Coders were instructed to categorized "BAYC," "Bored Ape," "Yuga Labs," "Mutant Ape Yacht Club" as mentions of Bored Ape Yacht Club. There are three instances where respondents indicated that Yuga Labs or Mutant Ape Yacht Club has a business relationship with the NFT collection, and I consider these respondents as also confused as to a business relationship between the RR/BAYC (or RR/CGBC) NFT collection and Bored Ape Yacht Club.

FENWICK & WEST LLP
ATTORNEYS AT LAW

to the CGBC Group as confused to source and/or business relationships. In comparing the results between the experimental groups, I find an overall net confusion rate of 40.4% percent, which is indicative of a meaningful likelihood of confusion due to Ripps' and Cahen's use of the BAYC Marks on the Foundation marketplace. Figure 9 below provides a summary of overall confusion when aggregating results for key confusion questions Q4 and Q8. *See* Exhibit 4 to my report (JTX-721 (Dkt. 265-1) at 80).

48. **Figure 9: Net Confusion in Foundation Eveready Survey:**

| | BAYC Group | | CGBC Group | | Net Confusion BAYC Group - CGBC Group |
|---|---|---|---|---|---|
| | N | % | N | % | % |
| *# of Respondents* | 254 | | 251 | | |
| **Confusion as to Source** | 117 | 46.1% | 18 | 7.2% | 38.9% |
| **Confusion as to Business Relationship** | 15 | 5.9% | 7 | 2.8% | 3.1% |
| **Overall Confusion** | 125 | 49.2% | 22 | 8.8% | 40.4% |

49. Recent research on trademark surveys in litigation contexts discusses the role that uncertainty may play in survey evidence and warns that if likelihood of confusion findings are based primarily on weakly held beliefs, the survey findings may be less meaningful. (*See* JTX-1121 at pp. 1-52). That is, even as trademark surveys typically test for whether consumers hold particular beliefs, they generally do not test for the strength or certainty of such beliefs.

50. As discussed above, to minimize the risk of putting too much weight on respondents' weakly held beliefs, I included in my Foundation Eveready Survey questions that measure each respondent's certainty of the answers they provided to the key questions about source and business relationship confusion. Questions Q6 and Q9 were asked to measure each respondent's certainty of their answers to Q4 and Q8 respectively.

51. I find that approximately 78% of the "confused" respondents in the BAYC Group expressed certainty in their beliefs as to the source of the NFT

collection (Q4), based on their responses to Q6.  These results point to strongly held beliefs as they relate to confusion as to the source of the NFT collection, which is the dominant form of confusion in my Foundation Eveready Survey.[19]  By comparison, I find that approximately 33% of the "confused" respondents in the BAYC Group expressed certainty in their beliefs as to business relationships (Q8), based on their responses to Q9.[20]  The relatively lower rate of certainty with respect to this question is consistent with a relatively higher share of respondents indicating that they were "unsure" to questions about the existence of business relationship (Q7 / Q8).[21]  Overall, the results show that respondents are more certain about the source of the NFT collection than about the existence of other business relationships.

52.    I ran a sensitivity that *excludes* from the net confusion rate respondents that were confused as to the source and/or business relationship of the NFT collection they viewed but did *not* answer "very likely correct" or "definitely correct" to Q6 or Q9 as the follow-up certainty questions.  Overall, I identified 36.2% percent of respondents assigned to the BAYC Group, and 6.4% percent of respondents assigned to the CGBC Group as confused to source and/or business relationships.   In comparing the results between experimental groups, I find a net overall confusion rate of 29.8% percent in this sensitivity.  This net confusion rate is indicative of a likelihood of confusion due to Ripps' and Cahen's use of the BAYC Marks on the Foundation marketplace.  Figure 10 below provides a summary of the confusion

---

[19]  47 respondents (40%) indicated they were "definitely correct" and 44 respondents (38%) indicated they were "very likely correct" while only 24 respondents (21%) indicated they were only "somewhat likely correct" and 2 respondents (2%) indicated they were "just guessing."

[20]  1 respondent (7%) indicated they were "definitely correct" and 4 respondents (27%) indicated they were "very likely correct" while 9 respondents (60%) indicated they were only "somewhat likely correct" and 1 respondent (7%) indicated they were "just guessing."

