# Trial Exhibit JTX-1121

# NEW YORK UNIVERSITY

# SCHOOL OF LAW

### LAW AND ECONOMIC RESEARCH PAPER SERIES
### WORKING PAPER NO. 21-13



## The Role of Consumer Uncertainty in Trademark Law:
## An Experimental and Theoretical Investigation

*Barton Beebe, Roy Germano, Christopher Jon Sprigman, and Joel Steckel*

May 2021



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
Case No. **2:22-cv-04355-JFW-JEM**
**Yuga Labs, Inc.**
vs.
**Ryder Ripps, Jeremy Cahen**
JOINT EXHIBIT _____ **JTX-1121**
DATE _____ IDEN.
DATE _____ EVID.
BY _____
**Deputy Clerk**

Electronic copy available at: https://ssrn.com/abstract=3864740

**JTX-1121.00001**

YUGALABS_00033998

# The Role of Consumer Uncertainty in Trademark Law: An Experimental and Theoretical Investigation

Barton Beebe, Roy Germano, Christopher Jon Sprigman & Joel H. Steckel[*]

## Abstract

Nearly every important issue in trademark litigation turns on the question of what consumers in the marketplace subjectively believe to be true. To address this question, litigants frequently present consumer survey evidence, which can play a decisive role in driving the outcomes of disputes. But trademark survey evidence has proven to be highly controversial, not least because it is notoriously prone to expert manipulation. In this Article, we identify and present empirical evidence of a related, but more fundamental problem with trademark survey evidence: while all the leading survey formats in trademark law test for whether consumers hold a particular belief, they do not test for the *strength* or the *varying degrees of certainty* with which consumers hold that belief. In short, by treating the question of consumer beliefs as essentially binary, the formats do not test for *belief strength*. Yet as the social science literature has long recognized, the strength with which consumers hold particular beliefs shapes their behavior in the marketplace, and thus it should also shape, we believe, how trademark disputes play out in the courtroom. Through a series of experiments using the three leading trademark survey formats (the so-called *Teflon*, *Eveready*, and *Squirt* formats), we show the remarkable degree to which these formats as conventionally designed overlook—or suppress—crucial information about consumer uncertainty. We further demonstrate how a low-cost, easily-administered, and relatively simple modification in these formats can reveal that information. We discuss both the practical and theoretical implications of our findings. As a practical matter, trademark survey evidence that shows only weakly-held beliefs (or that does not even test for belief strength) should not, without more, satisfy a litigant's burden of persuasion on the issue addressed by the survey. Furthermore, in line with courts' growing efforts in intellectual property cases to tailor injunctive relief, survey evidence showing only weakly-held mistaken beliefs may provide courts with the opportunity to fashion more limited forms of relief short of an outright injunction. As a theoretical matter, we explain how trademark survey formats that reveal the true extent of consumer uncertainty in the marketplace may finally force trademark law and policy to confront normative questions it has long left unanswered going to exactly what kind of harm trademark law is meant to forestall.

(words: 21,395)

[*] Barton Beebe, John M. Demarais Professor of Intellectual Property Law, New York University School of Law; Roy Germano, Senior Research Scholar, New York University School of Law; Christopher Jon Sprigman, Murray and Kathleen Bring Professor of Law, New York University School of Law; Joel H. Steckel, Professor of Marketing and Vice Dean for Doctoral Education, NYU Stern School of Business. The authors thank Christopher Buccafusco, Jeanne Fromer, and Irina Manta, as well as participants in a trademark scholars online workshop hosted by Mark Lemley and Mark McKenna, and participants in faculty workshops at the New York University School of Law, the University of North Carolina School of Law, and the Tri-State Region IP Workshop held by the Engelberg Center on Innovation Law and Policy for helpful comments and conversations.

Electronic copy available at JTX-1121.00002 https://ssrn.com/abstract=3864700    YUGALABS_00033999

## Introduction

Trademark law is emphatically empirical, but unlike other empirical disciplines trademark law is less interested in understanding how the world is than how it *seems to be*. Courts typically analyze the most important issues in trademark disputes by asking some form of the following question: What is the probability that some threshold proportion of consumers hold a particular belief?[1] Trademark law focuses so intensively on the question of what consumers think because consumer beliefs — or courts' estimates of those beliefs — so often determine whether there is a trademark property right, whether that right has been infringed, and what the remedies for that infringement may be. At every stage of trademark litigation, consumer perception is at the center of the inquiry.

For example, the basic liability formula for trademark infringement, the so-called "likelihood of confusion" test, asks whether a "substantial" or "appreciable" number of consumers[2] — a minimum of 20–25% according to many courts,[3] but as low as 15%[4] for others — hold the mistaken belief that goods bearing the defendant's trademark originate from the plaintiff. Much the same is true of the criterion for determining whether a term such as BAND-AID, VELCRO, or FRISBEE is distinctive of a product's source, or rather "generic"[5] and thus not a legally protectable trademark. That "distinctiveness" test asks whether a majority of consumers believe that the

---

[1] J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:158 (5th ed. 2020) (hereinafter MCCARTHY) ("To an extent not true in other fields of law, in trademark and false advertising disputes the perceptions of large groups of ordinary people are key factual issues. Both trademark validity and infringement turn largely on factual issues of customer perception.")

[2] *See, e.g.,* International Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr., 103 F.3d 196 (1st Cir. 1996) ("the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care"); American Ass'n for Advancement of Science v. Hearst Corp., 498 F. Supp. 244 (D.D.C. 1980) (an "appreciable" number is not necessarily a majority).

[3] *See, e.g.,* McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268 (S.D.N.Y. 1986) (25% supports finding of likely confusion). *See also* MCCARTHY, *supra* note 1, §32:188 ("Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion.... In the author's view, survey confusion numbers that go below 20% need to be carefully viewed against the background of other evidence weighing for and against a conclusion of likely confusion.").

[4] Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500 (5th Cir. 1980) (survey showing 15% confusion was "strong evidence" of a likelihood of confusion where other evidence was also strongly supportive"). *See also* MCCARTHY, *supra* note 1, §32:188 (reviewing case law relying on a 15% rate of confusion in survey evidence as probative of likely confusion).

[5] A "generic" term is the name of a product or service, as distinguished from a term that denotes the *source* of a particular product or service. Generic terms cannot function as trademarks. *See* Restatement (Third) of Unfair Competition § 15 cmt. a (AM. L. INST. 1995) ("Generic designations are not subject to appropriation as trademarks at common law and are ineligible for registration under state and federal trademark statutes.").

2

Electronic copy available at: https://ssrn.com/abstract=3864700 YUGALABS_00034008

term refers to one particular commercial source of the goods rather than to multiple different sources.[6]

To understand what consumers believe, courts in trademark disputes often consider survey evidence.[7] Litigants hire survey experts to conduct small-scale surveys of a sample of the relevant consumer population and then testify about their surveys' results. These surveys are now typically conducted online.[8] Particular survey formats, often named after the cases in which they first appeared, have emerged as standards.[9] For example, the *Eveready, Squirt,* and *Exxon* survey formats each attempt in a different way to estimate what proportion of consumers are confused as to the true source of the defendant's goods because of the similarity of the defendant's mark to the plaintiff's mark. The *Nikepal* survey format, used in trademark dilution cases,[10] seeks to determine what proportion of consumers

---

[6] Judge Learned Hand's opinion in Bayer Co. v. United Drug Co., 272 F. 505 (D.N.Y. 1921), remains a touchstone. In that opinion, Judge Hand found the term "aspirin" to be generic, and stated that "[t he single question, as I view it, in all these cases, is merely one of fact: What do buyers understand by the word for whose use the parties are contending?".

[7] *See* McCARTHY, *supra* note 1, § 32:158 ("Survey [e vidence is [r outinely [r eceived and [w eighed by the [c ourts."); Schering Corp. v. Pfizer Inc., 189 F.3d 218, 225 (2d Cir. 1999), as amended on reh'g, (Sept. 29, 1999) ("Surveys are … routinely admitted in trademark and false advertising cases …."). *See also* Shari Seidman Diamond & David J. Franklyn, *Trademark Surveys: An Undulating Path*, 92 TEX. L. REV. 2029 (2014). Note however, that surveys may play a larger role in disputes involving high-value marks. Two comprehensive reviews of survey usage in trademark litigation have found that surveys are in fact not used in most trademark cases. *See* Barton Beebe, *An Empirical Study of the Multifactor Tests for Trademark Infringement*, 94 CALIF. L. REV. 1581, 1641 (2006) (finding that 20% of the 331 trademark opinions studied discussed survey evidence and 10% credited the survey evidence); Robert C. Bird & Joel H. Steckel, *The Role of Consumer Surveys in Trademark Infringement: Empirical Evidence from the Federal Courts*, 14 U. PA. J. BUS. L. 1013, 1017 (2012) (finding 16.6% of 533 trademark opinions studied discussed survey evidence). However, Professors Diamond and Franklyn report that survey evidence is used heavily in lawyers' pretrial assessment and strategic decision making, and so the studies reporting relatively low rates of usage in trademark litigation likely under-report the effect of surveys in shaping the outcome of trademark disputes. Diamond & Franklyn, *supra*, at 2061-2062.

[8] *See, e.g.*, GoSmile, Inc. v. Levine, 769 F. Supp. 2d 630 (S.D.N.Y. 2011) (admitting and relying on defendant's online *Eveready* survey showing no likelihood of confusion). Some trademark surveys are still occasionally administered as telephone surveys or in-person "intercept" surveys in which consumers are approached in the marketplace and asked a series of questions. *See, e.g.*, Schneider Saddlery Co. v. Best Shot Pet Prod. Int'l, LLC, 2009 WL 864072 (N.D. Ohio Mar. 31, 2009) (analyzing a telephone survey showing that a trademark was weak); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373 (2d Cir. 2005) (partially relying on a survey which was conducted in person at shopping malls).

[9] *See, e.g.*, Itamar Simonson, *The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test*, 83 TRADEMARK REP. 364, 366 (1993) (analyzing "commonly used techniques for assessing trademark confusion," including the *Eveready, Squirt,* and *Exxon* survey formats).

[10] Federal trademark law defines trademark dilution as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B).

3

YUGALABS_00034001

associate one mark with another. *Teflon* and *Thermos* surveys employ different methods to estimate what proportion of consumers believe that a particular designation is a generic term for a product or instead is "distinctive" i.e., an indicium that consumers use to identify the commercial source of a product or service.

All of these survey formats can play decisive roles in the outcomes of trademark disputes. For example, just last term in *United States Patent & Trademark Office v. Booking.com B.V.*, the Supreme Court held that adding ".com" to a generic word could result in a distinctive, protectable mark if consumers perceived it as indicating the source of products. The Court's ruling in the case relied heavily   too heavily, Justice Breyer suggested in dissent[11]   on the respondent's *Teflon* survey showing that 74.8% of the survey's respondents perceived BOOKING.COM as a brand name.[12]

Though its use is widespread, consumer survey evidence has long been a controversial form of proof in trademark litigation, and for good reason. First, it is notoriously susceptible to expert manipulation. Judge Posner repeatedly questioned the value of "tendentious expert testimony"[13] offered by trademark survey experts who are "prone to bias"[14] and took pains in his opinions to expose what he called the "tricks of the survey researcher's black arts."[15] Other judges have lamented that "as is so often the case in high-stakes litigation, highly qualified experts have presented

---

In construing this statutory language, a majority of courts have held that to establish blurring, a plaintiff need only show that consumers *associate* the defendant's mark with the plaintiff's famous mark. These courts appear to assume that to the extent that there is consumer association, this association alone will "impair[  the distinctiveness" of the famous mark. *See, e.g.*, Wrenn v. Boy Scouts of Am., 2008 WL 4792683, at *7 (N.D. Cal. Oct. 28, 2008); Hershey Co v. Art Van Furniture, Inc., 2008 WL 4724756, at *14–15 (E.D. Mich. Oct. 24, 2008); New York Yankees P'ship v. IET Prod. & Servs., Inc., 114 USPQ2d 1497, 1506 (T.T.A.B. 2015).

Plaintiffs sometimes employ *Nikepal* surveys to establish this association. In prior work, we demonstrated that establishing mere association using the *Nikepal* survey format does not necessarily provide evidence of dilution—i.e., that individuals may associate two marks without dilution occurring. *See* Barton Beebe, Roy Germano, Christopher Jon Sprigman & Joel Steckel, *Testing for Trademark Dilution in Court and in the Lab*, 86 U. CHI. L. REV. 611, 620-621, 624-630 (2019).

[11] 140 S.Ct. 2298, 2313 (2020) ("[S ome courts and the TTAB have concluded that survey evidence is generally of little value in separating generic from descriptive terms.") (Breyer, J., dissenting)

[12] *Id.* at 2313 (Breyer, J., dissenting) ("Consider the survey evidence that respondent introduced below. Respondent's survey showed that 74.8% of participants thought that 'Booking.com' is a brand name, whereas 23.8% believed it was a generic name. At the same time, 33% believed that 'Washingmachine.com'—which does not correspond to any company—is a brand, and 60.8% thought it was generic.") (internal citations omitted).

[13] Indianapolis Colts, Inc. v. Metro. Balt. Football Club Ltd. P'ship, 34 F.3d 410, 415 (7th Cir. 1994).

[14] Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc., 735 F.3d 735, 742 (7th Cir. 2013).

[15] *Indianapolis Colts, Inc.*, 34 F.3d at 416.

4

Electronic copy available JTX-1121.00005 com/abstract=3864700

YUGALABS_00034002

dueling [survey] reports that reach significantly different results."[16] Empirical studies of trademark case law suggest that courts are wary of survey evidence and sometimes discount it.[17]

Second and related, trademark surveys tend to elide complex normative and empirical questions that underlie trademark law and policy. Among the most important is how trademark law should understand *consumer uncertainty*, i.e., the varying degrees of confidence consumers have in their beliefs in the marketplace. As currently constituted, the leading survey formats inquire into consumer beliefs without providing any way for respondents to indicate *the strength with which they hold a particular belief*; i.e., their "belief strength" or "attitude strength."[18] While it is true that each format now conventionally provides respondents with the option to respond "Don't know/No opinion," decades of experience show that in many settings only very low proportions of respondents resort to that response.[19] The remaining response options reduce to a starkly binary choice. That is, in a distinctiveness survey, the remaining response options are framed as if the respondent fully believes the mark either is a brand name, or it is not. In a likelihood of confusion survey, the remaining response options are framed as if the respondent fully believes that the defendant's mark either originates with the plaintiff or it does not. In any particular survey it is likely, of course, that many respondents are uncertain about their beliefs, and that respondents hold beliefs of varying strengths short of complete certainty.[20] These respondents may have a belief, and may feel on that basis that responding "don't know" would be inaccurate. But once a respondent selects one of the remaining response options, that

---

[16] Bd. of Regents of the Univ. of Houston Sys. on Behalf of the Univ. of Houston Sys. & Its Member Institutions v. Houston Coll. of L., Inc., 214 F. Supp. 3d 573, 593 (S.D. Tex. 2016).

