# Trial Exhibit JTX-1122

# Trademark and Deceptive Advertising SURVEYS

## Law, Science, and Design

EDITED BY

### Shari Seidman Diamond and Jerre B. Swann*

*The editors' names are in alphabetical order to reflect the genuine collaboration, if not always agreement, between the editors in producing this volume.



ABA Section of Intellectual Property Law
AMERICAN BAR ASSOCIATION

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
Case No. 2:22-cv-04355-JFW-JEM
Yuga Labs, Inc.
vs.
Ryder Ripps, Jeremy Cahen
JOINT EXHIBIT       JTX-1122
DATE_____ IDEN.
DATE_____ EVID.
BY _____
Deputy Clerk

Cover by Daniel Mazanec/ABA Publishing.

The materials contained herein represent the views of each chapter author in his or her individual capacity and should not be construed as the views of the author's firms, employers, or clients, or of the editors or other chapter authors, or of the American Bar Association or the Section of Intellectual Property Law, unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2012 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, contact the ABA Copyrights and Contracts Department by e-mail at copyright@americanbar.org or fax at 312-988-6030, or complete the online request form at http://www.abanet.org/policy/reprints.html.

Printed in the United States of America

16 15 14 13    5 4 3 2

**Library of Congress Cataloging-in-Publication Data**

Trademark and deceptive advertising surveys / edited by Shari S. Diamond and Jerre B. Swann. — 1st ed.
   p. cm.
 Includes bibliographical references and index.
 ISBN 978-1-61438-474-8 (print : alk. paper)
1. Trademarks—Law and legislation—United States. 2. Deceptive advertising—Law and legislation—United States. 3. Market surveys—Law and legislation—United States. 4. Market surveys—Methodology—United States. I. Diamond, Shari Seidman. II. Swann, Jerre B.
 KF3193.T725 2012
 346.7304'88—dc23

                                                            2012021640

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ShopABA.org

56     SECTION III

confusion studies to their early status as substantial contributors to the resolution of infringement actions.[24]

## EVEREADY

### The Questionnaire and Variants

In a typical Eveready format, a respondent is first shown an exemplar,[25] photograph,[26] or advertisement of defendant's trademarked (or "dressed") product[27] and is asked an open-ended "source confusion" question, "Who makes or puts out _____?,"[28] followed by

---

24. *See, e.g.*, James Burrough, Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 278–79 (7th Cir. 1976) ("The record . . . establishes the consumer survey herein to have been fairly and scientifically conducted by qualified experts . . . [and it] qualifies as a reliable reproduction of prospective consumer reaction. . . . After finding that 15% of the survey respondents referred to Beefeater liquor . . . , when . . . asked who the restaurant sponsor was, the district court found that the survey demonstrated nothing more than a 'small percentage'. . . . We cannot agree that 15% is small [or] de minimis."); *Union Carbide*, 531 F.2d at 385 ("A district judge's determination of evidentiary matters is entitled to great respect. . . . we would hesitate to find his determination that Carbide failed to establish likelihood of confusion was clearly erroneous were it not for the survey evidence presented at trial."). Among cases decided in the past 10 years, however, this author found only 26 where even the results of an Eveready design overtly impacted a court's decision. *See, e.g.*, Re/Max Int'l, Inc. v. Trendsetter Realty, LLC, 2009 U.S. Dist. LEXIS 79356 (S.D. Tex. 2009); Hermes Int'l v. Lederer de Paris Fifth Ave. Inc., 50 F. Supp. 2d 212 (S.D. N.Y. 1999); Pharmacia Corp. v. Alcon Labs., Inc., 201 F. Supp. 2d 335 (D.N.J. 2002). This author found only seven where the results of a Squirt design overtly influenced the outcome. *See, e.g.*, Thane Int'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894 (9th Cir. 2002); Sally Beauty Co. v. Beautyco, Inc., 304 F.3d 964 (10th Cir. 2002); Gross v. Bare Escentuals Beauty, Inc., 641 F. Supp. 2d 175 (S.D.N.Y. 2008). Courts more frequently rely on surveys than reported cases suggest, but mute their reliance fearing reversal as to evidence that, likely, has been sharply criticized by an opposing expert and that they may not fully understand. There clearly is a need to supply courts with tools to promote sound survey practices by: (a) either expressing confidence in professionally executed research; or (b) engendering fear among practitioners that: "a weak survey may actually detract" from a case of infringement or an overblown critique may legitimize a survey. ConAgra, Inc. v. Geo. A. Hormel & Co., 784 F. Supp. 700, 722 (D. Neb. 1992), *aff'd*, 990 F.2d 368 (8th Cir. 1993); *see*, Riviana Foods, Inc. v. Societe Des Produits Nestle, S.A., 33 U.S.P.Q. 2d 1669, 1671 (S.D. Tex. 1994).

