# Trial Exhibit JTX-1125

# Jacob Jacoby

# TRADEMARK SURVEYS Volume I

*Designing, Implementing, and Evaluating Surveys*

ABA Section of Intellectual Property Law
AMERICAN BAR ASSOCIATION

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
Case No. 2:22-cv-04355-JFW-JEM
Yuga Labs, Inc.
vs.
Ryder Ripps, Jeremy Cahen
JOINT EXHIBIT  JTX-1125
DATE _____ IDEN.
DATE _____ EVID.
BY _____
Deputy Clerk

Cover by Jill Tedhams/ABA Publishing.

The materials contained herein represent the opinions of the authors and editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Intellectual Property Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2013 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission, contact the ABA Copyrights and Contracts Department by e-mail at copyright@americanbar.org or fax at 312-988-6030, or complete the online request form at http://www.americanbar.org/utility/reprint.

Printed in the United States of America

17 16 15 14 13     5 4 3 2 1

**Library of Congress Cataloging-in-Publication Data**

Trademark surveys / Edited By Jacob Jacoby. — First edition.
    pages cm
Includes bibliographical references and index.
    ISBN 978-1-62722-265-5 (print : alk. paper)
    1. Trademarks—Law and legislation—United States. 2. Market surveys—Law and legislation—United States. I. Jacoby, Jacob, (Researcher in economics), editor.
    KF3193.T74 2013
    346.7304'88—dc23

                                                                                    2013030535

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60654-7598.

www.ShopABA.org

In the second matter, Lawman Armor Corporation sought to register THE UNBREAKABLE AUTOLOCK as a mark for metal antitheft locks for motor vehicles, arguing that it represented a continuing commercial impression of THE UNBRAKEABLE AUTOLOCK, a mark for which it already held a registration.[102] In support of its contention, it commissioned and proffered a consumer survey that the U.S. Patent and Trademark Office examining attorney deemed unpersuasive.[103] Upon appeal, the TTAB concluded: "We do not find the results of the applicant's survey persuasive."[104]

In light of the *Navistar* court's observation, "Because the inquiry is how consumers perceive the marks, there must be some evidence demonstrating those perceptions,"[105] abandonment, continuing commercial impression, and tacking appear to be trademark issues where counsel and courts could benefit from the application of survey research.

### 1.14 Likelihood of Confusion

"[T]he test of likelihood of confusion is the touchstone of trademark infringement."[106] It is the likelihood that one party's use of a trademark is such that a likelihood of confusion exists as to the source of the product, its affiliation, connection, or sponsorship. The legal test is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."[107]

There are three main categories (as distinguished from "types"[108]) of trademark confusion, each of which calls for a slightly different survey focus. The first category pertains to traditional trademark infringement, known as "forward confusion." "Forward confusion" occurs when the use of a trademark by a second party (a junior user) is likely to lead consumers to mistakenly believe the junior user's goods originate from or are associated with the first (or senior) user of the mark.[109] Surveys for forward confusion should focus on whether the relevant consuming public believes that both products have a common origin, or come from affiliated sources or that the

---

102. *In re* Lawman, 2005 WL 2451654, at *1 (T.T.A.B. June 15, 2005).
103. *Id.* at *3.
104. *Id.* at *4.
105. *Id.* at *4; *see also* Chesapeake Bank v. Chesapeake Bank of Md., Oppos. No. 91114353, 2004 WL 240313 (T.T.A.B. 2004) (denying summary judgment as to priority, in light of issues of fact relating to continuing commercial impression, including similarity of marks, context of their use, and customer perception).
106. McCarthy, *supra* note 12, § 23:1. See also section 7.53.
107. Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 114 (2d Cir. 2009).
108. The "types" being (1) confusion as to source of origin, (2) confusion as to affiliation, association, connection or relationship, and (3) confusion as to authorization, sponsorship or permission.
109. McCoy v. Mitsuboshi Cutlery, 67 F.3d 917, 923–24 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996).

