Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

*Attorneys for Defendants*
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>　　　　　Defendants. | CASE NO. 2:22-cv-04355-JFW-JEM<br><br>**RYAN HICKMAN'S DECLARATION OF TRIAL TESTIMONY**<br><br>Judge: Hon. John F. Walter<br><br>Trial Date: July 31, 2023 |

# DECLARATION OF RYAN HICKMAN

I, Ryan Hickman, declare:

## I. MY BACKGROUND

1. I am a computer programmer with more than twenty years of experience in software development and related technologies.

2. I am ethnically African American and Jewish.

3. Throughout my career, I have worked with companies to develop new technologies.

4. Companies for which I have done work include Google, Verizon, Meta (formerly known as Facebook), and IBM.

5. My work has involved developing software for cutting-edge technologies, such as creating computer programs that write their own code and artificial intelligence systems.

6. I have also been part of technology start-ups that were successful in creating new technologies or implementing existing technologies in new ways.

7. Many of the start-ups with which I was involved were ultimately acquired by larger technology companies.

8. My current work focuses primarily on artificial intelligence and blockchain technology.

## II. OWNERSHIP OF A BORED APE YACHT CLUB NFT

9. I am an active member of the blockchain/crypto community.

10. I regularly post about blockchain/crypto issues on Twitter.

11. To me, the blockchain/crypto community (or "crypto community") is multifaceted, and includes developers, cryptocurrency holders, and technology enthusiasts.

12. Through my ordinary activities in the crypto community, I was aware of the

|   |   |   |
|---|---|---|
| 1 | | Bored Ape Yacht Club non-fungible token ("NFT") collection. |
| 2 | 13. | An NFT is a specific entry on a public blockchain that effectively acts as |
| 3 | | data in a public spreadsheet. |
| 4 | 14. | Each NFT is verifiably unique because it is unique code, unique |
| 5 | | functionality, and associated with a specific contract address, token ID, and |
| 6 | | creator. |
| 7 | 15. | Because every NFT has a unique address and unique functionality, an NFT |
| 8 | | cannot be copied. |
| 9 | 16. | NFTs can also include a digital pointer to data that is not contained in the |
| 10 | | blockchain, and that data can be an index for domain information, digital |
| 11 | | images, or crypto trading pairs. |
| 12 | 17. | The Bored Ape Yacht Club NFTs have unique addresses and unique |
| 13 | | functionality, and include digital pointers to indexes for digital images of |
| 14 | | anthropomorphized apes. |
| 15 | 18. | When I first saw Bored Ape Yacht Club images, I found the imagery |
| 16 | | problematic, but I did not originally pay it much attention. |
| 17 | 19. | I purchased and currently own a Bored Ape Yacht Club NFT. |
| 18 | 20. | The Bored Ape Yacht Club NFT that I own prominently displays what Yuga |
| 19 | | Labs, Inc. ("Yuga") calls the "ape skull" logo and the "BAYC" logo in the |
| 20 | | associated digital image. The terms BAYC, BORED APE, APE, and |
| 21 | | BORED APE YACHT CLUB are also in the code of the NFT itself. |
| 22 | 21. | I purchased this Bored Ape Yacht Club NFT in 2021. |
| 23 | 22. | The Bored Ape Yacht Club NFT that I own resides in an Ethereum wallet |
| 24 | | that I control. |
| 25 | 23. | I purchased a Bored Ape Yacht Club NFT partially due to the terms and |
| 26 | | conditions that Yuga provided, which stated that "[w]hen you purchase an |

NFT, you own the underlying Bored Ape, the Art, completely" and includes "an unlimited, worldwide license to use, copy, and display the purchased Art for the purpose of creating derivative works based upon the Art ('Commercial Use')."

24. As a holder of a Bored Ape Yacht Club NFT, I also paid attention to the public statements made by Yuga's founders, executives, and employees.

25. Yuga's founders and executives would encourage, and have continued to encourage, holders of Bored Ape Yacht Club NFTs to use their Bored Ape Yacht Club NFTs to create their own projects and to monetize their own projects using their granted IP.

26. Yuga's former CEO, Nicole Muniz, publicly stated in the context of the Bored Ape Yacht Club that "all of those IP rights are granted to the member … we have none of those rights."

27. **JTX-2673**, which is attached to this declaration as **Exhibit 1**, is an accurate video showing Ms. Muniz's statements regarding Yuga's lack of intellectual property rights. I have personal knowledge of the content of this video because I have personally viewed this announcement once it became public.

