Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>                    Plaintiff,<br><br>     v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>                    Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**MR. RIPPS AND MR. CAHEN'S TRIAL BRIEF**<br><br>Judge: Hon. John F. Walter<br><br>Trial Date:  July 31, 2023 |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   ARGUMENT .................................................................................... 2

      A.    Disgorgement of Profits Is Not Available as a Remedy ..................... 2

      B.    Minimal Profits Are Attributable to the Infringing
            Activity ...................................................................................... 5

            i.    Profits Attributable to Infringement Are Minimal ................... 6

            ii.   Costs and Deductions Reduce Profits ............................ 7

      C.    Yuga Cannot Recover More than the Statutory
            Minimum for its Cybersquatting Claim ................................... 9

      D.    Defendants are Entitled to a Finding of No Willfulness ................. 10

      E.    Any Injunction Should Be Reasonable ............................................. 10

      F.    Yuga's "Exceptional Case" Claim Should Be Rejected ................... 11

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                                      PAGE(S)

*Arcona, Inc. v. Farmacy Beauty, LLC,*
    No. 2:17-cv-7058-ODW-JPRx, 2021 WL 2414856
    (C.D. Cal. June 14, 2021) ...................................................................11

*BMG Music v. Gonzalez,*
    430 F.3d 888 (7th Cir. 2005) ..............................................................10

*Caiz v. Roberts*,
    No. 15-CV-09044-RSWL-AGRx, 2017 WL 830386
    (C.D. Cal. Mar. 2, 2017).............................................................11, 12

*Curtis v. Illumination Arts, Inc.,*
    957 F. Supp. 2d 1252 (W.D. Wash. 2013) .........................................10

*Daimler AG v. A-Z Wheels LLC,*
    498 F. Supp. 3d 1282 (S.D. Cal. 2020) ..............................................10

*Dairy Queen, Inc. v. Wood*,
    369 U.S. 469 (1962)...............................................................................5

*Dream Games of Ariz. Inc. v. PC Onsite,*
    561 F.3d 983 (9th Cir. 2009) ..............................................................10

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group, LLC*,
    879 F.3d 1332 (Fed. Cir. 2018) ..........................................................10

*Feltner v. Columbia Pictures Television, Inc.,*
    523 U.S. 340 (1998).............................................................................9

*GoPets Ltd. v. Hise,*
    657 F.3d 1024 (9th Cir. 2011) .............................................................9

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.,*
    No. SACV 17-01613-CJC (DFMx), 2023 WL 2652855
    (C.D. Cal. Mar. 13, 2023)....................................................................3

*Hunting World Inc. v. Reboans, Inc.*,
  No. C 92-1519 (BAC), 1994 WL 763408
  (N.D. Cal. Oct. 26, 1994) .................................................................................. 5

*Lindy Pen Co. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir. 1993) ........................................................................ 6, 8

*MGA Ent. Inc. v. Harris*,
  No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697
  (C.D. Cal. July 29, 2022) .................................................................................. 3

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
  316 U.S. 203(1942)............................................................................................ 6, 9

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014).......................................................................................... 11

*Ramirez v. Collier*,
  142 S. Ct. 1264 (2022)..................................................................................... 13

*Romag Fasteners, Inc v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020)....................................................................................... 2

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
  839 F.3d 1179 (9th Cir. 2016) ................................................................ 6, 11, 13

*Versace v. Awada*,
  CV 03-3254-GAF, 2009 WL 10673371
  (C.D. Cal. Sep. 4, 2009) .................................................................................... 9

*Watec Co. v. Liu*,
  403 F.3d 645 (9th Cir. 2005) .......................................................................... 11

*W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*,
  427 F.3d 1269 (10th Cir. 2005) ........................................................................ 3

**STATUTES AND RULES**

15 U.S.C. § 1117............................................................................................... 2

15 U.S.C. § 1125............................................................................................... 2

## I.   INTRODUCTION

In May 2022, Defendants Ryder Ripps and Jeremy Cahen collaborated on the satirical parody NFT collection called the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC").  Mr. Ripps—who is recognized as one of the most influential digital artists of the past decade—worked with Mr. Cahen to create the RR/BAYC project as a form of protest, designed to educate people on the nature of non-fungible tokens ("NFTs"), and the problematic content of Plaintiff Yuga Labs, Inc.'s ("Yuga") "Bored Ape Yacht Club" ("BAYC") NFT collection.

