ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC., | Case No.: 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **PLAINTIFF YUGA LABS, INC.'S INITIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| RYDER RIPPS, JEREMY CAHEN, | |
| Defendants. | Trial Date: July 31, 2023 |

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA 90401
Telephone: 310.434.4300

DAVID Y. SILLERS (*admitted pro hac vice*)
david@clarelocke.com
KATHRYN HUMPHREY (*admitted pro hac vice*)
kathryn@clarelocke.com
MEGAN L. MEIER (*admitted pro hac vice*)
megan@clarelocke.com
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: 202.628.7400

Attorneys for Plaintiff
YUGA LABS, INC.

## I.      INTRODUCTION

This matter was tried to the Court on July 31, 2023.  Previously, in its April 21, 2023 Order on Summary Judgment ("SJ Order") (Dkt. 225), the Court found Defendants liable for Yuga Labs' claims of false designation of origin and cybersquatting.  For these claims, Yuga Labs is entitled to monetary remedies and injunctive relief.  Thus, the only issues remaining are (1) the just award of Defendants' profits for their false designation of origin of RR/BAYC NFTs, (2) the statutory damages to award Yuga Labs for Defendants' cybersquatting of two domains, (3) the scope of injunctive relief to address the harm to Yuga Labs from Defendants' two Lanham Act violations, and (4) whether this is an exceptional case entitling Yuga Labs to an award of attorneys' fees under the Lanham Act.

Having heard and reviewed the evidence, observed the credibility of the witnesses, and considered the parties' submissions, the Court makes the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT[1]

### A.      Parties

1.      Yuga Labs is the creator of one of the most well-known and successful NFT collections, known as the Bored Ape Yacht Club ("BAYC").  SJ Order at 1. The BAYC NFT collection's value arises from their rarity because only 10,000 BAYC NFTs exist and each is entirely unique.  Yuga Labs owns and uses trademarks associated with its BAYC NFT collection, including BORED APE YACHT CLUB, BAYC, BORED APE, APE, the BA YC Logo, the BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo (collectively, the "BAYC Marks").  *Id.* at 6-10.  Yuga has used the BAYC Marks in connection with advertising, marketing, and promoting its products and services nationwide and internationally through multiple

---

[1] To the extent that any of the Findings of Fact herein are considered Conclusions of Law, they are adopted as such.  Likewise, to the extent that any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

platforms, including the BAYC website, NFT marketplaces, and social media.  *Id.* at 2.

2.      Defendants created an NFT collection known as Ryder Ripps Bored Ape Yacht Club ("RR/BAYC"), where RR/BAYC NFTs point to the same online digital images as Yuga Labs' BAYC NFT collection, using the BAYC Marks.  *Id.* at 2. Defendants promoted and sold RR/BAYC NFTs in NFT marketplaces, social media, and their websites rrbayc.com and apemarket.com.

**B.      Defendants' False Designation of Origin**

3.      Yuga Labs successfully proved every element of its false designation of origin claim and is entitled to monetary remedies and injunctive relief.  *Id.* at 13.

4.      Yuga Labs owns and uses the BAYC Marks, and Defendants used the BAYC Marks without authorization to falsely suggest that RR/BAYC NFTs relate to Yuga Labs in a way that was likely to cause, and actually caused, confusion.  *Id.* at 12-13.

5.      Confusion was likely given the "complexity and required sophistication to understand the blockchain and verify provenance."  *Id.* at 12.  Defendants knew that "at least some purchasers of their RR/BAYC NFTs would have difficulty identifying the RR/BAYC NFTs as a different and distinct product from Yuga's BAYC NFTs."  *Id.* at 13; *see also* JTX-49 (Mr. Cahen stating "these users are too unsophisticated by far"); JTX-109 (Mr. Lehman stating "it is too confusing to the 'average joe'"); JTX-110 (Mr. Lehman stating "Ppl will not read the contract").

6.      Defendants' infringement was intentional.  The Court's findings on summary judgment, in addition to further evidence presented at trial, illustrate Defendants' intent to deceive consumers, including:

a.      "Defendants knowingly and intentionally used Yuga's BAYC Marks . . . in an effort to confuse consumers" and "intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding."  *Id.* at 12; *see also* JTX-671; JTX-686.

b.     "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." SJ Order at 11.

c.     "Defendants are selling the exact same product – NFTs that point to Yuga Labs' BAYC images – and Defendants marketed their RR/BAYC NFTs using the same corresponding BAYC Ape ID number used by Yuga Labs for the BAYC NFTs." SJ Order at 11; *see also* JTX-686.

d.     "Defendants used Yuga Labs' BAYC Marks to make their competing product look identical to Yuga Labs' product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT." SJ Order at 17; *see also* JTX-600; JTX-117; JTX-1146; JTX-36.   Authenticating NFTs requires specialized knowledge and, because of the specialized knowledge required, the Defendants knew that their RR/BAYC NFTs were likely to be confused with Yuga Labs' BAYC NFTs and that at least some purchasers of their RR/BAYC NFTs would have difficulty identifying the RR/BAYC NFTs as a different and distinct product from Yuga Labs' BAYC NFTs. SJ Order at 12–13.

