# Which Method Is for You? Not All Surveys Are Made the Same

By Laura O'Laughlin, Harriet Ho and Duy (Joey) Duong

*Law Journal Newsletters: The Intellectual Property Strategist,* September 2020



Laura O'Laughlin



Harriet Ho



Duy (Joey) Duong



As survey evidence has become increasingly common in litigation, it is important to remember that not all surveys are made the same. It's important to be able to identify the right survey methodology for the matter at hand. For this article, as for Part 1 and Part 2 in our series, we draw on our review of a set of over 300 cases involving survey evidence, including over 150 involving *Daubert* challenges spanning different survey methodologies. These rulings provide insight into factors that courts may consider when determining whether to admit surveys and how much weight to afford them. The appropriate use of survey methodologies frequently is a consideration in those determinations.

## Trademark Infringement

*Are You Famous, Among the Famous, or Both?*

In *consumer confusion* matters, consumers may confuse a product from one company with a product from another. Eveready and Squirt are two common survey formats used in U.S. courts to assess potential confusion. Courts generally view trademark strength and marketplace proximity as factors to consider when choosing between Eveready





and Squirt. (**Note:** The surveys discussed in this article typically are referred to by the names of parties or at-issue marks in seminal cases in which the methodologies were introduced or established.)

An Eveready survey presents respondents with the mark or product at issue, and elicits the degree of confusion without a side-by-side product comparison. This makes the Eveready format generally more appropriate for "top-of-mind" marks, e.g., strong brand names. For example, in *Fancaster v. Comcast*, 832 F. Supp. 2d 380, 405 (D.N.J. Dec. 22, 2011), the court found that "it was proper [...] to use an Eveready survey" because "there is ample evidence that [the] FANCAST mark had saturated the marketplace."

A Squirt survey presents respondents with a lineup of products, and courts typically view it as appropriate when the plaintiff's mark is weak and the defendant's mark is in close proximity to the plaintiff's. In *Rex Real Estate I, L.P. v. Rex Real Estate Exchange, Inc.*, 2020 U.S. Dist. LEXIS 24227 (W.D. Tex. Feb. 12, 2020), Rex Real Estate Exchange's argument that the plaintiff Rex Real Estate should have used the Eveready format instead of Squirt was deemed *"at best premature"* because "the strength of the [plaintiff] Real Estate mark is disputed." Similarly, because both parties disputed the marketplace proximity of the Real Estate marks, the court did not justify survey exclusion based on the use of Squirt.

## In Genericness Matters, Should You Stick with Teflon or Warm Up to Thermos?

In *genericness* matters, a trademark can be a victim of its own success and lose its exclusive status if consumers use the name to describe a whole category of products, *i.e.*, the product genus. Conversely, a trademark will not lose its exclusive status if consumers do not use the name to denote the product genus. For instance, in *In re: Network Associates Technology*, Serial No. 76426050 (TTAB Nov. 17, 2004), the at-issue mark was not shown to be generic after the court was unable to conclude that "the [at-issue] term is understood [...] to refer to the genus of the goods." Court rulings suggest that the strength of the mark and the number of associated generic terms are factors to consider when choosing between the two typical genericness survey formats, Teflon and Thermos.

Generally favored by the courts, Teflon surveys use close-ended questions to ask respondents to classify marks as brand name or generic. However, literature suggests that Teflon may not always be preferable for testing lesser-known marks. To overcome this potential issue, a defendant's Teflon survey in *Windsurfing International Inc. v. Fred Ostermann GmbH*, 613 F. Supp. 933 (S.D.N.Y. Oct. 24, 1985), filtered out respondents not knowledgeable about the term "windsurfer." Although the court did not comment specifically on the filter question, it did "find that [the survey] represents an objective and logical procedure."

Thermos surveys typically use open-ended questions to ask respondents to name any trademarks or brands associated with a mark. While Teflon might be inappropriate for weaker marks, Thermos might be inappropriate for stronger marks. In *Nightlight*

2

*Systems v. NiteLites Franchise Systems*, 2007 U.S. Dist LEXIS 95565 (N.D. Ga. Jul. 17, 2007), the court noted that "[t]he drawback of a 'Thermos Survey' is that for a very strong trademark, respondents with brand loyalty may answer with the trademark and not use what they consider to be a generic name." The defendant's expert supported his use of Thermos by showing that the at-issue term had "a low incidence of consumer penetration in the relevant market and, therefore, was not a popular brand name for the product." The court thus found that the survey was of "sufficient relevance and reliability to allow admissibility."

