*Highly Confidential*
*ATTORNEYS' EYES ONLY*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

YUGA LABS, INC.,               §
                               §
        Plaintiff and          §
Counterclaim Defendant,        §
                               §
        v.                     §   Case No.  2:22-cv-4355-JFW-JEM
                               §
RYDER RIPPS and JEREMY CAHEN,  §
                               §
                               §
        Defendants and         §
Counterclaim Plaintiffs.       §
_____§

# EXPERT REPORT OF LAUREN R. KINDLER

## February 6, 2023



U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA
Case No. **2:22-cv-04355-JFW-JEM**
**Yuga Labs, Inc.**
**vs.**
**Ryder Ripps, Jeremy Cahen**
JOINT EXHIBIT _____ **JTX-0723**
DATE _____ **IDEN.**
DATE _____ **EVID.**
BY _____
**Deputy Clerk**

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

## Table of Contents

I.    INTRODUCTION AND ASSIGNMENT ............................................................. 1

II.   QUALIFICATIONS AND EXPERIENCE ....................................................... 1

III.  INFORMATION REVIEWED AND CONSIDERED ...................................... 2

IV.  SUMMARY OF OPINIONS ............................................................................. 3

V.   BACKGROUND ................................................................................................. 5

    A.   Relevant Parties ......................................................................................... 5

        1.  Yuga Labs, Inc. ................................................................................5

        2.  Defendants .........................................................................................6

        3.  Thomas Lehman and Ryan Hickman ...............................................7

    B.   Blockchain and NFTs ............................................................................... 8

        1.  Blockchain Technology ....................................................................8

        2.  Smart Contracts and NFTs................................................................9

        3.  NFT Marketplaces ..........................................................................11

    C.   Yuga Labs' BAYC Brand and NFT Collections ..................................... 13

    D.   Defendants' Wrongful Conduct............................................................... 18

        1.  Trademark Infringement .................................................................18

        2.  False Advertising ............................................................................20

VI.  EVIDENCE OF CONSUMER CONFUSION RESULTING FROM THE
WRONGFUL CONDUCT ............................................................................. 21

    A.   Evidence of Confusion Among RR/BAYC NFT Consumers .................................... 22

    B.   Evidence that Defendants Exacerbated and Sought to Profit from Consumer
Confusion............................................................................................... 24

    C.   Academic Research Suggests that it is Difficult for Consumers to Determine
Provenance for NFTs.............................................................................. 27

VII. REMEDIES AVAILABLE TO YUGA LABS ................................................. 29

VIII. EVALUATION OF YUGA LABS' DAMAGES DUE TO DEFENDANTS'
WRONGFUL CONDUCT ............................................................................. 30

    A.   Disgorgement of Defendants' Profits Associated with the Wrongful Conduct ........ 30

        1.  Profits from Initial Sales of RR/BAYC NFTs ...............................31

        2.  Profits from Resales of RR/BAYC NFTs.......................................35

        3.  Value of RR/BAYC NFTs Held or Not Minted by Defendants ............................36

**JTX-0723.00002**

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

|   |   |   |   |
|---|---|---|---|
| 4. | Total Disgorgement for Defendants' Wrongful Conduct | ...................................... | 38 |
| 5. | Disgorgement as a Proxy for Yuga Labs' Lost Profits | ............................................ | 39 |
| B. | Yuga Labs' Corrective Advertising Expenses Attributable to Defendants' Wrongful Conduct | ....................... | 40 |
| 1. | Yuga Labs' Corrective Advertising Expenses | ...................................................... | 40 |
| 2. | Yuga Labs' Cost to Acquire RR/BAYC NFTs at Current Market Prices | ............................... | 42 |
| 3. | Defendants' Advertising Expenses as a Proxy for Yuga Labs' Corrective Advertising Expense | ........................ | 44 |
| C. | Defendants' Avoided Costs from the Wrongful Conduct | ........................................ | 45 |
| D. | Additional Unquantified Harm to Yuga Labs from the Wrongful Conduct | ............... | 45 |
| IX. | DAMAGES SUMMARY | ............................................................................................ | 47 |

ii

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

# I.     INTRODUCTION AND ASSIGNMENT

1.     I have been retained as an economics and damages expert for Yuga Labs, Inc. ("Yuga Labs") in the matter of *Yuga Labs, Inc. vs. Ryder Ripps and Jeremy Cahen.*  Yuga Labs contends that Ryder Ripps and Jeremy Cahen (collectively, "Defendants") have (a) misappropriated Yuga Labs' trademarks relating to its well-known Bored Ape Yacht Club ("BAYC") brand, misleading and confusing consumers, and (b) made false and misleading claims that their "RR/BAYC"[1] non-fungible token ("NFTs") are equivalent to the authentic BAYC NFTs.[2]  Yuga Labs is seeking monetary damages and injunctive relief as a consequence of Defendants' wrongful conduct.[3]  I have been asked to evaluate Yuga Labs' monetary damages and/or remedies associated with Defendants' wrongful conduct.

# II.    QUALIFICATIONS AND EXPERIENCE

2.     I am a Managing Principal at Analysis Group, Inc. ("AG").  AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models.  AG consists of over 1,000 professionals who specialize in, among other things, the fields of economics, accounting, statistics, finance, and strategy consulting.

3.     My primary responsibility at AG is to provide financial, economic, and damage quantification consulting services to clients.  For more than 18 years, I have provided financial and economic consulting services in various matters including intellectual property disputes, false

---

[1]     Sometimes also referred to by Defendants as just "Bored Ape Yacht Club" NFTs or "Bored Ape Yacht Club V3" NFTs. YUGALABS_00030081-082; YUGALABS_00030104; YUGALABS_00000541.

[2]     Complaint for False Designation of Origin, False Advertising, Cybersquatting, Trademark Infringement, Unfair Competition, Unjust Enrichment, Conversion, and Tortious Interference, *Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen and Does 1-10,* Case No. 2:22-cv-04355, dated June 24, 2022 ("Complaint"), pp. 29-30, 32-33.

[3]     Complaint, ¶ 6.

JTX-0723.00004

advertising allegations, securities litigation, antitrust matters, breach of contract matters, and general damages assessments. With regard to patent infringement matters, I have analyzed lost sales, lost profits, and reasonable royalty damages. With respect to false advertising and trademark infringement matters, I have analyzed lost profits damages, corrective advertising-related damages, and unjust enrichment. I have consulted with numerous public and private companies across a variety of industries including software, medical devices, consumer products, electronics, biotechnology, and oil & gas, among others. My work has also included the development of complex damage models, analysis of statistical data, and analysis of stock price movements.

4. I received my B.A. in Economics from Tulane University and my M.A. in Economics from Southern Methodist University. Attached as **Appendix A** is a true and correct copy of my current resume and testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas 75219.

5. AG is being compensated based on hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $900 per hour for my time and $375 per hour to $900 per hour for time spent by AG staff assisting me in this matter.

## III.   INFORMATION REVIEWED AND CONSIDERED

6. The information and data available to me in forming my opinions are listed in **Appendix B**. This information generally includes legal documents (*e.g.*, the Complaint and interrogatory responses), deposition testimony, data and documents produced by the parties, other expert reports, and data and information independently obtained.

7. My analyses and opinions are based on the information available to date and are contained throughout the narrative to this report and the associated exhibits. I understand that fact

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

discovery is ongoing.  I therefore reserve the ability to update and supplement the analyses and opinions in this report as discovery continues.  I also reserve the ability to use demonstrative exhibits and/or other information at trial to illustrate my opinions.

## IV.   SUMMARY OF OPINIONS

8.   In forming my opinions, I have assumed that Defendants have infringed Yuga Labs' trademarks and made false and misleading advertising claims.  I have also assumed that this wrongful conduct is likely to cause confusion in the marketplace,[4] such that damages are an appropriate remedy.

9.   Based on my economics training and expertise and the materials I have reviewed and considered, I have formed the following opinions.

a.   Defendants' profits associated with the wrongful conduct.[5]  As of February 1, 2023, the wrongful conduct is associated with $1,589,455 in profits for the Defendants.  These profits were generated by 1) Defendants' sales of the RR/BAYC NFTs that they minted and began to sell in May 2022, 2) creator fees that Defendants collected from resales of RR/BAYC NFTs on secondary markets, and 3) the value of RR/BAYC NFTs that Defendants hold or did not mint.  Profits continue to accrue to Defendants, as resales on secondary markets are ongoing.[6]  (**Section VIII.A**)

b.   Yuga Labs' lost profits.  I understand that Defendants' profits generated by the wrongful conduct can be used as a proxy for Yuga Labs' lost profits.  However, Defendants' profits of $1,589,455 likely underestimates Yuga Labs' lost profits.  Had Yuga Labs, as opposed to Defendants, minted additional NFTs with its marks, it likely would have earned more profits than Defendants earned from the RR/BAYC NFT collection.  (**Section VIII.A.5**)

---

[4]   My opinions and calculations assume that Yuga Labs' allegations are true as set forth in the Complaint.  I understand that the truth of these allegations is supported by other testimony, publicly available evidence, and documents produced in this matter.  I discuss some of the evidence in **Section V.D** of this report.

[5] I understand that, for trademark damages, the plaintiff has the burden to prove the defendants' gross revenues and that it is defendants' burden to prove any deductions for expenses and/or the portion of its profits attributable to factors other than use of the infringed trademark.  While I understand that Yuga Labs does not have the burden to prove profits or any other deductions from revenues, I calculated Defendants' profits associated with the wrongful conduct, based on available information.

[6]   As noted above, I intend to supplement my opinions should additional data and information relevant to the evaluation of Yuga Labs' damages be provided to me.

3

    c.   <u>Yuga Labs' corrective advertising expenses</u>.  In this matter, there are multiple ways to quantify Yuga Labs' corrective advertising expenses associated with the wrongful conduct.

        i.   First, testimony from Yuga Labs' former CEO and invoices to Yuga Labs indicate that Yuga Labs spent between $285,977 and $535,977 on corrective advertising activities to mitigate the wrongful conduct.  These expenses include costs associated with 1) pursuing "takedowns" of the infringing RR/BAYC NFT collection and 2) an advertising campaign in New York City that was launched to combat the Defendants' wrongful conduct.  I understand that this range of corrective advertising expenditures likely would understate Yuga Labs' total corrective advertising-related damages.  (**Section VIII.B.1**)

        ii.   Second, Yuga Labs could, as an effort to mitigate further harm, purchase and destroy all RR/BAYC NFTs.  I estimate that Yuga Labs' cost to do so would be $1,792,704.  This estimate is very likely understated, as some RR/BAYC NFT owners (including the Defendants themselves) may be "holdouts" in this hypothetical buyback effort and drive up costs to Yuga Labs by charging above-market prices.  (**Section VIII.B.2**)

        iii.   Third, I understand that Defendants' advertising costs can be used as a proxy for Yuga Labs' corrective advertising costs.  Blockchain transaction data and deposition testimony indicate that Defendants' costs associated with the accused RR/BAYC NFTs total $434,233, most of which constitute payments to their collaborators, whom I understand were involved in promoting the accused RR/BAYC NFTs.  To the extent these are advertising costs, they may serve as a proxy for Yuga Labs' corrective advertising costs.  (**Section VIII.B.3**)

These three measures quantify expenses that Yuga Labs would not incur absent Defendants' wrongful conduct.

10.    In addition to the measures of harm quantified above, Defendants' wrongful conduct caused (and continues to cause) additional types of unjust enrichment to Defendants and harm to Yuga Labs that are significant, yet more difficult to quantify.  As discussed in **Section VIII.C**, Defendants were unjustly enriched in the form of avoided costs, as they were able to "free ride" on investments that Yuga Labs made to develop the marks that the Defendants infringed.  As discussed in **Section VIII.D**, Yuga Labs suffered additional types of harm.  First, the confusion created by the wrongful conduct caused damage to Yuga Labs' business.  Evidence of this may

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

manifest in multiple ways, including decreased interest in and sales of authentic BAYC NFTs and BAYC branded merchandise, resulting in loss of creator fees and other revenues for Yuga Labs. Second, testimony from Yuga Labs' former CEO indicates that the wrongful conduct likely resulted in Yuga Labs' loss of at least one valuable partnership opportunity with another firm. Third, the wrongful conduct likely harmed Yuga Labs' goodwill. Therefore, Yuga Labs has suffered (and continues to suffer) harm as a result of Defendants' wrongful conduct, beyond the damages amounts I have calculated in this report.

## V.   BACKGROUND

11.     This section provides background information on 1) the parties to this lawsuit, 2) the technology and marketplaces associated with the at-issue NFTs, 3) the at-issue NFTs, and 4) evidence describing Defendants' alleged wrongful conduct.

### A.   Relevant Parties

#### 1.   Yuga Labs, Inc.

12.     Yuga Labs is a blockchain technology corporation that develops, markets, and sells NFTs, which are a form of digital collectibles, and other content, entertainment, and consumer products based on its brands.[7]   The company was founded in early 2021, with the creation of its flagship NFT collection, Bored Ape Yacht Club.[8]   Since then, Yuga Labs has introduced or

---

[7]     Complaint, ¶ 8; YUGALABS_00030223-230; Crunchbase, "Yuga Labs – About," (https://www.crunchbase.com/organization/yuga-labs, viewed on January 19, 2023); CryptoSlate, "Yuga Labs," (https://cryptoslate.com/companies/yuga-labs/, viewed on January 19, 2023); Yuga Labs, Inc.'s Second Supplemental Response to Ryder Ripps' and Jeremy Cahen's First Set of Interrogatories, January 31, 2023 ("Second Responses to Interrogatories"), Interrogatory No. 1.

[8]     YUGALABS_00030223-230 at 224.

JTX-0723.00008

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

acquired other NFT collections, organized community events, and launched or announced the launch of other products.[9, 10]

### 2.   Defendants

13.   Ryder Ripps is self-employed and describes himself as a conceptual artist and designer.[11]  Mr. Ripps is the primary force behind the RR/BAYC NFTs, which Yuga Labs alleges infringe its trademarks.[12]  Mr. Ripps is also known for copying (and then selling) NFTs created by others.[13]  Mr. Ripps is one of two officers of LIVE9000 LLC, a company created "for tax [and] legal reasons" that Mr. Ripps uses for his "art projects in terms of crypto."[14, 15]  On May 13, 2022,

---

[9]   YUGALABS_00030223-230.

[10]   30(b)(6) Rough Deposition of Yuga Labs (Nicole Muniz), January 4, 2023 ("30(b)(6) Muniz Deposition"), 9:22-10:11 ("*We do games, scripted story telling. We have NFT collections. We have merchandising. We do events in -- as well. […] One of Yuga's categories of products is NFT collections; right? A. Yes.*")

[11]   Ryder Ripps website (https://ryder-ripps.com/, viewed on January 19, 2023); Twitter (@ryder_ripps) (https://twitter.com/ryder_ripps, viewed on January 19, 2023); Deposition of Ryder Ripps, Volume I, January 12, 2023 ("Ripps Deposition"), 18:13-14 ("*Q.  Do you have a current employer, sir? A.  I'm self employed.*").

[12]   *See, e.g.*, RIPPSCAHEN00000850-865; *See* Complaint.

[13]   In 2021, Mr. Ripps created and sold an NFT called "CryptoPunk #3100" which contained the same image as another NFT of the same name, originally created by Larva Labs, which Mr. Ripps described as "a critique of NFT and Larva Labs." CoinDesk, "CryptoPunks Gets Punked," July 6, 2021 (https://www.coindesk.com/markets/2021/07/06/cryptopunks-get-punked/, viewed on January 24, 2023) ("*On June 29, Ripps listed an NFT titled "CryptoPunk #3100" on Foundation, a near-facsimile of an official punk by the same name.*"). *See also* YUGALABS_00000569.

[14]   *See* YUGALABS_00031397.  The other listed officer is Rodney Ripps, Ryder Ripps' father.

[15]   Mr. Ripps testified that his assets, including from the sale of RR/BAYC NFTs, are held in accounts under the LIVE9000 LLC entity.  He further testified that these accounts were on Kraken, a cryptocurrency exchange, and at Chase Bank. Ripps Deposition, 160:24-161:10, 177:17-178:4 ("*the LIVE9000 entity was set up for my Kraken account which is a cryptocurrency exchange […] So, yes, if I made capital with RR/BAYC in the form of ETH, it probably has transferred to the LLC LIVE9000 in terms of the -- whatever, the crypto exchange, whatever you call it, private exchange.*" "*When did you transfer ETH relating to the RR/BAYC NFT to LIVE9000, LLC? A.  I'm not sure. Q. You're not sure when you transferred, and you're not sure how much you transferred? A.  That's correct. I mean, I definitely made transfers. I don't – I can't tell you the amounts or the dates right now. Q.  And what bank does the LLC -- LIVE9000 LLC, operate with? A.  Chase.*").

6

Mr. Ripps began creating the accused RR/BAYC NFTs,[16] and he "oversaw" their "creation and commercialization."[17]

14.     Jeremy Cahen is self-employed and works in the cryptocurrency industry.[18]  Mr. Cahen testified that his sources of income include "friends [that] have sent [him] money," "money from trading digital assets," and "money from real estate that [he] owns."[19]  Mr. Cahen testified that he met Mr. Ripps in early or mid-2021, and that they are "friends."[20]  Mr. Cahen served as the "project manager" in the "creation and commercialization" of RR/BAYC NFTs.[21]

### 3.     Thomas Lehman and Ryan Hickman

15.     Thomas Lehman and Ryan Hickman are web developers who worked with Defendants to create materials that infringed on Yuga Labs' trademarks.[22]  Mr. Lehman and Mr.

---

[16]   RR/BAYC (https://rrbayc.com/, viewed on January 26, 2023).

[17]   Declaration of Thomas Lehman, *Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen*, Case No. 2:22-cv-04355-JFW-JEM, dated February 3, 2023 ("Lehman Declaration"), ¶ 7.

[18]   Deposition of Jeremy Cahen, January 11, 2023 ("Cahen Deposition"), 13:23-17:9 ("*Q   Who is your current employer? A   I'm self-employed I would say.*" […] "*Q   Of what you did in 2022 as a self-employed individual. A   I do a lot of different things. Q   Can you please provide an example? A   Let me try to think.  Does it have to be something that produces income?  I don't understand -- that's sort of -- the reason it's a difficult question to answer is because the nature of what I do is hard to even explain.  It's a – you know, I'm involved with cryptocurrency and cryptocurrency is a new field.  So you know, that's one of the funny things about it is that if someone asks me what do I do, it's quite difficult to explain.  So it's difficult to answer your question.*").

[19]   Cahen Deposition, 23:20-24:8 ("*Q   You just said you have various sources of income.  What are those sources? A   I still don't understand how you would define 'income.'  I think that in order -- and I use the word because I'm responding to you.  But like I stated before, I don't understand what our working definition of 'income' is. And I'm happy to answer the question.  But it would be helpful if we could define what that means.  Q   Money coming to you. A   Sources of money coming to me.  Friends have sent me money.  I've made money from trading digital assets.  I've made money from real estate that I own.  Those are things that come to mind.*").

[20]   Cahen Deposition, 67:17, 68:2, 70:3-7, 128:20, 261:25-262:1, 269:24-270:10, 291:18-19, 304:24-305:2 (For example, at 70:3-7: "*Q   Outside of communications with your attorneys, have you ever e-mailed with Mr. Ripps? A No.  We are friends.*" And at 269:24-270:10: "*Q   […] When did you first meet Mr. Ripps? […] A […] I think it would probably be in like the first quarter of 2021 is -- if Im guessing.  I have a terrible concept of time, but I think it was early 2021.  Maybe mid 2021. And I'm just guessing here.*").

[21]   Lehman Declaration, ¶ 7.

[22]   I understand Yuga Labs sued each of them for their role in the wrongful conduct.  *See* Complaint for False Designation of Origin and Cybersquatting, *Yuga Labs, Inc., v. Thomas Lehman*, dated January 20, 2023 and Complaint for False Designation of Origin and Cybersquatting, *Yuga Labs, Inc., v. Ryan Hickman*, Case No. 2:23-cv-00111-JCM-NJK, dated January 20, 2023, respectively.  Although I understand that Mr. Lehman and Mr. Hickman were

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Hickman also assisted in the creation of marketing content that Yuga Labs alleges constitutes false advertising.[23] The Defendants shared the profits generated by the wrongful conduct with Mr. Lehman and Mr. Hickman.[24]

### B.    Blockchain and NFTs

#### 1.    Blockchain Technology

16.    A blockchain is a cryptographic ledger that records digital transactions.  Each additional transaction that occurs is recorded as a "block" of data on the blockchain.[25]  Each "block" confirms the precise time and sequence of its associated transaction and is connected to the "blocks" that come before and after it – thereby forming a "chain […] of blocks."[26]

17.    In contrast to a regular database stored on a server or a personal device, a blockchain ledger is duplicated on many computers in the network.[27]  Computers in the network must "agree" on the content of the digital ledger, such that if any network participant decides to modify, delete, or add records, other participants in the network have an opportunity to reject these changes.

---

participants in the wrongful conduct, as alleged in those complaints and shown in the evidence adduced in this case, I only calculate in my report the remedies that Yuga Labs is entitled to receive from Mr. Ripps and Mr. Cahen in this lawsuit as a result of their actions.  I also understand that Yuga Labs and Mr. Lehman settled their case on February 3, 2023.

23    Lehman Declaration, ¶ 7.

24    Lehman Deposition, ¶¶ 33-34; Deposition of Ryan Hickman, December 7, 2022 ("Hickman Deposition"), 126:12-24 ("*Q. He goes on. 'So we are all equally incentivized 15 percent of mint plus 15 percent of Ryder's share of royalties.' Do you see that? A. Yes. Q. Was that the ultimate financial terms that the four of you came together around for your work on the RSVP contract? A. It is the right financial arrangement. I'm not certain of -- not really aware of understanding it as, like, a business partnership. But definitely being compensated 15 percent of the proceeds and -- so yes.*").

25    IBM, "What is Blockchain Technology?" (https://www.ibm.com/topics/what-is-blockchain, viewed on January 19, 2023).

26    IBM, "What is Blockchain Technology?" (https://www.ibm.com/topics/what-is-blockchain, viewed on January 19, 2023); Bitstamp, "What are the blocks in blockchain?," August 17, 2022 (https://www.bitstamp.net/learn/crypto-101/what-are-blocks-in-the-blockchain/, viewed on January 19, 2023).

27    Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023).

JTX-0723.00011

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Because blockchain records are thus dependent on consensus mechanisms, they are considered to be decentralized and immutable.[28]

18.    Ethereum is a blockchain network that was launched in 2015.[29] Ethereum is a public blockchain, meaning that all network participants have access to its ledger and its record of transactions.[30] Ethereum is used "for building apps and organizations, holding assets, [and] transacting and communicating without being controlled by a central authority."[31] Ethereum has a native cryptocurrency, called Ether (or "ETH"), which "is used to pay for certain activities on the Ethereum network."[32] Parties transacting on the Ethereum blockchain are charged transaction fees called "gas."[33]

19.    Ethereum is more flexible than many other blockchain technologies, as it allows users to "build and deploy decentralized applications on its network."[34] Ethereum provides this functionality through smart contracts.

### 2.    Smart Contracts and NFTs

20.    A smart contract is a computer program stored on a blockchain that executes a set of predetermined rules when certain conditions are met.[35] For instance, a smart contract can verify

---

[28]    IBM, "What is Blockchain Technology?" (https://www.ibm.com/topics/what-is-blockchain, viewed on January 19, 2023).

[29]    Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023).

[30]    IBM, "What is Blockchain Technology?" (https://www.ibm.com/topics/what-is-blockchain, viewed on January 19, 2023).

[31]    Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023).

[32]    Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023).

[33]    Gas are transaction fees collected on the Ethereum blockchain. *See* Ethereum, "Gas and Fees," February 2, 2023 (https://ethereum.org/en/developers/docs/gas/, viewed on February 3, 2023).

[34]    Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023).

[35]    Ethereum, "Introduction to Smart Contracts," (https://ethereum.org/en/smart-contracts/, viewed on January 22, 2023); Nick Szabo, "Smart Contracts," 1994 (https://www fon hum.uva.nl/rob/Courses/ InformationInSpeech/CDROM/Literature/LOTwinterschool2006/szabo.best.vwh.net/smart.contracts html, viewed on January 22, 2023).

JTX-0723.00012

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

whether the conditions of an agreement (such as payment terms) have been met, and then self-execute pre-defined actions (*e.g.*, transfer an asset) based on this verification.[36]  When a smart contract executes, an additional and immutable record is appended to the blockchain.  The transactions executed by smart contracts are permanently stored in the Ethereum network and can be publicly viewed.[37]

21.     NFTs are an application of smart contracts.[38]  NFTs are recorded on the blockchain and can identify ownership or other rights to unique items, such as digital art or real estate in a metaverse.[39, 40]     Unlike a fungible token such as cryptocurrency where each token is interchangeable, each NFT has a unique identification, like a serial number, which distinguishes it from all others.[41]  For example, while each ETH is interchangeable with any other ETH, NFTs

---

[36]   Ethereum, "Introduction to Smart Contracts" (https://ethereum.org/en/smart-contracts/, viewed on January 22, 2023); Nick Szabo, "Smart Contracts," 1994 (https://www fon hum.uva.nl/rob/Courses/InformationInSpeech/CDROM/Literature/LOTwinterschool2006/szabo.best.vwh net/smart.contracts.html, viewed on January 22, 2023); IBM, "What are smart contracts on blockchain?" (https://www.ibm.com/topics/smart-contracts, viewed on January 22, 2023); Investopedia, "What Are Smart Contracts on the Blockchain and How They Work," March 24, 2022 (https://www.investopedia.com/terms/s/smart-contracts.asp, viewed on January 22, 2023).

[37]   IBM, "What are smart contracts on blockchain?" (https://www.ibm.com/topics/smart-contracts, viewed on January 22, 2023).

[38]   Ethereum, "Introduction to Smart Contracts" (https://ethereum.org/en/smart-contracts/, viewed on January 22, 2023).

[39]   Ethereum, "Non-fungible tokens (NFT)," (https://ethereum.org/en/nft/#:~:text=A%20way%20to%20represent%20anything,contracts%20on%20the%20Ethereum%20blockchain, viewed on January 22, 2023); Investopedia, "Non-Fungible Token (NFT): What It Means and How It Works," June 22, 2022 (https://www.investopedia.com/non-fungible-tokens-nft-5115211, viewed on January 22, 2023).

