1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ryder Ripps and Jeremy Cahen, <br><br> Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **MR. RIPPS AND MR. CAHEN'S POST-TRIAL PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW** <br><br> Judge: Hon. John F. Walter |

## POST-TRIAL FINDINGS OF FACTS AND CONCLUSIONS OF LAW[1]

This matter is before the Court following the trial of *Yuga Labs, Inc. v. Ryder Ripps and Jeremy Cahen*, 2:22-cv-04355-JFW-JEM.   The Court held a one-day bench trial on the issue of equitable remedies.  The Court, having considered the pleadings and evidence presented at trial as well as the arguments of both parties' counsel, makes the following findings of facts and conclusions of law:

## I.   FINDINGS OF FACT

**A.   Witnesses Testimony**

1.     Defendants presented three witnesses at trial: Ryder Ripps, Jeremy Cahen, and Ryan Hickman.  Trial Tr. [Defendants' witnesses] 204:21-270:23.

2.     Defendant Ryder Ripps submitted a twenty-seven-page declaration of trial testimony that was properly authenticated as his sworn testimony at trial.  Trial Tr. [Ripps] 266:15-267:2.

3.     During the course of trial, Plaintiff Yuga Labs, Inc. ("Yuga") did not cross-examine Mr. Ripps on any portion of his declaration and left the entirety of the declaration unchallenged.  Trial Tr. [Ripps] 267:8-269:5.

4.     The Court accepts the substance of Mr. Ripps's unchallenged declaration as true, because Yuga elected to not challenge any aspect of it at trial.  Trial Tr. [Ripps] 267:8-269:5.

5.     Defendant Jeremy Cahen submitted a twenty-nine-page declaration of trial testimony that was properly authenticated as his sworn testimony at trial.  Trial Tr. [Cahen] 223:25-224:9.

6.     Third Party Ryan Hickman submitted a thirteen-page declaration of trial testimony that was authenticated at trial.  Trial Tr. [Hickman] 204:21-205:12.

---

[1] Defendants expressly preserve and do not waive their objections to and rights to appeal all findings and conclusions made as part of the Court's order granting summary judgment, including those finding Mr. Ripps and Mr. Cahen liable, that any injunctive relief is appropriate, and any underlying findings. Dkt. No. 225.

7.      The Court finds Defendants' witnesses Ryder Ripps, Jeremy Cahen, and Ryan Hickman credible.  Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

8.      The Court finds the testimony of Plaintiff's witness Greg Solano lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes." ); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists?  'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**B.      The RR/BAYC Project**

9.      The evidence presented at trial establishes that the RR/BAYC project was created as a form of satire intended to protest NFTs linked to what defendants believed were antisemitic or racist injury.  Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

10.      In May 2022, Ryder Ripps and Jeremy Cahen collaborated on what they intended to be a satirical parody NFT collection called the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC").  Ripps Decl. ¶¶ 87-94 (uncontested); Cahen Decl. ¶¶ 97-103; Hickman Decl. ¶¶ 62-66.

11.     Mr. Ripps is an artist, and has previously created satirical art projects spotlighting problematic societal issues.  Ripps Decl. ¶¶ 15-26 (uncontested).

12.     Mr. Ripps's artistic contributions have been recognized by mainstream media.  *New York Times* has called Mr. Ripps one of the most influential digital artists of the past decade and recognized his work on the RR/BAYC project.  Ripps Decl. ¶ 21 (uncontested).

13.     Mr. Ripps and Mr. Cahen intended RR/BAYC as a form of protest designed to educate people on the nature of non-fungible tokens ("NFTs"), and what they saw as problematic content in Yuga's "Bored Ape Yacht Club" ("BAYC") NFT collection.  Ripps Decl. ¶¶ 87-94 (uncontested); Cahen Decl. ¶¶ 97-103; Hickman Decl. ¶¶ 62-66; Trial Tr. [Cahen] 229:9-13.

14.     A non-fungible token, or NFT, is a representation of ownership of a unique piece of data on an internet blockchain.  Trial Tr. [Atalay] 127:9-16.

15.     The RR/BAYC NFTs included digital pointers to Bored Ape images, which "are public" and "available for anyone to navigate to on the Internet."  Trial Tr. [Hickman] 222:15-16.

16.     The RR/BAYC NFTs were effectively a "receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to including Yuga Labs."  Trial Tr. [Hickman] 222:18-21.

