Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:  650.988.8500
Facsimile:   650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone:  415.875.2300

*Additional Counsel listed on next page*

Attorneys for Plaintiff
YUGA LABS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., <br><br>                Plaintiff, <br><br>    v. <br><br> Ryder Ripps, Jeremy Cahen, <br><br>                Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **JOINT STATEMENT REGARDING OBJECTIONS TO YUGA LABS' POST TRIAL PROPOSED FINDINGS OF FACTS AND CONCLUSION OF LAW** <br><br> Judge:  Hon. John F. Walter |

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA  90401
Telephone:   310.434.4300

Attorneys for Plaintiff

YUGA LABS, INC.

JOINT STATEMENT RE: OBJECTIONS

Pursuant to the Court's Order Regarding Post Trial Findings of Fact and Conclusion of Law (Dkt. 409), Defendant Ryder Ripps and Defendant Jeremy Cahen and Plaintiff Yuga Labs, Inc. ("Yuga Labs") respectfully submit the following joint statement regarding objections to the parties' Post Trial Proposed Findings of Fact and Conclusion of Law.

Pursuant to the Court's order, lead counsel for the parties met and conferred in person on September 20, 2023 in Los Angeles, California. Eric Ball participated on behalf of the Plaintiff, and Louis Tompros, Derek Gosma, and Henry Nikogosyan participated on behalf of the Defendants.

The parties discussed their objections to each parties' post trial proposed findings of facts and conclusion of law but were not able to reach an agreement on the withdrawal of any objection.

1. **Joint Statement re: Plaintiff's Post Trial Findings of Fact and Conclusion of Law** (Plaintiff's Proposed Post Trial Findings of Fact, Defendants' Basis for Dispute, Plaintiff's Responses and Defendants' Replies)

**Plaintiff's Disputed Post Trial Finding of Fact No. 1, lines 1:21-24:**

Yuga Labs owns and uses trademarks associated with its BAYC NFT collection, including BORED APE YACHT CLUB, BAYC, BORED APE, the BA YC Logo, the BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo (collectively, the "BAYC Marks"). SJ Order at 6-10; Dkt. 342 ¶3.

**Defendants' Basis for Dispute:**

Evidence at trial showed that Yuga does not own the marks BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman

Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.[1]  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a **communicative** work is a dispute relegated to the confines of copyright law, not trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims

---

[1] Citations to paragraphs within witness declarations shall exclude content that is subject to objections sustained at trial.  *See* Dkts. 392, 406.

1   based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
2   "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
3   certificates of authenticity/ownership and are not digital goods in themselves.  Trial
4   Tr. [Atalay] 127:9-16.

5          Yuga also fails to identify adequate evidentiary support for its proposed finding.
6   First, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's
7   summary judgment order.  The "law of the case doctrine does not apply to pretrial
8   rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d
9   902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076,
10  1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't
11  bind district judges for the remainder of the case.  Given the nature of such motions, it
12  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although
13  *aspects* of an issue were decided at summary judgment for one purpose, the summary
14  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-
15  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that
16  evidence of initial police contact was relevant as background, but not to an already
17  decided issue that initial contact was not excessive force).  This case is just like
18  *Sienze*: the summary judgment ruling on Yuga's ownership for the asserted marks
19  applies to only the issue of infringement and is not adequate support for Yuga's lack
20  of ownership as applied to availability of disgorgement as a remedy (including
21  Defendants' mental state as applied to disgorgement), apportionment, and an
22  exceptional case analysis.

23         Second, Yuga relies on the Declaration of Greg Solano to argue that Yuga owns
24  the asserted marks.  But Mr. Solano's testimony was not credible given the many false
25  and misleading statements contained in his declaration, as well as his repeated
26  impeachment at trial.  For example, Mr. Solano was also forced to concede on cross
27  examination that his sworn declaration included a false statement claiming that

28

"Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) Defendants have stipulated to this fact, (2) the objection seeks to relitigate issues already adjudicated by the Court, (3) the record shows that Yuga Labs in fact owns the BAYC Marks, (4)

1  Yuga Labs did not grant Defendants a license to infringe, (5) other alleged infringers

2  do not negate Defendants' infringement, and (6) Defendants fail to impeach Mr.

3  Solano's accurate testimony.

4  **Defendants Stipulated To Yuga Labs' Ownership Of The BAYC Marks:**

5  Defendants' objection contradicts their own stipulations in the proposed pre-trial

6  conference order.  *See* Dkt. 320-1 at 3.  In that stipulation and proposed order,

7  Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT

8  collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted

9  that "[t]he Court has determined that Defendants infringed the BAYC Marks" and

10 "that Defendants' registration and use of the domain names https://rrbayc.com and

11 https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting

12 Consumer Protection Act."  *Id.* at 13.  Defendants have waived their right to now

13 argue that they were not liable for infringing upon Yuga Labs' marks or

14 cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882,

15 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial

16 which are not included in the [pre-trial conference] order *or which contradict its*

17 *terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting

18 to it clearly contradict the terms of the pre-trial conference order.

19 Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive

20 litigation tactic that unjustifiably increases the cost of resolving this case.  Defendants'

21 actions again make this an exceptional case.  The Court should reject Defendants'

22 objection.

23 **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

24 objection improperly disputes facts already adjudicated in the Court's Summary

25 Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its

26 BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga

27 Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.

28

1   *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally

2   used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily

3   conclude[d]" that Defendants' use of identical marks, on identical products, in

4   identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That

5   order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

6   Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

7   motion may "enter an order stating any material fact — including an item of damages

8   or other relief — that is not genuinely in dispute and treating the fact as established in

9   the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

10  *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

11  *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

12  partial summary judgment are taken as established at trial.").

13       Defendants did not move the Court to reconsider its holdings.  Nevertheless,

14  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

15  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

16  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

17  purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

18  ***trial of facts and issues over which there was really never any controversy*** and

19  which would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos*

20  *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

21  1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

22  n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

23  position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

24  (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

25  judgment is ***generally not relevant and should be excluded***" at trial( (emphasis

26  added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

27  applicability of the law of the case doctrine where a case is assigned to a new judge).

28

1   "The partial summary judgment is merely a pretrial adjudication that certain

2   issues shall be deemed established for the trial of the case and likewise serves the

3   purpose of speeding up litigation by eliminating before trial matters wherein there is

4   no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

5   2009) (alteration and citation omitted). Defendants' repeated attempts to ignore or

6   undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

7   tactic that has unjustifiably increased the cost of resolving this case.

8       Nevertheless, Defendants forced the Court and the parties to re-litigate this

9   decided issue. As discussed below, the evidence the Court can consider following the

10  trial amply supports this factual finding. Thus, the outcome on this issue after trial is

11  no different than it was after Yuga Labs' Motion for Summary Judgment.

12      **Yuga Labs Owns The BAYC Marks:**  The Court has already decided that

13  Yuga Labs owns its BAYC Marks. *See* Order on Motion for Summary Judgment

14  (Dkt. 225) ("SJ Order") at 6. "[A]n unregistered trademark can be enforced against

15  would-be infringers . . . ." *Matal v. Tam*, 582 U.S. 218, 225 (2017). "It is axiomatic

16  in trademark law that the standard test of ownership is priority of use." *Halicki Films*

17  *v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008). Yuga Labs started

18  using the BAYC Marks long before Defendants began their infringement. *Compare*

19  Dkt. 193-2 ¶¶4, 6 *with* ¶24. Since Yuga Labs' first use in April 2021, the BAYC

20  brand has been the cornerstone of its business. *Id.* ¶¶2, 8-14; *see also* Muniz Decl.

21  (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole brand for Yuga Labs. . . . Yuga

22  Labs' marketing of the BAYC brand includes, among other things, its operation of

23  social media accounts, hosting community events, and its brand collaboration and

24  high-profile partnerships"); Solano Decl. (Dkt. 342) at ¶ 16 ("Part of the reason Yuga

25  Labs was able to reach such a large audience is due to significant effort, time and

26  money we spent promoting the BAYC brand."). Indeed, Defendants admit that the

27  BAYC Marks identify Yuga Labs. *Id.* ¶70.

28

1    **Yuga Labs Did Not Give Defendants A License To Infringe:**  To the extent

2    that Defendants seek to rehash their argument that the BAYC Terms gave BAYC NFT

3    holders any and all trademark rights, the Court already found on summary judgment

4    that the BAYC Marks are valid trademarks and that Yuga Labs granted BAYC

5    holders a valid copyright license, not a trademark license.  SJ Order (Dkt. 225) at 9-10

6    ("Yuga has not granted BAYC NFT holders a trademark license.").  Defendants offer

7    no credible evidence to support their claim that the Court should reach a different

8    conclusion at trial.  The BAYC Terms give BAYC NFT holders a copyright license to

9    use their respective Bored Ape image for personal or commercial use, not the marks

10   within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs

11   explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

12   Additionally, the Court has already held that NFTs are goods, as consumers

13   understand them, that are subject to trademark protection under the Lanham Act.  SJ

14   Order (Dkt. 225) at 6-8; *see also Hermès International v. Rothschild*, 590 F. Supp. 3d

15   647, 655 (S.D.N.Y. 2022).  Defendants offer no reason for the Court to reconsider or

16   vacate this portion of its prior ruling.

17   **Other Alleged Infringers Do Not Negate Defendants' Own Infringement:**

18   Defendants' references to unknown, and alleged, third-party infringers, in an attempt

19   to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any

20   alleged third-party use of the BAYC Marks, or similar marks, is immaterial and

21   irrelevant.  As this Court has already found, "despite Defendants' attempt to argue

22   abandonment through third party use or failure to police, these arguments are

23   unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention*

24   *v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22,

25   2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made

26   clear that third-party use of a mark is irrelevant in a suit against a particular infringer.

27   *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1119 (9th

28

Cir. 1990) (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law"); *Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir. 2017) (a "'sheer quantity' of irrelevant evidence," which is "largely inapposite to the relevant inquiry," is meaningless); *see also* *F.T.C. v. Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from "introducing into evidence . . . 'thousands of third-party webpages'" because they were irrelevant and thus inadmissible under FRE 401 and 402).  Even so, Defendants have failed to demonstrate actual use of these marks in commerce.  *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of third-party marks in an advertisement because "evidence of third-party use is not admissible unless the proponent can provide evidence that the trademarks were *actually used* by third parties, that they were well promoted or that they were recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v. Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3 (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website.  Come get it here.  And also, by the way, we are going to rip off Yuga's other site next.  And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up

1   on Bloomberg News with people confused thinking it's us.  I've never had phone calls

2   from–you know, concerned – with my CEO telling me that she's getting calls from

3   investors that are saying you need to do something about this.  So, yes, this is

4   especially egregious."); *see also* Trial Tr. 96:19-97:8.  Moreover, Yuga Labs took

5   significant steps to protect the BAYC brand and take down infringing content.  *See*

6   Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an

7   enormous amount of infringing collections.  I think we spent something like $600,000

8   a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for

9   takedowns.  And we spend, at least in my tenure as CEO, a million dollars a year

10  doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is

11  strong evidence that Yuga enforces its trademark rights in the BAYC Marks against

12  infringing third-party users.").

13  **Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The

14  vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of

15  Defendants' intentional and repeated use of the BAYC Marks is undisputed and went

16  unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's

17  trial declaration based on a purported lack of personal knowledge were overruled at

18  trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is

19  because Mr. Solano was referring to Defendants' own words promoting their

20  infringement.

21  Nevertheless, the arguments Defendants raise are themselves meritless.  First,

22  Mr. Solano's testimony that Defendants collected royalties off secondary sales was

23  supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility

24  of further royalties on LooksRare or other new marketplaces if Defendants continued

25  to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at

26  89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338)

27

28

1    at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at

2    the time of his declaration and trial.

3            Apparently Defendants' argument is that Mr. Solano's testimony is correct that

4    Defendants continued to profit from their royalties after February until at least May.

5    *See, e.g.*, Defendants' objection to Plaintiff's Finding of Fact No. 2 in which

6    Defendants admit to earning royalties through at least May 2023 (one year after they

7    began minting the infringing NFTs).  And Mr. Solano's testimony is correct that

8    Defendants can continue to profit from royalties in the future if they hold the

9    RR/BAYC smart contract.  But somehow Mr. Solano's testimony should be

10   discredited because Defendants claim they were not profiting off royalties in June or

11   July of 2023.  Even if Defendants' claim is true, it is immaterial.  Defendants' own

12   admissions highlight their actual and ongoing potential to profit from royalties.

13           Second, Mr. Solano's testimony that Defendants' activities constitute a business

14   venture is amply supported by Defendants' own actions that Mr. Solano personally

15   observed.  It does not matter that Mr. Lehman agreed to call it a business venture.

16   But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's

17   declaration by arguing that Mr. Solano did so without reading his entire deposition are

18   without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of

19   how he may have felt about the process of being sued for his role in Defendants'

20   scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr.

21   Lehman's declaration was also corroborated by the consent judgment entered against

22   him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had

23   clearly reviewed the declaration based upon his testimony about its contents in his

24   own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration

25   under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps'

26   commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was

27

28

expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on ApeMarket.'").

Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr. Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

Finally, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages generated by running the source code for the planned ApeMarket.com website," informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic and based his knowledge on these exhibits.  *Id.*; JTX-806–JTX-809.  Those webpages were not generated from the source code produced by Mr. Lehman until ***after*** Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano where or how he came to his knowledge, but he attaches the basis for that knowledge to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which Defendants did not object).  Defendants fail to impeach Mr. Solano's accurate knowledge.

**Defendants' Reply**

1    Yuga's responses to Defendants' objections fails to address the central issue

2    raised by the Defendants—the trial evidence does not sufficiently support Yuga's

3    proposed finding of fact.  Instead, Yuga primarily devolves into arguing that the issue

4    of ownership has already been decided at summary judgment.  But the law of case

5    doctrine precludes this Court from relying on its summary judgment order.  Moreover,

6    it is Yuga that has unnecessarily raised this issue in the context of a remedies trial, and

7    the evidence shows that Yuga does not own the BAYC marks.

8    **First,** Defendants have never stipulated to Yuga's Ownership of the BAYC

9    Marks.  Defendants hotly disputed ownership of the BAYC marks at summary

10   judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant

11   to the remedies trial in this case, Yuga has for some reason affirmatively raised the

12   issue—forcing Defendants to re-articulate their dispute for purposes of preserving

13   their position for appeal and all other proceedings involving the BAYC marks.  Yuga

14   attempts to mischaracterize the Court record by citing to the pre-trial conference

15   order.  ***But nowhere in the pre-trial conference order did Defendants stipulate to***

16   ***ownership of the BAYC marks.***  Section 6 of the order contains all stipulated facts

17   and those stipulated facts include only that Yuga released the BAYC collection and

18   various facts about Defendants' activities associated with the RR/BAYC collection.

19   Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts section, but

20   this section again does not contain any admissions regarding "ownership" of the

21   marks.  Rather it merely identifies the asserted marks at issue for the remedies trial—

22   something that Defendants admitted in light of the scope of the remedies trial and to

23   ease this Court's work in adjudicating the remaining issues.   Dkt. 32-1 at 2-3.  Lastly,

24   Yuga cites to Defendants' statement that the "Court has determined that Defendants

25   infringed the BAYC Marks." Dkt. 320-1 at 13.  But again, this is not an admission of

26   ownership, it is a statement regarding the procedural history in this case that explains

27   that the scope of trial is limited to remedies and does not include infringement.  Had

28

Defendants wanted to stipulate to ownership, they would have expressly done so—they have not.  Defendants reserve the right to dispute ownership on appeal and in any other proceedings involving the BAYC marks.

*Second,* Defendants do not dispute that this Court has entered summary judgment in this case*.*  However, in their summary judgment briefing, Defendants made clear that there is a material evidentiary dispute on whether Yuga actual owns the BAYC marks and Defendants reserve the right to raise this issue on appeal and in all other proceedings involving the BAYC marks.  And while ownership of the marks is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue and asked the Court to unnecessarily make a finding of fact regarding ownership in a trial that was limited to determination of remedies.  Yuga's decision to affirmatively raise the issue of ownership has forced Defendants to re-articulate their position for preservation purposes.

Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on ownership for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already

1  decided issue that initial contact was not excessive force).  This case is just like

2  *Sienze*: the summary judgment ruling on ownership of the asserted marks is limited to

3  infringement and cannot be applied more broadly.  Again, Defendants make clear that

4  ownership of the marks is an unnecessary issue that Yuga did not need to raise at this

5  stage in this case.  But to the extent the Court addresses this issue, it cannot rely on the

6  summary judgment order and the evidence at trial weighs against a finding of

7  ownership.

8      ***Third,*** the evidence at trial showed that Yuga does not own the BAYC marks

9  because (1) Yuga has either given away or abandoned its rights in the marks and

10  (2) NFTs are not eligible for trademark protection.  Yuga gave away all intellectual

11  property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole

12  Muniz had publicly represented that BAYC NFT holders received all IP rights and

13  that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189

14  (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of

15  rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr.

16  Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr.

17  [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow

18  people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.

19  That is covered in the terms.").

20      As a result, at the time of the RR/BAYC project, there were more than 9,000

21  other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

22  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

23  hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

24  Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

25  78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

26  thousands" of products that use Yuga trademarks without sponsorship or affiliation

27  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks

28

1   with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
2   brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
3   use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

4       Further, Yuga does not own the asserted marks because NFTs are not eligible
5   for trademark protection.  The Supreme Court has held that trademarks are limited to
6   "tangible goods that are offered for sale, and not the author of any idea, concept, or
7   communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox
8   Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a
9   *communicative* work is a dispute relegated to the confines of copyright law, not
10  trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-
11  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims
12  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
13  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
14  certificates of authenticity/ownership and are not digital goods in themselves.  Trial
15  Tr. [Atalay] 127:9-16.

16      Defendants further note that the trial evidence raised additional issues that
17  preclude ownership of the BAYC mark that are detailed in subsequent objections,
18  such as Yuga's failure to satisfy the "use in commerce" requirement for trademark
19  ownership.

20      ***Fourth,*** Yuga gave away all intellectual property rights (not just copyright, but
21  ***all*** intellectual property rights) associated with the Bored Ape Yacht Club.  Yuga's
22  CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP
23  rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen
24  Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  Ms.
25  Muniz confirmed that someone listening to her public statement about Yuga not
26  having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz]
27  72:19-22.

28

1    That transfer of rights was made, in part, pursuant to the BAYC Terms &
2    Conditions, which Mr. Solano drafted with the intent to allow people to
3    commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the
4    terms and conditions was to allow people to be able to commercialize their NFTs.  We
5    can agree on that; right? A. Yes.  That is covered in the terms.").  Again, the Terms &
6    Conditions contain no language limiting the transfer of rights to copyright.

7    As a result, at the time of the RR/BAYC project, there were more than 9,000
8    other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)
9    (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were
10   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
11   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]
12   78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally
13   thousands" of products that use Yuga trademarks without sponsorship or affiliation
14   with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks
15   with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
16   brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
17   use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

18   This evidence shows that Yuga did in fact surrender its trademark rights to the
19   world.  Moreover, Ryan Hickman, who worked on the RR/BAYC collection, is one of
20   those thousands of unaffiliated third parties and a BAYC holder that received "all IP
21   rights" from Yuga.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

22   ***Fifth,*** other alleged infringers confirm that Yuga did in fact surrender the
23   BAYC marks to the world.  As explained above, Yuga created Terms & Conditions
24   that transferred commercialization rights to thousands of BAYC holders and made
25   public statements that Yuga does not hold any IP rights in the Bored Ape Yacht Club
26   brand.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions
27   was to allow people to be able to commercialize their NFTs.  We can agree on that;

28

1   right? A. Yes.  That is covered in the terms."); Trial Tr. [Muniz] 72:3–73:17; Cahen

2   Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  The

3   fact that Yuga's conduct led to over 9,000 third-party projects using the BAYC marks,

4   including hundreds of unaffiliated NFT collections, shows that Yuga did in fact

5   release "all IP rights" in the Bored Ape Yacht Club.  Ripps Decl. ¶¶ 187-191 (Dkt.

6   346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; Trial Tr.

7   [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.

8          Yuga's reliance on the Court's summary judgment order to rebut this evidence

9   improper.  As noted earlier, Defendants are not asking that this Court reconsider its

10  holding, because under the law of the case doctrine this Court has not made a holding

11  on transfer/abandonment of IP rights for purposes of determining availability of

12  disgorgement as a remedy (including Defendants' mental state as applied to

13  disgorgement), apportionment, and an exceptional case analysis.  The "law of the case

14  doctrine does not apply to pretrial rulings *such as motions for summary*

15  *judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

16  added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

17  rulings, often based on incomplete information, don't bind district judges for the

18  remainder of the case.  Given the nature of such motions, it could not be

19  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of

20  an issue were decided at summary judgment for one purpose, the summary judgment

21  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

22  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

23  of initial police contact was relevant as background, but not to the already decided

24  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

25  summary judgment ruling on transfer/abandonment of rights in the asserted marks is

26  limited to infringement and cannot be applied more broadly.

27

28

---

1    Rather, if the Court is to make a finding on this issue at trial, it must do so

2    based on the evidence presented at trial.  And that evidence shows that Yuga wrote

3    Terms & Conditions that transferred commercialization rights, Yuga publicly stated

4    that it has no IP rights in the Bored Ape Yacht Club, and that thousands of unaffiliated

5    third parties used the BAYC marks in reliance on Yuga's surrender of all IP rights.

6    Defendants' reliance on Yuga's public conduct was reasonable as their conduct

7    aligned with the thousands of other third parties that also relied on Yuga's public

8    conduct.

9    **Sixth**, Mr. Solano is not a credible witness.   At trial, Mr. **Solano admitted to**

10   **testifying falsely** in his sworn declaration of trial testimony when he was forced to

11   concede on cross-examination that his sworn declaration included a false statement

12   claiming that Defendants continue to receive royalties from sales on secondary

13   marketplaces:

14
15       Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that
16              they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?

17       A.    Yes.

18       Q.    So you don't have any basis for your statement that their profits
19              continue to increase; correct?

20       A.    It's my understanding that they were collecting royalties or creator
21              fees from LooksRare for quite a while.  Although, those were
22              supposed to be donated to charity and never were.

23       Q.    **They don't continue to increase; correct, sir?**

24       A.    **Correct.**
25
26       Q.    **That statement, that part of your witness statement is incorrect;**
27              **right?**

28

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,

1   no one has been able to identify a single confused consumer in the entirety of this

2   case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

3   **Plaintiff's Disputed Post Trial Finding of Fact No. 1, lines 1:24-2:1:**

4   Yuga Labs has used the BAYC Marks for advertising, marketing, and

5   promoting its products and services nationwide through multiple platforms, including

6   the BAYC website, NFT marketplaces, and social media. SJ Order at 2; Dkt. 342 ¶¶4-

7   33; JTX-607; JTX-608; JTX-1302; JTX-1306.

8   **Defendants' Basis of Dispute:**

9         The evidence at trial failed to show that Yuga has used in commerce the marks

10   in connection with NFTs.  "Use in commerce" requires that a mark be "placed in any

11   manner on the goods or their containers or displays associated therewith." *Social*

12   *Techs. LLC v. Apple Inc.*, 4 F.4th 811, 817 (9th Cir. 2021).  The cited portion of Greg

13   Solano's Declaration does not contain any testimony relating to placing the asserted

14   marks on any BAYC NFTs, BAYC NFT containers (which do not exist), or displays

15   associated with BAYC NFTs.  The cited exhibits similarly fail to show "use in

16   commerce."  JTX-607 is a webpage that generally discusses Yuga and does not

17   contain any BAYC NFTs or displays associated with any BAYC NFT.  JTX-608 is

18   the webpage for the Bored Ape Yacht Club, which also does not contain BAYC

19   NFTs, has not been used to sell BAYC NFTs since April 30, 2021, and does not show

20   any displays associated with BAYC NFTs that contain any of the asserted marks

21   within the display.  JTX-1302 is the Bored Ape Yacht Club Twitter page and JTX-

22   1306 is the Yuga Twitter page, both of which do not contain BAYC NFTs or any

23   display associated with BAYC NFTs that contain any of the asserted marks within the

24   display.

25         The evidence at trial also failed to establish "that such use has continued to the

26   present," another condition of "use in commerce." *Watec Co., Ltd. v. Liu*, 403 F.3d

27   645, 654 (9th Cir. 2005); *see Committee for Idaho's High Desert, Inc. v. Yost*, 92

28

1    F.3d 814, 820-21 (9th Cir. 1996) (continuous use applies to unregistered trademarks).

2    If the marks were ever used for NFTs, the usage was not "maintained without

3    interruption" because Yuga has not sold a single BAYC NFT since May 1, 2021.

4    Berger Decl. ¶ 38; *see Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493

5    F.2d 709, 712 (9th Cir. 1974).

6              Yuga's activities associated with BAYC NFTs also cannot form the basis for a

7    "use in commerce" claim because the sale of BAYC NFTs were illegal under 17

8    U.S.C. § 77e and thus not a lawful use in commerce.  *See Kiva Health Brands v. Kiva*

9    *Brands, Inc.*, 402 F. Supp. 3d 877, 888 (N.D. Cal. 2019) ("[O]ne cannot claim first

10   use based on an illegal product"); *S. Cal. Darts Ass'n v. Saffina*, 762 F.3d 921, 931

11   (9th Cir. 2014) ("[O]nly *lawful* use in commerce can give rise to trademark priority").

12   BAYC NFTs were unregistered investment vehicles, with a roadmap (created by

13   Yuga) promising purchasers an expectation of future profits by (1) stating that Yuga

14   was "in this for the long haul" and (2) identifying future benchmarks such liquidity

15   polls that would allow BAYC NFT holders to treat their NFTs as investments.  JTX-

16   608.  Yuga also promised purchasers an expectation of future profits by promoting its

17   open-source IP business model, which attracted investors such as Samsung.  *See*

18   Hickman Decl. ¶¶ 23-28, 34-39 (Dkt.345).  These activities make clear that BAYC

19   NFTs, like other similar collections launched around the same time, were unregistered

20   securities under 17 U.S.C. § 77e.  *See, e.g.*, *Friel v. Dapper Labs, Inc.* -- F. Supp. 3d --

21   , 2023 WL 2162747 at *22 (S.D.N.Y. 2023) (rejecting motion to dismiss claim

22   because an NFT is a security).  This is precisely why there are wide reports of an SEC

23   investigation and a securities fraud class action against Yuga.  Cahen Decl. ¶ 75 (Dkt.

24   344).

25             Yuga also incorrectly relies on the law of the case doctrine by citing to this

26   Court's summary judgment order.  The "law of the case doctrine does not apply to

27   pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792

28

1  F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d
2  1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,
3  don't bind district judges for the remainder of the case.  Given the nature of such
4  motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held
5  that although **aspects** of an issue were decided at summary judgment for one purpose,
6  the summary judgment order did resolve the issue generally or as to other topics.  *See*
7  No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)
8  (holding that evidence of initial police contact was relevant as background, but not to
9  the already decided issue that initial contact was not excessive force).  This case is just
10  like *Sienze*: the summary judgment ruling on Yuga's "use in commerce" applies to
11  only the issue of infringement and is not adequate support for Yuga's "use-in
12  commerce" as applied to availability of disgorgement as a remedy (including
13  Defendants' mental state as applied to disgorgement), apportionment, and an
14  exceptional case analysis.

15        Yuga also relies on the unreliable Declaration of Greg Solano to argue that
16  Yuga owns the asserted marks.  Greg Solano's testimony is not credible given the
17  many false and misleading statements contained in his declaration, as well as his
18  repeated impeachment at trial.  For example, Mr. Solano was also forced to concede
19  on cross examination that his sworn declaration included a false statement claiming
20  that "Defendants continue to receive royalties or creator fees from sales on secondary
21  marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase
22  "business venture" in Mr. Lehman's declaration, without having considered that the
23  phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman
24  would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also
25  relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew
26  he could not settle his case without executing a declaration concerning matters of
27  Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his
28

1  family at the time he signed his declaration, because Yuga's lawsuit against him

2  would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

3  [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

4  impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't

5  even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A

6  Yes, I do. Q Let's see what you said at your deposition, if we could.  You gave a

7  deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same

8  oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up

9  on the screen -- at page 152, starting at line 13 'QUESTION:  Was the Bored Ape V3

10  created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER:  I

11  don't know.' Was that your testimony at your deposition? A Yes." ); *id*. at 34:9-19

12  ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market

13  from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through

14  6. 'QUESTION:  Do you know whether Ape Market exists? 'ANSWER:  I don't

15  recall.' Were you asked that question, and did you give that answer? A Yes.").

16  **Plaintiff's Response:**

17     Defendants' objection should be rejected because (1) the objection seeks to

18  relitigate issues already adjudicated by the Court, (2) the record shows that Yuga Labs

19  uses the BAYC Marks in commerce, and (3) Defendants failed to impeach Mr.

20  Solano's accurate testimony.

21     **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

22  objection improperly disputes facts already adjudicated in the Court's Summary

23  Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its

24  BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga

25  Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.

26  *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally

27  used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11.  The Court "easily

28

conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That order establishes the matters adjudicated therein for purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings.  Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist.  Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary judgment is ***generally not relevant and should be excluded***" at trial) (emphasis added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing applicability of the law of the case doctrine where a case is assigned to a new judge).

"The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case and likewise serves the

1  purpose of speeding up litigation by eliminating before trial matters wherein there is
2  no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.
3  2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or
4  undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation
5  tactic that has unjustifiably increased the cost of resolving this case.

6      Nevertheless, Defendants forced the Court and the parties to re-litigate this
7  decided issue.  As discussed below, the evidence the Court can consider following the
8  trial amply supports this factual finding.  Thus, the outcome on this issue after trial is
9  no different than it was after Yuga Labs' Motion for Summary Judgment.

10     **Yuga Labs Uses Its Marks In Commerce:**  The Court has already determined
11 that Yuga Labs used its marks in commerce.  SJ Order (Dkt. 225) at 8.  Defendants
12 have admitted that Yuga Labs has proven all of the elements of its false designation of
13 origin claim.  Dkt. 320-1 at 13.  Indeed, Yuga Labs has marketed its products in the
14 exact same marketplaces as Defendants' infringing products.  SJ Order (Dkt. 225) at
15 12 ("Yuga and Defendants promoted and sold their NFTs through the same online
16 NFT marketplaces – OpenSea and x2y2.").

17     Although not at issue at trial, in her trial declaration, Ms. Muniz confirmed the
18 Court's finding.  Muniz Decl. (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole
19 brand for Yuga Labs."); *id.* ("Yuga Labs' marketing of the BAYC brand includes,
20 among other things, its operation of social media accounts, hosting community events,
21 and its brand collaboration and high-profile partnerships").  Mr. Solano also testified
22 to Yuga Labs' use of the BAYC brand in commerce.  Solano Decl. (Dkt. 342) at ¶ 16
23 ("Part of the reason Yuga Labs was able to reach such a large audience is due to
24 significant effort, time and money we spent promoting the BAYC brand.").  Even a
25 mere cursory scan of the Bored Ape Yacht Club Twitter page shows countless
26 instances of Yuga Labs marketing and promotion using the BAYC Marks and brand.
27 *See* JTX-1233.

28

1   Finally, Defendants have already stipulated that Yuga Labs owns the BAYC

2   Marks and the Court has already found that Yuga Labs' owns the BAYC Marks.  SJ

3   Order (Dkt. 225) at 6; Dkt. 320-1 at 2-3.  The Court has also rejected Defendants'

4   unclean hands affirmative defense.  SJ Order (Dkt. 225) at 8 (finding that Defendants'

5   allegations regarding securities violations did not relate to the trademark dispute

6   between the parties.).

7   **Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The

8   vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of

9   Defendants' intentional and repeated use of the BAYC Marks is undisputed and went

10  unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's

11  trial declaration based on a purported lack of personal knowledge were overruled at

12  trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is

13  because Mr. Solano was referring to Defendants' own words promoting their

14  infringement.

15  Nevertheless, the arguments Defendants raise are themselves meritless.  First,

16  Mr. Solano's testimony that Defendants collected royalties off secondary sales was

17  supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility

18  of further royalties on LooksRare or other new marketplaces if Defendants continued

19  to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at

20  89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338)

21  at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at

22  the time of his declaration and trial.

23  Second, Mr. Solano's testimony that Defendants' activities constitute a business

24  venture is amply supported by Defendants' own actions that Mr. Solano personally

25  observed.  It does not matter that Mr. Lehman agreed to call it a business venture.

26  But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's

27  declaration by arguing that Mr. Solano did so without reading his entire deposition are

28

1    without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of

2    how he may have felt about the process of being sued for his role in Defendants'

3    scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr.

4    Lehman's declaration was also corroborated by the consent judgment entered against

5    him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had

6    clearly reviewed the declaration based upon his testimony about its contents in his

7    own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration

8    under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps'

9    commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was

10   expected to make money by selling RR/BAYC NFTs and by potentially generating

11   transaction fees from the sale of NFTs on ApeMarket.'").

12          Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-

13   33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr.

14   Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the

15   cited line of trial testimony.  Mr. Solano cannot be impeached by reference to

16   deposition testimony covering an entirely different topic.  To be clear, the quoted

17   deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr.

18   Ripps claims he does not control, and which was not at issue at trial.  Solano Depo.

19   (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr.

20   Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape

21   Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

22          Finally, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19

23   regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages

24   generated by running the source code for the planned ApeMarket.com website,"

25   informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano

26   Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic

27   and based his knowledge on these exhibits.  *Id.*; JTX-806–JTX-809.  Those webpages

28

1  were not generated from the source code produced by Mr. Lehman until *after* Mr.

2  Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to

3  truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano

4  where or how he came to his knowledge, but he attaches the basis for that knowledge

5  to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which

6  Defendants did not object).  Defendants fail to impeach Mr. Solano's accurate

7  knowledge.

8  **Defendants' Reply:**

9  Yuga's response completely ignores the central issue raised by Defendants'

10  objection: that Yuga has not used the BAYC marks in commerce in connection with

11  *NFTs* because (1) Yuga has not sold a BAYC NFT since May 1, 2021, and therefore

12  does not have "continuous" use and (2) Yuga has not shown "lawful" use in

13  commerce given that BAYC NFTs are illegal, unregistered securities under 17 U.S.C.

14  § 77e.   Additionally, as explained above, the evidence Yuga cites in its proposed

15  finding of fact does not show use of the BAYC Marks on a BAYC NFT or any

16  associated display.

17  *First*, Defendants do not dispute that this Court has entered summary judgment

18  in this case.  However, in their summary judgment briefing, Defendants made clear

19  that there is a material evidentiary dispute on whether Yuga actually owns the BAYC

20  marks (including due to lack of "use in commerce") and Defendants reserve the right

21  to raise this issue on appeal and in all other proceedings involving the BAYC marks.

22  And while ownership of the marks is not an issue relevant to the remedies trial in this

23  case, Yuga has for some reason affirmatively raised the issue and asked the Court to

24  unnecessarily make a finding of fact regarding "use in commerce" in a trial that was

25  limited to determination of remedies.  Yuga's decision to affirmatively raise the issue

26  of "use in commerce" has forced Defendants to re-articulate their position for

27  preservation purposes.

28

Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on "use in commerce" for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on use in commerce for the asserted marks is limited to infringement and cannot be applied more broadly.  Again, Defendants make clear that the "use in commerce" dispute is an unnecessary issue that Yuga did not need to raise at this stage in this case.  But to the extent the Court addresses this issue, it cannot rely on the summary judgment order and the evidence at trial weighs against a finding of ownership.

*Second*, the evidence at trial showed that Yuga has failed to satisfy the "use in commerce" requirement for trademark ownership.  In addition to Yuga's failure to cite evidence showing use of the asserted marks directly on BAYC NFTs or associated display, the evidence also affirmatively shows that any use by Yuga (1) has not continued to the present and (2) was not lawful.

---

1       The evidence at trial did not establish "that such use has continued to the

2 present," another condition of "use in commerce." *Watec Co., Ltd. v. Liu*, 403 F.3d

3 645, 654 (9th Cir. 2005) ; *see Committee for Idaho's High Desert, Inc. v. Yost*, 92

4 F.3d 814, 820-21 (9th Cir. 1996) (continuous use applies to unregistered trademarks).

5 If the marks were ever used for NFTs, the usage was not "maintained without

6 interruption" because Yuga has not sold a single BAYC NFT since May 1, 2021.

7 Berger Decl. ¶ 38; *see Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493

8 F.2d 709, 712 (9th Cir. 1974) .

9       Further, Yuga's activities associated with BAYC NFTs also cannot form the

10 basis for a "use in commerce" claim because the sale of BAYC NFTs were illegal

11 under 17 U.S.C. § 77e and thus not a lawful use in commerce. *See Kiva Health*

12 *Brands v. Kiva Brands, Inc.*, 402 F. Supp. 3d 877, 888 (N.D. Cal. 2019) ("[O]ne

13 cannot claim first use based on an illegal product"); *S. Cal. Darts Ass'n v. Saffina*, 762

14 F.3d 921, 931 (9th Cir. 2014) ("[O]nly ***lawful*** use in commerce can give rise to

15 trademark priority").  BAYC NFTs were unregistered investment vehicles, with a

16 roadmap (created by Yuga) promising purchasers an expectation of future profits by

17 (1) stating that Yuga was "in this for the long haul" and (2) identifying future

18 benchmarks such liquidity polls that would allow BAYC NFT holders to treat their

19 NFTs as investments.  JTX-608.  Yuga also promised purchasers an expectation of

20 future profits by promoting its open-source IP business model, which attracted

21 investors such as Samsung.  *See* Hickman Decl. ¶¶ 23-28, 34-39 (Dkt.345).  These

22 activities make clear that BAYC NFTs, like other similar collections launched around

23 the same time, were unregistered securities under 17 U.S.C. § 77e.  *See, e.g.*, *Friel v.*

24 *Dapper Labs, Inc.* -- F. Supp. 3d --, 2023 WL 2162747 at *22 (S.D.N.Y. 2023)

25 (rejecting motion to dismiss claim because an NFT is a security).  This is precisely

26 why there are wide reports of an SEC investigation and a securities fraud class action

27 against Yuga.  Cahen Decl. ¶ 75 (Dkt. 344).

28

1    Yuga did not present any evidence rebutting (1) Yuga's failure to use BAYC

2   NFTs in commerce after their final sale on May 1, 2021, or (2) that Yuga's BAYC

3   NFT offering amounts to an illegal sale of unregistered securities for which there is a

4   pending SEC investigation and an ongoing class action lawsuit for securities fraud.

5    **Third,** Mr. Solano is not a credible witness.   At trial, Mr. **Solano admitted to**

6   **testifying falsely** in his sworn declaration of trial testimony when he was forced to

7   concede on cross-examination that his sworn declaration included a false statement

8   claiming that Defendants continue to receive royalties from sales on secondary

9   marketplaces:

10    Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that
11          they do not currently receive any royalties or creator fees from sales
12          on secondary marketplaces; right?

13    A.    Yes.

14    Q.    So you don't have any basis for your statement that their profits
15          continue to increase; correct?

16    A.    It's my understanding that they were collecting royalties or creator
17          fees from LooksRare for quite a while.   Although, those were
18          supposed to be donated to charity and never were.

19    Q.    **They don't continue to increase; correct, sir?**

20    A.    **Correct.**

21
22    Q.    **That statement, that part of your witness statement is incorrect;**
          **right?**
23
24    A.    **Yes.**

25   Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase

26   "business venture" in Mr. Lehman's declaration, without having considered that the

27   phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman

28

would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 2, lines 4, 6-7:**

Defendants created an NFT collection known as Ryder Ripps Bored Ape Yacht Club ("RR/BAYC") that uses the BAYC Marks and points to the same online digital

images as Yuga Labs' BAYC NFT collection. SJ Order at 2. Defendants promoted and/or sold RR/BAYC NFTs on the same NFT marketplaces where BAYC NFTs are sold, social media, and with their websites rrbayc.com and apemarket.com. *Id.* at 12; JTX-696.

### Defendants' Basis of Dispute:

The evidence at trial showed that the RR/BAYC collection involved modified use of marks involving appropriation to make commentary and raise awareness of what Defendants believed were antisemitic or racist imagery. Ripps Decl. ¶¶ 87-94 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 97-103 (Dkt. 344); Hickman Decl. ¶¶ 62-66 (Dkt. 345); Trial Tr. [Hickman] 222:18-21, [Cahen] 229:9-13. The RR/BAYC collection also pointed to digital images which "are public" and "available for anyone to navigate to on the Internet." Trial Tr. [Hickman] 222:15-16. Further, Yuga never presented any evidence at trial showing that Defendants sold RR/BAYC NFTs on the same marketplaces where BAYC NFTs were being sold. To the contrary, more than 80% RR/BAYC NFTs reservations were made through rrbayc.com, which has never sold a BAYC NFT. Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 135, 138, 144 (Dkt. 344). The remaining reservations for RR/BAYC NFTs were made through Defendants' personal Twitter accounts, which also have never been used to sell BAYC NFTs. Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344). Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not present any evidence of having a Foundation page for the Bored Ape Yacht Club at the time of the RR/BAYC project because it simply did not have a Foundation page at the time. As for remaining marketplaces, Defendants only received limited royalties from LooksRare because the marketplace did not honor Defendants request to shut off royalties for secondary sales until May 2023. Cahen Decl. ¶¶ 169-171 (Dkt. 344).

Finally, there is no evidence in the record that Defendants sold or promoted RR/BAYC NFTs on the apemarket.com.  ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also fails to cite adequate evidence in support of its allegations.  Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on the use of marks and promote/sales of RR/BAYC NFTs applies to only the issue of infringement and is not adequate support for these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga also cites to JTX-696 to incorrectly argue that apemarket.com was used to promote and sell RR/BAYC NFTs.  JTX-696 is not apemarket.com but is instead the ApeMarket Twitter page (which Yuga has not alleged in this case as infringing any of the asserted marks).  JTX-696 does not show what apemarket.com displayed, what

1   functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.  As

2   noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman]

3   217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

4   (uncontested)) and no evidence shows that the website domain apemarket.com was

5   ever used for the promotion or sale of anything.

6            **Plaintiff's Response:**

7            Defendants' objection should be rejected because (1) the objection seeks to

8   relitigate issues already adjudicated by the Court, (2) the record shows that

9   Defendants intended to confuse consumers, (3) Defendants infringement was not an

10  art project, (4) the Bored Ape Yacht Club NFTs are not public, (5) Defendants used

11  the BAYC Marks to sell and advertise their infringing NFTs on the same NFT

12  marketplaces and social media platforms where BAYC NFTs are sold and advertised,

13  and (6) Defendants' objection is based on numerous false claims.

14           **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

15  objection improperly disputes facts already adjudicated in the Court's Summary

16  Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its

17  BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga

18  Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.

19  *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally

20  used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily

21  conclude[d]" that Defendants' use of identical marks, on identical products, in

22  identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That

23  order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

24  Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

25  motion may "enter an order stating any material fact — including an item of damages

26  or other relief — that is not genuinely in dispute and treating the fact as established in

27  the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

28

*Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.
Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on
partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings.  Nevertheless,
Defendants refuse to accept the Court's order, unnecessarily burdening the Court and
Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if
the Court's order does not exist.  Defendants' tactics are inconsistent with the very
purpose of a partial summary judgment order, which is "intended to avoid a ***useless
trial of facts and issues over which there was really never any controversy*** and
which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos
Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d
1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769
n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their
position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3
(E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary
judgment is ***generally not relevant and should be excluded***" at trial) (emphasis
added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing
applicability of the law of the case doctrine where a case is assigned to a new judge).

"The partial summary judgment is merely a pretrial adjudication that certain
issues shall be deemed established for the trial of the case and likewise serves the
purpose of speeding up litigation by eliminating before trial matters wherein there is
no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.
2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or
undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation
tactic that has unjustifiably increased the cost of resolving this case.

**Defendants Intended To Confuse Consumers:**  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."
> . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.  Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

**Defendants' Infringement Was Not An Art Project:**  Defendants' contention that their infringing NFTs were an art project is not supported by the evidence.  To the

1    contrary, the relevant evidence demonstrates that Defendants intended to use Yuga

2    Labs' BAYC Marks to profit through their commercial promotion and sale of

3    RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-

4    801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement

5    could not have been in good faith because, even after the Court found their

6    infringement was likely to cause confusion and was not art protected by Rogers and

7    the First Amendment, Defendants intentionally continued to infringe on Yuga Labs'

8    Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants'

9    @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a

10   marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt.

11   342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

12         Moreover, Defendants' *Rogers* and First Amendment defenses have already

13   been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were

14   commercial trademark infringement.  *Id*.  And, the Court has already decided the issue

15   of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs'

16   BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from

17   their use of the marks.  SJ Order (Dkt. 225) at 12-15.

18         While Defendants publicly claim there was an artistic goal (to ensure they "look

19   really sympathetic to people" if caught, in the words of their partner (JTX-

20   918.00036)), their internal communications overwhelmingly focus on a business

21   venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and

22   riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1

23   (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make

24   money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to

25   tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal: mint out the remainder of

26   the collection + incentivize people to use the marketplace, specifically the BAYC

27   original side"); *id*. (Mr. Cahen:  "More royalties for us . . . More work for sure, but

28

1   much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr.

2   Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so

3   low that we dont make anything"); *id.* (Mr. Cahen:  "priorities: getting RRBAYC to

4   sell out by creating demand + getting BAYC and MAYC users to call our marketplace

5   their new home [] and collecting royalties at a fraction of what the other big dogs are

6   charging [] which will be considerable passive income if we strike the right balance");

7   JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low

8   prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574

9   (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will

10  sell out within 48 hours I think [] You'll make like a million dollars [] Straight up");

11  JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

12  man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit

13  motive and desire to charge royalties).  Defendants knew they were stealing from

14  Yuga Labs.

15      **The Bored Ape Yacht Club Images Are Not Public:**  Yuga Labs' Bored Ape

16  Yacht Club images are not available for "public" ownership.  While anyone may ***view***

17  a Bored Ape Yacht Club NFT and the associated image (like any image on the

18  internet), Yuga Labs goes to great lengths to combat the unauthorized use of its marks

19  and images.  *See* Trial Tr. at 82:1-2 (Ms. Muniz testifying that Yuga Labs has "a

20  pretty robust process for takedowns.  And we spend, at least in my tenure as CEO, a

21  million dollars a year doing it.").  Further, this objection is immaterial because this is

22  a case for trademark, not copyright, Infringement.  And even so, the Court has already

23  held that Defendants' direct appropriation of Yuga Labs' images favored a finding

24  that there was a likelihood of confusion.  SJ Order (Dkt. 225) at 11 ("Indeed,

25  Defendants are selling the exact same product – NFTs that point to Yuga's BAYC

26  images – and Defendants marketed their RR/BAYC NFTs using the same

27  corresponding Ape ID number used by Yuga for the BAYC NFTs.  Accordingly, the

28

1    second *Sleekcraft* factor weighs in favor of Yuga.").  Thus, regardless of whether the

2    Bored Ape Yacht Club images are viewable by the public, it is impermissible to sell

3    infringing NFTs using Yuga Labs' marks and creating a likelihood of confusion.  This

4    objection should be rejected as misleading and immaterial.

5        **Defendants Used Yuga Labs' Marks To Market Their Products On The**

6    **Same Marketplaces As Yuga Labs:**  The Court has already found that Defendants'

7    sold their infringing products in the exact same marketplaces as Yuga Labs' NFTs.  SJ

8    Order (Dkt. 225) at 12 ("Yuga and Defendants promoted and sold their NFTs through

9    the same online NFT marketplaces – OpenSea and x2y2.").  *Stone Creek, Inc. v.*

10   *Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving

11   identical marks on competitive goods are rare and 'hardly ever find their way into the

12   appellate reports' because liability is 'open and shut.'") (citation omitted).

13       The evidence in the trial record overwhelmingly supports the finding that

14   Defendants marketed their infringing products on the same marketplaces where

15   official BAYC NFTs were marketed and sold.  For example, Defendants actively

16   marketed secondary sales of their infringing NFTs on OpenSea and pushed for such

17   sales to continue.  *See, e.g.*, JTX-683 (tweet from Mr. Cahen stating "RR/BAYC is

18   officially the highest 24h volume . . . IN THE WORLD!"; JTX-685 (tweet from Mr.

19   Cahen stating "RR/BAYC about to become the first project ever to top both the

20   @foundation and the @opensea charts."); Cahen Decl. (Dkt. 344) ¶ 253 (Mr. Cahen's

21   testimony that he continued to attempt to sell the infringing NFTs even though he

22   believed they were subject to over two dozen takedowns); Dkt. 163-95 (Mr. Ripps'

23   tweet advertising infringing NFTs on OpenSea).  Mr. Ripps had control over a sales

24   page for the sale of RR/BAYC NFTs on OpenSea, *see* Ripps Depo. Designations

25   (Dkt. 396) at 81:3-81:14, and Mr. Cahen directly sold the infringing NFTs on

26   OpenSea.  Trial Tr. at 202:24-25 ("Mr. Cahen has sold through OpenSea, LooksRare,

27   and even Foundation.").

28

**Defendants' Objection Relies On False Assertions:**  To begin, rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks.  Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").  Defendants' contention is therefore incorrect and misleading.

1    Defendants also falsely claim that Ape Market was never ready to launch.

2    Despite Defendants' attempts to argue otherwise, the evidence shows that Ape Market

3    was ready to launch.  *See* Trial Tr. at 137:23-24 ("The code was in such a state of

4    completion that it was operational."); *see also* JTX-807; JTX-808; JTX-809.  Indeed,

5    at trial Mr. Cahen confirmed that Ape Market was ready to launch within a matter of

6    days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by

7    February – excuse me – by June 24, 2022? A:  Among other things, yes[.]").  Mr.

8    Cahen later confirmed that he had "no reason to doubt" that the marketplace could be

9    launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by

10   documentary evidence submitted at trial.  See JTX-1027 (post from Ape Market

11   twitter account advertising that "ApeMarket.com will go live within 24 hours of the

12   final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman

13   stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour

14   commitment Friday afternoon would be the release" and Mr. Cahen responding "I

15   think it makes sense to launch a bit earlier imo if we are comfortable doing so.");

16   JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every

17   YugaLabs asset . . . [a]nd we got sued for it.").  Ape Market existed as an entity

18   actively marketing on social media, and the actual online marketplace was actively

19   advertising on social media ready to launch.

20   Defendants' claim that they did not promote RR/BAYC NFTs on the

21   @ApeMarketplace Twitter account is also false.  Defendants created the

22   @ApeMarketplace Twitter account to promote the Ape Market marketplace and their

23   infringing RR/BAYC NFTs.  The fact that the Twitter handle solely controlled by Mr.

24   Cahen contains "ApeMarket" alone demonstrates the connection between the Twitter

25   account and marketplace, but the Tweets from the account confirm that Defendants

26   used @ApeMarketplace to promote Ape Market.  Cahen Depo. Designations (Dkt.

27   395) at 126:5-7 (Q:  And you are the sole operator of the Ape Marketplace account?

28

1  A:  That is correct, yes.").  One such Tweet on June 20 asks, "Are you ready for

2  ApeMarket.com, anon?" and another on June 13 teases the release of Ape Market

3  stating "Get Ready" alongside a screenshot of Ape Market.  JTX-696.  And Mr.

4  Cahen lied at trial when, under oath, he stated that he did not "plan to stimulate the

5  sales of RR/BAYC NFTs by teasing the future release of ApeMarket."  Trial Tr. at

6  234:15-18.  Mr. Cahen tweeted from @ApeMarketplace a link to reserve an

7  RR/BAYC NFTs on multiple occasions and on June 2 he tweeted that "[l]isting

8  requires holding RR/BAYC."  JTX-696.  Defendants' own internal communications

9  confirm the lie.  On June 1 Mr. Cahen stated, "my goal for today is to create an

10  announcement that will create hype and volume, we want to mint out the remainder of

11  that collection."  JTX-801.221.  On that same day Mr. Cahen tweeted from

12  @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC and a

13  link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the prospect

14  of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim that Ape

15  Market, @ApeMarketplace, and RR/BAYC are not connected is obviously false.  The

16  Tweets in JTX-696 repeatedly show the look, functionality, and intent of Ape Market

17  and the infringing RR/BAYC NFTs within Ape Market.

18          **Defendants' Reply:**

19          Yuga's response does not substantially engage with Defendants' objection and

20  instead makes a series of arguments on issues unrelated to the substance of this

21  proposed findings of facts.   Each of Yuga's arguments are flawed.

22          *First*, Defendants do not dispute that this Court has entered summary judgment

23  in this case.  And while this proposed finding is not relevant to the remedies trial in

24  this case, Yuga has for some reason affirmatively raised the issue and asked the Court

25  to unnecessarily make a finding of fact that is not necessary for the determination of

26  remedies.  Yuga's decision to affirmatively raise the issue has forced Defendants to

27  re-articulate their position for preservation purposes.

28

1    Defendants are not asking that this Court reconsider its holding, because this

2   under the law of the case doctrine this Court has not made a holding on use of the

3   marks and promotional activities for purposes of determining availability of

4   disgorgement as a remedy (including Defendants' mental state as applied to

5   disgorgement), apportionment, and an exceptional case analysis.  The "law of the case

6   doctrine does not apply to pretrial rulings *such as motions for summary*

7   *judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

8   added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

9   rulings, often based on incomplete information, don't bind district judges for the

10  remainder of the case.  Given the nature of such motions, it could not be

11  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of

12  an issue were decided at summary judgment for one purpose, the summary judgment

13  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

14  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

15  of initial police contact was relevant as background, but not to the already decided

16  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

17  summary judgment ruling on ownership of the asserted marks is limited to

18  infringement and cannot be applied more broadly.  Again, Defendants make clear that

19  use of marks and promotional activities are unnecessary issues that Yuga did not need

20  to raise at this stage in this case.  But to the extent the Court addresses this issue, it

21  cannot rely on the summary judgment order and the evidence at trial does not support

22  Yuga's proposed finding.

23    *Second,* Yuga's argument that Defendants' intended to confuse consumers is

24  baseless.  The evidence at trial showed that Defendants are not intentional infringers

25  and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr.

26  Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC

27  project confirm that their intent was to use RR/BAYC to criticize rather than to

28

1   confuse.  For example, in private group chats among participants in the RR/BAYC

2   project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic

3   purpose of the project, their intention that it would spread criticism of Yuga, and their

4   intention that social media platforms be used to educate the public about the nature of

5   NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346)

6   (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240,

7   276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

8         Defendants also took multiple steps to make clear that the RR/BAYC collection

9   was not related to Yuga in any way.  For example, the rrbayc.com website—through

10  which the majority of RR/BAYC commissions occurred and the vast majority of

11  alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

12  144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

13  Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

14  Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

15  rrbayc.com website were also required to read and click through a disclaimer

16  acknowledging the artistic purpose of the project before they were allowed to

17  commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

18  2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

19  additional steps so that the artistic purpose of the work would be clear to participants.

20  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

21  ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted

22  it and so he had the final call.").

23        Defendants' online discussion, which consisted of nearly the entirety of

24  Defendants' public activities associated with RR/BAYC, confirms their intent.  In

25  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

26  inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

27

28

that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

1   allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

2   Your intent in writing the terms and conditions was to allow people to be able to

3   commercialize their NFTs.  We can agree on that; right?  A.  Yes.  That is covered in

4   the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

5   with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

6   publicly represented that BAYC NFT holders received all IP rights and that Yuga has

7   none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

8   Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

9   someone listening to her public statement about Yuga not having any IP rights would

10   not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

11       The evidence that Yuga cites does not rebut this overwhelming evidence of

12   Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

13   and taking out of context evidence.  For example, Yuga repeatedly cites to various

14   pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

15   confusion.  But those pages are internal discussion about the design of the ApeMarket

16   website to ensure that users of apemarket.com were not confused by the website

17   design.  Yuga even cross-examined Mr. Hickman about these communications and

18   received the same explanation: "This is our attempt to make it as clear as possible.

19   We are having discussion on how to make sure it was very clear for users."  Trial Tr.

20   [Hickman] 212:22-24.

21       Yuga also cites to correspondence among the creators discussing a possible fear

22   of litigation.  These discussions are taken out of a broader context of hundreds of

23   thousands of communications the creators made.  Further, whether the Defendants

24   feared possible litigation for criticizing a multi-billion dollar company does not

25   establish that they intended confuse anyone.

26       Additionally, Yuga points to private chat conversations the creators had about

27   Ape Market.  The portions they cite to do not show any intention to confuse and

28

1   further ApeMarket was never released, and there was no evidence that the webpage
2   apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]
3   217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)
4   (uncontested).
5          Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,
6   in which he states that "RR/BAYC grants to 100% commercial rights, community
7   member created a shopping site for his! Now you can get the hoodie of your dreams."
8   This was a tweet making fun of Yuga's Terms & Conditions, which has caused
9   thousands of third parties to use the Bored Ape Yacht Club and its marks for projects
10  and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)
11  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-
12  2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was
13  ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC
14  t-shirts), and this does not demonstrate an intent to confuse consumers.
15         ***Third***, Yuga ignores that the evidence at trial (including Mr. Ripps's
16  uncontested declaration) confirms that Mr. Ripps has a long history as a successful
17  artist and that the RR/BAYC collection was yet another art project that Mr. Ripps
18  created.  Indeed, Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic
19  contributions have been recognized by mainstream media. Dkt. 419-1 at 3.
20         Despite having admitted that Mr. Ripps is a publicly recognized artist, Yuga
21  now attempt to rebut Mr. Ripps's unchallenged declaration regarding his career,
22  including his work on the RR/BAYC collection, without having any meaning rebuttal
23  evidence and without have cross-examined Mr. Ripps at trial.  If Yuga truly believes
24  that Mr. Ripps's declaration contains untrue statements about his career as one of the
25  most recognized digital artists in the world and the RR/BAYC collection as a
26  continuation of his artistic accomplishments, then Yuga could have tested those
27  statements on cross-examination.  As the Supreme Court has explained, "[c]ross-
28

examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that the "principle means" of testing Mr. Ripps's credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's declaration uncontested, including the following statements:

24.   My artwork intentionally pushes the boundaries of what is deemed socially or artistically "acceptable," particularly when critiquing internet culture.

25.   One of my most well-known works, *Diventare Schiavo*, involved having people pack boxes through a VR set to demonstrate how the modern internet has reduced us all to "packing boxes."

26.   Other works I created that comment on the internet include: *Barbara Lee*, a commentary on the interplay between truth and clickbait online, and *Ho*, an exhibit I created for the Postmasters Gallery which explores how social media uses manipulated images to mediate perception of self.

27.   My art is meant to be interactive, and to be discussed and critiqued.

28.   Much of my work has been the source of criticism and controversy. I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.   And critically, publications such as the *New York Times* have recognized how Mr. Ripps's work has allowed Mr. Ripps to shape internet culture as we know it:

> And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[2]   This record, which Yuga has not rebutted, shows that Mr. Ripps has been remarkably influential in the field of digital art and using satire to comment on the boundaries between trolling, art, and commerce.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

**Fourth,** the evidence at trial showed that the BAYC digital images are public. Mr. Hickman's unrebutted trail testimony explained that the images are public, which is why it is possible for RR/BAYC and many other NFT collection to point to those digital images:

> THE COURT:        When you are selling defendants' NFTs, you are selling Yuga's images.
>
> THE WITNESS:   ***No. We are selling the record.***

---

[2] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.  Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

1    THE COURT:          Okay.  But the record points to and displays those images.

2    THE WITNESS:        *So the images are public.*  They are available for anybody to

3                        navigate to on the Internet.

4    THE COURT:          Right

5    THE WITNESS:        *We are selling a receipt that says I committed to this*

6                        *protest that points to the same public [image] that a lot of*

7                        *different collections point to* including Yuga Labs pointing

8                        to the same resource.

9    Trial Tr. [Hickman] 222:10-22 (emphasis added).   Yuga elected to not cross-examine

10   Mr. Hickman on this testimony that the BAYC images are readily accessible and

11   usable by anyone with internet.  Further. Yuga presented no evidence at trial to rebut

12   or contest this testimony—and Yuga's counter-factual arguments after the matter

13   cannot serve a basis for ignoring the clear trial evidence on this issue.  Moreover, as

14   Mr. Hickman clarified to this Court, Defendants are not selling images but instead are

15   selling a record on the blockchain associated with Defendants' and their protest of

16   Yuga and its use of offensive imagery.

17          *Fifth,* the evidence at trial showed that Defendants did not sell RR/BAYC

18   NFTs on the same marketplaces as Yuga.  Over 80% of commissions for RR/BAYC

19   NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps

20   Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on

21   rrbayc.com is substantially corroborated by Yuga's own expert who admits that *7,028*

22   *out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC*

23   *reservations) were sold through the RSVP Contract*, *which was only available and*

24   *usable through rrbayc.com*.  Kindler Decl. ¶ 36 (Dkt. 338).   Yuga expert also admits

25   that the *RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants'*

26   *total profits (which is more than 82% of all profits)*.  Kindler Decl. 40 (Dkt. 338).

27   To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs

28

1    *before the RSVP contract was ever implemented*, meaning that the actual sales on
2    rrbayc.com is larger than the sales through the RSVP Contract alone.

3         The remaining reservations for RR/BAYC NFTs were made through
4    Defendants' personal Twitter accounts, which also have never been used to sell
5    BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt.
6    344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not
7    present any evidence of having a Foundation page for the Bored Ape Yacht Club at
8    the time of the RR/BAYC project because it simply did not have a Foundation page at
9    the time.

10        Yuga attempts to rebut this direct trial evidence by relying on this Court's
11    summary judgment order.   But the "law of the case doctrine does not apply to pretrial
12    rulings *such as motions for summary judgment*."  Shouse v. Ljunggren, 792 F.2d
13    902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076,
14    1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't
15    bind district judges for the remainder of the case.  Given the nature of such motions, it
16    could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although
17    *aspects* of an issue were decided at summary judgment for one purpose, the summary
18    judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-
19    0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that
20    evidence of initial police contact was relevant as background, but not to the already
21    decided issue that initial contact was not excessive force).  This case is just like
22    *Sienze*: even if the summary judgment order ruled on marketplace activity applies only
23    the issue of infringement and is not adequate support for this topic as applied to
24    availability of disgorgement as a remedy (including Defendants' mental state as
25    applied to disgorgement), apportionment, and an exceptional case analysis.

26        Yuga similarly attempts to argue that Defendants sold RR/BAYC NFTs on
27    OpenSea and LooksRare, but Yuga has pointed to absolutely no evidence of

28

Defendants actually making any sales on either platform.   In fact, Mr. Solano was cross-examined on OpenSea sales, to which he admitted that he falsely attributed Defendants with selling RR/BAYC NFTs based on documents showing that some anonymous, third-part was re-selling the NFTs:

> Let's look specifically at JTX-686, which is excerpted in your witness statement.  And if we can maybe blow up what you've put there.   This is one of the documents you rely on in your witness statement; right?

A.   Yes.

Q.   And you say that this image from JTX-686 shows Defendants using the BAYC marks to sell their NFTs alongside authentic Yuga Labs BAYC NFTs; right?

A.   Yes.

Q.   ***This side-by-side image, JTX-686, never appeared on OpenSea, did it?***

A.   ***This side-by-side image, no.***  But these are two different pages that look exactly the same.

Q.   It never appeared – this side-by-side image never appeared on any website selling NFTs; right?

A.   I don't know if that's true.  But this is a crop of two different pages that look exactly the same.

Q.   It never appeared side-by-side, correct?

MR. BALL:  Objection.  Vague

THE COURT:  Overruled.

THE WITNESS:  I just answered the question.

Q.     BY MR. TOMPROS:  *Where did you get this image, JTX-686.*

A.     *It was prepared for us.  Counsel prepared it.*

Q.     You didn't find it on OpenSea; right?

A.     I did not specifically screenshot this image, no.

Q.     This image, the combined image like this – strike that.  It's hard to see. But if we could blow up on the right-hand side, there's a "Created By" section.  And it's hard to see, but it looks like it says – sorry, "owned by," not "created by," "Owned by Safo214"; right?

A.     I'll take your word for it that that's what it says. But yes, it's owned by a username.

Q.     *That's not Mr. Ripps or Mr. Cahen; right?*

A.     *No.* This had already been sold to that person by them.

Trial Tr. [Solano] 45:12-46:24 (emphasis added).

And as for LooksRare, again, Yuga presented no evidence at trial that Defendants actually made any sales on LooksRare.  Yuga is instead conflating the record regarding Defendants' receipt of limited royalties for sales conducted by third parties on LooksRare.  Notably, Defendants were forced to receive these royalties because LooksRare did not honor Defendants request to shut off royalties for secondary sales until May 2023.  Cahen Decl. ¶¶ 169-171 (Dkt. 344).

And finally, Yuga references a string of cites to Defendants' Twitter posts (such as JTX-683, Dkt. 163-95) in which they report news involving RR/BAYC NFTs.  Reporting news on Twitter is not the sale of NFTs and Yuga is improperly attempting to conflate the two.

Yuga also falsely asserts that Mr. Ripps had control of the RR/BAYC sales page on OpenSea.  But the deposition transcript that Yuga cites actual confirms that Mr. Ripps did not have a page on OpenSea:

1

2

Q.     Where – were RR/BAYC NFTS available for transfer on OpenSea?

3

A.     Not by me.

4

5

Q.     *But you had a page on OpenSea?*

6

A.     *I had a page?  Did I have a page?  No*.  Perhaps RR/BAYC collection had a page on OpenSea.

7

8

Q.     And who ran that collection?

9

10

A.     Who ran that collection?  I did because I have the keys to the RR/BAYC.

11

Q.     *And what did the RR/BAYC collection on OpenSea look like?*

12

13

A.     *I'm not sure.*

14

15

16

17

18

19

Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (emphasis added).  Mr. Ripps at most admits that he has the keys to the digital wallet that holds the smart contract for RR/BAYC and not that he controls the OpenSea page for the RR/BAYC collection. Mr. Ripps further testified at his deposition about how he had limited say in how OpenSea would display the collection, but that he still made every effort he could to make sure the page OpenSea designed was a clear as possible:

20

21

Q.     Do you have any images of what the RR/BAYC NFT page looked like on OpenSea?

22

23

24

25

26

27

A.     *I do remember at one point making the background image the banner, if you will, to say "Long Live Conceptual Art,"* or something like that, or "You can't copy an NFT," or something along those lines, or – and *I do remember making sure that people had a link to RRBAYC.com*, which is the artist statement at which all the RR/BAYCs – or, I would say, *the vast majority of them were sold through RRBAYC.com.*

28

Ripps Depo. Designations (Dkt. 396) at 81:22-82:7 (emphasis added).

**Sixth,** Defendants' objection does not rely on false assertions.  To the contrary, it is Yuga that is misleadingly taking out of context evidence and mischaracterizing exhibits to supports its false proposed findings.  As explained above, over 80% of RR/BAYC sales by Defendants occurred on rrbayc.com.  This fact is confirmed in Mr. Ripps's uncontested declaration and corroborated by Yuga's own expert witness. Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  Kindler Decl. ¶¶ 36, 40 (Dkt. 338).

Further, Yuga ignores the ample evidence that ApeMarket was not release and was still in the ideation stage.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q. You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A. What I would say I did was use the prospect of a potential marketplace **which we were in the ideation phase of**, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.  We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259.  Ultimately, **we never agreed on what ApeMarket would be**.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr.

Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.     BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A.     This is a discussion, ***an ideation of different ideas, none of which were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added). The exhibits that Yuga cites to rebut the trial testimony on this issue are out-context source code and related screenshots. (JTX-807, 808, 809).  But this code was had never been reviewed or approved by Mr. Ripps and, as Mr. Cahen testified, there was no agreement that ApeMarket was ready to launch, but that his team had the ability to build anything Mr. Ripps would have asked for in short order:

> Q.     Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?
>
> A.     I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.
>
> Q.     And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.     Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  Indeed, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

And finally, Yuga wrongly argues that Defendants' used ApeMarket to sell RR/BAYC NFTs.  Yuga cross-examined Mr. Cahen about this issue at trial and was unable to impeach his testimony showing that ApeMarket was not used for the promotion of RR/BAYC NFTs:

> Q.    And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.    ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***
>
> Q.    You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.    There never existed a marketplace.
>
> Q.    You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.    What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.
>
> Q.    You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?
>
> A.    ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).

**Plaintiff's Disputed Post Trial Finding of Fact No. 3:**

Yuga Labs proved every element of its false designation of origin claim and is
entitled to monetary remedies and injunctive relief. SJ Order at 13.

**Defendants' Basis of Dispute:**

Defendants acknowledge that this Court granted summary judgment on Yuga's
false designation of origin claim.  However, Defendants dispute that Yuga satisfied
the summary judgment standard and reserve the right to appeal the Court's order.
Because the final remedies in this action will be subject to the outcome of any appeal,
Defendants dispute that Yuga has proven its claim and that it is entitled to monetary
remedies or injunctive relief.

**Plaintiff's Response:**

Defendants provide no authority for their proposition that Yuga Labs is not
entitled to relief until resolution of an appeal.  **Forcing Yuga Labs to respond to an
objection based purely on the fact that Defendants disagree with the Court's
binding order is another example of Defendants' oppressive litigation tactics
supporting a finding that this is an exceptional case**.  The objection should be
rejected because (1) the objection seeks to relitigate issues already adjudicated by the
Court and (2) Defendants have stipulated to this fact.

**The Court's Summary Judgment Order Establishes Liability:**  Defendants'
objection improperly disputes facts already adjudicated in the Court's Summary
Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its
BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga
Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.
*Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally
used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily
conclude[d]" that Defendants' use of identical marks, on identical products, in

1  identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That

2  order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

3  Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

4  motion may "enter an order stating any material fact — including an item of damages

5  or other relief — that is not genuinely in dispute and treating the fact as established in

6  the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

7  *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

8  *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

9  partial summary judgment are taken as established at trial.").

10        Defendants did not move the Court to reconsider its holdings.  Nevertheless,

11  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

12  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

13  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

14  purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

15  ***trial of facts and issues over which there was really never any controversy*** and

16  which would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos*

17  *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

18  1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

19  n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

20  position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

21  (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

22  judgment is ***generally not relevant and should be excluded***" at trial) (emphasis

23  added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

24  applicability of the law of the case doctrine where a case is assigned to a new judge).

25        "The partial summary judgment is merely a pretrial adjudication that certain

26  issues shall be deemed established for the trial of the case and likewise serves the

27  purpose of speeding up litigation by eliminating before trial matters wherein there is

28

1  no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

2  2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

3  undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

4  tactic that has unjustifiably increased the cost of resolving this case.

5  **Defendants' Objection Improperly Contradicts Facts Stipulated To In The**

6  **Pre-Trial Conference Order:**  Defendants' objection contradicts their own

7  stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 13.  In that

8  order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club

9  NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further

10  admitted that "[t]he Court has determined that Defendants infringed the BAYC

11  Marks" and "that Defendants' registration and use of the domain names

12  https://rrbayc.com and https://apemarket.com constituted cybersquatting under the

13  Anti-Cybersquatting Consumer Protection Act."  *Id.* at 13.  As such, Defendants have

14  waived their right to now argue that they were not liable for infringing upon Yuga

15  Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*,

16  652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance

17  theories at the trial which are not included in the [pre-trial conference] order *or which*

18  *contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability

19  after admitting to it clearly contradict the terms of the pre-trial conference order.

20  Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive

21  litigation tactic that unjustifiably increases the cost of resolving this case.  Defendants'

22  actions again make this an exceptional case.  The Court should reject Defendants'

23  objection.

24  Defendants offer no basis to dispute this finding.  They offer no contradictory

25  facts, nor do they cite to any evidence in the record.  Rather, Defendants are merely

26  expressing their disappointment in the Court's well-reasoned summary judgment

27  order.  This is not a proper basis for objection.

28

**Defendants' Reply:**

Defendants do not dispute that this Court has entered summary judgment in this case.  However, in their summary judgment briefing, Defendants made clear that there are material evidentiary disputes that precluded summary judgment and Defendants reserve the right raise this issue on appeal and in all other proceedings involving the BAYC marks.  And while proving "every element" of Yuga's false designation claim is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue and asked the Court to unnecessarily make a finding of fact regarding the elements for false designation of origin in a trial that was limited to determination of remedies.  Yuga's decision to affirmatively raise the issue of has forced Defendants to re-articulate their position for preservation purposes.

Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on the elements for false designation of origin for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the

1   summary judgment ruling on Yuga's false designation claim is limited to infringement

2   and cannot be applied more broadly.  Again, Defendants make clear that proof of the

3   elements for Yuga's false designation claim is an unnecessary issue that Yuga did not

4   need to raise at this stage in this case.  But to the extent the Court addresses this issue,

5   it cannot rely on the summary judgment order and the evidence at trial weighs against

6   a finding that the elements for false designation have been proven.

7        Additionally, Defendants have never stipulated that the trial evidence proves

8   each element for Yuga's false designation of origin claim.  Defendants hotly disputed

9   Yuga's false designation claim at summary judgment.  *See* Dkt. 163.  And while proof

10  of the elements for false designation is not an issue relevant to the remedies trial in

11  this case, Yuga has affirmatively raised the issue and attempts to mischaracterize the

12  Court record by citing to the pre-trial conference order.  But ***nowhere*** in the pre-trial

13  conference order did Defendants stipulate to that the elements for false designation

14  have been met.  Section 6 of the order contains all stipulated facts and those stipulated

15  facts include only that Yuga released the BAYC collection and various facts about

16  Defendants' activities associated with the RR/BAYC collection.  Dkt. 320-1 at 3-4.

17  Yuga cites to Defendants' statement that the "Court has determined that Defendants

18  infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an admission of

19  that the evidence proves each element for false designation of origin, it is a statement

20  regarding the procedural history in this case that explains that the scope of trial is

21  limited to remedies and does not include infringement.  Had Defendants wanted to

22  stipulate to proof of all elements for Yuga's false designation claim, they would have

23  clearly and expressly done so—they have not.  Defendants reserve the right to dispute

24  Yuga's false designation claim on appeal and in any other proceedings involving the

25  BAYC marks.

26              **Plaintiff's Disputed Post Trial Finding of Fact No.  4:**

27

28

1    <u>Defendants used Yuga Labs' BAYC Marks without authorization to falsely</u>

2    <u>suggest that RR/BAYC NFTs relate to Yuga Labs in a way that was likely to cause,</u>

3    <u>and actually caused, confusion.</u> *Id.* at 12-13; Dkts. 342 ¶¶34-35, 63; 392 (Trial Tr.

4    Vol. 1) at 53:14-54:22.

5                    **Defendants' Basis of Dispute:**

6            The evidence at trial showed that Defendants did not create the RR/BAYC

7    collection to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and

8    Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm

9    that their intent was to use RR/BAYC to criticize rather than to confuse.  For example,

10   in private group chats among participants in the RR/BAYC project (JTX-801, 803-

11   804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project,

12   their intention that it would spread criticism of Yuga, and their intention that social

13   media platforms be used to educate the public about the nature of NFTs and what they

14   saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (uncontested) (Dkt. 346); Cahen

15   Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354;

16   JTX-803.0003-05, 08, 29-30.

17           Defendants also took multiple steps to make clear that the RR/BAYC collection

18   was not related to Yuga in any way.  For example, the rrbayc.com website—through

19   which the majority of RR/BAYC commissions occurred and the vast majority of

20   alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

21   144 (Dkt. 344) included an explanation of the artistic intent for the project.  Ripps

22   Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147;

23   Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

24   rrbayc.com website were also required to read and click through a disclaimer

25   acknowledging the artistic purpose of the project before they were allowed to

26   commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

27   2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

28

1   additional steps so that the artistic purpose of the work would be clear to participants.

2   *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

3   ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted

4   it and so he had the final call.").

5         Defendants' online discussion, which consisted of nearly the entirety of

6   Defendants' public activities associated with RR/BAYC, confirms their intent.  In

7   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

8   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

9   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

10  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

11        The evidence at trial also showed that the RR/BAYC collection did not cause

12  any actual confusion and was not likely to confusion.  Defendants received

13  voluminous correspondence from RR/BAYC participants—none of which indicated

14  any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.

15  346) (uncontested).  To the contrary, the correspondence expressed gratitude and

16  support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested);

17  JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-

18  2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman

19  are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

20  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial

21  Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who

22  obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz]

23  85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has

24  been unable to identify even[] a single person who purchased an RR/BAYC believing

25  it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President,

26  similarly could not identify a single person that ever bought an RR/BAYC NFT

27  believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants

28

1    public discussions, steps taken to clarify the origin and purpose of the RR/BAYC

2    collection, and the fact that there was not even a single confused consumer confirms

3    that there was no likelihood of consumer confusion and no actual consumer confusion.

4        The evidence at trial also shows that Yuga's public activities amounted to

5    authorization of RR/BAYC collection and the other collections that use the asserted

6    marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there

7    were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶

8    187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX

9    2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had

10   not taken steps to stop these third-party projects from using Yuga's marks.  Ripps.

11   Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were

12   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

13   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

14   78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr.

15   Hickman would have probably seen these collections using the Bored Ape Yacht Club

16   trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-

17   23. 26.  There are "literally thousands" of products that use Yuga trademarks without

18   sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there

19   are published notebooks with ISBN numbers, commemorative coins, alcohol

20   products, skateboards, cereal brands, restaurants, and CBD/marijuana products that

21   are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-

22   2134; JTX-2410; JTX-2075.

23       Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

24   holder of a BAYC NFT containing the asserted marks and having received IP rights

25   associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

26   Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

27   of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

28

1   Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

2   allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

3   Your intent in writing the terms and conditions was to allow people to be able to

4   commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

5   the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

6   with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

7   publicly represented that BAYC NFT holders received all IP rights and that Yuga has

8   none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

9   Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

10  someone listening to her public statement about Yuga not having any IP rights would

11  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

12          Yuga also fails to cite adequate evidence in support of its allegations.  Yuga

13  incorrectly relies on the law of the case doctrine by citing to this Court's summary

14  judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such

15  as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

16  Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

17  Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

18  district judges for the remainder of the case.  Given the nature of such motions, it

19  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

20  *aspects* of an issue were decided at summary judgment for one purpose, the summary

21  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

22  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

23  evidence of initial police contact was relevant as background, but not to the already

24  decided issue that initial contact was not excessive force).  This case is just like

25  *Sienze*: the summary judgment ruling on intent, likelihood of confusion, actual

26  confusion, and authorization by Yuga applies only the issue of infringement and is not

27  adequate support on these issues generally or as applied to availability of

28

1  disgorgement as a remedy (including Defendants' mental state as applied to

2  disgorgement), apportionment, and an exceptional case analysis.

3        Yuga also relies on the unreliable Declaration of Greg Solano and his rebutted

4  trial testimony to argue that Yuga owns the asserted marks.  Mr. Solano is not credible

5  given the many false and misleading statements contained in his declaration.  For

6  example, Mr. Solano was also forced to concede on cross examination that his sworn

7  declaration included a false statement claiming that "Defendants continue to receive

8  royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano]

9  48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's

10  declaration, without having considered that the phrase "business venture" was selected

11  by Yuga's counsel, and that Mr. Lehman would have liked to use different words.

12  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration

13  without having considered that Mr. Lehman knew he could not settle his case without

14  executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano]

15  38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his

16  declaration, because Yuga's lawsuit against him would be disastrous to his family and

17  himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also

18  lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial

19  Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was

20  created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

21  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you

22  swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your

23  depo–tion -- and we can pull it up on the –reen -- at page 152, starting at line 13

24  'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection

25  from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your

26  deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists?

27  A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your

28

1  deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape

2  Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you

3  give that answer? A Yes.").

4         Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano]

5  5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person

6  that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano]

7  18:23-19:1.  In fact, no one has been able to identify a single confused consumer in

8  the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

9              **Plaintiff's Response:**

10        Defendants do not dispute that they used Yuga Labs' BAYC Marks, nor could

11  they.  Instead, they argue either that their use was not confusing or was permitted.

12  Defendants' objection should be rejected because (1) the objection seeks to relitigate

13  issues already adjudicated by the Court, (2) the record shows that Defendants intended

14  to confuse consumers, (3) Defendants' commercial infringement was not protected

15  "art," (4) Defendants intended to profit off of their infringement, (5) Defendants were

16  well aware that their infringement would cause confusion, (6) the record shows ample

17  actual confusion and likelihood of confusion, (7) Defendants' "disclaimers" did not

18  dispel likelihood of confusion, (8) the majority of the sales of Defendants' infringing

19  NFTs did not occur on rrbayc.com, (9) Defendants did not take steps to avoid

20  confusion, (10) Yuga Labs did not license Defendants' infringement, and Mr.

21  Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs'

22  BAYC Marks, (12) other alleged infringers do not negate Defendants' infringement,

23  (13) Defendants fail to impeach Mr. Solano's credible testimony, and (14)

24  Defendants' unreliable communications with third parties does not negate the Court's

25  finding that there was a likelihood of confusion.

26        **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

27  objection improperly disputes facts already adjudicated in the Court's Summary

28

Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That order establishes the matters adjudicated therein for purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings.  Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist.  Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their position. *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

1    judgment is *generally not relevant and should be excluded*" at trial) (emphasis

2    added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

3    applicability of the law of the case doctrine where a case is assigned to a new judge).

4         "The partial summary judgment is merely a pretrial adjudication that certain

5    issues shall be deemed established for the trial of the case and likewise serves the

6    purpose of speeding up litigation by eliminating before trial matters wherein there is

7    no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

8    2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

9    undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

10   tactic that has unjustifiably increased the cost of resolving this case.

11        **Defendants Intended To Confuse Consumers:**  Defendants' argument that

12   they did not intend to confuse consumers is contradicted by the record.  In granting

13   Yuga Labs' motion for summary judgment, this Court held that Defendants intended

14   to deceive consumers:

15            When the alleged infringer knowingly adopts a mark similar to
16            another's, reviewing courts presume that the defendant can
             accomplish his purpose:  that is, that the public will be deceived."
17            . . . In this case, Defendants knowingly and intentionally used
18            Yuga [Labs'] BAYC marks.  Because Defendants knowingly and
             intentionally used Yuga [Labs'] BAYC marks, and in the absence
19            of contrary evidence, the Court concludes that Defendants used
             the BAYC marks in an effort to confuse consumers. . . . In
20            addition, the Court concludes that Defendants intentionally
21            designed the RR/BAYC NFTs and sales websites to resemble
             Yuga's branding.  For example, Defendants listed the RR/BAYC
22            NFTs on rrbayc.com under the very same Ape ID number
23            associated with BAYC NFTs, despite having their very own
24            unique and different ID numbers.

25   SJ Order at 12 (citations omitted).  Similarly, the Court already determined that

26   "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit

27   handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial activities

28

1   designed to sell infringing products, not expressive artistic speech protected by the

2   First Amendment." *Id.*  Defendants' infringement is thus not art.  Instead,

3   "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  Finally, the

4   Court determined that Defendants' use of the rrbayc.com and apemarket.com domains

5   was "with a bad faith intent to profit." *Id.* at 15.  Despite these holdings, Defendants

6   have continually disregarded this order and compounded this litigation by relitigating

7   these settled issues.  Nevertheless, the evidence admitted at trial proves that these

8   settled issues should remain settled—Defendants were not motivated by a desire to

9   create satire, they were motivated by greed.

10      Defendants' private communications show they knew they were using the

11   BAYC Marks in a way that was likely to confuse consumers and did so with the intent

12   to profit from their infringement.  Defendants discussed making "like a million

13   dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are

14   gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think

15   we will make alot of money tbh"; "Potentially a lot").  And despite being urged to use

16   different images or overlay some commentary on the images they did use to avoid

17   confusion, Defendants chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing

18   "an overlay or something like Getty images" because "it's just insane to have the same

19   art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and

20   recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

21   showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

22   showing screenshot of Ape Market).  They also discussed that they knew they were

23   infringing and creating confusion, as they acted contrary to their attorneys' advice.

24   JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull

25   / If we want to fight trademark").  Instead of making changes, such as those

26   recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs'

27   BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶

28

1   70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos

2   and imagery for brands, every choice is intentional.").

3          Defendants also knew that what they were doing was likely to lead to a lawsuit.

4   For instance, Mr. Ripps asked for a reference to his limited liability company,

5   Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued

6   personally." JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and

7   branding direction in light of the trademark thing" to Mr. Cahen before they learned of

8   this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get

9   sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now

10   with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which

11   Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs'

12   marks to minimize the confusion and their infringement.

13          Privately, Defendants also discussed strategies to "cannibalize" the secondary

14   NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC

15   NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at

16   getting engagement on twitter."  JTX-801.203.  Defendants brainstormed about

17   needing some "controversy," "art press," "law stuff," "some unexpected event," or

18   "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC

19   NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have

20   an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

21          Publicly, Defendants made false representations about the RR/BAYC NFTs that

22   implied owning one offered equivalent benefits to owning a genuine BAYC NFT.

23   JTX-1037.  Defendants published their promotions from their individual Twitter

24   accounts and from the commercial @ApeMarketplace account advertising their

25   forthcoming NFT marketplace.  These advertisements were also directed at BAYC

26   NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342)

27   ¶¶ 46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have

28

on Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications, Defendants revealed their true intent to profit from the infringing use of Yuga Labs' BAYC Marks.

**Defendants' Infringement Was Not An Art Project:**  Defendants' contention that their infringing NFTs were an art project is not supported by the evidence.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by Rogers and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Moreover, Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were commercial trademark infringement.  *Id*.  And, the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants' Infringement Was Motivated By A Desire To Profit Off Of Yuga Labs' Marks:**  While Defendants publicly claim there was an artistic goal (to ensure they "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and

1   riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1

2   (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make

3   money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to

4   tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal:  mint out the remainder of

5   the collection + incentivize people to use the marketplace, specifically the BAYC

6   original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but

7   much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr.

8   Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so

9   low that we dont make anything"); *id.* (Mr. Cahen:  "priorities:  getting RRBAYC to

10  sell out by creating demand + getting BAYC and MAYC users to call our marketplace

11  their new home [] and collecting royalties at a fraction of what the other big dogs are

12  charging [] which will be considerable passive income if we strike the right balance");

13  JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low

14  prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574

15  (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will

16  sell out within 48 hours I think [] You'll make like a million dollars [] Straight up");

17  JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

18  man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit

19  motive and desire to charge royalties).  Defendants knew they were profiting from

20  their theft of Yuga Labs' trademarks.

21       **Defendants Knew That Their Infringement Would Result In Confusion:**

22  The evidence shows that Defendants knew they were infringing and creating

23  confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to

24  change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing,

25  "overall I think we should be very careful about doing this in terms of the confusion it

26  will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult

27  to make the collections coexist" because "they are the same art" and "same logos");

28

---

JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and
writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the
RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name.");
JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy
definitely some people will buy thinking they are buying originals!"); JTX-918.00036
(Mr. Lehman stating to Mr. Cahen the need to ensure they "look really sympathetic to
people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId
should match the RR ID. that is where they get confused"); Hickman Depo.
Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and
"BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga
Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know
what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of
people don't have the technical expertise or knowledge to be able to have a
conversation about crypto technology and blockchain technology."), at 148:10-13
(testifying it is "very common" for people to refer to NFT collections by the token
tracker).  Instead of making changes, such as those recommended by their lawyer or
Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the
RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience,
when designing logos and imagery for brands, every choice is intentional.").

**There Is Ample Evidence Of Confusion In The Record:**  Defendants'
argument that consumers were not confused by their infringement is unavailing.  Yuga
Labs produced ample documentary and testimonial evidence demonstrating consumer
confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-
801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035;
Ripps Depo. Designations at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-
76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano
Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga

Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.
Defendants were aware of the confusion. *See, e.g.*, JTX-801.195 (Mr. Lehman noting
that people "making mistakes with apes is already a huge meme" and "Remember the
'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga
Labs' survey evidence demonstrated significant confusion among consumers who
incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-
721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.
Defendants do not offer any admissible or credible evidence to rebut the evidence that
consumers believed, or were likely to believe, RR/BAYC was affiliated with or
sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale
confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the
same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at
10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.
2017)* ("[C]ases involving identical marks on competitive goods are rare and 'hardly
ever find their way into the appellate reports' because liability is 'open and shut.'")
(citation omitted).  In any event, actual confusion is not required; and the Court
already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)
at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity
regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.
Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's
profits even where infringement claims premised solely on post-sale confusion where
a "potential purchaser, knowing that the public is likely to be confused or deceived by
the allegedly infringing product, [] choose[s] to purchase that product instead of a
genuine one").

**Defendants' "Disclaimer" Does Not Negate The Court's Finding That
Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer

1   on rrbayc.com, "the fact that Defendants concluded it was necessary to include a

2   disclaimer demonstrates their awareness that their use of the BAYC Marks was

3   misleading."  SJ Order (Dkt. 225) at 17.  That Defendants took some steps to try to

4   conceal their intent when they were inevitably sued does not make the infringing

5   activity less confusing; it just demonstrates their culpability.

6          More fundamentally though, Defendants' claimed steps did not prevent

7   confusion.  The public was not required to read and click a disclaimer.  Indeed, even

8   on rrbayc.com, Defendants could not enforce any requirement that users "read" what

9   Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one"

10  would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion

11  amongst the general public when every single RR/BAYC NFT sold (or that ever will

12  sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—

13  without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-

14  134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer

15  on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The

16  majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where

17  there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million

18  impact).

19         Defendants have no survey, or material consumer evidence, that users of the

20  infringing rrbayc.com website read any disclaimer.  This is not surprising since the

21  vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

22  admitted that all sales went through Foundation—where there was no disclaimer.

23  Ripps Depo. Designations (Dkt. 396) at 82:8-13.

24         Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

25  uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

26  337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today

27  linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see

28

Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-existent to ineffective at best.

**rrbayc.com is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred."  Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks.  Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of

1  confusion going forward—especially since they are where Defendants continue to
2  market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC
3  NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-
4  25 ("the Ape Market Twitter [account], that actually links directly to LooksRare
5  where these NFTs are still selling").  Defendants' contention is therefore incorrect and
6  misleading.

7  **Defendants Did Not Take Steps To Avoid Confusing Consumers:**
8  Defendants did not attempt to avoid confusion, on the contrary Defendants
9  deliberately designed and marketed their infringing NFTs to confuse consumers.
10  Defendants could have called their NFT collection something other than "Bored Ape
11  Yacht Club" with the symbol "BAYC" ***immutably*** in the metadata for the NFT smart
12  contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants
13  could have used different images or overlaid some commentary on the images they
14  did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an
15  overlay or something like Getty images" because "it's just insane to have the same
16  art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and
17  recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]
18  showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet
19  showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in
20  countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs'
21  marks, commercially, in the way that would make Defendants the most money by
22  selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

23  **Yuga Labs' Did Not Give Defendants A License To Infringe:**  To the extent
24  that Defendants seek to rehash their argument that the BAYC Terms gave BAYC NFT
25  holders any and all trademark rights, the Court already found on summary judgment
26  that the BAYC Marks are valid trademarks and that Yuga Labs granted BAYC
27  holders a valid copyright license, not a trademark license.  SJ Order (Dkt. 225) at 9-10
28

1    ("Yuga has not granted BAYC NFT holders a trademark license.").  Defendants offer

2    no credible evidence to support their claim that the Court should reach a different

3    conclusion at trial.  The BAYC Terms give BAYC NFT holders a copyright license to

4    use their respective Bored Ape image for personal or commercial use, not the marks

5    within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs

6    explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

7            Ms. Muniz explained that in the one interview where she mentioned "IP" rights,

8    she was referring to copyrights and that the context is clear to that effect.  *Id.* at 72:3-

9    18.  Moreover, this interview is immaterial and irrelevant to Defendants' intent—it

10    occurred in November 2022—long after Defendants made the majority of their sales

11    and after this lawsuit was filed.  Regardless, there is no reasonable interpretation of

12    Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving

13    permission to create and sell exact copies of their NFTs using the exact same marks.

14            Defendants' dubious claim that they believed they were entitled to create

15    copycat NFTs and brand their infringing NFTs with Yuga Labs' BAYC Marks fails to

16    change the fact that Yuga Labs retained its trademark rights.  Moreso, the record

17    disproves that Defendants actually believed this was a justification for their actions,

18    because even as of June 9, 2022, Mr. Ripps ***did not know*** that one of his partners

19    allegedly owned a BAYC NFT and expressed his desire to have access to one:

20            maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]

21            or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]

22            and put them on the marketplace

23            so people trust it?

24            i don't think buying a BAYC makes sense

25            unless it's for a deal..

26            [third party] sold his ape

27            s

1       sucks

2       that would have been perfect marketing

3       wish i spoke to him before he sold

4  JTX-801.332.  Defendants' newly contrived defense—and their false claim that they

5  contemporaneously believed this justification, despite lack of a single communication

6  to that effect—has no merit and further highlights their lack of credibility.  Indeed,

7  Mr. Ripps' own antagonism towards Yuga Labs highlights the fact that Defendants

8  knew that their infringement was not authorized.  Trial Tr. at 61:12-17 ("We've never

9  had someone that we've done a takedown for, then respond and say, oh, here it is on

10  some other website.  Come get it here.  And also, by the way, we are going to rip off

11  Yuga's other site next.  And we're going – you know, I've made a million dollars with

12  this scam, and no one can stop me.").  And this evidence, which shows Defendants

13  explicitly wanted to own and promote Yuga Labs NFTs to help promote their

14  commercial, for profit marketplace, eviscerates Defendants' claims that they found the

15  Bored Ape Yacht Club images "problematic."  *See also* Trial Tr. at 222:22-24 (the

16  Court questioning Mr. Hickman, "Q:  And that didn't bother you, that it pointed to the

17  same [images]? A:  No.").  Defendants and their associates are not credible people.

18       **Other Alleged Infringers Do Not Negate Defendants' Own Infringement:**

19  Defendants' references to unknown, and alleged, third-party infringers, in an attempt

20  to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any

21  alleged third-party use of the BAYC Marks, or similar marks, is immaterial and

22  irrelevant.  As this Court has already found, "despite Defendants' attempt to argue

23  abandonment through third party use or failure to police, these arguments are

24  unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention*

25  *v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22,

26  2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made

27  clear that third-party use of a mark is irrelevant in a suit against a particular infringer.

28

1   *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th

2   Cir. 1990) (affirming district court's exclusion of evidence of third-party use of

3   plaintiff's mark because "[e]vidence of other unrelated potential infringers is

4   irrelevant to claims of trademark infringement and unfair competition under federal

5   law"); *Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125, 1130 (C.D. Cal.

6   2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant

7   and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir.

8   2017) (a "'sheer quantity' of irrelevant evidence," which is "largely inapposite to the

9   relevant inquiry," is meaningless); *see also* *F.T.C. v. Neovi, Inc.*, No. 06-CV-1952,

10  2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from

11  "introducing into evidence . . . 'thousands of third-party webpages'" because they

12  were irrelevant and thus inadmissible under FRE 401 and 402).  Even so, Defendants

13  have failed to demonstrate actual use of these marks in commerce.  *See*, *e.g.*, *Icon*

14  *Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at *30 (C.D.

15  Cal. Oct. 7, 2004) (excluding evidence of third-party marks in an advertisement

16  because "evidence of third-party use is not admissible unless the proponent can

17  provide evidence that the trademarks were *actually used* by third parties, that they

18  were well promoted or that they were recognized by consumers.") (cleaned up)

19  (emphasis added); *BuzzBallz, LLC v. Buzzbox Beverages, Inc.*, No. ED14CV01725,

20  2016 WL 7496769, at *3 (excluding evidence of third-party marks because defendants

21  "presented no evidence showing *actual use*.") (emphasis added).

22       Even if third party infringement were material or relevant (it is not), none of

23  these "projects" caused as much confusion in the marketplace as Defendants' sale of

24  RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never

25  had someone that we've done a takedown for, then respond and say, oh, here it is on

26  some other website.  Come get it here.  And also, by the way, we are going to rip off

27  Yuga's other site next.  And we're going – you know, I've made a million dollars with

28

1   this scam, and no one can stop me. We've never had another collection get shown up

2   on Bloomberg News with people confused thinking it's us.  I've never had phone calls

3   from–you know, concerned – with my CEO telling me that she's getting calls from

4   investors that are saying you need to do something about this.  So, yes, this is

5   especially egregious."); *see also* Trial Tr. 96:19-97:8.  Moreover, Yuga Labs took

6   significant steps to protect the BAYC brand and take down infringing content.  *See*

7   Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an

8   enormous amount of infringing collections.  I think we spent something like $600,000

9   a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for

10   takedowns.  And we spend, at least in my tenure as CEO, a million dollars a year

11   doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is

12   strong evidence that Yuga enforces its trademark rights in the BAYC Marks against

13   infringing third-party users.").

14        **Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The

15   vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of

16   Defendants' intentional and repeated use of the BAYC Marks is undisputed and went

17   unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's

18   trial declaration based on a purported lack of personal knowledge were overruled at

19   trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is

20   because Mr. Solano was referring to Defendants' own words promoting their

21   infringement.

22        Nevertheless, the arguments Defendants raise are themselves meritless.  First,

23   Mr. Solano's testimony that Defendants collected royalties off secondary sales was

24   supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility

25   of further royalties on LooksRare or other new marketplaces if Defendants continued

26   to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at

27   89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338)

28

Case 2:22-cv-04355-JFW-JEM   Document 420   Filed 09/26/23   Page 88 of 817   Page ID #:31010

at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at the time of his declaration and trial.

Second, Mr. Solano's testimony that Defendants' activities constitute a business venture is amply supported by Defendants' own actions that Mr. Solano personally observed.  It does not matter that Mr. Lehman agreed to call it a business venture.  But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's declaration by arguing that Mr. Solano did so without reading his entire deposition are without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of how he may have felt about the process of being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr. Lehman's declaration was also corroborated by the consent judgment entered against him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had clearly reviewed the declaration based upon his testimony about its contents in his own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps' commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on ApeMarket.'").

Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr.

1  Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape
2  Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

3          Finally, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19
4  regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages
5  generated by running the source code for the planned ApeMarket.com website,"
6  informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano
7  Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic
8  and based his knowledge on these exhibits.  *Id.*; JTX-806–JTX-809.  Those webpages
9  were not generated from the source code produced by Mr. Lehman until ***after*** Mr.
10  Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to
11  truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano
12  where or how he came to his knowledge, but he attaches the basis for that knowledge
13  to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which
14  Defendants did not object).  Defendants fail to impeach Mr. Solano's accurate
15  knowledge.

16          **Defendants' Third-Party, Unreliable Communications Do Not Negate The**
17  **Court's Findings Or Yuga Labs' Experts' Opinions:**  Defendants' cherry-picked
18  communications from a self-selecting group are far from a comprehensive survey of
19  consumer confusion in the market.  Defendants have no evidence supporting a claim
20  that a statistically significant number of consumers were not confused.  Indeed, by
21  Defendants' own admission it is "not even practically possible" for them to e-mail all
22  RR/BAYC holders.  *See infra,* Defendants' Objection to Yuga Labs' proposed Post
23  Trial Conclusion of Law No. IV.2.  Furthermore, the hundreds of refunds they
24  provided at consumers' requests suggest that some purchasers were confused.  *See,*
25  *e.g.*, Kindler Decl. (Dkt. 338) ¶ 44.  At least some of those hundreds of refund
26  demands could have been from confused consumers who "weren't going to, you
27  know, raise their hand and shout about it."  Trial Tr. at 54:10-16.

28

1   Yuga Labs' survey evidence demonstrated significant confusion among

2   consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with

3   Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48,

4   73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the

5   evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated

6   with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-

7   sale confusion.  Finally, there is no reliable evidence in the record that the individuals

8   identified in the cited emails, or all other purchasers, are "collectors" as Defendants

9   contend.

10   **Defendants' Reply:**

11   Yuga's response fails to address that it cannot rely on the law of the case

12   doctrine to rebut evidence showing that Defendants, and thousands of third parties,

13   received authorization from Yuga to use the BAYC marks.  Each of Yuga's arguments

14   against Defendants' objection fail as follows:

15   *First,* Defendants do not dispute that this Court has entered summary judgment

16   in this case.  However, in their summary judgment briefing, Defendants made clear

17   that there are material evidentiary disputes that precluded summary judgment and

18   Defendants reserve the right raise this issue on appeal and in all other proceedings

19   involving the BAYC marks.  And while Defendants' authorization to use the BAYC

20   marks is not an issue relevant to the remedies trial in this case, Yuga has for some

21   reason affirmatively raised the issue and asked the Court to unnecessarily make a

22   finding of fact regarding Yuga's activities associated with surrendering its rights in the

23   Bored Ape Yacht Club brand in a trial that was limited to determination of remedies.

24   Yuga's decision to affirmatively raise the issue of has forced Defendants to re-

25   articulate their position for preservation purposes.

26   Defendants are not asking that this Court reconsider its holding, because this

27   under the law of the case doctrine this Court has not made a holding on Yuga's

28

surrender of its IP rights for purposes of determining availability of disgorgement as a
remedy (including Defendants' mental state as applied to disgorgement),
apportionment, and an exceptional case analysis.  The "law of the case doctrine does
not apply to pretrial rulings **such as motions for summary judgment**."  *Shouse v.
Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.
Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on
incomplete information, don't bind district judges for the remainder of the
case.  Given the nature of such motions, it could not be otherwise.").  For example, in
*Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at
summary judgment for one purpose, the summary judgment order did resolve the
issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL
1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police
contact was relevant as background, but not to the already decided issue that initial
contact was not excessive force).  This case is just like *Sienze*: the summary judgment
ruling on Yuga's false designation claim is limited to infringement and cannot be
applied more broadly.  Again, Defendants make clear that proof of Yuga giving
authorization to third parties to use the BAYC marks (though the fact they did so
weighs heavily on Defendants' intent) is an unnecessary issue that Yuga did not need
to raise at this stage in this case.  But to the extent the Court addresses this issue, it
cannot rely on the summary judgment order and the evidence at trial weighs against a
finding that Yuga did not give authorization to Defendants to use the BAYC Marks—
as it has done so to thousands of third parties.

   ***Second,*** Yuga's argument that Defendants' intended to confuse consumers is
baseless.  The evidence at trial showed that Defendants are not intentional infringers
and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr.
Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC
project confirm that their intent was to use RR/BAYC to criticize rather than to

confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

1    that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

2    Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

3    Defendants also created the RR/BAYC collection based on a good faith belief that

4    Yuga had given authorization for the creation of projects like RR/BAYC.  At the time

5    Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than

6    9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.

7    346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before

8    suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps

9    to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.

10   346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT

11   collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the

12   NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]

13   80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would

14   have probably seen these collections using the Bored Ape Yacht Club trademarks at

15   the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There

16   are "literally thousands" of products that use Yuga trademarks without sponsorship or

17   affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

18   notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

19   cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

20   Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

21   2075.

22        Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

23   holder of a BAYC NFT containing the asserted marks and having received IP rights

24   associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

25   Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

26   of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

27   Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

28

1  allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

2  Your intent in writing the terms and conditions was to allow people to be able to

3  commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

4  the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

5  with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

6  publicly represented that BAYC NFT holders received all IP rights and that Yuga has

7  none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

8  Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

9  someone listening to her public statement about Yuga not having any IP rights would

10  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

11      The evidence that Yuga cites does not rebut this overwhelming evidence of

12  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

13  and taking out of context evidence.  For example, Yuga repeatedly cites to various

14  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

15  confusion.  But those pages are internal discussion about the design of the ApeMarket

16  website to ensure that users of apemarket.com were not confused by the website

17  design.  Yuga even cross-examined Mr. Hickman about these communications and

18  received the same explanation: "This is our attempt to make it as clear as possible.

19  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

20  [Hickman] 212:22-24.

21      Yuga also cites to correspondence among the creators discussing a possible fear

22  of litigation.  These discussions are taken out of a broader context of hundreds of

23  thousands of communications the creators made.  Further, whether the Defendants

24  feared possible litigation for criticizing a multi-billion dollar company does not

25  establish that they intended confuse anyone.

26      Additionally, Yuga points to private chat conversations the creators had about

27  Ape Market.  The portions they cite to do not show any intention to confuse and

28

1  further ApeMarket was never released, and there was no evidence that the webpage

2  apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]

3  217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

4  (uncontested).

5       Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,

6  in which he states that "RR/BAYC grants to 100% commercial rights, community

7  member created a shopping site for his! Now you can get the hoodie of your dreams."

8  This was a tweet making fun of Yuga's Terms & Conditions, which has caused

9  thousands of third parties to use the Bored Ape Yacht Club and its marks for projects

10  and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

11  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-

12  2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was

13  ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC

14  t-shirts), and this does not demonstrate an intent to confuse consumers.

15       ***Third,*** Yuga ignores that the evidence at trial (including Mr. Ripps's

16  uncontested declaration) confirms that Mr. Ripps has a long history as a successful

17  artist and that the RR/BAYC collection was yet another art project that Mr. Ripps

18  created.  Indeed, Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic

19  contributions have been recognized by mainstream media. Dkt. 419-1 at 3.

20       Despite having admitted that Mr. Ripps is a publicly recognized artist, Yuga

21  now attempt to rebut Mr. Ripps's unchallenged declaration regarding his career,

22  including his work on the RR/BAYC collection, without having any meaning rebuttal

23  evidence and without have cross-examined Mr. Ripps at trial.  If Yuga truly believes

24  that Mr. Ripps's declaration contains untrue statements about his career as one of the

25  most recognized digital artists in the world and the RR/BAYC collection as a

26  continuation of his artistic accomplishments, then Yuga could have tested those

27  statements on cross-examination.  As the Supreme Court has explained, "[c]ross-

28

examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that the "principle means" of testing Mr. Ripps's credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's declaration uncontested, including the following statements:

24.   My artwork intentionally pushes the boundaries of what is deemed socially or artistically "acceptable," particularly when critiquing internet culture.

25.   One of my most well-known works, *Diventare Schiavo*, involved having people pack boxes through a VR set to demonstrate how the modern internet has reduced us all to "packing boxes."

26.   Other works I created that comment on the internet include: *Barbara Lee*, a commentary on the interplay between truth and clickbait online, and *Ho*, an exhibit I created for the Postmasters Gallery which explores how social media uses manipulated images to mediate perception of self.

27.   My art is meant to be interactive, and to be discussed and critiqued.

28.   Much of my work has been the source of criticism and controversy. I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.   And critically, publications such as the *New York Times* have recognized how Mr. Ripps's work has allowed Mr. Ripps to shape internet culture as we know it:

> And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[3]  This record, which Yuga has not rebutted, shows that Mr. Ripps has been remarkably influential in the field of digital art and using satire to comment on the boundaries between trolling, art, and commerce.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

**Fourth,** the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt.

---

[3] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.  Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Yuga's response here misleading takes out of context communications between the creators and relies on them to imply that the creators' artistic motives were not genuine.  This is unfounded.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30. Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Fifth,** the evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants' knowledge of confusion, Yuga cites to documents it

1  argues show that the Defendants intended to make a profit.  Intending to profit from

2  your artwork is not the same thing as intending to confuse consumers and one does

3  not weigh toward the other.

4         Further, the evidence at trial showed that Defendants were not primarily

5  motivated by profits.  Defendants explained that profits were a concern, but not the

6  primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset

7  costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).

8  Defendants' decisions surrounding refunds and royalties confirm that they were not

9  primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);

10  Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund,

11  for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt.

12  344).  Additionally, the Defendants' declined taking royalties on transfers of

13  RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt.

14  346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

15         Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

16  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

17  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

18  Buttressing this fact, Yuga's founders were also not aware of a single instance of

19  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

20  let's focus on, I think, what you were focused on. Yuga Labs has been unable to

21  identify even[] a single person who purchased an RR/BAYC believing it to be

22  sponsored by Yuga Labs; right? A Correct.").

23         Further, the evidence that Yuga cites does not rebut the overwhelming evidence

24  of Defendants' intent to protest and criticize and Yuga instead relies on

25  mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

26  cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

27  confusion.  But those pages are internal discussion about the design of the ApeMarket

28

website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.  That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

The record clearly shows that Defendants did not know that there were any confused consumers and further there is no evidence presented that anyone was actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

**Sixth,** there is ample evidence that there was *no* consumer confusion.  Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the

1  majority of RR/BAYC commissions occurred and the vast majority of alleged profits

2  accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344))

3  included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103

4  (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-

5  202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website

6  were also required to read and click through a disclaimer acknowledging the artistic

7  purpose of the project before they were allowed to commission an NFT.  *See* Ripps

8  Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

9  Mr. Ripps insisted on these requirement and additional steps so that the artistic

10  purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman

11  Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had

12  a negative impact on usability? … A.   … Ryder wanted it and so he had the final

13  call.").

14       Unsurprisingly, therefore, the evidence presented at trial shows that many

15  people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

16  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

17  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

18       As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a

19  single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

20  Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,

21  Yuga's founders were also not aware of a single instance of actual confusion.  Trial

22  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

23  what you were focused on. Yuga Labs has been unable to identify even[] a single

24  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

25  right? A Correct.").

26       The evidence Yuga cites to is not supportive of a finding that there was

27  consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

28

O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an

1  RR/BAYC NFT.  This evidence provides no support for an argument that this finding

2  of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the

3  users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-

4  1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to

5  believe purchased an RR/BAYC NFT, replying to GemBot).

6      Yuga also cites to private chats that the RR/BAYC creators used.  These

7  exhibits are unsupportive of a finding that there was actual confusion.  For example,

8  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

9  marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

10  suggestions about what they could do to make it even more clear.  Further, this chat

11  focused on the creation of ApeMarket, which never was launched and could,

12  therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

13  (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

14  ApeMarket clearer).

15      Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

16  exhibit does not support a finding of actual confusion.  The chart separately lists both

17  "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

18  understood that these were two different projects.  Additionally, as Mr. Cahen

19  testified, he is not aware of anyone who watched the Bloomberg program and reserved

20  an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

21  344).

22      Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

23  credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

24  case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

25  case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

26  entered after Mr. Lehman settled his own case with Yuga.

27

28

1      Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

2  LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

3  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

4  a finding of consumer confusion as any consumer had the ability to determine the

5  provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further,

6  this does not undermine the finding of fact as this does not show that anyone who

7  reserved an RR/BAYC NFT was confused about the origin.

8      Finally, Yuga cites to its own declarations and trial testimony where their

9  witnesses make conclusory and unfounded statements about possible confusion.  *See*

10  Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

11  (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

12  392) at 53:14-54:22. These statements do not support a finding, however, that anyone

13  who bought an RR/BAYC NFT was actually confused.

14      Yuga also states that Mr. Ripps and Mr. Cahen did not offer admissible

15  evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

16  This is categorically false.  The evidence presented at trial shows that many people

17  who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl.

18  ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590,

19  JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

20  presented at trial that showed consumers were not confused about the source of the

21  RR/BAYC NFTs.

22      Yuga's response is also inaccurate given Defendants used modified versions of

23  the alleged BAYC Marks in their reservations.  For example, the logo used states

24  "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the

25  website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

26      Yuga incorrectly relies on the law of the case doctrine by citing to this Court's

27  summary judgment order.  The "law of the case doctrine does not apply to pretrial

28

1  rulings **such as motions for summary judgment**." *Shouse v. Ljunggren*, 792 F.2d

2  902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076,

3  1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't

4  bind district judges for the remainder of the case.  Given the nature of such motions, it

5  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

6  **aspects** of an issue were decided at summary judgment for one purpose, the summary

7  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

8  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

9  evidence of initial police contact was relevant as background, but not to the already

10 decided issue that initial contact was not excessive force).  This case is just like

11 *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the

12 issue of infringement and is not adequate support for a determination of how to

13 apportion disgorgement of profits attributable to infringement.

14       Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

15 profits, which is something Defendants argue they are not, Yuga can only receive

16 profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982

17 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun

18 Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires

19 distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

20 protest against Yuga (and were thus not confused about Defendants' use of Yuga's

21 marks) and revenue from purchasers who mistakenly believed they were purchasing

22 Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

23 single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored

24 by Yuga.

25        Yuga's citations to *Gucci* are inapplicable here, given the evidence shows

26 consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps

27 Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

28

2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not
support a finding that these reservations were made so that the buyer could then
confuse someone else in secondary sales.  Also, as mentioned above, there is no
evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary
sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);
Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
[Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen]
265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial
Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,
what you were focused on. Yuga Labs has been unable to identify even[] a single
person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;
right? A Correct.").  Finally, the portion of profits attributable to secondary sales of
RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.
418-1 at 6.

**Seventh,** Yuga incorrectly cites to this Court's summary judgment order to
suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the
case doctrine does not apply to pretrial rulings ***such as motions for summary***
***judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis
added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial
rulings, often based on incomplete information, don't bind district judges for the
remainder of the case.  Given the nature of such motions, it could not be otherwise.").
For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were
decided at summary judgment for one purpose, the summary judgment order did
resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB,
2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial
police contact was relevant as background, but not to the already decided issue that
initial contact was not excessive force).  This case is just like *Sienze*: the summary

1   judgment ruling the Defendants' disclaimer applies only the issue of infringement and

2   is not adequate support for use of a disclaimer generally or as applied to availability of

3   disgorgement as a remedy, apportionment, and an exceptional case analysis.

4          And Yuga's complaint that Defendants did not use a disclaimer on Foundation,

5   Etherscan, or any other third-party website is inapposite.  Defendants have no control

6   over third party websites such as Etherscan and do not have the ability to design the

7   pages third-party websites use or how they choose to display the RR/BAYC NFT

8   collection.  It simply was not possible for Defendants to add a disclaimer on

9   Foundation or Etherscan because they do not control those websites.

10  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use

11  Etherscan's token tracker/token name but instead rely on marketplaces or by checking

12  the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay

13  explained that using token names to distinguish NFTs "would be a fairly weak way to

14  do so because often those things are mutable.  They can be changed after the fact.

15  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

16         Further, the smart contract clearly indicates Mr. Ripps is the creator and not

17  Yuga and allows consumers to easily establish provenance, which undermines Yuga's

18  assertions about what consumers see when they review the NFT.  *See* JTX-1146;

19  Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT

20  uses the alleged marks. Defendants used modified versions of the alleged BAYC

21  Marks in their reservations.  For example, the logo used states "This Logo is Based on

22  the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project,

23  rrbayc.com, used the modified "RR/BAYC" throughout. Id.

24         Yuga also incorrectly argues that the disclaimer "did nothing to dispel

25  confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes

26  clear, the rrbayc.com website "required collectors to acknowledge and accept a

27  disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶

28

105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶ 106.  While it is possible that a consumer chose not to read this disclaimer or the prominent artistic statement included on rrbayc.com, this evidence tends to prove that many did and further shows that Defendants were trying to ensure that no one was confused about the source of their collection.  *Id.* at ¶¶ 102, 108.  Yuga's assertion that this disclaimer shows the opposite intent is baseless.

Yuga also cites to correspondence among the creators discussing a possible fear of litigation.  These discussions are taken out of a broader context of hundreds of thousands of communications the creators made.  Further, whether the Defendants feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

Yuga misstates the meaning of Mr. Ripps's deposition testimony surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract.  *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation?  A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19.  This however is different than the "Foundation page" for Ryder Ripps.  Accordingly, Mr. Ripps was not admitting that all sales went through his Foundation page and his testimony that

1   over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl.

2   ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

3          While there may have been many sales on secondary marketplaces as Yuga

4   alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit

5   from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's

6   testimony make clear, they tried to turn off royalties from the secondary sales of

7   RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties

8   on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116,

9   118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they

10  received only a small amount of royalties from Foundation before they shut it off,

11  around $1,000, and some from LooksRare, as that marketplace initially refused to turn

12  off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

13  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

14  the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

15  shut off royalties from such sales yet again supports a finding that they did not intend

16  to confuse and were motivated by their protest of Yuga not to profit.

17         ***Eighth,*** the evidence at trial showed that over 80% of commissions for

18  RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any

19  time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales

20  occurred on rrbayc.com is substantially corroborated by Yuga's own expert who

21  admits that ***7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales***

22  ***RR/BAYC reservations) were sold through the RSVP Contract***, ***which was only***

23  ***available and usable through rrbayc.com***.  Kindler Decl. ¶ 36 (Dkt. 338).   Yuga

24  expert also admits that the ***RSVP Contract sales amounted to 981 Eth out of 1196***

25  ***Eth of Defendants' total profits (which is more than 82% of all profits)***.  Kindler

26  Decl. ¶ 40 (Dkt. 338).   To note, rrbayc.com also allowed reservations for the purchase

27  of RR/BAYC NFTs ***before the RSVP contract was ever implemented***, meaning that

28

1   the actual sales on rrbayc.com is larger than the sales through the RSVP Contract

2   alone.

3        The remaining reservations for RR/BAYC NFTs were made through

4   Defendants' personal Twitter accounts, which also have never been used to sell

5   BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt.

6   344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not

7   present any evidence of having a Foundation page for the Bored Ape Yacht Club at

8   the time of the RR/BAYC project because it simply did not have a Foundation page at

9   the time.

10       Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little

11  profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr.

12  Cahen's testimony make clear, they tried to turn off royalties from the secondary sales

13  of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of

14  royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps

15  Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states

16  that they received only a small amount of royalties from Foundation before they shut

17  it off, around $1,000, and some from LooksRare, as that marketplace initially refused

18  to turn off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

19  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

20  the analysis of Defendants' profits.

21       ***Ninth,*** Yuga's argument that Defendants did not take steps to avoid confusion

22  is baseless. As the evidence presented at trial shows, Defendants took multiple steps to

23  make clear that the RR/BAYC collection was not related to Yuga in any way.  For

24  example, the rrbayc.com website—through which the majority of RR/BAYC

25  commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶

26  110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation

27  of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

28

1    Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

2    [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read

3    and click through a disclaimer acknowledging the artistic purpose of the project before

4    they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

5    (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

6    requirement and additional steps so that the artistic purpose of the work would be

7    clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

8    was the artist statement ultimately included, if it had a negative impact on usability?

9    … A.   … Ryder wanted it and so he had the final call.").

10          Further, the evidence Yuga cites to is unsupportive. For example, Yuga points

11   to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract

12   clearly indicates Mr. Ripps is the creator and allows consumers to easily establish

13   provenance.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

14          Again, Yuga repeatedly cites to various pages of JTX-801 to argue that

15   Defendants did not take steps to avoid confusion.  But those pages are internal

16   discussion about the design of the ApeMarket website to ensure that users of

17   apemarket.com were not confused by the website design.  Yuga even cross-examined

18   Mr. Hickman about these communications and received the same explanation: "This is

19   our attempt to make it as clear as possible.  We are having discussion on how to make

20   sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.  Further, this chat

21   focused on the creation of ApeMarket, which never was launched and could,

22   therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262

23   (Dkt. 344).

24          Finally, Yuga's statements regarding Defendants' use of the alleged marks are

25   misleading.  Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest

26   against Yuga and it is pretty difficult to criticize someone without saying who they

27   are.

28

**Tenth,** Yuga gave away all intellectual property rights (not just copyright, but **all** intellectual property rights) associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Again, the Terms & Conditions contain no language limiting the transfer of rights to copyright.

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

This evidence shows that Yuga did in fact surrender its trademark rights to the world.  Moreover, Ryan Hickman, who worked on the RR/BAYC collection, is one of

those thousands of unaffiliated third parties and a BAYC holders that received "all IP rights" from Yuga.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

**Eleventh,** other alleged infringers confirm that Yuga did in fact surrender the BAYC marks to the world.  As explained above, Yuga created Terms & Conditions that transferred commercialization rights to thousands of BAYC holders and made public statements that Yuga does not hold any IP rights in the Bored Ape Yacht Club brand.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms."); Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  The fact that Yuga's conduct led to over 9,000 third-party projects using the BAYC marks, including hundreds of unaffiliated NFT collections, shows that Yuga did in fact release "all IP rights" in the Bored Ape Yacht Club.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.

Yuga's reliance on the Court's summary judgment order to rebut this evidence improper.  As noted earlier, Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on transfer/abandonment of IP rights for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

1    an issue were decided at summary judgment for one purpose, the summary judgment

2    order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

3    AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

4    of initial police contact was relevant as background, but not to the already decided

5    issue that initial contact was not excessive force).  This case is just like *Sienze*: the

6    summary judgment ruling on transfer/abandonment of rights in the asserted marks is

7    limited to infringement and cannot be applied more broadly.

8           Rather, if the Court is to make a holding on this issue at trial, it must do so

9    based on the evidence presented at trial.  And that evidence shows that Yuga wrote

10   Terms & Conditions that transferred commercialization rights, Yuga publicly stated

11   that it has no IP rights in the Bored Ape Yacht Club, and that thousands of unaffiliated

12   third parties used the BAYC marks in reliance on Yuga's surrender of all IP rights.

13   Defendants' reliance on Yuga's public conduct was reasonable as their conduct

14   aligned with the thousands of other third parties that also relied on Yuga's public

15   conduct.

16          ***Twelfth,*** Mr. Solano is not a credible witness.   At trial, Mr. ***Solano admitted to***

17   ***testifying falsely*** in his sworn declaration of trial testimony when he was forced to

18   concede on cross-examination that his sworn declaration included a false statement

19   claiming that Defendants continue to receive royalties from sales on secondary

20   marketplaces:

21          Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that
22                they do not currently receive any royalties or creator fees from sales
23                on secondary marketplaces; right?

24          A.    Yes.

25          Q.    So you don't have any basis for your statement that their profits
26                continue to increase; correct?

27

28

A.    It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.    *They don't continue to increase; correct, sir?*

A.    *Correct.*

Q.    *That statement, that part of your witness statement is incorrect; right?*

A.    *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do

1  you know whether Ape Market exists? A We have the code for Ape Market from Tom

2  Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6.

3  'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

4  Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's

5  testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

6  been rebutted. Mr. Solano could not identify a single person that ever bought an

7  RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact,

8  no one has been able to identify a single confused consumer in the entirety of this

9  case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

10     ***Thirteenth,*** the communications from RR/BAYC NFT collection rebuts all of

11  Yuga's false accusations of profits arising from confusion or infringement. Yuga

12  falsely states that these are "cherry-picked communications."  Mr. Ripps testified in

13  his declaration: "I received ***hundreds of letters*** thanking me for creating the

14  RR/BAYC artwork and for standing up against a corporation that had used hateful

15  references in its brand" and then went on to give eight specific examples of the letters

16  he received. Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added). At no point

17  during trial did Yuga dispute this fact. Yuga did not present any rebuttal evidence at

18  trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the

19  uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from

20  RR/BAYC participants expressing support for the project and its criticism.

21     Yuga has also failed to present evidence disputing the fact that none of these

22  correspondences indicated that commissions or secondary sales were due to

23  confusion. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). Instead of addressing

24  correspondences from collectors, Yuga attempts to point to indications of consumer

25  confusion.

26     Further, Yuga's reliance on experts to make false accusations are not credible.

27  Yuga's citation to Ms. Kindler's declaration does not support their allegations that

28

1  Defendants provided "hundreds of refunds" or that those alleged refunds indicate

2  confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating Defendants' profits,

3  transactions that were refunded through Defendants' RSVP smart contract were

4  omitted. Specifically, transactions that were refunded through the RefundIssued and

5  RSVPCanceled functions in the RSVP smart contract were not included in my

6  calculation of profits. To my knowledge, Defendants have not produced any records

7  of other refunds related to the sale of RR/BAYC NFTs.").  Mr. Ripps never received a

8  refund request from anyone stating they were confused or thought that they were

9  reserving a Yuga product.  Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

10       And Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin

11  conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin

12  acknowledged that she used an overly expansive definition of the market that included

13  people who did not have any interest in purchasing an NFT, much less knowledge of

14  what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification

15  flow); 152:4-10.  She acknowledged that she changed the survey population after

16  running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also

17  acknowledged that she lacked basic knowledge about the NFT market, admitting to

18  erroneously believing that cryptocurrency was an NFT when she formulated her

19  surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an

20  inherently flawed survey that could not show confusion because the market was too

21  broad.  This was despite her acknowledgement that choosing the right sample

22  population "matters for the analysis" and choosing an improper sample population

23  would be a mistake.  *Id.* at 146:18-25.

24       **Plaintiff's Disputed Post Trial Finding of Fact No. 5, lines 2:16-19:**

25       Confusion was likely, in part, because of the "complexity and required

26  sophistication to understand the blockchain and verify provenance." SJ Order at 12.

27  Defendants were also aware of likely confusion resulting from their actions, but they

28

1   still continued with their infringement. *See*, *e.g.*, JTX-801.15 (Regarding the use of

2   unaltered BAYC Marks on the RR/BAYC Foundation page, Mr. Lehman, one of the

3   Defendants' partners, wrote, "I mean how do they not shut this down at some point

4   haha."); JTX-801.196 (Mr. Lehman writing, "we should not under-estimate how

5   confusing it is" and Mr. Cahen responding, "yeah."); *see also* Dkt. 392 at 211:17-

6   212:24.

7   <center>**Defendants' Basis of Dispute:**</center>

8   The evidence at trial did not show that confusion was likely.  To the contrary,

9   As Mr. Cahen explained:

10
11   > At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was
   > not even 1/1000th the price of a Bored Ape Yacht Club NFT.  A collector
12   > being confused about RR/BAYC would be akin to a consumer thinking
   > they are able to purchase a Lamborghini that normally costs $300,000 for
13   > $300, which no person in their right mind would ever believe is possible.

14
15   Cahen Decl. ¶ 225 (Dkt. 344).  Defendants also took multiple steps to make clear that

16   the RR/BAYC collection was not related to Yuga in any way.  Defendants included an

17   artistic disclaimer on rrbayc.com, on which over 80% of reservations occurred,

18   explaining the artistic intent of the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346)

19   (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-

20   2085; Trial Tr. [Solano] 63:1-10.  Defendants also required collectors on rrbayc.com

21   to read and click through a disclaimer acknowledging the artistic purpose of the

22   project.  *See* Ripps Decl. ¶¶ 106-109 (uncontested); JTX-2086; Trial Tr. [Muniz]

23   83:10-13.  Defendants also engaged in extensive online discussion confirming and

24   raising awareness about the satirical nature of the RR/BAYC project.  Ripps Decl. ¶¶

25   148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-

26   1 ¶¶ 203-04.

27
28

1   As a result of Defendants activities, the RR/BAYC collection did not cause any

2   actual confusion and was not likely to lead to confusion.   Defendants received

3   voluminous correspondence from RR/BAYC participants—none of which indicated

4   any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt.

5   346) (uncontested).  To the contrary, the correspondence expressed gratitude and

6   support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested);

7   JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-

8   2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman

9   are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

10   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial

11   Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who

12   obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz]

13   85:3-7 (“Q.  Now let's focus on, I think, what you were focused on.  Yuga Labs has

14   been unable to identify even[] a single person who purchased an RR/BAYC believing

15   it to be sponsored by Yuga Labs; right? A Correct.”).  Mr. Solano, Yuga's President,

16   similarly could not identify a single person that ever bought an RR/BAYC NFT

17   believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants

18   public discussions, steps taken to clarify the origin and purpose of the RR/BAYC

19   collection, and the fact that there was not even a single confused consumer confirms

20   that confusion was not likely nor were Defendants aware of any likelihood of

21   confusion.

22   Yuga also fails to cite adequate evidence in support of its allegations.  Yuga

23   incorrectly relies on the law of the case doctrine by citing to this Court's summary

24   judgment order.  The “law of the case doctrine does not apply to pretrial rulings *such

25   as motions for summary judgment*.”  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

26   Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

27   Cir. 2014) (“Pretrial rulings, often based on incomplete information, don't bind

28

1   district judges for the remainder of the case.  Given the nature of such motions, it
2   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although
3   **aspects** of an issue were decided at summary judgment for one purpose, the summary
4   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-
5   0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that
6   evidence of initial police contact was relevant as background, but not to the already
7   decided issue that initial contact was not excessive force).  This case is just like
8   *Sienze*: the summary judgment ruling on likelihood of confusion applies only the issue
9   of infringement and is not adequate support for these issues generally or as applied to
10  availability of disgorgement as a remedy (including Defendants' mental state as
11  applied to disgorgement), apportionment, and an exceptional case analysis.

12          Yuga also misleadingly cites to JTX-801.  The statement at JTX-801.196 that
13  Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually
14  discussing how to create a design for the never-released ApeMarket that would not be
15  confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we
16  could also have a label under the logo that denotes which collection you are viewing
17  or something" and further stating "[b]ecause that's where the real importance lies[,]
18  rrbayc truly is very important conceptual art …").  Similarly, the statement at JTX-
19  801.15 that Yuga relies on was a question from Mr. Lehman regarding whether
20  RR/BAYC's page will be shut down.  Mr. Cahen response shows that he did not
21  believe there was anything wrong with the page, stating "[t]hey can't imo." JTX-
22  801.15.

23          Yuga also misleadingly cites to the trial testimony of Mr. Hickman.  The
24  portion of the transcript that Yuga relies on (Trial Tr. [Hickman] 211:17-212:24)
25  involves questions regarding Defendants desire to add a "friction step" to the never-
26  released "ApeMarket" to ensure that the design of the website would not cause
27  confusion.   Mr. Hickman explains, "This is our attempt to make it as clear as

28

possible.  We are having discussion on how to make sure it was very clear for users."
Trial Tr. [Hickman] 212:22-24.

### Plaintiff's Response:

Defendants do not dispute that they used Yuga Labs' BAYC Marks, nor could
they.  Instead, they argue either that their use was not confusing or was permitted.

Defendants' objections should be rejected for the same reasons discussed *supra*
¶ 4; specifically:  (1) the objection seeks to relitigate issues already adjudicated by the
Court, (2) the record shows that Defendants intended to confuse consumers, (3)
Defendants' commercial infringement was not protected "art," (4) Defendants
intended to profit off of their infringement, (5) the record shows ample actual
confusion and likelihood of confusion, (6) Defendants' "disclaimers" did not dispel
likelihood of confusion, (7) the majority of the sales of Defendants' infringing NFTs
did not occur on rrbayc.com, (8) Defendants did not take steps to avoid confusion, (9)
Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have
(or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (10)
Defendants fail to impeach Mr. Solano's credible testimony.

Additionally, as described below, Defendants' objection should be rejected
because (1) Defendants' anecdotal evidence of purported supporters does not negate
the Court's finding that there was a likelihood of confusion, (2) the record shows that
Defendants promoted their infringing NFTs using Yuga Labs' marks in the same
marketplaces as Yuga Labs, and (3) Defendants were well aware that their
infringement would cause confusion.

**Defendants' Anecdotal Evidence Of Individuals Stating They Support
Defendants' Infringement Are Irrelevant And Immaterial:**  A handbag
counterfeiter may have allies or distributors, and those allies / distributors may even
profess to believe in a cause, but that does not excuse the counterfeiter's wrongdoing
or mitigate the likelihood of confusion in the marketplace.  *See* SJ Order (Dkt. 225) at

16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."). And Defendants do nothing to rebut the likelihood of post-sale confusion. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). Further, confused consumers are unlikely to admit that they have fallen for Defendants' scam. As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16. Nonetheless, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.

**Defendants Promoted Their Infringing NFTs On The Same Marketplaces As Yuga Labs:** Defendants' infringing NFTs were promoted and sold in the same marketplaces as genuine BAYC NFTs *without* the additional friction steps Defendants allegedly contemplated for Ape Market, highlighting how the likely confusion from Defendants' actions had already pervaded the secondary markets. *See* Solano Decl. (Dkt. 342) ¶ 42 ("In the case of OpenSea and LooksRare NFT marketplaces, Defendants used the BAYC Marks to sell their scam NFTs alongside authentic Yuga Labs BAYC NFTs . . . ."); Kindler Decl. (Dkt. 338) ¶ 61 ("RR/BAYC NFTs were reserved on Mr. Ripps' website, rrbayc; other RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation which used the BAYC Marks"); *see also* JTX-29; JTX-670.   Mr. Ripps even had control over a sales page for the sale of RR/BAYC NFTs on OpenSea. *See* Ripps Depo. Designations (Dkt. 396) at 81:3-81:14. And yet there were no friction steps.

**Defendants Knew That Their Infringement Would Result In Confusion:**
The evidence shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

1    Defendants' objection admits what Mr. Hickman's testimony says:  when

2 designing the forthcoming Ape Market to sell their infringing NFTs alongside

3 authentic BAYC NFTs, Defendants knew affirmative "friction step[s]" would be

4 required to prevent the obvious risk of confusion.  As Mr. Hickman told Mr. Cahen,

5 "[t]hey are the same art."  Trial Tr. at 212:17-24.  Thus, Defendants and their partners

6 worried over how to "make it as clear as possible" the two were different.  *Id.*  This is

7 because selling the same products under the same marks is confusing.  And yet,

8 Defendants' continued ahead without any changes in their sales and promotion of the

9 RR/BAYC NFTs.

10    **Defendants' Reply:**

11    Yuga's response fails to adequately address Defendants' objections and the trial

12 evidence that supports Defendants' objections.   For reasons provided in *supra* ¶ 4

13 (both in Defendants' objections and Defendants' reply in support of their objections),

14 the evidence showed that confusion was not likely and in fact there was not a single

15 actual RR/BAYC NFT consumer that was confused regarding the source of origin for

16 the NFTs.  Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's

17 summary judgment cannot be used to support a finding of fact a trial, (2) Defendants

18 did not intend to confuse consumers, (3) Defendants' intent was to protest and

19 criticize Yuga, (4) the record shows ample evidence of *no* actual confusion, (5) the

20 disclaimer was evidence of Defendants' good faith intent to protest and further

21 decreased any likelihood of confusion, (6) more than 80% of Defendants' sales

22 occurred on rrbayc.com (as corroborated by Yuga's own expert), (7) Defendants took

23 many steps to avoid confusion including through the use of an artistic statement,

24 disclaimer, and Twitter activity critical of Yuga, (8) Yuga surrendered to the world

25 "all IP rights" associated with the Bored Ape Yacht Club, and (9) Mr. Solano is not a

26 credible witness given his many false statements and his admission at trial that he

27 testified falsely.

28

1  Yuga's additional responses similarly fail to identify evidence showing that
2  Defendants' profits were a result of confused consumers:

3  **First,** Yuga effectively admits that there is no evidence of actual confused
4  consumers and tries to explain away this gaping hole in their evidence by arguing that
5  the world is hiding evidence of actual confusion from Yuga because it would be
6  "super embarrassing" to admit being confused.  Not only does this response lack
7  merit, but it is also an admission that there is insufficient evidence in the record to
8  support a finding that any sales were a result of actual confusion.

9  And Defendants' evidence from actual consumers of RR/BAYC NFTs is
10 sweeping, involving hundreds of actual consumers admitting that they were not
11 confused and supported Defendants' protest.  Mr. Ripps testified in his declaration: "I
12 received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for
13 standing up against a corporation that had used hateful references in its brand" and
14 then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶
15 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute
16 this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not
17 cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows
18 that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing
19 support for the project and its criticism.

20 Yuga has also failed to present evidence disputing the fact that none of these
21 correspondences indicated that commissions or secondary sales were due to
22 confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing
23 correspondences from collectors, Yuga attempts to point to indications of consumer
24 confusion.

25 **Second,** the evidence at trial showed that Defendants did not sell RR/BAYC
26 NFTs on the same marketplaces as Yuga.  Over 80% of commissions for RR/BAYC
27 NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps

28

Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is substantially corroborated by Yuga's own expert who admits that *7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract*, *which was only available and usable through rrbayc.com*.  Kindler Decl. ¶ 36 (Dkt. 338).   Yuga expert also admits that the *RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)*.  Kindler Decl. ¶ 40 (Dkt. 338).  To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs *before the RSVP contract was ever implemented*, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract alone.

The remaining reservations for RR/BAYC NFTs were made through Defendants' personal Twitter accounts, which also have never been used to sell BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not present any evidence of having a Foundation page for the Bored Ape Yacht Club at the time of the RR/BAYC project because it simply did not have a Foundation page at the time.

Yuga attempts to rebut this direct trial evidence by relying on this Court's summary judgment order.   But the "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: even if the summary judgment order ruled on marketplace activity applies only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga similarly attempts to argue that Defendants sold RR/BAYC NFTs on OpenSea and LooksRare, but Yuga has pointed to absolutely no evidence of Defendants actually making any sales on either platform.   In fact, Mr. Solano was cross-examined on OpenSea sales, to which he admitted that he falsely attributed Defendants with selling RR/BAYC NFTs based on documents showing that some anonymous, third-part was re-selling the NFTs:

> Q.   Let's look specifically at JTX-686, which is excerpted in your witness statement.  And if we can maybe blow up what you've put there.   This is one of the documents you rely on in your witness statement; right?
>
> A.   Yes.
>
> Q.   And you say that this image from JTX-686 shows Defendants using the BAYC marks to sell their NFTs alongside authentic Yuga Labs BAYC NFTs; right?
>
> A.   Yes.
>
> Q.   ***This side-by-side image, JTX-686, never appeared on OpenSea, did it?***
>
> A.   ***This side-by-side image, no.***  But these are two different pages that look exactly the same.
>
> Q.   It never appeared – this side-by-side image never appeared on any website selling NFTs; right?

A.      I don't know if that's true.  But this is a crop of two different pages that look exactly the same.

Q.      It never appeared side-by-side, correct?

        MR. BALL:  Objection.  Vague

        THE COURT:  Overruled.

        THE WITNESS:  I just answered the question.

Q.      BY MR. TOMPROS:  ***Where did you get this image, JTX-686.***

A.      ***It was prepared for us.  Counsel prepared it.***
Q.      You didn't find it on OpenSea; right?

A.      I did not specifically screenshot this image, no.

Q.      This image, the combined image like this – strike that.  It's hard to see.  But if we could blow up on the right-hand side, there's a "Created By" section.  And it's hard to see, but it looks like it says – sorry, "owned by," not "created by," "Owned by Safo214"; right?

A.      I'll take your word for it that that's what it says. But yes, it's owned by a username.

Q.      ***That's not Mr. Ripps or Mr. Cahen; right?***

A.      ***No.*** This had already been sold to that person by them.

Trial Tr. [Solano] 45:12-46:24 (emphasis added).

        And as for LooksRare, again, Yuga presented no evidence at trial that Defendants actually made any sales on LooksRare.  Yuga is instead conflating the record regarding Defendants' receipt of limited royalties for sales conducted by third parties on LooksRare.  Notably, Defendants were forced to receive these royalties because LooksRare did not honor Defendants request to shut off royalties for secondary sales until May 2023.  Cahen Decl. ¶¶ 169-171 (Dkt. 344).

And finally, Yuga references a string of cites to Defendants' Twitter posts (such as JTX-683, Dkt. 163-95) in which they report news involving RR/BAYC NFTs.  Reporting news on Twitter is not the sale of NFTs and Yuga is improperly attempting to conflate the two.

Yuga also falsely asserts that Mr. Ripps had control of the RR/BAYC sales page on OpenSea.  But the deposition transcript that Yuga cites actual confirms that Mr. Ripps did not have page on OpenSea:

> Q.    Were – were RR/BAYC NFTS available for transfer on OpenSea?
>
> A.    Not by me.
>
> Q.    ***But you had a page on OpenSea?***
>
> A.    ***I had a page?  Did I have a page?  No***.  Perhaps RR/BAYC collection had a page on OpenSea.
>
> Q.    And who ran that collection?
>
> A.    Who ran that collection?  I did because I have the keys to the RR/BAYC.
>
> Q.    ***And what did the RR/BAYC collection on OpenSea look like?***
>
> A.    ***I'm not sure.***

Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (emphasis added).  Mr. Ripps at most admits that he has the keys to the digital wallet that holds the smart contract for RR/BAYC and not that he controls the OpenSea page for the RR/BAYC collection.  Mr. Ripps further testified at his deposition about how he had limited say in how OpenSea would display the collection, but that he still made every effort he could to make sure the page OpenSea designed was a clear as possible:

Q.   Do you have any images of what the RR/BAYC NFT page looked like on OpenSea?

A.   ***I do remember at one point making the background image the banner, if you will, to say "Long Live Conceptual Art,"*** or something like that, or "You can't copy an NFT," or something along those lines, or – and ***I do remember making sure that people had a link to RRBAYC.com***, which is the artist statement at which all the RR/BAYCs – or, I would say, ***the vast majority of them were sold through RRBAYC.com.***

Ripps Depo. Designations (Dkt. 396) at 81:22-82:7 (emphasis added).

***Third,*** the evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants' knowledge of confusion, Yuga cites to documents it argues show that the Defendants intended to make a profit. Intending to profit from your artwork is not the same thing as intending to confuse consumers and one does not weigh toward the other.

Further, the evidence at trial showed that Defendants were not primarily motivated by profits. Defendants explained that profits were a concern, but not the primary motive of the project. Cahen Decl. ¶ 156 (Dkt. 344). Profits helped offset costs and sustain Defendants' artistic project. Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344). The RR/BAYC project allowed for a full refund, for any reason. Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344). Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible. Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

(uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Further, the evidence that Yuga cites does not rebut the overwhelming evidence of Defendants' intent to protest and criticize and Yuga instead relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.  That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

1    The record clearly shows that Defendants did not know that there were any

2    confused consumers and further there is no evidence presented that anyone was

3    actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

4    265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

5    Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

6    what you were focused on. Yuga Labs has been unable to identify even[] a single

7    person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

8    right? A Correct.").

9    <u>**Plaintiff's Disputed Post Trial Finding of Fact No.  6, lines 2:25-27:**</u>

10    <u>Defendants knew that "at least some purchasers of their RR/BAYC NFTs</u>

11    <u>would have difficulty identifying the RR/BAYC NFTs as a different and distinct</u>

12    <u>product from Yuga's BAYC NFTs."</u> SJ Order at 13; *see also* JTX-801.185 (Mr.

13    Cahen writing, "these users are too unsophisticated by far"); Dkt. 395 (Cahen Depo.

14    Designations) at 59:7-59:16.

15    <u>**Defendants' Basis of Dispute:**</u>

16    The evidence at trial did not show that Defendants knew purchasers would have

17    difficulty identifying RR/BAYC NFTs.  Defendants unrebutted testimony confirms

18    that Defendants understood that confusion was not likely.  As Mr. Cahen explained:

19
20    > At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was
      > not even 1/1000th the price of a Bored Ape Yacht Club NFT.  A collector
21    > being confused about RR/BAYC would be akin to a consumer thinking
      > they are able to purchase a Lamborghini that normally costs $300,000 for
22    > $300, which no person in their right mind would ever believe is possible.

23
24    Cahen Decl. ¶ 225 (Dkt. 344).  Moreover, Defendants took multiple steps to make

25    clear that the RR/BAYC collection was not related to Yuga in any way.  Defendants

26    included an artistic disclaimer on rrbayc.com, on which over 80% of reservations

27    occurred, explaining the artistic intent of the project. Ripps Decl. ¶¶ 101-103 (Dkt.

28

1    346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202;

2    JTX-2085; Trial Tr. [Solano] 63:1-10.  Defendants also required collectors on

3    rrbayc.com to read and click through a disclaimer acknowledging the artistic purpose

4    of the project.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial

5    Tr. [Muniz] 83:10-13.  Defendants also engaged in extensive online discussion

6    confirming and raising awareness about the satirical nature of the RR/BAYC project.

7    Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt.

8    344); Dkt. 197-1 ¶¶ 203-04.

9          As a result of Defendants activities, the RR/BAYC collection did not cause any

10   actual confusion and was not likely to cause confusion.  Defendants received

11   voluminous correspondence from RR/BAYC participants—none of which indicated

12   any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.

13   346) (uncontested).  To the contrary, the correspondence expressed gratitude and

14   support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested);

15   JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-

16   2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman

17   are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346)

18   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial

19   Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who

20   obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz]

21   85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has

22   been unable to identify even[] a single person who purchased an RR/BAYC believing

23   it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President,

24   similarly could not identify a single person that ever bought an RR/BAYC NFT

25   believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1. Given Defendants public

26   discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection,

27   and the fact that there was not even a single confused consumer confirms that

28

1   Defendants reasonably believed that the RR/BAYC collection would not cause

2   confusion.

3        Yuga also fails to cite adequate evidence in support of its allegations.  Yuga

4   incorrectly relies on the law of the case doctrine by citing to this Court's summary

5   judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such*

6   *as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

7   Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

8   Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

9   district judges for the remainder of the case.  Given the nature of such motions, it

10  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

11  *aspects* of an issue were decided at summary judgment for one purpose, the summary

12  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

13  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

14  evidence of initial police contact was relevant as background, but not to the already

15  decided issue that initial contact was not excessive force).  This case is just like

16  *Sienze*: the summary judgment ruling on Defendants knowledge applies only the issue

17  of infringement and is not adequate support for these issues generally or as applied to

18  availability of disgorgement as a remedy (including Defendants' mental state as

19  applied to disgorgement), apportionment, and an exceptional case analysis.

20       Yuga also misleadingly cites to JTX-801 to argue that Defendants knew that

21  confusion was likely.  The statement that Yuga relies on at JTX-801.185 was made in

22  the context of designing the never-released ApeMarket with a wrapper on the website.

23  Mr. Cahen stated at JTX-801.185, "I don't want to start implementing a wrapper."

24  Mr. Lehman responds, "Agreed."  And Mr. Cahen explains, "these users are too

25  unsophisticated by far."  As is apparent from the exhibit, statement Yuga cites does

26  not relate to knowledge of confusion but instead discusses whether users of a

27

28

1  marketplace would be sophisticated enough to correctly utilize a wrapper, which

2  Defendants were considering using on ApeMarket.

3       Yuga's citation to Mr. Cahen deposition designations are similarly misleading.

4  At 59:7-59:16 of Mr. Cahen's designations, Mr. Cahen is commenting on the

5  knowledge of the general public (which does not engage in the crypto industry, much

6  less in the purchase or sale of NFTs).  Yuga improperly uses this testimony to suggest

7  that Mr. Cahen was discussing typical consumers of NFTs, which he was not.

8  Tellingly, Yuga had the opportunity to cross-examine Mr. Cahen regarding this issue

9  at trial but instead chose not to because it is undisputed that NFT purchasers (which

10  includes purchasers of NFTs costing hundreds of thousands of dollars) have a greater

11  level of sophistication about NFTs than the general public.

12       **<u>Plaintiff's Response:</u>**

13       Defendants do not dispute that they used Yuga Labs' BAYC Marks, nor could

14  they.  Instead, they argue either that their use was not confusing or was permitted.

15       Defendants' objections should be rejected for the same reasons discussed *supra*

16  ¶ 4; specifically:  (1) the objection seeks to relitigate issues already adjudicated by the

17  Court, (2) the record shows that Defendants intended to confuse consumers, (3)

18  Defendants' commercial infringement was not protected "art," (4) Defendants

19  intended to profit off of their infringement, (5) the record shows ample actual

20  confusion and likelihood of confusion, (6) Defendants' "disclaimers" did not dispel

21  likelihood of confusion, (7) the majority of the sales of Defendants' infringing NFTs

22  did not occur on rrbayc.com, (8) Defendants did not take steps to avoid confusion, (9)

23  Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have

24  (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (10) other

25  alleged infringers do not negate Defendants' infringement, (11) Defendants fail to

26  impeach Mr. Solano's credible testimony.

27

28

1    Additionally, as described below, Defendants' objection should be rejected

2    because (1) Defendants' anecdotal evidence of purported supporters does not negate

3    the Court's finding that there was a likelihood of confusion, (2) Defendants were well

4    aware that their infringement would cause confusion, and (3) Defendants believed that

5    consumers lacked the sophistication to verify the authenticity of their NFTs and their

6    assertions to the contrary are not credible.

7        **Defendants' Anecdotal Evidence Of Individuals Stating They Support**

8    **Defendants' Infringement Are Irrelevant And Immaterial:**  Defendants' anecdotal

9    evidence of individuals stating they support Defendants' infringement are irrelevant

10   and immaterial.  A handbag counterfeiter may have allies or distributors, and those

11   allies / distributors may even profess to believe in a cause, but that does not excuse the

12   counterfeiter's wrongdoing or mitigate the likelihood of confusion in the marketplace.

13   *See* SJ Order (Dkt. 225) at 16 ("Defendants' sale of RR/BAYC NFTs is no more

14   artistic than the sale of a counterfeit handbag.").  And Defendants do nothing to rebut

15   the likelihood of post-sale confusion.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F.

16   Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where

17   infringement claims premised solely on post-sale confusion where a "potential

18   purchaser, knowing that the public is likely to be confused or deceived by the

19   allegedly infringing product, [] choose[s] to purchase that product instead of a genuine

20   one").  Defendants' admission that they processed over $90,000 in refunds (Ripps.

21   Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of

22   their infringing NFTs were universally supportive and that no one was confused.

23       **Defendants Knew That Their Infringement Would Result In Confusion:**

24   The evidence shows that Defendants knew they were infringing and creating

25   confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to

26   change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing,

27   "overall I think we should be very careful about doing this in terms of the confusion it

28

will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

**Defendants Believed That Consumers Lacked Sophistication:**  Defendants argue that Mr. Cahen only called their consumers "unsophisticated" in the context of understanding certain aspects of NFTs, which they say does not equate to consumers having difficulty distinguishing two different NFTs.  But in other cases, Defendants admitted exactly that.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average

1   joes'?", and Cahen responding, "I mean that is unavoidable"); JTX-801.279 (Mr.

2   Lehman referring to potential customers as "SHEEPLE" and stating, "Ppl will not

3   read the contract"); *see also* Cahen Depo. Designations (Dkt. 395) at 59:7-59:16

4   (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is

5   complicated.  A lot of people don't have the technical expertise or knowledge to be

6   able to have a conversation about crypto technology and blockchain technology.");

7   Trial Tr. at 225:25-226:2 (Mr. Cahen testifying that it is common for consumers to

8   refer to NFTs by token name).    Additionally, there is nothing "telling" regarding

9   Yuga Labs' decision not to cross examine Mr. Cahen regarding his deposition

10   testimony, especially where the issue relates to a matter already adjudicated by the

11   Court and Yuga Labs proved that Mr. Cahen is an uncredible witness.

12                 **Defendants' Reply:**

13        Yuga's response fails to adequately address Defendants' objections and the trial

14   evidence that supports Defendants' objections.   For reasons provided in *supra* ¶ 4

15   (both in Defendants' objections and Defendants' reply in support of their objections),

16   the evidence showed that confusion was not likely and in fact there was not a single

17   actual RR/BAYC NFT consumer that was confused regarding the source of origin for

18   the NFTs.  Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's

19   summary judgment cannot be used to support a finding of fact a trial, (2) Defendants

20   did not intend to confuse consumers, (3) Defendants' intent was to protest and

21   criticize Yuga, (4) the record shows ample evidence of ***no*** actual confusion, (5) the

22   disclaimer was evidence of Defendants' good faith intent to protest and further

23   decreased any likelihood of confusion, (6) more than 80% of Defendants' sales

24   occurred on rrbayc.com (as corroborated by Yuga's own expert), (7) Defendants took

25   many steps to avoid confusion including through the use of an artistic statement,

26   disclaimer, and Twitter activity critical of Yuga, (8) Yuga surrendered to the world

27   "all IP rights" associated with the Bored Ape Yacht Club, and (9) Mr. Solano is not a

28

1  credible witness given his many false statements and his admission at trial that he

2  testified falsely.

3      Yuga's additional responses similarly fail to identify evidence showing that

4  Defendants' profits were a result of confused consumers:

5      **First,** Yuga effectively admits that there is no evidence of actual confused

6  consumers and tries to explain away this gaping hole in their evidence by arguing that

7  the world is hiding evidence of actual confusion from Yuga because it would be

8  "super embarrassing" to admit being confused.  Not only does this response lack

9  merit, but it is also an admission that there is insufficient evidence in the record to

10  support a finding that any sales were a result of actual confusion.

11      And Defendants' evidence from actual consumers of RR/BAYC NFTs is

12  sweeping, involving hundreds of actual consumers admitting that they were not

13  confused and supported Defendants' protest.  Mr. Ripps testified in his declaration: "I

14  received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for

15  standing up against a corporation that had used hateful references in its brand" and

16  then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶

17  196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute

18  this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not

19  cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows

20  that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing

21  support for the project and its criticism.

22      Yuga has also failed to present evidence disputing the fact that none of these

23  correspondences indicated that commissions or secondary sales were due to

24  confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing

25  correspondences from collectors, Yuga attempts to point to indications of consumer

26  confusion.

27

28

1       ***Second,*** the evidence presented at trial shows that there was not any actual

2  confusion and that Defendants did not know of any confusion. First, to support this

3  assertion about Defendants' knowledge of confusion, Yuga cites to documents it

4  argues show that the Defendants intended to make a profit.  Intending to profit from

5  your artwork is not the same thing as intending to confuse consumers and one does

6  not weigh toward the other.

7       Further, the evidence at trial showed that Defendants were not primarily

8  motivated by profits.  Defendants explained that profits were a concern, but not the

9  primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset

10  costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).

11  Defendants' decisions surrounding refunds and royalties confirm that they were not

12  primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);

13  Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund,

14  for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt.

15  344).  Additionally, the Defendants' declined taking royalties on transfers of

16  RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt.

17  346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

18       Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

19  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

20  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

21  Buttressing this fact, Yuga's founders were also not aware of a single instance of

22  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

23  let's focus on, I think, what you were focused on. Yuga Labs has been unable to

24  identify even[] a single person who purchased an RR/BAYC believing it to be

25  sponsored by Yuga Labs; right? A Correct.").

26       Further, the evidence that Yuga cites does not rebut the overwhelming evidence

27  of Defendants' intent to protest and criticize and Yuga instead relies on

28

1    mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

2    cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

3    confusion.  But those pages are internal discussion about the design of the ApeMarket

4    website to ensure that users of apemarket.com were not confused by the website

5    design.  Yuga even cross-examined Mr. Hickman about these communications and

6    received the same explanation: "This is our attempt to make it as clear as possible.

7    We are having discussion on how to make sure it was very clear for users."  Trial Tr.

8    [Hickman] 212:22-24.

9         Yuga similarly takes out of context exhibits such as JTX-44.00002 to

10   incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

11   44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

12   ID.  that is where they get confused."  This statement is not discussing confusion

13   regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

14   RR/BAYC collection used a different numbering system that BAYC NFTs, and that

15   consumers expected the numbers match as a shorthand manner of cataloguing the

16   digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

17   numbering system, some consumers were confused as to which RR/BAYC NFT they

18   received but they understood very well that they received an NFT created by Mr.

19   Ripps that protests and criticizes Yuga.

20        The record clearly shows that Defendants did not know that there were any

21   confused consumers and further there is no evidence presented that anyone was

22   actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

23   265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

24   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

25   what you were focused on. Yuga Labs has been unable to identify even[] a single

26   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

27   right? A Correct.").

28

1     ***Third,*** Yuga improperly takes exhibits out of context to falsely accuse

2     Defendants of stating that they believed consumers lacked sophistication. For

3     example, Yuga misleadingly cites to JTX-801 to argue that Defendants said that

4     consumers of NFTs are too unsophicated.  The statement that Yuga relies on at JTX-

5     801.185 was made in the context of designing the never-released ApeMarket with a

6     wrapper on the website.  Mr. Cahen stated at JTX-801.185, "I don't want to start

7     implementing a wrapper."  Mr. Lehman responds, "Agreed."  And Mr. Cahen

8     explains, "these users are too unsophisticated by far."  As is apparent from the exhibit,

9     statement Yuga cites does not relate to knowledge of confusion but instead discusses

10    whether users of a marketplace would be sophisticated enough to correctly utilize a

11    wrapper, which Defendants were considering using on ApeMarket.  Yuga also cites to

12    various documents (JTX-801.195, JTX-801.279), but these pages of JTX-801 also

13    involve discussions in how to design ***ApeMarket*** to ensure that the website design was

14    not confusing to users of the website.  Yuga even cross-examined Mr. Hickman about

15    these communications and received the same explanation: "This is our attempt to

16    make it as clear as possible.  We are having discussion on how to make sure it was

17    very clear for users."  Trial Tr. [Hickman] 212:22-24.

18        **Plaintiff's Disputed Post Trial Finding of Fact No. 6, lines 3:1-3:**

19        Further, Mr. Hickman, another one of Defendants' partners, confused the listing

20    for RR/BAYC NFTs on Foundation as being for genuine BAYC NFTs during his

21    deposition. JTX-28; Dkt. 392 at 213:4-14.

22        **Defendants' Basis of Dispute:**

23        The evidence at trial did not show that Mr. Hickman was confused about the

24    RR/BAYC Foundation page during his deposition.  During trial, Yuga had an

25    opportunity to examine Mr. Hickman and was unable to elicit testimony indicating

26    that any confusion had occurred.  The trial testimony shows that Mr. Hickman was

27    ***not*** confused:

28

Q. And at your deposition, you were confused about whether the Foundation page for the RR/BAYCs was actually the Foundation page for BAYC NFTs?

A. ***I was not confused***

Q. At your deposition when you reviewed JTX-28, you originally thought it was the Foundation page website for what looks to be Bored Ape Yacht Club; correct?

A. ***No.***

Trial Tr. [Hickman] 212:25-213:8 (emphasis added).

During re-direct, Mr. Hickman was given an opportunity to further discuss his deposition testimony, and explained:

Q. Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page or a page by Mr. Ripps?

A. ***I was not confused.  The video shows me describe all aspects of the page in real time.***

Q. And were you – what was your level of confidence that this foundation page that you were shown at your deposition was indeed a page for the RR/BAYC collection?

A. It was that it was actually Ryder's creator page for the RR/BAYC collection.

Q. Are you aware of anyone who ever obtained an RR/BAYC from Foundation believing that it was sponsored by Yuga?

A. Absolutely not.

Trial Tr. [Hickman] 219:3-16 (emphasis added).  This testimony makes clear that Mr. Hickman was describing text appearing in JTX-28 real-time before arriving at his

1  conclusion that it was Mr. Ripps's creator page on Foundation for the RR/BAYC
2  collection.

3  **Plaintiff's Response:**

4      Mr. Hickman's (and Defendants') attempt to explain away his obvious
5  confusion is self-evidently not credible.  When asked to identify the source of the
6  NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he
7  paused for around five seconds, examined the page closely and stated that the page
8  "looks to be Bored Ape Yacht Club."  Trial Tr. 213:9-13 (lodged at Dkt. 415); *id.*  His
9  body language and demeanor showed that, after this examination, Mr. Hickman
10  genuinely believed that he was looking at a Bored Ape Yacht Club sales page.  It was
11  only after around fifteen seconds of a second, long, pause and closer examination that
12  Mr. Hickman amended his answer and identified the page as Defendants' infringing
13  website.  Dkt. 415.  Mr. Hickman's testimony at trial that he was not confused lacks
14  credibility in light of his testimony and his demeanor when giving that testimony.  His
15  self-serving denial contradicts what was clear in his video-taped deposition and at
16  trial.  Dkt. No. 415 (notice of lodging of video testimony); Trial Tr. 213:13.  Mr.
17  Hickman's bias explains why he would falsely deny his confusion:  if even an insider
18  like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on
19  Defendants' marketplace page, the "nonexpert, nontechnical public" stood no chance
20  when presented with Defendants' scam.  Trial Tr. at 135:18-19.

21  **Defendants' Reply:**

22      Yuga mischaracterizes Mr. Hickman's deposition and trial testimony to support
23  their false assertion that he was confused and misidentified the RR/BAYC sales page
24  on Foundation.  This is inaccurate.  As Mr. Hickman credibly testified at trial, he was
25  not confused, and his deposition video shows him reviewing and describing all
26  portions of the exhibit. Trial Tr. [Hickman] 219:3-12 ("Q Were you at your deposition
27  confused about whether the page that you were shown was indeed a Yuga Labs page

28

1   or a page by Mr. Ripps? A I was not confused. The video shows me describe all of the

2   aspects of the page real time. Q And were you—what was your level of confidence

3   that this Foundation page that you were shown at your deposition was indeed a page

4   for the RR/BAYC collection? A It was that it was actually Ryder's creator page for

5   the RR/BAYC collection."). Mr. Hickman's trial testimony has been reproduced in

6   full in Defendants' objection in which he explains that he was simply observing the

7   document in real-time. That is not confusion. That is Mr. Hickman articulating in

8   real-time the process under which he confidently concluded that he was looking at Mr.

9   Ripps's creator page.

10          **Plaintiff's Disputed Post Trial Finding of Fact No. 6 n.2:**

11          Although Mr. Hickman testified at trial that he was not confused, after viewing

12   Mr. Hickman's video deposition (149:24-150:10), the Court concludes that Mr.

13   Hickman's demeanor, body language, and tone of voice reflect that he was initially

14   confused. This deposition testimony also supported Yuga Labs' motion for summary

15   judgment. *See*, *e.g.*, Dkt. 141-2 CSUF 57 at page 40.

16          **Defendants' Basis of Dispute:**

17          The evidence at trial did not show that Mr. Hickman was confused. Mr.

18   Hickman's demeanor, body language, and tone of voice during his deposition

19   reflected that he was describing JTX-28 in real-time while observing the document.

20   Mr. Hickman further repeatedly confirmed that he was not confused during his

21   deposition (Trial Tr. [Hickman] 213:5-8, 219:3-6) and further testified "The video

22   shows me describe all aspects of the page in real time" (Trial Tr. Hickman 2:19:6-7).

23          Yuga also fails to cite adequate evidence in support of its allegations. First,

24   Yuga incorrectly argues that Hickman's deposition supported this Court's summary

25   judgment order. The Court did not hold at summary judgment that Mr. Hickman was

26   confused at his deposition. Second, Yuga's misleading suggestions about summary

27   judgment are also an improper reliance on the law of the case doctrine. The "law of

28

the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling applies to the issue of infringement and is not adequate support as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Additionally, the trial testimony shows that Mr. Hickman was ***not*** confused:

Q.   And at your deposition, you were confused about whether the Foundation page for the RR/BAYCs was actually the Foundation page for BAYC NFTs?

A.   ***I was not confused***

Q.   At your deposition when you reviewed JTX-28, you originally thought it was the Foundation page website for what looks to be Bored Ape Yacht Club; correct?

A.   ***No.***

Trial Tr. [Hickman] 212:25-213:8 (emphasis added).

During re-direct, Mr. Hickman was given an opportunity to further discuss his deposition testimony, and explained:

Q.   Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page or a page by Mr. Ripps?

A.   ***I was not confused.  The video shows me describe all aspects of the page in real time.***

Q.   And were you – what was your level of confidence that his foundation page that you were shown at your deposition was indeed a page for the RR/BAYC collection?

A.   It was that it was actually Ryder's creator page for the RR/BAYC collection.

Q.   Are you aware of anyone who ever obtained an RR/BAYC from Foundation believing that it was sponsored by Yuga?

A.   Absolutely not.

Trial Tr. [Hickman] 219:3-16 (emphasis added).  This testimony makes clear that Mr. Hickman was describing text appearing in JTX-28 real-time before arriving at his conclusion that it was Mr. Ripps's creator page on Foundation for the RR/BAYC collection.

**Plaintiff's Response:**

Mr. Hickman's (and Defendants') attempt to explain away his obvious confusion is self-evidently not credible for the reasons discussed *supra* ¶ 6.

**Defendants' Reply:**

Yuga mischaracterizes Mr. Hickman's deposition and trial testimony to support their false assertion that he was confused and misidentified the RR/BAYC sales page on Foundation.  This is inaccurate.  As Mr. Hickman credibly testified at trial, he was not confused, and his deposition video shows him reviewing and describing all portions of the exhibit. Trial Tr. [Hickman] 219:3-12 ("Q Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page

1  or a page by Mr. Ripps? A I was not confused. The video shows me describe all of the

2  aspects of the page real time. Q And were you—what was your level of confidence

3  that this Foundation page that you were shown at your deposition was indeed a page

4  for the RR/BAYC collection? A It was that it was actually Ryder's creator page for

5  the RR/BAYC collection."). Mr. Hickman's trial testimony has been reproduced in

6  full in Defendants' objection in which he explains that he was simply observing the

7  document in real-time. That is not confusion. That is Mr. Hickman articulating in

8  real-time the process under which he confidently concluded that he was looking at Mr.

9  Ripps's creator page.

10  **Plaintiff's Disputed Post Trial Finding of Fact No. 7(preamble):**

11  Defendants' infringement was intentional. The Court's findings on summary

12  judgment, in addition to evidence presented at trial, illustrate Defendants' intent to

13  deceive consumers, including:

14  **Defendants' Basis of Dispute:**

15  The evidence at trial showed that Defendants are not intentional infringers and

16  did not intend to suggest that RR/BAYC was related to Yuga in any way. Mr. Ripps's

17  and Mr. Cahen's contemporaneous communications about the RR/BAYC project

18  confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For

19  example, in private group chats among participants in the RR/BAYC project (JTX-

20  801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of

21  the project, their intention that it would spread criticism of Yuga, and their intention

22  that social media platforms be used to educate the public about the nature of NFTs and

23  what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346)

24  (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240,

25  276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

26  Defendants also took multiple steps to make clear that the RR/BAYC collection

27  was not related to Yuga in any way. For example, the rrbayc.com website—through

28

which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT

1    collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the

2    NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]

3    80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would

4    have probably seen these collections using the Bored Ape Yacht Club trademarks at

5    the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There

6    are "literally thousands" of products that use Yuga trademarks without sponsorship or

7    affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

8    notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

9    cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

10    Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

11    2075.

12        Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

13    holder of a BAYC NFT containing the asserted marks and having received IP rights

14    associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

15    Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

16    of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

17    Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

18    allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

19    Your intent in writing the terms and conditions was to allow people to be able to

20    commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

21    the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

22    with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

23    publicly represented that BAYC NFT holders received all IP rights and that Yuga has

24    none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

25    Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

26    someone listening to her public statement about Yuga not having any IP rights would

27    not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

28

1      Yuga also fails to reference adequate evidence in support of its allegation of
2  intentional infringement.  Yuga, by arguing that the Court's summary judgment order
3  supports a finding of intentional infringement, has incorrectly relied on the law of the
4  case doctrine.  The "law of the case doctrine does not apply to pretrial rulings **such as**
5  **motions for summary judgment**."  Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir.
6  1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir.
7  2014) ("Pretrial rulings, often based on incomplete information, don't bind district
8  judges for the remainder of the case.  Given the nature of such motions, it could not be
9  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of
10 an issue were decided at summary judgment for one purpose, the summary judgment
11 order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-
12 AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence
13 of initial police contact was relevant as background, but not to the already decided
14 issue that initial contact was not excessive force).  This case is just like *Sienze*: the
15 summary judgment ruling on intent applies only the issue of infringement and is not
16 adequate support for intent generally or as applied to availability of disgorgement as a
17 remedy, apportionment, and an exceptional case analysis.

18                    **Plaintiff's Response:**

19      Defendants' objections should be rejected for the same reasons discussed *supra*
20 ¶ 4; specifically:  (1) the objection seeks to relitigate issues already adjudicated by the
21 Court, (2) the record shows that Defendants intended to cause confusion, (3)
22 Defendants' commercial infringement was not protected "art," (4) Defendants took no
23 steps to avoid confusion in the marketplace, (5) Yuga Labs did not authorize
24 Defendants' infringement and, to the contrary, had implemented a robust enforcement
25 program to shut down infringers like Defendants, Mr. Hickman did not have (or
26 convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (6) and
27 Defendants intended to profit off of their infringement.

28

1    Additionally, Defendants' objection should be rejected because their

2    "disclaimer" did not dispel likelihood of confusion or disprove their intent.

3    **Defendants' "Disclaimer" Does Not Negate The Court's Finding That**

4    **Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer

5    on rrbayc.com, "the fact that Defendants concluded it was necessary to include a

6    disclaimer demonstrates their awareness that their use of the BAYC Marks was

7    misleading."  SJ Order (Dkt. 225) at 17.  Defendants knew they were infringing and

8    creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371

9    (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want

10   to fight trademark").  Instead of making changes, such as those recommended by their

11   lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote

12   and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl.

13   (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands,

14   every choice is intentional.").

15       Defendants also knew that what they were doing was likely to lead to a lawsuit.

16   For instance, Mr. Ripps asked for a reference to his limited liability company,

17   Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued

18   personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and

19   branding direction in light of the trademark thing" to Mr. Cahen before they learned of

20   this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get

21   sued, for us to look really sympathetic to everyone" (JTX-918.0036).  That

22   Defendants took some steps to try to conceal their intent when they were inevitably

23   sued does not make the infringing activity less confusing; it just demonstrates their

24   culpability.

25       The public was not required to read and click a disclaimer.  Indeed, even on

26   rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr.

27   Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one"

28

---

Case No. 2:22-cv-04355-JFW-JEM            -151-            JOINT STATEMENT RE: OBJECTIONS

1  would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion

2  amongst the general public when every single RR/BAYC NFT sold (or that ever will

3  sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—

4  without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-

5  134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer

6  on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The

7  majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where

8  there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million

9  impact).

10      Defendants have no survey, or material consumer evidence, that users of the

11  infringing rrbayc.com website read any disclaimer.  This is not surprising since the

12  vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

13  admitted that all sales went through Foundation—where there was no disclaimer.

14  Ripps Depo. Designations (Dkt. 396) at 82:8-13.

15      Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

16  uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

17  337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today

18  linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see

19  Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at

20  52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47,

21  78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th

22  Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did

23  "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-

24  existent to ineffective at best.

25      **Defendants' Reply:**

26      Yuga's response fails to adequately address Defendants' objections and the trial

27  evidence that supports Defendants' objections.  For reasons provided in *supra* ¶ 4

28

(both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed that Defendants did not intend to infringe any trademark rights and instead aimed to protest and criticize Yuga.  Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) Defendants did not intend to confuse consumers, (3) Defendants' intent was to protest and criticize Yuga, (4) the record shows ample evidence of ***no*** actual confusion, (5) Defendants took many steps to avoid confusion including through the use of an artistic statement, disclaimer, and Twitter activity critical of Yuga, and (6) Yuga surrendered to the world "all IP rights" associated with the Bored Ape Yacht Club.

Further, Yuga's incorrectly argues that Defendants' use of disclaimer did not show Defendants good faith intent to criticize Yuga and acts taken to avoid any confusion. First, Yuga incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and

1    is not adequate support for use of a disclaimer generally or as applied to availability of

2    disgorgement as a remedy, apportionment, and an exceptional case analysis.

3         And Yuga's complaint that Defendants did not use a disclaimer on Foundation,

4    Etherscan, or any other third-party website is inapposite.  Defendants have no control

5    over third party websites such as Etherscan and do not have the ability to design the

6    pages third-party websites use or how they choose to display the RR/BAYC NFT

7    collection.  It simply was not possible for Defendants to add a disclaimer on

8    Foundation or Etherscan because they do not control those websites.

9    And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use

10   Etherscan's token tracker/token name but instead rely on marketplaces or by checking

11   the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay

12   explained that using token names to distinguish NFTs "would be a fairly weak way to

13   do so because often those things are mutable.  They can be changed after the fact.

14   Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

15        Further, the smart contract clearly indicates Mr. Ripps is the creator and not

16   Yuga and allows consumers to easily establish provenance, which undermines Yuga's

17   assertions about what consumers see when they review the NFT.  *See* JTX-1146;

18   Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT

19   uses the alleged marks. Defendants used modified versions of the alleged BAYC

20   Marks in their reservations.  For example, the logo used states "This Logo is Based on

21   the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project,

22   rrbayc.com, used the modified "RR/BAYC" throughout. Id.

23        Second, Yuga incorrectly argues that the disclaimer "did nothing to dispel

24   confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes

25   clear, the rrbayc.com website "required collectors to acknowledge and accept a

26   disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶

27   105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this

28

Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶ 106. While it is possible that a consumer chose not to read this disclaimer or the prominent artistic statement included on rrbayc.com, this evidence tends to prove that many did and further shows that Defendants were trying to ensure that no one was confused about the source of their collection. *Id.* at ¶¶ 102, 108. Yuga's assertion that this disclaimer shows the opposite intent is baseless.

Third, Yuga also cites to correspondence among the creators discussing a possible fear of litigation. These discussions are taken out of a broader context of hundreds of thousands of communications the creators made. Further, whether the Defendants feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

Fourth, Yuga misstates the meaning of Mr. Ripps's deposition testimony surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation? A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19. This however is different than the "Foundation page" for Ryder Ripps. Accordingly, Mr. Ripps was not admitting that all sales went through his Foundation page and his testimony that over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

1    Fifth, while there may have been many sales on secondary marketplaces as

2    Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little

3    profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr.

4    Cahen's testimony make clear, they tried to turn off royalties from the secondary sales

5    of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of

6    royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps

7    Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states

8    that they received only a small amount of royalties from Foundation before they shut

9    it off, around $1,000, and some from LooksRare, as that marketplace initially refused

10   to turn off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

11   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

12   the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

13   shut off royalties from such sales yet again supports a finding that they did not intend

14   to confuse and were motivated by their protest of Yuga not to profit.

15   **<u>Plaintiff's Disputed Post Trial Finding of Fact No. 7(a):</u>**

16   <u>"Defendants knowingly and intentionally used Yuga's BAYC Marks . . . in an</u>

17   <u>effort to confuse consumers" and "intentionally designed the RR/BAYC NFTs and</u>

18   <u>sales websites to resemble Yuga's branding."</u> SJ Order at 12; *see also* JTX-671; JTX-

19   686; Dkt. 392 at 52:6-21.

20   **<u>Defendants' Basis of Dispute:</u>**

21   The evidence at trial showed that Defendants are not intentional infringers and

22   did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's

23   and Mr. Cahen's contemporaneous communications about the RR/BAYC project

24   confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For

25   example, in private group chats among participants in the RR/BAYC project (JTX-

26   801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of

27   the project, their intention that it would spread criticism of Yuga, and their intention

28

1   that social media platforms be used to educate the public about the nature of NFTs and
2   what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346)
3   (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240,
4   276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

5          Defendants also took multiple steps to make clear that the RR/BAYC collection
6   was not related to Yuga in any way.  For example, the rrbayc.com website—through
7   which the majority of RR/BAYC commissions occurred and the vast majority of
8   alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶
9   144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps
10  Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147;
11  Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the
12  rrbayc.com website were also required to read and click through a disclaimer
13  acknowledging the artistic purpose of the project before they were allowed to
14  commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-
15  2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and
16  additional steps so that the artistic purpose of the work would be clear to participants.
17  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement
18  ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted
19  it and so he had the final call.").

20         Defendants' online discussion, which consisted of nearly the entirety of
21  Defendants' public activities associated with RR/BAYC, confirms their intent.  In
22  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be
23  inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows
24  that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
25  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

26         Defendants also created the RR/BAYC collection based on a good faith belief
27  that Yuga had given authorization for the creation of projects like RR/BAYC.  At the
28

1   time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than

2   9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.

3   346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before

4   suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps

5   to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.

6   346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT

7   collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the

8   NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]

9   80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would

10  have probably seen these collections using the Bored Ape Yacht Club trademarks at

11  the time they created the RR/BAYC project. Trial Tr. [Muniz] 77:19-23. 26.  There

12  are "literally thousands" of products that use Yuga trademarks without sponsorship or

13  affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

14  notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

15  cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

16  Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

17  2075.

18        Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

19  holder of a BAYC NFT containing the asserted marks and having received IP rights

20  associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

21  Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

22  of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

23  Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

24  allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

25  Your intent in writing the terms and conditions was to allow people to be able to

26  commercialize their NFTs.  We can agree on that; right? A. yes.  That is covered in

27  the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

28

1  with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

2  publicly represented that BAYC NFT holders received all IP rights and that Yuga has

3  none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

4  Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

5  someone listening to her public statement about Yuga not having any IP rights would

6  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

7        Yuga also fails to reference adequate evidence in support of its allegation of

8  intentional infringement.  Yuga, by arguing that the Court's summary judgment order

9  supports a finding of intentional infringement, has incorrectly relied on the law of the

10  case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as***

11  ***motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir.

12  1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

13  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

14  judges for the remainder of the case.  Given the nature of such motions, it could not be

15  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

16  an issue were decided at summary judgment for one purpose, the summary judgment

17  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

18  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

19  of initial police contact was relevant as background, but not to the already decided

20  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

21  summary judgment ruling on intent applies only the issue of infringement and is not

22  adequate support for intent generally or as applied to availability of disgorgement as a

23  remedy, apportionment, and an exceptional case analysis.

24        Yuga also misleading relies on JTX-671 and JTX-686 to argue that Defendants

25  intentionally tried to confuse consumers into thinking that Yuga was the source of

26  origin for RR/BAYC NFTs.   JTX-671 is a Twitter post from Ryder Ripps containing

27  the Foundation page for the RR/BAYC collection.  Nowhere in the post does Mr.

28

1  Ripps suggest that Yuga sponsored RR/BAYC and the image in the post clearly shows
2  "@ryder_ripps" as the creator of the collection.  Futher, it is undisputed that Mr.
3  Ripps's Twitter page contained numerous posts criticizing Yuga, the Bored Ape Yacht
4  Club, discussion of RR/BAYC as a conceptual artwork that amplified Mr. Ripps's
5  criticism.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested).  No consumer of NFTs
6  that navigated to Mr. Ripps Twitter and saw this post would have reasonably believed
7  that Mr. Ripps was trying to confuse anyone as to the source of origin for RR/BAYC
8  NFTs.

9         Similarly, Yuga has cited to JTX-686 is a misleading manner as well.  Mr.
10  Solano admitted during trial that JTX-686 never appeared on any website selling
11  NFTs:

12       Q.     This side-by-side image, JTX-686, never appeared on OpenSea,
13              did it?

14       A.     This side-by-side image, no.  But these are two different pages that
15              look exactly the same.

16
17  Trial Tr. [Solano] 45:22-25.  In fact, Mr. Solano admitted that JTX-686 is a document
18  that Yuga's attorneys created for purposes of this litigation.

19       Q.     Where did you get this image, JTX-686?

20
21       A.     It was prepared for us.  Counsel prepared it.

22  Trial Tr. [Solano] 46:9-11.  The cropped images in JTX-686 shows that some
23  unidentified third-party, not the Defendants, was selling an RR/BAYC NFT.

24
25       Q.     This image, the combined image like this – strike that.
               It's hard to see.  But if we could blow up on the right-hand side, there's a
26             "Created By" section.  And it's hard to see, but it looks like it says –
               sorry, "owned by," not "created by,"  "Owned by Safo214; right?
27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    A.      I'll take your word for it that that's what it says.  But, yes, it's owned by a username.

    Q.      That's not Mr. Ripps or Mr. Cahen; right?

    A.      No.  This had already been sold to that person by them.

Trial Tr. [Solano] 46:16-24.

Yuga also cites to the unreliable trial testimony of Greg Solano.  The cited testimony is a string of conclusory statements about what Defendants allegedly did and is not based on any personal knowledge.  Moreover, Mr. Solano's testimony is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was also forced to concede on cross examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If

1  we look at your deposition – and we can pull it up on the screen – at page 152, starting

2  at line 13 'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an

3  objection from your counsel. 'ANSWER:  I don't know.' Was that your testimony at

4  your deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market

5  exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at

6  your deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether

7  Ape Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did

8  you give that answer? A Yes.").

9  **Plaintiff's Response:**

10        Defendants dispute an exact quote from the Court, underscoring their bad-faith

11  efforts to multiply the cost of this litigation by rehashing decided issues.  **Forcing**

12  **Yuga Labs to respond to an objection based purely on the fact that Defendants**

13  **disagree with the Court's binding order is another example of Defendants'**

14  **oppressive litigation tactics supporting a finding that this is an exceptional case.**

15  This objection should be rejected.

16        Defendants' objections should be rejected for the same reasons discussed *supra*

17  ¶ 4; specifically:  (1) the objection seeks to relitigate issues already adjudicated by the

18  Court, (2) the record shows that Defendants intended to cause confusion, (3)

19  Defendants' commercial infringement was not protected "art," (4) Defendants'

20  "disclaimer" did not dispel likelihood of confusion, (5) Defendants took no steps to

21  avoid confusion in the marketplace, (6) Yuga Labs did not authorize Defendants'

22  infringement and, to the contrary, had implemented a robust enforcement program to

23  shut down infringers like Defendants, (7) Mr. Hickman did not have (or convey to

24  Defendants) the right to infringe Yuga Labs' BAYC Marks, (8) Defendants intended

25  to profit off of their infringement, (9) Defendants' fail to impeach Mr. Solano's

26  credible testimony, and (10) there is ample evidence of confusion in the record.

27

28

1    Additionally, as described below, Defendants' objection should be rejected

2    because (1) Defendants' characterization of the evidence is unpersuasive and (2)

3    Defendants were well aware that their infringement would cause confusion.

4    **The Exhibits To Which Yuga Labs Cites Are Not Misleading:**  Nothing is

5    misleading about JTX-686.  That document shows a comparison of a genuine BAYC

6    NFT listed on OpenSea and one of Defendants' infringing NFTs listed on OpenSea.

7    Defendants do not and cannot dispute that both NFTs appeared on OpenSea at the

8    same time.  While Mr. Cahen did sell Defendants' infringing NFTs directly on

9    OpenSea, (*see* Trial Tr. at 202:18-25); JTX-686 includes a listing on the secondary

10   market by a third party, which is not surprising as a significant portion of the trading

11   volume put into motion and actively promoted by Defendants' infringement took

12   place on secondary markets.  *See* Trial Tr. 202:4-12 ("The majority of the sales are

13   taking place on secondary markets.").

14   There is also nothing misleading about JTX-671—a promotion by Mr. Ripps of

15   Defendants' infringing NFT collection on Foundation with the URL

16   foundation.app/collection/bayc, the symbol "BAYC," and the name "Bored Ape

17   Yacht Club."  Mr. Ripps repeatedly used Yuga Labs' marks – without any

18   modification – to promote his sale of infringing products.  The fact that Defendants'

19   infringing NFTs directly copied Yuga Labs' marks necessarily implies an affiliation

20   between Defendants and Yuga Labs.  That Mr. Ripps associated his name with his

21   infringement does not cure this affiliation, it exacerbates it by immutably connecting

22   Mr. Ripps with the Bored Ape Yacht Club brand.  And Defendants' direct copying of

23   Yuga Labs marks supported a finding that there was a likelihood of confusion.  *Stone*

24   *Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases

25   involving identical marks on competitive goods are rare and 'hardly ever find their

26   way into the appellate reports' because liability is 'open and shut.'") (citation

27   omitted); SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that

28

1   Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  This

2   confusion existed even if consumers were too ashamed to admit it.  Finally,

3   Defendants' assertion that a consumer who navigated to Mr. Ripps' Twitter page

4   would not be confused is unsupported by the record.  Mr. Ripps' Tweets also reached

5   a broader audience.  *See* Muniz Decl. (Dkt. 340) ¶ 13 ("[Defendants] directed their

6   Tweets not just to their followers, but to the NFT community and Board Ape Yacht

7   Club members generally."); *see also* Trial Tr. at 233:17-18 ("You can't tweet to

8   someone in particular.  You can just tweet to the general public, yes.")

9          **Defendants Knew That Their Infringement Would Result in Confusion:**

10  Defendants' internal communications do not "confirm[] their intent," rather they

11  demonstrate that Defendants knew they were infringing and creating confusion.  JTX-

12  801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If

13  we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we

14  should be very careful about doing this in terms of the confusion it will create"); JTX-

15  801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the

16  collections coexist" because "they are the same art" and "same logos"); JTX-801.279

17  (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will

18  not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo

19  "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third

20  party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people

21  will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to

22  Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002

23  (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is

24  where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16

25  (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the

26  Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at

27  59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the

28

1   blockchain is complicated.  A lot of people don't have the technical expertise or

2   knowledge to be able to have a conversation about crypto technology and blockchain

3   technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT

4   collections by the token tracker).  Instead of making changes, such as those

5   recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs'

6   BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also*

7   Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands,

8   every choice is intentional.").

9                          **Defendants' Reply:**

10          Defendants do not dispute that this Court has entered summary judgment in this

11   case*.*  However, in their summary judgment briefing, Defendants made clear that there

12   is a material evidentiary dispute regarding Defendants intent and knowledge and

13   Defendants reserve the right raise this issue for purposes of determining remedies, on

14   appeal, and in all other proceedings involving the BAYC marks.  Defendants are not

15   asking that this Court reconsider its holding, because this under the law of the case

16   doctrine this Court has not made a holding on Defendants' intent for purposes of

17   determining availability of disgorgement as a remedy (including Defendants' mental

18   state as applied to disgorgement), apportionment, and an exceptional case analysis.

19   The "law of the case doctrine does not apply to pretrial rulings ***such as motions for***

20   ***summary judgment***."  Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)*

21   (emphasis added); *see also* Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)*

22   ("Pretrial rulings, often based on incomplete information, don't bind district judges for

23   the remainder of the case.  Given the nature of such motions, it could not be

24   otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

25   an issue were decided at summary judgment for one purpose, the summary judgment

26   order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

27   AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

28

1  of initial police contact was relevant as background, but not to the already decided

2  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

3  summary judgment ruling on intent is limited to infringement and cannot be applied

4  more broadly.

5          Additionally, Yuga's reference back to its responses in *supra* ¶ 4 do not provide

6  adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons

7  provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in

8  support of their objections), the evidence showed that Defendants did not act with

9  intent to cause confusion or to infringe.  Defendants' reply in *supra* ¶ 4 similarly

10  explains that (1) this Court's summary judgment cannot be used to support a finding

11  of fact a trial, (2) Defendants did not intend to confuse consumers, (3) Defendants'

12  intent was to protest and criticize Yuga, (4) Defendants' disclaimer evidence

13  Defendants' good faith attempt to creating protest art and decreasing any likelihood of

14  confusion, (5) Defendants took many steps to avoid confusion including through the

15  use of an artistic statement, disclaimer, and Twitter activity critical of Yuga, (6) Yuga

16  surrendered to the world "all IP rights" associated with the Bored Ape Yacht Club, (7)

17  Mr. Hickman was a BAYC holder that officially received the transfer of "all IP right"

18  that Yuga had made, (8) Defendants did not intend to profit off confusion as the

19  record shows they took many steps to avoid confusion and there is ample evidence of

20  *no* actual confusion, (9) Mr. Solano is not a credible witness given his many false

21  statements and his admission at trial that he testified falsely, and (10) the trial revealed

22  that there is no evidence of a confused purchaser of RR/BAYC NFTs.

23          Yuga similarly fails to show that it's exhibits are not misleading.  For the

24  reasons explained in Defendants' objection, (1) JTX-686 is of Defendants selling

25  RR/BAYC NFTS on OpenSea but rather a lawyer created document showing market

26  activated by an anonymous third party and (2) JTX-671 is a tweet on Mr. Ripps's

27

28

1  personal Twitter account of the Foundation page clearly showing that Mr. Ripps was
2  the creator and not Yuga.

3          Yuga also incorrectly accuses Defendants of "knowing" that RR/BAYC would
4  cause confusion. The evidence presented at trial shows that there was not any actual
5  confusion and that Defendants did not know of any confusion. First, to support this
6  assertion about Defendants' knowledge of confusion, Yuga cites to documents it
7  argues show that the Defendants intended to make a profit.  Intending to profit from
8  your artwork is not the same thing as intending to confuse consumers and one does
9  not weigh toward the other.

10         The evidence at trial showed that Defendants were not primarily motivated by
11 profits.  Defendants explained that profits were a concern, but not the primary motive
12 of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain
13 Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions
14 surrounding refunds and royalties confirm that they were not primarily motivated by
15 profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt.
16 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶
17 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the
18 Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever
19 possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171
20 (Dkt. 344).

21         Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not
22 aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)
23 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).
24 Buttressing this fact, Yuga's founders were also not aware of a single instance of
25 actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now
26 let's focus on, I think, what you were focused on. Yuga Labs has been unable to

27
28

1   identify even[] a single person who purchased an RR/BAYC believing it to be

2   sponsored by Yuga Labs; right? A Correct.").

3          Further, the evidence that Yuga cites does not rebut the overwhelming evidence

4   of Defendants' intent to protest and criticize and Yuga instead relies on

5   mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

6   cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

7   confusion.  But those pages are internal discussion about the design of the ApeMarket

8   website to ensure that users of apemarket.com were not confused by the website

9   design.  Yuga even cross-examined Mr. Hickman about these communications and

10  received the same explanation: "This is our attempt to make it as clear as possible.

11  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

12  [Hickman] 212:22-24.

13         Yuga similarly takes out of context exhibits such as JTX-44.00002 to

14  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

15  44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

16  ID.  that is where they get confused."  This statement is not discussing confusion

17  regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

18  RR/BAYC collection used a different numbering system that BAYC NFTs, and that

19  consumers expected the numbers match as a shorthand manner of cataloguing the

20  digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

21  numbering system, some consumers were confused as to which RR/BAYC NFT they

22  received but they understood very well that they received an NFT created by Mr.

23  Ripps that protests and criticizes Yuga.

24         The record clearly shows that Defendants did not know that there were any

25  confused consumers and further there is no evidence presented that anyone was

26  actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

27  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

28

Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

### **Plaintiff's Disputed Post Trial Finding of Fact No. 7(b):**

"Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." SJ Order at 11; Dkt. 396 (Ripps Depo. Designations) at 149:18-150:10.

### **Defendants' Basis of Dispute:**

The trial evidence does not show that Defendants admitted that they intentionally using the asserted marks to engage in any acts of intentional infringement.  To the contrary, the record is clear that Defendants used the RR/BAYC project to refer to Yuga and make criticism.  Ripps Decl. ¶¶ 110, 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 131, 144 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Moreover, Defendants had a reasonable belief that they were permitted to create the RR/BAYC collection based on Yuga's public activities of permitting and encouraging thousands of third parties to create their own crypto projects and to be creative with the Bored Ape Yacht Club. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; Trial Tr. [Muniz] 81:18-22.

Yuga also misleadingly cites to Mr. Ripps's deposition testimony as evidence of Defendants' alleged admission.  That cited testimony, however, contains no such admission.  It involves questions on what "RR" and "BAYC" refer to in the RR/BAYC collection (Dkt. 396 at 149:18-150:7) and Mr. Ripps explaining why he did not apply for a trademark for "RR/BAYC":  "Because I'm an artist.  I don't have any reason to trademark things." (Dkt. 396 at 150:8-10, 11-13).

1      Yuga has also incorrectly relied on the law of the case doctrine by arguing that

2  the Court's summary judgment order supports a finding of intentionality.  The "law of

3  the case doctrine does not apply to pretrial rulings ***such as motions for summary***

4  ***judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

5  added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

6  rulings, often based on incomplete information, don't bind district judges for the

7  remainder of the case.  Given the nature of such motions, it could not be otherwise.").

8  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were

9  decided at summary judgment for one purpose, the summary judgment order did

10 resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB,

11 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial

12 police contact was relevant as background, but not to the already decided issue that

13 initial contact was not excessive force).  This case is just like *Sienze*: the summary

14 judgment ruling on intent applies only the issue of infringement and is not adequate

15 support for intent generally or as applied to availability of disgorgement as a remedy,

16 apportionment, and an exceptional case analysis.

17             **Plaintiff's Response:**

18       Defendants dispute an exact quote from the Court, underscoring their bad-faith

19 efforts to multiply the cost of this litigation by rehashing decided issues.  And, for the

20 immediately following proposed finding of fact (¶ 7I), Defendants admit the truth and

21 relevance of the fact that:  "**Each of Defendants' 9,546 RR/BAYC NFTs used the**

22 **BAYC Marks**."  Defendants' contradictory admissions about their basic use of Yuga

23 Labs' BAYC Marks unnecessarily increases the costs and complexity of this litigation

24 about their known infringement.

25       Defendants' objection should be rejected for the same reasons discussed *supra* ¶

26 7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by

27 the Court, (2) the record shows that Defendants intended to cause confusion, (3) the

28

record shows that Defendants' commercial infringement was not protected "art," (4) Defendants' "disclaimer" did not dispel likelihood of confusion, (5) Yuga Labs did not authorize Defendants' infringement and, to the contrary, had implemented a robust enforcement program to shut down infringers like Defendants, (6) Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (7) there is no dispute that Defendants used Yuga Labs marks, and (8) Defendants intended to profit off of their infringement.

Additionally, as described below, Defendants' objection should be rejected because (1) Defendants' characterization of the evidence is unpersuasive, and (2) Defendants have already admitted to their blatant infringement in the pre-trial conference order.

**<u>Defendants' Characterization Of The Evidence In This Objection Is Incorrect:</u>**  Defendants attempt to deflect from their use of the BAYC Marks to why they used those marks – there is no dispute that they used the BAYC Marks. *See* Ripps 2d Supp. Response to Interrogatory No. 3 ("in some circumstances the RR/BAYC project also displayed unmodified marks, so that the RR/BAYC project would be directly tied to Yuga, BAYC, and specific BAYC NFTs . . ."); Ripps Response to Interrogatory No. 5 ("'BAYC' [in RR/BAYC] references the abbreviated title of Yuga's NFT collection"); Defendants' Motion to Strike (Dkt. 48) at 18 ("Mr. Ripps's appropriation art project would not be readily identifiable, or even possible, without using Yuga's marks"); *id.* at 19 ("the nature of Mr. Ripps's performance and appropriation art project requires use of Yuga's marks").

The cited deposition testimony of Mr. Ripps is one of many admissions that the "BAYC" in "RR/BAYC" refers to Bored Ape Yacht Club, which is Yuga Labs' brand:

> Q. And the Bored Ape Yacht Club -- or "BAYC"
>
> refers to Bored Ape Yacht Club?

1    A. Yup.

2    Q. And Bored Ape Yacht Club is associated

3    with Yuga Labs?

4    A. Yes.

5    Dkt. 396 (Ripps Depo. Designations) at 150:2-7; *see also* JTX-801.371 (Cahen to

6    Ripps: "per our attorney we may just need to change the skull / If we want to fight

7    trademark"); *see also* JTX-801.185 (Mr. Lehman writing, "overall I think we should

8    be very careful about doing this in terms of the confusion it will create"); JTX-

9    801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the

10   collections coexist" because "they are the same art" and "same logos"); JTX-801.279

11   (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will

12   not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo

13   "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third

14   party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people

15   will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to

16   Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002

17   (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is

18   where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16

19   (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the

20   Bored Ape Yacht Club made by Yuga Labs). Defendants intentionally use the BAYC

21   Marks to infringe.

22   **Defendants' Objection Improperly Contradicts Facts Stipulated To In The**

23   **Pre-Trial Conference Order:**  Defendants' objection contradicts their own

24   stipulations in the proposed pre-trial conference order. *See* Dkt. 320-1 at 13. In that

25   order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club

26   NFT collection and owner of the BAYC Marks. *Id.* at 2-3. Defendants further

27   admitted that "[t]he Court has determined that Defendants infringed the BAYC

28

1    Marks" and "that Defendants' registration and use of the domain names

2    https://rrbayc.com and https://apemarket.com constituted cybersquatting under the

3    Anti-Cybersquatting Consumer Protection Act." *Id.* at 13.  As such, Defendants have

4    waived their right to now argue that they were not liable for infringing upon Yuga

5    Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle,*

6    *652 F.2d 882, 886 (9th Cir. 1981)* ("[N]or may a party offer evidence or advance

7    theories at the trial which are not included in the [pre-trial conference] order *or which*

8    *contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability

9    after admitting to it clearly contradict the terms of the pre-trial conference order.

10   Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive

11   litigation tactic that unjustifiably increases the cost of resolving this case.  Defendants'

12   actions again make this an exceptional case.  The Court should reject Defendants'

13   objection.

14                       **Defendants' Reply:**

15           Defendants do not dispute that this Court has entered summary judgment in this

16   case.  However, in their summary judgment briefing, Defendants made clear that there

17   is a material evidentiary dispute regarding Defendants intent and knowledge and

18   Defendants reserve the right raise this issue for purposes of determining remedies, on

19   appeal, and in all other proceedings involving the BAYC marks.  Defendants are not

20   asking that this Court reconsider its holding, because this under the law of the case

21   doctrine this Court has not made a holding on Defendants' intent for purposes of

22   determining availability of disgorgement as a remedy (including Defendants' mental

23   state as applied to disgorgement), apportionment, and an exceptional case analysis.

24   The "law of the case doctrine does not apply to pretrial rulings *such as motions for*

25   *summary judgment*." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)*

26   (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)*

27   ("Pretrial rulings, often based on incomplete information, don't bind district judges for

28

1  the remainder of the case.  Given the nature of such motions, it could not be

2  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

3  an issue were decided at summary judgment for one purpose, the summary judgment

4  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

5  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

6  of initial police contact was relevant as background, but not to the already decided

7  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

8  summary judgment ruling on intent is limited to infringement and cannot be applied

9  more broadly.

10  Additionally, Yuga's reference back to its responses in *supra* ¶ 4 do not provide

11  adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons

12  provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in

13  support of their objections), the evidence showed that Defendants did not act with

14  intent to cause confusion or to infringe.  Defendants' reply in *supra* ¶ 4 similarly

15  explains that (1) this Court's summary judgment cannot be used to support a finding

16  of fact a trial, (2) Defendants did not intend to confuse consumers, (3) Defendants'

17  intent was to protest and criticize Yuga, (4) Defendants' disclaimer evidence

18  Defendants' good faith attempt to creating protest art and decreasing any likelihood of

19  confusion, (5) Defendants took many steps to avoid confusion including through the

20  use of an artistic statement, disclaimer, and Twitter activity critical of Yuga, (6) Yuga

21  surrendered to the world "all IP rights" associated with the Bored Ape Yacht Club, (7)

22  Mr. Hickman was a BAYC holder that officially received the transfer of "all IP right"

23  that Yuga had made, (8) Defendants did not intend to profit off confusion as the

24  record shows they took many steps to avoid confusion and there is ample evidence of

25  **no** actual confusion, (9) Mr. Solano is not a credible witness given his many false

26  statements and his admission at trial that he testified falsely, and (10) the trial revealed

27  that there is no evidence of a confused purchaser of RR/BAYC NFTs.

28

Yuga also (1) fails to show that it has not mischaracterized and misrepresented the trial evidence and (2) incorrectly argues that Defendants "admitted" infringement in the pre-trial conference order.

**First,** with regards to the evidence that Yuga mischaracterizes, Yuga now points to Defendants interrogatory responses.  But nowhere in those response did Defendant state that they created the RR/BAYC collection intentionally to infringe trademark rights or to cause confusion.  And, as explained in the deposition, Mr. Ripps's deposition testimony is only a description of RR/BAYC and not any admission regarding intentional use of any modified marks to cause infringement or confusion.   Similarly, as explained in the Defendants' objection, Yuga has taken the statements made in various documents out of context, such as in JTX-801, JTX-44, and Mr. Hickman's deposition designations.

**Second,** Defendants have never stipulated or admitted to intentional infringement or intentionally trying to cause confusion.  Defendants hotly disputed this topic at summary judgment (*see* Dkt. 163) and at trial.  Yuga ignores this clear record and instead attempts to mischaracterize the Court record by citing to the pre-trial conference order.  But **nowhere** in the pre-trial conference order did Defendants state that they intentional infringed or intentionally caused confusion.  Section 6 of the order contains all stipulated facts and those stipulated facts include only that Yuga released the BAYC collection and various facts about Defendants' activities associated with the RR/BAYC collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts section, but this section again does not contain any admissions regarding "ownership" of the marks.  Rather it merely identifies the asserted marks at issue for the remedies trial—something that Defendants admitted in light of the scope of the remedies trial and to ease this Court's work in adjudicating the remaining issues.  Dkt. 32-1 at 2-3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that Defendants infringed the BAYC Marks" and

1   similarly with regard to "Defendants' registration and use of the domain names
2   https://rrbayc.com and https://apemarket.com." Dkt. 320-1 at 13. But again, this is
3   not an admission of intentional infringement, it is a statement regarding the procedural
4   history in this case that explains that the scope of trial is limited to remedies and does
5   not include infringement. Had Defendants wanted to stipulate to intentional
6   infringement, they would have clearly and expressly done so—they have not.
7   Defendants reserve the right to dispute intent on appeal and in any other proceedings
8   involving the BAYC marks.

9   **Plaintiff's Disputed Post Trial Finding of Fact No. 7(c), lines 3:16-17:**

10   Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks, which
11   Defendant Ripps intentionally coded into the smart contract, and many of the
12   associated images contained the BAYC Marks. Dkts. 342 ¶36; 337 (Atalay Decl.) ¶¶2-
13   6 (admitted into evidence in Dkt. 392 at 125:22-126:11); JTX-600; JTX-687; JTX-
14   688; JTX-1146.

15   **Defendants' Basis of Dispute:**

16   The evidence at trial did not show that Defendants intentionally coded into the
17   RR/BAYC smart contract the asserted marks and the Bored Ape images. Mr. Ripps's
18   uncontested declaration explains that the idea behind the RR/BAYC collection arose
19   when the NFT community asked Mr. Ripps to mint RR/BAYC NFTs after observing a
20   public exchange between Mr. Ripps and Mr. McNelis where Mr. Ripps used NFTs to
21   demonstrate provenance by using verifiably unique NFTs to point to the same digital
22   images. Ripps Decl. ¶ 73-81 (Dkt. 346) (uncontested). Further, RR/BAYC NFTs do
23   not have "coded in" digital ape images but instead have digital pointers to bored ape
24   images that "are public" and "available for anyone to navigate to on the Internet."
25   Trial Tr. [Hickman] 222:15-16. Mr. Ripps's creation of these verifiably unique NFTs
26   with digital pointers to public images did not involve any activities suggesting

27

28

1  intentional infringement but instead show Defendants' belief that they were engaging
2  in artistic commentary.

3      The evidence that Yuga relies on does not show that Defendants coded the
4  RR/BAYC project to intentionally infringe on the asserted marks.  For example, Yuga
5  cites to the unreliable Declaration of Greg Solano, specifically pointing to a paragraph
6  contain bare allegations not rooted in any of Mr. Solano's personal knowledge to
7  argue that Defendants engage in activities of intentional infringement.  Mr. Solano's
8  testimony is not credible given the many false and misleading statements contained in
9  his declaration.  For example, Mr. Solano was also forced to concede on cross
10  examination that his sworn declaration included a false statement claiming that
11  "Defendants continue to receive royalties or creator fees from sales on secondary
12  marketplaces."  Trial Tr. [Solano] 48:15-49:4.  Mr. Solano also relied on the phrase
13  "business venture" in Mr. Lehman's declaration, without having considered that the
14  phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman
15  would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also
16  relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew
17  he could not settle his case without executing a declaration concerning matters of
18  Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his
19  family at the time he signed his declaration, because Yuga's lawsuit against him
20  would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.
21  [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated
22  impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't
23  even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A
24  Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a
25  deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same
26  oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up
27  on the screen -- at page 152, starting at line 13 'QUESTION:  Was the Bored Ape V3

28

1  created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER:  I
2  don't know.' Was that your testimony at your deposition? A Yes." ); *id*. at 34:9-19
3  ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market
4  from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through
5  6. 'QUESTION:  Do you know whether Ape Market exists? 'ANSWER:  I don't
6  recall.' Were you asked that question, and did you give that answer? A Yes.").

7        Yuga's citation to the Declaration of Mr. Atalay also fails to show intentional
8  infringement because Mr. Atalay lacks personal knowledge regarding the creation of
9  the RR/BAYC project and of Defendants' intent.  Further, the paragraphs of Mr.
10 Atalay's declaration that Yuga cites discusses how Etherscan (a third-party website)
11 display the RR/BAYC contract on the Ethereum network in part by using a token
12 tracker or token name.  Atalay Decl. ¶¶ 4-6.  But Defendants have no control over the
13 Etherscan website, what it displays, and how it chooses to show the RR/BAYC
14 collection.  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do
15 not use Etherscan's token tracker/token name but instead rely on marketplaces or by
16 checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr.
17 Atalay explained that using token names to distinguish NFTs "would be a fairly weak
18 way to do so because often those things are mutable.  They can be changed after the
19 fact.  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

20       The corresponding exhibits that Yuga cited also fail to show any such intent.
21 JTX-600 and JTX-1146 are printouts of "Etherscan" pages that identify "*ryder-
22 ripps.eth" as the creator of the RR/BAYC collection.  Etherscan is a third-party
23 website that Defendants have no control over.  Defendants have no say in the
24 activities of Etherscan and Yuga has made no efforts to ask Etherscan to change how
25 it displays content on its website.  JTX-687 and JTX-688 are merely bored ape images
26 that Yuga does not own and are, in fact, public domain images that anyone one the

27
28

internet can navigate to and use.  None of these exhibits suggests that Defendant created the RR/BAYC smart contract to intentionally infringe the asserted marks.

**Plaintiff's Response:**

Defendants' objection should be rejected for the same reasons discussed *supra* ¶ 7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to cause confusion, (3) Defendants' commercial infringement was not protected "art," (4) Defendants' "disclaimer" did not dispel likelihood of confusion, (5) Defendants took no steps to avoid confusion in the marketplace, (6) Yuga Labs did not authorize Defendants' infringement and, to the contrary, had implemented a robust enforcement program to shut down infringers like Defendants, (7) Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (8) Defendants' fail to impeach Mr. Solano's credible testimony, and (9) Defendants intended to profit off of their infringement.

Additionally, as described below, Defendants' objection should be rejected because (1) Defendants' characterization of the evidence is unpersuasive, (2) Defendants misrepresent Mr. Atalay's testimony, (3) Defendants coded the smart contract to cause Etherscan and other websites to attribute Defendants' NFTs to Yuga Labs, (4) that attribution is immutable, and (5) the Bored Ape Yacht Club images are not public.

**Defendants' Characterization Of The Evidence In This Objection Is Incorrect:**  It is undisputed that Mr. Ripps created the RR/BAYC smart contract, and that the marks "Bored Ape Yacht Club" and "BAYC" are immutably coded into the smart contract.  *See* JTX-600; *see also* (Atalay Decl.) ¶¶2-6 (admitted into evidence in Dkt. 392 at 125:22-126:11).  Mr. Ripps does not deny this fact.  And Defendants' vague, unsupported assertion that someone other than Mr. Ripps put those terms into the smart contract that Mr. Ripps created is contrary to the evidence and is not

credible.  Indeed, their assertion is contradicted by their own objection, where Defendants admit that JTX-600 "is an Etherscan page recording a transaction between Mr. Ripps and Foundation."  *Infra* ¶ 7(e).

The reason Mr. Ripps is unwilling to directly admit the obvious—that he typed "Bored Ape Yacht Club" and "BAYC"—is because this fact disproves the lie that Mr. Ripps tried to use his name "whenever possible" (*see infra* Defendants' response to ¶ 7(e)).

**Defendants Misrepresent Mr. Atalay's Testimony:**  Mr. Atalay's testimony does not say "that consumers of NFTs do not use Etherscan's token tracker/token name" as Defendants attribute to it.  What Mr. Atalay actually testified is that "for the average person who is not an expert in blockchain technology," viewing NFTs on a marketplace such as OpenSea "is probably the most straightforward way to distinguish two NFTs."  Trial Tr. at 135:5-10.  And, Mr. Atalay testified that users on such secondary markets typically refer to the token name to identify NFTs.  Trial Tr. at 132:3-5 ("Q  And you also agree that the NFT community uses the token name when it's buying on secondary markets; correct?" / "A  Yes.");  *see also* JTX-1558 (tweet from third party stating "If you were curious to see how malicious this scam is, check out the token tracker/ID name that he chose to use on the smart contract. This is a critical piece of data the NFT community uses when they are buying on the secondary market.").  Even if a consumer were to view an RR/BAYC on OpenSea they would still be confused because listings for RR/BAYC NFTs were virtual identical to a listing for an authentic Bored Ape Yacht Club NFT.  *See* JTX-686.

**Defendants Caused Sources Such As Etherscan To Identify Their Infringing NFTs With The BAYC Marks:**  Defendants say that the evidence at trial shows they were not responsible for token trackers such as Etherscan's identifying Defendants' NFTs with the BAYC Marks.  There is no such evidence to support this argument, and Defendants cite none.  JTX-600 shows "Bored Ape Yacht Club" and

1  "BAYC" coded into the RR/BAYC smart contract as source identifiers, and

2  Defendants admit that JTX-600 "is an Etherscan page recording a transaction between

3  Mr. Ripps and Foundation."  *Infra* ¶ 7(e).  In other words, Mr. Ripps admits that he

4  launched the smart contract with the BAYC Marks coded into it, which caused

5  websites such as Etherscan to confusingly display those marks to the public as if the

6  smart contract was created by Yuga Labs.  These marks can never be removed from

7  the smart contract, causing hyperlinks and other references to the collection to display

8  the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  And

9  despite Mr. Ripps testimony that he minted the RR/BAYC NFTs to his "personal

10 wallet, ryder-ripps.eth," the "ryder-ripps.eth" name did not appear on Etherscan until

11 *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.

12 Defendants therefore caused their infringement of Yuga Labs' marks to be an inherent

13 and unchangeable part of their NFT collection, in turn causing third party systems and

14 observers to confusingly associate the two, resulting in more downstream marketplace

15 confusion.  The permanent existence of Yuga Labs' marks in association with the

16 RR/BAYC smart contract is why, like a domain name, the smart contract should be

17 transferred to Yuga Labs so that Yuga Labs can retain some control of the use of its

18 their marks.

19     **The RR/BAYC Smart Contract Is Immutably Linked To Yuga Labs:**

20 Defendants' assertion regarding mutability of token trackers is immaterial and

21 misleading because the token tracker for Defendants' infringing NFTs is not

22 "mutable."  Indeed, in response to the question directly after the response cited in

23 Defendants' objection, Mr. Atalay explained that "[i]n this particular instance, upon

24 inspection of the Foundation smart contract that was used to deploy the RR/BAYC

25 smart contract, it's evident that these are not mutable fields in this particular instance.

26 So this isn't entirely relevant."  Trial Tr. at 134:1-8.  Mr. Solano testified to the same

27 in his trial declaration.  Solano Decl. (Dkt. 342) at ¶ 80 ("My understanding is that

28

1  Defendants cannot change the name of their Etherscan contract bearing the BAYC

2  Marks, nor can the RR/BAYC smart contract be destroyed."). Thus, the RR/BAYC

3  smart contract will display "Bored Ape Yacht Club" and "BAYC" as the contract

4  name and the contract symbol, respectively, in perpetuity, and without a transfer of the

5  smart contract to Yuga Labs, confusion from Defendants infringing NFTs will

6  continue. *Id.* ("By transferring the RR/BAYC smart contract to Yuga Labs, the

7  Defendants' association with the BAYC brand will no longer be 'forever' as Mr.

8  Ripps proclaimed it would be."). Therefore, as Mr. Atalay testified, this misleading

9  counterfactual is neither relevant nor material.

10      **The Bored Ape Yacht Club Images Are Not Public:** Yuga Labs' Bored Ape

11  Yacht Club images are not available for "public" ownership. While anyone may ***view***

12  a Bored Ape Yacht Club NFT and the associated image (like any image on the

13  internet), Yuga Labs goes to great lengths to combat the unauthorized use of its marks

14  and images. *See* Trial Tr. at 82:1-2 (Ms. Muniz testifying that Yuga Labs has "a

15  pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a

16  million dollars a year doing it."). Further, this objection is immaterial because this is

17  a case for trademark, not copyright, infringement. And even so, the Court has already

18  held that Defendants' direct appropriation of Yuga Labs' images favored a finding

19  that there was a likelihood of confusion. SJ Order (Dkt. 225) at 11 ("Indeed,

20  Defendants are selling the exact same product – NFTs that point to Yuga's BAYC

21  images – and Defendants marketed their RR/BAYC NFTs using the same

22  corresponding Ape ID number used by Yuga for the BAYC NFTs. Accordingly, the

23  second *Sleekcraft* factor weighs in favor of Yuga."). Thus, regardless of whether the

24  Bored Ape Yacht Club images are viewable by the public, it is impermissible to sell

25  infringing NFTs using Yuga Labs' marks and creating a likelihood of confusion. This

26  objection should be rejected as misleading and immaterial.

27      **<u>Defendants' Reply:</u>**

28

Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed that Defendants did not act with intent to cause confusion or to infringe.  Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) Defendants did not intend to confuse consumers, (3) Defendants' intent was to protest and criticize Yuga, (4) Defendants' disclaimer evidence Defendants' good faith attempt to creating protest art and decreasing any likelihood of confusion, (5) Defendants took many steps to avoid confusion including through the use of an artistic statement, disclaimer, and Twitter activity critical of Yuga, (6) Yuga surrendered to the world "all IP rights" associated with the Bored Ape Yacht Club, (7) Mr. Hickman was a BAYC holder that officially received the transfer of "all IP right" that Yuga had made, (8) Mr. Solano is not a credible witness given his many false statements and his admission at trial that he testified falsely, and (9) Defendants did not intend to infringe or otherwise profit off infringement, but were instead creating a satirical collection aimed at protesting Yuga.

Yuga's additional responses to this objection similarly fail because (1) Yuga has mischaracterized and misrepresented the trial evidence and (2) that Mr. Atalay's testimony is clear that token trackers do not matter, (3) Defendants did not cause Etherscan and other website to attribute RR/BACY to Yuga, and (4) the undisputed evidence shows that BAYC images are public.

***First,*** as explained in Defendants' objection, Yuga has mischaracterized documents to improperly suggest that Mr. Ripps coded the RR/BAYC smart contract to "intentionally" infringe or cause confusion.  The Etherscan pages that Yuga cites (JTX-600 and JTX-1146) clearly identify Mr. Ripps as the creator of the RR/BAYC

contract and the Bored Ape images that Yuga cites (JTX-687 and JTX-688) are public images that are not contained in the RR/BAYC contract.

Moreover, Mr. Ripps's uncontested declaration explains that the idea behind the RR/BAYC collection arose when the NFT community asked Mr. Ripps to mint RR/BAYC NFTs after observing a public exchange between Mr. Ripps and Mr. McNelis where Mr. Ripps used NFTs to demonstrate provenance by using verifiably unique NFTs to point to the same digital images.  Ripps Decl. ¶ 73-81 (Dkt. 346) (uncontested).  Mr. Ripps's creation of these verifiably unique NFTs with digital pointers to public images did not involve any activities suggesting intentional infringement but instead show Defendants' belief that they were engaging in artistic commentary.

*Second,* Mr. Atalay clearly and unequivocally testified at trial that token trackers/token names are not used to identify NFTs.   If there was anything wrong with Mr. Atalay's admission, then Yuga should have rehabilitated the witness on re-direct.  Yuga did not, because Mr. Atalay's admission is clear.  He admitted that using token names or token trackers to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.  Indeed, as Mr. Atalay admitted, consumers of NFTs rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.

*Third,* Defendants did not cause Etherscan and other websites to attribute the RR/BAYC collection to Yuga.   Mr. Ripps explained, in his uncontested declaration, that the smart contract was coded so that it would be specifically attributable to him through his personal smart wallet and identify a unique smart contract address:

> 89.    The RR/BAYC collection was minted from my personal Ethereum blockchain "wallet," ryder-ripps.eth, was located at a unique "contract" address, and was minted on different dates and with different token IDs than Yuga's Bored Ape Yacht Club NFTs.

Ripps Decl. ¶ 89 (Dkt. 346). This information was always coded into the RR/BAYC contract, giving any third party a surefire way to know that RR/BAYC NFTs were created by Mr. Ripps and not by Yuga.

Third party websites, such as Etherscan, always displayed the RR/BAYC collection in a manner that disclosed Mr. Ripps's unique personal wallet (either by name or by alphanumeric code verifiable on Etherscan itself) and also disclosing the unique smart contract address for the RR/BAYC collection. As Mr. Atalay admitted, it is the unique smart contract address that is critical to identifying NFTs. Trial Tr. [Atalay] 135:2-25. Moreover, it is undisputed that Defendants do not own or operate Etherscan or any of the other third-party websites that displayed information about RR/BAYC NFTs. Defendants cannot be responsible for the actions of third parties, especially when the code for the RR/BAYC collection provided to all third parties a definite source identifier and a verifiably unique smart contract address.

**Fourth,** The RR/BAYC collection is not immutably linked to Yuga. In fact, it is not linked to Yuga at all. As explained in Mr. Ripps's uncontested declaration, the RR/BAYC collection contains in its permanent code that it was minted from Mr. Ripps's wallet and contains a verifiably unique smart contract address (Ripps Decl. ¶ 89 (Dkt. 346)), which permanently and definitively identifies that RR/BAYC was created by Mr. Ripps and not Yuga.

**Fifth,** the evidence at trial showed that the BAYC digital images are public. Mr. Hickman's unrebutted trail testimony explained that the images are public, which is why it is possible for RR/BAYC and many other NFT collection to point to those digital images:

THE COURT:  When you are selling defendants' NFTs, you are selling Yuga's images.

THE WITNESS:  *No. We are selling the record.*

| | | |
|---|---|---|
| THE COURT: | Okay.  But the record points to and displays those images. | |
| THE WITNESS: | **_So the images are public._**  They are available for anybody to navigate to on the Internet. | |
| THE COURT: | Right | |
| THE WITNESS: | **_We are selling a receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to_** including Yuga Labs pointing to the same resource. | |

Trial Tr. [Hickman] 222:10-22 (emphasis added).   Yuga elected to not cross-examine Mr. Hickman on this testimony that the BAYC images are readily accessible and usable by anyone with internet.  Further. Yuga presented no evidence at trial to rebut or contest this testimony—and Yuga's counter-factual arguments after the matter cannot serve a basis for ignoring the clear trial evidence on this issue.  Moreover, as Mr. Hickman clarified to this Court, Defendants are not selling images but instead are selling a record on the blockchain associated with Defendants' and their protest of Yuga and its use of offensive imagery.

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(d), lines 3:20-23:**

"Defendants are selling the exact same product – NFTs that point to Yuga Labs' BAYC images – and Defendants marketed their RR/BAYC NFTs using the same corresponding BAYC Ape ID number used by Yuga Labs for the BAYC NFTs." SJ Order at 11; Dkts. 342 ¶37; 392 at 56:3-10, 221:16-222:24; 396 at 169:4-6, 184:14-186:19; JTX-44.2; JTX-669; JTX-686.

**Defendants' Basis of Dispute:**

The evidence at trial showed that the RR/BAYC collection is not the "exact same product" as Yuga NFTs and is more accurately described as antithetical or the

opposite of Yuga's NFTs.  The RR/BAYC project was created as a form of satire intended to protest NFTs linked to what defendants believed were antisemitic or racist imagery.  Ripps Decl. ¶¶ 87-94 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 97-103 (Dkt. 344); Hickman Decl. ¶¶ 62-66 (Dkt. 345).  The RR/BAYC NFTs included verifiably unique NFTs with digital pointers to Bored Ape images, which "are public" and "available for anyone to navigate to on the Internet."  Trial Tr. [Hickman] 222:15-16. The RR/BAYC NFTs were effectively a "receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to including Yuga Labs."  Trial Tr. [Hickman] 222:18-21.

Defendants' internal communications confirm that RR/BAYC NFTs were the opposite products of Yuga's NFTs.  For example, Mr. Ripps pointed out at JTX-801 that RR/BAYC "doesn't impact Yuga" and that "the clients buying rrbaycs are legit the opposite [of clients buying BAYC NFTs]."  JTX-801-376; Hickman Decl. ¶ 95(b) (Dkt. 345).  And reserving of RR/BAYC NFT on rrbayc.com, where more than 80% of reservations occurred, required reading a clicking through a disclaimed stating that "By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary."  Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086.

Yuga also fails to cite adequate evidence in support of its incorrect allegation that RR/BAYC NFTs are the exact same product as Yuga NFTs.  First, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it

1   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

2   ***aspects*** of an issue were decided at summary judgment for one purpose, the summary

3   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

4   0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

5   evidence of initial police contact was relevant as background, but not to the already

6   decided issue that initial contact was not excessive force).  This case is just like

7   *Sienze*: the summary judgment ruling regarding RR/BAYC NFTs applies only to the

8   issue of infringement and is not adequate support for this issue as applied to

9   availability of disgorgement as a remedy (including Defendants' mental state as

10  applied to disgorgement), apportionment, and an exceptional case analysis.

11      Yuga also cites the unreliable Declaration and trial testimony of Greg Solano to

12  argue that RR/BAYC NFTs are the same product as Yuga's NFT.  Tellingly, the

13  portions of Mr. Solano's testimony that Yuga cites completely ignores the many

14  aspects of RR/BAYC NFTs that were unique, such as their verifiable uniqueness on

15  the Etherscan blockchain, the satirical commentary the NFTs raised, how Defendants

16  presented RR/BAYC NFTs in the market (on Twitter and rrbayc.com) as protest art

17  that criticizes Yuga.  Moreover, Mr. Solano is not credible given the many false and

18  misleading statements contained in his declaration.  For example, Mr. Solano was

19  forced to concede on cross examination that his sworn declaration included a false

20  statement claiming that "Defendants continue to receive royalties or creator fees from

21  sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4.  Mr. Solano also

22  relied on the phrase "business venture" in Mr. Lehman's declaration, without having

23  considered that the phrase "business venture" was selected by Yuga's counsel, and

24  that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.

25  Mr. Solano also relied on Mr. Lehman's declaration without having considered that

26  Mr. Lehman knew he could not settle his case without executing a declaration

27  concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

28

1   Lehman was afraid for his family at the time he signed his declaration, because
2   Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr.
3   Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a
4   result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-
5   33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder
6   Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we
7   could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to
8   tell the truth, same oath as today; right? A Yes. Q If we look at your deposit–n -- and
9   we can pull it up on the scr–n -- at page 152, starting at line 13 'QUESTION:  Was the
10  Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel.
11  'ANSWER:  I don't know.' Was that your testimony at your deposition? A Yes." ); *id.*
12  at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for
13  Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116,
14  lines 5 through 6. 'QUESTION:  Do you know whether Ape Market exists?
15  'ANSWER:  I don't recall.' Were you asked that question, and did you give that
16  answer? A Yes.").

17      Yuga also misleadingly cites to the trial testimony of Mr. Hickman to argue that
18  RR/BAYC NFTs were the same products as Yuga's NFTs because they point to the
19  same digital images.  But Mr. Hickman made clear during trial that (1) RR/BAYC
20  NFTs do not involve the sale of digital images, (2) there are numerous other NFT
21  collections that point to the Bored Ape digital images, and (3) the Bored Ape digital
22  images are public and not owned by Yuga:

23  THE COURT:          When you are selling defendant's NFTs, you are selling
24                      Yuga's images.

25  THE WITNESS:        ***No. We are selling the record.***
26
27  THE COURT:          Okay.  But the record points to and displays those images.

28

1

2

   THE WITNESS: ***So the images are public.***  They are available for anybody to navigate to on the Internet.

3

   THE COURT: Right

4

5

6

   THE WITNESS: ***We are selling a receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to*** including Yuga Labs pointing to the same resource.

7

8

Trial Tr. [Hickman] 222:10-22 (emphasis added).

9

   Yuga also cites to Mr. Ripps's deposition designation, but again refers to

10

deposition testimony that does not show the RR/BAYC NFTs are the same product.

11

For example, Yuga cites to Dkt. 396 at 396 at 169:4-6 in which Mr. Ripps testifies

12

about his conversation with someone reserving a RR/BAYC NFT and asking for an

13

NFT that points to a particular Bored Ape image.  In the counter-designation, Mr.

14

Ripps explains that this consumer is reserving an RR/BAYC NFT for the purpose of

15

protesting Yuga and not to have the same product of a Yuga NFT:

16

17

18

   … she's someone who – says right there.  ***She's a survivor***, she's someone who is – is in favor of decentralize.  ***You see the emoji with the fist***.  So this is someone who is very much a part, I think, of this speech and movement that RR/BAYC is within.

19

20

Dkt. 396 at 169:21-25 (emphasis added).  Mr. Ripps also explains that his

21

understanding is that this participate was likely interested in a RR/BAYC NFT

22

pointing to a particular public bored ape image due to its offensive content:

23

24

25

26

27

   … it's a specific one and she is within the community that I am in as well, that there is specific really disgusting, vile aspects to that.  Maybe it has Prussian helmet, maybe it has a sushi chef headband that actually says "kamikaze" and she wants that to be solidified and looked at an – and – and interrogated more, with more scrutiny.  So perhaps that's why she wanted that specific Bored Ape Yacht Club image and that's why she wanted to create a new mint of it.

28

Dkt. 396 at 169:8-17.  Again, this testimony confirms that purchasers of RR/BAYC NFTs are the exact opposite of purchasers of Yuga NFTs, and that the NFT collections themselves are also the exact opposite.

Similarly, the counter-designation to Yuga's citation to Dkt. 396 at 184:14-186:19 makes clear that the two NFT collection are not the same product.  Mr. Ripps testified that "I feel like I've – you know, we've spoken now for, like, four hours, and I feel like I've kind of laid out what the artwork of RR/BAYC is.  It's many things: It's an NFT; it's a performance; it's a statement.  So it's – it's a lot of things."  Dkt. 396 at 193:8-13.  Critically, Yuga's NFTs are not a performance or a statement.

The exhibits to which Yuga cites similarly fail to show that RR/BAYC NFTs are the same as Yuga NFTs.   JTX-44 is an internal communication in which Mr. Hickman discusses how RR/BAYC NFTs have different IDs than Yuga's NFTs. JTX-669 is a Twitter post from Mr. Ripps saying that he will mint RR/BAYC NFTs for .1 ethereum, which is price that is nearly 1/1,000th of the price Yuga NFTs sold for.  And JTX-686 is a document that Yuga's attorneys created for purposes of this litigation (Trial Tr. [Solano] 46:9-11) and involves cropped images of an unidentified third-party selling an RR/BAYC NFT in manner that labels the sale with "RR/BAYC" (Trial Tr. [Solano] 46:16-24; *see* JTX-686).

**Plaintiff's Response:**

Defendants dispute an exact quote from the Court, underscoring their bad-faith efforts to multiply the cost of this litigation by rehashing decided issues.

Defendants' objection should be rejected for the same reasons discussed *supra* ¶ 7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) Defendants' infringement was not an art project, (3) Yuga Labs' Bored Ape Yacht Club images are not public, (4) Yuga Labs did not authorize Defendants' infringement and, to the contrary, had implemented a robust enforcement program to

1    shut down infringers like Defendants, and (5) Defendants failed to impeach Mr.
2    Solano's accurate testimony.

3        Additionally, as described below, Defendants' objection should be rejected
4    because (1) Defendants' definition of an NFT is artificially narrow, (2) actual
5    confusion is not necessary and post-sale confusion is actionable, (3) Defendants sold
6    their NFTs at the same price that Yuga Labs has sold its NFTs, and (4) Defendants'
7    cherry-picked communications with alleged consumers does not negate the confusion
8    in the marketplace.

9        **Defendants' Definition Of An NFT Is Too Narrow:**  An NFT is more than
10   merely a proof of ownership.  The Court has already found as much on Yuga Labs'
11   Motion for Summary Judgment, for example, writing that "viewing the NFTs as
12   ownership receipts treats the NFTs as mere written instructions while ignoring their
13   documented commercial value."  SJ Order (Dkt. 225) at 7.  NFTs are sold
14   "specifically for their connection to a particular brand, creator, or associated creative
15   work."  *Id.* at 8.  Moreover, "'individuals do not purchase NFTs to own a digital deed
16   divorced from any other asset; they buy them precisely so that they can exclusively
17   own the content associated with the NFT.'"  *Id.* (quoting  *Hermès International v.*
18   *Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023))
19   (cleaned up).

20       The evidence introduced at trial also establishes that Defendants' definition of
21   an NFT is too narrow.  Mr. Solano explained that NFTs "are units of data stored on a
22   blockchain that are created to transfer ownership of either physical things or digital
23   media—here digital images of cartoon apes. The term 'NFT' commonly refers to both
24   the token stored on the blockchain and the digital image with which it is associated."
25   Solano Decl. ¶ 2 n 1.  And Mr. Solano further testified that purchasers of BAYC NFTs
26   purchased for different reasons, including how the BAYC NFT image resonated with
27   them, showing that for some people an NFT includes the image associated with it.  *Id.*

28

¶ 12.  Mr. Atalay also testified that there is "probably more that you could say than that…" in reference to Defendants' limited definition.  Trial Tr. at 127:9-13.  Mr. Atalay went on to explain that NFTs include metadata and other data that is not metadata but may be on the blockchain.  *Id.* 128:8-24.

**Post-Sale Confusion Supports The Court's Finding That Confusion Is Likely:**  There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

**Whether Defendants' Infringing NFTs Often Sell For Less Than Authentic Bored Ape Yacht Club NFTs Re-Sale For Is Immaterial:**  The difference in price between re-sales of authentic Bored Ape Yacht Club NFTs and the mint price for Defendants' fakes did not prevent confusion in the marketplace.  To begin, the Court has already found a likelihood of confusion.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Nonetheless, as Mr. Solano explained, authentic Bored Ape Yacht Club NFTs were launched at a price similar to the initial price of Defendants'

1  infringing NFTs.  Trial Tr. at 58:9-11 ("The original Bored Apes sold for $200.  And
2  we've done other sales over the past two years that are for lower prices."); *see also*
3  Solano Decl. (Dkt. 342) at 4 ("We initially sold each BAYC NFT for .08 Ether, which
4  was approximately $169 to $236 USD, based on the price of Ether at the time.").
5  Therefore, that some Bored Ape Yacht Club NFTs re-sell for larger sums is
6  immaterial – those consumers who might know the re-sale price of an authentic
7  BAYC also likely know there is a history of these NFTs selling for prices near the
8  initial sales price of Defendants' infringing NFTs.  Consumers could be, and indeed
9  were, confused.

10        **Defendants' Third-Party, Unreliable Communications Do Not Negate The
11  Court's Findings Or Yuga Labs' Experts' Opinions:**  Defendants' cherry-picked
12  communications from a self-selecting group are far from a comprehensive survey of
13  consumer confusion in the market.  Defendants have no evidence supporting a claim
14  that a statistically significant number of consumers were not confused.  Indeed, the
15  hundreds of refunds they provided at consumers' requests suggest that some
16  purchasers were confused.  *See, e.g.*, Kindler Decl. (Dkt. 338) ¶ 44.  At least some of
17  those hundreds of refund demands could have been from confused consumers who
18  "weren't going to, you know, raise their hand and shout about it."  Trial Tr. at 54:10-
19  16.  Moreover, they ignore the ample confusion on Twitter and other sources that
20  Yuga Labs identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-
21  701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034;
22  JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl.
23  (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶
24  13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-
25  54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at
26  ¶¶ 4-7.  Defendants were aware of the confusion.  JTX-801.371 (Cahen to Ripps:  "per
27  our attorney we may just need to change the skull / If we want to fight trademark");
28

---

1    JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about
2    doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman
3    informing Mr. Cahen that it was "difficult to make the collections coexist" because
4    "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to
5    potential customers as "SHEEPLE" and writing, "Ppl will not read the contract");
6    JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered
7    confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr.
8    Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking
9    they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the
10   need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman
11   stating, "people believe the tokenId should match the RR ID. that is where they get
12   confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying
13   "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape
14   Yacht Club made by Yuga Labs; Cahen Depo. Designations (Dkt. 395) at 59:7-59:16
15   (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is
16   complicated.  A lot of people don't have the technical expertise or knowledge to be
17   able to have a conversation about crypto technology and blockchain technology."), at
18   148:10-13 (testifying it is "very common" for people to refer to NFT collections by
19   the token tracker).
20         Yuga Labs' survey evidence demonstrated significant confusion among
21   consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with
22   Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48,
23   73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the
24   evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated
25   with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-
26   sale confusion.  Moreover, there is no reliable evidence in the record that the
27
28

1  individuals identified in the cited emails, or all other purchasers, are "collectors" as

2  Defendants contend.

3                   **<u>Defendants' Reply:</u>**

4       Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate

5  grounds to accept Yuga's erroneous proposed finding of fact.  For reasons provided in

6  *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their

7  objections), the evidence showed that RR/BAYC NFTs are not the exact same as

8  Yuga's NFTs.  Additionally, Defendants' reply in *supra* ¶ 4 similarly explains that (1)

9  this Court's summary judgment cannot be used to support a finding of fact a trial, (2)

10  Defendants did not intend to confuse consumers, (3) Defendants' intent was to protest

11  and criticize Yuga, (4) Yuga surrendered to the world "all IP rights" associated with

12  the Bored Ape Yacht Club, and (5) Mr. Solano is not a credible witness given his

13  many false statements and his admission at trial that he testified falsely.

14       Yuga's additional responses to this objection similarly fail because (1)

15  Defendants use the definition of NFTs advance by both Mr. Atalay and Mr. Hicman,

16  (2) none of Defendants profits were attributable to confusion, (3) Defendants did not

17  sell RR/BAYC NFTs as the same price as Yuga NFTs, (4) and Defendants did not

18  "cherry-pick" communications from actual RR/BAYC purchasers.

19       ***First,*** Yuga incorrectly argues that an NFT is more than just a certificate of

20  ownership of unique data on a blockchain (which is essentially a digital spreadsheet).

21  Yuga's contention is inconsistent with the trial record.   Yuga's Chief Technical

22  Officer was asked to explain to the Court what an NFT is, and he confirmed it is a

23  certificate of ownership:

24

25        Q.    An NFT is an on-chain representation of ownership; right, sir?

26        A.    ***I would say that's accurate.***  There's probably more that you could

27                 say than that, but that's generally accurate, yeah.

28

---

Q.     It's ownership of a unique piece of data; right, sir?

A.     *Yes.*

Trial Tr. [Atalay] 127:9-16 (emphasis added).   Mr. Atalay's testimony, and the fact than an NFT is simply a certificate of ownership of data on the blockchain and does not include associated public images readily accessible and usable by anyone with internet, was further corroborated by Mr. Hickman's trial testimony:

> THE COURT:          *When you are selling defendants' NFTs, you are selling Yuga's images.*
>
> THE WITNESS:        *No.  We are selling the record*.
>
> THE COURT:          Okay.   But the record points to and displays those images.
>
> THE WITNESS:        So the images are public.   They are available for anybody to navigate to on the internet.
>
> THE COURT:          Right.
>
> THE WITNESS:        *We are selling a receipt that says I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-21 (emphasis added).

Thus, the only two engineers that testified during trial provided the Court with the same substantive testimony—that an NFT is a certificate of ownership and does not include the images that an NFT often points to.  Yuga attempts to rebut this evidence (including the testimony of its own Chief Technical Officer) by citing to the Declaration of Greg Solano.  But Mr. Solano is not credible given the many false and misleading statements contained in his declaration.

***Second,*** the trial evidence showed that there was no confusion or post-sale confusion associated with the RR/BAYC collection, meaning that none of Defendants' profits are attributable to infringement. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147;

Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

**Third,** RR/BAYC NFTs sold for approximately 1/1000th the price of Yuga's NFTs.  This drastic difference in price all but confirms that it was practically impossible for any consumers to be confused. As Mr. Cahen explained:

> At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was not even 1/1000th the price of a Bored Ape Yacht Club NFT.  A collector being confused about RR/BAYC would be akin to a consumer thinking they are able to purchase a Lamborghini that normally costs $300,000 for $300, which no person in their right mind would ever believe is possible.

Cahen Decl. ¶ 225 (Dkt. 344).

And while the significant difference in price alone was likely enough to guarantee no confusion, Defendants still took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  Defendants included an artistic disclaimer on rrbayc.com, on which over 80% of reservations occurred, explaining the artistic intent of the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Defendants also required collectors on rrbayc.com to read and click through a disclaimer acknowledging the artistic purpose of the project.  *See* Ripps Decl. ¶¶ 106-109 (uncontested); JTX-2086; Trial Tr. [Muniz]

83:10-13.  Defendants also engaged in extensive online discussion confirming and raising awareness about the satirical nature of the RR/BAYC project.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

*Fourth,* Yuga falsely states that these Defendants relies on "cherry-picked communications" from actual purchasers of RR/BAYC NFTs.   Mr. Ripps testified in his declaration: "I received *hundreds of letters* thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.

Further, Yuga's reliance on experts to make false accusations are not credible.  Yuga's citation to Ms. Kindler's declaration does not support their allegations that Defendants provided "hundreds of refunds" or that those alleged refunds indicate confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating Defendants' profits, transactions that were refunded through Defendants' RSVP smart contract were omitted. Specifically, transactions that were refunded through the RefundIssued and RSVPCanceled functions in the RSVP smart contract were not included in my calculation of profits. To my knowledge, Defendants have not produced any records

of other refunds related to the sale of RR/BAYC NFTs.").  Mr. Ripps never received a refund request from anyone stating they were confused or thought that they were reserving a Yuga product.  Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

And Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(d), lines 4:3-6:**

Though Mr. Ripps and Mr. Hickman testified that they were averse to the BAYC imagery ((Dkts. 345 (Hickman Decl.) ¶41 (admitted into evidence in Dkt. 392 at 204:21-205:14); 346 (Ripps Decl.) ¶139 (admitted into evidence in Dkt. 406 at 266:15-267:6)), they nonetheless sought to profit from spreading the same imagery. Defendants' creation and marketing of RR/BAYC NFTs was commercial activity designed to sell infringing products, not expressive artistic speech protected by the First Amendment. SJ Order at 16.

**Defendants' Basis of Dispute:**

1       The evidence at trial showed that the RR/BAYC collection was not intended as

2  an infringing product but was instead intended to raise awareness of Defendants'

3  criticism that Yuga has systematically used antisemitic and racist imagery.  Ripps

4  Decl. ¶¶ 87-94 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 97-103 (Dkt. 344); Hickman

5  Decl. ¶¶ 62-66 (Dkt. 345); Trial Tr. [Hickman] 222:18-21, [Cahen] 229:9-13.  The

6  RR/BAYC collection also pointed to digital images which "are public" and "available

7  for anyone to navigate to on the Internet."  Trial Tr. [Hickman] 222:15-16.  Further,

8  Yuga never presented any evidence at trial showing that Defendants sold RR/BAYC

9  NFTs on the same marketplaces where BAYC NFTs were being sold.  To the

10  contrary, more than 80% RR/BAYC NFTs reservations were made through

11  rrbayc.com, which has never sold a BAYC NFT.  Ripps Decl. ¶ 110 (Dkt. 346)

12  (uncontested); Cahen Decl. ¶¶ 135, 138, 144 (Dkt. 344).  The remaining reservations

13  for RR/BAYC NFTs were made through Defendants' personal Twitter account, which

14  also have never been used to sell BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346)

15  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344).  Defendants also had a Foundation page

16  for RR/BAYC NFTs, but Yuga did not present any evidence of having a Foundation

17  page for the Bored Ape Yacht Club at the time of the RR/BAYC project because it

18  simply did not have a Foundation page at the time.  As for remaining marketplaces,

19  Defendants only received limited royalties from LooksRare because the marketplace

20  did not honor Defendants request to shut off royalties for secondary sales until May

21  2023.  Cahen Decl. ¶¶ 169-171 (Dkt. 344).

22       Yuga also fails to cite adequate evidence in support of its allegation that

23  Defendants intended to sell infringing products and profit from that infringement.

24  Yuga incorrectly relies on the law of the case doctrine by citing to this Court's

25  summary judgment order.  The "law of the case doctrine does not apply to pretrial

26  rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d

27  902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076,

28

1  [1088 (9th Cir. 2014)](#) ("Pretrial rulings, often based on incomplete information, don't

2  bind district judges for the remainder of the case. Given the nature of such motions, it

3  could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although

4  ***aspects*** of an issue were decided at summary judgment for one purpose, the summary

5  judgment order did resolve the issue generally or as to other topics. *See* [No. 1:17-CV-

6  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)](#) (holding that

7  evidence of initial police contact was relevant as background, but not to the already

8  decided issue that initial contact was not excessive force). This case is just like

9  *Sienze*: the summary judgment ruling on Defendants' intent applies to only the issue

10 of infringement and is not adequate support for these issues generally or as applied to

11 availability of disgorgement as a remedy (including Defendants' mental state as

12 applied to disgorgement), apportionment, and an exceptional case analysis.

13  **Plaintiff's Response:**

14  Defendants do not—and cannot—dispute that they sold NFTs with the same

15 imagery and sought to profit from that venture.

16  Defendants' objection should be rejected for the same reasons discussed *supra* ¶

17 7(a); specifically: (1) the objection seeks to relitigate issues already adjudicated by

18 the Court, (2) the record shows that Defendants intended to cause confusion with their

19 infringement, (3) the record shows that Defendants' commercial infringement was not

20 protected "art," and (4) Defendants knew that their infringement would cause

21 confusion.

22  **Defendants' Reply:**

23  Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate

24 grounds to accept Yuga's erroneous proposed finding of fact. For reasons provided in

25 *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their

26 objections), the evidence showed Defendants created RR/BAYC NFTs as a protest art

27 project and did not intend to profit off infringement or confusion. Additionally,

28

Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) Defendants did not intend to confuse consumers, (3) Defendants' intent was to protest and criticize Yuga, (4) Yuga has admitted that Mr. Ripps is a recognized artist and the record is clear that RR/BAYC is yet another satirical artwork that Mr. Ripps created, and (5) Defendants ensured that there would be no confusion by taking many steps to make sure that NFTs consumers understood the protest nature of the RR/BAYC collection, and those consumers confirmed they were not confused in the hundreds of letters they sent to Mr. Ripps.

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(e):**

"Defendants used Yuga Labs' BAYC Marks to make their competing product look identical to Yuga Labs' product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT." SJ Order at 17; *see also* JTX-117; JTX-600; JTX-972; Dkts. 342 ¶44; 392 at 130:23-131:2, 138:6-20; 394 (Hickman Depo. Designations) at 143:15-144:16; 395 at 148:10-13.

**Defendants' Basis of Dispute:**

The evidence at trial showed that Defendants presented RR/BAYC NFTs as the opposite or antithetical to Yuga's NFTs and did not design them to appear identical to Yuga's NFTs. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a

disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Whenever possible, Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-2086), Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344); JTX-671), Foundation (*see* JTX-671), and even Etherscan identified "*ryder-ripps.eth" as the creator of the RR/BAYC collection (JTX-600; JTX-1146).

Moreover, RR/BAYC NFTs were verifiably unique NFTs with digital pointers to Bored Ape images, which "are public" and "available for anyone to navigate to on the Internet."  Trial Tr. [Hickman] 222:15-16.  The RR/BAYC NFTs were effectively a "receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to including Yuga Labs."  Trial Tr. [Hickman] 222:18-21.  They did not include the public Bored Ape images, they simply pointed to them as numerous other NFT collections do as well. Trial Tr. [Hickman] 222:10-24

RR/BAYC NFTs were also readily distinguishable from Yuga's NFTs due to the drastically different price points.  As Mr. Cahen explained:

> At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was not even 1/1000th the price of a Bored Ape Yacht Club NFT.  A collector being confused about RR/BAYC would be akin to a consumer thinking they are able to purchase a Lamborghini that normally costs $300,000 for $300, which no person in their right mind would ever believe is possible.

Cahen Decl. ¶ 225 (Dkt. 344).

The evidence at trial also showed that Defendants did not create a token tracker designed to mislead NFT collectors. Etherscan's token tracker is created by Etherscan and displayed on Etherscan's website. Defendants have no control over the Etherscan website, what it displays, and how it chooses to show the RR/BAYC collection. And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address. Trial Tr. [Atalay] 135:2-25. Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact. Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also fails to cite adequate evidence in support of its allegation that Defendants' made RR/BAYC NFTs look identical to BAYC NFTs and to create a misleading token tracker. Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on how RR/BAYC NFTs appeared to NFT collectors and Etherscan's token tracker for RR/BAYC NFTs applies to only the issue of infringement and is not adequate support

for these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga's cited exhibits also fail to show that RR/BAYC NFTs appeared identical to Yuga's NFTs to NFT consumers.  JTX-117 and JTX-972 are printouts of pages from Etherscan that show the verifiably unique smart contract address for RR/BAYC NFTs.  Yuga's own witness, Mr. Atalay, confirmed that consumers of NFTs rely on the associated smart contract address to confirm the identity of a particular NFT or NFT collection.  Trial Tr. [Atalay] 135:2-25.  Thus, these documents actually refute that RR/BAYC NFTs appeared identical to Yuga's NFTs.  And JTX-600 is irrelevant to how RR/BAYC NFTs appeared because it is an Etherscan page recording a transaction between Mr. Ripps and Foundation.

Yuga also cites to self-serving, false testimony that the RR/BAYC collection and the manner Etherscan chose to display the RR/BAYC NFT collection led to confusion.  Yuga itself was unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1.  And neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

**Plaintiff's Response:**

Defendants dispute an exact quote from the Court, underscoring their bad-faith efforts to multiply the cost of this litigation by rehashing decided issues.

Defendants' objection should be rejected for the same reasons discussed *supra* ¶ 7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) the record shows ample actual confusion and likelihood of confusion, and (3) Defendants' "disclaimer" did not dispel confusion.

Additionally, as described below, Defendants' objection should be rejected because (1) the record shows that Defendants did not use Mr. Ripps' name as the creator of their infringing NFT collection "whenever possible", (2) the record shows that the different price point of Defendants' infringing NFTs did not dispel likelihood of confusion, (3) Defendants' infringement caused third-party platforms such as Etherscan to confusingly identify their infringing NFTs with the BAYC Marks, (4) consumers use the contract name and token tracker to identify NFTs, (5) Defendants knew that their infringement would cause confusion, (6) the majority of Defendants' infringing NFTs were not sold on rrbayc.com, (7) Defendants did not take steps to avoid confusion, and (8) the RR/BAYC smart contract immutably references Yuga Labs' marks.

**Defendants Did Not Attribute RR/BAYC NFTs To Mr. Ripps "Whenever Possible":**  Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have called their Foundation page anything other than "Bored Ape Yacht Club," but chose not to.  JTX-28.  Mr. Ripps could have replied to the @j1mmy.eth Tweet asking what NFTs consumers were buying with any phrase other than "bayc v3," but

1   he chose not to.  JTX-689.  Defendants could have used different images or overlaid

2   some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-

3   801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because

4   "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating

5   what an overlay might look like and recommending not to "in the marketing show

6   screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the

7   'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants

8   could have attacked Yuga Labs in countless non-infringing ways.  But they did not.

9   Instead, they used Yuga Labs' marks, commercially, in the way that would make

10  Defendants the most money by selling counterfeit NFTs that confused consumers.

11  O'Laughlin Decl. (Dkt. 341).

12      **The Price of Defendants' Infringing NFTs Does Not Mitigate Confusion:**

13  Defendants' argument that their infringing NFTs sold at a different price point than

14  authentic BAYC NFTs does not mitigate likelihood of confusion.  In fact, the price

15  point of Defendants' NFTs only *compounded* likelihood of confusion.  "Defendants

16  even used a similar price point to sell RR/BAYC NFTs—around 0.1 to 0.15 ETH per

17  NFT. At the time, this amounted to approximately $200 per NFT.  This is about the

18  same value as BAYC's original 0.08 ETH BAYC price, which was approximately

19  $169 to $236 when we initially sold them. It would not have been unreasonable for

20  consumers to assume that 'RR/BAYC' was another Yuga Labs release related to

21  BAYC, just like MAYC or BAKC."  Solano Decl. (Dkt. 342) ¶ 54; *see also* Trial Tr.

22  at 58:9-11 ("The original Bored Apes sold for $200.  And we've done other sales over

23  the past two years that are for lower prices.").  Indeed, Defendants marketed their

24  infringing NFT collection as "Bored Ape Yacht Club V3."  *See* JTX-689; JTX-690;

25  JTX-1249.  In other words, they marketed it as another version, and possibly a

26  cheaper version.

27

28

**Defendants Caused Sources Such as Etherscan To Identify Their Infringing NFTs With The BAYC Marks:**  Defendants say that the evidence at trial shows they were not responsible for token trackers such as Etherscan's identifying Defendants' NFTs with the BAYC Marks.  There is no such evidence to support this argument, and Defendants cite none.  JTX-600 shows "Bored Ape Yacht Club" and "BAYC" coded into the RR/BAYC smart contract as source identifiers, and Defendants admit in their objection that JTX-600 "is an Etherscan page recording a transaction between Mr. Ripps and Foundation."  In other words, Mr. Ripps admits that he launched the smart contract with the BAYC Marks coded into it, which caused websites such as Etherscan to confusingly display those marks to the public as if the smart contract was created by Yuga Labs.  These marks can never be removed from the smart contract, causing hyperlinks and other references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  And despite Mr. Ripps testimony that he minted the RR/BAYC NFTs to his "personal wallet, ryder-ripps.eth," the "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.  Defendants therefore caused their infringement of Yuga Labs' marks to be an inherent and unchangeable part of their NFT collection, in turn causing third party systems and observers to confusingly associate the two, resulting in more downstream marketplace confusion.  The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs so that Yuga Labs can retain some control of the use of its their marks..

**The Market Relies On The Token Tracker To Verify The Authenticity Of NFTs:**  Defendants cannot keep straight whether their position is that consumers do or do not rely on the token tracker to verify the authenticity of NFTs.  Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC

NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."); *id.* at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Regardless of how common or easy it is, consumers will use token trackers when purchasing an NFT.  Trial Tr. 132:3-5 (cross examination of Mr. Atalay:  "Q  And you also agree that the NFT community uses the token name when it's buying on secondary markets; correct?" / "A  Yes."); *see also* Atalay Decl. (Dkt. 337) at ¶ 7; JTX-1558.  The evidence at trial is, therefore, consistent with the Court's holding on Yuga Labs' Motion for Summary Judgment that "Defendants used Yuga's BAYC Marks to make their competing product look identical to Yuga's product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT."  SJ Order (Dkt. 225) at 17.

**Defendants Knew That Their Infringement Would Result In Confusion:** The evidence shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if

1   sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match

2   the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394)

3   at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token

4   tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo.

5   Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC

6   NFT" is and stating "the blockchain is complicated.  A lot of people don't have the

7   technical expertise or knowledge to be able to have a conversation about crypto

8   technology and blockchain technology."), at 148:10-13 (testifying it is "very

9   common" for people to refer to NFT collections by the token tracker).  Instead of

10  making changes, such as those recommended by their lawyer or Mr. Lehman, they

11  continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.

12  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing

13  logos and imagery for brands, every choice is intentional.").

14      **rrbayc.com Is Not Where Defendants' Sold The Majority Of Their NFTs:**

15  rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue

16  occurred."  Defendants have no support for this figure; even Mr. Ripps' own

17  declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred

18  on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr.

19  Ripps' claims, NFTs reserved on that website were actually minted and sold through

20  the confusing Foundation page that used the BAYC Marks.  Ripps Depo.

21  Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" /

22  "A. Well, technically, all of them were because it was a Foundation contract, so...").

23      **Defendants Did Not Take Steps To Avoid Confusing Consumers:**

24  Defendants did not attempt to avoid confusion, on the contrary Defendants

25  deliberately designed and marketed their infringing NFTs to confuse consumers.

26  Defendants could have called their NFT collection something other than "Bored Ape

27  Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart

28

1    contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants

2    could have used different images or overlaid some commentary on the images they

3    did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an

4    overlay or something like Getty images" because "it's just insane to have the same

5    art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and

6    recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

7    showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

8    showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in

9    countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs'

10   marks, commercially, in the way that would make Defendants the most money by

11   selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

12          **The RR/BAYC Smart Contract Is Immutably Linked To Yuga Labs:**

13   Defendants' assertion regarding mutability of token trackers is immaterial and

14   misleading because the token tracker for Defendants' infringing NFTs is not

15   "mutable."  Indeed, in response to the question directly after the response cited in

16   Defendants' objection, Mr. Atalay explained that "[i]n this particular instance, upon

17   inspection of the Foundation smart contract that was used to deploy the RR/BAYC

18   smart contract, it's evident that these are not mutable fields in this particular instance.

19   So this isn't entirely relevant."  Trial Tr. at 134:1-8.  Mr. Solano testified to the same

20   in his trial declaration.  Solano Decl. (Dkt. 342) at ¶ 80 ("My understanding is that

21   Defendants cannot change the name of their Etherscan contract bearing the BAYC

22   Marks, nor can the RR/BAYC smart contract be destroyed.").  Thus, the RR/BAYC

23   smart contract will display "Bored Ape Yacht Club" and "BAYC" as the contract

24   name and the contract symbol, respectively, in perpetuity, and without a transfer of the

25   smart contract to Yuga Labs, confusion from Defendants infringing NFTs will

26   continue.  *Id.* ("By transferring the RR/BAYC smart contract to Yuga Labs, the

27   Defendants' association with the BAYC brand will no longer be 'forever' as Mr.

28

Ripps proclaimed it would be.").  Therefore, as Mr. Atalay testified, this misleading counterfactual is neither relevant nor material.

### **Defendants' Reply:**

Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed that Defendants did not design RR/BAYC NFTs to be identical to Yuga's NFTs and that NFT consumers do not use token trackers to identify/verify NFTs.  Additionally, Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) there is ample evidence that RR/BAYC NFTs did not cause any confusion, and (3) Defendants disclaimer shows that Defendants acted in good faith and it also decreased any likelihood of confusion.

Yuga's additional responses to this objection similarly fail because (1) the Defendants always identified Mr. Ripps as the creator of RR/BAYC collection whenever it was possible to do so, (2) the difference in price between RR/BAYC NFTs and Yuga's NFTs all but guaranteed no confusion, (3) Defendants did not cause third-party platform to identify RR/BAYC NFTs as Yuga NFTs, (4) consumers do not use token trackers to identify NFTs, (5) Defendants did not cause any confusion and always acted in a manner to ensure that purchasers understood what they were buying, (6) more than 80% of Defendants' sales occurred on rrbayc.com, (7) Defendants took many steps to prevent confusion, and (8) the RR/BAYC smart contract does not immutable reference Yuga.

***First,*** Defendants attributed RR/BAYC NFTs to Mr. Ripps whenever it was possible to do so.   Defendants controlled their personal Twitter accounts and rrbayc.com—and Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-2086),

Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344); JTX-671).  All other platforms were owned and operated by third parties, which put restraints on what Defendants could do.  Still, even though Defendants did not have control over third party platforms, they used what little abilities they had to ensure that, for example, Foundation identified Mr. Ripps as the creator.  JTX-671.  Likewise, Etherscan identified Mr. Ripps as the create either by his wallet name or unique wallet address.  JTX-600; JTX-1146.  And even OpenSea clearly labeled the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps."  JTX-28.

*Second,* RR/BAYC NFTs sold for approximately 1/1000th the price of Yuga's NFTs.  This drastic difference in price all but confirms that it was practically impossible for any consumers to be confused. As Mr. Cahen explained:

> At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was not even 1/1000th the price of a Bored Ape Yacht Club NFT.  A collector being confused about RR/BAYC would be akin to a consumer thinking they are able to purchase a Lamborghini that normally costs $300,000 for $300, which no person in their right mind would ever believe is possible.

Cahen Decl. ¶ 225 (Dkt. 344).

And while the significant difference in price alone was likely enough to guarantee no confusion, Defendants still took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  Defendants included an artistic disclaimer on rrbayc.com, on which over 80% of reservations occurred, explaining the artistic intent of the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Defendants also required collectors on rrbayc.com to read and click through a disclaimer acknowledging the artistic purpose of the project.  *See* Ripps Decl. ¶¶ 106-109 (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Defendants also engaged in extensive online discussion confirming and

1   raising awareness about the satirical nature of the RR/BAYC project.  Ripps Decl. ¶¶

2   148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-

3   1 ¶¶ 203-04.

4     ***Third,*** Defendants did not cause Etherscan and other websites to attribute the

5   RR/BAYC collection to Yuga.   Mr. Ripps explained, in his uncontested declaration,

6   that the smart contract was coded so that it would be specifically attributable to him

7   through his personal smart wallet and identify a unique smart contract address:

8     89.   The RR/BAYC collection was minted from my personal Ethereum

9       blockchain "wallet," ryder-ripps.eth, was located at a unique

10      "contract" address, and was minted on different dates and with

    different token IDs than Yuga's Bored Ape Yacht Club NFTs.

11

12  Ripps Decl. ¶ 89 (Dkt. 346).  This information was always coded into the RR/BAYC

13  contract, giving any third party a surefire way to know that RR/BAYC NFTs were

14  created by Mr. Ripps and not by Yuga.

15    Third party websites, such as Etherscan, always displayed the RR/BAYC

16  collection in a manner that disclosed Mr. Ripps's unique personal wallet (either by

17  name or by alphanumeric code verifiable on Etherscan itself) and also disclosing the

18  unique smart contract address for the RR/BAYC collection.   As Mr. Atalay admitted,

19  it is the unique smart contract address that is critical to identifying NFTs.  Trial Tr.

20  [Atalay] 135:2-25.   Moreover, it is undisputed that Defendants do not own or operate

21  Etherscan or any of the other third-party websites that displayed information about

22  RR/BAYC NFTs.   Defendants cannot be responsible for the actions of third parties,

23  especially when the code for the RR/BAYC collection provided to all third parties a

24  definite source identifier and a verifiably unique smart contract address.

25    ***Fourth,*** the undisputed evidence at trial showed that NFT consumers do not

26  rely on token trackers to verify the authenticity of NFTs.  Mr. Atalay clearly and

27  unequivocally testified at trial that token trackers/token names are not used to identify

28

NFTs.   If there was anything wrong with Mr. Atalay's admission, then Yuga should have rehabilitated the witness on re-direct.  Yuga did not, because Mr. Atalay's admission is clear.  He admitted that using token names or token trackers to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.  Indeed, as Mr. Atalay admitted, consumers of NFTs rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.

*Fifth,* the evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants' knowledge of confusion, Yuga cites to documents it argues show that the Defendants intended to make a profit.  Intending to profit from your artwork is not the same thing as intending to confuse consumers and one does not weigh toward the other.

Further, the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

1    (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

2    Buttressing this fact, Yuga's founders were also not aware of a single instance of

3    actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

4    let's focus on, I think, what you were focused on. Yuga Labs has been unable to

5    identify even[] a single person who purchased an RR/BAYC believing it to be

6    sponsored by Yuga Labs; right? A Correct.").

7            Further, the evidence that Yuga cites does not rebut the overwhelming evidence

8    of Defendants' intent to protest and criticize and Yuga instead relies on

9    mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

10   cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

11   confusion.  But those pages are internal discussion about the design of the ApeMarket

12   website to ensure that users of apemarket.com were not confused by the website

13   design.  Yuga even cross-examined Mr. Hickman about these communications and

14   received the same explanation: "This is our attempt to make it as clear as possible.

15   We are having discussion on how to make sure it was very clear for users."  Trial Tr.

16   [Hickman] 212:22-24.

17           Yuga similarly takes out of context exhibits such as JTX-44.00002 to

18   incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

19   44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

20   ID.  that is where they get confused."  This statement is not discussing confusion

21   regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

22   RR/BAYC collection used a different numbering system that BAYC NFTs, and that

23   consumers expected the numbers match as a shorthand manner of cataloguing the

24   digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

25   numbering system, some consumers were confused as to which RR/BAYC NFT they

26   received but they understood very well that they received an NFT created by Mr.

27   Ripps that protests and criticizes Yuga.

28

The record clearly shows that Defendants did not know that there were any confused consumers and further there is no evidence presented that anyone was actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

**Sixth,** over 80% of commissions for RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is substantially corroborated by Yuga's own expert who admits that ***7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract***, ***which was only available and usable through rrbayc.com***.  Kindler Decl. ¶¶ 36 (Dkt. 338).   Yuga expert also admits that the ***RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)***.  Kindler Decl. ¶ 40 (Dkt. 338).   To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs ***before the RSVP contract was ever implemented***, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract alone.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut

1   it off, around $1,000, and some from LooksRare, as that marketplace initially refused

2   to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).

3   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

4   the analysis of Defendants' profits.

5         ***Seventh,*** Yuga's argument that Defendants did not take steps to avoid

6   confusion is baseless. As the evidence presented at trial shows, Defendants took

7   multiple steps to make clear that the RR/BAYC collection was not related to Yuga in

8   any way.  For example, the rrbayc.com website—through which the majority of

9   RR/BAYC commissions occurred and the vast majority of alleged profits accrued

10  (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included

11  an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346)

12  (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-

13  2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also

14  required to read and click through a disclaimer acknowledging the artistic purpose of

15  the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

16  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

17  insisted on these requirement and additional steps so that the artistic purpose of the

18  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24]

19  ("Q. … Why was the artist statement ultimately included, if it had a negative impact

20  on usability? …  A.   … Ryder wanted it and so he had the final call.").

21        Further, the evidence Yuga cites to is unsupportive. For example, Yuga points

22  to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract

23  clearly indicates Mr. Ripps is the creator and allows consumers to easily establish

24  provenance.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

25        Again, Yuga repeatedly cites to various pages of JTX-801 to argue that

26  Defendants did not take steps to avoid confusion.  But those pages are internal

27  discussion about the design of the ApeMarket website to ensure that users of

28

1   apemarket.com were not confused by the website design.  Yuga even cross-examined

2   Mr. Hickman about these communications and received the same explanation: "This is

3   our attempt to make it as clear as possible.  We are having discussion on how to make

4   sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.  Further, this chat

5   focused on the creation of ApeMarket, which never was launched and could,

6   therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262

7   (Dkt. 344).

8        Finally, Yuga's statements regarding Defendants' use of the alleged marks are

9   misleading.  Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest

10   against Yuga and it is pretty difficult to criticize someone without saying who they

11   are.

12        ***Eighth,*** The RR/BAYC collection is not immutably linked to Yuga.  In fact, it

13   is not linked to Yuga at all.   As explained in Mr. Ripps's uncontested declaration, the

14   RR/BAYC collection contains in its permanent code that it was minted from Mr.

15   Ripps's wallet and contains a verifiably unique smart contract address (Ripps Decl. ¶

16   89 (Dkt. 346)), which permanently and definitively identifies that RR/BAYC was

17   created by Mr. Ripps and not Yuga.

18          **<u>Plaintiff's Disputed Post Trial Finding of Fact No. 7(f), lines 14-15:</u>**

19        <u>"Defendants frequently used the entirety of the BAYC Marks without</u>

20   <u>modification."</u> SJ Order at 18.

21           **<u>Defendants' Basis of Dispute:</u>**

22        The evidence at trial showed that the RR/BAYC collection involved modified

23   marks to make commentary and raise awareness of what Defendants believed were

24   antisemitic or racist imagery.  Ripps Decl. ¶¶ 87-94 (Dkt. 346) (uncontested); Cahen

25   Decl. ¶¶ 97-103 (Dkt. 344); Hickman Decl. ¶¶ 62-66 (Dkt. 345); Trial Tr. [Hickman]

26   222:18-21, [Cahen] 229:9-13.  For example, the logo used states "This Logo is Based

27

28

1  on the SS Totenkopf; 18 Teeth." *See* JTX-2085.  Additionally, the website for the

2  project used the modified "RR/BAYC" throughout.  *Id.*

3      Yuga also fails to cite adequate evidence in support of its allegations that

4  Defendants frequently used unmodified version of the asserted marks.  Yuga

5  incorrectly relies on the law of the case doctrine by citing to this Court's summary

6  judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such***

7  ***as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

8  Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

9  Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

10  district judges for the remainder of the case.  Given the nature of such motions, it

11  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

12  ***aspects*** of an issue were decided at summary judgment for one purpose, the summary

13  judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-

14  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

15  evidence of initial police contact was relevant as background, but not to the already

16  decided issue that initial contact was not excessive force).  This case is just like

17  *Sienze*: the summary judgment ruling on the use of marks applies to only the issue of

18  infringement and is not adequate support for this issue generally or as applied to

19  availability of disgorgement as a remedy (including Defendants' mental state as

20  applied to disgorgement), apportionment, and an exceptional case analysis.

21      **Plaintiff's Response:**

22      Defendants dispute an exact quote from the Court, underscoring their bad-faith

23  efforts to multiply the cost of this litigation by rehashing decided issues.  Even worse,

24  Defendants, in this filing, admit the very fact at issue here.  Defendants admit that they

25  used the BAYC Marks. *See* Defendants admission to Plaintiff's Finding of Fact 7(c):

26  **"Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."**  Using

27  Yuga Labs' BAYC Marks over 9000 times in each of their infringing products is

28

1  unquestionably a frequent use.  Defendants have no good faith basis to challenge this

2  admitted finding of fact.

3  **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

4  objection improperly disputes facts already adjudicated in the Court's Summary

5  Judgment Order (Dkt. 225).  In that order, the Court held that "Defendants have

6  admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs."  *Id.*

7  at 11.  The Court "easily conclude[d]" that Defendants' use of identical marks, on

8  identical products, in identical markets supported a finding of a likelihood of

9  confusion.  *Id.* at 10-13.  That order establishes the matters adjudicated therein for

10 purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case

11 on a summary judgment motion may "enter an order stating any material fact —

12 including an item of damages or other relief — that is not genuinely in dispute and

13 treating the fact as established in the case"); *accord* *Nat'l Union Fire Ins. Co. of*

14 *Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal.

15 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d

16 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as

17 established at trial.").

18 Even so, Defendants do not dispute that they used the exact BAYC Marks as a

19 source-identifier for their infringing NFTs.  Mr. Ripps even admitted to using

20 unmodified BAYC Marks.  Dkt. 149-42 at 9-10 ("Mr. Ripps's RR/BAYC project . . .

21 displayed unmodified marks, so that the RR/BAYC project would be directly tied to

22 Yuga, BAYC, and specific BAYC NFTs . . . .")  The fact that Defendants also

23 "modified" BAYC Marks instead of the exact marks does not change this fact or undo

24 the likelihood of confusion they caused.

25 **Defendants' Reply:**

26 Defendants do not dispute that this Court has entered summary judgment in this

27 case.  Defendants are not asking that this Court reconsider its holding, because this

28

under the law of the case doctrine this Court has not made a holding on Defendants'

intent for purposes of determining availability of disgorgement as a remedy (including

Defendants' mental state as applied to disgorgement), apportionment, and an

exceptional case analysis.  The "law of the case doctrine does not apply to pretrial

rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d

902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076,

1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't

bind district judges for the remainder of the case.  Given the nature of such motions, it

could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

*aspects* of an issue were decided at summary judgment for one purpose, the summary

judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

evidence of initial police contact was relevant as background, but not to the already

decided issue that initial contact was not excessive force).  This case is just like

*Sienze*: the summary judgment ruling use of marks is limited to infringement and

cannot be applied more broadly.

Moreover, Defendants made clear in their summary judgment briefing and at

trial that they primarily used modified versions of the marks such as "RR/BAYC."

For example, Defendants used the modified mark "RR/BAYC" in the website

rrbayc.com, and repeatedly referred to the collection with "RR/BAYC" on the

website, which is where over 80% of Defendants' sales occurred.  Ripps Decl. ¶¶ 101-

103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶

201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.

**<u>Plaintiff's Disputed Post Trial Finding of Fact No. 7(f), lines 15-16:</u>**

<u>They marketed their RR/BAYC NFTs as "Bored Ape Yacht Club" and used</u>

<u>Yuga Labs' logo and marks to sell the NFTs.</u> JTX-28; JTX-133; JTX-137; JTX-138;

JTX-671; JTX-719; Dkts. 342 ¶¶35, 42-43; 392 at 47:18-48:4; 396 at 60:18-61:4, 71:9-12.

### **Defendants' Basis of Dispute:**

The evidence at trial did not show that Defendants "marketed their RR/BAYC NFTs as 'Bored Ape Yacht Club." To the contrary, Defendants constantly referred to the collection as RR/BAYC or as having been created by Ryder Ripps. Nearly the entirety of Defendants activities associated with publicly discussing the RR/BAYC NFT collection occurred online, where Defendants addressed the project as having been created by Mr. Ripps for the purpose for of criticizing Yuga. Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04. In these public, undisputed activities, Defendants popularized the RR/BAYC collection by referring to its satirical nature by making clear it was Mr. Ripps's collection. Mr. Ripps confirmed at his deposition that this was his consistent practice:

> Q.    And you use the phrase "Bored Ape Yacht Club"?
>
> A.    Not by itself ever. It's always been in the context of Ryder Ripps. Just like the name of the project is Ryder Ripps/Bored Ape Yacht Club.

Dkt. 369 [Ripps Depo. Designation] 61:5-9.

The evidence at trial also showed that collectors reserved and purchased RR/BAYC NFTs specifically due to their artistic commentary. The correspondence Mr. Ripps received from collectors of RR/BAYC NFTs confirm that they purchased the NFTs (including on secondary markets) as an act of protest. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599

Further, the exhibits that Yuga cites do not show that Defendants marketed the RR/BAYC collection as "Bored Ape Yacht Club" or that they relied on infringement

to sell their NFTs.  JTX-28, JTX-133, JTX-671, and JTX-671 show Foundation pages associated with the RR/BAYC collection.  Foundation decides how to format collections presented on its website.  Dkt. 369 [Ripps Depo. Designations] 70:19-25 ("Q. And who created this page for you?  A. Who created this page for?  Q. Uh-huh A. *I guess Foundation helped make it because I didn't design [it]*.  Like, that's not my logo in the corner, and I, you know, I probably would have designed it bit different.  So Foundation.").  Within Foundation's chosen design, the exhibits show that the RR/BAYC collection was listed under Mr. Ripps's creator page.  As Mr. Ripps explained at this deposition, the Foundation page (based on the way it organizes content) was showing the NFT collection as Ryder Ripps's Bored Ape Yacht Club which is simply the long-form of "RR/BAYC":

> Q.    On this Foundation page.
>
> A.    Well, this is my Foundation page.  So it already says "Ryder Ripps/Bored Ape Yacht Club." You can see it right there, Ryder Ripps/Bored Ape Yacht Club. So I wouldn't write "Ryder Ripps, Ryder Ripps, Ryder Ripps/Bored Ape yacht Club."  It already says "Ryder Ripps/Bored Ape Yacht Club."
>
> Q.    Can you show me where it says "Ryder Ripps/Bored Ape Yacht Club."
>
> A.    Ryder Ripps/Bore Ape Yacht Club.

 Dkt. 369 [Ripps Depo. Designations] 76:13-22.  Further, JTX-137 is a page created by some unidentified third party on LooksRare and JTX-138 is also a page created by an unidentified third party on a website also unidentified in the exhibit.  Defendants did not create these pages, did not decide how they would appear or be formatted, and had no control over what was displayed on these third-party websites.

Yuga also cites to snippets of Mr. Ripps's deposition testimony while conveniently omitting portions of Mr. Ripps's testimony showing that Mr. Ripps

1  always presented his NFT collection under his name and relied on the satirical nature

2  of the artwork to popularize the collection.  Dkt. 369 [Ripps Depo. Designations]

3  35:2-11, 61:5-9, 76:13-22; 169:6-25.

4          Lastly, Yuga also cites to the unreliable declaration and trial testimony of

5  Gregory Solano.  Mr. Solano's testimony was not credible given the many false and

6  misleading statements contained in his declaration.  For example, Mr. Solano was

7  forced to concede on cross examination that his sworn declaration included a false

8  statement claiming that "Defendants continue to receive royalties or creator fees from

9  sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also

10 relied on the phrase "business venture" in Mr. Lehman's declaration, without having

11 considered that the phrase "business venture" was selected by Yuga's counsel, and

12 that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.

13 Mr. Solano also relied on Mr. Lehman's declaration without having considered that

14 Mr. Lehman knew he could not settle his case without executing a declaration

15 concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

16 Lehman was afraid for his family at the time he signed his declaration, because

17 Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr.

18 Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a

19 result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-

20 33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder

21 Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we

22 could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to

23 tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and

24 we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION:  Was

25 the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel.

26 'ANSWER:  I don't know.' Was that your testimony at your deposition? A Yes." ); *id.*

27 at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for

28

1   Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116,

2   lines 5 through 6. 'QUESTION:  Do you know whether Ape Market exists?

3   'ANSWER:  I don't recall.' Were you asked that question, and did you give that

4   answer? A Yes.").

5        Moreover, Yuga cites to portion of Mr. Solano's testimony that are particularly

6   unreliable.  For example, at pages 47:18-48:4 of the trial transcript, Mr. Solano is

7   testifying as to his reliance of a document that was created by Yuga's attorneys for

8   purposes of this litigation and that the document refers to the activity of some

9   unidentified third party and not any activity of the Defendants.

10        **Plaintiff's Response:**

11        Here too, Defendants have no good faith basis to challenge this admitted

12   finding of fact.  Defendants admit with respect to Finding of Fact 7(c):  **"Each of**

13   **Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."**

14        Defendants' objection should be rejected for the same reasons discussed *supra* ¶

15   7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by

16   the Court, (2) the record shows that Defendants' commercial infringement was not

17   protected "art," and (3) Defendants fail to impeach Mr. Solano's accurate testimony.

18        Additionally, as described below, Defendants' objection should be rejected

19   because (1) Defendants did not use Mr. Ripps' name as the creator of their infringing

20   NFT collection "whenever possible," (2) Defendants' alternative explanation for why

21   the RR/BAYC Foundation page displayed Yuga Labs' marks is not credible, (3) Mr.

22   Ripps testimony is not credible, and (4) Defendants' cherry-picked communications

23   with alleged customers to do not discredit the Court's finding that confusion was

24   likely.

25        **Defendants Did Not Attribute RR/BAYC NFTs To Mr. Ripps Whenever**

26   **Possible:**  Defendants did not attempt to avoid confusion, on the contrary Defendants

27   deliberately designed and marketed their infringing NFTs to confuse consumers.

28

Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have called their Foundation page anything other than "Bored Ape Yacht Club," but chose not to.  JTX-28.  Mr. Ripps could have replied to the @j1mmy.eth Tweet asking what NFTs consumers were buying with any phrase other than "bayc v3," but he chose not to.  JTX-689.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

**Defendants' Alternative Explanation For Why The RR/BAYC Foundation Page Bore Yuga Labs' Marks Lacks Credibility:**  Defendants ask the Court to believe that Foundation unilaterally chose to brand their infringing NFT collection with Yuga Labs' marks.  This explanation is implausible.  Even if Mr. Ripps did not personally make the decision for Foundation to display Yuga Labs marks, and even if he could not have edited it after the fact (like he admits he could on other marketplaces), the use of Yuga Labs's marks likely occurred because Mr. Ripps chose to use Yuga Labs' marks for the RR/BAYC token name and token tracker.  Atalay Decl. (Dkt. 337) ¶ 4.  Thus, even if Foundation did decide to name Defendants' infringing NFTs "Bored Ape Yacht Club," that fact neither cuts against the Court's

1   finding of intent and in fact supports the Court's finding of a likelihood of confusion

2   by showing that even the Foundation website was confused by the RR/BAYC's

3   deceptive token name and token tracker.

4        It is implausible and uncredible for Mr. Ripps to claim that he had zero insight

5   into or control over the look and feel of the website through which each of his

6   infringing NFTs were sold.  Ripps Depo. Designation (Dkt. 396) at 82:12-13 ("Well,

7   technically, all of them were [sold through Foundation] because it was a Foundation

8   contract").  Mr. Ripps' testimony is a lie.

9        **Mr. Ripps' Testimony Is Not Credible:**  Mr. Ripps' testimony is not credible,

10  as demonstrated by its contradictions by the evidentiary record, other testimony, and

11  impeachment at trial.  For instance, in his trial declaration Mr. Ripps testified that he

12  "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl.

13  (Dkt. 346) ¶ 178.  However, ApeMarket was ready to launch within a matter of days.

14  *See* Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February

15  – excuse me – by June 24, 2022?  A:  Among other things, yes[.]"); JTX-1027 (post

16  from Ape Market twitter account advertising that "ApeMarket.com will go live within

17  24 hours of the final mint, which we will announce shortly"); JTX 696 (posts from

18  Ape Market Twitter account).  This confirms Mr. Atalay's testimony that the Ape

19  Market source code "was in such a state of completion that it was operational."  Trial

20  Tr. at 137:23-24.

21       Mr. Ripps also testified that his "intention in making the RR/BAYC artwork

22  was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However,

23  documents entered into evidence at trial showed that Defendants intended to "make

24  like a million dollars."  JTX-1574; *see also* Solano Decl. (Dkt. 342) at ¶ 72 ("Based

25  on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that

26  he made over $1.2 million on his scam, implying no one could stop him from

27  counterfeiting NFTs and harming the goodwill of the BAYC brand.").  And, as a

28

further example, Mr. Ripps testified that he minted the RR/BAYC NFTs to his "personal wallet, ryder-ripps.eth" despite the fact that the "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs. *Compare* JTX-25, *with* JTX-36.  Thus, Defendants' narrative that customers would not be confused because they could see the NFTs were minted from Mr. Ripps' wallet is belied by the fact that the wallet displayed Mr. Ripps' name *after* the initial mint and customers would not encounter the "ryder-ripps.eth" creator tag had they even tried to look.  While Mr. Ripps attempts to couch his lies in "sarcasm," the ultimate effect was confusion in the marketplace and a significant payday for Defendants.

Mr. Ripps also repeatedly lied about his discovery obligations.  Throughout discovery Mr. Ripps signed no fewer than three declarations (two of which were Court-ordered), under penalty of perjury, stating that he had searched his records and produced all responsive documents related to the RR/BAYC NFTs.  JTX-1541 (Jan. 17, 2023); Dkt. 109-42 (Feb. 17, 2023); Dkt. 158 (Mar. 21, 2023).  After each of these three declarations, however, Defendants continued to produce responsive documents after Yuga Labs independently discovered evidence of improper withholding.  *See, e.g.*, JTX-1574-JTX- 1591 (text messages between Mr. Ripps and Mr. Cahen, withheld until March 21, 2023, discussing relevant topics such as Defendants' infringing NFT collection, Yuga Labs, Defendants' profit intent, Ape Market, and marketing).  Defendants withheld documents such as ***hundreds of pages of text messages*** them until March 21, 2023 — after Mr. Ripps verified under penalty of perjury that he produced all responsive documents, after the Court had to order responsive documents produced twice in response to Yuga Labs' discovery motions, and after Yuga Labs had already filed its motion for summary judgment.  *See* Dkt. 145 (order requiring Defendants to produce communications).  Defendants also produced responsive documents even after their March 21, 2023 declaration; for example, on April 11, 2023, Defendants produced messages with a BAYC NFT holder to whom

Defendants were trying to provide an infringing NFT.  Defendants have no excuse for their repeated improper withholding of material evidence and repeated lies under oath.

Mr. Ripps' testimony that the text message presented to him at trial did not have anything to do with the RR/BAYC project is another blatant lie.  These documents that Mr. Ripps wrongly withheld until after Yuga Labs' summary judgment submission included text messages discussing airdropping more of Defendants' infringing NFTs to the wallets of those who have already purchased them.  Thus, Mr. Ripps' testimony that he did not "really find it to have anything to do with the RR/BAYC project" is unbelievable.  Trial Tr. at 268:17-21; JTX-1574 (text messages in which Mr. Cahen suggests Mr. Ripps "airdrop like 10 more to each person who already bought one" and that if Mr. Ripps airdropped "20-30" he would "sell out within 48 hours" and "make like a million dollars").  Mr. Ripps' testimony reiterates what is obvious from the record:  Defendants' stories change based on what is convenient for them at the time.  Mr. Ripps, a proven liar, is not a credible witness.

And Mr. Ripps' testimony that he never marketed his infringing NFTs with the "Bored Ape Yacht Club" marks is also not credible.  Ripps Depo. Designations (Dkt. 369) 61:5-9.  Significant evidence proves the contrary.  *See, e.g.,* JTX-28 (Defendants' Foundation page listing their infringing NFTs as "Bored Ape Yacht Club").

**Defendants' Third-Party, Unreliable Communications Do Not Negate The Court's Findings Or Yuga Labs' Experts' Opinions:**  As discussed further *supra* ¶ 7(d) (lines 3:20-23), Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market.  Defendants have no evidence supporting a claim that a statistically significant number of consumers were not confused.  Indeed, the hundreds of refunds they provided at consumers' requests suggest that some purchasers were confused.  And, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

**Defendants' Reply:**

Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed that Defendants did not market RR/BAYC NFTs as Bored Ape Yacht Club NFTs and did not rely on Yuga's marks to sell the NFTs. Additionally, Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) Defendants acted in a good faith belief that the RR/BAYC collection was protest art and consumers understood the satirical nature of RR/BAYC NFTs, and (3) Mr. Solano is not a credible witness including because he admitting at trial that he testified falsely.

Yuga's additional responses to this objection similarly fail because (1) the Defendants always identified Mr. Ripps as the creator of RR/BAYC collection whenever it was possible to do so, (2) the Foundation page for RR/BAYC always identified Mr. Ripps as the creator, (3) Mr. Ripps is a credible witness and was unimpeached, and (4) Defendants received hundreds of letters from actual purchasers of RR/BAYC NFTs showing that purchasers were not confused.

***First,*** Defendants attributed RR/BAYC NFTs to Mr. Ripps whenever it was possible to do so.   Defendants controlled their personal Twitter accounts and rrbayc.com—and Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-2086), Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344); JTX-671).  All other platforms were owned and operated by third parties, which put restraints on what Defendants could do.  Still, even though Defendants did not have control over third party platforms, they used what little abilities they had to ensure that, for example, Foundation identified Mr. Ripps as the creator.  JTX-671. Likewise, Etherscan identified Mr. Ripps as the create either by his wallet name or

1  unique wallet address.  JTX-600; JTX-1146.  And even OpenSea clearly labeled the

2  NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps."  JTX-28.

3      ***Second,*** the uncontested evidence at trial, including Mr. Ripps's designated

4  deposition testimony, show that Mr. Ripps did not design the Foundation page for

5  RR/BAYC.  Dkt. 369 [Ripps Depo. Designations] 70:19-25 ("Q. And who created this

6  page for you?  A. Who created this page for?  Q. Uh-huh A.  ***I guess Foundation***

7  ***helped make it because I didn't design [it]***.  Like, that's not my logo in the corner,

8  and I, you know, I probably would have designed it bit different.  So Foundation.").

9  Within Foundation's chosen design, the exhibits show that the RR/BAYC collection

10  was listed under Mr. Ripps's creator page.  As Mr. Ripps explained at this deposition,

11  the Foundation page (based on the way it organizes content) was showing the NFT

12  collection as Ryder Ripps's Bored Ape Yacht Club which is simply the long-form of

13  "RR/BAYC":

14
15      Q.    On this Foundation page.

16      A.    Well, this is my Foundation page.  So it already says "Ryder
             Ripps/Bored Ape Yacht Club." You can see it right there, Ryder
17            Ripps/Bored Ape Yacht Club. So I wouldn't write "Ryder Ripps,
             Ryder Ripps, Ryder Ripps/Bored Ape yacht Club."  It already says
18            "Ryder Ripps/Bored Ape Yacht Club."
19
20      Q.    Can you show me where it says "Ryder Ripps/Bored Ape Yacht
             Club."
21
22      A.    Ryder Ripps/Bore Ape Yacht Club.
23
   Dkt. 369 [Ripps Depo. Designations] 76:13-22.
24
       ***Third,*** Mr. Ripps is a credible witness.  Mr. Ripps's declaration was
25
   uncontested because Yuga elected to forego any substantive cross-examination of Mr.
26
   Ripps on ***any*** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.
27
   As the Supreme Court has explained, "[c]ross-examination is the principal means by
28

which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because the purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record.  Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial.  This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony. Having failed to challenge Mr. Ripps's testimony at trial, Yuga now seeks to take evidence out of context and mischaracterize documents.  This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.    You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.    What I would say I did was use the prospect of a potential marketplace *which we were in the ideation phase of*, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.   We discussed the idea of creating a system that would allow holders
>         of popular NFT collections to trade their NFTs without being fleeced
>         by centralized parties charging exorbitant fees.
>
> 259.   Ultimately, ***we never agreed on what ApeMarket would be***.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated
Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr.
Hickman testified about his ongoing discussion on potential designs of ApeMarket,
explaining:

> Q.   BY MR. BALL:  You state here, "It's difficult to make the collection
>      coexist without adding a friction step."
>
> A.   This is a discussion, ***an ideation of different ideas, none of which
>      were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's
declaration regarding his intent in creating the RR/BAYC collection.   The full
testimony that Yuga cites provides:

> 182.   My intention in making the RR/BAYC artwork was not to monetize
>         Yuga's brand but instead to criticize Yuga's use of objectionable
>         imagery and to educate the public about the nature of NFTs.
>
> 183.   As an artist, I believed that I could create an "army of educators"
>         through my art.
>
> 184.   I believed that use of art to criticize Yuga and its imagery was
>         protected by the First Amendment.

Ripps Decl. (Dkt. 346) ¶¶ 182-184.  Significant evidence in the record corroborates Mr. Ripps's statements.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen.   And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in

response to more jokes from Mr. Cahen (again, not a reference to any intent to profit). *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***
>
> Q.   ***That statement, that part of your witness statement is incorrect; right?***
>
> A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew

1   he could not settle his case without executing a declaration concerning matters of

2   Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his

3   family at the time he signed his declaration, because Yuga's lawsuit against him

4   would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

5   [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

6   impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't

7   even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A

8   Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a

9   deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same

10  oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up

11  on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3

12  created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't

13  know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do

14  you know whether Ape Market exists? A We have the code for Ape Market from Tom

15  Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6.

16  'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

17  Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's

18  testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

19  been rebutted.  Mr. Solano could not identify a single person that ever bought an

20  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,

21  no one has been able to identify a single confused consumer in the entirety of this

22  case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

23        Yuga then incorrectly argues that Mr. Ripps's statement about his intent is

24  refuted by comments from other members of the RR/BAYC project.  But these

25  statements show no such thing.   For example, Yuga's cites JTX-801.208 in which

26  Mr. Cahen states that a priority is "getting RR/BAYC to sell out."  But as Mr. Cahen

27  explained at trial, the whole point of broad exposure through the RR/BAYC collection

28

1   (including getting people to reserve NFTs) was "spreading and magnifying criticism
2   of Yuga."  Cahen Decl. ¶ 98 (Dkt. 344).  And Mr. Cahen's private communications in
3   the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for
4   artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these
5   things.  It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary
6   focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes
7   a strong statement.  This is art, not Pokemon cards." (JTX-801.00013); "Because
8   that's where the real importance lies.  RR/BAYC truly is very important conceptual
9   art imo.  And now we are all helping shape that art further." (JTX-801.00196).
10  Yuga also cites Mr. Hickman's deposition testimony in which he stated that his
11  "financial arrangement" was "a software developer being compensated for making
12  software."  Hickman Depo. Designations (Dkt. 394) at 129:3-6.  But Mr. Hickman's
13  testimony about this topic at trial was unequivocal about his purpose in participating
14  in the RR/BAYC project:

15      Q.    Why did you expect to make less from your work on this RSVP
16            contract than your normal rate?

17      A.    I was contributing because I believe in standing up for the illegitimate
18            business practices and imagery in this Yuga Labs BAYC NFT
19            collection.

20  Trial Tr. [Hickman] 221:11-15.  Mr. Hickman further explained, "We are selling a
21  receipt that says *I committed to this protest* that points to the same public [images] that
22  a lot of different collections point to including Yuga Labs point to the same resource."
23  Trial Tr. [Hickman] 222:18-21 (emphasis in original).
24      Yuga also cites to Mr. Lehman's declaration to suggest that Defendants
25  considered the RR/BAYC collection to be a "business venture."  Defendants never
26  used the term "business venture" to describe the RR/BAYC project.  In fact, the only
27  place where the term appears is in Mr. Lehman's declaration, which was a document
28

drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.
Yuga's attorneys, not the Defendants, coined the term "business venture."  As
demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr.
Lehman's declaration, without having considered that Yuga's counsel drafted the
declaration and selected the phrase "business venture," and without having considered
that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-
22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having
considered that Mr. Lehman was afraid for his family at the time he signed his
declaration, because Yuga's lawsuit against him would be disastrous to his family and
himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration
through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023,
verification.  But Yuga's cross-examination did not result in any impeachment or
inconsistency:

> Q.    You produced those text messages, that you withheld throughout this
> case, including when you testified that you had no responsive
> documents on January 17, 2023; correct?
>
> A.    I think that we – the question was all communications that relate to
> the creation of RR/BAYC, which we felt was very much in the group
> chat that was called RR/BAYC.  And we produced that, which you
> guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

> Q.    And, Mr. Ripps, the text messages that you produced in this case
> include the RR/BAYC chat; right?
>
> A.    Yes.  We produced everything that we could, despite the fact that
> Yuga produced nothing.

1

2

Q.     Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?

3

4

A.     I don't have it on the screen, but I see you holding them, and I see them –

5

Q.     Do you see it now?

6

7

8

A.     Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.

9

10

Q.     Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

11

12

A.     Yes, I did.

13

14

15

16

17

18

19

20

21

22

23

24

25

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation. ***I reserve the right to make changes or additions to any of these answers or document productions*** if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added).  Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

26

27

      The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration.  Yuga had an

28

opportunity to fully vet its false allegations at trial through cross-examination of Mr.
Ripps but elected not to do so.  Mr. Ripps's testimony was therefore unchallenged.

**Fourth,** Yuga falsely states that these Defendants relies on "cherry-picked
communications" from actual purchasers of RR/BAYC NFTs.   Mr. Ripps testified in
his declaration: "I received **hundreds of letters** thanking me for creating the
RR/BAYC artwork and for standing up against a corporation that had used hateful
references in its brand" and then went on to give eight specific examples of the letters
he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point
during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at
trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the
uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from
RR/BAYC participants expressing support for the project and its criticism.
Yuga has also failed to present evidence disputing the fact that none of these
correspondences indicated that commissions or secondary sales were due to
confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing
correspondences from collectors, Yuga attempts to point to indications of consumer
confusion.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 7(g):**

Mr. Ripps promoted the RR/BAYC NFTs as "Bored Ape Yacht Club V3" and
"BAYC V3." JTX-689; JTX-690; JTX-1249; JTX-1556.3-4; Dkts. 340 ¶10; 342 ¶¶65-
67; 392 at 53:7-13.

### **Defendants' Basis of Dispute:**

The evidence at trial showed that Mr. Ripps did not use "BAYC V3" or "Bored
Ape Yacht Club V3" to promote the RR/BAYC collection.  Mr. Ripps, Mr. Cahen,
Mr. Hickman, and third-party Thomas Lehman never used BAYC V3 or Bored Ape
Yacht Club V3 to suggest that the RR/BAYC project had any affiliation with Yuga or
to confuse any purchaser.  Trial Tr. [Cahen] 253:18-21; [Cahen] 254:24-255:3.  The

term "BAYC V3" was, however, referenced on social media in a sarcastic context and as a joke. Trial Tr. [Cahen] 254:25-255:2.  Some third-party resellers also auto-generated the terms "Bored Ape Yacht Club V3" or "BAYC V3," including when generating a new name space after resolution of requests pursuant to the Digital Millennium Copyright Act. Trial Tr.  [Cahen] 253:22-254:7.  Mr. Ripps and Mr. Cahen had no control over and no affiliation with those third parties who auto-generated "Bored Ape Yacht Club V3" or "BAYC V3."  Trial Tr. [Cahen] 254:3-7.

The exhibits that Yuga cites also do not show that Mr. Ripps ever referred to the RR/BAYC NFT collection as "BAYC V3" or "Bored Ape Yacht Club V3."  JTX-689, for example, is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis question on what NFTs people are buying.  Mr. Ripps's reply is a satirical comment that has absolutely nothing to do with the RR/BAYC collection and, in fact, the comment was made before Mr. Ripps even started take commission for RR/BAYC NFTs.  JTX-690 is a Twitter post by Mr. Ripps of the link to the x2y2.io page for the RR/BAYC collection.  At no point did Mr. Ripps state "BAYC V3" or "Bored Ape Yacht Club V3" in this post as it simply contains a link.  And while the URL does contain "bored-ape-yacht-club-v3," Mr. Ripps had no control over the URL that x2y2.io used or how it chose to auto-populate pages.  Similarly, JTX-1249 is another Twitter post made by Mr. Ripps that also does not use the term "BAYC V3" or "Bored Ape Yacht Club V3" in the body of the text.  The post also includes a video of the OpenSea website that had chosen to auto-populate the delisted subsequently relisted RR/BAYC page with "Bored Ape Yacht Club V3" but again Mr. Ripps had no control over how OpenSea auto-populated the name of the RR/BAYC collection after having delisted the collection in response to Yuga's DMCA requests.  The text of the tweet mentions Yuga's unsuccessful efforts to "block the ryder ripps ape from opensea."  And lastly, JTX-1556.3-4 shows a post from an unidentified third party with the username "sting" that appears to have posted an image from a third-party

1   marketplace that also auto-populated the RR/BAYC collection as "Bored Ape Yacht

2   Club V3" after having delisted the collection in response to Yuga's DMCA request.

3        Yuga could have cross-examined Mr. Ripps regarding JTX-689, JTX-690, JTX-

4   1249, and JTX-1556.3-4 but instead chose not to despite the fact that Mr. Cahen

5   unequivocally testified that Mr. Ripps had never used "BAYC V3" or "Bored Ape

6   Yacht Club V3" to refer to the RR/BAYC collection.  Trial Tr. [Cahen] 253:18-21;

7   [Cahen] 254:24-255:3.

8        In lieu of cross-examining Mr. Ripps, Yuga cites to Ms. Muniz and Mr.

9   Solano's incorrect after-the-fact analysis of these documents.  Ms. Muniz's testimony

10  is clearly incorrect given the content and context of the exhibits at issue.  And Mr.

11  Solano's testimony both during trial and in his declaration are just more unreliable

12  statements, in addition to the numerous other false and misleading statement he made.

13  For example, Mr. Solano was forced to concede on cross examination that his sworn

14  declaration included a false statement claiming that "Defendants continue to receive

15  royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano]

16  48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's

17  declaration, without having considered that the phrase "business venture" was selected

18  by Yuga's counsel, and that Mr. Lehman would have liked to use different words.

19  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration

20  without having considered that Mr. Lehman knew he could not settle his case without

21  executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano]

22  38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his

23  declaration, because Yuga's lawsuit against him would be disastrous to his family and

24  himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also

25  lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial

26  Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was

27  created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

28

1   deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you

2   swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your

3   deposition -- and we can pull it up on the screen -- at page 152, starting at line 13

4   'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection

5   from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your

6   deposition? A Yes." ); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists?

7   A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your

8   deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape

9   Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you

10  give that answer? A Yes.").

11              **Plaintiff's Response:**

12        Defendants' objection should be rejected because (1) the record shows the

13  Defendants promoted their infringing NFTs under the name "Bored Ape Yacht Club

14  V3," (2) Defendants fail to impeach Mr. Solano, and (3) the record shows that Ms.

15  Muniz's trial declaration testimony was accurate.

16        **Defendants Promoted Their Infringing NFTs Under The Name Bored Ape**

17  **Yacht Club V3:**  Defendants' assertion that they did not use "BAYC V3" to imply an

18  affiliation with Yuga Labs or confuse consumers is contradicted by the evidence

19  admitted at trial.  This contradiction is highlighted by the fact that Defendants could

20  not keep their story straight.  First, Mr. Cahen testified at trial that "the V3 thing is

21  never something that I used or Ryder used or Ryan Hickman used or Mr. Lehman

22  used."  Trial Tr. at 253:19-21.  But now, in their proposed findings of fact and

23  conclusions law, Defendants concede that they used the term, but argue that their use

24  was "in a sarcastic context and as a joke."  Defendants' inconsistent testimony should

25  be given no weight and their assertion should not be accepted as true.

26        It also does not matter if they thought the infringement was funny.  Mr. Ripps'

27  use of "BAYC V3" to refer to the infringing NFTs suggests an affiliation with Yuga

28

Labs, and therefore the assertion that neither Defendants nor their associates used the term "to suggest that the RR/BAYC project had any affiliation with Yuga or to confuse any purchaser" is false.  On one occasion, in response to a Tweet by @j1mmy.eth asking what NFT collections consumers were purchasing, Mr. Ripps tweeted "bayc v3."  JTX-689.  This was the ***same day* he created the RR/BAYC smart contract**.  Atalay Decl. (Dkt. 337) ¶ 3 ("on May 13, 2022, Defendant Ripps created the Ethereum blockchain smart contract); JTX-600 (showing May 13, 2022 as the creation date).  Four days later, Mr. Ripps tweeted a link to a secondary sales marketplace where his infringing NFTs were listed under the name "Bored Ape Yacht Club V3."  JTX-690.  Both of these terms include Yuga Labs' trademarks and thus imply an affiliation with Yuga Labs and the Bored Ape Yacht Club brand.  Both of these uses were tied to his sales and marketing of his infringing NFTs.  And in neither Tweet did Mr. Ripps make any attempt to dispel any confusion as to this obvious affiliation.  He only said "bayc v3" or "Bored Ape Yacht Club V3."

Defendants' assertion that the use of Yuga Labs' marks was not meant "to confuse any purchaser" should be given no weight in light of the Court's finding that Defendants "used the BAYC marks in an effort to confuse consumers."  SJ Order (Dkt. 225) at 12.  But, setting aside even the Court's on finding of Defendants' intent, the evidence admitted at trial demonstrates Defendants' obvious intent to use Yuga Labs' BAYC Marks to make money.  Whether funny or not, the end result of Defendants calling their infringing NFTs "V3" was overwhelming confusion in the marketplace and a significant payday for Defendants and their associates.  *See* JTX-701 (Bloomberg referring to RR/BAYC as Bored Ape Yacht Club V3); Muniz Decl. (Dkt. 340) ¶¶ 10-11; Kindler Decl. (Dkt. 338) ¶ 23.

**Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of Defendants' intentional and repeated use of the BAYC Marks is undisputed and went

1   unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's

2   trial declaration based on a purported lack of personal knowledge were overruled at

3   trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is

4   because Mr. Solano was referring to Defendants' own words promoting their

5   infringement.

6       Nevertheless, the arguments Defendants raise are themselves meritless.  First,

7   Mr. Solano's testimony that Defendants collected royalties off secondary sales was

8   supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility

9   of further royalties on LooksRare or other new marketplaces if Defendants continued

10  to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at

11  89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338)

12  at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at

13  the time of his declaration and trial.

14      Second, Mr. Solano's testimony that Defendants' activities constitute a business

15  venture is amply supported by Defendants' own actions that Mr. Solano personally

16  observed.  It does not matter that Mr. Lehman agreed to call it a business venture.

17  But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's

18  declaration by arguing that Mr. Solano did so without reading his entire deposition are

19  without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of

20  how he may have felt about the process of being sued for his role in Defendants'

21  scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr.

22  Lehman's declaration was also corroborated by the consent judgment entered against

23  him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had

24  clearly reviewed the declaration based upon his testimony about its contents in his

25  own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration

26  under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps'

27  commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was

28

1  expected to make money by selling RR/BAYC NFTs and by potentially generating

2  transaction fees from the sale of NFTs on ApeMarket.'").

3      Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-

4  33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr.

5  Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the

6  cited line of trial testimony.  Mr. Solano cannot be impeached by reference to

7  deposition testimony covering an entirely different topic.  To be clear, the quoted

8  deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr.

9  Ripps claims he does not control, and which was not at issue at trial.  Solano Depo.

10  (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr.

11  Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape

12  Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

13      Finally, Defendants likewise fail to impeach Mr. Solano's statement at Trial Tr.

14  34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the

15  webpages generated by running the source code for the planned ApeMarket.com

16  website," informing his response that Yuga Labs obtained the code from Mr. Lehman.

17  Solano Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with

18  this topic and based his knowledge on these exhibits.  *Id.*; JTX-806–JTX-809.  Those

19  webpages were not generated from the source code produced by Mr. Lehman until

20  **after** Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he

21  was able to truthfully testify at trial as to that knowledge.  Defendants did not ask Mr.

22  Solano where or how he came to his knowledge, but he attaches the basis for that

23  knowledge to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-

24  809, to which Defendants did not object).  Defendants fail to impeach Mr. Solano's

25  accurate knowledge.

26      **Ms. Muniz's Testimony was Accurate:**  Defendants fail to impeach Ms.

27  Muniz's testimony that Defendants promoted their infringing NFTs under the titles

28

"BAYC V3" and "Bored Ape Yacht Club V3."  Muniz Decl. (Dkt. 340) ¶ 10.  Ms. Muniz testifies that she viewed the Bloomberg segment describing Defendants' infringing NFTs as "Bored Ape Yacht Club V3."  *Id.*; *see also* JTX-701.  The segment listed "Bored Ape Yacht Club V3" as the highest volume collection at the time.  Ms. Muniz knew that this referred to Defendants' RR/BAYC NFTs because Mr. Cahen bragged that Defendants' infringing NFTs were trading at the highest volume on OpenSea in a Tweet the day before the Bloomberg segment aired.  JTX-683 (June 20, 2022 Cahen Tweet stating that "RR/BAYC is officially the highest 24h volume… IN THE WORLD" and that RR/BAYC "passed BAYC in the middle of ApeFest!").  OpenSea's own data also confirm that at the time that Bloomberg was reporting that "Bored Ape Yacht Club V3" NFTs were trading at the highest volume, so too were Defendants' infringing RR/BAYC NFTs.  And Mr. Ripps tweeted a link to a secondary sales marketplace where his infringing NFTs were listed under the name "Bored Ape Yacht Club V3."  JTX-690.  Ms. Muniz's testimony is accurate.

### **Defendants' Reply:**

Yuga's responses to Defendants' objection fails because (1) the evidence shows that Defendants did not promote their NFTs as "Bored Ape Yacht Club V3," (2) Mr. Solano is not a credible witness, and (3) Ms. Muniz's statements about "Bored Ape Yacht Club V3" are untrue and inconsistent with trial evidence.

*First,* Yuga fails to cite evidence showing that Defendants use "Bored Ape Yacht Club V3" or "bayc v3" to promote the RR/BAYC collection.  Mr. Cahen testified that he would have never referred to the RR/BAYC project as "V3"and explained that he believed the term originated in this context from DMCA takedowns. Trial Tr. [Cahen] 253:15-254:7.  He then explains that *others* on the internet would use the "V3" as a joke but that "myself, nor anyone on my team, ever used that label or name or whatever you want to call it. V3 is something that we have absolutely nothing to do with."  *Id.* at 255:4-7.  It is entirely consistent that Mr. Cahen never used

1   the term v3 but that others on the internet might have.  He also stated that Mr. Ripps

2   might have used the term sarcastically.  *Id.* at 255: 8-12.

3        JTX-689 and JTX-690 do not show an intentional use of Bayc V3 to confuse.

4   JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis's

5   question on what NFTs people are buying.  Mr. Ripps's reply is a satirical comment

6   that has absolutely nothing to do with the RR/BAYC collection and, in fact, the

7   comment was made before Mr. Ripps even started taking commissions for RR/BAYC

8   NFTs.  *See* JTX-689; Dkt. 346 Ripps Decl. ¶¶ 73-80 (uncontested).  It was a clear joke

9   that anybody familiar with the feud between Jimmy and Mr. Ripps would understand

10  and not an attempt to dupe anybody.  Likewise, JTX-690 which purportedly shows a

11  Tweet with v3 only displays "v3" if the mouse is left hovering over the link in a

12  specific way.  The actual body of the Tweet does *not* include the v3 term, and Yuga

13  has shown no evidence that the URL name was not automatically generated.

14       Yuga points to the Bloomberg video as evidence that the use of "v3" by

15  Defendants led to confusion.  *See* JTX-701.  But the Bloomberg news segment did not

16  discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains about.

17  The Bloomberg Crypto segment centered on the recent cryptocurrency market crash

18  and its impact on the valuation of various cryptocurrency assets.  JTX-1049.  During a

19  discussion of the NFT market, Bloomberg news reporters highlighted that NFT

20  valuation had dropped in 2022, along with the valuation of other cryptocurrency

21  assets.  *Id.*  However, during a brief discussion of an "eight percent jump in the NFT

22  index," a chart listing NFT collections appeared behind the Bloomberg reporter.  *Id.*

23  While the chart was displayed, the reporter did not discuss any of the collections.

24  Instead, she highlighted market changes such as volume drops on OpenSea of "almost

25  200%."  *Id.*  As the NFT collections chart was taken down, the reporter said "let's talk

26  a second longer about the Bored Ape Yacht Club collection" before discussing how

27

28

drops in valuation across the cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

Although the NFT collections chart shown during the Bloomberg segment listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter did not spend any time discussing and analyzing the chart. *Id*. She never referenced the Defendants by name, she never referenced Defendants' criticisms of Yuga, and she never even mentioned Yuga. Instead, she briefly mentioned the Bored Ape Yacht Club as the chart was taken down. *Id*. This is unsurprising since the Bored Ape Yacht club was one of the collections listed on the chart. *Id*. However, nothing that the reporter said characterized Defendants' RR/BAYC project as being affiliated with Yuga or the Bored Ape Yacht Club. In fact, the reporter did not compare or contrast any of the listed collections. *Id*. She simply continued to her other talking points. *Id*. Thus, the Bloomberg news segment has not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs listed on the chart and the V3 NFTs listed on the chart—the same chart that was never discussed by anyone at any point during the news segment.

Accordingly, Yuga does not point to any evidence that the Bloomberg reporters were actually confused or that even the chart in the background indicated any confusion between the Bored Ape Yacht Club, which was listed separate and apart from the V3 listing). In fact, Yuga witnesses admitted that they never spoke with Bloomberg reporters and thus cannot actually speak about Bloomberg's state of mind. Trial Tr. [Solano] 31:3-17. Yuga has also shown no evidence that it was Defendants' use of the term "v3" that led to the Bloomberg report.

***Second,*** Mr. Solano is not a credible witness. At trial, Mr. ***Solano admitted to testifying falsely*** in his sworn declaration of trial testimony when he was forced to concede on cross-examination that his sworn declaration included a false statement

claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.    Yes.
>
> Q.    So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.    It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.    *They don't continue to increase; correct, sir?*
>
> A.    *Correct.*
>
> Q.    *That statement, that part of your witness statement is incorrect; right?*
>
> A.    *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Third,** Ms. Muniz did not provide accurate testimony regarding the use of Bored Ape Yacht Club V3.  Her declaration relied on exhibits such as JTX-689 and JTX-690, and the Bloomberg video.  As explained above, none of these documents show Defendants actually used "Bored Ape Yacht Club V3" or "bayc v3" in reference to the RR/BAYC collection.   Moreover, Ms. Muniz's declaration was not based on her personal knowledge, but instead her speculating what Defendants may or may not have done based on her secondhand knowledge from unnamed, anonymous, third parties.   This evidence does not rebut the testimony from Mr. Ripps and Mr. Cahen regarding their own actions and it does not rebut the exhibits, which consistently show that Defendants are not using "v3" as a reference to the RR/BAYC collection.

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(h), lines 4:22-25:**

Defendants developed and marketed an NFT marketplace, Ape Market, where consumers could, as Defendants intended, purchase and sell RR/BAYC NFTs alongside BAYC NFTs, and which used BAYC Marks in a manner likely to confuse consumers. *See* Dkts. 337 ¶9; 392 at 136:23-138:5; JTX-696; JTX-806-JTX-809.

**Defendants' Basis of Dispute:**

The trial evidence did not show that Defendants developed an NFT marketplace that was likely to confuse consumers. ApeMarket was never released, the development of the website apemarket.com was never completed, and there was never a functioning marketplace. Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested). In fact, Mr. Ripps had never decided on what he wanted ApeMarket to be and had never signed off proposed or worked on by the RR/BAYC team. Ripps Decl. ¶ 178 (Dkt. 346) (uncontested). Mr. Cahen and Mr. Hickman also confirmed that ApeMarket never made it past the ideation stage. Cahen Decl. ¶¶ 258-259 (Dkt. 344); Trial Tr. [Hickman] 211:21-22.

Moreover, the trial evidence showed that in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing. For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users. JTX-801.185. Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com. *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").

Yuga also misleadingly cites to the trial testimony of Mr. Hickman. The portion of the transcript that Yuga relies on (Trial Tr. [Hickman] 211:17-212:24)

1   involves questions regarding Defendants desire to add a friction step to the never

2   released ApeMarket to ensure that the design of the website would not cause

3   confusion.   Mr. Hickman explains, "This is our attempt to make it as clear as

4   possible.  We are having discussion on how to make sure it was very clear for users."

5   Trial Tr. [Hickman] 212:22-24.

6       Yuga ignores the trial evidence showing that apemarket.com was in the ideation

7   stage and was never released—the testimony of Mr. Atalay where he falsely states that

8   the marketplace was ready to be deployed.  Mr. Atalay made this testimony having no

9   personal knowledge about the RR/BAYC team's work in connection with ApeMarket,

10  on how it was still in the ideation stage, on how Mr. Ripps had not even decided what

11  apemarket.com would be, and that Defendants never actually released ApeMarket.

12      Yuga also cites to several exhibits that fail to show that Defendants designed

13  ApeMarket to be confusing to users.  For example, JTX-696 is not apemarket.com but

14  is instead the ApeMarket Twitter page (which Yuga has not alleged in this case as

15  infringing any of the asserted marks).  JTX-696 does not show what apemarket.com

16  displayed, what functionalities it had, and whether it has ever had any content that was

17  confusing in any way.  As noted above, ApeMarket was never released (Trial Tr.

18  [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps

19  Decl. ¶ 180 (Dkt. 346) (uncontested) and no evidence shows that the website domain

20  apemarket.com displayed anything that would confuse NFT collectors.  JTX-806 is

21  the source code for the unreleased ApeMarket that Mr. Ripps never approved and was

22  still subject to substantial changes that would have been necessary during the

23  RR/BAYC team's ongoing ideation stage.  And JTX-809 is a screenshot of mock-up

24  of apemarket.com that Mr. Ripps did not approve and that was still subject to

25  substantial changes from the ongoing ideation process for apemarket.com.

26          **Plaintiff's Response:**

27

28

Defendants' objection should be rejected because (1) the record shows that Ape Market was ready to launch, (2) Defendants promoted Ape Market and the RR/BAYC NFTs through the @ApeMarketplace Twitter account, and (3) Defendants' disclaimer demonstrates the likelihood of confusion and did nothing to dispel confusion.

**Evidence Admitted At Trial Confirms That Ape Market Was Ready To Launch:**  Despite Defendants' attempts to argue otherwise, the evidence shows that Ape Market was ready to launch.  *See* Trial Tr. at 137:23-24 ("The code was in such a state of completion that it was operational."); *see also* JTX-807; JTX-808; JTX-809. Indeed, at trial Mr. Cahen confirmed that Ape Market was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A:  Among other things, yes[.]").  Mr. Cahen later confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  See JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour commitment Friday afternoon would be the release" and Mr. Cahen responding "I think it makes sense to launch a bit earlier imo if we are comfortable doing so."); JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every YugaLabs asset . . . [a]nd we got sued for it.").  Ape Market existed as an entity actively marketing on social media, and the actual online marketplace was ready to launch.

**The @ApeMarketplace Twitter Account And The Ape Market NFT Marketplace Are Clearly Related And Both Were Used To Promote RR/BAYC:** Defendants created the @ApeMarketplace Twitter account to promote the Ape Market marketplace and their infringing RR/BAYC NFTs.  The fact that the Twitter handle

1  solely controlled by Mr. Cahen contains "ApeMarket" alone demonstrates the
2  connection between the Twitter account and marketplace, but the Tweets from the
3  account confirm that Defendants used @ApeMarketplace to promote Ape Market.
4  Cahen Depo. Designations (Dkt. 395) at 126:5-7 (Q:  And you are the sole operator of
5  the Ape Marketplace account? A:  That is correct, yes.").  One such Tweet on June 20
6  asks, "Are you ready for ApeMarket.com, anon?" and another on June 13 teases the
7  release of Ape Market stating "Get Ready" alongside a screenshot of Ape Market.
8  JTX-696.  And Mr. Cahen lied at trial when, under oath, he stated that he did not
9  "plan to stimulate the sales of RR/BAYC NFTs by teasing the future release of
10 ApeMarket."  Trial Tr. at 234:15-18.  Mr. Cahen tweeted from @ApeMarketplace a
11 link to reserve an RR/BAYC on multiple occasions and on June 2 he tweeted that
12 "[l]isting requires holding RR/BAYC."  JTX-696.  Defendants' own internal
13 communications confirm the lie.  On June 1 Mr. Cahen stated, "my goal for today is to
14 create an announcement that will create hype and volume, we want to mint out the
15 remainder of that collection."  JTX-801.221.  On that same day Mr. Cahen tweeted
16 from @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC
17 and a link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the
18 prospect of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim
19 that Ape Market, @ApeMarketplace, and RR/BAYC are not connected is obviously
20 false.  The Tweets in JTX-696 repeatedly show the look, functionality, and intent of
21 Ape Market and the infringing RR/BAYC NFTs within Ape Market.

22      **Defendants' "Disclaimer" Does Not Negate The Court's Finding That**
23 **Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer
24 on rrbayc.com, "the fact that Defendants concluded it was necessary to include a
25 disclaimer demonstrates their awareness that their use of the BAYC Marks was
26 misleading."  SJ Order (Dkt. 225) at 17.  Defendants knew they were infringing and
27 creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371

28

1 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want

2 to fight trademark").  Instead of making changes, such as those recommended by their

3 lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote

4 and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl.

5 (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands,

6 every choice is intentional.").

7        Defendants also knew that what they were doing was likely to lead to a lawsuit.

8 For instance, Mr. Ripps asked for a reference to his limited liability company,

9 Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued

10 personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and

11 branding direction in light of the trademark thing" to Mr. Cahen before they learned of

12 this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get

13 sued, for us to look really sympathetic to everyone" (JTX-918.0036).  That

14 Defendants took some steps to try to conceal their intent when they were inevitably

15 sued does not make the infringing activity less confusing; it just demonstrates their

16 culpability.

17        The public was not required to read and click a disclaimer.  Indeed, even on

18 rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr.

19 Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one"

20 would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion

21 amongst the general public when every single RR/BAYC NFT sold (or that ever will

22 sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—

23 without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-

24 134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer

25 on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The

26 majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where

27

28

1   there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million

2   impact).

3        Defendants have no survey, or material consumer evidence, that users of the

4   infringing rrbayc.com website read any disclaimer.  This is not surprising since the

5   vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

6   admitted that all sales went through Foundation—where there was no disclaimer.

7   Ripps Depo. Designations (Dkt. 396) at 82:8-13.

8        Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

9   uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

10  337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today

11  linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see

12  Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at

13  52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47,

14  78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th

15  Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did

16  "nothing to dispel post-purchase confusion).  Defendants' claimed disclaimer is non-

17  existent to ineffective at best.

18        **Defendants' Reply:**

19        Yuga's responses to Defendants' objection fails because (1) the trial evidence

20  shows that ApeMarket was in the ideation stage, (2) Defendants did not use

21  ApeMarket to pomote the sale of RR/BAYC NFTs, and (3) Defendants' disclaimer

22  shows that Defendants acted in good faith and that they took steps to decrease any

23  likelihood of confusion.

24        ***First,*** Yuga incorrectly argues that ApeMarket was ready to launch.  Mr. Cahen

25  repeatedly testified that ApeMarket was in the ideation stage:

26

27        Q.    You used the prospect of a marketplace to drive sales of RR/BAYC
              NFTs; correct?

28

A.   What I would say I did was use the prospect of a potential marketplace *which we were in the ideation phase of*, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.

259.   Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

Q.   BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."

A.   This is a discussion, *an ideation of different ideas, none of which were actualized*.

Trial Tr. [Hickman] 211:19-22 (emphasis added).  To rebut this clear evidence that ApeMarket was in the ideation stage by mischaracterizing Mr. Cahen's testimony as saying that ApeMarket was "ready to go" by June 24, 2022.  But what Mr. Cahen actually said is that he did not know if ApeMarket was "ready to go" by June 24, 2022.  Mr. Cahen then also stated that he works with the high skilled engineers that can implement nearly any project within days and that ApeMarket did not require much work in the first place as it used open-source code:

Q.   Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?

A.   I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.

Q.   And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?

A.   Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

as saying that ApeMarket was "ready to go" by June 24, 2022.  But what Mr. Cahen actually said is that he did not know if ApeMarket was "ready to go" by June 24, 2022.  Mr. Cahen then also stated that he works with the high skilled engineers that can implement nearly any project within days and that ApeMarket did not require much work in the first place as it used open-source code:

Q.   Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?

A.   I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.

1
2
3
4
5
6

> Q.    And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.    Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

7
8
9
10
11

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

12
13
14
15
16

**Second,** the evidence at trial showed that Defendants did not use ApeMarket to stimulate sales of RR/BAYC NFTs.  Yuga cross-examined Mr. Cahen about this very topic and was unable to show any evidence during that cross-examination showing that Defendant used ApeMarket with the intention to stimulate sales of RR/BAYC NFTs:

17
18
19

> Q.    And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?

20
21

> A.    ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***

22
23

> Q.    You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?

24
25

> A.    There never existed a marketplace.

26
27

> Q.    You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?

28

A.    What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Q.    You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?

A.    **No, I did not.**

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).

The evidence that Yuga cites does not rebut this trial testimony. Yuga cites to JTX-696 to incorrectly argue that apemarket.com was used to promote and sell RR/BAYC NFTs. JTX-696 is not apemarket.com but is instead the ApeMarket Twitter page (which Yuga has not alleged in this case as infringing any of the asserted marks). JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs. In fact, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested) and no evidence shows that the website domain apemarket.com was ever used for the promotion or sale of anything. And moreover, the ApeMarket Twitter page was tied, as Mr. Cahen testified at trial, to the criticism of the RR/BAYC project, by posting links to rrbayc.com which contained a length artistic statement and incorporated gordongoner.com, which reveals Yuga use of racist imagery in length. And further, the deposition testimony of Mr. Ripps that Yuga cites does not address using ApeMarket to stimulate sales of RR/BAYC NFTs but instead merely asked if Mr. Ripps ever made a statement tying the release schedule for ApeMarket to the minting out of RR/BAYC NFTs.

**Third,** Yuga fails to rebut that Defendants use of disclaimer is evidence of their good faith and was an act that reduced any likelihood of confusion. Yuga incorrectly

1   cites to this Court's summary judgment order to suggest that use of a disclaimer is not

2   a step taken to avoid confusion.  The "law of the case doctrine does not apply to

3   pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792

4   F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d

5   1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,

6   don't bind district judges for the remainder of the case.  Given the nature of such

7   motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held

8   that although *aspects* of an issue were decided at summary judgment for one purpose,

9   the summary judgment order did resolve the issue generally or as to other topics.  *See*

10  No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)

11  (holding that evidence of initial police contact was relevant as background, but not to

12  the already decided issue that initial contact was not excessive force).  This case is just

13  like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the

14  issue of infringement and is not adequate support for use of a disclaimer generally or

15  as applied to availability of disgorgement as a remedy, apportionment, and an

16  exceptional case analysis.

17      Yuga incorrectly argues that the disclaimer "did nothing to dispel confusion."

18  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes clear, the

19  rrbayc.com website "required collectors to acknowledge and accept a disclaimer

20  before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶ 105 (Dkt.

21  346) (uncontested).  Further that disclaimer stated "By purchasing this Ryder Ripps

22  artwork in the form of an NFT, you understand that this is a new mint of BAYC

23  imagery, recontextualizing it for educational purposes, as protest and satirical

24  commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to

25  verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold

26  for an order that will be fulfilled or rejected/refunded by Ryder within 24h

27

28

1  (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶
2  106.

3        Further, Defendants' disclaimer did require all commissions of RR/BAYC
4  NFTs on rrbayc.com to view and click through the disclaimer.  Further, it is apparent
5  that NFT collectors read the disclaimer because the disclaimer, and Defendants'
6  remaining activities aimed at preventing confusion, were successful.  The evidence at
7  trial also showed that the RR/BAYC collection did not cause any actual confusion and
8  was not likely to cause confusion.  Defendants received voluminous correspondence
9  from RR/BAYC participants—none of which indicated any confusion from primary
10 sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the
11 contrary, the correspondence expressed gratitude and support for the criticism of
12 Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-
13 2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr.
14 Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps
15 Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶
16 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to
17 identify a single person who obtained an RR/BAYC NFT believing it to be sponsored
18 by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were
19 focused on. Yuga Labs has been unable to identify even[] a single person who
20 purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A
21 Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person
22 that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano]
23 18:23-19:1.  The fact that there was not even a single confused consumer confirms
24 that the disclaimer was read by collectors and that Defendants were successful in
25 identifying for consumers Mr. Ripps as the source of origin for RR/BAYC NFTs.

26       Yuga also cites to correspondence among the creators discussing a possible fear
27 of litigation.  These discussions are taken out of a broader context of hundreds of

28

269efa277131cc5a

thousands of communications the creators made.  Further, whether the Defendants feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite.  Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.

Further, while there may have been many sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully shut off royalties from such sales yet again supports a finding that they did not intend to confuse and were motivated by their protest of Yuga not to profit.

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(h), lines 4:26-28:**

To stimulate sales of RR/BAYC NFTs, Defendants advertised that consumers were required to purchase one of Defendants' RR/BAYC NFTs to use Ape Market. JTX-696; Dkt. 396 at 46:2-7.

**Defendants' Basis of Dispute:**

The evidence at trial showed that Defendants did not use ApeMarket to stimulate sales of RR/BAYC NFTs.  Yuga cross-examined Mr. Cahen about this very topic and was unable to show any evidence during that cross-examination showing that Defendant used ApeMarket with the intention to stimulate sales of RR/BAYC NFTs:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.   ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***
>
> Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   There never existed a marketplace.
>
> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.
>
> Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?
>
> A.   ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).

1    The evidence that Yuga cites does not rebut this trial testimony.  Yuga cites to

2    JTX-696 to incorrectly argue that apemarket.com was used to promote and sell

3    RR/BAYC NFTs.  JTX-696 is not apemarket.com but is instead the ApeMarket

4    Twitter page (which Yuga has not alleged in this case as infringing any of the asserted

5    marks).  JTX-696 does not show what apemarket.com displayed, what functionalities

6    it had, and whether it has ever promoted or sold RR/BAYC NFTs.  In fact, ApeMarket

7    was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen

8    Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested) and no evidence

9    shows that the website domain apemarket.com was ever used for the promotion or sale

10   of anything.  And moreover, the ApeMarket Twitter page was tied, as Mr. Cahen

11   testified at trial, to the criticism of the RR/BAYC project, by posting links to

12   rrbayc.com which contained a length artistic statement and incorporated

13   gordongoner.com, which reveals Yuga use of racist imagery in length.  And further,

14   the deposition testimony of Mr. Ripps that Yuga cites does not address using

15   ApeMarket to stimulate sales of RR/BAYC NFTs but instead merely asked if Mr.

16   Ripps ever made a statement tying the release schedule for ApeMarket to the minting

17   out of RR/BAYC NFTs.

18   **Plaintiff's Response:**

19   Mr. Cahen's testimony is contradicted by the evidence.  *Supra* ¶ 7(g).  His

20   sworn testimony that Defendants never used the prospect of Ape Market to mint out

21   the remainder of the RR/BAYC NFT collection is a lie.  JTX-801.185 ("Goal:  ***mint***

22   ***out the remainder of the collection*** + incentivize people to use the marketplace,

23   specifically the BAYC original side"); JTX-801.221 ("so basically my goal for today

24   is to create an announcement that will create hype and volume, ***we want to mint out***

25   ***the remainder of that collection*** [] thats our primary goal . . . I really want to tweet an

26   image like this today to create major hype and speculation [followed by image of Ape

27

28

Market webpage]"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com").

**Mr. Cahen's Testimony Is Not Credible:**  Mr. Cahen's self-serving testimony is not credible, as demonstrated by its contradictions by the evidentiary record, other testimony, and impeachment at trial.  Mr. Cahen's testimony was littered with contradictions and demonstrated an attitude of disrespect towards the Court and these proceedings.  For example, in his trial declaration, Mr. Cahen testified that the ApeMarket marketplace was "just in the ideation phase."  Cahen Decl. (Dkt. 344) ¶ 263.  However, at trial Mr. Cahen confirmed that there was a "ready-to-go Ape Market by . . . June 24, 2022."  Trial Tr. at 247:10-12.  Mr. Cahen also confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly").

Similarly, Mr. Cahen testified in his trial declaration that he "did not expect the project would result in consumer confusion," Cahen Decl. (Dkt. 344) ¶ 155, however, Mr. Cahen's communications in the Team ApeMarket discord chat demonstrate that he was acutely aware of the likelihood of confusion.  *See* JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").  Not only was Mr. Cahen aware of the likelihood of confusion—he was apathetic to it.  His testimony at trial otherwise is not credible.

Mr. Cahen's testimony should also be given little weight due to his disrespect for the Court and flagrant disregard of his obligation to be truthful under oath.  Indeed, at trial Mr. Cahen repeatedly offered non-responsive rants in response to unrelated

1   questions.  *See, e.g.*, Trial Tr. at 237:14-238:1.  This approach is consistent with his

2   hostile and obstructive deposition misconduct.  *See, e.g.*, Cahen Depo. Designations

3   (Dkt. 395) at 80:5-7 ("Q:  What is one thing [RR/BAYC] could stand for? A:  It could

4   be Ronald Reagan bought apples yesterday, classy.  I don't know.").  Mr. Cahen's

5   lack of respect for the Court and the litigation process further underscores that he is

6   not credible.

7         Mr. Cahen also contradicted himself by claiming that he purchased a computer

8   to help create the RR/BAYC collection several months prior to the conception of the

9   project.  Cahen Decl. (Dkt. 344) ¶ 174.  Mr. Cahen tried to explain this at trial by

10   stating that the "project" began before May of 2022, Trial Tr. at 229:5-13, but his

11   latest tale contradicts the prior testimony by Defendants that they began working on

12   the RR/BAYC NFTs in May of 2022.  *See* Dkt. 200-3; Dkt. 200-4.  Defendants have

13   no problem changing the date of the conception of the project when convenient for

14   them.  When Defendants sought to skirt their discovery obligations and hide their

15   communications about the real intent of their infringement, they claimed that the

16   project began in May of 2022, but when they tried to claim expenses purportedly

17   related to the project that were incurred months prior, they claim the project began in

18   2021.  Mr. Cahen either lied at trial or he lied to the Court during discovery.

19         Finally, in both his declaration and at trial, Mr. Cahen testified that none of the

20   Defendants had ever used the term "BAYC v3" to refer to their infringing NFTs and

21   that the name was used only after Yuga Labs sent DMCA takedown notices to combat

22   the infringement.  Cahen Decl. (Dkt. 344) ¶ 253; Trial Tr. at 252:2-253:8.  This

23   testimony is also false.  Documentary evidence shows Mr. Ripps referring to his

24   infringing NFTs as BAYC V3 before Yuga Labs had sent a single notice.  JTX-689

25   (Tweet from Mr. Ripps promoting infringing NFTs as "bayc v3").  Indeed, Mr. Ripps

26   tweeted a link to the RR/BAYC page on a secondary marketplace that listed the NFTs

27   under the name "Bored Ape Yacht Club V3" on the same day that Defendants admit

28

1  that Yuga Labs sent its first notice.  *See* JTX-690; *see also* Dkt. 193-2 ¶ 93

2  (undisputed fact that the first takedown notice issued against the RR/BAYC NFTs

3  occurred on May 17, 2022).  Given his myriad contradictions, non-responsive and

4  evasive rants, and omissions, the only conclusion is that Mr. Cahen is an unreliable

5  witness.

6  **Defendants' Reply:**

7  Yuga fails to show that Defendants used ApeMarket to stimulate sales of

8  RR/BAYC NFTs.  In fact, Yuga cross-examined Mr. Cahen about this very topic and

9  was unable to show any evidence during that cross-examination showing that

10 Defendant used ApeMarket with the intention to stimulate sales of RR/BAYC NFTs.

11 That testimony has been quoted above in Defendants' objection, which explains that

12 the use of ApeMarket to stimulate sales of RR/BAYC NFTs was "theoretically

13 impossible because doing that – creating an NFT marketplace would offer absolutely

14 no functionality in terms of minting an already existing NFT contract."  Trial Tr.

15 [Cahen] 231:8-232:6.

16 Further, Mr. Cahen is credible. Yuga tries to mischaracterize Mr. Cahen's

17 testimony to suggest that he was contradicting himself.   But there is nothing

18 inconsistent about Mr. Cahen testimony.   He testified that ApeMarket was in the

19 ideation phase, which means that anything under development was subject to

20 substantive changes pending Mr. Ripps's review and signoff on the website.  But

21 simply because Mr. Ripps had not reviewed and signed off on anything in connection

22 with ApeMarket did not mean that the RR/BAYC team was not working on the

23 website and exploring different ideas to implement.

24 Yuga mischaracterized Mr. Cahen as saying that ApeMarket was "ready to go"

25 by June 24, 2022.  But what Mr. Cahen actually said is that he did not know if

26 ApeMarket was "ready to go" by June 24, 2022.  Mr. Cahen then also stated that he

27 works with the high skilled engineers that can implement nearly any project within

28

days and that ApeMarket did not require much work in the first place as it used open-source code:

> Q.   Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?
>
> A.   I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.
>
> Q.   And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.   Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also accused Mr. Cahen of "disrespect for the Court" by making "non-responsive rants" in response to questions about ApeMarket stimulating sales of RR/BAYC NFTs.  But the trial transcript shows otherwise:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.   ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***

Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?

A.   There never existed a marketplace.

Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?

A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?

A.   ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).   Yuga's citation to Mr. Cahen's deposition similarly cherry picks one question from a full-day of deposition testimony, and even then, the testimony Mr. Cahen gave is responsive to Yuga's question to give a hypothetical answer to "things" RR/BAYC could stand for.

Yuga further mischaracterized Mr. Cahen's testimony by incorrectly suggesting that he did not purchase a computer to work on the RR/BAYC project.  The trial testimony shows that the 2021 purchase date is consistent with Mr. Cahen's work in connection with the RR/BAYC project and its protest of Yuga:

Q.   Would it surprise you that the date for that computer is December 2021?

A.   That would not surprise me at all, no.

Q.   Why?

A.   Because it's a date on a receipt.  I'm not sure what the point is, but I'm hearing you, yeah.

Q.   Okay.  So either the RR/BAYC project started in May 2022 or the RR/BAYC project started in December 2021, and you bought a computer for it; correct?

A.   The RR/BAYC project is a protest project.  And the protest began well, well before the RR/BAYC project did.  So if you are asking me why I make a connection between earlier dates and that project, it's because we spent about a year protesting in different ways before we released any sort of nonfungible token and rather, before Ryder did and I decided to join and help him expand his vision and protest.

Trial Tr. [Cahen] 227:11-228:1.

Finally, Yuga incorrectly argues that Mr. Cahen is not credible because he testified that Defendants never used the term "bayc v3" to refer to the RR/BAYC collection.   But Yuga was unable to impeach this testimony during cross-examination of Mr. Cahen and Yuga did not even attempt to cross-examine Mr. Ripps on this issue.  The exhibit that Yuga cites, JTX-689, also confirms that Mr. Cahen's testimony was true.  JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis's question on what NFTs people are buying.  Mr. Ripps's reply is a satirical comment that has absolutely nothing to do with the RR/BAYC collection and, in fact, the comment was made before Mr. Ripps even started taking commissions for RR/BAYC NFTs.

**Plaintiff's Disputed Post Trial Finding of Fact No.  7(h), lines 5:2-4:**

They even targeted this marketplace at Yuga Labs NFT holders, for example, by directing their marketing to the "Yuga community." Dkts. 342 ¶49; 392 at 51:11-21; JTX-114; JTX-697; JTX-804.00048.

**Defendants' Basis of Dispute:**

The evidence does not show that Defendants "targeted" BAYC NFT holders with ApeMarket.  Mr. Cahen explained in his trial testimony that ApeMarket was used

1    as an extension of the RR/BAYC project to further raise awareness regarding

2    Defendants' criticism.  Trial Tr. [Cahen] 231:23-232:3.  The Twitter page for

3    ApeMarket made posts containing the language "Dear Yuga community" because

4    Defendants wanted to ensure that the Yuga community understood Yuga's practices

5    of colluding with other parties to charge exorbitant fees.  Defendants were considering

6    the idea of teaching the Yuga community about Yuga harmful business practices by

7    showing that it is possible to create a marketplace that does not charge exorbitant fees.

8    Cahen Decl. (Dkt. 344) ¶ 258.  In fact, the very post where defendants used the term

9    "Dear Yuga community" also points out how "RR/BAYC is about to save you over

10   $8b a year" because ApeMarket will not engage in the same predatory business

11   practices as Yuga.  JTX-697.  Thus, the evidence does not show that Defendants

12   "targeted" the Yuga community because ApeMarket was meant to educate the Yuga

13   community about Yuga's business practices, not to confuse the Yuga community into

14   thinking that Yuga was the source of origin for apemarket.com.

15        The evidence that Yuga cites fails to show that Defendants "targeted" BAYC

16   NFT holders.  Yuga cites to the declaration and trial testimony of Mr. Solano, in

17   which he discussed Defendants use of "Dear Yuga community."  But Mr. Solano

18   conveniently does not discuss how Defendants were using ApeMarket to educate the

19   Yuga community about Yuga's predatory business practices and not to confuse the

20   Yuga community regarding the source of origin for apemarket.com.

21        Yuga's exhibits similarly do not show that Defendants' "targeted" BAYC NFT

22   holders.  JTX-114 is entirely unrelated to ApeMarket because it is an internal

23   communication in which the RR/BAYC team discusses how to mint RR/BAYC NFTs

24   in a manner that would reduce gas costs (the costs of actually creating each individual

25   NFTs).  JTX-697 is the post on ApeMarket's Twitter page including the term "Dear

26   Yuga community" and pointing out how the Yuga community could save "over $8b a

27   year" because ApeMarket will not engage in the same predatory business practices as

28

1   Yuga.  And JTX 804.00048 is an internal communication where the RR/BAYC team

2   is ideating about possible designs for apemarket.com and about potentially using a

3   burn function.

4              **Plaintiff's Response:**

5          Defendants concede in their objection that Mr. Cahen made a promotion for

6   Ape Market, on the Ape Market Twitter page, beginning "Dear Yuga community."

7   The remainder of their objection fails to disprove this evidence that they were

8   targeting the Yuga Labs' community of BAYC NFT holders.  Defendants' testimony

9   that these promotions of their infringement and commercial was an educational

10  project is not credible.

11         **Defendants' Infringement Was Motivated By A Desire To Profit Off Of**

12  **Yuga Labs' Marks:**  While Defendants publicly claim there was an artistic goal (to

13  ensure they "look really sympathetic to people" if caught, in the words of their partner

14  (JTX-918.00036)), their internal communications overwhelmingly focus on a business

15  venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and

16  riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1

17  (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make

18  money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to

19  tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal:  mint out the remainder of

20  the collection + incentivize people to use the marketplace, specifically the BAYC

21  original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but

22  much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr.

23  Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so

24  low that we dont make anything"); *id.* (Mr. Cahen:  "priorities: getting RRBAYC to

25  sell out by creating demand + getting BAYC and MAYC users to call our marketplace

26  their new home [] and collecting royalties at a fraction of what the other big dogs are

27  charging [] which will be considerable passive income if we strike the right balance");

28

1   JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low
2   prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574
3   (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will
4   sell out within 48 hours I think [] You'll make like a million dollars [] Straight up");
5   JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too
6   man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit
7   motive and desire to charge royalties).  Defendants knew they were stealing from
8   Yuga Labs.

9          JTX-114 supports this proposed finding of fact because Mr. Ripps discusses
10  buying one of Yuga Labs' NFTs to entice Yuga Labs' customers to "trust" Ape
11  Market.  JTX-804.48 similarly demonstrates that Defendants planned to target Ape
12  Market to BAYC NFT holders; Mr. Ripps proposes, as "good marketing," to offer
13  BAYC NFT holders a deal to "burn one bayc for 50 rr/bayc."

14         Finally, Defendants' false and unsupported claims regarding "predatory
15  business practices" are irrelevant.

16         **Defendants' Reply:**

17         Yuga's response, once again, takes out of context what Defendants meant with
18  their Twitter post to falsely suggest that Defendants were "targeting" Yuga's
19  customers.  As Mr. Cahen explained in his trial testimony that ApeMarket was used as
20  an extension of the RR/BAYC project to further raise awareness regarding
21  Defendants' criticism.  Trial Tr. [Cahen] 231:23-232:3.  The Twitter page for
22  ApeMarket made posts containing the language "Dear Yuga community" because
23  Defendants wanted to ensure that the Yuga community understood Yuga's practices
24  of colluding with other parties to charge exorbitant fees.  Defendants were considering
25  the idea of teaching the Yuga community about Yuga harmful business practices by
26  showing that it is possible to create a marketplace that does not charge exorbitant fees.
27  Cahen Decl. (Dkt. 344) ¶ 258.  In fact, the very post where Defendants used the term

28

1  "Dear Yuga community" also points out how "RR/BAYC is about to save you over

2  $8b a year" because ApeMarket will not engage in the same predatory business

3  practices as Yuga.  JTX-697.

4       Further, the evidence at trial showed that Defendants were not primarily

5  motivated by profits.  Defendants explained that profits were a concern, but not the

6  primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset

7  costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).

8  Defendants' decisions surrounding refunds and royalties confirm that they were not

9  primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);

10 Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund,

11 for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt.

12 344).  Additionally, the Defendants' declined taking royalties on transfers of

13 RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt.

14 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

15      Yuga's response here misleading takes out of context communications between

16 the creators and relies on them to imply that the creators' artistic motives were not

17 genuine.  This is unfounded.  Mr. Ripps's and Mr. Cahen's contemporaneous

18 communications about the RR/BAYC project confirm that their intent was to use

19 RR/BAYC to criticize.  For example, in private group chats among participants in the

20 RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their

21 intended artistic purpose of the project, their intention that it would spread criticism of

22 Yuga, and their intention that social media platforms be used to educate the public

23 about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010,

24 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

25 Defendants' online discussion, which consisted of nearly the entirety of Defendants'

26 public activities associated with RR/BAYC, confirms their intent.  In those

27 discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

28

inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

### Plaintiff's Disputed Post Trial Finding of Fact No. 7(i):

Defendants treated RR/BAYC as a business venture and expected to profit from using Yuga Labs' BAYC Marks to sell and resell RR/BAYC NFTs, and to use those sales to build Ape Market, from which they expected to further profit. *See* JTX-1 at ¶¶10-13; JTX-801.185; JTX-801.208 ("considerable passive income"); JTX-801.237; JTX-801.156; JTX-1574; JTX-1586; Dkt. 394 at 238:12-240:20; JTX-801.144; JTX-803.66-JTX-803.67.

### Defendants' Basis of Dispute:

The evidence at trial showed the Defendant treated and intend the RR/BAYC collection as a vehicle for artistic commentary that successfully criticized Yuga.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

1    Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the

2  public that RR/BAYC was intended as a protest art project.  Ripps Decl. ¶¶ 158-176

3  (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 145-155 (Dkt. 344); Dkt. 197-1 ¶ 230.  For

4  example, example, the rrbayc.com website—through which the majority of RR/BAYC

5  commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶

6  110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation

7  of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

8  Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

9  [Solano] 63:1-10.  Collectors using the rrbayc.com website were required to read and

10  click through a disclaimer acknowledging the artistic purpose of the project before

11  they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

12  (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

13    Although Mr. Ripps and Mr. Cahen understood that the additional requirements

14  associated with going through a lengthy artistic statement and clicking through a

15  disclaimer made it more cumbersome for collectors to commission an NFT piece

16  through the project, Mr. Ripps insisted on them so that the artistic purpose of his work

17  would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q.

18  … Why was the artist statement ultimately included, if it had a negative impact on

19  usability? …  A.  … Ryder wanted it and so he had the final call.").

20    Further, Defendants never used the term "business venture" to describe the

21  RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's

22  declaration, which was a document signed under coercion and under threat to Mr.

23  Lehman's family.  Strangely enough, Yuga cites to the declaration and Mr. Solano

24  affirmatively relied on the declaration even though Yuga's own attorneys coined the

25  term "business venture.".  As demonstrated during trial, Mr. Solano relied on the

26  phrase "business venture" in Mr. Lehman's declaration, without having considered

27  that Yuga's counsel drafted the declaration and selected the phrase "business venture,"

28

1  and without having considered that Mr. Lehman would have liked to use different

2  words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the

3  declaration without having considered that Mr. Lehman was afraid for his family at

4  the time he signed his declaration, because Yuga's lawsuit against him would be

5  disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano]

6  38:17-19.

7        And while Yuga cites to a series of exhibits where the RR/BAYC team discuss

8  or post about fulfilling reservations for RR/BAYC NFTs, including financial aspects

9  of fulfilling those reservations, Yuga conveniently ignores that those reservations

10  were made as a vehicle to protest Yuga.  Discovery in this case revealed voluminous

11  correspondence from actual purchasers of RR/BAYC NFTs, both through direct

12  commissions and purchases on the secondary market.  These correspondence from

13  collectors expressed gratitude and support for the artistic project, the artistic

14  statement, and Mr. Ripps's and Mr. Cahen's criticism of Yuga.  Ripps Decl. ¶¶ 198-

15  205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590,

16  JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The fact that RR/BAYC

17  participants collected RR/BAYC NFTs as protest art confirms that Defendants treated

18  the project as a vehicle for protest and satire, and not as a "business venture."

19              **Plaintiff's Response:**

20        Defendants' objection should be rejected for the same reasons discussed *supra* ¶

21  7(a); specifically:  (1) the record shows that Defendants intended to profit from

22  infringement, (2) the record shows that Defendants' commercial infringement was not

23  protected "art," and (3) Defendants did not take steps to limit confusion.

24        Additionally, as described below, Defendants' objection should be rejected

25  because (1) Defendants' attempt to refute this evidence by undermining Mr. Lehman's

26  sworn declaration is unavailing, (2) the majority of the RR/BAYC NFTs were not sold

27

28

on rrbayc.com, and (3) Defendants' cherry-picked communications with alleged customers to not negate the confusion in the marketplace.

**Mr. Lehman's Declaration Is Reliable And Contradicts Defendants:** Yuga Labs has demonstrated that Mr. Lehman's declaration is truthful and reliable. Mr. Lehman testified that he spent several days drafting the declaration prior to signing it and had the advice of his counsel. Lehman Depo. Designations (Dkt. 404-2) at 240:3-9. Mr. Lehman further testified that he toiled to make sure that everything included in his declaration was truthful and adequately supported by documentary evidence. Lehman Depo. Designations (Dkt. 404-2) at 241:21-24. And regardless of whether Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his deposition that his declaration is truthful and reliable. Lehman Depo. Designations (Dkt. 404-2) at 124:5-9; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration). Mr. Lehman's declaration was also corroborated by the consent judgment entered against him in the Northern District of New York. *See* JTX-621. Defendants' continued attempts to discredit Mr. Lehman's declaration fall flat.

**rrbayc.com Is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com **is not** where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT **reservations** occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

**Defendants' Third-Party, Unreliable Communications Do Not Negate The Court's Findings Or Yuga Labs' Experts' Opinions:** As discussed further *supra*

¶ 7(d) (lines 3:20-23), Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market. Defendants have no evidence supporting a claim that a statistically significant number of consumers were not confused. Indeed, the hundreds of refunds they provided at consumers' requests suggest that some purchasers were confused. And, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

### **Defendants' Reply:**

Yuga's response fails to adequately address Defendants' objections and the trial evidence that supports Defendants' objections. For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed RR/BAYC was not a "business venture" and in fact the term was misleadingly coined by Yuga's counsel. Defendants' reply in *supra* ¶ 4 similarly explains that (1) Defendants intent was to create a satire that protests Yuga, (2) that Mr. Ripps is a recognized artist and that the RR/BAYC collection is yet another artwork Mr. Ripps created, and (3) Defendants took many steps to limit confusion.

Yuga's additional responses similarly fail to give adequate grounds to reject Defendants' objection because (1) Mr. Lehmann's coerced declaration is not reliabile, (2) more than 80% of RR/BAYC NFTs were sold on rrbayc.com, and (3) Defendants received hundreds of letters from actual consumers confirming that they understood the satirical nature of RR/BAYC and wanted to participate in protesting Yuga.

***First,*** Mr. Lehman's declaration is not reliable. Yuga cites to the declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture." Defendants never used the term "business venture" to describe the RR/BAYC project. In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family. Yuga's attorneys, not the Defendants, coined

1  the term "business venture."  As demonstrated during trial, Mr. Solano relied on the

2  phrase "business venture" in Mr. Lehman's declaration, without having considered

3  that Yuga's counsel drafted the declaration and selected the phrase "business venture,"

4  and without having considered that Mr. Lehman would have liked to use different

5  words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.

6          Mr. Lehman's declaration is also unreliable because it was signed under

7  coercion.  Specifically, Yuga and Mr. Solano relied on the declaration despite the fact

8  that Mr. Lehman knew he could not settle his case without executing a declaration

9  concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

10  Lehman was afraid for his family at the time he signed his declaration, because

11  Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr.

12  Lehman won (Trial Tr. [Solano] 38:17-19).

13          ***Second,*** over 80% of commissions for RR/BAYC NFTs occurred on

14  rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps Decl. Dkt. 346 ¶

15  110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is

16  substantially corroborated by Yuga's own expert who admits that ***7,028 out of the***

17  ***total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were***

18  ***sold through the RSVP Contract***, ***which was only available and usable through***

19  ***rrbayc.com***.  Kindler Decl. ¶¶ 36 (Dkt. 338).   Yuga expert also admits that the ***RSVP***

20  ***Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits***

21  ***(which is more than 82% of all profits)***.  Kindler Decl. ¶ 40 (Dkt. 338).   To note,

22  rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs ***before the***

23  ***RSVP contract was ever implemented***, meaning that the actual sales on rrbayc.com is

24  larger than the sales through the RSVP Contract alone.

25          Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little

26  profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr.

27  Cahen's testimony make clear, they tried to turn off royalties from the secondary sales

28

of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344). Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits.

**Third,** the communications from RR/BAYC NFT collection rebuts all of Yuga's false accusations of profits arising from confusion or infringement. Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.

Further, Yuga's reliance on experts to make false accusations are not credible. Yuga's citation to Ms. Kindler's declaration does not support their allegations that Defendants provided "hundreds of refunds" or that those alleged refunds indicate

confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating Defendants' profits, transactions that were refunded through Defendants' RSVP smart contract were omitted. Specifically, transactions that were refunded through the RefundIssued and RSVPCanceled functions in the RSVP smart contract were not included in my calculation of profits. To my knowledge, Defendants have not produced any records of other refunds related to the sale of RR/BAYC NFTs.").  Mr. Ripps never received a refund request from anyone stating they were confused or thought that they were reserving a Yuga product.  Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

And Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 7(j):**

Despite multiple successful takedowns on third-party marketplaces on the basis of trademark infringement, Defendants persisted in attempting to promote and sell their RR/BAYC NFTs by circumventing those takedowns and relisting their NFTs.

1  Dkt. 344 (Cahen Decl.) ¶253 (admitted into evidence in Dkt. 392 at 223:25-224:14);
2  JTX-801.305.

3             **Defendants' Basis of Dispute:**

4             The evidence at trial did not show that Defendants circumvented Yuga's

5  DMCA takedown requests by relisting their NFTs.  During the RR/BAYC project,

6  Yuga submitted improper DCMA takedown notices based on trademark infringement

7  to listing for RR/BAYC NFTs that were created by third parties.  Cahen Decl. ¶ 253

8  (Dkt. 344).  Those DMCA takedown notices were disputed (in some cases by

9  Defendants and in other cases by third parties).  *Id*.  Marketplaces, after receiving

10  those disputes and resolving them, would then re-list RR/BAYC NFTs and Yuga

11  would then subsequently re-file DMCA takedown notices, triggering the de-listing

12  process again.  *Id*.  All of this led to Yuga filing twenty-seven DCMA takedown

13  notices based on trademark infringement.  *Id*.  Defendants were not circumventing

14  "successful" DMCA takedown notices; rather, third-party marketplaces were

15  repeatedly re-listing RR/BAYC NFTs after considering disputes that individuals had

16  submitted to those marketplaces regarding the takedown notices.

17             Moreover, the evidence that Yuga cites does not show that Defendants were re-

18  listing RR/BAYC NFTs or in any way circumventing supposed "successful" DMCA

19  takedown notices.  Yuga cites to Mr. Cahen's declaration, but the declaration does not

20  state that Defendants were re-listing RR/BAYC NFTs.  Defendants do not have the

21  ability to control what third party marketplaces delist and re-list.  Yuga also cites to

22  JTX-801.305, in which Defendants are discussing an attorney that did not represent

23  the Defendants and who was submitting disputes to Yuga's DMCA takedown notices

24  that were based on trademark infringement.  These exhibits do not show that re-listing

25  any RR/BAYC NFTs on third-party websites or attempting to circumvent DMCA

26  takedown notices.

27             **Plaintiff's Response:**

28

The Court has already rejected Defendants' position that Yuga Labs submitted any "improper DCMA takedown notices." SJ Order (Dkt. 225) at 19-21. Their attempt to relitigate that issue as a smokescreen for their own wrongful conduct is unpersuasive and a waste of time and resources.

The repeated relisting of Defendants' infringing NFTs was not done by marketplaces acting on their own behalf, but rather by Defendants making "small changes" and persistently attempting to relist their NFTs after successful *trademark infringement* takedowns. Trial Tr. 96:19-25. Defendants' objection that they "do not have the ability to control" relisting of taken down collections is demonstrably false. Even more Defendants cite no evidence in support of their objection. Instead, the evidence shows that Cahen admitted in internal correspondence that he caused the infringing NFT collection to be relisted on OpenSea, and when Mr. Lehman asked "How did you do this??," Mr. Cahen responded: "Our attorney just writes them for us [a]nd they do what she says." JTX-801.305-06. Defendants' claim that this attorney did not represent them is immaterial, contrary to the evidence, and belied by Defendants' assertion of attorney-client privilege over these communications and refusal to produce them in discovery. Defendants' claim that they did not act to evade takedowns, and that "[thei]r attorney" did not act on their behalf, is another lie.

In any event, Defendants do not dispute that they continued promoting and selling their infringing NFTs and notwithstanding that Yuga Labs' trademark takedown notices resulted in their removal from certain marketplaces.

**Defendants' Reply:**

Defendants do not dispute that this Court has entered summary judgment in this case. However, in their summary judgment briefing, Defendants made clear that there is a material evidentiary dispute on whether Yuga submitted fraudulent DMCA takedown notices. And while this issue is not relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue and asked the Court to

1    unnecessarily make a finding of fact regarding its DMCA takedown notices.  Yuga's

2    decision to affirmatively raise the issue has forced Defendants to re-articulate their

3    position for preservation purposes.

4           Defendants are not asking that this Court reconsider its holding, because this

5    under the law of the case doctrine this Court has not made a holding on DMCA

6    takedown notices for purposes of determining availability of disgorgement as a

7    remedy (including Defendants' mental state as applied to disgorgement),

8    apportionment, and an exceptional case analysis.  The "law of the case doctrine does

9    not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v.*

10   *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*

11   *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on

12   incomplete information, don't bind district judges for the remainder of the

13   case.  Given the nature of such motions, it could not be otherwise.").  For example, in

14   *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at

15   summary judgment for one purpose, the summary judgment order did resolve the

16   issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL

17   1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police

18   contact was relevant as background, but not to the already decided issue that initial

19   contact was not excessive force).  This case is just like *Sienze*: the summary judgment

20   ruling on Yuga's fraudulent DMCA takedown notices is limited to infringement and

21   cannot be applied more broadly.

22          Further, Yuga's response identifies no evidence to suggest that Defendants

23   repeatedly relisted RR/BAYC NFTs.  Yuga's response also identified no evidence to

24   rebut that obvious truth that Defendants do not control third party websites and the

25   third party website practices for de-listing and re-listing content in response to DMCA

26   takedown notices.   Instead, Yuga simply joints to JTX-801.305-306, which with Mr.

27   Cahen and Mr. Lehman are discussing the activities of a third-party lawyer that (1)

28

has never represented Defendants and (2) who works with an anonymous third party named "Kenobi."   This is not evidence of Defendants circumventing DMCA takedown notices.  And, further, an attorney contacting a company regarding the Copyright Act and its enforcement provisions is not improper conduct.  That's prototypical legal work, to attempt to resolve legal disputes between parties.

### Plaintiff's Disputed Post Trial Finding of Fact No. 8:

Yuga Labs successfully proved every element of its cybersquatting claim and is entitled to damages and injunctive relief. SJ Order at 14-15.

### Defendants' Basis of Dispute:

Defendants acknowledge that this Court granted summary judgment on Yuga's cybersquatting claim.  However, Defendants dispute that Yuga satisfied the summary judgment standard and reserve the right to appeal the Court's order.  Because the final remedies in this action will be subject to the outcome of any appeal, Defendants dispute that Yuga has proven its claim and that it is entitled to monetary remedies or injunctive relief.

### Plaintiff's Response:

Defendants provide no authority for their proposition that Yuga Labs is not entitled to relief until resolution of an appeal.  **Forcing Yuga Labs to respond to an objection based purely on the fact that Defendants disagree with the Court's binding order is another example of Defendants' oppressive litigation tactics supporting a finding that this is an exceptional case.**  That order establishes the matters adjudicated therein for purposes of this case.  The objection should be rejected.

**The Court's Summary Judgment Order and Defendants' Own Stipulations Establish Liability:**  Defendants' objection improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the

purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10. The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11. The Court "easily conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion. *Id.* at 10-13. That order establishes the matters adjudicated therein for purposes of this case. Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings. Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist. Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added). Defendants' authorities do not support their position. *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary judgment is ***generally not relevant and should be excluded***" at trial) (emphasis

added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

applicability of the law of the case doctrine where a case is assigned to a new judge).

   "The partial summary judgment is merely a pretrial adjudication that certain

issues shall be deemed established for the trial of the case and likewise serves the

purpose of speeding up litigation by eliminating before trial matters wherein there is

no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

tactic that has unjustifiably increased the cost of resolving this case.

   Defendants' objection also contradicts their own stipulations in the proposed

pre-trial conference order.  *See* Dkt. 320-1 at 13.  In that stipulation and proposed

order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club

NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further

admitted that "[t]he Court has determined that Defendants infringed the BAYC

Marks" and "that Defendants' registration and use of the domain names

https://rrbayc.com and https://apemarket.com constituted cybersquatting under the

Anti-Cybersquatting Consumer Protection Act."  *Id.* at 13.  As such, Defendants have

waived their right to now argue that they were not liable for infringing upon Yuga

Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*,

652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance

theories at the trial which are not included in the [pre-trial conference] order *or which

contradict its terms*.") (emphasis added).  Defendants' sudden refusal to accept a

stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the

cost of resolving this case.  Defendants' actions again make this an exceptional case.

The Court should reject Defendants' objection.

   Defendants offer no basis to dispute this finding.  They offer no contradictory

facts, nor do they cite to any evidence in the record.  Rather, Defendants are merely

1  expressing their disappointment in the Court's well-reasoned summary judgment

2  order.  This is not a proper basis for objection.  Instead, Defendants' objection is

3  evidence of their tactics making this an exceptional case.

4                                         **Defendants' Reply:**

5         Defendants have the right to preserve arguments for appeal. Yuga's

6  characterization of Defendants attempting to relitigate resolved issues makes no sense

7  because Yuga has proposed this finding of fact. Defendants have not engaged in any

8  litigation misconduct. *See generally* Dkt. 348 at 11-15.  Defendants' defenses were

9  made reasonably and in good faith.  *Id*.  All of Defendants' efforts to litigate and settle

10  in good faith were impacted by Yuga's unreasonable demands, including Yuga's

11  demand for a non-disparagement clause and Yuga's ever fluctuating assessment of

12  actual damages.  *See* Dkt 286 at 2-3 (asserting damages of $1,792,704 on June 7);

13  Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June 8); Dkt. 315-1 at 2

14  (dropping actual damages on June 15).  This Court acknowledged that Yuga's demand

15  for a non-disparagement clause was "a condition that is quite frankly unreasonable."

16  Hearing Transcript June 16, 2023, at 9:9-12.  Furthermore, Yuga has failed to present

17  evidence which shows that Defendants lack respect for this Court or the rule of law.

18  To the contrary, both Defendants fully participated in the pre-trial litigation process,

19  appeared for trial, conducted themselves respectfully, and testified truthfully under

20  oath, as any reasonable litigant would.

21         The evidence at trial showed that Yuga does not own the BAYC marks because

22  (1) Yuga has either given away or abandoned its rights in the marks and (2) NFTs are

23  not eligible for trademark protection. Yuga gave away all intellectual property rights

24  associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly

25  represented that BAYC NFT holders received all IP rights and that Yuga has none of

26  those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman

27  Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of rights was made, in

28

part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.  Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a **communicative** work is a dispute relegated to the confines of copyright law, not trademark.  *Id* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

1   certificates of authenticity/ownership and are not digital goods in themselves.  Trial
2   Tr. [Atalay] 127:9-16.

3       Defendants have never stipulated to Yuga's Ownership of the BAYC
4   Marks.  Defendants hotly disputed ownership of the BAYC marks at summary
5   judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant
6   to the remedies trial in this case, Yuga has for some reason affirmatively raised the
7   issue—forcing Defendants to re-articulate their dispute for purposes of preserving
8   their position for appeal and all other proceedings involving the BAYC marks.  Yuga
9   attempts to mischaracterize the Court record by citing to the pre-trial conference
10  order.  But **nowhere** in the pre-trial conference order did Defendants stipulate to
11  ownership of the BAYC marks.  Section 6 of the order contains all stipulated facts and
12  those stipulated facts include only that Yuga released the BAYC collection and
13  various facts about Defendants' activities associated with the RR/BAYC
14  collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts
15  section, but this section again does not contain any admissions regarding "ownership"
16  of the marks.  Rather it merely identifies the asserted marks at issue for the remedies
17  trial—something that Defendants admitted in light of the scope of the remedies trial
18  and to ease this Court's work in adjudicating the remaining issues.  Dkt. 32-1 at 2-
19  3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that
20  Defendants infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an
21  admission of ownership, it is a statement regarding the procedural history in this case
22  that explains that the scope of trial is limited to remedies and does not include
23  infringement.  Had Defendants wanted to stipulate to ownership, they would have
24  clearly and expressly done so—they have not.  Defendants reserve the right to dispute
25  ownership on appeal and in any other proceedings involving the BAYC marks.

26      Yuga improperly relies on the Court's summary judgement order to establish
27  facts at trial.  The "law of the case doctrine does not apply to pretrial rulings ***such as***

28

*motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged marks applies to only the issue of likelihood of confusion and cannot be applied more broadly.

### Plaintiff's Disputed Post Trial Finding of Fact No. 9, line 5:20:

"Defendants registered, used, and continue to use the domain names https://rrbayc.com/ and https://apemarket.com." *Id*. at 14; Dkts. 346 ¶100; 396 at 36:18-37:8

### Defendants' Basis of Dispute:

Evidence at trial did not establish that Defendants continue to use the rrbayc.com and apemarket.com domain names.  Defendants were not asked about their alleged ongoing use of these domains.  There was speculative testimony by Yuga witnesses about Defendants alleged ongoing activities.  But that testimony was admitted to be false under cross examination:  Mr. Solano admitted that his declaration included a false statement regarding Defendants continuing to receive royalties and fees from sales on secondary marketplaces. Trial Tr. [Solano] 48:15-49:4.  Yuga's claim that Defendants "continue to use" the domain names is speculation.

1    Yuga also fails to cite any evidence in support of its allegations of continued
2 use of these domains.  All of Yuga's cited evidence speaks to whether the domain
3 names were initially ***registered*** (which Defendants concede they were), not whether
4 they are still being used.

5                 **Plaintiff's Response:**

6    Even a month after trial, Defendants still advertise rrbayc.com in the profile
7 heading of the Ape Market Twitter profile.  *See* https://twitter.com/apemarketplace
8 and screenshot below.  That same Twitter account remains live, with promotions of
9 apemarket.com, the infringing rrbayc.com domain, and their promotion of the
10 infringing RR/BAYC NFTs on Looksrare.  Defendants' claims to the contrary are not
11 in good faith and contrary to the evidence.  *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr.
12 at 57:8-58:6, 58:20-59:19.  In any event, Defendants have not transferred ownership
13 of either domain, continuing their cybersquatting.  15 U.S.C. § 1125(d)(1)(a)(ii)
14 (liability established when Defendant "***registers***, traffics in, or uses a domain name" as
15 specified in statute).



1

**Defendants' Reply:**

2      Yuga fails to cite credible evidence alleging that Defendants ***continue*** to use

3 these domain names.  First, Yuga relies on a twitter account which Defendants no

4 longer use. Yuga's screenshot of the twitter profile does not demonstrate continued

5 use.  Second, Yuga cites testimony from Mr. Solano, who admitted a trial that he

6 made a false statement regarding Defendants' continued activities.  Trial Tr. [Solano]

7 48:15-49:4.

8      Both rrbayc.com and apemarket.com are inactive domains. Both URL addresses

9 do not have active websites associate with them.  Yuga's speculation regarding

10 Defendants' continued use is not adequate grounds for granting injunctive relief.

11      **Plaintiff's Disputed Post Trial Finding of Fact No. 10:**

12      <u>And Defendants "acted with a bad faith intent to profit" from Yuga</u>

13 <u>Labs' marks in registering the infringing domains.</u> SJ Order at 14-15.

14      **Defendants' Basis of Dispute:**

15      Defendants did not intent to infringe Yuga's trademarks.  There are hundreds of

16 NFT collections and "literally thousands" of products which use Yuga's marks.  Trial

17 Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13; Trial Tr. [Muniz] 81:18-22.

18 This vast use of Yuga's marks shaped defendants understanding of Yuga's rights in

19 these marks. Ms. Muniz admitted at trial that Defendants would probably have been

20 aware of these other NFT collections using the Bored Ape Yacht Club marks at the

21 time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23.  The use of

22 these marks by numerous NFT collections, and numerous other products, that are

23 unaffiliated with Yuga should weigh against a finding of bad intent.

24      Defendants did not intend to create confusion regarding the origin of RR/BAYC

25 NFTs.  Instead, Defendants took steps to make clear the RRBAYC project was

26 intended as a protest art project. Ripps Decl. ¶¶ 158-176 (Dkt. 346) (uncontested);

27 Cahen Decl. (Dkt. 344) ¶¶ 145-155; Dkt. 197-1 ¶ 230.  For instance, Defendants

28

included an explanation of their artistic intent on the rrbayc website.  Cahen Decl. ¶¶
138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-
10.  Additionally, collectors using the rrbayc website were required to read and click
through a disclaimer outlining the purpose of the project before they were able to
commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-
2086; Trial Tr. [Muniz] 83:10-13.  The fact that defendants took several steps to
prevent confusion should weigh against a finding of bad intent.

None of the parties are aware of a single instance of consumer confusion.
Defendants are not aware of any instances of actual confusion.  Ripps Decl. ¶ 223
(Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt.
344).  Mr. Hickman is not aware of any instances of actual confusion.  Trial Tr.
[Hickman] 219:13-19.  And Yuga was unable to identify a single person who obtained
an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7;
Trial Tr. [Solano] 18:23-19:1.  Thus, there is little basis to suggest that Defendants'
domain names are confusingly similar to Yuga's domains or that Defendants' domains
suggest Yuga's endorsement.

### Plaintiff's Response:

Defendants dispute an exact quote from the Court, underscoring their bad-faith
efforts to multiply the cost of this litigation by rehashing decided issues.  **Forcing
Yuga Labs to respond to an objection based purely on the fact that Defendants
disagree with the Court's binding order is another example of Defendants'
oppressive litigation tactics supporting a finding that this is an exceptional case.**
This objection should be rejected.

**The Court's Summary Judgment Order and Defendants' Own Stipulations
Establish Liability:**  The Court has already adjudicated this issue in its Summary
Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its
BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga

1  Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.

2  *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally

3  used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily

4  conclude[d]" that Defendants' use of identical marks, on identical products, in

5  identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13. That

6  order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

7  Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

8  motion may "enter an order stating any material fact — including an item of damages

9  or other relief — that is not genuinely in dispute and treating the fact as established in

10  the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

11  *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

12  *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

13  partial summary judgment are taken as established at trial.").

14      Defendants did not move the Court to reconsider its holdings.  Nevertheless,

15  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

16  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

17  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

18  purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

19  ***trial of facts and issues over which there was really never any controversy*** and

20  which would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos*

21  *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

22  1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

23  n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

24  position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

25  (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

26  judgment is ***generally not relevant and should be excluded***" at trial) (emphasis

27

28

1   added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

2   applicability of the law of the case doctrine where a case is assigned to a new judge).

3       "The partial summary judgment is merely a pretrial adjudication that certain

4   issues shall be deemed established for the trial of the case and likewise serves the

5   purpose of speeding up litigation by eliminating before trial matters wherein there is

6   no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

7   2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

8   undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

9   tactic that has unjustifiably increased the cost of resolving this case.

10      Defendants' objection contradicts their own stipulations in the proposed pre-

11  trial conference order.  *See* Dkt. 320-1 at 13.  In that stipulation and proposed order,

12  Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT

13  collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted

14  that "[t]he Court has determined that Defendants infringed the BAYC Marks" and

15  "that Defendants' registration and use of the domain names https://rrbayc.com and

16  https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting

17  Consumer Protection Act."  *Id.* at 13.  As such, Defendants have waived their right to

18  now argue that they were not liable for infringing upon Yuga Labs' marks or

19  cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882,

20  886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial

21  which are not included in the [pre-trial conference] order *or which contradict its*

22  *terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting

23  to it clearly contradict the terms of the pre-trial conference order.  Defendants' sudden

24  refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that

25  unjustifiably increases the cost of resolving this case.  Defendants' actions again make

26  this an exceptional case.  The Court should reject Defendants' objection.

27

28

Defendants offer no basis to dispute this finding.  They offer no contradictory facts, nor do they cite to any evidence in the record.  Rather, Defendants are merely expressing their disappointment in the Court's well-reasoned summary judgment order.  This is not a proper basis for objection.  Defendants' various arguments regarding intent, third parties' use of Yuga Labs' marks, Defendants' "disclaimer," and confusion and their knowledge thereof lack merit (*see supra* ¶ 4) and do not change this conclusion.

### **Defendants' Reply:**

Defendants have the right to preserve arguments for appeal. Yuga's characterization of Defendants attempting to relitigate resolved issues makes no sense because Yuga has proposed this finding of fact. Defendants have not engaged in any litigation misconduct.  *See generally* Dkt. 348 at 11-15.  Defendants' defenses were made reasonably and in good faith.  *Id.*  All of Defendants' efforts to litigate and settle in good faith were impacted by Yuga's unreasonable demands, including Yuga's demand for a non-disparagement clause and Yuga's ever fluctuating assessment of actual damages.  *See* Dkt 286 at 2-3 (asserting damages of $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June 8); Dkt. 315-1 at 2 (dropping actual damages on June 15).  This Court acknowledged that Yuga's demand for a non-disparagement clause was "a condition that is quite frankly unreasonable." Hearing Transcript June 16, 2023, at 9:9-12.  Furthermore, Yuga has failed to present evidence which shows that Defendants lack respect for this Court or the rule of law. To the contrary, both Defendants fully participated in the pre-trial litigation process, appeared for trial, conducted themselves respectfully, and testified truthfully under oath, as any reasonable litigant would.

The evidence at trial showed that Yuga does not own the BAYC marks because (1) Yuga has either given away or abandoned its rights in the marks and (2) NFTs are not eligible for trademark protection. Yuga gave away all intellectual property rights

associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075. Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a ***communicative*** work is a dispute relegated to the confines of copyright law, not trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

1  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

2  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the

3  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

4  certificates of authenticity/ownership and are not digital goods in themselves.  Trial

5  Tr. [Atalay] 127:9-16.

6      Defendants have never stipulated to Yuga's Ownership of the BAYC

7  Marks.  Defendants hotly disputed ownership of the BAYC marks at summary

8  judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant

9  to the remedies trial in this case, Yuga has for some reason affirmatively raised the

10  issue—forcing Defendants to re-articulate their dispute for purposes of preserving

11  their position for appeal and all other proceedings involving the BAYC marks.  Yuga

12  attempts to mischaracterize the Court record by citing to the pre-trial conference

13  order.  But *nowhere* in the pre-trial conference order did Defendants stipulate to

14  ownership of the BAYC marks.  Section 6 of the order contains all stipulated facts and

15  those stipulated facts include only that Yuga released the BAYC collection and

16  various facts about Defendants' activities associated with the RR/BAYC

17  collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts

18  section, but this section again does not contain any admissions regarding "ownership"

19  of the marks.  Rather it merely identifies the asserted marks at issue for the remedies

20  trial—something that Defendants admitted in light of the scope of the remedies trial

21  and to ease this Court's work in adjudicating the remaining issues.  Dkt. 32-1 at 2-

22  3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that

23  Defendants infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an

24  admission of ownership, it is a statement regarding the procedural history in this case

25  that explains that the scope of trial is limited to remedies and does not include

26  infringement.  Had Defendants wanted to stipulate to ownership, they would have

27

28

1  clearly and expressly done so—they have not.  Defendants reserve the right to dispute

2  ownership on appeal and in any other proceedings involving the BAYC marks.

3        Yuga improperly relies on the Court's summary judgement order to establish

4  facts at trial.  The "law of the case doctrine does not apply to pretrial rulings such as

5  motions for summary judgment.  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir.

6  1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

7  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

8  judges for the remainder of the case.  Given the nature of such motions, it could not be

9  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although aspects of an

10  issue were decided at summary judgment for one purpose, the summary judgment

11  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

12  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

13  of initial police contact was relevant as background, but not to the already decided

14  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

15  summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged

16  marks applies to only the issue of likelihood of confusion and cannot be applied more

17  broadly.

18        **Plaintiff's Disputed Post Trial Finding of Fact No. 11(b), lines 6:5-7:**

19        <u>Removing the "gas" transaction costs and profits accrued to non-defendants,</u>

20  <u>Mr. Lehman and Mr. Hickman, reflects the amount of profits that accrued to</u>

21  <u>Defendants only from the initial sales of RR/BAYC NFTs, totaling $1,366,090.</u> JTX-

22  723 ¶¶75-76; Dkt. 338 ¶¶57-60

23        **Defendants' Basis of Dispute:**

24        Yuga's $1,366,090 figure fails to exclude several categories of expenses that

25  the evidence presented at trial indicated should be removed to calculate the profits Mr.

26  Ripps and Mr. Cahen received from the initial sales of RR/BAYC NFTs.  First, the

27  $1,366,090 figure removes only $419,733 for profit sharing that was paid to Mr.

28

1    Lehman and Mr. Hickman and fails to exclude an additional $108,037.08 in profit

2    sharing sent to Mr. Hickman and Mr. Lehman.  *See* Kindler Decl. ¶¶ 59-60 (Dkt. 338);

3    Trial Tr. [Kindler] 196:22-197:2 (admitting that her calculations failed to deduct these

4    profits); Ripps Decl. ¶¶ 132-135 (Dkt. 346) (uncontested); Lehman's Depo. 210:16-

5    214:7 (Dkt. 411) (confirming that a payment received by Mr. Ripps for 32.98 ETH

6    was for "the profits [Mr. Ripps] made before [the RSVP contract], and then looking

7    forward.  It's all automatic.") JTX-2710; and JTX-2711.  Elsewhere in their Findings

8    of Fact, Yuga even agrees that this figure needs to be reduced by $108,037.08 to

9    determine the accurate amount of profits Mr. Ripps and Mr. Cahen received from the

10   initial sales and they exclude this amount. *See* Yuga's Proposed Finding of Fact 11(b)

11   8-11 (Dkt. 418-1).

12       Additionally, the evidence presented at trial showed that the RSVP contract also

13   distributed $93,135.62 in automated refunds.  Ripps Decl. ¶¶ 174-175 (Dkt. 346)

14   (uncontested).  This figure improperly includes in its profits calculation $93,135.62 in

15   automated refunds executed through the RSVP reservation contract.  Ripps Decl. ¶¶

16   174-175 (Dkt. 346) (uncontested).

17       Finally, Mr. Ripps and Mr. Cahen also incurred approximately $15,100.00 in

18   expenses necessary to create the RR/BAYC project, including wages paid to an

19   assistant, a computer, and travel expenses.  Ripps Decl. ¶ 136 (Dkt. 346)

20   (uncontested); Cahen Decl. ¶¶ 174-176 (Dkt. 344).  This figure fails to exclude those

21   expenses from the profit calculation.  An accurate calculation of Mr. Ripps and Mr.

22   Cahen's profits from the initial sales of the RR/BAYC NFTs would accordingly be

23   $1,149,817.30.

24       For support, Yuga cites to portions of Ms. Kindler's expert report and

25   declaration.  JTX-723 ¶¶ 75-76; Kindler Decl. ¶¶ 57-60 (Dkt. 338).  But those

26   segments make clear that the expenses outlined above *have not* been removed from

27   her profit calculation.  Accordingly, the evidence cited by Yuga is flawed and does not

28

accurately support a calculation of the profits Mr. Ripps and Mr. Cahen received from the initial sales of RR/BAYC NFTs. *See* Kindler Decl. ¶ 57 (Dkt. 338) (only accounting for $419,733 in profit sharing to Mr. Lehman and Mr. Hickman and not the additional $108,037.08); JTX-723, n. 149 ("Defendants testified that they incurred some additional expenses related to the sale of RR/BAYC NFTs… I have [] not included them in my analysis."); *see generally* JTX-723 (the word "refund" is not mentioned once in Ms. Kindler's 91-page report and appendices, providing no support for her later claims that she accounted for refunds).

**Plaintiff's Response:**

Defendants' disputes regarding Ms. Kindler's unrebutted expert testimony are baseless.

As to manual payments made to Mr. Lehman and Mr. Hickman beyond the $419,733 transferred through the RSVP contract, Defendants failed to provide evidence of manual profit-sharing payments to Mr. Hickman and Mr. Lehman in discovery.  *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that defendant failed to meet burden to prove a 40% royalty was a proper deduction, where "the documentary evidence leaves uncertainty as to the amount of royalty fees paid" and defendant "did not produce sufficient documentation to prove the specific amounts").  After Defendants identified the purpose of certain payments for the first time in their trial testimony, *see* Ripps Decl. (Dkt. 346) ¶¶ 132-135, Ms. Kindler testified that those figures may be appropriate deductions from a disgorgement judgment.  Trial Tr. at 195:3-7 ("If it is established that that money is, in fact, profit sharing that's tied to the work on this case involving the infringing marks, then I would have no problem deducting that from my ultimate conclusion.  I just have not seen any evidence to suggest that it would be appropriate to do that.").  Unless the Court finds that Defendants' belated,

1   self-serving statements proved their entitlement to these deductions, they should not

2   be disgorged.

3   As to the refunds processed through the RSVP contract, Ms. Kindler excluded

4   those refunds from her profit analysis.  Specifically, Mr. Kindler testified that

5   "transactions that were refunded through the RefundIssued and RSVPCanceled

6   functions in the RSVP smart contract were not included in my calculation of profits."

7   Kindler Decl. (Dkt. 338) ¶ 44.  Ms. Kindler affirmatively made these deductions,

8   again despite Defendants' failure to disclose them in discovery.  **"Neither Defendant**

9   **provided information sufficient to identify any refunds issued to RR/BAYC NFT**

10  **purchasers" despite interrogatory requests to do so.  *Id.* ¶ 43.**  Instead of providing

11  this information during discovery, Defendants original interrogatory responses falsely

12  said they were unaware of any refunds.  Nevertheless, Defendants' insinuation that

13  Ms. Kindler did not deduct refunds from her calculations, as she testified, has already

14  been rejected by the Court.  Trial Tr. at 170:11-13.

15  As to the alleged expenses incurred in furtherance of profiting from their

16  infringing NFTs, there is no basis to Defendants' objection.  Defendants—not Yuga

17  Labs or Ms. Kindler—bear the burden of proving their deductions, and they have

18  failed to do so.

19  First, Defendants provide no documentary evidence that Mr. Ripps paid Ian

20  Garner "roughly $3,500 for his work" as an "assistant," what that work entailed, or

21  how it was relevant to the revenue generated by Defendants' infringing activities.

22  Second, Defendants offered no documentary evidence of Mr. Cahen's travel

23  expenses or how these alleged travel expenses were necessary to earn revenue from

24  minting infringing NFTs.  There is no basis for this deduction.

25  Third, Defendants failed to offer any evidence of Mr. Cahen's computer

26  purchase or why a several-thousand-dollar computer was necessary to earn revenue

27  from Mr. Ripps' supposed minting of infringing NFTs.  Defendants have claimed that

28

it was all Mr. Ripps (or at least Mr. Ripps' computer), and not Mr. Cahen, who minted the infringing NFTs.  *See, e.g.*, Defendants' Answer and Counterclaim (Dkt. 65) ¶ 49 ("Each RR/BAYC NFT was hand-minted by the wallet of Mr. Ripps, and Mr. Ripps sold all RR/BAYC NFTs through only his personal Twitter account, Foundation, private sales, and the website https://rrbayc.com.").  There is no basis for this deduction.  *See Vital Pharmaceuticals v. PhD Marketing, Inc.*, No. CV 20-06745, 2022 WL 2952495, *4, 6 (C.D. Cal. 2022) (rejecting deductions where defendant "has produced troublingly little evidence to support that figure. Not a single invoice, receipt, or other original source document has been produced to support the costs and expenses Defendant claims. . . .  Other courts have similarly found that summary financial documents coupled with testimony, absent any documentary evidence, were insufficient to satisfy the defendant's burden to prove costs."); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06-CV-1584, 2009 WL 10674076, at *10 (S.D. Cal. 2009) (affirming rejection of deductions where defendant "did not submit any documentary evidence such as invoices to substantiate its claimed deductions").  Defendants' tacit admission that Mr. Cahen's contribution to the revenue generated from sales of RR/BAYC NFTs was his "stimulat[ion]" of sales (JTX-801.144), such as with his Tweets from @ApeMarketplace, does not obviate the need to prove the cost of purchasing this computer in December 2021 was for Defendants' business venture.  Defendants' admission does however highlight that they are lying when they claimed that accounts, such as the @ApeMarketplace Twitter account, did not support their marketing and infringement.  *See supra* ¶ 14 (lines 7:15, 7:16-18).  Finally, Mr. Cahen admitted at trial that he purchased the computer in December 2021, approximately *five months before the "project" even began*.  Trial Tr. at 227:2-229:21.  Mr. Cahen's sworn testimony that he bought a computer "to use for the project" that would not exist for another five months further belies any possible link between this cost and Defendants' profits attributable to their infringement.

**Defendants' Reply:**

Yuga's response is unsupported.  First, Yuga's response inaccurately describes the documents in evidence.  As JTX-2710 and JTX-2711 demonstrate, data available on the blockchain show that there were additional payments made from Mr. Ripps to Mr. Lehman and Mr. Hickman.  That blockchain data has been publicly accessible since those transactions were made.

Further, it is inaccurate to say Defendants did not provide evidence of this profit sharing until trial.  Deposition testimony made clear and supported this finding that there were individual transfers made to account for profit-sharing before the RSVP contract was put in place.  *See* Lehman's Depo. 210:16-214:7 (Dkt. 411) (confirming that a payment received by Mr. Ripps for 32.98 ETH was for "the profits [Mr. Ripps] made before [the RSVP contract], and then looking forward.  It's all automatic.").  Defendants also produced spreadsheets of internal reporting and profit splitting, including JTX-103, which shows a 15% split of *all* profits (not just those accrued through the RSVP contract) with both Mr. Lehman and Mr. Hickman.  Finally, even Mr. Lehman's declaration, which Yuga was intimately involved in drafting, that was signed on February 3, 2023, clearly stated that the profit share included profits received before the RSVP contract was put in place.  *See* JTX-001, ¶33 ("In exchange for developing the RSVP Contract and rrbayc.com website for the Business Venture, I was to receive 15% of the combined revenue of the RR/BAYC mints with and without the RSVP Contract.").   Accordingly, Yuga's claim there was not evidence presented to support pre-RSVP contract profit splitting before trial is patently false.  The proof that an additional $108,037.08 in profit sharing needs to be removed from Ms. Kindler's calculations is not based on "belated, self-serving statements" but credible testimony and evidence.

Additionally, Yuga's response here is inconsistent with their own Findings of Fact.  Specifically, in their Findings of Fact, Yuga agrees that their calculation of

1    Defendants' profits needs to be reduced by $108,037.08 to determine the accurate

2    amount of profits Mr. Ripps and Mr. Cahen received from the initial sales.  *See* Yuga's

3    Proposed Finding of Fact 11(b) (Dkt. 418-1).  To state in this objection that the

4    transfers made to Mr. Lehman and Mr. Hickman should not be excluded is

5    inconsistent, unfounded, and misleading.

6         Second, Ms. Kindler's trial testimony on refunds was unfounded.  *See* generally

7    JTX-723 (the word "refund" is not mentioned once in Ms. Kindler's 91-page report

8    and appendices, providing no support for her later claims that she accounted for

9    refunds).

10        Also, it is inaccurate and misleading to state that Defendants tried to withhold

11   this evidence during discovery.  As Mr. Ripps's testimony makes clear, the

12   transactions outlining both the automated refunds offered through the RR/BAYC

13   contract and the refunds Mr. Ripps directly issued are all available and publicly

14   recorded on Etherscan.  Ripps Decl. ¶¶ 172-15 (Dkt. 346) (uncontested).  That

15   information has been available since those transactions occurred.  Further, that

16   information is available on the very source Ms. Kindler states she reviewed and

17   extracted information from when forming her opinions.  *See* Kindler Decl. ¶¶ 5-7.

18   ("My calculation of Defendants' profits is based on public Ethereum blockchain data,

19   which contains records of all transactions executed on the network…. In order to

20   calculate Defendants' profits, four datasets were extracted using Etherscan: (1) all

21   transactions associated with Mr. Ripps and Mr. Cahen's wallets, (2) all transactions

22   associated with RR/BAYC NFTs…").  Accordingly, this information has not been

23   withheld from Yuga and to state otherwise is misleading.

24        Additionally, this Court is entitled to accept Mr. Ripps's declaration because the

25   trial transcript shows that Yuga elected to forego any substantive cross-examination of

26   Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See*

27   Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-

28

examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Finally, Yuga's statement that Defendants' attempts to exclude this testimony were overruled is misleading.  For support, Yuga cites to the portion of the trial transcript where the court overrules Defendants' objections to Ms. Kindler's testimony.  Just because the court allowed the testimony to be entered, does not mean that the court finds the testimony credible or that evidence presented that rebuts said testimony is not persuasive.

Third, Mr. Ripps's testimony showed that Mr. Garner was his assistant and worked on the RR/BAYC Project for one week and was paid for his work.  Ripps Decl. ¶¶ 124, 127, 136 (Dkt. 346) (uncontested).  Such assistance on the project helped with the creation of reservations of RR/BAYC NFTs.  Second, Mr. Cahen testified that he paid for travel to meet and collaborate with Mr. Ripps for the project.  Cahen Decl. ¶ 175 (Dkt. 344).  Travel expenses paid so that two of the creators of the project could meet and work with one another, helped with the creation of reservations of RR/BAYC NFTs.  Finally, Mr. Cahen testified about the cost of a computer he used to work on the RR/BAYC project.  Cahen Decl. ¶ 174 (Dkt. 344).  The cost of the materials Mr. Cahen used for creating the RR/BAYC project did help with the creation of reservations of the RR/BAYC NFTs.

Further, as Mr. Cahen testified, he used the computer he purchased for the RR/BAYC Project for research about Yuga ***that led up to*** and helped create the

1  RR/BAYC Project.  Trial Tr. [Cahen] 229:14-21.  Additionally, Yuga's citation to Mr.

2  Cahen's declaration does not support this objection as it affirms that Mr. Cahen

3  purchased a computer that he used for the project.  Cahen Decl. ¶ 174 (Dkt. 344).

4  Accordingly, the fact the computer was purchased in December 2021 and the

5  RR/BAYC NFTs were not minted until later, does not diminish the usefulness of this

6  tool in the RR/BAYC project as a whole, warranting including it among appropriate

7  deductions.

8        Finally, as outlined further *infra ¶ 14* ApeMarket never suggested any

9  sponsorship or affiliation with Yuga. ApeMarket was never released, and there was no

10  evidence that the webpage apemarket.com was a functioning website that could sell or

11  promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl.

12  ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  And the exhibits Yuga

13  cites do not show otherwise.  For example, JTX-696 does not show what

14  apemarket.com displayed, what functionalities it had, and whether it has ever

15  promoted or sold RR/BAYC NFTs.  As noted above, ApeMarket was never released

16  (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344);

17  Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website

18  domain apemarket.com was ever used for the promotion or sale of anything.   This

19  Response is unfounded.

20        **Plaintiff's Disputed Post Trial Finding of Fact No. 11(c), line 6:14:**

21        Defendants' profits from royalties or creator fees from resales of RR/BAYC

22  NFTs totaled at least $117,309. JTX-723 ¶68; Dkt. 338 ¶¶45-50.

23              **Defendants' Basis of Dispute:**

24        This finding of fact is misleading.  Yuga's finding of fact states that the profits

25  Mr. Ripps and Mr. Cahen received from royalties for the secondary sale of RR/BAYC

26  NFTs are "at least" $117,309, which implies that Mr. Ripps and Mr. Cahen are still

27  receiving royalties and that the figure could be even higher.  As the evidence at trial

28

showed, Mr. Ripps and Mr. Cahen purposefully shut off the royalties they received from marketplaces as a criticism of Yuga's practice of receiving a 2.5% royalty on their secondary sales.  Ripps Decl. ¶ 118 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 166-167 (Dkt. 344).  Yuga's president, Mr. Solano, was also forced to concede on cross examination that his sworn declaration is false in its claim that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4.  Further, the evidence showed that Mr. Ripps and Mr. Cahen turned off the royalties they received from any marketplace that would allow them to do so.  Ripps Decl. ¶¶ 116-117 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 166-169 (Dkt. 344).  The only marketplace that initially would not allow them to turn off royalties, LooksRare, eventually honored Mr. Ripps and Mr. Cahen's request and shut off secondary sale royalties in May 2023.  Cahen Decl. ¶¶ 170-171 (Dkt. 344). Accordingly, royalties from secondary sales of RR/BAYC NFTs are not ongoing.

Additionally, Mr. Cahen testified that the total royalties he and Mr. Ripps received were around $78,000 (at most $1,000 through Foundation and $77,000 from LooksRare, before they were shut off).  Cahen Decl. ¶¶ 168, 172 (Dkt. 344).  This evidence further supports a finding that the total royalties Mr. Ripps and Mr. Cahen have received for the RR/BAYC Project are not more than $117,309, as this finding of fact misleading implies.

The portions of Ms. Kindler's declaration that Yuga cites to for support also note that Mr. Ripps and Mr. Cahen only received royalties from two NFT marketplaces, LooksRare and Foundation.  Kindler Decl. ¶ 48 (Dkt. 338). Accordingly, the evidence cited to here does not support this misleading finding of fact.

**Plaintiff's Response:**

Defendants' objection is largely non-sequitur.  Defendants concede they made at least $117,309 in royalties on secondary market sales, but they dispute that it could

possibly be more than that.  However, Defendants admit they accrued profits from Looksrare until May 2023—i.e., for at least three months after Ms. Kindler's blockchain transaction analysis.  *See* Kindler Decl. ¶ 5 ("These datasets were extracted on February 1, 2023 and contain transactions from May 13, 2022 (when Mr. Ripps began to mint RR/BAYC NFTs) through February 1, 2023."); *id.* ¶ 50 ("My calculation, which was as February 1, 2023, does not fully capture the total profits earned by Defendants from resales of RR/BAYC NFTs since then, and it does not capture future potential profits and other benefits that would accrue to Defendants as purchasers continue to buy and sell RR/BAYC NFTs.").  There is no basis for Defendants' objection.

### Defendants' Reply:

This Response is unsupported.  Defendants do not concede that they made at least $117,309 in royalties from the secondary market sales.  As outlined in the objection, Mr. Ripps and Mr. Cahen credibly testified about the steps they took to prevent the accrual of royalties and how they no longer receive any.   Ripps Decl. ¶¶ 116-117 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 166-171 (Dkt. 344).  Further, Mr. Cahen testified, and the documentary evidence supports a finding, that he calculated the total royalties received from secondary sales was around $78,000.  *See* JTX-103 (calculating that by June 20, 2022 royalties from LooksRare were 70 ETH or $77,000).  Further, that determination of ETH received from LooksRare is higher than the amount Ms. Kindler calculated, which could account for any delta in time period between when Ms. Kindler made her calculations and when LooksRare royalties were shut off.  *See* Kindler Decl. ¶ 49 (Dkt. 338) ("Defendants estimated that they earned 70 ETH from LooksRare creator fees, which is higher than my calculation of 65 ETH.").

### Plaintiff's Disputed Post Trial Finding of Fact No. 11(d), lines 16-17:

1   <u>The value of RR/BAYC NFTs that Defendants hold or did not mint totals</u>

2   <u>$106,055.</u> JTX-723 ¶74; Dkt. 338 ¶¶51-57.

3   **Defendants' Basis of Dispute:**

4   This $106,055 figure is not profit, but includes the theoretical value of NFTs

5   that either Mr. Ripps and Mr. Cahen hold but have not sold or, more egregiously, that

6   Mr. Ripps and Mr. Cahen have never actually minted. *See* Kindler Decl. ¶ 51, 54, 56

7   (Dkt. 338). It is improper to include in a determination of the profits Mr. Ripps and

8   Mr. Cahen received an estimated value of theoretical sales and theoretical NFTs that

9   do not exist.

10  Further, in the course of Ms. Kindler's calculation of the value of these NFTs,

11  she uses the floor price for RR/BAYC NFTs based on the secondary markets for them

12  on January 27, 2023. Kindler Decl. ¶ 54 (Dkt. 338). Ms. Kindler opines that the floor

13  price at that time was 0.115 ETH. *Id.* As the trial testimony indicated, however, the

14  floor price for RR/BAYC NFTs has gone down and the floor price on June 7, 2023

15  was only 0.07 ETH. JTX-1624, Dkt. 287-1, Trial Tr. [Kindler] 182:11-13. Despite

16  this considerable decrease in value, Ms. Kindler testified that she did not update her

17  calculation to reflect the new floor price. Trial Tr. [Kindler] 198:2-12. Using the

18  updated floor price of RR/BAYC NFTs the value of the 590 NFTs would be 41.3

19  ETH or around $82,600. *See* Trial Tr. [Kindler] 182:14-22 (Ms. Kindler agreeing that

20  a current conversion rate of 1 ETH for $2,000 "sounds right."). .

21  The portions of Ms. Kindler's report and declaration Yuga cites to for support

22  here clearly indicate that this figure is based on a calculation of profits for NFTs that

23  Mr. Ripps and Mr. Cahen hold but have not sold or those that do not exist.

24  Accordingly, the evidence cited for support is flawed for the reasons outlined above.

25  **Plaintiff's Response:**

26  Defendants object that Ms. Kindler's economic opinion "is improper" without

27  any citation to evidence or authority to dispute rebut her opinion. Their unsupported,

28

1   non-expert opinion is not a meritorious objection.  In fact, the unrebutted analysis of

2   Ms. Kindler demonstrates that Defendants did derive certain benefits of determinable

3   value from the NFTs they hold in their own wallets or have yet to mint.  "While these

4   RR/BAYC NFTs may not have directly generated revenue for Defendants, they still

5   have value.  For example, one of the Defendants, Mr. Cahen, testified that the value of

6   the held RR/BAYC NFTs 'is pretty much the same as when they were originally

7   being produced,' which is 'anywhere between .1 Ethereum and .15 Ethereum.'"

8   Kindler Decl. (Dkt. 338) ¶ 52 (quoting Cahen Deposition Tr. at 255:25-256:7).  Ms.

9   Kindler's unrebutted testimony provides a conservative calculation of these NFTs as

10   providing $106,055 in profit to Defendants.  Kindler Decl. (Dkt. 338) ¶¶ 51-57.

11          The floor price of NFTs fluctuates over time, and the change in the floor price

12   of Defendants' infringing NFTs does not render Ms. Kindler's valuation of the

13   unminted and unsold NFTs unreasonable.  Ms. Kindler's estimate is consistent with

14   Mr. Cahen's own estimate of 0.1-0.15 ETH.  Kindler Decl. (Dkt. 338) ¶ 52 (quoting

15   Cahen Deposition Tr. at 255:25-256:7).  Ms. Kindler arrived at this estimate by using

16   the floor price (i.e., the lowest market value of any NFT in the entire collection at a

17   given time) as a low-end valuation of the remaining NFTs in the collection.  Her

18   conservative valuation of 0.115 ETH remains reasonable, even if the floor price of the

19   collection has fluctuated.  As Ms. Kindler testified at trial, "[t]hat data changes on a

20   daily basis.  I think at the time there was testimony from both defendants about the

21   pricing that I used being a reasonable price generally as to how to value their NFTs.

22   So I still think it's a reasonable approximation of value."  Trial Tr. 198:8-12.  This

23   0.115 ETH figure is also significantly lower (by about 23%) than the price charged by

24   the RSVP contract for newly minted NFTs (0.15 ETH).  *See* Kindler Decl. (Dkt. 338)

25   ¶ 36.  Moreover, the evidence shows that Defendants are readily able to drive up the

26   floor price and the transaction volume if they choose to do so.  *See id.* ¶ 73.  The

27

28

unrebutted evidence shows a conservative estimate of the profit Defendants would reap should they retain the ability to mint and sell.

Should Defendants, however, be ordered to burn the NFTs they currently hold and transfer control of the smart contract for their infringing NFTs to Yuga Labs, it is Yuga Labs' position that Defendants should not be required to disgorge profits, respectively, from their currently held NFTs and their not yet minted NFTs.

### **Defendants' Reply:**

First, what Yuga argues here is that there may be some value to these unsold or theoretical NFTs that do not yet exist.  But this does nothing to undermine Defendants' objection that they are not profit.  Not all things that have value have made the holder of them a profit.  Profit is a quantifiable economic calculation that looks at revenue for the sale of a good or service and subtracts associated costs.  An item that has never been made cannot yet provide any profit and nothing in what Yuga cites to undermines this.  Instead, Yuga cites to a portion of Ms. Kindler's declaration where she concedes "these RR/BAYC NFTs may not have directly generated revenue…"  Kindler Decl. ¶ 52 (Dkt. 338).

Second, Yuga's response that the floor price of the RR/BAYC NFTs fluctuates does not undermine the validity of Defendants' objection that the floor price Ms. Kindler used is outdated and providing an overestimation of the profit likely to be received if these theoretical NFTs were minted and sold.  Specifically, Mr. Cahen's rough estimation of the price of RR/BAYC NFTs on January 11, 2023 during his deposition does not change what the current price these NFTs would sell for if they were minted and sold.  Nor does it undermine Defendants' objection here.  Further, the portion of Ms. Kindler's declaration Yuga cites to support an argument that Defendants could drive up the floor price is based on tweets made by users Ms. Kindler did not confirm even own RR/BAYC NFTs and that could have been hyperbolic statements or jokes. *See* Trial Tr. [Kindler] 179:12-14 ("Q Your new

1  opinion was based on Tweets posted by defendants on June 6, 2023, and some

2  responses; correct? A Yes. That was the events that had transpired."); *Id*. at 180:18-

3  21.

4          Finally, even if the Court limits its order to preventing the creation or sale of

5  RR/BAYC NFTs and not the transfer of the smart contract, this figure should be

6  considered outside what Yuga can seek in disgorgement.  *See* Trial Tr. [Kindler]

7  198:18-25 ("Q Now, if the Court orders an injunction prohibiting minting of any new

8  RR/BAYC NFTs, the value of the unminted NFTs is zero; correct? A I don't know

9  that -- maybe. I would agree with you that it would not need to be included in an

10 unjust enrichment monetary compensation to Yuga. Q Yuga doesn't get to double-dip;

11 right? A Yes. Absolutely.").

12              **Plaintiff's Disputed Post Trial Finding of Fact No. 11(d), lines 18-20:**

13 This amount shall not be disgorged because the Court finds it appropriate to

14 transfer the RR/BAYC smart contract to Yuga Labs and Ms. Kindler agreed that Yuga

15 Labs should not receive this sum if it received the smart contract. Dkt. 392 at 198:18-

16 25.

17                        **Defendants' Basis of Dispute:**

18         Given the evidence presented at trial, the Court should not find that it is

19 appropriate to transfer the RR/BAYC smart contract to Yuga.[4]  "A trademark

20 injunction . . . can raise serious First Amendment concerns because it can interfere

21 with truthful communication between buyers and sellers in the marketplace.

22 Accordingly, we must ensure that the injunction is tailored to eliminate only the

23 specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171,

24 1176 (9th Cir. 2010) (cleaned up).  Here, a properly tailored injunction must be

25

26 [4] No injunction should enter in this case, and nothing in this document should be
27 construed to suggest that Defendants believe any injunction is proper or as a waiver of
   any right to contest on appeal the entry of an injunction.

28

targeted to eliminate any confusion resulting from the sale of RR/BAYC NFTs, or the use of the "rrbayc.com" and "apemarket.com" domains.  Transferring the RR/BAYC smart contract to Yuga is not tailored to eliminate the harm alleged and could have a stifling effect on Mr. Ripps and Mr. Cahen's First Amendment rights as the minting of the RR/BAYC NFTs is intricately connected to their protest against Yuga.  Ripps Decl. ¶ 87 (Dkt. 346) (uncontested); Cahen Decl. ¶ 97 (Dkt. 344).  Further, as the evidence presented at trial indicated, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Accordingly, there is no evidence of actual confusion resulting from the sale of RR/BAYC NFTs that an injunction transferring the RR/BAYC smart contract would eliminate.  Finally, the RR/BAYC smart contract already clearly indicates the creator is Mr. Ripps.  Ripps Decl. ¶¶ 88-90 (Dkt. 346).  Transferring the smart contract to Yuga, therefore, would not help eliminate any of the alleged confusion resulting from the sale of RR/BAYC NFTs.

Finally, the evidence Yuga cited is misleading.  Ms. Kindler testified if Yuga receives an injunction preventing Mr. Ripps and Mr. Cahen from minting any new RR/BAYC NFTs or selling the ones they currently hold, Yuga is not entitled to the estimated value of these NFTs in disgorgement. Trial Tr. [Kindler] 198:18-25 ("Q Now, if the Court orders an injunction prohibiting minting of any new RR/BAYC NFTs, the value of the unminted NFTs is zero; correct? A I don't know that -- maybe. I would agree with you that it would not need to be included in an unjust enrichment

1    monetary compensation to Yuga. Q Yuga doesn't get to double-dip; right? A Yes.

2    Absolutely.").  Even if the Court limits its order to preventing the creation or sale of

3    RR/BAYC NFTs, this figure should be considered outside what Yuga can seek in

4    disgorgement.

5                        **Plaintiff's Response:**

6           Transferring control of the smart contract to Yuga Labs would allow it to regain

7    control over its brand.  The injunctive relief proposed by Yuga Labs is specifically

8    tailored to accomplish this.  *Infra* Conclusion of Law No. IV.2.  Indeed, although two

9    other courts have entered similar injunctions against Defendants' business partners.

10   *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30),

11   *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023);

12   JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas

13   Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD

14   (N.D.N.Y Feb. 6, 2023)), only this Court can order the transfer of RR/BAYC smart

15   contract to Yuga Labs because only this Court has jurisdiction over Mr. Ripps.  Mr.

16   Lehman has, however, transferred control of the RR/BAYC RSVP smart contract (the

17   contract that interfaced with the RR/BAYC smart contract and rrbayc.com) to Yuga

18   Labs because he controlled that contract.

19          "Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs'

20   brand will be forever tied to Mr. Ripps," Solano Decl. (Dkt. 342) ¶ 47, because he and

21   Mr. Cahen still control the smart contract used to create the infringing NFTs that are

22   permanently embedded with Yuga Labs' brand.  Transfer of the smart contract will

23   mean that "all uses of the BAYC Marks are under the control of the rightful owner of

24   these marks.  As long as Defendants own the RR/BAYC smart contract bearing the

25   BAYC Marks, they will continue to confuse consumers by associating the BAYC

26   Marks with themselves and their copycat NFTs." *Id.* ¶ 79.  "If Yuga Labs had control

27   of the RR/BAYC Smart Contract, it could limit the minting cap to 9,546 RR/BAYC

28

1   NFTs to ensure that no additional NFTs were minted using the RR/BAYC Smart

2   Contract." Atalay Decl. (Dkt. 337) ¶ 8. In addition, if Yuga Labs has control of the

3   RR/BAYC smart contract, it will allow Yuga Labs to work with the NFT

4   marketplaces to ensure that the human readable elements of the marketplace clearly

5   indicate that RR/BAYC NFTs are not authentic BAYC NFTs. *See* Trial Tr. 136:9-18

6   ("But if Yuga Labs had control . . . we would have a much greater flexibility in

7   controlling how the collection is displayed in marketplaces, including OpenSea."); *see*

8   *also* Trial Tr. 100:6-14; Trial Tr. 138:6-139:11. As long as Defendants retain control

9   of the smart contract, "Yuga Labs does not have the ability to exclusively control its

10   BAYC brand." Muniz Decl. (Dkt. 340) ¶ 22.

11          There is also a concrete risk that Defendants will find ways to continue their

12   infringement if anything less than transfer of the smart contract is ordered by the

13   injunction. Indeed, in these very objections, Defendant **admit they intend to mint** the

14   remainder of the infringing NFTs in their collection and insist they have a

15   constitutional right to do so. *Infra* ¶ 11(d), lines 18-20 (arguing that surrendering

16   control of the smart contract to Yuga Labs would "have a stifling effect on Mr. Ripps

17   and Mr. Cahen's First Amendment rights as the minting of the RR/BAYC NFTs is

18   intricately connected to their protest against Yuga"). Defendants should not be able to

19   retain their ill-gotten profits and the means to continue profiting from their

20   infringement.

21          Finally, Defendants' argument that their infringement did not cause "actual

22   confusion" is irrelevant because (1) actual confusion is not a required element under

23   the Lanham Act to obtain equitable relief and (2) even so, there is ample evidence of

24   confusion in the record. *See supra* ¶ 4.

25                        **Defendants' Reply:**

26          Yuga's Response is unsupported. First, as outlined above, we "must ensure that

27   the injunction is tailored to eliminate only the specific harm alleged." *Toyota Motor*

28

---

Case No. 2:22-cv-04355-JFW-JEM          -323-          JOINT STATEMENT RE: OBJECTIONS

1    *Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) (cleaned up).

2    Including a transfer of the smart contract would not be tailored to address the harm

3    alleged here.  Further, Yuga's citations to the decisions other courts have held with

4    regard to cases against Mr. Lehman (who settled with Yuga) and Mr. Hickman (who

5    had a default judgment entered against him) are dissimilar to the posture in this case,

6    not binding, and irrelevant.

7         Second, the testimony Yuga cites to for support is unconvincing.  Specifically,

8    Yuga cites to Mr. Solano's declaration where he asserts that the smart contract uses

9    the BAYC Marks and that it has caused and will continue to cause confusion.  This is

10   not supported. The smart contract that Yuga seeks to obtain clearly indicates the

11   source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga.  *See* JTX-1146.

12   Therefore, the smart contract does not contribute to the alleged confusion.

13   Additionally, the smart contract is, even according to Yuga's own witness's

14   testimony, immutable and cannot be changed even if transferred to Yuga.  *See* Trial

15   Tr. [Atalay] 133:24-8.  Accordingly, an injunction transferring the contract to Yuga

16   would not be tailored to eliminate the alleged harm of infringement.

17        Additionally, as the evidence presented at trial indicated, Yuga has not

18   identified even a single person who obtained an RR/BAYC NFT believing it was

19   sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a

20   single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

21   Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman]

22   219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's

23   focus on, I think, what you were focused on. Yuga Labs has been unable to identify

24   even[] a single person who purchased an RR/BAYC believing it to be sponsored by

25   Yuga Labs; right? A Correct.").  Accordingly, there is no evidence of actual confusion

26   resulting from the sale of RR/BAYC NFTs that an injunction transferring the

27   RR/BAYC smart contract would eliminate.

28

1    Yuga also cites to Mr. Atalay's declaration, which states that Yuga could limit

2  any additional RR/BAYC NFTs that were minted if they had the contract.  This same

3  goal could be reached by less restrictive means, however, such as an injunction that

4  prohibits Mr. Ripps and Mr. Cahen from selling RR/BAYC NFTs.  *See* Dkt. 419-1,

5  CL 145.  Accordingly, the injunctive relief Yuga seeks is not tailored to address the

6  harm alleged here.

7    Third, acknowledging that minting RR/BAYC NFTs is intricately connected to

8  Mr. Ripps and Mr. Cahen's protest against Yuga is in no way an admission that

9  Defendants intend to mint more RR/BAYC NFTs and Yuga's assertion that it is, is

10  unfounded and misleading.  That portion of Defendants' objection shows the

11  important First Amendment considerations at play in issuing an injunction that

12  involves the transfer of the smart contract that the court must weigh.

13    Fourth, Mr. Solano's testimony was not credible given the many false and

14  misleading statements contained in his declaration, as well as his repeated

15  impeachment at trial.  For example, Mr. Solano was also forced to concede on cross-

16  examination that his sworn declaration included a false statement claiming that

17  "Defendants continue to receive royalties or creator fees from sales on secondary

18  marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase

19  "business venture" in Mr. Lehman's declaration, without having considered that the

20  phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman

21  would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also

22  relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew

23  he could not settle his case without executing a declaration concerning matters of

24  Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his

25  family at the time he signed his declaration, because Yuga's lawsuit against him

26  would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

27  [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

28

impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

Finally, *see supra* ¶ 4, for Defendants' fulsome reply to Yuga's unfounded and inaccurate response concerning actual confusion.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 11(d), lines 20-21:**

But for the transfer of the RR/BAYC smart contract, Yuga Labs would be entitled to $106,055 as disgorgement.

### **Defendants' Basis of Dispute:**

First, this $106,055 figure is not profit, but includes the theoretical value of NFTs that either Mr. Ripps and Mr. Cahen hold but have not sold or, more egregiously, that Mr. Ripps and Mr. Cahen have never actually minted.  *See* Kindler Decl. ¶ 51, 54, 56 (Dkt. 338). It is improper to include in a determination of the profits for disgorgement an estimated value of theoretical sales and theoretical NFTs that do not exist.

Second, in the course of Ms. Kindler's calculation of the value of these NFTs, she uses the floor price for RR/BAYC NFTs based on the secondary markets for them on January 27, 2023.  Kindler Decl. ¶ 54 (Dkt. 338).  Ms. Kindler opines that the floor

1  price at that time was 0.115 ETH.  *Id.*  As the trial testimony indicated, however, the

2  floor price for RR/BAYC NFTs has gone down and the floor price on June 7, 2023

3  was only 0.07 ETH.  JTX-1624, Dkt. 287-1, Trial Tr. [Kindler] 182:11-13.  Despite

4  this considerable decrease in value, Ms. Kindler testified that she did not update her

5  calculation to reflect the new floor price. Trial Tr. [Kindler] 198:2-12.  It is inaccurate

6  and outdated, therefore, to state that the value of these theoretical NFTs is $106,055.

7       Third, disgorgement is inappropriate here.  An infringer's mental state is a

8  "highly important consideration in determining whether an award of profits is

9  appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

10  Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc.*

11  *v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July

12  29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the

13  evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious

14  wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen

15  Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29,

16  353-354; JTX-803.0003-05, 08, 29-30.

17       Disgorgement is also unavailable here because Yuga has not shown "the

18  absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469,

19  478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and

20  offered expert testimony in support of legal remedies (including a claim for actual

21  damages that its expert was able to quantify), which it then voluntarily relinquished.

22  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler]

23  172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies,

24  Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C

25  92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough

26  Plaintiff has waived the right to collect damages, this does not render the claim purely

27  equitable because, as discussed above, this is a statutory claim.  Again, because the

28

1   statutes provide adequate remedies, a purely equitable claim may not be

2   maintained.").

3        Even if disgorgement were available here, Yuga would only be entitled to

4   disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic*

5   *Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by*

6   *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

7   This requires distinguishing between revenue from collectors who reserved

8   RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

9   Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

10  believed they were purchasing Yuga NFTs.  *See id.*  Here, the $106,055 that Yuga

11  seeks in disgorgement is related to RR/BAYC NFTs that either Mr. Ripps and Mr.

12  Cahen hold themselves or ones that do not yet exist.  Mr. Ripps and Mr. Cahen

13  obviously did not reserve the RR/BAYC NFTs they hold mistakenly believing they

14  were sponsored by Yuga.  *See* Trial Tr. [Kindler] 198:13-17 ("Q As the creator of the

15  NFTs, Mr. Ripps was certainly not confused about the source of those NFTs; correct?

16  A I would hope not. Q And neither was Mr. Cahen; correct? A I would agree.").

17  Accordingly, this $106,055 cannot be considered profits attributable to infringement

18  that would appropriately be disgorged.

19        Finally, the evidence Yuga cited is misleading.  Ms. Kindler testified if Yuga

20  receives an injunction preventing Mr. Ripps and Mr. Cahen from minting any new

21  RR/BAYC NFTs or selling the ones they currently hold, Yuga is not entitled to the

22  estimated value of these NFTs in disgorgement.  Trial Tr. [Kindler] 198:18-25 ("Q

23  Now, if the Court orders an injunction prohibiting minting of any new RR/BAYC

24  NFTs, the value of the unminted NFTs is zero; correct? A I don't know that -- maybe.

25  I would agree with you that it would not need to be included in an unjust enrichment

26  monetary compensation to Yuga. Q Yuga doesn't get to double-dip; right? A Yes.

27  Absolutely.").  Even if the Court limits its order to preventing the creation or sale of

28

RR/BAYC NFTs, this figure should be considered outside what Yuga can seek in disgorgement.

## Plaintiff's Response:

The value of the NFTs Defendants that have yet to sell or mint is a profit that should be disgorged, unless the issue is resolved by an appropriate injunction. *Supra* ¶ 11(d). The fluctuation in floor price of Defendants' infringing NFT collection does not make Ms. Kindler's valuation unreasonable. *Id.* Alternatively, even if Defendants' argument to exclude these quantifiable benefits from their profits calculation was correct, the Lanham Act authorizes the Court to modify the award to Yuga Labs upward to account for shortfalls such as this. *See also* 15 U.S.C. § 1117(a) (authorizing Court to "find that the amount of the recovery based on profits is [] inadequate" and "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

Defendants' additional objections should also be rejected because (1) disgorgement is available as a remedy in this case, (2) Defendants' profits derived from their infringing NFTs are indeed attributable to their infringement, and (3) though it is not required to obtain disgorgement of Defendants' profits from their infringing NFTs, there is ample evidence of confusion in the record.

**Yuga Labs Is Entitled to Disgorgement as a Remedy:** This case arises out of the Lanham Act, which expressly provides for damages **_and_** disgorgement of Defendants' profits. "The Lanham Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's profits." *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to defendant's profits."). Accordingly, the Lanham Act allows for three distinct remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are not stated in the disjunctive, and each are separately available under the statute.

1  Moreover, the model jury instructions make clear that actual damages and

2  disgorgement are available in the same case:  "*In addition to actual damages*, the

3  plaintiff is entitled to any profits earned by the defendant that are attributable to the

4  infringement, which the plaintiff proves by a preponderance of the evidence."  Manual

5  of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits

6  (emphasis added).  Because the Court has found Defendants liable for intentional

7  infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits

8  from their infringing acts.  Defendants are not allowed to retain the fruits of

9  unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778

10  F.3d 1059, 1077 (9th Cir. 2015).

11  Additionally, disgorgement is expressly provided as a remedy for false

12  designation of origin under the Lanham Act, regardless of willfulness.  15 U.S.C.

13  § 1117(a) (a plaintiff is entitled to recover a "defendant's profits" for "a violation

14  under section 1125(a)," in contrast to "a willful violation under section 1125(c)").

15  Indeed, as the Court has already observed, Defendants are incorrect to argue that

16  intent is required for the Court to order disgorgement of their profits.  June 9, 2023

17  Pretrial Conference Tr. at 33:12-16 ("But with respect to the remaining issues that

18  we're going to be trying in this case, the defendants' profits, there is no willfulness

19  requirement for the defendants' profits.  It's an equitable remedy.  It is a

20  disgorgement.  This is my view.").

21  **Defendants' Profits Are All Attributable To Their Infringement:**

22  Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC

23  NFT.  The smart contract underlying each of Defendants' infringing NFTs is

24  immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC,"

25  which is replicated on the Etherscan token tracker and anywhere that systems pull

26  information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl.

27  (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants

28

1    caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape

2    Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific

3    use of the BAYC brand as the NFT Collection's smart contract name and symbol").

4    Additionally, some of the NFTs that were offered for sale were reserved through the

5    infringing rrbayc.com domain.  Kindler Decl. (Dkt. 338) ¶ 61.  So again, Defendants

6    were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC

7    NFTs.  More still, "other RR/BAYC NFTs were sold on marketplaces such as

8    OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-

9    670).  Defendants also "used the BAYC Marks to sell and promote their own

10   product."  SJ Order (Dkt. 255) at 18.  And finally, "[t]he NFTs held by Defendants or

11   not yet minted derive their value from being part of the broader RR/BAYC NFT

12   collection, the value of which has accrued through the sale and promotion of

13   RR/BAYC NFTs that are already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.  All

14   profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their

15   willful infringement of Yuga Labs' BAYC Marks.  Defendants are not allowed to

16   retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. V.*

17   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

18        Yuga Labs is entitled to disgorgement of profits that are derived "from the

19   infringement." *Id.* at 1076.  The RR/BAYC NFTs are infringing goods that

20   Defendants created and placed into interstate commerce—the Court has already

21   determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at

22   10-13—and so profits derived from the sale of those goods resulted from Defendants'

23   infringement.  There is no requirement for Yuga Labs to go beyond that and prove that

24   every dollar was attributable to instances of "actual confusion," which is not even a

25   required element of an infringement case.  SJ Order (Dkt. 225) at 10 (citing *AMF Inc.*

26   *v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

27

28

1    In sum, profits from the sales of Defendants' infringing NFTs, each of which

2    Defendants admit used the BAYC Marks, are necessarily attributable to Defendants'

3    infringement of the BAYC Marks.  In fact, Defendants admit Yuga Labs' portion of

4    the proposed finding of fact in ¶ 7(c) that "Each of Defendants' 9,546 RR/BAYC

5    NFTs used the BAYC Marks".

6    **There Is Ample Evidence Of Confusion In The Record:**  Defendants'

7    argument that consumers were not confused by their infringement is unavailing.  Yuga

8    Labs produced ample documentary and testimonial evidence demonstrating consumer

9    confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-

10   801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035;

11   Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76;

12   Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl.

13   (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs'

14   Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants

15   were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people

16   "making mistakes with apes is already a huge meme" and "Remember the 'average

17   joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs'

18   survey evidence demonstrated significant confusion among consumers who

19   incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-

20   721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

21   Defendants do not offer any admissible or credible evidence to rebut the evidence that

22   consumers believed, or were likely to believe, RR/BAYC was affiliated with or

23   sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale

24   confusion.

25   There is a clear likelihood of confusion as well, given Defendants' use of the

26   same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at

27   10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.

28

1   2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

2   ever find their way into the appellate reports' because liability is 'open and shut.'")

3   (citation omitted).  In any event, actual confusion is not required; and the Court

4   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

5   at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

6   regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

7   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

8   profits even where infringement claims premised solely on post-sale confusion where

9   a "potential purchaser, knowing that the public is likely to be confused or deceived by

10  the allegedly infringing product, [] choose[s] to purchase that product instead of a

11  genuine one").

12                  **Defendants' Reply:**

13          Yuga's response is unsupported and inaccurate.  First, *see supra* ¶ 11(d) for a

14  fulsome discussion of why the value of RR/BAYC NFTs that do not exist or have not

15  been sold should not be considered profits.  Additionally, see that section for a

16  complete explanation of how the floor price Ms. Kindler uses for her calculations of

17  the value of those RR/BAYC NFTs is outdated and over-estimates the possible profit

18  the sale of these theoretical NFTs could make.

19          Second, the section of the Lanham Act that Yuga cites to for support for its

20  argument that the court should consider an upward modification of a profit calculation

21  is inapplicable here and misleading.  As the full portion of Section 1117(a) states "[i]f

22  the court shall find that the amount of the recovery based on profits is either

23  inadequate *or excessive* the court may in its discretion enter judgment for such sum as

24  the court shall find to be just, *according to the circumstances of the case. Such sum*

25  in either of the above circumstances *shall constitute compensation and not a*

26  *penalty.*" 15 U.S.C. § 1117(a) (emphasis added).  Here, the circumstances of the case

27  support a finding that any recovery of profits beyond those Mr. Ripps and Mr. Cahen

28

1    received would be excessive.  For example, the evidence shows that the intent of the

2    RR/BAYC project was to criticize Yuga's problematic imagery and educate

3    consumers about the nature of NFTs—the exact opposite of confusing consumers.

4    Cahen Decl. ¶¶ 97-98, 133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346)

5    (uncontested); JTX-2033.  Mr. Ripps has had a long and successful career as an artist,

6    during which he has created numerous satirical art projects spotlighting problematic

7    societal issues.  Ripps Decl. ¶¶ 15-26 (Dkt. 346) (uncontested).

8         Defendants also took multiple steps to make clear that the RR/BAYC collection

9    was not related to Yuga in any way.  For example, the rrbayc.com website—through

10   which the majority of RR/BAYC commissions occurred and the vast majority of

11   alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

12   144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

13   Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

14   Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

15   rrbayc.com website were also required to read and click through a disclaimer

16   acknowledging the artistic purpose of the project before they were allowed to

17   commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

18   2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

19   additional steps so that the artistic purpose of the work would be clear to participants.

20   *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

21   ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted

22   it and so he had the final call.").

23        Defendants' online discussion, which consisted of nearly the entirety of

24   Defendants' public activities associated with RR/BAYC, confirms their intent.  In

25   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

26   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

27

28

1    that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
2    Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

3            The evidence at trial also shows that Yuga's public activities amounted to
4    authorization of RR/BAYC collection and the numerous other collections that use the
5    asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC
6    project, there were more than 9,000 other third-party projects using Yuga's marks.
7    Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345);
8    JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC
9    project, Yuga had not taken steps to stop these third-party projects from using Yuga's
10   marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).
11   There were hundreds of NFT collections unaffiliated with Yuga that use the Bored
12   Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-
13   23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr.
14   Cahen, and Mr. Hickman would have probably seen these collections using the Bored
15   Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.
16   [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga
17   trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.
18   For example, there are published notebooks with ISBN numbers, commemorative
19   coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana
20   products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-
21   2398; JTX-2134; JTX-2410; JTX-2075.

22           Given these circumstances, if the court finds that disgorgement is appropriate,
23   the court should not find disgorgement of Mr. Ripps and Mr. Cahen's profits to be
24   inadequate and require additional disgorgement of profits the evidence shows went to
25   Mr. Hickman and Mr. Lehman.  Such a decision would go beyond compensation and
26   veer into punishment, impermissible under the statute.

27

28

1    Third, as stated fully in the objection to this finding of fact, disgorgement is not

2    an available remedy here and the sources Yuga cites to in response are unsupportive.

3    Firstly, Yuga citations to portions of the Lanham Act and model jury instructions that

4    indicate disgorgement generally is an available remedy for infringement does not

5    undermine Defendants' objection that it is not an available remedy here as Yuga has

6    not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*,

7    369 U.S. 469, 478 (1962). Legal remedies were available in this case. Yuga

8    expressly asserted and offered expert testimony in support of legal remedies

9    (including a claim for actual damages that its expert was able to quantify), which it

10   then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal

11   remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19. Having

12   abandoned available legal remedies, Yuga cannot obtain disgorgement. *See Hunting*

13   *World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D.

14   Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this

15   does not render the claim purely equitable because, as discussed above, this is a

16   statutory claim. Again, because the statutes provide adequate remedies, a purely

17   equitable claim may not be maintained.").

18       Additionally, Yuga improperly responds by arguing that the Court's summary

19   judgment order supports a finding of intentional infringement, Yuga has incorrectly

20   relied on the law of the case doctrine. The "law of the case doctrine does not apply to

21   pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792

22   F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d

23   1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,

24   don't bind district judges for the remainder of the case. Given the nature of such

25   motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held

26   that although ***aspects*** of an issue were decided at summary judgment for one purpose,

27   the summary judgment order did resolve the issue generally or as to other topics. *See*

28

1    No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)

2    (holding that evidence of initial police contact was relevant as background, but not to

3    the already decided issue that initial contact was not excessive force).  This case is just

4    like *Sienze*: the summary judgment ruling on intent applies only the issue of

5    infringement and is not adequate support for intent generally or as applied to

6    availability of disgorgement as a remedy, apportionment, and an exceptional case

7    analysis.

8         Also, Yuga's citations to the Lanham Act and the Court's statements at a pre-

9    trial conference miss the mark.  Even if willfulness is not a requirement for

10   disgorgement, that does not change that Courts have held an analysis of the infringer's

11   mental state is crucial.  An infringer's mental state is a "highly important

12   consideration in determining whether an award of profits is appropriate." *Romag*

13   *Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only

14   warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-

15   11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).

16   Disgorgement is, therefore, not an available remedy here because – as the evidence

17   showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See*

18   Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-

19   155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-

20   803.0003-05, 08, 29-30.

21        Fourth, Yuga incorrectly outlines what is required for profit to be considered

22   attributable to the infringing activity.  It is not enough for a sale to be "traceable" to

23   the use of Yuga's marks.  Yuga is only entitled to disgorgement of profits

24   "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

25   1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun*

26   *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues

27   that any sale that uses a BAYC mark is attributable to the infringing activity.  "If it

28

can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).  This fundamental principle clearly prevents Yuga from receiving profits that were made for reasons beyond the appeal of its symbol, namely the profits attributable to those who reserved an RR/BAYC NFT as a protest against Yuga or to support Mr. Ripps and his renowned reputation as a conceptual artist.  *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

    The record in this case is clear that *many* sales of RR/BAYC NFTs were not the result of confusion, but genuine protest.  Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating that they purchased the NFTs not because they were confused, but because they genuinely wanted to protest Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Although Ms. Kindler could not deny that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases was unnecessary since *subsequent* purchasers may have been confused (an assertion for which she offered no evidence).  But that explanation makes little sense, and certainly does not justify her failure to apportion. To the contrary, in the hypothetical scenario where an initial purchaser *was not* confused and a subsequent purchaser was, a proper damages analysis would apportion out the profits accrued from the original sale and only count the profits from the sale that was attributable to confusion.  *See Mishawaka Rubber*, 316 U.S. at 206.

Further, Yuga's citations are unsupportive.  Specifically, the smart contract clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga.  *See* JTX-1146.   Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.* Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer. Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

Fifth, there is ample evidence in the record that shows that there was no confusion and Yuga's response is not based in fact. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

1   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
2   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

3        Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not
4   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)
5   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).
6   Buttressing this fact, Yuga's founders were also not aware of a single instance of
7   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now
8   let's focus on, I think, what you were focused on. Yuga Labs has been unable to
9   identify even[] a single person who purchased an RR/BAYC believing it to be
10  sponsored by Yuga Labs; right? A Correct.").

11       Third, the evidence Yuga cites to is not supportive of a finding that there was
12  consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.
13  O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two
14  flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that
15  she used an overly expansive definition of the market that included people who did
16  not have any interest in purchasing an NFT, much less knowledge of what an NFT is.
17  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.
18  She acknowledged that she changed the survey population after running pretests to
19  make it more inclusive. *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that
20  she lacked basic knowledge about the NFT market, admitting to erroneously believing
21  that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*.
22  at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey
23  that could not show confusion because the market was too broad.  This was despite
24  her acknowledgement that choosing the right sample population "matters for the
25  analysis" and choosing an improper sample population would be a mistake. *Id.* at
26  146:18-25.

27
28

1    Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020
2    she authored an article titled, "Which Method is For You? Not All Surveys Are Made
3    the Same" JTX-314.  In that article she discusses choosing between the Squirt and
4    Eveready surveys on the basis of the strength of the mark.  In this case, however, she
5    ignored her own advice and operated both surveys.  This was despite acknowledging
6    that at her deposition she agreed with her earlier advice that the Eveready survey is
7    most appropriate when the mark is strong, and the Squirt survey when the mark is
8    weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the
9    strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it
10   was the first case she personally testified in where she offered an opinion based on
11   both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the
12   surveys, but by not doing so she did not produce a finding of value on either survey.
13         Ms. O'Laughlin also could not explain the extremely strong priming effect
14   which influenced her results to her Everready survey.  In that survey, people were split
15   into those who saw a version of the RR/BAYC Foundation page that included the
16   words "Bored Ape Yacht Club."  Those in the control group of the experience would
17   see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote
18   the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those
19   in the control group who copied down the words "Chill Gorilla Boat Crew" were not
20   counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of
21   those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not
22   counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that
23   she did not account for this extreme priming effect calling it "not particularly
24   relevant."  *Id.* at 158:20-159:1.
25         Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the
26   versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-
27   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

28

fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344). The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Thirdly, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fourthly, Yuga's response is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout.  *Id.*

Fifthly, Yuga, again, incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  As outlined earlier, the "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise.").  Here, the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, as outlined above, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

1  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly
2  believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was
3  no evidence presented that a single purchase of RR/BAYC NFTs was made by
4  someone thinking it was sponsored by Yuga.

5   Yuga's citations to *Gucci* are inapplicable here, given the evidence shows
6  consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps
7  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
8  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not
9  support a finding that these reservations were made so that the buyer could then
10  confuse someone else in secondary sales.  Also, as mentioned above, there is no
11  evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary
12  sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);
13  Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
14  [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen]
15  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial
16  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,
17  what you were focused on. Yuga Labs has been unable to identify even[] a single
18  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;
19  right? A Correct.").  Finally, the portion of profits attributable to secondary sales of
20  RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.
21  418-1 at 6.

22  **Plaintiff's Disputed Post Trial Finding of Fact No. 11(e):**
23  The sum of Defendants' profits to be disgorged is $1,375,361.92.
24  **Defendants' Basis of Dispute:**
25  First, as stated above, disgorgement is not an available remedy here.  An
26  infringer's mental state is a "highly important consideration in determining whether an
27  award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct.

28

1492, 1497 (2020).  Disgorgement is only warranted in cases of "conscious wrongdoers."  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at tri–l - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law."  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Finally, even if disgorgement were available here, Yuga would only be entitled to disgorgement of profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

1   Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly
2   believed they were purchasing Yuga NFTs. *See id.*

3         Yuga has failed to show that any portion of this $1,375,361.92 figure is
4   attributable to the infringing activity.  As the evidence presented at trial showed, Yuga
5   has not identified even a single person who obtained an RR/BAYC NFT believing it
6   was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of
7   a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested);
8   Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman]
9   219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's
10  focus on, I think, what you were focused on. Yuga Labs has been unable to identify
11  even[] a single person who purchased an RR/BAYC believing it to be sponsored by
12  Yuga Labs; right? A Correct.").  Conversely, the evidence presented at trial shows that
13  many people who reserved RR/BAYC NFTs did so out of a protest *against* Yuga.  *See*
14  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,
15  JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given
16  the evidence, Yuga has not shown that they are entitled to any portion of profit from
17  the RR/BAYC project as there was no profit made that was attributable to the
18  infringing activity.

19        Finally, the $1,375,361.92 figure itself is an incorrect calculation of the profits
20  Mr. Ripps and Mr. Cahen have received from the RR/BAYC project.  First, the
21  evidence presented at trial showed that the RSVP contract also distributed $93,135.62
22  in automated refunds.  Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).  This figure
23  improperly includes in its profits calculation $93,135.62 in automated refunds
24  executed through the RSVP reservation contract. Ripps Decl. ¶¶ 174-175 (Dkt. 346)
25  (uncontested).  Also, Mr. Ripps and Mr. Cahen incurred approximately $15,100.00 in
26  miscellaneous expenses associated with wages, a computer, and travel expenses.

27

28

Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 174-176 (Dkt. 344).  This figure fails to exclude those expenses from the profit calculation.

**Plaintiff's Response:**

This total figure is correct for all the reasons that the subtotals are correct.  *Supra* ¶ 11(b-d).  Specifically, Ms. Kindler correctly deducted refunds despite Defendants' false claim to the contrary, and Defendants failed to justify their proposed deductions.  *Id.*

Defendants remaining arguments regarding the availability of disgorgement in this case and attributing their profits to their infringement are addressed in the prior section, where Defendants made identical arguments.  *Supra* ¶ 11(d).  Therefore, Defendants' objection should be rejected because (1) disgorgement is available as a remedy in this case, (2) Defendants' profits derived from their infringing NFTs are indeed attributable to their infringement, and (3) though it is not required to obtain disgorgement of Defendants' profits from their infringing NFTs, there is ample evidence of confusion in the record.  In addition to these reasons, Defendants' objection should also be rejected because (4) Defendants' cherry-picked communications from third parties are not a reliable rebuttal to Yuga Labs' experts' findings.

**Defendants' Cherry-Picked Communications With Purported Consumers Do Not Rebut Yuga Labs' Experts' Findings:**  Additionally, Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market.  Defendants have no evidence supporting a claim that a statistically significant number of consumers were not confused.  Indeed, the hundreds of refunds they provided at consumers' requests suggest that some purchasers were confused.  *See, e.g.*, Kindler Decl. (Dkt. 338) ¶ 44.  At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it."  Trial Tr. at

54:10-16.  Moreover, they ignore the ample confusion on Twitter and other sources that Yuga Labs identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Moreover, Defendants were aware of the confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain

technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).

Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.  Moreover, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

### **Defendants' Reply:**

First, Defendants' objections and replies from above are incorporated here and show that this figure is an inaccurate calculation of disgorgement and that disgorgement generally is not an available remedy here.  *See* ¶ 11(b-d).

Second, Defendants received a great amount of correspondence from collectors of RR/BAYC NFTs.  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

1    Yuga has also failed to present evidence disputing the fact that none of these

2  correspondences indicated that commissions or secondary sales were due to

3  confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing

4  correspondences from collectors, Yuga attempts to point to indications of consumer

5  confusion.  However, none of Yuga's alleged indications of confusion are credible.

6    Third, Yuga's citation to Ms. Kindler's declaration does not support their

7  allegations that Defendants provided "hundreds of refunds" or that those alleged

8  refunds indicate confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating

9  Defendants' profits, transactions that were refunded through Defendants' RSVP smart

10  contract were omitted. Specifically, transactions that were refunded through the

11  RefundIssued and RSVPCanceled functions in the RSVP smart contract were not

12  included in my calculation of profits. To my knowledge, Defendants have not

13  produced any records of other refunds related to the sale of RR/BAYC NFTs.").  As

14  Mr. Ripps's declaration makes clear, he instituted a refund policy for the RR/BAYC

15  NFTs as they are commissioned works of art and he wanted to ensure that every

16  person that received one was happy with the work they got.  Ripps Decl. ¶ 121 (Dkt.

17  346) (uncontested).  Further, Mr. Ripps's testimony undermines Yuga's assertions

18  here completely as he also testified that he never received a refund request from

19  anyone stating they were confused or thought that they were reserving a Yuga

20  product.  Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

21    Fourth, there is ample evidence in the record that shows that there was no

22  confusion and Yuga's response is not based in fact.  Defendants took multiple steps to

23  make clear that the RR/BAYC collection was not related to Yuga in any way.  For

24  example, the rrbayc.com website—through which the majority of RR/BAYC

25  commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶

26  110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation

27  of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

28

1   Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

2   [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read

3   and click through a disclaimer acknowledging the artistic purpose of the project before

4   they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

5   (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

6   requirement and additional steps so that the artistic purpose of the work would be

7   clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

8   was the artist statement ultimately included, if it had a negative impact on usability?

9   …  A.   … Ryder wanted it and so he had the final call.").

10      Unsurprisingly, therefore, the evidence presented at trial shows that many

11  people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

12  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

13  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

14      Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

15  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

16  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

17  Buttressing this fact, Yuga's founders were also not aware of a single instance of

18  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

19  let's focus on, I think, what you were focused on. Yuga Labs has been unable to

20  identify even[] a single person who purchased an RR/BAYC believing it to be

21  sponsored by Yuga Labs; right? A Correct.").

22      Third, the evidence Yuga cites to is not supportive of a finding that there was

23  consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

24  O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

25  flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that

26  she used an overly expansive definition of the market that included people who did

27  not have any interest in purchasing an NFT, much less knowledge of what an NFT is.

28

1   Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.

2   She acknowledged that she changed the survey population after running pretests to

3   make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that

4   she lacked basic knowledge about the NFT market, admitting to erroneously believing

5   that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.*

6   at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

7   that could not show confusion because the market was too broad.  This was despite

8   her acknowledgement that choosing the right sample population "matters for the

9   analysis" and choosing an improper sample population would be a mistake.  *Id.* at

10  146:18-25.

11      Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

12  she authored an article titled, "Which Method is For You? Not All Surveys Are Made

13  the Same" JTX-314.  In that article she discusses choosing between the Squirt and

14  Eveready surveys on the basis of the strength of the mark.  In this case, however, she

15  ignored her own advice and operated both surveys.  This was despite acknowledging

16  that at her deposition she agreed with her earlier advice that the Eveready survey is

17  most appropriate when the mark is strong, and the Squirt survey when the mark is

18  weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

19  strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it

20  was the first case she personally testified in where she offered an opinion based on

21  both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

22  surveys, but by not doing so she did not produce a finding of value on either survey.

23      Ms. O'Laughlin also could not explain the extremely strong priming effect

24  which influenced her results to her Everready survey.  In that survey, people were split

25  into those who saw a version of the RR/BAYC Foundation page that included the

26  words "Bored Ape Yacht Club."  Those in the control group of the experience would

27  see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

28

the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

1     Yuga also cites to private chats that the RR/BAYC creators used.  These

2 exhibits are unsupportive of a finding that there was actual confusion.  For example,

3 JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

4 marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

5 suggestions about what they could do to make it even more clear.  Further, this chat

6 focused on the creation of ApeMarket, which never was launched and could,

7 therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

8 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

9 ApeMarket clearer).

10     Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

11 exhibit does not support a finding of actual confusion.  The chart separately lists both

12 "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

13 understood that these were two different projects.  Additionally, as Mr. Cahen

14 testified, he is not aware of anyone who watched the Bloomberg program and reserved

15 an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

16 344).

17     Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

18 credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

19 case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

20 case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

21 entered after Mr. Lehman settled his own case with Yuga.

22     Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

23 LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

24 Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

25 a finding of consumer confusion as any consumer had the ability to determine the

26 provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further,

27

28

1  this does not undermine the finding of fact as this does not show that anyone who
2  reserved an RR/BAYC NFT was confused about the origin.

3      Yuga cites to its own declarations and trial testimony where their witnesses
4  make conclusory and unfounded statements about possible confusion. *See* Berger
5  Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt.
6  341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at
7  53:14-54:22. These statements do not support a finding, however, that anyone who
8  bought an RR/BAYC NFT was actually confused.

9      Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence
10  that consumers believed RR/BAYC NFTs were not affiliated with Yuga.  This is
11  categorically false.  The evidence presented at trial shows that many people who
12  reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶
13  198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-
14  2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence
15  presented at trial that showed consumers were not confused about the source of the
16  RR/BAYC NFTs.

17      Moreover, the evidence at trial showed that Defendants are not intentional
18  infringers and did not intend to suggest that RR/BAYC was related to Yuga in any
19  way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the
20  RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather
21  than to confuse.  For example, in private group chats among participants in the
22  RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their
23  intended artistic purpose of the project, their intention that it would spread criticism of
24  Yuga, and their intention that social media platforms be used to educate the public
25  about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶
26  144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010,
27  012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

28

1    The evidence that Yuga cites does not rebut this overwhelming evidence of
2  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing
3  and taking out of context evidence.  For example, Yuga repeatedly cites to various
4  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged
5  confusion.  But those pages are internal discussion about the design of the ApeMarket
6  website to ensure that users of apemarket.com were not confused by the website
7  design.  Yuga even cross-examined Mr. Hickman about these communications and
8  received the same explanation: "This is our attempt to make it as clear as possible.
9  We are having discussion on how to make sure it was very clear for users."  Trial Tr.
10 [Hickman] 212:22-24.

11    Yuga similarly takes out of context exhibits such as JTX-44.00002 to
12 incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-
13 44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR
14 ID.  that is where they get confused."  This statement is not discussing confusion
15 regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the
16 RR/BAYC collection used a different numbering system that BAYC NFTs, and that
17 consumers expected the numbers match as a shorthand manner of cataloguing the
18 digital pointers contained within the RR/BAYC NFTs.  That is, due to the different
19 numbering system, some consumers were confused as to which RR/BAYC NFT they
20 received but they understood very well that they received an NFT created by Mr.
21 Ripps that protests and criticizes Yuga.

22    **Plaintiff's Disputed Post Trial Finding of Fact No.  12, lines 6:24-25:**
23    All of Defendants' profits result from their infringing activity because each
24 RR/BAYC NFT used the BAYC Marks. Dkts. 338 ¶61 ("these profits are all traceable
25 to Defendants' uses of Yuga Labs' BAYC Marks"); 342 ¶36; 392 at 188:15-25,
26 203:1-17.

27    **Defendants' Basis of Dispute:**

28

1    Yuga has failed to show that any portion of the profits Mr. Ripps and Mr.
2    Cahen received from the RR/BAYC project are attributable to the infringing activity.
3    As the evidence presented at trial showed, Yuga has not identified even a single
4    person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr.
5    Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual
6    confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18;
7    Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr.
8    [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what
9    you were focused on. Yuga Labs has been unable to identify even[] a single person
10   who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A.
11   Correct.").  Conversely, the evidence presented at trial shows that many people who
12   reserved RR/BAYC NFTs did so out of a protest *against* Yuga.  *See* Ripps Decl. ¶¶
13   198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-
14   2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given the evidence,
15   Yuga has not shown that they are entitled to any portion of profit from the RR/BAYC
16   project as there was no profit made that was attributable to the infringing activity.

17   Additionally, evidence at trial showed that Yuga does not own the alleged
18   BAYC Marks.  Yuga gave away all intellectual property rights associated with the
19   Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that
20   BAYC NFT holders received all IP rights and that Yuga has none of those rights.
21   Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26
22   (Dkt. 345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant
23   to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow
24   people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in
25   writing the terms and conditions was to allow people to be able to commercialize their
26   NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

27
28

1    Further, Yuga does not own the asserted marks because NFTs are not eligible

2    for trademark protection.  The Supreme Court has held that trademarks are limited to

3    "tangible goods that are offered for sale, and not the author of any idea, concept, or

4    communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox*

5    *Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a

6    ***communicative*** work is a dispute relegated to the confines of copyright law, not

7    trademark.  *Id.* at 33-35; *see also* *Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

8    SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

9    based on origin of hologram, as it is "likened to a cartoon animation").  Here, the

10   "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

11   certificates of authenticity/ownership and are not digital goods in themselves.  Trial

12   Tr. [Atalay] 127:9-16.

13   Also, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC

14   Marks.  For example, the logo used states "This Logo is Based on the SS Totenkopf;

15   18 Teeth."  *See* JTX-2085.  Additionally, the website for the project used the modified

16   "RR/BAYC" throughout. *Id.*

17   Finally, the evidence Yuga cites to does not support this finding of fact.  Yuga

18   cites to Ms. Kindler's declaration and trial testimony where she includes conclusory

19   statements that she believes the profits she calculated are traceable to Mr. Ripps and

20   Mr. Cahen's use of Yuga's marks.  But, as described above, the evidence shows that

21   Yuga does not own the alleged BAYC marks and Mr. Ripps and Mr. Cahen used

22   modified versions of the alleged BAYC Marks.  Further, Ms. Kindler's opinion does

23   not include any apportionment to determine what profits were attributable to

24   infringement.  Trial Tr. [Kindler] 189:16-25.

25   Yuga also cites to Mr. Solano's declaration, Dkt. 342, which includes an

26   inaccurate statement that Mr. Ripps and Mr. Cahen used the alleged BAYC Marks in

27   every reservation of RR/BAYC NFTs.  Again, as outlined above, the evidence shows

28

1  that Yuga does not own the alleged BAYC marks and Mr. Ripps and Mr. Cahen used

2  modified versions of the alleged BAYC Marks.  Mr. Solano also lacks credibility as a

3  result of his repeated impeachment at trial.  Solano Decl. (Dkt. 342); Trial Tr.

4  [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was

5  created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

6  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you

7  swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your

8  deposition -- and we can pull it up on the screen -- at page 152, starting at line 13

9  'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection

10  from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your

11  deposition? A Yes." ); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists?

12  A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your

13  deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape

14  Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you

15  give that answer? A Yes.").

16       **Plaintiff's Response:**

17       Defendants' objection should be rejected because (1) Defendants' profits

18  derived from their infringing NFTs are indeed attributable to their infringement, (2)

19  the record shows (and Defendants admit) that Defendants used the BAYC Marks in

20  each RR/BAYC NFT, and (3) Defendants' additional arguments that Yuga Labs does

21  not own the BAYC Marks and regarding actual confusion are meritless.

22       **Defendants' Profits Are All Attributable To Their Infringement:**

23  Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC

24  NFT.  The smart contract underlying each of Defendants' infringing NFTs is

25  immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC,"

26  which is replicated on the Etherscan token tracker and anywhere that systems pull

27  information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl.

28

1   (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants

2   caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape

3   Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific

4   use of the BAYC brand as the NFT Collection's smart contract name and symbol").

5   Additionally, some of the NFTs that were offered for sale were reserved through the

6   infringing rrbayc.com domain.  Kindler Decl. (Dkt. 338) ¶ 61.  So again, Defendants

7   were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC

8   NFTs.  "[O]ther RR/BAYC NFTs were sold on marketplaces such as OpenSea and

9   Foundation, which used the BAYC Marks."  *Id.* (citing JTX-29; JTX-670).

10  Defendants also "used the BAYC Marks to sell and promote their own product."  SJ

11  Order at 18.  And finally, "[t]he NFTs held by Defendants or not yet minted derive

12  their value from being part of the broader RR/BAYC NFT collection, the value of

13  which has accrued through the sale and promotion of RR/BAYC NFTs that are

14  already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.  All profits Defendants derived

15  from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga

16  Labs' BAYC Marks.  Defendants are not allowed to retain the fruits of unauthorized

17  trademark use.  *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059,

18  1077 (9th Cir. 2015).

19          Yuga Labs is entitled to disgorgement of profits that are derived "from the

20  infringement."  *Id.* at 1076.  The RR/BAYC NFTs are infringing goods that

21  Defendants created and placed into interstate commerce—the Court has already

22  determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at

23  10-13—and so profits derived from the sale of those goods resulted from Defendants'

24  infringement.  There is no requirement for Yuga Labs to go beyond that and prove that

25  every dollar was attributable to instances of "actual confusion," which is not even a

26  required element of an infringement case.  SJ Order (Dkt. 225) at 10 (citing *AMF Inc.*

27  *v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

28

1    Ms. Kindler's testimony to this effect is not "conclusory," as Defendants state.

2  She explained all of these considerations in her trial declaration, assessing NFTs

3  "reserved on Mr. Ripps' website, rrbayc.com"; "sold on marketplaces such as

4  OpenSea and Foundation"; sold "without the use of either rrbayc.com or an NFT

5  marketplace"; and "held by Defendants or not yet minted."  Kindler Decl. (Dkt. 338)

6  ¶ 61.  Indeed, Ms. Kindler testified at trial when asked why she did not apportion less

7  than all of Defendants' profits to their infringement:  "I don't think that would be

8  appropriate because they all were sold using the infringing marks.  And in the first

9  instance, even if there's not confusion because people might believe or agree with the

10  premise under which the tokens are being sold, that doesn't mean in the second and

11  third and fourth instance that there isn't confusion occurring in the marketplace."

12  Trial Tr. at 189:4-10.  This opinion is further supported by the consumer surveys

13  conducted by Ms. O'Laughlin, which demonstrate a substantial likelihood of

14  confusion on secondary marketplaces.  O'Laughlin Decl. (Dkt. 341) .  Defendants

15  provided no affirmative or rebuttal expert to rebut any of this testimony.

16        **Defendants' Infringing NFTs All Used BAYC Marks:**  Defendants have no

17  good-faith basis to dispute this fact, where they admit Yuga Labs' proposed finding of

18  fact that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."

19  *Supra* ¶ 7(c) (underlined blue).  And, as discussed *supra* ¶ 7(b), their argument

20  contradicts the Court's prior holding, and it is incorrect based on the trial record.  The

21  fact that Defendants sometimes used "modified" BAYC Marks instead of the exact

22  marks does not change this fact or undo the likelihood of confusion they caused.

23        **Defendants' Additional Arguments Are Meritless:**  Defendants also reassert

24  objections that Yuga Labs does not own the BAYC Marks and that their infringement

25  did not cause actual confusion.  These arguments have no merit.

26        The Court has already held, and Defendants have already stipulated, that Yuga

27  Labs owns the BAYC Marks.  *See supra* ¶ 1.  There is no good-faith basis for

28

1  Defendants to dispute this or to reargue that Yuga Labs granted Defendants a license

2  to infringe.  *Id.*

3        As to confusion, as discussed above, Yuga Labs is entitled to disgorgement of

4  profits that are derived "from the infringement," *Fifty-Six Hope Rd. Music, Ltd. V.*

5  *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015)—not only from discrete,

6  provable instances of actual confusion as Defendants seem to propose.  Even so, the

7  record contains ample evidence of actual confusion and likelihood of confusion,

8  notwithstanding Defendants' arguments to the contrary and efforts to relitigate these

9  issues.  *Supra* ¶ 4.

10                    **Defendants' Reply:**

11        First, Defendants' profits from the RR/BAYC Project are not attributable to the

12  infringement. Yuga incorrectly outlines what is required for profit to be considered

13  attributable to the infringing activity.  It is not enough for a sale to be "traceable" to

14  the use of Yuga's marks.  Yuga is only entitled to disgorgement of profits

15  "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

16  1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun*

17  *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues

18  that any sale that uses a BAYC mark is attributable to the infringing activity.  "If it

19  can be shown that the infringement had no relation to profits made by the defendant,

20  that some purchasers bought goods bearing the infringing mark because of the

21  defendant's recommendation or his reputation or for any reason other than a response

22  to the diffused appeal of the plaintiff's symbol" then they cannot be disgorged as

23  "[t]he plaintiff of course is not entitled to profits demonstrably not attributable to the

24  unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge*

25  *Co.*, 316 U.S. 203, 206 (1942).  This fundamental principle clearly prevents Yuga

26  from receiving profits that were made for reasons beyond the appeal of its symbol,

27  namely the profits attributable to those who reserved an RR/BAYC NFT as a protest

28

Case No. 2:22-cv-04355-JFW-JEM          -363-          JOINT STATEMENT RE: OBJECTIONS

1   against Yuga or to support Mr. Ripps and his renowned reputation as a conceptual

2   artist.  *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

3        The record in this case is clear that *many* sales of RR/BAYC NFTs were not the

4   result of confusion, but genuine protest.  Indeed, Mr. Ripps received dozens of letters

5   from supporters of his artwork indicating that they purchased the NFTs not because

6   they were confused, but because they genuinely wanted to protest Yuga.  Ripps Decl.

7   ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590;

8   JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Although Ms. Kindler could not deny

9   that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga

10  (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases

11  was unnecessary since *subsequent* purchasers may have been confused (an assertion

12  for which she offered no evidence).  But that explanation makes little sense, and

13  certainly does not justify her failure to apportion. To the contrary, in the hypothetical

14  scenario where an initial purchaser *was not* confused and a subsequent purchaser was,

15  a proper damages analysis would apportion out the profits accrued from the original

16  sale and only count the profits from the sale that was attributable to confusion.  *See*

17  *Mishawaka Rubber*, 316 U.S. at 206.

18       Further, Yuga's citations are unsupportive.  Specifically, the smart contract

19  clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not

20  Yuga.  *See* JTX-1146.  Additionally, Mr. Ripps and Mr. Cahen used modified

21  versions of the alleged BAYC Marks in their reservations.  For example, the logo used

22  states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the

23  website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

24  Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer.

25  Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

26       Second, there is ample evidence in the record that shows that there was no

27  confusion and Yuga's response is not based in fact. Defendants took multiple steps to

28

make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

1    In turn, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As

2    demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that

3    failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly

4    expansive definition of the market that included people who did not have any interest

5    in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr.

6    [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She

7    acknowledged that she changed the survey population after running pretests to make it

8    more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she

9    lacked basic knowledge about the NFT market, admitting to erroneously believing that

10   cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*. at

11   147:12-14.  The result of her lack of knowledge was an inherently flawed survey that

12   could not show confusion because the market was too broad.  This was despite her

13   acknowledgement that choosing the right sample population "matters for the analysis"

14   and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

15   Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

16   she authored an article titled, "Which Method is For You? Not All Surveys Are Made

17   the Same" JTX-314.  In that article she discusses choosing between the Squirt and

18   Eveready surveys on the basis of the strength of the mark.  In this case, however, she

19   ignored her own advice and operated both surveys.  This was despite acknowledging

20   that at her deposition she agreed with her earlier advice that the Eveready survey is

21   most appropriate when the mark is strong, and the Squirt survey when the mark is

22   weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

23   strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it

24   was the first case she personally testified in where she offered an opinion based on

25   both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

26   surveys, but by not doing so she did not produce a finding of value on either survey.

27

28

1    Ms. O'Laughlin also could not explain the extremely strong priming effect

2    which influenced her results to her Everready survey.  In that survey, people were split

3    into those who saw a version of the RR/BAYC Foundation page that included the

4    words "Bored Ape Yacht Club."  Those in the control group of the experience would

5    see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

6    the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those

7    in the control group who copied down the words "Chill Gorilla Boat Crew" were not

8    counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of

9    those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not

10   counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that

11   she did not account for this extreme priming effect calling it "not particularly

12   relevant."  *Id.* at 158:20-159:1.

13   Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the

14   versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

15   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

16   fundamentally flawed, she can attest to confusion on two websites for only a matter of

17   days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court

18   should reject them and provide them no weight.

19   Further, this unreliable survey evidence, again does not show that anyone who

20   actually reserved an RR/BAYC NFT was confused about its origin and, therefore,

21   does not undermine the accuracy of this finding of fact.

22   Yuga also argues that Defendants did use the BAYC Marks, but their arguments

23   fail.  As discussed above, Mr. Ripps and Mr. Cahen used modified versions of the

24   alleged BAYC Marks in their reservations.  For example, the logo used states "This

25   Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for

26   the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

27

28

1    Further, evidence at trial showed that Yuga does not own the alleged BAYC

2    Marks.  Yuga gave away all intellectual property rights associated with the Bored Ape

3    Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT

4    holders received all IP rights and that Yuga has none of those rights.  Trial Tr.

5    [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt.

6    345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant to the

7    BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people

8    to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the

9    terms and conditions was to allow people to be able to commercialize their NFTs.  We

10   can agree on that; right? A. Yes.  That is covered in the terms.").

11   As a result, at the time of the RR/BAYC project, there were more than 9,000

12   other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

13   (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

14   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

15   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

16   78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

17   thousands" of products that use Yuga trademarks without sponsorship or affiliation

18   with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks

19   with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal

20   brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that

21   use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

22   Also, Yuga does not own the asserted marks because NFTs are not eligible for

23   trademark protection.  The Supreme Court has held that trademarks are limited to

24   "tangible goods that are offered for sale, and not the author of any idea, concept, or

25   communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox*

26   *Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a

27   ***communicative*** work is a dispute relegated to the confines of copyright law, not

28

1    trademark. *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

2    SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

3    based on origin of hologram, as it is "likened to a cartoon animation"). Here, the

4    "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

5    certificates of authenticity/ownership and are not digital goods in themselves. Trial

6    Tr. [Atalay] 127:9-16.

7          Additionally, Yuga incorrectly relies on the law of the case doctrine by stating

8    Defendants' position goes against the Court's holding. The "law of the case doctrine

9    does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v.*

10   *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*

11   *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on

12   incomplete information, don't bind district judges for the remainder of the case.

13   Given the nature of such motions, it could not be otherwise."). For example, in *Sienze*

14   *v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary

15   judgment for one purpose, the summary judgment order did resolve the issue

16   generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184

17   at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was

18   relevant as background, but not to the already decided issue that initial contact was not

19   excessive force). This case is just like *Sienze*: the summary judgment ruling on

20   likelihood of confusion only applies to the issue of infringement and is not adequate

21   support for a determination of the validity of the BAYC Marks and what profits are

22   attributable to infringement.

23          Finally, Defendants hotly contested the issues of the BAYC Marks at Summary

24   Judgment. Defendants showed that it was reasonable for parties to believe that Yuga

25   surrendered its rights to world and therefore did not own the marks. Trial Tr. [Solano]

26   24:11-25; [Muniz] 72:3-73:17. As discussed above this directly implicates intent,

27   including whether Defendants reasonably believed they could use the marks which is

28

1   still relevant for damages.  Further, Defendants reserve the right to appeal factual

2   findings made at summary judgment and will not risk losing any right to appeal.

3   **Plaintiff's Disputed Post Trial Finding of Fact No. 12, lines 6:27-28:**

4   Each RR/BAYC NFT refers to a contract with a token tracker displaying

5   "Bored Ape Yacht Club (BAYC)"…

6   **Defendants' Basis of Dispute:**

7          This statement is misleading given the other indicators used in the RR/BAYC

8   NFT contract that clearly indicate the source of the NFT was not Yuga.  For example,

9   the NFT collection was minted from Mr. Ripps's wallet, identified as "ryder-

10  ripps.eth," was located at a unique "contract" address, and was minted on different

11  dates and with different token IDs than Yuga's Bored Ape Yacht Club NFTs. *See*

12  Ripps Decl. ¶ 89 (Dkt. 346) (uncontested); *see also* JTX-1146 cited in Atalay Decl. ¶

13  5 (Dkt. 337).

14         Additionally, relying on the token tracker is misplaced.  Yuga's former Chief

15  Technical Officer, Kerem Atalay, explained that using token trackers or token names

16  to distinguish NFTs is not "how most people would do that, and . . . I don't think that

17  would be a surefire way of distinguishing between two smart contracts."  Trial Tr.

18  [Atalay] 132:21-133:8.

19         Finally, the evidence Yuga cites to is misleading.  JTX-117 shows that the

20  "Contract Creator" field in the Etherscan website can be selected and would allow any

21  user to determine and confirm the provenance of the NFT contract.  Finally, the

22  portion of Mr. Atalay's declaration Yuga cites to, Dkt. 337, only includes a

23  description of JTX-1146, which is a smart contract on Etherscan that includes "ryder-

24  ripps.eth" as the Contract Creator.  Accordingly, this evidence is misleading.

25  **Plaintiff's Response:**

26         It is undisputed that Mr. Ripps created the RR/BAYC smart contract, and that

27  the marks "Bored Ape Yacht Club" and "BAYC" are immutably coded into the smart

28

contract.  Every RR/BAYC NFT to ever exist will refer to this smart contract and thus the BAYC Marks.  The infringement is inseparable from the product.  To remedy this irreparable harm, Yuga Labs should be given control of the smart contract for these infringing NFTs and regain "the ability to exclusively control its BAYC brand." Muniz Decl. (Dkt. 340) ¶ 22.

JTX-600 shows "Bored Ape Yacht Club" and "BAYC" coded into the RR/BAYC smart contract as source identifiers, and Defendants admit that JTX-600 "is an Etherscan page recording a transaction between Mr. Ripps and Foundation." *Supra* ¶ 7(e).  In other words, Mr. Ripps admits that he launched the smart contract with the BAYC Marks coded into it, which caused websites such as Etherscan to confusingly display those marks to the public as if the smart contract was created by Yuga Labs.  These marks can never be removed from the smart contract, causing hyperlinks and other references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  And despite Mr. Ripps testimony that he minted the RR/BAYC NFTs to his "personal wallet, ryder-ripps.eth," the "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.  Defendants therefore caused their infringement of Yuga Labs' marks to be an inherent and unchangeable part of their NFT collection, in turn causing third party systems and observers to confusingly associate the two, resulting in more downstream marketplace confusion. The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs so that Yuga Labs can retain some control of the use of its marks.

Separately, whether or not relying upon a token tracker or token name is a "surefire" way to verify the provenance of an NFT does change the fact that Defendants caused the token tracker for their NFTs to use the BAYC Marks.  Even so, Defendants testified the tracker is a "very common" way that consumers refer to their

1   NFTs.  Cahen Depo. Designations (Dkt. 395) at 148:12-13 ("Oh, yes.  I believe that

2   it's very common for people to do that.").  Mr. Cahen reiterated this testimony at trial.

3   Trial Tr. at 225:25-226:2.  And as Defendants admit, the token tracker for their

4   infringing NFTs is "Bored Ape Yacht Club" which led third-party websites to also

5   refer to Defendants' infringing NFTs using Yuga Labs' marks.  *Id.* at 149:12-13; JTX-

6   117; JTX-138; JTX-671.  Not only were third-party websites confused by this false

7   affiliation, but the token tracker also caused the Twitter bot @0xGem to falsely report

8   sales of RR/BAYC NFTs as sales of legitimate Bored Ape Yacht Club NFTs,

9   propagating confusion in the marketplace and diluting Yuga Labs' exclusivity.  JTX-

10  705; JTX-1029; Berger Decl. (Dkt. 339) at ¶ 8(i) ("First, the introduction of

11  RR/BAYC NFTs increased the perceived supply and decreased the perceived

12  exclusivity of authentic BAYC NFTs").  Indeed, the Court has already found that

13  "Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be

14  explicitly misled in the token tracker, which is the place where a consumer should be

15  able to authenticate and verify who created the NFT."  SJ Order (Dkt. 225) at 17.

16                    **Defendants' Reply:**

17        First, as stated in our objection, this finding of fact is misleading given the other

18  indicia of provenance included in the smart contract for RR/BAYC NFTs, including

19  the contract address. *See* Ripps Decl. ¶ 89 (Dkt. 346) (uncontested); *see also* JTX-

20  1146 cited in Atalay Decl. ¶ 5 (Dkt. 337).

21        Second, we "must ensure that the injunction is tailored to eliminate only the

22  specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171,

23  1176 (9th Cir. 2010) (cleaned up).  Including a transfer of the smart contract would

24  not be tailored to address the harm alleged here.  The smart contract that Yuga seeks

25  to obtain clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and

26  not Yuga.  *See* JTX-1146.  Even JTX-600, clearly shows that the transactions is from

27  Mr. Ripps's wallet.  Therefore, the smart contract does not contribute to the alleged

28

1    confusion.  Additionally, the smart contract is, even according to Yuga's own

2    witness's testimony, immutable and cannot be changed even if transferred to Yuga.

3    *See* Trial Tr. [Atalay] 133:24-8.  Accordingly, an injunction transferring the contract

4    to Yuga would not be tailored to eliminate the alleged harm of infringement.

5         Additionally, as the evidence presented at trial indicated, Yuga has not

6    identified even a single person who obtained an RR/BAYC NFT believing it was

7    sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a

8    single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

9    Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman]

10   219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's

11   focus on, I think, what you were focused on. Yuga Labs has been unable to identify

12   even[] a single person who purchased an RR/BAYC believing it to be sponsored by

13   Yuga Labs; right? A Correct.").  Accordingly, there is no evidence of actual confusion

14   resulting from the sale of RR/BAYC NFTs that an injunction transferring the

15   RR/BAYC smart contract would eliminate.

16        Contrary to Yuga's assertions, Mr. Ripps and Mr. Cahen do not admit that the

17   smart contract has the BAYC Marks coded into it. Evidence at trial showed that Yuga

18   does not own the alleged BAYC Marks.  Yuga gave away all intellectual property

19   rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had

20   publicly represented that BAYC NFT holders received all IP rights and that Yuga has

21   none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

22   Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  That transfer of rights was

23   made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted

24   with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4

25   ("Q. Your intent in writing the terms and conditions was to allow people to be able to

26   commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

27   the terms.").

28

1    As a result, at the time of the RR/BAYC project, there were more than 9,000

2    other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

3    (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

4    hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

5    Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

6    78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

7    thousands" of products that use Yuga trademarks without sponsorship or affiliation

8    with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks

9    with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal

10   brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that

11   use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

12   Also, Yuga does not own the asserted marks because NFTs are not eligible for

13   trademark protection.  The Supreme Court has held that trademarks are limited to

14   "tangible goods that are offered for sale, and not the author of any idea, concept, or

15   communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox*

16   *Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a

17   **communicative** work is a dispute relegated to the confines of copyright law, not

18   trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

19   SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

20   based on origin of hologram, as it is "likened to a cartoon animation").  Here, the

21   "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

22   certificates of authenticity/ownership and are not digital goods in themselves.  Trial

23   Tr. [Atalay] 127:9-16.

24   Third, contrary to what Yuga argues, there is ample evidence that there was not

25   confusion.  Defendants took multiple steps to make clear that the RR/BAYC

26   collection was not related to Yuga in any way.  For example, the rrbayc.com

27   website—through which the majority of RR/BAYC commissions occurred and the

28

vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested);
Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the
project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139
(Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.
Collectors using the rrbayc.com website were also required to read and click through a
disclaimer acknowledging the artistic purpose of the project before they were allowed
to commission an NFT.  See Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-
2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and
additional steps so that the artistic purpose of the work would be clear to participants.
See Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement
ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted
it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many
people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps
Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Additionally, as mentioned
above, Mr. Ripps, Mr. Cahen, and Yuga's founders are not aware of a single instance
of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]
265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Trial Tr. [Solano] 18:23-19:1; Trial
Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga
Labs has been unable to identify even[] a single person who purchased an RR/BAYC
believing it to be sponsored by Yuga Labs; right? A Correct.").

Fourth, the evidence Yuga relies on to establish confusion is unsupportive.  For
example, they point to tweets made from "GemBot," which is an automated software
application and not evidence of a real person's confusion.  *See* Cahen Decl. ¶¶ 226-
227. Accordingly, its tweets do not prove any confusion.

Finally, Yuga improperly responds by arguing that the Court's summary judgment order supports a finding of what injunctive relief is available, incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling is not supportive of a finding of what injunctive relief is appropriate.

### Plaintiff's Disputed Post Trial Finding of Fact No. 12, lines 6:28-7:1-2:

… and NFT marketplaces where RR/BAYC NFTs were sold listed "bayc" in the URLs and identified the infringing NFTs as "Bored Ape Yacht Club." See, e.g., JTX-117; JTX-138; JTX-671; see also Dkt. 337 ¶5.

### Defendants' Basis of Dispute:

This statement is misleading, as the exhibits cited indicate clearly that the source of the NFT collections are not Yuga.  JTX-138, for example, does not list the NFT collection as "bayc" or "Bored Ape Yacht Club" as this finding of fact states, but rather, entitles the collection "RR/BAYC." JTX-138.  JTX-671 also includes a clear indicator that the creator of the NFT collection on Foundation is "@ryder_ripps."

### Plaintiff's Response:

Defendants do not dispute that JTX-117, JTX-671, and other sources show that their infringing NFT collection was identified on NFT marketplaces as "Bored Ape Yacht Club." They also do not dispute that "bayc" appeared in the URLs. The proposed finding of fact is concededly true.

Defendants only argue that JTX-138 does not display the name "Bored Ape Yacht Club." This is wrong. On the right-hand side of the page, under the heading "You're Buying," six of Defendants' NFTs are listed. Each is titled with the name "Bored Ape Yacht Club." This is the confusion that the Defendants created in the marketplace. Consumers were told, falsely, that they were buying genuine Bored Ape Yacht Club NFTs, when actually they were viewing misleading and confusing listings for Defendants' counterfeits.

### Defendants' Reply:

Yuga's response mischaracterizes Defendants' objections and is unfounded. First, Defendants do dispute that JTX-117 and JTX-671 identify the RR/BAYC NFT collection as "Bored Ape Yacht Club" on NFT marketplaces. Specifically, JTX-117, is not an exhibit depicting an NFT marketplace, but rather, it is a printout of a contract on Etherscan. This exhibit citation does not support a finding about how the collection appeared on marketplaces and appeared to be supportive of Yuga's previous portion of this finding of fact at lines 6:27-28, which discusses the smart contract. Further, as explained in our objection above, this exhibit shows that the "Contract Creator" field in the Etherscan website can be selected and would allow any user to determine and confirm the provenance of the NFT contract. JTX-671, also makes clear the source of the NFT as it shows the creator of the collection is "@ryder_ripps."

Second, Yuga's description of JTX-138 is misleading. The heading of the entire page depicted is listed as "RRBAYC" with a smaller "RR/BAYC" underneath that and a logo that says "RR/." Yuga relies on print that appears on the side only after

1   you have selected an NFT to reserve, which undermines their argument that this

2   exhibit shows consumers would have been presented with "Bored Ape Yacht Club"

3   before they decided to reserve it. Finally, there is no url listed in this exhibit and so

4   Defendants do object to Yuga's incorrect assertion that a url shows "bayc" was used

5   in it.

6       Finally, Yuga's assertion that RR/BAYC NFT consumers were told that they

7   were reserving a Yuga NFT and were confused is false.  There is ample evidence in

8   the record that shows that there was no confusion and Yuga's response is not based in

9   fact.  Defendants took multiple steps to make clear that the RR/BAYC collection was

10  not related to Yuga in any way.  For example, the rrbayc.com website—through which

11  the majority of RR/BAYC commissions occurred and the vast majority of alleged

12  profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt.

13  344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-

14  103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶

15  201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com

16  website were also required to read and click through a disclaimer acknowledging the

17  artistic purpose of the project before they were allowed to commission an NFT.  *See*

18  Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-

19  13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic

20  purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman

21  Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had

22  a negative impact on usability? … A.   … Ryder wanted it and so he had the final

23  call.").

24      Unsurprisingly, therefore, the evidence presented at trial shows that many

25  people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

26  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

27  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

28

1       Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

2   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

3   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

4   Buttressing this fact, Yuga's founders were also not aware of a single instance of

5   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

6   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

7   identify even[] a single person who purchased an RR/BAYC believing it to be

8   sponsored by Yuga Labs; right? A Correct.").

9           **<u>Plaintiff's Disputed Post Trial Finding of Fact No. 13:</u>**

10       <u>Defendants were also unjustly enriched in the form of avoided costs.</u> JTX-723

11   ¶89; Dkt. 338 ¶68; Dkt. 342 ¶¶35, 39, 40, 52, 72. <u>Yuga Labs' investment in</u>

12   <u>developing its BAYC brand, including its marks, are costs that Defendants were able</u>

13   <u>to avoid in generating their profits.</u> JTX-723 ¶89. <u>Defendants leveraged the value</u>

14   <u>created by Yuga Labs to effectively "free ride" on the BAYC brand. Yuga Labs'</u>

15   <u>investments in the BAYC brand are thus costs that Defendants would otherwise have</u>

16   <u>had to invest themselves to attract consumers to their RR/BAYC NFTs.</u> JTX-723 ¶89;

17   Dkt. 338 ¶68. <u>The Court finds that disgorgement of Defendants' profits in the amount</u>

18   <u>of $1,375,361.92 is adequate to address Defendants' unjust enrichment in the form of</u>

19   <u>avoided costs.</u>

20                   **<u>Defendants' Basis of Dispute:</u>**

21       As the evidence at trial showed, Mr. Ripps and Mr. Cahen clearly created their

22   NFT collection as a protest ***against*** Yuga.  *See* Ripps Decl. ¶¶ 71-72, 87, 102 (Dkt.

23   346) (uncontested); Cahen Decl. ¶¶97-98 (Dkt. 344).  The RR/BAYC NFT project,

24   therefore, was a protest against the "BAYC brand" and, therefore, could not have

25   possibly generated profits "free riding" or leveraging the value of Yuga's brand.

26   Further, the evidence presented at trial showed that the people who reserved the

27   RR/BAYC NFTs did so as part of the protest against Yuga and not to support the

28

BAYC brand.  *See* Ripps Decl. ¶¶ 198-205 (uncontested) (Dkt. 346); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not show that Mr. Ripps and Mr. Cahen were unjustly enriched or profited from the BAYC brand, but rather shows that they received revenue as part of a protest against the BAYC brand.

Additionally, as outlined above, disgorgement is not available here. An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris,* No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial – neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement. *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim. Again, because the

1    statutes provide adequate remedies, a purely equitable claim may not be

2    maintained.").

3         Finally, the evidence Yuga cites to for support is misleading and unsupportive.

4    First, Yuga cites to Ms. Kindler's expert report, at JTX-723, and her declaration, at

5    Dkt. 338, which state that Mr. Ripps and Mr. Cahen were unjustly enriched by Yuga's

6    brand.  For the reasons stated above that statement is not substantiated by the evidence

7    presented at trial and is inaccurate.  Second, Yuga cites to portions of Mr. Solano's

8    declaration, at Dkt. 342, where he expresses his opinion that Mr. Ripps and Mr. Cahen

9    were unjustly enriched by Yuga's brand.  Mr. Solano's testimony was not credible

10   given the many false and misleading statements contained in his declaration, as well

11   as his repeated impeachment at trial.  For example, Mr. Solano was also forced to

12   concede on cross examination that his sworn declaration included a false statement

13   claiming that "Defendants continue to receive royalties or creator fees from sales on

14   secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the

15   phrase "business venture" in Mr. Lehman's declaration, without having considered

16   that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

17   Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.

18   Solano also relied on Mr. Lehman's declaration without having considered that Mr.

19   Lehman knew he could not settle his case without executing a declaration concerning

20   matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was

21   afraid for his family at the time he signed his declaration, because Yuga's lawsuit

22   against him would be disastrous to his family and himself, even if Mr. Lehman won

23   (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his

24   repeated impeachment at trial. Solano Decl. (Dkt. 342); Trial Tr. [Solano] 32:19-33:11

25   ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or

26   not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could.

27   You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the

28

1   truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can

2   pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored

3   Ape V3 created by Ryder Ripps?' There's an objection from your counsel.

4   'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes." ); *id.*

5   at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for

6   Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116,

7   lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists?

8   'ANSWER: I don't recall.' Were you asked that question, and did you give that

9   answer? A Yes.").

10                 **Plaintiff's Response:**

11         Defendants do not actually challenge the facts of Ms. Kindler's unrebutted

12   expert testimony regarding non-monetary benefits Defendants accrued from their

13   infringement, but instead rehash their arguments that their infringing NFTs were

14   meant to be a "protest." This response is unavailing.

15         Specifically, the Court should reject Defendants' objection for the same reasons

16   discussed *supra* ¶ 4, (1) there is ample evidence of confusion in the record, (2) the

17   record shows that Defendants' unreliable communications with third parties does not

18   negate the Court's finding that there was a likelihood of confusion, and (3) Defendants

19   fail to impeach Mr. Solano's accurate testimony.

20         Additionally, Defendants' profits were attributable to their infringement. *Supra*

21   ¶ 12.

22                 **Defendants' Reply:**

23         Yuga's response is misleading and unsupported. Contrary to Yuga's assertions,

24   Defendants **do** rebut Ms. Kindler's testimony that Defendants were unjustly enriched.

25   *See supra* ¶ 13. Further, Ms. Kindler's testimony clearly shows that she did not

26   quantify any possible unjust enrichment and her unfounded speculation on the matter

27   is not supportive of a finding of damages here. *See* Kindler Decl. ¶ 67 (Dkt. 338)

28

("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…").

Also, as discussed *supra* ¶ 4, it is clear that there is ample evidence in the record that there was not confusion, the record shows many people reserved RR/BAYC NFTs as part of a protest against Yuga, and no actual confusion has been established.  Finally, our objection here clearly outlines how Mr. Solano's testimony was impeached and his credibility, accordingly, was impacted.

**Plaintiff's Disputed Post Trial Finding of Fact No.  14, lines 7:15, 7:16-18:**

Defendants registered and used the infringing rrbayc.com and apemarket.com domains, and created the @ApeMarketplace Twitter account, to market and sell RR/BAYC NFTs by directly incorporating Yuga Labs' BAYC Marks. SJ Order at 14-15; Dkts. 342 ¶48; 346 ¶100; JTX-94; JTX-95; JTX-696.

**Defendants' Basis of Dispute:**

Evidence at trial shows that the rrbayc.com and apemarket.com domains were not "infringing" because Yuga does not own the marks BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo.  Yuga Labs gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga Labs' CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  Additionally, Yuga incorrectly states that Defendants directly incorporated references to the marks. Defendants' RR/BAYC project only addressed Yuga's products in order to protest and criticize Yuga's use of problematic imagery.

Furthermore, evidence shows that Defendants created the rrbayc.com website to facilitate reservations related to their protest art project.  Ripps Decl. ¶ 100 (Dkt. 346)

1   (uncontested); Cahen Decl. ¶ 135 (Dkt. 344); Hickman Decl. ¶ 69 (Dkt. 345).  The

2   rrbayc site helped streamline an artwork reservation process that Mr. Ripps was

3   facilitating himself.  Ripps Decl. ¶ 100 (Dkt. 346) (uncontested).

4   Apemarket.com never launched and was never used to sell anything.  Ripps

5   Decl. ¶ 180 (Dkt. 346) (uncontested); Cahen Decl. ¶ 260 (Dkt. 344).  Therefore,

6   apemarket.com never generated any revenue or profit. Cahen Decl. ¶ 261 (Dkt. 344).

7   Yuga cited a screenshot of the ApeMarket twitter page (JTX-696) in support of

8   their proposed finding of fact.  However, this doesn't establish any of the behaviors or

9   motivations they described. Defendants never released apemarket.com because it was

10   still in the ideation phase and Defendants ultimately decided against it.  Ripps Decl.

11   ¶ 178 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 257-258 (Dkt. 344).

12   **Plaintiff's Response:**

13   Defendants' objections should be rejected for the same reasons discussed *supra*

14   ¶ 4; specifically:  (1) Yuga Labs owns the BAYC Marks, (2) Yuga Labs did not give

15   Defendants a license to infringe the BAYC Marks, and (3) Defendants' infringement

16   is not art.

17   Additionally, as described below, Defendants' objection should be rejected

18   because Defendants used Ape Market to market their infringing NFTs.

19   **The @ApeMarketplace Twitter Account And The Ape Market NFT**

20   **Marketplace Are Clearly Related And Both Were Used To Promote RR/BAYC:**

21   Defendants created the @ApeMarketplace Twitter account to promote the Ape Market

22   marketplace and their infringing RR/BAYC NFTs.  The fact that the Twitter handle

23   solely controlled by Mr. Cahen contains "ApeMarket" alone demonstrates the

24   connection between the Twitter account and marketplace, but the Tweets from the

25   account confirm that Defendants used @ApeMarketplace to promote Ape Market and

26   RR/BAYC NFTs.  Cahen Depo. Designations (Dkt. 395) at 126:5-7 (Q:  And you are

27   the sole operator of the Ape Marketplace account? A:  That is correct, yes.").  One

28

such Tweet on June 20 asks, "Are you ready for ApeMarket.com, anon?" and another on June 13 teases the release of Ape Market stating "Get Ready" alongside a screenshot of Ape Market.  JTX-696.  And Mr. Cahen lied at trial when, under oath, he stated that he did not "plan to stimulate the sales of RR/BAYC NFTs by teasing the future release of ApeMarket."  Trial Tr. at 234:15-18.  Mr. Cahen tweeted from @ApeMarketplace a link to reserve an RR/BAYC on multiple occasions and on June 2 he tweeted that "[l]isting requires holding RR/BAYC."  JTX-696.  Defendants' own internal communications confirm the lie.  On June 1 Mr. Cahen stated, "my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collection."  JTX-801.221.  On that same day Mr. Cahen tweeted from @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC and a link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the prospect of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim that Ape Market, @ApeMarketplace, and RR/BAYC are not connected is obviously false.  The Tweets in JTX-696 repeatedly show the look, functionality, and intent of Ape Market using Yuga Labs' BAYC Marks and the infringing RR/BAYC NFTs within Ape Market.

### **Defendants' Reply:**

Yuga has failed to cite credible evidence demonstrating the alleged infringement or the alleged marketing mentioned in this finding of fact.  Therefore, this finding of fact should be rejected.

***First,*** the evidence at trial showed that Yuga does not own the BAYC marks because (1) Yuga has either given away or abandoned its rights in the marks and (2) NFTs are not eligible for trademark protection. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189

(Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.  Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a **communicative** work is a dispute relegated to the confines of copyright law, not trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

1    certificates of authenticity/ownership and are not digital goods in themselves.  Trial

2    Tr. [Atalay] 127:9-16.

3           Defendants have never stipulated to Yuga's Ownership of the BAYC

4    Marks.  Defendants hotly disputed ownership of the BAYC marks at summary

5    judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant

6    to the remedies trial in this case, Yuga has for some reason affirmatively raised the

7    issue—forcing Defendants to re-articulate their dispute for purposes of preserving

8    their position for appeal and all other proceedings involving the BAYC marks.  Yuga

9    attempts to mischaracterize the Court record by citing to the pre-trial conference

10   order.  But *nowhere* in the pre-trial conference order did Defendants stipulate to

11   ownership of the BAYC marks.  Section 6 of the order contains all stipulated facts and

12   those stipulated facts include only that Yuga released the BAYC collection and

13   various facts about Defendants' activities associated with the RR/BAYC

14   collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts

15   section, but this section again does not contain any admissions regarding "ownership"

16   of the marks.  Rather it merely identifies the asserted marks at issue for the remedies

17   trial—something that Defendants admitted in light of the scope of the remedies trial

18   and to ease this Court's work in adjudicating the remaining issues.   Dkt. 32-1 at 2-

19   3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that

20   Defendants infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an

21   admission of ownership, it is a statement regarding the procedural history in this case

22   that explains that the scope of trial is limited to remedies and does not include

23   infringement.  Had Defendants wanted to stipulate to ownership, they would have

24   clearly and expressly done so—they have not.  Defendants reserve the right to dispute

25   ownership on appeal and in any other proceedings involving the BAYC marks.

26          ***Second,*** Yuga ignores that the evidence at trial (including Mr. Ripps's

27   uncontested declaration) confirms that Mr. Ripps has a long history as a successful

28

artist and that the RR/BAYC collection was yet another art project that Mr. Ripps created.  Indeed, Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic contributions have been recognized by mainstream media. Dkt. 419-1 at 3.

Despite having admitted that Mr. Ripps is a publicly recognized artist, Yuga now attempt to rebut Mr. Ripps's unchallenged declaration regarding his career, including his work on the RR/BAYC collection, without having any meaning rebuttal evidence and without have cross-examined Mr. Ripps at trial.  If Yuga truly believes that Mr. Ripps's declaration contains untrue statements about his career as one of the most recognized digital artists in the world and the RR/BAYC collection as a continuation of his artistic accomplishments, then Yuga could have tested those statements on cross-examination.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that the "principle means" of testing Mr. Ripps's credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's declaration uncontested, including the following statements:

24.    My artwork intentionally pushes the boundaries of what is deemed socially or artistically "acceptable," particularly when critiquing internet culture.

25.    One of my most well-known works, *Diventare Schiavo*, involved having people pack boxes through a VR set to demonstrate how the modern internet has reduced us all to "packing boxes."

26.     Other works I created that comment on the internet include: *Barbara Lee*, a commentary on the interplay between truth and clickbait online, and *Ho*, an exhibit I created for the Postmasters Gallery which explores how social media uses manipulated images to mediate perception of self.

27.     My art is meant to be interactive, and to be discussed and critiqued.

28.     Much of my work has been the source of criticism and controversy. I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

**Third,** Defendants never used ApeMarket to market anything.  Yuga fails to present any evidence that ApeMarket was released.  Instead, Yuga points to a twitter page which Defendants no longer use and present weak arguments that Defendants promoted a product which never existed.  ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  And the exhibits Yuga cites do not show otherwise.  For example, JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.  As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website

domain apemarket.com was ever used for the promotion or sale of anything.  And JTX-801 shows that Defendants were in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing.  For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users.  JTX-801.185.  Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  And JTX-809 is a screenshot of mock-up of apemarket.com that Mr. Ripps did not approve and that was still subject to substantial changes from the ongoing ideation process for apemarket.com.

### Plaintiff's Disputed Post Trial Finding of Fact No. 15, lines 7:19-20:

The token tracker for the RR/BAYC smart contract uses Yuga Labs' BORED APE YACHT CLUB and BAYC marks. JT X-117; JTX-600; JTX-1146; Dkts. 337 ¶¶4, 5; 392 at 130:23-131:2.

### Defendants' Basis of Dispute:

Defendants did not create a token tracker "for" the RR/BAYC smart contract.  Token trackers are tools created by third parties, such as Etherscan, which read metadata in smart contracts and digest that information.  Yuga's characterization of the token tracker incorrectly attributes the token tracker to the smart contract created by Defendants.

Defendants intended for the RR/BAYC smart contract to be discernable from other smart contracts.  The RR/BAYC collection was minted from Mr. Ripps personal wallet, "ryder-ripps.eth," which was displayed on the smart contract.  Ripps Decl. ¶ 89 (Dkt. 346) (uncontested).  Furthermore, the RR/BAYC smart contract featured a

distinct contract address, different dates, and different token IDs than Yuga's Bored
Ape Yacht Club NFTs.  Ripps Decl. ¶ 89 (Dkt. 346) (uncontested).

With respect to the marks, Defendants dispute that Yuga owns marks for
BORED APE YACHT CLUB and BAYC.  Yuga Labs gave away all intellectual
property rights associated with the Bored Ape Yacht Club.  Yuga Labs' CEO Nicole
Muniz had publicly represented that BAYC NFT holders received all IP rights and
that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189
(Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.

**Plaintiff's Response:**

Defendants do not actually dispute this proposed finding of fact.  Their
arguments regarding other issues are nonetheless incorrect.

Defendants claim they were not responsible for token trackers such as
Etherscan's identifying Defendants' NFTs with the BAYC Marks.  There is no such
evidence to support this argument, and Defendants cite none.  JTX-600 shows "Bored
Ape Yacht Club" and "BAYC" coded into the RR/BAYC smart contract as source
identifiers, and Defendants admit that JTX-600 "is an Etherscan page recording a
transaction between Mr. Ripps and Foundation."  *Supra* ¶ 7(e).  In other words, Mr.
Ripps admits that he launched the smart contract with the BAYC Marks coded into it,
which caused websites such as Etherscan to confusingly display those marks to the
public as if the smart contract was created by Yuga Labs.  These marks can never be
removed from the smart contract, causing hyperlinks and other references to the
collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶
46-47, 78.  And despite Mr. Ripps' testimony that he minted the RR/BAYC NFTs to
his "personal wallet, ryder-ripps.eth," the "ryder-ripps.eth" name did not appear on
Etherscan until *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-
25, *with* JTX-36.  Defendants therefore caused their infringement of Yuga Labs'
marks to be an inherent and unchangeable part of their NFT collection, in turn causing

1   third party systems and observers to confusingly associate the two, resulting in more

2   downstream marketplace confusion.  The permanent existence of Yuga Labs' marks in

3   association with the RR/BAYC smart contract is why, like a domain name, the smart

4   contract should be transferred to Yuga Labs so that Yuga Labs can retain some control

5   of the use of its their marks.  Defendants' wrongful infringement of the BAYC Marks

6   caused this result.

7          Defendants also argue that their infringing NFTs used "different token IDs"

8   than BAYC NFTs, but they fail to acknowledge that they intentionally "marketed their

9   RR/BAYC NFTs using the same corresponding BAYC Ape ID number used by Yuga

10  for the BAYC NFTs" even though they minted RR/BAYC NFTs in a different order

11  than BAYC NFTs.  SJ Order (Dkt. 225) at 11.

12         Finally, Defendants' argument that Yuga Labs does not own the BAYC Marks

13  is false, contrary to the Court's Summary Judgment Order, and precluded by their own

14  stipulation.  *Supra* ¶ 1.

15         **Defendants' Reply:**

16         Defendants did not cause Etherscan and other websites to attribute the

17  RR/BAYC collection to Yuga.  Mr. Ripps explained, in his uncontested declaration,

18  that the smart contract was coded so that it would be specifically attributable to him

19  through his personal smart wallet and identify a unique smart contract address:

20         89.    The RR/BAYC collection was minted from my personal Ethereum
21                blockchain "wallet," ryder-ripps.eth, was located at a unique
22                "contract" address, and was minted on different dates and with
                  different token IDs than Yuga's Bored Ape Yacht Club NFTs.
23

24  Ripps Decl. ¶ 89 (Dkt. 346).  This information was always coded into the RR/BAYC

25  contract, giving any third party a surefire way to know that RR/BAYC NFTs were

26  created by Mr. Ripps and not by Yuga.

27

28

1    Third party websites, such as Etherscan, always displayed the RR/BAYC
2    collection in a manner that disclosed Mr. Ripps's unique personal wallet (either by
3    name or by alphanumeric code verifiable on Etherscan itself) and also disclosing the
4    unique smart contract address for the RR/BAYC collection.   As Mr. Atalay admitted,
5    it is the unique smart contract address that is critical to identifying NFTs.  Trial Tr.
6    [Atalay] 135:2-25.   Moreover, it is undisputed that Defendants do not own or operate
7    Etherscan or any of the other third-party websites that displayed information about
8    RR/BAYC NFTs.   Defendants cannot be responsible for the actions of third parties,
9    especially when the code for the RR/BAYC collection provided to all third parties a
10   definite source identifier and a verifiably unique smart contract address.

11   Furthermore, Yuga's own witness, Mr. Atalay, himself has admitted that
12   consumers of NFTs do not use Etherscan's token tracker/token name but instead rely
13   on marketplaces or by checking the associated smart contract address.  Trial Tr.
14   [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs
15   "would be a fairly weak way to do so because often those things are mutable.  They
16   can be changed after the fact.  Also, there's no guarantee of uniqueness."  Trial Tr.
17   [Atalay] 133:12-23.

18   Further, the evidence at trial showed that Yuga does not own the BAYC marks
19   because (1) Yuga has either given away or abandoned its rights in the marks and (2)
20   NFTs are not eligible for trademark protection. Yuga gave away all intellectual
21   property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole
22   Muniz had publicly represented that BAYC NFT holders received all IP rights and
23   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189
24   (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of
25   rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr.
26   Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr.
27   [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow

28

1    people to be able to commercialize their NFTs.  We can agree on that; right?  A.

2    Yes.  That is covered in the terms.").

3           As a result, at the time of the RR/BAYC project, there were more than 9,000

4    other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

5    (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

6    hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

7    Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

8    78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

9    thousands" of products that use Yuga trademarks without sponsorship or affiliation

10   with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks

11   with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal

12   brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that

13   use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

14   Further, Yuga does not own the asserted marks because NFTs are not eligible for

15   trademark protection.  The Supreme Court has held that trademarks are limited to

16   "tangible goods that are offered for sale, and not the author of any idea, concept, or

17   communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox*

18   *Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a

19   **communicative** work is a dispute relegated to the confines of copyright law, not

20   trademark.  *Id.* at 33-35; *see also* *Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

21   SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims

22   based on origin of hologram, as it is "likened to a cartoon animation").  Here, the

23   "goods" for which Yuga claims trademark rights are NFTs, which are comparable to

24   certificates of authenticity/ownership and are not digital goods in themselves.  Trial

25   Tr. [Atalay] 127:9-16.

26          Defendants have never stipulated to Yuga's Ownership of the BAYC

27   Marks.  Defendants hotly disputed ownership of the BAYC marks at summary

28

judgment. Dkt. 163 at 2-8. And while ownership of the marks is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue—forcing Defendants to re-articulate their dispute for purposes of preserving their position for appeal and all other proceedings involving the BAYC marks. Yuga attempts to mischaracterize the Court record by citing to the pre-trial conference order. But ***nowhere*** in the pre-trial conference order did Defendants stipulate to ownership of the BAYC marks. Section 6 of the order contains all stipulated facts and those stipulated facts include only that Yuga released the BAYC collection and various facts about Defendants' activities associated with the RR/BAYC collection. Dkt. 320-1 at 3-4. Yuga points to Section 5, which is the admitted facts section, but this section again does not contain any admissions regarding "ownership" of the marks. Rather it merely identifies the asserted marks at issue for the remedies trial—something that Defendants admitted in light of the scope of the remedies trial and to ease this Court's work in adjudicating the remaining issues. Dkt. 32-1 at 2-3. Lastly, Yuga cites to Defendants' statement that the "Court has determined that Defendants infringed the BAYC Marks." Dkt. 320-1 at 13. But again, this is not an admission of ownership, it is a statement regarding the procedural history in this case that explains that the scope of trial is limited to remedies and does not include infringement. Had Defendants wanted to stipulate to ownership, they would have clearly and expressly done so—they have not. Defendants reserve the right to dispute ownership on appeal and in any other proceedings involving the BAYC marks.

**Plaintiff's Disputed Post Trial Finding of Fact No. 15, lines 7:21-22:**

Consumers use token trackers to verify the source and authenticity of the digital assets that they are viewing and purchasing. SJ Order at 17; *see also* JTX-721 ¶14; JTX-1558; Dkts. 337 ¶7; 392 at 138:6-20; 395 at 148:10-13.

**Defendants' Basis of Dispute:**

Evidence at trial showed the opposite. An NFT is a representation of ownership of a unique piece of data on an internet blockchain. Trial Tr. [Atalay] 127:9-16. Because of the unique nature of NFTs, consumers employ several methods to distinguish these particular digital assets. Consumers can distinguish between two NFTs by looking at them on NFT marketplaces, such as OpenSea. Trial Tr. [Atalay] 135:5-10. Consumers can also distinguish between NFTs by looking at the smart contract that each NFT is associated with. Trial Tr. [Atalay] 135:11-15. If one NFT is associated with a particular smart contract, and another NFT is associated with a different smart contract, consumers can infer that those two NFTs are distinct. Trial Tr. [Atalay] 135:16-19.

During his trial testimony, Mr. Atalay confirmed that he had previously testified that token names are a "fairly weak" way to distinguish NFTs from each other. Trial Tr. [Atalay] 133:12-23. In his previous testimony, Mr. Atalay confirmed that token names are a poor way for someone to distinguish two NFTs because token names are mutable and can be "changed after the fact." *Id*.

**Plaintiff's Response:**

Mr. Cahen's own testimony on consumers undermines Defendants' position. Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."); *id.* at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker). Mr. Cahen's prior testimony is consistent with the understanding of consumers. *See* JTX-1558 (tweet stating: "If you were curious to see how malicious this scam is, check out the token tracker/ID name that he chose to use on the smart contract. This is a critical piece of data the NFT community uses when they are buying on the secondary market.").

1    While Defendants are correct that some token names may be changed after the

2    fact, they neglect to add that they created the RR/BAYC smart contract in such a way

3    that it *immutably* uses the BAYC Marks.  Defendants could have called their NFT

4    collection something other than "Bored Ape Yacht Club" with the symbol "BAYC"

5    ***immutably*** in the metadata for the NFT smart contract, but chose not to.  Atalay Decl.

6    ¶¶ 3-6; JTX-600; JTX-1146.  As a consequence, their NFTs will forever be referred to

7    as "Bored Ape Yacht Club" and "BAYC" on the blockchain and anywhere that

8    obtains those data points from the smart contract.  Trial Tr. at 134:1-8 (Mr. Atalay

9    testifying that "[i]n this particular instance, upon inspection of the Foundation smart

10   contract that was used to deploy the RR/BAYC smart contract, it's evident that these

11   are not mutable fields in this particular instance.").

12   As Mr. Atalay also testified, users on secondary markets typically refer to the

13   token name to identify NFTs.  Trial Tr. at 132:3-5 ("Q  And you also agree that the

14   NFT community uses the token name when it's buying on secondary markets;

15   correct?" / "A  Yes."); *see also* JTX-1558.  And even if a consumer were to view an

16   RR/BAYC on OpenSea, as Defendants suggest, the consumer would still be confused

17   because Defendants' listing was virtually identical to a listing for an authentic Bored

18   Ape Yacht Club NFT.  *See* JTX-686.

19   **Defendants' Reply:**

20   The undisputed evidence at trial showed that NFT consumers do not rely on

21   token trackers to verify the authenticity of NFTs.  Mr. Atalay clearly and

22   unequivocally testified at trial that token trackers/token names are not used to identify

23   NFTs.   If there was anything wrong with Mr. Atalay's admission, then Yuga should

24   have rehabilitated the witness on re-direct.  Yuga did not, because Mr. Atalay's

25   admission is clear.  He admitted that using token names or token trackers to

26   distinguish NFTs "would be a fairly weak way to do so because often those things are

27   mutable.  They can be changed after the fact.  Also, there's no guarantee of

28

1    uniqueness." Trial Tr. [Atalay] 133:12-23. Indeed, as Mr. Atalay admitted,

2    consumers of NFTs rely on marketplaces or by checking the associated smart contract

3    address. Trial Tr. [Atalay] 135:2-25.

4        Yuga again speculates regarding what would confuse consumers without being

5    able to identify a single consumer who purchased an RR/BAYC NFT thinking it was

6    sponsored by Yuga. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

7    <u>**Plaintiff's Disputed Post Trial Finding of Fact No. 16:**</u>

8        <u>Consumers and Twitter bots tracking and posting about NFT transfers falsely</u>

9    <u>attribute sales of RR/BAYC NFTs as BAYC NFTs as they reflect the BORED APE</u>

10   <u>YACHT CLUB and BAYC marks in the RR/BAYC smart contract's token tracker,</u>

11   <u>which causes confusion among consumers as to source, sponsorship, or affiliation.</u>

12   *See, e.g.*, JTX-705; JTX-722 ¶¶71-72; JTX-1029 See, e.g., JTX-705; JTX-722 ¶¶71-

13   72; JTX-1029. <u>Even more, whenever (now, or in the future) a consumer shares links</u>

14   <u>to the RR/BAYC Etherscan page on Twitter, the resulting image displays Yuga Labs'</u>

15   <u>BAYC Marks.</u> Dkt. 342 ¶¶46-47.

16   <u>**Defendants' Basis of Dispute:**</u>

17       Yuga has been unable to identify a single person who commissioned an

18   RR/BAYC NFT thinking they were purchasing one of Yuga's Bored Ape Yacht Club

19   NFTs. *See, e.g.*, Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

20   265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

21   Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1. Instead, Yuga points to tweets by

22   Twitter bots and other users to suggest that consumers were confused. This ignores

23   the fact that Twitter bots, like @0xGem, are not consumers. Twitter Bots are pieces

24   of software that read the blockchain and tweet about transactions. Furthermore,

25   Twitter users who replied to Twitter bot tweets were able to discern between

26   RR/BAYC NFTs and Bored Ape Yacht Club NFTs. JTX-705; JTX-1029.

27

28

1    In both JTX-705 and JTX-1029, Twitter users are quick to remark that the

2    Twitter bot falsely indicated a Bored Ape Yacht Club transaction.  JTX-705; JTX-

3    1029.  Users replied to the bot by saying "It's a RR ape" or "RRBAYC > BAYC."

4    JTX-705. Another twitter user replied to the bot and mentioned this litigation, clearly

5    indicating their ability to differentiate between RR/BAYC NFTs and Bored Ape

6    Yacht Club NFTs.  JTX-1029.

7    Actual consumers have shown overwhelming support and appreciation for

8    Defendants' art project.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033,

9    JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-

10   2596; JTX-2599.  One collector stated that he was "glad [Mr. Ripps was] pointing out

11   what bayc was doing."  Ripps Decl. ¶ 199 (Dkt. 346) (uncontested); JTX-2592.

12   Another collector stated that Mr. Ripps did a "very positive thing" by "bringing

13   attention to BAYC" and showing "what they are."  Ripps Decl. ¶ 204 (Dkt. 346)

14   (uncontested), JTX-2035.

15   With respect to the marks, Defendants dispute that Yuga owns the referenced

16   marks.  Yuga Labs gave away all intellectual property rights associated with the Bored

17   Ape Yacht Club.  Yuga Labs' CEO Nicole Muniz had publicly represented that

18   BAYC NFT holders received all IP rights and that Yuga has none of those rights.

19   Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26

20   (Dkt. 345); JTX 2672; JTX 2673.

21   **<u>Plaintiff's Response:</u>**

22   Defendants' objection concedes both that Twitter bots misreport sales of

23   Defendants' infringing NFTs as genuine BAYC NFTs (due to Defendants' choice to

24   name their infringing NFTs with the BAYC Marks, *see supra* ¶ 15) and that certain

25   commenters on such posts felt the need to explain to others that these were indeed

26   scam NFTs.  Such explanation was warranted, because other users in JTX-705 and

27   JTX-1029 clearly exhibit confusion.  Even the tweet that Defendants note "mentioned

28

1  this litigation" does so by saying "[t]he confusion in these comments will be prime

2  evidence in the RR v Yuga case." JTX-1029.  The fact that some consumers

3  eventually realized that Defendants' scam was a scam does not make it legitimate or

4  any less likely to cause confusion.

5       Defendants' anecdotal evidence of individuals stating they support Defendants'

6  infringement are irrelevant and immaterial.  A handbag counterfeiter may have allies

7  or distributors, and those allies / distributors may even profess to believe in a cause,

8  but that does not excuse the counterfeiter's wrongdoing or mitigate the likelihood of

9  confusion in the marketplace.  *See* SJ Order (Dkt. 225) at 16 ("Defendants' sale of

10 RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag.").  Further,

11 confused consumers are unlikely to admit that they have fallen for Defendants' scam.

12 As Mr. Solano explained, being scammed is "super embarrassing" and consumers

13 who were tricked "weren't going to, you know, raise their hand and shout about it."

14 Trial Tr. at 54:10-16.  Nonetheless, Defendants' admission that they processed over

15 $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants'

16 suggestion that purchasers of their infringing NFTs were universally supportive and

17 that no one was confused.

18      Defendants' argument that their infringement did not cause "actual confusion"

19 is irrelevant because (1) actual infringement is not a required element under the

20 Lanham Act to obtain equitable relief and (2) there is ample evidence of confusion in

21 the record.  *See supra* ¶ 4.

22      Finally, Defendants' argument that Yuga Labs does not own the BAYC Marks

23 is irrelevant, contrary to the Court's Summary Judgment Order, and precluded by their

24 own stipulation.  *Supra* ¶ 1.

25      **Defendants' Reply:**

26

27

28

1    Twitter bots, like GemBot, are automated software applications and not

2    evidence of a real person's confusion.  *See* Cahen Decl. ¶¶ 226-227.  Yuga has failed

3    to present any credible evidence demonstrating consumer confusion.

4    None of Yuga's witnesses have been able to identify a single confused

5    consumer who purchased an RR/BAYC NFT believing it was sponsored by Yuga.

6    *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.  Instead, Yuga attempts to fabricate

7    confusion by pointing to twitter bots and twitter users replying to twitter bots.

8    However, these twitter replies demonstrate that users were not confused and able to

9    distinguish between NFT collections.  *See* JTX-1030, JTX-1032 (Tweets where the

10   users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-

11   1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to

12   believe purchased an RR/BAYC NFT, replying to GemBot).

13   Yuga cites Mr. Solano's testimony to argue that confused consumers are too

14   embarrassed to admit that they were misled by the Defendants' art project.  However,

15   Mr. Solano has already demonstrated that his speculations are inaccurate.  Trial Tr.

16   [Solano] 48:15-49:4.  Furthermore, if there were as many confused consumers as

17   Yuga alleges, it is reasonable to believe that Yuga would be able to identify at least

18   one.

19   Additionally, the evidence at trial showed that Yuga does not own the BAYC

20   marks because (1) Yuga has either given away or abandoned its rights in the marks

21   and (2) NFTs are not eligible for trademark protection. Yuga gave away all

22   intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO

23   Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights

24   and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

25   189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That

26   transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions,

27   which Mr. Solano drafted with the intent to allow people to commercialize their

28

1   NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions
2   was to allow people to be able to commercialize their NFTs.  We can agree on that;
3   right? A. Yes.  That is covered in the terms.").

4         As a result, at the time of the RR/BAYC project, there were more than 9,000
5   other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)
6   (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were
7   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
8   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]
9   78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally
10  thousands" of products that use Yuga trademarks without sponsorship or affiliation
11  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks
12  with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
13  brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
14  use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.
15  Further, Yuga does not own the asserted marks because NFTs are not eligible for
16  trademark protection.  The Supreme Court has held that trademarks are limited to
17  "tangible goods that are offered for sale, and not the author of any idea, concept, or
18  communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox*
19  *Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a
20  **communicative** work is a dispute relegated to the confines of copyright law, not
21  trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-
22  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims
23  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
24  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
25  certificates of authenticity/ownership and are not digital goods in themselves.  Trial
26  Tr. [Atalay] 127:9-16.

27

28

Defendants have never stipulated to Yuga's Ownership of the BAYC Marks.  Defendants hotly disputed ownership of the BAYC marks at summary judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue—forcing Defendants to re-articulate their dispute for purposes of preserving their position for appeal and all other proceedings involving the BAYC marks.  Yuga attempts to mischaracterize the Court record by citing to the pre-trial conference order.  But *nowhere* in the pre-trial conference order did Defendants stipulate to ownership of the BAYC marks.  Section 6 of the order contains all stipulated facts and those stipulated facts include only that Yuga released the BAYC collection and various facts about Defendants' activities associated with the RR/BAYC collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts section, but this section again does not contain any admissions regarding "ownership" of the marks.  Rather it merely identifies the asserted marks at issue for the remedies trial—something that Defendants admitted in light of the scope of the remedies trial and to ease this Court's work in adjudicating the remaining issues.  Dkt. 32-1 at 2-3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that Defendants infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an admission of ownership, it is a statement regarding the procedural history in this case that explains that the scope of trial is limited to remedies and does not include infringement.  Had Defendants wanted to stipulate to ownership, they would have clearly and expressly done so—they have not.  Defendants reserve the right to dispute ownership on appeal and in any other proceedings involving the BAYC marks.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 17:**

Indeed, Bloomberg aired a news segment that reported Defendants' infringing NFT collection, under the name "Bored Ape Yacht Club V3," as a top-performing collection. JTX-701, JTX-1049; Dkt. 342 ¶66. The segment discussed only Yuga Labs

1  and Bored Ape Yacht Club. *See* Dkt. 340 ¶10; Dkt. 342 ¶67. As such, the segment

2  made no distinction that this "Bored Ape Yacht Club V3" collection was not

3  associated with the genuine Bored Ape Yacht Club collection, nor did it reference

4  either Defendant. It is apparent that Bloomberg News was under the impression (and

5  giving viewers the impression) that Defendants' infringement was affiliated with or a

6  new "version" of the genuine Bored Ape Yacht Club.

7  **Defendants' Basis of Dispute:**

8  Evidence at trial does not support Yuga's characterization of the Bloomberg

9  Crypto news segment.  Trial Tr. [Solano] 31:3-5; JTX-1049.  Mr. Solano admitted that

10  he had not actually spoken with Bloomberg reporters in order to discern whether they

11  had been confused.  Trial Tr. [Solano] 31:3-5.  Furthermore, Defendants did not create

12  the "Bored Ape Yacht Club V3" title.  Cahen Decl. ¶ 251 (Dkt. 344).  Mr. Cahen

13  believes that the "Bored Ape Yacht Club V3" title was a result of Yuga's DMCA take

14  downs. Cahen Decl. ¶ 253 (Dkt. 344).

15  The Bloomberg Crypto segment centered on the recent cryptocurrency market

16  crash and its impact on the valuation of various cryptocurrency assets.  JTX-1049.

17  During a discussion of the NFT market, Bloomberg news reporters highlighted that

18  NFT valuation had dropped in 2022, along with the valuation of other cryptocurrency

19  assets.  *Id.*  However, during a brief discussion of an "eight percent jump in the NFT

20  index," a chart listing NFT collections appeared behind the Bloomberg reporter.  *Id*.

21  While the chart was displayed, the reporter did not discuss any of the collections.

22  Instead, she highlighted market changes such as volume drops on OpenSea of "almost

23  200%."  *Id.*  As the NFT collections chart was taken down, the reporter said "let's talk

24  a second longer about the Bored Ape Yacht Club collection" before discussing how

25  drops in valuation across the cryptocurrency market have also impacted that Bored

26  Ape Yacht Club's valuation.

27

28

1    Although the NFT collections chart shown during the Bloomberg segment
2    listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter did
3    not spend any time discussing and analyzing the chart. *Id*. She never referenced the
4    Defendants by name, she never referenced Defendants' criticisms of Yuga, and she
5    never even mentioned Yuga. Instead, she briefly mentioned the Bored Ape Yacht
6    Club as the chart was taken down. *Id*. This is unsurprising since the Bored Ape
7    Yacht club was one of the collections listed on the chart. *Id*. However, nothing that
8    the reporter said characterized Defendants' RR/BAYC project as being affiliated with
9    Yuga or the Bored Ape Yacht Club. In fact, the reporter did not compare or contrast
10   any of the listed collections. *Id*. She simply continued to her other talking points. *Id*.

11   Yuga incorrectly claims that Defendants are responsible for the "Bored Ape
12   Yacht Club V3" collection title and the way it was shown on Bloomberg crypto.
13   However, the chart itself displayed that the source of the information was DappRadar,
14   an NFT marketplace. *Id*. This supports Mr. Cahen's testimony that the "Bored Ape
15   Yacht Club V3" title was created by NFT marketplaces after marketplaces complied
16   with Yuga's DMCA takedowns removed the "RR/BAYC" title from their
17   marketplaces. Cahen Decl. ¶ 253 (Dkt. 344).

18   **<u>Plaintiff's Response:</u>**

19   Despite Defendants' objection that they "did not create" the "Bored Ape Yacht
20   Club V3" name, they undeniably marketed their infringing NFT collection under that
21   name. On one occasion, in response to a Tweet by @j1mmy.eth asking what NFT
22   collections consumers were purchasing, Mr. Ripps tweeted "bayc v3." JTX-689. This
23   was the ***<u>same day</u> he created the RR/BAYC smart contract***. Atalay Decl. (Dkt. 337)
24   ¶ 3 ("on May 13, 2022, Defendant Ripps created the Ethereum blockchain smart
25   contract); JTX-600 (showing May 13, 2022 as the creation date). Four days later, Mr.
26   Ripps tweeted a link to a secondary sales marketplace where his infringing NFTs were
27   listed under the name "Bored Ape Yacht Club V3." JTX-690. Defendants have

28

1   offered no evidence that anyone used the "Bored Ape Yacht Club V3" or "bayc v3"

2   names before they used it to promote their collection; the only evidence on this issue

3   shows that Defendants used this name and that they caused confusion in the market

4   where their products were consistently labeled with the BAYC Marks.  Mr. Cahen's

5   "belief" regarding the source of this name makes no difference, as his testimony is

6   provably false, as detailed in Yuga Labs' response to the following objection.

7   Defendants object that the Bloomberg reporter "never referenced the

8   Defendants by name" and "never referenced Defendants' criticisms of Yuga," but this

9   is exactly the point:  the two different products appeared on the ***same chart*** under the

10  ***same name***, with Defendants' collection falsely denoted as a new version of Yuga

11  Labs' genuine NFT collection.  Consumers and even sophisticated market analysts

12  were confused by Defendants infringement and ***did not realize*** that the infringing

13  collection was affiliated with Defendants or meant to express any "criticisms."  This

14  result is not surprising, since Defendants' infringing NFT collection used the BAYC

15  Marks without Defendants' names or any "criticisms" in the NFTs or the smart

16  contract whatsoever.  *See, e.g.*, JTX-28; JTX-600.  Defendants' objection that the

17  Bloomberg reporter did not know that Defendants' infringing collection originated

18  from them or was actually a purported art project only proves the point that

19  Defendants' actions led to confusion in the marketplace where consumers were not in

20  on the scam.

21  **<u>Defendants' Reply:</u>**

22  Yuga fails to present any evidence to support their claim that Bloomberg News

23  reporters were under the impression (and giving viewers the impression) that the

24  RR/BAYC project was affiliated with or a new version of the Bored Ape Yacht Club

25  collection.  JTX-689 and JTX-690 do not show an intentional use of Bayc V3 to

26  confuse.  JTX-689 is a sarcastic response to j1mmy.eth (Mr. McNelis) a Twitter user

27  with longstanding and public disagreements with Mr. Ripps.  Mr. Ripps discussed this

28

1   in his declaration.  Ripps Decl. Dkt. 346 ¶¶ 73-80.  Anybody seeing that Tweet—

2   which did not link to any RR/BAYC NFT materials—would understand that it was

3   sarcastic and meant to mock j1mmy.eth.  Further, it was common on the internet to

4   reference things jokingly as "v3" so this was a common joke that the average crypto

5   enthusiast would understand.  *See* Trial Tr. [Cahen] 255: 1-3 (explaining that it is a

6   common joke that others may have engaged with).  The timing in relationship to the

7   DMCA has no bearing on the proposed finding of fact.

8        Likewise, JTX-690 which purportedly shows a Tweet with v3 only displays

9   "v3" if the mouse is left hovering over the link in a specific way.  The actual body of

10  the Tweet does *not* include the v3 term, and Yuga has shown no evidence that the

11  URL name was not automatically generated.

12       Yuga also cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

13  exhibit does not support a finding of actual confusion.  The chart separately lists both

14  "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

15  understood that these were two different projects.  Additionally, as Mr. Cahen

16  testified, he is not aware of anyone who watched the Bloomberg program and reserved

17  an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

18  344).

19       **Plaintiff's Disputed Post Trial Finding of Fact No. 18, lines 8:13-22:**

20       The Court does not credit Mr. Cahen's testimony that the "V3" designation was

21  "the result of Yuga having repeatedly filed twenty-seven Digital Millennium

22  Copyright Act takedowns directed to the RR/BAYC artwork." Dkt. 344 ¶253. More

23  credible evidence establishes that Mr. Ripps used the "V3" designation before even

24  the first takedown Yuga Labs issued toward the RR/BAYC NFT collection. JTX-689;

25  Dkt. 193-2 ¶93 (undisputed fact that the first takedown notice issued against the

26  RR/BAYC NFTs occurred on May 17, 2022). Mr. Cahen's testimony is not only false

27

28  _____

as to the timing of the "V3" name, but also as to the causal relationship, as the "V3"
name was used by Defendants before any takedown had occurred.

### Defendants' Basis of Dispute:

Mr. Cahen's testimony regarding the "Bored Ape Yacht Club V3" designation
is credible and corroborated by the Bloomberg's citation to DappRadar, an NFT
Marketplace.  Cahen Decl. ¶ 253 (Dkt. 344); JTX-1049.  Defendants never referred to
the RR/BAYC project as "Bored Ape Yacht Club V3."  Cahen Decl. ¶ 253 (Dkt. 344).

Yuga cites the Combined Statement of Fact to assert the "undisputed fact that
the first takedown notice issued against the RR/BAYC NFTs occurred on May 17,
2022."  Dkt. 193-2 ¶ 93.  However, this is incorrect reading of the Combined
Statement of Fact.  Defendants did not dispute that "[t]he May 17, 2022 Takedown
was sent to Foundation marketplace for the RR/BAYC NFT collection and stated:
"[t]he infringing content uses copyrighted material from
https://opensea.io/collection/boredapeyachtclub produced by Yuga Labs without
authorization."  Dkt. 193-2 ¶ 93.  However, Defendants never characterized the May
17, 2022 Takedown as the first takedown.  Mr. Cahen testified that he believed that
Yuga served 27 takedowns but he could not recall when the first one was issued.  Trial
Tr. [Cahen] 252:2- 255:12.

Yuga has failed to cite evidence establishing the date of the first DMCA
takedown notice and, therefore, have not done anything to call into question the
veracity of Mr. Cahen's testimony and timeline.

### Plaintiff's Response:

Defendants' attempt to salvage Mr. Cahen's false testimony is unavailing.  Mr.
Cahen testified under penalty of perjury that the "Bored Ape Yacht Club V3" name
originated after, and as the result of, 27 takedowns of Defendants' infringing NFT
collection.  Cahen Decl. (Dkt. 344) ¶ 253.  He confidently stood by this assertion at
trial.  Trial Tr. at 252:7 ("I believe that that is accurate"); 252:10-12 ("this is my

1  testimony, and I believe that all of my testimony is correct and truthful, yes.");

2  252:20-21 ("as I said, this is my testimony under oath, and I do believe it to be

3  accurate and true."); 252:23-24 ("I believe it is absolutely the result of takedowns that

4  were created by Yuga Labs . . .").

5      There is no basis for Defendants' claim that 27 takedowns occurred before

6  (much less caused) the creation of the "V3" name.  Defendants do not cite to a single

7  document or witness testimony supporting their claim.  To the contrary, Defendants

8  were using the "V3" name before even a *single takedown* occurred.  The timeline of

9  takedown requests Yuga Labs submitted against Defendants' infringing NFT

10  collection was submitted with the Declaration of Kevin Williams as part of the

11  summary judgment record in this case (Dkt. 149-5), and *every single takedown*

12  *request* occurs after Defendants were using the "V3" name to promote their infringing

13  NFT collection.  JTX-689 (May 13, 2022 tweet by Mr. Ripps using "bayc v3"); JTX-

14  1249 (May 14, 2022 tweet by Mr. Ripps showing "Bored Ape Yacht Club V3" as the

15  name of his NFT).

16      Indeed, Mr. Ripps was promoting and marketing "bayc v3" starting on May 13,

17  2022—the ***same day*** **he created the RR/BAYC smart contract**.  Atalay Decl. (Dkt.

18  337) ¶ 3 ("on May 13, 2022, Defendant Ripps created the Ethereum blockchain smart

19  contract); JTX-600 (showing May 13, 2022 as the creation date).  Even if Defendants

20  argue it is a spectacular coincidence that Mr. Ripps started promoting "bayc v3" the

21  same day that he created RR/BAYC NFTs, Defendants concede in their objection

22  immediately below that this date was "before Mr. Ripps even started take commission

23  for RR/BAYC NFTs."  In other words, Defendants argue, and Mr. Cahen testified

24  under oath, that Defendants' NFT collection had been taken down 27 times *before*

25  *primary sales had even begun*.

26      Defendants' false testimony and persistent denial of these facts severely

27  undermines their credibility and discredits their objection.

28

1    **Defendants' Reply:**

2         Yuga mischaracterizes Mr. Cahen's testimony regarding the 27 takedowns. In

3    his declaration, Mr. Cahen stated that "[t]he term "BAYC V3" or "Bored Ape Yacht

4    Club V3," as I understand it, is the result of Yuga having repeatedly filed twenty-

5    seven Digital Millennium Copyright Act takedowns directed to the RR/BAYC

6    artwork. Each time RR/BAYC was relisted, the name would be repopulated with a

7    term that we had no control over."  Cahen Decl. (Dkt. 344) ¶ 253.  It is clear from Mr.

8    Cahen's description of the mechanism through which collections were taken down

9    and new titles were populated upon collections being relisted that he did not testify

10   that all 27 takedowns occurred prior to the "Bored Ape Yach Club V3" title being

11   populated into any marketplace.  Mr. Cahen further clarified this at trial, testifying that

12   "when a DMCA gets filed, certain front-ends will have a name space reserved for that

13   collection. And when the name space is taken down because of a DMCA takedown

14   request, it will then –if the DMCA takedown request is disputed and goes away, then

15   it will generate new name space for that collection."  Trial Tr. [Cahen] at 253:22-

16   254:2.  Mr. Cahen explained the mechanism by describing a single DMCA takedown.

17   *Id*.   Therefore, it is clear that Mr. Cahen specified 27 takedowns in his declaration in

18   order to testify to the absurdly large number of takedowns Yuga imposed, not to

19   suggest that the "Bored Ape Yacht Club V3" title only occurred in marketplaces after

20   all 27 takedowns.  Yuga employs this mischaracterization of Mr. Cahen's testimony in

21   an attempt to fabricate a timeline inconsistency where there is not one, and thereby

22   discredit Mr. Cahen's testimony.

23        Mr. Cahen was clear and consistent in his testimony regarding "Bored Ape

24   Yacht Club V3." Defendants were not involved in creating or promoting the "Bored

25   Ape Yacht Club V3" collection name.  Cahen Decl. ¶ 253 (Dkt. 344); Trial Tr.

26   [Cahen] 252:2-255:12.  Although "Bored Ape Yacht Club V3" was referenced

27   sarcastically and in jest, Defendants did not create "Bored Ape Yacht Club V3" or

28

1   promote it.  Trial Tr. [Cahen] 254:22- 255:12. Yuga has failed to present evidence

2   which contradicts these facts.

3   **Plaintiff's Disputed Post Trial Finding of Fact No. 18, lines 8:22-24:**

4   Further, Mr. Cahen's testimony that "the V3 thing is never something that I

5   used or Ryder used or Ryan Hickman used or Mr. Lehman used" (Dkt. 392 at 253:18-

6   21, 254:24-255:7) is demonstrably false. JTX-689; JTX-1249.

7   **Defendants' Basis of Dispute:**

8   Evidence at trial showed that Defendants were not involved in creating or

9   promoting the "Bored Ape Yacht Club V3" collection name.  Cahen Decl. ¶ 253 (Dkt.

10  344); Trial Tr. [Cahen] 252:2-255:12.  Mr. Cahen admitted that "Bored Ape Yacht

11  Club V3" was referenced sarcastically and in jest, but Defendants did not create

12  "Bored Ape Yacht Club V3" or promote it.  Trial Tr. [Cahen] 254:22- 255:12.

13  Yuga attempts to discredit Mr. Cahen's testimony by providing a narrow quote

14  from the trial transcript, citing two tweets which show Mr. Ripps posting "Bored Ape

15  Yacht Club V3," and claiming that Mr. Cahen was false.  However, Mr. Cahen

16  explained that Defendants had referenced "Bored Ape Yacht Club V3" as a joke.

17  Trial Tr. [Cahen] 254:22-255:12.  If we take each of Yuga's cited tweets in turn, it is

18  clear that they conform with Mr. Cahen's testimony. JTX-689, for example, is a reply

19  Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis question on what NFTs

20  people are buying.  Mr. Ripps's reply is a satirical comment that has absolutely

21  nothing to do with the RR/BAYC collection and, in fact, the comment was made

22  before Mr. Ripps even started take commission for RR/BAYC NFTs.  In JTX-1249,

23  Mr. Ripps tweeted a video screen capture demonstrating that an RR/BAYC NFT was

24  still visible on OpenSea, despite the DMCA takedown.  JTX-1249.  The video shows

25  the RR/BAYC NFT under the "Bored Ape Yacht Club V3" Opensea collection.  *Id.*

26  This video screen capture corroborates Mr. Cahen's explanation regarding where the

27  "Bored Ape Yacht Club V3" designation originated from.  Cahen Decl. ¶ 253 (Dkt.

28

1    344).  Marketplaces, like OpenSea, auto-populated that title after "RR/BAYC" was

2    removed from the marketplace.  Cahen Decl. ¶ 253 (Dkt. 344).

3         Again, Yuga has failed to cite evidence establishing that the date of the first

4    DMCA takedown notice and, therefore, have not done anything to call into question

5    the veracity of Mr. Cahen's testimony and timeline.

6         **<u>Plaintiff's Response:</u>**

7         Defendants' claim that they did not create or promote the "Bored Ape Yacht

8    Club V3" name is false.  As discussed in response to the preceding objection, and as

9    Defendants concede in this objection, Mr. Ripps did promote "the RR/BAYC NFT

10   under the 'Bored Ape Yacht Club V3'" name.  *See also* JTX-689; JTX-1249.

11   Defendants claim that they "referenced 'Bored Ape Yacht Club V3' as a joke,"

12   attempting to provide a justification but ultimately conceding that they did in fact use

13   this name in reference to their NFT collection.  These concessions suffice to prove the

14   proposed finding of fact.  Even so, Defendants' remaining arguments fail.

15        The record shows that the first takedown of the RR/BAYC collection occurred

16   on May 17, 2022.  Dkt. 149-5 (table of takedown requests in summary judgment

17   record).  ***Every single takedown request*** occurs after Defendants were using the "V3"

18   name to promote their infringing NFT collection.  JTX-689 (May 13, 2022 tweet by

19   Mr. Ripps using "bayc v3"); JTX-1249 (May 14, 2022 tweet by Mr. Ripps showing

20   "Bored Ape Yacht Club V3" as the name of his NFT).

21        Defendants also concede this point through their objection.  They argue that

22   May 13, 2022—the same date Mr. Ripps created the RR/BAYC smart contract (JTX-

23   600)—was "before Mr. Ripps even started take [sic] commission for RR/BAYC

24   NFTs."  In other words, Defendants argue, and Mr. Cahen testified under oath, that

25   Defendants' NFT collection had been taken down 27 times ***before primary sales had***

26   ***even begun***.  This is transparently false.  The fact that Mr. Ripps claimed to have used

27   the "bayc v3" name before Defendants sold any NFTs from their collection

28

1    definitively proves the falsity of Mr. Cahen's testimony that this name resulted from

2    "twenty-seven" takedowns of the collection from secondary markets such as OpenSea.

3    Cahen Decl. (Dkt. 344) ¶ 253.

4          Mr. Cahen testified unequivocally that he and his partners "did not promote the

5    RR/BAYC collection as BAYC V3 or Bored Ape Yacht Club V3 and it is not the

6    name of a project that we have ever been involved with or familiar with."  Cahen

7    Decl. (Dkt. 344) ¶ 251.  And again at trial, he testified "the V3 thing is never

8    something that I used or Ryder used or Ryan Hickman used or Mr. Lehman used."

9    Trial Tr. 253:15-21.  When asked again about Mr. Ripps' use of the name "BAYC

10   V3," Mr. Cahen testified "I literally just told you a moment ago that we never used

11   that nomenclature."  Trial Tr. 254:22-25.  He only later testified that it may have been

12   used **by others** "on social media in a sarcastic context and as a joke," but "I myself,

13   nor anyone on my team, ever used that label or name or whatever you want to call it.

14   V3 is something that we have absolutely nothing to do with."  Trial Tr. 255:4-7.

15   When asked if it would "surprise [him] that Mr. Ripps has, in fact, used BAYC V3?",

16   Mr. Cahen finally admitted that Mr. Ripps may have used the term, but it was only

17   "jokes and sarcasm."  Trial Tr. 255:8-12.  The damage to Mr. Cahen's credibility from

18   his repeatedly false testimony is not salvaged by his eventual equivocation and

19   explaining away the issue as a joke.

20         **<u>Defendants' Reply:</u>**

21         Yuga mischaracterizes Mr. Cahen's testimony regarding the 27 takedowns. In

22   his declaration, Mr. Cahen stated that "[t]he term "BAYC V3" or "Bored Ape Yacht

23   Club V3," as I understand it, is the result of Yuga having repeatedly filed twenty-

24   seven Digital Millennium Copyright Act takedowns directed to the RR/BAYC

25   artwork. Each time RR/BAYC was relisted, the name would be repopulated with a

26   term that we had no control over."  Cahen Decl. (Dkt. 344) ¶ 253.  It is clear from Mr.

27   Cahen's description of the mechanism through which collections were taken down

28

1   and new titles were populated upon collections being relisted that he did not testify
2   that all 27 takedowns occurred prior to the "Bored Ape Yach Club V3" title being
3   populated into any marketplace.  Mr. Cahen further clarified this at trial, testifying that
4   "when a DMCA gets filed, certain front-ends will have a name space reserved for that
5   collection. And when the name space is taken down because of a DMCA takedown
6   request, it will then –if the DMCA takedown request is disputed and goes away, then
7   it will generate new name space for that collection."  Trial Tr. [Cahen] at 253:22-
8   254:2.  Mr. Cahen explained the mechanism by describing a single DMCA takedown.
9   *Id*.   Therefore, it is clear that Mr. Cahen specified 27 takedowns in his declaration in
10  order to testify to the absurdly large number of takedowns Yuga imposed, not to
11  suggest that the "Bored Ape Yacht Club V3" title only occurred in marketplaces after
12  all 27 takedowns.  Yuga employs this mischaracterization of Mr. Cahen's testimony in
13  an attempt to fabricate a timeline inconsistency where there is not one, and thereby
14  discredit Mr. Cahen's testimony.

15          Mr. Cahen was clear and consistent in his testimony regarding "Bored Ape
16  Yacht Club V3." Defendants were not involved in creating or promoting the "Bored
17  Ape Yacht Club V3" collection name.  Cahen Decl. ¶ 253 (Dkt. 344); Trial Tr.
18  [Cahen] 252:2-255:12.  Although "Bored Ape Yacht Club V3" was referenced
19  sarcastically and in jest, Defendants did not create "Bored Ape Yacht Club V3" or
20  promote it.  Trial Tr. [Cahen] 254:22- 255:12. Yuga has failed to present evidence
21  which contradicts these facts.

22  **Plaintiff's Disputed Post Trial Finding of Fact No. 19, lines 8:25, 8:27-9:1:**

23          Further demonstrating confusion, Laura O'Laughlin, an expert in designing,
24  administering, and analyzing consumer surveys, conducted two unrebutted surveys
25  with results showing confusion of the BAYC Marks used in connection with
26  RR/BAYC NFTs at net rates of 40.4% on Foundation and 20.0% on OpenSea,

27

28

respectively. JTX-721 ¶¶16, 47, 73; Dkt. 341 (O'Laughlin Decl.) ¶¶13.ac, 16, 47, 48, 73, 81, 82 (admitted into evidence in Dkt. 392 at 140:9-141:13).

**<u>Defendants' Basis of Dispute:</u>**

In support of this finding of fact, Yuga points to Ms. O'Laughlin's reports and designations. As demonstrated at trial, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id.* 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.

*Id.* 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant".  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

### **Plaintiff's Response:**

Defendants' efforts to undermine Ms. O'Laughlin's findings and expert testimony – which are unrebutted by any affirmative or rebuttal expert of their own – lack merit.  The Court has already determined that Ms. O'Laughlin's testimony and the findings in her expert report are "relevant, reliable, and admissible."  Trial Tr. at 141:3-5.  Defendants' arguments to the contrary fail.

1     **Survey Participants:**  Defendants' contention that Ms. O'Laughlin selected an

2    overbroad target population is meritless, as is their argument that this renders her

3    findings unreliable.  The survey audience for both surveys consisted of individuals

4    who indicated that they "(i) have purchased an NFT in the past year using Ethereum,"

5    "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii)

6    have purchased digital art as a collectible in the past year," or "(iv) are considering

7    doing so in the next year."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.  The latter

8    categories of participants were included to account for consumers who may be "in

9    market for digital art or digital collectibles" without having specifically considered

10   NFTs in the past.  Trial Tr. at 148:4-9.  Indeed, as the Court has found, some potential

11   consumers were not necessarily blockchain-savvy NFT purchasers.  SJ Order (Dkt.

12   225) at 12-13.  Ms. O'Laughlin accordingly determined that "consumers can think of

13   NFTs in different ways, and [she] wanted to make sure that [she] got people in the

14   survey who thought about NFTs in the way [NFTs are] referred to in the

15   marketplace."  Trial Tr. at 148:15-18.  *See also* Berger Report at 5 n.2 (observing

16   "NFTs have mostly been associated with digital items such as artwork, images, or

17   videos"); SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible*

18   *Tokens as Digital Goods Under the Lanham Act*, 63 IDEA:  L. Rev. Franklin Pierce

19   Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that

20   exist in a digital space, they are also items that have specific uses and values that are

21   dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-

22   JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) (cleaned up) ("Individuals do

23   not purchase NFTs to own a 'digital deed' divorced from any other asset:  they buy

24   them precisely so that they can exclusively own the content associated with the

25   NFT.").

26        When Defendants and their partners previously agreed that their use of Yuga

27   Labs' marks could be "too confusing to the 'average joe'", who they were targeting,

28

JTX-801.196, Defendants cannot now credibly argue that the "average joe" who may be interested in NFTs as digital collectibles or art should be excluded from the survey population.

**Choice of Survey Formats:**  The Court considered Defendants' argument and rejected it.  Trial Tr. at 141:3–5.  Their position remains meritless.

Though Defendants complain that Ms. O'Laughlin "used two different surveys that are appropriate for different uses," that is exactly the approach called for where—as here—two different marketplaces are being tested for likelihood of confusion. There is no principle dictating that the same survey format must be used in every circumstance, regardless of context in which the marks appear.  *See* Trial Tr. at 142:18-23 ("Q And it is important to be able to identify the right survey methodology for the matter at hand; correct?" / "A I would generally agree with that. However, it's possible that one or many methodologies may be appropriate for a particular matter. So it's not a one or none. It could be a one, many, or none.").

Ms. O'Laughlin surveyed two different contexts in which Defendants misappropriated the BAYC Marks.  She used accepted principles in choosing which survey methodology to use in each context.  On the Foundation marketplace where the parties' NFT collections were not sold at the same time, she used an Eveready survey, which presents participants with only the junior mark.  O'Laughlin Decl. (Dkt. 341) ¶ 17; *see also id.* ¶ 17 n.6 ("In Eveready format surveys involving forward confusion, respondents are presented with only the allegedly infringing mark and asked open-ended questions to assess confusion.").  On the OpenSea marketplace, where the parties NFT collections were sold at the same time, she used a Squirt survey, which presents participants with both the junior and the senior mark.  *Id.* ¶ 18; *see also* ¶ 18 n.7 ("In Squirt format surveys involving forward confusion, respondents are presented with both parties' marks and asked closed-ended questions to assess confusion.").

There is nothing inconsistent about using the appropriate survey in the appropriate context to best replicate market conditions.

Accordingly, Courts regularly credit survey expert testimony that employs both Eveready and Squirt survey formats in the same litigation.  *See, e.g.*, *Icleen Entwicklungs-Und Vertiebsanstalt Für Umweltprodukte v. Blueair AB*, No. 21-cv-2236 DSF (ADS), 2021 WL 6104397, at *8-9 (C.D. Cal. Oct. 4, 2021) (crediting testimony relying on both Eveready and Squirt formats in ruling on a preliminary injunction); *Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 977 (D. Minn. 2017) (same); *GoSMiLE, Inc. v. Levine*, 769 F. Supp. 2d 630, 642-43 (S.D.N.Y. 2011) (same).

Though strength of the marks is one factor that can guide the choice of survey methodology, it is not determinative as Defendants suggest.  *See, e.g.*, Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 737 (2016) ("Where, in sum, marks are not *proximate*, an Eveready is likely the only format available; and even as to proximate marks, an Eveready may always be offered (possibly in response to complaint allegations of trademark strength) in conjunction with a Squirt to negate the reach capabilities of a brand.") (footnote omitted). Defendants' argument that Ms. O'Laughlin should have based her choice of methodology on strength of the marks alone contradicts established principles.

**Calculation of Confusion Rate:**  The operative questions in calculating the net confusion rate in Ms. O'Laughlin's Foundation/Eveready survey were "Who or what entity do you believe puts out the NFT collection you saw?" and "What other entity or entities do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever puts out the NFT collection you saw?"  O'Laughlin Decl. (Dkt. 341) ¶¶ 45-46.  Defendants aver, without any authority or expert testimony, that Ms. O'Laughlin's Foundation/Eveready survey was "unreliable" and "biased" because she only considered respondents who identified the source of

1   Defendants' Foundation webpage as "Bored Ape Yacht Club" to be confused and did

2   not count those who mentioned "Chill Gorilla Boat Crew."  This argument has no

3   merit and demonstrates a fundamental misunderstanding of the purpose of a control in

4   an Eveready survey.  *See* Trial Tr. at 156:16-157:14.

5         Ms. O'Laughlin's Foundation/Eveready survey employs a test/control

6   experimental design where respondents are randomly assigned to one of two groups

7   and exposed to stimuli that are identical but for the at-issue characteristic(s) being

8   tested.  Ms. O'Laughlin compared the share of respondents who associate the

9   Defendants' Foundation webpage with "Bored Ape Yacht Club," when shown the

10  page ***as it actually appeared in the real world*** with the at-issue BAYC Marks (BAYC

11  test group), versus when shown a modified page that used an alternative to the at-issue

12  BAYC Marks (CGBC control group).  By comparing the share of respondents who

13  believe that the source of the Foundation page collection is "Bored Ape Yacht Club"

14  in both the test and control groups, Ms. O'Laughlin was able to measure the rate of

15  confusion attributable specifically to Defendants' actual use of the BAYC Marks.

16        Ms. O'Laughlin's Eveready survey and analysis are not methodologically

17  flawed.  Consistent with standard Eveready survey practice, Ms. O'Laughlin's

18  analysis counts mentions of the "Bored Ape Yacht Club" in both the test and control

19  groups, but does not count mentions of "Chill Gorilla Boat Crew" in the control group

20  when calculating net confusion.  This is consistent with the approach taken by other

21  leading trademark survey experts in Eveready survey analysis for forward confusion

22  cases.  *See* JTX-1122 at 210-11.  All other characteristics of the stimuli, including the

23  alternative mark in the control group, are not at issue and therefore are not considered

24  when calculating confusion.  Accordingly, it would be nonsensical to count

25  respondents who mention Chill Gorilla Boat Crew as confused.

26        Moreover, Defendants argue that respondents in the test group "merely copied

27  text from the images that they were shown," after seeing the Defendants' Foundation

28

webpage, and essentially complain that the survey is biased because the prominence of the BAYC Marks in the stimuli would lead anyone to believe the Foundation webpage is associated with the "Bored Ape Yacht Club" or "BAYC" NFT collection. The complaint though is of the Defendants' own making.  The stimuli used in Ms. O'Laughlin's Foundation/Eveready survey reflects the Defendants' explicit and blatant infringement found on their own Foundation webpage *as it actually appeared in the real world*, which simply demonstrates the egregious and deceptive nature of Defendants' use of the BAYC Marks.  *See* JTX 28; JTX 1557.

Indeed, the fact that many survey respondents associated Defendants' Foundation webpage with "Bored Ape Yacht Club" and the modified control version of the webpage with "Chill Gorilla Boat Crew" highlights how respondents (and consumers more broadly) rely on collection names and logos to communicate the source of an NFT collection.  The Court has already found that "the BAYC Marks are both conceptually and commercially strong," SJ Order (Dkt. 225) at 10-11, and they accordingly serve as a designation of origin to actual and prospective consumers as they did in Ms. O'Laughlin's surveys.

Finally, Ms. O'Laughlin's survey specimens reflected Defendants' marketing when they promoted themselves as the top selling NFT collection, and at a time when even Bloomberg was confused as to whether Defendants' infringing NFTs were indeed a Bored Ape Yacht Club collection.  This period is also when Defendants claim the majority of their sales occurred.  The survey reflects the main secondary marketplace for Defendants' NFTs during their most significant promotional period.

## **Defendants' Reply:**

Yuga conflates the fact that Ms. O'Laughlin's testimony was admitted to argue that it should be given weight.  However, the Court noted "counsel will have an opportunity to fully expose any limitations or flaws during cross-examination."  Trial Tr. 141:8-10.  Admission, of an expert's testimony, of course, has nothing to do with

1   weight.  It is also black letter law that an expert's testimony can be exposed as
2   unreliable through cross examination alone.  *See City of Pomona v. SQM N. Am.*
3   *Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be
4   attacked by **cross examination**") (emphasis added).  Yuga's rule requiring a rebuttal
5   expert is unfounded and would increase the cost of litigation far beyond what can be
6   reasonably expected of most litigants.

7          Yuga attempts to defend its selection of survey participants who may not even
8   know what an NFT is.  We agree with Yuga that the survey flow includes "individuals
9   who indicated that they "(i) have purchased an NFT in the past year using Ethereum,"
10  "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "*(iii)*
11  *have purchased digital art as a collectible in the past year," or "(iv) are considering*
12  *doing so in the next year*."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.  Yuga's
13  citations to people conflating digital art with purchasing an NFT do not assist it.
14  While it is true that perhaps some consumers do not buy it as a "digital deed" divorced
15  from the art, one must be aware of what you are purchasing.  Ms. O'Laughlin, who
16  admittedly did not know what an NFT was at the time she conducted the survey as she
17  was unaware that it was not cryptocurrency, never asked the digital art respondents if
18  they were aware of NFTs.  Trial Tr. [O'Laughlin] 152:11-14; 147:12-14 (erroneously
19  admitting that cryptocurrency was an NFT).  To the extent Yuga is trying to
20  rehabilitate its flawed survey population through Ms. O'Laughlin's expertise on
21  NFTs, she admittedly is not one and lacked even below basic knowledge on NFTs at
22  the time she conducted her research.  *Id.* at 147:4-12.  Yuga also states that
23  Defendants are wrongly arguing to exclude "average Joes" who might be interested in
24  buying NFTs. That is not what Defendants argue at all.  If the survey was limited to
25  the average NFT consumer, then the survey population would possibly be adequate.  It
26  however swept further and included people who likely have no interest in NFTs or
27  even knowledge about what an NFT is.  Lastly, Yuga never addresses that Ms.

28

O'Laughlin admittedly broadened the survey population to include the non-interested persons *after* her team accessed the results.  *Id.* 144:25-146:7

Ms. O'Laughlin's use of two different marks was also exposed on cross examination as being incorrect and is contrary to her prior practice and writings.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark.  Ms. O'Laughlin's consistent position has been that mark strength is the most important factor for choosing surveys.  *Id.* at 143:6-144:6. Ms. O'Laughlin further admitted that she had never presented two surveys in one case, thus breaking from her prior practice.  Trial Tr. [O'Laughlin] 144:19-23.

Yuga's citation to authority to support Ms. O'Laughlin's decision to run two contradictory surveys does not help it.  All of those citations implicate preliminary injunctions, not trials on the merits.  Further, they do not address the fundamental issue which is that Ms. O'Laughlin consistently has represented that strength matters for the survey selection.  *See* Trial Tr. [O'Laughlin] 143:6-144:1.  Instead, here she decided not to even investigate strength and just present to surveys.  *See id.* at 144:12-18.

Yuga's defense of the confusion rate it calculated misapprehends the basic problem.  The survey did not show those how actually were confused at all.  In fact, only two out of 505 respondents even mentioned Yuga Labs.  *See* Trial Tr. [O'Laughlin] 155:18-156:1. All the survey showed was that people know how to read. "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion.  *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) (holding that survey had limited weight as a reading test). Ms. O'Laughlin makes the sweeping claim that there was an extensive amount of confusion based on her Eveready survey

1    because 49% of test group respondents were confused.  *See* JTX-310 at Figure 9.  Of

2    these, almost all of them wrote the screen prompt exactly.  In the control group, 27%

3    of test group respondents wrote "Chill Gorilla Boat Crew"—the on-screen stimulus,

4    and were not counted as confused.  *See* Trial Tr. [O'Laughlin] 157: 9-14.  Notably,

5    Ms. O'Laughlin was not able to provide an explanation for writing "Chill Gorilla Boat

6    Crew" besides rank copying.  *Id.* at 157:25-158:7 (calling fact that people simply

7    copied on screen stimuli "not surprising").  It is undisputed that Ms. O'Laughlin did

8    nothing to control for people merely copying on-screen stimuli which likely

9    comprised about 2/3 of the test group's "confusion" answers if the test and control

10   groups were similar.  It is also impossible to untangle which of the survey respondents

11   who were counted as confused were merely copying the screen, and which were

12   actually confused.  As such, the result should be disregarded as whole.

13        Lastly, Yuga appears to concede that Ms. O'Laughlin's survey specimens are

14   limited in time by arguing that it covers the biggest promotional period for

15   Defendants.  Ms. O'Laughlin's opinions are therefore limited to June 19 and June 20,

16   2022 for the Squirt survey.  Trial Tr. [O'Laughlin] 165:1-11; 15:22.  They are

17   likewise limited to June 21-24.  *Id.* at 163:11-164:17.

18             **Plaintiff's Disputed Post Trial Finding of Fact No. 19, lines 9:2-4:**

19        The Court concludes that the sale and promotion of RR/BAYC NFTs on

20   secondary marketplaces was likely to cause confusion among purchasers.

21                          **Defendants' Basis of Dispute:**

22        Given all of the fundamental flaws with both surveys Ms. O'Laughlin presented

23   as foundational to her opinion on confusion, her surveys cannot serve as the basis of a

24   finding that there was confusion on the secondary market.  *See* supra. ¶ No. 19, lines

25   8:25, 8:27-9:1.  The surveys included overly-broad, non-representative samples that

26   answered with priming effects that were not controlled for by Ms. O'Laughlin.  *See*

27   supra. ¶ No. 19, lines 8:25, 8:27-9:1.

28

1   Yuga's witnesses admitted that they could not identify a single confused

2   consumer.  *See* Trial Tr. [Solano] 18:18-19:15 ("I cannot" answer by Solano when

3   asked if he could identify a single confused consumer); [Muniz] 85:3-7 (Muniz

4   admitting she could not name a single confused consumer).  On the contrary,

5   Defendants demonstrated that they were receiving fan mail from consumers on the

6   secondary market.  *See* JTX-2035; Ripps Decl. ¶ 204 (Dkt. 346) (uncontested).

7   Because Yuga presented no evidence of a single confused consumer on the secondary

8   market, and Ms. O'Laughlin's fundamentally flawed survey should be provided no

9   weight, Yuga has failed to show any confusion on the secondary market.

10          **Plaintiff's Response:**

11   The Court has already held that Defendants' infringement was likely to cause

12   confusion.  SJ Order (Dkt. 225) at 13 ("[T]he Court easily concludes that Defendants'

13   use of Yuga's BAYC Marks was likely to cause confusion.").  This is an adjudicated

14   issue that is only reinforced by the evidence at trial.  *See also supra* ¶ 4 (ample

15   evidence in the record of likelihood of confusion, as well as actual confusion).  This

16   evidence is not negated by Defendants' citation to third-party, unreliable

17   communications.  *Id.*

18   Even so, Defendants fail to discredit Ms. O'Laughlin's unrebutted survey

19   evidence for the reasons discussed in response to the preceding objection.  *Supra* ¶ 19

20   (lines 8:25, 8:27-9:1).

21          **Defendants' Reply:**

22   The Court has never held that there was a likelihood of confusion on secondary

23   markets.  Further, to the extent the issue was decided, the issue of the extent of that

24   confusion is still live.  Defendants presented evidence that people knew what they

25   were buying on the Secondary market.  *See* JTX-2035; Ripps Decl. ¶ 204 (Dkt. 346)

26   (uncontested).  Yuga by contrast admitted they could not point to a single confused

27   buyer, whether on the secondary market or primary market.  Trial Tr. [Solano] 18:18-

28

19:15 ("I cannot" answer by Solano when asked if he could identify a single confused consumer); [Muniz] 85:3-7 (Muniz admitting she could not name a single confused consumer).

Lastly for reasons stated above, Ms. O'Laughlin was thoroughly rebutted on cross examination for her survey which involved an overly broad sample and only tested the literacy of the respondents.

**Plaintiff's Disputed Post Trial Finding of Fact No. 20, lines 9:5-9:**

<u>This confusion resulted in harm to Yuga Labs. As Ms. Muniz testified, she received reports and concerns about confusion and the BAYC NFT collections' loss of exclusivity caused by Defendants' NFT collection, including because it was misleadingly labeled as the same as the BAYC collection (or at times, a "V3" of BAYC).</u> Dkt. 340 ¶¶11, 16, 17.

**Defendants' Basis of Dispute:**

These reports of harm are unsubstantiated and not credible and Yuga provides no documentary support for them.  Specifically, Yuga used e-mail and instant messaging to communicate for business. Trial Tr. [Muniz] 85:24-86:4.  And yet, Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga.  Trial Tr. [Muniz] 87:17-88:6.  Yuga was also unable to identify any documentation of any press inquiries related to the RR/BAYC collection.  Trial Tr. [Muniz] 88:7-89:2. Further, Yuga could not identify a single email, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from any brand partner that mentions changes in negotiating dynamics with brand partners as a result of the RR/BAYC collection.  Trial Tr. [Muniz] 101:7-12. ("Q. Did you identify a single e-mail, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from

1   any brand partner that mentions any of these concerns at all? A No, it was phone calls

2   and e–ails -- I mean, phone calls and Zooms.").  Ultimately, Yuga did not mention

3   RR/BAYC in any of its quarterly reports to its investors.  Trial Tr. [Muniz] 89:18-23.

4        Additionally, the evidence at trial showed that Mr. Ripps, Mr. Cahen, Mr.

5   Hickman, and third-party Mr. Lehman did not use BAYC V3 or Bored Ape Yacht

6   Club V3 to suggest that the RR/BAYC project had any affiliation with Yuga or to

7   confuse any purchaser.  Trial Tr. [Cahen] 253:18-21, 254:24-255:3.  The term "BAYC

8   V3" was, however, referenced on social media in a sarcastic context and as a joke.

9   Trial Tr. [Cahen] 254:25-255:2.  Some third-party resellers also auto-generated the

10  terms "Bored Ape Yacht Club V3" or "BAYC V3," including when generating a new

11  name space after resolution of requests pursuant to the Digital Millennium Copyright

12  Act.  Trial Tr. [Cahen] 253:22-254:7.  Mr. Ripps and Mr. Cahen had no control over

13  and no affiliation with those third parties who auto-generated "Bored Ape Yacht Club

14  V3" or "BAYC V3."  Trial Tr. [Cahen] 254:3-7.

15       Finally, the evidence Yuga cites to is unsupportive as it includes only Ms.

16  Muniz's unsubstantiated reports of concerns raised, none of which appeared in even a

17  single piece of contemporaneous documentation.

18       **<u>Plaintiff's Response:</u>**

19       Likelihood of confusion is an adjudicated issue, which was separately proven

20  again by the evidence at trial.  *See also supra* ¶ 4 (ample evidence in the record of

21  likelihood of confusion, as well as actual confusion).

22       Additionally, Yuga Labs' evidence of harm to its brand is overwhelming,

23  credible, and unrebutted.  Ms. Muniz's testimony describes how three separate

24  significant business relationships were damaged by Defendants' infringement.  Muniz

25  Decl. (Dkt. 340) ¶ 16.  It also harmed relationships with investors (*id.* ¶ 17) and

26  community members (*id.* ¶ 15).  Mr. Solano testified how Defendants' infringing NFT

27  collection was launched to coincide with ApeFest 2022 and to interfere with Yuga

28

1    Labs' branding efforts within the NFT community.  Solano Decl. (Dkt. 342) ¶¶ 39-40.

2    Defendants are well aware of investors' knowledge of the harm caused by Defendants,

3    as Defendants deposed Yuga Labs' investors during this litigation.

4         Dr. Berger's unrebutted expert report (JTX-722) and testimony further explain

5    how Defendants' "minting and sales of RR/BAYC NFTs using Yuga Labs' marks

6    harmed the brand equity of BAYC for multiple reasons," including by diminishing the

7    "perceived exclusivity of authentic BAYC NFTs," causing confusion, and damaging

8    "consumer attitudes toward the BAYC brand."  JTX-722 ¶ 11; *see also* Berger Decl.

9    (Dkt. 339) ¶¶ 62-92; 340.

10        Furthermore, it is a red herring that Yuga Labs did not produce emails and texts

11   of internally discussion of confusion—Yuga Labs was not required to do so in

12   discovery, and the absence of such documents at trial proves nothing.  The Court

13   previously ruled that given the publicly available evidence of confusion and the

14   evidence within Defendants' possession, it was not proportionate to the needs of the

15   case for Yuga Labs to search its internal communications regarding confusion.  Dkt.

16   87 at 2 (denying motion to compel production of further "documents on lack of

17   consumer confusion").  As the Court found, Yuga Labs' extensive enforcement efforts

18   "related to Defendants' confusing use of Yuga's marks," among other evidence, was

19   sufficient to demonstrate confusion.  *Id.*  Further, there is abundant evidence of actual

20   confusion in this case unique to Defendants' infringing NFTs.  *See, e.g.*, JTX-701 and

21   JTX-1049 (Bloomberg news segment reporting Defendants' infringing NFT

22   collection, under the name "Bored Ape Yacht Club V3"); JTX-705 (Twitter bot

23   misreporting sale of Defendants' infringing NFT as "Bored Ape Yacht Club" NFT);

24   JTX-1029 (noting "confusion in these comments" in response to JTX-705); JTX-1030

25   (comment indicating confusion).  Even Defendants' business partner, Mr. Lehman

26   admitted to confusion, agreed to a consent judgment admitting to this confusion, and

27   warned Defendants about the confusion.  JTX 1; JTX 621.  That Yuga Labs did not

28

1  produce further documentation of confusion does not establish that confusion did not

2  exist or undermine the substantial other evidence.

3  Finally, Defendants' argument that Mr. Ripps did not use the V3 reference is

4  false, as proven by his own Tweets.  Mr. Ripps tweeted, in response to a Tweet by

5  @j1mmy.eth asking what NFT collections consumers were purchasing, "bayc v3."

6  JTX-689.  This was the ***same day he created the RR/BAYC smart contract***.  Atalay

7  Decl. (Dkt. 337) ¶ 3; JTX-600.  Four days later, Mr. Ripps tweeted a link to a

8  secondary sales marketplace where his infringing NFTs were listed under the name

9  "Bored Ape Yacht Club V3."  JTX-690.  Defendants have offered no evidence that

10  anyone used the "Bored Ape Yacht Club V3" or "bayc v3" names before they used it

11  to promote their collection; the only evidence on this issue shows that Defendants

12  used this name and that they caused confusion in the market where their products were

13  consistently labeled with the BAYC Marks.  And, Defendants now concede (*supra*

14  ¶ 18) that they *did* use these names in connection with their NFT collection, although

15  they now incredibly claim it was only as a "joke."

16  **Defendants' Reply:**

17  Yuga's response is inaccurate.  As discussed above, the record shows that there

18  was no evidence of confusion presented at trial and that the issue of confusion and its

19  relation to damages was not an adjudicated issue.  *See supra* ¶ 4.

20  Second, evidence of harm to Yuga's brand is certainly not "overwhelming,

21  credible, and unrebutted."  Specifically, Yuga relies on the unsubstantiated testimony

22  of Ms. Muniz about various interactions she had with brands that she has no

23  documentary support for.  *See* Trial Tr. [Muniz] 101:7-12.  Additionally, Yuga cites to

24  Mr. Solano's unfounded assumption about when the RR/BAYC NFT collection was

25  released.  Solano Decl. (Dkt. 342) ¶¶ 39-40.  Further, Ms. Kindler did not quantify this

26  supposed harm.  *See* Kindler Decl. ¶ 64 (Dkt. 338) ("I have not quantified the extent

27  to which the confusion impacted Yuga Labs' business partnerships…"); Kindler Decl.

28

¶ 65 (Dkt. 338) ("I have not quantified the extent to which Defendants' wrongful
conduct negatively impacted the value of Yuga Labs' goodwill…");

Third, Yuga incorrectly argues that Dr. Berger's report explains how Yuga's
brand was harmed.  The evidence at trial showed that Dr. Berger's limited analysis did
not establish that the minting of RR/BAYC NFTs was the source of the alleged brand
harm.  Although Dr. Berger acknowledged that several different causes could have
impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of
harm in his analysis.  Trial Tr. [Berger] 108:7-109:4; 115:16-25.  He limited his
analysis to the period from May 6, 2022, to late June, and completely disregarded
events leading up to that period.  Trial Tr. [Berger] 106:1-3.  For instance, Dr.
Berger's analysis ignored the Otherside scandal, which occurred mere days before his
chosen analysis period.  Trial Tr. [Berger] 113:10-114:2; JTX-2715.  Dr. Berger even
ignored events, like the general downturn of the cryptocurrency market, which
occurred during his analysis period. Trial Tr. [Berger] 109:5-110:5; JTX-306.
At trial, Dr. Berger claimed that the presence of other potential causes of brand harm
does not dilute the hypothesis that the minting of RR/BAYC NFTs caused brand
harm.  Trial Tr. [Berger] 115:19-25.  However, in ignoring other potential causes of
harm, Dr. Berger has not been able to establish which factors caused harm or quantify
the harm of any given factor.  Indeed, Dr. Berger failed to quantify any alleged harm
to Yuga's brand equity, goodwill, or reputation.  *See generally* Berger Decl.; Dkt. 343
at 15.

Fourth, Yuga's citations to the Court's order on motions to compel document
production in this case miss the mark.  Not only did Yuga not produce any
documentary evidence to support these claims of brand harm, Ms. Muniz testified that
none existed despite the companies use of various platforms of communication.  Trial
Tr. [Muniz] 101:7-12. ("Q. Did you identify a single e-mail, text message, or any
other contemporaneous written communication from any brand partner or repeating

1  any communication from any brand partner that mentions any of these concerns at all?

2  A No, it was phone calls and e–ails -- I mean, phone calls and Zooms.").

3        Fifth, as explained *supra* ¶ 4, there is extensive evidence that there was no

4  confusion and the exhibits Yuga cites to are unsupportive.  Yuga cites to a screenshot,

5  JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual

6  confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape

7  Yacht Club V3" indicating that the anchor understood that these were two different

8  projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched

9  the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga

10  collection.  Cahen Decl. ¶ 252 (Dkt. 344).

11        Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

12  credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

13  case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

14  case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

15  entered after Mr. Lehman settled his own case with Yuga.

16         Yuga also cites to JTX-1029, which includes a tweet from GemBot, which is

17  an automated software application and not evidence of a real person's confusion. *See*

18  Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users

19  identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no

20  indication that any of the Twitter users commenting actually reserved an RR/BAYC

21  NFT.

22        Finally, as outlined in our objection above, the evidence at trial showed that Mr.

23  Ripps, Mr. Cahen, Mr. Hickman, and third-party Mr. Lehman did not use BAYC V3

24  or Bored Ape Yacht Club V3 to suggest that the RR/BAYC project had any affiliation

25  with Yuga or to confuse any purchaser.  Trial Tr. [Cahen] 253:18-21, 254:24-255:3.

26  The term "BAYC V3" was, however, referenced on social media in a sarcastic context

27  and as a joke.  Trial Tr. [Cahen] 254:25-255:2.  Further, Yuga decided not to cross-

28

examine Mr. Ripps regarding this issue and cannot backdoor said questioning of his

correspondence through its response to a finding of fact.

### Plaintiff's Disputed Post Trial Finding of Fact No. 20, lines 9:9-11:

These instances of marketplace confusion harmed the perception of the BAYC

brand and Yuga Labs' negotiating position in obtaining new deals under the BAYC

brand. *See* Dkts. 340 ¶¶15-17; 342 ¶29.

### Defendants' Basis of Dispute:

These reports of harm are unsubstantiated and not credible and Yuga provides

no documentary support for them.  Specifically, Yuga used e-mail and instant

messaging to communicate for business.  Trial Tr. [Muniz] 85:24-86:4.  And yet,

Yuga could not identify a single e-mail or text message discussing (1) confusion

associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how

RR/BAYC uniquely caused any problems in the day-to-day business operations of

Yuga.  Trial Tr. [Muniz] 87:17-88:6.  Yuga was also unable to identify any

documentation of any press inquiries related to the RR/BAYC collection.  Trial Tr.

[Muniz] 88:7-89:2.  Further, Yuga could not identify a single email, text message, or

any other contemporaneous written communication from any brand partner or

repeating any communication from any brand partner that mentions changes in

negotiating dynamics with brand partners as a result of the RR/BAYC collection.

Trial Tr. [Muniz] 101:7-12. ("Q. Did you identify a single e-mail, text message, or any

other contemporaneous written communication from any brand partner or repeating

any communication from any brand partner that mentions any of these concerns at all?

A No, it was phone calls and e–ails -- I mean, phone calls and Zooms.").  Ultimately,

Yuga did not mention RR/BAYC in any of its quarterly reports to its investors.  Trial

Tr. [Muniz] 89:18-23.

1      Finally, the evidence Yuga cites to is unsupportive as it includes only Ms.

2   Muniz and Mr. Solano's unsubstantiated reports of concerns raised, none of which

3   appeared in even a single piece of contemporaneous documentation.

4                  **Plaintiff's Response:**

5      Likelihood of confusion is an adjudicated issue that is only reinforced by the

6   evidence at trial.  *See also supra* ¶ 4 (ample evidence in the record of likelihood of

7   confusion, as well as actual confusion).

8      Additionally, Yuga Labs' evidence of harm to its brand is overwhelming,

9   credible, and unrebutted.  *Supra* ¶ 20 (lines 9:5-9).

10      Dr. Berger's unrebutted expert report (JTX-722) and testimony further explain

11   how Defendants' "minting and sales of RR/BAYC NFTs using Yuga Labs' marks

12   harmed the brand equity of BAYC for multiple reasons," including by diminishing the

13   "perceived exclusivity of authentic BAYC NFTs," causing confusion, and damaging

14   "consumer attitudes toward the BAYC brand."  JTX-722 ¶ 11; *see also* Berger Decl.

15   (Dkt. 339) ¶¶ 62-92; 340.

16      Furthermore, it is a red herring that Yuga Labs did not produce emails and texts

17   of internally discussion of confusion—Yuga Labs was not required to do so in

18   discovery, and the absence of such documents at trial proves nothing.  The Court

19   previously ruled that given the publicly available evidence of confusion and the

20   evidence within Defendants' possession, it was not proportionate to the needs of the

21   case for Yuga Labs to search its internal communications regarding confusion.  Dkt.

22   87 at 2 (denying motion to compel production of further "documents on lack of

23   consumer confusion").  As the Court found, Yuga Labs' extensive enforcement efforts

24   "related to Defendants' confusing use of Yuga's marks," among other evidence, was

25   sufficient to demonstrate confusion.  *Id.*  Further, there is abundant evidence of actual

26   confusion in this case unique to Defendants' infringing NFTs.  *See, e.g.*, JTX-701 and

27   JTX-1049 (Bloomberg news segment reporting Defendants' infringing NFT

28

collection, under the name "Bored Ape Yacht Club V3"); JTX-705 (Twitter bot
misreporting sale of Defendants' infringing NFT as "Bored Ape Yacht Club" NFT);
JTX-1029 (noting "confusion in these comments" in response to JTX-705); JTX-1030
(comment indicating confusion).  Even Defendants' business partner, Mr. Lehman
admitted to confusion, agreed to a consent judgment admitting to this confusion, and
warned Defendants about the confusion.  JTX 1; JTX 621.  That Yuga Labs did not
produce further documentation of confusion does not establish that confusion did not
exist or undermine the substantial other evidence.

**Defendants' Reply:**

Yuga's response is inaccurate.  As discussed above, the record shows that there
was no evidence of confusion presented at trial and that the issue of confusion and its
relation to damages was not an adjudicated issue.  *See supra* ¶ 4.

Second, evidence of harm to Yuga's brand is certainly not "overwhelming,
credible, and unrebutted."  Specifically, Yuga relies on the unsubstantiated testimony
of Ms. Muniz about various interactions she had with brands that she has no
documentary support for.  *See* Trial Tr. [Muniz] 101:7-12.  Additionally, Yuga cites to
Mr. Solano's unfounded assumption about when the RR/BAYC NFT collection was
released.  Solano Decl. (Dkt. 342) ¶¶ 39-40.  Further, Ms. Kindler did not quantify this
supposed harm.  *See* Kindler Decl. ¶ 64 (Dkt. 338) ("I have not quantified the extent
to which the confusion impacted Yuga Labs' business partnerships…"); Kindler Decl.
¶ 65 (Dkt. 338) ("I have not quantified the extent to which Defendants' wrongful
conduct negatively impacted the value of Yuga Labs' goodwill…").

Third, Yuga incorrectly argues that Dr. Berger's report explains how Yuga's
brand was harmed.  The evidence at trial showed that Dr. Berger's limited analysis did
not establish that the minting of RR/BAYC NFTs was the source of the alleged brand
harm.  Although Dr. Berger acknowledged that several different causes could have
impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of

harm in his analysis.  Trial Tr. [Berger] 108:7-109:4; 115:16-25.  He limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period.  Trial Tr. [Berger] 106:1-3.  For instance, Dr. Berger's analysis ignored the Otherside scandal, which occurred mere days before his chosen analysis period.  Trial Tr. [Berger] 113:10-114:2; JTX-2715.  Dr. Berger even ignored events, like the general downturn of the cryptocurrency market, which occurred during his analysis period. Trial Tr. [Berger] 109:5-110:5; JTX-306. At trial, Dr. Berger claimed that the presence of other potential causes of brand harm does not dilute the hypothesis that the minting of RR/BAYC NFTs caused brand harm.  Trial Tr. [Berger] 115:19-25.  However, in ignoring other potential causes of harm, Dr. Berger has not been able to establish which factors caused harm or quantify the harm of any given factor.  Indeed, Dr. Berger failed to quantify any alleged harm to Yuga's brand equity, goodwill, or reputation.  *See generally* Berger Decl.; Dkt. 343 at 15.

Fourth, Yuga's citations to the Court's order on motions to compel document production in this case miss the mark.  Not only did Yuga not produce any documentary evidence to support these claims of brand harm, Ms. Muniz testified that none existed despite the companies use of various platforms of communication.  Trial Tr. [Muniz] 101:7-12. ("Q. Did you identify a single e-mail, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from any brand partner that mentions any of these concerns at all? A No, it was phone calls and e–ails -- I mean, phone calls and Zooms.").

Fifth, as explained *supra* ¶ 4, there is extensive evidence that there was no confusion, and the exhibits Yuga cites to are unsupportive.  Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different

projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.

### Plaintiff's Disputed Post Trial Finding of Fact No. 21, lines 9:13-14:

Professor Jonah Berger, an expert in brand equity and consumer behavior, found that Defendants' minting and sales of RR/BAYC NFTs harmed Yuga Labs' brand equity, goodwill, and reputation. JTX-722 ¶¶11, 12, 64-92; Dkts. 271; 339 ¶¶62-92; 340 ¶¶16-17; Dkt. 342 ¶¶62-87.

### Defendants' Basis of Dispute:

Evidence at trial shows that Dr. Berger's limited analysis did not establish that the minting of RR/BAYC NFTs was the source of the alleged brand harm.  Although Dr. Berger acknowledged that several different causes could have impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of harm in his analysis.  Trial Tr. [Berger] 108:7-109:4; 115:16-25.  He limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period.  Trial Tr. [Berger] 106:1-3.  For instance, Dr. Berger's analysis ignored

the Otherside scandal, which occurred mere days before his chosen analysis period. Trial Tr. [Berger] 113:10-114:2; JTX-2715.  Dr. Berger even ignored events, like the general downturn of the cryptocurrency market, which occurred during his analysis period. Trial Tr. [Berger] 109:5-110:5; JTX-306.

At trial, Dr. Berger claimed that the presence of other potential causes of brand harm does not dilute the hypothesis that the minting of RR/BAYC NFTs caused brand harm.  Trial Tr. [Berger] 115:19-25.  However, in ignoring other potential causes of harm, Dr. Berger has not been able to establish which factors caused harm or quantify the harm of any given factor.  Indeed, Dr. Berger failed to quantify any alleged harm to Yuga's brand equity, goodwill, or reputation.  *See generally* Berger Decl.; Dkt. 343 at 15.

**Plaintiff's Response:**

**Dr. Berger's Report Discredited Defendants' Alternative Harms Argument:**  Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs."  Trial Tr. at 115:16-117:10; 121:23-123:8.  Dr. Berger specifically considered, and rejected, whether the share of Tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share of positive sentiment was decreasing; he found that the data are inconsistent with that alternate hypothesis, thus ruling out any supposed alternative causes preceding the release of RR/BAYC NFTs.  Berger Decl. (Dkt. 339) at n.55.

In addition, Dr. Berger has not seen any evidence to support Defendants' hypothesis.  Trial. Tr. 119:21-25.  Nevertheless, as the Court has already found this case is about Defendants' commercial infringement.  SJ Order (Dkt. 255) at 16 ("These are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."); *see also* June 9, 2023

Pretrial Conference Tr. at 8–10 (Defense counsel acknowledging "there is a difference between the criticism and the sales of the product.").  Nothing in Defendants' supposed false criticism negates that:  (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

Defendants did not object to the admissibility of Dr. Berger's testimony.  Dkt. 366.

### **Defendants' Reply:**

Using its superior resources, Yuga hired an expert and paid him at least tens of thousands of dollars to offer an opinion that its brand suffered some unquantified amount of harm.  Trial Tr. [Berger] 104:5-9.  An expert's testimony is not *per se* reliable just because the opposing party does not retain an expert.  Furthermore, The cited "say-so" testimony that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs" is belied by the numerous holes in Dr. Berger's analysis, revealed during cross-examination, including his failure to consider other controversies involving Yuga before, during, and after the narrow timeframe that he considered.  *See* Trial Tr. [Berger] 106:1-3, 108:7-110:5, 113:10-114:2, 115:16-25.

Dr. Berger's analysis of negative sentiment trends in his limited sample of tweets, between May 6 and May 12, did not allow him to discern whether other sources caused harm to Yuga's brand equity or attribute any specific harm to Defendants.  Again, Dr. Berger limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period.  Trial Tr. [Berger] 106:1-3.  Although Dr. Berger claimed to have reviewed tweets from before that period, he admittedly did not actually conduct any empirical analysis on those tweets.  Trial. Tr. [Berger] 105:14-106:3 ("Q Your empirical analysis was limited to the period from May 6, 2022, to late June 2022; correct? A For a number of reasons, that's the period that I focused on…").  Dr. Berger further did not review any tweets

from after June of 2022 to determine whether there was any ongoing brand damage due to RR/BAYC or any other factor, and whether the BAYC brand recovered value after that period.  *See* Trial Tr. [Berger] 106:4-10.

Yuga fails to cite any legal authority to support a waiver argument. Defendants did not waive any arguments regarding the scope of Dr. Berger's analysis. Defendants are not required to object to admissibility of Dr. Berger's testimony in order to argue that Dr. Berger's analysis was limited and failed to demonstrate that Defendants caused harm.

### Plaintiff's Disputed Post Trial Finding of Fact No. 22, lines 9:16-18, 23-25:

Finally, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs. On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX1315; see also JTX-1317. Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (see JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account. JTX1048; Dkt. 342 ¶¶74-76. As recently as the day before trial, @ApeMarketplace continued to advertise rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale. JTX-696; Dkts. 342 ¶77; 392 at 57:8-58:6, 58:20-59:19

### Defendants' Basis of Dispute:

ApeMarket never launched.  *E.g.*, Ripps Decl. ¶ 180-81 (Dkt. 346) (uncontested).  In fact, it never got beyond the idea stage.  *Id.* at ¶ 178.  There have been no sales of any kind on ApeMarket at any time.  *Id.* at 178-181; Trial Tr. [Muniz] 85:8-23.  Defendants abandoned their plans for ApeMarket well before the summary judgment stage.

---

1    The ApeMarket Twitter page has not tweeted since February 10, 2023, before
2    summary judgment was granted.  This paragraph gives the misimpression that
3    ApeMarket as an account was still sending Tweets and promoting itself.  Of the
4    Tweets made after the ApeMarket idea was abandoned, they were mainly criticisms of
5    Yuga.  Once again, Yuga is trying to silence any criticism about its company.

6    Yuga's citations to the record do not help it.  JTX-696 is a screenshot of the
7    @ApeMarket Twitter from July 2022, and therefore cannot serve as proof that
8    Defendants were still using the Twitter account after summary judgment.  *See* JTX-
9    696.  There is no advertisement of RR/BAYC NFTs on the ApeMarket Twitter
10   account.

11   Yuga Labs also failed to prove that they were harmed in any way from the
12   alleged marketing.  Because Yuga surrendered its legal remedies, it is seeking the only
13   equitable remedies.  *See* Dkt. 315; 316.  This limits their proof of harm to proving that
14   Defendants were profiting *because of* their infringement and not some other reason
15   such as protest against Yuga's problematic conduct.  *See Lindy Pen Co. v. Bic Pen*
16   *Corp*., 982 F.2d 1400, 1408 (9th Cir. 1993),*abrogated on other grounds by SunEarth,*
17   *Inc. v. Sun Earth Solar Power Co.,* 839 F.3d 1179 (9th Cir. 2016).  Yuga fails to prove
18   that royalties are continuing to accrue for Defendants.  *See* Trial Tr. [Solano] 48:15-
19   49:4. Yuga therefore fails to prove the correct type of harm that would entitle them to
20   equitable damages related to any marketing to the extent that Defendants actually
21   marketed.

22   **Plaintiff's Response:**

23   Defendants' objection should be rejected because (1) the record shows that the
24   @ApeMarketplace Twitter account was used to promote Ape Market and the
25   RR/BAYC NFTs, and (2) Defendants' profits are traceable to their infringement.

26   Defendants' refrain that "Apemarket never launched" is a beside the point.  *See*
27   *supra* ¶ 7(h).  Defendants have and continue to use Ape Market to market their

28

1  infringing NFTs, and indeed they do not dispute the portion of this finding of fact

2  stating that Mr. Cahen continued to promote sales information about RR/BAYC

3  NFTs.  Defendants also tweeted a screen shot of the finished Ape Market to entice

4  people to buy RR/BAYC NFTs.  JTX-696.

5  **The @ApeMarketplace Twitter Account And The Ape Market NFT**

6  **Marketplace Are Clearly Related And Both Were Used To Promote RR/BAYC:**

7  Defendants created the @ApeMarketplace Twitter account to promote the Ape Market

8  marketplace and their infringing RR/BAYC NFTs.  The fact that the Twitter handle

9  solely controlled by Mr. Cahen contains "ApeMarket" alone demonstrates the

10  connection between the Twitter account and marketplace, but the Tweets from the

11  account confirm that Defendants used @ApeMarketplace to promote Ape Market.

12  Cahen Depo. Designations (Dkt. 395) at 126:5-7 (Q:  And you are the sole operator of

13  the Ape Marketplace account? A:  That is correct, yes.").  Mr. Cahen lied at trial

14  when, under oath, he stated that he did not "plan to stimulate the sales of RR/BAYC

15  NFTs by teasing the future release of ApeMarket."  Trial Tr. at 234:15-18.  Mr. Cahen

16  tweeted from @ApeMarketplace a link to reserve an RR/BAYC on multiple occasions

17  and on June 2 he tweeted that "[l]isting requires holding RR/BAYC."  JTX-696.

18  Defendants' own internal communications confirm the lie.  On June 1 Mr. Cahen

19  stated, "my goal for today is to create an announcement that will create hype and

20  volume, we want to mint out the remainder of that collection."  JTX-801.221.  On that

21  same day Mr. Cahen tweeted from @ApeMarketplace a screenshot of Ape Market

22  with an image of an RR/BAYC and a link to reserve an RR/BAYC.  JTX-696.  This

23  was a direct attempt to use the prospect of Ape Market to promote Defendants'

24  infringing NFTs.  Whether or not Defendants continue to post new Tweets from the

25  account, these Tweets remain public and thus the account continues to promote Ape

26  Market and RR/BAYC.  Defendants' claim that Ape Market, @ApeMarketplace, and

27  RR/BAYC are not connected is obviously false.  The Tweets in JTX-696 repeatedly

28

1  show the look, functionality, and intent of Ape Market and the infringing RR/BAYC

2  NFTs within Ape Market.

3      Now, even a month after trial, Defendants still advertise rrbayc.com in the

4  profile heading of the Ape Market Twitter profile.  *See*

5  https://twitter.com/apemarketplace and screenshot below.  That same Twitter account

6  remains live, with promotions of apemarket.com, the infringing rrbayc.com domain,

7  and their promotion of the infringing RR/BAYC NFTs on Looksrare.  Defendants'

8  claims to the contrary are not in good faith and contrary to the evidence.  *See* Solano

9  Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  In any event, Defendants

10 have not transferred ownership of either domain, continuing their cybersquatting.  15

11 U.S.C. § 1125(d)(1)(a)(ii) (liability established when Defendant "***registers***, traffics in,

12 or uses a domain name" as specified in statute).



There is similarly no credible dispute that Defendants' marketing and

promotion of RR/BAYC NFTs, including by using the promise of Ape Market to

"stimulate" sales of RR/BAYC NFTs, harmed Yuga Labs' brand equity.  *See, e.g.*,

*supra* ¶¶ 20-21.  Likewise, there is no credible dispute that Defendants earned royalties at least through May 2023.  Defendants admit to this fact.  Cahen Decl. (Dkt. 344) ¶ 171.  Defendants also do not deny that the RR/BAYC smart contact allows them to receive royalties in the future if the marketplaces provided them royalties. Defendants provide no basis for why the Court should not disgorge the royalties from the sales of RR/BAYC NFTs that they admit use Yuga Labs marks.

**All of Defendants' Profits Are Attributable To Their Infringing Activity:** Yuga Labs has shown that Defendants' profits are attributable to Defendants' infringing activity – each and every single RR/BAYC NFT uses the marks BORED APE YACHT CLUB and BAYC, to say nothing of how Defendants sold, marketed, and promoted these NFTs.  In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty.  Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408. From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019).  Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks. *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37.  Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks.  They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."  Dkt. 418-1 at 3:15-16.  Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement.  *See* Kindler Decl. (Dkt.

338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps," consumers would not have bought them.  Indeed, even Defendants admit that they had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10 (Mr. Ripps' second supplemental response to interrogatory 3 states:  "Mr. Ripps's RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project would be directly tied to Yuga, BAYC, and specific BAYC NFTs . . ."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin of the collection.").  This is because the appeal of the BAYC Marks was core to their infringement and profits.  Yuga Labs should be awarded the full amount of Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

### **Defendants' Reply:**

Yuga is still relying on JTX-696 to support a finding that apemarket.com, is still being used to promote RR/BAYCs.  This is fundamentally flawed.  First, ApeMarket was never released. Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)).  JTX-696 is a screenshot of the @ApeMarket Twitter from July 2022, and therefore cannot serve as proof that Defendants were still using the Twitter account after summary judgment.  *See* JTX-696.  Yuga misleadingly (and intentionally) omits the year when recounting the various Apemarket Tweets when it walks through ApeMarket's June 2022 tweets.  The fact of the matter, and it is undisputed, is that the @apemarket account, has not

1  tweeted since before summary judgment was granted.  It is incorrect to say that it is
2  being used to continue to market RR/BAYCs.  It is more akin to a defeated election
3  candidate's old campaign page remaining online years after the race ended.

4       Yuga, perhaps discusses issues unrelated to this proposed finding of fact which
5  is whether Plaintiffs continued to market rrbayc NFTs on ApeMarket because of the
6  lack of evidence to support its claims.  This includes whether they properly
7  apportioned damages.  While Defendants have proven that sales stem from protest
8  against Yuga and not infringement, that is simply irrelevant to Yuga's proposed
9  finding of fact which is that Defendants continue to market ApeMarket.

10       However, as to the actual proposed finding of fact, Yuga fails to answer the
11  second issue that Defendants raise which is that its finding of fact does not support its
12  equitable remedy claims.  *See* Dkt. 315; 316 (disclaiming legal remedies).  This limits
13  their proof of harm to proving that Defendants were profiting *because of* their
14  infringement and not some other reason such as protest against Yuga's problematic
15  conduct.  *See Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1408 (9th Cir.
16  1993),*abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.,
17  839 F.3d 1179 (9th Cir. 2016).*  Yuga provides no evidence that it was harmed by the
18  alleged continuing marketing.  Yuga fails to prove that royalties are continuing to
19  accrue for Defendants.  *See* Trial Tr. [Solano] 48:15-49:4.  In fact, they admit that the
20  remedies ceased for Defendants before trial   Yuga therefore fails to prove the correct
21  type of harm that would entitle them to equitable damages related to any marketing to
22  the extent that Defendants actually marketed.  Cahen Decl. (Dkt. 344) ¶ 171.

23       **Plaintiff's Disputed Post Trial Finding of Fact No. 23:**
24       The RR/BAYC smart contract is immutable and will use Yuga Labs' BORED
25  APE YACHT CLUB and BAYC marks in perpetuity, which will continue to cause
26  consumer confusion, unless, at a minimum, Yuga Labs obtains control of the contract.

27
28

JTX-722 ¶71; JTX-1146; *see also* JTX-1249; Dkts. 337 ¶¶2-6; 342 ¶80; 392 at 133:24-134:20.

### **Defendants' Basis of Dispute:**

The evidence at trial showed that the RR/BAYC smart contract is not causing any confusion.  Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga Labs itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Further, Yuga cites no evidence that retaining control of the smart contract would in any way remediate the non-existent confusion that it alleges.  As Yuga alleges, the RR/BAYC smart contract is immutable, which remains true regardless of who possesses the smart contract.  The NFT community will always associate

RR/BAYC with a conceptual artwork created by Ryder Ripps and the smart contract will always demonstrate this fact regardless of which digital address the smart contract resides.  Thus, Yuga "obtaining control" of the smart contract would accomplish nothing because, as Yuga admits, the smart contract is immutable.

### Plaintiff's Response:

Defendants' objection should be rejected because (1) the record shows ample evidence of actual confusion, and (2) Defendants' cherry-picked communications with purported purchasers do not rebut Yuga Labs' experts' findings.

**There Is Ample Evidence of Confusion in the Record:**  Defendants' argument that consumers were not confused by their infringement is unavailing.  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

1        There is a clear likelihood of confusion as well, given Defendants' use of the

2   same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at

3   10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.

4   2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

5   ever find their way into the appellate reports' because liability is 'open and shut.'")

6   (citation omitted).  In any event, actual confusion is not required; and the Court

7   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

8   at 12.  The Court "easily conclude[d]" that Defendants' use of identical marks, on

9   identical products, in identical markets supported a finding of a likelihood of

10  confusion.  *Id.* at 10-13.  Yuga Labs is thus entitled to Defendants' profits due to their

11  infringing activity regardless of whether purchasers were actually confused.  *See*

12  *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012)

13  (granting defendant's profits even where infringement claims premised solely on post-

14  sale confusion where a "potential purchaser, knowing that the public is likely to be

15  confused or deceived by the allegedly infringing product, [] choose[s] to purchase that

16  product instead of a genuine one").

17       **Defendants' Anecdotal Evidence Of Individuals Stating They Support**

18  **Defendants' Infringement Are Irrelevant And Immaterial:**  A handbag

19  counterfeiter may have allies or distributors, and those allies / distributors may even

20  profess to believe in a cause, but that does not excuse the counterfeiter's wrongdoing

21  or mitigate the likelihood of confusion in the marketplace.  *See* SJ Order (Dkt. 225) at

22  16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a

23  counterfeit handbag.").  And Defendants do nothing to rebut the likelihood of post-

24  sale confusion.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255

25  (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims

26  premised solely on post-sale confusion where a "potential purchaser, knowing that the

27  public is likely to be confused or deceived by the allegedly infringing product, []

28

1   choose[s] to purchase that product instead of a genuine one").  Defendants' admission

2   that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75)

3   undermines Defendants' suggestion that purchasers of their infringing NFTs were

4   universally supportive and that no one was confused.

5          Defendants' objection admits what Mr. Hickman's testimony says:  when

6   designing the forthcoming Ape Market to sell their infringing NFTs alongside

7   authentic BAYC NFTs, Defendants knew affirmative "friction step[s]" would be

8   required to prevent the obvious risk of confusion.  As Mr. Hickman told Mr. Cahen,

9   "[t]hey are the same art."  Trial Tr. at 212:17-24.  Thus, Defendants and their partners

10  worried over how to "make it as clear as possible" the two were different.  *Id.*  This is

11  because selling the same products under the same marks is confusing.  And yet,

12  Defendants' continued ahead without any changes in their sales and promotion of the

13  RR/BAYC NFTs.

14         It is undisputed that Mr. Ripps created the RR/BAYC smart contract, and that

15  the marks "Bored Ape Yacht Club" and "BAYC" are immutably coded into the smart

16  contract.  Every RR/BAYC NFT to ever exist will refer to this smart contract and thus

17  the BAYC Marks.  The infringement is inseparable from the product.  To remedy this

18  irreparable harm, Yuga Labs should be given control of the smart contract for these

19  infringing NFTs and regain "the ability to exclusively control its BAYC brand."

20  Muniz Decl. (Dkt. 340) ¶ 22.

21         **Defendants' Reply:**

22         Yuga's response fails to address the fact that the evidence does not show that

23  the RR/BAYC smart contract will not forever be associated as a product originating

24  from Yuga.  Ignoring the pertinent issue that Defendants' raise in their objection,

25  instead (1) disregards the significant evidence in the record showing there was no

26  actual confusion and (2) ignore that Defendants received hundreds of letters from

27  actual RR/BAYC NFT purchaser confirming that they were not confused.

28

**First,** there is ample evidence that there was **no** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single

person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*. at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id*. at 144:12-18. This broke with her prior practice as well, as it

was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See*

1   Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet

2   include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further,

3   there is no indication that any of the Twitter users commenting actually reserved an

4   RR/BAYC NFT.  This evidence provides no support for an argument that this finding

5   of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the

6   users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-

7   1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to

8   believe purchased an RR/BAYC NFT, replying to GemBot).

9        Yuga also cites to private chats that the RR/BAYC creators used.  These

10   exhibits are unsupportive of a finding that there was actual confusion.  For example,

11   JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

12   marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

13   suggestions about what they could do to make it even more clear.  Further, this chat

14   focused on the creation of ApeMarket, which never was launched and could,

15   therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

16   (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

17   ApeMarket clearer).

18        Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

19   exhibit does not support a finding of actual confusion.  The chart separately lists both

20   "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

21   understood that these were two different projects.  Additionally, as Mr. Cahen

22   testified, he is not aware of anyone who watched the Bloomberg program and reserved

23   an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

24   344).

25        Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

26   credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

27   case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

28

1  case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

2  entered after Mr. Lehman settled his own case with Yuga.

3      Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

4  LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

5  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

6  a finding of consumer confusion as any consumer had the ability to determine the

7  provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further,

8  this does not undermine the finding of fact as this does not show that anyone who

9  reserved an RR/BAYC NFT was confused about the origin.

10     Finally, Yuga cites to its own declarations and trial testimony where their

11  witnesses make conclusory and unfounded statements about possible confusion.  *See*

12  Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

13  (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

14  392) at 53:14-54:22. These statements do not support a finding, however, that anyone

15  who bought an RR/BAYC NFT was actually confused.

16     Yuga also states that Mr. Ripps and Mr. Cahen did not offer admissible

17  evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

18  This is categorically false.  The evidence presented at trial shows that many people

19  who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl.

20  ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590,

21  JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

22  presented at trial that showed consumers were not confused about the source of the

23  RR/BAYC NFTs.

24     Yuga's argument is inaccurate given Defendants used modified versions of the

25  alleged BAYC Marks in their reservations.  For example, the logo used states "This

26  Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for

27  the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

28

1    Yuga also incorrectly relies on the law of the case doctrine by citing to this
2    Court's summary judgment order.  The "law of the case doctrine does not apply to
3    pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792
4    F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d
5    1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,
6    don't bind district judges for the remainder of the case.  Given the nature of such
7    motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held
8    that although *aspects* of an issue were decided at summary judgment for one purpose,
9    the summary judgment order did resolve the issue generally or as to other topics.  *See*
10   No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)
11   (holding that evidence of initial police contact was relevant as background, but not to
12   the already decided issue that initial contact was not excessive force).  This case is just
13   like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to
14   the issue of infringement and is not adequate support for a determination of how to
15   apportion disgorgement of profits attributable to infringement.

16   Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's
17   profits, which is something Defendants argue they are not, Yuga can only receive
18   profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982
19   F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun*
20   *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires
21   distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a
22   protest against Yuga (and were thus not confused about Defendants' use of Yuga's
23   marks) and revenue from purchasers who mistakenly believed they were purchasing
24   Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a
25   single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored
26   by Yuga.

27

28

Yuga's citations to *Gucci* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Second,** Yuga effectively admits that there is no evidence of actual confused consumers and tries to explain away this gaping hole in their evidence by arguing that the world is hiding evidence of actual confusion from Yuga because it would be "super embarrassing" to admit being confused.  Not only does this response lack merit, but it is also an admission that there is insufficient evidence in the record to support a finding that any sales were a result of actual confusion.

And Defendants' evidence from actual consumers of RR/BAYC NFTs is sweeping, involving hundreds of actual consumers admitting that they were not confused and supported Defendants' protest.  Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for

standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.

### Plaintiff's Disputed Post Trial Finding of Fact No.  24, lines 10:5, 6-10:

Defendants filed a frivolous counterclaim for declaratory judgment of no defamation with no good-faith basis; instead, it was filed to introduce irrelevant and inflammatory theories through the "backdoor of a counterclaim." Dkts. 87 at 2; 80 at 1, 3-4. Defendants withdrew this counterclaim only after they were unsuccessful in their attempts to leverage it for discovery and after Yuga Labs had already expended resources seeking its dismissal. *See* Dkt. 156 at 11.

### Defendants' Basis of Dispute:

Defendants had a good faith basis for its no defamation counterclaim.  The claim largely mirrored Yuga's claim for unjust enrichment in that it was a reasonable extension of the law as it existed.  *See* Dkt 1 at 37.  Defendants ultimately withdrew their no defamation counterclaim, in the same way that Yuga withdrew its unjust enrichment counterclaim.

1    To the extent that Yuga is seeking fees for actions pertaining to Defendants

2    counter-claims, they have already been compensated through their anti-SLAPP motion

3    to strike and settlement on the issue of fees.  *See* Dkt. 227; 228 (notifying court of

4    settlement on issue of fees).  Permitting double recovery for that would be wrongful.

5    *See Corder v. Brown*, 25 F.3d 833, 840 (9th Cir. 1994) (reversing an attorney's fee

6    award that ignored prior settlement of fee award, as a "windfall" and "manifestly

7    unreasonable")

8              **Plaintiff's Response:**

9    Defendants' objection is a false equivalence.  Defendants never had any basis to

10   bring a "no defamation" cause of action.  "From the outset, Yuga Labs explained to

11   Defendants' counsel that 'there is no claim for declaratory relief of non-defamation.'

12   Defendants have made no attempt to provide authority that they had a good-faith basis

13   for filing it . . . ."  Dkt. 97 at 1.  Defendants cite no cases in which their "no

14   defamation" claim survived a motion to dismiss and made no argument that their

15   claim was an extension of the law as it existed.  Yuga Labs warned Defendants of this,

16   twice, yet they forced Yuga Labs to fully brief the issue, incurring substantial

17   attorneys' fees.  *Id.* at 3.

18   What's worse, and clear from their conduct, is that this was all a bad faith

19   litigation tactic.  They withdrew their "no defamation" counterclaim only after they

20   were unsuccessful in their attempts to leverage it for discovery and after Yuga Labs

21   had already expended resources seeking its dismissal.  *See* Dkt. 156 at 11.  This is

22   nothing like Yuga Labs' withdrawal of unjust enrichment as a cause of action.  Some

23   courts recognize unjust enrichment as a cause of action while others, including this

24   Court, recognize it only as a remedy, so Yuga Labs "withdr[ew] this claim but

25   continue[d] to seek unjust enrichment as a remedy."  Dkt. 53 at 24.  And, Defendants

26   did not argue that unjust enrichment was not available as a claim in their motion to

27   dismiss.  Instead, they merely argued that it was inadequately pled.

28

**Defendants' Reply:**

Yuga admits in its response that it was already fully compensated for actions pertaining to Defendants counter-claims, they have already been compensated through their anti-SLAPP motion to strike and settlement on the issue of fees. *See* Dkt. 227; 228 (notifying court of settlement on issue of fees). Permitting double recovery for that would be wrongful. *See Corder v. Brown*, 25 F.3d 833, 840 (9th Cir. 1994) (reversing an attorney's fee award that ignored prior settlement of fee award, as a "windfall" and "manifestly unreasonable"), as such to the extent this finding of fact is intended to support an attorney's fee award it should be disregarded.

Further, Defendants routinely discussed with Yuga that it believed that given Yuga's posture about the truth of Defendants' accusations, that it would be beneficial to "declare the legal rights and other legal relations" and to avoid "uncertainty" related to Yuga's representations that Defendants were defaming them. *See* U.S.C.A. § 2201 (explaining purpose of declaratory action).

**Plaintiff's Disputed Post Trial Finding of Fact No. 25**

Defendants repeatedly attempted to re-litigate issues the Court rejected in its December 16, 2022 Order Denying Defendants' Motion to Dismiss and Motion to Strike (Dkt. 62). See Dkts. 69-1, 103-1, 118, 199-1 at 12-13. But the Court repeatedly rebuffed these attempts. *See, e.g.*, Dkts. 87 at 1 (rejecting motion to compel premised on Defendants' rejected First Amendment *Rogers* defense as "moot, irrelevant and not proportionate to the needs of the case in view of the District Court's December 16, 2022 ruling."); 144 at 1; 178 at 6.

**Defendants' Basis of Dispute:**

Defendants were not attempting to relitigate any issues. Yuga focuses on issues on intent in claiming that Defendants were re-litigating decided matters in the case, but intent is plainly relevant to this case, and remains relevant to this case.

For example, because Yuga limited itself to disgorgement damages, intent is directly relevant to the extent that they are entitled to disgorgement and whether they are entitled to disgorgement at all. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) ("a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate."). This Court's rejection of Defendants' good faith *Rogers* defense does not render intent irrelevant for all issues for the remainder of the case.

To the extent that Yuga is making a law of the case argument. Law of the case does not apply. An anti-SLAPP motion, like a motion for summary judgment is a preliminary decision, so law of the case does not apply. *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986). It is also true that even if it did apply, a factual finding can matter for one issue—for example the *Rogers* defense—but does not apply to a different issue, for example damages. *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that preliminary decision on one issue does not bind court as to similar issue later in case). The "intent" is different between these two issues. In the first, it deals with whether Defendants pled a valid *Rogers* defense as a matter of law. In the second, it turns on whether Defendants have the malicious intent that underlies Yuga's intent-laden damages theories.

### Plaintiff's Response:

The Court's December 16, 2022 Order held that Defendants' activities in connection with promoting and selling their infringing NFTs were "commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." Dkt. 62 at 7. Defendants unreasonably continued to litigate their First Amendment defense. For instance, even after Judge McDermott denied Defendants' first motion to compel because Defendants' theories were "moot, irrelevant and not proportionate to the needs of the case in view of the District Court's

December 16, 2022 ruling," Dkt. 87 at 1, Defendants persisted with another motion to compel document productions seeking similar materials, Judge McDermott had to deny those requests too, holding "[t]hese Requests are irrelevant or have been answered and/or are permanently or temporarily barred by this Court's and the District Court's prior rulings on Inflammatory Material . . . ." Dkt. 144 at 1. Defendants also continued to assert this same defense at the summary judgment stage, which the Court again rejected. Dkt. 225. And, as evident throughout Defendants' objections in this document, they have refused to acknowledge that the Court's Summary Judgment Order has any effect, which further underscores their bad-faith efforts to multiply the cost of this litigation by rehashing decided issues.

### Defendants' Reply:

Yuga fails to grapple with any of Defendants' cited authority because it still presses a law of the case argument that strikes far too broadly. For the remainder of issues in the case, intent is directly relevant to the extent that they are entitled to disgorgement and whether they are entitled to disgorgement at all. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) ("a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate.").

Yuga's citation to a discovery dispute further does not mean that Defendants are re-litigating issues. Instead, they were seeking information that could support their Defenses which rely on intent. Defendants understand that the Summary Judgment Order has effect, but that does not mean that the court decided issues it never decided. Lastly, law of the case does not apply to summary judgment issues (as discussed in detail above). *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986).

### Plaintiff's Disputed Post Trial Finding of Fact No. 26:

Defendants again refused to accept the Court's findings in its SJ Order, instead indicating an intent to re-litigate adjudicated issues at trial. See, e.g., Dkt.

320-1 at 11-12 (Proposed Pretrial Conference Order in which Defendants argued that
their infringement was not intentional/willful despite the Court's holding otherwise).
<u>As a result, Yuga Labs was forced to prepare for trial on previously adjudicated
issues.</u>

### Defendants' Basis of Dispute:

As stated above, intent was and still is relevant, especially in light of Yuga's
intent-laden damages theories.  *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct.
1492, 1497 (2020) ("a trademark defendant's mental state is a highly important
consideration in determining whether an award of profits is appropriate.");  *Harbor
Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No. SACV 17-01613-CJCDFMx,
2023 WL 2652855 at *4-5 (C.D. Cal. Mar. 13, 2023) (discussing importance of
Defendants' mental state as vital to damages estimate).  The issue of intent related to
damages was never adjudicated, and to the extent that it was, the law of the case does
not apply to decisions made on summary judgment.  *Shouse v. Ljunggren*, 792 F.2d
902, 904 (9th Cir. 1986); *Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL
1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that decision on summary judgment
on one issue does not bind court as to similar issue later in case).

Beyond never being decided for purposes of trial, this Court never prohibited
Defendants from defending themselves on damages issue through introducing matters
of intent, and Yuga did not have to "prepare for trial on previously adjudicated
issues."  Yuga's citation to Defendants' pre-trial conference order does not support its
argument.  This Court never held that the infringement was willful.  If it had, Yuga
would have cited to that decision, not to a pleading from Defendants.

### Plaintiff's Response:

As the Court has already observed, Defendants are incorrect to argue that intent
is required for the Court to order disgorgement of their profits.  June 9, 2023 Pretrial
Conference Tr. at 33:12-16 ("But with respect to the remaining issues that we're going

to be trying in this case, the defendants' profits, there is no willfulness requirement for the defendants' profits. It's an equitable remedy. It is a disgorgement. This is my view."). Even so, Defendants' argument as to this issue has no merit. *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir. 1993) ("Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity."). Defendants have no basis for their argument that they should be allowed to relitigate the Court's findings regarding intent.

The Court should reject Defendants' objections to already adjudicated issues, including whether Yuga Labs owns the BAYC Marks (*see supra* ¶ 1), whether those marks were used in commerce (*see supra* ¶ 1), and whether Defendants' infringing NFTs used the BAYC Marks (*see supra* ¶ 2). Defendants also dispute various exact quotes from the Court's Summary Judgment Order, seeking to litigate those already adjudicated matters. *See supra* ¶¶ 7(b), 7(d), 7(e), 10.

### **Defendants' Reply:**

"[A] trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Even if there is no "willfulness requirement" per se, *Romag* still holds that intent is a "highly important consideration" for damages in this case, and Defendants are unaware of a case involving non-willful infringement that resulted in an exceptional case finding. Regardless, Defendants' motivations matter for the live issues remaining in the case.

Defendants also hotly contested the issues at Summary Judgment. Defendants showed that it was reasonable for parties to believe that Yuga surrendered its rights to world and therefore did not own the marks. Trial Tr. [Solano] 24:11-25; [Muniz] 72:3-73:17. As discussed above this directly implicates intent, including whether Defendants reasonably believed they could use the marks which is still relevant for

1    damages.  Further, Defendants reserve the right to appeal factual findings made at

2    summary judgment and will not risk losing any right to appeal.

3              **Plaintiff's Disputed Post Trial Finding of Fact No. 27:**

4              Defendants were obstructive and intentionally evasive throughout their

5    depositions and at trial, wasting time with rehearsed, non-responsive monologues on

6    the same issues the Court already deemed irrelevant.  *See, e.g.*, Dkts. 392 at 229:3-

7    13, 231:21-232:3, 234:24-235:5, 237:14-238:7; 395 at 101:7-102:4, 163:13-23; 396

8    at 35:2-11, 44:19-45:11.

9                        **Defendants' Basis of Dispute:**

10             Mr. Ripps and Mr. Cahen testified using their own words and answered Yuga's

11   counsel's frequently confusing and/or repetitive questions to the best of their ability.

12   *See, e.g.*, Trial Tr. [Cahen] 234:15-235:5 ("Q Mr. Cahen, your plan was to stimulate

13   sales of RR/BAYC NFTs by teasing the future release of Ape Market; correct? A No.

14   Q No? A I believe I heard you correctly. Would you mind repeating yourself?

15   Because I believe the answer is no, but if you wouldn't mind repeating yourself, I can

16   make sure.  Q Yes. Your plan was to stimulate sales of RR/BAYC NFTs by teasing

17   the future release of Ape Market?  A No. In fact, I already answered that question. My

18   goal was to draw additional awareness to my protest of racism, anti-Semitism, and

19   financial fraud being conducted by Yuga Labs and Bored Ape Yacht Club. That is --

20   and that is still today something that I care very much about.")

21             Yuga's counsel's mid-trial motion to strike Mr. Cahen's testimony as non-

22   responsive was, in fact, denied.  Trial Tr. [Cahen] 234:11-13.

23                          **Plaintiff's Response:**

24             Defendants' objection that their monologues were responsive and not

25   obstructive is not credible.  Defendants' contention that the following responses by

26   Mr. Cahen, for example, in official court proceedings is a display of answering

27   questions "to the best of [his] ability" is disingenuous and not made in good faith:

28

- Cahen Depo Tr. at 81:22-82:14 (designated by Defendants (Dkt. 395)) (making accusations of "Nazism, racism, financial fraud, pedophilia" in response to question about what the acronym "RR/BAYC" refers to)

- Cahen Depo Tr. at 88:14-22 (making accusations of "Nazism, racism, pedophilia, fraud" in response to the question "Have you talked with Ian Garner about the RR BAYC project?")

- Cahen Depo Tr. at 89:1-8 (making accusations of "illegal, unregistered security[ies] and a multi-billion-dollar fraud" in response to question "So part of the RR BAYC project is criticizing Fenwick?")

- Cahen Depo Tr. at 90:9-17 (making accusations of "Nazism, racism, pedophilia, securities fraud" in response to the question "What did you do in 2022 in connection with the project?")

- Cahen Depo Tr. at 91:23-92:9 (making accusations of "Neo-Nazism, racism, pedophilia, fraud" in response to question about what the acronym "RR/BAYC" refers to)

- Cahen Depo Tr. at 104:4-15 (making accusations of "Neo-Nazi and racist and pedophilic and fraudulent company known as Yuga Labs" in response to in response to question about whether the two NFT collections point to the same images)

- Cahen Depo Tr. at 106:23-107:9 (designated by Defendants (Dkt. 395)) (making accusations of "Neo-Nazism, racism, pedophilia, financial fraud" in response to question about whether the two NFT collections point to the same images)

- Cahen Depo Tr. at 111:13-112:17 (making accusations of "racism," "pedophilia," "mass fraud" in response to question about benefits received from third parties)

- Cahen Depo Tr. at 113:22-114:2 (making accusations of "Neo-Nazism, racism, pedophilia, financial fraud" in response to question about what the acronym "RR/BAYC" refers to)

- Cahen Depo Tr. at 115:22-116:7 (making accusations of "racist anti-Semitic pedophile-themed assets that are fraudulent" in response to question "And you wanted them to buy RR BAYC's instead?")

- Cahen Depo Tr. at 121:23-122:12 (responding "I don't understand how a racist and Nazi and pedophile-themed and fraudulent company would be able to enforce trademarks" in response to question "Were you aware of trademarks when you started working on the RR BAYC project?")

- Cahen Depo Tr. at 145:23-146:6 (making accusations of "racism and fraud and so on" in response to question about what the acronym "RR/BAYC" refers to)

- Cahen Depo Tr. at 155:3-13 (making accusations of "Nazism, racism, pedophilia and fraud" in response to question about what the acronym "RR/BAYC" refers to)

- Cahen Depo Tr. at 163:13-23 (designated by Defendants (Dkt. 395)) (making accusations of "multi-million-dollar Nazi ponzi schemes" in response to question about why he purchased an RR/BAYC NFT)

- Cahen Depo Tr. at 166:22-167:5 (making accusations of "Neo-Nazism, racism and pedophilia" in response to question about his role in the "RR BAYC Project")

- Cahen Depo Tr. at 205:17-207:4 (making accusations of "racism, Nazism and pedophile subversion" in response to question about hopes for price increase of RR/BAYC NFTs)

- Cahen Depo Tr. at 220:6-221:4 (making accusations of "racism, Nazism, pedophilia and fraud" in response to question about whether purchasers understood that RR/BAYC NFTs were minted by Mr. Ripps directly)
- Cahen Depo Tr. at 236:3-22 (making accusations of "racism, Nazism, pedophilia and extensive fraudulent practices" in response to question "Did anyone come and -- to the RR BAYC project team and ask for an NFT based on a BAYC ID number?")
- Cahen Depo Tr. at 241:25-242:13 (making accusations of "Nazism, racism, pedophile-influenced subversion and fraud" in response to question "Why would the BAYC ID number be used in connection with the RR BAYC's?")
- Cahen Depo Tr. at 253:17-254:18 (making accusations of "anti-Semitism, racism, pedophilia and widespread financial fraud" in response to question about definition of "promotion")
- Cahen Depo Tr. at 264:21-265:4 (making accusations of "Nazism, racism, pedophilia and fraud" in response to question about whether third party promoted RR/BAYC NFTs)
- Cahen Depo Tr. at 285:7-286:25 (42-line response making accusations of "Nazism, racism and pedophilia" and "widespread fraud and market manipulation" in response to question "Did you provide apes to Kenobi and his lawyer friend?")
- Trial Tr. at 229:3-13 (making accusations of "racism, anti-Semitism, financial fraud, and all kinds of horrible practices and iconography" in response to question about the start date of the RR/BAYC Project)
- Trial Tr. at 231:21-232:3 (making accusations of "racism, anti-Semitism, and financial fraud" in response to question about whether Ape Market was used to drive sales of NFTs)

- Trial Tr. at 234:24-235:5 (making accusations of "racism, anti-Semitism, and financial fraud" in response to question about whether Ape Market was used to drive sales of NFTs)

- Trial Tr. at 237:14-238:7 (making accusations of "racism, anti-Semitism, and financial fraud" in response to question about whether tweets about Ape Market were used to drive sales of NFTs)

Defendants made these false and obstructive accusations even after the Court rejected their baseless First Amendment defense; worse, they made these accusations at trial even after they represented to the Court that they would not. *See, e.g.*, Dkt. 320-1 ¶ 6(A) (agreeing in proposed pretrial conference order not to introduce evidence or argument regarding "pedophilia," or Defendants' "emotional distress counterclaims" and other irrelevant topics); Dkt. 314 (agreeing in Defendants' proposal that they will not offer testimony regarding "the words 'Nazi' or 'Hitler'," "allegations concerning death threats or harassment," the "class action lawsuit brought against Yuga for securities fraud," or "the SEC investigation into Yuga for securities fraud"); Dkt. 334 at 60:13-14 (representing to the Court "We don't want a mini trial on Naziism for sure"); *id.* at 61:9-11 ("I agree they should stand up and object if we start -- if anybody starts talking about -- ranting about how everybody at Yuga are a bunch of Nazis. That is clearly inappropriate and shouldn't be done.").

## **Defendants' Reply:**

Yuga's response cherry-picks and takes out of context testimony (some of which it did not even elect to make part of the record in this case) to falsely create the impression that Mr. Cahen was not acting in good faith.

First, Yuga took a full day of deposition with Mr. Cahen and repeatedly asked Mr. Cahen questions regarding his protest and criticism of Yuga. Mr. Cahen honestly answered those questions by articulating his protest in response to Yuga's questions. When looking at the full context of Yuga's questions, it is clear that Mr. Cahen did

not engage in any dishonesty or obstructive behavior.  For example, Yuga cites to
pages 81:22-82:14 of Mr. Cahen's deposition but then omits critical context of Yuga
asking what Mr. Cahen he was using RR/BAYC for:

> Q.   I need your testimony, not mine.  And you just said you've used that
>      acronym to – you used acronym RR/BAYC to refer to Ryder Ripps
>      Bored Ape Yacht Club?
>
> A.   Correct.  That's what I've used it for.
>
> Q.   So, ***in what context have you used that acronym?***
>
> A.   In what context have I used the acronym RR/BAYC?
>
> Q.   Correct.
>
> A.   ***The context that I typically use that acronym for would be in
>      reference for an art project that was created by Ryder Ripps.  And
>      that art project is a piece of conceptual art which is a powerful
>      criticism of Nazism, racism, financial fraud, pedophilia.***  And it
>      also involves institutions such as FTX, who has perpetuate the
>      greatest fraud in the history of the United States finance, and also
>      OpenSea who's business partners with them, and law firm known as
>      Fenwick & west, who is also business partners with them.  So that's
>      what I refer to typically when I use the acronym RR/BAYC.

Cahen Depo. Designation 81:17-82:14 (Dkt. 396) (emphasis added).  Virtually every
example that Yuga gives is similar, where Mr. Cahen is providing a direct and clear
answer to Yuga's question, but Yuga cites that testimony in a manner that omits
context to falsely suggest that Mr. Cahen was not being cooperative.

While it would be impracticable to go through every single instance where
Yuga misrepresents Mr. Cahen's actions, Defendants provide a few more examples to
show how pervasive Yuga's misrepresentations are.  Yuga cites to pages 89:1-8 of
Mr. Cahen's deposition testimony, but here Yuga was directly asking about Mr.
Cahen's protest:

Q.     So part of *the RR/BAYC project is criticizing Fenwick?*

A.     Well, Fenwick is business partners with FTX and Yuga Labs.  And *they were involved with the creation of ApeCoin, which is an illegal unregistered security and a multi-billion-dollar fraud.*  So that's why I'm referring to Fenwick & West in that context.

       Is it incorrect that Fenwick & West is involved with the creation of ApeCoin?

Cahen Depo. Tr. at 89:1-10 (emphasis added).  Yuga also cites to pages 90:9-17 of Mr. Cahen's deposition, but again the context shows that Mr. Cahen provided a direct answer:

Q.     What did you do in 2022 in connection with the project?

A.     I helped create a dialogue about it.  I helped do research about Nazism, racism, pedophilia, securities fraud, FTX, Fenwick, ApeCoin, Guy Oseary, Illa Da Producer.  Illa, I-L-L-A, Da, D-A, Producer.  And the various high-profile celebrities who helped perpetuate this very large-scale fraud and subversion.

Cahen Depo. Tr. at 90:9-17.  Yuga also cites to pages 106:23 to 107:9 of Mr. Cahen's deposition, but here Yuga directly asked Mr. Cahen about his protest of Yuga's racism:

Q.     So the URI involved with the RR/BAYC art project –

A.     Yeah, Sure. Go ahead.

Q.     -- that points to the same images that BAYC uses –

A.     Yes.

Q.     *That you say are racist?*

---

A.   ***Yeah, that's the whole point of the project*** is to draw attention to Neo-Nazism, racism, pedophilia, financial fraud, Yuga Labs, ApeCoin, Fenwick & West and FTX, who are all business partners, as well as OpenSea.

Cahen Depo. Designation 106:23-107:9 (Dkt. 396) (emphasis added).  Similarly, Yuga misleadingly cites to pages 111:13-112:17, which again was a direct and straightforward answer to Yuga's question:

Q.   ***Outside of the Ethereum network, did you receive any benefits from any third party in connection with the RR/BAYC project?***

MR. TOMPROS:  Object to the form.

THE WITNESS:   ***Well, I'd love to answer that question.***

MR. TOMPROS:  You can answer it if you understand it.

THE WITNESS:   ***I would say that there's been a lot of benefits being involved with this project.***  Because a lot of people don't like Neo-Nazis.  A lot of people don't like racism.  A lot of people don't like pedophiles, and they don't like pedophilia.  When this imagery is being perpetuated to the masses, that offends a tremendous amount of people in a very deep way.
  In addition to that, people do not like it when large companies perpetuate mass fraud and steal million, if not billions, of dollars from individuals.
  ***So as a result of my involvement with this project, people have really given me a lot of respect.  They have given me a lot of support.  They have given me a lot of attention.  And they have given me a lot of praise.***
  ***And it's very rewarding and fulfilling to know that just because I'm a small individual, it does not mean that I can't stand up against these outrageous atrocities and financial crimes*** that involve Yuga Labs, ApeCoin, Fenwick & West and FTX.

Cahen Depo. Tr. at 11:13-112:17 (emphasis added).  Yuga also cites to pages 163:13-23 of Mr. Cahen's deposition but again omits that Yuga directly asked Mr. Cahen for his personal reasons he may want an RR/BAYC NFT, and Mr. Cahen honestly answered:

> Q.   *Why would you buy an RR/BAYC NFT?*
>
> A.    Well, I'm a big fan of Ryder Ripps as an artist.  He's been a huge inspiration to me as an individual.  *And I've been a major collector of his art since I first began exploring nonfungible tokens because I find what he does as a creative and as a human being is remarkable.  And it's an incredible display of courage and willingness to speak his truth even if it means he's going to be threatened by multi-million-dollar Nazi ponzi schemes like Yuga Labs.*

Cahen Depo. Designation 163:13-23 (Dkt. 396) (emphasis added).  Virtually every example that Yuga provides is the same.  Yuga has taken testimony out of context by not mentioning that Mr. Cahen is directly answering questions that Yuga itself asked.  Such behavior does not render a case exceptional.

Yuga also complains that the trial evidence includes references to the pending SEC investigation against Yuga and Defendants' neo-Nazi allegations.  But Yuga never objected to any of that testimony at trial.  *See Fenton v. Freedman*, 748 F.3d 1358, 1360 (9th Cir. 1984) (objections not made at trial are waived).  Further, all of Yuga's cited testimony is relevant to the issue of intent.  The argument that Defendants have somehow breached an agreement not to bring up issues of "inflammatory" material is factually incorrect and ignores the fact that intent is still at issue.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  All of Yuga's citations to the record involve discussions of intent.  As Yuga is seeking intent-laden damages, Defendants should be able to explain their intentions.  As such, Defendants were permitted to discuss their motivations.  Notably, Yuga does not

1  explain how these answers—which were clearly about Defendants' intentions and

2  motivations—were non-responsive.  In short, that is because each one was responsive.

3  Beyond that, to the extent there was an error, it was an evidentiary issue as Yuga

4  admits.  *See Citation to* Dkt. 334 at 61:9-11.

5      Moreover, Defendants' agreement to not present evidence regarding aspects of

6  Defendants' allegations was made in the context of a jury trial.  After Yuga dropped

7  all legal remedies and submitted this case for a bench trial, the Rule 403 concerns of

8  that evidence no longer applied because the Court was already aware of Defendants'

9  criticism and the Court is not susceptible to Rule 403 concerns.

### **Plaintiff's Disputed Post Trial Finding of Fact No. 28, lines 11:1-4, 5-6, 7-12, 14-15:**

Defendants made false representations to the Court regarding the existence and production of documents during discovery. For example, Mr. Ripps swore under penalty of perjury in a verification dated January 17, 2022 that he had produced all documents responsive to Yuga Labs' discovery requests. Dkt. 406 (Trial Tr. Vol. 2) at 267:11-14. Mr. Ripps was asked at trial about a text message from Mr. Cahen stating "It will sell out within 48 hours I think You'll make like a million dollars Straight up." JTX-1574. Mr. Ripps claimed he did not produce that text message because he did not "really find it to have anything to do with the RR/BAYC project." Dkt. 406 at 268:17-21. The Court does not find this explanation to be credible given its clear relation to the sale of infringing NFTs, nor does it explain his withholding of every other text message with Mr. Cahen about the RR/BAYC NFTs. *See* Dkt. 145 at 2-3 (finding "The Court takes a dim view of Defendants' blanket withholding of pre-litigation communications between Ripps and Cahen . . . ."). Mr. Ripps' misrepresentation demonstrates his disrespect for the judicial process and willingness to lie under oath.

### **Defendants' Basis of Dispute:**

1    The verification that Mr. Ripps signed on January 17, 2023, stated "[I]

2  produced all responsive documents that I have been able to locate after a reasonable

3  search" and that "[t]o the best of my knowledge, I do not have any further documents

4  left to produce in response to Plaintiff's discovery requests."  Dkt. 109-33.  At trial,

5  Mr. Ripps testified that he had conducted—at minimum—a reasonable search and

6  produced hundreds of thousands of messages between the creators of the RR/BAYC

7  project.  Trial Tr. [Ripps] 270:3-15.  Further, Mr. Ripps testified that he believed, in

8  good faith, that he produced everything that was related to Yuga's discovery requests.

9  Trial Tr. [Ripps] 270:16-20.  This evidence shows that Mr. Ripps fulfilled his

10  discovery obligations and upheld his verification by providing all of the responsive

11  material he located after a reasonable search to the best of his knowledge.

12    Additionally, the verification to which Yuga cites specifically allowed for the

13  type of continuing production that occurred.  It stated "I also understand that

14  discovery obligations are continuing, and I will produce any additional responsive

15  materials or information to the extent any are found based on a reasonable

16  investigation.  I reserve the right to make changes or additions to any of these answers

17  or document productions if it appears at any time that errors or omissions have been

18  made or if more accurate or complete information becomes available."  Dkt. 109-33.

19  Mr. Ripps's later production of any text messages, including JTX-1574, were

20  completely aligned with the verification he made.  To suggest that such a later

21  production amounts to Mr. Ripps having "disrespect for the judicial process and

22  willingness to lie under oath" is unfounded and a manipulative distortion of the sworn

23  statements he made in his verification.

24    Finally, the evidence Yuga cites to for support is misleading given the above

25  background and full text of the verification Mr. Ripps swore to.  Additionally, Mr.

26  Ripps was not asked about the text stating "It will sell out within 48 hours I think" at

27  trial.  Instead, Mr. Ripps was only asked about a text he received that stated, "You'll

28

1   make like a million dollars straight up." *See* Trial Tr. [Ripps] at 268:12-25.

2   Accordingly, stating that Mr. Ripps was asked about both texts at trial is inaccurate

3   and misleading.

4   **Plaintiff's Response:**

5        Throughout discovery Mr. Ripps signed no fewer than three declarations (two

6   of which were Court-ordered), under penalty of perjury, stating that he had searched

7   his records and produced all responsive documents related to the RR/BAYC NFTs.

8   JTX-1541 (Jan. 17, 2023); Dkt. 109-42 (Feb. 17, 2023); Dkt. 158 (Mar. 21, 2023).

9   After each of these three declarations, however, Defendants continued to produce

10  responsive documents after Yuga Labs independently discovered evidence of

11  improper withholding. *See, e.g.*, JTX-1574-JTX-1591 (text messages between Mr.

12  Ripps and Mr. Cahen, withheld until March 21, 2023, discussing relevant topics such

13  as Defendants' infringing NFT collection, Yuga Labs, Defendants' profit intent, Ape

14  Market, and marketing).  Defendants withheld documents such as ***hundreds of pages***

15  ***of text messages*** between them until March 21, 2023 — after Mr. Ripps verified under

16  penalty of perjury that he produced all responsive documents, after the Court had to

17  order responsive documents produced twice in response to Yuga Labs' discovery

18  motions, and after Yuga Labs had already filed its motion for summary judgment. *See*

19  Dkt. 145 (order requiring Defendants to produce communications).  Defendants also

20  produced responsive documents even after their March 21, 2023 declaration; for

21  example, on April 11, 2023, Defendants produced messages with a BAYC NFT

22  holder to whom Defendants were trying to provide an infringing NFT.  Defendants

23  have no excuse for their repeated improper withholding of material evidence and

24  repeated lies under oath.

25       The text messages presented to Mr. Ripps at trial, sent to him from Mr. Cahen,

26  said "You'll make like a million dollars" "Straight up."  Trial Tr. at 268:12-16; JTX-

27  1574.  Mr. Ripps sworn testimony at trial that he did not "really find it to have

28

anything to do with the RR/BAYC project" is not credible.  Trial Tr. at 268:17-21.

Defendants' objection offers no alternative business venture between the two of them at the same time that would have presented such profit-making opportunity.  Indeed, the messages immediately preceding the ones discussed at trial discuss "airdrop[ping]" NFTs to people "who already bought one" so that the collection could "sell out within 48 hours."  JTX-1574.  The text messages immediately after include "we already have ape market."  *Id.*  These text messages between Defendants were directly relevant to the litigation and should have easily been found and produced had any reasonable search been conducted.  Defendants' position, even now, that this message does not have "anything to do with the RR/BAYC project" highlights their lack of credibility.  *See* Dkt. 145 at 2-3 ("The Court takes a dim view of Defendants' blanket withholding of pre-litigation communications between Ripps and Cahen . . . .").

### **Defendants' Reply:**

Yuga argues that Defendants made misrepresentations about their compliance with discovery under oath.  This is false on its face.  At trial, Yuga claimed that Mr. Ripps was out of compliance with a statement he signed which swore under penalty of perjury that he was compliant with his discovery obligations.  That declaration reads, "I also understand that *discovery obligations are continuing*, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation.  I reserve the right to make *changes or additions to any of these answers or document productions if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available.*"  Dkt. 109-33 (emphasis added).

Yuga then faults Mr. Ripps for complying with his continued obligation to produce documents to Yuga.  There is nothing inconsistent with discovering more documents and supplementing documents.  Further, Mr. Ripps had a reason for

believing it was not relevant.  *See* Trial Tr. 268:19-21.  Regardless, he produced the texts and other documents.  Notably, the Court denied every one of Yuga's *six* different requests to find discovery violations and sanction Defendnats.  This Court should reject this proposed finding of fact because (unlike Yuga) Defendants were substantially cooperative and compliant in discovery, including by turning over thousands of communications.

### Plaintiff's Disputed Post Trial Finding of Fact No. 29:

Defendants made heinous attacks on Yuga Labs and its counsel throughout litigation. *See*, *e.g.*, Dkts. 149-50; 149-51.

### Defendants' Basis of Dispute:

The documents that Yuga cites to is a collection of Twitter posts that Yuga has taken out of context.  As Mr. Cahen explained in his declaration of trial testimony, many of these posts "frequently use terms or context that requires knowledge of contemporary crypto culture to understand."  Cahen Decl. ¶ 54 (Dkt. 344).  And many of Defendants' posts "involve pushing back forcefully on users that spread inaccurate, misleading, hypocritical, self-serving, or hateful message."  Cahen Decl. ¶ 55 (Dkt. 344).  To a person not familiar with the context of crypto culture, Mr. Cahen's posts can, "come across as combative or mean-spirited, but they are typical of crypto-related social engagement on Twitter."  *Id*.

For example, Yuga cites to Dkt. 149-50, which are crops of Twitter posts. Many of these posts are memes that are commonly used in crypto Twitter culture and on the internet generally.  Dkt. 149-50 at 2-5.  Defendants made minor modifications to these common memes so that they reference the RR/BAYC project's criticism and protest of Yuga.  *Id*.  Posting common internet memes on Twitter is not a "heinous attack."  Dkt. 149-50 also contains posts from Mr. Ripps criticizing Yuga and its leadership for make false statements to the public and behaving in a manner that Mr.

1   Ripps considers to be bad-hearted and unintelligent.  While these posts are critical of
2   Yuga and its leadership, they are voicing Mr. Ripps's honest beliefs.

3          Yuga also cites to Dkt. 149-51 which is also another collection of Twitter posts
4   that Yuga has also mischaracterized and taken out of context.  Defendants have
5   engaged in extensive criticism of Yuga and its supporters, including calling out
6   Yuga's content for including what Defendants believe to be references to racism,
7   fraud, pedophilia, and other offensive material.  Yuga attempted to use this litigation
8   to silence Defendants by conditioning any settlement on a non-disparagement clause
9   or comparable restrictions, to prevent Defendants from criticizing Yuga's problematic
10  content.  Defendants' honest belief is that Yuga's use of litigation in this manner
11  amounts to promotion and support of Yuga's harmful and dangerous messages.
12  Defendants voicing their beliefs on Twitter may come across as alarming, given the
13  nature of the content that they are criticizing.  But in context, Defendants' statements
14  are not rightly characterized as "heinous attacks."

15          **Plaintiff's Response:**

16          Defendants' objection should be rejected because they underplay the severity
17  of Defendants' conduct.  This was not mere "criticism" or "memes" as Defendants
18  contend, it was cruel-hearted harassment to intimidate Yuga Labs and its counsel.
19  *See* Dkt. 334 (When Yuga Labs' counsel raised this issue at the June 9 pretrial
20  conference, claiming that criticism is different that Defendants' attacks against Yuga
21  Labs and its attorneys, the Court responded:  "I understand their conduct is absolutely
22  horrible, and you know, I don't disagree.").  For example, Mr. Ripps called Yuga
23  Labs "demonic evil liars," comparing the company to Jeffrey Epstein.  Dkt. 149-50.
24  Defendants threatened Yuga Labs with images portraying Mr. Cahen next to a grave
25  marked "Yuga Labs," Mr. Ripps and Mr. Cahen holding a gun and a knife up to
26  Yuga Labs, and Mr. Cahen hoisting the severed head of one of the founders' apes
27  over his head.  *Id*.  Mr. Cahen targeted another Yuga Labs founder by falsely

28

tweeting: "[h]e's named after [a] banned 1971 child porn film."[5]   He further tweeted that the founder "REFUSES to change his name,"[6] based on the founder's response to a question from an ongoing Highly Confidential – Attorneys' Eyes Only deposition.  *See* Atalay Depo. (Dkt. 271) at 157-160 (showing testimony and break taken 42 minutes prior to Mr. Cahen's Tweet).

Defendants targeted Yuga Labs' counsel too, accusing Yuga Labs' lead attorney of supporting "racism, antisemitism, beastiality, pedophilia, and using cartoons to market drugs to young children."  Dkt. 149-51.  Mr. Ripps likewise sent a "personal message" to the attorney, posting an image stating: "Hey maybe you can suck my d**k."  *Id.* (censored).  This offensive and harassing conduct is par for the course for Defendants.  Mr. Ripps' tumblr account is plastered with racist and offensive content.[7]  And near the end of August 2023, Mr. Ripps was permanently suspended from Twitter for sending violent death threats.[8]  Whether or not Defendants' conduct is "typical" in their circles (an unsupported proposition that Yuga Labs disputes), in federal court, it is "egregious and beyond the pale of acceptable litigation conduct."  *See TE-TA-MA*, 392 F.3d at 264; *see also AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002) (affirming exceptional case where "defendant acted deliberately to and intended to harm the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "harass[] the plaintiff").  Their conduct warrants a finding that this is an exceptional case.

**Defendants' Reply:**

---

[5] https://twitter.com/Pauly0x/status/1620158732872331264
[6] *Id.*
[7] https://twitter.com/nft_decency/status/1538961466015076352
[8] https://twitter.com/PopPunkOnChain/status/1700226047612977249

1    Yuga has spent nearly the entirety of this case name-calling Defendants, to

2    which Defendant have not had an opportunity to respond.  This document is the first

3    time the Court is apprised of the context of these materials, which makes clear that

4    Yuga's name calling has been uncalled for, exaggerated, and misleading.

5    As noted in Defendants' objection, the examples in the documents that Yuga

6    cites involve, for example, Twitter posts of **memes** that are commonly used in crypto

7    Twitter culture and on the internet generally.  Dkt. 149-50 at 2-5.  And many of the

8    statements that Defendants made were made based one (1) their honest beliefs that the

9    statement contained in the post are true and (2) are public acts of criticism which are

10   commonplace on Twitter, particularly in the cryptocurrency community.

11   For example, Yuga's response cites to a post to allege that Mr. Ripps compared

12   Yuga to Jeffrey Epstein.  But in reality, the post **contrasts** Yuga by saying "they

13   [Yuga] don't have epstein money."  Moreover, this post expressed Mr. Ripps's honest

14   belief and criticism that Yuga has been dishonest regarding its use of offensive

15   content and harmful business practices—something that Mr. Ripps has a right to

16   criticize and which Yuga has taken out of context in an effort to prejudice Defendants

17   before the Court.

18   Yuga also references a meme that Mr. Cahen posted of a grave for the company

19   Yuga.  Again, this is a common meme that is regularly used on the internet to suggest

20   that a company has failed.  The meme comments on the downfall of Yuga because of

21   the successfully protest and criticism of the RR/BAYC collection.  Using a common,

22   generic meme to point out the success of Defendants' criticism is not a "heinous

23   attack."

24   Yuga then references a meme that Mr. Cahen posted of a scene from the famous

25   film *Inglorious Bastards*, which is a World War II movie involving the pursuit of

26   Nazis.  Some unknown third-party created this meme, which depicts the main

27   characters holding weapons to a suspected Nazi.  Again, it is commonplace to use

28

*Inglorious Bastards* memes when making this type of commentary online.  Mr. Cahen re-posted a meme that already exist, to reference Yuga and its use of subversive racism.  Sharing a generic meme from a famous movie is not "cruel-hearted harassment" as Yuga irresponsibly alleges in its response.

Yuga then cites a meme of a famous Gustav Dore artwork in which David is hoisting the head of Goliath, modified to reference Yuga as Goliath.  This famous painting is again a common meme that is used to convey success or victory, and in this particular context the meme references the success of the RR/BAYC protest and criticism of Yuga.  There is nothing wrong with Mr. Cahen posting this generic meme as it is ordinary behavior on Twitter, particularly in the cryptocurrency community.  Yuga has provided no explanation why it has chosen to take this meme out of context in a misleadingly way.

Yuga then cites to a Twitter post where Mr. Cahen criticizes a Yuga member with the name "Emperor Tomato Ketchup" for using the same name as a child pornography film that is also named *Emperor Tomato Ketchup*.  Mr. Cahen was (and is) disgusted that a Yuga executive would choose for his internet persona the name of a film that includes child pornography.  He accordingly raised criticism about it on Twitter.  Again, Mr. Cahen has a right to protest Yuga's executive's reference to pedophilia and moreover Yuga's refusal take any action to change it, even after having been publicly criticized for it.

Yuga also falsely states that Mr. Cahen made this tweet "based on the founder's responses" in an ongoing deposition.  This is a baseless assertion for which Yuga provided no supporting evidence.  Mr. Cahen was not present at the deposition and never saw or heard any of the confidential content of the deposition.  Mr. Cahen's statement that "Emperor Tomato Ketchup" continued to refuse to change his problematic name was based on his knowledge that, in fact, he had not changed his name.  Yuga's false accusation that Mr. Cahen somehow obtained information from

1   the deposition is yet another false allegation that Yuga and its counsel have carelessly

2   levied without support.

3        Yuga also exaggerates Defendants' posts in which they express their criticism

4   against Yuga and its harmful activities.  For example, Yuga complains that Mr. Cahen

5   has criticized Fenwick & West's involvement with criminal activity that FTX has

6   alleged to have committed and the crimes that he suspects that Yuga has committed.

7   But Mr. Cahen has every right to make posts that express his honest beliefs.  His

8   Twitter post about, for example, Yuga's counsel supporting Yuga's atrocious behavior

9   articulates his honest beliefs, given that Yuga's counsel has pretended (and suggested

10  in court documents) that the allegations are untrue and has wrongly (in court

11  documents) accused Mr. Ripps and Mr. Cahen of being liars.  The jarring content of

12  Mr. Cahen's comments is result of the vile nature of Yuga's accused activities.

13       Yuga similarly references a tweet form Mr. Ripps that Yuga alleges was

14  harassing conduct towards Yuga's counsel.  Yuga's co-founder, Wylie Aronow,

15  posted on Twitter "Hey maybe you can suck my d**k."  Mr. Ripps's post involved

16  taking a picture of what Wylie Aronow had publicly stated when he was still acting as

17  Co-President of Yuga and referencing it to Yuga's counsel.  Mr. Ripps's post was

18  aimed at raising awareness of the offensive conduct that Yuga's co-founder was

19  engaging in online.  And now, Yuga attempts to twist this post to mean something

20  more than an effort to bring attention to the kind of insulting statement Yuga has been

21  posting on Twitter.

22       Yuga also falsely accused Mr. Ripps's online history by referencing a tumblr

23  page that is *more than 14 years old* and on which Mr. Ripps used a massive banner at

24  the time stating "***SARCASM***:"

25

26

27

28



And while the page references offensive content found online, as the banner makes clear, Mr. Ripps was *sarcastically* referencing the offensive content because he found it offensive and did not like it.

### Plaintiff's Disputed Post Trial Finding of Fact No. 30:

Defendants used the litigation to "farm" for engagement on social media with the intent to further harm Yuga Labs. *See* JTX-938, JTX-1568, JTX-1617, JTX-1620.

### Defendants' Basis of Dispute:

The evidence at trial did not show that Defendants used the litigation to "farm" engagement on social media with the intent to harm Yuga.  Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness."  Cahen Decl. ¶ 52 (Dkt. 344).

This lawsuit has become one of the most widely reported art law cases in the world.  Mr. Cahen, who has a history of working with creators, has posted about this lawsuit on social media to report on court filings or to comment on the lawsuit in general.  Reporting news and commenting on the lawsuit is normal activity on Twitter and cannot be reasonably characterized as engagement farming with "intent to further harm Yuga Labs."

1       The documents that Yuga cites similarly show that Defendants did not farm for

2   engagement with the intent to harm Yuga Labs.  JTX-938 is a Twitter post by Mr.

3   Cahen commenting on a news article that failed to mention that Yuga stole

4   Defendants' idea for ApeMarket.  JTX-1568 is a post where Mr. Cahen states his

5   opinion that this lawsuit was a poor business decision.  JTX-1617 and JTX-1620 are

6   posts reporting the filing of specific public documents in this case.  These are all

7   ordinary reporting/commentary activities that numerous users on Twitter routinely

8   engage in.  Nothing in these exhibits contains evidence of "intent to harm" or anything

9   out of the norm for Twitter activity.

10             **Plaintiff's Response:**

11      Defendants' communications and tweets demonstrate that their intent in posting

12  about this lawsuit was to engagement farm and further harm Yuga Labs.  Mr. Cahen

13  has admitted that "social media is an attention economy" and "engagement =

14  currency."[9]  He also bragged about being "pretty elite at getting engagement on

15  twitter."  JTX-801.203.  So when he posted things like "We built a marketplace for

16  every Yuga Labs asset 6 months before any of this bullshit.  And we got sued for

17  it. . . . @ApeMarketplace was our platform.  It came 1st,"  he was not simply

18  reporting or commenting on the lawsuit, he was promoting Ape Market.  Likewise,

19  when he posted the tweet in JTX-1617 and JTX-1620, he wasn't just reporting the

20  filing of Ms. Kindler's report, he was quoting a specific portion highlighting that

21  Yuga Labs' expert proposed to "'purchase and destroy' the entire supply of

22  RR/BAYC for $1,792,704."  This signaled to the NFT community that demand for

23  RR/BAYC NFTs could increase, increasing their perceived value.  And this tweet

24  succeeded:  "The price and trading volume of RR/BAYC NFTs also increased

25  immediately following Mr. Cahen's tweet." Kindler Decl. (Dkt. 338) ¶ 73.  Such

26  conduct "likely indirectly benefit[s] Defendants, as they create more visibility for the

27  _____

28  [9] https://twitter.com/Pauly0x/status/1653117215552446471

RR/BAYC NFT collection on secondary markets and allow Defendants to remain relevant and use engagement to obtain more followers." *Id*. ¶ 69.

As further evidence of engagement farming, Mr. Cahen tweeted about their subpoena of Paris Hilton and Jimmy Fallon to drum up engagement on Twitter, retweeting it from his @apemarketplace account in order to promote Ape Market.[10] These subpoenas themselves were facially invalid and Defendants only served them in order to get attention from the news media. *See* Mem. Supp. Motion to Quash, *In re Document Subpoena to James Fallon*, No. 1:23-mc-00059-JHR (Dkt. 3) (Mar. 6, 2023 S.D.N.Y) (Mr. Fallon's brief arguing "Mr. Tompros, the signatory of the Subpoena on behalf of Ripps and Cahen, apparently is neither admitted to practice law in New York, Vermont, or Connecticut, nor admitted to the bar of the Southern District of New York. Courts in this district and elsewhere have recognized that this defect alone renders a subpoena fatally deficient on its face."). Defendants never pursued either deposition. Yet, they only withdrew the subpoenas *after* Yuga Labs' counsel appeared for the deposition of Paris Hilton only to find out that Defendants were not proceeding with the deposition. The publicity they received may have led, or may lead in the future, to additional revenue streams to enrich Defendants, including other NFT sales. *See*, *e.g.*, Kindler Decl. (Dkt. 338) ¶ 70. The charade of issuing the subpoenas (but not serving them) certainly allowed Mr. Cahen to engage with his Twitter following about RR/BAYC NFTs. Defendants' Tweets about the lawsuit were not mere "reporting" – they were blatant promotion.

### Defendants' Reply:

As explained in Defendants' objection, the exhibits that Yuga cites do not show that Defendants used this litigation to "farm" engagement. Instead, Yuga cites to a string of comments and statements in JTX-801 in which Mr. Cahen was generally commenting on developing ApeMarket. And Yuga references more Tweets from

---

[10] https://twitter.com/Pauly0x/status/1602819954335748098

Defendants regarding current events associated with this lawsuit.  Again, that is just generic reporting.  And now, Yuga alleges wild fantasies that somehow Yuga filing this expensive and burdensome lawsuit against the individual Defendants has somehow made Defendants wealthy by creating additionally revenue streams.  Yuga's allegation makes no sense.   Defending a lawsuit does not create revenue streams.  To the contrary, lawsuits are costly and almost always create financial burden.

Yuga also makes unfounded accusations about Defendants issuing subpoenas for purposes of farming engagement.  But in reality, Defendants issued subpoenas in good faith and declined to pursue the deposition of Mr. Fallon after discovering (based on representations following a discussion with Mr. Fallon's counsel), that Mr. Fallon did not have useful information.  In a similar vein, Defendants halted their third-party discovery of Ms. Hilton after Ms. Hilton avoided service of Defendants' subpoena.  Further, Yuga complains about its own election to appear at Defendants' counsel's office (for which it cites nothing in the record), without noting that weeks before, Defendants had already informed Yuga that they have been unable to serve Ms. Hilton.  If Yuga had any questions regarding the deposition schedule, Yuga should have conferred with Defendants.  Yuga's counsel has had a habit of refusing to confer in good faith in this litigation regarding the deposition schedule, and Yuga has in fact has been sanctioned for it.  Dkt. 77.

**Plaintiff's Disputed Post Trial Finding of Fact No. 31, line 11:22:**

Defendants' public disclosure of confidential material violated this Court's Protective Order (Dkt. 51) and intentionally harmed Yuga Labs. *See* Dkts. 180, 183, 194.

**Defendants' Basis of Dispute:**

Defendants did not intentionally violate the Court's Protective Order or intend to harm Yuga with the disclosure of any confidential information.  Defendants inadvertently filed documents that were not fully redacted, though that error was

largely the result of Yuga's failure to cooperate on sealing procedures.  One week
before Defendants' summary judgment opposition, which was filing containing
spanning thousands of pages, Defendants sent an email to Yuga to discuss what
materials needed to be sealed.  Dkt. 176 at 1.  But Yuga did not timely respond to
Defendants' email as required in page 18 of this Court's Standing Order (Dkt. 14).
Defendants, after sending a follow up email, only received a response from Yuga after
close-of-business on Friday for a summary judgment filing that was due on the
following Monday.  Dkt. 176 at 2.  Moreover, Yuga designated for sealing sweeping
portions of Defendants' filing (almost all of which was public material that was
already on this Court's public docket or readily available on the internet).  *See* Dkt.
176 at 3-5.  Defendants did their best to apply redactions despite the crisis that Yuga's
failure to cooperate had created.

This led to discrepancies in redactions and an inadvertent violation of the
Protective Order.  After Defendants became aware of the discrepancies, they informed
Yuga and promptly made efforts to seal relevant materials from the docket and third-
party website, and (at Yuga's request) contacted reporters that appeared to have
received the filings to ask that they honor the Protective Order.  Defendants also
compensated Yuga financially pursuant to the terms of the protective order for the
inadvertent disclosure.  None of Defendants' activities directed at "intentionally"
harming Yuga.

### **Plaintiff's Response:**

Defendants' objections are no more than false and weak excuses that attempt to
push the blame for their violation of the Protective Order on Yuga Labs, rather than
acknowledge the severe and injurious nature of their actions.  Yet it was Defendants,
not Yuga Labs, who publicly filed numerous Yuga Labs' Highly Confidential –
Attorneys' Eyes Only materials in an admitted violation of the Protective Order.  And
it was Defendants who immediately and intentionally sent these Highly Confidential

1  materials to prominent news outlets—actions that are difficult to reconcile with

2  Defendants' position that these materials were merely "inadvertently filed . . . not

3  fully redacted." *See* Docket 180 at 5.  Defendants' intentional actions caused harm to

4  Yuga Labs when these materials were inaccurately reported in national media such as

5  CNN and falsely cited in other meritless litigation against Yuga Labs.  It is no excuse

6  for Defendants to disclaim the obvious resultant harm of their violation of a Court

7  order.

8          **Defendants' Reply:**

9        Yuga's response fails to address the substance of Defendants' objection.

10  Specifically, Yuga ignores that ***it*** violated this Court's Standing Order by providing

11  egregiously late notice of portions of documents it seeks to file under seal, materially

12  prejudicing Defendants' ability to redact thousands of pages of documents shortly

13  before filing.  Defendants did the best they could granted the circumstances, and any

14  redaction errors were clearly inadvertent.  In fact, Yuga's lead counsel acknowledged

15  this much during a meet and confer—that he understood that Defendants made an

16  honest mistake given the circumstances surrounding the redaction requests.  Given

17  this acknowledgement, Yuga's request for a finding of "intentional" violation of the

18  protective order is wrong, unprofessional, and offensive.

19        **Plaintiff's Disputed Post Trial Conclusion of Law No.  33, line 12:1:**

20        <u>Defendants acted with intent to deceive consumers.</u>[3] *See* SJ Order at 12; *see*

21  *supra* Section II.B.

22        **Defendants' Basis of Dispute:**

23        Mr. Ripps and Mr. Cahen did not act with intent to deceive consumers.  Mr.

24  Ripps and Mr. Cahen took steps to make clear to collectors and to the public that

25  RR/BAYC was intended as a protest art project. Ripps Decl. ¶¶ 158-176 (Dkt. 346)

26  (uncontested); Cahen Decl. ¶¶ 145-155 (Dkt. 344); Dkt. 197-1 ¶ 230.  For example,

27  the rrbayc.com website—through which the majority of RR/BAYC commissions

28

occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.

Further, collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Additionally, Mr. Ripps and Mr. Cahen's online discussion of the RR/BAYC project confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  Accordingly, this conclusion of law is unfounded based on the evidence presented at trial.

Yuga Labs also fails to cite to adequate evidentiary support.  Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

1  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

2  judges for the remainder of the case.  Given the nature of such motions, it could not be

3  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

4  an issue were decided at summary judgment for one purpose, the summary judgment

5  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

6  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

7  of initial police contact was relevant as background, but not to the already decided

8  issue that initial contact was not excessive force).  This case is just like *Sienze*:  the

9  summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged

10  marks applies to only the issue of likelihood of confusion and cannot be applied more

11  broadly.

12                    **Plaintiff's Response:**

13         Defendants' objection should be rejected because (1) the Court has already

14  found that Defendants intended to deceive consumers; (2) the evidence shows that

15  Defendants intended to confuse consumers; (3) Defendants knew their infringement

16  would result in confusion; (4) the record shows ample actual confusion and likelihood

17  of confusion; (5) Defendants intended to profit off this confusion; (6) Defendants did

18  not take steps to avoid confusion; (7) Defendants' "disclaimer" did not dispel

19  likelihood of confusion; and (8) most RR/BAYC NFTs were sold on secondary

20  marketplaces without a disclaimer.

21         **The Court Has Already Adjudicated This Issue In Its Summary Judgment**

22  **Order (Dkt. 225)**:  In that order, the Court held that Yuga Labs owns its BAYC

23  Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used

24  those marks in commerce, and that Yuga Labs has not abandoned its marks.  *Id*. at 6-

25  10.  The Court also held that "Defendants have admitted that they intentionally used

26  the BAYC Marks in their RR/BAYC NFTs."  *Id*. at 11.  The Court "easily

27  conclude[d]" that Defendants' use of identical marks, on identical products, in

28

1    identical markets supported a finding of a likelihood of confusion.  *Id*. at 10-13.  That
2    order establishes the matters adjudicated therein for purposes of this case.  Fed. R.
3    Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment
4    motion may "enter an order stating any material fact — including an item of damages
5    or other relief — that is not genuinely in dispute and treating the fact as established in
6    the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*
7    *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*
8    *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on
9    partial summary judgment are taken as established at trial.").

10        Defendants did not move the Court to reconsider its holdings.  Nevertheless,
11   Defendants refuse to accept the Court's order, unnecessarily burdening the Court and
12   Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if
13   the Court's order does not exist.  Defendants' tactics are inconsistent with the very
14   purpose of a partial summary judgment order, which is "intended to avoid a useless
15   trial of facts and issues over which there was really never any controversy and which
16   would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos Internacionales,*
17   *S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D.
18   Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981))
19   (emphasis added).  Defendants' authorities do not support their position.  *See Sienze v*
20   *Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25,
21   2019) ("evidence concerning issues resolved at summary judgment is ***generally not***
22   ***relevant and should be excluded***" at trial) (emphasis added); *Shouse v. Ljunggren,*
23   792 F.2d 902, 904 (9th Cir. 1986) (discussing applicability of the law of the case
24   doctrine where a case is assigned to a new judge).

25        "The partial summary judgment is merely a pretrial adjudication that certain
26   issues shall be deemed established for the trial of the case and likewise serves the
27   purpose of speeding up litigation by eliminating before trial matters wherein there is

28

1    no genuine issue of fact." *Lahoti v. VeriCheck, Inc*., 586 F.3d 1190, 1203 n.9 (9th Cir.

2    2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

3    undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

4    tactic that has unjustifiably increased the cost of resolving this case.

5        Nevertheless, Defendants forced the Court and the parties to re-litigate this

6    decided issue.  As discussed below, the evidence the Court can consider following the

7    trial amply supports this factual finding.  Thus, the outcome on this issue after trial is

8    no different than it was after Yuga Labs' Motion for Summary Judgment.

9    Defendants' objection should be rejected because the evidence shows that Defendants

10    intended to confuse consumers.

11       **Defendants Intended To Confuse Consumers:**  Defendants' private

12    communications show they knew they were using the BAYC Marks in a way that was

13    likely to confuse consumers and did so with the intent to profit from their

14    infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see*

15    *also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

16    man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of

17    money tbh"; "Potentially a lot").  And despite being urged to use different images or

18    overlay some commentary on the images they did use to avoid confusion, Defendants

19    chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or

20    something like Getty images" because "it's just insane to have the same art"); JTX-

21    801.196 (Mr. Lehman demonstrating what an overlay might look like and

22    recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

23    showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

24    showing screenshot of Ape Market).  They also discussed that they knew they were

25    infringing and creating confusion, as they acted contrary to their attorneys' advice.

26    JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull

27    / If we want to fight trademark").  Instead of making changes, such as those

28

1    recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs'
2    BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also*
3    Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands,
4    every choice is intentional.").

5          Defendants also knew that what they were doing was likely to lead to a lawsuit.
6    For instance, Mr. Ripps asked for a reference to his limited liability company,
7    Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued
8    personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and
9    branding direction in light of the trademark thing" to Mr. Cahen before they learned of
10   this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get
11   sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now
12   with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which
13   Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs'
14   marks to minimize the confusion and their infringement.

15         Privately, Defendants also discussed strategies to "cannibalize" the secondary
16   NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC
17   NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at
18   getting engagement on twitter."  *Id.*  Defendants brainstormed about needing some
19   "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in
20   order to complete the first sale ("mint") of each infringing RR/BAYC NFT.  JTX-
21   801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have an effect" on
22   their ability to "mint out" the RR/BAYC NFTs.  *Id.*

23         Publicly, Defendants made false representations about the RR/BAYC NFTs that
24   implied owning one offered equivalent benefits to owning a genuine BAYC NFT.
25   JTX-1037.  Defendants published their promotions from their individual Twitter
26   accounts and from the commercial @ApeMarketplace account advertising their
27   forthcoming NFT marketplace.  These advertisements were also directed at BAYC
28

1  NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶

2  46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have on

3  Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications,

4  Defendants revealed their true intent to profit from the infringing use of Yuga Labs'

5  BAYC Marks.

6        **There Is Ample Evidence That Defendants Knew They Were Confusing**

7  **Consumers:**  Defendants knew they were using the BAYC Marks in a way that was

8  likely to confuse consumers and did so with the intent to profit from their

9  infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see*

10  *also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

11  man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of

12  money tbh"; "Potentially a lot").  And despite being urged to use different images or

13  overlay some commentary on the images they did use to avoid confusion, Defendants

14  chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or

15  something like Getty images" because "it's just insane to have the same art"); JTX-

16  801.196 (Mr. Lehman demonstrating what an overlay might look like and

17  recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

18  showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

19  showing screenshot of Ape Market).  Instead, they continued with their infringement,

20  knowing that they were creating confusion.  JTX-801.185 (Mr. Lehman writing,

21  "overall I think we should be very careful about doing this in terms of the confusion it

22  will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult

23  to make the collections coexist" because "they are the same art" and "same logos");

24  JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and

25  writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the

26  RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name.");

27  JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy

28

definitely some people will buy thinking they are buying originals!"); JTX-44.00002
(Mr. Hickman stating, "people believe the tokenId should match the RR ID.  that is
where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16
(testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the
Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at
59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the
blockchain is complicated.   A lot of people don't have the technical expertise or
knowledge to be able to have a conversation about crypto technology and blockchain
technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT
collections by the token tracker); Dkt. 416 at ¶ 7.

They also discussed that they knew they were infringing as they acted contrary
to their attorneys' advice.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may
just need to change the skull / If we want to fight trademark").  Instead of making
changes, such as those recommended by their lawyer or Mr. Lehman, they continued
to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano
Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and
imagery for brands, every choice is intentional.").

**The Evidence is Overwhelming That There Was Actual And Likely
Confusion:**  Finally, Yuga Labs produced ample documentary and testimonial
evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-
109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-
1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger
Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.
(Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.
392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law
(Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195
(Mr. Lehman noting that people "making mistakes with apes is already a huge meme"

and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

**Defendants Intended To Profit Off This Confusion:**  While Defendants publicly claim there was an artistic goal (to ensure they "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC

brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal:  mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so low that we I make anything"); *id.* (Mr. Cahen: "priorities:  getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).  Defendants knew they were stealing from Yuga Labs.

**Defendants Did Not Take Steps To Avoid Confusing Consumers:**
Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" ***immutably*** in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an

1   overlay or something like Getty images" because "it's just insane to have the same
2   art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and
3   recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]
4   showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet
5   showing screenshot of Ape Market). Defendants could have attacked Yuga Labs in
6   countless non-infringing ways. But they did not. Instead, they used Yuga Labs'
7   marks, commercially, in the way that would make Defendants the most money by
8   selling counterfeit NFTs that confused consumers. O'Laughlin Decl. (Dkt. 341).

9   **Defendants' Disclaimer Is Evidence Of Their Culpability:** With respect to
10   the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was
11   necessary to include a disclaimer demonstrates their awareness that their use of the
12   BAYC Marks was misleading." SJ Order (Dkt. 225) at 17.

13   Defendants also knew that what they were doing was likely to lead to a lawsuit.
14   For instance, Mr. Ripps asked for a reference to his limited liability company,
15   Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued
16   personally." JTX-803.57; *see also* JTX-918.00036 (Mr. Lehman stating to Mr. Cahen
17   the need to "look really sympathetic to people" if sued). And, Mr. Lehman was still
18   advocating for a "new logo and branding direction in light of the trademark thing" to
19   Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want
20   to get sued, OR, if get do get sued, for us to look really sympathetic to everyone"
21   (JTX-918.0036). That Defendants took some steps to try to conceal their intent when
22   they were inevitably sued does not make the infringing activity less confusing; it just
23   demonstrates their culpability.

24   Additionally, the public was not required to read and click a disclaimer.
25   Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users
26   "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they
27   agreed "no one" would read (JTX-801.128). And, this wall of text did nothing to

28

dispel confusion amongst the general public when every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer.  This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer.  (Ripps Deposition Designations) at 82:8-13.

Moreover, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-existent to ineffective at best.

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:**  Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on

1   secondary markets. . . .  [T]he vast majority of them are occurring in secondary

2   markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723

3   (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm,

4   e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're

5   closing in on *$10 million impact to yuga'"").  These secondary markets did not

6   involve a disclaimer.

7          Thus, the vast majority of market activity involving Defendants' infringing

8   NFTs is taking place on the secondary market, including platforms such as Foundation

9   and OpenSea.  These secondary marketplaces are one place where consumer

10  confusion is likely to result from Defendants' actions to flood the market with their

11  infringing products.  These secondary marketplaces are also a prominent source of

12  confusion going forward—especially since they are where Defendants continue to

13  market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC

14  NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-

15  25 ("the Ape Market Twitter [account], that actually links directly to LooksRare

16  where these NFTs are still selling").  Defendants' contention is therefore incorrect and

17  misleading.In that order, the Court held that Yuga Labs owns

18         **<u>Defendants' Reply:</u>**

19         ***First,*** the Court has not adjudicated this issue in its summary judgment order.

20  Yuga incorrectly states that the Court has already decided the issue of Defendants'

21  intent.  In support of this assertion, Yuga incorrectly relies on the law of the case

22  doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as***

23  ***motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir.

24  1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

25  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

26  judges for the remainder of the case.  Given the nature of such motions, it could not be

27  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

28

an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged marks applies to only the issue of likelihood of confusion and cannot be applied more broadly. Here, Defendants' intent is particularly relevant to the determination of whether disgorgement is available and that is an issue that the Court has not decided and needs to weigh the evidence presented at trial on the issue. *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Accordingly, Defendants do not raise that issue to burden the Court's time, as Yuga incorrectly states, but to present evidence on a central issue of the case. Further, Yuga's assertion that Defendants' objection here constitutes a refusal to accept the Court's orders is inaccurate and misleading.

   ***Second,*** Defendants did not intend to confuse consumers. Yuga's argument that Defendants' intended to confuse consumers is baseless. The evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶

131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04. Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.

346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has

1  none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

2  Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

3  someone listening to her public statement about Yuga not having any IP rights would

4  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

5      The evidence that Yuga cites does not rebut this overwhelming evidence of

6  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

7  and taking out of context evidence.  For example, Yuga repeatedly cites to various

8  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

9  confusion.  But those pages are internal discussion about the design of the ApeMarket

10  website to ensure that users of apemarket.com were not confused by the website

11  design.  Yuga even cross-examined Mr. Hickman about these communications and

12  received the same explanation: "This is our attempt to make it as clear as possible.

13  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

14  [Hickman] 212:22-24.

15      Yuga also cites to correspondence among the creators discussing a possible fear

16  of litigation.  These discussions are taken out of a broader context of hundreds of

17  thousands of communications the creators made.  Further, whether the Defendants

18  feared possible litigation for criticizing a multi-billion dollar company does not

19  establish that they intended confuse anyone.

20      Additionally, Yuga points to private chat conversations the creators had about

21  Ape Market.  The portions they cite to do not show any intention to confuse and

22  further ApeMarket was never released, and there was no evidence that the webpage

23  apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]

24  217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

25  (uncontested).

26      Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,

27  in which he states that "RR/BAYC grants to 100% commercial rights, community

28

member created a shopping site for his! Now you can get the hoodie of your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which has caused thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and this does not demonstrate an intent to confuse consumers.

*Third,* there is ample evidence that Defendants did not know that any consumers were confused, nor that there was any actual confusion. The evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants' knowledge of confusion, Yuga cites to documents it argues show that the Defendants intended to make a profit.  Intending to profit from your artwork is not the same thing as intending to confuse consumers and one does not weigh toward the other.

Further, the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

1        Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

2   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

3   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

4   Buttressing this fact, Yuga's founders were also not aware of a single instance of

5   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

6   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

7   identify even[] a single person who purchased an RR/BAYC believing it to be

8   sponsored by Yuga Labs; right? A Correct.").

9        Further, the evidence that Yuga cites does not rebut the overwhelming evidence

10  of Defendants' intent to protest and criticize and Yuga instead relies on

11  mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

12  cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

13  confusion.  But those pages are internal discussion about the design of the ApeMarket

14  website to ensure that users of apemarket.com were not confused by the website

15  design.  Yuga even cross-examined Mr. Hickman about these communications and

16  received the same explanation: "This is our attempt to make it as clear as possible.

17  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

18  [Hickman] 212:22-24.

19       Yuga similarly takes out of context exhibits such as JTX-44.00002 to

20  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

21  44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

22  ID.  that is where they get confused."  This statement is not discussing confusion

23  regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

24  RR/BAYC collection used a different numbering system that BAYC NFTs, and that

25  consumers expected the numbers match as a shorthand manner of cataloguing the

26  digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

27  numbering system, some consumers were confused as to which RR/BAYC NFT they

28

1  received but they understood very well that they received an NFT created by Mr.

2  Ripps that protests and criticizes Yuga.

3          The record clearly shows that Defendants did not know that there were any

4  confused consumers and further there is no evidence presented that anyone was

5  actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

6  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

7  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

8  what you were focused on. Yuga Labs has been unable to identify even[] a single

9  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

10  right? A Correct.").

11          ***Fourth,*** the evidence is overwhelming that there was not any actual and likely

12  confusion.  Yuga's response is not based in fact.  First, there is ample evidence that

13  there was ***no*** consumer confusion. Defendants took multiple steps to make clear that

14  the RR/BAYC collection was not related to Yuga in any way.  For example, the

15  rrbayc.com website—through which the majority of RR/BAYC commissions occurred

16  and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

17  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

18  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl.

19  ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano]

20  63:1-10.  Collectors using the rrbayc.com website were also required to read and click

21  through a disclaimer acknowledging the artistic purpose of the project before they

22  were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

23  (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

24  requirement and additional steps so that the artistic purpose of the work would be

25  clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

26  was the artist statement ultimately included, if it had a negative impact on usability?

27  … A.  … Ryder wanted it and so he had the final call.").

28

1    Unsurprisingly, therefore, the evidence presented at trial shows that many

2    people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

3    Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

4    2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

5    As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a

6    single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

7    Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,

8    Yuga's founders were also not aware of a single instance of actual confusion.  Trial

9    Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

10   what you were focused on. Yuga Labs has been unable to identify even[] a single

11   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

12   right? A Correct.").

13   The evidence Yuga cites to is not supportive of a finding that there was

14   consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

15   O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

16   flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that

17   she used an overly expansive definition of the market that included people who did

18   not have any interest in purchasing an NFT, much less knowledge of what an NFT is.

19   Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.

20   She acknowledged that she changed the survey population after running pretests to

21   make it more inclusive. *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that

22   she lacked basic knowledge about the NFT market, admitting to erroneously believing

23   that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*.

24   at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

25   that could not show confusion because the market was too broad.  This was despite

26   her acknowledgement that choosing the right sample population "matters for the

27

28

1  analysis" and choosing an improper sample population would be a mistake.  *Id.* at
2  146:18-25.

3        Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020
4  she authored an article titled, "Which Method is For You? Not All Surveys Are Made
5  the Same" JTX-314.  In that article she discusses choosing between the Squirt and
6  Eveready surveys on the basis of the strength of the mark.  In this case, however, she
7  ignored her own advice and operated both surveys.  This was despite acknowledging
8  that at her deposition she agreed with her earlier advice that the Eveready survey is
9  most appropriate when the mark is strong, and the Squirt survey when the mark is
10 weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the
11 strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it
12 was the first case she personally testified in where she offered an opinion based on
13 both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the
14 surveys, but by not doing so she did not produce a finding of value on either survey.

15       Ms. O'Laughlin also could not explain the extremely strong priming effect
16 which influenced her results to her Everready survey.  In that survey, people were split
17 into those who saw a version of the RR/BAYC Foundation page that included the
18 words "Bored Ape Yacht Club."  Those in the control group of the experience would
19 see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote
20 the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those
21 in the control group who copied down the words "Chill Gorilla Boat Crew" were not
22 counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of
23 those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not
24 counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that
25 she did not account for this extreme priming effect calling it "not particularly
26 relevant."  *Id.* at 158:20-159:1.

27
28

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

The documentary evidence Yuga cites to is also unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344). The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262

(Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

1     Yuga further states that Mr. Ripps and Mr. Cahen did not offer admissible

2  evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

3  This is categorically false.  The evidence presented at trial shows that many people

4  who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl.

5  ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590,

6  JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

7  presented at trial that showed consumers were not confused about the source of the

8  RR/BAYC NFTs.

9     Yuga's response is also inaccurate given Defendants used modified versions of

10  the alleged BAYC Marks in their reservations.  For example, the logo used states

11  "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the

12  website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

13     Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

14  profits, which is something Defendants argue they are not, Yuga can only receive

15  profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982

16  *F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun*

17  *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires

18  distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

19  protest against Yuga (and were thus not confused about Defendants' use of Yuga's

20  marks) and revenue from purchasers who mistakenly believed they were purchasing

21  Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

22  single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored

23  by Yuga.

24      Yuga's citations to *Gucci* are inapplicable here, given the evidence shows

25  consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps

26  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

27  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not

28

support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

***Fifth,*** Defendants intended to create a protest. Evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Yuga's response here misleading takes out of context communications between the creators and relies on them to imply that the creators' artistic motives were not genuine.  This is unfounded.  Mr. Ripps's and Mr. Cahen's contemporaneous

1    communications about the RR/BAYC project confirm that their intent was to use

2    RR/BAYC to criticize.  For example, in private group chats among participants in the

3    RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their

4    intended artistic purpose of the project, their intention that it would spread criticism of

5    Yuga, and their intention that social media platforms be used to educate the public

6    about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010,

7    012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

8    Defendants' online discussion, which consisted of nearly the entirety of Defendants'

9    public activities associated with RR/BAYC, confirms their intent.  In those

10   discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

11   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

12   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

13   Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the

14   voluminous correspondence that Defendants received shows that they did in fact

15   create a "community of educations" as Mr. Ripps intended, who have written letters

16   expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205

17   (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592,

18   JTX-2595, JTX-2596; JTX-2599.

19       *Sixth,* Defendants took many steps to avoid confusion.  Yuga's argument that

20   Defendants did not take steps to avoid confusion is baseless. As the evidence

21   presented at trial shows, Defendants took multiple steps to make clear that the

22   RR/BAYC collection was not related to Yuga in any way.  For example, the

23   rrbayc.com website—through which the majority of RR/BAYC commissions occurred

24   and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

25   (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

26   intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl.

27   ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano]

28

63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Further, the evidence Yuga cites to is unsupportive.  For example, Yuga points to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract clearly indicates Mr. Ripps is the creator and allows consumers to easily establish provenance.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

Again, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants did not take steps to avoid confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344).

Finally, Yuga's statements regarding Defendants' use of the alleged marks are misleading.  Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize someone without saying who they are.

1    **Seventh,** Defendants' disclaimer is not evidence of culpability. First, Yuga

2    incorrectly cites to this Court's summary judgment order to suggest that use of a

3    disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does

4    not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v.*

5    *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*

6    *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on

7    incomplete information, don't bind district judges for the remainder of the case.

8    Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze*

9    *v Kutz*, the Court held that although *aspects* of an issue were decided at summary

10   judgment for one purpose, the summary judgment order did resolve the issue

11   generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184

12   at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was

13   relevant as background, but not to the already decided issue that initial contact was not

14   excessive force).  This case is just like *Sienze*: the summary judgment ruling the

15   Defendants' disclaimer applies only the issue of infringement and is not adequate

16   support on use of a disclaimer generally or as applied to availability of disgorgement

17   as a remedy, apportionment, and an exceptional case analysis.

18   And Yuga's complaint that Defendants did not use a disclaimer on Foundation,

19   Etherscan, or any other third-party website is inapposite.  Defendants have no control

20   over third party websites such as Etherscan and do not have the ability to design the

21   pages third-party websites use or how they choose to display the RR/BAYC NFT

22   collection.  It simply was not possible for Defendants to add a disclaimer on

23   Foundation or Etherscan because they do not control those websites.

24   And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use

25   Etherscan's token tracker/token name but instead rely on marketplaces or by checking

26   the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay

27   explained that using token names to distinguish NFTs "would be a fairly weak way to

28

do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

Further, the smart contract clearly indicates Mr. Ripps is the creator and not Yuga and allows consumers to easily establish provenance, which undermines Yuga's assertions about what consumers see when they review the NFT.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT uses the alleged marks. Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. Id.

Second, Yuga incorrectly argues that the disclaimer "did nothing to dispel confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes clear, the rrbayc.com website "required collectors to acknowledge and accept a disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶ 105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶ 106.  While it is possible that a consumer chose not to read this disclaimer or the prominent artistic statement included on rrbayc.com, this evidence tends to prove that many did and further shows that Defendants were trying to ensure that no one was confused about the source of their collection.  *Id.* at ¶¶ 102, 108.  Yuga's assertion that this disclaimer shows the opposite intent is baseless.

1    Third, Yuga also cites to correspondence among the creators discussing a

2    possible fear of litigation.  These discussions are taken out of a broader context of

3    hundreds of thousands of communications the creators made.  Further, whether the

4    Defendants feared possible litigation from a multi-billion-dollar company does not

5    establish that they intended confuse anyone.

6    Fourth, Yuga misstates the meaning of Mr. Ripps's deposition testimony

7    surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were

8    "technically sold" on Foundation is because the contract is a Foundation contract.  *See*

9    Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC

10   NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How

11   many were sold through Foundation?  A. Well, technically, all of them were because

12   it was a Foundation contract, so..."); Counter designation 82:14-19.  This however is

13   different than the "Foundation page" for Ryder Ripps.  Accordingly, Mr. Ripps was

14   not admitting that all sales went through his Foundation page and his testimony that

15   over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl.

16   ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

17   Fifth, while there may have been many sales on secondary marketplaces as

18   Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little

19   profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr.

20   Cahen's testimony make clear, they tried to turn off royalties from the secondary sales

21   of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of

22   royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps

23   Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states

24   that they received only a small amount of royalties from Foundation before they shut

25   it off, around $1,000, and some from LooksRare, as that marketplace initially refused

26   to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).

27   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

28

1   the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

2   shut off royalties from such sales yet again supports a finding that they did not intend

3   to confuse and were motivated by their protest of Yuga not to profit.

4        **Eighth,** while there may have been many sales on secondary marketplaces as

5   Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little

6   profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr.

7   Cahen's testimony make clear, they tried to turn off royalties from the secondary sales

8   of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of

9   royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps

10   Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states

11   that they received only a small amount of royalties from Foundation before they shut

12   it off, around $1,000, and some from LooksRare, as that marketplace initially refused

13   to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).

14   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

15   the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

16   shut off royalties from such sales yet again supports a finding that they did not intend

17   to confuse.

18        Second, it is incorrect that there is a likelihood of confusion on the secondary

19   marketplaces, as Yuga alleges.  The evidence presented at trial shows that many

20   people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

21   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

22   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

23        Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

24   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

25   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

26   Buttressing this fact, Yuga's founders were also not aware of a single instance of

27   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

28

let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Further, the smart contract clearly indicates Mr. Ripps is the creator and not Yuga and allows consumers to easily establish provenance, which undermines Yuga's assertions about what consumers see when they review the NFT. *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

Third, Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs. For support Yuga cites to Mr. Solano's declaration where he states two marketplaces that sell RR/BAYC NFTs and testimony that the ApeMarket Twitter account links to a marketplace. Neither of those pieces of evidence supports a finding that Mr. Ripps and Mr. Cahen are actively marketing.

### **Plaintiff's Disputed Post Trial Conclusion of Law No. 33, lines 12:2-5 and n.3:**

*Footnote 3*

Mr. Ripps' testimony as to his intent and "good faith" is not credible, as many of the statements in his declaration are contradicted by the documentary evidence. The Court therefore finds Mr. Ripps' characterization of his actions when they do not suit present purposes, to be unavailing. *Cf. supra* Section II.B.

Similarly, the Court finds Mr. Hickman's testimony as to his and Defendants' intent to not be credible. *See* JTX-2723; Dkt. 392 at 206:8–207:20. While Mr. Hickman testified his compensation was tied to his belief in Mr. Ripps' alleged protest art (Dkt. 345 ¶¶75-76; Dkt. 392 at 221:11-15), Mr. Hickman's deposition testimony contradicts that assertion. *See* Dkt. 394 at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software.")

*Lines 12:2-5*

<u>The Court finds Defendants, and their business partner Ryan Hickman, to be uncredible witnesses. The evidence admitted at trial establishes that Defendants' use of Yuga Labs' BAYC Marks was intentional and was done with the expectation of profiting from such use.</u> *See supra* ¶¶7, 10

**Defendants' Basis of Dispute:**

Yuga's request for a finding that Mr. Ripps's lacks credibility is baseless given Yuga's election to forego any substantive cross examination of Mr. Ripps on any of the issues that it now challenges.  Mr. Ripps's testimony was, as a result, uncontested.

Additionally, Mr. Ripps and Mr. Hickman's testimony regarding their intent for creating the RR/BAYC project is credible and supported by documentary evidence. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps, Mr. Cahen, and Mr. Hickman discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Further, beyond the documentary evidence, Mr. Ripps, Mr. Cahen, and Mr. Hickman took many steps in how the project was created that support the finding that they were motivated by artistic purpose and to spread criticism.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they

were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

Although these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Finally, Yuga also fails to cite to adequate evidentiary support.  First, they cite to JTX-2723 and Mr. Hickman's corresponding trial testimony to support a finding that Mr. Hickman's intent in creating the RR/BAYC Project as a protest is not credible.  That exhibit shows that Yuga has sued Mr. Hickman individually for his role in the RR/BAYC Project and that there is a default judgment entered in another case.  Mr. Hickman testified at trial that he was not aware of this judgment.  Trial Tr. [Hickman] 207:2-6.  Whether Mr. Hickman was notified and opposed a lawsuit Yuga has brought against him in another case does not weigh at all toward a finding of his intent in creating the RR/BAYC Project.

Additionally, Yuga asserts that Mr. Hickman's deposition contradicts his testimony that his compensation amount was tied to his desire to help with the protest against Yuga.  For support Yuga cites to a portion of Mr. Hickman's deposition testimony where he states that he was compensated for work as a software developer on the RR/BAYC project.  Dkt. 394 at 129:3-6.  The fact that Mr. Hickman's role on the project was that of a software developer does not discredit his other testimony that he accepted a smaller amount of compensation than he typically charges because he was inspired by the goal of the project.  *See* Hickman Decl. ¶¶75-76 (Dkt. 345); Trial Tr. 221:11-15 [Hickman] ("Q Why did you expect to make less from your work on this RSVP contract than your normal rate? A I was contributing because I believe in

1   standing up for the illegitimate business practices and imagery in this Yuga Labs
2   BAYC NFT collection.").

3   **Plaintiff's Response:**

4   Yuga Labs contests and has contested the sworn testimony of Defendants, as
5   well as that of Mr. Hickman.  Defendants' objection should be rejected because Yuga
6   Labs has demonstrated that (1) Mr. Ripps' declaration should be ignored given that he
7   is not a credible witness; (2) Mr. Cahen is not a credible witness; (3) Mr. Hickman is
8   also not a credible witness; (4) Defendants intended to confuse consumers with the
9   RR/BAYC NFTs; and (5) most RR/BAYC NFTs were sold on secondary
10  marketplaces without a disclaimer.

11  **Mr. Ripps' Testimony Is Not Credible, As Proven By Other, Credible,**
12  **Evidence:** Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence
13  admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring
14  instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial
15  declaration, Mr. Ripps testified that he "never reached a conclusion on what
16  ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at trial
17  Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.
18  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February –
19  excuse me – by June 24, 2022? A:  Among other things, yes[.]").  Another glaring
20  contradiction is that Mr. Ripps testified that his "intention in making the RR/BAYC
21  artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.
22  However, text messages entered into evidence demonstrated that Defendants intended
23  to "make like a million dollars" off of their infringement.  JTX-1574.  Evidence
24  further entered at trial depicted Mr. Ripps publicly bragging about the millions of
25  dollars he made off of his use of Yuga Labs' marks.  *See* Solano Decl. (Dkt. 342) ¶ 72
26  ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps
27  boasted that he made over $1.2 million on his scam, implying that no one could stop

28

1   him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  Mr.

2   Ripps' associates also confirmed this financial motive.  JTX-801.208 (Mr. Cahen:

3   "priorities:  getting RRBAYC to sell out by creating demand + getting BAYC and

4   MAYC users to call our marketplace their new home [] and collecting royalties at a

5   fraction of what the other big dogs are charging [] which will be considerable passive

6   income if we strike the right balance"); Hickman Depo. Designations (Dkt. 394) at

7   129:3-6 ("My financial arrangement for this whole thing is about as a software

8   developer being compensated for making software"); JTX-1 at ¶ 11 ("I understood,

9   based on more than a few conversations with Defendants, that the Business Venture

10  was expected to make money by selling RR/BAYC NFTs and by potentially

11  generating transaction fees from the sale of NFTs on Ape Market.").  Mr. Ripps can

12  attempt to couch his lies in "sarcasm," but the ultimate result was confusion in the

13  marketplace and a substantial payday for Defendants.  Simply repeating falsehoods

14  and repeatedly rejected immaterial claims, as Mr. Ripps does in his declaration, does

15  not make them true or material to the Court's remaining decisions.

16        Moreover, at trial, Yuga Labs demonstrated that Mr. Ripps is an unreliable

17  witness.  During cross-examination, Mr. Ripps admitted to his dishonesty during

18  discovery and his lies in prior declarations submitted under oath.  Trial Tr. at 268:12-

19  25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of

20  perjury that he has "produced all responsive documents that I have been able to locate

21  after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating

22  under penalty of perjury that he has "re-investigated my platforms and taken

23  reasonable efforts to search for additional material for collection" and "[a]ll

24  responsive materials that I have collected during my investigation has been provided

25  to my attorneys and I have given permission to produce those materials with

26  appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration

27  stating under penalty of perjury that he has "produced all relevant, nonprivileged

28

documents" subject to Court's order compelling production).  Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants withheld numerous documents (including their text messages with each other) until March 21, 2023 — after Yuga Labs had filed its motion for summary judgment.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

Yuga Labs' cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to conclude that he lied to avoid the consequences of his infringement.  Therefore, his entire declaration cannot be relied upon.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**Mr. Cahen's Testimony Is Not Credible:**  Mr. Cahen's testimony is not credible, as demonstrated by its contradictions by the evidentiary record, other testimony, and impeachment at trial.  Mr. Cahen's testimony was littered with contradictions and demonstrated an attitude of disrespect towards the Court and these proceedings.  For example, in his trial declaration, Mr. Cahen testified that the ApeMarket marketplace was "just in the ideation phase."  Cahen Decl. (Dkt. 344) ¶ 263.  However, at trial Mr. Cahen confirmed that there was a "ready-to-go Ape Market by . . . June 24, 2022."  Trial Tr. at 247:10-12.  Mr. Cahen also confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly").

1      Similarly, Mr. Cahen testified in his trial declaration that he "did not expect the

2  project would result in consumer confusion," Cahen Decl. (Dkt. 344) ¶ 155, however,

3  Mr. Cahen's communications in the Team ApeMarket discord chat demonstrate that

4  he was acutely aware of the likelihood of confusion.  *See* JTX-801.189 (Mr. Hickman

5  informing Mr. Cahen that it was "difficult to make the collections coexist" because

6  "they are the same art" and "same logos"); JTX-801.196 (Mr. Lehman noting, "we

7  should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").

8  Not only was Mr. Cahen aware of the likelihood of confusion—he was apathetic to it.

9  His testimony at trial otherwise is not credible.

10      Mr. Cahen's testimony should also be given little weight due to his disrespect

11  for the Court and flagrant disregard of his obligation to be truthful under oath.  Indeed,

12  at trial Mr. Cahen repeatedly offered non-responsive rants in response to unrelated

13  questions.  *See, e.g.*, Trial Tr.  at 237:14-238:1.  This approach is consistent with his

14  hostile and obstructive deposition misconduct.  *See, e.g.*, Cahen Depo. Designations

15  (Dkt. 395) at 80:5-7 ("Q:  What is one thing [RR/BAYC] could stand for? A:  It could

16  be Ronald Reagan bought apples yesterday, classy.  I don't know.").  Mr. Cahen's

17  lack of respect for the Court and the litigation process further underscores that he is

18  not credible.

19      Mr. Cahen also contradicted himself by claiming that he purchased a computer

20  to help create the RR/BAYC collection several months prior to the conception of the

21  project.  Cahen Decl. (Dkt. 344) ¶ 174.  Mr. Cahen tried to explain this at trial by

22  stating that the "project" began before May of 2022, Trial Tr. at 229:5-13, but his

23  latest tale contradicts the prior testimony by Defendants that they began working on

24  the RR/BAYC NFTs in May of 2022.  *See* Dkt. 200-3; Dkt. 200-4.  Defendants have

25  no problem changing the date of the conception of the project when convenient for

26  them.  When Defendants sought to skirt their discovery obligations and hide their

27  communications about the real intent of their infringement, they claimed that the

28

1   project began in May of 2022, but when they tried to claim expenses purportedly

2   related to the project that were incurred months prior, they claim the project began in

3   2021.  Mr. Cahen either lied at trial or he lied to the Court during discovery.

4          Finally, in both his declaration and at trial, Mr. Cahen testified that none of the

5   Defendants had ever used the term "BAYC v3" to refer to their infringing NFTs and

6   that the name was used only after Yuga Labs sent DMCA takedown notices to combat

7   the infringement.  Cahen Decl. (Dkt. 344) ¶ 253; Trial Tr. at 252:2-253:8.  This

8   testimony is also false.  Documentary evidence shows Mr. Ripps referring to his

9   infringing NFTs as BAYC V3 before Yuga Labs had sent a single notice.  JTX-689

10  (Tweet from Mr. Ripps promoting infringing NFTs as "bayc v3").  Indeed, Mr. Ripps

11  tweeted a link to the RR/BAYC page on a secondary marketplace that listed the NFTs

12  under the name "Bored Ape Yacht Club V3" on the same day that Defendants admit

13  that Yuga Labs sent its first notice.  *See* JTX-690; *see also* Dkt. 193-2 ¶ 93

14  (undisputed fact that the first takedown notice Issued against the RR/BAYC NFTs

15  occurred on May 17, 2022).  Given his myriad contradictions, non-responsive and

16  evasive rants, and omissions, the only conclusion is that Mr. Cahen is an unreliable

17  witness.

18         **Mr. Hickman Is Not A Credible Witness:** Likewise, Mr. Hickman's

19  testimony is not credible, as demonstrated by its contradictions by the evidentiary

20  record, other testimony, and impeachment at trial.  Mr. Hickman testified that

21  ApeMarket was not ready to launch and was merely in the ideation phase.  Trial Tr. at

22  210:1-2.  This was proven false at trial.  *See* Trial Tr. at 247:10-12 ("Q:  And there

23  was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A:

24  Among other things, yes[.]"); JTX-1027 (post from Ape Market twitter account

25  advertising that "ApeMarket.com will go live within 24 hours of the final mint, which

26  we will announce shortly").  Mr. Hickman testified in his trial declaration that he was

27  unaware of instances of confusion stemming from the infringing NFTs.  Hickman

28

1 Decl. (Dkt. 345) ¶ 92.  However, Mr. Hickman discussed with Defendants that
2 consumers were confused by Defendants' misleading use of authentic BAYC NFT
3 token IDs.  JTX-44.  Further, Mr. Hickman was an active participant in the Team
4 ApeMarket discord chat where Defendants, Mr. Lehman, and Mr. Hickman himself
5 raised the likelihood of confusion many times.  *See, e.g.*, JTX-801.195 (Mr. Lehman
6 noting that people "making mistakes with apes is already a huge meme" and
7 "Remember the 'average joes'?", and Cahen responding, "I mean that is
8 unavoidable"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult
9 to make the collections coexist" because "they are the same art" and "same logos");
10 JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the
11 RR ID. that is where they get confused").

12      Further, in his trial declaration Mr. Hickman testified about his and a family
13 member's purportedly adverse reactions to the Bored Ape Yacht Club images,
14 Hickman Decl. (Dkt. 345) ¶¶ 41-58, but when questioned by the Court at trial Mr.
15 Hickman testified that he does not have any problem with selling NFTs that point to
16 those exact same images.  Trial Tr. at 222:24.  Mr. Hickman's testimony that he found
17 Yuga Labs' NFTs problematic is even more difficult to reconcile with the fact that he
18 claimed to purchase a Bored Ape Yacht Club NFT after forming the supposed belief
19 that it was problematic, and continued to purportedly own one up until trial.  Hickman
20 Decl. (Dkt. 345) ¶¶ 18-19, 21.  Finally, despite Mr. Hickman's testimony at trial that
21 he did not want to profit off the RR/BAYC NFTs, Trial Tr. at 209:21-23, Mr.
22 Hickman testified at deposition that he was financially motivated to develop the
23 software that facilitated Defendants' infringement.  Hickman Depo. Designations
24 (Dkt. 394) at 128:25-129:6 ("In this reference I'm specifically stating that I'm a
25 developer.  I make software.  I charge to make software.  I have a record, a history, of
26 charging to make software.  My financial arrangement for this whole thing is about a
27 software developer being compensated for making software.").

28

1    Defendants' attempts to downplay the importance of citations that show Mr.
2    Hickman's lack of credibility should be ignored.  Mr. Hickman's testimony that he is
3    unaware of a judgment against him in Nevada is contradicted by proper service of that
4    judgment and his attempts to overturn it.  JTX-2723; Dkt. 392 at 206:8–207:20; *see*
5    *also* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30),
6    *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023).
7    Even more, since Mr. Hickman has been sued by Yuga Labs in another proceeding he
8    is biased against Yuga Labs and unlikely to admit the truth of his scam, in a vain
9    attempt to avoid suffering the same fate as Mr. Lehman and Defendants.  Mr.
10   Hickman lacks credibility.

11       **Defendants' Intent To Confuse Consumers In Order To Turn A Profit Is**
12   **Well-Documented:** That Defendants intended to confuse consumers and their
13   supposed disclaimer is proof of their intent, not the absence of it.  This is thoroughly
14   established.  *See supra* ¶ 33, line 12:1.

15       **Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A**
16   **Disclaimer:**  Defendants acknowledge that their alleged disclaimer was only on
17   rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for
18   Defendants' infringing NFTs, "[t]he majority of the sales are taking place on
19   secondary markets. . . .  [T]he vast majority of them are occurring in secondary
20   markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723
21   (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm,
22   e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're
23   closing in on *$10 million impact to yuga'").  These secondary markets did not
24   involve a disclaimer.

25       Thus, the vast majority of market activity involving Defendants' infringing
26   NFTs is taking place on the secondary market, including platforms such as Foundation
27   and OpenSea.  These secondary marketplaces are one place where consumer

28

1   confusion is likely to result from Defendants' actions to flood the market with their

2   infringing products.  These secondary marketplaces are also a prominent source of

3   confusion going forward—especially since they are where Defendants continue to

4   market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC

5   NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-

6   25 ("the Ape Market Twitter [account], that actually links directly to LooksRare

7   where these NFTs are still selling").  Defendants' contention is therefore incorrect and

8   misleading.

9            **Defendants' Reply:**

10           ***First,*** Mr. Ripps is a credible witness.  Mr. Ripps's declaration was uncontested

11   because Yuga elected to forego any substantive cross-examination of Mr. Ripps on

12   ***any*** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the

13   Supreme Court has explained, "[c]ross-examination is the principal means by which

14   the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*,

15   415 U.S. 308, 316 (1974).  This is because the purpose of cross-examination is "the

16   direct and personal putting of questions and obtaining immediate answers." *Id.*;

17   *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of

18   cross examination is to expose to the fact-finder relevant and discrediting

19   information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any

20   portion of his declaration means that "principle means" of testing Mr. Ripps

21   credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

22           Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other

23   evidence in the trial record.  Yuga did not show at trial that any of this other evidence

24   in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed

25   that purported other evidence in any way at trial.  This is precisely why Yuga's failure

26   to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony.

27   Having failed to challenge Mr. Ripps's testimony at trial (either through cross-

28

examination or presentation of contradictory evidence), Yuga now seeks to take evidence out of context and mischaracterize documents. This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony that ApeMarket *could* have been launched in the near-term. Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.    You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.    What I would say I did was use the prospect of a potential marketplace *which we were in the ideation phase of*, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.    We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259.    Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added). Other witnesses corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be. Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.    BY MR. BALL: You state here, "It's difficult to make the collection coexist without adding a friction step."

A.   This is a discussion, ***an ideation of different ideas, none of which were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's declaration regarding his intent in creating the RR/BAYC collection.   The full testimony that Yuga cites provides:

182.   My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.

183.   As an artist, I believed that I could create an "army of educators" through my art.

184.   I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl.  ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the record corroborates Mr. Ripps's statements.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30. Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

1    that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
2    Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the
3    voluminous correspondence that Defendants received shows that they did in fact
4    create a "community of educations" as Mr. Ripps intended, who have written letters
5    expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205
6    (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592;
7    JTX-2595; JTX-2596; JTX-2599.

8        Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has
9    been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he
10   intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the***
11   ***document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps
12   statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated
13   twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen.   And
14   Mr. Ripps in the same exchange later stated that he needs "to get a front end" in
15   response to more jokes from Mr. Cahen (again, not a reference to any intent to profit).
16   *See* JTX-1574.

17       Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not
18   credible given the many false and misleading statements contained in his declaration.
19   For example, Mr. Solano was forced to concede on cross-examination that his sworn
20   declaration included a false statement claiming that Defendants continue to receive
21   royalties from sales on secondary marketplaces:

22       Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that
23            they do not currently receive any royalties or creator fees from sales
24            on secondary marketplaces; right?

25       A.   Yes.

26       Q.   So you don't have any basis for your statement that their profits
27            continue to increase; correct?

28

A.      It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.   Although, those were supposed to be donated to charity and never were.

Q.      ***They don't continue to increase; correct, sir?***

A.      ***Correct.***

Q.      ***That statement, that part of your witness statement is incorrect; right?***

A.      ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do

1    you know whether Ape Market exists? A We have the code for Ape Market from Tom

2    Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6.

3    'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

4    Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's

5    testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

6    been rebutted. Mr. Solano could not identify a single person that ever bought an

7    RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact,

8    no one has been able to identify a single confused consumer in the entirety of this

9    case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

10         Yuga then incorrectly argues that Mr. Ripps's statement about his intent is

11   refuted by comments from other members of the RR/BAYC project. But these

12   statements show no such thing.   For example, Yuga's cites JTX-801.208 in which

13   Mr. Cahen states that a priority is "getting RR/BAYC to sell out." But as Mr. Cahen

14   explained at trial, the whole point of broad exposure through the RR/BAYC collection

15   (including getting people to reserve NFTs) was "spreading and magnifying criticism

16   of Yuga." Cahen Decl. ¶ 98 (Dkt. 344). And Mr. Cahen's private communications in

17   the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for

18   artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these

19   things. It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary

20   focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes

21   a strong statement. This is art, not Pokemon cards." (JTX-801.00013); "Because

22   that's where the real importance lies. RR/BAYC truly is very important conceptual

23   art imo. And now we are all helping shape that art further." (JTX-801.00196).

24   Yuga also cites Mr. Hickman's deposition testimony in which he stated that his

25   "financial arrangement" was "a software developer being compensated for making

26   software." Hickman Depo. Designations (Dkt. 394) at 129:3-6. But Mr. Hickman's

27

28

testimony about this topic at trial was unequivocal about his purpose in participating in the RR/BAYC project:

> Q.    Why did you expect to make less from your work on this RSVP contract than your normal rate?
>
> A.    I was contributing because I believe in standing up for the illegitimate business practices and imagery in this Yuga Labs BAYC NFT collection.

Trial Tr. [Hickman] 221:11-15.  Mr. Hickman further explained, "We are selling a receipt that says *I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs point to the same resource." Trial Tr. [Hickman] 222:18-21 (emphasis in original).

Yuga also cites to Mr. Lehman's declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture."  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family. Yuga's attorneys, not the Defendants, coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023, verification.  But Yuga's cross-examination did not result in any impeachment or inconsistency:

> Q.    You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?
>
> A.    I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

> Q.    And, Mr. Ripps, the text messages that you produced in this case include the RR/BAYC chat; right?
>
> A.    Yes.  We produced everything that we could, despite the fact that Yuga produced nothing.
>
> Q.    Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?
>
> A.    I don't have it on the screen, but I see you holding them, and I see them –
>
> Q.    Do you see it now?
>
> A.    Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.
>
> Q.    Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

A.     Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation. ***I reserve the right to make changes or additions to any of these answers or document productions*** if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added).  Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration.  Yuga had an opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but elected not to do so.  Mr. Ripps's testimony was therefore unchallenged.

***Second,*** Mr. Cahen is a credible witness.  Yuga failed to impeach Mr. Cahen during trial and the trial record does not contain any evidence showing that this witness is not credible or that they did not give truthful testimony. Yuga tries to mischaracterize Mr. Cahen's testimony to suggest that he was contradicting himself.  But there is nothing inconsistent about Mr. Cahen testimony.   He testified that ApeMarket was in the ideation phase, which means that anything under development was subject to substantive changes pending Mr. Ripps's review and signoff on the website.  But simply because Mr. Ripps had not reviewed and signed off on anything

in connection with ApeMarket did not mean that the RR/BAYC team was not working on the website and exploring different ideas to implement.

Yuga mischaracterized Mr. Cahen as saying that ApeMarket was "ready to go" by June 24, 2022.  But what Mr. Cahen actually said is that he did not know if ApeMarket was "ready to go" by June 24, 2022.  Mr. Cahen then also stated that he works with the high skilled engineers that can implement nearly any project within days and that ApeMarket did not require much work in the first place as it used open-source code:

> Q.   Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?
>
> A.   I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.
>
> Q.   And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.   Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also accused Mr. Cahen of "disrespect for the Court" by making "non-responsive rants" in response to questions about ApeMarket stimulating sales of RR/BAYC NFTs.  But the trial transcript shows otherwise:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.   ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***
>
> Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   There never existed a marketplace.
>
> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.
>
> Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?
>
> A.   ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).   Yuga's citation to Mr. Cahen's deposition similarly cherry picks one question from a full-day of deposition testimony, and even then, the testimony Mr. Cahen gave is responsive to Yuga's question to give a hypothetical answer to "things" RR/BAYC could stand for.

Yuga further mischaracterized Mr. Cahen's testimony by incorrectly suggesting that he did not purchase a computer to work on the RR/BAYC project.  The trial testimony shows that the 2021 purchase date is consistent with Mr. Cahen's work in connection with the RR/BAYC project and its protest of Yuga:

Q.    Would it surprise you that the date for that computer is December 2021?

A.    That would not surprise me at all, no.

Q.    Why?

A.    Because it's a date on a receipt.  I'm not sure what the point is, but I'm hearing you, yeah.

Q.    Okay.  So either the RR/BAYC project started in May 2022 or the RR/BAYC project started in December 2021, and you bought a computer for it; correct?

A.    The RR/BAYC project is a protest project.  And the protest began well, well before the RR/BAYC project did.  So if you are asking me why I make a connection between earlier dates and that project, it's because we spent about a year protesting in different ways before we released any sort of nonfungible token and rather, before Ryder did and I decided to join and help him expand his vision and protest.

Trial Tr. [Cahen] 227:11-228:1.  That Mr. Cahen purchased the computer before the project was conceived is not inconsistent with his testimony that the computer was ultimately used for the project.  It would be entirely unremarkable if a hypothetical company purchased equipment (such as a PC) in January, subsequently conceived of a project, Project X, deployed the equipment for use on Project X, and then characterized the initial purchase as attributable to Project X for accounting purposes.  That is precisely what occurred here.

1    Finally, Yuga incorrectly argues that Mr. Cahen is not credible because he

2    testified that Defendants never used the term "bayc v3" to refer to the RR/BAYC

3    collection.   But Yuga was unable to impeach this testimony during cross-examination

4    of Mr. Cahen and Yuga did not even attempt to cross-examine Mr. Ripps on this

5    issue.  The exhibit that Yuga cites, JTX-689, also confirms that Mr. Cahen's

6    testimony was true.  JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022

7    to Mr. McNelis's question on what NFTs people are buying.  Mr. Ripps's reply is a

8    satirical comment that has absolutely nothing to do with the RR/BAYC collection and,

9    in fact, the comment was made before Mr. Ripps even started taking commissions for

10   RR/BAYC NFTs.

11   Further, Yuga's unfounded and offensive statements that Defendants "sought to

12   skirt their discovery obligations and hide their communications about the real intent of

13   their infringement" is unacceptable.  As the record clearly shows, Defendants

14   produced hundreds of thousands of communications in this matter and upheld their

15   ongoing responsibility to produce discoverable information. *See* Trial Tr. [Ripps]

16   270:3-18; Dkt. 109-33.  To state that Defendants willfully avoided their discovery

17   obligations is categorically incorrect.

18   ***Third,*** Mr. Hickman is a credible witness.  Yuga failed to impeach Mr.

19   Hickman during trial and the trial record does not contain any evidence showing that

20   this witness is not credible or that they did not give truthful testimony. Yuga argues

21   that Mr. Hickman is not credible because he purportedly "wrongly" testified that he is

22   not aware of any actual instance of confusion.  But the trial record confirmed that ***no***

23   ***one*** is aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

24   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial

25   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

26   what you were focused on. Yuga Labs has been unable to identify even[] a single

27   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

28

1   right? A Correct.").  Yuga then cites to various documents (JTX-44, JTX-801.195) to

2   argue that Mr. Hickman purportedly believed that consumers would be confused by

3   the RR/BAYC project.  But these documents involve discussion in how to design

4   *ApeMarket* to ensure that the website design was not confusing to users of the

5   website.  And, in fact, Yuga cross-examined Mr. Hickman about this issue and

6   confirmed that Mr. Hickman and other members of the RR/BAYC project were not

7   discussing confusion regarding the source of RR/BAYC NFTs. Instead, as Mr.

8   Hickman explained, "[t]his is our attempt to make it as clear as possible.  We are

9   having discussion on how to make sure it was very clear for users."  Trial Tr.

10  [Hickman] 212:22-24.

11          Yuga also argues that Mr. Hickman is not credible because he did not have a

12  problem working on an NFT project that points to public digital images that he finds

13  to be offensive.  But Yuga's argument missing the mark.  As Mr. Hickman explained,

14  the whole purpose of his work on the RR/BAYC collection was to protest the

15  offensive imagery that Yuga had been normalizing:

16  
17      THE COURT:          When you are selling defendants' NFTs, you are selling
                            Yuga's images.

18  
19      THE WITNESS:        ***No. We are selling the record.***

20      THE COURT:          Okay.  But the record points to and displays those images.

21      THE WITNESS:        ***So the images are public.***  They are available for anybody to
22                          navigate to on the Internet.

23      THE COURT:          Right

24      THE WITNESS:        ***We are selling a receipt that says I committed to this
25                          protest that points to the same public [image] that a lot of
                            different collections point to*** including Yuga Labs pointing
26                          to the same resource.

27  

28

Trial Tr. [Hickman] 222:10-22 (emphasis added).  Yuga then suggests that Mr. Hickman is not credible because he himself owns a BAYC NFT even though he finds the images offensive.  But Mr. Hickman's declaration explains, "When I first saw Bored Ape Yacht Club images, I found the imagery problematic, but I did not originally pay it much attention."  Hickman Decl. ¶ 18 (Dkt.345).   Only later, when speaking with is great aunt, did Mr. Hickman realize how harmful and dangerous Yuga's misconduct is:

> 48.   We then had a long discussion about why Yuga's use of ape images was a serious issue.
>
> 49.   My great aunt explained to me the history of siminaization, which involved depicting African Americans as apes to dehumanize them.
>
> 50.   My great aunt also explained how African Americans are often called "monkeys" as a deeply offensive insult.
>
> 51.   My great aunt also reminded me that our family had dealt with and had to overcome these kinds of acts of racism over many generations
>
> 52.   My great aunt explained that, if simianization is becoming popular again, normalized, and incentivized, this would be very dangerous for African Americans.
>
> 53.   ***My great aunt described Yuga's acts as "a step back 100 years."***
>
> 54.   ***This conversation with my great aunt caused me to think more critically about Yuga's offensive imagery and why it needs to be taken seriously.***

Hickman Decl. ¶¶ 48-54 (Dkt.345) (emphasis added).  There is nothing about Mr. Hickman's conversation with his great aunt and how he became part of the RR/BAYC movement that makes him an untrustworthy witness.  Moreover, as Mr. Hickman testified in his declaration, he continued to hold his BAYC NFT because the Terms & Conditions and Yuga's public conduct indicated that his ownership of a BAYC NFT

1  granted rights that allowed creation of the RR/BAYC collection.  Hickman Decl. ¶¶ 9-
2  40 (Dkt.345).

3        Yuga also incorrectly states that Mr. Hickman's testimony that he is not aware
4  of Yuga's default judgment against him is contradicted by "proper service" of the
5  default judgment.   Mr. Hickman did not know that there was a valid case pending
6  against him.  Yuga never served the complaint in Mr. Hickman's case and instead left
7  it on his porch unattended after the server told Mr. Hickman's twelve-year-old
8  daughter that he could not serve her.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-
9  JCM-NJK, Dkt. 31-1 at 2 (D. Nev.) ("6.  I told the stranger that my parents were not
10  home, and that I was twelve years old.  7.  The stranger told me he could not leave the
11  papers with me, and left.  I did not see the stranger return.").  Yuga then submitted an
12  affidavit ***falsely stating*** to the court that it had served Mr. Hickman's fifteen-year-old
13  daughter.  *See Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 31 at 7 (D.
14  Nev.) ("Plaintiff fraudulently represented to the Court that Hickman's daughter was
15  fifteen and that the process server delivered copies of the Complaint and summons to
16  her. … This is blatantly false, and was undoubtedly asserted by Plaintiff in an effort to
17  obtain a favorable Default Judgment ruling.").   The Court in Mr. Hickman's case has
18  stayed judgment to reassess the validity of default judgment.  *Yuga Labs, Inc. v.
19  Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 37 (D. Nev.) (granting emergency motion to
20  stay enforcement of default judgment).

21        ***Fourth,*** ample evidence at trial showed, Defendants' intent in creating the
22  RR/BAYC Project was to create an artistic protest of Yuga.  *See supra* ¶ 33, line 12:1
23  for a fulsome outlining of Defendants' reply to Yuga's unfounded and inaccurate
24  response.

25        ***Fifth***, while there may have been sales on secondary marketplaces as Yuga
26  alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit
27  from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's

28

testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully shut off royalties from such sales yet again supports a finding that they did not intend to confuse and shows that they were taking steps that would minimize their own profits.

It is incorrect to claim that there is a likelihood of confusion on the secondary marketplaces, as Yuga alleges.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Further, the smart contract clearly indicates Mr. Ripps is the creator and not Yuga and allows consumers to easily establish provenance, which undermines Yuga's

assertions about what consumers see when they review the NFT.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).

Third, Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs.  For support Yuga cites to Mr. Solano's declaration where he states that two marketplaces sell RR/BAYC NFTs and testimony that the ApeMarket Twitter account links to a marketplace.  Neither of those pieces of evidence supports a finding that Mr. Ripps and Mr. Cahen are actively marketing.

### Plaintiff's Disputed Post Trial Conclusion of Law No. 33, lines 12:5-8:

The evidence further establishes that Defendants were aware of the likelihood of consumer confusion based on their use of the BAYC Marks and nevertheless proceeded to use them in a manner likely to confuse consumers. *See supra* ¶¶5-6.

### Defendants' Basis of Dispute:

The evidence presented at trial shows that Mr. Ripps and Mr. Cahen took many steps to avoid any possible confusion.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

1  ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it
2  and so he had the final call.").

3         Further, as the evidence presented at trial indicated, these steps worked and
4  Yuga was not able to identify even a single person who obtained an RR/BAYC NFT
5  believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are
6  not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346)
7  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial
8  Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q.
9  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to
10  identify even[] a single person who purchased an RR/BAYC believing it to be
11  sponsored by Yuga Labs; right? A Correct.").

12         **<u>Plaintiff's Response:</u>**

13         Defendants' objection should be rejected because (1) the record contains ample
14  evidence that Defendants knew they were confusing consumers, (2) Defendants'
15  disclaimer and other supposed steps do not negate their obvious intent, and (3) the
16  evidence of actual and likely confusion is overwhelming.

17         **There Is Ample Evidence That Defendants Knew They Were Confusing**
18  **Consumers:** Defendants knew they were using the BAYC Marks in a way that was
19  likely to confuse consumers and did so with the intent to profit from their
20  infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see*
21  *also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too
22  man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of
23  money tbh"; "Potentially a lot").  And despite being urged to use different images or
24  overlay some commentary on the images they did use to avoid confusion, Defendants
25  chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or
26  something like Getty images" because "it's just insane to have the same art"); JTX-
27  801.196 (Mr. Lehman demonstrating what an overlay might look like and

28

recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). Instead, they continued with their infringement, knowing that they were creating confusion. JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7.

They also discussed that they knew they were infringing as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano

1   Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 (Dkt. 346) (uncontested) ("In my experience,

2   when designing logos and imagery for brands, every choice is intentional.").

3       **Defendants' Disclaimer Is Evidence Of Their Culpability:** With respect to

4   the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was

5   necessary to include a disclaimer demonstrates their awareness that their use of the

6   BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.

7       Defendants also knew that what they were doing was likely to lead to a lawsuit.

8   For instance, Mr. Ripps asked for a reference to his limited liability company,

9   Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued

10  personally."  JTX-803.57; *see also* JTX-918.00036 (Mr. Lehman stating to Mr. Cahen

11  the need to "look really sympathetic to people" if sued).  And, Mr. Lehman was still

12  advocating for a "new logo and branding direction in light of the trademark thing" to

13  Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want

14  to get sued, OR, if get do get sued, for us to look really sympathetic to everyone"

15  (JTX-918.0036).  That Defendants took some steps to try to conceal their intent when

16  they were inevitably sued does not make the infringing activity less confusing; it just

17  demonstrates their culpability.

18      Additionally, the public was not required to read and click a disclaimer.

19  Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users

20  "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they

21  agreed "no one" would read (JTX-801.128).  And, this wall of text did nothing to

22  dispel confusion amongst the general public when every single RR/BAYC NFT sold

23  (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB

24  and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial

25  Tr. at 133:12-134:20; JTX-600; JTX-1146.  Defendants also did not include any

26  similar disclaimer on Foundation or other secondary marketplaces, nor was there one

27  on Etherscan.  Thus, the majority of the sales of RR/BAYC NFTs have been on

28

secondary marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer.  This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer.  (Ripps Deposition Designations) at 82:8-13.

Finally, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-existent to ineffective at best.

**The Evidence Is Overwhelming That There Was Actual And Likely Confusion:** Finally, Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is

1   already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I
2   mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated
3   significant confusion among consumers who incorrectly believed RR/BAYC was
4   sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl.
5   (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or
6   credible evidence to rebut the evidence that consumers believed, or were likely to
7   believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut
8   evidence of initial interest or post-sale confusion.

9         There is a clear likelihood of confusion as well, given Defendants' use of the
10  same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at
11  10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.
12  2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly
13  ever find their way into the appellate reports' because liability is 'open and shut.'")
14  (citation omitted).  In any event, actual confusion is not required; and the Court
15  already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)
16  at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity
17  regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*
18  *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's
19  profits even where infringement claims premised solely on post-sale confusion where
20  a "potential purchaser, knowing that the public is likely to be confused or deceived by
21  the allegedly infringing product, [] choose[s] to purchase that product instead of a
22  genuine one").

23              **Defendants' Reply:**

24        The evidence presented at trial shows that there was not any actual confusion
25  and that Defendants did not know of any confusion. First, to support this assertion
26  about Defendants' knowledge of confusion, Yuga cites to documents it argues show
27  that the Defendants intended to make a profit.  Intending to profit from your artwork is

28

not the same thing as intending to confuse consumers and one does not weigh toward the other.

***First***, the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits.  Ripps Decl. ¶ 116-118 (Dkt. 346) (uncontested); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (Dkt. 346) (uncontested); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence that Yuga cites does not rebut the overwhelming evidence of Defendants' intent to protest and criticize and Yuga instead relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website

1  design.  Yuga even cross-examined Mr. Hickman about these communications and

2  received the same explanation: "This is our attempt to make it as clear as possible.

3  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

4  [Hickman] 212:22-24.

5      Yuga similarly takes out of context exhibits such as JTX-44.00002 to

6  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

7  44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

8  ID.  that is where they get confused."  This statement is not discussing confusion

9  regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

10  RR/BAYC collection used a different numbering system that BAYC NFTs, and that

11  consumers expected the numbers match as a shorthand manner of cataloguing the

12  digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

13  numbering system, some consumers were confused as to which RR/BAYC NFT they

14  received but they understood very well that they received an NFT created by Mr.

15  Ripps that protests and criticizes Yuga.

16      The record clearly shows that Defendants did not know that there were any

17  confused consumers and further there is no evidence presented that anyone was

18  actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

19  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

20  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

21  what you were focused on. Yuga Labs has been unable to identify even[] a single

22  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

23  right? A Correct.").

24      ***Second,*** Defendants' disclaimer is not evidence of their culpability, in fact it

25  demonstrates the opposite.  First, Yuga incorrectly cites to this Court's summary

26  judgment order to suggest that use of a disclaimer is not a step taken to avoid

27  confusion.  The "law of the case doctrine does not apply to pretrial rulings ***such as***

28

1  *motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir.

2  1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

3  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

4  judges for the remainder of the case.  Given the nature of such motions, it could not be

5  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of

6  an issue were decided at summary judgment for one purpose, the summary judgment

7  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

8  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

9  of initial police contact was relevant as background, but not to the already decided

10  issue that initial contact was not excessive force).  This case is just like *Sienze*: the

11  summary judgment ruling the Defendants' disclaimer applies only the issue of

12  infringement and is not adequate support on use of a disclaimer generally or as applied

13  to availability of disgorgement as a remedy, apportionment, and an exceptional case

14  analysis.

15       And Yuga's complaint that Defendants did not use a disclaimer on Foundation,

16  Etherscan, or any other third-party website is inapposite.  Defendants have no control

17  over third party websites such as Etherscan and do not have the ability to design the

18  pages third-party websites use or how they choose to display the RR/BAYC NFT

19  collection.  It simply was not possible for Defendants to add a disclaimer on

20  Foundation or Etherscan because they do not control those websites.

21  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use

22  Etherscan's token tracker/token name but instead rely on marketplaces or by checking

23  the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay

24  explained that using token names to distinguish NFTs "would be a fairly weak way to

25  do so because often those things are mutable.  They can be changed after the fact.

26  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

27

28

1    Further, the smart contract clearly indicates Mr. Ripps is the creator and not

2    Yuga and allows consumers to easily establish provenance, which undermines Yuga's

3    assertions about what consumers see when they review the NFT.  *See* JTX-1146;

4    Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Yuga is also incorrect in stating that

5    every RR/BAYC NFT uses the alleged marks. Defendants used modified versions of

6    the alleged BAYC Marks in their reservations.  For example, the logo used states

7    "This Logo is Based on the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the

8    website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. Id.

9    Yuga also incorrectly argues that the disclaimer "did nothing to dispel

10   confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes

11   clear, the rrbayc.com website "required collectors to acknowledge and accept a

12   disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶

13   105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this

14   Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of

15   BAYC imagery, recontextualizing it for educational purposes, as protest and satirical

16   commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to

17   verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold

18   for an order that will be fulfilled or rejected/refunded by Ryder within 24h

19   (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶

20   106.  While it is possible that a consumer chose not to read this disclaimer or the

21   prominent artistic statement included on rrbayc.com, this evidence tends to prove that

22   many did and further shows that Defendants were trying to ensure that no one was

23   confused about the source of their collection.  *Id.* at ¶¶ 102, 108.  Yuga's assertion that

24   this disclaimer shows the opposite intent is baseless.

25   Yuga also cites to correspondence among the creators discussing a possible fear

26   of litigation.  These discussions are taken out of a broader context of hundreds of

27   thousands of communications the creators made.  Further, whether the Defendants

28

feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

Yuga further misstates the meaning of Mr. Ripps's deposition testimony surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation?  A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19.  This however is different than the "Foundation page" for Ryder Ripps.  Accordingly, Mr. Ripps was not admitting that all sales went through his Foundation page and his testimony that over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

And while there may have been many sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully shut off royalties from such sales yet again supports a finding that they did not intend to confuse and were motivated by their protest of Yuga not to profit.

*Third,* the evidence is overwhelming that there was not actual confusion. Yuga's response is not based in fact.  First, there is ample evidence that there was ***no*** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single

person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*. at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id*. at 144:12-18. This broke with her prior practice as well, as it

was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

The documentary evidence Yuga cites to is also unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl.

¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga also cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Yuga further states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Yuga's response also inaccurately omits that Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

1    Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

2    profits, which is something Defendants argue they are not, Yuga can only receive

3    profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982

4    *F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun*

5    *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires

6    distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

7    protest against Yuga (and were thus not confused about Defendants' use of Yuga's

8    marks) and revenue from purchasers who mistakenly believed they were purchasing

9    Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

10   single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored

11   by Yuga.

12   Yuga's citations to *Gucci* are inapplicable here, given the evidence shows

13   consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps

14   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

15   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not

16   support a finding that these reservations were made so that the buyer could then

17   confuse someone else in secondary sales.  Also, as mentioned above, there is no

18   evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary

19   sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

20   Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

21   [Solano] 63:1-10. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

22   265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

23   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

24   what you were focused on. Yuga Labs has been unable to identify even[] a single

25   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

26   right? A Correct.").  Finally, the portion of profits attributable to secondary sales of

27

28

1 RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.

2 418-1 at 6.

3 **Plaintiff's Disputed Post Trial Conclusion of Law No. 34:**

4 All profits identified by Yuga Labs are attributable to Defendants' sales (and

5 profits from resales) of the infringing RR/BAYC NFTs. Equity does not permit

6 Defendants to retain profits from the sale of an infringing product that is likely to

7 confuse consumers, as is the case with the infringing RR/BAYC NFTs.

8 **Defendants' Basis of Dispute:**

9 As discussed above, the evidence presented at trial showed that Mr. Ripps and

10 Mr. Cahen took numerous steps to ensure that their collection did not cause confusion

11 and there has been no evidence presented that anyone who reserved an RR/BAYC

12 NFT was confused about its origin.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

13 Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

14 [Solano] 63:1-10. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

15 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

16 Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

17 what you were focused on. Yuga Labs has been unable to identify even[] a single

18 person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

19 right? A Correct.").

20 Further, equitable disgorgement of profits is not appropriate here.  An

21 infringer's mental state is a "highly important consideration in determining whether an

22 award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct.

23 1492, 1497 (2020).  Disgorgement is only warranted in cases of "conscious

24 wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL

25 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an

26 available remedy here because – as the evidence showed at trial – neither Mr. Ripps

27 nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176

28

(Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478 (1962). Legal remedies were available in this case. Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19. Having abandoned available legal remedies, Yuga cannot obtain disgorgement. *See Hunting World Inc. v. Reboans, Inc.,* No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim. Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Finally, even if disgorgement were available here, Yuga would only be entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,* 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.*

As the evidence presented at trial showed, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18;

Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Conversely, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest *against* Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given the evidence, Yuga has not shown that they are entitled to any portion of profit from the RR/BAYC project as there was no profit made that was attributable to the infringing activity.

### Plaintiff's Response:

Defendants' objection should be rejected because (1) there is ample evidence of confusion; (2) disgorgement is available as a remedy; (3) all of Defendants' profits are attributable to infringing activity; (4) Defendants' additional arguments challenging disgorgement are unpersuasive; and (5) this Court should increase the profit award.

**The Weight Of The Evidence Demonstrates Consumer Confusion:** Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who

1    incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-

2    721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

3    Defendants do not offer any admissible or credible evidence to rebut the evidence that

4    consumers believed, or were likely to believe, RR/BAYC was affiliated with or

5    sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale

6    confusion.

7          There is a clear likelihood of confusion as well, given Defendants' use of the

8    same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at

9    10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.

10   2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

11   ever find their way into the appellate reports' because liability is 'open and shut.'")

12   (citation omitted).  In any event, actual confusion is not required; and the Court

13   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

14   at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

15   regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

16   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

17   profits even where infringement claims premised solely on post-sale confusion where

18   a "potential purchaser, knowing that the public is likely to be confused or deceived by

19   the allegedly infringing product, [] choose[s] to purchase that product instead of a

20   genuine one").

21         **Yuga Labs Is Entitled to Disgorgement of Defendants' Profits:**  Yuga Labs'

22   only burden is to prove Defendants' sales to obtain disgorgement.  15 U.S.C. §

23   1117(a) (allowing plaintiff "to recover . . . defendant's profits.").  Defendants cite no

24   case to the contrary.  Defendants wrongly claim that *MGA* holds that disgorgement is

25   "only" warranted in cases of conscious wrongdoers.  To the contrary, *MGA* found that

26   willfulness is a sufficient, ***but not necessary***, condition to a disgorgement finding.

27   *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548, 2022 WL 4596697, at *17 ("willfulness

28

---

1   is not an inflexible precondition to recovery of a defendant's profits under § 35(a) of

2   the Lanham Act") (cleaned up); *see also Harbor Breeze Corporation v. Newport*

3   *Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022) ("a plaintiff need not show

4   that a defendant acted with a particular mental state, such as willfulness, in order to be

5   entitled to an award of profits."). Because the Court has found Defendants liable for

6   intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to

7   Defendants' profits from their infringing acts. *See supra* ¶¶ 34; *see also* Yuga Labs'

8   Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37.

9   Even though a finding of willfulness is not necessary for disgorgement, Defendants'

10  infringement was willful. *See supra* ¶ 7; *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

11  1400, 1406 (9th Cir. 1993) ("[w]illful infringement carries a connotation of deliberate

12  intent to deceive." ).

13          Separately, there is no requirement for an absence of an "adequate remedy at

14  law" to obtain disgorgement. This case arises out of the Lanham Act, which expressly

15  provides for actual damages ***and*** disgorgement of Defendants' profits. "The Lanham

16  Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's

17  profits." *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair*

18  *Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some

19  circumstances in addition to defendant's profits."). Accordingly, the Lanham Act

20  allows for three distinct remedies—(1) defendants' profits, (2) plaintiffs' damages,

21  and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are not stated in

22  the disjunctive, and each are separately available under the statute. For example, the

23  model jury instructions clearly state that actual damages and disgorgement are

24  available in the same case: "*In addition to actual damages*, the plaintiff is entitled to

25  any profits earned by the defendant that are attributable to the infringement, which the

26  plaintiff proves by a preponderance of the evidence." Manual of Model Civil Jury

27  Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added).

28

1   Defendants are not allowed to retain the fruits of unauthorized trademark use.  *Fifty-*
2   *Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

3       Finally, through at least the testimony of Ms. Kindler, Yuga Labs has met its
4   burden to "establish[] the defendant's gross profits from the infringing activity with
5   reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir.
6   1993); *see also See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law
7   (Dkt. 416) at ¶¶ 7, 11-13, 32-37.  Defendants cite no case to the contrary.

8       *Dairy Queen* does not impose any different burden, nor did it hold that
9   disgorgement in a Lanham Act case is unavailable in the absence of an adequate
10  remedy at law.  *Dairy Queen* did not involve a disgorgement claim under the Lanham
11  Act, but rather an "equitable accounting" claim.  *Dairy Queen, Inc. v. Wood*, 369 U.S.
12  469, 478 (1962).  "[T]he Supreme Court characterizes the *Dairy Queen* claim as a
13  legal claim for damages (not disgorgement of profits)."  *Fifty-Six Hope Rd. Music,*
14  *Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (citing *Feltner v.*
15  *Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998)).  As a result, *Dairy*
16  *Queen* does not apply to Yuga Labs' disgorgement claim under the Lanham Act.

17      **All of Defendants' Profits Are Attributable To Their Infringing Activity:**
18  Yuga Labs has shown that Defendants' profits are attributable to Defendants'
19  infringing activity – each and every single RR/BAYC NFT uses the marks BORED
20  APE YACHT CLUB and BAYC, to say nothing of how Defendants sold, marketed,
21  and promoted these NFTs.  In a trademark infringement case, "[t]he plaintiff has only
22  the burden of establishing the defendant's gross profits from the infringing activity
23  with reasonable certainty.  Once the plaintiff demonstrates gross profits, they are
24  presumed to be the result of the infringing activity."  *Lindy Pen Co.*, 982 F.2d at 1408.
25  From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of
26  its total sales are not attributable to the infringing activity, and, additionally, any
27  permissible deductions for overhead."  *Id.*; *Frank Lloyd Wright Found. V.*

28

1    *Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July

2    29, 2019). Yuga Labs has established that Defendants' profits are attributable to their

3    infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks.

4    *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7,

5    11-13, 32-37. Defendants do not provide any credible evidence undermining this

6    presumption.

7            Defendants' "infringing activity" was use of the BAYC Marks. They admit that

8    "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." Dkt. 418-1

9    at 3:15-16. Accordingly, each and every RR/BAYC NFT sale is a result of

10   Defendants' infringing activity and subject to disgorgement. *See* Kindler Decl. (Dkt.

11   338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain

12   data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs'

13   BAYC Marks."). Yuga Labs' evidence shows that consumers bought RR/BAYC

14   NFTs because of the appeal of the BAYC Marks. Kindler Decl. (Dkt. 338) ¶ 61;

15   Berger Decl. (Dkt. 339) ¶¶ 71-76. If the NFTs just said "Ryder Ripps," consumers

16   would not have bought them. Indeed, even Defendants admit that they had to use the

17   BAYC Marks in their infringing products. Dkt. 149-42 at 9-10 (Mr. Ripps' second

18   supplemental response to interrogatory 3 states: "Mr. Ripps's RR/BAYC project . . .

19   displayed unmodified marks, so that the RR/BAYC project would be directly tied to

20   Yuga, BAYC, and specific BAYC NFTs . . ."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr.

21   Ripps wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club"

22   ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin of

23   the collection."). This is because the appeal of the BAYC Marks was core to their

24   infringement and profits. Yuga Labs should be awarded the full amount of

25   Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized

26   trademark use or continue that use . . . ." *Fifty-Six Hope Rd. Music, Ltd. V.*

27   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

28

1   **Defendants' Additional Arguments Opposing Disgorgement Are**

2   **Unpersuasive:**  Yuga Labs has established that it is entitled to at least $1,375,361.92

3   of Defendants' profits (after deducting payments to Defendants' business partners and

4   the amount of RR/BAYC NFTs that they hold or did not mint).  *See supra* ¶ 11(e).

5   Defendants provided no expert witness testimony, consumer survey, or financial

6   analysis to the contrary.  Since they cannot rebut these calculations, Yuga Labs is

7   entitled to the *Lindy Pen* presumption that Defendants made $1,375,361.92 as a result

8   of infringing activity.

9   Defendants have failed to carry their burden to show that even one of these

10  sales is not attributable to their infringing NFTs.  Instead, they contend that, even

11  though they used—and had to use—the BAYC Marks to sell their counterfeit NFTs,

12  their profits were somehow not attributable to the BAYC Marks.  Yet again,

13  Defendants cite no case law, expert testimony, or survey evidence to support this

14  claim, and their baseless argument fails.  *See Fifty-Six Hope Rd. Music, Ltd. V.*

15  *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that

16  defendant failed to meet burden to prove a 40% royalty was a proper deduction, where

17  "the documentary evidence leaves uncertainty as to the amount of royalty fees paid"

18  and defendant "did not produce sufficient documentation to prove the specific

19  amounts").  Indeed, the Ninth Circuit has rejected similar arguments before, finding

20  that "where infringing and noninfringing elements of a work cannot be readily

21  separated, all of a defendant's profits should be awarded to a plaintiff."  *Nintendo of*

22  *Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) (rejecting argument

23  that "multiple-game format and Nintendo-compatibility were the cartridges' selling

24  point, not the use of the Nintendo trademark").

25  Defendants point to a few cherry-picked emails as examples of alleged

26  consumers who were purportedly not confused.  Yuga Labs doubts the credibility of

27  these documents, but even taken at face value, they establish no more than a handful

28

1   of consumers who were not confused.  They also do not show that the BAYC Marks

2   were not part of the appeal of the RR/BAYC NFTs.  Without any evidence to carry

3   Defendants' burden, the Court can continue to presume that Defendants' profits were

4   attributable to the infringing activity.  *See Fifty-Six Hope Rd. Music, Ltd. V.*

5   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015).

6          **The Court Should Increase The Profit Award:**  Additionally, rather than

7   decreasing the profits award, the evidence shows that the Court should use its

8   discretion "to increase the profit award above the net profits proven '[i]f the court

9   shall find . . . the amount of the recovery . . . inadequate.'"  *Fifty-Six Hope Rd. Music,*

10  *Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) ("district court should

11  award actual, proven profits unless the defendant infringer gained more from the

12  infringement than the defendant's profits reflect"); 15 U.S.C. § 1117(a) ("If the court

13  shall find that the amount of the recovery based on profits is either inadequate or

14  excessive the court may in its discretion enter judgment for such sum as the court shall

15  find to be just, according to the circumstances of the case.").  The Court could do so to

16  address any additional award that it deems equitable to make Yuga Labs whole for

17  Defendants' egregious infringement and the harm they caused.

18          Ms. Kindler stated throughout her testimony that, although she was able to

19  calculate certain profits accrued by Defendants, the extent of harm to Yuga Labs was

20  not practically quantifiable including because of unjust enrichment to Defendants,

21  additional harm to Yuga Labs' business, harm to Yuga Labs' business partnerships,

22  harm to Yuga Labs' brand, and harm to Yuga Labs by the presence of RR/BAYC

23  NFTs in the marketplace.  *See* Kindler Decl. (Dkt. 338) ¶¶ 62-65, 67, 75; Trial Tr. at

24  176:14-22 ("I computed other potential measures of harm, and I also discussed at

25  length in my report other significant areas of harm that would not be easily

26  quantifiable, such as harm to goodwill, harm to brand equity, and things of that

27  nature."); *see also* Berger Decl. (Dkt. 339) ¶¶ 62-92.

28

1

**Defendants' Reply:**

2      Yuga's response fails to rebut Defendants' objection and similarly is not based

3   in fact or an accurate reading of the trial evidence.

4      ***First,*** there is ample evidence that there was ***no*** consumer confusion.

5   Defendants took multiple steps to make clear that the RR/BAYC collection was not

6   related to Yuga in any way.  For example, the rrbayc.com website—through which the

7   majority of RR/BAYC commissions occurred and the vast majority of alleged profits

8   accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344))

9   included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103

10  (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-

11  202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website

12  were also required to read and click through a disclaimer acknowledging the artistic

13  purpose of the project before they were allowed to commission an NFT.  *See* Ripps

14  Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

15  Mr. Ripps insisted on these requirement and additional steps so that the artistic

16  purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman

17  Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had

18  a negative impact on usability? …  A.   … Ryder wanted it and so he had the final

19  call.").

20      Unsurprisingly, therefore, the evidence presented at trial shows that many

21  people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

22  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

23  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

24      As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a

25  single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

26  Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,

27  Yuga's founders were also not aware of a single instance of actual confusion.  Trial

28

Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is

1    weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

2    strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it

3    was the first case she personally testified in where she offered an opinion based on

4    both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

5    surveys, but by not doing so she did not produce a finding of value on either survey.

6          Ms. O'Laughlin also could not explain the extremely strong priming effect

7    which influenced her results to her Everready survey.  In that survey, people were split

8    into those who saw a version of the RR/BAYC Foundation page that included the

9    words "Bored Ape Yacht Club."  Those in the control group of the experience would

10   see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

11   the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those

12   in the control group who copied down the words "Chill Gorilla Boat Crew" were not

13   counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of

14   those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not

15   counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that

16   she did not account for this extreme priming effect calling it "not particularly

17   relevant."  *Id.* at 158:20-159:1.

18         Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the

19   versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

20   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

21   fundamentally flawed, she can attest to confusion on two websites for only a matter of

22   days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court

23   should reject them and provide them no weight.

24         Further, this unreliable survey evidence, again does not show that anyone who

25   actually reserved an RR/BAYC NFT was confused about its origin and, therefore,

26   does not undermine the accuracy of this finding of fact.

27

28

The documentary evidence Yuga cites to is also unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344). The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Yuga further states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Yuga's response is also inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

1   what you were focused on. Yuga Labs has been unable to identify even[] a single

2   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

3   right? A Correct.").  Finally, the portion of profits attributable to secondary sales of

4   RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.

5   418-1 at 6.

6        ***Second***, Yuga is not entitled to disgorgement of profits.   As stated fully in our

7   objection to this finding of fact, disgorgement is not an available remedy here and the

8   sources Yuga cites to in response are unsupportive.  Firstly, Yuga citations to portions

9   of the Lanham Act and model jury instructions that indicate disgorgement generally is

10  an available remedy for infringement does not undermine Defendants' objection that it

11  is not an available remedy here.  Contrary to Yuga's response, the Supreme Court has

12  held that disgorgement is not available unless there is "the absence of an adequate

13  remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).   And the rule

14  set forth in *Dairy Queen* has been applied to awarding defendant's profits under the

15  Lanham Act.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994

16  WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994).

17       Legal remedies were available in this case.  Yuga expressly asserted and offered

18  expert testimony in support of legal remedies (including a claim for actual damages

19  that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-

20  1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17,

21  173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga

22  cannot obtain disgorgement.  *See Hunting World Inc.*, 1994 WL 763408, at *2-3

23  ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the

24  claim purely equitable because, as discussed above, this is a statutory claim.  Again,

25  because the statutes provide adequate remedies, a purely equitable claim may not be

26  maintained.").

27

28

1    Additionally, Yuga improperly responds by arguing that the Court's summary
2    judgment order supports a finding of intentional infringement, Yuga has incorrectly
3    relied on the law of the case doctrine.  The "law of the case doctrine does not apply to
4    pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792
5    F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d
6    1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,
7    don't bind district judges for the remainder of the case.  Given the nature of such
8    motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held
9    that although *aspects* of an issue were decided at summary judgment for one purpose,
10   the summary judgment order did resolve the issue generally or as to other topics.  *See*
11   No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)
12   (holding that evidence of initial police contact was relevant as background, but not to
13   the already decided issue that initial contact was not excessive force).  This case is just
14   like *Sienze*: the summary judgment ruling on intent applies only the issue of
15   infringement and is not adequate support on intent generally or as applied to
16   availability of disgorgement as a remedy, apportionment, and an exceptional case
17   analysis.

18       Also, Yuga's citations to the Lanham Act and the Court's statements at a pre-
19   trial conference miss the mark.  Even if willfulness is not a requirement for
20   disgorgement, that does not change that Courts have held an analysis of the infringer's
21   mental state is crucial.  An infringer's mental state is a "highly important
22   consideration in determining whether an award of profits is appropriate." *Romag
23   Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only
24   warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-
25   11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).
26   Disgorgement is, therefore, not an available remedy here because – as the evidence
27   showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See*
28

1  Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-

2  155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-

3  803.0003-05, 08, 29-30.

4      ***Third,*** none of Defendants' profits are attributable to infringing activity.  Yuga

5  incorrectly outlines what is required for profit to be considered attributable to the

6  infringing activity.  It is not enough for a sale to be "traceable" to the use of Yuga's

7  marks.  Yuga is only entitled to disgorgement of profits "attributable to the infringing

8  activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993),

9  abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839

10  F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a BAYC

11  mark is attributable to the infringing activity.  "If it can be shown that the

12  infringement had no relation to profits made by the defendant, that some purchasers

13  bought goods bearing the infringing mark because of the defendant's recommendation

14  or his reputation or for any reason other than a response to the diffused appeal of the

15  plaintiff's symbol" then they cannot be disgorged as "[t]he plaintiff of course is not

16  entitled to profits demonstrably not attributable to the unlawful use of his mark."

17  *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).

18  This fundamental principle clearly prevents Yuga from receiving profits that were

19  made for reasons beyond the appeal of its symbol, namely the profits attributable to

20  those who reserved an RR/BAYC NFT as a protest against Yuga or to support Mr.

21  Ripps and his renowned reputation as a conceptual artist.  *See* Ripps Decl. ¶ 21 (Dkt.

22  346) (uncontested); JTX-2333.

23      The record in this case is clear that *many* sales of RR/BAYC NFTs were not the

24  result of confusion, but genuine protest.  Indeed, Mr. Ripps received dozens of letters

25  from supporters of his artwork indicating that they purchased the NFTs not because

26  they were confused, but because they genuinely wanted to protest Yuga.  Ripps Decl.

27  ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590;

28

1    JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Although Ms. Kindler could not deny

2    that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga

3    (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases

4    was unnecessary since *subsequent* purchasers may have been confused (an assertion

5    for which she offered no evidence).  But that explanation makes little sense, and

6    certainly does not justify her failure to apportion. To the contrary, in the hypothetical

7    scenario where an initial purchaser *was not* confused and a subsequent purchaser was,

8    a proper damages analysis would apportion out the profits accrued from the original

9    sale and only count the profits from the sale that was attributable to confusion.  *See*

10   *Mishawaka Rubber*, 316 U.S. at 206.

11       Further, Yuga's citations are unsupportive.  Specifically, the smart contract

12   clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not

13   Yuga.  *See* JTX-1146.   Additionally, Mr. Ripps and Mr. Cahen used modified

14   versions of the alleged BAYC Marks in their reservations.  For example, the logo used

15   states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the

16   website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

17   Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer.

18   Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

19       There is also ample evidence in the record that shows that there was no

20   confusion and Yuga's response is not based in fact. Defendants took multiple steps to

21   make clear that the RR/BAYC collection was not related to Yuga in any way.  For

22   example, the rrbayc.com website—through which the majority of RR/BAYC

23   commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶

24   110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation

25   of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

26   Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

27   [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read

28

1   and click through a disclaimer acknowledging the artistic purpose of the project before

2   they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

3   (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

4   requirement and additional steps so that the artistic purpose of the work would be

5   clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

6   was the artist statement ultimately included, if it had a negative impact on usability?

7   … A.  … Ryder wanted it and so he had the final call.").

8        Unsurprisingly, therefore, the evidence presented at trial shows that many

9   people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

10  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

11  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

12       Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

13  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

14  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

15  Buttressing this fact, Yuga's founders were also not aware of a single instance of

16  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

17  let's focus on, I think, what you were focused on. Yuga Labs has been unable to

18  identify even[] a single person who purchased an RR/BAYC believing it to be

19  sponsored by Yuga Labs; right? A Correct.").

20       ***Fourth,*** Yuga's additional arguments are not persuasive.  Defendants

21  incorporate their previous response as to why Yuga has failed to establish that they are

22  entitled to at least $1,375,361.92 of Defendants' profits outlined above. *See supra* ¶

23  11(e).  As outlined previously, Defendants have shown that many sales of RR/BAYC

24  NFTs were made out of a protest against Yuga and not attributable to infringement

25  and Yuga's assertion that Defendants have failed to carry that burden is baseless.

26  Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating

27  that they purchased the NFTs not because they were confused, but because they

28

genuinely wanted to protest Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.   Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Second, Defendants received a great amount of correspondence from collectors of RR/BAYC NFTs.  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact. Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

1    **Fifth,** the Court should not increase the profit award.  The section of the

2    Lanham Act that Yuga cites to for support for its argument that the court should

3    consider an upward modification of a profit calculation is inapplicable here and

4    misleading.  As the full portion of Section 1117(a) states "[i]f the court shall find that

5    the amount of the recovery based on profits is either inadequate *or excessive* the court

6    may in its discretion enter judgment for such sum as the court shall find to be just,

7    *according to the circumstances of the case. Such sum* in either of the above

8    circumstances *shall constitute compensation and not a penalty*." 15 U.S.C. § 1117(a)

9    (emphasis added).  Here, the circumstances of the case support a finding that any

10   recovery of profits beyond those Mr. Ripps and Mr. Cahen received would be

11   excessive.  For example, the evidence shows that the intent of the RR/BAYC project

12   was to criticize Yuga's problematic imagery and educate consumers about the nature

13   of NFTs—the exact opposite of confusing consumers.  Cahen Decl. ¶¶ 97-98, 133

14   (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346) (uncontested); JTX-2033.  Mr. Ripps

15   has had a long and successful career as an artist, during which he has created

16   numerous satirical art projects spotlighting problematic societal issues.  Ripps Decl. ¶¶

17   15-26 (Dkt. 346) (uncontested).

18        Defendants also took multiple steps to make clear that the RR/BAYC collection

19   was not related to Yuga in any way.  For example, the rrbayc.com website—through

20   which the majority of RR/BAYC commissions occurred and the vast majority of

21   alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

22   144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

23   Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

24   Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

25   rrbayc.com website were also required to read and click through a disclaimer

26   acknowledging the artistic purpose of the project before they were allowed to

27   commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

28

2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

The evidence at trial also shows that Yuga's public activities amounted to authorization of RR/BAYC collection and the numerous other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344). There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative

coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Given these circumstances, if the court finds that disgorgement is appropriate, the court should not find disgorgement of more than Mr. Ripps and Mr. Cahen's profits is appropriate.  Such a decision would go beyond compensation and veer into punishment, impermissible under the statute.

Second, Yuga's response here is inconsistent with their own Findings of Fact. Specifically, in their Findings of Fact, Yuga asks for disgorgement of $1,375,361.92 in Defendants' profits. *See* Yuga's Proposed Finding of Fact Conclusion (Dkt. 418-1). To state in this response to Defendants' Finding of Fact that Yuga seeks more in disgorgement is inconsistent, unfounded, and misleading.

Finally, Yuga's citations to Ms. Kindler's testimony that there were damages that she was not asked to evaluate or chose not to quantify are irrelevant to the determination of how much disgorgement of profit Yuga is entitled to. *See* Kindler Decl. ¶ 64 (Dkt. 338) ("I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships…"); Kindler Decl. ¶ 65 (Dkt. 338) ("I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill…"); Kindler Decl. ¶ 67 (Dkt. 338) ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…").

### **Plaintiff's Disputed Post Trial Conclusion of Law No. 35:**

Defendants were also unjustly enriched, including by avoided costs.

### **Defendants' Basis of Dispute:**

This conclusion of law is unfounded.  As the evidence at trial showed, Mr. Ripps and Mr. Cahen clearly created their NFT collection as a protest *against* Yuga. *See* Ripps Decl. ¶¶ 71-72, 87, and 102 (Dkt. 346) (uncontested); Cahen Decl. ¶¶97-98

1   (Dkt. 344).  The RR/BAYC NFT project, therefore, was a protest against the "BAYC

2   brand" and, therefore, could not have possibly generated profits "free riding" or

3   leveraging the value of Yuga's brand.  Further, the evidence presented at trial showed

4   that the people who reserved the RR/BAYC NFTs did so as part of the protest against

5   Yuga and not to support the BAYC brand.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346)

6   (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591,

7   JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not show

8   that Mr. Ripps and Mr. Cahen were unjustly enriched or profited from the BAYC

9   brand, but rather shows that they received revenue as part of a protest against the

10  BAYC brand.

11  **Plaintiff's Response:**

12         Yuga Labs provided ample evidence that Defendants' wrongful conduct caused

13  (and continues to cause) unjust enrichment, including the unrebutted testimony of Ms.

14  Kindler.  For example, Defendants were unjustly enriched in the form of avoided

15  costs, as they were able to "free ride" on investments that Yuga Labs made to develop

16  the marks that the Defendants infringed.  Kindler Decl. (Dkt. 338) ¶ 68.  In addition to

17  the 3,023 RR/BAYC NFTs resales which generated profits for Defendants, there have

18  also been many resales of RR/BAYC NFTs where no creator fees were generated but

19  from which Defendants may still benefit by, e.g., creating more visibility for the

20  RR/BAYC NFT collection on secondary markets and allowing Defendants to remain

21  relevant and use engagement to obtain more followers.  *Id*. ¶ 69.  As another example,

22  Defendants have publicly discussed the RR/BAYC NFT collection on Twitter and

23  other channels, and this discussion has been noticed and picked up by news media.

24  This publicity may have led, or may lead in the future, to additional revenue streams

25  to enrich Defendants, including other NFT sales.  *See*, *e.g.*, JTX-1171, JTX-1567.  *Id*.

26  ¶ 70.  Even since the beginning of this litigation, Defendants have continued to

27  promote RR/BAYC NFTs, promote their planned Ape Market NFT marketplace, and

28

advertise their sales. *See, e.g.*, JTX-1048, JTX-1315, JTX-1613, JTX-1614, JTX-1615.  Defendants have also acknowledged in public posts that their RR/BAYC NFTs have caused irreparable harm to Yuga Labs or that they anticipate their actions will cause the company to fail.  *See, e.g.*, JTX-1566, JTX-1568.  Further promotion and sales result in yet additional benefits to Defendants and harm to Yuga Labs.  *Id.* ¶ 71.  Finally, Defendants also failed to prove that their profits were generated as some form of protest.  *See, e.g.*, *supra* ¶¶ 4, 7(d) (lines 4:3-6), 11(d) (lines 20-21).  They have no survey or other evidence to prove that the profits were based on any protest as opposed to use of the BAYC Marks.  Indeed, they tacitly admit that even if there was a protest, it was a commercial sale, in which every sale used the BAYC Marks.  Nonetheless, their commercial infringement was not art or a protest.  It was a bland counterfeit.  SJ Order (Dkt. 225) at 16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag.").

### Defendants' Reply:

First, Yuga's cites to Ms. Kindler's declaration are unsupportive and discuss vague and speculative benefits Mr. Ripps and Mr. Cahen may have received from secondary sales where they did not receive creator fees.  *See* Kindler Decl. ¶ 69 (Dkt. 338).  But Ms. Kindler testified that these supposed benefits "are not quantified by my profit analysis." *Id.* at ¶ 67.  Accordingly, assertions of benefits they received are unfounded and speculative. Yuga also alleges that Defendants will benefit with revenue streams that may occur in the future.  These wildly speculative claims of possible benefit are not supportive of this finding of fact.

Second, contrary to Yuga's unfounded assertion, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

1    Finally, Defendants do not admit to using the BAYC Marks as Yuga asserts.

2  Defendants used modified versions of the alleged BAYC Marks in their reservations.

3  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18

4  Teeth."  See JTX-2085.  Also, the website for the project, rrbayc.com, used the

5  modified "RR/BAYC" throughout. Id.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 36, lines 12:16-**
6
**17, 19-13:2:**
7
Defendants offer additional deductions from Ms. Kindler's profit calculations,
8
none of which the Court finds persuasive.
9
**Defendants' Basis of Dispute:**
10
11    This conclusion of law is unsupported and the testimony Mr. Ripps and Mr.

12  Cahen provided outlining the additional deductions for costs associated with the

13  RR/BAYC project that should be removed from Ms. Kindler's profit calculations are

14  persuasive.  See Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344)

15  ¶¶ 174-176.

**Plaintiff's Response:**
16
17    Defendants' objection should be rejected because their arguments claiming

18  further deductions are baseless and have no documentary support.  Supra ¶ 11(b).

**Defendants' Reply:**
19
20    Defendants' have provided details of costs.  For example, there were two

21  payments made to Mr. Lehman and Mr. Hickman that were not deducted from Ms.

22  Kindler's calculation.  See Ripps Decl. ¶¶ 133-35 (Dkt. 346) (uncontested); JTX-2710,

23  2711.  These were supported by direct documentary support.  There is also no dispute

24  that Mr. Ripps paid his assistant roughly $3,500.  Ripps Decl. ¶ 136 (Dkt. 346)

25  (uncontested).  Mr. Cahen also testified convincingly about these expenses.  See

26  Cahen Decl. ¶¶ 174-176 (Dkt. 344).

**Plaintiff's Disputed Post Trial Conclusion of Law No. 36, lines 12:19-**
27
**13:2:**
28

1    <u>Defendants offer no documentary evidence of these expenses and do not</u>
2    <u>attempt to show how they were necessary to earn revenue from the RR/BAYC NFTs.</u>
3    <u>Further, the Court does not find this testimony credible, because Mr. Cahen conceded</u>
4    <u>that he purchased the computer in December 2021 for the RR/BAYC "project" that</u>
5    <u>purportedly started in May 2022.</u> Dkts. 200-3, 200-4; 344 ¶174; see also Dkt. 200 at
6    3 (arguing "[t]he RR/BAYC Project began in mid-May").

7                              **Defendants' Basis of Dispute:**

8            Mr. Ripps and Mr. Cahen's testimony and evidence presented at trial do show
9    how the expenses they identified were used to create the RR/BAYC Project.  First,
10   Mr. Ripps's testimony showed that Mr. Garner was his assistant and worked on the
11   RR/BAYC Project for one week and was paid for his work.  Ripps Decl. ¶¶ 124, 127,
12   136 (Dkt. 346) (uncontested).  Such assistance on the project helped with the creation
13   of reservations of RR/BAYC NFTs.  Second, Mr. Cahen testified that he paid for
14   travel to meet and collaborate with Mr. Ripps for the project.  Cahen Decl. ¶ 175 (Dkt.
15   344).  Travel expenses paid so that two of the creators of the project could meet and
16   work with one another, helped with the creation of reservations of RR/BAYC NFTs.
17   Finally, Mr. Cahen testified about the cost of a computer he used to work on the
18   RR/BAYC project.  Cahen Decl. ¶ 174 (Dkt. 344).  The cost of the materials Mr.
19   Cahen used for creating the RR/BAYC project did help with the creation of
20   reservations of the RR/BAYC NFTs.

21           The evidence that Yuga cites to for support is misleading.  As Mr. Cahen
22   testified, he used the computer he purchased for the RR/BAYC Project and for
23   research about Yuga that led up to and helped create the RR/BAYC Project.  Trial Tr.
24   [Cahen] 229:14-21.  Yuga's citations to declarations Mr. Cahen and Mr. Ripps made
25   and filings regarding discovery relating to when possible communications began for
26   the RR/BAYC Project are misleading and non-supportive of this conclusion of law.
27   *See* Dkts. 200, 200-3, 200-4.  Additionally, Yuga's citation to Mr. Cahen's declaration

28

1    does not support this conclusion of law as it affirms that Mr. Cahen purchased a

2    computer that he used for the project.  Cahen Decl. ¶ 174 (Dkt. 344).  Accordingly,

3    the fact the computer was purchased in December 2021 and the RR/BAYC NFTs

4    were not minted until later, does not diminish the usefulness of this tool in the

5    RR/BAYC project as a whole.

6                        **Plaintiff's Response:**

7              Defendants' objection should be rejected because Defendants fail to provide

8    sufficient basis for why these expenses were necessary for the supposed minting of

9    infringing NFTs.

10             First, Defendants provide no documentary evidence (such as bank statements,

11   transaction data, or Form 1099) that Mr. Ripps paid Ian Garner "roughly $3,500 for

12   his work" as an "assistant," what that work entailed, or how it was relevant to the

13   revenue generated by Defendants' infringing activities.  Their conclusory statement

14   that Mr. Garner "helped with the creation of reservations" is insufficient.  *See Vital*

15   *Pharmaceuticals v. PhD Marketing, Inc.*, No. CV 20-06745, 2022 WL 2952495, *4, 6

16   (C.D. Cal. 2022) (rejecting deductions where defendant "has produced troublingly

17   little evidence to support that figure. Not a single invoice, receipt, or other original

18   source document has been produced to support the costs and expenses Defendant

19   claims. . . .  Other courts have similarly found that summary financial documents

20   coupled with testimony, absent any documentary evidence, were insufficient to satisfy

21   the defendant's burden to prove costs."); *Brighton Collectibles, Inc. v. Marc Chantal*

22   *USA, Inc.*, No. 06-CV-1584, 2009 WL 10674076, at *10 (S.D. Cal. 2009) (affirming

23   rejection of deductions where defendant "did not submit any documentary evidence

24   such as invoices to substantiate its claimed deductions").

25             Second, Defendants offered no documentary evidence of Mr. Cahen's travel

26   expenses or how these alleged travel expenses were necessary to earn revenue from

27

28

minting infringing NFTs. Justifying such travel so they "could meet and work with one another" is no basis for this deduction. *See id.*

Third, Defendants failed to offer any evidence of Mr. Cahen's computer purchase or why a several-thousand-dollar computer was necessary to earn revenue from Mr. Ripps' supposed minting of infringing NFTs. *See id.* Defendants have claimed that it was all Mr. Ripps (or at least Mr. Ripps' computer), and not Mr. Cahen, that minted the infringing NFTs. *See, e.g.*, Defendants' Answer and Counterclaim (Dkt. 65) ¶ 49 ("Each RR/BAYC NFT was hand-minted by the wallet of Mr. Ripps, and Mr. Ripps sold all RR/BAYC NFTs through only his personal Twitter account, Foundation, private sales, and the website https://rrbayc.com."). Defendants' tacit admission that Mr. Cahen's contribution to the revenue generated from sales of RR/BAYC NFTs was his "stimulat[ion]" of sales (JTX-801.144), such as with his Tweets from @ApeMarketplace, does not obviate the need to prove the cost of purchasing this computer in December 2021 was for Defendants' business venture. Defendants' admission does however highlight that they are lying when they claimed that accounts, such as the @ApeMarketplace Twitter account, did not support their marketing and infringement. *See supra* ¶ 14 (lines 7:15, 7:16-18).

Finally, Mr. Cahen's testimony about his computer was shown to be perjured. Mr. Cahen first testified under oath, in a declaration dated April 5, 2023, that the "RR/BAYC Project" began in May 2022 in order to avoid producing discovery related to Defendants' communications before May 2022. Dkt. 200-4 (declaring communications with Mr. Ripps "began in mid-May, 2022, which is also the same time period that the RR/BAYC Project began."); Dkt. 200 at 3 (arguing "[t]he RR/BAYC Project began in mid-May"). Mr. Cahen then testified in his trial declaration that "I had to buy a new computer to use for the project" that started in May 2022. Cahen Decl. (Dkt. 344) ¶ 174. But at trial, Mr. Cahen admitted that he purchased the computer in December 2021, approximately *five months before the*

1    *"project" even began*.  Trial Tr. at 227:2-229:21.  Mr. Cahen's sworn testimony that

2    he bought a computer "to use for the project" that would not exist for another five

3    months belies any possible link between this cost and Defendants' profits attributable

4    to their infringement and severely impeaches his credibility generally.

5        Given Defendants failure to support their claimed expenses and their admission

6    that they have no documentary support in evidence, each of Defendants' claimed

7    expenses should be rejected.

8                              **Defendants' Reply:**

9        Mr. Cahen testified on multiple occasions that he believed the project to be an

10   art project, not a business venture.  *See*, *e.g.*, Cahen Decl. (Dkt. 344) ¶¶ 180-212

11   (explaining intent).  It is further undisputed that the Defendants believe that

12   gordongoner.com was part of the project and it launched in January 2022 to highlight

13   Defendants' research.  Ripps Decl. ¶¶ 70-71 (Dkt. 346) (uncontested).

14       A computer purchased in December 2021 is not inconsistent with research done

15   about Yuga that was released publicly in January 2022.  In fact, it is entirely

16   consistent with Mr. Cahen's explanation that the computer was purchased to further

17   their overall protest project against Yuga.  *See* Trial Tr. [Cahen] 227:17-228:2.  Yuga

18   provided no evidence that this computer was *not* purchased for that purpose, nor that

19   the computer was purchased for any other purpose.  Arguing that the purchase date

20   renders the computer necessarily unrelated to the project is at misleading.

21                 **Plaintiff's Disputed Post Trial Conclusion of Law No. 36, lines 13:5-
                   7:**

22       Again, however, Defendants provide no documents showing this payment was

23   made or explanation of how it was entirely relevant to the revenue generated by their

24   infringing activities.

25                              **Defendants' Basis of Dispute:**

26       As explained above, this conclusion of law is unfounded as Mr. Ripps and Mr.

27   Cahen's testimony and evidence presented at trial do show how the expenses they

28

identified were used to create the RR/BAYC Project and the corresponding revenue generated by it.  First, Mr. Ripps's testimony showed that Mr. Garner was his assistant and worked on the RR/BAYC project for one week and was paid for his work.  Ripps Decl. ¶¶ 124, 127, 136 (Dkt. 346) (uncontested).  Such assistance on the project helped with the creation of reservations of RR/BAYC NFTs.  Second, Mr. Cahen testified that he paid for travel to meet and collaborate with Mr. Ripps for the project. Cahen Decl. ¶ 175 (Dkt. 344).  Travel expenses paid so that two of the creators of the project could meet and work with one another, helped with the creation of reservations of RR/BAYC NFTs.  Finally, Mr. Cahen testified about the cost of a computer he used to work on the RR/BAYC project.  Cahen Decl. ¶ 174 (Dkt. 344).  The cost of the materials Mr. Cahen used for creating the RR/BAYC Project did help with the creation of reservations of the RR/BAYC NFTs.  All three of the expenses Mr. Ripps and Mr. Cahen raise are directly related to the creation of the RR/BAYC Project and RR/BAYC NFTs, which created revenue.  This conclusion of law is, therefore, unfounded.

### Plaintiff's Response:

Defendants' objection should be rejected because Defendants fail to provide sufficient basis for why these expenses were necessary for the supposed minting of infringing NFTs.  *See supra* ¶ 36, 12:19-13:2.

### Defendants' Reply:

It is undisputed that Mr. Garner was helpful to the RR/BAYC project and that he was paid for his work.  Ripps Decl. ¶¶ 124; 127; 136 (Dkt. 346) (uncontested).  As such, any money paid to Mr. Garner should be deducted and Defendants have shown sufficient basis for the expenses.  Lastly, for the reasons stated above, Mr. Cahen's computer was sufficiently tied to the RR/BAYC project.  He testified he believed the project was part of protest art. Trial Tr. [Cahen] 227:17-228:2.  Part of that protest was

gordongoner.com.  Ripps Decl. ¶¶ 170-71 (Dkt. 346) (uncontested).  Therefore, Defendants have provided sufficient evidence linking the computer and the project.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 37:**

Therefore, the Court deems it just to award Yuga Labs $1,375,361.92 of Defendants' profits (consisting of $1,258,052.92 of profits from initial sales and $117,309 of profits from secondary sales) to account for Defendants' profits and unjust enrichment. See 15 U.S.C. § 1117(a).

**Defendants' Basis of Dispute:**

Disgorgement is not an available remedy here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.,* 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial – neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case. Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement. *See Hunting World Inc. v. Reboans, Inc.,* No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough

1  Plaintiff has waived the right to collect damages, this does not render the claim purely

2  equitable because, as discussed above, this is a statutory claim.  Again, because the

3  statutes provide adequate remedies, a purely equitable claim may not be

4  maintained.").

5      Finally, even if disgorgement were available here, Yuga would only be entitled

6  to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v.*

7  *Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by*

8  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

9  This requires distinguishing between revenue from collectors who reserved

10  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

11  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

12  believed they were purchasing Yuga NFTs.  *See id.*

13      Yuga has failed to show that any portion of this $1,375,361.92 figure is

14  attributable to the infringing activity.  As the evidence presented at trial showed, Yuga

15  has not identified even a single person who obtained an RR/BAYC NFT believing it

16  was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of

17  a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested);

18  Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman]

19  219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's

20  focus on, I think, what you were focused on. Yuga Labs has been unable to identify

21  even[] a single person who purchased an RR/BAYC believing it to be sponsored by

22  Yuga Labs; right? A Correct.").  Conversely, the evidence presented at trial shows that

23  many people who reserved RR/BAYC NFTs did so out of a protest *against* Yuga.  *See*

24  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,

25  JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given

26  the evidence, Yuga has not shown that they are entitled to any portion of profit from

27

28

1   the RR/BAYC project as there was no profit made that was attributable to the

2   infringing activity.

3          Finally, the $1,375,361.92 figure itself is an incorrect calculation of the profits

4   Mr. Ripps and Mr. Cahen have received from the RR/BAYC project.  First, the

5   evidence presented at trial showed that the RSVP contract also distributed $93,135.62

6   in automated refunds.  Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).  This figure

7   improperly includes in its profits calculation $93,135.62 in automated refunds

8   executed through the RSVP reservation contract.  Ripps Decl. ¶¶ 174-175 (Dkt. 346)

9   (uncontested).  Also, Mr. Ripps and Mr. Cahen incurred approximately $15,100.00 in

10  miscellaneous expenses associated with wages, a computer, and travel expenses.

11  Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344) ¶¶ 174-176.  This

12  figure fails to exclude those expenses from the profit calculation.

13          **Plaintiff's Response:**

14          Defendants' objections should be rejected for the same reasons discussed *supra*

15  ¶ 34; specifically:  (1) there is ample evidence of confusion; (2) disgorgement is

16  available as a remedy; (3) all of Defendants' profits are attributable to infringing

17  activity; (4) Defendants' additional arguments challenging disgorgement are

18  unpersuasive; and (5) the Court should increase the disgorgement award.

19          Additionally, as described below, Defendants' objection should be rejected

20  because (1) Defendants intended to confuse consumers in order to turn a profit, and

21  (2) Yuga Labs correctly calculated Defendants' profits.

22          **Defendants Intended To Confuse Consumers:**  Defendants' private

23  communications show they knew they were using the BAYC Marks in a way that was

24  likely to confuse consumers and did so with the intent to profit from their

25  infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see*

26  *also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too

27  man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of

28

1   money tbh"; "Potentially a lot").  And despite being urged to use different images or
2   overlay some commentary on the images they did use to avoid confusion, Defendants
3   chose not to.  *See. e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or
4   something like Getty images" because "it's just insane to have the same art"); JTX-
5   801.196 (Mr. Lehman demonstrating what an overlay might look like and
6   recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]
7   showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet
8   showing screenshot of Ape Market).  They also discussed that they knew they were
9   infringing and creating confusion, as they acted contrary to their attorneys' advice.
10  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull
11  / If we want to fight trademark").  Instead of making changes, such as those
12  recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs'
13  BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also*
14  Ripps Decl. ¶ 55 (Dkt. 346) (uncontested) ("In my experience, when designing logos
15  and imagery for brands, every choice is intentional.").

16      Defendants also knew that what they were doing was likely to lead to a lawsuit.
17  For instance, Mr. Ripps asked for a reference to his limited liability company,
18  Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued
19  personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and
20  branding direction in light of the trademark thing" to Mr. Cahen before they learned of
21  this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get
22  sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now
23  with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which
24  Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs'
25  marks to minimize the confusion and their infringement.

26      Privately, Defendants also discussed strategies to "cannibalize" the secondary
27  NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC

28

NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at getting engagement on twitter."  JTX-801.203.  Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

Publicly, Defendants made false representations about the RR/BAYC NFTs that implied owning one offered equivalent benefits to owning a genuine BAYC NFT. JTX-1037.  Defendants published their promotions from their individual Twitter accounts and from the commercial @ApeMarketplace account advertising their forthcoming NFT marketplace.  These advertisements were also directed at BAYC NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶ 46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have on Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications, Defendants revealed their true intent to profit from the infringing use of Yuga Labs' BAYC Marks.

**Yuga Labs Properly Calculated Defendants' Profits:**  Ms. Kindler correctly deducted refunds despite Defendants' false claim to the contrary, and Defendants failed to justify their proposed deductions, *supra* ¶ 11(b) (lines 6:5-7).

**Defendants' Reply:**

To be eligible for equitable relief, Yuga must prove that there is no adequate remedy at law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). This principle bars equitable relief where a party is able to name a sum certain for the amount of harm it suffered.  *Id.* (denying equitable relief to a party that pled legal damages and "fail[ed] to explain how the same amount of money for the exact same harm is inadequate or incomplete").  Yuga failed to show that their legal remedies

were inadequate, and therefore cannot rely on Ms. Kindler's reports—which underlay their legal remedy theory—to support their claim for equitable remedies.

Until shortly before trial, Yuga represented that it ***could*** calculate damages and placed monetary amounts on its damages. *See* JTX-308 (Kindler expert report); Dkt 268 (offer of proof Ms. Kindler affirming $1.7m damages total); Dkt. 287-I (amending damages figure to $787,183,838). Although these damages figures fluctuated wildly over a span of three days, *See* Dkt. 268 (June 5, 2023) and Dkt. 287-I (June 8, 2023), Yuga was able to place a monetary amount on its damages. In order to avoid a jury trial, Yuga changed its position one week later and argued that it could not discern the monetary amount of damages it suffered despite having recently provided a damages calculation. *See* Dkt. 315-1. In Yuga's own theory of the case, there were adequate monetary damages and Yuga failed to explain what changed between which rendered these damages unavailing. Instead, Yuga seeks to use disgorgement to avoid trial. However, because they could not show that a legal remedy was inadequate, they cannot claim an equitable one.

Even if Yuga has shown that they are generally entitled to an equitable remedy, they have not proven that they entitled to disgorgement in this case. Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022). Yuga's citation to the record does not demonstrate conscious wrongdoing.

For example, all of the citations to Mr. Lehman's discussions in the chat do not change the fact that ***Defendants*** were intending to make a statement in protest of Yuga and its actions. *See* Ripps Decl. (Dkt. 346) ¶¶ 137-57 (uncontested); Cahen Decl. (Dkt. 344) ¶¶ 180-212; Trial Tr. [Hickman] 214:23-215:3; 222:13-222:24. It is not inconsistent with art to make a money. Mr. Ripps after all, is an artist by trade. Ripps Decl. ¶¶ 1-3 (Dkt. 346) (uncontested). Therefore, texts about money he might make show little in terms of not having a good faith artistic intent. Likewise, discussions of

1  gaining attention for the RR/BAYC project getting attention do not show any lack of

2  good faith artistic intent.  It is axiomatic that art is only as good as people's interations

3  with it.  Further, Mr. Ripps had an unrebutted intention to make an "army of

4  educators" about Yuga.  *Id.* at ¶ 183 (uncontested).

5      Lastly, Ms. Kindler's calculation is incorrect in that it failed to deduct refunds,

6  payments to Mr. Lehman and Mr. Hickman, and Defendants expenses.  These

7  deductions were properly proven at trial and as discussed above.

8  **Plaintiff's Disputed Post Trial Conclusion of Law No. 39:**

9  Courts have "'wide discretion' in determining an appropriate amount of

10  damages" under the ACPA. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-

11  08982 MMM, 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010) (citation

12  omitted).

13  **Defendants' Basis of Dispute:**

14      A court's discretion in awarding damages is curbed by Defendants' rights,

15  including Defendants' Seventh Amendment right to a jury trial. Statutory damages are

16  legal remedies for which there is a right to a jury trial.  *See Feltner v. Columbia*

17  *Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial includes

18  the right to have a jury determine the amount of statutory damages") (emphasis in

19  original).  However, a jury trial is not required in instances when a plaintiff elects to

20  accept the minimum amount of statutory damages.  *See GoPets Ltd. V. Hise*, 657 F.3d

21  1024, 1034 (9th Cir. 2011).  Here, the Court has discretion to award statutory

22  minimum damages of $1,000 for each of the two cybersquatting violations that the

23  Court found (Dkt. 225 at 13-15), for a total of $2,000.  *See* 15 U.S.C. § 1117(d)

24  (permitting "award of statutory damages in the amount of not less than $1,000").

25      Yuga improperly relies on *Bekins*, a default judgement case, to argue that this

26  Court has wide discretion to award cybersquatting damages above the statutory

27  minimum.  *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09–08982, 2010 WL

28

1   11597623, at *1 (C.D. Cal. Nov. 19, 2010).  In *Belkins,* the defendant ignored the

2   complaint and continued to use the domain name in question.  *Id*.  As a result, the

3   court applied the *Eitel* factors to determine whether entry of default judgement was

4   justified.  *Id.* at 3.  Our facts are completely distinct from *Belkins.*  Here, Yuga waited

5   until after the summary judgement stage to waive "all legal remedies."  Yuga's

6   decision to forgo a jury trial does not impact Defendants right to have a jury determine

7   the amount of statutory damages.  *See Feltner v. Columbia Pictures Television, Inc.,*

8   *523 U.S. 340, 353 (1998)*.

9               **Plaintiff's Response:**

10          Defendants' objection should be rejected because (1) statutory damages are an

11   equitable remedy and (2) the Court may award more than the minimum statutory

12   damages.

13          **Statutory Damages Are An Equitable Remedy:**  Statutory damages are an

14   equitable remedy and courts are not required to refer the issue of statutory damages to

15   a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th

16   Cir. 2014)* ("The district court did not err in calculating statutory damages rather than

17   holding a jury trial on that issue because the ACPA allows for statutory damages

18   between $1,000 and $100,000, 'as the court considers just.' 15 U.S.C. § 1117(d).");

19   *Acad. Of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX),

20   *2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015)* ("[T]here is no right to a jury

21   trial for the assessment of statutory damages.").  "[C]ourts generally consider a

22   number of factors, including the egregiousness or willfulness of the defendant's

23   cybersquatting, the defendant's use of false contact information to conceal its

24   infringing activities and other behavior by the defendant evidencing an attitude of

25   contempt towards the court."  *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d

26   1072, 1086 (C.D. Cal. 2012) (cleaned up) (citation omitted).

27

28

**The Court May Award More Than The Minimum Statutory Damages:**

Defendants' contention that this Court may only award the statutory minimum
damages is wrong.  To the contrary, Ninth Circuit precedent demonstrates that Courts
have the authority to award more than the minimum statutory damages for ACPA
claims, even after a bench trial.  *Two Plus Two Pub., LLC v. Jacknames.com*, 572 F.
App'x 466, 467 (9th Cir. 2014); *see also, City of Carlsbad v. Shah*, 850 F. Supp. 2d
1087, 1108 (S.D. Cal. 2012) (after bench trial, awarding plaintiff $100,000 under
ACPA for infringing uses of marks); *Flow Control Indus. Inc. v. AMHI Inc.*, 278 F.
Supp. 2d 1193, 1201 (W.D. Wash. 2003) (An award of statutory damages under the
ACPA "requires *the Court* to balance the equities of the situation in determining the
amount.") (emphasis added).

## Defendants' Reply:

Monetary relief is a legal remedy.  *Feltner v. Columbia Pictures Television,
Inc.*, 523 U.S. 340, 352 (1998).  Statutory damages can "serve purposes traditionally
associated with legal relief, such as compensation and punishment.  *Id*.  As such, Yuga
cannot be awarded more than the statutory minimum on its cybersquatting claim
without violating Defendants' Seventh Amendment rights.  *See Daimler AG v. A-Z
Wheels LLC*, 498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020) (holding that award above
minimum is a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d
983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252,
1260 (W.D. Wash. 2013) (holding that statutory damages are a jury issue).

Yuga relies on unpublished cases, *Two Plus Two Pub* and *GoDaddy Inc*,
which are not binding precedent on this court, to argue that statutory damages are an
equitable remedy.  District Courts have declined to follow these unpublished decisions
and instead held that determination of stator damages is a jury issue.  *See, e.g.,
Daimler AG*, 498 F. Supp. 3d at 1290 (S.D. Cal. 2020) (holding in 2020 that an award
above the statutory minimum is a jury issue).  Moreover, *Two Plus Two Pub* is

distinguishable because it addressed an egregious case of cybersquatting.  In *Two Plus Two Pub*, one of the defendants admitted that he became aware of the plaintiff's marks in 1999 and proceeded to register an infringing domain years later. *Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466 (9th Cir. 2014).  Yuga's other case, *GoDaddy Inc,* should be disregarded because it is a nonpresidential case which departs from the holdings in *Feltner* and *GoPets*.  *Acad. Of Motion Picture Arts & Scis. V. GoDaddy, Inc.,* 2015 WL 12697732, at \*3 (C.D. Cal. Apr. 10, 2015) (misapplying *GoPets*).

Yuga also improperly relies on cases which are not analogous to the facts here. In *City of Carlsbad*, the court was dealing with an egregious case of cybersquatting involving 20 domains and continued use of multiple domains. *City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1108 (S.D. Cal. 2012).  *Wecosign* was a default judgment case where five defendants failed to appear or otherwise present any defense. *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1081 (C.D. Cal. 2012) ("Plaintiff would suffer prejudice if the Court does not grant its motion for the entry of default judgment because it has no other means of recourse.").  Finally, the court in *Flow Control* refrained from awarding statutory damages regarding cybersquatting pending further determinations.  *Flow Control Indus. Inc. v. AMHI Inc.*, 278 F. Supp. 2d 1193, 1202 (W.D. Wash. 2003).

**Plaintiff's Disputed Post Trial Conclusion of Law No. 40:**

Statutory damages are an equitable remedy and may be decided by the Court. *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x. 466, 467 (9th Cir. 2014); *Acad. Of Motion Picture Arts & Scis. V. GoDaddy, Inc.*, No. CV 10-3738-AB, 2015 WL 12697732, at \*4 (C.D. Cal. Apr. 10, 2015).

**Defendants' Basis of Dispute:**

Monetary relief is a legal remedy. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998). Statutory damages can "serve purposes traditionally

1  associated with legal relief, such as compensation and punishment. *Id*. As such, Yuga

2  cannot be awarded more than the statutory minimum on its cybersquatting claim

3  without violating Defendants' Seventh Amendment rights. *See Daimler AG v. A-Z*

4  *Wheels LLC*, 498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020) (holding that award above

5  minimum is a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d

6  983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252,

7  1260 (W.D. Wash. 2013) (holding that statutory damages are a jury issue).

8        Yuga relies on two unpublished cases (*Two Plus Two Pub* and *Acad. Of Motion*

9  *Picture Arts*), which are not binding precedent on this court, to argue that statutory

10  damages are an equitable remedy.  District Courts have declined to follow these

11  unpublished decisions and instead held that determination of stator damages is a jury

12  issue.  *See*, *e.g.*, *Daimler AG*, 498 F. Supp. 3d at 1290 (S.D. Cal. 2020) (holding in

13  2020 that an award above the statutory minimum is a jury issue).

14        Moreover, *Two Plus Two Pub* is distinguishable because it addressed an

15  egregious case of cybersquatting.  In *Two Plus Two Pub*, one of the defendants

16  admitted that he became aware of the plaintiff's marks in 1999 and proceeded to

17  register an infringing domain years later. *Two Plus Two Pub., LLC v. Jacknames.com*,

18  572 F. App'x 466 (9th Cir. 2014).  Yuga's other case, *GoDaddy Inc,* should be

19  disregarded because it is a nonpresidential case which departs from the holdings in

20  *Feltner* and *GoPets*.  *Acad. Of Motion Picture Arts & Scis. V. GoDaddy, Inc.,* 2015

21  WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) (misapplying *GoPets*).

22        The law set forth in *GoPets* is that a jury trial is not required only when the

23  Court awards only the statutory minimum.  *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034

24  (9th Cir. 2011).  But awarding anything more than the statutory minimum is a legal

25  remedy, which Yuga has foregone.  *See Versace v. Awada*, CV 03-3254-GAF, 2009

26  WL 10673371, at *7 (C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court

27  will not permit Plaintiff to withdraw its demand for a jury trial because Defendants do

28

1  not consent, and because the law holds clearly that Defendant has a right to a jury

2  determination of statutory damages.").

3  **Plaintiff's Response:**

4  Defendants' objections should be rejected for the same reasons discussed *supra*

5  ¶ 39; specifically:  (1) statutory damages are an equitable remedy and (2) the Court

6  may award more than the minimum statutory damages.

7  Additionally, Defendants' cases in this objection do not establish that monetary

8  relief under the ACPA is a legal remedy to be determined by a jury.  Both *Daimler*

9  *AG*, a non-binding case from another judicial district, and *Versace* concerned statutory

10  damages under 15 U.S.C. § 1117(c)(2), *not* under 15 U.S.C. § 1117(d), the statute at

11  issue here.  Significantly, *Daimler AG* found that a jury was required to determine

12  willfulness as a precondition to awarding statutory damages, as required by §

13  1117(c)(2).  *See Daimler AG*, 498 F. Supp. 3d at 1290; 15 U.S.C. § 1117(c)(2) ("*if the*

14  *court finds that the use of the counterfeit mark was willful*, not more than $2,000,000

15  per counterfeit mark . . . .") (emphasis added).  15 U.S.C. § 1117(d) has no such

16  willfulness requirement.  While willfulness can be a consideration in awarding

17  maximum statutory damages, *see Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV

18  09–08982, 2010 WL 11597623, at *9 (C.D. Cal. Nov. 19, 2010), it is not a pre-

19  requisite under § 1117(d).  While other cases may hold that a jury *may* decide

20  statutory damages under 15 U.S.C. § 1117(d), they do not establish it *as of right*.  *See*

21  *GoDaddy*, 2015 WL 12697732, at *3.

22  For authority on this issue, the Court should look to *Two Plus Two*, a Ninth

23  Circuit case upholding a district court's calculation of statutory damages under the

24  ACPA rather than holding a jury trial, and *GoDaddy*, a case from the Central District

25  holding that "there is no right to a jury trial for the assessment of statutory damages"

26  under the ACPA.  *Two Plus Two*, 572 F. App'x 466 (9th Cir. 2014); GoDaddy, 2015

27  WL 12697732.  Moreover, the law in the Ninth Circuit makes clear that courts have

28

1  discretion to award up to the maximum amount of statutory damages for ACPA

2  claims.  *See supra* ¶ 39.  This is consistent with the statute, which provides that the

3  amount of statutory damages is based on what "the court considers just."  15 U.S.C. §

4  1117(d).

5  **Defendants' Reply:**

6  Monetary relief is a legal remedy.  *Feltner v. Columbia Pictures Television,*

7  *Inc.*, 523 U.S. 340, 352 (1998). Statutory damages can "serve purposes traditionally

8  associated with legal relief, such as compensation and punishment. *Id*. As such, Yuga

9  cannot be awarded more than the statutory minimum on its cybersquatting claim

10  without violating Defendants' Seventh Amendment rights.  *See Daimler AG v. A-Z*

11  *Wheels LLC*, 498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020) (holding that award above

12  minimum is a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d

13  983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252,

14  1260 (W.D. Wash. 2013) (holding that statutory damages are a jury issue).

15  In *Daimler*, the court's holding regarding statutory damages was not limited to

16  statutory damages arising from 15 U.S.C. § 1117(c). The court made clear that courts

17  within the Ninth Circuit have held that where a plaintiff "seeks more than the statutory

18  minimum—and particularly where, as here, the plaintiff seeks significantly more—the

19  quantum of statutory damages should be determined by the jury." *Daimler AG v. A-Z*

20  *Wheels LLC*, 498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020).  It is evident that the

21  *Daimler* court was not limiting its holding to statutory damages arising from 15

22  U.S.C. § 1117(c) because it cited other cases within the Ninth Circuit which did not

23  pertain to that particular statute. *See Dream Games of Ariz. Inc. v. PC Onsite*, 561

24  F.3d 983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252,

25  1260 (W.D. Wash. 2013) (holding that statutory damages are a jury issue).

26  Yuga relies on unpublished cases which are not binding precedent on this court,

27  to argue that statutory damages are an equitable remedy.  District Courts have

28

declined to follow these unpublished decisions and instead held that determination of
stator damages is a jury issue.  *See*, *e.g.*, *Daimler AG*, 498 F. Supp. 3d at 1290 (S.D.
Cal. 2020) (holding in 2020 that an award above the statutory minimum is a jury
issue).  Moreover, *Two Plus Two Pub* is distinguishable because it addressed an
egregious case of cybersquatting.  In *Two Plus Two Pub*, one of the defendants
admitted that he became aware of the plaintiff's marks in 1999 and proceeded to
register an infringing domain years later. *Two Plus Two Pub., LLC v. Jacknames.com,*
572 F. App'x 466 (9th Cir. 2014).  Yuga's other case, *GoDaddy Inc,* should be
disregarded because it is a nonpresidential case which departs from the holdings in
*Feltner* and *GoPets*.  *Acad. Of Motion Picture Arts & Scis. V. GoDaddy, Inc.,* 2015
WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) (misapplying *GoPets*).

Yuga also improperly relies on *Bekins*, a default judgement case, to argue that
this Court has wide discretion to award cybersquatting damages above the statutory
minimum.  *Bekins Holding Corp. v. BGT Trans, Inc.*, 2010 WL 11597623, at *1 (C.D.
Cal. Nov. 19, 2010).  In *Belkins,* the defendant ignored the complaint and continued to
use the domain name in question.  *Id.*  As a result, the court applied the *Eitel* factors to
determine whether entry of default judgement was justified.  *Id.* at 3.  Our facts are
completely distinct from *Belkins.*  Here, Yuga waited until after the summary
judgement stage to waive "all legal remedies."  Yuga's decision to forgo a jury trial
does not impact Defendants right to have a jury determine the amount of statutory
damages.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353
(1998).

### Plaintiff's Disputed Post Trial Conclusion of Law No. 41:

Defendants' cybersquatting was willful and egregious. Defendants intentionally
infringed Yuga Labs' BAYC Marks. *See* SJ Order at 12. Moreover, "Defendants acted
with a bad faith intent to profit" from Yuga Labs' marks, including by "register[ing]
multiple domain names—https://rrbayc.com/, https://apemarket.com/, and pages

within OpenSea and Foundation—knowing that they were identical or confusingly similar to the BAYC Marks" and by "register[ing] their domains . . . for commercial gain to divert customers from purchasing BAYC NFTs." *See id*. at 15; JTX-670; JTX-677. These circumstances support Yuga Labs' request for $200,000 in statutory damages. *See Belkins*, 2010 WL 11597623, at *11.

**<u>Defendants' Basis of Dispute:</u>**

Yuga waived its right to any claim of willful infringement, and there has been no finding of willfulness. To the contrary, because Yuga gave up all legal remedies, Defendants are entitled to judgment of no willfulness. Furthermore, Yuga points the Court to its summary judgement order and incorrectly suggests that this Court is tied to its previous findings regarding Defendants' intent. That is not the case. Yuga has incorrectly relied on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).

Additionally, Yuga relies on a default judgement case where the court determined that the defendant had willfully infringed. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09–08982, 2010 WL 11597623, at *9 (C.D. Cal. Nov. 19, 2010). *Bekins* is very distinct from our case and does not impact Defendants' right to have a

1   jury determine the amount of statutory damages.  *See* *Feltner v. Columbia Pictures*

2   *Television, Inc.*, 523 U.S. 340, 353 (1998).  Here, the Court has discretion to award

3   statutory minimum damages of $1,000 for each of the two cybersquatting violations

4   that the Court found (Dkt. 225 at 13-15), for a total of $2,000. *See* 15 U.S.C. §

5   1117(d) (permitting "award of statutory damages in the amount of not less than

6   $1,000").

7                           **Plaintiff's Response:**

8         Defendants' objection should be rejected because (1) as the Court has already

9   found, Defendants' cybersquatting was willful, (2) Defendants seek to relitigate issues

10   already adjudicated by the Court, and (3) the Court may award more than the

11   minimum statutory damages.

12         **Defendants' Cybersquatting Was Willful And Egregious:**  Here,

13   Defendants' cybersquatting was willful and egregious.  Defendants intentionally

14   infringed the BAYC Marks to deceive consumers.  *See* SJ Order (Dkt. 225) at 12.

15   Moreover, "Defendants acted with a bad faith intent to profit" from Yuga Labs'

16   marks, including by "register[ing] multiple domain names—https://rrbayc.com/,

17   https://apemarket.com/, and pages within OpenSea and Foundation—knowing that

18   they were identical or confusingly similar to the BAYC Marks" and by "register[ing]

19   their domains . . . for commercial gain to divert customers from purchasing BAYC

20   NFTs." *See id.* at 15.  These circumstances alone support Yuga Labs' request for

21   $200,000 in statutory damages.  *See Bekins*, 2010 WL 11597623, at *11 (defendant's

22   willful and bad faith cybersquatting supported maximum amount of statutory

23   damages).  Even more, Defendants concealed their infringing activities by registering

24   the domain names through a proxy registration service.  SJ Order (Dkt. 225) at 15.

25         Defendants also display a clear contempt towards the Court.  Despite the Court

26   finding Defendants liable for cybersquatting (SJ Order (Dkt. 225) at 15), they have

27   continued to use and promote the domains to advertise their infringing RR/BAYC

28

1   NFTs.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Defendants'

2   pattern of abusive and bad-faith litigation conduct and disregard of the authority of

3   this Court and its proceedings warrants a high statutory damages award.  *See St.*

4   *Luke's Cataract and Laser Inst., P.A. v. Sanderson,* 573 F.3d 1186, 1206 (11th Cir.

5   2009) ("We agree and conclude that an ACPA statutory damages award . . . serves as

6   a sanction to deter wrongful conduct"); *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C08-

7   2832, 2009 WL 2706393, at *6 (N.D. Cal. Aug. 25, 2009) (awarding $50,000 per-

8   violation award because of "noncompliance with court orders, as well as its

9   systematically deceptive behavior").

10   **Defendants Cannot Relitigate Issues Already Decided on Summary**

11   **Judgment:**  Defendants' objection improperly disputes facts already adjudicated in

12   the Court's Summary Judgment Order (Dkt. 225).  In that order, the Court held that

13   Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the

14   Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has

15   not abandoned its marks.  *Id.* at 6-10.  The Court also held that "Defendants have

16   admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs."  *Id.*

17   at 11.  The Court "easily conclude[d]" that Defendants' use of identical marks, on

18   identical products, in identical markets supported a finding of a likelihood of

19   confusion.  *Id.* at 10-13.  That order establishes the matters adjudicated therein for

20   purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case

21   on a summary judgment motion may "enter an order stating any material fact —

22   including an item of damages or other relief — that is not genuinely in dispute and

23   treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of*

24   *Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal.

25   2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d

26   1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as

27   established at trial.").

28

Defendants did not move the Court to reconsider its holdings. Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist. Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a *useless trial of facts and issues over which there was really never any controversy* and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added). Defendants' authorities do not support their position. *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary judgment is *generally not relevant and should be excluded*" at trial) (emphasis added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing applicability of the law of the case doctrine where a case is assigned to a new judge).

"The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case and likewise serves the purpose of *speeding* up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir. 2009) (emphasis added) (alteration and citation omitted). Defendants' repeated attempts to ignore or undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation tactic that has unjustifiably increased the cost of resolving this case.

**Defendants Are Not Entitled To A Jury Determination, And The Court May Award More Than The Statutory Minimum**. Defendants' contention that this Court may only award the statutory minimum damages is false, as discussed *supra* ¶ 39.

**Defendants' Reply:**

1    Yuga waived its right to any claim of willful infringement, and there has been

2    no finding of willfulness.  To the contrary, because Yuga gave up all legal remedies,

3    Defendants are entitled to judgment of no willfulness.  Furthermore, Yuga points the

4    Court to its summary judgement order and incorrectly suggests that this Court is tied

5    to its previous findings regarding Defendants' intent.  That is not the case.  Yuga has

6    incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does

7    not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v.*

8    *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*

9    *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on

10   incomplete information, don't bind district judges for the remainder of the case.

11   Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze*

12   *v Kutz*, the Court held that although *aspects* of an issue were decided at summary

13   judgment for one purpose, the summary judgment order did resolve the issue

14   generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184

15   at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was

16   relevant as background, but not to the already decided issue that initial contact was not

17   excessive force).

18   The evidence at trial showed that Yuga does not own the BAYC marks because

19   (1) Yuga has either given away or abandoned its rights in the marks and (2) NFTs are

20   not eligible for trademark protection. Yuga gave away all intellectual property rights

21   associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly

22   represented that BAYC NFT holders received all IP rights and that Yuga has none of

23   those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman

24   Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673. That transfer of rights was made, in

25   part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the

26   intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

27   Your intent in writing the terms and conditions was to allow people to be able to

28

1   commercialize their NFTs.  We can agree on that; right?  A. Yes.  That is covered in
2   the terms.").

3          As a result, at the time of the RR/BAYC project, there were more than 9,000
4   other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)
5   (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were
6   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
7   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]
8   78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally
9   thousands" of products that use Yuga trademarks without sponsorship or affiliation
10  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks
11  with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
12  brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
13  use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.
14  Further, Yuga does not own the asserted marks because NFTs are not eligible for
15  trademark protection.  The Supreme Court has held that trademarks are limited to
16  "tangible goods that are offered for sale, and not the author of any idea, concept, or
17  communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox
18  Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a
19  **communicative** work is a dispute relegated to the confines of copyright law, not
20  trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-
21  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims
22  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
23  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
24  certificates of authenticity/ownership and are not digital goods in themselves.  Trial
25  Tr. [Atalay] 127:9-16.

26         Defendants have never stipulated to Yuga's Ownership of the BAYC
27  Marks.  Defendants hotly disputed ownership of the BAYC marks at summary

28

judgment. Dkt. 163 at 2-8. And while ownership of the marks is not an issue relevant
to the remedies trial in this case, Yuga has for some reason affirmatively raised the
issue—forcing Defendants to re-articulate their dispute for purposes of preserving
their position for appeal and all other proceedings involving the BAYC marks. Yuga
attempts to mischaracterize the Court record by citing to the pre-trial conference
order. But ***nowhere*** in the pre-trial conference order did Defendants stipulate to
ownership of the BAYC marks. Section 6 of the order contains all stipulated facts and
those stipulated facts include only that Yuga released the BAYC collection and
various facts about Defendants' activities associated with the RR/BAYC
collection. Dkt. 320-1 at 3-4. Yuga points to Section 5, which is the admitted facts
section, but this section again does not contain any admissions regarding "ownership"
of the marks. Rather it merely identifies the asserted marks at issue for the remedies
trial—something that Defendants admitted in light of the scope of the remedies trial
and to ease this Court's work in adjudicating the remaining issues. Dkt. 32-1 at 2-
3. Lastly, Yuga cites to Defendants' statement that the "Court has determined that
Defendants infringed the BAYC Marks." Dkt. 320-1 at 13. But again, this is not an
admission of ownership, it is a statement regarding the procedural history in this case
that explains that the scope of trial is limited to remedies and does not include
infringement. Had Defendants wanted to stipulate to ownership, they would have
clearly and expressly done so—they have not. Defendants reserve the right to dispute
ownership on appeal and in any other proceedings involving the BAYC marks.

Finally, the Court has discretion to award statutory minimum damages of
$1,000 for each of the two cybersquatting violations that the Court found (Dkt. 225 at
13-15), for a total of $2,000. *See* 15 U.S.C. § 1117(d) (permitting "award of statutory
damages in the amount of not less than $1,000"). Statutory damages can "serve
purposes traditionally associated with legal relief, such as compensation and
punishment. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998).

As such, Yuga cannot be awarded more than the statutory minimum on its cybersquatting claim without violating Defendants' Seventh Amendment rights. *See Daimler AG v. A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020) (holding that award above minimum is a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 3d 1252, 1260 (W.D. Wash. 2013) (holding that statutory damages are a jury issue).

### Plaintiff's Disputed Post Trial Conclusion of Law No. 42:

Defendants' bad-faith litigation conduct also evidences their contempt of the Court. Despite the Court finding Defendants liable for cybersquatting, they continued to use and promote the rrbayc.com domain to advertise their infringing RR/BAYC NFTs. Defendants' disregard for the authority of this Court and its proceedings warrants a high statutory damages award, given the policy interest in deterring such wrongful and sanctionable conduct. *See infra* Section III.C; *St. Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1206 (11th Cir. 2009); *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C 08-2832, 2009 WL 2706393, at *6 (C.D. Cal. Jan. 3, 2013).

### Defendants' Basis of Dispute:

Yuga presents no evidence that Defendants continued to use and promote the rrbayc.com domain after this Court's summary judgement order. Instead, Yuga merely speculates about Defendants continued activities. Yuga's speculation is not sufficient grounds to go above the statutory minimum. Furthermore, Defendants have the right to have a jury determine any amount of statutory damages above the statutory minimum. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

Yuga's argument that this Court should award higher statutory damages to deter wrongful conduct further underscores that statutory damages is a legal remedy.

1   *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345–47 (1998)

2   (explaining that "monetary relief is legal ... and an award of statutory damages may

3   serve purposes traditionally associated with legal relief, such as compensation and

4   punishment.").

5       Defendants have not engaged in any litigation misconduct.  *See generally* Dkt.

6   348 at 11-15.  Defendants' defenses were made reasonably and in good faith.  *Id*.  All

7   of Defendants' efforts to litigate and settle in good faith were impacted by Yuga's

8   unreasonable demands, including Yuga's demand for a non-disparagement clause and

9   Yuga's ever fluctuating assessment of actual damages.  *See* Dkt 286 at 2-3 (asserting

10  damages of $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of

11  $797,183,838 on June 8); Dkt. 315-1 at 2 (dropping actual damages on June 15).  This

12  Court acknowledged that Yuga's demand for a non-disparagement clause was "a

13  condition that is quite frankly unreasonable."  Hearing Transcript June 16, 2023, at

14  9:9-12.  Furthermore, Yuga has failed to present evidence which shows that

15  Defendants lack respect for this Court or the rule of law.  To the contrary, both

16  Defendants fully participated in the pre-trial litigation process, appeared for trial,

17  conducted themselves respectfully, and testified truthfully under oath, as any

18  reasonable litigant would.

19          **Plaintiff's Response:**

20      Defendants continued to use and promote the rrbayc.com domain after this

21  Court's summary judgement order.  *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at

22  57:8-58:6, 58:20-59:19.  Even a month after trial, Defendants still advertise

23  rrbayc.com in the profile heading of the Ape Market Twitter profile.  See

24  https://twitter.com/ApeMarketplace.

25      Defendants' contention that this Court may only award the statutory minimum

26  damages is false, as discussed *supra* ¶ 39.

27

28

1    Finally, Defendants' excuses for their egregious litigation misconduct are
2    unavailing.  *See infra* ¶ 61-66.

3        **Defendants' Reply:**

4        Yuga fails to cite credible evidence alleging that Defendants continue to use
5    these domain names.  First, Yuga cites testimony from Mr. Solano, who admitted a
6    trial that he made a false statement regarding Defendants' continued activities.  Trial
7    Tr. [Solano] 48:15-49:4.  Second, Yuga relies on a twitter account which Defendants
8    no longer use.  Both rrbayc.com and apemarket.com are inactive domains. Both URL
9    addresses do not have active websites associate with them.  Yuga's speculation
10   regarding Defendants' continued use is not adequate grounds for relief.

11       Furthermore, Yuga has failed to present evidence which shows that Defendants
12   lack respect for this Court or the rule of law.  To the contrary, both Defendants fully
13   participated in the pre-trial litigation process, appeared for trial, conducted themselves
14   respectfully, and testified truthfully under oath, as any reasonable litigant would.

15       **Plaintiff's Disputed Post Trial Finding of Fact No. 43:**

16       Therefore, Yuga Labs is entitled to the maximum amount of $200,000 in
17   statutory damages for Defendants' cybersquatting.

18       **Defendants' Basis of Dispute:**

19       Yuga presents no evidence of exceptional or egregious conduct, and no
20   analogous legal precedent to justify awarding the maximum amount of $200,000.
21   Yuga primarily relies on a default judgement case where the court determined that the
22   defendant had willfully infringed.  *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV
23   09–08982, , 2010 WL 11597623, at *9 (C.D. Cal. Nov. 19, 2010).  *Bekins* is very
24   distinct from our case and does not impact Defendants' right to have a jury determine
25   the amount of statutory damages.  *See Feltner v. Columbia Pictures Television, Inc.*,
26   523 U.S. 340, 353 (1998).  Here, the Court has discretion to award statutory minimum
27   damages of $1,000 for each of the two cybersquatting violations that the Court found
28

1   (Dkt. 225 at 13-15), for a total of $2,000. *See* 15 U.S.C. § 1117(d) (permitting "award
2   of statutory damages in the amount of not less than $1,000").

3   <u>**Plaintiff's Response:**</u>

4   Defendants' objection should be rejected because Yuga Labs has provided
5   ample evidence that Defendants' cybersquatting was willful and egregious. *See supra*
6   ¶ 41.

7   Additionally, Defendants are not entitled to a jury determination and the Court
8   may award more than the statutory minimum. *See supra* ¶ 39.

9   <u>**Defendants' Reply:**</u>

10  Yuga is not entitled to more than the statutory minimum for its cybersquatting
11  claim because Yuga has withdrawn and waived "all legal remedies."  Statutory
12  damages are a legal remedy (for which there is a jury trial right). *See Feltner v.*
13  *Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("The right to a jury
14  trial includes the right to have a jury determine the *amount* of statutory damages")
15  (emphasis in original).  Under Ninth Circuit law, a jury is not required when a
16  plaintiff elects to accept the minimum amount of statutory damages for
17  cybersquatting. *See GoPets Ltd. V. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  But
18  awarding anything more than the statutory minimum is a legal remedy, which Yuga
19  has foregone. *See Versace v. Awada*, CV 03-3254-GAF, 2009 WL 10673371, at *7
20  (C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court will not permit
21  Plaintiff to withdraw its demand for a jury trial because Defendants do not consent,
22  and because the law holds clearly that Defendant has a right to a jury determination
23  of statutory damages.").

24  <u>**Plaintiff's Disputed Post Trial Conclusion of Law No. 44, line 14:24:**</u>
25  <u>Yuga Labs is entitled to injunctive relief.</u> SJ Order at 13, 15.

26  <u>**Defendants' Basis of Dispute:**</u>

27

28

1      While Defendants reserve their right to appeal the Court's summary judgment

2 determination (and thus dispute that Yuga is entitled to any injunctive relief),

3 Defendants concede that if the Court's summary judgment order were to stand Yuga

4 would be entitled to reasonable injunctive relief. Yuga however seeks an

5 extraordinarily broad injunction that would prevent Defendants from making criticism

6 about Yuga's business practices. *See* Trial Tr. [Muniz] 94:12-13 ("They should not

7 have the right to say Bored Ape Yacht Club again."). Yuga's proposed injunction is

8 far too broad and should be rejected.

9      Injunctive relief must be "tailored to remedy the specific harm alleged." *Lamb-*

10 *Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). "An

11 overbroad injunction is an abuse of discretion." *Id.* Here, the specific harm alleged is

12 Defendants' use of Yuga's marks to sell products. *See* Dkt. 1 at ¶ 5 (complaint is

13 about sales of RR/BAYC NFTs). Therefore, the injunction must be tailored to only

14 that harm, and not the ancillary issues such as Defendants' free speech rights that

15 Yuga has wrongfully tried to introduce into the injunction.

16      **Plaintiff's Response:**

17      Defendants' objection should be rejected because (1) Yuga Labs' proposed

18 injunction does not seek to curtail Defendants' First Amendment rights and (2) Yuga

19 Labs' proposed injunction is tailored to address the irreparable harm done to Yuga

20 Labs and allow it to regain control of its brand.

21      **Yuga Labs' Proposed Injunction Does Not Seek To Curtail Defendants'**

22 **First Amendment Rights:** Defendants did not infringe Yuga Labs' BAYC Marks by

23 merely selling NFTs. They infringed Yuga Labs' NFTs by creating the RR/BAYC

24 NFTs (the Foundation contract), creating NFT marketplaces on which to sell the NFTs

25 (e.g. the Foundation sales page), giving away infringing NFTs to get people to market

26 or support their business venture, promoting their NFTs, marketing them through

27 @ApeMarketplace and developing an NFT marketplace (Ape Market) to "stimulate"

28

1  the sales of their infringing NFTs, by selling their NFTs to initial purchasers, and by

2  driving up the price of their NFTs and then re-selling those they hold for a further

3  profit.  Defendants continue to infringe by marketing RR/BAYC NFTs—for example

4  advertising rrbayc.com on their @Ape Market Twitter page alongside a link to an

5  NFT marketplace where users can still purchase RR/BAYC NFTs.  *See* Solano Decl. ¶

6  77.  Yuga Labs' proposed injunction would put an end to that marketing by

7  transferring control of these instrumentalities of infringement to Yuga Labs.  The

8  terms of the injunction that Yuga Labs contends is appropriate in this case are clear

9  from its proposed findings of fact and conclusions of law.  Dkt. 416.  Yuga Labs has

10  not sought to limit Defendants' criticisms of Yuga Labs through its proposed

11  injunction.  Indeed, Defendants' contention that their ongoing infringement constitutes

12  "criticism" demonstrates why a court order "enjoining them from using the mark"

13  alone would not stop their infringement.  *See* Dkt. 419-1 at 3:25-4:6.  Yuga Labs must

14  be given the instrumentalities of their infringement so that they cannot continue to

15  infringe and claim it is criticism.

16  Yuga Labs' former CEO did not testify that Yuga Labs intends to silence

17  Defendants.  Rather, the context of Ms. Muniz's testimony is clear that she was

18  speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club trademark to

19  promote products.  Trial Tr. at 94:5-13.  There is no debate that Yuga Labs is seeking

20  an injunction to stop Defendants' infringement of its marks.  Yuga Labs has not,

21  however, sought to limit Defendants' criticisms of Yuga Labs through its proposed

22  injunction.  What is nevertheless clear is that Defendants refuse to accept any

23  reasonable injunctive relief, even though the Court has already found that Yuga Labs

24  is entitled to injunctive relief.  Dkt. 418-1.

25  **Yuga Labs' Proposed Injunction Is Proper:**  A properly tailored injunction

26  must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain

27  control of the brand.  This includes putting an end to Defendants' sales, promotion,

28

1  and marketing of infringing NFTs; preventing Defendants from creating any future

2  confusion by minting new infringing NFTs or improperly using Yuga Labs' Marks;

3  alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart

4  contract and other infringing domains and instrumentalities to Yuga Labs so it once

5  again has sole control over its marks.  It is unrebutted that transferring the smart

6  contract to Yuga Labs would allow it to regain control over its brand.  The injunctive

7  relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law is

8  specifically tailored to accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two

9  other courts have entered similar injunctions against Defendants' business partners.

10  *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30),

11  *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023);

12  JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas

13  Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD

14  (N.D.N.Y Feb. 6, 2023)).

15                          **<u>Defendants' Reply:</u>**

16          Yuga argues that this Court should adopt its injunctive relief terms and cite to

17  the Lehman consent judgment—which was a condition of settlement—and the

18  injunction entered against Mr. Hickman—which was attained via a default judgment.

19  Neither Mr. Lehman and Mr. Hickman were defending themselves against the terms

20  of the overbroad injunction.   And Mr. Hickman's default judgment was improperly

21  obtained under false pretenses because Yuga never served the complaint in Mr.

22  Hickman's case and instead left it on his porch unattended after the server told Mr.

23  Hickman's twelve-year-old daughter that he could not serve her.  *<u>Yuga Labs, Inc. v.</u>*

24  *<u>Hickman</u>*, 2:23-cv-00111-JCM-NJK, Dkt. 31-1 at 2 (D. Nev.) ("6.  I told the stranger

25  that my parents were not home, and that I was twelve years old.  7.  The stranger told

26  me he could not leave the papers with me, and left.  I did not see the stranger return.").

27  Yuga then submitted an affidavit ***falsely stating*** to the court that it had served Mr.

28

Hickman's fifteen-year-old daughter.  *See Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 31 at 7 (D. Nev.) ("Plaintiff fraudulently represented to the Court that Hickman's daughter was fifteen and that the process server delivered copies of the Complaint and summons to her. … This is blatantly false, and was undoubtedly asserted by Plaintiff in an effort to obtain a favorable Default Judgment ruling."). The Court in Mr. Hickman's case has stayed judgment to reassess the validity of default judgment.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 37 (D. Nev.) (granting emergency motion to stay enforcement of default judgment).

Just because courts entered overbroad stipulated injunction, or an *ex parte* injunction obtained under false pretenses in other cases does not mean that the Court can or should enter an overbroad injunction in this case over Defendants' objections.

Ms. Muniz explained **precisely** what Yuga wants, for Defendants to lose their right to say "Bored Ape Yacht Club" ever again.  Trial Tr. [Muniz] at 94:5-13.  As Yuga's proposed injunction is written, there is a high likelihood that basic criticisms of Yuga and its marks would be covered by the injunction.

To the extent Yuga is demanding the smart contract, doing so might not be technically feasible and it is futile.  As such, this term runs a high risk of being set as a "trap" for Defendants to fall into as compliance might not be possible.  Further, Yuga has admitted that the contract is immutable, which means that the smart contract cannot be changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  An order that prohibits Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the injury alleged in this case.  Further, it would be enforceable in court. Likewise, a prohibition from using the rrbayc.com and apemarket.com domains—both of which are inactive—would suffice and fit the scope of the injury found by the court in this case (subject to Defendants' right to appeal).  Yuga's argument that an injunction that prevents Defendants from using the marks and domain names in

commerce would be insufficient without the smart contract is speculative and wrongly
assumes that Defendants would not comply with a court order.

### Plaintiff's Disputed Post Trial Finding of Fact No. 45, lines 15:8-10:

<u>Defendants have presented no persuasive argument or evidence rebutting that
presumption. Moreover, Defendants' infringing conduct caused irreparable injury to
Yuga Labs by hindering its ability to control its reputation and brand</u>. *See, e.g.*, JTX-
722 ¶¶11, 12; Dkts. 392 at 95:17-99:7; 340 ¶16-17; *Stuhlbarg Int'l Sales Co., Inc. v.
John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.2001).

### Defendants' Basis of Dispute:

Defendants have effectively rebutted the presumption of irreparable harm by
showing that any harm caused to Yuga was not from the alleged infringement but
instead derived from Yuga's own business practices.  Yuga's harm theory is that it
was losing prospective customers and good will.  The harm alleged by Yuga must
relate to the Defendants' infringement.  *See Stuhlbarg Int'l Sales, Inc. v. John
Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (explaining that *use* of mark by
defendant caused loss of customers for plaintiff).  Yuga failed to show that it was
Defendants' alleged infringing actions, and not some other action that caused its brand
to suffer damage.

Yuga relies exclusively on the opinions of its expert on brand harm, Jonah
Berger.  Dr. Berger admitted that he did not consider the impact of several scandals,
and broad market-wide issues on Yuga's brand, including admitting that he was
unaware of some of the scandals at the time he made his analysis.  *See* Trial Tr. 109:8-
25; 113:11-114:2; 114:8-115:1. Defendants showed that these scandals had a major
impact on Yuga and its standing in the market.  *See* JTX-306; 307; 2715.  Dr. Berger
was also unable to ascertain whether Defendants' infringement or their criticisms of
Yuga had an impact on brand harm.  Trial Tr. 118:11-119:19 (disclaiming any
knowledge of association of Yuga with subject of Defendants' criticism).  If the harm

1  derived from Defendants' criticism of Yuga, then the infringement is not the source of

2  the harm.

3  **Plaintiff's Response:**

4  Defendants' objection should be rejected because (1) Defendants' actions

5  caused irreparable harm to the BAYC brand; (2) Defendants do not rebut the

6  presumption that they caused irreparable harm; and (3) Dr. Berger's report is reliable

7  and discredited Defendants' alternative harms argument.

8  **Defendants' Actions Irreparably Harmed Yuga Labs:**  There is ample

9  evidence in the record that Defendants caused irreparable harm to Yuga Labs.  As Ms.

10  Muniz explained, Defendants' actions "created confusion in the marketplace about

11  whether Yuga Labs had launched a new BAYC collection, whether Yuga Labs would

12  mint more BAYC NFTs, and whether the existing BAYC NFTs were still an

13  exclusive good."  Muniz Decl. (Dkt. 340) ¶ 9.  Likewise, Mr. Solano testified that

14  "Defendants' use of BAYC Marks brought confusion to the marketplace and

15  irreparable harm to Yuga Labs," listing specific examples of consumer confusion that

16  resulted from their use of the BAYC Marks.  Solano Decl. (Dkt. 342) ¶ 63.  And

17  Defendants' "design of Ape Market was an attempt to make people trust their scam

18  marketplace by associating it with Yuga Labs and the consumer trust the BAYC brand

19  has built up through years of work," causing further irreparable harm to Yuga Labs.

20  *Id*. ¶ 51.  This confusion in the market damaged Yuga Labs' relationships with

21  multiple businesses and Yuga Labs investors, and is directly attributable to the

22  confusion Defendants caused.  Muniz Decl. (Dkt. 340) ¶¶ 15-17; Kindler Decl. (Dkt.

23  338) ¶ 62; Trial Tr. at 97:14-98:3.  Ms. Kindler separately testified that Defendants'

24  actions caused harm to Yuga Labs that is "significant, yet more difficult to quantify,"

25  including harm to Yuga Labs' good will, use of RR/BAYC NFTs as replacement

26  goods, and unearned benefits to Defendants such as unjust enrichment.  Kindler Decl.

27  (Dkt. 338) ¶¶ 62-71; Trial Tr. at 176:14-22 ("I computed other potential measures of

28

harm, and I also discussed at length in my report other significant areas of harm that would not be easily quantifiable, such as harm to goodwill, harm to brand equity, and things of that nature.").

The harm caused by Defendants' infringement is ongoing through, e.g., Defendants' continued promotion of rrbayc.com on their @ApeMarketplace Twitter page, their continued promotion of RR/BAYC NFTs on secondary marketplaces, continued sales of RR/BAYC NFTs on these marketplaces, ongoing bot tweets and platforms like Etherscan calling RR/BAYC NFT sales "Bored Ape Yacht Club," and use of RR/BAYC NFTs as verified hexagon profile pictures on Twitter. *See Id.* ¶¶ 64, 77-78; Muniz Decl. (Dkt. 340) ¶ 22; Kindler Decl. (Dkt. 338) ¶ 71; Trial Tr. at 57:8-58:6.

Yuga Labs' injunction is designed specifically to mitigate the irreparable harm identified at trial by transferring the RR/BAYC smart contract and other infringing instrumentalities to Yuga Labs. *Id.* ¶ 64, 77-85 ("As long as the RR/BAYC NFTs remain in the market under Defendants' control, people will be confused by their origin, decreasing the perceived exclusivity of authentic BAYC NFTs and harming Yuga Labs."); Muniz Decl. (Dkt. 340) ¶ 22; Kindler Decl. (Dkt. 338) ¶ 75 ("[I]t is my opinion that there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or ensuring that Yuga Labs receives adequate monetary compensation for the harm it has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace, which supports Yuga Labs' position that the harm caused by Defendants' infringing NFTs is irreparable through economic means alone."); Trial Tr. at 59:24-60:12.

**Defendants Do Not Rebut The Presumption Of Irreparable Harm:** Defendants offer no evidence or even explanation to support their claim that they did not cause harm.  They have no expert testimony concerning the fact of alleged harm and that such alleged harm perceived by Dr. Berger was not caused by Defendants.

1   They likewise have no evidence from Yuga Labs that the harm Yuga Labs perceived

2   was caused by sources other than Defendants – Yuga Labs' witnesses were consistent

3   and specific that the harm they identified to the Court was caused by Defendants'

4   creation and marketing of the RR/BAYC scam.  Indeed, Defendants have even

5   publicly acknowledged that their RR/BAYC NFTs have caused irreparable harm to

6   Yuga Labs.  *See* Kindler Decl. ¶ 71; JTX-1566, JTX-1568.  Thus, not only do

7   Defendants *not* have evidence that the irreparable harm discussed at trial was caused

8   by them, there is evidence that they themselves have admitted to causing such harm.

9   **Dr. Berger's Opinion Is Reliable And Discredited Defendants' Alternate**

10  **Harms Argument:**  Dr. Berger's unrebutted testimony explains that he "conducted a

11  number of analyses, not just one," which helps to rule out the alternative theories that

12  Defendants hypothesize might explain Dr. Berger's findings.  Trial Tr. at 107:8-108:1;

13  114:15-115:25; 121:23-125:1.  Defendants offered no expert of their own to support

14  any of their other hypothetical causes of brand harm to Yuga Labs.  Without an expert

15  of their own to support their theories and in light of Dr. Berger's reasonable and

16  rational explanation of what he found in the data, Dr. Berger's opinions should be

17  accepted.  Moreover, Defendants did not object to the admissibility of Dr. Berger's

18  testimony.  Dkt. 366.

19  Dr. Berger testified that, hypothetically, there could be multiple different causes

20  of harm, but his data revealed that "the only factor that can distribute to that outcome

21  is the minting and publication of RR/BAYCs."  Trial Tr. at 115:16-117:10; 121:23-

22  123:8.  Dr. Berger specifically considered, and rejected, whether the share of Tweets

23  expressing negative sentiment toward BAYC was increasing between May 6, 2022

24  and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share

25  of positive sentiment was decreasing; he found that the data are inconsistent with that

26  alternate hypothesis, thus ruling out any supposed alternative causes preceding the

27  release of RR/BAYC NFTs.  Berger Decl. (Dkt. 339) at n.55.

28

1    In addition, Dr. Berger has not seen any evidence to support Defendants'

2    hypothesis.  Trial. Tr. 119:21-25.  Nevertheless, as the Court has already found this

3    case is about Defendants' commercial infringement.  SJ Order (Dkt. 255) at 16

4    ("These are all commercial activities designed to sell infringing products, not

5    expressive artistic speech protected by the First Amendment."); *see also* June 9, 2023

6    Pretrial Conference Tr. at 8–10 (Defense counsel acknowledging "there is a difference

7    between the criticism and the sales of the product.").  Nothing in Defendants'

8    supposed false criticism, nor isolated articles on alleged separate issues, negates that

9    Defendants' creation, marketing, and promotion of RR/BAYC NFTs has caused

10   irreparable harm to Yuga Labs and will continue to cause such harm unless Yuga Labs

11   is able to regain control of its brand and exclusivity over its BAYC brand.

12   ### **Defendants' Reply:**

13   Yuga's reply demonstrates that they have not shown that any harm derived

14   from the infringement and not some other issue.  Their citations to Ms. Muniz's and

15   Mr. Solano's declarations in support show this weakness.  Both Ms. Muniz and Mr.

16   Solano were unable to identify a *single* confused consumer.  *See* Trial Tr. [Muniz]

17   84:20-85:7 (admitting Yuga was unable to identify a single consumer who bought an

18   RR/BAYC believing it to be a BAYC); Trial Tr. [Solano] 18:18-19:15.  In fact, Yuga

19   could not identify a single document discussing harms from the RR/BAYC project,

20   including from investors, and inside the business.  Trial Tr. [Muniz] 84:14-87:6;

21   87:17-88:6; 101:7-12.  This was despite admitting that as a multi-billion dollar

22   company, they use email and instant messaging for business.  *Id.* 85:24-86:4.  The

23   paucity of documents from Yuga stands in contrast to Defendants who received

24   several emails from people who explained that they were buying RR/BAYC NFTs

25   because of the art and the protest message.  Ripps Decl. ¶¶ 195-207 (Dkt. 346)

26   (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX2590; JTX-2592; JTX-2595;

27   JTX-2596; JTX-2599.

28

1      Citations to Ms. Kindler's declaration fare no better.  Ms. Kindler changed her

2  opinion by astonishing amounts across a matter of days.  She represented that in a

3  declaration that damages were in the neighborhood of $797 million, but there is no

4  dispute that the $797 million figure was nowhere to be found in Ms. Kindler's original

5  expert report.  Trial Tr. [Kindler] 175:17-179:8; *see generally* JTX-308.  The $797

6  million figure, 400 times greater than her original damages estimate, first appeared in

7  Ms. Kindler's amended offer of proof more than four months after her original

8  damages report.  Dkt. 287-10 at 4 n.3.  It is also undisputed that her estimate increased

9  400-fold over three days.  Trial Tr. [Kindler] 178:8-23.  Her reasoning behind this

10  400-fold increase was a series of three tweets. *See id.* at 179:15:18.  Accordingly, her

11  opinion cannot support its finding because it was an unreasonable opinion.  Likewise,

12  Yuga's other citations to the record do not support a finding that there is irreparable

13  harm from Defendants as they are either irrelevant to this issue, or are compensable

14  harms.

15      Yuga still principally relies on Dr. Berger's testimony and report.  First, as an

16  initial matter, Yuga's proposed "must have an expert" rule ignores the role of cross

17  examination and would make litigation a playground only available to massive

18  corporations like Yuga. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036,

19  1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by **cross**

20  **examination**") (emphasis added).  Defendants rebutted Dr. Berger's analysis because

21  they demonstrated that he ignored several alternative causes of harm to his analysis.

22  Trial Tr. [Berger] 108:7-109:4; 115:16-25 .  For example, he ignored the general

23  downturn of the cryptocurrency market, which occurred during his analysis period.

24  Trial Tr. [Berger] 109:5-110:5; JTX-306.  He also claimed no knowledge of the

25  Otherside scandal, which occurred mere days before his chosen analysis period.  Trial

26  Tr. [Berger] 113:10-114:2; JTX-2715.  These scandals caused BAYC holders to lose

27  lots of money.  It stands to reason that this could be another source of harm.  Indeed,

28

Dr. Berger's lack of knowledge about other scandals directly undercuts his assertion that the minting of RR/BAYCs alone, and not Defendants' First Amendment protected criticism, Yuga's own scandals, and the collapse of the cryptocurrency market were other sources of harm.

### Plaintiff's Disputed Post Trial Conclusion of Law No. 46, lines 15:13-14:

Monetary damages are inadequate to compensate for the irreparable injury.

### Defendants' Basis of Dispute:

To be eligible for equitable relief, Yuga must prove that there is no adequate remedy at law. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). This principle bars equitable relief where a party is able to name a sum certain for the amount of harm it suffered. *Id.* (denying equitable relief to a party that pled legal damages and "fail[ed] to explain how the same amount of money for the exact same harm is inadequate or incomplete"). Yuga failed to show that their legal remedies were inadequate, and therefore cannot rely on Ms. Kindler's reports—which underlay their legal remedy theory—to support their claim for equitable remedies.

Until shortly before trial, Yuga represented that it ***could*** calculate damages and placed monetary amounts on its damages. *See* JTX-308 (Kindler expert report); Dkt 268 (offer of proof Ms. Kindler affirming $1.7m damages total); Dkt. 287-I (amending damages figure to $787,183,838). Although these damages figures fluctuated wildly over a span of three days, *See* Dkt. 268 (June 5, 2023) and Dkt. 287-I (June 8, 2023), Yuga was able to place a monetary amount on its damages. In order to avoid a jury trial, Yuga changed its position one week later and argued that it could not discern the monetary amount of damages it suffered despite having recently provided a damages calculation. *See* Dkt. 315-1. In Yuga's own theory of the case, there were adequate monetary damages and Yuga failed to explain what changed between which rendered these damages unavailing.

### Plaintiff's Response:

1    Defendants' objection should be rejected because (1) Yuga Labs does not need

2 to show the absence of an adequate remedy at law to obtain an injunction and, even

3 so, (2) Ms. Kindler's testimony expressly, and correctly, states that monetary damages

4 are not sufficient.

5    **Yuga Labs Does Not Need To Show The Absence Of An Adequate Remedy**

6 **At Law To Obtain An Injunction:**  Injunctive relief is the "remedy of choice for

7 trademark . . . cases, since there is no adequate remedy at law for the injury caused by

8 a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846

9 F.2d 1175, 1180 (9th Cir. 1988).  In addition, "[d]amage to reputation and loss of

10 customers are intangible harms not adequately compensable through monetary

11 damages." *Leadership Studies, Inc. v. ReadyToManage, Inc.*, No. 2:15-cv-09459-

12 CAS, 2017 WL 2408118, at *6 (C.D. Cal. June 2, 2017) (citation omitted).  The Court

13 has already found that Defendants infringed Yuga Labs' trademarks, and thus

14 irreparable injury is presumed, and Defendants have presented no persuasive

15 argument or evidence rebutting that presumption.  *See supra* ¶ 45 (lines 15:8-10); SJ

16 Order at 13; 15 U.S.C. § 1116(a).  It has further proven that Defendants' infringing

17 conduct caused irreparable injury to Yuga Labs by hindering its ability to control its

18 reputation and brand.  *Id*.  Monetary damages are inadequate in the face of this

19 irreparable harm.  Moreover, the Court has found that Yuga Labs is entitled to both

20 "monetary damages *and* injunctive relief" for its trademark claims.  SJ Order (Dkt.

21 225) at 13 (emphasis added).  It did not find that Yuga Labs was entitled to *either*

22 monetary damages *or* injunctive relief.  Defendants' citation to *Sonner* is inapplicable

23 as it involves state law claims, not Lanham Act claims.  And even if it were

24 applicable, the case did not involve a presumption of irreparable harm, as is the case

25 here.  *See* 15 U.S.C. § 1116(a) (expressly permitting injunctions and presumption of

26 irreparable harm).

27

28

**Ms. Kindler Was Not Able To Quantify All Of The Harm To Yuga Labs:**
There are no adequate monetary damages, and Ms. Kindler stated throughout her testimony that, although she was able to calculate certain profits accrued by Defendants, the extent of harm to Yuga Labs was not practically quantifiable. *See* Kindler Decl. (Dkt. 338) ¶ 62 ("In addition to the measures of harm quantified above, Defendants' wrongful conduct caused (and continues to cause) unjust enrichment to Defendants and harm to Yuga Labs that are significant, yet more difficult to quantify."); *id.* ¶ 63 ("The confusion created by the wrongful conduct caused harm to Yuga Labs' business that I have not attempted to quantify."); *id.* ¶ 64 ("I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships"); *id.* ¶ 65 ("I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill, but directionally, it would decrease the value."); *id.* ¶ 67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis"); *id.* ¶ 75 ("it is my opinion that there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or ensuring that Yuga Labs receives adequate monetary compensation for the harm it has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace, which supports Yuga Labs' position that the harm caused by Defendants' infringing NFTs is irreparable through economic means alone."); Trial Tr. at 176:14-22 ("I computed other potential measures of harm, and I also discussed at length in my report other significant areas of harm that would not be easily quantifiable, such as harm to goodwill, harm to brand equity, and things of that nature.").

Defendants attack Ms. Kindler's calculations as unreliable, but Ms. Kindler supplemented her damages calculation with new information once it became available; she did not change her prior analysis. *See* Trial Tr. 179:2-5 ("based on additional events that had transpired and available market data, that I could then

1  update my analysis to show the impact of what I had already identified previously as

2  likely holdouts in the marketplace.").  Ms. Kindler initially calculated "a 'floor' for

3  what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the

4  RR/BAYC NFT collection."  Kindler Decl. (Dkt. 338) ¶ 72.  Then, based on new data

5  made available by Defendants' posts to their followers regarding the buyback estimate

6  (which also prompted an increase in the price and trading volume of the infringing

7  NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor

8  value for a hypothetical buyback significantly underestimated the actual cost of such

9  an exercise, as I originally opined."  *Id.* ¶¶ 73-74.  "Based on these materials and

10  available market data, my assignment was to estimate a 'ceiling' for what a buyback

11  would cost.  I determined the cost to purchase and destroy all RR/BAYC NTFs could

12  even be higher than $797,183,838 . . . based on the then-current floor price of

13  authentic BAYC NFTs."  *Id.* ¶ 74.

14  <div align="center">**Defendants' Reply:**</div>

15  "It is a basic doctrine of equity jurisprudence that courts of equity should not

16  act . . . when the moving party has an adequate remedy at law." *Sonner v. Premier*

17  *Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (holding that failure to show that

18  legal monetary relief was inadequate to entitle it to equitable monetary relief); quoting

19  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  All of Yuga's cited

20  cases are easily distinguishable because they did not deal with monetary equitable

21  relief, but instead with injunctive relief.  *See Century 21 Real Estate Corp. v. Sandlin*,

22  846 F.2d 1175, 1180 (9th Cir. 1988); *Leadership Studies, Inc. v. ReadyToManage,*

23  *Inc.*, No. 2:15-cv-09459-CAS, 2017 WL 2408118, at *5-6 (C.D. Cal. June 2, 2017).

24  As such, Yuga cannot get around the *Sonner* rule as it applies to monetary equitable

25  relief.

26  Yuga also cannot escape the fact that Ms. Kindler placed a sum certain on

27  Yuga's damages.  *See* Trial Tr. [Kindler] 175:17-22 (explaining that $1,792,704

28

represented her calculation of the cost in February); *see also generally* JTX-308; Dkt. 287-10 at *4 n.3.  Ms. Kindler's report and offers of proof were served to support Yuga's attempt to get legal damages.  As a result, Yuga avoids citing to these documents because they were meant to support a ***legal*** damages claim that was adequate and that it elected to forego.  It also cannot escape the fact that it believed legal damages *were available* until days before trial when they withdrew their claim for legal damages.  Dkt. 315-1.  Nothing changed between the filing of Ms. Kindler's estimates for legal damages, and Yuga's withdrawal of its claim for legal damages except for Yuga's willingness to face a jury.

### Plaintiff's Disputed Post Trial Finding of Fact No. 46, Lines 15:20-16:3:

Here, money alone cannot remedy Yuga Labs or extinguish the ongoing harm and the continued threat that Defendants will repeat their fraud. Ms. Kindler's testimony corroborated this point. One potential measure of damages assessed was the cost for Yuga Labs to purchase the infringing NFTs and remove them from the market. However, her calculations showed that a "hypothetical buyback effort is not economically feasible" because some RR/BAYC NFT holders will demand prices beyond market value, and other likely holdouts will not give Yuga Labs an "opportunity [] to go back and just purchase the infringing NFTs." Dkt. 392 184:17-185:4. And Defendants' conduct suggests that they will continue to harm Yuga Labs. *See, e.g.*, JTX-1048, JTX-1315, JTX-1613, JTX-1615; Dkt. 342 ¶¶76-77, 79. In the absence of a permanent injunction, Yuga Labs is likely to be exposed to further irreparable harm.

### Defendants' Basis of Dispute:

Yuga presented no evidence that Defendants "will continue to repeat their fraud."  There is no evidence that Defendants continue to make money on the

---

1  RR/BAYC project.  On the contrary, Yuga has admitted that there are no continuing

2  royalties.  Trial Tr. [Solano] 48:15-49:4.

3  Ms. Kindler's report inflating the damages estimation almost 400-times should

4  also be disregarded because of its errors.  First, she wrote her report while Yuga was

5  still arguing for monetary damages and placed an estimation on the amount of

6  damages that Yuga suffered.  Dkt. 268.  Second, she admitted that she based her 100-

7  fold increase in her damages estimation off of three Tweets.  *See* Trial Tr. [Kindler]

8  179:12-14.  She combined this with the fact that the RR/BAYC floor price increased,

9  however she did not adjust for the fact that the floor price had decreased compared to

10  when she first wrote her report.  *See Id.* at 181:24-183:2; 184:10-12.  The inferential

11  leaps that Ms. Kindler took to increase her damages calculation 400-fold were

12  unreasonable.

13  Yuga's other citations to the record do not assist it in making the point that

14  Defendants continue to profit from the fraud.  The citation to the "OpenSea Pro"

15  Tweets do not prove that any sales were actually made of RR/BAYC or that

16  Defendants profited from them.  JTX-1048 has nothing to do with profiting but is

17  instead a common meme that highlights how uncool Yuga is.

18  **Plaintiff's Response:**

19  Defendants argue that there is no evidence they will repeat their fraud in the

20  very same document that they admit they intend to mint the remainder of the

21  infringing NFTs in their collection.  *Supra* ¶ 11(d), lines 18-20 (arguing that

22  surrendering control of the smart contract to Yuga Labs would "have a stifling effect

23  on Mr. Ripps and Mr. Cahen's First Amendment rights as the minting of the

24  RR/BAYC NFTs is intricately connected to their protest against Yuga").  Defendants'

25  position that an injunction is not needed to prevent future infringement does not just

26  lack credibility—it is admittedly false.

27

28

And, to be clear, the Court has *already determined three times* that the minting of the RR/BAYC NFTs is not protected by the First Amendment. *See* Dkt. 62 at 6 ("Although Defendants' argue that the larger RR/BAYC 'project' is an expressive artistic work protected by the First Amendment, Defendants' sale of what is admittedly a 'collection of NFTs that point to the same online digital images as the BAYC collection' (Motion, 6:20-21) is the only conduct at issue in this action and does not constitute an expressive artistic work protected by the First Amendment. In particular, the RR/BAYC NFTs do not express an idea or point of view, but, instead, merely 'point to the same online digital images associated with the BAYC collection.'"); Dkt. 178 at 6 ("[T]he Court has concluded that this action concerns Defendants' commercial conduct and not Defendants' free speech rights") Dkt. 225 at 16 (same as Dkt. 62). Defendants have no constitutional right to create and sell (or market and promote) infringing products.

Further, Defendants' objection should be rejected because (1) Defendants continued to market RR/BAYC NFTs after the commencement of this lawsuit and after the Court's Order on Summary Judgment, (2) Ms. Kindler properly updated her calculations with new information, and (3) Yuga Labs must regain control of its BAYC brand to adequately remedy Defendants' wrongdoing.

**Defendants Continued To Market RR/BAYC NFTs Throughout This Lawsuit:** Yuga Labs has reason to believe that Defendants will continue to harm Yuga Labs or repeat their fraud. Defendants continued to market RR/BAYC NFTs after this case began. JTX-1048 (Mr. Cahen retweeted a post in January 2023 from @ApeMarketplace on Twitter promoting Ape Market as coming "soon"), JTX-1315, JTX-1613, JTX-1615 (Mr. Cahen admittedly promoting RR/BAYC NFT sales on OpenSea Pro in April 2023); Solano Decl. (Dkt. 342) ¶¶74-75. And they continued to market RR/BAYC NFTs after this Court's summary judgement order. *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19. Even a month after trial,

Defendants still advertise rrbayc.com in the profile heading of the Ape Market Twitter profile.  *See* https://twitter.com/apemarketplace.  Following this trend, their infringement will likely continue, resulting in further harm to Yuga Labs.  And their ownership of the RR/BAYC smart contract guarantees future harm.  Solano Decl. (Dkt. 342) ¶¶ 46, 78-79.  If Defendants continued to control the RR/BAYC smart contract, there also remains a very real possibility of Defendants receiving further royalties on LooksRare or other new marketplaces that may be launched and insist on paying creator fees (such as LooksRare, which Defendants admit they could not stop for more than one year).  Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.

Defendants misrepresent Mr. Solano's testimony.  In his declaration, Mr. Solano testified that Defendants' "profits . . . increase as [they] gain royalties and creator fees from sales on secondary marketplaces."  Solano Decl. (Dkt. 342) at ¶ 86.  This forward-looking statement properly highlights the fact that as long as Defendants maintain control of the smart contract the risk remains that they will resume collecting royalties on some new marketplace on which the RR/BAYC NFTs are not currently listed.  And Ms. Kindler testified that she calculated Defendants' profits up until February 1, 2023, so even if Defendants are not currently collecting royalties, it is beyond dispute that they did continue to profit from royalties from at least February to May.  Kindler Decl. (Dkt. 338) at ¶ 23.  Despite Defendants' attempt to spin Mr. Solano's testimony, it accurately reflects the fact that Defendants have collected royalties throughout much of this litigation and may collect them again unless they are ordered to relinquish control of the smart contract to Yuga Labs.

**Ms. Kindler Properly Updated Her Calculations With New Information:**
Ms. Kindler supplemented her damages calculation with new information once it became available; she did not change her prior analysis.  *See* Trial Tr. 179:2-5 ("based on additional events that had transpired and available market data, that I could then

1   update my analysis to show the impact of what I had already identified previously as

2   likely holdouts in the marketplace.").  Ms. Kindler initially calculated "a 'floor' for

3   what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the

4   RR/BAYC NFT collection."  Kindler Decl. (Dkt. 338) ¶ 72.  Then, based on new data

5   made available by Defendants' posts to their followers regarding the buyback estimate

6   (which also prompted an increase in the price and trading volume of the infringing

7   NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor

8   value for a hypothetical buyback significantly underestimated the actual cost of such

9   an exercise, as I originally opined."  *Id.* ¶¶ 73-74.  "Based on these materials and

10  available market data, my assignment was to estimate a 'ceiling' for what a buyback

11  would cost.  I determined the cost to purchase and destroy all RR/BAYC NTFs could

12  even be higher than $797,183,838 . . . based on the then-current floor price of

13  authentic BAYC NFTs."  *Id.* ¶ 74.  Ms. Kindler's updated calculations highlight how

14  impractical actual damages would be in this case, and thus the need for injunctive

15  relief to address Defendants' harm.

16      **Irreparable Harm Will Continue Until Yuga Labs Regains Control Of The**

17  **BAYC Brand:**  More egregiously, if Defendants maintain control of the RR/BAYC

18  smart contract and the other instrumentalities of their infringement (e.g., the domains

19  and @ApeMarketplace account), they will continue to associate themselves and their

20  infringing activity with the BAYC Marks, which will continue to cause irreparable

21  harm to the brand.  For example, consumers and Twitter bots tracking NFT transfers

22  will continue to confuse sales of RR/BAYC NFTs as BAYC NFTs as they reflect the

23  BORED APE YACHT CLUB and BAYC marks in the RR/BAYC smart contract's

24  token tracker.  Thus, even if Defendants cease actively promoting their infringement

25  of Yuga Labs' marks, and even if Defendants transfer the domain names and social

26  media accounts to Yuga Labs, confusion from their infringement will continue unless

27  Yuga Labs owns and controls the smart contract.  Without transfer of the contract, the

28

1  Defendants would forever have control over and a connection to Yuga Labs' BAYC

2  Marks.  *See, e.g.,* Solano Decl. (Dkt. 342) ¶ 79.   Additionally, because nearly 500

3  RR/BAYC NFTs remain available to mint through the RR/BAYC smart contract,

4  Defendants retain the tool to continue their infringement.

5          However, transferring control of the contract to Yuga Labs allows Yuga Labs to

6  work with NFT marketplaces to address the confusion on their marketplace through

7  changes to the marketplace itself.  Trial Tr. 100:6-14 (having control of the contract

8  allows Yuga Labs to "change the front-facing terminology so that people could at

9  least be aware of the fact that this is fraudulent in an easier capacity"); Trial Tr. 136:9-

10  18 ("But if Yuga Labs had control, was the owner of the smart contract, we would

11  have a much greater flexibility in controlling how the collection is displayed in

12  marketplaces, including OpenSea."); Trial Tr. 138:6-139:11 (Mr. Atalay detailing the

13  how control of the smart contract will allow Yuga Labs to combat consumer

14  confusion).  An injunction that includes a transfer of the RR/BAYC smart contract

15  and other instrumentalities of the infringement is necessary and narrowly tailored.

16  Without this injunctive remedy, allowing Yuga Labs to regain control over the

17  instrumentalities of commerce that bear its BAYC trademarks, Yuga Labs cannot

18  protect its brand and prevent future harm.

19          **Defendants' Reply:**

20          Defendants have not stated they would remint.  *See* Ripps. Decl. ¶ 87 (Dkt. 346)

21  (uncontested) (saying *nothing* about minting the remainder of the contract.  The smart

22  contract itself contains speech elements, and forcing the transfer to Yuga could

23  impinge on the speech aspects.  There is however, a difference between future minting

24  and ownership of a smart contract.  The smart contract that Yuga seeks to obtain

25  clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not

26  Yuga.  *See* JTX-1146.  Therefore, the smart contract does not contribute to the alleged

27  confusion.  Additionally, the smart contract is, even according to Yuga's own

28

1    witness's testimony, immutable and cannot be changed even if transferred to Yuga.

2    *See* Trial Tr. [Atalay] 133:24-8.  Accordingly, an injunction transferring the contract

3    to Yuga would not be tailored to eliminate the alleged harm of infringement.

4         The exhibits Yuga cites as evidence of marketing (JTX-1315, JTX-1317, JTX-

5    1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what

6    is occurring in relation to the RR/BAYC collection: specifically, that certain third-

7    party marketplaces were trading the NFTs despite Yuga's efforts to silence

8    Defendants' criticism and public reports of certain transactions occurring in

9    connection with the RR/BAYC collection.  As Mr. Cahen explained in his declaration,

10   "Overall, I would consider myself a very active community member in the

11   cryptocurrency space, which is something that I take pride in.  A lot of the work I do

12   takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further

13   explained, "I often use my social media accounts to report on crypto news or other

14   topics I find noteworthy to help spread awareness."  Cahen Decl. ¶ 52 (Dkt. 344).

15   These tweets are not "marketing" activities but simply report news/crypto events in

16   relation to the RR/BAYC collection.

17        Yuga speculates without basis that Defendants might restart collecting royalties.

18   This is based on no evidence whatsoever.  Further, Yuga has admitted that there are

19   no continuing royalties.  Trial Tr. [Solano] 48:15-49:4.  There was no

20   misrepresentation of Mr. Solano's testimony.  He was asked whether he made the

21   statement that royalties were increasing, he said he did and acknowledged that it was a

22   mistruth.  Trial Tr. [Solano] 48:15-49:4.  The fact that there are no royalties is well-

23   established at this point.

24        Yuga's other citations show how weak its position is.  Ms. Kindler's $787

25   million dollar adjustment was based on three tweets.  *See* Trial Tr. 179:2-5

26   (acknowledging that tweets were basis of her new damages estimation).  However,

27

28

1  this has nothing that indicates that Defendants seek to re-enter the market using

2  Yuga's marks, which is what this case is actually about.  *See* Dkt. 1 at *5.

3      Yuga's claim that it must have the smart contract to "regain control of its

4  brand" is incorrect and also contradicted by Mr. Atalay.  Mr. Atalay explained that

5  while in some situations a smart contract could be mutable, *in this case* the smart

6  contract immutable and cannot be changed even if transferred to Yuga.  *See* Trial Tr.

7  [Atalay] 133:24-8.  As such, transfer of the smart contract will not change anything

8  and serves no goal of giving Yuga its brand back.

9      Lastly, Yuga still has provided no evidence that Defendants will not comply

10  with the court order, or continue to harm Yuga.  In fact, they betray their true

11  motivation which is to silence Defendants.  JTX-1048 contains a criticism of how

12  Yuga is uncool through the Virgin/Chad meme format.  This type of meme criticism

13  can be cutting, and to outsiders of the internet somewhat mean spirited because it

14  needs contextual knowledge to understand.  *See* Cahen Decl. ¶ 54 (explaining need for

15  context to understand his social media posts).  However, it is just this type of Tweet

16  that calls out Yuga for its uncool nature that Yuga seeks to ban through an overbroad

17  injunction.

## Plaintiff's Disputed Post Trial Conclusion of Law No. 47, lines 16:4-6:

Third, the balance of hardships weighs heavily in Yuga Labs' favor. Yuga Labs has a strong interest in being protected from Defendants' unlawful conduct that continues to harm its reputation and goodwill.

## Defendants' Basis of Dispute:

23      The balance of equities do not favor Yuga in its attempt to silence Defendants

24  from making any form of criticism.  Trial Tr. [Muniz] 94:12-13.  While Defendants

25  may not have an interest in infringing Yuga's marks, Defendants have an

26  extraordinary interest in the freedom of speech and expression.  *See Klein v. City of*

27  *San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (recognizing in balancing the

equities that the loss of free speech is an irreparable personal injury, and that there is a significant public interest in upholding free speech principles).  Yuga has not shown why injunctive relief terms that would squash Defendants' constitutional rights are necessary and have shown no interest in being free from legitimate criticism.  On the contrary, Defendants have shown an extraordinarily strong interest in being able to continue their criticism.

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights and (2) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it to regain control of its brand.  *See supra* ¶¶ 44, 46.

**Defendants' Reply:**

Yuga's proposed injunction is broad and is meant to curtail Defendants' First Amendment Rights.  Ms. Muniz revealed as much at trial when she stated— unqualified by a discussion of copyrights and trademarks—that Defendants should lose their right to say the words Bored Ape Yacht Club.  Trial Tr. [Muniz] 94:5-13.

In this very document to support an overbroad injunction they cite to JTX-1048. JTX-1048 contains a criticism of how Yuga is uncool through the Virgin/Chad meme format.  This type of meme criticism can be cutting, and to outsiders of the internet somewhat mean spirited because it needs contextual knowledge to understand.  *See* Cahen Decl. ¶ 54 (explaining need for context to understand his social media posts). However, it is just this type of tweet that calls out Yuga for its uncool nature that Yuga seeks to ban through an overbroad injunction.  Further, as written, the injunctive relief could apply to criticism about Yuga's marks.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 48:**

<u>Injunctive relief will serve the public interest by preventing consumer confusion, and it will vindicate the Lanham Act by protecting Yuga Labs' trademark</u>

1  rights against Defendants' continued infringement. *See Am. Rena Int'l Corp. v.*

2  *SisJoyce Int'l Co.*, 534 F. App'x. 633, 636 (9th Cir. 2013); Dkts. 342 ¶¶62, 78, 79;

3  392 at 100:6-14; 136:5-18; 138:6-139:11.

4  **Defendants' Basis of Dispute:**

5  There is no "continued infringement" by Defendants. In support of there being

6  "continued infringement" Yuga cites to sections of the trial transcript referencing the

7  smart contract. Defendants oppose a transfer of the smart contract to Yuga because a

8  transfer would serve no effective purpose. The Court can simply enjoin the

9  Defendants from making more RR/BAYC NFTs. Likewise, even though Defendants

10  do not own the "live version" of the Apemarket website, which the parties agree never

11  sold a single NFT, enjoining them from using the mark is sufficient to serve the

12  purposes of the injunction. Lastly, there is no evidence that Defendants have minted

13  any more RR/BAYC NFTs recently.

14  To the extent that the "continued infringement" is Defendants' continued

15  criticism of Yuga, its marks, and its business practices, the proposed injunction is far

16  too broad. The legal authority that Yuga cites in support of its severe and overly

17  broad injunction actually supports Defendants' position because it affirms an

18  injunction as not overly-broad because, "it does not prevent Sis–Joyce from selling

19  non-infringing products or ***from engaging in speech that does not constitute***

20  ***infringement*** or intentional interference with economic advantage." *American Rena-*

21  *Int'l Corp. v. Sis-Joyce Int'l Co. Ltd.*, 435 F. App'x 633, 636 (9th Cir. 2013)

22  (emphasis added). Yuga's proposed injunction would try to stop Defendants' non-

23  infringing speech.

24  **Plaintiff's Response:**

25  Defendants' objection should be rejected because (1) Yuga Labs' proposed

26  injunction does not seek to curtail Defendants' First Amendment rights, (2)

27  Defendants' proposed injunctive relief is too narrow, (3) Yuga Labs' proposed

28

injunction is tailored to address the irreparable harm done to Yuga Labs and allow it to regain control of its brand.

**Yuga Labs' Proposed Injunction Does Not Seek To Curtail Defendants' First Amendment Rights:**  Defendants' did not infringe Yuga Labs' BAYC Marks by merely selling NFTs.  They infringed Yuga Labs' NFTs by creating the RR/BAYC NFTs (the Foundation contract), creating NFT marketplaces on which to sell the NFTs (e.g. the Foundation sales page), giving away infringing NFTs to get people to market or support their business venture, promoting their NFTs, marketing them through @ApeMarketplace and developing an NFT marketplace (Ape Market) to "stimulate" the sales of their infringing NFTs, by selling their NFTs to initial purchasers, and by driving up the price of their NFTs and then re-selling those they hold for a further profit.  Defendants continue to infringe by marketing RR/BAYC NFTs—for example advertising rrbayc.com on their @Ape Market Twitter page alongside a link to an NFT marketplace where users can still purchase RR/BAYC NFTs.  *See* Solano Decl. ¶ 77.  Yuga Labs' proposed injunction would put an end to that marketing by transferring control of these instrumentalities of infringement to Yuga Labs.  The terms of the injunction that Yuga Labs contends is appropriate in this case are clear from its proposed findings of fact and conclusions of law.  Dkt. 416.  Yuga Labs has not sought to limit Defendants' criticisms of Yuga Labs through its proposed injunction.  Indeed, Defendants' contention that their ongoing infringement constitutes "criticism" demonstrates why a court order "enjoining them from using the mark" alone would not stop their infringement.  *See* Dkt. 419-1 at 3:25-4:6.  Yuga Labs must be given the instrumentalities of their infringement so that they cannot continue to infringe and claim it is criticism.

Yuga Labs' former CEO did not testify that Yuga Labs intends to silence Defendants.  Rather, the context of Ms. Muniz's testimony is clear that she was speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club trademark to

1   promote products.  Trial Tr. at 94:5-13.  There is no debate that Yuga Labs is seeking

2   an injunction to stop Defendants' infringement of its marks.  The terms of the

3   injunction that Yuga Labs contends is appropriate in this case are clear from its

4   proposed findings of fact and conclusions of law.  Dkt. 416.  Yuga Labs has not

5   sought to limit Defendants' criticisms of Yuga Labs through its proposed injunction,

6   only Defendants' commercial infringement, which is the focus of this case, as the

7   Court has found many times.  *See* Dkt. 62 at 7 ("These are all commercial activities

8   designed to sell infringing products, not expressive artistic speech protected by the

9   First Amendment"); Dkt. 178 at 6 ("[T]he Court has concluded that this action

10  concerns Defendants' commercial conduct and not Defendants' free speech rights");

11  Dkt. 225 at 16 (same as Dkt. 62).  What is also clear is that Defendants refuse to

12  accept any reasonable injunctive relief, even though the Court has already found that

13  Yuga Labs is entitled to injunctive relief.  Dkt. 418-1.

14       **Defendants' Proposed Injunction Is Too Narrow:**  Defendants' proposed

15  injunction does not prohibit Defendants from marketing, licensing, or manufacturing

16  RR/BAYC NFTs.  Dkt. 418-1 at 20:21-21:5, 22:7-10.  It also does not prohibit them

17  from promoting RR/BAYC NFTs if someone else is selling the NFT.  Likewise,

18  simply eliminating Defendants' direct sales of their infringing NFTs does not protect

19  Yuga Labs from the irreparable harm done by Defendants' infringement.  *Id.* ¶¶ 45-

20  56.  Part of this irreparable harm derives from the fact that the RR/BAYC NFTs are

21  immutably linked to Yuga Labs' Bored Ape Yacht Club brand through the RR/BAYC

22  smart contract and token tracker.  Trial Tr. at 134:1-8 (Mr. Atalay testifying that "[i]n

23  this particular instance, upon inspection of the Foundation smart contract that was

24  used to deploy the RR/BAYC smart contract, it's evident that these are not mutable

25  fields in this particular instance.").  Defendants' proposed injunction would also not

26  transfer control of the RR/BAYC smart contract to Yuga Labs.  Without transfer of

27  the contract, the Defendants would forever have control over and a connection to

28

1  Yuga Labs' BAYC Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.  However, transferring

2  control of the contract to Yuga Labs allows Yuga Labs to work with NFT

3  marketplaces to address the confusion on their marketplace through changes to the

4  marketplace itself.  Trial Tr. 100:6-14 (having control of the contract allows Yuga

5  Labs to "change the front-facing terminology so that people could at least be aware of

6  the fact that this is fraudulent in an easier capacity"); Trial Tr. 136:9-18 ("But if Yuga

7  Labs had control, was the owner of the smart contract, we would have a much greater

8  flexibility in controlling how the collection is displayed in marketplaces, including

9  OpenSea."); Trial Tr. 138:6-139:11 (Mr. Atalay detailing the how control of the smart

10  contract will allow Yuga Labs to combat consumer confusion).  Defendants have no

11  basis for continuing to hold on to the instrumentalities of their bad faith

12  infringement—namely the RR/BAYC smart contract used to manufacture and sell the

13  infringing NFTs and the cybersquatting domains rrbayc.com and apemarket.com.

14  Each of these instrumentalities should be under the control of Yuga Labs as the

15  rightful owner of the BAYC Marks.

16       **Yuga Labs' Injunction Is Properly Tailored:**  A properly tailored injunction

17  must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain

18  control of the brand.  This includes putting an end to Defendants' sales, promotion,

19  and marketing of infringing NFTs; preventing Defendants from creating any future

20  confusion by minting new infringing NFTs or improperly using Yuga Labs' Marks;

21  alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart

22  contract and other infringing domains and instrumentalities to Yuga Labs so it once

23  again has sole control over its marks.  It is unrebutted that transferring the smart

24  contract to Yuga Labs would allow it to regain control over its brand.  The injunctive

25  relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law

26  would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two other courts have

27  entered similar injunctions against Defendants' business partners.  *See* Judgment and

28

1   Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v.*
2   *Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent
3   Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12),
4   *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).

5   <u>**Defendants' Reply:**</u>

6       Yuga's proposed injunctive relief is too broad.  First, citations to the Lehman
7   consent judgment—which was a condition of settlement—and the injunction entered
8   against Mr. Hickman—which was attained via a default judgment.  Neither Mr.
9   Lehman and Mr. Hickman were defending themselves against the terms of the
10  overbroad injunction.   And the injunction in Mr. Hickman's case was obtained under
11  false pretenses because Yuga never served the complaint in Mr. Hickman's case and
12  instead left it on his porch unattended after the server told Mr. Hickman's twelve-
13  year-old daughter that he could not serve her.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-
14  00111-JCM-NJK, Dkt. 31-1 at 2 (D. Nev.) ("6.  I told the stranger that my parents
15  were not home, and that I was twelve years old.  7.  The stranger told me he could not
16  leave the papers with me, and left.  I did not see the stranger return.").  Yuga then
17  submitted an affidavit ***falsely stating*** to the court that it had served Mr. Hickman's
18  fifteen-year-old daughter.  *See Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK,
19  Dkt. 31 at 7 (D. Nev.) ("Plaintiff fraudulently represented to the Court that Hickman's
20  daughter was fifteen and that the process server delivered copies of the Complaint and
21  summons to her. … This is blatantly false, and was undoubtedly asserted by Plaintiff
22  in an effort to obtain a favorable Default Judgment ruling.").   The Court in Mr.
23  Hickman's case has stayed judgment to reassess the validity of default judgment.
24  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 37 (D. Nev.) (granting
25  emergency motion to stay enforcement of default judgment).   Thus, these stipulated,
26  and *ex parte*, injunctions do not set the standard for what a reasonable injunction
27  should be.

28

1    Instead, a well-tailored injunction would instead focus on Yuga's complaint,

2    which focused on the use of Yuga's marks in domain names and in commerce.  *See*

3    Dkt. 1 at *5.  Any injunction must be technologically feasible, and also fit the

4    substance of the complaint.  Further, the Court would have the ability to enforce

5    anything, so a court order barring Defendants from using or selling products with and

6    a prohibition against using rrbayc.com and apemarket.com domains would be

7    sufficient to fit the alleged harms.

8    Yuga focuses much of its dispute on being given the smart contract.  That

9    would  serve no purpose of addressing infringement might not be technically feasible.

10   But Yuga has admitted that the contract is immutable, which means that the smart

11   contract cannot be changed or modified in any meaningful way, no matter who owns

12   it.  *See* Trial Tr. [Atalay] 134:11-20.  However, an order that prohibits Defendants

13   from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants

14   from causing Yuga the injury alleged in this case.  Further, it would be enforceable in

15   court.  Likewise, a prohibition on minting—something Defendants have never claimed

16   having any interest in doing—would be enforceable and effectively give Yuga its

17   proposed relief while being technologically feasible.

18   Lastly, Yuga is focused on alleged continued sales of RR/BAYC NFTs.

19   Defendants are not involved in (or making money off of) continued sales of

20   RR/BAYC NFTs.  Like its fear about future minting, any concern about Defendants

21   being engaged in the future sales of RR/BAYC NFTs is speculative and not based on

22   anything that Defendants have said.

23                  **Plaintiff's Disputed Post Trial Conclusion of Law No. 49:**

24   Accordingly, Yuga Labs has met all four requirements for a permanent

25   injunction against Defendants to prevent them from infringing Yuga Labs' trademarks

26   and otherwise deceiving the public by impersonating or claiming a false association

27   with Yuga Labs.

28

**Defendants' Basis of Dispute:**

For the reasons stated above in the objections to Yuga's proposed finding of fact numbers 44-49, none of the four requirements for a permanent injunction support the blanket ban on criticism that Yuga seeks.

**Plaintiff's Response:**

Defendants' objection should be rejected for the reasons set forth *supra* ¶¶ 44-49.

**Defendants' Reply:**

Yuga has failed to demonstrate that any of the four requirements for a permanent injunction support its overly broad injunctive relief.  In short, Yuga's proposed injunctive relief would wrongfully impact Defendants rights, and also ignore the fact that this Court can enter enforceable orders.  Yuga instead premises its relief on an assumption that Defendants will not obey injunctive relief claims.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 50:**

An injunction ordering Defendants to transfer domain names and social media accounts to remedy their trademark infringement and cybersquatting is an appropriate form of relief. *See* 15 U.S.C. § 1116; *Smith v. Guerilla Union, Inc.*, No. CV 18-9902 DSF, 2019 WL 1517551, at *4 (C.D. Cal. Apr. 8, 2019); *Entrepreneur Media, Inc. v. Alfonso*, No. 8:21-cv-00644-DOC-(JDEx), 2021 WL 2941983, at *5 (C.D. Cal. July 12, 2021).

**Defendants' Basis of Dispute:**

This conclusion of law seeks an overly restrictive injunction that is not tailored to remedy the alleged harm and would impermissibly infringe on Mr. Ripps and Mr. Cahen's First Amendment rights.  Specifically, "[a] trademark injunction . . . can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace. Accordingly, we must ensure that the injunction is tailored to eliminate only the specific harm alleged."

1    *Toyota Motor Sales, U.S.A., Inc. v. Tabari,* 610 F.3d 1171, 1176 (9th Cir. 2010)

2    (cleaned up).  "Prohibition of . . . truthful and non-misleading speech does not

3    advance the Lanham Act's purpose of protecting consumers and preventing unfair

4    competition; in fact, it undermines that rationale by frustrating honest communication

5    . . . ."  *Id.* at 1176-77.

6          An injunction ordering Mr. Ripps and Mr. Cahen to transfer their social media

7    accounts to Yuga would directly infringe on their ability to exercise their First

8    Amendment rights to post their ideas to social media, engage with those that follow

9    them, comment on other users' thoughts, and criticize Yuga.

10         By its own admission, Yuga's suggested injunction here would take away "the

11   right to say 'Bored Ape Yacht Club' again."  Trial Tr. [Muniz] 94:5-13.  Such an

12   injunction is not tailored to eliminate the specific harm alleged here of trademark

13   infringement and would be unconstitutionally restrictive.

14         Finally, the law the Yuga cites for support here are dissimilar situations that are

15   not instructive.  *Smith* deals with a cyberpiracy claim where the court sought the

16   transfer of social media accounts that were particularly used for the promotion of the

17   infringing concert.  *Smith v. Guerilla Union, Inc.,* No. CV 18-9902 DSF, 2019 WL

18   1517551, at *1 (C.D. Cal. Apr. 8, 2019).  *Entrepreneur Media* deals with a case where

19   the Defendant failed to defend and default judgment was rendered, which the court

20   considered in determining injunctive relief.  *Entrepreneur Media, Inc. v. Alfonso*, No.

21   8:21-cv-00644-DOC-(JDEx), 2021 WL 2941983, at *1, 5

22   (C.D. Cal. July 12, 2021).

23                        **Plaintiff's Response:**

24         Defendants' objections should be rejected because (1) Yuga Labs' proposed

25   injunction does not seek to curtail Defendants' First Amendment rights and (2) Yuga

26   Labs' proposed injunction is tailored to address the irreparable harm done to Yuga

27   Labs and allow it to regain control of its brand.  *See supra* ¶¶  44-49.

28

---

1    Further, as the holder of the BAYC Marks, Yuga Labs has a superior right to

2 the disputed domains.  Defendants admit this conclusion of law.  *See* Dkt. 418-1

3 (undisputed that "[i]n trademark cases involving infringing internet accounts, mark

4 holders have a superior claim of ownership relative to the infringer").  In addition,

5 Yuga Labs does not seek to take away Defendants' personal social media accounts

6 (@ryder_ripps, @jeremycahen, @pauly0x).[11]  Yuga Labs instead seeks to obtain

7 Defendants' @ApeMarketplace account, which was designed to and continues to

8 promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still

9 available for sale.

10    Defendants' superficial attempts to distinguish *Smith* and *Entrepreneur Media*

11 fail to rebut their holdings that courts have the power to issue a permanent injunction

12 to transfer infringing social media accounts and domain names.  *See also* 15 U.S.C. §

13 1125(d) ("a court may order . . . the transfer of the domain name to the owner of

14 the Mark.").  The transfer of the domains in an 1125(d) is a standard and statutory

15 remedy.

16    *Smith* is instructive.  There, defendant continued to make "limited passive use

17 of the Marks without Plaintiff's permission or authorization" including a website and

18 a Twitter handle that infringed on the disputed marks.  Smith, 2019 WL 1517551, at

19 *1.  Like *Smith*, Defendants' use of the @ApeMarketplace Twitter account to promote

20 their infringing NFTs would cause (a) "a likelihood of irreparable harm in the form of

21 'damages to [Yuga Labs'] trademarks, business reputation, and goodwill,'" (b) legal

22 remedies were not "adequate to compensate for this harm," and (c) an injunction is

23 warranted to "protect the public from likely confusion."  *Smith*, 2019 WL 1517551, at

24 *4; *see supra* ¶ 2 (lines 4, 6-7).  And as in *Smith*, the Court should order that this

25 account be transferred to Yuga Labs as part of the injunctive relief.  Likewise, in

26

27 ───────────────
[11] Even if Yuga Labs wanted Mr. Ripps' account, he has been permanently suspended by Twitter for sending violent death threats.  *See* https://twitter.com/ryder_ripps; https://twitter.com/PopPunkOnChain/status/1700226047612977249.

28 ───────────────

1   *Entrepreneur Media*, providing the infringing domains and social media accounts is

2   necessary because they are "confusingly similar to or contain" Yuga Labs' marks.

3   *Entrepreneur Media*, 2021 WL 2941983, at *5.  Each of these cases ordered a transfer

4   of the infringing instrumentality just as the Court should order here.

5          Moreover, two other courts have entered similar injunctions against

6   Defendants' business partners.  *See* Judgment and Order for Permanent Injunction

7   Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-

8   JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for

9   Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*,

10  No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).  And in the latter case, Mr.

11  Lehman transferred an infringing webpage to Yuga Labs under the terms of the

12  consent judgment.

13                        **Defendants' Reply:**

14         Yuga argues that this Court should adopt its injunctive relief terms and cite to

15  the Lehman consent judgment—which was a condition of settlement—and the

16  injunction entered against Mr. Hickman under false pretenses (as explained above)—

17  which was attained via a default judgment.  Neither Mr. Lehman and Mr. Hickman

18  were defending themselves against the terms of the overbroad injunction.  This cannot

19  be correct.  Instead, the Court should look at the shocking breadth of the terms and

20  Yuga's stated intent to prevent Defendants from saying "Bored Ape Yacht Club" ever

21  again.  Trial Tr. [Muniz] 94:12-13.

22         Like the Hickman reference, both of Yuga's cited cases in support are ***default

23  judgment*** cases.  In both of those cases, the alleged infringer did not defend

24  themselves, and the cases are of minimal assistance to Yuga.  Instead, any injunction

25  must be narrowly tailored to avoid infringing on Defendants' rights.  *Toyota Motor

26  Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010).  An order of this

27  court barring Defendants from using or selling Yuga's marks would suffice.

28

**Plaintiff's Disputed Post Trial Conclusion of Law No. 52:**

The same logic extends to the NFT smart contracts. Like domain names and social media accounts, smart contracts give consumers confidence in the authenticity and source of digital accounts. Thus, Yuga Labs has a superior claim of title to the RR/BAYC smart contract bearing its trademarks.

**Defendants' Basis of Dispute:**

This conclusion of law seeks an overly restrictive injunction that is not tailored to remedy the alleged harm and is impermissible. Specifically, "[a] trademark injunction . . . can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace. Accordingly, we must ensure that the injunction is tailored to eliminate only the specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) (cleaned up). "Prohibition of . . . truthful and non-misleading speech does not advance the Lanham Act's purpose of protecting consumers and preventing unfair competition; in fact, it undermines that rationale by frustrating honest communication . . . ." *Id.* at 1176-77.

The smart contract that Yuga seeks to obtain clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga. *See* JTX-1146. Therefore, the smart contract does not contribute to the alleged confusion. Additionally, the smart contract is, even according to Yuga's own witness's testimony, immutable and cannot be changed even if transferred to Yuga. *See* Trial Tr. [Atalay] 133:24-8. Accordingly, an injunction transferring the contract to Yuga would not be tailored to eliminate the alleged harm of infringement.

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it

to regain control of its brand and (2) obtaining the RR/BAYC smart contract is an important part of addressing that harm.

**Yuga Labs' Proposed Injunction Is Properly Tailored:**  A properly tailored injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain control of the brand.  This includes putting an end to Defendants' sales, promotion, and marketing of infringing NFTs; preventing Defendants from creating any future confusion by minting new infringing NFTs or improperly using Yuga Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart contract and other infringing domains and instrumentalities to Yuga Labs so it once again has sole control over its marks.  It is unrebutted that transferring the smart contract to Yuga Labs would allow it to regain control over its brand.  The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two other courts have entered similar injunctions against Defendants' business partners.  *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).

**Obtaining The RR/BAYC Smart Contract Is An Important Part Of The Injunction:**  The immutability of the RR/BAYC NFT contract is a major reason the contract should be transferred to Yuga Labs.  Without transfer of the contract, the Defendants would forever have control over and a connection to Yuga Labs' BAYC Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.  Defendants have no basis for continuing to hold on to the instrumentalities of their bad faith infringement—namely the RR/BAYC smart contract used to manufacture and sell the infringing NFTs, the cybersquatting domains rrbayc.com and apemarket.com, and the @ApeMarketplace

account used exclusively to promote RR/BAYC NFTs and Ape Market.  Each of these instrumentalities should be under the control of Yuga Labs as the rightful owner of the BAYC Marks.

Defendants' contention that the smart contract indicates the source of the RR/BAYC NFTs as Mr. Ripps' wallet is misleading.  The "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.  More directly, though, the contract will always say Bored Ape Yacht Club and BAYC – Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  On the contrary, Yuga Labs explained at trial how ownership of the smart contract will allow Yuga Labs to work with the NFT marketplaces to ensure that the human readable elements of the marketplace clearly indicate that RR/BAYC NFTs are not authentic BAYC NFTs.  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs will help reduce future confusion.

Defendants' claim that retaining the smart contract would not result in further infringement is facially invalid.  As long as they have the RR/BAYC smart contract, they will continue to be infringing on the BAYC Marks in it.  Moreover, ownership and control of the smart contract could allow Defendants to obtain royalties or mint new RR/BAYC NFTs in the future.  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs, will help reduce future confusion and reduce the risk of future ill-gotten gains to Mr. Ripps.

### **Defendants' Reply:**

It is undisputed that the wallet connected to the contract says "ryderripps.eth" JTX-1146.  Yuga has not proven how the smart contract itself will cause confusion.  Further, to the extent it relies on vague concerns that Defendants will remint or mint RR/BAYC NFTs this is without any backing in the record.  An order barring such minting would also suffice to ameliorate any possible harm.

1    Likewise ordering transfer of the smart contract might not be technically

2  feasible and it is futile.  As such, this term runs a high risk of being set as a "trap" for

3  Defendants to fall into as compliance might not be possible.  Further, Yuga has

4  admitted that the contract is immutable, which means that the smart contract cannot be

5  changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr.

6  [Atalay] 134:11-20.  An order that prohibits Defendants from minting anymore

7  RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the

8  injury alleged in this case.  Further, it would be enforceable in court.  Likewise, a

9  prohibition from using the rrbayc.com and apemarket.com domains—both of which

10  are inactive—would suffice and fit the scope of the injury found by the court in this

11  case (subject to Defendants' right to appeal). Yuga's argument that an injunction that

12  prevents Defendants from using the marks and domain names in commerce would be

13  insufficient without the smart contract is speculative and wrongly assumes that

14  Defendants would not comply with a court order.

15    Yuga also misleadingly references the injunctions entered in the related cases

16  against Mr. Lehman and Mr. Hickman.  First, the injunction entered in Mr. Lehman's

17  case as entered via consent judgment that was obtained through the same settlement

18  that resulted in Mr. Lehman's coerced declaration to which Yuga repeatedly cites.

19  Mr. Lehman, in order to save his family and himself, agreed to Yuga's overbroad

20  terms.

21    And in Mr. Hickman's case, Yuga obtained a default judgment by submitting a

22  false affidavit to the court in Nevada, which has resulted in a stay in enforcing the

23  injunction.  Specifically, Yuga never served the complaint in Mr. Hickman's case and

24  instead left it on his porch unattended after the server told Mr. Hickman's twelve-

25  year-old daughter that he could not serve her.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-

26  *00111-JCM-NJK, Dkt. 31-1 at 2 (D. Nev.)* ("6.  I told the stranger that my parents

27  were not home, and that I was twelve years old.  7.  The stranger told me he could not

28

leave the papers with me, and left.  I did not see the stranger return.").  Yuga then submitted an affidavit *falsely stating* to the court that it had served Mr. Hickman's fifteen-year-old daughter.  *See Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 31 at 7 (D. Nev.) ("Plaintiff fraudulently represented to the Court that Hickman's daughter was fifteen and that the process server delivered copies of the Complaint and summons to her. … This is blatantly false, and was undoubtedly asserted by Plaintiff in an effort to obtain a favorable Default Judgment ruling.").   The Court in Mr. Hickman's case has stayed the injunction to reassess the validity of default judgment. *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 37 (D. Nev.) (granting emergency motion to stay enforcement of default judgment).

### Plaintiff's Disputed Post Trial Conclusion of Law No. 53, lines 17:8-10, 12-14:

Defendants' infringing smart contract is the source of the infringing NFTs and immutably uses Yuga Labs' BORED APE YACHT CLUB and BAYC marks in the manufacture, sale, and promotion of the infringing RR/BAYC NFTs. *See supra* ¶¶7c, 7e, 12, 15, 23; Dkt. 392 at 59:20-60:12, 133:24-134:20, 138:6- 139:11; *see also* Dkt. 337 ¶¶2-6; Dkt. 342 ¶80; JTX-1616. Therefore, the RR/BAYC smart contract harms the perceived exclusivity of genuine BAYC NFTs, and fosters confusion, if left in the control of anyone other than Yuga Labs.

### Defendants' Basis of Dispute:

Evidence at trial showed that Yuga does not own the alleged BAYC Marks. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to

1   commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the
2   terms and conditions was to allow people to be able to commercialize their NFTs.  We
3   can agree on that; right? A. Yes.  That is covered in the terms.").

4       As a result, at the time of the RR/BAYC project, there were more than 9,000
5   other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)
6   (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were
7   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
8   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]
9   78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally
10  thousands" of products that use Yuga trademarks without sponsorship or affiliation
11  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks
12  with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
13  brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
14  use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

15      Further, Yuga does not own the asserted marks because NFTs are not eligible
16  for trademark protection.  The Supreme Court has held that trademarks are limited to
17  "tangible goods that are offered for sale, and not the author of any idea, concept, or
18  communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox*
19  *Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a
20  **communicative** work is a dispute relegated to the confines of copyright law, not
21  trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-
22  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims
23  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
24  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
25  certificates of authenticity/ownership and are not digital goods in themselves.  Trial
26  Tr. [Atalay] 127:9-16.

27
28

Second, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states: "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Third, the smart contract for the RR/BAYC NFTs clearly indicates that the creator is Mr. Ripps's wallet, and not Yuga's.  *See* JTX-1146.  Accordingly, there is no support for the statement that the smart contract fosters confusion.

Finally, as the evidence presented at trial indicated, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Accordingly, there is no evidence of actual confusion resulting from the sale of RR/BAYC NFTs that an injunction transferring the RR/BAYC smart contract would eliminate.

Finally, the evidence Yuga cites to does not support this conclusion of law as they do not show any consumer was actually confused by the smart contract when reserving an RR/BAYC NFT nor do they show how the transferring an immutable smart contract to Yuga will help prevent confusion going forward.  *See* Dkt. 392 at 59:20-60:12, 133:24-134:20, 138:6- 139:11; *see also* Atalay Decl. ¶¶ 2-6 (Dkt. 337); Solano Decl. ¶ 80 (Dkt. 342); JTX-1616.

**Plaintiff's Response:**

Defendants' objections should be rejected because (1) the Court has rejected Defendants' arguments that Yuga Labs does not own the BAYC Marks, and the

1   evidence shows that Yuga Labs owns these marks; (2) Defendants used unmodified
2   marks many times; (3) The RR/BAYC contract only showed Mr. Ripps' name after
3   minting; (4) Yuga Labs has provided ample evidence of actual confusion; (5) Yuga
4   Labs' proposed injunction is tailored to address the irreparable harm done to Yuga
5   Labs and allow it to regain control of its brand; and (6) Obtaining the RR/BAYC
6   smart contract is an important part of the injunction.

7           **Defendants Cannot Relitigate Issues Decided On Summary Judgment:**  The
8   Court has already adjudicated these issues in its Summary Judgment Order (Dkt. 225).
9   In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are
10  goods for the purpose of the Lanham Act, that Yuga Labs used those marks in
11  commerce, and that Yuga Labs has not abandoned its marks.  *Id.* at 6-10.  The Court
12  also held that "Defendants have admitted that they intentionally used the BAYC
13  Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily conclude[d]" that
14  Defendants' use of identical marks, on identical products, in identical markets
15  supported a finding of a likelihood of confusion.  *Id.* at 10-13.  Additionally, the Court
16  has already held that NFTs are goods that are subject to trademark protection under
17  the Lanham Act.  SJ Order (Dkt. 225) at 6-8; *see also Hermès International v.*
18  *Rothschild*, 590 F. Supp. 3d 647, 655 (S.D.N.Y. 2022).

19          The SJ Order establishes the matters adjudicated therein for purposes of this
20  case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary
21  judgment motion may "enter an order stating any material fact — including an item of
22  damages or other relief — that is not genuinely in dispute and treating the fact as
23  established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready*
24  *Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George*
25  *Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007)
26  ("Facts found on partial summary judgment are taken as established at trial.").

27

28

1    Defendants did not move the Court to reconsider its holdings.  Nevertheless,

2    Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

3    Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

4    the Court's order does not exist.  Defendants' tactics are inconsistent with the very

5    purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

6    ***trial of facts and issues over which there was really never any controversy*** and

7    which would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos*

8    *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

9    1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

10   n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

11   position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

12   (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

13   judgment is ***generally not relevant and should be excluded***" at trial) (emphasis

14   added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

15   applicability of the law of the case doctrine where a case is assigned to a new judge).

16   "The partial summary judgment is merely a pretrial adjudication that certain

17   issues shall be deemed established for the trial of the case and likewise serves the

18   purpose of speeding up litigation by eliminating before trial matters wherein there is

19   no genuine issue of fact."  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

20   2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

21   undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

22   tactic that has unjustifiably increased the cost of resolving this case.

23   **Defendants Used Unmodified Versions Of Yuga Labs' BAYC Marks:**

24   Defendants contention to the contrary is contradicted by the evidence in the record.

25   *See, e.g.*, JTX-25, JTX-80, JTX-82, JTX-138, JTX-670, JTX-675, JTX-677, JTX-972,

26   JTX-1595.  Mr. Ripps even admitted that the "RR/BAYC project . . . displayed

27

28

1  unmodified marks, so that the RR/BAYC project would be directly tied to Yuga,
2  BAYC, and specific BAYC NFTs…."  Dkt. 149-42 at 9-10.

3  **The RR/BAYC Contract Only Showed Mr. Ripps' Name After Minting:**
4  Mr. Ripps testified that he minted the RR/BAYC NFTs to his "personal wallet, ryder-
5  ripps.eth", but the "ryder-ripps.eth" name did not appear on Etherscan until *after*
6  minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.
7  Thus, Defendants' narrative that customers would not be confused because they could
8  see the NFTs were minted from Mr. Ripps' wallet is belied by the fact that the wallet
9  displayed Mr. Ripps' name *after* the initial mint and customers would not encounter
10  the "ryder-ripps.eth" creator tag had they even tried to look.

11  **Yuga Labs Has Provided Ample Evidence Of Actual Confusion:**  Yuga
12  Labs produced ample documentary and testimonial evidence demonstrating consumer
13  confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-
14  801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035;
15  Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76;
16  Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl.
17  (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs'
18  Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants
19  were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people
20  "making mistakes with apes is already a huge meme" and "Remember the 'average
21  joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs'
22  survey evidence demonstrated significant confusion among consumers who
23  incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-
24  721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.
25  Defendants do not offer any admissible or credible evidence to rebut the evidence that
26  consumers believed, or were likely to believe, RR/BAYC was affiliated with or
27
28

1   sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale

2   confusion.

3       There is a clear likelihood of confusion as well, given Defendants' use of the

4   same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at

5   10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.

6   2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

7   ever find their way into the appellate reports' because liability is 'open and shut.'")

8   (citation omitted).  In any event, actual confusion is not required; and the Court

9   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

10  at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

11  regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

12  *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

13  profits even where infringement claims premised solely on post-sale confusion where

14  a "potential purchaser, knowing that the public is likely to be confused or deceived by

15  the allegedly infringing product, [] choose[s] to purchase that product instead of a

16  genuine one").

17      **Yuga Labs' Proposed Injunction Is Properly Tailored:**  A properly tailored

18  injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow

19  it to regain control of the brand.  This includes putting an end to Defendants' sales,

20  promotion, and marketing of infringing NFTs; preventing Defendants from creating

21  any future confusion by minting new infringing NFTs or improperly using Yuga

22  Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and

23  transferring the smart contract and other infringing domains and instrumentalities to

24  Yuga Labs so it once again has sole control over its marks.  It is unrebutted that

25  transferring the smart contract to Yuga Labs would allow it to regain control over its

26  brand.  The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and

27  Conclusions of Law would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed,

28

1  two other courts have entered similar injunctions against Defendants' business

2  partners.  *See* Judgment and Order for Permanent Injunction Against Ryan Hickman

3  (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug.

4  25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against

5  Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-

6  TWD (N.D.N.Y Feb. 6, 2023)).

7       **Obtaining the RR/BAYC smart contract is an important part of the**

8  **injunction:**  The immutability of the RR/BAYC NFT contract is a major reason the

9  contract should be transferred to Yuga Labs.  Without transfer of the contract, the

10  Defendants would forever have control over and a connection to Yuga Labs' BAYC

11  Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.  Defendants have no basis for continuing to

12  hold on to the instrumentalities of their bad faith infringement—namely the

13  RR/BAYC smart contract used to manufacture and sell the infringing NFTs, the

14  cybersquatting domains rrbayc.com and apemarket.com, and the @ApeMarketplace

15  account used exclusively to promote RR/BAYC NFTs and Ape Market.  Each of these

16  instrumentalities should be under the control of Yuga Labs as the rightful owner of the

17  BAYC Marks.

18       Defendants' contention that the smart contract indicates the source of the

19  RR/BAYC NFTs as Mr. Ripps' wallet is misleading.  The "ryder-ripps.eth" name did

20  not appear on Etherscan until *after* minting most, if not all, of the infringing NFTs.

21  *Compare* JTX-25, *with* JTX-36.  More directly, though, the contract will always say

22  Bored Ape Yacht Club and BAYC – Mr. Ripps has no right to forever associate

23  himself with Yuga Labs' trademarks.  On the contrary, Yuga Labs explained at trial

24  how ownership of the smart contract will allow Yuga Labs to work with the NFT

25  marketplaces to ensure that the human readable elements of the marketplace clearly

26  indicate that RR/BAYC NFTs are not authentic BAYC NFTs.  Defendants'

27  conclusory statements fail to rebut any of these basic facts.

28

1

**Defendants' Reply:**

2       The Smart contract clearly indicates that it is owned by Ryder Ripps.  *See* JTX-

3   1146; Trial Tr. [Atalay] 130:19-131:6.  Further, Yuga has not proven that anybody

4   was confused by the smart contract.  This is especially pertinent because the Ryder

5   Ripps smart contract is a different smart contract than Yuga's and therefore

6   necessarily implied that the NFTs underlying the contracts had different sources.  *Id.*

7   at 135:22-25.

8       Defendants acknowledge this Court's finding on summary judgment.  However,

9   Yuga affirmatively raised some of these issues here, and to the extent anything in

10  Defendants' objection is in disagreement with the Court's legal findings at summary

11  judgment, Defendants are contesting the legal findings to preserve for appeal.

12  However, to the extent Defendants objections implicate issues of intent, Defendants

13  had a good-faith intent to believe that Yuga surrendered its marks to the world

14  generally and to them specifically through Mr. Hickman's ownership of a BAYC.  *See*

15  Trial Tr. [Solano] 24:3-11; *id.* at 28:6-9; 76:5-15 [Muniz].  The Court never

16  considered or decided how Mr. Hickman's ownership of a BAYC had any effect on

17  Defendants' intent.

18      Regardless, Yuga's demand for the smart contract not be technically feasible

19  and it is futile.  As such, this term runs a high risk of being set as a "trap" for

20  Defendants to fall into as compliance might not be possible.  Further, Yuga has

21  admitted that the contract is immutable, which means that the smart contract cannot be

22  changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr.

23  [Atalay] 134:11-20.  An order that prohibits Defendants from minting anymore

24  RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the

25  injury alleged in this case.  Likewise, a prohibition from using the rrbayc.com and

26  apemarket.com domains—both of which are inactive—fit the scope of the injury

27  found by the Court at summary judgment (subject to Defendants' right to appeal).

28

Yuga's argument that an injunction that prevents Defendants from using the marks and domain names in commerce would be insufficient without the smart contract is speculative and wrongly assumes that Defendants would not comply with a court order.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 54, lines 17:16-18:**

Defendants retain the tool to continue their infringement. *See* Dkt. 337 ¶8. Thus, Yuga Labs should own the smart contract to prevent any further infringing NFTs to exist.

**Defendants' Basis of Dispute:**

The smart contract for the RR/BAYC NFTs clearly indicates that the creator is Mr. Ripps's wallet and not Yuga's. *See* JTX-1146. Accordingly, there is no support for the statement that retaining the smart contract allows for continued infringement. Additionally, the smart contract is immutable and cannot be changed even if transferred to Yuga. *See* Trial Tr. [Atalay] 133:24-8. Accordingly, an injunction transferring the contract to Yuga would not prevent "any further infringing NFTs" as this conclusion of law claims.

Finally, Yuga's evidence cited is not supportive. They cite to Mr. Atalay's declaration where he states that a smart contract function could be applied to prevent any further minting of the RR/BAYC NFT contract. *See* Atalay Decl. ¶ 8 (Dkt. 337). Transferring the entire smart contract just to perform that function is not a narrowly tailored injunction, however. The more appropriate response is to enjoin Mr. Ripps and Mr. Cahen from minting more RR/BAYC NFTs, which is part of the appropriate injunction proposed by Defendants. *See* Dkt 417 ¶ 145.

**Plaintiff's Response:**

Defendants' objections should be rejected because (1) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it

1  to regain control of its brand, and (2) obtaining the RR/BAYC smart contract is an
2  important part of addressing that harm.

3  **Yuga Labs' Proposed Injunction Is Properly Tailored:**  A properly tailored
4  injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow
5  it to regain control of the brand.  This includes putting an end to Defendants' sales,
6  promotion, and marketing of infringing NFTs; preventing Defendants from creating
7  any future confusion by minting new infringing NFTs or improperly using Yuga
8  Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and
9  transferring the smart contract and other infringing domains and instrumentalities to
10  Yuga Labs so it once again has sole control over its marks.  It is unrebutted that
11  transferring the smart contract to Yuga Labs would allow it to regain control over its
12  brand.  The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and
13  Conclusions of Law would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed,
14  two other courts have entered similar injunctions against Defendants' business
15  partners.  *See* Judgment and Order for Permanent Injunction Against Ryan Hickman
16  (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug.
17  25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against
18  Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-
19  TWD (N.D.N.Y Feb. 6, 2023)).

20  **Obtaining The RR/BAYC Smart Contract Is An Important Part Of The**
21  **Injunction:**  The immutability of the RR/BAYC NFT contract is a major reason the
22  contract should be transferred to Yuga Labs.  Without transfer of the contract, the
23  Defendants would forever have control over and a connection to Yuga Labs' BAYC
24  Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.  Defendants have no basis for continuing to
25  hold on to the instrumentalities of their bad faith infringement—namely the
26  RR/BAYC smart contract used to manufacture and sell the infringing NFTs, the
27  cybersquatting domains rrbayc.com and apemarket.com, and the @ApeMarketplace
28

account used exclusively to promote RR/BAYC NFTs and Ape Market.  Each of these instrumentalities should be under the control of Yuga Labs as the rightful owner of the BAYC Marks.

Defendants' contention that the smart contract indicates the source of the RR/BAYC NFTs as Mr. Ripps' wallet is misleading.  The "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs. *Compare* JTX-25, *with* JTX-36.  More directly, though, the contract will always say Bored Ape Yacht Club and BAYC – Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  On the contrary, Yuga Labs explained at trial how ownership of the smart contract will allow Yuga Labs to work with the NFT marketplaces to ensure that the human readable elements of the marketplace clearly indicate that RR/BAYC NFTs are not authentic BAYC NFTs.

Defendants' claim that retaining the smart contract would not result in further infringement is facially invalid.  As long as they have the RR/BAYC smart contract, they will continue to be infringing on the BAYC Marks in it.  Moreover, ownership and control of the smart contract could allow Defendants to obtain royalties or mint new RR/BAYC NFTs in the future.  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs will help reduce future confusion.

**Defendants' Reply:**

Yuga's citations to the decisions other courts have held with regard to cases against Mr. Lehman (who settled with Yuga) and Mr. Hickman (who had a default judgment entered against him) are dissimilar to the posture in this case, not binding, and irrelevant.  Yuga's demand for transferring the smart contract should be rejected because doing so might not be technically feasible and it is futile.  As such, this term runs a high risk of being set as a "trap" for Defendants to fall into as compliance might not be possible.  Further, Yuga has admitted that the contract is immutable,

1  which means that the smart contract cannot be changed or modified in any meaningful

2  way, no matter who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  An order that prohibits

3  Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent

4  Defendants from causing Yuga the injury alleged in this case.  Further, it would be

5  enforceable in court.  Likewise, a prohibition from using the rrbayc.com and

6  apemarket.com domains—both of which are inactive—would suffice and fit the scope

7  of the injury found by the court in this case (subject to defendants' right to appeal).

8  Yuga's argument that an injunction that prevents Defendants from using the marks

9  and domain names in commerce would be insufficient without the smart contract is

10  speculative and wrongly assumes that Defendants would not comply with a court

11  order.  Giving Yuga the smart contract will do nothing to ameliorate any future

12  confusion and in fact would be very difficult and render little pay off for Yuga.

13  **Plaintiff's Disputed Post Trial Conclusion of Law No. 55:**

14  The terms of the permanent injunction are described in the Conclusion below.

15  The Court finds these terms reasonable and necessary to protect Yuga Labs from

16  irreparable harm.

17  **Defendants' Basis of Dispute:**

18  This conclusion of law seeks an overly restrictive injunction that is not tailored

19  to remedy the alleged harm and is impermissible.  Specifically, "[a] trademark

20  injunction . . . can raise serious First Amendment concerns because it can interfere

21  with truthful communication between buyers and sellers in the marketplace.

22  Accordingly, we must ensure that the injunction is tailored to eliminate only the

23  specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171,

24  1176 (9th Cir. 2010) (cleaned up).  "Prohibition of . . . truthful and non-misleading

25  speech does not advance the Lanham Act's purpose of protecting consumers and

26  preventing unfair competition; in fact, it undermines that rationale by frustrating

27  honest communication . . . ." *Id.* at 1176-77.

28

1   To the extent that the Court enters a permanent injunction, the injunctive terms

2   that Defendants propose are tailored to eliminate the purported harm and should be

3   used instead.  *See* Dkt 417 ¶ 145.

4   **Plaintiff's Response:**

5   Defendants' objection should be rejected because (1) Yuga Labs' proposed

6   injunction is tailored to address the irreparable harm done to Yuga Labs and allow it

7   to regain control of its brand and (2) Defendants' proposed injunctive relief is too

8   narrow.  *See supra* ¶ 48.

9   **Defendants' Reply:**

10   "A trademark injunction . . . can raise serious First Amendment concerns

11   because it can interfere with truthful communication between buyers and sellers in the

12   marketplace.  Accordingly, we must ensure that the injunction is tailored to eliminate

13   only the specific harm alleged." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d

14   1171, 1176 (9th Cir. 2010).  If the Court enters injunctive relief, it should be tailored

15   to the harms alleged by Yuga in its complaint while balancing Defendants' right to

16   free speech.  *See* Dkt. 417 ¶ 145; Dkt. 1 at ¶ 5.  Yuga has not shown why a prohibition

17   on using the "rrbayc.com" and "apemarket.com" domain names would be insufficient.

18   Nor has it shown why a ban on promoting or selling RRBAYC NFTs would be

19   insufficient.  On the other hand, Yuga's proposed terms would be exceptionally

20   difficult to comply with and infringe on Defendants' rights.

21   **Plaintiff's Disputed Post Trial Conclusion of Law No. 56:**

22   Under the Lanham Act, the prevailing party of a Section 1125 claim is entitled

23   to "the costs of the action." 15 U.S.C. § 1117(a).

24   **Defendants' Basis of Dispute:**

25   Yuga incorrectly broadens 15 U.S.C. § 1117(a).  This statute states that, subject

26   to principles of equity, a plaintiff is entitled to recover costs if it prevails in a

1   "violation under section 1125(a) or (d)."  Here, the principles of equity weigh against
2   awarding Yuga's costs (as discussed in detail below).

3   **Plaintiff's Response:**

4   Defendants' objection is irrelevant because the principles of equity support
5   granting Yuga Labs' costs.  *See infra* ¶ 57.

6   **Defendants' Reply:**

7   Yuga concedes that a prevailing party is not automatically entitled to recover
8   costs.  15 U.S.C. § 1117(a).  This conclusion of law should be rejected.   Here, the
9   principles of equity weigh against awarding Yuga's costs (as discussed in detail
10  below).

11  **Plaintiff's Disputed Post Trial Conclusion of Law No. 57:**

12  Yuga Labs is the prevailing party. *See*, *e.g.*, SJ Order at 13, 15, 22. Thus, Yuga
13  Labs is entitled to recover its costs.

14  **Defendants' Basis of Dispute:**

15  Defendants acknowledge that this Court granted summary judgment in Yuga's
16  favor on Yuga's false designation claim and Yuga's cybersquatting claim.  However,
17  this Court made no determination regarding costs in its summary judgement order.
18  Dkt. 225.  Furthermore, Defendants dispute that Yuga satisfied the summary judgment
19  standard and reserve the right to appeal the Court's order.  Because the final remedies
20  in this action will be subject to the outcome of any appeal, Defendants dispute that
21  Yuga has proven its claims and that it is entitled to monetary remedies, injunctive
22  relief, or costs.

23  An appellee is no longer a "prevailing party" when a favorable judgment on the
24  merits in a lower proceeding is reversed on appeal.  *See*, *e.g.*, ., *Lovell v. Poway*
25  *Unified Sch. Dist.*, 90 F.3d 367, 373–74 (9th Cir. 1996) (directing award of attorneys'
26  fees in district court to be vacated once appellees lost on their appeal); *Turner v.*
27  *McMahon*, 830 F.2d 1003, 1009 (9th Cir. 1987) (same).

28

1    Moreover, Yuga is not entitled to any costs because the equities of this case
2    weight against the award of any costs.  Here, Defendants were forced to advance with
3    litigation to trial because of Yuga's unreasonable settlement demand that Defendants
4    surrender their speech rights to criticize Yuga.  As the Court itself noted, Yuga's
5    demand for a non-disparagement clause was "a condition that is quite frankly
6    unreasonable."  Hearing Transcript June 16, 2023, at 9:9-12.  The reason that this case
7    has continued as far as it has is Yuga's insistence on silencing Defendants.

8    Defendants also advanced good faith arguments in favor of their positions on
9    both liability and damages.  Defendants made a good-faith argument that they were
10   entitled to a *Rogers* defense on free speech grounds— a common defense in
11   trademark cases involving artists and their creations.  While this Court disagreed,
12   Defendants advanced this defense based on relevant evidence.  *See, e.g.*, Dkt. 163;
13   Dkt. 163-17-31 (fifteen unsolicited letters applauding the RR/BAYC project as
14   protest art that criticizes Yuga); Dkt. 163-80 (artist's statement); Dkt. 163-81
15   (disclaimer).

16   Yuga's litigation misconduct likewise precludes an award of costs under the
17   principles of equity.  For example, Yuga used this litigation as means to harass Mr.
18   Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee
19   threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file
20   a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should
21   die.'  You said that.  And my dad is … freaked out, you know … he really is scared,
22   you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially
23   brushed off the issue, then later conceded that a threat did in fact occur.  Dkt. 97 at 4.
24   But Yuga's harassment of Mr. Ripps's father continued, including serving a facially
25   invalid subpoena on him seeking to compel his trial attendance (notwithstanding his
26   complete irrelevance to any issue in the case).

27

28

1    Yuga served more than sixteen subpoenas in this action, nearly all of them

2  facially irrelevant and procuring no useful discovery, apparently to harass anyone that

3  is in any way associated with the Defendants.  For example, Yuga targeted people on

4  Twitter whose sole relevance was apparently having "liked" the RR/BAYC project,

5  Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties

6  repeatedly commented on how Yuga's behavior in this lawsuit impacted them

7  personally, including for example Mr. Ripps's part-time, one-week general assistant

8  (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory,

9  honestly." Garner Depo. At 190:9-17.

10    Yuga also improperly tried to preclude relevant discovery by making a

11  baseless apex witness argument in an *ex parte* motion for a protective order.  The

12  Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the

13  merits" because the co-founders were "the only people who have knowledge of the

14  creation of the marks." Dkt. 77 at 2.  The Court accordingly ordered that Yuga

15  employees Wylie Aronow and Greg Solano appear for depositions on January 9 and

16  11 respectively (excusing Mr. Solano only if he had medical complications). *Id*.  Yet,

17  despite this Court's order, ***neither witness appeared***.  Yuga has never identified any

18  medical reason why Mr. Solano could not attend.  The Court was clear that failing to

19  appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did

20  not show up. Dkt. 77 at *2.  Yuga has not done so.

21    Yuga also flouted this Court's Protective Order by improperly designating the

22  entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

23  CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

24  from the public.  This deposition involved no Yuga confidential information; instead,

25  it was the testimony of a Black Jewish third party that included discussion of racism

26  and antisemitism in Yuga's branding. *See* Dkt. 123-2.  Defendants were forced to

27  bring a motion to address Yuga's misuse of the Protective Order, which the Court

28

1 | granted ordering complete de-designation of the transcript and finding that Yuga was

2 | wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

3 |       Yuga also baselessly refused to produce materials relating to third-party

4 | Thomas Lehman's settlement-procured declaration to run the clock on the discovery

5 | schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

6 | and sought expedited review of that motion to allow time for its use in a deposition of

7 | Mr. Lehman.  The Court declined to consider the motion on an expedited basis,

8 | stating that Defendants could instead depose Mr. Lehman in "the last week of March

9 | before the April 1, 2023 discovery cut-off date."  Dkt. 119 at 2.  The Court ultimately

10 | granted Defendants' motion, holding that Yuga waived any claim to confidentiality

11 | due to its "unfettered use of Lehman's declaration[.]"  Dkt. 159 at 2.  After Yuga

12 | belatedly made its court-ordered production, Defendants took Mr. Lehman's

13 | deposition in the final week of discovery as suggested by the Court.  But because of

14 | Yuga's delay, the deposition testimony—which raised disputes of fact regarding

15 | Defendants' infringement and Yuga's credibility—was unavailable for consideration

16 | in opposition to Yuga's motion for summary judgment.  *See* Dkt. 215 at 2.

17 |       Throughout the course of this litigation, Yuga also made repeated baseless

18 | threats of fees and sanctions.  In total, Yuga has unsuccessfully asked the Court to

19 | impose sanctions ***six times***.  *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at

20 | 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.

21 | This kind of scorched-earth litigation strategy is improper in any context, but

22 | particularly problematic where Defendants are two individuals attempting to respond

23 | to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

24 |       Because Defendants advanced good faith arguments, because Defendants'

25 | positions were reasonable and their defense of this litigation was necessitated by

26 | Yuga's unreasonable settlement requirements, and because Yuga does not come to

27 | the Court with clean hands as result of its litigation misconduct, Defendants

28 |

1   respectfully request that the Court hold that the principles of equity mandate an

2   award of costs.

3                       **<u>Plaintiff's Response:</u>**

4         Defendants' objection should be rejected because (1) the Court has already

5   found Yuga Labs to be the prevailing party; (2) Defendants' exceptional case

6   objections are irrelevant and lack merit; and (3) Defendants improperly contradict

7   facts stipulated to in the Pre-Trial Conference Order.

8         **The Court Has Already Found Yuga Labs To Be The Prevailing Party:**  In

9   that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods

10  for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce,

11  and that Yuga Labs has not abandoned its marks.  *Id*. at 6-10.  The Court also held that

12  "Defendants have admitted that they intentionally used the BAYC Marks in their

13  RR/BAYC NFTs."  *Id*. at 11.  The Court "easily conclude[d]" that Defendants' use of

14  identical marks, on identical products, in identical markets supported a finding of a

15  likelihood of confusion.  *Id*. at 10-13.  That order establishes the matters adjudicated

16  therein for purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially

17  adjudicating case on a summary judgment motion may "enter an order stating any

18  material fact — including an item of damages or other relief — that is not genuinely

19  in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire*

20  *Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051

21  (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis*.,

22  508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are

23  taken as established at trial.").

24        Defendants did not move the Court to reconsider its holdings.  Nevertheless,

25  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

26  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

27  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

28

1   purpose of a partial summary judgment order, which is "intended to avoid a useless

2   trial of facts and issues over which there was really never any controversy and which

3   would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales,*

4   *S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D.

5   Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981))

6   (emphasis added).  Defendants' authorities do not support their position.  *See Sienze v*

7   *Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25,

8   2019) ("evidence concerning issues resolved at summary judgment is ***generally not***

9   ***relevant and should be excluded***" at trial) (emphasis added); *Shouse v. Ljunggren,*

10  792 F.2d 902, 904 (9th Cir. 1986) (discussing applicability of the law of the case

11  doctrine where a case is assigned to a new judge).

12      "The partial summary judgment is merely a pretrial adjudication that certain

13  issues shall be deemed established for the trial of the case and likewise serves the

14  purpose of speeding up litigation by eliminating before trial matters wherein there is

15  no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

16  2009) (alteration citation omitted).  Defendants' repeated attempts to ignore or undo

17  the Court's Order "speeding up litigation" is a dilatory and abusive litigation tactic

18  that has unjustifiably increased the cost of resolving this case.

19      Nevertheless, Defendants forced the Court and the parties to re-litigate this

20  decided issue.  As discussed herein, the evidence the Court can consider following the

21  trial amply supports this factual finding.  Thus, the outcome on this issue after trial is

22  no different than it was after Yuga Labs' Motion for Summary Judgment.

23  Defendants' objection should be rejected because the evidence shows that Defendants

24  intended to confuse consumers.

25      Defendants have no basis to dispute that Yuga Labs prevailed on its false

26  designation of origin and cybersquatting claims.  The authorities cited by Defendants

27  do not support their absurd position that a prevailing party can only be determined on

28

appeal or that only circuit courts have authority to award attorneys' fees.  *Cf. San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020) (affirming district court's award of attorneys' fees in exceptional case).

**Defendants' Exceptional Case Objections Are Irrelevant And Lack Merit:** The remainder of Defendants' objections are irrelevant to this issue and, in any event, lacks any merit.  *See infra* ¶¶ 61-66.  For instance, Defendants complain that Yuga Labs subpoenaed Mr. Ripps' "gallerist" neglecting to mention that Defendants first disclosed this person as a witness on their own initial disclosures; Defendants also complain that Yuga Labs took the deposition of Mr. Ripps' "part-time, one-week general assistant (whom Yuga insisted on deposing)," even though they now claim that trial that Mr. Garner's services were essential expenditures such that a deduction in disgorgement is warranted.  These are not good-faith positions.

**Defendants Improperly Contradict Facts Stipulated to in the Pre-Trial Conference Order**:  Defendants' objections contradict their own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1.  In that order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act."  *Id.* at 13.  As such, Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA.  *See U.S. First Nat. Bank or Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.  Defendants' sudden

1   refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that

2   unjustifiably increases the cost of resolving this case.  Defendants' actions again make

3   this an exceptional case.  The Court should reject Defendants' objection.

4                    **Defendants' Reply:**

5           Yuga provides almost no context for its litigation misconduct.  This is

6   unsurprising because its repeated abuses of the litigation process were unreasonable

7   and unjustifiable.  Yuga has engaged in several egregious acts in this litigation

8   including (1) threatening to kill Mr. Ripps and his 72-year-old father, (2) harassing

9   sixteen facially irrelevant third parties, (3) improperly holding the deposition

10  transcript of Mr. Hickman "hostage" as this Court has described it, (4) not showing up

11  to deposition despite Court orders requiring them to do so, (5) baselessly refusing to

12  produce materials, (6) Yuga's demand for a non-disparagement clause in an effort to

13  take away Defendants' speech rights, and (7) having made six baseless threats of fee

14  and sanctions, all of which the Court has denied.  Given Yuga's numerous instances

15  of litigation misconduct, the principles of equity mandate against an award of costs.

16          Yuga's response also fails to rebut that a party is no longer a "prevailing party"

17  when a favorable judgment on the merits in a lower proceeding is reversed on appeal.

18  *See*, *e.g.*, ., *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373–74 (9th Cir. 1996)

19  (directing award of attorneys' fees in district court to be vacated once appellees lost on

20  their appeal); *Turner v. McMahon*, 830 F.2d 1003, 1009 (9th Cir. 1987) (same).

21  Defendants do not dispute that summary judgment has been entered in this case.

22  However, Defendants reserve the right to appeal and the outcome the appeal may

23  change who is the prevailing party in this action.

24          And lastly, Defendants do not contradict the pre-trial conference order.  Yuga

25  attempts to mischaracterize the Court record by citing to the pre-trial conference

26  order.  But ***nowhere*** in the pre-trial conference order did Defendants stipulate to

27  ownership of the BAYC marks.  Section 6 of the order contains all stipulated facts and

28

Case No. 2:22-cv-04355-JFW-JEM          -679-          JOINT STATEMENT RE: OBJECTIONS

1   those stipulated facts include only that Yuga released the BAYC collection and

2   various facts about Defendants' activities associated with the RR/BAYC collection.

3   Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts section, but

4   this section again does not contain any admissions regarding "ownership" of the

5   marks.  Rather it merely identifies the asserted marks at issue for the remedies trial—

6   something that Defendants admitted in light of the scope of the remedies trial and to

7   ease this Court's work in adjudicating the remaining issues.   Dkt. 32-1 at 2-3.  Lastly,

8   Yuga cites to Defendants' statement that the "Court has determined that Defendants

9   infringed the BAYC Marks" and similar statements involving Yuga's cybersquatting

10  claim.  Dkt. 320-1 at 13.  But again, this is not an admission of ownership or

11  infringement, it is a statement regarding the procedural history in this case that

12  explains that the scope of trial is limited to remedies and does not include

13  infringement.  Had Defendants wanted to stipulate to ownership or infringement, they

14  would have clearly and expressly done so—they have not.  Defendants reserve the

15  right to dispute ownership and infringement on appeal and in any other proceedings

16  involving the BAYC marks.

17              **Plaintiff's Disputed Post Trial Conclusion of Law No. 59:**

18          Here, Yuga Labs is the prevailing party on its claims for false designation of

19  origin and cybersquatting. *See* SJ Order at 13, 15, 22.

20                        **Defendants' Basis of Dispute:**

21          While Yuga was the prevailing party on its false designation of origin and

22  cybersquatting claims, that alone does not support an exceptional case finding.  *See*

23  *Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at

24  *4-5 (C.D. Cal. 2017) (rejecting exceptional case finding in trademark case because

25  claims were not "frivolous").  Yuga's arguments risk making the exceptional case the

26  normal case because it would collapse victoriousness on the underlying claim and

27  frivolousness.

28

1    Further, Defendants intend to file an appeal in this matter and it is premature to

2    deem Yuga the prevailing party prior to appeal.  An appellee is no longer a "prevailing

3    party" when a favorable judgment on the merits in a lower proceeding is reversed on

4    appeal.  *See*, *e.g.*, *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373–74 (9th

5    Cir.1996) (directing award of attorneys' fees in district court to be vacated once

6    appellees lost on their appeal); *Turner v. McMahon*, 830 F.2d 1003, 1009 (9th Cir.

7    1987) (same).  Thus, it is premature to award attorneys' fees.

## Plaintiff's Response:

9    Defendants have no basis to dispute that Yuga Labs prevailed on its false

10    designation of origin and cybersquatting claims.  The authorities cited by Defendants

11    do not support their absurd position that a prevailing party can only be determined on

12    appeal or that only circuit courts have authority to award attorneys' fees.  *Cf. San

13    Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020)

14    (affirming district court's award of attorneys' fees in exceptional case).

15    The remainder of Defendants' objection is irrelevant to this issue and, in any

16    event, lacks any merit.  *See infra* ¶¶ 61-66.

## Defendants' Reply:

18    Yuga does not answer Defendants' objection that its position risks collapsing a

19    winning position and a position that supports an exceptional case finding.  As

20    discussed in more detail below, this district generally requires a finding of

21    frivolousness.  *Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017

22    WL 11630841 at *4-5 (C.D. Cal. 2017) (rejecting exceptional case finding in

23    trademark case because claims were not "frivolous"); *D.N. v. Los Angeles Unified

24    Sch. Dist.*, No. 18-cv-01582-AB-AFMx, 2019 WL 7841083 at *2 (C.D. Cal. Sept. 25,

25    2019).  Merely pointing to success is simply insufficient to carry its burden to prove

26    that Defendants' legal positions were frivolous in the exceptional case context.  As

1 such, this legal conclusion standing alone does not support an exceptional case

2 finding.

3 **Plaintiff's Disputed Post Trial Conclusion of Law No. 61:**

4 Based on the totality of the circumstances, the Court concludes that this is an

5 exceptional case.

6 **Defendants' Basis of Dispute:**

7 The totality of circumstances show that this is not an exceptional case.  Courts

8 determine if a case is exceptional by considering the totality of the circumstances and

9 evaluating whether the case is "one that stands out from others with respect to the

10 substantive strength of a party's litigation position (considering both the governing

11 law and the facts of the case) or the unreasonable manner in which the case was

12 litigated." *SunEarth, Inc.*, 839 F.3d at 1180 (quoting *Octane Fitness, LLC v. ICON*

13 *Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  Exceptional case findings are rare

14 and not considered the norm.  *Octane Fitness, LLC*, 572 U.S. at 553 (defining

15 exceptional as "uncommon, rare and not ordinary") (internal quotations omitted).  As

16 the name implies, the case must present something "exceptional" to depart from the

17 normal rule that parties pay their own costs.  *See Watec Co. v. Liu*, 403 F.3d 645, 656

18 (9th Cir. 2005) (reversing district court because it was only based on a finding of

19 intentional infringement, but not the kind of extreme conduct necessary for an

20 exceptional case finding).  Plaintiffs bear the burden to prove that a case is

21 exceptional.  *Caiz v. Roberts*, No. 15-CV-09044-RSWL-AGRx, 2017 WL 830386 at

22 *5 (C.D. Cal. Mar. 2, 2017).

23 This is not an "exceptional case" under these exacting standards.  Defendants

24 put forward reasonable defenses and were justified in defending this litigation,

25 particularly given Yuga's demand for terms that Yuga could never attain through this

26 litigation.  *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058-ODW

27 (JPRx), 2021 WL 2414856 at *2 (C.D. Cal. June 14, 2021) ("Courts in this district

28

have held that a party's litigation position must be objectively meritless for a case to be exceptional…").  Here, Defendants' litigation position has been defined by Yuga's unreasonable settlement demand that Defendants surrender their speech rights to criticize Yuga.  As the Court itself noted, Yuga's demand for a non-disparagement clause was "a condition that is quite frankly unreasonable."  Hearing Transcript June 16, 2023, at 9:9-12.  The reason that this case has continued as far as it has is Yuga's insistence on silencing Defendants.

Defendants have advanced good faith arguments in favor of their positions on both liability and damages.  *See Caiz*, 2017 WL 830386, at *5 (holding that mere "lack of success" does not support an exceptional case finding).  Defendants made a good-faith argument that they were entitled to a *Rogers* defense on free speech grounds— a common defense in trademark cases involving artists and their creations.  While this Court disagreed, Defendants advanced this defense based on relevant evidence.  *See, e.g.*, Dkt. 163; Dkt. 163-17-31 (fifteen unsolicited letters applauding the RR/BAYC project as protest art that criticizes Yuga); Dkt. 163-80 (artist's statement); Dkt. 163-81 (disclaimer).

Defendants' litigation conduct also does not support an exceptional case finding.  Defendants are entitled to mount a vigorous defense (especially given Yuga's settlement conditions) both on the merits and during the burdensome discovery process.  Yuga brought motion after motion in discovery, only to have their arguments repeatedly rejected.  *See, e.g.*, Dkt. 77 (rejecting Yuga's "apex witness" argument); Dkt. 133 (rejecting Yuga's attempt to seal the entirety of the deposition transcript of a witness critical of Yuga); Dkt. 159 (ordering production of materials Yuga improperly withheld); Dkt. 145 (denying Yuga's baseless motion for sanctions).

Further, Defendants have also had to defend against moving targets.  For example, within a span of ten days, Yuga first claimed damages of roughly $2 million

in actual damages, to a claim of nearly **$800 million** in actual damages, to complete abandonment of all actual damages.  *See* Dkt 286 at 2-3 (asserting damages of $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June 8); Dkt. 315-1 at 2 (dropping actual damages on June 15).  Defendants have made reasonable offers of settlement and put forward reasonable legal arguments in the face of Yuga's shifting claims.

Yuga's litigation misconduct likewise precludes a finding that this case is exceptional in Yuga's favor. *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case finding is an exercise of the court's equitable powers).  For example, Yuga used this litigation as means to harass Mr. Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should die.'  You said that.  And my dad is … freaked out, you know … he really is scared, you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially brushed off the issue, then later conceded that a threat did in fact occur.  Dkt. 97 at 4.  But Yuga's harassment of Mr. Ripps's father continued, including serving a facially invalid subpoena on him seeking to compel his trial attendance (notwithstanding his complete irrelevance to any issue in the case).

Yuga served more than sixteen subpoenas in this action, nearly all of them facially irrelevant and procuring no useful discovery, apparently to harass anyone that is in any way associated with the Defendants.  For example, Yuga targeted people on Twitter whose sole relevance was apparently having "liked" the RR/BAYC project, Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties

1  repeatedly commented on how Yuga's behavior in this lawsuit impacted them

2  personally, including for example Mr. Ripps's part-time, one-week general assistant

3  (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory,

4  honestly." Garner Depo. At 190:9-17.

5       Yuga also improperly tried to preclude relevant discovery by making a

6  baseless apex witness argument in an *ex parte* motion for a protective order.  The

7  Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the

8  merits" because the co-founders were "the only people who have knowledge of the

9  creation of the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga

10 employees Wylie Aronow and Greg Solano appear for depositions on January 9 and

11 11 respectively (excusing Mr. Solano only if he had medical complications).  *Id*.  Yet,

12 despite this Court's order, ***neither witness appeared***.  Yuga has never identified any

13 medical reason why Mr. Solano could not attend.  The Court was clear that failing to

14 appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did

15 not show up.  Dkt. 77 at 2.  Yuga has not done so.

16      Yuga also flouted this Court's Protective Order by improperly designating the

17 entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

18 CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

19 from the public.  This deposition involved no Yuga confidential information; instead,

20 it was the testimony of a Black Jewish third party that included discussion of racism

21 and antisemitism in Yuga's branding.  *See* Dkt. 123-2.  Defendants were forced to

22 bring a motion to address Yuga's misuse of the Protective Order, which the Court

23 granted ordering complete de-designation of the transcript and finding that Yuga was

24 wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

25      Yuga also baselessly refused to produce materials relating to third-party

26 Thomas Lehman's settlement-procured declaration to run the clock on the discovery

27 schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

28

1  and sought expedited review of that motion to allow time for its use in a deposition of

2  Mr. Lehman.  The Court declined to consider the motion on an expedited basis,

3  stating that Defendants could instead depose Mr. Lehman in "the last week of March

4  before the April 1, 2023 discovery cut-off date."  Dkt. 119 at 2.  The Court ultimately

5  granted Defendants' motion, holding that Yuga waived any claim to confidentiality

6  due to its "unfettered use of Lehman's declaration[.]"  Dkt. 159 at 2.  After Yuga

7  belatedly made its court-ordered production, Defendants took Mr. Lehman's

8  deposition in the final week of discovery as suggested by the Court.  But because of

9  Yuga's delay, the deposition testimony—which raised disputes of fact regarding

10  Defendants' infringement and Yuga's credibility—was unavailable for consideration

11  in opposition to Yuga's motion for summary judgment.  *See* Dkt. 215 at 2.

12      Throughout the course of this litigation, Yuga also made repeated baseless

13  threats of fees and sanctions.  In total, Yuga has unsuccessfully asked the Court to

14  impose sanctions **six times**.  *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at

15  6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.

16  This kind of scorched-earth litigation strategy is improper in any context, but

17  particularly problematic where Defendants are two individuals attempting to respond

18  to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

19      Because Yuga has abandoned its claim that Defendants' infringement was

20  willful, because Defendants' positions were reasonable and their defense of this

21  litigation was necessitated by Yuga's unreasonable settlement requirements, and

22  because Yuga does not come to the Court with clean hands as result of its litigation

23  misconduct, Defendants respectfully request that the Court reject Plaintiff's claim

24  that this case is "exceptional" warranting an award of attorneys' fees in Yuga's favor.

25  **Plaintiff's Response:**

26      Defendants' objection should be rejected because (1) Defendants' actions

27  make this an exceptional case; (2) Yuga Labs has not engaged in litigation

28

misconduct; (3) Ms. Kindler properly updated her calculations with new information; (4) Defendants Intentionally and Willfully Confused Consumers.

**This Is An Exceptional Case:**  Defendants engaged in egregious litigation misconduct justifying a finding that this is an exceptional case.

First, Yuga Labs' case is particularly strong on the merits.  As evinced by the Court's Order granting summary judgment on liability, this case stands out from the bulk of trademark infringement cases.  Ignoring the clear strength of Yuga Labs' case, Defendants relentlessly advanced frivolous legal theories (e.g., RR/BAYC NFTs as an "art" project intended to criticize Yuga Labs, Yuga Labs abandoned its rights to the BAYC Marks, a frivolous counterclaim for declaratory judgment of "no defamation") that were rendered moot and irrelevant by multiple orders from the Court.  *See, e.g.*, Dkt. 62 (rejecting Defendants' First Amendment arguments), SJ Order (Dkt. 225) (granting summary judgment in favor of Yuga Labs and against Defendants' affirmative defenses).

Second, notwithstanding the strength of Yuga Labs' case, Defendants refused to engage in reasonable settlement discussions.  For instance, Defendants demanded payment in excess of $5 million to cease their infringement, demanded that Yuga Labs pay Defendants' attorneys' fees even after losing the merits of the case on summary judgment, refused to agree to any monetary settlement terms for their infringement even after the Court's Summary Judgment Order, and even demanded that Yuga Labs dismiss claims against their partners in other courts.

Third, Defendants repeatedly sought (and continue to seek) to re-litigate issues already addressed and rejected by the Court, unnecessarily complicating and increasing the cost of litigation.  For example, Defendants filed numerous motions to compel documents and information explicitly premised on their rejected First Amendment *Rogers* defense.  *See* Dkt. 69-1, Dkt. 103-1.  The Court denied these motions and requests as "moot, irrelevant and not proportionate to the needs of the

1   case in view of the District Court's December 16, 2022 ruling."  Dkt. 87 at 1; *see also*,

2   Dkt. 144 at 1.  Similarly, when Defendants filed a meritless motion to stay

3   proceedings (Dkt. 118) after nearly three months of unnecessary delay, the Court

4   reiterated that *Rogers* did not apply in this case due to Defendants' commercial

5   conduct.  Dkt. 178 at 6.  Still, on summary judgment, Defendants maintained that

6   "there is a material dispute whether the RR/BAYC Project is an expressive work that

7   must be resolved at trial" (Dkt. 199-1 at 12-13), despite the Court's orders otherwise.

8   Defendants then indicated they planned to re-litigate, again at trial, the issues decided

9   on summary judgment, necessitating that Yuga Labs file Motions In Limine.  *See*

10  Dkts. 232-2, 236-2, 239-2, 241-2 (Culp Declarations in Support of Motions In Limine

11  Nos. 1-3, 5).  And even in these objections, Defendants again advance these frivolous

12  and rejected theories.  This pattern of conduct justifies finding this to be an

13  exceptional case.  *San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x.

14  674, 676 (9th Cir. 2020) (affirming exceptional case where defendants litigated in an

15  "unreasonable manner" such as its "failure to comply with court rules" and "persistent

16  desire to re-litigate issues already decided").

17       Fourth, Defendants and their counsel engaged in a pattern of unreasonable and

18  obstructive discovery conduct that consistently crossed the line from advocacy into

19  bad faith.  Defendants were obstructive and intentionally evasive throughout their

20  depositions and at trial, wasting time with rehearsed, non-responsive monologues on

21  the same issues the Court already deemed irrelevant.  *See, e.g.*, Trial Tr. at 229:3-13,

22  231:21-232:3, 234:24-235:5, 237:14-238:7; Cahen Depo. Designations (Dkt. 395) at

23  101:7-102:4, 163:13-23; Ripps Depo. Designations (Dkt. 396) at 35:2-11, 44:19-

24  45:11.  *See Jackson v. Gaspar*, No. 2:19-CV10450-DOC, 2022 WL 2155975, at *5

25  (C.D. Cal. Feb. 24, 2022) (finding exceptional case from "antagonistic discovery

26  conduct" that was "improperly motivated and sought to drag out or obfuscate

27  proceedings," such as deposition conduct where the defendant's "preparation,

28

recollection and candor appear to have been marginal at best").  Defendants also made false representations to the Court regarding the existence and production of documents during discovery.  For example, Mr. Ripps swore under penalty of perjury in a verification dated January 17, 2022 that he had produced all documents responsive to Yuga Labs' discovery requests.  Trial Tr. at 267:11-14.  This was a lie.  As just one example, Mr. Ripps was asked at trial about a text message from Mr. Cahen stating "It will sell out within 48 hours I think You'll make like a million dollars Straight up." JTX-1574.  Mr. Ripps claimed he did not produce that text message because he did not "really find it to have anything to do with the RR/BAYC project."  Trial Tr. at 268:17-21.  This explanation is not credible given the communication's clear relation to the sale of infringing NFTs, nor does it explain his withholding of every other text message with Mr. Cahen about the RR/BAYC NFTs.  *See* Dkt. 145 at 2-3 ("The Court takes a dim view of Defendants' blanket withholding of pre-litigation communications between Ripps and Cahen . . . ."); *see also supra* ¶ 7 (describing Defendants' false sworn statements regarding their document productions).  Yuga Labs was forced to file numerous motions and obtain repeated sworn declarations from Defendants confirming their compliance with discovery obligations, because Defendants were continually caught concealing additional documents.  *See* Dkt. 79 at 2 (Jan. 10, 2023 order requiring Ripps to verify that he has produced "all relevant non-privileged documents"); Dkt. 145 (order requiring Defendants to file a declaration that they have produced relevant documents).  Even Defendants' Discord chat (JTX-801)—cited extensively by both parties in the summary judgment and trial record, and even in both parties' proposed findings of fact and conclusions of law—had to be obtained through third-party discovery before Defendants voluntarily produced it.  *See* Dkt. 67 at 77 (joint stipulation regarding Yuga Labs' motion to compel, noting Telegram and Discord chats were produced by a third party, even after which Defendants still failed

1  to produce them in a usable format).  This misconduct justified Yuga Labs' requests

2  for sanctions.

3      Fifth, Defendants repeatedly attacked Yuga Labs, its representatives, and its

4  counsel in an egregious and unacceptable manner.  Defendants' heinous statements

5  about Yuga Labs and its counsel during litigation, including calling Yuga Labs'

6  counsel "criminals" who support "racism, antisemitism, beastiality, pedophilia and

7  using cartoons to market drugs to young children," *see* Dkt. 149-50, Dkt. 149-51, far

8  exceed the bounds of acceptable conduct.  *See Te-Ta-Ma Truth Found.-Family of Uri,*

9  *Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir. 2004) (finding

10 "no difficulty" holding defendant's harassing and racist remarks towards plaintiff and

11 their counsel an exceptional case); *AANP v. Am. Ass'n of Naturopathic Physicians*, 37

12 F. App'x. 893, 894 (9th Cir. 2002) (affirming exceptional case where "defendant acted

13 deliberately to and intended to harm the plaintiff by using its mark" which was

14 "especially egregious" because defendant "continue[d] to use the mark after notice of

15 violation" and continued to "harass[] the plaintiff").  Throughout this case, Yuga

16 Labs' counsel asked opposing counsel to reason with their clients and turn down the

17 temperature of the improper attacks and threats to our safety.  Defense counsel failed

18 to take any responsibility or control.  Just as bad, even in these objections, Defense

19 counsel seem to argue that the Defendants' threats and vile harassment is all part of

20 the litigation game and permissible tactics.  And so, Defendants maintained their

21 tactics of ridiculous attacks throughout the entire case.

22     Further representative of the lack of control and respect for counsel and the

23 Court, Defendants promised to Yuga Labs and the Court that they would not offer

24 testimony on irrelevant and inflammatory issues at trial.  *See* Dkt. 320-1 ¶ 6(A)

25 (agreeing in proposed pretrial conference order not to introduce evidence or argument

26 regarding "pedophilia," "4chan," or Defendants' "emotional distress counterclaims");

27 Dkt. 314 (agreeing in Defendants' proposal that they will not offer testimony

28

regarding "the words 'Nazi' or 'Hitler'," "allegations concerning death threats or harassment," the "class action lawsuit brought against Yuga for securities fraud," or "the SEC investigation into Yuga for securities fraud"); Dkt. 334 at 60:13-14 (representing to Court "We don't want a mini trial on Naziism for sure"); *id*. at 61:9-11 ("I agree they should stand up and object if we start – if anybody starts talking about – ranting about how everybody at Yuga are a bunch of Nazis. That is clearly inappropriate and shouldn't be done.").  Yet Defendants repeatedly violated these promises.  *See* Cahen Decl. (Dkt. 344) ¶¶ 60, 65, 66, 67, 75, 90. 91, 96; Hickman Decl. (Dkt. 345) ¶¶ 55, 58, 59; Ripps Decl. (Dkt. 346) ¶¶ 59, 69, 152; Trial Tr. at 265:17-18 (characterizing logo as a "Nazi log[o]"), 215:2-3 ("Pictures of monkeys represent racism"), 118:18-120:22 (Defendants' counsel referring to "racism," "racist imagery," and "hate speech"); Dkt. 395 at 9-10 (Defendants' designation of testimony from Mr. Cahen accusing Yuga Labs of "Nazism, racism, financial fraud, pedophilia").  Similarly, Defendants stipulated to certain facts which they now dispute and dispute factual findings in the Court's Summary Judgment Order, all of which unnecessarily and unjustifiably multiplies this litigation.

Sixth, Defendants used the litigation to "farm" for engagement on social media with the intent to further harm Yuga Labs and profit from their misconduct.  See JTX-938, JTX-1568, JTX-1617, JTX-1620.  For instance, Mr. Cahen tweeted about their subpoena of Paris Hilton and Jimmy Fallon to drum up engagement on Twitter, retweeting it from his @apemarketplace account in order to promote Ape Market.[12] These subpoenas themselves were facially invalid and Defendants only served them in order to get attention from the news media.

Finally, Defendants' public disclosure of confidential material violated this Court's Protective Order (Dkt. 51) and intentionally harmed Yuga Labs.  *See* Dkts. 180, 183, 194.  Defendants failed to take responsibility for this violation, instead

---

[12]  https://twitter.com/Pauly0x/status/1602819954335748098

1   blaming Yuga Labs.  Dkt. 176.  Defendants publicly filed numerous Yuga Labs'

2   Highly Confidential – Attorneys' Eyes Only materials, and immediately and

3   intentionally sent these Highly Confidential materials to prominent news outlets.

4   These actions are difficult to reconcile with Defendants' position that these materials

5   were merely "inadvertently filed . . . not fully redacted."  *See* Docket 180 at 5.

6   Defendants' intentional actions caused harm to Yuga Labs when these materials were

7   inaccurately reported in national media such as CNN and falsely cited in other

8   meritless litigation against Yuga Labs.  As another example, Mr. Cahen targeted

9   another Yuga Labs founder by falsely tweeting:  "[h]e's named after [a] banned 1971

10  child porn film." [13]  He further tweeted that the founder "REFUSES to change his

11  name,"[14] based on the founder's response to a question from an ongoing Highly

12  Confidential – Attorneys' Eyes Only deposition.  *See* Atalay Depo. (Dkt. 271) at 157-

13  160 (showing testimony and break taken 42 minutes prior to Mr. Cahen's Tweet).

14          **Yuga Labs Has Not Engaged In Litigation Misconduct:**  Defendants'

15  attempts to evade responsibility for their egregious litigation misconduct by pointing

16  a finger at Yuga Labs has no relevance.  The losing party in a Lanham Act case

17  cannot defend against an exceptional case finding by accusing the prevailing party of

18  engaging in similar misconduct.  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-

19  E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022) (finding exceptional case

20  amidst allegations that "[b]oth parties conducted themselves poorly at times

21  throughout litigation" where "Defendants' conduct was worse and more frequent than

22  [plaintiff's].").  Even so, Defendants' contention that Yuga Labs engaged in

23  misconduct is incorrect and filled with multiple false claims.

24          During the course of settlement discussions, Yuga Labs initially sought a

25  reasonable non-disparagement clause to protect the company's representatives, their

26

27  [13] https://twitter.com/Pauly0x/status/1620158732872331264
    [14] *Id.*

28  Case No. 2:22-cv-04355-JFW-JEM        -692-        JOINT STATEMENT RE: OBJECTIONS

1 families, and counsel given Defendants' history of making personal, targeted, heinous

2 claims and in the context of foregoing certain other relief to which it would be entitled

3 through litigation, as one proposed compromise.  Non-disparagement clauses are

4 typical in litigation settlements.  Defendants however claimed that a non-

5 disparagement clause was a barrier to them entering into a settlement.  This proved to

6 be another lie by Defendants.  After Yuga Labs ***withdrew its request for a non-***

7 ***disparagement clause,*** Defendants still refused to negotiate a settlement in good faith.

8 In particular, Defendants refused to offer a single dollar in settlement to pay for their

9 profits or statutory damages, even after being held liable.  Defendants likewise refused

10 to agree to stop promoting their infringing NFTs or Ape Market, which promoted

11 sales of RR/BAYC NFTs.  *See* JTX-1048.  For example, the @ApeMarketplace

12 Twitter account continues to promote rrbayc.com and link to a marketplace on which

13 RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at

14 57:8-58:6, 58:20-59:19.  After the Court found that Defendants infringed on Yuga

15 Labs' BAYC Marks, including through the RR/BAYC NFT smart contract and

16 cybersquatting of rrbayc.com and apemarket.com, they still refused to transfer control

17 of this smart contract or domains to Yuga Labs.

18      Yuga Labs never attempted to preclude depositions of its witnesses.  Yuga Labs

19 asked Defendants to complete a Rule 30(b)(6) deposition before deciding whether it

20 was necessary to depose Mr. Solano and Mr. Aronow, and it sought a protective order

21 when Defendants refused.  Dkt. 75.  The Court disagreed, and Yuga Labs produced

22 both witnesses for deposition.  Mr. Aronow was unable to appear for his deposition

23 the day after the Court's order because of a medical emergency.  The Court ordered

24 the parties to meet and confer n an appropriate date for the deposition for Mr. Solano,

25 Dkt. 77 at 2, which Yuga Labs did, and Mr. Solano appeared for his deposition a few

26 days after the Court's order.

27

28

1   As to Defendants' contention that Yuga Labs has not paid attorneys' fees
2   related to Mr. Solano's deposition, Defendants omit that Yuga Labs has a pending
3   objection to Defendants' claimed attorneys' fees.  Moreover, Defendants have failed
4   to file any motion for attorneys' fees or even respond to Yuga Labs' request for an
5   accounting to offset any attorneys' fees given the substantial and unpaid expert
6   deposition fees that Defendants still have not paid.

7   Defendants' dubious claim of a threat against Rodney Ripps is not in the record;
8   Yuga Labs disputes it and Defendants' false claim that it has ever been "conceded."
9   Defendants' claims on this issue were also already dismissed by the Court as lacking
10   any plausibility.  *See* Order on Yuga Labs' Motion to Strike/Dismiss (Dkt. 156) at 6-
11   10 (denying Defendants' intentional and negligent infliction of emotional distress
12   claims, which were based in part on this alleged threat).  And Defendants noticeably
13   do not mention the death threats they and their associates leveled against Yuga Labs,
14   its counsel, and their families.  Even so, it is irrelevant because it did not come from
15   Yuga Labs and was not directed to Defendants.  Defendants cry foul over Yuga Labs'
16   subpoena of Rodney Ripps, when it is they who designated him in their amended
17   initial disclosures as a person with knowledge of "RR/BAYC NFTs."  And the
18   document subpoena Yuga Labs issued for Mr. Rodney Ripps sought relevant
19   information related to his role as an officer of LIVE9000, Ryder Ripps' defunct
20   limited liability company to which he tried to hide the ill-gotten profits from the
21   RR/BAYC NFTs when he knew he was being sued.

22   Yuga Labs' other subpoenas in this action were also targeted at relevant parties
23   whom Yuga Labs reasonably believed had information relevant to the litigation.
24   Many of them, including Mr. Ripps' gallerist, were subpoenas to individuals
25   designated in Defendants' amended initial disclosures as individuals with knowledge
26   of the RR/BAYC NFTs.  Likewise, Defendants indicated in their depositions that their
27   accountants had relevant information.  *See* Cahen Deposition at 24:18-25 ("Like I

28

said, I think that would probably be an easier question for my accountant or someone like that."); Ripps Deposition at 235:1-24. Defendants cannot complain that we subpoenaed their own identified witnesses. Moreover, the vast majority of subpoenas issued by Yuga Labs were document subpoenas, which stands in stark contrast to the sixteen depositions and deposition subpoenas Defendants threated and issued to Yuga Labs' founders and employees, and more. Finally, Defendants' position that Mr. Garner is relevant to the litigation as Mr. Ripps' assistant for purposes of deducting from their profits contradicts their position that Yuga Labs' deposition of him was irrelevant. This again highlights their willingness to lie to get what they want.

Next, with respect to the discovery dispute with Mr. Hickman, the Court observed that, "Defendants, not Yuga, designated the documents discussed at Ryan Hickman's deposition as highly confidential ('HC') and attorneys' eyes only ('AEO')." Dkt. 133 at 1. Consistent with Yuga Labs' reading of the Protective Order, Yuga Labs kept the deposition transcript under similar protection "because HC/AEO documents were discussed at the deposition," *id.*, and Defendants refused to specify which portions of those underlying documents they contended were no longer HC/AEO. The Court noted Defendants' indiscriminate confidentiality designations, holding that Yuga Labs was "not wrong that Defendants are obliged by the Protective Order to ensure HC/AEO material is 'clearly so designated.'" *Id.* at 3. Accordingly, the Court ordered the transcript to be made public and ordered Defendants to comply with the Protective Order by "reproduc[ing] and redesignat[ing] the HC/AEO documents discussed at the deposition to 'clearly identify the protected portion(s)'" – the "result Yuga recommended if the Motion was granted." *Id.* In other words, the Court ordered what Yuga Labs had asked the Defendants to do from the start. This was another problem all of the Defendants' own making.

Yuga Labs contested the discovery of documents reflecting settlement negotiations with Mr. Lehman in good faith. Mr. Lehman's settlement materials

expressly included a confidentiality provision, and Yuga Labs sought to have that
bargained-for confidentiality protected.  *See* Dkt. 121-01 at 17-18.  Yuga Labs briefed
the issues in good faith and, although the Court ultimately ordered the materials to be
produced, there was no finding of bad faith.  *See* Dkt. 159 (ordering Yuga Labs to
produce settlement materials without finding bad faith).  That is because there was no
bad faith.  Of course, symbolic of Defendants creating unnecessary disputes, the
Defendants did not use a single one of the settlement communications in the
deposition with Mr. Lehman or at trial.  Here too, this dispute could have been
avoided if the Defendants had accepted Yuga Labs' pre-motion offer.

Yuga Labs was overwhelmingly successful in its own discovery motions.  Yuga
Labs was forced to file numerous motions and obtain repeated sworn declarations
from Defendants confirming their compliance with discovery obligations, because
Defendants were continually caught concealing additional documents.  *See* Dkt. 79 at
2 (Jan. 10, 2023 order requiring Ripps to verify that he has produced "all relevant non-
privileged documents"); Dkt. 145 (order requiring Defendants to file a declaration that
they have produced relevant documents).  Although the Court did not award Yuga
Labs fees for these discovery violations, each fee request was nonetheless in response
to Defendants' egregious and repetitive discovery violations.  If Defendants took issue
with Yuga Labs' discovery strategy, they should have raised it with the Court during
discovery, yet they did not, and thus this issue is waived.

Defendants' persistent refusal to take any responsibility for their conduct
merely highlights how their tactics have increased the time and expense of this
litigation.

**Ms. Kindler Properly Updated Her Calculations With New Information:**
Ms. Kindler supplemented her damages calculation with new information once it
became available; she did not change her prior analysis.  *See* Trial Tr. 179:2-5 ("based
on additional events that had transpired and available market data, that I could then

update my analysis to show the impact of what I had already identified previously as likely holdouts in the marketplace."). Ms. Kindler initially calculated "a 'floor' for what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the RR/BAYC NFT collection." Kindler Decl. (Dkt. 338) ¶ 72. Then, based on new data made available by Defendants' posts to their followers regarding the buyback estimate (which also prompted an increase in the price and trading volume of the infringing NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor value for a hypothetical buyback significantly underestimated the actual cost of such an exercise, as I originally opined." *Id.* ¶¶ 73-74. "Based on these materials and available market data, my assignment was to estimate a 'ceiling' for what a buyback would cost. I determined the cost to purchase and destroy all RR/BAYC NTFs could even be higher than $797,183,838 . . . based on the then-current floor price of authentic BAYC NFTs." *Id.* ¶ 74.

**Defendants' Intentionally and Willfully Confused Consumers:** Defendants' contention that Yuga Labs abandoned its claim of willfulness is irrelevant because the Court already found Defendants willfully infringed. *See supra* ¶ 7; SJ Order at 12 (citations omitted); *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993)* ("[w]illful infringement carries a connotation of deliberate intent to deceive."). Likewise, Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.

**Defendants' Reply:**

First, Yuga ignores the requirement that the losing party's position in this case must be "objectively meritless" or frivolous to support an exceptional case finding in this district. *See Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at *4-5 (C.D. Cal. 2017) (rejecting exceptional case finding in trademark case because claims were not "frivolous");

1    *Sch. Dist.*, No. 18-cv-01582-AB-AFMx, 2019 WL 7841083 at *2 (C.D. Cal. Sept. 25,

2    2019); *Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058-ODW (JPRx), 2021

3    WL 2414856 at *2 (C.D. Cal. June 14, 2021) ("Courts in this district have held that a

4    party's litigation position must be objectively meritless for a case to be

5    exceptional…").  They focus their criticisms on Defendants' *Rogers* defense.  As

6    explained above, a *Rogers* defense is a common defense in trademark defense.

7    Further, there was evidentiary support that Defendants believed in good faith that they

8    were in good faith involved in an act of protected speech through art.  *See* Ripps Decl.

9    ¶¶ 180-91 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 208-12 (Dkt. 344); JTX-2086

10   (disclaimer identifying Ryder as artist and Yuga as subject of criticism); JTX-

11   801.000508; 804.008; Hickman Decl. (Dkt. 245) ¶¶ 190-205.  Although ultimately

12   unsuccessful, the *Rogers* claim was not frivolous as is required to support an

13   exceptional case finding.

14        Second, Defendants engaged in good faith settlement discussions given that

15   their rights were on the line and a good faith belief in the substantive strength of their

16   possible success on appeal.  Instead, it was Yuga how proposed settlement terms that

17   this Court informed it were unavailable and "quite frankly unreasonable."  Dkt. 334 at

18   9:9-12.  Yuga cannot offer unreasonable terms and then claim that it was Defendants

19   who offered unreasonable terms.  Despite any claim to the contrary, Yuga did not

20   withdraw its unreasonable terms, it merely moved them into their proposed injunctive

21   relief.  As such, any action by Defendants cannot support entering an exceptional case

22   finding against Defendants.

23        Third, Yuga's argument that Defendants have re-litigated issues in this case is

24   incorrect because it both ignores the relevance of intent to the case even as it went to

25   trial and also confuses different aspects of intent.  On the contrary, Defendants made

26   clear that they were *not* re-litigating the issues decided at summary judgment, namely

27   liability.  However, Defendants were—as is their right—defending themselves from

28

paying an inordinate amount on the claim.  The majority of Yuga's argument about re-

litigation revolves around issues of intent.  Yuga is attempting to win excessively

broad injunctive relief and disgorgement.  *See* Dkt. 315-I.  Intent is an important

factor for disgorgement damages.  *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct.

1492, 1497 (2020).  Disgorgement is only warranted in cases of "conscious

wrongdoers."  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL

4596697, at *17 (C.D. Cal. July 29, 2022).  Further, to the extent Yuga is making a

law of the case argument, it is misplaced because, a summary judgment decision is a

preliminary decision, so law of the case does not apply.  *Shouse v. Ljunggren*, 792

F.2d 902, 904 (9th Cir. 1986).  It is also true that even if it did apply, a factual finding

can matter for one issue—for example the *Rogers* defense—but does not apply to a

different issue, for example damages.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-

SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that preliminary

decision on one issue does not bind court as to similar issue later in case).  As such,

Defendants were correct to be able to continue to press matters that are still relevant to

the case.

Fourth, Yuga's contention that it is entitled to an exceptional case finding based

on allegedly rehearsed and non-responsive monologues at trial is incorrect and

waived.  First, its citations to the record implicate issues of intent.  *See e.g.* Trial Tr.

[Cahen] 229:3-13 (explaining the point of the project was protest); *Id.* 231:21-232:3

(explaining how Apemarket fit into protest intent).   Regardless, Yuga never objected

to Defendants objections on relevance grounds.  Thus, to the extent they are making

an evidentiary objection it is waived.  *See Fenton v. Freedman*, 748 F.3d 1358, 1360

(9th Cir. 1984).  Further, Yuga never sought to reopen any depositions.  Yuga's

citation to *Jackson v. Gaspar*, does not assist it, because in that case the parties were

previously chastised for their conduct at deposition.  *Jackson v. Gaspar*, No. 2:19-cv-

10450-DOC-E 2022 WL 2155975 at *5 (C.D. Cal. 2022) (citing prior docket entry

1   sanctioning party).  That kind of history within this case is simply not present.

2   Notably, Yuga  never brought any motion to reopen any deposition.

3   Yuga's argument that Defendants failed to produce documents is incorrect and

4   rebutted both in the record and at trial.  At trial, Mr. Ripps explained that he produced

5   everything to the best of his ability.  Trial Tr. [Ripps] 269:10-270:18.  Mr. Ripps

6   further testified that Yuga had sought sanctions multiple times based on Yuga's false

7   accusations of discovery misconduct, and that this Court denied all of Yuga's baseless

8   motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise

9   given that the verification stated "[I] produced all responsive documents that I have

10  been able to locate after a reasonable search" and further stated "I also understand that

11  discovery obligations are continuing, and I will produce any additional responsive

12  materials or information to the extent any are found based on a reasonable

13  investigation.  *I reserve the right to make changes or additions to any of these*

14  *answers or document productions* if it appears at any time that errors or omissions

15  have been made or if more accurate or complete information becomes available." Dkt.

16  109-33 (emphasis added).  Mr. Ripps fulfilled his discovery obligations and upheld

17  his verification by providing all the responsive material he located after a reasonable

18  search to the best of his knowledge.  In short, Yuga has not produced any evidence

19  that Mr. Ripps did not produce documents in bad faith, nor has it shown that Mr.

20  Ripps was dishonest on the stand.

21        Yuga once again relies on the easily distinguishable cases. *Te-Ta-Ma Truth*

22  *Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 251-52 (7th

23  Cir. 2004) (calling opposition in lawsuit a "race traitor" and threatening to place them

24  in Concentration camps).  Defendants' tweets referenced by Mr. Ball in his

25  declaration in support of the summary judgment motion are simply different in kind to

26  the threats in *Te-Ta-Ma*.  *Compare* Dkts 149-50; 149-51 with *Te-Ta-Ma*, 392 F.3d at

27  251. *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, (9th Cir.

28

1   2002), also provides no support for Yuga.  It involved a party showing up pretending

2   to be the plaintiff at trade shows.  *Id.* at 894.  Nothing similar to that occurred in this

3   case.  Yuga's accusation that this was all simply "the litigation game" to Defendants

4   and their counsel is improper, especially because it was clearly seeking shelter from

5   good-faith criticism.

6          Likewise, the argument that Defendants have somehow breached an agreement

7   not to bring up issues of "inflammatory" material is factually incorrect and ignores the

8   well-trodden discussion that intent is still at issue.  All of Yuga's citations to the

9   record involve discussions of intent.  As Yuga is seeking intent-laden damages,

10  Defendants should be able to explain their intentions.  As such, Defendants were

11  permitted to discuss their motivations.  Beyond that, to the extent there was an error, it

12  was an evidentiary issue as Yuga admits.  *See Citation to* Dkt. 334 at 61:9-11.  Yuga

13  never objected to *any* of this testimony as improper or irrelevant and therefore they

14  cannot be heard now to complain about it.  *Fenton v. Freedman*, 748 F.3d 1358, 1360

15  (9th Cir. 1984).

16         Yuga's claim that Defendants were engaged in using this litigation in an effort

17  of "engagement farming" is also unsupported.  They cite several Tweets including

18  JTX-938, JTX-1568, and JTX-1617.  JTX-938 is a Twitter post by Mr. Cahen

19  commenting on a news article that failed to mention that Yuga stole Defendants' idea

20  for ApeMarket.  JTX-1568 is a post where Mr. Cahen states his opinion that this

21  lawsuit was a poor business decision.  JTX-1617 and JTX-1620 are posts reporting the

22  filing of specific public documents in this case.  These are all ordinary

23  reporting/commentary activities that numerous users on Twitter routinely engage in.

24  Nothing in these exhibits contains evidence of "intent to harm" or anything out of the

25  norm for Twitter activity.  Further, subpoenas served on Paris Hilton and Jimmy

26  Fallon and Mr. Cahen's Tweets about them do not serve as the basis for an accusation

27  of "engagement farming."  Like the other Tweets, this was nothing out of the norm for

28

1  Twitter activity.  Lastly, at the time of the Tweets, ApeMarket was no longer in
2  existence.

3        Yuga's accusation that Defendants violated the protective order so they could
4  intentionally harm Yuga is not well-taken.  Yuga is aware that Defendants worked
5  hard to fully redact their summary judgment response in good faith despite Yuga's
6  exceedingly tardy request to seal.  *See* Dkt. 176 (explaining situation).  This was
7  despite being given ample time to provide their redaction requests.  *See* 176-1
8  (explaining Yuga did not act for over one week).  There is absolutely no evidence that
9  Defendants did anything to intentionally harm Yuga.  To the extent that Yuga was
10 harmed, it was through inadvertence (and was addressed fully in the Court's order,
11 Dkt. No. 194).  Likewise, Yuga is aware that Defendants have *long* criticized the
12 name choices of its co-founders.  On May 15, 2022 Mr. Ripps tweeted out a tweet
13 which corresponds with the four co-founders names.  JTX-2097; Ripps Decl. ¶¶ 155-
14 56 (Dkt. 346) (uncontested).  These criticisms *far* pre-date Mr. Atalay's deposition.
15 The fact that Mr. Cahen was parroting prior made accusations on a day where they
16 were likely on his mind does not prove that he revealed information that was not
17 publicly known.  In fact, Mr. Atalay and Yuga have both publicly acknowledged his
18 use of the "Emperor Tomato Ketchup" moniker.

19       Yuga then claims that this court cannot consider Yuga's litigation misconduct.
20 "The Court also considers the conduct of ***both parties*** throughout the case." *Jackson*
21 *v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24,
22 2022).  Therefore, it is proper for this Court to consider Yuga's actions and whether it
23 is entitled to injunctive relief.  Yuga's litigation actions preclude it from injunctive
24 relief because they engaged in scorched Earth tactics in an attempt to coerce
25 Defendants into signing away their rights.

26       First, Yuga has acknowledged that a Yuga employee threatened Rodney Ripps,
27 but instead argues that it was nothing more than "blowing off steam."  Dkt. 97 at 4.

28

1  Rodney Ripps felt threatened enough to file a police report in response to this action.

2  Yuga now states—without evidence—that Defendants have committed death threats

3  against Yuga parties.  This should be disregarded as without evidentiary support.

4  Yuga also never remediates the fact that its subpoena to Rodney Ripps was facially

5  invalid.  It was instead intended to bring the case "close to home" for Mr. Ripps and

6  cause him fear and discomfort.  As for the other subpoenas served by Yuga they

7  sought documents and information far beyond what the witnesses would know and

8  witnesses such as Ian Garner commented on Yuga's aggression in discovery as "quite

9  predatory." Garner Depo. at 190:9-17.

10  Yuga attempts to flip its effort to wrongfully conceal Ryan Hickman's

11  deposition as Defendants' fault.  A quick glance at the Court's order quickly disabuses

12  that notion.  The Court was clear that Yuga took an untenable position regarding its

13  over-designation of Mr. Hickman's deposition.  *See* Dkt 133 at 2 ("The Court does not

14  understand why Yuga designated the entire Hickman deposition transcript as

15  HC/AEO, even the portions not discussing HC/AEO documents. The Court also faults

16  Yuga for conditioning de-designation of the Hickman deposition transcript on

17  obtaining de-designation of the HC/AEO documents discussed at the Hickman

18  deposition.).  It clearly held Yuga at fault for its actions, chastising Yuga for "holding

19  the transcript hostage."  *Id.*  The fact that the Court granted relief that Yuga suggested

20  if it lost the motion does not change the fact that Yuga acted wrongfully and did, in

21  fact, lose and wrongfully hold the transcript hostage.

22  Yuga claims that its improper hiding of materials related to Mr. Lehman's

23  settlement was permissible because were not accused of good faith similarly tries to

24  ignore something fundamental about the decision.  It in all bold it demands that Yuga

25  produce the withheld documents within three days.  Dkt. 159 at *1.  The court noted

26  that all of Yuga's arguments against disclosing this evidence was "fatally

27  undermined" by Yuga's "unfettered use of Lehman's declaration" to support its

28

1   positions.  *Id.* at *3.  In short, Defendants' motion to compel the Lehman materials

2   was an unmitigated victory for Defendants.

3          Yuga tries to argue that its pattern and practice of seeking sanctions and failing

4   somehow denotes success, and cites to two docket entries.  The Court did not, in fact,

5   grant Yuga's motion to compel and stated that it "cannot discern what discovery

6   requests remain in dispute" when rejecting Yuga's position.  Dkt. 79 at *1.  Dkt. 145

7   also rejects Yuga's spoliation sanctions request as being made "with no direct

8   evidence."  Dkt. 145 at *1.  Further, as mentioned above, Defendants complied with

9   discovery obligations to the best of their ability and explained as much at trial.  Trial

10  Tr. [Ripps] 269:10-270:18.  Yuga cannot escape the fact that it used baseless claims

11  for sanctions as a litigation technique.  This Court should take that into consideration

12  when considering Yuga's request for relief.

13         Yuga tries to defend its 400-fold increase of its damages estimate from Ms.

14  Kindler by calling it proper.  The 400-fold increase was absurd on its face.  Notably,

15  Yuga backed down from this number for the purposes of trial.  *See* Trial Tr. [Kindler]

16  174:14-18.  Yuga attempts to remediate this by pointing out that the floor price had

17  increased.  But Yuga fails to grapple with the fact that the floor price had actually

18  *fallen* from the time of her first report.  *Id.* at 186:2-12.  The $787 million figure was a

19  figure that Yuga certainly knew it was never going to receive.  Instead it was

20  obviously intended to scare Defendants into settling.

21         Lastly, Yuga falsely claims that this Court found "willful infringement."  ***That***

22  ***is false.***  The Court expressly rejected Yuga's request for a willful infringement

23  finding at summary judgment, and the Court cannot find willful infringement at trial

24  without violating the Defendants' Seventh Amendment rights.  Courts have

25  repeatedly recognized that "willfulness is an issue for the jury." *Exmark Mfg. Co. Inc.*

26  *v. Briggs & Stratton Power Prods. Group, LLC*, 879 F.3d 1332, 1353 (Fed. Cir.

27  2018).  Yuga's waiver of "all legal remedies" thus waived any claim of willful

28

infringement, and Defendants are thus entitled to a judgment of no willfulness. *See also* Dkt. 236 at 13 (Yuga conceding that it is not pursuing a claim of willful infringement). Likewise, Yuga this court never made a finding on willfulness. In fact, the terms "willful", "willfulness" or "willful infringement" never appear in the Summary Judgment motion. *See* Dkt. 225. Willfulness is its own legal concept that appears in the Lanham Act. *See* 15 U.S.C. 1117(c)(2). Infringement is not willful if the alleged infringer has a good faith belief that they were not infringing. *See SA Music LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 882 (N.D. Cal. 2022). The Court simply never discussed Defendants good faith.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 62, lines 18:19-22:**

For example, Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks. SJ Order at 12, 15. This intent is evident throughout their internal communications. *See, e.g.,* JTX-801.155, JTX-801.185, JTX-801.208, JTX801.237, JTX-801.238, JTX-801.239, JTX-1574, JTX-1586.

**Defendants' Basis of Dispute:**

Defendants did not infringe on the BAYC marks with the intent to deceive customers or act with a bad-faith intent to profit off of the marks. Defendants were involved in good-faith criticism of Yuga and its products. Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense. JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested). Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps. The only direct evidence about Mr. Ripps's intent is his declaration, and it should be credited over Yuga's statements because Yuga did not challenge his declaration.

1    Yuga's citations to the internal chat are misleading and omit several aspects of

2    the internal chats which show a desire to avoid confusion or to criticize Yuga.  *See*

3    JTX-801.448-49; 801.508; (calling project "education") 801.606-08; 803.005;

4    803.0029-30; 804.008.  They also ignore efforts by Defendants to *avoid* being

5    confused with Yuga.  *See* JTX-2085; 2086; 2103.  Defendants do not like BAYC, and

6    do not like Yuga or its activities.  Ripps Decl. ¶ 138 (Dkt. 346) (uncontested).  They

7    did not want to, and were not, confusing purchasers of RR/BAYC NFTs into

8    erroneously believing that they were purchasing a Yuga product. *Id.*  In fact, Yuga

9    cannot point to a single instance of consumer confusion. Trial Tr: [Solano] 18:18-

10    19:15.

**Plaintiff's Response:**

12    Defendants' objection should be rejected because (1) Defendants' infringement

13    was not in "good faith"; (2) Defendants intended to confuse consumers; (3) Mr.

14    Ripps' declaration is not credible; (4) Mr. Ripps' Declaration is not uncontested; and

15    (5) Yuga Labs has produced ample evidence of confusion.

16    **Defendants' Infringement Was Not In Good Faith:**  Defendants' contention

17    that their infringing NFTs were good faith criticism is not supported by the evidence.

18    To the contrary, the relevant evidence demonstrates that Defendants intended to use

19    Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of

20    RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-

21    801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement

22    could not have been in good faith because, even after the Court found their

23    infringement was likely to cause confusion and was not art protected by Rogers and

24    the First Amendment, Defendants intentionally continued to infringe on Yuga Labs'

25    Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants'

26    @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a

27

28

1 marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt.

2 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19; *see also*, *supra* ¶ 4.

3      Moreover, Defendants' *Rogers* and First Amendment defenses have already

4 been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were

5 commercial trademark infringement.  *Id*.  And, the Court has already decided the issue

6 of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs'

7 BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from

8 their use of the marks.  SJ Order (Dkt. 225) at 12-15.

9     **Defendants Intended To Confuse Consumers:**  In granting Yuga Labs'

10 motion for summary judgment, this Court held that Defendants intended to deceive

11 consumers:

12     When the alleged infringer knowingly adopts a mark similar to

13 another's, reviewing courts presume that the defendant can accomplish

14 his purpose:  that is, that the public will be deceived." . . . In this case,
Defendants knowingly and intentionally used Yuga [Labs'] BAYC

15 marks.  Because Defendants knowingly and intentionally used Yuga

16 [Labs'] BAYC marks, and in the absence of contrary evidence, the
Court concludes that Defendants used the BAYC marks in an effort to

17 confuse consumers. . . . In addition, the Court concludes that

18 Defendants intentionally designed the RR/BAYC NFTs and sales
websites to resemble Yuga's branding.  For example, Defendants listed

19 the RR/BAYC NFTs on rrbayc.com under the very same Ape ID

20 number associated with BAYC NFTs, despite having their very own
unique and different ID numbers.

21 SJ Order at 12 (citations omitted).  Similarly, the Court already determined that

22 "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit

23 handbag."  *Id*. at 16.  Indeed, the accused actions "are all commercial activities

24 designed to sell infringing products, not expressive artistic speech protected by the

25 First Amendment."  *Id*.  Defendants' infringement is thus not art.  Instead,

26 "Defendants' use of the BAYC marks is explicitly misleading."  *Id*. at 17.  Finally, the

27

28

Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15. Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues. Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement. Defendants discussed making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally." JTX-803.57. And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*). But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Privately, Defendants also discussed strategies to "cannibalize" the secondary NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC NFTs. JTX-801.203; JTX-801.144. Mr. Cahen bragged about being "pretty elite at getting engagement on twitter." JTX-801.203. Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC NFT. JTX-801.289-290. They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs. *Id.*

Publicly, Defendants made false representations about the RR/BAYC NFTs that implied owning one offered equivalent benefits to owning a genuine BAYC NFT. JTX-1037. Defendants published their promotions from their individual Twitter accounts and from the commercial @ApeMarketplace account advertising their forthcoming NFT marketplace. These advertisements were also directed at BAYC NFT owners specifically. Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶ 46, 49. Defendants were aware of the harm that RR/BAYC NFT sales would have on Yuga Labs. JTX-42; Trial Tr. at 208:16-209:6. Through their communications,

1  Defendants revealed their true intent to profit from the infringing use of Yuga Labs'

2  BAYC Marks.

3        **Mr. Ripps' Testimony Is Not Credible:** Mr. Ripps' testimony is not credible,

4  as demonstrated by its contradictions by the evidentiary record, other testimony, and

5  impeachment at trial.  For instance, in his trial declaration Mr. Ripps testified that he

6  "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl.

7  (Dkt. 346) ¶ 178.  However, ApeMarket was ready to launch within a matter of days.

8  *See* Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February

9  – excuse me – by June 24, 2022?  A:  Among other things, yes[.]"); JTX-1027 (post

10  from Ape Market twitter account advertising that "ApeMarket.com will go live within

11  24 hours of the final mint, which we will announce shortly"); JTX 696 (posts from

12  Ape Market Twitter account).  This confirms Mr. Atalay's testimony that the Ape

13  Market source code "was in such a state of completion that it was operational."  Trial

14  Tr. at 137:23-24.

15        Mr. Ripps also testified that his "intention in making the RR/BAYC artwork

16  was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However,

17  documents entered into evidence at trial showed that Defendants intended to "make

18  like a million dollars."  JTX-1574; *see also* Solano Decl. (Dkt. 342) at ¶ 72 ("Based

19  on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that

20  he made over $1.2 million on his scam, implying no one could stop him from

21  counterfeiting NFTs and harming the goodwill of the BAYC brand.").  And, as a

22  further example, Mr. Ripps testified that he minted the RR/BAYC NFTs to his

23  "personal wallet, ryder-ripps.eth" despite the fact that the "ryder-ripps.eth" name did

24  not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs.

25  *Compare* JTX-25, *with* JTX-36.  Thus, Defendants' narrative that customers would

26  not be confused because they could see the NFTs were minted from Mr. Ripps' wallet

27  is belied by the fact that the wallet displayed Mr. Ripps' name *after* the initial mint

28

1  and customers would not encounter the "ryder-ripps.eth" creator tag had they even

2  tried to look.  While Mr. Ripps attempts to couch his lies in "sarcasm," the ultimate

3  effect was confusion in the marketplace and a significant payday for Defendants.

4      Mr. Ripps also repeatedly lied about his discovery obligations, claiming that he

5  had produced all responsive documents related to the RR/BAYC NFTs, but then

6  producing additional documents after Yuga Labs independently discovered evidence

7  of improper withholding.  *See* JTX-1541; Dkt. 109-42; Dkt. 158; JTX-1574-JTX-

8  1591.  Defendants have no excuse for their repeated improper withholding of material

9  evidence and repeated lies under oath.

10     Mr. Ripps' testimony that the text message presented to him at trial did not have

11 anything to do with the RR/BAYC project is another blatant lie.  These documents

12 that Mr. Ripps wrongly withheld until after Yuga Labs' summary judgment

13 submission included text messages discussing airdropping more of Defendants'

14 infringing NFTs to the wallets of those who have already purchased them.  Thus, Mr.

15 Ripps' testimony that he did not "really find it to have anything to do with the

16 RR/BAYC project" is unbelievable.  Trial Tr. at 268:17-21; JTX-1574 (text messages

17 in which Mr. Cahen suggests Mr. Ripps "airdrop like 10 more to each person who

18 already bought one" and that if Mr. Ripps airdropped "20-30" he would "sell out

19 within 48 hours" and "make like a million dollars").  Mr. Ripps' testimony reiterates

20 what is obvious from the record:  Defendants' stories change based on what is

21 convenient for them at the time.  Mr. Ripps, a proven liar, is not a credible witness.

22 His intent to infringe is proven by his own words In the documentary evidence.

23     And Mr. Ripps' testimony that he never marketed his infringing NFTs with the

24 "Bored Ape Yacht Club" marks is also not credible.  Ripps Depo. Designations (Dkt.

25 369) 61:5-9.  Significant evidence proves the contrary.  *See, e.g.,* JTX-28 (Defendants'

26 Foundation page listing their infringing NFTs as "Bored Ape Yacht Club").

27

28

**Yuga Labs Sufficiently Contested Mr. Ripps' Declaration:**  Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial declaration, Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at trial Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A: Among other things, yes[.]").  Another glaring contradiction is that Mr. Ripps testified that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, text messages entered into evidence demonstrated that Defendants intended to "make like a million dollars" off of their infringement.  JTX-1574.  Evidence further entered at trial depicted Mr. Ripps publicly bragging about the millions of dollars he made off of his use of Yuga Labs' marks.  *See* Solano Decl. (Dkt. 342) ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying that no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  Mr. Ripps' associates also confirmed this financial motive.  JTX-801.208 (Mr. Cahen:  "priorities:  getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); Hickman Depo. Designations (Dkt. 394) at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software"); JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs

on Ape Market.").  Mr. Ripps can attempt to couch his lies in "sarcasm," but the ultimate result was confusion in the marketplace and a substantial payday for Defendants.  Simply repeating falsehoods and repeatedly rejected immaterial claims, as Mr. Ripps does in his declaration, does not make them true or material to the Court's remaining decisions.

Moreover, at trial, Yuga Labs demonstrated that Mr. Ripps is an unreliable witness.  During cross-examination, Mr. Ripps admitted to his dishonesty during discovery and his lies in prior declarations submitted under oath.  Trial Tr. at 268:12-25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of perjury that he has "produced all responsive documents that I have been able to locate after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-investigated my platforms and taken reasonable efforts to search for additional material for collection" and "[a]ll responsive materials that I have collected during my investigation has been provided to my attorneys and I have given permission to produce those materials with appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has "produced all relevant, nonprivileged documents" subject to Court's order compelling production).  Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants withheld numerous documents (including their text messages with each other) until March 21, 2023 — after Yuga Labs had filed its motion for summary judgment.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

Yuga Labs' cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to

conclude that he lied to avoid the consequences of his infringement.  Therefore, ***his entire declaration*** cannot be relied upon.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**There Is Ample Evidence Of Confusion In The Record:**  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'")

1  (citation omitted).  In any event, actual confusion is not required; and the Court

2  already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

3  at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

4  regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

5  *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

6  profits even where infringement claims premised solely on post-sale confusion where

7  a "potential purchaser, knowing that the public is likely to be confused or deceived by

8  the allegedly infringing product, [] choose[s] to purchase that product instead of a

9  genuine one").

10                    **Defendants' Reply:**

11         Yuga claims that Defendants could not have acted in good faith criticism and

12  because Plaintiffs allegedly sought to profit and continued to "promote" rrbayc.com

13  on the ApeMarket Twitter account after the granting of summary judgment.  Yuga's

14  response is incorrect for several reasons: (1) the main support for Yuga's response is

15  Mr. Solano's unreliable testimony, (2) Defendants acted in good faith because they

16  believed the RR/BAYC collection was permissible criticism and took many steps to

17  avoid confusion, (3) Mr. Ripps, who testified at length regarding the RR/BAYC

18  project in his declaration, was credible, (4) Yuga failed to impeach Mr. Ripps, and (5)

19  there is ample evidence of no confusion.

20         *First,* Yuga primarily relies on the declaration of Mr. Solano to argue that

21  Defendants acted intentionally to deceive consumers.  Mr. Solano is not credible given

22  the many false and misleading statements contained in his declaration.  For example,

23  Mr. Solano was forced to concede on cross-examination that his sworn declaration

24  included a false statement claiming that Defendants continue to receive royalties from

25  sales on secondary marketplaces:

26

27

28

Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?

A.   Yes.

Q.   So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.   ***They don't continue to increase; correct, sir?***

A.   ***Correct.***

Q.   ***That statement, that part of your witness statement is incorrect; right?***

A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A

Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

   ***Second***, Yuga's argument that Defendants' intended to confuse consumers is baseless. The evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04. Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps

1  to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.

2  346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT

3  collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the

4  NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]

5  80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would

6  have probably seen these collections using the Bored Ape Yacht Club trademarks at

7  the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There

8  are "literally thousands" of products that use Yuga trademarks without sponsorship or

9  affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

10 notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

11 cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

12 Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

13 2075.

14       Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

15 holder of a BAYC NFT containing the asserted marks and having received IP rights

16 associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

17 Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

18 of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

19 Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

20 allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

21 Your intent in writing the terms and conditions was to allow people to be able to

22 commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

23 the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

24 with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

25 publicly represented that BAYC NFT holders received all IP rights and that Yuga has

26 none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

27 Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

28

someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga also cites to correspondence among the creators discussing a possible fear of litigation.  These discussions are taken out of a broader context of hundreds of thousands of communications the creators made.  Further, whether the Defendants feared possible litigation for criticizing a multi-billion dollar company does not establish that they intended confuse anyone.

Additionally, Yuga points to private chat conversations the creators had about Ape Market.  The portions they cite to do not show any intention to confuse and further ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037, in which he states that "RR/BAYC grants to 100% commercial rights, community member created a shopping site for his! Now you can get the hoodie of your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which has caused

thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and this does not demonstrate an intent to confuse consumers.

**Third,** Mr. Ripps was credible.  Mr. Ripps's declaration was uncontested because Yuga elected to forego any substantive cross-examination of Mr. Ripps on **any** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska, 415 U.S. 308, 316 (1974).*  This is because the purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro, 365 F.3d 699, 702 (9th Cir. 2004)* ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record.  Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial.  This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony. Having failed to challenge Mr. Ripps's testimony at trial, Yuga now seeks to take evidence out of context and mischaracterize documents.  This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace *which we were in the ideation phase of*, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259.   Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.   BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A.   This is a discussion, *an ideation of different ideas, none of which were actualized*.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's declaration regarding his intent in creating the RR/BAYC collection.   The full testimony that Yuga cites provides:

182.   My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.

183.   As an artist, I believed that I could create an "army of educators" through my art.

184.   I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl. ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the record corroborates Mr. Ripps's statements.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30. Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters

expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen.   And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in response to more jokes from Mr. Cahen (again, not a reference to any intent to profit). *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.    Yes.
>
> Q.    So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.    It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.    ***They don't continue to increase; correct, sir?***

A.   *Correct.*

Q.   *That statement, that part of your witness statement is incorrect; right?*

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's

1    testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also
2    been rebutted.  Mr. Solano could not identify a single person that ever bought an
3    RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,
4    no one has been able to identify a single confused consumer in the entirety of this
5    case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

6         Yuga then incorrectly argues that Mr. Ripps's statement about his intent is
7    refuted by comments from other members of the RR/BAYC project.  But these
8    statements show no such thing.   For example, Yuga's cites JTX-801.208 in which
9    Mr. Cahen states that a priority is "getting RR/BAYC to sell out."  But as Mr. Cahen
10   explained at trial, the whole point of broad exposure through the RR/BAYC collection
11   (including getting people to reserve NFTs) was "spreading and magnifying criticism
12   of Yuga."  Cahen Decl. ¶ 98 (Dkt. 344).  And Mr. Cahen's private communications in
13   the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for
14   artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these
15   things.  It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary
16   focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes
17   a strong statement.  This is art, not Pokemon cards." (JTX-801.00013); "Because
18   that's where the real importance lies.  RR/BAYC truly is very important conceptual
19   art imo.  And now we are all helping shape that art further." (JTX-801.00196).
20   Yuga also cites Mr. Hickman's deposition testimony in which he stated that his
21   "financial arrangement" was "a software developer being compensated for making
22   software."  Hickman Depo. Designations (Dkt. 394) at 129:3-6.  But Mr. Hickman's
23   testimony about this topic at trial was unequivocal about his purpose in participating
24   in the RR/BAYC project:

25        Q.    Why did you expect to make less from your work on this RSVP
26              contract than your normal rate?

27
28

A.  I was contributing because I believe in standing up for the illegitimate business practices and imagery in this Yuga Labs BAYC NFT collection.

Trial Tr. [Hickman] 221:11-15.  Mr. Hickman further explained, "We are selling a receipt that says *I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs point to the same resource." Trial Tr. [Hickman] 222:18-21 (emphasis in original).

Yuga also cites to Mr. Lehman's declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture."  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family. Yuga's attorneys, not the Defendants, coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023, verification.  But Yuga's cross-examination did not result in any impeachment or inconsistency:

Q.  You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?

A.      I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

Q.      And, Mr. Ripps, the text messages that you produced in this case include the RR/BAYC chat; right?

A.      Yes.  We produced everything that we could, despite the fact that Yuga produced nothing.

Q.      Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?

A.      I don't have it on the screen, but I see you holding them, and I see them –

Q.      Do you see it now?

A.      Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.

Q.      Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

A.      Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and

further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation. ***I reserve the right to make changes or additions to any of these answers or document productions*** if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added). Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration. Yuga had an opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but elected not to do so. Mr. Ripps's testimony was therefore unchallenged.

***Fourth,*** Yuga failed to impeach Mr. Ripps because, as explained, Yuga's cross-examination regarding Mr. Ripps's production of documents did not show any inconsistency and, in fact, the very verification that Yuga references made that Mr. Ripps acknowledging ongoing discovery obligations and reserved the right to make supplemental productions. Dkt. 109-33.

***Fifth,*** there is ample evidence that there was ***no*** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps

Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.
Mr. Ripps insisted on these requirement and additional steps so that the artistic
purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman
Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had
a negative impact on usability? …  A.   … Ryder wanted it and so he had the final
call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many
people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps
Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a
single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial
Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,
Yuga's founders were also not aware of a single instance of actual confusion.  Trial
Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,
what you were focused on. Yuga Labs has been unable to identify even[] a single
person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;
right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was
consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.
O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two
flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that
she used an overly expansive definition of the market that included people who did
not have any interest in purchasing an NFT, much less knowledge of what an NFT is.
Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.
She acknowledged that she changed the survey population after running pretests to
make it more inclusive. *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that

1    she lacked basic knowledge about the NFT market, admitting to erroneously believing

2    that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*.

3    at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

4    that could not show confusion because the market was too broad.  This was despite

5    her acknowledgement that choosing the right sample population "matters for the

6    analysis" and choosing an improper sample population would be a mistake.  *Id.* at

7    146:18-25.

8         Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

9    she authored an article titled, "Which Method is For You? Not All Surveys Are Made

10   the Same" JTX-314.  In that article she discusses choosing between the Squirt and

11   Eveready surveys on the basis of the strength of the mark.  In this case, however, she

12   ignored her own advice and operated both surveys.  This was despite acknowledging

13   that at her deposition she agreed with her earlier advice that the Eveready survey is

14   most appropriate when the mark is strong, and the Squirt survey when the mark is

15   weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

16   strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it

17   was the first case she personally testified in where she offered an opinion based on

18   both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

19   surveys, but by not doing so she did not produce a finding of value on either survey.

20        Ms. O'Laughlin also could not explain the extremely strong priming effect

21   which influenced her results to her Everready survey.  In that survey, people were split

22   into those who saw a version of the RR/BAYC Foundation page that included the

23   words "Bored Ape Yacht Club."  Those in the control group of the experience would

24   see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

25   the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those

26   in the control group who copied down the words "Chill Gorilla Boat Crew" were not

27   counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of

28

1   those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not

2   counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that

3   she did not account for this extreme priming effect calling it "not particularly

4   relevant."  *Id.* at 158:20-159:1.

5        Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the

6   versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

7   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

8   fundamentally flawed, she can attest to confusion on two websites for only a matter of

9   days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court

10  should reject them and provide them no weight.

11       Further, this unreliable survey evidence, again does not show that anyone who

12  actually reserved an RR/BAYC NFT was confused about its origin and, therefore,

13  does not undermine the accuracy of this finding of fact.

14       The documentary evidence Yuga cites to is also unsupportive. For example,

15  Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated

16  software application and not evidence of a real person's confusion. *See* Cahen Decl.

17  ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users

18  identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no

19  indication that any of the Twitter users commenting actually reserved an RR/BAYC

20  NFT.  This evidence provides no support for an argument that this finding of fact is

21  inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are

22  quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-

23  1035 (Out of context one off tweets of users, that there is no evidence to believe

24  purchased an RR/BAYC NFT, replying to GemBot).

25       Yuga also cites to private chats that the RR/BAYC creators used.  These

26  exhibits are unsupportive of a finding that there was actual confusion.  For example,

27  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

28

1  marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

2  suggestions about what they could do to make it even more clear.  Further, this chat

3  focused on the creation of ApeMarket, which never was launched and could,

4  therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

5  (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

6  ApeMarket clearer).

7        Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

8  exhibit does not support a finding of actual confusion.  The chart separately lists both

9  "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

10  understood that these were two different projects.  Additionally, as Mr. Cahen

11  testified, he is not aware of anyone who watched the Bloomberg program and reserved

12  an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

13  344).

14        Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

15  credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

16  case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

17  case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

18  entered after Mr. Lehman settled his own case with Yuga.

19        Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

20  LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

21  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

22  a finding of consumer confusion as any consumer had the ability to determine the

23  provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt.

24  346) (uncontested).  Further, this does not undermine the finding of fact as this does

25  not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

26        Finally, Yuga cites to its own declarations and trial testimony where their

27  witnesses make conclusory and unfounded statements about possible confusion.  *See*

28

1   Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

2   (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

3   392) at 53:14-54:22. These statements do not support a finding, however, that anyone

4   who bought an RR/BAYC NFT was actually confused.

5       Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence

6   that consumers believed RR/BAYC NFTs were not affiliated with Yuga.  This is

7   categorically false.  The evidence presented at trial shows that many people who

8   reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶

9   198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-

10   2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

11   presented at trial that showed consumers were not confused about the source of the

12   RR/BAYC NFTs.  Indeed, Mr. Ripps testified in his uncontested declaration: "I

13   received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for

14   standing up against a corporation that had used hateful references in its brand" and

15   then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶

16   196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga

17   dispute this fact.

18       ***Lastly,*** to the extent that it is arguing that the Court foreclosed any evidence of

19   intent, this is incorrect for two reasons.  First, it conflates two different types of intent.

20   The issue of intent is uniquely impacted at the exceptional case and damages stages.

21   The "law of the case doctrine does not apply to pretrial rulings ***such as motions for***

22   ***summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)

23   (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)

24   ("Pretrial rulings, often based on incomplete information, don't bind district judges for

25   the remainder of the case.  Given the nature of such motions, it could not be

26   otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

27   an issue were decided at summary judgment for one purpose, the summary judgment

28

order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*:  the summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged marks applies to only the issue of likelihood of confusion and cannot be applied more broadly.  Here, Defendants' intent is particularly relevant to the determination of whether disgorgement is available and that is an issue that the Court has not decided and needs to weigh the evidence presented at trial on the issue.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  Accordingly, Defendants do not raise that issue to burden the Court's time, as Yuga incorrectly states, but to present evidence on a central issue of the case.  Further, Yuga's assertion that Defendants' objection here constitutes a refusal to accept the Court's orders is inaccurate and misleading.  As stated above, there is ample evidence of Defendants' good faith in creating the marks including evidence of steps taken to ***avoid*** confusion with Yuga.  *See* JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).

**Plaintiff's Disputed Post Trial Conclusion of Law No. 62, lines 18:23-25:**

Even after the filing of this lawsuit and the SJ Order, Defendants continued to promote their infringing RR/BAYC NFTs and Ape Market. *See AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002); *see, e.g.,* JTX-1048; Dkt. 342 ¶77.

**Defendants' Basis of Dispute:**

It is undisputed that ApeMarket never sold a single NFT and never existed as a functional market.  Ripps Decl. ¶¶ 180-81 (Dkt. 346) (uncontested); Trial Tr [Muniz] 85:8-23.  Yuga's citations to the record do not assist its claims, JTX-1048 is not a promotion of ApeMarket, but instead is a Tweet using the common "virgin/Chad"

1  meme format.  This meme format is used to show the difference between a "cool" and

2  "uncool" point of view and was supposed to highlight the how uncool Yuga Labs and

3  the BAYC collection are.  It does not link to apemarket.com—which, as is undisputed

4  by the parties at the time of the Tweet was a non-existent website)—nor does it

5  promote apemarket.com, but instead highlights criticism of Yuga.

6       Yuga's reliance on Mr. Solano's declaration for support serves no better.  His

7  declaration cites to JTX-696 which is a screenshot of the Apemarket Twitter account.

8  However, this only shows tweets dating up to June 20, 2022.  Yuga provides no

9  citation for its point that Defendants promoted RR/BAYC sales, which Defendants

10 have not profited from recently.  Yuga's claim about continued promotion is factually

11 incorrect and therefore cannot support an exceptional case finding.  Moreover, Mr.

12 Solano's testimony was not credible given the many false and misleading statements

13 contained in his declaration, as well as his repeated impeachment at trial.  For

14 example, Mr. Solano was also forced to concede on cross examination that his sworn

15 declaration included a false statement claiming that "Defendants continue to receive

16 royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano]

17 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's

18 declaration, without having considered that the phrase "business venture" was selected

19 by Yuga's counsel, and that Mr. Lehman would have liked to use different words.

20 Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration

21 without having considered that Mr. Lehman knew he could not settle his case without

22 executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano]

23 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his

24 declaration, because Yuga's lawsuit against him would be disastrous to his family and

25 himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also

26 lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial

27 Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was

28

1  created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your
2  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you
3  swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your
4  deposition–- and we can pull it up on the screen–- at page 152, starting at line 13
5  'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection
6  from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your
7  deposition? A Yes." ); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists?
8  A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your
9  deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape
10 Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you
11 give that answer? A Yes.").

12            **<u>Plaintiff's Response:</u>**

13        Defendants' objection should be rejected because (1) the evidence shows that
14 Defendants continued to promote RR/BAYC NFTs and Ape Market and (2) Mr.
15 Solano's testimony is credible.

16        **Defendants Continued To Promote RR/BAYC NFTs:**  Yuga Labs has reason
17 to believe that Defendants will continue to harm Yuga Labs or repeat their fraud.
18 Defendants continued to market RR/BAYC NFTs after this case began.  JTX-1048
19 (Mr. Cahen retweeted a post in January 2023 from @ApeMarketplace on Twitter
20 promoting Ape Market as coming "soon"), JTX-1315, JTX-1613, JTX-1615 (Mr.
21 Cahen promoting RR/BAYC NFT sales on OpenSea Pro in April 2023); Solano Decl.
22 (Dkt. 342) ¶¶74-75.  And they continued to market RR/BAYC NFTs after this Court's
23 summary judgement order.  *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6,
24 58:20-59:19.  Even a month after trial, Defendants still advertise rrbayc.com in the
25 profile heading of the Ape Market Twitter profile.  *See*
26 https://twitter.com/apemarketplace.  As explained above, this account was created to
27 promote the Ape Market marketplace and their infringing RR/BAYC NFTs.  *See*

28

*supra* ¶ 7(h) (lines 4:22-25).  Following this trend, their infringement will likely continue, resulting in further harm to Yuga Labs.  And their ownership of the RR/BAYC smart contract guarantees future harm.  Solano Decl. (Dkt. 342) ¶¶ 46, 78-79.

**Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of Defendants' intentional and repeated use of the BAYC Marks is undisputed and went unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's trial declaration based on a purported lack of personal knowledge were overruled at trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is because Mr. Solano was referring to Defendants' own words promoting their infringement. *See also, supra* ¶ 4.

## **Defendants' Reply:**

It is undisputed that ApeMarket never sold a single NFT and never existed as a functional market.  Ripps Decl. ¶¶ 180-81 (Dkt. 346) (uncontested); Trial Tr [Muniz] 85:8-23.  It does violence to the English language to claim that an account that has not Tweeted since before summary judgment was granted is actively promoting Ape Market—which never existed, or RR/BAYC.  Further, it is undisputed that Defendants have not received royalties on RR/BAYC NFTs for several months.  Mr. Solano was forced to admit as much   Trial Tr. [Solano] 48:15-49:4.  There was no misrepresentation of Mr. Solano's testimony.  He was asked whether he made the statement that royalties were increasing, he said he did and acknowledged that it was a mistruth. *Id.*

Mr. Solano is not a credible witness. At trial, Mr. Solano admitted that he committed a mistruth in his sworn declaration of trial testimony when he was forced to concede on cross-examination that his sworn declaration included a false statement

claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.   Although, those were supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***
>
> Q.   ***That statement, that part of your witness statement is incorrect; right?***
>
> A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Lastly, Yuga's bald assertion that "infringement is likely to continue" should be rejected out of hand because it relies on a wrongful assumption that Defendants will not comply with court orders.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 63:**

Next, Yuga Labs' substantive strength in its litigating position, as evidenced in the Court's Order on Summary Judgment, stands out from the bulk of trademark cases. *See* SJ Order at 22; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017). Ignoring the clear strength of Yuga Labs' case, Defendants relentlessly advanced frivolous legal theories (e.g., calling RR/BAYC NFTs an "art" project, arguing Yuga Labs abandoned its rights to the BAYC Marks, a frivolous

counterclaim for declaratory judgment of no defamation, etc.) that were rendered moot and irrelevant by multiple orders from the Court (*see, e.g.*, Dkt. 62 and SJ Order). Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated litigation and make this an exceptional case. See *San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020).

**Defendants' Basis of Dispute:**

Yuga fails to carry its burden that Defendants' litigating position was so weak as to be frivolous as needed in this district to prove an exceptional case. *Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at *4-5 (C.D. Cal. 2017) (rejecting exceptional case finding in trademark case because claims were not "frivolous"). Under Yuga's test, any summary judgment winner would be entitled to fees in a patent case.  That cannot be correct. Litigants are defeated at the summary judgment stage routinely, but their claims to do not arise to being frivolous.

Yuga's contention that Defendants "advanced frivolous legal theories" such as calling the RR/BAYC project an "art project" among other issues is also incorrect. All of these issues were factually correct, good-faith litigation positions, and/or involved issues of intent which are still relevant to this case, including for an exceptional case finding and damages. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) ("a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate.").  Yuga's view of the case as having these being "re-litigated" issues both ignores the relevance of intent to the case even as it went to trial and also confuses different aspects of intent.  On the contrary, Defendants made clear that they were *not* re-litigating the issues decided at summary judgment, namely liability.  However, Defendants were— as is their right—defending themselves from paying an inordinate amount on the claim.

**Plaintiff's Response:**

Defendants' objection should be rejected because they (1) falsely claim Yuga Labs relies solely on frivolousness to show that this is an exceptional case and (2) ignore the many examples of where they sought to relitigate issues.

**Yuga Labs Does Not Rely Solely On Frivolousness To Show That This Is An Exceptional Case:** An exceptional case is determined based on the "totality of the circumstances," and the strength of Yuga Labs' case is but one of the factors to be considered, along with Defendants' refusal to engage in reasonable settlement discussions, seeking to re-litigate issues already decided, engaging in a pattern of unreasonable and obstruct discovery, attacks against Yuga Labs and its associates, farming for engagement on social media, and public disclosure of protected material in violation of the protective order. *See supra* ¶ 61. Regardless, it is uncommon for a trademark plaintiff to receive summary judgment on its claims. The Court's summary judgment order here highlights how this is an uncommon and exceptional case of clear infringement. *See* SJ Order at 22; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017).

**Defendants Sought To Needlessly Relitigate Many Issues In This Case:** Defendants ignore the many examples where they sought to relitigate issues already addressed and rejected by the Court, unnecessarily complicating and increasing the cost of litigation. *See supra* ¶ 26.

**Defendants' Reply:**

Defendants do not ignore any examples where they sought to relitigate issues in the case because they did not relitigate issues. To the extent this argument is about Defendants intent, the "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

1    district judges for the remainder of the case.  Given the nature of such motions, it

2    could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

3    **aspects** of an issue were decided at summary judgment for one purpose, the summary

4    judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

5    0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

6    evidence of initial police contact was relevant as background, but not to the already

7    decided issue that initial contact was not excessive force).  This case is just like

8    *Sienze*: the summary judgment ruling on Mr. Ripps's and Mr. Cahen's intent in using

9    the alleged marks applies to only the issue of likelihood of confusion and cannot be

10   applied more broadly.  Here the issue of intent was not decided for damages and

11   exceptional case purposes.  Therefore, there was no relitigating.

12         Lastly, while Yuga may not be relying solely on frivolousness, it is still

13   required to prove frivolousness to rely on it even in part.  *See Anhing Corp. v. Viet*

14   *Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at *4-5 (C.D. Cal. 2017)

15   (rejecting exceptional case finding in trademark case because claims were not

16   "frivolous"); *D.N. v. Los Angeles Unified Sch. Dist.*, No. 18-cv-01582-AB-AFMx,

17   2019 WL 7841083 at *2 (C.D. Cal. Sept. 25, 2019); *Arcona, Inc. v. Farmacy Beauty,*

18   *LLC*, No. 2:17-cv-7058-ODW (JPRx), 2021 WL 2414856 at *2 (C.D. Cal. June 14,

19   2021) ("Courts in this district have held that a party's litigation position must be

20   objectively meritless for a case to be exceptional…").  Yuga simply has not proven

21   that Defendants had no basis for their defenses.  To the contrary, Defendants have

22   presented plentiful evidence rendering their ultimately unsuccessful defenses

23   reasonable.  Instead, Yuga wishes to collapse a victory at summary judgment and a

24   finding of frivolousness.  This Court should refuse to do so.

25                    **Plaintiff's Disputed Post Trial Conclusion of Law No. 64:**

26            Additionally, Defendants and their counsel have engaged in a pattern of

27

28

1  unreasonable and obstructive litigation conduct that crossed the line from advocacy

2  into bad faith. *See supra* ¶¶27. Such obstructive and antagonistic conduct supports a

3  finding that this is an exceptional case. *See Jackson v. Gaspar*, No. 2:19-CV10450-

4  DOC, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022).

5  **Defendants' Basis of Dispute:**

6      Defendants—two individuals sued by a $4 billion corporation defended this

7  case to the best of their ability. Unlike Yuga's witnesses, Defendants attended their

8  depositions and gave good faith answers to the questions Yuga. Yuga also claims that

9  Defendants' answers on the stand were "obstructive" and "rehearsed" without

10  evidence. The case cited by Yuga in support of its contention is different in kind. In

11  that case, the defendant was previously chastised by the Court for giving Deposition

12  answers that showed her "preparation, recollection and candor appear to have been

13  marginal at best." *See Jackson v. Gaspar*, No. 2:19-cv-10450-DOC-E 2022 WL

14  2155975 (C.D. Cal. 2022) (citing to the record and previous docket entries as proof of

15  Defendant's misconduct). By way of contrast, Defendants have not been sanctioned

16  in this way, nor were they sanctioned for any deposition related misconduct. The only

17  deposition related misconduct that the Court had to remedy in this case was

18  committed by Yuga—who skipped its depositions and improperly tried to designate

19  all of Ryan Hickman's deposition transcript. *See* Dkt. 77 (order denying motion to

20  avoid attendance at deposition); Dkt. 133 (order compelling de-designation of

21  deposition transcript). Defendants gave testimony and documents—even those that

22  were eventually damaging to their case—to Yuga.

23      Yuga's contentions about Counsel are also without any foundation, and without

24  any support. Counsel for Defendants operated honestly and in good faith throughout

25  this case.

26      In contrast, Yuga, through its counsel, has engaged in a pattern of litigation

27  misconduct. For example, Yuga used this litigation as means to harass Mr. Ripps's

28

72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should die.' You said that.  And my dad is … freaked out, you know … he really is scared, you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially brushed off the issue, then later conceded that a threat did in fact occur.  Dkt. 97 at 4. But Yuga's harassment of Mr. Ripps's father continued, including serving a facially invalid subpoena on him seeking to compel his trial attendance (notwithstanding his complete irrelevance to any issue in the case).

Yuga served more than sixteen subpoenas in this action, nearly all of them facially irrelevant and procuring no useful discovery, apparently to harass anyone that is in any way associated with the Defendants.  For example, Yuga targeted people on Twitter whose sole relevance was apparently having "liked" the RR/BAYC project, Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties repeatedly commented on how Yuga's behavior in this lawsuit impacted them personally, including for example Mr. Ripps's part-time, one-week general assistant (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory, honestly." Garner Depo. at 190:9-17.

Yuga also improperly tried to preclude relevant discovery by making a baseless apex witness argument in an *ex parte* motion for a protective order.  The Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the merits" because the co-founders were "the only people who have knowledge of the creation of the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga employees Wylie Aronow and Greg Solano appear for depositions on January 9 and 11 respectively (excusing Mr. Solano only if he had medical complications).  *Id*.  Yet, despite this Court's order, ***neither witness appeared***.  Yuga has never identified any medical reason why Mr. Solano could not attend.  The Court was clear that failing to

1   appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did

2   not show up.  Dkt. 77 at *2.  Yuga has not done so.

3          Yuga also flouted this Court's Protective Order by improperly designating the

4   entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

5   CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

6   from the public.  This deposition involved no Yuga confidential information; instead,

7   it was the testimony of a Black Jewish third party that included discussion of racism

8   and antisemitism in Yuga's branding.  *See* Dkt. 123-2.  Defendants were forced to

9   bring a motion to address Yuga's misuse of the Protective Order, which the Court

10  granted ordering complete de-designation of the transcript and finding that Yuga was

11  wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

12         Yuga also baselessly refused to produce materials relating to third-party

13  Thomas Lehman's settlement-procured declaration to run the clock on the discovery

14  schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

15  and sought expedited review of that motion to allow time for its use in a deposition of

16  Mr. Lehman.  The Court declined to consider the motion on an expedited basis,

17  stating that Defendants could instead depose Mr. Lehman in "the last week of March

18  before the April 1, 2023 discovery cut-off date."  Dkt. 119 at 2.  The Court ultimately

19  granted Defendants' motion, holding that Yuga waived any claim to confidentiality

20  due to its "unfettered use of Lehman's declaration[.]"  Dkt. 159 at 2.  After Yuga

21  belatedly made its court-ordered production, Defendants took Mr. Lehman's

22  deposition in the final week of discovery as suggested by the Court.  But because of

23  Yuga's delay, the deposition testimony—which raised disputes of fact regarding

24  Defendants' infringement and Yuga's credibility—was unavailable for consideration

25  in opposition to Yuga's motion for summary judgment.  *See* Dkt. 215 at 2.

26         Throughout the course of this litigation, Yuga also made repeated baseless

27  threats of fees and sanctions.  In total, Yuga has unsuccessfully asked the Court to

28

impose sanctions *six times*. *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.  This kind of scorched-earth litigation strategy is improper in any context, but particularly problematic where Defendants are two individuals attempting to respond to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

Because Yuga has abandoned its claim that Defendants' infringement was willful, because Defendants' positions were reasonable and their defense of this litigation was necessitated by Yuga's unreasonable settlement requirements, and because Yuga does not come to the Court with clean hands as result of its litigation misconduct, Defendants respectfully request that the Court reject Plaintiff's claim that this case is "exceptional" warranting an award of attorneys' fees in Yuga's favor.

### **Plaintiff's Response:**

Defendants' objection should be rejected because (1) Yuga Labs has not engaged in litigation misconduct and (2) Defendants ignore the many instances of unreasonable litigation misconduct that they engaged in.

**Yuga Labs Has Not Engaged In Litigation Misconduct:**  Defendants' attempts to evade responsibility for their egregious litigation misconduct by pointing a finger at Yuga Labs has no relevance.  The losing party in a Lanham Act case cannot defend against an exceptional case finding by accusing the prevailing party of engaging in similar misconduct.  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at \*5 (C.D. Cal. Feb. 24, 2022) (finding exceptional case amidst allegations that "[b]oth parties conducted themselves poorly at times throughout litigation" where "Defendants' conduct was worse and more frequent than [plaintiff's].").  Even so, Defendants' contention that Yuga Labs engaged in misconduct is incorrect and filled with multiple false claims.

During the course of settlement discussions, Yuga Labs initially sought a reasonable non-disparagement clause to protect the company's representatives, their

families, and counsel given Defendants' history of making personal, targeted, heinous
claims and in the context of foregoing certain other relief to which it would be entitled
through litigation, as one proposed compromise.  Non-disparagement clauses are
typical in litigation settlements.  Defendants however claimed that a non-
disparagement clause was a barrier to them entering into a settlement.  This proved to
be another lie by Defendants.  After Yuga Labs ***withdrew its request for a non-
disparagement clause***, Defendants still refused to negotiate a settlement in good faith.
In particular, Defendants refused to offer a single dollar in settlement to pay for their
profits or statutory damages, even after being held liable.  Defendants likewise refused
to agree to stop promoting their infringing NFTs or Ape Market, which promoted
sales of RR/BAYC NFTs.  *See* JTX-1048.  For example, the @ApeMarketplace
Twitter account continues to promote rrbayc.com and link to a marketplace on which
RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at
57:8-58:6, 58:20-59:19.   After the Court found that Defendants infringed on Yuga
Labs' BAYC Marks, including through the RR/BAYC NFT smart contract and
cybersquatting of rrbayc.com and apemarket.com, they still refused to transfer control
of this smart contract or domains to Yuga Labs.

Yuga Labs never attempted to preclude depositions of its witnesses.  Yuga Labs
asked Defendants to complete a Rule 30(b)(6) deposition before deciding whether it
was necessary to depose Mr. Solano and Mr. Aronow, and it sought a protective order
when Defendants refused.  Dkt. 75.  The Court disagreed, and Yuga Labs produced
both witnesses for deposition.  Mr. Aronow was unable to appear for his deposition
the day after the Court's order because of a medical emergency.  The Court ordered
the parties to meet and confer on an appropriate date for the deposition for Mr.
Solano, Dkt. 77 at 2, which Yuga Labs did, and Mr. Solano appeared for his
deposition a few days after the Court's order.  As to the dispute on attorneys' fees
related to the Defendants' motion, Defendants know that Yuga Labs has a pending

1   objection to Defendants' claimed attorneys' fees, Defendants have failed to file any

2   motion for attorneys' fees, and Defendants have failed to respond to Yuga Labs'

3   request for an accounting to offset any attorneys' fees given the substantial and unpaid

4   expert deposition fees that Defendants still have not paid.

5          Defendants' dubious claim of a threat against Rodney Ripps is not in the record;

6   Yuga Labs disputes it and Defendants' false claim that it has ever been "conceded."

7   *See* Ripps Designated Deposition Testimony (Dkt. 342).  Defendants' claims on this

8   issue were also already dismissed by the Court as lacking any plausibility.  *See* order

9   on Yuga Labs' Motion to Strike/Dismiss (Dkt. 156) at 6-10 (denying Defendants'

10  intentional and negligent infliction of emotional distress claims, which were based in

11  part on this threat).  And Defendants noticeably do not mention the death threats they

12  and their associates leveled against Yuga Labs, its counsel, and their families.  Even

13  so, it is irrelevant because it did not come from Yuga Labs and was not directed to

14  Defendants.  Defendants cry foul over Yuga Labs' subpoena of Rodney Ripps, when

15  it is they who designated him in their amended initial disclosures as a person with

16  knowledge of "RR/BAYC NFTs."  And the document subpoena Yuga Labs issued for

17  Mr. Rodney Ripps sought relevant information related to his role as an officer of

18  LIVE9000, Ryder Ripps' defunct limited liability company to which he tried to hide

19  the ill-gotten profits from the RR/BAYC NFTs when he knew he was being sued.

20         Yuga Labs' other subpoenas in this action were also targeted at relevant parties

21  whom Yuga Labs reasonably believed had information relevant to the litigation.

22  Many of them, including Mr. Ripps' gallerist, were designated in Defendants'

23  amended initial disclosures as individuals with knowledge of the RR/BAYC NFTs.

24  Likewise, Defendants indicated in their depositions that their accountants had relevant

25  information.  *See* Cahen Deposition at 24:18-25 ("Like I said, I think that would

26  probably be an easier question for my accountant or someone like that."); Ripps

27  Deposition at 235:1-24.  Defendants cannot complain that we subpoenaed their own

28

1   identified witnesses.  Moreover, the vast majority of subpoenas issued by Yuga Labs

2   were document subpoenas, which stands in stark contrast to the sixteen depositions

3   and deposition subpoenas Defendants threatened and issued to Yuga Labs' founders and

4   employees.  Finally, Defendants' position that Mr. Garner is relevant to the litigation

5   as Mr. Ripps' assistant for purposes of deducting from their profits contradicts their

6   position that Yuga Labs' deposition of him was irrelevant.  This again highlights their

7   willingness to lie to get what they want.

8        Next, with respect to the discovery dispute with Mr. Hickman, the Court

9   observed that "Defendants, not Yuga, designated the documents discussed at Ryan

10  Hickman's deposition as highly confidential ('HC') and attorneys' eyes only

11  ('AEO')."  Dkt. 133 at 1.  Consistent with Yuga Labs' reading of the Protective Order,

12  Yuga Labs kept the deposition transcript under similar protection "because HC/AEO

13  documents were discussed at the deposition," *id.*, and Defendants refused to specify

14  which portions of those underlying documents they contended were no longer

15  HC/AEO.  The Court noted Defendants' indiscriminate confidentiality designations,

16  holding that Yuga Labs was "not wrong that Defendants are obliged by the Protective

17  Order to ensure HC/AEO material is 'clearly so designated.'"  *Id.* at 3.  Accordingly,

18  the Court ordered the transcript to be made public and ordered Defendants to comply

19  with the Protective Order by "reproduc[ing] and redesignat[ing] the HC/AEO

20  documents discussed at the deposition to 'clearly identify the protected portion(s)'" –

21  the "result Yuga recommended if the Motion was granted."  *Id.*  In other words, the

22  Court ordered what Yuga Labs had asked the Defendants to do from the start.  This

23  was another problem all of the Defendants' own making.

24       Yuga Labs contested the discovery of documents reflecting settlement

25  negotiations with Mr. Lehman in good faith.  Mr. Lehman's settlement materials

26  expressly included a confidentiality provision, and Yuga Labs sought to have that

27  bargained-for confidentiality protected.  *See* Dkt. 121-01 at 17-18.  Yuga Labs briefed

28

1   the issues in good faith and, although the Court ultimately ordered the materials to be

2   produced, there was no finding of bad faith.  *See* Dkt. 159 (ordering Yuga Labs to

3   produce settlement materials without finding bad faith).  That is because there was no

4   bad faith.  Of course, symbolic of Defendants creating unnecessary disputes, the

5   Defendants did not use a single one of the settlement communications in the

6   deposition with Mr. Lehman or at trial.  Here too, this dispute could have been

7   avoided if the Defendants had accepted Yuga Labs' pre-motion offer.

8      Yuga Labs was overwhelmingly successful in its own discovery motions.  Yuga

9   Labs was forced to file numerous motions and obtain repeated sworn declarations

10  from Defendants confirming their compliance with discovery obligations, because

11  Defendants were continually caught concealing additional documents.  *See* Dkt. 79 at

12  2 (Jan. 10, 2023 order requiring Ripps to verify that he has produced "all relevant non-

13  privileged documents"); Dkt. 145 (order requiring Defendants to file a declaration that

14  they have produced relevant documents).  Although the Court did not award Yuga

15  Labs fees for these discovery violations, each fee request was nonetheless in response

16  to Defendants' egregious and repetitive discovery violations.  If Defendants took issue

17  with Yuga Labs' discovery strategy, they should have raised it with the Court during

18  discovery, yet they did not, and thus this issue is waived.

19     Defendants' persistent refusal to take any responsibility for their conduct

20  merely highlights how their tactics have increased the time and expense of this

21  litigation.

22     **Defendants' Litigation Misconduct:**  Defendants ignore their own egregious

23  actions in this case, including Defendants' refusal to engage in reasonable settlement

24  discussions, seeking to re-litigate issues already decided, engaging in a pattern of

25  unreasonable and obstruct discovery, attacks against Yuga Labs and its associates,

26  farming for engagement on social media, and public disclosure of protected material

27  in violation of the protective order.  *See supra* ¶ 61.

28

1

**Defendants' Reply:**

2      Yuga is incorrect as a matter of law. Their cited case actually directly stands

3 for the proposition that Defendants advance stating, "The Court also considers the

4 conduct of **both parties** throughout the case." *Jackson v. Gaspar*, No. 2:19-CV-

5 10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022). This makes

6 sense, because an exceptional case finding is equitable relief. *Ramirez v. Collier*, 142

7 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated

8 conscience, or good faith, or other equitable principle, in his prior conduct, then the

9 doors of the court will be shut against him.") (internal quotations and citations

10 omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case

11 finding is an exercise of the court's equitable powers).

12      First, Yuga has acknowledged that a Yuga employee threatened Rodney Ripps,

13 but instead argues that it was nothing more than "blowing off steam." Dkt. 97 at 4.

14 Rodney Ripps felt threatened enough to file a police report in response to this action.

15 Yuga now states—without evidence—that Defendants have committed death threats

16 against Yuga parties. This should be disregarded as without evidentiary support.

17 Yuga also never remediates the fact that its subpoena to Rodney Ripps was facially

18 invalid. It was instead intended to bring the case "close to home" for Mr. Ripps and

19 cause him fear and discomfort. As for the other subpoenas served by Yuga they

20 sought documents and information far beyond what the witnesses would know and

21 witnesses such as Ian Garner commented on Yuga's aggression in discovery as "quite

22 predatory." Garner Depo. at 190:9-17.

23      Yuga attempts to flip its effort to wrongfully conceal Ryan Hickman's

24 deposition as Defendants' fault. A quick glance at the Court's order quickly disabuses

25 that notion. The Court was clear that Yuga took an untenable position regarding its

26 over-designation of Mr. Hickman's deposition. *See* Dkt 133 at 2 ("The Court does not

27 understand why Yuga designated the entire Hickman deposition transcript as

28

1   HC/AEO, even the portions not discussing HC/AEO documents. The Court also faults

2   Yuga for conditioning de-designation of the Hickman deposition transcript on

3   obtaining de-designation of the HC/AEO documents discussed at the Hickman

4   deposition.).  It clearly held Yuga at fault for its actions, chastising Yuga for "holding

5   the transcript hostage." *Id.*  The fact that the Court granted relief that Yuga suggested

6   if it lost the motion does not change the fact that Yuga acted wrongfully and did, in

7   fact, lose and wrongfully hold the transcript hostage.

8       Yuga claims that its improper hiding of materials related to Mr. Lehman's

9   settlement was permissible because were not accused of good faith similarly tries to

10  ignore something fundamental about the decision.  It in all bold it demands that Yuga

11  produce the withheld documents within three day. Dkt. 159 at *1.  The court noted

12  that all of Yuga's arguments against disclosing this evidence was "fatally

13  undermined" by Yuga's "unfettered use of Lehman's declaration" to support its

14  positions.  *Id.* at *3.  In short, Defendants' motion to compel the Lehman materials

15  was an unmitigated victory for Defendants.

16      Yuga tries to argue that its pattern and practice of seeking sanctions and failing

17  denotes success and cites to two docket entries.  Instead of a hugely successful

18  motion, the Court did not grant Yuga's motion to compel and stated that it "cannot

19  discern what discovery requests remain in dispute" when rejecting Yuga's position.

20  Dkt. 79 at *1.  Dkt. 145 also rejects Yuga's spoliation sanctions request as being made

21  "with no direct evidence."  Dkt. 145 at *1.  Further, as mentioned above, Defendants

22  complied with discovery obligations to the best of their ability and explained as much

23  at trial. Trial Tr. [Ripps] 269:10-270:18.  Yuga cannot escape the fact that it used

24  seeking sanctions as a litigating technique and that is wrongful.  This court should

25  take that into consideration when considering Yuga's request for relief.

26      Lastly, Defendants have not engaged in litigation misconduct in this case.

27  While contentious, the examples of alleged litigation misconduct alleged by Yuga

28

show no such thing.  For reasons stated above, Defendants never re-litigated a matter, complied with discovery to the best of their ability including attendance at their noticed depositions (unlike Yuga's executives), and their public criticism of Yuga was not impermissible—but Yuga's argument against the criticism betrays that this case was truly about silencing Defendants.  Defendants do not "ignore" their own litigation misconduct; and the Court should not ignore Yuga's.

### Plaintiff's Disputed Post Trial Conclusion of Law No. 65, lines 19:16-18:

And Defendants' statements on Twitter about Yuga Labs and its counsel throughout litigation (*see*, *e.g.*, Dkts. 149-50, 149-51) were egregious and far exceeded the bounds of acceptable conduct. *See Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator, 392 F.3d 248, 263-64* (7th Cir. 2004).

### Defendants' Basis of Dispute:

Yuga's relies on an easily distinguishable out-of-circuit case to support its claim that Defendants' activities exceeded the bounds of proper behavior.  *Te-Ta-Ma*, involves threats from a White Supremacist murderer in order to intimidate the other party and a witness. *Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 251-52 (7th Cir. 2004).  Tweets made by Defendants are different in kind to the threats to witnesses made in *Te-Ta-Ma*.  *Compare* Dkts 149-50; 149-51 with *Te-Ta-Ma*, 392 F.3d at 251 (calling opposition in lawsuit a "race traitor" and threatening to place them in Concentration camps).

The documents that Yuga cites to is a collection of Twitter posts that Yuga has taken out of context.  As Mr. Cahen explained in his declaration of trial testimony, many of these posts "frequently use terms or context that requires knowledge of contemporary crypto culture to understand."  Cahen Decl. ¶ 54 (Dkt. 344).  And many of Defendants' posts "involve pushing back forcefully on users that spread inaccurate, misleading, hypocritical, self-serving, or hateful message."  Cahen Decl. ¶ 55 (Dkt. 344).  To a person not familiar with the context of crypto culture, Mr. Cahen's posts

1   can, "come across as combative or mean-spirited, but they are typical of crypto-related
2   social engagement on Twitter." *Id*.

3          For example, Yuga cites to Dkt. 149-50, which are crops of Twitter posts.
4   Many of these posts are memes that are commonly used in crypto Twitter culture and
5   on the internet generally.  Dkt. 149-50 at 2-5.  Defendants made minor modifications
6   to these common memes so that they reference the RR/BAYC project's criticism and
7   protest of Yuga.  *Id*.  Posting common internet memes on Twitter is not a "heinous
8   attack."  Dkt. 149-50 also contains posts from Mr. Ripps criticizing Yuga and its
9   leadership for make false statements to the public and behaving in a manner that Mr.
10  Ripps considers to be bad-hearted and unintelligent.  While these posts are critical of
11  Yuga and its leadership, they are voicing Mr. Ripps's honest beliefs.

12         Yuga also cites to Dkt. 149-51 which is also another collection of Twitter posts
13  that Yuga has also mischaracterized and taken out of context.  Defendants have
14  engaged in extensive criticism of Yuga and its supporters, including calling out
15  Yuga's content for including what Defendants believe to be references to racism,
16  fraud, pedophilia, and other offensive material.  Yuga attempted to use this litigation
17  to silence Defendants by conditioning any settlement on a non-disparagement clause
18  or comparable restrictions, to prevent Defendants from criticizing Yuga's problematic
19  content.  Defendants' honest belief is that Yuga's use of litigation in this manner
20  amounts to promotion and support of Yuga's harmful and dangerous messages.
21  Defendants voicing their beliefs on Twitter may come across as alarming, given the
22  nature of the content that they are criticizing.  But in context, Defendants' statements
23  do not warrant an exceptional case finding.

24         **Plaintiff's Response:**

25         Defendants' objection should be rejected because they underplay the severity
26  of Defendants' conduct.  This was not mere "criticism" or "memes" as Defendants
27  contend, it was cruel-hearted harassment to intimidate Yuga Labs and its counsel.

28

1   *See* Dkt. 334 (When Yuga Labs' counsel raised this issue at the June 9 pretrial

2   conference, claiming that criticism is different that Defendants' attacks against Yuga

3   Labs and its attorneys, the Court responded:  "I understand their conduct is absolutely

4   horrible, and you know, I don't disagree.").  For example, Mr. Ripps called Yuga

5   Labs "demonic evil liars," comparing the company to Jeffrey Epstein.  Dkt. 149-50.

6   Defendants threatened Yuga Labs with images portraying Mr. Cahen next to a grave

7   marked "Yuga Labs," Mr. Ripps and Mr. Cahen holding a gun and a knife up to

8   Yuga Labs, and Mr. Cahen hoisting the severed head of one of the founders' apes

9   over his head.  *Id*.  Mr. Cahen targeted another Yuga Labs founder by falsely

10  tweeting:  "[h]e's named after [a] banned 1971 child porn film."[15]  He further

11  tweeted that the founder "REFUSES to change his name,"[16] based on the founder's

12  response to a question from an ongoing Highly Confidential – Attorneys' Eyes Only

13  deposition.  *See* Atalay Depo. (Dkt. 271) at 157-160 (showing testimony and break

14  taken 42 minutes prior to Mr. Cahen's Tweet).

15          Defendants targeted Yuga Labs' counsel too, accusing Yuga Labs' lead

16  attorney of supporting "racism, antisemitism, beastiality, pedophilia, and using

17  cartoons to market drugs to young children."  Dkt. 149-51.  Mr. Ripps likewise sent a

18  "personal message" to the attorney, posting an image stating:  "Hey maybe you can

19  suck my d**k."  *Id*. (censored).  This offensive and harassing conduct is par for the

20  course for Defendants.  Mr. Ripps' tumblr account is plastered with racist and

21  offensive content.[17]  And near the end of August 2023, Mr. Ripps was permanently

22  suspended from Twitter for sending violent death threats.[18]  Whether or not

23  Defendants' conduct is "typical" in their circles (an unsupported proposition that

24  Yuga Labs disputes), in federal court, it is "egregious and beyond the pale of

25

26  [15] https://twitter.com/Pauly0x/status/1620158732872331264
    [16] *Id*.

27  [17] https://twitter.com/nft_decency/status/1538961466015076352
    [18] https://twitter.com/PopPunkOnChain/status/1700226047612977249

28

1  acceptable litigation conduct." *See TE-TA-MA*, 392 F.3d at 264; *see also AANP v.*

2  *Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002)

3  (affirming exceptional case where "defendant acted deliberately to and intended to

4  harm the plaintiff by using its mark" which was "especially egregious" because

5  defendant "continue[d] to use the mark after notice of violation" and continued to

6  "harass[] the plaintiff").  And despite it all, Defendants' counsel did not stop

7  Defendants' egregious conduct.  *See supra* ¶ 61.  Their conduct warrants a finding

8  that this is an exceptional case.

9               **Defendants' Reply:**

10       Yuga still relies on easily distinguishable cases and actions ***not*** involving Yuga

11  to help it make its case that they are entitled to an exceptional case finding.  First, the

12  criticisms of Yuga may not have always been as orderly as Yuga would have pleased

13  (it is clear that Yuga would prefer no criticism at all), principles of free speech do not

14  turn on how "orderly" the words used are.  Yuga once again does not point to

15  anything that rises to the deplorable conduct committed by a White Supremacist who

16  was arrested for hiring a hit man against the judge in his case.[19]  *See e.g. Te-Ta-Ma*

17  *Truth Fdn-Family of URI v. World Church of the Creator*, 392 F.3d 248, 252 (7th Cir.

18  2004) ("Listen up you Kike, you better leave our fuckin' church alone or I'm gonna

19  fuckin' kill you.").  Simply put, no matter how disagreeable people might find

20  Defendants' expression, they are not Matthew Hale.

21       Citations to Mr. Ripps's actions toward non-parties in this case are irrelevant.

22  On the face of the Tweet cited by Yuga about Mr. Ripps suspension from Twitter

23  (which is not from Twitter) about Mr. Ripps's Twitter suspension, it is clear that it

24  was unrelated to the case. Mr. Ripps's Tumblr account has not been active in over 7

25  years, and the posts cited in the unverified Tweet over 13 years old and therefore are

26

27  [19] *See* https://en.wikipedia.org/wiki/Matthew_F._Hale

28

1  irrelevant.[20]  However, what it does demonstrate is a wish for Yuga to police
2  Defendants' lives generally, particularly what they say and how they say it.

3  **Plaintiff's Disputed Post Trial Conclusion of Law 65, lines 19:20-23:**

4      Moreover, even after representing numerous times to the Court that they would
5  not do so, Defendants introduced trial declarations and gave live trial testimony to
6  make irrelevant and prejudicial claims regarding the same inflammatory material that
7  the Court has repeatedly found to be immaterial to this litigation. *See*, *e.g.*, Dkt. 395
8  n.1.

9  **Defendants' Basis of Dispute:**

10      Yuga claims that Defendants introduced trial testimony that made
11  "inflammatory claims" that Defendants claimed they would not introduce.  Yuga does
12  not cite to anywhere in the record where Defendants introduced this material in an
13  inappropriate way.  And notably, Yuga never objected on this basis at trial (either to
14  Defendant's declarations or during cross examination).  Any such objection now is
15  therefore waived.

16      Yuga is also aware that Defendants have consistently held that their intentions
17  in creating the RR/BAYC project—including the good faith belief in their
18  criticisms—were always relevant.  *See, e.g.,* Dkt. 275 at 4-6.  Introduction of this
19  material is not a surprise to Yuga.  Beyond that, the introduction of evidence related to
20  intent is directly relevant to the issues remaining at trial, including whether Yuga is
21  entitled to profits.  *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497
22  (2020) ("a trademark defendant's mental state is a highly important consideration in
23  determining whether an award of profits is appropriate.")

24  **Plaintiff's Response:**

25

26

27  _____

[20] *See* https://ryderripps.tumblr.com/archive

28

Defendants' objection should be rejected because they do not address or deny Defendants' violations of their promises to Yuga Labs and the Court that they would not offer testimony on irrelevant and inflammatory issues at trial. *See* Dkt. 320-1 ¶ 6(A) (agreeing in proposed pretrial conference order not to introduce evidence or argument regarding "pedophilia," "4chan," or Defendants' "emotional distress counterclaims"); Dkt. 314 (agreeing in Defendants' proposal that they will not offer testimony regarding "the words 'Nazi' or 'Hitler'," "allegations concerning death threats or harassment," the "class action lawsuit brought against Yuga for securities fraud," or "the SEC investigation into Yuga for securities fraud"); Dkt. 334 at 60:13-14 (representing to Court "We don't want a mini trial on Naziism for sure"); *id*. at 61:9-11 ("I agree they should stand up and object if we start – if anybody starts talking about – ranting about how everybody at Yuga are a bunch of Nazis. That is clearly inappropriate and shouldn't be done."). Yet Defendants repeatedly violated these promises. *See* Cahen Decl. (Dkt. 344) ¶¶ 60, 65, 66, 67, 75, 90. 91, 96; Hickman Decl. (Dkt. 345) ¶¶ 55, 58, 59; Ripps Decl. (Dkt. 346) ¶¶ 59, 69, 152; Trial Tr. at 265:17-18 (characterizing logo as a "Nazi log[o]"), 215:2-3 ("Pictures of monkeys represent racism"), 118:18-120:22 (Defendants' counsel referring to "racism," "racist imagery," and "hate speech"); Dkt. 395 at 9-10 (Defendants' designation of testimony from Mr. Cahen accusing Yuga Labs of "Nazism, racism, financial fraud, pedophilia"). This is representative of Defendants' lack of control and respect for the Court and warrants a finding that this is an exceptional case.

Defendants' contention that Yuga Labs did not object to their introduction of inflammatory material at trial is immaterial. Whether objected to or not, their actions at trial still weigh in favor of a finding that this is an exceptional case.

Defendants claim that their inflammatory claims were "always relevant" is wrong. If they were ever relevant to begin with, they were certainly irrelevant by trial, after the Court had rejected them numerous times. *See Sienze v Kutz*, No. 1:17-CV-

1   0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence

2   concerning issues resolved at summary judgment is *generally not relevant and should*

3   *be excluded*" at trial) (emphasis added).

4   **Defendants' Reply:**

5   Defendants have explained that it has not re-litigated any issue, especially

6   because intent remains relevant to Yuga's intent-laden damages theory and its

7   exceptional case request. *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492,

8   1497 (2020) ("a trademark defendant's mental state is a highly important

9   consideration in determining whether an award of profits is appropriate."). Further, it

10  appears Yuga is making an evidentiary objection based on the evidence's relevance.

11  It never objected and any such evidentiary objection is waived. *See Fenton v.*

12  *Freedman*, 748 F.3d 1358, 1360 (9th Cir. 1984).

13  Regardless, there was no improper introduction of inflammatory material, nor

14  was there a "mini trial" about alleged inflammatory material. Instead, there was a trial

15  about Defendants' intent and damages. The issue of intent was never decided for the

16  issue of disgorgement or damages more generally. And of course, a matter can be

17  decided for one purpose, but not another. *Sienze v Kutz,* No. 1:17-CV-0736-AWI-

18  SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019). All of Yuga's citations are

19  explanations of Defendants intent, an issue that Defendants consistently maintained

20  was at issue and which this Court never stated was no longer at issue. As such, this

21  proposed conclusion of law should be rejected out of hand because it is not based in

22  the reality of the trial that actually occurred, any error is waived, and the legal

23  underpinnings of Yuga's claims are erroneous.

24  **Plaintiff's Disputed Post Trial Conclusion of Law No. 66:**

25  Therefore, Yuga Labs is entitled to its reasonable attorneys' fees.

26  **Defendants' Basis of Dispute:**

27

28

1    Yuga is not entitled to any attorneys' fees.  Yuga is seeking its attorneys' fees

2    under the basis that this is an "exceptional case."  For the reasons listed above, the

3    factual underpinnings of this claim are erroneous.  *See Supra* at ¶¶ 61-65.  Absent any

4    other factual allegations, Yuga has failed to carry its burden that it is entitled to an

5    exceptional case finding.  *See Caiz v. Roberts*, No. 15-cv-09044-RSWL-AGRx, 2017

6    WL 830386 at *5 (C.D. Cal. 2017) (movant bears burden on exceptional case).

7    Even if Yuga's factual contentions are accepted by this court, it has failed to

8    carry its burden of proof.  An exceptional case is abnormal.  The Supreme Court has

9    defined exceptional to mean,  "uncommon," "rare," or "not ordinary."  *Octane*

10    *Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  In

11    determining whether a case is exceptional, courts consider all of the circumstances in

12    making the equitable determination, including a Defendant's intent.  *See Romag*

13    *Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) ("a trademark defendant's

14    mental state is a highly important consideration in determining whether an award of

15    profits is appropriate.").  As an equitable determination, the conduct of the party

16    seeking equity must also be considered.  *Ramirez v. Collier,* 142 S. Ct. 1264, 1282

17    (2021) ("[w]hen a party seeking equitable relief "has violated conscience, or good

18    faith, or other equitable principle, in his prior conduct, then the doors of the court will

19    be shut against him.") (citations omitted).  Here, Defendants' litigation conduct was

20    justified in light of a corporate opponent bent on making litigation as costly and

21    unreasonable as possible.  Defendants were asked to sign away their constitutional

22    rights.  Trial Tr. [Muniz] 94:5-13.

23    Yuga's legal contentions also fail.  Yuga cites to *Te-Ta-Ma Truth Found.-*

24    *Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir.

25    2004) in a strained argument that critical Tweets entitle it to fees. *Te-Ta-Ma* involved

26    a white supremacist making threats.  *See id.* at 251 ("Race Traitors, We will include

27    you in the concentration camps next time around, so you can be with the jews you so

28

love.")  *Te-Ta-Ma* is factually not even close to the First Amendment protected criticism of a large company and cannot serve as the basis of fees.  *See* JTX-2096; Ripps Decl. ¶¶ 150-52 (Dkt. 346) (uncontested).  The very comparison between this case and *Te-Ta-Ma* is frankly offensive.  There are no death threats involved, either directly or indirectly.

The prevailing party is not, as Yuga suggests, entitled to attorneys' fees in trademark actions without a showing that the opposing party's claims were frivolous.  *See Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at *4-5 (rejecting exceptional case finding in trademark case because claims were not "frivolous").  Yuga ignores this exceedingly high burden, and Defendants claims were not objectively meritless.  This case did not rise to the level of an "exceptional case" and therefore Yuga is not entitled to attorney's fees.

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) as shown in prior sections, this is an exceptional case, (2) intent is not relevant to this determination, and (3) there is no requirement that Defendants bring "frivolous" claims for a finding of exceptional case.

**This is an Exceptional Case:**  Under the "totality of the circumstances," it is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016); *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *4 (C.D. Cal. Feb. 24, 2022); *see supra* ¶ 61.

Defendants claim that *Te-Ta-Ma* is distinct from the facts of this case, but to the contrary, both cases involve conduct that was "egregious and beyond the pale of

acceptable litigation conduct." *See TE-TA-MA*, 392 F.3d at 264.  Like *Te-Ta-Ma*, Defendants "purposely orchestrated a campaign of harassment throughout the litigation below which targeted [Yuga Labs] and its attorneys." *Id*.  Much of this harassment consisted of "explicit threats of violence" (*Id*.), such as when they threatened Yuga Labs with images portraying Mr. Cahen next to a grave marked "Yuga Labs," Mr. Ripps and Mr. Cahen holding a gun and a knife up to Yuga Labs, and Mr. Cahen hoisting the severed head of one of the founders' apes over his head. Dkt. 149-50; *supra* ¶ 29.  They also accused Yuga Labs and its counsel of supporting "racism, antisemitism, beastiality, pedophilia, and using cartoons to market drugs to young children." Dkt. 149-51.  And, like the defendant in *Te-Ta-Ma*, Defendants in effect called one of Yuga Labs' founders a race traitor, accusing him, a man of Jewish ancestry, of being a Nazi.  *TE-TA-MA*, 392 F.3d at 251.

Moreover, they made these accusations at trial despite their promise not to make such accusations.  *Supra* ¶ 65 (lines 19:20-23).  And Defendants' made these accusations to promote their RR/BAYC NFTs and Ape Market.  Notably, this is the same marketplace where they planned to sell Yuga Labs NFTs, which they incredibly claimed were offensive.  *See, e.g.*, JTX-696; JTX-806-JTX-809.  Finally, even after the Court's Order finding that Defendants' infringed on the BAYC Marks and that Yuga Labs was entitled to an injunction, Defendants continued to "purposely infringe" on Yuga Labs' marks.  *TE-TA-MA*, 392 F.3d at 264; Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Even were *Te-Ta-Ma* is distinguishable, Defendants ignore other caselaw finding exceptional use where "defendant acted deliberately to and intended to harm the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "harass[] the plaintiff" *just as Defendants did*.  *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002).

**The Court Has Already Found Bad Faith And Intentional Infringement By Defendants, And A Finding Of Further Intent Is Not Necessary For An Exceptional Case:**  Defendants' claim that their intent is a necessary part of this determination is unfounded.  Defendants' citation to *Ramirez* is inapposite, as it does not address an exceptional case or even the Lanham Act for that matter.  *See, generally,* Ramirez v. Collier, 142 S. Ct. 1264 (2022) (condemned criminal claiming violation under the Religious Land Use and Institutionalized Persons Act and the First Amendment).  Moreover, Defendants' claim that their harassment of Yuga Labs and its counsel was "justified" in the context of the litigation demonstrates (a) that their conduct was in fact intentionally targeted at Yuga Labs and (b) that they are unrepentant of this conduct, further contributing to an exceptional case finding.  Indeed, their only basis for this harassment is that they were "asked to sign away their constitutional rights," citing to Ms. Muniz's trial testimony that Defendants have no right to use the BAYC Marks to promote products.  But this post hoc justification is just another reason to make an exceptional case finding.

**Frivolous Claims Not Necessary:**  Finally, *Anhing* does not hold that a finding of frivolousness is necessary to an exceptional case.  It is merely one of the numerous "factors the district court *may* consider when deciding whether to grant attorneys' fees."  *Anhing Corp. v. Viet Phu, Inc.*, 2017 WL 11630841, at *3.  At this stage though, Defendants repeated re-litigating of settled issues makes their arguments frivolous.

### Defendants' Reply:

Yuga is not entitled to attorneys' fees.  Their response in many ways indicates the shakiness of their position.  First, Yuga makes the malicious accusation that "like the defendant in *Te-Ta-Ma*, Defendants in effect called one of Yuga Labs' founders a race traitor, accusing him, a man of Jewish ancestry, of being a Nazi."  *See supra.* ¶ 66.  This attempt to link Defendants with Matthew Hale through an accusation like

1   this without adequate evidence to support the claim demonstrates how different this
2   case is from *Te-Ta-Ma*, which ultimately ended with Matthew Hale being sentenced to
3   prison for threatening a federal judge. For the reasons stated above, Defendants are
4   not Matthew Hale, and Yuga's accusation is not well-taken.

5       Nor does *AANP* support Yuga's plea. In *AANP* the infringer went to trade
6   shows and before state legislatures claiming to be the plaintiff. *See AANP v.*
7   *American Ass'n of Naturopathic Physicians*, 37 F. App'x 893, 894 (9th Cir. 2002).
8   On the contrary, Defendants made affirmative statements that they were *not* Yuga and
9   have not continued in their infringement. In *AANP* the court found that the defendants
10  were willful infringers. *Id.* at 893-94. That finding was never made in this case.

11      The *Ramirez* citation stands for a general proposition in equitable relief.
12  *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable
13  relief has violated conscience, or good faith, or other equitable principle, in his prior
14  conduct, then the doors of the court will be shut against him."). This general
15  proposition applies to equitable relief generally. Further, it is clear that this Court may
16  consider Yuga's misconduct when determining whether it is due relief. "The Court
17  also considers the conduct of **both parties** throughout the case." *Jackson v. Gaspar*,
18  No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022).

19      Lastly, Defendants have not put forth frivolous positions. Yuga concedes that it
20  is arguing that Defendants' positions are only frivolous to the extent they were already
21  litigated. However, for reasons stated above, this is either an evidentiary objection
22  that Yuga has waived, and Defendants have not re-litigated any settled issues. They
23  were only introducing matters of intent which had not been decided for disgorgement
24  or an exceptional case finding.

25      In summary, there is nothing that would entitle Yuga to an exceptional case
26  finding. Therefore, Defendants respectfully request that this Court reject Yuga's
27  request for an exceptional case finding entered in its favor.

28

**Plaintiff's Disputed Post Trial Conclusion of Law No. 67:**

The Copyright Act provides for the award of full costs and reasonable
attorneys' fees to the prevailing party. 17 U.S.C. § 505.

**Defendants' Basis of Dispute:**

Yuga incorrectly describes the Copyright Act's provisions for the ***discretionary***
award of costs and fees.  17 U.S.C. § 505 provides that "the court ***in its discretion***
***may*** allow the recovery of full costs" and "the court ***may*** also award a reasonable
attorney's fee to the prevailing party as part of the costs."  Court's exercise their
discretion by considering non-exclusive factors such as the degree of success in
litigation, the conduct of litigants, and the goals of the copyright act.  *Glacier Films
(USA), Inc. v. Turchin*, 896 F3d 1033, 1038-1044 (9th Cir. 2018).

Courts have exercised this discretion to not award any costs or fees even when a
party prevailed at summary judgment.  For example, in *Grateful Dead Prods., Inc. v.
Auditory Odyssey*, 76 F.3d 386 (9th Cir. 1996), the Ninth Circuit affirmed the district
court's denial of attorneys fees because "plaintiffs prevailed by summary judgment on
the issue of liability" but "failed to prove the main issue at trial which as whether the
defendants acted willfully."

This case is no different.  While the Court granted summary judgment on
Defendants' claim under the Copyright Act, Yuga conceded the bulk of its claims for
trial.  Yuga attended this Court's pre-trial conference stating that it hand suffered
damages "up to hundreds of millions" (Dkt. 334 at 23:7) and that Yuga would ask the
jury to award "north of $10 million" in actual damages (Dkt. 334 at 27:8) in addition
to any equitable relief that it seeks.  But Yuga pre-emptively abandoned its damages
claims when it informed the Court that "Yuga Labs is withdrawing all legal remedies
and will proceed to trial solely on its prayer for equitable remedies[.]"  Dkt. 315-1 at
2.  As a result, similar to *Grateful Dead*, 76 F.3d 386, Defendants prevailed on the

main issue for trial because Yuga's actual damages claim that was "up to hundreds of millions" was reduced to $0.

Similarly, the goals of the Copyright Act weigh strongly against the award of any fees.  The goal of the Copyright Act is "to promote creativity for the public good." *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994); *see also Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994) ("The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public.").  Here, Defendants filed a claim based on Yuga's improper use of the Digital Millennium Copyright Act to take down content based on trademarks rather than copyright.  Defendants filed these claims because Yuga had improperly leveraged DMCA's "safe harbor" regime, which is intended only for copyrights, to take down content based on allegations of trademark infringement.  While this Court may disagree with the merits of Defendants' claim, their exercise of the Copyright Act was intended to pursue what they believed to an abuse of the DMCA statute, which often results in improper suppression of artworks on the internet.  An award of fees would deter artists in the future from challenging in Court (which is the only way to meaningfully challenge unlawful DMCA requests) what they perceive to be abusive use of the DMCA statute and the remarkable leverage of the DMCA's safe harbor regime.

Lasty, considering Yuga's misconduct throughout this litigation, an award of costs and fees would be unjust.  For example, Yuga used this litigation as means to harass Mr. Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should die.'  You said that.  And my dad is … freaked out, you know … he really is scared, you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially brushed off the issue, then later conceded that a threat did in fact occur.

Dkt. 97 at 4.  But Yuga's harassment of Mr. Ripps's father continued, including serving a facially invalid subpoena on him seeking to compel his trial attendance (notwithstanding his complete irrelevance to any issue in the case).

Yuga served more than sixteen subpoenas in this action, nearly all of them facially irrelevant and procuring no useful discovery, apparently to harass anyone that is in any way associated with the Defendants.  For example, Yuga targeted people on Twitter whose sole relevance was apparently having "liked" the RR/BAYC project, Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties repeatedly commented on how Yuga's behavior in this lawsuit impacted them personally, including for example Mr. Ripps's part-time, one-week general assistant (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory, honestly."  Garner Depo. At 190:9-17.

Yuga also improperly tried to preclude relevant discovery by making a baseless apex witness argument in an *ex parte* motion for a protective order.  The Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the merits" because the co-founders were "the only people who have knowledge of the creation of the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga employees Wylie Aronow and Greg Solano appear for depositions on January 9 and 11 respectively (excusing Mr. Solano only if he had medical complications).  *Id*.  Yet, despite this Court's order, ***neither witness appeared***.  Yuga has never identified any medical reason why Mr. Solano could not attend.  The Court was clear that failing to appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did not show up.  Dkt. 77 at *2.  Yuga has not done so.

Yuga also flouted this Court's Protective Order by improperly designating the entirety of third-party Ryan Hickman's deposition testimony as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony from the public.  This deposition involved no Yuga confidential information; instead,

it was the testimony of a Black Jewish third party that included discussion of racism and antisemitism in Yuga's branding.  *See* Dkt. 123-2.  Defendants were forced to bring a motion to address Yuga's misuse of the Protective Order, which the Court granted ordering complete de-designation of the transcript and finding that Yuga was wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

Yuga also baselessly refused to produce materials relating to third-party Thomas Lehman's settlement-procured declaration to run the clock on the discovery schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration and sought expedited review of that motion to allow time for its use in a deposition of Mr. Lehman.  The Court declined to consider the motion on an expedited basis, stating that Defendants could instead depose Mr. Lehman in "the last week of March before the April 1, 2023 discovery cut-off date."  Dkt. 119 at 2.  The Court ultimately granted Defendants' motion, holding that Yuga waived any claim to confidentiality due to its "unfettered use of Lehman's declaration[.]"  Dkt. 159 at 2.  After Yuga belatedly made its court-ordered production, Defendants took Mr. Lehman's deposition in the final week of discovery as suggested by the Court.  But because of Yuga's delay, the deposition testimony—which raised disputes of fact regarding Defendants' infringement and Yuga's credibility—was unavailable for consideration in opposition to Yuga's motion for summary judgment.  *See* Dkt. 215 at 2.

Throughout the course of this litigation, Yuga also made repeated baseless threats of fees and sanctions.  In total, Yuga has unsuccessfully asked the Court to impose sanctions ***six times***. *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.  This kind of scorched-earth litigation strategy is improper in any context, but particularly problematic where Defendants are two individuals attempting to respond to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

1  Because Defendants substantially prevailed at trial by entirely eliminating

2  Yuga's actual damages claim that was up to hundreds of millions of dollars, an award

3  of fees would run contrary to the goals of the copyright act, and Yuga's failure to

4  come to the Court with clean hands as a result of its litigation misconduct, a

5  discretionary award of costs attorneys' fees under 17 U.S.C. § 505 is not appropriate.

6  <u>**Plaintiff's Response:**</u>

7  Defendants unequivocally lost each of their three copyright counterclaims –

8  two did not survive Yuga Labs' motion to dismiss and the third failed on summary

9  judgment.  In other words, Defendants' counterclaims were so lacking in merit that

10 not one of them survived trial.  Moreover, Defendants' counterclaims did not

11 further the purpose of the Copyright Act – creativity – they sought to stifle it by

12 attacking (without any basis in law or fact) the only creative work in this case – the

13 Bored Ape Yacht Club.  Therefore, granting fees to Yuga Labs in the face of

14 Defendants' meritless copyright counterclaims, filed to gain leverage in discovery

15 and not to advance any creative project of theirs, serves the very purpose of the

16 Copyright Act by deterring other would-be bad actors.

17 Defendants' objection should be rejected because (1) Yuga Labs resoundingly

18 won all copyright issues in this case on its motions, entitling it to fees, and (2)

19 Defendants' litigation misconduct objections are irrelevant and nevertheless lack

20 merit.

21 **Yuga Labs Won All Copyright Issues In This Case, Entitling It To Fees:**

22 The copyright act is clear that, in any copyright action, "the court in its

23 discretion may allow the recovery of full costs by or against any party" and "the court

24 may also award a reasonable attorney's fee to the prevailing party as part of the

25 costs."  17 U.S.C. § 505.  There were three copyright claims in this case:

26 Defendants' two counterclaims for declaratory relief that Yuga Labs did not own a

27 copyright; and Defendants' counterclaim under 17 U.S.C. § 512(f).  The Court

28

dismissed Defendants' two counterclaims for declaratory relief as there was not even a justiciable dispute or subject matter jurisdiction.  Order on Yuga Labs' Motion to Dismiss (Dkt. 156) at 13-14.  And the Court found that "Yuga is entitled to summary judgment on Defendants' counterclaim alleging a knowing misrepresentation of infringing activity. . ."  SJ Order (Dkt. 225) at 21.  The copyright counterclaims have been fully adjudicated and the only remaining issue is whether Yuga Labs is entitled to costs and fees, within the Court's discretion.

Defendants' policy argument that enforcing the fees provision of the Copyright Act would somehow go against the "goals of the copyright act" is unpersuasive and unsupported by any legal authority.  Their contention that they filed their copyright claim because "Yuga had improperly leveraged DMCA's 'safe harbor' regime" is false.  As the Court found, Yuga Labs' behavior was not improper under the DMCA.  *See* SJ Order (Dkt. 225) at 19-21.  And enforcing the fees provision against Defendants would not deter future artists from challenging fees in court.  To the contrary, granting Yuga Labs its fees may deter litigants from pursuing frivolous copyright claims in the future.

Defendants' citation to *Grateful Dead* is unpersuasive.  First, Defendants' copyright counterclaims were not at issue at trial – they were all adjudicated on motion practice months before trial in Yuga Labs' favor.  Therefore, the question of whether Yuga Labs is the prevailing party on the three copyright claims is a resounding "yes."  Second, regardless, willfulness is not "the main issue at trial" or even an issue at all, as the Court has already decided that Defendants acted with the intent to deceive when using Yuga Labs' BAYC Marks.  SJ Order (Dkt. 225) at 12.  Finally, Yuga Labs did not "concede[] the bulk of its claims for trial."  In fact, it won all copyright issues in this case before trial commenced (indeed, Yuga Labs defeated all six of Defendants' counterclaims before trial).  Yuga Labs' state law claims were stayed pending resolution of Defendants' appeal to the Ninth Circuit and, therefore,

were not at issue at trial.  Only Yuga Labs' two remaining federal claims were at issue at trial and, even then, were *not at issue* for purposes of liability because Yuga Labs had already proven those two claims.  Only the remedies Yuga Labs sought on those two claims was at issue at trial.

Nor did Defendants "substantially prevail" at trial by Yuga Labs electing to defer its actual damages claims.  Injunctive relief is the most important remedy in this case for Yuga Labs, followed by disgorgement of Defendants' profits.  These remedies ensure that Yuga Labs is able to regain control of its brand, begin to end the irreparable harm by Defendants, and stop Defendants' from benefiting from their infringement.

Despite Defendants' policy arguments and citations to inapplicable caselaw, the Court's decision is simple:  whether Yuga Labs is entitled to an award of costs and fees.  In light of its complete victory on the three copyright claims in this case, Yuga Labs believes the answer is yes.

**Defendants' Litigation Misconduct Objections Are Irrelevant And Lack Merit:**  The remainder of Defendants' objections are irrelevant to this issue and, in any event, lack any merit.  *See infra* ¶¶ 61-66.

**<u>Defendants' Reply:</u>**

Yuga provides no context for its litigation misconduct and fails to rebut that its misconduct bars any award for fees and costs. 17 U.S.C. § 505 provides that "the court ***in its discretion may*** allow the recovery of full costs" and "the court ***may*** also award a reasonable attorney's fee to the prevailing party as part of the costs."  Courts exercise their discretion by considering non-exclusive factors such as the degree of success in litigation, the conduct of litigants, and the goals of the copyright act. *Glacier Films (USA), Inc. v. Turchin*, 896 F3d 1033, 1038-1044 (9th Cir. 2018). Yuga has engaged in egregious acts in this litigation including (1) threatening to kill Mr. Ripps and his 72-year-old father, (2) harassing sixteen facially irrelevant third

parties, (3) improperly holding the deposition transcript of Mr. Hickman "hostage" as this Court has described it, (4) not showing up to deposition despite Court orders requiring them to do so, (5) baselessly refusing to produce materials, (6) Yuga insisting on a non-disparagement clause in an effort to take away Defendants' speech rights, and (7) having made six baseless threats of fee and sanctions, all of which the Court has denied.  Given Yuga's numerous instances of litigation misconduct, the use of this Court's equity powers to award fees would be inappropriate.

Yuga similarly fails to contrast *Grateful Dead Prods., Inc. v. Auditory Odyssey*, *76 F.3d 386 (9th Cir. 1996)*, the Ninth Circuit affirmed the district court's denial of attorneys fees despite the prevailing party winning at summary judgment.  The main issue in *Grateful Dead* was that the prevailing party's performance at trial was poor, and that barred any award of fees.  The same is true here.   Yuga was seeking in excess of $800,000,000.00 in remedies in this action and has now reduced the remedies figure Yuga seeks to approximately $1.5 million, with the actual damages figure reduced to $0.  The fact that Yuga has lost so much in the trial process indicates significant success on part of the Defendants and precludes any award of fees or costs.

**Plaintiff's Disputed Post Trial Conclusion of Law No. 68, lines 20:5-7:**

Accordingly, because Yuga Labs is the prevailing party on Defendants' copyright counterclaims, it is entitled to its full costs and fees for those claims.

**Defendants' Basis of Dispute:**

As noted earlier, Yuga incorrectly argues that it is entitled to costs and attorneys' fees under the Copyright.  17 U.S.C. § 505 provides that "the court ***in its discretion may*** allow the recovery of full costs" and "the court ***may*** also award a reasonable attorney's fee to the prevailing party as part of the costs."  Court's exercise their discretion by considering non-exclusive factors such as the degree of success in litigation, the conduct of litigants, and the goals of the copyright act.  *Glacier Films (USA), Inc. v. Turchin*, 896 F3d 1033, 1038-1044 (9th Cir. 2018).

1  Courts have exercised this discretion to not award any costs or fees even when a

2  party prevailed at summary judgment.  For example, in *Grateful Dead Prods., Inc. v.*

3  *Auditory Odssey*, 76 F.3d 386 (9th Cir. 1996), the Ninth Circuit affirmed the district

4  court's denial of attorney's fees because "plaintiffs prevailed by summary judgment

5  on the issue of liability" but "failed to prove the main issue at trial which as whether

6  the defendants acted willfully."

7  This case is no different.  While the Court granted summary judgment on

8  Defendants' claim under the Copyright Act, Yuga has already lost on the main issues

9  remained for trial.   Yuga attended this Court's pre-trial conference stating that it had

10  suffered damages "up to hundreds of millions" (Dkt. 344 at 23:7) and that Yuga

11  would ask the jury to award "north of $10 million" in actual damages (Dkt. 344 at

12  27:8) in addition to any equitable relief that it seeks.  But Yuga pre-emptively

13  abandoned its damages claims when it informed the Court that "Yuga Labs is

14  withdrawing all legal remedies and will proceed to trial solely on its prayer for

15  equitable remedies[.]"  Dkt. 315-1 at 2.  As a result, similar to *Grateful Dead*, 76 F.3d

16  386, Defendants prevailed on the main issue for trial because Yuga's actual damages

17  claim that was "up to hundreds of million" was reduced to $0.

18  Similarly, the goals of the Copyright Act weigh strongly against the award of

19  any fees.  The goal of the Copyright Act is "to promote creativity for the public good."

20  *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994); *see also* *Fogerty v. Fantasy, Inc.*,

21  510 U.S. 517, 524 (1994) ("The primary objective of the Copyright Act is to

22  encourage the production of original literary, artistic, and musical expression for the

23  good of the public.").  Here, Defendants filed a claim based on Yuga's improper use

24  of the Digital Millennium Copyright Act to take down content based on trademarks

25  rather than copyright.  Defendants filed these claims because Yuga had improperly

26  leveraged DMCA's "safe harbor" regime, which is intended only for copyrights, to

27  take down content based on allegations of trademark infringement.  While this Court

28

Case No. 2:22-cv-04355-JFW-JEM        -774-        JOINT STATEMENT RE: OBJECTIONS

1  may disagree with the merits of Defendants' claim, their exercise of the Copyright Act

2  was intended to pursue what they believed to an abuse of the DMCA statute, which

3  often results in improper suppression of artworks on the internet.  An award of fees

4  would deter artists in the future from challenging in Court (which is the only way to

5  meaningfully challenge unlawful DMCA requests) what they perceive to be abusive

6  use of the DMCA statute and the remarkable leverage of the DMCA's safe harbor

7  regime.

8       Lasty, considering Yuga's misconduct throughout this litigation, an award of

9  costs and fees would be unjust.  For example, Yuga used this litigation as means to

10  harass Mr. Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga

11  employee threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's

12  father to file a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and

13  your son should die.'  You said that.  And my dad is … freaked out, you know … he

14  really is scared, you know … You keep … harassing my family[.]").  Yuga's counsel

15  Yuga initially brushed off the issue, then later conceded that a threat did in fact occur.

16  Dkt. 97 at 4.  But Yuga's harassment of Mr. Ripps's father continued, including

17  serving a facially invalid subpoena on him seeking to compel his trial attendance

18  (notwithstanding his complete irrelevance to any issue in the case).

19       Yuga served more than sixteen subpoenas in this action, nearly all of them

20  facially irrelevant and procuring no useful discovery, apparently to harass anyone that

21  is in any way associated with the Defendants.  For example, Yuga targeted people on

22  Twitter whose sole relevance was apparently having "liked" the RR/BAYC project,

23  Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties

24  repeatedly commented on how Yuga's behavior in this lawsuit impacted them

25  personally, including for example Mr. Ripps's part-time, one-week general assistant

26  (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory,

27  honestly."  Garner Depo. At 190:9-17.

28

1      Yuga also improperly tried to preclude relevant discovery by making a

2  baseless apex witness argument in an *ex parte* motion for a protective order.  The

3  Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the

4  merits" because the co-founders were "the only people who have knowledge of the

5  creation of the marks." Dkt. 77 at 2.  The Court accordingly ordered that Yuga

6  employees Wylie Aronow and Greg Solano appear for depositions on January 9 and

7  11 respectively (excusing Mr. Solano only if he had medical complications). *Id*.  Yet,

8  despite this Court's order, ***neither witness appeared***.  Yuga has never identified any

9  medical reason why Mr. Solano could not attend.  The Court was clear that failing to

10  appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did

11  not show up.  Dkt. 77 at *2.  Yuga has not done so.

12      Yuga also flouted this Court's Protective Order by improperly designating the

13  entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

14  CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

15  from the public.  This deposition involved no Yuga confidential information; instead,

16  it was the testimony of a Black Jewish third party that included discussion of racism

17  and antisemitism in Yuga's branding. *See* Dkt. 123-2.  Defendants were forced to

18  bring a motion to address Yuga's misuse of the Protective Order, which the Court

19  granted ordering complete de-designation of the transcript and finding that Yuga was

20  wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

21      Yuga also baselessly refused to produce materials relating to third-party

22  Thomas Lehman's settlement-procured declaration to run the clock on the discovery

23  schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

24  and sought expedited review of that motion to allow time for its use in a deposition of

25  Mr. Lehman.  The Court declined to consider the motion on an expedited basis,

26  stating that Defendants could instead depose Mr. Lehman in "the last week of March

27  before the April 1, 2023 discovery cut-off date." Dkt. 119 at 2.  The Court ultimately

28

granted Defendants' motion, holding that Yuga waived any claim to confidentiality due to its "unfettered use of Lehman's declaration[.]" Dkt. 159 at 2. After Yuga belatedly made its court-ordered production, Defendants took Mr. Lehman's deposition in the final week of discovery as suggested by the Court. But because of Yuga's delay, the deposition testimony—which raised disputes of fact regarding Defendants' infringement and Yuga's credibility—was unavailable for consideration in opposition to Yuga's motion for summary judgment. *See* Dkt. 215 at 2.

Throughout the course of this litigation, Yuga also made repeated baseless threats of fees and sanctions. In total, Yuga has unsuccessfully asked the Court to impose sanctions ***six times***. *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20. Every request was denied. This kind of scorched-earth litigation strategy is improper in any context, but particularly problematic where Defendants are two individuals attempting to respond to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

Because Defendants substantially prevailed at trial by entirely eliminating Yuga's actual damages claim that was up to hundreds of millions of dollars, an award of fees would run contrary to the goals of the copyright act, and Yuga's failure to come to the Court with clean hands as a result of its litigation misconduct, a discretionary award of costs and attorneys' fees under 17 U.S.C. § 505 is not appropriate.

### Plaintiff's Response:

In light of its complete victory on the three copyright claims in this case, Yuga Labs is entitled to its fees and costs under this statute. *See supra* ¶ 67.

### Defendants' Reply:

For the reasons stated above in ¶ 67 this court should deny its claim for legal damages.

### Plaintiff's Disputed Post Trial Conclusion of Law No. IV Conclusion:

For the reasons explained above, it is hereby ORDERED THAT Defendants pay to Plaintiff:

1. $1,375,361.92 in Defendants' profits;

2. $200,000 in statutory damages;

3. Attorneys' fees;

4. Costs; and

5. Pre- and post-judgment interest.

The amount of Yuga Labs' fees and costs shall be determined after Yuga Labs files a separate fee application no later than thirty (30) days from the date of this order and judgment.

### Defendants' Basis of Dispute:

Yuga's proposed award is inconsistent with the evidence at trial and applicable law. *First*, Yuga is not entitled to any disgorgement of profits because Yuga advanced concerned numbers for actual damage and thereby failed to show "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Because Yuga's remedies at law were available but waived, Yuga can no longer obtain disgorgement. *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim. Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

*Second*, Yuga cannot obtain disgorgement because Defendants' intent was to protest against Yuga, not to cause confusion. *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (holding that an infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate."). Here, disgorgement is not an appropriate remedy because the intent of the RR/BAYC

1  project was to criticize Yuga's problematic imagery and educate consumers about the

2  nature of NFTs—the exact opposite of confusing consumers.  Cahen Decl. ¶¶ 97-98,

3  133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346) (uncontested); JTX-2033.  Mr.

4  Ripps has had a long and successful career as an artist, during which he has created

5  numerous satirical art projects spotlighting problematic societal issues.  Ripps Decl.

6  ¶¶ 15-26 (Dkt. 346) (uncontested).  Mr. Ripps's first solo exhibition commented on

7  how social media uses manipulated images of women to influence our perception of

8  beauty.  Ripps Decl. ¶ 26 (Dkt. 346) (uncontested).  Mr. Ripps's artistic contributions

9  have been widely acknowledged and celebrated; he is, as the *New York Times*

10  explained that he is one of the most prominent digital artists of the 2010's.  Ripps

11  Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

12      Defendants also took multiple steps to make clear that the RR/BAYC collection

13  was not related to Yuga in any way.  For example, the rrbayc.com website—through

14  which the majority of RR/BAYC commissions occurred and the vast majority of

15  alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

16  144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

17  Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

18  Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

19  rrbayc.com website were also required to read and click through a disclaimer

20  acknowledging the artistic purpose of the project before they were allowed to

21  commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

22  2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

23  additional steps so that the artistic purpose of the work would be clear to participants.

24  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

25  ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted

26  it and so he had the final call.").

27

28

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

The evidence at trial also shows that Yuga's public activities amounted to authorization of RR/BAYC collection and the numerous other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344). There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights

1    associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with
2    Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time
3    of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &
4    Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to
5    allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.
6    Your intent in writing the terms and conditions was to allow people to be able to
7    commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in
8    the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative
9    with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had
10   publicly represented that BAYC NFT holders received all IP rights and that Yuga has
11   none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);
12   Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that
13   someone listening to her public statement about Yuga not having any IP rights would
14   not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

15          All of these facts proven at trial preclude the conclusion that Defendants had the
16   mental state necessary to render disgorgement an available remedy.

17          ***Third***, Yuga is not entitled to disgorgement because Yuga failed to show that
18   any of the profits associated with the RR/BAYC collection are "attributable to the
19   infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir.
20   1993), *abrogated on other grounds by* *SunEarth, Inc. v. Sun Earth Solar Power Co.*,
21   839 F.3d 1179 (9th Cir. 2016).  The evidence at trial showed that RR/BAYC NFTs
22   were reserved in protest ***against*** Yuga and to support Defendants' artistic criticism,
23   not in response to the "appeal of [Yuga's] symbol."  *Mishawaka Rubber & Woolen*
24   *Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).

25          The evidence at trial did not reveal even a single transaction associated with the
26   RR/BAYC collection that was a result of confusion or a result of appeal to the BAYC
27   marks.  Neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance

28

of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.

Furthermore, the trial record included many letters directly from actual consumers of RR/BAYC NFTs.  From these voluminous correspondence from RR/BAYC Participants, none indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

This evidence shows that none of the profits associated with the RR/BAYC collection arose from consumer confusion or appeal of the BAYC marks.  Which means under appropriate apportionment, Yuga is not entitled to any disgorgement of profits.

**Fourth**, Yuga is not entitled to more than the statutory minimum for its cybersquatting claim because Yuga has withdrawn and waived "all legal remedies." Statutory damages are a legal remedy (for which there is a jury trial right).  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("The right to a jury trial includes the right to have a jury determine the *amount* of statutory damages") (emphasis in original).  Under Ninth Circuit law, a jury is not required when a plaintiff elects to accept the minimum amount of statutory damages for

1  cybersquatting.  *See GoPets Ltd. V. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  But

2  awarding anything more than the statutory minimum is a legal remedy, which Yuga

3  has foregone.  *See Versace v. Awada*, CV 03-3254-GAF, 2009 WL 10673371, at *7

4  (C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court will not permit

5  Plaintiff to withdraw its demand for a jury trial because Defendants do not consent,

6  and because the law holds clearly that Defendant has a right to a jury determination

7  of statutory damages.").

8      Having abandoned "all legal remedies," Yuga cannot obtain more than the

9  statutory minimum on its cybersquatting claim.  *See Daimler AG v. A-Z Wheels LLC*,

10  498 F. Supp. 3d 1282, 1290 (S.D. Cal. 2020) (holding that award above minimum is

11  a jury issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th

12  Cir. 2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252, 1260 (W.D.

13  Wash. 2013) (holding that statutory damages are a jury issue) (citing *BMG Music v.

14  Gonzalez*, 430 F.3d 888, 892 (7th Cir. 2005)).  The Court should thus enter judgment

15  of $2,000 on cybersquatting (the minimum statutory amount of $1,000 for each of the

16  two cybersquatting violations that the Court has found).

17      **Fifth**, Yuga is not entitled to any costs or fees because this is not an

18  exceptional case.  Courts determine if a case is exceptional by considering the totality

19  of the circumstances and evaluating whether the case is "one that stands out from

20  others with respect to the substantive strength of a party's litigation position

21  (considering both the governing law and the facts of the case) or the unreasonable

22  manner in which the case was litigated."  *SunEarth, Inc.*, 839 F.3d at 1180 (quoting

23  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).

24  Exceptional case findings are rare and not considered the norm.  *Octane Fitness,

25  LLC*, 572 U.S. at 553 (defining exceptional as "uncommon, rare and not ordinary")

26  (internal quotations omitted).  As the name implies, the case must present something

27  "exceptional" to depart from the normal rule that parties pay their own costs.  *See*

28

*Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005) (reversing district court because it was only based on a finding of intentional infringement, but not the kind of extreme conduct necessary for an exceptional case finding).  Plaintiffs bear the burden to prove that a case is exceptional.  *Caiz v. Roberts*, No. 15-CV-09044-RSWL-AGRx, 2017 WL 830386 at *5 (C.D. Cal. Mar. 2, 2017).

This is not an "exceptional case" under these exacting standards.  Defendants put forward reasonable defenses and were justified in defending this litigation, particularly given Yuga's demand for terms that Yuga could never attain through this litigation.  *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058-ODW (JPRx), 2021 WL 2414856 at *2 (C.D. Cal. June 14, 2021) ("Courts in this district have held that a party's litigation position must be objectively meritless for a case to be exceptional…").  Here, Defendants' litigation position has been defined by Yuga's unreasonable settlement demand that Defendants surrender their speech rights to criticize Yuga.  As the Court itself noted, Yuga's demand for a non-disparagement clause was "a condition that is quite frankly unreasonable."  Dkt. 334 at 9:9-12.  The reason that this case has continued as far as it has is Yuga's insistence on silencing Defendants.

Defendants have advanced good faith arguments in favor of their positions on both liability and damages.  *See Caiz,* 2017 WL 830386, at *5 (holding that mere "lack of success" does not support an exceptional case finding).  Defendants made a good-faith argument that they were entitled to a *Rogers* defense on free speech grounds— a common defense in trademark cases involving artists and their creations. While this Court disagreed, Defendants advanced this defense based on relevant evidence.  *See*, *e.g.*, Dkt. 163; Dkt. 163-17-31 (fifteen unsolicited letters applauding the RR/BAYC project as protest art that criticizes Yuga); Dkt. 163-80 (artist's statement); Dkt. 163-81 (disclaimer).

1    Defendants' litigation conduct also does not support an exceptional case

2    finding.  Defendants are entitled to mount a vigorous defense (especially given

3    Yuga's settlement conditions) both on the merits and during the burdensome

4    discovery process.  Yuga brought motion after motion in discovery, only to have their

5    arguments repeatedly rejected.  *See, e.g.*, Dkt. 77 (rejecting Yuga's "apex witness"

6    argument); Dkt. 133 (rejecting Yuga's attempt to seal the entirety of the deposition

7    transcript of a witness critical of Yuga); Dkt. 159 (ordering production of materials

8    Yuga improperly withheld); Dkt. 145 (denying Yuga's baseless motion for

9    sanctions).

10    Further, Defendants have also had to defend against moving targets.  For

11    example, within a span of ten days, Yuga first claimed damages of roughly $2 million

12    in actual damages, to a claim of nearly ***$800 million*** in actual damages, to complete

13    abandonment of all actual damages.  *See* Dkt 286 at 2-3 (asserting damages of

14    $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June

15    8); Dkt. 315-1 at 2 (dropping actual damages on June 15).  Defendants have made

16    reasonable offers of settlement and put forward reasonable legal arguments in the

17    face of Yuga's shifting claims.

18    Yuga's litigation misconduct likewise precludes a finding that this case is

19    exceptional in Yuga's favor.  *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022)

20    ("When a party seeking equitable relief has violated conscience, or good faith, or

21    other equitable principle, in his prior conduct, then the doors of the court will be shut

22    against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at

23    1180-81 (holding that an exceptional case finding is an exercise of the court's

24    equitable powers).  For example, Yuga used this litigation as means to harass Mr.

25    Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee

26    threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file

27    a police report).  *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should

28

die.'  You said that.  And my dad is … freaked out, you know … he really is scared, you know … You keep … harassing my family[.]").  Yuga's counsel Yuga initially brushed off the issue, then later conceded that a threat did in fact occur.  Dkt. 97 at 4.  But Yuga's harassment of Mr. Ripps's father continued, including serving a facially invalid subpoena on him seeking to compel his trial attendance (notwithstanding his complete irrelevance to any issue in the case).

Yuga served more than sixteen subpoenas in this action, nearly all of them facially irrelevant and procuring no useful discovery, apparently to harass anyone that is in any way associated with the Defendants.  For example, Yuga targeted people on Twitter whose sole relevance was apparently having "liked" the RR/BAYC project, Defendants' personal accountants, and Mr. Ripps's gallerist.  These parties repeatedly commented on how Yuga's behavior in this lawsuit impacted them personally, including for example Mr. Ripps's part-time, one-week general assistant (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory, honestly."  Garner Depo. at 190:9-17.

Yuga also improperly tried to preclude relevant discovery by making a baseless apex witness argument in an *ex parte* motion for a protective order.  The Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the merits" because the co-founders were "the only people who have knowledge of the creation of the marks."  Dkt. 77 at 2.  The Court accordingly ordered that Yuga employees Wylie Aronow and Greg Solano appear for depositions on January 9 and 11 respectively (excusing Mr. Solano only if he had medical complications).  *Id*.  Yet, despite this Court's order, ***neither witness appeared***.  Yuga has never identified any medical reason why Mr. Solano could not attend.  The Court was clear that failing to appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did not show up.  Dkt. 77 at *2.  Yuga has not done so.

1    Yuga also flouted this Court's Protective Order by improperly designating the

2    entirety of third-party Ryan Hickman's deposition testimony as HIGHLY

3    CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony

4    from the public.  This deposition involved no Yuga confidential information; instead,

5    it was the testimony of a Black Jewish third party that included discussion of racism

6    and antisemitism in Yuga's branding.  *See* Dkt. 123-2.  Defendants were forced to

7    bring a motion to address Yuga's misuse of the Protective Order, which the Court

8    granted ordering complete de-designation of the transcript and finding that Yuga was

9    wrong to "***hold the transcript hostage***."  Dkt. 133 at *2 (emphasis added).

10    Yuga also baselessly refused to produce materials relating to third-party

11    Thomas Lehman's settlement-procured declaration to run the clock on the discovery

12    schedule.  Defendants filed a motion to compel once Yuga disclosed the declaration

13    and sought expedited review of that motion to allow time for its use in a deposition of

14    Mr. Lehman.  The Court declined to consider the motion on an expedited basis,

15    stating that Defendants could instead depose Mr. Lehman in "the last week of March

16    before the April 1, 2023 discovery cut-off date."  Dkt. 119 at 2.  The Court ultimately

17    granted Defendants' motion, holding that Yuga waived any claim to confidentiality

18    due to its "unfettered use of Lehman's declaration[.]"  Dkt. 159 at 2.  After Yuga

19    belatedly made its court-ordered production, Defendants took Mr. Lehman's

20    deposition in the final week of discovery as suggested by the Court.  But because of

21    Yuga's delay, the deposition testimony—which raised disputes of fact regarding

22    Defendants' infringement and Yuga's credibility—was unavailable for consideration

23    in opposition to Yuga's motion for summary judgment.  *See* Dkt. 215 at 2.

24    Throughout the course of this litigation, Yuga also made repeated baseless

25    threats of fees and sanctions.  In total, Yuga has unsuccessfully asked the Court to

26    impose sanctions ***six times***.  *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at

27    6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.

28

This kind of scorched-earth litigation strategy is improper in any context, but particularly problematic where Defendants are two individuals attempting to respond to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

Yuga exacerbated its litigation misconduct by presenting false testimony at trial in the form of its Declaration of Greg Solano.  Mr. Solano conceded on cross examination that his declaration included untrue statements, and he was repeatedly impeached at trial.  For example, Mr. Solano was also forced to concede on cross examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4.  Mr. Solano was likewise repeatedly impeached. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

Because Yuga has abandoned its claim that Defendants' infringement was willful, because Defendants' positions were reasonable and their defense of this litigation was necessitated by Yuga's unreasonable settlement requirements, and because Yuga does not come to the Court with clean hands as result of its litigation

misconduct, Defendants respectfully request that the Court reject Plaintiff's claim that this case is "exceptional" warranting an award of attorneys' fees in Yuga's favor.

**Sixth**, Yuga's proposed judgment improperly omits that Defendants are entitled to a finding of no willfulness. Yuga put Defendants' willfulness at issue as a factual matter by requesting a finding at summary judgment that "this is an exceptional case *of intentional infringement*." Dkt. 149 at 13 (emphasis added). The Court denied Yuga's summary judgment motion on this issue. Courts have repeatedly recognized that "willfulness is an issue for the jury." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Group, LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018). Yuga's waiver of "all legal remedies" thus waived any claim of willful infringement, and Defendants are thus entitled to a judgment of no willfulness. *See also* Dkt. 236 at 13 (Yuga conceding that it is not pursuing a claim of willful infringement).

### Plaintiff's Response:

Defendants' objection should be rejected because (1) the availability of actual damages is not a bar to recovery for disgorgement; (2) Defendants were intentional infringers; (3) there is ample evidence of confusion in the record, which is unrebutted by Defendants' evidence; (4) the Court may award more than the minimum statutory damages; (5) Yuga Labs has proven that this is an exceptional case; (6) willfulness is no longer at issue in this case, and (7) Defendants fail to impeach Mr. Solano's accurate testimony.

**The Availability Of Actual Damages Is Not A Bar To Recovery For Disgorgement:** There is no requirement for an absence of an "adequate remedy at law" to obtain disgorgement. *See supra* ¶ 31. To receive Defendants' profits, Yuga Labs' only burden is to "establish[] the defendant's gross profits from the infringing activity with reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400,

1408 (9th Cir. 1993).  Through at least the testimony of Ms. Kindler, Yuga Labs has met its burden.  *See supra* ¶¶ 31, 36.

**Defendants Were Intentional Infringers:**  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers. SJ Order (Dkt. 225) at 12; *supra* ¶ 7.  Likewise, Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.  *See supra* ¶ 7. Defendants' attempts to shift the blame onto third party infringers, claim that they believed they had the right to use the BAYC Marks, or claim that their infringement is "art" have all been rejected, and should be rejected once again.  *Id*.

**There Is Ample Evidence Of Confusion In The Record, Which Is Unrebutted By Defendants' Evidence:**  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  *See supra* ¶ 4. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.  *Id*.

**The Court May Award More Than The Minimum Statutory Damages:** Statutory damages are an equitable remedy and courts are not required to refer the issue of statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014); *Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015); *See supra* ¶ 39.  To the contrary, Ninth Circuit precedent demonstrates that Courts have the authority to award more than the minimum statutory damages for ACPA claims, even after a bench trial.  *See Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982, 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010); *City of*

1  *Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1108 (S.D. Cal. 2012).  The Court may

2  award statutory damages as "the court considers just."  15 U.S.C. § 1117(d).

3  **Yuga Labs Has Proven That This Is An Exceptional Case:**  Defendants

4  engaged in egregious litigation misconduct justifying a finding that this is an

5  exceptional case.  *See supra* ¶ 61-66.  And Defendants' attempts to evade

6  responsibility for their egregious litigation misconduct by pointing a finger at Yuga

7  Labs has no relevance.  *Id*.  The losing party in a Lanham Act case cannot defend

8  against an exceptional case finding by accusing the prevailing party of engaging in

9  similar misconduct.  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL

10  2155975, at *5 (C.D. Cal. Feb. 24, 2022).

11  **Willfulness Is No Longer At Issue In This Case:**  The Court has already

12  found Defendants' infringement was willful.  *See* SJ Order at 12; *see also Lindy Pen*,

13  982 F.3d at 1405-06 (willfulness "carries a connotation of deliberate intent to deceive.

14  Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or

15  'fraudulent' to conduct that meets this standard.").  Regardless, Defendants intended

16  to confuse consumers.  *See supra* ¶ 7.

17  **Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  *See*

18  *supra* ¶ 1 (lines 1:21-24).  The vast majority of Mr. Solano's testimony detailing the

19  harm to Yuga Labs because of Defendants' intentional and repeated use of the BAYC

20  Marks is undisputed and supported by other record evidence.  *Id*.  The few arguments

21  Defendants raise claiming his testimony is not credible are meritless.  *Id*.

22  **Defendants' Reply:**

23  Contrary to Yuga's argument, the Supreme Court has held that disgorgement is

24  not available unless there is "the absence of an adequate remedy at law."  *Dairy*

25  *Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  And the rule set forth in *Dairy*

26  *Queen* has been applied to awarding defendant's profits under the Lanham Act.  *See*

27

28

1  *Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-
2  3 (N.D. Cal. Oct. 26, 1994).

3        Legal remedies were available in this case.  Yuga expressly asserted and offered
4  expert testimony in support of legal remedies (including a claim for actual damages
5  that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-
6  1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17,
7  173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga
8  cannot obtain disgorgement.  *See Hunting World Inc.*, 1994 WL 763408, at *2-3
9  ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the
10  claim purely equitable because, as discussed above, this is a statutory claim.  Again,
11  because the statutes provide adequate remedies, a purely equitable claim may not be
12  maintained.").

13        Yuga's discussion about whether Defendants were "intentional infringers" is
14  irrelevant and highlights that Yuga failed to show the proper type of intent for
15  disgorgement damages.  Disgorgement is only warranted in cases of "conscious
16  wrongdoers."  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL
17  4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an
18  available remedy here because – as the evidence showed at trial - neither Mr. Ripps
19  nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176
20  (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010,
21  012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Likewise
22  whether Defendants acted willfully is at issue, except to the extent that Yuga failed to
23  seek it.  Regardless, Defendants intent is at issue because Yuga seeks intent-laden
24  relief.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

25        Yuga's right to statutory damages is capped at the minimum because it elected
26  to surrender legal remedies.  *See* Dkt. 315-I.  A court's discretion in awarding
27  damages is curbed by Defendants' rights, including Defendants' Seventh Amendment

28

1 | right to a jury trial.  Statutory damages are legal remedies for which there is a right to
2 | a jury trial.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353
3 | (1998) ("[t]he right to a jury trial includes the right to have a jury determine the
4 | amount of statutory damages") (emphasis in original).  However, a jury trial is not
5 | required in instances when a plaintiff elects to accept the minimum amount of
6 | statutory damages.  *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).
7 | Here, the Court has discretion to award statutory minimum damages of $1,000 for
8 | each of the two cybersquatting violations that the Court found (Dkt. 225 at 13-15), for
9 | a total of $2,000.  *See* 15 U.S.C. § 1117(d) (permitting "award of statutory damages in
10 | the amount of not less than $1,000").  Defendants never surrendered their right to a
11 | jury trial, and therefore this Court has no discretion to award more than what Yuga
12 | implicated elected—the minimum.

13 |      Yuga has failed to prove that it is entitled to an exceptional case finding.  First,
14 | the case they cite in favor of ignoring their own misconduct holds precisely the
15 | opposite.  That case holds, "The Court also considers the conduct of **both parties**
16 | throughout the case." *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL
17 | 2155975, at *5 (C.D. Cal. Feb. 24, 2022).  Yuga has done no more than demonstrate
18 | that it won at summary judgment and not that Defendants put forward frivolous
19 | arguments.  Yuga's misconduct should also preclude such a finding.

20 |      Mr. Solano is not a credible witness.   At trial, Mr. Solano admitted that he
21 | committed a mistruth in his sworn declaration of trial testimony when he was forced
22 | to concede on cross-examination that his sworn declaration included a false statement
23 | claiming that Defendants continue to receive royalties from sales on secondary
24 | marketplaces.  *See* Trial Tr. [Solano] 48:14-49:4.  Mr. Solano also premised much of
25 | his declaration on Mr. Lehman's extraordinarily flawed declaration to support his
26 | sweeping assertions without realizing that it was drafted by Yuga's counsel, as a
27 | condition of settlement, using words that Mr. Lehman would not use.  *Id.* at 38:14-19;

28 |

40:3-14.  Overall, Mr. Solano was caught in several mistruths on the stand and was exposed for relying on unreliable information that was outside of his knowledge.

**Plaintiff's Disputed Post Trial Conclusion of Law No. IV.1**

1.    Defendants, their agents, employees, and attorneys, and anyone in active concert or participation with Defendants, their agents, employees, and attorneys, are hereby permanently restrained and enjoined from, directly or indirectly, or authorizing or assisting any third-party to engage in:

   a.    Manufacturing, minting, issuing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, loaning, renting, or otherwise disposing of the RR/BAYC NFTs (except as provided in this Judgment) and any other products or merchandise related to the RR/BAYC NFTs, including without limitation, listing the RR/BAYC NFTs or related products or merchandise for sale on any marketplace, and/or collecting royalties in connection with the RR/BAYC NFTs;

   b.    Using in any manner any logo, trade name, trademark, or designation confusingly similar to any of the BAYC Marks or any other Yuga Labs source identifier, alone or in combination with other words or designs, as a trademark, trade name component, or otherwise, to market, advertise, promote, or identify any good and/or service not produced, offered, or authorized by Yuga Labs, or to falsely represent or have the effect of falsely representing that the goods or services of any Defendant or of others are sponsored by, authorized by, or in any way associated with Yuga Labs, or to otherwise unfairly compete with Yuga Labs in manufacturing, selling, offering for sale, distributing, or advertising goods or services;

c.   Registering, owning, using, or trafficking any other website, domain name, e-commerce page or account, digital marketplace page or account, licensing business or other business, or any entity or store whose name or d.b.a. confusingly uses and/or incorporates any of the BAYC Marks, or includes "BAYC", "Bored Ape", or "Yuga" or any other Yuga Labs source identifier, or that is confusingly similar to any of the BAYC Marks, or that is calculated to or reasonably likely to confuse consumers into believing that Defendant is Yuga Labs, or is in any manner associated or connected with Yuga Labs when it is not;

d.   Registering, owning, using, or trafficking any social media account, including but not limited to www.discord.com or www.twitter.com account(s), that purports to originate from Yuga Labs, or to be sponsored or licensed by, or affiliated with Yuga Labs or uses and/or incorporates any portion of the BAYC Marks within its name, when it is not;

e.   Using the infringing "RR/BAYC" and "APE MARKET" marks on social media platforms to facilitate the manufacture, circulation, sale, transfer, marketing, advertising, promoting, and/or renting of RR/BAYC NFTs or related goods or services;

f.   Providing any benefits to holders of the RR/BAYC NFTs, such as airdrops, or otherwise creating incentives for third parties to sell, purchase, trade, transfer, loan, rent, and/or profit from RR/BAYC NFTs.

g.   Further infringing any BAYC Mark and/or any other Yuga Labs source identifier;

**Defendants' Basis of Dispute:**

Yuga proposed injunction is impermissibly overbroad.  Injunctive relief must be "tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).  "An overbroad injunction is an abuse of

discretion." *Id.*  Here, the specific harm alleged is Defendants' use of Yuga's marks to sell products.  *See* Dkt. 1 at ¶ 5 (complaint is about sales of RR/BAYC NFTs).  Therefore, the injunction must be tailored to only that harm, and not the ancillary issues such as Defendants' free speech rights that Yuga has wrongfully tried to introduce into the injunction.

Section 1 of Yuga's proposed injunction is overbroad because it seeks to backdoor a non-disparagement clause by seeking injunction terms that would also prevent Defendants from being able to criticize Yuga.  Yuga made clear at trial that it wishes to silence the Defendants' criticism:

> Q.   Yuga Labs has asked for an injunction that would prevent Mr. Ripps and Mr. Cahen from using any of those words in any way to promote anything; right?
>
> A.   They have taken our brand and stolen it.  We want our brand out of their hands in every capacity.
>
> Q.   Do you want them never to say "Bored Ape Yacht Club" again?
>
> A.   ***They should not have the right to say "Bored Ape Yacht Club" again.***  They have stolen from us.

Trial Tr. [Muniz] 94:5-13 (emphasis added).

Yuga's proposed injunction includes terms that would allow Yuga to realize its wish to silence the Defendants.  The injunction is not reasonably tailored to cover RR/BAYC NFTs.  Rather, section 1(a) seeks to enjoin Defendants from "Manufacturing, minting, issuing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, loaning, renting, or otherwise disposing of … any other product or merchandise related to the RR/BAYC NFTs …."  The "related to" language is impermissibly vague and broad.  As a result, this injunction could be read to prohibit Defendants from creating any non-infringing

1    products or merchandise that would advance the protest and criticism of the

2    RR/BAYC project.  For example, this provision could be read to restrict Mr. Ripps

3    from continuing or expanding his criticism on gordongoner.com, could restrict Mr.

4    Ripps from talking about that prior criticism, or promoting that criticism on Twitter or

5    elsewhere.

6         Section 1(b) of the Yuga's proposed injunction is similarly vague overbroad.  It

7    prohibits Defendants from using "any other Yuga Labs source identifier, alone or in

8    combination with other words … to market, advertise, promote, or identify any good

9    and/or service not produced, offered, or authorized by Yuga Labs."  This provision

10    could be read to restrict Defendants from referencing the Bored Ape Yacht Club at all

11    in connection with any service not sponsored by Yuga Labs.  For example, this

12    provision could be read to preclude Mr. Ripps from using the words "Bored Ape

13    Yacht Club"—or even "ape"—when promoting his criticism on gordongonner.com or

14    any other criticism or artwork critiquing Yuga.  It goes even further with its broad

15    "source identifier" language—it would preclude Mr. Ripps from even saying "Yuga"

16    when critiquing Yuga.  This is overbroad restriction consistent with Yuga's stated

17    goal of preventing Mr. Ripps from ever uttering the words "Bored Ape Yacht Club"

18    again.  *See* Trial Tr. [Muniz] 94:5-13.  But it is wholly inconsistent with the First

19    Amendment.

20         Section 1(d) similarly prohibits Defendants from "[r]egistering, owning, using,

21    or trafficking any social media account, including but not limited to www.discord.com

22    or www.twitter.com account(s), that … or uses and/or incorporates any portion of the

23    BAYC Marks within its name …"  This provision would prohibit Defendants from

24    creating any social media account that includes even only a portion of a BAYC Mark

25    within its name.  For example, Defendants could not create a social media account

26    with the name, "Online Bulletin for Ryder Ripps's Criticism of the Bored Ape Yacht

27

28

Club."  But again, doing so is precisely the kind of critical activity that the First Amendment protects.

And Section 1(e) seeks to restrict Defendants from "[u]sing the infringing "RR/BAYC" and "APE MARKET" marks on social media platforms to facilitate the manufacture, circulation, sale, transfer, marketing, advertising, promoting, and/or renting of RR/BAYC NFTs or related goods or services."  This provision likewise could be read to restrict use of any goods or services "related" to RR/BAYC NFTs in any way.  This would wrongly preclude Defendants from discussing on social media artworks or writings that discuss the RR/BAYC project and its criticism of Yuga.  Once again, this is inconsistent with both the First Amendment and established law curtailing the scope of trademark injunctions.  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

There is no reasonable basis the Yuga should be given an injunction that has these kinds of overbroad terms.  They do nothing to serve the purposes of the Lanham act and instead were drafted to realize Yuga's goal of taking away Defendants' "right to say 'Bored Ape Yacht Club.'"  Trial Tr. [Muniz] 94:12-13.

## Plaintiff's Response:

Defendants' objection should be rejected because (1) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it to regain control of its brand and (2) Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights.

**Yuga Labs' proposed injunction is properly tailored:**  Defendants do not object to sections 1(c), 1(f), or 1(g).  Defendants thus concede that these provisions are appropriate injunctive relief.

The remainder of Yuga Labs' proposed injunction is likewise properly and narrowly tailored.  An injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain control of the brand.  This includes putting an end

1   to Defendants' sales, promotion, and marketing of infringing NFTs; preventing

2   Defendants from creating any future confusion by minting new infringing NFTs or

3   improperly using Yuga Labs' Marks; alerting consumers that the RR/BAYC NFTs are

4   a scam; and transferring the smart contract and other infringing domains and

5   instrumentalities to Yuga Labs so it once again has sole control over its marks.  It is

6   unrebutted that transferring the smart contract to Yuga Labs would allow it to regain

7   control over its brand.  Solano Decl. (Dkt. 342) ¶ 79; Muniz Decl. (Dkt. 340) ¶ 22;

8   Trial Tr. 100:6-14; Trial Tr. 136:9-18; Trial Tr. 138:6-139:11.  The injunctive relief

9   set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law would

10  accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two other courts have entered

11  similar injunctions against Defendants' business partners.  *See* Judgment and Order

12  for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v.*

13  *Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent

14  Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12),

15  *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).

16       **Yuga Labs' Proposed Injunction Does Not Seek To Curtail Defendants'**

17  **First Amendment Rights:**  Yuga Labs does not seek to "backdoor" a non-

18  disparagement clause.  Defendants intentionally misread sections 1(a) and 1(e) of

19  Yuga Labs' proposed injunction.  Section 1(a) prohibits Defendants from creating,

20  marketing, etc., any products "related to the RR/BAYC NFTs."  Likewise, section

21  1(e) prohibits Defendants from using RR/BAYC and Ape Market to create, market,

22  etc. "RR/BAYC NFTs or related goods and services."  Neither of these prohibit

23  Defendants' so-called "protest and criticism" of Yuga Labs, as they contend.  Rather,

24  they are narrowly tailored to enjoin Defendants from creating or marketing their

25  infringing NFTs or further creating or marketing other infringing products associated

26  with the RR/BAYC NFTs.

27

28

Defendants also intentionally misread section 1(b), which is targeted at prohibiting Defendants to from using any Yuga Labs source identifier to identify goods not produced by Yuga Labs.  Again, this is not aimed at stopping Defendants from criticizing Yuga Labs, but merely from creating further infringing products.  Section 1(d) likewise is aimed at preventing Defendants from creating social media accounts that could confuse consumers into thinking they are from Yuga Labs or affiliated with Yuga Labs.  Again, this is not intended to stifle Defendants' use of the BAYC Marks to criticize Yuga Labs.

Yuga Labs' former CEO did not testify that Yuga Labs intends to silence Defendants.  Rather, the context of Ms. Muniz's testimony is clear that she was speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club trademark to promote products.  Trial Tr. at 94:5-13.  There is no debate that Yuga Labs is seeking an injunction to stop Defendants' infringement of its marks.  The terms of the injunction that Yuga Labs contends is appropriate in this case are clear from its proposed findings of fact and conclusions of law.  Dkt. 416.  Yuga Labs has not sought to limit Defendants' criticisms of Yuga Labs through its proposed injunction.  What is also clear is that Defendants refuse to accept any reasonable injunctive relief, even though the Court has already found that Yuga Labs is entitled to injunctive relief.  Dkt. 418-1.

**Defendants' Reply:**

Defendants object to Yuga's proposed injunctive relief in its entirety and instead propose that if the Court enters an injunction (which it should not), it be limited to reasonable terms.  *See* Dkt. 417 ¶ 145.  Yuga's citations to the decisions other courts have held with regard to cases against Mr. Lehman (who settled with Yuga) and Mr. Hickman (who had a default judgment entered against him) are dissimilar to the posture in this case, not binding, and irrelevant and therefore cannot support its overly broad injunctive relief claim.

What is clear is that Yuga has long sought to silence Defendants and are attempting to do so through this overly broad injunctive relief proposal.  *See* Trial Tr. [Muniz] 94:5-13 (expressing wish that Defendants never say "Bored Ape Yacht Club" ever again).  As written, this broad injunctive relief clause would infringe on Defendants' rights to criticize Yuga's marks.  Instead, this Court if it were to enter an injunction should tailor it to the two major issues identified in Yuga's complaint (1) the sale of RR/BAYC NFTs and (2) the use of rrbayc.com and apemarket.com.

Yuga's claim for the smart contract should be rejected because it might not be technically feasible and is futile.  As such, this term runs a high risk of being set as a "trap" for Defendants to fall into as compliance might not be possible.  Further, Yuga has admitted that the contract is immutable, which means that the smart contract cannot be changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  An order that prohibits Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the injury alleged in this case.  Further, it would be enforceable in court. Likewise, a prohibition from using the rrbayc.com and apemarket.com domains—both of which are inactive—would suffice and fit the scope of the injury found by the court in this case (subject to Defendants' right to appeal). Yuga's argument that an injunction that prevents Defendants from using the marks and domain names in commerce would be insufficient without the smart contract is speculative and wrongly assumes that Defendants would not comply with a court order.   Defendants are aware that this Court has held that Yuga is entitled to some injunctive relief.  But any such relief must be well-tailored and reasonable.

**Plaintiff's Disputed Post Trial Conclusion of Law No. IV.2**

2.      Within fourteen (14) days after entry of this Order, Defendants shall:

    a.      Transfer to Yuga Labs, including by facilitating the transfer of rights with any necessary third-party host website, registrar, or other entity,

1     rrbayc.com, apemarket.com, the @ApeMarketplace Twitter account, and

2     the RR/BAYC smart contract

3     (0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e); together with

4     all codes, passwords, credentials, or other information necessary for

5     Yuga Labs to fully and solely access and operate the same;

6    b.    If Defendants own any RR/BAYC NFT, they shall destroy (e.g., "burn")

7     that NFT or provide it to Yuga Labs to burn;

8    c.    Except as provided in subsections (a) and (b) of this section, destroy any

9     other infringing materials, including NFTs, articles, documents, software,

10     promotional items, or advertisements in their possession or control using

11     any BAYC Mark or any other mark confusingly similar with the BAYC

12     Marks;

13    d.    To give practical effect to this Order, any third-party host website,

14     registrar, or other entity related to any of the domains, social media

15     account, or digital accounts subject to this Order shall, within fourteen

16     (14) days of receipt of this Order, transfer or otherwise assign those

17     subject domains, social media accounts, or digital accounts to Yuga Labs

18     if Defendants have not already done so.

19    e.    Contact by e-mail, text, or other written form of communication all

20     persons to whom Defendants gave, sold, issued, or distributed a

21     RR/BAYC NFT, and provide each of those persons with solely a copy of

22     this Order;

23    f.    Airdrop to all RR/BAYC NFT holders a copy of this Order.

24     **Defendants' Basis of Dispute:**

25     Like its other terms, these terms Yuga proposed injunction are impermissibly

26 overbroad.  Injunctive relief must be "tailored to remedy the specific harm alleged."

27 *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).  "An

overbroad injunction is an abuse of discretion." *Id.* Here, the specific harm alleged is Defendants' use of Yuga's marks to sell products. *See* Dkt. 1 at ¶ 5 (complaint is about sales of RR/BAYC NFTs). Therefore, the injunction should be tailored to only that harm, and not the ancillary issues that impact Defendants' free speech rights.

Section 2 of Yuga's proposed injunction is overbroad because it seeks to backdoor a non-disparagement clause by seeking injunction terms that would also prevent Defendants from being able to criticize Yuga. As Yuga made clear at trial, its goal is to silence the Defendants:

> Q.    Yuga Labs has asked for an injunction that would prevent Mr. Ripps and Mr. Cahen from using any of those words in any way to promote anything; right?
>
> A.    They have taken our brand and stolen it. We want our brand out of their hands in every capacity.
>
> Q.    Do you want them never to say "Bored Ape Yacht Club" again?
>
> A.    **They should not have the right to say "Bored Ape Yacht Club" again.** They have stolen from us.

Trial Tr. [Muniz] 94:5-13 (emphasis added).

Yuga's proposed injunction includes terms that would allow Yuga to realize its wish to silence the Defendants. Section 2(c) seeks to require Defendants to "destroy any other infringing materials, including NFTs, articles, documents, software, promotional items, or advertisements in their possession or control using any BAYC Mark or any other mark confusingly similar with the BAYC Marks." This term could be read to force Defendants to destroy their social media posts that criticize the Bored Ape Yacht Club and Yuga's misconduct by name. It would also force Defendants to destroy gordongoner.com, which Yuga does not allege infringes any Yuga mark. It could also be read to force Defendants to never say "Bored Ape Yacht Club" again—

just as Yuga testified at trial that it desires to do.  Trial Tr. [Muniz] 94:12-13.  There is no justification for this Court to enjoin Defendants lawful First Amendment activity in such a broad and sweeping manner.

Section 2 also contains terms (Sections 2(a), 2(b), 2(e), and 2(f)) that serve no purpose of addressing infringement and/or that are not even practically possible. Yuga has included in Section 2(a) of its proposed injunction that Defendants transfer the RR/BAYC smart contract to Yuga.  But Yuga has admitted that the contract is immutable, which means that the smart contract cannot be changed or modified in any meaningful way, no matter who owns it.  Thus, if the Court elects to enter an injunction precluding the Defendants from making further RR/BAYC NFTs, transferring the contract to Yuga would serve no purpose.

Similarly, Section 2(b) would require Defendants to "destroy (e.g., "burn") that NFT or provide it to Yuga Labs to burn."  But transferring an NFT to a burn address does not actually "destroy" the NFT.  All it does is transfer the NFT to a digital wallet that is not owned or controlled by any person or entity.  The NFT even after being sent to a burn address continues to exist on the blockchain and is readily accessible to anyone that has internet access.  Thus, such an injunction term serves no propose.

Section 2(e) is impractical because it would require that Defendants contact in written communications all persons that commissioned RR/BAYC NFTs and provide them with a copy of the injunction order.  Defendants do not have the contact information for all individuals that commissioned RR/BAYC NFTs and therefore do not have the ability to contact by written communication all persons that commissioned RR/BAYC NFTs.

Lastly, Section 2(f) is a term that serves no purpose.  Section 2(f) would require Defendants to "airdrop" the Court's injunction order to all RR/BAYC NFT holders. But doing so would not ensure that those holders learn about the order, because most active cryptocurrency wallets regularly receive thousands of "airdrops" (including

airdrops of potentially dangerous tokens that can comprise financial assets).  Thus, RR/BAYC NFT holders would almost certainly ignore whatever has been unilaterally airdropped into their wallets and, thus, Section 2(f) would achieve nothing.  Moreover, Yuga itself has the ability to issue such an "airdrop" to RR/BAYC holders (the addresses of whom are publicly known), and Yuga is better positioned than Defendants to airdrop whatever it likes, including the Court's injunction order, to all RR/BAYC NFT holders at any time it pleases.

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allows it to regain control of its brand and (2) Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights.

**Yuga Labs' Proposed Injunction Is Properly Tailored:** Defendants do not object to sections 2(c) or 2(d).  Defendants thus concede that these provisions are appropriate injunctive relief.

The remainder of Yuga Labs' proposed injunction is likewise properly and narrowly tailored.  An injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain control of the brand.  This includes putting an end to Defendants' sales, promotion, and marketing of infringing NFTs; preventing Defendants from creating any future confusion by minting new infringing NFTs or improperly using Yuga Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart contract and other infringing domains and instrumentalities to Yuga Labs so it once again has sole control over its marks.  It is unrebutted that transferring the smart contract to Yuga Labs would allow it to regain control over its brand.  The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two other courts have entered similar injunctions against

1   Defendants' business partners.  *See* Judgment and Order for Permanent Injunction
2   Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-
3   JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for
4   Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*,
5   No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).

6           **Yuga Labs' Proposed Injunction Does Not Seek To Curtail Defendants'**
7   **First Amendment Rights:**  Yuga Labs does not seek to "silence" Defendants, but
8   rather destroy any infringing materials.  Defendants misinterpret section 2(c), which
9   requires Defendants to "destroy any other infringing materials" in their possession.
10  Criticism, such as a social media post saying "BAYC sucks" does not count as
11  infringement, and thus it would not be covered by Section 2(c).  And Defendants
12  misrepresent section 2(e).  While an NFT cannot technically be destroyed, burning
13  that NFT will prevent it from ever being owned, bought, or sold again, mitigating the
14  pervasive harm Defendants have caused by taking it out of circulation.  Regarding
15  section 2(f), Defendants furnish no admissible evidence that RR/BAYC NFT holders
16  would "almost certainly ignore" any airdrop.  Indeed, Yuga Labs is dubious that the
17  average NFT holders receives "thousands of airdrops."  Finally, airdropping to NFT
18  holders costs money, and as the infringers, Defendants should bear this burden.

19          Defendants predictably do not want to transfer the RR/BAYC contract to Yuga
20  Labs because the smart contract is immutable (and so, they seem to argue, there is no
21  point in ordering the transfer).  The immutability of the RR/BAYC NFT contract is,
22  however, the major reason why the contract should be transferred to Yuga Labs.
23  Without transfer of the contract, the Defendants would forever have control over and a
24  connection to Yuga Labs' BAYC Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.
25  Defendants have no basis for continuing to hold on to the instrumentalities of their
26  bad faith infringement—namely the RR/BAYC smart contract used to manufacture
27  and sell the infringing NFTs, the cybersquatting domains rrbayc.com and
28

apemarket.com, and the @ApeMarketplace account used exclusively to promote RR/BAYC NFTs and Ape Market.  Each of these instrumentalities should be under the control of Yuga Labs as the rightful owner of the BAYC Marks.

Defendants' contention that the smart contract indicates the source of the RR/BAYC NFTs as Mr. Ripps' wallet is misleading.  The "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs. *Compare* JTX-25, *with* JTX-36.  Mr. Ripps can change the wallet name in the future, too.  More directly and by contrast, though, the RR/BAYC contract will always say Bored Ape Yacht Club and BAYC – Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  Transferring the contract away from Mr. Ripps is, therefore, one first step to breaking that connection.  Moreover, Yuga Labs explained at trial how ownership of the smart contract will allow Yuga Labs to work with the NFT marketplaces to ensure that the human readable elements of the marketplace clearly indicate that RR/BAYC NFTs are not authentic BAYC NFTs. *See* Trial Tr. 136:9-18 ("But if Yuga Labs had control . . . we would have a much greater flexibility in controlling how the collection is displayed in marketplaces, including OpenSea."); *see also* Trial Tr. 100:6-14; Trial Tr. 138:6-139:11.

Yuga Labs' former CEO did not testify that Yuga Labs intends to silence Defendants.  Rather, the context of Ms. Muniz's testimony is clear that she was speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club trademark to promote products.  Trial Tr. at 94:5-13.  There is no debate that Yuga Labs is seeking an injunction to stop Defendants' infringement of its marks.  The terms of the injunction that Yuga Labs contends is appropriate in this case are clear from its proposed findings of fact and conclusions of law.  Dkt. 416.  Yuga Labs has not sought to limit Defendants' criticisms of Yuga Labs through its proposed injunction.  What is also clear is that Defendants refuse to accept any reasonable injunctive relief,

1  even though the Court has already found that Yuga Labs is entitled to injunctive relief.

2  Dkt. 418-1.

3  **Defendants' Reply:**

4      Defendants object to Yuga's proposed injunctive relief in its entirety and

5  instead propose that if the Court enters an injunction (which it should not), it be

6  limited to reasonable terms.  *See* Dkt. 417 ¶ 145.  Yuga's citations to the decisions

7  other courts have held with regard to cases against Mr. Lehman (who settled with

8  Yuga) and Mr. Hickman (who had a default judgment entered against him) are

9  dissimilar to the posture in this case, not binding, and irrelevant and therefore cannot

10  support its overly broad injunctive relief claim.

11      What is clear is that Yuga has long sought to silence Defendants and are

12  attempting to do so through this overly broad injunctive relief proposal.  *See* Trial Tr.

13  [Muniz] 94:5-13 (expressing wish that Defendants never say "Bored Ape Yacht Club"

14  ever again).  As written, this broad injunctive relief clause would infringe on

15  Defendants' rights to criticize Yuga's marks.  Instead, if this Court elects to enter an

16  injunction, it should be tailored to one that implicates two major issues identified in

17  Yuga's complaint (1) the sale of RR/BAYC NFTs and (2) the use of rrbayc.com and

18  apemarket.com.

19      Yuga's claim for the smart contract should be rejected because its proposed

20  relief might not be technically feasible and is futile.  As such, this term runs a high

21  risk of being set as a "trap" for Defendants to fall into as compliance might not be

22  possible.  Further, Yuga has admitted that the contract is immutable, which means that

23  the smart contract cannot be changed or modified in any meaningful way, no matter

24  who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  An order that prohibits Defendants

25  from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants

26  from causing Yuga the injury alleged in this case.  Further, it would be enforceable in

27  court.  Likewise, a prohibition from using the rrbayc.com and apemarket.com

28

domains—both of which are inactive—would suffice and fit the scope of the injury found by the court in this case (subject to Defendants' right to appeal). Yuga's argument that an injunction that prevents Defendants from using the marks and domain names in commerce would be insufficient without the smart contract is speculative and wrongly assumes that Defendants would not comply with a court order.

Yuga also does not address Defendants' arguments that many of their terms including the air-drop term are practically impossible and would accomplish little. Yuga merely claims without evidence that these terms are possible and proportionate. Seeking functionally impossible but ultimately not very useful relief is an overarching theme to Yuga's proposed injunctive relief terms which are not intended to ameliorate the harms Yuga identified in its complaint, but instead to make compliance with an injunction as difficult as possible.

### Plaintiff's Disputed Post Trial Conclusion of Law No. IV.3

3. Upon entry of this Order, Defendants shall be deemed to have actual notice of the issuance and terms of the permanent injunction, and any act in violation of any of the terms of the permanent injunction may be considered and prosecuted as contempt of Court, and such other, further relief this Court deems just and proper.

### Defendants' Basis of Dispute:

Yuga's proposed injunction is overly broad and therefore not enforceable. "Injunctive relief must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." *Storman's Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotations and citations omitted). An overly broad injunction cannot be enforced. *See id.* at 1142. Because Yuga's overly broad proposed injunction cannot be enforced without violating Defendants' First Amendment rights, this order cannot subject them to prosecution for contempt of Court.

**Plaintiff's Response:**

Defendants' objection should be rejected because Yuga Labs' proposed injunction is not overbroad and thus enforceable. Indeed, two other courts have entered similar injunctions against Defendants' business partners. *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)). The proposed injunction would not violate Defendants' First Amendment rights, *see supra* ¶ IV.2, but regardless, this is not a proper basis to object to this standard language pertaining solely to notice. Defendants' irrelevant and boilerplate objection should be rejected.

**Defendants' Reply:**

Defendants object to Yuga's proposed injunctive relief in its entirety and instead propose that if the Court enters an injunction (which it should not), it be limited to reasonable terms. *See* Dkt. 417 ¶ 145. Yuga's citations to the decisions other courts have held with regard to cases against Mr. Lehman (who settled with Yuga) and Mr. Hickman (who had a default judgment entered against him) are dissimilar to the posture in this case, not binding, and irrelevant and therefore cannot support its overly broad injunctive relief claim.

Likewise, as stated above, many of the terms of Yuga's proposed injunction would be practically impossible to comply with. As such, any notice of the terms would be invalid.

**Plaintiff's Disputed Post Trial Conclusion of Law No. IV.4**

4.   Within thirty (30) days after entry of this Order, Defendants shall file with the Court and serve upon Yuga Labs' counsel a declaration under oath setting forth

<u>in detail the manner and form in which Defendants have complied with this Order.</u>

**Defendants' Basis of Dispute:**

Yuga's proposed injunction is overly broad and therefore not enforceable. "Injunctive relief must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." *Storman's Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (internal quotations and citations omitted). An overly broad injunction cannot be enforced. *See id.* at 1142. Because Yuga's overly broad proposed injunction cannot be enforced without violating Defendants' First Amendment rights, Defendants cannot be forced to submit a declaration setting forth how they complied with the Injunction's terms.

**Plaintiff's Response:**

Defendants' objection should be rejected because Yuga Labs' proposed injunction is not overbroad and thus enforceable. Indeed, two other courts have entered similar injunctions against Defendants' business partners. *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)). This declaration is especially necessary in this case given Defendants' repeated refusal to accept the orders of the Court. *See supra* ¶ 25 (highlighting Defendants' refusal to accept Court's denial of motion to compel seeking documents related to their failed *Rogers* defense and forcing Yuga Labs to respond to subsequent irrelevant discovery motions on the same); ¶ 31 (discussing Defendants' violation of protective order by leaking confidential documents to the press). Defendants' contempt for the Court's orders is plainly evident in these objections where they refuse to accept the entirety of

1  this Court's summary judgment order.  Requiring Defendants to file this declaration

2  will ensure Defendants' compliance with the Court's order.

3  **Defendants' Reply:**

4  Defendants object to Yuga's proposed injunctive relief in its entirety and

5  instead propose that if the Court enters an injunction (which it should not), it be

6  limited to reasonable terms.  *See* Dkt. 417 ¶ 145.  Yuga's citations to the decisions

7  other courts have held with regard to cases against Mr. Lehman (who settled with

8  Yuga) and Mr. Hickman (who had a default judgment entered against him) are

9  dissimilar to the posture in this case, not binding, and irrelevant and therefore cannot

10  support its overly broad injunctive relief claim.

11  Likewise, as stated above, many of the terms of Yuga's proposed injunction

12  would be practically impossible to comply with.  Defendants would struggle to

13  honestly file a declaration.  Further, Defendants will comply with whatever injunction

14  the court orders to the extent they can.  This declaration is not necessary.

15  **Plaintiff's Disputed Post Trial Conclusion of Law No. IV.5**

16  5.    This Court shall retain jurisdiction over this action for the purpose of

17  implementing and enforcing this injunction.

18  **Defendants' Basis of Dispute:**

19  Yuga's proposed injunction is overly broad and therefore not enforceable.

20  "Injunctive relief must be tailored to remedy the specific harm alleged.  An overbroad

21  injunction is an abuse of discretion." *Storman's Inc. v. Selecky*, 586 F.3d 1109, 1140

22  (9th Cir. 2009) (internal quotations and citations omitted).  An overly broad injunction

23  cannot be enforced.  *See id.* at 1142.

24  **Plaintiff's Response:**

25  Defendants' objection should be rejected because Yuga Labs' proposed

26  injunction is not overbroad and it is enforceable.  Indeed, two other courts have

27  entered similar injunctions against Defendants' business partners.  *See* Judgment and

28

1  Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v.*
2  *Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent
3  Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12),
4  *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).
5  The proposed injunction is not overbroad, *see supra* ¶ IV.2, but regardless, this is not
6  a proper basis to object to this standard language pertaining solely to the Court's
7  jurisdiction over its own injunction.  Defendants' irrelevant and boilerplate objection
8  should be rejected.
9           **Defendants' Reply:**
10          Defendants object to Yuga's proposed injunctive relief in its entirety and
11  instead propose that if the Court enters an injunction (which it should not), it be
12  limited to reasonable terms.  *See* Dkt. 417 ¶ 145.  Yuga's citations to the decisions
13  other courts have held with regard to cases against Mr. Lehman (who settled with
14  Yuga) and Mr. Hickman (who had a default judgment entered against him) are
15  dissimilar to the posture in this case, not binding, and irrelevant and therefore cannot
16  support its overly broad injunctive relief claim.  This objection to Yuga's proposed
17  injunctive relief is relevant because it is too broad, and an overly broad injunction
18  cannot be enforced.

Dated:  September 26, 2023        WILMER CUTLER PICKERING HALE &
                                  DORR LLP


                                  By:*/s/ Louis W. Tompros*
                                    Louis W. Tompros
                                    Attorneys for Defendants
                                  RYDER RIPPS and JEREMY CAHEN

Dated:  September 26, 2023            FENWICK & WEST LLP


                                      By: _/s/ Eric Ball_____
                                          Eric Ball
                                          Attorneys for Plaintiff
                                          YUGA LABS, INC.



            **ATTESTATION OF CONCURRENCE IN FILING**

    Pursuant to the United States District Court for the Central District of

California's Civil L.R. 5-4.3.4(a)(2)(i), Louis W. Tompros attests that concurrence in

the filing of this document has been obtained from Eric Ball


                                      By: /s/ _Louis W. Tompros_____
                                          Louis W. Tompros (*pro hac vice*)
                                          louis.tompros@wilmerhale.com
                                          **WILMER CUTLER PICKERING
                                              HALE AND DORR LLP**
                                          60 State Street
                                          Boston, MA 02109
                                          Telephone: (617) 526-6000
                                          Fax: (617) 526-5000

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all attorneys of record via the Court's ECF system on September 26, 2023.

By: /s/ *Louis W. Tompros*
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000