1 | ERIC BALL (CSB No. 241327)
eball@fenwick.com
2 | KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
3 | FENWICK & WEST LLP
801 California Street
4 | Mountain View, CA 94041
Telephone: 650.988.8500
5 | Facsimile: 650.938.5200

6 | MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
7 | ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
8 | ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
9 | FENWICK & WEST LLP
555 California Street, 12th Floor
10 | San Francisco, CA 94104
Telephone: 415.875.2300

11 | *Additional Counsel listed on next page*

12 | Attorneys for Plaintiff
13 | YUGA LABS, INC.

Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
RYDER RIPPS and JEREMY CAHEN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>RYDER RIPPS, JEREMY CAHEN,<br><br>Defendants. | Case No.: 2:22-cv-04355-JFW-JEM<br><br>**JOINT STATEMENT RE DEFENDANTS' PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW AND YUGA LABS' OBJECTIONS**<br><br>Judge: John F. Walter<br><br>Trial Date: July 31, 2023 |

1  MELISSA L. LAWTON (CSB No. 225452)
   mlawton@fenwick.com
2  FENWICK & WEST LLP
   228 Santa Monica Boulevard
3  Santa Monica, CA  90401
   Telephone:   310.434.4300
4
   Attorneys for Plaintiff
5  YUGA LABS, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's Minute Order of August 15, 2023 Civil Trial Order of June 7, 2023 (Dkt. 409), Plaintiff Yuga Labs, Inc. and Defendants Ryder Ripps and Jeremy Cahen submit the following joint statement regarding objections to Defendants' Post Trial Proposed Findings of Fact and Conclusion of Law.

Pursuant to the Court's order, lead counsel for the parties met and conferred in person on September 20, 2023 in Los Angeles, California.  Eric Ball and Anthony Fares participated on behalf of the Plaintiff, and Louis Tompros, Derek Gosma, and Henry Nikogosyan participated on behalf of the Defendants.

The parties were not able to resolve objections to the following sections of Yuga's Post Trial Proposed Findings of Facts and Conclusion of Law:

### FINDINGS OF FACT

### I.  JOINT STATEMENT RE:  DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Defendants' Disputed Post Trial Finding of Fact No. 3:**

During the course of trial, Plaintiff Yuga Labs, Inc. ("Yuga") did not cross-examine Mr. Ripps on any portion of his declaration and left the entirety of the declaration unchallenged. Trial Tr. [Ripps] 267:8-269:5.

**Plaintiff's Basis for Dispute**

Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial declaration, Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at trial Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q: And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A: Among other things, yes[.]").  Another glaring contradiction is that Mr. Ripps testified that his "intention in

making the RR/BAYC artwork was not to monetize Yuga Labs' brand." Ripps Decl. (Dkt. 346) ¶ 182.  However, text messages entered into evidence demonstrated that Defendants intended to "make like a million dollars" off of their infringement.  JTX-1574.  Evidence further entered at trial depicted Mr. Ripps publicly bragging about the millions of dollars he made off of his use of Yuga Labs' marks.  *See* Solano Decl. (Dkt. 342) ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying that no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  Mr. Ripps' associates also confirmed this financial motive.  JTX-801.208 (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); Hickman Depo. Designations (Dkt. 394) at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software"); JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market.").  Mr. Ripps can attempt to couch his lies in "sarcasm," but the ultimate result was confusion in the marketplace and a substantial payday for Defendants.  Simply repeating falsehoods and repeatedly rejected immaterial claims, as Mr. Ripps does in his declaration, does not make them true or material to the Court's remaining decisions.

Moreover, at trial, Yuga Labs demonstrated that Mr. Ripps is an unreliable witness.  During cross-examination, Mr. Ripps admitted to his dishonesty during discovery and his lies in prior declarations submitted under oath.  Trial Tr. at 268:12-25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of perjury that he has "produced all responsive documents that I have been

able to locate after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-investigated my platforms and taken reasonable efforts to search for additional material for collection" and "[a]ll responsive materials that I have collected during my investigation has been provided to my attorneys and I have given permission to produce those materials with appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has "produced all relevant, nonprivileged documents" subject to Court's order compelling production).  Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants withheld numerous documents (including their text messages with each other) until March 21, 2023 — after Yuga Labs had filed its motion for summary judgment.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

Yuga Labs' cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to conclude that he lied to avoid the consequences of his infringement. Therefore, ***his entire declaration*** cannot be relied upon.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**Defendants' Response:**

Mr. Ripps's declaration was uncontested because Yuga elected to forego any substantive cross-examination of Mr. Ripps on ***any*** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because the purpose of cross-examination is "the direct and

personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record.  Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial.  This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony.  Having failed to challenge Mr. Ripps's testimony at trial, Yuga now seeks to take evidence out of context and mischaracterize documents.  This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony. Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace ***which we were in the ideation phase of***, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.

259.     Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated

Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr.

Hickman testified about his ongoing discussion on potential designs of ApeMarket,

explaining:

> Q.     BY MR. BALL:   You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A.     This is a discussion, *an ideation of different ideas, none of which were actualized*.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's

declaration regarding his intent in creating the RR/BAYC collection.   The full

testimony that Yuga cites provides:

> 182.     My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.
>
> 183.     As an artist, I believed that I could create an "army of educators" through my art.
>
> 184.     I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl. ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the

record corroborates Mr. Ripps's statements.  Mr. Ripps's and Mr. Cahen's

contemporaneous communications about the RR/BAYC project confirm that their

intent was to use RR/BAYC to criticize.  For example, in private group chats

among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and

Mr. Cahen discussed their intended artistic purpose of the project, their intention

that it would spread criticism of Yuga, and their intention that social media

platforms be used to educate the public about the nature of NFTs and what they saw

as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-

354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated twice).  In other words, Mr. Ripps was laughing at a *joke* made by Mr. Cahen.  And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in response to more jokes from Mr. Cahen (again, not a reference to any intent to profit).  *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration.  For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?

A.   Yes.

Q.   So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.   *They don't continue to increase; correct, sir?*

A.   *Correct.*

Q.   *That statement, that part of your witness statement is incorrect; right?*

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Yuga then incorrectly argues that Mr. Ripps's statement about his intent is refuted by comments from other members of the RR/BAYC project. But these statements show no such thing. For example, Yuga's cites JTX-801.208 in which Mr. Cahen states that a priority is "getting RR/BAYC to sell out." But as Mr. Cahen explained at trial, the whole point of broad exposure through the RR/BAYC collection (including getting people to reserve NFTs) was "spreading and magnifying criticism of Yuga." Cahen Decl. (Dkt. 344) ¶ 98. And Mr. Cahen's private communications in the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these things. It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes a strong statement. This is art, not Pokemon cards." (JTX-801.00013); "Because that's where the real importance lies. RR/BAYC truly is very important conceptual art imo. And now we are all helping shape that art further." (JTX-801.00196).

Yuga also cites Mr. Hickman's deposition testimony in which he stated that his "financial arrangement" was "a software developer being compensated for making software." Hickman Depo. Designations (Dkt. 394) at 129:3-6. But Mr.

Hickman's testimony about this topic at trial was unequivocal about his purpose in participating in the RR/BAYC project:

> Q.   Why did you expect to make less from your work on this RSVP contract than your normal rate?
>
> A.   I was contributing because I believe in standing up for the illegitimate business practices and imagery in this Yuga Labs BAYC NFT collection.

Trial Tr. [Hickman] 221:11-15.  Mr. Hickman further explained, "We are selling a receipt that says *I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs point to the same resource."  Trial Tr. [Hickman] 222:18-21 (emphasis in original).

Yuga also cites to Mr. Lehman's declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture."  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.  Yuga's attorneys, not the Defendants, coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023,

verification.  But Yuga's cross-examination did not result in any impeachment or inconsistency:

> Q. You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?
>
> A. I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

> Q. And, Mr. Ripps, the text messages that you produced in this case include the RR/BAYC chat; right?
>
> A. Yes.  We produced everything that we could, despite the fact that Yuga produced nothing.
>
> Q. Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?
>
> A. I don't have it on the screen, but I see you holding them, and I see them –
>
> Q. Do you see it now?
>
> A. Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.
>
> Q. Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?
>
> A. Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials

or information to the extent any are found based on a reasonable investigation. ***I reserve the right to make changes or additions to any of these answers or document productions*** if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added). Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration. Yuga had an opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but elected not to do so. Mr. Ripps's testimony was therefore unchallenged.

**Plaintiff's Reply:**

Mr. Ripps' trial declaration is neither unchallenged nor uncontested. Yuga Labs' cross-examination of Mr. Ripps and the evidence admitted at trial demonstrate that Mr. Ripps lied to protect his profitable scam. That Yuga Labs opted not to give Mr. Ripps a bully pulpit to extrapolate on his already inaccurate testimony does not alter the fact that his declaration is unreliable.

The Court should reject Defendants' responses because (1) evidence admitted at trial discredits Mr. Ripps' trial declaration, (2) Defendants' attempts to pass their infringement off as a joke are unavailing, (3) Defendants fail to rebut Mr. Ripps' profit motives as evidenced in his text messages, (4) Ape Market was operational and ready to launch, (5) Defendants were not motivated by artistic intent, (6) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion, (7) there is ample evidence of actual confusion in the record, (8) Mr. Ripps' excuses for his discovery violation are not credible, (9) Defendants fail to impeach Mr. Solano's accurate testimony, and (10) Mr. Lehman's declaration is truthful.

**Evidence Admitted At Trial Demonstrates That Mr. Ripps' Declaration Is Not Reliable:** Mr. Ripps' testimony conflicts with significant documentary and testimonial evidence admitted at trial and is therefore unreliable. Defendants' argument that the Court must accept Mr. Ripps' testimony as true violates the basic judicial tenet that a finder of fact shall weigh the evidence and assess the credibility of witnesses. *Murray v. U.S.*, No. C-04-3707 SC, 2006 WL 1708220, at *2 (N.D. Cal. June 19, 2006) ("In bench trials, it is the judge's duty to weigh the evidence, assess the credibility of witnesses, and decide questions of fact and issues."). Defendants cannot divest the Court of this duty. Defendants further ignore the fact that all trial declarations sworn to in this case are part of the trial record and were entered into evidence prior to the cross-examination of each witness. *See, e.g.*, Trial Tr. 11:19-20 ("All right. The Court will receive the declaration of Mr. Solano into evidence."). Defendants similarly ignore that their own contemporaneous statements form part of the evidence at trial that the Court can consider. *See e.g.* JTX-801. Therefore, it is not true that Yuga Labs "never addressed that purported other evidence in any way at trial," on the contrary and as explained above the trial record is filled with evidence, both documentary and testimonial, that undercuts Mr. Ripps' self-serving narrative.

**Defendants' Infringement Was Not A Joke:** Defendants' attempts to laugh off Mr. Ripps' profit motive are unavailing. Even a cursory review of the text messages contained in JTX-1574 demonstrate that this was not a sarcastic conversation. To begin, Mr. Ripps said "lolol" *before* Mr. Cahen told him that he would "make like a million dollars" by airdropping NFTs to RR/BAYC purchasers. Indeed, Mr. Cahen explicitly states that he "honestly" believes that Mr. Ripps stood to make a million dollars. *Id.* This was no joke, rather it was Mr. Cahen's genuine business proposition. Mr. Ripps' reply is likewise serious, stating that Defendants "need to get a front end for this shit" in order to facilitate that payday. *Id.* Mr. Cahen then responded that they "already have ape market" to further their business

payday.  Mr. Cahen's admission on Ape Market further undermines Mr. Ripps' declaration and Defendants' response to this objection, as well as Defendants' repeated refrain that Ape Market was not ready to launch.  *Id.*  Other text messages confirm Defendants' profit motive.  In one such exchange Mr. Cahen tells Mr. Ripps that he thinks Mr. Ripps is "gonna make like millions" followed up by "no cap."  JTX-1586.  No cap is colloquial for "no joke," which directly rebuts Defendants' self-serving humor narrative.  Mr. Ripps responded with "ok cool" indicating that he was pleased to be making so much money.  *Id.*  There is no indication that these text messages were meant to be jokes, because they were not.  And even if Defendants found what they were doing funny, that does not excuse their intentional use of the BAYC Marks in a manner likely to confuse consumers.

**Defendants' Internal Discussions Confirm Their Profit Motive:**

Defendants' public statements represented what they needed to say to market their product.  Any scam requires an appearance of legitimacy.  Like most online influencers, Defendants' social media pages contain organic posts mixed in with their marketing to obfuscate their commercial motives.  Defendants' public comments about their artistic goal (to ensure they "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), contradict their internal discussions that overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own unjust enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen:  "we need a very delicious value proposition [] to bring in users

1  . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities:
2  getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users
3  to call our marketplace their new home [] and collecting royalties at a fraction of
4  what the other big dogs are charging [] which will be considerable passive income
5  if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned
6  about launching something with low prospect for recurring revenue"; Mr. Cahen:
7  "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna
8  make so much on this shit LMFAO"; "It will sell out within 48 hours I think []
9  You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr.
10 Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo.
11 Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge
12 royalties).  Defendants knew they were stealing from Yuga Labs.

13      That Mr. Hickman leaned on Defendants' self-serving artistic narrative does
14 not negate the fact that he stood to make at least hundreds of thousands of dollars
15 off of Defendants' infringement.  *See* Trial Tr. at 220:3-221:5.  Defendants' may
16 have attempted to make themselves look more sympathetic, but the evidence
17 discussed above makes it clear that they sought to profit through their infringement
18 of the BAYC Marks.

19      **Evidence Admitted At Trial Confirms That Ape Market Was Ready To**
20 **Launch:**  Despite Defendants' attempts to argue otherwise, the evidence shows that
21 Ape Market was ready to launch.  *See* JTX-1574 ("we already have ape market");
22 *see also* Trial Tr. at 137:23-24 ("The code was in such a state of completion that it
23 was operational."); JTX-807; JTX-808; JTX-809.  Indeed, at trial Mr. Cahen
24 confirmed that Ape Market was ready to launch within a matter of days.  Trial Tr.
25 at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse
26 me – by June 24, 2022?  A:  Among other things, yes[.]").  Mr. Cahen later
27 confirmed that he had "no reason to doubt" that the marketplace could be launched
28 within a matter of 48 hours.  *Id.* at 248:7-9.  Defendants' rebuttal that Mr. Cahen's

testimony pertains to the quality of his engineers is inapposite.  It does not matter why the website was ready to launch, it is only pertinent that there existed an "operational" website.  Trial Tr. at 137:23-24.  Defendants' argument does not rebut Yuga Labs' objection, it proves it.

That fact is also supported by documentary evidence submitted at trial.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour commitment Friday afternoon would be the release" and Mr. Cahen responding "I think it makes sense to launch a bit earlier imo if we are comfortable doing so."); JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every YugaLabs asset . . . [a]nd we got sued for it."). Ape Market existed as a commercial endeavor actively marketing on social media to increase the sales of RR/BAYC NFTs; and the online marketplace was ready to launch, and would have launched but for this litigation.  JTX-1 at ¶ 12.

**Defendants' Infringement Was Intentional And Not An Art Project:**  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."  .  .  .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers.  .  .  .  In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated

with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Even after trial, Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Moreover, Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were commercial trademark infringement.  *Id*.  And, the Court has already decided the issue of Defendants' intent, finding that Defendants **knowingly and intentionally** infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants' Anecdotal Evidence Of Individuals Stating They Support Defendants' Infringement Are Irrelevant And Immaterial:**  A handbag counterfeiter may have distributors, and those distributors may even profess to believe in a cause, but that does not excuse the counterfeiter's wrongdoing or mitigate the likelihood of confusion in the marketplace.  *See* SJ Order (Dkt. 225) at

16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag.").  And Defendants do nothing to rebut the likelihood of initial interest or post-sale confusion.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"); *see also* Trial Tr. at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew that this was a scam and that were buying them to sell on a secondary market").  Further, confused consumers are unlikely to admit that they have fallen for Defendants' scam.  As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it."  Trial Tr. at 54:10-16. Nonetheless, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.

**Yuga Labs Has Produced Ample Evidence Of Actual Confusion:**
Defendants' anecdotal and unreliable "evidence" does nothing to rebut the Court's finding of a likelihood of confusion or the incidents of actual confusion in the record.  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the

confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  As Ms. Muniz testified at trial, "people came that were lured in because they believed it was a BAYC and then were, like, oh, it's not.  But it's a really, really good fake.  And it's such a good fake that it actually convinced Twitter and I mean Twitter from a front-end user interact platform but also Twitter as individuals and people in a community and consumers.  So I believe people were lured in thinking it was authentic BAYC then realized, oh, wait, it's not, but it's a cheap version that's really, really good.  It's a really good fake."  Trial Tr. at 83:19-84:3; *see also* JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull []

1  If we want to fight trademark").  Confusion in the marketplace is abundant

2  throughout the trial record.

3  **Mr. Ripps' Excuses For Withholding Relevant Evidence Are Not**

4  **Persuasive:**  Defendants claim that Mr. Ripps' withholding of relevant evidence

5  was excused by the fact that he eventually produced certain documents.  This

6  argument ignores the fact that the initial withholding forced Yuga Labs to engage in

7  expensive motion practice to seek documents that should have been produced in the

8  first place and ignores the multiple declarations signed by Mr. Ripps stating that he

9  had fulfilled his discovery obligations.  *See* JTX-1541 (Jan. 17, 2023 Ripps

10 verification stating under penalty of perjury that he has "produced all responsive

11 documents that I have been able to locate after a reasonable search"); Dkt. 109-42

12 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-

13 investigated my platforms and taken reasonable efforts to search for additional

14 material for collection" and "[a]ll responsive materials that I have collected during

15 my investigation has been provided to my attorneys and I have given permission to

16 produce those materials with appropriate confidentiality designations"); Dkt. 158

17 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has

18 "produced all relevant, nonprivileged documents" subject to Court's order

19 compelling production).

20      It was ***never*** credible for Mr. Ripps to testify that a text message exchange

21 about the money that Mr. Ripps stood to make off of the sales of RR/BAYC NFTs

22 did not "have anything to do with the RR/BAYC project."  Trial Tr. at 268:17-21;

23 JTX-1574.  This text exchange discussed airdropping NFTs to purchasers,

24 monetizing Defendants' scam, the existence of Ape Market as a "front end"

25 marketplace, and the development of a bot to announce the sale of Defendants'

26 infringing NFTs.  *Id.*  There is no reasonable basis to believe that this conversation

27 would not pertain to the RR/BAYC NFTs.  Mr. Ripps' testimony claiming

28 otherwise is a lie.  Furthermore, his withholding of these texts until after a *series* of

1   requests for relief before Judge McDermott underscore Defendants' bad faith

2   litigation approach throughout this case.

3        Defendants further point to the fact that Mr. Ripps swore that he had

4   conducted a "reasonable search" and reserved the right to supplement his responses,

5   but a reasonable search would have included a search of his correspondence with

6   his business associate and co-defendant Mr. Cahen.  Text messages directly

7   between the two defendants about their infringing acts should have been among the

8   first documents produced, not the last.  Defendants' attempts to explain away these

9   discovery violations and the lie in Mr. Ripps' declaration are unavailing.

10       **Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.

11  The vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs

12  because of Defendants' intentional and repeated use of the BAYC Marks is

13  undisputed and went unchallenged by Defendants.  Nevertheless, the arguments

14  Defendants raise are themselves meritless.

15       First, Mr. Solano's testimony that Defendants collected royalties off

16  secondary sales was supported by Defendants' own testimony, Ms. Kindler's

17  testimony, and the possibility of further royalties on LooksRare or other new

18  marketplaces if Defendants continued to control the RR/BAYC smart contract.

19  Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt.

20  395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.  Apparently, Defendants'

21  argument is that Mr. Solano's testimony is correct that Defendants continued to

22  profit from their royalties after February until at least May.  *See, e.g.*, Cahen Decl.

23  (Dkt. 344) ¶ 171 ("LooksRare finally honored our request in May 2023 and has

24  shut off royalties on secondary sales").  And Mr. Solano's testimony is correct that

25  Defendants can continue to profit from royalties in the future if they hold the

26  RR/BAYC smart contract.  But somehow Mr. Solano's testimony should be

27  discredited because Defendants claim they were not profiting off royalties in June

28  or July of 2023.  And even this claim stands on dubious ground as Defendants'

counsel represented as recently as the June 9 pretrial conference that Defendants were still receiving royalties from LooksRare.  PTC Hrg. Tr. at 43:22-24 ("They are [still collecting royalties] only in the sense of this very minimum set of LooksRare royalties.").  Even if Defendants' claim is true, that they are not at this very moment collecting royalties, it is immaterial.  Defendants' own admissions highlight their actual and ongoing potential to profit from royalties.

Second, Mr. Solano's testimony that Defendants' activities constitute a business venture is amply supported by Defendants' own actions that Mr. Solano personally observed.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's declaration by arguing that Mr. Solano did so without reading Mr. Lehman's entire deposition are without merit.  Mr. Lehman repeatedly testified to the accuracy of his declaration, regardless of how he may have felt about the process of being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The Lehman declaration stands on its own, and Mr. Solano had reviewed the declaration based upon his testimony about its contents in his own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71.

Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr. Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.  Defendants do not even attempt to address the fact that the testimony was on two different topics.

Finally, Defendants likewise fail to impeach Mr. Solano's statement at Trial

Tr. 34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages generated by running the source code for the planned ApeMarket.com website," informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano Decl. ¶ 49; *see also* ; JTX-806–JTX-809.  Those webpages were not generated from the source code produced by Mr. Lehman until *after* Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to truthfully testify at trial as to that knowledge.  Defendants fail to impeach Mr. Solano's accurate knowledge.

**Mr. Lehman's Declaration Is Reliable And Contradicts Defendants:**
Yuga Labs has demonstrated that Mr. Lehman's declaration is truthful and reliable. Mr. Lehman testified that he toiled to make sure that everything included in his declaration was truthful and adequately supported by documentary evidence. Lehman Depo. Designations (Dkt. 404-2) at 241:21-24.  And regardless of whether Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Defendants fail to discredit their own business partner.

**Defendants' Disputed Post Trial Finding of Fact No. 4:**

The Court accepts the substance of Mr. Ripps's unchallenged declaration as true, because Yuga elected to not challenge any aspect of it at trial. Trial Tr. [Ripps] 267:8-269:5.

**Plaintiff's Basis for Dispute:**

Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial declaration, Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at

trial Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q: And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A: Among other things, yes[.]").  Another glaring contradiction is that Mr. Ripps testified that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, text messages entered into evidence demonstrated that Defendants intended to "make like a million dollars" off of their infringement.  JTX-1574.  Evidence further entered at trial depicted Mr. Ripps publicly bragging about the millions of dollars he made off of his use of Yuga Labs' marks.  *See* Solano Decl. (Dkt. 342) ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying that no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  Mr. Ripps' associates also confirmed this financial motive.  JTX-801.208 (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); Hickman Depo. Designations (Dkt. 394) at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software"); JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market.").  Mr. Ripps can attempt to couch his lies in "sarcasm," but the ultimate effect was confusion in the marketplace and a substantial payday for Defendants.  Simply repeating falsehoods and repeatedly rejected immaterial claims, as Mr. Ripps does in his declaration, does not make them true or material to the Court's remaining decisions.

Moreover, Yuga Labs demonstrated that Mr. Ripps' is an unreliable witness.

During cross-examination Mr. Ripps admitted to his dishonesty during discovery and his lies in connection with prior declarations submitted under oath.  Trial Tr.at 268:12-25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of perjury that he has "produced all responsive documents that I have been able to locate after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-investigated my platforms and taken reasonable efforts to search for additional material for collection" and "[a]ll responsive materials that I have collected during my investigation has been provided to my attorneys and I have given permission to produce those materials with appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has "produced all relevant, nonprivileged documents" subject to Court's order compelling production).  Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants continued to produce responsive documents that they had improperly withheld.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

This cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  Therefore, ***his entire declaration*** cannot be relied upon.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to conclude that he lied to avoid the consequences of his infringement.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**Defendants' Response:**

The Court should accept Mr. Ripps's declaration because Mr. Ripps's declaration was uncontested because Yuga elected to forego any substantive cross-examination of Mr. Ripps on ***any*** portion of Mr. Ripps's declaration.  *See* Trial Tr.

[Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record.  Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial.  This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony.  Having failed to challenge Mr. Ripps's testimony at trial, Yuga now seeks to take evidence out of context and mischaracterizes documents.  This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.    You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.    What I would say I did was use the prospect of a potential marketplace ***which we were in the ideation phase of***, I would say that I absolutely 100 percent used the prospect of that to draw

> attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258. We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259. Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added). Other witness also corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be. Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q. BY MR. BALL: You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A. This is a discussion, *an ideation of different ideas, none of which were actualized*.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's declaration regarding his intent in creating the RR/BAYC collection. The full testimony that Yuga cites provides:

> 182. My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.
>
> 183. As an artist, I believed that I could create an "army of educators" through my art.

184.   I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl. ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the record corroborates Mr. Ripps's declaration.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated

twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen. And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in response to more jokes from Mr. Cahen (again, not a reference to any intent to profit).  *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration.  For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.  And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.  Yes.
>
> Q.  So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.  It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.  ***They don't continue to increase; correct, sir?***
>
> A.  ***Correct.***
>
> Q.  ***That statement, that part of your witness statement is incorrect; right?***
>
> A.  ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); id. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  See Trial Tr. [Yuga's witnesses] 11:3-203:24.

Yuga then incorrectly argues that Mr. Ripps's statement about his intent is refuted by comments from other members of the RR/BAYC project.  But these statements show no such thing.  For example, Yuga's cites JTX-801.208 in which

Mr. Cahen states that a priority is "getting RR/BAYC to sell out." But as Mr. Cahen explained at trial, the whole point of broad exposure through the RR/BAYC collection (including getting people to reserve NFTs) was "spreading and magnifying criticism of Yuga." Cahen Decl. (Dkt. 344) ¶ 98. And Mr. Cahen's private communications in the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these things. It' quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes a strong statement. This is art, not Pokemon cards." (JTX-801.00013); "Because that's where the real importance lies. RR/BAYC truly is very important conceptual art imo. And now we are all helping shape that art further." (JTX-801.00196).

Yuga also cites Mr. Hickman's deposition testimony in which he stated that his "financial arrangement" was "a software developer being compensated for making software." Hickman Depo. Designations (Dkt. 394) at 129:3-6. But Mr. Hickman's testimony about this topic at trial was unequivocal about his purpose in participating in the RR/BAYC project:

> Q.   Why did you expect to make less from your work on this RSVP contract than your normal rate?
>
> A.   I was contributing because I believe in standing up for the illegitimate business practices and imagery in this Yuga Labs BAYC NFT collection.

Trial Tr. [Hickman] 221:11-15. Mr. Hickman further explained, "We are selling a receipt that says *I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs point to the same resource." Trial Tr. [Hickman] 222:18-21 (emphasis in original).

Yuga also cites to Mr. Lehman's declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture."  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.  Yuga's attorneys, not the Defendants, coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023, verification.  But Yuga's cross-examination did not result in any impeachment or inconsistency:

> Q.   You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?
>
> A.   I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

Q.     And, Mr. Ripps, the text messages that you produced in this case
include the RR/BAYC chat; right?

A.     Yes.  We produced everything that we could, despite the fact that
Yuga produced nothing.

Q.     Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC
chats that you produced; right?

A.     I don't have it on the screen, but I see you holding them, and I see
them –

Q.     Do you see it now?

A.     Yes.  We produced hundreds of thousands possibly of messages
that all were between the four people involved in the final state of
the project and basically everything to do with the development of
this project.

Q.     Did you believe, in good faith, that you had given Yuga everything
that had to do with the development of this project?

A.     Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought

sanctions multiple times based on Yuga's false accusations of discovery

misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr.

[Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the

verification stated "[I] produced all responsive documents that I have been able to

locate after a reasonable search" and further stated "I also understand that discovery

obligations are continuing, and I will produce any additional responsive materials

or information to the extent any are found based on a reasonable investigation. *I*

*reserve the right to make changes or additions to any of these answers or*

*document productions* if it appears at any time that errors or omissions have been

made or if more accurate or complete information becomes available." Dkt. 109-33

(emphasis added Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration.  Yuga had an opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but instead elected not to do so.  The reliability of Mr. Ripps's testimony was therefore unchallenged.

**Plaintiff's Reply:**

Defendants again ask the Court to relinquish its role as finder or fact in assessing the credibility of witnesses and the weight of evidence.  *See Murray, 2006 WL 1708220, at \*2.*  This attempt is unavailing in light of significant evidence demonstrating that Mr. Ripps was chronically dishonest throughout this litigation.

As discussed *supra* ¶ 3, Defendants' responses lack merit.  Specifically:  (1) evidence admitted at trial adequately discredits Mr. Ripps' trial declaration, (2) Defendants fail to rebut Mr. Ripps' profit motives as evidenced in his text messages, (3) Ape Market was operational and ready to launch, (4) Defendants were motivated by profit not artistic intent, (5) there is ample evidence of confusion and post-sale confusion is actionable, (6) Mr. Ripps' excuses for his discovery violation are not credible, (7) Defendants fail to impeach Mr. Solano's accurate testimony, and (8) Mr. Lehman's declaration is truthful.

**Defendants' Disputed Post Trial Finding of Fact No. 7:**

The Court finds Defendants' witnesses Ryder Ripps, Jeremy Cahen, and Ryan Hickman credible.  Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

**Plaintiff's Basis for Dispute:**

Each of Defendants' witnesses lack credibility and Mr. Ripps' declaration is undermined entirely by his lack of credibility, documentary evidence, and

testimony from witnesses who are credible.  Defendants' witnesses' testimony often conflicted with both their prior testimony and the testimony proffered at trial by the other two witnesses.  As such, they have been shown to be unreliable and should not be the basis of the Court's findings of facts or conclusions of law.

Mr. Cahen's testimony was littered with contradictions and demonstrated an attitude of disrespect towards the Court and these proceedings, which is part of the reason his testimony lacks credibility.  For example, in his trial declaration, Mr. Cahen testified that the ApeMarket marketplace was "just in the ideation phase." Cahen Decl. (Dkt. 344) ¶ 263.  However, at trial Mr. Cahen confirmed that there was a "ready-to-go Ape Market by . . . June 24, 2022."  Trial Tr.  at 247:10-12.  Mr. Cahen later confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly").

Similarly, Mr. Cahen testified in his trial declaration that he "did not expect the project would result in consumer confusion," Cahen Decl. (Dkt. 344) ¶ 155, however Mr. Cahen's communications in the Team ApeMarket discord chat demonstrate that he was aware of the likelihood of confusion.  *See* JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").  This demonstrates that not only was Mr. Cahen aware of the likelihood of confusion—he was apathetic to it.

Mr. Cahen's testimony should also be given little weight due to his disrespect for the Court, the seriousness of this litigation, and his obligation to be truthful but failure to be so.  Indeed, at trial Mr. Cahen repeatedly offered non-responsive rants in response to unrelated questions such as whether he "stimulated the sales of

RR/BAYC NFTs by tweeting" about ApeMarket.  Trial Tr. at 237:14-238:1.  This is consistent with his hostile and obstructive deposition misconduct.  *See e.g.*, Cahen Depo. Designations (Dkt. 395) at 80:5-7 ("Q: What is one thing [RR/BAYC] could stand for? A: It could be Ronald Reagan bought apples yesterday, classy.  I don't know.").  Mr. Cahen's lack of respect for the Court and its truth-finding processes should prevent any finding that he is credible.

Mr. Cahen also contradicted himself by claiming that he purchased a computer to help create the RR/BAYC collection several months prior to the conception of the project.  Cahen Decl. (Dkt. 344) ¶ 174.  Mr. Cahen tried to explain this at trial by stating that the "project" began before May of 2022, Trial Tr. at 229:5-13, but his latest tale contradicts the prior testimony by Defendants that they began working on the RR/BAYC NFTs in May of 2022.  *See* Dkt. 200-3; Dkt. 200-4.  When Defendants sought to skirt their discovery obligations and hide their communications about the real intent of their infringement, they claimed that the project began in May of 2022, but when they tried to claim expenses related to the project they claim that it began in 2021.  Mr. Cahen either lied at trial or he lied to the Court during discovery.  He is therefore discredited.

Finally, in both his declaration and at trial, Mr. Cahen testified that none of the Defendants had ever used the term "BAYC v3" to refer to their infringing NFTs and that the name was only used after Yuga Labs sent DMCA takedown notices to combat the infringement.  Cahen Decl. (Dkt. 344) ¶ 253; Trial Tr. at 252:2-253:8.  This testimony is false.  Documentary evidence shows Mr. Ripps referring to his infringing NFTs as BAYC V3, before Yuga Labs had sent a single notice.  JTX-689 (tweet from Mr. Ripps promoting infringing NFTs as "bayc v3").  Given his myriad contradictions, non-responsive and truth-hiding rants, and omissions, the only conclusion is that Mr. Cahen is an unreliable witness.

Mr. Ripps also lacks credibility.  For instance, in his trial declaration Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would

actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, as discussed above, ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q: And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A: Among other things, yes[.]").  And Defendants were marketing ApeMarket, and their plans to sell Yuga Labs NFTs alongside RR/BAYC NFTs as a way to increase the sales of the infringing RR/BAYC NFTs.  JTX 696 (posts from Ape Market Twitter account).

Mr. Ripps also testified that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, documents entered into evidence at trial showed that Defendants' intended to "make like a million dollars."  JTX-1574; Solano Decl. (Dkt. 342) at ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  And Mr. Ripps testified that he minted the RR/BAYC NFTs to his "personal wallet, ryder-ripps.eth" despite the fact that his wallet was named "ryder-ripps.eth" only *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.  Thus, the narrative that customers would not be confused because they could see the NFTs were minted from Mr. Ripps' wallet is dismantled by the fact that it only bore Mr. Ripps' name **after** the initial mint and customers would not encounter the "ryder-ripps.eth" creator tag had they even tried to look.  Mr. Ripps can attempt to couch his lies in "sarcasm," but the ultimate effect was confusion in the marketplace and a significant payday for Defendants.

Finally, Mr. Ripps repeatedly lied about his discovery obligations.  Throughout discovery Mr. Ripps signed no fewer than three declarations (two of which were Court-ordered), under penalty of perjury, stating that he had searched his records and produced all responsive documents related to the RR/BAYC NFTs.  JTX-1541 (Jan. 17, 2023); Dkt. 109-42 (Feb. 17, 2023); Dkt. 158 (Mar. 21, 2023).

After each of these three declarations, however, Defendants continued to produce responsive documents after Yuga Labs independently discovered evidence of improper withholding. *See, e.g.*, JTX-1574-JTX- 1591 (text messages between Mr. Ripps and Mr. Cahen, withheld until March 21, 2023, discussing relevant topics such as Defendants' infringing NFT collection, Yuga Labs, Defendants' profit intent, Ape Market, and marketing).  Defendants withheld documents such as ***hundreds of pages of text messages between*** them until March 21, 2023 — after Mr. Ripps verified under penalty of perjury that he produced all responsive documents, after the Court had to order responsive documents produced twice in response to Yuga Labs' discovery motions, and after Yuga Labs had already filed its motion for summary judgment. *See* Dkt. 145 (order requiring Defendants to produce communications).  Defendants also produced responsive documents even after their March 21, 2023 declaration; for example, on April 11, 2023, Defendants produced messages with a BAYC NFT holder to whom Defendants were trying to provide an infringing NFT.  Defendants have no excuse for their repeated improper withholding of material evidence and repeated lies under oath.

Mr. Ripps' testimony that the text message presented to him at trial did not have anything to do with the RR/BAYC project is another blatant lie.  These documents that Mr. Ripps wrongly withheld until after Yuga Labs' summary judgment submission included text messages discussing airdropping more of Defendants' infringing NFTs to the wallets of those who have already purchased them.  Thus, Mr. Ripps' testimony that he did not "really find it to have anything to do with the RR/BAYC project" is unbelievable.  Trial Tr. at 268:17-21; JTX-1574 (text messages in which Mr. Cahen suggests Mr. Ripps "airdrop like 10 more to each person who already bought one" and that if Mr. Ripps airdropped "20-30" he would "sell out within 48 hours" and "make like a million dollars").  Mr. Ripps' testimony reiterates what is obvious from the record: Defendants' stories change based on what is convenient for them at the time.  Mr. Ripps, a proven liar, is not a

credible witness.

Mr. Hickman similarly lacks credibility.  Mr. Hickman also testified that ApeMarket was not ready to launch and was merely in the ideation phase.  Trial Tr. at 210:1-2.  As discussed above, this was proven false at trial.  Mr. Hickman testified in his trial declaration that he was unaware of instances of confusion stemming from the infringing NFTs.  Hickman Decl. (Dkt. 345) ¶ 92.  However, Mr. Hickman discussed with Defendants that consumers were confused by Defendants' misleading use of authentic BAYC NFT token IDs.  JTX-44.  Further, Mr. Hickman was an active participant in the Team ApeMarket discord chat where Defendants, Mr. Lehman, and Mr. Hickman himself raised the likelihood of confusion many times.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable"); *infra* Paragraph 10.

Further, in his trial declaration Mr. Hickman testified about his and a family member's purportedly adverse reactions to the Bored Ape Yacht Club images, Hickman Decl. (Dkt. 345) ¶¶ 41-58, but when questioned by the Court at trial Mr. Hickman testified that he does not have any problem with selling NFTs that point to those exact same images.  Trial Tr. at 222:24.  Mr. Hickman's testimony that he found Yuga Labs' NFTs problematic is even more difficult to reconcile with the fact that he claimed to purchase a Bored Ape Yacht Club NFT after forming the supposed belief that it was problematic, and continued to purportedly own one up until trial.  Hickman Decl. (Dkt. 345) ¶¶ 18-19, 21.  Finally, despite Mr. Hickman's testimony at trial that he did not want to profit off the RR/BAYC NFTs, Trial Tr. at 209:21-23, Mr. Hickman testified at deposition that he was financially motivated to develop the software that facilitated Defendants' infringement.  Hickman Depo. Designations (Dkt. 394) at 128:25-129:6 ("In this reference I'm specifically stating that I'm a developer.  I make software.  I charge to make software.  I have a record, a history, of charging to make software.  My financial arrangement for this whole

thing is about a software developer being compensated for making software.").  Mr. Hickman lacks credibility.

Defendants' testimony was also contradicted by the declaration of their co-conspirator:  Mr. Lehman.  As noted above, Defendants frequently testified that they did not intend to profit from their infringement, but Mr. Lehman testified "based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market." JTX-1 at ¶ 11.  Despite Mr. Cahen's testimony that he did not anticipate his infringement to cause confusion in the marketplace, Mr. Lehman testified that "[o]n at least one occasion, Defendant Cahen affirmatively agreed with the concern about underestimating how confusing it would be to use the BAYC logo alongside the RR/BAYC logo on Ape Market."  *Id.* at ¶ 22.  Indeed, all three witnesses testified that they did not expect their products to cause confusion even though Mr. Lehman testified that he "repeatedly shared [his] concerns with Defendants" that the RR/BAYC NFTs would cause confusion and lead to a lawsuit.  *Id.* at ¶ 21.  Mr. Lehman's testimony is corroborated by the documentary evidence, including principally the Team ApeMarket Discord (JTX-801).  The contradictions with Mr. Lehman's testimony and the documentary evidence highlight the dishonesty of Defendants' testimony and Mr. Hickman's testimony and demonstrate why the Court should discount their trial testimony completely.

**Defendants' Response:**

Yuga failed to impeach Mr. Ripps, Mr. Cahen, or Mr. Hickman during trial and the trial record does not contain any evidence showing that these witnesses are not credible or that they did not give truthful testimony.

Yuga tries to mischaracterize Mr. Cahen's testimony to suggest that he was contradicting himself.   But there is nothing inconsistent about Mr. Cahen testimony.   He testified that ApeMarket was in the ideation phase, which means

that anything under development was subject to substantive changes pending Mr.
Ripps's review and signoff on the website.  But simply because Mr. Ripps had not
reviewed and signed off on anything in connection with ApeMarket did not mean
that the RR/BAYC team was not working on the website and exploring different
ideas to implement.

Yuga mischaracterized Mr. Cahen as saying that ApeMarket was "ready to
go" by June 24, 2022.  But what Mr. Cahen actually said is that he did not know if
ApeMarket was "ready to go" by June 24, 2022.  Mr. Cahen then also stated that he
works with the high skilled engineers that can implement nearly any project within
days and that ApeMarket did not require much work in the first place as it used
open-source code:

> Q.     Sure.  By Friday, June 24, ,2022, you and your associates had built
>        a functioning ApeMarket?
>
> A.     I'm not certain to answer that.  But I believe with the quality of
>        engineers that I work with, we could pretty much deploy anything
>        within reason within a 48-hour window.  So I always feel like the
>        people that I work with are ready to go at the drop of a hat.  That's
>        kind of how I look at that.
>
> Q.     And there was a ready-to-go ApeMarket by February – excuse me
>        – by June 24, 2022?
>
> A.     Among other things, yes, because this – a lot of the code used is
>        open source.    And ApeMarket is very similar to other
>        marketplaces.  The only differences that we were discussing that
>        are really worth noting would be that it would be a cheaper source
>        of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there
was no evidence that the webpage apemarket.com was a functioning website.  Trial
Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344);
Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also accused Mr. Cahen of "disrespect for the Court" by making "non-responsive rants" in response to questions about ApeMarket stimulating sales of RR/BAYC NFTS.  But the trial transcript shows otherwise:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.   ***No.   That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***
>
> Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTS; correct?
>
> A.   There never existed a marketplace.
>
> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTS; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.
>
> Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?
>
> A.   ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).   Yuga's citation to Mr. Cahen's deposition similarly cherry picks one question from a full-day of deposition testimony, and even then, the testimony Mr. Cahen gave is responsive to Yuga's question to give a hypothetical answer to "things" RR/BAYC could stand for.

Yuga further mischaracterized Mr. Cahen's testimony by incorrectly suggesting that he did not purchase a computer to work on the RR/BAYC project. The trial testimony shows that the 2021 purchase date is consistent with Mr. Cahen's work in connection with the RR/BAYC project and its protest of Yuga:

> Q.  Would it surprise you that the date for that computer is December 2021?
>
> A.  That would not surprise me at all, no.
>
> Q.  Why?
>
> A.  Because it's a date on a receipt.  I'm not sure what the point is, but I'm hearing you, yeah.
>
> Q.  Okay.  So either the RR/BAYC project started in May 2022 or the RR/BAYC project started in December 2021, and you bought a computer for it; correct?
>
> A.  The RR/BAYC project is a protest project.  And the protest began well, well before the RR/BAYC project did.  So if you are asking me why I make a connection between earlier dates and that project, it's because we spent about a year protesting in different ways before we released any sort of nonfungible token and rather, before Ryder did and I decided to join and help him expand his vision and protest.

Trial Tr. [Cahen] 227:11-228:1.

Finally, Yuga incorrectly argues that Mr. Cahen is not credible because he testified that Defendants never used the term "bayc v3" to refer to the RR/BAYC collection.   But Yuga was unable to impeach this testimony during cross-examination of Mr. Cahen and Yuga did not even attempt to cross-examine Mr. Ripps on this issue.  The exhibit that Yuga cites, JTX-689, also confirms that Mr. Cahen's testimony was true.  JTX-689 is a reply Mr. Ripps made on Twitter on

May 13, 2022 to Mr. McNelis's question on what NFTs people are buying.  Mr. Ripps's reply is a satirical comment that has absolutely nothing to do with the RR/BAYC collection and, in fact, the comment was made before Mr. Ripps even started taking commissions for RR/BAYC NFTs.

Yuga also incorrectly argues that Mr. Ripps lacks credibility by stating that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony.  But contrary to Yuga's argument Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace *which we were in the ideation phase of*, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259.   Ultimately, *we never agreed on what ApeMarket would be*.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness also corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.   BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."

A.   This is a discussion, ***an ideation of different ideas, none of which
were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's

declaration regarding his intent in creating the RR/BAYC collection.   The full

testimony that Yuga cites provides:

> 182.   My intention in making the RR/BAYC artwork was not to
> monetize Yuga's brand but instead to criticize Yuga's use of
> objectionable imagery and to educate the public about the nature
> of NFTs.
>
> 183.   As an artist, I believed that I could create an "army of educators"
> through my art.
>
> 184.   I believed that use of art to criticize Yuga and its imagery was
> protected by the First Amendment.

Ripps Decl. ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the

record corroborates Mr. Ripps's declaration.  Mr. Ripps's and Mr. Cahen's

contemporaneous communications about the RR/BAYC project confirm that their

intent was to use RR/BAYC to criticize.  For example, in private group chats

among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and

Mr. Cahen discussed their intended artistic purpose of the project, their intention

that it would spread criticism of Yuga, and their intention that social media

platforms be used to educate the public about the nature of NFTs and what they saw

as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-

354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted

of nearly the entirety of Defendants' public activities associated with RR/BAYC,

confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed

what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen.  And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in response to more jokes from Mr. Cahen (again, not a reference to any intent to profit).  *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration.  For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.    Yes.
>
> Q.    So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.   Although, those were supposed to be donated to charity and never were.

Q.   *They don't continue to increase; correct, sir?*

A.   *Correct.*

Q.   *That statement, that part of your witness statement is incorrect; right?*

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Yuga similarly attempts to argue that Mr. Ripps's narrative that the RR/BAYC collection being minted from his personal wallet is "dismantled" based on JTX-25 and JTX-26. But these exhibits are printouts of the Etherscan website and how Etherscan chose to display the RR/BAYC collection. In JTX-26, Etherscan represents Mr. Ripps's unique walled with "ryder-ripps.eth" and in JTX-25 Etherscan represents Mr. Ripps's unique wallet with a unique alpha-numeric identified that Etherscan itself allows you to verify through use of the website. Critically, Defendants have not control over Etherscan or how it chooses to represent the RR/BAYC collection. And, as Yuga's Chief Technical Officer admitted at trial, consumers of NFTs do not use wallet names to verify NFTs but instead rely on marketplaces or by checking the associated smart contract address. Trial Tr. [Atalay] 135:2-25.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023, verification. But Yuga's cross-examination did not result in any impeachment or inconsistency:

Q.   You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?

A.   I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

Q.   And, Mr. Ripps, the text messages that you produced in this case include the RR/BAYC chat; right?

A.   Yes.  We produced everything that we could, despite the fact that Yuga produced nothing.

Q.   Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?

A.   I don't have it on the screen, but I see you holding them, and I see them –

Q.   Do you see it now?

A.   Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.

Q.   Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

A.   Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr.

[Ripps] 269:21-270:2.  Mr. Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation. *I reserve the right to make changes or additions to any of these answers or document productions* if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

Lastly, Yuga also incorrectly asserts that Mr. Hickman is not credible. Yuga's basis for this accusation is simply because Mr. Hickman testified that ApeMarket was in the ideation stage.  But, as discussed above, the trial evidence consistently shows that the ApeMarket *was* in the ideation stage and still subject to Mr. Ripps's review and approval.

Yuga also argues that Mr. Hickman is not credible because he purportedly "wrongly" testified that he is not aware of any actual instance of confusion.  But the trial record confirmed that *no one* is aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Yuga then cites to various documents (JTX-44, JTX-801.195) to argue that Mr. Hickman purportedly believed that consumers would be confused by the RR/BAYC project.  But these documents involve discussion in how to design *ApeMarket* to ensure that the website design was not confusing to users of the website.  And, in fact, Yuga cross-examined Mr. Hickman about this issue and confirmed that Mr. Hickman and other members of the RR/BAYC project were not discussing confusion regarding the source of RR/BAYC NFTs. Instead, as Mr. Hickman explained, "[t]his is our attempt to make it as clear as possible.  We

1  are having discussion on how to make sure it was very clear for users."  Trial Tr.

2  [Hickman] 212:22-24.

3      Yuga also argues that Mr. Hickman is not credible because he did not have a

4  problem working on an NFT project that points to public digital images that he

5  finds to be offensive.  But Yuga's argument missing the mark.  As Mr. Hickman

6  explained, the whole purpose of his work on the RR/BAYC collection was to

7  protest the offensive imagery that Yuga had been normalizing:

8
9  | THE COURT: | When you are selling defendants' NFTs, you are selling Yuga's images. |

10
11  | THE WITNESS: | **No. We are selling the record.** |

12  | THE COURT: | Okay.  But the record points to and displays those images. |

13
14  | THE WITNESS: | **So the images are public.**  They are available for anybody to navigate to on the Internet. |

15  | THE COURT: | Right |

16
17
18
19  | THE WITNESS: | **We are selling a receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to** including Yuga Labs pointing to the same resource. |

20  Trial Tr. [Hickman] 222:10-22 (emphasis added).  Yuga then suggests that Mr.

21  Hickman is not credible because he himself owns a BAYC NFT even though he

22  finds the images offense.  But Mr. Hickman's declaration explains, "When I first

23  saw Bored Ape Yacht Club images, I found the imagery problematic, but I did not

24  originally pay I much attention."  Hickman Decl. ¶ 18.  Only later, when speaking

25  with is great aunt, did Mr. Hickman realize how harmful and dangerous Yuga's

26  misconduct is:

27
28      48.    We then had a long discussion about why Yuga's use of ape images was a serious issue.

49.   My great aunt explained to me the history of siminaization, which involved depicting African Americans as apes to dehumanize them.

50.   My great aunt also explained how African Americans are often called "monkeys" as a deeply offensive insult.

51.   My great aunt also reminded me that our family had dealt with and had to overcome these kinds of acts of racism over many generations

52.   My great aunt explained that, if simianization is becoming popular again, normalized, and incentivized, this would be very dangerous for African Americans.

53.   ***My great aunt described Yuga's acts as "a step back 100 years."***

54.   ***This conversation with my great aunt caused me to think more critically about Yuga's offensive imagery and why it needs to be taken seriously.***

Hickman Decl. ¶¶ 48-54 (emphasis added).  There is nothing about Mr. Hickman's conversation with his great aunt and how he became part of the RR/BAYC movement that makes him an untrustworthy witness.

And finally, Yuga argues that Defendants are not credible because their testimony is contradicted by Mr. Lehman's declaration, which was signed under threat and coercion.  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.  Yuga's attorneys, not the Defendants, coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected

the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Yuga also references Mr. Lehman statement regarding the design of ApeMarket, but again, as Mr. Hickman confirmed during trial, these are statements on selecting a design for ApeMarket that would ensure that users of the website would not be confused by the website design.

**Plaintiff's Reply:**

Defendants' attempts to rehabilitate their witnesses are unavailing. Defendants and their business partner lied; repeatedly.  Rather than accept the obvious facts and do the best they can with them, Defendants lean into their lies. Defendants' attempt to manufacture facts should be rejected for what it is.

Additionally, as discussed *supra* ¶ 3, Defendants' responses lack merit. Specifically:  (1) evidence admitted at trial proves Mr. Ripps' trial declaration is littered with falsities, (2) Defendants fail to rebut Defendants' obvious profit motives, (3) Ape Market was operational and ready to launch, (4) Defendants were not motivated by artistic intent, (5) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion, (6) Mr. Ripps' excuses for his discovery violation are not credible, (7) Defendants fail to impeach Mr. Solano's accurate testimony, and (8) Mr. Lehman's declaration is truthful.

The Court also should reject Defendants' responses because (1) Defendants lied about "Bored Ape Yacht Club V3," (2) Defendants admit that Mr. Ripps' wallet only displayed "ryder-ripps.eth" after minting the infringing NFTs, (3) Mr.

Cahen's testimony is not credible, (4) Mr. Hickman's testimony is not credible, and (5) Defendants knew that confusion was the likely result of their infringement.

**Defendants Continue To Lie About "Bored Ape Yacht Club V3":** Defendants' ever-shifting narrative, trying to find an explanation for "BAYC V3" and "Bored Ape Yacht Club V3" that will withstand scrutiny, is transparently false.

Defendants first claimed that some marketplaces used "Bored Ape Yacht Club V3" in response to dozens of takedown notices. *See* Cahen Decl. (Dkt. 344) ¶ 253. The evidence definitively disproves that, and Defendants seem to no longer stand by Mr. Cahen's sworn testimony on this point. The record shows that the first takedown of the collection occurred on May 17, 2022. Dkt. 149-5 (table of takedown requests in summary judgment record). ***Every single takedown request*** occurs after Defendants were using the "V3" name to promote their infringing NFT collection. JTX-689 (May 13, 2022 tweet by Mr. Ripps using "bayc v3"); JTX-1249 (May 14, 2022 tweet by Mr. Ripps showing "Bored Ape Yacht Club V3" as the name of his NFT); *see also* JTX-690 (Mr. Ripps sharing a link to the X2Y2 marketplace with "bored-ape-yacht-club-v3" in the URL on May 17, 2022, before a single takedown request was sent to X2Y2).

After that takedown explanation fell apart, Mr. Cahen claimed that "I myself, nor anyone on the team, ever used that label or name or whatever you want to call it. V3 is something that we have absolutely nothing to do with." Trial Tr. 255:4-7. This sworn testimony in open court reaffirmed his commitment to the story told in his declaration that he and his partners "did not promote the RR/BAYC collection as BAYC V3 or Bored Ape Yacht Club V3 and it is not the name of a project that we have ever been involved with or familiar with." Cahen Decl. (Dkt. 344) ¶ 251. And again at trial, he testified "the V3 thing is never something that I used or Ryder used or Ryan Hickman used or Mr. Lehman used." Trial Tr. 253:15-21. When asked again about Mr. Ripps' use of the name "BAYC V3," Mr. Cahen testified "I literally just told you a moment ago that we never used that nomenclature." Trial

Tr. 254:22-25.  Yet, documentary evidence shows Mr. Ripps using the BAYC V3 on the *__same day he created the RR/BAYC smart contract__*.  JTX-689 (Ripps' use of "bayc v3" on May 13, 2023); JTX-600 (showing creation of the RR/BAYC smart contract on the same date).  It is a provable lie that Mr. Ripps "never used" and had "absolutely nothing to do with" the BAYC V3 name.

Pivoting again to reframe this lie, Defendants now seem to concede that Mr. Cahen lied under oath when he testified that the BAYC name was the result of 27 takedowns, and again when he testified that none of the Defendants or their co-conspirators ever used the name, but instead they now claim that "[BAYC V3] has nothing to with the RR/BAYC" NFTs and that it was simply an off-the-cuff joke. This explanation strains credulity.  Not only did Defendants never offer this explanation until their other explanations fell apart and they needed to fall back on claiming it was all a joke, but no evidence in the record supports how it was a joke for Defendants to refer to their infringing NFTs by a name that coincidentally came into existence the same day their collection was created.  And even if Defendants were promoting their collection by the Bored Ape Yacht Club V3 name as a joke, they fail to explain how X2Y2 (JTX-690), Bloomberg (JTX-701), and OpenSea (JTX-1249) all coincidentally used the same name to refer to their NFT collection that was first coined by Mr. Ripps *on the day he created the immutably infringing smart contract*.  And, their explanations aside, Defendants fail to explain how their now-conceded use of the Bored Ape Yacht Club V3 name to refer to their infringing NFTs, and linking to sales pages using that name, is anything other than Defendants using the V3 name to promote the sales of RR/BAYC NFTs.

Defendants ask the Court to abandon reason in favor of their farcical narrative of jokes and coincidences.  And now, recognizing how incredible their story has become, Defendants blame Yuga Labs for not cross-examining Mr. Ripps on Mr. Cahen's obvious lies.  But Mr. Ripps says nothing about this topic in his trial declaration, remarkably failing to address under oath his use of "BAYC V3"

and "Bored Ape Yacht Club V3" to market RR/BAYC NFTs.  Instead, he left it to Mr. Cahen to provide the cover story, but Mr. Cahen's lies fail to withstand scrutiny.

**Defendants Admit Mr. Ripps' Wallet Did Not Display His Name Until After Minting The RR/BAYC NFTs:**  Defendants now admit that Mr. Ripps' wallet address did not identify him until after the RR/BAYC NFTs were minted. But, they claim that they "have not control over Etherscan or how it chooses to represent the RR/BAYC collection."  That is beside the point—Defendants have argued that consumers would have known that the infringing NFTs were not authentic BAYC NFTs by looking at the creator name.  *See* Ripps Decl. (Dkt. 346) ¶ 161 ("Anyone with access to *etherscan.io* could see that the collection and the minting contract were minted by me, and not by Yuga Labs.").  Defendants' admission confirms the falsity of that statement and concedes that consumers would have been confused prior to the creator field showing Mr. Ripps' name.

But even after the creator field was changed, Defendants have no evidence that this field was sufficient to dispel the confusion they created.  This field does nothing to address initial-interest confusion, post-sale confusion, or confusion as to sponsorship or affiliation.  This is in part because, as the evidence admitted at trial shows, Mr. Ripps immutably labeled the infringing collection with the name "Bored Ape Yacht Club" and the Symbol "BAYC."  *See* JTX-600; *see also* Trial Tr. 130:19-22.  And while not responsive to the issue of Mr. Ripps' credibility, Defendants misrepresent Mr. Atalay's testimony pertaining to how consumers verify their NFTs.  *See infra*, ¶ 68.

**Defendants Fail To Rehabilitate Mr. Cahen:**  Defendants' attempts to rehabilitate Mr. Cahen fall far short of their goal.  Mr. Cahen's testimony that Ape Market was still in the "ideation" stage is false for the reasons outlined *supra* ¶ 3. That Defendants and their business partner are aligned on this dishonest characterization does not make it true.  None of these witnesses are credible, and

Mr. Lehman's testimony and the written record prove the truth.  And as explained above, Mr. Cahen's testimony about "BAYC V3" is plainly dishonest.

Defendants accuse Yuga Labs of cherry-picking quotes to demonstrate Mr. Cahen's deposition misconduct, but Mr. Cahen launched into non-responsive rants no less than 18 times over the course of his deposition, and he was similarly non-responsive at trial.  *See* Dkt. 271 (notice of lodging marked up copy of Mr. Cahen's deposition testimony).  Defendants' argument that Mr. Cahen's testimony that RR/BAYC could stand for "Ronald Reagan bought apples yesterday, classy" was responsive to the question in a lawsuit about the RR/BAYC NFTs is flatly bad faith.  Mr. Cahen has consistently proven himself to be evasive, non-responsive, dishonest, and disrespectful to the Court and judicial process.

Defendants' attempts to rehabilitate Mr. Cahen's testimony about his purchase of a computer purportedly to use on the RR/BAYC NFTs is also unavailing.  Mr. Cahen's pattern of contradictory and vacillating testimony proves that he lied to the Court repeatedly and without trepidation.  First, Defendants swore under oath that they had produced communications from "mid-May, 2022, which is also the same time period that the RR/BAYC Project began."  *See* Dkt. 200-3; Dkt. 200-4.  But at trial Mr. Cahen testified that the project began "well, well before" the minting of the RR/BAYC NFTs.  Trial Tr. at 227:20-21.  Defendants' rebuttal misses the point, Mr. Cahen's testimony that the computer he purchased in 2021 was "for the project" directly contradicts his previous testimony that "the RR/BAYC project began" in "mid-May, 2022."  *Compare* Cahen Decl. (Dkt. 344) ¶ 174; Dkt. 200-3.  Here again, Defendants' story changes based upon their desired outcome.  Whether the "project" began in 2021 or 2022, Mr. Cahen lied.

**Defendants Fail To Rehabilitate Mr. Hickman:**  Defendants' rehabilitation of Mr. Hickman similarly falls flat, and Mr. Hickman has more recently attempted to deceive Judge Mahan in the District of Nevada, which further serves to

undermine his testimony in this case.

Mr. Hickman's testimony pertaining to Ape Market is discredited for the reasons discussed *supra* ¶ 3.  Contrary to Defendants' assertion that Mr. Hickman was "not aware of a single instance of confusion," Mr. Hickman's communications with Defendants demonstrate that he was aware that their infringement would cause confusion.  *See* JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it Is too confusing to the 'average joe'"); *see also* JTX-44 ("people believe the tokenId should match the RR ID.  that is where they get confused").  While Mr. Hickman's conversations may have been geared towards designing Ape Market, these conversations were necessary because of the similarities between Yuga Labs' NFTs and Defendants' infringing NFTs that would be sold on Ape Market just as they were confusingly sold on other marketplaces.  If Mr. Hickman was aware that consumers would be confused on Ape Market, he would be aware that they would also be confused elsewhere.

Defendants also fail to rehabilitate Mr. Hickman's testimony about his belief that Yuga Labs' NFTs were "problematic."  Mr. Hickman allegedly bought a Bored Ape Yacht Club NFT, held that NFT, and sold infringing NFTs that point to the exact same images as the Bored Ape Yacht Club NFTs all ***after*** he purported found the images problematic, Hickman Decl. (345) ¶ 18, and ***after*** he purportedly had a conversation with his great-aunt about the images.  *Id.* at ¶¶ 48-54.  Mr. Hickman's *conduct* contradicts his testimony rendering it not credible.

Mr. Hickman's recent sworn statements in the related lawsuit against him also demonstrate that he is not a credible witness, and that he is willing to lie under oath where it best serves him.  In Yuga Labs' lawsuit against Mr. Hickman that is currently pending in the District of Nevada, Mr. Hickman makes false

representations to the court and disclaims his role as one of the lead developers in the RR/BAYC scam.  Specifically, in an effort to vacate the default judgment entered against him, Mr. Hickman states under oath, "I previously provided testimony in the *Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen*, Case No. 2:22-cv-04355-JFW-JEM (C.D. Cal. 2022) case that my only involvement in the websites located at the domain names <rrbayc.com> and <apemarket.com> ('Domain Names') included making some contributions to the 'RSVP Smart Contract.'").  Hickman Decl. ISO Reply to Motion to Vacate Default Judgment (Dkt. 38-1), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Sept. 20, 2023), at ¶ 3.

This statement is demonstrably false and directly contradicted by the record in this case.  In Mr. Hickman's prior testimony before ***this*** Court, he claimed to be a major contributor to the development and implementation of the RR/BAYC and Ape Market websites.  *See* Hickman Depo. Designations (Dkt. 394) at 42:17-19 ("[T]he smart contract coders and website developers in that context is myself and Tom."); *see also* Dkt. 271 (notice of lodging Mr. Hickman's marked up deposition transcript) at 211:1-4 ("Q: Technically, as of the 21st of June you're the primary person that's working on Ape Market? / A: That's fair to say. That's fair to say"); Hickman Decl. (Dkt. 345) ¶ 69 ("I also helped Mr. Ripps by working on developing the rrbayc.com website, which was where collectors would be able to use the RSVP program to make reservations."); ¶ 70 ("Mr. Ripps explained what he wanted the rrbayc.com website to look like, and I did my best to implement his creative vision.").  Mr. Hickman's blatant contradictions and willingness to lie for personal gain demonstrate his lack of credibility as a witness and render his declaration unreliable.

**Defendants Knew That Their Infringement Would Result In Confusion:**  Defendants were repeatedly warned that their infringing NFTs would cause confusion.  Their refusal to heed these warnings demonstrate their intent to infringe

and cause confusion.  Indeed, significant evidence shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, Defendants continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

**Defendants' Disputed Post Trial Finding of Fact No. 8:**

The Court finds the testimony of Plaintiff's witness Greg Solano lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition – and we can pull it up on the screen – at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Basis for Dispute:**

Defendants fail in attempting to impeach Mr. Solano on the basis that his deposition testimony on two topics is allegedly inconsistent with his testimony on those topics months later. Mr. Solano's acquisition of further knowledge about the facts of this case after his deposition is not impeachment.

The number of documents at issue in this case is voluminous, and discovery was just beginning at the time of his deposition on January 17, 2023. Since then, Mr. Solano has continued to learn and better understand the evidence in this case. Importantly, since his deposition, the issues in this case have become more focused and certain evidence has become more important and well known. So, it should come as no surprise that, in preparation for trial, Mr. Solano reviewed documents that were not used as exhibits at his deposition. For example, he "reviewed many of Defendants' tweets marketing their infringing NFT collection" (Solano Decl.

(Dkt. 342) ¶ 35), some of which demonstrated that Mr. Ripps created an NFT collection originally called "Bored Ape Yacht Club V3" or "bayc v3." *Id.* ¶ 65 (citing exhibits); JTX-689 (tweet from Mr. Ripps promoting infringing NFTs as "bayc v3"); JTX-690, JTX-1249.

Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr. Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

Defendants likewise fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages generated by running the source code for the planned ApeMarket.com website," informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic and based his knowledge on these exhibits.  *Id.* JTX-806–JTX-809.  Those webpages were not generated from the source code produced by Mr. Lehman until ***after*** Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano where or how he came to his knowledge, but he attaches the basis for that knowledge to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which Defendants did not object).  The two examples of supposed impeachment to which Defendants point fail to impeach Mr. Solano's accurate knowledge.

1

**<u>Defendants' Response</u>:**

2   Yuga ignores the substance of Greg Solano's cross-examination, which

3   demonstrated that Mr. Solano's declaration included numerous false statements.

4   Mr. Solano's cross-examination also included multiple examples of impeachment.

5   For example, Mr. Solano was forced to concede on cross-examination that his

6   sworn declaration included a false statement claiming that Defendants continue to

7   receive royalties from sales on secondary marketplaces:

8
9   Q.   And you understand that Mr. Ripps and Mr. Cahen have testified
        that they do not currently receive any royalties or creator fees from
10       sales on secondary marketplaces; right?

11  A.   Yes.

12  Q.   So you don't have any basis for your statement that their profits
13       continue to increase; correct?

14  A.   It's my understanding that they were collecting royalties or creator
15       fees from LooksRare for quite a while.   Although, those were
16       supposed to be donated to charity and never were.

17  Q.   *They don't continue to increase; correct, sir?*

18  A.   *Correct.*

19
20  Q.   *That statement, that part of your witness statement is incorrect;*
        *right?*

21
22  A.   *Yes.*

23  Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the

24  phrase "business venture" in Mr. Lehman's declaration, without having considered

25  that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

26  Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.

27  Solano also relied on Mr. Lehman's declaration without having considered that Mr.

28

Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).

Mr. Solano lacks credibility also because his allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Mr. Solano was also repeatedly impeached at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes.").

Yuga attempts to rehabilitate Mr. Solano's declaration by pointing to JTX-689 and JTX-690 as supporting his false accusation that Defendants used "bayc v3" and "Bored Ape Yacht Club V3" in connection with the RR/BAYC collection. However, those exhibit only provide further support showing that Mr. Solano's declaration is misleading and that he is not a credible witness. JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis's question on what NFTs people are buying. Mr. Ripps's reply is a satirical comment that has nothing to do with the RR/BAYC collection and, in fact, the comment was made before Mr.

Ripps even started taking commissions for RR/BAYC NFTs.  JTX-690 is a Twitter post by Mr. Ripps of the link to the x2y2.io page for the RR/BAYC collection.  At no point did Mr. Ripps state "BAYC V3" or "Bored Ape Yacht Club V3" in this post as it simply contains a link.  And while the URL does contain "bored-ape-yacht-club-v3," Mr. Ripps had no control over the URL that x2y2.io used or how it chose to auto-populate pages.

Mr. Solano similarly gave untrue testimony regarding ApeMarket.   Trial Tr. [Solano] 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Yuga attempts to rehabilitate Mr. Solano's testimony regarding ApeMarket by arguing that Mr. Solano gained knowledge regarding the existence of the website after his deposition.  But Yuga's explanation does not make sense because Mr. Solano has no personal knowledge regarding ApeMarket, is not competent to testify about the contents of source code, and further lacks the requisite knowledge regarding Defendants' ideation of the website.  And, in fact, the trial record shows that Mr. Solano's testimony regarding the existence of ApeMarket is demonstrably false.  ApeMarket was never released, the development of the website apemarket.com was never completed, and there was never a functioning marketplace.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  In fact, Mr. Ripps had never decided on what he wanted ApeMarket to be and had never signed off any proposed marketplace worked on by the RR/BAYC team.  Ripps Decl. ¶ 178 (Dkt. 346) (uncontested).  Mr. Cahen and Mr. Hickman also confirmed that ApeMarket never made it past the ideation stage.  Cahen Decl. ¶¶ 258-259 (Dkt. 344); Trial Tr. [Hickman] 211:21-22.

**Plaintiff's Reply:**

Defendants fail to impeach Mr. Solano's testimony. Defendants' cross-examination of Mr. Solano demonstrates only that Mr. Solano updated his testimony to reflect further fact discovery over the course of litigation. This is unsurprising and unspectacular. Mr. Solano is a reliable witness.

As discussed *supra*, Defendants' responses lack merit. Specifically, (1) Defendants fail to impeach Mr. Solano's accurate testimony (*supra* ¶ 3), (2) Mr. Lehman's declaration is truthful (*Id.*), (3) Ape Market exists and was ready to launch (*Id.*); (4) Defendants continue to lie about "BAYC V3" (*supra* ¶ 7).

Additionally, the Court should reject Defendants' responses because (1) there is ample evidence of confusion in the record, and (2) Ape Market was a marketing tool used to promote the RR/BAYC NFTs.

**There Is Ample Evidence Of Confusion In The Record:** Defendants' attempt to impeach Mr. Solano by claiming that he was unaware of confusion in the marketplace is unavailing. Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable"). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

As Ms. Muniz testified at trial, "people came that were lured in because they believed it was a BAYC and then were, like, oh, it's not. But it's a really, really good fake. And it's such a good fake that it actually convinced Twitter and I mean Twitter from a front-end user interact platform but also Twitter as individuals and people in a community and consumers. So I believe people were lured in thinking it was authentic BAYC then realized, oh, wait, it's not, but it's a cheap version that's really, really good. It's a really good fake." Trial Tr. at 83:19-84:3. Confusion in the marketplace is evident throughout the trial record.

**The @ApeMarketplace Twitter Account And The Ape Market NFT Marketplace Were Used To Promote RR/BAYC:** Defendants created the @ApeMarketplace Twitter account to promote the Ape Market marketplace and their infringing RR/BAYC NFTs. The Tweets from the account confirm that Defendants used @ApeMarketplace to promote Ape Market. One such Tweet on June 20 asks, "Are you ready for ApeMarket.com, anon?" and another on June 13 teases the release of Ape Market stating "Get Ready" alongside a screenshot of Ape Market. JTX-696. This purely commercial endeavor highlights Defendants' intent to profit, not criticize or make art. And Mr. Cahen lied at trial when, under oath, he stated that he did not "plan to stimulate the sales of RR/BAYC NFTs by teasing the future release of ApeMarket." Trial Tr. at 234:15-18. Mr. Cahen tweeted from @ApeMarketplace a link to reserve an RR/BAYC on multiple occasions and on June 2 he tweeted that "[l]isting requires holding RR/BAYC." JTX-696. Defendants' own internal communications confirm the lie. On June 1 Mr. Cahen stated, "my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collection." JTX-801.221. On

that same day Mr. Cahen tweeted from @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC and a link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the prospect of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim that Ape Market, @ApeMarketplace, and RR/BAYC are not connected is obviously false.  The Tweets in JTX-696 repeatedly show the look, functionality, and intent of Ape Market and the infringing RR/BAYC NFTs within Ape Market.

**Defendants' Disputed Post Trial Finding of Fact No. 9:**

The evidence presented at trial establishes that the RR/BAYC project was created as a form of satire intended to protest NFTs linked to what defendants believed were antisemitic or racist injury. Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

**Plaintiff's Basis for Dispute:**

In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."  .  .  .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers.  .  .  .  In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of

RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

The evidence presented at trial establishes that, from the outset, this was no satirical project.  It was a business venture where the Defendants were interested in making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink [*sic*] you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"); JTX 1; JTX 621.  Defendants did not create their infringing NFTs "as a form of satire."  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it Is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  They

made none of these choices at the outset, or changes when suggested to them, as those changes would have reduced the confusion and reduced their profits.

The evidence presented at trial also proves that Defendants were intentionally infringing and that their promotion and sale of RR/BAYC NFTs was not a form of satire. For example, they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); *see also* JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7. Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, Defendants continued to use Yuga Labs' BAYC Marks to promote

and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Worse still, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶ 7.

The Court should not find satire to be the reason Defendants created and marketed their commercially infringing RR/BAYC NFTs.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**Defendants' Response**:

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the

remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape

Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion.  But those pages are internal discussion about the design of the

ApeMarket website to ensure that users of apemarket.com were not confused by the
website design.  Yuga even cross-examined Mr. Hickman about these
communications and received the same explanation: "This is our attempt to make it
as clear as possible.  We are having discussion on how to make sure it was very
clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to
incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-
44.00002, Mr. Hickman stated that "people believe the tokenId should match the
RR ID.  that is where they get confused."  This statement is not discussing
confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is
discussing how the RR/BAYC collection used a different numbering system that
BAYC NFTs, and that consumers expected the numbers match as a shorthand
manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.
That is, due to the different numbering system, some consumers were confused as
to which RR/BAYC NFT they received but they understood very well that they
received an NFT created by Mr. Ripps that protests and criticizes Yuga.

Yuga also alleges that Etherscan's creation of a token tracker is evidence of
Defendants' intent to cause confusion.  But Defendants do not control the Etherscan
website or how Etherscan chooses to display the RR/BAYC NFT collection.
Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of
NFTs do not use Etherscan's token tracker/token name but instead rely on
marketplaces or by checking the associated smart contract address.  Trial Tr.
[Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish
NFTs "would be a fairly weak way to do so because often those things are mutable.
They can be changed after the fact.  Also, there's no guarantee of uniqueness."
Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC
NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

(JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection. As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in. A lot of the work I do takes place over social media." Cahen Decl. ¶ 50 (Dkt. 344). Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344). These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly alleges that Defendants continued to market ApeMarket after entry of summary judgment in this case. First, this argument makes no sense given that Defendants never released ApeMarket in the first place. Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which was well before the entry of summary judgment in this case.

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

Defendants' sale and promotion of RR/BAYC NFTs was intended to, and did, cause confusion among consumers in order to gain profit. As the Court has already found, Defendants' infringement was not art.

Defendants' response is unavailing because (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their

infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (8) other alleged infringers do not negate Defendants' infringement.

**The Court's Summary Judgment Order Establishes Liability:**

Defendants' response improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225). As discussed above, in that order, the Court held that Defendants intended to deceive consumers "with a bad faith intent to profit." *Id.* at 15. That order establishes the matters adjudicated therein for purposes of this case. Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings. Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist. Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added). Defendants' authorities do not

1    support their position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL

2    1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at

3    summary judgment is ***generally not relevant and should be excluded***" at trial)

4    (emphasis added).  Despite the Court's finding that Defendants knowingly and

5    intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted

6    with a bad-faith intent to profit from their use of the marks (SJ Order (Dkt. 225) at

7    12-15), Defendants' response fails to explain why the Court's findings on intent are

8    insufficient.

9         **Defendants Intended To Confuse Consumers:**  Defendants' argument that

10   they did not intend to confuse consumers is contradicted by the record.  As

11   discussed above, the numerous pieces of evidence presented at trial prove the

12   Court's settled issue of Defendants' knowledge of their infringement and intent to

13   confuse consumers.  The record is replete with numerous examples of Defendants'

14   internal communications demonstrating Defendants' awareness that their

15   infringement would confuse consumers and refusal to take steps to avoid that

16   confusion.  Defendants' response fails to address the overwhelming majority of

17   these communications, including how Defendants could have, but chose not to

18   make changes recommended by Mr. Lehman, or even by their lawyer, to reduce

19   confusion.  Defendants have no excuse for ignoring their own lawyers' advice.

20   Defendants also knew that what they were doing was likely to lead to a lawsuit.

21   For instance, Mr. Ripps asked for a reference to his limited liability company,

22   Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued

23   personally."  JTX-803.57.  They knew they were in the wrong from the start and

24   were trying to hide their assets from the consequences of their infringement.

25        Defendants' response fails to negate their intent to cause confusion.

26   Defendants outright fail to even address multiple pieces of evidence showing that

27   they knew they were infringing and creating confusion.  *See, e.g.*, JTX-631, JTX-

28   918.00036.  Regarding Defendants' internal discussions contained in JTX-801,

Defendants highlight the fact that when designing Ape Market to sell their infringing NFTs alongside authentic BAYC NFTs, Defendants knew affirmative "friction step[s]" would be required to prevent the obvious risk of confusion. As Mr. Hickman told Mr. Cahen, "[t]hey are the same art." Trial Tr. at 212:17-24. Thus, Defendants and their partners worried over how to "make it as clear as possible" the two were different. *Id.* This is because selling the same products under the same marks is confusing. And yet, Defendants continued ahead without any changes in their sales and promotion of the RR/BAYC NFTs. Furthermore, Defendants' response admits that their internal discussions recognized confusion from the design of the Ape Market website. Thus, Defendants would likewise be aware of potential confusion caused on other platforms, such as OpenSea, Foundation, or Twitter, that displayed the same confusingly similar logos and marks used in the design of the Ape Market website. Yet still, Defendants did not stop this this confusion.

Additionally, Defendants concede that despite the "different numbering system" assigned to RR/BAYC NFTs when minted, consumers were confused because Defendants sold and marketed the RR/BAYC NFTs using Yuga Labs' numbering system and token IDs, not their own. *See* JTX-44.00002. As Defendants admit, this was not what "consumers expected" as they were expecting to buy a product connected to Yuga Labs' numbering scheme.

Further, Defendants' attempt to argue that they had no control over third-party websites and marketplaces is false. Mr. Ripps admitted that he controlled the OpenSea page and made changes to it. Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (" Q.    But you had a page on OpenSea?  A. I had a page?  Did I have a page?  No. ***Perhaps RR/BAYC collection had a page on OpenSea***.  Q. And who ran that collection?  A. ***Who ran that collection?  I did because I have the keys to the RR/BAYC***.") (emphases added); *id.* at 81:22-82:7 ("A. ***I do remember at one point making the background image the banner***, if you will, to say 'Long Live

Conceptual Art,' or something like that, or 'You can't copy an NFT,' or something along those lines . . .") (emphases added).  Similarly, JTX-600 shows "Bored Ape Yacht Club" and "BAYC" coded into the RR/BAYC smart contract as source identifiers on Etherscan.  It also shows "ryder-ripps.eth" as the creator, which Mr. Ripps has admitted to own.  Ripps. Decl. (Dkt. 346) ¶ 89.  Thus, the evidence shows that Mr. Ripps launched the smart contract with the BAYC Marks coded into it, which caused websites such as Etherscan to confusingly display those marks to the public as if the smart contract was created by Yuga Labs.  These marks can never be removed from the smart contract, causing hyperlinks and other future references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs.  Without the RR/BAYC smart contract, Yuga Labs cannot retain control of the use of its marks.  *See* Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

Defendants' response also fails to meaningfully or accurately address the fact that they continued to promote Ape Market even after entry of summary judgment in this case.  As discussed *supra* ¶ 3, Defendants admit that Ape Market was operational and ready to launch.  And Defendants do not dispute the fact that as recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77.  Any suggestion otherwise by Defendants cannot be made in good faith.  Defendants' promotion of

Ape Market and RR/BAYC NFT sales throughout this litigation continued to harm Yuga Labs.

**Defendants' Infringement Was Not An Art Project:**  Defendants' contention that their infringing NFTs were an art project is not supported by the evidence.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Even now, Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  And as discussed above, Mr. Cahen continued to tweet and retweet posts about RR/BAYC NFTs trading on NFT marketplaces as well as their resales.  Defendants' attempt to characterize the posts as "reporting news" is merely pretext for all of their marketing tactics to promote and sell the RR/BAYC NFTs. This was not news.  Mr. Cahen's posts were retweets of bots posting about RR/BAYC NFT sales, which provide no other content, summary, or analysis that could reasonably constitute news reporting.  *See, e.g.*, JTX 1613; JTX-1614; JTX-1615.  Nor does Mr. Cahen's tweet merely stating "RR/BAYC is trading on OpenSea Pro" amount to anything more than convenient advertising.  JTX-1315. Defendants' response fails to raise any credible reason to believe that their infringement was motivated by anything other than money and greed.

**Defendants' Infringement Was Motivated By A Desire To Profit Off Of Yuga Labs' Marks:**  Defendants' public statements represented what they needed

to say to market their product.  Any scam requires an appearance of legitimacy. Like most online influencers, Defendants' social media pages contained organic posts mixed in with their marketing to obfuscate their commercial motives.  For example, despite Mr. Ripps' promise to donate the royalties earned from sales of RR/BAYC NFTs to charity, no proceeds were donated, and Defendants' kept the profits for themselves.  *See* Solano Decl. (Dkt. 342) ¶ 28 (citing JTX-1045). Moreover, Defendants' public comments about their artistic goal (to ensure they "look really sympathetic to people" if caught, (JTX-918.00036)), contradict their internal discussions that overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own unjust enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen:  "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); Hickman Depo.

1   Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge

2   royalties).  Defendants knew they were stealing from Yuga Labs for profit.

3           **Defendants Did Not Take Steps To Avoid Confusing Consumers:**

4   Defendants did not attempt to avoid confusion.  On the contrary Defendants

5   deliberately designed and marketed their infringing NFTs to confuse consumers.

6   Defendants could have called their NFT collection something other than "Bored

7   Ape Yacht Club" with the symbol "BAYC" ***immutably*** in the metadata for the NFT

8   smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

9   Defendants could have used different images or overlaid some commentary on the

10  images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman

11  proposing "an overlay or something like Getty images" because "it's just insane to

12  have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay

13  might look like and recommending not to "in the marketing show screenshots like

14  the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average

15  joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could

16  have attacked Yuga Labs in countless non-infringing ways.  But they did not.

17  Instead, they used Yuga Labs' marks, commercially, in the way that would make

18  Defendants the most money by selling counterfeit NFTs that confused consumers.

19  *See* O'Laughlin Decl. (Dkt. 341).

20          Defendants' response relies on an alleged "explanation of the artistic intent

21  for the project" that appeared only on the rrbayc.com website.  But rrbayc.com is

22  not where the majority of the RR/BAYC NFTs were sold.  Ms. Kindler's

23  unrebutted analysis of sales data demonstrates that for Defendants' infringing

24  NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he

25  vast majority of them are occurring in secondary markets and not from just the

26  initial sale."  Trial Tr. at 202:4-17.  Thus, the vast majority of market activity

27  involving Defendants' infringing NFTs is taking place on the secondary market,

28

including platforms such as Foundation and OpenSea, where Defendants' supposed "artistic explanation" is non-existent.

**Defendants' "Disclaimer" Does Not Negate The Court's Finding That Consumers Were Likely To Be Confused:** With respect to the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17. That Defendants took some steps to try to conceal their intent when they were inevitably sued does not make the infringing activity less confusing; it just demonstrates their culpability.

More fundamentally though, Defendants' claimed steps did not prevent confusion. The public was not required to read and click a disclaimer. Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer. Defendants also did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer. Kindler Decl. (Dkt. 338) at ¶ 69.

Further, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Indeed, a user today linking to Etherscan will not see Ryder Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club; and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion"). Defendants' claimed disclaimer is non-existent to ineffective at best.

**Yuga Labs' Did Not Give Defendants A License To Infringe:**

Defendants' response rehashes their rejected argument that the BAYC Terms gave BAYC NFT holders any and all trademark rights.  The Court already found on summary judgment that Yuga Labs granted BAYC holders a valid copyright license, not a trademark license.  SJ Order (Dkt. 225) at 9-10 ("Yuga has not granted BAYC NFT holders a trademark license.").  Defendants offer no credible evidence to support their claim that the Court should reach a different conclusion at trial.  The BAYC Terms give BAYC NFT holders a copyright license to use their respective Bored Ape image for personal or commercial use, not the marks within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

Ms. Muniz explained that in the one interview where she mentioned "IP" rights, she was referring to copyrights and that the context is clear to that effect.  *Id.* at 72:3-18.  Moreover, this interview is immaterial and irrelevant to Defendants' intent—it occurred in November 2022—long after Defendants made the majority of their sales and after this lawsuit was filed.  Defendants' fail to address the practical impossibility of their intent to create and sell RR/BAYC NFTs being influenced at all by Ms. Muniz's subsequent interview.  Regardless, there is no reasonable interpretation of Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

Additionally, the record disproves that Defendants actually believed this was a justification for their actions, because even as of June 9, 2022, Mr. Ripps ***did not know*** that one of his partners allegedly owned a BAYC NFT and expressed his desire to have access to one:

maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]

or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]

1    and put them on the marketplace

2    so people trust it?

3    i don't think buying a BAYC makes sense

4    unless it's for a deal..

5    [third party] sold his ape

6    s

7    sucks

8    that would have been perfect marketing

9    wish i spoke to him before he sold

JTX-801.332.  Defendants' contrived defense—and their false claim that they contemporaneously believed they had a license, despite the lack of a single communication to that effect—has no merit and further highlights their lack of credibility.

**Other Alleged Infringers Do Not Negate Defendants' Own Infringement, And Yuga Labs Had Robust Enforcement Programs:**  Defendants' references to unknown, and alleged, third-party infringers, in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any alleged third-party use of the BAYC Marks, or similar marks, is immaterial and irrelevant.  As this Court has already found, "despite Defendants' attempt to argue abandonment through third party use or failure to police, these arguments are unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22, 2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made clear that third-party use of a mark is irrelevant in a suit against a particular infringer.  *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition

1   under federal law"); *Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125,

2   1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed

3   mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151,

4   1159, 1162 (9th Cir. 2017) (a "'sheer quantity' of irrelevant evidence," which is

5   "largely inapposite to the relevant inquiry," is meaningless); *see also F.T.C. v.*

6   *Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011)

7   (precluding Defendants from "introducing into evidence . . . 'thousands of third-

8   party webpages'" because they were irrelevant and thus inadmissible under FRE

9   401 and 402.  Even so, Defendants have failed to demonstrate actual use of these

10  marks in commerce.  *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-

11  1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of

12  third-party marks in an advertisement because "evidence of third-party use is not

13  admissible unless the proponent can provide evidence that the trademarks were

14  *actually used* by third parties, that they were well promoted or that they were

15  recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v.*

16  *Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3 (excluding

17  evidence of third-party marks because defendants "presented no evidence showing

18  *actual use*.") (emphasis added).

19       Even if third-party infringement was material or relevant (it is not), none of

20  these "projects" caused as much confusion in the marketplace as Defendants' sale

21  of RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've

22  never had someone that we've done a takedown for, then respond and say, oh, here

23  it is on some other website.  Come get it here.  And also, by the way, we are going

24  to rip off Yuga's other site next.  And we're going – you know, I've made a million

25  dollars with this scam, and no one can stop me. We've never had another collection

26  get shown up on Bloomberg News with people confused thinking it's us.  I've

27  never had phone calls from–you know, concerned – with my CEO telling me that

28  she's getting calls from investors that are saying you need to do something about

this.  So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8.  Nor is it reasonable that third-party uses could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

Defendants' response belies the record.  Yuga Labs took significant steps to protect the BAYC brand and take down third-party infringing content.  *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections.  I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns.  And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Defendants' Disputed Post Trial Finding of Fact No. 10:**

In May 2022, Ryder Ripps and Jeremy Cahen collaborated on what they intended to be a satirical parody NFT collection called the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC"). Ripps Decl. ¶¶ 87-94 (uncontested); Cahen Decl. ¶¶ 97-103; Hickman Decl. ¶¶ 62-66.

**Plaintiff's Basis for Dispute:**

In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . .  In addition, the Court concludes that Defendants intentionally designed the

> RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire or parody, they were motivated by greed.

The evidence presented at trial establishes that, from the outset, this was no satire or parody.  It was a business venture where the Defendants were interested in making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make because of money tbh"; "Potentially a lot"); JTX 1; JTX 621.  Defendants did not create their infringing NFTs "as a form of satire."  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just

insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

The evidence presented at trial also shows that Defendants knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); *see also* JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631(third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, Defendants continued to use

Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."  JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

The Court should not find satire or parody to be the reason Defendants created and marketed their commercially infringing RR/BAYC NFTs.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

With respect to *when* Defendants started planning their scheme, the evidence shows that Mr. Ripps started planning their scheme in December 2021 when he tested the market for his scam by knocking off the Adidas Ape even though he has refused to admit that this was a test.  JTX-13; JTX-606; Muniz Decl. (Dkt. 340) at ¶ 16; Dkt 200-3 ("my conception of the project in May 2022").  But, Mr. Cahen has provided conflicting testimony that the RR/BAYC "project" began in December 2021 and in May 2022.  Trial Tr. at 229:14-21 ("So, you know, in my opinion, you could say that the project began in – at the end of 2021."); Dkt. 200-4 ("Those

communications began in mid-May 2022, which is also the same time period that the RR/BAYC Project began.").

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism

of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.

At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole

1   Muniz had publicly represented that BAYC NFT holders received all IP rights and

2   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

3   189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz

4   confirmed that someone listening to her public statement about Yuga not having

5   any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

6          The evidence that Yuga cites does not rebut this overwhelming evidence of

7   Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

8   and taking out of context evidence.  For example, Yuga repeatedly cites to various

9   pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

10  confusion.  But those pages are internal discussion about the design of the

11  ApeMarket website to ensure that users of apemarket.com were not confused by the

12  website design.  Yuga even cross-examined Mr. Hickman about these

13  communications and received the same explanation: "This is our attempt to make it

14  as clear as possible.  We are having discussion on how to make sure it was very

15  clear for users."  Trial Tr. [Hickman] 212:22-24.

16         Yuga similarly takes out of context exhibits such as JTX-44.00002 to

17  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

18  44.00002, Mr. Hickman stated that "people believe the tokenId should match the

19  RR ID.  that is where they get confused."  This statement is not discussing

20  confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is

21  discussing how the RR/BAYC collection used a different numbering system that

22  BAYC NFTs, and that consumers expected the numbers match as a shorthand

23  manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.

24  That is, due to the different numbering system, some consumers were confused as

25  to which RR/BAYC NFT they received but they understood very well that they

26  received an NFT created by Mr. Ripps that protests and criticizes Yuga.

27         Yuga also alleges that Etherscan's creation of a token tracker is evidence of

28  Defendants' intent to cause confusion.  But Defendants do not control the Etherscan

website or how Etherscan chooses to display the RR/BAYC NFT collection.
Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of
NFTs do not use Etherscan's token tracker/token name but instead rely on
marketplaces or by checking the associated smart contract address.  Trial Tr.
[Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish
NFTs "would be a fairly weak way to do so because often those things are mutable.
They can be changed after the fact.  Also, there's no guarantee of uniqueness."
Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC
NFTs even after the summary judgment order in this case.  The exhibits Yuga cites
(JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen
made reporting news on what is occurring in relation to the RR/BAYC collection:
specifically, that certain third-party marketplaces were trading the NFTs despite
Yuga's efforts to silence Defendants' criticism and public reports of certain
transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen
explained in his declaration, "Overall, I would consider myself a very active
community member in the cryptocurrency space, which is something that I take
pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50
(Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to
report on crypto news or other topics I find noteworthy to help spread awareness."
Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but
simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly alleges that Defendants continued to market
ApeMarket after entry of summary judgment in this case.  First, this argument
makes no sense given that Defendants never released ApeMarket in the first place.
Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which
was well before the entry of summary judgment in this case.

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

Defendants' sale and promotion of RR/BAYC NFTs was intended to cause confusion among consumers in order to gain profit.  As the Court has already found, Defendants' infringement was not art.

Defendants' response is unavailing for the same reasons discussed *supra* ¶ 9, specifically because (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, and (8) other alleged infringers do not negate Defendants' infringement.

Additionally, as to *when* Defendants started planning their scheme, Defendants' response fails to address Defendants' conflicting testimony that the RR/BAYC "project" began in either December 2021 or May 2022.  Defendants' inability to keep their story straight continues to highlight their lack of credibility.

**Defendants' Disputed Post Trial Finding of Fact No. 11:**

Mr. Ripps is an artist, and has previously created satirical art projects spotlighting problematic societal issues. Ripps Decl. ¶¶ 15-26 (uncontested).

**Plaintiff's Basis for Dispute:**

Mr. Ripps' declaration does not establish that Mr. Ripps has created satirical art projects that spotlight problematic societal issues.  At best, his declaration establishes that he believes he has done this and, even then, Mr. Ripps is not a

credible witness.  Regardless, the RR/BAYC NFTs were not satirical or art.  *See supra* ¶¶ 9-10.

**Defendants' Response:**

Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic contributions have been recognized by mainstream media. Dkt. 419-1 at 3.  Despite these admissions, Yuga disputes that Mr. Ripps has a history of creating satirical art projects without providing any evidence to rebut Mr. Ripps's unchallenged declaration.  If Yuga truly believes that Mr. Ripps's declaration contains untrue statements about his career as one of the most recognized digital artists in the world, then it could have tested those statement on cross-examination.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's declaration uncontested, including the following statement:

24.    My artwork intentionally pushes the boundaries of what is deemed socially or artistically "acceptable," particularly when critiquing internet culture.

25.    One of my most well-known works, *Diventare Schiavo*, involved having people pack boxes through a VR set to demonstrate how the modern internet has reduced us all to "packing boxes."

26.     Other works I created that comment on the internet include: *Barbara Lee*, a commentary on the interplay between truth and clickbait online, and *Ho*, an exhibit I created for the Postmasters Gallery which explores how social media uses manipulated images to mediate perception of self.

27.     My art is meant to be interactive, and to be discussed and critiqued.

28.     Much of my work has been the source of criticism and controversy.  I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.   And critically, publications such as the *New York Times* have recognized how Mr. Ripps's work has allowed Mr. Ripps to shape internet culture as we know it:

And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[1]  This record, which Yuga has not rebutted, shows that Mr. Ripps has been remarkably influential in the field of digital art and using satire to comment on the boundaries between trolling, art, and commerce.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

---

[1] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.   Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

**Plaintiff's Reply:**

Mr. Ripps' declaration is not uncontested for all the reasons stated *supra* ¶ 3. Moreover, Mr. Ripps' declaration provides no evidence, other than self-serving statements, to establish the alleged fact that he has "created satirical art projects spotlighting problematic societal issues." Rather, Mr. Ripps lies in his declaration with falsely attributed statements. For example, Mr. Ripps' declaration declares under oath that he has been, quote, "described in *The New York Times* as 'one of the most influential digital artists of the past decade.'" Ripps Decl. ¶ 21 (citing JTX-2333). *The New York Times* article (JTX-2333) does not call Mr. Ripps "one of the most influential digital artists of the past decade." There is no documentary evidence of *The New York Times* so labeling Mr. Ripps. This again highlights the unreliability of Mr. Ripps' testimony and his loose connection to the truth.

Instead of Mr. Ripps' fake quote, *The New York Times* article notes that members of design world "dismiss him out of hand." It also notes that Ripps has falsely claimed credit for himself in other scandals, for instance when he "created a website that falsely claimed to be the first public project of" Kanye West's creative agency.

In their response, Defendants' attempt to proffer other statements allegedly from *The New York Times* are similarly unavailing as they are merely hearsay and are not part of the record. *See* JTX-2333 (proffered statement omitted); JTX-2332 (not admitted into evidence or on parties' final joint trial exhibit list (Dkt. 376)).

Regardless, whether or not Mr. Ripps believes he is an artist is immaterial and irrelevant. As the Court has already held in granting Yuga Labs' motion for summary judgment, Defendants' actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." SJ Order (Dkt. 225) at 16. Thus, Defendants' conduct was not art and was in no way an excuse for their infringement.

Further, Defendants' anecdotal evidence of individuals sending emails of alleged support of Defendants' infringement is also irrelevant and immaterial.  A handbag counterfeiter may have distributors, and those distributors may even profess to believe in a cause, but that does not excuse the counterfeiter's wrongdoing or mitigate the likelihood of confusion in the marketplace.  *See* SJ Order (Dkt. 225) at 16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag.").  And Defendants do nothing to rebut the likelihood of post-sale confusion, such as through survey or expert analysis.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").  Further, confused consumers are unlikely to admit that they have fallen for Defendants' scam.  As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it."  Trial Tr. at 54:10-16.  Nonetheless, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive of, or even were aware of, any alleged artistic purpose.

**Defendants' Disputed Post Trial Finding of Fact No. 12:**

Mr. Ripps's artistic contributions have been recognized by mainstream media. *New York Times* has called Mr. Ripps one of the most influential digital artists of the past decade and recognized his work on the RR/BAYC project. Ripps Decl. ¶ 21 (uncontested).

**Plaintiff's Basis for Dispute:**

The New York Times article (JTX-2333) does not call Mr. Ripps "one of the most influential digital artists of the past decade."  There is no documentary

evidence of The New York Times so labeling Mr. Ripps.  This again highlights the unreliability of Mr. Ripps' testimony.  Instead, the New York Times article notes that members of design world "dismiss him out of hand.  To them, Mr. Ripps' Bored Ape project looks like a bid to thrust himself back into the zeitgeist."  The article also contains critiques of his prior purported artistic attempts ("Ho" and "Art Whore" in particular) as "unthinking, unethical and dull."  It also notes that Ripps has falsely claimed credit for himself in other scandals, for instance when he "created a website that falsely claimed to be the first public project of" Kanye West's creative agency.

Moreover, even if Mr. Ripps' "artistic contributions" have been recognized, such recognition is immaterial, as this Court already determined, because he did not have a right to infringe Yuga Labs' trademarks.  *See* SJ Order at 16.

**Defendants' Response**:

The *New York Times* has recognized Mr. Ripps as one of the most influential digital artists of the past decade:

> And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[2]  Moreover, Mr. Ripps's declaration references this quote and explains that the *New York Times* has recognized him as one of the most influential digital artists of the past decade.  Yuga elected to not cross-examine Mr. Ripps and thus failed to rebut this testimony.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony

---

[2] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.  Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

1  are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of

2  cross-examination is "the direct and personal putting of questions and obtaining

3  immediate answers."  *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004)

4  ("One longstanding purpose of cross examination is to expose to the fact-finder

5  relevant and discrediting information[.]").   Yuga's decision to not cross-examine

6  Mr. Ripps regarding any portion of his declaration means that "principle means" of

7  testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's

8  declaration.

9      **Plaintiff's Reply:**

10     Defendants' response is unavailing for the same reasons discussed *supra* ¶

11  11.  In particular, Defendants' response admits that Mr. Ripps' declaration falsely

12  identifies a quote from *The New York Times*.  Ripps Decl. ¶ 21 (citing JTX-2333).

13  *The New York Times* article (JTX-2333) does not call Mr. Ripps "one of the most

14  influential digital artists of the past decade."  There is no documentary evidence of

15  the New York Times so labeling Mr. Ripps.  This again highlights the unreliability

16  of Mr. Ripps' testimony and his loose connection to the truth.  Mr. Ripps, caught in

17  a lie, again shifts his story.

18     Defendants' attempt to proffer in their response *other* statements allegedly

19  from *The New York Times* are similarly unavailing as they are merely hearsay and

20  are not part of the record.  *See* JTX-2333 (proffered statement omitted); JTX-2332

21  (not admitted into evidence or on parties' final joint trial exhibit list (Dkt. 376)).

22     Regardless, whether or not Mr. Ripps' "artistic contributions" have been

23  recognized is immaterial and irrelevant.  As the Court has already held in granting

24  Yuga Labs' motion for summary judgment, Defendants' actions "are all

25  commercial activities designed to sell infringing products, not expressive artistic

26  speech protected by the First Amendment."  SJ Order (Dkt. 225) at 16.  Thus,

27  Defendants' conduct was not art and was in no way an excuse for their

28  infringement.

**<u>Defendants' Disputed Post Trial Finding of Fact No. 13:</u>**

  <u>Mr. Ripps and Mr. Cahen intended RR/BAYC as a form of protest designed to educate people on the nature of non-fungible tokens ("NFTs"), and what they saw as problematic content in Yuga's "Bored Ape Yacht Club" ("BAYC") NFT collection. Ripps Decl. ¶¶ 87-94 (uncontested); Cahen Decl. ¶¶ 97-103; Hickman Decl. ¶¶ 62-66; Trial Tr. [Cahen] 229:9-13</u>.

**<u>Plaintiff's Basis for Dispute</u>:**

  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:   that is, that the public will be deceived."  .  .  .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.   Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers.  .  .  .  In addition, the Court concludes   that   Defendants   intentionally   designed   the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.

Defendants have continually disregarded this order and compounded this litigation by relitigating this settled issue.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Nevertheless, the evidence presented at trial also establishes that, from the outset, the promotion and sale of RR/BAYC NFTs was not about the education of people.  Instead, it was a commercial venture where Defendants were interested in making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make I of money tbh"; "Potentially a lot").  They did not create their infringing NFTs "as a form of protest designed to educate people."  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Indeed, they used the very identical images that they claim are "problematic."  Trial Tr. at 222:7-9.

The evidence also shows that Defendants knew they were infringing and creating confusion, as they acted contrary to their attorney's advice.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create");

JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7.  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

Likewise, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts

sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

The Court's findings at summary judgment and the evidence at trial confirms that Defendants' infringing and commercial NFTs were not created and marketed as a protest or for educational purposes.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").  They were created as part of the business venture, including as an enticement to launch Ape Market.  JTX-1; JTX-696; JTX-801.144 (Mr. Cahen: "One thing we can do to stimulate the rsvp is to tease apemarket.com"); JTX-696 ("Listing requires holding RR/BAYC").

**Defendants' Response**:

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

insisted on these requirement and additional steps so that the artistic purpose of the

work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of

Defendants' public activities associated with RR/BAYC, confirms their intent.  In

those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith

belief that Yuga had given authorization for the creation of projects like RR/BAYC.

At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were

more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶

187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX

2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga

had not taken steps to stop these third-party projects from using Yuga's marks.

Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There

were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape

Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23;

[Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen,

and Mr. Hickman would have probably seen these collections using the Bored Ape

Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.

[Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga

trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-

22.  For example, there are published notebooks with ISBN numbers,

commemorative coins, alcohol products, skateboards, cereal brands, restaurants,

and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club. Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project. Hickman Decl. ¶¶ 19-22 (Dkt. 345). BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms."). Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property. For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673. Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright. Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence. For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion. But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design. Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users." Trial Tr. [Hickman] 212:22-24.

1    Yuga similarly takes out of context exhibits such as JTX-44.00002 to

2  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

3  44.00002, Mr. Hickman stated that "people believe the tokenId should match the

4  RR ID.  that is where they get confused."  This statement is not discussing

5  confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is

6  discussing how the RR/BAYC collection used a different numbering system that

7  BAYC NFTs, and that consumers expected the numbers match as a shorthand

8  manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.

9  That is, due to the different numbering system, some consumers were confused as

10  to which RR/BAYC NFT they received but they understood very well that they

11  received an NFT created by Mr. Ripps that protests and criticizes Yuga.

12    Yuga also alleges that Etherscan's creation of a token tracker is evidence of

13  Defendants' intent to cause confusion.  But Defendants do not control the Etherscan

14  website or how Etherscan chooses to display the RR/BAYC NFT collection.

15  Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of

16  NFTs do not use Etherscan's token tracker/token name but instead rely on

17  marketplaces or by checking the associated smart contract address.  Trial Tr.

18  [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish

19  NFTs "would be a fairly weak way to do so because often those things are mutable.

20  They can be changed after the fact.  Also, there's no guarantee of uniqueness."

21  Trial Tr. [Atalay] 133:12-23.

22    Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

23  NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

24  (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

25  made reporting news on what is occurring in relation to the RR/BAYC collection:

26  specifically, that certain third-party marketplaces were trading the NFTs despite

27  Yuga's efforts to silence Defendants' criticism and public reports of certain

28  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness."  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly alleges that Defendants continued to market ApeMarket after entry of summary judgment in this case.  First, this argument makes no sense given that Defendants never released ApeMarket in the first place.  Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which was well before the entry of summary judgment in this case.

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply**:

Defendants' sale and promotion of RR/BAYC NFTs was intended to cause confusion among consumers in order to gain profit.  As the Court has already found, Defendants' infringement was not art.

Defendants' response is unavailing for the same reasons discussed *supra* ¶ 9, specifically because (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs'

1  BAYC Marks, and (8) other alleged infringers do not negate Defendants'

2  infringement.

3  **Defendants' Disputed Post Trial Finding of Fact No. 14:**

4      A non-fungible token, or NFT, is a representation of ownership of a unique

5  piece of data on an internet blockchain. Trial Tr. [Atalay] 127:9-16.

6  **Plaintiff's Basis for Dispute:**

7      This is an incomplete definition of what an NFT is.  The Court has already

8  found as much on Yuga Labs' Motion for Summary Judgment, for example, writing

9  that "viewing the NFTs as ownership receipts treats the NFTs as mere written

10  instructions while ignoring their documented commercial value."  SJ Order (Dkt.

11  225) at 7.  NFTs are sold "specifically for their connection to a particular brand,

12  creator, or associated creative work."  *Id.* at 8.  Moreover, "'[i]ndividuals do not

13  purchase NFTs to own a digital deed divorced from any other asset; they buy them

14  precisely so that they can exclusively own the content associated with the NFT.'"

15  *Id.* (quoting *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL

16  1458126, at *5 (S.D.N.Y. Feb. 2, 2023) (internal quotation marks omitted)).

17      The evidence introduced at trial also establishes that Defendants' definition

18  of an NFT is too narrow.  Mr. Solano explained that NFTs "are units of data stored

19  on a blockchain that are created to transfer ownership of either physical things or

20  digital media—here digital images of cartoon apes. The term 'NFT' commonly

21  refers to both the token stored on the blockchain and the digital image with which it

22  is associated."  Solano Decl. ¶ 2 n 1.  And Mr. Solano further testified that

23  purchasers of BAYC NFTs purchased for different reasons, including how the

24  BAYC NFT image resonated with them, showing that for some people an NFT

25  includes the image associated with it.  *Id.* ¶ 12.  Mr. Atalay also testified that there

26  is "probably more that you could say than that…" in reference to Defendants'

27  limited definition.  Trial Tr. at 127:9-13.  Mr. Atalay went on to explain that NFTs

28

include metadata and other data that is not metadata but may be on the blockchain. *Id.* 128:8-24.

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding that an NFT is more than a certificate of ownership, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the nature of NFT applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Yuga argues that an NFT is more than just a certificate of ownership of unique data on a blockchain (which is essentially a digital spreadsheet), but Yuga's contention is inconsistent with the trial record.   Yuga's Chief Technical Officer was asked to explain to the Court what an NFT is, and he confirmed it is a certificate of ownership:

Q.    An NFT is an on-chain representation of ownership; right, sir?

A.    *I would say that's accurate.*   There's probably more that you could say than that, but that's generally accurate, yeah.

Q.    It's ownership of a unique piece of data; right, sir?

A.    *Yes.*

Trial Tr. [Atalay] 127:9-16 (emphasis added).   Mr. Atalay's testimony, and the fact than an NFT is simply a certificate of ownership of data on the blockchain and does not include associated public images readily accessible and usable by anyone with internet, was further corroborated by Mr. Hickman's trial testimony:

THE COURT:         *When you are selling defendants' NFTs, you are selling Yuga's images.*

THE WITNESS:       *No.  We are selling the record*.

THE COURT:         Okay.  But the record points to and displays those images.

THE WITNESS:       So the images are public.  They are available for anybody to navigate to on the internet.

THE COURT:         Right.

THE WITNESS:       *We are selling a receipt that says I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-21 (emphasis added).

Thus, the only two engineers that testified during trial provided the Court with the same substantive testimony—that an NFT is a certificate of ownership and does not include the images that an NFT often points to.  Yuga attempts to rebut this evidence (including the testimony of its own Chief Technical Officer) by citing

1  to the Declaration of Greg Solano.  But Mr. Solano is not credible given the many

2  false and misleading statements contained in his declaration.

3        For example, Mr. Solano was forced to concede on cross-examination that

4  his sworn declaration included a false statement claiming that Defendants continue

5  to receive royalties from sales on secondary marketplaces:

6
7        Q.    And you understand that Mr. Ripps and Mr. Cahen have testified
              that they do not currently receive any royalties or creator fees from
8              sales on secondary marketplaces; right?

9        A.    Yes.

10
11       Q.    So you don't have any basis for your statement that their profits
              continue to increase; correct?

12
13       A.    It's my understanding that they were collecting royalties or creator
              fees from LooksRare for quite a while.  Although, those were
14             supposed to be donated to charity and never were.

15       Q.    **They don't continue to increase; correct, sir?**

16       A.    **Correct.**

17
18       Q.    **That statement, that part of your witness statement is incorrect;
              right?**

19
20       A.    **Yes.**

21
22  Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the

23  phrase "business venture" in Mr. Lehman's declaration, without having considered

    that the phrase "business venture" was selected by Yuga's counsel, and that Mr.
24
    Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.
25
    Solano also relied on Mr. Lehman's declaration without having considered that Mr.
26
    Lehman knew he could not settle his case without executing a declaration
27
    concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.
28

1  Lehman was afraid for his family at the time he signed his declaration, because

2  Yuga's lawsuit against him would be disastrous to his family and himself, even if

3  Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility

4  as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano]

5  32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by

6  Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

7  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And

8  you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look

9  at your deposition -- and we can pull it up on the screen -- at page 152, starting at

10  line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an

11  objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

12  your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market

13  exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look

14  at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know

15  whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that

16  question, and did you give that answer? A Yes.").  Mr. Solano's testimony

17  regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been

18  rebutted.  Mr. Solano could not identify a single person that ever bought an

19  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1. In

20  fact, no one has been able to identify a single confused consumer in the entirety of

21  this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

22       **Plaintiff's Reply:**

23       As the Court has already found, Defendants' definition of an NFT is too

24  narrow and ignores their consumers' understanding of NFTs' connection to a

25  particular brand, creator, or associated creative work.  SJ Order (Dkt. 225) at 7-8.

26  As discussed *supra* ¶ 9, the Court's summary judgment order already ruled on basic

27  facts establishing Defendants' liability—including Yuga Labs' ownership of the

28  marks.  Defendants' repeated attempt to undermine that ruling is unavailing and

makes this an exceptional case.  Further, Defendants' response contradicts their
own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 3.  In
that stipulation and proposed order, Defendants admitted that Yuga Labs is the
creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC
Marks.  *Id.* at 2-3.  Defendants further admitted that "[t]he Court has determined
that Defendants infringed the BAYC Marks."  *Id.* at 13.

As discussed *supra* ¶ 3, Defendants' response further lacks merit.
Specifically: (1) Defendants fail to impeach Mr. Solano's accurate testimony; and
(2) confused consumers are unlikely to admit that they have fallen for Defendants'
scam.  As Mr. Solano explained, being scammed is "super embarrassing" and
consumers who were tricked "weren't going to, you know, raise their hand and
shout about it."  Trial Tr. at 54:10-16.

Additionally, the Court should reject Defendants' responses because (1) they
mischaracterize the evidence presented at trial.  Defendants' limited reading of Mr.
Atalay's trial testimony ignores the fact that when asked whether "[a]n NFT is an
on-chain representation of ownership," he answered "I would say that's accurate.
***There's probably more that you could say than that***, but that's generally accurate,
yeah."  Trial Tr. 127:9-16 (emphasis added).  In fact, as described above, the
evidence and testimony presented at trial accurately described the additional aspects
of an NFT.  Mr. Atalay went on to explain that NFTs include metadata and other
data that is not metadata but may be on the blockchain.  *Id.* 128:8-24.  And Mr.
Solano added that NFTs also include ownership of physical things or digital media
associated with it.  Solano Decl. ¶¶ 2 n.1, 12.

The testimony of Mr. Solano and Mr. Atalay align with the Court's ruling in
its summary judgment order.  Defendants' narrow definition is baseless.

**<u>Defendants' Disputed Post Trial Finding of Fact No. 15</u>:**

The RR/BAYC NFTs included digital pointers to Bored Ape images, which "are public" and "available for anyone to navigate to on the Internet." Trial Tr. [Hickman] 222:15-16.

**<u>Plaintiff's Basis for Dispute</u>:**

Yuga Labs' Bored Ape Yacht Club images are not available for "public" ownership. While anyone may *view* a Bored Ape Yacht Club NFT and the associated image, Yuga Labs goes to great lengths to combat the unauthorized use of its marks and images. *See* Trial Tr. at 82:1-2 (Ms. Muniz testifying that Yuga Labs has "a pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a million dollars a year doing it."). Further, this contention is immaterial because this is a case for trademark, not copyright, infringement. And even so, the Court has already held that Defendants' direct appropriation of Yuga Labs' images favored a finding that there was a likelihood of confusion. SJ Order (Dkt. 225) at 11 ("Indeed, Defendants are selling the exact same product – NFTs that point to Yuga's BAYC images – and Defendants marketed their RR/BAYC NFTs using the same corresponding Ape ID number used by Yuga for the BAYC NFTs. Accordingly, the second *Sleekcraft* factor weighs in favor of Yuga."). Thus, regardless of whether the Bored Ape Yacht Club images are viewable by the public, it is impermissible to sell infringing NFTs using Yuga Labs' marks and creating a likelihood of confusion. This contention should be rejected as misleading and immaterial.

**<u>Defendants' Response</u>:**

The fact that Bored Ape images are public is material to this case because it bears on Defendants' intent and why they believed it was acceptable to point to those public Bored Ape images. There is no evidence in the trial record indicating that the Bored Ape images not public, and Yuga's citation to testimony from Ms. Muniz regarding alleged trademark takedowns does not support a showing that the

publicly available Bored Ape digital *images* are somehow the property of Yuga.   In fact, Ms. Muniz has affirmatively and publicly stated that Yuga has no IP rights in BAYC NFTs or the Bored Ape images. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.

Moreover, the testimony of Mr. Hickman explained that the Bored Ape images *are public* and that is precisely why many NFT collections (including BAYC and RR/BAYC NFTs) all point to those public Bored Ape images:

> THE COURT:      When you are selling defendants' NFTs, you are selling Yuga's images.
>
> THE WITNESS:    No.  We are selling the record.
>
> THE COURT:      Okay.  But the record points to and displays those images.
>
> THE WITNESS:    *So the images are public.  They are available for anybody to navigate to on the internet.*
>
> THE COURT:      Right.
>
> THE WITNESS:    *We are selling a receipt that says I committed to this protest that points to the same public [images] that a lot of different collections point to including Yuga labs pointing to the same resource*.

Trial Tr. [Hickman] 222:10-21 (emphasis added).  Nothing in the trial record rebuts this testimony.

**Plaintiff's Reply:**

Defendants' response, suggesting that the Bored Ape Yacht Club images are publicly owned because they are viewable by the public, is wrong.  They cite no law supporting their claim that everything on the Internet is publicly owned.  There is no basis for their claim that anyone can copy and infringe whatever they see.

As discussed *supra* ¶ 9, Defendants' responses lack merit. Specifically: (1) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks.

Additionally, the Court should reject Defendants' responses because (1) the evidence presented at trial proves that the Bored Ape Yacht Club images were licensed to their owners, not owned by the larger public.

**The Bored Ape Yacht Club Images Were Licensed To Their Owners, Not Owned By The Larger Public:**  The BAYC Terms give *BAYC NFT holders* a copyright *license* to use their respective Bored Ape image for personal or commercial use, not the marks within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.  Ms. Muniz confirmed this at trial when she testified that "We told our ***members*** that they have a ***license*** for the copyright to the imagery." *Id.* (emphases added).

Even Defendants and Mr. Hickman understood that the Bored Ape Yacht Club images were licensed to its owners, not to the public.  Hickman Decl. (Dkt. 345) ¶ 23 ("I purchased a Bored Ape Yacht Club NFT partially due to the terms and conditions that Yuga provided, which stated that '*[w]hen you purchase an NFT*, you own the underlying Bored Ape, the Art, completely' and includes 'an unlimited, worldwide ***license*** to use, copy, and display the purchased Art for the purpose of creating derivative works based upon the Art ('Commercial Use')") (emphases added).

**<u>Defendants' Disputed Post Trial Finding of Fact No. 16</u>:**

<u>The RR/BAYC NFTs were effectively a "receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to including Yuga Labs." Trial Tr. [Hickman] 222:18-21.</u>

**<u>Plaintiff's Basis for Dispute</u>:**

An NFT is more than a "receipt," and therefore this contention should be

rejected.  In granting Yuga Labs' Motion for Summary Judgment, the Court held that "viewing the NFTs as ownership receipts treats the NFTs as mere written instructions while ignoring their documented commercial value."  SJ Order (Dkt. 225) at 7.  And the evidence introduced at trial also establishes that Defendants' definition of an NFT is too narrow.  Mr. Solano explained that NFTs "are units of data stored on a blockchain that are created to transfer ownership of either physical things or digital media—here digital images of cartoon apes.  The term 'NFT' commonly refers to both the token stored on the blockchain and the digital image with which it is associated."  Solano Decl. (Dkt. 342) ¶ 2 n.1.  Similarly, in *Hermès* the court held that "the title 'MetaBirkins' should be understood to refer to both the NFT and the digital image with which it is associated." *Hermès Int'l. v. Rothschild, No. 22-CV-384-JSR, 2023 WL 1458126, at *6 (S.D.N.Y. Feb. 3, 2023)*.  Mr. Atalay also testified that there is "probably more that you could say than that . . ." in reference to Defendants' limited definition.  Trial Tr. at 127:9-13.  He went on to explain that NFTs include metadata and other data that is not metadata but may be on the blockchain.  *Id.* 128:8-24.  Therefore, the RR/BAYC NFTs consist of more than simply a "receipt."

Defendants' repeated reference to the RR/BAYC NFTs as a "protest" also flies in the face of the significant evidence that Defendants sought to profit from their infringement.  *See* JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market."); JTX-1574 (Text message from Mr. Cahen to Mr. Ripps stating that he will "make like a million dollars" off of his infringement); JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot").  And the Court has already found that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a

1    counterfeit handbag." SJ Order (Dkt. 225) at 16.  The RR/BAYC NFTs are

2    infringing products created to generate profit through the use of Yuga Labs' BAYC

3    Marks.  They are not a mere receipt, they are not a protest, and they are not art. *See*

4    SJ Order at 16.

5        **Defendants' Response:**

6        Yuga improperly objects to Defendants' proposed finding of fact because, by

7    arguing that the Court's summary judgment order supports a finding that an NFT is

8    more than a certificate of ownership, Yuga has incorrectly relied on the law of the

9    case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such***

10   ***as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

11   Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

12   Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

13   district judges for the remainder of the case.  Given the nature of such motions, it

14   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that

15   although ***aspects*** of an issue were decided at summary judgment for one purpose,

16   the summary judgment order did resolve the issue generally or as to other topics.

17   *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25,

18   2019) (holding that evidence of initial police contact was relevant as background,

19   but not to already decided issue that initial contact was not excessive force).  This

20   case is just like *Sienze*: the summary judgment ruling the nature of NFT applies

21   only the issue of infringement and is not adequate support on intent generally or as

22   applied to availability of disgorgement as a remedy, apportionment, and an

23   exceptional case analysis.

24       Yuga argues that an NFT is more than just a certificate of ownership, but this

25   is inconsistent with the trial record.   Yuga's Chief Technical Officer was asked to

26   explain to the Court what an NFT is, and he confirmed it is essentially a certificate

27   of ownership:

28

Q.      An NFT is an on-chain representation of ownership; right, sir?

A.      ***I would say that's accurate.***   There's probably more that you could
say than that, but that's generally accurate, yeah.

Q.      It's ownership of a unique piece of data; right, sir?

A.      ***Yes.***

Trial Tr. [Atalay] 127:9-16 (emphasis added).   Mr. Atalay's testimony, and the fact
than an NFT is simply a certificate of ownership and does not include associated
public images readily accessible and usable by anyone with internet, was further
corroborated by Mr. Hickman's trial testimony:

THE COURT:      ***When you are selling defendants' NFTs, you are
selling Yuga's images.***

THE WITNESS:    ***No.  We are selling the record.***

THE COURT:      Okay.  But the record points to and displays those
images.

THE WITNESS:    So the images are public.  They are available for
anybody to navigate to on the internet.

THE COURT:      Right.

THE WITNESS:    ***We are selling a receipt that says I committed to this
protest*** that points to the same public [images] that a
lot of different collections point to including Yuga
labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-21 (emphasis added).

Thus, the only two engineers that testified during trial provided the Court
with the same substantive testimony—that an NFT is a certificate of ownership and
does not include the public images that it points to.

Yuga attempts to rebut this evidence (including the testimony of its own Chief Technical Officer) by cited to the Declaration of Greg Solano. But Mr. Solano is not credible given the many false and misleading statements contained in his declaration.

For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q. And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A. Yes.
>
> Q. So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A. It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q. *They don't continue to increase; correct, sir?*
>
> A. *Correct.*
>
> Q. *That statement, that part of your witness statement is incorrect; right?*
>
> A. *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr.

Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Lastly, the trial record well-established that Defendants' intent behind the RR/BAYC collection was to protest and criticize Yuga. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-

1    801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose

2    of the project, their intention that it would spread criticism of Yuga, and their

3    intention that social media platforms be used to educate the public about the nature

4    of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt.

5    346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146,

6    196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

7          Defendants also took multiple steps to make clear that the RR/BAYC

8    collection was not related to Yuga in any way.  For example, the rrbayc.com

9    website—through which the majority of RR/BAYC commissions occurred and the

10   vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

11   (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

12   intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

13   Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

14   [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

15   read and click through a disclaimer acknowledging the artistic purpose of the

16   project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

17   109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

18   insisted on these requirement and additional steps so that the artistic purpose of the

19   work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

20   60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

21   impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

22         Defendants' online discussion, which consisted of nearly the entirety of

23   Defendants' public activities associated with RR/BAYC, confirms their intent.  In

24   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

25   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

26   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

27   Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

28

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered

in the terms."). Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property. For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673. Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright. Trial Tr. [Muniz] 72:19-22.

**Plaintiff's Reply:**

Defendants' response is largely inapposite. The Court's summary judgment order has already determined the fact of what constitutes an NFT to establish Defendants' liability. The summary judgment order also found Defendants' infringement to be commercial, not protest or art. Rather than confront the Court's ruling, Defendants engage in collateral disputes to obfuscate the issues. These responses should be rejected and again highlight that Defendants' litigation tactics make this an exceptional case.

As discussed *supra* ¶ 14, Defendants' response lacks merit. Specifically: (1) the Court's summary judgment order already ruled on basic facts establishing Defendants' liability, and in support of that holding, found Defendants' definition of an NFT too narrow, (2) Defendants fail to impeach Mr. Solano's accurate testimony, and (3) Defendants mischaracterize the evidence presented at trial proving what an NFT encompasses.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere, as discussed *supra* ¶ 9: (1) the record shows that Defendants intended to confuse consumers, (2) Defendants' commercial infringement was not protected "art," (3) Defendants intended to profit off of their infringement, (4) Defendants did not take steps to avoid confusion, (5) Defendants' "disclaimers" did not dispel likelihood of confusion, (6) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to

1    Defendants) the right to infringe Yuga Labs' BAYC Marks, and (7) other alleged
2    infringers do not negate Defendants' infringement.

3        Defendants claim that they could create an exact copy of Yuga Labs' well-
4    known BAYC NFTs and market and sell that copy for a profit is not credible.

5    **Defendants' Disputed Post Trial Finding of Fact No. 17:**

6        The evidence presented at trial establishes that defendants did not intend to
7    infringe Yuga's trademarks or create confusion regarding the origin of the
8    RR/BAYC NFTs. Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl.
9    (uncontested); Cahen Decl.; Hickman Decl.

10   **Plaintiff's Basis for Dispute:**

11       In granting Yuga Labs' motion for summary judgment, this Court held that
12   Defendants intended to deceive consumers:

13       When the alleged infringer knowingly adopts a mark similar to
         another's, reviewing courts presume that the defendant can
14       accomplish his purpose:   that is, that the public will be
15       deceived." . . . In this case, Defendants knowingly and
         intentionally used Yuga [Labs'] BAYC marks.   Because
16       Defendants knowingly and intentionally used Yuga [Labs']
17       BAYC marks, and in the absence of contrary evidence, the
         Court concludes that Defendants used the BAYC marks in an
18       effort to confuse consumers. . . . In addition, the Court
19       concludes that Defendants intentionally designed the
         RR/BAYC NFTs and sales websites to resemble Yuga's
20       branding.  For example, Defendants listed the RR/BAYC NFTs
21       on rrbayc.com under the very same Ape ID number associated
         with BAYC NFTs, despite having their very own unique and
22       different ID numbers.

23   Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that
24   "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a
25   counterfeit handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial
26   activities designed to sell infringing products, not expressive artistic speech
27   protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.
28

Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.
Likewise, the Court determined that Defendants' use of the rrbayc.com and
apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  But,
Defendants have continually disregarded this order and compounded this litigation
by relitigating these settled issues.  Nevertheless, the evidence admitted at trial
proves that these settled issues should remain settled—Defendants were not
motivated by a desire to create satire, they were motivated by greed.

Nevertheless, the evidence presented at trial also establishes that, from the
outset, this was a business venture where Defendants were interested in making
"like a million dollars" from using the BAYC Marks.  JTX-1574; *see also* JTX-
1586 (Mr. Cahen to Mr. Ripps:  "I think you are gonna make millions too man");
JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money
tbh"; "Potentially a lot"); JTX-1.  They created their RR/BAYC NFTs with the
intent to infringe because using Yuga Labs' BAYC Marks allowed them to freeride
off of the commercial success of the BAYC brand.  Kindler Decl. (Dkt. 338) at ¶ 68
("Defendants were unjustly enriched in the form of avoided costs, as they were able
to 'free ride' on investments that Yuga Labs made to develop the marks that the
Defendants infringed.").  Defendants could have called their NFT collection
something other than "Bored Ape Yacht Club" with the symbol "BAYC"
immutably in the metadata for the NFT smart contract, but they chose not to.
Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different
images or overlaid some commentary on the images they did use, but they chose
not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something
like Getty images" because "it's just insane to have the same art"); JTX-801.196
(Mr. Lehman demonstrating what an overlay might look like and recommending
not to "in the marketing show screenshots like the ones [Mr. Hickman] showed"
"[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing

screenshot of Ape Market); Dkt. 416 at ¶ 7.  Indeed, they used the very identical images that they claim are "problematic."  Trial Tr. at 222:7-9.

The evidence also shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Furthermore, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images. Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342)¶ 25 n.2. Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT. Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter. *Id.* ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710. This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well. *See, e.g.*, JTX-522, JTX-523.  Beyond their confusing promotion on Twitter, Defendants promoted their infringing collection on platforms such as OpenSea and Foundation, on which the collection appeared almost identical to Yuga Labs' genuine BAYC collection.  JTX-28; JTX-29; JTX-683; JTX-719.  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion. *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

Additionally, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were

still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  They could have stopped after the Court found them to be infringing.  But they continued to intentionally add to the confusion.

The evidence establishes that Defendants did intend to confuse consumers and did intend to use Yuga Labs' BAYC Marks.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any

1  way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the

2  RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather

3  than to confuse.  For example, in private group chats among participants in the

4  RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their

5  intended artistic purpose of the project, their intention that it would spread criticism

6  of Yuga, and their intention that social media platforms be used to educate the

7  public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps

8  Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-

9  801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08,

10  29-30.

11      Defendants also took multiple steps to make clear that the RR/BAYC

12  collection was not related to Yuga in any way.  For example, the rrbayc.com

13  website—through which the majority of RR/BAYC commissions occurred and the

14  vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

15  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

16  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

17  Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

18  [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

19  read and click through a disclaimer acknowledging the artistic purpose of the

20  project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

21  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

22  insisted on these requirement and additional steps so that the artistic purpose of the

23  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

24  60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

25  impact on usability? … A.  … Ryder wanted it and so he had the final call.").

26      Defendants' online discussion, which consisted of nearly the entirety of

27  Defendants' public activities associated with RR/BAYC, confirms their intent.  In

28  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was

1   to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4

2   ("Q. Your intent in writing the terms and conditions was to allow people to be able

3   to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered

4   in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be

5   creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole

6   Muniz had publicly represented that BAYC NFT holders received all IP rights and

7   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

8   189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz

9   confirmed that someone listening to her public statement about Yuga not having

10  any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

11      The evidence that Yuga cites does not rebut this overwhelming evidence of

12  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

13  and taking out of context evidence.  For example, Yuga repeatedly cites to various

14  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

15  confusion.  But those pages are internal discussion about the design of the

16  ApeMarket website to ensure that users of apemarket.com were not confused by the

17  website design.  Yuga even cross-examined Mr. Hickman about these

18  communications and received the same explanation: "This is our attempt to make it

19  as clear as possible.  We are having discussion on how to make sure it was very

20  clear for users."  Trial Tr. [Hickman] 212:22-24.

21      Yuga similarly takes out of context exhibits such as JTX-44.00002 to

22  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

23  44.00002, Mr. Hickman stated that "people believe the tokenId should match the

24  RR ID.  that is where they get confused."  This statement is not discussing

25  confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is

26  discussing how the RR/BAYC collection used a different numbering system that

27  BAYC NFTs, and that consumers expected the numbers match as a shorthand

28  manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.

1  That is, due to the different numbering system, some consumers were confused as

2  to which RR/BAYC NFT they received but they understood very well that they

3  received an NFT created by Mr. Ripps that protests and criticizes Yuga.

4       Yuga also alleges that Etherscan's creation of a token tracker is evidence of

5  Defendants' intent to cause confusion.  But Defendants do not control the Etherscan

6  website or how Etherscan chooses to display the RR/BAYC NFT collection.

7  Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of

8  NFTs do not use Etherscan's token tracker/token name but instead rely on

9  marketplaces or by checking the associated smart contract address.  Trial Tr.

10  [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish

11  NFTs "would be a fairly weak way to do so because often those things are mutable.

12  They can be changed after the fact.  Also, there's no guarantee of uniqueness."

13  Trial Tr. [Atalay] 133:12-23.

14       Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

15  NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

16  (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

17  made reporting news on what is occurring in relation to the RR/BAYC collection:

18  specifically, that certain third-party marketplaces were trading the NFTs despite

19  Yuga's efforts to silence Defendants' criticism and public reports of certain

20  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

21  explained in his declaration, "Overall, I would consider myself a very active

22  community member in the cryptocurrency space, which is something that I take

23  pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

24  (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

25  report on crypto news or other topics I find noteworthy to help spread awareness."

26  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

27  simply report news/crypto events in relation to the RR/BAYC collection.

28

Yuga also incorrectly alleges that Defendants continued to market ApeMarket after entry of summary judgment in this case.  First, this argument makes no sense given that Defendants never released ApeMarket in the first place.  Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which was well before the entry of summary judgment in this case.

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

As the Court's summary judgment order explicitly held, Defendants' sale and promotion of their infringing RR/BAYC NFTs was intended to cause confusion among consumers in order to gain profit.  Defendants' attempt to disregard the Court's order is unavailing.

As discussed *supra* ¶ 9, Defendants' response lacks merit.  Specifically: (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, and (8) other alleged infringers do not negate Defendants' infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 18:**

Rather, Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it

would spread criticism of Yuga, and their intention that social media platforms be
used to educate the public about the nature of NFTs and what they saw as Yuga's
misconduct. Ripps Decl. ¶¶ 144, 147 (uncontested); Cahen Decl. ¶ 131; JTX-
801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08,
29-30.

**Plaintiff's Basis for Dispute:**

In granting Yuga Labs' motion for summary judgment, this Court held that
Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to
> another's, reviewing courts presume that the defendant can
> accomplish his purpose:  that is, that the public will be
> deceived." . . .  In this case, Defendants knowingly and
> intentionally used Yuga [Labs'] BAYC marks.  Because
> Defendants knowingly and intentionally used Yuga [Labs']
> BAYC marks, and in the absence of contrary evidence, the
> Court concludes that Defendants used the BAYC marks in an
> effort to confuse consumers. . . .  In addition, the Court
> concludes that Defendants intentionally designed the
> RR/BAYC NFTs and sales websites to resemble Yuga's
> branding.  For example, Defendants listed the RR/BAYC NFTs
> on rrbayc.com under the very same Ape ID number associated
> with BAYC NFTs, despite having their very own unique and
> different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that
"Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a
counterfeit handbag."  *Id.* at 16.  Despite the Court's holding, Defendants seek to
re-litigate these settled issues.

The evidence presented at trial, including communications between
Defendants, also establishes that, from the outset, this was a business venture where
Defendants were interested in making "like a million dollars" and knew they were
infringing and creating confusion.  JTX-1574; *see also* JTX-1586 (Mr. Cahen to
Mr. Ripps:  "I think you are gonna make millions too man"); JTX-801.239 (Mr.

Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"); JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7.  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for

the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

Furthermore, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images.  Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2.  Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT.  Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.  Beyond their confusing promotion on Twitter, Defendants promoted their infringing collection on platforms such as OpenSea and Foundation, on which the collection appeared almost identical to Yuga Labs' genuine BAYC collection.  JTX-28; JTX-29; JTX-

683; JTX-719.  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

Additionally, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

The evidence establishes that Defendants did intend to confuse consumers and did intend to use Yuga Labs' BAYC Marks.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, Defendants internal communications do not show that RR/BAYC NFT was created as a "business venture."  Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document signed under coercion and under threat to Mr. Lehman's family.  Strangely enough, Yuga cites to the declaration and Mr. Solano affirmatively relied on the declaration even though Yuga's own attorneys coined the term "business venture."  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Yuga's citations to the internal chat are misleading and omit several aspects of the internal chats which show a desire to avoid confusion or to criticize Yuga.  *See* JTX-801.448-49; 801.508; (calling project "education") 801.606-08; 803.005; 803.0029-30; 804.008.  They also ignore efforts by Defendants to *avoid* being

confused with Yuga. *See* JTX-2085; 2086; 2103.  Defendants do not like BAYC, and do not like Yuga or its activities.  Ripps Decl. ¶ 138 (Dkt. 346) (uncontested). They did not want to, and were not, confusing purchasers of RR/BAYC NFTs into erroneously believing that they were purchasing a Yuga product. *Id.*  In fact, Yuga cannot point to a single instance of consumer confusion. Trial Tr. [Solano] 18:18-19:15; Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Moreover, the evidence at trial showed that Defendants are not intentional infringers and intended RR/BAYC as a protest art project.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-

22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it

as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs. That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

Yuga also alleges that Etherscan's creation of a token tracker is evidence of Defendants' intent to cause confusion.  But Defendants do not control the Etherscan website or how Etherscan chooses to display the RR/BAYC NFT collection. Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite

1  Yuga's efforts to silence Defendants' criticism and public reports of certain

2  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

3  explained in his declaration, "Overall, I would consider myself a very active

4  community member in the cryptocurrency space, which is something that I take

5  pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

6  (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

7  report on crypto news or other topics I find noteworthy to help spread awareness."

8  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

9  simply report news/crypto events in relation to the RR/BAYC collection.

10      Yuga also incorrectly alleges that Defendants continued to market

11  ApeMarket after entry of summary judgment in this case.  First, this argument

12  makes no sense given that Defendants never released ApeMarket in the first place.

13  Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which

14  was well before the entry of summary judgment in this case.

15      The evidence that Yuga has cherry-picked and mischaracterized are not

16  sufficient to rebut the overwhelming evidence showing Defendants' intent to

17  protest and criticize Yuga.

18  **Plaintiff's Reply:**

19      As the Court's summary judgment order explicitly held, Defendants' sale and

20  promotion of RR/BAYC NFTs was intended to cause confusion among consumers

21  in order to gain profit.  Defendants' infringement was not art, and Defendants'

22  attempt to disregard the Court's order is unavailing.

23      As discussed *supra* ¶ 9, Defendants' response lacks merit.  Specifically: (1)

24  the response seeks to relitigate issues already adjudicated by the Court, (2) the

25  record shows that Defendants intended to confuse consumers, (3) Defendants'

26  commercial infringement was not protected "art," (4) Defendants intended to profit

27  off of their infringement, (5) Defendants did not take steps to avoid confusion—

28  instead they ignored their attorney's advice, (6) Defendants' "disclaimers" did not

dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, and (8) other alleged infringers do not negate Defendants' infringement.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere because (1) Mr. Lehman's declaration is truthful (*supra* ¶ 3).

**Defendants' Disputed Post Trial Finding of Fact No. 19:**

Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the public that RR/BAYC was intended as a protest art project. Ripps Decl. ¶¶ 158-176 (uncontested); Cahen Decl. ¶¶ 145-155; Dkt. 197-1 ¶ 230.

**Plaintiff's Basis for Dispute:**

Defendants did not take steps to "make clear" to the public that "RR/BAYC was intended as a protest art project."  To the contrary, Defendants took many steps to ensure that the public was and would remain confused.

First, Defendants named their NFT collection "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, when they could have named it anything else.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

Second, Defendants could have used, but chose not to use, different images or overlaid some commentary on the images they did use.  *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

Third, Defendants prominently and without commentary used Yuga Labs' BAYC Marks in their marketing efforts.  JTX-28; JTX-29; JTX-683; JTX-719; JTX-696.  This use on Twitter and secondary marketplaces, such as Foundation and

1   OpenSea, was likely to and intended to cause confusion.  JTX-721; SJ Order (Dkt.

2   225) at 13.

3       Fourth, Mr. Ripps took further steps to confuse the public.  For example, Mr.

4   Ripps represented that by owning an RR/BAYC NFT, a consumer would own

5   commercial rights in Yuga Labs' underlying artwork—a representation that was not

6   only false, but further misleading because owners of genuine BAYC NFTs do own

7   certain commercial rights in the underlying images.  Muniz Decl. (Dkt. 340) ¶ 13;

8   JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2.  Adding to this confusion,

9   Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature

10  on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon

11  border, signaling that Twitter had "verified" his ownership of the NFT and

12  misleadingly suggesting his ownership of a BAYC NFT.  Muniz Decl. (Dkt. 340) ¶

13  12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-

14  1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This

15  caused further confusion as RR/BAYC NFT holders used the NFTs as their profile

16  pictures as well.  *See, e.g.*, JTX-522, JTX-523.

17      Fifth, it is not credible that Defendants were not trying to confuse the public

18  when throughout this litigation and even after the summary judgment order

19  confirming their infringement, Defendants continued to market their RR/BAYC

20  NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted

21  an announcement that "RR/BAYC is trading on OpenSea Pro."  JTX-1315; *see also*

22  JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of

23  RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet

24  Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048;

25  Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the

26  @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a

27  marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl.

28  (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

Finally, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.  And Defendants did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan.  Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club or RR/BAYC for the infringing NFTS, but instead will see "Bored Ape Yacht Club" and "BAYC" as the contract name and contract symbol, respectively.  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; _Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc._, 457 F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion).

**Defendants' Response:**

The trial record shows that Defendant had taken significant steps to make clear that collectors understood the satirical nature of the RR/BAYC project.  For example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense.  JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).  Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.

Further, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website

were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, also consists of acts taken that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Yuga argues that this evidence of efforts to not confuse is rebutted by Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have no control over the Etherscan website, what it displays, and how it chooses to show the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also misleadingly cites to internal chats, and falsely states that Defendants discussed using different images overlaid with commentary.  However, the communications that Yuga cites are in fact internal discussions about

ApeMarket and how to design the website so as to ensure that users would not be confused by the design of website.  For example, the statement at JTX-801.196 that Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  And, in fact, Yuga attempted to cross-examine Mr. Hickman regarding these communications, and Mr. Hickman explained, "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.   Thus, Yuga cites conversations that have nothing to do with confusion regarding the source off RR/BAYC NFTs and instead are internal discussion about potential designs for ApeMarket.

Yuga also falsely argues that Defendants' marketing efforts did not indicate that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical purposes.  For example, Yuga cites to JTX-29, which is an OpenSea page that Mr. Ripps did not create.  Regardless, the page clearly labels the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps."  The exhibit also has Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF."   JTX-28, similarly, is the Foundation page which Mr. Ripps also did not design.  But regardless, the page states that the collection was created by "@ryder_ripps."  JTX-683 also makes clear that Defendants' NFT collection is not the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on @openseas … We passed BAYC in the middle of Apefest!"  JTX-719 is similarly a tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight" with a link to the Foundation page for the RR/BAYC collection.  Again, this is an exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection.

And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and
states in the first post, "Make sure to join the RR/BAYC community discord!"
Again, Yuga is wrong to assert that these exhibits show that Defendants marketed
the RR/BAYC collection without commentary.

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-
1037, in which he states that "RR/BAYC grants to 100% commercial rights,
community member created a shopping site for his! Now you can get the hoodie of
your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which
has caused thousands of third parties to use the Bored Ape Yacht Club and its
marks for projects and products unaffiliated with Yuga. Ripps Decl. ¶¶ 187-191
(Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244;
JTX-2398; JTX-2134; JTX-2410; JTX-2075. The trial record contains no evidence
that there was ever a website selling RR/BAYC clothes (Defendants have never
sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms
& Conditions hardly amounts to representing that RR/BAYC granted commercial
rights. In fact, the post does the opposite because it is commenting on how full
commercial rights cannot be granted without destroying those rights, as Yuga has
done by surrendering the Bored Ape Yacht Club brand to the world.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC
NFTs even after the summary judgment order in this case. The exhibits Yuga cites
(JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen
made reporting news on what is occurring in relation to the RR/BAYC collection:
specifically, that certain third-party marketplaces were trading the NFTs despite
Yuga's efforts to silence Defendants' criticism and public reports of certain
transactions occurring in connection with the RR/BAYC collection. As Mr. Cahen
explained in his declaration, "Overall, I would consider myself a very active
community member in the cryptocurrency space, which is something that I take
pride in. A lot of the work I do takes place over social media." Cahen Decl. ¶ 50

(Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite.  Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.

And lastly, efforts Defendants made to ensure that nobody was confused were clearly done in good faith because those efforts were successful.  The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to cause confusion.  Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Indeed, Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps

Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Plaintiff's Reply:**

Defendants' lengthy and scattershot response fails to grapple with the facts and law of the case.  Contrary to Defendants' suggestion, they failed to take steps to avoid confusion when selling the infringing RR/BAYC NFTs, creating further potential for actionable initial interest and post-sale confusion.  Defendants' spaghetti doesn't stick.

As discussed *supra*, Defendants' response is unavailing because (1) the Court's summary judgment order established liability, even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants intended to confuse consumers and refused to implement "friction steps" to avoid confusion (*supra* ¶ 9), (3) Defendants' "disclaimer" does not negate the Court's finding that consumers were likely to be confused (*supra* ¶ 9), (4) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (5) Defendants' infringement was not an art project or "reporting news" (*supra* ¶ 9), and (5) Ape Market was operational and ready to launch (*supra* ¶ 3).  Indeed, even a month after trial, Defendants still advertise rrbayc.com in the profile heading of the Ape Market Twitter profile.  *See* https://twitter.com/apemarketplace.  In their response directly above, Defendants admit that "the ApeMarket Twitter page, [] links to rrbayc.com."  That same Twitter account remains live, with promotions of apemarket.com, the infringing rrbayc.com domain, and their promotion of the infringing RR/BAYC NFTs on Looksrare.  Defendants' claims to the contrary are not in good faith and contrary to the evidence.  *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, the Court should reject Defendants' responses because, as discussed further below, (1) it ignores post-sale confusion as actionable, (2) confusion over sponsorship or affiliation is actionable, (3) most RR/BAYC NFTs

were sold on secondary marketplaces without a disclaimer, and (4) Defendants intended to confuse consumers and had control over third-party websites and marketplaces.

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

**Post-Sale Confusion Is Actionable:** Defendants' alleged steps to address confusion by the first purchaser ignore post-sale confusion. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."). That consumers were purchasing Defendants' NFTs with the expectation to resell them to other confused consumers is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17 *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants do not and cannot rebut this fact or law.

**Confusion Over Sponsorship Or Affiliation Is Actionable:** Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship. The Lanham Act, however, expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the affiliation, connection, or association of such person

with another person, or as to the or as to the origin, sponsorship, or approval of his or her goods[.]" 15 U.S.C. § 1125(a)(1)(A).  Therefore, regardless of whether a consumer saw Mr. Ripps' name or "RR/BAYC" on OpenSea or Foundation sales pages, their confusion as to whether Defendants' were associated with Yuga Labs and Bored Ape Yacht Club is nonetheless actionable.  Such confusion was likely, as the Court has already held.  SJ Order (Dkt. 225) at 13.  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs, including when testing Defendants' alleged modified use of the BAYC Marks.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Indeed, Mr. Hickman was clearly confused when he viewed Defendants' infringing Foundation webpage.  When asked to identify the source of the NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he paused for around five seconds, examined the page closely and stated that the page "looks to be Bored Ape Yacht Club."  Trial Tr. 213:9-13 (lodged at Dkt. 415).

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:**  Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").  These secondary markets did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing NFTs took place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer

confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").  Defendants' contention is therefore incorrect and misleading.

**Defendants Intended To Confuse Consumers And Had Control Over Third-Party Websites And Marketplaces:**  As discussed *supra* ¶ 9, Defendants had control over their infringing use of the BAYC Marks on websites and marketplaces.  But even if Defendants falsely claim they had no control over these websites and marketplaces, the point remains that their confusing use of the BAYC Marks can never be removed from the smart contract, causing hyperlinks and other future references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs.  Without the RR/BAYC smart contract, Yuga Labs cannot retain control of the use of its marks.  *See* Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

**Defendants' Disputed Post Trial Finding of Fact No. 20:**

For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (uncontested); Cahen Decl. ¶ 144) included an explanation of

1   the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (uncontested); Cahen

2   Decl. ¶¶ 138-139, 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-

3   10.

4   **Plaintiff's Basis for Dispute**:

5       Yuga Labs agrees with Defendants' admission that they made profits from

6   the infringing RR/BAYC NFTs, though Yuga Labs does not concede the remainder

7   of this paragraph.

8       Defendants did not take steps to "make clear" to the public that "RR/BAYC

9   was intended as a protest art project."  To the contrary, Defendants took many steps

10  to ensure that the public was and would remain confused.

11      First, Defendants named their NFT collection "Bored Ape Yacht Club" with

12  the symbol "BAYC" immutably in the metadata for the NFT smart contract, when

13  they could have named it anything else.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

14      Second, Defendants could have used, but chose not to use, different images

15  or overlaid some commentary on the images they did use.  *See e.g.* JTX-801.192

16  (Mr. Lehman proposing "an overlay or something like Getty images" because "it's

17  just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what

18  an overlay might look like and recommending not to "in the marketing show

19  screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to

20  the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

21      Third, Defendants prominently and without commentary used Yuga Labs'

22  BAYC Marks in their marketing efforts.  JTX-28; JTX-29; JTX-683; JTX-719;

23  JTX-696.  This use on secondary marketplaces, such as Foundation and OpenSea,

24  was likely to and intended to cause confusion.  JTX-721; SJ Order (Dkt. 225) at 10-

25  13.

26      Fourth, Mr. Ripps took further steps to confuse the public.  For example, Mr.

27  Ripps represented that by owning an RR/BAYC NFT, a consumer would own

28  commercial rights in Yuga Labs' underlying artwork—a representation that was not

only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images.  Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2.  Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT.  Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  These actions caused further confusion, as RR/BAYC NFT holders used the NFTs as their profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.

Fifth, it is not credible that Defendants were not trying to confuse the public when throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their infringing NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."  JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

Sixth, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.  On rrbayc.com Defendants could not enforce any requirement that users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they

agreed "no one" would read (JTX-801.128).  And, this wall of text did nothing to
dispel confusion amongst the general public when every single RR/BAYC NFT
sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT
CLUB and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶
3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  The public was not required
to read and click a disclaimer because Defendants did not include any similar
disclaimer on Foundation or other secondary marketplaces, nor was there one on
Etherscan.  Even more, the majority of the sales of RR/BAYC NFTs were on
secondary marketplaces—not rrbayc.com—where there was no disclaimer.  Kindler
Decl. (Dkt. 338) at ¶ 69; JTX-801.376 (estimating $10 million impact).  Mr. Ripps
admits that "technically" all RR/BAYC NFTs were sold through Foundation.  Dkt.
396 (Ripps Deposition Designations) at 82:8-13.

Finally, because every single RR/BAYC NFT uses the trademarks BORED
APE YACHT CLUB and BAYC, a user today linking to Etherscan will not see
Ryders Ripps' Bored Ape Yacht Club or RR/BAYC, but will see Bored Ape Yacht
Club and BAYC.  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay
Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of
America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on
packaging, but not on infringing product, did "nothing to dispel post-purchase
confusion).

**Defendants' Response:**

The trial record shows that Defendant had taken significant steps to make
clear that collectors understood the satirical nature of the RR/BAYC project.  For
example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody
he believed was confused, believed that consumers could not be confused, took
steps to avoid confusion, and that he chose to make his project an NFT collection
because that was the only way his criticisms would make sense.  JTX-2085; JTX-
2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346)

1  (uncontested).  Yuga did not challenge these statements when it elected not to

2  cross-examine Mr. Ripps.

3         Further, the rrbayc.com website—through which the majority of RR/BAYC

4  commissions occurred and the vast majority of alleged profits accrued (Ripps Decl.

5  ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an

6  explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346)

7  (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202;

8  JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website

9  were also required to read and click through a disclaimer acknowledging the artistic

10 purpose of the project before they were allowed to commission an NFT.  *See* Ripps

11 Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

12 Mr. Ripps insisted on these requirement and additional steps so that the artistic

13 purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman

14 Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it

15 had a negative impact on usability? …  A.   … Ryder wanted it and so he had the

16 final call.").

17        Defendants' online discussion, which consisted of nearly the entirety of

18 Defendants' public activities associated with RR/BAYC, also consists of acts taken

19 that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those

20 discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

21 inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

22 that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

23 Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

24        Yuga argues that this evidence of efforts to not confuse is rebutted by

25 Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have

26 no control over the Etherscan website, what it displays, and how it chooses to show

27 the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that

28 consumers of NFTs do not use Etherscan's token tracker/token name but instead

rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also misleadingly cites to internal chats, and falsely states that Defendants discussed using different images overlaid with commentary.  However, the communications that Yuga cites are in fact internal discussions about ApeMarket and how to design the website so as to ensure that users would not be confused by the design of website.  For example, the statement at JTX-801.196 that Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  And, in fact, Yuga attempted to cross-examine Mr. Hickman regarding these communications, and Mr. Hickman explained, "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.   Thus, Yuga cites conversations that have nothing to do with confusion regarding the source off RR/BAYC NFTs and instead are internal discussion about potential designs for ApeMarket.

Yuga also falsely argues that Defendants' marketing efforts did not indicate that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical purposes.  For example, Yuga cites to JTX-29, which is an OpenSea page that Mr. Ripps did not create.  Regardless, the page clearly labels the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps."  The exhibit also has Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS

TOTENKOPF."   JTX-28, similarly, is the Foundation page which Mr. Ripps also did not design.  But regardless, the page states that the collection was created by "@ryder_ripps."  JTX-683 also makes clear that Defendants' NFT collection is not the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on @openseas … We passed BAYC in the middle of Apefest!"  JTX-719 is similarly a tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight" with a link to the Foundation page for the RR/BAYC collection.  Again, this is an exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection. And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and states in the first post, "Make sure to join the RR/BAYC community discord!" Again, Yuga is wrong to assert that these exhibits show that Defendants marketed the RR/BAYC collection without commentary.

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037, in which he states that "RR/BAYC grants to 100% commercial rights, community member created a shopping site for his! Now you can get the hoodie of your dreams."  This was a tweet making fun of Yuga's Terms & Conditions, which has caused thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms & Conditions hardly amounts to representing that RR/BAYC granted commercial rights.  In fact, the post does the opposite because it is commenting on how full commercial rights cannot be granted without destroying those rights, as Yuga has done by surrendering the Bored Ape Yacht Club brand to the world.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

(JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally

or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite. Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection. It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.

And lastly, efforts Defendants made to ensure that nobody was confused were clearly done in good faith because those efforts were successful. The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to cause confusion. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19. Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. Given Defendants public discussions, steps taken to clarify the origin and

1   purpose of the RR/BAYC collection, and the fact that there was not even a single
2   confused consumer confirms that there was no likelihood of consumer confusion
3   and no actual consumer confusion.

4       Indeed, Defendants received voluminous correspondence from RR/BAYC
5   participants—none of which indicated any confusion from primary sales or
6   secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the
7   contrary, the correspondence expressed gratitude and support for the criticism of
8   Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035,
9   JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

10      **Plaintiff's Reply:**

11      Defendants' lengthy response fails to grapple with the facts and law of the
12  case.  Contrary to Defendants' suggestion, they failed to take steps to avoid
13  confusion when selling the infringing RR/BAYC NFTs, creating further potential
14  for actionable initial interest and post-sale confusion.

15      As with Defendants' previous response (*supra* ¶ 19), Defendants' response is
16  unavailing because (1) the Court's summary judgment order established liability,
17  even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants
18  intended to confuse consumers and refused to implement "friction steps" to avoid
19  confusion (*supra* ¶ 9), (3) Defendants' unreliable communications with third-parties
20  do not negate evidence of actual confusion or the likelihood of post-sale confusion
21  (*supra* ¶ 3), (4) Defendants' infringement was not an art project or "reporting news"
22  (*supra* ¶ 9), (5) it ignores post-sale confusion as actionable (*supra* ¶ 19), (6)
23  confusion over sponsorship or affiliation is actionable (*supra* ¶ 19), (7) most
24  RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra*
25  ¶ 19), and (8) Defendants intended to confuse consumers and had control over
26  third-party websites and marketplaces (*supra* ¶ 19).

27      Defendants' response also lacks merit because, as discussed further below,
28  Defendants fail to disprove that any RR/BAYC purchasers were confused.

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

**Defendants Fail To Disprove That Any RR/BAYC Purchasers Were Confused:** Defendants present no evidence to show that no consumers purchased their infringing NFTs out of confusion. Defendants' anecdotal evidence of purported support from purchasers does not rebut the evidence of actual confusion in the record, as explained *supra* ¶ 3. Defendants admit that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) which undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused. Defendants also claim that it is not feasible for them to contact every consumer who requested a refund or purchased an RR/BAYC NFT and therefore Mr. Ripps lacks knowledge of why each refund was issued or why each purchase was made. And as discussed *supra* there is ample evidence of consumer confusion in the record. *See supra* ¶ 3; *see also* O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14 (discussing survey evidence finding that Defendants' infringement caused confusion). In sum, Defendants do not have a survey of or even communications from the majority of purchasers to prove no confusion; there is thus no basis for their claim that no one was confused.

**Defendants' Disputed Post Trial Finding of Fact No. 21:**

Collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

**Plaintiff's Basis for Dispute:**

The public was not required to read and click a disclaimer. Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no

one" would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion amongst the general public when *every single* RR/BAYC NFT sold (or that ever will sell) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  The public was not required to read and click a disclaimer because Defendants did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer.  This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer.  Dkt. 396 (Ripps Deposition Designations) at 82:8-13.

Additionally, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17.

### **Defendants' Response:**

Yuga once again takes out of context and mischaracterizes exhibits to incorrectly argue that RR/BAYC participants did not read the RR/BAYC disclaimer.  Yuga incorrectly states that Defendants described the disclaimer as a "wall of text" that no one would read.  Those statements in the cited exhibit (JTX-801.128) are not discussing the disclaimer.   The "wall of text" comment was made by Mr. Lehman in reference to a potential design of rrbayc.com (*a design that was never actually implemented*) where the lengthy artist statement on the website included a window and inside that window was an actual copy of a DMCA

takedown notice that Yuga had voluntarily withdrawn.  Mr. Lehman stated that no-one would read the text showing withdrawal of Yuga's DMCA notice that was contained within a window embedded in the middle of Mr. Ripps's lengthy artist statement.  Yuga's attempt to attribute this statement to the disclaimer is a gross mischaracterization of the exhibit because the disclaimer is separate and apart from the never-implement version of Mr. Ripps's artist statement that contained Yuga's withdrawal of its DMCA takedown notice.

Additionally, Defendants' disclaimer did require all commissions of RR/BAYC NFTs on rrbayc.com to view and click through the disclaimer.  Further, it is apparent that NFT collectors read the disclaimer because the disclaimer, and Defendants' remaining activities aimed at preventing confusion, were successful.  The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to cause confusion.  Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-

19:1.  The fact that there was not even a single confused consumer confirms that the disclaimer was ready by collectors and that Defendants were successful in identifying for consumers Mr. Ripps as the source of origin for RR/BAYC NFTs.

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

**Plaintiff's Reply:**

Defendants' reliance on an alleged disclaimer is misguided.  Defendants provide no evidence that every, or any, consumer read the disclaimer.  And the majority of RR/BAYC NFT sales took place on websites without the disclaimer. As the Court has held in its summary judgement order, Defendants' alleged disclaimer fails to disprove their infringement.  *See* SJ Order (Dkt. 225) at 12.

As discussed *supra*, Defendants' response is unavailing.  Specifically: (1) the Court's summary judgment order established liability, even in the face of

Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants' "disclaimer" does not negate the Court's finding that consumers were likely to be confused (*supra* ¶ 9); (3) most RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra* ¶ 19), (4) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (5) there is ample evidence of actual confusion in the record (*supra* ¶ 3), and (6) post-sale confusion is actionable (*supra* ¶ 19).

Additionally, Defendants concede the fact that Mr. Lehman stated "no one" would read the "wall of text" of Mr. Ripps' alleged artist statement.  Defendants' attempt to distinguish between the alleged artist statement and disclaimer is immaterial where, as Defendants contend, both had lengthy text purportedly explaining the alleged artistic purpose of RR/BAYC.  *See* Def's Proposed Findings of Fact ¶¶ 20, 21.

**Defendants' Disputed Post Trial Finding of Fact No. 22:**

Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

**Plaintiff's Basis for Dispute:**

Defendants did not take steps to make "clear" to the public Mr. Ripps' supposed artistic intent.  To the contrary, Defendants took many steps to try to conceal their intent and ensure that the public was and would remain confused.

First, Defendants named their NFT collection "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, when they could have named it anything else.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

Second, Defendants could have used, but chose not to use, different images or overlaid some commentary on the images they did use.  *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

Third, Defendants prominently and without commentary used Yuga Labs' BAYC Marks in their marketing efforts.  JTX-28; JTX-29; JTX-683; JTX-719; JTX-696.  This use on secondary marketplaces, such as Foundation and OpenSea, was likely to and intended to cause confusion.  JTX-721.

Fourth, Mr. Ripps took further steps to confuse the public.  For example, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images.  Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2.  Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT.  Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.

Fifth, it is not credible that Defendants were not trying to confuse the public when throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC

NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."  JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

Sixth, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.  Defendants knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark").  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").  Defendants also knew that what they were doing was likely to lead to a lawsuit.  For instance Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get sued, for us to look really sympathetic to everyone" (JTX-918.0036).  That Defendants took some steps to try to conceal their intent when they were

inevitably sued does not make the infringing activity less confusing; it just demonstrates their culpability.

The public was not required to read and click a disclaimer.  Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one" would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion amongst the general public when every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  The public was not required to read and click a disclaimer because Defendants did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer.  This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer.  (Ripps Deposition Designations) at 82:8-13.

Finally, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457

F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion).

**Defendants' Response:**

The trial record shows that Defendant had taken significant steps to make clear that collectors understood the satirical nature of the RR/BAYC project.  For example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense.  JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).  Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.

Further, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, also consists of acts taken

that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Yuga argues that this evidence of efforts to not confuse is rebutted by Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have no control over the Etherscan website, what it displays, and how it chooses to show the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also misleadingly cites to internal chats, and falsely states that Defendants discussed using different images overlaid with commentary.  However, the communications that Yuga cites are in fact internal discussions about ApeMarket and how to design the website so as to ensure that users would not be confused by the design of website.  For example, the statement at JTX-801.196 that Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  And, in fact, Yuga attempted to cross-examine Mr. Hickman regarding these communications, and Mr. Hickman explained, "This is our attempt to make it as clear as possible.

We are having discussion on how to make sure it was very clear for users." Trial

Tr. [Hickman] 212:22-24.   Thus, Yuga cites conversations that have nothing to do

with confusion regarding the source off RR/BAYC NFTs and instead are internal

discussion about potential designs for ApeMarket.

Yuga also falsely argues that Defendants' marketing efforts did not indicate

that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical

purposes.  For example, Yuga cites to JTX-29, which is an OpenSea page that Mr.

Ripps did not create.  Regardless, the page clearly labels the NFT collection as

"RR/BAYC" and stated that it is "By ryder_ripps."  The exhibit also has

Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS

TOTENKOPF."   JTX-28, similarly, is the Foundation page which Mr. Ripps also

did not design.  But regardless, the page states that the collection was created by

"@ryder_ripps."  JTX-683 also makes clear that Defendants' NFT collection is not

the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on

@openseas … We passed BAYC in the middle of Apefest!"  JTX-719 is similarly a

tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight"

with a link to the Foundation page for the RR/BAYC collection.  Again, this is an

exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection.

And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and

states in the first post, "Make sure to join the RR/BAYC community discord!"

Again, Yuga is wrong to assert that these exhibits show that Defendants marketed

the RR/BAYC collection without commentary.

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-

1037, in which he states that "RR/BAYC grants to 100% commercial rights,

community member created a shopping site for his! Now you can get the hoodie of

your dreams."  This was a tweet making fun of Yuga's Terms & Conditions, which

has caused thousands of third parties to use the Bored Ape Yacht Club and its

marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191

1   (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244;

2   JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence

3   that there was ever a website selling RR/BAYC clothes (Defendants have never

4   sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms

5   & Conditions hardly amounts to representing that RR/BAYC granted commercial

6   rights.  In fact, the post does the opposite because it is commenting on how full

7   commercial rights cannot be granted without destroying those rights, as Yuga has

8   done by surrendering the Bored Ape Yacht Club brand to the world.

9        Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

10  NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

11  (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

12  made reporting news on what is occurring in relation to the RR/BAYC collection:

13  specifically, that certain third-party marketplaces were trading the NFTs despite

14  Yuga's efforts to silence Defendants' criticism and public reports of certain

15  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

16  explained in his declaration, "Overall, I would consider myself a very active

17  community member in the cryptocurrency space, which is something that I take

18  pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

19  (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

20  report on crypto news or other topics I find noteworthy to help spread awareness."

21  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

22  simply report news/crypto events in relation to the RR/BAYC collection.

23       Yuga also incorrectly cites to this Court's summary judgment order to

24  suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of

25  the case doctrine does not apply to pretrial rulings *such as motions for summary*

26  *judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

27  added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

28  rulings, often based on incomplete information, don't bind district judges for the

1  remainder of the case.  Given the nature of such motions, it could not be

2  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

3  an issue were decided at summary judgment for one purpose, the summary

4  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

5  CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

6  that evidence of initial police contact was relevant as background, but not to already

7  decided issue that initial contact was not excessive force).  This case is just like

8  *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the

9  issue of infringement and is not adequate support on use of a disclaimer generally

10  or as applied to availability of disgorgement as a remedy, apportionment, and an

11  exceptional case analysis.

12      And Yuga's complaint that Defendants did not use a disclaimer on

13  Foundation, Etherscan, or any other third-party website is inapposite.  Defendants

14  have no control over third party websites such as Etherscan and do not have the

15  ability to design the pages third-party websites use or how they choose to display

16  the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a

17  disclaimer on Foundation or Etherscan because they do not control those websites.

18      And lastly, efforts Defendants made to ensure that nobody was confused

19  were clearly done in good faith because those efforts were successful. The evidence

20  at trial also showed that the RR/BAYC collection did not cause any actual

21  confusion and was not likely to cause confusion.  Defendants received voluminous

22  correspondence from RR/BAYC participants—none of which indicated any

23  confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.

24  346) (uncontested).  To the contrary, the correspondence expressed gratitude and

25  support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346)

26  (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595,

27  JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are

28  aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

1  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

2  Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single

3  person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.

4  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused

5  on. Yuga Labs has been unable to identify even[] a single person who purchased an

6  RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr.

7  Solano, Yuga's President, similarly could not identify a single person that ever

8  bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-

9  19:1.  Given Defendants public discussions, steps taken to clarify the origin and

10 purpose of the RR/BAYC collection, and the fact that there was not even a single

11 confused consumer confirms that there was no likelihood of consumer confusion

12 and no actual consumer confusion.

13      Indeed, Defendants received voluminous correspondence from RR/BAYC

14 participants—none of which indicated any confusion from primary sales or

15 secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the

16 contrary, the correspondence expressed gratitude and support for the criticism of

17 Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035,

18 JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

19      **Plaintiff's Reply:**

20      Defendants' lengthy response fails to grapple with the facts and law of the

21 case.  Contrary to Defendants' suggestion, they failed to take steps to avoid

22 confusion when selling the infringing RR/BAYC NFTs, creating further potential

23 for actionable initial interest and post-sale confusion.  Defendants' scattershot

24 response misses the mark.

25      As with Defendants' previous response (*supra* ¶ 19), Defendants' response is

26 unavailing because (1) the Court's summary judgment order established liability,

27 even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants

28 intended to confuse consumers and refused to implement "friction steps" to avoid

confusion (*supra* ¶ 9), (3) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (4) Defendants' infringement was not an art project or "reporting news" (*supra* ¶ 9), (5) it ignores post-sale confusion as actionable (*supra* ¶ 19), (6) confusion over sponsorship or affiliation is actionable (*supra* ¶ 19), (7) most RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra* ¶ 19), and (8) Defendants intended to confuse consumers and had control over third-party websites and marketplaces (*supra* ¶ 9).

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

**Defendants' Disputed Post Trial Finding of Fact No. 23:**

Mr. Ripps and Mr. Cahen's online discussion of the RR/BAYC project confirms their intent. In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images. Ripps Decl. ¶¶ 148-157 (uncontested); Cahen Decl. ¶¶ 151, 208-209; Dkt. 197-1 ¶¶ 203-04; JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

**Plaintiff's Basis for Dispute:**

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.

Defendants discussed making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I think you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to. *See e.g.* JTX-801.192 (Mr. Lehman proposing "an

overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark").  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit.  For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Privately, Defendants also discussed strategies to "cannibalize" the secondary NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at getting engagement on twitter."  *Id.*  Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or

"yuga dirt" in order complete the first sale ("mint") of each infringing RR/BAYC NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

Publicly, Defendants made false representations about the RR/BAYC NFTs that implied owning one offered equivalent benefits to owning a genuine BAYC NFT.  JTX-1037.  Defendants published their promotions from their individual Twitter accounts and from the commercial @ApeMarketplace account advertising their forthcoming NFT marketplace.  These advertisements were also directed at BAYC NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶ 46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have on Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications, Defendants revealed their true intent to profit from the infringing use of Yuga Labs' BAYC Marks.

**Defendants' Response:**

Yuga does not meaningfully dispute the proposed finding of fact.  Yuga fails to present evidence which refutes that Defendants addressed Yuga's problematic imagery and the nature of NFTs during discussions about RR/BAYC project.  Ripps Decl. ¶¶ 148-157 (uncontested); Cahen Decl. ¶¶ 151, 208-209; Dkt. 197-1 ¶¶ 203-04; JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Evidence at trial showed that Yuga does not own the alleged BAYC Marks.  Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in

writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").

Furthermore, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a **communicative** work is a dispute relegated to the confines of copyright law, not trademark.  *Id* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to certificates of authenticity/ownership and are not digital goods in themselves.  Trial Tr. [Atalay] 127:9-16.

Evidence at trial also showed that Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For

example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Finally, evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

### Plaintiff's Reply:

Yuga Labs' objection directly hits Defendants' proposed finding of fact on its head, disputing Defendants' false contention regarding their alleged artistic

intent.  Defendants' infringement was not art.  It was motivated by a bad faith intent to profit from consumer confusion.

As discussed *supra* ¶ 9, Defendants' response lacks merit.  Specifically: (1) the record shows that Defendants intended to confuse consumers, (2) Defendants' commercial infringement was not protected "art," (3) Defendants intended to profit off of their infringement, (4) Defendants did not take steps to avoid confusion, (5) Defendants' "disclaimers" did not dispel likelihood of confusion, (6) Yuga Labs did not license Defendants' infringement, and (7) other alleged infringers do not negate Defendants' infringement.

Defendants' contention that they were not motivated primarily by profits is false.  Defendants' communications show their rampant interest in making money (*see supra* ¶ 9).  Pointing to their costs, which amounted to less than $16,000, to attempt to meaningfully offset their profits of over $1 million is disingenuous.  Additionally, despite Mr. Ripps' promise to donate the royalties earned from sales of RR/BAYC NFTs to charity, no proceeds were donated and Defendants' kept the profits for themselves.  *See* Solano Decl. (Dkt. 342) ¶ 28 (citing JTX-1045).  Defendants' argument that they were not motivated by money lacks credibility.

Additionally, Defendants' response should be rejected because, as discussed further below, (1) Defendants have stipulated to Yuga Labs' ownership of the BAYC Marks, and (2) Defendants attempt to relitigate issues already adjudicated by the Court, and (3) the record shows that Yuga Labs in fact owns the BAYC Marks.

**Defendants Stipulated To Yuga Labs' Ownership Of The BAYC Marks:**
Defendants' response contradicts their own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 3.  In that stipulation and proposed order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC

Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act." *Id.* at 13.  Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA. *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.

Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the cost of resolving this case. Defendants' actions again make this an exceptional case.  The Court should reject Defendants' response.

**The Court's Summary Judgment Order Establishes Liability:**
Defendants' response improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11.  The Court "easily conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion. *Id.* at 10-13.

Defendants' attempt to re-litigate the already-decided issue of what constitutes an NFT is similarly misplaced.  In the Court's summary judgment order, the Court rejected Defendants' narrow, "tangible goods" definition of a trademark as it applies to NFTs.  Specifically, the Court held "viewing the NFTs as ownership

receipts treats the NFTs as mere written instructions while ignoring their documented commercial value." SJ Order (Dkt. 225) at 7. NFTs are sold "specifically for their connection to a particular brand, creator, or associated creative work." *Id.* at 8. Moreover, "'individuals do not purchase NFTs to own a digital deed divorced from any other asset; they buy them precisely so that they can exclusively own the content associated with the NFT.'" *Id.* (quoting *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023)*) (cleaned up).

That order establishes the matters adjudicated therein for purposes of this case. Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

**Yuga Labs Owns The BAYC Marks:** The Court has already decided that Yuga Labs owns its BAYC Marks. *See* Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 6. "[A]n unregistered trademark can be enforced against would-be infringers . . . ." *Matal v. Tam*, 582 U.S. 218, 225 (2017). "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008). Yuga Labs started using the BAYC Marks long before Defendants began their infringement. *Compare* Dkt. 193-2 ¶¶4, 6 *with* ¶24. Since Yuga Labs' first use in April 2021, the BAYC brand has been the cornerstone of its business. *Id.* ¶¶2, 8-14; *see also* Muniz Decl. (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole brand for Yuga Labs. . . . Yuga Labs' marketing of the BAYC brand includes, among

other things, its operation of social media accounts, hosting community events, and its brand collaboration and high-profile partnerships"); Solano Decl. (Dkt. 342) at ¶ 16 ("Part of the reason Yuga Labs was able to reach such a large audience is due to significant effort, time and money we spent promoting the BAYC brand."). Indeed, Defendants admit that the BAYC Marks identify Yuga Labs. *Id.* ¶70.

**Defendants' Disputed Post Trial Finding of Fact No. 24:**

Mr. Ripps and Mr. Cahen also had a reasonable belief that the use of Yuga's marks in the RR/BAYC project was permissible as protest art. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (uncontested); Hickman Decl. ¶ 33; JTX 2243; JTX 2244. Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (uncontested); Cahen Decl. ¶ 206.

**Plaintiff's Basis for Dispute:**

Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court. SJ Order (Dkt. 225) at 15-17. Defendants' actions were commercial trademark infringement. *Id*. And the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks. SJ Order (Dkt. 225) at 12-15.

Even to the extent Defendants seek to relitigate this issue, Defendants' contention that their infringing NFTs were an art project does not establish that Defendants acted in good faith for purposes of avoiding equitable remedies. Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* or the First Amendment, Defendants continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶

74.  And Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  In light of this ongoing infringement, no credence should be given to Defendants' alleged "reasonable belief."

While Defendants publicly claim there was an artistic goal (to "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Declaration) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); JTX-801.208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803.66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).

1      Likewise, their internal communications demonstrate awareness of

2  confusion, yet they continued to persist in their infringement. *See, e.g.*, JTX-

3  801.015 (Regarding the use of unaltered BAYC Marks on the RR/BAYC

4  Foundation page, Mr. Lehman wrote, "I mean how do they not shut this down at

5  some point haha."); JTX-801.185 (Mr. Lehman stating, "overall I think we should

6  be very careful about doing this in terms of the confusion it will create"); JTX-

7  801.195 (Mr. Lehman noting that people "making mistakes with apes is already a

8  huge meme" and "[r]emember the 'average joes'?", and Cahen responding, "I mean

9  that is unavoidable"); JTX-801.196 (Mr. Lehman noting, "we should not under-

10  estimate how confusing it is" and Mr. Cahen responding, "yeah."); JTX-801.279

11  (Mr. Lehman referring to potential customers as "SHEEPLE" and stating, "Ppl will

12  not read the contract"); JTX-801.288-89 (Mr. Lehman stating, "I think it might be

13  good to put [Ape Market] out ther[e]as only yuga . . . To limit confusion I mean");

14  JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered

15  confusing and our use of the 'BAYC' name."); JTX-801.371 (Mr. Cahen wrote,

16  "@ryder per our attorney we may just need to change the skull if we want to fight

17  trademark."); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look

18  really sympathetic to people" if sued); JTX-631 (third party informing Mr. Lehman

19  that RR/BAYC was "quite crazy definitely some people will buy thinking they are

20  buying originals!"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was

21  "difficult to make the collections coexist" because "they are the same art" and

22  "same logos"); *see also* Trial Tr. at 211:17-212:24.

23      Defendants' references to unknown, and alleged, third-party infringers, in an

24  attempt to excuse their intentional infringement of Yuga Labs' trademarks is

25  unavailing.  Any alleged third-party use of the BAYC Marks, or similar marks, is

26  immaterial and irrelevant.  As this Court has already found, "despite Defendants'

27  attempt to argue abandonment through third party use or failure to police, these

28  arguments are unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego*

1   *Comic Convention v. Dan Farr Productions*, 2017 WL 4227000, *12 (S.D. Cal.

2   Sept. 22, 2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit,

3   have made clear that third-party use of a mark is irrelevant in a suit against a

4   particular infringer.  *See, e.g.*, *Eclipse Associates Ltd. V. Data General Corp.*, 894

5   F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of

6   third-party use of plaintiff's mark because "[e]vidence of other unrelated potential

7   infringers is irrelevant to claims of trademark infringement and unfair competition

8   under federal law."); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125,

9   1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed

10  mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151,

11  1159, 1162 (9th Cir. 2017) (a "sheer quantity of irrelevant evidence," which is

12  "largely inapposite to the relevant inquiry," is meaningless); *see also F.T.C. v.*

13  *Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011)

14  (precluding Defendants from "introducing into evidence . . . 'thousands of third-

15  party webpages'" because they were irrelevant and thus inadmissible under FRE

16  401 and 402).  Even so, Defendants have failed to demonstrate actual use of these

17  marks in commerce.  *See, e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-

18  1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of

19  third-party marks in an advertisement because "evidence of third-party use is not

20  admissible unless the proponent can provide evidence that the trademarks were

21  *actually used* by third parties, that they were well promoted or that they were

22  recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v.*

23  *Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3 (excluding

24  evidence of third-party marks because defendants "presented no evidence showing

25  *actual use*.") (emphasis added).

26      Mr. Ripps' declaration points to two screenshots purportedly showing NFT

27  projects that use certain BAYC Marks.  Ripps Decl. ¶¶ 187-190, JTX-2243, JTX-

28  2244.  But these documents do not establish that the listed "projects" are actually

NFTs; they do not show the sales volume for these projects; they do not show whether or the extent that these projects are in use in the United States; they do not show how much (if anything) these projects have earned in sales; and they do not show whether the projects are authorized by Yuga Labs. *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 11:88 (5th ed.) (noting that, in introducing evidence of third-party marks, a defendant "should go further to show how extensive these uses are and how long they have continued"). Mr. Hickman's claim that "there are more than a hundred derivative NFT collections that used the Bored Ape Yacht Club name and images" lack any factual support and is equally groundless. *See* Hickman Decl. (Dkt. 345) ¶ 33.

Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website. Come get it here. And also, by the way, we are going to rip off Yuga's other site next. And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up on Bloomberg News with people confused thinking it's us. I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this. So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8. Moreover, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content. *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections. I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10

("Indeed, the filing of this action is strong evidence that Yuga enforces its
trademark rights in the BAYC Marks against infringing third-party users.").

**Defendants' Response:**

The evidence at trial showed that Yuga did not take any reasonable steps to
provide notice of its intent to enforce trademark rights (despite its repeated public
activities indicating to the public and to Defendants that projects like the RR/BAYC
collection were permissible). Prior to this lawsuit, Yuga had not brought any
lawsuits related to other NFT collections using the asserted marks. Trial Tr.
[Muniz] at 78:18-21. And even though Yuga was aware of hundreds of NFTs
collections which use the asserted marks, and "literally thousands" of products
using the asserted marks, without any affiliation with Yuga, they have never
brought an infringement lawsuit before. *Id.* Yuga alleges that it has a robust
takedown enforcement mechanism, but the evidence contradicts this claim. Yuga's
enforcement efforts have not even identified how many NFT collections use the
asserted marks without Yuga's consent. Trial Tr. [Muniz] at 82:12-21.

In addition to Yuga's narrow enforcement measures, Yuga publicly
represented that they do not have intellectual property rights associated with the
Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that
BAYC NFT holders received all IP rights and that Yuga has none of those rights.
Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-
26 (Dkt. 345); JTX 2672; JTX 2673. That transfer of rights was made, in part,
pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the
intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q.
Your intent in writing the terms and conditions was to allow people to be able to
commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in
the terms.").

Given Yuga's minimal and ineffectual enforcement measures and Yuga's
public representations regarding their lack of intellectual property rights, it was

reasonable for Defendants to believe that the use of these marks in the RR/BAYC project was permissible as protest art.  Ms. Muniz admitted that, at the time of the RR/BAYC project, Defendants would likely have seen hundreds of NFT collections on OpenSea which use these marks.  Trial Tr. [Muniz] at 77:19-23.  These NFT collections were allowed to remain on OpenSea due to Yuga's narrow enforcement mechanisms.

Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  See *No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)* (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, Mr. Ripps's uncontested declaration supports this finding of fact.  This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his

1  testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because

2  purpose of cross-examination is "the direct and personal putting of questions and

3  obtaining immediate answers."  *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir.

4  2004) ("One longstanding purpose of cross examination is to expose to the fact-

5  finder relevant and discrediting information[.]").   Yuga's decision to not cross-

6  examine Mr. Ripps regarding any portion of his declaration means that "principle

7  means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr.

8  Ripps's declaration.

9  **Plaintiff's Reply:**

10  Defendants' baseless attacks on Yuga Labs' enforcement programs to protect

11  its trademarks are not only irrelevant, but they are also directly contrary to the

12  evidence.  Third-party infringers do not negate Yuga Labs' trademark rights against

13  Defendants.  *See* SJ Order (Dkt. 225) at 10.  And in any event, Yuga Labs has

14  implemented robust trademark enforcement programs.  When you are a popular,

15  major brand, then scammers, like the Defendants will try to ride your brand to

16  profit.  This is not new.  Defendants cannot use Yuga Lab's success as an excuse

17  for their infringement.  Nor is it credible for Defendants to claim that they could set

18  up a scam creating an exact copy of Yuga Labs' BAYC Marks and NFTs.

19  As discussed *supra*, Defendants' responses lack merit.  Specifically: (1)

20  evidence admitted at trial discredits Mr. Ripps' trial declaration (*supra* ¶ 3), (2)

21  other alleged infringers do not negate Defendants' infringement, and Yuga Labs

22  implemented robust enforcement (*supra* ¶ 9), (3) the response seeks to relitigate

23  issues already adjudicated by the Court (*supra* ¶ 9), (4) Yuga Labs did not license

24  Defendants' infringement (*supra* ¶ 9), (5) Defendants have stipulated to Yuga Labs'

25  ownership of the BAYC Marks (*supra* ¶ 23), and (6) the record shows that Yuga

26  Labs in fact owns the BAYC Marks (*supra* ¶ 23).

27

28

**Defendants' Disputed Post Trial Finding of Fact No. 25:**

There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project. Trial Tr. [Muniz] 77:19-23.

**Plaintiff's Basis for Dispute:**

Defendants have no legal basis for claiming their infringement was in good faith because they saw others purportedly infringing. This juvenile justification is preposterous—whether or not others are doing it, theft is still theft. This is especially true because Defendants were warned of their infringement (including by their attorney and co-conspirators) and the confusion that resulted from their infringement. Despite these warnings, they continued to infringe on the BAYC Marks. *See supra* ¶ 24 (collecting citations).

Defendants' references to unknown, and alleged, third-party infringers in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing, immaterial, and irrelevant. *See id.* (collecting cases). And even if third party infringement were material or relevant, Yuga Labs' unrefuted evidence shows that it took significant steps to protect the BAYC brand. *See id*. (citing testimony regarding Yuga Labs' takedown process). Finally, unrefuted evidence shows that none of these collections, such as the Bored Ape Solana Club, caused as much confusion, or harm, in the marketplace as Defendants' sale of RR/BAYC NFTs. *See id.* (citing testimony demonstrating the egregiousness of Defendants' infringement in comparison to prior instances of infringement). Ms. Muniz testified that people try to trade on the goodwill of popular brands to make some quick money (Trial Tr. at 96: 13-15)—Defendants' infringement of the BAYC Marks is no different.

**Defendants' Response:**

Yuga does not meaningfully dispute the proposed finding of fact (but rather elects to engage in alliterative name-calling). Yuga fails to present any evidence which refutes Ms. Muniz's testimony regarding the existence of hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  Additionally, Yuga does not refute that Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project. Trial Tr. [Muniz] 77:19-23.

 **Plaintiff's Reply:**

Defendants' response regurgitates the same citations from their disputed finding of fact without offering any new argument for why they are material or relevant to this case.  Yuga Labs "meaningfully dispute[s] the proposed finding of fact" by showing that Defendants have no legal basis for claiming their infringement was in good faith.  *See supra* ¶ 25 (Plaintiff's Basis for Dispute).  As Yuga Labs has shown: (1) the Court has already found Defendants are intentional infringers and rejected their arguments about third party use of marks as "meritless;" (2) Ninth Circuit caselaw is clear that third party uses of marks are irrelevant in lawsuits against a particular infringer; (3) Yuga Labs took significant steps to stop infringement from the likes of Defendants and other scammers; and (4) none of the third party uses of marks caused as much harm as Defendants, nor is there evidence in the record that they caused any harm at all.  *See supra* ¶ 9.

Moreover, Defendants cite to no documentary or testimonial evidence that third party uses of the BAYC Marks informed their decision to create the RR/BAYC NFTs or even that they saw these uses before creating and marketing their infringing NFT collection.  Defendants' citation to Ms. Muniz' testimony, a third party who would not know if Defendants' had seen these uses, is immaterial.

Defendants' attempt to avoid culpability by pointing the finger at others should be rejected.

**Defendants' Disputed Post Trial Finding of Fact No. 26:**

There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga. Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

**Plaintiff's Basis for Dispute:**

Defendants have no legal basis for claiming their infringement was in good faith because they saw others purportedly infringing. This juvenile justification is preposterous—whether or not others are doing it, theft is still theft. This is especially true because Defendants were warned of their infringement (including by their attorney and co-conspirators) and the confusion that resulted from their infringement. Despite these warnings, they continued to infringe on the BAYC Marks. *See supra* ¶ 24 (collecting citations).

Defendants' references to unknown, and alleged, third-party infringers in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing, immaterial, and irrelevant. *See id.* (collecting cases). And even if third party infringement were material or relevant, Yuga Labs' unrefuted evidence shows that it took significant steps to protect the BAYC brand. *See id.* (citing testimony regarding Yuga Labs' takedown process). Finally, unrefuted evidence shows that none of these products caused as much confusion, or harm, in the marketplace as Defendants' sale of RR/BAYC NFTs. *See id.* (citing testimony demonstrating the egregiousness of Defendants' infringement in comparison to prior instances of infringement). Ms. Muniz testified that people try to trade on the goodwill of popular brands to make some quick money (Trial Tr. at 96: 13-15)—Defendants'

1  infringement of the BAYC Marks is no different.

2  **Defendants' Response:**

3  Yuga does not meaningfully dispute the proposed finding of fact (but rather

4  repeats its name-calling). Yuga fails to present any evidence which refutes Ms.

5  Muniz's testimony regarding the existence of "literally thousands" of products that

6  use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr.

7  [Muniz] 81:18-22.

8  **Plaintiff's Reply:**

9  Defendants' response regurgitates the same citations from their disputed

10  finding of fact without offering any new argument for why they are material or

11  relevant to this case.  Yuga Labs "meaningfully dispute[s] the proposed finding of

12  fact" by showing that Defendants have no legal basis for claiming their

13  infringement was in good faith.  *See supra* ¶ 26 (Plaintiff's Basis for Dispute).  As

14  Yuga Labs has shown: (1) the Court has already found Defendants are intentional

15  infringers and rejected their arguments about third party use of marks as

16  "meritless;" (2) Ninth Circuit caselaw is clear that third party uses of marks are

17  irrelevant in lawsuits against a particular infringer; (3) Yuga Labs took significant

18  steps to stop infringement from the likes of Defendants and other scammers; and (4)

19  none of the third party uses of marks caused as much harm as Defendants, nor is

20  there evidence in the record that they caused any harm.  *See supra* ¶ 9.

21  Moreover, Defendants cite nothing to support the fact that these cited

22  exhibits are material to their third-party use defense—e.g., the sales volumes for

23  these products; whether or the extent that these products are in use in the United

24  States; and how much (if anything) these products have earned in sales.  *See supra*

25  ¶ 24.  Moreover, Defendants cite no evidence that these products were not

26  sponsored or authorized by Yuga Labs.  Indeed, at least some examples Defendants

27  have put forth in support of their third party use argument actually *were* authorized

28  by Yuga Labs.  For example, Mr. Hickman's collage of images (JTX-2075)

1 allegedly showing "commercial products unrelated to Yuga" contains several

2 examples of products authorized by Yuga Labs.

3      Finally, Defendants do not cite to any evidence that these third party products

4 informed their decision to create RR/BAYC NFTs, or even that they saw these

5 products before creating and marketing their infringing NFT collection.

6 Defendants' attempt to avoid culpability by pointing the finger at others should be

7 rejected.

8 **Defendants' Disputed Post Trial Finding of Fact No. 28:**

9     Yuga encouraged the public to use the BAYC artwork and to be creative with

10 BAYC's intellectual property. For example, Yuga's CEO Nicole Muniz had publicly

11 represented that BAYC NFT holders received all IP rights and that Yuga has none of

12 those rights. Trial Tr. [Muniz] 72:3-73:17; Cahen Decl. ¶ 189; Hickman Decl. ¶¶ 25-

13 26; JTX 2672; JTX 2673.

14 **Plaintiff's Basis for Dispute:**

15     To the extent that Defendants seek to rehash their argument that the BAYC

16 Terms gave BAYC NFT holders any and all trademark rights, the Court already

17 found on summary judgment that the BAYC Marks are valid trademarks and that

18 Yuga Labs granted BAYC holders a valid copyright license, not a trademark

19 license.  SJ Order (Dkt. 225) at 9-10 ("Yuga has not granted BAYC NFT holders a

20 trademark license.").  The BAYC Terms give BAYC NFT holders a copyright

21 license to use their respective Bored Ape image for personal or commercial use, not

22 the marks within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.

23 Yuga Labs explains this not just in the Terms, but in FAQs and in Discord.  Trial

24 Tr. at 70:18-23.

25     Ms. Muniz explained that in the one interview where she mentioned "IP"

26 rights, she was referring to copyrights and that the context is clear to that effect. *Id.*

27 at 72:3-18.  Moreover, this interview is immaterial and irrelevant to Defendants'

28 intent—it occurred in November 2022—long after Defendants made the majority of

their sales and after this lawsuit was filed.  Regardless, there is no reasonable interpretation of Ms. Muniz' interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

**Defendants' Response:**

Yuga's activities of encouraging the public to use the Bored Ape Yacht Club brand to create NFT collections, products, and services unaffiliated with Yuga is material to Defendants' intent because it shows that Defendants had a reasonable belief that the RR/BAYC collection was permissible.

Specifically, BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga's Terms & Conditions along with its public activities amounted to authorization of RR/BAYC collection and the other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using

Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344) ¶ 206.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

Yuga attempts to ignore this evidence showing Defendants' good faith by incorrectly invoking the law of the case doctrine by citing to this Court's summary judgment order.  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already

decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on the BAYC Terms & Conditions and Yuga's public activities applies only the issue of infringement and is not adequate support on these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

And, as noted above, Yuga's contention that the Terms & Conditions applied only to copyrights was rebutted by Ms. Muniz's own testimony. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed during cross-examination that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright. Trial Tr. [Muniz] 72:19-22.  Moreover, the word copyright appears nowhere in Yuga's terms and conditions.  *See generally*, JTX-209.

### **Plaintiff's Reply:**

Defendants' responses rehash the same tired arguments without adequately addressing the evidence and caselaw refuting them.  They should be rejected because (1) they seek to relitigate issues already adjudicated by the Court (*see supra* ¶ 9), (2) the record shows that Defendants intended to confuse consumers (*see id.*), (3) Defendants were well aware that their infringement would cause confusion (*see infra* ¶ 24), (4) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶ 3), (5) Defendants did not take steps to avoid confusion (*see supra* ¶ 9), (6) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*); and (7) other alleged infringers do not negate Defendants' infringement (*see id.*).

Defendants' responses should also be rejected because (1) the BAYC Terms only provide a copyright license and (2) Yuga Labs did not encourage the public to use the BAYC brand.

**The BAYC Terms Only Provide A Copyright License:**  Defendants' argument claiming that "the Terms & Conditions applied only to copyrights was rebutted by Ms. Muniz's own testimony" is patently false.  It is not just "Yuga's contention," that the BAYC Terms applied only to copyrights, it is the Court's order.  *See* SJ Order (Dkt. 225) at 9 ("Yuga grants each BAYC NFT holder a copyright license for both personal use and commercial use with respect to their respective BAYC ape image, but not a trademark license to use the BAYC Marks.").  Moreover, it is clear that this license applies only to the image itself, not the marks within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25. Yuga Labs explains this not just in the Terms, but in FAQs, and in Discord.  *Id*. at 70:18-23; 73:1-6 ("This video "doesn't stand alone as the only form of communication from the company.  We have our terms.  We have our FAQ.  We have our Discord.  We have every other thing that we have provided to make sure that the terms are clear.").

Defendants attempt to take a video clip of Ms. Muniz out of context, but in the context of the larger discussion, Ms. Muniz was clearly referring to granting BAYC NFT holders copyright licenses, not trademark rights.  *Id*. at 73:1-3 ("No one has ever come to me and said, 'We were confused about what you meant in that video.'"); 73:14-17.  Notably, Defendants do not even address the fact that this interview, which occurred in November 2022, long after Defendants made the majority of their sales and after this lawsuit was filed, is immaterial and irrelevant to their intent.  Regardless, there is no reasonable interpretation of Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

208

**Yuga Labs Did Not Encourage The Public To Use The BAYC Brand:**
Defendants cite no evidence that Yuga Labs "encouraged the public to use the
Bored Ape Yacht Club brand to create NFT collections, products, and services
unaffiliated with Yuga." As explained, Yuga Labs grants BAYC NFT holders a
copyright license to use the ape image underlying their NFT. Period. *See supra* ¶
24. Defendants' contention that Yuga Labs encouraged people who do not own
BAYC NFTs—including Mr. Ripps and Mr. Cahen—to use the BAYC brand,
especially to mint new NFT collections, is absurd. The Court has already found
that Defendants are infringers, and there is no good-faith basis for Defendants to
dispute this or to reargue that Yuga Labs somehow granted Defendants a license to
infringe.

**Defendants' Disputed Post Trial Finding of Fact No. 29:**

Ms. Muniz confirmed that someone listening to her public statement about
Yuga not having any IP rights would not have heard the word copyright. Trial Tr.
[Muniz] 72:19-22.

**Plaintiff's Basis for Dispute:**

This issue is immaterial and irrelevant. Defendants have not asserted, nor
can they assert, that Yuga Labs authorized *their* use of the BAYC Marks on the
infringing NFTs. Indeed, they could not have relied on Ms. Muniz' statement since
it was made in November 2022—months after they began minting the RR/BAYC
NFTs and even months after this lawsuit was filed. To the extent that Defendants
seek to rehash their argument that the BAYC Terms gave BAYC NFT holders any
and all trademark rights, the Court already found on summary judgment that the
BAYC Marks are valid trademarks and that Yuga Labs granted BAYC holders a
valid copyright license, not a trademark license. SJ Order (Dkt. 225) at 9-10
("Yuga has not granted BAYC NFT holders a trademark license."). The BAYC
Terms give BAYC NFT holders a copyright license to use their respective Bored
Ape image for personal or commercial use, not the marks within the image. *See*

Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs has explained this not just in the Terms, but in FAQs and on Discord.  Trial Tr. at 70:18-23.  Ms. Muniz explained that in the one interview where she mentioned "IP" rights, she was referring to copyrights and that the context is clear to that effect. *Id. at* 72:3-18. Regardless, no reasonable interpretation of Ms. Muniz' interview could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of BAYC NFTs using the exact same marks.

**Defendants' Response:**

Yuga's activities of encouraging the public to use the Bored Ape Yacht Club brand to create NFT collections, products, and services unaffiliated with Yuga is material to Defendants' intent because it shows that Defendants had a reasonable belief that the RR/BAYC collection was permissible.

Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed during cross-examination that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga's, and Ms. Muniz's, activities are important indications of Defendants' good faith because it shows that Defendants held a reasonable belief that the RR/BAYC collection was permissible.  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms."). Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga

has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga's Terms & Conditions along with its public activities amounted to authorization of RR/BAYC collection and the other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344) ¶ 206.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                    211                    Case No. 2:22-cv-04355-JFW-JEM

Yuga attempts to ignore this evidence showing Defendants' good faith by incorrectly invoking the law of the case doctrine by citing to this Court's summary judgment order. *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on the BAYC Terms & Conditions and Yuga's public activities applies only the issue of infringement and is not adequate support on these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

**Plaintiff's Reply:**

Defendants' responses rehash the same tired arguments without adequately addressing the evidence and caselaw refuting them.  They should be rejected because (1) they seek to relitigate issues already adjudicated by the Court (*see supra* ¶ 9), (2) the record shows that Defendants intended to confuse consumers (*see id.*), (3) Defendants were well aware that their infringement would cause confusion (*see infra* ¶ 24), (4) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶ 3), (5) Defendants did not take steps to avoid confusion (*see supra* ¶ 9), (6) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*); (7) other alleged infringers do not negate Defendants'

212

infringement (*see supra* ¶ 24); (8) the BAYC Terms only provide a copyright license (*see supra* ¶ 28); and (9) Yuga Labs did not encourage the public to use the BAYC brand (*see id.*).  The Court has already found that Defendants are infringers, and there is no good-faith basis for Defendants to dispute this or to reargue that Yuga Labs somehow granted Defendants a license to infringe.

**Defendants' Disputed Post Trial Finding of Fact No. 31:**

Based on Yuga's conduct, Mr. Ripps and Mr. Cahen reasonably believed that the RR/BAYC project was permissible. Ripps Decl. ¶ 191 (uncontested); Cahen Decl. ¶¶ 206, 212; Hickman Decl. ¶¶ 24-40. Tellingly, neither Mr. Ripps nor Mr. Cahen were cross-examined on their beliefs about the RR/BAYC project, even though—as discussed below—their intent is "highly important" in determining whether disgorgement is appropriate.

**Plaintiff's Basis for Dispute:**

Defendants cannot claim that *Yuga Labs'* actions are somehow responsible for *Defendants'* use of the BAYC Marks on the infringing NFTs.  Defendants' and Mr. Hickman's statements are self-serving and not credible.  *See supra* ¶¶ 3, 4, 7. Their argument that they reasonably believed their infringement was permissible due to third party use of the BAYC Marks and Yuga Labs' copyright license, should also be rejected.  The Court already found that these issues are not relevant to the claims in this case.  SJ Order (Dkt. 225) at 9-10.  Whether or not third parties are using the BAYC Marks, theft is still theft, and Defendants' infringement is not excused on this basis.  *See supra* ¶¶ 24-25.  Similarly, their reliance on statements made by Ms. Muniz long after the commencement of this lawsuit do not excuse, explain, or justify Defendants' infringement.  *See supra* ¶¶ 28-29.

As this Court found and their internal communications revealed, Defendants intentionally infringed on the BAYC Marks.  SJ Order (Dkt. 225) at 12; *see also, e.g.*, *supra* ¶ 9 (compiling communications).  Yet Defendants continued to infringe even after the Court found their conduct was infringing.  *See supra* ¶ 9; Solano

Decl. (Dkt. 342) ¶¶ 74, 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Continuing to infringe, after you have been told by a federal court that you are infringing, is not good faith.  Moreover, they were aware that RR/BAYC NFTs were confusing.  *See*, *e.g.*, JTX-801.15 (Regarding the use of unaltered BAYC Marks on the RR/BAYC Foundation page, Mr. Lehman, one of the Defendants' partners, wrote, "I mean how do they not shut this down at some point haha."); JTX-801.196 (Mr. Lehman writing, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah."); *see also* Trial Tr. at 211:17-212:24.  Defendant Ripps even taunted Yuga Labs that no one would stop his infringement.  JTX-860 ("over $1.2 million dollars has made from RR/BAYC and YugaLabs nor the BAYC holders aren't going to do anything about it?").  And they worked to conceal their infringement.  *See, e.g.*, JTX-803.57 (Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued personally."); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued).  Finally, even after the RR/BAYC NFTs were removed from various marketplaces, Defendants again continued to infringe.  Cahen Decl. (Dkt. 344) ¶ 253.  The evidence presented at trial establishes that, from the outset, this was no satirical project.  It was a business venture where the Defendants were interested in making "like a million dollars."  JTX-1574; *supra* ¶ 9.

Yuga Labs' decision not to cross-examine Defendants on the issue of their beliefs about RR/BAYC is not "telling[]."  The Court already found that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.  Indeed, the Defendants' actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Yuga

1  Labs did not need to cross-examine Defendants when they had already proven their
2  willingness to lie.  *See, e.g.*, *supra* ¶¶ 3, 7.  Moreover, Yuga Labs does not need
3  Defendants' testimony to prove their intent – their written documents (e.g. Team
4  ApeMarket Discord, text messages to one another, etc.) provide more truthful and
5  complete evidence of Defendants' intent to profit off of their use of Yuga Labs'
6  BAYC Marks.  *See, e.g.*, *supra* ¶ 9.

7        The Court's finding of intent to deceive also shows that Defendants' conduct
8  was willful, since "[w]illful infringement carries a connotation of deliberate intent
9  to deceive." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993).
10  And there is ample evidence in the record of this intent.  JTX-1 ¶¶ 10-13; JTX-621;
11  JTX-801,144, 185, 208, 237; JTX-803 at 66-67; JTX-1574; JTX-1586; Hickman
12  Depo. Designations (Dkt. 394) at 238:12-40.  There was no need to cross-examine
13  Defendants on their supposed and uncredible "beliefs" to prove those beliefs are not
14  stated in good faith.

15  **Defendants' Response:**

16        The evidence at trial showed that Defendants had a reasonable basis for
17  believing that it was permissible for them to create the RR/BAYC collection based
18  on Yuga's own public activities and permitting third parties to create their own
19  Bored Ape Yacht Club NFT collection.

20        BAYC NFTs had Terms & Conditions, and the intent behind the Terms &
21  Conditions for BAYC NFTs was to allow people to be able to commercialize their
22  NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and
23  conditions was to allow people to be able to commercialize their NFTs.  We can
24  agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the
25  public to use the BAYC artwork and to be creative with BAYC's intellectual
26  property.  For example, Yuga's CEO Nicole Muniz had publicly represented that
27  BAYC NFT holders received all IP rights and that Yuga has none of those rights.
28  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-

26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga's Terms & Conditions along with its public activities amounted to authorization of RR/BAYC collection and the other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344) ¶ 206.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

1   Yuga attempts to ignore this evidence showing Defendants' good faith by

2   incorrectly invoking the law of the case doctrine by citing to this Court's summary

3   judgment order.  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

4   added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

5   rulings, often based on incomplete information, don't bind district judges for the

6   remainder of the case.  Given the nature of such motions, it could not be

7   otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

8   an issue were decided at summary judgment for one purpose, the summary

9   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

10  CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

11  that evidence of initial police contact was relevant as background, but not to already

12  decided issue that initial contact was not excessive force).  This case is just like

13  *Sienze*: the summary judgment ruling on the BAYC Terms & Conditions and

14  Yuga's public activities applies only the issue of infringement and is not adequate

15  support on these issues generally or as applied to availability of disgorgement as a

16  remedy (including Defendants' mental state as applied to disgorgement),

17  apportionment, and an exceptional case analysis.

18  Yuga also attempts to rebut Defendants' good faith by arguing that

19  Defendants intended to infringe.  But the evidence at trial showed that Defendants'

20  intent was to create a satire that was a protest of Yuga. Mr. Ripps's and Mr.

21  Cahen's contemporaneous communications about the RR/BAYC project confirm

22  that their intent was to use RR/BAYC to criticize rather than to confuse.  For

23  example, in private group chats among participants in the RR/BAYC project (JTX-

24  801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose

25  of the project, their intention that it would spread criticism of Yuga, and their

26  intention that social media platforms be used to educate the public about the nature

27  of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147

28

1    (uncontested) (Dkt. 346); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13,
2    146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

3          Defendants also took multiple steps to make clear that the RR/BAYC
4    collection was not related to Yuga in any way.  For example, the rrbayc.com
5    website—through which the majority of RR/BAYC commissions occurred and the
6    vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)
7    (uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic
8    intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen
9    Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
10   [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to
11   read and click through a disclaimer acknowledging the artistic purpose of the
12   project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-
13   109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps
14   insisted on these requirement and additional steps so that the artistic purpose of the
15   work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-
16   60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative
17   impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

18         Defendants' online discussion, which consisted of nearly the entirety of
19   Defendants' public activities associated with RR/BAYC, confirms their intent.  In
20   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be
21   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows
22   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
23   Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

24         The evidence at trial also showed that the RR/BAYC collection did not cause
25   any actual confusion and was not likely to cause confusion.  Defendants received
26   voluminous correspondence from RR/BAYC participants—none of which indicated
27   any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.
28   346) (uncontested).  To the contrary, the correspondence expressed gratitude and

support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Yuga attempts to rebut this evidence of Defendants' intent by mischaracterizing evidence in the record.  For example, Yuga misleadingly cites to JTX-801 as evidence of intentional infringement.  But the statement at JTX-801.196 that Yuga relies on is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  Similarly, the statement at JTX-801.15 that Yuga relies on was a question from Mr. Lehman regarding whether RR/BAYC's page will be shut down.  Mr. Cahen response shows that he did not believe there was anything wrong with the page, stating "[t]hey can't imo."  JTX-801.15.

**Plaintiff's Reply:**

Defendants' responses rehash the same tired arguments without adequately addressing Yuga Labs' arguments.  They should be rejected because (1) they seek to relitigate issues already adjudicated by the Court (*see supra* ¶ 9); (2) the record shows that Defendants intended to confuse consumers (*see id.*); (3) Defendants' commercial infringement was not protected "art" (*see id.*); (4) Defendants intended to profit off of their infringement (*see id.*); (5) Defendants were well aware that their infringement would cause confusion (*see supra* ¶ 24); (6) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶ 3); (7) Defendants' "disclaimers" did not dispel likelihood of confusion (*see supra* ¶ 9); (8) the majority of the sales of Defendants' infringing NFTs did not occur on rrbayc.com (*see infra* ¶ 76); (9) Defendants did not take steps to avoid confusion (*see supra* ¶ 9); (10) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*); (11) other alleged infringers do not negate Defendants' infringement (*see id.*); (12) the BAYC Terms only provide a copyright license (*see supra* ¶ 28); and (13) Yuga Labs did not encourage the public to use the BAYC brand (*see id.*).

Additionally, Defendants fail to mitigate Mr. Lehman's warning that they were infringing by using Yuga Labs' exact marks on the Foundation marketplace. JTX-801.15 (Mr. Lehman: "I mean how do they not shut this down at some point haha."  Mr. Cahen: "They can't lmo").  Whether or not Mr. Cahen agreed with the possibility of a takedown is immaterial, as he does not decide whether use of a mark is infringing—this Court does.  Moreover, his response demonstrates that he was aware that (1) they were using exact copies of the BAYC marks, (2) there was potential for confusion, and (3) they nonetheless continued to intentionally use unmodified versions of the BAYC Marks to sell their infringing NFTs.  This is just one example of many warnings Defendants received, including from their own lawyers, and Mr. Hickman, that demonstrate their knowledge of confusion and

intent to infringe the BAYC Marks. *See supra* ¶ 31 (Plaintiff's Basis for Dispute); JTX-1 ¶¶ 18-28; JTX-621 (acknowledging confusion caused by Defendants RR/BAYC NFTs).

**Defendants' Disputed Post Trial Finding of Fact No. 32:**

The evidence presented at trial did not show that a single RR/BAYC NFT was sold to a consumer who believed it was created by Yuga rather than by defendants. *See, e.g.,* Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1.

**Plaintiff's Basis for Dispute:**

Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th

1  Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and

2  'hardly ever find their way into the appellate reports' because liability is 'open and

3  shut.'").  In any event, actual confusion is not required; and the Court already found

4  Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

5  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

6  regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

7  *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

8  profits even where infringement claims premised solely on post-sale confusion

9  where a "potential purchaser, knowing that the public is likely to be confused or

10  deceived by the allegedly infringing product, [] choose[s] to purchase that product

11  instead of a genuine one"); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d

12  817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar

13  labeling on jeans "is likely to cause confusion among prospective purchasers who

14  carry even an imperfect recollection of Strauss's mark and who observe Wrangler's

15  projecting label after the point of sale."); *See* J. Thomas McCarthy, 2 *McCarthy on*

16  *Trademarks and Unfair Competition* § 23:6 (5th ed.) ("Infringement can be based

17  upon confusion that creates initial customer interest, even though no actual sale is

18  finally completed as a result of the confusion.").

19      **Defendants' Response:**

20      Yuga's objection is not based in fact.  First, there is ample evidence that there

21  was **no** consumer confusion. Defendants took multiple steps to make clear that the

22  RR/BAYC collection was not related to Yuga in any way.  For example, the

23  rrbayc.com website—through which the majority of RR/BAYC commissions

24  occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt.

25  346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the

26  artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

27  Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial

28  Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required

to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin

also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark. *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.

Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and

provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial

Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false. The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of

confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, *982 F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, *839 F.3d 1179 (9th Cir. 2016)*.  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* and *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be

sponsored by Yuga Labs; right? A Correct.").  Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' lengthy responses fail to grapple with the facts of the case.  The Court has already found a likelihood of confusion, there are many instances of confusion in the record, and Yuga Labs' experts found that consumers were confused.  Defendants' scattershot response misses the mark.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) Defendants' infringement was intentional and not an art project (*supra* ¶ 3), (2) there is ample evidence of confusion in the record (*Id.*), (3) the record shows that Defendants were aware that their infringement would result in confusion (*supra* ¶ 7), (4) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (5) the Court's summary judgment order establishes liability and intent (*supra* ¶ 9), and Defendants have already stipulated to Yuga Labs' ownership of its BAYC Marks (*supra* ¶ 23).

Additionally, the Court should reject Defendants' responses because (1) Ms. O'Laughlin's methodology and report are reliable, (2) Yuga Labs is entitled to Defendants' profits, (3) all of Defendants' profits are attributable to their infringement, (4) Defendants used Yuga Labs' marks, (5) Defendants' disclaimers did not negate confusion in the marketplace, (6) the majority of Defendants' infringing NFTs were not sold on rrbayc.com, (7) post-sale and initial interest confusion are actionable, (8) consumers looking to Etherscan to verify their NFTs would still be confused, (9) confusion based on affiliation or sponsorship is actionable, (10) the @0xGem Tweets demonstrated confusion in the marketplace, (11) Defendants' internal conversations demonstrated knowledge of a likelihood of confusion, and (12) Defendants fail to account for ongoing harm.

**Ms. O'Laughlin's Findings Are Sound And Reliable:**  As the Court has already held, Ms. O'Laughlin's report is "relevant, reliable, and admissible."  Trial Tr. 141:3-5.  The Court denied Defendants' Motion *in Limine* no. 6, Dkt. 242, but Defendants nonetheless continue to attack Ms. O'Laughlin's sound testimony.  Defendants' response should be rejected for the reasons outlined below.

First, Defendants have no evidence establishing that Ms. O'Laughlin's survey population was overbroad, and the evidence admitted at trial confirms that Ms. O'Laughlin's selection criteria was appropriate.  *See infra* ¶¶ 70, 71.

Second**,** Defendants' tired argument that Ms. O'Laughlin's methodology was flawed because she used two survey formats is unavailing because Ms. O'Laughlin testified that her methods were appropriate where Defendants' infringing NFTs were marketed in two different marketplace settings.  *See infra* ¶ 78.  Contrary to Defendants demands, a survey should not be one-sized fits all.  It should be tailored to the facts and here relevant marketplaces.

Third, Ms. O'Laughlin's Eveready survey and analysis are not methodologically flawed because her methods were consistent with the approach taken by trademark survey experts and participants were shown Defendants' Foundation webpage as it appeared in the real world.  *See infra* ¶ 74.

Fourth, Defendants misrepresent Ms. O'Laughlin's trial testimony.  Ms. O'Laughlin testified that she chose to analyze confusion based upon how the sales pages looked as of June 21st "because it was a more conservative choice."  Trial Tr. 161:15-16.  Therefore, it is likely that the time frame that Ms. O'Laughlin chose resulted in rate of confusion *lower* than what was occurring in the real world.  Ms. O'Laughlin further testified that her survey focused on the shell of the website, so small changes would not invalidate her results.  Trial Tr. 163:15-20 ("what I'm testing is sort of the shell, right, the shell that uses the trademarks that are at issue in the case.  So it's the use of the BAYC, Bored Ape Yacht Club, the use of the ape skull logo.  The particular NFTs would vary, of course.  That's a marketplace.

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                            230                            Case No. 2:22-cv-04355-JFW-JEM

Things change. But the framework is pretty consistent over those two months."). As Ms. O'Laughlin explained, she chose a reasonable time frame for her analysis. Indeed, it was also the time frame through which Defendants were promoting their NFTs as top sellers in the marketplace.

Fifth, Ms. O'Laughlin's surveys are an accurate data point for the rates of actual confusion in the marketplace. And as discussed *supra* ¶ 7, Yuga Labs has put forth volumes of evidence of actual confusion, including actionable post-sale confusion. Further, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.

**Yuga Labs Is Entitled To Disgorgement As A Remedy:** This case arises out of the Lanham Act, which expressly provides for damages ***and*** disgorgement of Defendants' profits. "The Lanham Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's profits." *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to defendant's profits."). Accordingly, the Lanham Act allows for three distinct financial remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are not stated in the disjunctive, and each are separately available under the statute. Moreover, the model jury instructions make clear that actual damages and disgorgement are available in the same case: "*In addition to actual damages*, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence." Manual of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added). Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts.

Defendants are not allowed to retain the fruits of unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Additionally, disgorgement is expressly provided as a remedy for false designation of origin under the Lanham Act, regardless of willfulness.  15 U.S.C. § 1117(a) (a plaintiff is entitled to recover a "defendant's profits" for "a violation under section 1125(a)," in contrast to "a willful violation under section 1125(c)").  Indeed, as the Court has already observed, Defendants are incorrect to argue that intent is required for the Court to order disgorgement of their profits.  June 9, 2023 Pretrial Conference Tr. at 33:12-16 ("But with respect to the remaining issues that we're going to be trying in this case, the defendants' profits, there is no willfulness requirement for the defendants' profits.  It's an equitable remedy.  It is a disgorgement.  This is my view.").

Defendants' position runs contrary to basic statutory and jury instruction principles for Lanham Act claims and should be rejected.

**Defendants' Profits Are All Attributable To Their Infringement:** Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC NFT.  The smart contract for each of Defendants' infringing NFTs is immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC," which is replicated on the Etherscan token tracker and anywhere that systems pull information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific use of the BAYC brand as the NFT Collection's smart contract name and symbol").  Additionally, some of the NFTs that were offered for sale were reserved through the infringing rrbayc.com domain.  Kindler Decl. (Dkt. 338) ¶ 61.  So again, Defendants were using Yuga Labs' BAYC Marks in the marketing

of the infringing RR/BAYC NFTs.  More still, "other RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-670).  Defendants also "used the BAYC Marks to sell and promote their own product."  SJ Order (Dkt. 255) at 18.  Consumers would not have purchased the RR/BAYC NFTs if not for the confusion caused by Defendants in using the BAYC Marks and leading them to believe they were or were affiliated with genuine BAYC NFTs.  And finally, "[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.  All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga Labs' BAYC Marks.  Defendants are not allowed to retain the fruits of unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement." *Id.* at 1076.  The RR/BAYC NFTs are infringing goods that Defendants created and placed into interstate commerce—the Court has already determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at 10-13—and so profits derived from the sale of those goods resulted from Defendants' infringement.  There is no requirement for Yuga Labs to go beyond that and prove that every dollar was attributable to instances of "actual confusion," which is not even a required element of an infringement case.  SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

In sum, profits from the sales of Defendants' infringing NFTs, each of which Defendants admit used the BAYC Marks, are necessarily attributable to Defendants' infringement of the BAYC Marks.  *See* Dkt. 418-1(Defendants admitting that "Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks").

**Defendants Used Yuga Labs' Marks Without Altering Them:** Defendants' response misleading implies that Defendants did not use Yuga Labs' marks without alteration. This is false. "Indeed, Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." SJ Order (Dkt. 225) at 11. And there is significant documentary evidence supporting this finding. *See, e.g.*, JTX-600 (showing "BAYC" and "Bored Ape Yacht Club" input to Defendants' smart contract"); JTX-28 (Defendants' Foundation page marketing their NFTs as "BAYC" and "Bored Ape Yacht Club" using a direct copy of Yuga Labs' ape skull logo). Thus, whether Defendants modified Yuga Labs' marks at times, they nonetheless used Yuga Labs' unaltered marks to market their infringing NFTs. "Therefore, the Court easily conclude[d] that Defendants' use of Yuga's BAYC Marks was likely to cause confusion." SJ Order (Dkt. 225) at 13.

**Defendants' Disclaimer Is Evidence Of Their Culpability:** With respect to the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17.

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued personally." JTX-803.57; *see also* JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued). And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get sued, for us to look really sympathetic to everyone" (JTX-918.0036). That Defendants took some steps to try to conceal their intent when they were inevitably sued does not make the infringing activity less confusing; it just demonstrates their culpability.

Additionally, the public was not required to read and click a disclaimer. Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one" would read (JTX-801.128). And, this wall of text did nothing to dispel confusion amongst the general public when every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Defendants also did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer. Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer. This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website. Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer. (Ripps Deposition Designations) at 82:8-13.

Moreover, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.,* *457 F.3d 1062, 1078 (9th Cir. 2006)* (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion"). Defendants' claimed disclaimer is non-existent to ineffective at best.

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without
A Disclaimer:**  Defendants acknowledge that their alleged disclaimer was only on
rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that
for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on
secondary markets. . . .  [T]he vast majority of them are occurring in secondary
markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723
(Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm,
e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that
'[w]e're closing in on *$10 million impact to yuga'").  These secondary markets
did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing
NFTs is taking place on the secondary market, including platforms such as
Foundation and OpenSea.  These secondary marketplaces are one place where
consumer confusion is likely to result from Defendants' actions to flood the market
with their infringing products.  These secondary marketplaces are also a prominent
source of confusion going forward—especially since they are where Defendants
continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78
("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx");
Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly
to LooksRare where these NFTs are still selling").  Defendants' contention that the
majority of the RR/BAYC NFTs were purchased through rrbayc.com is therefore
incorrect and misleading.

**Post-Sale And Initial Interest Confusion Are Actionable:**  Actual
confusion is not required; and the Court already found Defendants' use of BAYC
Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to
Defendants' profits due to their infringing activity regardless of whether purchasers
were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207,
238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement

claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). Defendants offer only self-serving, anecdotal evidence of communications with purported purchasers of RR/BAYC NFTs to support their claim that consumers were purchasing the infringing NFTs as a "protest."  As explained *supra* ¶ 3, this evidence should be given little weight.  That consumers, or here distributors, were purchasing Defendants' NFTs with the expectation to resell them is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17 *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market.").  Defendants cannot rebut this fact.

**Confusion Over Sponsorship Or Affiliation Is Actionable:**  Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship.  The Lanham Act, however, expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the ***affiliation, connection, or association*** of such person with another person, or as to the or as to the origin, ***sponsorship, or approval*** of his or her goods[.]"  15 U.S.C. § 1125(a)(1)(A) (emphases added).  Therefore, regardless of whether a consumer who watched the Bloomberg piece thought that "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" were the same *product*, their confusion as to whether they originated from the same *company* or were sponsored or affiliated with the same company is nonetheless actionable.  It is simply not credible for Defendants to argue that consumers would not be confused by encountering two NFT collections that use the exact same mark, only differentiated by "V3."  Indeed, "V3" is commonly understood to mean "version 3," therefore expressly indicating that Defendants' infringing NFTs are a new

"version" of Yuga Labs' legitimate Bored Ape Yacht Club NFTs.  This is plainly confusing.  And such confusion was likely, as the Court has already ruled, due to the unaltered display of Yuga Labs' marks.  SJ Order (Dkt. 225) at 13.

**Consumers Looking To Etherscan Were Still Confused:**  Defendants cannot keep their story straight.  Now, they proffer that consumers *do* look to Etherscan to verify their NFTs after they initially claimed that this was not the proper way to authenticate an NFT.  *See infra* ¶ 66.  Nonetheless, those consumers who did look to Etherscan to verify their NFTs, which as Mr. Cahen conceded is "very common," (Cahen Depo. Designations (Dkt. 395) at 148:10-13), they would still encounter Yuga Labs' marks.  *See* JTX-117 (Etherscan screenshot showing "Bored Ape Yacht Club" and "BAYC" as token tracker and contract name respectively); *see also* Atalay Decl. (Dkt. 337) ¶ 7 ("If you were curious to see how malicious this scam is, check out the token tracker/ID name that he chose to use on the smart contract.  This is a critical piece of data the NFT community uses when they are buying on the secondary market.").  Defendants' unaltered use of Yuga Labs' marks on the RR/BAYC smart contract supported a finding of likelihood of confusion.  SJ Order (Dkt. 225) at 17 ("Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT.").

**The Gem Bot Tweet And Replies Demonstrated Confusion:**  The @0xGem Tweets demonstrated confusion in the marketplace.  As discussed above, that some consumers were not confused is irrelevant because post-sale and initial interest confusion are nonetheless actionable.  But more importantly, several replies to the @0xGem Tweets demonstrated consumers confusion.  *See* JTX-1029 ("The confusion in these comments will be prime evidence in the RR v Yuga case."); JTX-1030 ("shit man I looked on chain and didn't even realize it was RR."); JTX-1031 ("What a gold ape sold for 6eth must be a glitch!").  Thus, these Tweets

demonstrate how confusing Defendants' scam was as they demonstrated how
consumers were confused by the fact that the infringing NFTs used Yuga Labs'
same marks and their same images, and were even confusingly labeled on
Etherscan.

**Defendants' Internal Communications Showed They Knew Confusion
Was Likely:**  The evidence shows that Defendants knew they were infringing and
creating confusion.  *See supra* ¶ 7; JTX-801.371 (Cahen to Ripps: "per our
attorney we may just need to change the skull / If we want to fight trademark");
JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered
confusing and our use of the 'BAYC' name."); JTX-801.185 (Mr. Lehman writing,
"overall I think we should be very careful about doing this in terms of the confusion
it will create").

**Defendants Fail To Account For Ongoing Harm:**  Regardless of how
much Defendants profited off the sale of their infringing NFTs on secondary
marketplaces, the fact remains that Yuga Labs continues to suffer ongoing harm.
Indeed, Yuga Labs will only be made whole by an injunction that orders the
transfer of the immutably infringing smart contract.  Trial Tr. 134:4-7 ("In this
particular instance, upon inspection of the Foundation smart contract that was used
to deploy the RR/BAYC smart contract, it's evident that these are not mutable
fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless
Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be
forever tied to Mr. Ripps").  Defendants' citation to the profits calculation of Yuga
Labs' own witness does nothing to rebut this ongoing harm or militate against a
sufficient injunction.

**<u>Defendants' Disputed Post Trial Finding of Fact No. 33:</u>**

<u>None of the correspondence that Mr. Ripps or Mr. Cahen received from
actual RR/BAYC NFT collectors indicated that any commissions or secondary</u>

1  sales were due to confusion as to the source or the nature of the RR/BAYC NFTs.

2  Ripps Decl. ¶¶ 196-207 (uncontested).

3  **Plaintiff's Basis for Dispute:**

4        Defendants' cherry-picked communications from a self-selecting group are

5  far from a comprehensive survey of consumer confusion in the market.  Defendants

6  have no evidence supporting a claim that a statistically significant number of

7  consumers were not confused.  Indeed, the hundreds of refunds they provided at

8  consumers' requests suggest that some purchasers were confused.  *See e.g.* Kindler

9  Decl. (Dkt. 338) ¶ 44.  At least some of those hundreds of refund demands could

10  have been from confused consumers who "weren't going to, you know, raise their

11  hand and shout about it."  Trial Tr. at 54:10-16.  Moreover, they ignore the ample

12  confusion on Twitter and other sources that Yuga Labs identified.  SJ Order (Dkt.

13  225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029;

14  JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations

15  (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl.

16  (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342)

17  ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed

18  Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were

19  aware of the confusion.  *See, e.g.*, *supra* ¶ 24 (collecting examples).  And Yuga

20  Labs' survey evidence demonstrated significant confusion among consumers who

21  incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.

22  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81,

23  82.  Defendants do not offer any admissible or credible evidence to rebut the

24  evidence that consumers believed, or were likely to believe, RR/BAYC was

25  affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial

26  interest or post-sale confusion.  Moreover, there is no reliable evidence in the

27  record that the individuals identified in the cited emails, or all other purchasers, are

28  "collectors" as Defendants contend.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13.  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity, regardless of whether purchasers were actually confused.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale.").

**Defendants' Response:**

This finding of fact addresses correspondences which Defendants received from collectors of RR/BAYC NFTs and the views expressed within those correspondences.  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

1    First, Yuga's citation to Dr. Kindler's declaration does not support their

2    allegations that Defendants provided "hundreds of refunds" or that those alleged

3    refunds indicate confusion.  *See* Kindler Decl. (Dkt. 338) ¶ 44 ("When calculating

4    Defendants' profits, transactions that were refunded through Defendants' RSVP

5    smart contract were omitted. Specifically, transactions that were refunded through

6    the RefundIssued and RSVPCanceled functions in the RSVP smart contract were

7    not included in my calculation of profits. To my knowledge, Defendants have not

8    produced any records of other refunds related to the sale of RR/BAYC NFTs.").

9    Mr. Ripps never received a refund request from anyone stating they were confused

10   or thought that they were reserving a Yuga product.  Ripps Decl. ¶ 122 (Dkt. 346)

11   (uncontested).

12   Second, Yuga's evidence does not indicate there was confusion on Twitter.

13   For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which

14   is an automated software application and not evidence of a real person's confusion.

15   *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet

16   include users identifying that the Mr. Ripps is the source of the NFT not Yuga.

17   Further, there is no indication that any of the Twitter users commenting actually

18   reserved an RR/BAYC NFT.  This evidence provides no support for an argument

19   that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032

20   (Tweets where the users are quickly identifying Mr. Ripps as the source of the

21   NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that

22   there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

23   Third, Yuga also cites to private chats that the RR/BAYC creators used.

24   These exhibits are unsupportive of a finding that there was actual confusion. For

25   example, JTX-109 includes a discussion where Mr. Lehman raises concerns about

26   how the marketplace is designed and may cause confusion.  Mr. Cahen responds

27   and provides suggestions about what they could do to make it even more clear.

28   Further, this chat focused on the creation of ApeMarket, which never was launched

1   and could, therefore, never have caused any actual consumer confusion. Cahen

2   Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to

3   make ApeMarket clearer).

4          Fourth, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin

5   conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin

6   acknowledged that she used an overly expansive definition of the market that

7   included people who did not have any interest in purchasing an NFT, much less

8   knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing

9   survey qualification flow); 152:4-10.  She acknowledged that she changed the

10  survey population after running pretests to make it more inclusive.  *Id.* at 144:25-

11  146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about

12  the NFT market, admitting to erroneously believing that cryptocurrency was an

13  NFT when she formulated her surveys and her reports.  *Id*. at 147:12-14.  The result

14  of her lack of knowledge was an inherently flawed survey that could not show

15  confusion because the market was too broad.  This was despite her

16  acknowledgement that choosing the right sample population "matters for the

17  analysis" and choosing an improper sample population would be a mistake.  *Id.* at

18  146:18-25.

19         Fifth, Yuga incorrectly relies on the law of the case doctrine by citing to this

20  Court's summary judgment order.  The "law of the case doctrine does not apply to

21  pretrial rulings ***such as motions for summary judgment***."  Shouse v. Ljunggren,

22  792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard,

23  744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete

24  information, don't bind district judges for the remainder of the case.  Given the

25  nature of such motions, it could not be otherwise.").  For example, in Sienze v Kutz,

26  the Court held that although ***aspects*** of an issue were decided at summary judgment

27  for one purpose, the summary judgment order did resolve the issue generally or as

28  to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D.

Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Sixth, Yuga's citation to *Levi* is inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the

project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga. Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact.  This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro,*

1   365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination

2   is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's

3   decision to not cross-examine Mr. Ripps regarding any portion of his declaration

4   means that "principle means" of testing Mr. Ripps credibility weighs decisively in

5   favor of accepting Mr. Ripps's declaration.

6       **Plaintiff's Reply:**

7       Defendants again spend five pages of briefing to attempt to rebut two

8   paragraphs.  But again, their responses fall short.  Defendants obfuscate the issues

9   with irrelevant and immaterial arguments and fail to rebut Yuga Labs objection.

10      As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

11  Defendants' anecdotal evidence of communications with purported purchasers is

12  unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused,

13  post-sale and initial interest confusion are nonetheless actionable (*supra* ¶ 32), (3)

14  Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4)

15  the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (5)

16  Ms. O'Laughlin's report is reliable and accurate (*Id.*), (6) the Court's summary

17  judgment order establishes Defendants' liability (*Id.*), (7) Defendants' "disclaimer"

18  did not prevent confusion, (*Id.*), (8) most of Defendants' infringing NFTs did not

19  sell on rrbayc.com (*Id.*), (9) the record shows multiple instances of actual confusion

20  (*supra* ¶ 3); and (10) Mr. Lehman's declaration is truthful and contradicts

21  Defendants (*Id.*).

22      Additionally, the Court should reject Defendants' responses because (1) *Levi*

23  applies and post-sale confusion is thus actionable, (2) Defendants failed take steps

24  to avoid confusion, and (3) Defendants' refunds demonstrate confusion.

25      **Defendants Fail To Rebut *Levi*:**  Actual confusion is not required; and the

26  Court already found Defendants' use of BAYC Marks to be infringing because it

27  created a likelihood of confusion.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus

28  entitled to Defendants' profits due to their infringing activity—the use of the

BAYC Marks—regardless of whether purchasers were actually confused.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale.").  Defendants offer only self-serving, anecdotal evidence of communications with purported purchasers of RR/BAYC NFTs to support their claim that consumers were purchasing the infringing NFTs as a "protest."  As explained *supra* ¶ 3, this evidence should be given little weight.  That consumers, or here distributors, were purchasing Defendants' NFTs with the expectation to resell them is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market.").  Defendants cannot rebut this fact.

**Defendants Failed Take Steps To Avoid Confusion:**  Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers.  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could have attacked Yuga

Labs in countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

**The Refunds Issued By Defendants Are Evidence Of Confusion:**

Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused. Defendants' cherry-picked communications with purported purchasers do not credibly rebut this fact for the reasons discussed *supra* ¶ 3.  With Defendants' infringing NFTs selling for "approximately $200 per NFT," Defendants' own calculations demonstrate that hundreds of refunds were requested and processed. Solano Decl. (Dkt. 342) ¶ 54.  Indeed, Defendants have admitted that a substantial number of purchasers demanded a refund.  Ripps Decl. (Dkt. 346) ¶¶ 119, 170, 172, 174-175.  At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it."  Trial Tr. at 54:10-16; *see also* Trial Tr. at 83:19-84:3 (Ms. Muniz testifying that "people came that were lured in because they believed it was a BAYC and then were, like, oh, it's not.  But it's a really, really good fake.  And it's such a good fake that it actually convinced Twitter and I mean Twitter from a front-end user interact platform but also Twitter as individuals and people in a community and consumers.  So I believe people were lured in thinking it was authentic BAYC then realized, oh, wait, it's not, but it's a cheap version that's really, really good.  It's a really good fake.").  These consumers likely requested refunds, regardless of whether they admitted to their confusion.

**Defendants' Disputed Post Trial Finding of Fact No. 34:**

Rather, these correspondence from collectors expressed gratitude and support for the artistic project, the artistic statement, and Mr. Ripps's and Mr. Cahen's

1  criticism of Yuga. Ripps Decl. ¶¶ 198-205 (uncontested); JTX-2033, JTX-2035,

2  JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596;

3  JTX-2599.

4  **Plaintiff's Basis for Dispute:**

5       Defendants' cherry-picked communications from a self-selecting group are

6  far from a comprehensive survey of consumer confusion in the market.  Meanwhile,

7  they ignore the ample confusion on Twitter and other sources that Yuga Labs

8  identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-

9  801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035;

10  Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt.

11  339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-

12  14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-

13  54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at

14  ¶¶ 4-7.  Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting

15  examples).  And Yuga Labs' survey evidence demonstrated significant confusion

16  among consumers who incorrectly believed RR/BAYC was sponsored by or

17  affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶

18  13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible

19  evidence to rebut the evidence that consumers believed, or were likely to believe,

20  RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut

21  evidence of initial interest or post-sale confusion.  Moreover, there is no reliable

22  evidence in the record that the individuals identified in the cited emails, or all other

23  purchasers, are "collectors" as Defendants contend.

24       There is a clear likelihood of confusion as well, given Defendants' use of the

25  same marks and images, which the Court already determined.  SJ Order (Dkt. 225)

26  at 10-13.  In any event, actual confusion is not required, and the Court already

27  found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

28  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

regardless of whether purchasers were actually confused.  *See* J. Thomas McCarthy,

2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale

confusion damages trademark holders because "consumers could acquire the

prestige value of the senior user's product by buying the copier's cheap imitation.

Even though the knowledgeable buyer knew that it was getting an imitation,

viewers would be confused.").

Moreover, Defendants' *Rogers* and First Amendment defenses have already

been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions

were commercial trademark infringement.  *Id*.  And the Court has already decided

the issue of Defendants' intent, finding that Defendants intentionally infringed

Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to

profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

To the extent Defendants seek to relitigate these issues, Defendants'

contention that their infringing NFTs were an art project does not prove it to be

true.  To the contrary, the relevant evidence demonstrates that Defendants intended

to use Yuga Labs' BAYC Marks to profit through their commercial promotion and

sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants'

infringement could not have been in good faith because, even after the Court found

their infringement was likely to cause confusion and was not art protected by

*Rogers* or the First Amendment, Defendants continued to infringe on Yuga Labs'

Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And

Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

and link to a marketplace on which RR/BAYC NFTs are still available for sale.

Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, while Defendants publicly claim there was an artistic goal (to

"look really sympathetic to people" if caught, in the words of their partner (JTX-

918.00036)), their internal communications overwhelmingly focus on a business

venture to sell Ape Market, their profit motive, and riding on the coattails of the

BAYC brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).  Defendants knew they were stealing from Yuga Labs regardless of what any single consumer may have believed.

Finally, JTX-2589 and JTX-2591 are not in evidence, and not proper for consideration on this issue.

**Defendants' Response:**

This finding of fact addresses correspondences which Defendants received from collectors of RR/BAYC NFTs and the views expressed within those correspondences.  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against

a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that these communications expressed gratitude and support for the artistic project, the artistic statement, and Mr. Ripps's and Mr. Cahen's criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Instead of addressing the actual communications from collectors, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion.  *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about

how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*. at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*,

the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

[Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316

1   (1974).  This is because purpose of cross-examination is "the direct and personal

2   putting of questions and obtaining immediate answers."  *Id.*; *Murdoch v. Castro,*

3   *365 F.3d 699, 702 (9th Cir. 2004)* ("One longstanding purpose of cross examination

4   is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's

5   decision to not cross-examine Mr. Ripps regarding any portion of his declaration

6   means that "principle means" of testing Mr. Ripps credibility weighs decisively in

7   favor of accepting Mr. Ripps's declaration.

8       Defendants withdraw their citations to JTX-2589 and JTX-2591.  This

9   finding of fact is adequately supported by Defendants' other citations.

10      **Plaintiff's Reply:**

11      Defendants' responses should be rejected.  Defendants again seek to avoid

12  the Court's finding of a likelihood of confusion.  *See* SJ Order (Dkt. 225) at 13.

13  Defendants put forth only their same stale, oft rejected arguments to attempt to

14  avoid the Court's prior findings.  Time and time again Defendants have forced

15  Yuga Labs to respond to their already rejected arguments and time and time again

16  Yuga Labs has rebutted their efforts.  Unsurprisingly, their latest attempts are again

17  unavailing as the record is replete with evidence of actual and likely confusion.

18      As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

19  Defendants' anecdotal evidence of communications with purported purchasers is

20  unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused,

21  post-sale and initial interest confusion are nonetheless actionable (*supra* ¶ 32), (3)

22  Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4)

23  Defendants were motivated by an intent to profit (*supra* ¶ 7), (5) the @0xGem

24  Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms.

25  O'Laughlin's report is reliable and accurate (*Id.*), (7) the Court's summary

26  judgment order establishes Defendants' liability (*Id.*), (8) Defendants' "disclaimer"

27  did not prevent confusion, (*Id.*), (9) most of Defendants' infringing NFTs did not

28  sell on rrbayc.com (*Id.*), (10) the record shows multiple instances of actual

confusion (*supra* ¶ 3), (11) Defendants failed take steps to avoid confusion (*supra* ¶ 33), (12) Mr. Lehman's declaration is truthful and accurate (*supra* ¶ 3), and (12) the refunds Defendants issued demonstrate that consumers were confused (*supra* ¶ 33).

**Defendants' Disputed Post Trial Finding of Fact No. 35:**

For example, one collector wrote:

> Hope this email convinces you to accept my reservation for rrbayc 4878. I'm an artist, professor and I've been interested in the work you've been doing. Glad you're pointing out what bayc is doing and glad you make the art you do.

Ripps Decl. ¶ 199; JTX-2592 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market. Meanwhile, they ignore the ample confusion on Twitter and other sources that Yuga Labs has identified. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Moreover, there is no reliable

1   evidence in the record that the individuals identified in the cited emails, or all other

2   purchasers, are "collectors" as Defendants contend.

3        There is a clear likelihood of confusion as well, given Defendants' use of the

4   same marks and images, which the Court already determined.  SJ Order (Dkt. 225)

5   at 10-13.  In any event, actual confusion is not required; and the Court already

6   found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

7   Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

8   regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

9   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

10  profits even where infringement claims premised solely on post-sale confusion

11  where a "potential purchaser, knowing that the public is likely to be confused or

12  deceived by the allegedly infringing product, [] choose[s] to purchase that product

13  instead of a genuine one").

14       Moreover, Defendants' *Rogers* and First Amendment defenses have already

15  been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions

16  were commercial trademark infringement.  *Id*.  And, the Court has already decided

17  the issue of Defendants' intent, finding that Defendants intentionally infringed

18  Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to

19  profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

20       But, to the extent Defendants seek to relitigate these issues, Defendants'

21  contention that their infringing NFTs were an art project does not prove it to be

22  true.  To the contrary, the relevant evidence demonstrates that Defendants intended

23  to use Yuga Labs' BAYC Marks to profit through their commercial promotion and

24  sale of RR/BAYC NFTs.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants'

25  infringement could not have been in good faith because, even after the Court found

26  their infringement was likely to cause confusion and was not art protected by

27  *Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs'

28  Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And

Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, while Defendants publicly claim there was an artistic goal (to "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment. *See, e.g.*, JTX-1 (Lehman Declaration) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties). Defendants knew they were stealing from Yuga Labs regardless of what any single consumer may have believed.

**Defendants' Response**:

This finding of fact addresses a correspondence which Defendants received from an RR/BAYC NFT collector.  Ripps Decl. ¶ 199 (uncontested); JTX-2592. Yuga falsely states that these are "cherry-picked communications."  Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that the quoted language is accurate.  Instead of addressing this correspondence, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                                    260                                    Case No. 2:22-cv-04355-JFW-JEM

Second, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable. Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*

744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated by profits. Defendants explained that profits were a concern, but not the primary motive of the project. Cahen Decl. ¶ 156 (Dkt. 344). Profits helped offset costs and sustain Defendants' artistic project. Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344). The RR/BAYC project allowed for a full refund, for any reason. Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344). Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible. Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

(uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact.  This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now

1   challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has

2   explained, "[c]ross-examination is the principal means by which the believability of

3   a witness and truth of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316

4   (1974).  This is because purpose of cross-examination is "the direct and personal

5   putting of questions and obtaining immediate answers."  *Id.*; *Murdoch v. Castro,*

6   365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination

7   is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's

8   decision to not cross-examine Mr. Ripps regarding any portion of his declaration

9   means that "principle means" of testing Mr. Ripps credibility weighs decisively in

10  favor of accepting Mr. Ripps's declaration.

11       **Plaintiff's Reply:**

12       Defendants' unreliable communications with purported distributors or

13  purchasers of their infringing products are immaterial.  The Court has already found

14  a likelihood of confusion and these correspondences do not rebut that finding.  SJ

15  Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of

16  allegedly hundreds of e-mails to use as purported evidence of their alleged protest.

17  These attempts to obfuscate the issues are unavailing.

18       As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

19  Defendants' anecdotal evidence of communications with purported purchasers is

20  unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused,

21  post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 32, 33),

22  (3) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3),

23  (4) Defendants were motivated by an intent to profit (*supra* ¶7), (5) the @0xGem

24  Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms.

25  O'Laughlin's report is reliable and accurate (*Id.*), (7) the Court's summary

26  judgment order establishes Defendants' liability (*Id.*), (8) Defendants' "disclaimer"

27  did not prevent confusion, (*Id.*), (9) most of Defendants' infringing NFTs did not

28  sell on rrbayc.com (*Id.*), (10) the record shows multiple instances of actual

confusion (*supra* ¶ 3), (11) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), and (12) the refunds Defendants issued demonstrate that consumers were confused (*Id.*).

**Defendants' Disputed Post Trial Finding of Fact No. 36:**

Another collector wrote:

You have done a very positive thing bringing attention to BAYC. These people need to be shown for what they are! I bought one of yours on the secondary, and it is a protest purchase!

Ripps Decl. ¶ 204, JTX-2035 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market. Meanwhile, they ignore the ample confusion on Twitter and other sources that Yuga Labs has identified. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* at ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Moreover, there is no reliable

evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

Moreover, Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were commercial trademark infringement.  *Id*.  And, the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

But, to the extent Defendants seek to relitigate this issue, Defendants' contention that their infringing NFTs were an art project does not prove it to be true.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found

1  their infringement was likely to cause confusion and was not art protected by

2  *Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs'

3  Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And

4  Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

5  and link to a marketplace on which RR/BAYC NFTs are still available for sale.

6  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

7        Additionally, while Defendants publicly claim there was an artistic goal (to

8  "look really sympathetic to people" if caught, in the words of their partner (JTX-

9  918.00036)), their internal communications overwhelmingly focus on a business

10  venture to sell Ape Market, their profit motive, and riding on the coattails of the

11  BAYC brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13

12  (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One

13  thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-

14  801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize

15  people to use the marketplace, specifically the BAYC original side"); *id.* (Mr.

16  Cahen: "More royalties for us . . . More work for sure, but much higher likelihood

17  of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very

18  delicious value proposition [] to bring in users . . . but not so low that we dont make

19  anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating

20  demand + getting BAYC and MAYC users to call our marketplace their new home

21  [] and collecting royalties at a fraction of what the other big dogs are charging []

22  which will be considerable passive income if we strike the right balance"); JTX-

23  801.237 (Mr. Lehman: "I'm just concerned about launching something with low

24  prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-

25  1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It

26  will sell out within 48 hours I think [] You'll make like a million dollars [] Straight

27  up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions

28  too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit

motive and desire to charge royalties).  Defendants knew they were stealing from Yuga Labs regardless of what any single consumer may have believed.

**Defendants' Response**:

This finding of fact addresses a correspondence which Defendants received from an RR/BAYC NFT collector.  Ripps Decl. ¶ 204 (uncontested); JTX-2035. Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that the quoted language is accurate.  Instead of addressing this correspondence, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031,

JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*. at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply

to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits.  Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com

website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration

271

because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers."  *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

### **Plaintiff's Reply:**

Defendants' unreliable communications with purported distributors or purchasers of their infringing products are immaterial.  The Court has already found a likelihood of confusion and these correspondences do not rebut that finding.  SJ Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of allegedly hundreds of e-mails to use as purported evidence of their alleged protest.  These attempts to obfuscate the issues are unavailing.

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused, post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 32, 33), (3) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4) Defendants were motivated by an intent to profit (*supra* ¶7), (5) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (7) the Court's summary judgment order establishes Defendants' liability (*Id.*), (8) Defendants' "disclaimer"

did not prevent confusion, (*Id.*), (9) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), and (12) the refunds Defendants issued demonstrate that consumers were confused (*Id.*).

**Defendants' Disputed Post Trial Finding of Fact No. 37:**

A supporter stated that Mr. Ripps and Mr. Cahen were "truly iconic in my eyes and something that the true artist[s] in this space deserve." Ripps Decl. ¶ 202 (uncontested); JTX-2595.

**Plaintiff's Basis for Dispute:**

Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market.  Meanwhile, they ignore the ample confusion on Twitter and other sources that Yuga Labs has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples).  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13.  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

Moreover, Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were commercial trademark infringement.  *Id*.  And, the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

But, to the extent Defendants seek to relitigate this issue, Defendants' contention that their infringing NFTs were an art project does not prove it to be true.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

and link to a marketplace on which RR/BAYC NFTs are still available for sale.
Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, while Defendants publicly claim there was an artistic goal (to
"look really sympathetic to people" if caught, in the words of their partner (JTX-
918.00036)), their internal communications overwhelmingly focus on a business
venture to sell Ape Market, their profit motive, and riding on the coattails of the
BAYC brand for their own enrichment. *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13
(Defendants "expected the Business Venture to make money"); JTX-801.144 ("One
thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-
801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize
people to use the marketplace, specifically the BAYC original side"); *id.* (Mr.
Cahen: "More royalties for us . . . More work for sure, but much higher likelihood
of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very
delicious value proposition [] to bring in users . . . but not so low that we dont make
anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating
demand + getting BAYC and MAYC users to call our marketplace their new home
[] and collecting royalties at a fraction of what the other big dogs are charging []
which will be considerable passive income if we strike the right balance"); JTX-
801.237 (Mr. Lehman: "I'm just concerned about launching something with low
prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-
1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It
will sell out within 48 hours I think [] You'll make like a million dollars [] Straight
up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions
too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit
motive and desire to charge royalties).  Defendants knew they were stealing from
Yuga Labs regardless of what any single consumer may have believed.

**<u>Defendants' Response</u>:**

This finding of fact addresses a correspondence which Defendants received from an RR/BAYC NFT collector.  Ripps Decl. ¶ 202 (uncontested); JTX-2595.  Yuga falsely states that these are "cherry-picked communications."  Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that the quoted language is accurate.  Instead of addressing this correspondence, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion.  *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*

744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits.  Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion.  Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

1  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

2  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

3  Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

4  [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

5  read and click through a disclaimer acknowledging the artistic purpose of the

6  project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

7  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

8  insisted on these requirement and additional steps so that the artistic purpose of the

9  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

10 60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

11 impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

12        The evidence presented at trial shows that many people who reserved

13 RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205

14 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592,

15 JTX-2595, JTX-2596; JTX-2599.  Furthermore, none of the parties in this case can

16 identify a single person who purchased an RR/BAYC NFT believing it to be

17 sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of

18 actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

19 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's

20 founders were also not aware of a single instance of actual confusion. Trial Tr.

21 [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

22 what you were focused on.  Yuga Labs has been unable to identify even[] a single

23 person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

24 right? A Correct.").

25        Additionally, Defendants cite Mr. Ripps's uncontested declaration in support

26 of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration

27 because the trial transcript shows that Yuga elected to forego any substantive cross-

28 examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now

1   challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has

2   explained, "[c]ross-examination is the principal means by which the believability of

3   a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316

4   (1974).  This is because purpose of cross-examination is "the direct and personal

5   putting of questions and obtaining immediate answers."  *Id.*; *Murdoch v. Castro,*

6   365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination

7   is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's

8   decision to not cross-examine Mr. Ripps regarding any portion of his declaration

9   means that "principle means" of testing Mr. Ripps credibility weighs decisively in

10   favor of accepting Mr. Ripps's declaration.

11        **Plaintiff's Reply:**

12        Defendants' unreliable communications with purported distributors or

13   purchasers of their infringing products are immaterial.  The Court has already found

14   a likelihood of confusion and these correspondences do not rebut that finding.  SJ

15   Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of

16   allegedly hundreds of e-mails to use as purported evidence of their alleged protest.

17   These attempts to obfuscate the issues are unavailing.

18        As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

19   Defendants' anecdotal evidence of communications with purported purchasers is

20   unpersuasive (*supra* ¶ 3), (2) Yuga Labs adequately demonstrated that Mr. Ripps

21   lacks credibility (*supra* ¶ 3), (3) Defendants were motivated by an intent to profit

22   (*supra* ¶7), (4) the @0xGem Tweet and replies demonstrate consumer confusion

23   (*supra* ¶ 32), (5) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (6) the

24   Court's summary judgment order establishes Defendants' liability (*Id.*), (7)

25   Defendants' "disclaimer" did not prevent confusion, (*Id.*), (8) most of Defendants'

26   infringing NFTs did not sell on rrbayc.com (*Id.*), (9) the record shows several

27   instances of actual confusion (*supra* ¶ 3), (10) Defendants failed take steps to avoid

28

1   confusion (*supra* ¶ 33), and (11) the refunds Defendants issued demonstrate that
2   consumers were confused (*Id.*).

3        Additionally, The Court should reject Defendants' responses because (1)
4   post-sale and initial interest confusion are actionable.

5        **Post Sale and Initial Interest Confusion Support A Likelihood Of**
6   **Confusion:**  Actual confusion is not required; and the Court already found
7   Defendants' use of BAYC Marks to be infringing because it created a likelihood of
8   confusion.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants'
9   profits due to their infringing activity—the use of the BAYC Marks—regardless of
10   whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.,*
11   *868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012)* (granting defendant's profits even
12   where infringement claims premised solely on post-sale confusion where a
13   "potential purchaser, knowing that the public is likely to be confused or deceived
14   by the allegedly infringing product, [] choose[s] to purchase that product instead of
15   a genuine one"); *Levi Strauss & Co. v. Blue Bell, Inc.*, *632 F.2d 817, 822 (9th Cir.*
16   *1980)* (finding post-sale confusion actionable since use of similar labeling on jeans
17   "is likely to cause confusion among prospective purchasers who carry even an
18   imperfect recollection of Strauss's mark and who observe Wrangler's projecting
19   label after the point of sale.").  Defendants offer only self-serving, anecdotal
20   evidence of communications with purported purchasers of RR/BAYC NFTs to
21   support their claim that consumers were purchasing the infringing NFTs as a
22   "protest."  As explained *supra* ¶ 3, this evidence should be given little weight.  That
23   consumers, or here distributors, were purchasing Defendants' NFTs with the
24   expectation to resell them is supported by the fact that "the vast majority of [sales]
25   are occurring in secondary markets and not from just the initial sale."  Trial Tr. at
26   202:4-17; *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that
27   bought these that knew this was a scam and that were buying them to sell them on a
28   secondary market.").  Defendants cannot rebut this fact.

**Defendants' Disputed Post Trial Finding of Fact No. 38:**

Collectors of RR/BAYC NFTs referred to the project as "art" or to Mr. Ripps's "work." Ripps Decl. ¶ 203 (uncontested); JTX-2590.

**Plaintiff's Basis for Dispute:**

Defendants did not conduct a survey about what "collectors" of RR/BAYC NFTs thought, nor do they have any other basis to claim that these NFTs were perceived as "art" by consumers in general. Instead, they cherry-picked a handful of emails from a self-selecting group, ignoring the ample confusion on Twitter and other sources that Yuga Labs identified. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Moreover, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13. In any event, actual confusion is not required; and the Court already

found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

*Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

profits even where infringement claims premised solely on post-sale confusion

where a "potential purchaser, knowing that the public is likely to be confused or

deceived by the allegedly infringing product, [] choose[s] to purchase that product

instead of a genuine one").

Moreover, Defendants' *Rogers* and First Amendment defenses have already

been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions

were commercial trademark infringement.  *Id*.  And, the Court has already decided

the issue of Defendants' intent, finding that Defendants intentionally infringed

Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to

profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

But, to the extent Defendants seek to relitigate this issue, Defendants'

contention that their infringing NFTs were an art project does not prove it to be

true.  To the contrary, the relevant evidence demonstrates that Defendants intended

to use Yuga Labs' BAYC Marks to profit through their commercial promotion and

sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants'

infringement could not have been in good faith because, even after the Court found

their infringement was likely to cause confusion and was not art protected by

*Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs'

Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And

Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

and link to a marketplace on which RR/BAYC NFTs are still available for sale.

Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Finally, while Defendants claim there was an artistic goal (to "look really

sympathetic to people" if caught, in the words of their partner (JTX-918.00036)),

their internal communications overwhelmingly focus on a business venture to sell
Ape Market, their profit motive, and riding on the coattails of the BAYC brand for
their own enrichment. *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants
"expected the Business Venture to make money"); JTX-801.144 ("One thing we
can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185
(Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to
use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More
royalties for us . . . More work for sure, but much higher likelihood of generating
more royalties and users"); JTX-801.208 (Mr. Cahen: "we need a very delicious
value proposition [] to bring in users . . . but not so low that we dont make
anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating
demand + getting BAYC and MAYC users to call our marketplace their new home
[] and collecting royalties at a fraction of what the other big dogs are charging []
which will be considerable passive income if we strike the right balance"); JTX-
801.237 (Mr. Lehman: "I'm just concerned about launching something with low
prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-
1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It
will sell out within 48 hours I think [] You'll make like a million dollars [] Straight
up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions
too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit
motive and desire to charge royalties).  Defendants knew they were stealing from
Yuga Labs regardless of what any single consumer may have believed.

### **Defendants' Response:**

This finding of fact addresses correspondences which Defendants received
from collectors of RR/BAYC NFTs and the views expressed within those
correspondences.  Yuga falsely states that these are "cherry-picked
communications."  Mr. Ripps testified in his declaration: "I received **hundreds of
letters** thanking me for creating the RR/BAYC artwork and for standing up against

a corporation that had used hateful references in its brand" and then went on to give

eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt.

346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this

fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not

cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial

shows that Mr. Ripps received hundreds of letters from RR/BAYC participants

expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that collectors of

RR/BAYC NFTs referred to the project as "art" or to Mr. Ripps's "work."  Ripps

Decl. ¶ 203 (uncontested); JTX-2590.  Instead of addressing correspondences from

collectors, Yuga attempts to point to indications of consumer confusion.  However,

none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For

example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is

an automated software application and not evidence of a real person's confusion.

*See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet

include users identifying that the Mr. Ripps is the source of the NFT not Yuga.

Further, there is no indication that any of the Twitter users commenting actually

reserved an RR/BAYC NFT.  This evidence provides no support for an argument

that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032

(Tweets where the users are quickly identifying Mr. Ripps as the source of the

NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that

there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used.

These exhibits are unsupportive of a finding that there was actual confusion.  For

example, JTX-109 includes a discussion where Mr. Lehman raises concerns about

how the marketplace is designed and may cause confusion.  Mr. Cahen responds

and provides suggestions about what they could do to make it even more clear.

Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*. at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the

issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL
1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police
contact was relevant as background, but not to already decided issue that initial
contact was not excessive force).  This case is just like *Sienze*: the summary
judgment ruling on likelihood of confusion only applies to the issue of infringement
and is not adequate support for a determination of how to apportion disgorgement
of profits attributable to infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated
by profits.  Defendants explained that profits were a concern, but not the primary
motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs
and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).
Defendants' decisions surrounding refunds and royalties confirm that they were not
primarily motivated by profits.  Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);
Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full
refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶
159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers
of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested)
(Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of
confusion. Defendants took multiple steps to make clear that the RR/BAYC
collection was not related to Yuga in any way.  For example, the rrbayc.com
website—through which the majority of RR/BAYC commissions occurred and the
vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)
(uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic
intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen
Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
[Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to
read and click through a disclaimer acknowledging the artistic purpose of the

project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9. As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro,*

1  365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination

2  is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's

3  decision to not cross-examine Mr. Ripps regarding any portion of his declaration

4  means that "principle means" of testing Mr. Ripps credibility weighs decisively in

5  favor of accepting Mr. Ripps's declaration.

6       **Plaintiff's Reply:**

7         Defendants' unreliable communications with purported distributors or

8  purchasers of their infringing products are immaterial.  Defendants have still failed

9  to provide evidence that the purported communications were with "collectors" or

10  that "collectors" were their primary purchasers.  The Court has also already found a

11  likelihood of confusion and these correspondences do not rebut that finding.  SJ

12  Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of

13  allegedly hundreds of e-mails to use as purported evidence of their alleged protest.

14  These attempts to obfuscate the issues are unavailing.

15         As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

16  Defendants' anecdotal evidence of communications with purported purchasers is

17  unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused,

18  post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 37), (3)

19  Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4)

20  Defendants were motivated by an intent to profit (*supra* ¶7), (5) the @0xGem

21  Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms.

22  O'Laughlin's report is reliable and accurate (*Id.*), (7) the Court's summary

23  judgment order establishes Defendants' liability (*Id.*), (8) Defendants' "disclaimer"

24  did not prevent confusion, (*Id.*), (9) most of Defendants' infringing NFTs did not

25  sell on rrbayc.com (*Id.*), (10) the record shows multiple instances of actual

26  confusion (*supra* ¶ 3), (11) Defendants failed to take steps to avoid confusion

27  (*supra* ¶ 33), and (12) the refunds Defendants issued demonstrate consumer

28  confusion (*Id.*).

1   **Defendants' Disputed Post Trial Finding of Fact No. 39:**

2   Collectors of RR/BAYC NFTs intended their purchases to support the

3   project's goals of criticizing Yuga's imagery and educating people about the nature

4   of NFTs. Ripps Decl. ¶¶ 200-201 (uncontested); JTX-2033, JTX-2035, JTX-2039,

5   JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

6   **Plaintiff's Basis for Dispute:**

7   Defendants did not conduct a survey about what "collectors" of RR/BAYC

8   NFTs thought.  Instead, they cherry-picked a handful of emails from a self-selecting

9   group, ignoring the ample confusion on Twitter and other sources that Yuga Labs

10  has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701;

11  JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-

12  1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl.

13  (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341)

14  ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at

15  53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt.

16  416) at ¶¶ 4-7.  Defendants were aware of the confusion. *See, e.g.*, *supra* at ¶ 24

17  (collecting examples).  And Yuga Labs' survey evidence demonstrated significant

18  confusion among consumers who incorrectly believed RR/BAYC was sponsored by

19  or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)

20  ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible

21  evidence to rebut the evidence that consumers believed, or were likely to believe,

22  RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut

23  evidence of initial interest or post-sale confusion.  Moreover, there is no reliable

24  evidence in the record that the individuals identified in the cited emails, or all other

25  purchasers, are "collectors" as Defendants contend.

26  There is a clear likelihood of confusion as well, given Defendants' use of the

27  same marks and images, which the Court already determined.  SJ Order (Dkt. 225)

28  at 10-13.  In any event, actual confusion is not required; and the Court already

found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.
Yuga Labs is thus entitled to Defendants' profits due to their infringing activity
regardless of whether purchasers were actually confused.  *See Levi Strauss & Co. v.
Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion
actionable since use of similar labeling on jeans "is likely to cause confusion among
prospective purchasers who carry even an imperfect recollection of Strauss's mark
and who observe Wrangler's projecting label after the point of sale."); J. Thomas
McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.)
("Infringement can be based upon confusion that creates initial customer interest,
even though no actual sale is finally completed as a result of the confusion.").

Moreover, Defendants' *Rogers* and First Amendment defenses have already
been repeatedly rejected by the Court, which held that "Defendants' sale of
RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at
16.  SJ Order (Dkt. 225) at 15-17; *see also* Dkt. 62 at 6.  And, the Court has already
decided the issue of Defendants' intent, finding that Defendants intentionally
infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-
faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

But, to the extent Defendants seek to relitigate this issue, Defendants'
contention that their infringing NFTs were an art project does not prove it to be
true.  To the contrary, the relevant evidence demonstrates that Defendants intended
to use Yuga Labs' BAYC Marks to profit through their commercial promotion and
sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants'
infringement could not have been in good faith because, even after the Court found
their infringement was likely to cause confusion and was not art protected by
*Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs'
Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And
Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, while Defendants publicly claim there was an artistic goal (to "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment. *See, e.g.*, JTX-1 (Lehman Declaration) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); JTX-801.208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we I make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties). Defendants knew they were stealing from Yuga Labs regardless of what any single consumer may have believed.

Finally, JTX-2589 and JTX-2591 are not in evidence, and not proper for consideration on this issue.

**Defendants' Response:**

This finding of fact addresses correspondences which Defendants received from collectors of RR/BAYC NFTs and the views expressed within those correspondences.  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that collectors purchased RR/BAYC NFTs in order to support the project's goals of criticizing Yuga's imagery and educating people about the nature of NFTs.  Ripps Decl. ¶¶ 200-201 (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion.  *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually

reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*. at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the

1  analysis" and choosing an improper sample population would be a mistake. *Id.* at

2  146:18-25.

3          Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to

4  this Court's summary judgment order. The "law of the case doctrine does not apply

5  to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren,*

6  *792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*

7  *744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete

8  information, don't bind district judges for the remainder of the case. Given the

9  nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*,

10 the Court held that although ***aspects*** of an issue were decided at summary judgment

11 for one purpose, the summary judgment order did resolve the issue generally or as

12 to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D.

13 Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as

14 background, but not to already decided issue that initial contact was not excessive

15 force). This case is just like *Sienze*: the summary judgment ruling on likelihood of

16 confusion only applies to the issue of infringement and is not adequate support for a

17 determination of how to apportion disgorgement of profits attributable to

18 infringement.

19         Fifth, Yuga's citations to *Levi* is inapplicable here, given the evidence shows

20 consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps

21 Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

22 2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does

23 not support a finding that these reservations were made so that the buyer could then

24 confuse someone else in secondary sales. Also, as mentioned above, there is no

25 evidence that anyone who reserved an RR/BAYC NFT, on either initial or

26 secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346)

27 (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202;

28 JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346);

Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr.
[Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Sixth, evidence at trial showed that Defendants were not primarily motivated
by profits.  Defendants explained that profits were a concern, but not the primary
motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs
and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).
Defendants' decisions surrounding refunds and royalties confirm that they were not
primarily motivated by profits.  Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);
Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full
refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶
159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers
of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested)
(Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of
confusion. Defendants took multiple steps to make clear that the RR/BAYC
collection was not related to Yuga in any way.  For example, the rrbayc.com
website—through which the majority of RR/BAYC commissions occurred and the
vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)
(uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic
intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen
Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
[Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to
read and click through a disclaimer acknowledging the artistic purpose of the
project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-
109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps
insisted on these requirement and additional steps so that the artistic purpose of the
work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga.  Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration

means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Defendants withdraw their citations to JTX-2589 and JTX-2591.  This finding of fact is adequately supported by Defendants' other citations.

**Plaintiff's Reply:**

Defendants' unreliable communications with purported distributors or purchasers of their infringing products are immaterial.  Defendants have still failed to provide evidence that the purported communications were with "collectors" or that "collectors" were their primary purchasers.  The Court has also already found a likelihood of confusion and these correspondences do not rebut that finding.  SJ Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of allegedly hundreds of e-mails to use as purported evidence of their alleged protest.  These attempts to obfuscate the issues are unavailing.

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused, post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 32, 33), (3) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4) Defendants were motivated by an intent to profit (*supra* ¶7), (5) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (7) the Court's summary judgment order establishes Defendants' liability (*Id.*), (8) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (9) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), and (12) the refunds Defendants issued demonstrate consumer confusion (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) the evidence Defendants cite do not support their finding of fact.

**Defendants' Evidence Does Not Support Their Finding Of Fact:**

Defendants' evidence does not prove this fact.  As explained *supra* ¶ 3, Defendants' cherry-picked communications with purported purchasers of RR/BAYC NFTs do not rebut the Court's finding of a likelihood of confusion.  SJ Order (Dkt. 225). Unlike Yuga Labs, Defendants have no survey or other expert evidence to support their contention that consumers were not confused.  Indeed, Defendants claim that it is not feasible for Defendants to speak with all or even most of the purchasers of their infringing products and thus they cannot support the statement "[c]ollectors of RR/BAYC NFTs intended their purchases to support the project's goals[.]" Defendants' contention is also rebutted by Ms. O'Laughlin's survey evidence showing that there was up to a 40.4% net confusion rate among consumers. O'Laughlin Decl. (Dkt. 341) ¶¶ 13 (b)-(c).  Defendants also fail to rebut Mr. Solano's testimony that "there's a number of people that bought these that knew that this was a scam and that were buying them to sell them on a secondary market."  Trial Tr. 16:13-15.  Defendants fail to support their finding of fact with evidence admitted at trial.

**Defendants' Disputed Post Trial Finding of Fact No. 40:**

Mr. Ripps was not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (uncontested).

**Plaintiff's Basis for Dispute:**

Mr. Ripps' claim that he was not aware of any instances of confusion is belied by the ample evidence of confusion on Twitter and other sources that Yuga Labs has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt.

341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, *supra* ¶ 24 (collecting examples).  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation.  Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); J. Thomas McCarthy, 2 McCarthy on

Trademarks and Unfair Competition § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**<u>Defendants' Response</u>:**

Yuga's objection is unfounded.  First, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Second, there is ample evidence that there was not consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she

never discerned the strength of the mark. *Id.* at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant". *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is

an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets again quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further this does nothing to undermine this finding of fact, which states that Mr. Ripps is not aware of any actual confusion.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false. The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179 (9th Cir. 2016)*. This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' response is largely inapt. Defendants' internal communications demonstrate that Defendants were aware that their infringement would confuse consumers and refused to take steps to avoid that confusion. Rather than confront this fact, Defendants engage in collateral disputes to obfuscate the issues. These responses should be rejected.

As discussed *supra*, Defendants' responses lack merit. Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (3) Yuga Labs adequately demonstrated that Mr. Cahen lacks credibility (*supra* ¶ 4), (4) Defendants fail to demonstrate that "many"

consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (5) Defendants' assertion that the Bloomberg segment would not cause confusion because both collections were listed lacks credibility (*supra* ¶ 32), (6) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (7) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (8) the Court's summary judgment order establishes Defendants' liability (*Id.*), (9) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (10) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (11) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*supra* ¶ 32), (12) all of Defendants' profits are attributable to their infringement (*supra* ¶ 32), (13) the record shows many instances of actual confusion (*supra* ¶ 3), (14) Defendants used Yuga Labs' marks (*supra* ¶ 32), and (15) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (16) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), and (17) Ape Market existed as a commercial endeavor and the marketplace was ready to launch (*Id.*) .

Additionally, the Court should reject Defendants' responses because, (1) Defendants fail to rebut Yuga Labs' witness testimony, (2) Defendants' fail to support Mr. Ripps' deposition testimony about LooksRare, (3) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation, (4) Defendants fail to rebut the likelihood of post-sale and initial interest confusion, and (5) Defendants' fail to account for ongoing harm.

**Defendants Fail To Rebut Yuga Labs' Witnesses:** Defendants' contention that Yuga Labs' witness testimony was "conclusory" is unfounded.  Indeed, Defendants' contention itself is conclusory as they fail to cite evidence in the record to support their claim.  The Court rejected the vast majority of Defendants' voluminous objections to Yuga Labs' trial declarations, including those made on the basis that the witnesses lacked personal knowledge or were speculating.  *See, e.g.,* Trial Tr. at 69:8-12 (the Court overruling all but three of Defendants' thirty-

eight objections to Ms. Muniz's testimony).  Yuga Labs' witnesses' testimony supports a likelihood that at least some portion of RR/BAYC purchasers were confused.  *See, e.g.,* Solano Decl. ¶ 42 ("Time and time again, Defendants used the BAYC Marks to sell identical-looking NFTs in the exact same markets that Yuga Labs' BAYC NFTs are sold."); *see also* SJ Order (Dkt. 225) at 11-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").  This testimony speaks directly to the likelihood that consumers were confused, and is supported by significant documentary evidence.  JTX-29; JTX-137, JTX-670.  Mr. Solano cited to all of these exhibits in his declaration.  This testimony is not "conclusory," it is well supported and directly on point.

**Defendants Fail To Explain Away Mr. Ripps' Testimony About LooksRare:**  Defendants cannot keep their story straight about where consumers should look to verify their NFTs.  To begin, Mr. Ripps' testimony demonstrates that the LooksRare sales page misidentified Defendants' infringing NFTs as "Bored Ape Yacht Club," so the testimony clearly supports a finding of likelihood of confusion.  *See* Ripps Depo. Designations (Dkt. 396) 290:4-12; *see also Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").  And the full testimony demonstrates that, contrary to Defendants' assertions, they do have the ability to alter the display of Yuga Labs' marks on secondary marketplaces.  *See* Ripps Depo. Designations (Dkt. 396) 289:7-11 ("Q: So you signed in with a wallet to LooksRare, and they permitted you to make changes to the page dedicated to the RR/BAYC NFTs? / A:  The change of this redacted thing, it's something that I have done, yeah/").  ***This testimony directly refutes Defendants' claim that they have no control over the RR/BAYC sales pages on***

***secondary marketplaces.***  *See* Dkt. 419-1 ¶ 55 ("Mr. Ripps and Mr. Cahen had no control over and no affiliation with those third-parties who auto-generated "Bored Ape Yacht Club V3" or "BAYC V3."); *see also* Ripps Depo. Designations (Dkt. 396) at 81:7-8, 81:22-82:7 (admitting to changing the OpenSea marketplace page for RR/BAYC NFTs).  Defendants could have taken steps to make their secondary marketplace pages less confusing, but they chose not to.

Further, as discussed *supra* ¶ 32, even if a consumer were to navigate to Etherscan to verify their NFTs they would still be confused.  *See* JTX-117 (Etherscan screenshot showing "Bored Ape Yacht Club" and "BAYC" as token tracker and contract name respectively).  By Defendants' own admission, consumers should look to the immutably infringing Etherscan page to verify their NFTs, thus highlighting the importance of an injunction that would transfer control of that contract to Yuga Labs.  Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

**Confusion Over Sponsorship Or Affiliation Is Actionable:**  Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship.  Regardless of whether a consumer who watched the Bloomberg piece thought that "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" were the same *product*, their confusion as to whether they originated from the same *company* or were sponsored or affiliated with the same company is nonetheless actionable.  JTX-701.  The Lanham Act expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the ***affiliation, connection, or association*** of such person with another person, or as to the or as to the origin, ***sponsorship, or approval*** of his

or her goods[.]"  15 U.S.C. § 1125(a)(1)(A) (emphases added).  And such confusion
was likely, as the Court has already ruled, due to the unaltered display of Yuga
Labs' marks.  SJ Order (Dkt. 225) at 13.  Defendants' argument that there is no
likelihood of confusion because of the Bloomberg video is not in good faith.

**Post Sale And Initial Interest Confusion Support A Likelihood Of
Confusion:**  Actual confusion is not required; and the Court already found
Defendants' use of BAYC Marks to be infringing because it created a likelihood of
confusion.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants'
profits due to their infringing activity—the use of the BAYC Marks—regardless of
whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.,*
*868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012)* (granting defendant's profits even
where infringement claims premised solely on post-sale confusion where a
"potential purchaser, knowing that the public is likely to be confused or deceived
by the allegedly infringing product, [] choose[s] to purchase that product instead of
a genuine one"); *Levi Strauss & Co. v. Blue Bell, Inc.*, *632 F.2d 817, 822 (9th Cir.*
*1980)* (finding post-sale confusion actionable since use of similar labeling on jeans
"is likely to cause confusion among prospective purchasers who carry even an
imperfect recollection of Strauss's mark and who observe Wrangler's projecting
label after the point of sale."); *see also* J. Thomas McCarthy, 2 McCarthy on
Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages
trademark holders because "consumers could acquire the prestige value of the
senior user's product by buying the copier's cheap imitation.  Even though the
knowledgeable buyer knew that it was getting an imitation, viewers would be
confused.").  Indeed, Defendants fail to confront the fact that initial interest
confusion is actionable "even though no actual sale is finally completed as a result
of the confusion."  J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair
Competition § 23:6 (5th ed.).  Defendants offer only a handful of cherry-picked
communications support their argument, but Defendants cannot feasibly determine

1   how many potential consumers were lured in by their confusing and infringing

2   products.  SJ Order (Dkt. 225) at 13.

3          Defendants also offer only self-serving, anecdotal evidence of

4   communications with purported purchasers of RR/BAYC NFTs to support their

5   claim that consumers were purchasing the infringing NFTs as a "protest."  As

6   explained *supra* ¶ 3, this evidence should be given little weight.  That consumers,

7   or here distributors, were purchasing Defendants' NFTs with the expectation to

8   resell them is supported by the fact that "the vast majority of [sales] are occurring in

9   secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also*

10  *id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that

11  knew this was a scam and that were buying them to sell them on a secondary

12  market.").  Defendants cannot rebut this argument.

13         **Defendants Fail To Account For Ongoing Harm:**  Regardless of how

14  much Defendants profited off the sale of their infringing NFTs on secondary

15  marketplaces, the fact remains that Yuga Labs continues to suffer ongoing harm.

16  Indeed, Yuga Labs will only be made whole by an injunction that orders the

17  transfer of the immutably infringing smart contract.  Trial Tr. 134:4-7 ("In this

18  particular instance, upon inspection of the Foundation smart contract that was used

19  to deploy the RR/BAYC smart contract, it's evident that these are not mutable

20  fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless

21  Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be

22  forever tied to Mr. Ripps").  Defendants' citation to the profits calculation of Yuga

23  Labs' own witness does nothing to rebut this ongoing harm or militate against a

24  sufficient injunction.

25  **Defendants' Disputed Post Trial Finding of Fact No. 41:**

26         Mr. Cahen was not aware of a single instance of actual confusion. Trial Tr.

27  [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224.

28

**Plaintiff's Basis for Dispute:**

Mr. Cahen's claim that he was not aware of any instances of confusion is belied by the ample evidence of confusion on Twitter and other sources that Yuga Labs has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Indeed, Mr. Cahen was confused when he misidentified an RR/BAYC NFT holder's profile picture on Twitter as a BAYC NFT.  JTX-722 (Berger Report) ¶ 74(iv).  He and Mr. Ripps were also warned about the likelihood of consumer confusion.  *See, e.g.*, *supra* ¶ 9 (collecting examples).  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13.  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion

where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation.  Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**Defendants' Response**:

Yuga's objection is unfounded.  First, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Yuga cites to a portion of Dr. Berger's report that cites to YUGALABS_00002708 to support their assertion that Mr. Cahen was confused about the source of a Twitter user's profile picture.  This is incorrect.  Dr. Berger's report fails to include the entirety of that Twitter thread.  In the thread, Mr. Cahen says that a Twitter user has "a racist monkey pfp."  The user responds and states that their pfp is from an RR/BAYC NFT and asks then "Is my pfp racist?"  Mr. Cahen responds, "Yes.  The iconography of BAYC is racist and Nazi. Full Stop. We use NFTs as a means to draw attention to that." *See* excerpt below.  As the full

1   context of the Twitter thread makes clear, Mr. Cahen never was confused about the

2   origin of the Twitter users pfp nor did he think it was from a BAYC NFT.  Instead,

3   Mr. Cahen's comment about the pfp being racist was based on the issues he sees in

4   BAYC's imagery, which RR/BAYC use as part of their protest and conceptual art.

5

6

7   

8

9

10

11

12

13

14

15

16

17       Second, there is ample evidence that there was no consumer confusion.

18   Defendants took multiple steps to make clear that the RR/BAYC collection was not

19   related to Yuga in any way.  For example, the rrbayc.com website—through which

20   the majority of RR/BAYC commissions occurred and the vast majority of alleged

21   profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144

22   (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

23   Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344),

24   147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors

25   using the rrbayc.com website were also required to read and click through a

26   disclaimer acknowledging the artistic purpose of the project before they were

27   allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

28

1  (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

2  requirement and additional steps so that the artistic purpose of the work would be

3  clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

4  was the artist statement ultimately included, if it had a negative impact on usability?

5  … A.   … Ryder wanted it and so he had the final call.").

6          Unsurprisingly, therefore, the evidence presented at trial shows that many

7  people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See*

8  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,

9  JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

10          Third, the evidence Yuga cites to is not supportive of a finding that there was

11  consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

12  O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

13  flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged

14  that she used an overly expansive definition of the market that included people who

15  did not have any interest in purchasing an NFT, much less knowledge of what an

16  NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification

17  flow); 152:4-10.  She acknowledged that she changed the survey population after

18  running pretests to make it more inclusive.  *Id*. at 144:25-146:7.  Ms. O'Laughlin

19  also acknowledged that she lacked basic knowledge about the NFT market,

20  admitting to erroneously believing that cryptocurrency was an NFT when she

21  formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of

22  knowledge was an inherently flawed survey that could not show confusion because

23  the market was too broad.  This was despite her acknowledgement that choosing the

24  right sample population "matters for the analysis" and choosing an improper sample

25  population would be a mistake.  *Id.* at 146:18-25.

26          Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

27  she authored an article titled, "Which Method is For You? Not All Surveys Are

28  Made the Same" JTX-314.  In that article she discusses choosing between the

Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id*. at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant".  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate.  *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence that they purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program

and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl.
¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and
credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing
case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's
case against Mr. Lehman, JTX-621, which is immaterial to this matter and again
was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how
the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.
Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to
support a finding of confusion given the ability of any consumer to determine the
provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt.
346) (uncontested).  Further, this does not undermine this finding of fact or show
that anyone that reserved an RR/BAYC NFT was confused.

Finally, Yuga cites to its own declarations and trial testimony where their
witnesses make conclusory and unfounded statements about possible confusion.
*See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin
Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial
Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however,
that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible
evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.
This is categorically false.  The evidence presented at trial shows that many people
who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps
Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample
evidence presented at trial that showed consumers were not confused about the
source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout.  *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179 (9th Cir. 2016)*.  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's

marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id.*  And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' response is largely inapt.  Defendants' internal communications demonstrate that Defendants were aware that their infringement would confuse consumers and refused to take steps to avoid that confusion.  Rather than confront this fact, Defendants engage in collateral disputes to obfuscate the issues.  These responses should be rejected.

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (3) Yuga Labs adequately demonstrated that Mr. Cahen lacks credibility (*supra* ¶ 4), (4) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (5) Defendants' assertion that the Bloomberg segment would not cause confusion because both collections were listed lacks credibility (*supra* ¶ 32), (6) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (7) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (8) the Court's summary judgment order establishes Defendants' liability (*Id.*), (9) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (10) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (11) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*supra* ¶ 32), (12) all of Defendants' profits are attributable to their infringement (*supra* ¶ 32), (13) the record shows multiple instances of actual confusion (*supra* ¶ 3), (14) Defendants used Yuga Labs  marks (*supra* ¶ 32), (15) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (16) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (17) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (18) Defendants fail to rebut Yuga Labs' witness's testimony (*Id.*), (19) Defendants fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*), (20) Defendants fail to rebut the likelihood of post-sale confusion (*Id.*), and (21) Defendants fail to account for ongoing harm (*Id.*).

Additionally, The Court should reject Defendants' responses because (1) Defendants' misrepresent Mr. Cahen's Twitter exchange with @SachDana.

**Defendants Misrepresent Mr. Cahen's Twitter Exchange With @SachDana:**  Mr. Cahen was confused by @SachDana's RR/BAYC profile picture.  The initial exchange confirms this; Mr. Cahen was arguing with

@SachDana and when things did not go his way, he accused the user of having a "racist monkey pfp."  Defendants now contend that Mr. Cahen was aware that it was an RR/BAYC NFT, but that would mean that Mr. Cahen was calling out purportedly racist iconography in his own NFTs.  This explanation lacks credibility.  It is implausible to accept that Defendants actively marketed and profited from their infringing NFTs, but found their display offensive.  Indeed, Mr. Ripps himself used his RR/BAYC NFT as his profile picture on Twitter.  *See* JTX-132.  Mr. Cahen was not "drawing attention" to anything.  He was trying to attack @SachDana for disagreeing with his posthumous critique of the Queen.  Defendants' attempt to avoid this conclusion is not credible.

**Defendants' Disputed Post Trial Finding of Fact No. 42:**

Mr. Hickman was not aware of a single instance of actual confusion. Trial Tr. [Hickman] 219:13-19.

**Plaintiff's Basis for Dispute:**

Mr. Hickman's claim that he was not aware of any instances of confusion is belied by the ample evidence of confusion on Twitter and other sources that Yuga Labs has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Indeed, Mr. Hickman was confused by Mr. Ripps' use of the BAYC Marks when he misidentified the RR/BAYC sales page on Foundation as "Bored Ape Yacht Club."  Trial Tr. at 213:4-14; Hickman Deposition at 149:24-150:10; Dkt. 415.  He and Defendants were aware of the confusion.  *See, e.g.*, *supra* ¶ 24 (collecting examples).  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was

sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin

Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any

admissible or credible evidence to rebut the evidence that consumers believed, or

were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs,

nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the

same marks and images, which the Court already determined.  SJ Order (Dkt. 225)

at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th

Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and

'hardly ever find their way into the appellate reports' because liability is 'open and

shut.'").  In any event, actual confusion is not required; and the Court already found

Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

*Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

profits even where infringement claims premised solely on post-sale confusion

where a "potential purchaser, knowing that the public is likely to be confused or

deceived by the allegedly infringing product, [] choose[s] to purchase that product

instead of a genuine one"); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d

817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar

labeling on jeans "is likely to cause confusion among prospective purchasers who

carry even an imperfect recollection of Strauss's mark and who observe Wrangler's

projecting label after the point of sale.").

**Defendants' Response:**

Yuga's objection is unfounded.  First, as Mr. Hickman credibly testified, he

is not aware of a single instance of actual confusion.  Trial Tr. [Hickman] 219:13-

19 ("Q Are you aware of anyone whoever obtained an RR/BAYC from Foundation

believing that it was sponsored by Yuga? A Absolutely not. Q Were are you aware

of anyone who ever received an RR/BAYC from anywhere believing it was sponsored by Yuga? A No.").  Buttressing this fact, Mr. Ripps, Mr. Cahen, and Yuga's founders were also not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Second, there is ample evidence that there was not consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  See Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  See Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  See Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Yuga misleadingly cites to a portion of Mr. Hickman's deposition and trial testimony to support their assertion that he was confused and misidentified the RR/BAYC sales page on Foundation.  This is inaccurate.  As Mr. Hickman credibly testified at trial, he was not confused, and his deposition video shows him reviewing and describing all portions of the exhibit. Trial Tr. [Hickman] 219:3-12 ("Q Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page or a page by Mr. Ripps? A I was not confused. The video shows me describe all of the aspects of the page real time. Q And were you—what was your level of confidence that this Foundation page that you were shown at your deposition was indeed a page for the RR/BAYC collection? A It was that it was actually Ryder's creator page for the RR/BAYC collection.").

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

1   fundamentally flawed, she can attest to confusion on two websites for only a matter

2   of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this

3   Court should reject them and provide them no weight.

4        Further, this unreliable survey evidence, again does not show that anyone

5   who actually reserved an RR/BAYC NFT was confused about its origin and,

6   therefore, does not undermine the accuracy of this finding of fact.

7        Secondly, the documentary evidence Yuga cites to is unsupportive. For

8   example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is

9   an automated software application and not evidence of a real person's confusion.

10  *See* Cahen Decl. ¶¶ 226-227. bThe very first comments included on that tweet

11  include users identifying that Mr. Ripps is the source of the NFT not Yuga.

12  Further, there is no indication that any of the Twitter users commenting actually

13  reserved an RR/BAYC NFT. This evidence provides no support for an argument

14  that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets where

15  users are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-

16  1035 (Out of context one off tweets of users, that there is no evidence to believe

17  purchased an RR/BAYC NFT, replying to GemBot).

18       Yuga also cites to private chats that the RR/BAYC creators used. These

19  exhibits are unsupportive of a finding that there was actual confusion. For example,

20  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

21  marketplace is designed and may cause confusion. Mr. Cahen responds and

22  provides suggestions about what they could do to make it even more clear. Further,

23  this chat focused on the creation of ApeMarket, which never was launched and

24  could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-

25  262; *see also* JTX-801.185 (again including a discussion about how to make

26  ApeMarket clearer).

27       Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit

28  does not support a finding of actual confusion. The chart separately lists both

1   "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the

2   anchor understood that these were two different projects.  Additionally, as Mr.

3   Cahen testified, he is not aware of anyone who watched the Bloomberg program

4   and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl.

5   ¶ 252.

6       Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

7   credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

8   case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

9   case against Mr. Lehman, JTX-621, which is immaterial to this matter and again

10  was entered after Mr. Lehman settled his own case with Yuga.

11      Yuga also cites to Mr. Ripps's deposition transcript where he discusses how

12  the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

13  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to

14  support a finding of confusion given the ability of any consumer to determine the

15  provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt.

16  346) (uncontested).  Further, this does not support a finding that this fact is

17  inaccurate and does not prove that anyone who reserved an RR/BAYC NFT was

18  confused about its origin.

19      Finally, Yuga cites to its own declarations and trial testimony where their

20  witnesses make conclusory and unfounded statements about possible confusion.

21  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin

22  Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial

23  Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however,

24  that anyone who bought an RR/BAYC NFT was actually confused.

25      Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible

26  evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

27  This is categorically false.  The evidence presented at trial shows that many people

28  who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps

Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,*

982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* and *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' response is largely inapt. Defendants' internal communications, and Mr. Hickman's reaction to Defendants' Foundation page, demonstrate that

Defendants were aware that their infringement would confuse consumers and refused to take steps to avoid that confusion.  Rather than confront this fact, Defendants engage in collateral disputes to obfuscate the issues.  These responses should be rejected.

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (3) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (4) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (5) Defendants' assertion that the Bloomberg segment would not cause confusion because both collections were listed lacks credibility (*supra* ¶ 32), (6) the Court's summary judgment order establishes Defendants' liability (*Id.*), (7) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (8) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (9) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*Id.*), (10) all of Defendants' profits are attributable to their infringement (*Id.*), (11) the record shows multiple instances of actual confusion (*supra* ¶ 3), (12) Defendants used Yuga Labs  marks (*supra* ¶ 32), (13) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (14) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (15) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (16) Defendants fail to rebut Yuga Labs' witness testimony (*supra* ¶40), (17) Defendants fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*), (18) Defendants fail to account for ongoing harm (*Id.*).

Additionally, The Court should reject Defendants' responses because (1) Mr. Hickman was aware of at least one instance of actual confusion—his own.

**Mr. Hickman Was Aware That Defendants' Infringement Was Confusing Because He Himself Was Confused:**  Mr. Hickman was clearly

confused when he viewed Defendants' infringing Foundation webpage.  When asked to identify the source of the NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he paused for around five seconds, examined the page closely and stated that the page "looks to be Bored Ape Yacht Club."  Trial Tr. 213:9-13 (lodged at Dkt. 415); *id.*  His body language and demeanor showed that, after this examination, Mr. Hickman genuinely believed that he was looking at a Bored Ape Yacht Club sales page.  It was only after around fifteen seconds of a second, long, pause and closer examination that Mr. Hickman amended his answer and identified the page as Defendants' infringing website.  Dkt. 415.  Mr. Hickman's testimony at trial that he was not confused lacks credibility in light of his testimony and his demeanor when giving his deposition testimony.  His self-serving denial contradicts what was clear in his video-taped deposition and at trial.  Dkt. No. 415 (notice of lodging of video testimony); Trial Tr. 213:13.  Mr. Hickman's bias explains why he would falsely deny his confusion:  if even an insider like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on Defendants' marketplace page, the "nonexpert, nontechnical public" stood no chance when presented with Defendants' scam.  Trial Tr. at 135:18-19.

Mr. Hickman is not credible, so his testimony that he was not confused should be given no weight.  *See supra* ¶ 7.  And Mr. Hickman's recent sworn statements in the related lawsuit against him demonstrate that he is not a credible witness, and that he is willing to lie under oath where it best serves him.  In Yuga Labs' lawsuit against Mr. Hickman that is currently pending in the District of Nevada, Mr. Hickman makes false representations to the court and disclaims his role as one of the lead developers in the RR/BAYC scam.  Specifically, in an effort to vacate the default judgment entered against him, Mr. Hickman states under oath, "I previously provided testimony in the *Yuga Labs, Inc., v. Ryder Ripps, Jeremy Cahen*, Case No. 2:22-cv-04355-JFW-JEM (C.D. Cal. 2022) case that my only involvement in the websites located at the domain names <rrbayc.com> and

<apemarket.com> ('Domain Names') included making some contributions to the 'RSVP Smart Contract.'"). Hickman Decl. ISO Reply to Motion to Vacate Default Judgment (Dkt. 38-1), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Sept. 20, 2023), at ¶ 3.

This statement is demonstrably false and directly contradicted by the record in this case. In Mr. Hickman's prior testimony before *this* Court, he claimed to be a major contributor to the development and implementation of the RR/BAYC and Ape Market websites. *See* Hickman Depo. Designations (Dkt. 394) at 42:17-19 ("[T]he smart contract coders and website developers in that context is myself and Tom."). *See also*, Hickman Decl. (Dkt. 345) ¶ 69 ("I also helped Mr. Ripps by working on developing the rrbayc.com website, which was where collectors would be able to use the RSVP program to make reservations."); ¶ 70 ("Mr. Ripps explained what he wanted the rrbayc.com website to look like, and I did my best to implement his creative vision."). Mr. Hickman's blatant contradictions and willingness to lie for personal gain demonstrate his lack of credibility as a witness and render his declaration unreliable.

**Defendants' Disputed Post Trial Finding of Fact No. 43:**

Yuga was unable to identify even a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

**Plaintiff's Basis for Dispute:**

As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16. Nonetheless, Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376;

JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo.
Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76;
Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano
Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga
Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.
Defendants were aware of the confusion.  *See, e.g.*, *supra* at ¶ 24 (collecting
examples).  And Yuga Labs' survey evidence demonstrated significant confusion
among consumers who incorrectly believed RR/BAYC was sponsored by or
affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶
13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible
evidence to rebut the evidence that consumers believed, or were likely to believe,
RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut
evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the
same marks and images, which the Court already determined.  SJ Order (Dkt. 225)
at 10-13.  In any event, actual confusion is not required; and the Court already
found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.
Yuga Labs is thus entitled to Defendants' profits due to their infringing activity
regardless of whether purchasers were actually confused.  J. Thomas McCarthy, 2
McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale
confusion damages trademark holders because "consumers could acquire the
prestige value of the senior user's product by buying the copier's cheap imitation.
Even though the knowledgeable buyer knew that it was getting an imitation,
viewers would be confused.").

**Defendants' Response:**

Yuga's objection is unfounded.  First, there is ample evidence that there was
not consumer confusion. Defendants took multiple steps to make clear that the
RR/BAYC collection was not related to Yuga in any way.  For example, the

rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

To help explain why no one in this case has been able to identify a single person who reserved an RR/BAYC NFT because they were confused about its origin, Yuga cites to testimony from Mr. Solano, a lay person, that he thinks people

may be embarrassed to admit they were confused.  The weight of Mr. Solano's
undocumented and unsupported beliefs is negligent.  Further, said beliefs do
nothing to combat the accuracy of this finding of fact, which is that Yuga has not
been able to identify any instance of actual confusion.

Third, the evidence Yuga cites to is not supportive of a finding that there was
consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.
O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two
flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged
that she used an overly expansive definition of the market that included people who
did not have any interest in purchasing an NFT, much less knowledge of what an
NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification
flow); 152:4-10.  She acknowledged that she changed the survey population after
running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin
also acknowledged that she lacked basic knowledge about the NFT market,
admitting to erroneously believing that cryptocurrency was an NFT when she
formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of
knowledge was an inherently flawed survey that could not show confusion because
the market was too broad.  This was despite her acknowledgement that choosing the
right sample population "matters for the analysis" and choosing an improper sample
population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020
she authored an article titled, "Which Method is For You? Not All Surveys Are
Made the Same" JTX-314.  In that article she discusses choosing between the
Squirt and Eveready surveys on the basis of the strength of the mark.  In this case,
however, she ignored her own advice and operated both surveys.  This was despite
acknowledging that at deposition she agreed with her earlier advice that the
Eveready survey is most appropriate when the mark is strong, and the Squirt survey
when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she

never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id*. at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id*. at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is

an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227.  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate.  *See also* JTX-1030, JTX-1032 (Tweets where users are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion.  For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Further, this does not undermine this finding of fact that Yuga was not able to identify anyone who reserved an RR/BAYC NFT that was confused about its origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.

Also, the website for the project, rrbayc.com, used the modified "RR/BAYC"

throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this

Court's summary judgment order.  The "law of the case doctrine does not apply to

pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren,*

*792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*

*744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete

information, don't bind district judges for the remainder of the case.  Given the

nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*,

the Court held that although ***aspects*** of an issue were decided at summary judgment

for one purpose, the summary judgment order did resolve the issue generally or as

to other topics.  *See No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D.*

*Cal. Mar. 25, 2019)* (holding that evidence of initial police contact was relevant as

background, but not to already decided issue that initial contact was not excessive

force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of

confusion only applies to the issue of infringement and is not adequate support for a

determination of how to apportion disgorgement of profits attributable to

infringement.

Seventh, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

profits, which is something Defendants argue they are not, Yuga can only receive

profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,*

*982 F.2d 1400, 1408 (9th Cir. 1993),* abrogated on other grounds by *SunEarth, Inc.*

*v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179 (9th Cir. 2016)*.  This requires

distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

protest against Yuga (and were thus not confused about Defendants' use of Yuga's

marks) and revenue from purchasers who mistakenly believed they were purchasing

Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Finally, Mr. Solano's testimony was not credible given the many false and misleading statements contained in his declaration, as well as his repeated impeachment at trial.  For example, Mr. Solano was also forced to concede on cross-examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know

whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Reply:**

Defendants repetitive and non-responsive briefing should be rejected.  As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (3) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (4) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (5) the Court's summary judgment order establishes Defendants' liability (*Id.*), (6) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (7) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (8) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*Id.*), (9) all of Defendants' profits are attributable to their infringement (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants used Yuga Labs' marks (*supra* ¶ 32), (12) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (13) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (14) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (15) Defendants fail to rebut Yuga Labs' witness testimony (*supra* ¶40), and (16) Defendants fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) Mr. Solano is a credible witness and his testimony is supported by Yuga Labs' experts, and (2) Defendants' testimony that they were unaware of the confusion lacks credibility.

**Mr. Solano's Accurate Testimony Is Supported By Yuga Labs Experts:**

Mr. Solano is credible for the reasons discussed *supra* ¶ 3.  Additionally,

Defendants' attempts to impeach Mr. Solano in these responses fall short. Defendants' repetitive and non-responsive questioning of Mr. Solano did not impeach his testimony. *See* Trial Tr. at 34:9-19 ("Q: Do you know whether Ape Market exists? / A: We have the code for Ape Market from Tom Lehman, yes. / Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? / A Yes"). This does not impeach Mr. Solano, it merely demonstrates that as the case progressed and new information was discovered, it became evident to Mr. Solano that Ape Market does in fact exist as a marketing platform, and the marketplace was ready to launch. *See* Atalay Decl. (Dkt. 337) ¶ 9; *see also* JTX-807; JTX-808. Mr. Atalay confirmed this fact in his trial testimony. Trial Tr. at 137:23-24 ("The code was in such a state of completion that it was operational."). That Mr. Solano's testimony evolved as new facts were discovered is unremarkable.

Mr. Solano's experience as the President of the company that created the most successful NFT project of all time allowed him to testify as to his own experience that consumers are hesitant to admit to being scammed. The Court will weigh the value of Mr. Solano's testimony in light of this personal knowledge. Nevertheless, Yuga Labs offered survey expert testimony to support its witnesses' lay-testimony. Yuga Labs' experts testified to the confusion in the marketplace. *See* O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14 (finding confusion based on survey evidence); Berger Decl. (Dkt. 339) ¶¶ 71-76 (outlining instances of confusion in the marketplace). Defendants again do nothing to discredit Mr. Solano's testimony.

**Defendants' Witnesses Are Not Credible:** Defendants' witnesses are not credible for the reasons discussed *supra* ¶ 7. Defendants' testimony that they were unaware of instances of confusion lacks credibility and is contradicted by evidence admitted at trial. *See supra* ¶ 3; *see also* JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark");

1   JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the

2   collections coexist" because "they are the same art" and "same logos").  Indeed, as

3   discussed *supra* ¶ 43, even Mr. Hickman was confused by Defendants'

4   infringement.  Trial Tr. 213:9-13 (lodged at Dkt. 415) (Mr. Hickman testifying

5   "looks to be Bored Ape Yacht Club" when viewing Defendants' Foundation page).

6   **Defendants' Disputed Post Trial Finding of Fact No. 44:**

7        Gregory Solano, Yuga's President, could not identify a single person who

8   ever bought an RR/BAYC made by Ryder Ripps believing it was a Yuga NFT.

9   Trial Tr. [Solano] 18:23-19:1.

10  **Plaintiff's Basis for Dispute:**

11       As Mr. Solano explained, being scammed is "super embarrassing" and

12  consumers who were tricked "weren't going to, you know, raise their hand and

13  shout about it."  Trial Tr. at 54:10-16.  Nonetheless, Yuga Labs produced ample

14  documentary and testimonial evidence demonstrating consumer confusion.  SJ

15  Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376;

16  JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo.

17  Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76;

18  Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano

19  Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga

20  Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.

21  Defendants were aware of the confusion.  *See, e.g.*, *supra* at ¶ 24.  And Yuga Labs'

22  survey evidence demonstrated significant confusion among consumers who

23  incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.

24  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81,

25  82. Defendants do not offer any admissible or credible evidence to rebut the

26  evidence that consumers believed, or were likely to believe, RR/BAYC was

27  affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial

28  interest or post-sale confusion.

1    There is a clear likelihood of confusion as well, given Defendants' use of the

2    same marks and images, which the Court already determined.  SJ Order (Dkt. 225)

3    at 10-13.  In any event, actual confusion is not required; and the Court already

4    found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.

5    Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

6    regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

7    *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

8    profits even where infringement claims premised solely on post-sale confusion

9    where a "potential purchaser, knowing that the public is likely to be confused or

10   deceived by the allegedly infringing product, [] choose[s] to purchase that product

11   instead of a genuine one").

12   **Defendants' Response**:

13   Yuga's objection is unfounded.  First, there is ample evidence that there was

14   no consumer confusion.  Defendants took multiple steps to make clear that the

15   RR/BAYC collection was not related to Yuga in any way.  For example, the

16   rrbayc.com website—through which the majority of RR/BAYC commissions

17   occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt.

18   346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the

19   artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

20   Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial

21   Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required

22   to read and click through a disclaimer acknowledging the artistic purpose of the

23   project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

24   109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

25   insisted on these requirement and additional steps so that the artistic purpose of the

26   work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

27   60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

28   impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

To help explain why no one in this case has been able to identify a single person who reserved an RR/BAYC NFT because they were confused about its origin, Yuga cites to testimony from Mr. Solano, a lay person, that he thinks people may be embarrassed to admit they were confused.  The weight of Mr. Solano's undocumented and unsupported beliefs is negligent.  Further, said beliefs do nothing to combat the accuracy of this finding of fact, which is that Mr. Solano has not been able to identify any instance of actual confusion.

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin to demonstrate confusion.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id*.

at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla

1   Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.

2   Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat

3   Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.

4   Ms. O'Laughlin admitted that she did not account for this extreme priming effect

5   calling it "not particularly relevant."  *Id.* at 158:20-159:1.

6       Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long

7   the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

8   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

9   fundamentally flawed, she can attest to confusion on two websites for only a matter

10  of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this

11  Court should reject them and provide them no weight.

12      Further, this unreliable survey evidence, again does not show that anyone

13  who actually reserved an RR/BAYC NFT was confused about its origin and,

14  therefore, does not undermine the accuracy of this finding of fact.

15      Secondly, the documentary evidence Yuga cites to is unsupportive. For

16  example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is

17  an automated software application and not evidence of a real person's confusion.

18  *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet

19  include users identifying that Mr. Ripps is the source of the NFT not Yuga.

20  Further, there is no indication that any of the Twitter users commenting actually

21  reserved an RR/BAYC NFT.  This evidence provides no support for an argument

22  that this finding of fact is inaccurate.  *See also* JTX-1030, JTX-1032 (Tweets again

23  quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out

24  of context one off tweets of users, that there is no evidence to believe purchased an

25  RR/BAYC NFT, replying to GemBot).

26      Yuga also cites to private chats that the RR/BAYC creators used.  These

27  exhibits are unsupportive of a finding that there was actual confusion.  For example,

28  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion.  Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.  Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further, this does not support a finding that anyone who reserved an RR/BAYC NFT was confused about its origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin

1   Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial

2   Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however,

3   that anyone who bought an RR/BAYC NFT was actually confused.

4         Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible

5   evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

6   This is categorically false.  The evidence presented at trial shows that many people

7   who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps

8   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

9   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample

10  evidence presented at trial that showed consumers were not confused about the

11  source of the RR/BAYC NFTs.

12        Fifth, Yuga's objection is inaccurate given Defendants used modified

13  versions of the alleged BAYC Marks in their reservations.  For example, the logo

14  used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.

15  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC"

16  throughout. *Id.*

17        Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this

18  Court's summary judgment order.  The "law of the case doctrine does not apply to

19  pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren,*

20  *792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*

21  *744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete

22  information, don't bind district judges for the remainder of the case.  Given the

23  nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz,*

24  the Court held that although ***aspects*** of an issue were decided at summary judgment

25  for one purpose, the summary judgment order did resolve the issue generally or as

26  to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D.

27  Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as

28  background, but not to already decided issue that initial contact was not excessive

force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citation to *Gucci* is inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable

to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309.  *See* Dkt. 418-1 at 6.

Finally, Mr. Solano's testimony was not credible given the many false and misleading statements contained in his declaration, as well as his repeated impeachment at trial.  For example, Mr. Solano was also forced to concede on cross-examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market

exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Reply:**

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (3) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (4) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (5) the Court's summary judgment order establishes Defendants' liability (*Id.*), (6) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (7) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (8) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*Id.*), (9) all of Defendants' profits are attributable to their infringement (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants used Yuga Labs' marks (*supra* ¶ 32), (12) Defendants failed to steps to avoid confusion (*supra* ¶ 33), (13) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (14) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (15) Defendants fail to rebut Yuga Labs' witness's testimony (*Id.*), (16) Defendants' fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*), and (17) Mr. Solano is a credible witness and his testimony is supported by Yuga Labs' experts (*supra* ¶¶ 3, 44).

Additionally, the Court should reject Defendants' responses because (1) evidence admitted at trial demonstrates that Defendants were apathetic to the likelihood of confusion.

**Defendants Were Aware Of Confusion But Chose Not To Act:**  The

evidence shows that Defendants were aware of confusion for the reasons discussed *supra* ¶ 7.  Defendants' internal communications demonstrate that, despite this knowledge, they were apathetic to consumer confusion.  *See* JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").  Indeed, Defendants were warned by their attorney that they needed to make changes to their infringing products in order to avoid confusion.  *See* JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark").  Yet Defendants still used Yuga Labs' unaltered marks on, among other places, their Foundation page and in the RR/BAYC smart contact, despite the warning from their attorney.  JTX-28.  Defendants cannot now claim ignorance when they were warned, repeatedly, by their attorney and their co-conspirators that their infringing NFTs were confusing.

**Defendants' Disputed Post Trial Finding of Fact No. 45:**

No sales of RR/BAYC NFTs were the result of actual consumer confusion.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Basis for Dispute:**

Defendants offer no evidence to support this contention and Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants did not introduce a single piece of expert testimony or other market analysis.  They do not have a survey of or even communications from the majority of purchasers.  Instead, they have admitted that a substantial number of purchasers demanded a refund.  Ripps Decl. (Dkt. 346) ¶¶ 119, 170, 172, 174-175.

At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16. Even more, Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused. J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation. Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**Defendants' Response:**

Yuga's objection is unfounded.  First, there is ample evidence that there was
no consumer confusion. Defendants took multiple steps to make clear that the
RR/BAYC collection was not related to Yuga in any way.  For example, the
rrbayc.com website—through which the majority of RR/BAYC commissions
occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt.
346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the
artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);
Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial
Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required
to read and click through a disclaimer acknowledging the artistic purpose of the
project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-
109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps
insisted on these requirement and additional steps so that the artistic purpose of the
work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-
60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative
impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many
people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See*
Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,
JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  This evidence of
purchasers of RR/BAYC NFTs motivations for reserving the art is credible and
convincing and undermines Yuga's objections here stating that this evidence is
insufficient.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not
aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346)
(uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).
Buttressing this fact, Yuga's founders were also not aware of a single instance of

actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

let's focus on, I think, what you were focused on. Yuga Labs has been unable to

identify even[] a single person who purchased an RR/BAYC believing it to be

sponsored by Yuga Labs; right? A Correct.").

      To try to undermine this finding of fact, Yuga cites to Mr. Ripps's

declaration's discussion of offering refunds for the RR/BAYC NFTs to support an

argument that some of those refunds came from consumers that were confused

about the NFT's origin.  This is inaccurate and unfounded speculation.  As Mr.

Ripps's declaration makes clear, he instituted a refund policy for the RR/BAYC

NFTs as they are commissioned works of art and he wanted to ensure that every

person that received one was happy with the work they got.  Ripps Decl. ¶ 121

(Dkt. 346) (uncontested).  Further, Mr. Ripps's testimony undermines Yuga's

assertions here completely as he also testified that he never received a refund

request from anyone stating they were confused or thought that they were reserving

a Yuga product. Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

      Third, the evidence Yuga cites to is not supportive of a finding that there was

consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged

that she used an overly expansive definition of the market that included people who

did not have any interest in purchasing an NFT, much less knowledge of what an

NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification

flow); 152:4-10.  She acknowledged that she changed the survey population after

running pretests to make it more inclusive.  *Id*. at 144:25-146:7.  Ms. O'Laughlin

also acknowledged that she lacked basic knowledge about the NFT market,

admitting to erroneously believing that cryptocurrency was an NFT when she

formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of

knowledge was an inherently flawed survey that could not show confusion because

the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id*. at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant".  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id*.  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets of users that are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-

262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further this evidence does not show that anyone who reserved an RR/BAYC NFT did so because they were confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout.  *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a

1  determination of how to apportion disgorgement of profits attributable to

2  infringement.

3        Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

4  profits, which is something Defendants argue they are not, Yuga can only receive

5  profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,*

6  *982 F.2d 1400, 1408 (9th Cir. 1993),* abrogated on other grounds by *SunEarth, Inc.*

7  *v. Sun Earth Solar Power Co., Ltd.*, *839 F.3d 1179 (9th Cir. 2016).*  This requires

8  distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

9  protest against Yuga (and were thus not confused about Defendants' use of Yuga's

10 marks) and revenue from purchasers who mistakenly believed they were purchasing

11 Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

12 single purchase of RR/BAYC NFTs was made by someone thinking it was

13 sponsored by Yuga.

14        **Plaintiff's Reply:**

15        Defendants again engage in non-responsive argument and soliloquy to

16 attempt to rebut Yuga Labs' objection.  Defendants' responses fall short of proving

17 that no sales of Defendants' infringing NFTs were attributable to confusion.

18 Defendants have not and cannot prove this fact.  Confusion was likely, and evident,

19 in the marketplace and Defendants' anecdotal evidence of purported support does

20 not rebut this fact.  Defendants' responses should be rejected.

21        As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)

22 Defendants' anecdotal evidence of communications with purported purchasers is

23 unpersuasive (*supra* ¶ 3), (2) Defendants fail to demonstrate that "many"

24 consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (3)

25 the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (4)

26 Ms. O'Laughlin's report is reliable and accurate (*Id.*), (5) the Court's summary

27 judgment order establishes Defendants' liability (*Id.*), (6) Defendants' "disclaimer"

28 did not prevent confusion, (*Id.*), (7) most of Defendants' infringing NFTs did not

sell on rrbayc.com (*Id.*), (8) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*Id.*), (9) all of Defendants' profits are attributable to their infringement (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants used Yuga Labs' marks (*supra* ¶ 32), (12) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (13) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (14) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (15) Defendants fail to rebut Yuga Labs' witness's testimony (*Id.*), (16) Defendants fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*), and (17) evidence admitted at trial demonstrates that Defendants' were apathetic to the likelihood of confusion (*supra* ¶ 44).

Additionally, The Court should reject Defendants' responses because (1) Defendants fail to disprove that any consumer purchased their infringing NFTs out of confusion.

**Defendants Fail To Disprove That Any RR/BAYC Purchasers Were Confused:** Defendants present no evidence to show that no consumers purchased their infringing NFTs out of confusion. Defendants' anecdotal evidence of purported support from purchasers does not rebut the evidence of actual confusion in the record as explained *supra* ¶ 3. Defendants also admit that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) which undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused. Mr. Ripps' self-serving testimony that he created the refund process to "ensure that every person that received one was happy with the work they got" does not prove that no consumer that requested a refund was confused. Ripps. Decl. (Dkt. 246) ¶ 121. Defendants claim it is not feasible for Defendants to contact every consumer who requested a refund or purchased an RR/BAYC NFT and therefore Mr. Ripps lacks knowledge of why each refund was issued or why each purchase was made. In any event, a consumer who purchased

an RR/BAYC NFT thinking they were purchasing the real thing would certainly not be "happy with the work they got."  And as discussed *supra* there is ample evidence of consumer confusion in the record.  *See supra* ¶ 3; *see also* O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14 (discussing survey evidence finding that Defendants' infringement caused confusion).  Defendants fail to support this finding of fact.

**Defendants' Disputed Post Trial Finding of Fact No. 47:**

Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga. Trial Tr. [Muniz] 87:17-88:6. Yuga was also unable to identify any documentation of any press inquiries related to the RR/BAYC collection. Trial Tr. [Muniz] 88:7-89:2.

**Plaintiff's Basis for Dispute:**

Likelihood of confusion has already been established in this case.  SJ Order (Dkt. 225) at 10-13.  Even to the extent Defendants seek to relitigate this issue, this statement is incorrect and misleading.  The Court previously ruled that given the publicly available evidence of confusion and the evidence within Defendants' possession, it was not proportionate to the needs of the case for Yuga Labs to search its internal communications regarding confusion.  Dkt. 87 at 2 (denying motion to compel production of further "documents on lack of consumer confusion").  As the Court found, Yuga Labs' extensive enforcement efforts "related to Defendants' confusing use of Yuga's marks," among other evidence, was sufficient to demonstrate confusion.  *Id.*  Further, there is abundant evidence of actual confusion in this case unique to Defendants' infringing NFTs.  *See, e.g.*, JTX-701 and JTX-1049 (Bloomberg news segment reporting Defendants' infringing NFT collection, under the name "Bored Ape Yacht Club V3"); JTX-705 (Twitter bot misreporting reporting sale of Defendants' infringing NFT as "Bored Ape Yacht Club" NFT); JTX-1029 (noting "confusion in these comments" in

response to JTX-705); JTX-1030 (comment indicating confusion).  Even Defendants' business partner, Mr. Lehman admitted to confusion, agreed to a consent judgment admitting to this confusion, and warned Defendants about the confusion.  JTX 1; JTX 621.  That Yuga Labs did not produce further documentation of confusion does not establish that confusion did not exist or undermine the substantial other evidence.

Yuga Labs also provided persuasive and unrebutted evidence of harm and confusion unique to Defendants' infringement.  Dr. Berger's unrebutted expert report (JTX-722) and testimony explain how Defendants' "minting and sales of RR/BAYC NFTs using Yuga Labs' marks harmed the brand equity of BAYC for multiple reasons," including by diminishing the "perceived exclusivity of authentic BAYC NFTs," causing confusion, and damaging "consumer attitudes toward the BAYC brand."  JTX-722 ¶ 11; *see also* Berger Decl. (Dkt. 339) ¶¶ 62-92; 340. Additionally, Ms. O'Laughlin's unrebutted survey evidence determined that there was actual confusion in the marketplace, finding net confusion rates of 40.4% on Foundation and 20.0% on OpenSea, respectively.  JTX-721 (O'Laughlin Expert Report) ¶¶ 16, 47, 73; *see also* O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

**<u>Defendants' Response</u>:**

The evidence at trial showed that Yuga could not identify a single e-mail or text message at Yuga discussing the alleged confusion and harm that the RR/BAYC collection caused despite the fact that Yuga is a self-proclaimed multi-billion dollar corporation.  Yuga admits that it used e-mail and instant messaging to communicate for business. Trial Tr. [Muniz] 85:24-86:4.  And yet, Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga.  Trial Tr. [Muniz] 87:17-88:6.  Yuga was also unable to identify any documentation of any

press inquiries related to the RR/BAYC collection.  Trial Tr. [Muniz] 88:7-89:2.
Further, Yuga could not identify a single email, text message, or any other
contemporaneous written communication from any brand partner or repeating any
communication from any brand partner that mentions changes in negotiating
dynamics with brand partners as a result of the RR/BAYC collection.  Trial Tr.
[Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other
contemporaneous written communication from any brand partner or repeating any
communication from any brand partner that mentions any of these concerns at all?
A No, it was phone calls and e-mails -- I mean, phone calls and Zooms.").
Ultimately, Yuga did not mention RR/BAYC in any of its quarterly reports to its
investors.  Trial Tr. [Muniz] 89:18-23.

     Yuga attempts to rebut the evidentiary record by referencing this Court's
summary judgment order even though this Court did not make any finding at
summary judgment on this particular issue.  Further, relying on this Court's
summary judgment order is an incorrect use of the law of the case doctrine.  The
"law of the case doctrine does not apply to pretrial rulings *such as motions for
summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)
(emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)
("Pretrial rulings, often based on incomplete information, don't bind district judges
for the remainder of the case.  Given the nature of such motions, it could not be
otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of
an issue were decided at summary judgment for one purpose, the summary
judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-
CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding
that evidence of initial police contact was relevant as background, but not to already
decided issue that initial contact was not excessive force).  This case is just like
*Sienze*: even if the summary judgment order ruled on Yuga having no internal
document indicating any confusion or harm associated with RR/BAYC NFTs

(which the summary judgement order did not rule on) such a ruling would apply only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga then incorrectly argues that the fact it has no internal documents indicating confusion can be ignored given the "abundance" of evidence of confusion.  But the examples Yuga cites are not actually evidence of confusion.  For example, Yuga relies on a Bloomberg news segment.  But the Bloomberg news segment did not discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains about. The Bloomberg Crypto segment centered on the recent cryptocurrency market crash and its impact on the valuation of various cryptocurrency assets.  JTX-1049.  During a discussion of the NFT market, Bloomberg news reporters highlighted that NFT valuation had dropped in 2022, along with the valuation of other cryptocurrency assets.  *Id.*  However, during a brief discussion of an "eight percent jump in the NFT index," a chart listing NFT collections appeared behind the Bloomberg reporter.  *Id*.  While the chart was displayed, the reporter did not discuss any of the collections.  Instead, she highlighted market changes such as volume drops on OpenSea of "almost 200%." *Id*.  As the NFT collections chart was taken down, the reporter said "let's talk a second longer about the Bored Ape Yacht Club collection" before discussing how drops in valuation across the cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

Although the NFT collections chart shown during the Bloomberg segment listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter did not spend any time discussing and analyzing the chart.  *Id*.  She never referenced the Defendants by name, she never referenced Defendants' criticisms of Yuga, and she never even mentioned Yuga.  Instead, she briefly mentioned the Bored Ape Yacht Club as the chart was taken down.  *Id*.  This is unsurprising since

the Bored Ape Yacht club was one of the collections listed on the chart. *Id*. However, nothing that the reporter said characterized Defendants' RR/BAYC project as being affiliated with Yuga or the Bored Ape Yacht Club. In fact, the reporter did not compare or contrast any of the listed collections. *Id*. She simply continued to her other talking points. *Id*. Thus, the Bloomberg news segment has not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs listed on the chart and the V3 NFTs listed on the chart—the same chart that was never discussed by anyone at any point during the news segment.

Yuga also misleadingly cites to posts by Twitter bots as "evidence of confusion." But in these posts by Twitter bots, users are quick to remark that the Twitter bot falsely indicated a Bored Ape Yacht Club transaction. JTX-705; JTX-1029. Users replied to the bot by saying "It's a RR ape" or "RRBAYC > BAYC." JTX-705. Another twitter user replied to the bot and mentioned this litigation, clearly indicating their ability to differentiate between RR/BAYC NFTs and Bored Ape Yacht Club NFTs. JTX-1029. These posts by bots, thus, also are not actually evidence of confusion. To the contrary, they show lack of confusion because users were readily able to identify that the bots were posting about RR/BAYC NFTs.

Yuga then cites to the Lehman declaration (which was signed under coercion) as evidence of confusion, which Yuga and Mr. Solano have relied in this litigation to advance false claims of actual confusion. As demonstrated during trial, Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won. Trial Tr. [Solano] 38:17-19. Mr. Solano also relied on the declaration without considering that Mr. Lehman explained under oath that he was intimated by Yuga's lawsuit and that his understanding was "No declaration. No settlement." Trial Tr. [Solano] 38:11-16. A coerced declaration such as this is not probative evidence of confusion, especially given that Yuga has absolutely no

internal documentation of confusion and that none of the parties have been able to identify a single confused consumer.

Yuga also incorrectly argues that there is "abundant" evidence of confusion because of Dr. Berger and Dr. O'Laughlin's expert reports. But the evidence at trial showed that Dr. Berger's limited analysis did not establish that the minting of RR/BAYC NFTs was the source of the alleged brand harm. Although Dr. Berger acknowledged that several different causes could have impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of harm in his analysis. Trial Tr. [Berger] 108:7-109:4; 115:16-25. He limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period. Trial Tr. [Berger] 106:1-3. For instance, Dr. Berger's analysis ignored the Otherside scandal, which occurred mere days before his chosen analysis period. Trial Tr. [Berger] 113:10-114:2; JTX-2715. Dr. Berger even ignored events, like the general downturn of the cryptocurrency market, which occurred during his analysis period. Trial Tr. [Berger] 109:5-110:5; JTX-306.

At trial, Dr. Berger claimed that the presence of other potential causes of brand harm does not dilute the hypothesis that the minting of RR/BAYC NFTs caused brand harm. Trial Tr. [Berger] 115:19-25. However, in ignoring other potential causes of harm, Dr. Berger has not been able to establish which factors caused harm or quantify the harm of any given factor. Indeed, Dr. Berger failed to quantify any alleged harm to Yuga's brand equity, goodwill, or reputation. *See generally* Berger Decl.; Dkt. 343 at 15.

As for O'Laughlin, her survey evidence is unreliable and was rebutted on several grounds. As demonstrated at trial, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-

10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as

confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant".  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

**Plaintiff's Reply:**

Defendants' arguments are merely a distraction because they argue a decided issue.  Defendants infringed Yuga Labs' marks in a manner that was likely to cause confusion, as the Court has already adjudicated.  SJ Order (Dkt. 225) at 10-13. Defendants have not sought relief from that order and cannot seek to undo it through their submissions following trial on the issue of remedies.  Similarly, because likelihood of confusion had already been established and trial was limited to the issue of remedies, there is no basis for Defendants' argument that the Court should make any factual inferences because Yuga Labs did not burden the Court with cumulative evidence of adjudicated issues.  *See Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (partial summary judgment is "intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit.") (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)).

Defendants' response completely fails to address the other fatal flaw of their objection: they already sought these materials, and the Court held that they were not needed in light of existing evidence of confusion, including evidence that was publicly available or in their possession.  Dkt. 87 at 2 (denying motion to compel production of further "documents on lack of consumer confusion").  Defendants cannot demand disproportionate discovery and then argue that the Court's agreement that the discovery is inappropriate warrants a factual inference in their favor.

Because Yuga Labs has proven likelihood of confusion before trial (and reiterated by the evidence presented at trial), and because this evidence was determined to be unnecessary even before the Court's summary judgment order, Defendants' proposed finding of fact that Yuga Labs "could not identify" evidence within their arbitrary categories is incorrect and immaterial.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere.  *See supra* ¶ 32 (objection and reply rebutting Defendants' arguments regarding lack of confusion, including with respect to Bloomberg and Defendants' "Bored Ape Yacht Club V3"); *infra* ¶¶ 70-80 (objection and reply rebutting Defendants' arguments regarding Ms. O'Laughlin's expert testimony), 83-91 (objection and reply rebutting Defendants' arguments regarding Dr. Berger's expert testimony).

**Defendants' Disputed Post Trial Finding of Fact No. 48:**

Yuga could not identify a single e-mail or text message that shows Yuga engaged in advertising work in response to the RR/BAYC project. Trial Tr. [Muniz] 89:7-13.

**Plaintiff's Basis for Dispute:**

Likelihood of confusion has already been established in this case.  SJ Order (Dkt. 225) at 10-13.  Yuga Labs is not currently seeking damages for past corrective advertising.  Defendants' insinuation that no such costs exist, however, is

1   incorrect and immaterial to the current issues in this case.  *See* JTX-723 (Kindler

2   Expert Report) ¶¶ 80-84.

3       Even so, Yuga Labs provided abundant and unrebutted evidence of its efforts

4   to address Defendants' infringing NFTs.  For instance, Ms. Muniz specifically

5   testified that Yuga Labs "increased its focus on marketing the BAYC brand, hoping

6   to drown out the noise of RR/BAYC NFTs."  Muniz Decl. (Dkt. 340) ¶ 22.  Ms.

7   Muniz also testified that Yuga Labs "tried to work with third parties to remove the

8   RR/BAYC NFT collection from the marketplace," but "had limited success with

9   our takedown efforts on third-party platforms.  This is because, Defendants kept

10  making limited changes to their sales pages to try to get them put back up.  And

11  each time they made a change, they still used the BAYC trademarks to sell the

12  RR/BAYC NFT collection.  They had to use Yuga Labs' BAYC trademarks to

13  make the RR/BAYC NFT collection noticeable and attractive to customers."

14  Muniz Decl. (Dkt. 340) ¶ 19.  Yuga Labs also "burned" the BAYC smart contract

15  "to address perceived concerns about exclusivity in the marketplace" that resulted

16  from Defendants' infringement.  *Id.* ¶ 20.  Defendants have not rebutted or

17  discredited any of this evidence, or evidence in the record reflecting the costs of

18  such efforts.

19      **Defendants' Response:**

20      The evidence at trial showed that Yuga could not identify a single e-mail or

21  text message at Yuga discussing the alleged confusion and harm that the RR/BAYC

22  collection caused despite the fact that Yuga is a self-proclaimed multi-billion dollar

23  corporation.  Yuga admits that it used e-mail and instant messaging to communicate

24  for business. Trial Tr. [Muniz] 85:24-86:4.  And yet, Yuga could not identify a

25  single e-mail or text message discussing (1) confusion associated with the

26  RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely

27  caused any problems in the day-to-day business operations of Yuga.  Trial Tr.

28  [Muniz] 87:17-88:6.  Yuga was also unable to identify any documentation of any

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                    374                    Case No. 2:22-cv-04355-JFW-JEM

1   press inquiries related to the RR/BAYC collection.  Trial Tr. [Muniz] 88:7-89:2.

2   Further, Yuga could not identify a single email, text message, or any other

3   contemporaneous written communication from any brand partner or repeating any

4   communication from any brand partner that mentions changes in negotiating

5   dynamics with brand partners as a result of the RR/BAYC collection. Trial Tr.

6   [Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other

7   contemporaneous written communication from any brand partner or repeating any

8   communication from any brand partner that mentions any of these concerns at all?

9   A No, it was phone calls and e-mails -- I mean, phone calls and Zooms.").

10  Ultimately, Yuga did not mention RR/BAYC in any of its quarterly reports to its

11  investors.  Trial Tr. [Muniz] 89:18-23.

12      Yuga attempts to rebut the evidentiary record by referencing this Court's

13  summary judgment order even though this Court did not make any finding at

14  summary judgment on this particular issues.  Further, relying on this Court's

15  summary judgment order is an incorrect use of the law of the case doctrine.  The

16  "law of the case doctrine does not apply to pretrial rulings **such as motions for**

17  **summary judgment**." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)

18  (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)

19  ("Pretrial rulings, often based on incomplete information, don't bind district judges

20  for the remainder of the case.  Given the nature of such motions, it could not be

21  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

22  an issue were decided at summary judgment for one purpose, the summary

23  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

24  CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

25  that evidence of initial police contact was relevant as background, but not to already

26  decided issue that initial contact was not excessive force).  This case is just like

27  *Sienze*: even if the summary judgment order ruled on Yuga having no internal

28  document indicating any confusion or harm associated with RR/BAYC NFTs

1   (which the summary judgement order did not rule on) such a ruling would apply

2   only the issue of infringement and is not adequate support for this topic as applied

3   to availability of disgorgement as a remedy (including Defendants' mental state as

4   applied to disgorgement), apportionment, and an exceptional case analysis.

5        Yuga then incorrectly argues that it has provided "abundant" evidence of its

6   internal documents associated with the RR/BAYC collection and the alleged

7   confusion that it caused.  But, critically, Yuga does not cite to a single

8   contemporaneous internal document to corroborate its self-serving statement.

9   Yuga simply cites Ms. Muniz's testimony that she worked with third parties to take

10  down the RR/BAYC NFT collection from marketplaces.  But Yuga's improper use

11  of DMCA takedown notices is not evidence of any internal records discussing

12  confusion associated with the RR/BAYC collection.  Yuga then references that it

13  had to "burn" the BAYC smart contract to avoid confusion.  But again, this is a

14  self-serving statement.  Yuga has not submitted any evidence showing that moving

15  the BAYC contract to the "burn" address would help avoid any alleged confusion.

16  In fact, it would not.  The only thing "burning" the BAYC smart contract could

17  accomplished was ensuring that the offensive content in the smart contract could

18  never be removed.

19       **Plaintiff's Reply**:

20       As with their previous response (*supra* ¶ 47), Defendants' argument lacks

21  merit because the Court has already adjudicated the ultimate issue of likelihood of

22  confusion and infringement, and because the Court agreed such internal

23  communications about confusion were unnecessary in light of substantial other

24  evidence of confusion.  Dkt. 87 at 2 (denying motion to compel production of

25  further "documents on lack of consumer confusion").

26       Additionally, Yuga Labs did not seek damages for past corrective advertising

27  at trial, so there is no reason that an "e-mail or text message that shows Yuga

28  engaged in advertising work in response to the RR/BAYC project" should have

1   been in the trial record.  Defendants' finding of fact that Yuga Labs "could not

2   identify" documents in this arbitrary category is incorrect and immaterial, as is their

3   argument that the Court should draw any inference from the absence of these

4   irrelevant materials the trial record.

5       Finally, Defendants do not dispute that Yuga Labs burned the BAYC smart

6   contract in response to their actions, but they incorrectly argue that there is no

7   evidence that this action was necessary to address their infringement.  In fact, Ms.

8   Muniz explained this in her declaration.  The result of burning the smart contract

9   was "to prevent its ability to ever mint another BAYC NFT," and Yuga Labs did so

10  to signal that "Yuga Labs could never mint more BAYC NFTs to generate revenue.

11  Muniz Decl. (Dkt. 340) ¶ 20.  This was necessary because of Defendants'

12  wrongdoing and to "address perceived concerns about exclusivity in the

13  marketplace."  *Id.*

14  **Defendants' Disputed Post Trial Finding of Fact No. 49:**

15      Yuga could not identify a single email, text message, or any other

16  contemporaneous written communication from any brand partner or repeating any

17  communication from any brand partner that mentions changes in negotiating

18  dynamics with brand partners as a result of the RR/BAYC collection. Trial Tr.

19  [Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other

20  contemporaneous written communication from any brand partner or repeating any

21  communication from any brand partner that mentions any of these concerns at all? A

22  No, it was phone calls and e-mails – I mean, phone calls and Zooms.").

23  **Plaintiff's Basis for Dispute:**

24      Likelihood of confusion has already been established in this case.  SJ Order

25  (Dkt. 225) at 10-13.  Even to the extent Defendants seek to relitigate this issue, this

26  statement is incorrect and misleading.  The Court previously ruled that given the

27  publicly available evidence of confusion and the evidence within Defendants'

28  possession, it was not proportionate to the needs of the case for Yuga Labs to

search its internal communications regarding confusion.  Dkt. 87 at 2 (denying
motion to compel production of further "documents on lack of consumer
confusion").  As the Court found, Yuga Labs' extensive enforcement efforts
"related to Defendants' confusing use of Yuga's marks," among other evidence,
was sufficient to demonstrate confusion.  *Id.*  Further, there is abundant evidence of
actual confusion in this case unique to Defendants' infringing NFTs.  *See, e.g.*,
JTX-701 and JTX-1049 (Bloomberg news segment reporting Defendants'
infringing NFT collection, under the name "Bored Ape Yacht Club V3"); JTX-705
(Twitter bot misreporting reporting sale of Defendants' infringing NFT as "Bored
Ape Yacht Club" NFT); JTX-1029 (noting "confusion in these comments" in
response to JTX-705).  That Yuga Labs did not produce further documentation of
confusion does not establish that confusion did not exist or undermine the
substantial other evidence.

Further, testimony from Yuga Labs' witnesses demonstrate harm to the
company's business relationships due to Defendants' infringement.  Ms. Muniz's
testimony describes how three separate significant business relationships were
damaged by Defendants' infringement.  Muniz Decl. (Dkt. 340) ¶ 16.  It also
harmed relationships with investors (*id.* ¶ 17) and community members (*id.* ¶ 15).
Mr. Solano testified how Defendants' infringing NFT collection was launched to
coincide with ApeFest 2022 and to interfere with Yuga Labs' branding efforts
within the NFT community.  Solano Decl. (Dkt. 342) ¶¶ 39-40.  This testimony is
credible and unrebutted.

**Defendants' Response:**

The evidence at trial showed that Yuga could not identify a single e-mail or
text message at Yuga discussing the alleged confusion and harm that the RR/BAYC
collection caused despite the fact that Yuga is a self-proclaimed multi-billion dollar
corporation.  Yuga admits that it used e-mail and instant messaging to communicate
for business.  Trial Tr. [Muniz] 85:24-86:4.  And yet, Yuga could not identify a

single e-mail or text message discussing (1) confusion associated with the

RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely

caused any problems in the day-to-day business operations of Yuga.  Trial Tr.

[Muniz] 87:17-88:6.  Yuga was also unable to identify any documentation of any

press inquiries related to the RR/BAYC collection.  Trial Tr. [Muniz] 88:7-89:2.

Further, Yuga could not identify a single email, text message, or any other

contemporaneous written communication from any brand partner or repeating any

communication from any brand partner that mentions changes in negotiating

dynamics with brand partners as a result of the RR/BAYC collection. Trial Tr.

[Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other

contemporaneous written communication from any brand partner or repeating any

communication from any brand partner that mentions any of these concerns at all?

A No, it was phone calls and e-mails -- I mean, phone calls and Zooms.").

Ultimately, Yuga did not mention RR/BAYC in any of its quarterly reports to its

investors.  Trial Tr. [Muniz] 89:18-23.

　　　　Yuga attempts to rebut the evidentiary record by referencing this Court's

summary judgment order even though this Court did not make any finding at

summary judgment on this particular issues.  Further, relying on this Court's

summary judgment order is an incorrect use of the law of the case doctrine.  The

"law of the case doctrine does not apply to pretrial rulings *such as motions for*

*summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)

(emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)

("Pretrial rulings, often based on incomplete information, don't bind district judges

for the remainder of the case.  Given the nature of such motions, it could not be

otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of

an issue were decided at summary judgment for one purpose, the summary

judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-

CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: even if the summary judgment order ruled on Yuga having no internal document indicating any confusion or harm associated with RR/BAYC NFTs (which the summary judgement order did not rule on) such a ruling would apply only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga then incorrectly argues that the fact it has no internal documents indicating confusion can be ignored given the "abundance" of evidence of confusion.  But the examples Yuga cites are not actually evidence of confusion. For example, Yuga relies on a Bloomberg news segment.  But the Bloomberg news segment did not discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains about.  The Bloomberg Crypto segment centered on the recent cryptocurrency market crash and its impact on the valuation of various cryptocurrency assets.  JTX-1049.  During a discussion of the NFT market, Bloomberg news reporters highlighted that NFT valuation had dropped in 2022, along with the valuation of other cryptocurrency assets.  *Id.*  However, during a brief discussion of an "eight percent jump in the NFT index," a chart listing NFT collections appeared behind the Bloomberg reporter.  *Id*.  While the chart was displayed, the reporter did not discuss any of the collections.  Instead, she highlighted market changes such as volume drops on OpenSea of "almost 200%." *Id*.  As the NFT collections chart was taken down, the reporter said "let's talk a second longer about the Bored Ape Yacht Club collection" before discussing how drops in valuation across the cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

Although the NFT collections chart shown during the Bloomberg segment listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter

did not spend any time discussing and analyzing the chart.  *Id*.  She never
referenced the Defendants by name, she never referenced Defendants' criticisms of
Yuga, and she never even mentioned Yuga.  Instead, she briefly mentioned the
Bored Ape Yacht Club as the chart was taken down.  *Id*.  This is unsurprising since
the Bored Ape Yacht club was one of the collections listed on the chart.  *Id*.
However, nothing that the reporter said characterized Defendants' RR/BAYC
project as being affiliated with Yuga or the Bored Ape Yacht Club.  In fact, the
reporter did not compare or contrast any of the listed collections.  *Id*.  She simply
continued to her other talking points.  *Id*.  Thus, the Bloomberg news segment has
not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs
listed on the chart and the V3 NFTs listed on the chart—the same chart that was
never discussed by anyone at any point during the news segment.

Yuga also misleadingly cites to posts by Twitter bots as "evidence of
confusion."  But in these posts by Twitter bots, users are quick to remark that the
Twitter bot falsely indicated a Bored Ape Yacht Club transaction.  JTX-705; JTX-
1029.  Users replied to the bot by saying "It's a RR ape" or "RRBAYC > BAYC."
JTX-705. Another twitter user replied to the bot and mentioned this litigation,
clearly indicating their ability to differentiate between RR/BAYC NFTs and Bored
Ape Yacht Club NFTs.  JTX-1029.  These posts by bots, thus, also are not actually
evidence of confusion.  To the contrary, they show lack of confusion because users
were readily able to identify that the bots were posting about RR/BAYC NFTs.

Yuga then incorrectly argues that it has provided evidence of its internal
activities associated with the RR/BAYC collection and the alleged confusion that it
caused by citing Ms. Muniz's self-serving testimony that certain business
relationships were damaged due to the RR/BAYC collection.  But Yuga has
provided no contemporaneous document discussing or commenting on how this
"damage" occurred.   Presumably, if the RR/BAYC collection was harming
relationship with investors, community members, and business partners, there

would be at least one contemporaneous internal document address these alleged problems.

Yuga also cites to the unreliable Declaration of Mr. Solano as basis for excusing that Yuga has zero internal documents addressing the alleged confusion associated with the RR/BAYC collection.  Mr. Solano is not credible given the many false and misleading statements contained in his declaration.  For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***
>
> Q.   ***That statement, that part of your witness statement is incorrect; right?***
>
> A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I do't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

   **Plaintiff's Reply:**

   Emails are not the *sine qua non* of proof of likelihood of confusion, as Defendants appear to suggest.  Indeed, during discovery, the Court ruled that given

the publicly available evidence of confusion and the evidence within Defendants' possession, it was not proportionate to the needs of the case for Yuga Labs to search its internal communications regarding confusion.  Dkt. 87 at 2 (denying motion to compel production of further "documents on lack of consumer confusion").  As the Court found, Yuga Labs' extensive enforcement efforts "related to Defendants' confusing use of Yuga's marks," among other evidence, was sufficient to demonstrate confusion.  *Id.*

Yuga Labs cannot be faulted for not producing cumulative evidence of confusion that the Court held was not proportionate to the needs of the case.  It should be no surprise that Yuga Labs would not volunteer internal communications it is not obligated, especially to these particular Defendants, who have repeatedly made up lies about the Company, its founders, its employees, its investors, and its attorneys.  Yuga Labs also had legitimate concerns about Defendants' willingness to comply with the Court's Protective Order.  Yuga Labs produced substantial *other* evidence of confusion sufficient to prove its case.  Therefore, it is immaterial that the evidence at trial does not include internal Yuga Labs communications.

Moreover, as with their previous responses (*supra* ¶¶ 47, 48), Defendants' argument lacks merit because the Court has already adjudicated the ultimate issue of likelihood of confusion and infringement.  Regardless, the evidence remains uncontested that Defendants' infringing activities harmed Yuga Labs' relationships with its brand partners.

Ms. Muniz testified as to how Yuga Labs entered into many brand partnerships prior to Defendants' infringement, but since Defendants flooded the market with their infringing NFTs, those deals slowed; business partners remain willing to enter into partnerships with Yuga Labs, but not the BAYC brand.  Trial Tr. at 98:14-99:7.  The brand's loss of perceived exclusivity and resultant "back-foot negotiations" are reflected in the different dynamic with potential partners.

Trial Tr. at 98:12-18.  Defendants have no evidence which could possibly prove the contrary.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere.  *See supra* ¶ 32 (objection and reply rebutting Defendants' arguments regarding lack of confusion, including with respect to Bloomberg and Defendants' "Bored Ape Yacht Club V3"); ¶ 3 (objection and reply rebutting Defendants' allegations about the reliability of Mr. Solano's testimony); *id.* (objection and reply rebutting Defendants' allegations about the reliability of Mr. Lehman's declaration).

**Defendants' Disputed Post Trial Finding of Fact No. 50:**

Yuga did not mention RR/BAYC in any of its quarterly reports to its investors. Trial Tr. [Muniz] 89:18-23.

**Plaintiff's Basis for Dispute:**

Yuga Labs' decision not to further broadcast Defendants' infringing products is not relevant to any issue, especially where awareness of Defendants' confusingly similar NFTs was already widespread and damaging the BAYC brand.  Ms. Muniz's testimony specifically describes how three separate significant business relationships were damaged by Defendants' infringement.  Muniz Decl. (Dkt. 340) ¶ 16.  It also harmed relationships with investors (*id.* ¶ 17) and community members (*id.* ¶ 15).  Indeed, Defendants are well aware of investors' knowledge of the harm caused by Defendants, as Defendants harassed and deposed Yuga Labs' investors during this litigation.

Defendants persisted in pushing their harmful infringing NFTs despite numerous pre-litigation efforts to limit them, circumventing takedowns and continuing their infringement even after this lawsuit was filed.  Trial Tr. at 96:19:97:8.  *See also* Solano Decl. (Dkt. 342) ¶ 74 ("Yuga Labs has asked Defendants to stop promoting the RR/BAYC NFTs, but they have refused. And not only have they refused to stop infringing, they are deliberately taking steps to make

it difficult if not impossible, for us to remove these infringing products from the public."). This testimony is credible and unrebutted.

**Defendants' Response**:

The evidence at trial showed that Yuga did not mention the RR/BAYC, its harms to Yuga, and business concerns relating to the RR/BAYC collection in quarterly reports even though Yuga almost certainly would have had an obligation to do so if any of that alleged harm or confusion existed:

> Q.    Focusing again on your claim that Yuga uniquely caused problems in the day-to-day business operations of Yuga. You were CEO at the time of those unique problems; correct?
>
> A.    Yes.
>
> Q.    And you made quarterly reports to your investors at that time; correct?
>
> A.    Yes
>
> Q.    ***RR/BAYC was not mentioned even once in any of those quarterly reports; correct?***
>
> A.    ***I don't believe it was***.

Trial Tr. [Muniz] 89:14-23 (emphasis added). In fact, Yuga was not able to identify any internal documents at all discussing the RR/BAYC collection. Yuga could not identify a single e-mail or text message at Yuga discussing the alleged confusion and harm that the RR/BAYC collection caused despite the fact that Yuga is a self-proclaimed multi-billion dollar corporation. Yuga admits that it used e-mail and instant messaging to communicate for business. Trial Tr. [Muniz] 85:24-86:4. And yet, Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business

operations of Yuga.  Trial Tr. [Muniz] 87:17-88:6.  Yuga was also unable to
identify any documentation of any press inquiries related to the RR/BAYC
collection.  Trial Tr. [Muniz] 88:7-89:2.  Further, Yuga could not identify a single
email, text message, or any other contemporaneous written communication from
any brand partner or repeating any communication from any brand partner that
mentions changes in negotiating dynamics with brand partners as a result of the
RR/BAYC collection.  Trial Tr. [Muniz]101:7-12. ("Q. Did you identify a single e-
mail, text message, or any other contemporaneous written communication from any
brand partner or repeating any communication from any brand partner that
mentions any of these concerns at all? A No, it was phone calls and e-mails -- I
mean, phone calls and Zooms.").

Yuga incorrectly argues that it has provided evidence of its internal activities
associated with the RR/BAYC collection and the alleged confusion that it caused
by citing Ms. Muniz's self-serving testimony that certain business relationships
were damaged due to the RR/BAYC collection.  But Yuga has provided no
contemporaneous document discussing or commenting on how this "damage"
occurred.   Presumably, if the RR/BAYC collection was harming relationship with
investors, community members, and business partners, there would be at least one
contemporaneous internal document address these alleged problems.

Yuga also cites to the unreliable Declaration of Mr. Solano as basis for
excusing that Yuga has zero internal documents addressing the alleged confusion
associated with the RR/BAYC collection.  Mr. Solano is not credible given the
many false and misleading statements contained in his declaration.  For example,
Mr. Solano was forced to concede on cross-examination that his sworn declaration
included a false statement claiming that Defendants continue to receive royalties
from sales on secondary marketplaces:

Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?

A.   Yes.

Q.   So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.   ***They don't continue to increase; correct, sir?***

A.   ***Correct.***

Q.   ***That statement, that part of your witness statement is incorrect; right?***

A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by

1 Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

2 deposition, if we could. You gave a deposition in this case; right? A Yes. Q And

3 you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look

4 at your deposition -- and we can pull it up on the screen -- at page 152, starting at

5 line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an

6 objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

7 your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market

8 exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look

9 at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know

10 whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that

11 question, and did you give that answer? A Yes."). Mr. Solano's testimony

12 regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been

13 rebutted. Mr. Solano could not identify a single person that ever bought an

14 RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In

15 fact, no one has been able to identify a single confused consumer in the entirety of

16 this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

17 **Plaintiff's Reply:**

18 Throughout Defendants' questioning at trial, proposed finding of fact, and

19 response, they never once explained why Yuga Labs should be expected to have

20 "quarterly reports to its investors" that discuss Defendants' infringing NFTs or the

21 harm they have done to the brand. Defendants cite no authority or even explain

22 their bare "presump[tion]" that Yuga Labs—which is not a publicly traded

23 company— "almost certainly would have had an obligation to do so." Defendants'

24 proposed finding is irrelevant and immaterial—especially to the extent it related to

25 the adjudicated issue of likelihood of confusion—and their suggested inference that

26 any brand harm would be highlighted in investor reports is unsupported.

27 Regardless, as disputed *supra* ¶ 50 in Yuga Labs' objection, Defendants know that

28

Yuga Labs discussed the harm caused by Defendants with Yuga Labs' investors, because Defendants deposed a Yuga Labs investor.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere.  *See supra* ¶ 32 (objection and reply rebutting Defendants' arguments regarding lack of confusion, including with respect to Bloomberg and Defendants' "Bored Ape Yacht Club V3"); ¶ 3 (objection and reply rebutting Defendants' allegations about the reliability of Mr. Solano's testimony); *id.* (objection and reply rebutting Defendants' allegations about the reliability of Mr. Lehman's declaration).

**Defendants' Disputed Post Trial Finding of Fact No. 51:**

Yuga's President, Mr. Solano, could not identify a single instance in which Mr. Ripps sold an RR/BAYC NFT on a marketplace where a BAYC NFT was also sold. Trial Tr. [Solano] 44:6-24.

**Plaintiff's Basis for Dispute:**

This statement is contrary to the evidence and Mr. Solano's testimony.  Both genuine BAYC NFTs and RR/BAYC NFTs were sold on OpenSea, for instance. SJ Order (Dkt. 225) (Dkt. 225) at 12 ("it is not surprising that both Yuga and Defendants promoted and sold their NFTs through the same online NFT marketplaces – OpenSea and x2y2."); Solano Decl. (Dkt. 342) ¶ 42 ("In the case of OpenSea and LooksRare NFT marketplaces, Defendants used the BAYC Marks to sell their scam NFTs alongside authentic Yuga Labs BAYC NFTs . . . .").  Defendants mischaracterize Mr. Solano's testimony.  Mr. Ripps *directly* sold the infringing NFTs on Foundation before genuine BAYC NFTs were available on that platform in mass.  Trial Tr. at 44:10-11.  This was confusing, because Yuga Labs did not have a sales page for BAYC NFTs on Foundation at the time of Defendants' launch.  Muniz Decl. (Dkt. 340) ¶ 14 ("because Yuga Labs did not have a branded page on Foundation, but did on OpenSea, Defendants' launch of the RR/BAYC NFT collection on Foundation using Yuga Labs' BAYC trademarks was

particularly confusing because it looked like a branded Yuga Labs page").  Further, Defendants' claim that Ripps did not personally, directly sell the infringing NFTs on certain marketplaces is immaterial to Yuga Labs' claim for equitable relief, because Defendants actively marketed secondary sales of their infringing NFTs on OpenSea and pushed for such sales to continue.  *See, e.g.*, JTX-683 (tweet from Mr. Cahen stating "RR/BAYC is officially the highest 24h volume . . . IN THE WORLD!"; JTX-685 (tweet from Mr. Cahen stating "RR/BAYC about to become the first project ever to top both the @foundation and the @opensea charts."); Cahen Decl. (Dkt. 344) ¶ 253 (Mr. Cahen's testimony that he continued to attempt to sell the infringing NFTs even though he believed they were subject to over two dozen takedowns); Dkt. 163-95 (Mr. Ripps' tweet advertising infringing NFTs on OpenSea.  Mr. Ripps even had control over a sales page for the sale of RR/BAYC NFTs on OpenSea.  *See* Ripps Depo. Designations (Dkt. 396) at 81:3-81:14.  As such, Defendants promoted and had control over the harmful secondary market of Defendants' infringing NFTs sold on the OpenSea platform alongside the genuine BAYC NFTs.  Trial Tr. at 44:11-15; Solano Decl. (Dkt. 342) ¶ 42; JTX-684 (sales chart from OpenSea showing both NFT collections among the "top collections").  Finally, in addition to Mr. Ripps, Mr. Cahen did directly, and repeatedly, sell the infringing NFTs on OpenSea.  Trial Tr. at 202:24-25 ("Mr. Cahen has sold through OpenSea, LooksRare, and even Foundation.").

**Defendants' Response:**

The evidence at trial showed that Mr. Solano could not identify a single instance where Mr. Ripps sold an RR/BAYC NFT on a marketplace that also sold BAYC NFTs:

> Q.    You have not identified a single instance in which Mr. Ripps sold an RR/BAYC NFT on any marketplace where Yuga sold a BAYC NFT; correct?

A.    I already explained why that would be.  Foundation did not – could not list Bored Apes until the very moment that they decided to run the scam on that website.  And then, of course, yes, then their secondaries are being sold on OpenSea.  It's like getting together with your friends, buying a bunch of counterfeit bags, and then you take them to the swap meet.

Q.    Sir, I'm focused on whether the statements in your witness statement are true or not.  You have not identified a single instance in which Mr. Ripps sold an RR/BAYC on any marketplace where Yuga sold BAYC NFT; correct?

A.    These marketplaces have done thousands of these in volume on both brands' NFTs.

Q.    Is that your best answer to my question sir?

A.    Yes.

Q.    Okay.  Now, Yuga never had a page on Foundation for the Bored Ape Yacht Club, right?

A.    Yes.

Trial Tr. [Solano] 44:6-45:2.  Mr. Solano similarly admitted that his declaration falsely attributed Defendants with selling RR/BAYC NFTs based on documents showing that some anonymous, third-part was re-selling the NFTs:

Let's look specifically at JTX-686, which is excerpted in your witness statement.  And if we can maybe blow up what you've put there.   This is one of the documents you rely on in your witness statement; right?

A.    Yes.

Q.    And you say that this image from JTX-686 shows Defendants using the BAYC marks to sell their NFTs alongside authentic Yuga Labs BAYC NFTs; right?

1

2    A.    Yes.

3    Q.    ***This side-by-side image, JTX-686, never appeared on OpenSea,***

4          ***did it?***

5    A.    ***This side-by-side image, no.***  But these are two different pages that

6          look exactly the same.

7    Q.    It never appeared – this side-by-side image never appeared on any

8          website selling NFTs; right?

9    A.    I don't know if that's true.  But this is a crop of two different pages

10         that look exactly the same.

11    Q.    It never appeared side-by-side, correct?

12         MR. BALL:  Objection.  Vague

13

14         THE COURT:  Overruled.

15         THE WITNESS:  I just answered the question.

16

17    Q.    BY MR. TOMPROS:  ***Where did you get this image, JTX-686.***

18    A.    ***It was prepared for us.  Counsel prepared it.***

     Q.    You didn't find it on OpenSea; right?

19

20    A.    I did not specifically screenshot this image, no.

21    Q.    This image, the combined image like this – strike that.  It's hard to

22         see.  But if we could blow up on the right-hand side, there's a

23         "Created By" section.  And it's hard to see, but it looks like it says

24         – sorry, "owned by," not "created by," "Owned by Safo214";

          right?

25    A.    I'll take your word for it that that's what it says. But yes, it's owned

26         by a username.

27    Q.    ***That's not Mr. Ripps or Mr. Cahen; right?***

28

A.     *No.* This had already been sold to that person by them.

Trial Tr. [Solano] 45:12-46:24 (emphasis added).

Yuga incorrectly argues that this trial testimony by Mr. Solano admitting that he could not identify a single instance where Mr. Ripps sold RR/BAYC NFTs on the same marketplace as BAYC NFTs should be ignored by referring back to this Court's summary judgment order.  But relying on this Court's summary judgment order is an incorrect use of the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: even if the summary judgment order ruled on marketplace activity applies only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga also attempts to rehabilitee Mr. Solano (and his admissions during cross-examination) by reference back to the very declaration that had been impeached during trial, including impeached on this exact topic based on the portion to the transcript quoted above.  Moreover, Mr. Solano's declaration was globally impeached and shows to be untrustworthy.  For example, Mr. Solano was

forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***
>
> Q.   ***That statement, that part of your witness statement is incorrect; right?***
>
> A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if

Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

Yuga also argues that the fact Defendants never sold RR/BAYC NFTs on the same marketplaces that sold BAYC NFT does not matter because Defendants' tweeted about marketplace listings created by third parties.   But Yuga fails to mention that a simple tweet does not amount to "marketing activities" because it is simply reporting what is going on in the crypto space.  Moreover, those tweets make clear to identify RR/BAYC NFTs as having been created by Mr. Ripps and not Yuga by pointing out their satirical content and purpose.  For example, Yuga cites to JTX-683, which makes clear that Defendants' NFT collection is not the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on

@openseas … We passed BAYC in the middle of Apefest!"  JTX-719 is similarly a
tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight"
with a link to the Foundation page for the RR/BAYC collection.  Again, this is an
exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection.
Similarly, JTX-685 is a tweet of the top NFTs on OpenSea and identifies
RR/BAYC collection as "RR/BAYC" along with the satirical logo saying, "THIS
LOGO IS BASED ON THE SS TOTENKOPF."  The post also differentiates
RR/BAYC from BAYC NFTs by having separate entries for them on the chart.
JTX-684 is an exhibit from an unidentified website again stating the top collection,
once again identifying the RR/BAYC collection as "RR/BAYC" along with the
satirical logo saying, "THIS LOGO IS BASED ON THE SS TOTENKOPF."

   Yuga also false states that Mr. Ripps admitted at his deposition at 81:3-81:14
controlled the OpenSea page that Yuga complains of in this litigation.  But the
deposition transcript that Yuga cites actual confirms that Mr. Ripps did not have
page on OpenSea:

Q.  Were – were RR/BAYC NFTS available for transfer on
   OpenSea?

A.  Not by me.

Q.  **But you had a page on OpenSea?**

A.  **I had a page?  Did I have a page?  No**.  Perhaps RR/BAYC
   collection had a page on OpenSea.

Q.  And who ran that collection?

A.  Who ran that collection?  I did because I have the keys to the
   RR/BAYC.

Q.  **And what did the RR/BAYC collection on OpenSea look like?**

A.  **I'm not sure.**

Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (emphasis added).  Mr. Ripps at most admits that he has the keys to the digital wallet that holds the smart contract for RR/BAYC and not that he controls the OpenSea page for the RR/BAYC collection.  Mr. Ripps further testified at his deposition about how he had limited say in how OpenSea would display the collection, but that he still made every effort he could to make sure the page OpenSea designed was a clear as possible:

> Q.    Do you have any images of what the RR/BAYC NFT page looked like on OpenSea?
>
> A.    ***I do remember at one point making the background image the banner, if you will, to say "Long Live Conceptual Art,"*** or something like that, or "You can't copy an NFT," or something along those lines, or – and ***I do remember making sure that people had a link to RRBAYC.com***, which is the artist statement at which all the RR/BAYCs – or, I would say, ***the vast majority of them were sold through RRBAYC.com.***

Ripps Depo. Designations (Dkt. 396) at 81:22-82:7 (emphasis added).

**Plaintiff's Reply:**

Defendants' response contains a series of sideshows to distract from the fact that Defendants' infringing RR/BAYC NFTs were sold in the same marketplaces as Yuga Labs' official BAYC NFTs.  The Court explicitly held that "Defendants promoted and sold their NFTs through the same online NFT marketplaces" as Yuga Labs.  SJ Order (Dkt. 225) at 12.  Defendants' attempt to re-litigate this issue is meritless.

As discussed *supra*, Defendants' response fails to rebut the objection because: (1) the response seeks to relitigate issues already adjudicated by the Court (*supra* ¶ 9), and (2) Defendants fail to impeach Mr. Solano's accurate testimony (*supra* ¶ 3).

Additionally, the Court should reject Defendants' response because, as discussed further below, (1) Defendants promoted and had control over secondary marketplaces where RR/BAYC NFTs were sold alongside BAYC NFTS, and (2) the exhibits to which Yuga Labs cites are not misleading.

**Defendants Promoted And Had Control Over Secondary Marketplaces Where RR/BAYC NFTs Were Sold Alongside BAYC NFTs:**  Defendants' claim that Mr. Ripps did not personally, directly sell the infringing NFTs on certain marketplaces is immaterial.  As discussed above, the record is replete with examples demonstrating how Defendants actively marketed secondary sales of their infringing NFTs on OpenSea and pushed for such sales to continue.  Moreover, Mr. Ripps admitted that he controlled the OpenSea sales page and made changes to it.  Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (" Q. But you had a page on OpenSea?  A. I had a page?  Did I have a page?  No.  ***Perhaps RR/BAYC collection had a page on OpenSea***.  Q. And who ran that collection?  A. ***Who ran that collection?  I did because I have the keys to the RR/BAYC***.") (emphasis added); *id.* at 81:22-82:7 ("A. ***I do remember at one point making the background image the banner***, if you will, to say 'Long Live Conceptual Art,' or something like that, or 'You can't copy an NFT,' or something along those lines . . .") (emphasis added).  Further, as Mr. Atalay testified, the owner of the RR/BAYC smart contract controls how the collection is displayed in secondary marketplaces such as OpenSea.  Trial Tr. at 136:13-16.  In other words, since Mr. Ripps owns the RR/BAYC smart contract, he also controls it on marketplaces such as OpenSea.  Accordingly, Mr. Ripps' promotion of RR/BAYC NFT secondary sales on OpenSea and control of the website demonstrate his actions to sell RR/BAYC NFTs on the same marketplace as genuine BAYC NFTs.

Additionally, Defendants' attempt to characterize Defendants' tweets (e.g., JTX-683, JTX-719, JTX-685) as "simply reporting what is going on in the crypto space" or as adequately identifying Mr. Ripps as the creator is misleading at best.

These tweets are all marketing tactics to promote and sell the RR/BAYC NFTs by advertising their success in NFT marketplaces and thereby attract consumers to purchase their infringing NFTs. Defendants' claim of using a modified version of Yuga Labs' logo also does not support their position. Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs, including when testing Defendants' alleged modified use of the BAYC Marks. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

**The Exhibits To Which Yuga Labs Cites Are Not Misleading:** Nothing is misleading about JTX-686. That document shows a comparison of a genuine BAYC NFT listed on OpenSea and one of Defendants' infringing NFTs listed on OpenSea. Defendants do not and cannot dispute that both NFTs appeared on OpenSea at the same time. Even though Mr. Cahen admits that he did sell Defendants' infringing NFTs directly on OpenSea, (*see* Trial Tr. at 202:18-25); JTX-686 includes a listing on the secondary market by a third party, which is not surprising as a significant portion of the trading volume put into motion and actively promoted by Defendants' infringement took place on secondary markets. *See* Trial Tr. 202:4-12 ("The majority of the sales are taking place on secondary markets."). The fact also remains that Defendants actively marketed secondary sales of their infringing NFTs on OpenSea and pushed for such sales to continue. *See, e.g.*, JTX-683 (tweet from Mr. Cahen stating "RR/BAYC is officially the highest 24h volume . . . IN THE WORLD!"; JTX-685 (tweet from Mr. Cahen stating "RR/BAYC about to become the first project ever to top both the @foundation and the @opensea charts."). It simply lacks credibility for Defendants to claim otherwise.

**Defendants' Disputed Post Trial Finding of Fact No. 52:**

Yuga's allegations that Mr. Ripps and Mr. Cahen obtained profits resulting from actual confusion relies on a set of social media "bot" accounts, out-of-context

jokes, and sarcastic comments made by fans of Mr. Ripps and Mr. Cahen (Cahen Decl. ¶¶ 226-253; Ripps Decl. ¶¶ 210-222 (uncontested)). They do not show profits resulting from actual confusion.

**Plaintiff's Basis for Dispute:**

Defendants offer no support for their self-serving claim that evidence unfavorable to them is "sarcastic" or a "joke." Nor does that persuasively demonstrate that the confused parties were friends or supporters who were merely in on the joke and perpetuating the confusion (rather than being confused themselves).

Defendants' RR/BAYC NFTs are infringing goods to which they are not entitled to retain profits. All of the NFTs incorporate the BAYC Marks by virtue of the immutable traits coded into the smart contract, Atalay Decl. (Dkt. 337) ¶ 4, and they are all part of a collection that the Court has already ruled was likely to cause consumer confusion. SJ Order (Dkt. 225) at 10-13. There is no requirement for Yuga Labs to prove that all of Defendants' profits resulted from "actual confusion"; the standard under the Lanham Act is likelihood of confusion, which has already been established. All profits Yuga Labs seeks to disgorge are attributable to Defendants' infringing products—each of which use the BAYC Marks in the marketing and sale of the infringing products. *See* Kindler Decl. (Dkt. 338) ¶ 61 (Defendants' profits are "are all traceable to Defendants' uses of Yuga Labs' BAYC Marks" because the marks are used on rrbayc.com, other marketplaces, "on the Etherscan token tracker, in the RR/BAYC smart contract, and in their promotions" (citation omitted)). Just as a counterfeit handbag peddler is not entitled to keep any ill-gotten profits from their sale of infringing goods, it is not a defense for Defendants to claim that some purchasers were in on the infringement. *See, e.g.*, *Gucci Am., Inc.*, 868 F. Supp. 2d at 238, 255 (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived

by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").  Ultimately, it is up to the court to "ensure that the defendant may not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ." *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) (cleaned up).

Even so, there is abundant evidence of actual confusion in this case unique to Defendants' infringing NFTs.  *See, e.g.*, JTX-701 and JTX-1049 (Bloomberg news segment reporting Defendants' infringing NFT collection, under the name "Bored Ape Yacht Club V3"); JTX-705 (Twitter bot misreporting reporting sale of Defendants' infringing NFT as "Bored Ape Yacht Club" NFT); JTX-1029 (noting "confusion in these comments" in response to JTX-705).  Defendants' choice to market their infringing NFTs with Yuga Labs' BAYC Marks directly caused bots, sales pages, and other consumers to refer to the infringing NFTs with the BAYC and Bored Ape Yacht Club names.  *See, e.g.,* Solano Decl. (Dkt. 342) ¶¶ 63 (describing confusion caused by bot posts about sales of Defendants' infringing NFTs) (citing JTX-311, JTX-523, JTX-705, JTX-709, JTX-710, JTX-1030), 42 (discussing OpenSea listings of both genuine BAYC NFTs and Defendants' infringing NFTs) (citing JTX-686, JTX-611, JTX-684).  Worse still, for these downstream uses of the BAYC Marks, there was no disclaimer or evidence to suggest association with anyone other than Yuga Labs.

**Defendants' Response:**

Yuga does not offer any evidence to show that its use of sarcastic comments aimed at criticizing Yuga (such as JTX-1037, explained above) or jokes entirely unrelated to RR/BAYC NFTs (such as JTX-689, explained above) were in fact serious statement taken seriously by the public.  These exhibit, both facially and when considered in the context of the Twitter users involved, are clearly sarcastic comments and jokes.  But despite this, Yuga has taken these posts out of context

1   and mischaracterized them to create false arguments that there were actions aimed

2   at causing confusion.

3          Critically, the evidence at trial also showed that the RR/BAYC collection did

4   not cause any actual confusion and was not likely to cause confusion.  Defendants

5   received voluminous correspondence from RR/BAYC participants—none of which

6   indicated any confusion from primary sales or secondary sales.  Ripps Decl. ¶¶ 196-

7   207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed

8   gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346)

9   (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595,

10  JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are

11  aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

12  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

13  Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single

14  person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.

15  Trial Tr. [Muniz] 85:3-7 (“Q.  Now let's focus on, I think, what you were focused

16  on. Yuga Labs has been unable to identify even[] a single person who purchased an

17  RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.”).  Mr.

18  Solano, Yuga's President, similarly could not identify a single person that ever

19  bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-

20  19:1.  Given Defendants public discussions, steps taken to clarify the origin and

21  purpose of the RR/BAYC collection, and the fact that there was not even a single

22  confused consumer confirms that there was no likelihood of consumer confusion

23  and no actual consumer confusion.

24          The absolute lack of any actual confusion is critical to Yuga's request for

25  disgorgement.  This is because Yuga is not entitled to disgorgement because Yuga

26  failed to show that any of the profits associated with the RR/BAYC collection are

27  "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d

28  1400, 1408 (9th Cir. 1993),* abrogated on other grounds by *SunEarth, Inc. v. Sun*

1  *Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).  The evidence at trial

2  showed that RR/BAYC NFTs were reserved in protest ***against*** Yuga and to support

3  Defendants' artistic criticism, not in response to the "appeal of [Yuga's] symbol."

4  *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206

5  (1942).

6       Further, Yuga does not offer any evidence to show that its use of sarcastic

7  comments or jokes were improper, but again refers to exhibits that are not actually

8  evidence of confusion.  For example, Yuga relies on a Bloomberg news segment.

9  But the Bloomberg news segment did not discuss RR/BAYC NFTs or even the

10  BAYC V3 label that Yuga complains about.  The Bloomberg Crypto segment

11  centered on the recent cryptocurrency market crash and its impact on the valuation

12  of various cryptocurrency assets.  JTX-1049.  During a discussion of the NFT

13  market, Bloomberg news reporters highlighted that NFT valuation had dropped in

14  2022, along with the valuation of other cryptocurrency assets.  *Id.*  However, during

15  a brief discussion of an "eight percent jump in the NFT index," a chart listing NFT

16  collections appeared behind the Bloomberg reporter.  *Id.*  While the chart was

17  displayed, the reporter did not discuss any of the collections.  Instead, she

18  highlighted market changes such as volume drops on OpenSea of "almost 200%."

19  *Id.*  As the NFT collections chart was taken down, the reporter said "let's talk a

20  second longer about the Bored Ape Yacht Club collection" before discussing how

21  drops in valuation across the cryptocurrency market have also impacted that Bored

22  Ape Yacht Club's valuation.

23       Although the NFT collections chart shown during the Bloomberg segment

24  listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter

25  did not spend any time discussing and analyzing the chart.  *Id.*  She never

26  referenced the Defendants by name, she never referenced Defendants' criticisms of

27  Yuga, and she never even mentioned Yuga.  Instead, she briefly mentioned the

28  Bored Ape Yacht Club as the chart was taken down.  *Id.*  This is unsurprising since

the Bored Ape Yacht club was one of the collections listed on the chart. *Id*. However, nothing that the reporter said characterized Defendants' RR/BAYC project as being affiliated with Yuga or the Bored Ape Yacht Club. In fact, the reporter did not compare or contrast any of the listed collections. *Id*. She simply continued to her other talking points. *Id*. Thus, the Bloomberg news segment has not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs listed on the chart and the V3 NFTs listed on the chart—the same chart that was never discussed by anyone at any point during the news segment.

Yuga also misleadingly cites to posts by Twitter bots as "evidence of confusion." But in these posts by Twitter bots, users are quick to remark that the Twitter bot falsely indicated a Bored Ape Yacht Club transaction. JTX-705; JTX-1029. Users replied to the bot by saying "It's a RR ape" or "RRBAYC > BAYC." JTX-705. Another twitter user replied to the bot and mentioned this litigation, clearly indicating their ability to differentiate between RR/BAYC NFTs and Bored Ape Yacht Club NFTs. JTX-1029. These posts by bots, thus, also are not actually evidence of confusion. To the contrary, they show lack of confusion because users were readily able to identify that the bots were posting about RR/BAYC NFTs.

Yuga also cites to the unreliable Declaration of Mr. Solano as evidence of actual confusion associated with the RR/BAYC collection. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified
>        that they do not currently receive any royalties or creator fees from
>        sales on secondary marketplaces; right?
>
> A.   Yes.

Q.   So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.   Although, those were supposed to be donated to charity and never were.

Q.   ***They don't continue to increase; correct, sir?***

A.   ***Correct.***

Q.   ***That statement, that part of your witness statement is incorrect; right?***

A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at

line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Reply:**

Ample evidence of actual confusion has been presented at trial.  Defendants' response merely relies on their self-serving, fallback claim that they are jokes or sarcasm.  Defendants do not and cannot offer any substantiating proof.  Confusion was likely, and evident, in the marketplace and Defendants' anecdotal evidence of purported support does not rebut this fact.  Defendants continue to fail to offer any consumer or survey expert or even any larger market analysis.  Defendants' responses should be rejected.

As discussed *supra*, Defendants' response is unavailing.  Specifically: (1) there is ample evidence of actual confusion in the record (*supra* ¶ 3), (2) the Gem Bot tweet and replies demonstrated confusion (*supra* ¶ 32), (3) Defendants fail to disprove that any RR/BAYC purchasers were confused (*supra* ¶ 45), (4) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (5) Disgorgement is warranted because Defendants' profits are all attributable to their infringement and actual confusion is not necessary (*supra* ¶ 32), (6) Confusion

based on affiliation or sponsorship is actionable regarding "Bored Ape Yacht Club v3" on Bloomberg (*supra* ¶ 32), and (7) Defendants fail to impeach Mr. Solano's accurate testimony (*supra* ¶ 3).

**Defendants' Disputed Post Trial Finding of Fact No. 53:**

Yuga's alleged evidence of profits resulting from actual confusion are also based on Defendants' alleged use of terms BAYC V3 or Bored Ape Yacht Club V3. However, in reality, Mr. Ripps, Mr. Cahen, Mr. Hickman, and third-party Thomas Lehman did not use BAYC V3 or Bored Ape Yacht Club V3 to suggest that the RR/BAYC project had any affiliation with Yuga or to confuse any purchaser. Trial Tr. [Cahen] 253:18-21; [Cahen] 254:24-255:3.

**Plaintiff's Basis for Dispute:**

Defendants' assertion that they did not use "BAYC V3" to imply an affiliation with Yuga Labs or confuse consumers is contradicted by the evidence admitted at trial.  This contradiction is highlighted by the fact that Defendants could not keep their story straight.  First, Mr. Cahen testified at trial that "the V3 thing is never something that I used or Ryder used or Ryan Hickman used or Mr. Lehman used."  Trial Tr. at 253:19-21.  But now, in their proposed findings of fact and conclusions law, Defendants concede that they used the term, but argue that such use was "in a sarcastic context and as a joke."  Defendants' inconsistent testimony should be given no weight and this assertion should not be accepted as true.

Mr. Ripps' use of "BAYC V3" to refer to the infringing NFTs suggests an affiliation with Yuga Labs, and therefore the assertion that neither Defendants nor their associates used the term "to suggest that the RR/BAYC project had any affiliation with Yuga or to confuse any purchaser" is false.  On one occasion, in response to a Tweet by @j1mmy.eth asking what NFT collections consumers were purchasing, Mr. Ripps tweeted "bayc v3."  JTX-689.  Four days later, Mr. Ripps tweeted a link to a secondary sales marketplace where his infringing NFTs were listed under the name "Bored Ape Yacht Club V3."  JTX-690.  Both of these terms

include Yuga Labs' trademarks and thus imply an affiliation with Yuga Labs and the Bored Ape Yacht Club brand.  And in neither Tweet did Mr. Ripps make any attempt to dispel any confusion as to this obvious affiliation.  He did not mention Ryder Ripps NFTs or RR/BAYC.  He only said "bayc v3" or "Bored Ape Yacht Club V3."  And given the fact that Mr. Ripps referred to the RR/BAYC NFTs as "bayc v3" and "Bored Ape Yacht Club V3" at least twice, Defendants' use of "alleged" in this contention lacks credibility and is demonstrably false.

Defendants' assertion that the use of Yuga Labs' marks was not meant "to confuse any purchaser" should be given no weight in light of the Court's finding that Defendants "used the BAYC marks in an effort to confuse consumers."  SJ Order (Dkt. 225) at 12.   Defendants cannot evade liability by claiming that their blatant infringement was a joke—and regardless, the end result was confusion in the marketplace and a significant payday for Defendants and their associates.  *See* JTX-701 (Bloomberg referring to RR/BAYC as Bored Ape Yacht Club V3).

**Defendants' Response:**

Yuga cites to various trial transcript segments to argue that the trial transcript indicates that Mr. Cahen used "v3" in a sarcastic manner and as a joke and is inconsistent with his statement that he never used the term.  First, Mr. Cahen states that he would have never referred to the RR/BAYC project as "V3"and explained that he believed the term originated in this context from DMCA takedowns. Trial Tr. [Cahen] 253:15-254:7.  He then explains that *others* on the internet would use the "V3" as a joke but that "myself, nor anyone on my team, ever used that label or name or whatever you want to call it. V3 is something that we have absolutely nothing to do with."  *Id.* at 255:4-7.  It is entirely consistent that Mr. Cahen never used the term v3 but that others on the internet might have.  He also stated that Mr. Ripps might have used the term sarcastically.  *Id.* at 255: 8-12.

JTX-689 and JTX-690 do not show an intentional use of Bayc V3 to confuse. JTX-689 is a sarcastic reply to j1mmy.eth, one of the more prominent BAYC

1  holders that Ryder had publicly feuded with in the past.  *See* JTX-689; Dkt. 346

2  Ripps Decl. ¶¶ 73-80 (Dkt. 346) (uncontested).  It was a clear joke that anybody

3  familiar with the feud between Jimmy and Mr. Ripps would understand and not an

4  attempt to dupe anybody.  Likewise, JTX-690 which purportedly shows a Tweet

5  with v3 only displays "v3" if the mouse is left hovering over the link in a specific

6  way.  The actual body of the Tweet does *not* include the v3 term, and Yuga has

7  shown no evidence that the URL name was not automatically generated.

8      Yuga points to the Bloomberg video as evidence that the use of "v3" by

9  Defendants led to confusion.  *See* JTX-701.  But the Bloomberg news segment did

10  not discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains

11  about.  The Bloomberg Crypto segment centered on the recent cryptocurrency

12  market crash and its impact on the valuation of various cryptocurrency assets.  JTX-

13  1049.  During a discussion of the NFT market, Bloomberg news reporters

14  highlighted that NFT valuation had dropped in 2022, along with the valuation of

15  other cryptocurrency assets.  *Id.*  However, during a brief discussion of an "eight

16  percent jump in the NFT index," a chart listing NFT collections appeared behind

17  the Bloomberg reporter.  *Id.*  While the chart was displayed, the reporter did not

18  discuss any of the collections.  Instead, she highlighted market changes such as

19  volume drops on OpenSea of "almost 200%."  *Id.*  As the NFT collections chart

20  was taken down, the reporter said "let's talk a second longer about the Bored Ape

21  Yacht Club collection" before discussing how drops in valuation across the

22  cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

23      Although the NFT collections chart shown during the Bloomberg segment

24  listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter

25  did not spend any time discussing and analyzing the chart.  *Id.*  She never

26  referenced the Defendants by name, she never referenced Defendants' criticisms of

27  Yuga, and she never even mentioned Yuga.  Instead, she briefly mentioned the

28  Bored Ape Yacht Club as the chart was taken down.  *Id.*  This is unsurprising since

the Bored Ape Yacht club was one of the collections listed on the chart. *Id*.
However, nothing that the reporter said characterized Defendants' RR/BAYC
project as being affiliated with Yuga or the Bored Ape Yacht Club. In fact, the
reporter did not compare or contrast any of the listed collections. *Id*. She simply
continued to her other talking points. *Id*. Thus, the Bloomberg news segment has
not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs
listed on the chart and the V3 NFTs listed on the chart—the same chart that was
never discussed by anyone at any point during the news segment.

Accordingly, Yuga does not point to any evidence that the Bloomberg
reporters were actually confused or that even the chart in the background indicated
any confusion between the Bored Ape Yacht Club, which was listed separate and
apart from the V3 listing). In fact, Yuga witnesses admitted that they never spoke
with Bloomberg reporters and thus cannot actually speak about Bloomberg's state
of mind. Trial Tr. [Solano] 31:3-17. They have also shown no evidence that it was
Defendants' use of the term "v3" that led to the Bloomberg report.

**Plaintiff's Reply:**

Defendants' response merely relies on their self-serving, fallback claim that
their confusing use of BAYC V3 and Bored Ape Yacht Club V3 are jokes and
sarcasm. Defendants only arrived at this alternative explanation after their first two
explanations—offered through Mr. Cahen, under oath—were disproven. *Supra*
¶ (7) (reply in support of objection, refuting Defendants' claims the name
originated from 27 takedowns, and alternative explanation that Defendants never
used the term). Mr. Cahen testified to these other explanations under oath several
times before finally admitting that Defendants did use these names to promote their
infringing NFT collections. *Id*.

Defendants now argue here that the Bored Ape Yacht Club V3 and BAYC
V3 names are just a "joke," but fail to substantiate this with any evidence or even
explain what the joke is. *See supra* ¶ (7) (reply in support of objection, addressing

claim that Defendants used the terms but only as a joke).  Critically, they do not address the confusion by those who are not in-on-the-joke.  As Defendants admit, Twitter is open to everyone, not just the distributors of their counterfeits. Confusion was likely and evident in the marketplace.

Defendants fail to support their argument that Bloomberg's reporting of their infringing NFT collection as another version of Yuga Labs' genuine BAYC NFT collection does not demonstrate confusion.  Defendants contend that the Bloomberg reporter "never referenced the Defendants by name" and "never referenced Defendants' criticisms of Yuga," but this is exactly the point.  The two different products appeared on the **same chart** under the **same name**, with Defendants' collection falsely denoted as a new version of Yuga Labs' genuine NFT collection. Consumers and even sophisticated market analysts were confused by Defendants' infringement and **did not realize** that the infringing collection was affiliated with Defendants or meant to express any "criticisms."  This result is not surprising, since Defendants' infringing NFT collection used the BAYC Marks without Defendants' names or any "criticisms" in the NFTs or the smart contract whatsoever.  *See, e.g.*, JTX-28; JTX-600.  For Defendants to contend that their sale of the same exact product under the same exact marks did not create confusion simply lacks any credibility.  *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  Defendants' argument that the Bloomberg reporter did not know that Defendants' infringing collection originated from them or was actually a purported art project only proves the point that Defendants' actions led to confusion in the marketplace where consumers were not in on the scam.

Finally, as discussed *supra* ¶ 32, confusion based on affiliation or sponsorship is actionable regarding "Bored Ape Yacht Club v3" on Bloomberg.

**Defendants' Disputed Post Trial Finding of Fact No. 54**:

The term "BAYC V3" was, however, referenced on social media in a sarcastic context and as a joke. Trial Tr. [Cahen] 254:25-255:2.

**Plaintiff's Basis for Dispute**:

Defendants offer no support for their self-serving claim that evidence unfavorable to them is "sarcastic" or a "joke" and this assertion is contradicted by evidence admitted at trial.  Four days after tweeting "bayc v3," Mr. Ripps tweeted a link to a secondary sales marketplace where his infringing NFTs were listed under the name "Bored Ape Yacht Club V3."  JTX-690.  Neither Tweet contained any additional context or editorialization that would demonstrate an attempt at humor, because they were not jokes, they were intended to stimulate sales of Defendants' infringing NFTs.  And Defendants' new admission about Defendants' use of BAYC V3 flies in the face of Mr. Cahen's testimony at trial and in his trial declaration. *See* Trial Tr. at 253:18-21 ("And like to give a little bit more clarity around that, the V3 thing is never something that I used or Ryder used or Ryan Hickman used or Mr. Lehman used."); Cahen Decl. (Dkt. 344) ¶ 251 ("We did not promote the RR/BAYC collection as BAYC V3 or Bored Ape Yacht Club V3 and it is not the name of a project that we have ever been involved with or familiar with.").  Mr. Cahen lied; repeatedly.

It is telling that Mr. Ripps' testimony was silent on the issue, Mr. Ripps made no attempt to explain his Tweets referencing the confusing "V3" name but instead stood firm on Mr. Cahen's demonstrably false testimony.

Mr. Ripps' use of BAYC V3 to refer to the infringing NFTs incorporates Yuga Labs' trademarks and thus necessarily creates an affiliation with Yuga Labs and the Bored Ape Yacht Club brand.  Defendants' attempt to relitigate intent falters in light of the Court's finding that Defendants "used the BAYC marks in an effort to confuse consumers."  SJ Order (Dkt. 225) at 12.  Defendants cannot evade liability by claiming that their blatant infringement was a joke—and regardless, the

end result was confusion in the marketplace and a significant payday for Defendants and their associates. *See* JTX-701 (Bloomberg referring to RR/BAYC as Bored Ape Yacht Club V3).

**Defendants' Response:**

As explained above JTX-689 is a sarcastic response to j1mmy.eth (Mr. McNelis) a Twitter user with longstanding and public disagreements with Mr. Ripps. Mr. Ripps discussed this in his declaration. Ripps Decl. ¶¶ 73-80 (Dkt. 346) (uncontested). Anybody seeing that Tweet—which did not link to any RR/BAYC NFT materials—would understand that it was sarcastic and meant to mock Mr. McNelis.

Likewise, as explained above, "bayc v3" does not show up in the body of the Tweet that comprises JTX-690. Instead, one must hover their mouse precisely over the link for the "v3" to show. *See* JTX-690. Yuga has presented no evidence that Mr. Ripps was responsible for the technical aspects of the URL as it appears when a person hovers their mouse over it. Relying on text that only appears when a mouse is held over the link in a precise manner does not make a compelling case that Mr. Ripps was attempting to have customers be duped by the use of the term.

Lastly, as explained above, Yuga selectively cuts portions of Mr. Cahen's testimony to try to manufacture an inconsistency. In short, Mr. Cahen tesetified that he would have never referred to the RR/BAYC project as "V3"and explained that he believed the term originated in this context from DMCA takedowns. Trial Tr. [Cahen] 253:15-254:7. He then explains that *others* on the internet would use the "V3" as a joke but that "myself, nor anyone on my team, ever used that label or name or whatever you want to call it. V3 is something that we have absolutely nothing to do with." *Id.* at 255:4-7. It is entirely consistent that Mr. Cahen never used the term v3 but that others on the internet might have. It is also consistent for him to say that *others* used it as a joke, but that does not mean that he used it, or

even that he used it as a joke.   He also stated that Mr. Ripps might have used the term sarcastically.  *Id.* at 255:8-12.

Yuga points to the Bloomberg video as evidence that the use of "v3" by Defendants led to confusion.  *See* JTX-701.  But the Bloomberg news segment did not discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains about.  The Bloomberg Crypto segment centered on the recent cryptocurrency market crash and its impact on the valuation of various cryptocurrency assets.  JTX-1049.  During a discussion of the NFT market, Bloomberg news reporters highlighted that NFT valuation had dropped in 2022, along with the valuation of other cryptocurrency assets.  *Id.*  However, during a brief discussion of an "eight percent jump in the NFT index," a chart listing NFT collections appeared behind the Bloomberg reporter.  *Id.*  While the chart was displayed, the reporter did not discuss any of the collections.  Instead, she highlighted market changes such as volume drops on OpenSea of "almost 200%."  *Id.*  As the NFT collections chart was taken down, the reporter said "let's talk a second longer about the Bored Ape Yacht Club collection" before discussing how drops in valuation across the cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

Although the NFT collections chart shown during the Bloomberg segment listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter did not spend any time discussing and analyzing the chart.  *Id.*  She never referenced the Defendants by name, she never referenced Defendants' criticisms of Yuga, and she never even mentioned Yuga.  Instead, she briefly mentioned the Bored Ape Yacht Club as the chart was taken down.  *Id.*  This is unsurprising since the Bored Ape Yacht club was one of the collections listed on the chart.  *Id.*  However, nothing that the reporter said characterized Defendants' RR/BAYC project as being affiliated with Yuga or the Bored Ape Yacht Club.  In fact, the reporter did not compare or contrast any of the listed collections.  *Id.*  She simply continued to her other talking points.  *Id.*  Thus, the Bloomberg news segment has

not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs listed on the chart and the V3 NFTs listed on the chart—the same chart that was never discussed by anyone at any point during the news segment.

Accordingly, Yuga does not point to any evidence that the Bloomberg reporters were actually confused or that even the chart in the background indicated any confusion between the Bored Ape Yacht Club, which was listed separate and apart from the V3 listing). In fact, Yuga witnesses admitted that they never spoke with Bloomberg reporters and thus cannot actually speak about Bloomberg's state of mind. Trial Tr. [Solano] 31:3-17. They have also shown no evidence that it was Defendants' use of the term "v3" that led to the Bloomberg report.

**Plaintiff's Reply:**

As with their previous response (*supra* ¶ 53) Defendants' response here merely relies on their self-serving, fallback claim that their confusing use of BAYC V3 and Bored Ape Yacht Club V3 are jokes or sarcasm. Defendants do not and cannot offer any substantiating proof to substantiate that they are jokes or sarcasm or to disprove Mr. Ripps' creation of them. Nor do they address the confusion by those who are not in-on-the-joke. As they admit—Twitter is open to everyone, not just the distributors of their counterfeits. Confusion was likely and evident in the marketplace.

As discussed *supra*, Defendants' response is unavailing. Specifically: (1) Defendants continue to lie about their use of BAYC V3 and Bored Ape Yacht Club V3 (*supra* ¶ 7), and (2) confusion based on affiliation or sponsorship is actionable regarding "Bored Ape Yacht Club v3" on Bloomberg (*supra* ¶ 32), and (3) Defendants' use of Bored Ape Yacht Club V3 caused confusion (*supra* ¶ 53).

Further, Defendants' contention that they did not use "V3" merely because a mouse pointer must hover over the URL to see the full "Bored Ape Yacht Club V3" (*see* JTX-690) is false. By simply clicking on the link, consumers would be taken to Bored Ape Yacht Club V3 sales page. And JTX-689 shows the BAYC V3 mark

in-full in Mr. Ripps' tweet.  Defendants' hand-waving misses the point—Mr. Ripps posted links to NFT sales pages bearing the BAYC Marks.

**Defendants' Disputed Post Trial Finding of Fact No. 55:**

Some third-party resellers also auto-generated the terms "Bored Ape Yacht Club V3" or "BAYC V3," including when generating a new name space after resolution of requests pursuant to the Digital Millennium Copyright Act. Trial Tr. [Cahen] 253:22-254:7. Mr. Ripps and Mr. Cahen had no control over and no affiliation with those third-parties who auto-generated "Bored Ape Yacht Club V3" or "BAYC V3." Trial Tr. [Cahen] 254:3-7.

**Plaintiff's Basis for Dispute:**

Evidence admitted at trial demonstrates that Mr. Ripps used the term BAYC V3 before Yuga Labs sent a single DMCA notice to enforce its trademark rights against Defendants' infringement.  JTX-689 (tweet from Mr. Ripps on May 13, 2022, promoting infringing NFTs as "bayc v3"); Dkt. 193-2 ¶ 93 (undisputed fact that the first takedown notice issued against the RR/BAYC NFTs occurred on May 17, 2022).  Defendants also lack personal knowledge as to why certain third-party marketplaces purportedly used the same terminology as Mr. Ripps to refer to Defendants' infringing NFTs—which is a dubious coincidence.  And even if some marketplaces adopted the name *first used by Mr. Ripps* in response to Yuga Labs' takedown notices, it merely demonstrates that these marketplaces were confused and associated Defendants' infringing NFTs with Yuga Labs' Bored Ape Yacht Club brand.  This was compounded by the fact that Mr. Ripps marketed his infringing NFTs by tweeting links to marketplaces selling the NFTs under the "Bored Ape Yacht Club V3" name.  JTX-690.  This repeated false association in turn amplified confusion in the marketplace to the point that even Bloomberg, a national media company, attributed Defendants' infringing products to the Yuga Labs' Bored Ape Yacht Club brand.  *See* JTX-701.  This confusion was also compounded by the fact that the RR/BAYC token tracker immutably copies Yuga

Labs' marks so even if someone tried to determine if Mr. Ripps' use of BAYC V3
referred to some unaffiliated NFT collection they would still encounter Yuga Labs'
marks and attribute the infringing NFTs to Yuga Labs.  JTX-117.  All of this
confusion flows directly from Defendants' deliberate decision to steal Yuga Labs'
BAYC Marks and adopt the same images for their infringing NFTs.

**Defendants' Response:**

As explained above JTX-689 is a sarcastic response to j1mmy.eth (Mr.
McNelis) a Twitter user with longstanding and public disagreements with Mr.
Ripps.  Mr. Ripps discussed this in his declaration.  Ripps Decl. ¶¶ 73-80 (Dkt. 346)
(uncontested).  Anybody seeing that Tweet—which did not link to any RR/BAYC
NFT materials—would understand that it was sarcastic and meant to mock
j1mmy.eth.  Further, it was common on the internet to reference things jokingly as
"v3" so this was a common joke that the average crypto enthusiast would
understand.  *See* Trial Tr. [Cahen] 255: 1-3 (explaining that it is a common joke that
others may have engaged with).  The timing in relationship to the DMCA has no
bearing on the proposed finding of fact.

Yuga claims that Defendants lack personal knowledge as to "why certain
third-party marketplaces purportedly used the same terminology as Mr. Ripps to
refer to Defendants' infringing NFTs."  First, Yuga did not object to any portion of
Defendants' testimony on this regard.  Thus, to the extent they are making an
evidentiary objection it is waived.  *See Fenton v. Freedman*, 748 F.3d 1358, 1360
(9th Cir. 1984).  Further, Defendants do not need to know *why* certain third-party
websites took an action, it is sufficient for them to state that third-party websites
took an action.  Yuga presented no evidence contradicting this testimony that third-
party websites "version up" names of NFT collections.

Lastly, the argument that the marketplaces were "confused" by the use of
BAYC is presented without evidence.  In fact, Yuga presented no evidence about
any confusion by any market that believed that the RR/BAYC project was

associated with it.  As such, the fact that the Token Tracker contained the term "BAYC" has no bearing on whether Defendants used the term "Bayc v3" with the intent to confuse consumers.  Finally, for the reasons stated above, Yuga did not prove that Bloomberg was confused, nor that it was confused by Defendants' use of the term "Bayc v3".  Trial Tr. [Solano] 31:3-17.

**Plaintiff's Reply:**

Defendants' response states "[t]he timing [of Defendants' use of V3] in relationship to the DMCA has no bearing on the proposed finding of fact."  But that is precisely the causal relationship that Defendants' proposed finding of fact contends.  Caught in their lies, Defendants' attempt to walk back their position.

The record shows that the first takedown of the RR/BAYC collection occurred on May 17, 2022.  Dkt. 149-5 (table of takedown requests in summary judgment record).  ***Every single takedown request*** occurs after Defendants were using the "V3" name to promote their infringing NFT collection.  JTX-689 (May 13, 2022 tweet by Mr. Ripps using "bayc v3"); JTX-1249 (May 14, 2022 tweet by Mr. Ripps showing "Bored Ape Yacht Club V3" as the name of his NFT).  Defendants' testimony is a knowing lie, and a failed attempt to mislead the Court about their intentional use of Yuga Labs' BAYC Marks to sell their infringing NFTs.  Defendants' persistent shifting of stories to try to hide their blatant lies and intent is telling.  Defendants are bad-faith infringers and this is an exceptional case.

Nevertheless, even accepting as true Defendants' contention that third-party marketplaces would "version up" the BAYC name used by Defendants, that necessitates that Defendants first used the confusingly similar name.  Defendants prove Yuga Labs' point.  Defendants' use of the BAYC Marks caused the marketplace to confuse and associate Defendants' NFTs with Yuga Labs' Bored Ape Yacht Club brand.  That is the infringement that must be remedied through disgorgement of Defendants profits and injunctive relief, including transferring the

RR/BAYC smart contract to Yuga Labs so that Yuga Labs can prevent or address further confusion on these marketplaces.

Defendants' actions caused third-party marketplaces to associate Defendants' infringement with Yuga Labs' BAYC marks, which furthered the confusion in the marketplace.  Defendants have no response to these facts.

Finally, as discussed *supra*, the rest of Defendants' response is unavailing. Specifically: (1) Defendants continue to lie about their use of BAYC V3 and Bored Ape Yacht Club V3 (*supra* ¶ 7), and (2) Defendants' use of Bored Ape Yacht Club V3 caused confusion (*supra* ¶ 53, 54).

**Defendants' Disputed Post Trial Finding of Fact No. 56:**

Yuga's alleged evidence of confusion also relies on a Bloomberg News clip with "Bored Ape Yacht Club V3" written in the background. Yuga's President, Mr. Solano, could not identify any basis for Yuga's contention that the background image references the RR/BAYC project. Trial Tr. [Solano] 30:22-31:5.

**Plaintiff's Basis for Dispute:**

This contention is contradicted by testimonial and documentary evidence. Contrary to Defendants' assertions, Mr. Solano's testimony demonstrates that he knew that "Bored Ape Yacht Club V3" referred to Defendants' infringing NFTs because Defendants promoted the RR/BAYC NFTs under that misleading title. Trial Tr. at 32:5-8 ("And, yeah, the whole way that we're describing it as RR/BAYC, of course they are not saying that because it said Bored Ape Yacht Club V3. That's how [Defendants] were promoting it.").  As Mr. Solano testified, Mr. Ripps has referred to and marketed his infringing NFTs under the names "BAYC V3" and "Bored Ape Yacht Club V3."  JTX-689 (tweet from Mr. Ripps promoting infringing NFTs as "bayc v3"); JTX-690.

Additionally, the Bloomberg segment lists NFT collections by their trading volume.  JTX-701.  Mr. Cahen bragged that Defendants' infringing NFTs were trading at the highest volume on OpenSea in a Tweet the day before the Bloomberg

segment aired.  JTX-683 (June 20, 2022 Cahen Tweet stating that "RR/BAYC is officially the highest 24h volume… IN THE WORLD" and that RR/BAYC "passed BAYC in the middle of ApeFest!").  OpenSea's own data also confirm that at the time that Bloomberg was reporting that "Bored Ape Yacht Club V3" NFTs were trading at the highest volume, so too were Defendants' infringing RR/BAYC NFTs.  JTX-684.  Thus, it is disingenuous at best for Defendants to now claim that the Bloomberg segment did not refer to the RR/BAYC NFTs when, as Mr. Solano noted, Defendants "bragged that RR/BAYC NFTS were the number on NFT collection in the world" at the same time that OpenSea reported that "Bored Ape Yacht Club V3" was trading at the highest volume globally.  Solano Decl. (Dkt. 342) at ¶ 72.  Tellingly, Defendants offered no alternative explanation for what "Bored Ape Yacht Club V3" referred to if not the RR/BAYC NFTs.  That is because "Bored Ape Yacht Club V3" and RR/BAYC are one and the same.  Defendants' false contention should be rejected.

### Defendants' Response:

Yuga's attempt to parlay a clip which they admitted never actually says the term "BAYC v3" or any variant thereof into proof that Bloomberg News had somehow seen one of the very few incidents they could find referencing "v3" [Solano] 30:22-31:5.  Tellingly, Mr. Solano materially changed his testimony between trial where he tried to claim that "v3" was made by Defendants and his deposition.  He was impeached over this gross inconsistency.  Trial Tr. [Solano] 33:4-11 (admitting that he did not know whether v3 was made by Defendants).

Yuga points to specific testimony from Mr. Solano to buttress its claim that he was able to testify that "Bayc v3" is the same as "RR/BAYC."  *See* Trial Tr. [Solano] 32:5-8.  However, that relies upon evidence that Defendants "were promoting" the collection as such.  Yuga can only cite to two solitary Tweets to support its claim, JTX-689 and JTX-690.  JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis's question on what NFTs people are

buying.  Mr. Ripps's reply is a satirical comment that has absolutely nothing to do with the RR/BAYC collection and, in fact, the comment was made before Mr. Ripps even started taking commissions for RR/BAYC NFTs.  Thus, JTX-689 was an obvious joke reply to j1mmy.eth (Mr. McNelis), who Mr. Ripps explained he had a pre-existing relationship with.  Dkt. 346 Ripps Decl. ¶¶ 73-80 (Dkt. 346) (uncontested).   And JTX-690 is a Twitter post by Mr. Ripps of the link to the x2y2.io page for the RR/BAYC collection.  At no point did Mr. Ripps state "BAYC V3" or "Bored Ape Yacht Club V3" in this post as it simply contains a link.  And while the URL does contain "bored-ape-yacht-club-v3," Mr. Ripps had no control over the URL.

By way of comparison Defendants used the term "RR/BAYC" numerous times in connection with the Project including in promotion.  *See e.g.*, JTX-2102 (promoting project using term RR/BAYC); JTX-2085 (rrbayc.com); JTX-2086 (disclaimer reference "RR/BAYC"); Ripps Decl. ¶¶ 87-91 (Dkt. 346) (uncontested) (explaining choice to name collection "RR/BAYC).

So contrary to the argument that "RR/BAYC" and "BAYC v3" are the same thing, the evidence indicates that Bayc v3 is ***not*** a name that Defendants would have ever chosen.

**Plaintiff's Reply:**

Defendants do not dispute the fact that Mr. Cahen tweeted that RR/BAYC NFTs were trading at the highest volume on OpenSea the day before Bloomberg reported "Bored Ape Yacht Club V3" as the top NFT collection.  Defendants also do not dispute the fact that Mr. Ripps tweeted posts stating "BAYC V3" and a URL containing "Bored Ape Yacht Club V3."  Nor do Defendants offer any alternative explanation for what "Bored Ape Yacht Club V3" could have referred to.  That is because "Bored Ape Yacht Club V3" is RR/BAYC.  Defendants' responses lack merit.  Worse still Defendants' claim that "Bayc v3 is not a name that Defendants would have ever chosen" is a lie.  The evidence shows that it was Mr. Ripps and

only Mr. Ripps that was the first to use the Bayc v3 moniker.  Despite their shifting stories, they haven't been able to run from this fact.

Further, Defendants suggest that their use of the term "RR/BAYC" precludes the possibility that they also used "Bored Ape Yacht Club V3."  That is non-sensical.  Defendants can, and have, used multiple terms using the BAYC Marks to identify and promote their infringement.

Defendants' response is unavailing for the same reasons discussed *supra*, specifically because (1) Defendants continue to lie about their use of BAYC V3 and Bored Ape Yacht Club V3 (*supra* ¶ 7), (2) Defendants' use of Bored Ape Yacht Club V3 caused confusion (*supra* ¶ 53), (3) Defendants fail to impeach Mr. Solano's accurate testimony (*supra* ¶ 3), and (4) Defendants intended to confuse consumers and had control over third-party websites and marketplaces (*supra* ¶ 9). But even if Defendants had no control over these websites and marketplaces, the point remains that their confusing use of the BAYC Marks can never be removed from the smart contract, causing hyperlinks and other future references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs.  Without the RR/BAYC smart contract, Yuga Labs cannot retain control of the use of its marks.  *See* Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

Indeed, the immutability of the RR/BAYC NFT contract is not an impediment to transferring the contract to Yuga Labs, but a major reason the contract *should* be transferred to Yuga Labs.  As long as Defendants have the

RR/BAYC smart contract, they will continue to be infringing on the BAYC Marks in it.  More directly, though, the contract will always say Bored Ape Yacht Club and BAYC—Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  If Defendants maintain control of the RR/BAYC smart contract consumers may still be confused as to the source of the NFTs – Defendants have argued that consumers will see Mr. Ripps' name as the creator of the NFTs and thus know that his NFTs are not Yuga Labs' NFTs.  Defendants have no survey concluding this is likely; it is equally possible that consumers see his name and think he is somehow related to Yuga Labs because the contract prominently uses two BAYC Marks.

Moreover, if Defendants maintain ownership and control over the smart contract, they could continue to obtain royalties or mint new RR/BAYC NFTs in the future (even if ordered not to do so).  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs, will help reduce future confusion and reduce the risk of future ill-gotten gains to Mr. Ripps.  An order solely prohibiting Defendants from minting RR/BAYC NFTs would not accomplish this.

**Defendants' Disputed Post Trial Finding of Fact No. 58:**

Yuga's President, Mr. Solano, relied on the declaration despite not having read the entirety of Mr. Lehman's deposition. Trial Tr. [Solano] 38:4-10.

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable.  Mr. Solano testified that he had reviewed some portions of Mr. Lehman's deposition.  Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no").  It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day.  And Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman

Depo. Designations (Dkt. 404-2) at 124:5-9.  Therefore, Mr. Solano relied upon a reliable document to support his testimony and it is thus immaterial whether he reviewed the entire deposition.  And even if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement.  *Id.*; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York. *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs the injunction to which it is entitled or Defendants' profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Defendants' contention should be disregarded as immaterial and irrelevant.

**Defendants' Response:**

Yuga fails to present any evidence which disputes this finding of fact. Instead, Yuga argues that this finding of fact is immaterial.  Given Yuga's position, it would be more accurate for Yuga to mark this finding of fact yellow (undisputed, but irrelevant), rather than red (disputed).

Mr. Solano cites Mr. Lehman's declaration in his declaration.  Dkt. 342 at ¶ 50; ¶ 71.  Additionally, Mr. Solano admitted that he did not read the entirety of Mr. Lehman's deposition:

Q.    Did you read Mr. Lehman's deposition?

A.    No.

Q.    Mr. Lehman's deposition has -- you didn't take a look at Mr. Lehman's deposition before you relied on his declaration?

A.    I have read parts of it, but I have not read his entire deposition, no.

Trial Tr. [Solano] 38:4-10.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact.  Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

**Mr. Lehman's Declaration Is Truthful and Reliable:**  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's declaration by arguing that Mr. Solano did so without reading his entire deposition are without merit.

Mr. Lehman repeatedly testified to the accuracy of his declaration, regardless of how he may have felt about the process of being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr. Lehman's declaration was also corroborated by the consent judgment entered against him in the Northern District of New York.  JTX-621.

More specifically, Mr. Lehman testified that he spent several days drafting the declaration prior to signing it—with the advice of his counsel.  Lehman Depo. Designations (Dkt. 404-2) at 240:3-9.  Mr. Lehman testified that he toiled to make sure that everything included in his declaration was truthful and adequately supported by documentary evidence.  Lehman Depo. Designations (Dkt. 404-2) at 241:21-24.  And regardless of whether Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).

Mr. Lehman's declaration stands on its own, and Mr. Solano had reviewed the declaration based upon his testimony about its contents in his own trial declaration. *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71.

**Defendants' Disputed Post Trial Finding of Fact No. 59:**

Mr. Solano relied on the declaration without having considered that Mr. Lehman signed the declaration because he was intimidated by Yuga's lawsuit against him. Trial Tr. [Solano] 38:1-13

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable.  Mr. Solano testified that he had reviewed some portions of Mr. Lehman's deposition.  Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no").  It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day.  And regardless of whether he felt "intimidated" by the meritorious lawsuit against him, Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  Therefore, Mr. Solano relied upon a reliable document to support his testimony and it is thus immaterial whether he reviewed the entire deposition.  And even if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement.  *Id.*; *see also*  Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York. *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs the injunction to which it is entitled or Defendants'

1  profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that

2  Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").

3  Defendants' contention should be disregarded as immaterial and irrelevant.

4  **Defendants' Response:**

5  Yuga fails to present any evidence which disputes this finding of fact.

6  Instead, Yuga argues that this finding of fact is immaterial.  Given Yuga's position,

7  it would be more accurate for Yuga to mark this finding of fact yellow (undisputed,

8  but irrelevant), rather than red (disputed).

9  Mr. Lehman's declaration is not reliable.  During his deposition, Mr. Lehman

10  testified that he felt intimidated by the Yuga's lawsuit against him and that he was

11  concerned for his family.  Lehman Depo. Designations (Dkt. 404-2) at 108:14–

12  109:20; 117:3–117:15.  He explained that he settled with Yuga in order to "avoid

13  what [he] perceived to be the massive time and money suck of defending a case that

14  even if [he] won would still be disastrous for [his] family."  Lehman Depo.

15  Designations (Dkt. 404-2) at 97:15–98:8. Mr. Lehman also testified that, at the time

16  he signed the declaration, he felt it was something that he "had to do to get a

17  settlement of the claim against [him]." Lehman Depo. Designations (Dkt. 404-2) at

18  96:3–96:20.  Additionally, Yuga drafted the first version of Mr. Lehman's

19  declaration.  Lehman Depo. Designations (Dkt. 404-2) at 126:11–126:15; 246:13–

20  247:25.   Mr. Lehman acquiesced to much of Yuga's draft declaration under

21  stressful and coercive circumstances.

22  Despite the unreliability of the declaration, and the coercive circumstances

23  under which it was reviewed, Mr. Solano relied on Mr. Lehman's declaration for

24  multiple assertions in his declaration.  Dkt. 342 at ¶ 50; ¶ 71.  And as Mr. Solano

25  admitted at trial, he did not consider that Mr. Lehman signed the declaration

26  because he was intimidated by Yuga's lawsuit. Trial Tr. [Solano] 38:1-13.

27  Therefore, the Court should not find Mr. Solano's testimony to be credible.

28

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact. Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

As with Defendants' previous response (*supra* ¶ 58), Mr. Lehman's declaration is truthful and reliable, and Mr. Solano justifiably relied on its accurate statements. Defendants fail to discredit their own business partner.

**Defendants' Disputed Post Trial Finding of Fact No. 60:**

Mr. Solano relied on the declaration without having considered that Mr. Lehman signed the declaration because Mr. Lehman knew he could not get a settlement without executing a declaration concerning matters of Yuga's choosing. Trial Tr. [Solano] 38:14-16.

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable. Mr. Solano testified that he had reviewed some portions of Mr. Lehman's deposition. Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no"). It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day. And regardless of whether Mr. Lehman could have settled without the declaration, Mr. Lehman testified in his deposition that his declaration is truthful and reliable. Lehman Depo. Designations (Dkt. 404-2) at 124:5-9. Therefore, Mr. Solano relied upon a reliable document to support his testimony and it is thus immaterial whether he reviewed the entire deposition. And even if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement. *Id.*; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the

truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York. *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs' the injunction to which it is entitled or Defendants' profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Defendants' contention should be disregarded as immaterial and irrelevant.

**Defendants' Response**:

Yuga fails to present any evidence which disputes this finding of fact. Instead, Yuga argues that this finding of fact is immaterial.  Given Yuga's position, it would be more accurate for Yuga to mark this finding of fact yellow (undisputed, but irrelevant), rather than red (disputed).

Mr. Lehman's declaration is not reliable.  During his deposition, Mr. Lehman testified that he felt intimidated by the Yuga's lawsuit against him and that he was concerned for his family.  Lehman Depo. Designations (Dkt. 404-2) at 108:14–109:20; 117:3–117:15.  He explained that he settled with Yuga in order to "avoid what [he] perceived to be the massive time and money suck of defending a case that even if [he] won would still be disastrous for [his] family."  Lehman Depo. Designations (Dkt. 404-2) at 97:15–98:8. Mr. Lehman also testified that, at the time he signed the declaration, he felt it was something that he "had to do to get a settlement of the claim against [him]."  Lehman Depo. Designations (Dkt. 404-2) at 96:3–96:20.  Additionally, Yuga drafted the first version of Mr. Lehman's declaration.  Lehman Depo. Designations (Dkt. 404-2) at 126:11–126:15; 246:13–247:25.  Mr. Lehman acquiesced to much of Yuga's draft declaration under stressful and coercive circumstances.

Despite the unreliability of the declaration, and the coercive circumstances under which it was reviewed, Mr. Solano relied on Mr. Lehman's declaration for

multiple assertions in his declaration. Dkt. 342 at ¶ 50; ¶ 71. And as Mr. Solano admitted at trial, he did not consider that Mr. Lehman signed the declaration because Mr. Lehman believed he could not get a settlement without executing a declaration concerning matters of Yuga's choosing. Trial Tr. [Solano] 38:14-16. Therefore, the Court should not find Mr. Solano's testimony to be credible.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact. Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

As with Defendants' previous response (*supra* ¶¶ 58, 59), Mr. Lehman's declaration is truthful and reliable, and Mr. Solano justifiably relied on its accurate statements. Defendants fail to discredit their own business partner.

**Defendants' Disputed Post Trial Finding of Fact No. 61:**

Mr. Solano relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won. Trial Tr. [Solano] 38:17-19.

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable. Mr. Solano testified that he had reviewed some portions of Mr. Lehman's deposition. Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no"). It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day. And regardless of whether Mr. Lehman worried about his family's financial wellbeing as a result of Yuga Labs' meritorious lawsuit, Mr. Lehman testified in his deposition that his declaration is truthful and reliable. Lehman Depo. Designations (Dkt. 404-2) at 124:5-9. Therefore, Mr. Solano relied upon a reliable document to support his

testimony and it is thus immaterial whether he reviewed the entire deposition.  And even if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement.  *Id.*; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York.  *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs' the injunction to which it is entitled or Defendants' profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Defendants' contention should be disregarded as immaterial and irrelevant.

**Defendants' Response**:

Yuga fails to present any evidence which disputes this finding of fact.  Instead, Yuga argues that this finding of fact is immaterial.  Given Yuga's position, it would be more accurate for Yuga to mark this finding of fact yellow (undisputed, but irrelevant), rather than red (disputed).

Mr. Lehman's declaration is not reliable.  During his deposition, Mr. Lehman testified that he felt intimidated by the Yuga's lawsuit against him and that he was concerned for his family.  Lehman Depo. Designations (Dkt. 404-2) at 108:14–109:20; 117:3–117:15.  He explained that he settled with Yuga in order to "avoid what [he] perceived to be the massive time and money suck of defending a case that even if [he] won would still be disastrous for [his] family."  Lehman Depo. Designations (Dkt. 404-2) at 97:15–98:8.  Mr. Lehman also testified that, at the time he signed the declaration, he felt it was something that he "had to do to get a settlement of the claim against [him]."  Lehman Depo. Designations (Dkt. 404-2) at

96:3–96:20.  Additionally, Yuga drafted the first version of Mr. Lehman's declaration.  Lehman Depo. Designations (Dkt. 404-2) at 126:11–126:15; 246:13–247:25.  Mr. Lehman acquiesced to much of Yuga's draft declaration under stressful and coercive circumstances.

Despite the unreliability of the declaration, and the coercive circumstances under which it was reviewed, Mr. Solano relied on Mr. Lehman's declaration for multiple assertions in his declaration.  Dkt. 342 at ¶ 50; ¶ 71.  And as Mr. Solano admitted at trial, he did not consider that Mr. Lehman signed the declaration because he was concerned for his family.  Trial Tr. [Solano] 38:17-19.  Therefore, the Court should not find Mr. Solano's testimony to be credible.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact.  Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

As with Defendants' previous response (*supra* ¶¶ 58, 59), Mr. Lehman's declaration is truthful and reliable, and Mr. Solano justifiably relied on its accurate statements.  Defendants fail to discredit their own business partner.

**Defendants' Disputed Post Trial Finding of Fact No. 62:**

Mr. Solano relied on the declaration without having considered that the declaration was not drafted by Mr. Lehman and was instead drafted by Yuga's lawyers. Trial Tr. [Solano] 37:20-22.

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable.  This contention is also contradicted by the fact that Mr. Lehman testified that he spent several days drafting the declaration prior to signing it.  Lehman Depo. Designations (Dkt. 404-2) at 240:3-9.

Mr. Solano testified that he had reviewed some portions of Mr. Lehman's

deposition.  Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no").  It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day.  And regardless of whether Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  Therefore, Mr. Solano relied upon a reliable document to support his testimony and it is thus immaterial whether he reviewed the entire deposition.  And if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement.  *Id.*; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York.  *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs' the injunction to which it is entitled or Defendants' profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Defendants' contention should be disregarded as immaterial and irrelevant.

**Defendants' Response:**

Mr. Lehman's declaration is not reliable.  During his deposition, Mr. Lehman testified that he felt intimidated by the Yuga's lawsuit against him and that he was concerned for his family.  Lehman Depo. Designations (Dkt. 404-2) at 108:14–109:20; 117:3–117:15.  He explained that he settled with Yuga in order to "avoid what [he] perceived to be the massive time and money suck of defending a case that even if [he] won would still be disastrous for [his] family."  Lehman Depo. Designations (Dkt. 404-2) at 97:15–98:8. Mr. Lehman also testified that, at the time

he signed the declaration, he felt it was something that he "had to do to get a settlement of the claim against [him]."  Lehman Depo. Designations (Dkt. 404-2) at 96:3–96:20.  Additionally, Yuga drafted the first version of Mr. Lehman's declaration.  Lehman Depo. Designations (Dkt. 404-2) at 126:11–126:15; 246:13–247:25.  Mr. Lehman acquiesced to much of Yuga's draft declaration under stressful and coercive circumstances.

Despite the unreliability of the declaration, and the coercive circumstances under which it was reviewed, Mr. Solano relied on Mr. Lehman's declaration for multiple assertions in his declaration.  Dkt. 342 at ¶ 50; ¶ 71.  And as Mr. Solano admitted at trial, he did not consider whether Mr. Lehman had actually drafted the declaration himself.  Trial Tr. [Solano] 37:20-22.  Therefore, the Court should not find Mr. Solano's testimony to be credible.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact.  Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

As with Defendants' previous response (*supra* ¶¶ 58, 59), Mr. Lehman's declaration is truthful and reliable, and Mr. Solano justifiably relied on its accurate statements.  Defendants fail to discredit their own business partner.

**Defendants' Disputed Post Trial Finding of Fact No. 63:**

Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14.

**Plaintiff's Basis for Dispute:**

This contention is immaterial because Mr. Solano reviewed the relevant portions of Mr. Lehman's deposition and, in any event, Mr. Lehman's declaration is reliable.  This contention is also contradicted by the fact that Mr. Lehman testified

that he spent several days drafting the declaration prior to signing it.  Lehman Depo. Designations (Dkt. 404-2) at 240:3-9.  Mr. Lehman further testified that he toiled to make sure that everything included in his declaration was truthful and adequately supported by documentary evidence.  Lehman Depo. Designations (Dkt. 404-2) at 241:21-24.

Mr. Solano testified that he had reviewed some portions of Mr. Lehman's deposition.  Trial Tr. at 38:9-10 ("I have read parts of it, but I have not read his entire deposition, no").  It is unremarkable that a witness would not have reviewed the entire transcript of a deposition that lasted an entire day.  And regardless of whether Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his deposition that his declaration is truthful and reliable.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  Therefore, Mr. Solano relied upon a reliable document to support his testimony and it is thus immaterial whether he reviewed the entire deposition.  And even if Mr. Solano reviewed the entire deposition, he would have come to the same conclusion—that Mr. Lehman's declaration is accurate and supports a finding that consumers were confused by Defendants' infringement.  *Id.*; *see also* Dkt. 209-1 at 5-9 (explaining why documents produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his declaration).  Mr. Lehman's declaration was also corroborated in the consent judgment entered against him in the Northern District of New York.  *See* JTX-621.  Defendants' contention does not contradict the Court's prior finding that Defendants' infringement created a likelihood of confusion, nor does it militate against granting Yuga Labs' the injunction to which it is entitled or Defendants' profits.  SJ Order (Dkt. 225) at 13 ("Therefore, the Court easily concludes that Defendants' use of Yuga's BAYC Marks was likely to cause confusion.").  Defendants' contention should be disregarded as immaterial and irrelevant.

**Defendants' Response:**

Mr. Lehman's declaration is not reliable.  During his deposition, Mr. Lehman testified that he felt intimidated by the Yuga's lawsuit against him and that he was concerned for his family.  Lehman Depo. Designations (Dkt. 404-2) at 108:14–109:20; 117:3–117:15.  He explained that he settled with Yuga in order to "avoid what [he] perceived to be the massive time and money suck of defending a case that even if [he] won would still be disastrous for [his] family."  Lehman Depo. Designations (Dkt. 404-2) at 97:15–98:8. Mr. Lehman also testified that, at the time he signed the declaration, he felt it was something that he "had to do to get a settlement of the claim against [him]." Lehman Depo. Designations (Dkt. 404-2) at 96:3–96:20.  Additionally, Yuga drafted the first version of Mr. Lehman's declaration.  Lehman Depo. Designations (Dkt. 404-2) at 126:11–126:15; 246:13–247:25.  Mr. Lehman acquiesced to much of Yuga's draft declaration under stressful and coercive circumstances.

Mr. Lehman also explained that he did not chose the term "business venture" to describe the RR/BAYC project in his declaration and that his selection would been the "project." Lehman Depo. Designations (Dkt. 404-2) at 126:20-127:3.  In fact, Mr. Lehman admitted that the declaration that Yuga drafted, and he reviewed, lacked context regarding his participation in the RR/BAYC project.  Lehman Depo. Designations (Dkt. 404-2) at 124:10-124:13.

Despite the unreliability of the declaration, and the coercive circumstances under which it was reviewed, Mr. Solano relied on Mr. Lehman's declaration for multiple assertions in his declaration.  Dkt. 342 at ¶ 50; ¶ 71.  For instance, Mr. Solano testified that "Mr. Lehman described Mr. Ripps' commercialization and sale of RR/BAYC NFTs as a "business venture"…"  Dkt. 342 at ¶ 71.  However, as Mr. Solano admitted at trial, he failed to fully read Mr. Lehman's deposition and consider whether that was, in fact, Mr. Lehman's choice of words.  Trial Tr.

[Solano] 40:3-14.  Therefore, the Court should not find Mr. Solano's testimony to be credible.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact.  Defendants' response fails to address the truthfulness and reliability of Mr. Lehman's declaration.

As with Defendants' previous response (*supra* ¶¶ 58, 59), Mr. Lehman's declaration is truthful and reliable, and Mr. Solano justifiably relied on its accurate statements.  Defendants fail to discredit their own business partner.

Mr. Solano's testimony that Defendants' activities constitute a business venture is amply supported by Defendants' own actions that Mr. Solano personally observed.  It does not matter that Mr. Lehman agreed to call it a business venture.  But, he did.  And he repeatedly confirmed that his calling it a business venture was true.  *See supra* ¶ 58.

**Defendants' Disputed Post Trial Finding of Fact No. 64:**

Mr. Solano was also forced to concede on cross examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4. Mr. Ripps and Mr. Cahen do not continue to receive royalties or creator fees from sales on secondary marketplaces. *Id.*

**Plaintiff's Basis for Dispute:**

This contention is both misleading and immaterial.  Mr. Solano testified truthfully based on Defendants' own testimony.  At the time that Mr. Solano drafted his declaration, both Defendants had testified under oath that they were collecting royalties from sales on the LooksRare secondary sales platform.  Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3.  And Mr. Cahen testified in his declaration that Defendants received royalties on LooksRare until at least May of 2023.  Cahen Decl. (Dkt. 344) ¶¶ 169-

171.  But now, their tale has changed.  Mr. Cahen's declaration, filed on the same day as Mr. Solano's, was the first time Defendants testified that they had ceased collecting royalties off the sale of their infringing NFTs.  Thus Mr. Solano's declaration accurately represented Defendants' sworn testimony at the time he drafted his declaration.  Given Defendants' testimony, it was reasonable for Mr. Solano to believe that Defendants were still collecting royalties at the time Mr. Solano drafted his declaration.  This contention is also immaterial, by Mr. Cahen's own admission Defendants received nearly $80,000 in royalties from sales on LooksRare alone.  *Id.* at ¶ 172.  This contention neither impacts Mr. Solano's credibility, nor does it militate against a disgorgement of Defendants' profits or an injunction in Yuga Labs' favor.

Further, Defendants misrepresent Mr. Solano's testimony.  In his declaration, Mr. Solano testified that Defendants' "profits . . . increase as [they] gain royalties and creator fees from sales on secondary marketplaces."  Solano Decl. (Dkt. 342) at ¶ 86.  This forward-looking statement properly highlights the fact that as long as Defendants maintain control of the smart contract the risk remains that they will resume collecting royalties on some new marketplace on which the RR/BAYC NFTs are not currently listed.  And Ms. Kindler testified that she calculated Defendants' profits up until February 1, 2023, so even if Defendants are not currently collecting royalties, it is beyond dispute that they did continue to profit from royalties from at least February to May.  Kindler Decl. (Dkt. 338) at ¶ 23.  Despite Defendants' attempt to spin Mr. Solano's testimony, it accurately reflects the fact that Defendants have collected royalties throughout much of this litigation and may collect them again unless they are ordered to relinquish control the smart contract to Yuga Labs.

**Defendants' Response:**

Yuga fails to present any evidence which disputes this finding of fact.  Instead, Yuga argues that this finding of fact is immaterial.  Given Yuga's position,

it would be more accurate for Yuga to mark this finding of fact yellow (undisputed, but irrelevant), rather than red (disputed).

Mr. Solano testified, in his declaration, that "[t]heir profits continue to increase as Defendants gain royalties and creator fees from sales on secondary marketplaces." Dkt. 342 at ¶ 86. Later, at trial, Mr. Solano admitted that this was false. Trial Tr. [Solano] 48:15-49:4. This was not a forward looking statement, or conjecture about what might happen in the future. Mr. Solano made a false statement regarding continued profits, past through the present, and subsequently admitted that his statement was "incorrect." Trial Tr. [Solano] 49:2-4.

It was Mr. Solano's responsibility to verify the accuracy of his declaration testimony. Yuga attempts to justify Mr. Solano's inaccurate declaration testimony by pointing to his reliance on Defendants' earlier deposition testimony, but this ignores that Mr. Cahen's deposition was taken on January 11, 2023, and Mr. Ripps's deposition was taken on January 12, 2023. Nothing prevented Mr. Solano from confining his testimony to the time period reflected in Defendants' depositions. Instead, Mr. Solano chose to speculate regarding several intervening months in 2023.

It was not reasonable for Mr. Solano to speculate regarding whether Defendants continue to receive royalties and profits as of July 13, 2023. Dkt. 342 at 34. It was dishonest. Especially given the fact that alleged profits are some of the more consequential, disputed facts in this case. As such, the Court should not find Mr. Solano's testimony to be credible.

**Plaintiff's Reply:**

In addition to this contention being irrelevant and immaterial, Yuga Labs properly disputes this proposed finding of fact. Mr. Solano's trial declaration provided truthful statements as known to him at that time and based on information provided by Defendants. Defendants' contention fails to rebut Mr. Solano's credibility.

1    Mr. Solano's testimony that Defendants collected royalties off secondary

2    sales was supported by Defendants' own testimony, Ms. Kindler's testimony, and

3    the possibility of further royalties on LooksRare or other new marketplaces if

4    Defendants continued to control the RR/BAYC smart contract, and even Defense

5    counsel's representations.  Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen

6    Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23; *see also*

7    *supra* ¶ 3.

8    Apparently, Defendants' argument is that Mr. Solano's testimony is correct

9    that Defendants continued to profit from their royalties after February until at least

10   May.  *See* Cahen Decl. (Dkt. 344) ¶¶ 169-171.  And that Mr. Solano's testimony is

11   correct that Defendants can continue to profit from royalties in the future if they

12   hold the RR/BAYC smart contract.  But somehow Mr. Solano's testimony should

13   be discredited because Defendants claim they were not profiting off royalties in

14   June or July of 2023.  Even if Defendants' claim is true, that they are not at this

15   very moment collecting royalties, it is immaterial.  Defendants' own admissions

16   highlight their actual and ongoing potential to profit from royalties.  *Id.* at ¶ 172.

17   **Defendants' Disputed Post Trial Finding of Fact No. 65:**

18   The Court does not find Mr. Solano's testimony to be credible. Trial Tr.

19   [Solano] 11:11–65:23.

20   **Plaintiff's Basis for Dispute:**

21   As demonstrated above, Mr. Solano's testimony is credible.  The vast

22   majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of

23   Defendants intentional and repeated use of the BAYC Marks is undisputed and

24   went unchallenged by Defendants.  This is because Mr. Solano used Defendants'

25   own words and actions against them.

26   Nevertheless, Defendants' attempts to discredit Mr. Solano's testimony by

27   arguing that Mr. Solano relied on Mr. Lehman's declaration without reading his

28   entire deposition are without merit.  As discussed, Mr. Lehman testified to the

accuracy of his declaration, regardless of how he may have felt about the process of
being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt.
404-2) at 124:5-9.  The veracity of Mr. Lehman's declaration was also corroborated
by the consent judgment entered against him.  JTX-621.  The Lehman declaration
stands on its own, and Mr. Solano had clearly reviewed the declaration based upon
his testimony about its contents in his own trial declaration.  *See, e.g.*, Solano Decl.
(Dkt. 342) at ¶ 71 ("In his declaration under oath, Defendants' co-conspirator Mr.
Lehman described Mr. Ripps' commercialization and sale of RR/BAYC NFTs as a
'business venture' that 'was expected to make money by selling RR/BAYC NFTs
and by potentially generating transaction fees from the sale of NFTs on
ApeMarket.'").  Similarly, Mr. Solano's testimony that Defendants collected
royalties off secondary sales was supported by Defendants' own testimony, Ms.
Kindler's testimony, and the possibility of further royalties on LooksRare or other
new marketplaces if Defendants continued to control the RR/BAYC smart contract.
Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt.
395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.  Mr. Solano testified truthfully
based on the information available to him at the time of his declaration and trial.

**Defendants' Response:**

Mr. Solano's testimony was not credible given the many false and misleading
statements contained in his declaration, as well as his repeated impeachment at trial.
For example, Mr. Solano was also forced to concede on cross-examination that his
sworn declaration included a false statement claiming that "Defendants continue to
receive royalties or creator fees from sales on secondary marketplaces."  Trial Tr.
[Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr.
Lehman's declaration, without having considered that the phrase "business venture"
was selected by Yuga's counsel, and that Mr. Lehman would have liked to use
different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr.
Lehman's declaration without having considered that Mr. Lehman knew he could

not settle his case without executing a declaration concerning matters of Yuga's
choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his
family at the time he signed his declaration, because Yuga's lawsuit against him
would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.
[Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated
impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't
even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you?
A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a
deposition in this case; right? A Yes. Q And you swore an oath to tell the truth,
same oath as today; right? A Yes. Q If we look at your deposition -- and we can
pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the
Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel.
'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes.");
*id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code
for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page
116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists?
'ANSWER: I don't recall.' Were you asked that question, and did you give that
answer? A Yes.").

**Plaintiff's Reply:**

Mr. Solano's testimony is credible.  Defendants fail to impeach Mr. Solano's
accurate and truthful testimony.

First, Mr. Solano's testimony that Defendants collected royalties off
secondary sales was supported by Defendants' own testimony, Ms. Kindler's
testimony, and the possibility of further royalties on LooksRare or other new
marketplaces if Defendants continued to control the RR/BAYC smart contract.
Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt.
395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.

Apparently, Defendants' argument is that Mr. Solano's testimony is correct that Defendants continued to profit from their royalties after February until at least May. *See* Cahen Decl. (Dkt. 344) ¶¶ 169-171.  And that Mr. Solano's testimony is correct that Defendants can continue to profit from royalties in the future if they hold the RR/BAYC smart contract.  But somehow Mr. Solano's testimony should be discredited because Defendants claim they were not profiting off royalties in June or July of 2023.  And even this claim stands on dubious ground as Defendants' counsel represented as recently as the June 9 pretrial conference that Defendants were still receiving royalties from LooksRare.  PTC Hrg. Tr. at 43:22-24 ("They are [still collecting royalties] only in the sense of this very minimum set of LooksRare royalties.").  Even if Defendants' claim is true, that they are not at this very moment collecting royalties, it is immaterial.  Defendants' own admissions highlight their actual and ongoing potential to profit from royalties.  *Id.* at ¶ 172.

Second, Mr. Solano's testimony that Defendants' activities constitute a business venture is amply supported by Defendants' own actions that Mr. Solano personally observed.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's declaration by arguing that Mr. Solano did so without reading his entire deposition are without merit.  But Mr. Lehman repeatedly testified to the accuracy of his declaration, regardless of how he may have felt about the process of being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The Lehman declaration stands on its own, and Mr. Solano had reviewed the declaration based upon his testimony about its contents in his own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71.

Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted

deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr. Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.  Defendants do not even attempt to address the fact that the testimony was on two different topics.

Finally, Defendants likewise fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages generated by running the source code for the planned ApeMarket.com website," informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano Decl. ¶ 49; *see also* JTX-806–JTX-809.  Those webpages were not generated from the source code produced by Mr. Lehman until *after* Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to truthfully testify at trial as to that knowledge.  Defendants fail to impeach Mr. Solano's accurate knowledge.

**Defendants' Disputed Post Trial Finding of Fact No. 66:**

Yuga also relied on the "token tracker" or "token name" for the RR/BAYC as purported evidence of sales attributable to consumer confusion. Yuga's former Chief Technical Officer Kerem Atalay explained that using token trackers or token names to distinguish NFTs is not "how most people would do that, and . . . I don't think that would be a surefire way of distinguishing between two smart contracts." Trial Tr. [Atalay] 132:21-133:8.

**Plaintiff's Basis for Dispute:**

This assertion is immaterial.  Whether or not relying upon a token tracker or token name is a "surefire" way to verify the provenance of an NFT does not impact the remedies in this case.  Indeed, Defendants testified the tracker is a "very common" way that consumers refer to their NFTs.  Cahen Depo. Designations (Dkt. 395) at 148:12-13 ("Oh, yes.  I believe that it's very common for people to do

that.").  Mr. Cahen reiterated this testimony at trial.  Trial Tr. at 225:25-226:2.  And as Defendants admit, the token tracker for their infringing NFTs is "Bored Ape Yacht Club" which led third-party websites to also refer to Defendants' infringing NFTs using Yuga Labs' marks.  *Id.* at 149:12-13; JTX-117; JTX-138; JTX-671. Not only were third-party websites confused by this false affiliation, but the token tracker also caused the Twitter bot @0xGem to falsely report sales of RR/BAYC NFTs as sales of legitimate Bored Ape Yacht Club NFTs, propagating confusing in the marketplace and diluting Yuga Labs' exclusivity.  JTX-705; JTX-1029; Berger Decl. (Dkt. 339) at ¶ 8(i) ("First, the introduction of RR/BAYC NFTs increased the perceived supply and decreased the perceived exclusivity of authentic BAYC NFTs").  Regardless of whether a token tracker is the "surefire" way to verify an NFT the parties agree that it is a way used by consumers and the market to potentially identify the source of an NFT.  Indeed, the Court has already found that "Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT."  SJ Order (Dkt. 225) at 17. Defendants cannot avoid this finding by now asserting that the token tracker is not the best way to verify an NFT when they have already conceded that it is a very common way that consumers identify NFTs.

Defendants' RR/BAYC NFTs are also immutably linked to Yuga Labs' Bored Ape Yacht Club brand through the RR/BAYC smart contract and token tracker.  Trial Tr. at 134:1-8 (Mr. Atalay testifying that "[i]n this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance.").  By creating this link, Defendants divested Yuga Labs of its ability to properly control its brand.  Trial Tr. at 100:10-14 (Ms. Muniz testifying that "more than anything, we need to control our brand.  We need to have our brand back.").  This ongoing harm can only be remedied by injunctive relief.

1   **Defendants' Response:**

2   Yuga's response is improper because it is not a basis to oppose a finding of

3   fact that Mr. Atalay made the quoted statement.

4   Yuga's response also completely ignores Mr. Atalay's statement that "most

5   people ***would not*** use the token tracker to differentiate an NFT collection—a fact

6   that directly undercuts Yuga's claim that the token tracker drove widespread

7   confusion among consumers.  *Compare* Trial Tr. [Atalay] 132:21-133:8 *with* Atalay

8   Decl. ¶ 7 ([Token Tracker] is a critical piece of data the NFT community uses when

9   they are buying on the secondary market.")

10   **Plaintiff's Reply:**

11   Defendants' response fails to dispute their own admissions that token

12   trackers are a common way for consumers to identify the source of NFTs.

13   Defendants' attempt to contend the opposite is unavailing, particularly in light of

14   the Court's finding that token trackers authenticate and verify NFTs, and

15   Defendants' use of BAYC Marks in the RR/BAYC smart contract's token tracker

16   was explicitly misleading.

17   Defendants' cited testimony from Mr. Atalay does not disprove the potential

18   for confusion in this case resulting in the need to rely on token trackers.  At trial,

19   Mr. Atalay confirmed that for the "average person" the "most straightforward way

20   [] to distinguish two NFTs from each other is just to look at them on a marketplace

21   like OpenSea."  Trial Tr. at 135:5-10.  But that is not possible in this case due to

22   Defendants' causing confusion with their promotion of the use of the same exact

23   BAYC Marks on OpenSea (*see* O'Laughlin Decl. (Dkt. 341) ¶ 13(b)); *see also*

24   JTX-686.  Thus, because an average person would not be able to discern between

25   RR/BAYC and genuine BAYC just by looking at the marketplace, they would need

26   to verify another way, such as by the token tracker.  But there too, Defendants' use

27   of the BAYC Marks caused confusion.

28

1   **Defendants' Disputed Post Trial Finding of Fact No. 67:**

2        Mr. Atalay also explained that using token names to distinguish NFTs

3   "would be a fairly weak way to do so because often those things are mutable. They

4   can be changed after the fact. Also, there's no guarantee of uniqueness." Trial Tr.

5   [Atalay] 133:12-23.

6   **Plaintiff's Basis for Dispute:**

7        This assertion is immaterial and misleading because the token tracker for

8   Defendants' infringing NFTs is not "mutable."  Indeed, in response to the question

9   directly after the response cited in Defendants' contention, Mr. Atalay testified that

10  "[i]n this particular instance, upon inspection of the Foundation smart contract that

11  was used to deploy the RR/BAYC smart contract, it's evident that these are not

12  mutable fields in this particular instance.  So this isn't entirely relevant."  Trial Tr.

13  at 134:1-8.  Mr. Solano testified to the same in his trial declaration.  Solano Decl.

14  (Dkt. 342) at ¶ 80 ("My understanding is that Defendants cannot change the name

15  of their Etherscan contract bearing the BAYC Marks, nor can the RR/BAYC smart

16  contract be destroyed.").  Thus, the RR/BAYC smart contract will display "Bored

17  Ape Yacht Club" and "BAYC" as the contract name and the contract symbol,

18  respectively, in perpetuity, and without a transfer of the smart contract to Yuga

19  Labs, confusion from Defendants' infringing NFTs will continue.  *Id.* ("By

20  transferring the RR/BAYC smart contract to Yuga Labs, the Defendants'

21  association with the BAYC brand will no longer be 'forever' as Mr. Ripps

22  proclaimed it would be.").  Therefore, as Mr. Atalay testified, this misleading

23  counterfactual is neither relevant nor material.

24  **Defendants' Response:**

25        Yuga's response is improper because it is not a basis to oppose a finding of

26  fact that Mr. Atalay made the quoted statement.  Moreover, even if Mr. Atalay was

27  previously mistaken that the RR/BAYC token tracker was mutable, that does not

28  negate his admission that "most people" would not use the token tracker to

differentiate NFT contracts.  Trial Tr. [Atalay] 132:21-133:8.  Indeed, that Mr. Atalay had to look closely at the smart contract to determine whether the field was mutable or not suggests that it is generally ***not*** a reliable way to differentiate smart contracts.

 **Plaintiff's Reply:**

Yuga Labs properly disputes this proposed finding of fact.  Defendants mischaracterize Mr. Atalay's testimony to suggest that Defendants' use of the BAYC Marks as the RR/BAYC smart contact's token tracker would not cause confusion.  The response also contradicts Defendants' own admissions that token trackers are a common way for consumers to identify the source of NFTs.  *See* Cahen Depo. Designations (Dkt. 395) at 148:12-13; Trial Tr. at 225:25-226:2. Defendants' response and proposed finding of fact should be rejected.

Mr. Atalay never testified that the token tracker in the RR/BAYC smart contract is mutable.  Thus, contrary to Defendants' mischaracterization, Mr. Atalay was not "previously mistaken" in the RR/BAYC token tracker's mutability.  As Mr. Atalay stated at trial, "[i]n this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."  Trial Tr. at 134:1-7.  This immutability highlights the ongoing harm to Yuga Labs' ability to control its brand and the need for Yuga Labs to own the smart contract.

Indeed, the immutability of the RR/BAYC NFT contract is not an impediment to transferring the contract to Yuga Labs, but a major reason the contract *should* be transferred to Yuga Labs.  As long as Defendants have the RR/BAYC smart contract, they will continue to be infringing on the BAYC Marks in it.  More directly, though, the contract will always say Bored Ape Yacht Club and BAYC—Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  If Defendants maintain control of the RR/BAYC smart contract consumers may still be confused as to the source of the NFTs – Defendants have

argued that consumers will see Mr. Ripps' name as the creator of the NFTs and thus know that his NFTs are not Yuga Labs' NFTs.  Defendants have no survey concluding this is likely; it is equally possible that consumers see his name and think he is somehow related to Yuga Labs because the contract prominently uses two BAYC Marks.

Moreover, if Defendants maintain ownership and control over the smart contract, they could continue to obtain royalties or mint new RR/BAYC NFTs in the future (even if ordered not to do so).  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs, will help reduce future confusion and reduce the risk of future ill-gotten gains to Mr. Ripps. An order solely prohibiting Defendants from minting RR/BAYC NFTs would not accomplish this.

If, however, Yuga Labs owns the RR/BAYC smart contract, ownership will allow Yuga Labs to work with the NFT marketplaces to ensure that the human readable elements of the marketplace clearly indicate that RR/BAYC NFTs are not authentic BAYC NFTs.  Trial Tr. at 136:9-139:11.  Defendants admit this essential fact.  *See* Ripps Depo. Designations (Dkt. 396) 289:7-11 (***admitting Mr. Ripps has control over aspects of secondary marketplace listings***)

Finally, as discussed *supra* ¶ 66, Defendants' contention that "most people" would not identify NFTs by the contract's token tracker fails to recognize how an "average person" would still be confused in viewing RR/BAYC NFTs and BAYC NFTs on a marketplace such as OpenSea.

**Defendants' Disputed Post Trial Finding of Fact No. 68:**

Mr. Atalay confirmed that consumers differentiate NFT collections by reviewing them on a marketplace or by checking the associated smart contract address. Trial Tr. [Atalay] 135:2-25.

**Plaintiff's Basis for Dispute:**

This contention misrepresents Mr. Atalay's testimony and, in any event, is

immaterial given Defendants' admission that token trackers are a "very common"
way for consumers to identify NFTs and their Foundation page listed the
RR/BAYC NFTs under the Bored Ape Yacht Club name.  Cahen Depo.
Designations (Dkt. 395) at 148:12-13 ("Oh, yes.  I believe that it's very common
for people to do that.").  Mr. Cahen reiterated this testimony at trial.  Trial Tr. at
225:25-226:2.  This contention is also ironic given that the Defendants group chat
admitted their belief that consumers were too unsophisticated to check the smart
contract.  JTX-801.279 ("Ppl will not read the contract").

Mr. Atalay testified that consumers differentiate among NFTs in different
ways depending largely on their level of expertise.  *See* Trial Tr. at 135:8-10 ("It
depends on your level of expertise.  I would say for the average person who is not
an expert in blockchain technology" viewing an NFT on a marketplace would be
"the most straightforward way" to distinguish NFTs); *id.* at 135:13-15 (stating that
differentiating NFTs based on the smart contract is "something that requires a level
of expertise" and "most casual consumers of this technology don't go that far"); *id.*
at 135:18-19 (testifying that the inference that NFTs associated with different smart
contracts are different "is lost on the majority of the nonexpert, nontechnical
public.").  As Mr. Atalay testified, the "nonexpert, nontechnical public" is unlikely
to the look to the smart contract to verify the authenticity of an NFT.  Rather, these
consumers often rely upon the token tracker to differentiate between NFT
collections.  Atalay Decl. (Dkt. 337) at ¶ 7 ("[the token tracker] is a critical piece of
data the NFT community uses when they are buying on the secondary market.");
*see also* SJ Order (Dkt. 225) at 17 ("Defendants used Yuga's BAYC Marks to . . .
ensure that the consumer will be explicitly misled in the token tracker, which is the
place where a consumer should be able to authenticate and verify who created the
NFT.").  This reliance on the token tracker, and resulting confusion, is what
happened in the marketplace.  *See, e.g.*, JTX-690 (Mr. Ripps' Tweet with link to
RR/BAYC NFTs on X2Y2 listed as "Bored Ape Yacht Club V3"); JTX-705

(@0xGem Tweet reporting sale of RR/BAYC NFT as sale of Bored Ape Yacht Club NFT).

But even if those less sophisticated consumers looked to the sales page to verify their NFTs, Defendants' infringing NFTs were listed as "Bored Ape Yacht Club" on Foundation.  JTX-671.  Indeed, this page was so confusing that even Defendants' co-conspirator Mr. Hickman confused the RR/BAYC Foundation page for the Bored Ape Yacht Club.  Hickman Depo. Designations (Dkt. 322) at 150:6 ("Looks to be Bored Ape Yacht Club" when viewing RR/BAYC Foundation page). If even a seasoned NFT consumer and an insider like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on Defendants' marketplace page, the "nonexpert, nontechnical public" would stand no chance.

**Defendants' Response:**

Plaintiffs dispute does not engage with the substance of the finding of fact. At the outset Yuga fails to acknowledge that its own witness, Mr. Atalay, said that "most people" would *not* use the token tracker to differentiate between collection. Trial Tr. [Atalay] 132:21-133:8.  Yet in his trial declaration, Mr. Atalay cited approvingly to a tweet from @AllCityBAYC expressing the exact opposite sentiment.  *See* Atalay Decl. ¶ 7   Mr. Atalay's change of heart on this issue appears litigation driven, since Yuga relies heavily on the token tracker as evidence of confusion.  *Id.* ([Token Tracker] is a critical piece of data the NFT community uses when they are buying on the secondary market.").

Not only does Mr. Atalay's contradictory testimony undermine his credibility, his other testimony undermines Yuga's entire theory of confusion. Indeed, Mr. Atalay testified that most users differentiate between smart contracts when purchasing NFTs by looking at a marketplace like OpenSea or the associated smart contract.  Trial Tr. 135:5-10 (using Opensea is "probably the most straightforward way" to differentiate NFTs).  Using either method, a user could easily differentiate between an RR/BAYC NFT and a BAYC NFT by comparing

token address, holder count, floor price, creator address, or any number of other parameters.  Because in those instances there would be almost no way a user could be confused, that undermines Yuga's baseless claim that *every* transaction involving RR/BAYC was the result of confusion.  Trial Tr. 14:1-3 (Q. "You don't think that anybody ever paid Mr. Ripps or Mr. Cahen any money for an RR/BAYC as an act of protest against Yuga. That's your testimony; right?  A. Correct")

Yuga misleadingly cites to a portion of Mr. Hickman's deposition and trial testimony to support their assertion that he was confused and misidentified the RR/BAYC sales page on Foundation.  This is inaccurate.  As Mr. Hickman credibly testified at trial, he was not confused, and his deposition video shows him reviewing and describing all portions of the exhibit.  Trial Tr. [Hickman] 219:3-12 ("Q Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page or a page by Mr. Ripps? A I was not confused. The video shows me describe all of the aspects of the page real time. Q And were you -- what was your level of confidence that this Foundation page that you were shown at your deposition was indeed a page for the RR/BAYC collection? A It was that it was actually Ryder's creator page for the RR/BAYC collection.").

**Plaintiff's Reply:**

Defendants' response continues to misrepresent Mr. Atalay's testimony and fails to dispute their own admissions that token trackers are a common way for consumers to identify the source of NFTs.  Defendants' attempt to contend the opposite is unavailing, particularly in light of the Court's finding that token trackers authenticate and verify NFTs, and Defendants' use of BAYC Marks in the RR/BAYC smart contract's token tracker was explicitly misleading.  SJ Order (Dkt. 225) at 17

Mr. Atalay's testimony that "[the token tracker] is a critical piece of data the NFT community uses when they are buying on the secondary market" is truthful

and accurate.  Atalay Decl. (Dkt. 337) at ¶ 7.  Defendants admit the same.  *See* Cahen Depo. Designations (Dkt. 395) at 148:12-13; Trial Tr. at 225:25-226:2. Further, it is entirely consistent for Mr. Atalay to state that "the NFT community" uses token trackers, and that "most people," depending on their level of technical expertise, may not and may rely instead on the marketplace.  The larger public is a different community.  And even those in the NFT community can use both a token tracker and the marketplace in their review of NFTs.  Each have their own purpose and use.  More importantly, as discussed above, a consumer would not be able to distinguish the RR/BAYC NFTs from BAYC NFTs because of Defendants' copying of the same exact marks on the same exact products in the marketplaces— for example, on Foundation (*see* JTX-673), on OpenSea (*see* JTX-29, JTX-686), on LooksRare (*see* JTX-137), on x2y2 (JTX-690), and on NFTX (*see* JTX-138).  *See also* SJ Order (Dkt. 225) at 11-12 ("Defendants have used Yuga's BAYC Marks . . . both Yuga and Defendants promoted and sold their NFTs through the same online NFT marketplaces").

Finally, Defendants' attempt to explain away Mr. Hickman's obvious confusion is self-evidently not credible.  When asked to identify the source of the NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he paused for around five seconds, examined the page closely and stated that the page "looks to be Bored Ape Yacht Club."  Trial Tr. 213:9-13 (lodged at Dkt. 415).  His body language and demeanor showed that, after this examination, Mr. Hickman genuinely believed that he was looking at a Bored Ape Yacht Club sales page.  It was only after around fifteen seconds of a second, long, pause and closer examination that Mr. Hickman amended his answer and identified the page as Defendants' infringing website.  Dkt. 415.  Mr. Hickman's testimony at trial that he was not confused lacks credibility in light of his testimony and his demeanor when giving that testimony.  His self-serving denial contradicts what was clear in his video-taped deposition and at trial.  Dkt. No. 415 (notice of lodging of video

testimony); Trial Tr. 213:13.  Mr. Hickman's bias, including from separately being sued by Yuga Labs, explains why he would falsely deny his confusion.  If even an insider like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on Defendants' marketplace page, the "nonexpert, nontechnical public" stood no chance when presented with Defendants' scam.  Trial Tr. at 135:18-19.

**Defendants' Disputed Post Trial Finding of Fact No. 70:**

Ms. O'Laughlin's surveys were unreliable. They included flawed methodologies, including by using an inappropriately overbroad target population that was not limited to people who have purchased or were intending to purchase NFTs. Trial Tr. [O'Laughlin] 148:1-21.

**Plaintiff's Basis for Dispute:**

The Court has already found that Defendants' infringement was likely to cause confusion to consumers.  SJ Order (Dkt. 225) at 10-13.  Additionally, the Court has determined Ms. O'Laughlin's testimony and the findings in her expert report are "relevant, reliable, and admissible."  Trial Tr. at 141:3-5.

Ms. O'Laughlin's methodologies were not flawed; as detailed in her report, Ms. O'Laughlin adhered to best practices for surveys used in litigation and employed rigorous standards consistent with academic literature and judicial precedent.  *See generally* JTX-721 (O'Laughlin Expert Report); O'Laughlin Decl. (Dkt. 342).  Defendants have presented no evidence or rebuttal expert testimony to the contrary.

Defendants' contention that Ms. O'Laughlin selected an overbroad target population is meritless, as is their argument that this renders her findings unreliable. The survey audience for both surveys consisted of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.  The latter

categories of participants were included to account for consumers who may be "in market for digital art or digital collectibles" without having specifically considered NFTs in the past.  Trial Tr. at 148:4-9.  Indeed, as the Court has found, some potential consumers were not necessarily blockchain-savvy NFT purchasers.  SJ Order (Dkt. 225) at 12-13.  Ms. O'Laughlin accordingly determined that "consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace."  Trial Tr. at 148:15-18.  *See also* Berger Report at 5 n.2 (observing "NFTs have mostly been associated with digital items such as artwork, images, or videos"); SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham Act*, 63 IDEA: L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that exist in a digital space, they are also items that have specific uses and values that are dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) ("Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset: they buy them precisely so that they can exclusively own the content associated with the NFT.").

When Defendants and their partners previously agreed that their use of Yuga Labs' marks could be "too confusing to the 'average joe'" they were targeting, JTX-801.196, Defendants cannot now credibly argue that the "average joe" who may be interested in NFTs as digital collectibles or art should be excluded from the survey population.

**Defendants' Response**:

Yuga tries to leverage the fact that Ms. O'Laughlin's testimony was admitted to argue that it should be given weight.  However, the Court noted "counsel will have an opportunity to fully expose any limitations or flaws during cross-examination."  Trial Tr. 141:8-10.

1    Yuga cites to Ms. O'Laughlin's own report and declaration as proof that her

2    testimony ought to be given weight.  But no expert would claim that they were not

3    adhering to "to best practices for surveys used in litigation and employed rigorous

4    standards consistent with academic literature and judicial precedent."  Yuga then

5    claims that Defendants did not demonstrate that she deviated from "best practices"

6    in any way.  Defendants' cross-examination pointed out several fundamental flaws

7    with her survey methodology, including by re-adjusting the survey population to

8    capture people with no interest in purchasing NFTs.  Trial Tr. [O'Laughlin] 144:25-

9    146:17 (acknowledging that she broadened the survey population *after* he team

10   accessed pretest results).  Ms. O'Laughlin also acknowledged that the population

11   "matters" for the analysis.  *Id.* at 144:18-20.  In this case the "appropriate target

12   population" was supposed to be "past and potential purchasers of NFTs."  *Id.* at

13   144:21-25.

14   Ms. O'Laughlin acknowledged that somebody would qualify for the survey if

15   they were merely considering purchasing digital art collectibles.  Trial Tr.

16   [O'Laughlin 148:19-20].  This is despite the fact that an NFT is not necessarily

17   digital artwork under her own admission.  *Id.* at 149:1-2.  The "digital art"

18   respondents were never asked if they were aware of NFTs.  *Id.* at 152:11-14.  By

19   way of analogy, this is like conducting a survey on a specific question—like

20   attitudes about the Los Angeles Dodgers' performance—while including

21   respondents who do not follow baseball.  It will not generate accurate results.

22   Yuga closes by stating, "Defendants cannot now credibly argue that the

23   "average joe" who may be interested in NFTs as digital collectibles or art should be

24   excluded from the survey population."  Yet that is not what Defendants argue at all.

25   If the survey was limited to the average NFT consumer, then the survey population

26   would possibly be adequate.  It however swept further and included people who

27   likely have no interest in NFTs or even knowledge about what an NFT is.

28

**Plaintiff's Reply:**

Defendants' belief that Ms. O'Laughlin's survey population was overbroad does not make it so; Defendants' have no evidence that the survey population was overbroad.  What evidence there is in the record confirms that Ms. O'Laughlin's survey population was appropriate.  The evidence shows that consumers who might be interested in NFTs may include people who are interested in digital art.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 12 (people commonly joined BAYC because of how the "image resonated with them"); JTX-722.00005 ("NFTs have mostly been associated with digital items such as artwork, images, or videos. . ."); JTX-801.196 (Defendants were targeting the "average joe").  Even Mr. Ripps admits "NFTs became popular among artists and art collectors most associated with internet culture" (Ripps Decl. (Dkt. 346) at ¶ 38)) and that blockchain technology is merely an extension of the "existing internet" (*id.* at ¶¶ 34-35).  *See also* SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham Act*, 63 IDEA:  L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that exist in a digital space, they are also items that have specific uses and values that are dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) (cleaned up) ("Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset:  they buy them precisely so that they can exclusively own the content associated with the NFT.").

Therefore, Ms. O'Laughlin appropriately determined that "consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace."  Trial Tr. at 148:15-18.  Accordingly, she was correct in determining that survey audience for both surveys would consist of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum,"

"(ii) are considering purchasing an NFT using cryptocurrency in the next year,"

"(iii) have purchased digital art as a collectible in the past year," or "(iv) are

considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.

The latter categories of participants were included to account for consumers who

may be "in market for digital art or digital collectibles" without having specifically

considered NFTs in the past.  Trial Tr. at 148:4-9.  Her opinion is consistent with

the evidence in the record about who might buy an NFT, and Defendants have no

evidence establishing otherwise.

**Defendants' Disputed Post Trial Finding of Fact No. 71:**

Ms. O'Laughlin's surveys included people who considered purchasing digital
art irrespective of whether they were considering purchasing an NFT. Trial Tr.
[O'Laughlin] 149:17-21.

**Plaintiff's Basis for Dispute:**

The survey audience for both of Ms. O'Laughlin's surveys consisted of

individuals who indicated that they "(i) have purchased an NFT in the past year

using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in

the next year," "(iii) have purchased digital art as a collectible in the past year," or

"(iv) are considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342)

¶¶ 31, 68-69.  Defendants' proposed finding oversimplifies the selection criteria by

ignoring consumers who purchase NFTs as digital collectibles or art.  *See also*

Berger Report at 5 n.2 (observing "NFTs have mostly been associated with digital

items such as artwork, images, or videos"); SJ Order (Dkt. 225) at 7 (citing Andrea

McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham

Act*, 63 IDEA: L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While

virtual goods are intangible items that exist in a digital space, they are also items

that have specific uses and values that are dependent on the consumer")); *Hermès

International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5

(S.D.N.Y. Feb. 2, 2023) ("Individuals do not purchase NFTs to own a 'digital deed'

divorced from any other asset: they buy them precisely so that they can exclusively own the content associated with the NFT.").

**Defendants' Response:**

Defendants' proposed finding of fact is that the survey selection criteria included those who were interested in purchasing digital art irrespective of whether they were interested in an NFT.  Two of the survey flow options that would qualify a respondent are, ""(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342).  Neither of these qualification screens has anything to do with "consumers who purchase NFTs as digital collectibles or art."  Lastly, Ms. O'Laughlin directly confirmed that her purchase flow would qualify people "irrespective of whether they were considering purchasing an NFT".  *See* Trial Tr. [O'Laughlin] 149:17-20 ("Q: You qualified people who were considering purchasing digital artwork, irrespective of whether they were considering purchasing an NFT, didn't you? A: **That's correct.**").  Yuga dismissal of this material testimony is an attempt to avoid the clear implication that this admission means that O'Laughlin's survey sweeps far broader than the NFT market.

**Plaintiff's Reply:**

Defendants have no evidence establishing that Ms. O'Laughlin's survey population was overbroad.  To the contrary, as discussed *supra* ¶ 70, Ms. O'Laughlin's opinion consists of an appropriately defined survey population that is consistent with the evidence.  Indeed, Mr. Ripps' own testimony supports Ms. O'Laughlin's opinion.  *Id.*

**Defendants' Disputed Post Trial Finding of Fact No. 72:**

Ms. O'Laughlin could have asked potential survey participants if they are past or potential purchasers of an NFT, but instead chose a qualification criteria that was overbroad, and thus improperly changed the survey results. Trial Tr.

[O'Laughlin] 151:14-19 ("Q. You could have just asked, are you a past or potential purchaser of an NFT and left it at that; right? A. I could have yes.").

**Plaintiff's Basis for Dispute:**

Ms. O'Laughlin's survey qualification criteria was not overbroad. *Supra* ¶ 70. Defendants have offered no evidence, expert testimony, or rebuttal survey to support their bare assertion that it was overbroad or "improperly changed the survey results." Ms. O'Laughlin's survey remains unrebutted.

**Defendants' Response:**

It is undisputed that Ms. O'Laughlin broadened the survey qualification flow *after* her team was able to access pre-test results. Trial Tr. [O'Laughlin] 145:21-146:20; 150:15-22. It is elementary that asking different groups of people survey questions will result in different results. The question, "What is your favorite television show?" will reveal different answers when asked at a Brooklyn bar, an elementary school playground, or a big law firm. Changing the qualification criteria obviously changed the results. Lastly, Ms. O'Laughlin's survey was rebutted through cross-examination which demonstrates that it should be provided no weight.

**Plaintiff's Reply:**

Similar to how Defendants have no evidence that Ms. O'Laughlin's survey population was overbroad (because it was not), Defendants have no support for their proposition that Ms. O'Laughlin should not have made changes following the pretest. On the other hand, the evidence in the record confirms the appropriateness of the pretest and Ms. O'Laughlin's adjustments in response to the pretest. *See e.g.* Trial Tr. 166:24-167:17.

**Defendants' Disputed Post Trial Finding of Fact No. 73:**

Ms. O'Laughlin modified her survey eligibility following pre-tests (to which members of her team had access) to expand the survey population. Trial Tr. [O'Laughlin] 145:21-146:7; [O'Laughlin] 146:10-25.

**Plaintiff's Basis for Dispute**:

Yuga Labs objects to this finding to the extent Defendants suggest the modification was improper or that it diminishes the reliability of her survey findings.

Pretests are part of accepted methodology in conducting consumer confusion surveys, as Ms. O'Laughlin testified.  O'Laughlin Decl. (Dkt. 341) ¶ 30 n.12; *see also* JTX-1612 at 388-89 ("Texts on survey research generally recommend pretests as a way to increase the likelihood that questions are clear and unambiguous, and some courts have recognized the value of pretests.").  Ms. O'Laughlin conducted pretests for her Foundation/Eveready survey, as disclosed to Defendants. O'Laughlin Decl. (Dkt. 341) ¶ 30 n.14.  As a result of the pretest feedback, she "made minor changes to the survey instrument." *Id.* ¶ 30.  "The minor modification made to the Foundation Eveready Survey included updating the screening questions to allow respondents to qualify as either a past or potential NFT purchaser."  JTX-721 at 31 (O'Laughlin Expert Report) n.72.

Defendants offer no evidence or expert testimony to suggest this modification was in any way improper or that it affects the reliability of Ms. O'Laughlin's findings.

**Defendants' Response**:

The pretest led to changes that "made it easier for a certain subset" of people to qualify for the survey.  Trial Tr. [O'Laughlin] 167:13-17.  As stated above, this decision to broaden the survey population was made *after* her team accessed survey results.  *Id.* at 145:21-146:7.

Ms. O'Laughlin acknowledges that the survey population matters for her analysis.  *Id.* at 146:18-20.  She also stated that the appropriate population is "past and potential purchasers of NFTs."  *Id.* at 146:21-25.  Broadening the population of the survey after accessing initial results calls into question the validity of that

survey, especially where the changes allowed those who may not even be aware of
NFTs to participate in the survey.

**Plaintiff's Reply:**

As discussed, *supra* ¶ 72, Defendants have no support for their proposition
that Ms. O'Laughlin's changes following the pretest affect the weight of the survey;
they do not.

**Defendants' Disputed Post Trial Finding of Fact No. 74:**

Ms. O'Laughlin's surveys are also unreliable because they were biased in
favor of finding confusion because they counted consumers as "confused" in the
test group who merely copied text from the images that they were shown, but did
not count consumers as "confused" in the control group when they did the same
thing. In her *Eveready* survey, when shown an image showing "Bored Ape Yacht
Club" respondents that wrote "Bored Ape Yacht Club" were counted as confused.
Trial Tr. [O'Laughlin] 154:4-155:3. However, in the corresponding control group,
when shown an image displaying "Chill Gorilla Boat Crew" respondents that wrote
"Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin]
156:16-157:8.

**Plaintiff's Basis for Dispute:**

The operative questions in calculating the net confusion rate in Ms.
O'Laughlin's Foundation/Eveready survey were "Who or what entity do you
believe puts out the NFT collection you saw?" and "What other entity or entities do
you believe have a business relationship (e.g. affiliation, sponsorship, or other
connection) with whoever puts out the NFT collection you saw?"  O'Laughlin Decl.
(Dkt. 341) ¶¶ 45-46.  Defendants aver, without any authority or expert testimony,
that Ms. O'Laughlin's Foundation/Eveready survey was "unreliable" and "biased"
because she only considered respondents who identified the source of Defendants'
Foundation webpage as "Bored Ape Yacht Club" to be confused and did not count
those who mentioned "Chill Gorilla Boat Crew."  This argument has no merit and

1   demonstrates a fundamental misunderstanding of the purpose of a control in an

2   Eveready survey.  *See* Trial Tr. at 156:16-157:14.

3       Ms. O'Laughlin's Foundation/Eveready survey employs a test/control

4   experimental design where respondents are randomly assigned to one of two groups

5   and exposed to stimuli that are identical but for the at-issue characteristic(s) being

6   tested.  Ms. O'Laughlin compared the share of respondents who associate the

7   Defendants' Foundation webpage with "Bored Ape Yacht Club," when shown the

8   page ***as it actually appeared in the real world*** with the at-issue BAYC Marks

9   (BAYC test group), versus when shown a modified page that used an alternative to

10  the at-issue BAYC Marks (CGBC control group).  By comparing the share of

11  respondents who believe that the source of the Foundation page collection is

12  "Bored Ape Yacht Club" in both the test and control groups, Ms. O'Laughlin was

13  able to measure the rate of confusion attributable specifically to Defendants' actual

14  use of the BAYC Marks.

15      Ms. O'Laughlin's Eveready survey and analysis are not methodologically

16  flawed.  Consistent with standard Eveready survey practice, Ms. O'Laughlin's

17  analysis counts mentions of the "Bored Ape Yacht Club" in both the test and

18  control groups, but does not count mentions of "Chill Gorilla Boat Crew" in the

19  control group when calculating net confusion.  This is consistent with the approach

20  taken by other leading trademark survey experts in Eveready survey analysis for

21  forward confusion cases.  *See* JTX-1122 at 210-11.  All other characteristics of the

22  stimuli, including the alternative mark in the control group, are not at issue and

23  therefore are not considered when calculating confusion.  Accordingly, it would be

24  nonsensical to count respondents who mention Chill Gorilla Boat Crew as

25  confused.

26      Moreover, Defendants argue that respondents in the test group "merely

27  copied text from the images that they were shown," after seeing the Defendants'

28  Foundation webpage, and essentially complain that the survey is biased because the

prominence of the BAYC Marks in the stimuli would lead anyone to believe the Foundation webpage is associated with the "Bored Ape Yacht Club" or "BAYC" NFT collection.  The complaint though is of the Defendants' own making.  The stimuli used in Ms. O'Laughlin's Foundation/Eveready survey reflects the Defendants' explicit and blatant infringement found on their own Foundation webpage *as it actually appeared in the real world*, which simply demonstrates the egregious and deceptive nature of Defendants' use of the BAYC Marks.  *See* JTX 28; JTX 1557.

Indeed, the fact that many survey respondents associated Defendants' Foundation webpage *as it actually appeared in the real world* with "Bored Ape Yacht Club" and the modified control version of the webpage with "Chill Gorilla Boat Crew" highlights how respondents (and consumers more broadly) rely on collection names and logos to communicate the source of an NFT collection.  The Court has already found that "the BAYC Marks are both conceptually and commercially strong," SJ Order (Dkt. 225) at 10-11, and they accordingly serve as a designation of origin to actual and prospective consumers as they did in Ms. O'Laughlin's surveys.

**Defendants' Response**:

Yuga talks past Defendants proposed finding of fact perhaps because they do not have a response to the fact that the survey does not control for survey respondents who were merely writing down the words they saw on the page.  In fact, only 2 out of 505 respondents in the *Everready* survey actually gave any indication that they were confused and believed that any tested product was sponsored by Yuga.  Trial Tr. [O'Laughlin] 155:18-156:1.

Yuga also misapprehends the problem with the survey.  All it did was prove that people could read.  "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion." *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp.

1   322, 335 (S.D.N.Y. 1997) (holding that survey had limited weight as a reading

2   test).  Ms. O'Laughlin makes the sweeping claim that there was an extensive

3   amount of confusion based on her Eveready survey because 49% of test group

4   respondents were confused.  *See* JTX-310 at Figure 9.  Of these, almost all of them

5   wrote the screen prompt exactly.  In the control group, 27% of test group

6   respondents wrote "Chill Gorilla Boat Crew"—the on-screen stimulus, and were

7   not counted as confused.  *See* Trial Tr. [O'Laughlin] 157: 9-14.  Notably, Ms.

8   O'Laughlin was not able to provide an explanation for writing "Chill Gorilla Boat

9   Crew" besides rank copying.  *Id.* at 157:25-158:7 (calling fact that people simply

10  copied on screen stimuli "not surprising").  It is undisputed that Ms. O'Laughlin did

11  nothing to control for people merely copying on-screen stimuli which likely

12  comprised about 2/3 of the test group's "confusion" answers if the test and control

13  groups were similar.  However, because it is impossible to untangle who was

14  actually confused, and who was merely copying words, Ms. O'Laughlin's opinion

15  on the extent of confusion should be disregarded.

16      **Plaintiff's Reply**:

17      Defendants' response, attempting to undermine standard expert survey

18  methodology, continues to misunderstand the test/control experimental design used

19  to test for confusion in circumstances such as this where the infringer uses the exact

20  same mark as the genuine good.  In those circumstances, it is appropriate to

21  consider participants confused when they identify the infringing product with the

22  name of the genuine one.  That methodology is standard and accepted in the field,

23  as discussed in Yuga Labs' objection, and Defendants' response fails to rebut it.

24      In other words, consumers who see an RR/BAYC NFT and identify the

25  source as the "Bored Ape Yacht Club" brand have indeed misidentified the source

26  of the NFT.  A Bored Ape Yacht Club NFT is the only NFT that is, indeed, a Bored

27  Ape Yacht Club NFT.  Defendants essentially complain that their false marketing

28  of their knockoff NFTs as "Bored Ape Yacht Club" NFTs unduly persuaded survey

1  participants to misattribute the origin of Defendants' NFTs.  But as explained in

2  Yuga Labs' objection, this response misunderstands the survey design and

3  essentially complains that Defendants' misbranding was too confusing to be

4  appropriately tested.  That objection has no merit.

5       Defendants' citation to *Franklin Resources, Inc. v. Franklin Credit Mgmt*

6  *Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997), merely underscores their

7  misunderstanding of the issue.  The survey at issue in that case involved an

8  interviewer showing a participant an advertisement with the plaintiff's name, then

9  showing an advertisement with the defendant's name, and finally asking the

10  participant if they believed the defendant's advertisement used the name shown in

11  the first round.  Unlike here, the survey in *Franklin* was not an Eveready survey.

12  And, the court criticized the survey as essentially testing the "ability of the present

13  respondents, to read and remember the name 'Franklin' as having been in both" sets

14  of advertisements.  *Id.*  Here, by contrast, Ms. O'Laughlin's Eveready survey

15  showed only one specimen: Defendants' Foundation page *as it actually appeared*

16  *in the real world*.  Participants who saw that page and identified the source of the

17  NFTs as "Bored Ape Yacht Club" were appropriately labeled as confused as to the

18  source.

19  **Defendants' Disputed Post Trial Finding of Fact No. 75:**

20       The most reasonable interpretation of the results of Ms. O'Laughlin's

21  methodologically flawed survey evidence is that participants wrote down the words

22  they were shown in the survey prompts. Trial Tr. [O'Laughlin] 157:9-14;

23  [O'Laughlin] 157:25-158:7.

24  **Plaintiff's Basis for Dispute:**

25       This argument about Defendants' "most reasonable interpretation" is pure

26  speculation, which Defendants could have tested through a rebuttal survey but

27  chose not to.  This methodology is not flawed for the reasons discussed *supra* ¶ 74.

28  Ms. O'Laughlin's survey remains unrebutted.

**Defendants' Response**:

Plaintiffs bear the "ultimate burden of proof in a trademark infringement action." *Yellow Cab Co. of Sac v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).  As such, Defendants do not need to present anything including commissioning a rebuttal survey to show that Yuga's survey was methodologically flawed.  Instead, Defendants may choose to demonstrate the manifest flaws in Ms. O'Laughlin's survey through other means such as through cross-examination.  Ms. O'Laughlin herself could not identify another interpretation for her survey participants' actions in copying the survey stimuli.  Trial Tr. [O'Laughlin] 157:25-158:7.  Further, it is undisputed that the "Chill Gorilla Boat Club" does not exist outside of the survey.  The only other explanation is that spontaneously 27% of the control group named the collection they were shown "Chill Gorilla Boat Crew" but that is manifestly unreasonable.

**Plaintiff's Reply:**

As discussed *supra* ¶ 74, Defendants have no evidence that Ms. O'Laughlin's methodology was flawed.  To the contrary, the evidence confirms the appropriateness of Ms. O'Laughlin's methodology.

**Defendants' Disputed Post Trial Finding of Fact No. 76:**

Ms. O'Laughlin's surveys did not test for confusion for sales on rrbayc.com, which is where more than 80% of sales for which Defendants made revenue occurred. Trial Tr. [O'Laughlin] 159:21-160:13; Ripps Decl. ¶ 110 (uncontested).

**Plaintiff's Basis for Dispute:**

rrbayc.com is not where "more than 80% of sales for which Defendants made revenue occurred."  Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation.  Ripps Depo. Designations (Dkt. 396)

1  at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically,

2  all of them were because it was a Foundation contract, so...").

3       Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for

4  Defendants' infringing NFTs, "[t]he majority of the sales are taking place on

5  secondary markets. . . .  [T]he vast majority of them are occurring in secondary

6  markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723

7  (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm,

8  e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that

9  '[w]e're closing in on *$10 million impact to yuga'").

10       Thus, the vast majority of market activity involving Defendants' infringing

11  NFTs is taking place on the secondary market, including platforms such as

12  Foundation and OpenSea.  These secondary marketplaces are one place where

13  consumer confusion is likely to result from Defendants' actions to flood the market

14  with their infringing products.  These secondary marketplaces are also a prominent

15  source of confusion going forward—especially since they are where Defendants

16  continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78

17  ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx");

18  Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly

19  to LooksRare where these NFTs are still selling").  Defendants' contention is

20  therefore incorrect and misleading.

21  **Defendants' Response:**

22       Mr. Ripps's declaration went undisputed at trial, and there is no dispute that

23  80% of the reservations and commissions for RR/BAYC NFTs were through the

24  rrbayc.com website.  Ripps Decl. ¶ 110 (Dkt. 346) (uncontested).  Mr. Ripps's

25  comment that all of the NFTs were "technically sold" on Foundation is because the

26  contract is a Foundation contract.  *See* Ripps Depo. Designations (Dkt. 396) at

27  82:8-13; Counter designation 82:14-19.  This however is different than the

28  "Foundation page" for Ryder Ripps.  Yuga's conflation of the two through an

incomplete portion of Mr. Ripps's deposition testimony shows that they cannot differentiate between the contract itself and the marketplace that facilitated transactions on the contract.  Further, Yuga presented no evidence contradicting the fact that nobody could identify a single person who was confused by sales on Foundation.  *See* Trial Tr. [Solano] 19:13-15 (cannot identify a *single* confused consumer); [Hickman] 219:13-19.

Ms. Kindler's report also shows the strong divide between profits made on initial sales and secondary sales.  *See* JTX-308 ¶¶ 63 (calculating initial sales profits at 1,245 ETH); 68 (calculating secondary sale profits at 91 ETH).  This shows that the vast majority of profits for Defendants being from initial sales.  *Id.*  This is entirely consistent with the majority of sales being made on rrbayc.com. Yuga's citation to Mr. Hickman's statement that they were closing in on "$10 million" in impact on Yuga does not implicate anything about initial or secondary markets, or where RR-BAYC NFTs were sold.  In fact, the comment was not about revenue or profits at all but instead referred to volume.  *See* Hickman Decl. ¶ 95 ("Mr. Ripps and Mr. Cahen's responses, thus, confirm that my statement was in reference to adding $10 million in activity…").

Lastly, it is undisputed that Defendants are no longer profiting from royalties on RR/BAYC NFTs.  *See* Trial Tr. [Solano] 48:15-49:4 (acknowledging lie in witness statement and that royalties are no longer increasing); Cahen Decl. (Dkt 344) ¶¶ 167-172.  Regardless, Yuga cannot reasonably dispute that Ms. O'Laughlin did not test for confusion on rrbayc.com because she admitted she did not.  Trial Tr. [O'Laughlin] 160:2-12.

**Plaintiff's Reply**:

Defendants' response admits that their proposed fact is unproven.  They respond that "80% of the reservations and commissions for RR/BAYC NFTs were through the rrbayc.com website."  But, that is not their proposed fact.  The dispute is over "where more than 80% of sales for which Defendants made revenue

occurred."  There is no dispute that Defendants "made revenue" through the initial mint of RR/BAYC NFTs ***and*** through secondary sales; Defendants' response confirms that fact as well.  Defendants have ***no analysis*** comparing what percentage of the sales volume occurred through rrbayc.com and what percentage through secondary marketplaces.

In contrast, Ms. Kindler did this analysis.  Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "***[t]he majority of the sales are taking place on secondary markets***. . . .  [T]he ***vast majority of them are occurring in secondary markets*** and not from just the initial sale."  Trial Tr. at 202:4-17 (emphasis added); *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Moreover, Defendants admitted that they planned to transition from rrbayc.com to apemarket.com once all of their infringing NFTs were minted.  JTX-801.9; 801.148; 801.280; 801.281 (Mr. Ripps recommending that they migrate users to apemarket.com "once it mints out"); 801.288 (Mr. Cahen;  "I think the first logical step to me is migrating the rsvp site to apemarket.com"); 801.376 (Mr. Lehman on June 24, 2022 (before Defendants learned of the lawsuit):  "With respect to the rrbayc.com trademark issue I say we maybe get some attention around it and how unfair it is but ultimately take the site down probably . . . especially since we're migrating off anyway").  Ms. O'Laughlin's testimony is most relevant to this forward-looking scenario where she establishes that on two different NFT marketplace designs consumers were likely to be confused by Defendants' infringing NFTs.

### **Defendants' Disputed Post Trial Finding of Fact No. 77:**

Ms. O'Laughlin also did not consider whether Defendants actually made any sales on OpenSea. Trial Tr. [O'Laughlin] 165:1-4.

__Plaintiff's Basis for Dispute__:

It was irrelevant to Ms. O'Laughlin's analysis whether either Defendant personally sold their infringing NFTs on OpenSea.  The purpose of the survey was to determine "the likelihood of confusion, if any, due to Ripps' and Cahen's use of the BAYC Marks in connection with the at-issue RR/BAYC NFT collection" on the OpenSea marketplace.  O'Laughlin Decl. (Dkt. 341) ¶ 70.  This includes initial interest confusion and post-sale confusion through OpenSea.

Even so, blockchain transaction data reveals that "Mr. Cahen has sold [RR/BAYC NFTs] through OpenSea, LooksRare, and even Foundation."  Trial Tr. at 202:18-25.  And Defendants promoted the sales of the infringing NFTs on OpenSea.  *See, e.g.*, JTX-683 (tweet from Mr. Cahen stating "RR/BAYC is officially the highest 24h volume . . . IN THE WORLD!"; JTX-685 (tweet from Mr. Cahen stating "RR/BAYC about to become the first project ever to top both the @foundation and the @opensea charts."); Cahen Decl. (Dkt. 344) ¶ 253 (Mr. Cahen's testimony that he continued to attempt to sell the infringing NFTs even though he believed they were subject to over two dozen takedowns); Dkt. 163-95 (Mr. Ripps' tweet advertising infringing NFTs on OpenSea).

__Defendants' Response__:

One of the two marketplaces that Ms. O'Laughlin assessed confusion on was OpenSea.  *See* Trial Tr. [O'Laughlin] 164:21-25.  Because this Court has already held that there was confusion, Ms. O'Laughlin's testimony is relevant only to the extent of confusion and therefore, the extent of damages from confusion.  Because she is unaware of the amount of profits, sales, or how long RR/BAYC NFTs were on OpenSea, her opinion to the extent of confusion on OpenSea is inherently limited to the amount of time the page she tested about was online.  *See id.* 165:1-11.  These dates were June 19, and June 20, 2022.  *Id.* at 15-22.

1    **Plaintiff's Reply:**

2    Defendants' response has nothing to do with their proposed fact.  It is also

3    wrong.  Ms. O'Laughlin's determination that there is a likelihood of confusion on

4    OpenSea is relevant to the extent to which the Court should enjoin Defendants'

5    activities.  Ms. O'Laughlin's survey results confirm that, among other things, it is

6    appropriate for the Court to order the transfer of the RR/BAYC smart contract to

7    Yuga Labs because it is undisputed that there is a likelihood of confusion on

8    OpenSea that Yuga Labs could address if it becomes the owner of the RR/BAYC

9    smart contract.  Trial Tr. 136:9-18 ("But if Yuga Labs had control, was the owner

10   of the smart contract, we would have a much greater flexibility in controlling how

11   the collection is displayed in marketplaces, including OpenSea.").

12   **Defendants' Disputed Post Trial Finding of Fact No. 78:**

13   Ms. O'Laughlin's survey methodology was flawed from the outset because

14   she did not determine which survey format she should use, but instead used two

15   different surveys that are appropriate for different uses in different and mutually

16   exclusive circumstances. *See* Trial Tr. [O'Laughlin] 142:24-144:14.

17   **Plaintiff's Basis for Dispute:**

18   The Court considered Defendants' argument and rejected it when the Court

19   determined that Ms. O'Laughlin's testimony and the findings in her expert report

20   are "relevant, reliable, and admissible."  Trial Tr. at 141:3–5.  Defendants offer no

21   evidence or expert testimony to the contrary.

22   Though Defendants complain that Ms. O'Laughlin "used two different

23   surveys that are appropriate for different uses," that is exactly the approach called

24   for where—as here—two different marketplaces are being tested for likelihood of

25   confusion.  There is no principle dictating that the same survey format must be used

26   in every circumstance, regardless of context in which the marks appear.  *See* Trial

27   Tr. at 142:18-23 ("Q And it is important to be able to identify the right survey

28   methodology for the matter at hand; correct?" / "A I would generally agree with

that. However, it's possible that one or many methodologies may be appropriate for a particular matter. So it's not a one or none. It could be a one, many, or none.").

Ms. O'Laughlin surveyed two different contexts in which Defendants misappropriated the BAYC Marks.  She used accepted principles in choosing which survey methodology to use in each context.  On the Foundation marketplace where the parties' NFT collections were not sold at the same time, she used an Eveready survey, which presents participants with only the junior mark.  O'Laughlin Decl. (Dkt. 341) ¶ 17; *see also id.* ¶ 17 n.6 ("In Eveready format surveys involving forward confusion, respondents are presented with only the allegedly infringing mark and asked open-ended questions to assess confusion.").  On the OpenSea marketplace, where the parties NFT collections were sold at the same time, she used a Squirt survey, which presents participants with both the junior and the senior mark. *Id.* ¶ 18; *see also* ¶ 18 n.7 ("In Squirt format surveys involving forward confusion, respondents are presented with both parties' marks and asked closed-ended questions to assess confusion.").  There is nothing inconsistent about using the appropriate survey in the appropriate context to best replicate market conditions.

Accordingly, Courts regularly credit survey expert testimony that employs both Eveready and Squirt survey formats in the same litigation.  *See, e.g.*, *Icleen Entwicklungs-Und Vertiebsanstalt Für Umweltprodukte v. Blueair AB*, No. 21-cv-2236 DSF (ADS), 2021 WL 6104397, at *8-9 (C.D. Cal. Oct. 4, 2021) (crediting testimony relying on both Eveready and Squirt formats in ruling on a preliminary injunction); *Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 977 (D. Minn. 2017) (same); *GoSMiLE, Inc. v. Levine*, 769 F. Supp. 2d 630, 642-43 (S.D.N.Y. 2011) (same).

Though strength of the marks is one factor that can guide the choice of survey methodology, it is not determinative as Defendants suggest. *See, e.g.*, Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727,

737 (2016) ("Where, in sum, marks are not *proximate*, an Eveready is likely the only format available; and even as to proximate marks, an Eveready may always be offered (possibly in response to complaint allegations of trademark strength) in conjunction with a Squirt to negate the reach capabilities of a brand.") (footnote omitted).  Defendants' argument that Ms. O'Laughlin should have based her choice of methodology on strength of the marks alone contradicts established principles.

**Defendants' Response:**

Yuga misconstrues the Court's own words.  The Court specifically stated, "[W]hether the methodology chosen by this witness to conduct both the Squirt and Eveready Surveys ***goes to the weight of the witness's testimony***, not to its admissibility.  And counsel will have an opportunity to fully expose any limitations or flaws on cross-examination."  Trial Tr. 141:5-10 (emphasis added).

The cross-examination of Ms. O'Laughlin fully "expose[d]" limitations and flaws with using both methodologies.  Ms. O'Laughlin's testimony fundamentally changed between her deposition and trial on this matter.  At trial, she began by saying that while it is generally important to chose the correct methodology, there could be one, two or no methodologies that are applicable.  Trial Tr. [O'Laughlin] 142:24-143:5.  She then refused to acknowledge that an Eveready survey is most accepted when the asserted mark is "top of mind" despite testifying to that at her deposition.  *Id.* at 143:6-144:1.  This is in context to a *Squirt* survey which is to be used when marks are weak.  *See id.* at 144:4-6.  In fact, Ms. O'Laughlin herself has counseled other practitioners on how to choose *between* the two surveys.  JTX-314.  However, in this case she decided she would break from her prior practice and advice.  Trial Tr. [O'Laughlin] 144:19-23.

Yuga's citation to case law does not assist its position.  While some courts have credited expert opinions relying on both *Squirt* and *Eveready* surveys, those decisions should be given little weight.  First, they all implicate preliminary injunctions.  *See Icleen Entwicklungs-Und Vertiebanstalt Fur Umweltprodukte v.*

1  *Blueair AB*, 2021 WL 6104397 (C.D. Cal. 2021) (accepting surveys at preliminary

2  injunction stage).  Ms. O'Laughlin's consistent position has been that mark strength

3  is the most important factor for choosing surveys.  *Id.* at 143:6-144:6.  Although her

4  choice to not choose between the two surveys did not render her opinion

5  inadmissible, her cross-examination revealed that it should be afforded little to no

6  weight.

7      **Plaintiff's Reply:**

8      Defendants' tired argument is not supported by law or fact.  The only

9  evidence in the record about the proper methodology is Ms. O'Laughlin's.  It is

10 possible that more than one methodology is appropriate for a given case.  Trial Tr.

11 at 142:18-23.  Defendants' cross-examination of Ms. O'Laughlin did not "expose"

12 any limitations.  To the contrary, it reinforced that since Foundation and OpenSea

13 are two *different* NFT marketplaces with *different* ecommerce designs, two *different*

14 survey methodologies were appropriate for this case where Ms. O'Laughlin

15 conducted a survey of each *different* marketplace.

16 **Defendants' Disputed Post Trial Finding of Fact No. 79:**

17     The *Eveready* survey format is most accepted when the asserted mark is top

18 of mind. Trial Tr. [O'Laughlin] 143:6-144:3

19 **Plaintiff's Basis for Dispute:**

20     This is an inaccurate statement of the accepted methodology for conducting

21 consumer confusion surveys, as discussed *supra* ¶ 78.  In fact, as Ms. O'Laughlin

22 explains in the testimony Defendants cite, "I believe it depends on a few factors. I

23 think the choice of Eveready is often used for marks that are top of mind. However,

24 the Eveready studies can also be used depending on the context in which a

25 particular good is offered."  Trial Tr. at 143:8-11.  Defendants cite no expert

26 testimony or law to support their position.  Once again, Ms. O'Laughlin's survey

27 remains unrebutted.

28

Nevertheless, the strength of Yuga Labs' mark is no longer at issue.  The
court has already found that that "the BAYC Marks are both conceptually and
commercially strong," SJ Order (Dkt. 225) at 10-11.  And Defendants agreed.  Dkt.
418-1 ¶ 1 (admitting "Yuga Labs is the creator of one of the most well-known and
successful NFT collections, known as the Bored Ape Yacht Club ('BAYC')").  An
Eveready survey is thus one available survey.

**Defendants' Response:**

Everready surveys apply when a mark is "top of mind."  Marks that are top
of mind are those that appear "readily accessible in memory."  Jerre B. Swann & R.
Charles Henn Jr., 109 Trademark Rptr 671, 672.  A paradigmatic example of a "top
of mind" mark is McDonalds.  "Relatively few trademarks, however, are readily
accessible in memory".  *Id.*  This is of course, different than whether a mark is
"conceptually and commercially strong" as a mark can be conceptually and
commercially strong but not be on top of the average consumer's memory.  For
example, the term "Yuga" is likely conceptually and commercially strong, but only
two out of 505 respondents associated it with the BAYC pictures.  *See* Trial Tr.
[O'Laughlin] 155:25-156:1.  Given Ms. O'Laughlin's prior representations that
fame of the mark is the most important aspect of choosing between the surveys, she
should have determined the fame of Yuga's marks.  Instead, she chose not to
conduct a fame survey.  *Id.* at 144:12-18.  This court should weigh that
methodological decision and give her surveys little weight.

**Plaintiff's Reply:**

Once again, Defendants' argument is not supported by any evidence, law, or
even basic survey methodology.  They have presented no evidence that Eveready
surveys are rejected or discounted when there is no fame survey.  Defendants chose
not to offer a rebuttal survey expert at their peril.  The evidence demonstrates that
Ms. O'Laughlin used the appropriate survey methodology.  *See supra* ¶ 78.

1  **Defendants' Disputed Post Trial Finding of Fact No. 80:**

2    The *Squirt* survey format is used when the asserted mark is weak. Trial Tr.

3  [O'Laughlin] 144:4-6.

4  **Plaintiff's Basis for Dispute:**

5    This is an inaccurate statement of the accepted methodology for conducting

6  consumer confusion surveys, as discussed *supra* ¶ 78.  In fact, as Ms. O'Laughlin

7  explains in the testimony Defendants cite, "It is a reason, but it is not the only

8  reason.  As I said, it can depend on the context in which the marks are being used.

9  And so the choice of the Squirt can depend on whether or not the mark is of a

10  particular strength but also depending on the marketplace context in which a mark

11  is offered."  Trial Tr. at 144:6-11.  Here, the Squirt survey format was appropriate

12  to test confusion on OpenSea, because both products were sold on the same

13  marketplace at the same time.  O'Laughlin Decl. (Dkt. 341) ¶ 18 ("[A]t various

14  points in time, consumers on the OpenSea website (http://opensea.io), another

15  popular NFT marketplace, would have observed both the Yuga Labs BAYC

16  collection and the at-issue RR/BAYC NFT collection available and even directly

17  next to each other on OpenSea's 'Top Collections' leaderboard.  Because both

18  collections were available in the same marketplace, I [] test for likelihood of

19  confusion in this context using a Squirt survey design . . . .") (citations omitted); *see*

20  *also, e.g.*, *Icleen Entwicklungs-Und Vertiebsanstalt Für Umweltprodukte v. Blueair*

21  *AB*, No. 21-cv-2236 DSF (ADS), 2021 WL 6104397, at *5 (C.D. Cal. Oct. 4, 2021)

22  (approving use of "a Squirt survey to determine the likelihood of confusion in

23  scenarios where the parties' marks are considered proximate in the marketplace"

24  (cleaned up)).

25    **Defendants' Response:**

26    Squirt surveys apply where the mark is weak *and* sold in close proximity

27  with the alleged infringing mark.  Jerre B. Swan & R. Charles Henn Jr.,  *Likelihood*

28  *of Confusion Surveys: The Ever Constant Eveready Format; The Ever-Evolving*

1   *Squirt Format*, 109 The Trademark Rptr. 671, 676 (2019); *see also* Jerre B. Swann,

2   *Likelihood of Confusion Studies and the Straightened Scope of Squirt*, 98

3   Trademark Rptr 739, 755-56 (2008) (stating that *Squirt* surveys are for weak

4   marks).  Ms. O'Laughlin is relying on proximity alone to support her use of a

5   *Squirt* survey because she admittedly did not assess the mark's strength.  Trial Tr.

6   [O'Laughlin] 144:12-14.  Yuga's marks must be either weak or strong.  They

7   cannot be both.  However, Ms. O'Laughlin proceeded as though the marks were

8   both.  This was an error.

9   **Plaintiff's Reply:**

10   As before, Defendants' argument is not supported by any evidence.

11   Defendants chose not to offer a rebuttal survey expert at their peril.  The evidence

12   demonstrates that Ms. O'Laughlin used the appropriate survey methodology.  *See*

13   *supra* ¶ 78.

14   **Defendants' Disputed Post Trial Finding of Fact No. 83:**

15   Yuga's brand equity expert, Dr. Jonah Berger, offered a flawed and

16   unreliable opinion that the RR/BAYC project caused harm to Yuga's brand equity.

17   *See* Trial Tr. [Berger] 103:23-104:4.

18   **Plaintiff's Basis for Dispute:**

19   Dr. Berger's unrebutted testimony explains that he "conducted a number of

20   analyses, not just one," which helps to rule out the alternative theories that

21   Defendants hypothesize might explain Dr. Berger's findings.  Trial Tr. at 107:8-

22   108:1; 114:15-115:25; 121:23-125:1.  Defendants offered no expert of their own to

23   support any of their other hypothetical causes of brand harm to Yuga Labs.

24   Without an expert of their own to support their theories and in light of Dr. Berger's

25   reasonable and rational explanation of what he found in the data, Dr. Berger's

26   opinions should be accepted.

27   Defendants did not object to the admissibility of Dr. Berger's testimony.

28   Dkt. 366.

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections     479     Case No. 2:22-cv-04355-JFW-JEM

**Defendants' Response:**

Using its superior resources, Yuga hired an expert and paid him at least tens of thousands of dollars to offer an opinion that its brand suffered some unquantified amount of harm.  Trial Tr. [Berger] 104:5-9.  An expert's testimony is not *per se* reliable just because the opposing party does not retain an expert.  Indeed, the evidence at trial shows that Dr. Berger's limited analysis did not establish that the minting of RR/BAYC NFTs was the source of the alleged brand harm.  Although Dr. Berger acknowledged that several different causes could have impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of harm in his analysis.  Trial Tr. [Berger] 108:7-109:4; 115:16-25.  He limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period.  Trial Tr. [Berger] 106:1-3.  For instance, Dr. Berger's analysis ignored the Otherside scandal, which occurred mere days before his chosen analysis period.  Trial Tr. [Berger] 113:10-114:2; JTX-2715.  Dr. Berger even ignored events, like the general downturn of the cryptocurrency market, which occurred during his analysis period.  Trial Tr. [Berger] 109:5-110:5; JTX-306.

At trial, Dr. Berger claimed that the presence of other potential causes of brand harm does not dilute his hypothesis that the minting of RR/BAYC NFTs caused brand harm.  Trial Tr. [Berger] 115:19-25.  However, in ignoring other potential causes of harm, Dr. Berger cannot definitively establish which factors caused harm or quantify how much harm was attributable to any given factor.  *See* Trial Tr. [Berger] 108:16-109:4 ("I don't mean to suggest that any single one of them is the only reason for the harm.  All of them could be -- all of the things that I stated in my answer a couple minutes ago could be contributing to the harm, among other things.").  Indeed, Dr. Berger failed to quantify any alleged harm to Yuga's brand equity, goodwill, or reputation.  *See generally* Berger Decl.; Dkt. 343 at 15.

1    **Plaintiff's Reply:**

2         Dr. Berger—a brand equity expert, not a financial expert—observed harm to

3    Yuga Labs' BAYC brand in the marketplace.  Ms. Kindler—an economics expert,

4    not a brand equity expert—testified as to why that harm to Yuga Labs' BAYC

5    brand was unquantifiable.

6         The fact of harm caused by Defendants' infringing activities is proven by, at

7    least, Dr. Berger's testimony.  Defendants however, without evidence or an expert

8    of their own, offer alternative theories that they believe might also have accounted

9    for some of the harm that Dr. Berger observed.  The evidence shows, however, that

10   Dr. Berger's methodologies ruled out these alternative theories of harm that

11   Defendants posit.  Trial Tr. at 107:8-108:1; 114:15-115:25; 121:23-125:1.

12   Defendants also have no evidence that any other supposed harms would explain the

13   harms Dr. Berger observed in the data.  Dr. Berger explained why the data does not

14   support Defendants' theories.  Defendants' unsupported theories, and counsel

15   argument, do not amount to evidence.  Moreover, Defendants' attacks on Dr.

16   Berger's sentiment analysis have no impact on his independent opinion that he

17   observed evidence that the BAYC brand has brand premium and that Defendants'

18   infringing activities harmed that premium.  Berger Decl. (Dkt. 339) at ¶¶ 6-76, 93-

19   95.

20        Defendants had a chance to hire an expert, if they could have found someone

21   to support their position.  *See e.g.* JTX-1171, 1567.  But they chose not to.  As such,

22   Defendants have no evidence to negate or undermine Dr. Berger's observation and

23   opinion that Defendants' infringing activities harmed Yuga Labs.

24   **Defendants' Disputed Post Trial Finding of Fact No. 84:**

25        Dr. Berger's analysis was limited to a two-month time period and thus did

26   not consider broadly how Yuga Lab's brand equity was impacted outside of that

27   period. Specifically, Dr. Berger did not evaluate any brand harm prior to May 6,

28   2022 or after late June 2022. Trial Tr. [Berger] 106:1-3.

**Plaintiff's Basis for Dispute:**

Defendants' contention is incorrect and not based on the evidence.  Dr. Berger's analysis included an examination of tweets referencing "BAYC" or "Bored Ape" and that also included a reference to Mr. Ripps or RR/BAYC for the period December 1, 2021 through May 5, 2022.  Berger Decl. (Dkt. 339) ¶ 83. Based on this analysis, he noted that the discussion around the BAYC brand did not begin to incorporate Mr. Ripps until May 2022.  *Id.*  He then looked at how the attitudes toward BAYC changed between May 6, 2022 and June 27, 2022.  *Id.* at ¶ 88.  Dr. Berger's analysis of this time period concluded that the sale and marketing of RR/BAYC NFTs harmed Yuga Labs' brand value.  *Id.* at ¶ 92.  Dr. Berger further opined that harm to Yuga Labs' brand value during that time frame can harm the value of its future projects.  *Id.* at ¶ 95.

**Defendants' Response:**

Plaintiff's dispute ignores Dr. Berger's unambiguous testimony that his "analysis was limited to the period from May 6, 2022 to late June."  Trial Tr. [Berger] 106:1-3.  Although Dr. Berger claimed to have reviewed tweets from before that period, he admittedly did not actually conduct any empirical analysis on those tweets.  Trial. Tr. [Berger] 105:14-106:3 ("Q Your empirical analysis was limited to the period from May 6, 2022, to late June 2022; correct? A For a number of reasons, that's the period that I focused on…").  Dr. Berger further did not review any tweets from after June of 2022 to determine whether there was any ongoing brand damage due to RR/BAYC or any other factor, and whether the BAYC brand recovered value after that period.  *See* Trial Tr. [Berger] 106:4-10. Although Dr. Berger opined that harm during the examined timeframe *could have* harmed the value of Yuga's future projects, he offered no opinion (and in fact did not even analyze) whether such harm in fact occurred after June of 2022.  *Id.* at 106:4-10.

<u>**Plaintiff's Reply**</u>:

Defendants ignore the plain language of Dr. Berger's declaration and report. Further, Dr. Berger's answer at trial, quoted above, was in response to a question about his sentiment analysis specifically, not all of the data he considered in forming his opinions.  Trial Tr. 105:4-6 ("you conducted an analysis of social media posts *as part of your work on this case*") (emphasis added).  Moreover, Dr. Berger's analysis established a base line for sentiment before Defendants commenced their infringing activity, which would have captured any alleged harms pre-dating the first mint, and also correlated Defendants' marketing activities and promotion of RR/BAYC NFTs on Twitter to the expressed sentiment of Yuga Labs on Twitter.  The harm to Yuga Labs' brand equity did not evaporate overnight; it persists.  Trial Tr. 95:17-96:15; 97:9-99:7 (Ms. Muniz testifying about the failure of Yuga Labs to extend the BAYC brand following Defendants' infringing activities); Berger Decl. (Dkt. 339) at ¶ 34 ("brand equity premium manifests itself through brand extensions"), ¶¶ 47-70 (the presence of counterfeits in the marketplace has a negative impact on brand equity and can create confusion, which is what Defendants' infringing activities did to the BAYC brand).  Thus, Dr. Berger's analysis does consider a broader time period, and the evidence certainly supports the conclusion that Yuga Labs' goodwill continues to be harmed by Defendants' infringing activities.

<u>**Defendants' Disputed Post Trial Finding of Fact No. 86**</u>:

<u>Dr. Berger admitted that that there could be multiple different and separate causes of the harm that Yuga's brand purportedly suffered. Trial Tr. [Berger] 108:7-109:4.</u>

<u>**Plaintiff's Basis for Dispute**</u>:

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs."  Trial Tr. at 115:16-

117:10; 121:23-123:8.  Nevertheless, even if there were other harms to Yuga Labs, this does not negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Response:**

Plaintiff does not meaningfully dispute the proposed finding of fact.  Indeed, Plaintiff acknowledges that its brand has been damaged and that multiple factors beyond RR/BAYC could have caused that harm.  The cited "say-so" testimony that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs" is belied by the numerous holes in Dr. Berger's analysis, revealed during cross-examination, including his failure to consider other controversies involving Yuga before, during, and after the narrow timeframe that he considered. *See* Trial Tr. 106:1-3, 108:7-110:5, 113:10-114:2, 115:16-25.

**Plaintiff's Reply:**

As discussed *supra* ¶ 83, Defendants' hypothesis that the data does not show their harm to Yuga Labs is belied by Dr. Berger's analysis.  Defendants have no evidence supporting their theories.  Dr. Berger was unable to discern any evidence to support Defendants' hypothesis, and Defendants' hearsay does not establish that fact.  Trial. Tr. 121:7-125:1.  Additionally, contrary to Defendants' claim the evidence does not support their contention that Yuga Labs acknowledged that its BAYC brand had been damaged by multiple factors.  Finally, Defendant's contention and their response fail to negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 87:**

Dr. Berger, however, did not consider alternative causes of brand harm such as the general downturn of the cryptocurrency market. Trial Tr. [Berger] 109:5-110:5; 115:16-25.

**Plaintiff's Basis for Dispute**:

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs."  Trial Tr. at 115:16-117:10; 121:23-123:8.  Dr. Berger specifically considered, and rejected, whether the share of tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share of positive sentiment was decreasing; he found that the data are inconsistent with that alternate hypothesis, thus ruling out any supposed alternative causes before the release of RR/BAYC NFTs.  Berger Decl. (Dkt. 339) ¶ 91 n. 55.

**Defendants' Response**:

Yuga acknowledges that its brand has been damaged and that multiple factors beyond RR/BAYC could have caused that harm.  Although Plaintiff points out that Dr. Berger concluded that the share of tweets expressing negative sentiment toward BAYC was not increasing between May 6, 2022 and May 12, 2022, that cannot explain events that occurred *during* the period that Dr. Berger examined, including the massive crash in cryptocurrency prices that occurred during the analysis period.  Trial Tr. [Berger] 109:5-110:5; JTX-306.

**Plaintiff's Reply**:

As discussed *supra* ¶ 83, Dr. Berger's analysis does not support Defendants' hypothesis that the data does not show their harm to Yuga Labs, and Defendants have no evidence supporting their theories.  Dr. Berger has not seen any evidence to support Defendants' hypothesis, and Defendants' hearsay does not establish that fact.  Trial. Tr. 121:7-123:8; 124:12-125:1.  Additionally, contrary to Defendants' claim the evidence does not support their contention that Yuga Labs acknowledged that its BAYC brand had been damaged by multiple factors.  Finally, Defendants do not address that their contention does not negate that: (1) Defendants should not

profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 88:**

Dr. Berger did not consider whether Yuga's scandal associated with its Otherdeed NFTs for Otherside, which are related to BAYC NFTs and were released on April 2022 (just before the period selected for his analysis), was responsible for any alleged harm to Yuga's brand. Trial Tr. [Berger] 113:10-114:2; 109:5-7; 110:6-9.

**Plaintiff's Basis for Dispute:**

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs." Trial Tr. at 115:16-117:10; 121:23-123:8. Dr. Berger, specifically considered, and rejected, whether the share of tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share of positive sentiment was decreasing; he found that the data are inconsistent with that alternate hypothesis, thus ruling out any supposed alternative causes before the release of RR/BAYC NFTs. Berger Decl. (Dkt. 339) ¶ 91 n.55.

Dr. Berger also explained that he would not expect harm to the Otherside brand to cause harm to the BAYC brand, given the relationship of the two brands within the Yuga Labs brand portfolio. Trial Tr. at 123:19-124:11.

**Defendants' Response:**

Plaintiff's statement that harm to the Otherside brand would not cause harm to the BAYC brand is nonsensical. Plaintiff's own response admits that the two brands are "related" and within the same Yuga Labs portfolio. Moreover, the press report about the Otherside scandal, JTX-2715, expressly mentions Bored Ape Yacht Club, Otherdeed, Otherside, and Yuga Labs itself. The article further notes

that participants in the Otherside launch lost thousands of dollars in gas fees and became the target of scam activities. *See* JTX-2715 at 1-2. At a minimum, this demonstrates that the failed Otherside launch resulted in negative publicity for all Yuga brands, including BAYC, Otherside, and Yuga itself.

Moreover, Plaintiff acknowledges that its brand has been damaged and that multiple factors other than RR/BAYC could have caused that harm. *See* Trial Tr. 106:1-3, 108:7-110:5, 113:10-114:2, 115:16-25.

**Plaintiff's Reply:**

As discussed *supra* ¶ 83, Dr. Berger's analysis does not support Defendants' hypothesis that the data does not show their harm to Yuga Labs, and Defendants have no evidence supporting their theories. Dr. Berger has not seen any evidence to support Defendants' hypothesis, and Defendants' hearsay does not establish that fact. Trial. Tr. 121:7-124:11;. Additionally, contrary to Defendants' claim the evidence does not support their contention that Yuga Labs acknowledged that its BAYC brand had been damaged by multiple factors. Finally, Defendants do not address that their contention does not negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 89:**

Dr. Berger did not consider whether the Nekst scandal, in which Yuga desecrated graffiti artwork in New York City, was responsible for any alleged harm to Yuga's brand. Trial Tr. [Berger] 114:10-115:15.

**Plaintiff's Basis for Dispute:**

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs." Trial Tr. at 115:16-117:10; 121:23-123:8.

Nevertheless, even if there were other harms to Yuga Labs, this does not negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.  Defendants' arguments appear to relate to actual damages rather than addressing the equitable harms caused by Defendants.

**Defendants' Response**:

Yuga does not meaningfully dispute the proposed finding of fact.  Indeed, Yuga acknowledges that its brand has been damaged and that multiple factors beyond RR/BAYC could have caused that harm.  The cited "say-so" testimony that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs" is belied by the numerous holes in Dr. Berger's analysis, revealed during cross-examination, including his failure to consider certain events and the narrow timeframe that he considered.  *See* Trial Tr. 106:1-3, 108:7-110:5, 113:10-114:2, 115:16-25.

**Plaintiff's Reply**:

As discussed *supra* ¶ 83, Dr. Berger's analysis does not support Defendants' hypothesis that the data does not show their harm to Yuga Labs, and Defendants have no evidence supporting their theories.  Dr. Berger has not seen any evidence to support Defendants' hypothesis, and Defendants' hearsay does not establish that fact.  Trial. Tr. 121:7-123:8.  Additionally, contrary to Defendants' claim the evidence does not support their contention that Yuga Labs acknowledged that its BAYC brand had been damaged by multiple factors.  Finally, Defendants do not address that their contention does not negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 90:**

Dr. Berger did not consider whether the validity of Defendants' criticism of Yuga was responsible for any alleged harm to Yuga's brand. Trial Tr. [Berger] 117:15-24.

**Plaintiff's Basis for Dispute:**

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs." Trial Tr. at 115:16-117:10; 121:23-123:8. Dr. Berger, specifically considered, and rejected, whether the share of Tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share of positive sentiment was decreasing; he found that the data are inconsistent with that alternate hypothesis, thus ruling out any supposed alternative causes preceding the release of RR/BAYC NFTs. Berger Decl. (Dkt. 339) at n.55.

**Defendants' Response:**

Yuga acknowledges that its brand has been damaged and that multiple factors beyond RR/BAYC could have caused that harm. The cited "say-so" testimony that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs" is belied by the numerous holes in Dr. Berger's analysis, revealed during cross-examination, including his failure to consider certain events and the narrow timeframe that he considered. *See* Trial Tr. 106:1-3, 108:7-110:5, 113:10-114:2, 115:16-25.

Dr. Berger's failure to consider the effect of Mr. Ripps and Mr. Cahen's criticisms is particularly problematic. There is no dispute in this litigation that both individuals were vocal critics of Yuga on social media and repeatedly pointed out parallels between Yuga Labs' artwork and logos and, for instance, Nazi iconography. Yet Dr. Berger *was not even aware that Yuga had ever been*

1   *associated with racism or hate speech* at the time he gave his deposition.  Trial Tr.

2   119:5-19 ("I'm not aware that BAYC or Yuga has been associated with racism or

3   hate speech").  Nor did he consider in his analysis whether the minting of

4   RR/BAYC NFTs increased public awareness of the racism allegations.  *Id.* 119:20-

5   25 ("So you did not analyze whether the minting of RR/BAYC NFTs increased

6   public awareness of the racism allegations; correct? A I did not look at that, no…").

7   Dr. Berger's failure to even consider, much less analyze the impact of Mr. Ripps

8   and Mr. Cahen's criticism—a central issue in this case—undermines the credibility

9   and reliability of his analysis.

10          **Plaintiff's Reply:**

11          As discussed *supra* ¶ 83, Dr. Berger's analysis does not support Defendants'

12   hypothesis that the data does not show their harm to Yuga Labs from their

13   trademark infringement, and Defendants have no evidence supporting their theories.

14   Dr. Berger has not seen any evidence to support Defendants' hypothesis, and

15   Defendants' hearsay does not establish that fact.  Trial. Tr. 118:11-119:25; 121:7-

16   123:8.  Additionally, contrary to Defendants' claim the evidence does not support

17   their contention that Yuga Labs acknowledged that its BAYC brand had been

18   damaged by multiple factors.  Finally, Defendants do not address that their

19   contention does not negate that: (1) Defendants should not profit from their

20   infringing NFTs; and (2) Defendants should be enjoined from continued

21   infringement.

22   **Defendants' Disputed Post Trial Finding of Fact No. 91:**

23          Dr. Berger did not consider whether the minting of RR/BAYC NFTs

24   increased awareness of Defendants' criticism of Yuga, and whether that increased

25   awareness of Yuga's misconduct was responsible for any alleged harm to Yuga's

26   brand. Trial Tr. [Berger] 119:21-25.

27

28

**Plaintiff's Basis for Dispute**:

Dr. Berger testified that, hypothetically, there could be multiple different causes of harm, but his data revealed that "the only factor that can distribute to that outcome is the minting and publication of RR/BAYCs."  Trial Tr. At 115:16-117:10; 121:23-123:8.  Dr. Berger, specifically considered, and rejected whether the share of Tweets expressing negative sentiment toward BAYC was increasing between May 6, 2022 and May 12, 2022 (i.e., before the release of RR/BAYC NFTs) and whether the share of positive sentiment was decreasing; he found that the data are inconsistent with that alternate hypothesis, thus ruling out any supposed alternative causes preceding the release of RR/BAYC NFTs.  Berger Decl. (Dkt. 339) at n.55.

In addition, Dr. Berger has not seen any evidence to support Defendants' hypothesis.  Trial. Tr. 119:21-25.  Nevertheless, as the Court has already found this case is about Defendants' commercial infringement.  SJ Order (Dkt. 255) at 16 ("These are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."); *see also* June 9, 2023 Pretrial Conference Tr. At 8–10 (Defense counsel acknowledging "there is a difference between the criticism and the sales of the product.").  Nothing in Defendants' supposed false criticism negates that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Response**:

Dr. Berger's failure to consider the effect of Mr. Ripps and Mr. Cahen's criticisms is particularly problematic.  There is no dispute in this litigation that both individuals were vocal critics of Yuga on social media and repeatedly pointed out parallels between Yuga's artwork and logos and, for instance, Nazi iconography.  Yet Dr. Berger *was not even aware that Yuga had ever been associated with racism or hate speech* at the time he gave his deposition.  Trial Tr. 119:5-19 ("I'm not

1  aware that BAYC or Yuga has been associated with racism or hate speech"). Nor

2  did he consider in his analysis whether the minting of RR/BAYC NFTs increased

3  public awareness of the racism allegations. *Id.* 119:20-25 ("So you did not analyze

4  whether the minting of RR/BAYC NFTs increased public awareness of the racism

5  allegations; correct? A I did not look at that, no…"). Dr. Berger's failure to even

6  consider, much less analyze the impact of Mr. Ripps and Mr. Cahen's criticisms—a

7  central issue in this case—undermines the credibility and reliability of his analysis.

8      Yuga's suggestion that "this case is about Defendants' commercial

9  infringement" does not rehabilitate Dr. Berger's analytical failure. Regardless of

10  whether there was commercial activity, the central question raised by Dr. Berger's

11  testimony is whether the marked deterioration of Yuga's brand was due to any

12  confusion associated with RR/BAYC or something else. His failure to consider Mr.

13  Ripps and Mr. Cahen's criticism (as opposed to any commercial activity) as the

14  source of that harm undermines his conclusion that the minting of RR/BAYCs and

15  alleged resulting confusion were actually the source of harm to Yuga. Indeed, as

16  explained at length above, there is no evidence of *any* confusion associated with the

17  minting of RR/BAYC NFTs.

18      **Plaintiff's Reply**:

19      As discussed *supra* ¶ 83, Dr. Berger's analysis does not support Defendants'

20  hypothesis that the data does not show their harm to Yuga Labs from their

21  trademark infringement, and Defendants have no evidence supporting their theories.

22  Dr. Berger has not seen any evidence to support Defendants' hypothesis, and

23  Defendants' hearsay does not establish that fact. Trial. Tr. 118:11-119:25; 121:7-

24  123:8. Additionally, contrary to Defendants' claim the evidence does not support

25  their contention that Yuga Labs acknowledged that its BAYC brand had been

26  damaged by multiple factors. Moreover, separate from his sentiment analysis, Dr.

27  Berger opined that the evidence supports his conclusion that the BAYC brand has

28  brand premium and that Defendants' infringing activities harmed that premium.

Berger Decl. (Dkt. 339) at ¶¶ 6-76, 93-95.  He reached this opinion, in part, because of the ample evidence of actual confusion in the record.  Finally, Defendants do not address that their contention does not negate that: (1) Defendants should not profit from their infringing NFTs; and (2) Defendants should be enjoined from continued infringement.

**Defendants' Disputed Post Trial Finding of Fact No. 92:**

Yuga's damages expert, Lauren Kindler, was able to quantify the alleged damages Yuga suffered. Trial Tr. [Kindler] 172:14-17.

**Plaintiff's Basis for Dispute:**

Ms. Kindler stated throughout her testimony that, although she was able to calculate certain profits accrued by Defendants, the extent of harm to Yuga Labs was not practically quantifiable.  *See* Kindler Decl. (Dkt. 338) ¶ 62 ("In addition to the measures of harm quantified above, Defendants' wrongful conduct caused (and continues to cause) unjust enrichment to Defendants and harm to Yuga Labs that are significant, yet more difficult to quantify."); *id.* ¶ 63 ("The confusion created by the wrongful conduct caused harm to Yuga Labs' business that I have not attempted to quantify."); *id.* ¶ 64 ("I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships"); *id.* ¶ 65 ("I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill, but directionally, it would decrease the value."); *id.* ¶ 67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis"); *id.* ¶ 75 ("it is my opinion that there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or ensuring that Yuga Labs receives adequate monetary compensation for the harm it has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace, which supports Yuga Labs' position that the harm caused by Defendants' infringing NFTs is irreparable through economic means alone."); Trial Tr. at 176:14-22 ("I computed other potential measures of harm, and I also discussed at length in my

report other significant areas of harm that would not be easily quantifiable, such as harm to goodwill, harm to brand equity, and things of that nature.").

**Defendants' Response:**

This objection is misleading and raises irrelevant testimony.  Without question, Ms. Kindler did calculate Yuga's damages. *See, e.g.,* Trial Tr. [Kindler] 173:1-8 ("This figure depicts the different damages calculations that you performed in this case; correct? A Yes, at the time of my report which was in February of this year. Q And you stand by those figures as accurate; correct? A Yes. I have no reason to believe sitting here that they are not.").

Yuga's citations to Ms. Kindler's testimony on other areas of possible damages that Ms. Kindler was not asked to evaluate or chose not to quantify are irrelevant to the accuracy of this finding of fact, which is that there were damages that Ms. Kindler could quantify.  *See* Kindler Decl. ¶64 ("I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships…"); Kindler Decl. ¶65 ("I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill…"); Kindler Decl. ¶67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…").

**Plaintiff's Reply:**

The evidence Defendants cite includes the reason their proposed fact is inaccurate—Ms. Kindler testified that in February 2023 her report included certain damages calculations related to specific harms and remedies.  Her report did not state that she "was able to quantify the alleged damages."  Trial Tr. 173:1-8. Rather, as Ms. Kindler testified, there were certain aspects of harm to Yuga Labs that were unquantifiable.  Kindler Decl. (Dkt. 338) ¶¶ 62-65, 67, 72.  Moreover, Defendants ignore Ms. Kindler's testimony that as a result of Defendants' actions after February 2023, Ms. Kindler reached the opinion "that there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or

ensuring that Yuga Labs receives adequate monetary compensation for the harm it
has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace,
which supports Yuga Labs' position that the harm caused by Defendants' infringing
NFTs is irreparable through economic means alone." Kindler Decl. (Dkt. 338)
¶ 75. Ms. Kindler also testified it was her opinion that injunctive relief in the form
of transfer of the smart contract was necessary because it was not "economically
feasible" to buyback the infringing RR/BAYC NFTs from the market. Trial Tr.
184:13-185:4. This testimony further confirms that Ms. Kindler was not able to
quantify all of the harm to Yuga Labs from Defendants' trademark infringement
because there was irreparable harm.

**Defendants' Disputed Post Trial Finding of Fact No. 95:**

Ms. Kindler calculated damages in the amount of $1,792,704 for Yuga to
repurchase all RR/BAYC NFTs. Trial Tr. [Kindler] 175:17-22.

**Plaintiff's Basis for Dispute:**

This statement is inaccurate. Ms. Kindler's actual testimony was that this
figure "would be understated because there would be holdouts that would not be
willing to sell back the NFTs to Yuga Labs" and that the figure would
"significantly understate" Defendants' harm to Yuga Labs. Trial Tr. at 176:10-12,
17-18.

**Defendants' Response:**

This objection is misleading. Ms. Kindler testified that as of the date of her
expert report she calculated that the cost of acquiring RR/BAYC NFTs was
$1,792,704. *See* Trial Tr. [Kindler] 175:17-22 ("***Q Now, when you served this
report back in February, your calculation of that cost was $1,792,704; correct? A
Yes.*** As of the date that I issued my report and the floor price of the knockoff
BAYC NFTs at that time, that was my estimate.")

The qualifications to this opinion Yuga raises do not undermine the accuracy
of this finding of fact, as Ms. Kindler included this figure in her report and believed

those numbers to be an accurate determination of damages.  *See* Trial Tr. [Kindler] 175:12-22 (testifying that $1,792,704 represents a calculation of the cost of acquiring RR/BAYC NFTs, which Ms. Kindler included in Figure 7 of her expert report); Trial Tr. [Kindler] 172:23-173:8 ("Okay. This is a Figure 7 from your report; correct? A That's correct. Q This figure depicts the different damages calculations that you performed in this case; correct? A Yes, at the time of my report which was in February of this year. Q And you stand by those figures as accurate; correct? A Yes. I have no reason to believe sitting here that they are not.").

**Plaintiff's Reply:**

As discussed *supra* ¶ 94, Ms. Kindler testified a buyback, one possible type of damages remedy, was not "economically feasible."  She also testified that "a full buyback would likely be impossible."  Kindler Decl. (Dkt. 338) ¶ 72.  Indeed, the cost to purchase and destroy all RR/BAYC NFTs could be higher than $797,183,838. *Id.* ¶ 74.  Therefore, she concluded that the "wide range in the floor and the ceiling that [she] calculated for the hypothetical buyback underscores the economic reality — which is that Yuga Labs cannot force any holder of an RR/BAYC to sell that NFT to Yuga Labs. Thus, given the behavior and comments following Mr. Cahen's June 6 tweet (and subsequent tweets on this topic), it is [her] opinion that **there is no economically feasible option for removing the RR/BAYC NFTs from the marketplace entirely or ensuring that Yuga Labs receives adequate monetary compensation for the harm it has suffered and will suffer by having RR/BAYC NFTs exist in the marketplace, which supports Yuga Labs' position that the harm caused by Defendants' infringing NFTs is irreparable through economic means alone**." *Id.* ¶ 75 (emphasis added).

**Defendants' Disputed Post Trial Finding of Fact No. 96:**

Ms. Kindler later changed her damages calculation in the amount of repurchase costs to be "up to $797 million." Trial Tr. [Kindler] 178:24-179:5.

**Plaintiff's Basis for Dispute**:

Ms. Kindler supplemented her damages calculation with new information once it became available; she did not change her prior analysis.  *See* Trial Tr. 179:2-5 ("based on additional events that had transpired and available market data, that I could then update my analysis to show the impact of what I had already identified previously as likely holdouts in the marketplace.").  Ms. Kindler initially calculated "a 'floor' for what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the RR/BAYC NFT collection."  Kindler Decl. (Dkt. 338) ¶ 72.  Then, based on new data made available by Defendants' posts to their followers regarding the buyback estimate (which also prompted an increase in the price and trading volume of the infringing NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor value for a hypothetical buyback significantly underestimated the actual cost of such an exercise, as I originally opined."  *Id.* ¶¶ 73-74.  "Based on these materials and available market data, my assignment was to estimate a 'ceiling' for what a buyback would cost.  I determined the cost to purchase and destroy all RR/BAYC [NFTs] could even be higher than $797,183,838 . . . based on the then-current floor price of authentic BAYC NFTs."  *Id.* ¶ 74.

**Defendants' Response**:

Yuga's "dispute" is little more than an exercise in semantics.  There is no dispute that the $797 million figure was nowhere to be found in Ms. Kindler's original expert report.  Trial Tr. [Kindler] 175:17-179:8; *see generally* JTX-308.  The $797 million figure, 400 times greater than her original damages estimate, first appeared in Ms. Kindler's amended offer of proof more than four months after her original damages report.  Dkt. 287-10 at 4 n.3.

The $797 million figure is facially unreasonable, as there has never, to Defendants knowledge, ever been an award of trademark infringement damages that even approaches that amount.  The $797 million number is also unreasonable

1  because of what Ms. Kindler claims precipitated it.  That is, during the trial Ms.

2  Kindler confirmed that the entire basis for increasing the damages by more than 400

3  times was a series of tweets made by Mr. Cahen and others on Twitter.  Trial Tr.

4  [Kindler] 179:12-14 ('Q Your new opinion was based on Tweets posted by

5  defendants on June 6, 2023, and some responses; correct? A Yes. That was the

6  events that had transpired.").  In those tweets, Twitter users claimed they would not

7  sell their RR/BAYCs. *See* Dkt. 287-10 at 4.   But Ms. Kindler acknowledged that

8  the possibility of a holdout was not a new thing that came into existence at the time

9  of Mr. Cahen's tweet. *Id.* at 180:3-10.  More likely, Ms. Kindler's opinion was an

10  attempt to scare Defendants into settling before the trial.  When that effort failed,

11  Yuga quickly withdrew its claim for a jury trial and legal damages.

12      Ms. Kindler's shifting opinion—driven by Yuga's concurrent decision to

13  drop all legal remedies on the eve of trial—undermines her credibility as a witness.

14      **Plaintiff's Reply:**

15      Ms. Kindler's February 2023 report confirmed that there would likely be

16  holdouts who would demand higher prices than she assumed based on the evidence

17  at that time and that her "estimate very likely understates the cost Yuga Labs would

18  actually incur."  JTX-0723.00046.  This opinion is consistent with her opinion at

19  trial that her original calculation was understated, that there would be holdouts, and

20  that a buyback was not economically feasible. *See supra* ¶ 95.  Ms. Kindler's

21  consistency and conservative approach confirms her credibility.

22  **Defendants' Disputed Post Trial Finding of Fact No. 97:**

23      Ms. Kindler changed her damages figure to "up to $797 million" based on

24  tweets posted by Defendants on June 6, 2023, and some responses to those tweets.

25  Trial Tr. [Kindler] 179:6-14.

26  **Plaintiff's Basis for Dispute:**

27      Ms. Kindler supplemented her damages calculation with new information

28  once it became available; she did not change her prior analysis.  Her ceiling figure

1   for a hypothetical buyback scenario was based on market and transaction data in

2   addition to statements by Defendants and their followers.  *See supra* ¶ 96.

3   **Defendants' Response:**

4   Yuga's "dispute" is little more than an exercise in semantics.  There is no

5   dispute that the $797 million figure was nowhere to be found in Ms. Kindler's

6   original expert report.  Trial Tr. [Kindler] 175:17-179:8.  The $797 million figure,

7   400 times greater than her original damages estimate, first appeared in Ms.

8   Kindler's amended offer of proof more than four months after her original damages

9   report.  Dkt. 287-10 at 4 n.3.

10   The $797 million figure is facially unreasonable, as there has never, to

11   Defendants knowledge, ever been an award of trademark infringement damages

12   that even approaches that amount.  The $797 million number is also unreasonable

13   because of what Ms. Kindler claims precipitated it.  That is, during the trial Ms.

14   Kindler confirmed that the entire basis for increasing the damages by more than 400

15   times was a series of tweets made by Mr. Cahen and others on Twitter.  Trial Tr.

16   179:12-14 ('Q Your new opinion was based on Tweets posted by defendants on

17   June 6, 2023, and some responses; correct? A Yes. That was the events that had

18   transpired.").  In those tweets, Twitter users claimed they would not sell their

19   RR/BAYCs.  *See* Dkt. 287-10 at 4.   But Ms. Kindler acknowledged that the

20   possibility of a holdout was not a new thing that came into existence at the time of

21   Mr. Cahen's tweet.  *Id.* at 180:3-10.  More likely, Ms. Kindler's opinion was an

22   attempt to scare Defendants into settling before the trial.  When that effort failed,

23   Yuga quickly withdrew its claim for a jury trial and legal damages.

24   Ms. Kindler's shifting opinion—driven by Yuga's concurrent decision to

25   drop all legal remedies on the eve of trial—undermines her credibility as a witness.

26   **Plaintiff's Reply:**

27   As discussed *supra* ¶ 96, Ms. Kindler did not "change" her opinion.

28

**Defendants' Disputed Post Trial Finding of Fact No. 98:**

Ms. Kindler further changed her damages calculation in her trial testimony, opining that "the cost to purchase and destroy all RR/BAYC NFTs could *even be higher* than $797,183,838." Kindler Decl. ¶ 74.

**Plaintiff's Basis for Dispute:**

Ms. Kindler did not change her analysis.  The amended offer of proof for Ms. Kindler explicitly states: "It is Ms. Kindler's opinion that if there are holdouts even at this price, consistent with the recent social media evidence, the cost to purchase and destroy all RR/BAYC [NFTs] *could even be higher*."  Dkt. 287-10 at 4 n.3 (emphasis added).  This is consistent with her trial testimony.  Kindler Decl. (Dkt. 338) ¶ 74 (hypothetical buyback price "could even be higher than $797,183,838").  In other words, Ms. Kindler calculated a "ceiling" for what a hypothetical buyback could cost, but acknowledged that the ceiling figure could be higher based on the factors she discussed.

**Defendants' Response:**

Yuga's "dispute" is little more than an exercise in semantics.  There is no dispute that the $797 million figure was nowhere to be found in Ms. Kindler's original expert report.  Trial Tr. [Kindler] 175:17-179:8.  The $797 million figure, 400 times greater than her original damages estimate, first appeared in Ms. Kindler's amended offer of proof more than four months after her original damages report.  Dkt. 287-10 at 4 n.3.

The $797 million figure is facially unreasonable, as there has never, to Defendants knowledge, ever been an award of trademark infringement damages that even approaches that amount.  The $797 million number is also unreasonable because of what Ms. Kindler claims precipitated it.  That is, during the trial Ms. Kindler confirmed that the entire basis for increasing the damages by more than 400 times was a series of tweets made by Mr. Cahen and others on Twitter.  Trial Tr. 179:12-14 ('Q Your new opinion was based on Tweets posted by defendants on

June 6, 2023, and some responses; correct? A Yes. That was the events that had transpired.").  In those tweets, Twitter users claimed they would not sell their RR/BAYCs.  *See* Dkt. 287-10 at 4.  But Ms. Kindler acknowledged that the possibility of a holdout was not a new thing that came into existence at the time of Mr. Cahen's tweet.  *Id.* at 180:3-10.  More likely, Ms. Kindler's opinion was an attempt to scare Defendants into settling before the trial.  When that effort failed, Yuga quickly withdrew its claim for a jury trial and legal damages.

Ms. Kindler's shifting opinion—driven by Yuga's concurrent decision to drop all legal remedies on the eve of trial—undermines her credibility as a witness.

**Plaintiff's Reply:**

As discussed *supra* ¶ 96, Ms. Kindler did not "change" her opinion.

**Defendants' Disputed Post Trial Finding of Fact No. 99:**

Ms. Kindler also separately calculated Defendants' profits to be $1,589,445. Trial Tr. [Kindler] 174:8-23.

**Plaintiff's Basis for Dispute:**

As a preliminary matter, Defendants have the burden to calculate any profits attributable to their infringement after Yuga Labs' identifies the gross sales of Defendants' infringing products.  15 U.S.C. ¶ 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) ("The trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement. Then the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue to arrive at the defendant infringer's lost profits.") (citation omitted).  Defendants have not challenged Ms. Kindler's calculation of gross revenue from their infringing NFTs.

Ms. Kindler made this profit calculation based on information available at the time of her trial declaration but was willing to update it based on new evidence in

Defendants' testimony.  Defendants failed to provide evidence of manual profit-sharing payments to Mr. Hickman and Mr. Lehman in discovery.  After Defendants identified the purpose of those payments for the first time in their trial testimony, *see* Ripps Decl. (Dkt. 346) ¶¶ 132-135, Ms. Kindler testified that those figures could be appropriate deductions from a disgorgement judgment if adequately supported.  Trial Tr. at 195:3-7 ("If it is established that that money is, in fact, profit sharing that's tied to the work on this case involving the infringing marks, then I would have no problem deducting that from my ultimate conclusion. I just have not seen any evidence to suggest that it would be appropriate to do that.").

**Defendants' Response:**

Yuga does not meaningfully dispute this proposed finding of fact, which simply contains the damages calculation that Ms. Kindler included in her expert report.  Rather, Yuga uses the opportunity to make an excuse for Ms. Kindler's failure to accurately calculate Defendants' profits based on publicly available blockchain data.  Yuga is incorrect that there was any failure to produce evidence during discovery.  *See* Trial Tr. 267:19-22 ("I think the question was if I had produced everything I thought was relevant, and I believe I did."), 270:3-6 ("Yes. We produced everything that we could, despite the fact that Yuga produced nothing.").  To the contrary, Mr. Lehman was questioned about the manual payments he received from Mr. Ripps at his deposition, and Defendants produced Etherscan records showing the payments during discovery, and admitted them into evidence at trial.  *See* Lehman Dep. (Dkt. 401) at 210:16-25 ("For funds that were received before the RSVP contract was implemented, how were those funds distributed? A. So I or Ryan, I think it was me, made some kind of calculation based on Etherscan or what mints that it happened or something like this and sent a text message and said here's how much Ryder needs to send for the profits he made before this… Q. And he did, in fact, send you those funds?  A. Yes."); *id.* 211:11-13 ("So if I go on Etherscan and I look at either of your wallets, I can find that

transaction, right? A. Yes."); *see generally id.* at 210-214 (walking through finding the transaction on etherscan and confirming it was payment for pre-RSVP contract proceeds); JTX-2170 (transaction from Mr. Ripps to Mr. Lehman), JTX-2711 (transaction from Mr. Ripps to Mr. Hickman).

In any event, Yuga's objection here is inconsistent with its own Findings of Fact.   Specifically, in its Findings of Fact, Yuga agrees that their calculation of Defendants' profits needs to be ***reduced*** by $108,037.08 to determine the accurate amount of profits Mr. Ripps and Mr. Cahen received from the initial sales. *See* Yuga's Proposed Finding of Fact 11(b) (Dkt. 418-1).

**Plaintiff's Reply:**

First, Defendants confuse damages and profits—they are not the same remedy.  Second, Defendants confuse Yuga Labs' burden and Defendants' burden. Finally, Defendants' proposed fact does not accurately capture Ms. Kindler's testimony at trial.  *See e.g.* Trial Tr. at 195:3-7.

**Defendants' Disputed Post Trial Finding of Fact No. 100:**

Ms. Kindler's calculation that Mr. Ripps and Mr. Cahen earned a total of $1,589,455 in profits was incorrect. *See* Dkt-287-10, p. 1; *infra* ¶¶ 101-113.

**Plaintiff's Basis for Dispute:**

This calculation was correct based on the information available to Ms. Kindler.  *See supra* ¶ 99.  Defendants' further proposed deductions, made through attorney argument and without an affirmative or rebuttal damages expert, are meritless.  *See infra*, ¶ 113.

**Defendants' Response:**

Through its own proposed finding of fact (#37), Yuga admits that Ms. Kindler's calculation of profits was incorrect.  *See* Yuga's Proposed Finding of Fact 11(b) (Dkt. 418-1 at 6).  Yuga's findings seek $1,375,361.92 in profits (consisting of $1,258,052.92 of profits from initial sales and $117,309 of profits from secondary sales).  *Id.* at 6 (11(e)).

1    But even that number is incorrect.  First, the evidence presented at trial

2    showed that the RSVP contract also distributed $93,135.62 in automated refunds.

3    Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).  Yuga's figure improperly

4    includes in its profits calculation $93,135.62 in automated refunds executed through

5    the RSVP reservation contract.  Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).

6    Also, Mr. Ripps and Mr. Cahen incurred approximately $15,100.00 in

7    miscellaneous expenses associated with wages, a computer, and travel expenses.

8    Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 174-176 (Dkt. 344).

9    This figure fails to exclude those expenses from the profit calculation.

10          **Plaintiff's Reply**:

11          This calculation was correct based on the information available to Ms.

12    Kindler.  *See supra* ¶ 99.  Defendants failed to provide evidence of manual profit-

13    sharing payments to Mr. Hickman and Mr. Lehman in discovery.  After Defendants

14    identified the purpose of certain payments for the first time in their trial testimony,

15    *see* Ripps Decl. (Dkt. 346) ¶¶ 132-135, Ms. Kindler testified that those figures may

16    be appropriate deductions from a disgorgement judgment.  Trial Tr. at 195:3-7.

17    Defendants' further proposed deductions, made through attorney argument and

18    without an affirmative or rebuttal damages expert, are meritless.  *See infra*, ¶ 113.

19    **Defendants' Disputed Post Trial Finding of Fact No. 101**:

20          Ms. Kindler failed to perform any apportionment of her profits calculation to

21    determine profits attributable to infringement and profits not attributable to

22    infringement. Trial Tr. [Kindler] 189:16-25.

23    **Plaintiff's Basis for Dispute**:

24          Ms. Kindler did not "fail" to apportion profits.  She determined: "Based on

25    my review of evidence produced in this case and blockchain data I analyzed, ***these***

26    ***profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks***."

27    Kindler Decl. (Dkt. 338) ¶ 61 (emphasis added).  Indeed, she testified at trial when

28    asked why she did not apportion less than all of Defendants' profits to their

infringement:  "I don't think that would be appropriate because they all were sold using the infringing marks.  And in the first instance, even if there's not confusion because people might believe or agree with the premise under which the tokens are being sold, that doesn't mean in the second and third and fourth instance that there isn't confusion occurring in the marketplace."  Trial Tr. at 189:4-10.  Defendants provided no affirmative or rebuttal expert to rebut this testimony.

Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC NFT.  The smart contract underlying each of Defendants' infringing NFTs is immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC," which is replicated on the Etherscan token tracker and anywhere that systems pull information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific use of the BAYC brand as the NFT Collection's smart contract name and symbol").  Additionally, some of the NFTs that were offered for sale were reserved on the infringing rrbayc.com website.  Kindler Decl. (Dkt. 338) ¶ 61.  So again, Defendants were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC NFTs.  "[O]ther RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation, which used the BAYC Marks."  *Id.* (citing JTX-29; JTX-670).  Defendants also "used the BAYC Marks to sell and promote their own product."  SJ Order (Dkt. 255) at 18.  And finally, "[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.  All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga Labs' BAYC Marks.  Defendants are not allowed to retain the fruits of unauthorized

trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Ms. Kindler's conclusion is consistent with the law. Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement." *Id.* at 1076. The RR/BAYC NFTs are infringing goods—the Court has already determined that they are likely to confuse consumers, SJ Order (Dkt. 225) at 10-13—and so profits derived from the sale of those goods resulted from Defendants' infringement. There is no requirement for Yuga Labs to go beyond that and prove that every dollar was attributable to instances of "actual confusion," which is not even a required element of an infringement case. SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

Profits from the sales of Defendants' infringing NFTs, each of which Defendants admit used the BAYC Marks, are necessarily attributable to Defendants' infringement of the BAYC Marks. Dkt. 418-1 ¶ 7(c) (admitting "Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks").

**Defendants' Response:**

Ms. Kindler's conclusion that "all" profits are "traceable to Defendants' uses of Yuga's BAYC Marks" makes clear that she failed to perform the required apportionment of the profits down to those attributable to confusion. *See* Trial Tr. [Kindler] 189:16-20 ("My question was did you or did you not perform an apportionment for people who were not confused? A Again, I don't think that that would be appropriate here."). It is not enough for a sale to be "traceable" to the use of Yuga's marks. Yuga is only entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a BAYC mark is attributable to the infringing activity. "If it can be shown that the infringement had no relation to profits made by the defendant, that some

1    purchasers bought goods bearing the infringing mark because of the defendant's
2    recommendation or his reputation or for any reason other than a response to the
3    diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he
4    plaintiff of course is not entitled to profits demonstrably not attributable to the
5    unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge*
6    *Co.*, 316 U.S. 203, 206 (1942). This fundamental principle clearly prevents Yuga
7    from receiving profits that were made for reasons beyond the appeal of its symbol,
8    namely the profits attributable to those who reserved an RR/BAYC NFT as a
9    protest against Yuga or to support Mr. Ripps and his renowned reputation as a
10   conceptual artist. *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

11   The record in this case is clear that *many* sales of RR/BAYC NFTs were not
12   the result of confusion, but genuine protest. Indeed, Mr. Ripps received dozens of
13   letters from supporters of his artwork indicating that they purchased the NFTs not
14   because they were confused, but because they genuinely wanted to protest Yuga.
15   Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039;
16   JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599. Although Ms. Kindler
17   could not deny that some purchasers bought the RR/BAYC NFTs out of genuine
18   protest of Yuga (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out
19   those purchases was unnecessary since *subsequent* purchasers may have been
20   confused (an assertion for which she offered no evidence). But that explanation
21   makes little sense, and certainly does not justify her failure to apportion. To the
22   contrary, in the hypothetical scenario where an initial purchaser *was not* confused
23   and a subsequent purchaser was, a proper damages analysis would apportion out the
24   profits accrued from the original sale and only count the profits from the sale that
25   was attributable to confusion. *See Mishawaka Rubber*, 316 U.S. at 206.

26   Accordingly, because at least some number of sales were not attributable to
27   confusion, Ms. Kindler's conclusion that "all" profits should be disgorged is

28

erroneous because it fails to apportion out the profits that are not attributable to confusion.

**Plaintiff's Reply:**

Defendants' response admits the fallacy in their logic.  They admit that the profits to be disgorged are from the "infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).  But, then they say that Ms. Kindler "failed to perform the required apportionment of the profits down *to those attributable to confusion*."  That is not the correct legal standard.

Moreover, Defendants do not dispute—but rather have admitted—that each and every single NFT that they created uses (and will always use) two of the BAYC Marks at issue: BORED APE YACHT CLUB and BAYC.  Dkt. 418-1 ¶ 7(c) (admitting "Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks").  Of course, Defendants also used the BAYC Marks in other infringing ways (such as, on their sales pages on at least Foundation and OpenSea and in their marketing and promotion of RR/BAYC).  *See e.g.* JTX-29; JTX-670; JTX-696; Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; Solano Decl. (Dkt. 342) ¶¶ 46-47.  Indeed, there is a likelihood of confusion for every resale of RR/BAYC NFTs because of how Defendants created their infringing NFTs.  O'Laughlin Decl. (Dkt. 341).  Because likelihood of confusion is the touchstone for what is infringing activity, Yuga Labs met its burden of showing that all of Defendants' profits derived from infringing activity.  *See e.g.* SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

There is a clear likelihood of confusion given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  Thus, Yuga Labs is entitled to Defendants' profits due

to their infringing activity regardless of whether purchasers were actually confused. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

Defendants were also unjustly enriched by their ability to "free ride" on Yuga Labs' investment in the BAYC Marks.  Kindler Decl. (Dkt. 338) at ¶ 68; Trial Tr. 35:10-16 (Mr. Solano describing how Defendants were riding on Yuga Labs' "coattails").  There is no evidence that consumers would have purchased Defendants' infringing NFTs if they had named them "Ryder Ripps'" or *anything else* that did not use the BAYC Marks.

Defendants fail to rebut this proof with evidence that their profits do not derive from infringing activity.

**Defendants' Disputed Post Trial Finding of Fact No. 102:**

Instead, Ms. Kindler improperly assumed that all profits are attributable to infringement. Trial Tr. [Kindler] 189:16-25.

**Plaintiff's Basis for Dispute:**

Ms. Kindler did not "improperly assume[] that all profits are attributable to infringement"—she correctly reached that conclusion based on the evidence.  *Supra* ¶ 101.  Defendants offered no contrary damages, consumer, or survey expert analysis.

**Defendants' Response:**

Ms. Kindler's conclusion is contrary to the evidence.  As explained above in response to Finding of Fact No. 101, there is no evidence that anyone, anywhere, bought an RR/BAYC because they were confused.  To the contrary, the record reflects that many purchasers bought RR/BAYC NFTs to protest Yuga.  *See* Trial Tr. [Kindler] 189:16-20 ("My question was did you or did you not perform an

apportionment for people who were not confused? A Again, I don't think that that would be appropriate here."). Accordingly, Ms. Kindler's assumption that *all* profits were attributable to infringement was erroneous.

**Plaintiff's Reply:**

Defendants misstate the law—Yuga Labs does not need to prove that someone "bought an RR/BAYC because they were confused." *Supra* ¶ 101. Defendants offered no contrary damages, consumer, or survey expert analysis to prove that a single dollar in profit was derived from anything other than their infringing activity, i.e., the promotion and sale of their infringing good. This result is unsurprising, since Defendants labeled each and every NFT in the RR/BAYC collection with the marks "Bored Ape Yacht Club" and "BAYC."

**Defendants' Disputed Post Trial Finding of Fact No. 103:**

Over 80% of sales by Defendants occurred on rrbayc.com where there was a prominent artistic statement and a disclaimer. Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

**Plaintiff's Basis for Dispute:**

This statement is incorrect. Even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). NFTs reserved on that website were minted and sold on Foundation. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

This statement is also misleading in that it fails to account for the significant trading on secondary markets making use of the BAYC Marks, from which Defendants received substantial benefits. *See* Kindler Decl. (Dkt. 338) ¶¶ 45-50 (discussing sales on secondary markets); 62-71 (discussing other forms of enrichment Defendants unjustly received through secondary market sales).

Mr. Ripps' self-serving testimony regarding the "prominent artistic statement" and "disclaimer" on his infringing website are objectionable as discussed *supra* ¶¶ 19, 21.  As the Court has already held, "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  SJ Order (Dkt. 225) at 16.

**Defendants' Response**:

First, Mr. Ripps's declaration went undisputed at trial, and there is no dispute that 80% of the reservations and commissions for RR/BAYC NFTs were through the rrbayc.com website.  Ripps Decl. ¶ 110 (Dkt. 346) (uncontested).  Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract.  *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation?  A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19.  This however is different than the "Foundation page" for Ryder Ripps.  Further, Yuga presented no evidence contradicting the fact that nobody could identify a single person who was confused by sales on Foundation.  *See* Trial Tr. [Solano] 19:13-15 (cannot identify a *single* confused consumer); [Hickman] 219:13-19.

Second, Yuga's statement that this finding of fact is misleading because it does not discuss sales of RR/BAYC NFTs that occurred on secondary markets is irrelevant.  This finding of fact outlines the percentage of "sales by Defendants" that occurred on rrbayc.com.  This finding of fact is, therefore, discussing the initial sales of RR/BAYC NFTs.  How many RR/BAYC NFTs were sold on secondary markets is irrelevant to the accuracy of this finding of fact.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the

secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales. *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested). Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000. *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344). Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits.

Additionally, Yuga cites to Ms. Kindler's testimony that includes statements of vague benefits that she admittedly did not quantify. *See* Kindler Decl. ¶ 67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…"). This testimony, therefore, does not support Yuga's assertions of other unnamed benefit Defendants received. Further, regardless of what possible additional benefits Mr. Ripps and Mr. Cahen may have received, that has no impact on the accuracy of this finding of fact that simply states where a portion of reservations for RR/BAYC NFTs occurred.

Third, Mr. Ripps's statements about the artistic statement and disclaimer are not self-serving as Yuga incorrectly alleges. Instead, they present important evidence of the information a person reserving an RR/BAYC NFT saw which is directly relevant to whether said person was confused about the origin of the NFT they were reserving.

Finally, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*,

the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling about the artistic nature of the RR/BAYC NFT project has no bearing here to the question of what portion of profits are attributable to infringement.

**Plaintiff's Reply:**

Defendants concede the fact that Mr. Ripps admitted that all RR/BAYC NFTs were sold through Foundation. Defendants do not meaningfully dispute this fact and provide no evidence that the Foundation page is anything different than the contract. There is no dispute that the majority of RR/BAYC NFT sales did not occur on rrbayc.com but on secondary marketplaces with no disclaimer.

As discussed *supra*, Defendants' response lacks merit. Specifically: (1) Defendants promoted and had control over secondary marketplaces where RR/BAYC NFTs were sold alongside BAYC NFTS (*supra* ¶ 51), (2) there is ample evidence of actual confusion in the record (*supra* ¶ 3), (3) Defendants' "disclaimers" did not dispel likelihood of confusion (*supra* ¶ 9), (4) evidence admitted at trial discredits Mr. Ripps' trial declaration (*supra* ¶ 3), and (5) the response seeks to relitigate issues already adjudicated by the Court (*supra* ¶ 9).

Additionally, the Court should reject Defendants' responses because (1) rrbayc.com is not where Defendants' sold the majority of their NFTs, and (2) all of Defendants' profits are attributable to their infringing activity.

**rrbayc.com is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure. Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold

through the confusing Foundation page that used the BAYC Marks.  Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  Defendants' sale of RR/BAYC NFTs on these secondary marketplaces caused Yuga Labs irreparable harm and are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").

**All of Defendants' Profits Are Attributable To Their Infringing Activity:**

Defendants' "infringing activity" was use of the BAYC Marks.  They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."  Dkt. 418-1 at 3:15-16.  Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement.  *See* Kindler Decl. (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and

blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks."). Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks. Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76. All of the NFTs incorporate the BAYC Marks by virtue of the immutable traits coded into the smart contract, Atalay Decl. (Dkt. 337) ¶ 4, and they are all part of a collection that the Court has already ruled was likely to cause consumer confusion. SJ Order (Dkt. 225) at 10-13. Just as a counterfeit handbag peddler is not entitled to keep any ill-gotten profits from their sale of infringing goods, Defendants cannot retain their profits from secondary marketplaces. *See, e.g.*, *Gucci Am., Inc.*, 868 F. Supp. 2d at 238, 255 (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). Ultimately, it is up to the court to "ensure that the defendant may not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ." *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) (cleaned up).

Defendants also do not meaningfully dispute the fact that "Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…" Kindler Decl. ¶ 67. As Ms. Kindler stated in her trial declaration, the reason for not being able to provide a specific number for the unjust enrichment Defendants accrued and continue to accrue is that these benefits are not necessarily easily quantifiable. *See* Kindler Decl. ¶ 62. Still, Defendants offer no evidence to disprove the "possible additional benefits Mr. Ripps and Mr. Cahen may have received." Yuga Labs is entitled to disgorge all of the profits from these benefits.

1  **Defendants' Disputed Post Trial Finding of Fact No. 104:**

2    Mr. Ripps and Mr. Cahen did not receive royalties for secondary sales

3  (except for a small amount for a platform that carried mandatory resale royalties).

4  Ripps Decl. ¶¶ 167-118 (uncontested).

5  **Plaintiff's Basis for Dispute:**

6    This statement is false.  Ms. Kindler's undisputed calculations demonstrate

7  that Defendants received at least $117,309 in profit from resales of their infringing

8  NFTs.  Over one hundred thousand dollars of ill-gotten gains is not small.

9    Defendants have admitted to this calculation of royalties, estimating even

10  higher figures.  *Compare* JTX-103 (estimating 70 ETH income for "LooksRare

11  Royalty) *and* Ripps Depo. Designations (Dkt. 396) at 90:11-91:8 (estimating 70

12  ETH in royalties received from LooksRare) *with* Kindler Decl. (Dkt. 338) ¶ 49

13  ("Defendants estimated that they earned 70 ETH from LooksRare creator fees,

14  which is higher than my calculation of 65 ETH.").

15    **Defendants' Response:**

16    This finding of fact is not false.  As Mr. Ripps and Mr. Cahen's testimony

17  make clear, they tried to turn off royalties from the secondary sales of RR/BAYC

18  NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their

19  secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118

20  (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received

21  a small amount of royalties from Foundation before they shut it off, around $1,000,

22  and some from LooksRare, as that marketplace initially refused to turn off the

23  royalties, around $77,000. *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

24    Roughly $78,000 is a small amount compared to the profits Yuga claims

25  were received—$1,366,090, (Kindler Decl. ¶59 (Dkt. 338)).  It is also small

26  compared to the revenue Mr. Ripps and Mr. Cahen could have made had they

27  received royalties from all secondary sales of RR/BAYC NFTs instead of shutting

28  them off as part of their protest.  *See* Kindler Decl. ¶69 (Dkt. 344) (finding that

"there have also been many resales of RR/BAYC NFTs where no creator fees were generated…one NFT sales tracker (NFTGO) calculated nearly 6,000 ETH in total sales of RR/BAYC NFTs, which equates to almost $10 million using the ETH to USD conversion rate as of February 1, 2023 ($1,641.61 to 1 ETH).").

Finally, the evidence Yuga cites to is misleading.  JTX-103 does not show that Mr. Ripps and Mr. Cahen's calculations could be even higher than $117,309.  Instead, JTX-103 clearly shows an estimation that 70 ETH had been received from LooksRare and that the value of that ETH in USD at the time was $77,000, which is exactly what Mr. Cahen's testimony provides.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

**Plaintiff's Reply:**

Defendants again cannot keep their lies straight.  Defendants' own testimony directly contradicts the proposed finding of fact, and the Court should reject it.

As discussed *supra*, Defendants' response lacks merit.  Specifically: (1) all of Defendants' profits are attributable to their infringing activity (*supra* ¶ 103).  That Defendants may deem $117,309 (or even $77,000) a "small amount" is disingenuous, and regardless, Yuga Labs is entitled to recover these profits.

Defendants' response lacks merit and continues their lies because (1) Defendants received royalties for secondary sales on multiple marketplaces.

**Defendants Received Royalties For Secondary Sales On Multiple Marketplaces:**  Defendants' proposed finding of fact contends that they only received royalties for "a small amount" from "a platform that carried mandatory resale royalties."  That is false.  Defendants' trial declaration and responses here confirm that they earned a significant amount of royalties from multiple marketplaces—$1000 from Foundation (which Defendants were able to readily shut off) and at least $77,000 from LooksRare.  *See* Cahen Decl. (Dkt. 344) ¶¶ 168-172; Jt. Stmt. re Def's Post-Trial Findings of Fact and Conclusion of Law ¶ 103 ("their testimony credibly states that they received only a small amount of royalties from

Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000."); ¶ 104 (same).  Defendants' attempt to obfuscate all of their earnings highlights again their lack of credibility.

**Defendants' Disputed Post Trial Finding of Fact No. 105:**

Defendants did not collect any royalties from sales on OpenSea. Trial Tr. [Kindler] 202:4-12.

**Plaintiff's Basis for Dispute:**

Defendants benefited in numerous ways from sales of their infringing NFTs on OpenSea, including Mr. Cahen's direct monetary benefits of selling the infringing NFTs himself.  Trial Tr. at 202:18-25; Kindler Decl. (Dkt. 338) ¶¶ 62-71 (discussing unjust enrichment to Defendants' due to sales of infringing NFTs).

**Defendants' Response:**

Yuga's objection does nothing to undermine the accuracy of this finding of fact, which is that Mr. Ripps and Mr. Cahen did not collect any royalties from the RR/BAYC NFT sales on the marketplace OpenSea.  Yuga is not able to dispute this fact.

Further the evidence Yuga presents instead is misleading.  Whether Mr. Cahen sold any of the RR/BAYC NFTs he personally held on OpenSea does not change that he received no royalties from these sales.

Additionally, Yuga's cites to Ms. Kindler's declaration are unsupportive and discuss vague and speculative benefits Mr. Ripps and Mr. Cahen may have received from secondary sales where they did not receive creator fees.  *See* Kindler Decl. (Dkt. 338) ¶ 69.  But Ms. Kindler testified that these supposed benefits "are not quantified by my profit analysis." *Id.* at ¶ 67.  Accordingly, assertions of benefits they received are unfounded and speculative.  Finally, again, even if true, any supposed benefit Mr. Ripps and Mr. Cahen received from secondary sales of

RR/BAYC NFTs does nothing to undermine the accuracy of this finding of fact, which is that they did not receive royalties from secondary sales on OpenSea.

**Plaintiff's Reply:**

Defendants' contention is immaterial.  Defendants gained direct monetary benefits through their sale of RR/BAYC NFTs on OpenSea.  Defendants do not and cannot dispute the fact that Mr. Cahen sold RR/BAYC NFTs on OpenSea.  Mr. Cahen therefore directly benefited monetarily through the profits he earned from those direct sales.  Yuga Labs is entitled to those profits based on the sale of those infringing NFTs.

Similarly, Defendants do not meaningfully dispute Ms. Kindler's finding of unjust enrichment to Defendants due to sales of infringing NFTs.  As Ms. Kindler stated in her trial declaration, the reason for not being able to provide a specific number for the unjust enrichment Defendants accrued and continue to accrue is that these benefits are not necessarily easily quantifiable.  *See* Kindler Decl. ¶ 62. Still, Defendants offer no evidence to disprove the benefits Defendants "may have received from secondary sales."  Yuga Labs is entitled to disgorge any profits derived from these benefits.

**Defendants' Disputed Post Trial Finding of Fact No. 107:**

The value of unmade and unsold theoretical NFTs is not "profit."

**Plaintiff's Basis for Dispute:**

Defendants have no support for this proposition, and in fact the unrebutted analysis of Ms. Kindler demonstrates that Defendants did derive benefits of determinable value from the NFTs they hold in their own wallets or have yet to mint.  "While these RR/BAYC NFTs may not have directly generated revenue for Defendants, they still have value. For example, one of the Defendants, Mr. Cahen, testified that the value of the held RR/BAYC NFTs 'is pretty much the same as when they were originally being produced,' which is 'anywhere between .1 Ethereum and .15 Ethereum.'"  Kindler Decl. (Dkt. 338) ¶ 52 (quoting Cahen

Deposition Tr. at 255:25-256:7).  Ms. Kindler's unrebutted testimony provides a conservative calculation of these NFTs as providing $106,055 in profit to Defendants.  Kindler Decl. (Dkt. 338) ¶¶ 51-57.

Should Defendants be ordered to burn the NFTs they currently hold and transfer control of the smart contract for their infringing NFTs to Yuga Labs, Ms. Kindler agreed (and it is Yuga Labs' position) that Defendants should not be required to disgorge profits from their currently held NFTs and not yet minted NFTs, respectively.  *See* Trial Tr. at 198:18-25.

**Defendants' Response**:

First, what Yuga argues here is that there may be some value to these unsold or theoretical NFTs that do not yet exist.  But this does nothing to undermine this finding of fact, which states that they are not profit.  Not all things that have value have made the holder of them a profit.  Profit is a quantifiable economic calculation that looks at revenue for the sale of a good or service and subtracts associated costs.  An item that has never been made cannot yet provide any profit and nothing in what Yuga cites to undermines this.  Instead, Yuga cites to a portion of Ms. Kindler's declaration where she concedes "these RR/BAYC NFTs may not have directly generated revenue…"  Kindler Decl. (Dkt. 338) ¶ 52.

Second, $106,055 is not a "conservative" calculation for the profit Mr. Ripps and Mr. Cahen would receive if they created and sold those NFTs.  In the course of Ms. Kindler's calculation of the value of these NFTs, she uses the floor price for RR/BAYC NFTs based on the secondary markets for them on January 27, 2023.  Kindler Decl. ¶ 54 (Dkt. 338).  Ms. Kindler opines that the floor price at that time was 0.115 ETH.  *Id.*  As the trial testimony indicated, however, the floor price for RR/BAYC NFTs has gone down and the floor price on June 7, 2023 was only 0.07 ETH.  JTX-1624, Dkt. 287-1, Trial Tr. [Kindler] 182:11-13.  Despite this considerable decrease in value, Ms. Kindler testified that she did not update her calculation to reflect the new floor price.  Trial Tr. [Kindler] 198:2-12. Using the

updated floor price of RR/BAYC NFTs the value of the 590 NFTs would be 41.3 ETH or around $82,600.  *See* Trial Tr. [Kindler] 182:14-22 (Ms. Kindler agreeing that a current conversion rate of 1 ETH for $2,000 "sounds right.").

Third, Yuga's objection misleadingly characterizes Ms. Kindler's testimony. Ms. Kindler testified if Yuga receives an injunction preventing Mr. Ripps and Mr. Cahen from minting any new RR/BAYC NFTs or selling the ones they currently hold, Yuga is not entitled to the estimated value of these NFTs in disgorgement. Trial Tr. [Kindler] 198:18-25 ("Q Now, if the Court orders an injunction prohibiting minting of any new RR/BAYC NFTs, the value of the unminted NFTs is zero; correct? A I don't know that -- maybe. I would agree with you that it would not need to be included in an unjust enrichment monetary compensation to Yuga. Q Yuga doesn't get to double-dip; right? A Yes. Absolutely.").  Ms. Kindler did not additionally opine that Mr. Ripps and Mr. Cahen would need to transfer control of the smart contract all together for these damages to be outside of Yuga's reach.

Fourth, disgorgement is inappropriate here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for

1  actual damages that its expert was able to quantify), which it then voluntarily

2  relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies");

3  Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned

4  available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World*

5  *Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal.

6  Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this

7  does not render the claim purely equitable because, as discussed above, this is a

8  statutory claim.  Again, because the statutes provide adequate remedies, a purely

9  equitable claim may not be maintained.").

10        Even if disgorgement were available here, Yuga would only be entitled to

11  disgorgement of profits "attributable to the infringing activity."  *Lindy Pen Co. v.*

12  *Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by

13  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

14  This requires distinguishing between revenue from collectors who reserved

15  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

16  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

17  believed they were purchasing Yuga NFTs.  *See id.*  Here, Yuga seeks

18  disgorgement related to RR/BAYC NFTs that either Mr. Ripps and Mr. Cahen hold

19  themselves or ones that do not yet exist.  Mr. Ripps and Mr. Cahen obviously did

20  not reserve the RR/BAYC NFTs they hold mistakenly believing they were

21  sponsored by Yuga.  *See* Trial Tr. [Kindler] 198:13-17 ("Q As the creator of the

22  NFTs, Mr. Ripps was certainly not confused about the source of those NFTs;

23  correct? A I would hope not. Q And neither was Mr. Cahen; correct? A I would

24  agree.").  Accordingly, they would never properly be considered as part of a

25  disgorgement analysis.

26     **Plaintiff's Reply:**

27        Defendants should not be allowed to retain benefits from their intentional

28  infringement.  Should Defendants retain their infringing NFTs they will continue to

reap the benefits of their promotion and marketing efforts.  And as long as Defendants remain in possession of the smart contract, the risk remains that they will mint even more infringing products.  Defendants' responses fail to rebut this fact.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) all of Defendants' profits are attributable to their infringement (*infra* ¶ 131), (2) Defendants intended to infringe and cause confusion (*supra* ¶ 3), and (3) Yuga Labs is entitled to a disgorgement of Defendants' profits (*infra* ¶ 131).

Additionally, the Court should reject Defendants' responses because (1) Defendants are not entitled to their ill-gotten profits, (2) Ms. Kindler's calculations were conservative, and (3) Defendants' citation to *Dairy Queen* and *Hunting World* are unpersuasive.

**Defendants Are Not Entitled To Retain The Fruits Of Their Infringement:**  Evidence admitted at trial demonstrates that the NFTs held by Defendants derive value even if not yet sold.  *See* Kindler Decl. (Dkt. 338) ¶ 61 ("[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market.").  Defendants have no expert to rebut this finding.  Thus, as long as Defendants hold these NFTs, they continue to reap the benefits of this value.  This value is ill-gotten and a direct result of Defendants' infringement.  Defendants are not allowed to retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Further, as long as Defendants maintain control over the smart contract, the risk remains that they will mint more infringing NFTs and gain more from their infringement.  This not only profits Defendants, but also further divests control from Yuga Labs over its brand.  Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied

to Mr. Ripps.").  This association must be ended and Defendants must not be allowed to retain their ill-gotten gains.  Yuga Labs is entitled to Defendants' total profits and to gain control over the RR/BAYC smart contract.

**By Defendants' Own Admission Ms. Kindler's Calculations Were Conservative:**  Ms. Kindler's unrebutted testimony provides a conservative calculation of these NFTs as providing $106,055 in profit to Defendants.  Kindler Decl. (Dkt. 338) ¶¶ 51-57.  The floor price of NFTs fluctuates over time, and the change in the floor price of Defendants' infringing NFTs does not render Ms. Kindler's valuation of the unminted and unsold NFTs unreasonable.  Ms. Kindler's estimate is consistent with Mr. Cahen's own estimate of 0.1-0.15 ETH.  Kindler Decl. (Dkt. 338) ¶ 52 (quoting Cahen Deposition Tr. at 255:25-256:7).  Ms. Kindler arrived at this estimate by using the floor price (i.e., the lowest market value of any NFT in the entire collection at a given time) as a low-end valuation of the remaining NFTs in the collection.  Her conservative valuation of 0.115 ETH remains reasonable, even if the floor price of the collection has fluctuated.  As Ms. Kindler testified at trial, "[t]hat data changes on a daily basis.  I think at the time there was testimony from both defendants about the pricing that I used being a reasonable price generally as to how to value their NFTs.  So I still think it's a reasonable approximation of value."  Trial Tr. 198:8-12.  This 0.115 ETH figure is also significantly lower (by about 23%) than the price charged by the RSVP contract for newly minted NFTs (0.15 ETH).  *See* Kindler Decl. (Dkt. 338) ¶ 36.  Moreover, the evidence shows that Defendants are readily able to drive up the floor price and the transaction volume if they choose to do so.  *See id.* ¶ 73.  The unrebutted evidence shows a conservative estimate of the profit Defendants would reap should they retain the ability to mint and sell.

Should Defendants, however, be ordered to burn the NFTs they currently hold and transfer control of the smart contract for their infringing NFTs to Yuga

Labs, it is Yuga Labs' position that Defendants should not be required to disgorge profits, respectively, from their currently held NFTs and their not yet minted NFTs.

**Defendants' Citation To *Dairy Queen* and *Hunting World* Are Unpersuasive:**  Yuga Labs is entitled to Defendants' profits for the reasons outlined *infra* ¶ 131.  Defendants' case law does not change this fact.  *Dairy Queen* does not impose any different burden, nor did it hold that disgorgement in a Lanham Act case is unavailable in the absence of an adequate remedy at law. *Dairy Queen* did not involve a disgorgement claim under the Lanham Act, but rather an "equitable accounting" claim.  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  "[T]he Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits)."  *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998)).  As a result, *Dairy Queen* does not apply to Yuga Labs' disgorgement claim under the Lanham Act.

Further, the Lanham Act and model jury instructions are more authoritative on the issue of disgorgement than *Hunting World*, an unpublished case from another judicial district that has been rejected in C.D. Cal.  *See Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*, No. EDCV1001858VAPDTBX, 2012 WL 12893524, at *6 n.5 (C.D. Cal. June 27, 2012).  There is no requirement for an absence of an "adequate remedy at law" to obtain disgorgement, and even if there were, Yuga Labs' actual damages would not be sufficient to compensate for the irreparable harm Defendants caused.  *See infra* ¶ 132.

**Defendants' Disputed Post Trial Finding of Fact No. 108:**

Ms. Kindler agrees that the $106,0555 amount that she included in her calculation should be excluded if the Court enters an injunction. Trial Tr. [Kindler] 198:18-25.

**Plaintiff's Basis for Dispute**:

Should Defendants be ordered to burn the NFTs they currently hold and transfer control of the smart contract of their infringing NFTs to Yuga Labs, Ms. Kindler agreed (and it is Yuga Labs' position) that Defendants should not be required to disgorge profits from their currently held NFTs and not yet minted NFTs, respectively. *See* Trial Tr. at 198:18-25. Should an injunction issue that allows Defendants to retain either of these benefits, however, the value of the benefits enjoyed by Defendants should still be disgorged.

**Defendants' Response**:

Yuga's objection misleadingly characterizes Ms. Kindler's testimony. Ms. Kindler testified if Yuga receives an injunction preventing Mr. Ripps and Mr. Cahen ***from minting any new RR/BAYC NFTs or selling the ones they currently hold***, Yuga is not entitled to the estimated value of these NFTs in disgorgement. Trial Tr. [Kindler] 198:18-25 ("Q Now, if the Court orders an injunction prohibiting minting of any new RR/BAYC NFTs, the value of the unminted NFTs is zero; correct? A I don't know that -- maybe. I would agree with you that it would not need to be included in an unjust enrichment monetary compensation to Yuga. Q Yuga doesn't get to double-dip; right? A Yes. Absolutely."). Ms. Kindler did not additionally opine that Mr. Ripps and Mr. Cahen would need to transfer control of the smart contract all together for these damages to be outside of Yuga's reach.

Further, Yuga is incorrect in stating that absent such an injunction, they are entitled to disgorgement of the value Ms. Kindler calculated for these NFTs Mr. Ripps and Mr. Cahen hold or have not minted. Disgorgement is inappropriate here. An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022). Disgorgement is,

therefore, not an available remedy here because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Legal remedies were available in this case. Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished. Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19. Having abandoned available legal remedies, Yuga cannot obtain disgorgement. *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim. Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Even if disgorgement were available here, Yuga would only be entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* Here, Yuga seeks disgorgement related to RR/BAYC NFTs that either Mr. Ripps and Mr. Cahen hold themselves or ones that do not yet exist. Mr. Ripps and Mr. Cahen obviously did

not reserve the RR/BAYC NFTs they hold mistakenly believing they were
sponsored by Yuga. *See* Trial Tr. [Kindler] 198:13-17 ("Q As the creator of the
NFTs, Mr. Ripps was certainly not confused about the source of those NFTs;
correct? A I would hope not. Q And neither was Mr. Cahen; correct? A I would
agree."). Accordingly, they would never properly be considered as part of a
disgorgement analysis.

Finally, even if the court were to find that disgorgement were appropriate for
these NFTs, the $106,055 figure is not correct. In the course of Ms. Kindler's
calculation of the value of these NFTs, she uses the floor price for RR/BAYC NFTs
based on the secondary markets for them on January 27, 2023. Kindler Decl. ¶54
(Dkt. 338). Ms. Kindler opines that the floor price at that time was 0.115 ETH. *Id.*
As the trial testimony indicated, however, the floor price for RR/BAYC NFTs has
gone down and the floor price on June 7, 2023 was only 0.07 ETH. JTX-1624,
Dkt. 287-1, Trial Tr. [Kindler] 182:11-13. Despite this considerable decrease in
value, Ms. Kindler testified that she did not update her calculation to reflect the new
floor price. Trial Tr. [Kindler] 198:2-12. Using the updated floor price of
RR/BAYC NFTs the value of the 590 NFTs would be 41.3 ETH or around $82,600.
*See* Trial Tr. [Kindler] 182:14-22 (Ms. Kindler agreeing that a current conversion
rate of 1 ETH for $2,000 "sounds right.").

**Plaintiff's Reply:**

Defendants should not be allowed to retain benefits from their intentional
infringement. Should Defendants retain their infringing NFTs they will continue to
reap the benefits of their promotion and marketing efforts. And as long as
Defendants remain in possession of the smart contract, the risk remains that they
will mint even more infringing products. Defendants' responses fail to rebut this
fact.

As discussed *supra*, Defendants' responses lack merit. Specifically: (1) all
of Defendants' profits are attributable to their infringement (*infra* ¶ 131), (2)

Defendants intended to infringe and cause confusion (*supra* ¶ 3), and (3) Yuga Labs' is entitled to a disgorgement of Defendants' profits (*infra* ¶ 131).

Additionally, the Court should reject Defendants' responses because (1) Defendants are not entitled to their ill-gotten profits, (2) Ms. Kindler's calculations were conservative, and (3) Defendants' citation to *Dairy Queen* and *Hunting World* are unpersuasive.

**Defendants Are Not Entitled To Retain The Fruits Of Their Infringement:** Evidence admitted at trial demonstrates that the NFTs held by Defendants derive value even if not yet sold. *See* Kindler Decl. (Dkt. 338) ¶ 61 ("[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market."). Defendants have no expert to rebut this finding. Thus, as long as Defendants hold these NFTs, Defendants continue to reap the benefits of this value. This value is ill-gotten and a direct result of Defendants' infringement. Defendants are not allowed to retain the fruits of unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Further, as long as Defendants maintain control over the smart contract, the risk remains that they will mint more infringing NFTs and gain more from their infringement. This not only profits Defendants, but also further divests control from Yuga Labs over its brand. Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps."). This association must be ended and Defendants must not be allowed to retain their ill-gotten gains. Yuga Labs is entitled to Defendants' total profits and to gain control over the RR/BAYC smart contract.

**By Defendants' Own Admission Ms. Kindler's Calculations Were Conservative:** Ms. Kindler's unrebutted testimony provides a conservative calculation of these NFTs as providing $106,055 in profit to Defendants. Kindler

Decl. (Dkt. 338) ¶¶ 51-57.  The floor price of NFTs fluctuates over time, and the change in the floor price of Defendants' infringing NFTs does not render Ms. Kindler's valuation of the unminted and unsold NFTs unreasonable.  Ms. Kindler's estimate is consistent with Mr. Cahen's own estimate of 0.1-0.15 ETH.  Kindler Decl. (Dkt. 338) ¶ 52 (quoting Cahen Deposition Tr. at 255:25-256:7).  Ms. Kindler arrived at this estimate by using the floor price (i.e., the lowest market value of any NFT in the entire collection at a given time) as a low-end valuation of the remaining NFTs in the collection.  Her conservative valuation of 0.115 ETH remains reasonable, even if the floor price of the collection has fluctuated.  As Ms. Kindler testified at trial, "[t]hat data changes on a daily basis.  I think at the time there was testimony from both defendants about the pricing that I used being a reasonable price generally as to how to value their NFTs.  So I still think it's a reasonable approximation of value."  Trial Tr. 198:8-12.  This 0.115 ETH figure is also significantly lower (by about 23%) than the price charged by the RSVP contract for newly minted NFTs (0.15 ETH).  *See* Kindler Decl. (Dkt. 338) ¶ 36.  Moreover, the evidence shows that Defendants are readily able to drive up the floor price and the transaction volume if they choose to do so.  *See id.* ¶ 73.  The unrebutted evidence shows a conservative estimate of the profit Defendants would reap should they retain the ability to mint and sell.

Should Defendants, however, be ordered to burn the NFTs they currently hold and transfer control of the smart contract for their infringing NFTs to Yuga Labs, it is Yuga Labs' position that Defendants should not be required to disgorge profits, respectively, from their currently held NFTs and their not yet minted NFTs.

**Defendants' Citation To *Dairy Queen* and *Hunting World* Are Unpersuasive:**  Yuga Labs is entitled to Defendants' profits for the reasons outlined *infra* ¶ 131.  Defendants' case law does not change this fact.  *Dairy Queen* does not impose any different burden, nor did it hold that disgorgement in a Lanham Act case is unavailable in the absence of an adequate remedy at law.

*Dairy Queen* did not involve a disgorgement claim under the Lanham Act, but rather an "equitable accounting" claim. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). "[T]he Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits)." *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998)). As a result, *Dairy Queen* does not apply to Yuga Labs' disgorgement claim under the Lanham Act.

Further, the Lanham Act and model jury instructions are more authoritative on the issue of disgorgement than *Hunting World*, an unpublished case from another judicial district that has been rejected in C.D. Cal. *See Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*, No. EDCV1001858VAPDTBX, 2012 WL 12893524, at *6 n.5 (C.D. Cal. June 27, 2012). There is no requirement for an absence of an "adequate remedy at law" to obtain disgorgement, and even if there were, Yuga Labs' actual damages would not be sufficient to compensate for the irreparable harm Defendants caused. *See infra* ¶ 132.

**Defendants' Disputed Post Trial Finding of Fact No. 109:**

Profits for all RR/BAYC NFT reservations were split with Mr. Hickman and Mr. Lehman—including for pre-RSVP contract reservations that Yuga's calculations fail to apportion—with each receiving 15% of profits. Ripps Decl. ¶¶ 129-135 (uncontested); Cahen Decl. ¶¶ 177-178; Trial Tr. [Kindler] 196:22-197:2.

**Plaintiff's Basis for Dispute:**

Data available on the blockchain only shows $419,733 transferred to Mr. Hickman and Mr. Lehman (collectively) through the RSVP contract. Kindler Decl. (Dkt. 338) ¶ 59. Defendants failed to provide evidence of manual profit-sharing payments to Mr. Hickman and Mr. Lehman in discovery. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that defendant failed to meet burden to prove a 40% royalty was a proper

deduction, where "the documentary evidence leaves uncertainty as to the amount of royalty fees paid" and defendant "did not produce sufficient documentation to prove the specific amounts").  After Defendants identified the purpose of certain payments for the first time in their trial testimony, *see* Ripps Decl. (Dkt. 346) ¶¶ 132-135, Ms. Kindler testified that those figures were likely appropriate deductions from a disgorgement judgment.  Trial Tr. at 195:3-7 ("If it is established that that money is, in fact, profit sharing that's tied to the work on this case involving the infringing marks, then I would have no problem deducting that from my ultimate conclusion. I just have not seen any evidence to suggest that it would be appropriate to do that.").

However, even considering Defendants' new position that these payments constitute profit-sharing, these payments are arguably not proper cost deductions, but shared profit that Defendants must collect if at all through a claim against Mr. Lehman and/or Mr. Hickman for contribution.  The Court may therefore hold that they should still be disgorged from Defendants.  Alternatively, even if Defendants could satisfy their burden to prove these deductions, the Lanham Act authorizes the Court to modify the award to Yuga Labs upward to account for shortfalls such as this.  *See also* 15 U.S.C. § 1117(a) (authorizing Court to "find that the amount of the recovery based on profits is [] inadequate" and "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

**Defendants' Response**:

Yuga's objection inaccurately describes the documents in evidence.  As JTX-2710 and JTX-2711 demonstrate, data available on the blockchain show that there were additional payments made from Mr. Ripps to Mr. Lehman and Mr. Hickman.  That blockchain data has been publicly accessible since those transactions were made.

Further, it is inaccurate to say Defendants did not provide evidence of this profit sharing until trial.  Deposition testimony made clear and supported this

finding that there were individual transfers made to account for profit-sharing before the RSVP contract was put in place.  *See* Lehman's Depo. 210:16-214:7 (Dkt. 411) (confirming that a payment received by Mr. Ripps for 32.98 ETH was for "the profits [Mr. Ripps] made before [the RSVP contract], and then looking forward.  It's all automatic.").  Defendants also produced spreadsheets of internal reporting and profit splitting, including JTX-103, which shows a 15% split with both Mr. Lehman and Mr. Hickman.  Finally, even Mr. Lehman's declaration, which Yuga was intimately involved in drafting, that was signed on February 3, 2023, clearly stated that the profit share included profits received before the RSVP contract was put in place.  *See* JTX-001, ¶33 ("In exchange for developing the RSVP Contract and rrbayc.com website for the Business Venture, I was to receive 15% of the combined revenue of the RR/BAYC mints with and without the RSVP Contract.").   Accordingly, Yuga's claim there was not evidence presented to support pre-RSVP contract profit splitting before trial is patently false.

Second, as Ms. Kindler's calculations of Mr. Ripps and Mr. Cahen's profits show, she determined that the proper way to calculate their profit from the sales of RR/BAYC NFTs was to remove the profits that Mr. Lehman and Mr. Hickman received.  Kindler Decl. ¶ 59 (Dkt. 338).  Yuga itself relies on that figure, and by extension the analysis underlying its calculation, in its request for damages.  Dkt. 343 at 15.  Ms. Kindler also testified at trial that these additional profit-sharing transfers should be removed from her profit calculation if they are established.  Trial Tr. [Kindler] 195:3-7.  As outlined above, these transfers have properly been proven to be profit sharing and should, therefore, be removed.

Third, Yuga's objection here is inconsistent with their own Findings of Fact and their trial brief.  Specifically, in their Findings of Fact, Yuga agrees that their calculation of Defendants' profits needs to be reduced by $108,037.08 to determine the accurate amount of profits Mr. Ripps and Mr. Cahen received from the initial sales. *See* Yuga's Proposed Finding of Fact 11(b) (Dkt. 418-1).  To state in this

objection that the transfers made to Mr. Lehman and Mr. Hickman should not be excluded is inconsistent, unfounded, and misleading.

Also, Yuga stated in its trial brief that the damages they seek include only disgorgement of Mr. Ripps and Mr. Cahen's profits from the sales of RR/BAYC NFTs, not Mr. Lehman and Mr. Hickman's.  To raise an argument that Yuga is entitled to receive profits received by Mr. Lehman and Mr. Hickman and possibly more for the first time after trial has been completed in an objection to Defendants' finding of fact is prejudicially too late.  *See* Dkt. 343 at 15.

Finally, the section of the Lanham Act that Yuga cites to is inapplicable here and misleading.  As the full portion of Section 1117(a) states "[i]f the court shall find that the amount of the recovery based on profits is either inadequate ***or excessive*** the court may in its discretion enter judgment for such sum as the court shall find to be just, ***according to the circumstances of the case. Such sum*** in either of the above circumstances ***shall constitute compensation and not a penalty***." 15 U.S.C. § 1117(a) (emphasis added).  Here, the circumstances of the case support a finding that any recovery of profits beyond those Mr. Ripps and Mr. Cahen received would be excessive.  For example, the evidence shows that the intent of the RR/BAYC project was to criticize Yuga's problematic imagery and educate consumers about the nature of NFTs—the exact opposite of confusing consumers.  Cahen Decl. ¶¶ 97-98, 133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346) (uncontested); JTX-2033.  Mr. Ripps has had a long and successful career as an artist, during which he has created numerous satirical art projects spotlighting problematic societal issues.  Ripps Decl. ¶¶ 15-26 (Dkt. 346) (uncontested).

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

The evidence at trial also shows that Yuga's public activities amounted to authorization of RR/BAYC collection and the numerous other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections

using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Given these circumstances, if the court finds that disgorgement is appropriate, the court should not find disgorgement of Mr. Ripps and Mr. Cahen's profits to be inadequate and require additional disgorgement of profits the evidence shows went to Mr. Hickman and Mr. Lehman.  Such a decision would go beyond compensation and veer into punishment, impermissible under the statute.

**Plaintiff's Reply**:

Defendants' belated and purported "evidence" of profit sharing does not rebut Yuga Labs' experts.  Defendants failed to call expert witnesses to corroborate their profits calculations and instead attempt to spring unreliable new evidence on the Court and the parties at trial.  Yuga Labs' experts have provided detailed reports outlining their findings, Defendants' self-serving spreadsheet does not rebut these expert opinions.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) Defendants intended to infringe (*supra* ¶ 3); (2) Defendants' online discussions prove their profit motive (*Id.*), (3) Defendants' "disclaimer" does not negate the likelihood of confusion (*infra* ¶ 132), (4) the majority of Defendants' infringing NFTs were not sold on rrbayc.com (*Id.*), (5) Defendants failed to take steps to make their infringement less confusing (*Id.*), and (6) Yuga Labs did not abandon its marks or license Defendants' infringement (*Infra* ¶ 114).

Additionally, the Court should reject Defendants' responses because (1) Defendants' belated evidence does not rebut Yuga Labs' experts, and (2) Defendants are not entitled to their ill-gotten gains.

**Defendants' Late And Self-Serving Documents Do Not Demonstrate A Need For A Reduction In Disgorgement:** The spreadsheet Defendant has provided to prove their deductions is unreliable. Defendants did not cite to this document in any of the witness declarations. *See* Ripps Decl. (Dkt. 346); Cahen Decl. (Dkt. 344); Hickman Decl. (Dkt. (345). This made-for litigation spreadsheet is unreliable, and Defendants offer no expert testimony to corroborate its accuracy. *See* JTX-103. Rather, Defendants offer only JTX-2710 and JTX-2711 as corroboration. These were never produced in discovery, as evidenced by their lack of a Bates number and July 2023 date. Instead, Defendants sprung them on Yuga Labs on the eve of trial. If these exhibits had been produced earlier, the parties may have been able to reach a solution on the issue of monetary remedies (*see infra* ¶ 111) without needing to involve the Court. Instead, these exhibits represent Defendants' last-ditch effort to rebut Yuga Labs' well-reasoned expert reports. But this last-ditch effort must fail in light of Ms. Kindler's expert opinion. *See* Kindler Decl. (Dkt. 338) ¶¶ 58-61. Defendants, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Lindy Pen Co.*, 982 F.2d at 1408; *Frank Lloyd Wright Found. V. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019). Defendants' self-serving documents do not meet this burden.

Because this late, purported evidence need not be considered, Defendants failed to provide evidence of manual profit-sharing payments to Mr. Hickman and Mr. Lehman in discovery. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that defendant failed to meet burden to prove a 40% royalty was a proper deduction, where "the

1   documentary evidence leaves uncertainty as to the amount of royalty fees paid" and

2   defendant "did not produce sufficient documentation to prove the specific

3   amounts").  Nevertheless, after Defendants identified the purpose of certain

4   payments for the first time in their trial testimony, *see* Ripps Decl. (Dkt. 346)

5   ¶¶ 132-135, Ms. Kindler testified that those figures may be appropriate deductions

6   from a disgorgement judgment.  Trial Tr. at 195:3-7 ("If it is established that that

7   money is, in fact, profit sharing that's tied to the work on this case involving the

8   infringing marks, then I would have no problem deducting that from my ultimate

9   conclusion.  I just have not seen any evidence to suggest that it would be

10  appropriate to do that.").  Even if the Court finds that Defendants' belated, self-

11  serving statements proved their entitlement to these deductions, the Court may

12  adjust the profits award "to be just."  15 U.S.C. § 1117(a) (authorizing Court to

13  "find that the amount of the recovery based on profits is [] inadequate" and "enter

14  judgment for such sum as the court shall find to be just, according to the

15  circumstances of the case.").  Therefore, Yuga Labs may be awarded these profits

16  regardless of whether Defendants' belated document is found persuasive.

17  **Defendants Are Not Entitled To Retain Their Ill-Gotten Gains:**

18  Defendants' argument that justice requires their profits to be lowered is

19  unsupported by evidence.  It is patently unjust for Defendants to retain the profits

20  from their scam.  All profits Defendants derived from their RR/BAYC NFTs were

21  ill-gotten from their willful infringement of Yuga Labs' BAYC Marks.  Defendants

22  are not allowed to retain the fruits of unauthorized trademark use.  *Fifty-Six Hope*

23  *Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).  This is

24  especially so where, and contrary to Defendants' argument, Defendants intended to

25  infringe and confuse consumers.  *See supra* ¶ 3, SJ Order. (Dkt. 225) at 16

26  ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a

27  counterfeit handbag.").  Yuga Labs is entitled to all of Defendants' profits.

28

1   **Defendants' Disputed Post Trial Finding of Fact No. 111**:

2       Ms. Kindler improperly included in her profits calculation $108,037.08 in

3   pre-RSVP contract transfers for Mr. Hickman and Mr. Lehman. Trial Tr. [Kindler]

4   196:22-197:2; Ripps Decl. ¶¶ 132-135 (uncontested).

5   **Plaintiff's Basis for Dispute**:

6       Ms. Kindler's calculations were not improper for the reasons discussed *supra*

7   ¶ 109.

8       **Defendants' Response**:

9       In addition to the reasons stated *supra* ¶ 109, the evidence at trial clearly

10  shows that Ms. Kindler's initial opinion calculating profits Mr. Ripps and Mr.

11  Cahen received from the RR/BAYC Project failed to exclude an additional

12  $108,037.08 in profit sharing sent to Mr. Hickman and Mr. Lehman.  *See* Kindler

13  Decl. ¶¶ 59-60 (Dkt. 338); Trial Tr. [Kindler] 196:22-197:2 (admitting that her

14  calculations failed to deduct these profits); Ripps Decl. ¶¶ 132-135 (Dkt. 346)

15  (uncontested); Lehman's Depo. 210:16-214:7 (Dkt. 411) (confirming that a

16  payment received by Mr. Ripps for 32.98 ETH was for "the profits [Mr. Ripps]

17  made before [the RSVP contract], and then looking forward.  It's all automatic.")

18  JTX-2710; and JTX-2711.

19      Further, in their Findings of Fact, Yuga even agrees that Ms. Kindler's

20  calculation needs to be reduced by $108,037.08 to determine the accurate amount

21  of profits Mr. Ripps and Mr. Cahen received from the initial sales. *See* Yuga's

22  Proposed Finding of Fact 11(b) (Dkt. 418-1).  To state in their objections to

23  Defendants' Finding of Fact that this amount is properly included is misleading,

24  inconsistent, and unfounded.

25      **Plaintiff's Reply**:

26      Ms. Kindler's calculations were not improper for the reasons discussed *supra*

27  ¶ 109.  Defendants bore the burden of proving their costs.  Because, however, Ms.

28  Kindler is an honest and credible witness, she agreed that if Defendants proved

certain costs it would be appropriate to deduct them in the final disgorgement award. Yuga Labs' proposed findings of fact and conclusion take her testimony into account. But, that does not mean she "improperly" calculated profits.

**Defendants' Disputed Post Trial Finding of Fact No. 112:**

The RSVP contract also distributed $93,135.62 in automated refunds. Ripps Decl. ¶¶ 174-175 (uncontested). Yuga improperly includes in its profits calculation $93,135.62 in automated refunds executed through the RSVP reservation contract. Ripps Decl. ¶¶ 174-175 (uncontested).

**Plaintiff's Basis for Dispute:**

This statement is false. Ms. Kindler excluded the refunds from her profit analysis. Specifically, Mr. Kindler testified that "transactions that were refunded through the RefundIssued and RSVPCanceled functions in the RSVP smart contract were not included in my calculation of profits." Kindler Decl. (Dkt. 338) ¶ 44.

"Neither Defendant provided information sufficient to identify any refunds issued to RR/BAYC NFT purchasers" despite interrogatory requests to do so. *Id.* ¶ 43. Despite Defendants' attempts to withhold evidence of these refunds in discovery and introduce it as a surprise at trial, Defendants' attempt to exclude this testimony and double-count the refunds as a deduction from their profits was overruled. Trial Tr. at 170:11-13.

**Defendants' Response:**

Ms. Kindler's trial testimony on refunds was unfounded. *See* generally JTX-723 (the word "refund" is not mentioned once in Ms. Kindler's 91-page report and appendices, providing no support for her later claims that she accounted for refunds).

Second, it is inaccurate and misleading to state that Defendants tried to withhold this evidence until trial. As Mr. Ripps's testimony makes clear, the transactions outlining both the automated refunds offered through the RR/BAYC contract and the refunds Mr. Ripps directly issued are all available and publicly

1    recorded on Etherscan.  Ripps Decl. ¶¶ 172-15 (Dkt. 346) (uncontested).  That

2    information has been available since those transactions occurred.  Further, that

3    information is available on the very source Ms. Kindler states she reviewed and

4    extracted information from when forming her opinions.  *See* Kindler Decl. ¶¶ 5-7.

5    ("My calculation of Defendants' profits is based on public Ethereum blockchain

6    data, which contains records of all transactions executed on the network…. In order

7    to calculate Defendants' profits, four datasets were extracted using Etherscan: (1)

8    all transactions associated with Mr. Ripps' and Mr. Cahen's wallets, (2) all

9    transactions associated with RR/BAYC NFTs…").  Accordingly, this information

10   has not been withheld from Yuga and to state otherwise is misleading.

11          Third, this Court is entitled to accept Mr. Ripps's declaration because the

12   trial transcript shows that Yuga elected to forego any substantive cross-examination

13   of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges.

14   *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-

15   examination is the principal means by which the believability of a witness and truth

16   of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is

17   because purpose of cross-examination is "the direct and personal putting of

18   questions and obtaining immediate answers."  *Id.*; *Murdoch v. Castro*, 365 F.3d

19   699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to

20   expose to the fact-finder relevant and discrediting information[.]").   Yuga's

21   decision to not cross-examine Mr. Ripps regarding any portion of his declaration

22   means that "principle means" of testing Mr. Ripps credibility weighs decisively in

23   favor of accepting Mr. Ripps's declaration.

24          Finally, Yuga's statement that Defendants' attempts to exclude this testimony

25   were overruled is misleading.  For support, Yuga cites to the portion of the trial

26   transcript where the court overrules Defendants' objections to Ms. Kindler's

27   testimony.  Just because the court allowed the testimony to be entered, does not

28

1  mean that the court finds the testimony credible or that evidence presented that

2  rebuts said testimony is not persuasive.

3      **Plaintiff's Reply:**

4      Defendants' response on this issue strains their credibility.  On the one hand,

5  they say, the refunds are all obvious because they are recorded on the blockchain

6  and, therefore, they did not need to provide any discovery about the transactions

7  even though they were served an interrogatory on the issue.  Kindler Decl. (Dkt.

8  338) ¶ 43.  On the other hand, they say, Ms. Kindler's analysis of the blockchain

9  data must be wrong because she does not call attention to the refunds by using the

10  word "refund" in her report.  But, Ms. Kindler, not Defendants, produced the

11  blockchain data.  If Defendants had done their own analysis of that data, they would

12  have seen what they elsewhere claim is obvious—that Ms. Kindler's analysis of

13  that data recognized and recorded the refunds.  Regardless, she testified under oath

14  that she did account for the refunds and Defendants do not actually dispute that her

15  analysis accurately accounted for them.  Kindler Decl. (Dkt. 338) ¶ 44.

16  **Defendants' Disputed Post Trial Finding of Fact No. 113:**

17      Mr. Ripps and Mr. Cahen also incurred approximately $15,100.00 in

18  miscellaneous expenses associated with wages, a computer, and travel expenses.

19  Ripps Decl. ¶ 136 (uncontested); Cahen Decl. ¶¶ 174-176.

20  **Plaintiff's Basis for Dispute:**

21      Each of Defendants' proposed deductions is meritless.

22      First, Defendants provide no documentary evidence that Mr. Ripps paid Ian

23  Garner "roughly $3,500 for his work" as an "assistant," what that work entailed, or

24  how it was relevant to the revenue generated by Defendants' infringing activities.

25      Second, Defendants offered no documentary evidence of Mr. Cahen's travel

26  expenses or how these alleged travel expenses were necessary to earn revenue from

27  minting infringing NFTs.  There is no basis for this deduction.

28

Third, Defendants failed to offer any evidence of Mr. Cahen's computer purchase or why a several-thousand-dollar computer was necessary to earn revenue from Mr. Ripps' supposed minting of infringing NFTs.  Defendants have claimed that it was all Mr. Ripps (or at least Mr. Ripps' computer), and not Mr. Cahen, that minted the infringing NFTs.  *See, e.g.*, Defendants' Answer and Counterclaim (Dkt. 65) ¶ 49 ("Each RR/BAYC NFT was hand-minted by the wallet of Mr. Ripps, and Mr. Ripps sold all RR/BAYC NFTs through only his personal Twitter account, Foundation, private sales, and the website https://rrbayc.com.").  There is no basis for this deduction.  *See Vital Pharmaceuticals v. PhD Marketing, Inc.*, No. CV 20-06745, 2022 WL 2952495, *4, 6 (C.D. Cal. 2022) (rejecting deductions where defendant "has produced troublingly little evidence to support that figure. Not a single invoice, receipt, or other original source document has been produced to support the costs and expenses Defendant claims. . . .  Other courts have similarly found that summary financial documents coupled with testimony, absent any documentary evidence, were insufficient to satisfy the defendant's burden to prove costs."); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, No. 06-CV-1584, 2009 WL 10674076, at *10 (S.D. Cal. 2009) (affirming rejection of deductions where defendant "did not submit any documentary evidence such as invoices to substantiate its claimed deductions").

Worse, Mr. Cahen's testimony on this issue was shown to be perjured at trial. Mr. Cahen first testified under oath, in a declaration dated April 5, 2023, that the "RR/BAYC Project" began in May 2022 in order to avoid producing discovery related to Defendants' communications before May 2022.  Dkt. 200-4 (declaring communications with Mr. Ripps "began in mid-May, 2022, which is also the same time period that the RR/BAYC Project began."); Dkt. 200 at 3 (arguing "[t]he RR/BAYC Project began in mid-May").  Mr. Cahen then testified in his trial declaration that "I had to buy a new computer to use for the project" that started in May 2022.  Cahen Decl. (Dkt. 344) ¶ 174.  But at trial, Mr. Cahen admitted that he

purchased the computer in December 2021, approximately *five months before the "project" even began*. Trial Tr. at 227:2-229:21. Mr. Cahen's sworn testimony that he bought a computer "to use for the project" that would not exist for another five months not only disproves the link between this cost and Defendants' profits attributable to their infringement, but severely impeaches his credibility generally.

**Defendants' Response:**

This objection is inaccurate and unfounded. First, Mr. Ripps's testimony showed that Mr. Garner was his assistant and worked on the RR/BAYC Project for one week and was paid for his work. Ripps Decl. ¶¶ 124, 127, 136 (Dkt. 346) (uncontested). Such assistance on the project helped with the creation of reservations of RR/BAYC NFTs. Second, Mr. Cahen testified that he paid for travel to meet and collaborate with Mr. Ripps for the project. Cahen Decl. ¶ 175 (Dkt. 344). Travel expenses paid so that two of the creators of the project could meet and work with one another, helped with the creation of reservations of RR/BAYC NFTs. Finally, Mr. Cahen testified about the cost of a computer he used to work on the RR/BAYC project. Cahen Decl. ¶174 (Dkt. 344). The cost of the materials Mr. Cahen used for creating the RR/BAYC project did help with the creation of reservations of the RR/BAYC NFTs.

Second, the offensive claim that Mr. Cahen's trial testimony "was shown to be perjured" is an unfounded and shameful claim for Yuga to make, and well beneath the dignity of its counsel to endorse as officers of the Court. Yuga knows full well that there was no such "showing." As Mr. Cahen testified, he used the computer he purchased for the RR/BAYC Project and for research about Yuga *that led up to* and helped create the RR/BAYC Project. Trial Tr. [Cahen] 229:14-21. Yuga's citations to declarations Mr. Cahen and Mr. Ripps made and filings regarding discovery relating to when possible *communications* began for the RR/BAYC Project are misleading and non-supportive of this objection. *See* Dkts. 200, 200-3, 200-4. Additionally, Yuga's citation to Mr. Cahen's declaration does

not support this objection as it affirms that Mr. Cahen purchased a computer that he used for the project.  Cahen Decl. ¶174 (Dkt. 344).  Accordingly, the fact the computer was purchased in December 2021 and the RR/BAYC NFTs were not minted until later, does not diminish the usefulness of this tool in the RR/BAYC project as a whole, warranting including it among appropriate deductions.

**Plaintiff's Reply:**

First, Defendants offer no legal authority to support their claim that these costs are recoverable.  Their bare bones self-serving declarations do not meet their burden of proof.

Second, what is shameful is Defendants' willingness to contradict themselves under oath when it serves their then-current litigation purposes.  Mr. Cahen testified unequivocally that he bought the computer "for the project."  Cahen Decl. (Dkt. 344) at ¶ 174.  That declaration was submitted under "penalty of perjury" and signed by Mr. Cahen. *See id.* at p. 29.  That computer that Mr. Cahen bought "for the project" was purchased in December 2021.  Trial Tr. 227:11-16.  And, the RR/BAYC business venture did not start until May 2022.  Trial Tr. 227:2-3; Dkt. 200-4.  When presented with the conflict, Mr. Cahen backtracked to say "you could say the project began in – at the end of 2021."  Trial Tr. 229:14-21.  Of course, that is not what Mr. Cahen told Judge McDermott when trying to withhold discovery from Yuga Labs.  Dkt. 200-4. ("Those communications began in ***mid-May 2022, which is also the same time period that the RR/BAYC Project began***.") (emphasis added).  That declaration, too, was offered to the court under "penalty of perjury." *Id.*

Finally, even accepting Defendants' latest spin on Mr. Cahen's sworn testimony, he seeks recovery for the full purchase price of a computer he now says *wasn't* purchased for the RR/BAYC business venture, but was later used for the RR/BAYC business venture. *Compare* Cahen Decl. (Dkt. 344) at ¶ 174 ("First, I had to buy a new computer to use for the project.") *with* Counsel's Response to ¶

113 *supra* ("Mr. Cahen purchased a computer that he used for the project"). Defendants have no legal authority that Yuga Labs must pay the full purchase price for a computer that was allegedly later used for the RR/BAYC business venture. He also wants the Court to just take him at his word on the travel expenses.  But, his word is not credible.

**Defendants' Disputed Post Trial Finding of Fact No. 114:**

The term "ape" in the crypto context is a colloquialism used in expressions like "I aped into something," which means to just jump in. Trial Tr. [Cahen] 264:18-25.

**Plaintiff's Basis for Dispute:**

Defendants offer no expert testimony or other credible evidentiary support for this representation.  As shown above, Mr. Cahen's testimony is not credible. *See supra* ¶¶ 7, 113.  To the extent the Court finds that the Defendants' claim is material to any relevant issue, it does not negate the Court's findings and the Defendants' admission that Yuga Labs owns the BAYC Marks.  SJ Order (Dkt. 225) at 6-10; Dkt. 320-1 (Proposed Revised Pretrial Conference Order) at 2-3.  Nor does it negate the Court's findings that the Defendants had a bad faith intent to profit from and infringe Yuga Labs' BAYC Marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants' Response:**

The trial evidence shows that "ape" is a term commonly used in crypto and that it means to just jump in.  Mr. Cahen testified (and Yuga did not rebut) Mr. Cahen's history and personal knowledge in the crypto industry, which was admitted into evidence without objection:

> 8.  After working in film, I transitioned to the cryptocurrency industry, which involves digital currency that is secured by cryptography to make it all but impossible to counterfeit.
>
> 9.  I have worked on numerous influential cryptocurrency projects.

10.     My roles on these projects are varied, but include business strategy, project management, art/content creation, and promotion through community building and social engagement.

11.     Some of my work relates to non-fungible tokens ("NFTs").

Cahen Decl. ¶¶ 8-11.  Based on Mr. Cahen's personal knowledge of the crypto industry, he testified about the term "ape" and his personal knowledge on how it is used:

Q.      Before this lawsuit did you think there was any issue with using the word "ape"?

A.      In my opinion, there is no issue with using the word "ape."

Q.      Why not?

A.      Because it is a word that describes, like, one of the most common animals on the entire planet.  What? Am I not going to be allowed to say "apple" or "cucumber"?   You know, it seems pretty reasonable that I would be allowed to say the word "ape."

Q.      What about in the context of crypto?  What does "ape" mean?

A.      I think it means different things.   But I think there is a colloquialism used which people use as like "I aped into something."

Q.      And what does that mean?

A.      Like, I invested or I participated.  Like, I just jumped in.  Maybe, like, a synonym for it.

Q.      And where else have you seen the word "ape" used in the crypto context?

A.      Definitely in the context of the Bored Ape Yacht Club.

Q.      Anywhere else?

A.      Other pieces of artwork or NFT collections, I guess, you could say.

Trial Tr. [Cahen] 264:8-265:6.

Yuga now asks that the Court reject this unrebutted, uncontested evidence based on an improper use of the law of the case doctrine.  Specifically, Yuga asks this Court to reject this finding based on the Court's summary judgment order, even though the order did not address the use of "ape" in the crypto industry prior to the Bored Ape Yacht Club.  Moreover, the "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on prior use of the asserted marks applies to only the issue of infringement and is not adequate support finding on prior use of the marks by third parties as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

**Plaintiff's Reply:**

Defendants again seek to relitigate decided issues.  Defendants infringed upon Yuga Labs' marks, and Mr. Cahen's self-serving and inappropriate expert testimony does not change this fact.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) Defendants' liability has already been established through the Court's summary judgment order (*supra* ¶ 32).

Additionally, the Court should reject Defendants' responses because (1) Mr. Cahen is not qualified to provide expert testimony, (2) Yuga Labs owns its marks, and (3) Defendants have already admitted to Yuga Labs' ownership of the marks in the pre-trial conference order.

**Mr. Cahen's Improper Expert Testimony Does Not Support This Finding Of Fact:**  Mr. Cahen's testimony about how individuals in the cryptocurrency community use the term "ape" is improper expert testimony.  Fed. R. Evid. 702.  Mr. Cahen lacks any "scientific, technical, or other specialized knowledge" of the cryptocurrency industry and its consumers.  *Id.*  Defendants only cite to Mr. Cahen's work in the industry to prop up his expert testimony, but these three paragraphs do not qualify Mr. Cahen as an expert.  Cahen Decl. (Dkt. 344) ¶¶ 8-11.  Nor did Defendants ever designate Mr. Cahen as an expert.

Defendants offer no other evidence aside from Mr. Cahen's improper expert testimony to support this finding of fact.  If Defendants wanted testimony as to how cryptocurrency consumers interact, they should have called an expert to proffer such testimony.  Defendants instead opted to rely on their lay-witnesses.  Defendants may not now attempt to slip inaccurate expert testimony in through these lay-witnesses.

**Yuga Labs Owns Its Marks:**  The Court has already decided that Yuga Labs owns its marks.  *See* Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 6.  "[A]n unregistered trademark can be enforced against would-be infringers . . . ."  *Matal v. Tam*, 582 U.S. 218, 225 (2017).  "It is axiomatic in trademark law that the standard test of ownership is priority of use."  *Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008).  Yuga Labs started using the BAYC Marks long before Defendants began their infringement.

*Compare* Dkt. 193-2 ¶¶4, 6 *with* ¶24.  Since Yuga Labs' first use in April 2021, the BAYC brand has been the cornerstone of its business.  *Id.* ¶¶2, 8-14; *see also* Muniz Decl. (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole brand for Yuga Labs. . . .  Yuga Labs' marketing of the BAYC brand includes, among other things, its operation of social media accounts, hosting community events, and its brand collaboration and high-profile partnerships"); Solano Decl. (Dkt. 342) at ¶ 16 ("Part of the reason Yuga Labs was able to reach such a large audience is due to significant effort, time and money we spent promoting the BAYC brand.").  Indeed, Defendants admit that the BAYC Marks identify Yuga Labs.  Dkt. 193-2 at ¶ 70.

**Defendants' Response Improperly Contradicts Facts Stipulated To In The Pre-Trial Conference Order:**  Defendants' response contradicts their own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 2-3.  In that order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks.  *Id.*  Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act."  *Id.* at 13.  As such, Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.  Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the cost of resolving this case.  Defendants' actions again make this an exceptional case.  The Court should reject Defendants' response.

1    **Defendants' Disputed Post Trial Finding of Fact No. 115:**

2           The term "ape" has been used in pieces of artwork or NFT collections other

3    than the RR/BAYC collection and the Bored Ape Yacht Club. Trial Tr. [Cahen]

4    265:4-6.

5    **Plaintiff's Basis for Dispute:**

6           Defendants offer no expert testimony or other credible evidentiary support

7    for this representation.  As shown above, Mr. Cahen's testimony is not credible.

8    *See supra* ¶¶ 7, 113.  Moreover, the Ninth Circuit, and courts within the Ninth

9    Circuit, have made clear that third-party use of a mark is irrelevant in a suit against

10   a particular infringer.  *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894

11   F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of

12   third-party use of plaintiff's mark because "[e]vidence of other unrelated potential

13   infringers is irrelevant to claims of trademark infringement and unfair competition

14   under federal law."); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125,

15   1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed

16   mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151,

17   1159, 1162 (9th Cir. 2017) (a "sheer quantity of irrelevant evidence," which is

18   "largely inapposite to the relevant inquiry," is meaningless); *see also* *F.T.C. v.*

19   *Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011)

20   (precluding Defendants from "introducing into evidence . . . 'thousands of third-

21   party webpages'" because they were irrelevant and thus inadmissible under FRE

22   401 and 402).  Even so, Defendants have failed to demonstrate actual use of these

23   marks in commerce.  *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-

24   1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of

25   third-party marks in an advertisement because "evidence of third-party use is not

26   admissible unless the proponent can provide evidence that the trademarks were

27   *actually used* by third parties, that they were well promoted or that they were

28   recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz*, 2016 WL

7496769, at *3 (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

To the extent the Court finds that the Defendants' claim is material to any relevant issue, it does not negate the Court's findings and the Defendants' admission that Yuga Labs owns the BAYC Marks.  SJ Order (Dkt. 225) at 6-10; Dkt. 320-1 at 2-3.  Nor does it negate the Court's findings that the Defendants had a bad faith intent to profit off of and infringe Yuga Labs' BAYC Marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants' Response:**

Widespread third-party use of the marks is relevant to Defendants' intent, which is critical for awarding disgorgement, because the wide-spread third-party use of the asserted marks shows that Defendants had a reasonable good faith belief that it was permissible to create the RR/BAYC collection.

At the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl.¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

This overwhelming evidence regarding third-party use corroborates Mr. Cahen's testimony on how "ape" was used in the crypto industry and in other NFT collections:

Q.    What about in the context of crypto?  What does "ape" mean?

A.    I think it means different things.  But I think there is a colloquialism used which people use as like "I aped into something."

Q.    And what does that mean?

A.    Like, I invested or I participated.  Like, I just jumped in.  Maybe, like, a synonym for it.

Q.    And where else have you seen the word "ape" used in the crypto context?

A.    Definitely in the context of the Bored Ape Yacht Club.

Q.    ***Anywhere else?***

A.    ***Other pieces of artwork or NFT collections, I guess, you could say.***

Trial Tr. [Cahen] 265:1-6 (emphasis added).

Yuga also falsely states that Defendants had "admitted" that Yuga own's the asserted marks, and supports this false claim by citing to this Court's summary judgment order.  Ownership is a topic that Defendants have hotly disputed at summary judgment and reserve the right to continue to dispute on appeal.

**Plaintiff's Reply:**

Defendants did not infringe in good faith.  They intended to deceive.  SJ Order. (Dkt. 225) at 12.  Defendants offer no basis to dispute the Court's finding of their knowing and intentional infringement.  They offer no contradictory facts, nor do they cite to any evidence in the record.  Rather, Defendants are merely expressing their disappointment in the Court's summary judgment order.  Reserving the right to appeal is not a valid basis to ask the Court to disregard its

own orders.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) Defendants' liability has already been established through the Court's summary judgment order (*supra* ¶ 32), (2) Mr. Cahen is not qualified to provide expert testimony (*supra* ¶ 114), (3) Yuga Labs owns its marks (*Id.*), and (4) Defendants have already admitted to Yuga Labs' ownership of the marks in the pre-trial conference order (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) Defendants acted with the intent to confuse, not in good faith, (2) Yuga Labs did not abandon its marks, and (3) Yuga Labs did not grant Defendants a license to infringe.

**Defendants Did Not Act In Good Faith:**  Defendants' argument that they acted in good faith is contradicted by the record.  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted).  "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  And the Court determined that Defendants' use of

the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues. Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of money tbh"; "Potentially a lot").  And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark").  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit.  For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Not only did Defendants continue marketing after the institution of this suit, they continued to market and sell their infringing NFTs and website even after the Court's summary judgment order.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Defendants did not act in good faith.

**Yuga Labs Did Not Abandon Its Marks:**  The Court has already held that Yuga Labs did not abandon its marks.  SJ Order (Dkt. 225) at 9-10.  Nonetheless, Defendants' references to unknown, and alleged, third-party infringers, in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any alleged third-party use of the BAYC Marks, or similar marks, is immaterial and irrelevant.  Indeed, the Ninth Circuit, and courts within the Ninth

has made clear that third-party use of a mark is irrelevant in a suit against a particular infringer.  *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp., 894 F.2d 1114, 1119 (9th Cir. 1990)* (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law").  Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website.  Come get it here.  And also, by the way, we are going to rip off Yuga's other site next.  And we're going – you know, I've made a million dollars with this scam, and no one can stop me.  We've never had another collection get shown up on Bloomberg News with people confused thinking it's us.  I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this.  So, yes, this is especially egregious.").  Yuga Labs owns its marks.

There is also not "overwhelming evidence" of third-party use.  On the contrary, the evidence shows that Yuga Labs protected its marks zealously.  Indeed, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content.  *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections.  I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns.  And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Yuga Labs Did Not Grant Defendants' A License To Infringe:**  Ms. Muniz explained that in the one interview where she mentioned "IP" rights, she was referring to copyrights and that the context is clear to that effect.  *Id.* at 72:3-18.  Moreover, this interview is immaterial and irrelevant to Defendants' intent—it occurred in November 2022—long after Defendants made the majority of their sales and after this lawsuit was filed.  Regardless, there is no reasonable interpretation of Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

**Defendants' Disputed Post Trial Finding of Fact No. 116:**

Mr. Cahen believed it was appropriate to use the term "ape" in a project called "ApeMarket" and explained at trial that "it is a word that describes, like one of the most common animals on the entire planet. What? Am I not going to be allowed to say 'apple' or 'cucumber'? You know, it seems pretty reasonable that I would be allowed to say the word 'ape.'" Trial Tr. [Cahen] 264:13-17.

**Plaintiff's Basis for Dispute:**

Yuga Labs does not seek to stop Mr. Cahen from being "allowed to say the word 'ape,'" but rather to stop him from using it as a part of Yuga Labs' BAYC Marks to confuse consumers into purchasing counterfeit NFTs for profit.  The confusion Defendants caused is a violation of trademark law.  Specifically, Defendants developed and marketed an NFT marketplace, Ape Market, where consumers could purchase and sell RR/BAYC NFTs alongside BAYC NFTs on a platform that implied it originated from, was sponsored by, or approved by Yuga Labs.  *See* JTX-696; JTX-697; JTX-698; JTX-807 ("Trade Yuga NFTs for free"); JTX-938; Solano Decl. (Dkt. 342) ¶ 49.  Defendants teased the release of Ape Market to drive up sales of RR/BAYC NFTs.  *See* JTX-696; JTX-801.170-178; JTX-801.185.  As Mr. Cahen stated: "One thing we can do to stimulate the rsvp completing is to tease apemarket.com."  JTX-801.144.  Defendants even continued

to promote Ape Market after the filing of this lawsuit. *See* JTX-1048. For example, the @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19. And Defendants expected to profit off of their use of the BAYC Marks to sell and resell RR/BAYC NFTs and to generate transaction fees from sales on Ape Market. *See* JTX-1 at ¶¶ 10-13; JTX-49; JTX-1574; JTX-1586. They even targeted Ape Market at Yuga Labs NFT holders to harm Yuga Labs, directing their marketing to the "Yuga community." Solano Decl. (Dkt. 342) ¶ 49; JTX-697.

Their promotion of Ape Market used "ape" and Yuga Labs' BAYC Marks as trademarks to market infringing NFTs. For example, through their "@ApeMarketplace" Twitter account, and their website "apemarket.com" which used Yuga Labs' Ape Skull Logo in its favicon. JTX-95, JTX-696. As Mr. Ripps admits, these marks and logos were chosen by Defendants for a reason. Ripps Tr. Decl. (Dkt. 346) ¶ 55. That reason was to intentionally deceive consumers, with a bad faith intent to profit off of Yuga Labs' goodwill in the BAYC Marks. SJ Order (Dkt. 225) at 12-15.

Contrary to Mr. Cahen's inapt analogy, Defendants' actions are more akin to using the "Apple" mark and logo to sell computers that are identical to Apple computers, at computer stores alongside real Apple computers.

**Defendants' Response:**

The evidence at trial shows that Mr. Cahen testified (and Yuga did not cross-examine or attempt to rebut) his belief that it was appropriate use the term ape:

Q.    Before this lawsuit did you think there was any issue with using the word "ape"?

A.    ***In my opinion, there is no issue with using the word "ape."***

Q.    Why not?

A.   *Because it is a word that describes, like, one of the most common animals on the entire planet.   What? Am I not going to be allowed to say "apple" or "cucumber"?   You know, it seems pretty reasonable that I would be allowed to say the word "ape."*

Q.   What about in the context of crypto?  What does "ape" mean?

A.   *I think it means different things.   But I think there is a colloquialism used which people use as like "I aped into something."*

Q.   And what does that mean?

A.   Like, I invested or I participated.  Like, I just jumped in.  Maybe, like, a synonym for it.

Q.   And where else have you seen the word "ape" used in the crypto context?

A.   Definitely in the context of the Bored Ape Yacht Club.

Q.   Anywhere else?

A.   *Other pieces of artwork or NFT collections, I guess, you could say.*

Trial Tr. [Cahen] 264:8-265:6 (emphasis added).

Moreover, the common use of "ape" and other assert marks by third parties further justified Mr. Cahen's good faith belief that there was nothing wrong with using the term "ape." At the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl.¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are

"literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Yuga's claims against the website "apemarket.com" is an effort to prohibit from using the word "ape" despite the hundreds of third-party projects that have been using, and that Yuga is permitting to use, "ape" and other asserted mark in connection with NFTs before this lawsuit was filed.

ApeMarket never suggested any sponsorship or affiliation with Yuga.  ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  And the exhibits Yuga cites do not show otherwise.  For example, JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.  As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website domain apemarket.com was ever used for the promotion or sale of anything.  And JTX-801 shows that Defendants were in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing.  For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users.  JTX-801.185.  Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo

that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  And JTX-809 is a screenshot of mock-up of apemarket.com that Mr. Ripps did not approve and that was still subject to substantial changes from the ongoing ideation process for apemarket.com.

And Yuga's analogy to the technology company Apple in inapposite.  What Mr. Cahen is was testifying to was that the term "ape" was readily used broadly, in crypto, and in connection with NFT collection.  He did not see anything wrong with using "ape" as it would just be one of many crypto projects that use the term. Moreover, at the time of the RR/BAYC collection, Yuga did not have any NFT marketplace and the idea that Yuga can use a generic term like "ape" to enforce trademark rights in business areas that Yuga at the time did not operate in was something that Mr. Cahen believed was inappropriate.  It would be similar to the company Apple using its trademark for mobile phone/computer/stores to prohibit someone from use the word "Apple" in a line of business for which the company Apple does not operate, such as a gardening service or a repair shop for off-road vehicles.   Mr. Cahen's belief that this would not be appropriate activity is reasonable.

**Plaintiff's Reply:**

Defendants' infringement was not in good faith.  Notably, Defendants argue that only Mr. Cahen had a belief that his use of "Ape" was in good faith, apparently conceding that Mr. Ripps had no such good faith belief.  Regardless, evidence admitted at trial demonstrates that neither Defendant acted in good faith. Defendants' infringement is not akin to opening a "gardening service or repair shop[.]"  In Defendants' universe of trademark law, they believe they should be allowed to open a store that sells counterfeit iPhones next to the real thing and call it an "Apple Store."  That is not something the Lanham Act allows.

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) Defendants' liability has already been established through the Court's summary judgment order (*supra* ¶ 32), (2) Defendants acted with the intent to confuse, not in good faith, (*supra* ¶ 115), (3) Yuga Labs did not abandon its marks (*Id.*), and (4) Yuga Labs did not grant Defendants a license to infringe (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) Mr. Cahen's testimony that he thought he could use the APE mark is not credible, (2) Ape Market has already been found infringing, (3) Ape Market exists and the website was ready to launch, and (4) the Ape Market Twitter account showed the infringing website and promoted Defendants' infringing NFTs.

**Mr. Cahen's Testimony Is Not Credible:**  Mr. Cahen is not credible for the reasons discussed *supra* ¶ 7.  Mr. Cahen's testimony that he thought he could infringe upon Yuga Labs' marks is a clear attempt to come up with a *post hoc* justification for his infringement.  Mr. Cahen was aware that he was infringing. JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark").  Yet, despite this advice from his attorney, the rrbayc.com and Ape Market favicons consisted of that very logo.  JTX-94; JTX-95.  Mr. Cahen's testimony that he chose the word "Ape" because it is purportedly common in the cryptocurrency community is also farcical, Mr. Cahen's plan was to use Ape Market to promote his infringing NFTs, NFTs that point to the exact same ape images as legitimate Bored Ape Yacht Club NFTs.  JTX-801.221 ("so basically my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collection [] thats our primary goal . . . I really want to tweet an image like this today to create major hype and speculation [followed by image of Ape Market webpage]").  Mr. Cahen's testimony to the contrary is not credible.

**Ape Market Confusingly Incorporates Yuga Labs Marks:**  The Court has already found that Defendants' use of Ape Market is confusing in granting Yuga

Labs' summary judgment motion. SJ Order (Dkt. 225) at 14 (https://apemarket.com/ uses Yuga's "BORED APE and other "APE"-based marks and merely adds the descriptive work "market." These additions do not change the fact that Defendants' domain names are confusingly similar to Yuga's trademarks."). Defendants stipulated to this fact in the pre-trial conference order. Dkt. 320-1 at 13. Yuga Labs is not seeking to preclude Defendants from using the word "ape," it is trying to regain control over its brand and end Defendants' ongoing infringement. Trial Tr. at 64:8-11 ("[Defendants] can criticize Bored Ape Yacht Club and use those words. But if you are trying to say that criticism also means selling exact same NFTs to exact same people on the exact same marketplaces, that's absurd.").

Defendants' argument that Ape Market does not suggest an affiliation with Yuga Labs is also false. The favicon for the Ape Market web domain directly copies Yuga Labs' ape skull logo. JTX-95. Using Yuga Labs' trademarks necessarily infers an affiliation. And Defendants marketed their infringing products side-by-side with Yuga Labs' legitimate Bored Ape Yacht Club NFTs on the Ape Market website. *See* JTX-696; Atalay Decl. ¶ 9 ("JTX-808 is a copy of the rendering of source code contained in JTX-806 for the ApeMarket homepage, containing an overview of the top Ape Market Collections and the dropdown menu at the top of that page, titled "Collections," which lists "Bored Ape Yacht Club," "Mutant Ape Yacht Club," Otherdeed for Otherside," "Bored Ape Kennel Club," and "RR/BAYC."). Defendants' own internal discussions also show that Defendants' co-conspirators suggested several ways to try to avoid confusion due to this obvious affiliation. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"). But Defendants chose to disregard the advice of the lawyer and their co-conspirators and designed Ape Market to reinforce that clear affiliation.

**Evidence Admitted At Trial Confirms That Ape Market Was Ready To Launch:**  Despite Defendants' attempts to argue otherwise, the evidence shows that Ape Market was ready to launch.  *See* Trial Tr. at 137:23-24 ("The code was in such a state of completion that it was operational."); *see also* JTX-807; JTX-808; JTX-809.  Indeed, at trial Mr. Cahen confirmed that Ape Market was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022?  A:  Among other things, yes[.]").  Mr. Cahen later confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  See JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour commitment Friday afternoon would be the release" and Mr. Cahen responding "I think it makes sense to launch a bit earlier imo if we are comfortable doing so."); JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every YugaLabs asset . . . [a]nd we got sued for it.").  Ape Market existed as a commercial endeavor actively marketing on social media, and the online marketplace was ready to launch, and would have launched but for this litigation.  JTX-1 at ¶ 12.

**The Ape Market Twitter Account Showed The Functionalities of Ape Market And Promoted The RR/BAYC NFTs:**  Defendants created the @ApeMarketplace Twitter account to promote the Ape Market marketplace and their infringing RR/BAYC NFTs.  The Tweets from the account confirm that Defendants used @ApeMarketplace to promote Ape Market.  One such Tweet on June 20 asks, "Are you ready for ApeMarket.com, anon?" and another on June 13 teases the release of Ape Market stating "Get Ready" alongside a screenshot of Ape Market.  JTX-696.  And Mr. Cahen lied at trial when, under oath, he stated that he

did not "plan to stimulate the sales of RR/BAYC NFTs by teasing the future release of ApeMarket."  Trial Tr. at 234:15-18.  Mr. Cahen tweeted from @ApeMarketplace a link to reserve an RR/BAYC on multiple occasions and on June 2 he tweeted that "[l]isting requires holding RR/BAYC."  JTX-696. Defendants' own internal communications confirm the lie.  On June 1 Mr. Cahen stated, "my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collection."  JTX-801.221.  On that same day Mr. Cahen tweeted from @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC and a link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the prospect of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim that Ape Market, @ApeMarketplace, and RR/BAYC are not connected is obviously false.  The Tweets in JTX-696 repeatedly show the look, functionality, and intent of Ape Market and the infringing RR/BAYC NFTs within Ape Market.

**Defendants' Disputed Post Trial Finding of Fact No. 117:**

ApeMarket was never released. Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260; Ripps Decl. ¶ 180 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants developed and marketed Ape Market, where consumers could purchase and sell RR/BAYC NFTs alongside BAYC NFTs.  *See* JTX-696; JTX-697; JTX-698; JTX-938; Solano Decl. (Dkt. 342) ¶ 49.  Defendants teased the release of Ape Market to drive up sales of RR/BAYC NFTs.  *See* JTX-696; JTX-801.170-178; JTX-801.185.  As Mr. Cahen stated: "One thing we can do to stimulate the rsvp completing is to tease apemarket.com."  JTX-801.144. Defendants even continued to promote Ape Market after the filing of this lawsuit. *See* JTX-1048.  For example, the @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-

59:19.  And Defendants expected to profit off of their use of the BAYC Marks to sell and resell RR/BAYC NFTs and to generate transaction fees from sales on Ape Market.  *See* JTX-1 at ¶¶ 10-13; JTX-49; JTX-1574; JTX-1586.  They even targeted Ape Market at Yuga Labs NFT holders to harm Yuga Labs, directing their marketing to the "Yuga community."  Solano Decl. (Dkt. 342) ¶ 49; JTX-697.  Even without a complete launch to the public, the marketing of the website and marketplace was targeted at profiting from consumer confusion based on use of Yuga Labs' marks in the sale of infringing RR/BAYC NFTs, and harmed Yuga Labs.

In any event, Defendants would have launched Ape Market if not for this lawsuit.  JTX-1 at ¶ 12; Trial Tr. 247:2-9.  Defendants' code for Ape Market was complete and showed a marketplace that sold RR/BAYC NFTs alongside authentic BAYC NFTs, consistent with what they marketed.  As Mr. Atalay testified, "The code was in such a state of completion that it was operational.  It hadn't necessarily been deployed for public consumption, but it was close enough to complete that it was essentially apparently feature complete; otherwise, totally operational or ready to be deployed for consumption."  Trial Tr. at 137:23-138:2; *see also* Atalay Decl. (Dkt. 337) ¶ 9, Solano Decl. (Dkt. 342) ¶ 49.

**<u>Defendants' Response</u>:**

The evidence at trial showed that ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  Moreover, JTX-801 shows that Defendants were in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing.  For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users.  JTX-801.185.

Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  Mr. Hickman was also cross-examined about this topic and exhibits that Yuga now misleadingly cites, and Mr. Hickman explained that they were thinking about designed that would avoid any chance of confusion: "This is our attempt to make it as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga's remaining citations to exhibits are similarly misleading.  For example, JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.  As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website domain apemarket.com was ever used for the promotion or sale of anything.  JTX-697 is a post on ApeMarket's Twitter page including the term "Dear Yuga community" and pointing out how the Yuga community could save "over $8b a year" because ApeMarket will not engage in the same predatory business practices as Yuga. JTX-698 is a screenshot of apemarket.com showing that nothing had been released on the website.  JTX-938 is a Twitter post by Mr. Cahen commenting on a news article that failed to mention that Yuga stole Defendants' idea for ApeMarket.

Yuga also misleadingly cites to JTX-801 to argue that Defendants knew that confusion was likely.  The statement that Yuga relies on at JTX-801.185 was made in the context of designing the never-released ApeMarket with a wrapper on the website.  Mr. Cahen stated at JTX-801.185, "I don't want to start implementing a wrapper."  Mr. Lehman responds, "Agreed."  And Mr. Cahen explains, "these users

are too unsophisticated by far." As is apparent from the exhibit, statement Yuga cites does not relate to knowledge of confusion but instead discusses whether users of a marketplace would be sophisticated enough to correctly utilize a wrapper, which Defendants were considering using on ApeMarket.

Yuga then cites to the Lehman declaration (which was signed under coercion) as evidence of confusion, which Yuga and Mr. Solano have relied in this litigation to advance false claims of actual confusion. As demonstrated during trial, Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won. Trial Tr. [Solano] 38:17-19. Mr. Solano also relied on the declaration without considering that Mr. Lehman explained under oath that he was intimated by Yuga's lawsuit and that his understanding was "No declaration. No settlement." Trial Tr. [Solano] 38:11-16. A coerced declaration such as this is not probative evidence of confusion, especially given that Yuga has absolutely no internal documentation of confusion and that none of the parties have been able to identify a single confused consumer.

Yuga also relies on Mr. Atalay's declaration to ignore the trial evidence showing that apemarket.com was in the ideation stage and was never released—the testimony of Mr. Atalay where he falsely states that the marketplace was ready to be deployed. Mr. Atalay made this testimony having no personal knowledge about the RR/BAYC team's work in connection with ApeMarket, on how it was still in the ideation stage, on how Mr. Ripps had not even decided what apemarket.com would be, and that Defendants never actually released ApeMarket.

And finally, Yuga improperly relies on the unreliable declaration of Mr. Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on

cross-examination that his sworn declaration included a false statement claiming

that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.  And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.  Yes.
>
> Q.  So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.  It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.  **They don't continue to increase; correct, sir?**
>
> A.  **Correct.**
>
> Q.  **That statement, that part of your witness statement is incorrect; right?**
>
> A.  **Yes.**

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the

phrase "business venture" in Mr. Lehman's declaration, without having considered

that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.

Solano also relied on Mr. Lehman's declaration without having considered that Mr.

Lehman knew he could not settle his case without executing a declaration

concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

Lehman was afraid for his family at the time he signed his declaration, because

Yuga's lawsuit against him would be disastrous to his family and himself, even if

Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility

as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Reply:**

As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) the Ape Market Twitter account showed the infringing website and promoted Defendants' infringing NFTs (*supra* ¶ 116), (2) Ape Market exists and the website was ready to launch (*Id.*), (3) Defendants failed to impeach Mr. Solano's testimony (*supra* ¶ 3), and (4) Mr. Lehman's declaration is accurate and contradicts Defendants (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) Mr. Cahen's testimony and documentary evidence prove Mr. Atalay's testimony, and (2) Defendants' internal communications prove likelihood of confusion and do not

rebut it.

**Mr. Atalay's Testimony Is Corroborated By Other Evidence:**  In his trial declaration, Mr. Atalay testified as to the elements present on the rendered source code for Ape Market.  Atalay Decl. (Dkt. 337) ¶ 9.  Mr. Atalay's trial testimony confirmed that the website was ready to launch.  Trial Tr. at 137:23-24 ("The code was in such a state of completion that it was operational.").  Mr. Cahen also corroborated Mr. Atalay's trial testimony.  Trial Tr. at 247:10-12 (Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022 / A: Among other things, yes[.]"); *id.* at 247:4-7 ("But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.").  And significant documentary evidence confirms that Ape Market was ready to launch.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour commitment Friday afternoon would be the release" and Mr. Cahen responding "I think it makes sense to launch a bit earlier imo if we are comfortable doing so."); JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every YugaLabs asset . . . [a]nd we got sued for it.").  Mr. Atalay's testimony is reliable and corroborated by Defendants.

**Defendants Were Aware Of Confusion But Chose Not To Act:**  The evidence shows that Defendants' were aware of confusion for the reasons discussed *supra* ¶ 7.  Defendants' internal communications demonstrate that, despite this knowledge, they were apathetic to consumer confusion.  *See* JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").  Indeed, Defendants were warned by their attorney that they needed to make changes to their infringing products in order to avoid confusion.  *See* JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change

the skull / If we want to fight trademark").  Yet Defendants still used Yuga Labs' unaltered ape skull logo on as the favicon for the Ape Market web page.  JTX-95. Defendants were given several other warnings from their co-conspirators.  *See* JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name.").  It does not matter what steps Defendants' co-conspirators recommended because Defendants chose not to implement those changes.  Defendants did not shy away from confusion, they leaned into it.

**Defendants' Disputed Post Trial Finding of Fact No. 118:**

Mr. Ripps and Mr. Cahen never generated any revenue or profit from ApeMarket. Trial Tr. [Cahen] 265:7-10; Cahen Decl. ¶ 261; Ripps Decl. ¶ 181 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants developed and marketed Ape Market, where consumers could purchase and sell RR/BAYC NFTs alongside BAYC NFTs.  *See* JTX-696; JTX-697; JTX-698; JTX-938; Solano Decl. (Dkt. 342) ¶ 49.  Defendants teased the release of Ape Market to drive up sales of RR/BAYC NFTs.  *See* JTX-696; JTX-801.170-178; JTX-801.185.  As Mr. Cahen stated: "One thing we can do to stimulate the rsvp completing is to tease apemarket.com."  JTX-801.144. Defendants even continued to promote Ape Market after the filing of this lawsuit. *See* JTX-1048.  For example, the @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-

59:19.  And Defendants expected to profit off of their use of the BAYC Marks to sell and resell RR/BAYC NFTs and to generate transaction fees from sales on Ape Market.  *See* JTX-1 at ¶¶ 10-13; JTX-49; JTX-1574; JTX-1586.  They even targeted Ape Market at Yuga Labs NFT holders to harm Yuga Labs, directing their marketing to the "Yuga community."  Solano Decl. (Dkt. 342) ¶ 49; JTX-697. Even without a complete launch to the public, the marketing of the website and marketplace increased the sales of the RR/BAYC NFTs, increased Defendants' profits, and harmed Yuga Labs.

**Defendants' Response:**

Yuga falsely states that "users could purchase and sell RR/BAYC NFTs alongside BAYC NFTS" on ApeMarket.   The evidence at trial showed that ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything. Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).  Moreover, JTX-801 shows that Defendants were in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing. For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users.  JTX-801.185.  Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …"). Mr. Hickman was also cross-examined about this topic and exhibits that Yuga now misleadingly cites, and Mr. Hickman explained that they were thinking about designed that would avoid any chance of confusion: "This is our attempt to make it as clear as possible.  We are having discussion on how to make sure it was very

1  clear for users."  Trial Tr. [Hickman] 212:22-24.

2      Yuga's remaining citations to exhibits are similarly misleading.  For

3  example, JTX-696 does not show what apemarket.com displayed, what

4  functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.

5  As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12;

6  [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt.

7  346) (uncontested)) and no evidence shows that the website domain apemarket.com

8  was ever used for the promotion or sale of anything.  JTX-697 is a post on

9  ApeMarket's Twitter page including the term "Dear Yuga community" and

10  pointing out how the Yuga community could save "over $8b a year" because

11  ApeMarket will not engage in the same predatory business practices as Yuga.  JTX-

12  698 is a screenshot of apemarket.com showing that nothing had been released on

13  the website.  JTX-938 is a Twitter post by Mr. Cahen commenting on a news article

14  that failed to mention that Yuga stole Defendants' idea for ApeMarket.

15      Yuga also misleadingly cites to JTX-801 to argue that Defendants knew that

16  confusion was likely.  The statement that Yuga relies on at JTX-801.185 was made

17  in the context of designing the never-released ApeMarket with a wrapper on the

18  website.  Mr. Cahen stated at JTX-801.185, "I don't want to start implementing a

19  wrapper."  Mr. Lehman responds, "Agreed."  And Mr. Cahen explains, "these users

20  are too unsophisticated by far."  As is apparent from the exhibit, statement Yuga

21  cites does not relate to knowledge of confusion but instead discusses whether users

22  of a marketplace would be sophisticated enough to correctly utilize a wrapper,

23  which Defendants were considering using on ApeMarket.

24      Yuga then cites to the Lehman declaration (which was signed under

25  coercion) as evidence of confusion, which Yuga and Mr. Solano have relied in this

26  litigation to advance false claims of actual confusion.  As demonstrated during trial,

27  Mr. Solano also relied on the declaration without having considered that Mr.

28  Lehman was afraid for his family at the time he signed his declaration, because

1   Yuga's lawsuit against him would be disastrous to his family and himself, even if

2   Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.  Mr. Solano also relied on the

3   declaration without considering that Mr. Lehman explained under oath that he was

4   intimated by Yuga's lawsuit and that his understanding was "No declaration.  No

5   settlement." Trial Tr. [Solano] 38:11-16.   A coerced declaration such as this is not

6   probative evidence of confusion, especially given that Yuga has absolutely no

7   internal documentation of confusion and that none of the parties have been able to

8   identify a single confused consumer.

9          And finally, Yuga improperly relies on the unreliable declaration of Mr.

10  Solano.  Mr. Solano is not credible given the many false and misleading statements

11  contained in his declaration.  For example, Mr. Solano was forced to concede on

12  cross-examination that his sworn declaration included a false statement claiming

13  that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified
>       that they do not currently receive any royalties or creator fees from
>       sales on secondary marketplaces; right?
>
> A.    Yes.
>
> Q.    So you don't have any basis for your statement that their profits
>       continue to increase; correct?
>
> A.    It's my understanding that they were collecting royalties or creator
>       fees from LooksRare for quite a while.   Although, those were
>       supposed to be donated to charity and never were.
>
> Q.    ***They don't continue to increase; correct, sir?***
>
> A.    ***Correct.***
>
> Q.    ***That statement, that part of your witness statement is incorrect;
>       right?***
>
> A.    ***Yes.***

1

2   Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the

3   phrase "business venture" in Mr. Lehman's declaration, without having considered

4   that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

5   Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.

6   Solano also relied on Mr. Lehman's declaration without having considered that Mr.

7   Lehman knew he could not settle his case without executing a declaration

8   concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

9   Lehman was afraid for his family at the time he signed his declaration, because

10  Yuga's lawsuit against him would be disastrous to his family and himself, even if

11  Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility

12  as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano]

13  32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by

14  Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

15  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And

16  you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look

17  at your deposition -- and we can pull it up on the screen -- at page 152, starting at

18  line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an

19  objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

20  your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market

21  exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look

22  at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know

23  whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that

24  question, and did you give that answer? A Yes.").  Mr. Solano's testimony

25  regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been

26  rebutted.  Mr. Solano could not identify a single person that ever bought an

27  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In

28

fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Reply:**

Defendants' fail to rebut Yuga Lab's objection.  Ape Market was developed, ready to launch, and used to promote their infringing NFTs.  Defendants used the prospect of the marketplace to drive up sales of their infringing NFTs.  This contributed to Defendants' profits from their scam.  Defendants' responses should be rejected for the reasons discussed above.  *See supra* ¶¶ 3, 116, 117.

As further discussed *supra*, Defendants' responses lack merit.  Specifically: (1) the Ape Market Twitter account showed the infringing website and promoted Defendants' infringing NFTs (*supra* ¶ 116), (2) Ape Market exists and the website was ready to launch (*Id.*), (3) Defendants fail to impeach Mr. Solano's testimony (*supra* ¶ 3), (4) Mr. Lehman's declaration is accurate and contradicts Defendants (*Id.*), and (5) Defendants' internal communications prove likelihood of confusion and do not rebut it (*supra* ¶ 117).

Additionally, Defendants' responses should be rejected because (1) regardless of whether Ape Market was "released" it was still used to promote the RR/BAYC NFTs.

**Ape Market Was Used To Promote The RR/BAYC NFTs:**  As discussed *supra* ¶ 116, Ape Market was ready to launch and the Ape Market Twitter account was used to promote Defendants' infringing NFTs.  Defendants do not rebut this fact.  Whether Ape Market was ever "released," Defendants actively used the Ape Market Twitter to promote the RR/BAYC NFTs.  *See* JTX-696 (showing several Tweets urging consumers to purchase RR/BAYC NFTs).  And regardless of whether the marketplace was ever "released," Defendants used the *prospect* of the marketplace to promote their infringement.  *See, e.g.*, *id.* (June 2 Tweet stating "[l]isting requires holding RR/BAYC.  Reserve yours now" with link to reserve RR/BAYC NFT); *see also* JTX-801.221 ("so basically my goal for today is to

create an announcement that will create hype and volume, we want to mint out the remainder of that collectio*n* [] thats our primary goal . . . I really want to tweet an image like this today to create major hype and speculation [followed by image of Ape Market webpage]").  Defendants' attempt to avoid this conclusion by arguing that Ape Market was never released ignores the fact that Ape Market existed as a commercial endeavor that was used to promote Defendants' RR/BAYC NFTs using Yuga Labs' marks.

**Defendants' Disputed Post Trial Finding of Fact No. 119:**

Defendants' liability arguments, though ultimately unsuccessful on Defendants' motion to dismiss and at summary judgment, were made reasonably and in good faith. *See generally* Dkt. 348 at 11-15.

**Plaintiff's Basis for Dispute:**

Defendants' stubborn re-argument of the same issues even after the Court rejected them was not reasonable or in good faith.  There was no credible basis for Defendants to continue to claim their copying was permissible, nor was there any credible basis for Defendants to make and persist with a claim for "no defamation" that they ultimately did not try to defend.  Defendants know this.  They withdrew their "no defamation" counterclaim only after they were unsuccessful in their attempts to leverage it for discovery and after Yuga Labs had already expended resources seeking its dismissal.  *See* Dkt. 156 at 11.  The bulk of Defendants' other counterclaims were a meritless SLAPP for which the Court has already awarded fees.

Defendants again refused to accept the Court's findings in the summary judgment order (Dkt. 225), instead indicating an intent to re-litigate adjudicated issues at trial.  *See, e.g.*, Dkt. 320-1 at 11-12 (Proposed Pretrial Conference Order in which Defendants argued that their infringement was not intentional/willful despite the Court's holding otherwise).  As a result, Yuga Labs was forced to prepare for trial on previously adjudicated issues.  Worse still, as part of the Court's findings of

1   fact and conclusions of law process, Defendants still refuse to agree to

2   straightforward, already adjudicated facts—disputing for example direct quotes

3   from the Court's summary judgment order.  *See, e.g.,* Dkt. 418-1 ¶¶ 7(a), 7(b), 7(d),

4   7(e), 7(f), 10.

5   **Defendants' Response:**

6   Once again, Yuga speaks past Defendants proposed finding of fact because

7   they have no substantive response.  No part of Yuga's objection addresses

8   Defendants' liability arguments at the motion to dismiss or at summary judgment.

9   In fact, despite citing several orders of this Court, it does not cite *either* of the

10  referenced motions.  While this Court disagreed with Defendants' positions on

11  those motions, they were made in good faith and were not frivolous.

12  Defendants also never re-adjudicated any issues.  The majority of Yuga's

13  argument revolves around issues of intent.  Yuga is attempting to win excessively

14  broad injunctive relief and disgorgement.  *See* Dkt. 315-I.  Intent is an important

15  factor for disgorgement damages.  *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct.

16  1492, 1497 (2020).  Disgorgement is only warranted in cases of "conscious

17  wrongdoers."  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL

18  4596697, at *17 (C.D. Cal. July 29, 2022).  Further, to the extent Yuga is making a

19  law of the case argument, it is misplaced because, a summary judgment decision is

20  a preliminary decision, so law of the case does not apply.  *Shouse v. Ljunggren*, 792

21  F.2d 902, 904 (9th Cir. 1986).  It is also true that even if it did apply, a factual

22  finding can matter for one issue—for example the *Rogers* defense—but does not

23  apply to a different issue, for example damages.  *See Sienze v Kutz*, No. 1:17-CV-

24  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

25  preliminary decision on one issue does not bind court as to similar issue later in

26  case).   This Court has not make a finding of willfulness.

27

28

Nor can Defendants be faulted for maintaining their objections to Yuga's repetition of the Court's findings made at summary judgment, to preserve their ultimate ability to appeal the Court's summary judgment order.

Lastly, Yuga invokes Defendants' counterclaims including its counterclaim for a declaratory judgment of no defamation. That claim largely mirrored Yuga's claim for unjust enrichment in that it was a reasonable extension of the law as it existed. *See* Dkt 1 at 37. Defendants ultimately withdrew their no defamation counterclaim, in the same way that Yuga withdrew its unjust enrichment counterclaim.

**Plaintiff's Reply:**

Defendants' refusal to accept the Court's prior orders has forced Yuga Labs to continually respond to stale arguments and relitigate closed issues. These dilatory and abusive litigation tactics support a finding that this is an extraordinary case. Relitigating closed issues *in the same trial court that decided those issues* is not preserving an issue for appeal, it is patently bad faith.

As discussed herein, Defendants' responses lack merit. Specifically: (1) Defendants intended to infringe and cause confusion (*supra* ¶ 3), disgorgement is available as a remedy (*infra* ¶ 131), and the Court's summary judgment order establishes liability and ill-intent (*supra* ¶ 114).

Additionally, the Court should reject Defendants' responses because (1) Defendants' refusal to accept the Court's orders is in bad faith, and (2) Defendants' no defamation counterclaim was in bad faith.

**Defendants' Repeated Refusal To Accept The Court's Orders Is Not Good Faith:** Defendants have multiplied the costs of litigation by continuing to present rejected arguments. First, the Court dismissed Defendants' First Amendment and *Rogers* defenses in its order denying Defendants' motion to dismiss and denying Defendants' motion to stay. Order on Defendants' Motion to Dismiss (Dkt. 156) at 6-7; *see also* Order on Defendants' Motion to Stay (Dkt. 178)

at 6 ("Because the Court has concluded that this action concerns Defendants' commercial conduct and not Defendants' free speech rights, the Court also concludes that the orderly course of justice will be best served by resolving Yuga's federal claims as expeditiously as possible."). And yet, Defendants still put these same arguments forward to oppose Yuga Labs' motion for summary judgment and again the Court rejected these defenses. SJ Order (Dkt. 225) at 16-17. Undeterred, Defendants continued at trial to put forth these rejected arguments forcing Yuga Labs' to file multiple motions *in limine* on the issues. *See* Yuga Labs' Motion *in Limine* No. 1 (Dkt. 232); Yuga Labs' Motion *in Limine* No. 2 (Dkt. 236). Defendants continued to press these issues through cross-examination at trial. Trial Tr. 20:9-11 ("Q: So there has been public criticism of the images in the BAYC collection by people other than the defendants, correct?"). And Defendants maintain their position on these long-decided issues in these proposed findings of fact and conclusions of law. *See, e.g.,* Dkt. 419-1 ¶ 9 ("The evidence presented at trial establishes that the RR/BAYC project was created as a form of satire intended to protest NFTs linked to what defendants believed were antisemitic or racist injury."). This is not zealous advocacy or preserving issues for appeal, it is an abuse of the judicial process and waste of everyone's time. Worse still it is part of the Defendants' bad faith approach to this litigation to continue to attack Yuga Labs and try to make the litigation about anything other than Defendants' scam.

**Defendants' No Defamation Counterclaim Was Bad Faith:** Defendants' response is a false equivalence. Defendants never had a basis to bring a "no defamation" cause of action. "From the outset, Yuga Labs explained to Defendants' counsel that 'there is no claim for declaratory relief of non-defamation.' Defendants have made no attempt to provide authority that they had a good-faith basis for filing it . . . ." Dkt. 97 at 1. Defendants cite no cases in which their "no defamation" claim survived a motion to dismiss and made no argument that their claim was an extension of the law as it existed. Yuga Labs warned

Defendants of this, twice, yet they forced Yuga Labs to fully brief the issue, incurring substantial attorneys' fees. *Id.* at 3.

What's worse, and clear from their conduct, is that this too was all a bad faith litigation tactic. They withdrew their "no defamation" counterclaim only after they were unsuccessful in their attempts to leverage it for discovery and after Yuga Labs had already expended resources seeking its dismissal. *See* Dkt. 156 at 11.

This is nothing like Yuga Labs' withdrawal of unjust enrichment as a cause of action. Some courts recognize unjust enrichment as a cause of action while others, including this Court, recognize it only as a remedy, so Yuga Labs "withdr[ew] this claim but continue[d] to seek unjust enrichment as a remedy." Dkt. 53 at 24. And, unlike Yuga Labs' motion against Defendants, Defendants did not argue that unjust enrichment was not available as a claim in their motion to dismiss. Instead, they merely argued that it was inadequately pled. Here too, Defendants false equivalence is wrong. There is no procedural or substantive similarity between Yuga Labs and Defendants' withdrawal of claims.

**Defendants' Disputed Post Trial Finding of Fact No. 120:**

Defendants' infringement was not willful. *See* Dkt. 149 at 13 (Yuga seeking at summary judgment a finding of exceptional case of "intentional infringement"); SJ Order (Dkt. 225) at 13 (denying Yuga's motion); Dkt. 236 at 13 (Yuga conceding that it is not pursuing a claim of willful infringement); Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies").

**Plaintiff's Basis for Dispute:**

Defendants' infringement was willful. *See supra* ¶ 17 (refuting argument that "defendants did not intend to infringe Yuga's trademarks or create confusion regarding the origin of the RR/BAYC NFTs."). The Court already found that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad faith intent to profit from their use of the marks. SJ Order (Dkt. 225) at 12-15. The Court's finding of intent to deceive shows that

Defendants' conduct was willful, since "[w]illful infringement carries a connotation of deliberate intent to deceive." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993). And there is ample evidence in the record of this willful intent. *See* JTX-1 ¶¶ 10-13; JTX-621; JTX-801.44, 185, 208, 237; JTX-803 at 66-67; JTX-1574; JTX-1586; Hickman Depo. Designations (Dkt. 394) at 238:12-40. Defendants have no basis to relitigate this issue.

Defendants misleadingly cite the Court's Summary Judgment Order as "denying" Yuga Labs' request for a finding of exceptional case. This too is wrong. The Court deferred decision on whether this was an exceptional case because Yuga Labs "reserved the issue of damages for trial." SJ Order (Dkt. 225) at 13. The record at trial both reaffirms that Defendants' conduct was willful and proves that this is an exceptional case.

Defendants' citation to Dkt. 315-1 is irrelevant, because it is not a "legal remedy" for the Court to find that Defendants' conduct was willful. To the contrary, the Lanham Act specifies that "*[t]he court* in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). The Court, as the factfinder in this bench trial, may make findings of fact in support of its determination that this is an exceptional case. *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 (9th Cir. 2023) (affirming finding of exceptional case following bench trial, noting that the district court found infringement to be "willful and brazen"); *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 505 (9th Cir. 2011) (affirming finding of exceptional case following bench trial, citing district court's finding that infringer acted in bad faith).

**Defendants' Response:**

Yuga is attempting to conflate two different types of intent to try to avoid the fact that they never received a finding of "willful infringement." *See* Dkt. 149 at 13 (Yuga seeking at summary judgment a finding of exceptional case of "intentional

infringement"); SJ Order (Dkt. 225) at 13 (denying Yuga's motion); Dkt. 236 at 13 (Yuga conceding that it is not pursuing a claim of willful infringement). Infringers who are intentionally using protected work are not willful infringers if they are operating in the good faith belief that they are not infringing. *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1228 (9th Cir. 2012). Defendants were operating under the good faith belief that they were engaged in art and that it was therefore protected speech. Ripps Decl. ¶¶ 71-92; 137-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 129-33 (Dkt. 344). Defendants private chat is replete with entries demonstrating this belief that they were involved in art. *See e.g.*, JTX-801.00019; 801.00024; 801.00025; 801.00366-67; 801.00448-49; 803.00029-30; 804.008.

Yuga's citations do not indicate willful infringement. Mr. Lehman's declaration was signed under duress and included words that he would not have included. *See* Lehman Depo Designation 127:15-128:10 (acquiescing to term "business venture" in order "to get the deal done"); 97:15-98:8; 109:6-11 (acknowledging that he signed declaration because he was scared). JTX-621 is a consent judgment drafted by Yuga's counsel and does not constitute evidence. All of Yuga's other citations merely show a belief that Defendants believed they would make money. But art projects make money all the time, so that cannot be a source of willful infringement.

Yuga also cannot escape the fact that willful infringement is a finding of fact that belongs to the jury. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 958-59 (9th Cir. 2001) (discussing willful infringement as a factual issue that could result in a jury finding); *Anhing Corp. v. Thuan Phong Co. Ltd.*, No. 13-cv-05167-BRO-MANx, 2015 WL 4517846 at *8 (discussing impact of jury finding of willfulness). Defendants never waived their right to a jury trial. Yuga, changed its case to avoid a jury trial. Far from being irrelevant, Yuga's June 15, 2023 application to Request

1   Continuation of Trial (Dkt 315-1) disclaimed Yuga's right to *any* legal remedies.

2   Therefore, it accordingly disclaimed a finding of willful infringement.

3       **Plaintiff's Reply:**

4       Defendants' response is unavailing because (1) they fail to justify their bare

5   assertion that there are "two different types of intent" or that the Court must apply a

6   higher standard when finding an exceptional case, and (2) even if the Court needed

7   to make a another finding of willfulness, they fail to dispute the overwhelming

8   evidence of their willful infringement.

9       **The Court's Finding Of Defendants' Intentional Infringement and**

10  **Intent to Confuse Customer Is Sufficient to Establish Willfulness:**  The Court

11  has already held Defendants' infringement was "explicitly misleading," SJ Order

12  (Dkt. 225) at 12, and that "Defendants knowingly and intentionally used Yuga's

13  BAYC Marks . . . in an effort to confuse consumers." *Id.* at 12.  This finding is

14  sufficient to find that their infringement was indeed willful.  *See Lindy Pen Co. v.*

15  *Bic Pen Corp.*, 982 F.2d 1400, 1405-06 (9th Cir. 1993), *abrogated on other*

16  *grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th

17  Cir. 2016) (willfulness "carries a connotation of deliberate intent to deceive.  Courts

18  generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or

19  'fraudulent' to conduct that meets this standard.").

20      Defendants' arguments that a jury trial is necessary to reach this finding lacks

21  merit.  Defendants do not even address the authorities cited by Yuga Labs that

22  explain when the Lanham Act specifies that "*[t]he court* in exceptional cases may

23  award reasonable attorney fees to the prevailing party," 15 U.S.C. § 1117(a)

24  (emphasis added), that statutory language indeed authorizes the Court to make such

25  a finding.  *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th

26  1203, 1223 (9th Cir. 2023); *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 505 (9th Cir.

27  2011).  Defendants' argument the Court actually cannot determine an exceptional

28  case absent a jury finding is incorrect, and it is not supported by their authorities.

*See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 958-59 (9th Cir. 2001) (considering willfulness in the context of a laches defense to a copyright infringement claim, affirming district court finding of willfulness, confirming there is "no right to a jury on the equitable" issue); *Anhing Corp. v. Thuan Phong Co. Ltd.*, No. 13-cv-05167-BRO-MANx, 2015 WL 4517846 at *8 (considering willfulness in the context of a laches defense to a trademark claim and observing that where there was a jury trial, the jury's finding of willful infringement negated laches defense); *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221 (9th Cir. 2012) (considering willfulness in the context of a laches defense to a copyright infringement claim, discussing defendant's collaboration with plaintiff in developing a training manual, including express acknowledgments and requests for suggestions and comments, in support of finding defendant believed it had an implied copyright license).

**Even If The Court Must Find Anew That Defendants' Infringement Was Willful, The Record Supports Such A Finding:** The Court does not need to find Defendants' infringement to be willful in order to deem this an exceptional case. *See* June 9, 2023 Pretrial Conference Tr. at 62:3-6 ("I don't need to make a determine as to willful or not willful for an exceptional case determination. That's not the criteria. There are a number of factors that I look at. Willfulness may be one."). However, the trial record overwhelmingly supports that Defendants intentionally infringed Yuga Labs' BAYC Marks intending to confuse consumers for their personal gain. *Supra* ¶ 17 (objections explaining profit intent and knowledge of likely confusion).

Defendants cannot avoid this outcome by claiming good faith. As the Court has already determined, "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs" and they did so "in an effort to confuse consumers." SJ Order (Dkt. 225) at 11, 12. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Network*

1   *Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir.

2   2011) (*quoting AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979)); SJ

3   Order (Dkt. 225) at 12 (citing the same).

4          Moreover, in violating the Lanham Act, "Defendants acted with a bad faith

5   intent to profit." SJ Order (Dkt. 225) at 15. Their actions were "commercial

6   activities designed to sell infringing products, not expressive artistic speech

7   protected by the First Amendment." *Id.* at 16. The question of whether Defendants

8   acted in good faith has already been resolved against them.

9          The record also overwhelmingly contradicts Defendants' claim that they

10  were acting in good faith when they stole Yuga Labs' intellectual property, harmed

11  its brand, and deceived consumers. Defendants' argument that their private

12  communications demonstrate their good faith is simply a false statement seeking to

13  backfill the facts to conform with their desired outcome. The truth is that their

14  private correspondence overwhelmingly revealed their intent to profit, desire to do

15  harm, knowledge that their actions would cause confusion, and disregard of advice

16  to mitigate that confusion. *See, e.g.*, JTX-801.185 (Mr. Lehman writing, "overall I

17  think we should be very careful about doing this in terms of the confusion it will

18  create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to

19  make the collections coexist" because "they are the same art" and "same logos");

20  JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and

21  writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the

22  RR/BAYC logo "could be considered confusing and our use of the 'BAYC'

23  name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite

24  crazy definitely some people will buy thinking they are buying originals!"); JTX-

25  918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic

26  to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the

27  tokenId should match the RR ID. that is where they get confused"); Hickman Depo.

28  Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and

"BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional."). Defendants fail to explain why infringers acting in good faith would receive, and ignore, advice from their attorney advising them to stop using someone else's trademark. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark").

And, as discussed above, Defendants fail to support their claim that that their commercial infringement was a mere art project. *Supra* ¶¶ 18, 19. They also fail to explain how their continued promotion of their infringing goods throughout the course of this lawsuit, including after the Court's summary judgment order, (*supra* ¶ 17) is consistent with good faith.

Finally, Defendants have lied, under oath, throughout the course of these proceedings. *See, e.g.*, *supra* ¶ 7. Their dishonesty and attempts to cover up their wrongdoing are inconsistent with a claim that they did not believe they did anything wrong.

**Defendants' Disputed Post Trial Finding of Fact No. 121:**

Defendants have not engaged in litigation misconduct. *See generally* Dkt. 348 at 11-15.

**Plaintiff's Basis for Dispute:**

Defendants engaged in egregious litigation misconduct justifying a finding that this is an exceptional case.

First, Yuga Labs' case is particularly strong on the merits.  As evinced by the Court's Order granting summary judgment as to liability, this case stands out from the bulk of trademark infringement cases.  Ignoring the clear strength of Yuga Labs' case, Defendants relentlessly advanced frivolous legal theories (e.g., RR/BAYC NFTs as an "art" project intended to criticize Yuga Labs, Yuga Labs abandoned its rights to the BAYC Marks, a frivolous counterclaim for declaratory judgment of "no defamation") that were rendered moot and irrelevant by multiple orders from the Court.  *See, e.g.*, Dkt. 62 (rejecting Defendants' First Amendment arguments), SJ Order (Dkt. 225) (granting summary judgment in favor of Yuga Labs and against Defendants' affirmative defenses).

Second, notwithstanding the strength of Yuga Labs' case, Defendants refused to engage in reasonable settlement discussions.  For instance, Defendants demanded payment in excess of $5 million to cease their infringement, demanded that Yuga Labs pay Defendants' attorneys' fees even after losing the merits of the case on summary judgment, refused to agree to any monetary settlement terms for their infringement even after the Court's Summary Judgment Order, and even demanded that Yuga Labs dismiss claims against their partners in other courts.

Third, Defendants repeatedly sought (and continue to seek) to re-litigate issues already addressed and rejected by the Court, unnecessarily complicating and increasing the cost of litigation.  For example, Defendants filed numerous motions to compel documents and information explicitly premised on their rejected First Amendment *Rogers* defense.  *See* Dkt. 69-1, Dkt. 103-1.  The Court denied these motions and requests as "moot, irrelevant and not proportionate to the needs of the case in view of the District Court's December 16, 2022 ruling."  Dkt. 87 at 1; *see also*, Dkt. 144 at 1.  Similarly, when Defendants filed a meritless motion to stay

proceedings (Dkt. 118) after nearly three months of unnecessary delay, the Court

reiterated that *Rogers* did not apply in this case due to Defendants' commercial

conduct.  Dkt. 178 at 6.  Still, on summary judgment, Defendants maintained that

"there is a material dispute whether the RR/BAYC Project is an expressive work

that must be resolved at trial" (Dkt. 199-1 at 12-13), despite the Court's orders

otherwise.  Defendants then indicated they planned to re-litigate, again at trial, the

issues decided on summary judgment, necessitating that Yuga Labs file Motions In

Limine.  *See* Dkts. 232-2, 236-2, 239-2, 241-2 (Culp Declarations in Support of

Motions In Limine Nos. 1-3, 5).  This pattern of conduct justifies finding this to be

an exceptional case.  *San Diego Comic Convention v. Dan Farr Prods.*, 807 F.

App'x. 674, 676 (9th Cir. 2020) (affirming exceptional case where defendants

litigated in an "unreasonable manner" such as its "failure to comply with court

rules" and "persistent desire to re-litigate issues already decided").

Fourth, Defendants and their counsel engaged in a pattern of unreasonable

and obstructive discovery conduct that consistently crossed the line from advocacy

into bad faith.  Defendants were obstructive and intentionally evasive throughout

their depositions and at trial, wasting time with rehearsed, non-responsive

monologues on the same issues the Court already deemed irrelevant.  *See, e.g.*,

Trial Tr. at 229:3-13, 231:21-232:3, 234:24-235:5, 237:14-238:7; Cahen Depo.

Designations (Dkt. 395) at 101:7-102:4, 163:13-23; Ripps Depo. Designations

(Dkt. 396) at 35:2-11, 44:19-45:11.  *See Jackson v. Gaspar*, No. 2:19-CV10450-

DOC, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022) (finding exceptional case

from "antagonistic discovery conduct" that was "improperly motivated and sought

to drag out or obfuscate proceedings," such as deposition conduct where the

defendant's "preparation, recollection and candor appear to have been marginal at

best").  Defendants also made false representations to the Court regarding the

existence and production of documents during discovery.  For example, Mr. Ripps

swore under penalty of perjury in a verification dated January 17, 2022 that he had

produced all documents responsive to Yuga Labs' discovery requests.  Trial Tr. at
267:11-14.  This was a lie.  As just one example, Mr. Ripps was asked at trial about
a text message from Mr. Cahen stating "It will sell out within 48 hours I think
You'll make like a million dollars Straight up."  JTX-1574.  Mr. Ripps claimed he
did not produce that text message because he did not "really find it to have anything
to do with the RR/BAYC project."  Trial Tr. at 268:17-21.  This explanation is not
credible given the communication's clear relation to the sale of infringing NFTs,
nor does it explain his withholding of every other text message with Mr. Cahen
about the RR/BAYC NFTs.  *See* Dkt. 145 at 2-3 ("The Court takes a dim view of
Defendants' blanket withholding of pre-litigation communications between Ripps
and Cahen . . . .");  *see also supra* ¶ 7 (describing Defendants' false sworn
statements regarding their document productions).  Yuga Labs was forced to file
numerous motions and obtain repeated sworn declarations from Defendants
confirming their compliance with discovery obligations, because Defendants were
continually caught concealing additional documents.  *See* Dkt. 79 at 2 (Jan. 10,
2023 order requiring Ripps to verify that he has produced "all relevant non-
privileged documents"); Dkt. 145 (order requiring Defendants to file a declaration
that they have produced relevant documents).  Even Defendants' Discord chat
(JTX-801)—cited extensively by both parties in the summary judgment and trial
record, and even in both parties' proposed findings of fact and conclusions of law—
had to be obtained through third-party discovery before Defendants voluntarily
produced it.  *See* Dkt. 67 at 77 (joint stipulation regarding Yuga Labs' motion to
compel, noting Telegram and Discord chats were produced by a third party, even
after which Defendants still failed to produce them in a usable format).

     Fifth, Defendants repeatedly attacked Yuga Labs, its representatives, and its
counsel in an egregious and unacceptable manner.  Defendants' heinous statements
about Yuga Labs and its counsel during litigation, including calling Yuga Labs'
counsel "criminals" who support "racism, antisemitism, beastiality, pedophilia and

using cartoons to market drugs to young children," *see* Dkt. 149-50, Dkt. 149-51, far exceed the bounds of acceptable conduct. *See Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir. 2004) (finding "no difficulty" holding defendant's harassing and racist remarks towards plaintiff and their counsel an exceptional case); *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002) (affirming exceptional case where "defendant acted deliberately to and intended to harm the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "harass[] the plaintiff"). Throughout this case, Yuga Labs' counsel asked opposing counsel to reason with their clients and turn down the temperature of the improper attacks and threats to our safety. Defense counsel failed to take any responsibility or control. And so, Defendants maintained their tactics of ridiculous attacks throughout the entire case.

Further representative of the lack of control and respect for counsel and the Court, Defendants promised to Yuga Labs and the Court that they would not offer testimony on irrelevant and inflammatory issues at trial. *See* Dkt. 320-1 ¶ 6(A) (agreeing in proposed pretrial conference order not to introduce evidence or argument regarding "pedophilia," "4chan," or Defendants' "emotional distress counterclaims"); Dkt. 314 (agreeing in Defendants' proposal that they will not offer testimony regarding "the words 'Nazi' or 'Hitler'," "allegations concerning death threats or harassment," the "class action lawsuit brought against Yuga for securities fraud," or "the SEC investigation into Yuga for securities fraud"); Dkt. 334 at 60:13-14 (representing to Court "We don't want a mini trial on Naziism for sure"); *id*. at 61:9-11 ("I agree they should stand up and object if we start -- if anybody starts talking about -- ranting about how everybody at Yuga are a bunch of Nazis. That is clearly inappropriate and shouldn't be done."). Yet Defendants repeatedly violated these promises. *See* Cahen Decl. (Dkt. 344) ¶¶ 60, 65, 66, 67, 75, 90. 91, 96; Hickman Decl. (Dkt. 345) ¶¶ 55, 58, 59; Ripps Decl. (Dkt. 346) ¶¶ 59, 69, 152;

1    Trial Tr. at 265:17-18 (characterizing logo as a "Nazi log[o]"), 215:2-3 ("Pictures

2    of monkeys represent racism"), 118:18-120:22 (Defendants' counsel referring to

3    "racism," "racist imagery," and "hate speech"); Dkt. 395 at 9-10 (Defendants'

4    designation of testimony from Mr. Cahen accusing Yuga Labs of "Nazism, racism,

5    financial fraud, pedophilia").

6         Sixth, Defendants used the litigation to "farm" for engagement on social

7    media with the intent to further harm Yuga Labs and profit from their misconduct.

8    See JTX-938, JTX-1568, JTX-1617, JTX-1620.

9         Finally, Defendants' public disclosure of confidential material violated this

10   Court's Protective Order (Dkt. 51) and intentionally harmed Yuga Labs.  *See* Dkts.

11   180, 183, 194.  Defendants failed to take responsibility for this violation, instead

12   blaming Yuga Labs.  Dkt. 176.  This disclosure resulted in Highly Confidential –

13   Attorneys' Eyes Only materials being inaccurately reported in national media such

14   as CNN and falsely cited in other meritless litigation against Yuga Labs.

15   **Defendants' Response**:

16        Yuga's arguments that Defendants engaged in litigation misconduct are all

17   baseless.  Defendants—two individuals—sued by a multi-billion dollar company

18   litigated this case reasonably and in good faith.

19        First, Yuga attempts to use the fact that it was successful at summary

20   judgment and on Defendants' motion to dismiss to take the leap that Defendants'

21   positions were "frivolous."  A defeated position, is of course not automatically

22   frivolous.  *Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL

23   11630841 at *4-5 (C.D. Cal. 2017) (rejecting exceptional case finding in trademark

24   case because claims were not "frivolous"); *D.N. v. Los Angeles Unified Sch. Dist.*,

25   No. 18-cv-01582-AB-AFMx, 2019 WL 7841083 at *2 (C.D. Cal. Sept. 25, 2019).

26   Merely pointing to success is simply insufficient to carry its burden to prove that

27   Defendants' legal positions were frivolous in the exceptional case context.

28

Second, Yuga is the party that failed to engage in good faith settlement negotiations.  In fact, this Court noted that Yuga's settlement terms were "quite frankly unreasonable."  Dkt. 334 at 9:9-12.  Yuga sought to have Defendants sign away their right to criticize the company.  Defendants cherish their right to speak.  Not acquiescing to Yuga's "unreasonable" demands was entirely reasonable.

Third, as stated above and in several other places, there was no re-litigation of issues in this case.  Yuga is pressing an overly expansive "law of the case" argument which would hold that when a decision is made in one context, anything vaguely similar to that decision apply for the rest of the case.  However, the "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  All of the issues identified by Yuga are issues of intent.  Yuga is seeking disgorgement damages, so intent remains a relevant issue that has not been decided for disgorgement damages.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (referring to intent as a "highly important consideration"); *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022) (limiting disgorgement to conscious wrongdoers).

Fourth, Yuga wrongly attacks both Defendants and counsel for discovery.  But Yuga sought sanctions against Defendants six time—and six times Yuga was

denied.  Trial Tr. [Ripps] 269:21-270:2.  It is undisputed that Defendants produced "possibly hundreds of thousands" of documents to Yuga.  *Id.* at 270:12-15.  Further, Defendants believed in good faith that they handed all of the documents over to Yuga.  *Id.* at 270:16-18.  This of course includes the chat reflected in JTX-801.  *Id.* at 270:7-15.  It further alleges that trial testimony by Mr. Cahen was "rehearsed" or "irrelevant."  But Yuga failed to object each time on relevance so any relevance objection is waived.  *See* Trial Tr. [Cahen] at 229:3-13, 231:21-232:3, 234:24-235:5, 237:14-238:7.  Beyond that, each of the cited portions of the trial transcript are about issues of intent—an issue that is still a pertinent part of the case.  Likewise, the portions of deposition designations are unlike what happened in *Jackson v. Gaspar,* because in that case the parties were previously chastised for their conduct at deposition.  *Jackson v. Gaspar*, No. 2:19-cv-10450-DOC-E 2022 WL 2155975 at *5 (C.D. Cal. 2022) (citing prior docket entry sanctioning party).  Nor did Yuga ever bring any motion to reopen any deposition.

Fifth, Yuga's attempt to use easily distinguishable cases to leverage Defendants criticism of Yuga into an exceptional case finding lacks merit.  Yuga primarily invokes an out-of-circuit case about a white supremacist murderer making threats against his opposition in a lawsuit to support its case.  *Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 251-52 (7th Cir. 2004) (calling opposition in lawsuit a "race traitor" and threatening to place them in Concentration camps).  Defendants' tweets referenced by Mr. Ball in his declaration in support of the summary judgment motion are simply different in kind to the threats in *Te-Ta-Ma*.  *Compare* Dkts 149-50; 149-51 with *Te-Ta-Ma*, 392 F.3d at 251.  *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, (9th Cir. 2002), also provides no support for Yuga.  It involved a party showing up pretending to be the plaintiff at trade shows.  *Id.* at 894.  Nothing similar to that occurred in this case.

1    Sixth, Defendants did not violate any promises made in pre-trial filings or at

2    the pre-trial hearing.  Defendants' intent is relevant to damages.  *See Romag*

3    *Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (referring to intent as a

4    "highly important consideration"); *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-

5    JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022) (limiting

6    disgorgement to conscious wrongdoers).  The paragraphs that Yuga cites from

7    Defendants' declarations are explanations of their motivations or about confusion.

8    This is equally true for the designated deposition testimony that Yuga cites.  The

9    same is true for all of the deposition testimony cited by Yuga.  *See e.g.*, Trial Tr.

10   [Hickman] 215:1-3 (answering question "What do you mean protest the imagery?";

11   [Cahen] 265:15-18 (explaining why nobody would buy RR/BAYCs as confused

12   because of words on *RR/BAYC* logo).  References to Yuga and its agents

13   threatening actions is relevant to whether Yuga is entitled to equitable relief.  *See*

14   *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable

15   relief has violated conscience, or good faith, or other equitable principle, in his

16   prior conduct, then the doors of the court will be shut against him.") .

17   Lastly, Yuga's accusation that Defendants violated the protective order so

18   they could intentionally harm Yuga is not well-taken.  Yuga is aware that

19   Defendants worked hard to fully redact their summary judgment response in good

20   faith despite Yuga's exceedingly tardy request to seal.  *See* Dkt. 176 (explaining

21   situation).  This was despite being given ample time to provide their redaction

22   requests.  *See* 176-1 (explaining Yuga did not act for over one week).  There is

23   absolutely no evidence that Defendants did anything to intentionally harm Yuga.

24   To the extent that Yuga was harmed, it was through inadvertence (and was

25   addressed fully in the Court's order, Dkt. No. 194).

26

27

28

1          **Plaintiff's Reply**:

2          Defendants' response fails to justify their conduct throughout the course of

3    this litigation.  The circumstances of this litigation, independently and certainly in

4    totality, demonstrate that this is an exceptional case.

5          **First**, Defendants misstate the law in proposing that Lanham Act cases are

6    only exceptional where the losing party's position is "frivolous."  The correct

7    standard is whether, based on the "totality of the circumstances, the case "stands out

8    from others with respect to the substantive strength of a party's litigating position

9    (considering both the governing law and the facts of the case) or the unreasonable

10   manner in which the case was litigated." *SunEarth, Inc. v. Sun Earth Solar Power*

11   *Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting *Octane Fitness, LLC v. ICON*

12   *Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  Indeed, the Supreme Court

13   rejected the frivolousness standard Defendants propose in their response.  *Octane*

14   *Fitness*, 572 U.S. at 545 (reversing Circuit Court standard for exceptional case that

15   applied where "the litigation was both 'brought in subjective bad faith' and

16   'objectively baseless.").

17          The Court should instead ask whether the relative strength of the claims and

18   defenses in this litigation were exceptional.  Given the rejection of Defendants'

19   principal defenses at the motion to dismiss stage, the adjudication of liability

20   against Defendants and dismissal of their affirmative defenses at the summary

21   judgment stage (a rarity in trademark infringement litigation), and Defendants'

22   persistence in fighting those same claims and defenses through trial, this is an

23   exceptional case.  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL

24   2155975, at *5 (C.D. Cal. Feb. 24, 2022) (finding exceptional case where "it was

25   objectively unreasonable for Defendants to litigate as aggressively as they did on

26   the issue of liability.  There was no basis for Defendants to believe in success on the

27   merits on the issue of liability.").

28

*Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx, 2017 WL 11630841 at \*4-5 (C.D. Cal. 2017) does not help Defendants.  Though the prevailing defendant there argued that the claim was frivolous, the Court did not actually hold that to be the standard.  And in any event, that case is distinguishable, including because the prevailing defendants "did not bring a dispositive motion" allowing the Court to evaluate the sufficiency of the evidence before trial and because the plaintiff proved several aspects of its case in chief. *Id.* at \*4-5.  Here, by contrast, Defendants lost three dispositive motions on every element of liability for the parties' claims and defenses, and they still unreasonably proceeded to trial, seeking to relitigate those same issues.  Similarly, *D.N. v. Los Angeles Unified Sch. Dist.*, No. 18-cv-01582-AB-AFMx, 2019 WL 7841083 at \*2 (C.D. Cal. Sept. 25, 2019), cited by Defendants, is of no help.  It is a case about the Individuals with Disabilities Education Act and a motion for fees under a completely different statute.

Defendants' stubborn refusal to accept the court's summary judgment order and re-litigation of settled issues, all the way through trial, makes this an exceptional case.  Here, the case is even more exceptional given the strength of Yuga Labs' case of straightforward trademark infringement.  So, even if Defendants' arguments were not frivolous to start, Defendants continued pursuit of rejected arguments is frivolous now.

**Second**, the transcript that Defendants cite does not contain the words they attribute to the Court.  Their argument is also a misrepresentation of Yuga Labs' settlement offer and substantively unpersuasive. *See infra* ¶ 123.  Defendants do not dispute that they unreasonably demanded Yuga Labs to pay them even after losing the case on summary judgment.  And they never so much as offering a dollar in monetary terms to address their liability for trademark infringement.

**Third**, Defendants' argument that they were free to ignore the Court's summary judgment order and pretend it had no effect is baseless, as discussed

throughout this filing where Defendants make the same argument. *See, e.g.*, *supra* ¶ 9. Defendants' position is also contrary to what the Court signaled to the parties in the pretrial conference. Pretrial Conference Tr. at 4:5-8 ("What I want to try to accomplish today is to discuss the remaining claims in light of the Court's grant of summary judgment . . . ."). Defendants never sought any relief from the summary judgment order or leave to rechallenge those holdings at trial, but unilaterally decided to waste time and resources rehashing these issues at trial.

**Fourth**, even though Defendants were not "previously chastised for their conduct at deposition," that does not make their conduct acceptable. Nor do Defendants offer any authority that they must have been previously sanctioned for improper conduct in order for that conduct to contribute to the totality of the circumstances constituting an exceptional case. Defendants fail to dispute the remainder of their discovery misconduct or attempt to justify their improper concealment of relevant evidence, which similarly makes this an exceptional case.

**Fifth**, Defendants do not even attempt to frame their attacks on Yuga Labs, its employees, and its counsel as anything appropriate; they only argue that their conduct is not as bad as "a white supremacist murderer" in the cited case. But they underplay the severity of Defendants' conduct. This was not mere criticism as Defendants contend; it was cruel-hearted harassment to intimidate Yuga Labs and its counsel. *See* Dkt. 334 (When Yuga Labs' counsel raised this issue at the June 9 pretrial conference, claiming that criticism is different that Defendants' attacks against Yuga Labs and its attorneys, the Court responded: "I understand their conduct is absolutely horrible, and you know, I don't disagree."). For example, Mr. Ripps called Yuga Labs "demonic evil liars," comparing the company to Jeffrey Epstein. Dkt. 149-50. Defendants threatened Yuga Labs with images portraying Mr. Cahen next to a grave marked "Yuga Labs," Mr. Ripps and Mr. Cahen holding a gun and a knife up to Yuga Labs, and Mr. Cahen hoisting the severed head of one of the founders' apes over his head. *Id.* Mr. Cahen targeted another Yuga Labs

founder by falsely tweeting: "[h]e's named after [a] banned 1971 child porn film."
[3] He further tweeted that the founder "REFUSES to change his name,"[4] based on
the founder's response to a question from an ongoing Highly Confidential –
Attorneys' Eyes Only deposition. *See* Atalay Depo. (Dkt. 271) at 157-160
(showing testimony and break taken 42 minutes prior to Mr. Cahen's Tweet).

Defendants targeted Yuga Labs' counsel too, accusing Yuga Labs' lead
attorney of supporting "racism, antisemitism, beastiality, pedophilia, and using
cartoons to market drugs to young children." Dkt. 149-51. Mr. Ripps likewise sent
a "personal message" to the attorney, posting an image stating: "Hey maybe you
can suck my d**k." *Id.* (censored). This offensive and harassing conduct is par for
the course for Defendants. Mr. Ripps' tumblr account is plastered with racist and
offensive content.[5] And near the end of August 2023, Mr. Ripps was permanently
suspended from Twitter for sending violent death threats.[6]

Whether or not Defendants' conduct is "typical" in their circles (an
unsupported proposition that Yuga Labs disputes), in federal court, it is "egregious
and beyond the pale of acceptable litigation conduct." *See TE-TA-MA*, 392 F.3d at
264; *see also AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893,
894 (9th Cir. 2002) (affirming exceptional case where "defendant acted deliberately
to and intended to harm the plaintiff by using its mark" which was "especially
egregious" because defendant "continue[d] to use the mark after notice of
violation" and continued to "harass[] the plaintiff"). And despite it all, Defendants'
counsel did not stop Defendants' egregious conduct. Instead, even in the post-trial
briefing, they seem to condone it. Defense counsel's failure to work with Plaintiff's
counsel to bring the temperature down in this case, and litigate on the facts, rather

---

[3] https://twitter.com/Pauly0x/status/1620158732872331264
[4] *Id.*
[5] https://twitter.com/nft_decency/status/1538961466015076352
[6] https://twitter.com/PopPunkOnChain/status/1700226047612977249

1  than Defendants' attacks, is exceptional.  Defendants' conduct warrants a finding

2  that this is an exceptional case.

3      **Sixth**, Defendants defend their misrepresentation to Yuga Labs and the Court

4  about the scope of evidence and testimony they would offer at trial by vaguely

5  stating their baseless accusations put into the trial record about racism, Naziism,

6  antisemitism, pedophilia, and other inflammatory topics relate to "confusion" or

7  their motivations.  Critically, even if there were a colorable basis for that argument,

8  Defendants do not explain why they represented to the Court that they would not

9  offer this testimony and did so anyway.  Defendants' refusal to honor their

10  promises and statements to the Court make this an exceptional case.

11      **Finally**, Defendants continue to admit their violation of the Protective Order

12  while failing to explain why, for instance, they immediately and intentionally sent

13  Highly Confidential Attorneys' Eyes Only materials to reporters after failing to

14  redact it.  Defendants also disclosed Highly Confidential - Attorneys' Eyes Only

15  materials in their filing that were not even part of the redaction requests they had

16  sent before filing.  As such, Defendants' admitted breach of the Protective Order

17  cannot be explained through their inaccurate claim that Yuga Labs contributed to

18  their violation.

19      This pattern of conduct is not typical and it is not excusable—especially

20  where the strength of Yuga Labs' affirmative case and the weakness of Defendants'

21  defenses was clear from the outset.  Defendants' tactics served only to raise the

22  temperature of the litigation and exact additional cost at every turn.  This conduct

23  certainly "stands out" from other cases and warrants a finding that the case is

24  exceptional, both to compensate Yuga Labs for the unnecessarily high cost of this

25  litigation and to deter others from acting in such a manner in future proceedings.

26  <u>**Defendants' Disputed Post Trial Finding of Fact No. 123:**</u>

27      <u>In the course of this litigation, Yuga has made settlement demands including</u>

28  <u>conditions that are unreasonable such as a non-disparagement clause that would</u>

1  prevent Defendants from ever criticizing Yuga. Dkt. 317 [Hearing Transcript June

2  16, 2023, at 10:15-11:13].

3  **Plaintiff's Basis for Dispute:**

4  Defendants' attempts to evade responsibility for their egregious litigation

5  misconduct by pointing a finger at Yuga Labs has no relevance.  The losing party in

6  a Lanham Act case cannot defend against an exceptional case finding by accusing

7  the prevailing party of engaging in similar misconduct.  *See Jackson v. Gaspar*, No.

8  2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022)

9  (finding exceptional case amidst allegations that "[b]oth parties conducted

10  themselves poorly at times throughout litigation" where "Defendants' conduct was

11  worse and more frequent than [plaintiff's].").  Even so, this contention is incorrect.

12  During the course of settlement discussions, Yuga Labs initially sought a

13  reasonable non-disparagement clause to protect the company's representatives, their

14  families, and counsel given Defendants' history of making personal, targeted,

15  heinous claims and in the context of foregoing certain other relief to which it would

16  be entitled through litigation, as one proposed compromise.  Non-disparagement

17  clauses are typical in litigation settlements.  Defendants however claimed that a

18  non-disparagement clause was a barrier to them entering into a settlement.  This

19  proved to be another lie by Defendants.  After Yuga Labs ***withdrew its request for***

20  ***a non-disparagement clause,*** Defendants still refused to negotiate a settlement in

21  good faith.  In particular, Defendants refused to offer a single dollar in settlement to

22  pay for their profits or statutory damages, even after being held liable.  Defendants

23  likewise refused to agree to stop promoting their infringing NFTs or Ape Market,

24  which promoted sales of RR/BAYC NFTs.  *See supra* ¶ 117.  After the Court found

25  that Defendants infringed on Yuga Labs' BAYC Marks, including through the

26  RR/BAYC NFT smart contract and cybersquatting of rrbayc.com and

27  apemarket.com, they still refused to transfer control of this smart contract or

28  domains to Yuga Labs.

It is clear that Defendants will continue to criticize Yuga Labs, as they have been, but this does not entitle them to continue their trademark infringement or avoid responsibility for their conduct.

**Defendants' Response:**

Yuga's citation to *Jackson* is simply incorrect.  That case states, "The Court also considers the conduct of ***both parties*** throughout the case."  *Jackson v. Gaspar, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at \*5 (C.D. Cal. Feb. 24, 2022)*. The non-disparagement clause was specifically criticized by this Court as being an unreasonable demand.  Dkt. 317 at 10:15-11:13.

Yuga also never actually withdrew their demand for non-disparagement. They simply re-hashed their non-disparagement clause in the form of overbroad injunction terms that would have the same effect: silencing criticism from Mr. Ripps and Mr. Cahen.   *See* Yuga Proposed Findings of Fact and Law ¶ No.IV.4.1; Trial Tr. [Muniz] 94:5-13.

**Plaintiff's Reply:**

Defendants' finger-pointing does not excuse their contemptuous conduct toward the legal system and their adversaries.  Yuga Labs litigated this case fairly and successfully, and Defendants' various complaints have no merit.

In *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975 (C.D. Cal. Feb. 24, 2022), the court did consider the conduct of both parties.  But even in that case, where the plaintiff *did* engage in poor conduct, the court found an exceptional case in the plaintiff's favor.  *Id.* at \*5 ("Both parties conducted themselves poorly at times throughout litigation.  However, Defendants' conduct was worse and more frequent than [Plaintiff]'s.  Therefore, the Court finds that based on the conduct of the parties, this case is exceptional under the Lanham Act and will award [Plaintiff] attorneys' fees.") (citations omitted).  Even where there was a finding that the plaintiff engaged in bad litigation conduct, that did not preclude a finding of exceptional case where the defendant's conduct was, as here,

"worse and more frequent."

Defendants' claim that Yuga Labs "never actually withdrew their demand for non-disparagement" is simply false. Defendants admit this, now acknowledging that the non-disparagement clause was no longer a settlement demand, but they walk back their previous representations by claiming the proposed injunction is itself a non-disparagement clause. But Defendants' characterization of the proposed injunction as akin to a non-disparagement order is wrong. The proposed injunction does not prohibit criticism, as Mr. Solano repeatedly stated at trial. *See infra* ¶ 124.

Defendants had no good-faith intent to resolve this case before trial. And even now, during the parties' most recent meet and confer, Defendants refused to provide their version of a complete injunction for the Court to assess—e.g., an injunction in a complete proposed order form as Yuga Labs did in its Conclusions of Law (Dkt. 416). Defendants' refusal to provide an alternative injunction is an example of the continued stubborn refusal to accept their litigation position. And given Defendants' refusal to provide an alternative injunction, the Court should enter Yuga Labs' proposed injunction.

Defendants' misrepresentations about the parties' settlement positions (eventually rescinded in this briefing to clarify that Yuga Labs did not, in fact, persist in demanding a non-disparagement clause) and their efforts to make this litigation as cumbersome as possible are all factors that make this case exceptional.

**Defendants' Disputed Post Trial Finding of Fact No. 124:**

At trial, Yuga's corporate representative confirmed its intent to silence Defendants by testifying that "[t]hey should not have the right to say 'Bored Ape Yacht Club' again." Trial Tr. [Muniz] 94:5-13.

**Plaintiff's Basis for Dispute:**

Yuga Labs' former CEO did not testify that Yuga Labs intends to "silence" Defendants. Rather, the context of Ms. Muniz's testimony is clear that she was

speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club trademark to promote products. Trial Tr. at 94:5-13. There is no debate that Yuga Labs is seeking an injunction to stop Defendants' infringement of its marks. The terms of the injunction that Yuga Labs contends is appropriate in this case are clear from its proposed findings of fact and conclusions of law. Dkt. 416. Yuga Labs has not sought to limit Defendants' criticisms of Yuga Labs through its proposed injunction. What is also clear is that Defendants refuse to accept any reasonable injunctive relief, even though the Court has already found that Yuga Labs is entitled to injunctive relief. Dkt. 418-1.

**Defendants' Response:**

Ms. Muniz clearly testified at trial regarding Yuga's intent to silence the Defendants: "***They should not have the right to say "Bored Ape Yacht Club" again.***" Trial Tr. [Muniz] 94:12-13 (answering question about scope of injunction). As written, the injunction would likely force Mr. Ripps and Mr. Cahen to avoid criticism that references Yuga and possibly lead to Mr. Ripps having to shut off gordongoner.com. As Defendants have consistently maintained, that is simply not acceptable to them and is too broad.

**Plaintiff's Reply:**

The terms of Yuga Labs' proposed injunction are exactly what they appear. *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at IV (Conclusion). Those terms are not overbroad or prohibitive of "criticism." *Id.*; *infra* ¶ 143.

A witness's personal belief about what defendants *should* do in the future does not determine the propriety of the injunction actually proposed and entered, and so Defendants have no basis to avoid an injunction on these grounds. But even so, Defendants misleadingly cite to Ms. Muniz's testimony. The context of this series of questions was about Defendants' use of the BAYC Marks "to promote" goods in the future (Trial Tr. 94:5-5), and the question asked was "Do *you want*

them never to say 'Bored Ape Yacht Club' again?" (Trial Tr. 10-13) (emphasis added).  Ms. Muniz's desire for Defendants to stop using Yuga Labs' brand, in the context of counterfeit goods, aligns with what the proposed injunction appropriately seeks to prohibit.

Indeed, Mr. Solano's testimony on clearer questions confirms what is clear from the text of Yuga Labs' proposed injunction: it is not overbroad and does not seek to "silence" anyone:

> Q  Under what Yuga has requested, Yuga has requested a
> prohibition on Mr. Ripps and Mr. Cahen promoting
> criticism of Yuga Labs using the words "BAYC" or
> "Bored Ape Yacht Club"; isn't that right?
> A  I'm not aware of this, no.

Trial Tr. at 50:11-15.

> Q  Is it your understanding whether Yuga Labs is seeking
> an injunction to enjoin Mr. Ripps's or Mr. Cahen's
> criticisms?
> A  No. My understanding is that we want to prevent them
> from doing things like they did in promoting Ape Market,
> where they created an advertisement and they
> workshopped it internally.  And it says, quote, "Dear
> Yuga Community."

Trial Tr. at 51:11-17.

> Q  Should Mr. Ripps and Mr. Cahen be allowed to
> criticize Bored Ape Yacht Club?
> A  Yes.
> Q  Should they be allowed to use the terms "BAYC" and
> "Bored Ape Yacht Club" to make those criticisms?

1          A  They can criticize Bored Ape Yacht Club and use

2          those words.  But if you are trying to say that criticism

3          also means selling exact same NFTs to all the exact same

4          people on the exact same marketplaces, that's absurd.

5   Trial Tr. at 64:3-11.

6          Q  You don't disagree that even after this lawsuit, no

7          matter what happens, Mr. Ripps and Mr. Cahen should

8          still be allowed to criticize Yuga and use the words

9          "Bored Ape Yacht Club" when they do so; right?

10         A  I fully anticipate that they will be criticizing us, yes.

11  Trial Tr. at 65:17-22.

12  **Defendants' Disputed Post Trial Finding of Fact No. 125:**

13      Yuga engaged in conduct in the litigation of this case that precludes an

14  exceptional case finding in its favor.

15  **Plaintiff's Basis for Dispute:**

16      Defendants' attempts to evade responsibility for their egregious litigation

17  misconduct by pointing a finger at Yuga Labs fail.  The losing party in a Lanham

18  Act case cannot defend against an exceptional case finding by accusing the

19  prevailing party of engaging in similar misconduct.  *See Jackson v. Gaspar*, No.

20  2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022)

21  (finding exceptional case amidst allegations that "[b]oth parties conducted

22  themselves poorly at times throughout litigation" where "Defendants' conduct was

23  worse and more frequent than [plaintiff's].").

24      Defendants' persistent refusal to take any responsibility for their conduct

25  merely highlights how their tactics have increased the time and expense of this

26  litigation.

27

28

1   **Defendants' Response**:

2       Yuga is incorrect as a matter of law.  Their cited case actually directly stands

3   for the proposition that Defendants advance stating, "The Court also considers the

4   conduct of **both parties** throughout the case."  *Jackson v. Gaspar*, No. 2:19-CV-

5   10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022).  This makes

6   sense, because an exceptional case finding is equitable relief.  *Ramirez v. Collier*,

7   142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated

8   conscience, or good faith, or other equitable principle, in his prior conduct, then the

9   doors of the court will be shut against him.") (internal quotations and citations

10  omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case

11  finding is an exercise of the court's equitable powers).

12      Yuga's actions in this litigation have been reprehensible.  Two of their key

13  witnesses blew off their depositions despite being ordered to attend.  Dkt. 77 at 2;

14  Trial Tr. [Solano] 49:8-21 (acknowledging non-attendance at deposition *after* being

15  ordered by court to attend).  Yuga was ordered to pay the costs associated with their

16  non-attendance.  They have not.  Yuga also served depositions and facially invalid

17  subpoenas on people largely or entirely unrelated to the case, including Ryder's

18  father.  Yuga attempted to hide Ryan Hickman's deposition testimony from public

19  view by marking it entirely highly confidential-attorney's eyes only.  The Court

20  ordered them to be more reasonable and not "hold the transcript hostage."  Dkt. 133

21  at *2.  Lastly, Yuga made a pattern and practice of seeking sanctions and losing.

22  *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt.

23  198 at 4; Dkt. 210 at 18-20.  These requests for sanctions were obviously intended

24  to overwhelm two individual Defendants into a place a panic and fear.  In short, the

25  Court should consider Yuga's litigation misconduct in determining whether they

26  are entitled to the equitable exceptional case finding.

27      **Plaintiff's Reply**:

28      Defendants' finger-pointing does not excuse their contemptuous conduct

toward the legal system and their adversaries.  Yuga Labs litigated this case fairly and successfully, and Defendants' various complaints have no merit.

In *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975 (C.D. Cal. Feb. 24, 2022), the court did consider the conduct of both parties.  But even in that case, where the plaintiff *did* engage in poor conduct, the court found an exceptional case in the plaintiff's favor.  *Id.* at *5 ("Both parties conducted themselves poorly at times throughout litigation.  However, Defendants' conduct was worse and more frequent than [Plaintiff]'s.  Therefore, the Court finds that based on the conduct of the parties, this case is exceptional under the Lanham Act and will award [Plaintiff] attorneys' fees.") (citations omitted).  Even where there was a finding that the plaintiff engaged in bad litigation conduct, that did not preclude a finding of exceptional case where the defendant's conduct was, as here, "worse and more frequent."  The frequency and degree of Defendants' litigation conduct (including refusing to accept court orders and concealing discovery) far outweighs even their mischaracterization of the discovery skirmishes Defendants complain of here.

First, Yuga Labs' witnesses did not "bl[o]w off" their depositions.  Yuga Labs informed Defendants prior to the deposition that Mr. Aronow had a medical emergency for what he has now publicly announced was heart failure.  Defendants took his deposition at a later date.  As to Mr. Solano, "the Court direct[ed] the parties to meet and confer in good faith" on arrangements for his deposition; and the deposition was taken less than a week after it was originally scheduled.  Yuga Labs has not paid costs associated with the depositions because Defendants ignored Yuga Labs last correspondence on the issue and have not filed any application for their reasonable costs with the Court.  Defendants also have not paid Yuga Labs the higher costs that Defendants owe under Fed. R. Civ. P. 26(b)(4)(E) for the depositions of Yuga Labs' experts.

Second, Yuga Labs did not serve any inappropriate subpoenas.  Yuga Labs pursued discovery from a number of third parties largely due to Defendants' obstructive approach toward discovery, and indeed the subpoena recipients produced documents that Defendants had withheld.  For example, Yuga Labs received the code for Ape Market and the Ape Market chat that is frequently cited herein (JTX-801) long before Defendants produced the records.  Mr. Hickman provided a financial accounting of the group's scam before Defendants did.  Other third parties revealed the scope of Defendants' intentionally confusing activities and marketing efforts.

Defendants allege falsely that Mr. Ripps' father was "entirely unrelated" to this litigation but fail to disclose that ***defendants themselves identified him*** on their Fed. R. Civ. P. 26 disclosures as a person with relevant information.  Rodney Ripps was also a co-member with Defendants Ripps in Live9000 LLC, a Nevada limited liability company, Mr. Ripps used as an attempt to avoid being sued personally for Defendants' scam (JTX-801.57 ("i think we should add on the site somewhere [] LIVE9000 LLC [] i dont want to get sued personally")) and to which Defendant Ripps transferred proceeds from his infringement.  Defendants have no basis to suggest that Yuga Labs should not seek discovery from witnesses Defendants themselves identified for trial.

Third, Yuga Labs did not attempt to "hide" Mr. Hickman's deposition testimony, but rather asked Defendants to first clarify which portions of their materials contained therein were Highly Confidential – Attorneys' Eyes Only.  Defendants refused to do so, leading to a dispute in which the Court ordered Defendants' compliance with the Protective Order, after which Yuga Labs would be required to de-designate the transcript—which the Court observed was "a result Yuga recommended" for an outcome of the dispute.  Dkt. 133 at 3.

Fourth, Yuga Labs' requests for discovery sanctions were appropriate and consistent with Fed. R. Civ. P. 37 and the Court's Local Rules.  Yuga Labs

prevailed to some degree on ***every single motion*** Defendants reference, but the Court did not impose sanctions.  Dkt. 133 (order on Defendants' motion to de-designate Mr. Hickman's deposition); Dkt. 145 (order compelling Defendants' to produce documents, requiring Defendants to submit declarations, and warning Defendants of "monetary sanctions" for failure to comply); Dkt. 114 (Defendants' withdrawal of ex parte application); Dkt. 119 (order denying Defendants' ex parte application to shorten time); Dkt. 215 (order denying Defendants' ex parte application to file a sur-reply).  The requests were not improper merely because the Court declined to impose sanctions; they were attempts to enforce the rules against Defendants who had bragged about making millions from their infringement but who failed to engage fairly in discovery and motion practice.  And, far from being in a "panic and fear" as a result of Yuga Labs' meritorious discovery motions, Defendants frequently sought to capitalize on this litigation by using it as a marketing opportunity.  *See, e.g.*, *supra* ¶ 121 (discussing Defendants' social media engagement farming).

None of Yuga Labs' conduct in appropriately litigating its meritorious case is "reprehensible" and Defendants' attempt to muddy the waters through false equivalences merely highlights their dishonest approach to this litigation.

**Defendants' Disputed Post Trial Finding of Fact No. 126:**

Yuga tried to preclude relevant discovery by invoking the "apex witness" rule to improperly to block the depositions of Greg Solano (who testified at trial) and Wylie Aronow. The Court found Yuga's motion "deficient on the merits" because the witnesses at issue were "the only people who have knowledge of the creation of the marks." Dkt. 77 at 2. The Court accordingly ordered that Yuga employees Wylie Aronow and Greg Solano appear for depositions on January 9 and 11 respectively (excusing Mr. Solano only if he had medical complications). *Id*. Neither witness appeared as ordered.  *See, e.g.*, Trial Tr. 49:8-19 [Solano] ("Q You did not appear for your deposition on January 11th, 2023; correct? A Yes. I was in an international

business meeting, and I appeared the next week. Q The reason you did not appear was because of this business meeting; correct? A Yes. Q Yuga had filed a motion asking to excuse your appearance in part because of this business meeting; correct? A That's correct. Q The Court denied Yuga's motion; correct? A That's correct.")

**Plaintiff's Basis for Dispute:**

Defendants' attempts to evade responsibility for their egregious litigation misconduct by pointing a finger at Yuga Labs fail.  The losing party in a Lanham Act case cannot defend against an exceptional case finding by accusing the prevailing party of engaging in similar misconduct.  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022) (finding exceptional case amidst allegations that "[b]oth parties conducted themselves poorly at times throughout litigation" where "Defendants' conduct was worse and more frequent than [plaintiff's].").  Even so, this contention is incorrect.

Yuga Labs never attempted to preclude depositions of its witnesses.  Yuga Labs asked Defendants to complete a Rule 30(b)(6) deposition before deciding whether it was necessary to depose Mr. Solano and Mr. Aronow, and it sought a protective order when Defendants refused.  Dkt. 75.  The Court disagreed, and Yuga Labs produced both witnesses for deposition.  Mr. Aronow was unable to appear for his deposition the day after the Court's order because of a medical emergency.  The Court ordered the parties to meet and confer as to a date of the deposition for Mr. Solano, Dkt. 77 at 2, which Yuga Labs did, and Mr. Solano appeared for his deposition days later.

**Defendants' Response:**

Yuga is incorrect as a matter of law.  Their cited case actually directly stands for the proposition that Defendants advance stating, "The Court also considers the conduct of ***both parties*** throughout the case."  *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022).  This makes sense, because an exceptional case finding is equitable relief.  *Ramirez v. Collier*,

142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case finding is an exercise of the court's equitable powers).

It is undisputed that Mr. Solano failed to attend his deposition on January 11, 2023 even though he was ordered to by the Court.  Dkt. 77 at 2; *See* Trial Tr. [Solano] 49:8-19 (admitting that he failed to attend because of a business meeting). Mr. Aronow was ordered to appear on January 9, 2023 full stop—and he did not attend.  Dkt. 77 at 2.  The parties were supposed to "meet and confer" for a new date in the event he skipped his deposition with costs to be awarded to Defendants for his non-attendance.  *Id.*  Yuga still has not paid its costs.  Yuga offers no meaningful excuse for its failure to comply with the Court's order.

**Plaintiff's Reply:**

Yuga Labs informed Defendants prior to the deposition that Mr. Aronow had a medical emergency for what he has now publicly announced was heart failure. Defendants took his deposition at a later date.

As to Mr. Solano, "the Court direct[ed] the parties to meet and confer in good faith" on arrangements for his deposition; the deposition was taken less than a week after it was originally scheduled.  The text of the order makes clear that Mr. Solano was not "ordered to by the Court" to attend the deposition as originally scheduled, as Defendants incorrectly state above.  *See* Dkt. 77 at 2.

The end result was that Defendants were able to depose both witnesses without undue delay or any prejudice.  Yuga Labs has not paid costs associated with the depositions because Defendants ignored Yuga Labs last correspondence on the issue and have not filed any application for their reasonable costs with the Court.

1    Finally, Defendants' effort to distinguish *Jackson v. Gaspar*, No. 2:19-CV-

2    10450-DOC-E, 2022 WL 2155975 (C.D. Cal. Feb. 24, 2022) is misguided. *Supra*

3    ¶ 125.

**Defendants' Disputed Post Trial Finding of Fact No. 127:**

5    Yuga also improperly designated the entirety of third-party Ryan Hickman's

6    deposition testimony as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY in

7    violation of the Court's protective order as the transcript contained no Yuga

8    confidential information. *See* Dkt. 123-2. The Court ordered complete de-designation

9    of the transcript and found that Yuga was wrong to "hold the transcript hostage."

10   Dkt. 133 at 2.

**Plaintiff's Basis for Dispute:**

12   Defendants' attempts to evade responsibility for their egregious litigation

13   misconduct by pointing a finger at Yuga Labs fail.  The losing party in a Lanham

14   Act case cannot defend against an exceptional case finding by accusing the

15   prevailing party of engaging in similar misconduct. *See Jackson v. Gaspar*, No.

16   2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022)

17   (finding exceptional case amidst allegations that "[b]oth parties conducted

18   themselves poorly at times throughout litigation" where "Defendants' conduct was

19   worse and more frequent than [plaintiff's].").  Even so, this contention is incorrect.

20   Defendants mischaracterize this dispute.  As the Court observed,

21   "Defendants, not Yuga, designated the documents discussed at Ryan Hickman's

22   deposition as highly confidential ('HC') and attorneys' eyes only ('AEO')."  Dkt.

23   133 at 1.  Consistent with Yuga Labs' reading of the Protective Order, Yuga Labs

24   kept the deposition transcript under similar protection "because HC/AEO

25   documents were discussed at the deposition," *id.*, and Defendants refused to specify

26   which portions of those underlying documents they contended were no longer

27   HC/AEO.  The Court noted Defendants' indiscriminate confidentiality

28   designations, holding that Yuga Labs was "not wrong that Defendants are obliged

by the Protective Order to ensure HC/AEO material is 'clearly so designated.'" *Id.*
at 3.  Accordingly, the Court ordered the transcript to be made public and ordered
Defendants to comply with the Protective Order by "reproduc[ing] and
redesignat[ing] the HC/AEO documents discussed at the deposition to 'clearly
identify the protected portion(s)'" – the "result Yuga recommended if the Motion
was granted." *Id.*

**Defendants' Response:**

Yuga is incorrect as a matter of law.  Their cited case actually directly stands
for the proposition that Defendants advance stating, "The Court also considers the
conduct of ***both parties*** throughout the case." *Jackson v. Gaspar*, No. 2:19-CV-
10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022).  This makes
sense, because an exceptional case finding is equitable relief. *Ramirez v. Collier*,
142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated
conscience, or good faith, or other equitable principle, in his prior conduct, then the
doors of the court will be shut against him.") (internal quotations and citations
omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case
finding is an exercise of the court's equitable powers).

The Court was clear that Yuga took an untenable position regarding its over-
designation of Mr. Hickman's deposition. *See* Dkt 133 at 2 ("The Court does not
understand why Yuga designated the entire Hickman deposition transcript as
HC/AEO, even the portions not discussing HC/AEO documents. The Court also
faults Yuga for conditioning de-designation of the Hickman deposition transcript on
obtaining de-designation of the HC/AEO documents discussed at the Hickman
deposition.).  It clearly held Yuga at fault for its actions, chastising Yuga for
"holding the transcript hostage." *Id.*  The fact that the Court granted relief that
Yuga suggested if it lost the motion does not change the fact that Yuga acted
wrongfully and did, in fact, lose.

**Plaintiff's Reply:**

Defendants' efforts to excuse their pervasive misconduct by reference to this confidentiality designation dispute are unavailing.  The type and degree of conduct at issue are not comparable.  No party was harmed or prejudiced by the fact that Yuga Labs maintained the confidentiality of a transcript, *which contained materials Defendants designated as Confidential or HC-AEO*, in a good-faith attempt to comply with the Protective Order and Defendants' own confidentiality designations.

Yuga Labs disagrees, however, with Defendants' characterization of the outcome of the motion.  Defendants do not dispute that they wrongfully applied blanket confidentiality designations to materials that were disclosed throughout Mr. Hickman's deposition; they do not dispute that their refusal to comply with the Protective Order's instructions regarding designations precipitated the dispute; and they do not dispute that the Court found them to have violated the confidentiality-designation portions of the Protective Order and compelled their compliance.  Yuga Labs does not dispute that the Court found that it should have moved for relief directly instead of asking Defendants to comply before disclosing the transcript, and Yuga Labs accepted that decision.  Once Defendants complied with the order for them to appropriately designate their documents, Yuga Labs promptly designated the transcript as public.  The Court's order reflected Yuga Labs' compromise proposal.

Even so, as discussed above, Defendants' pointing the finger back at Yuga Labs does not do away with the exceptional nature of the case.  In *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975 (C.D. Cal. Feb. 24, 2022), the court indeed considered the conduct of both parties.  But even in that case, where the plaintiff *did* engage in poor conduct, the court found an exceptional case in the plaintiff's favor.  *Id.* at *5 ("Both parties conducted themselves poorly at times throughout litigation.  However, Defendants' conduct was worse and more

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                              617                              Case No. 2:22-cv-04355-JFW-JEM

frequent than [Plaintiff]'s.  Therefore, the Court finds that based on the conduct of the parties, this case is exceptional under the Lanham Act and will award [Plaintiff] attorneys' fees.") (citations omitted).  In other words, even where there was a finding that the plaintiff engaged in bad litigation conduct, that did not preclude a finding of exceptional case where the defendant's conduct was "worse and more frequent."

**Defendants' Disputed Post Trial Finding of Fact No. 128:**

Throughout the course of this litigation, Yuga also made repeated improper requests for sanctions against the individual defendants. Specifically, Yuga unsuccessfully asked the Court to impose sanctions six times. Trial Tr. [Ripps] 269:21-270:2; *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20. Each request was denied.

**Plaintiff's Basis for Dispute**

Fed. R. Civ. P. 37(d) and L.R. 37-4 allow for sanctions to be granted in discovery disputes.  Defendants repeatedly forced Yuga Labs to seek relief from the Court based on their improper discovery conduct; Yuga Labs requested such sanctions as appropriate under those rules.  These requests were not improper.

**Defendants' Response:**

Seeking sanctions is a very serious manner.  Seeking sanctions ***six times***, and being denied ***all six times***, is a litigation strategy plainly meant to make Defendants'—two individuals facing a multi-billion dollar company—defense as expensive and painful as possible.  As such, it was an improper attempt to intimidate Defendants through excessive litigation.

**Plaintiff's Reply:**

Violating Court orders and discovery obligations is also a very serious matter.  Defendants do not dispute that they did so repeatedly and had to be compelled to cooperate in discovery repeatedly.  Yuga Labs' requests to shift the

costs of Defendants' abusive discovery tactics to Defendants, as the rules permit, was not improper in any way.

Yuga Labs prevailed to some degree on ***every single motion*** Defendants reference, but the Court did not impose sanctions.  Dkt. 133 (order on Defendants' motion to de-designate Mr. Hickman's deposition); Dkt. 145 (order compelling Defendants' to produce documents, requiring Defendants to submit declarations, and warning Defendants of "monetary sanctions" for failure to comply); Dkt. 114 (Defendants' withdrawal of ex parte application); Dkt. 119 (order denying Defendants' ex parte application to shorten time); Dkt. 215 (order denying Defendants' ex parte application to file a sur-reply).  The requests were not improper merely because the Court declined to impose sanctions; they were attempts to enforce the rules against Defendants who had bragged about making millions from their infringement but who failed to engage fairly in discovery and motion practice.

Defendants essentially argue that they should not have been required to participate fully in discovery or comply with the rules because, despite hiring a sophisticated law firm as counsel on this matter, they are "individuals" instead of a large "company."  That argument failed in discovery, *see, e.g.*, Dkt. 109-1 at 17 (arguing "[d]iscovery in this case has been highly burdensome on the Defendants because they had to manually collect and produce massive quantities of private materials"), and it lacks merit here.

Finally, Defendants fail to explain how Yuga Labs' meritorious claims, on which it has prevailed, constitute "excessive litigation" that is "an improper attempt to intimidate."  Yuga Labs is entitled to petition the Court to remedy the harm of Defendants' wrongdoing.

## **CONCLUSIONS OF LAW**

Joint Stmt. re Defendants' Proposed Post-
Trial Findings of Fact and Conclusions of
Law and Yuga Labs' Objections                                    619                            Case No. 2:22-cv-04355-JFW-JEM

**Defendants' Disputed Post Trial Conclusion of Law No. 130:**

Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).

**Plaintiff's Basis for Dispute:**

Defendants' conclusion of law is false. The cited case does not hold that disgorgement is "only" warranted in cases of conscious wrongdoers. To the contrary, this case found that willfulness is a sufficient, but not necessary, condition to a disgorgement finding. *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548, 2022 WL 4596697, at *17 ("willfulness is not an inflexible precondition to recovery of a defendant's profits under § 35(a) of the Lanham Act") (cleaned up); *see also Harbor Breeze Corporation v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022) ("a plaintiff need not show that a defendant acted with a particular mental state, such as willfulness, in order to be entitled to an award of profits."). The Lanham Act does not contain a willfulness requirement, and Yuga Labs' only burden is to prove Defendants' sales. 15 U.S.C. § 1117(a) (allowing plaintiff "to recover . . . defendant's profits."). Defendants cite no case to the contrary. Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts. *See supra* ¶¶ 17-31; *see also* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.

**Defendants' Response:**

The Supreme Court has undisputedly held that an infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). And courts in this jurisdiction have recognized that disgorgement is appropriate in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-

1  JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  The holding in

2  *MGA Entertainment* explained:

3

4      ***Principles of equity and restitution recognize that disgorgement of***
       ***profits is typically appropriate in cases involving "conscious***
5      ***wrongdoers;"*** in those cases, plaintiffs seek disgorgement of profits not
       necessarily to be made whole, but to prevent the defendant from retaining
6      gains made possible by its wrongdoing.  See Restatement (Third) of
       Restitution and Unjust Enrichment § 51 (2011) ("***This profit-based***
7      ***measure of unjust enrichment determines recoveries against conscious***
       ***wrongdoers*** and defaulting fiduciaries.  Recovery so measured may
8      potentially exceed any loss to the claimant.").

9

10 *MGA Ent. Inc.*, 2022 WL 4596697, at *17 (emphasis added).

11        **Plaintiff's Reply:**

12        Defendants' response regurgitates the same citation from *MGA* without

13 addressing the fact that they misstated the law.  The quoted language reaffirms that

14 being a "conscious wrongdoer" is not a necessary condition for disgorgement of

15 profits and recognizes that disgorgement can be sought in circumstances without

16 regard to intent, e.g., as part of an effort "to be made whole." *MGA Ent. Inc.*, 2022

17 WL 4596697, at *17.  Moreover, Defendants make no effort to distinguish the

18 Ninth Circuit's unequivocal holding that "a plaintiff need not show that a defendant

19 acted with a particular mental state, such as willfulness, in order to be entitled to an

20 award of profits." *Harbor Breeze Corporation*, 28 F.4th at 38.  Intentional

21 infringement is not necessary for disgorgement.  Indeed, as the Court has already

22 observed, Defendants are incorrect to argue that intent is required for the Court to

23 order disgorgement of their profits.  June 9, 2023 Pretrial Conference Tr. at 33:12-

24 16 ("But with respect to the remaining issues that we're going to be trying in this

25 case, the defendants' profits, there is no willfulness requirement for the defendants'

26 profits.  It's an equitable remedy.  It is a disgorgement.  This is my view.").

27

28

Regardless, the Court has already found, and the evidence shows, that Defendants intentionally infringed on the BAYC Marks. *See infra* ¶ 131.

**Defendants' Disputed Post Trial Conclusion of Law No. 131:**

Disgorgement is not an available remedy because—for all the reasons explained above—neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See supra* ¶¶ 17-31.

**Plaintiff's Basis for Dispute:**

The Lanham Act does not contain a willfulness requirement; Yuga Labs' only burden is to prove Defendants' sales. 15 U.S.C. § 1117(a) (allowing plaintiff "to recover . . . defendant's profits."). Defendants cite no case to the contrary. Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts. *See supra* ¶¶ 17-31; *see also* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.

Ms. Kindler's calculations of $1,375,361.92 in Defendants' profits are unrebutted. Accordingly, these profits are "presumed to be the result of the infringing activity," and Defendants fail to meet their "burden of showing which, if any, of its total sales are not attributable to the infringing activity." *Frank Lloyd Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019). As Defendants admit, *each* RR/BAYC NFT used the BAYC Marks (Dkt. 418-1 at 3:15-16), so Defendants *cannot* show that any RR/BAYC NFT sale (or re-sale) was *not* the result of their infringing activity.

Nevertheless, Yuga Labs is entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238-39, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to

purchase that product instead of a genuine one"); *see also* J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation. Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); Berger Decl. ¶¶ 44-92.

Even though a finding of willfulness is not necessary for disgorgement, Defendants' infringement was willful.  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . .  In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  The accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.  But,

Defendants compound this litigation and seek to re-litigate this settled issue. Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

The evidence presented at trial also establishes Defendants' willful infringing intent, including that, from the outset, Defendants were interested in making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). They created their RR/BAYC NFTs with the intent to infringe because using Yuga Labs' BAYC Marks allowed them to freeride off of the commercial success of the BAYC brand. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but chose not to. Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146. Defendants could have used different images or overlaid some commentary on the images they used, but chose not to. *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market); Dkt. 416 at ¶ 7. Indeed, they used the very identical images that they claim are "problematic." Trial Tr. at 222:7-9.

The evidence also shows that Defendants knew they were infringing and creating confusion. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr.

Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Furthermore, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images. Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2. Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as

his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT. Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.  Beyond their confusing promotion on Twitter, Defendants promoted their infringing collection on platforms such as OpenSea and Foundation, on which the collection appeared almost identical to Yuga Labs' genuine BAYC collection.  JTX-28; JTX-29; JTX-683; JTX-719.

Additionally, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.  They could have stopped after the Court found them to be infringing. But they continued to intentionally add to the confusion.

The evidence establishes that Defendants did intend to confuse consumers and did intend to use Yuga Labs' BAYC Marks.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**<u>Defendants' Response</u>:**

The Supreme Court has undisputedly held that an infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). And courts in this jurisdiction have recognized that disgorgement is appropriate in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).

Yuga incorrectly argues that Ms. Kindler's profits calculation is unrebutted because, critically, Ms. Kindler did not correctly apportion what portion of those profits are attributable to confusion—especially given that there is not a single case of actual confusion in this case. Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016) (holding that disgorgement is limited to profits "attributable to the infringing activity."). Regardless, this issue is a separate reason for why Yuga is not entitled to disgorgement apart from the fact that Defendants' mental state just not justify disgorging profits under *Romag Fasteners*.

Yuga also improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.

*See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the

project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-
109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps
insisted on these requirement and additional steps so that the artistic purpose of the
work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-
60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative
impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of
Defendants' public activities associated with RR/BAYC, confirms their intent.  In
those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be
inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows
that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith
belief that Yuga had given authorization for the creation of projects like RR/BAYC.
At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were
more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶
187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX
2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga
had not taken steps to stop these third-party projects from using Yuga's marks.
Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There
were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape
Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23;
[Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen,
and Mr. Hickman would have probably seen these collections using the Bored Ape
Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.
[Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga
trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-
22.  For example, there are published notebooks with ISBN numbers,

commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it

as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.  That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

Yuga also alleges that Etherscan's creation of a token tracker is evidence of Defendants' intent to cause confusion.  But Defendants do not control the Etherscan website or how Etherscan chooses to display the RR/BAYC NFT collection.  Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite

1  Yuga's efforts to silence Defendants' criticism and public reports of certain

2  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

3  explained in his declaration, "Overall, I would consider myself a very active

4  community member in the cryptocurrency space, which is something that I take

5  pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

6  (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

7  report on crypto news or other topics I find noteworthy to help spread awareness."

8  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

9  simply report news/crypto events in relation to the RR/BAYC collection.

10       Yuga also incorrectly alleges that Defendants continued to market

11  ApeMarket after entry of summary judgment in this case.  First, this argument

12  makes no sense given that Defendants never released ApeMarket in the first place.

13  Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which

14  was well before the entry of summary judgment in this case.

15       Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is

16  not credible given the many false and misleading statements contained in his

17  declaration.  For example, Mr. Solano was forced to concede on cross-examination

18  that his sworn declaration included a false statement claiming that Defendants

19  continue to receive royalties from sales on secondary marketplaces:

20  Q.    And you understand that Mr. Ripps and Mr. Cahen have testified
21        that they do not currently receive any royalties or creator fees from
22        sales on secondary marketplaces; right?

23  A.    Yes.

24  Q.    So you don't have any basis for your statement that their profits
25        continue to increase; correct?

26  A.    It's my understanding that they were collecting royalties or creator
27        fees from LooksRare for quite a while.  Although, those were
28        supposed to be donated to charity and never were.

1

2       Q.      *They don't continue to increase; correct, sir?*

3       A.      *Correct.*

4       Q.      *That statement, that part of your witness statement is incorrect;*

5               *right?*

6       A.      *Yes.*

7

8    Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the

9    phrase "business venture" in Mr. Lehman's declaration, without having considered

10   that the phrase "business venture" was selected by Yuga's counsel, and that Mr.

11   Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.

12   Solano also relied on Mr. Lehman's declaration without having considered that Mr.

13   Lehman knew he could not settle his case without executing a declaration

14   concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.

15   Lehman was afraid for his family at the time he signed his declaration, because

16   Yuga's lawsuit against him would be disastrous to his family and himself, even if

17   Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility

18   as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano]

19   32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by

20   Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

21   deposition, if we could. You gave a deposition in this case; right? A Yes. Q And

22   you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look

23   at your deposition -- and we can pull it up on the screen -- at page 152, starting at

24   line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an

25   objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at

26   your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market

27   exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look

28

at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24. The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

Despite the fact that the Court has already held that Defendants intended to infringe, Defendants seek another bite at the apple. SJ Order (Dkt. 225) at 12. Disgorgement is available and proper as a remedy for Defendants' infringement. Defendants' responses are just another attempt to avoid the Court's summary judgment ruling and relitigate closed issues.

As discussed *supra*, Defendants' responses lack merit. Specifically: (1) the Court's summary judgment order is controlling (*supra* ¶ 32), (2) Defendants intended to infringe and their infringement was not an art project (*supra* ¶ 3), (3) Defendants' internal discussions confirm their profit motive (*Id.*), (4) Defendants' "disclaimers" did not negate confusion (*supra* ¶ 132), (5) the majority of RR/BAYC NFTs were not sold on rrbayc.com (*Id.*), (6) Defendants failed to take steps to avoid confusion, (*Id.*), (7) Yuga Labs did not abandon its marks (*supra* ¶ 114), (8) Yuga Labs did not license Defendants' infringement (*Id.*), and (9) Defendants failed to impeach Mr. Solano (*supra* ¶ 3).

Additionally, the Court should reject Defendants' responses because (1) Yuga Labs need not attribute all profits to confusion and, in any event, all of Defendants' profits were attributable to Defendants' infringement, (2) Yuga Labs is

entitled to disgorgement of Defendants' profits, (3) Defendants' *post hoc* justification that Mr. Hickman gave Defendants the right to infringe lacks credibility, and (4) Defendants misrepresent Mr. Atalay's testimony.

**All of Defendants' Profits Are Attributable To Their Infringing Activity:** Defendants do not dispute Ms. Kindler's findings, but rather argue that she did not attribute her profits calculation to confusion. This argument is without merit because Yuga Labs need not make such an attribution and, in any event, all of Defendants' profits are attributable to their infringement.

Yuga Labs has shown that Defendants' profits are attributable to Defendants' infringing activity – each and every single RR/BAYC NFT uses the marks BORED APE YACHT CLUB and BAYC, to say nothing of how Defendants sold, marketed, and promoted these NFTs. In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408. From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019). Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks. *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37. Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks. They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." Dkt. 418-1 at 3:15-16. Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement. *See* Kindler Decl.

(Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps," consumers would not have bought them.  Indeed, even Defendants admit that they had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10 (Mr. Ripps' second supplemental response to interrogatory 3 states:  "Mr. Ripps's RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project would be directly tied to Yuga, BAYC, and specific BAYC NFTs . . ."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin of the collection.").  This is because the appeal of the BAYC Marks was core to their infringement and profits.  Yuga Labs should be awarded the full amount of Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

Defendants have no persuasive evidence that their infringing RR/BAYC NFTs would have sold without the use of the BAYC Marks or connection to Yuga Labs; in fact, they argue extensively that they were identifying Yuga Labs' in their marketing and sales.  Their profits were only attainable through the unlawful misappropriation of Yuga Labs' name and intellectual property.

**Yuga Labs Is Entitled to Disgorgement of Defendants' Profits:**  Yuga Labs' only burden is to prove Defendants' sales to obtain disgorgement.  15 U.S.C. § 1117(a) (allowing plaintiff "to recover . . . defendant's profits.").  Defendants cite no case to the contrary.  Defendants wrongly claim that *MGA* holds that disgorgement is "only" warranted in cases of conscious wrongdoers.  To the contrary, *MGA* found that willfulness is a sufficient, ***but not necessary***, condition to

a disgorgement finding.  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548, 2022 WL
4596697, at *17 ("willfulness is not an inflexible precondition to recovery of a
defendant's profits under § 35(a) of the Lanham Act") (cleaned up); *see also*
*Harbor Breeze Corporation v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38
(9th Cir. 2022) ("a plaintiff need not show that a defendant acted with a particular
mental state, such as willfulness, in order to be entitled to an award of profits.").
Because the Court has found Defendants liable for intentional infringement (SJ
Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their
infringing acts.  *See supra* ¶¶ 34; *see also* Yuga Labs' Proposed Findings of Fact
and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37.  Even though a finding of
willfulness is not necessary for disgorgement, Defendants' infringement was
willful.  *See supra* ¶ 7; *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th
Cir. 1993) ("[w]illful infringement carries a connotation of deliberate intent to
deceive.").

**Mr. Hickman Had No Right To License Defendants' Infringement:**
Defendants' dubious claim that they believed they were entitled to create copycat
NFTs and brand their infringing NFTs with Yuga Labs' BAYC Marks fails to
change the fact that Yuga Labs retained its trademark rights.  Moreso, the record
disproves that Defendants actually believed this was a justification for their actions,
because even as of June 9, 2022, Mr. Ripps ***did not know*** that one of his partners
allegedly owned a BAYC NFT and expressed his desire to have access to one:

maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]

or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]

and put them on the marketplace

so people trust it?

i don't think buying a BAYC makes sense

unless it's for a deal..

[third party] sold his ape

1    s

2    sucks

3    that would have been perfect marketing

4    wish i spoke to him before he sold

JTX-801.332.  Defendants' newly contrived defense—and their false claim that they contemporaneously believed this justification, despite lack of a single communication to that effect—has no merit and further highlights their lack of credibility.

**Defendants Misrepresent Mr. Atalay's Testimony:**  Mr. Atalay's testimony does not say that consumers "do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address" as Defendants attribute to it.  What Mr. Atalay actually testified is that "for the average person who is not an expert in blockchain technology," viewing NFTs on a marketplace such as OpenSea "is probably the most straightforward way to distinguish two NFTs."  Trial Tr. at 135:5-10.  And, Mr. Atalay testified that users on such secondary markets typically refer to the token name to identify NFTs.  Trial Tr. at 132:3-5 ("Q  And you also agree that the NFT community uses the token name when it's buying on secondary markets; correct?" / "A  Yes."); *see also* JTX-1558 (tweet from third party stating "If you were curious to see how malicious this scam is, check out the token tracker/ID name that he chose to use on the smart contract. This is a critical piece of data the NFT community uses when they are buying on the secondary market.").  But here, even if a consumer were to view an RR/BAYC on OpenSea they would still be confused because listings for RR/BAYC NFTs were virtual identical to a listing for an authentic Bored Ape Yacht Club NFT.  *See* JTX-686; *see also supra* ¶ 68.

1    **Defendants' Disputed Post Trial Conclusion of Law No. 132:**

2           Separately, disgorgement is also unavailable because Yuga has not shown

3    "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S.

4    469, 478 (1962).

5    **Plaintiff's Basis for Dispute:**

6           This case arises out of the Lanham Act, which expressly provides for actual

7    damages **_and_** disgorgement of Defendants' profits.  "The Lanham Act itself is no

8    obstacle to a recovery of both plaintiff's damages and defendant's profits."  *See* J.

9    Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73

10   (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to

11   defendant's profits.").  Accordingly, the Lanham Act allows for three distinct

12   financial remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the

13   costs of the action. 15 U.S.C. § 1117(a).  These remedies are not stated in the

14   disjunctive, and each are separately available under the statute.  Moreover, the

15   model jury instructions make clear that actual damages and disgorgement are

16   available in the same case: "*In addition to actual damages*, the plaintiff is entitled

17   to any profits earned by the defendant that are attributable to the infringement,

18   which the plaintiff proves by a preponderance of the evidence."  Manual of Model

19   Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits

20   (emphasis added).  Because the Court has found Defendants liable for intentional

21   infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants'

22   profits from their infringing acts.  *See* Yuga Labs' Proposed Findings of Fact and

23   Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.  Defendants are not allowed to

24   retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. v.*

25   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

26          To receive Defendants' profits, Yuga Labs' only burden is to "establish[] the

27   defendant's gross profits from the infringing activity with reasonable certainty."

28   *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).  Defendants

cite no case to the contrary.  Through at least the testimony of Ms. Kindler, Yuga Labs has met its burden.  *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.

*Dairy Queen* does not impose any different burden, nor did it hold that disgorgement in a Lanham Act case is unavailable in the absence of an adequate remedy at law.  *Dairy Queen* did not involve a disgorgement claim under the Lanham Act, but rather an "equitable accounting" claim.  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  "[T]he Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits)."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998)).  As a result, *Dairy Queen* does not apply to Yuga Labs' disgorgement claim under the Lanham Act.

**Defendants' Response:**

The Supreme Court has held that disgorgement is not available unless there is "the absence of an adequate remedy at law."  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  And the rule set forth in *Dairy Queen* has been applied to awarding defendant's profits under the Lanham Act.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994).

Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc.*, 1994 WL 763408, at *2-3 ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a

1  statutory claim.  Again, because the statutes provide adequate remedies, a purely
2  equitable claim may not be maintained.").

3  **Plaintiff's Reply:**

4  Defendants' response regurgitates the same citations from their disputed
5  findings of fact without rebutting or even acknowledging that (1) the Lanham Act
6  and model jury instructions allow parties to seek both actual damages and
7  disgorgement, (2) Yuga Labs' only burden is to establish gross profits (which it has
8  accomplished), and (3) *Dairy Queen* is inapposite to the claims at issue here.  *See*
9  *supra* ¶ 132 (Plaintiff's Basis for Dispute).  The Lanham Act and model jury
10  instructions are more authoritative on the issue of disgorgement than *Hunting*
11  *World*, an unpublished case from another judicial district that has been rejected in
12  C.D. Cal.  *See Out of the Box Enterprises, LLC v. El Paseo Jewelry Exch., Inc.*, No.
13  EDCV1001858VAPDTBX, 2012 WL 12893524, at *6 n.5 (C.D. Cal. June 27,
14  2012).  There is no requirement for an absence of an "adequate remedy at law" to
15  obtain disgorgement, and even if there were, Yuga Labs' actual damages would not
16  be sufficient to compensate for the irreparable harm Defendants caused.  *See supra*
17  ¶ 132 (Plaintiff's Basis for Dispute).

18  **Defendants' Disputed Post Trial Conclusion of Law No. 134:**

19  Having abandoned available legal remedies, Yuga cannot obtain
20  disgorgement. *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC),
21  1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough Plaintiff has
22  waived the right to collect damages, this does not render the claim purely equitable
23  because, as discussed above, this is a statutory claim. Again, because the statutes
24  provide adequate remedies, a purely equitable claim may not be maintained.").

25  **Plaintiff's Basis for Dispute:**

26  This case arises out of the Lanham Act, which expressly provides for
27  damages **_and_** disgorgement of Defendants' profits.  "The Lanham Act itself is no
28  obstacle to a recovery of both plaintiff's damages and defendant's profits."  *See* J.

Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to defendant's profits.").  Accordingly, the Lanham Act allows for three distinct financial remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the costs of the action. 15 U.S.C. § 1117(a).  These remedies are not stated in the disjunctive, and each are separately available under the statute.  Moreover, the model jury instructions make clear that actual damages and disgorgement are available in the same case: "*In addition to actual damages*, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence."  Manual of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added).  Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts.  *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.  In sum, Defendants are not allowed to retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

To receive Defendants' profits, Yuga Labs' only burden is to "establish[] the defendant's gross profits from the infringing activity with reasonable certainty."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).  Defendants cite no case to the contrary.  Through at least the testimony of Ms. Kindler, Yuga Labs has met its burden.

Finally, the cited case—which is almost 30 years old, unpublished, and from another district—is neither controlling nor persuasive precedent for this court.  Indeed, the only other court that has cited this case is from C.D. Cal. and rejected its findings, "disagree[ing] with the basis for the holding, *i.e.*, that any claim prescribed by a statute is a legal claim."  *Out of the Box Enterprises, LLC v. El*

1   *Paseo Jewelry Exch., Inc.*, No. EDCV1001858VAPDTBX, 2012 WL 12893524, at

2   *6 n.5 (C.D. Cal. June 27, 2012).

3   **Defendants' Response:**

4   The Supreme Court has held that disgorgement is not available unless there is

5   "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S.

6   469, 478 (1962).   And the rule set forth in *Dairy Queen* has been applied to

7   awarding defendant's profits under the Lanham Act.  *See Hunting World Inc. v.*

8   *Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26,

9   1994).

10   Legal remedies were available in this case.  Yuga expressly asserted and

11   offered expert testimony in support of legal remedies (including a claim for actual

12   damages that its expert was able to quantify), which it then voluntarily relinquished.

13   Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler]

14   172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal

15   remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc.*, 1994 WL

16   763408, at *2-3 ("[A]lthough Plaintiff has waived the right to collect damages, this

17   does not render the claim purely equitable because, as discussed above, this is a

18   statutory claim.  Again, because the statutes provide adequate remedies, a purely

19   equitable claim may not be maintained.").

20   **Plaintiff's Reply:**

21   There is no requirement for an absence of an "adequate remedy at law" to

22   obtain disgorgement, and even if there were, Yuga Labs' actual damages would not

23   be sufficient to compensate for the irreparable harm Defendants caused.  *See supra*

24   ¶ 132.

25   **Defendants' Disputed Post Trial Conclusion of Law No. 135:**

26   Even if disgorgement of profits were available, Yuga would only be entitled

27   to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v.*

28   *Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by

1  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.,* 839 F.3d 1179 (9th Cir. 2016).

2  This requires distinguishing between revenue from collectors who reserved

3  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

4  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

5  believed they were purchasing Yuga NFTs. *See id.*

6  **Plaintiff's Basis for Dispute:**

7        In a trademark infringement case, "[t]he plaintiff has only the burden of

8  establishing the defendant's gross profits from the infringing activity with

9  reasonable certainty.  Once the plaintiff demonstrates gross profits, they are

10  presumed re be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at

11  1408.  From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which,

12  if any, of its total sales are not attributable to the infringing activity, and,

13  additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright*

14  *Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2

15  (N.D. Cal. July 29, 2019).  Yuga Labs has established that Defendants' profits are

16  attributable to their infringing activity, and that these NFTs sold due to the appeal

17  of the BAYC Marks.  *See* Yuga Labs' Proposed Findings of Fact and Conclusions

18  of Law (Dkt. 416) at ¶¶ 11-13, 32-37.  Defendants do not provide any credible

19  evidence undermining this presumption.

20        Defendants' "infringing activity" was use of the BAYC Marks.  They admit

21  that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."  Dkt.

22  418-1 at 3:15-16.  Accordingly, each and every RR/BAYC NFT sale is a result of

23  Defendants' infringing activity and subject to disgorgement.  *See* Kindler Decl.

24  (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and

25  blockchain data I analyzed, these profits are all traceable to Defendants' uses of

26  Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought

27  RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt.

28  338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps,"

1    consumers would not have bought them.  Indeed, even Defendants admit that they

2    had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10 (Mr.

3    Ripps' second supplemental response to interrogatory 3 states: "Mr. Ripps's

4    RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project

5    would be directly tied to Yuga, BAYC, and specific BAYC NFTs that were the

6    target of Mr. Ripps's commentary."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps

7    wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club"

8    ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin

9    of the collection.").  This is because the appeal of the BAYC Marks was core to

10   their infringement and profits.  Yuga Labs should be awarded the full amount of

11   Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized

12   trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. v.*

13   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

14       Yuga Labs has established that it is entitled to at least $1,375,361.92 of

15   Defendants' profits (after deducting payments to Defendants' business partners and

16   the amount of RR/BAYC NFTs that they hold or did not mint).  Dkt. 416 at 6:23.

17   Defendants provided no expert witness testimony, consumer survey, or financial

18   analysis to the contrary.  Since they cannot rebut these calculations, Yuga Labs is

19   entitled to the *Lindy Pen* presumption that Defendants made $1,375,361.92 as a

20   result of infringing activity.

21       Defendants have failed to carry their burden to show that even one of these

22   sales is not attributable to their infringing NFTs.  Instead, they contend that, even

23   though they used—and had to use—the BAYC Marks to sell their counterfeit

24   NFTs, their profits were somehow not attributable to the BAYC Marks.  Yet again,

25   Defendants cite no case law, expert testimony, or survey evidence to support this

26   claim, and their baseless argument fails.  *See Fifty-Six Hope Rd. Music, Ltd. v.*

27   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that

28   defendant failed to meet burden to prove a 40% royalty was a proper deduction,

where "the documentary evidence leaves uncertainty as to the amount of royalty fees paid" and defendant "did not produce sufficient documentation to prove the specific amounts").  Indeed, the Ninth Circuit has rejected similar arguments before, finding that "where infringing and noninfringing elements of a work cannot be readily separated, all of a defendant's profits should be awarded to a plaintiff." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) (rejecting argument that "multiple-game format and Nintendo-compatibility were the cartridges' selling point, not the use of the Nintendo trademark").

Defendants may point to a few cherry-picked emails as examples of consumers who were purportedly not confused.  Yuga Labs doubts the credibility of these documents, but even taken at face value, they establish no more than a handful of consumers who were not confused.  They do not show that the BAYC Marks were not part of the appeal of the RR/BAYC NFTs.  Without any evidence to carry Defendants' burden, the Court can continue to presume that Defendants' profits were attributable to the infringing activity.  *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015).

Additionally, rather than decreasing the profits award, the evidence shows that the Court should use its discretion "to increase the profit award above the net profits proven '[i]f the court shall find . . . the amount of the recovery . . . inadequate.'"  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) ("district court should award actual, proven profits unless the defendant infringer gained more from the infringement than the defendant's profits reflect"); 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

Ms. Kindler stated throughout her testimony that, although she was able to calculate certain profits accrued by Defendants, the extent of harm to Yuga Labs

was not practically quantifiable including because of unjust enrichment to Defendants, additional harm to Yuga Labs' business, harm to Yuga Labs' business partnerships, harm to Yuga Labs' brand, and harm to Yuga Labs by the presence of RR/BAYC NFTs in the marketplace.  *See* Kindler Decl. (Dkt. 338) ¶¶ 62-65, 67, 75; Trial Tr. at 176:14-22 ("I computed other potential measures of harm, and I also discussed at length in my report other significant areas of harm that would not be easily quantifiable, such as harm to goodwill, harm to brand equity, and things of that nature."); *see also* Berger Decl. (Dkt. 339) ¶¶ 62-92.

### **Defendants' Response:**

This objection is unfounded.  First, as Defendants have proven, there is ample evidence to support a finding that those who reserved RR/BAYC NFTs did so as a protest *against* Yuga and are not attributable to the infringing activity.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  As Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC collectors indicating that they acquired RR/BAYC NFTs to support Defendants' protest.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic

1   intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

2   Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

3   [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

4   read and click through a disclaimer acknowledging the artistic purpose of the

5   project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

6   109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

7   insisted on these requirement and additional steps so that the artistic purpose of the

8   work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

9   60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

10  impact on usability? … A.   … Ryder wanted it and so he had the final call.").

11        Unsurprisingly, given these measures, the evidence presented at trial showed,

12  Yuga has not identified even a single person who obtained an RR/BAYC NFT

13  believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman

14  are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

15  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

16  Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz]

17  85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has

18  been unable to identify even[] a single person who purchased an RR/BAYC

19  believing it to be sponsored by Yuga Labs; right? A Correct.").

20        Yuga's continued assertions that there is no credible evidence showing sales

21  were made not attributable to the infringing activity is unfounded and inaccurate.

22  These are not "cherry picked" pieces of evidence, but the breadth of evidence

23  presented at trial makes clear that there was no actual confusion.

24        Second, Defendants do not admit that they used Yuga's marks. Evidence at

25  trial showed that Yuga does not own the alleged BAYC Marks.  Yuga gave away

26  all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's

27  CEO Nicole Muniz had publicly represented that BAYC NFT holders received all

28  IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17;

1    Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX

2    2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms &

3    Conditions, which Mr. Solano drafted with the intent to allow people to

4    commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the

5    terms and conditions was to allow people to be able to commercialize their NFTs.

6    We can agree on that; right? A. Yes.  That is covered in the terms.").

7           As a result, at the time of the RR/BAYC project, there were more than 9,000

8    other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

9    (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

10   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

11   Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23;

12   [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are

13   "literally thousands" of products that use Yuga trademarks without sponsorship or

14   affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are

15   published notebooks with ISBN numbers, commemorative coins, alcohol products,

16   skateboards, cereal brands, restaurants, and CBD/marijuana products that are

17   unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-

18   2134; JTX-2410; JTX-2075.

19          Further, Yuga does not own the asserted marks because NFTs are not eligible

20   for trademark protection.  The Supreme Court has held that trademarks are limited

21   to "tangible goods that are offered for sale, and not the author of any idea, concept,

22   or communication embodied in those goods." *Dastar Corp. v. Twentieth Century*

23   *Fox Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a

24   ***communicative*** work is a dispute relegated to the confines of copyright law, not

25   trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

26   SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

27   based on origin of hologram, as it is "likened to a cartoon animation").  Here, the

28   "goods" for which Yuga claims trademark rights are NFTs, which are comparable

1  to certificates of authenticity/ownership and are not digital goods in themselves.

2  Trial Tr. [Atalay] 127:9-16.

3     Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged

4  BAYC Marks in their reservations.  For example, the logo used states "This Logo is

5  Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the

6  project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

7     Third, Yuga is only entitled to disgorgement of profits "attributable to the

8  infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir.

9  1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co.,*

10  839 F.3d 1179 (9th Cir. 2016).  Yuga incorrectly argues that any sale that uses a

11  BAYC mark is attributable to the infringing activity.  "If it can be shown that the

12  infringement had no relation to profits made by the defendant, that some purchasers

13  bought goods bearing the infringing mark because of the defendant's

14  recommendation or his reputation or for any reason other than a response to the

15  diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he

16  plaintiff of course is not entitled to profits demonstrably not attributable to the

17  unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge*

18  *Co.*, 316 U.S. 203, 206 (1942).  This fundamental principle clearly prevents Yuga

19  from receiving profits that were made for reasons beyond the appeal of its symbol,

20  namely the profits attributable to those who reserved an RR/BAYC NFT as a

21  protest against Yuga or to support Mr. Ripps and his renowned reputation as a

22  conceptual artist.  *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.  As

23  discussed above, there is ample evidence in the record to support a finding that all

24  of the RR/BAYC NFT sales were, therefore, not attributable to the infringing

25  activity.

26     Further, to support their assertion that every RR/BAYC NFT sold was

27  attributable to infringement, Yuga cites to Ms. Kindler's conclusory statements.

28

But Ms. Kindler's opinion does not include any apportionment to determine what profits were attributable to infringement.  Trial Tr. [Kindler] 189:16-25.

Fourth, Yuga's statements regarding Defendants' use of the alleged marks are misleading.  As those statements clearly show, Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize someone without saying who they are.  This does not support, as Yuga falsely asserts, that the profits made from RR/BAYC NFTs were due to the appeal of the BAYC Marks.  It shows the opposite.

Fifth, disgorgement is not an available remedy here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.,* 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case. Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.,* No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994)* ("[A]lthough Plaintiff has waived the right to collect damages, this

does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Sixth, if the court decides to award disgorgement, Yuga is not entitled to more than Mr. Ripps and Mr. Cahen's profits as Yuga's objection now suggests. Yuga's objection here is inconsistent with their own trial brief, which clearly stated that for infringement they were only seeking an award of "Defendants' profits." *See* Dkt. 343 at 15.  This is also inconsistent with Yuga's Findings of Fact, which clearly state that "[t]he sum of Defendants' profits to be disgorged is $1,375,361.92" and that said disgorgement sum is "adequate to address Defendants' unjust enrichment in the form of avoided costs."  *See* Dkt. 418-1 at 11(e), 13, and Conclusion at 20. To try to raise after trial has concluded in an objection to Defendants' findings of fact that they are entitled to broader damages than those sought in their trial brief or findings of fact is untimely, unfounded, and inconsistent.

Further, to support a finding that disgorgement of Defendants' profits should be higher, Yuga relies on Ms. Kindler's vague assertions of additional harm that she failed to quantify, that have nothing to do with a calculation of profit.  *See* Kindler Decl. ¶64 ("I have not quantified the extent to which the confusion impacted Yuga Labs' business partnerships…"); Kindler Decl. ¶65 ("I have not quantified the extent to which Defendants' wrongful conduct negatively impacted the value of Yuga Labs' goodwill…"); Kindler Decl. ¶67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…").

Additionally, the section of the Lanham Act that Yuga cites to is inapplicable here and misleading.  As the full portion of Section 1117(a) states "[i]f the court shall find that the amount of the recovery based on profits is either inadequate ***or excessive*** the court may in its discretion enter judgment for such sum as the court

shall find to be just, *according to the circumstances of the case. Such sum* in either of the above circumstances *shall constitute compensation and not a penalty*." 15 U.S.C. § 1117(a) (emphasis added). Here, the circumstances of the case support a finding that any recovery of profits beyond those Mr. Ripps and Mr. Cahen received would be excessive. For example, as outlined above, the evidence shows that the intent of the RR/BAYC project was to criticize Yuga's problematic imagery and educate consumers about the nature of NFTs—the exact opposite of confusing consumers. Cahen Decl. ¶¶ 97-98, 133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346) (uncontested); JTX-2033.

Given these circumstances, if the Court finds that disgorgement is appropriate, the Court should not find disgorgement of Mr. Ripps and Mr. Cahen's profits to be inadequate and require additional disgorgement of profits. Such a decision would go beyond compensation and veer into punishment, impermissible under the statute.

Finally, the $1,375,361.92 figure itself is an incorrect calculation of the profits Mr. Ripps and Mr. Cahen have received from the RR/BAYC project. First, the evidence presented at trial showed that the RSVP contract also distributed $93,135.62 in automated refunds. Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested). This figure improperly includes in its profits calculation $93,135.62 in automated refunds executed through the RSVP reservation contract. Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested). Also, Mr. Ripps and Mr. Cahen incurred approximately $15,100.00 in miscellaneous expenses associated with wages, a computer, and travel expenses. Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 174-176 (Dkt. 344). This figure fails to exclude those expenses from the profit calculation.

### Plaintiff's Reply:

Defendants' response rehashes the same tired arguments without adequately addressing Yuga Labs' arguments. Defendants' response should be rejected

because (1) they seek to relitigate issues already adjudicated by the Court (*see supra* ¶ 9), (2) the record shows that Defendants intended to confuse consumers (*see id.*), (3) Defendants' commercial infringement was not protected "art" (*see id.*), (4) Defendants intended to profit off of their infringement (*see id.*), (5) Defendants were well aware that their infringement would cause confusion (*see supra* ¶ 24), (6) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶ 3), (7) Defendants' "disclaimers" did not dispel likelihood of confusion (*see supra* ¶ 9), (8) the majority of the sales of Defendants' infringing NFTs did not occur on rrbayc.com (*see supra* ¶ 76), (9) Defendants did not take steps to avoid confusion (*see supra* ¶ 9), (10) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*), (11) other alleged infringers do not negate Defendants' infringement (*see id.*), (12) Defendants' unreliable communications with third-parties does not negate the Court's finding that there was a likelihood of confusion (*see supra* ¶ 3); (13) Mr. Ripps' declaration is not credible (*see supra* ¶¶ 3, 7); (14) Mr. Ripps' Declaration is not uncontested (*see supra* ¶ 3);  (16) the record shows that Yuga Labs in fact owns the BAYC Marks (*see supra* ¶ 23); (17) disgorgement is available as a remedy (*see supra* ¶ 132); and (18) Defendants' additional arguments challenging disgorgement are wrong (*see supra* ¶¶ 131, 132, 135; *infra* ¶ 136).

In addition, Defendants' response should be rejected because: (1) Defendants stipulated to Yuga Labs' ownership of the BAYC Marks; (2) the Court has already found that NFTs are eligible for trademark protection; (3) Defendants used unmodified versions of the BAYC Marks; (4) all RR/BAYC NFT sales were attributable to Defendants' infringing activity; and (5) the profit award should be adjusted upward; and (6) Yuga Labs correctly calculated Defendants' profits.

**Defendants Stipulated To Yuga Labs' Ownership Of The BAYC Marks:** Defendants' response contradicts their own stipulations in the proposed pre-trial

conference order.  *See* Dkt. 320-1 at 3.  In that stipulation and proposed order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act."  *Id.* at 13.  Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.

Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the cost of resolving this case. Defendants' actions again make this an exceptional case.  The Court should reject Defendants' contentions.

**NFTs Are Eligible For Trademark Protection:** Additionally, the Court has already held that NFTs are goods, as consumers understand them, that are subject to trademark protection under the Lanham Act.  SJ Order (Dkt. 225) at 6-8; *see also Hermès International v. Rothschild*, 590 F. Supp. 3d 647, 655 (S.D.N.Y. 2022). Defendants offer no reason for the Court to reconsider or vacate this portion of its prior ruling.

**Defendants Used Unmodified Versions Of Yuga Labs' BAYC Marks:** Defendants contention to the contrary is contradicted by the evidence in the record. *See, e.g.*, JTX-25, JTX-80, JTX-82, JTX-138, JTX-670, JTX-675, JTX-677, JTX-972, JTX-1595.  Mr. Ripps even admitted that the "RR/BAYC project . . . displayed

1   unmodified marks, so that the RR/BAYC project would be directly tied to Yuga,

2   BAYC, and specific BAYC NFTs…."  Dkt. 149-42 at 9-10.

3        **Defendants' Profits Are All Attributable To Their Infringement:**

4   Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC

5   NFTs.  Defendants admit Yuga Labs' proposed finding of fact that "Each of

6   Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks".  *See* Dkt. 418-1

7   ¶ 7(c).  The smart contract underlying each of Defendants' infringing NFTs is

8   immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC,"

9   which is replicated on the Etherscan token tracker and anywhere that systems pull

10  information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay

11  Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that

12  Defendants caused websites such as Etherscan to "prominently display[] the token

13  as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs

14  and his specific use of the BAYC brand as the NFT Collection's smart contract

15  name and symbol").  Additionally, some of the NFTs that were offered for sale

16  were reserved through the infringing rrbayc.com domain.  Kindler Decl. (Dkt. 338)

17  ¶ 61.  So again, Defendants were using Yuga Labs' BAYC Marks in the marketing

18  of the infringing RR/BAYC NFTs.

19       More still, "other RR/BAYC NFTs were sold on marketplaces such as

20  OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-

21  670).  Defendants also "used the BAYC Marks to sell and promote their own

22  product."  SJ Order (Dkt. 255) at 18.  And finally, "[t]he NFTs held by Defendants

23  or not yet minted derive their value from being part of the broader RR/BAYC NFT

24  collection, the value of which has accrued through the sale and promotion of

25  RR/BAYC NFTs that are already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.

26  All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from

27  their willful infringement of Yuga Labs' BAYC Marks.  Defendants are not

28

1  allowed to retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd.*

2  *Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

3        Yuga Labs is entitled to disgorgement of profits that are derived "from the

4  infringement."  *Id.* at 1076.  The RR/BAYC NFTs are infringing goods that

5  Defendants created and placed into interstate commerce—the Court has already

6  determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at

7  10-13—and so profits derived from the sale of those goods resulted from

8  Defendants' infringement.  There is no requirement for Yuga Labs to go beyond

9  that and prove that every dollar was attributable to instances of "actual confusion,"

10  which is not even a required element of an infringement case.  SJ Order (Dkt. 225)

11  at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

12        Ms. Kindler's testimony to this effect is not "conclusory," as Defendants

13  state.  She explained all of these considerations in her trial declaration, assessing

14  NFTs "reserved on Mr. Ripps' website, rrbayc.com"; "sold on marketplaces such as

15  OpenSea and Foundation"; sold "without the use of either rrbayc.com or an NFT

16  marketplace"; and "held by Defendants or not yet minted."  Kindler Decl. (Dkt.

17  338) ¶ 61.  Indeed, Ms. Kindler testified at trial when asked why she did not

18  apportion less than all of Defendants' profits to their infringement:  "I don't think

19  that would be appropriate because they all were sold using the infringing marks.

20  And in the first instance, even if there's not confusion because people might believe

21  or agree with the premise under which the tokens are being sold, that doesn't mean

22  in the second and third and fourth instance that there isn't confusion occurring in

23  the marketplace."  Trial Tr. at 189:4-10.  This opinion is further supported by the

24  consumer surveys conducted by Ms. O'Laughlin, which demonstrate a substantial

25  likelihood of confusion on secondary marketplaces.  O'Laughlin Decl. (Dkt. 341) .

26  Defendants provided no affirmative or rebuttal expert to rebut any of this testimony.

27

28

In sum, profits from the sales of Defendants' infringing NFTs, each of which Defendants admit used the BAYC Marks, are necessarily attributable to Defendants' infringement of the BAYC Marks.

**The Court Should Increase The Profit Award:**  Contrary to Defendants' claim that 15 U.S.C. § 1117(a) is "inapplicable" and "misleading", this is exactly the type of case where a profits award is inadequate, justifying an increase to compensate Yuga Labs for the egregious harm Defendants have caused.  *See* 15 U.S.C. § 1117(a); *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).  The timing of Yuga Labs' request does nothing to diminish the Court's authority in granting such a discretionary award.  *See* 15 U.S.C. § 1117(a).  Regardless, this request is not inconsistent with Yuga Labs' trial brief and proposed findings of fact and conclusions of law because an increase in the profit award goes beyond mere profits and avoided costs, and is targeted at making Yuga Labs whole for the unquantifiable harms Defendants have caused. *See supra* ¶ 135.  For example, the disgorgement award should be adjusted to compensate Yuga Labs for loss of goodwill and business partnerships caused by Defendants' infringement.  Muniz Decl. (Dkt. 340) ¶¶ 16-17; Solano Decl. (Dkt. 342) ¶ 27.  Likewise, the disgorgement award should be adjusted to account for the $10 million "impact to Yuga" through secondary sales Defendants caused.  JTX-801.376.

**Yuga Labs Properly Calculated Defendants' Profits:**  Ms. Kindler correctly deducted refunds despite Defendants' false claim to the contrary, and Defendants failed to justify their other proposed deductions.  *See supra* ¶ 100.

**Defendants' Disputed Post Trial Conclusion of Law No. 136:**

As discussed above, none of the revenue on which Yuga bases its claim of profits is "attributable to the infringing activity" *Lindy Pen,* 982 F.2d at 1408, or to the "appeal of [Yuga's] symbol," *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942). Rather, there is no evidence that any

purchaser of the RR/BAYC NFTs was confused about their origin or believed that they came from someone other than Mr. Ripps and Mr. Cahen. Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1; JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Plaintiff's Basis for Dispute:**

In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty.  Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408.  From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. V. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019).  Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks.  Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks.  They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."  Dkt. 418-1 at 3:15-16.  Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement.  *See* Kindler Decl. (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps,"

consumers would not have bought them.  Indeed, even Defendants admit that they had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10. (Mr. Ripps' second supplemental response to interrogatory 3 states: "Mr. Ripps's RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project would be directly tied to Yuga, BAYC, and specific BAYC NFTs that were the target of Mr. Ripps's commentary."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin of the collection.").  This is because the appeal of the BAYC Marks was core to their infringement and profits.  Yuga Labs should be awarded the full amount of Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

Yuga Labs has established that it is entitled to $1,375,361.92 of Defendants' profits (after deducting payments to Defendants' business partners and the amount of RR/BAYC NFTs that they hold or did not mint).  Dkt. 416 at 6:23.  Defendants provided no expert witness testimony, consumer survey, or financial analysis to the contrary.  Since they cannot rebut these calculations, Yuga Labs is entitled to a presumption that Defendants made $1,375,361.92 as a result of infringing activity.

Defendants have failed to carry their burden to show that even one of these sales is not attributable to their infringing NFTs.  Instead, they contend that, even though they used—and had to use—the BAYC Marks to sell their counterfeit NFTs, their profits were somehow not attributable to the BAYC Marks.  Yet again, Defendants cite no case law, expert testimony, or survey evidence to support this claim, and their baseless argument fails.  *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that defendant failed to meet burden to prove a 40% royalty was a proper deduction, where "the documentary evidence leaves uncertainty as to the amount of royalty

1  fees paid" and defendant "did not produce sufficient documentation to prove the

2  specific amounts").  Indeed, the Ninth Circuit has rejected similar arguments

3  before, finding that "where infringing and noninfringing elements of a work cannot

4  be readily separated, all of a defendant's profits should be awarded to a plaintiff."

5  *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994)

6  (rejecting argument that "multiple-game format and Nintendo-compatibility were

7  the cartridges' selling point, not the use of the Nintendo trademark").

8       Defendants may point to a few cherry-picked emails as examples of

9  consumers who were purportedly not confused.  Yuga Labs doubts the credibility

10  of these documents, but even taken at face value, they establish no more than a

11  handful of consumers who were not confused.  They do not show that the BAYC

12  Marks were not part of the appeal of the RR/BAYC NFTs.  Without any evidence

13  to carry Defendants' burden, the Court can continue to presume that Defendants'

14  profits were attributable to the infringing activity.  *See Fifty-Six Hope Rd. Music,*

15  *Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015).

16       Finally, Yuga Labs produced ample documentary and testimonial evidence

17  demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109;

18  JTX 621; JTX-701; JTX-801.185, 376;  JTX-1029; JTX-1030; JTX-1031; JTX-

19  1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger

20  Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

21  (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

22  392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of

23  Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See supra* ¶ 24.

24  And Yuga Labs' survey evidence demonstrated significant confusion among

25  consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with

26  Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47,

27  48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut

28  the evidence that consumers believed, or were likely to believe, RR/BAYC was

affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial
interest or post-sale confusion.  There is a clear likelihood of confusion as well,
given Defendants' use of the same marks and images, which the Court already
determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian
Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks
on competitive goods are rare and 'hardly ever find their way into the appellate
reports' because liability is 'open and shut.'").

**Defendants' Response:**

This objection is unfounded.  First, as Defendants have proven, there is
ample evidence to support a finding that those who reserved RR/BAYC NFTs did
so as a protest *against* Yuga and are not attributable to the infringing activity.  *See*
Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,
JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  As Mr. Ripps testified in
his declaration: "I received **hundreds of letters** thanking me for creating the
RR/BAYC artwork and for standing up against a corporation that had used hateful
references in its brand" and then went on to give eight specific examples of the
letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis
added).  At no point during trial did Yuga dispute this fact.  Yuga did not present
any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on
this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received
hundreds of letters from RR/BAYC collectors indicating that they acquired
RR/BAYC NFTs to support Defendants' protest.

Defendants also took multiple steps to make clear that the RR/BAYC
collection was not related to Yuga in any way.  For example, the rrbayc.com
website—through which the majority of RR/BAYC commissions occurred and the
vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)
(uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic
intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, given these measures, the evidence presented at trial showed, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Yuga's continued assertions that there is no credible evidence showing sales were made not attributable to the infringing activity is unfounded and inaccurate. These are not "cherry picked" pieces of evidence, but the breadth of evidence presented at trial makes clear that there was no actual confusion.

Second, Defendants do not admit that they used Yuga's marks. Evidence at trial showed that Yuga does not own the alleged BAYC Marks.  Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX

2673.  That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes.  That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a ***communicative*** work is a dispute relegated to the confines of copyright law, not trademark. *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable

1  to certificates of authenticity/ownership and are not digital goods in themselves.

2  Trial Tr. [Atalay] 127:9-16.

3      Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged

4  BAYC Marks in their reservations.  For example, the logo used states "This Logo is

5  Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the

6  project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

7      Third, Yuga is only entitled to disgorgement of profits "attributable to the

8  infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir.

9  1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co.,*

10  839 F.3d 1179 (9th Cir. 2016).  Yuga incorrectly argues that any sale that uses a

11  BAYC mark is attributable to the infringing activity.  "If it can be shown that the

12  infringement had no relation to profits made by the defendant, that some purchasers

13  bought goods bearing the infringing mark because of the defendant's

14  recommendation or his reputation or for any reason other than a response to the

15  diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he

16  plaintiff of course is not entitled to profits demonstrably not attributable to the

17  unlawful use of his mark." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge

18  Co., 316 U.S. 203, 206 (1942).  This fundamental principle clearly prevents Yuga

19  from receiving profits that were made for reasons beyond the appeal of its symbol,

20  namely the profits attributable to those who reserved an RR/BAYC NFT as a

21  protest against Yuga or to support Mr. Ripps and his renowned reputation as a

22  conceptual artist.  *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.  As

23  discussed above, there is ample evidence in the record to support a finding that all

24  of the RR/BAYC NFT sales were, therefore, not attributable to the infringing

25  activity.

26      Further, to support their assertion that every RR/BAYC NFT sold was

27  attributable to infringement, Yuga cites to Ms. Kindler's conclusory statements.

28

But Ms. Kindler's opinion does not include any apportionment to determine what profits were attributable to infringement.  Trial Tr. [Kindler] 189:16-25.

Fourth, Yuga's statements regarding Defendants' use of the alleged marks are misleading.  As those statements clearly show, Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize someone without saying who they are.  This does not support, as Yuga falsely asserts, that the profits made from RR/BAYC NFTs was due to the appeal of the BAYC Marks.  It shows the opposite.

Fifth, disgorgement is not an available remedy here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.,* 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Disgorgement is also unavailable here because Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).  Legal remedies were available in this case. Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.,* No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994)* ("[A]lthough Plaintiff has waived the right to collect damages, this

does not render the claim purely equitable because, as discussed above, this is a
statutory claim.  Again, because the statutes provide adequate remedies, a purely
equitable claim may not be maintained.").

Sixth, the evidence Yuga cites to show confusion is unsupported. the
evidence Yuga cites to is not supportive of a finding that there was consumer
confusion.  Specifically, Yuga relies on survey evidence provided by Ms.
O'Laughlin to demonstrate confusion. As demonstrated at trial, however, Ms.
O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms.
O'Laughlin acknowledged that she used an overly expansive definition of the
market that included people who did not have any interest in purchasing an NFT,
much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16
(discussing survey qualification flow); 152:4-10.  She acknowledged that she
changed the survey population after running pretests to make it more inclusive.  *Id.*
at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic
knowledge about the NFT market, admitting to erroneously believing that
cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.*
at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey
that could not show confusion because the market was too broad.  This was despite
her acknowledgement that choosing the right sample population "matters for the
analysis" and choosing an improper sample population would be a mistake.  *Id*. at
146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020
she authored an article titled, "Which Method is For You? Not All Surveys Are
Made the Same" JTX-314.  In that article she discusses choosing between the
Squirt and Eveready surveys on the basis of the strength of the mark.  In this case,
however, she ignored her own advice and operated both surveys.  This was despite
acknowledging that at deposition she agreed with her earlier advice that the
Eveready survey is most appropriate when the mark is strong, and the Squirt survey

when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id*. at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant".  *Id*. at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id*.  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets where uses are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further, this does support a finding that anyone that reserved an RR/BAYC NFT was confused about its origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Seventh, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Finally, the $1,375,361.92 figure itself is an incorrect calculation of the profits Mr. Ripps and Mr. Cahen have received from the RR/BAYC project.  First,

the evidence presented at trial showed that the RSVP contract also distributed $93,135.62 in automated refunds.  Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).  This figure improperly includes in its profits calculation $93,135.62 in automated refunds executed through the RSVP reservation contract. Ripps Decl. ¶¶ 174-175 (Dkt. 346) (uncontested).  Also, Mr. Ripps and Mr. Cahen incurred approximately $15,100.00 in miscellaneous expenses associated with wages, a computer, and travel expenses.  Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 174-176 (Dkt. 344).  This figure fails to exclude those expenses from the profit calculation.

**Plaintiff's Reply:**

Defendants' response rehashes the same tired arguments without adequately addressing Yuga Labs' arguments.  Defendants' response should be rejected because (1) they seek to relitigate issues already adjudicated by the Court (*see id.*), (2) the record shows that Defendants intended to confuse consumers (*see id.*), (3) Defendants' commercial infringement was not protected "art" (*see id.*), (4) Defendants intended to profit off of their infringement (*see supra* ¶ 24), (5) Defendants were well aware that their infringement would cause confusion (*see supra* ¶¶ 24, 32), (6) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶¶ 3, 32), (7) Defendants' "disclaimers" did not dispel likelihood of confusion (*see supra* ¶ 9), (8) the majority of the sales of Defendants' infringing NFTs did not occur on rrbayc.com (*see supra* ¶ 76), (9) Defendants did not take steps to avoid confusion (*see supra* ¶ 9), (10) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*), (11) other alleged infringers do not negate Defendants' infringement (*see supra* ¶ 24), (12) Defendants' unreliable communications with third-parties does not negate the Court's finding that there was a likelihood of confusion (*see supra* ¶ 3); (13) Mr. Ripps' declaration is not credible (*see supra* ¶¶ 3, 7); (14) Mr. Ripps' Declaration is

not uncontested (*see supra* ¶ 3);  (16) the record shows that Yuga Labs in fact owns the BAYC Marks (*see supra* ¶ 23); (17) disgorgement is available as a remedy (*see supra* ¶ 132); (18) Defendants' additional arguments challenging disgorgement are wrong (*see supra* ¶¶ 131, 132, 135, 136); (19) Ms. O'Laughlin's surveys are valid (*see supra* ¶ 32).

In addition, Defendants' response should be rejected because: (1) Defendants Stipulated to Yuga Labs' Ownership of the BAYC Marks; (2) the Court has already found that NFTs are eligible for trademark protection; (3) Defendants used unmodified versions of the BAYC Marks; (4) all RR/BAYC NFT sales were attributable to Defendants' infringing activity; and (5) Yuga Labs correctly calculated Defendants' profits.  *See supra* ¶ 135.

**Defendants' Disputed Post Trial Conclusion of Law No. 137:**

Statutory damages are a legal remedy for which there is a jury trial right. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial includes the right to have a jury determine the *amount* of statutory damages") (emphasis in original).

**Plaintiff's Basis for Dispute:**

Courts are given "wide discretion" in determining the appropriate amount of ACPA damages. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982 MMM (MANx), 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010).  Statutory damages are an equitable remedy and courts are not required to refer the issue of statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014) ("The district court did not err in calculating statutory damages rather than holding a jury trial on that issue because the ACPA allows for statutory damages between $1,000 and $100,000, 'as the court considers just.' 15 U.S.C. § 1117(d)."); *Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) ("[T]here is no right to a jury trial for the assessment of statutory damages.").

"'[C]ourts generally consider a number of factors . . ., including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities . . . and other behavior by the defendant evidencing an attitude of contempt towards the court.'" *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012).

Here, Defendants' cybersquatting was willful and egregious. Defendants intentionally infringed the BAYC Marks to deceive consumers. *See* SJ Order (Dkt. 225) at 12. Moreover, "Defendants acted with a bad faith intent to profit" from Yuga Labs' marks, including by "register[ing] multiple domain names— https://rrbayc.com/, https://apemarket.com/, and pages within OpenSea and Foundation—knowing that they were identical or confusingly similar to the BAYC Marks" and by "register[ing] their domains . . . for commercial gain to divert customers from purchasing BAYC NFTs." *See id.* at 15. These circumstances alone support Yuga Labs' request for $200,000 in statutory damages. *See Bekins, 2010 WL 11597623, at *11* (defendant's willful and bad faith cybersquatting supported maximum amount of statutory damages); *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *19 (N.D. Cal. June 21, 2012), report and recommendation adopted, 2012 WL 4005454 (N.D. Cal. Sept. 11, 2012) ("Defendant's willfulness and deception justify statutory damages in the maximum amount of $100,000."). Even more, Defendants concealed their infringing activities by registering the domain names through a proxy registration service. SJ Order (Dkt. 225) at 15.

Defendants also display a clear contempt towards the Court. Despite the Court finding Defendants liable for cybersquatting (SJ Order (Dkt. 225) at 15), they have continued to use and promote the domains to advertise their infringing RR/BAYC NFTs. Defendants' pattern of abusive and bad-faith litigation conduct and disregard of the authority of this Court and its proceedings warrants a high statutory damages award. *See also infra* Section III.C; *St. Luke's Cataract and*

1  *Laser Inst., P.A. v. Sanderson,* 573 F.3d 1186, 1206 (11th Cir. 2009) ("We agree

2  and conclude that an ACPA statutory damages award . . . serves as a sanction to

3  deter wrongful conduct"); *Verizon Cal. Inc. v. OnlineNIC, Inc.*, No. C08-2832,

4  2009 WL 2706393, at \*6 (N.D. Cal. Aug. 25, 2009) (awarding $50,000 per-

5  violation award because of "noncompliance with court orders, as well as its

6  systematically deceptive behavior").

7        **Defendants' Response:**

8        A court's discretion in awarding damages is curbed by Defendants' rights,

9  including Defendants' Seventh Amendment right to a jury trial.  Statutory damages

10  are legal remedies for which there is a right to a jury trial.  *See Feltner v. Columbia*

11  *Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial

12  includes the right to have a jury determine the amount of statutory damages")

13  (emphasis in original).  However, a jury trial is not required in instances when a

14  plaintiff elects to accept the minimum amount of statutory damages.  *See GoPets*

15  *Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  Here, the Court has discretion to

16  award statutory minimum damages of $1,000 for each of the two cybersquatting

17  violations that the Court found (Dkt. 225 at 13-15), for a total of $2,000.  *See* 15

18  U.S.C. § 1117(d) (permitting "award of statutory damages in the amount of not less

19  than $1,000").

20        Yuga improperly relies on *Bekins*, a default judgement case, to argue that this

21  Court has wide discretion to award cybersquatting damages above the statutory

22  minimum.  *Bekins Holding Corp. v. BGT Trans, Inc.*, 2010 WL 11597623, at \*1

23  (C.D. Cal. Nov. 19, 2010).  In *Belkins,* the defendant ignored the complaint and

24  continued to use the domain name in question.  *Id.*  As a result, the court applied the

25  *Eitel* factors to determine whether entry of default judgement was justified.  *Id.* at 3.

26  Our facts are completely distinct from *Belkins.*  Here*,* Yuga waited until after the

27  summary judgement stage to waive "all legal remedies."  Yuga's decision to forgo

28  a jury trial does not impact Defendants right to have a jury determine the amount of

1    statutory damages.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S.

2    340, 353 (1998).

3       Yuga also relies on two unpublished cases (*Two Plus Two Pub* and *Acad. Of*

4    *Motion Pictur of Arts*), which are not binding precedent on this Court, to argue that

5    statutory damages are an equitable remedy.  District Courts have declined to follow

6    these unpublished decisions and instead held that determination of statory damages

7    is a jury issue.  *See*, *e.g.*, *Daimler AG*, 498 F. Supp. 3d at 1290 (S.D. Cal. 2020)

8    (holding in 2020 that an award above the statutory minimum is a jury issue).

9       Further, Yuga waived its right to any claim of willful infringement, and there

10   has been no finding of willfulness.  To the contrary, because Yuga gave up all legal

11   remedies, Defendants are entitled to judgment of no willfulness.  Furthermore,

12   Yuga points the Court to its summary judgement order and incorrectly suggests that

13   this Court is tied to its previous findings regarding Defendants' intent.  That is not

14   the case.  Yuga has incorrectly relied on the law of the case doctrine.  The "law of

15   the case doctrine does not apply to pretrial rulings ***such as motions for summary***

16   ***judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

17   added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

18   rulings, often based on incomplete information, don't bind district judges for the

19   remainder of the case.  Given the nature of such motions, it could not be

20   otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

21   an issue were decided at summary judgment for one purpose, the summary

22   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

23   CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

24   that evidence of initial police contact was relevant as background, but not to already

25   decided issue that initial contact was not excessive force).

26       Yuga presents no evidence that Defendants continued to use and promote the

27   rrbayc.com domain after this Court's summary judgement order.  Instead, Yuga

28   merely speculates about Defendants continued activities.  Yuga's speculation is not

sufficient grounds to go above the statutory minimum.  Furthermore, Yuga's

argument that this Court should award higher statutory damages to deter wrongful

conduct further underscores that statutory damages is a legal remedy. *Feltner v.*

*Columbia Pictures Television, Inc.*, 523 U.S. 340, 345–47 (1998) (explaining that

"monetary relief is legal ... and an award of statutory damages may serve purposes

traditionally associated with legal relief, such as compensation and punishment.").

Defendants have not engaged in any litigation misconduct.  *See generally*

Dkt. 348 at 11-15.  Defendants' defenses were made reasonably and in good faith.

*Id*.  All of Defendants' efforts to litigate and settle in good faith were impacted by

Yuga's unreasonable demands, including Yuga's demand for a non-disparagement

clause and Yuga's ever fluctuating assessment of actual damages.  *See* Dkt 286 at

2-3 (asserting damages of $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting

damages of $797,183,838 on June 8); Dkt. 315-1 at 2 (dropping actual damages on

June 15).  This Court acknowledged that Yuga's demand for a non-disparagement

clause was "a condition that is quite frankly unreasonable."  Hearing Transcript

June 16, 2023, at 9:9-12.  Furthermore, Yuga has failed to present evidence which

shows that Defendants lack respect for this Court or the rule of law.  To the

contrary, both Defendants fully participated in the pre-trial litigation process,

appeared for trial, conducted themselves respectfully, and testified truthfully under

oath, as any reasonable litigant would.

**Plaintiff's Reply:**

Defendants' response should be rejected because (1) the Court has found

Defendants willfully cybersquatted (*supra* ¶ 131); (2) the Court's order finding that

Defendants' cybersquatting was willful is binding (*supra* ¶ 9) and (3) Defendants'

excuses for their litigation misconduct are unavailing (*supra* ¶ 121).

Their new arguments should also be rejected because:  (1) statutory damages

are an equitable remedy and the Court may award more than the minimum statutory

damages; and (2) Defendants continue to use and promote rrbayc.com.

**The Court May Award More Than The Minimum Statutory Damages:**
The ACPA expressly delegates the issue of statutory damages to the Court, stating that they are allowed up to the maximum $100,000 "as *the Court* considers just." 15 U.S.C. § 1117(d) (emphasis added).  Statutory damages are an equitable remedy and courts are not required to refer the issue of statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014) ("The district court did not err in calculating statutory damages rather than holding a jury trial on that issue because the ACPA allows for statutory damages between $1,000 and $100,000, 'as the court considers just.' 15 U.S.C. § 1117(d)."); *Acad. Of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) ("[T]here is no right to a jury trial for the assessment of statutory damages.").  "[C]ourts generally consider a number of factors, including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities and other behavior by the defendant evidencing an attitude of contempt towards the court."  *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012) (cleaned up) (citation omitted).

Accordingly, Defendants' contention that this Court may only award the statutory minimum damages is wrong.  To the contrary, Ninth Circuit precedent demonstrates that Courts have the authority to award more than the minimum statutory damages for ACPA claims, even after a bench trial.  *Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014); *see also City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1108 (S.D. Cal. 2012) (after bench trial, awarding plaintiff $100,000 under ACPA for infringing uses of marks); *Flow Control Indus. Inc. v. AMHI Inc.*, 278 F. Supp. 2d 1193, 1201 (W.D. Wash. 2003) (An award of statutory damages under the ACPA "requires *the Court* to balance the equities of the situation in determining the amount.") (emphasis added).  This is

consistent with the statute, which provides that the amount of statutory damages is based on what "the court considers just." 15 U.S.C. § 1117(d).

Additionally, *Daimler AG*, a non-binding case from another judicial district, concerned statutory damages under 15 U.S.C. § 1117(c)(2), *not* under 15 U.S.C. § 1117(d), the statute at issue here. Significantly, this case found that a jury was required to determine willfulness as a precondition to awarding statutory damages, as required by § 1117(c)(2). *See Daimler AG*, 498 F. Supp. 3d at 1290; 15 U.S.C. § 1117(c)(2) ("*if the court finds that the use of the counterfeit mark was willful*, not more than $2,000,000 per counterfeit mark . . . .") (emphasis added). 15 U.S.C. § 1117(d) has no such willfulness requirement. While willfulness can be a consideration in awarding maximum statutory damages, *see Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09–08982, 2010 WL 11597623, at *9 (C.D. Cal. Nov. 19, 2010), it is not a pre-requisite under § 1117(d). And while other cases may hold that a jury *may* decide statutory damages under 15 U.S.C. § 1117(d), they do not establish it *as of right*. *See GoDaddy*, 2015 WL 12697732, at *3.

Defendants' attempt to distinguish *Bekins* is unavailing. The procedural posture of that case is irrelevant because the court analyzed the "substantive merits and sufficiency of the claims," determining that the defendant was liable for trademark infringement and cybersquatting. *Bekins Holding Corp.*, 2010 WL 11597623, at *3-*6. While the defendant in *Bekins* "ignored the complaint and continued to use the domain name in question," Mr. Ripps and Mr. Cahen went a step further and ignored the Court's summary judgment order finding they were liable for cybersquatting and continued to promote the rrbayc.com domain (*see below*). This egregious litigation conduct justifies a maximum award of statutory damages.

**Defendants Continue to Use and Promote rrbayc.com:** Contrary to Defendants' allegations of "mere speculation," Yuga Labs' unrefuted evidence in the record demonstrates Defendants' continued use and promotion of the

rrbayc.com domain.  *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Even a month after trial, Defendants still advertise rrbayc.com in the profile heading of the Ape Market Twitter profile.  *See* https://twitter.com/ApeMarketplace.

**Defendants' Disputed Post Trial Conclusion of Law No. 138:**

A jury is not required when a plaintiff elects to accept the minimum amount of statutory damages for cybersquatting. *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011). Awarding anything more than the statutory minimum is a legal remedy. *See Versace v. Awada*, CV 03-3254-GAF, 2009 WL 10673371, at *7 (C.D. Cal. Sep. 4, 2009) ("Strictly construing Rule 38, the Court will not permit Plaintiff to withdraw its demand for a jury trial because Defendants do not consent, and because the law holds clearly that Defendant has a right to a jury determination of statutory damages.").

**Plaintiff's Basis for Dispute:**

Courts are given "wide discretion" in determining the appropriate amount of ACPA damages. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982 MMM (MANx), 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010).  Statutory damages are an equitable remedy and courts are not required to refer the issue of statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014) ("The district court did not err in calculating statutory damages rather than holding a jury trial on that issue because the ACPA allows for statutory damages between $1,000 and $100,000, 'as the court considers just.' 15 U.S.C. § 1117(d)."); *Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) ("[T]here is no right to a jury trial for the assessment of statutory damages."). "'[C]ourts generally consider a number of factors . . ., including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities . . . and other behavior by the

1   defendant evidencing an attitude of contempt towards the court.'" *Wecosign, Inc. v.*
2   *IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012).

3       Here, Defendants' cybersquatting was willful and egregious.  Defendants
4   intentionally infringed the BAYC Marks to deceive consumers.  *See* SJ Order (Dkt.
5   225) at 12.  Moreover, "Defendants acted with a bad faith intent to profit" from
6   Yuga Labs' marks, including by "register[ing] multiple domain names—
7   https://rrbayc.com/, https://apemarket.com/, and pages within OpenSea and
8   Foundation—knowing that they were identical or confusingly similar to the BAYC
9   Marks" and by "register[ing] their domains . . . for commercial gain to divert
10  customers from purchasing BAYC NFTs."  *See id.* at 15.  These circumstances
11  alone support Yuga Labs' request for $200,000 in statutory damages.  *See Bekins,*
12  *2010 WL 11597623, at \*11* (defendant's willful and bad faith cybersquatting
13  supported maximum amount of statutory damages).  Even more, Defendants
14  concealed their infringing activities by registering the domain names through a
15  proxy registration service.  SJ Order (Dkt. 225) at 15.

16      **Defendants' Response:**

17      A court's discretion in awarding damages is curbed by Defendants' rights,
18  including Defendants' Seventh Amendment right to a jury trial. Statutory damages
19  are legal remedies for which there is a right to a jury trial.  *See Feltner v. Columbia*
20  *Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial
21  includes the right to have a jury determine the amount of statutory damages")
22  (emphasis in original).  However, a jury trial is not required in instances when a
23  plaintiff elects to accept the minimum amount of statutory damages.  *See GoPets*
24  *Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  Here, the Court has discretion to
25  award statutory minimum damages of $1,000 for each of the two cybersquatting
26  violations that the Court found (Dkt. 225 at 13-15), for a total of $2,000.  *See* 15
27  U.S.C. § 1117(d) (permitting "award of statutory damages in the amount of not less
28  than $1,000").

Yuga improperly relies on *Bekins*, a default judgement case, to argue that this Court has wide discretion to award cybersquatting damages above the statutory minimum. *Bekins Holding Corp. v. BGT Trans, Inc.*, 2010 WL 11597623, at *1 (C.D. Cal. Nov. 19, 2010). In *Belkins*, the defendant ignored the complaint and continued to use the domain name in question. *Id*. As a result, the court applied the *Eitel* factors to determine whether entry of default judgement was justified. *Id.* at 3. Our facts are completely distinct from *Belkins*. Here, Yuga waited until after the summary judgement stage to waive "all legal remedies." Yuga's decision to forgo a jury trial does not impact Defendants right to have a jury determine the amount of statutory damages. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

Yuga also relies on two unpublished cases (*Two Plus Two Pub* and *Acad. Of Motion Pictur of Arts*), which are not binding precedent on this court, to argue that statutory damages are an equitable remedy. District Courts have declined to follow these unpublished decisions and instead held that determination of stator damages is a jury issue. *See*, *e.g.*, *Daimler AG*, 498 F. Supp. 3d at 1290 (S.D. Cal. 2020) (holding in 2020 that an award above the statutory minimum is a jury issue).

Yuga waived its right to any claim of willful infringement, and there has been no finding of willfulness. To the contrary, because Yuga gave up all legal remedies, Defendants are entitled to judgment of no willfulness. Furthermore, Yuga points the Court to its summary judgement order and incorrectly suggests that this Court is tied to its previous findings regarding Defendants' intent. That is not the case. Yuga has incorrectly relied on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be

1  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of

2  an issue were decided at summary judgment for one purpose, the summary

3  judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-

4  CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

5  that evidence of initial police contact was relevant as background, but not to already

6  decided issue that initial contact was not excessive force).

7      **Plaintiff's Reply:**

8      Defendants' response should be rejected because (1) statutory damages are

9  an equitable remedy and the Court may award more than the minimum statutory

10  damages (*supra* ¶ 137); (2) the Court has found Defendants willfully cybersquatted

11  (*supra* ¶ 131); and (3) the Court's order finding that Defendants' cybersquatting

12  was willful is binding (*supra* ¶ 9).

13  **Defendants' Disputed Post Trial Conclusion of Law No. 139:**

14      As the above authorities make clear, having abandoned "all legal remedies,"

15  Yuga cannot permissibly obtain more than the statutory minimum on its

16  cybersquatting claim without violating Mr. Ripps' and Mr. Cahen's Seventh

17  Amendment rights. *See Daimler AG v. A-Z Wheels LLC*, 498 F. Supp. 3d 1282, 1290

18  (S.D. Cal. 2020) (holding that awarding more than the statutory minimum is a jury

19  issue) (citing *Dream Games of Ariz. Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir.

20  2009)); *Curtis v. Illumination Arts, Inc.*, 957 F. Supp. 2d 1252, 1259-60 (W.D.

21  Wash. 2013) (holding that statutory damages are a jury issue)).

22  **Plaintiff's Basis for Dispute:**

23      Courts are given "wide discretion" in determining the appropriate amount of

24  ACPA damages. *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982

25  MMM (MANx), 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010).  Statutory

26  damages are an equitable remedy and courts are not required to refer the issue of

27  statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572

28  F. App'x 466, 467 (9th Cir. 2014) ("The district court did not err in calculating

statutory damages rather than holding a jury trial on that issue because the ACPA allows for statutory damages between $1,000 and $100,000, 'as the court considers just.' 15 U.S.C. § 1117(d)."); *Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10, 2015) ("[T]here is no right to a jury trial for the assessment of statutory damages."). "'[C]ourts generally consider a number of factors . . ., including the egregiousness or willfulness of the defendant's cybersquatting, the defendant's use of false contact information to conceal its infringing activities . . . and other behavior by the defendant evidencing an attitude of contempt towards the court.'" *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012).

Here, Defendants' cybersquatting was willful and egregious.  Defendants intentionally infringed the BAYC Marks to deceive consumers.  *See* SJ Order (Dkt. 225) at 12.  Moreover, "Defendants acted with a bad faith intent to profit" from Yuga Labs' marks, including by "register[ing] multiple domain names— https://rrbayc.com/, https://apemarket.com/, and pages within OpenSea and Foundation—knowing that they were identical or confusingly similar to the BAYC Marks" and by "register[ing] their domains . . . for commercial gain to divert customers from purchasing BAYC NFTs."  *See id.* at 15.  These circumstances alone support Yuga Labs' request for $200,000 in statutory damages.  *See Bekins, 2010 WL 11597623, at *11* (defendant's willful and bad faith cybersquatting supported maximum amount of statutory damages); *eAdGear, Inc. v. Liu*, No. CV-11-05398 JCS, 2012 WL 2367805, at *19 (N.D. Cal. June 21, 2012), report and recommendation adopted, 2012 WL 4005454 (N.D. Cal. Sept. 11, 2012) ("Defendant's willfulness and deception justify statutory damages in the maximum amount of $100,000.").  Even more, Defendants concealed their infringing activities by registering the domain names through a proxy registration service.  SJ Order (Dkt. 225) at 15.

**Defendants' Response:**

A court's discretion in awarding damages is curbed by Defendants' rights, including Defendants' Seventh Amendment right to a jury trial. Statutory damages are legal remedies for which there is a right to a jury trial.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial includes the right to have a jury determine the amount of statutory damages") (emphasis in original).  However, a jury trial is not required in instances when a plaintiff elects to accept the minimum amount of statutory damages.  *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).  Here, the Court has discretion to award statutory minimum damages of $1,000 for each of the two cybersquatting violations that the Court found (Dkt. 225 at 13-15), for a total of $2,000.  *See* 15 U.S.C. § 1117(d) (permitting "award of statutory damages in the amount of not less than $1,000").

Yuga improperly relies on *Bekins*, a default judgement case, to argue that this Court has wide discretion to award cybersquatting damages above the statutory minimum.  *Bekins Holding Corp. v. BGT Trans, Inc.*, 2010 WL 11597623, at *1 (C.D. Cal. Nov. 19, 2010).  In *Belkins,* the defendant ignored the complaint and continued to use the domain name in question.  *Id.*  As a result, the court applied the *Eitel* factors to determine whether entry of default judgement was justified.  *Id.* at 3.  Our facts are completely distinct from *Belkins.*  Here*,* Yuga waited until after the summary judgement stage to waive "all legal remedies."  Yuga's decision to forgo a jury trial does not impact Defendants right to have a jury determine the amount of statutory damages.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

Yuga also relies on two unpublished cases (*Two Plus Two Pub* and *Acad. Of Motion Pictur of Arts*), which are not binding precedent on this court, to argue that statutory damages are an equitable remedy.  District Courts have declined to follow these unpublished decisions and instead held that determination of stator damages

is a jury issue.  *See*, *e.g.*, *Daimler AG*, 498 F. Supp. 3d at 1290 (S.D. Cal. 2020) (holding in 2020 that an award above the statutory minimum is a jury issue).

Yuga waived its right to any claim of willful infringement, and there has been no finding of willfulness.  To the contrary, because Yuga gave up all legal remedies, Defendants are entitled to judgment of no willfulness.  Furthermore, Yuga points the Court to its summary judgement order and incorrectly suggests that this Court is tied to its previous findings regarding Defendants' intent.  That is not the case.  Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).

**Plaintiff's Reply:**

Defendants' response should be rejected because (1) statutory damages are an equitable remedy and the Court may award more than the minimum statutory damages (*supra* ¶ 137); (2) the Court has found Defendants willfully cybersquatted (*supra* ¶ 131); and (3) the Court's order finding that Defendants' cybersquatting was willful is binding (*supra* ¶ 9).

**Defendants' Disputed Post Trial Conclusion of Law No. 140:**

Yuga is entitled to, at most, the statutory minimum damages of $1,000 for each of the two cybersquatting violations that the Court found (SJ Order (Dkt. 225)

1   at 13-15), for a total of $2,000. *See* 15 U.S.C. § 1117(d) (permitting "award of

2   statutory damages in the amount of not less than $1,000").

3   **Plaintiff's Basis for Dispute:**

4          The Court should award Yuga Labs $200,000 in statutory damages for

5   Defendants' cybersquatting violations under the ACPA.  *See* 15 U.S.C. § 1117(d).

6          Courts are given "wide discretion" in determining the appropriate amount of

7   ACPA damages.  *Bekins Holding Corp. v. BGT Trans, Inc.*, No. CV 09-08982

8   MMM (MANx), 2010 WL 11597623, at *10 (C.D. Cal. Nov. 19, 2010).  Statutory

9   damages are an equitable remedy and courts are not required to refer the issue of

10  statutory damages to a jury.  *See Two Plus Two Pub., LLC v. Jacknames.com*, 572

11  F. App'x 466, 467 (9th Cir. 2014) ("The district court did not err in calculating

12  statutory damages rather than holding a jury trial on that issue because the ACPA

13  allows for statutory damages between $1,000 and $100,000, 'as the court considers

14  just.' 15 U.S.C. § 1117(d)."); *Acad. of Motion Picture Arts & Scis. v. GoDaddy,

15  Inc.*, No. CV 10-3738-AB (CWX), 2015 WL 12697732, at *3 (C.D. Cal. Apr. 10,

16  2015) ("[T]here is no right to a jury trial for the assessment of statutory damages.").

17  "'[C]ourts generally consider a number of factors . . ., including the egregiousness

18  or willfulness of the defendant's cybersquatting, the defendant's use of false contact

19  information to conceal its infringing activities . . . and other behavior by the

20  defendant evidencing an attitude of contempt towards the court.'"  *Wecosign, Inc. v.

21  IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1086 (C.D. Cal. 2012).

22          Here, Defendants' cybersquatting was willful and egregious.  Defendants

23  intentionally infringed the BAYC Marks to deceive consumers.  *See* SJ Order (Dkt.

24  225) at 12.  Moreover, "Defendants acted with a bad faith intent to profit" from

25  Yuga Labs' marks, including by "register[ing] multiple domain names—

26  https://rrbayc.com/, https://apemarket.com/, and pages within OpenSea and

27  Foundation—knowing that they were identical or confusingly similar to the BAYC

28  Marks" and by "register[ing] their domains . . . for commercial gain to divert

customers from purchasing BAYC NFTs." *See id.* at 15.  These circumstances alone support Yuga Labs' request for $200,000 in statutory damages.  *See Bekins, 2010 WL 11597623, at *11* (defendant's willful and bad faith cybersquatting supported maximum amount of statutory damages).  Even more, Defendants concealed their infringing activities by registering the domain names through a proxy registration service.  SJ Order (Dkt. 225) at 15.

Defendants also display a clear contempt towards the Court.  Despite the Court finding Defendants liable for cybersquatting (SJ Order (Dkt. 225) at 15), they have continued to use and promote the domains to advertise their infringing RR/BAYC NFTs.  Defendants' pattern of abusive and bad-faith litigation conduct and disregard of the authority of this Court and its proceedings warrants a high statutory damages award.  *See also infra* Section III.C; *St. Luke's Cataract and Laser Inst., P.A. v. Sanderson,* 573 F.3d 1186, 1206 (11th Cir. 2009) ("We agree and conclude that an ACPA statutory damages award . . . serves as a sanction to deter wrongful conduct"); *Verizon Cal. Inc. v. OnlineNIC, Inc.,* No. C08-2832, 2009 WL 2706393, at *6 (N.D. Cal. Aug. 25, 2009) (awarding $50,000 per-violation award because of "noncompliance with court orders, as well as its systematically deceptive behavior").

**Defendants' Response:**

The Court has discretion to award statutory minimum damages of $1,000 for each of the two cybersquatting violations that the Court found (Dkt. 225 at 13-15), for a total of $2,000.  *See* 15 U.S.C. § 1117(d) (permitting "award of statutory damages in the amount of not less than $1,000").

A court's discretion in awarding damages is curbed by Defendants' rights, including Defendants' Seventh Amendment right to a jury trial. Statutory damages are legal remedies for which there is a right to a jury trial.  *See Feltner v. Columbia Pictures Television, Inc.,* 523 U.S. 340, 353 (1998) ("[t]he right to a jury trial includes the right to have a jury determine the amount of statutory damages")

(emphasis in original).  However, a jury trial is not required in instances when a plaintiff elects to accept the minimum amount of statutory damages.  *See GoPets Ltd. v. Hise*, 657 F.3d 1024, 1034 (9th Cir. 2011).

Yuga improperly relies on *Bekins*, a default judgement case, to argue that this Court has wide discretion to award cybersquatting damages above the statutory minimum.  *Bekins Holding Corp. v. BGT Trans, Inc.*, 2010 WL 11597623, at *1 (C.D. Cal. Nov. 19, 2010).  In *Belkins,* the defendant ignored the complaint and continued to use the domain name in question.  *Id.*  As a result, the court applied the *Eitel* factors to determine whether entry of default judgement was justified.  *Id.* at 3.  Our facts are completely distinct from *Belkins.*  Here*,* Yuga waited until after the summary judgement stage to waive "all legal remedies."  Yuga's decision to forgo a jury trial does not impact Defendants right to have a jury determine the amount of statutory damages.  *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998).

Yuga waived its right to any claim of willful infringement, and there has been no finding of willfulness.  To the contrary, because Yuga gave up all legal remedies, Defendants are entitled to judgment of no willfulness.  Furthermore, Yuga points the Court to its summary judgement order and incorrectly suggests that this Court is tied to its previous findings regarding Defendants' intent.  That is not the case.  Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).

Yuga presents no evidence that Defendants continued to use and promote the rrbayc.com domain after this Court's summary judgement order. Instead, Yuga merely speculates about Defendants continued activities. Yuga's speculation is not sufficient grounds to go above the statutory minimum. Furthermore, Yuga's argument that this Court should award higher statutory damages to deter wrongful conduct further underscores that statutory damages is a legal remedy. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 345–47 (1998) (explaining that "monetary relief is legal ... and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment.").

Defendants have not engaged in any litigation misconduct. *See generally* Dkt. 348 at 11-15. Defendants' defenses were made reasonably and in good faith. *Id.* All of Defendants' efforts to litigate and settle in good faith were impacted by Yuga's unreasonable demands, including Yuga's demand for a non-disparagement clause and Yuga's ever fluctuating assessment of actual damages. *See* Dkt 286 at 2-3 (asserting damages of $1,792,704 on June 7); Dkt. 287-10 at 4 (asserting damages of $797,183,838 on June 8); Dkt. 315-1 at 2 (dropping actual damages on June 15). This Court acknowledged that Yuga's demand for a non-disparagement clause was "a condition that is quite frankly unreasonable." Hearing Transcript June 16, 2023, at 9:9-12. Furthermore, Yuga has failed to present evidence which shows that Defendants lack respect for this Court or the rule of law. To the contrary, both Defendants fully participated in the pre-trial litigation process, appeared for trial, conducted themselves respectfully, and testified truthfully under oath, as any reasonable litigant would.

1    **Plaintiff's Reply:**

2         Defendants' arguments should be rejected for the reasons stated above.  *See*

3    *supra* ¶ 137.  Additionally, Defendants' argument that the Court *must* award the

4    minimum statutory damages flies in the face of the clear language of the statute and

5    their own admission that "the Court has *discretion* to award minimum statutory

6    damages . . ." (emphasis added); *See* 15 U.S.C. § 1117(d) (allowing plaintiff to

7    recover the minimum or maximum statutory damages "as the court considers

8    just.").  The statute does not say that the Court *must* award only minimum statutory

9    damages.

10   **Defendants' Disputed Post Trial Conclusion of Law No. 143:**

11        Yuga improperly seeks injunctive relief that would curtail Mr. Ripps's and

12   Mr. Cahen's First Amendment right to criticize Yuga and its products by name.

13   Yuga has proposed injunctive relief that, by its own admission, would take away

14   "the right to say 'Bored Ape Yacht Club' again.". Trial Tr. [Muniz] 94:5-13.

15   **Plaintiff's Basis for Dispute:**

16        Yuga Labs' former CEO did not testify that Yuga Labs intends to "curtail"

17   any first amendment rights.  Rather, the context of Ms. Muniz's testimony is clear

18   that she was speaking about Defendants' use of Yuga Labs' Bored Ape Yacht Club

19   trademark to promote infringing products.  Trial Tr. at 94:5-13.  There is no debate

20   that Yuga Labs is seeking an injunction to stop Defendants' infringement of their

21   marks.  The terms of the injunction that Yuga Labs contends is appropriate in this

22   case are clear from its proposed findings of fact and conclusions of law.  Dkt. 416.

23   Yuga Labs has not sought to limit Defendants' criticisms of Yuga Labs through its

24   proposed injunction.  What is also clear is that Defendants refuse to accept any

25   injunctive relief, even though the Court has already found that Yuga Labs is entitled

26   to injunctive relief.  Dkt. 418-1.

27

28

**Defendants' Response**:

Injunctive relief must be "tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).  "An overbroad injunction is an abuse of discretion."  *Id.*  Here, the specific harm alleged is Defendants' use of Yuga's marks to sell products. *See* Dkt. 1 at ¶ 5 (complaint is about sales of RR/BAYC NFTs).  Therefore, any injunction must be tailored to only that harm, and not the ancillary issues such as Defendants' free speech rights that Yuga has wrongfully tried to introduce into the injunction.

Ms. Muniz's testimony is not limited to the use of Yuga's marks in commerce.  Instead, she was asked "Do you want them to never say 'Bored Ape Yacht Club' again?"  And she responded that "***They should not have the right to say "Bored Ape Yacht Club" again***."  Trial Tr. [Muniz] 91:10-13.  This is an unqualified statement.  Taken at its meaning, it would prevent criticism that includes the words "Bored Ape Yacht Club."  That is definitionally overbroad.

**Plaintiff's Reply**:

Defendants' response should be rejected because Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights.  Defendants did not infringe Yuga Labs' BAYC Marks by merely selling NFTs.  They infringed Yuga Labs' NFTs by creating the RR/BAYC NFTs (the Foundation contract), creating NFT marketplaces on which to sell the NFTs (e.g. the Foundation sales page), giving away infringing NFTs to get people to market or support their business venture, promoting their NFTs, marketing them through @ApeMarketplace and developing an NFT marketplace (Ape Market) to "stimulate" the sales of their infringing NFTs, by selling their NFTs to initial purchasers, and by driving up the price of their NFTs and then re-selling those they hold for a further profit.  Defendants continue to infringe by marketing RR/BAYC NFTs—for example advertising rrbayc.com on their @ApeMarketplace Twitter page alongside a link to an NFT marketplace where users can still purchase

RR/BAYC NFTs.  *See* Solano Decl. ¶ 77.  Yuga Labs' proposed injunction would put an end to that marketing by transferring control of these instrumentalities of infringement to Yuga Labs.

The terms of the injunction that Yuga Labs contends is appropriate in this case are clear from its proposed findings of fact and conclusions of law, and nowhere in those terms does Yuga Labs seek to limit Defendants' criticism of Yuga Labs.  Dkt. 416; Trial Tr. 51:11-52:1, 64:3-15.  Defendants' contention that their ongoing infringement constitutes "criticism" demonstrates why a court order "enjoining them from using the mark" alone would not stop their infringement.  *See* Dkt. 419-1 at 3:25-4:6.  Yuga Labs must be given the instrumentalities of their infringement so that they cannot continue to infringe and claim it is criticism and so Yuga Labs could potentially offset future irreparable harm by changing the confusing information shown on secondary marketplaces.  *See* Ripps Depo. Designations (Dkt. 396) 289:7-11 (***admitting Mr. Ripps has control over aspects of secondary marketplace listings***) ("Q: So you signed in with a wallet to LooksRare, and they permitted you to make changes to the page dedicated to the RR/BAYC NFTs? / A:  The change of this redacted thing, it's something that I have done, yeah/"); Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (***admitting Mr. Ripps controls the OpenSea sales page and has made changes to it***) (" Q. But you had a page on OpenSea? A. I had a page?  Did I have a page?  No.  Perhaps RR/BAYC collection had a page on OpenSea.  Q. And who ran that collection?  A. Who ran that collection?  I did because I have the keys to the RR/BAYC."); *id.* at 81:22-82:7 ("A. I do remember at one point making the background image the banner, if you will, to say 'Long Live Conceptual Art,' or something like that, or 'You can't copy an NFT,' or something along those lines . . .").

What is nevertheless clear is that Defendants refuse to accept any reasonable injunctive relief, even though the Court has already found that Yuga Labs is entitled to injunctive relief.  Dkt. 418-1.  Defendants did not even submit a proposed order

for injunctive relief, and when Yuga Labs' counsel requested that they submit one, they refused.

Defendants' fixation on an out of context statement from Ms. Muniz is immaterial because Yuga Labs' proposed injunction "taken at its meaning" does not seek to curtail Defendants' first amendment rights. As Mr. Solano testified, Yuga Labs is not seeking an injunction preventing Defendants from criticizing Yuga Labs or using the terms "BAYC" and "Bored Ape Yacht Club" altogether. Trial Tr. at 64:3-15. Yuga Labs' proposed injunction instead seeks to stop current and future infringement.

**Defendants' Disputed Post Trial Conclusion of Law No. 144:**

Here, a properly tailored injunction must be targeted to eliminating any confusion resulting from the sale of RR/BAYC NFTs, or the use of the "rrbayc.com" and "apemarket.com" domains.

**Plaintiff's Basis for Dispute:**

A properly tailored injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain control of the brand. This includes putting an end to Defendants' sales, promotion, and marketing of infringing NFTs; preventing Defendants from creating any future confusion by minting new infringing NFTs or improperly using Yuga Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart contract and other infringing domains and instrumentalities to Yuga Labs so it once again has sole control over its marks. The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law would accomplish this. *See* Dkt. 416 at 14-17, 20-23. Indeed, two other courts have entered similar injunctions against Defendants' business partners. *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for

1  Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v.*
2  *Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).

3          Defendants' proposed injunction is too narrow.  For example, it does not
4  prohibit Defendants from marketing, licensing, or manufacturing RR/BAYC NFTs.
5  Dkt. 418-1 at 20:21-21:5, 22:7-10.  Likewise, simply eliminating confusion does
6  not protect Yuga Labs from the irreparable harm done by Defendants'
7  infringement.  *Id.* ¶¶ 45-56.  Part of this irreparable harm derives from the fact that
8  the RR/BAYC NFTs are immutably linked to Yuga Labs' Bored Ape Yacht Club
9  brand through the RR/BAYC smart contract and token tracker.  Trial Tr. at 134:1-8
10  (Mr. Atalay testifying that "[i]n this particular instance, upon inspection of the
11  Foundation smart contract that was used to deploy the RR/BAYC smart contract,
12  it's evident that these are not mutable fields in this particular instance.").
13  Defendants' proposed injunctions would also not transfer control of the RR/BAYC
14  smart contract to Yuga Labs.  Without transfer of the contract, the Defendants
15  would forever have control over and a connection to Yuga Labs' BAYC Marks.
16  *See* Solano Decl. (Dkt. 342) ¶ 79.  Defendants have no basis for continuing to hold
17  on to the instrumentalities of their bad faith infringement—namely the RR/BAYC
18  smart contract used to manufacture and sell the infringing NFTs and the
19  cybersquatting domains rrbayc.com and apemarket.com.  Each of these
20  instrumentalities should be under the control of Yuga Labs as the rightful owner of
21  the BAYC Marks.

22          **Defendants' Response:**

23          Yuga argues that this Court should adopt its injunctive relief terms and cite to
24  the Lehman consent judgment—which was a condition of settlement—and the
25  injunction entered against Mr. Hickman—which was attained via a default
26  judgment.  Neither Mr. Lehman and Mr. Hickman were defending themselves
27  against the terms of the overbroad injunction.  Yuga cites to its *own* proposed terms
28  to argue that Defendants' terms are in some way unreasonable.  *See* Dkt 418 20:21-

23:28.  Defendants objected to the injunction as a whole because it is not tailored to the specific harm.  Yuga's attempt to remediate it by pointing to specific terms is unavailing.

Yuga also focuses on its term that it be given the smart contract.  That would serve no purpose of addressing infringement might not be technically feasible.  But Yuga has admitted that the contract is immutable, which means that the smart contract cannot be changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  However, an order that prohibits Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the injury alleged in this case.  Further, it would be enforceable in court.

**Plaintiff's Reply:**

Defendants' response should be rejected because (1) Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights and (2) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it to regain control of its brand.  *See supra* ¶ 143.

Defendants' argument that giving Yuga Labs the smart contract "would serve no purpose of addressing infringement might not be technically feasible" (sic) ignores the evidence.  First, Yuga Labs' witnesses testified that it *is* feasible.  Solano Decl. (Dkt. 342) ¶ 79; Trial Tr. 100:6-14; Trial Tr. 136:9-18.  Moreover, Mr. Lehman has transferred the RR/BAYC RSVP smart contract to Yuga Labs, which demonstrates the technical feasibility of this relief.  Second, the undisputed evidence demonstrates that, without transfer of the contract, the Defendants would forever have control over and a connection to Yuga Labs' BAYC Marks.  *See* Solano Decl. (Dkt. 342) ¶ 79.  The immutability of the RR/BAYC NFT contract is not an impediment to transferring the contract to Yuga Labs, but a major reason the contract *should* be transferred to Yuga Labs.  As long as Defendants have the RR/BAYC smart contract, they will continue to be infringing on the BAYC Marks

in it.  More directly, though, the contract will always say Bored Ape Yacht Club and BAYC—Mr. Ripps has no right to forever associate himself with Yuga Labs' trademarks.  If Defendants maintain control of the RR/BAYC smart contract consumers may still be confused as to the source of the NFTs – Defendants have argued that consumers will see Mr. Ripps' name as the creator of the NFTs and thus know that his NFTs are not Yuga Labs' NFTs.  Defendants have no survey concluding this is likely; it is equally possible that consumers see his name and think he is somehow related to Yuga Labs because the contract prominently uses two BAYC Marks.

Finally, Yuga Labs explained at trial how having ownership of the smart contract will, in fact, do more to remedy the irreparable harm to Yuga Labs than merely an order that Defendants never mint more RR/BAYC NFTs.  If Yuga Labs owns the RR/BAYC smart contract, ownership will allow Yuga Labs to work with the NFT marketplaces to ensure that the human readable elements of the marketplace clearly indicate that RR/BAYC NFTs are not authentic BAYC NFTs. Trial Tr. at 136:9-139:11.  Defendants admit this essential fact.  *See* Ripps Depo. Designations (Dkt. 396) 289:7-11 (***admitting Mr. Ripps has control over aspects of secondary marketplace listings***) ("Q: So you signed in with a wallet to LooksRare, and they permitted you to make changes to the page dedicated to the RR/BAYC NFTs? / A:  The change of this redacted thing, it's something that I have done, yeah/").  Moreover, if Defendants maintain ownership and control over the smart contract, they could continue to obtain royalties or mint new RR/BAYC NFTs in the future (even if ordered not to do so).  Thus, transferring the RR/BAYC smart contract from the infringer, Mr. Ripps, to the rightful owner, Yuga Labs, will help reduce future confusion and reduce the risk of future ill-gotten gains to Mr. Ripps. An order solely prohibiting Defendants from minting RR/BAYC NFTs would not accomplish this.

Finally, Defendants' argument that Mr. Lehman and Mr. Hickman were not defending themselves against Yuga Labs' proposed injunction is false.  Mr. Lehman and Mr. Hickman were both named Defendants in these cases, and they both defended themselves.  Mr. Lehman, who was represented by counsel throughout the course of litigation against him, specifically agreed to the consent judgment entered by the Court, which contained the terms of the injunction.  *See* JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).  And Mr. Hickman opposed Yuga Labs' motion for default judgment, unequivocally indicating his awareness of Yuga Labs' requested injunctive relief, stating that "Fenwick and West is threatening me by attempting to enter an injunctive relief similar to Thomas Lehman's case . . . ."  *See* Letter (Dkt. 24), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Apr. 12, 2023).  Moreover, Yuga Labs' Motion for Default that Mr. Hickman responded to specifically laid out the injunctive relief Yuga Labs sought.  *See* Motion for Default (Dkt. 23), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Mar. 31, 2023).  Nevertheless, Defendants' argument is misplaced because two federal courts (N.D.N.Y and D. Nev.) found the injunctions to be reasonable.

**Defendants' Disputed Post Trial Conclusion of Law No. 145:**

Accordingly, appropriately tailored injunctive relief should be limited to: (1) prohibiting Defendants from using the domain "rrbayc.com" or the domain "apemarket.com"; and (2) prohibiting Defendants from selling or promoting the sale of RR/BAYC NFTs.

**Plaintiff's Basis for Dispute:**

A properly tailored injunction must end the irreparable harm done to Yuga Labs' BAYC brand and allow it to regain control of the brand.  This includes putting an end to Defendants' sales, promotion, and marketing of infringing NFTs; preventing Defendants from creating any future confusion by minting new

infringing NFTs or improperly using Yuga Labs' Marks; alerting consumers that the RR/BAYC NFTs are a scam; and transferring the smart contract and other infringing domains and instrumentalities to Yuga Labs so it once again has sole control over its marks.  The injunctive relief set forth in Yuga Labs' Proposed Findings of Fact and Conclusions of Law would accomplish this.  *See* Dkt. 416 at 14-17, 20-23.  Indeed, two other courts have entered similar injunctions against Defendants' business partners.  *See* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023); JTX-621 (Consent Judgment and Order for Permanent Injunction Against Thomas Lehman (Dkt. 12), *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023)).  Defendants' proposed injunction is too narrow.  For example, it does not prohibit Defendants from marketing RR/BAYC NFTs.  Dkt. 418-1 at 20:21-21:5, 22:7-10.  Likewise, simply eliminating confusion does not protect Yuga Labs from the irreparable harm done by Defendants' infringement.  *Id.* ¶¶ 45-56.  Defendants' proposed injunctions would also not transfer over control of the RR/BAYC smart contract to Yuga Labs.  Defendants have no basis for continuing to hold on to the instrumentalities of their bad faith infringement—namely the RR/BAYC smart contract used to manufacture and sell the infringing NFTs and the cybersquatting domains rrbayc.com and apemarket.com.

**Defendants' Response:**

Yuga argues that this Court should adopt its injunctive relief terms and cite to the Lehman consent judgment—which was a condition of settlement—and the injunction entered against Mr. Hickman—which was attained via a default judgment.  Neither Mr. Lehman and Mr. Hickman were defending themselves against the terms of the overbroad injunction.  Yuga cites to its *own* proposed terms to argue that Defendants' terms are in some way unreasonable.  *See* Dkt 418 20:21-23:28.  Defendants objected to the injunction as a whole because it is not tailored to

the specific harm.  Yuga's attempt to remediate it by pointing to specific terms is unavailing.

Yuga also focuses on its term that it be given the smart contract.  That would serve no purpose of addressing infringement might not be technically feasible.  But Yuga has admitted that the contract is immutable, which means that the smart contract cannot be changed or modified in any meaningful way, no matter who owns it.  *See* Trial Tr. [Atalay] 134:11-20.  However, an order that prohibits Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the injury alleged in this case.  Further, it would be enforceable in court.  Likewise, a prohibition from using the rrbayc.com and apemarket.com domains—both of which are inactive—would suffice and fit the scope of the injury found by the court in this case.

**Plaintiff's Reply:**

Defendants' response should be rejected because (1) Yuga Labs' proposed injunction does not seek to curtail Defendants' First Amendment rights and (2) Yuga Labs' proposed injunction is tailored to address the irreparable harm done to Yuga Labs and allow it to regain control of its brand.  *See supra* ¶¶ 143, 144.

Initially, Yuga Labs notes that Defendants admit the injunctive relief should include not only use of the infringing domains and a prohibition against selling or promoting RR/BAYC NFTs, but also a prohibition against minting new RR/BAYC NFTs.  *See supra* ¶ 145 (Defendants admitting that "an order that prohibits Defendants from minting anymore RR/BAYC NFTs would be sufficient to prevent Defendants from causing Yuga the injury alleged in this case.").

As explained above, both Mr. Lehman and Mr. Hickman defended themselves against the Terms of Yuga Labs' proposed injunction, and a federal court granted these injunctions as appropriate and narrowly tailored.  *See supra* ¶ 144.

And as explained above, the RR/BAYC smart contract should be transferred to Yuga Labs, the rightful owner of the marks that are indelibly printed on the contract.  *Id*.  Only the transfer of the infringing instrumentalities—e.g. the counterfeit plates—will allow Yuga Labs to regain control of its brand and stop future confusion in the marketplace.  *See* Solano Decl. (Dkt. 342) ¶ 81; Ripps Depo. Designations (Dkt. 396) 289:7-11 (***admitting Mr. Ripps has control over aspects of secondary marketplace listings***) ("Q: So you signed in with a wallet to LooksRare, and they permitted you to make changes to the page dedicated to the RR/BAYC NFTs? / A:  The change of this redacted thing, it's something that I have done, yeah/"); Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (***admitting Mr. Ripps controls the OpenSea sales page and has made changes to it***) (" Q. But you had a page on OpenSea? A. I had a page?  Did I have a page?  No.  Perhaps RR/BAYC collection had a page on OpenSea.  Q. And who ran that collection?  A. Who ran that collection?  I did because I have the keys to the RR/BAYC."); *id.* at 81:22-82:7 ("A. I do remember at one point making the background image the banner, if you will, to say 'Long Live Conceptual Art,' or something like that, or 'You can't copy an NFT,' or something along those lines . . .").

**Defendants' Disputed Post Trial Conclusion of Law No. 150:**

This is not an exceptional case in Yuga's favor. *See supra* ¶¶ 118-127.

**Plaintiff's Basis for Dispute:**

This is an exceptional case because, under the "totality of the circumstances," it is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016); *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *4 (C.D. Cal. Feb. 24,

2022); *see supra* ¶¶ 118-127.  In determining whether a case is exceptional, courts consider "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need . . . to advance considerations of compensation and deterrence." *SunEarth*, 839 F.3d at 1181 (cleaned up).  Each of the following bases is sufficient justification for a finding that this is an exceptional case, but taking the totality of these circumstances together, such a finding is undeniable.

- Yuga Labs' substantive strength in its litigating position, as evidenced by the Court's Order on Summary Judgment, stands out from the bulk of trademark cases.  *See* SJ Order at 22; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"); *supra* ¶ 121.

- Ignoring the clear strength of Yuga Labs' case, Defendants litigated in an "unreasonable manner" including a "failure to comply with court rules" and "persistent desire to re-litigate issues already decided." *San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020).

  o Defendants relentlessly advanced frivolous legal theories, even after they were rendered moot and irrelevant by multiple orders from the Court.  *Supra* ¶ 121.

  o Defendants refused to engage in reasonable settlement discussions.  *Supra* ¶ 121.

  o Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated and increased the cost of litigation.  *Supra* ¶ 121.

- o Defendants used the litigation to "farm" for engagement on social media with the intent to further harm Yuga Labs. *Supra* ¶ 121.
  - o Defendants' public disclosure of confidential material violated this Court's Protective Order (Dkt. 51) and intentionally harmed Yuga Labs. *Supra* ¶ 121.
- Defendants engaged in "antagonistic discovery conduct" that was "improperly motivated and sought to drag out or obfuscate proceedings," such as deposition conduct where the defendant's "preparation, recollection and candor appear to have been marginal at best." *Jackson, 2022 WL 2155975, at *5*; *see supra* ¶ 121.
- Defendants leveled heinous statements against Yuga Labs and its counsel during litigation. *See Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir. 2004) (finding "no difficulty" holding defendant's harassing and racist remarks towards plaintiff and their counsel an exceptional case); *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002) (affirming exceptional case where "defendant acted deliberately to and intended to harm the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "harass[] the plaintiff").

Defendants should not be allowed to intentionally infringe on Yuga Labs' marks and then cause further harm to Yuga Labs and the Court by abusing the legal process that enforces these marks. The Court should find this an exceptional case to compensate Yuga Labs for Defendants' conduct and deter future infringers from pursuing such unreasonable litigation tactics. *SunEarth*, 839 F.3d at 1181.

**Defendants' Response:**

Yuga is not entitled to any attorneys' fees or an exceptional case finding. The factual allegations underlying this are erroneous or misstated, Yuga has failed

to carry its burden that it is entitled to an exceptional case finding.  *See Caiz v. Roberts*, No. 15-cv-09044-RSWL-AGRx, 2017 WL 830386 at *5 (C.D. Cal. 2017) (movant bears burden on exceptional case).   Further, it is rank speculation that Defendants will abuse the legal process used to enforce an injunction.

Even if Yuga's factual contentions are accepted by this Court, it has failed to carry its burden of proof.  An exceptional case is abnormal.  The Supreme Court has defined exceptional to mean, "uncommon," "rare," or "not ordinary." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  In determining whether a case is exceptional, courts consider all of the circumstances in making the equitable determination, including a defendant's intent.  *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) ("a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate.").  As an equitable determination, the conduct of the party seeking equity must also be considered.  *Ramirez v. Collier,* 142 S. Ct. 1264, 1282 (2021)* ("[w]hen a party seeking equitable relief "has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.") (citations omitted).  Here, Defendants' litigation conduct was justified in light of a corporate opponent bent on making litigation as costly and unreasonable as possible.  Defendants were asked to sign away their constitutional rights.  Trial Tr. [Muniz] 94:5-13.

Yuga's legal contentions also fail.  Yuga cites to *Te-Ta-Ma Truth Found.-Family of Uri, Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir. 2004) in a strained argument that critical Tweets entitle it to fees. *Te-Ta-Ma* involved a white supremacist making threats.  *See id.* at 251 ("Race Traitors, We will include you in the concentration camps next time around, so you can be with the jews you so love.").  *Te-Ta-Ma* is factually not even close to the First Amendment protected criticism of a large company and cannot serve as the basis of fees.  *See* JTX-2096; Ripps Decl. ¶¶ 150-52 (Dkt. 346) (uncontested).

The prevailing party is not, as Yuga suggests, entitled to attorneys' fees in trademark actions without a showing that the opposing party's claims were frivolous.  *See* *Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL 11630841 at *4-5 (rejecting exceptional case finding in trademark case because claims were not "frivolous").  Yuga ignores this exceedingly high burden, and Defendants claims were not objectively meritless.  This case did not rise to the level of an "exceptional case" and therefore Yuga is not entitled to attorney's fees.

Yuga's contention about "discovery misconduct" is also unfounded.  Yuga made a pattern and practice of seeking sanctions and losing.  *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116 at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  At trial, Mr. Ripps explained that he produced everything.  Trial Tr. [Ripps] 269:10-270:18.  Further, Yuga alleges that Defendants engaged in antagonistic depositions and cites to *Jackson v. Gaspar*, 2022 WL 2155975, at *5 but in that case the Court had already chastised the defendant for not participating in her depositions.  The quoted language is a quote the court pulled from a docket filed earlier in the case.  Here by contrast, the Court did not mention anything about Defendants' deposition conduct.

Lastly, Yuga's accusation that Defendants violated the protective order so they could intentionally harm Yuga is not well-taken.  Yuga is aware that Defendants worked hard to fully redact their summary judgment response in good faith despite Yuga's exceedingly tardy request to seal.  *See* Dkt. 176 (explaining situation).  This was despite being given ample time to provide their redaction requests.  *See* 176-1 (explaining Yuga did not act for over one week).  There is absolutely no evidence that Defendants did anything to intentionally harm Yuga.  To the extent that Yuga was harmed, it was through inadvertence.

Yuga's litigation misconduct likewise precludes an award of costs under the principles of equity.  For example, Yuga used this litigation as means to harass Mr. Ripps's 72-year-old father, Rodney Ripps.  During this lawsuit, a Yuga employee

threatened the life of Mr. Ripps's father (ultimately forcing Mr. Ripps's father to file a police report). *See* Ripps Depo. 181:15-182:3 ("He said, 'You and your son should die.' You said that. And my dad is … freaked out, you know … he really is scared, you know … You keep … harassing my family[.]"). Yuga's counsel Yuga initially brushed off the issue, then later conceded that a threat did in fact occur. Dkt. 97 at 4. But Yuga's harassment of Mr. Ripps's father continued, including serving a facially invalid subpoena on him seeking to compel his trial attendance (notwithstanding his complete irrelevance to any issue in the case).

Yuga served more than sixteen subpoenas in this action, nearly all of them facially irrelevant and procuring no useful discovery, apparently to harass anyone that is in any way associated with the Defendants. For example, Yuga targeted people on Twitter whose sole relevance was apparently having "liked" the RR/BAYC project, Defendants' personal accountants, and Mr. Ripps's gallerist. These parties repeatedly commented on how Yuga's behavior in this lawsuit impacted them personally, including for example Mr. Ripps's part-time, one-week general assistant (whom Yuga insisted on deposing) who called Yuga's conduct "quite predatory, honestly." Garner Depo. at 190:9-17.

Yuga also improperly tried to preclude relevant discovery by making a baseless apex witness argument in an *ex parte* motion for a protective order. The Court rejected Yuga's baseless arguments, finding Yuga's motion "deficient on the merits" because the co-founders were "the only people who have knowledge of the creation of the marks." Dkt. 77 at 2. The Court accordingly ordered that Yuga employees Wylie Aronow and Greg Solano appear for depositions on January 9 and 11 respectively (excusing Mr. Solano only if he had medical complications). *Id*. Yet, despite this Court's order, ***neither witness appeared***. Yuga has never identified any medical reason why Mr. Solano could not attend. The Court was clear that failing to appear was sanctionable and ordered Yuga to pay Defendants' expenses if they did not show up. Dkt. 77 at *2. Yuga has not done so.

Yuga also flouted this Court's Protective Order by improperly designating the entirety of third-party Ryan Hickman's deposition testimony as HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY to hide Mr. Hickman's testimony from the public. This deposition involved no Yuga confidential information; instead, it was the testimony of a Black Jewish third party that included discussion of racism and antisemitism in Yuga's branding. *See* Dkt. 123-2. Defendants were forced to bring a motion to address Yuga's misuse of the Protective Order, which the Court granted ordering complete de-designation of the transcript and finding that Yuga was wrong to "***hold the transcript hostage***." Dkt. 133 at *2 (emphasis added).

Yuga also baselessly refused to produce materials relating to third-party Thomas Lehman's settlement-procured declaration to run the clock on the discovery schedule. Defendants filed a motion to compel once Yuga disclosed the declaration and sought expedited review of that motion to allow time for its use in a deposition of Mr. Lehman. The Court declined to consider the motion on an expedited basis, stating that Defendants could instead depose Mr. Lehman in "the last week of March before the April 1, 2023 discovery cut-off date." Dkt. 119 at 2. The Court ultimately granted Defendants' motion, holding that Yuga waived any claim to confidentiality due to its "unfettered use of Lehman's declaration[.]" Dkt. 159 at 2. After Yuga belatedly made its court-ordered production, Defendants took Mr. Lehman's deposition in the final week of discovery as suggested by the Court. But because of Yuga's delay, the deposition testimony—which raised disputes of fact regarding Defendants' infringement and Yuga's credibility—was unavailable for consideration in opposition to Yuga's motion for summary judgment. *See* Dkt. 215 at 2.

Throughout the course of this litigation, Yuga also made repeated baseless threats of fees and sanctions. In total, Yuga has unsuccessfully asked the Court to impose sanctions ***six times***. *See* Dkt. 98-1 at 4; Dkt. 109; Dkt. 113 at 9; Dkt. 116

at 6-8; Dkt. 122 at 4-5; Dkt. 198 at 4; Dkt. 210 at 18-20.  Every request was denied.  This kind of scorched-earth litigation strategy is improper in any context, but particularly problematic where Defendants are two individuals attempting to respond to claims brought by an uncompromising multi-billion-dollar corporate plaintiff.

**Plaintiff's Reply:**

As demonstrated above, Defendants engaged in egregious litigation misconduct, warranting a finding of exceptional case in Yuga Labs' favor.  *See supra* ¶ 121.

Additionally, Defendants' response should be rejected because (1) Defendants' infringement is ongoing; (2) *Te-Ta-Ma* is similar to this case; (3) Defendants brought frivolous claims; (4) Defendants engaged in discovery misconduct; and (5) Yuga Labs has not engaged in litigation misconduct.

**Defendants' Infringement Is Ongoing:**  It is more than "rank speculation" that Defendants will abuse the legal process used to enforce an injunction; it is a near certainty.  Their conduct in this case demonstrates this:

- Defendants needlessly relitigated issues throughout this case and to this day refuse to acknowledge the authority of the Court's SJ Order.  *See supra* ¶ 121.

- They have ignored Court orders in the past.  Even after the Court's Order finding that Defendants infringed on the BAYC Marks and that Yuga Labs was entitled to an injunction, Defendants continued to "purposely infringe" on Yuga Labs' marks.  *TE-TA-MA*, 392 F.3d at 264; Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

- Despite the Court's Order finding that Yuga Labs is entitled to injunctive relief, Defendants refuse to even submit a proposed injunction for the Court's consideration.

- They are already trying to slip out of the terms of the injunction, claiming

1    that Mr. Cahen's promotion of RR/BAYC NFT sales is "reporting news."
2    *See supra* ¶ 9.

3    • Indeed, Defendants' contention that their ongoing commercial infringement,
4      including promoting sales, is "criticism" demonstrates why a court order
5      "enjoining them from using the mark" alone would not stop their
6      infringement.  *See* Dkt. 419-1 at 3:25-4:6.

7    Yuga Labs must be given the instrumentalities of their infringement so that
8    Defendants cannot ignore the injunction and/or continue to infringe and claim it is
9    criticism, and Yuga Labs could potentially offset future irreparable harm by
10   changing the confusing information shown on secondary marketplaces.  *See* Ripps
11   Depo. Designations (Dkt. 396) 289:7-11 (***admitting Mr. Ripps has control over***
12   ***aspects of secondary marketplace listings***) ("Q: So you signed in with a wallet to
13   LooksRare, and they permitted you to make changes to the page dedicated to the
14   RR/BAYC NFTs? / A:  The change of this redacted thing, it's something that I have
15   done, yeah/"); Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (***admitting Mr.***
16   ***Ripps controls the OpenSea sales page and has made changes to it***) (" Q. But you
17   had a page on OpenSea? A. I had a page?  Did I have a page?  No.  Perhaps
18   RR/BAYC collection had a page on OpenSea.  Q. And who ran that
19   collection?  A. Who ran that collection?  I did because I have the keys to the
20   RR/BAYC."); *id.* at 81:22-82:7 ("A. I do remember at one point making the
21   background image the banner, if you will, to say 'Long Live Conceptual Art,' or
22   something like that, or 'You can't copy an NFT,' or something along those lines
23   . . .").

24       **TE-TA-MA Is Instructive:**  Defendants claim that *Te-Ta-Ma* is distinct from
25   the facts of this case, but to the contrary, both cases involve conduct that was
26   "egregious and beyond the pale of acceptable litigation conduct."  *See Te-Ta-Ma*,
27   392 F.3d at 264.  Like *Te-Ta-Ma*, Defendants "purposely orchestrated a campaign
28   of harassment throughout the litigation below which targeted [Yuga Labs] and its

attorneys." *Id.*  Much of this harassment consisted of "explicit threats of violence" (*id.*), such as when they threatened Yuga Labs with images portraying Mr. Cahen next to a grave marked "Yuga Labs," Mr. Ripps and Mr. Cahen holding a gun and a knife up to Yuga Labs, and Mr. Cahen hoisting the severed head of one of the founders' apes over his head.  Dkt. 149-50; *supra* ¶ 29.  They also accused Yuga Labs and its counsel of supporting "racism, antisemitism, beastiality, pedophilia, and using cartoons to market drugs to young children."  Dkt. 149-51.  And, like the defendant in *Te-Ta-Ma*, Defendants in effect called one of Yuga Labs' founders a race traitor, accusing him, a man of Jewish ancestry, of being a Nazi.  *Te-Ta-Ma*, 392 F.3d at 251.

Moreover, they made these accusations at trial despite their promise not to make such accusations.  *See, e.g.*, Dkt. 320-1 ¶ 6(A); Dkt. 314; Dkt. 334 at 60:13-14, 61:9-11.  And Defendants made these accusations to promote their RR/BAYC NFTs and Ape Market.  Notably, this is the same marketplace where they planned to sell Yuga Labs NFTs, which they incredibly claimed were offensive.  *See, e.g.*, JTX-696; JTX-806-JTX-809.

Even putting aside *Te-Ta-Ma*, Defendants ignore other caselaw finding exceptional use where "defendant acted deliberately to and intended to harm the plaintiff by using its mark" which was "especially egregious" because defendant "continue[d] to use the mark after notice of violation" and continued to "harass[] the plaintiff" *just as Defendants did*.  *AANP v. Am. Ass'n of Naturopathic Physicians*, 37 F. App'x. 893, 894 (9th Cir. 2002).

**Defendants Brought Frivolous Claims:**  *Anhing* does not hold that a finding of frivolousness is necessary for an exceptional case.  It is merely one of the numerous "factors the district court *may* consider when deciding whether to grant attorneys' fees."  *Anhing Corp. v. Viet Phu, Inc.*, 2017 WL 11630841, at *3.  As described above, however, Defendants' repeated re-litigating of settled issues made their claims frivolous.  But they were also frivolous from the beginning, when they

sought to raise arguments that their infringement was art, in the face of Yuga Labs' "slam-dunk evidence of a conceptually strong mark together with the use of identical marks on identical goods" proving their infringement.  *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'").

**Defendants Engaged In Discovery Misconduct:** Defendants' argument that Yuga Labs made a "pattern and practice of sanctions" ignores the fact that Yuga Labs sought sanctions for discovery motions because it *kept winning* discovery motions.  *See supra* ¶ 125.  Yuga Labs was forced to file these motions because Defendants withheld crucial evidence during discovery.

Mr. Ripps' statement at trial that he "produced everything" is false.  Trial Tr. 269:10-270:18.  Even recently, Defendants revealed they are in the possession of new material information relevant to this case.  For example, at trial, Defendants used two screenshots of Etherscan purportedly showing payments to Mr. Lehman and Mr. Hickman.  *See* JTX-2710, JTX-2711.  These were never produced in discovery, as evidenced by their lack of a Bates number and July 2023 date.  Instead, Defendants sprung them on Yuga Labs on the eve of trial.  If these exhibits had been produced earlier (as they should have been in response to Yuga Labs' discovery requests), the parties may have been able to reach a solution on the issue of monetary remedies (*see supra* ¶¶ 109, 111) without needing to involve the Court.  Defendants' games of hide and seek with crucial documents are par for the course in this case.  Even after Mr. Ripps lied under oath in a declaration filed with this Court that he had produced all relevant documents, Defendants made numerous additional productions of documents.  *See supra* ¶ 121.  For example, even after submitting repeated declarations that they had produced all relevant evidence (including declarations submitted to the Court on March 21, 2023 (Dkts. 157, 158)), on April 11, 2023, Defendants produced messages with a BAYC NFT holder to

whom Defendants were trying to provide an infringing NFT.  Defendants have no

excuse for their repeated improper withholding of material evidence and repeated

lies under oath.  If Mr. Ripps lied under oath before, his word at trial on the very

same subject cannot be trusted.

Defendants continue to admit their violation of the Protective Order while

failing to explain why, for instance, they immediately and intentionally sent Highly

Confidential Attorneys' Eyes Only materials to reporters after failing to redact it.

Defendants also disclosed Highly Confidential - Attorneys' Eyes Only materials in

their filing that were not even part of the redaction requests they had sent before

filing.  As such, Defendants' admitted breach of the Protective Order cannot be

explained through their inaccurate claim that Yuga Labs contributed to their

violation.

Defendants' tactics, which served only to raise the temperature of the

litigation and increase costs at every turn, warrant a finding that the case is

exceptional.

**Yuga Labs Has Not Engaged In Litigation Misconduct:**

Defendants' persistent refusal to take any responsibility for their conduct

merely highlights how their tactics have increased the time and expense of this

litigation.  All their false examples of "litigation misconduct" are a mere distraction

from their own misconduct.

Defendants' dubious claim of a threat against Rodney Ripps is not in the

record; Yuga Labs disputes it and Defendants' assertion that Yuga Labs has ever

"conceded" is false.  Defendants' claims on this issue were also already dismissed

by the Court as lacking any plausibility.  *See* Order on Yuga Labs' Motion to

Strike/Dismiss (Dkt. 156) at 6-10 (denying Defendants' intentional and negligent

infliction of emotional distress claims, which were based in part on this alleged

threat).  And Defendants noticeably do not mention the death threats they and their

associates leveled against Yuga Labs, its counsel, and their families.  Even so, it is

irrelevant because it did not come from Yuga Labs and was not directed to Defendants.

Defendants also cry foul over Yuga Labs' subpoena of Rodney Ripps, when *they* designated him in their amended initial disclosures as a person with knowledge of "RR/BAYC NFTs." And the document subpoena Yuga Labs issued to Mr. Rodney Ripps sought relevant information related to his role as an officer of LIVE9000, Ryder Ripps' defunct limited liability company, which he used to try to hide the ill-gotten profits from the RR/BAYC NFTs when he knew he was being sued.

Yuga Labs' other subpoenas in this action were also targeted at relevant parties that Yuga Labs reasonably believed had information relevant to the litigation. Mr. Ripps' gallerist, for example, was designated in Defendants' amended initial disclosures as individuals with knowledge of the RR/BAYC NFTs. Likewise, Defendants indicated in their depositions that their accountants had relevant information. *See* Cahen Deposition at 24:18-25 ("Like I said, I think that would probably be an easier question for my accountant or someone like that."); Ripps Deposition at 235:1-24. Defendants cannot complain that Yuga Labs subpoenaed their own identified witnesses. Moreover, the vast majority of subpoenas issued by Yuga Labs were document subpoenas, which stands in stark contrast to the sixteen depositions and deposition subpoenas Defendants threatened and issued to Yuga Labs' founders and employees, and more. Finally, Defendants' position that Mr. Garner is relevant to the litigation as Mr. Ripps' assistant for purposes of deducting from their profits contradicts their prior position that he is irrelevant and that he should not have been deposed. This again highlights their willingness to lie to get what they want.

Yuga Labs never attempted to preclude depositions of its witnesses. Yuga Labs asked Defendants to complete a Rule 30(b)(6) deposition before deciding whether it was necessary to depose Mr. Solano and Mr. Aronow, and it sought a

protective order when Defendants refused. Dkt. 75. The Court disagreed, and Yuga Labs produced both witnesses for deposition. Mr. Aronow was unable to appear for his deposition the day after the Court's Order because of a medical emergency. The Court ordered the parties to meet and confer on an appropriate date for the deposition for Mr. Solano, Dkt. 77 at 2, which Yuga Labs did, and Mr. Solano appeared for his deposition a few days after the Court's Order. Defendants' attempt to label this short delay of a matter of days into full blown "litigation misconduct" is absurd.

As to Defendants' contention that Yuga Labs has not paid attorneys' fees related to Mr. Solano's deposition, Defendants omit that Yuga Labs has a pending objection to Defendants' claimed attorneys' fees. Moreover, Defendants have failed to file any motion for attorneys' fees or even respond to Yuga Labs' request for an accounting to offset any attorneys' fees given the substantially more and unpaid expert deposition fees that Defendants still have not paid.

Next, with respect to the discovery dispute with Mr. Hickman, the Court observed that, "Defendants, not Yuga, designated the documents discussed at Ryan Hickman's deposition as highly confidential ('HC') and attorneys' eyes only ('AEO')." Dkt. 133 at 1. Consistent with Yuga Labs' reading of the Protective Order, Yuga Labs kept the deposition transcript under similar protection "because HC/AEO documents were discussed at the deposition," *id.*, and Defendants refused to specify which portions of those underlying documents they contended were no longer HC/AEO. The Court noted Defendants' indiscriminate confidentiality designations, holding that Yuga Labs was "not wrong that Defendants are obliged by the Protective Order to ensure HC/AEO material is 'clearly so designated.'" *Id.* at 3. Accordingly, the Court ordered the transcript to be made public and ordered Defendants to comply with the Protective Order by "reproduc[ing] and redesignat[ing] the HC/AEO documents discussed at the deposition to 'clearly identify the protected portion(s)'"—the "result Yuga recommended if the Motion

was granted." *Id.*  In other words, the Court ordered what Yuga Labs had asked the Defendants to do from the start.  This was another problem all of the Defendants' own making.

Yuga Labs contested the discovery of documents reflecting settlement negotiations with Mr. Lehman in good faith.  Mr. Lehman's settlement materials expressly included a confidentiality provision, and Yuga Labs sought to have that bargained-for confidentiality protected.  *See* Dkt. 121-01 at 17-18.  Yuga Labs briefed the issues in good faith and, although the Court ultimately ordered the materials to be produced, there was no finding of bad faith.  *See* Dkt. 159 (ordering Yuga Labs to produce settlement materials without finding bad faith).  That is because there was no bad faith.  Of course, consistent with Defendants creating unnecessary disputes, Defendants did not use a single one of the settlement communications in the deposition with Mr. Lehman or at trial.  Here too, this dispute could have been avoided if the Defendants had accepted Yuga Labs' pre-motion offer.

Yuga Labs was forced by Defendants' discovery misconduct to file numerous discovery motions, which were overwhelmingly successful, justifying its requests for sanctions.  For example, Yuga Labs was forced to obtain repeated sworn declarations from Defendants confirming their compliance with discovery obligations, because Defendants were continually caught concealing additional documents.  *See* Dkt. 79 at 2 (Jan. 10, 2023 Order requiring Ripps to verify that he has produced "all relevant non-privileged documents"); Dkt. 145 (Order requiring Defendants to file a declaration that they have produced relevant documents).  Although the Court did not award Yuga Labs fees for these discovery violations, each fee request was nonetheless in response to Defendants' egregious and repetitive discovery violations.  If Defendants took issue with Yuga Labs' discovery strategy, they should have raised it with the Court during discovery, yet they did not, and thus Defendants waived this issue.

1    None of this is litigation misconduct and should not be weighed against

2  Defendants' misconduct.

3  **Defendants' Disputed Post Trial Conclusion of Law No. 151:**

4    Mr. Ripps and Mr. Cahen put forward defenses that were objectively

5  reasonable, and Mr. Ripps and Mr. Cahen were justified in defending this litigation

6  through trial, particularly given Yuga's demand for terms that Yuga could never

7  attain through this litigation. *See Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-

8  cv-7058-ODW (JPRx), 2021 WL 2414856, at *2 (C.D. Cal. June 14, 2021)

9  ("Courts in this district have held that a party's litigation position must be

10  objectively meritless for a case to be exceptional…").

11  **Plaintiff's Basis for Dispute:**

12    Defendants' positions in this case were objectively unreasonable and

13  unjustified, and only became more so as the case progressed.  When Yuga Labs

14  filed the Complaint in June 2022, it began with a substantively strong litigating

15  position, alleging that Defendants used identical marks to sell identical competitive

16  goods on the same marketplaces as Yuga Labs. *Stone Creek, Inc. v. Omnia Italian*

17  *Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks

18  on competitive goods are rare and 'hardly ever find their way into the appellate

19  reports' because liability is 'open and shut.'").  This objectively strong position

20  alone is enough to find an exceptional case. *See Octane Fitness, LLC v. ICON*

21  *Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (Under the "totality of the

22  circumstances," an exceptional case is "one that stands out from others with respect

23  to the substantive strength of a party's litigating position (considering both the

24  governing law and the facts of the case) or the unreasonable manner in which the

25  case was litigated."); *SunEarth, Inc. v. Sun Earth Solar Power Co.,* 839 F.3d 1179,

26  1180 (9th Cir. 2016); *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL

27  2155975, at *4 (C.D. Cal. Feb. 24, 2022).

28

1   Defendants also unreasonably litigated this case, making frivolous and

2   objectively unreasonable claims and re-litigating issues that had already been

3   decided.  *SunEarth*, 839 F.3d at 1181 (in determining whether a case is exceptional,

4   courts consider "frivolousness, motivation, objective unreasonableness (both in the

5   factual and legal components of the case) and the need . . . to advance

6   considerations of compensation and deterrence.") (cleaned up).  *See supra* ¶¶ 121,

7   123.

8   Further, Defendants' statement that Yuga Labs hindered settlement

9   discussions is factually untrue.  *See supra* ¶ 121.  Throughout the process, it has

10  been Defendants' hostile approach to these proceedings, their bad-faith demands,

11  and refusal to accept the reality of their infringement, as explained by the Court,

12  that prevented any productive settlement discussions.

13  **<u>Defendants' Response</u>:**

14  Yuga ignores this court's general rule requiring a finding of frivolousness.

15  *See Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL

16  11630841 at *4-5 (rejecting exceptional case finding in trademark case because

17  claims were not "frivolous").  They instead focus on the fact that the marks were

18  allegedly the same.  This ignores that Defendants lodged a reasonable—but

19  ultimately unsuccessful—*Rogers* defense.  Instead, Yuga's proposed rule would

20  collapse winning and risk turning exceptional cases into usual cases.  *Octane*

21  *Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) (defining

22  exceptional in exceptional case as "uncommon, rare and not ordinary").  This Court

23  should ignore their invitation to make exceptional cases more common.

24  Lastly, Yuga complains that it was Defendants who took unreasonable

25  positions in settlement.  However, Yuga is the party that failed to engage in good

26  faith settlement negotiations.  In fact, this Court noted that Yuga's settlement terms

27  were "quite frankly unreasonable." Dkt. 334 at 9:9-12.  Yuga sought to have

28  Defendants sign away their right to criticize the company.  Defendants cherish their

1  right to speak.  Not acquiescing to Yuga's unreasonable demands was entirely

2  reasonable.

3     **Plaintiff's Reply:**

4     As demonstrated above, Defendants engaged in egregious litigation

5  misconduct, warranting a finding of exceptional case in Yuga Labs' favor.  *See*

6  *supra* ¶¶ 121, 150.

7     Additionally, Defendants' response should be rejected because (1)

8  Defendants' claims were frivolous (*see supra* ¶ 150) and (2) Yuga Labs did not take

9  unreasonable settlement positions (*see supra* ¶ 123).

10  **Defendants' Disputed Post Trial Conclusion of Law No. 152:**

11     Mr. Ripps and Mr. Cahen advanced reasonable arguments in favor of their

12  positions on both liability and damages. *See Caiz,* 2017 WL 830386, at *5 (holding

13  that mere "lack of success" does not support an exceptional case finding).

14  **Plaintiff's Basis for Dispute:**

15     An exceptional case is warranted here, not because of a "mere lack of

16  success," but because, among other things, Defendants attempted to re-litigate

17  unreasonable arguments over and over again despite the Court's numerous

18  rejections of their litigation positions.  *Supra* ¶¶ 150, 151.

19     **Defendants' Response:**

20     Yuga ignores this court's general rule requiring a finding of frivolousness.

21  *See Anhing Corp. v. Viet Phu, Inc.*, No 13-CV-04348-BRO-JCGx 2017 WL

22  11630841 at *4-5 (rejecting exceptional case finding in trademark case because

23  claims were not "frivolous").  They instead focus on the fact that the marks were

24  allegedly the same.  This ignores that Defendants lodged a reasonable—but

25  ultimately unsuccessful—*Rogers* defense.  Instead, Yuga's proposed rule would

26  collapse winning and risk turning exceptional cases into usual cases.  *Octane*

27  *Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) (defining

28

1   exceptional in exceptional case as "uncommon, rare and not ordinary").  This Court
2   should ignore their invitation to make exceptional cases more common.

3   Defendants did not re-litigate any positions.  Yuga sought intent-laden
4   damages.  *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020)
5   ("a trademark defendant's mental state is a highly important consideration in
6   determining whether an award of profits is appropriate.");  *Harbor Breeze Corp. v.*
7   *Newport Landing Sportfishing, Inc.,* No. SACV 17-01613-CJCDFMx, 2023 WL
8   2652855 at *4-5 (C.D. Cal. Mar. 13, 2023) (discussing importance of Defendants'
9   mental state as vital to damages estimate).  The issue of intent related to damages
10  was never adjudicated, and to the extent that it was, the law of the case does not
11  apply to decisions made on summary judgment.  *Shouse v. Ljunggren*, 792 F.2d
12  902, 904 (9th Cir. 1986); *Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL
13  1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that decision on summary
14  judgment on one issue does not bind court as to similar issue later in case).
15  Because the issue was never litigated, it was never re-litigated.

16  **Plaintiff's Reply**:

17  As shown above, (1) Defendants engaged in egregious litigation misconduct,
18  warranting a finding of exceptional case in Yuga Labs' favor (*see supra* ¶¶ 121,
19  150) and (2) Defendants' claims were frivolous (*see supra* ¶ 150).

20  In addition, their objections should be rejected because Defendants re-
21  litigated numerous positions.  Defendants' claim that they did not re-litigate any
22  positions on the basis that "Yuga sought intent-laden damages" is patently false.
23  *See supra* ¶ 121.  Even though the Court decided these issues on Summary
24  Judgment, Defendants sought to relitigate at trial issues such as whether RR/BAYC
25  NFTs are protected art and whether Yuga Labs owns the BAYC Marks.  Even
26  worse, they tried to justify relitigating these issues under the guise of "intent,"
27  necessitating that Yuga Labs file Motions In Limine.  *See* Dkts. 232-2, 236-2, 239-
28  2, 241-2 (Culp Declarations in Support of Motions In Limine Nos. 1-3, 5).  Yet

even their "intent" justification is disingenuous, as the Court had already decided the issue of intent on summary judgment.  SJ Order (Dkt. 225) at 12.  Moreover, Yuga Labs explicitly did not seek intent-laden damages, it was *Defendants* who attempted to shoehorn the already decided issue of intent into trial so they could continue to argue these points.  *See, e.g.*, Proposed Findings of Fact and Conclusions of Law (Dkt. 229-1) at 14 (Defendants stating: "To the extent that Yuga's position is now that it is not pursuing its claim of willful or intentional infringement, Defendants are entitled to judgment as a matter of law that their infringement and any false advertising was not willful.").  Indeed, even today they continue litigating these stale issues, as demonstrated by their argument that Yuga Labs abandoned the BAYC Marks, using the same arguments rejected at Summary Judgment.  *See, e.g.*, *supra* ¶ 24.

Additionally, Defendants do not object to, and thus admit, Yuga Labs' other examples of re-litigated issues that are completely unrelated to intent.  For example, they do not dispute that:

- Defendants filed numerous motions to compel documents and information explicitly premised on their rejected First Amendment *Rogers* defense.  *See* Dkt. 69-1, Dkt. 103-1.  The Court denied these motions and requests as "moot, irrelevant and not proportionate to the needs of the case in view of the District Court's December 16, 2022 ruling."  Dkt. 87 at 1; *see also*, Dkt. 144 at 1.

- When Defendants filed a meritless motion to stay proceedings (Dkt. 118) after nearly three months of unnecessary delay, the Court reiterated that *Rogers* did not apply in this case due to Defendants' commercial conduct.  Dkt. 178 at 6.

- Still, on summary judgment, Defendants maintained that "there is a material dispute whether the RR/BAYC Project is an expressive work that

1   must be resolved at trial" (Dkt. 199-1 at 12-13), despite the Court's orders
2   otherwise.

3   And as shown above, the Court's summary judgment rulings apply to narrow
4   the trial in this case.  *See supra* ¶ 9.  Defendants' refusal to acknowledge this basic
5   reality has unnecessarily complicated these proceedings.

6   **Defendants' Disputed Post Trial Conclusion of Law No. 153:**

7   Yuga's own conduct in this litigation—including, but not limited to, making
8   unreasonable settlement demands, seeking overbroad injunctive relief, unjustifiably
9   resisting discovery obligations, ignoring a Court order on its executive's deposition
10  date, and repeatedly making unwarranted requests for sanctions—precludes a
11  finding that this case is exceptional in Yuga's favor. *Ramirez v. Collier*, 142 S. Ct.
12  1264, 1282 (2022) ("When a party seeking equitable relief has violated conscience,
13  or good faith, or other equitable principle, in his prior conduct, then the doors of the
14  court will be shut against him.") (internal quotations and citations omitted);
15  *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case finding is an
16  exercise of the court's equitable powers).

17  **Plaintiff's Basis for Dispute:**

18  The losing party in a Lanham Act case cannot defend against an exceptional
19  case finding by accusing the prevailing party of engaging in similar misconduct.
20  *See Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5
21  (C.D. Cal. Feb. 24, 2022) (finding exceptional case amidst allegations that "[b]oth
22  parties conducted themselves poorly at times throughout litigation" where
23  "Defendants' conduct was worse and more frequent than [plaintiff's].").
24  Nonetheless, Yuga Labs conducted itself appropriately throughout this case.  *See*
25  *supra* ¶ 125.  Furthermore, Defendants' citation to *Ramirez* is inapposite, as it does
26  not address an exceptional case or even the Lanham Act for that matter.  *See,*
27  *generally*, *Ramirez v. Collier*, 142 S. Ct. 1264 (2022) (condemned criminal

28

claiming violation under the Religious Land Use and Institutionalized Persons Act and the First Amendment).

After a year of litigation and bad faith conduct by Defendants, now is the time for Defendants to allow Yuga Labs to regain control of its brand, end their infringements, and face the consequences of their actions.

**Defendants' Response:**

Yuga is incorrect as a matter of law. Their cited case actually directly stands for the proposition that Defendants advance, stating that "The Court also considers the conduct of **both parties** throughout the case." *Jackson v. Gaspar*, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022). This makes sense, because an exceptional case finding is equitable relief. *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) ("When a party seeking equitable relief has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him.") (internal quotations and citations omitted); *SunEarth, Inc.*, 839 F.3d at 1180-81 (holding that an exceptional case finding is an exercise of the court's equitable powers). Further, the quote from *Ramirez*, is on point because it discusses general principles of equitable relief, which Yuga admits it is seeking through its exceptional case finding. This Court should consider the conduct of Yuga in determining whether it is entitled to its prayer for equitable relief.

**Plaintiff's Reply:**

Defendants cannot defend against the evidence of their own egregious litigation misconduct by pointing the finger at Yuga Labs. *See supra* ¶ 150. As in *Jackson*, the alleged misconduct of one party was not material in awarding attorneys' fees because "Defendants' conduct was worse and more frequent than [plaintiff's]," warranting an award of attorneys' fees to Yuga Labs. *Jackson*, 2022 WL 2155975, at *5 (C.D. Cal. Feb. 24, 2022). Every example of so-called "misconduct" that Defendants cite is no more than minor discovery or settlement

disputes that have mostly been resolved; for example, a minor deposition delay well before the close of discovery and Yuga Labs' request for Defendants to be consistent in their confidentiality designations.  *See supra* ¶ 150.  In contrast, Defendants' conduct was truly egregious, including: (1) making heinous statements about Yuga Labs, its employees, and counsel and then breaking their agreement not to make these accusations at trial; (2) seeking to relitigate issues throughout the course of this case and even to this day; (3) withholding documents and lying under oath about it; (4) publicly disclosing confidential documents to harm Yuga Labs; (5) using the litigation to farm for engagement on social media; and (6) refusing to settle under reasonable terms after losing the case on the merits.  *See supra* ¶ 121. Regardless, Yuga Labs' objectively strong litigating position alone is enough to find an exceptional case.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014)* (Under the "totality of the circumstances," an exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."); *SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1180 (9th Cir. 2016); Jackson v. Gaspar, No. 2:19-CV-10450-DOC-E, 2022 WL 2155975, at *4 (C.D. Cal. Feb. 24, 2022); see supra* ¶ 151.

Defendants' willful infringement caused egregious harm to Yuga Labs and its BAYC brand.  It is time for the Defendants to face the consequences of their harm through an injunction against further infringement and by handing over their unearned profits along with Yuga Labs' attorneys' fees.

1   Dated:  September 26, 2023          FENWICK & WEST LLP

2

3                                       By: /s/ Eric Ball

4                                          Eric Ball
                                           eball@fenwick.com
5                                          **FENWICK & WEST LLP**
                                           801 California Street
6                                          Mountain View, CA  94041
                                           Telephone: (650) 988-8500
7                                          Fax: (650) 938-5200

8                                       Attorneys for Plaintiff

9                                       YUGA LABS, INC.

10

11  Dated:  September 26, 2023          WILMER CUTLER PICKERING HALE
                                        AND DORR LLP
12

13                                      By: /s/ Louis W. Tompros

14                                         Louis W. Tompros (*pro hac vice*)
                                           louis.tompros@wilmerhale.com
15                                         **WILMER CUTLER PICKERING
                                           HALE AND DORR LLP**
16                                         60 State Street
                                           Boston, MA 02109
17                                         Telephone: (617) 526-6000
                                           Fax: (617) 526-5000
18

19                                      Attorneys for Defendants
                                        RYDER RIPPS and JEREMY CAHEN
20

21

22

23

24

25

26

27

28

1  **ATTESTATION OF CONCURRENCE IN FILING**

2  Pursuant to the United States District Court for the Central District of

3  California's Civil L.R. 5-4.3.4(a)(2)(i), Eric Ball attests that concurrence in the

4  filing of this document has been obtained from Louis W. Tompros.

5

6

7  /s/ *Eric Ball*

   Eric Ball

8  eball@fenwick.com

   **FENWICK & WEST LLP**

9  801 California Street

   Mountain View, CA  94041

10  Telephone: (650) 988-8500

11  Fax: (650) 938-5200

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28