**Defendants' Disputed Post Trial Finding of Fact No. 9:**

The evidence presented at trial establishes that the RR/BAYC project was created as a form of satire intended to protest NFTs linked to what defendants believed were antisemitic or racist injury. Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

**Plaintiff's Basis for Dispute:**

In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  Despite these holdings,

Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

The evidence presented at trial establishes that, from the outset, this was no satirical project.  It was a business venture where the Defendants were interested in making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink [*sic*] you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"); JTX 1; JTX 621.  Defendants did not create their infringing NFTs "as a form of satire."  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it Is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  They made none of these choices at the outset, or changes when suggested to them, as those changes would have reduced the confusion and reduced their profits.

The evidence presented at trial also proves that Defendants were intentionally infringing and that their promotion and sale of RR/BAYC NFTs was not a form of satire.  For example, they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); *see also* JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful

about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID.  that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7.  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, Defendants continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Worse still, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts

sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶ 7.

The Court should not find satire to be the reason Defendants created and marketed their commercially infringing RR/BAYC NFTs.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of

1   infringement and is not adequate support on intent generally or as applied to

2   availability of disgorgement as a remedy, apportionment, and an exceptional case

3   analysis.

4       Moreover, the evidence at trial showed that Defendants are not intentional

5   infringers and did not intend to suggest that RR/BAYC was related to Yuga in any

6   way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the

7   RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather

8   than to confuse.  For example, in private group chats among participants in the

9   RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their

10  intended artistic purpose of the project, their intention that it would spread criticism

11  of Yuga, and their intention that social media platforms be used to educate the

12  public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps

13  Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-

14  801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08,

15  29-30.

16      Defendants also took multiple steps to make clear that the RR/BAYC

17  collection was not related to Yuga in any way.  For example, the rrbayc.com

18  website—through which the majority of RR/BAYC commissions occurred and the

19  vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

20  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

21  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

22  Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

23  [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

24  read and click through a disclaimer acknowledging the artistic purpose of the

25  project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

26  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

27  insisted on these requirement and additional steps so that the artistic purpose of the

28  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

1    Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

2    holder of a BAYC NFT containing the asserted marks and having received IP rights

3    associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

4    Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the

5    time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms

6    & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was

7    to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4

8    ("Q. Your intent in writing the terms and conditions was to allow people to be able

9    to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered

10   in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be

11   creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole

12   Muniz had publicly represented that BAYC NFT holders received all IP rights and

13   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

14   189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz

15   confirmed that someone listening to her public statement about Yuga not having

16   any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

17       The evidence that Yuga cites does not rebut this overwhelming evidence of

18   Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

19   and taking out of context evidence.  For example, Yuga repeatedly cites to various

20   pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

21   confusion.  But those pages are internal discussion about the design of the

22   ApeMarket website to ensure that users of apemarket.com were not confused by the

23   website design.  Yuga even cross-examined Mr. Hickman about these

24   communications and received the same explanation: "This is our attempt to make it

25   as clear as possible.  We are having discussion on how to make sure it was very

26   clear for users."  Trial Tr. [Hickman] 212:22-24.

27       Yuga similarly takes out of context exhibits such as JTX-44.00002 to

28   incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs. That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

Yuga also alleges that Etherscan's creation of a token tracker is evidence of Defendants' intent to cause confusion.  But Defendants do not control the Etherscan website or how Etherscan chooses to display the RR/BAYC NFT collection. Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take

pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness."  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly alleges that Defendants continued to market ApeMarket after entry of summary judgment in this case.  First, this argument makes no sense given that Defendants never released ApeMarket in the first place.  Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which was well before the entry of summary judgment in this case.

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

Defendants' sale and promotion of RR/BAYC NFTs was intended to, and did, cause confusion among consumers in order to gain profit.  As the Court has already found, Defendants' infringement was not art.

