**<u>Defendants' Disputed Post Trial Finding of Fact No. 13</u>:**

  <u>Mr. Ripps and Mr. Cahen intended RR/BAYC as a form of protest designed to educate people on the nature of non-fungible tokens ("NFTs"), and what they saw as problematic content in Yuga's "Bored Ape Yacht Club" ("BAYC") NFT collection. Ripps Decl. ¶¶ 87-94 (uncontested); Cahen Decl. ¶¶ 97-103; Hickman Decl. ¶¶ 62-66; Trial Tr. [Cahen] 229:9-13</u>.

  **<u>Plaintiff's Basis for Dispute</u>:**

  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived."  . . .  In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . .  In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.

Defendants have continually disregarded this order and compounded this litigation by relitigating this settled issue.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Nevertheless, the evidence presented at trial also establishes that, from the outset, the promotion and sale of RR/BAYC NFTs was not about the education of people.  Instead, it was a commercial venture where Defendants were interested in making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make I of money tbh"; "Potentially a lot").  They did not create their infringing NFTs "as a form of protest designed to educate people."  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Indeed, they used the very identical images that they claim are "problematic."  Trial Tr. at 222:7-9.

The evidence also shows that Defendants knew they were infringing and creating confusion, as they acted contrary to their attorney's advice.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create");

JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker); Dkt. 416 at ¶ 7.  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").  In sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

Likewise, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts

1  sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as

2  well as retweet Defendants' own tweets from the @ApeMarketplace Twitter

3  account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day

4  before trial, the @ApeMarketplace Twitter account continued to promote the

5  infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were

6  still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-

7  59:19.

8          The Court's findings at summary judgment and the evidence at trial confirms

9  that Defendants' infringing and commercial NFTs were not created and marketed as

10  a protest or for educational purposes.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It

11  does not use satire and protest.  It is the exact same artwork and the exact same

12  logo").  They were created as part of the business venture, including as an

13  enticement to launch Ape Market.  JTX-1; JTX-696; JTX-801.144 (Mr. Cahen:

14  "One thing we can do to stimulate the rsvp is to tease apemarket.com"); JTX-696

15  ("Listing requires holding RR/BAYC").

16  **Defendants' Response:**

17          Yuga improperly objects to Defendants' proposed finding of fact because, by

18  arguing that the Court's summary judgment order supports a finding of intentional

19  infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law

20  of the case doctrine does not apply to pretrial rulings ***such as motions for summary***

21  ***judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

22  added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

23  rulings, often based on incomplete information, don't bind district judges for the

24  remainder of the case.  Given the nature of such motions, it could not be

25  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

26  an issue were decided at summary judgment for one purpose, the summary

27  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

28  CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

insisted on these requirement and additional steps so that the artistic purpose of the

work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of

Defendants' public activities associated with RR/BAYC, confirms their intent.  In

those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith

belief that Yuga had given authorization for the creation of projects like RR/BAYC.

At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were

more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶

187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX

2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga

had not taken steps to stop these third-party projects from using Yuga's marks.

Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There

were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape

Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23;

[Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen,

and Mr. Hickman would have probably seen these collections using the Bored Ape

Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.

[Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga

trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-

22.  For example, there are published notebooks with ISBN numbers,

commemorative coins, alcohol products, skateboards, cereal brands, restaurants,

1   and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's

2   trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

3        Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

4   holder of a BAYC NFT containing the asserted marks and having received IP rights

5   associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

6   Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the

7   time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms

8   & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was

9   to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4

10  ("Q. Your intent in writing the terms and conditions was to allow people to be able

11  to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered

12  in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be

13  creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole

14  Muniz had publicly represented that BAYC NFT holders received all IP rights and

15  that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

16  189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz

17  confirmed that someone listening to her public statement about Yuga not having

18  any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

19       The evidence that Yuga cites does not rebut this overwhelming evidence of

20  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

21  and taking out of context evidence.  For example, Yuga repeatedly cites to various

22  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

23  confusion.  But those pages are internal discussion about the design of the

24  ApeMarket website to ensure that users of apemarket.com were not confused by the

25  website design.  Yuga even cross-examined Mr. Hickman about these

26  communications and received the same explanation: "This is our attempt to make it

27  as clear as possible.  We are having discussion on how to make sure it was very

28  clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs. That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

Yuga also alleges that Etherscan's creation of a token tracker is evidence of Defendants' intent to cause confusion.  But Defendants do not control the Etherscan website or how Etherscan chooses to display the RR/BAYC NFT collection. Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

1  explained in his declaration, "Overall, I would consider myself a very active
2  community member in the cryptocurrency space, which is something that I take
3  pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50
4  (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to
5  report on crypto news or other topics I find noteworthy to help spread awareness."
6  Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but
7  simply report news/crypto events in relation to the RR/BAYC collection.

8       Yuga also incorrectly alleges that Defendants continued to market
9  ApeMarket after entry of summary judgment in this case.  First, this argument
10 makes no sense given that Defendants never released ApeMarket in the first place.
11 Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which
12 was well before the entry of summary judgment in this case.

13      The evidence that Yuga has cherry-picked and mischaracterized are not
14 sufficient to rebut the overwhelming evidence showing Defendants' intent to
15 protest and criticize Yuga.

16      **Plaintiff's Reply:**

17      Defendants' sale and promotion of RR/BAYC NFTs was intended to cause
18 confusion among consumers in order to gain profit.  As the Court has already
19 found, Defendants' infringement was not art.

20      Defendants' response is unavailing for the same reasons discussed *supra* ¶ 9,
21 specifically because (1) the response seeks to relitigate issues already adjudicated
22 by the Court, (2) the record shows that Defendants intended to confuse consumers,
23 (3) Defendants' commercial infringement was not protected "art," (4) Defendants
24 intended to profit off of their infringement, (5) Defendants did not take steps to
25 avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of
26 confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr.
27 Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs'

28

1  BAYC Marks, and (8) other alleged infringers do not negate Defendants'

2  infringement.