**Defendants' Disputed Post Trial Finding of Fact No. 17:**

The evidence presented at trial establishes that defendants did not intend to infringe Yuga's trademarks or create confusion regarding the origin of the RR/BAYC NFTs. Trial Tr. [Defendants' witnesses] 204:21-270:23; Ripps Decl. (uncontested); Cahen Decl.; Hickman Decl.

**Plaintiff's Basis for Dispute:**

In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.*  Defendants' infringement is thus not art. Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17. Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  But, Defendants have continually disregarded this order and compounded this litigation

by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Nevertheless, the evidence presented at trial also establishes that, from the outset, this was a business venture where Defendants were interested in making "like a million dollars" from using the BAYC Marks.  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"); JTX-1.  They created their RR/BAYC NFTs with the intent to infringe because using Yuga Labs' BAYC Marks allowed them to freeride off of the commercial success of the BAYC brand.  Kindler Decl. (Dkt. 338) at ¶ 68 ("Defendants were unjustly enriched in the form of avoided costs, as they were able to 'free ride' on investments that Yuga Labs made to develop the marks that the Defendants infringed.").  Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market); Dkt. 416 at ¶ 7.  Indeed, they used the very identical images that they claim are "problematic."  Trial Tr. at 222:7-9.

The evidence also shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr.

Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Furthermore, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images. Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342)¶ 25 n.2.

1  Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter
2  account and used a feature on Twitter that displayed Yuga Labs' artwork as his
3  profile picture with a hexagon border, signaling that Twitter had "verified" his
4  ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT.
5  Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  *Id.* ¶ 12;
6  JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.
7  This caused further confusion as RR/BAYC NFT holders used the NFTs as their
8  profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.  Beyond their confusing
9  promotion on Twitter, Defendants promoted their infringing collection on platforms
10  such as OpenSea and Foundation, on which the collection appeared almost identical
11  to Yuga Labs' genuine BAYC collection.  JTX-28; JTX-29; JTX-683; JTX-719.  In
12  sum, Defendants repeatedly demonstrated their intent to infringe and knowledge of
13  a likelihood of confusion.  *See, e.g.*, Dkt. 416 at ¶¶ 5-7.

14       Additionally, throughout this litigation and even after the summary judgment
15  order confirming their infringement, Defendants continued to market their
16  RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr.
17  Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."
18  JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts
19  sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as
20  well as retweet Defendants' own tweets from the @ApeMarketplace Twitter
21  account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day
22  before trial, the @ApeMarketplace Twitter account continued to promote the
23  infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were
24  still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-
25  59:19.  They could have stopped after the Court found them to be infringing.  But
26  they continued to intentionally add to the confusion.

27       The evidence establishes that Defendants did intend to confuse consumers
28  and did intend to use Yuga Labs' BAYC Marks.  Trial Tr. at 17:20-18:14 and

63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

 **Defendants' Response**:

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Moreover, the evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism

of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.

At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244. Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344). There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project. Trial Tr. [Muniz] 77:19-23. 26. There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga. Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club. Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project. Hickman Decl. ¶¶ 19-22 (Dkt. 345). BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms."). Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property. For example, Yuga's CEO Nicole

1   Muniz had publicly represented that BAYC NFT holders received all IP rights and
2   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶
3   189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz
4   confirmed that someone listening to her public statement about Yuga not having
5   any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

6        The evidence that Yuga cites does not rebut this overwhelming evidence of
7   Defendants' intent to protest and criticize because Yuga relies on mischaracterizing
8   and taking out of context evidence.  For example, Yuga repeatedly cites to various
9   pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged
10  confusion.  But those pages are internal discussion about the design of the
11  ApeMarket website to ensure that users of apemarket.com were not confused by the
12  website design.  Yuga even cross-examined Mr. Hickman about these
13  communications and received the same explanation: "This is our attempt to make it
14  as clear as possible.  We are having discussion on how to make sure it was very
15  clear for users."  Trial Tr. [Hickman] 212:22-24.

16       Yuga similarly takes out of context exhibits such as JTX-44.00002 to
17  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-
18  44.00002, Mr. Hickman stated that "people believe the tokenId should match the
19  RR ID.  that is where they get confused."  This statement is not discussing
20  confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is
21  discussing how the RR/BAYC collection used a different numbering system that
22  BAYC NFTs, and that consumers expected the numbers match as a shorthand
23  manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.
24  That is, due to the different numbering system, some consumers were confused as
25  to which RR/BAYC NFT they received but they understood very well that they
26  received an NFT created by Mr. Ripps that protests and criticizes Yuga.

27       Yuga also alleges that Etherscan's creation of a token tracker is evidence of
28  Defendants' intent to cause confusion.  But Defendants do not control the Etherscan

1    website or how Etherscan chooses to display the RR/BAYC NFT collection.

2    Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of

3    NFTs do not use Etherscan's token tracker/token name but instead rely on

4    marketplaces or by checking the associated smart contract address.  Trial Tr.

5    [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish

6    NFTs "would be a fairly weak way to do so because often those things are mutable.

7    They can be changed after the fact.  Also, there's no guarantee of uniqueness."

8    Trial Tr. [Atalay] 133:12-23.

9        Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

10   NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

11   (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

12   made reporting news on what is occurring in relation to the RR/BAYC collection:

13   specifically, that certain third-party marketplaces were trading the NFTs despite

14   Yuga's efforts to silence Defendants' criticism and public reports of certain

15   transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

16   explained in his declaration, "Overall, I would consider myself a very active

17   community member in the cryptocurrency space, which is something that I take

18   pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

19   (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

20   report on crypto news or other topics I find noteworthy to help spread awareness."

21   Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

22   simply report news/crypto events in relation to the RR/BAYC collection.

23       Yuga also incorrectly alleges that Defendants continued to market

24   ApeMarket after entry of summary judgment in this case.  First, this argument

25   makes no sense given that Defendants never released ApeMarket in the first place.

26   Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which

27   was well before the entry of summary judgment in this case.

28

The evidence that Yuga has cherry-picked and mischaracterized are not sufficient to rebut the overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

**Plaintiff's Reply:**

As the Court's summary judgment order explicitly held, Defendants' sale and promotion of their infringing RR/BAYC NFTs was intended to cause confusion among consumers in order to gain profit.  Defendants' attempt to disregard the Court's order is unavailing.

As discussed *supra* ¶ 9, Defendants' response lacks merit.  Specifically: (1) the response seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants' commercial infringement was not protected "art," (4) Defendants intended to profit off of their infringement, (5) Defendants did not take steps to avoid confusion, (6) Defendants' "disclaimers" did not dispel likelihood of confusion, (7) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, and (8) other alleged infringers do not negate Defendants' infringement.