**Defendants' Disputed Post Trial Finding of Fact No. 19:**

Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the public that RR/BAYC was intended as a protest art project. Ripps Decl. ¶¶ 158-176 (uncontested); Cahen Decl. ¶¶ 145-155; Dkt. 197-1 ¶ 230.

**Plaintiff's Basis for Dispute:**

Defendants did not take steps to "make clear" to the public that "RR/BAYC was intended as a protest art project." To the contrary, Defendants took many steps to ensure that the public was and would remain confused.

First, Defendants named their NFT collection "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, when they could have named it anything else. Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

Second, Defendants could have used, but chose not to use, different images or overlaid some commentary on the images they did use. *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

Third, Defendants prominently and without commentary used Yuga Labs' BAYC Marks in their marketing efforts. JTX-28; JTX-29; JTX-683; JTX-719; JTX-696. This use on Twitter and secondary marketplaces, such as Foundation and OpenSea, was likely to and intended to cause confusion. JTX-721; SJ Order (Dkt. 225) at 13.

Fourth, Mr. Ripps took further steps to confuse the public. For example, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images. Muniz Decl. (Dkt. 340) ¶ 13;

JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2. Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT. Muniz Decl. (Dkt. 340) ¶ 12. This confused some viewers on Twitter. Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710. This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well. *See, e.g.*, JTX-522, JTX-523.

Fifth, it is not credible that Defendants were not trying to confuse the public when throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs. On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317. Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account. JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76. As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

Finally, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17. And Defendants did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club or RR/BAYC for the infringing NFTS, but instead will see "Bored Ape Yacht Club"

and "BAYC" as the contract name and contract symbol, respectively. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion).

**Defendants' Response:**

The trial record shows that Defendant had taken significant steps to make clear that collectors understood the satirical nature of the RR/BAYC project. For example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense. JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested). Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.

Further, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it

had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, also consists of acts taken that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Yuga argues that this evidence of efforts to not confuse is rebutted by Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have no control over the Etherscan website, what it displays, and how it chooses to show the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable. They can be changed after the fact.  Also, there's no guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

Yuga also misleadingly cites to internal chats, and falsely states that Defendants discussed using different images overlaid with commentary.  However, the communications that Yuga cites are in fact internal discussions about ApeMarket and how to design the website so as to ensure that users would not be confused by the design of website.  For example, the statement at JTX-801.196 that Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are

viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …"). And, in fact, Yuga attempted to cross-examine Mr. Hickman regarding these communications, and Mr. Hickman explained, "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users." Trial Tr. [Hickman] 212:22-24. Thus, Yuga cites conversations that have nothing to do with confusion regarding the source off RR/BAYC NFTs and instead are internal discussion about potential designs for ApeMarket.

Yuga also falsely argues that Defendants' marketing efforts did not indicate that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical purposes. For example, Yuga cites to JTX-29, which is an OpenSea page that Mr. Ripps did not create. Regardless, the page clearly labels the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps." The exhibit also has Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF." JTX-28, similarly, is the Foundation page which Mr. Ripps also did not design. But regardless, the page states that the collection was created by "@ryder_ripps." JTX-683 also makes clear that Defendants' NFT collection is not the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on @openseas … We passed BAYC in the middle of Apefest!" JTX-719 is similarly a tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight" with a link to the Foundation page for the RR/BAYC collection. Again, this is an exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection. And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and states in the first post, "Make sure to join the RR/BAYC community discord!" Again, Yuga is wrong to assert that these exhibits show that Defendants marketed the RR/BAYC collection without commentary.

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037, in which he states that "RR/BAYC grants to 100% commercial rights,

community member created a shopping site for his! Now you can get the hoodie of your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which has caused thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075. The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms & Conditions hardly amounts to representing that RR/BAYC granted commercial rights. In fact, the post does the opposite because it is commenting on how full commercial rights cannot be granted without destroying those rights, as Yuga has done by surrendering the Bored Ape Yacht Club brand to the world.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case. The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection. As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in. A lot of the work I do takes place over social media." Cahen Decl. ¶ 50 (Dkt. 344). Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344). These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion. The "law of

the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite. Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection. It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.

