**Defendants' Disputed Post Trial Finding of Fact No. 20:**

<u>For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (uncontested); Cahen Decl. ¶ 144) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (uncontested); Cahen Decl. ¶¶ 138-139, 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.</u>

**Plaintiff's Basis for Dispute:**

Yuga Labs agrees with Defendants' admission that they made profits from the infringing RR/BAYC NFTs, though Yuga Labs does not concede the remainder of this paragraph.

Defendants did not take steps to "make clear" to the public that "RR/BAYC was intended as a protest art project." To the contrary, Defendants took many steps to ensure that the public was and would remain confused.

First, Defendants named their NFT collection "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, when they could have named it anything else. Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

Second, Defendants could have used, but chose not to use, different images or overlaid some commentary on the images they did use. *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

Third, Defendants prominently and without commentary used Yuga Labs' BAYC Marks in their marketing efforts. JTX-28; JTX-29; JTX-683; JTX-719; JTX-696. This use on secondary marketplaces, such as Foundation and OpenSea,

was likely to and intended to cause confusion. JTX-721; SJ Order (Dkt. 225) at 10-13.

Fourth, Mr. Ripps took further steps to confuse the public. For example, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own commercial rights in Yuga Labs' underlying artwork—a representation that was not only false, but further misleading because owners of genuine BAYC NFTs do own certain commercial rights in the underlying images. Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2. Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon border, signaling that Twitter had "verified" his ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT. Muniz Decl. (Dkt. 340) ¶ 12. This confused some viewers on Twitter. Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710. These actions caused further confusion, as RR/BAYC NFT holders used the NFTs as their profile pictures as well. *See, e.g.*, JTX-522, JTX-523.

Fifth, it is not credible that Defendants were not trying to confuse the public when throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their infringing NFTs and Ape Market and harm Yuga Labs. On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317. Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account. JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76. As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

Sixth, with respect to the supposed disclaimers on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17. On rrbayc.com Defendants could not enforce any requirement that users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one" would read (JTX-801.128). And, this wall of text did nothing to dispel confusion amongst the general public when every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. The public was not required to read and click a disclaimer because Defendants did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. Even more, the majority of the sales of RR/BAYC NFTs were on secondary marketplaces—not rrbayc.com—where there was no disclaimer. Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 (estimating $10 million impact). Mr. Ripps admits that "technically" all RR/BAYC NFTs were sold through Foundation. Dkt. 396 (Ripps Deposition Designations) at 82:8-13.

Finally, because every single RR/BAYC NFT uses the trademarks BORED APE YACHT CLUB and BAYC, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club or RR/BAYC, but will see Bored Ape Yacht Club and BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion).

**Defendants' Response:**

The trial record shows that Defendant had taken significant steps to make clear that collectors understood the satirical nature of the RR/BAYC project. For

example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense.  JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).  Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.

Further, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, also consists of acts taken that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

1    Yuga argues that this evidence of efforts to not confuse is rebutted by
2 Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have
3 no control over the Etherscan website, what it displays, and how it chooses to show
4 the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that
5 consumers of NFTs do not use Etherscan's token tracker/token name but instead
6 rely on marketplaces or by checking the associated smart contract address.  Trial Tr.
7 [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish
8 NFTs "would be a fairly weak way to do so because often those things are mutable.
9 They can be changed after the fact.  Also, there's no guarantee of uniqueness."
10 Trial Tr. [Atalay] 133:12-23.

11    Yuga also misleadingly cites to internal chats, and falsely states that
12 Defendants discussed using different images overlaid with commentary.  However,
13 the communications that Yuga cites are in fact internal discussions about
14 ApeMarket and how to design the website so as to ensure that users would not be
15 confused by the design of website.  For example, the statement at JTX-801.196 that
16 Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually
17 discussing how to create a design for the never-released ApeMarket that would not
18 be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think
19 we could also have a label under the logo that denotes which collection you are
20 viewing or something" and further stating "[b]ecause that's where the real
21 importance lies[,] rrbayc truly is very important conceptual art …").  And, in fact,
22 Yuga attempted to cross-examine Mr. Hickman regarding these communications,
23 and Mr. Hickman explained, "This is our attempt to make it as clear as possible.
24 We are having discussion on how to make sure it was very clear for users."  Trial
25 Tr. [Hickman] 212:22-24.   Thus, Yuga cites conversations that have nothing to do
26 with confusion regarding the source off RR/BAYC NFTs and instead are internal
27 discussion about potential designs for ApeMarket.
28

