**Defendants' Disputed Post Trial Finding of Fact No. 22:**

Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

**Plaintiff's Basis for Dispute:**

Defendants did not take steps to make "clear" to the public Mr. Ripps' supposed artistic intent.  To the contrary, Defendants took many steps to try to conceal their intent and ensure that the public was and would remain confused.

First, Defendants named their NFT collection "Bored Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT smart contract, when they could have named it anything else.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

Second, Defendants could have used, but chose not to use, different images or overlaid some commentary on the images they did use.  *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).

Third, Defendants prominently and without commentary used Yuga Labs' BAYC Marks in their marketing efforts.  JTX-28; JTX-29; JTX-683; JTX-719; JTX-696.  This use on secondary marketplaces, such as Foundation and OpenSea, was likely to and intended to cause confusion.  JTX-721.

Fourth, Mr. Ripps took further steps to confuse the public.  For example, Mr. Ripps represented that by owning an RR/BAYC NFT, a consumer would own

1  commercial rights in Yuga Labs' underlying artwork—a representation that was not

2  only false, but further misleading because owners of genuine BAYC NFTs do own

3  certain commercial rights in the underlying images.  Muniz Decl. (Dkt. 340) ¶ 13;

4  JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25 n.2.  Adding to this confusion,

5  Mr. Ripps connected an RR/BAYC NFT to his Twitter account and used a feature

6  on Twitter that displayed Yuga Labs' artwork as his profile picture with a hexagon

7  border, signaling that Twitter had "verified" his ownership of the NFT and

8  misleadingly suggesting his ownership of a BAYC NFT.  Muniz Decl. (Dkt. 340) ¶

9  12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-

10  1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This

11  caused further confusion as RR/BAYC NFT holders used the NFTs as their profile

12  pictures as well.  *See, e.g.*, JTX-522, JTX-523.

13  Fifth, it is not credible that Defendants were not trying to confuse the public

14  when throughout this litigation and even after the summary judgment order

15  confirming their infringement, Defendants continued to market their RR/BAYC

16  NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted

17  an announcement that "RR/BAYC is trading on OpenSea Pro."  JTX-1315; *see also*

18  JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of

19  RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet

20  Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048;

21  Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the

22  @ApeMarketplace Twitter account continued to promote rrbayc.com and link to a

23  marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl.

24  (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.

25  Sixth, with respect to the supposed disclaimers on rrbayc.com, "the fact that

26  Defendants concluded it was necessary to include a disclaimer demonstrates their

27  awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225)

28  at 17.  Defendants knew they were infringing and creating confusion, as they acted

contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps: "per our

attorney we may just need to change the skull / If we want to fight trademark").

Instead of making changes, such as those recommended by their lawyer or Mr.

Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the

RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience,

when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit.

For instance Mr. Ripps asked for a reference to his limited liability company,

Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued

personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo

and branding direction in light of the trademark thing" to Mr. Cahen before they

learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if

get do get sued, for us to look really sympathetic to everyone" (JTX-918.0036).

That Defendants took some steps to try to conceal their intent when they were

inevitably sued does not make the infringing activity less confusing; it just

demonstrates their culpability.

       The public was not required to read and click a disclaimer.  Indeed, even on

rrbayc.com, Defendants could not enforce any requirement that users "read" what

Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no

one" would read (JTX-801.128).  And, this wall of text did nothing to dispel

confusion amongst the general public when every single RR/BAYC NFT sold (or

that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB

and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6;

Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  The public was not required to

read and click a disclaimer because Defendants did not include any similar

disclaimer on Foundation or other secondary marketplaces, nor was there one on

Etherscan.  The majority of the sales of RR/BAYC NFTs have been on secondary

1   marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69;

2   JTX-801.376 ($10 million impact).

3        Defendants have no survey, or material consumer evidence, that users of the

4   infringing rrbayc.com website read any disclaimer.  This is not surprising since the

5   vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr.

6   Ripps admitted that all sales went through Foundation—where there was no

7   disclaimer.  (Ripps Deposition Designations) at 82:8-13.

8        Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

9   uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

10  337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user

11  today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but

12  will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.

13  Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano

14  Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457

15  F.3d 1062, 1077 (9th Cir. 2006) (finding that disclaimers on packaging, but not on

16  infringing product, did "nothing to dispel post-purchase confusion).

17  **Defendants' Response:**

18       The trial record shows that Defendant had taken significant steps to make

19  clear that collectors understood the satirical nature of the RR/BAYC project.  For

20  example, Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody

21  he believed was confused, believed that consumers could not be confused, took

22  steps to avoid confusion, and that he chose to make his project an NFT collection

23  because that was the only way his criticisms would make sense.  JTX-2085; JTX-

24  2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346)

25  (uncontested).  Yuga did not challenge these statements when it elected not to

26  cross-examine Mr. Ripps.

