**Defendants' Disputed Post Trial Finding of Fact No. 23:**

<u>Mr. Ripps and Mr. Cahen's online discussion of the RR/BAYC project confirms their intent. In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images. Ripps Decl. ¶¶ 148-157 (uncontested); Cahen Decl. ¶¶ 151, 208-209; Dkt. 197-1 ¶¶ 203-04; JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.</u>

**Plaintiff's Basis for Dispute:**

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.

Defendants discussed making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I tbink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to. *See e.g.* JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC

NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally." JTX-803.57. And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*). But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Privately, Defendants also discussed strategies to "cannibalize" the secondary NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC NFTs. JTX-801.203; JTX-801.144. Mr. Cahen bragged about being "pretty elite at getting engagement on twitter." *Id.* Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in order complete the first sale ("mint") of each infringing RR/BAYC NFT. JTX-801.289-290. They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs. *Id.*

Publicly, Defendants made false representations about the RR/BAYC NFTs that implied owning one offered equivalent benefits to owning a genuine BAYC NFT. JTX-1037. Defendants published their promotions from their individual Twitter accounts and from the commercial @ApeMarketplace account advertising their forthcoming NFT marketplace. These advertisements were also directed at BAYC NFT owners specifically. Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶ 46, 49. Defendants were aware of the harm that RR/BAYC NFT sales

would have on Yuga Labs. JTX-42; Trial Tr. at 208:16-209:6. Through their communications, Defendants revealed their true intent to profit from the infringing use of Yuga Labs' BAYC Marks.

**Defendants' Response:**

Yuga does not meaningfully dispute the proposed finding of fact. Yuga fails to present evidence which refutes that Defendants addressed Yuga's problematic imagery and the nature of NFTs during discussions about RR/BAYC project. Ripps Decl. ¶¶ 148-157 (uncontested); Cahen Decl. ¶¶ 151, 208-209; Dkt. 197-1 ¶¶ 203-04; JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Evidence at trial showed that Yuga does not own the alleged BAYC Marks. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673. That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms.").

Furthermore, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244. There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga. Trial Tr. [Muniz] 81:18-22. For example, there are

published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Yuga does not own the asserted marks because NFTs are not eligible for trademark protection. The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Misrepresentation of the origins of a ***communicative*** work is a dispute relegated to the confines of copyright law, not trademark. *Id* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation"). Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to certificates of authenticity/ownership and are not digital goods in themselves. Trial Tr. [Atalay] 127:9-16.

Evidence at trial also showed that Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic

purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Finally, evidence at trial showed that Defendants were not primarily motivated by profits. Defendants explained that profits were a concern, but not the primary motive of the project. Cahen Decl. ¶ 156 (Dkt. 344). Profits helped offset costs and sustain Defendants' artistic project. Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344). The RR/BAYC project allowed for a full refund, for any reason. Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344). Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible. Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

**Plaintiff's Reply:**

Yuga Labs' objection directly hits Defendants' proposed finding of fact on its head, disputing Defendants' false contention regarding their alleged artistic intent. Defendants' infringement was not art. It was motivated by a bad faith intent to profit from consumer confusion.

As discussed *supra* ¶ 9, Defendants' response lacks merit. Specifically: (1) the record shows that Defendants intended to confuse consumers, (2) Defendants' commercial infringement was not protected "art," (3) Defendants intended to profit off of their infringement, (4) Defendants did not take steps to avoid confusion, (5) Defendants' "disclaimers" did not dispel likelihood of confusion, (6) Yuga Labs did not license Defendants' infringement, and (7) other alleged infringers do not negate Defendants' infringement.

Defendants' contention that they were not motivated primarily by profits is false. Defendants' communications show their rampant interest in making money (*see supra* ¶ 9). Pointing to their costs, which amounted to less than $16,000, to attempt to meaningfully offset their profits of over $1 million is disingenuous. Additionally, despite Mr. Ripps' promise to donate the royalties earned from sales of RR/BAYC NFTs to charity, no proceeds were donated and Defendants' kept the profits for themselves. *See* Solano Decl. (Dkt. 342) ¶ 28 (citing JTX-1045). Defendants' argument that they were not motivated by money lacks credibility.

Additionally, Defendants' response should be rejected because, as discussed further below, (1) Defendants have stipulated to Yuga Labs' ownership of the BAYC Marks, and (2) Defendants attempt to relitigate issues already adjudicated by the Court, and (3) the record shows that Yuga Labs in fact owns the BAYC Marks.

**Defendants Stipulated To Yuga Labs' Ownership Of The BAYC Marks:** Defendants' response contradicts their own stipulations in the proposed pre-trial conference order. *See* Dkt. 320-1 at 3. In that stipulation and proposed order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks. *Id.* at 2-3. Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act." *Id.* at 13. Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA. *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms*.") (emphasis added). Defendants' attempt to

now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.

Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the cost of resolving this case. Defendants' actions again make this an exceptional case. The Court should reject Defendants' response.

**The Court's Summary Judgment Order Establishes Liability:** Defendants' response improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225). In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10. The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11. The Court "easily conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion. *Id.* at 10-13.

Defendants' attempt to re-litigate the already-decided issue of what constitutes an NFT is similarly misplaced. In the Court's summary judgment order, the Court rejected Defendants' narrow, "tangible goods" definition of a trademark as it applies to NFTs. Specifically, the Court held "viewing the NFTs as ownership receipts treats the NFTs as mere written instructions while ignoring their documented commercial value." SJ Order (Dkt. 225) at 7. NFTs are sold "specifically for their connection to a particular brand, creator, or associated creative work." *Id.* at 8. Moreover, "'individuals do not purchase NFTs to own a digital deed divorced from any other asset; they buy them precisely so that they can exclusively own the content associated with the NFT.'" *Id.* (quoting *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023)) (cleaned up).

That order establishes the matters adjudicated therein for purposes of this case. Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

**Yuga Labs Owns The BAYC Marks:** The Court has already decided that Yuga Labs owns its BAYC Marks. *See* Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 6. "[A]n unregistered trademark can be enforced against would-be infringers . . . ." *Matal v. Tam*, 582 U.S. 218, 225 (2017). "It is axiomatic in trademark law that the standard test of ownership is priority of use." *Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008). Yuga Labs started using the BAYC Marks long before Defendants began their infringement. *Compare* Dkt. 193-2 ¶¶4, 6 *with* ¶24. Since Yuga Labs' first use in April 2021, the BAYC brand has been the cornerstone of its business. *Id.* ¶¶2, 8-14; *see also* Muniz Decl. (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole brand for Yuga Labs. . . . Yuga Labs' marketing of the BAYC brand includes, among other things, its operation of social media accounts, hosting community events, and its brand collaboration and high-profile partnerships"); Solano Decl. (Dkt. 342) at ¶ 16 ("Part of the reason Yuga Labs was able to reach such a large audience is due to significant effort, time and money we spent promoting the BAYC brand."). Indeed, Defendants admit that the BAYC Marks identify Yuga Labs. *Id.* ¶70.