**Defendants' Disputed Post Trial Finding of Fact No. 24:**

Mr. Ripps and Mr. Cahen also had a reasonable belief that the use of Yuga's marks in the RR/BAYC project was permissible as protest art. At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (uncontested); Hickman Decl. ¶ 33; JTX 2243; JTX 2244. Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks. Ripps. Decl. ¶ 185 (uncontested); Cahen Decl. ¶ 206.

**Plaintiff's Basis for Dispute:**

Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court. SJ Order (Dkt. 225) at 15-17. Defendants' actions were commercial trademark infringement. *Id*. And the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks. SJ Order (Dkt. 225) at 12-15.

Even to the extent Defendants seek to relitigate this issue, Defendants' contention that their infringing NFTs were an art project does not establish that Defendants acted in good faith for purposes of avoiding equitable remedies. Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* or the First Amendment, Defendants continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 74. And Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19. In light of this ongoing infringement, no credence should be given to Defendants' alleged "reasonable belief."

While Defendants publicly claim there was an artistic goal (to "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment. *See, e.g.*, JTX-1 (Lehman Declaration) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen: "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); JTX-801.208 (Mr. Cahen: "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman: "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803.66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).

Likewise, their internal communications demonstrate awareness of confusion, yet they continued to persist in their infringement. *See, e.g.*, JTX-801.015 (Regarding the use of unaltered BAYC Marks on the RR/BAYC Foundation page, Mr. Lehman wrote, "I mean how do they not shut this down at some point haha."); JTX-801.185 (Mr. Lehman stating, "overall I think we should

be very careful about doing this in terms of the confusion it will create"); JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "[r]emember the 'average joes'?", and Cahen responding, "I mean that is unavoidable"); JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah."); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and stating, "Ppl will not read the contract"); JTX-801.288-89 (Mr. Lehman stating, "I think it might be good to put [Ape Market] out ther[e]as only yuga . . . To limit confusion I mean"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-801.371 (Mr. Cahen wrote, "@ryder per our attorney we may just need to change the skull if we want to fight trademark."); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); *see also* Trial Tr. at 211:17-212:24.

Defendants' references to unknown, and alleged, third-party infringers, in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing. Any alleged third-party use of the BAYC Marks, or similar marks, is immaterial and irrelevant. As this Court has already found, "despite Defendants' attempt to argue abandonment through third party use or failure to police, these arguments are unquestionably meritless." Dkt. No. 225 at 10 (quoting *San Diego Comic Convention v. Dan Farr Productions*, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22, 2017)). Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made clear that third-party use of a mark is irrelevant in a suit against a particular infringer. *See, e.g.*, *Eclipse Associates Ltd. V. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of

1  third-party use of plaintiff's mark because "[e]vidence of other unrelated potential
2  infringers is irrelevant to claims of trademark infringement and unfair competition
3  under federal law."); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125,
4  1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed
5  mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151,
6  1159, 1162 (9th Cir. 2017) (a "sheer quantity of irrelevant evidence," which is
7  "largely inapposite to the relevant inquiry," is meaningless); *see also F.T.C. v.
8  Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011)
9  (precluding Defendants from "introducing into evidence . . . 'thousands of third-
10 party webpages'" because they were irrelevant and thus inadmissible under FRE
11 401 and 402). Even so, Defendants have failed to demonstrate actual use of these
12 marks in commerce. *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-
13 1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of
14 third-party marks in an advertisement because "evidence of third-party use is not
15 admissible unless the proponent can provide evidence that the trademarks were
16 *actually used* by third parties, that they were well promoted or that they were
17 recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v.
18 Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3 (excluding
19 evidence of third-party marks because defendants "presented no evidence showing
20 *actual use*.") (emphasis added).

