1

**Defendants' Disputed Post Trial Finding of Fact No. 31:**

2

Based on Yuga's conduct, Mr. Ripps and Mr. Cahen reasonably believed that

3

the RR/BAYC project was permissible. Ripps Decl. ¶ 191 (uncontested); Cahen

4

Decl. ¶¶ 206, 212; Hickman Decl. ¶¶ 24-40. Tellingly, neither Mr. Ripps nor Mr.

5

Cahen were cross-examined on their beliefs about the RR/BAYC project, even

6

though—as discussed below—their intent is "highly important" in determining

7

whether disgorgement is appropriate.

8

**Plaintiff's Basis for Dispute:**

9

Defendants cannot claim that *Yuga Labs'* actions are somehow responsible

10

for *Defendants'* use of the BAYC Marks on the infringing NFTs.  Defendants' and

11

Mr. Hickman's statements are self-serving and not credible.  *See supra* ¶¶ 3, 4, 7.

12

Their argument that they reasonably believed their infringement was permissible

13

due to third party use of the BAYC Marks and Yuga Labs' copyright license,

14

should also be rejected.  The Court already found that these issues are not relevant

15

to the claims in this case. SJ Order (Dkt. 225) at 9-10.  Whether or not third parties

16

are using the BAYC Marks, theft is still theft, and Defendants' infringement is not

17

excused on this basis.  *See supra* ¶¶ 24-25.  Similarly, their reliance on statements

18

made by Ms. Muniz long after the commencement of this lawsuit do not excuse,

19

explain, or justify Defendants' infringement.  *See supra* ¶¶ 28-29.

20

As this Court found and their internal communications revealed, Defendants

21

intentionally infringed on the BAYC Marks. SJ Order (Dkt. 225) at 12; *see also,*

22

*e.g.*, *supra* ¶ 9 (compiling communications).  Yet Defendants continued to infringe

23

even after the Court found their conduct was infringing.  *See supra* ¶ 9; Solano

24

Decl. (Dkt. 342) ¶¶ 74, 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Continuing to

25

infringe, after you have been told by a federal court that you are infringing, is not

26

good faith.  Moreover, they were aware that RR/BAYC NFTs were confusing.  *See*,

27

*e.g.*, JTX-801.15 (Regarding the use of unaltered BAYC Marks on the RR/BAYC

28

Foundation page, Mr. Lehman, one of the Defendants' partners, wrote, "I mean

1  how do they not shut this down at some point haha."); JTX-801.196 (Mr. Lehman

2  writing, "we should not under-estimate how confusing it is" and Mr. Cahen

3  responding, "yeah."); *see also* Trial Tr. at 211:17-212:24.  Defendant Ripps even

4  taunted Yuga Labs that no one would stop his infringement.  JTX-860 ("over $1.2

5  million dollars has made from RR/BAYC and YugaLabs nor the BAYC holders

6  aren't going to do anything about it?").  And they worked to conceal their

7  infringement.  *See, e.g.*, JTX-803.57 (Mr. Ripps asked for a reference to his limited

8  liability company, Live9000 LLC, to be added to the rrbayc.com because he did not

9  "want to get sued personally."); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen

10  the need to "look really sympathetic to people" if sued).  Finally, even after the

11  RR/BAYC NFTs were removed from various marketplaces, Defendants again

12  continued to infringe.  Cahen Decl. (Dkt. 344) ¶ 253.  The evidence presented at

13  trial establishes that, from the outset, this was no satirical project.  It was a business

14  venture where the Defendants were interested in making "like a million dollars."

15  JTX-1574; *supra* ¶ 9.

16      Yuga Labs' decision not to cross-examine Defendants on the issue of their

17  beliefs about RR/BAYC is not "telling[]."  The Court already found that

18  Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers

19  and acted with a bad faith intent to profit from their use of the marks.  SJ Order

20  (Dkt. 225) at 12-15.  Indeed, the Defendants' actions "are all commercial activities

21  designed to sell infringing products, not expressive artistic speech protected by the

22  First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead,

23  "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Yuga

24  Labs did not need to cross-examine Defendants when they had already proven their

25  willingness to lie.  *See, e.g.*, *supra* ¶¶ 3, 7.  Moreover, Yuga Labs does not need

26  Defendants' testimony to prove their intent – their written documents (e.g. Team

27  ApeMarket Discord, text messages to one another, etc.) provide more truthful and

28

complete evidence of Defendants' intent to profit off of their use of Yuga Labs' BAYC Marks.  *See, e.g.*, *supra* ¶ 9.

The Court's finding of intent to deceive also shows that Defendants' conduct was willful, since "[w]illful infringement carries a connotation of deliberate intent to deceive." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993). And there is ample evidence in the record of this intent.  JTX-1 ¶¶ 10-13; JTX-621; JTX-801,144, 185, 208, 237; JTX-803 at 66-67; JTX-1574; JTX-1586; Hickman Depo. Designations (Dkt. 394) at 238:12-40.  There was no need to cross-examine Defendants on their supposed and uncredible "beliefs" to prove those beliefs are not stated in good faith.

