**Defendants' Disputed Post Trial Finding of Fact No. 32:**

The evidence presented at trial did not show that a single RR/BAYC NFT was sold to a consumer who believed it was created by Yuga rather than by defendants. *See, e.g.,* Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1.

**Plaintiff's Basis for Dispute:**

Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). In any event, actual confusion is not required; and the Court already found

Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  See *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."); *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**Defendants' Response:**

Yuga's objection is not based in fact.  First, there is ample evidence that there was **no** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*. at 147:12-14. The result of her lack of

knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id*. at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1.

Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and

could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false. The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in Sienze v Kutz, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a

determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* and *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits

attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' lengthy responses fail to grapple with the facts of the case. The Court has already found a likelihood of confusion, there are many instances of confusion in the record, and Yuga Labs' experts found that consumers were confused. Defendants' scattershot response misses the mark.

As discussed *supra*, Defendants' responses lack merit. Specifically: (1) Defendants' infringement was intentional and not an art project (*supra* ¶ 3), (2) there is ample evidence of confusion in the record (*Id.*), (3) the record shows that Defendants were aware that their infringement would result in confusion (*supra* ¶ 7), (4) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (5) the Court's summary judgment order establishes liability and intent (*supra* ¶ 9), and Defendants have already stipulated to Yuga Labs' ownership of its BAYC Marks (*supra* ¶ 23).

Additionally, the Court should reject Defendants' responses because (1) Ms. O'Laughlin's methodology and report are reliable, (2) Yuga Labs is entitled to Defendants' profits, (3) all of Defendants' profits are attributable to their infringement, (4) Defendants used Yuga Labs' marks, (5) Defendants' disclaimers did not negate confusion in the marketplace, (6) the majority of Defendants' infringing NFTs were not sold on rrbayc.com, (7) post-sale and initial interest confusion are actionable, (8) consumers looking to Etherscan to verify their NFTs would still be confused, (9) confusion based on affiliation or sponsorship is actionable, (10) the @0xGem Tweets demonstrated confusion in the marketplace, (11) Defendants' internal conversations demonstrated knowledge of a likelihood of confusion, and (12) Defendants fail to account for ongoing harm.

**Ms. O'Laughlin's Findings Are Sound And Reliable:** As the Court has already held, Ms. O'Laughlin's report is "relevant, reliable, and admissible." Trial

Tr. 141:3-5. The Court denied Defendants' Motion *in Limine* no. 6, Dkt. 242, but Defendants nonetheless continue to attack Ms. O'Laughlin's sound testimony. Defendants' response should be rejected for the reasons outlined below.

First, Defendants have no evidence establishing that Ms. O'Laughlin's survey population was overbroad, and the evidence admitted at trial confirms that Ms. O'Laughlin's selection criteria was appropriate. *See infra* ¶¶ 70, 71.

Second**,** Defendants' tired argument that Ms. O'Laughlin's methodology was flawed because she used two survey formats is unavailing because Ms. O'Laughlin testified that her methods were appropriate where Defendants' infringing NFTs were marketed in two different marketplace settings. *See infra* ¶ 78. Contrary to Defendants demands, a survey should not be one-sized fits all. It should be tailored to the facts and here relevant marketplaces.

Third, Ms. O'Laughlin's Eveready survey and analysis are not methodologically flawed because her methods were consistent with the approach taken by trademark survey experts and participants were shown Defendants' Foundation webpage as it appeared in the real world. *See infra* ¶ 74.

Fourth, Defendants misrepresent Ms. O'Laughlin's trial testimony. Ms. O'Laughlin testified that she chose to analyze confusion based upon how the sales pages looked as of June 21st "because it was a more conservative choice." Trial Tr. 161:15-16. Therefore, it is likely that the time frame that Ms. O'Laughlin chose resulted in rate of confusion *lower* than what was occurring in the real world. Ms. O'Laughlin further testified that her survey focused on the shell of the website, so small changes would not invalidate her results. Trial Tr. 163:15-20 ("what I'm testing is sort of the shell, right, the shell that uses the trademarks that are at issue in the case. So it's the use of the BAYC, Bored Ape Yacht Club, the use of the ape skull logo. The particular NFTs would vary, of course. That's a marketplace. Things change. But the framework is pretty consistent over those two months."). As Ms. O'Laughlin explained, she chose a reasonable time frame for her analysis.

Indeed, it was also the time frame through which Defendants were promoting their NFTs as top sellers in the marketplace.

Fifth, Ms. O'Laughlin's surveys are an accurate data point for the rates of actual confusion in the marketplace. And as discussed *supra* ¶ 7, Yuga Labs has put forth volumes of evidence of actual confusion, including actionable post-sale confusion. Further, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.

