**Defendants' Disputed Post Trial Finding of Fact No. 37:**

A supporter stated that Mr. Ripps and Mr. Cahen were "truly iconic in my eyes and something that the true artist[s] in this space deserve." Ripps Decl. ¶ 202 (uncontested); JTX-2595.

**Plaintiff's Basis for Dispute:**

Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market.  Meanwhile, they ignore the ample confusion on Twitter and other sources that Yuga Labs has identified.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, *supra* ¶ 24 (collecting examples).  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13.  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

1   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

2   profits even where infringement claims premised solely on post-sale confusion

3   where a "potential purchaser, knowing that the public is likely to be confused or

4   deceived by the allegedly infringing product, [] choose[s] to purchase that product

5   instead of a genuine one").

6       Moreover, Defendants' *Rogers* and First Amendment defenses have already

7   been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions

8   were commercial trademark infringement.  *Id*.  And, the Court has already decided

9   the issue of Defendants' intent, finding that Defendants intentionally infringed

10  Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to

11  profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

12      But, to the extent Defendants seek to relitigate this issue, Defendants'

13  contention that their infringing NFTs were an art project does not prove it to be

14  true.  To the contrary, the relevant evidence demonstrates that Defendants intended

15  to use Yuga Labs' BAYC Marks to profit through their commercial promotion and

16  sale of RR/BAYC NFTS.  *See supra* ¶¶ 9-10, 13, 17-19.  Indeed, Defendants'

17  infringement could not have been in good faith because, even after the Court found

18  their infringement was likely to cause confusion and was not art protected by

19  *Rogers* and the First Amendment, Defendants continued to infringe on Yuga Labs'

20  Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  And

21  Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com

22  and link to a marketplace on which RR/BAYC NFTs are still available for sale.

23  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

24      Additionally, while Defendants publicly claim there was an artistic goal (to

25  "look really sympathetic to people" if caught, in the words of their partner (JTX-

26  918.00036)), their internal communications overwhelmingly focus on a business

27  venture to sell Ape Market, their profit motive, and riding on the coattails of the

28  BAYC brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13

1  (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One

2  thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-

3  801.185 (Mr. Cahen: "Goal: mint out the remainder of the collection + incentivize

4  people to use the marketplace, specifically the BAYC original side"); *id.* (Mr.

5  Cahen: "More royalties for us . . . More work for sure, but much higher likelihood

6  of generating more royalties and users"); *id.* at 208 (Mr. Cahen: "we need a very

7  delicious value proposition [] to bring in users . . . but not so low that we dont make

8  anything"); *id.* (Mr. Cahen: "priorities: getting RRBAYC to sell out by creating

9  demand + getting BAYC and MAYC users to call our marketplace their new home

10  [] and collecting royalties at a fraction of what the other big dogs are charging []

11  which will be considerable passive income if we strike the right balance"); JTX-

12  801.237 (Mr. Lehman: "I'm just concerned about launching something with low

13  prospect for recurring revenue"; Mr. Cahen: "I agree"); JTX-803 at 66-67; JTX-

14  1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It

15  will sell out within 48 hours I think [] You'll make like a million dollars [] Straight

16  up"); JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions

17  too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit

18  motive and desire to charge royalties).  Defendants knew they were stealing from

19  Yuga Labs regardless of what any single consumer may have believed.

20      **Defendants' Response:**

21      This finding of fact addresses a correspondence which Defendants received

22  from an RR/BAYC NFT collector.  Ripps Decl. ¶ 202 (uncontested); JTX-2595.

23  Yuga falsely states that these are "cherry-picked communications."   Mr. Ripps

24  testified in his declaration: "I received ***hundreds of letters*** thanking me for creating

25  the RR/BAYC artwork and for standing up against a corporation that had used

26  hateful references in its brand" and then went on to give eight specific examples of

27  the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis

28  added).  At no point during trial did Yuga dispute this fact.  Yuga did not present

any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue. Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that the quoted language is accurate. Instead of addressing this correspondence, Yuga attempts to point to indications of consumer confusion. However, none of Yuga's alleged indications of confusion are credible.

