**Defendants' Disputed Post Trial Finding of Fact No. 40:**

Mr. Ripps was not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (uncontested).

**Plaintiff's Basis for Dispute:**

Mr. Ripps' claim that he was not aware of any instances of confusion is belied by the ample evidence of confusion on Twitter and other sources that Yuga Labs has identified. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

regardless of whether purchasers were actually confused.  See *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation.  Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**Defendants' Response:**

Yuga's objection is unfounded.  First, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A. Correct.").

Second, there is ample evidence that there was not consumer confusion.  Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the

right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id*. at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id.* at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant". *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets again quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-

262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

     Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

     Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

     Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further this does nothing to undermine this finding of fact, which states that Mr. Ripps is not aware of any actual confusion.

     Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false. The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in Sienze v Kutz, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a

determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits

attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Plaintiff's Reply:**

Defendants' response is largely inapt.  Defendants' internal communications demonstrate that Defendants were aware that their infringement would confuse consumers and refused to take steps to avoid that confusion.  Rather than confront this fact, Defendants engage in collateral disputes to obfuscate the issues.  These responses should be rejected.

As discussed *supra*, Defendants' responses lack merit.  Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (3) Yuga Labs adequately demonstrated that Mr. Cahen lacks credibility (*supra* ¶ 4), (4) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (5) Defendants' assertion that the Bloomberg segment would not cause confusion because both collections were listed lacks credibility (*supra* ¶ 32), (6) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (7) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (8) the Court's summary judgment order establishes Defendants' liability (*Id.*), (9) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (10) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (11) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*supra* ¶ 32), (12) all of Defendants' profits are attributable to their infringement (*supra* ¶ 32), (13) the record shows many instances of actual confusion (*supra* ¶ 3), (14) Defendants used Yuga Labs' marks (*supra* ¶ 32), and (15) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (16) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), and (17) Ape Market existed as a commercial endeavor and the marketplace was ready to launch (*Id.*) .

Additionally, the Court should reject Defendants' responses because, (1) Defendants fail to rebut Yuga Labs' witness testimony, (2) Defendants' fail to support Mr. Ripps' deposition testimony about LooksRare, (3) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation, (4) Defendants fail to rebut the likelihood of post-sale and initial interest confusion, and (5) Defendants' fail to account for ongoing harm.

**Defendants Fail To Rebut Yuga Labs' Witnesses:** Defendants' contention that Yuga Labs' witness testimony was "conclusory" is unfounded. Indeed, Defendants' contention itself is conclusory as they fail to cite evidence in the record to support their claim. The Court rejected the vast majority of Defendants' voluminous objections to Yuga Labs' trial declarations, including those made on the basis that the witnesses lacked personal knowledge or were speculating. *See, e.g.,* Trial Tr. at 69:8-12 (the Court overruling all but three of Defendants' thirty-eight objections to Ms. Muniz's testimony). Yuga Labs' witnesses' testimony supports a likelihood that at least some portion of RR/BAYC purchasers were confused. *See, e.g.,* Solano Decl. ¶ 42 ("Time and time again, Defendants used the BAYC Marks to sell identical-looking NFTs in the exact same markets that Yuga Labs' BAYC NFTs are sold."); *see also* SJ Order (Dkt. 225) at 11-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). This testimony speaks directly to the likelihood that consumers were confused, and is supported by significant documentary evidence. JTX-29; JTX-137, JTX-670. Mr. Solano cited to all of these exhibits in his declaration. This testimony is not "conclusory," it is well supported and directly on point.

**Defendants Fail To Explain Away Mr. Ripps' Testimony About LooksRare:** Defendants cannot keep their story straight about where consumers should look to verify their NFTs. To begin, Mr. Ripps' testimony demonstrates that

