**Defendants' Disputed Post Trial Finding of Fact No. 44:**

<u>Gregory Solano, Yuga's President, could not identify a single person who ever bought an RR/BAYC made by Ryder Ripps believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1.</u>

**Plaintiff's Basis for Dispute:**

As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16. Nonetheless, Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations (Dkt. 396) at 290:4-9; JTX-1049; Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* at ¶ 24. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13. In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

regardless of whether purchasers were actually confused. See *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

**Defendants' Response:**

Yuga's objection is unfounded. First, there is ample evidence that there was no consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. See Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. See Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. See Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Second, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

To help explain why no one in this case has been able to identify a single person who reserved an RR/BAYC NFT because they were confused about its origin, Yuga cites to testimony from Mr. Solano, a lay person, that he thinks people may be embarrassed to admit they were confused. The weight of Mr. Solano's undocumented and unsupported beliefs is negligent. Further, said beliefs do nothing to combat the accuracy of this finding of fact, which is that Mr. Solano has not been able to identify any instance of actual confusion.

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin to demonstrate confusion. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey

that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id*. at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id.* at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id*. at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id*. at 157:9:14; 158:20-159:1.

Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate. *See also* JTX-1030, JTX-1032 (Tweets again quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and

could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested). Further, this does not support a finding that anyone who reserved an RR/BAYC NFT was confused about its origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Fourth, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false. The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in Sienze v Kutz, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a

determination of how to apportion disgorgement of profits attributable to infringement.

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citation to *Gucci* is inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits

attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

Finally, Mr. Solano's testimony was not credible given the many false and misleading statements contained in his declaration, as well as his repeated impeachment at trial. For example, Mr. Solano was also forced to concede on cross-examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know

whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Reply:**

As discussed *supra*, Defendants' responses lack merit. Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) Defendants fail to demonstrate that "many" consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (3) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (4) Ms. O'Laughlin's report is reliable and accurate (*Id.*), (5) the Court's summary judgment order establishes Defendants' liability (*Id.*), (6) Defendants' "disclaimer" did not prevent confusion, (*Id.*), (7) most of Defendants' infringing NFTs did not sell on rrbayc.com (*Id.*), (8) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*Id.*), (9) all of Defendants' profits are attributable to their infringement (*Id.*), (10) the record shows multiple instances of actual confusion (*supra* ¶ 3), (11) Defendants used Yuga Labs' marks (*supra* ¶ 32), (12) Defendants failed to steps to avoid confusion (*supra* ¶ 33), (13) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 3), (14) Defendants fail to recognize the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 40), (15) Defendants fail to rebut Yuga Labs' witness's testimony (*Id.*), (16) Defendants' fail to support Mr. Ripps' deposition testimony about LooksRare (*Id.*), and (17) Mr. Solano is a credible witness and his testimony is supported by Yuga Labs' experts (*supra* ¶¶ 3, 44).

Additionally, the Court should reject Defendants' responses because (1) evidence admitted at trial demonstrates that Defendants were apathetic to the likelihood of confusion.

**Defendants Were Aware Of Confusion But Chose Not To Act:** The evidence shows that Defendants were aware of confusion for the reasons discussed *supra* ¶ 7. Defendants' internal communications demonstrate that, despite this

knowledge, they were apathetic to consumer confusion. *See* JTX-801.196 (Mr. Lehman noting, "we should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah."). Indeed, Defendants were warned by their attorney that they needed to make changes to their infringing products in order to avoid confusion. *See* JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"). Yet Defendants still used Yuga Labs' unaltered marks on, among other places, their Foundation page and in the RR/BAYC smart contact, despite the warning from their attorney. JTX-28. Defendants cannot now claim ignorance when they were warned, repeatedly, by their attorney and their co-conspirators that their infringing NFTs were confusing.