**Defendants' Disputed Post Trial Finding of Fact No. 47:**

<u>Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga. Trial Tr. [Muniz] 87:17-88:6. Yuga was also unable to identify any documentation of any press inquiries related to the RR/BAYC collection. Trial Tr. [Muniz] 88:7-89:2.</u>

**Plaintiff's Basis for Dispute:**

Likelihood of confusion has already been established in this case. SJ Order (Dkt. 225) at 10-13. Even to the extent Defendants seek to relitigate this issue, this statement is incorrect and misleading. The Court previously ruled that given the publicly available evidence of confusion and the evidence within Defendants' possession, it was not proportionate to the needs of the case for Yuga Labs to search its internal communications regarding confusion. Dkt. 87 at 2 (denying motion to compel production of further "documents on lack of consumer confusion"). As the Court found, Yuga Labs' extensive enforcement efforts "related to Defendants' confusing use of Yuga's marks," among other evidence, was sufficient to demonstrate confusion. *Id.* Further, there is abundant evidence of actual confusion in this case unique to Defendants' infringing NFTs. *See, e.g.*, JTX-701 and JTX-1049 (Bloomberg news segment reporting Defendants' infringing NFT collection, under the name "Bored Ape Yacht Club V3"); JTX-705 (Twitter bot misreporting reporting sale of Defendants' infringing NFT as "Bored Ape Yacht Club" NFT); JTX-1029 (noting "confusion in these comments" in response to JTX-705); JTX-1030 (comment indicating confusion). Even Defendants' business partner, Mr. Lehman admitted to confusion, agreed to a consent judgment admitting to this confusion, and warned Defendants about the confusion. JTX 1; JTX 621. That Yuga Labs did not produce further

documentation of confusion does not establish that confusion did not exist or undermine the substantial other evidence.

Yuga Labs also provided persuasive and unrebutted evidence of harm and confusion unique to Defendants' infringement. Dr. Berger's unrebutted expert report (JTX-722) and testimony explain how Defendants' "minting and sales of RR/BAYC NFTs using Yuga Labs' marks harmed the brand equity of BAYC for multiple reasons," including by diminishing the "perceived exclusivity of authentic BAYC NFTs," causing confusion, and damaging "consumer attitudes toward the BAYC brand." JTX-722 ¶ 11; *see also* Berger Decl. (Dkt. 339) ¶¶ 62-92; 340. Additionally, Ms. O'Laughlin's unrebutted survey evidence determined that there was actual confusion in the marketplace, finding net confusion rates of 40.4% on Foundation and 20.0% on OpenSea, respectively. JTX-721 (O'Laughlin Expert Report) ¶¶ 16, 47, 73; *see also* O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

**Defendants' Response:**

The evidence at trial showed that Yuga could not identify a single e-mail or text message at Yuga discussing the alleged confusion and harm that the RR/BAYC collection caused despite the fact that Yuga is a self-proclaimed multi-billion dollar corporation. Yuga admits that it used e-mail and instant messaging to communicate for business. Trial Tr. [Muniz] 85:24-86:4. And yet, Yuga could not identify a single e-mail or text message discussing (1) confusion associated with the RR/BAYC project, Trial Tr. [Muniz] 86:14-87:6, or (2) how RR/BAYC uniquely caused any problems in the day-to-day business operations of Yuga. Trial Tr. [Muniz] 87:17-88:6. Yuga was also unable to identify any documentation of any press inquiries related to the RR/BAYC collection. Trial Tr. [Muniz] 88:7-89:2. Further, Yuga could not identify a single email, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from any brand partner that mentions changes in negotiating

dynamics with brand partners as a result of the RR/BAYC collection.  Trial Tr. [Muniz]101:7-12. ("Q. Did you identify a single e-mail, text message, or any other contemporaneous written communication from any brand partner or repeating any communication from any brand partner that mentions any of these concerns at all? A No, it was phone calls and e-mails -- I mean, phone calls and Zooms."). Ultimately, Yuga did not mention RR/BAYC in any of its quarterly reports to its investors.  Trial Tr. [Muniz] 89:18-23.

Yuga attempts to rebut the evidentiary record by referencing this Court's summary judgment order even though this Court did not make any finding at summary judgment on this particular issue.  Further, relying on this Court's summary judgment order is an incorrect use of the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: even if the summary judgment order ruled on Yuga having no internal document indicating any confusion or harm associated with RR/BAYC NFTs (which the summary judgement order did not rule on) such a ruling would apply only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga then incorrectly argues that the fact it has no internal documents indicating confusion can be ignored given the "abundance" of evidence of confusion. But the examples Yuga cites are not actually evidence of confusion. For example, Yuga relies on a Bloomberg news segment. But the Bloomberg news segment did not discuss RR/BAYC NFTs or even the BAYC V3 label that Yuga complains about. The Bloomberg Crypto segment centered on the recent cryptocurrency market crash and its impact on the valuation of various cryptocurrency assets. JTX-1049. During a discussion of the NFT market, Bloomberg news reporters highlighted that NFT valuation had dropped in 2022, along with the valuation of other cryptocurrency assets. *Id.* However, during a brief discussion of an "eight percent jump in the NFT index," a chart listing NFT collections appeared behind the Bloomberg reporter. *Id.* While the chart was displayed, the reporter did not discuss any of the collections. Instead, she highlighted market changes such as volume drops on OpenSea of "almost 200%." *Id.* As the NFT collections chart was taken down, the reporter said "let's talk a second longer about the Bored Ape Yacht Club collection" before discussing how drops in valuation across the cryptocurrency market have also impacted that Bored Ape Yacht Club's valuation.

