1 **Defendants' Disputed Post Trial Finding of Fact No. 68:**

2 <u>Mr. Atalay confirmed that consumers differentiate NFT collections by</u>
3 <u>reviewing them on a marketplace or by checking the associated smart contract</u>
4 <u>address. Trial Tr. [Atalay] 135:2-25.</u>

5 **Plaintiff's Basis for Dispute:**

6 This contention misrepresents Mr. Atalay's testimony and, in any event, is
7 immaterial given Defendants' admission that token trackers are a "very common"
8 way for consumers to identify NFTs and their Foundation page listed the
9 RR/BAYC NFTs under the Bored Ape Yacht Club name. Cahen Depo.
10 Designations (Dkt. 395) at 148:12-13 ("Oh, yes. I believe that it's very common
11 for people to do that."). Mr. Cahen reiterated this testimony at trial. Trial Tr. at
12 225:25-226:2. This contention is also ironic given that the Defendants group chat
13 admitted their belief that consumers were too unsophisticated to check the smart
14 contract. JTX-801.279 ("Ppl will not read the contract").

15 Mr. Atalay testified that consumers differentiate among NFTs in different
16 ways depending largely on their level of expertise. *See* Trial Tr. at 135:8-10 ("It
17 depends on your level of expertise. I would say for the average person who is not
18 an expert in blockchain technology" viewing an NFT on a marketplace would be
19 "the most straightforward way" to distinguish NFTs); *id.* at 135:13-15 (stating that
20 differentiating NFTs based on the smart contract is "something that requires a level
21 of expertise" and "most casual consumers of this technology don't go that far"); *id.*
22 at 135:18-19 (testifying that the inference that NFTs associated with different smart
23 contracts are different "is lost on the majority of the nonexpert, nontechnical
24 public."). As Mr. Atalay testified, the "nonexpert, nontechnical public" is unlikely
25 to the look to the smart contract to verify the authenticity of an NFT. Rather, these
26 consumers often rely upon the token tracker to differentiate between NFT
27 collections. Atalay Decl. (Dkt. 337) at ¶ 7 ("[the token tracker] is a critical piece of
28 data the NFT community uses when they are buying on the secondary market.");

*see also* SJ Order (Dkt. 225) at 17 ("Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT."). This reliance on the token tracker, and resulting confusion, is what happened in the marketplace. *See, e.g.*, JTX-690 (Mr. Ripps' Tweet with link to RR/BAYC NFTs on X2Y2 listed as "Bored Ape Yacht Club V3"); JTX-705 (@0xGem Tweet reporting sale of RR/BAYC NFT as sale of Bored Ape Yacht Club NFT).

But even if those less sophisticated consumers looked to the sales page to verify their NFTs, Defendants' infringing NFTs were listed as "Bored Ape Yacht Club" on Foundation. JTX-671. Indeed, this page was so confusing that even Defendants' co-conspirator Mr. Hickman confused the RR/BAYC Foundation page for the Bored Ape Yacht Club. Hickman Depo. Designations (Dkt. 322) at 150:6 ("Looks to be Bored Ape Yacht Club" when viewing RR/BAYC Foundation page). If even a seasoned NFT consumer and an insider like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on Defendants' marketplace page, the "nonexpert, nontechnical public" would stand no chance.

**Defendants' Response:**

Plaintiffs dispute does not engage with the substance of the finding of fact. At the outset Yuga fails to acknowledge that its own witness, Mr. Atalay, said that "most people" would *not* use the token tracker to differentiate between collection. Trial Tr. [Atalay] 132:21-133:8. Yet in his trial declaration, Mr. Atalay cited approvingly to a tweet from @AllCityBAYC expressing the exact opposite sentiment. *See* Atalay Decl. ¶ 7 Mr. Atalay's change of heart on this issue appears litigation driven, since Yuga relies heavily on the token tracker as evidence of confusion. *Id.* ([Token Tracker] is a critical piece of data the NFT community uses when they are buying on the secondary market.").

