**Defendants' Disputed Post Trial Finding of Fact No. 74:**

Ms. O'Laughlin's surveys are also unreliable because they were biased in favor of finding confusion because they counted consumers as "confused" in the test group who merely copied text from the images that they were shown, but did not count consumers as "confused" in the control group when they did the same thing. In her *Eveready* survey, when shown an image showing "Bored Ape Yacht Club" respondents that wrote "Bored Ape Yacht Club" were counted as confused. Trial Tr. [O'Laughlin] 154:4-155:3. However, in the corresponding control group, when shown an image displaying "Chill Gorilla Boat Crew" respondents that wrote "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 156:16-157:8.

**Plaintiff's Basis for Dispute:**

The operative questions in calculating the net confusion rate in Ms. O'Laughlin's Foundation/Eveready survey were "Who or what entity do you believe puts out the NFT collection you saw?" and "What other entity or entities do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever puts out the NFT collection you saw?" O'Laughlin Decl. (Dkt. 341) ¶¶ 45-46. Defendants aver, without any authority or expert testimony, that Ms. O'Laughlin's Foundation/Eveready survey was "unreliable" and "biased" because she only considered respondents who identified the source of Defendants' Foundation webpage as "Bored Ape Yacht Club" to be confused and did not count those who mentioned "Chill Gorilla Boat Crew." This argument has no merit and demonstrates a fundamental misunderstanding of the purpose of a control in an Eveready survey. *See* Trial Tr. at 156:16-157:14.

Ms. O'Laughlin's Foundation/Eveready survey employs a test/control experimental design where respondents are randomly assigned to one of two groups and exposed to stimuli that are identical but for the at-issue characteristic(s) being tested. Ms. O'Laughlin compared the share of respondents who associate the

Defendants' Foundation webpage with "Bored Ape Yacht Club," when shown the page *as it actually appeared in the real world* with the at-issue BAYC Marks (BAYC test group), versus when shown a modified page that used an alternative to the at-issue BAYC Marks (CGBC control group).  By comparing the share of respondents who believe that the source of the Foundation page collection is "Bored Ape Yacht Club" in both the test and control groups, Ms. O'Laughlin was able to measure the rate of confusion attributable specifically to Defendants' actual use of the BAYC Marks.

Ms. O'Laughlin's Eveready survey and analysis are not methodologically flawed.  Consistent with standard Eveready survey practice, Ms. O'Laughlin's analysis counts mentions of the "Bored Ape Yacht Club" in both the test and control groups, but does not count mentions of "Chill Gorilla Boat Crew" in the control group when calculating net confusion.  This is consistent with the approach taken by other leading trademark survey experts in Eveready survey analysis for forward confusion cases.  *See* JTX-1122 at 210-11.  All other characteristics of the stimuli, including the alternative mark in the control group, are not at issue and therefore are not considered when calculating confusion.  Accordingly, it would be nonsensical to count respondents who mention Chill Gorilla Boat Crew as confused.

Moreover, Defendants argue that respondents in the test group "merely copied text from the images that they were shown," after seeing the Defendants' Foundation webpage, and essentially complain that the survey is biased because the prominence of the BAYC Marks in the stimuli would lead anyone to believe the Foundation webpage is associated with the "Bored Ape Yacht Club" or "BAYC" NFT collection.  The complaint though is of the Defendants' own making.  The stimuli used in Ms. O'Laughlin's Foundation/Eveready survey reflects the Defendants' explicit and blatant infringement found on their own Foundation webpage *as it actually appeared in the real world*, which simply demonstrates the

egregious and deceptive nature of Defendants' use of the BAYC Marks. *See* JTX 28; JTX 1557.

Indeed, the fact that many survey respondents associated Defendants' Foundation webpage ***as it actually appeared in the real world*** with "Bored Ape Yacht Club" and the modified control version of the webpage with "Chill Gorilla Boat Crew" highlights how respondents (and consumers more broadly) rely on collection names and logos to communicate the source of an NFT collection. The Court has already found that "the BAYC Marks are both conceptually and commercially strong," SJ Order (Dkt. 225) at 10-11, and they accordingly serve as a designation of origin to actual and prospective consumers as they did in Ms. O'Laughlin's surveys.

**Defendants' Response:**

Yuga talks past Defendants proposed finding of fact perhaps because they do not have a response to the fact that the survey does not control for survey respondents who were merely writing down the words they saw on the page. In fact, only 2 out of 505 respondents in the *Everready* survey actually gave any indication that they were confused and believed that any tested product was sponsored by Yuga. Trial Tr. [O'Laughlin] 155:18-156:1.

Yuga also misapprehends the problem with the survey. All it did was prove that people could read. "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion." *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) (holding that survey had limited weight as a reading test). Ms. O'Laughlin makes the sweeping claim that there was an extensive amount of confusion based on her Eveready survey because 49% of test group respondents were confused. *See* JTX-310 at Figure 9. Of these, almost all of them wrote the screen prompt exactly. In the control group, 27% of test group respondents wrote "Chill Gorilla Boat Crew"—the on-screen stimulus, and were

not counted as confused. *See* Trial Tr. [O'Laughlin] 157: 9-14. Notably, Ms. O'Laughlin was not able to provide an explanation for writing "Chill Gorilla Boat Crew" besides rank copying. *Id.* at 157:25-158:7 (calling fact that people simply copied on screen stimuli "not surprising"). It is undisputed that Ms. O'Laughlin did nothing to control for people merely copying on-screen stimuli which likely comprised about 2/3 of the test group's "confusion" answers if the test and control groups were similar. However, because it is impossible to untangle who was actually confused, and who was merely copying words, Ms. O'Laughlin's opinion on the extent of confusion should be disregarded.

**Plaintiff's Reply:**

Defendants' response, attempting to undermine standard expert survey methodology, continues to misunderstand the test/control experimental design used to test for confusion in circumstances such as this where the infringer uses the exact same mark as the genuine good. In those circumstances, it is appropriate to consider participants confused when they identify the infringing product with the name of the genuine one. That methodology is standard and accepted in the field, as discussed in Yuga Labs' objection, and Defendants' response fails to rebut it.

In other words, consumers who see an RR/BAYC NFT and identify the source as the "Bored Ape Yacht Club" brand have indeed misidentified the source of the NFT. A Bored Ape Yacht Club NFT is the only NFT that is, indeed, a Bored Ape Yacht Club NFT. Defendants essentially complain that their false marketing of their knockoff NFTs as "Bored Ape Yacht Club" NFTs unduly persuaded survey participants to misattribute the origin of Defendants' NFTs. But as explained in Yuga Labs' objection, this response misunderstands the survey design and essentially complains that Defendants' misbranding was too confusing to be appropriately tested. That objection has no merit.

Defendants' citation to *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997), merely underscores their

misunderstanding of the issue.  The survey at issue in that case involved an interviewer showing a participant an advertisement with the plaintiff's name, then showing an advertisement with the defendant's name, and finally asking the participant if they believed the defendant's advertisement used the name shown in the first round.  Unlike here, the survey in *Franklin* was not an Eveready survey.  And, the court criticized the survey as essentially testing the "ability of the present respondents, to read and remember the name 'Franklin' as having been in both" sets of advertisements.  *Id.*  Here, by contrast, Ms. O'Laughlin's Eveready survey showed only one specimen: Defendants' Foundation page *as it actually appeared in the real world*.  Participants who saw that page and identified the source of the NFTs as "Bored Ape Yacht Club" were appropriately labeled as confused as to the source.