**Defendants' Disputed Post Trial Finding of Fact No. 76:**

<u>Ms. O'Laughlin's surveys did not test for confusion for sales on rrbayc.com, which is where more than 80% of sales for which Defendants made revenue occurred. Trial Tr. [O'Laughlin] 159:21-160:13; Ripps Decl. ¶ 110 (uncontested).</u>

**Plaintiff's Basis for Dispute:**

rrbayc.com is not where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products. These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale. Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx");

Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling"). Defendants' contention is therefore incorrect and misleading.

**Defendants' Response:**

Mr. Ripps's declaration went undisputed at trial, and there is no dispute that 80% of the reservations and commissions for RR/BAYC NFTs were through the rrbayc.com website. Ripps Decl. ¶ 110 (Dkt. 346) (uncontested). Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13; Counter designation 82:14-19. This however is different than the "Foundation page" for Ryder Ripps. Yuga's conflation of the two through an incomplete portion of Mr. Ripps's deposition testimony shows that they cannot differentiate between the contract itself and the marketplace that facilitated transactions on the contract. Further, Yuga presented no evidence contradicting the fact that nobody could identify a single person who was confused by sales on Foundation. *See* Trial Tr. [Solano] 19:13-15 (cannot identify a *single* confused consumer); [Hickman] 219:13-19.

Ms. Kindler's report also shows the strong divide between profits made on initial sales and secondary sales. *See* JTX-308 ¶¶ 63 (calculating initial sales profits at 1,245 ETH); 68 (calculating secondary sale profits at 91 ETH). This shows that the vast majority of profits for Defendants being from initial sales. *Id.* This is entirely consistent with the majority of sales being made on rrbayc.com. Yuga's citation to Mr. Hickman's statement that they were closing in on "$10 million" in impact on Yuga does not implicate anything about initial or secondary markets, or where RR-BAYC NFTs were sold. In fact, the comment was not about revenue or profits at all but instead referred to volume. *See* Hickman Decl. ¶ 95 ("Mr. Ripps and Mr. Cahen's responses, thus, confirm that my statement was in reference to adding $10 million in activity…").

Lastly, it is undisputed that Defendants are no longer profiting from royalties on RR/BAYC NFTs. *See* Trial Tr. [Solano] 48:15-49:4 (acknowledging lie in witness statement and that royalties are no longer increasing); Cahen Decl. (Dkt 344) ¶¶ 167-172. Regardless, Yuga cannot reasonably dispute that Ms. O'Laughlin did not test for confusion on rrbayc.com because she admitted she did not. Trial Tr. [O'Laughlin] 160:2-12.

**Plaintiff's Reply:**

Defendants' response admits that their proposed fact is unproven. They respond that "80% of the reservations and commissions for RR/BAYC NFTs were through the rrbayc.com website." But, that is not their proposed fact. The dispute is over "where more than 80% of sales for which Defendants made revenue occurred." There is no dispute that Defendants "made revenue" through the initial mint of RR/BAYC NFTs **and** through secondary sales; Defendants' response confirms that fact as well. Defendants have *no analysis* comparing what percentage of the sales volume occurred through rrbayc.com and what percentage through secondary marketplaces.

In contrast, Ms. Kindler did this analysis. Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "*[t]he majority of the sales are taking place on secondary markets*. . . . [T]he *vast majority of them are occurring in secondary markets* and not from just the initial sale." Trial Tr. at 202:4-17 (emphasis added); *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Moreover, Defendants admitted that they planned to transition from rrbayc.com to apemarket.com once all of their infringing NFTs were minted. JTX-801.9; 801.148; 801.280; 801.281 (Mr. Ripps recommending that they migrate users to apemarket.com "once it mints out"); 801.288 (Mr. Cahen; "I think the first

logical step to me is migrating the rsvp site to apemarket.com"); 801.376 (Mr. Lehman on June 24, 2022 (before Defendants learned of the lawsuit): "With respect to the rrbayc.com trademark issue I say we maybe get some attention around it and how unfair it is but ultimately take the site down probably . . . especially since we're migrating off anyway"). Ms. O'Laughlin's testimony is most relevant to this forward-looking scenario where she establishes that on two different NFT marketplace designs consumers were likely to be confused by Defendants' infringing NFTs.