**Defendants' Disputed Post Trial Finding of Fact No. 96:**

<u>Ms. Kindler later changed her damages calculation in the amount of repurchase costs to be "up to $797 million." Trial Tr. [Kindler] 178:24-179:5.</u>

**Plaintiff's Basis for Dispute:**

Ms. Kindler supplemented her damages calculation with new information once it became available; she did not change her prior analysis. *See* Trial Tr. 179:2-5 ("based on additional events that had transpired and available market data, that I could then update my analysis to show the impact of what I had already identified previously as likely holdouts in the marketplace."). Ms. Kindler initially calculated "a 'floor' for what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the RR/BAYC NFT collection." Kindler Decl. (Dkt. 338) ¶ 72. Then, based on new data made available by Defendants' posts to their followers regarding the buyback estimate (which also prompted an increase in the price and trading volume of the infringing NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor value for a hypothetical buyback significantly underestimated the actual cost of such an exercise, as I originally opined." *Id.* ¶¶ 73-74. "Based on these materials and available market data, my assignment was to estimate a 'ceiling' for what a buyback would cost. I determined the cost to purchase and destroy all RR/BAYC [NFTs] could even be higher than $797,183,838 . . . based on the then-current floor price of authentic BAYC NFTs." *Id.* ¶ 74.

**Defendants' Response:**

Yuga's "dispute" is little more than an exercise in semantics. There is no dispute that the $797 million figure was nowhere to be found in Ms. Kindler's original expert report. Trial Tr. [Kindler] 175:17-179:8; *see generally* JTX-308. The $797 million figure, 400 times greater than her original damages estimate, first appeared in Ms. Kindler's amended offer of proof more than four months after her original damages report. Dkt. 287-10 at 4 n.3.

The $797 million figure is facially unreasonable, as there has never, to Defendants knowledge, ever been an award of trademark infringement damages that even approaches that amount.  The $797 million number is also unreasonable because of what Ms. Kindler claims precipitated it.  That is, during the trial Ms. Kindler confirmed that the entire basis for increasing the damages by more than 400 times was a series of tweets made by Mr. Cahen and others on Twitter.  Trial Tr. [Kindler] 179:12-14 ('Q Your new opinion was based on Tweets posted by defendants on June 6, 2023, and some responses; correct? A Yes. That was the events that had transpired.").  In those tweets, Twitter users claimed they would not sell their RR/BAYCs.  *See* Dkt. 287-10 at 4.   But Ms. Kindler acknowledged that the possibility of a holdout was not a new thing that came into existence at the time of Mr. Cahen's tweet.  *Id.* at 180:3-10.  More likely, Ms. Kindler's opinion was an attempt to scare Defendants into settling before the trial.  When that effort failed, Yuga quickly withdrew its claim for a jury trial and legal damages.

Ms. Kindler's shifting opinion—driven by Yuga's concurrent decision to drop all legal remedies on the eve of trial—undermines her credibility as a witness.

**Plaintiff's Reply:**

Ms. Kindler's February 2023 report confirmed that there would likely be holdouts who would demand higher prices than she assumed based on the evidence at that time and that her "estimate very likely understates the cost Yuga Labs would actually incur." JTX-0723.00046.  This opinion is consistent with her opinion at trial that her original calculation was understated, that there would be holdouts, and that a buyback was not economically feasible.  *See supra* ¶ 95.  Ms. Kindler's consistency and conservative approach confirms her credibility.