**Defendants' Disputed Post Trial Finding of Fact No. 115:**

The term "ape" has been used in pieces of artwork or NFT collections other than the RR/BAYC collection and the Bored Ape Yacht Club. Trial Tr. [Cahen] 265:4-6.

**Plaintiff's Basis for Dispute:**

Defendants offer no expert testimony or other credible evidentiary support for this representation. As shown above, Mr. Cahen's testimony is not credible. *See supra* ¶¶ 7, 113. Moreover, the Ninth Circuit, and courts within the Ninth Circuit, have made clear that third-party use of a mark is irrelevant in a suit against a particular infringer. *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law."); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir. 2017) (a "sheer quantity of irrelevant evidence," which is "largely inapposite to the relevant inquiry," is meaningless); *see also F.T.C. v. Neovi, Inc.*, No. 06-CV-1952, 2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from "introducing into evidence . . . 'thousands of third-party webpages'" because they were irrelevant and thus inadmissible under FRE 401 and 402). Even so, Defendants have failed to demonstrate actual use of these marks in commerce. *See, e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004) (excluding evidence of third-party marks in an advertisement because "evidence of third-party use is not admissible unless the proponent can provide evidence that the trademarks were *actually used* by third parties, that they were well promoted or that they were recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz*, 2016 WL

7496769, at *3 (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

To the extent the Court finds that the Defendants' claim is material to any relevant issue, it does not negate the Court's findings and the Defendants' admission that Yuga Labs owns the BAYC Marks. SJ Order (Dkt. 225) at 6-10; Dkt. 320-1 at 2-3. Nor does it negate the Court's findings that the Defendants had a bad faith intent to profit off of and infringe Yuga Labs' BAYC Marks. SJ Order (Dkt. 225) at 12-15.

**Defendants' Response:**

Widespread third-party use of the marks is relevant to Defendants' intent, which is critical for awarding disgorgement, because the wide-spread third-party use of the asserted marks shows that Defendants had a reasonable good faith belief that it was permissible to create the RR/BAYC collection.

At the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244. There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga. Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

This overwhelming evidence regarding third-party use corroborates Mr. Cahen's testimony on how "ape" was used in the crypto industry and in other NFT collections:

> Q. What about in the context of crypto? What does "ape" mean?
>
> A. I think it means different things. But I think there is a colloquialism used which people use as like "I aped into something."
>
> Q. And what does that mean?
>
> A. Like, I invested or I participated. Like, I just jumped in. Maybe, like, a synonym for it.
>
> Q. And where else have you seen the word "ape" used in the crypto context?
>
> A. Definitely in the context of the Bored Ape Yacht Club.
>
> Q. ***Anywhere else?***
>
> A. ***Other pieces of artwork or NFT collections, I guess, you could say.***

Trial Tr. [Cahen] 265:1-6 (emphasis added).

Yuga also falsely states that Defendants had "admitted" that Yuga own's the asserted marks, and supports this false claim by citing to this Court's summary judgment order. Ownership is a topic that Defendants have hotly disputed at summary judgment and reserve the right to continue to dispute on appeal.

**Plaintiff's Reply:**

Defendants did not infringe in good faith. They intended to deceive. SJ Order. (Dkt. 225) at 12. Defendants offer no basis to dispute the Court's finding of their knowing and intentional infringement. They offer no contradictory facts, nor do they cite to any evidence in the record. Rather, Defendants are merely expressing their disappointment in the Court's summary judgment order. Reserving the right to appeal is not a valid basis to ask the Court to disregard its

own orders.

As discussed *supra*, Defendants' responses lack merit. Specifically: (1) Defendants' liability has already been established through the Court's summary judgment order (*supra* ¶ 32), (2) Mr. Cahen is not qualified to provide expert testimony (*supra* ¶ 114), (3) Yuga Labs owns its marks (*Id.*), and (4) Defendants have already admitted to Yuga Labs' ownership of the marks in the pre-trial conference order (*Id.*).

Additionally, the Court should reject Defendants' responses because (1) Defendants acted with the intent to confuse, not in good faith, (2) Yuga Labs did not abandon its marks, and (3) Yuga Labs did not grant Defendants a license to infringe.

**Defendants Did Not Act In Good Faith:** Defendants' argument that they acted in good faith is contradicted by the record. In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks. Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding. For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted). "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17. And the Court determined that Defendants' use of

the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15. Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues. Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement. Defendants discussed making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally." JTX-803.57. And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*). But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Not only did Defendants continue marketing after the institution of this suit, they continued to market and sell their infringing NFTs and website even after the Court's summary judgment order. Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by *Rogers* and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 74. Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19. Defendants did not act in good faith.

**Yuga Labs Did Not Abandon Its Marks:** The Court has already held that Yuga Labs did not abandon its marks. SJ Order (Dkt. 225) at 9-10. Nonetheless, Defendants' references to unknown, and alleged, third-party infringers, in an attempt to excuse their intentional infringement of Yuga Labs' trademarks is unavailing. Any alleged third-party use of the BAYC Marks, or similar marks, is immaterial and irrelevant. Indeed, the Ninth Circuit, and courts within the Ninth

has made clear that third-party use of a mark is irrelevant in a suit against a particular infringer. *See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990) (affirming district court's exclusion of evidence of third-party use of plaintiff's mark because "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law"). Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website. Come get it here. And also, by the way, we are going to rip off Yuga's other site next. And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up on Bloomberg News with people confused thinking it's us. I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this. So, yes, this is especially egregious."). Yuga Labs owns its marks.

There is also not "overwhelming evidence" of third-party use. On the contrary, the evidence shows that Yuga Labs protected its marks zealously. Indeed, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content. *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections. I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Yuga Labs Did Not Grant Defendants' A License To Infringe:** Ms. Muniz explained that in the one interview where she mentioned "IP" rights, she was referring to copyrights and that the context is clear to that effect. *Id.* at 72:3-18. Moreover, this interview is immaterial and irrelevant to Defendants' intent—it occurred in November 2022—long after Defendants made the majority of their sales and after this lawsuit was filed. Regardless, there is no reasonable interpretation of Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving permission to create and sell exact copies of their NFTs using the exact same marks.