**Defendants' Disputed Post Trial Finding of Fact No. 118:**

Mr. Ripps and Mr. Cahen never generated any revenue or profit from ApeMarket. Trial Tr. [Cahen] 265:7-10; Cahen Decl. ¶ 261; Ripps Decl. ¶ 181 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants developed and marketed Ape Market, where consumers could purchase and sell RR/BAYC NFTs alongside BAYC NFTs. *See* JTX-696; JTX-697; JTX-698; JTX-938; Solano Decl. (Dkt. 342) ¶ 49. Defendants teased the release of Ape Market to drive up sales of RR/BAYC NFTs. *See* JTX-696; JTX-801.170-178; JTX-801.185. As Mr. Cahen stated: "One thing we can do to stimulate the rsvp completing is to tease apemarket.com." JTX-801.144. Defendants even continued to promote Ape Market after the filing of this lawsuit. *See* JTX-1048. For example, the @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale. Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19. And Defendants expected to profit off of their use of the BAYC Marks to sell and resell RR/BAYC NFTs and to generate transaction fees from sales on Ape Market. *See* JTX-1 at ¶¶ 10-13; JTX-49; JTX-1574; JTX-1586. They even targeted Ape Market at Yuga Labs NFT holders to harm Yuga Labs, directing their marketing to the "Yuga community." Solano Decl. (Dkt. 342) ¶ 49; JTX-697. Even without a complete launch to the public, the marketing of the website and marketplace increased the sales of the RR/BAYC NFTs, increased Defendants' profits, and harmed Yuga Labs.

**Defendants' Response:**

Yuga falsely states that "users could purchase and sell RR/BAYC NFTs alongside BAYC NFTS" on ApeMarket. The evidence at trial showed that ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.

Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested). Moreover, JTX-801 shows that Defendants were in the ideation process for ApeMarket, the RR/BAYC team discussed extensively how to ensure that apemarket.com would not be confusing. For example, Mr. Cahen discussed with Mr. Lehman the idea of using a wrapper on apemarket.com to determine whether it would be an effective way to ensure that website was clear for users. JTX-801.185. Mr. Cahen also discussed with the RR/BAYC team the idea of using labels on apemarket.com. *See* JTX-801-196 (Mr. Cahen wrote, "I think we could also have a label under the logo that denotes which collection you are viewing or something" and further stating "[b]ecause that's where the real importance lies[,] rrbayc truly is very important conceptual art …"). Mr. Hickman was also cross-examined about this topic and exhibits that Yuga now misleadingly cites, and Mr. Hickman explained that they were thinking about designed that would avoid any chance of confusion: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users." Trial Tr. [Hickman] 212:22-24.

Yuga's remaining citations to exhibits are similarly misleading. For example, JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs. As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website domain apemarket.com was ever used for the promotion or sale of anything. JTX-697 is a post on ApeMarket's Twitter page including the term "Dear Yuga community" and pointing out how the Yuga community could save "over $8b a year" because ApeMarket will not engage in the same predatory business practices as Yuga. JTX-698 is a screenshot of apemarket.com showing that nothing had been released on

the website. JTX-938 is a Twitter post by Mr. Cahen commenting on a news article that failed to mention that Yuga stole Defendants' idea for ApeMarket.

Yuga also misleadingly cites to JTX-801 to argue that Defendants knew that confusion was likely. The statement that Yuga relies on at JTX-801.185 was made in the context of designing the never-released ApeMarket with a wrapper on the website. Mr. Cahen stated at JTX-801.185, "I don't want to start implementing a wrapper." Mr. Lehman responds, "Agreed." And Mr. Cahen explains, "these users are too unsophisticated by far." As is apparent from the exhibit, statement Yuga cites does not relate to knowledge of confusion but instead discusses whether users of a marketplace would be sophisticated enough to correctly utilize a wrapper, which Defendants were considering using on ApeMarket.

Yuga then cites to the Lehman declaration (which was signed under coercion) as evidence of confusion, which Yuga and Mr. Solano have relied in this litigation to advance false claims of actual confusion. As demonstrated during trial, Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won. Trial Tr. [Solano] 38:17-19. Mr. Solano also relied on the declaration without considering that Mr. Lehman explained under oath that he was intimated by Yuga's lawsuit and that his understanding was "No declaration. No settlement." Trial Tr. [Solano] 38:11-16. A coerced declaration such as this is not probative evidence of confusion, especially given that Yuga has absolutely no internal documentation of confusion and that none of the parties have been able to identify a single confused consumer.

And finally, Yuga improperly relies on the unreliable declaration of Mr. Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on

cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q. And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A. Yes.
>
> Q. So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A. It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while. Although, those were supposed to be donated to charity and never were.
>
> Q. ***They don't continue to increase; correct, sir?***
>
> A. ***Correct.***
>
> Q. ***That statement, that part of your witness statement is incorrect; right?***
>
> A. ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added). Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility

as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted. Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case. *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Reply:**

Defendants' fail to rebut Yuga Lab's objection. Ape Market was developed, ready to launch, and used to promote their infringing NFTs. Defendants used the prospect of the marketplace to drive up sales of their infringing NFTs. This contributed to Defendants' profits from their scam. Defendants' responses should be rejected for the reasons discussed above. *See supra* ¶¶ 3, 116, 117.

As further discussed *supra*, Defendants' responses lack merit. Specifically: (1) the Ape Market Twitter account showed the infringing website and promoted Defendants' infringing NFTs (*supra* ¶ 116), (2) Ape Market exists and the website was ready to launch (*Id.*), (3) Defendants fail to impeach Mr. Solano's testimony

(*supra* ¶ 3), (4) Mr. Lehman's declaration is accurate and contradicts Defendants (*Id.*), and (5) Defendants' internal communications prove likelihood of confusion and do not rebut it (*supra* ¶ 117).

Additionally, Defendants' responses should be rejected because (1) regardless of whether Ape Market was "released" it was still used to promote the RR/BAYC NFTs.

**Ape Market Was Used To Promote The RR/BAYC NFTs:** As discussed *supra* ¶ 116, Ape Market was ready to launch and the Ape Market Twitter account was used to promote Defendants' infringing NFTs. Defendants do not rebut this fact. Whether Ape Market was ever "released," Defendants actively used the Ape Market Twitter to promote the RR/BAYC NFTs. *See* JTX-696 (showing several Tweets urging consumers to purchase RR/BAYC NFTs). And regardless of whether the marketplace was ever "released," Defendants used the *prospect* of the marketplace to promote their infringement. *See, e.g.*, *id.* (June 2 Tweet stating "[l]isting requires holding RR/BAYC. Reserve yours now" with link to reserve RR/BAYC NFT); *see also* JTX-801.221 ("so basically my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collectio*n* [] thats our primary goal . . . I really want to tweet an image like this today to create major hype and speculation [followed by image of Ape Market webpage]"). Defendants' attempt to avoid this conclusion by arguing that Ape Market was never released ignores the fact that Ape Market existed as a commercial endeavor that was used to promote Defendants' RR/BAYC NFTs using Yuga Labs' marks.