1 **Defendants' Disputed Post Trial Conclusion of Law No. 131:**

2      Disgorgement is not an available remedy because—for all the reasons

3 explained above—neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer."

4 *See supra* ¶¶ 17-31.

5          **Plaintiff's Basis for Dispute:**

6      The Lanham Act does not contain a willfulness requirement; Yuga Labs'

7 only burden is to prove Defendants' sales.  15 U.S.C. § 1117(a) (allowing plaintiff

8 "to recover . . . defendant's profits.").  Defendants cite no case to the contrary.

9 Because the Court has found Defendants liable for intentional infringement (SJ

10 Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their

11 infringing acts.  *See supra* ¶¶ 17-31; *see also* Yuga Labs' Proposed Findings of Fact

12 and Conclusions of Law (Dkt. 416) at ¶¶ 11-13, 32-37.

13      Ms. Kindler's calculations of $1,375,361.92 in Defendants' profits are

14 unrebutted.  Accordingly, these profits are "presumed to be the result of the

15 infringing activity," and Defendants fail to meet their "burden of showing which, if

16 any, of its total sales are not attributable to the infringing activity."  *Frank Lloyd*

17 *Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1

18 n.2 (N.D. Cal. July 29, 2019).  As Defendants admit, *each* RR/BAYC NFT used the

19 BAYC Marks (Dkt. 418-1 at 3:15-16), so Defendants *cannot* show that any

20 RR/BAYC NFT sale (or re-sale) was *not* the result of their infringing activity.

21      Nevertheless, Yuga Labs is entitled to Defendants' profits due to their

22 infringing activity regardless of whether purchasers were actually confused.  *See*

23 *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238-39, 255 (S.D.N.Y. 2012)

24 (granting defendant's profits even where infringement claims premised solely on

25 post-sale confusion where a "potential purchaser, knowing that the public is likely

26 to be confused or deceived by the allegedly infringing product, [] choose[s] to

27 purchase that product instead of a genuine one"); *see also* J. Thomas McCarthy, 2

28 McCarthy on Trademarks and Unfair Competition § 23:7 (5th ed.) (Post-sale

confusion damages trademark holders because "consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation. Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused."); Berger Decl. ¶¶ 44-92.

Even though a finding of willfulness is not necessary for disgorgement, Defendants' infringement was willful.  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

Dkt. 225 at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  The accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17. Likewise, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.  But, Defendants compound this litigation and seek to re-litigate this settled issue. Nevertheless, the evidence admitted at trial proves that these settled issues should

1   remain settled—Defendants were not motivated by a desire to create satire, they

2   were motivated by greed.

3        The evidence presented at trial also establishes Defendants' willful infringing

4   intent, including that, from the outset, Defendants were interested in making "like a

5   million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I tbink

6   you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:

7   "I think we will make alot of money tbh"; "Potentially a lot").  They created their

8   RR/BAYC NFTs with the intent to infringe because using Yuga Labs' BAYC

9   Marks allowed them to freeride off of the commercial success of the BAYC brand.

10  Defendants could have called their NFT collection something other than "Bored

11  Ape Yacht Club" with the symbol "BAYC" immutably in the metadata for the NFT

12  smart contract, but chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.

13  Defendants could have used different images or overlaid some commentary on the

14  images they used, but chose not to.  *See e.g.* JTX-801.192 (Mr. Lehman proposing

15  "an overlay or something like Getty images" because "it's just insane to have the

16  same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look

17  like and recommending not to "in the marketing show screenshots like the ones

18  [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-

19  696.1 (tweet showing screenshot of Ape Market); Dkt. 416 at ¶ 7.  Indeed, they

20  used the very identical images that they claim are "problematic."  Trial Tr. at 222:7-

21  9.

22       The evidence also shows that Defendants knew they were infringing and

23  creating confusion.  JTX-801.371 (Cahen to Ripps: "per our attorney we may just

24  need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr.

