**Defendants' Disputed Post Trial Conclusion of Law No. 136:**

As discussed above, none of the revenue on which Yuga bases its claim of profits is "attributable to the infringing activity" *Lindy Pen,* 982 F.2d at 1408, or to the "appeal of [Yuga's] symbol," *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942). Rather, there is no evidence that any purchaser of the RR/BAYC NFTs was confused about their origin or believed that they came from someone other than Mr. Ripps and Mr. Cahen. Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1; JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

**Plaintiff's Basis for Dispute:**

In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408. From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. V. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019). Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks. Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks. They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." Dkt. 418-1 at 3:15-16. Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement. *See* Kindler Decl.

1    (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and

2    blockchain data I analyzed, these profits are all traceable to Defendants' uses of

3    Yuga Labs' BAYC Marks.").  Yuga Labs' evidence shows that consumers bought

4    RR/BAYC NFTs because of the appeal of the BAYC Marks.  Kindler Decl. (Dkt.

5    338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76.  If the NFTs just said "Ryder Ripps,"

6    consumers would not have bought them.  Indeed, even Defendants admit that they

7    had to use the BAYC Marks in their infringing products.  Dkt. 149-42 at 9-10. (Mr.

8    Ripps' second supplemental response to interrogatory 3 states: "Mr. Ripps's

9    RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project

10   would be directly tied to Yuga, BAYC, and specific BAYC NFTs that were the

11   target of Mr. Ripps's commentary."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps

12   wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club"

13   ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin

14   of the collection.").  This is because the appeal of the BAYC Marks was core to

15   their infringement and profits.  Yuga Labs should be awarded the full amount of

16   Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized

17   trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. v.*

18   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

19         Yuga Labs has established that it is entitled to $1,375,361.92 of Defendants'

20   profits (after deducting payments to Defendants' business partners and the amount

21   of RR/BAYC NFTs that they hold or did not mint).  Dkt. 416 at 6:23.  Defendants

22   provided no expert witness testimony, consumer survey, or financial analysis to the

23   contrary.  Since they cannot rebut these calculations, Yuga Labs is entitled to a

24   presumption that Defendants made $1,375,361.92 as a result of infringing activity.

25         Defendants have failed to carry their burden to show that even one of these

26   sales is not attributable to their infringing NFTs.  Instead, they contend that, even

27   though they used—and had to use—the BAYC Marks to sell their counterfeit

28   NFTs, their profits were somehow not attributable to the BAYC Marks.  Yet again,

1    Defendants cite no case law, expert testimony, or survey evidence to support this

2    claim, and their baseless argument fails.  *See Fifty-Six Hope Rd. Music, Ltd. v.*

3    *A.V.E.L.A., Inc.,* 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that

4    defendant failed to meet burden to prove a 40% royalty was a proper deduction,

5    where "the documentary evidence leaves uncertainty as to the amount of royalty

6    fees paid" and defendant "did not produce sufficient documentation to prove the

7    specific amounts").  Indeed, the Ninth Circuit has rejected similar arguments

8    before, finding that "where infringing and noninfringing elements of a work cannot

9    be readily separated, all of a defendant's profits should be awarded to a plaintiff."

10   *Nintendo of Am., Inc. v. Dragon Pac. Int'l,* 40 F.3d 1007, 1012 (9th Cir. 1994)

11   (rejecting argument that "multiple-game format and Nintendo-compatibility were

12   the cartridges' selling point, not the use of the Nintendo trademark").

13          Defendants may point to a few cherry-picked emails as examples of

14   consumers who were purportedly not confused.  Yuga Labs doubts the credibility

15   of these documents, but even taken at face value, they establish no more than a

16   handful of consumers who were not confused.  They do not show that the BAYC

17   Marks were not part of the appeal of the RR/BAYC NFTs.  Without any evidence

18   to carry Defendants' burden, the Court can continue to presume that Defendants'

19   profits were attributable to the infringing activity.  *See Fifty-Six Hope Rd. Music,*

20   *Ltd. v. A.V.E.L.A., Inc.,* 778 F.3d 1059, 1076 (9th Cir. 2015).

