Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **Defendants' Objections to Disputed Finding of Fact No. 1, lines 1:21-24** |
| v. | Judge: Hon. John F. Walter |
| Ryder Ripps, Jeremy Cahen, | |
| Defendants. | |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

### **Plaintiff's Disputed Post Trial Finding of Fact No. 1, lines 1:21-24:**

<u>Yuga Labs owns and uses trademarks associated with its BAYC NFT collection, including BORED APE YACHT CLUB, BAYC, BORED APE, the BA YC Logo, the BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo (collectively, the "BAYC Marks").</u> SJ Order at 6-10; Dkt. 342 ¶3.

### **Defendants' Basis for Dispute:**

Evidence at trial showed that Yuga does not own the marks BORED APE YACHT CLUB, BAYC, BORED APE, BA YC Logo, BA YC BORED APE YACHT CLUB Logo, and the Ape Skull Logo. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.[1] That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms.").

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt 346)

---

[1] Citations to paragraphs within witness declarations shall exclude content that is subject to objections sustained at trial. *See* Dkts. 392, 406.

(uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection.  The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a **communicative** work is a dispute relegated to the confines of copyright law, not trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to certificates of authenticity/ownership and are not digital goods in themselves.  Trial Tr. [Atalay] 127:9-16.

Yuga also fails to identify adequate evidentiary support for its proposed finding. First, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't

1   bind district judges for the remainder of the case.  Given the nature of such motions, it

2   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

3   **aspects** of an issue were decided at summary judgment for one purpose, the summary

4   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

5   0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

6   evidence of initial police contact was relevant as background, but not to an already

7   decided issue that initial contact was not excessive force).  This case is just like

8   *Sienze*: the summary judgment ruling on Yuga's ownership for the asserted marks

9   applies to only the issue of infringement and is not adequate support for Yuga's lack

10   of ownership as applied to availability of disgorgement as a remedy (including

11   Defendants' mental state as applied to disgorgement), apportionment, and an

12   exceptional case analysis.

13      Second, Yuga relies on the Declaration of Greg Solano to argue that Yuga owns

14   the asserted marks.  But Mr. Solano's testimony was not credible given the many false

15   and misleading statements contained in his declaration, as well as his repeated

16   impeachment at trial.  For example, Mr. Solano was also forced to concede on cross

17   examination that his sworn declaration included a false statement claiming that

18   "Defendants continue to receive royalties or creator fees from sales on secondary

19   marketplaces."  Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase

20   "business venture" in Mr. Lehman's declaration, without having considered that the

21   phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman

22   would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also

23   relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew

24   he could not settle his case without executing a declaration concerning matters of

25   Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his

26   family at the time he signed his declaration, because Yuga's lawsuit against him

27   would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

28

[Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you give that answer? A Yes.").

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) Defendants have stipulated to this fact, (2) the objection seeks to relitigate issues already adjudicated by the Court, (3) the record shows that Yuga Labs in fact owns the BAYC Marks, (4) Yuga Labs did not grant Defendants a license to infringe, (5) other alleged infringers do not negate Defendants' infringement, and (6) Defendants fail to impeach Mr. Solano's accurate testimony.

**Defendants Stipulated To Yuga Labs' Ownership Of The BAYC Marks:**
Defendants' objection contradicts their own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 3.  In that stipulation and proposed order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks.  *Id.* at 2-3.  Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks" and "that Defendants' registration and use of the domain names https://rrbayc.com and

https://apemarket.com constituted cybersquatting under the Anti-Cybersquatting Consumer Protection Act." *Id.* at 13.  Defendants have waived their right to now argue that they were not liable for infringing upon Yuga Labs' marks or cybersquatting under the ACPA.  *See U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981) ("[N]or may a party offer evidence or advance theories at the trial which are not included in the [pre-trial conference] order *or which contradict its terms.*") (emphasis added).  Defendants' attempt to now avoid liability after admitting to it clearly contradict the terms of the pre-trial conference order.

