Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>                    Plaintiff,<br><br>        v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>                    Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 2, lines 4, 6-7**<br><br>Judge:  Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**<u>Plaintiff's Disputed Post Trial Finding of Fact No. 2, lines 4, 6-7:</u>**

<u>Defendants created an NFT collection known as Ryder Ripps Bored Ape Yacht Club ("RR/BAYC")</u> that uses the BAYC <u>Marks and points to the same online digital images as Yuga Labs' BAYC NFT collection.</u> SJ Order at 2. <u>Defendants promoted and/or sold RR/BAYC NFTs on</u> the same NFT marketplaces where BAYC NFTs are sold, <u>social media, and with their websites rrbayc.com</u> and apemarket.com. *Id*. at 12; JTX-696.

**<u>Defendants' Basis of Dispute:</u>**

The evidence at trial showed that the RR/BAYC collection involved modified use of marks involving appropriation to make commentary and raise awareness of what Defendants believed were antisemitic or racist imagery.  Ripps Decl. ¶¶ 87-94 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 97-103 (Dkt. 344); Hickman Decl. ¶¶ 62-66 (Dkt. 345); Trial Tr. [Hickman] 222:18-21, [Cahen] 229:9-13.  The RR/BAYC collection also pointed to digital images which "are public" and "available for anyone to navigate to on the Internet."  Trial Tr. [Hickman] 222:15-16.  Further, Yuga never presented any evidence at trial showing that Defendants sold RR/BAYC NFTs on the same marketplaces where BAYC NFTs were being sold.  To the contrary, more than 80% RR/BAYC NFTs reservations were made through rrbayc.com, which has never sold a BAYC NFT.  Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 135, 138, 144 (Dkt. 344).  The remaining reservations for RR/BAYC NFTs were made through Defendants' personal Twitter accounts, which also have never been used to sell BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144

(Dkt. 344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not present any evidence of having a Foundation page for the Bored Ape Yacht Club at the time of the RR/BAYC project because it simply did not have a Foundation page at the time.  As for remaining marketplaces, Defendants only received limited royalties from LooksRare because the marketplace did not honor Defendants request to shut off royalties for secondary sales until May 2023.  Cahen Decl. ¶¶ 169-171 (Dkt. 344).

Finally, there is no evidence in the record that Defendants sold or promoted RR/BAYC NFTs on the apemarket.com.  ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website that could sell or promote anything.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also fails to cite adequate evidence in support of its allegations.  Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on the use of marks and promote/sales of RR/BAYC NFTs applies to only the issue of infringement and is not adequate support

for these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga also cites to JTX-696 to incorrectly argue that apemarket.com was used to promote and sell RR/BAYC NFTs.  JTX-696 is not apemarket.com but is instead the ApeMarket Twitter page (which Yuga has not alleged in this case as infringing any of the asserted marks).  JTX-696 does not show what apemarket.com displayed, what functionalities it had, and whether it has ever promoted or sold RR/BAYC NFTs.  As noted above, ApeMarket was never released (Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested)) and no evidence shows that the website domain apemarket.com was ever used for the promotion or sale of anything.

### Plaintiff's Response:

Defendants' objection should be rejected because (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to confuse consumers, (3) Defendants infringement was not an art project, (4) the Bored Ape Yacht Club NFTs are not public, (5) Defendants used the BAYC Marks to sell and advertise their infringing NFTs on the same NFT marketplaces and social media platforms where BAYC NFTs are sold and advertised, and (6) Defendants' objection is based on numerous false claims.

**The Court's Summary Judgment Order Establishes Liability:**  Defendants' objection improperly disputes facts already adjudicated in the Court's Summary Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks. *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally used the BAYC Marks in their RR/BAYC NFTs." *Id.* at 11.  The Court "easily

conclude[d]" that Defendants' use of identical marks, on identical products, in identical markets supported a finding of a likelihood of confusion. *Id.* at 10-13. That order establishes the matters adjudicated therein for purposes of this case. Fed. R. Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment motion may "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ. Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on partial summary judgment are taken as established at trial.").

