Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **Defendants' Objections to Disputed Finding of Fact No. 4** |
| v. | Judge:  Hon. John F. Walter |
| Ryder Ripps, Jeremy Cahen, | |
| Defendants. | |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**<u>Plaintiff's Disputed Post Trial Finding of Fact No. 4:</u>**

<u>Defendants used Yuga Labs' BAYC Marks without authorization to falsely suggest that RR/BAYC NFTs relate to Yuga Labs in a way that was likely to cause, and actually caused, confusion.</u> *Id*. at 12-13; Dkts. 342 ¶¶34-35, 63; 392 (Trial Tr. Vol. 1) at 53:14-54:22.

**<u>Defendants' Basis of Dispute:</u>**

The evidence at trial showed that Defendants did not create the RR/BAYC collection to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (uncontested) (Dkt. 346); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344) included an explanation of the artistic intent for the project.  Ripps

Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent. In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images. Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

The evidence at trial also showed that the RR/BAYC collection did not cause any actual confusion and was not likely to confusion. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19. Yuga itself was also unable to identify a single person who

obtained an RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.  Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

The evidence at trial also shows that Yuga's public activities amounted to authorization of RR/BAYC collection and the other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that

are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

Yuga also fails to cite adequate evidence in support of its allegations.  Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary

judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at \*3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling on intent, likelihood of confusion, actual confusion, and authorization by Yuga applies only the issue of infringement and is not adequate support on these issues generally or as applied to availability of disgorgement as a remedy (including Defendants' mental state as applied to disgorgement), apportionment, and an exceptional case analysis.

Yuga also relies on the unreliable Declaration of Greg Solano and his rebutted trial testimony to argue that Yuga owns the asserted marks. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was also forced to concede on cross examination that his sworn declaration included a false statement claiming that "Defendants continue to receive royalties or creator fees from sales on secondary marketplaces." Trial Tr. [Solano] 48:15-49:4. Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your

1  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you

2  swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your

3  depo–tion -- and we can pull it up on the –reen -- at page 152, starting at line 13

4  'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection

5  from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your

6  deposition? A Yes." ); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists?

7  A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your

8  deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape

9  Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you

10 give that answer? A Yes.").

11     Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano]

12 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person

13 that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano]

14 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in

15 the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

16     **Plaintiff's Response:**

17     Defendants do not dispute that they used Yuga Labs' BAYC Marks, nor could

18 they.  Instead, they argue either that their use was not confusing or was permitted.

19 Defendants' objection should be rejected because (1) the objection seeks to relitigate

20 issues already adjudicated by the Court, (2) the record shows that Defendants intended

21 to confuse consumers, (3) Defendants' commercial infringement was not protected

22 "art," (4) Defendants intended to profit off of their infringement, (5) Defendants were

23 well aware that their infringement would cause confusion, (6) the record shows ample

24 actual confusion and likelihood of confusion, (7) Defendants' "disclaimers" did not

25 dispel likelihood of confusion, (8) the majority of the sales of Defendants' infringing

26 NFTs did not occur on rrbayc.com, (9) Defendants did not take steps to avoid

27 confusion, (10) Yuga Labs did not license Defendants' infringement, and Mr.

28

1  Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs'

2  BAYC Marks, (12) other alleged infringers do not negate Defendants' infringement,

3  (13) Defendants fail to impeach Mr. Solano's credible testimony, and (14)

4  Defendants' unreliable communications with third parties does not negate the Court's

5  finding that there was a likelihood of confusion.

6      **The Court's Summary Judgment Order Establishes Liability:**  Defendants'

7  objection improperly disputes facts already adjudicated in the Court's Summary

8  Judgment Order (Dkt. 225).  In that order, the Court held that Yuga Labs owns its

9  BAYC Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga

10  Labs used those marks in commerce, and that Yuga Labs has not abandoned its marks.

11  *Id.* at 6-10.  The Court also held that "Defendants have admitted that they intentionally

12  used the BAYC Marks in their RR/BAYC NFTs."  *Id.* at 11.  The Court "easily

13  conclude[d]" that Defendants' use of identical marks, on identical products, in

14  identical markets supported a finding of a likelihood of confusion.  *Id.* at 10-13.  That

15  order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

16  Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

17  motion may "enter an order stating any material fact — including an item of damages

18  or other relief — that is not genuinely in dispute and treating the fact as established in

19  the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

20  *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

21  *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

22  partial summary judgment are taken as established at trial.").

23      Defendants did not move the Court to reconsider its holdings.  Nevertheless,

24  Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

25  Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

26  the Court's order does not exist.  Defendants' tactics are inconsistent with the very

27  purpose of a partial summary judgment order, which is "intended to avoid a ***useless***

28

1   ***trial of facts and issues over which there was really never any controversy*** and

2   which would tend to confuse and complicate a lawsuit." *Peliculas Y Videos*

3   *Internacionales, S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d

4   1131, 1133 (C.D. Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769

5   n.3 (9th Cir.1981)) (emphasis added).  Defendants' authorities do not support their

6   position.  *See Sienze v Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3

7   (E.D. Cal. Mar. 25, 2019) ("evidence concerning issues resolved at summary

8   judgment is ***generally not relevant and should be excluded***" at trial) (emphasis

9   added); *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (discussing

10  applicability of the law of the case doctrine where a case is assigned to a new judge).

11       "The partial summary judgment is merely a pretrial adjudication that certain

12  issues shall be deemed established for the trial of the case and likewise serves the

13  purpose of speeding up litigation by eliminating before trial matters wherein there is

14  no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

15  2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

16  undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

17  tactic that has unjustifiably increased the cost of resolving this case.

