Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>　　　　　　　Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 7(preamble)**<br><br>Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(preamble):**

Defendants' infringement was intentional. The Court's findings on summary judgment, in addition to evidence presented at trial, illustrate Defendants' intent to deceive consumers, including:

**Defendants' Basis of Dispute:**

The evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

1  Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the
2  rrbayc.com website were also required to read and click through a disclaimer
3  acknowledging the artistic purpose of the project before they were allowed to
4  commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-
5  2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and
6  additional steps so that the artistic purpose of the work would be clear to participants.
7  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement
8  ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted
9  it and so he had the final call.").

10  Defendants' online discussion, which consisted of nearly the entirety of
11  Defendants' public activities associated with RR/BAYC, confirms their intent.  In
12  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be
13  inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows
14  that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);
15  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

16  Defendants also created the RR/BAYC collection based on a good faith belief
17  that Yuga had given authorization for the creation of projects like RR/BAYC.  At the
18  time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than
19  9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt.
20  346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before
21  suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps
22  to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt.
23  346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT
24  collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the
25  NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz]
26  80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would
27  have probably seen these collections using the Bored Ape Yacht Club trademarks at
28

1  the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There
2  are "literally thousands" of products that use Yuga trademarks without sponsorship or
3  affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published
4  notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,
5  cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with
6  Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-
7  2075.
8        Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a
9  holder of a BAYC NFT containing the asserted marks and having received IP rights
10 associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with
11 Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time
12 of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &
13 Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to
14 allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.
15 Your intent in writing the terms and conditions was to allow people to be able to
16 commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in
17 the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative
18 with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had
19 publicly represented that BAYC NFT holders received all IP rights and that Yuga has
20 none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);
21 Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that
22 someone listening to her public statement about Yuga not having any IP rights would
23 not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.
24       Yuga also fails to reference adequate evidence in support of its allegation of
25 intentional infringement.  Yuga, by arguing that the Court's summary judgment order
26 supports a finding of intentional infringement, has incorrectly relied on the law of the
27 case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as***
28

*motions for summary judgment*." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); see also *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  See No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support for intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

**Plaintiff's Response:**

Defendants' objections should be rejected for the same reasons discussed *supra* ¶ 4; specifically:  (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) the record shows that Defendants intended to cause confusion, (3) Defendants' commercial infringement was not protected "art," (4) Defendants took no steps to avoid confusion in the marketplace, (5) Yuga Labs did not authorize Defendants' infringement and, to the contrary, had implemented a robust enforcement program to shut down infringers like Defendants, Mr. Hickman did not have (or convey to Defendants) the right to infringe Yuga Labs' BAYC Marks, (6) and Defendants intended to profit off of their infringement.

Additionally, Defendants' objection should be rejected because their "disclaimer" did not dispel likelihood of confusion or disprove their intent.

**Defendants' "Disclaimer" Does Not Negate The Court's Finding That Consumers Were Likely To Be Confused:**  With respect to the supposed disclaimer

1  on rrbayc.com, "the fact that Defendants concluded it was necessary to include a
2  disclaimer demonstrates their awareness that their use of the BAYC Marks was
3  misleading."  SJ Order (Dkt. 225) at 17.  Defendants knew they were infringing and
4  creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371
5  (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want
6  to fight trademark").  Instead of making changes, such as those recommended by their
7  lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote
8  and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl.
9  (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands,
10 every choice is intentional.").
11       Defendants also knew that what they were doing was likely to lead to a lawsuit.
12 For instance, Mr. Ripps asked for a reference to his limited liability company,
13 Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued
14 personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and
15 branding direction in light of the trademark thing" to Mr. Cahen before they learned of
16 this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if get do get
17 sued, for us to look really sympathetic to everyone" (JTX-918.0036).  That
18 Defendants took some steps to try to conceal their intent when they were inevitably
19 sued does not make the infringing activity less confusing; it just demonstrates their
20 culpability.
21       The public was not required to read and click a disclaimer.  Indeed, even on
22 rrbayc.com, Defendants could not enforce any requirement that users "read" what Mr.
23 Hickman and Mr. Lehman referred to as a "wall of text" that they agreed "no one"
24 would read (JTX-801.128).  And, this wall of text did nothing to dispel confusion
25 amongst the general public when every single RR/BAYC NFT sold (or that ever will
26 sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC—
27 without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-
28

1  134:20; JTX-600; JTX-1146.  Defendants also did not include any similar disclaimer

2  on Foundation or other secondary marketplaces, nor was there one on Etherscan.  The

3  majority of the sales of RR/BAYC NFTs have been on secondary marketplaces where

4  there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-801.376 ($10 million

5  impact).

6       Defendants have no survey, or material consumer evidence, that users of the

7  infringing rrbayc.com website read any disclaimer.  This is not surprising since the

8  vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

9  admitted that all sales went through Foundation—where there was no disclaimer.

10  Ripps Depo. Designations (Dkt. 396) at 82:8-13.

11       Finally, every single RR/BAYC NFT sold (or that ever will sell in the future)

12  uses the trademarks BORED APE YACHT CLUB and BAYC.  Atalay Decl. (Dkt.

13  337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146.  Indeed, a user today

14  linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see

15  Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC.  Trial Tr. at

16  52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47,

17  78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th

18  Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did

19  "nothing to dispel post-purchase confusion").  Defendants' claimed disclaimer is non-

20  existent to ineffective at best.

