Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ryder Ripps, Jeremy Cahen, <br><br> Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **Defendants' Objections to Disputed Finding of Fact No. 7(e)** <br><br> Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

### **Plaintiff's Disputed Post Trial Finding of Fact No. 7(e):**

"Defendants used Yuga Labs' BAYC Marks to make their competing product look identical to Yuga Labs' product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT." SJ Order at 17; *see also* JTX-117; JTX-600; JTX-972; Dkts. 342 ¶44; 392 at 130:23-131:2, 138:6-20; 394 (Hickman Depo. Designations) at 143:15-144:16; 395 at 148:10-13.

### **Defendants' Basis of Dispute:**

The evidence at trial showed that Defendants presented RR/BAYC NFTs as the opposite or antithetical to Yuga's NFTs and did not design them to appear identical to Yuga's NFTs. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.

*See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Whenever possible, Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-2086), Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344); JTX-671), Foundation (*see* JTX-671), and even Etherscan identified "*ryder-ripps.eth" as the creator of the RR/BAYC collection (JTX-600; JTX-1146).

Moreover, RR/BAYC NFTs were verifiably unique NFTs with digital pointers to Bored Ape images, which "are public" and "available for anyone to navigate to on the Internet." Trial Tr. [Hickman] 222:15-16. The RR/BAYC NFTs were effectively a "receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to including Yuga Labs." Trial Tr. [Hickman] 222:18-21. They did not include the public Bored Ape images, they simply pointed to them as numerous other NFT collections do as well. Trial Tr. [Hickman] 222:10-24

RR/BAYC NFTs were also readily distinguishable from Yuga's NFTs due to the drastically different price points. As Mr. Cahen explained:

> At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was not even 1/1000th the price of a Bored Ape Yacht Club NFT. A collector being confused about RR/BAYC would be akin to a consumer thinking they are able to purchase a Lamborghini that normally costs $300,000 for $300, which no person in their right mind would ever believe is possible.

Cahen Decl. ¶ 225 (Dkt. 344).

The evidence at trial also showed that Defendants did not create a token tracker designed to mislead NFT collectors. Etherscan's token tracker is created by Etherscan and displayed on Etherscan's website. Defendants have no control over the Etherscan website, what it displays, and how it chooses to show the RR/BAYC collection. And,

1   in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use
2   Etherscan's token tracker/token name but instead rely on marketplaces or by checking
3   the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay
4   explained that using token names to distinguish NFTs "would be a fairly weak way to
5   do so because often those things are mutable.  They can be changed after the fact.
6   Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

7          Yuga also fails to cite adequate evidence in support of its allegation that
8   Defendants' made RR/BAYC NFTs look identical to BAYC NFTs and to create a
9   misleading token tracker.  Yuga incorrectly relies on the law of the case doctrine by
10  citing to this Court's summary judgment order.  The "law of the case doctrine does not
11  apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v.*
12  *Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.*
13  *Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on
14  incomplete information, don't bind district judges for the remainder of the case.
15  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze*
16  *v Kutz*, the Court held that although *aspects* of an issue were decided at summary
17  judgment for one purpose, the summary judgment order did resolve the issue
18  generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184
19  at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was
20  relevant as background, but not to the already decided issue that initial contact was not
21  excessive force).  This case is just like *Sienze*: the summary judgment ruling on how
22  RR/BAYC NFTs appeared to NFT collectors and Etherscan's token tracker for
23  RR/BAYC NFTs applies to only the issue of infringement and is not adequate support
24  for these issues generally or as applied to availability of disgorgement as a remedy
25  (including Defendants' mental state as applied to disgorgement), apportionment, and
26  an exceptional case analysis.

27
28

1       Yuga's cited exhibits also fail to show that RR/BAYC NFTs appeared identical

2 to Yuga's NFTs to NFT consumers.  JTX-117 and JTX-972 are printouts of pages

3 from Etherscan that show the verifiably unique smart contract address for RR/BAYC

4 NFTs.  Yuga's own witness, Mr. Atalay, confirmed that consumers of NFTs rely on

5 the associated smart contract address to confirm the identity of a particular NFT or

6 NFT collection.  Trial Tr. [Atalay] 135:2-25.  Thus, these documents actually refute

7 that RR/BAYC NFTs appeared identical to Yuga's NFTs.  And JTX-600 is irrelevant

8 to how RR/BAYC NFTs appeared because it is an Etherscan page recording a

9 transaction between Mr. Ripps and Foundation.

