Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>　　　　　Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 7(i)**<br><br>Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Finding of Fact No. 7(i):**

Defendants treated RR/BAYC as a business venture and expected to profit from using Yuga Labs' BAYC Marks to sell and resell RR/BAYC NFTs, and to use those sales to build Ape Market, from which they expected to further profit. *See* JTX-1 at ¶¶10-13; JTX-801.185; JTX-801.208 ("considerable passive income"); JTX-801.237; JTX-801.156; JTX-1574; JTX-1586; Dkt. 394 at 238:12-240:20; JTX-801.144; JTX-803.66-JTX-803.67.

**Defendants' Basis of Dispute:**

The evidence at trial showed the Defendant treated and intend the RR/BAYC collection as a vehicle for artistic commentary that successfully criticized Yuga. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the public that RR/BAYC was intended as a protest art project. Ripps Decl. ¶¶ 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 145-155 (Dkt. 344); Dkt. 197-1 ¶ 230. For

example, example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

Although Mr. Ripps and Mr. Cahen understood that the additional requirements associated with going through a lengthy artistic statement and clicking through a disclaimer made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Further, Defendants never used the term "business venture" to describe the RR/BAYC project.  In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document signed under coercion and under threat to Mr. Lehman's family.  Strangely enough, Yuga cites to the declaration and Mr. Solano affirmatively relied on the declaration even though Yuga's own attorneys coined the term "business venture.".  As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture," and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having considered that Mr. Lehman was afraid for his family at

1  the time he signed his declaration, because Yuga's lawsuit against him would be
2  disastrous to his family and himself, even if Mr. Lehman won.  Trial Tr. [Solano]
3  38:17-19.
4       And while Yuga cites to a series of exhibits where the RR/BAYC team discuss
5  or post about fulfilling reservations for RR/BAYC NFTs, including financial aspects
6  of fulfilling those reservations, Yuga conveniently ignores that those reservations
7  were made as a vehicle to protest Yuga.  Discovery in this case revealed voluminous
8  correspondence from actual purchasers of RR/BAYC NFTs, both through direct
9  commissions and purchases on the secondary market.  These correspondence from
10 collectors expressed gratitude and support for the artistic project, the artistic
11 statement, and Mr. Ripps's and Mr. Cahen's criticism of Yuga.  Ripps Decl. ¶¶ 198-
12 205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590,
13 JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The fact that RR/BAYC
14 participants collected RR/BAYC NFTs as protest art confirms that Defendants treated
15 the project as a vehicle for protest and satire, and not as a "business venture."

16      **Plaintiff's Response:**

17      Defendants' objection should be rejected for the same reasons discussed *supra* ¶
18 7(a); specifically:  (1) the record shows that Defendants intended to profit from
19 infringement, (2) the record shows that Defendants' commercial infringement was not
20 protected "art," and (3) Defendants did not take steps to limit confusion.

21      Additionally, as described below, Defendants' objection should be rejected
22 because (1) Defendants' attempt to refute this evidence by undermining Mr. Lehman's
23 sworn declaration is unavailing, (2) the majority of the RR/BAYC NFTs were not sold
24 on rrbayc.com, and (3) Defendants' cherry-picked communications with alleged
25 customers to not negate the confusion in the marketplace.

26      **Mr. Lehman's Declaration Is Reliable And Contradicts Defendants:**  Yuga
27 Labs has demonstrated that Mr. Lehman's declaration is truthful and reliable.  Mr.

28

1  Lehman testified that he spent several days drafting the declaration prior to signing it
2  and had the advice of his counsel.  Lehman Depo. Designations (Dkt. 404-2) at 240:3-
3  9.  Mr. Lehman further testified that he toiled to make sure that everything included in
4  his declaration was truthful and adequately supported by documentary evidence.
5  Lehman Depo. Designations (Dkt. 404-2) at 241:21-24.  And regardless of whether
6  Mr. Lehman negotiated his declaration with Yuga Labs, Mr. Lehman testified in his
7  deposition that his declaration is truthful and reliable.  Lehman Depo. Designations
8  (Dkt. 404-2) at 124:5-9; *see also* Dkt. 209-1 at 5-9 (explaining why documents
9  produced by Mr. Lehman and his deposition testimony confirm the truthfulness of his
10 declaration).  Mr. Lehman's declaration was also corroborated by the consent
11 judgment entered against him in the Northern District of New York.  *See* JTX-621.
12 Defendants' continued attempts to discredit Mr. Lehman's declaration fall flat.

13 **rrbayc.com Is Not Where Defendants' Sold The Majority Of Their NFTs:**
14 rrbayc.com ***is not*** where "more than 80% of sales for which Defendants made revenue
15 occurred."  Defendants have no support for this figure; even Mr. Ripps' own
16 declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred
17 on" that website.  Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added).  Contrary to Mr.
18 Ripps' claims, NFTs reserved on that website were actually minted and sold through
19 the confusing Foundation page that used the BAYC Marks.  Ripps Depo.
20 Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" /
21 "A. Well, technically, all of them were because it was a Foundation contract, so...").

