Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| Yuga Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ryder Ripps, Jeremy Cahen, <br><br> Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **Defendants' Objections to Disputed Finding of Fact No. 11(d), lines 20-21** <br><br> Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Finding of Fact No. 11(d), lines 20-21:**

But for the transfer of the RR/BAYC smart contract, Yuga Labs would be entitled to $106,055 as disgorgement.

**Defendants' Basis of Dispute:**

First, this $106,055 figure is not profit, but includes the theoretical value of NFTs that either Mr. Ripps and Mr. Cahen hold but have not sold or, more egregiously, that Mr. Ripps and Mr. Cahen have never actually minted.  *See* Kindler Decl. ¶ 51, 54, 56 (Dkt. 338). It is improper to include in a determination of the profits for disgorgement an estimated value of theoretical sales and theoretical NFTs that do not exist.

Second, in the course of Ms. Kindler's calculation of the value of these NFTs, she uses the floor price for RR/BAYC NFTs based on the secondary markets for them on January 27, 2023.  Kindler Decl. ¶ 54 (Dkt. 338).  Ms. Kindler opines that the floor price at that time was 0.115 ETH.  *Id.*  As the trial testimony indicated, however, the floor price for RR/BAYC NFTs has gone down and the floor price on June 7, 2023 was only 0.07 ETH.  JTX-1624, Dkt. 287-1, Trial Tr. [Kindler] 182:11-13.  Despite this considerable decrease in value, Ms. Kindler testified that she did not update her calculation to reflect the new floor price. Trial Tr. [Kindler] 198:2-12.  It is inaccurate and outdated, therefore, to state that the value of these theoretical NFTs is $106,055.

Third, disgorgement is inappropriate here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate."  *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).

1   Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc.*
2   *v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July
3   29, 2022).  Disgorgement is, therefore, not an available remedy here because – as the
4   evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious
5   wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen
6   Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29,
7   353-354; JTX-803.0003-05, 08, 29-30.

8       Disgorgement is also unavailable here because Yuga has not shown "the
9   absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469,
10  478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and
11  offered expert testimony in support of legal remedies (including a claim for actual
12  damages that its expert was able to quantify), which it then voluntarily relinquished.
13  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler]
14  172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies,
15  Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C
16  92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough
17  Plaintiff has waived the right to collect damages, this does not render the claim purely
18  equitable because, as discussed above, this is a statutory claim.  Again, because the
19  statutes provide adequate remedies, a purely equitable claim may not be
20  maintained.").

21      Even if disgorgement were available here, Yuga would only be entitled to
22  disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic
23  Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by*
24  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).
25  This requires distinguishing between revenue from collectors who reserved
26  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about
27  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

28

believed they were purchasing Yuga NFTs.  *See id.*  Here, the $106,055 that Yuga

seeks in disgorgement is related to RR/BAYC NFTs that either Mr. Ripps and Mr.

Cahen hold themselves or ones that do not yet exist.  Mr. Ripps and Mr. Cahen

obviously did not reserve the RR/BAYC NFTs they hold mistakenly believing they

were sponsored by Yuga.  *See* Trial Tr. [Kindler] 198:13-17 ("Q As the creator of the

NFTs, Mr. Ripps was certainly not confused about the source of those NFTs; correct?

A I would hope not. Q And neither was Mr. Cahen; correct? A I would agree.").

Accordingly, this $106,055 cannot be considered profits attributable to infringement

that would appropriately be disgorged.

Finally, the evidence Yuga cited is misleading.  Ms. Kindler testified if Yuga

receives an injunction preventing Mr. Ripps and Mr. Cahen from minting any new

RR/BAYC NFTs or selling the ones they currently hold, Yuga is not entitled to the

estimated value of these NFTs in disgorgement.  Trial Tr. [Kindler] 198:18-25 ("Q

Now, if the Court orders an injunction prohibiting minting of any new RR/BAYC

NFTs, the value of the unminted NFTs is zero; correct? A I don't know that -- maybe.

I would agree with you that it would not need to be included in an unjust enrichment

monetary compensation to Yuga. Q Yuga doesn't get to double-dip; right? A Yes.

Absolutely.").  Even if the Court limits its order to preventing the creation or sale of

RR/BAYC NFTs, this figure should be considered outside what Yuga can seek in

disgorgement.

