Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
 HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
 HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>                    Plaintiff,<br><br>         v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>                    Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 12, lines 6:24-25**<br><br>Judge:  Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Finding of Fact No. 12, lines 6:24-25:**

<u>All of Defendants' profits result from their infringing activity because each RR/BAYC NFT used the BAYC Marks</u>. Dkts. 338 ¶61 ("these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks"); 342 ¶36; 392 at 188:15-25, 203:1-17.

**Defendants' Basis of Dispute:**

Yuga has failed to show that any portion of the profits Mr. Ripps and Mr. Cahen received from the RR/BAYC project are attributable to the infringing activity. As the evidence presented at trial showed, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Conversely, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest *against* Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given the evidence, Yuga has not shown that they are entitled to any portion of profit from the RR/BAYC project as there was no profit made that was attributable to the infringing activity.

1       Additionally, evidence at trial showed that Yuga does not own the alleged BAYC Marks. Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights. Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt. 345); JTX 2672; JTX 2673. That transfer of rights was made, in part, pursuant to the BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs. We can agree on that; right? A. Yes. That is covered in the terms.").

      Further, Yuga does not own the asserted marks because NFTs are not eligible for trademark protection. The Supreme Court has held that trademarks are limited to "tangible goods that are offered for sale, and not the author of any idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003). Misrepresentation of the origins of a ***communicative*** work is a dispute relegated to the confines of copyright law, not trademark. *Id*. at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims based on origin of hologram, as it is "likened to a cartoon animation"). Here, the "goods" for which Yuga claims trademark rights are NFTs, which are comparable to certificates of authenticity/ownership and are not digital goods in themselves. Trial Tr. [Atalay] 127:9-16.

      Also, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Additionally, the website for the project used the modified "RR/BAYC" throughout. *Id*.

1         Finally, the evidence Yuga cites to does not support this finding of fact.  Yuga
2  cites to Ms. Kindler's declaration and trial testimony where she includes conclusory
3  statements that she believes the profits she calculated are traceable to Mr. Ripps and
4  Mr. Cahen's use of Yuga's marks.  But, as described above, the evidence shows that
5  Yuga does not own the alleged BAYC marks and Mr. Ripps and Mr. Cahen used
6  modified versions of the alleged BAYC Marks.  Further, Ms. Kindler's opinion does
7  not include any apportionment to determine what profits were attributable to
8  infringement.  Trial Tr. [Kindler] 189:16-25.
9         Yuga also cites to Mr. Solano's declaration, Dkt. 342, which includes an
10  inaccurate statement that Mr. Ripps and Mr. Cahen used the alleged BAYC Marks in
11  every reservation of RR/BAYC NFTs.  Again, as outlined above, the evidence shows
12  that Yuga does not own the alleged BAYC marks and Mr. Ripps and Mr. Cahen used
13  modified versions of the alleged BAYC Marks.  Mr. Solano also lacks credibility as a
14  result of his repeated impeachment at trial.  Solano Decl. (Dkt. 342); Trial Tr.
15  [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was
16  created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your
17  deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you
18  swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your
19  deposition -- and we can pull it up on the screen -- at page 152, starting at line 13
20  'QUESTION:  Was the Bored Ape V3 created by Ryder Ripps?' There's an objection
21  from your counsel. 'ANSWER:  I don't know.' Was that your testimony at your
22  deposition? A Yes." ); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists?
23  A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your
24  deposition at page 116, lines 5 through 6. 'QUESTION:  Do you know whether Ape
25  Market exists? 'ANSWER:  I don't recall.' Were you asked that question, and did you
26  give that answer? A Yes.").
27         **Plaintiff's Response:**
28

1  Defendants' objection should be rejected because (1) Defendants' profits derived from their infringing NFTs are indeed attributable to their infringement, (2) the record shows (and Defendants admit) that Defendants used the BAYC Marks in each RR/BAYC NFT, and (3) Defendants' additional arguments that Yuga Labs does not own the BAYC Marks and regarding actual confusion are meritless.

