Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>              Plaintiff,<br><br>   v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>              Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 19, lines 8:25, 8:27-9:1**<br><br>Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Finding of Fact No. 19, lines 8:25, 8:27-9:1:**

Further demonstrating confusion, Laura O'Laughlin, an expert in designing, administering, and analyzing consumer surveys, conducted two unrebutted surveys with results showing confusion of the BAYC Marks used in connection with RR/BAYC NFTs at net rates of 40.4% on Foundation and 20.0% on OpenSea, respectively. JTX-721 ¶¶16, 47, 73; Dkt. 341 (O'Laughlin Decl.) ¶¶13.ac, 16, 47, 48, 73, 81, 82 (admitted into evidence in Dkt. 392 at 140:9-141:13).

**Defendants' Basis of Dispute:**

In support of this finding of fact, Yuga points to Ms. O'Laughlin's reports and designations. As demonstrated at trial, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her

1  acknowledgement that choosing the right sample population "matters for the analysis"
2  and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

3      Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020
4  she authored an article titled, "Which Method is For You? Not All Surveys Are Made
5  the Same" JTX-314. In that article she discusses choosing *between* the Squirt and
6  Eveready surveys on the basis of the strength of the mark. In this case, however, she
7  ignored her own advice and operated both surveys. This was despite acknowledging
8  that at deposition she agreed with her earlier advice that the Eveready survey is most
9  appropriate when the mark is strong, and the Squirt survey when the mark is weak.
10 Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of
11 the mark. *Id.* 144:12-18. This broke with her prior practice as well, as it was the first
12 case she personally testified in where she offered an opinion based on both surveys.
13 *Id.* 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not
14 doing so she did not produce a finding of value on either survey.

15     Ms. O'Laughlin also could not explain the extremely strong priming effect
16 which influenced her results to her Everready survey. In that survey, people were split
17 into those who saw a version of the RR/BAYC Foundation page that included the
18 words "Bored Ape Yacht Club." Those in the control group of the experience would
19 see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote
20 the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those
21 in the control group who copied down the words "Chill Gorilla Boat Crew" were not
22 counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of
23 those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not
24 counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that
25 she did not account for this extreme priming effect calling it "not particularly
26 relevant". *Id.* at 158:20-159:1.

27
28

Case No. 2:22-cv-04355-JFW-JEM      -2-      DEFENDANTS' OBJECTIONS

    Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

<b><u>Plaintiff's Response:</u></b>

    Defendants' efforts to undermine Ms. O'Laughlin's findings and expert testimony – which are unrebutted by any affirmative or rebuttal expert of their own – lack merit.  The Court has already determined that Ms. O'Laughlin's testimony and the findings in her expert report are "relevant, reliable, and admissible."  Trial Tr. at 141:3-5.  Defendants' arguments to the contrary fail.

    **Survey Participants:**  Defendants' contention that Ms. O'Laughlin selected an overbroad target population is meritless, as is their argument that this renders her findings unreliable.  The survey audience for both surveys consisted of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.  The latter categories of participants were included to account for consumers who may be "in market for digital art or digital collectibles" without having specifically considered NFTs in the past.  Trial Tr. at 148:4-9.  Indeed, as the Court has found, some potential consumers were not necessarily blockchain-savvy NFT purchasers.  SJ Order (Dkt. 225) at 12-13.  Ms. O'Laughlin accordingly determined that "consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace."  Trial Tr. at 148:15-18.  *See also* Berger Report at 5 n.2 (observing

1  "NFTs have mostly been associated with digital items such as artwork, images, or
2  videos"); SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible*
3  *Tokens as Digital Goods Under the Lanham Act*, 63 IDEA: L. Rev. Franklin Pierce
4  Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that
5  exist in a digital space, they are also items that have specific uses and values that are
6  dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-
7  JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) (cleaned up) ("Individuals do
8  not purchase NFTs to own a 'digital deed' divorced from any other asset: they buy
9  them precisely so that they can exclusively own the content associated with the
10 NFT.").

