Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ryder Ripps, Jeremy Cahen, <br><br> Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **Defendants' Objections to Disputed Finding of Fact No. 23** <br><br> Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

### Plaintiff's Disputed Post Trial Finding of Fact No. 23:

The RR/BAYC smart contract is immutable and will use Yuga Labs' BORED APE YACHT CLUB and BAYC marks in perpetuity, which will continue to cause consumer confusion, unless, at a minimum, Yuga Labs obtains control of the contract. JTX-722 ¶71; JTX-1146; *see also* JTX-1249; Dkts. 337 ¶¶2-6; 342 ¶80; 392 at 133:24-134:20.

### Defendants' Basis of Dispute:

The evidence at trial showed that the RR/BAYC smart contract is not causing any confusion. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales or secondary sales. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). To the contrary, the correspondence expressed gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Indeed, neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19. Yuga Labs itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct."). Mr. Solano, Yuga's President, similarly could not identify a single person

that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  Given Defendants public discussions, steps taken to clarify the origin and purpose of the RR/BAYC collection, and the fact that there was not even a single confused consumer confirms that there was no likelihood of consumer confusion and no actual consumer confusion.

Further, Yuga cites no evidence that retaining control of the smart contract would in any way remediate the non-existent confusion that it alleges.  As Yuga alleges, the RR/BAYC smart contract is immutable, which remains true regardless of who possesses the smart contract.  The NFT community will always associate RR/BAYC with a conceptual artwork created by Ryder Ripps and the smart contract will always demonstrate this fact regardless of which digital address the smart contract resides.  Thus, Yuga "obtaining control" of the smart contract would accomplish nothing because, as Yuga admits, the smart contract is immutable.

**Plaintiff's Response:**

Defendants' objection should be rejected because (1) the record shows ample evidence of actual confusion, and (2) Defendants' cherry-picked communications with purported purchasers do not rebut Yuga Labs' experts' findings.

**There Is Ample Evidence of Confusion in the Record:**  Defendants' argument that consumers were not confused by their infringement is unavailing.  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people

1 "making mistakes with apes is already a huge meme" and "Remember the 'average
2 joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs'
3 survey evidence demonstrated significant confusion among consumers who
4 incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-
5 721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.
6 Defendants do not offer any admissible or credible evidence to rebut the evidence that
7 consumers believed, or were likely to believe, RR/BAYC was affiliated with or
8 sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale
9 confusion.

10    There is a clear likelihood of confusion as well, given Defendants' use of the
11 same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at
12 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir.
13 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly
14 ever find their way into the appellate reports' because liability is 'open and shut.'")
15 (citation omitted).  In any event, actual confusion is not required; and the Court
16 already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)
17 at 12.  The Court "easily conclude[d]" that Defendants' use of identical marks, on
18 identical products, in identical markets supported a finding of a likelihood of
19 confusion.  *Id.* at 10-13.  Yuga Labs is thus entitled to Defendants' profits due to their
20 infringing activity regardless of whether purchasers were actually confused.  *See*
21 *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012)
22 (granting defendant's profits even where infringement claims premised solely on post-
23 sale confusion where a "potential purchaser, knowing that the public is likely to be
24 confused or deceived by the allegedly infringing product, [] choose[s] to purchase that
25 product instead of a genuine one").

26    **Defendants' Anecdotal Evidence Of Individuals Stating They Support
27 Defendants' Infringement Are Irrelevant And Immaterial:** A handbag
28

counterfeiter may have allies or distributors, and those allies / distributors may even profess to believe in a cause, but that does not excuse the counterfeiter's wrongdoing or mitigate the likelihood of confusion in the marketplace. *See* SJ Order (Dkt. 225) at 16 ("Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."). And Defendants do nothing to rebut the likelihood of post-sale confusion. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.

Defendants' objection admits what Mr. Hickman's testimony says: when designing the forthcoming Ape Market to sell their infringing NFTs alongside authentic BAYC NFTs, Defendants knew affirmative "friction step[s]" would be required to prevent the obvious risk of confusion. As Mr. Hickman told Mr. Cahen, "[t]hey are the same art." Trial Tr. at 212:17-24. Thus, Defendants and their partners worried over how to "make it as clear as possible" the two were different. *Id.* This is because selling the same products under the same marks is confusing. And yet, Defendants' continued ahead without any changes in their sales and promotion of the RR/BAYC NFTs.

It is undisputed that Mr. Ripps created the RR/BAYC smart contract, and that the marks "Bored Ape Yacht Club" and "BAYC" are immutably coded into the smart contract. Every RR/BAYC NFT to ever exist will refer to this smart contract and thus the BAYC Marks. The infringement is inseparable from the product. To remedy this irreparable harm, Yuga Labs should be given control of the smart contract for these

1 | infringing NFTs and regain "the ability to exclusively control its BAYC brand."
2 | Muniz Decl. (Dkt. 340) ¶ 22.

**Defendants' Reply:**

Yuga's response fails to address the fact that the evidence does not show that the RR/BAYC smart contract will not forever be associated as a product originating from Yuga. Ignoring the pertinent issue that Defendants' raise in their objection, instead (1) disregards the significant evidence in the record showing there was no actual confusion and (2) ignore that Defendants received hundreds of letters from actual RR/BAYC NFT purchaser confirming that they were not confused.

