Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **Defendants' Objections to Disputed Conclusion of Law No. 33, Lines 12:1** |
| v. | Judge: Hon. John F. Walter |
| Ryder Ripps, Jeremy Cahen, | |
| Defendants. | |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

### Plaintiff's Disputed Post Trial Conclusion of Law No. 33, line 12:1:

Defendants acted with intent to deceive consumers.[3] *See* SJ Order at 12; *see supra* Section II.B.

### Defendants' Basis of Dispute:

Mr. Ripps and Mr. Cahen did not act with intent to deceive consumers. Mr. Ripps and Mr. Cahen took steps to make clear to collectors and to the public that RR/BAYC was intended as a protest art project. Ripps Decl. ¶¶ 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 145-155 (Dkt. 344); Dkt. 197-1 ¶ 230. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.

Further, collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the

1  artist statement ultimately included, if it had a negative impact on usability? … A. …

2  Ryder wanted it and so he had the final call.").

3          Additionally, Mr. Ripps and Mr. Cahen's online discussion of the RR/BAYC

4  project confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen

5  discussed what they believed to be inappropriate messaging in Yuga's imagery and

6  how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶

7  148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-

8  1 ¶¶ 203-04.  Accordingly, this conclusion of law is unfounded based on the evidence

9  presented at trial.

10          Yuga Labs also fails to cite to adequate evidentiary support.  Yuga incorrectly

11  relies on the law of the case doctrine by citing to this Court's summary judgment

12  order.  The "law of the case doctrine does not apply to pretrial rulings ***such as***

13  ***motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir.

14  1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir.

15  2014) ("Pretrial rulings, often based on incomplete information, don't bind district

16  judges for the remainder of the case.  Given the nature of such motions, it could not be

17  otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of

18  an issue were decided at summary judgment for one purpose, the summary judgment

19  order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-

20  AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence

21  of initial police contact was relevant as background, but not to the already decided

22  issue that initial contact was not excessive force).  This case is just like *Sienze*:  the

23  summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged

24  marks applies to only the issue of likelihood of confusion and cannot be applied more

25  broadly.

26          **Plaintiff's Response:**

27

28

1    Defendants' objection should be rejected because (1) the Court has already

2  found that Defendants intended to deceive consumers; (2) the evidence shows that

3  Defendants intended to confuse consumers; (3) Defendants knew their infringement

4  would result in confusion; (4) the record shows ample actual confusion and likelihood

5  of confusion; (5) Defendants intended to profit off this confusion; (6) Defendants did

6  not take steps to avoid confusion; (7) Defendants' "disclaimer" did not dispel

7  likelihood of confusion; and (8) most RR/BAYC NFTs were sold on secondary

8  marketplaces without a disclaimer.

9    **The Court Has Already Adjudicated This Issue In Its Summary Judgment**

10 **Order (Dkt. 225)**:  In that order, the Court held that Yuga Labs owns its BAYC

11 Marks, that NFTs are goods for the purpose of the Lanham Act, that Yuga Labs used

12 those marks in commerce, and that Yuga Labs has not abandoned its marks.  *Id*. at 6-

13 10.  The Court also held that "Defendants have admitted that they intentionally used

14 the BAYC Marks in their RR/BAYC NFTs."  *Id*. at 11.  The Court "easily

15 conclude[d]" that Defendants' use of identical marks, on identical products, in

16 identical markets supported a finding of a likelihood of confusion.  *Id*. at 10-13.  That

17 order establishes the matters adjudicated therein for purposes of this case.  Fed. R.

18 Civ. P. 56(g) (district courts partially adjudicating case on a summary judgment

19 motion may "enter an order stating any material fact — including an item of damages

20 or other relief — that is not genuinely in dispute and treating the fact as established in

21 the case"); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Ready Pac Foods,*

22 *Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011); *Singh v. George Washington Univ.*

23 *Sch. Of Med. & Health Scis.*, 508 F.3d 1097, 1106 (D.C. Cir. 2007) ("Facts found on

24 partial summary judgment are taken as established at trial.").

