Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **Defendants' Objections to Disputed Conclusion of Law No. 33, Lines 12:2-5 and n.3** |
| v. | |
| Ryder Ripps, Jeremy Cahen, | Judge: Hon. John F. Walter |
| Defendants. | |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

**Plaintiff's Disputed Post Trial Conclusion of Law No. 33, lines 12:2-5 and n.3:**

*Footnote 3*

Mr. Ripps' testimony as to his intent and "good faith" is not credible, as many of the statements in his declaration are contradicted by the documentary evidence. The Court therefore finds Mr. Ripps' characterization of his actions when they do not suit present purposes, to be unavailing. *Cf. supra* Section II.B.

Similarly, the Court finds Mr. Hickman's testimony as to his and Defendants' intent to not be credible. *See* JTX-2723; Dkt. 392 at 206:8–207:20. While Mr. Hickman testified his compensation was tied to his belief in Mr. Ripps' alleged protest art (Dkt. 345 ¶¶75-76; Dkt. 392 at 221:11-15), Mr. Hickman's deposition testimony contradicts that assertion. *See* Dkt. 394 at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software.")

*Lines 12:2-5*

The Court finds Defendants, and their business partner Ryan Hickman, to be uncredible witnesses. The evidence admitted at trial establishes that Defendants' use of Yuga Labs' BAYC Marks was intentional and was done with the expectation of profiting from such use. *See supra* ¶¶7, 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendants' Basis of Dispute:**

Yuga's request for a finding that Mr. Ripps's lacks credibility is baseless given Yuga's election to forego any substantive cross examination of Mr. Ripps on any of the issues that it now challenges. Mr. Ripps's testimony was, as a result, uncontested.

Additionally, Mr. Ripps and Mr. Hickman's testimony regarding their intent for creating the RR/BAYC project is credible and supported by documentary evidence. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps, Mr. Cahen, and Mr. Hickman discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

Further, beyond the documentary evidence, Mr. Ripps, Mr. Cahen, and Mr. Hickman took many steps in how the project was created that support the finding that they were motivated by artistic purpose and to spread criticism. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.

Although these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr.

Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

Finally, Yuga also fails to cite to adequate evidentiary support. First, they cite to JTX-2723 and Mr. Hickman's corresponding trial testimony to support a finding that Mr. Hickman's intent in creating the RR/BAYC Project as a protest is not credible. That exhibit shows that Yuga has sued Mr. Hickman individually for his role in the RR/BAYC Project and that there is a default judgment entered in another case. Mr. Hickman testified at trial that he was not aware of this judgment. Trial Tr. [Hickman] 207:2-6. Whether Mr. Hickman was notified and opposed a lawsuit Yuga has brought against him in another case does not weigh at all toward a finding of his intent in creating the RR/BAYC Project.

Additionally, Yuga asserts that Mr. Hickman's deposition contradicts his testimony that his compensation amount was tied to his desire to help with the protest against Yuga. For support Yuga cites to a portion of Mr. Hickman's deposition testimony where he states that he was compensated for work as a software developer on the RR/BAYC project. Dkt. 394 at 129:3-6. The fact that Mr. Hickman's role on the project was that of a software developer does not discredit his other testimony that he accepted a smaller amount of compensation than he typically charges because he was inspired by the goal of the project. *See* Hickman Decl. ¶¶75-76 (Dkt. 345); Trial Tr. 221:11-15 [Hickman] ("Q Why did you expect to make less from your work on this RSVP contract than your normal rate? A I was contributing because I believe in standing up for the illegitimate business practices and imagery in this Yuga Labs BAYC NFT collection.").

**Plaintiff's Response:**

Yuga Labs contests and has contested the sworn testimony of Defendants, as well as that of Mr. Hickman.  Defendants' objection should be rejected because Yuga Labs has demonstrated that (1) Mr. Ripps' declaration should be ignored given that he is not a credible witness; (2) Mr. Cahen is not a credible witness; (3) Mr. Hickman is also not a credible witness; (4) Defendants intended to confuse consumers with the RR/BAYC NFTs; and (5) most RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer.

