Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., | Case No. 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **Defendants' Objections to Disputed Conclusion of Law No. 34** |
| v. | Judge: Hon. John F. Walter |
| Ryder Ripps, Jeremy Cahen, | |
| Defendants. | |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

## **Plaintiff's Disputed Post Trial Conclusion of Law No. 34:**

All profits identified by Yuga Labs are attributable to Defendants' sales (and profits from resales) of the infringing RR/BAYC NFTs. Equity does not permit Defendants to retain profits from the sale of an infringing product that is likely to confuse consumers, as is the case with the infringing RR/BAYC NFTs.

## **Defendants' Basis of Dispute:**

As discussed above, the evidence presented at trial showed that Mr. Ripps and Mr. Cahen took numerous steps to ensure that their collection did not cause confusion and there has been no evidence presented that anyone who reserved an RR/BAYC NFT was confused about its origin.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

Further, equitable disgorgement of profits is not appropriate here.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  Disgorgement is only warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548-JVS (AGRx), 2022 WL

1   4596697, at *17 (C.D. Cal. July 29, 2022).  Disgorgement is, therefore, not an

2   available remedy here because – as the evidence showed at trial – neither Mr. Ripps

3   nor Mr. Cahen is a "conscious wrongdoer."  *See* Ripps Decl. ¶¶ 144, 147, 158-176

4   (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-155 (Dkt. 344); JTX-801.00010,

5   012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

6        Disgorgement is also unavailable here because Yuga has not shown "the

7   absence of an adequate remedy at law."  *Dairy Queen, Inc. v. Wood,* 369 U.S. 469,

8   478 (1962).  Legal remedies were available in this case.  Yuga expressly asserted and

9   offered expert testimony in support of legal remedies (including a claim for actual

10  damages that its expert was able to quantify), which it then voluntarily relinquished.

11  Dkt. 315-1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler]

12  172:14-17, 173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies,

13  Yuga cannot obtain disgorgement.  *See* *Hunting World Inc. v. Reboans, Inc.,* No. C

14  92-1519 (BAC), 1994 WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994) ("[A]lthough

15  Plaintiff has waived the right to collect damages, this does not render the claim purely

16  equitable because, as discussed above, this is a statutory claim. Again, because the

17  statutes provide adequate remedies, a purely equitable claim may not be

18  maintained.").

19        Finally, even if disgorgement were available here, Yuga would only be entitled

20  to disgorgement of profits "attributable to the infringing activity."  *Lindy Pen Co. v.*

21  *Bic Pen Corp*., 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by*

22  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd*., 839 F.3d 1179 (9th Cir. 2016).

23  This requires distinguishing between revenue from collectors who reserved

24  RR/BAYC NFTs as a protest against Yuga (and were thus not confused about

25  Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly

26  believed they were purchasing Yuga NFTs.  *See id.*

27

28

As the evidence presented at trial showed, Yuga has not identified even a single person who obtained an RR/BAYC NFT believing it was sponsored by Yuga and Mr. Ripps, Mr. Cahen, and Mr. Hickman are not aware of a single instance of actual confusion.  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").  Conversely, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest *against* Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Given the evidence, Yuga has not shown that they are entitled to any portion of profit from the RR/BAYC project as there was no profit made that was attributable to the infringing activity.

### Plaintiff's Response:

Defendants' objection should be rejected because (1) there is ample evidence of confusion; (2) disgorgement is available as a remedy; (3) all of Defendants' profits are attributable to infringing activity; (4) Defendants' additional arguments challenging disgorgement are unpersuasive; and (5) this Court should increase the profit award.

**The Weight Of The Evidence Demonstrates Consumer Confusion:** Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants

were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82.  Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

**Yuga Labs Is Entitled to Disgorgement of Defendants' Profits:**  Yuga Labs' only burden is to prove Defendants' sales to obtain disgorgement.  15 U.S.C. § 1117(a) (allowing plaintiff "to recover . . . defendant's profits.").  Defendants cite no

1   case to the contrary.  Defendants wrongly claim that *MGA* holds that disgorgement is

2   "only" warranted in cases of conscious wrongdoers.  To the contrary, *MGA* found that

3   willfulness is a sufficient, ***but not necessary***, condition to a disgorgement finding.

