Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
   HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Ryder Ripps, Jeremy Cahen, <br><br> Defendants. | Case No. 2:22-cv-04355-JFW-JEM <br><br> **Defendants' Objections to Disputed Conclusion of Law No. 62, Lines 18:19-22** <br><br> Judge: Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

## Plaintiff's Disputed Post Trial Conclusion of Law No. 62, lines 18:19-22:

For example, Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks. SJ Order at 12, 15. This intent is evident throughout their internal communications. *See, e.g.,* JTX-801.155, JTX-801.185, JTX-801.208, JTX801.237, JTX-801.238, JTX-801.239, JTX-1574, JTX-1586.

## Defendants' Basis of Dispute:

Defendants did not infringe on the BAYC marks with the intent to deceive customers or act with a bad-faith intent to profit off of the marks.  Defendants were involved in good-faith criticism of Yuga and its products.  Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense.  JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).  Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.  The only direct evidence about Mr. Ripps's intent is his declaration, and it should be credited over Yuga's statements because Yuga did not challenge his declaration.

Yuga's citations to the internal chat are misleading and omit several aspects of the internal chats which show a desire to avoid confusion or to criticize Yuga.  *See* JTX-801.448-49; 801.508; (calling project "education") 801.606-08; 803.005; 803.0029-30; 804.008.  They also ignore efforts by Defendants to *avoid* being

1  confused with Yuga.  *See* JTX-2085; 2086; 2103.  Defendants do not like BAYC, and

2  do not like Yuga or its activities.  Ripps Decl. ¶ 138 (Dkt. 346) (uncontested).  They

3  did not want to, and were not, confusing purchasers of RR/BAYC NFTs into

4  erroneously believing that they were purchasing a Yuga product.  *Id.*  In fact, Yuga

5  cannot point to a single instance of consumer confusion. Trial Tr: [Solano] 18:18-

6  19:15.

7          **Plaintiff's Response:**

8          Defendants' objection should be rejected because (1) Defendants' infringement

9  was not in "good faith"; (2) Defendants intended to confuse consumers; (3) Mr.

10  Ripps' declaration is not credible; (4) Mr. Ripps' Declaration is not uncontested; and

11  (5) Yuga Labs has produced ample evidence of confusion.

12          **Defendants' Infringement Was Not In Good Faith:**  Defendants' contention

13  that their infringing NFTs were good faith criticism is not supported by the evidence.

14  To the contrary, the relevant evidence demonstrates that Defendants intended to use

15  Yuga Labs' BAYC Marks to profit through their commercial promotion and sale of

16  RR/BAYC NFTs.  *See, e.g.*, JTX-1; JTX-1574; JTX-1586; JTX-801.239; JTX-

17  801.192; JTX-801.196; JTX-696.1; JTX-801.371.  Indeed, Defendants' infringement

18  could not have been in good faith because, even after the Court found their

19  infringement was likely to cause confusion and was not art protected by Rogers and

20  the First Amendment, Defendants intentionally continued to infringe on Yuga Labs'

21  Marks and promote RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 74.  Defendants'

22  @ApeMarketplace Twitter account continues to promote rrbayc.com and link to a

23  marketplace on which RR/BAYC NFTs are still available for sale.  Solano Decl. (Dkt.

24  342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19; *see also*, *supra* ¶ 4.

25          Moreover, Defendants' *Rogers* and First Amendment defenses have already

26  been rejected by the Court.  SJ Order (Dkt. 225) at 15-17.  Defendants' actions were

27  commercial trademark infringement.  *Id.*  And, the Court has already decided the issue

28

of Defendants' intent, finding that Defendants intentionally infringed Yuga Labs' BAYC Marks to deceive consumers and acted with a bad-faith intent to profit from their use of the marks.  SJ Order (Dkt. 225) at 12-15.

**Defendants Intended To Confuse Consumers:**  In granting Yuga Labs' motion for summary judgment, this Court held that Defendants intended to deceive consumers:

> When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose:  that is, that the public will be deceived." . . . In this case, Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks.  Because Defendants knowingly and intentionally used Yuga [Labs'] BAYC marks, and in the absence of contrary evidence, the Court concludes that Defendants used the BAYC marks in an effort to confuse consumers. . . . In addition, the Court concludes that Defendants intentionally designed the RR/BAYC NFTs and sales websites to resemble Yuga's branding.  For example, Defendants listed the RR/BAYC NFTs on rrbayc.com under the very same Ape ID number associated with BAYC NFTs, despite having their very own unique and different ID numbers.

SJ Order at 12 (citations omitted).  Similarly, the Court already determined that "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag."  *Id.* at 16.  Indeed, the accused actions "are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment."  *Id.*  Defendants' infringement is thus not art.  Instead, "Defendants' use of the BAYC marks is explicitly misleading."  *Id.* at 17.  Finally, the Court determined that Defendants' use of the rrbayc.com and apemarket.com domains was "with a bad faith intent to profit."  *Id.* at 15.  Despite these holdings, Defendants have continually disregarded this order and compounded this litigation by relitigating these settled issues.  Nevertheless, the evidence admitted at trial proves that these

settled issues should remain settled—Defendants were not motivated by a desire to create satire, they were motivated by greed.

