1 **Defendants' Disputed Post Trial Finding of Fact No. 14:**

<u>A non-fungible token, or NFT, is a representation of ownership of a unique piece of data on an internet blockchain. Trial Tr. [Atalay] 127:9-16.</u>

**Plaintiff's Basis for Dispute:**

This is an incomplete definition of what an NFT is. The Court has already found as much on Yuga Labs' Motion for Summary Judgment, for example, writing that "viewing the NFTs as ownership receipts treats the NFTs as mere written instructions while ignoring their documented commercial value." SJ Order (Dkt. 225) at 7. NFTs are sold "specifically for their connection to a particular brand, creator, or associated creative work." *Id.* at 8. Moreover, "'[i]ndividuals do not purchase NFTs to own a digital deed divorced from any other asset; they buy them precisely so that they can exclusively own the content associated with the NFT.'" *Id.* (*quoting* <u>*Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023)</u> (internal quotation marks omitted)).

The evidence introduced at trial also establishes that Defendants' definition of an NFT is too narrow. Mr. Solano explained that NFTs "are units of data stored on a blockchain that are created to transfer ownership of either physical things or digital media—here digital images of cartoon apes. The term 'NFT' commonly refers to both the token stored on the blockchain and the digital image with which it is associated." Solano Decl. ¶ 2 n 1. And Mr. Solano further testified that purchasers of BAYC NFTs purchased for different reasons, including how the BAYC NFT image resonated with them, showing that for some people an NFT includes the image associated with it. *Id*. ¶ 12. Mr. Atalay also testified that there is "probably more that you could say than that…" in reference to Defendants' limited definition. Trial Tr. at 127:9-13. Mr. Atalay went on to explain that NFTs include metadata and other data that is not metadata but may be on the blockchain. *Id.* 128:8-24.

**Defendants' Response:**

Yuga improperly objects to Defendants' proposed finding of fact because, by arguing that the Court's summary judgment order supports a finding that an NFT is more than a certificate of ownership, Yuga has incorrectly relied on the law of the case doctrine. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although ***aspects*** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling the nature of NFT applies only the issue of infringement and is not adequate support on intent generally or as applied to availability of disgorgement as a remedy, apportionment, and an exceptional case analysis.

Yuga argues that an NFT is more than just a certificate of ownership of unique data on a blockchain (which is essentially a digital spreadsheet), but Yuga's contention is inconsistent with the trial record. Yuga's Chief Technical Officer was asked to explain to the Court what an NFT is, and he confirmed it is a certificate of ownership:

> Q. An NFT is an on-chain representation of ownership; right, sir?
>
> A. ***I would say that's accurate.*** There's probably more that you could say than that, but that's generally accurate, yeah.

> Q. It's ownership of a unique piece of data; right, sir?
>
> A. *Yes.*

Trial Tr. [Atalay] 127:9-16 (emphasis added). Mr. Atalay's testimony, and the fact than an NFT is simply a certificate of ownership of data on the blockchain and does not include associated public images readily accessible and usable by anyone with internet, was further corroborated by Mr. Hickman's trial testimony:

> THE COURT: *When you are selling defendants' NFTs, you are selling Yuga's images.*
>
> THE WITNESS: *No. We are selling the record.*
>
> THE COURT: Okay. But the record points to and displays those images.
>
> THE WITNESS: So the images are public. They are available for anybody to navigate to on the internet.
>
> THE COURT: Right.
>
> THE WITNESS: *We are selling a receipt that says I committed to this protest* that points to the same public [images] that a lot of different collections point to including Yuga Labs pointing to the same resource.

Trial Tr. [Hickman] 222:10-21 (emphasis added).

Thus, the only two engineers that testified during trial provided the Court with the same substantive testimony—that an NFT is a certificate of ownership and does not include the images that an NFT often points to. Yuga attempts to rebut this evidence (including the testimony of its own Chief Technical Officer) by citing to the Declaration of Greg Solano. But Mr. Solano is not credible given the many false and misleading statements contained in his declaration.

