**Defendants' Disputed Post Trial Finding of Fact No. 22:**

Although Mr. Ripps and Mr. Cahen understood that these requirements created additional steps that made it more cumbersome for collectors to commission an NFT piece through the project, Mr. Ripps insisted on them so that the artistic purpose of his work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24] ("Q. … Why was the artist statement ultimately included, if it had a negative impact on usability? … A. … Ryder wanted it and so he had the final call.").

**Plaintiff's Basis for Dispute:**

Defendants did not take steps to make the artistic purpose of his work clear. To the contrary, Defendants took many steps to ensure that the public was and would remain confused. *See supra* ¶¶ 19-21. In addition, Defendants' alleged steps to address confusion by the first purchaser ignore post-sale confusion. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."). That consumers were purchasing Defendants' NFTs with the expectation to resell them to other confused consumers is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17 *see also id.* at 16:13-15 ("As I mentioned, there's a number of people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants cannot rebut this fact or law.

**Defendants' Response:**

Defendants expressly reserve and reassert all responses made in the parties' Joint Statement (Dkt. 421).

The efforts Defendants made to ensure that nobody was confused were clearly done in good faith because those efforts were successful. Defendants received voluminous correspondence from RR/BAYC participants—none of which indicated any confusion from primary sales *or secondary sales* and further expressed support for the protest. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599.  Neither Defendants nor Mr. Hickman are aware of a single instance of confusion (*including post-sale confusion*).  Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.  Yuga itself was also unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga (*including post sale confusion*).  Trial Tr. [Muniz] 85:3-7.  Mr. Solano similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT (*including post sale confusion*).  Trial Tr. [Solano] 18:23-19:1.

This is no surprise given that Defendant took significant steps to make clear that collectors understood the satirical nature of the RR/BAYC project.  Mr. Ripps explained that he never sold an RR/BAYC NFT to somebody he believed was confused, believed that consumers could not be confused, took steps to avoid confusion, and that he chose to make his project an NFT collection because that was the only way his criticisms would make sense.  JTX-2085; JTX-2086; Ripps Decl. ¶¶ 92-94; 102-109; 113-114; 137-53; 159-76 (Dkt. 346) (uncontested).  Yuga did not challenge these statements when it elected not to cross-examine Mr. Ripps.

The rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an

1   explanation of the artistic intent.  Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested);

2   Cahen Decl. ¶¶ 138-139, 147 (Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial

3   Tr. [Solano] 63:1-10.  The rrbayc.com website were also required reading and

4   clicking through a disclaimer acknowledging the artistic purpose of the project.  *See*

5   Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz]

6   83:10-13.  Mr. Ripps insisted on these additional steps so that the artistic purpose of

7   the work would be clear.  *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

8        Defendants' online discussion, which consisted of nearly the entirety of

9   Defendants' public activities associated with RR/BAYC, also that informed the

10  public regarding the satirical nature of RR/BAYC NFTs, pointing out Yuga's

11  inappropriate messaging and the nature of NFTs. Ripps Decl. ¶¶ 148-157 (Dkt.

12  346) (uncontested); Cahen Decl. ¶¶ 151, 208-209 (Dkt. 344); Dkt. 197-1 ¶¶ 203-04.

13       Yuga argues that this evidence of efforts to not confuse is rebutted by

14  Etherscan's token tracker for the RR/BAYC NFT collection.  But Defendants have

15  no control over the Etherscan website, what it displays, and how it chooses to show

16  the RR/BAYC collection.  Mr. Atalay himself has admitted that consumers of NFTs

17  do not use Etherscan's token tracker/token name but instead rely on marketplaces

18  or check associated smart contract addresses.  Trial Tr. [Atalay] 135:2-25.  Mr.

19  Atalay explained that using token "would be a fairly weak way to do so because

20  often those things are mutable.  They can be changed after the fact.  Also, there's no

21  guarantee of uniqueness."  Trial Tr. [Atalay] 133:12-23.

22       Yuga also misleadingly cites to internal chats.  The communications that

23  Yuga cites are in fact internal discussions about ApeMarket and how to ensure that

24  users would not be confused by the design of website.  The statement at JTX-

25  801.196 that Yuga relies on to argue that RR/BAYC was likely to cause confusion

26  is actually discussing how to create a design for the never-released ApeMarket that

27  would not be confusing for users of the website.  *See* JTX-801-196.  Yuga

28  attempted to cross-examine Mr. Hickman regarding these communications, and Mr.

1    Hickman explained, "This is our attempt to make it as clear as possible.  We are

2    having discussion on how to make sure it was very clear for users."  Trial Tr.

3    [Hickman] 212:22-24.

4          Yuga also falsely argues that Defendants' marketing efforts did not indicate

5    that RR/BAYC was an NFT collection created by Mr. Ripps and for satirical

6    purposes.  Yuga cites to JTX-29, which is an OpenSea page that Mr. Ripps did not

7    create.  Regardless, the page clearly labels the NFT collection as "RR/BAYC" and

8    stated that it is "By ryder_ripps."  The exhibit also has Defendants' satirical logo

9    stating, "THIS LOGO IS BASED ON THE SS TOTENKOPF."   JTX-28, similarly,

10   is the Foundation page which Mr. Ripps also did not design.  But regardless, the

11   page states that the collection was created by "@ryder_ripps."  JTX-683 also makes

12   clear that Defendants' NFT collection is not the same as Yuga's—it states

13   "RR/BAYC is official the highest 24h volume on @openseas … We passed BAYC

14   in the middle of Apefest!"  JTX-719 is similarly a tweet by Mr. Ripps stating, "very

15   much winning this battle, will continue to fight" with a link to the Foundation page

16   for the RR/BAYC collection.  And JTX-696 is simply the ApeMarket Twitter page,

17   which links to rrbayc.com and states in the first post, "Make sure to join the

18   RR/BAYC community discord!"  Again, Yuga is wrong to assert that these exhibits

19   show that Defendants marketed the RR/BAYC collection without commentary.

