**Defendants' Disputed Post Trial Finding of Fact No. 32:**

The evidence presented at trial did not show that a single RR/BAYC NFT was sold to a consumer who believed it was created by Yuga rather than by defendants. *See, e.g.,* Ripps Decl. ¶¶ 196-207 (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224; Trial Tr. [Hickman] 219:13-19; Trial Tr. [Muniz] 85:3-7; Trial Tr. [Solano] 18:23-19:1.

**Plaintiff's Basis for Dispute:**

Yuga Labs produced ample documentary and testimonial evidence demonstrating consumer confusion. SJ Order (Dkt. 225) at 12; JTX-1; JTX-109; JTX 621; JTX-701; JTX-801.185, 376; JTX-1029; JTX-1030; JTX-1031; JTX-1032; JTX-1034; JTX-1035; Ripps Deposition at 290:4-9; JTX-1049; Berger Declaration (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22; Yuga Labs' Proposed Findings of Fact and Conclusions of Law (Dkt. 416) at ¶¶ 4-7. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. SJ Order (Dkt. 225) at 10-13; *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("[C]ases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut.'"). In any event, actual confusion is not required; and the Court already found

Defendants' use of BAYC Marks to be infringing. SJ Order (Dkt. 225) at 12. Yuga Labs is thus entitled to Defendants' profits due to their infringing activity regardless of whether purchasers were actually confused. *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 238, 255 (S.D.N.Y. 2012) (granting defendant's profits even where infringement claims premised solely on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale."); *See* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 23:6 (5th ed.) ("Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.").

**Defendants' Response:**

Defendants expressly reserve and reassert all responses made in the parties' Joint Statement (Dkt. 421).

First, there was *no* consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga. The rrbayc.com website—through which the majority of RR/BAYC commissions occurred (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) explained the artistic purpose. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 147(Dkt. 344); Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. The rrbayc.com website also required reading and clicking through a disclaimer. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these additional steps to make the artistic purpose clear. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

Unsurprisingly, the trial evidence shows that people reserved RR/BAYC NFTs out of protest. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595-2596, JTX-2599.

Second, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Yuga and Mr. Solano were also not aware of any actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Third, Yuga relies on O'Laughlin's flawed survey evidence. Ms. O'Laughlin admitted that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16; 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also admitted that she lacked basic knowledge about the NFT market and erroneously believed that cryptocurrency was an NFT when creating her surveys and reports. *Id.* at 147:12-14. The result of her lack of knowledge was a flawed survey that could not show confusion because the market was too broad. This was despite her admitting that the right sample population "matters for the analysis." *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article discussing choosing between the Squirt and Eveready surveys on the basis of the strength of the mark. JTX-314. However, she ignored her own advice and operated both surveys. This was despite her admission that she agreed that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak. Trial Tr. [O'Laughlin] 143:9-144:6. She never discerned the strength of the mark. *Id.* at 144:12-18. This was the first case she offered an opinion based on both surveys. *Id.* at 144:19-24.

Ms. O'Laughlin also could not explain the priming effect which tainted her Everready survey. In that survey, people were split into those who saw the

RR/BAYC Foundation page with the words "Bored Ape Yacht Club" and those in the control group that saw "Chill Gorilla Boat Crew." Those in the experiment group who wrote "Bored Ape Yacht Club" were counted as confused, but those in the control group who copied "Chill Gorilla Boat Crew" were not counted as confused. Trial Tr. [O'Laughlin] 154:24-157:14. Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew," but were not counted as confused. *Id.* at 157:9:14; 158:20-159:1. Ms. O'Laughlin admitted that she did not account for this priming effect. *Id.* at 158:20-159:1. Ms. O'Laughlin also acknowledged that she could not attest to how long the versions of the websites that she used existed. *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22. At most, she can attest to confusion for only a matter of days. *Id.*

The documentary evidence Yuga cites is unsupportive. Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not a real person. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that Mr. Ripps is the source of the NFT not Yuga. There is no indication that any users commenting reserved an RR/BAYC NFT. *See* JTX-1030, JTX-1031-1032, JTX-1034-1035.

Yuga also relies on JTX-109, but it includes a discussion where Mr. Lehman raises concerns about the design of ApeMarket and Mr. Cahen provides suggestions to make it clearer. Further, ApeMarket was never launched and could never have caused actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185.

Yuga also relies on a Bloomberg newscast. JTX-701. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the anchor understood that these were two different projects. Additionally, Mr. Cahen testified that he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga NFT. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and

credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which was entered after settlement.

Yuga also cites to Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs. Ripps Depo. Designations (Dkt. 396) at 290:4-9. Again, this does nothing to support a finding of consumer confusion as any consumer had the ability to determine the provenance of an RR/BAYC NFT through Etherscan. Ripps Decl. ¶¶ 88-89. This also does not show that anyone who reserved an RR/BAYC NFT was actually confused.

Finally, Yuga cites to witnesses making conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22. These statements do not support a finding of actual confusion.

Fourth, the trial evidence shows that people who reserved RR/BAYC NFTs did so out of protest. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595-2596; JTX-2599.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations. For example, the logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth" and rrbayc.com use "RR/BAYC" throughout. *See* JTX-2085.

Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings such as motions for summary judgment." *Shouse v. Ljunggren*, 792 F.2d 902, 904 (9th Cir. 1986); *see also Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).

Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's profits, Yuga can only receive profits "attributable to the infringing activity." *Lindy*

1  *Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016). As outlined above, there was no evidence that a single purchase of RR/BAYC NFTs was made by someone thinking it was sponsored by Yuga.

Yuga's citations to *Gucci* and *Levi* are inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as a protest. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595-2596, JTX-2599. There is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7. Finally, profits attributable to secondary sales according to Yuga's own expert is only $117,309. Dkt. 418-1 at 6.

**Plaintiff's Reply:**

The Court has already found a likelihood of confusion, there are many instances of confusion in the record, and Yuga Labs' experts found that consumers were confused. Defendants' responses lack merit. Specifically: (1) Defendants' infringement was intentional and not an art project (*supra* ¶ 10), (2) the record shows that Defendants were aware that their infringement would result in confusion (*supra* ¶¶ 13, 23), (3) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 22, *infra* ¶ 58), (4) the Court's summary judgment order establishes liability and intent (*supra* ¶ 9), and (5) Defendants have already stipulated to Yuga Labs' ownership of its BAYC Marks (*supra* ¶ 23).

Additionally, the Court should reject Defendants' responses because (1) Ms. O'Laughlin's methodology and report are reliable (*infra* ¶ 41), (2) Yuga Labs is entitled to Defendants' profits (*infra* ¶ 109), (3) all of Defendants' profits are

attributable to their infringement (*infra* ¶ 103), (4) Defendants used Yuga Labs' marks (*supra* ¶ 40), (5) Defendants' disclaimers did not negate confusion in the marketplace (*supra* ¶ 40), (6) the majority of Defendants' infringing NFTs were not sold on rrbayc.com (*infra* ¶¶ 19, 103), (7) post-sale and initial interest confusion are actionable (*supra* ¶¶ 22, 37), and (8) confusion based on affiliation or sponsorship is actionable (*supra* ¶ 19).  Finally, as discussed herein, (1) consumers looking to Etherscan to verify their NFTs would still be confused, (2) the @0xGem Tweets demonstrated confusion in the marketplace, (3) Defendants' internal conversations demonstrated knowledge of a likelihood of confusion, and (4) Defendants fail to account for ongoing harm.

**Consumers Looking To Etherscan Were Still Confused:**  Defendants cannot keep their story straight.  Now, they proffer that consumers *do* look to Etherscan to verify their NFTs after they initially claimed that this was not the proper way to authenticate an NFT.  *See infra* ¶ 66.  Nonetheless, those consumers who did look to Etherscan to verify their NFTs, which as Mr. Cahen conceded is "very common," (Cahen Depo. Designations (Dkt. 395) at 148:10-13), they would still encounter Yuga Labs' marks.  *See* JTX-117 (Etherscan screenshot showing "Bored Ape Yacht Club" and "BAYC" as token tracker and contract name respectively); *see also* Atalay Decl. (Dkt. 337) ¶ 7.  Defendants' unaltered use of Yuga Labs' marks on the RR/BAYC smart contract supported a finding of likelihood of confusion.  SJ Order (Dkt. 225) at 17 ("Defendants used Yuga's BAYC Marks to . . . ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT.").

**The Gem Bot Tweet And Replies Demonstrated Confusion:**  The @0xGem Tweets demonstrated confusion in the marketplace.  As discussed above, that some consumers were not confused is irrelevant because post-sale and initial interest confusion are nonetheless actionable.  But more importantly, several replies

to the @0xGem Tweets demonstrated consumers confusion. *See* JTX-1029 ("The confusion in these comments will be prime evidence in the RR v Yuga case."); JTX-1030 ("shit man I looked on chain and didn't even realize it was RR."); JTX-1031 ("What a gold ape sold for 6eth must be a glitch!"). Thus, these Tweets demonstrate how confusing Defendants' scam was as they demonstrated how consumers were confused by the fact that the infringing NFTs used Yuga Labs' same marks and their same images, and were even confusingly labeled on Etherscan.

**Defendants' Internal Communications Showed They Knew Confusion Was Likely:** The evidence shows that Defendants knew they were infringing and creating confusion. *See supra* ¶¶ 13, 23; JTX-801.371 (Cahen to Ripps: "per our attorney we may just need to change the skull / If we want to fight trademark"); JTX-801.376 (Mr. Lehman wrote that the RR/BAYC logo "could be considered confusing and our use of the 'BAYC' name."); JTX-801.185 (Mr. Lehman writing, "overall I think we should be very careful about doing this in terms of the confusion it will create").

**Defendants Fail To Account For Ongoing Harm:** Regardless of how much Defendants profited off the sale of their infringing NFTs on secondary marketplaces, the fact remains that Yuga Labs continues to suffer ongoing harm. Indeed, Yuga Labs will only be made whole by an injunction that orders the transfer of the immutably infringing smart contract. Trial Tr. 134:4-7 ("In this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance."); *see also* Solano Decl. (Dkt. 342) ¶ 47 ("Unless Yuga Labs has control of the RR/BAYC smart contract, Yuga Labs' brand will be forever tied to Mr. Ripps"). Defendants' citation to the profits calculation of Yuga Labs' own witness does nothing to rebut this ongoing harm or militate against a sufficient injunction.