**Defendants' Disputed Post Trial Finding of Fact No. 33:**

None of the correspondence that Mr. Ripps or Mr. Cahen received from actual RR/BAYC NFT collectors indicated that any commissions or secondary sales were due to confusion as to the source or the nature of the RR/BAYC NFTs. Ripps Decl. ¶¶ 196-207 (uncontested).

**Plaintiff's Basis for Dispute:**

Defendants' cherry-picked communications from a self-selecting group are far from a comprehensive survey of consumer confusion in the market. Defendants have no evidence supporting a claim that a statistically significant number of consumers were not confused. Indeed, the hundreds of refunds they provided at consumers' requests suggest that some purchasers were confused. *See e.g.* Kindler Decl. (Dkt. 338) ¶ 44. At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16. Moreover, they ignore the ample confusion on Twitter and other sources that Yuga Labs identified. *See, e.g.*, *supra* ¶ 32. Defendants were aware of the confusion. *See, e.g.*, *supra* ¶ 24 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341)¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Moreover, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. *See supra* ¶ 32.

**Defendants' Response:**

Defendants expressly reserve and reassert all responses made in the parties' Joint Statement (Dkt. 421).

Yuga falsely states that that Defendants "cherry-picked communications." Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added). At no point during trial did Yuga dispute this fact. Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.

Yuga has also failed to present evidence disputing the fact that none of these correspondences indicated that commissions or secondary sales were due to confusion. Ripps Decl. ¶¶ 196-207 (uncontested).

First, Yuga's citation to Dr. Kindler's declaration does not support their allegations that Defendants provided "hundreds of refunds" or that those alleged refunds indicate confusion. *See* Kindler Decl. (Dkt. 338) ¶ 44. Mr. Ripps never received a refund request from anyone stating they were confused or thought that they were reserving a Yuga product. Ripps Decl. ¶ 122 (Dkt. 346) (uncontested).

Second, Yuga's evidence does not indicate there was confusion on Twitter. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga. There is no indication that any users commenting actually reserved an RR/BAYC NFT. *See* JTX-1030, JTX-1032; JTX-1031, JTX-1034, JTX-1035.

Third, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For

example, JTX-109 includes a discussion where Mr. Lehman raises concerns about how the marketplace is designed and may cause confusion.  Mr. Cahen responds and provides suggestions about what they could do to make it even more clear.  Further, this chat focused on the creation of ApeMarket, which never was launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185 (again including a discussion about how to make ApeMarket clearer).

Fourth, Ms. O'Laughlin's survey evidence is unreliable.  Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion.  Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is.  Trial Tr. [O'Laughlin] 150:2-151:16 (discussing survey qualification flow); 152:4-10.  She acknowledged that she changed the survey population after running pretests to make it more inclusive.  *Id.* at 144:25-146:7.  Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports.  *Id.* at 147:12-14.  The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad.  This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake.  *Id.* at 146:18-25.

Fifth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order.  The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)*.

Sixth, Yuga's citation to *Levi* is inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. For example, the rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these requirement and additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. Furthermore, none of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga. Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Buttressing this fact, Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges. *See* Trial Tr. [Ripps] 267:7-271:9. As the Supreme Court has explained, "[c]ross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004) ("One longstanding purpose of cross examination is to expose to the fact-finder relevant and discrediting information[.]"). Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

**Plaintiff's Reply:**

Defendants obfuscate the issues with irrelevant and immaterial arguments and fail to rebut Yuga Labs objection. As discussed *supra*, Defendants' responses lack merit. Specifically, (1) Defendants' anecdotal evidence of communications

with purported purchasers is unpersuasive (*supra* ¶ 11), (2) whether a handful of initial purchasers were confused, post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 22, 37), (3) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (5) Ms. O'Laughlin's report is reliable and accurate (*infra* ¶ 41), (6) the Court's summary judgment order establishes Defendants' liability (*supra* ¶ 9), (7) Defendants' "disclaimer" did not prevent confusion, (*supra* ¶ 20), (8) most of Defendants' infringing NFTs did not sell on rrbayc.com (*infra* ¶¶ 19, 103), (9) the record shows multiple instances of actual confusion (*supra* ¶ 32); and (10) Mr. Lehman's declaration is truthful and contradicts Defendants (*supra* ¶ 22, *infra* ¶ 58).

Additionally, the Court should reject Defendants' responses because (1) Defendants failed take steps to avoid confusion, and (2) Defendants' refunds demonstrate confusion.

**Defendants Failed Take Steps To Avoid Confusion:** Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" *immutably* in the metadata for the NFT smart contract, but they chose not to. Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146. Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to. *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'"); JTX-696.1 (tweet showing screenshot of Ape Market). Defendants could have attacked Yuga Labs in countless non-infringing ways. But they did not. Instead, they used Yuga

Labs' marks, commercially, in the way that would make Defendants the most money by selling counterfeit NFTs that confused consumers. O'Laughlin Decl. (Dkt. 341).

**The Refunds Issued By Defendants Are Evidence Of Confusion:** Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused. Defendants' cherry-picked communications with purported purchasers do not credibly rebut this fact for the reasons discussed *supra* ¶ 11. With Defendants' infringing NFTs selling for "approximately $200 per NFT," Defendants' own calculations demonstrate that hundreds of refunds were requested and processed. Solano Decl. (Dkt. 342) ¶ 54. Indeed, Defendants have admitted that a substantial number of purchasers demanded a refund. Ripps Decl. (Dkt. 346) ¶¶ 119, 170, 172, 174-175. At least some of those hundreds of refund demands could have been from confused consumers who "weren't going to, you know, raise their hand and shout about it." Trial Tr. at 54:10-16; *see also* Trial Tr. at 83:19-84:3 (Ms. Muniz testifying that "people came that were lured in because they believed it was a BAYC and then were, like, oh, it's not. But it's a really, really good fake. And it's such a good fake that it actually convinced Twitter and I mean Twitter from a front-end user interact platform but also Twitter as individuals and people in a community and consumers. So I believe people were lured in thinking it was authentic BAYC then realized, oh, wait, it's not, but it's a cheap version that's really, really good. It's a really good fake."). These consumers likely requested refunds, regardless of whether they admitted to their confusion.