**Defendants' Disputed Post Trial Finding of Fact No. 39:**

<u>Collectors of RR/BAYC NFTs intended their purchases to support the project's goals of criticizing Yuga's imagery and educating people about the nature of NFTs. Ripps Decl. ¶¶ 200-201 (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2589, JTX-2590, JTX-2591, JTX-2592, JTX-2595, JTX-2596; JTX-2599.</u>

**Plaintiff's Basis for Dispute:**

Defendants did not conduct a survey about what "collectors" of RR/BAYC NFTs thought. Instead, they cherry-picked a handful of emails from a self-selecting group, ignoring the ample confusion on Twitter and other sources that Yuga Labs has identified. *See supra* ¶ 32. And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion. Moreover, there is no reliable evidence in the record that the individuals identified in the cited emails, or all other purchasers, are "collectors" as Defendants contend.

There is a clear likelihood of confusion as well, given Defendants' use of the same marks and images, which the Court already determined. *See supra* ¶ 32.

Additionally, while Defendants publicly claim there was an artistic goal (to "look really sympathetic to people" if caught, in the words of their partner (JTX-918.00036)), their internal communications overwhelmingly focus on a business venture to sell Ape Market, their profit motive, and riding on the coattails of the BAYC brand for their own enrichment. *Supra* ¶ 38 (collecting citations).

Finally, JTX-2589 and JTX-2591 are not in evidence, and not proper for consideration on this issue.

**Defendants' Response:**

Defendants expressly reserve and reassert all responses made in the parties' Joint Statement (Dkt. 421).

Yuga falsely states that Defendants "cherry-picked communications." Mr. Ripps testified in his declaration: "I received **hundreds of letters** thanking me for creating the RR/BAYC artwork and for standing up against a corporation that had used hateful references in its brand" and then went on to give eight specific examples of the letters he received. Ripps Decl. ¶¶ 196-207 (Dkt. 346) (uncontested) (emphasis added). At no point during trial did Yuga dispute this fact. Yuga did not present any rebuttal evidence at trial and Yuga elected to not cross-examine Mr. Ripps on this issue.

Yuga has also failed to present evidence disputing the fact that collectors purchased RR/BAYC NFTs in order to support the project's goals of criticizing Yuga's imagery and educating people about the nature of NFTs. Ripps Decl. ¶¶ 200-201 (uncontested); JTX-2033; JTX-2035; JTX-2039; JTX-2590; JTX-2592; JTX-2595; JTX-2596; JTX-2599.

First, Yuga's evidence does not indicate there was confusion on Twitter. For example, Yuga cites to JTX-1029, which includes a tweet from GemBot, which is an automated software application and not evidence of a real person's confusion. *See* Cahen Decl. ¶¶ 226-227. The very first comments included on that tweet include users identifying that the Mr. Ripps is the source of the NFT not Yuga. Further, there is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. *See* JTX-1030, JTX-1032; JTX-1031, JTX-1034, JTX-1035.

Second, Yuga also cites to private chats that the RR/BAYC creators used. These exhibits are unsupportive of a finding that there was actual confusion. For example, JTX-109 includes a discussion where Mr. Lehman raises concerns about the design of ApeMarket and Mr. Cahen suggests how to make it clearer. Further,

ApeMarket was never launched and could, therefore, never have caused any actual consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185.

Third, Ms. O'Laughlin's survey evidence is unreliable. Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16; 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis" and choosing an improper sample population would be a mistake. *Id.* at 146:18-25.

Fourth, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings ***such as motions for summary judgment***." [Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986)](emphasis added); *see also* [Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014)](.

Fifth, Yuga's citations to *Levi* is inapplicable here, given the evidence shows consumers reserved RR/BAYC NFTS as part of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. The evidence, therefore, does not support a finding that these reservations were made so that the buyer could then confuse someone else in secondary sales. Also, as mentioned above, there is no evidence that anyone who reserved an RR/BAYC NFT, on either initial or

secondary sales, was confused about its origin. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Ripps Decl. ¶ 223 (uncontested) (Dkt. 346); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19; Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Sixth, evidence at trial showed that Defendants were not primarily motivated by profits. Defendants explained that profits were a concern, but not the primary motive of the project. Cahen Decl. ¶ 156 (Dkt. 344). Profits helped offset costs and sustain Defendants' artistic project. Cahen Decl. ¶ 173 (Dkt. 344). Defendants' decisions surrounding refunds and royalties confirm that they were not primarily motivated by profits. Ripps Decl. ¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶ 158-171 (Dkt. 344). The RR/BAYC project allowed for a full refund, for any reason. Ripps Decl. ¶ 119 (uncontested) (Dkt. 346); Cahen Decl. ¶ 159 (Dkt. 344). Additionally, the Defendants' declined taking royalties on transfers of RR/BAYC NFTs whenever possible. Ripps Decl. ¶¶ 116-118 (uncontested) (Dkt. 346); Cahen Decl. ¶¶ 166-171 (Dkt. 344).

