**Defendants' Disputed Post Trial Finding of Fact No. 41:**

<u>Mr. Cahen was not aware of a single instance of actual confusion. Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224.</u>

**Plaintiff's Basis for Dispute:**

Mr. Cahen's claim that he was not aware of any instances of confusion is belied by the ample evidence of confusion on Twitter and other sources that Yuga Labs has identified. *See supra* ¶ 32. Indeed, Mr. Cahen was confused when he misidentified an RR/BAYC NFT holder's profile picture on Twitter as a BAYC NFT. JTX-722 (Berger Report) ¶ 74(iv). He and Mr. Ripps were also warned about the likelihood of consumer confusion. *See, e.g.*, *supra* ¶ 9 (collecting examples). And Yuga Labs' survey evidence demonstrated significant confusion among consumers who incorrectly believed RR/BAYC was sponsored by or affiliated with Yuga Labs. JTX-721 ¶¶ 16, 47, 73; O'Laughlin Decl. (Dkt. 341) ¶¶ 13.a-c, 16, 47, 48, 73, 81, 82. Defendants do not offer any admissible or credible evidence to rebut the evidence that consumers believed, or were likely to believe, RR/BAYC was affiliated with or sponsored by Yuga Labs, nor do they rebut evidence of initial interest or post-sale confusion.

**Defendants' Response:**

Defendants expressly reserve and reassert all responses made in the parties' Joint Statement (Dkt. 421).

Yuga's objection is unfounded. First, as Defendants credibly testified, Mr. Ripps and Mr. Cahen are not aware of a single instance of actual confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344). Yuga and Mr. Solano were also not aware of a single instance of actual confusion. Trial Tr. [Solano] 18:23-19:1; Trial Tr. [Muniz] 85:3-7.

Additionally, Yuga cites to a portion of Dr. Berger's report that relies on YUGALABS_00002708 to assert that Mr. Cahen was confused about the source of a Twitter user's profile picture. This is incorrect. Dr. Berger's report fails to

include the entirety of that Twitter thread in which Mr. Cahen says that a Twitter user has "a racist monkey pfp." The user responds and states that their pfp is from an RR/BAYC NFT and asks then "Is my pfp racist?" Mr. Cahen responds, "Yes. The iconography of BAYC is racist and Nazi. Full Stop. We use NFTs as a means to draw attention to that." *See* excerpt below. As the full context of the Twitter thread makes clear, Mr. Cahen never was confused about the origin of the Twitter users pfp nor did he think it was from a BAYC NFT.



Second, there is ample evidence that there was no consumer confusion. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga. The rrbayc.com website—through which the majority of RR/BAYC commissions occurred (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer before they were allowed to commission an NFT. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these additional steps so that the artistic purpose of the work would be clear to participants. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

Unsurprisingly, the trial evidence shows that people reserved RR/BAYC NFTs out of protest. *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595-2596, JTX-2599.

Third, the evidence Yuga cites does not show actual confusion. Specifically, Yuga relies on survey evidence provided by Ms. O'Laughlin. For the reasons provided in Defendants' response in *supra* ¶ 32, Ms. O'Laughlin's surveys do not show any actual or likely consumer confusion because they (1) used an overly broad population that included people that don't even know what an NFT is, (2) used two contradictory surveys, (3) failed to account for strong priming effects based on the survey format, and (4) applied to market conditions that lasted only a matter of days. Further, this unreliable survey evidence, again does not show that anyone who actually reserved an RR/BAYC NFT was confused about its origin and, therefore, does not undermine the accuracy of this finding of fact.

The documentary evidence Yuga relies on is unsupportive. Yuga relies on JTX-1029, which includes a tweet from GemBot, which is an automated software application and not a real person. *See* Cahen Decl. ¶¶ 226-227. The very first comments are users identifying that Mr. Ripps is the source of the NFT. There is no indication that any of the Twitter users commenting actually reserved an RR/BAYC NFT. *See* JTX-1030, JTX-1032; JTX-1031, JTX-1034, JTX-1035.

Yuga also relies on private chats that the RR/BAYC creators used. But these chats do not show actual confusion. JTX-109 includes a discussion where Mr. Lehman raises concerns about the design of ApeMarket and Mr. Cahen makes suggestions on how to make it clearer. Further, ApeMarket was never was launched and could never have caused any consumer confusion. Cahen Decl. ¶¶ 257-262; *see also* JTX-801.185.

Yuga also relies on a screenshot, JTX-701, of a Bloomberg newscast. This exhibit does not support a finding of actual confusion. The chart separately lists both "Bored Ape Yacht Club" and "Bored Ape Yacht Club V3" indicating that the

anchor understood that these were two different projects.  Additionally, as Mr. Cahen testified, he is not aware of anyone who watched the Bloomberg program and reserved an RR/BAYC NFT believing it to be a Yuga NFT. Cahen Decl. ¶ 252.

