**Defendants' Disputed Post Trial Finding of Fact No. 70:**

<u>Ms. O'Laughlin's surveys were unreliable. They included flawed methodologies, including by using an inappropriately overbroad target population that was not limited to people who have purchased or were intending to purchase NFTs. Trial Tr. [O'Laughlin] 148:1-21.</u>

**Plaintiff's Basis for Dispute:**

The Court has already found that Defendants' infringement was likely to cause confusion to consumers. SJ Order (Dkt. 225) at 10-13. Additionally, the Court has determined Ms. O'Laughlin's testimony and the findings in her expert report are "relevant, reliable, and admissible." Trial Tr. at 141:3-5.

Ms. O'Laughlin's methodologies were not flawed; as detailed in her report, Ms. O'Laughlin adhered to best practices for surveys used in litigation and employed rigorous standards consistent with academic literature and judicial precedent. *See generally* JTX-721 (O'Laughlin Expert Report); O'Laughlin Decl. (Dkt. 342). Defendants have presented no evidence or rebuttal expert testimony to the contrary.

Defendants' contention that Ms. O'Laughlin selected an overbroad target population is meritless, as is their argument that this renders her findings unreliable. The survey audience for both surveys consisted of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year." O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69. The latter categories of participants were included to account for consumers who may be "in market for digital art or digital collectibles" without having specifically considered NFTs in the past. Trial Tr. at 148:4-9. Indeed, as the Court has found, some potential consumers were not necessarily blockchain-savvy NFT purchasers. SJ Order (Dkt. 225) at 12-13. Ms. O'Laughlin accordingly determined that

"consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace."  Trial Tr. at 148:15-18.  *See also* Berger Report at 5 n.2 (observing "NFTs have mostly been associated with digital items such as artwork, images, or videos"); SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham Act*, 63 IDEA: L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that exist in a digital space, they are also items that have specific uses and values that are dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) ("Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset: they buy them precisely so that they can exclusively own the content associated with the NFT.").

When Defendants and their partners previously agreed that their use of Yuga Labs' marks could be "too confusing to the 'average joe'" they were targeting, JTX-801.196, Defendants cannot now credibly argue that the "average joe" who may be interested in NFTs as digital collectibles or art should be excluded from the survey population.

**Defendants' Response:**

Yuga tries to leverage the fact that Ms. O'Laughlin's testimony was admitted to argue that it should be given weight.  However, the Court noted "counsel will have an opportunity to fully expose any limitations or flaws during cross-examination."  Trial Tr. 141:8-10.

Yuga cites to Ms. O'Laughlin's own report and declaration as proof that her testimony ought to be given weight.  But no expert would claim that they were not adhering to "to best practices for surveys used in litigation and employed rigorous standards consistent with academic literature and judicial precedent."  Yuga then claims that Defendants did not demonstrate that she deviated from "best practices"

in any way.  Defendants' cross-examination pointed out several fundamental flaws with her survey methodology, including by re-adjusting the survey population to capture people with no interest in purchasing NFTs.  Trial Tr. [O'Laughlin] 144:25-146:17 (acknowledging that she broadened the survey population *after* he team accessed pretest results).  Ms. O'Laughlin also acknowledged that the population "matters" for the analysis.  *Id.* at 144:18-20.  In this case the "appropriate target population" was supposed to be "past and potential purchasers of NFTs."  *Id.* at 144:21-25.

Ms. O'Laughlin acknowledged that somebody would qualify for the survey if they were merely considering purchasing digital art collectibles.  Trial Tr. [O'Laughlin 148:19-20].  This is despite the fact that an NFT is not necessarily digital artwork under her own admission.  *Id.* at 149:1-2.  The "digital art" respondents were never asked if they were aware of NFTs.  *Id.* at 152:11-14.  By way of analogy, this is like conducting a survey on a specific question—like attitudes about the Los Angeles Dodgers' performance—while including respondents who do not follow baseball.  It will not generate accurate results.

Yuga closes by stating, "Defendants cannot now credibly argue that the "average joe" who may be interested in NFTs as digital collectibles or art should be excluded from the survey population."  Yet that is not what Defendants argue at all.  If the survey was limited to the average NFT consumer, then the survey population would possibly be adequate.  It however swept further and included people who likely have no interest in NFTs or even knowledge about what an NFT is.

**Plaintiff's Reply:**

Defendants' belief that Ms. O'Laughlin's survey population was overbroad does not make it so; Defendants' have no evidence that the survey population was overbroad.  What evidence there is in the record confirms that Ms. O'Laughlin's survey population was appropriate.  The evidence shows that consumers who might be interested in NFTs may include people who are interested in digital art.  *See,*

*e.g.*, Solano Decl. (Dkt. 342) at ¶ 12 (people commonly joined BAYC because of how the "image resonated with them"); JTX-722.00005 ("NFTs have mostly been associated with digital items such as artwork, images, or videos. . ."); JTX-801.196 (Defendants were targeting the "average joe").  Even Mr. Ripps admits "NFTs became popular among artists and art collectors most associated with internet culture" (Ripps Decl. (Dkt. 346) at ¶ 38)) and that blockchain technology is merely an extension of the "existing internet" (*id.* at ¶¶ 34-35).  *See also* SJ Order (Dkt. 225) at 7 (citing Andrea McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham Act*, 63 IDEA:  L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that exist in a digital space, they are also items that have specific uses and values that are dependent on the consumer")); *Hermès International v. Rothschild*, No. 22-CV-384-JSR, 2023 WL 1458126, at *5 (S.D.N.Y. Feb. 2, 2023) (cleaned up) ("Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset:  they buy them precisely so that they can exclusively own the content associated with the NFT.").

Therefore, Ms. O'Laughlin appropriately determined that "consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace." Trial Tr. at 148:15-18.  Accordingly, she was correct in determining that survey audience for both surveys would consist of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year." O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69. The latter categories of participants were included to account for consumers who may be "in market for digital art or digital collectibles" without having specifically considered NFTs in the past.  Trial Tr. at 148:4-9.  Her opinion is consistent with

1  the evidence in the record about who might buy an NFT, and Defendants have no
2  evidence establishing otherwise.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28