**Defendants' Disputed Post Trial Finding of Fact No. 103:**

<u>Over 80% of sales by Defendants occurred on rrbayc.com where there was a prominent artistic statement and a disclaimer. Ripps Decl. ¶¶ 101, 104-106, 110 (uncontested).</u>

**Plaintiff's Basis for Dispute:**

This statement is incorrect. Even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). NFTs reserved on that website were minted and sold on Foundation. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

This statement is also misleading in that it fails to account for the significant trading on secondary markets making use of the BAYC Marks, from which Defendants received substantial benefits. *See* Kindler Decl. (Dkt. 338) ¶¶ 45-50 (discussing sales on secondary markets); 62-71 (discussing other forms of enrichment Defendants unjustly received through secondary market sales).

Mr. Ripps' self-serving testimony regarding the "prominent artistic statement" and "disclaimer" on his infringing website are objectionable as discussed *supra* ¶¶ 19, 21. As the Court has already held, "Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag." SJ Order (Dkt. 225) at 16.

**Defendants' Response:**

First, Mr. Ripps's declaration went undisputed at trial, and there is no dispute that 80% of the reservations and commissions for RR/BAYC NFTs were through the rrbayc.com website. Ripps Decl. ¶ 110 (Dkt. 346) (uncontested). Mr. Ripps's comment that all of the NFTs were "technically sold" on Foundation is because the contract is a Foundation contract. *See* Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many of the RR/BAYC NFTs were sold through

RRBAYC.com? A. I can't give you an exact figure. Q. How many were sold through Foundation? A. Well, technically, all of them were because it was a Foundation contract, so..."); Counter designation 82:14-19. This however is different than the "Foundation page" for Ryder Ripps. Further, Yuga presented no evidence contradicting the fact that nobody could identify a single person who was confused by sales on Foundation. *See* Trial Tr. [Solano] 19:13-15 (cannot identify a *single* confused consumer); [Hickman] 219:13-19.

Second, Yuga's statement that this finding of fact is misleading because it does not discuss sales of RR/BAYC NFTs that occurred on secondary markets is irrelevant. This finding of fact outlines the percentage of "sales by Defendants" that occurred on rrbayc.com. This finding of fact is, therefore, discussing the initial sales of RR/BAYC NFTs. How many RR/BAYC NFTs were sold on secondary markets is irrelevant to the accuracy of this finding of fact.

Further, as the evidence at trial showed, Mr. Ripps and Mr. Cahen earned little profit from the sales that occurred on secondary markets. As Mr. Ripps and Mr. Cahen's testimony make clear, they tried to turn off royalties from the secondary sales of RR/BAYC NFTs, as part of a criticism of Yuga's policy to receive 2.5% of royalties on their secondary sales. *See* Cahen Decl. ¶¶ 166-167 (Dkt. 344); Ripps Decl. ¶¶ 116, 118 (Dkt. 346) (uncontested). Further, their testimony credibly states that they received only a small amount of royalties from Foundation before they shut it off, around $1,000, and some from LooksRare, as that marketplace initially refused to turn off the royalties, around $77,000. *See* Cahen Decl. ¶¶ 168-172 (Dkt. 344). Accordingly, sales of RR/BAYC NFTs on secondary markets is minimally relevant to the analysis of Defendants' profits.

Additionally, Yuga cites to Ms. Kindler's testimony that includes statements of vague benefits that she admittedly did not quantify. *See* Kindler Decl. ¶ 67 ("Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…"). This testimony, therefore, does not support Yuga's

assertions of other unnamed benefit Defendants received. Further, regardless of what possible additional benefits Mr. Ripps and Mr. Cahen may have received, that has no impact on the accuracy of this finding of fact that simply states where a portion of reservations for RR/BAYC NFTs occurred.

Third, Mr. Ripps's statements about the artistic statement and disclaimer are not self-serving as Yuga incorrectly alleges. Instead, they present important evidence of the information a person reserving an RR/BAYC NFT saw which is directly relevant to whether said person was confused about the origin of the NFT they were reserving.

Finally, Yuga incorrectly relies on the law of the case doctrine by citing to this Court's summary judgment order. The "law of the case doctrine does not apply to pretrial rulings **such as motions for summary judgment**." Shouse v. Ljunggren, 792 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also* Peralta v. Dillard, 744 F.3d 1076, 1088 (9th Cir. 2014) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given the nature of such motions, it could not be otherwise."). For example, in *Sienze v Kutz*, the Court held that although **aspects** of an issue were decided at summary judgment for one purpose, the summary judgment order did resolve the issue generally or as to other topics. *See* No. 1:17-CV-0736-AWI-SAB, 2019 WL 1332184 at *3 (E.D. Cal. Mar. 25, 2019) (holding that evidence of initial police contact was relevant as background, but not to already decided issue that initial contact was not excessive force). This case is just like *Sienze*: the summary judgment ruling about the artistic nature of the RR/BAYC NFT project has no bearing here to the question of what portion of profits are attributable to infringement.

