| | |
|---|---|
| Louis W. Tompros (*pro hac vice*)<br>louis.tompros@wilmerhale.com<br>Monica Grewal (*pro hac vice*)<br>monica.grewal@wilmerhale.com<br>Scott W. Bertulli (*pro hac vice*)<br>scott.bertulli@wilmerhale.com<br>Tyler Carroll (*pro hac vice*)<br>tyler.carroll@wilmerhale.com<br>**WILMER CUTLER PICKERING<br>   HALE AND DORR LLP**<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Fax: (617) 526-5000<br><br>Derek Gosma (SBN 274515)<br>derek.gosma@wilmerhale.com<br>Henry Nikogosyan (SBN 326277)<br>henry.nikogosyan@wilmerhale.com<br>**WILMER CUTLER PICKERING<br>   HALE AND DORR LLP**<br>350 South Grand Ave., Suite 2400<br>Los Angeles, CA 90071<br>Telephone: (213) 443-5300<br>Fax: (213) 443-5400<br><br>Attorneys for Defendants<br>*Ryder Ripps and Jeremy Cahen* | ERIC BALL (CSB No. 241327)<br>eball@fenwick.com<br>KIMBERLY CULP (CSB No. 238839)<br>kculp@fenwick.com<br>FENWICK & WEST LLP<br>801 California Street<br>Mountain View, CA 94041<br>Telephone: 650.988.8500<br>Facsimile: 650.938.5200<br><br>MOLLY R. MELCHER (CSB No. 272950)<br>mmelcher@fenwick.com<br>ANTHONY M. FARES (CSB No. 318065)<br>afares@fenwick.com<br>ETHAN M. THOMAS (CSB No. 338062)<br>ethomas@fenwick.com<br>FENWICK & WEST LLP<br>555 California Street, 12th Floor<br>San Francisco, CA 94104<br>Telephone: 415.875.2300<br><br>Additional Counsel listed on next page<br><br>Attorneys for Plaintiff<br>YUGA LABS, INC. |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>　　　　　　　Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 7(e)**<br><br>Judge: Hon. John F. Walter |

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA 90401
Telephone:       310.434.4300

Attorneys for Plaintiff

YUGA LABS, INC.

| Case No. 2:22-cv-04355-JFW-JEM | DEFENDANTS' OBJECTIONS |
|---|---|

Pursuant to the Court's Order (Dkt. 428) Defendants submit the following objection, response, and reply.

### Plaintiff's Disputed Post Trial Finding of Fact No. 7(e):

"Defendants used Yuga Labs' BAYC Marks to make their competing product look identical to Yuga Labs' product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT." SJ Order at 17; *see also* JTX-117; JTX-600; JTX-972; Dkts. 342 ¶44; 392 at 130:23-131:2, 138:6-20; 394 (Hickman Depo. Designations) at 143:15-144:16; 395 at 148:10-13.

### Defendants' Basis of Dispute:

Defendants expressly reserve and reassert all objections made in the parties' Joint Statement Regarding Objections (Dkt. 420).

Defendants presented RR/BAYC NFTs as the opposite or antithetical to Yuga's NFTs and did not design them to appear identical to Yuga's NFTs. Defendants took multiple steps to make clear that the RR/BAYC collection was not related to Yuga in any way. The rrbayc.com website—through which the majority of RR/BAYC commissions occurred and the vast majority of alleged profits accrued (Ripps Decl. ¶ 110 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144 (Dkt. 344)) included an explanation of the artistic intent for the project. Ripps Decl. ¶¶ 101-103 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-202; JTX-2085; Trial Tr. [Solano] 63:1-10. Collectors using the rrbayc.com website were also required to read and click through a disclaimer acknowledging the artistic purpose of the project. *See* Ripps Decl. ¶¶ 106-109 (Dkt. 346) (uncontested); JTX-2086; Trial Tr. [Muniz] 83:10-13. Mr. Ripps insisted on these to make the artistic purpose of the work would be clear. *See* Dkt. 401 at 21 [Lehman Depo. 59:25-60:24].