[21]  There were 234 respondents (46%) across both the BAYC and CGBC Groups who selected "Don't know / Unsure" to Q7 or Q8, compared to 115 respondents (23%) who selected "Don't know / Unsure" to Q4.

FENWICK & WEST LLP
ATTORNEYS AT LAW

results based on this sensitivity.  *See* Exhibit 5 to my report (JTX-721 (Dkt. 265-1) at 81).

53.    **Figure 10: Sensitivity: Net Confusion with Certainty in Foundation Eveready Survey:**

| | BAYC Group | | CGBC Group | | Net Confusion BAYC Group - CGBC Group |
|---|---|---|---|---|---|
| | N | % | N | % | % |
| *# of Respondents* | 254 | | 251 | | |
| **Confusion as to Source** | 91 | 35.8% | 13 | 5.2% | 30.6% |
| **Confusion as to Business Relationship** | 5 | 2.0% | 6 | 2.4% | -0.4% |
| **Overall Confusion with Certainty** | 92 | 36.2% | 16 | 6.4% | 29.8% |

54.    I also ran two additional sensitivities, testing for the impact of speeders and laggards and for the impact of respondents who indicate they are aware of any lawsuits related to NFTs.  Neither sensitivity changes my finding of a likelihood of confusion based on Ripps' and Cahen's use of the BAYC Marks on the Foundation marketplace.[22]

**OpenSea Squirt Survey: Design, Stimuli, and Pretesting**

55.    In designing the OpenSea Squirt Survey, I adhered to best practices for surveys used in litigation.[23]  Similar to my Foundation Eveready Survey, my OpenSea Squirt Survey also employs a test/control experimental design, which is a reliable method to evaluate causal relationships.  In the OpenSea Squirt Survey, I tested for differences between two groups: the Bored Ape Yacht Club ("BAYC") Group, who saw an array stimulus that included the at-issue RR/BAYC NFT collection, and the

---

[22]  Specifically for the speeders and laggards, I excluded respondents who took less than 3.5 minutes or more than 30 minutes to complete the Foundation Eveready Survey. For this sensitivity, I find a net confusion rate of 41.4%.  *See* Exhibit 6 to my report (JTX-721 (Dkt. 265-1) at 82). For the litigation awareness sensitivity, I excluded respondents who indicated that they were aware of at least one lawsuit related to NFTs. For this sensitivity, I find a net confusion rate of 40.5%.  *See* Exhibit 7 to my report (JTX-721 (Dkt. 265-1) at 83).

[23]  Federal Judicial Center's Manual for Complex Litigation, *Federal Judicial Center*, 2004, available at https://www.uscourts.gov/sites/default/files/mcl4.pdf.

Chill Gorilla Boat Crew ("CGBC") Group, who saw a modified array stimulus that included a modified NFT collection that does not use the BAYC Marks.

56.     In my research, I identified a tweet by @Pauly0x from June 20, 2022, which includes a screenshot of an NFT collection leaderboard from OpenSea displaying the "Top [NFT] collections over last 24 hours." (*See* JTX-683; JTX-684). The NFT collection leaderboard displayed includes not only the at-issue RR/BAYC NFT collection, but also shows it in close proximity to the Yuga Labs BAYC NFT collection.  Figure 11 below shows the screenshot shared in the @Pauly0x tweet.

57.     **Figure 11: Top Collections Leaderboard Displayed in June 20, 2022 @Pauly0x tweet.  (*See* JTX-683; JTX-684):**



58.     In developing my stimulus for the OpenSea Squirt Survey, I found that during the relevant period, the OpenSea home page typically included a "Top collections" leaderboard, similar to the one from Pauly0x's June 20, 2022 tweet. Accordingly, I created the OpenSea stimulus based on the Wayback Machine website record of the June 20, 2022 OpenSea home page and the image from Pauly0x's tweet. The inclusion of the "Top Collections" image, specifically from Pauly0x's tweet, is conservative as respondents may focus their attention on relationships that fall

FENWICK & WEST LLP
ATTORNEYS AT LAW

outside of confusion at issue in this litigation, thus reducing observed confusion levels.   For example, a respondent may believe there is a relationship between ArtBlocks Curated and Chromie Squiggle due to the similar logo, RR/BAYC and Primates due to the ape nature of the NFT collection, CryptoPunks and CryptoPunks v1 due to the similarity in name, or Yeah Tigers and Okay Bears due to the animal nature of both NFT collections.   The Wayback Machine website record is shown below in Figure 12.  (*See* JTX-1599).