[17] *See, e.g.*, Citizens Banking Corp. v. Citizens Fin. Grp., Inc., 320 F. App'x 341, 348 (6th Cir. 2009) ("[T he district court did not commit clear error in minimizing the weight given to [plaintiff's surveys."). Yet judges will sometimes draw an "adverse inference" when a well-resourced party fails to present survey evidence in a trademark dispute. *See* MCCARTHY, *supra* note 1, § 32:195. *But see* Gen. Mills, Inc. & Gen. Mills IP Holdings II, LLC v. Fage Dairy Processing Indus. S.A., 100 U.S.P.Q.2d 1584, 1594 (T.T.A.B. 2011) ("[A pplicant requests the Board to make an adverse inference [of likelihood of confusion based on opposers' failure to conduct a likelihood of confusion survey. It is well-established that we do not make such adverse inferences.").

[18] *See infra* text accompanying notes 30–45.

[19] *See, e.g.*, Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1134 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002) (recording that 10% of respondents to a confusion survey question responded that they were not sure); Reddy Commc'ns, Inc. v. Envtl. Action Found., 477 F. Supp. 936, 949–54 (D.D.C. 1979) (reporting proportions of total respondents who responded "do not know" as ranging from 6% to 15%). *See also infra* notes 46–47 and accompanying text (discussing survey respondents' reluctance to admit that they have no opinion or do not know).

[20] For example, when the product in question has not yet been introduced to the market, respondents cannot possibly know whether it is put out by the same company as another (senior) product. Logic dictates that all respondents should be responding "Don't know/No opinion" by definition. Yet, they do not.

5

Electronic copy available at: https://ssrn.com/abstract=3864700

YUGALABS_00034003

respondent's uncertainty is not registered. In a sense, the way the survey is framed causes uncertainty to disappear and makes all beliefs appear equal regardless of how strongly or weakly-held they really are at the individual level.

The result is that trademark surveys fail to measure potentially valuable empirical information about consumer uncertainty. In the process, they also allow us to avoid important theoretical questions about what role consumer uncertainty should play in trademark law. Indeed, had trademark survey experts deliberately set out to conceal consumer uncertainty and avoid the difficult theoretical questions that uncertainty raises, it is not clear they could have come up with better formats than those currently in use.

In this Article, we present evidence that current trademark surveys fail to capture substantial consumer uncertainty, and that this failure matters for the law. Based on this evidence, we argue that the central trademark distinctiveness and confusion inquiries should ask  and trademark surveys should be re-designed to address  a question that is framed differently from the conventional one presented above. That revised question should ask whether a threshold proportion of consumers hold a particular belief *at some threshold level of certainty*. Re-framing these inquiries to account for consumer uncertainty is one step toward placing trademark law on a firmer empirical foundation. In particular, in both the trademark distinctiveness and trademark likelihood of confusion contexts, it is important to understand the number of consumers who are ambivalent or hold only weak beliefs. A survey in which a large number of respondents are shown to be ambivalent or to hold only weak beliefs is simply not as reliable an indicator of what real-world consumers in the marketplace are likely to believe, or to do.

To defend this claim, we explain why consumer uncertainty matters in trademark law, show empirically the extent to which conventional survey methods underreport consumer uncertainty, and describe and test improved survey methods that record consumers' varying levels of confidence in their marketplace judgments. We detail a low-cost, easily-administered, and relatively simple modification in the design of trademark surveys that, by registering consumer uncertainty, will make such surveys less prone to expert manipulation and provide courts with substantially better information about consumer beliefs.   We also consider how, as a normative matter, courts should interpret varying levels of consumer uncertainty when adjudicating trademark disputes  not simply to reach the right result in particular cases but more broadly to foster a more efficient and theoretically coherent trademark system and a more competitive marketplace. Incorporating the reality of consumer uncertainty into trademark law raises complex issues, some theoretical, others empirical. But failing to understand and account for consumer uncertainty essentially guarantees that trademark law will remain in a longstanding state of empirical and theoretical immaturity.

6

YUGALABS_00034004

Part I describes the limits of trademark law's current approach to measuring consumer beliefs. The crucial insight is this: Trademark courts routinely engage in probabilistic reasoning when evaluating whether a *population* of consumers holds a particular belief (e.g., when they evaluate whether a population of consumers is likely to believe that a term signifies the source of products, or that two products emanate from the same source). Trademark courts typically fail, however, to take into account the fact that *individual consumers* themselves engage in probabilistic reasoning. Consumers, especially when asked to make decisions based on little information or experience, operate in an environment of uncertainty. In such conditions, many consumers will believe various propositions to be more or less likely true, and the beliefs of consumers with a low level of certainty are more likely to be unstable (i.e., subject to change based on small changes in context, including small changes in the way the belief is elicited in a survey question). And, perhaps not surprisingly, the certainty or lack of certainty   with which consumers hold beliefs is likely to shape their behavior in the marketplace.

Part II presents the results of a series of experiments that reveal the prevalence of varying degrees of uncertainty among respondents in trademark surveys. We focus on three leading survey formats: the *Teflon* survey format for assessing trademark distinctiveness and the *Squirt* and *Eveready* survey formats for assessing the likelihood of consumer confusion. Adapting facts from recently litigated cases, we conducted each survey under two conditions. In the first condition, we followed current survey methods by providing respondents with a choice among conventional responses. For example, in the case of the likelihood of confusion surveys, which ask respondents to assess whether two products or services are produced by or originate from the same company or different companies, respondents were invited to respond (1) same company, (2) different companies, or (3) don't know. In the second condition, we provided respondents with possible responses comprising a seven point Likert scale. In the case of the likelihood of confusion surveys, they could respond: (1) definitely same company, (2) very likely same company, (3) somewhat likely same company, (4) don't know, (5) somewhat likely different companies, (6) very likely different companies, and (7) definitely different companies. We show that allowing respondents answer choices that register their uncertainty produces a significant information gain i.e., when we re-structure surveys to measure uncertainty, we find a lot of it.[21]

---

[21] The original surveys conducted in their respective litigations had the goal of isolating the impact of the allegedly infringing mark. As such, they employed control treatments in a test-control format in which the presence of the allegedly infringing mark is compared against its absence, all else being equal. Our objective is different. We are interested in isolating the informational impact of assessing consumer uncertainty. Thus, for our objectives, the original survey question without uncertainty assessment serves as

Electronic copy available at JTX-1121.00008 com/abstract=3864700

YUGALABS_00034005

Part III discusses the principal implications of our experimental findings for trademark adjudication and policy. First, and most concretely, we show how the revised survey formats we describe in Part II can re-capture information about the strength of beliefs    information that can aid courts in making more accurate determinations about whether an alleged mark indeed functions as one and is therefore protectable, whether defendant has infringed it by confusing consumers about the source of its products, and how, if defendant has infringed, the harm to consumers and the mark owner may be remedied.

Second, we discuss the role that improved survey evidence should play in trademark plaintiffs' proof of their prima facie case. In trademark disputes as in civil litigation generally, the plaintiff bears the burden of persuasion on most issues addressed by survey evidence. Once we start measuring the certainty of individual beliefs, a question immediately arises regarding how strongly consumers must hold beliefs before the plaintiff may adduce those beliefs to discharge its burden. In general, we argue that courts should not count weakly-held beliefs toward the satisfaction of plaintiffs' burden..

Finally and more broadly, we discuss a set of deeper normative problems that surface in trademark law once we begin to take variances in belief strength into account. One important normative question involves how courts should think of the harm that trademark law is meant to forestall. Is trademark law meant to police consumer beliefs in some abstract sense? Or rather does trademark law concern itself with consumer beliefs that are likely to have some market consequence? If the latter is correct , as we believe it is, then trademark law needs to develop a much more detailed account of the conditions in which belief is likely to mature into action, and how the strength with which beliefs are held will affect consumer behavior in a variety of contexts.

## I. Background: Framing Consumer Uncertainty in Trademark Law

### A. Trademark Law and the Probabilism of Consumer Beliefs

Given the decisive role that consumer perceptions play in the outcome of trademark disputes, it is of the utmost importance that courts understand what consumers actually believe. To do so, courts typically take a population approach to consumer perception, asking whether a certain threshold portion of the relevant population of consumers holds the particular belief in question. Further, trademark law's two main forms of infringement are both framed explicitly in terms of probabilities. The "likelihood of confusion" cause of action prompts courts to ask whether the defendant's trademark is *likely* to cause consumers to mistakenly believe

---

a control against which data obtained from questions that assess uncertainty can be compared.

8

Electronic copy available at JTX-1121.00009 com/abstract=3864700

that the plaintiff's and defendant's goods originate from the same source.[22] With respect to the "likelihood of dilution" cause of action, courts ask whether the defendant's trademark is *likely* to diminish the distinctiveness of the plaintiff's famous mark in the minds of consumers.[23] The antecedent question of distinctiveness   i.e., whether an asserted mark is protectable at all   is implicitly framed in the same way: to establish the distinctiveness of a descriptive term[24] or an element of product design trade dress,[25] courts consider how likely it is that a substantial proportion of the relevant consumer population perceives the term or element as distinctive of source.

Importantly, in assessing consumer beliefs, trademark law recognizes that most populations of relevant consumers are not homogenous. That is why the likelihood of confusion and likelihood of dilution causes of action do not require courts to find that it is likely that the *entire* population of relevant consumers is confused or experiencing dilution. Instead, trademark law asks courts to look inside the population of relevant consumers and determine whether an appreciable proportion of that population (typically, 20 to 25%, but sometimes as low as 15%) is confused or experiencing dilution.[26] If there is a better than even chance that the defendant's conduct will confuse or dilute more than that threshold proportion, then a court should find infringement. Trademark law takes the same approach when inquiring whether a word, symbol, or other indicium functions as a mark in the first place   although the threshold is typically set higher.[27] As with likelihood of confusion, tests for trademark genericism and distinctiveness base their findings on percentage of the relevant

---

[22] For federally registered marks, Section 32 of the Lanham Act brands a defendant's use as actionable trademark confusion if it is "likely to cause confusion, or to cause mistake, or to deceive." Lanham Act § 32, 15 U.S.C.A. § 1114(1). For unregistered marks, Section 43(a) of the Lanham Act defines an infringing use as one "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of the junior user with the senior user. Lanham Act § 43(a), 15 U.S.C.A. § 1125(a).

[23] *See* Lanham Act § 43(c), 15 U.S.C.A. § 1125(c); *see also supra* note 10.

[24] Descriptive terms are protectable as marks if the plaintiff establishes that they have acquired distinctiveness (sometimes referred to as "secondary meaning"); i.e., that an appreciable number of consumers perceive them as indicating the source of particular products or services. Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 163 (1995). A class of "inherently distinctive" marks—i.e., fanciful, arbitrary, and suggestive marks—are protected without the need for plaintiff to establish distinctiveness. Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9–10 (2d Cir. 1976).

[25] *See* Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 216 (2000) (holding that "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning").

[26] *See supra* notes 3–4 and accompanying text.

[27] *See, e.g.*, Spraying Systems Co. v. Delavan, 975 F.2d 387, 394 (7th Cir. 1992) ("While a 50-percent figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal.").

Electronic copy available at: https://ssrn.com/abstract=3864700 **JTX-1121.00010** YUGALABS_00034007

consumer population that perceives the indicium at issue as indicating source.[28]

That said, although trademark law recognizes the heterogeneity of beliefs within a given population of consumers, the empirical sophistication of trademark law stops there. It does not go deeper to consider the strength and meaningfulness of the beliefs held by each individual within that population. For example, while trademark law's likelihood of confusion analysis assesses consumer populations in continuous terms as more or less confused, it typically assesses individuals within those populations as binaries; each is either absolutely confused or absolutely not confused. The same is true for trademark law's distinctiveness analysis: it assesses consumer populations in continuous terms as manifesting a higher or lower incidence of belief that a particular asserted mark does or does not indicate the source of a product or service. But it treats individuals within those populations as binaries: each individual either holds or does not hold the belief that a putative mark is generic, or that a putative mark indicates the source of a product or service and is therefore distinctive.[29] In contrast, the social science literature has long recognized the obvious: individual beliefs are not binaries.

### B. The Social Science of Consumer Beliefs

Psychologists have defined beliefs as linkages between objects and their attributes.[30] In the context of trademark law, the "object" is the perceptible form of the trademark and the main "attribute" of interest is its reference to a particular commercial source. Just as individuals generally will have varying judgments of "the perceived likelihood that (an) object has (or is associated with) the attribute in question," so individual consumers will be more or less certain that a putative trademark refers to a particular source.

Behavioral scientists recommend that "'belief strength,' or more simply 'belief' be measured by a procedure which places the subject along a dimension of subjective probability involving (the) object and some related attribute."[31] The effect of beliefs on behavior is complex and moderated by many factors, including personality traits, situational factors, and social

---

[28] *See* Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 211 (2000) ("[A mark has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark is to identify the source of the product rather than the product itself.' Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851, n. 11 (1982).")

[29] *See* Itamar Simonson, *Trademark Infringement From the Buyer Perspective: Conceptual Analysis and Measurement Implications,* 13 J. PUB. POL. & MARKETING 181, 195 (1994) (noting that trademark surveys typically fail to account for respondents' degree of confidence in their responses).

[30] MARTIN FISHBEIN & ICEK AJZEN, BELIEF, ATTITUDE, INTENTION, AND BEHAVIOR: AN INTRODUCTION TO THEORY AND RESEARCH 12 (1975).

[31] *Id.*

10

Electronic copy available at JTX-1121.00011 com/abstract=3864700
YUGALABS_00034008

influences.[32] Numerous studies indicate, however, that in general beliefs become more salient predictors of behavior the better developed and more strongly-held they are.[33]

Social scientists have traditionally measured belief strength by asking subjects how certain or confident they are about beliefs expressed in response to survey questions. In one simple experiment, for example, researchers showed five different puzzle games to test subjects and asked them to rate how interesting the puzzles seemed on an 11-point scale that ranged from "extremely boring" to "extremely interesting." Then, in a follow up question, the researchers asked subjects how confident they were of their interest rating on an 11-point scale that ranged from "not at all confident" to "completely confident." The subjects were then left alone for fifteen minutes to work on the puzzles in any order and for however long they pleased. The researchers expected that subjects would be more likely to begin working on and spend more time on puzzles that they had identified as potentially more interesting. Indeed, they found this to be the case, but to a far greater extent among subjects who had expressed high levels of confidence in their interest rating. Thus, it was not simply the attitude that the subject expressed that was predictive of the resultant behavior, but also the strength of the attitude.[34]

In another study, college students filled out a survey prior to a student government election. One objective of the survey was to measure students' attitudes about participating in student government. After each attitude question, the researchers asked the students to rate how certain they were of their answer on a 5-point scale that ranged from "not very certain" to "very certain." The researchers then obtained a list of students who voted in a student government election that took place shortly after the survey was administered. In their analyses, the researchers found that students' attitudes toward participating in student government was a robust predictor of whether or not a student voted, but only among students who had expressed high levels of certainty about their attitudes. Attitudes that were weak or nonexistent were not predictive.[35]

The theoretical basis for the importance of belief strength in studying issues of consumer behavior resides in studies of the attitude construct in

[32] Stephen J. Kraus, *Attitudes and the Prediction of Behavior: A Meta-Analysis of the Empirical Literature,* 21 PERSONALITY AND SOCIAL PSYCHOLOGY BULLETIN 58 (1995).