25. ==The nature of the stimulus may vary depending on whether point-of-sale, post-sale, or initial interest confusion is at issue.== Context at the point of purchase can convey information that consumers use in making source determinations, and "the closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has," McCarthy, *supra* note 6 at § 32:163, which often requires displaying actual products, packaging, or other source indicia that consumers would encounter at the point of sale.

26. With post-sale confusion, the purchasing context is often irrelevant and would give the respondent information not available in a post-sale encounter. *See* Gateway, Inc. v. Companion Products, Inc., 68 U.S.P.Q. 2d 1407, 1420 (D.S.D. 2003) ("Post-sale confusion is particularly relevant in this case because . . . [a]fter Cody Cow is purchased, the point of sale materials are removed by the purchaser, and [have] no 'confusion obviating effect'"). Accordingly, photographs or videos that fairly reproduce what a respondent would see in a post-sale environment are easier to control (and afford greater certainty as to what respondents see) than actual displays that a field service may not faithfully execute in a shopping center interviewing booth. *See Hermes*, 50 F. Supp. 2d at 222 approving a post-sale stimulus showing a "Kelly bag (as carried by a woman walking at a distance of four feet)."

27. Stimulus exposure may occur in a shopping center interviewing booth, by mail in a call/mail/call study, with Internet assistance in a telephone study, or exclusively via the Internet.

28. Open-ended questions "require the respondent to . . . express an answer in his or her own words [and] give the respondent fewer hints about expected or preferred answers." Diamond, *supra* note 9 at 391–92. The "puts out" phraseology in the original questionnaire is out-of-date and is supplemented with who "makes" or like terminology in current Eveready versions.

"Why do you say that?"[29] "Sponsorship" and "affiliation" confusion questions[30] often follow,[31] frequently in closed-ended form:[32]

> Do you believe that whoever makes or puts out _____:
> ONE, is sponsored or approved by another company?
> TWO, is not sponsored or approved by any other company? or
> THREE, you don't know or have no opinion?[33]
> [If ONE] What other company? [and] Why do you say that?

and/or

> Do you believe that whoever makes or puts out _____:

---

29. With the advent of experimental designs, and the acknowledged difficulty that consumers can have in expressing "higher order processes," Richard E. Nisbett & Timothy DeCamp Wilson, *Telling More than We Can Know: Verbal Reports on Mental Processes*, 84 PSYCHOLOGICAL REV. 231 (1977), the editors of this book are of the opinion that "why" questions may no longer be necessary, particularly to demonstrate causation. Courts, however, often like to play with the "clarifying" information that "why" questions produce, Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 572–73, 576 (E.D. N.Y. 1999); some courts reject studies without "why" questions, Pep Boys Manny, Moe & Jack of Cal. v. Goodyear Tire & Rubber Co., 2002 U.S. Dist. LEXIS 5925 *30–33 (E.D. Pa. 2002); and information developed from "why" questions may be helpful to counsel in analyzing both consumer perceptions and the efficacy of the control stimulus, H-D Mich., Inc. v. Top Quality Serv., Inc., 496 F.3d 755, 758 (7th Cir. 2007); 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC, 447 F. Supp. 2d 266, 280–81 (S.D. N.Y. 2006). Survey experts should thus continue to ask "why" questions and report the responses thereto, but control cells, not "why" questions, are critical for a scientific causality assessment.

30. Just as confusion may occur at three different points, it may take three different forms: Section 43 (a) of the Lanham Act proscribes conduct that is "likely to cause confusion . . . as to [i] affiliation . . . , or as to [ii] origin, [or as to iii] sponsorship, or approval. . . ." Forward and reverse confusion further complicate the variants and combinations potentially to be tested. 15 U.S.C. § 1125 (d)(1)(A).

31. This author has advocated that in dilution cases, an "association" question—"what other brand or brands, if any, does ____ bring to mind"—may also follow, not for likelihood of confusion purposes, but to obviate the expense of doing a separate dilution study. *See* Nike, Inc. v. NikePal Int'l Inc., 2007 U.S. Dist. LEXIS 66686 (E.D. Cal. 2007). However, the universes differ for likelihood of confusion and dilution studies. In addition, for reasons of added questionnaire length, sufficing, or the like, it may be that an added "association" question will not produce the level of association response as would a separate association study.