JTX-1125.00003

YUGALABS_00035916

junior user is operating with authorization from the senior user. In contrast, the second category, "reverse confusion," occurs when a junior user engages in such extensive promotion of goods under a senior user's mark that the market is saturated and the senior user's mark is overwhelmed, resulting in a likelihood that consumers will mistakenly believe the senior user's goods originate from or are associated with the junior user.[110] Surveys testing for reverse confusion should focus on whether consumers of the senior user's product believe the senior user's product emanates from, or is sponsored by, the junior user.[111] A third type of confusion, "initial interest confusion," permits a finding of infringement when there is temporary confusion that is dispelled before the purchase is made.[112] Surveys constructed to gauge initial interest confusion should focus on whether consumers' attention was initially captured by mistaken association of the defendant's goods with the goodwill built up in the plaintiff's goods, even if at the time of purchase there was no confusion as to the origin.

The likelihood-of-confusion survey will attempt to determine who consumers believe owns or operates a particular business[113] or which company produces or puts out a particular product.[114] The survey may attempt to determine whether consumers believe the alleged infringer obtained permission to use another's mark before the goods in question were sold.[115] It may or may not be of value to determine what comes to mind when looking at a particular product or trademark. "[A] high level of association does not necessarily amount to confusion."[116] On the other hand, "[l]ikelihood of confusion will be found whenever consumers are likely to assume that a

---

110. McCarthy, *supra* note 12, § 23:10.
111. *Id.* § 32:159.
112. Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp., 174 F.3d 1036 (9th Cir. 1999); Blockbuster Ent. Grp. v. Laylco, Inc., 869 F. Supp. 505 (E.D. Mich. 1994) ("Because the names are so similar and the products sold are identical, some unwitting customers might enter a Video Busters store and think it is somehow connected to Blockbuster. Those customers probably will realize shortly that Video Busters is not related to Blockbuster, but under *Esercizio* and *Grotrian* that is irrelevant.").
113. Sears, Roebuck & Co. v. Sears Realty Co., 1990 WL 198712, 1990 U.S. Dist. LEXIS 16395 (N.D.N.Y. 1990).
114. Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1411, (S.D. Ohio 1990); Miller Brewing Co. v. Anheuser-Busch, 676 F. Supp. 1436 (E.D. Wis. 1987); Go SMiLE, Inc. v. Dr. Johnathan Levine, P.C., 769 F. Supp. 2d 630, 642–43 (S.D.N.Y. 2011) (providing an example of a well-executed secondary meaning survey which the court found reliable and probative evidence of an absence of a likelihood of confusion).
115. Pebble Beach Co. v. Tour 18 I, 155 F.3d 526 (5th Cir. 1998); U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F. Supp. 2d 515, 532–35 (S.D.N.Y. 2011) (lack of controls can render a likelihood of confusion survey useless).
116. U.S. Shoe Corp. v. Brown Grp. Inc., 740 F. Supp. 196, 200 (S.D.N.Y.), *aff'd*, 923 F.2d 844 (2d Cir. 1990). *Contra* Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc., 944 F.2d 1446 (9th Cir. 1991); Am. Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 5 U.S.P.Q.2d 1073 (3d Cir. 1987).

mark is *associated with another source or sponsor* because of similarities between the two marks."[117]

Discussed in greater detail in chapter 7, section 7.53, the most common formats for likelihood-of-confusion surveys are (1) the *Eveready* format,[118] (2) the *Squirt* format,[119] and, to a lesser extent, (3) the *Exxon* format.[120]

### 1.14.1 Eveready Format

In the *Eveready* format, the survey respondent is shown the defendant's product and then is asked three questions:

1. Who puts out this product (or this brand)?
2. What makes you think so?
3. Please name any other products put out by the same concern that puts out this product (or this brand)?

To address the issue of confusion about affiliation, connection, association, or sponsorship, two additional questions may be added:[121]

1. Do you think that this product was approved or sponsored by another company?
2. What company do you think approved or sponsored this product?