28. I understood the term "IP rights" used in Ms. Muniz's announcement to mean rights associated with copyright, trademarks, and patents.

29. I observed, through my daily interactions with the crypto community, that many third parties used Yuga's images and used the Bored Ape Yacht Club and BAYC names.

30. For example, Adidas and Arizona Iced Tea both created and marketed products using their Bored Ape IP.

31. **JTX-2075**, which is attached to this declaration as **Exhibit 2**, is an image showing many commercial products unrelated to Yuga that are also using

their holder IP rights in images created by Yuga and the Bored Ape Yacht Club and BAYC names.

32. I have personal knowledge of **JTX-2075** because I researched each of these third-party products shown in the collage and I created the collage myself.

33. In addition to these third-party products, I observed that there are more than a hundred derivative NFT collections that used the Bored Ape Yacht Club name and images.

34. I was further encouraged to continue holding my Bored Ape Yacht Club NFT when I saw that Samsung had invested in Yuga.

35. I was curious about why Samsung had chosen to support Yuga because, as someone that has worked extensively with large technology companies, I understood that investment decisions of this type are not usually made without a concrete basis for deploying capital.

36. I went onto Samsung's website and found a page that Samsung had published on why it chose to invest in Yuga.

37. The page on Samsung's website stated that Samsung invested in Yuga because of its "open-source IP" business model.

38. The information on Samsung's website led me to believe that Yuga really had given away all of its IP rights to the community.

39. The information on Samsung's website also confirmed my belief that by holding a Bored Ape Yacht Club NFT, I was free to use the IP that I had received through my Bored Ape Yacht Club NFT as I saw fit.

40. At no point prior to this lawsuit did I ever see a statement, press release, or announcement from Yuga that would suggest that I was mistaken in my belief that Yuga gave away all its IP rights.

## III. MY REACTION TO THE BORED APE YACHT CLUB'S OFFENSIVE CONTENT

41. Although the Bored Ape Yacht Club's imagery has bothered me since I first saw it, I became more aware of how problematic the imagery was after having a conversation with my great aunt.

42. My great aunt is also African American.

43. I was at a funeral when my great aunt and I had a discussion about NFTs.

44. Because NFTs can be difficult to explain, I wanted to show her NFT images. I used my phone to navigate to OpenSea, which is a secondary marketplace for NFTs similar to an online flea market or swap meet. I filtered by popularity to show my great aunt an example of an NFT.

45. The first NFT that showed up on OpenSea was a Bored Ape Yacht Club NFT.

46. My great aunt began to cry almost immediately.

47. She told me that she found the imagery associated with the Bored Ape Yacht Club to be deeply hurtful.

48. We then had a long discussion about why Yuga's use of ape images was a serious issue.

49. My great aunt explained to me the history of simianization, which involved depicting African Americans as apes to dehumanize them.

50. My great aunt also explained how African Americans are often called "monkeys" as a deeply offensive insult.

51. My great aunt also reminded me that our family had dealt with and had to overcome these kinds of acts of racism over many generations.

52. My great aunt explained that, if simianization is becoming popular again, normalized, and incentivized, this would be very dangerous for African

Americans.

53. My great aunt described Yuga's acts as "a step back 100 years."

54. This conversation with my great aunt caused me to think more critically about Yuga's offensive imagery and why it needs to be taken seriously.

55. I looked more closely at Yuga's imagery and discussed it with others. I learned that Yuga's imagery and publications include not only content that is offensive to African Americans, but also content offensive to Jewish people and to people of other ethnicities.

56. As I continued to look deeper and deeper into the Bored Ape Yacht Club, I realized that Yuga had embedded in its brand with hundreds of references to problematic content.

57. As an engineer, I naturally think in probabilities. While it is possible to have two, or three, or even four coincidences, I also know that it is nearly impossible to accidentally, coincidentally, or unintentionally use hundreds of references to offensive content.

58. All of this led me to my firm conviction that Yuga had deliberately used offensive material in the Bored Ape Yacht Club brand.

## IV. STANDING UP AGAINST YUGA

59. I believed that Yuga's acts were dangerous because they were normalizing and incentivizing hateful material, and I wanted to find a way to raise awareness about it.

60. I learned on Twitter that Ryder Ripps had also seen the problem with what Yuga was doing and was using his platform to protest Yuga's use of hateful content and Yuga's misrepresentations regarding the nature of NFTs.