Defendants did not intend to create confusion.  Rather, they sought to criticize Yuga, and they took many steps to ensure their RR/BAYC NFTs were understood to be a protest against, not a copy of, BAYC.  Defendants required potential collectors to agree to an express disclaimer on the rrbayc.com website when commissioning an NFT from Mr. Ripps:

 By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, re-contextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC, you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time).

Because of these steps, there is no evidence of a single individual ever having purchased an RR/BAYC as a result of confusion.  To the contrary, the public and private discourse around the RR/BAYC project shows that collectors were unconfused and interested in contributing to the project because of its protest message.  As one collector wrote:

> You have done a very positive thing bringing attention to BAYC.  These people need to be shown for what they are!  I bought one of yours on the secondary, and it is a protest purchase!

---

Ripps Decl. ¶ 204, JTX-2035.  Thus, profits from the RR/BAYC project are not attributable to confusion, but rather attributable to other factors—including collectors' interest in Mr. Ripps's art and desire to protest against Yuga.

Yuga brought this action on June 24, 2022, originally alleging that it had suffered damages from the RR/BAYC project based on three federal and eight state-law claims.  Dkt. 1.  The Court granted partial summary judgment on Yuga's Claim 1 (false designation of origin under 15 U.S.C. § 1125(a)) and Claim 3 (cybersquatting under 15 U.S.C. § 1125(d)).  Dkt. 225 at 22.  Yuga has since abandoned its claim for actual damages, along with all other legal remedies: "Yuga Labs is withdrawing all legal remedies and will proceed to trial solely on its prayer for equitable remedies as to the remaining active claims – Claim 1 and Claim 3" (Dkt. 315-1 at 2).

As a result, three issues remain for trial: (1) whether Yuga can recover disgorgement of profits having first asserted then later abandoned legal remedies; (2) if disgorgement is available, what portion of profits is attributable to confusion; and (3) whether Yuga has shown that this case is "exceptional."

## II.   ARGUMENT

### A.   Disgorgement of Profits Is Not Available as a Remedy

Yuga cannot demonstrate that it is entitled to disgorgement both because it cannot demonstrate Defendants were "conscious wrongdoers" (having conceded no willful infringement) and because it cannot demonstrate the inadequacy of legal remedies (having first asserted then later abandoned them).

*First*, because Defendants' intent was to protest against Yuga, not to cause confusion, disgorgement is not an appropriate remedy.  Section 1117 of the Lanham Act specifies that disgorgement of profits is "subject to the principles of equity."  15 U.S.C. § 1117 (a).  The Supreme Court has held that, under equitable principles, an infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  Specifically, disgorgement is only warranted in cases of "conscious

1  wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL
2  4596697, at *17 (C.D. Cal. July 29, 2022).  Courts apply this heightened standard for
3  intent because "an award of profits under the Lanham Act is truly an extraordinary
4  remedy and should be tightly cabined by principles of equity." *Harbor Breeze Corp.*
5  *v. Newport Landing Sportfishing, Inc.*, No. SACV 17-01613-CJC (DFMx), 2023 WL
6  2652855, at *6 (C.D. Cal. Mar. 13, 2023) (quoting *W. Diversified Servs., Inc. v.*
7  *Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1274 (10th Cir. 2005)).

8        Here, disgorgement is not an appropriate remedy because the intent of the
9  RR/BAYC project was to criticize Yuga's problematic imagery and educate
10 consumers about the nature of NFTs—the exact opposite of confusing consumers.
11 Cahen Decl. ¶¶ 97-98, 133; Ripps Decl. ¶¶ 137-139; JTX-2033.  Mr. Ripps has had a
12 long and successful career as an artist, during which he has created numerous satirical
13 art projects spotlighting problematic societal issues.  Ripps Decl. ¶¶ 15-26.  Mr.
14 Ripps's first solo exhibition commented on how social media uses manipulated
15 images of women to influence our perception of beauty.  Ripps Decl. ¶ 26.  Mr.
16 Ripps's artistic contributions have been widely acknowledged and celebrated; he is, as
17 the *New York Times* explained, "one of the most influential digital artists of the past
18 decade"—based in part on his work on the RR/BAYC project itself.  Ripps Decl. ¶ 21;
19 JTX-2333.