e.     "Defendants frequently used the entirety of the BAYC Marks without modification." SJ Order at 18; *see also* JTX-28; JTX-90; JTX-671; JTX-814.

f.     Defendants actively marketed their RR/BAYC NFTs as "Bored Ape Yacht Club" and used Yuga Labs' logo and marks to sell the NFTs.   JTX-133; JTX-671; JTX-28; JTX-29; *see also* JTX-682; JTX-683; JTX-685.

g.     Mr. Ripps promoted the RR/BAYC NFTs as "Bored Ape Yacht Club V3" and "BAYC V3."   JTX-689; JTX-690.

h.     Defendants promoted and sold their RR/BAYC NFTs through the same online NFT marketplaces as Yuga Labs.   SJ Order at 12.

i.     Defendants developed and marketed an NFT marketplace, Ape Market, where consumers could purchase and sell RR/BAYC NFTs alongside BAYC NFTs, and which used BAYC Marks in a manner likely to confuse consumers.   *See*

JTX-696; JTX-697; JTX-698; JTX-938.  To use Ape Market, consumers would be required to purchase one of Defendants' RR/BAYC NFTs, thus encouraging further sales and profit for Defendants.  Defendants continued to promote Ape Market even after the filing of this lawsuit.  *See* JTX-1048.

j.    Defendants expected to make profit from using Yuga Labs' BAYC Marks to sell and resell RR/BAYC NFTs and to generate transaction fees from NFT sales on Ape Market.  *See* JTX-1 at ¶¶ 10–13; JTX-49; JTX-1574; JTX-1586.

### C.    Defendants' Cybersquatting

7.    Yuga Labs successfully proved every element of its cybersquatting claim and is entitled to damages and injunctive relief.  SJ Order at 14–15.

8.    "Defendants registered, used, and continue to use the domain names https://rrbayc.com/ and https://apemarket.com."  *Id.* at 14.

9.    "Defendants registered multiple domain names – https://rrbayc.com, https://apemarket.com, and pages within OpenSea and Foundation – knowing that they were identical or confusingly similar to the BAYC Marks."  *Id.* at 15.

10.   And Defendants "acted with a bad faith intent to profit" from Yuga Labs' marks because they "registered their domains, which included Yuga Labs' marks, for commercial gain to divert customers from purchasing BAYC NFTs."  SJ Order at 14, 15.

11.   "Defendants concealed their registration of the domain names by using a proxy registration service."  *Id.* at 15.

### D.    Defendants' Profits

12.   Yuga Labs' expert, Lauren Kindler, an independent expert in economics and damages calculations, calculated that, as of February 1, 2023, Defendants generated **at least $1,589,455** in profits from the sale of their RR/BAYC NFTs.  *See* Dkt. 149-117 ¶ 76; JTX-723 ¶ 76.  Ms. Kindler calculated:

a. Defendants' gross revenue from the initial sale of RR/BAYC NFTs totaled $1,920,933.  *Id.* ¶ 66.

b. Removing the "gas" transaction costs and profits accrued to non-defendants, Mr. Lehman and Mr. Hickman, reflects the amount of profits that accrued to Defendants only from the initial sale of RR/BAYC NFTs, totaling **$1,366,090**.  *Id.*

c. When NFTs are resold in NFT marketplaces, royalties or creator fees can accrue to the creator of that NFT.  Defendants' profits from royalties or creator fees from resales of RR/BAYC NFTs totaled at least **$117,309**.  *Id.* ¶ 68.

d. The value of RR/BAYC NFTs that Defendants hold or did not mint totals **$106,055**.  *Id.* ¶ 74.

e. The sum of these profits is at least **$1,589,455**, as shown below. *Id.* ¶ 76.

|  | Profits |
|---|---|
| Profits from Initial Sales of RR/BAYC NFTs | $1,366,090 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| **Total** | **$1,589,455** |

13. All of Defendants' profits result from their infringing activity because each RR/BAYC NFT used the BAYC Marks.  Each RR/BAYC NFT refers to a contract with a token tracker displaying "Bored Ape Yacht Club (BAYC)", and the NFT marketplaces where RR/BAYC NFTs were sold listed "bayc" in the URLs.  *See*, *e.g.*, JTX-117; JTX-1146; JTX-36; JTX-28; JTX-671.

14. The amount of creator fees accrued to Defendants is likely underestimated as RR/BAYC NFTs continue to be available for resale on secondary markets.  Thus, the $117,309 figure likely does not fully capture the total profits earned by Defendants from further resales of RR/BAYC NFTs.  *Id.* ¶ 69.

15.     Defendants were also unjustly enriched in the form of avoided costs. *Id.* ¶ 89.  Yuga Labs' investments in developing its brand and trademarks, including its marks associated with the BAYC brand, are costs that Defendants were able to avoid. *Id.*  Instead, Defendants, through their wrongful conduct, leveraged the value created by Yuga Labs to effectively "free ride" on Yuga Labs' investments in its BAYC brand that Defendants would otherwise have had to invest themselves to attract consumers to their RR/BAYC NFTs.  *Id.*  The extent of these investments is difficult to quantify, and thus there is no easily determinable number to reflect Defendants' unjust enrichment in the form of avoided costs.  *Id.*

16.     Defendants calculate the profits from their sales of the RR/BAYC NFTs to be $1,273,252.93.

17.     Defendants offer no expert to rebut Ms. Kindler's opinions.

**E.     Defendants' Infringing Activities Harm Yuga Labs**

18.     Defendants registered and used the rrbayc.com domain, which directly incorporates Yuga Labs' BAYC Marks, to market and sell RR/BAYC NFTs.  SJ Order at 14–15.