## Timing Is (Almost) Everything

A mark that is not inherently distinctive must have acquired secondary meaning in order to register as a trademark. To assess *secondary meaning*, surveys typically ask if respondents associate a trademark or trade dress with a single company or with more than one company.

Although secondary meaning surveys are less standardized, timing is important. Generally, courts prefer surveys conducted within five years of the relevant date (e.g., date of infringement or date of trademark registration). From the court's perspective, a survey performed at the time of litigation may be less relevant in assessing secondary meaning in the past. For example, in *Converse, Inc. v. ITC Skechers U.S.A., Inc.*, 909 F.3d 1110 (Fed. Cir. Oct. 30, 2018), the appellate court cited an amicus brief that said, "[t]he relevant consumer population for assessing consumer attitudes at a point in the past is a group of consumers at that point in the past. A contemporaneous survey commissioned for litigation obviously cannot access such a pool of respondents." "weight appropriate to the extent that it sheds light on consumer perceptions in the past."

However, if an older and contemporaneous survey is unavailable and a survey needs to be conducted at the time of litigation, then, ideally, marketplace conditions and consumer perceptions would not have substantially changed since the at-issue period. Literature suggests that the survey expert can deploy some techniques to try to capture an accurate representation of these elements in a survey performed at the time of litigation. For instance, if respondents have sufficient real-life experience with the matter at hand (which can be determined through the use of filter questions), the survey expert may attempt to create realistic hypothetical scenarios. Other techniques include establishing landmark events to assist a respondent's memory, or relying on non-survey evidence to establish the similarity of the business, the market, and the consumer between the past and the present.

3

**Patent Infringement and False Advertising**

*Does It Pay to Use Conjoint Analysis, or Should You Use Experimental Design?*

Courts have considered both conjoint analysis and experimental design to be viable options when measuring the effect of attribute(s) on *consumer choices*. In determining damages, their consideration between conjoint analysis and experimental design usually depends on the variable of interest and the number of features at issue. Whereas conjoint analysis typically asks respondents to jointly consider *multiple* attributes to value the at-issue feature(s), experimental design utilizes a test/control environment to measure the *directionality* of consumer preference for a single attribute.

Conjoint analysis uses survey data to value tradeoffs that consumers make among the *salient features* of a product. In *Charlene Dzielak, et al. v. Whirlpool Corporation, et al.*, 2017 U.S. Dist. LEXIS 39232 (D.N.J. Mar. 17, 2017), defendants disputed the plaintiffs' use of a modified conjoint analysis. However, the court found that "[it] is simply a variant or an elaboration of the widely accepted conjoint analysis methodology," and conjoint analysis is a "valid method of estimating changes in *market value* for purposes of performing damages."

Experimental design serves as a powerful tool to determine the causal impact of a feature on a consumer's preferences, such as likelihood of purchase. In *Famular v. Whirlpool Corp.*, 2019 U.S. Dist. LEXIS 44907 (S.D.N.Y. Mar. 18, 2019), the court remarks that the plaintiff's experiment showed that it was possible to "isolate the alleged damage that stemmed *directly* from Defendants' alleged misrepresentation." In particular, the court remarked that the plaintiff measured the respondents' preference for a labeled product over an unlabeled but similar product using sound and accepted methodologies. This allowed the plaintiff to show that "defendant's alleged misrepresentations caused the proposed class members to pay a price premium that they otherwise would not have paid […] in the absence of the misrepresentation."

As shown in the examples above, courts recommend different types of surveys with their own unique considerations for different types of matters. Although we have extracted some general guidelines from our review of court opinions, whether your survey should be admitted and how much weight it should be afforded will ultimately depend on the evaluation by the court.

*[Laura O'Laughlin](#) is a vice president in the Montreal office of Analysis Group; she has extensive experience in the development, administration, and analysis of surveys in antitrust, consumer protection, false advertising, and intellectual property matters. Ms. O'Laughlin can be reached at [laura.olaughlin@analysisgroup.com](mailto:laura.olaughlin@analysisgroup.com)*. Harriet Ho is a senior research professional in the Montreal office of Analysis Group; she can be reached at [Harriet.Ho@analysisgroup.com](mailto:Harriet.Ho@analysisgroup.com). Duy (Joey) Duong is a senior analyst in the Washington, DC office of Analysis Group; he can be reached at [Duy.Duong@analysisgroup.com](mailto:Duy.Duong@analysisgroup.com).

The views expressed in the article are those of the authors and not necessarily the views of their clients or other attorneys in their firm.

Copyright 2020. ALM Media Properties, LLC. All rights reserved.