[40]   A metaverse is a "digital space that uses virtual reality, augmented reality, and other advanced internet and semiconductor technology to allow people to have lifelike personal and business experiences online."  A metaverse is not owned by a single vendor, but rather is an independent virtual economy.  It is enabled by blockchain-based technologies such as cryptocurrency and NFTs.  *See* McKinsey & Company, "What is the metaverse?" August 17, 2022 (https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-the-metaverse, viewed on January 31, 2023); Gartner, "What Is a Metaverse? And Should You Be Buying In?" October 21, 2022 (https://www.gartner.com/en/articles/what-is-a-metaverse, viewed on January 31, 2023).

[41]   Ethereum, "Non-fungible tokens (NFT)," (https://ethereum.org/en/nft/#:~:text=A%20way%20to%20represent%20anything,contracts%20on%20the%20Ethereum%20blockchain, viewed on January 22, 2023); Investopedia, "Non-Fungible Token (NFT): What It Means and How It Works," June 22, 2022 (https://www.investopedia.com/non-fungible-tokens-nft-5115211, viewed on January 22, 2023).

JTX-0723.00013

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

cannot be exchanged at equivalency.[42]  NFTs are added to the blockchain through a process called

minting.[43]  NFTs are minted and subsequently traded through an underlying smart contract.  The

smart contract associated with an NFT governs the assignment of that NFT's ownership and even

its destruction (or "burning").[44]

### 3.     NFT Marketplaces

22.     NFT marketplaces are platforms on which NFTs can be stored, displayed, traded,

and in some cases, minted.[45]  OpenSea is one of the largest NFT marketplaces, and supports NFTs

from multiple blockchains, including Ethereum.[46]  As of January 2022, OpenSea had over 1.26

million active users, 2 million collections, and over 80 million NFTs.[47]  Other prominent NFT

marketplaces include Rarible, LooksRare, and Foundation.[48]  These marketplaces provide a

---

[42]   Ethereum, "Non-fungible tokens (NFT)," (https://ethereum.org/en/nft/#:~:text=A%20way%20to%20
represent%20anything,contracts%20on%20the%20Ethereum%20blockchain, viewed on January 22, 2023);
Investopedia, "Non-Fungible Token (NFT): What It Means and How It Works," June 22, 2022
(https://www.investopedia.com/non-fungible-tokens-nft-5115211, viewed on January 22, 2023).

[43]   OpenSea, "What is Minting?" December 15, 2022 (https://opensea.io/learn/what-is-minting-nft, viewed on
January 22, 2023); SoFi Learn, "What Does Minting an NFT Mean?" September 9, 2022
(https://www.sofi.com/learn/content/what-is-nft-minting/#:~:text=Minting%20an%
20NFT%2C%20or%20non,bought%2C%20sold%2C%20and%20traded, viewed on January 22, 2023).

[44]   Ethereum,    "Non-fungible    tokens    (NFT)"    (https://ethereum.org/en/nft/#:~:text=A%20way
%20to%20represent%20anything,contracts%20on%20the%20Ethereum%20blockchain,  viewed  on  January  22,
2023); Investopedia, "Non-Fungible Token (NFT): What It Means and How It Works," June 22, 2022
(https://www.investopedia.com/non-fungible-tokens-nft-5115211, viewed on January 22, 2023).

[45]   CoinDesk,  "NFT  Marketplaces:  A  Beginner's  Guide,"  (https://www.coindesk.com/tech/2021/07/12/nft-
marketplaces-a-beginners-guide/, viewed on January 22, 2023).

[46]   OpenSea, "Who is OpenSea?" (https://opensea.io/learn/who-is-opensea#toc-0, viewed on January 22, 2023);
Investopedia, "What is OpenSea?" (https://www.investopedia.com/what-is-opensea-6362477, viewed on January 22,
2023); OpenSea, "Which blockchains are compatible with OpenSea?" (https://support.opensea.io/hc/en-
us/articles/4404027708051-Which-blockchains-are-compatible-with-OpenSea-, viewed on January 22, 2023).

[47]   Blockworks, "OpenSea Polygon NFT Sales On Track to Hit 2.2M by End of January," January 6, 2022
(https://blockworks.co/news/opensea-polygon-nft-sales-on-track-to-hit-2-2m-by-end-of-january, viewed on February
3, 2023).

[48]   NFT  Now,  "A  Complete  and  Simple  Guide  to  the  Top  10  NFT  Marketplaces,"  June  9,  2022,
(https://nftnow.com/guides/a-complete-and-simple-guide-to-the-top-10-nft-marketplaces/, viewed on February 3,
2023) (*See* list items OpenSea, LooksRare, Rarible, and Foundation, among others).

JTX-0723.00014

secondary market for NFTs, serving a similar function as eBay or consignment stores do for physical goods.[49]

23.    It is common for creators of NFTs to collect creator fees from resales of their NFTs on NFT marketplaces.[50]  Creator fees are collected by NFT creators each time one of their NFTs moves from a seller wallet to a buyer wallet on an NFT marketplace.[51]

24.    In 2022, the NFT market experienced a downturn.  The number of active NFT wallet addresses declined throughout the year and the volume of transactions on OpenSea hit record lows.[52]  In fact, according to Bloomberg, NFT trading volumes aggregated across multiple large NFT marketplaces (such as OpenSea, LooksRare, Foundation, and Rarible, among others) declined by 97 percent from record highs at the beginning of 2022.[53]  Despite these downturns, NFTs in Yuga Labs' flagship collection, the Bored Ape Yacht Club,[54] continued to demand top prices.  A 2023 article reported that while the broader category of "[b]lue [c]hip NFTs fell in value"

---

[49]    CoinDesk, "NFT Marketplaces: A Beginner's Guide," (https://www.coindesk.com/tech/2021/07/12/nft-marketplaces-a-beginners-guide/, viewed on January 22, 2023).

[50]    *See, e.g.,* Seeking Alpha, "What Are NFT Royalties & How Do They Work?" May 27, 2022 (https://seekingalpha.com/article/4483346-nft-royalties, viewed on January 31, 2023) ("*The average NFT royalty typically ranges from 5-10%.*").  Additionally, Yuga Labs' former CEO testified that Yuga Labs charges creator fees, and that this is common practice in the industry. 30(b)(6) Muniz Deposition, 57:6-13, 58:9-11 ("*So the creators fees are applied right now by, like, the marketplaces. So if it's sold on OpenSea and others such as OpenSea, we will get a creators fee. And the creators fee is pretty prominently displayed. So if you go to Bored Ape Yacht Club's page on OpenSea you'll actually see, like, pretty clearly that that's creators fee and the same goes for others.*" "*A.  We have a creators fee.  We created them. We created the work.  It's how this entire industry works right now.*").

[51]    OpenSea, for example, allows NFT creators to charge a creator fee of up to 10 percent of the sales price.  *See* OpenSea, "How do creator earnings work on OpenSea?" (https://support.opensea.io/hc/en-us/articles/1500009575482-How-do-creator-earnings-work-on-OpenSea-, viewed on January 26, 2023).

[52]    *See, e.g.,* Yahoo Finance, "2022, the year NFTs fell to earth," December 28, 2022 (https://news.yahoo.com/nft-crypto-2022-bitcoin-ethereum-060050452.html, viewed on January 27, 2023); Being Crypto, "OpenSea Volume Hits Lowest Since June 2021 With $303M in October," October 31, 2022 (https://beincrypto.com/opensea-volume-hits-lowest-since-june-2021-with-303m-in-october/, viewed on January 27, 2023).

[53]    Bloomberg, "NFT Trading Volumes Collapse 97% From January Peak," September 28, 2022 (https://www.bloomberg.com/news/articles/2022-09-28/nft-volumes-tumble-97-from-2022-highs-as-frenzy-fades-chart?leadSource=uverify%20wall, viewed on January 27, 2023).

[54]    *See* **Section V.C** for further background on Bored Ape Yacht Club NFTs.

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

during 2022, the Bored Ape Yacht Club NFTs remained at the very top of the charts and thus "proved its mettle."[55]  In another article, it was reported that "[d]espite the bear market, BAYC maintained the highest floor price among NFT projects for nearly the whole year."[56,57]  I discuss the popularity and success of Yuga Labs' BAYC brand and BAYC branded NFTs further in **Section V.C**.

### C.    Yuga Labs' BAYC Brand and NFT Collections

25.    In early 2021, Yuga Labs was formed, in part, because the founders wanted to launch a NFT collection.[58]  Yuga Labs launched with its flagship collection, the Bored Ape Yacht Club NFTs.[59]  The BAYC NFT collection, minted in April 2021, consists of unique collectible images (each an NFT) on the Ethereum blockchain.[60]

26.    Each of the 10,000 BAYC NFTs was minted at a price of 0.08 ETH, or approximately $200 at the time.[61]  The NFTs in the BAYC collection consist of unique

---

[55]    Blue chip NFTs are "*a subcategory of the broader NFT market that is considered to be of high quality and value.*" I note that BAYC is also considered a blue chip NFT.  *See* AMB Crypto, "Blue-Chip NFTs fell in value, but this Ape proved its mettle in the final days of 2022," January 2, 2023 (https://ambcrypto.com/blue-chip-nfts-fell-in-value-but-this-ape-proved-its-mettle-in-the-final-days-of-2022/, viewed on January 27, 2023).

[56]    The Block, "Bored Ape Yacht Club ends 2022 with 69 ETH floor price," December 31, 2022 (https://www.theblock.co/post/198625/bored-ape-yacht-club-ends-2022-with-69-eth-floor-price, viewed on January 27, 2023).

[57]    The "floor price" of a collection is the lowest price for an NFT within a collection at a given time.

[58]    Deposition of Greg Solano, Volume I, January 17, 2023 ("Solano Deposition"), 38:9-23 ("*Q.   When was Yuga Labs founded? […] A.   We filed LLC documents, I believe, in -- early 2021. […] Q.   Why did you form Yuga Labs, LLC in 2021? […] A.   We -- or I wanted to launch an NFT collection, start a business.*").

[59]    YUGALABS_00030223-230 at 224.

[60]    Complaint ¶ 16.

[61]    YUGALABS_00030223-230 at 224 ("*The company's flagship collection, Bored Ape Yacht Club (BAYC), launched in April 2021, with each NFT doubling as a membership to the community.  Inspired by the early crypto adopters who aped in, struck gold, yet always seemed bored – 10,000 Bored Apes were minted for roughly $200 at the time.*"); The New Yorker, "Why Bored Ape Avatars are Taking Over Twitter," July 30, 2021. (https://www.newyorker.com/culture/infinite-scroll/why-bored-ape-avatars-are-taking-over-twitter/, viewed on January 23, 2023) ("*The avatars came from a Web site called Bored Ape Yacht Club, which had officially launched on April 30th, offering ten thousand unique iterations of the cartoon primates for sale as non-fungible tokens (N.F.T.s), each at a price of about two hundred dollars in Ethereum cryptocurrency.*"); Complaint, ¶ 16 ("*In early 2021, Yuga*

13

representations of cartoon apes, inspired by "the early crypto adopters who aped in, struck gold, yet always seemed bored."[62]  Holders of a BAYC NFT also become part of the BAYC community and have access to additional privileges, most notably license rights to the cartoon image associated with each BAYC NFT.[63]

27.    In June 2021, Yuga Labs launched a related collection of approximately 9,602 NFTs[64] called Bored Ape Kennel Club ("BAKC").[65]  All holders of BAYC NFTs were given the opportunity to adopt a unique digital cartoon dog NFT as a companion to their Ape.[66]  The concept

---

*Labs created, and developed the smart contract behind, the Bored Ape Yacht Club (a.k.a. 'BAYC'), which consists of unique collectible works of digital art (each an NFT) when executed on the Ethereum blockchain.  Yuga Labs sold licenses for users to mint these Bored Ape NFTs for approximately 0.08 Ethereum each, which amounts to approximately $169 to $236 USD, based on the price of Ethereum at the time.  Only 10,000 unique Bored Ape NFTs were created as part of this collection.").*

[62]    YUGALABS_00030223-230 at 224 ("*The company's flagship collection, Bored Ape Yacht Club (BAYC), launched in April 2021, with each NFT doubling as a membership to the community.  Inspired by the early crypto adopters who aped in, struck gold, yet always seemed bored – 10,000 Bored Apes were minted for roughly $200 at the time.*"); The New Yorker, "Why Bored Ape Avatars are Taking Over Twitter," July 30, 2021. (https://www.newyorker.com/culture/infinite-scroll/why-bored-ape-avatars-are-taking-over-twitter, viewed on January 23, 2023) ("*The avatars came from a Web site called Bored Ape Yacht Club, which had officially launched on April 30th, offering ten thousand unique iterations of the cartoon primates for sale as non-fungible tokens (N.F.T.s), each at a price of about two hundred dollars in Ethereum cryptocurrency.*").

[63]    YUGALABS_00030223-230 at 224 ("*The company's flagship collection, Bored Ape Yacht Club (BAYC), launched in April 2021, with each NFT doubling as a membership to the community.*"); 30(b)(6) Muniz Deposition 118:8-11 ("*Q. And then that's heading under terms and conditions that says ownership. Do you see that; right? A. Yes*"); IP & Media Law Updates, "Reflections on BAYC's revolutionary NFT license," January 31, 2023. (https://ipandmedialaw.fkks.com/post/102i6pp/reflections-on-baycs-revolutionary-nft-license, viewed on February 3, 2023).

[64]    Kraken, "What is Bored Ape Kennel Club?" (https://www.kraken.com/learn/what-is-bored-ape-kennel-club-nft/, viewed on February 2, 2023) ("*Bored Ape Kennel Club is a collection of 9,602 cartoon dog NFTs, each a part of Yuga Labs' broader Bored Ape Yacht Club universe.*"); *See also* Rarity, "Bored Ape Kennel Club Ranked by Rarity," (https://rarity.tools/bored-ape-kennel-club/, viewed on February 2, 2023) ("*#9602*" is final BAKC NFT number indicated).

[65]    YUGALABS_00030223-230 at 225 ("*6/18 - Bored Ape Kennel Club (BAKC), companion dog NFTs, available for free for BAYC holders.*"); The Block, "How Bored Apes became the foundation for a metaverse," June 22, 2022, (https://www.theblock.co/post/153349/how-bored-apes-became-the-foundation-for-a-metaverse/, viewed on February 2, 2023) ("*In June 2021, Yuga created the Bored Ape Kennel Club (BAKC).  This was a new derivative collection, consisting of a further 10,000 NFTs airdropped to BAYC holders' wallets.  These are unique digital dogs 'bred' as companions to Apes.*").

[66]    YUGALABS_00030223-230 at 225 ("*6/18 – Bored Ape Kennel Club (back), companion dog NFTs, available for free for BAYC holders.*"); Kraken, "What is Bored Ape Kennel Club?" (https://www.kraken.com/learn/what-is-bored-ape-kennel-club-nft/, viewed on February 2, 2023) ("*Bored Ape Kennel Club is a collection of 9,602 cartoon dog NFTs, each a part of Yuga Labs' broader Bored Ape Yacht Club universe.*"); The Block, "How Bored Apes became

---

JTX-0723.00017

behind this collection was described as novel in June 2021 and has since become "a common part of the NFT landscape."[67]

28.     In August 2021, Yuga Labs released a set of 20,000 NFTs called the Mutant Ape Yacht Club ("MAYC").[68] Ten thousand of these NFTs were auctioned to the public. Additionally, current BAYC NFT holders were given 10,000 digital "'vial[s]' of airdropped 'Mutant Serum'" with which they were able to create new mutant Apes (totaling another 10,000 mutant Apes) by breeding them with existing BAYC Apes.[69]

29.     Following the launch of the first collection, the BAYC brand gained massive traction, attracting public interest, media coverage, and celebrity enthusiasts. A Fortune article reported that owning a BAYC NFT was "the epitome of NFT coolness for many."[70] The popularity of the BAYC was further documented in articles from Rolling Stone, CNET, Wired, and The New York Times, among others.[71] More recently, in October 2022, Fast Company

---

the foundation for a metaverse," June 22, 2022, (https://www.theblock.co/post/153349/how-bored-apes-became-the-foundation-for-a-metaverse, viewed on February 2, 2023) ("*In June 2021, Yuga created the Bored Ape Kennel Club (BAKC). This was a new derivative collection, consisting of a further 10,000 [sic] NFTs airdropped to BAYC holders' wallets. These are unique digital dogs 'bred' as companions to Apes.*").

[67] The Block, "How Bored Apes became the foundation for a metaverse," June 22, 2022, (https://www.theblock.co/post/153349/how-bored-apes-became-the-foundation-for-a-metaverse/, viewed on February 2, 2023) ("*At the time this was novel. This kind of thing has now become a common part of the NFT landscape.*").

[68] YUGALABS_00030223-230 at 225-226 ("*8/28 – Mutant Ape Yacht Club (MAYC) launches with serum airdrop & dutch auction.*"); Kraken, "What is Mutant Ape Yacht Club?" (https://www.kraken.com/learn/what-is-mutant-ape-yacht-club-nft/, viewed on January 23, 2023) ("Mutant Ape Yacht Club (MAYC), a non-fungible token (NFT) offshoot collection of the popular Bored Ape Yacht Club (BAYC) collection, is comprised of 20,000 unique Mutant Ape digital art images.").

[69] Kraken, "What is Mutant Ape Yacht Club?" (https://www.kraken.com/learn/what-is-mutant-ape-yacht-club-nft/, viewed on January 23, 2023) ("Half of the collection was sold in a public auction, while the rest were created by existing BAYC NFT holders who 'exposed' their Bored Ape to a 'vial' of airdropped 'Mutant Serum.'").

[70] Fortune, "Bored Ape Yacht Club and its multibillion-dollar ApeCoin, explained: What they are and how investors got rich," Marco Quiroz-Gutierrez, March 18, 2022 (https://fortune.com/2022/03/18/what-is-bored-ape-yacht-club-nft-apecoin-explained/, viewed on January 25, 2023).

[71] Rolling Stone, "How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes," November 1, 2021 (https://www.rollingstone.com/culture/culture-news/bayc-bored-ape-yacht-club-nft-interview-1250461/, viewed on January 25, 2023); CNET, "Bored Ape Yacht Club NFTs Explained," August 11, 2022

---

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

published an interview with Yuga Labs' cofounders Wylie Aronow and Greg Solano, highlighting their experiences in the NFT space.[72]  Celebrities and other public figures, such as Stephen Curry, Jimmy Fallon, Snoop Dogg, and Eminem, were widely reported to have purchased BAYC NFTs.[73]  While, as aforementioned, the NFTs were originally sold at a price of 0.08 ETH, they quickly began to resell to others who had missed the original mint at much higher prices.[74]

30.    In addition to developing the BAYC NFTs, Yuga Labs continues to engage with the community of BAYC holders and enthusiasts and to create.  For example, it sponsors ApeFest, an annual community meetup primarily for BAYC and MAYC NFT holders, featuring events such as gallery exhibitions, costume contests, music, and other performances.[75]  And, in March 2022, Yuga Labs announced "Otherside," a gamified metaverse it built in collaboration with Animoca

---

(https://www.cnet.com/culture/internet/bored-ape-yacht-club-nfts-explained/, viewed on January 25, 2023); Wired, "How Did the Bored Ape Yacht Club Get So Popular?" February 8, 2022 (https://www.wired.com/story/celebrity-nfts/, viewed on January 25, 2023); The New York Times, "Thefts, Fraud and Lawsuits at the World's Biggest NFT Marketplace," June 6, 2022 (https://www nytimes.com/2022/06/06/technology/nft-opensea-theft-fraud html, viewed on January 25, 2023).

[72]   Fast Company, "Bored Ape Yacht Club tell all: The untold story of the $4 billion crypto startup," October 26, 2022   (https://www.fastcompany.com/90796009/bored-ape-yacht-club-tell-all-the-untold-story-of-the-4-billion-crypto-startup, viewed on January 25, 2023).

[73]   Start with NFTs, "Explaining the Rise of Bored Ape Yacht Club - The NFT Project Making History," September 6, 2021 (https://www.startwithnfts.com/posts/explaining-the-rise-of-bored-ape-yacht-club-the-nft-project-making-history/, viewed on January 25, 2023); NFT Now, "21 Celebrities Who Have Jumped Into the Bored Ape Yacht Club," November 18, 2021 (https://nftnow.com/culture/celebrities-who-have-bored-ape-yacht-club-nfts/, viewed on January 31, 2023); Solano Deposition, 187:3-9 ("*Q.  The public announcement of those celebrities' ownership of a BAYC NFT contributed to the BAYC brand's popularity; correct? [...]  A.  I would think of it as a demonstration of the BAYC brand's existing popularity.*").

[74]   Chain Debrief, "From 0.08 To 769 ETH: Exploring The History And Rise Of The Bored Apes," March 12, 2022 (https://chaindebrief.com/bored-ape-yacht-club-history-rise-of-bayc/, viewed on January 25, 2023).

[75]   YUGALABS_00030223-230 at 226, 228 ("*6/20 – 6/23 – ApeFest '22*" and "*10/31 – 11/6 – First Annual ApeFest in NYC hosted on a yacht.*"); NFT Evening, "BAYC's First Annual Ape Fest Kicks Off With a Bang!," November 1, 2021, (https://nftevening.com/baycs-first-annual-ape-fest-kicks-off-with-a-bang/, viewed on February 3, 2023) ("*Yesterday's 'immersive gallery experience' was followed by a costume contest and 'Ape Fest Mutant Halloween Party'.  Then came the 'Ape Fest Yacht Party' aboard a 1,000 person yacht! The tickets for the yacht party were free for Bored Ape and Mutant Ape holders on a first come first serve basis.  The party also had celebrities joining in including DJ and producer, Kygo, and musician and OneRepublic's lead singer, Ryan Tedder.*); *See also* ApeFest, (https://apefest.com/, viewed on February 5, 2023).

16

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Brands as well as other Yuga Labs partners, and the Otherside community.[76]  A few days later, Yuga Labs raised funding at a valuation of approximately $4 billion.[77]

31.     The success of Yuga Labs' initiatives has contributed to the popularity of web3 – the next generation blockchain-based web environment that encompasses cryptocurrencies and NFTs, among other things.[78]  A recent article describes that "Yuga Labs drives growth in the Ethereum NFT market" and that it is "a major player in the industry," with both BAYC and MAYC NFTs being viewed as popular choices among NFT collectors.[79]  In a Harvard Business Review piece discussing the advent of web3, BAYC is cited as "the biggest success story of an NFT project going mainstream."[80]  Similarly, in a 2022 Business Wire article, Yuga Labs is touted as a "pioneering web3 company."[81]

32.     Yuga Labs most recently launched a skill-based web3 video game, which uses its flagship brand – BAYC – as well as other Yuga Labs brands.[82]

---

[76]   YUGALABS_00030223-230 at 224 (*"2022 was a year of rapid growth for Yuga.  The Yugaverse expanded beyond BAYC with the announcement of Otherside, a gamified metaverse."*); Solano Deposition, 92:11-16 (*"Q. There's a Yuga Labs product by the name of OtherSide; correct? [...] A.   OtherSide is a product that we work with Animoca Brands on as well as other partners and the OtherSide community."*).

[77]   The Verge, "Bored Ape Yacht Club creator raises $450 million to build an NFT metaverse," March 22, 2022 (https://www.theverge.com/2022/3/22/22991272/yuga-labs-seed-funding-a16z-bored-ape-yacht-club-bayc-metaverse-other-side/, viewed on February 3, 2023).

[78]   Harvard Business Review, "What Is Web3?" May 10, 2022 (https://hbr.org/2022/05/what-is-web3/, viewed on February 5, 2023).

[79]   AMB Crypto, "Is Yuga Labs responsible for these changes in the NFT landscape? Details inside…," January 10, 2023 (https://ambcrypto.com/is-yuga-labs-responsible-for-these-changes-in-the-nft-landscape-details-inside/, viewed on January 27, 2023).

[80]   Harvard Business Review, "What Is Web3?" May 10, 2022 (https://hbr.org/2022/05/what-is-web3/, viewed on February 5, 2023).

[81]   Business Wire, "Yuga Labs Pledges $1M to Education and Arts Initiatives in City of Miami," October 12, 2022 (https://www.businesswire.com/news/home/20221012005230/en/Yuga-Labs-Pledges-1M-to-Education-and-Arts-Initiatives-in-City-of-Miami/, viewed on February 5, 2023).

[82]   DEXter Lab, "Dookey Dash: Yuga Labs Skill-Based NFT Game," January 23, 2023 (https://dexterlab.com/dookey-dash-yuga-labs-skill-based-nft-game/amp/, viewed on January 31, 2023). *See also* 30(b)(6) Muniz Deposition, 253:3-10 (*"we didn't make the BAYC out of any type of hate red like not at all like it was genuinely meant to be fun and I rev went and it's so stupid we have a game about poop right now out in the world and*

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

### D.      Defendants' Wrongful Conduct

#### 1.      Trademark Infringement

33.      Yuga Labs uses the following trademarks to identify its BAYC NFT collection: BORED APE YACHT CLUB, BAYC, BORED APE, APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo.[83]   I understand that Defendants in this case have, since at least May 2022, used Yuga Labs' trademarks to promote their own NFT collection, the "RR/BAYC" NFTs, which is a collection of approximately 10,000 NFTs with identical names and images as Yuga Labs' BAYC NFTs.[84]   Yuga Labs alleges that Defendants have wrongfully marketed their RR/BAYC NFT collection using Yuga Labs' trademarks, as summarized below.

34.      Yuga Labs contends that Defendants' use of the domain for its websites rrbayc.com and apemarket.com constitute cybersquatting,[85]   and that the use of these trademarks alongside Yuga Labs' Ape Skull Logo mark and other branding constitute trademark infringement.  **Figure 1**, below, shows Yuga Labs' Ape Skull Logo mark on the left and Defendants' browser tab icon, or favicon, on the right.[86]

---

*people are playing it like lots of people are playing it and it's about poop.  Like it's a stupid brand with a stupid story and it's just meant to be fun.*").

[83]    Complaint, ¶ 33; Second Responses to Interrogatories, Interrogatory No. 9.

[84]    Complaint, ¶¶ 33-34; As of February 1, 2023, Defendants were 454 short of minting the full 10,000 in the BAYC NFT in their infringing RR/BAYC NFT collection. *See* **Appendix C**.  I understand that 500 were originally "reserved" by Mr. Ripps for his future use, such as to give to people to help market RR/BAYC.  Hickman Deposition, 165:23-166:8 ("*I believe we ran a script to randomly select 500 IDs to use to give away, to use for support of -- there was an event, a social event. I don't remember who it was. But to give some away at this social event to help with the activation. Q. What do you mean by 'to help with the activation'? A. To help spread awareness around what this was all about, what the RR/BAYC.com and the Gordongoner.com websites were about.*"); Hickman Deposition, Exhibit 71; LEHMAN0000294.

[85]    Complaint, ¶ 81.

[86]    Complaint, ¶ 34.