**C.     Mr. Ripps's and Mr. Cahen's Intent**

17.     The evidence presented at trial establishes that defendants did not intend to infringe Yuga's trademarks or create confusion regarding the origin of the RR/BAYC NFTs.  Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

18.     Rather, Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the

1   RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their
2   intended artistic purpose of the project, their intention that it would spread criticism of
3   Yuga, and their intention that social media platforms be used to educate the public
4   about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl.
5   ¶¶ 144, 147 (uncontested); Cahen Decl. ¶ 131; JTX-801.00010, 012-13, 146, 196, 240,
6   276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

7        19.    Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the
8   public that RR/BAYC was intended as a protest art project.  Ripps Decl. ¶¶ 158-176
9   (uncontested); Cahen Decl. ¶¶ 145-155; Dkt. 197-1 ¶ 230.

10       20.    For example, the rrbayc.com website—through which the majority of
11   RR/BAYC commissions occurred and the vast majority of alleged profits accrued
12   (Ripps Decl. ¶ 110 (uncontested); Cahen Decl. ¶ 144) included an explanation of the
13   artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (uncontested); Cahen Decl. ¶¶
14   138-139, 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.

15       21.    Collectors using the rrbayc.com website were required to read and click
16   through a disclaimer acknowledging the artistic purpose of the project before they
17   were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (uncontested);
18   JTX-2086; Trial Tr. [Muniz] 83:10-13.

19       22.    Although Mr. Ripps and Mr. Cahen understood that these requirements
20   created additional steps that made it more cumbersome for collectors to commission
21   an NFT piece through the project, Mr. Ripps insisted on them so that the artistic
22   purpose of his work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo.
23   59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a
24   negative impact on usability? …  A.   … Ryder wanted it and so he had the final
25   call.").

26       23.    Mr. Ripps and Mr. Cahen's online discussion of the RR/BAYC project
27   confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what

28   Case No. 2:22-cv-04355-JFW-JEM       -4-    POST-TRIAL PROPOSED FINDINGS OF
                                                FACTS AND CONCLUSIONS OF LAW

they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (uncontested); Cahen Decl. ¶¶ 151, 208-209; Dkt. 197-1 ¶¶ 203-04; JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

24.     Mr. Ripps and Mr. Cahen also had a reasonable belief that the use of Yuga's marks in the RR/BAYC project was permissible as protest art.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (uncontested); Hickman Decl. ¶ 33; JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (uncontested); Cahen Decl. ¶ 206.

25.     There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project. Trial Tr. [Muniz] 77:19-23.

26.     There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

27.     Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22.

28.     Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189; Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.

29.     Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

30.     BAYC NFTs also had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.")

31.     Based on Yuga's conduct, Mr. Ripps and Mr. Cahen reasonably believed that the RR/BAYC project was permissible. Ripps Decl. ¶ 191 (uncontested); Cahen Decl. ¶¶ 206, 212; Hickman Decl. ¶¶ 24-40.  Tellingly, neither Mr. Ripps nor Mr. Cahen were cross-examined on their beliefs about the RR/BAYC project, even though—as discussed below—their intent is "highly important" in determining whether disgorgement is appropriate.

**D.    Lack of Sales Attributable to Customer Confusion**

32.     The evidence presented at trial did not show that a single RR/BAYC NFT was sold to a consumer who believed it was created by Yuga rather than by defendants. *See, e.g.,* Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1.

33.     None of the correspondence that Mr. Ripps or Mr. Cahen received from actual RR/BAYC NFT collectors indicated that any commissions or secondary sales

1   were due to confusion as to the source or the nature of the RR/BAYC NFTs.  Ripps

2   Decl. ¶¶ 196-207 (uncontested).

3       34.   Rather, these correspondence from collectors expressed gratitude and

4   support for the artistic project, the artistic statement, and Mr. Ripps's and Mr. Cahen's

5   criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (uncontested); JTX-2033, JTX-2035, JTX-

6   2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

7       35.   For example, one collector wrote:

8           Hope this email convinces you to accept my reservation for
9           rrbayc 4878.  I'm an artist, professor and I've been interested
            in the work you've been doing.  Glad you're pointing out
10          what bayc is doing and glad you make the art you do.

11      Ripps Decl. ¶ 199; JTX-2592 (uncontested).

12      36.   Another collector wrote:

13          You have done a very positive thing bringing attention to
14          BAYC.  These people need to be shown for what they are!  I
            bought one of yours on the secondary, and it is a protest
15          purchase!

16      Ripps Decl. ¶ 204, JTX-2035 (uncontested).

17      37.   A supporter stated that Mr. Ripps and Mr. Cahen were "truly iconic in

18  my eyes and something that the true artist[s] in this space deserve."  Ripps Decl. ¶ 202

19  (uncontested); JTX-2595.

20      38.   Collectors of RR/BAYC NFTs referred to the project as "art" or to Mr.

21  Ripps's "work."  Ripps Decl. ¶ 203 (uncontested); JTX-2590.

22      39.   Collectors of RR/BAYC NFTs intended their purchases to support the

23  project's goals of criticizing Yuga's imagery and educating people about the nature of

24  NFTs.  Ripps Decl. ¶¶ 200-201 (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

25  2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

26      40.   Mr. Ripps was not aware of a single instance of actual confusion.  Ripps

27  Decl. ¶ 223 (uncontested).

28

41.   Mr. Cahen was not aware of a single instance of actual confusion.  Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224.