Defendants' response is unavailing because (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (8) other alleged infringers do not negate Defendants' infringement.

**The Court's Summary Judgment Order Establishes Liability:**

Defendants' response improperly disputes facts already adjudicated in the Court's

Summary Judgment Order (Dkt. 225).  As discussed above, in that order, the Court held that Defendants intended to deceive consumers "with a bad faith intent to profit."  *Id.* at 15.  That order establishes the matters adjudicated therein for purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings.  Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist.  Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary judgment is ***generally not relevant and should be excluded***" at trial) (emphasis added).  Despite the Court's finding that Defendants knowingly and intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks (SJ Order (Dkt. 225) at

12-15), Defendants' response fails to explain why the Court's findings on intent are insufficient.

**Defendants Intended To Confuse Consumers:**  Defendants' argument that they did not intend to confuse consumers is contradicted by the record.  As discussed above, the numerous pieces of evidence presented at trial prove the Court's settled issue of Defendants' knowledge of their infringement and intent to confuse consumers.  The record is replete with numerous examples of Defendants' internal communications demonstrating Defendants' awareness that their infringement would confuse consumers and refusal to take steps to avoid that confusion.  Defendants' response fails to address the overwhelming majority of these communications, including how Defendants could have, but chose not to make changes recommended by Mr. Lehman, or even by their lawyer, to reduce confusion.  Defendants have no excuse for ignoring their own lawyers' advice. Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  They knew they were in the wrong from the start and were trying to hide their assets from the consequences of their infringement.

Defendants' response fails to negate their intent to cause confusion. Defendants outright fail to even address multiple pieces of evidence showing that they knew they were infringing and creating confusion.  *See, e.g.*, JTX-631, JTX-918.00036.  Regarding Defendants' internal discussions contained in JTX-801, Defendants highlight the fact that when designing Ape Market to sell their infringing NFTs alongside authentic BAYC NFTs, Defendants knew affirmative "friction step[s]" would be required to prevent the obvious risk of confusion.  As Mr. Hickman told Mr. Cahen, "[t]hey are the same art."  Trial Tr. at 212:17-24. Thus, Defendants and their partners worried over how to "make it as clear as possible" the two were different.  *Id.*  This is because selling the same products

under the same marks is confusing.  And yet, Defendants continued ahead without any changes in their sales and promotion of the RR/BAYC NFTs.  Furthermore, Defendants' response admits that their internal discussions recognized confusion from the design of the Ape Market website.  Thus, Defendants would likewise be aware of potential confusion caused on other platforms, such as OpenSea, Foundation, or Twitter, that displayed the same confusingly similar logos and marks used in the design of the Ape Market website.  Yet still, Defendants did not stop this this confusion.

Additionally, Defendants concede that despite the "different numbering system" assigned to RR/BAYC NFTs when minted, consumers were confused because Defendants sold and marketed the RR/BAYC NFTs using Yuga Labs' numbering system and token IDs, not their own.  *See* JTX-44.00002.  As Defendants admit, this was not what "consumers expected" as they were expecting to buy a product connected to Yuga Labs' numbering scheme.

Further, Defendants' attempt to argue that they had no control over third-party websites and marketplaces is false.  Mr. Ripps admitted that he controlled the OpenSea page and made changes to it.  Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (" Q.    But you had a page on OpenSea?  A. I had a page?  Did I have a page?  No. ***Perhaps RR/BAYC collection had a page on OpenSea***.  Q. And who ran that collection?  A. ***Who ran that collection?  I did because I have the keys to the RR/BAYC***.") (emphases added); *id.* at 81:22-82:7 ("A. ***I do remember at one point making the background image the banner***, if you will, to say 'Long Live Conceptual Art,' or something like that, or 'You can't copy an NFT,' or something along those lines . . .") (emphases added).  Similarly, JTX-600 shows "Bored Ape Yacht Club" and "BAYC" coded into the RR/BAYC smart contract as source identifiers on Etherscan.  It also shows "ryder-ripps.eth" as the creator, which Mr. Ripps has admitted to own.  Ripps. Decl. (Dkt. 346) ¶ 89.  Thus, the evidence shows that Mr. Ripps launched the smart contract with the BAYC Marks coded into