And lastly, efforts Defendants made to ensure that nobody was confused were clearly done in good faith because those efforts were successful. The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to cause confusion. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and

support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A. Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Indeed, Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Plaintiff's Reply:**

Defendants' lengthy and scattershot response fails to grapple with the facts and law of the case.  Contrary to Defendants' suggestion, they failed to take steps to avoid confusion when selling the infringing RR/BAYC NFTs, creating further potential for actionable initial interest and post-sale confusion.  Defendants' spaghetti doesn't stick.

As discussed *supra*, Defendants' response is unavailing because (1) the Court's summary judgment order established liability, even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants intended to confuse consumers and refused to implement "friction steps" to avoid confusion (*supra* ¶ 9), (3) Defendants' "disclaimer" does not negate the Court's finding that consumers were likely to be confused (*supra* ¶ 9), (4) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (5) Defendants' infringement was not an art project or "reporting news" (*supra* ¶ 9), and (5) Ape Market was operational and ready to launch (*supra* ¶ 3). Indeed, even a month after trial, Defendants still advertise rrbayc.com in the profile heading of the Ape Market Twitter profile. *See* https://twitter.com/apemarketplace. In their response directly above, Defendants admit that "the ApeMarket Twitter page, [] links to rrbayc.com." That same Twitter account remains live, with promotions of apemarket.com, the infringing rrbayc.com domain, and their promotion of the infringing RR/BAYC NFTs on Looksrare. Defendants' claims to the contrary are not in good faith and contrary to the evidence. *See* Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Additionally, the Court should reject Defendants' responses because, as discussed further below, (1) it ignores post-sale confusion as actionable, (2) confusion over sponsorship or affiliation is actionable, (3) most RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer, and (4) Defendants intended to confuse consumers and had control over third-party websites and marketplaces.

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

**Post-Sale Confusion Is Actionable:** Defendants' alleged steps to address confusion by the first purchaser ignore post-sale confusion. *See Gucci Am., Inc. v.*

*Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."). That consumers were purchasing Defendants' NFTs with the expectation to resell them to other confused consumers is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17 *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants do not and cannot rebut this fact or law.

**Confusion Over Sponsorship Or Affiliation Is Actionable:** Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship. The Lanham Act, however, expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the or as to the origin, sponsorship, or approval of his or her goods[.]" 15 U.S.C. § 1125(a)(1)(A). Therefore, regardless of whether a consumer saw Mr. Ripps' name or "RR/BAYC" on OpenSea or Foundation sales pages, their confusion as to whether Defendants' were associated with Yuga Labs and Bored Ape Yacht Club is nonetheless actionable. Such confusion was likely, as the Court has already held. SJ Order (Dkt. 225) at 13. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs, including when

testing Defendants' alleged modified use of the BAYC Marks. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Indeed, Mr. Hickman was clearly confused when he viewed Defendants' infringing Foundation webpage. When asked to identify the source of the NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he paused for around five seconds, examined the page closely and stated that the page "looks to be Bored Ape Yacht Club." Trial Tr. 213:9-13 (lodged at Dkt. 415).

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:** Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'"). These secondary markets did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing NFTs took place on the secondary market, including platforms such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products. These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale. Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling"). Defendants' contention is therefore incorrect and misleading.

**Defendants Intended To Confuse Consumers And Had Control Over Third-Party Websites And Marketplaces:** As discussed *supra* ¶ 9, Defendants had control over their infringing use of the BAYC Marks on websites and marketplaces. But even if Defendants falsely claim they had no control over these websites and marketplaces, the point remains that their confusing use of the BAYC Marks can never be removed from the smart contract, causing hyperlinks and other future references to the collection to display the BAYC Marks. Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78. The permanent existence of Yuga Labs' marks in association with the RR/BAYC smart contract is why, like a domain name, the smart contract should be transferred to Yuga Labs. Without the RR/BAYC smart contract, Yuga Labs cannot retain control of the use of its marks. *See* Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").