     Yuga also falsely argues that Defendants' marketing efforts did not indicate that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical purposes. For example, Yuga cites to JTX-29, which is an OpenSea page that Mr. Ripps did not create. Regardless, the page clearly labels the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps." The exhibit also has Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF." JTX-28, similarly, is the Foundation page which Mr. Ripps also did not design. But regardless, the page states that the collection was created by "@ryder_ripps." JTX-683 also makes clear that Defendants' NFT collection is not the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on @openseas … We passed BAYC in the middle of Apefest!" JTX-719 is similarly a tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight" with a link to the Foundation page for the RR/BAYC collection. Again, this is an exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection. And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and states in the first post, "Make sure to join the RR/BAYC community discord!" Again, Yuga is wrong to assert that these exhibits show that Defendants marketed the RR/BAYC collection without commentary.

     Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037, in which he states that "RR/BAYC grants to 100% commercial rights, community member created a shopping site for his! Now you can get the hoodie of your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which has caused thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075. The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms

& Conditions hardly amounts to representing that RR/BAYC granted commercial rights. In fact, the post does the opposite because it is commenting on how full commercial rights cannot be granted without destroying those rights, as Yuga has done by surrendering the Bored Ape Yacht Club brand to the world.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case. The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection. As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in. A lot of the work I do takes place over social media." Cahen Decl. ¶ 50 (Dkt. 344). Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344). These tweets are not "marketing" activities but simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-

CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite. Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection. It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.

And lastly, efforts Defendants made to ensure that nobody was confused were clearly done in good faith because those efforts were successful. The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to cause confusion. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19. Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused

on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Indeed, Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Plaintiff's Reply:**

Defendants' lengthy response fails to grapple with the facts and law of the case. Contrary to Defendants' suggestion, they failed to take steps to avoid confusion when selling the infringing RR/BAYC NFTs, creating further potential for actionable initial interest and post-sale confusion.

As with Defendants' previous response (*supra* ¶ 19), Defendants' response is unavailing because (1) the Court's summary judgment order established liability, even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants intended to confuse consumers and refused to implement "friction steps" to avoid confusion (*supra* ¶ 9), (3) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 3), (4) Defendants' infringement was not an art project or "reporting news" (*supra* ¶ 9), (5) it ignores post-sale confusion as actionable (*supra* ¶ 19), (6) confusion over sponsorship or affiliation is actionable (*supra* ¶ 19), (7) most

RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra* ¶ 19), and (8) Defendants intended to confuse consumers and had control over third-party websites and marketplaces (*supra* ¶ 19).

Defendants' response also lacks merit because, as discussed further below, Defendants fail to disprove that any RR/BAYC purchasers were confused.

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

**Defendants Fail To Disprove That Any RR/BAYC Purchasers Were Confused:** Defendants present no evidence to show that no consumers purchased their infringing NFTs out of confusion. Defendants' anecdotal evidence of purported support from purchasers does not rebut the evidence of actual confusion in the record, as explained *supra* ¶ 3. Defendants admit that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) which undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused. Defendants also claim that it is not feasible for them to contact every consumer who requested a refund or purchased an RR/BAYC NFT and therefore Mr. Ripps lacks knowledge of why each refund was issued or why each purchase was made. And as discussed *supra* there is ample evidence of consumer confusion in the record. *See supra* ¶ 3; *see also* O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14 (discussing survey evidence finding that Defendants' infringement caused confusion). In sum, Defendants do not have a survey of or even communications from the majority of purchasers to prove no confusion; there is thus no basis for their claim that no one was confused.