27       Further, the rrbayc.com website—through which the majority of RR/BAYC

28  commissions occurred and the vast majority of alleged profits accrued (Ripps Decl.

¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an

explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346)

(uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202;

JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website

were also required to read and click through a disclaimer acknowledging the artistic

purpose of the project before they were allowed to commission an NFT.  *See* Ripps

Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

Mr. Ripps insisted on these requirement and additional steps so that the artistic

purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman

Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it

had a negative impact on usability? …  A.   … Ryder wanted it and so he had the

final call.").

Defendants' online discussion, which consisted of nearly the entirety of

Defendants' public activities associated with RR/BAYC, also consists of acts taken

that inform the public regarding the satirical nature of RR/BAYC NFTs.  In those

discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Yuga argues that this evidence of efforts to not confuse is rebutted by

Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have

no control over the Etherscan website, what it displays, and how it chooses to show

the RR/BAYC collection.  And, in fact, Mr. Atalay himself has admitted that

consumers of NFTs do not use Etherscan's token tracker/token name but instead

rely on marketplaces or by checking the associated smart contract address.  Trial Tr.

[Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish

NFTs "would be a fairly weak way to do so because often those things are mutable.

1    They can be changed after the fact.  Also, there's no guarantee of uniqueness."

2    Trial Tr. [Atalay] 133:12-23.

3           Yuga also misleadingly cites to internal chats, and falsely states that

4    Defendants discussed using different images overlaid with commentary.  However,

5    the communications that Yuga cites are in fact internal discussions about

6    ApeMarket and how to design the website so as to ensure that users would not be

7    confused by the design of website.  For example, the statement at JTX-801.196 that

8    Yuga relies on to argue that RR/BAYC was likely to cause confusion is actually

9    discussing how to create a design for the never-released ApeMarket that would not

10   be confusing for users of the website.  *See* JTX-801-196 (Mr. Cahen wrote, "I think

11   we could also have a label under the logo that denotes which collection you are

12   viewing or something" and further stating "[b]ecause that's where the real

13   importance lies[,] rrbayc truly is very important conceptual art …").  And, in fact,

14   Yuga attempted to cross-examine Mr. Hickman regarding these communications,

15   and Mr. Hickman explained, "This is our attempt to make it as clear as possible.

16   We are having discussion on how to make sure it was very clear for users."  Trial

17   Tr. [Hickman] 212:22-24.   Thus, Yuga cites conversations that have nothing to do

18   with confusion regarding the source off RR/BAYC NFTs and instead are internal

19   discussion about potential designs for ApeMarket.

20          Yuga also falsely argues that Defendants' marketing efforts did not indicate

21   that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical

22   purposes.  For example, Yuga cites to JTX-29, which is an OpenSea page that Mr.

23   Ripps did not create.  Regardless, the page clearly labels the NFT collection as

24   "RR/BAYC" and stated that it is "By ryder_ripps."  The exhibit also has

25   Defendants' satirical logo stating, "THIS LOGO IS BASED ON THE SS

26   TOTENKOPF."   JTX-28, similarly, is the Foundation page which Mr. Ripps also

27   did not design.  But regardless, the page states that the collection was created by

28   "@ryder_ripps."  JTX-683 also makes clear that Defendants' NFT collection is not

1    the same as Yuga's—it states "RR/BAYC is official the highest 24h volume on

2    @openseas … We passed BAYC in the middle of Apefest!"  JTX-719 is similarly a

3    tweet by Mr. Ripps stating, "very much winning this battle, will continue to fight"

4    with a link to the Foundation page for the RR/BAYC collection.  Again, this is an

5    exhibit that directly expresses the protest purpose of the RR/BAYC NFT collection.

6    And JTX-696 is simply the ApeMarket Twitter page, which links to rrbayc.com and

7    states in the first post, "Make sure to join the RR/BAYC community discord!"

8    Again, Yuga is wrong to assert that these exhibits show that Defendants marketed

9    the RR/BAYC collection without commentary.

10          Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-

11   1037, in which he states that "RR/BAYC grants to 100% commercial rights,

12   community member created a shopping site for his! Now you can get the hoodie of

13   your dreams."  This was a tweet making fun of Yuga's Terms & Conditions, which

14   has caused thousands of third parties to use the Bored Ape Yacht Club and its

15   marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191

16   (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244;

17   JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence

18   that there was ever a website selling RR/BAYC clothes (Defendants have never

19   sold any RR/BAYC t-shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms

20   & Conditions hardly amounts to representing that RR/BAYC granted commercial

21   rights.  In fact, the post does the opposite because it is commenting on how full

22   commercial rights cannot be granted without destroying those rights, as Yuga has

23   done by surrendering the Bored Ape Yacht Club brand to the world.