21       Mr. Ripps' declaration points to two screenshots purportedly showing NFT
22 projects that use certain BAYC Marks. Ripps Decl. ¶¶ 187-190, JTX-2243, JTX-
23 2244. But these documents do not establish that the listed "projects" are actually
24 NFTs; they do not show the sales volume for these projects; they do not show
25 whether or the extent that these projects are in use in the United States; they do not
26 show how much (if anything) these projects have earned in sales; and they do not
27 show whether the projects are authorized by Yuga Labs. *See* J. Thomas McCarthy,
28 2 *McCarthy on Trademarks and Unfair Competition* § 11:88 (5th ed.) (noting that,

in introducing evidence of third-party marks, a defendant "should go further to show how extensive these uses are and how long they have continued"). Mr. Hickman's claim that "there are more than a hundred derivative NFT collections that used the Bored Ape Yacht Club name and images" lack any factual support and is equally groundless. *See* Hickman Decl. (Dkt. 345) ¶ 33.

Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website. Come get it here. And also, by the way, we are going to rip off Yuga's other site next. And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up on Bloomberg News with people confused thinking it's us. I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this. So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8. Moreover, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content. *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections. I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Defendants' Response:**

The evidence at trial showed that Yuga did not take any reasonable steps to provide notice of its intent to enforce trademark rights (despite its repeated public activities indicating to the public and to Defendants that projects like the RR/BAYC

collection were permissible). Prior to this lawsuit, Yuga had not brought any lawsuits related to other NFT collections using the asserted marks. Trial Tr. [Muniz] at 78:18-21. And even though Yuga was aware of hundreds of NFTs collections which use the asserted marks, and "literally thousands" of products using the asserted marks, without any affiliation with Yuga, they have never brought an infringement lawsuit before. *Id.* Yuga alleges that it has a robust takedown enforcement mechanism, but the evidence contradicts this claim. Yuga's enforcement efforts have not even identified how many NFT collections use the asserted marks without Yuga's consent. Trial Tr. [Muniz] at 82:12-21.

In addition to Yuga's narrow enforcement measures, Yuga publicly represented that they do not have intellectual property rights associated with the Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673. That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms.").

Given Yuga's minimal and ineffectual enforcement measures and Yuga's public representations regarding their lack of intellectual property rights, it was reasonable for Defendants to believe that the use of these marks in the RR/BAYC project was permissible as protest art. Ms. Muniz admitted that, at the time of the RR/BAYC project, Defendants would likely have seen hundreds of NFT collections on OpenSea which use these marks. Trial Tr. [Muniz] at 77:19-23. These NFT collections were allowed to remain on OpenSea due to Yuga's narrow enforcement mechanisms.

Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. See No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of how to apportion disgorgement of profits attributable to infringement.

    Finally, Mr. Ripps's uncontested declaration supports this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges. *See* Trial Tr. [Ripps] 267:7-271:9. As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; Murdoch v. Castro, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]"). Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle

means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

**Plaintiff's Reply:**

Defendants' baseless attacks on Yuga Labs' enforcement programs to protect its trademarks are not only irrelevant, but they are also directly contrary to the evidence. Third-party infringers do not negate Yuga Labs' trademark rights against Defendants. *See* SJ Order (Dkt. 225) at 10. And in any event, Yuga Labs has implemented robust trademark enforcement programs. When you are a popular, major brand, then scammers, like the Defendants will try to ride your brand to profit. This is not new. Defendants cannot use Yuga Lab's success as an excuse for their infringement. Nor is it credible for Defendants to claim that they could set up a scam creating an exact copy of Yuga Labs' BAYC Marks and NFTs.

As discussed *supra*, Defendants' responses lack merit. Specifically: (1) evidence admitted at trial discredits Mr. Ripps' trial declaration (*supra* ¶ 3), (2) other alleged infringers do not negate Defendants' infringement, and Yuga Labs implemented robust enforcement (*supra* ¶ 9), (3) the response seeks to relitigate issues already adjudicated by the Court (*supra* ¶ 9), (4) Yuga Labs did not license Defendants' infringement (*supra* ¶ 9), (5) Defendants have stipulated to Yuga Labs' ownership of the BAYC Marks (*supra* ¶ 23), and (6) the record shows that Yuga Labs in fact owns the BAYC Marks (*supra* ¶ 23).