**Defendants' Response:**

The evidence at trial showed that Defendants had a reasonable basis for believing that it was permissible for them to create the RR/BAYC collection based on Yuga's own public activities and permitting third parties to create their own Bored Ape Yacht Club NFT collection.

BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga's Terms & Conditions along with its public activities amounted to authorization of RR/BAYC collection and the other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. (Dkt. 344) ¶ 206.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

Yuga attempts to ignore this evidence showing Defendants' good faith by incorrectly invoking the law of the case doctrine by citing to this Court's summary judgment order.  *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial

rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on the BAYC Terms & Conditions and Yuga's public activities applies only the issue of infringement and is not adequate support on these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga also attempts to rebut Defendants' good faith by arguing that Defendants intended to infringe.  But the evidence at trial showed that Defendants' intent was to create a satire that was a protest of Yuga. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (uncontested) (Dkt. 346); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the

1  vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

2  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic

3  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

4  Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

5  [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

6  read and click through a disclaimer acknowledging the artistic purpose of the

7  project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

8  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

9  insisted on these requirement and additional steps so that the artistic purpose of the

10  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

11  60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

12  impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

13      Defendants' online discussion, which consisted of nearly the entirety of

14  Defendants' public activities associated with RR/BAYC, confirms their intent.  In

15  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

16  inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

17  that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

18  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

19      The evidence at trial also showed that the RR/BAYC collection did not cause

20  any actual confusion and was not likely to cause confusion.  Defendants received

21  voluminous correspondence from RR/BAYC participants—none of which indicated

22  any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt.

23  346) (uncontested).  To the contrary, the correspondence expressed gratitude and

24  support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested);

25  JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596;

26  JTX-2599.  Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a

27  single instance of confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr.

28  [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman]

219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Yuga attempts to rebut this evidence of Defendants' intent by mischaracterizing evidence in the record.  For example, Yuga misleadingly cites to JTX-801 as evidence of intentional infringement.  But the statement at JTX-801.196 that Yuga relies on is actually discussing how to create a design for the never-released ApeMarket that would not be confusing for users of the website. *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …").  Similarly, the statement at JTX-801.15 that Yuga relies on was a question from Mr. Lehman regarding whether RR/BAYC's page will be shut down.  Mr. Cahen response shows that he did not believe there was anything wrong with the page, stating "[t]hey can't imo."  JTX-801.15.

**Plaintiff's Reply:**

Defendants' responses rehash the same tired arguments without adequately addressing Yuga Labs' arguments.  They should be rejected because (1) they seek to relitigate issues already adjudicated by the Court (*see supra* ¶ 9); (2) the record shows that Defendants intended to confuse consumers (*see id.*); (3) Defendants'

commercial infringement was not protected "art" (*see id.*); (4) Defendants intended to profit off of their infringement (*see id.*); (5) Defendants were well aware that their infringement would cause confusion (*see supra* ¶ 24); (6) the record shows ample actual confusion and likelihood of confusion (*see supra* ¶ 3); (7) Defendants' "disclaimers" did not dispel likelihood of confusion (*see supra* ¶ 9); (8) the majority of the sales of Defendants' infringing NFTs did not occur on rrbayc.com (*see infra* ¶ 76); (9) Defendants did not take steps to avoid confusion (*see supra* ¶ 9); (10) Yuga Labs did not license Defendants' infringement, and Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*); (11) other alleged infringers do not negate Defendants' infringement (*see id.*); (12) the BAYC Terms only provide a copyright license (*see supra* ¶ 28); and (13) Yuga Labs did not encourage the public to use the BAYC brand (*see id.*).

Additionally, Defendants fail to mitigate Mr. Lehman's warning that they were infringing by using Yuga Labs' exact marks on the Foundation marketplace. JTX-801.15 (Mr. Lehman: "I mean how do they not shut this down at some point haha."  Mr. Cahen: "They can't Imo").  Whether or not Mr. Cahen agreed with the possibility of a takedown is immaterial, as he does not decide whether use of a mark is infringing—this Court does.  Moreover, his response demonstrates that he was aware that (1) they were using exact copies of the BAYC marks, (2) there was potential for confusion, and (3) they nonetheless continued to intentionally use unmodified versions of the BAYC Marks to sell their infringing NFTs.  This is just one example of many warnings Defendants received, including from their own lawyers, and Mr. Hickman, that demonstrate their knowledge of confusion and intent to infringe the BAYC Marks.  *See supra* ¶ 31 (Plaintiff's Basis for Dispute); JTX-1 ¶¶ 18-28; JTX-621 (acknowledging confusion caused by Defendants RR/BAYC NFTs).