**Yuga Labs Is Entitled To Disgorgement As A Remedy:** This case arises out of the Lanham Act, which expressly provides for damages ***and*** disgorgement of Defendants' profits. "The Lanham Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's profits." *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to defendant's profits."). Accordingly, the Lanham Act allows for three distinct financial remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are not stated in the disjunctive, and each are separately available under the statute. Moreover, the model jury instructions make clear that actual damages and disgorgement are available in the same case: "*In addition to actual damages*, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence." Manual of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added). Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts. Defendants are not allowed to retain the fruits of unauthorized trademark use.

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Additionally, disgorgement is expressly provided as a remedy for false designation of origin under the Lanham Act, regardless of willfulness. 15 U.S.C. § 1117(a) (a plaintiff is entitled to recover a "defendant's profits" for "a violation under section 1125(a)," in contrast to "a willful violation under section 1125(c)"). Indeed, as the Court has already observed, Defendants are incorrect to argue that intent is required for the Court to order disgorgement of their profits. June 9, 2023 Pretrial Conference Tr. at 33:12-16 ("But with respect to the remaining issues that we're going to be trying in this case, the defendants' profits, there is no willfulness requirement for the defendants' profits. It's an equitable remedy. It is a disgorgement. This is my view.").

Defendants' position runs contrary to basic statutory and jury instruction principles for Lanham Act claims and should be rejected.

**Defendants' Profits Are All Attributable To Their Infringement:** Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC NFT. The smart contract for each of Defendants' infringing NFTs is immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC," which is replicated on the Etherscan token tracker and anywhere that systems pull information directly from the blockchain. Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific use of the BAYC brand as the NFT Collection's smart contract name and symbol"). Additionally, some of the NFTs that were offered for sale were reserved through the infringing rrbayc.com domain. Kindler Decl. (Dkt. 338) ¶ 61. So again, Defendants were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC NFTs. More still, "other RR/BAYC NFTs were sold

on marketplaces such as OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-670). Defendants also "used the BAYC Marks to sell and promote their own product." SJ Order (Dkt. 255) at 18. Consumers would not have purchased the RR/BAYC NFTs if not for the confusion caused by Defendants in using the BAYC Marks and leading them to believe they were or were affiliated with genuine BAYC NFTs. And finally, "[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market." Kindler Decl. (Dkt. 338) ¶ 61. All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga Labs' BAYC Marks. Defendants are not allowed to retain the fruits of unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement." *Id.* at 1076. The RR/BAYC NFTs are infringing goods that Defendants created and placed into interstate commerce—the Court has already determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at 10-13—and so profits derived from the sale of those goods resulted from Defendants' infringement. There is no requirement for Yuga Labs to go beyond that and prove that every dollar was attributable to instances of "actual confusion," which is not even a required element of an infringement case. SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

In sum, profits from the sales of Defendants' infringing NFTs, each of which Defendants admit used the BAYC Marks, are necessarily attributable to Defendants' infringement of the BAYC Marks. *See* Dkt. 418-1(Defendants admitting that "Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks").

**Defendants Used Yuga Labs' Marks Without Altering Them:**

Defendants' response misleading implies that Defendants did not use Yuga Labs' marks without alteration. This is false. "Indeed, Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." SJ Order (Dkt. 225) at 11. And there is significant documentary evidence supporting this finding. *See, e.g.*, JTX-600 (showing "BAYC" and "Bored Ape Yacht Club" input to Defendants' smart contract"); JTX-28 (Defendants' Foundation page marketing their NFTs as "BAYC" and "Bored Ape Yacht Club" using a direct copy of Yuga Labs' ape skull logo). Thus, whether Defendants modified Yuga Labs' marks at times, they nonetheless used Yuga Labs' unaltered marks to market their infringing NFTs. "Therefore, the Court easily conclude[d] that Defendants' use of Yuga's BAYC Marks was likely to cause confusion." SJ Order (Dkt. 225) at 13.

**Defendants' Disclaimer Is Evidence Of Their Culpability:** With respect to the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading." SJ Order (Dkt. 225) at 17.

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued personally." JTX-803.57; *see also* JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if sued). And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get sued, for us to look really sympathetic to everyone" (JTX-918.0036). That Defendants took some steps to try to conceal their intent when they were inevitably sued does not make the infringing activity less confusing; it just demonstrates their culpability.

Additionally, the public was not required to read and click a disclaimer. Indeed, even on rrbayc.com, Defendants could not enforce any requirement that

users "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one" would read (JTX-801.128). And, this wall of text did nothing to dispel confusion amongst the general public when every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—without any alleged disclaimer. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Defendants also did not include any similar disclaimer on Foundation or other secondary marketplaces, nor was there one on Etherscan. The majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where there was no disclaimer. Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million impact).