First, Yuga's evidence does not indicate there was confusion on Twitter. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Second, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

1    Third, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin
2  conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin
3  acknowledged that she used an overly expansive definition of the market that
4  included people who did not have any interest in purchasing an NFT, much less
5  knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing
6  survey qualification flow); 152:4-10.  She acknowledged that she changed the
7  survey population after running pretests to make it more inclusive.  *Id.* at 144:25-
8  146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about
9  the NFT market, admitting to erroneously believing that cryptocurrency was an
10  NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result
11  of her lack of knowledge was an inherently flawed survey that could not show
12  confusion because the market was too broad.  This was despite her
13  acknowledgement that choosing the right sample population "matters for the
14  analysis" and choosing an improper sample population would be a mistake.  *Id.* at
15  146:18-25.
16    Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to
17  this Court's summary judgment order.  The "law of the case doctrine does not apply
18  to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren,*
19  *792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,*
20  *744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete
21  information, don't bind district judges for the remainder of the case.  Given the
22  nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*,
23  the Court held that although ***aspects*** of an issue were decided at summary judgment
24  for one purpose, the summary judgment order did resolve the issue generally or as
25  to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D.
26  Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as
27  background, but not to already decided issue that initial contact was not excessive
28  force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of

confusion only applies to the issue of infringement and is not adequate support for a

determination of how to apportion disgorgement of profits attributable to

infringement.

Fifth, evidence at trial showed that Defendants were not primarily motivated

by profits.  Defendants explained that profits were a concern, but not the primary

motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs

and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).

Defendants' decisions surrounding refunds and royalties confirm that they were not

primarily motivated by profits.  Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);

Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full

refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶

159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers

of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested)

(Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of

confusion.  Defendants took multiple steps to make clear that the RR/BAYC

collection was not related to Yuga in any way.  For example, the rrbayc.com

website—through which the majority of RR/BAYC commissions occurred and the

vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

(uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

[Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

read and click through a disclaimer acknowledging the artistic purpose of the

project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

insisted on these requirement and additional steps so that the artistic purpose of the

work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga. Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges. *See* Trial Tr. [Ripps] 267:7-271:9. As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]"). Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration

1  means that "principle means" of testing Mr. Ripps credibility weighs decisively in
2  favor of accepting Mr. Ripps's declaration.

3  **Plaintiff's Reply:**

4  Defendants' unreliable communications with purported distributors or
5  purchasers of their infringing products are immaterial.  The Court has already found
6  a likelihood of confusion and these correspondences do not rebut that finding.  SJ
7  Order. (Dkt. 225) at 13.  And Defendants admit that they cherry-picked eight out of
8  allegedly hundreds of e-mails to use as purported evidence of their alleged protest.
9  These attempts to obfuscate the issues are unavailing.

10  As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)
11  Defendants' anecdotal evidence of communications with purported purchasers is
12  unpersuasive (*supra* ¶ 3), (2) Yuga Labs adequately demonstrated that Mr. Ripps
13  lacks credibility (*supra* ¶ 3), (3) Defendants were motivated by an intent to profit
14  (*supra* ¶7), (4) the @0xGem Tweet and replies demonstrate consumer confusion
15  (*supra* ¶ 32), (5) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (6) the
16  Court's summary judgment order establishes Defendants' liability (*Id.*), (7)
17  Defendants' "disclaimer" did not prevent confusion, (*Id.*), (8) most of Defendants'
18  infringing NFTs did not sell on rrbayc.com (*Id.*), (9) the record shows several
19  instances of actual confusion (*supra* ¶ 3), (10) Defendants failed take steps to avoid
20  confusion (*supra* ¶ 33), and (11) the refunds Defendants issued demonstrate that
21  consumers were confused (*Id.*).

22  Additionally, The Court should reject Defendants' responses because (1)
23  post-sale and initial interest confusion are actionable.

24  **Post Sale and Initial Interest Confusion Support A Likelihood Of**
25  **Confusion:**  Actual confusion is not required; and the Court already found
26  Defendants' use of BAYC Marks to be infringing because it created a likelihood of
27  confusion.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants'
28  profits due to their infringing activity—the use of the BAYC Marks—regardless of

1    whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.,*

2    *868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012)* (granting defendant's profits even

3    where infringement claims premised solely on post-sale confusion where a

4    "potential purchaser, knowing that the public is likely to be confused or deceived

5    by the allegedly infringing product, [] choose[s] to purchase that product instead of

6    a genuine one"); *Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir.*

7    *1980)* (finding post-sale confusion actionable since use of similar labeling on jeans

8    "is likely to cause confusion among prospective purchasers who carry even an

9    imperfect recollection of Strauss's mark and who observe Wrangler's projecting

10   label after the point of sale.").  Defendants offer only self-serving, anecdotal

11   evidence of communications with purported purchasers of RR/BAYC NFTs to

12   support their claim that consumers were purchasing the infringing NFTs as a

13   "protest."  As explained *supra* ¶ 3, this evidence should be given little weight.  That

14   consumers, or here distributors, were purchasing Defendants' NFTs with the

15   expectation to resell them is supported by the fact that "the vast majority of [sales]

16   are occurring in secondary markets and not from just the initial sale."  Trial Tr. at

17   202:4-17; *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that

18   bought these that knew this was a scam and that were buying them to sell them on a

19   secondary market.").  Defendants cannot rebut this fact.

20

21

22

23

24

25

26

27

28