the LooksRare sales page misidentified Defendants' infringing NFTs as "Bored Ape Yacht Club," so the testimony clearly supports a finding of likelihood of confusion. *See* Ripps Depo. Designations (Dkt. 396) 290:4-12; *see also* [Stone Creek, Inc. v. Omnia Italian Design, Inc., 875 F.3d 426, 432 (9th Cir. 2017)](#) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). And the full testimony demonstrates that, contrary to Defendants' assertions, they do have the ability to alter the display of Yuga Labs' marks on secondary marketplaces. *See* Ripps Depo. Designations (Dkt. 396) 289:7-11 ("Q: So you signed in with a wallet to LooksRare, and they permitted you to make changes to the page dedicated to the RR/BAYC NFTs? / A: The change of this redacted thing, it's something that I have done, yeah/"). ***This testimony directly refutes Defendants' claim that they have no control over the RR/BAYC sales pages on secondary marketplaces.*** *See* Dkt. 419-1 ¶ 55 ("Mr. Ripps and Mr. Cahen had no control over and no affiliation with those third-parties who auto-generated "Bored Ape Yacht Club V3" or "BAYC V3."); *see also* Ripps Depo. Designations (Dkt. 396) at 81:7-8, 81:22-82:7 (admitting to changing the OpenSea marketplace page for RR/BAYC NFTs). Defendants could have taken steps to make their secondary marketplace pages less confusing, but they chose not to.

Further, as discussed *supra* ¶ 32, even if a consumer were to navigate to Etherscan to verify their NFTs they would still be confused. *See* JTX-117 (Etherscan screenshot showing "Bored Ape Yacht Club" and "BAYC" as token tracker and contract name respectively). By Defendants' own admission, consumers should look to the immutably infringing Etherscan page to verify their NFTs, thus highlighting the importance of an injunction that would transfer control of that contract to Yuga Labs. Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular

instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps").

**Confusion Over Sponsorship Or Affiliation Is Actionable:** Defendants ask the Court to apply an artificially narrow construction of the Lanham Act and disallow infringement claims based on affiliation or sponsorship. Regardless of whether a consumer who watched the Bloomberg piece thought that "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" were the same *product*, their confusion as to whether they originated from the same *company* or were sponsored or affiliated with the same company is nonetheless actionable. JTX-701. The Lanham Act expressly applies where the appropriation of one's marks "is likely to cause confusion . . . as to the ***affiliation, connection, or association*** of such person with another person, or as to the or as to the origin, ***sponsorship, or approval*** of his or her goods[.]" 15 U.S.C. § 1125(a)(1)(A) (emphases added). And such confusion was likely, as the Court has already ruled, due to the unaltered display of Yuga Labs' marks. SJ Order (Dkt. 225) at 13. Defendants' argument that there is no likelihood of confusion because of the Bloomberg video is not in good faith.

**Post Sale And Initial Interest Confusion Support A Likelihood Of Confusion:** Actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing because it created a likelihood of confusion. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity—the use of the BAYC Marks—regardless of whether purchasers were actually confused. See *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir.

1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."); *see also* J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation. Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."). Indeed, Defendants fail to confront the fact that initial interest confusion is actionable "even though no actual sale is finally completed as a result of the confusion." J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 23:6 (5th ed.). Defendants offer only a handful of cherry-picked communications support their argument, but Defendants cannot feasibly determine how many potential consumers were lured in by their confusing and infringing products. SJ Order (Dkt. 225) at 13.

Defendants also offer only self-serving, anecdotal evidence of communications with purported purchasers of RR/BAYC NFTs to support their claim that consumers were purchasing the infringing NFTs as a "protest." As explained *supra* ¶ 3, this evidence should be given little weight. That consumers, or here distributors, were purchasing Defendants' NFTs with the expectation to resell them is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants cannot rebut this argument.

**Defendants Fail To Account For Ongoing Harm:** Regardless of how much Defendants profited off the sale of their infringing NFTs on secondary marketplaces, the fact remains that Yuga Labs continues to suffer ongoing harm.

1  Indeed, Yuga Labs will only be made whole by an injunction that orders the
2  transfer of the immutably infringing smart contract.  Trial Tr. 134:4-7 ("In this
3  particular instance, upon inspection of the Foundation smart contract that was used
4  to deploy the RR/BAYC smart contract, it's evident that these are not mutable
5  fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless
6  Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be
7  forever tied to Mr. Ripps").  Defendants' citation to the profits calculation of Yuga
8  Labs' own witness does nothing to rebut this ongoing harm or militate against a
9  sufficient injunction.