Although the NFT collections chart shown during the Bloomberg segment listed "Bored Ape Yacht Club V3" as a "Top NFT Collection," the news reporter did not spend any time discussing and analyzing the chart. *Id.* She never referenced the Defendants by name, she never referenced Defendants' criticisms of Yuga, and she never even mentioned Yuga. Instead, she briefly mentioned the Bored Ape Yacht Club as the chart was taken down. *Id*. This is unsurprising since the Bored Ape Yacht club was one of the collections listed on the chart. *Id*. However, nothing that the reporter said characterized Defendants' RR/BAYC project as being affiliated with Yuga or the Bored Ape Yacht Club. In fact, the reporter did not compare or contrast any of the listed collections. *Id*. She simply

continued to her other talking points. *Id.* Thus, the Bloomberg news segment has not indication that anyone was confused regarding the Bored Ape Yacht Club NFTs listed on the chart and the V3 NFTs listed on the chart—the same chart that was never discussed by anyone at any point during the news segment.

Yuga also misleadingly cites to posts by Twitter bots as "evidence of confusion." But in these posts by Twitter bots, users are quick to remark that the Twitter bot falsely indicated a Bored Ape Yacht Club transaction. JTX-705; JTX-1029. Users replied to the bot by saying "It's a RR ape" or "RRBAYC > BAYC." JTX-705. Another twitter user replied to the bot and mentioned this litigation, clearly indicating their ability to differentiate between RR/BAYC NFTs and Bored Ape Yacht Club NFTs. JTX-1029. These posts by bots, thus, also are not actually evidence of confusion. To the contrary, they show lack of confusion because users were readily able to identify that the bots were posting about RR/BAYC NFTs.

Yuga then cites to the Lehman declaration (which was signed under coercion) as evidence of confusion, which Yuga and Mr. Solano have relied in this litigation to advance false claims of actual confusion. As demonstrated during trial, Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won. Trial Tr. [Solano] 38:17-19. Mr. Solano also relied on the declaration without considering that Mr. Lehman explained under oath that he was intimated by Yuga's lawsuit and that his understanding was "No declaration. No settlement." Trial Tr. [Solano] 38:11-16. A coerced declaration such as this is not probative evidence of confusion, especially given that Yuga has absolutely no internal documentation of confusion and that none of the parties have been able to identify a single confused consumer.

Yuga also incorrectly argues that there is "abundant" evidence of confusion because of Dr. Berger and Dr. O'Laughlin's expert reports. But the evidence at

trial showed that Dr. Berger's limited analysis did not establish that the minting of RR/BAYC NFTs was the source of the alleged brand harm. Although Dr. Berger acknowledged that several different causes could have impacted Yuga's brand equity, Dr. Berger declined to consider alternative causes of harm in his analysis. Trial Tr. [Berger] 108:7-109:4; 115:16-25. He limited his analysis to the period from May 6, 2022, to late June, and completely disregarded events leading up to that period. Trial Tr. [Berger] 106:1-3. For instance, Dr. Berger's analysis ignored the Otherside scandal, which occurred mere days before his chosen analysis period. Trial Tr. [Berger] 113:10-114:2; JTX-2715. Dr. Berger even ignored events, like the general downturn of the cryptocurrency market, which occurred during his analysis period. Trial Tr. [Berger] 109:5-110:5; JTX-306.

At trial, Dr. Berger claimed that the presence of other potential causes of brand harm does not dilute the hypothesis that the minting of RR/BAYC NFTs caused brand harm. Trial Tr. [Berger] 115:19-25. However, in ignoring other potential causes of harm, Dr. Berger has not been able to establish which factors caused harm or quantify the harm of any given factor. Indeed, Dr. Berger failed to quantify any alleged harm to Yuga's brand equity, goodwill, or reputation. *See generally* Berger Decl.; Dkt. 343 at 15.

As for O'Laughlin, her survey evidence is unreliable and was rebutted on several grounds. As demonstrated at trial, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her

surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id.* at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1.

Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant". *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

**Plaintiff's Reply:**

Defendants' arguments are merely a distraction because they argue a decided issue. Defendants infringed Yuga Labs' marks in a manner that was likely to cause confusion, as the Court has already adjudicated. SJ Order (Dkt. 225) at 10-13. Defendants have not sought relief from that order and cannot seek to undo it through their submissions following trial on the issue of remedies. Similarly, because likelihood of confusion had already been established and trial was limited to the issue of remedies, there is no basis for Defendants' argument that the Court should make any factual inferences because Yuga Labs did not burden the Court with cumulative evidence of adjudicated issues. *See Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (partial summary judgment is "intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit.") (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)).

Defendants' response completely fails to address the other fatal flaw of their objection: they already sought these materials, and the Court held that they were not needed in light of existing evidence of confusion, including evidence that was publicly available or in their possession. Dkt. 87 at 2 (denying motion to compel production of further "documents on lack of consumer confusion"). Defendants

cannot demand disproportionate discovery and then argue that the Court's agreement that the discovery is inappropriate warrants a factual inference in their favor.

Because Yuga Labs has proven likelihood of confusion before trial (and reiterated by the evidence presented at trial), and because this evidence was determined to be unnecessary even before the Court's summary judgment order, Defendants' proposed finding of fact that Yuga Labs "could not identify" evidence within their arbitrary categories is incorrect and immaterial.

Defendants' additional arguments do not directly address this issue, but in any event they are rebutted elsewhere. *See supra* ¶ 32 (objection and reply rebutting Defendants' arguments regarding lack of confusion, including with respect to Bloomberg and Defendants' "Bored Ape Yacht Club V3"); *infra* ¶¶ 70-80 (objection and reply rebutting Defendants' arguments regarding Ms. O'Laughlin's expert testimony), 83-91 (objection and reply rebutting Defendants' arguments regarding Dr. Berger's expert testimony).