Not only does Mr. Atalay's contradictory testimony undermine his credibility, his other testimony undermines Yuga's entire theory of confusion. Indeed, Mr. Atalay testified that most users differentiate between smart contracts when purchasing NFTs by looking at a marketplace like OpenSea or the associated smart contract. Trial Tr. 135:5-10 (using Opensea is "probably the most straightforward way" to differentiate NFTs). Using either method, a user could easily differentiate between an RR/BAYC NFT and a BAYC NFT by comparing token address, holder count, floor price, creator address, or any number of other parameters. Because in those instances there would be almost no way a user could be confused, that undermines Yuga's baseless claim that *every* transaction involving RR/BAYC was the result of confusion. Trial Tr. 14:1-3 (Q. "You don't think that anybody ever paid Mr. Ripps or Mr. Cahen any money for an RR/BAYC as an act of protest against Yuga. That's your testimony; right? A. Correct")

Yuga misleadingly cites to a portion of Mr. Hickman's deposition and trial testimony to support their assertion that he was confused and misidentified the RR/BAYC sales page on Foundation. This is inaccurate. As Mr. Hickman credibly testified at trial, he was not confused, and his deposition video shows him reviewing and describing all portions of the exhibit. Trial Tr. [Hickman] 219:3-12 ("Q Were you at your deposition confused about whether the page that you were shown was indeed a Yuga Labs page or a page by Mr. Ripps? A I was not confused. The video shows me describe all of the aspects of the page real time. Q And were you -- what was your level of confidence that this Foundation page that you were shown at your deposition was indeed a page for the RR/BAYC collection? A It was that it was actually Ryder's creator page for the RR/BAYC collection.").

**Plaintiff's Reply:**

Defendants' response continues to misrepresent Mr. Atalay's testimony and fails to dispute their own admissions that token trackers are a common way for

consumers to identify the source of NFTs. Defendants' attempt to contend the opposite is unavailing, particularly in light of the Court's finding that token trackers authenticate and verify NFTs, and Defendants' use of BAYC Marks in the RR/BAYC smart contract's token tracker was explicitly misleading. SJ Order (Dkt. 225) at 17

Mr. Atalay's testimony that "[the token tracker] is a critical piece of data the NFT community uses when they are buying on the secondary market" is truthful and accurate. Atalay Decl. (Dkt. 337) at ¶ 7. Defendants admit the same. *See* Cahen Depo. Designations (Dkt. 395) at 148:12-13; Trial Tr. at 225:25-226:2. Further, it is entirely consistent for Mr. Atalay to state that "the NFT community" uses token trackers, and that "most people," depending on their level of technical expertise, may not and may rely instead on the marketplace. The larger public is a different community. And even those in the NFT community can use both a token tracker and the marketplace in their review of NFTs. Each have their own purpose and use. More importantly, as discussed above, a consumer would not be able to distinguish the RR/BAYC NFTs from BAYC NFTs because of Defendants' copying of the same exact marks on the same exact products in the marketplaces—for example, on Foundation (*see* JTX-673), on OpenSea (*see* JTX-29, JTX-686), on LooksRare (*see* JTX-137), on x2y2 (JTX-690), and on NFTX (*see* JTX-138). *See also* SJ Order (Dkt. 225) at 11-12 ("Defendants have used Yuga's BAYC Marks . . . both Yuga and Defendants promoted and sold their NFTs through the same online NFT marketplaces").

Finally, Defendants' attempt to explain away Mr. Hickman's obvious confusion is self-evidently not credible. When asked to identify the source of the NFTs for sale in JTX-28 (the sales page of his partners' own infringing NFTs) he paused for around five seconds, examined the page closely and stated that the page "looks to be Bored Ape Yacht Club." Trial Tr. 213:9-13 (lodged at Dkt. 415). His body language and demeanor showed that, after this examination, Mr. Hickman

genuinely believed that he was looking at a Bored Ape Yacht Club sales page. It was only after around fifteen seconds of a second, long, pause and closer examination that Mr. Hickman amended his answer and identified the page as Defendants' infringing website. Dkt. 415. Mr. Hickman's testimony at trial that he was not confused lacks credibility in light of his testimony and his demeanor when giving that testimony. His self-serving denial contradicts what was clear in his video-taped deposition and at trial. Dkt. No. 415 (notice of lodging of video testimony); Trial Tr. 213:13. Mr. Hickman's bias, including from separately being sued by Yuga Labs, explains why he would falsely deny his confusion. If even an insider like Mr. Hickman was confused by Defendants' use of Yuga Labs' marks on Defendants' marketplace page, the "nonexpert, nontechnical public" stood no chance when presented with Defendants' scam. Trial Tr. at 135:18-19.