25  Lehman writing, "overall I think we should be very careful about doing this in

26  terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr.

27  Cahen that it was "difficult to make the collections coexist" because "they are the

28  same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential

1   customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-

2   801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered

3   confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr.

4   Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking

5   they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the

6   need to "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman

7   stating, "people believe the tokenId should match the RR ID. that is where they get

8   confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying

9   "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape

10   Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-

11   59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the

12   blockchain is complicated. A lot of people don't have the technical expertise or

13   knowledge to be able to have a conversation about crypto technology and

14   blockchain technology."), at 148:10-13 (testifying it is "very common" for people

15   to refer to NFT collections by the token tracker).  Instead of making changes, such

16   as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga

17   Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70;

18   *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery

19   for brands, every choice is intentional.").

20         Furthermore, Mr. Ripps represented that by owning an RR/BAYC NFT, a

21   consumer would own commercial rights in Yuga Labs' underlying artwork—a

22   representation that was not only false, but further misleading because owners of

23   genuine BAYC NFTs do own certain commercial rights in the underlying images.

24   Muniz Decl. (Dkt. 340) ¶ 13; JTX-1037; JTX-857; Solano Decl. (Dkt. 342) ¶ 25

25   n.2.  Adding to this confusion, Mr. Ripps connected an RR/BAYC NFT to his

26   Twitter account and used a feature on Twitter that displayed Yuga Labs' artwork as

27   his profile picture with a hexagon border, signaling that Twitter had "verified" his

28   ownership of the NFT and misleadingly suggesting his ownership of a BAYC NFT.

Muniz Decl. (Dkt. 340) ¶ 12.  This confused some viewers on Twitter.  Muniz Decl. (Dkt. 340) ¶ 12; JTX-1556; JTX-524; JTX-525; Solano Decl. (Dkt. 342) ¶ 63; JTX-709; JTX-710.  This caused further confusion as RR/BAYC NFT holders used the NFTs as their profile pictures as well.  *See, e.g.*, JTX-522, JTX-523.  Beyond their confusing promotion on Twitter, Defendants promoted their infringing collection on platforms such as OpenSea and Foundation, on which the collection appeared almost identical to Yuga Labs' genuine BAYC collection.  JTX-28; JTX-29; JTX-683; JTX-719.

Additionally, throughout this litigation and even after the summary judgment order confirming their infringement, Defendants continued to market their RR/BAYC NFTs and Ape Market and harm Yuga Labs.  On April 4, 2023, Mr. Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro." JTX-1315; *see also* JTX-1317.  Mr. Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs (*see* JTX-1613; JTX-1614; JTX-1615), as well as retweet Defendants' own tweets from the @ApeMarketplace Twitter account.  JTX-1048; Solano Decl. (Dkt. 342) ¶¶ 74-76.  As recently as the day before trial, the @ApeMarketplace Twitter account continued to promote the infringing rrbayc.com and link to a marketplace on which RR/BAYC NFTs were still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. 392 at 57:8-58:6, 58:20-59:19.  They could have stopped after the Court found them to be infringing. But they continued to intentionally add to the confusion.

The evidence establishes that Defendants did intend to confuse consumers and did intend to use Yuga Labs' BAYC Marks.  Trial Tr. at 17:20-18:14 and 63:11-23 ("It does not use satire and protest.  It is the exact same artwork and the exact same logo").

**Defendants' Response:**

The Supreme Court has undisputedly held that an infringer's mental state is a "highly important consideration in determining whether an award of profits is

1    appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

2    And courts in this jurisdiction have recognized that disgorgement is appropriate in

3    cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-

4    JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).

5         Yuga incorrectly argues that Ms. Kindler's profits calculation is unrebutted

6    because, critically, Ms. Kindler did not correctly apportion what portion of those

7    profits are attributable to confusion—especially given that there is not a single case

8    of actual confusion in this case. Yuga can only receive profits "attributable to the

9    infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir.