21          Finally, Yuga Labs produced ample documentary and testimonial evidence

22   demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109;

23   JTX 621; JTX-701; JTX-801.185, 376;  JTX-1029; JTX-1030; JTX-1031; JTX-

24   1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger

25   Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

26   (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

27   392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of

28   Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See supra* ¶ 24.

1   And Yuga Labs' survey evidence demonstrated significant confusion among

2   consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with

3   Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47,

4   48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut

5   the evidence that consumers believed, or were likely to believe, RR/BAYC was

6   affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial

7   interest or post-sale confusion.  There is a clear likelihood of confusion as well,

8   given Defendants' use of the same marks and images, which the Court already

9   determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian*

10  *Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks

11  on competitive goods are rare and 'hardly ever find their way into the appellate

12  reports' because liability is 'open and shut.'").

13          **Defendants' Response:**

14          This objection is unfounded.  First, as Defendants have proven, there is

15  ample evidence to support a finding that those who reserved RR/BAYC NFTs did

16  so as a protest *against* Yuga and are not attributable to the infringing activity.  *See*

17  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039,

18  JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  As Mr. Ripps testified in

19  his declaration: "I received **hundreds of letters** thanking me for creating the

20  RR/BAYC artwork and for standing up against a corporation that had used hateful

21  references in its brand" and then went on to give eight specific examples of the

22  letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis

23  added).  At no point during trial did Yuga dispute this fact.  Yuga did not present

24  any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on

25  this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received

26  hundreds of letters from RR/BAYC collectors indicating that they acquired

27  RR/BAYC NFTs to support Defendants' protest.

28

1    Defendants also took multiple steps to make clear that the RR/BAYC

2 collection was not related to Yuga in any way.  For example, the rrbayc.com

3 website—through which the majority of RR/BAYC commissions occurred and the

4 vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

5 (uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic

6 intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen

7 Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

8 [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to

9 read and click through a disclaimer acknowledging the artistic purpose of the

10 project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

11 109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

12 insisted on these requirement and additional steps so that the artistic purpose of the

13 work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-

14 60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative

15 impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

16    Unsurprisingly, given these measures, the evidence presented at trial showed,

17 Yuga has not identified even a single person who obtained an RR/BAYC NFT

18 believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman

19 are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346)

20 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

21 Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz]

22 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has

23 been unable to identify even[] a single person who purchased an RR/BAYC

24 believing it to be sponsored by Yuga Labs; right? A Correct.").

25    Yuga's continued assertions that there is no credible evidence showing sales

26 were made not attributable to the infringing activity is unfounded and inaccurate.

27 These are not "cherry picked" pieces of evidence, but the breadth of evidence

28 presented at trial makes clear that there was no actual confusion.

1    Second, Defendants do not admit that they used Yuga's marks. Evidence at
2    trial showed that Yuga does not own the alleged BAYC Marks. Yuga gave away
3    all intellectual property rights associated with the Bored Ape Yacht Club. Yuga's
4    CEO Nicole Muniz had publicly represented that BAYC NFT holders received all
5    IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17;
6    Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX
7    2673. That transfer of rights was made, in part, pursuant to the BAYC Terms &
8    Conditions, which Mr. Solano drafted with the intent to allow people to
9    commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the
10   terms and conditions was to allow people to be able to commercialize their NFTs.
11   We can agree on that; right? A. Yes. That is covered in the terms.").

12       As a result, at the time of the RR/BAYC project, there were more than 9,000
13   other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346)
14   (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244. There were
15   hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
16   Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23;
17   [Muniz] 78:7-21; [Muniz] 80:3-13. And, as Yuga's CEO admitted, there are
18   "literally thousands" of products that use Yuga trademarks without sponsorship or
19   affiliation with Yuga. Trial Tr. [Muniz] 81:18-22. For example, there are
20   published notebooks with ISBN numbers, commemorative coins, alcohol products,
21   skateboards, cereal brands, restaurants, and CBD/marijuana products that are
22   unaffiliated with Yuga that use Yuga's trademarks. *See, e.g.*, JTX-2398; JTX-
23   2134; JTX-2410; JTX-2075.