Defendants' sudden refusal to accept a stipulated fact is a dilatory and abusive litigation tactic that unjustifiably increases the cost of resolving this case.  Defendants' actions again make this an exceptional case.  The Court should reject Defendants' objection.

**The Court's Summary Judgment Order Establishes Liability:**  Defendants' objection improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11.  The Court "easily conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That order establishes the matters adjudicated therein for purposes of this case.  Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

1  *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

2  partial summary judgment are taken as established at trial.").

3      Defendants did not move the Court to reconsider its holdings.  Nevertheless,

4  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

5  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

6  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

7  purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

8  ***trial of facts and issues over which there was really never any controversy*** and

9  which would tend to confuse and complicate a lawsuit."  *Peliculas Y Videos*

10 *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

11 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

12 n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

13 position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

14 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

15 judgment is ***generally not relevant and should be excluded***" at trial( (emphasis

16 added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

17 applicability of the law of the case doctrine where a case is assigned to a new judge).

18      "The partial summary judgment is merely a pretrial adjudication that certain

19 issues shall be deemed established for the trial of the case and likewise serves the

20 purpose of speeding up litigation by eliminating before trial matters wherein there is

21 no genuine issue of fact."  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

22 2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

23 undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

24 tactic that has unjustifiably increased the cost of resolving this case.

25      Nevertheless, Defendants forced the Court and the parties to re-litigate this

26 decided issue.  As discussed below, the evidence the Court can consider following the

27

28

trial amply supports this factual finding.  Thus, the outcome on this issue after trial is no different than it was after Yuga Labs' Motion for Summary Judgment.

**Yuga Labs Owns The BAYC Marks:**  The Court has already decided that Yuga Labs owns its BAYC Marks.  *See* Order on Motion for Summary Judgment (Dkt. 225) ("SJ Order") at 6.  "[A]n unregistered trademark can be enforced against would-be infringers . . . ."  *Matal v. Tam*, 582 U.S. 218, 225 (2017).  "It is axiomatic in trademark law that the standard test of ownership is priority of use."  *Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1226 (9th Cir. 2008).  Yuga Labs started using the BAYC Marks long before Defendants began their infringement.  *Compare* Dkt. 193-2 ¶¶4, 6 *with* ¶24.  Since Yuga Labs' first use in April 2021, the BAYC brand has been the cornerstone of its business.  *Id.* ¶¶2, 8-14; *see also* Muniz Decl. (Dkt. 340) at ¶ 7 ("The BAYC brand is the tentpole brand for Yuga Labs. . . .  Yuga Labs' marketing of the BAYC brand includes, among other things, its operation of social media accounts, hosting community events, and its brand collaboration and high-profile partnerships"); Solano Decl. (Dkt. 342) at ¶ 16 ("Part of the reason Yuga Labs was able to reach such a large audience is due to significant effort, time and money we spent promoting the BAYC brand.").  Indeed, Defendants admit that the BAYC Marks identify Yuga Labs.  *Id.* ¶70.

**Yuga Labs Did Not Give Defendants A License To Infringe:**  To the extent that Defendants seek to rehash their argument that the BAYC Terms gave BAYC NFT holders any and all trademark rights, the Court already found on summary judgment that the BAYC Marks are valid trademarks and that Yuga Labs granted BAYC holders a valid copyright license, not a trademark license.  SJ Order (Dkt. 225) at 9-10 ("Yuga has not granted BAYC NFT holders a trademark license.").  Defendants offer no credible evidence to support their claim that the Court should reach a different conclusion at trial.  The BAYC Terms give BAYC NFT holders a copyright license to use their respective Bored Ape image for personal or commercial use, not the marks

within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs

explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

Additionally, the Court has already held that NFTs are goods, as consumers

understand them, that are subject to trademark protection under the Lanham Act.  SJ

Order (Dkt. 225) at 6-8; *see also Hermès International v. Rothschild*, 590 F. Supp. 3d

647, 655 (S.D.N.Y. 2022).  Defendants offer no reason for the Court to reconsider or

vacate this portion of its prior ruling.