Defendants did not move the Court to reconsider its holdings. Nevertheless, Defendants refuse to accept the Court's order, unnecessarily burdening the Court and Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if the Court's order does not exist. Defendants' tactics are inconsistent with the very purpose of a partial summary judgment order, which is "intended to avoid a ***useless trial of facts and issues over which there was really never any controversy*** and which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981)) (emphasis added). Defendants' authorities do not support their position. *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary judgment is ***generally not relevant and should be excluded***" at trial) (emphasis added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing applicability of the law of the case doctrine where a case is assigned to a new judge).

"The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case and likewise serves the

purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir. 2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation tactic that has unjustifiably increased the cost of resolving this case.

**Defendants Intended To Confuse Consumers:**  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17.  Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15.  Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating

these settled issues.  Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

**Defendants' Infringement Was Not An Art Project:**  Defendants' contention that their infringing NFTs were an art project is not supported by the evidence.  To the contrary, the relevant evidence demonstrates that Defendants intended to use Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement could not have been in good faith because, even after the Court found their infringement was likely to cause confusion and was not art protected by Rogers and the First Amendment, Defendants intentionally continued to infringe on Yuga Labs' Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.   Defendants' @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

Moreover, Defendants' *Rogers* and First Amendment defenses have already been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were commercial trademark infringement.  *Id*.  And, the Court has already decided the issue of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

While Defendants publicly claim there was an artistic goal (to ensure they "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1

1  (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make

2  money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to

3  tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal: mint out the remainder of

4  the collection + incentivize people to use the marketplace, specifically the BAYC

5  original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but

6  much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr.

7  Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so

8  low that we dont make anything"); *id.* (Mr. Cahen:  "priorities: getting RRBAYC to

9  sell out by creating demand + getting BAYC and MAYC users to call our marketplace

10  their new home [] and collecting royalties at a fraction of what the other big dogs are

11  charging [] which will be considerable passive income if we strike the right balance");

12  JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low

13  prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574

14  (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will

15  sell out within 48 hours I think [] You'll make like a million dollars [] Straight up");

16  JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

17  man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit

18  motive and desire to charge royalties).  Defendants knew they were stealing from

19  Yuga Labs.

20      **The Bored Ape Yacht Club Images Are Not Public:**  Yuga Labs' Bored Ape

21  Yacht Club images are not available for "public" ownership.  While anyone may ***view***

22  a Bored Ape Yacht Club NFT and the associated image (like any image on the

23  internet), Yuga Labs goes to great lengths to combat the unauthorized use of its marks

24  and images.  *See* Trial Tr. at 82:1-2 (Ms. Muniz testifying that Yuga Labs has "a

25  pretty robust process for takedowns.  And we spend, at least in my tenure as CEO, a

26  million dollars a year doing it.").  Further, this objection is immaterial because this is

27  a case for trademark, not copyright, Infringement.  And even so, the Court has already

28

1   held that Defendants' direct appropriation of Yuga Labs' images favored a finding

2   that there was a likelihood of confusion.  SJ Order (Dkt. 225) at 11 ("Indeed,

3   Defendants are selling the exact same product – NFTs that point to Yuga's BAYC

4   images – and Defendants marketed their RR/BAYC NFTs using the same

5   corresponding Ape ID number used by Yuga for the BAYC NFTs.  Accordingly, the

6   second *Sleekcraft* factor weighs in favor of Yuga.").  Thus, regardless of whether the

7   Bored Ape Yacht Club images are viewable by the public, it is impermissible to sell

8   infringing NFTs using Yuga Labs' marks and creating a likelihood of confusion.  This

9   objection should be rejected as misleading and immaterial.

10   **Defendants Used Yuga Labs' Marks To Market Their Products On The**

11   **Same Marketplaces As Yuga Labs:**  The Court has already found that Defendants'

12   sold their infringing products in the exact same marketplaces as Yuga Labs' NFTs.  SJ

13   Order (Dkt. 225) at 12 ("Yuga and Defendants promoted and sold their NFTs through

14   the same online NFT marketplaces – OpenSea and x2y2.").  *Stone Creek, Inc. v.*

15   *Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving

16   identical marks on competitive goods are rare and 'hardly ever find their way into the

17   appellate reports' because liability is 'open and shut.'") (citation omitted).