18       **Defendants Intended To Confuse Consumers:**  Defendants' argument that

19  they did not intend to confuse consumers is contradicted by the record.  In granting

20  Yuga Labs' motion for summary judgment, this Court held that Defendants intended

21  to deceive consumers:

22               When the alleged infringer knowingly adopts a mark similar to
                 another's, reviewing courts presume that the defendant can
23               accomplish his purpose:  that is, that the public will be deceived."
                 . . . In this case, Defendants knowingly and intentionally used
24               Yuga [Labs'] BAYC marks.  Because Defendants knowingly and
                 intentionally used Yuga [Labs'] BAYC marks, and in the absence
25               of contrary evidence, the Court concludes that Defendants used
26               the BAYC marks in an effort to confuse consumers. . . . In
                 addition, the Court concludes that Defendants intentionally
27

28

designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding. For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted). Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." *Id.* at 16. Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment." *Id.* Defendants' infringement is thus not art. Instead, "Defendants' use of the BAYC marks is explicitly misleading." *Id.* at 17. Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit." *Id.* at 15. Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues. Nevertheless, the evidence admitted at trial proves that these settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement. Defendants discussed making "like a million dollars." JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps: "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman: "I think we will make alot of money tbh"; "Potentially a lot"). And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

showing screenshot of Ape Market).  They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice. JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark").  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit. For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Privately, Defendants also discussed strategies to "cannibalize" the secondary NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at getting engagement on twitter."  JTX-801.203.  Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

1    Publicly, Defendants made false representations about the RR/BAYC NFTs that

2    implied owning one offered equivalent benefits to owning a genuine BAYC NFT.

3    JTX-1037.  Defendants published their promotions from their individual Twitter

4    accounts and from the commercial @ApeMarketplace account advertising their

5    forthcoming NFT marketplace.  These advertisements were also directed at BAYC

6    NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342)

7    ¶¶ 46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have

8    on Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications,

9    Defendants revealed their true intent to profit from the infringing use of Yuga Labs'

10   BAYC Marks.

11   **Defendants' Infringement Was Not An Art Project:**  Defendants' contention

12   that their infringing NFTs were an art project is not supported by the evidence.  To the

13   contrary, the relevant evidence demonstrates that Defendants intended to use Yuga

14   Labs' BAYC Marks to profit through their commercial promotion and sale of

15   RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-

16   801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement

17   could not have been in good faith because, even after the Court found their

18   infringement was likely to cause confusion and was not art protected by Rogers and

19   the First Amendment, Defendants intentionally continued to infringe on Yuga Labs'

20   Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants'

21   @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a

22   marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt.

23   342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.

24   Moreover, Defendants' *Rogers* and First Amendment defenses have already

25   been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were

26   commercial trademark infringement.  *Id*.  And, the Court has already decided the issue

27   of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs'

28

BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants' Infringement Was Motivated By A Desire To Profit Off Of Yuga Labs' Marks:**  While Defendants publicly claim there was an artistic goal (to ensure they "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell RR/BAYC NFTs and launch Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13 (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-801.185 (Mr. Cahen:  "Goal:  mint out the remainder of the collection + incentivize people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen:  "More royalties for us . . . More work for sure, but much higher likelihood of generating more royalties and users"); *id.* at 208 (Mr. Cahen:  "we need a very delicious value proposition [] to bring in users . . . but not so low that we dont make anything"); *id.* (Mr. Cahen:  "priorities:  getting RRBAYC to sell out by creating demand + getting BAYC and MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); JTX-801.237 (Mr. Lehman:  "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps:  "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).  Defendants knew they were profiting from their theft of Yuga Labs' trademarks.

**Defendants Knew That Their Infringement Would Result In Confusion:**
The evidence shows that Defendants knew they were infringing and creating confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy definitely some people will buy thinking they are buying originals!"); JTX-918.00036 (Mr. Lehman stating to Mr. Cahen the need to ensure they "look really sympathetic to people" if sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

**There Is Ample Evidence Of Confusion In The Record:**  Defendants' argument that consumers were not confused by their infringement is unavailing.  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Depo. Designations at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017)* ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

1  regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

2  *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

3  profits even where infringement claims premised solely on post-sale confusion where

4  a "potential purchaser, knowing that the public is likely to be confused or deceived by

5  the allegedly infringing product, [] choose[s] to purchase that product instead of a

6  genuine one").

7      **Defendants' "Disclaimer" Does Not Negate The Court's Finding That**

8  **Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer

9  on rrbayc.com, "the fact that Defendants concluded it was necessary to include a

10  disclaimer demonstrates their awareness that their use of the BAYC Marks was

11  misleading."  SJ Order (Dkt. 225) at 17.  That Defendants took some steps to try to

12  conceal their intent when they were inevitably sued does not make the infringing

13  activity less confusing; it just demonstrates their culpability.

14      More fundamentally though, Defendants' claimed steps did not prevent

15  confusion.  The public was not required to read and click a disclaimer.  Indeed, even

16  on rrbayc.com, Defendants could not enforce any requirement that users "read" what

17  Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one"

18  would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion

19  amongst the general public when every single RR/BAYC NFT sold (or that ever will

20  sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—

21  without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-

22  134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer

23  on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The

24  majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where

25  there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million

26  impact).

27

28

1    Defendants have no survey, or material consumer evidence, that users of the

2   infringing rrbayc.com website read any disclaimer.  This is not surprising since the

3   vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

4   admitted that all sales went through Foundation—where there was no disclaimer.

5   Ripps Depo. Designations (Dkt. 396) at 82:8-13.

6    Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

7   uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

8   337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today

9   linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see

10  Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at

11  52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47,

12  78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th

13  Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did

14  "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-

15  existent to ineffective at best.

16   **rrbayc.com is Not Where Defendants' Sold The Majority Of Their NFTs:**

17  rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue

18  occurred."  Defendants have no support for this figure; even Mr. Ripps' own

19  declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred

20  on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr.

21  Ripps' claims, NFTs reserved on that website were actually minted and sold through

22  the confusing Foundation page that used the BAYC Marks.  Ripps Depo.

23  Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" /

24  "A. Well, technically, all of them were because it was a Foundation contract, so...").

25   Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for

26  Defendants' infringing NFTs, "[t]he majority of the sales are taking place on

27  secondary markets. . . .  [T]he vast majority of them are occurring in secondary

28

markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").  Defendants' contention is therefore incorrect and misleading.

**Defendants Did Not Take Steps To Avoid Confusing Consumers:** Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" ***immutably*** in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

1    showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in

2    countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs'

3    marks, commercially, in the way that would make Defendants the most money by

4    selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

5        **Yuga Labs' Did Not Give Defendants A License To Infringe:**  To the extent

6    that Defendants seek to rehash their argument that the BAYC Terms gave BAYC NFT

7    holders any and all trademark rights, the Court already found on summary judgment

8    that the BAYC Marks are valid trademarks and that Yuga Labs granted BAYC

9    holders a valid copyright license, not a trademark license.  SJ Order (Dkt. 225) at 9-10

10   ("Yuga has not granted BAYC NFT holders a trademark license.").  Defendants offer

11   no credible evidence to support their claim that the Court should reach a different

12   conclusion at trial.  The BAYC Terms give BAYC NFT holders a copyright license to

13   use their respective Bored Ape image for personal or commercial use, not the marks

14   within the image.  *See* Trial Tr. at 70:1-4, 70:18-23; Solano Decl. ¶ 25.  Yuga Labs

15   explains this not just in the Terms, but in FAQs, and in Discord.  Trial Tr. at 70:18-23.