21       **Defendants' Reply:**

22       Yuga's response fails to adequately address Defendants' objections and the trial

23  evidence that supports Defendants' objections.   For reasons provided in *supra* ¶ 4

24  (both in Defendants' objections and Defendants' reply in support of their objections),

25  the evidence showed that Defendants did not intend to infringe any trademark rights

26  and instead aimed to protest and criticize Yuga.  Defendants' reply in *supra* ¶ 4

27  similarly explains that (1) this Court's summary judgment cannot be used to support a

28

1  finding of fact a trial, (2) Defendants did not intend to confuse consumers, (3)
2  Defendants' intent was to protest and criticize Yuga, (4) the record shows ample
3  evidence of *no* actual confusion, (5) Defendants took many steps to avoid confusion
4  including through the use of an artistic statement, disclaimer, and Twitter activity
5  critical of Yuga, and (6) Yuga surrendered to the world "all IP rights" associated with
6  the Bored Ape Yacht Club.

7  Further, Yuga's incorrectly argues that Defendants' use of disclaimer did not
8  show Defendants good faith intent to criticize Yuga and acts taken to avoid any
9  confusion. First, Yuga incorrectly cites to this Court's summary judgment order to
10 suggest that use of a disclaimer is not a step taken to avoid confusion. The "law of the
11 case doctrine does not apply to pretrial rulings *such as motions for summary*
12 *judgment*." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis
13 added); see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial
14 rulings, often based on incomplete information, don't bind district judges for the
15 remainder of the case. Given the nature of such motions, it could not be otherwise.").
16 For example, in Sienze v Kutz, the Court held that although *aspects* of an issue were
17 decided at summary judgment for one purpose, the summary judgment order did
18 resolve the issue generally or as to other topics. See No. 1:17-CV-0736-AWI-SAB,
19 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial
20 police contact was relevant as background, but not to the already decided issue that
21 initial contact was not excessive force). This case is just like *Sienze*: the summary
22 judgment ruling the Defendants' disclaimer applies only the issue of infringement and
23 is not adequate support for use of a disclaimer generally or as applied to availability of
24 disgorgement as a remedy, apportionment, and an exceptional case analysis.

25 And Yuga's complaint that Defendants did not use a disclaimer on Foundation,
26 Etherscan, or any other third-party website is inapposite. Defendants have no control
27 over third party websites such as Etherscan and do not have the ability to design the
28

1. pages third-party websites use or how they choose to display the RR/BAYC NFT
2. collection.  It simply was not possible for Defendants to add a disclaimer on
3. Foundation or Etherscan because they do not control those websites.
4. And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use
5. Etherscan's token tracker/token name but instead rely on marketplaces or by checking
6. the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay
7. explained that using token names to distinguish NFTs "would be a fairly weak way to
8. do so because often those things are mutable.  They can be changed after the fact.
9. Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.
10.     Further, the smart contract clearly indicates Mr. Ripps is the creator and not
11. Yuga and allows consumers to easily establish provenance, which undermines Yuga's
12. assertions about what consumers see when they review the NFT.  *See* JTX-1146;
13. Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT
14. uses the alleged marks. Defendants used modified versions of the alleged BAYC
15. Marks in their reservations.  For example, the logo used states "This Logo is Based on
16. the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project,
17. rrbayc.com, used the modified "RR/BAYC" throughout. Id.
18.     Second, Yuga incorrectly argues that the disclaimer "did nothing to dispel
19. confusion."  This is inaccurate and unfounded.  As Mr. Ripps's testimony makes
20. clear, the rrbayc.com website "required collectors to acknowledge and accept a
21. disclaimer before they were able to commission an RR/BAYC NFT."  Ripps Decl. ¶
22. 105 (Dkt. 346) (uncontested).  Further that disclaimer stated "By purchasing this
23. Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of
24. BAYC imagery, recontextualizing it for educational purposes, as protest and satirical
25. commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to
26. verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold
27. for an order that will be fulfilled or rejected/refunded by Ryder within 24h
28.

(Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶ 106. While it is possible that a consumer chose not to read this disclaimer or the prominent artistic statement included on rrbayc.com, this evidence tends to prove that many did and further shows that Defendants were trying to ensure that no one was confused about the source of their collection. *Id.* at ¶¶ 102, 108. Yuga's assertion that this disclaimer shows the opposite intent is baseless.

Third, Yuga also cites to correspondence among the creators discussing a possible fear of litigation. These discussions are taken out of a broader context of hundreds of thousands of communications the creators made. Further, whether the Defendants feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

Fourth, Yuga misstates the meaning of Mr. Ripps's deposition testimony surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation? A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19. This however is different than the "Foundation page" for Ryder Ripps. Accordingly, Mr. Ripps was not admitting that all sales went through his Foundation page and his testimony that over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

Fifth, while there may have been many sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets. As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of

1  royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps
2  Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states
3  that they received only a small amount of royalties from Foundation before they shut
4  it off, around $1,000, and some from LooksRare, as that marketplace initially refused
5  to turn off the royalties, around $77,000.  *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344).
6  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to
7  the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully
8  shut off royalties from such sales yet again supports a finding that they did not intend
9  to confuse and were motivated by their protest of Yuga not to profit.