10       Yuga also cites to self-serving, false testimony that the RR/BAYC collection

11 and the manner Etherscan chose to display the RR/BAYC NFT collection led to

12 confusion.  Yuga itself was unable to identify a single person who obtained an

13 RR/BAYC NFT believing it to be sponsored by Yuga.  Trial Tr. [Muniz] 85:3-7 ("Q.

14 Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to

15 identify even[] a single person who purchased an RR/BAYC believing it to be

16 sponsored by Yuga Labs; right? A Correct.").  Mr. Solano, Yuga's President, similarly

17 could not identify a single person that ever bought an RR/BAYC NFT believing it was

18 a Yuga NFT. Trial Tr. [Solano] 18:23-19:1.  And neither Mr. Ripps, Mr. Cahen, or

19 Mr. Hickman are aware of a single instance of confusion.  Ripps Decl. ¶ 223 (Dkt.

20 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344);

21 Trial Tr. [Hickman] 219:13-19.  Given Defendants public discussions, steps taken to

22 clarify the origin and purpose of the RR/BAYC collection, and the fact that there was

23 not even a single confused consumer confirms that there was no likelihood of

24 consumer confusion and no actual consumer confusion.

25       **Plaintiff's Response:**

26       Defendants dispute an exact quote from the Court, underscoring their bad-faith

27 efforts to multiply the cost of this litigation by rehashing decided issues.

28

1    Defendants' objection should be rejected for the same reasons discussed *supra* ¶
2  7(a); specifically:  (1) the objection seeks to relitigate issues already adjudicated by
3  the Court, (2) the record shows ample actual confusion and likelihood of confusion,
4  and (3) Defendants' "disclaimer" did not dispel confusion.

5    Additionally, as described below, Defendants' objection should be rejected
6  because (1) the record shows that Defendants did not use Mr. Ripps' name as the
7  creator of their infringing NFT collection "whenever possible", (2) the record shows
8  that the different price point of Defendants' infringing NFTs did not dispel likelihood
9  of confusion, (3) Defendants' infringement caused third-party platforms such as
10  Etherscan to confusingly identify their infringing NFTs with the BAYC Marks, (4)
11  consumers use the contract name and token tracker to identify NFTs, (5) Defendants
12  knew that their infringement would cause confusion, (6) the majority of Defendants'
13  infringing NFTs were not sold on rrbayc.com, (7) Defendants did not take steps to
14  avoid confusion, and (8) the RR/BAYC smart contract immutably references Yuga
15  Labs' marks.

16    **Defendants Did Not Attribute RR/BAYC NFTs To Mr. Ripps "Whenever**
17  **Possible":**  Defendants did not attempt to avoid confusion, on the contrary Defendants
18  deliberately designed and marketed their infringing NFTs to confuse consumers.
19  Defendants could have called their NFT collection something other than "Bored Ape
20  Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart
21  contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants
22  could have called their Foundation page anything other than "Bored Ape Yacht Club,"
23  but chose not to.  JTX-28.  Mr. Ripps could have replied to the @j1mmy.eth Tweet
24  asking what NFTs consumers were buying with any phrase other than "bayc v3," but
25  he chose not to.  JTX-689.  Defendants could have used different images or overlaid
26  some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-
27  801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because

28

"it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). Defendants could have attacked Yuga Labs in countless non-infringing ways. But they did not. Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers. O'Laughlin Decl. (Dkt. 341).