22 **Defendants' Third-Party, Unreliable Communications Do Not Negate The**
23 **Court's Findings Or Yuga Labs' Experts' Opinions:**  As discussed further *supra*
24 ¶ 7(d) (lines 3:20-23), Defendants' cherry-picked communications from a self-
25 selecting group are far from a comprehensive survey of consumer confusion in the
26 market.  Defendants have no evidence supporting a claim that a statistically significant
27 number of consumers were not confused.  Indeed, the hundreds of refunds they

28

provided at consumers' requests suggest that some purchasers were confused. And, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

**Defendants' Reply:**

Yuga's response fails to adequately address Defendants' objections and the trial evidence that supports Defendants' objections. For reasons provided in *supra* ¶ 4 (both in Defendants' objections and Defendants' reply in support of their objections), the evidence showed RR/BAYC was not a "business venture" and in fact the term was misleadingly coined by Yuga's counsel. Defendants' reply in *supra* ¶ 4 similarly explains that (1) Defendants intent was to create a satire that protests Yuga, (2) that Mr. Ripps is a recognized artist and that the RR/BAYC collection is yet another artwork Mr. Ripps created, and (3) Defendants took many steps to limit confusion.

Yuga's additional responses similarly fail to give adequate grounds to reject Defendants' objection because (1) Mr. Lehmann's coerced declaration is not reliabile, (2) more than 80% of RR/BAYC NFTs were sold on rrbayc.com, and (3) Defendants received hundreds of letters from actual consumers confirming that they understood the satirical nature of RR/BAYC and wanted to participate in protesting Yuga.

*First,* Mr. Lehman's declaration is not reliable. Yuga cites to the declaration to suggest that Defendants considered the RR/BAYC collection to be a "business venture." Defendants never used the term "business venture" to describe the RR/BAYC project. In fact, the only place where the term appears is in Mr. Lehman's declaration, which was a document drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family. Yuga's attorneys, not the Defendants, coined the term "business venture." As demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that Yuga's counsel drafted the declaration and selected the phrase "business venture,"

and without having considered that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-22; [Solano] 40:3-14.

Mr. Lehman's declaration is also unreliable because it was signed under coercion.  Specifically, Yuga and Mr. Solano relied on the declaration despite the fact that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).

**Second,** over 80% of commissions for RR/BAYC NFTs occurred on rrbayc.com, which has never sold BAYC NFTs at any time.  Ripps Decl. Dkt. 346 ¶ 110 (uncontested).  The fact that over 80% of sales occurred on rrbayc.com is substantially corroborated by Yuga's own expert who admits that ***7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract***, ***which was only available and usable through rrbayc.com***.  Kindler Decl. ¶¶ 36 (Dkt. 338).   Yuga expert also admits that the ***RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)***.  Kindler Decl. ¶ 40 (Dkt. 338).  To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs ***before the RSVP contract was ever implemented***, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract alone.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states

1. that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).  Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits.

***Third,*** the communications from RR/BAYC NFT collection rebuts all of Yuga's false accusations of profits arising from confusion or infringement. Yuga falsely states that these are "cherry-picked communications."  Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.  Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.

Further, Yuga's reliance on experts to make false accusations are not credible.  Yuga's citation to Ms. Kindler's declaration does not support their allegations that Defendants provided "hundreds of refunds" or that those alleged refunds indicate confusion.  *See* Kindler Decl. ¶ 44 (Dkt. 338) ("When calculating Defendants' profits, transactions that were refunded through Defendants' RSVP smart contract were omitted. Specifically, transactions that were refunded through the RefundIssued and

1  RSVPCanceled functions in the RSVP smart contract were not included in my
2  calculation of profits. To my knowledge, Defendants have not produced any records
3  of other refunds related to the sale of RR/BAYC NFTs."). Mr. Ripps never received a
4  refund request from anyone stating they were confused or thought that they were
5  reserving a Yuga product. Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

6       And Ms. O'Laughlin's survey evidence is unreliable. Ms. O'Laughlin
7  conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin
8  acknowledged that she used an overly expansive definition of the market that included
9  people who did not have any interest in purchasing an NFT, much less knowledge of
10 what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification
11 flow); 152:4-10. She acknowledged that she changed the survey population after
12 running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also
13 acknowledged that she lacked basic knowledge about the NFT market, admitting to
14 erroneously believing that cryptocurrency was an NFT when she formulated her
15 surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an
16 inherently flawed survey that could not show confusion because the market was too
17 broad. This was despite her acknowledgement that choosing the right sample
18 population "matters for the analysis" and choosing an improper sample population
19 would be a mistake. *Id.* at 146:18-25.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28