### **Plaintiff's Response:**

The value of the NFTs Defendants that have yet to sell or mint is a profit that

should be disgorged, unless the issue is resolved by an appropriate injunction.  *Supra*

¶ 11(d).  The fluctuation in floor price of Defendants' infringing NFT collection does

not make Ms. Kindler's valuation unreasonable.  *Id.*  Alternatively, even if

Defendants' argument to exclude these quantifiable benefits from their profits

calculation was correct, the Lanham Act authorizes the Court to modify the award to

Yuga Labs upward to account for shortfalls such as this. *See also* 15 U.S.C. § 1117(a) (authorizing Court to "find that the amount of the recovery based on profits is [] inadequate" and "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").

Defendants' additional objections should also be rejected because (1) disgorgement is available as a remedy in this case, (2) Defendants' profits derived from their infringing NFTs are indeed attributable to their infringement, and (3) though it is not required to obtain disgorgement of Defendants' profits from their infringing NFTs, there is ample evidence of confusion in the record.

**Yuga Labs Is Entitled to Disgorgement as a Remedy:** This case arises out of the Lanham Act, which expressly provides for damages ***and*** disgorgement of Defendants' profits. "The Lanham Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's profits." *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some circumstances in addition to defendant's profits."). Accordingly, the Lanham Act allows for three distinct remedies—(1) defendants' profits, (2) plaintiffs' damages, and (3) the costs of the action. 15 U.S.C. § 1117(a). These remedies are not stated in the disjunctive, and each are separately available under the statute. Moreover, the model jury instructions make clear that actual damages and disgorgement are available in the same case: "*In addition to actual damages*, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence." Manual of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added). Because the Court has found Defendants liable for intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to Defendants' profits from their infringing acts. Defendants are not allowed to retain the fruits of

unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Additionally, disgorgement is expressly provided as a remedy for false designation of origin under the Lanham Act, regardless of willfulness. 15 U.S.C. § 1117(a) (a plaintiff is entitled to recover a "defendant's profits" for "a violation under section 1125(a)," in contrast to "a willful violation under section 1125(c)"). Indeed, as the Court has already observed, Defendants are incorrect to argue that intent is required for the Court to order disgorgement of their profits. June 9, 2023 Pretrial Conference Tr. at 33:12-16 ("But with respect to the remaining issues that we're going to be trying in this case, the defendants' profits, there is no willfulness requirement for the defendants' profits. It's an equitable remedy. It is a disgorgement. This is my view.").

**Defendants' Profits Are All Attributable To Their Infringement:**
Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC NFT. The smart contract underlying each of Defendants' infringing NFTs is immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC," which is replicated on the Etherscan token tracker and anywhere that systems pull information directly from the blockchain. Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific use of the BAYC brand as the NFT Collection's smart contract name and symbol"). Additionally, some of the NFTs that were offered for sale were reserved through the infringing rrbayc.com domain. Kindler Decl. (Dkt. 338) ¶ 61. So again, Defendants were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC NFTs. More still, "other RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-

670).  Defendants also "used the BAYC Marks to sell and promote their own product."  SJ Order (Dkt. 255) at 18.  And finally, "[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market."  Kindler Decl. (Dkt. 338) ¶ 61.  All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga Labs' BAYC Marks.  Defendants are not allowed to retain the fruits of unauthorized trademark use.  *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement."  *Id.* at 1076.  The RR/BAYC NFTs are infringing goods that Defendants created and placed into interstate commerce—the Court has already determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at 10-13—and so profits derived from the sale of those goods resulted from Defendants' infringement.  There is no requirement for Yuga Labs to go beyond that and prove that every dollar was attributable to instances of "actual confusion," which is not even a required element of an infringement case.  SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

In sum, profits from the sales of Defendants' infringing NFTs, each of which Defendants admit used the BAYC Marks, are necessarily attributable to Defendants' infringement of the BAYC Marks.  In fact, Defendants admit Yuga Labs' portion of the proposed finding of fact in ¶ 7(c) that "Each of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks".

**There Is Ample Evidence Of Confusion In The Record:**  Defendants' argument that consumers were not confused by their infringement is unavailing.  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-

1   801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035;

2   Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76;

3   Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl.

4   (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs'

5   Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants

6   were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people

7   "making mistakes with apes is already a huge meme" and "Remember the 'average

8   joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs'

9   survey evidence demonstrated significant confusion among consumers who

10   incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-

11   721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.