**Defendants' Profits Are All Attributable To Their Infringement:** Defendants' pervasive use of the BAYC Marks related to every sale of RR/BAYC NFT.  The smart contract underlying each of Defendants' infringing NFTs is immutably titled "Bored Ape Yacht Club" and given a contract symbol "BAYC," which is replicated on the Etherscan token tracker and anywhere that systems pull information directly from the blockchain.  Kindler Decl. (Dkt. 338) ¶ 61; Atalay Decl. (Dkt. 337) ¶ 4; *see also* Solano Decl. (Dkt. 342) ¶¶ 46-47 (explaining that Defendants caused websites such as Etherscan to "prominently display[] the token as 'Bored Ape Yacht Club'" due to "the way Mr. Ripps created the infringing NFTs and his specific use of the BAYC brand as the NFT Collection's smart contract name and symbol"). Additionally, some of the NFTs that were offered for sale were reserved through the infringing rrbayc.com domain.  Kindler Decl. (Dkt. 338) ¶ 61.  So again, Defendants were using Yuga Labs' BAYC Marks in the marketing of the infringing RR/BAYC NFTs.  "[O]ther RR/BAYC NFTs were sold on marketplaces such as OpenSea and Foundation, which used the BAYC Marks." *Id.* (citing JTX-29; JTX-670). Defendants also "used the BAYC Marks to sell and promote their own product." SJ Order at 18.  And finally, "[t]he NFTs held by Defendants or not yet minted derive their value from being part of the broader RR/BAYC NFT collection, the value of which has accrued through the sale and promotion of RR/BAYC NFTs that are already in the market." Kindler Decl. (Dkt. 338) ¶ 61.  All profits Defendants derived from their RR/BAYC NFTs were ill-gotten from their willful infringement of Yuga Labs' BAYC Marks.  Defendants are not allowed to retain the fruits of unauthorized

1  trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement." *Id.* at 1076. The RR/BAYC NFTs are infringing goods that Defendants created and placed into interstate commerce—the Court has already determined that these goods are likely to confuse consumers, SJ Order (Dkt. 225) at 10-13—and so profits derived from the sale of those goods resulted from Defendants' infringement. There is no requirement for Yuga Labs to go beyond that and prove that every dollar was attributable to instances of "actual confusion," which is not even a required element of an infringement case. SJ Order (Dkt. 225) at 10 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

Ms. Kindler's testimony to this effect is not "conclusory," as Defendants state. She explained all of these considerations in her trial declaration, assessing NFTs "reserved on Mr. Ripps' website, rrbayc.com"; "sold on marketplaces such as OpenSea and Foundation"; sold "without the use of either rrbayc.com or an NFT marketplace"; and "held by Defendants or not yet minted." Kindler Decl. (Dkt. 338) ¶ 61. Indeed, Ms. Kindler testified at trial when asked why she did not apportion less than all of Defendants' profits to their infringement: "I don't think that would be appropriate because they all were sold using the infringing marks. And in the first instance, even if there's not confusion because people might believe or agree with the premise under which the tokens are being sold, that doesn't mean in the second and third and fourth instance that there isn't confusion occurring in the marketplace." Trial Tr. at 189:4-10. This opinion is further supported by the consumer surveys conducted by Ms. O'Laughlin, which demonstrate a substantial likelihood of confusion on secondary marketplaces. O'Laughlin Decl. (Dkt. 341) . Defendants provided no affirmative or rebuttal expert to rebut any of this testimony.

1  **Defendants' Infringing NFTs All Used BAYC Marks:** Defendants have no good-faith basis to dispute this fact, where they admit Yuga Labs' proposed finding of fact that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." *Supra* ¶ 7(c) (underlined blue). And, as discussed *supra* ¶ 7(b), their argument contradicts the Court's prior holding, and it is incorrect based on the trial record. The fact that Defendants sometimes used "modified" BAYC Marks instead of the exact marks does not change this fact or undo the likelihood of confusion they caused.

**Defendants' Additional Arguments Are Meritless:** Defendants also reassert objections that Yuga Labs does not own the BAYC Marks and that their infringement did not cause actual confusion. These arguments have no merit.

The Court has already held, and Defendants have already stipulated, that Yuga Labs owns the BAYC Marks. *See supra* ¶ 1. There is no good-faith basis for Defendants to dispute this or to reargue that Yuga Labs granted Defendants a license to infringe. *Id.*

As to confusion, as discussed above, Yuga Labs is entitled to disgorgement of profits that are derived "from the infringement," *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015)—not only from discrete, provable instances of actual confusion as Defendants seem to propose. Even so, the record contains ample evidence of actual confusion and likelihood of confusion, notwithstanding Defendants' arguments to the contrary and efforts to relitigate these issues. *Supra* ¶ 4.

**Defendants' Reply:**

First, Defendants' profits from the RR/BAYC Project are not attributable to the infringement. Yuga incorrectly outlines what is required for profit to be considered attributable to the infringing activity. It is not enough for a sale to be "traceable" to the use of Yuga's marks. Yuga is only entitled to disgorgement of profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a BAYC mark is attributable to the infringing activity. "If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol" then they cannot be disgorged as "[t]he plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942). This fundamental principle clearly prevents Yuga from receiving profits that were made for reasons beyond the appeal of its symbol, namely the profits attributable to those who reserved an RR/BAYC NFT as a protest against Yuga or to support Mr. Ripps and his renowned reputation as a conceptual artist. *See* Ripps Decl. ¶ 21 (Dkt. 346) (uncontested); JTX-2333.