11 When Defendants and their partners previously agreed that their use of Yuga
12 Labs' marks could be "too confusing to the 'average joe'", who they were targeting,
13 JTX-801.196, Defendants cannot now credibly argue that the "average joe" who may
14 be interested in NFTs as digital collectibles or art should be excluded from the survey
15 population.

16 **Choice of Survey Formats:** The Court considered Defendants' argument and
17 rejected it. Trial Tr. at 141:3–5. Their position remains meritless.

18 Though Defendants complain that Ms. O'Laughlin "used two different surveys
19 that are appropriate for different uses," that is exactly the approach called for where—
20 as here—two different marketplaces are being tested for likelihood of confusion.
21 There is no principle dictating that the same survey format must be used in every
22 circumstance, regardless of context in which the marks appear. *See* Trial Tr. at
23 142:18-23 ("Q And it is important to be able to identify the right survey methodology
24 for the matter at hand; correct?" / "A I would generally agree with that. However, it's
25 possible that one or many methodologies may be appropriate for a particular matter.
26 So it's not a one or none. It could be a one, many, or none.").

27
28

Ms. O'Laughlin surveyed two different contexts in which Defendants misappropriated the BAYC Marks. She used accepted principles in choosing which survey methodology to use in each context. On the Foundation marketplace where the parties' NFT collections were not sold at the same time, she used an Eveready survey, which presents participants with only the junior mark. O'Laughlin Decl. (Dkt. 341) ¶ 17; *see also id.* ¶ 17 n.6 ("In Eveready format surveys involving forward confusion, respondents are presented with only the allegedly infringing mark and asked open-ended questions to assess confusion."). On the OpenSea marketplace, where the parties NFT collections were sold at the same time, she used a Squirt survey, which presents participants with both the junior and the senior mark. *Id.* ¶ 18; *see also* ¶ 18 n.7 ("In Squirt format surveys involving forward confusion, respondents are presented with both parties' marks and asked closed-ended questions to assess confusion."). There is nothing inconsistent about using the appropriate survey in the appropriate context to best replicate market conditions.

Accordingly, Courts regularly credit survey expert testimony that employs both Eveready and Squirt survey formats in the same litigation. *See, e.g.*, *Icleen Entwicklungs-Und Vertiebsanstalt Für Umweltprodukte v. Blueair AB*, No. 21-cv-2236 DSF (ADS), 2021 WL 6104397, at *8-9 (C.D. Cal. Oct. 4, 2021) (crediting testimony relying on both Eveready and Squirt formats in ruling on a preliminary injunction); *Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 977 (D. Minn. 2017) (same); *GoSMiLE, Inc. v. Levine*, 769 F. Supp. 2d 630, 642-43 (S.D.N.Y. 2011) (same).

Though strength of the marks is one factor that can guide the choice of survey methodology, it is not determinative as Defendants suggest. *See, e.g.*, Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 737 (2016) ("Where, in sum, marks are not *proximate*, an Eveready is likely the only format available; and even as to proximate marks, an Eveready may always be offered

(possibly in response to complaint allegations of trademark strength) in conjunction with a Squirt to negate the reach capabilities of a brand.") (footnote omitted). Defendants' argument that Ms. O'Laughlin should have based her choice of methodology on strength of the marks alone contradicts established principles.

**Calculation of Confusion Rate:** The operative questions in calculating the net confusion rate in Ms. O'Laughlin's Foundation/Eveready survey were "Who or what entity do you believe puts out the NFT collection you saw?" and "What other entity or entities do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever puts out the NFT collection you saw?" O'Laughlin Decl. (Dkt. 341) ¶¶ 45-46. Defendants aver, without any authority or expert testimony, that Ms. O'Laughlin's Foundation/Eveready survey was "unreliable" and "biased" because she only considered respondents who identified the source of Defendants' Foundation webpage as "Bored Ape Yacht Club" to be confused and did not count those who mentioned "Chill Gorilla Boat Crew." This argument has no merit and demonstrates a fundamental misunderstanding of the purpose of a control in an Eveready survey. *See* Trial Tr. at 156:16-157:14.