*First,* there is ample evidence that there was *no* consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

1  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
2  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.
3       As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a
4  single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial
5  Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,
6  Yuga's founders were also not aware of a single instance of actual confusion.  Trial
7  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,
8  what you were focused on. Yuga Labs has been unable to identify even[] a single
9  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;
10 right? A Correct.").
11      The evidence Yuga cites to is not supportive of a finding that there was
12 consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.
13 O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two
14 flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that
15 she used an overly expansive definition of the market that included people who did
16 not have any interest in purchasing an NFT, much less knowledge of what an NFT is.
17 Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.
18 She acknowledged that she changed the survey population after running pretests to
19 make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that
20 she lacked basic knowledge about the NFT market, admitting to erroneously believing
21 that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id*.
22 at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey
23 that could not show confusion because the market was too broad.  This was despite
24 her acknowledgement that choosing the right sample population "matters for the
25 analysis" and choosing an improper sample population would be a mistake.  *Id.* at
26 146:18-25.
27
28

      Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id*. at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys. *Id.* at 144:19-24. Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

      Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey. In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club." Those in the control group of the experience would see the words "Chill Gorilla Boat Crew." Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant." *Id.* at 158:20-159:1.

      Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, to the extent that her survey is not

1. fundamentally flawed, she can attest to confusion on two websites for only a matter of days. *Id.* Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

Secondly, the documentary evidence Yuga cites to is unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344). The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. This evidence provides no support for an argument that this finding of fact is inaccurate, therefore. *See also* JTX-1030, JTX-1032 (Tweets where the users are quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-1035 (Out of context one off tweets of users, that there is no evidence to believe purchased an RR/BAYC NFT, replying to GemBot).

Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion. Mr. Cahen responds and provides suggestions about what they could do to make it even more clear. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Yuga also states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

1  This is categorically false.  The evidence presented at trial shows that many people
2  who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl.
3  ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590,
4  JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence
5  presented at trial that showed consumers were not confused about the source of the
6  RR/BAYC NFTs.

7  Yuga's argument is inaccurate given Defendants used modified versions of the
8  alleged BAYC Marks in their reservations.  For example, the logo used states "This
9  Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for
10  the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

11  Yuga also incorrectly relies on the law of the case doctrine by citing to this
12  Court's summary judgment order.  The "law of the case doctrine does not apply to
13  pretrial rulings ***such as motions for summary judgment***."  Shouse v. Ljunggren, 792
14  F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d
15  1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information,
16  don't bind district judges for the remainder of the case.  Given the nature of such
17  motions, it could not be otherwise.").  For example, in Sienze v Kutz, the Court held
18  that although ***aspects*** of an issue were decided at summary judgment for one purpose,
19  the summary judgment order did resolve the issue generally or as to other topics.  *See*
20  No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019)
21  (holding that evidence of initial police contact was relevant as background, but not to
22  the already decided issue that initial contact was not excessive force).  This case is just
23  like *Sienze*: the summary judgment ruling on likelihood of confusion only applies to
24  the issue of infringement and is not adequate support for a determination of how to
25  apportion disgorgement of profits attributable to infringement.

26  Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's
27  profits, which is something Defendants argue they are not, Yuga can only receive
28

1  profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982
2  F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun
3  Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). This requires
4  distinguishing between revenue from collectors who reserved RR/BAYC NFTS as a
5  protest against Yuga (and were thus not confused about Defendants' use of Yuga's
6  marks) and revenue from purchasers who mistakenly believed they were purchasing
7  Yuga NFTs. *See id.* And as outlined above, there was no evidence presented that a
8  single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored
9  by Yuga.

10  Yuga's citations to *Gucci* are inapplicable here, given the evidence shows
11  consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps
12  Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
13  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not
14  support a finding that these reservations were made so that the buyer could then
15  confuse someone else in secondary sales. Also, as mentioned above, there is no
16  evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary
17  sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);
18  Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.
19  [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen]
20  265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial
21  Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,
22  what you were focused on. Yuga Labs has been unable to identify even[] a single
23  person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;
24  right? A Correct."). Finally, the portion of profits attributable to secondary sales of
25  RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.
26  418-1 at 6.

*Second,* Yuga effectively admits that there is no evidence of actual confused consumers and tries to explain away this gaping hole in their evidence by arguing that the world is hiding evidence of actual confusion from Yuga because it would be "super embarrassing" to admit being confused. Not only does this response lack merit, but it is also an admission that there is insufficient evidence in the record to support a finding that any sales were a result of actual confusion.

And Defendants' evidence from actual consumers of RR/BAYC NFTs is sweeping, involving hundreds of actual consumers admitting that they were not confused and supported Defendants' protest. Mr. Ripps testified in his declaration: "I received ***hundreds of letters*** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received. Ripps Decl. ¶¶ 196-207 (uncontested) (emphasis added). At no point during trial did Yuga dispute this fact. Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue. Thus, the uncontested evidence at trial shows that Mr. Ripps received hundreds of letters from RR/BAYC participants expressing support for the project and its criticism.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested). Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.