25    Defendants did not move the Court to reconsider its holdings.  Nevertheless,

26 Defendants refuse to accept the Court's order, unnecessarily burdening the Court and

27 Yuga Labs by attempting to relitigate these issues at trial and in post-trial filings as if

28

1   the Court's order does not exist.  Defendants' tactics are inconsistent with the very

2   purpose of a partial summary judgment order, which is "intended to avoid a useless

3   trial of facts and issues over which there was really never any controversy and which

4   would tend to confuse and complicate a lawsuit." *Peliculas Y Videos Internacionales,*

5   *S.A. de C.V. v. Harriscope of Los Angeles, Inc.*, 302 F. Supp. 2d 1131, 1133 (C.D.

6   Cal. 2004) (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.1981))

7   (emphasis added).  Defendants' authorities do not support their position.  *See Sienze v*

8   *Kutz*, No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25,

9   2019) ("evidence concerning issues resolved at summary judgment is ***generally not***

10  ***relevant and should be excluded***" at trial) (emphasis added); *Shouse v. Ljunggren,*

11  *792 F.2d 902, 904 (9th Cir. 1986)* (discussing applicability of the law of the case

12  doctrine where a case is assigned to a new judge).

13      "The partial summary judgment is merely a pretrial adjudication that certain

14  issues shall be deemed established for the trial of the case and likewise serves the

15  purpose of speeding up litigation by eliminating before trial matters wherein there is

16  no genuine issue of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 n.9 (9th Cir.

17  2009) (alteration and citation omitted).  Defendants' repeated attempts to ignore or

18  undo the Court's Order "speeding up litigation" is a dilatory and abusive litigation

19  tactic that has unjustifiably increased the cost of resolving this case.

20      Nevertheless, Defendants forced the Court and the parties to re-litigate this

21  decided issue.  As discussed below, the evidence the Court can consider following the

22  trial amply supports this factual finding.  Thus, the outcome on this issue after trial is

23  no different than it was after Yuga Labs' Motion for Summary Judgment.

24  Defendants' objection should be rejected because the evidence shows that Defendants

25  intended to confuse consumers.

26      **Defendants Intended To Confuse Consumers:**  Defendants' private

27  communications show they knew they were using the BAYC Marks in a way that was

28

1   likely to confuse consumers and did so with the intent to profit from their

2   infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see*

3   *also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too

4   man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of

5   money tbh"; "Potentially a lot").  And despite being urged to use different images or

6   overlay some commentary on the images they did use to avoid confusion, Defendants

7   chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or

8   something like Getty images" because "it's just insane to have the same art"); JTX-

9   801.196 (Mr. Lehman demonstrating what an overlay might look like and

10  recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

11  showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

12  showing screenshot of Ape Market).  They also discussed that they knew they were

13  infringing and creating confusion, as they acted contrary to their attorneys' advice.

14  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull

15  / If we want to fight trademark").  Instead of making changes, such as those

16  recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs'

17  BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. ¶ 70; *see also*

18  Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands,

19  every choice is intentional.").

20      Defendants also knew that what they were doing was likely to lead to a lawsuit.

21  For instance, Mr. Ripps asked for a reference to his limited liability company,

22  Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued

23  personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and

24  branding direction in light of the trademark thing" to Mr. Cahen before they learned of

25  this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get

26  sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now

27  with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which

28

Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs' marks to minimize the confusion and their infringement.

Privately, Defendants also discussed strategies to "cannibalize" the secondary NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at getting engagement on twitter." *Id.*  Defendants brainstormed about needing some "controversy," "art press," "law stuff," "some unexpected event," or "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

Publicly, Defendants made false representations about the RR/BAYC NFTs that implied owning one offered equivalent benefits to owning a genuine BAYC NFT. JTX-1037.  Defendants published their promotions from their individual Twitter accounts and from the commercial @ApeMarketplace account advertising their forthcoming NFT marketplace.  These advertisements were also directed at BAYC NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶ 46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have on Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications, Defendants revealed their true intent to profit from the infringing use of Yuga Labs' BAYC Marks.