**Mr. Ripps' Testimony Is Not Credible, As Proven By Other, Credible, Evidence:** Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial declaration, Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at trial Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A:  Among other things, yes[.]").  Another glaring contradiction is that Mr. Ripps testified that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, text messages entered into evidence demonstrated that Defendants intended to "make like a million dollars" off of their infringement.  JTX-1574.  Evidence further entered at trial depicted Mr. Ripps publicly bragging about the millions of dollars he made off of his use of Yuga Labs' marks.  *See* Solano Decl. (Dkt. 342) ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying that no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  Mr. Ripps' associates also confirmed this financial motive.  JTX-801.208 (Mr. Cahen: "priorities:  getting RRBAYC to sell out by creating demand + getting BAYC and

MAYC users to call our marketplace their new home [] and collecting royalties at a fraction of what the other big dogs are charging [] which will be considerable passive income if we strike the right balance"); Hickman Depo. Designations (Dkt. 394) at 129:3-6 ("My financial arrangement for this whole thing is about as a software developer being compensated for making software"); JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market."). Mr. Ripps can attempt to couch his lies in "sarcasm," but the ultimate result was confusion in the marketplace and a substantial payday for Defendants. Simply repeating falsehoods and repeatedly rejected immaterial claims, as Mr. Ripps does in his declaration, does not make them true or material to the Court's remaining decisions.

Moreover, at trial, Yuga Labs demonstrated that Mr. Ripps is an unreliable witness. During cross-examination, Mr. Ripps admitted to his dishonesty during discovery and his lies in prior declarations submitted under oath. Trial Tr. at 268:12-25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of perjury that he has "produced all responsive documents that I have been able to locate after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-investigated my platforms and taken reasonable efforts to search for additional material for collection" and "[a]ll responsive materials that I have collected during my investigation has been provided to my attorneys and I have given permission to produce those materials with appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has "produced all relevant, nonprivileged documents" subject to Court's order compelling production). Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants withheld numerous documents (including their text

messages with each other) until March 21, 2023 — after Yuga Labs had filed its motion for summary judgment.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

Yuga Labs' cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to conclude that he lied to avoid the consequences of his infringement.  Therefore, his entire declaration cannot be relied upon.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**Mr. Cahen's Testimony Is Not Credible:**  Mr. Cahen's testimony is not credible, as demonstrated by its contradictions by the evidentiary record, other testimony, and impeachment at trial.  Mr. Cahen's testimony was littered with contradictions and demonstrated an attitude of disrespect towards the Court and these proceedings.  For example, in his trial declaration, Mr. Cahen testified that the ApeMarket marketplace was "just in the ideation phase."  Cahen Decl. (Dkt. 344) ¶ 263.  However, at trial Mr. Cahen confirmed that there was a "ready-to-go Ape Market by . . . June 24, 2022."  Trial Tr. at 247:10-12.  Mr. Cahen also confirmed that he had "no reason to doubt" that the marketplace could be launched within a matter of 48 hours.  *Id.* at 248:7-9.  That fact is also supported by documentary evidence submitted at trial.  *See* JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly").

Similarly, Mr. Cahen testified in his trial declaration that he "did not expect the project would result in consumer confusion," Cahen Decl. (Dkt. 344) ¶ 155, however, Mr. Cahen's communications in the Team ApeMarket discord chat demonstrate that

1   he was acutely aware of the likelihood of confusion.  *See* JTX-801.189 (Mr. Hickman

2   informing Mr. Cahen that it was "difficult to make the collections coexist" because

3   "they are the same art" and "same logos"); JTX-801.196 (Mr. Lehman noting, "we

4   should not under-estimate how confusing it is" and Mr. Cahen responding, "yeah.").

5   Not only was Mr. Cahen aware of the likelihood of confusion—he was apathetic to it.

6   His testimony at trial otherwise is not credible.

7          Mr. Cahen's testimony should also be given little weight due to his disrespect

8   for the Court and flagrant disregard of his obligation to be truthful under oath.  Indeed,

9   at trial Mr. Cahen repeatedly offered non-responsive rants in response to unrelated

10  questions.  *See, e.g.*, Trial Tr.  at 237:14-238:1.  This approach is consistent with his

11  hostile and obstructive deposition misconduct.  *See, e.g.*, Cahen Depo. Designations

12  (Dkt. 395) at 80:5-7 ("Q:  What is one thing [RR/BAYC] could stand for?  A:  It could

13  be Ronald Reagan bought apples yesterday, classy.  I don't know.").  Mr. Cahen's

14  lack of respect for the Court and the litigation process further underscores that he is

15  not credible.