4   *MGA Ent. Inc. v. Harris*, No. 2:20-cv-11548, 2022 WL 4596697, at *17 ("willfulness

5   is not an inflexible precondition to recovery of a defendant's profits under § 35(a) of

6   the Lanham Act") (cleaned up); *see also Harbor Breeze Corporation v. Newport*

7   *Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022) ("a plaintiff need not show

8   that a defendant acted with a particular mental state, such as willfulness, in order to be

9   entitled to an award of profits.").  Because the Court has found Defendants liable for

10  intentional infringement (SJ Order (Dkt. 225) at 12), Yuga Labs is entitled to

11  Defendants' profits from their infringing acts.  *See supra* ¶¶ 34; *see also* Yuga Labs'

12  Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37.

13  Even though a finding of willfulness is not necessary for disgorgement, Defendants'

14  infringement was willful.  *See supra* ¶ 7; *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d

15  1400, 1406 (9th Cir. 1993) ("[w]illful infringement carries a connotation of deliberate

16  intent to deceive." ).

17        Separately, there is no requirement for an absence of an "adequate remedy at

18  law" to obtain disgorgement.  This case arises out of the Lanham Act, which expressly

19  provides for actual damages ***and*** disgorgement of Defendants' profits.  "The Lanham

20  Act itself is no obstacle to a recovery of both plaintiff's damages and defendant's

21  profits."  *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair*

22  *Competition* § 30:73 (5th ed.) ("Plaintiff may be awarded damages in some

23  circumstances in addition to defendant's profits.").  Accordingly, the Lanham Act

24  allows for three distinct remedies—(1) defendants' profits, (2) plaintiffs' damages,

25  and (3) the costs of the action. 15 U.S.C. § 1117(a).  These remedies are not stated in

26  the disjunctive, and each are separately available under the statute.  For example, the

27  model jury instructions clearly state that actual damages and disgorgement are

28

available in the same case: "*In addition to actual damages*, the plaintiff is entitled to any profits earned by the defendant that are attributable to the infringement, which the plaintiff proves by a preponderance of the evidence." Manual of Model Civil Jury Instructions § 15.29, Trademark Damages—Defendant's Profits (emphasis added). Defendants are not allowed to retain the fruits of unauthorized trademark use. *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015).

Finally, through at least the testimony of Ms. Kindler, Yuga Labs has met its burden to "establish[] the defendant's gross profits from the infringing activity with reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1408 (9th Cir. 1993); *see also See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 7, 11-13, 32-37. Defendants cite no case to the contrary.

*Dairy Queen* does not impose any different burden, nor did it hold that disgorgement in a Lanham Act case is unavailable in the absence of an adequate remedy at law. *Dairy Queen* did not involve a disgorgement claim under the Lanham Act, but rather an "equitable accounting" claim. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). "[T]he Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits)." *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (citing *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998)). As a result, *Dairy Queen* does not apply to Yuga Labs' disgorgement claim under the Lanham Act.

**All of Defendants' Profits Are Attributable To Their Infringing Activity:** Yuga Labs has shown that Defendants' profits are attributable to Defendants' infringing activity – each and every single RR/BAYC NFT uses the marks BORED APE YACHT CLUB and BAYC, to say nothing of how Defendants sold, marketed, and promoted these NFTs. In a trademark infringement case, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff demonstrates gross profits, they are

presumed to be the result of the infringing activity." *Lindy Pen Co.*, 982 F.2d at 1408. From there, *Defendants*, not Plaintiff, "bear[] the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.*; *Frank Lloyd Wright Found. V. Shmavonian*, No. 18-CV-06564-MMC, 2019 WL 3413479, at *1 n.2 (N.D. Cal. July 29, 2019). Yuga Labs has established that Defendants' profits are attributable to their infringing activity, and that these NFTs sold due to the appeal of the BAYC Marks. *See* Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) ¶¶ 7, 11-13, 32-37. Defendants do not provide any credible evidence undermining this presumption.