Defendants' private communications show they knew they were using the BAYC Marks in a way that was likely to confuse consumers and did so with the intent to profit from their infringement.  Defendants discussed making "like a million dollars."  JTX-1574; *see also* JTX-1586 (Mr. Cahen to Mr. Ripps:  "I t[h]ink you are gonna make millions too man"); JTX-801.239 (Mr. Cahen to Mr. Lehman:  "I think we will make alot of money tbh"; "Potentially a lot").  And despite being urged to use different images or overlay some commentary on the images they did use to avoid confusion, Defendants chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market).  They also discussed that they knew they were infringing and creating confusion, as they acted contrary to their attorneys' advice.  JTX-801.371 (Cahen to Ripps:  "per our attorney we may just need to change the skull / If we want to fight trademark").  Instead of making changes, such as those recommended by their lawyer or Mr. Lehman, they continued to use Yuga Labs' BAYC Marks to promote and sell the RR/BAYC NFTs.  Solano Decl. (Dkt. 342) ¶ 70; see also Ripps Decl. (Dkt. 346) ¶ 55 ("In my experience, when designing logos and imagery for brands, every choice is intentional.").

Defendants also knew that what they were doing was likely to lead to a lawsuit.  For instance, Mr. Ripps asked for a reference to his limited liability company, Live9000 LLC, to be added to rrbayc.com because he did not "want to get sued personally."  JTX-803.57.  And, Mr. Lehman was still advocating for a "new logo and branding direction in light of the trademark thing" to Mr. Cahen before they learned of

1  this lawsuit (JTX-918.00035) because "I don't want to get sued, OR, if we do get

2  sued, for us to look really sympathetic to everyone" (JTX-918.0036) and that "now

3  with the logo thing we don't look sympathetic to everyone" (JTX-918.0037), to which

4  Mr. Cahen agreed (*id.*).  But they changed nothing about their use of Yuga Labs'

5  marks to minimize the confusion and their infringement.

6      Privately, Defendants also discussed strategies to "cannibalize" the secondary

7  NFT market with Ape Market, which Defendants used to stimulate sales of RR/BAYC

8  NFTs.  JTX-801.203; JTX-801.144.  Mr. Cahen bragged about being "pretty elite at

9  getting engagement on twitter."  JTX-801.203.  Defendants brainstormed about

10  needing some "controversy," "art press," "law stuff," "some unexpected event," or

11  "yuga dirt" in order to complete the first sale ("mint") of each infringing RR/BAYC

12  NFT.  JTX-801.289-290.  They also agreed that "[r]eleasing [Ape Market] will have

13  an effect" on their ability to "mint out" the RR/BAYC NFTs.  *Id.*

14      Publicly, Defendants made false representations about the RR/BAYC NFTs that

15  implied owning one offered equivalent benefits to owning a genuine BAYC NFT.

16  JTX-1037.  Defendants published their promotions from their individual Twitter

17  accounts and from the commercial @ApeMarketplace account advertising their

18  forthcoming NFT marketplace.  These advertisements were also directed at BAYC

19  NFT owners specifically.  Muniz Decl. (Dkt. 340) ¶ 13; Solano Decl. (Dkt. 342) ¶¶

20  46, 49.  Defendants were aware of the harm that RR/BAYC NFT sales would have on

21  Yuga Labs.  JTX-42; Trial Tr. at 208:16-209:6.  Through their communications,

22  Defendants revealed their true intent to profit from the infringing use of Yuga Labs'

23  BAYC Marks.

24      **Mr. Ripps' Testimony Is Not Credible:**  Mr. Ripps' testimony is not credible,

25  as demonstrated by its contradictions by the evidentiary record, other testimony, and

26  impeachment at trial.  For instance, in his trial declaration Mr. Ripps testified that he

27  "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl.

28

(Dkt. 346) ¶ 178.  However, ApeMarket was ready to launch within a matter of days.  *See* Trial Tr. at 247:10-12 ("Q:  And there was a ready-to-go Ape Market by February – excuse me – by June 24, 2022?  A:  Among other things, yes[.]"); JTX-1027 (post from Ape Market twitter account advertising that "ApeMarket.com will go live within 24 hours of the final mint, which we will announce shortly"); JTX 696 (posts from Ape Market Twitter account).  This confirms Mr. Atalay's testimony that the Ape Market source code "was in such a state of completion that it was operational."  Trial Tr. at 137:23-24.

Mr. Ripps also testified that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs' brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, documents entered into evidence at trial showed that Defendants intended to "make like a million dollars."  JTX-1574; *see also* Solano Decl. (Dkt. 342) at ¶ 72 ("Based on my review of public Twitter posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his scam, implying no one could stop him from counterfeiting NFTs and harming the goodwill of the BAYC brand.").  And, as a further example, Mr. Ripps testified that he minted the RR/BAYC NFTs to his "personal wallet, ryder-ripps.eth" despite the fact that the "ryder-ripps.eth" name did not appear on Etherscan until *after* minting, most if not all of, the infringing NFTs.  *Compare* JTX-25, *with* JTX-36.  Thus, Defendants' narrative that customers would not be confused because they could see the NFTs were minted from Mr. Ripps' wallet is belied by the fact that the wallet displayed Mr. Ripps' name *after* the initial mint and customers would not encounter the "ryder-ripps.eth" creator tag had they even tried to look.  While Mr. Ripps attempts to couch his lies in "sarcasm," the ultimate effect was confusion in the marketplace and a significant payday for Defendants.

Mr. Ripps also repeatedly lied about his discovery obligations, claiming that he had produced all responsive documents related to the RR/BAYC NFTs, but then producing additional documents after Yuga Labs independently discovered evidence

of improper withholding.  *See* JTX-1541; Dkt. 109-42; Dkt. 158; JTX-1574-JTX-1591.  Defendants have no excuse for their repeated improper withholding of material evidence and repeated lies under oath.