For example, Mr. Solano was forced to concede on cross-examination that his sworn declaration included a false statement claiming that Defendants continue to receive royalties from sales on secondary marketplaces:

> Q. And you understand that Mr. Ripps and Mr. Cahen have testified that they do not currently receive any royalties or creator fees from sales on secondary marketplaces; right?
>
> A. Yes.
>
> Q. So you don't have any basis for your statement that their profits continue to increase; correct?
>
> A. It's my understanding that they were collecting royalties or creator fees from LooksRare for quite a while. Although, those were supposed to be donated to charity and never were.
>
> Q. ***They don't continue to increase; correct, sir?***
>
> A. ***Correct.***
>
> Q. ***That statement, that part of your witness statement is incorrect; right?***
>
> A. ***Yes.***

Trial Tr. [Solano] 48:15-49:4 (emphasis added). Mr. Solano also relied on the phrase "business venture" in Mr. Lehman's declaration, without having considered that the phrase "business venture" was selected by Yuga's counsel, and that Mr. Lehman would have liked to use different words. Trial Tr. [Solano] 40:3-14. Mr. Solano also relied on Mr. Lehman's declaration without having considered that Mr. Lehman knew he could not settle his case without executing a declaration concerning matters of Yuga's choosing (Trial Tr. [Solano] 38:14-16) and that Mr. Lehman was afraid for his family at the time he signed his declaration, because Yuga's lawsuit against him would be disastrous to his family and himself, even if

Mr. Lehman won (Trial Tr. [Solano] 38:17-19).  Mr. Solano also lacks credibility as a result of his repeated impeachment at trial.  Solano Decl.; Trial Tr. [Solano] 32:19-33:11 ("Q You don't even know, sir, whether Bored Ape V3 was created by Ryder Ripps or not, do you? A Yes, I do. Q Let's see what you said at your deposition, if we could. You gave a deposition in this case; right? A Yes. Q And you swore an oath to tell the truth, same oath as today; right? A Yes. Q If we look at your deposition -- and we can pull it up on the screen -- at page 152, starting at line 13 'QUESTION: Was the Bored Ape V3 created by Ryder Ripps?' There's an objection from your counsel. 'ANSWER: I don't know.' Was that your testimony at your deposition? A Yes."); *id.* at 34:9-19 ("[Q] Do you know whether Ape Market exists? A We have the code for Ape Market from Tom Lehman, yes. Q Take a look at your deposition at page 116, lines 5 through 6. 'QUESTION: Do you know whether Ape Market exists? 'ANSWER: I don't recall.' Were you asked that question, and did you give that answer? A Yes.").  Mr. Solano's testimony regarding allegations of confusion (Trial Tr. [Solano] 5:14-54:22) have also been rebutted.  Mr. Solano could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT.  Trial Tr. [Solano] 18:23-19:1. In fact, no one has been able to identify a single confused consumer in the entirety of this case.  *See* Trial Tr. [Yuga's witnesses] 11:3-203:24.

**Plaintiff's Reply:**

As the Court has already found, Defendants' definition of an NFT is too narrow and ignores their consumers' understanding of NFTs' connection to a particular brand, creator, or associated creative work.  SJ Order (Dkt. 225) at 7-8. As discussed *supra* ¶ 9, the Court's summary judgment order already ruled on basic facts establishing Defendants' liability—including Yuga Labs' ownership of the marks.  Defendants' repeated attempt to undermine that ruling is unavailing and makes this an exceptional case.  Further, Defendants' response contradicts their own stipulations in the proposed pre-trial conference order.  *See* Dkt. 320-1 at 3.  In

that stipulation and proposed order, Defendants admitted that Yuga Labs is the creator of the Bored Ape Yacht Club NFT collection and owner of the BAYC Marks. *Id.* at 2-3. Defendants further admitted that "[t]he Court has determined that Defendants infringed the BAYC Marks." *Id.* at 13.

As discussed *supra* ¶ 3, Defendants' response further lacks merit. Specifically: (1) Defendants fail to impeach Mr. Solano's accurate testimony; and (2) confused consumers are unlikely to admit that they have fallen for Defendants' scam. As Mr. Solano explained, being scammed is "super embarrassing" and consumers who were tricked "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16.

Additionally, the Court should reject Defendants' responses because (1) they mischaracterize the evidence presented at trial. Defendants' limited reading of Mr. Atalay's trial testimony ignores the fact that when asked whether "[a]n NFT is an on-chain representation of ownership," he answered "I would say that's accurate. ***There's probably more that you could say than that***, but that's generally accurate, yeah." Trial Tr. 127:9-16 (emphasis added). In fact, as described above, the evidence and testimony presented at trial accurately described the additional aspects of an NFT. Mr. Atalay went on to explain that NFTs include metadata and other data that is not metadata but may be on the blockchain. *Id.* 128:8-24. And Mr. Solano added that NFTs also include ownership of physical things or digital media associated with it. Solano Decl. ¶¶ 2 n.1, 12.

The testimony of Mr. Solano and Mr. Atalay align with the Court's ruling in its summary judgment order. Defendants' narrow definition is baseless.