20         Yuga similarly takes out of context Mr. Ripps satirical posts, such as JTX-

21   1037, in which he states that "RR/BAYC grants to 100% commercial rights,

22   community member created a shopping site for his! Now you can get the hoodie of

23   your dreams."  This was a tweet making fun of Yuga's Terms & Conditions, which

24   has caused thousands of third parties to use the asserted marks for projects and

25   products unaffiliated with Yuga.  Ripps Decl. ¶¶ 187-191 (Dkt. 346) (uncontested);

26   Hickman Decl. ¶ 33 (Dkt. 345); JTX 2243; JTX 2244; JTX-2398; JTX-2134; JTX-

27   2410; JTX-2075.   The trial record contains no evidence that there was ever a

28   website selling RR/BAYC clothes (Defendants have never sold any RR/BAYC t-

shirts), and Mr. Ripps's tweets poking fun at Yuga's Terms & Conditions hardly amounts to representing that RR/BAYC granted commercial rights.

Yuga also incorrectly asserts that Defendants continued to market RR/BAYC NFTs even after the summary judgment order in this case.  The exhibits Yuga cites (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-party marketplaces were trading the NFTs despite Yuga's efforts to silence Defendants' criticism and public reports of certain transactions occurring in connection with the RR/BAYC collection.  As Mr. Cahen explained in his declaration, "Overall, I would consider myself a very active community member in the cryptocurrency space, which is something that I take pride in.  A lot of the work I do takes place over social media."  Cahen Decl. ¶ 50 (Dkt. 344).  Mr. Cahen further explained, "I often use my social media accounts to report on crypto news or other topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344).

Yuga also incorrectly cites to this Court's summary judgment order to suggest that use of a disclaimer is not a step taken to avoid confusion.  The "law of the case doctrine does not apply to pretrial rulings such as motions for summary judgment." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986); *see also* *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).

And Yuga's complaint that Defendants did not use a disclaimer on Foundation, Etherscan, or any other third-party website is inapposite.  Defendants have no control over third party websites such as Etherscan and do not have the ability to design the pages third-party websites use or how they choose to display the RR/BAYC NFT collection.

**Plaintiff's Reply:**

Contrary to Defendants' suggestion, they failed to take steps to avoid confusion when selling the infringing RR/BAYC NFTs, creating further potential for actionable initial interest and post-sale confusion.

Defendants' response is unavailing because (1) the Court's summary judgment order established liability, even in the face of Defendants' alleged disclaimer (*supra* ¶ 9), (2) Defendants intended to confuse consumers and refused to implement "friction steps" to avoid confusion (*supra* ¶ 19), (3) Defendants' unreliable communications with third-parties do not negate evidence of actual confusion or the likelihood of post-sale confusion (*supra* ¶ 11), (4) Defendants' infringement was not an art project or "reporting news" (*supra* ¶ 10), (5) it fails to rebut Yuga Labs' evidence of post-sale confusion (discussed in Yuga Labs' objection to this section; *infra* ¶ 37), (6) confusion over sponsorship or affiliation is actionable (*supra* ¶ 19), (7) most RR/BAYC NFTs were sold on secondary marketplaces without a disclaimer (*supra* ¶ 19), and (8) Defendants intended to confuse consumers and had control over third-party websites and marketplaces (*supra* ¶ 19).

Further, Defendants' attempts to rebuff their false misrepresentation that "RR/BAYC grants to 100% commercial rights" as a joke merely concedes the point that Defendants' representations are lies and they are not credible.

Additionally, Defendants' cited testimony is not credible because it was contradicted by the declaration of their co-conspirator: Mr. Lehman. As noted above, Defendants frequently testified that they did not intend to profit from their infringement, but Mr. Lehman testified: "based on more than a few conversations with Defendants, that the Business Venture was expected to make money by selling RR/BAYC NFTs and by potentially generating transaction fees from the sale of NFTs on Ape Market." JTX-1 at ¶ 11. Despite Mr. Cahen's testimony that he did not anticipate his infringement to cause confusion in the marketplace, Mr. Lehman

testified that "[o]n at least one occasion, Defendant Cahen affirmatively agreed with the concern about underestimating how confusing it would be to use the BAYC logo alongside the RR/BAYC logo on Ape Market." Id. at ¶ 22. Indeed, all three witnesses testified that they did not expect their products to cause confusion even though Mr. Lehman testified that he "repeatedly shared [his] concerns with Defendants" that the RR/BAYC NFTs would cause confusion and lead to a lawsuit. Id. at ¶ 21. Mr. Lehman's testimony is corroborated by the documentary evidence, including principally the Team ApeMarket Discord (JTX-801). The contradictions with Mr. Lehman's testimony and the documentary evidence highlight the dishonesty of Defendants' testimony and Mr. Hickman's testimony and demonstrate why the Court should discount their trial testimony completely.