Defendants have provided extensive evidence to rebut Yuga's allegations of confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. The rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these

additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest against Yuga. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595, JTX-2596; JTX-2599. None of the parties in this case can identify a single person who purchased an RR/BAYC NFT believing it to be sponsored by Yuga. Defendants are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Yuga's founders were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Additionally, Defendants cite Mr. Ripps's uncontested declaration in support of this finding of fact. This Court is entitled to accept Mr. Ripps's declaration because the trial transcript shows that Yuga elected to forego any substantive cross-examination of Mr. Ripps on any portion of Mr. Ripps's declaration that Yuga now challenges. *See* Trial Tr. [Ripps] 267:7-271:9. "Cross-examination is the principal means by which the believability of a witness and truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). This is because purpose of cross-examination is "the direct and personal putting of questions and obtaining immediate answers." *Id.*; *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004). Yuga's decision to not cross-examine Mr. Ripps regarding any portion of his declaration means that "principle means" of testing Mr. Ripps credibility weighs decisively in favor of accepting Mr. Ripps's declaration.

Defendants withdraw their citations to JTX-2589 and JTX-2591. This finding of fact is adequately supported by Defendants' other citations.

**Plaintiff's Reply:**

Defendants' unreliable communications with purported distributors or purchasers of their infringing products are immaterial. Defendants have still failed

to provide evidence that the purported communications were with "collectors" or that "collectors" were their primary purchasers. The Court has also already found a likelihood of confusion and these correspondences do not rebut that finding. SJ Order. (Dkt. 225) at 13. And Defendants admit that they cherry-picked eight out of allegedly hundreds of e-mails to use as purported evidence of their alleged protest. These attempts to obfuscate the issues are unavailing.

As discussed *supra*, Defendants' responses lack merit. Specifically, (1) Defendants' anecdotal evidence of communications with purported purchasers is unpersuasive (*supra* ¶ 3), (2) whether a handful of initial purchasers were confused, post-sale and initial interest confusion are nonetheless actionable (*supra* ¶¶ 22, 37), (3) Yuga Labs adequately demonstrated that Mr. Ripps lacks credibility (*supra* ¶ 3), (4) Defendants were motivated by an intent to profit (*supra* ¶¶ 4, 13, 23), (5) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (6) Ms. O'Laughlin's report is reliable and accurate (*infra* ¶ 41), (7) the Court's summary judgment order establishes Defendants' liability (*supra* ¶ 9), (8) Defendants' "disclaimer" did not prevent confusion (*supra* ¶ 20), (9) most of Defendants' infringing NFTs did not sell on rrbayc.com (*infra* ¶¶ 19, 103), (10) the record shows multiple instances of actual confusion (*supra* ¶ 32), (11) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), and (12) the refunds Defendants issued demonstrate consumer confusion (*supra* ¶ 33).

Additionally, the Court should reject Defendants' responses because (1) the evidence Defendants cite do not support their finding of fact and (2) Defendants fail to rebut *Levi*.

**Defendants' Evidence Does Not Support Their Finding Of Fact:** Defendants' evidence does not prove this fact. As explained *supra* ¶ 11, Defendants' cherry-picked communications with purported purchasers of RR/BAYC NFTs do not rebut the Court's finding of a likelihood of confusion. SJ Order (Dkt. 225). Unlike Yuga Labs, Defendants have no survey or other expert

evidence to support their contention that consumers were not confused.  Indeed, Defendants claim that it is not feasible for Defendants to speak with all or even most of the purchasers of their infringing products and thus they cannot support the statement "[c]ollectors of RR/BAYC NFTs intended their purchases to support the project's goals[.]"  Defendants' contention is also rebutted by Ms. O'Laughlin's survey evidence showing that there was up to a 40.4% net confusion rate among consumers.  O'Laughlin Decl. (Dkt. 341) ¶¶ 13 (b)-(c).  Defendants also fail to rebut Mr. Solano's testimony that "there's a number of people that bought these that knew that this was a scam and that were buying them to sell them on a secondary market." Trial Tr. 16:13-15.  Defendants fail to support their finding of fact with evidence admitted at trial.

**Defendants Fail To Rebut *Levi*:**  Actual confusion is not required; and the Court already found Defendants' use of BAYC Marks to be infringing because it created a likelihood of confusion.  SJ Order (Dkt. 225) at 12.  Yuga Labs is thus entitled to Defendants' profits due to their infringing activity—the use of the BAYC Marks—regardless of whether purchasers were actually confused.  See  (finding post-sale confusion actionable since use of similar labeling on jeans "is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale.").  Defendants offer only self-serving, anecdotal evidence of communications with purported purchasers of RR/BAYC NFTs to support their claim that consumers were purchasing the infringing NFTs as a "protest."  As explained *supra* ¶ 11, this evidence should be given little weight.  That consumers, or here distributors, were purchasing Defendants' NFTs with the expectation to resell them is supported by the fact that "the vast majority of [sales] are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; see also id. at 16:13-15 ("As I mentioned, there's a number of

people that bought these that knew this was a scam and that were buying them to sell them on a secondary market."). Defendants cannot rebut this fact.