Additionally, Yuga cites to the Lehman Declaration, JTX-1, the accuracy and credibility of which are tainted by Mr. Lehman's motivations to settle his ongoing case with Yuga, (Dkt. 411, 97:15-98:8) and the Consent Judgment Order in Yuga's case against Mr. Lehman, JTX-621, which was entered after Mr. Lehman settled.

Yuga also relies on Mr. Ripps's deposition transcript where he discusses how the LooksRare platform that sold RR/BAYC NFTs looked like at one point in time. Ripps Depo. Designations (Dkt. 396) at 290:4-9.  This does nothing to support a finding of confusion given the ability of any consumer to determine the provenance of an RR/BAYC NFT through Etherscan.  Ripps Decl. ¶¶ 88-89 (Dkt. 346) (uncontested).  Further this does nothing to undermine this finding of fact, which states that Mr. Ripps is not aware of any actual confusion.

Finally, Yuga also relies on witnesses that made conclusory and unfounded statements about possible confusion. *See* Berger Decl. (Dkt. 339) ¶¶ 71-76; Muniz Decl. (Dkt. 340) ¶¶ 8-18; O'Laughlin Decl. (Dkt. 341) ¶¶ 13-14; Solano Decl. (Dkt. 342) ¶¶ 34-35, 42-55, 63-69; Trial Tr. (Dkt. 392) at 53:14-54:22.  These statements do not support a finding of actual confusion or likelihood of confusion.

Fourth, Yuga states that Defendants did not offer admissible evidence that consumers believed RR/BAYC NFTs were not affiliated with Yuga.  Not true.  The evidence presented at trial shows that many people who reserved RR/BAYC NFTs did so out of a protest.  *See* Ripps Decl. ¶¶ 198-205 (Dkt. 346) (uncontested); JTX-2033, JTX-2035, JTX-2039, JTX-2590, JTX-2592, JTX-2595-2596; JTX-2599.

Fifth, Yuga's objection is inaccurate given Defendants used modified versions of the alleged BAYC Marks in their reservations.  The logo used states "This Logo is Based on the SS Totenkopf; 18 Teeth." *See* JTX-2085.  Also, the website for the project, rrbayc.com, used the modified "RR/BAYC" throughout. *Id.*

1    Sixth, Yuga incorrectly relies on the law of the case doctrine by citing to this
2 Court's summary judgment order.  The "law of the case doctrine does not apply to
3 pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren,
4 792 F.2d 902, 904 (9th Cir. 1986)* (emphasis added); *see also Peralta v. Dillard,
5 744 F.3d 1076, 1088 (9th Cir. 2014)*.
6    Finally, if Yuga is entitled to disgorgement of Mr. Ripps and Mr. Cahen's
7 profits, which is something Defendants argue they are not, Yuga can only receive
8 profits "attributable to the infringing activity." *Lindy Pen Co. v. Bic Pen Corp.,
9 982 F.2d 1400, 1408 (9th Cir. 1993)*, abrogated on other grounds by *SunEarth, Inc.
10 v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179 (9th Cir. 2016).  This requires
11 distinguishing between revenue from collectors who reserved RR/BAYC NFTs as a
12 protest against Yuga (and were thus not confused about Defendants' use of Yuga's
13 marks) and revenue from purchasers who mistakenly believed they were purchasing
14 Yuga NFTs.  *See id.*  And as outlined above, there was no evidence presented that a
15 single purchase of RR/BAYC NFTs was made by someone thinking it was
16 sponsored by Yuga.

17    **Plaintiff's Reply**:

18    Defendants' response is largely inapt.  Defendants' internal communications
19 demonstrate that Defendants were aware that their infringement would confuse
20 consumers and refused to take steps to avoid that confusion.  Rather than confront
21 this fact, Defendants engage in collateral disputes to obfuscate the issues.  These
22 responses should be rejected.
23    As discussed *supra*, Defendants' responses lack merit.  Specifically, (1)
24 Defendants' anecdotal evidence of communications with purported purchasers is
25 unpersuasive (*supra* ¶ 11), (2) Yuga Labs adequately demonstrated that Mr. Ripps
26 lacks credibility (*supra* ¶ 3), (3) Yuga Labs adequately demonstrated that Mr.
27 Cahen lacks credibility (*supra* ¶ 7), (4) Defendants fail to demonstrate that "many"
28 consumers purchased Defendants' infringing NFTs out of protest (*supra* ¶ 39), (5)