**Plaintiff's Reply:**

Defendants concede the fact that Mr. Ripps admitted that all RR/BAYC NFTs were sold through Foundation. Defendants do not meaningfully dispute this fact and provide no evidence that the Foundation page is anything different than the

contract. There is no dispute that the majority of RR/BAYC NFT sales did not occur on rrbayc.com but on secondary marketplaces with no disclaimer.

As discussed *supra*, Defendants' response lacks merit. Specifically: (1) Defendants promoted and had control over secondary marketplaces where RR/BAYC NFTs were sold alongside BAYC NFTS (*supra* ¶ 51), (2) there is ample evidence of actual confusion in the record (*supra* ¶ 3), (3) Defendants' "disclaimers" did not dispel likelihood of confusion (*supra* ¶ 9), (4) evidence admitted at trial discredits Mr. Ripps' trial declaration (*supra* ¶ 3), and (5) the response seeks to relitigate issues already adjudicated by the Court (*supra* ¶ 9).

Additionally, the Court should reject Defendants' responses because (1) rrbayc.com is not where Defendants' sold the majority of their NFTs, and (2) all of Defendants' profits are attributable to their infringing activity.

**rrbayc.com is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com *is not* where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure. Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale." Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49 (discussing Defendants' acknowledgement of harm, e.g., where "Defendants' collaborator Mr. Hickman noted to Defendants that '[w]e're closing in on *$10 million impact to yuga'").

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, including platforms such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products. Defendants' sale of RR/BAYC NFTs on these secondary marketplaces caused Yuga Labs irreparable harm and are also a prominent source of confusion going forward—especially since they are where Defendants continue to market their infringing NFTs for sale. Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").

**All of Defendants' Profits Are Attributable To Their Infringing Activity:**

Defendants' "infringing activity" was use of the BAYC Marks. They admit that "[e]ach of Defendants' 9,546 RR/BAYC NFTs used the BAYC Marks." Dkt. 418-1 at 3:15-16. Accordingly, each and every RR/BAYC NFT sale is a result of Defendants' infringing activity and subject to disgorgement. *See* Kindler Decl. (Dkt. 338) ¶ 61 ("Based on my review of evidence produced in this case and blockchain data I analyzed, these profits are all traceable to Defendants' uses of Yuga Labs' BAYC Marks."). Yuga Labs' evidence shows that consumers bought RR/BAYC NFTs because of the appeal of the BAYC Marks. Kindler Decl. (Dkt. 338) ¶ 61; Berger Decl. (Dkt. 339) ¶¶ 71-76. All of the NFTs incorporate the BAYC Marks by virtue of the immutable traits coded into the smart contract, Atalay Decl. (Dkt. 337) ¶ 4, and they are all part of a collection that the Court has already ruled was likely to cause consumer confusion. SJ Order (Dkt. 225) at 10-13. Just as a counterfeit handbag peddler is not entitled to keep any ill-gotten profits from their sale of infringing goods, Defendants cannot retain their profits from secondary marketplaces. *See, e.g.*, Gucci Am., Inc., 868 F. Supp. 2d at 238, 255 (granting defendant's profits even where infringement claims premised solely

on post-sale confusion where a "potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, [] choose[s] to purchase that product instead of a genuine one"). Ultimately, it is up to the court to "ensure that the defendant may not retain the fruits, if any, of unauthorized trademark use or continue that use . . . ." *Fifty-Six Hope Rd. Music, Ltd. V. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) (cleaned up).

Defendants also do not meaningfully dispute the fact that "Defendants also benefited from their conduct in ways that are not quantified by my profit analysis…" Kindler Decl. ¶ 67. As Ms. Kindler stated in her trial declaration, the reason for not being able to provide a specific number for the unjust enrichment Defendants accrued and continue to accrue is that these benefits are not necessarily easily quantifiable. *See* Kindler Decl. ¶ 62. Still, Defendants offer no evidence to disprove the "possible additional benefits Mr. Ripps and Mr. Cahen may have received." Yuga Labs is entitled to disgorge all of the profits from these benefits.