Whenever possible, Defendants also included the name of Ryder Ripps (not Yuga) as the creator of RR/BAYC NFTs, including on rrbayc.com (JTX-2085, JTX-

1  2086), Twitter posts (Ripps Decl. ¶ 111 (Dkt. 346) (uncontested); Cahen Decl. ¶ 144
2  (Dkt. 344); JTX-671), Foundation (*see* JTX-671), and even Etherscan identified
3  "*ryder-ripps.eth" as the creator of the RR/BAYC collection (JTX-600; JTX-1146).
4  Moreover, RR/BAYC NFTs were verifiably unique NFTs with digital pointers
5  to Bored Ape images, which "are public" and "available for anyone to navigate to on
6  the Internet." Trial Tr. [Hickman] 222:15-16. The RR/BAYC NFTs were effectively
7  a "receipt that says I committed to this protest that points to the same public [image]
8  that a lot of different collections point to including Yuga Labs." Trial Tr. [Hickman]
9  222:18-21. They did not include the public Bored Ape images, they simply pointed to
10 them as numerous other NFT collections do as well. Trial Tr. [Hickman] 222:10-24

11 RR/BAYC NFTs were also readily distinguishable from Yuga's NFTs due to
12 the drastically different price points. Cahen Decl. ¶ 225 (Dkt. 344).

13 The evidence at trial also showed that Defendants did not create a token tracker
14 designed to mislead NFT collectors. Etherscan's token tracker is created by Etherscan
15 and displayed on Etherscan's website. Defendants have no control over the Etherscan
16 website, what it displays, and how it chooses to show the RR/BAYC collection. And
17 Mr. Atalay admitted that consumers of NFTs do not use Etherscan's token
18 tracker/token name but instead rely on marketplaces or by checking the associated
19 smart contract address. Trial Tr. [Atalay] 135:2-25. Mr. Atalay explained that using
20 token names to distinguish NFTs "would be a fairly weak way to do so because often
21 those things are mutable. They can be changed after the fact. Also, there's no
22 guarantee of uniqueness." Trial Tr. [Atalay] 133:12-23.

23 Yuga also incorrectly relies on the law of the case doctrine by citing to this
24 Court's summary judgment order. The "law of the case doctrine does not apply to
25 pretrial rulings **such as motions for summary judgment**." *Shouse v. Ljunggren*, 792
26 F.2d 902, 904 (9th Cir. 1986) (emphasis added); *see also Peralta v. Dillard*, 744 F.3d
27 1076, 1088 (9th Cir. 2014).
28

Case No. 2:22-cv-04355-JFW-JEM    -2-    DEFENDANTS' OBJECTIONS

Case 2:22-cv-04355-JFW-JEM   Document 430-16   Filed 10/05/23   Page 5 of 12   Page ID
#:35203

Yuga's cited exhibits also fail to show that RR/BAYC NFTs appeared identical to Yuga's NFTs to NFT consumers. JTX-117 and JTX-972 are printouts of pages from Etherscan that show the verifiably unique smart contract address for RR/BAYC NFTs. Mr. Atalay confirmed that consumers of NFTs rely on the associated smart contract address to confirm the identity of a particular NFT or NFT collection. Trial Tr. [Atalay] 135:2-25. Thus, these documents refute that RR/BAYC NFTs appeared identical to Yuga's NFTs. And JTX-600 is irrelevant to how RR/BAYC NFTs appeared because it is an Etherscan page recording a transaction.

Yuga also cites to self-serving, false testimony that the RR/BAYC collection and the manner Etherscan chose to display the RR/BAYC NFT collection led to confusion. Yuga itself was unable to identify a single person who obtained an RR/BAYC NFT believing it to be sponsored by Yuga. Trial Tr. [Muniz] 85:3-7. Mr. Solano, Yuga's President, similarly could not identify a single person that ever bought an RR/BAYC NFT believing it was a Yuga NFT. Trial Tr. [Solano] 18:23-19:1. And neither Mr. Ripps, Mr. Cahen, or Mr. Hickman are aware of a single instance of confusion. Ripps Decl. ¶ 223 (Dkt. 346) (uncontested); Trial Tr. [Cahen] 265:11-18; Cahen Decl. ¶¶ 222, 224 (Dkt. 344); Trial Tr. [Hickman] 219:13-19.