59.    **Figure 12: Wayback Machine Record of June 20, 2022 OpenSea Home Page:**



60.    For my OpenSea Squirt Survey, respondents were first presented with the OpenSea home page containing an array of NFT collections, as this replicates what a consumer would experience when visiting the OpenSea website to purchase an NFT.   Respondents were then asked to focus on the NFT collection array specifically.   Depending on the device used to enter the survey, respondents were presented with either the mobile or desktop version of OpenSea home page and NFT

FENWICK & WEST LLP
ATTORNEYS AT LAW

1   collection array.

2       61.    Given the experimental approach I described above, a modified

3   OpenSea homepage and NFT collection array was created for CGBC Group

4   respondents.  In developing the control, I followed best practices to ensure that my

5   control stimulus "share[d] as many characteristics with the experimental stimulus as

6   possible, with the key exception of the characteristic whose influence is being

7   assessed." (*See* JTX-1122 at p. 210).

8       62.    CGBC Group respondents were shown an identical OpenSea home page

9   containing the NFT collection array, except the mention of "RR/BAYC" was

10  replaced with "RR/CGBC."  In addition, the distorted BA YC BORED APE YACHT

11  CLUB Logo for the RR/BAYC collection was replaced with a different logo

12  previously used by Ripps. (*See* JTX-1600).  To illustrate the modifications, Figure

13  13 and Figure 15 present reduced size desktop and mobile versions of the main

14  OpenSea NFT collection array, while Figure 14 and Figure 16 indicate in blue the

15  areas where revisions were made to create the desktop and mobile control versions of

16  the same OpenSea NFT collection array.  Full sized images containing modifications

17  made to both the desktop and mobile OpenSea home page stimuli are included in

18  Appendix E.1 to my report (JTX-721 (Dkt. 265-1) at 235-249).

FENWICK & WEST LLP
ATTORNEYS AT LAW

63.     **Figure   13:   BAYC   Group:   OpenSea   NFT   Collection   Array
(Desktop):**



64.     **Figure 14: CGBC Group: Modified OpenSea NFT Collection Array
(Desktop):**



FENWICK & WEST LLP
ATTORNEYS AT LAW

65.    **Figure 15: BAYC Group: OpenSea NFT Collection Array (Mobile):**

66.     **Figure 16: CGBC Group: Modified OpenSea NFT Collection Array (Mobile):**

67.     In order to ensure that the questions in my OpenSea Squirt Survey were "clear and unambiguous," a team under my supervision conducted 9 pretests on January 25, 2023 with respondents from the target population in the same manner as described for my Foundation Eveready Survey.[24] Based on feedback received from conducting the pretests, I made minor changes to the survey instrument.[25]

**OpenSea Squirt Survey: Target Population, Sample, and Screening Criteria**

68.     As discussed in the Federal Judicial Center's *Reference Manual on Scientific Evidence*, a survey's target population "consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent." (JTX-1612 at p. 376).  A crucial "first step[] in designing a survey […] is to identify the target population (or universe)." (JTX-1612 at pp.376-377).  Here, given that the same set of allegations apply to Ripps' and Cahen's allegedly infringing use of the BAYC Marks in both the Foundation and OpenSea marketplaces, I chose the same target population as my Foundation Eveready Survey for my OpenSea Squirt Survey.  Accordingly, the target population in my OpenSea Squirt Survey is past and potential purchasers of RR/BAYC NFTs, which are individuals who indicate that they (i) have purchased an NFT in the past year using Ethereum, or (ii) are considering purchasing an NFT using cryptocurrency in the next year.

69.     Additionally, individuals who indicate that they either (iii) have purchased digital art as a collectible in the past year, or (iv) are considering doing so in the next year are also part of the target population as they too are likely prospective

---

[24] "Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, and some courts have recognized the value of pretests." (JTX-1612 at pp. 388-389).