[33] Jon A. Krosnick and Robert P. Abelson, *The Case for Measuring Attitude Strength in Surveys,* QUESTIONS ABOUT QUESTIONS: INQUIRES INTO THE COGNITIVE BASES OF SURVEYS (Judith M. Tanur, ed., Russell Sage Foundation, 1992).

[34] Russell H. Fazio & Mark P. Zanna, *On the Predictive Validity of Attitudes: The Roles of Direct Experience and Confidence,* 46 J. PERSONALITY 228 (1978); *see also* Denis T. Regan and Russell Fazio, *On the Consistency Between Attitudes and Behavior: Look to the Method of Attitude Formation,* 13 J. EXPERIMENTAL SOCIAL PSYCHOLOGY 28 (1977).

[35] John Sample & Rex Warland, *Attitude and Prediction of Behavior,* 51 SOCIAL FORCES 292 (1973). *See also* Charles R. Tittle & Richard J. Hill, *Attitude Measurement and Prediction of Behavior: An Evaluation of Conditions and Measurement Techniques,* 30 SOCIOMETRY 199 (1967).

11

YUGALABS_00034009

the field of social psychology.[36] This extensive literature is based on the assumption that consumers' attitudes towards competing brands are important determinants of consumer purchasing decisions.[37] Attitudes are generally defined as the tendency to respond to an object (e.g. brand) either favorably or unfavorably.[38] Favorable attitudes lead to positive intentions. Indeed, social psychologists view intentions as mediating the relationship between attitudes and behavior (e.g., purchasing).[39] Consumer researchers have conceptualized this causal sequence as the belief-attitude-intention hierarchy.[40]   Beyond that, others have studied and established the relationship between intentions and actual consumer purchases.[41]

The most widely accepted theory of attitude formation in consumer decision making relevant to brands and trademarks describes the relationship between an attitude towards a brand in terms of an expectancy-value model such as that proposed by Martin Fishbein.[42] In Fishbein's theory, people's evaluations of or attitudes towards a brand are

---

[36] ICEK AJZEN, *Consumer Attitudes and Behavior, in* HANDBOOK OF CONSUMER PYSCHOLOGY, 525, 525-48 (Curtis P. Haugtvedt et al. eds., 2008).

[37] *See, e.g.,* Frédéric F. Brunel et al., *Is the Implicit Association Test a Valid and Valuable Measure of Implicit Consumer Social Cognition?* 14 J. CONSUMER PSYCH., 385, 385-404 (2004); Keith Coulter & Girish Punj, *The Effects of Cognitive Resource Requirements, Availability, and Argument Quality on Brand Attitudes: A Melding of Elaboration Likelihood and Cognitive Resource Matching Theories,* 33 J. ADVERTISING, 53, 53-64 (1994); Jaideep Sengupta & Gavan J. Fitzsimons, *The Effect of Analyzing Reasons on the Stability of Brand Attitudes: A reconciliation of Opposing Predictions,* 31 J. CONSUMER RSCH., 705, 705–11 (2004).

[38] ALICE EAGLY & SHELLY CHAIKEN, THE PSYCHOLOGY OF ATTITUDES (1993); FISHBEIN & AJZEN, *supra* note 30; CHARLES E. OSGOOD, THE MEASUREMENT OF MEANING (1957); Richard E Petty & John T Cacioppo, *The Elaboration Likelihood Model of Persuasion* 19 ADVANCES IN EXPERIMENTAL SOCIAL PSYCH., 123, 123–205 (1986).

[39] Richard P. Bagozzi & Paul R. Warshaw, *Trying to Consume,* 17 J. CONSUMER RSCH, 127, 127-40 (1990); Peter M. Bentler & George Speckart, *Models of Attitude-Behavior Relations,* 86 PYSCH. REV., 452, 452–64 (1979); FISHBEIN & AJZEN, *supra* note 30; Jeffrey D. Fisher & William A. Fisher, *Changing AIDS-Risk Behavior,* 111 PYSCH. BULLETIN, 455, 455–74 (1992); Peter M. Gollwitzer, *Goal Achievement: The Role of Intentions,* 4 EUROPEAN REV. OF SOCIAL PSYCH., 141, 141-85 (1993); Julius Kuhl, *Volitional Aspects of Achievement Motivation and Learned Helplessness: Toward a Comprehensive Theory of Action Control,* 13 PROGRESS IN EXPERIMENTAL PERSONALITY RSCH., 99, 99–171 (1985); EDWIN A. LOCKE & GARY P. LATHAM, A THEORY OF GOAL SETTING AND TASK PERFORMANCE (1990); HARRY C. TRIANDIS, INTERPERSONAL BEHAVIOR (1977).

[40] Scott B. Follows & David Jobber, *Environmentally Responsible Purchase Behavior,* 34 EUROPEAN J. MKTG., 723, 723–46 (2000); Robert Madrigal, *Social Identity Effects in a Belief-Attitude Intentions Hierarchy: Implications for Corporate Sponsorship,* 18 PSYCH. & MKTG., 145, 145–65 (2001); Jennifer Paff Ogle et al., *Predicting Patronage Behaviors in a Sustainable Retail Environment: Adding Retail Characteristics and Consumer Lifestyle Orientation to the Belief-Attitude-Behavior Intention Model,* 36 ENV'T & BEHAV., 717, 717–47 (2004).

[41] Vicki Morwitz et al., *When Do Purchase Intentions Predict Sales?,* 23 INT'L J. FORECASTING, 347, 347–64 (2007).

[42] Martin Fishbein, *An Investigation of the Relationships Between Beliefs About an Object and the Attitude Toward that Object,* 16 HUMAN RELATIONS 233, 233-40 (1963); MARTIN FISHBEIN, *A Consideration of Beliefs and their Role in Attitude Measurement, in* READINGS IN ATTITUDE THEORY AND MEASUREMENT, 257, 257–66 (1967).

Electronic copy available at JTX-1121.00013 com/abstract=3864700

YUGALABS_00034010

determined by their beliefs about the brand, where a belief is defined as the subjective probability that the brand has a certain attribute (e.g., that it comes from a specific source).[43] Specifically, the evaluation of each attribute contributes to the overall attitude towards the product in direct proportion to the consumer's subjective probability that the product possesses the attribute in question.[44] The following equation illustrates the basic model. $A$ is the attitude toward the product, $b_i$ is the strength of the belief that the product has attribute $i$, $e_i$ is the consumer's evaluation of attribute $i$, and $n$ is the number of product attributes:

$$A \propto \sum_{i=1}^{n} b_i e_i.$$

Marketing scholars have established the validity of this model.[45] With respect to trademarks and source identification the guiding principle is that if a specific potential product source is evaluated favorably by a consumer, the consumer's overall evaluation of the product (and likelihood of purchase) is directly proportional to the strength of belief that the consumer has that the product comes from that source. As such, belief strength in a trademark is important to determining consumer behavior.

In light of this literature, it is clear that by treating individual beliefs as binaries, trademark law is unable to distinguish between consumers who hold meaningful beliefs from those who are ambivalent or who have no opinion, or at least no opinion that is *likely to lead to action*. And there is another risk of treating individual beliefs as binaries: one that relates to the validity of the trademark survey methods themselves. Trademark surveys are cognitively demanding tasks that require respondents to quickly form a belief about the relationship between products or the origin of products for products they may have never seen or thought about before. Survey respondents who are unable to form a meaningful opinion should say so by selecting "don't know." But going back to Philip Converse's 1964 study on attitude formation in public opinion surveys, we know that significant numbers of respondents are unwilling to admit that they don't know or have no opinion.[46] Instead, they engage in what Jon Krosnick has described

---

[43] FISHBEIN & AJZEN, *supra* note 30.

[44] *Id.*

[45] Richard J. Lutz, *An Experimental Investigation of Causal Relations Among Cognitions, Affect, and Behavioral Intention,* 3 J. OF CONSUMER RSCH., 197, 197-208 (1977); Andrew A. Mitchell & Jerry C. Olson, *Are Product Attribute Beliefs the Only Mediator of Advertising Effects on Brand Attitude?,* 18 J. OF MKTG. RSCH., 318, 318–32 (1977).

[46] Philip E. Converse, *The Nature of Belief Systems in Mass Publics,* 18 CRITICAL REV. 1, 2006 (1964). *See also* John P. Liefeld, *How Surveys Overestimate the Likelihood of Consumer Confusion,* 93 TRADEMARK REP. 939 (2003) (in light of survey respondents' reluctance to state that they have no opinion or do not know, reporting the results of a series of experiments involving trademark surveys using different forms of "filter questions" asking if respondents had a previously formed opinion or attitude available in memory to elicit no opinion or do not know responses.).

13

Electronic copy available at JTX-1121.00014 com/abstract=3864700

YUGALABS_00034011

as "mental coin-flipping" and select answer choices at random.[47] These "nonattitudes," as they are sometimes called, look like valid responses, but they do not measure an underlying attitude or meaningful belief.[48]

There is a danger, in other words, that some respondents in trademark surveys may be selecting answer choices unrelated to their actual beliefs. Other respondents may find that they are conflicted when presented with product images or brand names they have never seen or thought about before. They can imagine holding multiple beliefs depending on which factors they give consideration to, but they are nevertheless forced to select just one. Thus, while perhaps they are not necessarily guessing or choosing at random, they are ambivalent and could go either way.[49] Similar to nonattitudes, ambivalent responses generate data that do not represent fully formed or meaningful beliefs.

These insights into the complex relationship between belief strength and propensity to take action based on belief suggest that current approaches to trademark surveys are fundamentally flawed. Weakly-held beliefs, ambivalent responses, and nonattitudes do not necessarily translate into conduct in the marketplace, or more concretely, into any appreciable harm to the owner of a mark.

## II. Experiments Assessing the Effect of Consumer Uncertainty on Trademark Survey Methods

To study the extent to which trademark surveys obscure uncertainty, ambivalence, and nonattitudes, we conducted a series of experiments that built upon surveys used in recent litigation. We began by replicating the structure of these surveys based on information provided by the experts who designed them.[50] We then introduced changes to the question format

---

[47] Jon A. Krosnick, *Response Strategies for Coping with the Cognitive Demands of Attitude Measures in Surveys*, 5 APPLIED COGNITIVE PSYCH. 213, 220 (1991).

[48] English courts are especially sensitive to the problem of nonattitudes in trademark survey evidence and explicitly require surveys to avoid prompting respondents to form beliefs that they would not otherwise have had. According to the "Whitford Guidelines" developed by Mr. Justice Whitford in Imperial Group plc & Another v. Philip Morris Limited & Another, [1984  RPC 293, a survey question must not "direct the person answering the question into a field of speculation upon which that person would never have embarked had the question not been put." *Id.* at 303. *See also* Interflora Inc. v. Marks & Spencer Plc, [2013  F.S.R. 21, para. 151 (requiring courts to consider "evidence that any further survey will comply with the Whitford guidelines" when determining whether to grant a party permission to conduct a survey).

[49] John Zaller & Stanley Feldman, *A Simple Theory of the Survey Response: Answering Questions versus Revealing Preferences,* 36 AM. J. OF POL. SCI. 579 (1992).

[50] Surveys such as these are generally conducted in a test-control format. Control groups are used to control for alternative explanations to any results produced by surveys when they only examine the accused mark. These explanations include baseline levels of confusion, guessing, and noise. Our investigations of the impact of accounting of uncertainty do not need to control for alternative explanations for results gleaned from examining only the accused mark. Our comparisons will be between accounting for uncertainty and not accounting for uncertainty.

14

YUGALABS_00034012

and the answer choices. The surveys we studied fall into three broad classes: *Teflon* surveys for genericism and *Squirt* and *Eveready* surveys for likelihood of confusion. Our experiments show that the standard binary answer choice formats fail to measure high levels of uncertainty in consumers' responses to trademark surveys. Our experiments also show that measuring and calculating uncertainty requires neither complex adaptations nor a complete overhaul of the *Teflon, Squirt,* and *Eveready* survey formats. Rather, we demonstrate that by introducing modest, tractable changes to the format of questions and answer choices, courts can better understand the strength and meaningfulness of beliefs expressed in trademark surveys.

### A. The *Teflon* Genericism Survey Format

*Teflon* surveys are used to determine whether an asserted mark is *generic* or *distinctive*. A term is generic if most consumers understand it not as indicating the source of any particular product, but rather as denoting a type or category or "genus" of products. So, for example, the term "sugar" is generic for sucrose, whereas the term "Domino" is distinctive for a particular brand of sugar. Terms that function as generic labels, cannot serve as trademarks because they are, as a matter of definition, not distinctive    i.e., they do not indicate to consumers the source of particular products or services.[51]

The issue of genericism arises in cases where a defendant argues that plaintiffs' asserted mark is not protectable because it was "born generic"    i.e., that it is, and has always been, generic. The issue also arises in cases where a defendant offers a so-called "genericide" defense: i.e., where defendant argues that plaintiff's mark may have at one time been protectable but has come to be used by consumers as a general term that describes a category of products and so no longer functions as a mark. An example of the latter sort of "acquired" genericism is the word "zipper," which once served as a trademark for a particular type of toothed closure but is now a generic label used to label the entire product category of toothed closures.[52]

First employed in *E.I. DuPont De Nemours & Co. v. Yoshida International, Inc*,[53] the *Teflon* survey format is structured in two parts. The first offers

---

[51] United States Patent & Trademark Office v. Booking.com B.V, 140 S.Ct. 2298, 2301 (2020) ("A generic name—the name of a class of products or services—is ineligible for federal trademark registration).

[52] Whitson Gordon, *How a Brand Name Becomes Generic,* N.Y. Times (Jun. 24, 2019), https://www.nytimes.com/2019/06/24/smarter-living/how-a-brand-name-becomes-generic.html ("You may be aware of Kleenex, Velcro and ChapStick, but what about escalator? Or dumpster? Linoleum, zipper, trampoline? All of these are (or were) trademarks of companies whose products were so successful that they came to represent an entire category.").