32. *See, e.g.*, Starbucks U.S. Brands, LLC v. Ruben, 2006 TTAB LEXIS 54, *35–37 (T.T.A.B. 2006).

33. "[P]resentation of an explicit 'don't know' or 'no opinion' alternative [reduces demand effects and] commonly leads to a 20% to 25% increase in the proportion giving that response." Diamond, *supra* note 9, at 390. The benefits of "don't know" alternatives are debated in Michael Rappeport, *Litigation Surveys—Social "Science" as Evidence*, 92 TRADEMARK REP. 957 (2002) and Jacob Jacoby, *A Critique of Rappeport's 'Litigation Surveys—Social "Science" as Evidence,'* 92 TRADEMARK REP. 1480 (2002). Courts, to date, have typically favored explicit "don't know" alternatives. *See, e.g.*, Cumberland Packing Corp. v. Monsanto Co., 32 F. Supp. 2d 561, 572 (E.D. N.Y. 1999); Procter & Gamble Pharms., Inc. v. Hoffmann-La Roche Inc., 2006 WL 2588002 *22–25 (S.D. N.Y. 2006). Choices in closed-ended questions must "cover all possible answers a respondent might give to the question [and 'don't know' is arguably always one possible answer]. If the list . . . is incomplete, a respondent may be forced to choose one that does not express his or her opinion." Diamond, *supra* note 9 at 393, *citing* Am. Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568, 581 (S.D.N.Y. 1987).
  "Recent research[, however,] shows that ['don't know'] quasi-filters as well as full filters may discourage a respondent who would be able to provide a meaningful answer from expressing it[, by providing] a cue that it is acceptable to avoid the work of trying to provide a more substantive response. One solution . . . is to provide respondents with a general instruction not to guess at the beginning of an interview, rather than supplying [explicit 'don't know' options] to each question." Diamond, *supra* note 9 at 391. Another solution would be to use an explicit "don't know" to obtain a conservative estimate of respondents holding an opinion when seeking to prove a likelihood of confusion, and using only a "don't know" introductory admonition when seeking to disprove such a likelihood.

210 SECTION IV

a control enable us to conclude unambiguously[34] that there was something about $X$ that caused the post-treatment difference between groups.

## CHOOSING APPROPRIATE CONTROLS

The general principle for choosing an appropriate control is easily stated: It should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed. The reason for this approach is that it peels away any confounding influences that threaten the inference that the experimental stimulus caused the differences between the test and control groups on the post-treatment measure. The devil is of course in the details. How much sharing is enough? On what dimensions? How much sharing is too much? Judge Posner once opined that survey research involves "black arts," suggesting that devious manipulation might explain the differences between survey designs when opposing experts present surveys that produce different results, each favoring the particular expert's client.[35] While survey designs are not always optimal and experts are not always pure of heart, an alternative explanation to pure partisan manipulation in many cases is that good survey design requires the employment of "analytic" rather than "black" arts. The key is to analyze what needs to be present in the control and what needs to be absent, and to identify a control stimulus or set of stimuli that meet both requirements.

We begin with a recent case involving a relatively simple example of a control group survey design. RE/MAX sued TREND SETTER realty for trademark infringement, alleging that the red, white, and blue yard sign used by TREND SETTER was likely to cause confusion with RE/MAX's own red, white, and blue sign.[36] The RE/MAX sign consisted of three horizontal bars with red at the top, white in the middle, and blue on the bottom of the sign. The TREND SETTER sign used a similar color scheme and horizontal approach to the use of the three colors, but the white bar protruded into the red bar at the top to form a roof-sloped image.

Survey respondents viewed either the TREND SETTER sign or a control sign. The control sign was identical to the test sign except that the red and blue horizontal bars were modified so that they were white rather than red or blue.[37] The white roof silhouette was preserved with a blue line outlining the roof. Over one-fourth (25.3 percent) of the individuals who viewed the test sign said either that RE/MAX was the company being promoted or advertised by the sign, or that the company being promoted or advertised by the Trend Setter Realty sign was affiliated or connected

---

34. Within the limits of sampling error. See Kaye & Freedman, supra note 11 at 296.
35. Indianapolis Colts v. Metro Baltimore Football Club Ltd. P'ship., 34 F.3d 410, 416 (7th Cir. 1994).
36. RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC, 655 F. Supp. 2d 679 (S.D. Tex. 2009).
37. The white print on the red and blue portions of the test sign was changed to red on the control sign so that it would be visible when the background of the red and blue portions became white (personal communication, Robert Peterson, April 28, 2012).

YUGALABS_00034055