### 1.14.2 Squirt Format

The original *Squirt* survey format involved a side-by-side line up of both the defendant's and the plaintiff's products, with the respondent being asked the following questions:

1. Do you think [the defendant's product] is made by the same company that makes [the plaintiff's product], or do you think it is made by a different company?
2. What makes you think that?

Sometimes the format is varied to show the plaintiff's and defendant's products to the respondent at different times, one alone and the other in a group with other competitive products that appear in the marketplace with the parties' products. The respondent is then asked to state whether

---

117. *Acad. of Motion Picture Arts & Scis.*, 944 F.2d at 1456 (emphasis added); *see also* Stern's Miracle-Gro Prods., Inc. v. Shark Prods., Inc., 823 F. Supp. 1077 (S.D.N.Y. 1993).
118. Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976).
119. Squirt Co. v. Seven-Up Co., 207 U.S.P.Q. 12 (E.D. Mo. 1979).
120. Exxon Corp. v. Tex. Motor Exch. of Hous., Inc., 628 F.2d 500 (5th Cir. 1980).
121. Edge Wireless, LLC v. U.S. Cellular Corp., 2004 U.S. Dist. LEXIS 15297 (D. Or. 2004); Real News Project, Inc. v. Indep. World TV, Inc., 2008 U.S. Dist. LEXIS 41457 (S.D.N.Y. May 27, 2008); Upjohn Co. v. Am. Home Prods. Corp., 1996 U.S. Dist. LEXIS 8049 (W.D. Mich. 1996).

JTX-1125.00005

YUGALABS_00035918

compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity."[31]

+++++

The "proximity-of-the-products" inquiry "concerns whether and to what extent the two products compete with each other," an inquiry which leads in turn to examination of "the nature of the products themselves and the structure of the relevant market." Considerations germane to the structure of the market include "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold."[32]

The advertising and sale of products over the Internet adds another wrinkle to determining what constitutes proximity.

### 3.12.2 Point-of-Sale versus Postsale Confusion

When it comes to designing a likelihood-of-confusion survey, one important consideration is the type of confusion being alleged, as point-of-sale and postsale confusion can involve different marketplaces. Whereas only the product packaging may be visible at point of sale, the same product may take on a completely different appearance when seen without benefit of its package, as often occurs in postsale instances.

While a product's name, logo or other identifying indicia may easily be viewed by a prospective purchaser at point-of-sale, these indicia may not be visible to prospective purchasers in the post-sale environment. This applies in situations where prospective purchasers observe actual purchasers using the product (as was the case in *Ferrari v. McBurnie*[33]). It also applies to situations where the prospective purchaser may get to use the product after it has been removed from its packaging (as was the

---

[31]. Audi AG v. Shokan Coachworks, Inc., 592 F. Supp. 2d 246, 274 (N.D.N.Y. 2008) (citing and quoting Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 134 (2d Cir. 2004)) (citing Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 77 (2d Cir. 1988)).

[32]. Franklin Res., Inc. v. Franklin Credit Mgmt. Corp. 988 F. Supp. 322, 330 (S.D.N.Y. 1997) (internal citations omitted). *See, e.g.*, Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, LP, 2002 WL 1763999, at *9 (D. Minn. 2002) ("The Court next determines that the products of MSC and plaintiff do not compete with each other in the marketplace . . . [even though] both parties produce some of the same products, such as t-shirts, stickers, key chains, etc."); Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc. 198 F. Supp. 2d 474, 482 (S.D.N.Y. 2002) ("Although both products are made from vodka, National has failed to convince us that they compete with one another in the market.").

[33]. Ferrari S.p.A. v. McBurnie, 11 U.S.P.Q.2d 1843, 1846–47 (S.D. Cal. 1989); Ferrari S.p.A. v. Roberts, 739 F. Supp. 1138 (E.D. Tenn. 1990), aff'd, 944 F.2d 1235 (6th Cir. 1991).

JTX-1125.00006

YUGALABS_00035919

case in *AMHO v. Barr*,[34] where the survey tested analgesics out of their containers).