61. I admired Mr. Ripps's advocacy because I believed that he was standing up against something that is clearly very wrong.

62. In May of 2022, Jeremy Cahen reached out to me and asked if I could help find a software-based way to streamline the process for Mr. Ripps to "mint" (that is, create) NFTs for the Ryder Ripps Bored Ape Yacht Club ("RR/BAYC").

63. The project was interesting to me because of my feelings toward Yuga Labs.

64. I agreed to help Mr. Ripps because I wanted to do everything I could that would help Mr. Ripps amplify his protest and reach as many people as possible.

65. At the time, Mr. Ripps was personally receiving commissions for RR/BAYC NFTs and was manually minting each individual NFT, which is very labor-intensive and time-consuming.

66. I believed that, if I programmed a way to allow Mr. Ripps to hand mint at a faster pace, Mr. Ripps would have more time to dedicate to other aspects of the RR/BAYC artwork that would give his protest a louder voice.

67. I worked with another engineer, Thomas Lehman, to create a "RSVP" software program that would allow people to reserve a RR/BAYC NFT and automate Mr. Ripps's hand-minting process so that he could more quickly create RR/BAYC NFTs.

68. Internally, we referred to the RSVP program as "Robo Ryder" or Mr. Ripps's "bionic arm," because it allowed him to accept reservations and mint NFTs much more efficiently.

69. I also helped Mr. Ripps by working on developing the rrbayc.com website, which was where collectors would be able to use the RSVP program to make reservations.

70. Mr. Ripps explained what he wanted the rrbayc.com website to look like, and I did my best to implement his creative vision.

71. The rrbayc.com website prominently displayed an artist's statement that Mr. Ripps wrote. The statement is in large font and appears above the portion of the website that allowed a collector to reserve a RR/BAYC NFT.

72. The rrbayc.com website also required collectors to click though a disclaimer acknowledging that the RR/BAYC artwork was a satirical NFT collection aimed at protesting Yuga before being able to submit a reservation.

73. Mr. Ripps wrote the disclaimer that was used on rrbayc.com.

74. **JTX-2086**, which is attached to this declaration as **Exhibit 3**, is a complete and accurate exhibit showing the disclaimer. I have personal knowledge of this disclaimer because I worked with Mr. Ripps in adding this disclaimer to the rrbayc.com website.

75. In exchange for the work I provided to Mr. Ripps, I was compensated with 15% of the profits from the RR/BAYC artwork. I expected this amount to be considerably lower than the compensation I usually receive for similar projects.

76. I accepted less compensation because I believed in what Mr. Ripps was doing and the message of his protest art.

## V. THE OTHERDEED SCAM

77. As a holder of a Bored Ape Yacht Club NFT, I was also aware of Yuga's "Otherdeed" NFT collection.

78. About two weeks before Mr. Ripps began commissioning RR/BAYC NFTs, Yuga released the "Otherdeed" NFT collection.

79. The Otherdeed NFT collection claimed to be a deed for a digital parcel of land in a Bored Ape Yacht Club themed metaverse.

80. Different Otherdeed NFTs would have different monetary values based on the rarity of their location, land type, and artifacts on that digital land, and

the NFTs were purportedly sold to purchasers in a lottery system.

81. At the time, there was tremendous hype in the crypto community around metaverses, and it appeared to me Yuga was attempting to capitalize on that trend.

82. However, when Otherdeed NFTs were released on April 30, 2022, it turned out that most of the NFTs were not valuable. The few that were valuable had already been distributed to influencers that had promoted Yuga.

83. This triggered a race to the bottom, in which people were quickly liquidating Yuga assets to minimize losses before other holders had a chance to sell.

84. Within twenty-four hours, I saw the value of my Bored Ape Yacht Club NFT drop significantly due to the fallout of the Otherdeed scam.

85. Through my interactions and observations with the crypto community, I also saw that the Otherdeed scam changed the community opinion of Yuga in a negative way.

86. As a result, the RR/BAYC artwork criticizing Yuga, which came about approximately two weeks later, resonated with the discontent among the NFT community.

87. Until today, the value of Bored Ape Yacht Club NFTs, including my own, continues to drop. Today, the value of Bored Ape Yacht Club NFTs, including my own, have dropped in value by more than 90% from their peak.

## VI. IMPACT OF THE RR/BAYC ARTWORK

88. Based on my interactions with the crypto community and observations on social media, the RR/BAYC artwork was successful in raising awareness regarding Yuga's use of hateful content and harmful business practices.