20       Defendants' contemporaneous communications confirm their intent was to use
21 RR/BAYC to criticize (not to confuse).  For example, in private group chats among
22 participants in the RR/BAYC project (JTX-801, 803-804), Defendants discussed the
23 artistic purpose of the project, how it was spreading criticism of Yuga, and how social
24 media platforms were being used to educate the public about the nature of NFTs and
25 Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147; Cahen Decl. ¶ 131.

26       Defendants also took specific steps to make clear to collectors and to the public
27 generally that RR/BAYC was a protest art project.  Ripps Decl. ¶¶ 158-176; Cahen
28 Decl. ¶¶ 158-176; Dkt. 197-1 ¶ 230.  For example, the rrbayc.com website—through

1   which more than 80% of RR/BAYC NFTs reservations occurred (Ripps Decl. ¶ 110;

2   Cahen Decl. ¶ 144)—included a lengthy explanation of the project.  Ripps Decl. ¶¶

3   101-103; Cahen Decl. ¶¶ 138-139, 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085.  Collectors

4   were also required to read and click through a disclaimer expressly acknowledging the

5   artistic purpose of the project before they were allowed to commission an NFT.  *See*

6   Ripps Decl. ¶¶ 106-109 (reproduced on page 1 above).  Although these requirements

7   made it harder for collectors to commission an NFT piece through the project, Mr.

8   Ripps insisted on them so that the artistic purpose of his work would be crystal clear

9   to all participants.  *See* Lehman Depo. 59:25-60:24 ("Q. … Why was the artist

10  statement ultimately included, if it had a negative impact on usability? …  A.   …

11  Ryder wanted it and so he had the final call.").

12         Defendants' online discussion of the RR/BAYC project further confirms their

13  intent to protest and to educate.  In those discussions, Defendants repeatedly focused

14  on their critique of Yuga's imagery and on educating users that an NFT is just an entry

15  on a digital ledger.  Defendants repeatedly discussed the inappropriate, problematic

16  messaging of Yuga's imagery and how the RR/BAYC project shows that Yuga's

17  NFTs are not digital images.  Ripps Decl. ¶¶ 148-157; Cahen Decl. ¶¶ 151, 208-209;

18  Dkt. 197-1 ¶¶ 203-04.  The project was a performative commentary illuminating why

19  collectors should ***not*** collect or promote NFTs associated with Yuga.

20         Moreover, Defendants had a reasonable belief that the RR/BAYC project was

21  protest art that Yuga had no legitimate right to stop.  At the time Defendants launched

22  this project, there were already more than ***9,000*** other third-party crypto projects using

23  Yuga's marks.  Ripps Decl. ¶¶ 187-191; Hickman Decl. ¶ 33; JTX 2243; JTX 2244.

24  Before suing Defendants over the RR/BAYC project, Yuga had taken no steps to stop

25  any of these thousands of third-party crypto projects from using Yuga's marks.  Ripps.

26  Decl. ¶ 185; Cahen Decl. ¶ 206; Muniz Depo. at 155:9-16.  To the contrary, Yuga

27  repeatedly encouraged the public to use the BAYC artwork and to be creative with

28  BAYC's intellectual property, even publicly stating "we have none of those rights" in

the Bored Ape Yacht Club.  Cahen Decl. ¶ 189; Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Based on Yuga's own conduct, Defendants thus reasonably believed that the RR/BAYC project was permissible.  Ripps Decl. ¶ 191; Cahen Decl. ¶¶ 206, 212; Hickman Decl. ¶¶ 24-40.