19.     Defendants also registered the apemarket.com domain, which incorporates the BAYC Marks and included the Ape Skull logo as its favicon.  This website was developed to sell RR/BAYC NFTs directly alongside BAYC NFTs and was advertised to promote Defendants' RR/BAYC NFTs.  SJ Order at 14–15; *see also* JTX-698.

20.     Defendants' @ApeMarketplace Twitter account incorporates the BAYC Marks and was used to market Defendants' infringing RR/BAYC NFTs.  *See* JTX-696.

21.     Defendants' @ApeMarketBot Twitter account incorporates the BAYC Marks and was created to help market Defendants' infringing RR/BAYC NFTs and Ape Market.  *See* JTX-801.00025 at 11:26 p.m.

22. Defendants incorporated the BAYC Marks into the rrbayc-v0.netlify.app domain name and webpage, which Defendants used to transfer RR/BAYC NFTs to consumers. *See* JTX-167; JTX-171; JTX-1148. This tool was used to "mint" (or, manufacture) the infringing RR/BAYC NFTs.

23. The token tracker for the RR/BAYC smart contract uses Yuga Labs' BORED APE YACHT CLUB and BAYC marks. JTX-600; JTX-117. Consumers use token trackers to verify the source and authenticity of the digital assets that they are viewing and purchasing. SJ Order at 17; *see also* Dkt. 149-113 ¶ 14; JTX-721 ¶ 14; JTX-1558.

24. The RR/BAYC smart contract is immutable and will use Yuga Labs' BORED APE YACHT CLUB and BAYC marks in perpetuity. Dkt. 149-115 ¶ 71; JTX-722 ¶ 71; *see also* JTX-1249.

25. Consumers and Twitter bots tracking and posting about NFT transfers falsely attribute sales of RR/BAYC NFTs as BAYC NFTs as the bots reflect the BORED APE YACHT CLUB and BAYC marks in the RR/BAYC smart contract's token tracker, which causes confusion among consumers. *See* JTX-1029; *see also* JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035.

26. Yuga Labs' expert, Laura O'Laughlin, an expert in designing, administering, and analyzing consumer surveys, conducted two independent surveys with results showing confusion of the BAYC Marks used in connection with RR/BAYC NFTs at net rates of 40.4% on Foundation and 20.0% on OpenSea, respectively. Dkt. 149-113 ¶¶ 16, 47, 73; JTX-721 ¶¶ 16, 47, 73.

27. Yuga Labs' expert, Jonah Berger, an expert in brand equity and consumer behavior, found that Defendants' minting and sales of RR/BAYC NFTs harmed Yuga Labs' brand equity and goodwill. Dkt. 149-115 ¶¶ 11, 12, 64-92; JTX-722 ¶¶ 11, 12, 64–92. First, the introduction of RR/BAYC NFTs into commerce increased the perceived supply and decreased the perceived exclusivity of authentic BAYC NFTs. *Id.* ¶ 11. Second, there was marketplace confusion following the

minting and sales of RR/BAYC NFTs, largely because Defendants used the exact BAYC images, metadata, marks, and naming conventions for their RR/BAYC NFTs. *Id*. Third, consumer attitudes toward the BAYC brand became less positive as a result of Defendants' minting and sales of RR/BAYC NFTs. *Id.*

28.    Yuga Labs' witnesses testified that Defendants' infringing activities harmed Yuga Labs' brand equity, goodwill, and ability to control its brand and reputation.   *See* Dkt. 271; Dkt. 330-2, Aronow Depo. Tr. at 246:17–246:25; Dkt. 330-4, Muniz Depo. Tr. at 98:1–99:15.

29.    Defendants continue to market their RR/BAYC NFTs and Ape Market. On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."   JTX-1315; *see also* JTX-1317.   Mr. Cahen also continues to retweet Twitter posts sharing the resale of RR/BAYC NFTs, *see* JTX-1615; JTX-1613; JTX-1614, as well as retweet Defendants' own tweets from its @ApeMarketplace Twitter account.   JTX-1048.

### F.    Defendants' Litigation Misconduct

30.    Defendants filed a frivolous counterclaim for declaratory judgment of no defamation with no good-faith basis and to introduce irrelevant and inflammatory theories through the "backdoor of a counterclaim."   Dkt. 87 at 2; *see* Dkt. 80 at 1, 3-4. Defendants withdrew this counterclaim only after they were unsuccessful in their attempts to leverage it for discovery and Yuga Labs had already expended resources seeking its dismissal.   *See* Dkt. 156 at 11.