Expert Report of Lauren R. Kindler                                        *Highly Confidential*
February 6, 2023                                                     *ATTORNEYS' EYES ONLY*

**Figure 1**
**Example of Defendants' Trademark Infringement**

Yuga Labs BAYC                                      RR/BAYC

                                

35.     Yuga Labs also contends that Defendants' use of Yuga Labs' marks on its sales
pages on NFT marketplaces, such as the OpenSea NFT market,
https://opensea.io/collection/rrbayc,[87] and Foundation market,
https://foundation.app/collection/bayc,[88] infringe its trademarks.

36.     Yuga Labs further contends that Defendant Ripps' use of Yuga Labs' "Bored Ape
Yacht Club" and "BAYC" trademarks to label the token tracker for the RR/BAYC NFTs on
Etherscan, a platform used to explore Ethereum blockchain data, infringe its trademarks.[89]

37.     Yuga Labs also contends that Defendants promoted their RR/BAYC NFTs on
Twitter, used Yuga Labs' APE trademark in the name of one of their Twitter pages
(@ApeMarketplace) and website (apemarket.com), and used Yuga Labs' Ape Skull Logo mark in
the browser tab icon for the website.[90]  Yuga Labs alleges that Defendants planned to launch this
marketplace solely to sell RR/BAYC NFTs alongside authentic Yuga Labs NFTs.[91]

---

[87]   Complaint, ¶ 36; YUGALABS_00000571. OpenSea has since removed this page "based on a claim of intellectual property infringement."  *See* OpenSea, "RRBAYC," (https://opensea.io/collection/rrbayc, viewed on February 5, 2023).

[88]   Complaint, ¶ 37; YUGALABS_00030104.

[89]   Complaint, ¶ 39; YUGALABS_00030081; YUGALABS_00030088.  *See also* **Appendix C, Figure 1**. Defendants also named the smart contract that minted the RR/BAYC NFT collection "Bored Ape Yacht Club." *See* https://etherscan.io/address/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e#readContract#F13.

[90]   Complaint ¶¶ 42-46.

[91]   Complaint ¶ 55.

JTX-0723.00022

38.     The above are representative examples of Yuga Labs' trademark infringement

allegations but are not an exhaustive set.

### 2.      False Advertising

39.     Yuga Labs contends that Defendants marketed RR/BAYC NFTs as "falsely

equivalent to an authentic Bored Ape Yacht Club NFT."[92]  For example, authentic BAYC NFTs

are widely known to come with license rights to the associated cartoon image,[93] and there is

evidence that Defendants falsely told prospective buyers of RR/BAYC NFTs that they would

receive rights to the image.[94]  Yuga Labs also contends that Defendants falsely claimed that they

own a registered trademark for RR/BAYC and APEMARKET.[95]  Yuga Labs further contends that

Defendants falsely represented that an LLC was behind the reservation system for RR/BAYC

NFTs.[96]  Additionally, in his marketing of the NFT collection Defendant Ripps sometimes referred

to the knockoff RR/BAYC NFTs as "Bored Ape Yacht Club V3."[97]  Yuga Labs contends that

---

[92]     Complaint, ¶ 2. *See also* ¶ 72.

[93]     IP & Media Law Updates, "Reflections on BAYC's revolutionary NFT license," January 31, 2023 (https://ipandmedialaw.fkks.com/post/102i6pp/reflections-on-baycs-revolutionary-nft-license/, viewed on February 3, 2023)

[94]     YUGALABS_00000535; YUGALABS_00002041; Ripps Deposition 131:4-6 ("*Q. And did you grant them full personal and commercial rights? A. Absolutely not.*")

[95]     YUGALABS_00001978; Ripps Deposition 150:8-10 ("*Q. Did you ever apply for a trademark registration in RR/BAYC? A. No.*")

[96]     Documents produced in this matter also show that Defendants, due to concerns about Mr. Ripps' personal liability arising from the creation of the RR/BAYC NFTs, represented that LIVE9000 LLC was behind the reservation system for RR/BAYC NFTs.  However, I understand that LIVE9000 LLC did not develop the rrbayc.com website, and that instead it was developed by Mr. Lehman and Mr. Hickman.  Neither Mr. Lehman nor Mr. Hickman is a member of LIVE9000 LLC, and there is no evidence they were paid by LIVE9000 LLC.  The only listed officers are Ryder Ripps and his father Rodney Ripps.  YUGALABS_00030337; LEHMAN0000294; Hickman Deposition, Exhibit 38; YUGALABS_00031397; Hickman Deposition, 184:11-13 ("*Q. Fair to say you are not a member of Live 9000 LLC? A. Oh, 1,000 percent not a member.*")

[97]     YUGALABS_00000541; YUGALABS_00000565.

JTX-0723.00023

these actions, along with others, constitute false advertising, as they suggest false equivalence with BAYC and misled consumers about the legitimacy of the RR/BAYC NFT collection.[98, 99]

40.    As discussed in **Section VI** below, I understand that Defendants' wrongful conduct has created (and continues to create) confusion in the marketplace for NFTs.  In the subsequent sections, I discuss the remedies I understand are available to Yuga Labs and present my evaluation of Yuga Labs' damages due to Defendants' alleged trademark infringement and false advertising.[100]

## VI.    EVIDENCE OF CONSUMER CONFUSION RESULTING FROM THE WRONGFUL CONDUCT

41.    I understand that Yuga Labs contends that there is documentary and survey evidence, including the Expert Report of Laura O'Laughlin[101] and the Expert Report of Professor Jonah Berger,[102] demonstrating that actual and prospective consumers of RR/BAYC NFTs likely were confused by Defendants' wrongful conduct.  Furthermore, academic research suggests certain unique characteristics of NFTs increase the likelihood of confusion relating to their source. I discuss this evidence, and academic research, below.

---

[98]    Complaint ¶¶ 2, 72.

[99]    I understand that Yuga Labs also contends that Defendants falsely advertised that creator fees they earned from resales of RR/BAYC NFTs on secondary markets would be donated to charity.  YUGALABS_00030050; Ripps Deposition, 228:1-9 ("*Q. Have you ever told -- have you ever said on Twitter that you would -- all LooksRare royalties gained will be donated to a charity? A. I believe that was one of the ideas of what to do with the royalties that we actually didn't want on LooksRare. And we still have not figured out what to do with those royalties. Q. Have you donated them to charity? A. No.*").  I also understand that Yuga Labs also contends that Defendants repeatedly falsely advertised that the Defendants' NFTs were "hand minted" In order to build momentum so that they could sell the entire RR/BAYC NFT collection and use it to launch ApeMarket.  YUGALABS_00029988; YUGALABS_00030061;            LEHMAN0000294;            RIPPSCAHEN00001285-RIPPSCAHEN00001319; YUGALABS_00030068; RIPPSCAHEN00002273.

[100]   As noted above, I intend to supplement my opinions should additional data and information relevant to the evaluation of Yuga Labs' damages be provided to me.

[101]   Expert Report of Laura O'Laughlin, *Case No. 2:22-cv-4355-JFW-JEM*, dated February 6, 2023.

[102]   Expert Report of Professor Jonah Berger, *Case No. 2:22-cv-4355-JFW-JEM*, dated February 6, 2023.

JTX-0723.00024

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

### A.    Evidence of Confusion Among RR/BAYC NFT Consumers

42.    Documents and testimony produced in this matter describe how consumers were confused about the origin of the RR/BAYC NFTs, some even mistakenly purchasing RR/BAYC NFTs believing them to be Yuga Labs' BAYC NFTs.  Consumer statements regarding their confusion were posted on social media,[103] and in some cases, sent directly to Defendants.[104]

43.    Additionally, industry participants confused the RR/BAYC NFTs with Yuga Labs' BAYC NFTs, including a prominent example from Bloomberg News.[105, 106]  Testimony from Yuga Labs employees underscores an increasing awareness and concern about the confusion created by Defendants and the effect the confusion had not only on customers,[107] but also on Yuga Labs' operations.[108]

---

[103]  YUGALABS_00027519;  YUGALABS_00002625-634;  YUGALABS_00000570;  YUGALABS_00000580; YUGALABS_00000589;     YUGALABS_00000605;     YUGALABS_00000620;     YUGALABS_00000624; YUGALABS_00000629;     YUGALABS_00029080;     YUGALABS_00027516,     YUGALABS_00027686, YUGALABS_00029099,     CLINE00000035;     YUGALABS_00029097,     YUGALABS_00029098, YUGALABS_00031326-332, YUGALABS_00031357, YUGALABS_00031359, YUGALABS_00031367-168, YUGALABS_00031432-436; YUGALABS_00027491; YUGALABS_00027693.

[104]  For instance, one RR/BAYC consumer questioned Mr. Ripps on whether others would "know the difference or just think [they] own a BAYC." RIPPSCAHEN00001560 at 560.

[105]  YUGALABS_00030243;    YUGALABS_00030236;    YUGALABS_00031203;    YUGALABS_00031204; YUGALABS_00031205. Specifically, the "top NFT collection" displayed on a screen during the show was labelled "Bored Ape Yacht Club V3," but was actually the RR/BAYC NFT collection.

[106]  Icy Tools, an NFT analytics platform, made the same mistake in June 2022, when it listed Mr. Ripps' collection as "Bored Ape Yacht Club V3" on its trending page.  RIPPSCAHEN00000001 at 6/13/2022 9:41:24 AM.

[107]  The former CEO of Yuga Labs, Nicole Muniz, testified that the RR/BAYC NFT collection "*became problematic once there was real confusion once there was a Bloomberg piece that confused them.*" (30(b)(6) Muniz Deposition, 88:1-3.) Ms. Muniz also testified that Defendants' NFT collection was "*creating confusion*" and that Ms. Muniz was "*having to have conversations around the FCA that like hey that's not us.  And so, it was a lot of money and a lot of time.*" 30(b)(6) Muniz Deposition, 83:5-14, *See also* 30(b)(6) Muniz Deposition, 152:6-8, 162:16-163:16, 239:10-19, 240:19-20, 241:3-242:12, 249:16-21. In addition to Ms. Muniz, Kerem Atalay, a cofounder and the Chief Technology Office of Yuga Labs, testified that users may misinterpret the RR/BAYC collection. Rough Deposition of Kerem Atalay, January 30, 2023, 147:24-148:16 ("*Q    And if somebody wanted to learn about RR/BAYC NFTs, they could do the same, they can go on Twitter and read posts from the creators of RR/BAYCs; is that right? [...] A    One could do that.  I think it's likelier that they would -- a casual person -- like, sort of, user of Twitter might misinterpret, honestly, what they were interacting with, however, because they've hijacked all of our marks, taken our NFT images and associated their accounts with them.  So somebody might learn something about RR/BAYC. They probably would be actually misled into believing that they were learning something about our brands.*").

[108]  I discuss these impacts in **Section VIII.B** and **Section VIII.D**.

22

JTX-0723.00025

44.     I also understand that Dr. Laura O'Laughlin, another expert in this matter, conducted two consumer surveys in this matter and found evidence of a meaningful likelihood of confusion among consumers who saw the BAYC marks used in connection with the RR/BAYC NFT collection. More specifically, Dr. O'Laughlin measured net confusion rates of 40.4% and 20.0% in the Foundation and OpenSea marketplaces, respectively.[109] Dr. O'Laughlin also reported that the majority of confused respondents in her two likelihood of confusion surveys "exhibited strongly held beliefs as to the source of the at-issue RR/BAYC NFT collection," further supporting her findings of meaningful consumer confusion across NFT marketplaces.

45.     Consistently, Professor Jonah Berger, another expert in this matter, found evidence of consumer confusion caused by RR/BAYC NFTs.  The confusion was caused by the fact that RR/BAYC NFTs look visually identical to authentic BAYC NFTs and were named similarly, making it difficult for consumers to distinguish them.  Mr. Berger also opined that consumers were unlikely to look beyond the identical images and similar names to do their due diligence and understand whether they were getting a "real" or "fake" ape.  His report further provided evidence of instances of confusion among potential purchasers of NFTs and crypto reporters.[110]

46.     I have not been asked to provide an independent assessment of consumer confusion in this case.  Instead, I have been asked to assume that the documents, testimony, and opinions of other experts are sufficient, in whole or in part, to establish that there was significant confusion among actual and prospective NFT purchasers, and that commensurate damages are an appropriate remedy in this matter, including based on this evidence of likely confusion.

---

[109]   *See* Expert Report of Laura O'Laughlin, February 6, 2023, ¶ 16.

[110]   *See* Expert Report of Professor Jonah Berger, February 6, 2023, Section VII.B.

JTX-0723.00026

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

> **B.    Evidence that Defendants Exacerbated and Sought to Profit from Consumer Confusion**

47.    The Defendants also acknowledged the "confusion" the RR/BAYC project was creating for consumers in documents and testimony.  In their internal discussions, Mr. Cahen, Mr. Lehman, and Mr. Hickman repeatedly alluded to the "confusing" nature of the RR/BAYC project and the "confusion" it would create.[111]  For example, Mr. Lehman testified that he believes that "purchasers of RR/BAYC NFTs on Foundation.app might think they were buying authentic BAYC NFTs if they did not conduct further research."[112]  And in conversation with Mr. Lehman, a third party noted that the RR/BAYC NFTs were "quite crazy" because "definitely some people will buy thinking they are buying originals!"[113]

48.    Mr. Ripps also acknowledged consumer confusion that likely occurs from misuse of trademarks and described his own efforts to prevent copying of the "RR/BAYC" name.  In May 2022, Mr. Ripps observed that other NFT creators were using the "RR/BAYC" name for their projects, just as Mr. Ripps used the "BAYC" name for his.[114]  Mr. Ripps noted the confusion

---

[111]   Cahen Deposition, Exhibits 106, 107, 108, 109. *See also* Hickman Deposition, Exhibit 58; LEHMAN0000013-066 at 047-049 (*"Like a normal person could be like 'I see where Yuga is coming from, it's confusing how close your logo is to theirs'"*).

[112]   Lehman Declaration, ¶ 25.  Mr. Hickman testified that when these sales occurred through Foundation, sometimes individuals would "snipe" a newly-minted NFT before the reserving party could claim it. *See* Hickman Deposition, 77:15-78:6 (*"So the – so classifying the mint, what we did, or in this context, was created the reservation system that allowed Ryder to more rapidly handle the reservations. Because when he was doing it, he would issue the -- people would reserve over Twitter in public, and they would say, I want Number 4. I want Number 32. He would get that artwork. He would go to the public domain on Google, copy it -- or IPFS, copy it and load it onto the Foundation contract by hand. When he would give it to the person through a Foundation, the way that their system is designed allowed other people to snipe them. So people would expect to get something and they wouldn't be able to get it even though they paid for it."*). It is unknown if the individuals who "sniped" RR/BAYC NFTs on Foundation were aware that they were buying an RR/BAYC NFT or an authentic BAYC NFT.

[113]   LEHMAN0000077.  In this same discussion, Mr. Lehman acknowledged that the RR/BAYC's were "fake ape[s]."  LEHMAN0000078.  In a different conversation, when he was trying to convince two people to buy these "fake ape[s]," Mr. Lehman explained that they were "[j]ust copy pasted."  LEHMAN0000108.  Mr. Hickman, too, explained that it is "difficult to make the collections coexist" on ApeMarket because they are "the same art", which he and others found funny.  LEHMAN0000294 at May 30, 2022.

[114]   YUGALABS_00027523; YUGALABS_00030051.

created by these projects and requested that others avoid using the "RR/BAYC" name: "we're
seeing more 'RR/BAYC' titled collections on OpenSea, we're working on having these removed
to avoid confusion.  Note: We love RR/BAYC inspired projects/fan art, the only thing we ask is
to avoid using the RR/BAYC name[.]"[115]

49.     Defendant Cahen apparently understood that RR/BAYC NFTs were too confusing
for "average joes."[116]  Indeed, in conversation with Mr. Lehman, they agreed that people would
make "mistakes with apes."  Mr. Lehman suggested that they include a notice on the image of each
RR/BAYC image, but that idea was rejected in favor of using authentic Ape images without
notices.  Although Mr. Cahen agreed with Mr. Lehman's summary that they "should not under-
estimate how confusing it is" to the "average joe," no changes were to be made to address the
confusion.

50.     Indeed, when Mr. Hickman, Defendants' own software developer, was presented
with Defendants' Foundation page, he initially thought it was Yuga Labs' Bored Ape Yacht Club
page.[117]  Only after reviewing the page more closely was he able to tell that it was not Yuga Labs'
page.

51.     Before Yuga Labs filed its lawsuit, Mr. Lehman raised concerns that Defendants
needed to adopt a "new logo and branding direction in light of the trademark thing."[118]  Likewise

---

[115]  YUGALABS_00027523.  *See also* YUGALABS_00029089 ("*to clarify any confusion, the RR/BAYC apes minted
on @foundation are the originals, after I began, @Omakasea_ spun up a contract as a supported offshoot of my
original for new BAYCs and MAYCs which both minted out at 0.001 mint price, these are cool too but different*").

[116]  LEHMAN0000294 at May 31, 2022 9:01 a.m. - 9:33 a.m. ("*Because it is too confusing to the 'average joe'
IMO*")

[117]  Hickman Deposition, 149:24-152:3 ("*Q. What is Exhibit 28 an image of? A. This is the Foundation website. Q.
For what? A. Looks to be Bored Ape Yacht Club. No, this is the -- this is the – it looks like it's Ryder's page. Yeah.*").

[118]  LEHMAN0000013-066 at 047.  Ironically, Mr. Lehman explained that the reason for proposing the change was
"I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone."  LEHMAN0000013-
066 at 048.

25

before this lawsuit, Mr. Cahen learned that Yuga Labs' Ape Skull Logo was a registered trademark in the UK and stated "per our attorney we may just need to change the skull If we want to fight trademark."[119]  Mr. Lehman has acknowledged that he was concerned about Defendants' use of Yuga Labs' marks, that he voiced those concerns to the Defendants, and that Mr. Cahen agreed with his concerns on at least one occasion.[120]

52.     Despite Defendants' awareness and acknowledgement of the confusion, they nonetheless actively promoted RR/BAYC NFTs and their plans for "ApeMarket," an NFT marketplace they planned to create specifically for trading of RR/BAYC and authentic BAYC NFTs.[121, 122]  This promotion took place through Defendants' personal social media accounts[123] and a separate Twitter account that they set up to promote RR/BAYC NFTs and ApeMarket.[124] They also encouraged prominent members of their community to "shill" the RR/BAYC NFTs by giving away their RR/BAYC NFTs to these members.[125]  Defendants built their promotion of RR/BAYC NFTs and ApeMarket around their negative commentary about Yuga Labs.[126]  Mr. Ripps specifically noted that to mint all of their RR/BAYC NFTs, they would need, among other things, "controversy," "law stuff," an "unexpected event," and "a shitload of [Y]uga dirt."[127] Defendants' marketing campaign generated much of the "controversy" that they needed to sell

---

[119]   Hickman Deposition, Exhibit 53.

[120]   Lehman Declaration, ¶¶ 20-22.

[121]   LEHMAN0000294; YUGALABS_00000536.

[122]   Mr. Ripps also promoted on Twitter his plans to create his own version of Otherside, Yuga Labs' metaverse. YUGALABS_00031324 (*"RR/BAYC is just getting started.. planning to create an OTHERSIDE as well for the community and have dank events."*)

[123]   YUGALABS_00029886; YUGALABS_00000594; YUGALABS_00031325; YUGALABS_00031401.

[124]   YUGALABS_00014079.

[125]   LEHMAN0000294.

[126]   LEHMAN0000054.

[127]   LEHMAN0000294 at June 7, 2022 6:09 p.m. – 6:11 p.m.

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

each of their infringing NFTs.[128]  Defendants also used their forthcoming ApeMarket to market
their RR/BAYC NFTs.  Among other things, they advertised that they would not launch
ApeMarket until all RR/BAYC NFTs had been minted.[129]  Defendants' promotional activities
appear designed to further exacerbate the confusion in the marketplace and to profit from it.

### C.  Academic Research Suggests that it is Difficult for Consumers to Determine Provenance for NFTs

53.     Academic research suggests that it is challenging for most consumers to establish
provenance for NFTs, which increases the likelihood of confusion - even in the absence of an
intentional campaign to create confusion, such as Defendants'.[130]  Prominent academics and
researchers have commented on the complexity of understanding or verifying the origin of
cryptocurrency and NFTs during the purchase process, and the challenges this presents for
consumers navigating the process.  For instance, research from 2022 indicates that "[r]egulators
and law enforcement fear that the rapidly growing use of NFTs will present new opportunities for
misuse by illicit actors in […] misrepresentation […]."[131]  A paper by Professor Scott Duke
Kominers of Harvard Business School notes that "[m]ost crypto technology at the moment is not

---

[128]  *See, e.g.,* LEHMAN0000111-LEHMAN0000121 at 117, LEHMAN0000196-LEHMAN0000197 ("*Like we had
amazing day-one energy, huge volume, dies down, then we announce marketplace, MORE energy! dies down…*").;
Hickman Deposition, 211:11-212:17 ("*But what we communicated publicly, once we hit 10,000 of the RR/BAYC, all
of them, then we'll put the marketplace out. And there was a rapid increase in volume on the -- I don't know the specific
date. But I'll call it the first day of ApeFest. Somebody made a documentary and released a documentary, and the
documentary was seen by millions of people and it really amplified the mission. It amplified the narrative. It created
a lot of visibility into all of this. And there were nearly 3,000, I believe, or more reservations all within in that first
hour or so. And we went from, you know, kind of going really slow and we'd seen we had a nice horizon in front of us
to, wow, it feels like it's days away*").

[129]  YUGALABS_00000545.

[130]  OpenSea is one NFT marketplace that has enabled technology that allows a consumer to purchase simply with a
credit card. *See* OpenSea, "How do I buy NFTs with a credit or debit card?" (https://support.opensea.io/hc/en-
us/articles/4413380935187-How-do-I-buy-NFTs-with-a-credit-or-debit-card-, viewed on February 2, 2023).

[131]  Mondoh, Brian Sanya et. al., "NFT Legal and Regulatory Compliance: Connoisseurship and Critique," November
12, 2022, at p. 8.

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

user friendly to engage with" and that NFTs face similar challenges.[132]   It further explains that some NFT projects have "recruited onboarding directors to help first-time NFT consumers navigate the process of purchasing."[133]   In another discussion, Professor Kominers notes that while "[blockchain] technology is technically transparent, it's still very opaque for the average consumer, or even for the very sophisticated consumer."[134]   A 2018 paper on the blockchain revolution by Professor Hanna Halaburda from New York University Stern School of Business – an expert on digital currencies and blockchain technologies[135] – notes that the "technology for the most part is not well understood."[136]   More recently, academic literature from 2022 also acknowledges the "confusing nature of the myriad different NFT projects in existence."[137]

---

[132]   Kaczynski, Steve, and Scott Duke Kominers, Harvard Business Review, "How NFTs Create Value," November 10, 2021, https://hbr.org/2021/11/how-nfts-create-value ("*NFTs also face a number of challenges that are general across crypto entrepreneurship. Most crypto technology at the moment is not user friendly to engage with, requiring interfacing with a number of abstruse cryptocurrency exchanges and wallet providers.*").

[133]   Kaczynski, Steve, and Scott Duke Kominers, Harvard Business Review, "How NFTs Create Value," November 10, 2021, https://hbr.org/2021/11/how-nfts-create-value ("*NBA Top Shot has benefited tremendously from submerging most of the underlying crypto structure in its NFT market, and enabling users to purchase moments in fiat with credit cards, rather than requiring people to transact in cryptocurrency. Other projects have recruited onboarding directors to help first-time NFT consumers navigate the process of purchasing.*").

[134]   Harvard Business School, "The Exchange: The Road Ahead for Crypto," Re: Scott Duke Kominers (Professor of Business Administration (Leave of Absence)); Charles C.Y. Wang (Glenn and Mary Jane Creamer Associate Professor of Business Administration); By: Jen McFarland Flint, August 25, 2022, https://www.alumni.hbs.edu/stories/Pages/story-bulletin.aspx?num=8834/ ("*One of the many ways in which this stuff is not yet ready for widespread use is that while the technology is technically transparent, it's still very opaque for the average consumer, or even for the very sophisticated consumer. This shows up in the extent to which even very sophisticated actors are having their crypto assets stolen. And on the onboarding side, it's still very complicated even just to get a crypto wallet.*").

[135]   New York University Stern School of Business, Faculty Directory, "Hanna Halaburda – Associate Professor of Technology, Operations, and Statistics" (https://www.stern.nyu.edu/faculty/bio/hanna-halaburda, viewed on January 27, 2023).

[136]   Halaburda, Hanna, "Blockchain Revolution without the Blockchain," Bank and Canada and NYU, March 2, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3133313 ("*The technology behind blockchain has attracted a lot of attention. However, this technology is for the most part not well understood.*").

[137]   Harsono, Hugh, "Regaining the Technological Competitive Advantage by Supporting NFT Self-Governance," Fletcher Forum of World Affairs, Vol. 46(2), Summer 2022, pp. 155-164, at p. 158 ("*The confusing nature of the myriad different NFT projects in existence makes it easy to dismiss the entire NFT and Web 3.0 ecosystem, with many individuals fearful of falling victim to the growing number of NFT-related scams.*"). *See also* Das, Dipanjan, et al,. "Understanding Security Issues in the NFT Ecosystem," In Proceedings of ACM Conference on Computer and Communications Security, 2022.

JTX-0723.00031

54.     In contrast, consumers purchasing through more traditional and established means, such as visiting a brick-and-mortar store owned and operated by a well-known brand, are unlikely to be confused as to whether the goods sold are authentic.  Similarly, purchasing an obvious "knock off" product on a street corner creates little or no confusion to the purchaser regarding the fact that the trademark is not authentic, although it may later confuse others who see the knock off product in use or try to purchase it on a secondary market.  Because these distinctions do not exist for purchasers in the market for NFTs in obvious ways, the likelihood of confusion from trademark infringement is increased.

## VII.    REMEDIES AVAILABLE TO YUGA LABS

55.     I have been asked to opine on the following remedies available to Yuga Labs should Defendants be found liable for trademark infringement or false advertising:

- disgorgement of Defendants' profits, and other measures of Defendants' unjust enrichment;

- Yuga Labs' costs of corrective advertising, including the cost of obtaining and destroying the at-issue NFTs; and

- Yuga Labs' lost profits, and other measures of harm to Yuga Labs.

56.     These remedies are discussed below.  I understand that there are additional remedies available to Yuga Labs that I have not been asked to opine on in this report, some of which cannot yet be determined (*e.g.*, the costs of this legal action or any harm to Yuga Labs' trademarks that is determined to be "irreparable" by the court).