42.   Mr. Hickman was not aware of a single instance of actual confusion. Trial Tr. [Hickman] 219:13-19.

43.   Yuga was unable to identify even a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

44.   Gregory Solano, Yuga's President, could not identify a single person who ever bought an RR/BAYC made by Ryder Ripps believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.

45.   No sales of RR/BAYC NFTs were the result of actual consumer confusion.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

46.   Yuga used e-mail and instant messaging to communicate for business. Trial Tr. [Muniz] 85:24-86:4.

47.   Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga.  Trial Tr. [Muniz] 87:17-88:6.  Yuga was also unable to identify any documentation of any press inquiries related to the RR/BAYC collection.  Trial Tr. [Muniz] 88:7-89:2.

48.   Yuga could not identify a single e-mail or text message that shows Yuga engaged in advertising work in response to the RR/BAYC project.  Trial Tr. [Muniz] 89:7-13.

49.   Yuga could not identify a single email, text message, or any other contemporaneous written communication from any brand partner or repeating any

communication from any brand partner that mentions changes in negotiating dynamics with brand partners as a result of the RR/BAYC collection.  Trial Tr. [Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from any brand partner that mentions any of these concerns at all? A No, it was phone calls and e-mails -- I mean, phone calls and Zooms.").

50.     Yuga did not mention RR/BAYC in any of its quarterly reports to its investors.  Trial Tr.  [Muniz] 89:18-23.

51.     Yuga's President, Mr. Solano, could not identify a single instance in which Mr. Ripps sold an RR/BAYC NFT on a marketplace where a BAYC NFT was also sold.  Trial Tr. [Solano] 44:6-24.

52.     Yuga's allegations that Mr. Ripps and Mr. Cahen obtained profits resulting from actual confusion relies on a set of social media "bot" accounts, out-of-context jokes, and sarcastic comments made by fans of Mr. Ripps and Mr. Cahen (Cahen Decl. ¶¶ 226-253; Ripps Decl. ¶¶ 210-222 (uncontested)).  They do not show profits resulting from actual confusion.

53.     Yuga's alleged evidence of profits resulting from actual confusion are also based on Defendants' alleged use of terms BAYC V3 or Bored Ape Yacht Club V3.  However, in reality, Mr. Ripps, Mr. Cahen, Mr. Hickman, and third-party Thomas Lehman did not use BAYC V3 or Bored Ape Yacht Club V3 to suggest that the RR/BAYC project had any affiliation with Yuga or to confuse any purchaser.  Trial Tr. [Cahen] 253:18-21; [Cahen] 254:24-255:3.

54.     The term "BAYC V3" was, however, referenced on social media in a sarcastic context and as a joke.  Trial Tr. [Cahen] 254:25-255:2.

55.     Some third-party resellers also auto-generated the terms "Bored Ape Yacht Club V3" or "BAYC V3," including when generating a new name space after resolution of requests pursuant to the Digital Millennium Copyright Act.  Trial Tr.

[Cahen] 253:22-254:7.   Mr. Ripps and Mr. Cahen had no control over and no affiliation with those third-parties who auto-generated "Bored Ape Yacht Club V3" or "BAYC V3."  Trial Tr. [Cahen] 254:3-7.

56.     Yuga's alleged evidence of confusion also relies on a Bloomberg News clip with "Bored Ape Yacht Club V3" written in the background.  Yuga's President, Mr. Solano, could not identify any basis for Yuga's contention that the background image references the RR/BAYC project.  Trial Tr. [Solano] 30:22-31:5.

57.     Yuga's alleged evidence of confusion also relies on a declaration from third-party Thomas Lehman.  Trial Tr. [Solano] 37:8-14.

58.     Yuga's President, Mr. Solano, relied on the declaration despite not having read the entirety of Mr. Lehman's deposition.  Trial Tr. [Solano] 38:4-10.

59.     Mr. Solano relied on the declaration without having considered that Mr. Lehman signed the declaration because he was intimidated by Yuga's lawsuit against him.  Trial Tr. [Solano] 38:1-13

60.     Mr. Solano relied on the declaration without having considered that Mr. Lehman signed the declaration because Mr. Lehman knew he could not get a settlement without executing a declaration concerning matters of Yuga's choosing.  Trial Tr. [Solano] 38:14-16.

61.     Mr. Solano relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

62.     Mr. Solano relied on the declaration without having considered that the declaration was not drafted by Mr. Lehman and was instead drafted by Yuga's lawyers.  Trial Tr. [Solano] 37:20-22.