it, which caused websites such as Etherscan to confusingly display those marks to the public as if the smart contract was created by Yuga Labs.  These marks can never be removed from the smart contract, causing hyperlinks and other future references to the collection to display the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs.  Without the RR/BAYC smart contract, Yuga Labs cannot retain control of the use of its marks.  *See* Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

Defendants' response also fails to meaningfully or accurately address the fact that they continued to promote Ape Market even after entry of summary judgment in this case.  As discussed *supra* ¶ 3, Defendants admit that Ape Market was operational and ready to launch.  And Defendants do not dispute the fact that as recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77.  Any suggestion otherwise by Defendants cannot be made in good faith.  Defendants' promotion of Ape Market and RR/BAYC NFT sales throughout this litigation continued to harm Yuga Labs.

**Defendants' Infringement Was Not An Art Project:**  Defendants' contention that their infringing NFTs were an art project is not supported by the evidence.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586;

JTX-801.239; JTX-801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Even now, Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  And as discussed above, Mr. Cahen continued to tweet and retweet posts about RR/BAYC NFTs trading on NFT marketplaces as well as their resales.  Defendants' attempt to characterize the posts as "reporting news" is merely pretext for all of their marketing tactics to promote and sell the RR/BAYC NFTs. This was not news.  Mr. Cahen's posts were retweets of bots posting about RR/BAYC NFT sales, which provide no other content, summary, or analysis that could reasonably constitute news reporting.  *See, e.g.*, JTX 1613; JTX-1614; JTX-1615.  Nor does Mr. Cahen's tweet merely stating "RR/BAYC is trading on OpenSea Pro" amount to anything more than convenient advertising.  JTX-1315. Defendants' response fails to raise any credible reason to believe that their infringement was motivated by anything other than money and greed.

**Defendants' Infringement Was Motivated By A Desire To Profit Off Of Yuga Labs' Marks:**  Defendants' public statements represented what they needed to say to market their product.  Any scam requires an appearance of legitimacy. Like most online influencers, Defendants' social media pages contained organic posts mixed in with their marketing to obfuscate their commercial motives.  For example, despite Mr. Ripps' promise to donate the royalties earned from sales of RR/BAYC NFTs to charity, no proceeds were donated, and Defendants' kept the profits for themselves.  *See* Solano Decl. (Dkt. 342) ¶ 28 (citing JTX-1045). Moreover, Defendants' public comments about their artistic goal (to ensure they

"look really sympathetic to people" if caught, (JTX-918.00036)), contradict their internal discussions that overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own unjust enrichment. *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties). Defendants knew they were stealing from Yuga Labs for profit.

**Defendants Did Not Take Steps To Avoid Confusing Consumers:** Defendants did not attempt to avoid confusion. On the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT

smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146. Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in countless non-infringing ways.  But they did not. Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers. *See* O'Laughlin Decl. (Dkt. 341).

Defendants' response relies on an alleged "explanation of the artistic intent for the project" that appeared only on the rrbayc.com website.  But rrbayc.com is not where the majority of the RR/BAYC NFTs were sold.  Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17.  Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea, where Defendants' supposed "artistic explanation" is non-existent.

**Defendants' "Disclaimer" Does Not Negate The Court's Finding That Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.  That Defendants took some

steps to try to conceal their intent when they were inevitably sued does not make the infringing activity less confusing; it just demonstrates their culpability.

More fundamentally though, Defendants' claimed steps did not prevent confusion. The public was not required to read and click a disclaimer. Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer. Defendants also did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer. Kindler Decl. (Dkt. 338) at ¶ 69.