24          Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

25   NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

26   (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

27   made reporting news on what is occurring in relation to the RR/BAYC collection:

28   specifically, that certain third-party marketplaces were trading the NFTs despite

1    Yuga's efforts to silence Defendants' criticism and public reports of certain

2    transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

3    explained in his declaration, "Overall, I would consider myself a very active

4    community member in the cryptocurrency space, which is something that I take

5    pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

6    (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

7    report on crypto news or other topics I find noteworthy to help spread awareness."

8    Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

9    simply report news/crypto events in relation to the RR/BAYC collection.

10          Yuga also incorrectly cites to this Court's summary judgment order to

11   suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of

12   the case doctrine does not apply to pretrial rulings *such as motions for summary*

13   *judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis

14   added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

15   rulings, often based on incomplete information, don't bind district judges for the

16   remainder of the case.  Given the nature of such motions, it could not be

17   otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of

18   an issue were decided at summary judgment for one purpose, the summary

19   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-

20   CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding

21   that evidence of initial police contact was relevant as background, but not to already

22   decided issue that initial contact was not excessive force).  This case is just like

23   *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the

24   issue of infringement and is not adequate support on use of a disclaimer generally

25   or as applied to availability of disgorgement as a remedy, apportionment, and an

26   exceptional case analysis.

27          And Yuga's complaint that Defendants did not use a disclaimer on

28   Foundation, Etherscan, or any other third-party website is inapposite.  Defendants

1  have no control over third party websites such as Etherscan and do not have the

2  ability to design the pages third-party websites use or how they choose to display

3  the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a

4  disclaimer on Foundation or Etherscan because they do not control those websites.

5         And lastly, efforts Defendants made to ensure that nobody was confused

6  were clearly done in good faith because those efforts were successful. The evidence

7  at trial also showed that the RR/BAYC collection did not cause any actual

8  confusion and was not likely to cause confusion.  Defendants received voluminous

9  correspondence from RR/BAYC participants—none of which indicated any

10  confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.

11  346) (uncontested).  To the contrary, the correspondence expressed gratitude and

12  support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346)

13  (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595,

14  JTX-2596; JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are

15  aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

16  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

17  Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single

18  person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.

19  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused

20  on. Yuga Labs has been unable to identify even[] a single person who purchased an

21  RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr.

22  Solano, Yuga's President, similarly could not identify a single person that ever

23  bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-

24  19:1.  Given Defendants public discussions, steps taken to clarify the origin and

25  purpose of the RR/BAYC collection, and the fact that there was not even a single

26  confused consumer confirms that there was no likelihood of consumer confusion

27  and no actual consumer confusion.

28

1    Indeed, Defendants received voluminous correspondence from RR/BAYC

2  participants—none of which indicated any confusion from primary sales or

3  secondary sales.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  To the

4  contrary, the correspondence expressed gratitude and support for the criticism of

5  Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035,

6  JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

7    **Plaintiff's Reply:**

8    Defendants' lengthy response fails to grapple with the facts and law of the

9  case.  Contrary to Defendants' suggestion, they failed to take steps to avoid

10  confusion when selling the infringing RR/BAYC NFTs, creating further potential

11  for actionable initial interest and post-sale confusion.  Defendants' scattershot

12  response misses the mark.

13    As with Defendants' previous response (*supra* ¶ 19), Defendants' response is

14  unavailing because (1) the Court's summary judgment order established liability,

15  even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants

16  intended to confuse consumers and refused to implement "friction steps" to avoid

17  confusion (*supra* ¶ 9), (3) Defendants' unreliable communications with third-parties

18  do not negate evidence of actual confusion or the likelihood of post-sale confusion

19  (*supra* ¶ 3), (4) Defendants' infringement was not an art project or "reporting news"

20  (*supra* ¶ 9), (5) it ignores post-sale confusion as actionable (*supra* ¶ 19), (6)

21  confusion over sponsorship or affiliation is actionable (*supra* ¶ 19), (7) most

22  RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra*

23  ¶ 19), and (8) Defendants intended to confuse consumers and had control over

24  third-party websites and marketplaces (*supra* ¶ 9).

25    Further, Defendants' attempts to rebuff their false misrepresentation that

26  "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point

27  that Defendants' representations are lies and they are not credible.

28