Defendants have no survey, or material consumer evidence, that users of the infringing rrbayc.com website read any disclaimer. This is not surprising since the vast majority of sales occurred outside of the rrbayc.com website. Indeed, Mr. Ripps admitted that all sales went through Foundation—where there was no disclaimer. (Ripps Deposition Designations) at 82:8-13.

Moreover, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion"). Defendants' claimed disclaimer is non-existent to ineffective at best.

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:** Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that

for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'"). These secondary markets did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products. These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale. Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling"). Defendants' contention that the majority of the RR/BAYC NFTs were purchased through rrbayc.com is therefore incorrect and misleading.

**Post-Sale And Initial Interest Confusion Are Actionable:** Actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused. See *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

Defendants offer only self-serving, anecdotal evidence of communications with purported purchasers of RR/BAYC NFTs to support their claim that consumers were purchasing the infringing NFTs as a "protest." As explained *supra* ¶ 3, this evidence should be given little weight. That consumers, or here distributors, were purchasing Defendants' NFTs with the expectation to resell them is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17 *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants cannot rebut this fact.

**Confusion Over Sponsorship Or Affiliation Is Actionable:** Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship. The Lanham Act, however, expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the ***affiliation, connection, or association*** of such person with another person, or as to the or as to the origin, ***sponsorship, or approval*** of his or her goods[.]" 15 U.S.C. § 1125(a)(1)(A) (emphases added). Therefore, regardless of whether a consumer who watched the Bloomberg piece thought that "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" were the same *product*, their confusion as to whether they originated from the same *company* or were sponsored or affiliated with the same company is nonetheless actionable. It is simply not credible for Defendants to argue that consumers would not be confused by encountering two NFT collections that use the exact same mark, only differentiated by "V3." Indeed, "V3" is commonly understood to mean "version 3," therefore expressly indicating that Defendants' infringing NFTs are a new "version" of Yuga Labs' legitimate Bored Ape Yacht Club NFTs. This is plainly confusing. And such confusion was likely, as the Court has already ruled, due to the unaltered display of Yuga Labs' marks. SJ Order (Dkt. 225) at 13.

**Consumers Looking To Etherscan Were Still Confused:** Defendants cannot keep their story straight. Now, they proffer that consumers *do* look to Etherscan to verify their NFTs after they initially claimed that this was not the proper way to authenticate an NFT. *See infra* ¶ 66. Nonetheless, those consumers who did look to Etherscan to verify their NFTs, which as Mr. Cahen conceded is "very common," (Cahen Depo. Designations (Dkt. 395) at 148:10-13), they would still encounter Yuga Labs' marks. *See* JTX-117 (Etherscan screenshot showing "Bored Ape Yacht Club" and "BAYC" as token tracker and contract name respectively); *see also* Atalay Decl. (Dkt. 337) ¶ 7 ("If you were curious to see how malicious this scam is, check out the token tracker/ID name that he chose to use on the smart contract. This is a critical piece of data the NFT community uses when they are buying on the secondary market."). Defendants' unaltered use of Yuga Labs' marks on the RR/BAYC smart contract supported a finding of likelihood of confusion. SJ Order (Dkt. 225) at 17 ("Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT.").

**The Gem Bot Tweet And Replies Demonstrated Confusion:** The @0xGem Tweets demonstrated confusion in the marketplace. As discussed above, that some consumers were not confused is irrelevant because post-sale and initial interest confusion are nonetheless actionable. But more importantly, several replies to the @0xGem Tweets demonstrated consumers confusion. *See* JTX-1029 ("The confusion in these comments will be prime evidence in the RR v Yuga case."); JTX-1030 ("shit man I looked on chain and didn't even realize it was RR."); JTX-1031 ("What a gold ape sold for 6eth must be a glitch!"). Thus, these Tweets demonstrate how confusing Defendants' scam was as they demonstrated how consumers were confused by the fact that the infringing NFTs used Yuga Labs'

same marks and their same images, and were even confusingly labeled on Etherscan.

**Defendants' Internal Communications Showed They Knew Confusion Was Likely:** The evidence shows that Defendants knew they were infringing and creating confusion. *See supra* ¶ 7; JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create").

**Defendants Fail To Account For Ongoing Harm:** Regardless of how much Defendants profited off the sale of their infringing NFTs on secondary marketplaces, the fact remains that Yuga Labs continues to suffer ongoing harm. Indeed, Yuga Labs will only be made whole by an injunction that orders the transfer of the immutably infringing smart contract. Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps"). Defendants' citation to the profits calculation of Yuga Labs' own witness does nothing to rebut this ongoing harm or militate against a sufficient injunction.