10   1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co.,*

11   *Ltd.*, 839 F.3d 1179 (9th Cir. 2016) (holding that disgorgement is limited to profits

12   "attributable to the infringing activity.").   Regardless, this issue is a separate reason

13   for why Yuga is not entitled to disgorgement apart from the fact that Defendants'

14   mental state just not justify disgorging profits under *Romag Fasteners*.

15        Yuga also improperly objects to Defendants' proposed finding of fact

16   because, by arguing that the Court's summary judgment order supports a finding of

17   intentional infringement, Yuga has incorrectly relied on the law of the case

18   doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as***

19   ***motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th

20   Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th

21   Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind

22   district judges for the remainder of the case.  Given the nature of such motions, it

23   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that

24   although ***aspects*** of an issue were decided at summary judgment for one purpose,

25   the summary judgment order did resolve the issue generally or as to other topics.

26   *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25,

27   2019) (holding that evidence of initial police contact was relevant as background,

28   but not to already decided issue that initial contact was not excessive force).  This

1    case is just like *Sienze*: the summary judgment ruling on intent applies only the

2    issue of infringement and is not adequate support on intent generally or as applied

3    to availability of disgorgement as a remedy, apportionment, and an exceptional case

4    analysis.

5        Moreover, the evidence at trial showed that Defendants are not intentional

6    infringers and did not intend to suggest that RR/BAYC was related to Yuga in any

7    way. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the

8    RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather

9    than to confuse. For example, in private group chats among participants in the

10   RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their

11   intended artistic purpose of the project, their intention that it would spread criticism

12   of Yuga, and their intention that social media platforms be used to educate the

13   public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps

14   Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-

15   801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08,

16   29-30.

17       Defendants also took multiple steps to make clear that the RR/BAYC

18   collection was not related to Yuga in any way. For example, the rrbayc.com

19   website—through which the majority of RR/BAYC commissions occurred and the

20   vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

21   (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

22   intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

23   Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

24   [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to

25   read and click through a disclaimer acknowledging the artistic purpose of the

26   project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-

27   109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps

28   insisted on these requirement and additional steps so that the artistic purpose of the

1    work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

2    60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

3    impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

4         Defendants' online discussion, which consisted of nearly the entirety of

5    Defendants' public activities associated with RR/BAYC, confirms their intent.  In

6    those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

7    inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

8    that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

9    Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

10         Defendants also created the RR/BAYC collection based on a good faith

11   belief that Yuga had given authorization for the creation of projects like RR/BAYC.

12   At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were

13   more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶

14   187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX

15   2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga

16   had not taken steps to stop these third-party projects from using Yuga's marks.

17   Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There

18   were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape

19   Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23;

20   [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen,

21   and Mr. Hickman would have probably seen these collections using the Bored Ape

22   Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.

23   [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga

24   trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-

25   22.  For example, there are published notebooks with ISBN numbers,

26   commemorative coins, alcohol products, skateboards, cereal brands, restaurants,

27   and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's

28   trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

1    Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

2    holder of a BAYC NFT containing the asserted marks and having received IP rights

3    associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

4    Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the

5    time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms

6    & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was

7    to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4

8    ("Q. Your intent in writing the terms and conditions was to allow people to be able

9    to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered

10   in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be

11   creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole

12   Muniz had publicly represented that BAYC NFT holders received all IP rights and

13   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶

14   189 (Dkt. 344); Hickman Decl. ¶¶ 25-26; JTX 2672; JTX 2673.  Ms. Muniz

15   confirmed that someone listening to her public statement about Yuga not having

16   any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

17       The evidence that Yuga cites does not rebut this overwhelming evidence of

18   Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

19   and taking out of context evidence.  For example, Yuga repeatedly cites to various

20   pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

21   confusion.  But those pages are internal discussion about the design of the

22   ApeMarket website to ensure that users of apemarket.com were not confused by the

23   website design.  Yuga even cross-examined Mr. Hickman about these

24   communications and received the same explanation: "This is our attempt to make it

25   as clear as possible.  We are having discussion on how to make sure it was very

26   clear for users."  Trial Tr. [Hickman] 212:22-24.