24       Further, Yuga does not own the asserted marks because NFTs are not eligible
25   for trademark protection. The Supreme Court has held that trademarks are limited
26   to "tangible goods that are offered for sale, and not the author of any idea, concept,
27   or communication embodied in those goods." *Dastar Corp. v. Twentieth Century*
28   *Fox Film Corp.*, 539 U.S. 23, 37 (2003). Misrepresentation of the origins of a

1 | *communicative* work is a dispute relegated to the confines of copyright law, not

2 | trademark. *Id.* at 33-35; *see also* Pulse Entm't Corp. v. David, No. 2:14-cv-04732-

3 | SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims

4 | based on origin of hologram, as it is "likened to a cartoon animation"). Here, the

5 | "goods" for which Yuga claims trademark rights are NFTs, which are comparable

6 | to certificates of authenticity/ownership and are not digital goods in themselves.

7 | Trial Tr. [Atalay] 127:9-16.

8 | Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged

9 | BAYC Marks in their reservations. For example, the logo used states "This Logo is

10 | Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the

11 | project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

12 | Third, Yuga is only entitled to disgorgement of profits "attributable to the

13 | infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir.

14 | 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co.,*

15 | 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a

16 | BAYC mark is attributable to the infringing activity. "If it can be shown that the

17 | infringement had no relation to profits made by the defendant, that some purchasers

18 | bought goods bearing the infringing mark because of the defendant's

19 | recommendation or his reputation or for any reason other than a response to the

20 | diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he

21 | plaintiff of course is not entitled to profits demonstrably not attributable to the

22 | unlawful use of his mark." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge

23 | Co., 316 U.S. 203, 206 (1942). This fundamental principle clearly prevents Yuga

24 | from receiving profits that were made for reasons beyond the appeal of its symbol,

25 | namely the profits attributable to those who reserved an RR/BAYC NFT as a

26 | protest against Yuga or to support Mr. Ripps and his renowned reputation as a

27 | conceptual artist. *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333. As

28 | discussed above, there is ample evidence in the record to support a finding that all

1    of the RR/BAYC NFT sales were, therefore, not attributable to the infringing

2    activity.

3           Further, to support their assertion that every RR/BAYC NFT sold was

4    attributable to infringement, Yuga cites to Ms. Kindler's conclusory statements.

5    But Ms. Kindler's opinion does not include any apportionment to determine what

6    profits were attributable to infringement.  Trial Tr. [Kindler] 189:16-25.

7           Fourth, Yuga's statements regarding Defendants' use of the alleged marks

8    are misleading.  As those statements clearly show, Mr. Ripps and Mr. Cahen made

9    the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize

10   someone without saying who they are.  This does not support, as Yuga falsely

11   asserts, that the profits made from RR/BAYC NFTs was due to the appeal of the

12   BAYC Marks.  It shows the opposite.

13          Fifth, disgorgement is not an available remedy here.  An infringer's mental

14   state is a "highly important consideration in determining whether an award of

15   profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc., 140 S. Ct. 1492, 1497*

16   *(2020)*. Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA*

17   *Ent. Inc. v. Harris, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at \*17*

18   *(C.D. Cal. July 29, 2022)*.  Disgorgement is, therefore, not an available remedy here

19   because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a

20   "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346)

21   (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13,

22   146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

23          Disgorgement is also unavailable here because Yuga has not shown "the

24   absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood, 369 U.S. 469,*

25   *478 (1962)*.  Legal remedies were available in this case. Yuga expressly asserted

26   and offered expert testimony in support of legal remedies (including a claim for

27   actual damages that its expert was able to quantify), which it then voluntarily

28   relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies");

1   Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned

2   available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World*

3   *Inc. v. Reboans, Inc.,* No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal.