**Other Alleged Infringers Do Not Negate Defendants' Own Infringement:**

Defendants' references to unknown, and alleged, third-party infringers, in an attempt

to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any

alleged third-party use of the BAYC Marks, or similar marks, is immaterial and

irrelevant.  As this Court has already found, "despite Defendants' attempt to argue

abandonment through third party use or failure to police, these arguments are

unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention

v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22,

2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made

clear that third-party use of a mark is irrelevant in a suit against a particular infringer.

*See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th

Cir. 1990) (affirming district court's exclusion of evidence of third-party use of

plaintiff's mark because "[e]vidence of other unrelated potential infringers is

irrelevant to claims of trademark infringement and unfair competition under federal

law"); *Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125, 1130 (C.D. Cal.

2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant

and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir.

2017) (a "'sheer quantity' of irrelevant evidence," which is "largely inapposite to the

relevant inquiry," is meaningless); *see also F.T.C. v. Neovi, Inc.*, No. 06-CV-1952,

2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from

"introducing into evidence . . . 'thousands of third-party webpages'" because they were irrelevant and thus inadmissible under FRE 401 and 402). Even so, Defendants have failed to demonstrate actual use of these marks in commerce. *See*, *e.g.*, *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at *30 (C.D. Cal. Oct. 7, 2004)* (excluding evidence of third-party marks in an advertisement because "evidence of third-party use is not admissible unless the proponent can provide evidence that the trademarks were *actually used* by third parties, that they were well promoted or that they were recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v. Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3* (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs. Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website. Come get it here. And also, by the way, we are going to rip off Yuga's other site next. And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up on Bloomberg News with people confused thinking it's us. I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this. So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8. Moreover, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content. *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections. I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns. And we spend, at least in my tenure as CEO, a million dollars a year

doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of Defendants' intentional and repeated use of the BAYC Marks is undisputed and went unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's trial declaration based on a purported lack of personal knowledge were overruled at trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is because Mr. Solano was referring to Defendants' own words promoting their infringement.

Nevertheless, the arguments Defendants raise are themselves meritless.  First, Mr. Solano's testimony that Defendants collected royalties off secondary sales was supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility of further royalties on LooksRare or other new marketplaces if Defendants continued to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at the time of his declaration and trial.

Apparently Defendants' argument is that Mr. Solano's testimony is correct that Defendants continued to profit from their royalties after February until at least May.  *See, e.g.*, Defendants' objection to Plaintiff's Finding of Fact No. 2 in which Defendants admit to earning royalties through at least May 2023 (one year after they began minting the infringing NFTs).  And Mr. Solano's testimony is correct that Defendants can continue to profit from royalties in the future if they hold the RR/BAYC smart contract.  But somehow Mr. Solano's testimony should be discredited because Defendants claim they were not profiting off royalties in June or

July of 2023.  Even if Defendants' claim is true, it is immaterial.  Defendants' own admissions highlight their actual and ongoing potential to profit from royalties.

Second, Mr. Solano's testimony that Defendants' activities constitute a business venture is amply supported by Defendants' own actions that Mr. Solano personally observed.  It does not matter that Mr. Lehman agreed to call it a business venture.  But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's declaration by arguing that Mr. Solano did so without reading his entire deposition are without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of how he may have felt about the process of being sued for his role in Defendants' scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr. Lehman's declaration was also corroborated by the consent judgment entered against him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had clearly reviewed the declaration based upon his testimony about its contents in his own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps' commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on ApeMarket.'").

Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr. Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the cited line of trial testimony.  Mr. Solano cannot be impeached by reference to deposition testimony covering an entirely different topic.  To be clear, the quoted deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr. Ripps claims he does not control, and which was not at issue at trial.  Solano Depo. (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr.

Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape Yacht Club V3." *Cf.* Trial Tr. at 31:6-33:11.