18   The evidence in the trial record overwhelmingly supports the finding that

19   Defendants marketed their infringing products on the same marketplaces where

20   official BAYC NFTs were marketed and sold.  For example, Defendants actively

21   marketed secondary sales of their infringing NFTs on OpenSea and pushed for such

22   sales to continue.  *See, e.g.*, JTX-683 (tweet from Mr. Cahen stating "RR/BAYC is

23   officially the highest 24h volume . . . IN THE WORLD!"; JTX-685 (tweet from Mr.

24   Cahen stating "RR/BAYC about to become the first project ever to top both the

25   @foundation and the @opensea charts."); Cahen Decl. (Dkt. 344) ¶ 253 (Mr. Cahen's

26   testimony that he continued to attempt to sell the infringing NFTs even though he

27   believed they were subject to over two dozen takedowns); Dkt. 163-95 (Mr. Ripps'

28

tweet advertising infringing NFTs on OpenSea).  Mr. Ripps had control over a sales page for the sale of RR/BAYC NFTs on OpenSea, *see* Ripps Depo. Designations (Dkt. 396) at 81:3-81:14, and Mr. Cahen directly sold the infringing NFTs on OpenSea.  Trial Tr. at 202:24-25 ("Mr. Cahen has sold through OpenSea, LooksRare, and even Foundation.").

**Defendants' Objection Relies On False Assertions:**  To begin, rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks.  Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to

1   market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC

2   NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-

3   25 ("the Ape Market Twitter [account], that actually links directly to LooksRare

4   where these NFTs are still selling").  Defendants' contention is therefore incorrect and

5   misleading.

6       Defendants also falsely claim that Ape Market was never ready to launch.

7   Despite Defendants' attempts to argue otherwise, the evidence shows that Ape Market

8   was ready to launch.  *See* Trial Tr. at 137:23-24 ("The code was in such a state of

9   completion that it was operational."); *see also* JTX-807; JTX-808; JTX-809.  Indeed,

10  at trial Mr. Cahen confirmed that Ape Market was ready to launch within a matter of

11  days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by

12  February – excuse me – by June 24, 2022? A:  Among other things, yes[.]").  Mr.

13  Cahen later confirmed that he had "no reason to doubt" that the marketplace could be

14  launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by

15  documentary evidence submitted at trial.  See JTX-1027 (post from Ape Market

16  twitter account advertising that "ApeMarket.com will go live within 24 hours of the

17  final mint, which we will announce shortly"); *see also* JTX-801.370 (Mr. Lehman

18  stating "[s]hould finish minting between 8-10 hours from now . . . so per our 24 hour

19  commitment Friday afternoon would be the release" and Mr. Cahen responding "I

20  think it makes sense to launch a bit earlier imo if we are comfortable doing so.");

21  JTX-938 (Tweet from Mr. Cahen stating "[w]e built a marketplace for every

22  YugaLabs asset . . . [a]nd we got sued for it.").  Ape Market existed as an entity

23  actively marketing on social media, and the actual online marketplace was actively

24  advertising on social media ready to launch.

25      Defendants' claim that they did not promote RR/BAYC NFTs on the

26  @ApeMarketplace Twitter account is also false.  Defendants created the

27  @ApeMarketplace Twitter account to promote the Ape Market marketplace and their