16       Ms. Muniz explained that in the one interview where she mentioned "IP" rights,

17   she was referring to copyrights and that the context is clear to that effect.  *Id.* at 72:3-

18   18.  Moreover, this interview is immaterial and irrelevant to Defendants' intent—it

19   occurred in November 2022—long after Defendants made the majority of their sales

20   and after this lawsuit was filed.  Regardless, there is no reasonable interpretation of

21   Ms. Muniz's interview that could lead someone to believe Yuga Labs was giving

22   permission to create and sell exact copies of their NFTs using the exact same marks.

23       Defendants' dubious claim that they believed they were entitled to create

24   copycat NFTs and brand their infringing NFTs with Yuga Labs' BAYC Marks fails to

25   change the fact that Yuga Labs retained its trademark rights.  Moreso, the record

26   disproves that Defendants actually believed this was a justification for their actions,

27

28

1  because even as of June 9, 2022, Mr. Ripps **did not know** that one of his partners

2  allegedly owned a BAYC NFT and expressed his desire to have access to one:

3      maybe we buy a mutant [i.e., Yuga Labs Mutant Ape Yacht Club NFT]

4      or some dogs [i.e., Yuga Labs Bored Ape Kennel Club NFT]

5      and put them on the marketplace

6      so people trust it?

7      i don't think buying a BAYC makes sense

8      unless it's for a deal..

9      [third party] sold his ape

10      s

11      sucks

12      that would have been perfect marketing

13      wish i spoke to him before he sold

14  JTX-801.332.  Defendants' newly contrived defense—and their false claim that they

15  contemporaneously believed this justification, despite lack of a single communication

16  to that effect—has no merit and further highlights their lack of credibility.  Indeed,

17  Mr. Ripps' own antagonism towards Yuga Labs highlights the fact that Defendants

18  knew that their infringement was not authorized.  Trial Tr. at 61:12-17 ("We've never

19  had someone that we've done a takedown for, then respond and say, oh, here it is on

20  some other website.  Come get it here.  And also, by the way, we are going to rip off

21  Yuga's other site next.  And we're going – you know, I've made a million dollars with

22  this scam, and no one can stop me.").  And this evidence, which shows Defendants

23  explicitly wanted to own and promote Yuga Labs NFTs to help promote their

24  commercial, for profit marketplace, eviscerates Defendants' claims that they found the

25  Bored Ape Yacht Club images "problematic."  *See also* Trial Tr. at 222:22-24 (the

26  Court questioning Mr. Hickman, "Q:  And that didn't bother you, that it pointed to the

27  same [images]? A:  No.").  Defendants and their associates are not credible people.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Other Alleged Infringers Do Not Negate Defendants' Own Infringement:**
Defendants' references to unknown, and alleged, third-party infringers, in an attempt
to excuse their intentional infringement of Yuga Labs' trademarks is unavailing.  Any
alleged third-party use of the BAYC Marks, or similar marks, is immaterial and
irrelevant.  As this Court has already found, "despite Defendants' attempt to argue
abandonment through third party use or failure to police, these arguments are
unquestionably meritless."  Dkt. No. 225 at 10 (quoting *San Diego Comic Convention
v. Dan Farr Prods.*, No. 14-cv-1865, 2017 WL 4227000, *12 (S.D. Cal. Sept. 22,
2017)).  Indeed, the Ninth Circuit, and courts within the Ninth Circuit, have made
clear that third-party use of a mark is irrelevant in a suit against a particular infringer.
*See, e.g.*, *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th
Cir. 1990) (affirming district court's exclusion of evidence of third-party use of
plaintiff's mark because "[e]vidence of other unrelated potential infringers is
irrelevant to claims of trademark infringement and unfair competition under federal
law"); *Electropix v. Liberty Livewire Corp.,* 178 F. Supp. 2d 1125, 1130 (C.D. Cal.
2001) (rejecting extensive third-party use of the allegedly infringed mark as irrelevant
and weak in any event); *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159, 1162 (9th Cir.
2017) (a "'sheer quantity' of irrelevant evidence," which is "largely inapposite to the
relevant inquiry," is meaningless); *see also* *F.T.C. v. Neovi, Inc.*, No. 06-CV-1952,
2011 WL 1465590, at *3 (S.D. Cal. Apr. 18, 2011) (precluding Defendants from
"introducing into evidence . . . 'thousands of third-party webpages'" because they
were irrelevant and thus inadmissible under FRE 401 and 402).  Even so, Defendants
have failed to demonstrate actual use of these marks in commerce.  *See*, *e.g.*, *Icon
Enters. Int'l, Inc. v. Am. Prod. Co.*, No. 04-cv-1240, 2004 WL 5644805, at *30 (C.D.
Cal. Oct. 7, 2004) (excluding evidence of third-party marks in an advertisement
because "evidence of third-party use is not admissible unless the proponent can
provide evidence that the trademarks were *actually used* by third parties, that they

were well promoted or that they were recognized by consumers.") (cleaned up) (emphasis added); *BuzzBallz, LLC v. Buzzbox Beverages, Inc.*, No. ED14CV01725, 2016 WL 7496769, at *3 (excluding evidence of third-party marks because defendants "presented no evidence showing *actual use*.") (emphasis added).

Even if third party infringement were material or relevant (it is not), none of these "projects" caused as much confusion in the marketplace as Defendants' sale of RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 60; Trial Tr. at 61:12-23 ("We've never had someone that we've done a takedown for, then respond and say, oh, here it is on some other website.  Come get it here.  And also, by the way, we are going to rip off Yuga's other site next.  And we're going – you know, I've made a million dollars with this scam, and no one can stop me. We've never had another collection get shown up on Bloomberg News with people confused thinking it's us.  I've never had phone calls from–you know, concerned – with my CEO telling me that she's getting calls from investors that are saying you need to do something about this.  So, yes, this is especially egregious."); *see also* Trial Tr. 96:19-97:8.  Moreover, Yuga Labs took significant steps to protect the BAYC brand and take down infringing content.  *See* Muniz Decl. (Dkt. 340) ¶ 8, 19; Trial Tr. at 60:21-23 ("We've done takedowns of an enormous amount of infringing collections.  I think we spent something like $600,000 a year doing this."), 82:1-3 ("So, you know, we have a pretty robust process for takedowns.  And we spend, at least in my tenure as CEO, a million dollars a year doing it."); *see also* SJ Order (Dkt. 225) at 10 ("Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.").