**The Price of Defendants' Infringing NFTs Does Not Mitigate Confusion:** Defendants' argument that their infringing NFTs sold at a different price point than authentic BAYC NFTs does not mitigate likelihood of confusion. In fact, the price point of Defendants' NFTs only *compounded* likelihood of confusion. "Defendants even used a similar price point to sell RR/BAYC NFTs—around 0.1 to 0.15 ETH per NFT. At the time, this amounted to approximately $200 per NFT. This is about the same value as BAYC's original 0.08 ETH BAYC price, which was approximately $169 to $236 when we initially sold them. It would not have been unreasonable for consumers to assume that 'RR/BAYC' was another Yuga Labs release related to BAYC, just like MAYC or BAKC." Solano Decl. (Dkt. 342) ¶ 54; *see also* Trial Tr. at 58:9-11 ("The original Bored Apes sold for $200. And we've done other sales over the past two years that are for lower prices."). Indeed, Defendants marketed their infringing NFT collection as "Bored Ape Yacht Club V3." *See* JTX-689; JTX-690; JTX-1249. In other words, they marketed it as another version, and possibly a cheaper version.

**Defendants Caused Sources Such As Etherscan To Identify Their Infringing NFTs With The BAYC Marks:** Defendants say that the evidence at trial shows they were not responsible for token trackers such as Etherscan's identifying Defendants' NFTs with the BAYC Marks. There is no such evidence to support this

1   argument, and Defendants cite none.  JTX-600 shows "Bored Ape Yacht Club" and

2   "BAYC" coded into the RR/BAYC smart contract as source identifiers, and

3   Defendants admit in their objection that JTX-600 "is an Etherscan page recording a

4   transaction between Mr. Ripps and Foundation."  In other words, Mr. Ripps admits

5   that he launched the smart contract with the BAYC Marks coded into it, which caused

6   websites such as Etherscan to confusingly display those marks to the public as if the

7   smart contract was created by Yuga Labs.  These marks can never be removed from

8   the smart contract, causing hyperlinks and other references to the collection to display

9   the BAYC Marks.  Atalay Decl. (Dkt. 337) ¶ 6; Solano Decl. ¶¶ 46-47, 78.  And

10   despite Mr. Ripps testimony that he minted the RR/BAYC NFTs to his "personal

11   wallet, ryder-ripps.eth," the "ryder-ripps.eth" name did not appear on Etherscan until

12   *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.

13   Defendants therefore caused their infringement of Yuga Labs' marks to be an inherent

14   and unchangeable part of their NFT collection, in turn causing third party systems and

15   observers to confusingly associate the two, resulting in more downstream marketplace

16   confusion.  The permanent existence of Yuga Labs' marks in association with the

17   RR/BAYC smart contract is why, like a domain name, the smart contract should be

18   transferred to Yuga Labs so that Yuga Labs can retain some control of the use of its

19   their marks..

20        **The Market Relies On The Token Tracker To Verify The Authenticity Of**

21   **NFTs:**  Defendants cannot keep straight whether their position is that consumers do or

22   do not rely on the token tracker to verify the authenticity of NFTs.  Cahen Depo.

23   Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC

24   NFT" is and stating "the blockchain is complicated.  A lot of people don't have the

25   technical expertise or knowledge to be able to have a conversation about crypto

26   technology and blockchain technology."); *id.* at 148:10-13 (testifying it is "very

27   common" for people to refer to NFT collections by the token tracker).  Regardless of

28

1  how common or easy it is, consumers will use token trackers when purchasing an
2  NFT.  Trial Tr. 132:3-5 (cross examination of Mr. Atalay:  "Q  And you also agree
3  that the NFT community uses the token name when it's buying on secondary markets;
4  correct?" / "A  Yes."); *see also* Atalay Decl. (Dkt. 337) at ¶ 7; JTX-1558.  The
5  evidence at trial is, therefore, consistent with the Court's holding on Yuga Labs'
6  Motion for Summary Judgment that "Defendants used Yuga's BAYC Marks to make
7  their competing product look identical to Yuga's product and ensure that the consumer
8  will be explicitly misled in the token tracker, which is the place where a consumer
9  should be able to authenticate and verify who created the NFT."  SJ Order (Dkt. 225)
10  at 17.