12   Defendants do not offer any admissible or credible evidence to rebut the evidence that

13   consumers believed, or were likely to believe, RR/BAYC was affiliated with or

14   sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale

15   confusion.

16        There is a clear likelihood of confusion as well, given Defendants' use of the

17   same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at

18   10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.

19   2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

20   ever find their way into the appellate reports' because liability is 'open and shut.'")

21   (citation omitted).  In any event, actual confusion is not required; and the Court

22   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)

23   at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity

24   regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*

25   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's

26   profits even where infringement claims premised solely on post-sale confusion where

27   a "potential purchaser, knowing that the public is likely to be confused or deceived by

28

1 the allegedly infringing product, [] choose[s] to purchase that product instead of a

2 genuine one").

3 **<u>Defendants' Reply:</u>**

4 Yuga's response is unsupported and inaccurate.  First, *see supra* ¶ 11(d) for a

5 fulsome discussion of why the value of RR/BAYC NFTs that do not exist or have not

6 been sold should not be considered profits.  Additionally, see that section for a

7 complete explanation of how the floor price Ms. Kindler uses for her calculations of

8 the value of those RR/BAYC NFTs is outdated and over-estimates the possible profit

9 the sale of these theoretical NFTs could make.

10 Second, the section of the Lanham Act that Yuga cites to for support for its

11 argument that the court should consider an upward modification of a profit calculation

12 is inapplicable here and misleading.  As the full portion of Section 1117(a) states "[i]f

13 the court shall find that the amount of the recovery based on profits is either

14 inadequate *or excessive* the court may in its discretion enter judgment for such sum as

15 the court shall find to be just, ***according to the circumstances of the case. Such sum***

16 in either of the above circumstances ***shall constitute compensation and not a***

17 ***penalty***." 15 U.S.C. § 1117(a) (emphasis added).  Here, the circumstances of the case

18 support a finding that any recovery of profits beyond those Mr. Ripps and Mr. Cahen

19 received would be excessive.  For example, the evidence shows that the intent of the

20 RR/BAYC project was to criticize Yuga's problematic imagery and educate

21 consumers about the nature of NFTs—the exact opposite of confusing consumers.

22 Cahen Decl. ¶¶ 97-98, 133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346)

23 (uncontested); JTX-2033.  Mr. Ripps has had a long and successful career as an artist,

24 during which he has created numerous satirical art projects spotlighting problematic

25 societal issues.  Ripps Decl. ¶¶ 15-26 (Dkt. 346) (uncontested).

26 Defendants also took multiple steps to make clear that the RR/BAYC collection

27 was not related to Yuga in any way.  For example, the rrbayc.com website—through

28

1  which the majority of RR/BAYC commissions occurred and the vast majority of

2  alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

3  144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

4  Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

5  Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

6  rrbayc.com website were also required to read and click through a disclaimer

7  acknowledging the artistic purpose of the project before they were allowed to

8  commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

9  2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and

10  additional steps so that the artistic purpose of the work would be clear to participants.

11  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement

12  ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted

13  it and so he had the final call.").

14      Defendants' online discussion, which consisted of nearly the entirety of

15  Defendants' public activities associated with RR/BAYC, confirms their intent.  In

16  those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be

17  inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

18  that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

19  Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

20      The evidence at trial also shows that Yuga's public activities amounted to

21  authorization of RR/BAYC collection and the numerous other collections that use the

22  asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC

23  project, there were more than 9,000 other third-party projects using Yuga's marks.

24  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345);

25  JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC

26  project, Yuga had not taken steps to stop these third-party projects from using Yuga's

27  marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).

28

There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22. For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks. *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Given these circumstances, if the court finds that disgorgement is appropriate, the court should not find disgorgement of Mr. Ripps and Mr. Cahen's profits to be inadequate and require additional disgorgement of profits the evidence shows went to Mr. Hickman and Mr. Lehman.  Such a decision would go beyond compensation and veer into punishment, impermissible under the statute.