The record in this case is clear that *many* sales of RR/BAYC NFTs were not the result of confusion, but genuine protest. Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating that they purchased the NFTs not because they were confused, but because they genuinely wanted to protest Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599. Although Ms. Kindler could not deny that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases was unnecessary since *subsequent* purchasers may have been confused (an assertion for which she offered no evidence). But that explanation makes little sense, and certainly does not justify her failure to apportion. To the contrary, in the hypothetical scenario where an initial purchaser *was not* confused and a subsequent purchaser was, a proper damages analysis would apportion out the profits accrued from the original

1  sale and only count the profits from the sale that was attributable to confusion. *See Mishawaka Rubber*, 316 U.S. at 206.

3  Further, Yuga's citations are unsupportive. Specifically, the smart contract clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga. *See* JTX-1146. Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.* Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer. Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).

Second, there is ample evidence in the record that shows that there was no confusion and Yuga's response is not based in fact. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

1        Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

         Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

         In turn, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*. at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

1  Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id*. at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not

1  fundamentally flawed, she can attest to confusion on two websites for only a matter of
2  days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court
3  should reject them and provide them no weight.

4      Further, this unreliable survey evidence, again does not show that anyone who
5  actually reserved an RR/BAYC NFT was confused about its origin and, therefore,
6  does not undermine the accuracy of this finding of fact.

7      Yuga also argues that Defendants did use the BAYC Marks, but their arguments
8  fail. As discussed above, Mr. Ripps and Mr. Cahen used modified versions of the
9  alleged BAYC Marks in their reservations. For example, the logo used states "This
10 Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085. Also, the website for
11 the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

12     Further, evidence at trial showed that Yuga does not own the alleged BAYC
13 Marks. Yuga gave away all intellectual property rights associated with the Bored Ape
14 Yacht Club. Yuga's CEO Nicole Muniz had publicly represented that BAYC NFT
15 holders received all IP rights and that Yuga has none of those rights. Trial Tr.
16 [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt.
17 345); JTX 2672; JTX 2673. That transfer of rights was made, in part, pursuant to the
18 BAYC Terms & Conditions, which Mr. Solano drafted with the intent to allow people
19 to commercialize their NFTs. Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the
20 terms and conditions was to allow people to be able to commercialize their NFTs. We
21 can agree on that; right? A. Yes. That is covered in the terms.").

22     As a result, at the time of the RR/BAYC project, there were more than 9,000
23 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346)
24 (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244. There were
25 hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht
26 Club Brand on the NFT marketplace OpenSea. Trial Tr. [Muniz] 77:19-23; [Muniz]
27 78:7-21; [Muniz] 80:3-13. And, as Yuga's CEO admitted, there are "literally
28

1  thousands" of products that use Yuga trademarks without sponsorship or affiliation
2  with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks
3  with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal
4  brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that
5  use Yuga's trademarks.  *See, e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.
6      Also, Yuga does not own the asserted marks because NFTs are not eligible for
7  trademark protection.  The Supreme Court has held that trademarks are limited to
8  "tangible goods that are offered for sale, and not the author of any idea, concept, or
9  communication embodied in those goods."  *Dastar Corp. v. Twentieth Century Fox
10  Film Corp.*, 539 U.S. 23, 37 (2003).  Misrepresentation of the origins of a
11  *communicative* work is a dispute relegated to the confines of copyright law, not
12  trademark.  *Id.* at 33-35; *see also Pulse Entm't Corp. v. David*, No. 2:14-cv-04732-
13  SVW-MRW, Dkt. 19 at 4 (C.D. Cal. Sept. 17, 2014) (*Dastar* bars trademark claims
14  based on origin of hologram, as it is "likened to a cartoon animation").  Here, the
15  "goods" for which Yuga claims trademark rights are NFTs, which are comparable to
16  certificates of authenticity/ownership and are not digital goods in themselves.  Trial
17  Tr. [Atalay] 127:9-16.
18      Additionally, Yuga incorrectly relies on the law of the case doctrine by stating
19  Defendants' position goes against the Court's holding.  The "law of the case doctrine
20  does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v.
21  Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v.
22  Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on
23  incomplete information, don't bind district judges for the remainder of the case.
24  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze
25  v Kutz*, the Court held that although *aspects* of an issue were decided at summary
26  judgment for one purpose, the summary judgment order did resolve the issue
27  generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184
28

at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to the issue of infringement and is not adequate support for a determination of the validity of the BAYC Marks and what profits are attributable to infringement.

Finally, Defendants hotly contested the issues of the BAYC Marks at Summary Judgment. Defendants showed that it was reasonable for parties to believe that Yuga surrendered its rights to world and therefore did not own the marks.  Trial Tr. [Solano] 24:11-25; [Muniz] 72:3-73:17.  As discussed above this directly implicates intent, including whether Defendants reasonably believed they could use the marks which is still relevant for damages.  Further, Defendants reserve the right to appeal factual findings made at summary judgment and will not risk losing any right to appeal.