Ms. O'Laughlin's Foundation/Eveready survey employs a test/control experimental design where respondents are randomly assigned to one of two groups and exposed to stimuli that are identical but for the at-issue characteristic(s) being tested. Ms. O'Laughlin compared the share of respondents who associate the Defendants' Foundation webpage with "Bored Ape Yacht Club," when shown the page *as it actually appeared in the real world* with the at-issue BAYC Marks (BAYC test group), versus when shown a modified page that used an alternative to the at-issue BAYC Marks (CGBC control group). By comparing the share of respondents who believe that the source of the Foundation page collection is "Bored Ape Yacht Club" in both the test and control groups, Ms. O'Laughlin was able to measure the rate of confusion attributable specifically to Defendants' actual use of the BAYC Marks.

1	Ms. O'Laughlin's Eveready survey and analysis are not methodologically
2	flawed. Consistent with standard Eveready survey practice, Ms. O'Laughlin's
3	analysis counts mentions of the "Bored Ape Yacht Club" in both the test and control
4	groups, but does not count mentions of "Chill Gorilla Boat Crew" in the control group
5	when calculating net confusion. This is consistent with the approach taken by other
6	leading trademark survey experts in Eveready survey analysis for forward confusion
7	cases. *See* JTX-1122 at 210-11. All other characteristics of the stimuli, including the
8	alternative mark in the control group, are not at issue and therefore are not considered
9	when calculating confusion. Accordingly, it would be nonsensical to count
10	respondents who mention Chill Gorilla Boat Crew as confused.
11	Moreover, Defendants argue that respondents in the test group "merely copied
12	text from the images that they were shown," after seeing the Defendants' Foundation
13	webpage, and essentially complain that the survey is biased because the prominence
14	of the BAYC Marks in the stimuli would lead anyone to believe the Foundation
15	webpage is associated with the "Bored Ape Yacht Club" or "BAYC" NFT collection.
16	The complaint though is of the Defendants' own making. The stimuli used in Ms.
17	O'Laughlin's Foundation/Eveready survey reflects the Defendants' explicit and
18	blatant infringement found on their own Foundation webpage ***as it actually appeared***
19	***in the real world***, which simply demonstrates the egregious and deceptive nature of
20	Defendants' use of the BAYC Marks. *See* JTX 28; JTX 1557.
21	Indeed, the fact that many survey respondents associated Defendants'
22	Foundation webpage with "Bored Ape Yacht Club" and the modified control version
23	of the webpage with "Chill Gorilla Boat Crew" highlights how respondents (and
24	consumers more broadly) rely on collection names and logos to communicate the
25	source of an NFT collection. The Court has already found that "the BAYC Marks are
26	both conceptually and commercially strong," SJ Order (Dkt. 225) at 10-11, and they
27
28

accordingly serve as a designation of origin to actual and prospective consumers as they did in Ms. O'Laughlin's surveys.

Finally, Ms. O'Laughlin's survey specimens reflected Defendants' marketing when they promoted themselves as the top selling NFT collection, and at a time when even Bloomberg was confused as to whether Defendants' infringing NFTs were indeed a Bored Ape Yacht Club collection. This period is also when Defendants claim the majority of their sales occurred. The survey reflects the main secondary marketplace for Defendants' NFTs during their most significant promotional period.

**Defendants' Reply:**

Yuga conflates the fact that Ms. O'Laughlin's testimony was admitted to argue that it should be given weight. However, the Court noted "counsel will have an opportunity to fully expose any limitations or flaws during cross-examination." Trial Tr. 141:8-10. Admission, of an expert's testimony, of course, has nothing to do with weight. It is also black letter law that an expert's testimony can be exposed as unreliable through cross examination alone. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Shaky but admissible evidence is to be attacked by **cross examination**") (emphasis added). Yuga's rule requiring a rebuttal expert is unfounded and would increase the cost of litigation far beyond what can be reasonably expected of most litigants.