**There Is Ample Evidence That Defendants Knew They Were Confusing Consumers:**  Defendants knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of money tbh"; "Potentially a lot").  And despite being urged to use different images or

1   overlay some commentary on the images they did use to avoid confusion, Defendants

2   chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or

3   something like Getty images" because "it's just insane to have the same art"); JTX-

4   801.196 (Mr. Lehman demonstrating what an overlay might look like and

5   recommending not to "in the marketing show screenshots like the ones [Mr. Hickman]

6   showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet

7   showing screenshot of Ape Market). Instead, they continued with their infringement,

8   knowing that they were creating confusion. JTX-801.185 (Mr. Lehman writing,

9   "overall I think we should be very careful about doing this in terms of the confusion it

10  will create"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult

11  to make the collections coexist" because "they are the same art" and "same logos");

12  JTX-801.279 (Mr. Lehman referring to potential customers as "SHEEPLE" and

13  writing, "Ppl will not read the contract"); JTX-801.376 (Mr. Lehman wrote that the

14  RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name.");

15  JTX-631 (third party informing Mr. Lehman that RR/BAYC was "quite crazy

16  definitely some people will buy thinking they are buying originals!"); JTX-44.00002

17  (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is

18  where they get confused"); Hickman Depo. Designations (Dkt. 394) at 143:15-144:16

19  (testifying "Bored Ape Yacht Club" and "BAYC" in the token tracker refers to the

20  Bored Ape Yacht Club made by Yuga Labs); Cahen Depo. Designations (Dkt. 395) at

21  59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the

22  blockchain is complicated. A lot of people don't have the technical expertise or

23  knowledge to be able to have a conversation about crypto technology and blockchain

24  technology."), at 148:10-13 (testifying it is "very common" for people to refer to NFT

25  collections by the token tracker); Dkt. 416 at ¶ 7.

26          They also discussed that they knew they were infringing as they acted contrary

27  to their attorneys' advice. JTX-801.371 (Cahen to Ripps: "per our attorney we may

28

just need to change the skull / If we want to fight trademark"). Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs. Solano Decl. ¶ 70; *see also* Ripps Decl. ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

**The Evidence is Overwhelming That There Was Actual And Likely Confusion:** Finally, Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable"). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly

1   ever find their way into the appellate reports' because liability is 'open and shut.'")
2   (citation omitted).  In any event, actual confusion is not required; and the Court
3   already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225)
4   at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity
5   regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v.*
6   *Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's
7   profits even where infringement claims premised solely on post-sale confusion where
8   a "potential purchaser, knowing that the public is likely to be confused or deceived by
9   the allegedly infringing product, [] choose[s] to purchase that product instead of a
10  genuine one").

11          **Defendants Intended To Profit Off This Confusion:**  While Defendants
12  publicly claim there was an artistic goal (to ensure they "look really sympathetic to
13  people" if caught, in the words of their partner (JTX-918.00036)), their internal
14  communications overwhelmingly focus on a business venture to sell RR/BAYC NFTs
15  and launch Ape Market, their profit motive, and riding on the coattails of the BAYC
16  brand for their own enrichment.  *See, e.g.*, JTX-1 (Lehman Decl.) ¶¶ 10-13
17  (Defendants "expected the Business Venture to make money"); JTX-801.144 ("One
18  thing we can do to stimulate the rsvp completing is to tease apemarket.com"); JTX-
19  801.185 (Mr. Cahen: "Goal:  mint out the remainder of the collection + incentivize
20  people to use the marketplace, specifically the BAYC original side"); *id.* (Mr. Cahen:
21  "More royalties for us . . . More work for sure, but much higher likelihood of
22  generating more royalties and users"); *id.* at 208 (Mr. Cahen:  "we need a very
23  delicious value proposition [] to bring in users . . . but not so low that we I make
24  anything"); *id.* (Mr. Cahen:  "priorities:  getting RRBAYC to sell out by creating
25  demand + getting BAYC and MAYC users to call our marketplace their new home []
26  and collecting royalties at a fraction of what the other big dogs are charging [] which
27  will be considerable passive income if we strike the right balance"); JTX-801.237