16         Mr. Cahen also contradicted himself by claiming that he purchased a computer

17  to help create the RR/BAYC collection several months prior to the conception of the

18  project.  Cahen Decl. (Dkt. 344) ¶ 174.  Mr. Cahen tried to explain this at trial by

19  stating that the "project" began before May of 2022, Trial Tr. at 229:5-13, but his

20  latest tale contradicts the prior testimony by Defendants that they began working on

21  the RR/BAYC NFTs in May of 2022.  *See* Dkt. 200-3; Dkt. 200-4.  Defendants have

22  no problem changing the date of the conception of the project when convenient for

23  them.  When Defendants sought to skirt their discovery obligations and hide their

24  communications about the real intent of their infringement, they claimed that the

25  project began in May of 2022, but when they tried to claim expenses purportedly

26  related to the project that were incurred months prior, they claim the project began in

27  2021.  Mr. Cahen either lied at trial or he lied to the Court during discovery.

28

Finally, in both his declaration and at trial, Mr. Cahen testified that none of the Defendants had ever used the term "BAYC v3" to refer to their infringing NFTs and that the name was used only after Yuga Labs sent DMCA takedown notices to combat the infringement.  Cahen Decl. (Dkt. 344) ¶ 253; Trial Tr. at 252:2-253:8.  This testimony is also false.  Documentary evidence shows Mr. Ripps referring to his infringing NFTs as BAYC V3 before Yuga Labs had sent a single notice.  JTX-689 (Tweet from Mr. Ripps promoting infringing NFTs as "bayc v3").  Indeed, Mr. Ripps tweeted a link to the RR/BAYC page on a secondary marketplace that listed the NFTs under the name "Bored Ape Yacht Club V3" on the same day that Defendants admit that Yuga Labs sent its first notice.  *See* JTX-690; *see also* Dkt. 193-2 ¶ 93 (undisputed fact that the first takedown notice Issued against the RR/BAYC NFTs occurred on May 17, 2022).  Given his myriad contradictions, non-responsive and evasive rants, and omissions, the only conclusion is that Mr. Cahen is an unreliable witness.

**Mr. Hickman Is Not A Credible Witness:** Likewise, Mr. Hickman's testimony is not credible, as demonstrated by its contradictions by the evidentiary record, other testimony, and impeachment at trial.  Mr. Hickman testified that ApeMarket was not ready to launch and was merely in the ideation phase.  Trial Tr. at 210:1-2.  This was proven false at trial.  *See* Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A: Among other things, yes[.]"); JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly").  Mr. Hickman testified in his trial declaration that he was unaware of instances of confusion stemming from the infringing NFTs.  Hickman Decl. (Dkt. 345) ¶ 92.  However, Mr. Hickman discussed with Defendants that consumers were confused by Defendants' misleading use of authentic BAYC NFT token IDs.  JTX-44.  Further, Mr. Hickman was an active participant in the Team

ApeMarket discord chat where Defendants, Mr. Lehman, and Mr. Hickman himself raised the likelihood of confusion many times. *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable"); JTX-801.189 (Mr. Hickman informing Mr. Cahen that it was "difficult to make the collections coexist" because "they are the same art" and "same logos"); JTX-44.00002 (Mr. Hickman stating, "people believe the tokenId should match the RR ID. that is where they get confused").

Further, in his trial declaration Mr. Hickman testified about his and a family member's purportedly adverse reactions to the Bored Ape Yacht Club images, Hickman Decl. (Dkt. 345) ¶¶ 41-58, but when questioned by the Court at trial Mr. Hickman testified that he does not have any problem with selling NFTs that point to those exact same images. Trial Tr. at 222:24. Mr. Hickman's testimony that he found Yuga Labs' NFTs problematic is even more difficult to reconcile with the fact that he claimed to purchase a Bored Ape Yacht Club NFT after forming the supposed belief that it was problematic, and continued to purportedly own one up until trial. Hickman Decl. (Dkt. 345) ¶¶ 18-19, 21. Finally, despite Mr. Hickman's testimony at trial that he did not want to profit off the RR/BAYC NFTs, Trial Tr. at 209:21-23, Mr. Hickman testified at deposition that he was financially motivated to develop the software that facilitated Defendants' infringement. Hickman Depo. Designations (Dkt. 394) at 128:25-129:6 ("In this reference I'm specifically stating that I'm a developer. I make software. I charge to make software. I have a record, a history, of charging to make software. My financial arrangement for this whole thing is about a software developer being compensated for making software.").