Defendants' "infringing activity" was use of the BAYC Marks. They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." Dkt. 418-1 at 3:15-16. Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement. *See* Kindler Decl. (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks."). Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks. Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76. If the NFTs just said "Ryder Ripps," consumers would not have bought them. Indeed, even Defendants admit that they had to use the BAYC Marks in their infringing products. Dkt. 149-42 at 9-10 (Mr. Ripps' second supplemental response to interrogatory 3 states: "Mr. Ripps's RR/BAYC project . . . displayed unmodified marks, so that the RR/BAYC project would be directly tied to Yuga, BAYC, and specific BAYC NFTs . . ."); Cahen Decl. (Dkt. 344) ¶ 109 ("Mr. Ripps wanted to call the collection the "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC") both to emphasize the subject of our criticism and the artistic origin of the collection."). This is because the appeal of the BAYC Marks was core to their

1   infringement and profits.  Yuga Labs should be awarded the full amount of

2   Defendants' profits so Defendants may "not retain the fruits, if any, of unauthorized

3   trademark use or continue that use . . . ."  *Fifty-Six Hope Rd. Music, Ltd. V.*

4   *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073 (9th Cir. 2015).

5   **Defendants' Additional Arguments Opposing Disgorgement Are**

6   **Unpersuasive:**  Yuga Labs has established that it is entitled to at least $1,375,361.92

7   of Defendants' profits (after deducting payments to Defendants' business partners and

8   the amount of RR/BAYC NFTs that they hold or did not mint).  *See supra* ¶ 11(e).

9   Defendants provided no expert witness testimony, consumer survey, or financial

10  analysis to the contrary.  Since they cannot rebut these calculations, Yuga Labs is

11  entitled to the *Lindy Pen* presumption that Defendants made $1,375,361.92 as a result

12  of infringing activity.

13          Defendants have failed to carry their burden to show that even one of these

14  sales is not attributable to their infringing NFTs.  Instead, they contend that, even

15  though they used—and had to use—the BAYC Marks to sell their counterfeit NFTs,

16  their profits were somehow not attributable to the BAYC Marks.  Yet again,

17  Defendants cite no case law, expert testimony, or survey evidence to support this

18  claim, and their baseless argument fails.  *See Fifty-Six Hope Rd. Music, Ltd. V.*

19  *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015) (affirming holding that

20  defendant failed to meet burden to prove a 40% royalty was a proper deduction, where

21  "the documentary evidence leaves uncertainty as to the amount of royalty fees paid"

22  and defendant "did not produce sufficient documentation to prove the specific

23  amounts").  Indeed, the Ninth Circuit has rejected similar arguments before, finding

24  that "where infringing and noninfringing elements of a work cannot be readily

25  separated, all of a defendant's profits should be awarded to a plaintiff."  *Nintendo of*

26  *Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) (rejecting argument

27

28

that "multiple-game format and Nintendo-compatibility were the cartridges' selling point, not the use of the Nintendo trademark").

Defendants point to a few cherry-picked emails as examples of alleged consumers who were purportedly not confused.  Yuga Labs doubts the credibility of these documents, but even taken at face value, they establish no more than a handful of consumers who were not confused.  They also do not show that the BAYC Marks were not part of the appeal of the RR/BAYC NFTs.  Without any evidence to carry Defendants' burden, the Court can continue to presume that Defendants' profits were attributable to the infringing activity.  *See Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015).