Mr. Ripps' testimony that the text message presented to him at trial did not have anything to do with the RR/BAYC project is another blatant lie.  These documents that Mr. Ripps wrongly withheld until after Yuga Labs' summary judgment submission included text messages discussing airdropping more of Defendants' infringing NFTs to the wallets of those who have already purchased them.  Thus, Mr. Ripps' testimony that he did not "really find it to have anything to do with the RR/BAYC project" is unbelievable.  Trial Tr. at 268:17-21; JTX-1574 (text messages in which Mr. Cahen suggests Mr. Ripps "airdrop like 10 more to each person who already bought one" and that if Mr. Ripps airdropped "20-30" he would "sell out within 48 hours" and "make like a million dollars").  Mr. Ripps' testimony reiterates what is obvious from the record:  Defendants' stories change based on what is convenient for them at the time.  Mr. Ripps, a proven liar, is not a credible witness.  His intent to infringe is proven by his own words In the documentary evidence.

And Mr. Ripps' testimony that he never marketed his infringing NFTs with the "Bored Ape Yacht Club" marks is also not credible.  Ripps Depo. Designations (Dkt. 369) 61:5-9.  Significant evidence proves the contrary.  *See, e.g.,* JTX-28 (Defendants' Foundation page listing their infringing NFTs as "Bored Ape Yacht Club").

**Yuga Labs Sufficiently Contested Mr. Ripps' Declaration:**  Yuga Labs did not leave Mr. Ripps' declaration "unchallenged."  Evidence admitted at trial disproves the core of Mr. Ripps' testimony.  One of the glaring instances where the evidence contradicts Mr. Ripps' testimony is when, in his trial declaration, Mr. Ripps testified that he "never reached a conclusion on what ApeMarket would actually be . . . ."  Ripps Decl. (Dkt. 346) ¶ 178.  However, at trial Mr. Cahen confirmed that ApeMarket was ready to launch within a matter of days.  Trial Tr. at 247:10-12 ("Q:  And there

1    was a ready-to-go Ape Market by February – excuse me – by June 24, 2022? A:

2    Among other things, yes[.]").  Another glaring contradiction is that Mr. Ripps testified

3    that his "intention in making the RR/BAYC artwork was not to monetize Yuga Labs'

4    brand."  Ripps Decl. (Dkt. 346) ¶ 182.  However, text messages entered into evidence

5    demonstrated that Defendants intended to "make like a million dollars" off of their

6    infringement.  JTX-1574.  Evidence further entered at trial depicted Mr. Ripps

7    publicly bragging about the millions of dollars he made off of his use of Yuga Labs'

8    marks.  *See* Solano Decl. (Dkt. 342) ¶ 72 ("Based on my review of public Twitter

9    posts produced in discovery, Mr. Ripps boasted that he made over $1.2 million on his

10   scam, implying that no one could stop him from counterfeiting NFTs and harming the

11   goodwill of the BAYC brand.").  Mr. Ripps' associates also confirmed this financial

12   motive.  JTX-801.208 (Mr. Cahen:  "priorities:  getting RRBAYC to sell out by

13   creating demand + getting BAYC and MAYC users to call our marketplace their new

14   home [] and collecting royalties at a fraction of what the other big dogs are charging []

15   which will be considerable passive income if we strike the right balance"); Hickman

16   Depo. Designations (Dkt. 394) at 129:3-6 ("My financial arrangement for this whole

17   thing is about as a software developer being compensated for making software");

18   JTX-1 at ¶ 11 ("I understood, based on more than a few conversations with

19   Defendants, that the Business Venture was expected to make money by selling

20   RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs

21   on Ape Market.").  Mr. Ripps can attempt to couch his lies in "sarcasm," but the

22   ultimate result was confusion in the marketplace and a substantial payday for

23   Defendants.  Simply repeating falsehoods and repeatedly rejected immaterial claims,

24   as Mr. Ripps does in his declaration, does not make them true or material to the

25   Court's remaining decisions.

26          Moreover, at trial, Yuga Labs demonstrated that Mr. Ripps is an unreliable

27   witness.  During cross-examination, Mr. Ripps admitted to his dishonesty during

28

discovery and his lies in prior declarations submitted under oath.  Trial Tr. at 268:12-25; *see also* JTX-1541 (Jan. 17, 2023 Ripps verification stating under penalty of perjury that he has "produced all responsive documents that I have been able to locate after a reasonable search"); Dkt. 109-42 (Feb. 17, 2023 Ripps declaration stating under penalty of perjury that he has "re-investigated my platforms and taken reasonable efforts to search for additional material for collection" and "[a]ll responsive materials that I have collected during my investigation has been provided to my attorneys and I have given permission to produce those materials with appropriate confidentiality designations"); Dkt. 158 (Mar. 21, 2023 Ripps declaration stating under penalty of perjury that he has "produced all relevant, nonprivileged documents" subject to Court's order compelling production).  Despite the repeated, under-oath, and Court-ordered assurances, that they had searched for and produced all relevant documents, Defendants withheld numerous documents (including their text messages with each other) until March 21, 2023 — after Yuga Labs had filed its motion for summary judgment.  The wrongly withheld documents include communications with BAYC NFT holders and communications about Defendants' profit intent.