Defendants' assertion that the Bloomberg segment would not cause confusion because both collections were listed lacks credibility (*supra* ¶ 32), (6) the @0xGem Tweet and replies demonstrate consumer confusion (*supra* ¶ 32), (7) the Court's summary judgment order establishes Defendants' liability (*supra* ¶ 9), (8) Defendants' "disclaimer" did not prevent confusion (*supra* ¶ 20), (9) most of Defendants' infringing NFTs did not sell on rrbayc.com (*infra* ¶¶ 19, 103), (10) consumers verifying Defendants' infringing NFTs on Etherscan would still be confused (*supra* ¶ 32), (11) all of Defendants' profits are attributable to their infringement (*infra* ¶ 103), (12) the record shows multiple instances of actual confusion (*supra* ¶ 32), (13) Defendants used Yuga Labs marks (*supra* ¶ 32), (14) Defendants failed to take steps to avoid confusion (*supra* ¶ 33), (15) Mr. Lehman's declaration is accurate and contradicts Defendants (*supra* ¶ 22, *infra* ¶ 58), (16) Defendants fail to rebut the likelihood of confusion as to sponsorship or affiliation (*supra* ¶ 19), (17) Defendants fail to rebut Yuga Labs' witness's testimony (*supra* ¶ 44), (18) Defendants fail to support Mr. Ripps' deposition testimony about LooksRare (*supra* ¶ 40), (19) Defendants fail to rebut the likelihood of post-sale confusion (*supra* ¶ 11), and (20) Defendants fail to account for ongoing harm (*supra* ¶ 32).

Additionally, the Court should reject Defendants' responses because (1) Defendants' misrepresent Mr. Cahen's Twitter exchange with @SachDana and (2) Ms. O'Laughlin's findings are sound and reliable.

**Defendants Misrepresent Mr. Cahen's Twitter Exchange With @SachDana:** Mr. Cahen was confused by @SachDana's RR/BAYC profile picture. The initial exchange confirms this; Mr. Cahen was arguing with @SachDana and when things did not go his way, he accused the user of having a "racist monkey pfp." Defendants now contend that Mr. Cahen was aware that it was an RR/BAYC NFT, but that would mean that Mr. Cahen was calling out purportedly racist iconography in his own NFTs. This explanation lacks credibility.

It is implausible to accept that Defendants actively marketed and profited from their infringing NFTs, but found their display offensive. Indeed, Mr. Ripps himself used his RR/BAYC NFT as his profile picture on Twitter. *See* JTX-132. Mr. Cahen was not "drawing attention" to anything. He was trying to attack @SachDana for disagreeing with his posthumous critique of the Queen. Defendants' attempt to avoid this conclusion is not credible.

**Ms. O'Laughlin's Findings are Sound and Reliable:** As the Court has already held, Ms. O'Laughlin's report is "relevant, reliable, and admissible." Trial Tr. 141:3-5. The Court denied Defendants' Motion *in Limine* no. 6, Dkt. 242, but Defendants nonetheless continue to attack Ms. O'Laughlin's sound testimony. Defendants' response should be rejected for the reasons outlined below.

First, Defendants have no evidence establishing that Ms. O'Laughlin's survey population was overbroad, and the evidence admitted at trial confirms that Ms. O'Laughlin's selection criteria was appropriate. *See infra* ¶¶ 70, 71.

Second**,** Defendants' tired argument that Ms. O'Laughlin's methodology was flawed because she used two survey formats is unavailing because Ms. O'Laughlin testified that her methods were appropriate where Defendants' infringing NFTs were marketed in two different marketplace settings. *See infra* ¶ 78. Contrary to Defendants demands, a survey should not be one-sized fits all. It should be tailored to the facts and here relevant marketplaces.

Third, Ms. O'Laughlin's Eveready survey and analysis are not methodologically flawed because her methods were consistent with the approach taken by trademark survey experts and participants were shown Defendants' Foundation webpage as it appeared in the real world. *See infra* ¶ 74.

Fourth, Defendants misrepresent Ms. O'Laughlin's trial testimony. Ms. O'Laughlin testified that she chose to analyze confusion based upon how the sales pages looked as of June 21st "because it was a more conservative choice." Trial Tr.

161:15-16. Therefore, it is likely that the time frame that Ms. O'Laughlin chose resulted in rate of confusion *lower* than what was occurring in the real world. Ms. O'Laughlin further testified that her survey focused on the shell of the website, so small changes would not invalidate her results. Trial Tr. 163:15-20 ("what I'm testing is sort of the shell, right, the shell that uses the trademarks that are at issue in the case. So it's the use of the BAYC, Bored Ape Yacht Club, the use of the ape skull logo. The particular NFTs would vary, of course. That's a marketplace. Things change. But the framework is pretty consistent over those two months."). As Ms. O'Laughlin explained, she chose a reasonable time frame for her analysis. Indeed, it was also the time frame through which Defendants were promoting their NFTs as top sellers in the marketplace.

Fifth, Ms. O'Laughlin's surveys are an accurate data point for the rates of actual confusion in the marketplace. And as discussed *supra* ¶¶ 22, 32, and 37, Yuga Labs has put forth volumes of evidence of actual confusion, including actionable post-sale confusion. Further, Defendants' admission that they processed over $90,000 in refunds (Ripps. Decl. (Dkt. 346) ¶¶ 174-75) undermines Defendants' suggestion that purchasers of their infringing NFTs were universally supportive and that no one was confused.