**Plaintiff's Response:**

Given that "Defendants expressly reserve and reassert all objections made in its Joint Statement Regarding Objections (Dkt. 420)", Yuga Labs expressly reserves and reasserts all of its responses to those objections as stated in Dkt. 420. Defendants dispute an exact quote from the Court, underscoring their bad-faith efforts to multiply the cost of this litigation by rehashing decided issues.

Defendants' objection should be rejected for the same reasons discussed *supra* ¶ 7(a); specifically: (1) the objection seeks to relitigate issues already adjudicated by the Court, (2) the record shows ample actual confusion and likelihood of confusion, and (3) Defendants' "disclaimer" did not dispel confusion. Additionally, (1)

Defendants' infringement caused third-party platforms such as Etherscan to confusingly identify their infringing NFTs with the BAYC Marks (*supra* ¶ 7(c)), (2) Defendants knew that their infringement would cause confusion (*supra* ¶ 4), and (3) the record shows that Defendants did not use Mr. Ripps' name as the creator of their infringing NFT collection "whenever possible" (*infra* ¶ 7(f)).

Additionally, as described below, Defendants' objection should be rejected because (1) the record shows that the different price point of Defendants' infringing NFTs did not dispel likelihood of confusion, (2) consumers use the contract name and token tracker to identify NFTs, (3) the majority of Defendants' infringing NFTs were not sold on rrbayc.com, (4) Defendants did not take steps to avoid confusion, and (5) the RR/BAYC smart contract immutably references Yuga Labs' marks.

**The Price of Defendants' Infringing NFTs Does Not Mitigate Confusion:** Defendants' argument that their infringing NFTs sold at a different price point than authentic BAYC NFTs does not mitigate likelihood of confusion. In fact, the price point of Defendants' NFTs only *compounded* likelihood of confusion. "Defendants even used a similar price point to sell RR/BAYC NFTs—around 0.1 to 0.15 ETH per NFT. At the time, this amounted to approximately $200 per NFT. This is about the same value as BAYC's original 0.08 ETH BAYC price, which was approximately $169 to $236 when we initially sold them. It would not have been unreasonable for consumers to assume that 'RR/BAYC' was another Yuga Labs release related to BAYC, just like MAYC or BAKC." Solano Decl. (Dkt. 342) ¶ 54; *see also* Trial Tr. at 58:9-11 ("The original Bored Apes sold for $200. And we've done other sales over the past two years that are for lower prices."). Indeed, Defendants marketed their infringing NFT collection as "Bored Ape Yacht Club V3." *See* JTX-689; JTX-690; JTX-1249. In other words, they marketed it as another version, and possibly a cheaper version.

**The Market Relies On The Token Tracker To Verify The Authenticity Of NFTs:** Defendants cannot keep straight whether their position is that consumers do or do not rely on the token tracker to verify the authenticity of NFTs. Cahen Depo. Designations (Dkt. 395) at 59:7-59:16 (claiming not to know what an "RR/BAYC NFT" is and stating "the blockchain is complicated. A lot of people don't have the technical expertise or knowledge to be able to have a conversation about crypto technology and blockchain technology."); *id.* at 148:10-13 (testifying it is "very common" for people to refer to NFT collections by the token tracker). Regardless of how common or easy it is, consumers will use token trackers when purchasing an NFT. Trial Tr. 132:3-5 (cross examination of Mr. Atalay: "Q And you also agree that the NFT community uses the token name when it's buying on secondary markets; correct?" / "A Yes."); *see also* Atalay Decl. (Dkt. 337) at ¶ 7; JTX-1558. The evidence at trial is, therefore, consistent with the Court's holding on Yuga Labs' Motion for Summary Judgment that "Defendants used Yuga's BAYC Marks to make their competing product look identical to Yuga's product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT." SJ Order (Dkt. 225) at 17.