[25] The minor modifications made to the OpenSea Squirt Survey include changing all "company" references in the main questionnaire to "entity" for clarity; increasing the number of available Q6 answers from 5 to 10 as a few respondents specified wanting additional opportunities to indicate relationships; and adjusting the presentation of NFT collections displayed in Q6 to minimize confusion.

purchasers of the at-issue RR/BAYC NFTs.  Accordingly, my OpenSea Squirt Survey employs the same screener as my Foundation Eveready Survey to qualify the appropriate target population before asking the main Squirt confusion questions.  I also relied on Schlesinger to recruit respondents from a national panel of individuals 18 or older to participate in my OpenSea Squirt Survey.  The inbound sample was click balanced on the U.S. census.

### OpenSea Squirt Survey: Main Questionnaire

70.    As described above, I adopted a test/control experimental design for my OpenSea Squirt Survey, as such design allows me to isolate the likelihood of confusion, if any, due to Ripps' and Cahen's use of the BAYC Marks in connection with the at-issue RR/BAYC NFT collection.  Upon entering the main questionnaire, qualified respondents were assigned to either the BAYC Group (test group) or CGBC Group (control group).  Respondents were then provided with instructions.  (*See* JTX-721 at Appendix E.2 (Dkt. 265-1) at 258 (Q1)).

71.    Respondents were then shown the OpenSea home page in its entirety with an accompanying instruction.  Respondents were presented with a full-sized version of the webpage and were able to zoom into the image if desired.  An image of the OpenSea home page and accompanying instruction shown to BAYC Group is presented below in Figure 17.  (*See* JTX-721 at Appendix E.2 (Dkt. 265-1) at 258 (Q2)).

FENWICK & WEST LLP
ATTORNEYS AT LAW

72. **Figure 17: BAYC Group OpenSea Home Page Instructions and Stimulus:**

Q2. Please review the images of the NFT collections shown below as you would if you were considering purchasing **[PIPE IN "an NFT" IF RESPONDENT SELECTS "NFT purchase" IN QS11 OR QS12. ELSE PIPE IN "digital art"]**. You can look at the NFT marketplace page for as long as you like.



Fenwick & West LLP
Attorneys at Law

73.     After reviewing the image, respondents were asked if they could see the image clearly.  (*See* JTX-721 at Appendix E.2 (Dkt. 265-1) at 261 (Q3)).  If so, they continued with the survey.  Respondents were terminated from the survey if they indicated that they were not able to see the OpenSea home page stimulus in the survey clearly.

74.     Next, respondents were shown the NFT collection array that appeared in the OpenSea home page along with an accompanying instruction.  Respondents were presented with a full-sized version of the NFT collection array were able to zoom into the image if desired.  An image of the NFT collection array and accompanying instruction shown to the BAYC Group or CGBC Group is presented below in Figure 18.  (*See also* JTX-721 at Appendix E.3a and Appendix E.3b (Dkt. 265-1) at 266-339).

75.   **Figure 18: NFT Collection Array and Instructions:**





76.   Next, respondents were asked the first key confusion question.   (*See*
JTX-721 at Appendix E.2 at (Dkt. 265-1) at 262 (Q4)).   Respondents that selected
"Each of the NFT collections are made or put out by separate entities…" or "Don't
know/Unsure" skipped to QF1.   All other respondents were shown the NFT

collection array again and asked Q5. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 262 (Q5)). Respondents were allowed to select any combination of NFT collections as their answer to the question. Respondents that selected only "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" skipped to Q7. Respondents that selected a different combination of two NFT collections or "Don't know/Unsure" skipped to QF1. Respondents that selected more than two NFT collections continued to Q6. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 263 (Q6)).

77.    Respondents were presented with the NFT collections they selected in Q5 and were allowed to select specific pairings of NFT collections that they believe are from the same entity or are from affiliated or connected entities. Respondents that paired "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" together as an answer choice continued to Q7. All other respondents skipped to QF1. Respondents that continued to Q7 were presented with images of the "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" collections from the array and were asked why they believe these NFT collections are from the same entity or are from affiliated or connected entities. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 264 (Q7)).