[53] 393 F. Supp. 502 (E.D.N.Y. 1976). The case involved a trademark confusion dispute between DuPont, the owner of the TEFLON family of marks, and YKK, a firm that marketed a nylon zipper under the EFLON mark. YKK argued that the TEFLON mark had become

Electronic copy available at JTX-1121.00016 https://ssrn.com/abstract=3864700

YUGALABS_00034013

what commentators have described as "essentially a mini-course in the generic versus trademark distinction."[54] That survey runs a participant through a number of terms (such as "washing machine" and "Chevrolet"), asking whether they are common (generic) names or brand names (i.e., source-indicators). After the participant grasps the distinction, the second part of the *Teflon* survey asks the participant to categorize a number of terms, including the term at issue, as either generic or brand names.

Though the second part of the *Teflon* survey format allows for a "don't know" option, we believe that it fails to capture important information about a respondent's degree of uncertainty. To examine this issue, we conducted a set of online experiments that exposed 242 subjects to an instrument modeled after the *Teflon* survey used as evidence in *Frito-Lay North America, Inc. v. Princeton Vanguard, LLC.* The trademark dispute in that case arose when snack food behemoth Frito Lay opposed Princeton Vanguard's application to register the term PRETZEL CRISPS for its pretzel cracker snack. Frito Lay argued that "pretzel crisps" is a generic term and therefore not registerable. Survey evidence played a prominent role throughout the dispute.[55]

Our experiments build on the survey that E. Deborah Jay[56] developed as an expert witness for Princeton Vanguard. Like in Jay's survey, all subjects in our study saw seven terms—a mix of brand name snack foods and generic names for snack foods—and were asked if each refers to a brand name or a generic name. The first six terms were controls. They were CHEESE NIPS, MACADAMIA NUTS, ONION RINGS, GOURMET POPCORN, FLAVOR TWISTS, and SUN CHIPS. These terms were presented in random order. Then, after answering questions about the six control terms, subjects were asked if they think PRETZEL CRISPS is a brand name or a generic name.

### 1. Testing for Uncertainty in the Current "Three-Answer Forced Choice" *Teflon* Survey Methodology

In a departure from Jay's methodology, we randomly assigned our 242 subjects to three groups.[57] Each group saw variations on the *Teflon* question

---

generic. In response, DuPont submitted a telephone survey reporting that 68% of respondents identified TEFLON as a brand name. *Id.* at 526. This survey formed the basis of the current *Teflon* survey format.

[54] McCARTHY, *supra* note 1, § 12:16.

[55] *See* Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc., 786 F.3d 960 (Fed. Cir. 2015).

[56] E. Deborah Jay is principal of Jay Survey Strategics, LLC, where she conducts, evaluates and testifies about litigation surveys in trademark, deceptive advertising, right of publicity, copyright, patent, wage and hour, and employee discrimination cases, among others. *See* JAY SURVEY STRATEGICS LLC, http://www.jaysurveystrategics.com (last visited Feb. 11, 2021).

[57] For each of our experiments, we drew respondents from Amazon Mechanical Turk. For this experiment, 392 people responded to our call for participants. Following Jay's procedures, we determined eligibility by asking the following questions: (1) "In the past 3 months, did you, personally, purchase salty snacks for you or someone else?"; (2) "In the

Electronic copy available at JTX-1121.00017 abstract=3864706

YUGALABS_00034014

format. Subjects assigned to Group A (n=81) were first shown the main question asked on *Teflon* surveys: "Do you think PRETZEL CRISPS is a brand name or a generic name?" Below the question, subjects saw three answer choices: "Generic name," "Brand name," and "Don't know/Not sure."[58] Figure 1 shows the distribution of Group A's responses to this, the main *Teflon* question. A clear majority of Group A subjects (63%) said they believe PRETZEL CRISPS is a generic name, while just 27% percent said they believe PRETZEL CRISPS is a brand name. Consistent with other *Teflon* studies, a relatively small percentage (9.9%) said "Don't know/Not sure." These results would lead one to believe that consumers are strongly disposed to believe that PRETZEL CRISPS is a generic name. It is noteworthy that our results on the PRETZEL CRISPS term differed considerably from Jay's results. She noted that a clear majority (55%) thought that PRETZEL CRISPS is a brand name, whereas we found that a clear majority (63%) thought the term referred to a generic name. At the same time, our results and Jay's results on the control terms (e.g., SUN CHIPS, CHEESE NIPS, FLAVOR TWISTS, GOURMET POPCORN, ONION RINGS, and MACADAMIA NUTS) were almost identical. We believe that the apparent instability of beliefs regarding the PRETZEL CRISPS term is a symptom of uncertainty and nonattitudes,[59] a view which we detail further, below.

**Figure 1: Distribution of Group A responses to the standard *Teflon* question**

---

next 3 months, do you think you, personally, will purchase salty snacks for you or someone else?" If subjects did not answer in the affirmative to one of these questions, they were considered ineligible. Subjects then read a set of instructions that explained the difference between a brand name and a generic name, followed by two practice questions to make sure they understood this difference. The practice questions asked subjects whether the terms BAKED TOSTITOS and TORTILLA CHIPS are brand names or generic names. Only subjects who answered both practice questions correctly (the first is a brand, the second generic) were permitted to participate in the study. Of the 392 people who responded to our call for participants, 242 were deemed eligible.

[58] We randomized the order in which the words "brand name" and "generic name" appeared in the questions and answer choices.

[59] *See supra* Part I.B. In Frito-Lay N. Am., Inc. v. Princeton Vanguard, LLC, 124 U.S.P.Q.2d 1184 (T.T.A.B. 2017), the Trademark Trial and Appeal Board criticized Jay's use in her survey's initial mini-course of the term WHEAT THINS as an example of a brand, since it is a highly descriptive mark "and thus not a good example to participants of how to distinguish between a distinctive term and a merely well-advertised highly descriptive or even generic term." *Id.* at *15. To replicate Jay's protocol, we used the same example. Thus, we cannot point to the circumstances of the mini-course to explain the difference between Jay's and our results.

Electronic copy available at: https://ssrn.com/abstract=3864700  **JTX-1121.00018**  YUGALABS_00034015



After that first question, we asked a follow-up question that is not found on the standard *Teflon* survey. As a check on how certain they were of their answers to the first question, Group A subjects who responded "Generic name" or "Brand name" were asked: "How likely do you think it is that your answer is correct?" As shown in Figure 2, the answer choices were arrayed horizontally and included, "Just guessing," "Somewhat likely correct," "Very likely correct," and "Definitely correct."

**Figure 2: Group A follow-up question format**



The distribution of responses to the follow-up question reveals that there was substantial uncertainty hidden behind subjects' responses to the first question. Figure 3 shows the percentage of Group A subjects who gave each possible combination of answers to the main *Teflon* question and the certainty follow-up question. For example, the bar labeled "Brand name: Definitely Correct" refers to the percentage of Group A subjects who answered "brand name" to the first question, then in the follow-up question, said they believe their answer to the first question is definitely correct. The bar labeled "Brand name: Very likely correct" is the percentage of respondents who said "brand name" to the first question, and "very likely correct" to the follow-up, and so on. The middle category "Don't know/Not

18

Electronic copy available at: https://ssrn.com/abstract=3854730    **JTX-1121.00019**    YUGALABS_00034016

sure" includes just those respondents who selected the don't know option on the first question. Respondents who said "Don't know/Not sure" to the first question were not asked the follow-up question.

**Figure 3: Distribution of Group A responses to both questions**



We observe in Figure 3 that about a quarter of all subjects in Group A thought that their answer to the main *Teflon* question was "Definitely correct." That is, 6.2% of subjects said brand name and definitely correct and 18.5% said generic name and definitely correct. What we find so striking about these data is not subjects' certainty but rather their level of *uncertainty*. Slightly more than three-quarters of subjects expressed some level of uncertainty about their answer to the main *Teflon* question when offered a follow-up, and almost half expressed a high level of uncertainty. Those who were least certain of their answer to the main *Teflon* question are located in the five dark-gray bars in the middle of Figure 3. Along with the 9.9% of respondents who answered "Don't know/Not sure" to the first question, an additional 6.2% admitted in the follow-up question that they were just guessing when they selected brand name or generic name to the first question. This suggests that these respondents were not expressing a meaningful belief on the first question. Furthermore, 30.8% of respondents said they believe their answer to the first question was only "somewhat likely correct," which suggests that the belief was weakly held. In sum, 46.9% of subjects either said "Don't know" to the main *Teflon* question, or "Just guessing" or "Somewhat likely correct" to the follow-up question. Thus, nearly half of all subjects in Group A expressed high levels of

19

Electronic copy available at: https://ssrn.com/abstract=3854730

YUGALABS_00034017

uncertainty when asked whether they think PRETZEL CRISPS refers to a generic name or brand name.

It's not obviously apparent what the effect of the sort of uncertainty that we see in this experiment would be in litigation. One thing that is clear is that, once uncertainty is taken into account, the survey appears less probative overall than it first appeared on the question of whether the term is generic or distinctive. But how that uncertainty would work out in litigation would depend on the particular distribution of responses, both as between the top-line "generic name" and "brand name" responses, and also with respect to the effect of uncertainty on each category. The broader point is that currently this kind of uncertainty is not taken fully into account in trademark disputes. In fact, under current practice, just the first question answered by Group A subjects would be examined if these survey results were to be used as evidence. Because 63% of respondents answered "generic name" to the main *Teflon* question, one may be persuaded that most consumers   at least in this sample   consider PRETZEL CRISPS a generic name. But a closer look at the results in Figure 3 demonstrates that only 37% of respondents stated with any certainty that PRETZEL CRISPS is a generic name (i.e., they believed that their answer was either very likely correct or definitely correct). Put differently, only 58% of all subjects who answered "generic name" to the main *Teflon* question were confident in their answer. The rest were guessing, ambivalent, or expressing a weakly held attitude. We observe much the same, of course, with respect to subjects who answered "brand name" to the main *Teflon* question. Of the 27.2% of subjects who answered "brand name," only 16.1% provided that answer with any real certainty. That is, only 59% of all subjects who answered "brand name" to the main *Teflon* question were confident in their answer. The rest were guessing or unconvinced of the belief they expressed.

This pervasive uncertainty is, in our view, a likely cause of the substantial swing in apparent beliefs between Jay's study, which, as stated above, found a clear majority (55%) believing that PRETZEL CRISPS was a brand name, versus our re-run of Jay's study, undertaken according to the same methodology and with a sample drawn from a different pool but qualified using the same questions, yet finding essentially the opposite of what Jay's original study found   in our study a clear majority (63%) responded that PRETZEL CRISPS was a generic term. As we noted, when we look behind the top-line results of our survey to examine belief strength, we find that many subjects manifested weak beliefs and nonattitudes. We suspect that had Jay followed our methodology and examined her subjects' belief strength, she would have discovered that the same was true of individuals in her sample. Pervasive uncertainty and nonattitudes within a population may lead to top-line results that are unstable from sample to sample. We cannot prove that the instability of weakly-held beliefs was the cause of the variance between our top-line results and Jay's: obviously we cannot re-create and re-test Jay's particular sample. However, it is revealing that our results were virtually identical to Jay's for the other test terms in

Electronic copy available at JTX-1121.00021 com/abstract=3864700

YUGALABS_00034018

her survey   terms that were designed, on the whole, to fall more clearly in the category of either brand (e.g., CHEESE NIPS) or generic (e.g., MACADAMIA NUTS) relative to the "target" term (PRETZEL CRISPS). [60] If subjects were more uncertain about the target term, then beliefs about that term would likely have been more unstable and more prone to vary from sample to sample.

### 2. Alternative Method #1: Measuring Uncertainty in Teflon Surveys on a Seven-Point Likert Scale

With subjects assigned to Group B (n=81) and Group C (n=80), we tested two new approaches to the *Teflon* survey. Like Group A, Group B subjects were asked if each of the seven terms refers to a brand name or generic name. But instead of seeing the binary choice answer format, subjects assigned to Group B saw a seven-point Likert scale, arrayed horizontally across the screen, that ranged from "Definitely a generic name" to "Definitely a brand name." This question format, shown in Figure 4, allows subjects to state whether they believe the term is a brand name or generic and simultaneously signal their level of confidence in that belief.

### Figure 4: Group B question format



Do you think PRETZEL CRISPS is a generic name or a brand name?

| Definitely a generic name | Very likely a generic name | Somewhat likely a generic name | Not sure/Don't know | Somewhat likely a brand name | Very likely a brand name | Definitely a brand name |

How do Group B subjects compare? As a reliability check, we aggregated Group B responses into three categories. Grouping responses together, 59.3% said that PRETZEL CRISPS is somewhat likely, very likely, or definitely a generic name, while 30.9% said PRETZEL CRISPS is somewhat likely, very likely, or definitely a brand name. 9.9% said Not sure/Don't know. Recall from Figure 1 that this distribution is remarkably similar to Group A's distribution on the standard *Teflon* question. That is, about 30% of subjects in both groups indicated that PRETZEL CRISPS is a brand name,

---

[60] When presented with PRETZEL CRISPS, 55% of Jay's sample and 27.2% of our sample said the term refers to a brand name. Differences between the two studies were much smaller on the control terms. With regard to the three brand names, 96% of Jay's sample and 97.5% of our sample said that SUN CHIPS is a brand name; 85% of Jay's sample and 88.9% of our sample said that CHEESE NIPS is a brand name; and 48% of Jay's sample and 51.9% of our sample said that FLAVOR TWISTS is a brand name. With regard to the three generic names, 92% of Jay's sample and 96.3% of our sample said that MACADAMIA NUTS is a generic name; 91% of Jay's sample and 98% of our sample said that ONION RINGS is a generic name; and 72% of Jay's sample and 86.4% of our sample said that GOURMET POPCORN is a generic name.

21

YUGALABS_00034019

about 60% indicated that it is a generic name, and about 10% admitted that they do not know.

Figure 5 shows the distribution of Group B subjects on the seven-point scale that they used to provide their answers. On the extreme ends of the distribution, 14.8% said they believe PRETZEL CRISPS is definitely a brand name and 19.8% stated that they believe PRETZEL CRISPS is a generic name. In total, then, 34.6% of Group B subjects expressed complete certainty in their answers. These results suggest that Group B subjects who saw the seven-point scale expressed slightly more certainty than Group A subjects who saw the binary choice question and a certainty follow-up (34.6% in Group B vs. 24.7% in Group A). Although this difference is not statistically significant ($p = 0.17$), we had expected a different result going into the experiments. Our initial expectation was that subjects' initial responses to the forced choice question would produce an anchoring effect that would cause them to commit decisively to those responses in their answers to the follow-up question. But this anchoring effect did not occur. Nor did it occur as we expected in *Squirt* tests, which we will discuss later in this Article.