### 3.12.3 Consumers Are Not Tabulae Rasae

The two fundamental components of any marketplace are sellers and buyers. What consumers bring to the marketplace is no less important than what buyers bring to the marketplace. A proper consideration of what transpires in the marketplace needs to accommodate this basic fact.

Marketplace analysis sometimes arrives at the conclusion that if plaintiff's and defendant's goods are not generally seen contemporaneously or sequentially in the marketplace, then a survey format that involves the sequential presentation of plaintiff's and defendant's goods is improper. Yet regardless of how thorough the analysis of other aspects of the marketplace may be, this writer is of the opinion that such a conclusion essentially represents a narrow analysis, one that can be seen to ignore fundamental aspects of the marketplace as well as essential tenets of trademark law. Because this has direct implications for the kind of survey approach courts accept and reject in likelihood-of-confusion cases, the issue merits consideration. Two cases are discussed to illustrate why a marketplace analysis needs to consider more than the physical location or simultaneity of the goods in the marketplace.

Under the rubric "Marketplace Conditions and Survey Format," the court in *THOIP v. Disney* observed:

> Survey results are contingent on the method used, and different methods for assessing likelihood of confusion often produce drastically different results. . . . THOIP and Disney vigorously dispute the proper survey format for examining consumer confusion in the context of this case. Unsurprisingly, each side contends that its expert's survey design is the only appropriate format for the facts presented: THOIP urges the sequential array format . . . while Disney urges the single-exposure *Eveready* format. . . .[35]

As a basis for determining which of these formats—sequential versus nonsequential presentation of disputing parties' goods—was the more appropriate, the court first discussed its detailed analysis of the marketplace.

Because the [Miss Disneyland Little Miss Disney] lines of accused Disney shirts were available in different locations, I analyze each

---

34. Am. Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 56 USLW 2364, 6 U.S.P.Q.2d 1073 (3d Cir. 1987).
35. THOIP v. Walt Disney Co., 690 F. Supp. 2d 218, 232 (S.D.N.Y. 2010). An *Eveready* study is a likelihood of confusion study where respondents are exposed only to one disputant's use of its mark, typically, the second-comer's; see discussion at chapter 7, section 7.53.1.

By way of summary, it appears that the proper universe for assessing the likelihood of postsale confusion can be as narrowly defined as potential purchasers of the senior user's products or services, or as broadly defined as all individuals previously aware of the senior user's products or services, regardless of whether they are prospective purchasers of the product in question.

### 5.45.4 Initial Interest Confusion

Confusion that occurs prior to purchase but, while still prior to purchase, is then dissipated by further inspection of the goods, services, or premises is termed initial interest confusion. Based upon the following, it appears that the proper universe for testing initial interest confusion is prospective purchasers of the senior user's goods.

> [I]nitial-interest confusion, occurring in the early stages of a business transaction, harms the trademark owner even if the prospective customer ultimately recognizes his mistake, because that customer might be diverted to the junior user instead of the trademark owner who expended the time and resources developing customer goodwill. Initial-interest confusion is especially relevant when the parties are direct competitors in the same market.[79]

Initial interest confusion has been an issue in cases involving Internet searches and key-word entries.[80]

### 5.46 Dilution[81]

There are two varieties of dilution, dilution via blurring and dilution via tarnishment.[82] For either variety, pressing a claim requires that evidence be supplied on a number of factors. Survey evidence can be adduced for each of these factors. With specific respect to a claim of *dilution via blurring*, surveys can be used to provide evidence on (1) the *fame* of the first comer's mark, (2) the *distinctiveness* of that mark, (3) the *similarity* of the second comer's mark to the first comer's mark, (4) whether the

---

79. RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC 655 F. Supp. 2d 679, 707 (S.D. Tex. 2009) (citing Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 204 (5th Cir. 1998); Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., LLC, 83 F. Supp. 2d 810, 820 (S.D. Tex. 1999) (considering initial-interest confusion important to the analysis when both parties were operators of fitness centers in the same market); GILSON ON TRADEMARKS § 5.14[1][a] (2009)).