89. I personally saw many people, both in person and online, begin to discuss

what Yuga was doing and begin to understand the harm Yuga was causing.

90. The RR/BAYC artwork aimed to ensure that people who purchased Mr. Ripps's NFTs were doing so as an act of protest.

91. The process of even learning about RR/BAYC NFTs in the first place required either interacting with Mr. Ripps directly (typically via Twitter) or navigating to the rrbayc.com website, both of which made clear that RR/BAYC was a satirical NFT collection unaffiliated with Yuga.

92. I am not aware of a single instance of confusion or of anyone reserving an RR/BAYC NFT without realizing that it was an NFT created by Mr. Ripps.

93. I am aware that Yuga has used my statement "We're closing in on *$10 million impact to yuga" to wrongly suggest that the RR/BAYC artwork used the Bored Ape Yacht Club's brand to harm Yuga's profits.

94. I have made clear to Yuga on multiple occasions that this statement did not refer to harm, but instead that we had added $10 million in total economic activity to the NFT space. This is because collectors who obtained RR/BAYC NFTs were not Yuga customers, but instead were protesting the Bored Ape Yacht Club.

95. The correct meaning of my statement is clear in **JTX-801**, excerpts of which are attached to this declaration as **Exhibit 4**. **JTX-801** is a private group chat called Team ApeMarket that I participated in while working on the RR/BAYC artwork. The private chat contains the following statements:

   a. JTX-801.00695 is where I originally stated, "We're closing in on *$10 million impact to yuga."

   b. Mr. Ripps responded to my statement with the following response:
      it doesn't impact yuga
      the clients buying rrbaycs are legit the opposite

      c.    Mr. Cahen then responded to Mr. Ripps and stated, "Right, I'm think[ing] maybe he just meant 10 million volume total."

      d.    Mr. Ripps and Mr. Cahen's responses, thus, confirm that my statement was in reference to adding $10 million in activity and that Yuga's wrong interpretation of my statement does not make sense because the collectors of RR/BAYCs are, as Mr. Ripps aptly put, "the opposite" of BAYC customers.

## VII. MY UNDERSTANDING AND INTENT

96. At the time of the RR/BAYC artwork, I believed that our actions were appropriate and that we were not violating any laws.

97. As a holder of a Bored Ape Yacht Club NFT, I believed that Yuga had given me the right to use the images and marks referenced by my NFT, because Yuga had publicly stated so on multiple occasions.

98. Given Yuga's public confirmation that it did not have any of the IP rights in the Bored Ape Yacht Club, I did not think that creating an artwork that satirizes the Bored Ape Yacht Club would be infringing any of Yuga's rights because Yuga was telling everyone that it did not have any trademark rights in the first place.

99. I also saw that there were hundreds of companies and individuals that had created their own projects based on the Bored Ape Yacht Club.

100. These companies and individuals not only used the name and imagery of the Bored Ape Yacht Club, but also marketed their products in a manner that was indistinguishable from Yuga itself.

101. To my knowledge, Yuga never tried to constrain what these unaffiliated projects could do.

102. For example, there were companies selling marijuana products, tobacco

products, alcohol, and even children's clothes depicting Yuga's hateful imagery.

103. During the time of the RR/BAYC artwork, Yuga never took any action to control or regulate any of these Bored Ape products that were entirely unrelated to Yuga.

104. I also was a holder of a Bored Ape Yacht Club NFT during the entirety of the RR/BAYC artwork.

105. My Bored Ape Yacht Club NFT and the associated Bored Ape imagery contained within it all of Yuga's trademarks.

106. My understanding was that by holding a Bored Ape Yacht Club NFT, I had received all IP rights associated with the NFT.

107. That grant of all IP rights, as I understood it, gave me permission to create derivative projects such as the RR/BAYC artwork.

108. During my work on the RR/BAYC artwork, I had conversations with Mr. Ripps and Mr. Cahen regarding my views on Yuga's IP rights.

109. When Yuga filed suit against Mr. Ripps and Mr. Cahen, I was surprised.

110. I did not and still do not understand why it was okay for someone to use the name Bored Ape Yacht Club to sell marijuana, to sell alcohol, to sell nicotine products, to sell children's clothes normalizing hateful imagery, but that it was not okay to use that name to call out racism and unethical business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 17, 2023                    By: _____
                                            Ryan Hickman

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's ECF system on July 17, 2023.

By: /s/ *Louis W. Tompros*

Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000