**Second**, disgorgement is improper because Yuga cannot show "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Legal remedies were plainly available in this case:  Plaintiff expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages and various other abandoned claims), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies").  Where remedies at law were available but waived, Yuga can no longer obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994)* ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

**B.**    **Minimal Profits Are Attributable to the Infringing Activity**

Even if the Court were to conclude that disgorgement was available, there are at best minimal profits attributable to "the infringing activity"—that is, sales of NFTs *resulting from consumer confusion*—as opposed to other aspects of the RR/BAYC project.

Defendants expect Yuga to be unable to identify any commission or secondary market sale of any RR/BAYC NFT resulting from actual consumer confusion—that is, Yuga will be unable to identify anyone who ever obtained an RR/BAYC NFT believing it to be a Yuga product.  Instead, Yuga will rely on: (1) survey evidence purporting to demonstrate consumer confusion in secondary markets (namely, the "OpenSea" and "Foundation" marketplaces); and (2) evidence of profits Defendants obtained from commissions through the rrbayc.com website and direct

communications with Mr. Ripps.  But as to (1), less than 10% of Defendants' alleged "profits" came from secondary markets.  And as to (2), the profits Yuga identifies were not attributable to "the infringing activity."  Thus, where Yuga has claimed confusion there is minimal profit; where Yuga claims profit, there was no confusion.

### i.      Profits Attributable to Infringement Are Minimal

Yuga is only entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).  This requires distinguishing between collectors who reserved RR/BAYC NFTs in protest against Yuga (and were thus ***not*** confused about Defendants' use of Yuga's marks) versus those who mistakenly believed they were purchasing Yuga NFTs.  *See id.*

The evidence will show that RR/BAYC NFTs were reserved in protest ***against*** Yuga and to support Defendants' artistic criticism, not in response to the "appeal of [Yuga's] symbol." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).  Defendants received voluminous correspondence from RR/BAYC NFT collectors, not a single piece of which indicates any confusion as to the source or the nature of Defendants' artwork.  Ripps Decl. ¶¶ 196-207.  Rather, these letters expressed gratitude and support for the artistic project, the artistic statement, and the criticism of Yuga.  Ripps Decl. ¶¶ 198-205.  For example, one collector wrote:

> Hope this email convinces you to accept my reservation for rrbayc 4878. I'm an artist, professor and I've been interested in the work you've been doing.  Glad you're pointing out what bayc is doing and glad you make the art you do.

Ripps Decl. ¶ 199; JTX-2592.  Another supporter expressed that Defendants were "truly iconic in my eyes and something that the true artist[s] in this space deserve." Ripps Decl. ¶ 202; JTX-2595.  Collectors of RR/BAYC NFTs regularly referred to the

project as "art" or to Mr. Ripps's "work."  Ripps Decl. ¶ 203; JTX-2590.  And collectors encouraged the project's goals of criticizing Yuga's imagery and educating people about the nature of NFTs.  Ripps Decl. ¶¶ 200-201; JTX-2596; JTX-2599. This evidence demonstrates that collectors reserved the RR/BAYC NFTs because of Mr. Ripps's reputation as an artist, their recognition of the artistic and educational value of the work, and/or to protest Yuga—*not* because of any confusion about Yuga's brand.

Conversely, there is no evidence *at all* that anyone who obtained an RR/BAYC NFT did so under the belief that they were buying an NFT made by Yuga.  Yuga has not identified a single person who actually obtained an RR/BAYC NFT that was confused about its origin.  Muniz Depo. at 260:9-19 ("Whether there is a specific person that was confused and purchased, I don't know of any at this exact time."). Instead, Yuga's supposed evidence of actual confusion is a collection of social media "bot" accounts and out-of-context jokes or sarcastic comments made by fans of the Defendants (Cahen Decl. ¶¶ 226-253; Ripps Decl. ¶¶ 210-222).