31.    Defendants repeatedly attempted to re-litigate issues the Court rejected in its December 16, 2022 Order Denying Defendants' Motion to Dismiss and Motion to Strike (Dkt. 62).   For example, Defendants filed numerous motions to compel documents and information explicitly premised on their rejected First Amendment *Rogers* defense.   *See* Dkt. 69-1, Dkt. 103-1.   The Court denied these motions and requests as "moot, irrelevant and not proportionate to the needs of the case in view of the District Court's December 16, 2022 ruling."   Dkt. 87 at 1; *see also*, Dkt. 144

at 1.  Similarly, when Defendants filed a meritless motion to stay proceedings (Dkt. 118) after nearly three months of unnecessary delay, the Court reiterated that *Rogers* did not apply in this case due to Defendants' commercial conduct.  Dkt. 178 at 6. Still, on summary judgment, Defendants maintained that "there is a material dispute whether the RR/BAYC Project is an expressive work that must be resolved at trial" (Dkt. 199-1 at 12–13), despite the Court's Orders otherwise.

32.  Defendants again refused to accept the Court's findings in its SJ Order, instead indicating an intent to re-litigate adjudicated issues at trial.  *See* Culp Declarations in Support of Motions *In Limine* Nos. 1-3, 5, Dkt. 232-2, Dkt. 236-2, Dkt. 239-2, Dkt. 241-2.  As a result, Yuga Labs was forced to file motions *in limine* on previously-adjudicated issues.

33.  Defendants filed baseless and procedurally improper *ex parte* applications, which increased the costs of this litigation and burden on the Court. *See*, *e.g.*, Dkt. 108-1, Dkt. 114, Dkt. 115, Dkt. 119, Dkt. 207.

34.  Defendants were obstructive and evasive throughout their depositions, wasting time with rehearsed, non-responsive monologues on the same issues the Court already deemed irrelevant.  *See*, *e.g.*, Dkt. 271; Dkt. 321, Cahen Depo. Tr. at 101:7-102:4; 163:13-23; Dkt. 323, Ripps Depo. Tr. at 35:2-11; 44:19-45:11.

35.  Defendants made false representations to the Court regarding the existence and production of documents during discovery.  For example, Mr. Ripps verified to the Court that he produced all responsive documents to Yuga Labs' discovery requests.  Dkt. 109-8.  This was false as Defendants subsequently declared to the Court that they produced additional, relevant documents.  Dkt. 200-3; Dkt. 200-4.

36.  Defendants made heinous attacks on Yuga Labs and its counsel throughout litigation.  *See*, *e.g.*, Dkt. 149-50; Dkt. 149-51.

37.  Defendants used the litigation to "farm" for engagement on social media and further harm Yuga Labs.  *See* JTX-938, JTX-1475, JTX-1568, JTX-1617,

JTX-1620.   Defendants' public disclosure of confidential material violates this Court's Protective Order (Dkt. 51) and intentionally harmed Yuga Labs.   *See* Dkt. 183; Dkt. 194.

## III.   CONCLUSIONS OF LAW

### A.   Remedies

#### 1.   Disgorgement of Profits

38.   The Lanham Act permits a prevailing plaintiff, "subject to the principles of equity, to recover . . . defendant's profits." 15 U.S.C. § 1117(a).

39.   The Court has found Defendants liable for intentional infringement of the BAYC Marks (SJ Order at 12), and thus Yuga Labs is entitled to Defendants' profits.

40.   This Court has already determined Defendants' state of mind, concluding that Defendants acted with intent to deceive consumers. *See* Dkt. No. 225 at 12.   Further evidence at trial also supports that Defendants' infringement was deliberate and intentional. *See supra* Section II.B.

41.   Here, Defendants generated at least $1,589,455 in profits from the sale of their RR/BAYC NFTs. *See* Dkt. 149-117 ¶ 76; JTX-723 ¶ 76.

42.   Defendants offer no expert to rebut Ms. Kindler's calculations and thus cannot prove that any of its total sales of RR/BAYC NFTs are not attributable to the infringing activity.   *See Frank Lloyd Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019) ("Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity," and "[t]he defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity").

43.   Ms. Kindler's calculation likely underestimates Defendants' actual profits to date because RR/BAYC NFTs remain available for resale on secondary markets, and thus Defendants can continue to accrue creator fees for these ongoing resales.

44.   Defendants were also unjustly enriched by avoided costs.  Yuga Labs invested significant resources to develop its BAYC brand, trademarks, and NFTs. Defendants avoided the costs they would have to independently expend in order to attract consumers to their RR/BAYC NFTs.

45.   Therefore, the Court deems it just to award Yuga Labs the full amount of Defendants' profits, as calculated by Ms. Kindler, to account for Defendants' ongoing profits and unquantifiable unjust enrichment.  *See* 15 U.S.C. § 1117(a).

46.   Yuga Labs is entitled to recover Defendants' profits in the amount of $1,589,455, which the Court deems just.

### 2.   Statutory Damages Under the ACPA

47.   "In a case involving a violation of section 1125(d)(1) . . . the plaintiff may elect . . . to recover . . . an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d).

48.   Courts have "'wide discretion' in determining an appropriate amount of damages" under the ACPA. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982 MMM (MANx), 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010). "'[C]ourts generally consider a number of factors . . . including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities . . . and other behavior by the defendant evidencing an attitude of contempt towards the court of the proceedings.'" *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012).