## VIII. EVALUATION OF YUGA LABS' DAMAGES DUE TO DEFENDANTS' WRONGFUL CONDUCT

57.     In this section, I evaluate Yuga Labs' damages resulting from Defendants' wrongful conduct.[138]  First, based on the documents and data available to me, I have calculated Defendants' profits associated with the infringement of Yuga Labs' trademarks and false advertising. Second, I discuss Yuga Labs' corrective advertising expenses incurred to mitigate the harm caused by Defendants' wrongful conduct, as well as the cost to Yuga Labs of acquiring the RR/BAYC NFT collection to mitigate any further harm.  Third, I discuss Defendants' avoided costs (using Yuga Labs' investment in creating the BAYC brand and NFT collection and related branded NFT collections, as a proxy for Defendants' avoided costs), which is an additional measure of Defendants' unjust enrichment. Finally, I discuss additional harm from Defendants' wrongful conduct that can be observed, but that I have not yet quantified.

### A.     Disgorgement of Defendants' Profits Associated with the Wrongful Conduct

58.     Yuga Labs claims that Defendants have inappropriately used Yuga Labs' trademarks and falsely marketed its RR/BAYC NFT collection by suggesting false equivalence with authentic BAYC NFTs.  I understand that, for trademark damages, the plaintiff has the burden to prove the defendants' gross revenues and that it is defendants' burden to prove any deductions for expenses and/or the portion of its profits attributable to factors other than use of the infringed trademark.  While I understand that Yuga Labs does not have the burden to prove profits or any other deductions from revenues, I calculated Defendants' profits associated with the wrongful conduct, based on available information.

---

[138]   Defendants' wrongful conduct in this matter includes both trademark infringement and false advertising.  The damages I have calculated would apply if Defendants are found liable for either (or both) claim(s).

59.     I understand that the wrongful conduct involves the entire collection of Defendants'
RR/BAYC NFTs.  Hence, in this case, Defendants' profits attributable to the wrongful conduct
are comprised of: (1) the profits collected from the initial sale of the minted RR/BAYC NFTs, (2)
the profits collected from resales of RR/BAYC NFTs on the secondary market in the form of
creator fees, and (3) the value of RR/BAYC NFTs that Defendants hold or did not mint.  Below, I
describe my calculations of these profits.

60.     As discussed in **Section V.B.1**, blockchain transactions are recorded on a shared
ledger, meaning that transactions related to RR/BAYC NFTs, which occur on the Ethereum
blockchain, are recorded in publicly available data.  I collected this data by using Etherscan, a
"block explorer and analytics platform for Ethereum."[139, 140]  Details of my collection and analysis
of Etherscan data related to RR/BAYC NFTs are contained in **Appendix C**.

61.     My calculation of Defendants' profits is for the period May 13, 2022 (when minting
of RR/BAYC NFTs began) through February 1, 2023.  Profits are accruing to Defendants on an
ongoing basis.  I intend to update these calculations should I be asked by counsel to do so.

### 1.     Profits from Initial Sales of RR/BAYC NFTs

62.     Starting in May 2022, Mr. Ripps began to invite interested buyers to purchase
RR/BAYC NFTs.  I understand that Mr. Ripps invited buyers to "reserve an ape" by identifying
an image from the original 10,000 BAYC NFTs and notifying him on Twitter or on his website
(rrbayc.com) so that he could mint for the buyer an RR/BAYC NFT containing an identical

---

[139]   Etherscan (https://etherscan.io/, viewed on January 26, 2023).

[140]   In his deposition, Mr. Cahen confirms that Etherscan is a reliable and appropriate source of data on how much
Defendants made from the sale of RR/BAYC NFTs. Cahen Deposition, 299:7-10 ("*If you are referring to the RR
BAYC NFT's created by Ryder Ripps, that would be on the Ethereum blockchain, yes.  So I think Etherscan would be
a good reverse for that.*"); Cahen Deposition, 111:4-6 ("[*Mr. Cahen's accounting is*] *all completely public on the
blockchain locker.  So anyone has access to it.*").

JTX-0723.00034

image.[141]  The requested NFTs were minted by Mr. Ripps using a smart contract on the Ethereum

network that was created through Foundation.[142]  Initially, Mr. Ripps sold the RR/BAYC NFTs

by either placing them for sale on Foundation where the requester could then claim them, or by

transferring them directly to the buyer's wallet in exchange for ETH.  Soon after Mr. Lehman and

Mr. Hickman became involved, the reservation and sale process was automated through a second

smart contract, but the original Foundation contract continuing to handle the actual mint itself.[143]

63.     Based on my analysis of the RR/BAYC NFTs transaction data, 9,546 RR/BAYC

NFTs were minted through the original Foundation smart contract (*i.e.*, new NFTs containing the

exact same image of more than 95% of the original 10,000 BAYC NFTs were created).  Of the

9,546 minted RR/BAYC NFTs, Mr. Ripps transferred 191 to Mr. Cahen and 9,327 to non-

Defendant wallets.[144]  Mr. Cahen sold 88] of his 191 NFTs.  Of the 9,415 total RR/BAYC NFTs

transferred from Defendant wallets to non-Defendant wallets, 1,642 were sold for 0.1 ETH and

7,034 for 0.15 ETH. 529 were given away for free, and 210 were sold at other prices ranging from

0.03 to 2.25 ETH.  These findings are consistent with Mr. Ripps' testimony that Defendants

---

[141]   RR/BAYC (https://rrbayc.com/, viewed on January 26, 2023); Complaint ¶ 72.

[142]   Ripps Deposition, 60:21-22 (*"they were first minted on Foundation"*).

[143]   *See, e.g.,* **Appendix C**, **Section II.A.2**.

[144]   RR/BAYC NFTs transferred from Mr. Ripps to Mr. Cahen include both NFTs Mr. Cahen directly received from
Mr. Ripps for free and NFTs Mr. Cahen bought from Mr. Ripps on the Foundation marketplace.

JTX-0723.00035

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

initially sold RR/BAYC NFT for 0.1 ETH, that they later increased the price to 0.15 ETH, and that some were given away for free.[145]  I calculate revenues from these sales to be 1,285 ETH.[146, 147]

64.     The RR/BAYC NFTs transaction data includes information on "gas" costs, that is, transaction fees collected by the Ethereum network.   The gas costs associated with these transactions amounted to 89 ETH.[148, 149]

65.     A summary of the revenues and costs (in ETH) associated with these sales of RR/BAYC NFTs are shown in **Figure 2** below.  I calculate the profits from these sales to be 1,196 ETH.

---

[145]   Ripps Deposition, 194:11-12 ("*I think the first few were free. And then, maybe 0.1 ETH.*"); Ripps Deposition, 123:10-124:9 ("*Q. Why did you change the price of the RR/BAYCs from .1 ETH to.15 ETH? [...] A. And -- oh, so to answer your question, when the project went from just me to involving the three other individuals who I mentioned, I think collectively we found it appropriate to increase the price for, you know, to think about, you know, others.*").

[146]   In some of these sales, the full price of the RR/BAYC NFT did not accrue to Defendants, as the RR/BAYC NFT was sold through an NFT marketplace that collected fees.  Fees collected by marketplaces have been deducted from my calculation of revenue.

[147]   Mr. Cahen generated approximately 52 ETH in revenue from his sales of RR/BAYC NFTs. Using the daily average ETH to USD conversion, this amounts to $58,627.

[148]   The gas costs I calculate include 1) the cost of gas associated with minting the RR/BAYC NFTs and 2) the cost of gas associated with the transfer of the RR/BAYC NFT to the buyer.

[149]   Defendants testified that they incurred some additional expenses related to the sale of RR/BAYC NFTs.  However, I understand that they have not provided financial statements or other documentation necessary to establish these expenses.  I have therefore not included them in my analysis.  *See* Ripps Deposition, 241:12-16 ("*Q.   And what are your expenses here? A.   I think -- you mean this 3,500 -- Q.   Yes. A.   I think that's the money that I paid my assistant who Jeremy introduced me to, this kid Ian.*").  *See also* Cahen Deposition, 291:6-19. ("*Q.   And you've got here expenses next to your line Jeremy, 11,000. A. I see that, yeah. Q.   What is -- what makes up that number? A.   My -- that was pretty recent. I'm pretty sure what that covers is I had to buy a new machine which I used for the project. And then there was one travel event. And those expenses I would consider part of my contribution to the project. Q. What was the travel? A I went to New York. Q.   What did you go to New York for? A Ryder was there. So I wanted to be there in support of the artist and friend of mine.*")

JTX-0723.00036

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Figure 2**
**Profits from Initial Sales of RR/BAYC NFTs (ETH)**

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] − [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | 0 | 3 | (3) |
| 0.10 ETH | 1,642 | 162 | 10 | 152 |
| 0.15 ETH | 7,034 | 1,055 | 74 | 981 |
| Other | 210 | 68 | 2 | 66 |
|  |  |  |  |  |
| **Total** | **9,415** | **1,285** | **89** | **1,196** |

66.     In **Figure 3** below, I have converted revenue and costs in ETH to USD on a transaction-by-transaction basis, based on the conversion rate of ETH to USD on the date of each transaction.

**Figure 3**
**Profits from Initial Sales of RR/BAYC NFTs (USD)**

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] − [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | $0 | $5,611 | ($5,611) |
| 0.10 ETH | 1,642 | $322,536 | $19,404 | $303,132 |
| 0.15 ETH | 7,034 | $1,507,330 | $106,610 | $1,400,720 |
| Other | 210 | $91,006 | $3,484 | $87,582 |
|  |  |  |  |  |
| **Total** | **9,415** | **$1,920,933** | **$135,109** | **$1,785,823** |

67.     The revenues and costs I calculate are consistent with Defendants' own estimates. In a text exchange between Mr. Lehman and Mr. Cahen on August 31, 2022, Mr. Lehman estimated the revenue associated with the initial sales of RR/BAYC NFTs to be 1,337.9 ETH.[150] His calculation assumed all RR/BAYC NFTs were sold at either 0.1 or 0.15 ETH. Mr. Lehman's estimate is in line with my revenue calculation of 1,285 ETH in **Figure 2**, and the minor

---

[150]   LEHMAN0000013-LEHMAN0000066 at 063.

**JTX-0723.00037**

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

discrepancy likely stems in part from Mr. Lehman not fully accounting for RR/BAYC NFTs that

Defendants gave away for free and RR/BAYC NFTs sold for prices other than 0.1 ETH or 0.15

ETH.  In the same text exchange, Mr. Lehman estimated the total gas cost to be 85.5 ETH, which

also generally aligns with my gas calculation of 89 ETH.[151]

### 2.    Profits from Resales of RR/BAYC NFTs

68.    As discussed in **Section V.B.3**, when NFTs are resold in NFT marketplaces, creator

fees can accrue to the creator of that NFT.  The RR/BAYC NFTs transaction data indicates that

Defendants profited from 3,023 RR/BAYC NFTs resales that occurred in NFT marketplaces.

Some of these RR/BAYC have been resold multiple times.  These resales generated creator fees

of 91 ETH for the Defendants.[152, 153]  Using the ETH to USD conversion rates as of the date of

each resale, these creator fees were approximately $117,309.

69.    As RR/BAYC NFTs continue to be available for resale on secondary markets,

creator fees continue to accrue to Defendants. The above estimate, which includes resales through

February 1, 2023, therefore does not fully capture the total profits earned by Defendants from

---

[151]   LEHMAN0000013-LEHMAN0000066. Mr. Lehman reported two different gas estimates in this text exchange:
85.5 ETH in one instance and 129 ETH in another instance.  However, this same text exchange indicates that Mr.
Lehman's gas calculations may not be reliable.  (*"Oh another thing: my gas calculations were wrong haha."*).

[152]   Of the 91 ETH, I estimate that 65 were collected from LooksRare and 25 from Foundation.  While Mr. Ripps
testified that *"we did not want to accept [creator fees] for RR/BAYC, I didn't think it was in the spirit of the art piece,"*
he has acknowledged that Defendants did earn creator fees. *See* Ripps Deposition, 89:17-19, 90:13-16 (*"I think it was
around 70 ETH from LooksRare royalty of my artwork, RR/BAYC went into my wallet, something like that"*);
YUGALABS_00030050; Lehman Declaration, ¶ 37.  Defendants estimate that they earned 70 ETH from LooksRare
creator fees, which is higher than my estimate of 65 ETH. *See* RIPPSCAHEN00015341.

[153]   Mr. Ripps tweeted that creator fees associated with the resales of RR/BAYC NFTs would be donated to charity,
but he later testified that they had not been donated to charity. *See* YUGALABS_00030050; Ripps Deposition, 228:1-
9 (*"Q. Have you ever told -- have you ever said on Twitter that you would -- all LooksRare royalties gained will be
donated to a charity? A. I believe that was one of the ideas of what to do with the royalties that we actually didn't
want on LooksRare. And we still have not figured out what to do with those royalties. Q. Have you donated them to
charity? A. No."*)  Mr. Cahen testified that *"it's unclear what we are going to decide to do with [creator fees]."* Cahen
Deposition, 250:21-251:3.

35

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

resales of RR/BAYC NFTs, and it does not capture ongoing and future profits that would accrue to Defendants as purchasers buy and sell RR/BAYC NFTs.

70.   In addition to the 3,023 RR/BAYC NFTs resales which generated profits for Defendants discussed above, there have also been many resales of RR/BAYC NFTs where no creator fees were generated but from which Defendants may still benefit.  For example, as of February 1, 2023, RR/BAYC NFT #1231 had been sold 14 times on multiple marketplaces that did not generate creator fees for Mr. Ripps, including OpenSea, X2Y2, SushiSwap, and GemSwap, with prices ranging from 0.1 ETH to 1.6 ETH.[154]  Similarly high sales volumes can be observed for RR/BAYC NFT #1332, #1008, #998, and others.[155]  One NFT sales tracker calculates nearly 6,000 ETH in total sales of RR/BAYC NFTs,[156] which equates to almost $10 million using the ETH to USD conversion rate as of February 1, 2023.[157]  The numerous transactions involving these RR/BAYC NFTs likely indirectly benefit Defendants, as they create more visibility for the RR/BAYC NFT collection on secondary markets.

### 3.   Value of RR/BAYC NFTs Held or Not Minted by Defendants

71.   Of the 9,546 RR/BAYC NFTs minted, Defendants hold 136 RR/BAYC NFTs in their wallets.[158]  Defendants did not mint the remaining 454 RR/BAYC NFTs.  While these

---

[154]   https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1231.

[155]   https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1332;
https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1008;
https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=998.

[156]   NFTGO, RR/BAYC (https://nftgo.io/collection/rrbayc/overview, viewed on February 6, 2023).

[157]   The ETH to USD exchange rate as of February 1, 2023 was $1,641.61 to 1 ETH.
(https://etherscan.io/chart/etherprice, viewed on February 5, 2023).

[158]   Mr. Ripps testified that he held at least ten RR/BAYC NFTs in a wallet that he controls.  *See* Ripps Deposition, 170:24-171:9, 173:12-16 ("*Q. You say 'Need ten for my dad.' A. Okay. Q. And then, there's a -- is that a wallet address? A. It looks like a wallet address, yes. Q. And it says 'This is for your dad. I'll mint his now.'  So was Mr. Garner minting RR/BAYC NFTs for you? A. I minted them all because they were from my wallet, so no. [...] Q. Other than owning possession of the wallet from which you claim that the RR/BAYC NFTs were minted, how were the ten that were sent to your father -- A.   They weren't sent to my father.*").  Mr. Cahen also testified that he had "between

36

JTX-0723.00039

Expert Report of Lauren R. Kindler
February 6, 2023

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

RR/BAYC NFTs may not have directly generated revenue for Defendants, they still have value. One of the Defendants, Mr. Cahen, testified that the value of the held RR/BAYC NFTs "is pretty much the same as when they were originally being produced," which is "anywhere between .1 Ethereum and .15 Ethereum."[159]  I believe this estimate of their value to be reasonable for two reasons.

72.    First, the floor price of RR/BAYC NFTs secondary market as of January 27, 2023 is 0.115 ETH, which is consistent with Mr. Cahen's estimate of 0.1 – 0.15 ETH.[160]  Were Defendants to sell the 590 RR/BAYC NFTs that they hold or they did not mint on the secondary market at January 27's floor price, they would generate 65 ETH in profits.

73.    Second, Defendants could have sold each one of these RR/BAYC NFTs along with the others they sold.  Assuming 1) each held ape had been sold at the time of mint at the price Defendants were charging at that time, and 2) each ape they did not mint was sold today for 0.15 ETH, they would generate 79 ETH in profits.

74.    I calculate the value of the RR/BAYC NFTs that Defendants hold or have not minted as 65 ETH, the more conservative of the above two valuations.  Using the ETH to USD conversation rate as of February 1, 2023, this equates to $106,055.[161, 162]

---

ten and 100" and the values of those were between 0.1 and 0.15 ETH. *See* Cahen Deposition, 255:15-24. ("*Q. And how many RR BAYC NFT's do you currently possess? [...] A. I think more than ten. I would think somewhere between ten and 100 would be my guess.*").

[159]    Cahen Deposition, 255:25-256:7 ("*Q. What is the value of those RR BAYC's NFT's approximately right now? A. I think that the value of them is pretty much the same as when they were originally being produced by the artist Ryder Ripps. Q. And what is that? A. Anywhere between .1 Ethereum and .15 Ethereum is my recollection.*").

[160]    Coin Gecko, "RR/BAYC," (https://www.coingecko.com/en/nft/rr-bayc, viewed on February 3, 2023).

[161]    These profit calculations deduct 1) gas costs associated with the minting of the held RR/BAYC NFTs, and 2) estimated gas costs associated with the minting of RR/BAYC NFTs that Defendants have not minted.  I estimate the costs associated with each of the 454 apes the Defendants have not minted to be the average minting gas costs of the 9,546 minted RR/BAYC NFTs.

[162]    The ETH to USD exchange rate as of February 1, 2023 was $1,641.61 to 1 ETH. (https://etherscan.io/chart/etherprice, viewed on February 5, 2023).

JTX-0723.00040

### 4.    Total Disgorgement for Defendants' Wrongful Conduct

75.    Summing (1) the profits collected from the initial sale of minted RR/BAYC NFTs, (2) the profits collected from resales of RR/BAYC NFTs on the secondary market in the form of royalties, and (3) the value of RR/BAYC NFTs that Defendants hold or did not mint, total profits are $2,009,188, as shown in **Figure 4** below.

**Figure 4**
**Profits Associated with Sales of RR/BAYC NFTs and**
**Value of RR/BAYC NFTs Held or Not Minted by Defendants (USD)**

|  | Profits |
| --- | --- |
| Profits from Initial Sales of RR/BAYC NFTs | $1,785,823 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| **Total** | **$2,009,188** |

76.    The documents and data I reviewed indicate that when Mr. Lehman and Mr. Hickman began to assist Defendants with the RR/BAYC NFT project, a percentage of the profits from the initial sales of RR/BAYC NFTs accrued to Mr. Lehman and Mr. Hickman rather than the Defendants.[163]  In **Figure 5** below, I have removed the $419,733 of profits that accrued to Mr. Lehman and Mr. Hickman, such that the numbers reflect the profits that accrued to Defendants only.  After this adjustment, total disgorgement is $1,589,455.[164]

---

[163]  Mr. Lehman and Mr. Hickman each accrued 15 percent of profits from the initial sales of RR/BAYC NFTs from the RR/BAYC RSVP contract. *See* **Appendix C**; Lehman Declaration, ¶¶ 33-34;  RIPPSCAHEN00015341.

[164]  Additionally, Defendants may have accrued gains that are not included in this calculation, and/or gains that are difficult to quantify.  For example, Mr. Ripps has publicly discussed the RR/BAYC NFT collection on Twitter and other channels (*See* **Section VI.B**) and this discussion has been noticed and picked up by news media.  This publicity may have led, or may lead in the future, to additional revenue streams for Mr. Ripps. *See, e.g.*, Bloomberg Law, "Fake Bored Ape Yacht Club NFTs Sold by Artist, Yuga Labs Claims," June 27, 2022 (https://news.bloomberglaw.com/ip-law/fake-bored-ape-yacht-club-nfts-sold-by-artist-yuga-labs-claims, viewed on February 6, 2023); Forbes, "This Is No Mere Monkey Business" Yuga Labs, Bored Ape Yacht Club Creator, Files Lawsuit Against Self-Proclaimed 'Conceptual    Artist'    (https://www.forbes.com/sites/megchristensen/2022/06/27/this-is-no-mere-monkey-business-

**Figure 5**
**Disgorgement of Defendants' Profits (USD)**

|  | Profits |
|---|---|
| Profits from Initial Sales of RR/BAYC NFTs | $1,366,090 |
| Profits from Resales of RR/BAYC NFTs | $117,309 |
| Value of Held or Not Minted RR/BAYC NFTs | $106,055 |
|  |  |
| **Total** | **$1,589,455** |

### 5.     Disgorgement as a Proxy for Yuga Labs' Lost Profits

77.     I understand that Defendants' profits generated by the wrongful conduct can be used as an appropriate proxy for Yuga Labs' lost profits. Hence, the disgorgement calculated above may serve as a proxy for Yuga Labs' lost profits. This proxy, however, may significantly understate Yuga Labs' lost profits. Given the significant demand and popularity of the BAYC NFTs, had Yuga Labs, as opposed to Defendants, minted additional NFTs with its marks, it likely would have earned more profits than Defendants earned from minting the accused RR/BAYC NFTs. For example, the floor price of authentic BAYC NFTs was almost 99 ETH on May 13, 2022, the day that Defendants began minting RR/BAYC NFTs.[165]

78.     Furthermore, Ethereum blockchain data suggests that some consumers have treated RR/BAYC NFTs as replacement goods for BAYC NFTs, indicating that in at least some instances, Defendants' gain came at Yuga Labs' loss. For example, on June 26, 2022, wallet address 0x4a7e8dcb760c1068bb6a5828c0d0a57a6143daf0 bought an RR/BAYC NFT and later sold an authentic BAYC NFT bearing the exact same image as the RR/BAYC NFT that was

---

yuga-labs-bored-ape-yacht-club-creator-files-lawsuit-against-self-proclaimed-conceptual-artist/?sh=6636b771567f, viewed on February 6, 2023).

[165]   Coin Gecko, "Bored Ape Yacht Club (BAYC)," (https://www.coingecko.com/en/nft/bored-ape-yacht-club/, viewed on February 4, 2023).

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

purchased.[166]  These transactions suggest that this individual saw the RR/BAYC NFT as a cheaper replacement good for the authentic BAYC NFT.  While I have not quantified the extent of this type of behavior or Yuga Labs' associated damages, it demonstrates that RR/BAYC NFTs have the ability to draw consumers away from Yuga Labs.

**B.**    **Yuga Labs' Corrective Advertising Expenses Attributable to Defendants' Wrongful Conduct**

79.    I understand that another measure of damages available to Yuga Labs is corrective advertising expenses attributable to Defendants' wrongful conduct.  The documents, data, and testimony in this matter describe Yuga Labs' additional expenses related to corrective advertising attributable to the wrongful conduct.  Below, I calculate Yuga Labs' damages based on its corrective advertising-related expenses.

**1.**    **Yuga Labs' Corrective Advertising Expenses**

80.    Yuga Labs' corrective advertising expenses are described in testimony from Yuga Labs' former CEO and detailed in financial documents produced by Yuga Labs.[167]

81.    First, Yuga Labs' former CEO testified that Yuga Labs spends more than $1 million dollars a year enforcing "takedowns."[168]  In March 2022, Yuga Labs signed an agreement with

---

[166]  *See* YUGALABS_00015996;
https://etherscan.io/tx/0x79b3bc7e029ae9fe423cbf29c75bf6787e64fa7e0b8bb61e62166510c7e4dd65 (purchase of the RR/BAYC NFT); YUGALABS_00015417;
https://etherscan.io/tx/0xd6787edd130dffc37006884013d118bfe3d7e8bf319468e3eab793c6760f8bce (same-day sale of the authentic BAYC NFT); YUGALABS_00015413 (image underlying the RR/BAYC NFT as shown on LooksRare); YUGALABS_00015414 (image underlying the authentic BAYC NFT as shown on OpenSea).

[167]  In 2022, Yuga Labs spent $20,202,665 on advertising, marketing and community, which is more than eight times their spending in 2021.  Yuga Labs' former CEO testified that 98 percent of these expenses in 2022 are attributable to corrective advertising.  YUGALABS_00031620; 30(b)(6) Muniz Deposition, 172:17-24. ("*Q. […] What portion of the advertising marketing and community expenses in line 5100 are attributable to corrective advertising? […]  A. […] I would say 98 percent. You can also see that compared to the year before.*").

[168]  30(b)(6) Muniz Deposition, 76:21-77:5 ("*[T]he RR/BAYC project on the Foundation was taken down as part of like every -- like we do take downs we enforce our intellectual property it's a. huge -- it's a huge part of our business. We spend over a million dollars a year enforcing take downs because we treat our intellectual property and our brands very seriously especially Board Ape Yacht Club.*").

Expert Report of Lauren R. Kindler                                        *Highly Confidential*
February 6, 2023                                                   *ATTORNEYS' EYES ONLY*

vendor Appdetex, "a digital brand protection company which employs cyber security scanning and enforcement methods to protect its customers' brands, revenue and reputations from online counterfeiting, brand infringement and fraud."[169]   Yuga Labs hired Appdetex precisely to combat the very type of confusion that Defendants created in the marketplace.[170]   Yuga Labs paid Appdetex $250,000 for their services through 2022.[171]   To the extent that Appdetex's services were required because of Defendants' wrongful conduct, some of these expenses are appropriately due to Yuga Labs as damages.

82.     Second, Yuga Labs' former CEO testified that Yuga Labs engaged in more traditional corrective advertising efforts in response to Defendants' trademark infringement, including a campaign featuring billboards and wall postings in New York City.[172]   Invoices show that Yuga Labs incurred expenses of $285,977 associated with this campaign.[173]

83.     I summarize the corrective advertising expenses that Yuga Labs has identified as, at least in part, attributable to Defendants wrongful conduct in **Figure 6** below.   In the absence of the wrongful conduct, Yuga Labs would not have incurred all of these expenses.

---

[169]   YUGALABS_00031303-316 at 303, 308 (Master Services Agreement (Brand Protection Services) between Focus IP, Inc., doing business as Appdetex and Yuga Labs, Inc., March 22, 2022).

[170]   30(b)(6) Muniz Deposition, 77:1-78:23 ("*the overall process is apt to text which is a vendor for us SPEL for our legal team scans the internet he tech it havely for any fraudulent use of our intellectual property and then they issue take downs and enforce on our behalf.*")

[171]   YUGALABS_00031302 (Appdetex Invoice #INV5966, Billed to Nicole Schiller, Yuga Labs, Inc., March 24, 2022).