63.     Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected

by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14.

64.     Mr. Solano was also forced to concede on cross examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4.  Mr. Ripps and Mr. Cahen do not continue to receive royalties or creator fees from sales on secondary marketplaces. *Id.*

65.     The Court does not find Mr. Solano's testimony to be credible. Trial Tr. [Solano] 11:11–65:23.

66.     Yuga also relied on the "token tracker" or "token name" for the RR/BAYC as purported evidence of sales attributable to consumer confusion.  Yuga's former Chief Technical Officer Kerem Atalay explained that using token trackers or token names to distinguish NFTs is not "how most people would do that, and . . . I don't think that would be a surefire way of distinguishing between two smart contracts." Trial Tr. [Atalay] 132:21-133:8.

67.     Mr. Atalay also explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

68.     Mr. Atalay confirmed that consumers differentiate NFT collections by reviewing them on a marketplace or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.

69.     Yuga also relied on surveys from its expert, Laura O'Laughlin, as basis for its allegations of sales related to confusion.  Trial Tr.  [O'Laughlin] 142:11-13.

70.     Ms. O'Laughlin's surveys were unreliable.  They included flawed methodologies, including by using an inappropriately overbroad target population that

1  was not limited to people who have purchased or were intending to purchase NFTs.

2  Trial Tr. [O'Laughlin] 148:1-21.

3      71.    Ms. O'Laughlin's surveys included people who considered purchasing

4  digital art irrespective of whether they were considering purchasing an NFT.  Trial Tr.

5  [O'Laughlin] 149:17-21.

6      72.    Ms. O'Laughlin could have asked potential survey participants if they are

7  past or potential purchasers of an NFT, but instead chose a qualification criteria that

8  was overbroad, and thus improperly changed the survey results.  Trial Tr.

9  [O'Laughlin] 151:14-19 ("Q. You could have just asked, are you a past or potential

10  purchaser of an NFT and left it at that; right?  A. I could have yes.").

11      73.    Ms. O'Laughlin modified her survey eligibility following pre-tests (to

12  which members of her team had access) to expand the survey population.  Trial Tr.

13  [O'Laughlin] 145:21-146:7; [O'Laughlin] 146:10-25.

14      74.    Ms. O'Laughlin's surveys are also unreliable because they were biased in

15  favor of finding confusion because they counted consumers as "confused" in the test

16  group who merely copied text from the images that they were shown, but did not

17  count consumers as "confused" in the control group when they did the same thing. In

18  her *Eveready* survey, when shown an image showing "Bored Ape Yacht Club"

19  respondents that wrote "Bored Ape Yacht Club" were counted as confused.  Trial Tr.

20  [O'Laughlin] 154:4-155:3.  However, in the corresponding control group, when

21  shown an image displaying "Chill Gorilla Boat Crew" respondents that wrote "Chill

22  Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 156:16-

23  157:8.

24      75.    The most reasonable interpretation of the results of Ms. O'Laughlin's

25  methodologically flawed survey evidence is that participants wrote down the words

26  they were shown in the survey prompts.  Trial Tr. [O'Laughlin] 157:9-14;

27  [O'Laughlin] 157:25-158:7.

28  Case No. 2:22-cv-04355-JFW-JEM          -12-    POST-TRIAL PROPOSED FINDINGS OF
                                                    FACTS AND CONCLUSIONS OF LAW

76.  Ms. O'Laughlin's surveys did not test for confusion for sales on rrbayc.com, which is where more than 80% of sales for which Defendants made revenue occurred.  Trial Tr. [O'Laughlin] 159:21-160:13; Ripps Decl. ¶ 110 (uncontested).

77.  Ms. O'Laughlin also did not consider whether Defendants actually made any sales on OpenSea.  Trial Tr. [O'Laughlin] 165:1-4.

78.  Ms. O'Laughlin's survey methodology was flawed from the outset because she did not determine which survey format she should use, but instead used two different surveys that are appropriate for different uses in different and mutually exclusive circumstances.  *See* Trial Tr. [O'Laughlin] 142:24-144:14.

79.  The *Eveready* survey format is most accepted when the asserted mark is top of mind.  Trial Tr. [O'Laughlin] 143:6-144:3

80.  The *Squirt* survey format is used when the asserted mark is weak.  Trial Tr. [O'Laughlin] 144:4-6.

81.  Ms. O'Laughlin did not conduct a fame survey to determine whether the asserted marks were top of mind or weak.  Trial Tr. [O'Laughlin] 144:12-14.

82.  This was the first case in which Ms. O'Laughlin presented testimony about both an *Eveready* and *Squirt* survey.  Trial Tr. [O'Laughlin] 144:19-24.