Further, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Indeed, a user today linking to Etherscan will not see Ryder Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club; and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion"). Defendants' claimed disclaimer is non-existent to ineffective at best.

**Yuga Labs' Did Not Give Defendants A License To Infringe:** Defendants' response rehashes their rejected argument that the BAYC Terms gave BAYC NFT holders any and all trademark rights. The Court already found on summary judgment that Yuga Labs granted BAYC holders a valid copyright license, not a trademark license. SJ Order (Dkt. 225) at 9-10 ("Yuga has not granted BAYC NFT holders a trademark license."). Defendants offer no credible evidence to support their claim that the Court should reach a different conclusion at trial. The BAYC Terms give BAYC NFT holders a copyright license to use their

respective Bored Ape image for personal or commercial use, not the marks within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

Ms. Muniz explained that in the one interview where she mentioned "IP" rights, she was referring to copyrights and that the context is clear to that effect.  *Id.* at 72:3-18.  Moreover, this interview is immaterial and irrelevant to Defendants' intent—it occurred in November 2022—long after Defendants made the majority of their sales and after this lawsuit was filed.  Defendants' fail to address the practical impossibility of their intent to create and sell RR/BAYC NFTs being influenced at all by Ms. Muniz's subsequent interview.  Regardless, there is no reasonable interpretation of Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

Additionally, the record disproves that Defendants actually believed this was a justification for their actions, because even as of June 9, 2022, Mr. Ripps ***did not know*** that one of his partners allegedly owned a BAYC NFT and expressed his desire to have access to one:

> maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]
>
> or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]
>
> and put them on the marketplace
>
> so people trust it?
>
> i don't think buying a BAYC makes sense
>
> unless it's for a deal..
>
> [third party] sold his ape
>
> s
>
> sucks
>
> that would have been perfect marketing

wish i spoke to him before he sold

JTX-801.332.  Defendants' contrived defense—and their false claim that they

contemporaneously believed they had a license, despite the lack of a single

communication to that effect—has no merit and further highlights their lack of

credibility.

**Other Alleged Infringers Do Not Negate Defendants' Own Infringement, And Yuga Labs Had Robust Enforcement Programs:**  Defendants' references to unknown, and alleged, third-party infringers, in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any alleged third-party use of the BAYC Marks, or similar marks, is immaterial and irrelevant. As this Court has already found, "despite Defendants' attempt to argue abandonment through third party use or failure to police, these arguments are unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22, 2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made clear that third-party use of a mark is irrelevant in a suit against a particular infringer.  *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990)* (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law"); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir. 2017) (a "'sheer quantity' of irrelevant evidence," which is "largely inapposite to the relevant inquiry," is meaningless); *see also* *F.T.C. v. Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from "introducing into evidence . . . 'thousands of third-party webpages'" because they were irrelevant and thus inadmissible under FRE

401 and 402).  Even so, Defendants have failed to demonstrate actual use of these marks in commerce.  *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at \*30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of third-party marks in an advertisement because "evidence of third-party use is not admissible unless the proponent can provide evidence that the trademarks were *actually used* by third parties, that they were well promoted or that they were recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v. Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at \*3 (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

Even if third-party infringement was material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website.  Come get it here.  And also, by the way, we are going to rip off Yuga's other site next.  And we're going – you know, I've made a million dollars with this scam, and no one can stop me.  We've never had another collection get shown up on Bloomberg News with people confused thinking it's us.  I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this.  So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8.  Nor is it reasonable that third-party uses could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.

Defendants' response belies the record.  Yuga Labs took significant steps to protect the BAYC brand and take down third-party infringing content.  *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections.  I think we spent something like

1  $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust

2  process for takedowns.  And we spend, at least in my tenure as CEO, a million

3  dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of

4  this action is strong evidence that Yuga enforces its trademark rights in the BAYC

5  Marks against infringing third-party users.").

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28