27       Yuga similarly takes out of context exhibits such as JTX-44.00002 to

28   incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

1  44.00002, Mr. Hickman stated that "people believe the tokenId should match the

2  RR ID.  that is where they get confused."  This statement is not discussing

3  confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is

4  discussing how the RR/BAYC collection used a different numbering system that

5  BAYC NFTs, and that consumers expected the numbers match as a shorthand

6  manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.

7  That is, due to the different numbering system, some consumers were confused as

8  to which RR/BAYC NFT they received but they understood very well that they

9  received an NFT created by Mr. Ripps that protests and criticizes Yuga.

10       Yuga also alleges that Etherscan's creation of a token tracker is evidence of

11  Defendants' intent to cause confusion.  But Defendants do not control the Etherscan

12  website or how Etherscan chooses to display the RR/BAYC NFT collection.

13  Moreover, Yuga's own witness, Mr. Atalay, himself has admitted that consumers of

14  NFTs do not use Etherscan's token tracker/token name but instead rely on

15  marketplaces or by checking the associated smart contract address.  Trial Tr.

16  [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish

17  NFTs "would be a fairly weak way to do so because often those things are mutable.

18  They can be changed after the fact.  Also, there's no guarantee of uniqueness."

19  Trial Tr. [Atalay] 133:12-23.

20       Yuga also incorrectly asserts that Defendants continued to market RR/BAYC

21  NFTs even after the summary judgment order in this case.  The exhibits Yuga cites

22  (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen

23  made reporting news on what is occurring in relation to the RR/BAYC collection:

24  specifically, that certain third-party marketplaces were trading the NFTs despite

25  Yuga's efforts to silence Defendants' criticism and public reports of certain

26  transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen

27  explained in his declaration, "Overall, I would consider myself a very active

28  community member in the cryptocurrency space, which is something that I take

pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50

(Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to

report on crypto news or other topics I find noteworthy to help spread awareness."

Cahen Decl. ¶ 52 (Dkt. 344).  These tweets are not "marketing" activities but

simply report news/crypto events in relation to the RR/BAYC collection.

Yuga also incorrectly alleges that Defendants continued to market

ApeMarket after entry of summary judgment in this case.  First, this argument

makes no sense given that Defendants never released ApeMarket in the first place.

Second, the exhibit that Yuga cites (JTX-1048) is dated January 18, 2023, which

was well before the entry of summary judgment in this case.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is

not credible given the many false and misleading statements contained in his

declaration.  For example, Mr. Solano was forced to concede on cross-examination

that his sworn declaration included a false statement claiming that Defendants

continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified
> that they do not currently receive any royalties or creator fees from
> sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits
> continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator
> fees from LooksRare for quite a while.  Although, those were
> supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***

Q.   *That statement, that part of your witness statement is incorrect;
     right?*

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the
phrase "business venture" in Mr. Lehman's declaration, without having considered
that the phrase "business venture" was selected by Yuga's counsel, and that Mr.
Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr.
Solano also relied on Mr. Lehman's declaration without having considered that Mr.
Lehman knew he could not settle his case without executing a declaration
concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr.
Lehman was afraid for his family at the time he signed his declaration, because
Yuga's lawsuit against him would be disastrous to his family and himself, even if
Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility
as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano]
32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by
Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your
deposition, if we could. You gave a deposition in this case; right? A Yes. Q And
you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look
at your deposition -- and we can pull it up on the screen -- at page 152, starting at
line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an
objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at
your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market
exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look
at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know
whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that
question, and did you give that answer? A Yes.").  Mr. Solano's testimony
regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been

1  rebutted.  Mr. Solano could not identify a single person that ever bought an

2  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In

3  fact, no one has been able to identify a single confused consumer in the entirety of

4  this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.  The evidence that Yuga

5  has cherry-picked and mischaracterized are not sufficient to rebut the

6  overwhelming evidence showing Defendants' intent to protest and criticize Yuga.