4   Oct. 26, 1994) ("[A]lthough Plaintiff has waived the right to collect damages, this

5   does not render the claim purely equitable because, as discussed above, this is a

6   statutory claim.  Again, because the statutes provide adequate remedies, a purely

7   equitable claim may not be maintained.").

8        Sixth, the evidence Yuga cites to show confusion is unsupported. the

9   evidence Yuga cites to is not supportive of a finding that there was consumer

10  confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

11  O'Laughlin to demonstrate confusion. As demonstrated at trial, however, Ms.

12  O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms.

13  O'Laughlin acknowledged that she used an overly expansive definition of the

14  market that included people who did not have any interest in purchasing an NFT,

15  much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16

16  (discussing survey qualification flow); 152:4-10.  She acknowledged that she

17  changed the survey population after running pretests to make it more inclusive.  *Id.*

18  at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic

19  knowledge about the NFT market, admitting to erroneously believing that

20  cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.*

21  at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

22  that could not show confusion because the market was too broad.  This was despite

23  her acknowledgement that choosing the right sample population "matters for the

24  analysis" and choosing an improper sample population would be a mistake.  *Id*. at

25  146:18-25.

26       Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

27  she authored an article titled, "Which Method is For You? Not All Surveys Are

28  Made the Same" JTX-314.  In that article she discusses choosing between the

1   Squirt and Eveready surveys on the basis of the strength of the mark.  In this case,

2   however, she ignored her own advice and operated both surveys.  This was despite

3   acknowledging that at deposition she agreed with her earlier advice that the

4   Eveready survey is most appropriate when the mark is strong, and the Squirt survey

5   when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she

6   never discerned the strength of the mark.  *Id*. at 144:12-18.  This broke with her

7   prior practice as well, as it was the first case she personally testified in where she

8   offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin

9   should have chosen between the surveys, but by not doing so she did not produce a

10   finding of value on either survey.

11       Ms. O'Laughlin also could not explain the extremely strong priming effect

12   which influenced her results to her Everready survey.  In that survey, people were

13   split into those who saw a version of the RR/BAYC Foundation page that included

14   the words "Bored Ape Yacht Club."  Those in the control group of the experience

15   would see the words "Chill Gorilla Boat Crew."  Those in the experiment group

16   who wrote the words "Bored Ape Yacht Club" verbatim and were counted as

17   confused, but those in the control group who copied down the words "Chill Gorilla

18   Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.

19   Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat

20   Crew" verbatim, but were not counted as confused.  *Id*. at 157:9:14; 158:20-159:1.

21   Ms. O'Laughlin admitted that she did not account for this extreme priming effect

22   calling it "not particularly relevant".  *Id*. at 158:20-159:1.

23       Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long

24   the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

25   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

26   fundamentally flawed, she can attest to confusion on two websites for only a matter

27   of days.  *Id*.  Overall, her surveys were so fundamentally flawed with errors this

28   Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate.  *See also* JTX-1030, JTX-1032 (Tweets where uses are quickly identifying Mr. Ripps as the source); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used.  These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This exhibit does not support a finding of actual confusion.  The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program

1    and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl.

2    ¶ 252.

3         Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

4    credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

5    case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

6    case against Mr. Lehman, JTX-621, which is immaterial to this matter and again

7    was entered after Mr. Lehman settled his own case with Yuga.

8         Yuga also cites to Mr. Ripps's deposition transcript where he discusses how

9    the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

10   Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to

11   support a finding of confusion given the ability of any consumer to determine the

12   provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt.

13   346) (uncontested). Further, this does support a finding that anyone that reserved an

14   RR/BAYC NFT was confused about its origin.

15        Finally, Yuga cites to its own declarations and trial testimony where their

16   witnesses make conclusory and unfounded statements about possible confusion.