Finally, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19 regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages generated by running the source code for the planned ApeMarket.com website," informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic and based his knowledge on these exhibits. *Id.*; JTX-806–JTX-809.  Those webpages were not generated from the source code produced by Mr. Lehman until ***after*** Mr. Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano where or how he came to his knowledge, but he attaches the basis for that knowledge to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which Defendants did not object).  Defendants fail to impeach Mr. Solano's accurate knowledge.

### **Defendants' Reply**

Yuga's responses to Defendants' objections fails to address the central issue raised by the Defendants—the trial evidence does not sufficiently support Yuga's proposed finding of fact.  Instead, Yuga primarily devolves into arguing that the issue of ownership has already been decided at summary judgment.  But the law of case doctrine precludes this Court from relying on its summary judgment order.  Moreover, it is Yuga that has unnecessarily raised this issue in the context of a remedies trial, and the evidence shows that Yuga does not own the BAYC marks.

***First***, Defendants have never stipulated to Yuga's Ownership of the BAYC Marks.  Defendants hotly disputed ownership of the BAYC marks at summary judgment.  Dkt. 163 at 2-8.  And while ownership of the marks is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the

issue—forcing Defendants to re-articulate their dispute for purposes of preserving their position for appeal and all other proceedings involving the BAYC marks.  Yuga attempts to mischaracterize the Court record by citing to the pre-trial conference order.  ***But nowhere in the pre-trial conference order did Defendants stipulate to ownership of the BAYC marks.***  Section 6 of the order contains all stipulated facts and those stipulated facts include only that Yuga released the BAYC collection and various facts about Defendants' activities associated with the RR/BAYC collection.  Dkt. 320-1 at 3-4.  Yuga points to Section 5, which is the admitted facts section, but this section again does not contain any admissions regarding "ownership" of the marks.  Rather it merely identifies the asserted marks at issue for the remedies trial—something that Defendants admitted in light of the scope of the remedies trial and to ease this Court's work in adjudicating the remaining issues.   Dkt. 32-1 at 2-3.  Lastly, Yuga cites to Defendants' statement that the "Court has determined that Defendants infringed the BAYC Marks."  Dkt. 320-1 at 13.  But again, this is not an admission of ownership, it is a statement regarding the procedural history in this case that explains that the scope of trial is limited to remedies and does not include infringement.  Had Defendants wanted to stipulate to ownership, they would have expressly done so—they have not.  Defendants reserve the right to dispute ownership on appeal and in any other proceedings involving the BAYC marks.

   ***Second,*** Defendants do not dispute that this Court has entered summary judgment in this case.  However, in their summary judgment briefing, Defendants made clear that there is a material evidentiary dispute on whether Yuga actual owns the BAYC marks and Defendants reserve the right to raise this issue on appeal and in all other proceedings involving the BAYC marks.  And while ownership of the marks is not an issue relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue and asked the Court to unnecessarily make a finding of fact regarding ownership in a trial that was limited to determination of remedies.

Yuga's decision to affirmatively raise the issue of ownership has forced Defendants to re-articulate their position for preservation purposes.

Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on ownership for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on ownership of the asserted marks is limited to infringement and cannot be applied more broadly.  Again, Defendants make clear that ownership of the marks is an unnecessary issue that Yuga did not need to raise at this stage in this case.  But to the extent the Court addresses this issue, it cannot rely on the summary judgment order and the evidence at trial weighs against a finding of ownership.

***Third,*** the evidence at trial showed that Yuga does not own the BAYC marks because (1) Yuga has either given away or abandoned its rights in the marks and (2) NFTs are not eligible for trademark protection.  Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole

1   Muniz had publicly represented that BAYC NFT holders received all IP rights and

2   that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189

3   (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  That transfer of

4   rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr.

5   Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr.

6   [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow

7   people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.