28

infringing RR/BAYC NFTs.  The fact that the Twitter handle solely controlled by Mr. Cahen contains "ApeMarket" alone demonstrates the connection between the Twitter account and marketplace, but the Tweets from the account confirm that Defendants used @ApeMarketplace to promote Ape Market.  Cahen Depo. Designations (Dkt. 395) at 126:5-7 (Q:  And you are the sole operator of the Ape Marketplace account? A:  That is correct, yes.").  One such Tweet on June 20 asks, "Are you ready for ApeMarket.com, anon?" and another on June 13 teases the release of Ape Market stating "Get Ready" alongside a screenshot of Ape Market.  JTX-696.  And Mr. Cahen lied at trial when, under oath, he stated that he did not "plan to stimulate the sales of RR/BAYC NFTs by teasing the future release of ApeMarket."  Trial Tr. at 234:15-18.  Mr. Cahen tweeted from @ApeMarketplace a link to reserve an RR/BAYC NFTs on multiple occasions and on June 2 he tweeted that "[l]isting requires holding RR/BAYC."  JTX-696.  Defendants' own internal communications confirm the lie.  On June 1 Mr. Cahen stated, "my goal for today is to create an announcement that will create hype and volume, we want to mint out the remainder of that collection."  JTX-801.221.  On that same day Mr. Cahen tweeted from @ApeMarketplace a screenshot of Ape Market with an image of an RR/BAYC and a link to reserve an RR/BAYC.  JTX-696.  This was a direct attempt to use the prospect of Ape Market to promote Defendants' infringing NFTs.  Defendants' claim that Ape Market, @ApeMarketplace, and RR/BAYC are not connected is obviously false.  The Tweets in JTX-696 repeatedly show the look, functionality, and intent of Ape Market and the infringing RR/BAYC NFTs within Ape Market.

**Defendants' Reply:**

Yuga's response does not substantially engage with Defendants' objection and instead makes a series of arguments on issues unrelated to the substance of this proposed findings of facts.   Each of Yuga's arguments are flawed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**First**, Defendants do not dispute that this Court has entered summary judgment in this case. And while this proposed finding is not relevant to the remedies trial in this case, Yuga has for some reason affirmatively raised the issue and asked the Court to unnecessarily make a finding of fact that is not necessary for the determination of remedies. Yuga's decision to affirmatively raise the issue has forced Defendants to re-articulate their position for preservation purposes.

Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on use of the marks and promotional activities for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on ownership of the asserted marks is limited to infringement and cannot be applied more broadly. Again, Defendants make clear that use of marks and promotional activities are unnecessary issues that Yuga did not need to raise at this stage in this case. But to the extent the Court addresses this issue, it

cannot rely on the summary judgment order and the evidence at trial does not support Yuga's proposed finding.

 *Second,* Yuga's argument that Defendants' intended to confuse consumers is baseless.  The evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

 Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

1   ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted
2   it and so he had the final call.”).

3          Defendants' online discussion, which consisted of nearly the entirety of
4   Defendants' public activities associated with RR/BAYC, confirms their intent.  In
5   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be
6   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows
7   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
8   Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

9   Defendants also created the RR/BAYC collection based on a good faith belief that
10  Yuga had given authorization for the creation of projects like RR/BAYC.  At the time
11  Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than
12  9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.
13  346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before
14  suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps
15  to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.
16  346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT
17  collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the
18  NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]
19  80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would
20  have probably seen these collections using the Bored Ape Yacht Club trademarks at
21  the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There
22  are "literally thousands" of products that use Yuga trademarks without sponsorship or
23  affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published
24  notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,
25  cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with
26  Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-
27  2075.

28

1    Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

2  holder of a BAYC NFT containing the asserted marks and having received IP rights

3  associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

4  Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

5  of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

6  Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

7  allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

8  Your intent in writing the terms and conditions was to allow people to be able to

9  commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

10  the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

11  with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

12  publicly represented that BAYC NFT holders received all IP rights and that Yuga has

13  none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

14  Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

15  someone listening to her public statement about Yuga not having any IP rights would

16  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

17    The evidence that Yuga cites does not rebut this overwhelming evidence of

18  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

19  and taking out of context evidence.  For example, Yuga repeatedly cites to various

20  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

21  confusion.  But those pages are internal discussion about the design of the ApeMarket

22  website to ensure that users of apemarket.com were not confused by the website

23  design.  Yuga even cross-examined Mr. Hickman about these communications and

24  received the same explanation: "This is our attempt to make it as clear as possible.

25  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

26  [Hickman] 212:22-24.

27

28

1      Yuga also cites to correspondence among the creators discussing a possible fear

2   of litigation.  These discussions are taken out of a broader context of hundreds of

3   thousands of communications the creators made.  Further, whether the Defendants

4   feared possible litigation for criticizing a multi-billion dollar company does not

5   establish that they intended confuse anyone.