**Mr. Solano Is A Credible Witness:**  Mr. Solano's testimony is credible.  The vast majority of Mr. Solano's testimony detailing the harm to Yuga Labs because of Defendants' intentional and repeated use of the BAYC Marks is undisputed and went unchallenged by Defendants.  Indeed, many of Defendants' objections to Mr. Solano's

trial declaration based on a purported lack of personal knowledge were overruled at
trial, "including JTX-1," Mr. Lehman's declaration.  Trial Tr. 12:10-12.  This is
because Mr. Solano was referring to Defendants' own words promoting their
infringement.

Nevertheless, the arguments Defendants raise are themselves meritless.  First,
Mr. Solano's testimony that Defendants collected royalties off secondary sales was
supported by Defendants' own testimony, Ms. Kindler's testimony, and the possibility
of further royalties on LooksRare or other new marketplaces if Defendants continued
to control the RR/BAYC smart contract.  Ripps Depo. Designations (Dkt. 396) at
89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338)
at ¶ 23.  Mr. Solano testified truthfully based on the information available to him at
the time of his declaration and trial.

Second, Mr. Solano's testimony that Defendants' activities constitute a business
venture is amply supported by Defendants' own actions that Mr. Solano personally
observed.  It does not matter that Mr. Lehman agreed to call it a business venture.
But, he did.  Defendants' attempts to discredit Mr. Solano's reliance on Mr. Lehman's
declaration by arguing that Mr. Solano did so without reading his entire deposition are
without merit.  Mr. Lehman testified to the accuracy of his declaration, regardless of
how he may have felt about the process of being sued for his role in Defendants'
scam.  Lehman Depo. Designations (Dkt. 404-2) at 124:5-9.  The veracity of Mr.
Lehman's declaration was also corroborated by the consent judgment entered against
him.  JTX-621.  The Lehman declaration stands on its own, and Mr. Solano had
clearly reviewed the declaration based upon his testimony about its contents in his
own trial declaration.  *See, e.g.*, Solano Decl. (Dkt. 342) at ¶ 71 ("In his declaration
under oath, Defendants' co-conspirator Mr. Lehman described Mr. Ripps'
commercialization and sale of RR/BAYC NFTs as a 'business venture' that 'was

1   expected to make money by selling RR/BAYC NFTs and by potentially generating

2   transaction fees from the sale of NFTs on ApeMarket.'").

3   Third, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 32:19-

4   33:11 regarding Bored Ape V3, because the "Bored Ape V3" referenced in Mr.

5   Solano's deposition is different than the "Bored Ape Yacht Club V3" at issue in the

6   cited line of trial testimony.  Mr. Solano cannot be impeached by reference to

7   deposition testimony covering an entirely different topic.  To be clear, the quoted

8   deposition testimony relates to a Twitter page titled "@BoredApeV3," which Mr.

9   Ripps claims he does not control, and which was not at issue at trial.  Solano Depo.

10  (Dkt. 271) at 151:2-152:24.  But, the cited trial testimony, discusses a section of Mr.

11  Solano's declaration relating to Mr. Ripps naming his NFT collection "Bored Ape

12  Yacht Club V3."  *Cf.* Trial Tr. at 31:6-33:11.

13  Finally, Defendants fail to impeach Mr. Solano's statement at Trial Tr. 34:9-19

14  regarding ApeMarket.com.  As he explained, Mr. Solano "review[ed] [] the webpages

15  generated by running the source code for the planned ApeMarket.com website,"

16  informing his response that Yuga Labs obtained the code from Mr. Lehman.  Solano

17  Decl. ¶ 49.  Mr. Solano cited the referenced source code in connection with this topic

18  and based his knowledge on these exhibits.  *Id.*; JTX-806–JTX-809.  Those webpages

19  were not generated from the source code produced by Mr. Lehman until ***after*** Mr.

20  Solano's deposition.  Mr. Solano gained knowledge of these pages, and he was able to

21  truthfully testify at trial as to that knowledge.  Defendants did not ask Mr. Solano

22  where or how he came to his knowledge, but he attaches the basis for that knowledge

23  to his declaration.  Solano Decl. (Dkt. 342) ¶ 49 (citing JTX-806–JTX-809, to which

24  Defendants did not object).  Defendants fail to impeach Mr. Solano's accurate

25  knowledge.

26  **Defendants' Third-Party, Unreliable Communications Do Not Negate The**

27  **Court's Findings Or Yuga Labs' Experts' Opinions:**  Defendants' cherry-picked

28

communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market. Defendants have no evidence supporting a claim that a statistically significant number of consumers were not confused. Indeed, by Defendants' own admission it is "not even practically possible" for them to e-mail all RR/BAYC holders. *See infra,* Defendants' Objection to Yuga Labs' proposed Post Trial Conclusion of Law No. IV.2. Furthermore, the hundreds of refunds they provided at consumers' requests suggest that some purchasers were confused. *See, e.g.*, Kindler Decl. (Dkt. 338) ¶ 44. At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16.

Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Finally, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

### **Defendants' Reply:**

Yuga's response fails to address that it cannot rely on the law of the case doctrine to rebut evidence showing that Defendants, and thousands of third parties, received authorization from Yuga to use the BAYC marks. Each of Yuga's arguments against Defendants' objection fail as follows:

***First,*** Defendants do not dispute that this Court has entered summary judgment in this case. However, in their summary judgment briefing, Defendants made clear that there are material evidentiary disputes that precluded summary judgment and

1    Defendants reserve the right raise this issue on appeal and in all other proceedings

2    involving the BAYC marks.  And while Defendants' authorization to use the BAYC

3    marks is not an issue relevant to the remedies trial in this case, Yuga has for some

4    reason affirmatively raised the issue and asked the Court to unnecessarily make a

5    finding of fact regarding Yuga's activities associated with surrendering its rights in the

6    Bored Ape Yacht Club brand in a trial that was limited to determination of remedies.

7    Yuga's decision to affirmatively raise the issue of has forced Defendants to re-

8    articulate their position for preservation purposes.