11  **Defendants Knew That Their Infringement Would Result In Confusion:**
12  The evidence shows that Defendants knew they were infringing and creating
13  confusion.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to
14  change the skull / If we want to fight trademark"); JTX-801.185 (Mr. Lehman writing,
15  "overall I think we should be very careful about doing this in terms of the confusion it
16  will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult
17  to make the collections coexist" because "they are the same art" and "same logos");
18  JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and
19  writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the
20  RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name.");
21  JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy
22  definitely some people will buy thinking they are buying originals!"); JTX-918.00036
23  (Mr. Lehman stating to Mr. Cahen the need to "look really sympathetic to people" if
24  sued); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match
25  the RR ID. that is where they get confused"); Hickman Depo. Designations (Dkt. 394)
26  at 143:15-144:16 (testifying "Bored Ape Yacht Club" and "BAYC" in the token
27  tracker refers to the Bored Ape Yacht Club made by Yuga Labs); Cahen Depo.

28

Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated.  A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker).  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

**rrbayc.com Is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred."  Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks.  Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

**Defendants Did Not Take Steps To Avoid Confusing Consumers:** Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same

art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). Defendants could have attacked Yuga Labs in countless non-infringing ways. But they did not. Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers. O'Laughlin Decl. (Dkt. 341).

**The RR/BAYC Smart Contract Is Immutably Linked To Yuga Labs:** Defendants' assertion regarding mutability of token trackers is immaterial and misleading because the token tracker for Defendants' infringing NFTs is not "mutable." Indeed, in response to the question directly after the response cited in Defendants' objection, Mr. Atalay explained that "[i]n this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance. So this isn't entirely relevant." Trial Tr. at 134:1-8. Mr. Solano testified to the same in his trial declaration. Solano Decl. (Dkt. 342) at ¶ 80 ("My understanding is that Defendants cannot change the name of their Etherscan contract bearing the BAYC Marks, nor can the RR/BAYC smart contract be destroyed."). Thus, the RR/BAYC smart contract will display "Bored Ape Yacht Club" and "BAYC" as the contract name and the contract symbol, respectively, in perpetuity, and without a transfer of the smart contract to Yuga Labs, confusion from Defendants infringing NFTs will continue. *Id.* ("By transferring the RR/BAYC smart contract to Yuga Labs, the Defendants' association with the BAYC brand will no longer be 'forever' as Mr. Ripps proclaimed it would be."). Therefore, as Mr. Atalay testified, this misleading counterfactual is neither relevant nor material.

**Defendants' Reply:**

Yuga's reference back to its responses in *supra* ¶ 7(a) do not provide adequate grounds to accept Yuga's erroneous proposed finding of fact.  For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed that Defendants did not design RR/BAYC NFTs to be identical to Yuga's NFTs and that NFT consumers do not use token trackers to identify/verify NFTs.  Additionally, Defendants' reply in *supra* ¶ 4 similarly explains that (1) this Court's summary judgment cannot be used to support a finding of fact a trial, (2) there is ample evidence that RR/BAYC NFTs did not cause any confusion, and (3) Defendants disclaimer shows that Defendants acted in good faith and it also decreased any likelihood of confusion.

Yuga's additional responses to this objection similarly fail because (1) the Defendants always identified Mr. Ripps as the creator of RR/BAYC collection whenever it was possible to do so, (2) the difference in price between RR/BAYC NFTs and Yuga's NFTs all but guaranteed no confusion, (3) Defendants did not cause third-party platform to identify RR/BAYC NFTs as Yuga NFTs, (4) consumers do not use token trackers to identify NFTs, (5) Defendants did not cause any confusion and always acted in a manner to ensure that purchasers understood what they were buying, (6) more than 80% of Defendants' sales occurred on rrbayc.com, (7) Defendants took many steps to prevent confusion, and (8) the RR/BAYC smart contract does not immutable reference Yuga.

***First,*** Defendants attributed RR/BAYC NFTs to Mr. Ripps whenever it was possible to do so.   Defendants controlled their personal Twitter accounts and rrbayc.com—and Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-2086), Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344); JTX-671).  All other platforms were owned and operated by third parties, which put restraints on what Defendants could do.  Still, even though Defendants did not

have control over third party platforms, they used what little abilities they had to ensure that, for example, Foundation identified Mr. Ripps as the creator. JTX-671. Likewise, Etherscan identified Mr. Ripps as the create either by his wallet name or unique wallet address. JTX-600; JTX-1146. And even OpenSea clearly labeled the NFT collection as "RR/BAYC" and stated that it is "By ryder_ripps." JTX-28.