Third, as stated fully in the objection to this finding of fact, disgorgement is not an available remedy here and the sources Yuga cites to in response are unsupportive. Firstly, Yuga citations to portions of the Lanham Act and model jury instructions that indicate disgorgement generally is an available remedy for infringement does not undermine Defendants' objection that it is not an available remedy here as Yuga has not shown "the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962)*.  Legal remedies were available in this case.  Yuga expressly asserted and offered expert testimony in support of legal remedies (including a claim for actual damages that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having

abandoned available legal remedies, Yuga cannot obtain disgorgement.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994)* ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Additionally, Yuga improperly responds by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014)* ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)* (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support for intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Also, Yuga's citations to the Lanham Act and the Court's statements at a pre-trial conference miss the mark.  Even if willfulness is not a requirement for disgorgement, that does not change that Courts have held an analysis of the infringer's mental state is crucial.  An infringer's mental state is a "highly important

consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022). Disgorgement is, therefore, not an available remedy here because – as the evidence showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See* Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Fourth, Yuga incorrectly outlines what is required for profit to be considered attributable to the infringing activity. It is not enough for a sale to be "traceable" to the use of Yuga's marks. Yuga is only entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a BAYC mark is attributable to the infringing activity. "If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942). This fundamental principle clearly prevents Yuga from receiving profits that were made for reasons beyond the appeal of its symbol, namely the profits attributable to those who reserved an RR/BAYC NFT as a protest against Yuga or to support Mr. Ripps and his renowned reputation as a conceptual artist. *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

The record in this case is clear that *many* sales of RR/BAYC NFTs were not the result of confusion, but genuine protest.  Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating that they purchased the NFTs not because they were confused, but because they genuinely wanted to protest Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Although Ms. Kindler could not deny that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases was unnecessary since *subsequent* purchasers may have been confused (an assertion for which she offered no evidence).  But that explanation makes little sense, and certainly does not justify her failure to apportion. To the contrary, in the hypothetical scenario where an initial purchaser *was not* confused and a subsequent purchaser was, a proper damages analysis would apportion out the profits accrued from the original sale and only count the profits from the sale that was attributable to confusion.  *See Mishawaka Rubber*, 316 U.S. at 206.

Further, Yuga's citations are unsupportive.  Specifically, the smart contract clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga.  *See* JTX-1146.   Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.* Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer. Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

Fifth, there is ample evidence in the record that shows that there was no confusion and Yuga's response is not based in fact. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC

commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Third, the evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split

into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive.  For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT.  This evidence provides no support for an argument that this finding of fact is inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the

1    users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-

2    1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to

3    believe purchased an RR/BAYC NFT, replying to GemBot).

4    Yuga also cites to private chats that the RR/BAYC creators used.  These

5    exhibits are unsupportive of a finding that there was actual confusion.  For example,

6    JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

7    marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

8    suggestions about what they could do to make it even more clear.  Further, this chat

9    focused on the creation of ApeMarket, which never was launched and could,

10   therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

11   (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

12   ApeMarket clearer).

13   Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

14   exhibit does not support a finding of actual confusion.  The chart separately lists both

15   "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

16   understood that these were two different projects.  Additionally, as Mr. Cahen

17   testified, he is not aware of anyone who watched the Bloomberg program and reserved

18   an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

19   344).

20   Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

21   credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

22   case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

23   case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

24   entered after Mr. Lehman settled his own case with Yuga.

25   Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

26   LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

27   Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support

28

a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Thirdly, Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Fourthly, Yuga's response is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

Fifthly, Yuga, again, incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  As outlined earlier, the "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based

1  on incomplete information, don't bind district judges for the remainder of the case.

2  Given the nature of such motions, it could not be otherwise.").  Here, the summary

3  judgment ruling on likelihood of confusion only applies to the issue of infringement

4  and is not adequate support for a determination of how to apportion disgorgement of

5  profits attributable to infringement.

6          Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

7  profits, which is something Defendants argue they are not, as outlined above, Yuga

8  can only receive profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic*

9  *Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by

10  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).

11  This requires distinguishing between revenue from collectors who reserved

12  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

13  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

14  believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was

15  no evidence presented that a single purchase of RR/BAYC NFTs was made by

16  someone thinking it was sponsored by Yuga.

17          Yuga's citations to *Gucci* are inapplicable here, given the evidence shows

18  consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps

19  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

20  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not

21  support a finding that these reservations were made so that the buyer could then

22  confuse someone else in secondary sales.  Also, as mentioned above, there is no

23  evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary

24  sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

25  Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

26  [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen]

27  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

28

1   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

2   what you were focused on. Yuga Labs has been unable to identify even[] a single

3   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

4   right? A Correct.").  Finally, the portion of profits attributable to secondary sales of

5   RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.

6   418-1 at 6.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28