Yuga attempts to defend its selection of survey participants who may not even know what an NFT is. We agree with Yuga that the survey flow includes "individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "*(iii) have purchased digital art as a collectible in the past year,*" or "*(iv) are considering doing so in the next year.*" O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69. Yuga's citations to people conflating digital art with purchasing an NFT do not assist it. While it is true that perhaps some consumers do not buy it as a "digital deed" divorced

from the art, one must be aware of what you are purchasing. Ms. O'Laughlin, who admittedly did not know what an NFT was at the time she conducted the survey as she was unaware that it was not cryptocurrency, never asked the digital art respondents if they were aware of NFTs. Trial Tr. [O'Laughlin] 152:11-14; 147:12-14 (erroneously admitting that cryptocurrency was an NFT). To the extent Yuga is trying to rehabilitate its flawed survey population through Ms. O'Laughlin's expertise on NFTs, she admittedly is not one and lacked even below basic knowledge on NFTs at the time she conducted her research. *Id.* at 147:4-12. Yuga also states that Defendants are wrongly arguing to exclude "average Joes" who might be interested in buying NFTs. That is not what Defendants argue at all. If the survey was limited to the average NFT consumer, then the survey population would possibly be adequate. It however swept further and included people who likely have no interest in NFTs or even knowledge about what an NFT is. Lastly, Yuga never addresses that Ms. O'Laughlin admittedly broadened the survey population to include the non-interested persons *after* her team accessed the results. *Id.* 144:25-146:7

Ms. O'Laughlin's use of two different marks was also exposed on cross examination as being incorrect and is contrary to her prior practice and writings. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark. Ms. O'Laughlin's consistent position has been that mark strength is the most important factor for choosing surveys. *Id.* at 143:6-144:6. Ms. O'Laughlin further admitted that she had never presented two surveys in one case, thus breaking from her prior practice. Trial Tr. [O'Laughlin] 144:19-23.

Yuga's citation to authority to support Ms. O'Laughlin's decision to run two contradictory surveys does not help it. All of those citations implicate preliminary injunctions, not trials on the merits. Further, they do not address the fundamental

issue which is that Ms. O'Laughlin consistently has represented that strength matters for the survey selection. *See* Trial Tr. [O'Laughlin] 143:6-144:1. Instead, here she decided not to even investigate strength and just present to surveys. *See id.* at 144:12-18.

Yuga's defense of the confusion rate it calculated misapprehends the basic problem. The survey did not show those how actually were confused at all. In fact, only two out of 505 respondents even mentioned Yuga Labs. *See* Trial Tr. [O'Laughlin] 155:18-156:1. All the survey showed was that people know how to read. "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion. *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) (holding that survey had limited weight as a reading test). Ms. O'Laughlin makes the sweeping claim that there was an extensive amount of confusion based on her Eveready survey because 49% of test group respondents were confused. *See* JTX-310 at Figure 9. Of these, almost all of them wrote the screen prompt exactly. In the control group, 27% of test group respondents wrote "Chill Gorilla Boat Crew"—the on-screen stimulus, and were not counted as confused. *See* Trial Tr. [O'Laughlin] 157: 9-14. Notably, Ms. O'Laughlin was not able to provide an explanation for writing "Chill Gorilla Boat Crew" besides rank copying. *Id.* at 157:25-158:7 (calling fact that people simply copied on screen stimuli "not surprising"). It is undisputed that Ms. O'Laughlin did nothing to control for people merely copying on-screen stimuli which likely comprised about 2/3 of the test group's "confusion" answers if the test and control groups were similar. It is also impossible to untangle which of the survey respondents who were counted as confused were merely copying the screen, and which were actually confused. As such, the result should be disregarded as whole.

Lastly, Yuga appears to concede that Ms. O'Laughlin's survey specimens are limited in time by arguing that it covers the biggest promotional period for

Defendants. Ms. O'Laughlin's opinions are therefore limited to June 19 and June 20, 2022 for the Squirt survey. Trial Tr. [O'Laughlin] 165:1-11; 15:22. They are likewise limited to June 21-24. *Id*. at 163:11-164:17.