28

(Mr. Lehman:  "I'm just concerned about launching something with low prospect for recurring revenue"; Mr. Cahen:  "I agree"); JTX-803 at 66-67; JTX-1574 (Mr. Cahen to Mr. Ripps: "Ur gonna make so much on this shit LMFAO"; "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up"); JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); Hickman Depo. Designations (Dkt. 394) at 238:12-40 (discussing profit motive and desire to charge royalties).  Defendants knew they were stealing from Yuga Labs.

**Defendants Did Not Take Steps To Avoid Confusing Consumers:** Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  Defendants could have attacked Yuga Labs in countless non-infringing ways.  But they did not.  Instead, they used Yuga Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers.  O'Laughlin Decl. (Dkt. 341).

**Defendants' Disclaimer Is Evidence Of Their Culpability:**  With respect to the supposed disclaimer on rrbayc.com, "the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading."  SJ Order (Dkt. 225) at 17.

1    Defendants also knew that what they were doing was likely to lead to a lawsuit.

2    For instance, Mr. Ripps asked for a reference to his limited liability company,

3    Live9000 LLC, to be added to the rrbayc.com because he did not "want to get sued

4    personally."  JTX-803.57; *see also* JTX-918.00036 (Mr. Lehman stating to Mr. Cahen

5    the need to "look really sympathetic to people" if sued).  And, Mr. Lehman was still

6    advocating for a "new logo and branding direction in light of the trademark thing" to

7    Mr. Cahen before they learned of this lawsuit (JTX-918.00035) because "I don't want

8    to get sued, OR, if get do get sued, for us to look really sympathetic to everyone"

9    (JTX-918.0036).  That Defendants took some steps to try to conceal their intent when

10   they were inevitably sued does not make the infringing activity less confusing; it just

11   demonstrates their culpability.

12        Additionally, the public was not required to read and click a disclaimer.

13   Indeed, even on rrbayc.com, Defendants could not enforce any requirement that users

14   "read" what Mr. Hickman and Mr. Lehman referred to as a "wall of text" that they

15   agreed "no one" would read (JTX-801.128).  And, this wall of text did nothing to

16   dispel confusion amongst the general public when every single RR/BAYC NFT sold

17   (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB

18   and BAYC—without any alleged disclaimer.  Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial

19   Tr. at 133:12-134:20; JTX-600; JTX-1146.  Defendants also did not include any

20   similar disclaimer on Foundation or other secondary marketplaces, nor was there one

21   on Etherscan.  The majority of the sales of RR/BAYC NFTs have been on secondary

22   marketplaces where there was no disclaimer.  Kindler Decl. (Dkt. 338) at ¶ 69; JTX-

23   801.376 ($10 million impact).

24        Defendants have no survey, or material consumer evidence, that users of the

25   infringing rrbayc.com website read any disclaimer.  This is not surprising since the

26   vast majority of sales occurred outside of the rrbayc.com website.  Indeed, Mr. Ripps

27

28

admitted that all sales went through Foundation—where there was no disclaimer. (Ripps Deposition Designations) at 82:8-13.