Defendants' attempts to downplay the importance of citations that show Mr. Hickman's lack of credibility should be ignored. Mr. Hickman's testimony that he is unaware of a judgment against him in Nevada is contradicted by proper service of that

judgment and his attempts to overturn it.  JTX-2723; Dkt. 392 at 206:8–207:20; *see also* Judgment and Order for Permanent Injunction Against Ryan Hickman (Dkt. 30), *Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023). Even more, since Mr. Hickman has been sued by Yuga Labs in another proceeding he is biased against Yuga Labs and unlikely to admit the truth of his scam, in a vain attempt to avoid suffering the same fate as Mr. Lehman and Defendants.  Mr. Hickman lacks credibility.

**Defendants' Intent To Confuse Consumers In Order To Turn A Profit Is Well-Documented:** That Defendants intended to confuse consumers and their supposed disclaimer is proof of their intent, not the absence of it.  This is thoroughly established.  *See supra* ¶ 33, line 12:1.

**Most RR/BAYC NFTs Were Sold On Secondary Marketplaces Without A Disclaimer:**  Defendants acknowledge that their alleged disclaimer was only on rrbayc.com, but Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . .  [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").  These secondary markets did not involve a disclaimer.

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea.  These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products.  These secondary marketplaces are also a prominent source of confusion going forward—especially since they are where Defendants continue to

market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").  Defendants' contention is therefore incorrect and misleading.

### **Defendants' Reply:**

*First,* Mr. Ripps is a credible witness.  Mr. Ripps's declaration was uncontested because Yuga elected to forego any substantive cross-examination of Mr. Ripps on **any** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  This is because the purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]").  Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record.  Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial.  This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony.  Having failed to challenge Mr. Ripps's testimony at trial (either through cross-examination or presentation of contradictory evidence), Yuga now seeks to take evidence out of context and mischaracterize documents.  This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony that ApeMarket *could* have been launched in the near-term.  Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.  You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.  What I would say I did was use the prospect of a potential marketplace ***which we were in the ideation phase of***, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.  We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.
>
> 259.  Ultimately, ***we never agreed on what ApeMarket would be***.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witnesses corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.  BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."
>
> A.  This is a discussion, ***an ideation of different ideas, none of which were actualized***.

---

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's declaration regarding his intent in creating the RR/BAYC collection.   The full testimony that Yuga cites provides:

> 182.   My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.
>
> 183.   As an artist, I believed that I could create an "army of educators" through my art.
>
> 184.   I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl.  ¶¶ 182-184 (Dkt. 346) (uncontested).  Significant evidence in the record corroborates Mr. Ripps's statements.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.  Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.  And lastly, the voluminous correspondence that Defendants received shows that they did in fact

1   create a "community of educations" as Mr. Ripps intended, who have written letters

2   expressing gratitude and support for the criticism of Yuga.  Ripps Decl. ¶¶ 198-205

3   (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592;

4   JTX-2595; JTX-2596; JTX-2599.

5        Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has

6   been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he

7   intended to make a million dollars from the RR/BAYC artwork.  But in reality, ***the***

8   ***document contains no such statement from Mr. Ripps***.  The entirety of Mr. Ripps

9   statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated

10  twice).  In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen.   And

11  Mr. Ripps in the same exchange later stated that he needs "to get a front end" in

12  response to more jokes from Mr. Cahen (again, not a reference to any intent to profit).

13  *See* JTX-1574.

14       Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not

15  credible given the many false and misleading statements contained in his declaration.

16  For example, Mr. Solano was forced to concede on cross-examination that his sworn

17  declaration included a false statement claiming that Defendants continue to receive

18  royalties from sales on secondary marketplaces:

19
20  Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that
21       they do not currently receive any royalties or creator fees from sales
         on secondary marketplaces; right?

22  A.   Yes.

23
24  Q.   So you don't have any basis for your statement that their profits
         continue to increase; correct?

25
26  A.   It's my understanding that they were collecting royalties or creator
27       fees from LooksRare for quite a while.  Although, those were
         supposed to be donated to charity and never were.