**The Court Should Increase The Profit Award:**  Additionally, rather than decreasing the profits award, the evidence shows that the Court should use its discretion "to increase the profit award above the net profits proven '[i]f the court shall find . . . the amount of the recovery . . . inadequate.'"  *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) ("district court should award actual, proven profits unless the defendant infringer gained more from the infringement than the defendant's profits reflect"); 15 U.S.C. § 1117(a) ("If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.").  The Court could do so to address any additional award that it deems equitable to make Yuga Labs whole for Defendants' egregious infringement and the harm they caused.

Ms. Kindler stated throughout her testimony that, although she was able to calculate certain profits accrued by Defendants, the extent of harm to Yuga Labs was not practically quantifiable including because of unjust enrichment to Defendants, additional harm to Yuga Labs' business, harm to Yuga Labs' business partnerships, harm to Yuga Labs' brand, and harm to Yuga Labs by the presence of RR/BAYC

NFTs in the marketplace.  *See* Kindler Decl. (Dkt. 338) ¶¶ 62-65, 67, 75; Trial Tr. at 176:14-22 ("I computed other potential measures of harm, and I also discussed at length in my report other significant areas of harm that would not be easily quantifiable, such as harm to goodwill, harm to brand equity, and things of that nature."); *see also* Berger Decl. (Dkt. 339) ¶¶ 62-92.

**Defendants' Reply:**

Yuga's response fails to rebut Defendants' objection and similarly is not based in fact or an accurate reading of the trial evidence.

***First,*** there is ample evidence that there was ***no*** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps

Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

The evidence Yuga cites to is not supportive of a finding that there was consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made the Same" JTX-314.  In that article she discusses choosing between the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at her deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant."  *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

1  fundamentally flawed, she can attest to confusion on two websites for only a matter of
2  days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court
3  should reject them and provide them no weight.

4        Further, this unreliable survey evidence, again does not show that anyone who
5  actually reserved an RR/BAYC NFT was confused about its origin and, therefore,
6  does not undermine the accuracy of this finding of fact.

7        The documentary evidence Yuga cites to is also unsupportive.  For example,
8  Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated
9  software application and not evidence of a real person's confusion.  *See* Cahen Decl.
10 ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users
11 identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no
12 indication that any of the Twitter users commenting actually reserved an RR/BAYC
13 NFT.  This evidence provides no support for an argument that this finding of fact is
14 inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are
15 quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-
16 1035 (Out of context one off tweets of users, that there is no evidence to believe
17 purchased an RR/BAYC NFT, replying to GemBot).

18       Yuga also cites to private chats that the RR/BAYC creators used.  These
19 exhibits are unsupportive of a finding that there was actual confusion.  For example,
20 JTX-109 includes a discussion where Mr. Lehman raises concerns about how the
21 marketplace is designed and may cause confusion.  Mr. Cahen responds and provides
22 suggestions about what they could do to make it even more clear.  Further, this chat
23 focused on the creation of ApeMarket, which never was launched and could,
24 therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262
25 (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make
26 ApeMarket clearer).

27

28

1    Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast. This

2    exhibit does not support a finding of actual confusion. The chart separately lists both

3    "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

4    understood that these were two different projects. Additionally, as Mr. Cahen

5    testified, he is not aware of anyone who watched the Bloomberg program and reserved

6    an RR/BAYC NFT believing it to be a Yuga collection. Cahen Decl. ¶ 252 (Dkt.

7    344).

8    Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

9    credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing

10   case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's

11   case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was

12   entered after Mr. Lehman settled his own case with Yuga.

13   Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the

14   LooksRare platform that sold RR/BAYC NFTs looked like at one point in time.

15   Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support

16   a finding of consumer confusion as any consumer had the ability to determine the

17   provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89 (Dkt.

18   346) (uncontested). Further, this does not undermine the finding of fact as this does

19   not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

20   Finally, Yuga cites to its own declarations and trial testimony where their

21   witnesses make conclusory and unfounded statements about possible confusion. *See*

22   Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl.

23   (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt.