Yuga Labs' cross-examination demonstrated that Mr. Ripps lacks credibility as a witness.  If Mr. Ripps lied before in multiple declarations under penalty of perjury, to evade his discovery obligations and hide incriminating evidence, it is reasonable to conclude that he lied to avoid the consequences of his infringement.  Therefore, ***his entire declaration*** cannot be relied upon.  Yuga Labs sufficiently challenged Mr. Ripps' declaration, and its contradictions by the evidentiary record show it is unreliable.  It should not be accepted as fact.

**There Is Ample Evidence Of Confusion In The Record:**  Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion.  SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-

801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7.  Defendants were aware of the confusion.  *See, e.g.*, JTX-801.195 (Mr. Lehman noting that people "making mistakes with apes is already a huge meme" and "Remember the 'average joes'?", and Cahen responding, "I mean that is unavoidable").  And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs.  JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined.  SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'") (citation omitted).  In any event, actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by

the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one").

### **Defendants' Reply:**

Yuga claims that Defendants could not have acted in good faith criticism and because Plaintiffs allegedly sought to profit and continued to "promote" rrbayc.com on the ApeMarket Twitter account after the granting of summary judgment.  Yuga's response is incorrect for several reasons: (1) the main support for Yuga's response is Mr. Solano's unreliable testimony, (2) Defendants acted in good faith because they believed the RR/BAYC collection was permissible criticism and took many steps to avoid confusion, (3) Mr. Ripps, who testified at length regarding the RR/BAYC project in his declaration, was credible, (4) Yuga failed to impeach Mr. Ripps, and (5) there is ample evidence of no confusion.

***First,*** Yuga primarily relies on the declaration of Mr. Solano to argue that Defendants acted intentionally to deceive consumers.  Mr. Solano is not credible given the many false and misleading statements contained in his declaration.  For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.    And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.    Yes.
>
> Q.    So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.    It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.

Q.   *They don't continue to increase; correct, sir?*

A.   *Correct.*

Q.   *That statement, that part of your witness statement is incorrect; right?*

A.   *Yes.*

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

   ***Second***, Yuga's argument that Defendants' intended to confuse consumers is baseless.  The evidence at trial showed that Defendants are not intentional infringers and did not intend to suggest that RR/BAYC was related to Yuga in any way.  Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize rather than to confuse.  For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct.  Ripps Decl. ¶¶ 144, 147 (Dkt. 346) (uncontested); Cahen Decl. ¶ 131 (Dkt. 344); JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30.

   Defendants also took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to

commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13.  Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? …  A.  … Ryder wanted it and so he had the final call.").

Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent.  In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images.  Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.
Defendants also created the RR/BAYC collection based on a good faith belief that Yuga had given authorization for the creation of projects like RR/BAYC.  At the time Mr. Ripps and Mr. Cahen launched the RR/BAYC project, there were more than 9,000 other third-party projects using Yuga's marks.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244.  Before suing Mr. Ripps and Mr. Cahen over the RR/BAYC project, Yuga had not taken steps to stop these third-party projects from using Yuga's marks.  Ripps. Decl. ¶ 185 (Dkt. 346) (uncontested); Cahen Decl. ¶ 206 (Dkt. 344).  There were hundreds of NFT collections unaffiliated with Yuga that use the Bored Ape Yacht Club Brand on the NFT marketplace OpenSea.  Trial Tr. [Muniz] 77:19-23; [Muniz] 78:7-21; [Muniz] 80:3-13. Ms. Muniz admitted that Mr. Ripps, Mr. Cahen, and Mr. Hickman would have probably seen these collections using the Bored Ape Yacht Club trademarks at the time they created the RR/BAYC project.  Trial Tr. [Muniz] 77:19-23. 26.  There are "literally thousands" of products that use Yuga trademarks without sponsorship or affiliation with Yuga.  Trial Tr. [Muniz] 81:18-22.  For example, there are published

notebooks with ISBN numbers, commemorative coins, alcohol products, skateboards, cereal brands, restaurants, and CBD/marijuana products that are unaffiliated with Yuga that use Yuga's trademarks.  *See*, *e.g.*, JTX-2398; JTX-2134; JTX-2410; JTX-2075.

Moreover, Mr. Hickman, a member of the RR/BAYC project team, was a holder of a BAYC NFT containing the asserted marks and having received IP rights associated with the Bored Ape Yacht Club.  Ryan Hickman, who collaborated with Mr. Ripps and Mr. Cahen on the RR/BAYC project, owned a BAYC NFT at the time of the project.  Hickman Decl. ¶¶ 19-22 (Dkt. 345).  BAYC NFTs had Terms & Conditions, and the intent behind the Terms & Conditions for BAYC NFTs was to allow people to be able to commercialize their NFTs.  Trial Tr. [Solano] 25:1-4 ("Q. Your intent in writing the terms and conditions was to allow people to be able to commercialize their NFTs.  We can agree on that; right? A. Yes.  That is covered in the terms.").  Yuga encouraged the public to use the BAYC artwork and to be creative with BAYC's intellectual property.  For example, Yuga's CEO Nicole Muniz publicly represented that BAYC NFT holders received all IP rights and that Yuga has none of those rights.  Trial Tr. [Muniz] 72:3–73:17; Cahen Decl. ¶ 189 (Dkt. 344); Hickman Decl. ¶¶ 25-26 (Dkt.345); JTX 2672; JTX 2673.  Ms. Muniz confirmed that someone listening to her public statement about Yuga not having any IP rights would not have heard the word copyright.  Trial Tr. [Muniz] 72:19-22.