**rrbayc.com Is Not Where Defendants' Sold The Majority Of Their NFTs:** rrbayc.com ***is not*** where "more than 80% of sales for which Defendants made revenue occurred." Defendants have no support for this figure; even Mr. Ripps' own declaration merely stated that "[o]ver 80% of RR/BAYC NFT *reservations* occurred on" that website. Ripps Decl. (Dkt. 346) ¶ 110 (emphasis added). Contrary to Mr. Ripps' claims, NFTs reserved on that website were actually minted and sold through the confusing Foundation page that used the BAYC Marks. Ripps Depo. Designations (Dkt. 396) at 82:8-13 ("Q. How many were sold through Foundation?" / "A. Well, technically, all of them were because it was a Foundation contract, so...").

Further, Ms. Kindler's unrebutted analysis of sales data demonstrates that for Defendants' infringing NFTs, "[t]he majority of the sales are taking place on secondary markets. . . . [T]he vast majority of them are occurring in secondary markets and not from just the initial sale."  Trial Tr. at 202:4-17; *see also* JTX-723 (Kindler Expert Report) at 49.

Thus, the vast majority of market activity involving Defendants' infringing NFTs is taking place on the secondary market, such as Foundation and OpenSea. These secondary marketplaces are one place where consumer confusion is likely to result from Defendants' actions to flood the market with their infringing products, and especially since they are where Defendants continue to market their infringing NFTs for sale.  Solano Decl. (Dkt. 342) ¶ 78 ("RR/BAYC NFTs continue to be sold on websites like LooksRare and NFTx"); Trial Tr. at 58:23-25 ("the Ape Market Twitter [account], that actually links directly to LooksRare where these NFTs are still selling").

**Defendants Did Not Take Steps To Avoid Confusing Consumers:** Defendants did not attempt to avoid confusion, on the contrary Defendants deliberately designed and marketed their infringing NFTs to confuse consumers. Defendants could have called their NFT collection something other than "Bored Ape Yacht Club" with the symbol "BAYC" ***immutably*** in the metadata for the NFT smart contract, but they chose not to.  Atalay Decl. ¶¶ 3-6; JTX-600; JTX-1146.  Defendants could have used different images or overlaid some commentary on the images they did use, but they chose not to.  *See, e.g.*, JTX-801.192 (Mr. Lehman proposing "an overlay or something like Getty images" because "it's just insane to have the same art"); JTX-801.196 (Mr. Lehman demonstrating what an overlay might look like and recommending not to "in the marketing show screenshots like the ones [Mr. Hickman] showed" "[b]ecause it is too confusing to the 'average joe'").  Defendants could have attacked Yuga Labs in countless non-infringing ways.  But they did not.  Instead, they

used Yuga Labs' marks, commercially, to make money by selling counterfeit NFTs that confused consumers. O'Laughlin Decl. (Dkt. 341).

**The RR/BAYC Smart Contract Is Immutably Linked To Yuga Labs:** The token tracker for Defendants' infringing NFTs is not "mutable." Indeed, in response to the question directly after the response cited in Defendants' objection, Mr. Atalay explained that "[i]n this particular instance, upon inspection of the Foundation smart contract that was used to deploy the RR/BAYC smart contract, it's evident that these are not mutable fields in this particular instance. So this isn't entirely relevant." Trial Tr. at 134:1-8. Mr. Solano testified to the same in his trial declaration. Solano Decl. (Dkt. 342) at ¶ 80 ("My understanding is that Defendants cannot change the name of their Etherscan contract bearing the BAYC Marks, nor can the RR/BAYC smart contract be destroyed."). Thus, the RR/BAYC smart contract will display "Bored Ape Yacht Club" and "BAYC" as the contract name and the contract symbol, respectively, in perpetuity, and without a transfer of the smart contract to Yuga Labs, confusion from Defendants infringing NFTs will continue. *Id.* ("By transferring the RR/BAYC smart contract to Yuga Labs, the Defendants' association with the BAYC brand will no longer be 'forever' as Mr. Ripps proclaimed it would be.").