78.    Respondents were able to answer in their own words why they believe the "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" NFT collections are from the same entity or affiliated or connected entities or to select "Don't know/Unsure." Given the strong overlap and similarities in Ripps' and Cahen's use of the BAYC Marks and Ripps' and Cahen's claim that NFT consumers are aware of the "satirical" nature of the project, I took additional measures to ensure that my net confusion findings were not an artifact of guessing or weakly held beliefs. Therefore, respondents that selected "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" NFT collections were presented with images of the "RR/BAYC" (or

"RR/CGBC") and "Bored Ape Yacht Club" collections from the array and were asked how likely they believe that their previous answer is correct. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 264 (Q8)).

79.     After completing the main questionnaire, all respondents were asked a series of follow-up questions, which were included as a quality control measure and to conduct sensitivity analyses on my results. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 264-265 (QF1-QF3)).

### OpenSea Squirt Survey: Data Analysis and Results (*See* JTX-1593)

80.     The OpenSea Squirt Survey was administered online from January 26, 2023 to January 31, 2023.  505 respondents qualified for and completed my survey, with 250 and 255 respondents assigned to the BAYC and CGBC Groups, respectively.[26]  Exhibit 8 to my report (JTX-721 (Dkt. 265-1) at 84-85) is a detailed summary of the OpenSea Squirt response statistics.  Exhibit 9 to my report (JTX-721 (Dkt. 265-1) at 86) contains the demographics for the 505 qualified and completed survey respondents.

81.     With my OpenSea Squirt Survey, I assessed likelihood of confusion by analyzing each respondent's answer to key confusion questions.  Confused respondents include those who explicitly indicated in Q5 or Q6 that they believe "RR/BAYC" (or "RR/CGBC") and either "Bored Ape Yacht Club," "Mutant Ape Yacht Club," or "Otherdeed" are from the same or affiliated/connected sources. Specifically, in response to Q5 and Q6, 21.2% percent of respondents assigned to the BAYC Group and 1.2% percent of respondents assigned to the CGBC Group identified "RR/BAYC" (or "RR/CGBC") and either "Bored Ape Yacht Club," "Mutant Ape Yacht Club," or "Otherdeed" as being from the same or affiliated/connected sources.  In comparing the results between the experimental

---

[26] Prior to receiving the data, Schlesinger independently reviewed for quality control and removed respondents from the dataset by following a standard data cleaning process.

FENWICK & WEST LLP
ATTORNEYS AT LAW

groups, I find a net confusion rate of 20.0% percent, which is indicative of a likelihood of confusion due to Ripps' and Cahen's use of the BAYC Marks on the OpenSea marketplace.  Figure 19 below provides a summary of net confusion between "RR/BAYC" (or "RR/CGBC") and either "Bored Ape Yacht Club," "Mutant Ape Yacht Club," or "Otherdeed."  *See* Exhibit 10 to my report (JTX-721 (Dkt. 265-1) at 87).

82.    **Figure 19: Net Confusion in OpenSea Squirt Survey:**

| | BAYC Group | | CGBC Group | | Net Confusion BAYC Group - CGBC Group |
|---|---|---|---|---|---|
| | N | % | N | % | % |
| *# of Respondents* | 250 | | 255 | | |
| **Confusion** | 53 | 21.2% | 3 | 1.2% | 20.0% |

83.    As discussed above, recent literature on trademark survey evidence has suggested that testing for respondent certainty provides an additional measure of confidence in likelihood of confusion measures.  I included in my OpenSea Squirt Survey a question that measures respondents' certainty in the answers they provided to key confusion questions.  A robustness test is particularly appropriate here as experts have raised the possibility of respondents engaging in a "similarity analysis" in Squirt surveys involving arrays.  (*See* JTX-1123 at p. 72).  To minimize this risk, I asked respondents about the certainty of their answer if they indicated in Q5 or Q6 that the RR/BAYC (or RR/CGBC) and Bored Ape Yacht Club collections are from the same entity or from affiliated or connected entities.[27]  Specifically, the following question was asked in Q8 to measure respondents' certainty regarding their belief that the RR/BAYC (or RR/CGBC) and Bored Ape Yacht Club collections are from

---

[27]  Respondents that selected only RR/BAYC and Bored Ape Yacht Club in Q5 or indicated that RR/BAYC and Bored Ape Yacht Club have a relationship in Q6, were asked the follow up certainty question.

FENWICK & WEST LLP
ATTORNEYS AT LAW

the same entity or from affiliated or connected entities, as shown in Figure 20. (*See* JTX-721 at Appendix E.2 at (Dkt. 265-1) at 264 (Q8)).