**Figure 5: Distribution of Group B responses**



How did Group A and Group B subjects compare with regard to uncertainty? Recall from Figure 3 that 46.9% of Group A subjects either said "Don't know" to the binary forced choice question or "Just guessing" or "Somewhat likely correct" to the follow-up question. We considered these subjects, identified by the darker bars in Figure 3, to be exhibiting high levels of uncertainty. We observe similarly high levels of uncertainty among

22

Electronic copy available at: https://ssrn.com/abstract=3854730

YUGALABS_00034020

Group B subjects. The dark-gray bars in Figure 5 indicate that 44.5% of Group B subjects placed themselves at "Don't know" (9.9%), "Somewhat likely a generic name" (24.7%), or "Somewhat likely a brand name" (9.9%) on the seven-point scale. We therefore conclude that nearly half of respondents in both Group A and Group B were in or near equipoise on the question of whether PRETZEL CRISPS is a generic name or a brand name. This observation is striking because that level of uncertainty was not at all obvious from the distribution of Group A responses to the standard *Teflon* question. Recall that 9.9% of Group A subjects said "Don't know/Not sure" to the standard *Teflon* question just a fraction of those who expressed substantial uncertainty when offered more a nuanced question format. Based on these observations, we conclude that the standard *Teflon* question format is simply not equipped to measure uncertainty and the absence of well-formed opinions.

### 3. Alternative Method #2: Measuring Uncertainty in Teflon Surveys Using a Continuous Scale

We presented another variation on the standard *Teflon* format to Group C (n=80). Subjects assigned to Group C were asked if each of the same seven terms presented to Groups A and B refers to a brand name or generic name, but they did so using a slider that ranged from 0 to 100, where 0 represented "Definitely a brand name" and 100 represented "Definitely a generic name." The slider presented respondents with a continuous scale, but we placed intermediate labels on the slider between the 20 and 30 mark ("Likely a brand name"), at the 50 mark ("Don't know/Not sure") and between the 70 and 80 mark ("Likely a generic name") to help guide the respondent. Figure 6 shows the format of the slider presented to Group C subjects.

### Figure 6: Group C question format



On a scale of 0 to 100, where 0 represents "Definitely a brand name" and 100 represents "Definitely a generic name," do you think PRETZEL CRISPS is a generic name or a brand name?

| Definitely a brand name | | Likely a brand name | | | Don't know/ Not sure | | Likely a generic name | | Definitely a generic name |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 |

Figure 7 shows the distribution of Group C's responses. The general patterns are similar to what we saw with Group A and Group B. The large number of intervals on the slider do not make this obvious. But if we break the scale into three generalized categories, we find that 28.8% of Group C subjects moved the slider to a number between 0-39 (leaning brand name);

JTX-1121.00024

YUGALABS_00034021

63.8% moved it to a number between 60-100 (leaning generic), and 7.4% moved it to a number between 40-59 (at or near equipoise). This distribution is remarkably similar to the distribution of Group A responses on the standard *Teflon* question we showed in Figure 1.

**Figure 7: Distribution of Group C responses**



Figure 7 also provides useful information about Group C's uncertainty levels, but again, this is less obvious than in our analyses of Group A and Group B. With so many intervals on this scale, the cutoff points between more certain and less certain responses are necessarily arbitrary. But we can say with confidence that any subjects who moved the slider to 0 or 100 were expressing a high degree of certainty in their belief that PRETZEL CRISPS is either a brand name or a generic name. This included the 8.8% of subjects who moved the slider to 0 (definitely a brand name) and the 27.5% who moved it to 100 (definitely a generic name). If we expand the range for what we consider to be a high level of certainty to include 0-14 on the left side of Figure 7 and 86-100 on the right, 12.5% of Group C subjects believed with a high degree of certainty that PRETZEL CRISPS is a brand name and 40% believed with a high degree of certainty that it is a generic name. We are again left with just under half of Group C subjects (47.5%) in what could be thought of as the range of uncertainty.

This is consistent with the levels of uncertainty that we observed in Group A and Group B. About half of subjects in the three groups expressed considerable uncertainty about whether PRETZEL CRISPS is a brand name or a generic name. And while a strong majority of subjects in the three groups leaned toward "generic name," only about 35-40% of subjects expressed this belief with any degree of certainty.

24

Electronic copy available at: https://ssrn.com/abstract=3854730
YUGALABS_00034022

### 4. Evaluating the Relative Merits of Group A, B, and C Formats

Because the results were so consistent across the three conditions, we believe the scales and question types presented to Group A, Group B, and Group C are similarly capable of measuring the uncertainty that underlies responses to the standard binary forced choice *Teflon* question. For this reason, we believe that any of them are superior to the dominant practice of forcing respondents to choose whether a term refers to a brand name or a generic name, even if a "Don't know" option is explicitly or implicitly made available.

Among the three, we believe that the two-part question format shown to Group A provides the most useful information. The follow-up question gives respondents an opportunity to think about their answer to the main *Teflon* question and to indicate not only how strongly they hold the belief, but also whether the belief is meaningful or just a random guess. The seven-point Likert scale (Group B) sacrifices some of this information for efficiency. Because the Likert scale requires just one question, it demands less time and patience on the part of survey respondents than the two-part question format we showed to Group A. At the same time, we lose the ability to identify respondents who are willing to admit that they are just guessing. Finally, we are not persuaded that the 100-point slider used by Group C adds any meaningful information. In fact, it may create unnecessary confusion because cutoff points on a 100-point slider are arbitrary and up for debate. The two-part question format and the seven-point scale, on the other hand, describe each point on a continuum in language that should be clear to the respondent, the researcher, and the court.

### B. The *Squirt* Confusion Survey Format

A central question in trademark law is the *likelihood of consumer confusion*; that is, the likelihood that due to the similarity between the plaintiff's and the defendant's marks, some appreciable proportion of relevant consumers will mistakenly believe that the defendant's products originate with the plaintiff.[61] To determine the likelihood of consumer confusion, trademark law uses a multifactor test, one factor of which analyzes evidence of actual consumer confusion.[62] Under this factor, parties often present survey evidence of the likelihood of consumer confusion.

Survey experts have developed a number of survey formats to test for the likelihood of consumer confusion. One particular likelihood of confusion survey format is especially appropriate in situations where the

---

[61] There are also far less common claims of so-called "reverse confusion," in which plaintiff complains that the defendant's use of a similar mark causes consumers to mistakenly believe that the plaintiff's products or services originate with the defendant. W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567 (2d Cir. 1993).

[62] *E.g.*, Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867 (2d Cir. 1986); Restatement (Third) of Unfair Competition § 21 (AM. L. INST. 1995).

25

YUGALABS_00034023

plaintiff's mark is not well-known. This format is traditionally called the "*Squirt* format" after the 1980 case *Squirt Co. v. Seven-Up Co.*[63] in which the test first came to prominence.

Since the first use of the survey in the *Squirt* litigation, the *Squirt* survey format has evolved into various forms, but at its core, it presents respondents with the plaintiff's and the defendant's branded products, either one after another[64] or side-by-side,[65] and then asks the respondents if they believe that the products are put out by the same company or different companies. It now also routinely includes a "don't know" option.

Courts and commentators have criticized the *Squirt* format on the ground that it makes the respondent "artificially aware"[66] of the marks at issue, but courts nevertheless often credit *Squirt* surveys. For example, in the recent case *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*,[67] the Ninth Circuit found that the district court abused its discretion in excluding an online *Squirt* survey.[68] In the survey, 300 survey respondents were exposed to photographs of the plaintiff's shoes bearing the plaintiff's DELICIOUS mark and to photographs of the defendant's tank top bearing the term "Delicious."[69] The photographs were shown "one at a time and in rotated order."[70] The control group was exposed to the plaintiff's shoes and to tank tops bearing the terms "Beautiful," "Fabulous," or "Incredible." Respondents were then asked "a series of questions about whether they thought the two marks come from the same company, related companies, or they did not know."[71] The Ninth Circuit recognized various limitations of the survey format, but ruled that the survey should have been

---

[63] Squirt Co. v. Seven-Up Co., 1979 WL 25027, at *9–23 (E.D. Mo. Sept. 6, 1979) (discussing the survey in detail), aff'd in part, remanded in part sub nom. SquirtCo. v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980).

[64] *See, e.g.,* Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025 (9th Cir. 2010).

[65] *See, e.g.,* Bodum USA, Inc. v. A Top New Casting, Inc., 2017 WL 6626018, *7 (N.D. Ill. 2017) (Declining to exclude Squirt survey using "a photo array of five different French press coffeemakers side by side" when this method reflected actual marketplace conditions in which products appeared together on internet shopping sites).

[66] Nat'l Distillers Prod. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002); see *id.* (characterizing as a "major flaw" in the Squirt survey at issue that "every respondent was exposed to the [plaintiff's product in the first room [of the two room survey , thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to [the product's very limited distribution network and weak sales.")

[67] Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025 (9th Cir. 2010).

[68] *Id.* at 1037.

[69] *Id.* at 1036.

[70] *Id.*

[71] *Id.*

JTX-1121.00027

YUGALABS_00034024

admitted, particularly in light of a previous Ninth Circuit case that credited a similar survey.[72]

To explore unmeasured uncertainty in *Squirt* surveys, we conducted an online experiment that exposed 201 test subjects to side-by-side images of two competing brands of flavored vodka: JOHNNY LOVE (passion fruit flavor) and PUCKER (grape flavor). As the images in Figure 8 below show, both brands employ an image of lips as part of their trade dress. The two brands have been involved in a long-running trademark infringement dispute.[73]

**Figure 8: Experimental stimuli**



### 1. Testing for Uncertainty in the Current Binary Forced Choice" *Squirt* Survey Methodology

Our experimental protocol was relatively simple. Each of the test subjects was first shown the side-by-side images and required to view them for at least five seconds before advancing. On the next pages, the images remained in view as the test subjects were asked a series of questions about the depicted products.[74] We randomly assigned subjects to two groups.

---

[72] *Id.* at 1037 (citing Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 902–903 (9th Cir. 2002)).

[73] See JL Beverage Co., LLC v. Beam, Inc., 899 F. Supp. 2d 991, 1012 (D. Nev. 2012) (finding no likelihood of confusion and denying plaintiff's motion for preliminary injunction). The Plaintiffs did not present any survey evidence at trial.

[74] At the end of the survey, all subjects were asked the same series of questions about the number of bottles of liquor they had purchased in the past year, their level of knowledge about liquor, their general education level, gender, and age.

Electronic copy available at JTX-1121.00028 com/abstract=3864730

YUGALABS_00034025

Subjects assigned to Group A (n=102) were asked the main *Squirt* question:
"Do you believe these products are put out by the same company or by
different companies?"[75] They were provided with the answer choices
"Same company" and "Different companies," followed by a "Don't know/No
opinion" option.[76] Figure 9 shows the distribution of responses.

**Figure 9: Group A distribution of responses to standard *Squirt*
question**



Only 8.8% of subjects answered "Don't know/No opinion," which is
consistent with the low percentage of survey respondents choosing that
answer surveys reported in the case law.[77] The number of subjects
answering "same company," 24.5%, would be sufficient in most instances
to support a finding of trademark confusion liability, although it flirts with
the lower bound employed by some courts.

Unlike in conventional *Squirt* surveys, we then asked a follow-up
question to study the degree of certainty or uncertainty that Group A
subjects had in their responses. The 25 Group A subjects who responded
"Same company" were asked: "How likely do you think it is that these
products are put out by the same company?" They were provided with four
possible responses: "Just guessing," "Somewhat likely same company,"
"Very likely same company," or "Definitely same company." The 68 subjects
who responded "Different companies" were asked a similar question and

---

[75] We randomly varied the order of "by the same company" and "by different
companies."

[76] We randomly varied the order of "same company" and "different companies" with
"don't know/No opinion" always appearing last. Logistic regressions suggest that the
ordering of the answers had no effect on the answers that subjects choose.

[77] *See supra* note 19 and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=3854730 **JTX-1121.00029** YUGALABS_00034026

provided with similar answers except that "different companies" was substituted for "the same company."[78]

Figure 10 shows the percentage of Group A subjects who gave each possible combination of answers to the main *Squirt* question and the certainty follow-up question. The bars are labeled such that the answer to the main *Squirt* question is listed first, followed by the answer to the certainty follow-up. For example, the bar labeled "Same: Definitely" refers to the percentage of Group A subjects who answered "Same company" to the main *Squirt* question and "Definitely same company" to the certainty follow-up. The middle bar represents those subjects who said "Don't know/No opinion" to the main *Squirt* question.

**Figure 10: Group A distribution of responses to the standard *Squirt* question and certainty follow-up question**



The data reported in Figure 10 are remarkable. As we had in tests of the *Teflon* survey, we expected that subjects' responses to the main *Squirt* question would produce an anchoring effect that would cause them to

---

[78] The nine subjects who responded "Don't know/No opinion" were asked "If you had to guess, would you say these products are put out by different companies or by the same company?" They were shown five possible answers: "Very likely different companies," "Somewhat likely different companies," "No idea," "Somewhat likely same company," or "Very likely same company." We randomly varied the order of these answers so that they proceeded from "Very likely different companies" to "Very likely same company" or vice-versa. Six responded "Somewhat likely same company," two responded "No idea," and one responded "Somewhat likely different companies."

Electronic copy available at: https://ssrn.com/abstract=3854730

**JTX-1121.00030**

YUGALABS_00034027

commit decisively to those responses in their answers to the follow-up question. Again, this anchoring effect did not occur. In fact, while 24.5% of Group A subjects said they believe these products are put out by the same company, only 2% of Group A subjects expressed full certainty in that belief by selecting "Definitely same company" to the follow-up question. Also striking is the observation that while 91.2% of Group A subjects expressed an opinion in the first question, 10.8% admitted in the follow-up question that they were actually "just guessing" and did not have a meaningful belief. Another 6.9% of subjects retreated to the view that it was only "somewhat likely" that the products were put out by the same company, and 23.5% of subjects said it was only "somewhat likely" that the products were put out by different companies. As with the *Teflon* survey, we therefore see substantial uncertainty among respondents overall. If we group together the subjects who responded "Don't Know/No opinion" to the initial main *Squirt* question and the subjects who said "Just guessing," "Somewhat likely same company," and "Somewhat likely different companies" to the follow-up question (i.e., the darker bars), fully 50% of Group A's test subjects (51 out of 102) indicated a substantial degree of uncertainty about their answers. Once we take this uncertainty into account, we are left with 15.7% of subjects who answered "same company" with any certainty   a number substantially lower than the 24.5% of subjects who appeared to be confused in the initial survey and below the level that many courts (albeit not all) would find sufficient to support a finding of consumer confusion.

### 2. Measuring Uncertainty in *Squirt* Surveys on a Seven-Point Likert Scale

We next employed a separate group of subjects to test a new approach to the *Squirt* survey format. Subjects in Group B (n=99) were asked the same main *Squirt* question that was asked of Group A's subjects. The difference was that Group B subjects were provided with seven possible responses arrayed horizontally across the screen, as shown in Figure 11.[79]

### Figure 11: Group B question format

Do you believe these products are put out by different companies or by the same company?



| Definitely different companies | Very likely different companies | Somewhat likely different companies | Don't know/No opinion | Somewhat likely same company | Very likely same company | Definitely same company |

---

[79] We randomly varied the order of these answers so that they proceeded from "Definitely same company" to "Definitely different companies" or vice-versa. Logistic regressions suggest that the ordering of the answers had no effect on the answers that subjects choose.