80. Gov't Emps. Ins. Co. v. Google, Inc., 77 U.S.P.Q.2d 1841, 2005 WL 1903128 (E.D. Va. 2005).

81. Portions of this section have been taken from Jacob Jacoby, *Considering the What, When, Where and How of Measuring Dilution*, 24(3) SANTA CLARA COMPUTER & HIGH TECH L.J. 601 (2008).

82. 15 U.S.C.A. § 1125(c)(2)(C).

[left page — partial text, gutter-cut]

n, the survey did not
s a keyword, without
the appearance of the

d not share with the test
s being assessed," defen-
several respects, two of
espondents in one control
s way, one could compare
ttributable to respondents
esults page that appeared
IKE, the sponsored links
c listings contained three
ICO. The findings revealed
conditions (namely, typed
to insurance, but not men-
level of confusion as did
GEICO and saw sponsored
ol group findings were sub-
ffect revealed a de minimis

selecting an appropriate
timulus is the creation of
ble between what one group
group of respondents see
results obtained from
the effect of the trademark
marketplace differ from th
gle way, which is most of th
ires developing and using
. However, when developi
y retain the nonprotectabl
n *THOIP I v. Disney*
survey as it only cont
nprotectable elements
respondents were less
at [the expert] would

Q.2d 1841, 2005 WL

### 7.31.3 Controlling for Sight, Sound, or Meaning

Trademark infringement involves allegations of defendant's mark being likely to cause confusion as a result of its being unacceptably similar in visual appearance, sound, or meaning to plaintiff's mark.[97] When the allegation concerns one of these three factors, it is best to keep the other two factors constant (that is, the same or virtually the same across both test and control) and modify only the third factor. For example: "In the ... Survey, the subjects were shown either a bottle and four-pack of Glacier Bay, or a bottle and four-pack of a fictitious 'Arctic Bay' product as a control. The Arctic Bay product was created by modifying the Glacier Bay product by changing the word 'Glacier' to 'Arctic,' the abbreviation 'GB' to 'AB,' and by removing the mountains from the Glacier Bay label."[98] In this way, other than the presumably inconsequential removal of the mountains from the label, the control (Arctic Bay) maintained both the look and meaning of the test (Glacier Bay), although not the sound.

Sometimes it is possible to devise a control that comes close to being similar to the test stimulus in all three factors, sight, sound, and meaning. For example, "The 'control' survey was identical to the survey described above, except that everywhere the word 'CARGO' appeared on the cover page and interior magazine page, it was replaced by the word 'CARRY.'"[99] Like the test stimulus, the control is a two-syllable word consisting of five letters, the first three of which are CAR; further, it has a meaning that overlaps somewhat with the test stimulus.

In the examples just cited, the controls (Arctic Bay, Carry) were devised controls. The problem inherent in using a natural control caused the court in *Nabisco v. Warner-Lambert*, where the issue was a likelihood of confusion between the marks "Ice Breakers" and "Dentyne Ice," to opine as follows:

> Plaintiffs also failed to use a proper "control product." ... Plaintiffs' control product was Trident gum. Although Trident is a gum product, it fails to capture the essence of the allegedly confusing quality at issue, namely the "Ice" term or some variation of that theme. Trident, therefore, does not represent a suitable "control product" for this type of survey. Thus, plaintiffs' results cannot be sufficient proof of meaningful actual confusion between the products.[100]

McCarthy, *supra* note 1, § 23:21 ("Sound, sight, and meaning" trilogy).
Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc., 198 F. Supp. 2d 474, (S.D.N.Y. 2002).
Global, Inc. v. Advance Magazine Publishers, 2007 WL2258688, at *6 The survey had other flaws that resulted in the court assigning it no weight.
v. Warner-Lambert Co., 32 F. Supp. 2d 690, 701 (S.D.N.Y. 1999).

JTX-1125.00009    YUGALABS_00035922