Yuga relies on consumer surveys purporting to show potential consumer confusion—but those surveys are notably only of ***secondary markets*** (OpenSea and Foundation), not actions by Defendants—the original commissions for RR/BAYC NFTs (through rrbayc.com and direct communications with Mr. Ripps).  Even assuming that survey evidence is credible (which Defendants expect to dispute), it at most shows potential confusion in the secondary markets alone—from which even Yuga concedes Defendants made, ***at most***, $117,309 of revenue.  Thus, even if the Court were to credit both Yuga's survey expert and its damages expert entirely (and find entitlement to disgorgement of profits), Yuga can show only, at most, revenue of $117,309 attributable to infringing activity.

### ii.     Costs and Deductions Reduce Profits

The total profits Yuga argues Defendants have made is inflated.  Yuga's expert opines that Defendants earned a total of $1,589,455 in profits. Dkt-287-10, p. 1. This

figure includes: (a) $1,366,090 profits from reservations of RR/BAYC NFTS; (b) $106,055 value of RR/BAYC NFTs Defendants hold or have not minted; and (c) $117,309 profits from secondary market sales of RR/BAYC NFTs.  Dkt. 149-117 ¶ 76.  Yuga's calculations are flawed in numerous respects.

*First*, as discussed above, profits subject to disgorgement cannot include any profits from original RR/BAYC reservations (Yuga's $1.3 million figure, the part (a) amount above) because Yuga has no evidence of confusion as to these NFT commissions.  *See, e.g.*, *Lindy Pen,* 982 F.2d at 1408.

*Second*, even if it were somehow possible to include profits from original reservations, Yuga also incorrectly includes profits that *other* creators of the RR/BAYC project—Mr. Hickman and Mr. Lehman—received, separate and apart from Mr. Ripps and Mr. Cahen.  Acknowledging that it is not entitled to collect from the Defendants profits that were made by others, Yuga excludes *some* of the alleged profits split with Mr. Hickman and Mr. Lehman (those that accrued after rrbayc.com and the associated "RSVP" smart contract were launched).  Kindler Depo. at 139:9-14.  But this is insufficient: all profits for all RR/BAYC NFT reservations were split with Mr. Hickman and Mr. Lehman—including for pre-RSVP contract reservations that Yuga's calculations fail to apportion.  Ripps Decl. ¶¶ 129-135; Cahen Decl. ¶¶ 177-178.  This results in Yuga overstating Mr. Ripps's and Mr. Cahen's portion of profits from original reservations by at least $108,344.  Ripps Decl. ¶¶ 132-135.  The $1.3 million figure also fails to exclude $93,135.62 in automated refunds executed through the RSVP reservation contract.  Ripps Decl. ¶¶ 174-175.

*Third*, Yuga improperly seeks damages for NFTs that were not made or sold at all (the part (b) amount).  This $106,055 amount is not profit—it is the alleged theoretical value of NFTs that, in some cases, Defendants currently hold and have not sold, or, in others, have *never actually made*.  Dkt. 149-117 ¶ 74.  Because the speculative value of these unmade and unsold potential NFTs is not "profit," it cannot be counted toward a disgorgement remedy.  And regardless, an injunction (discussed

*infra* at 10) fully addresses relief for NFTs that Defendants have not yet made or
sold.[1]

    **Fourth**, Yuga's expert failed to deduct from gross revenues numerous costs
incurred in creating the RR/BAYC NFTs.  *See* Kindler Depo. at 121:11-17; 121:22-
122:5 (confirming only "gas costs" were deducted).  For example, Yuga fails to
account for compensation to Mr. Ripps's assistant on the project, computing expenses
associated with creating the NFTs, or travel expenses for the project, among other
costs.  Ripps Decl. ¶ 136; Cahen Decl. ¶¶ 174-176.  These un-deducted costs total at
least $15,136.14 that must be subtracted from revenues.  Ripps Decl. ¶ 136; Cahen
Decl. ¶¶ 174-176

### C.    Yuga Cannot Recover More than the Statutory Minimum for its Cybersquatting Claim

    To avoid a jury trial, Yuga has withdrawn and waived "all legal remedies,"
which included any claim to statutory damages for cybersquatting above the statutory
minimum.  Statutory damages are a legal remedy (for which there is a jury trial right).
*See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("The
right to a jury trial includes the right to have a jury determine the *amount* of statutory
damages") (emphasis in original).  Under Ninth Circuit law, a jury is not required
when a plaintiff elects to accept the minimum amount of statutory damages for
cybersquatting.  *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  But
awarding anything more than the statutory minimum is a legal remedy, which Yuga
has foregone.  *See Versace v. Awada*, CV 03-3254-GAF, 2009 WL 10673371, at *7
(C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court will not permit
Plaintiff to withdraw its demand for a jury trial because Defendants do not consent,