49.   Statutory damages are an equitable remedy and may be decided by the Court. *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x. 466, 467 (9th Cir. 2014) ("The district court did not err in calculating statutory damages rather than holding a jury trial on that issue because the ACPA allows for statutory damages . . . 'as the court considers just.'"); *Acad. of Motion Picture Arts & Scis. v. GoDaddy,*

*Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *4 (C.D. Cal. Apr. 10, 2015)* ("[T]here is no right to a jury trial for the assessment of statutory damages.").

50.   Defendants' cybersquatting was willful and egregious.   Defendants intentionally infringed Yuga Labs' BAYC Marks.   *See* SJ Order at 12.   Moreover, "Defendants acted with a bad faith intent to profit" from Yuga Labs' marks, including by   "register[ing]   multiple   domain   names—https://rrbayc.com/, https://apemarket.com/, and pages within OpenSea and Foundation—knowing that they were identical or confusingly similar to the BAYC Marks" and by "register[ing] their domains . . . for commercial gain to divert customers from purchasing BAYC NFTs."   *See id.* at 15.   These circumstances alone support Yuga Labs' request for $200,000 in statutory damages.   *See Bekins*, 2010 WL 11597623, at *11 (defendant's willful and bad faith cybersquatting supported maximum amount of statutory damages).   Furthermore, Defendants concealed their infringing activities by registering the domain names through a proxy registration service.   SJ Order at 15.

51.   Defendants' bad-faith litigation conduct also evidences their contempt of the Court.   Despite the Court finding Defendants liable for cybersquatting (SJ Order at 15), they have continued to use and promote the domains to advertise their infringing RR/BAYC NFTs.   Defendants' disregard for the authority of this Court and its proceedings warrants a high statutory damages award, given the policy interest in deterring such wrongful and sanctionable conduct.   *See infra* Section III.C; *St. Luke's Cataract and Laser Inst., P.A. v. Sanderson,* 573 F.3d 1186, 1206 (11th Cir. 2009)* ("We agree and conclude that an ACPA statutory damages award . . . serves as a sanction to deter wrongful conduct"); *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C 08–2832, 2009 WL 2706393, at *6 (C.D. Cal. Jan. 3, 2013)* (awarding $50,000 per-violation award because of "noncompliance with court orders, as well as its systematically deceptive behavior").

52.    Therefore, Yuga Labs is entitled to the maximum amount of $200,000 in statutory damages ($100,000 for each of Defendants' infringing domain names, rrybayc.com and apemarket.com) for Defendants' cybersquatting.

### 3.    Injunctive Relief

#### a.    Yuga Labs is Entitled to Injunctive Relief.

53.    The Court has already determined that Yuga Labs is entitled to injunctive relief.  SJ Order at 13, 15.  A plaintiff is entitled to a permanent injunction where: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1054 (9th Cir. 2013); *JUUL Labs, Inc. v. Chou*, No. CV 21-3056 DSF (PDX), 2023 WL 3886046, at *15 (C.D. Cal. June 8, 2023) (granting permanent injunction where all four factors met).

54.    Yuga Labs has suffered an irreparable injury.  "Congress has recently made it easier for trademark plaintiffs to obtain an injunction, amending the Lanham Act to provide that such plaintiffs 'shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection.'"  *Athena Cosmetics, Inc. v. AMN Distribution Inc.*, No. 20-cv-05526, 2022 WL 4596549, at *12 (C.D. Cal. Aug. 16, 2022) (quoting 15 U.S.C. § 1116(a)).  Here, the Court has already found that Defendants infringed Yuga Labs' trademarks, and thus irreparable injury is presumed.  *See* SJ Order at 13.  Moreover, Defendants' infringing conduct has caused irreparable injury to Yuga Labs by hindering its ability to control its reputation and brand.  *See* Dkt. 149-115 ¶¶ 11, 12; JTX-722 ¶¶ 11, 12; *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm.").

55. Monetary damages are inadequate to compensate for the irreparable injury. "Injunctive relief is the remedy of choice for trademark . . . cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). In addition, "[d]amage to reputation and loss of customers are intangible harms not adequately compensable through monetary damages." *Leadership Studies, Inc. v. ReadyToManage, Inc.*, No. 2:15-cv-09459-CAS(AJWx), 2017 WL 2408118, at *6 (C.D. Cal. June 2, 2017). Here, money alone cannot remedy Yuga Labs or extinguish the ongoing ham and the continued threat that Defendants will repeat their fraud. Indeed, Defendants' conduct continues to suggest that they will continue to harm Yuga Labs. *See, e.g.*, JTX-1315, JTX-1317, JTX-1615, JTX-1613, JTX-1614, JTX-1048. In the absence of a permanent injunction, Yuga Labs is likely to be exposed to further irreparable harm.

56. Third, the balance of hardships weighs heavily in favor of Yuga Labs. Defendants have no legitimate interest in remaining free and able to readily infringe Yuga Labs' trademarks, whereas Yuga Labs has a strong interest in being protected from Defendants' illegal conduct that continues to harm its reputation and goodwill. *See JUUL Labs, Inc.*, 2023 WL 3886046, at *15 ("The balance of hardships weighs in favor of an injunction. By granting injunctive relief, the Court is merely prohibiting [defendant] from infringing [plaintiff's] trademarks").