[172]   30(b)(6) Muniz Deposition, 82:14-24 ("*We did a top of advertising. We had to do an out of home campaign so we did an out of home campaign in New York City for instance which funny enough your client and I'm going to curse for two. Second fucked up and it ended up becoming a huge problem, but yes we did a lot of competitive corrective advertising. Q. Okay. What is an out of home campaign? A. Billboards, wall postings. We had nontraditional so we had engage add company to do like stencils across the city.*").

[173]   In May 2022, advertising vendors Colossal and Outfront invoiced Yuga Labs $206,000 and $79,977, respectively. YUGALABS_00032592; YUGALABS_00032594.

JTX-0723.00044

**Figure 6**
**Yuga Labs' Corrective Advertising Expenses**

|  | Corrective Advertising Expenses |
|---|---|
| Takedowns of RR/BAYC NFTs | up to $250,000 |
| NYC Billboards and Wall Postings Campaign | $285,977 |
|  |  |
| **Total Corrective Advertising Expenses** | **$285,977 – $535,977** |

84.     Defendants' wrongful conduct remains ongoing.  I understand that Defendants continue to infringe on Yuga Labs' trademarks and engage in false advertising of the RR/BAYC NFT collection, as discussed in **Section V.D**.[174]  Additionally, as discussed in **Section VIII.A.2**, RR/BAYC NFTs are still in the marketplace.  Therefore, Yuga Labs likely will continue to incur corrective advertising expenses.  Even if, at the conclusion of this litigation, Defendants cease their promotion of RR/BAYC NFTs altogether, Yuga Labs will continue to incur corrective advertising expenses to repair the damage done to its brand.[175]  The above estimate therefore does not capture the full extent of the corrective advertising expenses Yuga Labs will incur to address the confusion and harm caused by Defendants' wrongful conduct.

**2.     Yuga Labs' Cost to Acquire RR/BAYC NFTs at Current Market Prices**

85.     To mitigate the harm caused by Defendants wrongful conduct, one corrective action Yuga Labs could take would be to acquire, and then burn, all RR BAYC/NFTs.[176]  I consider this scenario hypothetical for several reasons.  First, not all RR/BAYC NFTs are available for purchase

---

[174]  In addition to the activities discussed in **Section V.D**, I understand that Defendants continue to publicly discuss their plans to create ApeMarket. *See, e.g.,* YUGALABS_00030238.

[175]  Expert Report of Professor Jonah Berger, February 6, 2023, Section VII.C. ("*The results of these analyses show that as the narrative in the marketplace shifted to include RR/BAYC, negative perceptions associated with BAYC increased.  This is evidence that BAYC brand equity was harmed.*").

[176]  In fact, Yuga Labs did pursue this remedy in its settlement with Mr. Lehman.  Mr. Lehman agreed to, and did, burn his RR/BAYC NFTs as part of his settlement.  Consent Judgment and Order for Permanent Injunction Against Thomas Lehman, Yuga Labs, Inc., v. Thomas Lehman, *Case No. 1:23-cv-00085-MAD-TWD*, dated February 6, 2023, ¶ 9.

JTX-0723.00045

on secondary markets. Second, it is likely that certain holders of RR/BAYC NFTs would not be willing to sell at current market prices, or perhaps all. If holders became aware that Yuga Labs' intent was to purchase *all* RR/BAYC NFTs, it would be expected that some would become holdouts, demanding higher than market prices. Third, this scenario assumes that Yuga Labs would be willing to purchase the RR/BAYC NFTs, and I have seen no evidence that they have or ever would consider doing so.

86.     Under this hypothetical scenario, a simple calculation can be used to estimate the cost to Yuga Labs. I use the current floor price of RR/BAYC NFTs (approximately 0.115 ETH),[177] multiplied by the total number of existing RR/BAYC NFTs (9,496),[178] to calculate the market price of the RR/BAYC NFT collection. This calculation results in 1,092 ETH or $1,792,704.[179] This estimate very likely understates the cost Yuga Labs would actually incur in this hypothetical scenario. If Yuga Labs' intent became known to the market, the floor price of the RR/BAYC NFT collection would likely rise quickly and encourage holdouts, causing Yuga Labs to pay much higher costs than the floor price used in the above calculation. These holdouts may be the Defendants themselves or other buyers looking to profit on the mitigation efforts. Because these efforts would not only create additional costs for Yuga Labs, but also further enrich Defendants, this hypothetical "acquire and burn" scenario would also require an adjustment to the disgorgement calculation above. At a minimum, disgorgement damages would increase commensurate with

---

[177]   Coin Gecko, "RR/BAYC," (https://www.coingecko.com/en/nft/rr-bayc, viewed on February 3, 2023).

[178]   While 9,546 RR/BAYC NFTs were minted, 50 were subsequently burned. *See* **Appendix C**.

[179]   The ETH to USD exchange rate as of February 1, 2023 was $1,641.61 to 1 ETH. (https://etherscan.io/chart/etherprice, viewed on February 5, 2023).

JTX-0723.00046

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

additional profits Defendants would earn from creator fees made on resales to Yuga Labs, and from the sales from Defendants to Yuga Labs of RR/BAYC NFTs held or not minted.[180]

### 3. Defendants' Advertising Expenses as a Proxy for Yuga Labs' Corrective Advertising Expense

87.     I understand that Defendants' advertising and marketing expenses can be used as a proxy for the expenses incurred by Yuga Labs for corrective advertising.  While Defendants have not produced financial data regarding their revenues and expenses, there is some available evidence regarding Defendants' expenses.  First, Defendants hired Mr. Lehman and Mr. Hickman to help them create and market the RR/BAYC NFT collection.  As discussed above in **Section VIII.A.4**, profits shared with Mr. Lehman and Mr. Hickman totaled $419,733.  To the extent that these payments are considered advertising and marketing expenses, they would be included in this proxy.  Second, in their testimony, Mr. Cahen and Mr. Ripps each provide examples of other expenses that they incurred in the ordinary course of business.[181]  While these expenses total less than $15,000, to the extent they are considered advertising and marketing expenses, they would also be included in this proxy.

88.     Due to the lack of documentation provided by Defendants, these expenses cannot be considered a definitive proxy, and they are likely understated relative to the actual advertising and marketing expenses incurred by Defendants.  For example, expenses and value related to their

---

[180]   As noted in **Section VIII.A** and in **Appendix C**, the Etherscan data would contain the data and information required to calculate these additional disgorgement damages and to verify that the RR/BAYC NFTs had, in fact, been burned.

[181]   *See* Ripps Deposition, 241:12-16 ("*Q.   And what are your expenses here?  A.   I think -- you mean this 3,500 -- Q.  Yes.  A.   I think that's the money that I paid my assistant who Jeremy introduced me to, this kid Ian.*"). *See also* Cahen Deposition, 291:6-19. ("*Q.   And you've got here expenses next to your line Jeremy, 11,000.  A.  I see that, yeah. Q.  What is -- what makes up that number?  A.  My -- that was pretty recent. I'm pretty sure what that covers is I had to buy a new machine which I used for the project. And then there was one travel event. And those expenses I would consider part of my contribution to the project. Q.  What was the travel? A I went to New York. Q.  What did you go to New York for? A.  Ryder was there. So I wanted to be there in support of the artist and friend of mine.*").

JTX-0723.00047

promotional activities on social media are not included. Therefore, while the $434,233 in expenses described here are useful to demonstrate that Defendants did incur expenses for their advertising and marketing, this total would only represent the lower bound of a range in which Yuga Labs' corrective advertising expenses should be considered.

### C. Defendants' Avoided Costs from the Wrongful Conduct

89. Defendants also were unjustly enriched in the form of avoided costs. In this case, Yuga Labs' investments in developing its brand and trademarks, including its marks associated with the BAYC and BAYC NFT collection, represent costs that Defendants were able to avoid. Instead, through their wrongful conduct, they leveraged the value created by Yuga Labs. As an example, Yuga Labs incurred costs associated with hiring of a freelance illustrator to do early sketches of the images for the BAYC NFT collection.[182] By copying the exact images of the final BAYC collection, Defendants effectively "free ride" on Yuga Labs' investments in creating them. Similarly, Defendants "free ride" on Yuga Labs' BAYC brand, which attracted consumers to their RR/BAYC NFTs. In other words, absent the wrongful conduct, Defendants would have had to make these investments themselves. While it is easy to observe that Yuga Labs incurred costs in developing the BAYC brand and associated marks, the extent of these investments are difficult to quantify, and thus this report does not attempt to quantify the extent of Defendants' unjust enrichment in the form of avoided costs.

### D. Additional Unquantified Harm to Yuga Labs from the Wrongful Conduct

90. There are additional forms of harm that Yuga Labs has suffered as a result of Defendants' wrongful conduct, but that have not been quantified in this report. Acknowledging

---

[182] 30(b)(6) Muniz Deposition, 60:23-61:3 ("*Q. And who did the earliest sketches of the apes? A. We had a freelance illustrator by the name of ███████████████████ do the early concept design.*").

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

the extent of the harm caused to Yuga Labs, in June 2022, Defendants' collaborator Mr. Hickman noted to Defendants that "[w]e're closing in on *$10 million impact to yuga."[183]  It is often the case that some aspects of damage to a business cannot be easily quantified, even though it can be observed.  Below, I describe three additional forms of harm that are likely, given the Defendants' wrongful conduct.

91.     First, the floor price of BAYC NFTs declined after the RR/BAYC NFTs were minted.  The floor price for BAYC NFTs peaked at 144.9 ETH on April 30, 2022, just before Defendants launched the RR/BAYC NFT collection.[184]  It then began to decline in May 2022, and, as of February 1, 2023, the floor price for BAYC NFTs had dropped to 64 ETH.[185]  The timing of the decline makes it likely that the decline was at least in part caused by confusion in the marketplace between the authentic BAYC NFTs and the RR/BAYC NFTs.  While I have not quantified the extent to which the confusion impacted interest in, and sales of, authentic BAYC NFTs and BAYC branded merchandise, the resulting harm to Yuga Labs would consist of, at a minimum, the loss of creator and other fees they would have earned.

92.     Second, testimony describes how the confusion caused by RR/BAYC NFTs negatively affected Yuga Labs' business partnerships.  In her testimony, Yuga Labs' former CEO recalls a specific instance in which the RR/BAYC NFTs collection was invoked in a conversation with one of Yuga Labs' potential partners in the fashion industry as a reason why the partner was

---

[183]   Hickman Deposition, Exhibit 58.

[184]   NFT Price Floor, "Bored Apes Yacht Club," (https://nftpricefloor.com/bored-ape-yacht-club, viewed on February 3, 2023.)

[185]   NFT Price Floor, "Bored Apes Yacht Club," (https://nftpricefloor.com/bored-ape-yacht-club, viewed on February 3, 2023).

hesitant to consummate a business partnership with Yuga Labs.[186]  To the extent that there were other such instances of negative impressions that were not directly raised with Yuga Labs, these would not be observed at all.  While I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships, the resulting harm to Yuga Labs would consist of, at a minimum, the loss of business partnerships and the associated profits to Yuga Labs from such partnerships.

93.     Third, Defendants' wrongful conduct likely damaged Yuga Labs' goodwill. Assuming that Yuga Labs is similar to other firms, the value of its goodwill would range anywhere between 0% to 30% of its assets.[187]  Yuga Labs' assets as of November 30, 2022, when most recently valued, were just over $294 million,[188]  meaning that the value of Yuga Labs' goodwill may be as high as $88 million.  This is an illustrative and simple calculation.  I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill, but directionally, it would decrease the value.

## IX.   DAMAGES SUMMARY

94.     In **Figure 7** below, I summarize the damages figures presented in this report.

---

[186]   30(b)(6) Muniz Deposition, 156:5-18.  Ms. Muniz testified that this "*change[d] the dynamic of [the] relationship*" with the potential partner.

[187]   InvestFAQ, "Goodwill to Assets Ratio," (https://invest-faq.com/goodwill-to-assets-ratio/, viewed on February 3, 2023).

[188]   YUGALABS_00031474-553 at 482.

JTX-0723.00050

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Figure 7**
**Summary of Damages Calculations (USD)**

| | Damages |
|---|---|
| **Disgorgement of Defendants' Profits** and Yuga Labs' Lost Profits (as a Proxy) | $1,589,455 |
| **Yuga Labs' Corrective Advertising Expenses** | |
| Yuga Lab's Corrective Advertising Expenses | $285,977 - $535,977 |
| Yuga Labs' Cost to Acquire RR/BAYC NFTs | $1,792,704 |
| Defendants' Advertising Expenses (as a Proxy) | $434,233 |

95.     For all the reasons described in **Section VIII**, above, Defendants' wrongful conduct caused (and continues to cause) unjust enrichment to Defendants and harm to Yuga Labs.[189] Therefore, the damages I have calculated for disgorgement of Defendants' profits and compensation for Yuga Labs' corrective advertising expenses, as seen in **Figure 7**, understate the total harm to Yuga Labs. Under certain remedies available to Yuga Labs, my calculations may significantly understate the total harm. I reserve the right to update my calculations and supplement my opinions if additional data and information become available to me and I am asked to do so.

Lauren R. Kindler
February 6, 2023

---

[189]  As described in **Sections VIII.A.5, VIII.B.2, VIII.B.3, VIII.C,** and **VIII.D.**

**JTX-0723.00051**

## Appendix A

### LAUREN R. KINDLER
**Managing Principal**

| | |
|---|---|
| Phone: 214 523 1410 | 2911 Turtle Creek Boulevard |
| Fax: 214 523 1401 | Suite 600 |
| lauren.kindler@analysisgroup.com | Dallas, TX 75219 |

Ms. Kindler has worked on a variety of engagements, including intellectual property (IP) disputes, contract disputes, litigation matters related to securities and finance, false advertising allegations, and antitrust matters. In litigation matters, she has testified in deposition and at trial, and assisted in all phases of the litigation process, including discovery, expert reports, deposition, and trial preparation. In patent infringement matters, Ms. Kindler has analyzed claimed lost sales, claimed lost profits, and claimed reasonable royalty damages. In antitrust matters, she has assessed the competitive consequences of mergers, analyzed the competitive behavior of market participants, and estimated the impact of market power. Her work has also included the development of complex damages models, the analysis of statistical data, and the analysis of stock price movements. Prior to joining Analysis Group, Ms. Kindler held positions with two economics consulting firms.

## EDUCATION

| | |
|---|---|
| 2006 | M.A., economics, Southern Methodist University |
| 1995 | B.A., economics (*cum laude*), Tulane University |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2000–Present | Analysis Group, Inc. |
| 1998–1999 | National Economic Research Associates, Inc. (NERA) |
| 1996–1998 | The Brattle Group |

## SELECTED EXPERT CASEWORK

- ***Vervain, LLC v. Micron Technology, Inc. et al.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Micron to evaluate damages resulting from Micron's alleged infringement of Vervain's patents relating to certain flash memory products.  Prepared expert report and testified in deposition.  (2023)

- ***Nichia Corporation v. Feit Electric Company, Inc.***
  *US District Court, Central District of California*
  Retained as an expert witness for Nichia to evaluate Nichia's damages resulting from Feit's infringement of its patent related to filament style LEDs.  Evaluated Nichia's reasonable royalty damages.  Also evaluated the commercial success associated with patent-practicing products.  Prepared three expert reports and

**JTX-0723.00052**

testified in deposition and trial.  (2023)

- ***Envirotainer AB v. DoubleDay Acquisitions LLC d/b/a CSafe Global***
  *US Patent and Trademark Office – PTAB*
  Retained as an expert witness for Envirotainer to evaluate commercial success attributable to CSafe's Challenged Patents relating to VIP technology for use in active air cargo containers. Prepared expert declaration and testified in deposition.  (2023)

- ***Estech Systems IP, LLC v. Conduent Business Services LLC. et al.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Conduent to evaluate damages resulting from Conduent's alleged infringement of Estech's patents relating to VoIP telephone systems and network equipment.  Prepared expert report. (2023)

- ***Estech Systems IP, LLC v. Liberty Mutual Group, Inc.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Liberty Mutual to evaluate damages resulting from Liberty Mutual's alleged infringement of Estech's patents relating to VoIP telephone systems and network equipment. Prepared expert report. (2023)

- ***Carolyn W. Hafeman v. LG Electronics, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for LG to evaluate damages resulting from LG's alleged infringement of certain patents relating to specific features of Find My Device.  Prepared expert report. (2023)

- ***Wolfspeed, Inc. and Ideal Industries Lighting, LLC d/b/a Cree Lighting v. CAO Lighting, Inc.***
  *Patent Trial and Appeal Board, U.S. Patent and Trademark Office*
  Retained as an expert witness for CAO Lighting to evaluate economic evidence of commercial success of products embodying the challenged claims of the patents at issue.  Prepared declaration. (2023)

- ***Via Transportation, Inc. v. RideCo, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for RideCo to evaluate damages resulting from Via's alleged infringement of RideCo's patents with respect to RideCo's counterclaims and damages resulting from RideCo's alleged infringement of Via's patents with respect to Via's claims.  The subject matter is technologies supporting on-demand public transit services.  Evaluated economic considerations relating to RideCo's request for a permanent injunction, in addition to RideCo's economic damages.  Prepared two expert reports and testified in deposition.  (2023)

- ***NXP USA, Inc. and NXP B.V. v. Impinj, Inc.***
  *US District Court, Western District of Washington*
  Retained as an expert witness for Impinj to evaluate damages resulting from Impinj's alleged infringement of certain patents relating to RAIN RFID technology.  Evaluated NXP's lost profits and reasonable royalty damages claim.  Prepared expert report and testified in deposition.  (2023)

- ***Traxcell Technologies, LLC v. Cellco Partnership d/b/a Verizon Wireless***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Verizon to evaluate Traxcell's damages associated with Verizon's alleged infringement of Traxcell's patented C-SON and navigation technologies.  Prepared expert report and testified in deposition.  (2022)

**JTX-0723.00053**

- **Paltalk Holdings, Inc. v. Cisco Systems, Inc.**
  *US District Court, Western District of Texas*
  Retained as an expert witness for Cisco to evaluate Paltalk's damages associated with Cisco's alleged infringement of Paltalk's patented audio mixing and multiplexing technology in audio conferencing products and systems.  Prepared expert report and testified in deposition.  (2022)

- **Jawbone Innovations, LLC v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.**
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Samsung to evaluate Jawbone's damages associated with Samsung's alleged infringement of Jawbone's patented noise suppression technology in smartphones and earbuds. Prepared expert report and testified in deposition.  (2022)

- **U.S. Well Services, Inc. v. Halliburton Energy Services, Inc. et al.**
  *US District Court, Western District of Texas*
  Retained as an expert witness for Halliburton to evaluate Halliburton's damages associated with USWS's alleged infringement of Halliburton's patents and evaluate USWS's claimed damages associated with Halliburton's alleged infringement of USWS's patents. Prepared two expert reports and testified in deposition.  (2022)

- **Stitch Editing Ltd. v. TikTok, Inc. et al.**
  *US District Court, Central District of California*
  Retained as an expert witness for TikTok and ByteDance Ltd. to evaluate Stitch Editing's damages associated with TikTok and ByteDance's alleged infringement of Stitch Editing's trademark and common law trademark rights. Prepared expert report and testified in deposition.  (2022)

- **MasterObjects, Inc. v. Meta Platforms, Inc.**
  *US District Court, Northern District of California*
  Retained as an expert witness for Meta Platforms to evaluate MasterObjects' royalty damages associated with Meta's alleged infringement of MasterObjects' patents relating to Facebook's predictive search feature. Prepared expert report and testified in deposition.  (2022)

- **W.H. Hall Family Holdings, LLP. v. Stryker Corporation**
  *US District Court, Western District of Texas*
  Retained as an expert witness for Stryker to evaluate Hall's royalty damages associated with alleged infringement of Hall's patents relating to stents. Prepared expert report and testified in deposition.  (2022)

- **Dali Wireless, Inc. v. Corning Optical Communications LLC**
  *US District Court, Northern District of California*
  Retained as an expert witness for Corning to evaluate Dali Wireless's royalty damages associated with Corning's alleged infringement of Dali Wireless's patents relating to DAS systems. Prepared expert report and testified in deposition.  (2022)

- **CAO Lighting, Inc. v. Feit Electric Company**
  *US District Court, Central District of California*
  Retained as an expert witness for CAO Lighting to evaluate its royalty damages associated with Feit's infringement of CAO Lighting's patent relating to LED lighting sources. Prepared expert report and testified in deposition.  (2022)

JTX-0723.00054

- ***Impinj, Inc. v. NXP USA, Inc.***
  *US District Court, Northern District of California*
  Retained as an expert witness for Impinj to evaluate damages resulting from NXP's alleged infringement of certain patents relating to RAIN RFID technology.  Evaluated Impinj's lost profits and reasonable royalty damages.  Prepared expert report and testified in deposition.  (2022)

- ***Godo Kaisha IP Bridge 1 v. Nokia Corporation et al.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Nokia to evaluate IP Bridge's damages resulting from Nokia's alleged infringement of certain patents declared essential to 4G LTE and 5G wireless standards.  Evaluated IP Bridge's reasonable royalty damages.  Prepared expert report and testified in deposition.  (2022)

- ***CAO Lighting, Inc. v. Osram Sylvania, Inc. and Ledvance LLC***
  *US District Court, Delaware*
  Retained as an expert witness for CAO Lighting to evaluate its royalty damages associated with Defendants' infringement of CAO Lighting's patent relating to LED lighting sources. Prepared two expert reports and testified in deposition.  (2022)

- ***CAO Lighting, Inc. v. General Electric Company, Consumer Lighting (U.S.) LLC d/b/a GE Lighting and Current Lighting Solutions, LLC***
  *US District Court, Delaware*
  Retained as an expert witness for CAO Lighting to evaluate its royalty damages associated with Defendants' infringement of CAO Lighting's patent relating to LED lighting sources. Prepared two expert reports and testified in deposition.  (2022)

- ***Conformis, Inc. v. Medacta USA, Inc. and Medacta International SA***
  *US District Court, Delaware*
  Retained as an expert witness for Conformis to evaluate Conformis's damages resulting from Medacta's infringement of its patents related to patient-specific instrumentation used in joint replacement procedures. Evaluated Conformis's reasonable royalty damages.  Prepared two expert reports and testified in deposition.  (2022)

- ***DoubleDay Acquisitions LLC d/b/a CSafe Global v. Envirotainer AB and Envirotainer Inc.***
  *US District Court, Northern District of Georgia*
  Retained as an expert witness for Envirotainer to evaluate preliminary injunction issues and commercial success relating to Envirotainer's alleged infringement of CSafe's patented VIP technology for use in active air cargo containers. Prepared expert declaration and testified in deposition.  (2022)

- ***Jens H.S. Nygaard v. Federation Internationale de L'Automobile, Formula One Management Ltd., et al.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Formula One to evaluate Mr. Nygaard's damages resulting from Defendants' alleged infringement of its patent related to the Halo.  Evaluated Mr. Nygaard's reasonable royalty damages.  Prepared expert report and testified in deposition.  (2022)

- ***Flexiworld Technologies, Inc. v. Roku Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Roku to evaluate Flexiworld's damages resulting from Roku's alleged infringement of its patents related to specific ways to screen mirror and cast content.  Evaluated Flexiworld's reasonable royalty damages.  Prepared expert report and testified in deposition.  (2022)

- ***Philips North America LLC v. Fitbit LLC***
  *US District Court, District of Massachusetts*
  Retained as an expert witness for Fitbit to evaluate Philips' damages resulting from Fitbit's alleged infringement of its patent related to a specific method of obtaining physiologic data on a device, transmitting it to a server, performing a calculation, and displaying that calculation on a mobile app. Evaluated Philips' reasonable royalty damages.  Prepared expert report and testified in deposition.  (2021)

- ***Zachary E. Gerut, M.D. v. BioSpecifics Technologies Corp. and Endo International Plc***
  *American Arbitration Association*
  Retained as an expert witness for Dr. Gerut to evaluate his damages resulting from Defendants' breach of contract relating to a license agreement in which Dr. Gerut granted BioSpecifics a worldwide exclusive license to his know-how for the removal or treatment of fat in humans or animals.  Evaluated Dr. Gerut's royalty and stock options-related damages. Prepared expert report.  (2021)

- ***AGIS Software Development LLC v. Uber Technologies Inc.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Uber to evaluate AGIS's damages resulting from Uber's infringement of its patents related to rider and driver communications, rider and driver location sharing, and forced message alerts.  Evaluated AGIS's reasonable royalty damages. Prepared expert report and testified in deposition. (2021)

- ***VideoShare, LLC v. Google LLC and YouTube, LLC***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Google and YouTube to evaluate VideoShare's damages resulting from the defendants' infringement of its patent related to a particular method of uploading, transcoding, and delivering a video file with an advertisement. Evaluated VideoShare's reasonable royalty damages. Prepared expert report and testified in deposition and trial.  (2021)

- ***Jiaxing Super Lighting Electric Appliance Co., Ltd. and Obert, Inc. v. CH Lighting Technology Co.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Super Lighting to evaluate its lost profits and royalty damages associated with Defendants' infringement of Super Lighting's patents relating to LED tube lamps. Prepared two expert reports and testified in deposition and trial.  (2021)

- ***Cellspin Soft, Inc. v. Fitbit LLC***
  *US District Court, Northern District of California*
  Retained as an expert witness for Fitbit to evaluate Cellspin's damages resulting from Fitibt's alleged infringement of its patents related to a specific method of wireless data transfer. Evaluated Cellspin's reasonable royalty damages. Prepared expert report. (2021)

- ***Barkan Wireless IP Holdings, L.P. v. T-Mobile US, Inc. and Nokia of America Corporation***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for T-Mobile and Nokia to evaluate Barkan's damages resulting from the defendants' infringement of its patents related to femtocells. Evaluated Barkan's reasonable royalty damages. Prepared expert report.  (2021)

- ***AlexSam, Inc. v. UMB Financial Corp. and UMB Bank, N.A.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for UMB Bank to evaluate AlexSam's damages resulting from the

A-5

**JTX-0723.00056**

defendants' infringement of its patent related to multifunction card system. Evaluated UMB's reasonable royalty damages. Prepared expert report.  (2021)

- ***Broadband iTV, Inc. v. AT&T Services, Inc. and AT&T Communications, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for AT&T to evaluate BBiTV's damages resulting from the defendants' infringement of its patent related to video-on-demand. Evaluated BBiTV's reasonable royalty damages. Prepared expert report.  (2021)

- ***Conformis, Inc. v. Medacta USA, Inc. and Medacta International SA***
  *US District Court, Delaware*
  Retained as an expert witness for Conformis to evaluate its damages resulting from the defendants' infringement of its patented patient-specific instruments and associated implants. Evaluated Conformis' reasonable royalty damages. Prepared two expert reports.  (2021)