83.  Yuga's brand equity expert, Dr. Jonah Berger, offered a flawed and unreliable opinion that the RR/BAYC project caused harm to Yuga's brand equity. *See* Trial Tr. [Berger] 103:23-104:4.

84.  Dr. Berger's analysis was limited to a two-month time period and thus did not consider broadly how Yuga Lab's brand equity was impacted outside of that period.  Specifically, Dr. Berger did not evaluate any brand harm prior to May 6, 2022 or after late June 2022.  Trial Tr. [Berger] 106:1-3.

85.  Dr. Berger's analysis did not quantify any brand harm (nor did Yuga seek damages resulting from brand harm).  *See generally* Berger Decl.; Dkt. 343 at 15.

86.     Dr. Berger admitted that that there could be multiple different and separate causes of the harm that Yuga's brand purportedly suffered.  Trial Tr. [Berger] 108:7-109:4.

87.     Dr. Berger, however, did not consider alternative causes of brand harm such as the general downturn of the cryptocurrency market.  Trial Tr. [Berger] 109:5-110:5; 115:16-25.

88.     Dr. Berger did not consider whether Yuga's scandal associated with its Otherdeed NFTs for Otherside, which are related to BAYC NFTs and were released on April 2022 (just before the period selected for his analysis), was responsible for any alleged harm to Yuga's brand.  Trial Tr. [Berger] 113:10-114:2; 109:5-7; 110:6-9.

89.     Dr. Berger did not consider whether the Nekst scandal, in which Yuga desecrated graffiti artwork in New York City, was responsible for any alleged harm to Yuga's brand.  Trial Tr. [Berger] 114:10-115:15.

90.     Dr. Berger did not consider whether the validity of Defendants' criticism of Yuga was responsible for any alleged harm to Yuga's brand.  Trial Tr. [Berger] 117:15-24.

91.     Dr. Berger did not consider whether the minting of RR/BAYC NFTs increased awareness of Defendants' criticism of Yuga, and whether that increased awareness of Yuga's misconduct was responsible for any alleged harm to Yuga's brand.  Trial Tr. [Berger] 119:21-25.

92.     Yuga's damages expert, Lauren Kindler, was able to quantify the alleged damages Yuga suffered.  Trial Tr. [Kindler] 172:14-17.

93.     Ms. Kindler opined that one component of Yuga's damages was corrective advertising expenditures, which she calculated were between $285,000 and $535,000 roughly.  Trial Tr. [Kindler] 174:4-7.

94.     Ms. Kindler testified that she stands by that figure as an accurate calculation of harm to Yuga.  Trial Tr. [Kindler] 173:1-8

95.    Ms. Kindler calculated damages in the amount of $1,792,704 for Yuga to repurchase all RR/BAYC NFTs.  Trial Tr. [Kindler] 175:17-22.

96.    Ms. Kindler later changed her damages calculation in the amount of repurchase costs to be "up to $797 million."  Trial Tr. [Kindler] 178:24-179:5.

97.    Ms. Kindler changed her damages figure to "up to $797 million" based on tweets posted by Defendants on June 6, 2023, and some responses to those tweets. Trial Tr. [Kindler] 179:6-14.

98.    Ms. Kindler further changed her damages calculation in her trial testimony, opining that "the cost to purchase and destroy all RR/BAYC NFTs could *even be higher* than $797,183,838." Kindler Decl. ¶ 74.

99.    Ms. Kindler also separately calculated Defendants' profits to be $1,589,445.  Trial Tr. [Kindler] 174:8-23.

100.   Ms. Kindler's calculation that Mr. Ripps and Mr. Cahen earned a total of $1,589,455 in profits was incorrect.  *See* Dkt-287-10, p. 1; *infra* ¶¶ 101-113.

101.   Ms. Kindler failed to perform any apportionment of her profits calculation to determine profits attributable to infringement and profits not attributable to infringement.  Trial Tr. [Kindler] 189:16-25.

102.   Instead, Ms. Kindler improperly assumed that all profits are attributable to infringement. Trial Tr. [Kindler] 189:16-25.

103.   Over 80% of sales by Defendants occurred on rrbayc.com where there was a prominent artistic statement and a disclaimer.  Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

104.   Mr. Ripps and Mr. Cahen did not receive royalties for secondary sales (except for a small amount for a platform that carried mandatory resale royalties). Ripps Decl. ¶¶ 167-118 (uncontested).

105.   Defendants did not collect any royalties from sales on OpenSea.  Trial Tr. [Kindler] 202:4-12.

106.   Ms. Kindler also included $106,055 in her profits calculation for the theoretical value of NFTs that either Mr. Ripps or Mr. Cahen currently hold and have never sold, or NFTs that have never actually been made.  Kindler Decl. ¶ 58, 60.