7         **Plaintiff's Reply:**

8         Despite the fact that the Court has already held that Defendants intended to

9  infringe, Defendants seek another bite at the apple.  SJ Order (Dkt. 225) at 12.

10  Disgorgement is available and proper as a remedy for Defendants' infringement.

11  Defendants' responses are just another attempt to avoid the Court's summary

12  judgment ruling and relitigate closed issues.

13         As discussed *supra*, Defendants' responses lack merit.  Specifically:  (1) the

14  Court's summary judgment order is controlling (*supra* ¶ 32), (2) Defendants

15  intended to infringe and their infringement was not an art project (*supra* ¶ 3), (3)

16  Defendants' internal discussions confirm their profit motive (*Id.*), (4) Defendants'

17  "disclaimers" did not negate confusion (*supra* ¶ 132), (5) the majority of

18  RR/BAYC NFTs were not sold on rrbayc.com (*Id.*), (6) Defendants failed to take

19  steps to avoid confusion, (*Id.*), (7) Yuga Labs did not abandon its marks (*supra* ¶

20  114), (8) Yuga Labs did not license Defendants' infringement (*Id.*), and (9)

21  Defendants failed to impeach Mr. Solano (*supra* ¶ 3).

22         Additionally, the Court should reject Defendants' responses because (1)

23  Yuga Labs need not attribute all profits to confusion and, in any event, all of

24  Defendants' profits were attributable to Defendants' infringement, (2) Yuga Labs is

25  entitled to disgorgement of Defendants' profits, (3) Defendants' *post hoc*

26  justification that Mr. Hickman gave Defendants the right to infringe lacks

27  credibility, and (4) Defendants misrepresent Mr. Atalay's testimony.

28

**All of Defendants' Profits Are Attributable To Their Infringing Activity:** Defendants do not dispute Ms. Kindler's findings, but rather argue that she did not attribute her profits calculation to confusion.  This argument is without merit because Yuga Labs need not make such an attribution and, in any event, all of Defendants' profits are attributable to their infringement.

Yuga Labs has shown that Defendants' profits are attributable to Defendants' infringing activity – each and every single RR/BAYC NFT uses the marks BORED APE YACHT CLUB and BAYC, to say nothing of how Defendants sold, marketed, and promoted these NFTs.  In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty.  Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408.  From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. v. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019).  Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks.  *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37.  Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks.  They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks."  Dkt. 418-1 at 3:15-16.  Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement.  *See* Kindler Decl. (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought

1   RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt.

2   338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps,"

3   consumers would not have bought them.  Indeed, even Defendants admit that they

4   had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10 (Mr.

5   Ripps' second supplemental response to interrogatory 3 states:  "Mr. Ripps's

6   RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project

7   would be directly tied to Yuga, BAYC, and specific BAYC NFTs . . ."); Cahen

8   Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps wanted to call the collection the "Ryder Ripps

9   Bored Ape Yacht Club" ("RR/BAYC") both to emphasize the subject of our

10  criticism and the artistic origin of the collection.").  This is because the appeal of

11  the BAYC Marks was core to their infringement and profits.  Yuga Labs should be

12  awarded the full amount of Defendants' profits so Defendants may "not retain the

13  fruits, if any, of unauthorized trademark use or continue that use . . . ."  *Fifty-Six*

14  *Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

15          Defendants have no persuasive evidence that their infringing RR/BAYC

16  NFTs would have sold without the use of the BAYC Marks or connection to Yuga

17  Labs; in fact, they argue extensively that they were identifying Yuga Labs' in their

18  marketing and sales.  Their profits were only attainable through the unlawful

19  misappropriation of Yuga Labs' name and intellectual property.