17   *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin

18   Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial

19   Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding, however,

20   that anyone who bought an RR/BAYC NFT was actually confused.

21        Seventh, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

22   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

23   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

24   Buttressing this fact, Yuga's founders were also not aware of a single instance of

25   actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

26   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

27   identify even[] a single person who purchased an RR/BAYC believing it to be

28   sponsored by Yuga Labs; right? A Correct.").

1    Finally, the $1,375,361.92 figure itself is an incorrect calculation of the

2    profits Mr. Ripps and Mr. Cahen have received from the RR/BAYC project.  First,

3    the evidence presented at trial showed that the RSVP contract also distributed

4    $93,135.62 in automated refunds.  Ripps Decl. ¶¶ 174-175 (Dkt. 346)

5    (uncontested).  This figure improperly includes in its profits calculation $93,135.62

6    in automated refunds executed through the RSVP reservation contract. Ripps Decl.

7    ¶¶ 174-175 (Dkt. 346) (uncontested).  Also, Mr. Ripps and Mr. Cahen incurred

8    approximately $15,100.00 in miscellaneous expenses associated with wages, a

9    computer, and travel expenses.  Ripps Decl. ¶ 136 (Dkt. 346) (uncontested); Cahen

10   Decl. ¶¶ 174-176 (Dkt. 344).  This figure fails to exclude those expenses from the

11   profit calculation.

12       **Plaintiff's Reply:**

13   Defendants' response rehashes the same tired arguments without adequately

14   addressing Yuga Labs' arguments.  Defendants' response should be rejected

15   because (1) they seek to relitigate issues already adjudicated by the Court (*see id.*),

16   (2) the record shows that Defendants intended to confuse consumers (*see id.*), (3)

17   Defendants' commercial infringement was not protected "art" (*see id.*), (4)

18   Defendants intended to profit off of their infringement (*see supra* ¶ 24), (5)

19   Defendants were well aware that their infringement would cause confusion (*see*

20   *supra* ¶¶ 24, 32), (6) the record shows ample actual confusion and likelihood of

21   confusion (*see supra* ¶¶ 3, 32), (7) Defendants' "disclaimers" did not dispel

22   likelihood of confusion (*see supra* ¶ 9), (8) the majority of the sales of Defendants'

23   infringing NFTs did not occur on rrbayc.com (*see supra* ¶ 76), (9) Defendants did

24   not take steps to avoid confusion (*see supra* ¶ 9), (10) Yuga Labs did not license

25   Defendants' infringement, and Mr. Hickman did not have (or convey to

26   Defendants) the right to infringe Yuga Labs' BAYC Marks (*see id.*), (11) other

27   alleged infringers do not negate Defendants' infringement (*see supra* ¶ 24), (12)

28   Defendants' unreliable communications with third-parties does not negate the

1   Court's finding that there was a likelihood of confusion (*see supra* ¶ 3); (13) Mr.

2   Ripps' declaration is not credible (*see supra* ¶¶ 3, 7); (14) Mr. Ripps' Declaration is

3   not uncontested (*see supra* ¶ 3);  (16) the record shows that Yuga Labs in fact owns

4   the BAYC Marks (*see supra* ¶ 23); (17) disgorgement is available as a remedy (*see

5   supra* ¶ 132); (18) Defendants' additional arguments challenging disgorgement are

6   wrong (*see supra* ¶¶ 131, 132, 135, 136); (19) Ms. O'Laughlin's surveys are valid

7   (*see supra* ¶ 32).

8          In addition, Defendants' response should be rejected because: (1) Defendants

9   Stipulated to Yuga Labs' Ownership of the BAYC Marks; (2) the Court has already

10  found that NFTs are eligible for trademark protection; (3) Defendants used

11  unmodified versions of the BAYC Marks; (4) all RR/BAYC NFT sales were

12  attributable to Defendants' infringing activity; and (5) Yuga Labs correctly

13  calculated Defendants' profits.  *See supra* ¶ 135.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28