8   That is covered in the terms.").

9        As a result, at the time of the RR/BAYC project, there were more than 9,000

10  other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

11  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

12  hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

13  Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

14  78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

15  thousands" of products that use Yuga trademarks without sponsorship or affiliation

16  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks

17  with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal

18  brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that

19  use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

20       Further, Yuga does not own the asserted marks because NFTs are not eligible

21  for trademark protection.  The Supreme Court has held that trademarks are limited to

22  "tangible goods that are offered for sale, and not the author of any idea, concept, or

23  communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox*

24  *Film Corp.*, 539 U.S. 23, 37 (2003) .  Misrepresentation of the origins of a

25  ***communicative*** work is a dispute relegated to the confines of copyright law, not

26  trademark.  *Id.* at 33-35; *see also* *Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-

27  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014)  (*Dastar* bars trademark claims

28

based on origin of hologram, as it is "likened to a cartoon animation").  Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to certificates of authenticity/ownership and are not digital goods in themselves.  Trial Tr. [Atalay] 127:9-16.

Defendants further note that the trial evidence raised additional issues that preclude ownership of the BAYC mark that are detailed in subsequent objections, such as Yuga's failure to satisfy the "use in commerce" requirement for trademark ownership.

***Fourth,*** Yuga gave away all intellectual property rights (not just copyright, but ***all*** intellectual property rights) associated with the Bored Ape Yacht Club.  Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Again, the Terms & Conditions contain no language limiting the transfer of rights to copyright.

As a result, at the time of the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

This evidence shows that Yuga did in fact surrender its trademark rights to the world.  Moreover, Ryan Hickman, who worked on the RR/BAYC collection, is one of those thousands of unaffiliated third parties and a BAYC holder that received "all IP rights" from Yuga.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

***Fifth,*** other alleged infringers confirm that Yuga did in fact surrender the BAYC marks to the world.  As explained above, Yuga created Terms & Conditions that transferred commercialization rights to thousands of BAYC holders and made public statements that Yuga does not hold any IP rights in the Bored Ape Yacht Club brand.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms."); Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  The fact that Yuga's conduct led to over 9,000 third-party projects using the BAYC marks, including hundreds of unaffiliated NFT collections, shows that Yuga did in fact release "all IP rights" in the Bored Ape Yacht Club.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.

Yuga's reliance on the Court's summary judgment order to rebut this evidence improper.  As noted earlier, Defendants are not asking that this Court reconsider its holding, because under the law of the case doctrine this Court has not made a holding on transfer/abandonment of IP rights for purposes of determining availability of

disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on transfer/abandonment of rights in the asserted marks is limited to infringement and cannot be applied more broadly.

Rather, if the Court is to make a finding on this issue at trial, it must do so based on the evidence presented at trial.  And that evidence shows that Yuga wrote Terms & Conditions that transferred commercialization rights, Yuga publicly stated that it has no IP rights in the Bored Ape Yacht Club, and that thousands of unaffiliated third parties used the BAYC marks in reliance on Yuga's surrender of all IP rights.  Defendants' reliance on Yuga's public conduct was reasonable as their conduct aligned with the thousands of other third parties that also relied on Yuga's public conduct.

**Sixth**, Mr. Solano is not a credible witness.   At trial, Mr. **Solano admitted to testifying falsely** in his sworn declaration of trial testimony when he was forced to concede on cross-examination that his sworn declaration included a false statement

claiming that Defendants continue to receive royalties from sales on secondary

marketplaces:

> Q.     And you understand that Mr. Ripps and Mr. Cahen have testified that
> they do not currently receive any royalties or creator fees from sales
> on secondary marketplaces; right?
>
> A.     Yes.
>
> Q.     So you don't have any basis for your statement that their profits
> continue to increase; correct?
>
> A.     It's my understanding that they were collecting royalties or creator
> fees from LooksRare for quite a while.  Although, those were
> supposed to be donated to charity and never were.
>
> Q.     ***They don't continue to increase; correct, sir?***
>
> A.     ***Correct.***
>
> Q.     ***That statement, that part of your witness statement is incorrect;
> right?***
>
> A.     ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase

"business venture" in Mr. Lehman's declaration, without having considered that the

phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman

would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also

relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew

he could not settle his case without executing a declaration concerning matters of

Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his

family at the time he signed his declaration, because Yuga's lawsuit against him

would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

[Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.