6      Additionally, Yuga points to private chat conversations the creators had about

7   Ape Market.  The portions they cite to do not show any intention to confuse and

8   further ApeMarket was never released, and there was no evidence that the webpage

9   apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]

10  217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

11  (uncontested).

12      Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,

13  in which he states that "RR/BAYC grants to 100% commercial rights, community

14  member created a shopping site for his! Now you can get the hoodie of your dreams."

15  This was a tweet making fun of Yuga's Terms & Conditions, which has caused

16  thousands of third parties to use the Bored Ape Yacht Club and its marks for projects

17  and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

18  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-

19  2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was

20  ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC

21  t-shirts), and this does not demonstrate an intent to confuse consumers.

22      ***Third***, Yuga ignores that the evidence at trial (including Mr. Ripps's

23  uncontested declaration) confirms that Mr. Ripps has a long history as a successful

24  artist and that the RR/BAYC collection was yet another art project that Mr. Ripps

25  created.  Indeed, Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic

26  contributions have been recognized by mainstream media. Dkt. 419-1 at 3.

27

28

1    Despite having admitted that Mr. Ripps is a publicly recognized artist, Yuga

2   now attempt to rebut Mr. Ripps's unchallenged declaration regarding his career,

3   including his work on the RR/BAYC collection, without having any meaning rebuttal

4   evidence and without have cross-examined Mr. Ripps at trial.  If Yuga truly believes

5   that Mr. Ripps's declaration contains untrue statements about his career as one of the

6   most recognized digital artists in the world and the RR/BAYC collection as a

7   continuation of his artistic accomplishments, then Yuga could have tested those

8   statements on cross-examination.  As the Supreme Court has explained, "[c]ross-

9   examination is the principal means by which the believability of a witness and truth of

10   his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because

11   purpose of cross-examination is "the direct and personal putting of questions and

12   obtaining immediate answers."  *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir.

13   2004) ("One longstanding purpose of cross examination is to expose to the fact-finder

14   relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr.

15   Ripps regarding any portion of his declaration means that the "principle means" of

16   testing Mr. Ripps's credibility weighs decisively in favor of accepting Mr. Ripps's

17   declaration.

18    Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's

19   declaration uncontested, including the following statements:

20   24.    My artwork intentionally pushes the boundaries of what is deemed
21          socially or artistically "acceptable," particularly when critiquing
22          internet culture.

23   25.    One of my most well-known works, *Diventare Schiavo*, involved
24          having people pack boxes through a VR set to demonstrate how the
25          modern internet has reduced us all to "packing boxes."

26   26.    Other works I created that comment on the internet include: *Barbara
27          Lee*, a commentary on the interplay between truth and clickbait
          online, and *Ho*, an exhibit I created for the Postmasters Gallery which

28

explores how social media uses manipulated images to mediate perception of self.

27. My art is meant to be interactive, and to be discussed and critiqued.

28. Much of my work has been the source of criticism and controversy. I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.   And critically, publications such as the *New York Times* have recognized how Mr. Ripps's work has allowed Mr. Ripps to shape internet culture as we know it:

And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[1]  This record, which Yuga has not rebutted, shows that Mr. Ripps has been remarkably influential in the field of digital art and using satire to comment on the boundaries between trolling, art, and commerce.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

**Fourth,** the evidence at trial showed that the BAYC digital images are public. Mr. Hickman's unrebutted trail testimony explained that the images are public, which

---

[1] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.  Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

is why it is possible for RR/BAYC and many other NFT collection to point to those digital images:

> THE COURT:     When you are selling defendants' NFTs, you are selling Yuga's images.
>
> THE WITNESS:    ***No. We are selling the record.***
>
> THE COURT:     Okay.  But the record points to and displays those images.
>
> THE WITNESS:    ***So the images are public.***  They are available for anybody to navigate to on the Internet.
>
> THE COURT:     Right
>
> THE WITNESS:    ***We are selling a receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to*** including Yuga Labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-22 (emphasis added).   Yuga elected to not cross-examine Mr. Hickman on this testimony that the BAYC images are readily accessible and usable by anyone with internet.  Further. Yuga presented no evidence at trial to rebut or contest this testimony—and Yuga's counter-factual arguments after the matter cannot serve a basis for ignoring the clear trial evidence on this issue.  Moreover, as Mr. Hickman clarified to this Court, Defendants are not selling images but instead are selling a record on the blockchain associated with Defendants' and their protest of Yuga and its use of offensive imagery.