9        Defendants are not asking that this Court reconsider its holding, because this

10   under the law of the case doctrine this Court has not made a holding on Yuga's

11   surrender of its IP rights for purposes of determining availability of disgorgement as a

12   remedy (including Defendants' mental state as applied to disgorgement),

13   apportionment, and an exceptional case analysis.  The "law of the case doctrine does

14   not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v.*

15   *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*

16   *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on

17   incomplete information, don't bind district judges for the remainder of the

18   case.  Given the nature of such motions, it could not be otherwise.").  For example, in

19   *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at

20   summary judgment for one purpose, the summary judgment order did resolve the

21   issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL

22   1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police

23   contact was relevant as background, but not to the already decided issue that initial

24   contact was not excessive force).  This case is just like *Sienze*: the summary judgment

25   ruling on Yuga's false designation claim is limited to infringement and cannot be

26   applied more broadly.  Again, Defendants make clear that proof of Yuga giving

27   authorization to third parties to use the BAYC marks (though the fact they did so

28

weighs heavily on Defendants' intent) is an unnecessary issue that Yuga did not need

to raise at this stage in this case.  But to the extent the Court addresses this issue, it

cannot rely on the summary judgment order and the evidence at trial weighs against a

finding that Yuga did not give authorization to Defendants to use the BAYC Marks—

as it has done so to thousands of third parties.

   ***Second,*** Yuga's argument that Defendants' intended to confuse consumers is

baseless.  The evidence at trial showed that Defendants are not intentional infringers

and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr.

Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC

project confirm that their intent was to use RR/BAYC to criticize rather than to

confuse.  For example, in private group chats among participants in the RR/BAYC

project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic

purpose of the project, their intention that it would spread criticism of Yuga, and their

intention that social media platforms be used to educate the public about the nature of

NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346)

(uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240,

276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

   Defendants also took multiple steps to make clear that the RR/BAYC collection

was not related to Yuga in any way.  For example, the rrbayc.com website—through

which the majority of RR/BAYC commissions occurred and the vast majority of

alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

rrbayc.com website were also required to read and click through a disclaimer

acknowledging the artistic purpose of the project before they were allowed to

commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

1   2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

2   additional steps so that the artistic purpose of the work would be clear to participants.

3   *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

4   ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted

5   it and so he had the final call.").

6        Defendants' online discussion, which consisted of nearly the entirety of

7   Defendants' public activities associated with RR/BAYC, confirms their intent.  In

8   those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

9   inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

10  that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

11  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

12  Defendants also created the RR/BAYC collection based on a good faith belief that

13  Yuga had given authorization for the creation of projects like RR/BAYC.  At the time

14  Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than

15  9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.

16  346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before

17  suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps

18  to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.

19  346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT

20  collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the

21  NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]

22  80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would

23  have probably seen these collections using the Bored Ape Yacht Club trademarks at

24  the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There

25  are "literally thousands" of products that use Yuga trademarks without sponsorship or

26  affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

27  notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

28

1 cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

2 Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

3 2075.

4       Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

5 holder of a BAYC NFT containing the asserted marks and having received IP rights

6 associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

7 Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

8 of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

9 Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

10 allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

11 Your intent in writing the terms and conditions was to allow people to be able to

12 commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

13 the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

14 with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

15 publicly represented that BAYC NFT holders received all IP rights and that Yuga has

16 none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

17 Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

18 someone listening to her public statement about Yuga not having any IP rights would

19 not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

20       The evidence that Yuga cites does not rebut this overwhelming evidence of

21 Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

22 and taking out of context evidence.  For example, Yuga repeatedly cites to various

23 pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

24 confusion.  But those pages are internal discussion about the design of the ApeMarket

25 website to ensure that users of apemarket.com were not confused by the website

26 design.  Yuga even cross-examined Mr. Hickman about these communications and

27 received the same explanation: "This is our attempt to make it as clear as possible.

28

1  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

2  [Hickman] 212:22-24.

3         Yuga also cites to correspondence among the creators discussing a possible fear

4  of litigation.  These discussions are taken out of a broader context of hundreds of

5  thousands of communications the creators made.  Further, whether the Defendants

6  feared possible litigation for criticizing a multi-billion dollar company does not

7  establish that they intended confuse anyone.

8         Additionally, Yuga points to private chat conversations the creators had about

9  Ape Market.  The portions they cite to do not show any intention to confuse and

10  further ApeMarket was never released, and there was no evidence that the webpage

11  apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]

12  217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

13  (uncontested).

14         Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,

15  in which he states that "RR/BAYC grants to 100% commercial rights, community

16  member created a shopping site for his! Now you can get the hoodie of your dreams."

17  This was a tweet making fun of Yuga's Terms & Conditions, which has caused

18  thousands of third parties to use the Bored Ape Yacht Club and its marks for projects

19  and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

20  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-

21  2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was

22  ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC

23  t-shirts), and this does not demonstrate an intent to confuse consumers.

24         ***Third,*** Yuga ignores that the evidence at trial (including Mr. Ripps's

25  uncontested declaration) confirms that Mr. Ripps has a long history as a successful

26  artist and that the RR/BAYC collection was yet another art project that Mr. Ripps

27

28

created.  Indeed, Yuga admits that Mr. Ripps is an artist and that Mr. Ripps's artistic contributions have been recognized by mainstream media. Dkt. 419-1 at 3.

Despite having admitted that Mr. Ripps is a publicly recognized artist, Yuga now attempt to rebut Mr. Ripps's unchallenged declaration regarding his career, including his work on the RR/BAYC collection, without having any meaning rebuttal evidence and without have cross-examined Mr. Ripps at trial.  If Yuga truly believes that Mr. Ripps's declaration contains untrue statements about his career as one of the most recognized digital artists in the world and the RR/BAYC collection as a continuation of his artistic accomplishments, then Yuga could have tested those statements on cross-examination.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").   Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that the "principle means" of testing Mr. Ripps's credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Thus, Yuga's election to not cross-examine Mr. Ripps has left Mr. Ripps's declaration uncontested, including the following statements:

24.    My artwork intentionally pushes the boundaries of what is deemed socially or artistically "acceptable," particularly when critiquing internet culture.