**Second,** RR/BAYC NFTs sold for approximately 1/1000th the price of Yuga's NFTs. This drastic difference in price all but confirms that it was practically impossible for any consumers to be confused. As Mr. Cahen explained:

> At the time of the RR/BAYC artwork, the price of an RR/BAYC NFT was not even 1/1000th the price of a Bored Ape Yacht Club NFT. A collector being confused about RR/BAYC would be akin to a consumer thinking they are able to purchase a Lamborghini that normally costs $300,000 for $300, which no person in their right mind would ever believe is possible.

Cahen Decl. ¶ 225 (Dkt. 344).

And while the significant difference in price alone was likely enough to guarantee no confusion, Defendants still took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. Defendants included an artistic disclaimer on rrbayc.com, on which over 80% of reservations occurred, explaining the artistic intent of the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Defendants also required collectors on rrbayc.com to read and click through a disclaimer acknowledging the artistic purpose of the project. *See* Ripps Decl. ¶¶ 106-109 (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Defendants also engaged in extensive online discussion confirming and raising awareness about the satirical nature of the RR/BAYC project. Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

***Third,*** Defendants did not cause Etherscan and other websites to attribute the RR/BAYC collection to Yuga.   Mr. Ripps explained, in his uncontested declaration, that the smart contract was coded so that it would be specifically attributable to him through his personal smart wallet and identify a unique smart contract address:

> 89.   The RR/BAYC collection was minted from my personal Ethereum blockchain "wallet," ryder-ripps.eth, was located at a unique "contract" address, and was minted on different dates and with different token IDs than Yuga's Bored Ape Yacht Club NFTs.

Ripps Decl. ¶ 89 (Dkt. 346).  This information was always coded into the RR/BAYC contract, giving any third party a surefire way to know that RR/BAYC NFTs were created by Mr. Ripps and not by Yuga.

Third party websites, such as Etherscan, always displayed the RR/BAYC collection in a manner that disclosed Mr. Ripps's unique personal wallet (either by name or by alphanumeric code verifiable on Etherscan itself) and also disclosing the unique smart contract address for the RR/BAYC collection.   As Mr. Atalay admitted, it is the unique smart contract address that is critical to identifying NFTs.  Trial Tr. [Atalay] 135:2-25.   Moreover, it is undisputed that Defendants do not own or operate Etherscan or any of the other third-party websites that displayed information about RR/BAYC NFTs.   Defendants cannot be responsible for the actions of third parties, especially when the code for the RR/BAYC collection provided to all third parties a definite source identifier and a verifiably unique smart contract address.

***Fourth,*** the undisputed evidence at trial showed that NFT consumers do not rely on token trackers to verify the authenticity of NFTs.  Mr. Atalay clearly and unequivocally testified at trial that token trackers/token names are not used to identify NFTs.   If there was anything wrong with Mr. Atalay's admission, then Yuga should have rehabilitated the witness on re-direct.  Yuga did not, because Mr. Atalay's admission is clear.  He admitted that using token names or token trackers to

1  distinguish NFTs "would be a fairly weak way to do so because often those things are

2  mutable.  They can be changed after the fact.  Also, there's no guarantee of

3  uniqueness."  Trial Tr. [Atalay] 133:12-23.  Indeed, as Mr. Atalay admitted,

4  consumers of NFTs rely on marketplaces or by checking the associated smart contract

5  address.  Trial Tr. [Atalay] 135:2-25.

6      *Fifth,* the evidence presented at trial shows that there was not any actual

7  confusion and that Defendants did not know of any confusion. First, to support this

8  assertion about Defendants' knowledge of confusion, Yuga cites to documents it

9  argues show that the Defendants intended to make a profit.  Intending to profit from

10  your artwork is not the same thing as intending to confuse consumers and one does

11  not weigh toward the other.

12      Further, the evidence at trial showed that Defendants were not primarily

13  motivated by profits.  Defendants explained that profits were a concern, but not the

14  primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset

15  costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344).

16  Defendants' decisions surrounding refunds and royalties confirm that they were not

17  primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346);

18  Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund,

19  for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt.