Moreover, every single RR/BAYC NFT sold (or that ever will sell in the future) uses the trademarks BORED APE YACHT CLUB and BAYC. Atalay Decl. (Dkt. 337) at ¶¶ 3-6; Trial Tr. at 133:12-134:20; JTX-600; JTX-1146. Indeed, a user today linking to Etherscan will not see Ryders Ripps' Bored Ape Yacht Club, but will see Bored Ape Yacht Club and will not see RR/BAYC but will see BAYC. Trial Tr. at 52:6-21, 53:14-54:22, 138:6-20; JTX-117; Atalay Decl. ¶¶ 3-6; Solano Decl. ¶¶ 46-47, 78; *Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1078 (9th Cir. 2006) (finding that disclaimers on packaging, but not on infringing product, did "nothing to dispel post-purchase confusion"). Defendants' claimed disclaimer is non-existent to ineffective at best.

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:** Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'"). These secondary markets did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products. These secondary marketplaces are also a prominent source of

confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").  Defendants' contention is therefore incorrect and misleading.In that order, the Court held that Yuga Labs owns

### **Defendants' Reply:**

*First,* the Court has not adjudicated this issue in its summary judgment order.  Yuga incorrectly states that the Court has already decided the issue of Defendants' intent.  In support of this assertion, Yuga incorrectly relies on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*:  the summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged marks applies to only the issue of likelihood of confusion and cannot be applied more broadly.  Here, Defendants' intent is particularly relevant to the determination of whether disgorgement is available and that is an issue that the Court has not decided and needs to weigh the evidence presented at trial on the issue.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  Accordingly, Defendants do not

1    raise that issue to burden the Court's time, as Yuga incorrectly states, but to present

2    evidence on a central issue of the case.  Further, Yuga's assertion that Defendants'

3    objection here constitutes a refusal to accept the Court's orders is inaccurate and

4    misleading.

5         ***Second,*** Defendants did not intend to confuse consumers.  Yuga's argument

6    that Defendants' intended to confuse consumers is baseless.  The evidence at trial

7    showed that Defendants are not intentional infringers and did not intend to suggest

8    that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's

9    contemporaneous communications about the RR/BAYC project confirm that their

10   intent was to use RR/BAYC to criticize rather than to confuse.  For example, in

11   private group chats among participants in the RR/BAYC project (JTX-801, 803-804),

12   Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their

13   intention that it would spread criticism of Yuga, and their intention that social media

14   platforms be used to educate the public about the nature of NFTs and what they saw as

15   Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶

16   131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-

17   803.0003-05, 08, 29-30.

18        Defendants also took multiple steps to make clear that the RR/BAYC collection

19   was not related to Yuga in any way.  For example, the rrbayc.com website—through

20   which the majority of RR/BAYC commissions occurred and the vast majority of

21   alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

22   144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps

23   Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344);

24   Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the

25   rrbayc.com website were also required to read and click through a disclaimer

26   acknowledging the artistic purpose of the project before they were allowed to

27   commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-

28

2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards,

1   cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with

2   Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-

3   2075.

4           Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a

5   holder of a BAYC NFT containing the asserted marks and having received IP rights

6   associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with

7   Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time

8   of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms &

9   Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to

10  allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q.

11  Your intent in writing the terms and conditions was to allow people to be able to

12  commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in

13  the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative

14  with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz had

15  publicly represented that BAYC NFT holders received all IP rights and that Yuga has

16  none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344);

17  Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that

18  someone listening to her public statement about Yuga not having any IP rights would

19  not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

20          The evidence that Yuga cites does not rebut this overwhelming evidence of

21  Defendants' intent to protest and criticize because Yuga relies on mischaracterizing

22  and taking out of context evidence.  For example, Yuga repeatedly cites to various

23  pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged

24  confusion.  But those pages are internal discussion about the design of the ApeMarket

25  website to ensure that users of apemarket.com were not confused by the website

26  design.  Yuga even cross-examined Mr. Hickman about these communications and

27  received the same explanation: "This is our attempt to make it as clear as possible.

28

We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga also cites to correspondence among the creators discussing a possible fear of litigation.  These discussions are taken out of a broader context of hundreds of thousands of communications the creators made.  Further, whether the Defendants feared possible litigation for criticizing a multi-billion dollar company does not establish that they intended confuse anyone.