28

---

Q. *They don't continue to increase; correct, sir?*

A. *Correct.*

Q. *That statement, that part of your witness statement is incorrect; right?*

A. *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added). Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19). Mr. Solano also lacks credibility as a result of his repeated impeachment at trial. Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

1   Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's

2   testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

3   been rebutted.  Mr. Solano could not identify a single person that ever bought an

4   RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,

5   no one has been able to identify a single confused consumer in the entirety of this

6   case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

7          Yuga then incorrectly argues that Mr. Ripps's statement about his intent is

8   refuted by comments from other members of the RR/BAYC project.  But these

9   statements show no such thing.   For example, Yuga's cites JTX-801.208 in which

10  Mr. Cahen states that a priority is "getting RR/BAYC to sell out."  But as Mr. Cahen

11  explained at trial, the whole point of broad exposure through the RR/BAYC collection

12  (including getting people to reserve NFTs) was "spreading and magnifying criticism

13  of Yuga."  Cahen Decl. ¶ 98 (Dkt. 344).  And Mr. Cahen's private communications in

14  the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for

15  artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these

16  things.  It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary

17  focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes

18  a strong statement.  This is art, not Pokemon cards." (JTX-801.00013); "Because

19  that's where the real importance lies.  RR/BAYC truly is very important conceptual

20  art imo.  And now we are all helping shape that art further." (JTX-801.00196).

21  Yuga also cites Mr. Hickman's deposition testimony in which he stated that his

22  "financial arrangement" was "a software developer being compensated for making

23  software."  Hickman Depo. Designations (Dkt. 394) at 129:3-6.  But Mr. Hickman's

24  testimony about this topic at trial was unequivocal about his purpose in participating

25  in the RR/BAYC project:

26

27          Q.    Why did you expect to make less from your work on this RSVP
                 contract than your normal rate?

28

A.    I was contributing because I believe in standing up for the illegitimate
business practices and imagery in this Yuga Labs BAYC NFT
collection.

Trial Tr. [Hickman] 221:11-15.  Mr. Hickman further explained, "We are selling a
receipt that says *I committed to this protest* that points to the same public [images] that
a lot of different collections point to including Yuga Labs point to the same resource."
Trial Tr. [Hickman] 222:18-21 (emphasis in original).

Yuga also cites to Mr. Lehman's declaration to suggest that Defendants
considered the RR/BAYC collection to be a "business venture."  Defendants never
used the term "business venture" to describe the RR/BAYC project.  In fact, the only
place where the term appears is in Mr. Lehman's declaration, which was a document
drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.
Yuga's attorneys, not the Defendants, coined the term "business venture."  As
demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr.
Lehman's declaration, without having considered that Yuga's counsel drafted the
declaration and selected the phrase "business venture," and without having considered
that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-
22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having
considered that Mr. Lehman was afraid for his family at the time he signed his
declaration, because Yuga's lawsuit against him would be disastrous to his family and
himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration
through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023,
verification.  But Yuga's cross-examination did not result in any impeachment or
inconsistency:

Q.   You produced those text messages, that you withheld throughout this case, including when you testified that you had no responsive documents on January 17, 2023; correct?

A.   I think that we – the question was all communications that relate to the creation of RR/BAYC, which we felt was very much in the group chat that was called RR/BAYC.  And we produced that, which you guys have extensively relied on.

Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

Q.   And, Mr. Ripps, the text messages that you produced in this case include the RR/BAYC chat; right?

A.   Yes.  We produced everything that we could, despite the fact that Yuga produced nothing.

Q.   Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?

A.   I don't have it on the screen, but I see you holding them, and I see them –

Q.   Do you see it now?

A.   Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.

Q.   Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

A.   Yes, I did.

Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions multiple times based on Yuga's false accusations of discovery misconduct, and that this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr.

Ripps's trial testimony is no surprise given that the verification stated "[I] produced all responsive documents that I have been able to locate after a reasonable search" and further stated "I also understand that discovery obligations are continuing, and I will produce any additional responsive materials or information to the extent any are found based on a reasonable investigation. ***I reserve the right to make changes or additions to any of these answers or document productions*** if it appears at any time that errors or omissions have been made or if more accurate or complete information becomes available." Dkt. 109-33 (emphasis added). Mr. Ripps fulfilled his discovery obligations and upheld his verification by providing all the responsive material he located after a reasonable search to the best of his knowledge.