24   392) at 53:14-54:22. These statements do not support a finding, however, that anyone

25   who bought an RR/BAYC NFT was actually confused.

26   Yuga further states that Mr. Ripps and Mr. Cahen did not offer admissible

27   evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.

28

This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.

Yuga's response is also inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout.  *Id.*

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, which is something Defendants argue they are not, Yuga can only receive profits "attributable to the infringing activity."  *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a protest against Yuga (and were thus not confused about Defendants' use of Yuga's marks) and revenue from purchasers who mistakenly believed they were purchasing Yuga NFTs.  *See id.* And as outlined above, there was no evidence presented that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales.  Also, as mentioned above, there is no

1    evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary

2    sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

3    Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr.

4    [Solano] 63:1-10. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen]

5    265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial

6    Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

7    what you were focused on. Yuga Labs has been unable to identify even[] a single

8    person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

9    right? A Correct.").  Finally, the portion of profits attributable to secondary sales of

10   RR/BAYC NFTs according to Yuga's own expert is limited to $117,309. *See* Dkt.

11   418-1 at 6.

12          ***Second***, Yuga is not entitled to disgorgement of profits.   As stated fully in our

13   objection to this finding of fact, disgorgement is not an available remedy here and the

14   sources Yuga cites to in response are unsupportive.  Firstly, Yuga citations to portions

15   of the Lanham Act and model jury instructions that indicate disgorgement generally is

16   an available remedy for infringement does not undermine Defendants' objection that it

17   is not an available remedy here.  Contrary to Yuga's response, the Supreme Court has

18   held that disgorgement is not available unless there is "the absence of an adequate

19   remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).   And the rule

20   set forth in *Dairy Queen* has been applied to awarding defendant's profits under the

21   Lanham Act.  *See Hunting World Inc. v. Reboans, Inc.*, No. C 92-1519 (BAC), 1994

22   WL 763408, at *2-3 (N.D. Cal. Oct. 26, 1994).

23          Legal remedies were available in this case.  Yuga expressly asserted and offered

24   expert testimony in support of legal remedies (including a claim for actual damages

25   that its expert was able to quantify), which it then voluntarily relinquished.  Dkt. 315-

26   1 at 2 ("Yuga Labs is withdrawing all legal remedies"); Trial Tr. [Kindler] 172:14-17,

27   173:1-8, 174:4-7, 175:17-19.  Having abandoned available legal remedies, Yuga

28

cannot obtain disgorgement.  *See Hunting World Inc.*, 1994 WL 763408, at *2-3 ("[A]lthough Plaintiff has waived the right to collect damages, this does not render the claim purely equitable because, as discussed above, this is a statutory claim.  Again, because the statutes provide adequate remedies, a purely equitable claim may not be maintained.").

Additionally, Yuga improperly responds by arguing that the Court's summary judgment order supports a finding of intentional infringement, Yuga has incorrectly relied on the law of the case doctrine.  The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*: the summary judgment ruling on intent applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Also, Yuga's citations to the Lanham Act and the Court's statements at a pre-trial conference miss the mark.  Even if willfulness is not a requirement for disgorgement, that does not change that Courts have held an analysis of the infringer's mental state is crucial.  An infringer's mental state is a "highly important consideration in determining whether an award of profits is appropriate."  *Romag*

1  *Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). Disgorgement is only

2  warranted in cases of "conscious wrongdoers." *MGA Ent. Inc. v. Harris*, No. 2:20-cv-

3  11548-JVS (AGRx), 2022 WL 4596697, at *17 (C.D. Cal. July 29, 2022).

4  Disgorgement is, therefore, not an available remedy here because – as the evidence

5  showed at trial - neither Mr. Ripps nor Mr. Cahen is a "conscious wrongdoer." *See*

6  Ripps Decl. ¶¶ 144, 147, 158-176 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131, 145-

7  155 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-

8  803.0003-05, 08, 29-30.