The evidence that Yuga cites does not rebut this overwhelming evidence of Defendants' intent to protest and criticize because Yuga relies on mischaracterizing and taking out of context evidence.  For example, Yuga repeatedly cites to various pages of JTX-801 to argue that Defendants were aware of the Yuga's alleged confusion.  But those pages are internal discussion about the design of the ApeMarket website to ensure that users of apemarket.com were not confused by the website design.  Yuga even cross-examined Mr. Hickman about these communications and

1   received the same explanation: "This is our attempt to make it as clear as possible.

2   We are having discussion on how to make sure it was very clear for users."  Trial Tr.

3   [Hickman] 212:22-24.

4         Yuga also cites to correspondence among the creators discussing a possible fear

5   of litigation.  These discussions are taken out of a broader context of hundreds of

6   thousands of communications the creators made.  Further, whether the Defendants

7   feared possible litigation for criticizing a multi-billion dollar company does not

8   establish that they intended confuse anyone.

9         Additionally, Yuga points to private chat conversations the creators had about

10  Ape Market.  The portions they cite to do not show any intention to confuse and

11  further ApeMarket was never released, and there was no evidence that the webpage

12  apemarket.com was a functioning website.  Trial Tr. [Muniz] 85:11-12; [Hickman]

13  217:25-218:1; Cahen Decl. ¶ 260 (Dkt. 344); Ripps Decl. ¶ 180 (Dkt. 346)

14  (uncontested).

15        Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-1037,

16  in which he states that "RR/BAYC grants to 100% commercial rights, community

17  member created a shopping site for his! Now you can get the hoodie of your dreams."

18  This was a tweet making fun of Yuga's Terms & Conditions, which has caused

19  thousands of third parties to use the Bored Ape Yacht Club and its marks for projects

20  and products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346)

21  (uncontested); Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-

22  2134; JTX-2410; JTX-2075.   The trial record contains no evidence that there was

23  ever a website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC

24  t-shirts), and this does not demonstrate an intent to confuse consumers.

25        ***Third,*** Mr. Ripps was credible.  Mr. Ripps's declaration was uncontested

26  because Yuga elected to forego any substantive cross-examination of Mr. Ripps on

27  ***any*** portion of Mr. Ripps's declaration.  *See* Trial Tr. [Ripps] 267:7-271:9.  As the

28

Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is because the purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]"). Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Yuga incorrectly argues that Mr. Ripps's declaration was challenged by other evidence in the trial record. Yuga did not show at trial that any of this other evidence in the trial record undermines Mr. Ripps's testimony, because Yuga never addressed that purported other evidence in any way at trial. This is precisely why Yuga's failure to cross-examine Mr. Ripps is fatal to their new post-trial challenges to his testimony. Having failed to challenge Mr. Ripps's testimony at trial, Yuga now seeks to take evidence out of context and mischaracterize documents. This cannot remediate their election not to contest Mr. Ripps's credibility at trial.

For example, Yuga incorrectly argues that Mr. Ripps's testimony that ApeMarket was in the ideation stage and that he had not decided on what ApeMarket would be was somehow contradicted by Mr. Cahen's testimony. Contrary to Yuga's argument, Mr. Cahen repeatedly testified that ApeMarket was in the ideation stage:

> Q.   You used the prospect of a marketplace to drive sales of RR/BAYC NFTs; correct?
>
> A.   What I would say I did was use the prospect of a potential marketplace ***which we were in the ideation phase of***, I would say that I absolutely 100 percent used the prospect of that to draw attention to my protest of racism, anti-Semitism, and financial fraud being committed by Yuga Labs and Bored Ape Yacht Club.

Trial Tr. [Cahen] 231:21-232:3 (emphasis added).

> 258.   We discussed the idea of creating a system that would allow holders of popular NFT collections to trade their NFTs without being fleeced by centralized parties charging exorbitant fees.

> 259.   Ultimately, **we never agreed on what ApeMarket would be**.

Cahen Decl. ¶¶ 258-259 (Dkt. 344) (emphasis added).  Other witness corroborated Mr. Ripps's testimony that he had not decided what ApeMarket would be.  Mr. Hickman testified about his ongoing discussion on potential designs of ApeMarket, explaining:

> Q.   BY MR. BALL:  You state here, "It's difficult to make the collection coexist without adding a friction step."

> A.   This is a discussion, ***an ideation of different ideas, none of which were actualized***.

Trial Tr. [Hickman] 211:19-22 (emphasis added).

Yuga also incorrectly argues that the trial record contradicts Mr. Ripps's declaration regarding his intent in creating the RR/BAYC collection.   The full testimony that Yuga cites provides:

> 182.   My intention in making the RR/BAYC artwork was not to monetize Yuga's brand but instead to criticize Yuga's use of objectionable imagery and to educate the public about the nature of NFTs.

> 183.   As an artist, I believed that I could create an "army of educators" through my art.

> 184.   I believed that use of art to criticize Yuga and its imagery was protected by the First Amendment.