**Defendants' Reply:**

Defendants expressly reserve and reassert all replies made in the parties' Joint Statement Regarding Objections (Dkt. 420).

Yuga's reference back to its responses in *supra* ¶ 4, 7(a), 7(c) and *infra* ¶ 7(f) do not provide adequate grounds to accept Yuga's erroneous finding of fact for the reasons provided in Defendants' objections and replies for the respective paragraphs. Yuga's additional responses to this objection similarly fail.

*First,* RR/BAYC NFTs sold for approximately 1/1000th the price of Yuga's NFTs. Cahen Decl. ¶ 225 (Dkt. 344). And while the significant difference in price alone was likely enough to guarantee no confusion, Defendants still took multiple

steps to make clear that RR/BAYC was not related to Yuga. Ripps Decl. ¶¶ 101-103, 148-157 (Dkt. 346) (uncontested); Cahen Decl. ¶¶ 138-139, 151, 208-209 (Dkt. 344), 147; Dkt. 197-1 ¶¶ 201-204; JTX-2085; Trial Tr. [Solano] 63:1-10.

***Second,*** Defendants did not cause Etherscan and other websites to attribute the RR/BAYC collection to Yuga. Mr. Ripps explained, in his uncontested declaration, that the smart contract was coded so that it would be specifically attributable to him through his personal smart wallet and identify a unique smart contract address. Ripps Decl. ¶ 89 (Dkt. 346). Third party websites, such as Etherscan, always displayed the RR/BAYC collection in a manner that disclosed Mr. Ripps's unique personal wallet (either by name or by alphanumeric code) and also disclosing the unique contract address for the RR/BAYC collection. As Mr. Atalay admitted, it is the unique smart contract address that is critical to identifying NFTs. Trial Tr. [Atalay] 135:2-25.

***Third,*** over 80% of commissions for RR/BAYC NFTs occurred on rrbayc.com. Ripps Decl. Dkt. 346 ¶ 110 (uncontested). Yuga's own expert corroborates this fact by stating that ***7,028 out of the total 9,415 RR/BAYC NFTs (more than 74% of sales RR/BAYC reservations) were sold through the RSVP Contract***, ***which was only available and usable through rrbayc.com***. Kindler Decl. ¶¶ 36 (Dkt. 338). Yuga expert also admits that the ***RSVP Contract sales amounted to 981 Eth out of 1196 Eth of Defendants' total profits (which is more than 82% of all profits)***. Kindler Decl. ¶ 40 (Dkt. 338). To note, rrbayc.com also allowed reservations for the purchase of RR/BAYC NFTs ***before the RSVP contract was ever implemented***, meaning that the actual sales on rrbayc.com is larger than the sales through the RSVP Contract.

***Fourth***, as explained in *supra* ¶ 4, Defendants took many steps to avoid confusion.

***Fifth***, as explained in Defendants' reply in *supra* ¶ 7(c), RR/BAYC is not linked to Yuga at all because the code permanently identifies Mr. Ripps as the creator and has a unique smart contract address.

| | | |
|---|---|---|
| 1 | Dated: October 5, 2023 | WILMER CUTLER PICKERING HALE AND DORR LLP |

By: /s/ *Louis W. Tompros*
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Attorneys for Defendants
RYDER RIPPS and JEREMY CAHEN

| | | |
|---|---|---|
| 13 | Dated: October 5, 2023 | FENWICK & WEST LLP |

By: /s/ *Eric Ball*
Eric Ball
eball@fenwick.com
**FENWICK & WEST LLP**
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Fax: (650) 938-5200

Attorneys for Plaintiff
YUGA LABS, INC.

**ATTESTATION OF CONCURRENCE IN FILING**

Pursuant to the United States District Court for the Central District of California's Civil L.R. 5-4.3.4(a)(2)(i), Louis W. Tompros attests that concurrence in the filing of this document has been obtained from Eric Ball.

By: /s/ *Louis W. Tompros*
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000