84.  **Figure 20: Q8 Image and Certainty Question Shown to BAYC Group and CGBC Group:**



85.  Due to the lower risk of respondents engaging in a similarity analysis between "RR/BAYC" (or "RR/CGBC") and other NFT collections in the array, respondents were not asked Q8 if they did not explicitly indicate in Q5 or Q6 that the "RR/BAYC" (or "RR/CGBC") and "Bored Ape Yacht Club" collections were from the same entity or from affiliated or connected entities.

86.  I find that approximately 77% of the "confused" respondents in the BAYC Group of the OpenSea Squirt Survey expressed certainty in their beliefs that

1  the RR/BAYC collection is from the same or an affiliated or connected source as

2  Bored Ape Yacht Club, based on their responses to Q8.[28]  These results point to

3  respondents' strongly held beliefs as they relate to confusion.

4        87.    I ran a sensitivity that *excludes* from the net confusion rate respondents

5  that were confused as to source or connection/affiliation between "RR/BAYC" (or

6  "RR/CGBC") and "Bored Ape Yacht Club" but did *not* answer "very likely correct"

7  or "definitely correct" to Q8 as the follow-up certainty question.[29]  I find that 16.8%

8  percent of respondents assigned to the BAYC Group and 1.2% percent of respondents

9  assigned to the CGBC Group identified "RR/BAYC" (or "RR/CGBC") and either

10  "Bored Ape Yacht Club," "Mutant Ape Yacht Club," or "Otherdeed" as being from

11  the same or affiliated/ connected source.   In comparing the results between

12  experimental groups, I find a net source confusion rate of 15.6% percent in this

13  sensitivity, which is still indicative of a likelihood of confusion due to Ripps' and

14  Cahen's use of the BAYC Marks on the OpenSea marketplace.  Figure 21 below

15  provides a summary of the confusion results based on this sensitivity.  *See* Exhibit

16  11 to my report (JTX-721 (Dkt. 265-1)) at 88.

FENWICK & WEST LLP
ATTORNEYS AT LAW

---

[28]  12 respondents (24%) indicated they were "definitely correct" and 26 respondents (53%) indicated they were "very likely correct" while only 10 respondents (20%) indicated they were only "somewhat likely correct" and 1 respondent (2%) indicated they were "just guessing."

[29]  In this sensitivity, I did not exclude the four respondents that indicated they believe RR/BAYC and either Mutant Ape Yacht Club or Otherdeed are from the same entity or from affiliated or connected entities. These respondents were not asked Q8 because their identification of the relationship to Mutant Ape Yacht Club or Otherdeed in Q5 or Q6 likely reflects a stronger awareness of the Yuga Labs' affiliated NFT collections.

88.    **Figure 21: Sensitivity: Net Confusion with Certainty in OpenSea Squirt Survey:**

| | BAYC Group | | CGBC Group | | Net Confusion BAYC Group - CGBC Group |
|---|---|---|---|---|---|
| | N | % | N | % | % |
| # of Respondents | 250 | | 255 | | |
| Confusion with Certainty | 42 | 16.8% | 3 | 1.2% | 15.6% |

89.    I also ran two additional sensitivities, testing for the impact of speeders and laggards and for the impact of respondents who indicate they are aware of any lawsuits related to NFTs.  Neither sensitivity changes my finding of a likelihood of confusion based on Ripps' and Cahen's use of the BAYC Marks on the OpenSea marketplace.[30]

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 13th day of July, 2023.

_____
Laura O'Laughlin

FENWICK & WEST LLP
ATTORNEYS AT LAW

---

[30]  Specifically for the speeders and laggards, I excluded respondents who took less than 2 minutes or more than 25 minutes to complete the OpenSea Squirt Survey.  For this sensitivity, I find a net confusion rate of 20.6%.  *See* Exhibit 12 to my report (JTX-721 (Dkt. 265-1) at 89).  For the litigation awareness sensitivity, I excluded respondents who indicated that they were aware of at least one lawsuit related to NFTs.  For this sensitivity, I find a net confusion rate of 21.3%.  *See* Exhibit 13 to my report (JTX-721 (Dkt. 265-1) at 90).