JTX-1121.00031

YUGALABS_00034028

Figure 12 shows the distribution of responses to the seven-point scale. Grouping these responses together, 35.4% answered "Definitely same company," "Very likely same company, or "Somewhat likely same company"; 57.6% answered "Definitely different companies," "Very likely different companies," or "Somewhat likely different companies"; and 7.1% chose the middle option, "Don't know/No opinion." These aggregated percentages are roughly similar to the percentages reported in Figure 9 by Group A subjects who answered the main *Squirt* question using the standard binary choice answer format.[80]

**Figure 12: Group B distribution of responses**



As we saw with Group A subjects, a more nuanced picture emerges when we use a seven-point scale to account for uncertainty. Although 35.4% of Group B subjects signaled that they believed the products are put out by the same company, only 3% said they believed that these products were *definitely* put out by the same company. This finding is very similar to what we just observed among Group A subjects who were exposed to the two-part question format. Recall that in that test, just 2% of respondents said they believed that the products are put out by the same company. Another 16.2% of Group B subjects said they believed it was *very likely* that these products are put out by the same company. In sum, 19.2% of Group B subjects stated either with certainty or with a high degree of confidence that they believe that these vodka products are put out by the same company.

At the same time, a plurality of Group B subjects expressed high levels of uncertainty. In addition to the 7.1% of subjects who selected the middle

---

[80] The aggregated percentages suggest that Group B subjects were more likely to believe that the products were put out by the same company (34.5% for Group B vs. 24.5% for Group A). This difference, however, is not statistically significant ($p = 0.093$).

Electronic copy available at: https://ssrn.com/abstract=3854730

JTX-1121.00032

YUGALABS_00034029

option and admitted to having no opinion, another 36.4% placed themselves just on either side of that option when they selected "Somewhat likely same company" or "Somewhat likely different companies." In total, 43.5% of Group B subjects appeared undecided or highly uncertain on the question of whether or not the two products are put out by the same or different companies (denoted by the darker bars in Figure 12). These subjects can be compared to the 50% of Group A subjects who said "Don't know," "Just guessing," or "Somewhat likely" to the main *Squirt* question and certainty follow-up.

As we saw with the *Teflon* studies, only a small percentage of subjects are willing to say they do not know or do not have an opinion in the context of a *Squirt* survey. When presented with follow-up questions or answer choices that allow researchers to probe their level of certainty, however, we find that significant number as many as half in our studies of responses to *Squirt* surveys may be eitherweakly-held or unmeaningful. Recall that the attitude theory principles discussed earlier dictate that weakly-held behaviors are unlikely to impact consumer behavior. Under current methodological practices, most of these weakly-held or unmeaningful responses unlikely to impact consumer behavior would be placed in the same category as strongly-held beliefs that are likely to do so.

### C. The *Eveready* Confusion Survey Format

Unlike *Squirt* confusion surveys, which are often used where the plaintiff's mark is not widely known, *Eveready* confusion surveys are used when many consumers are familiar with a plaintiff's mark, such that they would be expected to be able to call it to mind if exposed to a similar mark.[81] *Eveready* surveys expose respondents only to the defendant's mark. Respondents are then asked to name the company that puts that product out and any other products that company puts out. In contrast to *Squirt* and *Teflon* surveys, respondents to *Eveready* surveys are not given any options to choose from. Respondents must think of and state their own answers.

Due to the open-ended nature of the *Eveready* format, we expected it to be characterized by particularly high levels of uncertainty. Moreover, we expected that uncertainty to be compounded due to the particular format of the *Eveready* survey. That format exposes respondents to three questions, asked in succession of all respondents and designed to elicit responses related to different types of potentially actionable consumer confusion. The first question asks what company puts out the defendant's product or service this question tests for source confusion. The second asks whether the company that puts out the defendant's product or service is *connected or affiliated* with any other company. And the third asks

---

[81] The *Eveready* survey format first came to prominence in Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366 (7th Cir. 1976), in which Union Carbide, the longtime manufacturer of batteries under the mark EVEREADY, successfully sued the defendant for importing lamp bulbs and lamps bearing the mark EVER-READY.

Electronic copy available at JTX-1121.00033 com/abstract=3864700 YUGALABS_00034030

whether defendant's product or service is *approved or sponsored* by any other company. The second and third questions are designed to elicit responses relevant to potential "sponsorship or affiliation confusion"    i.e., the notion that, although consumers might not believe that defendant's product or service actually originates with plaintiff, they might nonetheless believe that defendant is connected to plaintiff either through ownership (connection/affiliation) or via an agreement connected with licensing, promotion or marketing (approval/sponsorship). We suspect that asking consumers to report their impressions about *legal relationships* like sponsorship or affiliation    matters about which consumers often are likely to have only the vaguest impressions   is likely to produce even more uncertainty than questions about the origin of products or services.

To measure uncertainty in *Eveready* surveys, we replicated the structure of a survey used in *Anheuser-Busch, LLC v. Innvopak Systems Pty Ltd.* In this Trademark Trial and Appeal Board[82] dispute, Anheuser-Busch opposed Innvopak Systems's application to register the trademark WINEBUD. Anheuser-Busch argued that consumers are likely to confuse the "bud" in WINEBUD with the Budweiser and Bud Light beer brands. In support of this position, Edward Blair,[83] an expert for Anheuser-Busch, presented results from an *Eveready* survey he conducted with 400 respondents. Blair reported to the Board that 24% of survey respondents confused WINEBUD with Anheuser-Busch or one of its brands. The Board found Blair's results convincing and ruled that the WINEBUD mark was likely to cause confusion with Anheuser-Busch marks.[84]

To calculate confusion, Blair told respondents that a new brand of wine products called WINEBUD may be introduced to the market soon, and then asked the following open-ended questions:

- In your opinion, what company puts out WINEBUD?
- In your opinion, is the company that puts out WINEBUD affiliated or connected with any other company? (If YES) What is that other company?
- In your opinion, is WINEBUD approved or sponsored by any other company? (If YES) What is that other company?

---

[82] The Trademark Trial and Appeal Board (TTAB) is an administrative board within the United States Patent and Trademark Office that hears and decides adversary proceedings including trademark oppositions (initiated when a party opposes a mark prior to final grant and after publication in the Official Gazette) and cancellations (initiated when a party seeks to cancel an existing registration). The TTAB also handles trademark interference and concurrent use proceedings, as well as appeals of final refusals issued by USPTO Trademark Examining Attorneys within the course of the prosecution of trademark applications. *See United States Patent and Trademark Office,* https://www.uspto.gov/trademarks/ttab (last visited Feb. 11, 2021).

[83] Blair is a professor at the University of Houston's Bauer College of Business.

[84] Anheuser-Busch, LLC v. Innvopak Sys. Pty Ltd., 115 U.S.P.Q.2d 1816 (T.T.A.B. 2015).

JTX-1121.00034                                                                    YUGALABS_00034031

Blair considered respondents to be "confused" if they answered affirmatively with respect to any one of the survey's three inquiries: that is, if they stated that they believe that WINEBUD is a product put out by, or connected/affiliated with, or approved/sponsored by Anheuser-Busch or its brands.

In this study, our goal was to calculate likelihood of confusion in the same way that Blair did while also measuring how certain or uncertain respondents felt about their answers. Like Blair, we asked respondents (n=1034) who they believe puts out WINEBUD, who the brand is affiliated or connected with, and who the brand is approved or sponsored by.[85] Our survey departed from Blair's survey in that we followed each open-ended question with a question that asked respondents to indicate how likely they think it is that their answer is correct. Respondents were given four answer choices, again arrayed across the screen horizontally, to select from: (1) No idea    just guessing, (2) Somewhat likely correct, (3) Very likely correct, (4) Definitely correct.

Table 1 shows that on the open-ended questions about who puts out Winebud, who Winebud is affiliated or connected with, and who Winebud is approved or sponsored by, 17.7% of respondents (n=183) gave a response that mentioned Bud, Bud Light, Budweiser, Anheuser-Busch, or InBev. These were all responses that indicated that "Winebud" was put out by, or was sponsored by or otherwise affiliated with, the same company, Anheuser-Busch InBev SA/NV, that puts out Budweiser beer. Responses from the remaining 82.3% were varied. The largest group of respondents (n=288; 27.9%) said that WINEBUD is put out, very generally, by "a wine company," "a vineyard," or "a winery." Others (n=110; 10.6%) named specific companies that produce wine or alcoholic beverages, such as Barefoot, Yellowtail, Seagrams, and E&J Gallo. Another large group of respondents said, simply, that a company called Winebud puts out the brand WINEBUD (n=132; 12.8%).[86] Finally, 9.2% of subjects (n=95) explicitly admitted that they do not know who puts out WINEBUD when they typed phrases such as "don't know," "no idea," "no clue," and "not sure." This percentage is similar to the percentage of subjects who selected "don't know" in our *Teflon* and *Squirt* surveys, which ranged from 7.1% to 9.9%.

### Table 1: Categorized Responses to Ever-Ready Survey

---

[85] We initially recruited n=1252 subjects; however, n=188 were screened out because they reported that they had not purchased at least one bottle of wine in the previous 12 months. We also omitted n=30 subjects because it was clear from their responses that they had not completed the survey in good faith (e.g., they had typed numbers instead of words, pasted in long strings of text, or typed the case citation, presumably after searching for WINEBUD on the internet). After taking these steps, we were left with n=1034 valid observations.

[86] Smaller groups wrote in descriptive adjectives, phrases, and references (general and specific) to soda companies, beer companies, liquor companies, grocery stores, cannabis companies, and technology companies.

Electronic copy available at JTX-1121.00035 om/abstract=3864700

YUGALABS_00034032

|  | Frequency | Percentage |
|---|---|---|
| Bud, Bud Light, Budweiser, Anheuser-Busch, InBev | 183 | 17.7% |
| Some other company, brand, word, or phrase | 756 | 73.1% |
| "Don't know," "not sure," etc. | 95 | 9.2% |

Under current practice, a survey showing that 17.7% of consumers confused a defendant's product with a plaintiff's product could result in a ruling for the plaintiff, as least in some courts. Our follow up questions show, however, that the vast majority of respondents who said WINEBUD is put out by, affiliated with, or approved by Anheuser-Busch and its brands were probably not actually confused. Rather it appears more likely that they were merely creating a momentary association because the survey encouraged them to do so. That is, many responses could simply be the result of a demand effect caused by the survey-taking environment.

Figure 13 shows the responses to our follow-up question, which asked respondents how likely they believe it is that their answer is correct. It is notable that 44.3% of the 183 respondents who mentioned Anheuser-Busch or its brands on the open-ended question admitted in the follow-up question that they actually have no idea who puts out WINEBUD and were just guessing. The very large number of people who offered a guess, rather than a belief, in response to the questions in this *Eveready* survey suggests that the survey created substantial demand effects — i.e., many respondents who had no actual beliefs regarding the survey questions reported one anyway, perhaps in a bid to be helpful to the surveyor. The survey also produced a substantial portion of weakly-held beliefs. More than a third of respondents who mentioned Anheuser-Busch or its brands (35%) said they only thought their answer was "Somewhat likely correct." In sum, 79.3% of respondents who mentioned Anheuser-Busch or its brands expressed high levels of uncertainty about their answers. Meanwhile, only 1.1% of respondents said they believed their answer to be "Definitely correct" and 19.7% said they believed their answer was "Very likely correct."

If we sum these two categories (20.8% of the 17.7% of subjects mentioning Anheuser-Busch or one of its brands), we see that only 3.7% of the respondents reported confusion with any degree of certainty on the three questions summed — a figure that certainly calls into question the validity of our top-line finding of 17.7% confusion. More importantly, given that Blair's subjects in the original WINEBUD study in all likelihood were also subject to some degree of uncertainty, our finding should cause us to ask whether Blair's topline finding of 24% apparent confusion was valid.

35

YUGALABS_00034033

**Figure 13: Uncertainty levels among subjects who mentioned
Anheuser-Busch or its brands (n=183)**



These findings have important implications for how courts interpret data from *Eveready* surveys, and indeed, for trademark surveys generally. We will consider these implications now.

### III. Implications

Our experiments reveal that consumers experience varying degrees of uncertainty in assessing whether a mark is generic or distinctive, or whether two similarly-branded products originate from the same source. Current standard trademark survey formats fail to register these degrees of uncertainty. This failure has both technical implications for the value of surveys in trademark litigation, and also wider significance for the coherence of trademark law.

Social scientists have routinely incorporated the subjective probability that a proposition is true  the mathematical expression of belief strength  into their measurement of beliefs. Yet such measures are conspicuous by their absence with respect to the standard form of trademark surveys in use today.[87] Reforming trademark surveys to gauge

---

[87] GARY CRONKHITE, PERSUASION: SPEECH AND BEHAVIORAL CHANGE (1969); William R. Ferrell & Paul J.McGoey, *A Model of Calibration for Subjective Probabilities*, 26 ORGANIZATIONAL BEHAV. & HUMAN PERFORMANCE 32, 32–53 (1980); Gerd Gigerenzer et al., *Probabilistic Mental Models: A Brunswikian Theory of Confidence*, 98 PSYCH. REV., 506, 506–28 (1991); SARAH LICHTENSTEIN & BARUCH FISCHHOFF, *Calibration of Probabilities: The State of the Art to 1980, in* JUDGMENT UNDER UNCERTAINTY: HEURISTICS AND BIASES 306–34 (1982); ANTHONY O'HAGAN ET AL., UNCERTAIN JUDGEMENTS: ELICITING EXPERTS' PROBABILITIES (2006);

36

Electronic copy available at: https://ssrn.com/abstract=3854730
YUGALABS_00034034

belief strength offers a way to refine courts' liability findings and focus trademark enforcement on those cases where the defendant's use is likely to harm consumers and senior users.

That leaves us to consider how, in general, to set the correct threshold for belief strength before a response is counted fully toward satisfying the plaintiff's prima facie case. Relatedly, we must ask how precisely to account for weak beliefs in analyzing the sort of revised trademark surveys we have presented here. Marketing research professionals and academics have studied ways to take responses to these seven (and five, nine or eleven) point scales and aggregate them into overall summary statistics in the context of predicting eventual purchase trial rates from purchase intentions data commonly collected in practice and similar to the scale in Figure 11 (i.e. a Likert scale with anchor points such as definitely will not buy, very unlikely to buy, somewhat unlikely to buy, may or may not buy, somewhat likely to buy, very likely to buy, and definitely will buy).[88] The most common ways to aggregate such data are simply to take the percentage of respondents in the top or top two boxes as indicators of purchase or to apply a weighting scheme where the weights decrease as the stated likelihood of purchase decreases. The underlying principle behind the use of weighting schemes is that some people who say they definitely will buy will not in the end and that some people who say they probably won't buy will.