---

[1] Defendants also did not retain their own NFTs due to any confusion or the "appeal of
[Yuga's] symbol," but rather to support their protest against Yuga.  *Mishawaka*, 316
U.S. at 206.  Therefore, the $106,055 amount that Yuga includes as "profit" is also
improper because it is not attributable to the infringing conduct.

1  and because the law holds clearly that Defendant has a right to a jury determination of

2  statutory damages.").

3      Having abandoned "all legal remedies," Yuga cannot obtain more than the

4  statutory minimum on its cybersquatting claim.  *See Daimler AG v. A-Z Wheels LLC,*

5  *498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020)* (holding that award above minimum is a

6  jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite,* 561 F.3d 983, 992 (9th

7  Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252, 1260 (W.D. Wash.

8  2013) (holding that statutory damages are a jury issue) (citing *BMG Music v.*

9  *Gonzalez*, 430 F.3d 888, 892 (7th Cir. 2005)).  The Court should thus enter judgment

10 of $2,000 on cybersquatting (the minimum statutory amount of $1,000 for each of the

11 two cybersquatting violations that the Court has found).

12     **D.   Defendants are Entitled to a Finding of No Willfulness**

13     Yuga put Defendants' willfulness at issue as a factual matter by requesting a

14 finding at summary judgment that "this is an exceptional case *of intentional*

15 *infringement*."  Dkt. 149 at 13 (emphasis added).  The Court denied Yuga's summary

16 judgment motion on this issue.  Courts have repeatedly recognized that "willfulness is

17 an issue for the jury." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods.*

18 *Group, LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018).  Yuga's waiver of "all legal

19 remedies" thus waived any claim of willful infringement, and Defendants are thus

20 entitled to a judgment of no willfulness.  *See also* Dkt. 236 at 13 (Yuga conceding that

21 it is not pursuing a claim of willful infringement).

22     **E.   Any Injunction Should Be Reasonable**

23     The Court's summary judgment order made clear that it intended to enter an

24 injunction.  Subject to their right to appeal the Court's summary judgment order,

25 Defendants do not expect to dispute entry of an injunction prohibiting Defendants

26 from using "rrbayc.com" or "apemarket.com" and from selling or promoting the sale

27 of RR/BAYC NFTs.

28

### F.   Yuga's "Exceptional Case" Claim Should Be Rejected

Defendants are two individuals sued by a multi-billion-dollar company who were forced to continue this litigation all the way to trial because Yuga demanded as a condition of settlement that Defendants surrender their First Amendment right to criticize Yuga.  This is not a case in which Yuga should be awarded attorneys' fees as a result of an "exceptional case" finding.  To the contrary, this is a case in which the plaintiff threw everything at the wall to see what would stick, demanded unreasonable settlement terms including Defendants silencing their criticism, then ultimately abandoned "all legal remedies" on the eve of trial.

Courts determine if a case is exceptional by considering the totality of the circumstances and evaluating whether the case is "one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc.*, 839 F.3d at 1180 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  Exceptional case findings are rare and not considered the norm.  *Octane Fitness, LLC*, 572 U.S. at 553 (defining exceptional as "uncommon, rare and not ordinary") (internal quotations omitted).  As the name implies, the case must present something "exceptional" to depart from the normal rule that parties pay their own costs.  *See Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005) (reversing district court because it was only based on a finding of intentional infringement, but not the kind of extreme conduct necessary for an exceptional case finding).  Plaintiffs bear the burden to prove that a case is exceptional.  *Caiz v. Roberts*, No. 15-CV-09044-RSWL-AGRx, 2017 WL 830386 at *5 (C.D. Cal. Mar. 2, 2017).