57. Injunctive relief will serve the public interest by preventing consumer confusion, and it will vindicate the Lanham Act by protecting Yuga Labs' trademark rights against Defendants' continued infringement. *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x. 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in trademark cases . . . serves the public interest.").

58. Accordingly, Yuga Labs has met all four requirements for a permanent injunction against Defendants to prevent them from infringing Yuga Labs'

trademarks and otherwise deceiving the public by impersonating or claiming a false association with Yuga Labs.

**b.     Yuga Labs' Requested Injunctive Relief is Appropriate.**

59.     Yuga Labs' request for an injunction, ordering Defendants to transfer domain names and social media accounts to remedy their trademark infringement and cybersquatting, is an appropriate form of relief.  *See* 15 U.S.C. § 1116; *Smith v. Guerilla Union, Inc.*, No. CV 18-9902 DSF (AGRx), 2019 WL 1517551, at *4 (C.D. Cal. Apr. 8, 2019) (granting permanent injunction to transfer infringing social media accounts and domain names); *Entrepreneur Media, Inc. v. Alfonso*, No. 8:21-cv-00644-DOC-(JDEx), 2021 WL 2941983, at *5 (C.D. Cal. July 12, 2021) (same).

60.     In trademark cases involving infringing internet accounts, mark holders have a superior claim of ownership relative to the infringer.  *See Brookfield Commc'n v. W. Coast Ent. Corp.*, No. CV98-9074 CM (AJWx), 1999 U.S. Dist. LEXIS 23247, at *30 (C.D. Cal. Sep. 9, 1999) ("West Coast has been found to have infringed Brookfield's trademark rights; relative to West Coast, Brookfield is the domain name's rightful owner."); *Left Coast Wrestling, LLC v. Dearborn Int'l, LLC*, No. 3:17-cv-00466-LAB-NLS, 2018 WL 2328471, at *7, 17 (S.D. Cal. May 23, 2018) (where plaintiff had a "right to possession" of domain names and social media accounts bearing plaintiff's marks, ordering transfer to plaintiff).

61.     The same logic extends to the NFT smart contracts.  Like domain names and social media accounts, smart contracts give consumers confidence in the authenticity and source of digital accounts.  Thus, mark holders have a superior claim of title to smart contracts bearing its trademarks.

62.     Because smart contracts are immutable and live on in perpetuity, Defendants' infringing smart contract will always reference Yuga Labs' BORED APE YACHT CLUB and BAYC marks, and thus resulting confusion and harm will continue.  For example, consumers and Twitter bots tracking NFT transfers will

continue to falsely attribute sales of RR/BAYC NFTs as BAYC NFTs as they reflect the BORED APE YACHT CLUB and BAYC marks in the RR/BAYC smart contract's token tracker. Thus, even if Defendants cease actively promoting their infringement of Yuga Labs' marks, and even if Defendants transfer the domain names and social media accounts to Yuga Labs, confusion from their infringement will continue unless Yuga Labs owns and controls the smart contract. *See Brookfield, 1999 U.S. Dist. LEXIS 23247, at *29–30* (noting transfer should be granted even if some non-infringing use could be made of it).

63.     Additionally, because nearly 500 RR/BAYC NFTs remain available to mint through the RR/BAYC smart contract, Defendants retain the tool to continue their infringement. Thus, Yuga Labs should own the smart contract to prevent any further infringing NFTs to exist.

64.     In order to maintain the exclusive quality of the 10,000 BAYC NFTs, Yuga Labs has a superior right to own and control the RR/BAYC smart contract. The RR/BAYC smart contract is the source of the infringing NFTs and immutably uses Yuga Labs' BORED APE YACHT CLUB and BAYC marks in the manufacture, sale, and promotion of the infringing RR/BAYC NFTs. Therefore, the RR/BAYC smart contract harms the perceived exclusivity of genuine BAYC NFTs if left in the control of anyone other than Yuga Labs. Yuga Labs also has a superior right to control the netlify tool, which uses the BAYC Marks and was itself used solely to manufacture the RR/BAYC NFTs. Similarly, Yuga Labs has a superior right to own and control the two social media accounts that Defendants created solely to market their infringing products, both of which are Twitter accounts - @Apemarketplace and @Apemarketbot.

65.     Defendants' cybersquatting violations entitle Yuga Labs to an injunction ordering the transfer of the rrbayc.com and apemarket.com domain names. The ACPA statutorily authorizes the Court to order the transfer of the infringing web domains as a remedy for cybersquatting. *See* 15 U.S.C. § 1125(d)(1)(C) ("In any

civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."); *Wilens v. Doe Defendant No. 1.*, No. 3:14–cv–02419–LB, 2015 WL 4606238, at *18 (N.D. Cal. July 31, 2015) (holding transfer of domain names appropriate due to Defendants' cybersquatting and "refusal to desist from" intentionally operating the infringing web domains).

66.   Yuga Labs is entitled to an injunction requiring Defendants to transfer to Yuga Labs control of rrbayc.com, apemarket.com, rrbayc-v0.netlify.app, the @ApeMarketplace Twitter account, the @ApeMarketBot Twitter account, and the RR/BAYC smart contract (0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e). Without this injunctive remedy, Yuga Labs cannot regain control over its brand and prevent future harm.