- ***Via Vadis, LLC and AC Technologies, S.A. v. Amazon.com, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Amazon to evaluate Via Vadis's royalty damages associated with Amazon's alleged infringement of Via Vadis's patent relating to peer-to-peer file distribution technology. Prepared expert report and testified in deposition.  (2021)

- ***Via Vadis, LLC and AC Technologies, S.A. v. Blizzard Entertainment, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Blizzard to evaluate Via Vadis's royalty damages associated with Blizzard's alleged infringement of Via Vadis's patent relating to peer-to-peer file distribution technology. Prepared two expert reports and testified in deposition.  (2021)

- ***Profectus Technology LLC v. Google LLC***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Google to evaluate Profectus's royalty damages associated with Google's alleged infringement of Profectus's patent related to digital picture displays. Prepared expert report and testified in deposition.  (2021)

- ***Unverferth Mfg. Co., Inc. v. Meridian Mfg., Inc.***
  *US District Court, Northern District of Iowa, Western Division*
  Retained as an expert witness for Unverferth to evaluate Unverferth's lost profits and royalty damages associated with Meridian's infringement of Unverferth's patents relating to its load/unload seed tenders. Also evaluated Meridian's counterclaims of infringement and associated royalty damages. Prepared three expert reports and testified in deposition.  (2021)

- ***LSP Products Group, Inc. v. Oatey Co.***
  *US District Court, Northern District of Texas*
  Retained as an expert witness for Oatey to evaluate LSP's claimed lost profits and royalty damages associated with Oatey's alleged patent infringement of LSP's patent relating to water outlet boxes with cross-linked polyethylene (PEX) connections. Prepared an expert report and testified in deposition.  (2020)

- ***MV3 Partners LLC. v. Roku, Inc.***
  *US District Court, Western District of Texas*
  Retained as an expert witness for Roku to evaluate MV3's claimed royalty damages associated with Roku's alleged patent infringement of MV3's patent relating to screen mirroring and casting content from a mobile

**JTX-0723.00057**

device to a TV. Prepared expert report and testified at deposition and at trial.  (2020)

- ***Infernal Technology, LLC and Terminal Reality, Inc. v. Sony Interactive Entertainment America, LLC***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Sony to evaluate Plaintiffs' claimed royalty damages associated with Sony's alleged infringement of Plaintiffs' patents relating to improved methods for rendering lighting and shadowing for video games. Prepared expert report and testified at deposition.  (2020)

- ***Girl Scouts of the United States of America v. Boy Scouts of America***
  *US District Court, Southern District of New York*
  Retained as an expert witness for the Girl Scouts of the USA (GSUSA) to evaluate GSUSA's economic damages, including disgorgement of the Boy Scouts of America's (BSA's) wrongful gains and GSUSA's corrective advertising expenses associated with BSA's alleged trademark infringement. Prepared two expert reports and testified in deposition.  (2020)

- ***Leading Technology Composites, Inc. v. MV2, LLC***
  *US District Court, District of Maryland*
  Retained as an expert witness for MV2 to evaluate Leading Technology Composites' (LTC's) claimed lost profits and royalty damages associated with MV2's alleged infringement of LTC's patent relating to composite armor panels with ballistic properties. Prepared expert report and testified at deposition.  (2020)

- ***Britax Child Safety, Inc. v. Nuna International B.V. and Nuna Baby Essentials, Inc.***
  *US District Court, Eastern District of Pennsylvania*
  Retained as an expert witness for Britax to evaluate its lost profits and royalty damages associated with Nuna's alleged infringement of patents covering its ClickTight installation system used in convertible car seats. Also performed an economic analysis in support of Britax's claim for a permanent injunction against Nuna. Prepared two expert reports and testified at deposition.  (2020)

- ***North Star Technology et al. v. Latham Pool Products, Inc.***
  *US District Court, Eastern District of Tennessee*
  Retained as an expert witness for Latham Pools to evaluate North Star's claimed damages resulting from Latham Pool's alleged infringement of its pool design patent. Evaluated Latham Pool's profits associated with the article of manufacture available for disgorgement and reasonable royalty damages.  Prepared expert report.  (2020)

- ***Escort Inc v. Uniden America Corporation***
  *US District Court, Northern District of Texas*
  Retained as an expert witness for Uniden to evaluate Escort's claimed lost profits and royalty damages associated with Uniden's alleged infringement of a patent related to its "mute memory" feature in GPS-enabled radar detectors. Prepared expert report and testified at deposition.  (2020)

- ***Trividia Health, Inc. v. Nipro Corporation***
  *International Court of Arbitration*
  Retained as an expert witness for Trividia to evaluate (a) Trividia's alleged economic harm resulting from Nipro's alleged breach of contract and trademark misuse and (b) Nipro's disgorgement relating to its alleged trademark misuse. Prepared two expert reports and testified in arbitration.  (2019)

- ***CXT Systems v. Academy Sports, et al.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Academy Sports and Fossil to evaluate CXT's claimed royalty damages

relating to defendants' alleged infringement of CXT's patents relating to e-commerce functionality. Prepared an expert report. (2019)

- ***Freeny, et al. v. Fossil Group, Inc.***
  *US District Court, Eastern District of Texas*
  Retained as an expert witness for Fossil to evaluate the plaintiffs' claimed damages resulting from Fossil's alleged patent infringement relating to Fossil's smartwatches. Prepared an expert report. (2019)

- ***MGA Entertainment, Inc. and The Little Tikes Company v. Dynacraft BSC, Inc.***
  *US District Court, Central District of California*
  Retained as an expert witness for Dynacraft to evaluate economic causation with respect to the plaintiffs' claim that they had been damaged as a result of Dynacraft's alleged trade dress infringement, and Dynacraft's profits associated with sales of its accused products. Prepared an expert report. (2019)

- ***Amgen Inc. and Amgen USA Inc. v. Coherus BioSciences, et al.***
  *Superior Court of the State of California, County of Ventura*
  Retained as an expert witness for Amgen to provide expert testimony regarding Coherus's use of Amgen's alleged misappropriated trade secrets in Coherus's account targeting and pricing models over time. Testified at deposition. (2018)

- ***Unverferth Mfg. Co., Inc. v. J&M Mfg. Co., Inc.***
  *US District Court, Northern District of Ohio, Western Division*
  Retained as an expert for Unverferth to evaluate Unverferth's lost profits and royalty damages associated with J&M's infringement of Unverferth's patents relating to its load / unload seed tenders. Prepared expert report. (2017)

- ***Au New Haven, et al. v. YKK Corporation, et al.***
  *US District Court, Southern District of New York*
  Retained as an expert witness for YKK to evaluate the plaintiffs' claimed damages resulting from YKK's alleged breach of the parties' exclusive license agreement (related to sales allegedly made into unlicensed fields) and alleged infringement of the plaintiffs' patents relating to polyurethane-laminated zippers. Prepared an expert report and testified at deposition. (2017)

- ***iLife Technologies, Inc. v. Nintendo of America, Inc.***
  *US District Court, Northern District of Texas, Dallas Division*
  Retained as an expert witness for Nintendo to evaluate iLife's claimed royalty damages resulting from Nintendo's alleged infringement of a patent related to motion detection and evaluation. Prepared an expert report and testified at both deposition and trial. (2017)

- ***Saint Lawrence Communications v. Motorola Mobility LLC***
  *US District Court, Eastern District of Texas, Marshall Division*
  Retained as an expert witness for Motorola Mobility to evaluate Saint Lawrence's claimed royalty damages resulting from Motorola Mobility's alleged infringement of four patents related to the AMR- WB standard. Evaluated a FRAND royalty rate for the patents-in-suit. Prepared two expert reports and testified at both deposition and trial. (2017)

- ***Script Security Solutions v. Protection One Alarm Monitoring, et al.***
  *US District Court, Eastern District of Texas, Marshall Division*
  Retained as an expert witness for Protection One to evaluate Script's claimed royalty damages resulting from Protection One's alleged infringement of three patents relating to interactivity in wireless alarm

systems. Prepared three expert reports.  (2016)

- ***Easton Baseball/Softball Inc. v. Wilson Sporting Goods Co.***
  *US District Court, Central District of California*
  Retained as an expert witness for Easton to evaluate damages resulting from Wilson's infringement of its patented baseball bat technology. Evaluated Easton's lost profits and reasonable royalty damages. Prepared two expert reports and testified at deposition.  (2016)

- ***KelDar, Inc. v. Mayborn USA, Inc., et al.***
  *US District Court, Eastern District of Texas, Marshall Division*
  Retained as an expert witness for Mayborn to evaluate the plaintiff's damages resulting from its alleged trade secret misappropriation and breach of contract relating to its Tommee Tippee Perfect Prep baby formula preparation machine. Evaluated KelDar's reasonable royalty damages and unjust enrichment damages. Prepared expert report and testified at deposition.  (2016).

- ***Biomedical Enterprises, Inc. v. Solana Surgical, LLC and Wright Medical Group, Inc.***
  *US District Court, Western District of Texas, Austin Division*
  Retained as an expert witness for Biomedical Enterprises (BME) to evaluate its damages resulting from the defendants' infringement of its patented nitinol implant technology. Evaluated BME's lost profits and reasonable royalty damages. Prepared two expert reports and provided deposition testimony.  (2016)

- ***Verisign, Inc. v. XYZ.com, LLC and Daniel Negari***
  *US District Court, Eastern District of Virginia, Alexandria Division*
  Retained as an expert witness for Verisign to evaluate the plaintiff's damages resulting from the defendants' alleged false and misleading advertising relating to the .xyz registry. Evaluated Verisign's disgorgement damages, lost profits damages, and corrective advertising-related damages. Prepared two expert reports and provided deposition testimony.  (2015)

- ***E2E Processing, Inc. v. Cabela's Inc.***
  *US District Court, Eastern District of Texas, Marshall Division*
  Retained as an expert witness for Cabela's to evaluate the plaintiff's claimed royalty damages resulting from Cabela's alleged infringement of the plaintiff's patent related to a particular method of transaction processing using XML. Prepared an expert report and testified at deposition.  (2015)

- ***Katrinecz, et al. v. Motorola Mobility LLC***
  *US District Court, Western District of Texas, Austin Division*
  Retained as an expert witness for Motorola Mobility to evaluate the plaintiffs' claimed royalty damages resulting from Motorola's alleged infringement of the plaintiffs' patent related to a particular method of backlighting a keypad. Prepared an expert report and testified at deposition.  (2014)

- ***Profectus Technology LLC v. Motorola Mobility LLC***
  *US District Court, Eastern District of Texas, Tyler Division*
  Retained as an expert witness for Motorola Mobility to evaluate Profectus's claimed royalty damages resulting from Motorola's alleged infringement of Profectus' patent related to digital displays on mobile devices. Prepared two expert reports.  (2014)

- ***Bern Unlimited, Inc. v. Easton-Bell Sports, Inc., The Burton Corporation, Smith Sport Optics, Inc., Amer Sports Winter & Outdoor Co., Vans, Inc., Dye Precision, Inc., and K-2 Corporation***
  *US District Court, District of Massachusetts*
  Retained as an expert witness for Easton-Bell, Smith Sport Optics, and K2 to evaluate their false marking

and false advertising counterclaim against Bern. Analysis included evaluation of the defendants' disgorgement damages. Also retained as an expert witness for Easton-Bell to evaluate Bern's claimed disgorgement damages related to Easton-Bell's alleged trade dress infringement. Prepared two expert reports.  (2014)

- ***Monec Holding AG v. Motorola Mobility, Inc., Samsung, HTC, et al.***
  *US District Court, District of Delaware*
  Retained as an expert witness for Motorola to evaluate Monec's claimed royalty damages related to Motorola's alleged infringement of Monec's patent. Prepared an expert report.  (2014)

- ***Effingo Wireless Inc. v. Motorola Mobility LLC***
  *US District Court, Western District of Texas, San Antonio Division*
  Retained as an expert witness to evaluate Effingo's damages claim resulting from Motorola Mobility's alleged infringement of Effingo's Bluetooth headset technology patent. Prepared an expert report and testified at deposition and trial. Opinions included a *Georgia-Pacific* analysis and a rebuttal of the plaintiff's expert's claimed damages opinions. Testified that Effingo's claimed reasonable royalty damages were overstated, based in part on an assessment of Motorola's costs to implement a non-infringing alternative headset design.  (2013)

- ***DFW Construction v. GJD Enterprises, et al.***
  Expert witness in a business failure dispute. Submitted expert disclosure statement identifying numerous factors that contributed to the failure of The Daily Grind, a coffee shop, including general economic and business-related factors. Conducted benchmark comparisons to similarly situated businesses and demonstrated the unreliability of counter-plaintiffs' business projections.  (2010)

## SELECTED CONSULTING EXPERIENCE

### Intellectual Property: Patent Infringement, Trademark, and Trade Secret Theft Cases

- Assisted in the evaluation of whether the plaintiff's licensing offers related to 3G and 4G/LTE wireless technology constituted FRAND licensing offers. Analyzed the economic benefits associated with patents, the economic benefits associated with standard-setting organizations, and the economic evidence related to the FRAND principles. Concluded that none of the plaintiff's licensing offers comported with FRAND principles.

- Assisted in the evaluation of the claimed damages of a medical device manufacturer who brought suit against a competing medical device manufacturer alleging patent infringement related to vascular closure devices. Analysis included an assessment of the plaintiff's sales of vascular closure devices in the absence of the infringement and an incremental revenue and cost analysis. Assisted in the determination of reasonable royalty damages based upon the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor/licensee negotiation.

- Assisted in the evaluation of the claimed damages of a foam ear sleeve manufacturer who brought suit against a high-performance professional and personal audio earphone manufacturer, alleging patent infringement related to ear pieces having disposable compressible polymeric foam sleeves. Assisted in the evaluation of the plaintiff's claimed royalty damages using market and industry data, a *Georgia-Pacific* factor analysis, and the changing licensing policies of the patent holder over time. Calculated an alternative royalty damages figure. Also assisted in the evaluation of the defendant's counterclaims of alleged patent misuse and antitrust violations. Analysis included a review of the patent holder's licensing strategy and certain provisions contained in the licenses into which the patent holder entered.

- Assisted in the evaluation of the plaintiff's claimed reasonable royalty damages in a patent infringement matter involving five defendants. The alleged infringing technology related to congestion management in ATM networks. Analyses included an assessment of sales of ATM network products allegedly containing the patented feature; an analysis of the price of the integrated circuits embodying the accused functionality relative to the price of the entire ATM product; and a review of industry license agreements. Assisted in the determination of reasonable royalty damages based on the *Georgia-Pacific* factors, in addition to a determination of important negotiating points in a hypothetical licensor/licensee negotiation.

- Assisted in the evaluation of reasonable royalty and lost profits damages in a patent infringement matter related to wave division multiplexing in optical networking equipment. Analysis included an assessment of alleged infringing sales under multiple potential damages scenarios. Lost profits analysis included a market share approach to calculating lost sales, and an incremental cost and revenue analysis. Evaluated both the plaintiff's claimed damages and the defendant's counterclaimed damages.

- Assisted in the critique of the plaintiff's claimed reasonable royalty damages in a patent infringement matter relating to implantable rate-responsive pacemakers and implantable cardioverter defibrillator devices (ICDs). Analysis included an assessment of alleged infringing sales of pacemakers and ICDs, review of the many license agreements entered into by the defendant, and an analysis of the defendant's cost savings associated with the allegedly infringing technology as compared to its next-best alternative. Assisted in the determination of reasonable royalty damages based on the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor/licensee negotiation.

- Assisted in the evaluation of the plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to DVR technology. Analysis included an assessment of the plaintiff's sales of DVR products and subscriptions in the absence of the infringement and an incremental revenue and cost analysis. Assisted in the determination of reasonable royalty damages based on the *Georgia-Pacific* factors and a determination of important negotiating points in a hypothetical licensor/licensee negotiation. Also assisted in the determination of a post-verdict royalty rate based on the evidence and arguments found material to the granting of an injunction and the change in the parties' bargaining positions. Finally, assisted in the evaluation of the plaintiff's damages resulting from the defendant being in contempt of the court-mandated injunction.

- Assisted in the evaluation of the plaintiff's reasonable royalty damages in a patent infringement matter relating to RFID tags and scanners for companion-animal applications. Analysis included an assessment of infringing sales of RFID tags and scanners, review of license agreements produced by the parties, and market research on the companion-animal applications of RFID tags and scanners. Assisted in the determination of a reasonable royalty rate based on a *Georgia-Pacific* factor analysis. Calculated the claimed royalty damages under various scenarios, based on potential court findings in terms of patents infringed.

- Assisted in the critique of the plaintiff's damages model in a trade secret theft case in the golf equipment industry. The plaintiff claimed disgorgement of global profits and other unjust enrichment due to the alleged misappropriation of trade secrets through the defendant's sale of the company and assets to a large sporting goods company. Analysis included calculating net profits from the sale of the accused golf clubs, calculating reasonable royalty damages, and evaluating the sale of the defendant's company and assets as an appropriate measure of damages.

- Assisted in the evaluation of the plaintiff's lost profits and reasonable royalty damages in a patent infringement matter related to coalbed methane (CBM) gas drilling. Analysis included an assessment of the plaintiff's CBM gas sales in the absence of the infringement, and the plaintiff's expected profitability of its

dual-well systems in the Appalachia region. Specifically, developed economic models of CBM gas extraction from dual-well systems in order to estimate CBM gas sales and profitability associated with dual-well systems.

- Assisted in the evaluation of claimed damages in a patent infringement matter related to course management system products and services using the internet to facilitate the interaction of students and instructors. Analyses included a *Panduit* and a *Georgia-Pacific* factor analysis, and calculation of lost profits and reasonable royalty damages. Analyses of the plaintiff's lost profits included an analysis of the plaintiff's business model and customer relationships, the defendant's infringing sales based on customer licensing agreements and contracts, and the plaintiff's incremental profitability associated with lost long-term customer contracts.

- Assisted in the evaluation of damages in a design patent infringement matter related to a restaurant chain's distribution of antenna balls wearing NFL-marked helmets. Analyses included an analysis of disgorgement-related damages and reasonable royalty damages, including calculation of increased sales, if any, related to the distribution of the accused antenna balls and costs associated with the antenna ball program.

## False Advertising Cases

- Assisted in the evaluation of damages in a case involving thermal imaging products and an allegedly false and misleading marketing video. Assisted the plaintiff in its claim for disgorgement and lost profits damages. Also evaluated counterclaim involving alleged false advertising and alleged trademark infringement by the plaintiff. Evaluated the defendant's claimed damages arising from these allegations.

- Assisted in the critique of the plaintiff's claimed damages in a false advertising matter involving tooth-whitening products. A large consumer product company filed suit against the defendant for allegedly making misleading and disparaging statements about the plaintiff's tooth-whitening products in comparative advertisements shown on television. The plaintiff sought to recover damages from reduced sales resulting from the alleged false advertising. Analyses included evaluation and critique of plaintiff's expert's claimed damages model, including analysis of Nielsen scanner data and CyberMedia Research (CMR) media data. Analysis demonstrated that the plaintiff's expert did not measure the impact of the alleged misleading content, failed to account for alternative reasons for the plaintiff's sales declines, and implemented an incorrectly specified econometric model.

- Assisted in the critique of the plaintiff's claimed damages in a false advertising matter involving scouting cameras. The plaintiff sought to recover disgorgement damages, the defendant's advertising expenses, and the plaintiff's claimed corrective advertising expenditures. Analysis included adjustments to the plaintiff's disgorgement damages claim, based on an evaluation of the defendant's false advertising claims in print, television, and online advertising; an assessment of the plaintiff's claimed corrective advertising; and an analysis of the defendant's advertising expenses related to the accused advertising.

## Securities and Finance-Related Cases

- Assisted in the evaluation of the plaintiff's claimed damages resulting from lost enterprise value due to the defendants' alleged fraudulent conduct resulting in artificial acceleration of income. Analyses included an assessment of alternative reasons for the plaintiff's business decline and ultimate bankruptcy, and an evaluation of the plaintiff's multiple approaches used in the determination of lost enterprise value.

- Assisted in conducting an "event study" on behalf of a technology company under investigation by the Securities and Exchange Commission (SEC) to determine if the company's alleged improper revenue

JTX-0723.00063

recognition policies led to unjust enrichment related to a merger. Analyses included the development of an appropriate peer group and isolation of economy-wide, industry-specific, and company-specific factors impacting the particular firm's stock price.

▪ Assisted in the evaluation of the plaintiff's claimed damages relating to claimed "benefit of the bargain." Analyses included a company- and industry-specific risk factor analysis, an analysis of a competitor's stock prices, and a critique of the plaintiff's expert's discounted cash-flow damages model.

▪ Assisted in the evaluation of the plaintiff's claimed damages in a Rule 10b-5 dispute involving allegations that the defendant's public announcements that a joint venture into which it had entered was nonrecourse were false and misleading. Provided preliminary plaintiff-style damages estimates and settlement analyses based on various curative disclosure dates.

▪ Assisted in the evaluation of the plaintiff's claimed damages related to an alleged failure of the defendant to conduct appropriate due diligence with respect to specific hedge fund investments, and improper recommendation of investments in hedge funds with unsuitable risk profiles. Analyses included an assessment of the defendant's initial and ongoing due diligence with respect to specific hedge fund investments, and the communication of specific risks to the plaintiff investor.

▪ Assisted in the evaluation of a community bank's (plaintiff's) claims related to specific mortgage-backed securities (MBS) and asset-backed securities (ABS) investments recommended by the defendant for the bank's investment portfolio. Analysis included assessment of the appropriateness of the defendant's due diligence performed with respect to these investments and the communication of specific risks, including credit risk, to the plaintiff bank. Analysis also included evaluation of the bank's role in selecting MBS and ABS investments for its investment portfolio, and the impact of the global financial crisis on portfolio performance. Damages analysis included a benchmarking study showing that similarly situated MBS and ABS indices fared no better than the recommended portfolio during the global financial crisis.

**Antitrust Matters**

▪ Assisted in the evaluation of the plaintiff's economic liability arguments in an antitrust claim related to restriction on the registration of cloned American Quarter Horses, including an evaluation of the plaintiff's theoretical economic model, and the effect, if any, on the supply and prices of high-quality American Quarter Horses. Also assisted in the evaluation of the plaintiff's damages claim related to claimed lost sales of cloned American Quarter Horses and associated breeding opportunities.

▪ Performed Appendix A analyses to address potential horizontal market power concerns resulting from mergers in the electricity industry. Analyses involved defining the relevant geographic and product markets, identifying competitors in the relevant markets, and analyzing market power and competition over time by calculating the Herfindahl-Hirschman Index (HHI) and other market concentration statistics. Work also included developing a transmission model reflecting system limits into defined destination markets.

▪ Estimated competitive benchmark prices for the California wholesale power market using the Henwood electricity production cost simulation model, and analyzed alleged capacity withholding by merchant generators.

▪ Estimated the impact of market power in the ancillary services markets in California using regression analysis. Developed techniques for identifying anticompetitive behavior in these markets.

▪ Assisted in the examination of the operating efficiency and competitiveness of the electricity market in England and Wales. Analyzed the bidding behavior of generating assets to quantify the effects of

anticompetitive behavior on electricity prices.

- Investigated allegations of price-fixing in the wholesale gasoline and fuel oil markets.

**Regulatory Matters**

- Assisted in conducting an industry survey of maintenance activities for coal-fired generating units. Used statistical modeling to analyze census data in order to determine factors that drive maintenance industry-wide, in response to allegations by the Environmental Protection Agency (EPA) of Clean Air Act violations.

- Estimated "stranded costs" from deregulation for a major utility, based on projections of long-run equilibrium prices.

- Contributed to drafting a briefing paper on the restructuring and design of competitive markets in Mexico and Thailand. Focused on the issues surrounding wholesale electricity market design and a comparative analysis of the methods implemented by various international governments in handling these issues.

- Assisted in conducting a statistical benchmarking study to compare costs and efficiencies of a major utility's generating assets in preparation for divestiture. Worked closely with senior management to understand company operations and competitive position to solve strategic, operational, and general management issues.

- Investigated the economic rationale underlying the rights-of-way provisions in the 1996 Telecommunications Act as it related to the city of Berkeley's demand for significant revenue-related fees from Qwest Communications in return for access to public rights of way for telecommunications construction.

**Other Engagements**

- Assisted in critique of the plaintiff's assessment of the value of the plaintiff's equity shares in a private e-marketing company, including claimed losses associated with the plaintiff's lost "benefit of the bargain." Analyses included evaluation of the plaintiff's discounted cash flow model and assumptions, evaluation of alternative market factors impacting the value of the business, and application of discounts for minority interest and lack of control.

- Assisted in evaluation of the plaintiffs' damages claims on behalf of 88 decedents of an airplane crash. The plaintiffs filed suits seeking damages in state and federal courts against the airline and certain parts manufacturers. Analysis included evaluating lost earnings, lost non-salary benefits, lost retirement funds, and lost savings. In at least one case, analysis included evaluation of claimed lost business value by plaintiffs' expert.

- Assisted in evaluation of the plaintiff's claimed damages resulting from a breach of contract relating to dicamba-tolerant trait technology. Analyses included valuation of the technology at issue using economic modeling under various assumptions relating to penetration rates, international market entry, and technology royalty rates, *inter alia*.

- Assisted in critique of the plaintiff's evaluation of damages in a professional negligence matter regarding the lost sales associated with the plaintiff's cattle ranch operation. Reviewed opposing expert's damages calculation and assisted in sensitivity analyses regarding assumptions in the plaintiff's damages evaluations.