107.   The value of unmade and unsold theoretical NFTs is not "profit."

108.   Ms. Kindler agrees that the $106,0555 amount that she included in her calculation should be excluded if the Court enters an injunction.  Trial Tr. [Kindler] 198:18-25.

109.   Profits for all RR/BAYC NFT reservations were split with Mr. Hickman and Mr. Lehman—including for pre-RSVP contract reservations that Yuga's calculations fail to apportion—with each receiving 15% of profits.  Ripps Decl. ¶¶ 129-135 (uncontested); Cahen Decl. ¶¶ 177-178; Trial Tr. [Kindler] 196:22-197:2.

110.   Prior to implementation of the RR/BAYC project's "RSVP contract" which automated disbursements for RR/BAYC NFT commissions, Mr. Ripps distributed Mr. Hickman and Mr. Lehman's share of profits in the amount of $108,037.08.  Ripps Decl. ¶¶ 132-135 (uncontested).  JTX-2710 is an Etherscan page detailing the transfer on May 27, 2022, of 32.398 ETH from Mr. Ripps' wallet address "ryder-ripps.eth" to the wallet address "middlemarch.eth," which Ms. Kindler testified she understood to be Mr. Lehman's.  *See generally*, Trial Tr. [Kindler] 195:9-22.  JTX-2711 is an Etherscan page detailing the transfer on May 27, 2022, of 30.242 ETH from Mr. Ripps' wallet address "ryder-ripps.eth" to the wallet address Ms. Kindler identified in her expert report as belonging to Mr. Hickman. *See generally*, Trial Tr. [Kindler] 196:7-21.

111.   Ms. Kindler improperly included in her profits calculation $108,037.08 in pre-RSVP contract transfers for Mr. Hickman and Mr. Lehman.  Trial Tr. [Kindler] 196:22-197:2; Ripps Decl. ¶¶ 132-135 (uncontested).

112.   The RSVP contract also distributed $93,135.62 in automated refunds.  Ripps Decl. ¶¶ 174-175 (uncontested).  Yuga improperly includes in its profits

1   calculation $93,135.62 in automated refunds executed through the RSVP reservation

2   contract.  Ripps Decl. ¶¶ 174-175 (uncontested).

3       113.   Mr. Ripps and Mr. Cahen also incurred approximately  $15,100.00 in

4   miscellaneous expenses associated with wages, a computer, and travel expenses.

5   Ripps Decl. ¶ 136 (uncontested); Cahen Decl. ¶¶ 174-176.

6   **E.      ApeMarket**

7       114.   The term "ape" in the crypto context is a colloquialism used in

8   expressions like "I aped into something," which means to just jump in.  Trial Tr.

9   [Cahen] 264:18-25.

10      115.   The term "ape" has been used in pieces of artwork or NFT collections

11  other than the RR/BAYC collection and the Bored Ape Yacht Club.  Trial Tr. [Cahen]

12  265:4-6.

13      116.   Mr. Cahen believed it was appropriate to use the term "ape" in a project

14  called "ApeMarket" and explained at trial that "it is a word that describes, like one of

15  the most common animals on the entire planet.  What?  Am I not going to be allowed

16  to say 'apple' or 'cucumber'?  You know, it seems pretty reasonable that I would be

17  allowed to say the word 'ape.'"  Trial Tr. [Cahen] 264:13-17.

18      117.   ApeMarket was never released.  Trial Tr. [Muniz] 85:11-12; [Hickman]

19  217:25-218:1; Cahen Decl. ¶ 260; Ripps Decl. ¶ 180 (uncontested).

20      118.   Mr. Ripps and Mr. Cahen never generated any revenue or profit from

21  ApeMarket.  Trial Tr. [Cahen] 265:7-10; Cahen Decl. ¶ 261; Ripps Decl. ¶ 181

22  (uncontested).

23  **F.      Mr. Ripps's and Mr. Cahen's Good Faith Litigation Conduct**

24      119.   Defendants' liability arguments, though ultimately unsuccessful on

25  Defendants' motion to dismiss and at summary judgment, were made reasonably and

26  in good faith.  *See generally* Dkt. 348 at 11-15.

27

28

120.   Defendants' infringement was not willful.  *See* Dkt. 149 at 13 (Yuga seeking at summary judgment a finding of exceptional case of "intentional infringement"); Dkt. 225 at 13 (denying Yuga's motion); Dkt. 236 at 13 (Yuga conceding that it is not pursuing a claim of willful infringement); Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies").

121.   Defendants have not engaged in litigation misconduct. *See generally* Dkt. 348 at 11-15.

**G.   Yuga's Litigation Misconduct**

122.   Yuga originally asserted the legal remedy of actual damages when it filed this case on June 24, 2022, and then approximately one-year later, on June 15, 2023, withdrew its claim for the legal remedy of actual damages.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies and will proceed to trial solely on its prayer for equitable remedies as to the remaining active claims – Claim 1 and Claim 3").