20          **Yuga Labs Is Entitled to Disgorgement of Defendants' Profits:**  Yuga

21  Labs' only burden is to prove Defendants' sales to obtain disgorgement.  15 U.S.C.

22  § 1117(a) (allowing plaintiff "to recover . . . defendant's profits.").  Defendants cite

23  no case to the contrary.  Defendants wrongly claim that *MGA* holds that

24  disgorgement is "only" warranted in cases of conscious wrongdoers.  To the

25  contrary, *MGA* found that willfulness is a sufficient, ***but not necessary***, condition to

26  a disgorgement finding.  *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548, 2022 WL

27  4596697, at *17 ("willfulness is not an inflexible precondition to recovery of a

28  defendant's profits under § 35(a) of the Lanham Act") (cleaned up); *see also*

1    *Harbor Breeze Corporation v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38

2    (9th Cir. 2022) ("a plaintiff need not show that a defendant acted with a particular

3    mental state, such as willfulness, in order to be entitled to an award of profits.").

4    Because the Court has found Defendants liable for intentional infringement (SJ

5    Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their

6    infringing acts. *See supra* ¶¶ 34; *see also* Yuga Labs' Proposed Findings of Fact

7    and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37. Even though a finding of

8    willfulness is not necessary for disgorgement, Defendants' infringement was

9    willful. *See supra* ¶ 7; *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th

10   Cir. 1993) ("[w]illful infringement carries a connotation of deliberate intent to

11   deceive.").

12       **Mr. Hickman Had No Right To License Defendants' Infringement:**

13   Defendants' dubious claim that they believed they were entitled to create copycat

14   NFTs and brand their infringing NFTs with Yuga Labs' BAYC Marks fails to

15   change the fact that Yuga Labs retained its trademark rights. Moreso, the record

16   disproves that Defendants actually believed this was a justification for their actions,

17   because even as of June 9, 2022, Mr. Ripps ***did not know*** that one of his partners

18   allegedly owned a BAYC NFT and expressed his desire to have access to one:

19       maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]

20       or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]

21       and put them on the marketplace

22       so people trust it?

23       i don't think buying a BAYC makes sense

24       unless it's for a deal..

25       [third party] sold his ape

26       s

27       sucks

28       that would have been perfect marketing

1    wish i spoke to him before he sold

2    JTX-801.332.  Defendants' newly contrived defense—and their false claim that

3    they contemporaneously believed this justification, despite lack of a single

4    communication to that effect—has no merit and further highlights their lack of

5    credibility.

6    **Defendants Misrepresent Mr. Atalay's Testimony:**  Mr. Atalay's

7    testimony does not say that consumers "do not use Etherscan's token tracker/token

8    name but instead rely on marketplaces or by checking the associated smart contract

9    address" as Defendants attribute to it.  What Mr. Atalay actually testified is that

10   "for the average person who is not an expert in blockchain technology," viewing

11   NFTs on a marketplace such as OpenSea "is probably the most straightforward way

12   to distinguish two NFTs."  Trial Tr. at 135:5-10.  And, Mr. Atalay testified that

13   users on such secondary markets typically refer to the token name to identify NFTs.

14   Trial Tr. at 132:3-5 ("Q  And you also agree that the NFT community uses the

15   token name when it's buying on secondary markets; correct?" / "A  Yes."); *see also*

16   JTX-1558 (tweet from third party stating "If you were curious to see how malicious

17   this scam is, check out the token tracker/ID name that he chose to use on the smart

18   contract. This is a critical piece of data the NFT community uses when they are

19   buying on the secondary market.").  But here, even if a consumer were to view an

20   RR/BAYC on OpenSea they would still be confused because listings for RR/BAYC

21   NFTs were virtual identical to a listing for an authentic Bored Ape Yacht Club

22   NFT.  *See* JTX-686; *see also supra* ¶ 68.

23

24

25

26

27

28