   ***Fifth,*** the evidence at trial showed that Defendants did not sell RR/BAYC NFTs on the same marketplaces as Yuga.  Over 80% of commissions for RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is substantially corroborated by Yuga's own expert who admits that ***7,028***

1  *out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC*

2  *reservations) were sold through the RSVP Contract*, **which was only available and**

3  **usable through rrbayc.com**.  Kindler Decl. ¶ 36 (Dkt. 338).   Yuga expert also admits

4  that the **RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants'**

5  **total profits (which is more than 82% of all profits)**.  Kindler Decl. 40 (Dkt. 338).

6  To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs

7  **before the RSVP contract was ever implemented**, meaning that the actual sales on

8  rrbayc.com is larger than the sales through the RSVP Contract alone.

9      The remaining reservations for RR/BAYC NFTs were made through

10  Defendants' personal Twitter accounts, which also have never been used to sell

11  BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt.

12  344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not

13  present any evidence of having a Foundation page for the Bored Ape Yacht Club at

14  the time of the RR/BAYC project because it simply did not have a Foundation page at

15  the time.

16      Yuga attempts to rebut this direct trial evidence by relying on this Court's

17  summary judgment order.   But the "law of the case doctrine does not apply to pretrial

18  rulings **such as motions for summary judgment**."  *Shouse v. Ljunggren*, 792 F.2d

19  902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076,

20  1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't

21  bind district judges for the remainder of the case.  Given the nature of such motions, it

22  could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

23  *aspects* of an issue were decided at summary judgment for one purpose, the summary

24  judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

25  0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

26  evidence of initial police contact was relevant as background, but not to the already

27  decided issue that initial contact was not excessive force).  This case is just like

28

*Sienze*: even if the summary judgment order ruled on marketplace activity applies only the issue of infringement and is not adequate support for this topic as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga similarly attempts to argue that Defendants sold RR/BAYC NFTs on OpenSea and LooksRare, but Yuga has pointed to absolutely no evidence of Defendants actually making any sales on either platform.   In fact, Mr. Solano was cross-examined on OpenSea sales, to which he admitted that he falsely attributed Defendants with selling RR/BAYC NFTs based on documents showing that some anonymous, third-part was re-selling the NFTs:

> Let's look specifically at JTX-686, which is excerpted in your witness statement.  And if we can maybe blow up what you've put there.   This is one of the documents you rely on in your witness statement; right?
>
> A.   Yes.
>
> Q.   And you say that this image from JTX-686 shows Defendants using the BAYC marks to sell their NFTs alongside authentic Yuga Labs BAYC NFTs; right?
>
> A.   Yes.
>
> Q.   ***This side-by-side image, JTX-686, never appeared on OpenSea, did it?***
>
> A.   ***This side-by-side image, no.***  But these are two different pages that look exactly the same.
>
> Q.   It never appeared – this side-by-side image never appeared on any website selling NFTs; right?
>
> A.   I don't know if that's true.  But this is a crop of two different pages that look exactly the same.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Q.     It never appeared side-by-side, correct?

MR. BALL:  Objection.  Vague

THE COURT:  Overruled.

THE WITNESS:  I just answered the question.

Q.     BY MR. TOMPROS:  *Where did you get this image, JTX-686.*

A.     *It was prepared for us.  Counsel prepared it.*
Q.     You didn't find it on OpenSea; right?

A.     I did not specifically screenshot this image, no.

Q.     This image, the combined image like this – strike that.  It's hard to see.  But if we could blow up on the right-hand side, there's a "Created By" section.  And it's hard to see, but it looks like it says – sorry, "owned by," not "created by," "Owned by Safo214"; right?

A.     I'll take your word for it that that's what it says. But yes, it's owned by a username.

Q.     *That's not Mr. Ripps or Mr. Cahen; right?*

A.     *No.* This had already been sold to that person by them.

Trial Tr. [Solano] 45:12-46:24 (emphasis added).