25.    One of my most well-known works, *Diventare Schiavo*, involved having people pack boxes through a VR set to demonstrate how the modern internet has reduced us all to "packing boxes."

26.   Other works I created that comment on the internet include: *Barbara Lee*, a commentary on the interplay between truth and clickbait online, and *Ho*, an exhibit I created for the Postmasters Gallery which explores how social media uses manipulated images to mediate perception of self.

27.   My art is meant to be interactive, and to be discussed and critiqued.

28.   Much of my work has been the source of criticism and controversy. I welcome this as new ideas are often controversial or else they would not be new.

Ripps Decl. (Dkt. 346) ¶¶ 24-28.   And critically, publications such as the *New York Times* have recognized how Mr. Ripps's work has allowed Mr. Ripps to shape internet culture as we know it:

And it has forced **one of the defining internet artists of the 2010's** into conflict with a culture he helped shape, one in which the boundaries among trolling, art and commerce are irrelevant.

JTX-2332 at 6 (emphasis added); JTX-2333 at 2 (overlayed by image).[1]  This record, which Yuga has not rebutted, shows that Mr. Ripps has been remarkably influential in the field of digital art and using satire to comment on the boundaries between trolling, art, and commerce.

Further, as discussed above, the RR/BAYC collection was yet another satirical art project as the voluminous emails from collectors show that the NFTs were reserved for the purpose of protesting and criticizing Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

---

[1] JTX-2333 is in the trial record, but due to formatting issues associated with the *New York Times* website, the PDF has an image covering the text.  JTX-2332 is the same article with modified formatting so that the image from the article does not cover the text.  Moreover, the *New York Times* quote is also publicly accessible at https://www.nytimes.com/2023/03/30/style/ryder-ripps-bored-apes-kanye.html.

**Fourth,** the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Yuga's response here misleading takes out of context communications between the creators and relies on them to imply that the creators' artistic motives were not genuine.  This is unfounded.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the

voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

*Fifth,* the evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants' knowledge of confusion, Yuga cites to documents it argues show that the Defendants intended to make a profit.  Intending to profit from your artwork is not the same thing as intending to confuse consumers and one does not weigh toward the other.

Further, the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).  Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

1   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

2   identify even[] a single person who purchased an RR/BAYC believing it to be

3   sponsored by Yuga Labs; right? A Correct.").

4        Further, the evidence that Yuga cites does not rebut the overwhelming evidence

5   of Defendants' intent to protest and criticize and Yuga instead relies on

6   mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

7   cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

8   confusion.  But those pages are internal discussion about the design of the ApeMarket

9   website to ensure that users of apemarket.com were not confused by the website

10  design.  Yuga even cross-examined Mr. Hickman about these communications and

11  received the same explanation: "This is our attempt to make it as clear as possible.

12  We are having discussion on how to make sure it was very clear for users."  Trial Tr.

13  [Hickman] 212:22-24.

14       Yuga similarly takes out of context exhibits such as JTX-44.00002 to

15  incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

16  44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

17  ID.  that is where they get confused."  This statement is not discussing confusion

18  regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

19  RR/BAYC collection used a different numbering system that BAYC NFTs, and that

20  consumers expected the numbers match as a shorthand manner of cataloguing the

21  digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

22  numbering system, some consumers were confused as to which RR/BAYC NFT they

23  received but they understood very well that they received an NFT created by Mr.

24  Ripps that protests and criticizes Yuga.

25       The record clearly shows that Defendants did not know that there were any

26  confused consumers and further there is no evidence presented that anyone was

27  actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

28

265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

*Sixth*, there is ample evidence that there was ***no*** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

1   Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,

2   Yuga's founders were also not aware of a single instance of actual confusion.  Trial

3   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

4   what you were focused on. Yuga Labs has been unable to identify even[] a single

5   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

6   right? A Correct.").

7          The evidence Yuga cites to is not supportive of a finding that there was

8   consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

9   O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

10  flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that

11  she used an overly expansive definition of the market that included people who did

12  not have any interest in purchasing an NFT, much less knowledge of what an NFT is.

13  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.

14  She acknowledged that she changed the survey population after running pretests to

15  make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that

16  she lacked basic knowledge about the NFT market, admitting to erroneously believing

17  that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.*

18  at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

19  that could not show confusion because the market was too broad.  This was despite

20  her acknowledgement that choosing the right sample population "matters for the

21  analysis" and choosing an improper sample population would be a mistake.  *Id.* at

22  146:18-25.

23         Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

24  she authored an article titled, "Which Method is For You? Not All Surveys Are Made

25  the Same" JTX-314.  In that article she discusses choosing between the Squirt and

26  Eveready surveys on the basis of the strength of the mark.  In this case, however, she

27  ignored her own advice and operated both surveys.  This was despite acknowledging

28

1    that at her deposition she agreed with her earlier advice that the Eveready survey is

2    most appropriate when the mark is strong, and the Squirt survey when the mark is

3    weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

4    strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it

5    was the first case she personally testified in where she offered an opinion based on

6    both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

7    surveys, but by not doing so she did not produce a finding of value on either survey.

8            Ms. O'Laughlin also could not explain the extremely strong priming effect

9    which influenced her results to her Everready survey.  In that survey, people were split

10   into those who saw a version of the RR/BAYC Foundation page that included the

11   words "Bored Ape Yacht Club."  Those in the control group of the experience would

12   see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

13   the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those

14   in the control group who copied down the words "Chill Gorilla Boat Crew" were not

15   counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of

16   those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not

17   counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that

18   she did not account for this extreme priming effect calling it "not particularly

19   relevant."  *Id.* at 158:20-159:1.

20           Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the

21   versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

22   163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

23   fundamentally flawed, she can attest to confusion on two websites for only a matter of

24   days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court

25   should reject them and provide them no weight.

26

27

28

1     Further, this unreliable survey evidence, again does not show that anyone who

2  actually reserved an RR/BAYC NFT was confused about its origin and, therefore,

3  does not undermine the accuracy of this finding of fact.

4     Secondly, the documentary evidence Yuga cites to is unsupportive. For

5  example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an

6  automated software application and not evidence of a real person's confusion. *See*

7  Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet

8  include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further,

9  there is no indication that any of the Twitter users commenting actually reserved an

10  RR/BAYC NFT.  This evidence provides no support for an argument that this finding

11  of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the

12  users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-

13  1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to

14  believe purchased an RR/BAYC NFT, replying to GemBot).