20  344).  Additionally, the Defendants' declined taking royalties on transfers of

21  RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt.

22  346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

23      Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

24  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

25  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

26  Buttressing this fact, Yuga's founders were also not aware of a single instance of

27  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

28

1  let's focus on, I think, what you were focused on. Yuga Labs has been unable to

2  identify even[] a single person who purchased an RR/BAYC believing it to be

3  sponsored by Yuga Labs; right? A Correct.").

4        Further, the evidence that Yuga cites does not rebut the overwhelming evidence

5  of Defendants' intent to protest and criticize and Yuga instead relies on

6  mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly

7  cites to various pages of JTX-801 to argue that Defendants were aware of the alleged

8  confusion.  But those pages are internal discussion about the design of the ApeMarket

9  website to ensure that users of apemarket.com were not confused by the website

10 design.  Yuga even cross-examined Mr. Hickman about these communications and

11 received the same explanation: "This is our attempt to make it as clear as possible.

12 We are having discussion on how to make sure it was very clear for users."  Trial Tr.

13 [Hickman] 212:22-24.

14        Yuga similarly takes out of context exhibits such as JTX-44.00002 to

15 incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-

16 44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR

17 ID. that is where they get confused."  This statement is not discussing confusion

18 regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the

19 RR/BAYC collection used a different numbering system that BAYC NFTs, and that

20 consumers expected the numbers match as a shorthand manner of cataloguing the

21 digital pointers contained within the RR/BAYC NFTs.  That is, due to the different

22 numbering system, some consumers were confused as to which RR/BAYC NFT they

23 received but they understood very well that they received an NFT created by Mr.

24 Ripps that protests and criticizes Yuga.

25        The record clearly shows that Defendants did not know that there were any

26 confused consumers and further there is no evidence presented that anyone was

27 actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

28

265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

*Sixth,* over 80% of commissions for RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is substantially corroborated by Yuga's own expert who admits that *7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract*, *which was only available and usable through rrbayc.com*.  Kindler Decl. ¶¶ 36 (Dkt. 338).   Yuga expert also admits that the *RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)*.  Kindler Decl. ¶ 40 (Dkt. 338).   To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs *before the RSVP contract was ever implemented*, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract alone.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

1  the analysis of Defendants' profits.

2  ***Seventh,*** Yuga's argument that Defendants did not take steps to avoid

3  confusion is baseless. As the evidence presented at trial shows, Defendants took

4  multiple steps to make clear that the RR/BAYC collection was not related to Yuga in

5  any way.  For example, the rrbayc.com website—through which the majority of

6  RR/BAYC commissions occurred and the vast majority of alleged profits accrued

7  (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included

8  an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346)

9  (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-

10  2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also

11  required to read and click through a disclaimer acknowledging the artistic purpose of

12  the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-

13  109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps

14  insisted on these requirement and additional steps so that the artistic purpose of the

15  work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24]

16  ("Q. … Why was the artist statement ultimately included, if it had a negative impact

17  on usability? …  A.   … Ryder wanted it and so he had the final call.").

18  Further, the evidence Yuga cites to is unsupportive. For example, Yuga points

19  to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract

20  clearly indicates Mr. Ripps is the creator and allows consumers to easily establish

21  provenance.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

22  Again, Yuga repeatedly cites to various pages of JTX-801 to argue that

23  Defendants did not take steps to avoid confusion.  But those pages are internal

24  discussion about the design of the ApeMarket website to ensure that users of

25  apemarket.com were not confused by the website design.  Yuga even cross-examined

26  Mr. Hickman about these communications and received the same explanation: "This is

27  our attempt to make it as clear as possible.  We are having discussion on how to make

28

sure it was very clear for users." Trial Tr. [Hickman] 212:22-24. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344).

Finally, Yuga's statements regarding Defendants' use of the alleged marks are misleading. Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize someone without saying who they are.

***Eighth,*** The RR/BAYC collection is not immutably linked to Yuga. In fact, it is not linked to Yuga at all. As explained in Mr. Ripps's uncontested declaration, the RR/BAYC collection contains in its permanent code that it was minted from Mr. Ripps's wallet and contains a verifiably unique smart contract address (Ripps Decl. ¶ 89 (Dkt. 346)), which permanently and definitively identifies that RR/BAYC was created by Mr. Ripps and not Yuga.