Additionally, Yuga points to private chat conversations the creators had about Ape Market.  The portions they cite to do not show any intention to confuse and further ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037, in which he states that "RR/BAYC grants to 100% commercial rights, community member created a shopping site for his! Now you can get the hoodie of your dreams." This was a tweet making fun of Yuga's Terms & Conditions, which has caused thousands of third parties to use the Bored Ape Yacht Club and its marks for projects and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-shirts), and this does not demonstrate an intent to confuse consumers.

***Third,*** there is ample evidence that Defendants did not know that any consumers were confused, nor that there was any actual confusion. The evidence presented at trial shows that there was not any actual confusion and that Defendants did not know of any confusion. First, to support this assertion about Defendants'

knowledge of confusion, Yuga cites to documents it argues show that the Defendants intended to make a profit.  Intending to profit from your artwork is not the same thing as intending to confuse consumers and one does not weigh toward the other.

Further, the evidence at trial showed that Defendants were not primarily motivated by profits.  Defendants explained that profits were a concern, but not the primary motive of the project.  Cahen Decl. ¶ 156 (Dkt. 344).  Profits helped offset costs and sustain Defendants' artistic project.  Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344).  The RR/BAYC project allowed for a full refund, for any reason.  Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344).  Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible.  Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Further, the evidence that Yuga cites does not rebut the overwhelming evidence of Defendants' intent to protest and criticize and Yuga instead relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the alleged confusion.  But those pages are internal discussion about the design of the ApeMarket

website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users."  Trial Tr. [Hickman] 212:22-24.

Yuga similarly takes out of context exhibits such as JTX-44.00002 to incorrectly argue that that Defendants were knowingly causing confusion.  In JTX-44.00002, Mr. Hickman stated that "people believe the tokenId should match the RR ID.  that is where they get confused."  This statement is not discussing confusion regarding the source of origin for RR/BAYC NFTs.  Instead, it is discussing how the RR/BAYC collection used a different numbering system that BAYC NFTs, and that consumers expected the numbers match as a shorthand manner of cataloguing the digital pointers contained within the RR/BAYC NFTs.  That is, due to the different numbering system, some consumers were confused as to which RR/BAYC NFT they received but they understood very well that they received an NFT created by Mr. Ripps that protests and criticizes Yuga.

The record clearly shows that Defendants did not know that there were any confused consumers and further there is no evidence presented that anyone was actually confused.  *See* Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

***Fourth,*** the evidence is overwhelming that there was not any actual and likely confusion.  Yuga's response is not based in fact.  First, there is ample evidence that there was ***no*** consumer confusion. Defendants took multiple steps to make clear that

the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was consumer confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314. In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. In this case, however, she ignored her own advice and operated both surveys. This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. All the while, she never discerned the strength of the mark. *Id.* at 144:12-18. This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on

both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

The documentary evidence Yuga cites to is also unsupportive. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users

1  identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no

2  indication that any of the Twitter users commenting actually reserved an RR/BAYC

3  NFT.  This evidence provides no support for an argument that this finding of fact is

4  inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are

5  quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-

6  1035 (Out of context one off tweets of users, that there is no evidence to believe

7  purchased an RR/BAYC NFT, replying to GemBot).

8       Yuga also cites to private chats that the RR/BAYC creators used.  These

9  exhibits are unsupportive of a finding that there was actual confusion.  For example,

10  JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

11  marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

12  suggestions about what they could do to make it even more clear.  Further, this chat

13  focused on the creation of ApeMarket, which never was launched and could,

14  therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

15  (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

16  ApeMarket clearer).

17       Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

18  exhibit does not support a finding of actual confusion.  The chart separately lists both

19  "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

20  understood that these were two different projects.  Additionally, as Mr. Cahen

21  testified, he is not aware of anyone who watched the Bloomberg program and reserved

22  an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt.