The context and accurate content of the evidence Yuga cites shows that the trial record does not contradict any portion of Mr. Ripps's declaration. Yuga had an opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but elected not to do so. Mr. Ripps's testimony was therefore unchallenged.

***Second,*** Mr. Cahen is a credible witness. Yuga failed to impeach Mr. Cahen during trial and the trial record does not contain any evidence showing that this witness is not credible or that they did not give truthful testimony. Yuga tries to mischaracterize Mr. Cahen's testimony to suggest that he was contradicting himself. But there is nothing inconsistent about Mr. Cahen testimony. He testified that ApeMarket was in the ideation phase, which means that anything under development was subject to substantive changes pending Mr. Ripps's review and signoff on the website. But simply because Mr. Ripps had not reviewed and signed off on anything in connection with ApeMarket did not mean that the RR/BAYC team was not working on the website and exploring different ideas to implement.

Yuga mischaracterized Mr. Cahen as saying that ApeMarket was "ready to go" by June 24, 2022. But what Mr. Cahen actually said is that he did not know if ApeMarket was "ready to go" by June 24, 2022. Mr. Cahen then also stated that he

works with the high skilled engineers that can implement nearly any project within days and that ApeMarket did not require much work in the first place as it used open-source code:

> Q.   Sure.  By Friday, June 24, ,2022, you and your associates had built a functioning ApeMarket?
>
> A.   I'm not certain to answer that.  But I believe with the quality of engineers that I work with, we could pretty much deploy anything within reason within a 48-hour window.  So I always feel like the people that I work with are ready to go at the drop of a hat.  That's kind of how I look at that.
>
> Q.   And there was a ready-to-go ApeMarket by February – excuse me – by June 24, 2022?
>
> A.   Among other things, yes, because this – a lot of the code used is open source.  And ApeMarket is very similar to other marketplaces.  The only differences that we were discussing that are really worth noting would be that it would be a cheaper source of infrastructure for the public to be able to utilize.

Trial Tr. [Cahen] 247:1-17.  And finally, ApeMarket was never released, and there was no evidence that the webpage apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman] 217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346) (uncontested).

Yuga also accused Mr. Cahen of "disrespect for the Court" by making "non-responsive rants" in response to questions about ApeMarket stimulating sales of RR/BAYC NFTs.  But the trial transcript shows otherwise:

> Q.   And in May and June of 2022, one of your goals for that apemarket.com domain was to use it to mint out the remainder of the RR/BAYC NFT collection; correct?

A.   ***No.  That's theoretically impossible because doing that – creating an NFT marketplace would offer absolutely no functionality in terms of minting an already existing NFT contract.***

Q.   You used the prospect of the marketplace to drive sales of RR/BAYC NFTs; correct?

A.   There never existed a marketplace.

Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?

A.   What I would say I did was use the prospect of a potential marketplace which we were in the ideation phase of, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Q.   You used the prospect of that marketplace to mint out the remained of the RR/BAYC NFT collection; correct?

A.   ***No, I did not.***

Trial Tr. [Cahen] 231:8-232:6 (emphasis added).   Yuga's citation to Mr. Cahen's deposition similarly cherry picks one question from a full-day of deposition testimony, and even then, the testimony Mr. Cahen gave is responsive to Yuga's question to give a hypothetical answer to "things" RR/BAYC could stand for.

Yuga further mischaracterized Mr. Cahen's testimony by incorrectly suggesting that he did not purchase a computer to work on the RR/BAYC project.  The trial testimony shows that the 2021 purchase date is consistent with Mr. Cahen's work in connection with the RR/BAYC project and its protest of Yuga:

Q.   Would it surprise you that the date for that computer is December 2021?

A.   That would not surprise me at all, no.

Q.   Why?

A.   Because it's a date on a receipt.  I'm not sure what the point is, but I'm hearing you, yeah.

Q.   Okay.  So either the RR/BAYC project started in May 2022 or the RR/BAYC project started in December 2021, and you bought a computer for it; correct?

A.   The RR/BAYC project is a protest project.  And the protest began well, well before the RR/BAYC project did.  So if you are asking me why I make a connection between earlier dates and that project, it's because we spent about a year protesting in different ways before we released any sort of nonfungible token and rather, before Ryder did and I decided to join and help him expand his vision and protest.