9      ***Third,*** none of Defendants' profits are attributable to infringing activity.  Yuga

10  incorrectly outlines what is required for profit to be considered attributable to the

11  infringing activity.  It is not enough for a sale to be "traceable" to the use of Yuga's

12  marks.  Yuga is only entitled to disgorgement of profits "attributable to the infringing

13  activity." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993),

14  abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839

15  F.3d 1179 (9th Cir. 2016). Yuga incorrectly argues that any sale that uses a BAYC

16  mark is attributable to the infringing activity.  "If it can be shown that the

17  infringement had no relation to profits made by the defendant, that some purchasers

18  bought goods bearing the infringing mark because of the defendant's recommendation

19  or his reputation or for any reason other than a response to the diffused appeal of the

20  plaintiff's symbol" then they cannot be disgorged as "[t]he plaintiff of course is not

21  entitled to profits demonstrably not attributable to the unlawful use of his mark."

22  *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942).

23  This fundamental principle clearly prevents Yuga from receiving profits that were

24  made for reasons beyond the appeal of its symbol, namely the profits attributable to

25  those who reserved an RR/BAYC NFT as a protest against Yuga or to support Mr.

26  Ripps and his renowned reputation as a conceptual artist. *See* Ripps Decl. ¶ 21 (Dkt.

27  346) (uncontested); JTX-2333.

28

The record in this case is clear that *many* sales of RR/BAYC NFTs were not the result of confusion, but genuine protest.  Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating that they purchased the NFTs not because they were confused, but because they genuinely wanted to protest Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.  Although Ms. Kindler could not deny that some purchasers bought the RR/BAYC NFTs out of genuine protest of Yuga (Tria. Tr. 189:1-10), she nevertheless argued that apportioning out those purchases was unnecessary since *subsequent* purchasers may have been confused (an assertion for which she offered no evidence).  But that explanation makes little sense, and certainly does not justify her failure to apportion. To the contrary, in the hypothetical scenario where an initial purchaser *was not* confused and a subsequent purchaser was, a proper damages analysis would apportion out the profits accrued from the original sale and only count the profits from the sale that was attributable to confusion.  *See Mishawaka Rubber*, 316 U.S. at 206.

Further, Yuga's citations are unsupportive.  Specifically, the smart contract clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga.  *See* JTX-1146.   Additionally, Mr. Ripps and Mr. Cahen used modified versions of the alleged BAYC Marks in their reservations.  For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth."  *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.* Additionally, rrbayc.com contained a prominent artistic statement and a disclaimer.  Ripps Decl. ¶¶ 101, 104-106, 110 (Dkt. 346) (uncontested).

There is also ample evidence in the record that shows that there was no confusion and Yuga's response is not based in fact. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC

commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think, what you were focused on. Yuga Labs has been unable to identify even[] a single person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs; right? A Correct.").

***Fourth,*** Yuga's additional arguments are not persuasive.  Defendants incorporate their previous response as to why Yuga has failed to establish that they are entitled to at least $1,375,361.92 of Defendants' profits outlined above. *See supra* ¶

1    11(e).  As outlined previously, Defendants have shown that many sales of RR/BAYC

2    NFTs were made out of a protest against Yuga and not attributable to infringement

3    and Yuga's assertion that Defendants have failed to carry that burden is baseless.

4    Indeed, Mr. Ripps received dozens of letters from supporters of his artwork indicating

5    that they purchased the NFTs not because they were confused, but because they

6    genuinely wanted to protest Yuga.  Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested);

7    JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-

8    2599.   Additionally, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are

9    not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346)

10   (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).

11   Buttressing this fact, Yuga's founders were also not aware of a single instance of

12   actual confusion.  Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now

13   let's focus on, I think, what you were focused on. Yuga Labs has been unable to

14   identify even[] a single person who purchased an RR/BAYC believing it to be

15   sponsored by Yuga Labs; right? A Correct.").