Ripps Decl. ¶¶ 182-184 (Dkt. 346) (uncontested). Significant evidence in the record corroborates Mr. Ripps's statements. Mr. Ripps's and Mr. Cahen's contemporaneous communications about the RR/BAYC project confirm that their intent was to use RR/BAYC to criticize. For example, in private group chats among participants in the RR/BAYC project (JTX-801, 803-804), Mr. Ripps and Mr. Cahen discussed their intended artistic purpose of the project, their intention that it would spread criticism of Yuga, and their intention that social media platforms be used to educate the public about the nature of NFTs and what they saw as Yuga's misconduct. JTX-801.00010, 012-13, 146, 196, 240, 276, 328-29, 353-354; JTX-803.0003-05, 08, 29-30. Defendants' online discussion, which consisted of nearly the entirety of Defendants' public activities associated with RR/BAYC, confirms their intent. In those discussions, Mr. Ripps and Mr. Cahen discussed what they believed to be inappropriate messaging in Yuga's imagery and how the RR/BAYC project shows that NFTs are not digital images. Ripps Decl. ¶¶ 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04. And lastly, the voluminous correspondence that Defendants received shows that they did in fact create a "community of educations" as Mr. Ripps intended, who have written letters expressing gratitude and support for the criticism of Yuga. Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

Yuga incorrectly argues that this evidence regarding Mr. Ripps's intent has been refuted by citing JTX-1574 to suggest that Mr. Ripps privately said that he intended to make a million dollars from the RR/BAYC artwork. But in reality, ***the document contains no such statement from Mr. Ripps***. The entirety of Mr. Ripps statements in JTX-1574 were "lolol" (which stands for "laugh out loud" repeated twice). In other words, Mr. Ripps was laughing at a ***joke*** made by Mr. Cahen. And Mr. Ripps in the same exchange later stated that he needs "to get a front end" in

response to more jokes from Mr. Cahen (again, not a reference to any intent to profit). *See* JTX-1574.

Yuga also cites the unreliable Declaration of Gregory Solano. Mr. Solano is not credible given the many false and misleading statements contained in his declaration. For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q.   And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A.   Yes.
>
> Q.   So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A.   It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while.  Although, those were supposed to be donated to charity and never were.
>
> Q.   ***They don't continue to increase; correct, sir?***
>
> A.   ***Correct.***
>
> Q.   ***That statement, that part of your witness statement is incorrect; right?***
>
> A.   ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added).  Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 40:3-14.  Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew

1   he could not settle his case without executing a declaration concerning matters of

2   Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his

3   family at the time he signed his declaration, because Yuga's lawsuit against him

4   would be disastrous to his family and himself, even if Mr. Lehman won (Trial Tr.

5   [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated

6   impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't

7   even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A

8   Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a

9   deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same

10  oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up

11  on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3

12  created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't

13  know.' Was that your testimony at your deposition? A Yes."); *id*. at 34:9-19 ("[Q] Do

14  you know whether Ape Market exists? A We have the code for Ape Market from Tom

15  Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6.

16  'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.'

17  Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's

18  testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also

19  been rebutted.  Mr. Solano could not identify a single person that ever bought an

20  RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1.  In fact,

21  no one has been able to identify a single confused consumer in the entirety of this

22  case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

23          Yuga then incorrectly argues that Mr. Ripps's statement about his intent is

24  refuted by comments from other members of the RR/BAYC project.  But these

25  statements show no such thing.   For example, Yuga's cites JTX-801.208 in which

26  Mr. Cahen states that a priority is "getting RR/BAYC to sell out."  But as Mr. Cahen

27  explained at trial, the whole point of broad exposure through the RR/BAYC collection

28

1   (including getting people to reserve NFTs) was "spreading and magnifying criticism

2   of Yuga." Cahen Decl. ¶ 98 (Dkt. 344). And Mr. Cahen's private communications in

3   the same exhibit (JTX-801) confirm that the RR/BAYC collection was created for

4   artistic criticism: "… we actually all dig the idea of Ryder literally hand minting these

5   things. It's quite funny and artistic." (JTX-801.00010); "I love it. It puts the primary

6   focus on the art … and is a conceptual commentary." (JTX-801.00012-13); "It makes

7   a strong statement. This is art, not Pokemon cards." (JTX-801.00013); "Because

8   that's where the real importance lies. RR/BAYC truly is very important conceptual

9   art imo. And now we are all helping shape that art further." (JTX-801.00196).

10  Yuga also cites Mr. Hickman's deposition testimony in which he stated that his

11  "financial arrangement" was "a software developer being compensated for making

12  software." Hickman Depo. Designations (Dkt. 394) at 129:3-6. But Mr. Hickman's

13  testimony about this topic at trial was unequivocal about his purpose in participating

14  in the RR/BAYC project:

15      Q.   Why did you expect to make less from your work on this RSVP
16           contract than your normal rate?

17      A.   I was contributing because I believe in standing up for the illegitimate
18           business practices and imagery in this Yuga Labs BAYC NFT
19           collection.

20  Trial Tr. [Hickman] 221:11-15. Mr. Hickman further explained, "We are selling a

21  receipt that says *I committed to this protest* that points to the same public [images] that

22  a lot of different collections point to including Yuga Labs point to the same resource."

23  Trial Tr. [Hickman] 222:18-21 (emphasis in original).

24      Yuga also cites to Mr. Lehman's declaration to suggest that Defendants

25  considered the RR/BAYC collection to be a "business venture." Defendants never

26  used the term "business venture" to describe the RR/BAYC project. In fact, the only

27  place where the term appears is in Mr. Lehman's declaration, which was a document

28

1  drafted by Yuga and signed under coercion and under threat to Mr. Lehman's family.

2  Yuga's attorneys, not the Defendants, coined the term "business venture."  As

3  demonstrated during trial, Mr. Solano relied on the phrase "business venture" in Mr.