For purposes of this Article we adopt the top two box approach for a variety of reasons. First, the legal standard in trademark cases (as in virtually all civil litigation) is preponderance of the evidence i.e., that consumer confusion is more likely than not. And once we re-design trademark surveys to take belief strength into account, it is only the top two points on the Likert scale that represent a belief that is arguably strong enough that the individual who holds it unambiguously believes that the proposition is more likely true than not and that belief is strong enough to potentially impact consumer behavior. Second, research in marketing has shown that weighting schemes are not absolute and vary with the type of product.[89] Given that, it would be virtually impossible to come up with unambiguous weights that could be used by the court in a variety of situations. Third, and related to the difficulty of creating unambiguous

---

KARL E. SCHEIBE, BELIEFS AND VALUES (1970); Peter B. Warr & J. Stuart Smith, *Combining Information About People: Comparisons Between Six Models*, 16 JOURNAL OF PERSONALITY AND SOCIAL PSYCHOLOGY 55–65 (1970); Robert S. Wyer, *Quantitative Prediction of Belief and Opinion Change: A Further Test of a Subjective Probability Model*, 16 J. PERSONALITY & SOCIAL PSYCH., 559, 559–70 (1970).

[88] Linda F. Jamieson & Frank M. Bass, *Adjusting Stated Intention Measures to Predict Trial Purchase of New Products: A Comparison of Models and Methods*, 26 J. MKTG. RSCH., 336, 336–45 (1989); Vicki G. Morwitz & David Schmittlein, *Using Segmentation to Improve Sales Forecasts Based on Purchase Intent: Which "Intenders" Actually Buy?*, 29 J. MKTG. RSCH., 391, 391–405 (1992); Vicki Morwitz et al., *supra* note 55.

[89] Vicki Morwitz et al., *supra* note 41.

Electronic copy available at JTX-1121.00038 com/abstract=3864700

YUGALABS_00034035

weights, the marketing industry has historically and generally adopted the top box or top two box approaches.[90] Finally, empirical studies of concurrent relationships between intentions and purchasing for packaged goods brands have exhibited a threshold effect.[91] Thresholds are consistent with top box or top two box rules used to score intentions data.[92]

Using this standard, courts might reasonably find infringement only when a threshold proportion of consumers believe it to be at least *substantially likely* that products bearing the defendant's mark originate from the plaintiff.[93] Given the absence of purchasing context in trademark surveys, and given that even carefully-worded survey questions might create substantial demand effects that produce false positives (i.e., spurious reports of "confusion"),[94] subjecting trademark plaintiffs' claims to this more demanding standard is likely necessary to avoid a substantial incidence of false positives in trademark litigation   i.e., findings that trademark defendants are liable based on the mis-measurement of consumer beliefs.

To be sure, in some trademark disputes there may be no need to gauge the strength of consumer beliefs. Indeed, there may be no need to gauge consumer beliefs at all. When, for example, a defendant is producing identical counterfeit goods that bear a plaintiff's marks, it may be correct for courts to presume that a high proportion of consumers would hold a strong belief that the counterfeits originate from the plaintiff   at least where the rival goods trade in similar channels, are marketed to similar

---

[90] Bertram Gold & William Salkind, *What Do 'Top Box' Scores Measure?*, 14 J. ADVERTISING RSCH., 19, 19–23 (1974); Alan Gruber, *Purchase Intent and Purchase Probability*, 10 J. OF ADVERTISING RSCH., 23, 23-27 (1970).

[91] Russell I. Haley & Peter B. Case, *Testing Thirteen Attitude Scales for Agreement and Brand Discrimination*, 43 J. MKTG., 20, 20–32 (1979); Michel Laroche & John A. Howard, *Non-Linear Relations in a Complex Model of Buyer Behavior*, 6 J. CONSUMER RSCH., 377, 377–88 (1980). Laroche and Howard employed a five-point Likert intention scale; Haley and Case's data demonstrate a threshold effect for both five-point and eleven-point Likert intention scales.

[92] Manohar U. Kalwani & Alvin J. Silk, *On the Reliability and Predictive Validity of Purchase Intention Measures*, 1 MKTG. SCI., 243, 243–286 (1982).

[93] It is commonplace in public opinion polling to measure the strength of the components of attitudes. Evaluations can be strongly or weakly held. Beliefs may be held to varying degrees.  Commitment to behavior may also be a matter of degree. Strength of psychological constructs are generally measured in one of three ways: (1) a strength dimension can be built into a question itself; (2) strength could be measured by a separate question; or (3) strength can be assessed by asking a series of independent questions, each one reflecting the same general underlying attitude. The first is the most common approach and is implemented by using response scales such as definitely agree, somewhat agree, neither agree nor disagree, somewhat disagree, definitely disagree. NORMAN BRADBURN ET AL., ASKING QUESTIONS: THE DEFINITIVE GUIDE TO QUESTIONNAIRE DESIGN – FOR MARKET RESEARCH, POLITICAL POLLS, AND SOCIAL AND HEALTH QUESTIONNAIRES, ch. 4 (2004).

[94] MCCARTHY, *supra* note 1, § 32:172.

Electronic copy available JTX-1121.00039 m/abstract=3864700 YUGALABS_00034036

customers, and are not otherwise distinguished.[95] But in the hard cases, which are, on the whole, more likely to survive to trial, measuring not just consumer belief but belief strength may make a critical difference in outcomes.

### A. Improving Surveys to Reduce Information Loss About Uncertainty

Treating beliefs as binaries beggars reality. Perhaps more importantly to trademark lawyers, it may undermine the intended pro-competitive mission of trademark law. Both common sense and previously alluded-to behavioral science evidence suggest that people are, in general, less likely to act on the basis of weakly-held beliefs.[96] But weakly-held beliefs are common, and can, unless accounted for, lead courts to assign liability in instances where a deeper understanding of consumer beliefs would counsel against it. Here's a concrete example: In the following *Squirt*-format confusion survey, we showed subjects images of two of the most recognizable brands in the world, Nike and Adidas. Subjects were shown a white sneaker with a black Nike swoosh next to a white sneaker with a black three-stripe Adidas logo (Figure 20).  Subjects were randomly assigned to two groups. Similar to our tests using the PUCKER/JOHNNY LOVE images,[97] Group A saw the main *Squirt* question with the Likert-scale certainty follow-up question. Group B saw only the seven-point Likert scale. There were 102 subjects in each group.

**Figure 14: Images of Adidas and Nike sneakers**



Figure 15 shows that there was significant apparent confusion among subjects who saw the NIKE and ADIDAS image. While 85.3% answered correctly that these shoes are put out by different companies, 2% said "don't know," and 12.7% said they believe the sneakers are put out by the same company a percentage close enough to the 15% threshold sometimes used by courts to determine that confusion exists that if this test were repeated several times with different samples, it is entirely possible, if not likely, that the figure would have *exceeded* 15% in one or more replicates. In other words, the standard *Squirt* question picked up a

---

[95] See, e.g., Bentley Motors Corp. v. McEntegart, 976 F. Supp. 2d 1297, 1311 (M.D. Fla. 2013) (court finding that a substantially identical appearance makes the likelihood of confusion "readily apparent.")

[96] *See* discussion *supra* Part I.B.

[97] *See* discussion *supra* Part II.B.3.

Electronic copy available at: https://ssrn.com/abstract=3864740 **JTX-1121.00040**   YUGALABS_00034037

surprisingly high level of what would be interpreted as "confusion" in a test comparing two famous global brands that are widely known to be put out by different companies.

**Figure 15: Distribution of responses to standard *Squirt* question for Nike/Adidas**



What happens when we elicit the belief strength of the respondents in this survey? The information we recover is somewhat helpful  though perhaps not as much as one might hope. Figure 16 shows the distribution of responses given to the follow-up question that Group A subjects saw after responding to the three-answer forced choice question. This figure shows that even when asked about two of the world's most famous brands, consumers experience some level of "confusion." Fewer than half of subjects (45.5%) who saw these images were able to say with complete confidence that they believe that the sneakers pictured are put out by different companies. The majority of subjects were therefore uncertain or confused to varying degrees. If we take data only from the top two boxes of "same company" (i.e., "definitely same company" and "very likely same company") and disregard those respondents who say that they were either just guessing or had weak beliefs (i.e., those responding that the NIKE and ADIDAS shoes pictured were only "somewhat likely" to be put out by the same company), the level of apparent "confusion" is reduced from 12.7% to 10.9%  a 14.2% reduction in the magnitude of confusion. We see a more substantial reduction in confusion in Figure 17, which shows the distribution of subjects in Group B who saw the NIKE/ADIDAS images and were asked to place their response on a seven-point Likert scale. Again, only about half of subjects (53%) who saw images of the sneakers were completely certain that NIKE and ADIDAS are put out by different companies. If we take data only from the top two boxes of "same company,"

40

Electronic copy available at: https://ssrn.com/abstract=3854730

YUGALABS_00034038

and disregard those respondents who say that they were either just guessing or had weak), the level of apparent "confusion" is reduced from 12.7% to 7.9%   a 38% reduction in the magnitude of confusion.

**Figure 16: Follow-up question to standard *Squirt* question**



**Figure 17: 7-Point Likert Scale**



This test provides further evidence that the law has constructed an epistemology of confusion that is too simple. Our test of the NIKE/ADIDAS images show that not only do many people not have well-formed opinions of even the most famous brands and their origins, but it shows that not accounting for this can raise the risk of inappropriate conclusions. As the NIKE/ADIDAS example shows, when accounting for uncertainty, a finding

41

Electronic copy available at: https://ssrn.com/abstract=3854730

YUGALABS_00034039

dangerously close to the threshold for confusion recedes when belief strength is measured and taken into account. According to attitude theory, weak beliefs are not likely to impact a consumer's behavior in the marketplace.

Additionally, our NIKE/ADIDAS test is another piece of evidence that the current practice of providing a "don't know" option is not enough. Many people refrain from choosing the "don't know" option even when they are unsure about their answer. By default, a great deal of uncertainty is funneled into the "same company" or "different companies" categories. This creates the perception that survey respondents are more certain about their answers than in fact they really are. Of course, as we saw with the PUCKER/JOHNNY LOVE tests, these high degrees of uncertainty are even more pronounced in the case of smaller, lesser-known brands.

For several reasons, we believe the information gain that comes from survey formats that more fully report consumer uncertainty would significantly improve the validity of surveys in trademark litigation. As an initial matter, revising surveys, as we have done here, to measure the certainty with which individuals hold the relevant beliefs will help litigants better assess the likelihood that individual responses are a product of demand effects   i.e., the bias that occurs when participants infer the purpose of an experiment and respond so as to help confirm a researcher's hypothesis.[98] Even carefully-constructed survey questions may produce demand effects,[99] and trademark surveys that fail to inquire into individuals' belief strength deprive us of information that would be useful in gauging whether some or all of the survey's apparent headline findings can be ascribed to demand effects.[100] If a significant number of respondents to a particular survey are highly uncertain about their beliefs, we might require the plaintiff to do more work to validate that the questions are not producing substantial demand effects.[101]

---

[98] *See generally* Jonathan Mumalo & Eric Peterson, *Demand Effects in Survey Experiments: An Empirical Assessment*, 113(2) AMERICAN POL. SCI. REV., 517–529 (2019).

[99] For example, *Eveready* surveys sometimes frame the third "approval or sponsorship" question to ask the respondent to state whether the defendant "needed to get permission" for their use or "did not need to get permission." *See, e.g.*, Report of Jacob Jacoby, Ph.D., in Juicy Couture, Inc. v. L'Oreal USA, Inc., 04 CIV 7203 (DLC) (S.D.N.Y. 2005) (submitted on behalf of defendant L'Oreal), at p. 12, report on file with authors. *See also* Report of Jacob Jacoby, Ph.D., in Smith v. Wal-Mart Stores, Inc., Civil Action No. 1:06-cv-526-TCB (N.D. Ga. 2005) (same). This question explicitly asks for a *legal* conclusion—i.e., whether the defendant's trademark use requires permission of the senior user. The beliefs of lay survey respondents about the content of legal rules are especially likely to be weakly held, and, thus, also especially likely to respond to respondents' perceptions about the answer that the survey-taker would expect or prefer.

[100] *See* Combe Inc. v. Dr. Aug. Wolff GmBH & Co. KG Arzneimittel, 382 F. Supp. 3d 429, 463 (E.D. Va. 2019) (the court acknowledged the need for a control group to help measure demand effects).

[101] *See, e.g.*, *id.*; MCCARTHY, *supra* note 1, § 32:187.

42

YUGALABS_00034040

This point about demand effects takes different forms across the different types of trademark survey methods. *Squirt* confusion surveys, and especially those that present products to respondents placed side-by-side, have been criticized for suggesting a source relationship where respondents may believe that the products would not be placed in this way if there was not a connection.[102] The risk of demand effects may be even more acute for *Eveready* surveys. The *Eveready* survey format is typically used when plaintiff's brand is the sort of household name that consumers are likely to be able to call to mind, unbidden. Given that context, it is possible that exposing respondents to a defendant's mark that has some similarity to plaintiff's may bring to mind a famous, market-leading brand, like BUDWEISER, without necessarily causing respondents to believe that the plaintiff's and defendant's products have any connection, either through common origin, or through affiliation or sponsorship. By integrating questions about certainty into the *Eveready* format, courts can better distinguish between respondents who are likely truly confused and those who are merely reporting an association because they perceive that they have been asked to do so in a survey-taking context. For example, if we agree that respondents who stated that they are "just guessing" are likely not actually confused but merely reporting a spurious association, the level of confusion in our WINEBUD *Eveready* test drops from 17.7% to 9.9% well below even the 15% threshold that courts and commentators generally recognize as the minimum to show a likelihood of confusion.[103] Likewise, if we only count as confused respondents who said Anheuser-Busch and its brands and then said they believe their responses is "Very likely correct" or "Definitely correct," the reported level of confusion in our sample drops from 17.7% to a mere 3.7%.

## B. Reducing the Risk that Trademark Law's Circularity Will Expand the Scope of Liability

More generally, by failing to account for uncertainty, current trademark survey methods are likely to contribute over time to the expansion of the scope of trademark liability. This is not because the current methods are bound to err in only one direction. Survey methods that elide uncertainty may either overstate or understate the extent to which respondents identify a term as distinctive, or regard the similarity between two marks as suggesting a common source, depending on the particular case. Indeed, we see errors in both directions in the experiments in this Article. Taking account of belief strength in our *Teflon* survey[104] showed that the

---

[102] *See, e.g.,* Kargo Glob., Inc. v. Advance Magazine Publishers, Inc., 2007 WL 2258688, 7 (S.D.N.Y. Aug. 6, 2007) (wherein the court found a survey to be "impermissibly leading" due to the "back-to-back design" that failed to recreated market conditions); Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000); MCCARTHY, *supra* note 1, § 32:172.