This is not an "exceptional case" under these exacting standards.  Defendants put forward reasonable defenses and were justified in defending this litigation, particularly given Yuga's demand for terms that Yuga could never attain through this litigation.  *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058-ODW (JPRx),

1    2021 WL 2414856 at *2 (C.D. Cal. June 14, 2021) ("Courts in this district have held

2    that a party's litigation position must be objectively meritless for a case to be

3    exceptional…").  Here, Defendants' litigation position has been defined by Yuga's

4    unreasonable settlement demand that Defendants surrender their speech rights to

5    criticize Yuga.  As the Court itself noted, Yuga's demand for a non-disparagement

6    clause was "a condition that is quite frankly unreasonable."  Hearing Transcript June

7    16, 2023, at 9:9-12.  The reason that this case has continued as far as it has is Yuga's

8    insistence on silencing Defendants.

9          1.        Defendants have advanced good faith arguments in favor of their

10    positions on both liability and damages.  *See Caiz,* 2017 WL 830386, at *5 (holding

11    that mere "lack of success" does not support an exceptional case finding).  Defendants

12    made a good-faith argument that they were entitled to a *Rogers* defense on free speech

13    grounds— a common defense in trademark cases involving artists and their creations.

14    While this Court disagreed, Defendants advanced this defense based on relevant

15    evidence.  *See, e.g.*, Dkt. 163; Dkt. 163-17-31 (fifteen unsolicited letters applauding the

16    RR/BAYC project as protest art that criticizes Yuga); Dkt. 163-80 (artist's statement);

17    Dkt. 163-81 (disclaimer).

18        Defendants' litigation conduct also does not support an exceptional case

19    finding.  ***First***, Defendants are entitled to mount a vigorous defense (especially given

20    Yuga's settlement conditions) both on the merits and during the burdensome

21    discovery process.  Yuga brought motion after motion in discovery, only to have their

22    arguments repeatedly rejected.  *See e.g.*, Dkt. 77 (rejecting Yuga's "apex witness"

23    argument); Dkt. 133 (rejecting Yuga's attempt to seal the entirety of the deposition

24    transcript of a witness critical of Yuga); Dkt. 159 (ordering production of materials

25    Yuga improperly withheld); Dkt. 145 (denying Yuga's baseless motion for sanctions).

26        ***Second***, Defendants have had to defend against moving targets.  For example,

27    within a span of ten days, Yuga first claimed damages of roughly $2 million in actual

28    damages, to a claim of nearly ***$800 million*** in actual damages, to complete

1   abandonment of all actual damages.  *See* Dkt 286 at 2-3 (asserting damages of

2   $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June

3   8); Dkt. 315-1 at 2 (dropping actual damages on June 15).  Defendants have made

4   reasonable offers of settlement and put forward reasonable legal arguments in the face

5   of Yuga's shifting claims.

6   　　　***Third***, Yuga's litigation misconduct likewise precludes a finding that this case

7   is exceptional in Yuga's favor.  *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022)

8   ("When a party seeking equitable relief has violated conscience, or good faith, or

9   other equitable principle, in his prior conduct, then the doors of the court will be shut

10  against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at

11  1180-81 (holding that an exceptional case finding is an exercise of the court's

12  equitable powers).  For example, Yuga used this litigation as means to harass Mr.

13  Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee

14  threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file a

15  police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should

16  die.'  You said that.  And my dad is … freaked out, you know … he really is scared,

17  you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially

18  brushed off the issue, then later conceded that a threat did in fact occur.  Dkt. 97 at 4.

19  But Yuga's harassment of Mr. Ripps's father continued, including serving a facially

20  invalid subpoena on him seeking to compel his trial attendance (notwithstanding his

21  complete irrelevance to any issue in the case).