67.   The terms of the permanent injunction are described in the Conclusion below.  The Court finds these terms reasonable and necessary to protect Yuga Labs from irreparable harm.

### B.   Costs

68.   Under the Lanham Act, the prevailing party of a Section 1125 claim is entitled to "the costs of the action."  15 U.S.C. § 1117(a).

69.   The Court has already determined that Defendants intentionally infringed the BAYC Marks in violation of 15 U.S.C. § 1125(a) (SJ Order at 12), and that Defendants cybersquatted with bad faith intent in violation of 15 U.S.C. § 1125(d) (SJ Order at 14–15).

70.   Thus, Yuga Labs is entitled to recover its costs.  The amount of Yuga Labs' costs shall be determined after Yuga Labs files a separate application for costs.

### C.   Exceptional Case

71.   Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

72.    Here, Yuga Labs is the prevailing party on its claims for false designation of origin and cybersquatting.  *See* SJ Order at 13, 15.

73.    A court determines if a case is exceptional by considering the "totality of the circumstances" and whether the case is "one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co.,* 839 F.3d 1179, 1180 (9th Cir. 2016); *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *4 (C.D. Cal. Feb. 24, 2022).  A "nonexclusive" list of factors to consider includes: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *SunEarth*, 839 F.3d at 1181 (cleaned up).

74.    Based on the totality of the circumstances, the Court concludes that this is an exceptional case.

75.    First, Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order at 12, 15; *see also* JTX-1574.  Even after the filing of this lawsuit, Defendants continued to promote their infringing RR/BAYC NFTs and Ape Market. *See AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002) (affirming exceptional case where "defendant acted *deliberately* to and *intended to harm* the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "*harass*[] the plaintiff"); *see*, *e.g.*, JTX-1048.

76.    Second, Yuga Labs' substantive strength in its litigating position, as evidenced in the Court's Order on Summary Judgment, stands out from the bulk of trademark cases.  *See* SJ Order at 22; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*,

875 F.3d 426, 436 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").  Ignoring the clear strength of Yuga Labs' case, Defendants relentlessly advanced frivolous legal theories (*e.g.*, RR/BAYC NFTs as an "art" project intended to criticize Yuga Labs, Yuga Labs abandoned its rights to the BAYC Marks, a frivolous counterclaim for declaratory judgment of no defamation, etc.) that were rendered moot and irrelevant by multiple orders from the Court (*see*, *e.g.*, Dkt. 62 and SJ Order).  Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated litigation and make this an exceptional case.  *See San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020) (affirming exceptional case where Defendants litigated in an "unreasonable manner" such as its "failure to comply with court rules" and "persistent desire to re-litigate issues already decided").

77.    Third, Defendants and their counsel have engaged in a pattern of unreasonable and obstructive litigation and discovery conduct that consistently crossed the line from advocacy into bad faith.  For instance, Defendants filed baseless and procedurally improper *ex parte* applications, which increased the costs of this litigation and the burden on the Court.  Defendants also filed a meritless motion to stay proceedings (Dkt. 118) after months of unnecessary delay.  Further, the deposition transcripts lodged with the Court (Dkt. 271; *see also* Dkt. 321, 323) reveal that Defendants were obstructive and evasive throughout their depositions.  Such obstructive and antagonistic conduct supports a finding that this is an exceptional case.  *See Jackson*, 2022 WL 2155975, at *5.

78.    Fourth, Defendants' statements on Twitter about Yuga Labs and its counsel throughout litigation included referring to Yuga Labs' counsel as "criminals" who support "racism, antisemitism, beastiality, pedophilia and using cartoons to market drugs to young children" (Dkt. 149-51) were egregious and far exceeded the

1  bounds of acceptable conduct.  *See Te-Ta-Ma Truth Found.-Family of Uri, Inc. v.*
2  *World Church of the Creator*, 392 F.3d 248, 263–64 (7th Cir. 2004).

3       79.     Therefore, Yuga Labs is entitled to its reasonable attorneys' fees.  The
4  amount of Yuga Labs' fees shall be determined after Yuga Labs files a separate fee
5  application.

6       **D.     Attorneys' Fees and Costs Related to Dismissed and Adjudicated**
7            **Copyright Claims**

8       80.     The Copyright Act provides for the award of full costs and reasonable
9  attorneys' fees to the prevailing party.  17 U.S.C. § 505.

10      81.     The Court granted Yuga Labs' motion to dismiss Defendants' two
11 counterclaims of non-infringement under the Declaratory Judgment Act (Dkt. 156 at
12 13–14).   The Court also granted Yuga Labs' motion for summary judgment on
13 Defendants' counterclaim under Section 512(f) of the Digital Millennium Copyright
14 Act (SJ Order at 21).   Accordingly, because Yuga Labs is the prevailing party on
15 Defendants' copyright counterclaims, it is entitled to its full costs and fees for those
16 claims.

17      82.     The amount of Yuga Labs' fees and costs shall be determined after Yuga
18 Labs files a separate application for fees and costs.

19 **IV.   CONCLUSION**

20      For the reasons explained above, it is hereby **ORDERED THAT** Defendants
21 pay to Plaintiff:

22      1.      $1,589,455 in Defendants' profits;

23      2.      $200,000 in statutory damages;

24      3.      Attorneys' fees;

25      4.      Costs; and

26      5.      Pre and post-judgment interest.