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

## Appendix B

## Materials Considered

### Bates Stamped Documents

| | | |
|---|---|---|
| CLINE00000035 | LEHMAN0000082 | LEHMAN0000126 |
| LEHMAN0000002 | LEHMAN0000083 | LEHMAN0000127 |
| LEHMAN0000004 | LEHMAN0000084 | LEHMAN0000128 |
| LEHMAN0000005 | LEHMAN0000086 | LEHMAN0000129 |
| LEHMAN0000006 | LEHMAN0000087 | LEHMAN0000130 |
| LEHMAN0000007 | LEHMAN0000088 | LEHMAN0000131 |
| LEHMAN0000008 | LEHMAN0000089 | LEHMAN0000132 |
| LEHMAN0000009 | LEHMAN0000090 | LEHMAN0000133 |
| LEHMAN0000010 | LEHMAN0000091 | LEHMAN0000134 |
| LEHMAN0000011 | LEHMAN0000092 | LEHMAN0000135 |
| LEHMAN0000012 | LEHMAN0000093 | LEHMAN0000136 |
| LEHMAN0000013-066 | LEHMAN0000094 | LEHMAN0000137 |
| LEHMAN0000070 | LEHMAN0000095 | LEHMAN0000138 |
| LEHMAN0000071 | LEHMAN0000096 | LEHMAN0000139 |
| LEHMAN0000072 | LEHMAN0000097 | LEHMAN0000140 |
| LEHMAN0000073 | LEHMAN0000098 | LEHMAN0000141 |
| LEHMAN0000074 | LEHMAN0000099 | LEHMAN0000142 |
| LEHMAN0000075 | LEHMAN0000100 | LEHMAN0000143 |
| LEHMAN0000076 | LEHMAN0000101 | LEHMAN0000144 |
| LEHMAN0000077 | LEHMAN0000102 | LEHMAN0000145 |
| LEHMAN0000078 | LEHMAN0000108 | LEHMAN0000146 |
| LEHMAN0000079 | LEHMAN0000109 | LEHMAN0000147 |
| LEHMAN0000080 | LEHMAN0000110 | LEHMAN0000148 |
| LEHMAN0000081 | LEHMAN0000111-121 | LEHMAN0000149 |

**JTX-0723.00066**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

| | | |
|---|---|---|
| LEHMAN0000150 | LEHMAN0000195 | LEHMAN0000300 |
| LEHMAN0000151 | LEHMAN0000196-197 | LEHMAN0000301 |
| LEHMAN0000152 | LEHMAN0000198 | LEHMAN0000302 |
| LEHMAN0000153 | LEHMAN0000199 | LEHMAN0000303 |
| LEHMAN0000154 | LEHMAN0000200 | LEHMAN0000304 |
| LEHMAN0000155 | LEHMAN0000201 | LEHMAN0000314 |
| LEHMAN0000156 | LEHMAN0000202 | RIPPSCAHEN00000001 |
| LEHMAN0000157 | LEHMAN0000203 | RIPPSCAHEN00000303 |
| LEHMAN0000158 | LEHMAN0000204 | RIPPSCAHEN00000304 |
| LEHMAN0000159 | LEHMAN0000205 | RIPPSCAHEN00000850-865 |
| LEHMAN0000160 | LEHMAN0000206 | RIPPSCAHEN00001258 |
| LEHMAN0000161 | LEHMAN0000207 | RIPPSCAHEN00001285-319 |
| LEHMAN0000162 | LEHMAN0000208 | RIPPSCAHEN00001327 |
| LEHMAN0000163 | LEHMAN0000209 | RIPPSCAHEN00001397 |
| LEHMAN0000164 | LEHMAN0000210 | RIPPSCAHEN00001443 |
| LEHMAN0000165 | LEHMAN0000211 | RIPPSCAHEN00001560 |
| LEHMAN0000166 | LEHMAN0000212 | RIPPSCAHEN00001920 |
| LEHMAN0000167 | LEHMAN0000213 | RIPPSCAHEN00001932 |
| LEHMAN0000168 | LEHMAN0000214 | RIPPSCAHEN00001960 |
| LEHMAN0000169 | LEHMAN0000215 | RIPPSCAHEN00002044 |
| LEHMAN0000170 | LEHMAN0000216 | RIPPSCAHEN00002127 |
| LEHMAN0000171 | LEHMAN0000217 | RIPPSCAHEN00002158 |
| LEHMAN0000187 | LEHMAN0000227-233 | RIPPSCAHEN00002174 |
| LEHMAN0000188 | LEHMAN0000291 | RIPPSCAHEN00002179 |
| LEHMAN0000189 | LEHMAN0000294 | RIPPSCAHEN00002183 |
| LEHMAN0000190 | LEHMAN0000295 | RIPPSCAHEN00002186 |
| LEHMAN0000191 | LEHMAN0000296 | RIPPSCAHEN00002244 |
| LEHMAN0000192 | LEHMAN0000297 | RIPPSCAHEN00002252 |
| LEHMAN0000193 | LEHMAN0000298 | RIPPSCAHEN00002265 |
| LEHMAN0000194 | LEHMAN0000299 | RIPPSCAHEN00002273 |

JTX-0723.00067

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

| | | |
|---|---|---|
| RIPPSCAHEN00002283 | RIPPSCAHEN00004125 | YUGALABS_00000600 |
| RIPPSCAHEN00002323 | RIPPSCAHEN00013243 | YUGALABS_00000605 |
| RIPPSCAHEN00002324 | RIPPSCAHEN00014286 | YUGALABS_00000607 |
| RIPPSCAHEN00002326 | RIPPSCAHEN00014295 | YUGALABS_00000610 |
| RIPPSCAHEN00002344 | RIPPSCAHEN00014318 | YUGALABS_00000620 |
| RIPPSCAHEN00002390 | RIPPSCAHEN00014321 | YUGALABS_00000624 |
| RIPPSCAHEN00002415 | RIPPSCAHEN00014330 | YUGALABS_00000628 |
| RIPPSCAHEN00002433 | RIPPSCAHEN00015341 | YUGALABS_00000629 |
| RIPPSCAHEN00002449 | YUGALABS_00000535 | YUGALABS_00000631 |
| RIPPSCAHEN00002548 | YUGALABS_00000536 | YUGALABS_00000653 |
| RIPPSCAHEN00002569 | YUGALABS_00000537 | YUGALABS_00000675 |
| RIPPSCAHEN00002596 | YUGALABS_00000538 | YUGALABS_00001978 |
| RIPPSCAHEN00002609 | YUGALABS_00000539 | YUGALABS_00002037 |
| RIPPSCAHEN00002632 | YUGALABS_00000541 | YUGALABS_00002041 |
| RIPPSCAHEN00002657 | YUGALABS_00000545 | YUGALABS_00002125 |
| RIPPSCAHEN00002658-659 | YUGALABS_00000554 | YUGALABS_00002334 |
| RIPPSCAHEN00002681 | YUGALABS_00000560 | YUGALABS_00002370 |
| RIPPSCAHEN00002703-704 | YUGALABS_00000564 | YUGALABS_00002578 |
| RIPPSCAHEN00002712 | YUGALABS_00000565 | YUGALABS_00002619 |
| RIPPSCAHEN00002741 | YUGALABS_00000567 | YUGALABS_00002622 |
| RIPPSCAHEN00002742 | YUGALABS_00000568 | YUGALABS_00002625-634 |
| RIPPSCAHEN00002762 | YUGALABS_00000569 | YUGALABS_00002708 |
| RIPPSCAHEN00002764 | YUGALABS_00000570 | YUGALABS_00002737 |
| RIPPSCAHEN00002792 | YUGALABS_00000571 | YUGALABS_00003335 |
| RIPPSCAHEN00002796 | YUGALABS_00000580 | YUGALABS_00013749 |
| RIPPSCAHEN00002799-800 | YUGALABS_00000585 | YUGALABS_00014079 |
| RIPPSCAHEN00002801 | YUGALABS_00000586 | YUGALABS_00015411 |
| RIPPSCAHEN00002802 | YUGALABS_00000589 | YUGALABS_00015412 |
| RIPPSCAHEN00002810 | YUGALABS_00000593 | YUGALABS_00015413 |
| RIPPSCAHEN00002811 | YUGALABS_00000594 | YUGALABS_00015414 |

**JTX-0723.00068**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

| | | |
|---|---|---|
| YUGALABS_00015417 | YUGALABS_00029107 | YUGALABS_00031312 |
| YUGALABS_00015423 | YUGALABS_00029118 | YUGALABS_00031313 |
| YUGALABS_00015424 | YUGALABS_00029144 | YUGALABS_00031314 |
| YUGALABS_00015425 | YUGALABS_00029886 | YUGALABS_00031315 |
| YUGALABS_00015439 | YUGALABS_00029988 | YUGALABS_00031316 |
| YUGALABS_00015992 | YUGALABS_00030050 | YUGALABS_00031324 |
| YUGALABS_00015996 | YUGALABS_00030051 | YUGALABS_00031325 |
| YUGALABS_00015997 | YUGALABS_00030061 | YUGALABS_00031326-332 |
| YUGALABS_00015998 | YUGALABS_00030068 | YUGALABS_00031357 |
| YUGALABS_00027491 | YUGALABS_00030081-082 | YUGALABS_00031359 |
| YUGALABS_00027495 | YUGALABS_00030088 | YUGALABS_00031367-168 |
| YUGALABS_00027510 | YUGALABS_00030104 | YUGALABS_00031370 |
| YUGALABS_00027515 | YUGALABS_00030223-230 | YUGALABS_00031397 |
| YUGALABS_00027516 | YUGALABS_00030236 | YUGALABS_00031401 |
| YUGALABS_00027519 | YUGALABS_00030238 | YUGALABS_00031432-436 |
| YUGALABS_00027520 | YUGALABS_00030243 | YUGALABS_00031474-553 |
| YUGALABS_00027522 | YUGALABS_00030337 | YUGALABS_00031595 |
| YUGALABS_00027523 | YUGALABS_00031203 | YUGALABS_00031598-599 |
| YUGALABS_00027686 | YUGALABS_00031204 | YUGALABS_00031601 |
| YUGALABS_00027690 | YUGALABS_00031205 | YUGALABS_00031603 |
| YUGALABS_00027691 | YUGALABS_00031302 | YUGALABS_00031605-608 |
| YUGALABS_00027692 | YUGALABS_00031303-316 | YUGALABS_00031610 |
| YUGALABS_00027693 | YUGALABS_00031304 | YUGALABS_00031612-614 |
| YUGALABS_00027765 | YUGALABS_00031305 | YUGALABS_00031615 |
| YUGALABS_00029080 | YUGALABS_00031306 | YUGALABS_00031616 |
| YUGALABS_00029089 | YUGALABS_00031307 | YUGALABS_00031617 |
| YUGALABS_00029092 | YUGALABS_00031308 | YUGALABS_00031618 |
| YUGALABS_00029097 | YUGALABS_00031309 | YUGALABS_00031619 |
| YUGALABS_00029098 | YUGALABS_00031310 | YUGALABS_00031620 |
| YUGALABS_00029099 | YUGALABS_00031311 | YUGALABS_00031621-623 |

JTX-0723.00069

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

| | | |
|---|---|---|
| YUGALABS_00031626 | YUGALABS_00031647 | YUGALABS_00032568 |
| YUGALABS_00031628 | YUGALABS_00031649 | YUGALABS_00032569-571 |
| YUGALABS_00031629-630 | YUGALABS_00032440-445 | YUGALABS_00032572 |
| YUGALABS_00031633 | YUGALABS_00032446 | YUGALABS_00032573-578 |
| YUGALABS_00031635 | YUGALABS_00032447 | YUGALABS_00032579 |
| YUGALABS_00031636 | YUGALABS_00032448 | YUGALABS_00032580 |
| YUGALABS_00031637 | YUGALABS_00032449-451 | YUGALABS_00032581-587 |
| YUGALABS_00031638 | YUGALABS_00032452-541 | YUGALABS_00032588-589 |
| YUGALABS_00031639-642 | YUGALABS_00032542-551 | YUGALABS_00032590-591 |
| YUGALABS_00031643 | YUGALABS_00032552-561 | YUGALABS_00032592 |
| YUGALABS_00031645 | YUGALABS_00032562-567 | YUGALABS_00032594 |

## Depositions

30(b)(6) Rough Deposition of Yuga Labs (Nicole Muniz), January 4, 2023

Deposition of Greg Solano, Volume I, January 17, 2023 and Associated Exhibits

Deposition of Jeremy Cahen, January 11, 2023 and Associated Exhibits

Deposition of Ryan Hickman, December 7, 2022 and Associated Exhibits

Deposition of Ryder Ripps, Volume I, January 12, 2023 and Associated Exhibits

Rough Deposition of Kerem Atalay, January 30, 2023

## Etherscan

https://etherscan.io/

https://etherscan.io/chart/etherprice (viewed on February 5, 2023)

https://etherscan.io/address/0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e

https://etherscan.io/address/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e#readContract#F13

https://etherscan.io/address/0x592814ff14e030b51f6087032db0f88f4214f254/

https://etherscan.io/address/0xbaf287cb2281841d9f5ba929d7dde87048fcaf1b/

https://etherscan.io/address/0xEE969B688442C2d5843Ad75f9117b3ab04b14960

https://etherscan.io/address/0xEE969B688442C2d5843Ad75f9117b3ab04b14960#code

JTX-0723.00070

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

https://etherscan.io/token/0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e

https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1008

https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1231

https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=1332

https://etherscan.io/token/0x2ee6af0dff3a1ce3f7e3414c52c48fd50d73691e?a=998

https://etherscan.io/tx/0x79b3bc7e029ae9fe423cbf29c75bf6787e64fa7e0b8bb61e62166510c7e4dd65

https://etherscan.io/tx/0xd6787edd130dffc37006884013d118bfe3d7e8bf319468e3eab793c6760f8bce

https://etherscan.io/tx/0xebaf7d156b20cf102968b1b88e52b052c511bc60ca0a9c6e13d446fb237015f8

https://etherscan.io/tx/0xf6f29725ed7127b0f3e91c3f327a785662dbb99abb1715c20561147e1572980d

## Expert Reports

Expert Report of Laura O'Laughlin, Case No. 2:22-cv-4355-JFW-JEM, dated February 6, 2023

Expert Report of Professor Jonah Berger, Case No. 2:22-cv-4355-JFW-JEM, dated February 6, 2023

## Journal Articles and Other Papers

Das, Dipanjan, et al,. "Understanding Security Issues in the NFT Ecosystem," In Proceedings of ACM Conference on Computer and Communications Security, 2022

Halaburda, Hanna, "Blockchain Revolution without the Blockchain," Bank and Canada and NYU, March 2, 2018, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3133313

Harsono, Hugh, "Regaining the Technological Competitive Advantage by Supporting NFT Self-Governance," Fletcher Forum of World Affairs, Vol. 46(2), Summer 2022, pp. 155-164

Harvard Business School, "The Exchange: The Road Ahead for Crypto," Re: Scott Duke Kominers (Professor of Business Administration (Leave of Absence)); Charles C.Y. Wang (Glenn and Mary Jane Creamer Associate Professor of Business Administration); By: Jen McFarland Flint, August 25, 2022, https://www.alumni.hbs.edu/stories/Pages/story-bulletin.aspx?num=8834/

Kaczynski, Steve, and Scott Duke Kominers, Harvard Business Review, "How NFTs Create Value," November 10, 2021, https://hbr.org/2021/11/how-nfts-create-value

Mondoh, Brian Sanya et. al., "NFT Legal and Regulatory Compliance: Connoisseurship and Critique," November 12, 2022

## Legal Filings

Complaint for False Designation of Origin and Cybersquatting, Yuga Labs, Inc., v. Ryan Hickman, *Case No. 2:23-cv-00111-JCM-NJK*, dated January 20, 2023

JTX-0723.00071

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Complaint for False Designation of Origin and Cybersquatting, Yuga Labs, Inc., v. Thomas Lehman, dated January 20, 2023

Complaint for False Designation of Origin, False Advertising, Cybersquatting, Trademark Infringement, Unfair Competition, Unjust Enrichment, Conversion, and Tortious Interference, Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen and Does 1-10, *Case No. 2:22-cv-04355*, dated June 24, 2022

Consent Judgment and Order for Permanent Injunction Against Thomas Lehman, Yuga Labs, Inc., v. Thomas Lehman, *Case No. 1:23-cv-00085-MAD-TWD*, dated February 6, 2023

Declaration of Thomas Lehman, Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen, *Case No. 2:22-cv-04355-JFW-JEM*, dated February 3, 2023

Jeremy Cahen's Supplemental Responses Yuga Lab, Inc.'s Requests for Admission to Jeremy Cahen (Nos. 1-49), *Case No. 2:22-cv-04355-JFW-JEM*, dated January 17, 2023

Ryder Ripps's Supplemental Response to Yuga Labs, Inc.'s Requests for Admission to Ryder Ripps (Nos. 1-49), *Case No. 2:22-cv-04355-JFW-JEM*, dated January 17, 2023

Yuga Labs, Inc.'s Second Supplemental Response to Ryder Ripps' and Jeremy Cahen's First Set of Interrogatories (Nos. 1-14), *Case No. 2:22-cv-04355-JFW-JEM*, dated January 31, 2023

## Websites

AMB Crypto, "Blue-Chip NFTs fell in value, but this Ape proved its mettle in the final days of 2022," January 2, 2023 (https://ambcrypto.com/blue-chip-nfts-fell-in-value-but-this-ape-proved-its-mettle-in-the-final-days-of-2022/, viewed on January 27, 2023)

AMB Crypto, "Is Yuga Labs responsible for these changes in the NFT landscape? Details inside…," January 10, 2023 (https://ambcrypto.com/is-yuga-labs-responsible-for-these-changes-in-the-nft-landscape-details-inside/, viewed on January 27, 2023)

ApeFest (https://apefest.com/, viewed on February 5, 2023)

Being Crypto, "OpenSea Volume Hits Lowest Since June 2021 With $303M in October," October 31, 2022 (https://beincrypto.com/opensea-volume-hits-lowest-since-june-2021-with-303m-in-october/, viewed on January 27, 2023)

Bitstamp, "What are the blocks in blockchain?," August 17, 2022 (https://www.bitstamp.net/learn/crypto-101/what-are-blocks-in-the-blockchain/, viewed on January 19, 2023)

Blockworks, "OpenSea Polygon NFT Sales On Track to Hit 2.2M by End of January," January 6, 2022 (https://blockworks.co/news/opensea-polygon-nft-sales-on-track-to-hit-2-2m-by-end-of-january, viewed on February 3, 2023)

Bloomberg, "NFT Trading Volumes Collapse 97% From January Peak," September 28, 2022 (https://www.bloomberg.com/news/articles/2022-09-28/nft-volumes-tumble-97-from-2022-highs-as-frenzy-fades-chart?leadSource=uverify%20wall, viewed on January 27, 2023)

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Bloomberg Law, "Fake Bored Ape Yacht Club NFTs Sold by Artist, Yuga Labs Claims," June 27, 2022 (https://news.bloomberglaw.com/ip-law/fake-bored-ape-yacht-club-nfts-sold-by-artist-yuga-labs-claims, viewed on February 6, 2023)

Business Wire, "Yuga Labs Pledges $1M to Education and Arts Initiatives in City of Miami," October 12, 2022 (https://www.businesswire.com/news/home/20221012005230/en/Yuga-Labs-Pledges-1M-to-Education-and-Arts-Initiatives-in-City-of-Miami/, viewed on February 5, 2023)

Chain Debrief, "From 0.08 To 769 ETH: Exploring The History And Rise Of The Bored Apes," March 12, 2022 (https://chaindebrief.com/bored-ape-yacht-club-history-rise-of-bayc/, viewed on January 25, 2023)

CNET, "Bored Ape Yacht Club NFTs Explained," August 11, 2022 (https://www.cnet.com/culture/internet/bored-ape-yacht-club-nfts-explained/, viewed on January 25, 2023)

Coin Gecko, "Bored Ape Yacht Club (BAYC)" (https://www.coingecko.com/en/nft/bored-ape-yacht-club, viewed on February 4, 2023)

Coin Gecko, "RR/BAYC" (https://www.coingecko.com/en/nft/rr-bayc, viewed on February 3, 2023)

CoinDesk, "CryptoPunks Gets Punked," July 6, 2021 (https://www.coindesk.com/markets/2021/07/06/cryptopunks-get-punked/, viewed on January 24, 2023)

CoinDesk, "NFT Marketplaces: A Beginner's Guide" (https://www.coindesk.com/tech/2021/07/12/nft-marketplaces-a-beginners-guide/, viewed on January 22, 2023)

Crunchbase, "Yuga Labs – About" (https://www.crunchbase.com/ organization/yuga-labs, viewed on January 19, 2023)

CryptoSlate, "Yuga Labs" (https://cryptoslate.com/ companies/yuga-labs/, viewed on January 19, 2023)

DEXter Lab, "Dookey Dash: Yuga Labs Skill-Based NFT Game", January 23, 2023 (https://dexterlab.com/dookey-dash-yuga-labs-skill-based-nft-game/amp/, viewed on January 31, 2023)

Ethereum, "Gas and Fees," February 2, 2023 (https://ethereum.org/en/developers/docs/gas/, viewed on February 3, 2023)

Ethereum, "Introduction to Smart Contracts" (https://ethereum.org/en/smart-contracts/, viewed on January 22, 2023)

Ethereum, "Logging Data from Smart Contracts with Events," April 2, 2020 (https://ethereum.org/en/developers/tutorials/logging-events-smart-contracts/, viewed on February 5, 2023)

Ethereum, "Non-fungible tokens (NFT)" (https://ethereum.org/en/nft/#:~:text=A%20way%20to%20represent%20anything,contracts%20on%20the%20Ethereum%20blockchain, viewed on January 22, 2023)

Ethereum, "What is Ethereum?" (https://ethereum.org/en/what-is-ethereum/, viewed on January 19, 2023)

Fast Company, "Bored Ape Yacht Club tell all: The untold story of the $4 billion crypto startup," October 26, 2022 (https://www.fastcompany.com/90796009/bored-ape-yacht-club-tell-all-the-untold-story-of-the-4-billion-crypto-startup, viewed on January 25, 2023)

JTX-0723.00073

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Forbes, "This Is No Mere Monkey Business" Yuga Labs, Bored Ape Yacht Club Creator, Files Lawsuit Against Self-Proclaimed 'Conceptual Artist' (https://www.forbes.com/sites/megchristensen/2022/06/27/this-is-no-mere-monkey-business-yuga-labs-bored-ape-yacht-club-creator-files-lawsuit-against-self-proclaimed-conceptual-artist/?sh=67d1021e567f, viewed on February 6, 2023)

Fortune, "Bored Ape Yacht Club and its multibillion-dollar ApeCoin, explained: What they are and how investors got rich," March 18, 2022 (https://fortune.com/2022/03/18/what-is-bored-ape-yacht-club-nft-apecoin-explained/, viewed on January 25, 2023)

Foundation, "What is Foundation's marketplace fee?" (https://help.foundation.app/hc/en-us/articles/4419440106011-What-is-Foundation-s-marketplace-fee-, viewed on February 2, 2023)

Gartner, "What Is a Metaverse? And Should You Be Buying In?" October 21, 2022 (https://www.gartner.com/en/articles/what-is-a-metaverse, viewed on January 31, 2023)

Harvard Business Review, What Is Web3?" May 10, 2022 (https://hbr.org/2022/05/what-is-web3/, viewed on February 5, 2023)

IBM, "What are smart contracts on blockchain?" (https://www.ibm.com/topics/smart-contracts, viewed on January 22, 2023)

IBM, "What is Blockchain Technology?" (https://www.ibm.com/topics/what-is-blockchain, viewed on January 19, 2023)

InvestFAQ, "Goodwill to Assets Ratio" (https://invest-faq.com/goodwill-to-assets-ratio/, viewed on February 3, 2023)

Investopedia, "Non-Fungible Token (NFT): What It Means and How It Works," June 22, 2022 (https://www.investopedia.com/non-fungible-tokens-nft-5115211, viewed on January 22, 2023)

Investopedia, "What Are Smart Contracts on the Blockchain and How They Work," March 24, 2022 (https://www.investopedia.com/terms/s/smart-contracts.asp, viewed on January 22, 2023)

Investopedia, "What is OpenSea?" (https://www.investopedia.com/what-is-opensea-6362477, viewed on January 22, 2023)

IP & Media Law Updates, "Reflections on BAYC's revolutionary NFT license," January 31, 2023 (https://ipandmedialaw.fkks.com/post/102i6pp/reflections-on-baycs-revolutionary-nft-license/, viewed on February 3, 2023)

Kraken, "What is Bored Ape Kennel Club?" (https://www.kraken.com/learn/what-is-bored-ape-kennel-club-nft/, viewed on February 2, 2023)

Kraken, "What is Mutant Ape Yacht Club?" (https://www.kraken.com/learn/what-is-mutant-ape-yacht-club-nft/, viewed on January 23, 2023)

McKinsey & Company, "What is the metaverse?" August 17, 2022 (https://www.mckinsey.com/featured-insights/mckinsey-explainers/what-is-the-metaverse, viewed on January 31, 2023)

Medium, "Step-by-Step Guide to Registering a .ETH Name," May 4, 2019 (https://medium.com/the-ethereum-name-service/step-by-step-guide-to-registering-a-eth-name-on-the-new-ens-registrar-c07d3ab9d6a6/, viewed on February 5, 2023)

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

New York University Stern School of Business, Faculty Directory, "Hanna Halaburda – Associate Professor of Technology, Operations, and Statistics" (https://www.stern.nyu.edu/faculty/bio/hanna-halaburda, viewed on January 27, 2023)

NFT Evening, "BAYC's First Annual Ape Fest Kicks Off With a Bang!," November 1, 2021 (https://nftevening.com/baycs-first-annual-ape-fest-kicks-off-with-a-bang/, viewed on February 3, 2023)

NFT Now, "21 Celebrities Who Have Jumped Into the Bored Ape Yacht Club," November 18, 2021 (https://nftnow.com/culture/celebrities-who-have-bored-ape-yacht-club-nfts/, viewed on January 31, 2023)

NFT Now, "A Complete and Simple Guide to the Top 10 NFT Marketplaces," June 9, 2022 (https://nftnow.com/guides/a-complete-and-simple-guide-to-the-top-10-nft-marketplaces/, viewed on February 3, 2023)

NFT Price Floor, "Bored Apes Yacht Club" (https://nftpricefloor.com/bored-ape-yacht-club, viewed on February 3, 2023)

NFGTO, RR/BAYC (https://nftgo.io/collection/rrbayc/overview, viewed on February 6, 2023)

Nick Szabo, "Smart Contracts," 1994 (https://www.fon.hum.uva.nl/rob/Courses/ InformationInSpeech/CDROM/Literature/LOTwinterschool2006/szabo.best.vwh.net/smart.contracts.html , viewed on January 22, 2023)

OpenSea, RR/BAYC (https://opensea.io/collection/rrbayc, viewed on February 5, 2023)

OpenSea, "How do creator earnings work on OpenSea?" (https://support.opensea.io/hc/en-us/articles/1500009575482-How-do-creator-earnings-work-on-OpenSea-, viewed on January 26, 2023)

OpenSea, "How do I buy NFTs with a credit or debit card?" (https://support.opensea.io/hc/en-us/articles/4413380935187-How-do-I-buy-NFTs-with-a-credit-or-debit-card-, viewed on February 2, 2023)

OpenSea, "What is Minting?" December 15, 2022 (https://opensea.io/learn/what-is-minting-nft, viewed on January 22, 2023)

OpenSea, "Which blockchains are compatible with OpenSea?" (https://support.opensea.io/hc/en-us/articles/4404027708051-Which-blockchains-are-compatible-with-OpenSea-, viewed on January 22, 2023)

OpenSea, "Who is OpenSea?" (https://opensea.io/learn/who-is-opensea#toc-0, viewed on January 22, 2023)

Rarity, "Bored Ape Kennel Club Ranked by Rarity" (https://rarity.tools/bored-ape-kennel-club/, viewed on February 2, 2023)

Rolling Stone, "How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes," November 1, 2021 (https://www.rollingstone.com/culture/culture-news/bayc-bored-ape-yacht-club-nft-interview-1250461/, viewed on January 25, 2023)

RR/BAYC (https://rrbayc.com/, viewed on January 26, 2023)

Ryder Ripps Website (https://ryder-ripps.com/, viewed on January 19, 2023)

JTX-0723.00075

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Seeking Alpha, "What Are NFT Royalties & How Do They Work?" May 27, 2022
(https://seekingalpha.com/article/4483346-nft-royalties, viewed on January 31, 2023)

SoFi Learn, "What Does Minting an NFT Mean?" September 9, 2022
(https://www.sofi.com/learn/content/what-is-nft-minting/#:~:text=Minting%20an%
20NFT%2C%20or%20non,bought%2C%20sold%2C%20and%20traded, viewed on January 22, 2023)

Start with NFTs, "Explaining the Rise of Bored Ape Yacht Club - The NFT Project Making History,"
September 6, 2021 (https://www.startwithnfts.com/posts/explaining-the-rise-of-bored-ape-yacht-club-the-
nft-project-making-history/, viewed on January 25, 2023)

The Block, "Bored Ape Yacht Club ends 2022 with 69 ETH floor price," December 31, 2022
(https://www.theblock.co/post/198625/bored-ape-yacht-club-ends-2022-with-69-eth-floor-price, viewed
on January 27, 2023)

The Block, "How Bored Apes became the foundation for a metaverse," June 22, 2022,
(https://www.theblock.co/post/153349/how-bored-apes-became-the-foundation-for-a-metaverse, viewed
on February 2, 2023)

The New York Times, "Thefts, Fraud and Lawsuits at the World's Biggest NFT Marketplace," June 6,
2022 (https://www.nytimes.com/2022/06/06/technology/nft-opensea-theft-fraud.html, viewed on January
25, 2023)

The New Yorker, "Why Bored Ape Avatars are Taking Over Twitter," July 30, 2021.
(https://www.newyorker.com/culture/infinite-scroll/why-bored-ape-avatars-are-taking-over-twitter/,
viewed on January 23, 2023)

The Verge, "Bored Ape Yacht Club creator raises $450 million to build an NFT metaverse," March 22,
2022 (https://www.theverge.com/2022/3/22/22991272/yuga-labs-seed-funding-a16z-bored-ape-yacht-
club-bayc-metaverse-other-side/, viewed on February 3, 2023)

Twitter (@ryder_ripps) (https://twitter.com/ryder_ripps, viewed on January 19, 2023)

Wired, "How Did the Bored Ape Yacht Club Get So Popular?" February 8, 2022
(https://www.wired.com/story/celebrity-nfts/, viewed on January 25, 2023)

X2Y2, "Trading Rewards" (https://docs.x2y2.io/tokens/rewards/trading-rewards, viewed on February 2,
2023)

Yahoo Finance, "2022, the year NFTs fell to earth," December 28, 2022 (https://news.yahoo.com/nft-
crypto-2022-bitcoin-ethereum-060050452.html, viewed on January 27, 2023)

JTX-0723.00076

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Appendix C**

**Ethereum Blockchain Data and
Calculation of Defendants' Profits
from Initial Sales and Resales of RR/BAYC NFTs**

1.      My calculation of Defendants' profits is based on public Ethereum blockchain data, which contains records of all transactions executed on the network.   Below I describe my methodology for collecting and analyzing this data.