123.   In the course of this litigation, Yuga has made settlement demands including conditions that are unreasonable such as a non-disparagement clause that would prevent Defendants from ever criticizing Yuga.  Dkt. 317 [Hearing Transcript June 16, 2023, at 10:15-11:13].

124.   At trial, Yuga's corporate representative confirmed its intent to silence Defendants by testifying that "[t]hey should not have the right to say 'Bored Ape Yacht Club' again."  Trial Tr. [Muniz] 94:5-13.

125.   Yuga engaged in conduct in the litigation of this case that precludes an exceptional case finding in its favor.

126.   Yuga tried to preclude relevant discovery by invoking the "apex witness" rule to improperly to block the depositions of Greg Solano (who testified at trial) and Wylie Aronow.  The Court found Yuga's motion "deficient on the merits" because the witnesses at issue were "the only people who have knowledge of the creation of the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga employees Wylie

-18-      POST-TRIAL PROPOSED FINDINGS OF
                                                                  FACTS AND CONCLUSIONS OF LAW

1   Aronow and Greg Solano appear for depositions on January 9 and 11 respectively

2   (excusing Mr. Solano only if he had medical complications). *Id.* Neither witness

3   appeared as ordered. *See, e.g.*, Trial Tr. 49:8-19 [Solano] ("Q You did not appear for

4   your deposition on January 11th, 2023; correct? A Yes. I was in an international

5   business meeting, and I appeared the next week. Q The reason you did not appear was

6   because of this business meeting; correct? A Yes. Q Yuga had filed a motion asking to

7   excuse your appearance in part because of this business meeting; correct? A That's

8   correct. Q The Court denied Yuga's motion; correct? A That's correct.")

9       127.   Yuga also improperly designated the entirety of third-party Ryan

10   Hickman's deposition testimony as HIGHLY CONFIDENTIAL-ATTORNEYS

11   EYES ONLY in violation of the Court's protective order as the transcript contained

12   no Yuga confidential information. *See* Dkt. 123-2. The Court ordered complete de-

13   designation of the transcript and found that Yuga was wrong to "hold the transcript

14   hostage." Dkt. 133 at 2.

15       128.   Throughout the course of this litigation, Yuga also made repeated

16   improper requests for sanctions against the individual defendants. Specifically, Yuga

17   unsuccessfully asked the Court to impose sanctions six times. Trial Tr. [Ripps]

18   269:21-270:2; *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at

19   4-5; Dkt. 198 at 4; Dkt. 210 at 18-20. Each request was denied.

20           **II.   CONCLUSIONS OF LAW**

21   **A.   Disgorgement of Profits Is Not Available as a Remedy**

22       129.   An infringer's mental state is a "highly important consideration in

23   determining whether an award of profits is appropriate." *Romag Fasteners, Inc v.*

24   *Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

25       130.   Disgorgement is only warranted in cases of "conscious wrongdoers."

26   *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17

27   (C.D. Cal. July 29, 2022).

28      Case No. 2:22-cv-04355-JFW-JEM     -19-   POST-TRIAL PROPOSED FINDINGS OF
                                    FACTS AND CONCLUSIONS OF LAW

131.   Disgorgement is not an available remedy because—for all the reasons explained above—neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See supra* ¶¶ 17-31.

132.   Separately, disgorgement is also unavailable because Yuga has not shown "the absence of an adequate remedy at law."  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).

133.   Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.

134.   Having abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

**B.     No Profits Are Attributable to Infringement**

135.   Even if disgorgement of profits were available, Yuga would only be entitled to disgorgement of profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id*.

136.     As discussed above, none of the revenue on which Yuga bases its claim of profits is "attributable to the infringing activity" *Lindy Pen,* 982 F.2d at 1408, or to the "appeal of [Yuga's] symbol," *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206 (1942).  Rather, there is no evidence that any purchaser of the RR/BAYC NFTs was confused about their origin or believed that they came from someone other than Mr. Ripps and Mr. Cahen.  Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1; JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**C.     Only the Statutory Minimum Cybersquatting Damages Are Available**

137.     Statutory damages are a legal remedy for which there is a jury trial right. *See Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial includes the right to have a jury determine the *amount* of statutory damages") (emphasis in original).

138.     A jury is not required when a plaintiff elects to accept the minimum amount of statutory damages for cybersquatting.  *See GoPets Ltd. v. Hise,* 657 F.3d 1024, 1034 (9th Cir. 2011).  Awarding anything more than the statutory minimum is a legal remedy.  *See Versace v. Awada,* CV 03-3254-GAF, 2009 WL 10673371, at *7 (C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court will not permit Plaintiff to withdraw its demand for a jury trial because Defendants do not consent, and because the law holds clearly that Defendant has a right to a jury determination of statutory damages.").