    And as for LooksRare, again, Yuga presented no evidence at trial that Defendants actually made any sales on LooksRare.  Yuga is instead conflating the record regarding Defendants' receipt of limited royalties for sales conducted by third parties on LooksRare.  Notably, Defendants were forced to receive these royalties because LooksRare did not honor Defendants request to shut off royalties for secondary sales until May 2023.  Cahen Decl. ¶¶ 169-171 (Dkt. 344).

    And finally, Yuga references a string of cites to Defendants' Twitter posts (such as JTX-683, Dkt. 163-95) in which they report news involving RR/BAYC

NFTs.  Reporting news on Twitter is not the sale of NFTs and Yuga is improperly attempting to conflate the two.

Yuga also falsely asserts that Mr. Ripps had control of the RR/BAYC sales page on OpenSea.  But the deposition transcript that Yuga cites actual confirms that Mr. Ripps did not have a page on OpenSea:

> Q.     Where – were RR/BAYC NFTS available for transfer on OpenSea?
>
> A.     Not by me.
>
> Q.     **But you had a page on OpenSea?**
>
> A.     *I had a page?  Did I have a page?  No.*  Perhaps RR/BAYC collection had a page on OpenSea.
>
> Q.     And who ran that collection?
>
> A.     Who ran that collection?  I did because I have the keys to the RR/BAYC.
>
> Q.     **And what did the RR/BAYC collection on OpenSea look like?**
>
> A.     *I'm not sure.*

Ripps Depo. Designations (Dkt. 396) at 81:3-81:14 (emphasis added).  Mr. Ripps at most admits that he has the keys to the digital wallet that holds the smart contract for RR/BAYC and not that he controls the OpenSea page for the RR/BAYC collection.  Mr. Ripps further testified at his deposition about how he had limited say in how OpenSea would display the collection, but that he still made every effort he could to make sure the page OpenSea designed was a clear as possible:

> Q.     Do you have any images of what the RR/BAYC NFT page looked like on OpenSea?

A.   ***I do remember at one point making the background image the banner, if you will, to say "Long Live Conceptual Art,"*** or something like that, or "You can't copy an NFT," or something along those lines, or – and ***I do remember making sure that people had a link to RRBAYC.com***, which is the artist statement at which all the RR/BAYCs – or, I would say, ***the vast majority of them were sold through RRBAYC.com.***

Ripps Depo. Designations (Dkt. 396) at 81:22-82:7 (emphasis added).

***Sixth,*** Defendants' objection does not rely on false assertions.  To the contrary, it is Yuga that is misleadingly taking out of context evidence and mischaracterizing exhibits to supports its false proposed findings.  As explained above, over 80% of RR/BAYC sales by Defendants occurred on rrbayc.com.  This fact is confirmed in Mr. Ripps's uncontested declaration and corroborated by Yuga's own expert witness. Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  Kindler Decl. ¶¶ 36, 40 (Dkt. 338).

Further, Yuga ignores the ample evidence that ApeMarket was not release and was still in the ideation stage.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?

A.   What I would say I did was use the prospect of a potential marketplace ***which we were in the ideation phase of***, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.

259.    Ultimately, ***we never agreed on what ApeMarket would be***.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.    BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A.    This is a discussion, ***an ideation of different ideas, none of which were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added). The exhibits that Yuga cites to rebut the trial testimony on this issue are out-context source code and related screenshots. (JTX-807, 808, 809).  But this code was had never been reviewed or approved by Mr. Ripps and, as Mr. Cahen testified, there was no agreement that ApeMarket was ready to launch, but that his team had the ability to build anything Mr. Ripps would have asked for in short order:

> Q.    Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?
>
> A.    I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.
>
> Q.    And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.    Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting

would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  Indeed, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

And finally, Yuga wrongly argues that Defendants' used ApeMarket to sell RR/BAYC NFTs.  Yuga cross-examined Mr. Cahen about this issue at trial and was unable to impeach his testimony showing that ApeMarket was not used for the promotion of RR/BAYC NFTs:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?
>
> A.   ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***
>
> Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   There never existed a marketplace.
>
> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.
>
> Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?

A.    ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).