15     Yuga also cites to private chats that the RR/BAYC creators used.  These

16  exhibits are unsupportive of a finding that there was actual confusion.  For example,

17  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

18  marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

19  suggestions about what they could do to make it even more clear.  Further, this chat

20  focused on the creation of ApeMarket, which never was launched and could,

21  therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

22  (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

23  ApeMarket clearer).

24     Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

25  exhibit does not support a finding of actual confusion.  The chart separately lists both

26  "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

27  understood that these were two different projects.  Additionally, as Mr. Cahen

28

1    testified, he is not aware of anyone who watched the Bloomberg program and reserved

2    an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

3    344).

4         Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

5    credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

6    case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

7    case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

8    entered after Mr. Lehman settled his own case with Yuga.

9         Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

10   LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

11   Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

12   a finding of consumer confusion as any consumer had the ability to determine the

13   provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further,

14   this does not undermine the finding of fact as this does not show that anyone who

15   reserved an RR/BAYC NFT was confused about the origin.

16        Finally, Yuga cites to its own declarations and trial testimony where their

17   witnesses make conclusory and unfounded statements about possible confusion.  *See*

18   Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

19   (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

20   392) at 53:14-54:22. These statements do not support a finding, however, that anyone

21   who bought an RR/BAYC NFT was actually confused.

22        Yuga also states that Mr. Ripps and Mr. Cahen did not offer admissible

23   evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

24   This is categorically false.  The evidence presented at trial shows that many people

25   who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl.

26   ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590,

27   JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

28

1   presented at trial that showed consumers were not confused about the source of the

2   RR/BAYC NFTs.

3       Yuga's response is also inaccurate given Defendants used modified versions of

4   the alleged BAYC Marks in their reservations.  For example, the logo used states

5   "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the

6   website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

7       Yuga incorrectly relies on the law of the case doctrine by citing to this Court's

8   summary judgment order.  The "law of the case doctrine does not apply to pretrial

9   rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d

10   902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076,

11   1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't

12   bind district judges for the remainder of the case.  Given the nature of such motions, it

13   could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although

14   ***aspects*** of an issue were decided at summary judgment for one purpose, the summary

15   judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-

16   0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that

17   evidence of initial police contact was relevant as background, but not to the already

18   decided issue that initial contact was not excessive force).  This case is just like

19   *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the

20   issue of infringement and is not adequate support for a determination of how to

21   apportion disgorgement of profits attributable to infringement.

22       Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

23   profits, which is something Defendants argue they are not, Yuga can only receive

24   profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982

25   F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun

26   Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires

27   distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

28

protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Finally, the portion of profits attributable to secondary sales of RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

**Seventh,** Yuga incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion. The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial

rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support for use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite.  Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites.  And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact.  Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

Further, the smart contract clearly indicates Mr. Ripps is the creator and not Yuga and allows consumers to easily establish provenance, which undermines Yuga's assertions about what consumers see when they review the NFT.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT

1    uses the alleged marks. Defendants used modified versions of the alleged BAYC

2    Marks in their reservations.  For example, the logo used states "This Logo is Based on

3    the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project,

4    rrbayc.com, used the modified "RR/BAYC" throughout. Id.

5         Yuga also incorrectly argues that the disclaimer "did nothing to dispel

6    confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes

7    clear, the rrbayc.com website "required collectors to acknowledge and accept a

8    disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶

9    105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this

10   Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of

11   BAYC imagery, recontextualizing it for educational purposes, as protest and satirical

12   commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to

13   verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold

14   for an order that will be fulfilled or rejected/refunded by Ryder within 24h

15   (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶

16   106.  While it is possible that a consumer chose not to read this disclaimer or the

17   prominent artistic statement included on rrbayc.com, this evidence tends to prove that

18   many did and further shows that Defendants were trying to ensure that no one was

19   confused about the source of their collection. *Id.* at ¶¶ 102, 108.  Yuga's assertion that

20   this disclaimer shows the opposite intent is baseless.

21        Yuga also cites to correspondence among the creators discussing a possible fear

22   of litigation.  These discussions are taken out of a broader context of hundreds of

23   thousands of communications the creators made.  Further, whether the Defendants

24   feared possible litigation from a multi-billion-dollar company does not establish that

25   they intended confuse anyone.

26        Yuga misstates the meaning of Mr. Ripps's deposition testimony surrounding

27   the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically

28

1   sold" on Foundation is because the contract is a Foundation contract. *See* Ripps

2   Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs

3   were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many

4   were sold through Foundation?  A. Well, technically, all of them were because it was

5   a Foundation contract, so..."); Counter designation 82:14-19.  This however is

6   different than the "Foundation page" for Ryder Ripps.  Accordingly, Mr. Ripps was

7   not admitting that all sales went through his Foundation page and his testimony that

8   over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl.

9   ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

10          While there may have been many sales on secondary marketplaces as Yuga

11   alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit

12   from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's

13   testimony make clear, they tried to turn off royalties from the secondary sales of

14   RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties

15   on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116,

16   118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they

17   received only a small amount of royalties from Foundation before they shut it off,

18   around $1,000, and some from LooksRare, as that marketplace initially refused to turn

19   off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).

20   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

21   the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

22   shut off royalties from such sales yet again supports a finding that they did not intend

23   to confuse and were motivated by their protest of Yuga not to profit.

24          ***Eighth,*** the evidence at trial showed that over 80% of commissions for

25   RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any

26   time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales

27   occurred on rrbayc.com is substantially corroborated by Yuga's own expert who

28

admits that ***7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract***, *which was only available and usable through rrbayc.com*.  Kindler Decl. ¶ 36 (Dkt. 338).   Yuga expert also admits that the ***RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)***.  Kindler Decl. ¶ 40 (Dkt. 338).   To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs ***before the RSVP contract was ever implemented***, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract alone.

The remaining reservations for RR/BAYC NFTs were made through Defendants' personal Twitter accounts, which also have never been used to sell BAYC NFTs.  Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344).  Defendants also had a Foundation page for RR/BAYC NFTs, but Yuga did not present any evidence of having a Foundation page for the Bored Ape Yacht Club at the time of the RR/BAYC project because it simply did not have a Foundation page at the time.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits.