23  344).

24       Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

25  credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

26  case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

27

28

case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89. Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Yuga further states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga. This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Yuga's response is also inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

1    Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's

2    profits, which is something Defendants argue they are not, Yuga can only receive

3    profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982

4    *F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc. v. Sun*

5    *Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires

6    distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a

7    protest against Yuga (and were thus not confused about Defendants' use of Yuga's

8    marks) and revenue from purchasers who mistakenly believed they were purchasing

9    Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a

10   single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored

11   by Yuga.

12    Yuga's citations to *Gucci* are inapplicable here, given the evidence shows

13   consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps

14   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

15   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not

16   support a finding that these reservations were made so that the buyer could then

17   confuse someone else in secondary sales.  Also, as mentioned above, there is no

18   evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary

19   sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

20   Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

21   [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen]

22   265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

23   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

24   what you were focused on. Yuga Labs has been unable to identify even[] a single

25   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

26   right? A Correct.").  Finally, the portion of profits attributable to secondary sales of

27

28

RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt. 418-1 at 6.

*Fifth,* Defendants intended to create a protest. Evidence at trial showed that Defendants were not primarily motivated by profits. Defendants explained that profits were a concern, but not the primary motive of the project. Cahen Decl. ¶ 156 (Dkt. 344). Profits helped offset costs and sustain Defendants' artistic project. Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344). The RR/BAYC project allowed for a full refund, for any reason. Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344). Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible. Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Yuga's response here misleading takes out of context communications between the creators and relies on them to imply that the creators' artistic motives were not genuine. This is unfounded. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30. Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent. In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows

1   that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested);

2   Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the

3   voluminous correspondence that Defendants received shows that they did in fact

4   create a "community of educations" as Mr. Ripps intended, who have written letters

5   expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205

6   (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592,

7   JTX-2595, JTX-2596; JTX-2599.

8       ***Sixth,*** Defendants took many steps to avoid confusion.  Yuga's argument that

9   Defendants did not take steps to avoid confusion is baseless. As the evidence

10  presented at trial shows, Defendants took multiple steps to make clear that the

11  RR/BAYC collection was not related to Yuga in any way.  For example, the

12  rrbayc.com website—through which the majority of RR/BAYC commissions occurred

13  and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346)

14  (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic

15  intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl.

16  ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano]

17  63:1-10.  Collectors using the rrbayc.com website were also required to read and click

18  through a disclaimer acknowledging the artistic purpose of the project before they

19  were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346)

20  (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these

21  requirement and additional steps so that the artistic purpose of the work would be

22  clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why

23  was the artist statement ultimately included, if it had a negative impact on usability?

24  … A.   … Ryder wanted it and so he had the final call.").

25      Further, the evidence Yuga cites to is unsupportive. For example, Yuga points

26  to testimony regarding the smart contract for the RR/BAYC NFTs.  But that contract

27

28

---

clearly indicates Mr. Ripps is the creator and allows consumers to easily establish provenance. *See* JTX-1146; Ripps Decl. ¶¶ 88-89.

Again, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants did not take steps to avoid confusion. But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design. Yuga even cross-examined Mr. Hickman about these communications and received the same explanation: "This is our attempt to make it as clear as possible. We are having discussion on how to make sure it was very clear for users." Trial Tr. [Hickman] 212:22-24. Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262 (Dkt. 344).

Finally, Yuga's statements regarding Defendants' use of the alleged marks are misleading. Mr. Ripps and Mr. Cahen made the RR/BAYC Project as a protest against Yuga and it is pretty difficult to criticize someone without saying who they are.