Trial Tr. [Cahen] 227:11-228:1.  That Mr. Cahen purchased the computer before the project was conceived is not inconsistent with his testimony that the computer was ultimately used for the project.  It would be entirely unremarkable if a hypothetical company purchased equipment (such as a PC) in January, subsequently conceived of a project, Project X, deployed the equipment for use on Project X, and then characterized the initial purchase as attributable to Project X for accounting purposes.  That is precisely what occurred here.

Finally, Yuga incorrectly argues that Mr. Cahen is not credible because he testified that Defendants never used the term "bayc v3" to refer to the RR/BAYC collection.   But Yuga was unable to impeach this testimony during cross-examination of Mr. Cahen and Yuga did not even attempt to cross-examine Mr. Ripps on this issue.  The exhibit that Yuga cites, JTX-689, also confirms that Mr. Cahen's testimony was true.  JTX-689 is a reply Mr. Ripps made on Twitter on May 13, 2022 to Mr. McNelis's question on what NFTs people are buying.  Mr. Ripps's reply is a satirical comment that has absolutely nothing to do with the RR/BAYC collection and,

in fact, the comment was made before Mr. Ripps even started taking commissions for RR/BAYC NFTs.

Further, Yuga's unfounded and offensive statements that Defendants "sought to skirt their discovery obligations and hide their communications about the real intent of their infringement" is unacceptable.  As the record clearly shows, Defendants produced hundreds of thousands of communications in this matter and upheld their ongoing responsibility to produce discoverable information. *See* Trial Tr. [Ripps] 270:3-18; Dkt. 109-33.  To state that Defendants willfully avoided their discovery obligations is categorically incorrect.

***Third,*** Mr. Hickman is a credible witness.  Yuga failed to impeach Mr. Hickman during trial and the trial record does not contain any evidence showing that this witness is not credible or that they did not give truthful testimony. Yuga argues that Mr. Hickman is not credible because he purportedly "wrongly" testified that he is not aware of any actual instance of confusion.  But the trial record confirmed that ***no one*** is aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Yuga then cites to various documents (JTX-44, JTX-801.195) to argue that Mr. Hickman purportedly believed that consumers would be confused by the RR/BAYC project.  But these documents involve discussion in how to design ***ApeMarket*** to ensure that the website design was not confusing to users of the website.  And, in fact, Yuga cross-examined Mr. Hickman about this issue and confirmed that Mr. Hickman and other members of the RR/BAYC project were not discussing confusion regarding the source of RR/BAYC NFTs. Instead, as Mr. Hickman explained, "[t]his is our attempt to make it as clear as possible.  We are

having discussion on how to make sure it was very clear for users." Trial Tr. [Hickman] 212:22-24.

Yuga also argues that Mr. Hickman is not credible because he did not have a problem working on an NFT project that points to public digital images that he finds to be offensive. But Yuga's argument missing the mark. As Mr. Hickman explained, the whole purpose of his work on the RR/BAYC collection was to protest the offensive imagery that Yuga had been normalizing:

> THE COURT: When you are selling defendants' NFTs, you are selling Yuga's images.
>
> THE WITNESS: ***No. We are selling the record.***
>
> THE COURT: Okay. But the record points to and displays those images.
>
> THE WITNESS: ***So the images are public.*** They are available for anybody to navigate to on the Internet.
>
> THE COURT: Right
>
> THE WITNESS: ***We are selling a receipt that says I committed to this protest that points to the same public [image] that a lot of different collections point to*** including Yuga Labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-22 (emphasis added). Yuga then suggests that Mr. Hickman is not credible because he himself owns a BAYC NFT even though he finds the images offensive. But Mr. Hickman's declaration explains, "When I first saw Bored Ape Yacht Club images, I found the imagery problematic, but I did not originally pay it much attention." Hickman Decl. ¶ 18 (Dkt.345). Only later, when speaking with is great aunt, did Mr. Hickman realize how harmful and dangerous Yuga's misconduct is:

48.    We then had a long discussion about why Yuga's use of ape images was a serious issue.

49.    My great aunt explained to me the history of siminaization, which involved depicting African Americans as apes to dehumanize them.