16        Second, Defendants received a great amount of correspondence from collectors

17   of RR/BAYC NFTs.  Yuga falsely states that these are "cherry-picked

18   communications."   Mr. Ripps testified in his declaration: "I received **hundreds of**

19   **letters** thanking me for creating the RR/BAYC artwork and for standing up against a

20   corporation that had used hateful references in its brand" and then went on to give

21   eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346)

22   (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.

23   Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-

24   examine Mr. Ripps on this issue.   Thus, the uncontested evidence at trial shows that

25   Mr. Ripps received hundreds of letters from RR/BAYC participants expressing

26   support for the project and its criticism.

27

28

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested).  Instead of addressing correspondences from collectors, Yuga attempts to point to indications of consumer confusion.  However, none of Yuga's alleged indications of confusion are credible.

**Fifth,** the Court should not increase the profit award.  The section of the Lanham Act that Yuga cites to for support for its argument that the court should consider an upward modification of a profit calculation is inapplicable here and misleading.  As the full portion of Section 1117(a) states "[i]f the court shall find that the amount of the recovery based on profits is either inadequate *or excessive* the court may in its discretion enter judgment for such sum as the court shall find to be just, *according to the circumstances of the case. Such sum* in either of the above circumstances *shall constitute compensation and not a penalty*." 15 U.S.C. § 1117(a) (emphasis added).  Here, the circumstances of the case support a finding that any recovery of profits beyond those Mr. Ripps and Mr. Cahen received would be excessive.  For example, the evidence shows that the intent of the RR/BAYC project was to criticize Yuga's problematic imagery and educate consumers about the nature of NFTs—the exact opposite of confusing consumers.  Cahen Decl. ¶¶ 97-98, 133 (Dkt. 344); Ripps Decl. ¶¶ 137-139 (Dkt. 346) (uncontested); JTX-2033.  Mr. Ripps has had a long and successful career as an artist, during which he has created numerous satirical art projects spotlighting problematic societal issues.  Ripps Decl. ¶¶ 15-26 (Dkt. 346) (uncontested).

Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶

144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.   … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

The evidence at trial also shows that Yuga's public activities amounted to authorization of RR/BAYC collection and the numerous other collections that use the asserted marks.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks. Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344). There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-

1   23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr.

2   Cahen, and Mr. Hickman would have probably seen these collections using the Bored

3   Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr.

4   [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga

5   trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.

6   For example, there are published notebooks with ISBN numbers, commemorative

7   coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana

8   products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-

9   2398; JTX-2134; JTX-2410; JTX-2075.

10          Given these circumstances, if the court finds that disgorgement is appropriate,

11  the court should not find disgorgement of more than Mr. Ripps and Mr. Cahen's

12  profits is appropriate.  Such a decision would go beyond compensation and veer into

13  punishment, impermissible under the statute.

14          Second, Yuga's response here is inconsistent with their own Findings of Fact.

15  Specifically, in their Findings of Fact, Yuga asks for disgorgement of $1,375,361.92

16  in Defendants' profits. *See* Yuga's Proposed Finding of Fact Conclusion (Dkt. 418-1).

17  To state in this response to Defendants' Finding of Fact that Yuga seeks more in

18  disgorgement is inconsistent, unfounded, and misleading.

19          Finally, Yuga's citations to Ms. Kindler's testimony that there were damages

20  that she was not asked to evaluate or chose not to quantify are irrelevant to the

21  determination of how much disgorgement of profit Yuga is entitled to. *See* Kindler

22  Decl. ¶ 64 (Dkt. 338) ("I have not quantified the extent to which the confusion

23  impacted Yuga Labs' business partnerships…"); Kindler Decl. ¶ 65 (Dkt. 338) ("I

24  have not quantified the extent to which Defendants' wrongful conduct negatively

25  impacted the value of Yuga Labs' goodwill…"); Kindler Decl. ¶ 67 (Dkt. 338)

26  ("Defendants also benefited from their conduct in ways that are not quantified by my

27  profit analysis…").

28