4  Lehman's declaration, without having considered that Yuga's counsel drafted the

5  declaration and selected the phrase "business venture," and without having considered

6  that Mr. Lehman would have liked to use different words.  Trial Tr. [Solano] 37:20-

7  22; [Solano] 40:3-14.  Mr. Solano also relied on the declaration without having

8  considered that Mr. Lehman was afraid for his family at the time he signed his

9  declaration, because Yuga's lawsuit against him would be disastrous to his family and

10  himself, even if Mr. Lehman won.  Trial Tr. [Solano] 38:17-19.

11      Lastly, Yuga argues that it somehow challenged Mr. Ripps's trial declaration

12  through its cross-examination of Mr. Ripps concerning his earlier January 17, 2023,

13  verification.  But Yuga's cross-examination did not result in any impeachment or

14  inconsistency:

15
16      Q.    You produced those text messages, that you withheld throughout this
           case, including when you testified that you had no responsive
17           documents on January 17, 2023; correct?

18      A.    I think that we – the question was all communications that relate to
           the creation of RR/BAYC, which we felt was very much in the group
19           chat that was called RR/BAYC.  And we produced that, which you
           guys have extensively relied on.
20

21

22  Trial Tr. [Ripps] 268:5-11.  Mr. Ripps further explained:

23      Q.    And, Mr. Ripps, the text messages that you produced in this case
24           include the RR/BAYC chat; right?

25      A.    Yes.  We produced everything that we could, despite the fact that
26           Yuga produced nothing.

27

28

1

2

Q.     Exhibit Number JTX-801 is the RR/BAYC – on of the RR/BAYC chats that you produced; right?

3

4

A.     I don't have it on the screen, but I see you holding them, and I see them –

5

Q.     Do you see it now?

6

7

8

A.     Yes.  We produced hundreds of thousands possibly of messages that all were between the four people involved in the final state of the project and basically everything to do with the development of this project.

9

10

Q.     Did you believe, in good faith, that you had given Yuga everything that had to do with the development of this project?

11

12

A.     Yes, I did.

13   Trial Tr. [Ripps] 270:3-18.  Mr. Ripps further testified that Yuga had sought sanctions

14   multiple times based on Yuga's false accusations of discovery misconduct, and that

15   this Court denied all of Yuga's baseless motions.  Trial Tr. [Ripps] 269:21-270:2.  Mr.

16   Ripps's trial testimony is no surprise given that the verification stated "[I] produced

17   all responsive documents that I have been able to locate after a reasonable search" and

18   further stated "I also understand that discovery obligations are continuing, and I will

19   produce any additional responsive materials or information to the extent any are found

20   based on a reasonable investigation.  ***I reserve the right to make changes or additions***

21   ***to any of these answers or document productions*** if it appears at any time that errors

22   or omissions have been made or if more accurate or complete information becomes

23   available." Dkt. 109-33 (emphasis added).  Mr. Ripps fulfilled his discovery

24   obligations and upheld his verification by providing all the responsive material he

25   located after a reasonable search to the best of his knowledge.

26          The context and accurate content of the evidence Yuga cites shows that the trial

27   record does not contradict any portion of Mr. Ripps's declaration.  Yuga had an

28

opportunity to fully vet its false allegations at trial through cross-examination of Mr. Ripps but elected not to do so.  Mr. Ripps's testimony was therefore unchallenged.

**Fourth,** Yuga failed to impeach Mr. Ripps because, as explained, Yuga's cross-examination regarding Mr. Ripps's production of documents did not show any inconsistency and, in fact, the very verification that Yuga references made that Mr. Ripps acknowledging ongoing discovery obligations and reserved the right to make supplemental productions. Dkt. 109-33.

**Fifth,** there is ample evidence that there was **no** consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way.  For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10.  Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT.  *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A.  … Ryder wanted it and so he had the final call.").

Unsurprisingly, therefore, the evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.

1   As Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a

2   single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial

3   Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344).  Buttressing this fact,

4   Yuga's founders were also not aware of a single instance of actual confusion.  Trial

5   Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7 ("Q. Now let's focus on, I think,

6   what you were focused on. Yuga Labs has been unable to identify even[] a single

7   person who purchased an RR/BAYC believing it to be sponsored by Yuga Labs;

8   right? A Correct.").

9   The evidence Yuga cites to is not supportive of a finding that there was

10  consumer confusion.  Specifically, Yuga relies on survey evidence provided by Ms.

11  O'Laughlin.  As demonstrated at trial, however, Ms. O'Laughlin conducted two

12  flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that

13  she used an overly expansive definition of the market that included people who did

14  not have any interest in purchasing an NFT, much less knowledge of what an NFT is.

15  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.

16  She acknowledged that she changed the survey population after running pretests to

17  make it more inclusive. *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that

18  she lacked basic knowledge about the NFT market, admitting to erroneously believing

19  that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id*.

20  at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey

21  that could not show confusion because the market was too broad.  This was despite

22  her acknowledgement that choosing the right sample population "matters for the

23  analysis" and choosing an improper sample population would be a mistake. *Id.* at

24  146:18-25.