[103] *See supra* note 4 and accompanying text.

[104] *See* discussion *supra* Part II.A.

Electronic copy available JTX-1121.00044 com/abstract=3864700

YUGALABS_00034041

conventional form of the survey overstated respondents' beliefs in the term's genericism (a form of error that would benefit the plaintiff in litigation). On the other hand, our *Squirt* and *Eveready* experiments showed error in the other direction[105] the conventional form of these surveys tended to overstate the degree of consumer confusion (an error which helps plaintiffs).

We should not be reassured, however, by the apparent bi-directionality of the conventional surveys' error: when the surveys interact with applicable standards of proof, the error may suddenly become directional. Plaintiffs ordinarily bear the burden of proof on both distinctiveness and the likelihood of confusion. Plaintiffs are unlikely, in the main, to seek to rely on surveys that are not helpful. Rather, they will tend to rely only on surveys that produce top-line distinctiveness or confusion numbers that advance their claims. For the surveys that plaintiffs are incentivized to introduce, it is likely that submerging consumer uncertainty will help plaintiffs disproportionately. Importantly, where consumer uncertainty works in plaintiffs' direction for example, in a likelihood of confusion survey where the "same company" respondents are highly certain and the "different company" respondents less so surfacing that uncertainty is likely to be only modestly helpful so long as the top-line confusion number exceeds the courts' undemanding thresholds.

Given this asymmetry, the failure of trademark survey methods to account for consumer uncertainty may work, over time, to expand the scope of trademark rights. In the case of distinctiveness surveys, this expansion is direct failing to surface consumer uncertainty is likely, over time, to lead to more terms being protected as trademarks than would otherwise be the case. And the increased prevalence of marks is likely then to feed through to consumer perception: if the law protects certain designations as trademarks (for example, a yellow color of adhesive note pads),[106] over time consumers may come to expect that similar designations (a red outsole on shoes)[107] also function as trademarks.

In the case of trademark confusion claims, the dynamic is similar, if perhaps a bit more complex. A positive feedback loop connects trademark litigation to consumer behavior and perception in the marketplace: consumer beliefs largely determine legal outcomes in trademark law, but those legal outcomes can in turn influence consumer beliefs. As courts

---

[105] *See* discussion *supra* Part II.B and II.C..

[106] *See* U.S. Trademark Reg. No. 2,390,667 (registered Oct. 3, 2000). *See also* David Lazarus, *3M Not Happy With Microsoft's Post-It Emulation*, WIRED (Jan. 9, 1997), https://www.wired.com/1997/01/3m-not-happy-with-microsofts-post-it-emulation/#:~:text=Minnesota%20Mining%20%26%20Manufacturing%2C%20better%20known,in%20damages%20and%20legal%20costs.

[107] *See* Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 228 (2d Cir. 2012) (holding that the plaintiff's "Red Sole Mark" consisting of a "red lacquered outsole that contrasts with the color of the adjoining 'upper'" is protectable as a trademark).

Electronic copy available at JTX-1121.00045 https://ssrn.com/abstract=3864700

YUGALABS_00034042

disallow conduct that creates even weak levels of confusion within certain consumers, consumers are increasingly confronted with a marketplace in which these sorts of uses are barred. Since vigilance is costly, consumers operating in a marketplace that trademark law has made "safe" for them are likely over time to reduce their vigilance, which paradoxically, reinforces the need for aggressive trademark enforcement.

Finally, our current failure to inquire into the strength of individual beliefs poses a broader threat to trademark's raison d'être, which is to promote competition in markets by providing consumers accurate information about product source. Current survey methods expose trademark courts to the risk of producing a lot of false positives i.e., cases in which plaintiffs prevail in having defendants held liable even where the evidence of either or both of distinctiveness or confusion is weak. And the error costs of false positives in the trademark context are far from trivial. When trademark courts find incorrectly that an asserted mark has acquired distinctiveness, the effect is to withdraw from competitive use a descriptive term; the cases involving that category of terms are precisely the ones in which proof of acquired distinctiveness (aka, "secondary meaning") is required. The result may be to hobble competitors, who are deprived of free use of a term that describes their product.[108] And because the term does not in reality serve as a source identifier, the harm of withdrawing a descriptor from full competitive use is not counterbalanced by the benefits to competition that accrue from protection of terms that consumers treat as source identifiers: If consumers do not in reality rely on the term to identify source, either because they lack a belief about the term's distinctiveness entirely, or because that belief is so weakly held that consumers do not *act on it*, then we will not benefit from the reduction in information costs that we expect trademarks to provide.

Much the same is true where trademark courts incorrectly find consumer confusion based on survey evidence that assesses belief but not belief strength. If consumers are not in fact confused, or if their beliefs about the common source of plaintiffs' and defendant's products are so weakly-held that individuals are unlikely to act upon them in real-world markets, then trademark courts are depriving non-confused consumers of a source identifier *that they use to correctly identify the source of products.*[109] That is,

---

[108] Trademark's doctrine of descriptive fair use generally permits competitors to make descriptive uses of terms protected as marks. *See* MCCARTHY, *supra* note 1, § 11:45. That said, the boundaries of what constitutes a descriptive versus a source-indicating use are unclear and depend entirely on context, are likely often to be contested in particular cases, and cannot be clarified without expensive litigation that is risky for would-be descriptive users. As a consequence, we cannot rely on trademark's descriptive fair use defense to dispel the harm caused by court's positives on the question of distinctiveness, although the availability of the defense certain reduces that harm somewhat.

[109] Michael Grynberg, *The Road Not Taken: Initial Interest Confusion, Consumer Search Costs, and the Challenge of the Internet*, 28 SEATTLE U. L. REV. 97, 98 (2004).

45

Electronic copy available at JTX-1121.00046 com/abstract=3864700

trademark courts are depriving non-confused consumers of valid
information regarding source. And again, there is no counterbalancing
trademark benefit: if consumers are not confused, or if mistaken beliefs
about source as weakly-held and therefore unlikely to be acted upon, then
legal intervention does little to dispel either confusion or "free-riding" on
the senior user's goodwill, for neither of those evils is present   at least if
we judge by real-world effect rather than by purely internal perceptions.
Legal intervention in such cases is all social cost, with no benefit other than
the private benefit to the senior mark owner of reduced competition   a
private benefit which is itself a component of the social cost and is therefore
not offsetting.

### C. Confronting the Meaning of Uncertainty in Trademark Law

Once courts begin to take consumer uncertainty into account, then they
face the decision of what the appropriate certainty threshold is for proof of
distinctiveness, or likelihood of confusion. And that decision raises some
fundamental normative questions that trademark law previously has
avoided confronting. Here are two: Should trademark law intervene to
protect consumers who believe that a mistaken proposition is only
somewhat likely to be true? And should that intervention be undertaken
without regard to whether a countervailing proportion of consumers
recognize with complete certainty the proposition's falsity?

The position that trademark law should show solicitude for consumers
with even weakly-held mistaken beliefs would benefit trademark plaintiffs.
But it would also penalize consumers who have strongly-held true beliefs,
but who now must do the work necessary to build new source associations
when the law forces the junior user to adopt a different mark. It might also
interfere with trademark law's mission to provide consumers with
"shortcuts" that make competitive markets more efficient. Is it efficient to
respond to confused consumers with weakly-held incorrect beliefs by
removing the "confusing" use from the marketplace? Is it efficient if doing
so means disrupting the strongly-held correct beliefs of non-confused
consumers? If it forces junior mark holders to incur the costs of
constructing new product/mark associations? If it requires non-confused
consumers to incur the costs of internalizing those new associations?

The alternative view (one which we favor) is that the party that bears
the burden of persuasion on the fact question addressed by a survey should
not be able to rely on consumers who admit to guessing or who report that
they are merely somewhat likely to perceive the mark or marks at issue in
the manner alleged. As we explained earlier,[110] we think the "top two box"
methodology   i.e., counting as evidence of distinctiveness only those who
are certain of a term's distinctiveness or consider it very likely, and
counting as evidence of confusion only those who are certain or believe it
very likely that the products at issue originate in a common source   is the

---

[110] *See* discussion *supra*, Part III.A.

Electronic copy available at: https://ssrn.com/abstract=3864700   **JTX-1121.00047**   YUGALABS_00034044

best way to ensure that courts do not make decisions based on survey respondents' weakly-held beliefs.

Consider, for example, the likelihood of confusion cause of action The current *Squirt* and *Eveready* formats are blunt instruments that allows plaintiffs to meet the relevant threshold by grouping together consumers who are only somewhat likely to be confused with those that are very likely to be confused or definitely confused. In this regard, the format takes advantage of survey respondents' willingness to speculate in low-stakes non-purchasing contexts. In our *Squirt* surveys above, of those respondents who would conventionally be classified as likely to be confused, in Group A one-third were in fact only somewhat likely to be confused and in Group B it was one-half. If these respondents are removed from the likely to be confused category, both groups would yield results that for most courts fail to meet the standard threshold proportion of confused consumers sufficient to trigger a finding of infringement.

Some trademark scholars have long argued for a general materiality requirement in trademark confusion cases i.e., for a requirement that plaintiffs show that confusion is likely to be material to actual purchasing decisions.[111] Our arguments here might be understood as a kind of "systemic" materiality requirement one which does not operate as an additional formal element of the plaintiff's claim, but rather as a factor shaping how plaintiffs in trademark cases are required to prove their claims. We agree that plaintiffs should be required to support their claims with evidence of consumer beliefs that are reasonably certain. If plaintiffs wish to argue that consumers with weak beliefs are likely to act on those beliefs, they should be required to offer context-specific arguments e.g., characteristics of the real-world purchasing environment that are likely to strengthen rather than dispel weakly-held beliefs and not mere assertion.

Finally, a more nuanced understanding of consumer uncertainty in the marketplace may allow for more nuanced forms of relief. With respect to injunctive relief, all the major fields of intellectual property law have grown increasingly sensitive in recent decades to the need for courts to fashion more tailored injunctions.[112] Though trademark law has shared in this trend, it significantly lags behind patent and copyright law. One reason for this may be that trademark courts are not provided with sufficient information about marketplace realities. Current likelihood of confusion surveys contribute to this problem, by giving the impression that there either is or is not confusion rather than accurately reflecting the varying

---

[111] See Mark A. Lemley & Mark McKenna, *Irrelevant Confusion*, 62 STAN. L. REV. 413, 447 (2010) (arguing that certain forms of consumer confusion "should only be actionable when they can be proven material to consumers' decisions in particular cases"); Rebecca Tushnet, *Running the Gamut from A to B: Federal Trademark and False Advertising Law*, 159 U. PA. L. REV. 1305, 1344–73 (2011) (advocating for the restoration of a materiality requirement in trademark law).

[112] *See* Aurelia Hepburn-Briscoe, *Irreparable Harm in Patent, Copyright, and Trademark Cases After Ebay v. Mercexchange*, 55 HOW. L.J. 643 (2012).

Electronic copy available JTX-1121.00048 om/abstract=3864700

YUGALABS_00034045

degrees of confusion among consumers that our experiments suggest are likely to characterize consumer beliefs in many cases. As courts become aware of the wide diversity of consumer beliefs, they may become more comfortable with forms of injunctive relief that fall short of outright prohibitions. For example, when a survey reveals that an appreciable number of consumers believe mistakenly that the parties' products come from the same source, but for many that belief is only weakly held, then it may be unnecessary for a court to issue an absolute prohibition on the defendant's accused mark. Disclaimers or modest changes in the defendant's mark may be sufficient to disabuse consumers of weakly-held mistaken beliefs. And such tailored relief may avoid imposing unneeded costs both on the plaintiff mark-owner's good faith competitors and perhaps most importantly  on consumers who are *not* confused. With respect to damages, many circuits require that the plaintiff show actual confusion to qualify for an award of damages.[113] Survey evidence is routinely accepted to support this showing.[114] But survey evidence that indicates primarily that survey respondents were only somewhat likely to be confused should not support a finding of actual confusion.

## Conclusion

It has now been exactly a century since courts first began to consider trademark survey evidence, and through the course of that century, the quality and utility of survey evidence has substantially deteriorated, leaving judges understandably wary of it. Perhaps because it eased the administration of surveys, perhaps because it suited their clients' interests, trademark survey experts regressed to the practice of treating consumer beliefs as simple binaries. Meanwhile, social science understandings of consumer beliefs and behavior have advanced considerably. Marketing scholars have long since recognized that any plausible model of consumer attitude formation must take into account consumer belief strength; i.e., $b_i$ in the expectancy-value model we outlined above.[115] Public opinion scholars have understood that some respondents are ambivalent or unwilling to admit that they don't know or have an opinion. As a result, attitudes expressed on surveys are not always meaningful or strongly-held.[116] This Article has sought to restore these basic insights  that consumer beliefs are not binary, but held at varying levels of strength and

---

[113] See, e.g., Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 523 (10th Cir. 1987) ("Likelihood of confusion is insufficient; to recover damages plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation . . . . Actual consumer confusion may be shown by direct evidence, a diversion of sales or direct testimony from the public, or by circumstantial evidence such as consumer surveys.").

[114] *See id.*

[115] *See supra* notes 42–45 and accompanying text.

[116] *See* discussion accompanying notes 46–47.

48

YUGALABS_00034046

meaningfulness to the administration and evaluation of trademark survey evidence. Our hope is that trademark survey evidence developed according to the protocols we have set out will better aid courts in reaching the right results in specific cases and further the trademark system's overarching goal of promoting efficient and fair competition.

While we believe that testing for consumer belief strength will significantly improve the utility of trademark survey evidence, we recognize that other simplifying assumptions built in to trademark surveys remain to be overhauled. Indeed, we have only scratched the surface of simplifying assumptions in trademark surveys. For example, not only is the core survey response binary, but so is sample extraction from the study's target universe i.e., individuals in that target universe are either expected to be future purchasers, and thereby eligible for inclusion in the sample, or they are not. But as with beliefs, propensity toward future purchasing behavior is probabilistic.[117] In line with the above cited research on the relationship between intention and purchase, it would be reasonable to ask whether prospective purchasers should be given the same weight as established purchasers. Similar questions could be asked about the likelihood that a stimulus presented in a survey might be able to mirror a marketplace context. Of course, some aspects of survey implementation need to be simplified in order to make the study practical. We have addressed what we believe is the most important and most easily remedied simplification at the entrance of what, in the future, might mature into a broader revision of the role of uncertainty and probabilism in trademark law.

---

[117] Thanks to Irina Manta for pointing this out.

49

Electronic copy available at JTX-1121.00050 https://ssrn.com/abstract=3864700

YUGALABS_00034047

## Appendix 1



50

Electronic copy available at: https://ssrn.com/abstract=3854730

JTX-1121.00051

YUGALABS_00034048

## Appendix 2



51

## Appendix 3



52

YUGALABS_00034050