22  　　　Yuga served more than sixteen subpoenas in this action, nearly all of them

23  facially irrelevant and procuring no useful discovery, apparently to harass anyone that

24  is in any way associated with the Defendants.  For example, Yuga targeted people on

25  Twitter whose sole relevance was apparently having "liked" the RR/BAYC project,

26  Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties repeatedly

27  commented on how Yuga's behavior in this lawsuit impacted them personally,

28  including for example Mr. Ripps's part-time, one-week general assistant (whom Yuga

1   insisted on deposing) who called Yuga's conduct "quite predatory, honestly." Garner

2   Depo. at 190:9-17.

3   Yuga also improperly tried to preclude relevant discovery by making a baseless

4   apex witness argument in an *ex parte* motion for a protective order.  The Court

5   rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the merits"

6   because the co-founders were "the only people who have knowledge of the creation of

7   the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga employees Wylie

8   Aronow and Greg Solano appear for depositions on January 9 and 11 respectively

9   (excusing Mr. Solano only if he had medical complications).  *Id*.  Yet, despite this

10  Court's order, ***neither witness appeared***.  Yuga has never identified any medical

11  reason why Mr. Solano could not attend.  The Court was clear that failing to appear

12  was sanctionable and ordered Yuga to pay Defendants' expenses if they did not show

13  up.  Dkt. 77 at *2.  Yuga has not done so.

14  Yuga also flouted this Court's Protective Order by improperly designating the

15  entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

16  CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

17  from the public.  This deposition involved no Yuga confidential information; instead,

18  it was the testimony of a Black Jewish third party that included discussion of racism

19  and antisemitism in Yuga's branding.  *See* Dkt. 123-2.  Defendants were forced to

20  bring a motion to address Yuga's misuse of the Protective Order, which the Court

21  granted ordering complete de-designation of the transcript and finding that Yuga was

22  wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

23  Yuga also baselessly refused to produce materials relating to third-party

24  Thomas Lehman's settlement-procured declaration to run the clock on the discovery

25  schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

26  and sought expedited review of that motion to allow time for its use in a deposition of

27  Mr. Lehman.  The Court declined to consider the motion on an expedited basis, stating

28  that Defendants could instead depose Mr. Lehman in "the last week of March before

1  the April 1, 2023 discovery cut-off date." Dkt. 119 at 2. The Court ultimately granted

2  Defendants' motion, holding that Yuga waived any claim to confidentiality due to its

3  "unfettered use of Lehman's declaration[.]" Dkt. 159 at 2. After Yuga belatedly made

4  its court-ordered production, Defendants took Mr. Lehman's deposition in the final

5  week of discovery as suggested by the Court. But because of Yuga's delay, the

6  deposition testimony—which raised disputes of fact regarding Defendants'

7  infringement and Yuga's credibility—was unavailable for consideration in opposition

8  to Yuga's motion for summary judgment. *See* Dkt. 215 at 2.

9  Throughout the course of this litigation, Yuga also made repeated baseless

10  threats of fees and sanctions. In total, Yuga has unsuccessfully asked the Court to

11  impose sanctions ***six times***. *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-

12  8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20. Every request was denied. This

13  kind of scorched-earth litigation strategy is improper in any context, but particularly

14  problematic where Defendants are two individuals attempting to respond to claims

15  brought by an uncompromising multi-billion-dollar corporate plaintiff.

16  Because Yuga has abandoned its claim that Defendants' infringement was

17  willful, because Defendants' positions were reasonable and their defense of this

18  litigation was necessitated by Yuga's unreasonable settlement requirements, and

19  because Yuga does not come to the Court with clean hands as result of its litigation

20  misconduct, Defendants respectfully request that the Court reject Plaintiff's claim that

21  this case is "exceptional" warranting an award of attorneys' fees in Yuga's favor.

Dated: July 17, 2023

By: /s/ *Louis W. Tompros*
_____
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (pro hac vice)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document is in compliance with the word limit for Points and Authorities set forth in Local Rule 11-6.1.


By: /s/ *Louis W. Tompros*
_____
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's EFC system on July 17, 2023.


By: /s/  *Louis W. Tompros*
    Louis W. Tompros (*pro hac vice*)
    louis.tompros@wilmerhale.com
    **WILMER CUTLER PICKERING
      HALE AND DORR LLP**
    60 State Street
    Boston, MA 02109
    Telephone: (617) 526-6000
    Fax: (617) 526-5000