27

28

The amount of Yuga Labs' fees and costs shall be determined after Yuga Labs files a separate fee application no later than thirty (30) days from the date of this order.

**IT IS HEREBY FURTHER ORDERED THAT** a permanent injunction issues in favor of Plaintiff and against Defendants as follows:

1. Defendants, their agents, employees, and attorneys, and anyone in active concert of participation with Defendants, their agents, employees, and attorneys, are hereby permanently restrained and enjoined from, directly or indirectly, or authorizing or assisting any third-party to engage in:

   a. Manufacturing, minting, issuing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, loaning, renting, or otherwise disposing of the RR/BAYC NFTs and any merchandise related to the RR/BAYC NFTs, including without limitation, listing the RR/BAYC NFTs or related merchandise for sale on any marketplace, collecting royalties in connection with the RR/BAYC NFTs, and/or otherwise disposing of the RR/BAYC NFTs;

   b. Using in any manner any logo, trade name, trademark, or designation confusingly similar to any of the BAYC Marks or any other Yuga Labs source identifier, alone or in combination with other words or designs, as a trademark, trade name component, or otherwise, to market, advertise, promote, or identify any good and/or service not produced, offered, or authorized by Yuga Labs, or to falsely represent or have the effect of falsely representing that the goods or services of any Defendant or of others are sponsored by, authorized by, or in any way associated with Yuga Labs, or may otherwise unfairly compete with Yuga Labs in the

manufacture, sale, offering for sale, distribution, advertisement, or any other use of Yuga Labs' goods or services;

c.  Registering, owning, using, or trafficking any other website, domain name, e-commerce page or account, digital marketplace page or account, licensing business or other business, or any entity or store whose name or d.b.a. uses and/or incorporates any of the BAYC Marks, or includes "BAYC", "Bored", "Ape", or "Yuga" or any other Yuga Labs source identifier, or that is confusingly similar to any of the BAYC Marks, or that is calculated to or reasonably likely to confuse consumers into believing that Defendant is Yuga Labs, or is in any matter associated or connected with Yuga Labs when it is not;

d.  Registering, owning, using, or trafficking any social media account, including but not limited to www.discord.com or www.twitter.com account(s), that purports to originate from Yuga Labs, or to be sponsored or licensed by, or affiliated with Yuga Labs or uses and/or incorporates any portion of the BAYC Marks within its name d.b.a., or username, when it is not;

e.  Using the infringing "RR/BAYC" and "APE MARKET" marks on social media platforms to facilitate the manufacture, circulation, sale, transfer, marketing, advertising, promoting, and/or renting of RR/BAYC NFTs or related goods or services;

f.  Providing any benefits to holders of the RR/BAYC NFTs, such as airdrops, or otherwise creating incentives for third parties to sell, purchase, trade, transfer, loan, rent, and/or profit from RR/BAYC NFTs.

g.  Further infringing any BAYC Mark and/or any other Yuga Labs source identifier;

2.    Within fourteen (14) days after entry of this Order, Defendants shall:

    a.    Destroy any materials in their possession or control publicly displaying any BAYC Mark or any other mark confusingly similar with the BAYC Marks.  If Defendants own any RR/BAYC NFT, they shall "burn" (e.g., destroy) that NFT or provide it to Yuga Labs to burn;

    b.    Transfer to Yuga Labs, including by facilitating the transfer of rights with any necessary third-party host website, registrar, or other entity, rrbayc.com, apemarket.com, rrbayc-v0.netlify.app, the @ApeMarketplace Twitter account, the @ApeMarketBot Twitter account, and the RR/BAYC smart contract (0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e); together with all codes, passwords, credentials, or other information necessary for Yuga Labs to fully and solely access and operate the same;

    c.    To give practical effect to this Order, any third-party host website, registrar, or other entity related to any of the domains, social media account, or digital accounts subject to this Order shall, within fourteen (14) days of receipt of this Order, transfer or otherwise assign those subject domains, social media accounts, or digital accounts to Yuga Labs if Defendants have not already done so.

    d.    Contact by e-mail, text, or other written form of communication all persons to whom Defendants gave, sold, issued, or distributed a RR/BAYC NFT, and provide each of those persons with solely a copy of this Order;

    e.    Airdrop to all RR/BAYC NFTs holders a copy of this Order.

3. Upon service of this Order, Defendants shall be deemed to have actual notice of the issuance and terms of the permanent injunction, and any act in violation of any of the terms of the permanent injunction may be considered and prosecuted as contempt of Court, and such other, further relief this Court deems just and proper.

4. Within thirty (30) days after service of this Order, Defendants shall file with the Court and serve upon Yuga Labs' counsel a declaration under oath setting forth in detail the manner and form in which Defendants have complied with this Order.

5. This Court shall retain jurisdiction over this action for the purpose of implementing and enforcing this injunction.

**IT IS SO ORDERED.**

Dated: _____, 2023      _____
                                     Honorable John F. Walter
                                     United States District Court Judge

Presented by:

Eric Ball
eball@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500

By:__ */s/ Eric Ball*_____
     Eric Ball
     Attorneys for Plaintiff
     YUGA LABS, INC.