## I.      ETHEREUM BLOCKCHAIN DATA COLLECTION

2.      Ethereum blockchain transaction data was collected using Etherscan, a "block explorer and analytics platform for Ethereum."[1]   Etherscan contains records of all transactions that occur on the Ethereum network, providing public access to information associated with wallet addresses ("wallets"), smart contracts, and tokens that reside on the Ethereum network.[2]   In order to calculate Defendants' profits, four datasets were extracted using Etherscan: (1) all transactions associated with Mr. Ripps' and Mr. Cahen's wallets, (2) all transactions associated with RR/BAYC NFTs, (3) all event logs associated with RR/BAYC NFT transactions,[3] and (4) the daily average ETH to USD conversion for the time period relevant to my analyses.   I have included these datasets, along with the computer code used to analyze the data, in the backup produced with my report.   These datasets were extracted on February 1, 2023 and contain transactions from May 13,

---

[1] Etherscan (https://etherscan.io/, viewed on January 26, 2023).

[2] Ethereum blockchain transaction data can be viewed on the Etherscan website through a web browser and is available for download through an application programming interface (API).   Etherscan's API was used to download the data required for my calculations.

[3] Smart contracts emit signals called "events" that other smart contracts can then act upon.   The events emitted by smart contracts are stored in event logs, which can be extracted from Etherscan and used to "read" actions that were performed to execute a transaction.   Raw event logs are encoded and must be decoded using a contract application binary interface ("ABI"), or through the Etherscan website.   Event logs provide insight into, among other things, the date and time of an NFT transfer, the ETH exchanged for the NFT, and creator fees generated by an NFT resale. *See* Ethereum, "Logging Data from Smart Contracts with Events," April 2, 2020. (https://ethereum.org/en/developers/tutorials/logging-events-smart-contracts/, viewed on February 5, 2023).

JTX-0723.00077

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

2022 (when Mr. Ripps began to mint RR/BAYC NFTs) through February 1, 2023.  Below I describe how these datasets were collected.

### A.   Transactions Associated with Defendants' Wallets

3.      Defendants identified two wallets belonging to Mr. Ripps[4] and one wallet belonging to Mr. Cahen.[5]  Based on a review of the transaction data related to these wallets, one of Mr. Ripps' two wallets is associated with the minting of every RR/BAYC NFT (the "minting wallet").[6]  This finding is consistent with Mr. Ripps' testimony that all RR/BAYC NFTs were minted from a wallet he controls.[7]  On Etherscan, Mr. Ripps has named his minting wallet "ryder-ripps.eth."[8]

4.      The second wallet that Mr. Ripps identified (the "non-minting wallet")[9] is also relevant to my calculations, as it was involved in RR/BAYC NFT transactions after the mint, and as of the date of this report, it holds RR/BAYC NFTs.

5.      The transaction data associated with the Defendants' wallets includes information such as a transaction ID (or "hash"), the date and time of the transaction, the address of the other

---

[4] Mr. Ripps represented that he holds the private keys to the wallet[s] 0x592814ff14e030b51f6087032db0f88f4214f254 and 0xbaf287cb2281841d9f5ba929d7dde87048fcaf1b.  *See* Ryder Ripps' Supplemental Responses Yuga Labs, Inc.'s Requests for Admission to Ryder Ripps (Nos. 1-49), Interrogatories No. 2 and 3.  *See also* Lehman Declaration, ¶ 36.

[5] Mr. Cahen represented that he holds the private keys to the wallet 0x7d2550161e8a31d0b9585bb9c88e63e9644af740. *See* Jeremy Cahen's Supplemental Responses Yuga Lab's Inc.'s Requests for Admission to Jeremy Cahen (Nos. 1-49), Response to Interrogatory No. 2.  *See also* Lehman Declaration, ¶ 36.

[6] Mr. Ripps' "minting wallet" address is 0x592814ff14e030b51f6087032db0f88f4214f254. The Etherscan page for this wallet can be found at https://etherscan.io/address/0x592814ff14e030b51f6087032db0f88f4214f254/.

[7] Ripps Deposition, 243:21-22 ("*they were all minted from my wallet.*")

[8] Wallet owners can register a name for their wallet. *See, e.g.*, Medium, "Step-by-Step Guide to Registering a .ETH Name," May 4, 2019. (https://medium.com/the-ethereum-name-service/step-by-step-guide-to-registering-a-eth-name-on-the-new-ens-registrar-c07d3ab9d6a6/, viewed on February 5, 2023).

[9] Mr. Ripps' "non-minting wallet" address is 0xbaf287cb2281841d9f5ba929d7dde87048fcaf1b.  The Etherscan page for this wallet can be found at https://etherscan.io/address/0xbaf287cb2281841d9f5ba929d7dde87048fcaf1b/.

JTX-0723.00078

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

wallet(s) associated with the transaction, and transaction fees (or "gas") associated with the transaction.[10]  Each row of the dataset represents a transaction from one address to another, where at least one of the addresses is a Defendant wallet address.  For example, in instances in which Mr. Ripps transferred an RR/BAYC NFT to a buyer in exchange for ETH, the data displays one row for the transfer of the RR/BAYC NFT from Mr. Ripps' wallet to the buyer's wallet and another row for the transfer of ETH from the buyer's wallet to Mr. Ripps' wallet.

6.    Etherscan was used to extract all transactions associated with the Defendants' wallets.

7.    The wallet addresses associated with Mr. Lehman[11] and Mr. Hickman[12] also were used to identify transactions that occur between Defendants and their collaborators.

**B.    Transactions Associated with RR/BAYC NFTs**

8.    Mr. Ripps testified that the RR/BAYC NFT collection was minted on Foundation in mid-May 2022.[13]  Consistent with this testimony, Etherscan shows that on May 13, 2022, Mr. Ripps' minting wallet, ryder-ripps.eth, created a smart contract through Foundation.  **Figure 1**

---

[10] Gas fees are transaction fees collected on the Ethereum blockchain to execute requested operations.  Gas prices are denoted in gwei, which is a denomination of ETH.  Each gwei equates to 0.000000001 ETH.  *See* Ethereum, "Gas and Fees," February 2, 2023. (https://ethereum.org/en/developers/docs/gas/, viewed on February 3, 2023).

[11] The wallet addresses 0xc650f01eb5b8f267ad3e18282e649afa0158b188, 0xc2172a6315c1d7f6855768f843c420ebb36eda97, and 0xe64f07d9d151ea7286b8470c8f38691baf2c146e belong to Mr. Lehman.  *See* LEHMAN0000227-LEHMAN0000233. Mr. Lehman admits he was involved in developing the RRBAYCRSVP contract, which was created by wallet address 0x5927b9c6dde237639bc45c08455fa8f6f1072aa0, named middlemarch-deployer.eth.  This fourth wallet address therefore also belongs to Mr. Lehman.  Lehman Declaration, ¶ 3.

[12] The wallet address 0xF9C2Ba78aE44ba98888B0e9EB27EB63d576F261B belongs to Mr. Hickman.  *See* Hickman Deposition, Exhibit 72.  *See also* Lehman Declaration, ¶ 36.

[13] Ripps Deposition, 60:21-22 (*"they were first minted on Foundation"*); Ripps Deposition, 68:22-23 (*"RR/BAYC - the NFT project [...] was minted, I think, mid May"*).

**JTX-0723.00079**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

below shows the Etherscan page for this contract, which I refer to as the "RR/BAYC minting
contract."

**Figure 1**
**Etherscan Page for RR/BAYC Minting Contract[14, 15]**



9.      The "Token Tracker" field associated with the RR/BAYC minting contract contains
the NFT collection name "Bored Ape Yacht Club (BAYC)."  While this token tracker carries the
exact same name as Yuga Labs' trademarked BAYC NFT collection, to avoid confusion, I refer
to this token tracker as the "RR/BAYC token tracker."

10.      The Etherscan page for the RR/BAYC token tracker displays all transactions
associated with RR/BAYC NFTs.[16]  Etherscan was used to extract all transactions associated with
RR/BAYC NFTs.  Each of these transactions contains information on the minting, transfer, or

---

[14] https://etherscan.io/address/0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e.

[15] Red boxes are added on images of Etherscan pages throughout this appendix for emphasis.

[16] https://etherscan.io/token/0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e.

JTX-0723.00080

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

burning of an RR/BAYC NFT.  I also extracted from Etherscan a dataset of log events associated with RR/BAYC NFT transactions.

### 1.    *Example of Minting*

11.    As an example, **Figure 2** below displays the Etherscan page for the minting of RR/BAYC NFT #1.

**JTX-0723.00081**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Figure 2**
**Etherscan Page for Minting Transaction of RR/BAYC NFT #1[17]**



12.      As shown in **Figure 2**, transaction records include, among other things, the date of the transaction, the name of the token, the smart contract(s) that were "interacted with" during execution of the transaction, the wallet(s) associated with the transaction, and the transaction fee(s) or "gas" costs associated with the transaction.  In this case, **Figure 2** shows that on May 13, 2022,

---

[17] https://etherscan.io/tx/0xebaf7d156b20cf102968b1b88e52b052c511bc60ca0a9c6e13d446fb237015f8.

**JTX-0723.00082**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

RR/BAYC NFT #1 was minted by the RR/BAYC minting contract and deposited into Mr. Ripps' minting wallet.  Approximately 0.0177 ETH was paid for gas.

> 2.    *Example of Transfer*

13.    As an example, **Figure 3** below displays the Etherscan page for the transfer and sale of RR/BAYC NFT #61 through the Foundation NFT marketplace.

**JTX-0723.00083**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Figure 3**
**Etherscan Page for Transfer Transaction of RR/BAYC NFT #61[18]**



14.     In this case, **Figure 3** shows that on May 15, 2022, RR/BAYC NFT #61 was transferred from Mr. Ripps' minting wallet to a buyer's wallet.  In this transaction, (1) the RR/BAYC minting contract was "interacted with"; (2) 0.1 ETH was transferred from the buyer's wallet to Foundation; (3) Foundation collected 0.005 ETH as transaction fee; and (4) Foundation transferred the remaining 0.095 ETH to Mr. Ripps' minting wallet.

---

[18] https://etherscan.io/tx/0xf6f29725ed7127b0f3e91c3f327a785662dbb99abb1715c20561147e1572980d.

**JTX-0723.00084**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

## II.   CALCULATION OF DEFENDANTS' PROFITS FROM INITIAL SALES AND RESALES OF RR/BAYC NFTS

15.     As explained in **Section I** above, four datasets were extracted from Etherscan: (1) all transactions associated with Defendants' wallets; (2) all transactions associated with RR/BAYC NFTs; (3) all event logs associated with RR/BAYC NFT transactions; and (4) the daily average ETH to USD conversion.   I primarily rely on the RR/BAYC NFT transaction data and the associated event logs for my calculations.   I use transactions associated with Defendants' wallets to calculate prices for certain sales for which price information is not available in the RR/BAYC NFT transaction data.   I use the ETH to USD conversion to convert revenues and costs in ETH to USD.

16.     In this section, I explain how these datasets were used to calculate Defendants' profits associated with RR/BAYC NFTs.   As discussed above, the data was extracted on February 1, 2023 and thus my calculations of profits covers May 13, 2022 through February 1, 2023.

17.     The calculations explained below include: (1) profits from the initial sales of minted RR/BAYC NFTs and (2) creator fees generated by resales of RR/BAYC NFTs on secondary markets.

### A.   Profits from Initial Sales of RR/BAYC NFTs

18.     To calculate profits from initial sales of RR/BAYC NFTs, I relied on the transaction and event logs data associated with RR/BAYC NFTs and transaction data associated with Defendants' wallets.

19.     The RR/BAYC NFT transaction data indicates that 9,546 RR/BAYC NFTs were minted.   The data also shows that 50 NFTs were burned (removed from circulation), leaving 9,496

**JTX-0723.00085**

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

RR/BAYC NFTs in the marketplace.  Some of the burned NFTs generated profits for the Defendants before they were burned, and those profits have been included in my analyses.

20.     Using the RR/BAYC NFT transaction data as well as the wallet addresses of Mr. Ripps and Mr. Cahen, I determined that of the minted 9,546 RR/BAYC NFTs, Mr. Ripps transferred 191 to Mr. Cahen and 9,327 to non-Defendant wallets.  Mr. Cahen sold 88 of his 191 NFTs to non-Defendants.[19]  Below I calculate the profits generated by the 9,415 that were transferred to non-Defendants.

21.     Not every RR/BAYC NFT was initially sold at the same price.  Documents and testimony in this case indicate that Defendants gave some away for free, that some were sold for 0.1 ETH, and that the price later increased to 0.15 ETH when the "RSVP contract" automated the RR/BAYC NFT sales process.[20]  Below I separately calculate Defendants' profits from (1) sales of RR/BAYC NFTs that occurred "manually," through only the RR/BAYC minting contract (and marketplace contracts, if applicable), and (2) sales that occurred in a more automated fashion though the RSVP contract and the RR/BAYC minting contract.

### 1.     RR/BAYC Minting Contract Only

22.     Prior to Mr. Lehman and Mr. Hickman's involvement, the collection of ETH from RR/BAYC NFT buyers was not automated by a smart contract.  In these early sales, buyers manually transferred ETH directly to Defendants' wallets, or the transaction was completed through a marketplace.  Mr. Ripps testified that the price of RR/BAYC NFTs was 0.1 ETH before

---

[19] Mr. Cahen generated approximately 52 ETH in revenue from his sales of RR/BAYC NFTs. Using the daily average ETH to USD conversion, this amounts to $58,627.

[20] Ripps Deposition, 194:11-12 ("*I think the first few were free. And then, maybe 0.1 ETH.*"); Ripps Deposition, 123:10-124:9 ("*Q. Why did you change the price of the RR/BAYCs from .1 ETH to.15 ETH? […] A. And -- oh, so to answer your question, when the project went from just me to involving the three other individuals who I mentioned, I think collectively we found it appropriate to increase the price for, you know, to think about, you know, others.*").

JTX-0723.00086

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

Mr. Lehman and Mr. Hickman's involvement,[21] which is consistent with the prices observed in the RR/BAYC NFT transaction data and associated logs.

23.     As discussed above, 9,415 RR/BAYC NFTs were transferred to non-Defendants. The RR/BAYC NFT transaction data shows that 2,387 were transferred to non-Defendant wallets without the use of the RSVP contract.  Of these, 650 were sold through NFT marketplaces.  The prices, transaction fees, and revenues to the seller for these marketplace transactions are observable in the event log data.  The total revenue generated by these 650 RR/BAYC NFT sales is 110 ETH.[22] Total gas cost, which includes minting gas and gas associated with the transfer of these RR/BAYC NFTs, is 5 ETH.  The profits generated by these marketplace sales of RR/BAYC NFTs are therefore 105 ETH.

24.     The remaining 1,737 RR/BAYC NFTs that were transferred to non-Defendant wallets without the use of the RSVP contract were sold directly to buyers, outside of any NFT marketplace.  In these transactions, the transfer of ETH to Defendants and the transfer of the RR/BAYC NFT to the buyer were two separate transactions, with no identifier to link them.  The price the buyer paid can therefore not be ascertained from the RR/BAYC NFT transaction data alone.  To calculate revenue associated with these sales, I also relied on the transaction data associated with Defendants' wallets.  I compared the list of wallets that received an RR/BAYC NFT to the list of wallets that sent ETH to Defendants' wallets.  In cases where the wallet receiving

---

[21] Ripps Deposition, 194:11-12 ("*I think the first few were free. And then, maybe 0.1 ETH.*")

[22] NFT marketplaces often collect marketplace fees. These fees have been deducted from this revenue calculation. *See*, *e.g.*, Foundation, "What is Foundation's marketplace fee" (https://help foundation.app/hc/en-us/articles/4419440106011-What-is-Foundation-s-marketplace-fee-, viewed on February 2, 2023); X2Y2, "Trading Rewards" (https://docs.x2y2.io/tokens/rewards/trading-rewards, viewed on February 2, 2023).

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

the NFT had transferred ETH to Defendants, I assumed the price was 0.1 ETH per an NFT.[23]  In cases where no ETH were transferred to Defendants, I assumed the NFT was given to the receiving wallet for free.[24]  Of the 1,737 RR/BAYC NFTs transferred without the use of the RSVP contract and outside of any NFT marketplace, I observe in the data that 529 were given away for free.  I calculate the revenues associated with the remaining 1,208 NFTs to be 121 ETH.  There were no marketplace fees associated with these direct transfers. However, total gas costs, including minting gas and gas associated with the transfer of RR/BAYC NFTs, are 10 ETH.  The profits generated by these direct transfers of RR/BAYC NFTs are therefore 111 ETH.

25.     Together, I estimate the revenue from "manual" sales (*i.e.*, sales that went only through the RR/BAYC minting contract but not the RSVP contract) to be 231 ETH.  The total gas costs, which include minting gas and gas associated with the transfer of RR/BAYC NFTs, are 15 ETH. The profits generated by these "manual" sales are therefore 216 ETH.

### 2.     *RR/BAYC Minting Contract and RSVP Contract*

26.     Documents and testimony in this matter indicate that a second smart contract, created by Mr. Lehman, was also involved in the sale of RR/BAYC NFTs.[25]  Consistent with this evidence, Etherscan shows that on May 24, 2022, a smart contract called "RRBAYCRSVP" was created.[26]

---

[23] An exception was made for RR/BAYC NFTs transferred to non-Defendants Mr. Lehman and Mr. Hickman.  I made the conservative assumption that RR/BAYC NFTs transferred to them did not generate revenue for Defendants, even though in some cases Defendants appear to have received ETH in exchange for these transfers.

[24] The observation from the data that some RR/BAYC NFTs were given away for free is consistent with Mr. Ripps' testimony.  *See* Ripps Deposition, 194:11 ("*I think the first few were free.*").

[25]  Ripps Deposition, 240:10-14 *("Q. And so, what does the pre-RSVP refer to? A. It refers to – there's a separate – what's called a -- I think a helper contract that was designed by Ryan [Hickman] and Tom [Lehman] to help facilitate the minting and creation of my artwork."). See also* Lehman Declaration, ¶ 3.

[26] https://etherscan.io/address/0xEE969B688442C2d5843Ad75f9117b3ab04b14960.  Mr. Lehman admits he was involved in developing the RRBAYCRSVP contract. *See* Lehman Declaration, ¶ 3.

JTX-0723.00088

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

27.     While the minting of the RR/BAYC NFTs continued to be handled by the RR/BAYC minting contract, the RSVP contract automated the process of triggering the RR/BAYC minting contract to mint the requested RR/BAYC NFT, transferring the RR/BAYC NFT to the buyer's wallet, and collecting ETH from the buyer.  ETH collected by the RSVP contract were deposited into the RSVP contract's wallet address, and periodic withdrawals were made and shared among the four individuals, with Mr. Ripps receiving 55%, Mr. Cahen 15%, Mr. Lehman 15%, and Mr. Hickman 15%.[27]

28.     The data shows 7,028 transfers of RR/BAYC NFTs that went through the RSVP contract.  Consistent with testimony in this case, the RR/BAYC transaction data shows that the price of NFTs transferred through the RSVP contract was 0.15 ETH.  This is also observable in the computer code behind the RSVP contract where the *apeSalePrice*, which represents the price of each RR/BAYC NFT, is set at 0.15 ETH.[28]

29.     I calculate the revenue from these 7,028 RR/BAYC NFTs priced at 0.15 ETH each to be 1,054 ETH.  Total gas, including minting gas and gas associated with the transfers of RR/BAYC NFTs, for these sales were 74 ETH.  The profits generated by these RSVP contract sales of RR/BAYC NFTs are therefore 980 ETH.

---

[27] Lehman Declaration, ¶¶ 33-34; Cahen Deposition, pp. 221-222 (*"Q. How many times were you paid out a profit share for the RR BAYC project? A. I don't know. Q. More -- more than once? A. I certainly think it was more than once.  I don't think that -- I don't think that distributions were made in it one lump sum.  If I recall correctly, there was a system designed that automatically distributed based on the percentage share that each team member had. Q. What was your percentage share? A. If I recall correctly, it was 15 percent."*); RIPPSCAHEN00015341.

[28] https://etherscan.io/address/0xEE969B688442C2d5843Ad75f9117b3ab04b14960#code.

JTX-0723.00089

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

### 3.    Total Profits from Initial Sales

30.    I calculate that the revenue from initial sales totaled 1,285 ETH.  This includes the revenue from sales that went only through the RR/BAYC minting contract (231 ETH) and sales that went through the RR/BAYC minting and RSVP contracts (1,054 ETH).

31.    I calculate that the gas costs totaled 89 ETH. This includes the gas from sales that went only through the RR/BAYC minting contract (15 ETH) and sales that went through the RR/BAYC minting and RSVP contract (74 ETH).

32.    Profits from these initial sales, therefore, were 1,196 ETH.  Below, I break the revenue, costs, and profits down by price.

**Figure 4**
**Profits from Initial Sales of RR/BAYC NFTs (ETH)**

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] – [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | 0 | 3 | (3) |
| 0.10 ETH | 1,624 | 162 | 10 | 152 |
| 0.15 ETH | 7,034 | 1,055 | 74 | 981 |
| Other | 210 | 68 | 2 | 66 |
| | | | | |
| **Total** | **9,415** | **1,285** | **89** | **1,196** |

33.    In **Figure 5** below, I have converted ETH to USD on a transaction-by-transaction basis using the daily average ETH to USD conversion data from Etherscan.

*Highly Confidential*
*ATTORNEYS' EYES ONLY*

**Figure 5**
**Profits from Initial Sales of RR/BAYC NFTs (USD)**

| Price | Count of RR/BAYC NFTs | Revenue [A] | Costs [B] | Profits [A] – [B] |
|---|---|---|---|---|
| 0.00 ETH | 529 | $0 | $5,611 | ($5,611) |
| 0.10 ETH | 1,642 | $322,536 | $19,404 | $303,132 |
| 0.15 ETH | 7,034 | $1,507,330 | $106,610 | $1,400,720 |
| Other | 210 | $91,006 | $3,484 | $87,582 |
| | | | | |
| **Total** | **9,415** | **$1,920,933** | **$135,109** | **$1,785,823** |

34.     As discussed above, 30 percent of the profits from sales of NFTs that went through the RSVP contract accrued to Mr. Lehman and Mr. Hickman.  I calculate their earnings to be $419,733.  The remaining $1,366,090 accrued to Defendants.

**B.     Profits from Resales of RR/BAYC NFTs**

35.     The transaction data for RR/BAYC NFTs and associated event logs show that 3,023 of the RR/BAYC NFTs were resold on the secondary market and generated creator fees for Defendants.  Some of these were resold multiple times.  Mr. Ripps acknowledged that he earned creator fees from resales on two NFT marketplaces: LooksRare and Foundation.[29]

36.     The RR/BAYC NFTs transaction and event logs data shows that Defendants earned 65 ETH in creator fees on LooksRare, and 25 ETH in creator fees on Foundation.  In total, Defendants earned 91 ETH from creator fees.  Using the ETH to USD conversion rates as of the date of each resale, these creator fees were approximately $117,309.

[29] YUGALABS_00030050.

**JTX-0723.00091**