139.     As the above authorities make clear, having abandoned "all legal remedies," Yuga cannot permissibly obtain more than the statutory minimum on its cybersquatting claim without violating Mr. Ripps' and Mr. Cahen's Seventh Amendment rights.  *See Daimler AG v. A-Z Wheels LLC,* 498 F. Supp. 3d 1282, 1290

(S.D. Cal. 2020) (holding that awarding more than the statutory minimum is a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252, 1259-60 (W.D. Wash. 2013) (holding that statutory damages are a jury issue)).

140.   Yuga is entitled to, at most, the statutory minimum damages of $1,000 for each of the two cybersquatting violations that the Court found (Dkt. 225 at 13-15), for a total of $2,000. *See* 15 U.S.C. § 1117(d) (permitting "award of statutory damages in the amount of not less than $1,000").

**D.     Only Reasonable Injunctive Relief Is Available**

141.   "A trademark injunction . . . can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace.  Accordingly, we must ensure that the injunction is tailored to eliminate only the specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) (cleaned up).

142.   "Prohibition of . . . truthful and non-misleading speech does not advance the Lanham Act's purpose of protecting consumers and preventing unfair competition; in fact, it undermines that rationale by frustrating honest communication . . . ." *Id.* at 1176-77.

143.   Yuga improperly seeks injunctive relief that would curtail Mr. Ripps's and Mr. Cahen's First Amendment right to criticize Yuga and its products by name. Yuga has proposed injunctive relief that, by its own admission, would take away "the right to say 'Bored Ape Yacht Club' again.".  Trial Tr. [Muniz] 94:5-13.

144.   Here, a properly tailored injunction must be targeted to eliminating any confusion resulting from the sale of RR/BAYC NFTs, or the use of the "rrbayc.com" and "apemarket.com" domains.

145.   Accordingly, appropriately tailored injunctive relief should be limited to: (1) prohibiting Defendants from using the domain "rrbayc.com" or the domain

1    "apemarket.com"; and (2) prohibiting Defendants from selling or promoting the sale

2    of RR/BAYC NFTs.

3    **E.      This Case is Not Exceptional in Yuga's Favor**

4          146.   Exceptional case findings are rare and not the norm. *Octane Fitness,*

5    *LLC*, 572 U.S. at 553 (defining exceptional as "uncommon, rare and not ordinary")

6    (internal quotations omitted).

7          147.   Courts determine if a case is exceptional by considering the totality of the

8    circumstances and evaluating whether the case is "one that stands out from others with

9    respect to the substantive strength of a party's litigation position (considering both the

10   governing law and the facts of the case) or the unreasonable manner in which the case

11   was litigated." *SunEarth, Inc.*, 839 F.3d at 1180 (quoting *Octane Fitness, LLC v.*

12   *ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

13         148.   As the name implies, the case must present something "exceptional" to

14   depart from the normal rule that parties pay their own costs. *See Watec Co. v. Liu*,

15   403 F.3d 645, 656 (9th Cir. 2005) (reversing district court because it was only based

16   on a finding of intentional infringement, but not the kind of extreme conduct

17   necessary for an exceptional case finding).

18         149.   Plaintiffs bear the burden to prove that a case is exceptional. *Caiz v.*

19   *Roberts*, No. 15-CV-09044-RSWL-AGRx, 2017 WL 830386 at *5 (C.D. Cal. Mar. 2,

20   2017).

21         150.   This is not an exceptional case in Yuga's favor. *See supra* ¶¶ 118-127.

22         151.   Mr. Ripps and Mr. Cahen put forward defenses that were objectively

23   reasonable, and Mr. Ripps and Mr. Cahen were justified in defending this litigation

24   through trial, particularly given Yuga's demand for terms that Yuga could never attain

25   through this litigation. *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058-

26   ODW (JPRx), 2021 WL 2414856 at *2 (C.D. Cal. June 14, 2021) ("Courts in this

27

28

district have held that a party's litigation position must be objectively meritless for a case to be exceptional…").

152.    Mr. Ripps and Mr. Cahen advanced reasonable arguments in favor of their positions on both liability and damages. *See Caiz,* 2017 WL 830386, at *5 (holding that mere "lack of success" does not support an exceptional case finding).

153.    Yuga's own conduct in this litigation—including, but not limited to, making unreasonable settlement demands, seeking overbroad injunctive relief, unjustifiably resisting discovery obligations, ignoring a Court order on its executive's deposition date, and repeatedly making unwarranted requests for sanctions—precludes a finding that this case is exceptional in Yuga's favor. *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case finding is an exercise of the court's equitable powers).

Dated: _____          _____
                                        Hon. John F. Walter
                                        United States District Judge