***Ninth,*** Yuga's argument that Defendants did not take steps to avoid confusion is baseless. As the evidence presented at trial shows, Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

Further, the evidence Yuga cites to is unsupportive. For example, Yuga points to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract clearly indicates Mr. Ripps is the creator and allows consumers to easily establish provenance.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

Again, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants did not take steps to avoid confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible.  We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.  Further, this chat

1   focused on the creation of ApeMarket, which never was launched and could,

2   therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262

3   (Dkt. 344).

4          Finally, Yuga's statements regarding Defendants' use of the alleged marks are

5   misleading.  Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest

6   against Yuga and it is pretty difficult to criticize someone without saying who they

7   are.

8          **Tenth,** Yuga gave away all intellectual property rights (not just copyright, but

9   **all** intellectual property rights) associated with the Bored Ape Yacht Club.  Yuga's

10  CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP

11  rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen

12  Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  Ms.

13  Muniz confirmed that someone listening to her public statement about Yuga not

14  having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz]

15  72:19-22.

16         That transfer of rights was made, in part, pursuant to the BAYC Terms &

17  Conditions, which Mr. Solano drafted with the intent to allow people to

18  commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the

19  terms and conditions was to allow people to be able to commercialize their NFTs.  We

20  can agree on that; right? A. Yes.  That is covered in the terms.").  Again, the Terms &

21  Conditions contain no language limiting the transfer of rights to copyright.

22         As a result, at the time of the RR/BAYC project, there were more than 9,000

23  other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

24  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  There were

25  hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht

26  Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz]

27  78:7-21; [Muniz] 80:3-13.  And, as Yuga's CEO admitted, there are "literally

28

thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

This evidence shows that Yuga did in fact surrender its trademark rights to the world.  Moreover, Ryan Hickman, who worked on the RR/BAYC collection, is one of those thousands of unaffiliated third parties and a BAYC holders that received "all IP rights" from Yuga.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).

***Eleventh,*** other alleged infringers confirm that Yuga did in fact surrender the BAYC marks to the world.  As explained above, Yuga created Terms & Conditions that transferred commercialization rights to thousands of BAYC holders and made public statements that Yuga does not hold any IP rights in the Bored Ape Yacht Club brand.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms."); Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt 344); Hickman Decl. ¶¶ 25-26 (Dkt 345); JTX 2672; JTX 2673.  The fact that Yuga's conduct led to over 9,000 third-party projects using the BAYC marks, including hundreds of unaffiliated NFT collections, shows that Yuga did in fact release "all IP rights" in the Bored Ape Yacht Club.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13.

Yuga's reliance on the Court's summary judgment order to rebut this evidence improper.  As noted earlier, Defendants are not asking that this Court reconsider its holding, because this under the law of the case doctrine this Court has not made a holding on transfer/abandonment of IP rights for purposes of determining availability of disgorgement as a remedy (including Defendants' mental state as applied to

disgorgement), apportionment, and an exceptional case analysis.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on transfer/abandonment of rights in the asserted marks is limited to infringement and cannot be applied more broadly.

Rather, if the Court is to make a holding on this issue at trial, it must do so based on the evidence presented at trial.  And that evidence shows that Yuga wrote Terms & Conditions that transferred commercialization rights, Yuga publicly stated that it has no IP rights in the Bored Ape Yacht Club, and that thousands of unaffiliated third parties used the BAYC marks in reliance on Yuga's surrender of all IP rights.  Defendants' reliance on Yuga's public conduct was reasonable as their conduct aligned with the thousands of other third parties that also relied on Yuga's public conduct.

***Twelfth,*** Mr. Solano is not a credible witness.   At trial, Mr. ***Solano admitted to testifying falsely*** in his sworn declaration of trial testimony when he was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?

A.   Yes.

Q.   So you don't have any basis for your statement that their profits continue to increase; correct?

A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.   ***They don't continue to increase; correct, sir?***

A.   ***Correct.***

Q.   ***That statement, that part of your witness statement is incorrect; right?***

A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A

1  Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a

2  deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same

3  oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up

4  on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3

5  created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't

6  know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do

7  you know whether Ape Market exists? A We have the code for Ape Market from Tom

8  Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6.

9  'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

10  Were you asked that question, and did you give that answer? A Yes."). Mr. Solano's

11  testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

12  been rebutted.  Mr. Solano could not identify a single person that ever bought an

13  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,

14  no one has been able to identify a single confused consumer in the entirety of this

15  case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

16      ***Thirteenth,*** the communications from RR/BAYC NFT collection rebuts all of

17  Yuga's false accusations of profits arising from confusion or infringement. Yuga

18  falsely states that these are "cherry-picked communications."   Mr. Ripps testified in

19  his declaration: "I received ***hundreds of letters*** thanking me for creating the

20  RR/BAYC artwork and for standing up against a corporation that had used hateful

21  references in its brand" and then went on to give eight specific examples of the letters

22  he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point

23  during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at

24  trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the

25  uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from

26  RR/BAYC participants expressing support for the project and its criticism.

27

28

1      Yuga has also failed to present evidence disputing the fact that none of these

2  correspondences indicated that commissions or secondary sales were due to

3  confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing

4  correspondences from collectors, Yuga attempts to point to indications of consumer

5  confusion.

6      Further, Yuga's reliance on experts to make false accusations are not credible.

7  Yuga's citation to Ms. Kindler's declaration does not support their allegations that

8  Defendants provided "hundreds of refunds" or that those alleged refunds indicate

9  confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating Defendants' profits,

10  transactions that were refunded through Defendants' RSVP smart contract were

11  omitted. Specifically, transactions that were refunded through the RefundIssued and

12  RSVPCanceled functions in the RSVP smart contract were not included in my

13  calculation of profits. To my knowledge, Defendants have not produced any records

14  of other refunds related to the sale of RR/BAYC NFTs.").  Mr. Ripps never received a

15  refund request from anyone stating they were confused or thought that they were

16  reserving a Yuga product.  Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

17      And Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin

18  conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin

19  acknowledged that she used an overly expansive definition of the market that included

20  people who did not have any interest in purchasing an NFT, much less knowledge of

21  what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification

22  flow); 152:4-10.  She acknowledged that she changed the survey population after

23  running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also

24  acknowledged that she lacked basic knowledge about the NFT market, admitting to

25  erroneously believing that cryptocurrency was an NFT when she formulated her

26  surveys and her reports.  *Id*. at 147:12-14.  The result of her lack of knowledge was an

27  inherently flawed survey that could not show confusion because the market was too

28

broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.