**Seventh,** Defendants' disclaimer is not evidence of culpability. First, Yuga incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184

at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling the Defendants' disclaimer applies only the issue of infringement and is not adequate support on use of a disclaimer generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite.  Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection.  It simply was not possible for Defendants to add a disclaimer on Foundation or Etherscan because they do not control those websites. And, in fact, Mr. Atalay himself has admitted that consumers of NFTs do not use Etherscan's token tracker/token name but instead rely on marketplaces or by checking the associated smart contract address.  Trial Tr. [Atalay] 135:2-25.  Mr. Atalay explained that using token names to distinguish NFTs "would be a fairly weak way to do so because often those things are mutable.  They can be changed after the fact. Also, there's no guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

Further, the smart contract clearly indicates Mr. Ripps is the creator and not Yuga and allows consumers to easily establish provenance, which undermines Yuga's assertions about what consumers see when they review the NFT.  *See* JTX-1146; Ripps Decl. ¶¶ 88-89.  Yuga is also incorrect in stating that every RR/BAYC NFT uses the alleged marks. Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  See JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. Id.

Second, Yuga incorrectly argues that the disclaimer "did nothing to dispel confusion." This is inaccurate and unfounded. As Mr. Ripps's testimony makes clear, the rrbayc.com website "required collectors to acknowledge and accept a disclaimer before they were able to commission an RR/BAYC NFT." Ripps Decl. ¶ 105 (Dkt. 346) (uncontested). Further that disclaimer stated "By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time)." *Id.* at ¶ 106. While it is possible that a consumer chose not to read this disclaimer or the prominent artistic statement included on rrbayc.com, this evidence tends to prove that many did and further shows that Defendants were trying to ensure that no one was confused about the source of their collection. *Id.* at ¶¶ 102, 108. Yuga's assertion that this disclaimer shows the opposite intent is baseless.

Third, Yuga also cites to correspondence among the creators discussing a possible fear of litigation. These discussions are taken out of a broader context of hundreds of thousands of communications the creators made. Further, whether the Defendants feared possible litigation from a multi-billion-dollar company does not establish that they intended confuse anyone.

Fourth, Yuga misstates the meaning of Mr. Ripps's deposition testimony surrounding the use of Foundation. Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation? A. Well, technically, all of them were because

it was a Foundation contract, so..."); Counter designation 82:14-19.  This however is different than the "Foundation page" for Ryder Ripps.  Accordingly, Mr. Ripps was not admitting that all sales went through his Foundation page and his testimony that over 80% of sales by Defendants occurred on rrbayc.com is uncontested. Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

Fifth, while there may have been many sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344). Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully shut off royalties from such sales yet again supports a finding that they did not intend to confuse and were motivated by their protest of Yuga not to profit.

**Eighth,** while there may have been many sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut

1    it off, around $1,000, and some from LooksRare, as that marketplace initially refused

2    to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).

3    Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to

4    the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully

5    shut off royalties from such sales yet again supports a finding that they did not intend

6    to confuse.

7          Second, it is incorrect that there is a likelihood of confusion on the secondary

8    marketplaces, as Yuga alleges.  The evidence presented at trial shows that many

9    people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

10   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-

11   2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

12         Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not

13   aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

14   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

15   Buttressing this fact, Yuga's founders were also not aware of a single instance of

16   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

17   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

18   identify even[] a single person who purchased an RR/BAYC believing it to be

19   sponsored by Yuga Labs; right? A Correct.").

20         Further, the smart contract clearly indicates Mr. Ripps is the creator and not

21   Yuga and allows consumers to easily establish provenance, which undermines Yuga's

22   assertions about what consumers see when they review the NFT.  *See* JTX-1146;

23   Ripps Decl. ¶¶ 88-89.

24         Third, Yuga also incorrectly asserts that Defendants continued to market

25   RR/BAYC NFTs.  For support Yuga cites to Mr. Solano's declaration where he states

26   two marketplaces that sell RR/BAYC NFTs and testimony that the ApeMarket Twitter

27

28

account links to a marketplace.  Neither of those pieces of evidence supports a finding that Mr. Ripps and Mr. Cahen are actively marketing.