50.    My great aunt also explained how African Americans are often called "monkeys" as a deeply offensive insult.

51.    My great aunt also reminded me that our family had dealt with and had to overcome these kinds of acts of racism over many generations

52.    My great aunt explained that, if simianization is becoming popular again, normalized, and incentivized, this would be very dangerous for African Americans.

53.    ***My great aunt described Yuga's acts as "a step back 100 years."***

54.    ***This conversation with my great aunt caused me to think more critically about Yuga's offensive imagery and why it needs to be taken seriously.***

Hickman Decl. ¶¶ 48-54 (Dkt.345) (emphasis added).  There is nothing about Mr. Hickman's conversation with his great aunt and how he became part of the RR/BAYC movement that makes him an untrustworthy witness.  Moreover, as Mr. Hickman testified in his declaration, he continued to hold his BAYC NFT because the Terms & Conditions and Yuga's public conduct indicated that his ownership of a BAYC NFT granted rights that allowed creation of the RR/BAYC collection.  Hickman Decl. ¶¶ 9-40 (Dkt.345).

Yuga also incorrectly states that Mr. Hickman's testimony that he is not aware of Yuga's default judgment against him is contradicted by "proper service" of the default judgment.   Mr. Hickman did not know that there was a valid case pending against him.  Yuga never served the complaint in Mr. Hickman's case and instead left it on his porch unattended after the server told Mr. Hickman's twelve-year-old

daughter that he could not serve her.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 31-1 at 2 (D. Nev.) ("6.  I told the stranger that my parents were not home, and that I was twelve years old.  7.  The stranger told me he could not leave the papers with me, and left.  I did not see the stranger return.").  Yuga then submitted an affidavit ***falsely stating*** to the court that it had served Mr. Hickman's fifteen-year-old daughter.  *See Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 31 at 7 (D. Nev.) ("Plaintiff fraudulently represented to the Court that Hickman's daughter was fifteen and that the process server delivered copies of the Complaint and summons to her. … This is blatantly false, and was undoubtedly asserted by Plaintiff in an effort to obtain a favorable Default Judgment ruling.").   The Court in Mr. Hickman's case has stayed judgment to reassess the validity of default judgment.  *Yuga Labs, Inc. v. Hickman*, 2:23-cv-00111-JCM-NJK, Dkt. 37 (D. Nev.) (granting emergency motion to stay enforcement of default judgment).

**Fourth,** ample evidence at trial showed, Defendants' intent in creating the RR/BAYC Project was to create an artistic protest of Yuga.  *See supra* ¶ 33, line 12:1 for a fulsome outlining of Defendants' reply to Yuga's unfounded and inaccurate response.

**Fifth**, while there may have been sales on secondary marketplaces as Yuga alleges, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets.  As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales.  See Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested).  Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000.  See Cahen Decl. ¶¶ 168-172 (Dkt. 344).

1   Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to
2   the analysis of Defendants' profits and the fact Mr. Ripps and Mr. Cahen purposefully
3   shut off royalties from such sales yet again supports a finding that they did not intend
4   to confuse and shows that they were taking steps that would minimize their own
5   profits.

6       It is incorrect to claim that there is a likelihood of confusion on the secondary
7   marketplaces, as Yuga alleges.  The evidence presented at trial shows that many
8   people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps
9   Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-
10  2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

11      Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not
12  aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)
13  (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).
14  Buttressing this fact, Yuga's founders were also not aware of a single instance of
15  actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now
16  let's focus on, I think, what you were focused on. Yuga Labs has been unable to
17  identify even[] a single person who purchased an RR/BAYC believing it to be
18  sponsored by Yuga Labs; right? A Correct.").

19      Further, the smart contract clearly indicates Mr. Ripps is the creator and not
20  Yuga and allows consumers to easily establish provenance, which undermines Yuga's
21  assertions about what consumers see when they review the NFT.  *See* JTX-1146;
22  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).

23      Third, Yuga also incorrectly asserts that Defendants continued to market
24  RR/BAYC NFTs.  For support Yuga cites to Mr. Solano's declaration where he states
25  that two marketplaces sell RR/BAYC NFTs and testimony that the ApeMarket Twitter
26  account links to a marketplace.  Neither of those pieces of evidence supports a finding
27  that Mr. Ripps and Mr. Cahen are actively marketing.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28