25  Ms. O'Laughlin also erred by producing two contradictory surveys.  In 2020

26  she authored an article titled, "Which Method is For You? Not All Surveys Are Made

27  the Same" JTX-314.  In that article she discusses choosing between the Squirt and

28

1  Eveready surveys on the basis of the strength of the mark.  In this case, however, she

2  ignored her own advice and operated both surveys.  This was despite acknowledging

3  that at her deposition she agreed with her earlier advice that the Eveready survey is

4  most appropriate when the mark is strong, and the Squirt survey when the mark is

5  weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the

6  strength of the mark.  *Id*. at 144:12-18.  This broke with her prior practice as well, as it

7  was the first case she personally testified in where she offered an opinion based on

8  both surveys.  *Id.* at 144:19-24.  Ms. O'Laughlin should have chosen between the

9  surveys, but by not doing so she did not produce a finding of value on either survey.

10      Ms. O'Laughlin also could not explain the extremely strong priming effect

11  which influenced her results to her Everready survey.  In that survey, people were split

12  into those who saw a version of the RR/BAYC Foundation page that included the

13  words "Bored Ape Yacht Club."  Those in the control group of the experience would

14  see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote

15  the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those

16  in the control group who copied down the words "Chill Gorilla Boat Crew" were not

17  counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of

18  those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not

19  counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that

20  she did not account for this extreme priming effect calling it "not particularly

21  relevant."  *Id.* at 158:20-159:1.

22      Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the

23  versions of the websites that she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-

24  163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not

25  fundamentally flawed, she can attest to confusion on two websites for only a matter of

26  days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court

27  should reject them and provide them no weight.

28

1    Further, this unreliable survey evidence, again does not show that anyone who

2    actually reserved an RR/BAYC NFT was confused about its origin and, therefore,

3    does not undermine the accuracy of this finding of fact.

4    The documentary evidence Yuga cites to is also unsupportive. For example,

5    Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated

6    software application and not evidence of a real person's confusion. *See* Cahen Decl.

7    ¶¶ 226-227 (Dkt. 344).  The very first comments included on that tweet include users

8    identifying that Mr. Ripps is the source of the NFT not Yuga.  Further, there is no

9    indication that any of the Twitter users commenting actually reserved an RR/BAYC

10   NFT.  This evidence provides no support for an argument that this finding of fact is

11   inaccurate, therefore.  *See also* JTX-1030, JTX-1032 (Tweets where the users are

12   quickly identifying Mr. Ripps as the source of the NFT); JTX-1031, JTX-1034, JTX-

13   1035 (Out of context one off tweets of users, that there is no evidence to believe

14   purchased an RR/BAYC NFT, replying to GemBot).

15   Yuga also cites to private chats that the RR/BAYC creators used.  These

16   exhibits are unsupportive of a finding that there was actual confusion.  For example,

17   JTX-109 includes a discussion where Mr. Lehman raises concerns about how the

18   marketplace is designed and may cause confusion.  Mr. Cahen responds and provides

19   suggestions about what they could do to make it even more clear.  Further, this chat

20   focused on the creation of ApeMarket, which never was launched and could,

21   therefore, never have caused any actual consumer confusion.  Cahen Decl. ¶¶ 257-262

22   (Dkt. 344); *see also* JTX-801.185 (again including a discussion about how to make

23   ApeMarket clearer).

24   Also, Yuga cites to a screenshot, JTX-701, of a Bloomberg newscast.  This

25   exhibit does not support a finding of actual confusion.  The chart separately lists both

26   "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor

27   understood that these were two different projects.  Additionally, as Mr. Cahen

28

testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga collection.  Cahen Decl. ¶ 252 (Dkt. 344).

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which is immaterial to this matter and again was entered after Mr. Lehman settled his own case with Yuga.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Further, this does not undermine the finding of fact as this does not show that anyone who reserved an RR/BAYC NFT was confused about the origin.

Finally, Yuga cites to its own declarations and trial testimony where their witnesses make conclusory and unfounded statements about possible confusion.  *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding, however, that anyone who bought an RR/BAYC NFT was actually confused.

Yuga states that Mr. Ripps and Mr. Cahen did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.  This is categorically false.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.   Accordingly, there was ample evidence

presented at trial that showed consumers were not confused about the source of the RR/BAYC NFTs.  Indeed, Mr. Ripps testified in his uncontested declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received.  Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added).  At no point during trial did Yuga dispute this fact.

*Lastly,* to the extent that it is arguing that the Court foreclosed any evidence of intent, this is incorrect for two reasons.  First, it conflates two different types of intent.  The issue of intent is uniquely impacted at the exceptional case and damages stages.  The "law of the case doctrine does not apply to pretrial rulings *such as motions for summary judgment*."  *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.  Given the nature of such motions, it could not be otherwise.").  For example, in *Sienze v Kutz*, the Court held that although *aspects* of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics.  *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to the already decided issue that initial contact was not excessive force).  This case is just like *Sienze*:  the summary judgment ruling on Mr. Ripps and Mr. Cahen's intent in using the alleged marks applies to only the issue of likelihood of confusion and cannot be applied more broadly.  Here, Defendants' intent is particularly relevant to the determination of whether disgorgement is available and that is an issue that the Court has not decided and needs to weigh the evidence presented at trial on the issue.  *See Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020).  Accordingly, Defendants do not

1  raise that issue to burden the Court's time, as Yuga incorrectly states, but to present

2  evidence on a central issue of the case.  Further, Yuga's assertion that Defendants'

3  objection here constitutes a refusal to accept the Court's orders is inaccurate and

4  misleading.  As stated above, there is ample evidence of Defendants' good faith in

5  creating the marks including evidence of steps taken to ***avoid*** confusion with Yuga.

6  *See* JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76

7  (Dkt. 346) (uncontested).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28