Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Additional Counsel listed on next page

Attorneys for Plaintiff
YUGA LABS, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>                              Plaintiff,<br><br>         v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>                              Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Finding of Fact No. 19, lines 8:25, 8:27-9:1**<br><br>Judge: Hon. John F. Walter |

MELISSA L. LAWTON (CSB No. 225452)
mlawton@fenwick.com
FENWICK & WEST LLP
228 Santa Monica Boulevard
Santa Monica, CA 90401
Telephone: 310.434.4300

Attorneys for Plaintiff

YUGA LABS, INC.

Pursuant to the Court's Order (Dkt. 428) Defendants submit the following objection, response, and reply.

### Plaintiff's Disputed Post Trial Finding of Fact No. 19, lines 8:25, 8:27-9:1:

<u>Further demonstrating confusion</u>, Laura O'Laughlin, an expert in designing, administering, and analyzing consumer surveys, conducted two unrebutted surveys with results showing confusion of the BAYC Marks used in connection with RR/BAYC NFTs at net rates of 40.4% on Foundation and 20.0% on OpenSea, respectively. JTX-721 ¶¶16, 47, 73; Dkt. 341 (O'Laughlin Decl.) ¶¶13.ac, 16, 47, 48, 73, 81, 82 (admitted into evidence in Dkt. 392 at 140:9-141:13).

### Defendants' Basis of Dispute:

Defendants expressly reserve and reassert all objections made in its Joint Statement Regarding Objections (Dkt. 420).

In support of this finding of fact, Yuga points to Ms. O'Laughlin's reports and designations. As demonstrated at trial, Ms. O'Laughlin conducted two flawed surveys that failed to measure confusion. Ms. O'Laughlin acknowledged that she used an overly expansive definition of the market that included people who did not have any interest in purchasing an NFT, much less knowledge of what an NFT is. Trial Tr. [O'Laughlin] 150:2-151:16; 152:4-10. She acknowledged that she changed the survey population after running pretests to make it more inclusive. *Id.* at 144:25-146:7. Ms. O'Laughlin also acknowledged that she lacked basic knowledge about the NFT market, admitting to erroneously believing that cryptocurrency was an NFT when she formulated her surveys and her reports. *Id.* at 147:12-14. The result of her lack of knowledge was an inherently flawed survey that could not show confusion because the market was too broad. This was despite her acknowledgement that choosing the right sample population "matters for the analysis". *Id.* at 146:18-25.

Ms. O'Laughlin also erred by producing two contradictory surveys. In 2020 she authored an article titled, "Which Method is For You? Not All Surveys Are Made

the Same" JTX-314.  In that article she discusses choosing *between* the Squirt and Eveready surveys on the basis of the strength of the mark.  In this case, however, she ignored her own advice and operated both surveys.  This was despite acknowledging that at deposition she agreed with her earlier advice that the Eveready survey is most appropriate when the mark is strong, and the Squirt survey when the mark is weak.  Trial Tr. [O'Laughlin] 143:9-144:6.  All the while, she never discerned the strength of the mark.  *Id.* 144:12-18.  This broke with her prior practice as well, as it was the first case she personally testified in where she offered an opinion based on both surveys.  *Id.* 144:19-24.  Ms. O'Laughlin should have chosen between the surveys, but by not doing so she did not produce a finding of value on either survey.

Ms. O'Laughlin also could not explain the extremely strong priming effect which influenced her results to her Everready survey.  In that survey, people were split into those who saw a version of the RR/BAYC Foundation page that included the words "Bored Ape Yacht Club."  Those in the control group of the experience would see the words "Chill Gorilla Boat Crew."  Those in the experiment group who wrote the words "Bored Ape Yacht Club" verbatim and were counted as confused, but those in the control group who copied down the words "Chill Gorilla Boat Crew" were not counted as confused.  Trial Tr. [O'Laughlin] 154:24-157:14.  Twenty-seven percent of those in the control group wrote "Chill Gorilla Boat Crew" verbatim, but were not counted as confused.  *Id.* at 157:9:14; 158:20-159:1.  Ms. O'Laughlin admitted that she did not account for this extreme priming effect calling it "not particularly relevant". *Id.* at 158:20-159:1.

Lastly, Ms. O'Laughlin acknowledged that she could not attest to how long the versions of the websites she used existed.  *See* Trial Tr. [O'Laughlin] 161:12-163:10; 163:13-163:20; 165:12-22.  At most, to the extent that her survey is not fundamentally flawed, she can attest to confusion on two websites for only a matter of days.  *Id.*  Overall, her surveys were so fundamentally flawed with errors this Court should reject them and provide them no weight.

1 **Plaintiff's Response:**

2 Given that "Defendants expressly reserve and reassert all objections made in its Joint Statement Regarding Objections (Dkt. 420)", Yuga Labs expressly reserves and reasserts all of its responses to those objections as stated in Dkt. 420.  The Court has already determined that Ms. O'Laughlin's testimony and the findings in her expert report are "relevant, reliable, and admissible."  Trial Tr. at 141:3-5.  Defendants' arguments to the contrary fail.

**Survey Participants:**  Defendants' contention that Ms. O'Laughlin selected an overbroad target population is meritless.  The survey audience for both surveys consisted of individuals who indicated that they "(i) have purchased an NFT in the past year using Ethereum," "(ii) are considering purchasing an NFT using cryptocurrency in the next year," "(iii) have purchased digital art as a collectible in the past year," or "(iv) are considering doing so in the next year."  O'Laughlin Decl. (Dkt. 342) ¶¶ 31, 68-69.  The latter categories of participants were included to account for consumers who may be "in market for digital art or digital collectibles" without having specifically considered NFTs in the past.  Trial Tr. at 148:4-9; .  As Ms. O'Laughlin noted, "consumers can think of NFTs in different ways, and [she] wanted to make sure that [she] got people in the survey who thought about NFTs in the way [NFTs are] referred to in the marketplace."  Trial Tr. at 148:15-18; *see also* Berger Report at 5 n.2 ; SJ Order (Dkt. 225) at 7.

Defendants and their partners previously agreed that their use of Yuga Labs' marks could be "too confusing to the 'average joe'", who they were targeting.  JTX-801.196.  They cannot credibly argue that the "average joe" who may be interested in NFTs as digital collectibles or art should be excluded from the survey population.

**Choice of Survey Formats:**  The Court considered Defendants' argument and rejected it.  Trial Tr. at 141:3–5.  Their position remains meritless.

Though Defendants complain that Ms. O'Laughlin "used two different surveys that are appropriate for different uses," that is exactly the approach called for where

two different marketplaces are being tested for likelihood of confusion.  There is no principle dictating that the same survey format must be used in every circumstance, regardless of context in which the marks appear.  *See* Trial Tr. at 142:18-23 ("it's possible that one or many methodologies may be appropriate for a particular matter. So it's not a one or none. It could be a one, many, or none.").  Ms. O'Laughlin used accepted principles in choosing which survey methodology to use in two different contexts.  On the Foundation marketplace where the parties' NFT collections were not sold at the same time, she used an Eveready survey, which presents participants with only the junior mark.  O'Laughlin Decl. (Dkt. 341) ¶ 17; *see also id.* ¶ 17 n.6.  On the OpenSea marketplace, where the parties NFT collections were sold at the same time, she used a Squirt survey, which presents participants with both the junior and the senior mark.  *Id.* ¶ 18; *see also* ¶ 18 n.7. There is nothing inconsistent about using the appropriate survey in the appropriate context to best replicate market conditions.

Accordingly, Courts regularly credit survey expert testimony that employs both survey formats in the same litigation.  *See, e.g.*, *Icleen Entwicklungs-Und Vertiebsanstalt Für Umweltprodukte v. Blueair AB*, No. 21-cv-2236 DSF (ADS), 2021 WL 6104397, at *8-9 (C.D. Cal. Oct. 4, 2021) (crediting testimony relying on both Eveready and Squirt formats in ruling on a preliminary injunction).

Defendants' argument that Ms. O'Laughlin should have based her choice of methodology on strength of the marks contradicts established principles.  *See, e.g.*, Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727, 737 (2016) ("Where, in sum, marks are not *proximate*, an Eveready is likely the only format available; and even as to proximate marks, an Eveready may always be offered (possibly in response to complaint allegations of trademark strength) in conjunction with a Squirt to negate the reach capabilities of a brand.") (footnote omitted).

**Calculation of Confusion Rate:**  The operative questions in calculating the net confusion rate in Ms. O'Laughlin's Foundation/Eveready survey were "Who or what entity do you believe puts out the NFT collection you saw?" and "What other entity or

entities do you believe have a business relationship (e.g. affiliation, sponsorship, or other connection) with whoever puts out the NFT collection you saw?" O'Laughlin Decl. (Dkt. 341) ¶¶ 45-46. Defendants aver, without any authority or expert testimony, that Ms. O'Laughlin's Foundation/Eveready survey was "unreliable" and "biased" because she only considered respondents who identified the source of Defendants' Foundation webpage as "Bored Ape Yacht Club" to be confused and did not count those who mentioned "Chill Gorilla Boat Crew." This argument has no merit and demonstrates a fundamental misunderstanding of the purpose of a control in an Eveready survey. *See* Trial Tr. at 156:16-157:14.

Ms. O'Laughlin's Foundation/Eveready survey employs a test/control experimental design where respondents are randomly assigned to one of two groups and exposed to stimuli that are identical but for the at-issue characteristic(s) being tested. Ms. O'Laughlin compared the share of respondents who associate the Defendants' Foundation webpage with "Bored Ape Yacht Club," when shown the page *as it actually appeared in the real world* with the at-issue BAYC Marks (BAYC test group), versus when shown a modified page that used an alternative to the at-issue BAYC Marks (CGBC control group). By comparing the share of respondents who believe that the source of the Foundation page collection is "Bored Ape Yacht Club" in both the test and control groups, Ms. O'Laughlin was able to measure the rate of confusion attributable specifically to Defendants' actual use of the BAYC Marks.

Ms. O'Laughlin's Eveready survey and analysis are not methodologically flawed. Consistent with standard Eveready survey practice, Ms. O'Laughlin's analysis counts mentions of the "Bored Ape Yacht Club" in both the test and control groups, but does not count mentions of "Chill Gorilla Boat Crew" in the control group when calculating net confusion. *See* JTX-1122 at 210-11. All other characteristics of the stimuli are not at issue and therefore are not considered when calculating confusion. Accordingly, it would be nonsensical to count respondents who mention Chill Gorilla Boat Crew as confused.

      Moreover, Defendants essentially complain that the survey is biased because the prominence of the BAYC Marks in the stimuli would lead anyone to believe the Foundation webpage is associated with the "Bored Ape Yacht Club" or "BAYC" NFT collection.  The complaint though is of the Defendants' own making.  The stimuli used in Ms. O'Laughlin's Foundation/Eveready survey reflects the Defendants' explicit and blatant infringement found on their own Foundation webpage ***as it actually appeared in the real world***, which simply demonstrates the egregious and deceptive nature of Defendants' use of the BAYC Marks.  *See* JTX 28; JTX 1557.  Indeed, the fact that many survey respondents associated Defendants' Foundation webpage with "Bored Ape Yacht Club" and the modified control version of the webpage with "Chill Gorilla Boat Crew" highlights how respondents (and consumers more broadly) rely on collection names and logos to communicate the source of an NFT collection.

      Finally, Ms. O'Laughlin's survey specimens reflected Defendants' marketing when they promoted themselves as the top selling NFT collection, and at a time when even Bloomberg was confused as to whether Defendants' infringing NFTs were indeed a Bored Ape Yacht Club collection.  This period is also when Defendants claim the majority of their sales occurred.  The survey reflects the main secondary marketplace for Defendants' NFTs during their most significant promotional period.

**Defendants' Reply:**

      Defendants expressly reserve and reassert all replies made in the parties' Joint Statement Regarding Objections (Dkt. 420).

      Defendants reiterate all points made in their objection.  Yuga conflates admission of Ms. O'Laughlin's testimony with weight.  The Court noted "counsel will have an opportunity to fully expose any limitations or flaws during cross-examination."  Trial Tr. 141:8-10.  It is also black letter law that an expert's testimony can be exposed as unreliable through cross examination alone.

1  *SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). Yuga's rule requiring a
2  rebuttal expert is unfounded and should be disregarded.
3         The survey population was too broad. We agree with Yuga that the survey flow
4  includes people who "(iii) have purchased digital art as a collectible in the past year,"
5  or "(iv) are considering doing so in the next year." O'Laughlin Decl. (Dkt. 342)
6  ¶¶ 31, 68-69. Yuga's citations its experts conflating digital art with purchasing an
7  NFT do not assist it. While it is true that perhaps some consumers do not buy it as a
8  "digital deed" divorced from the art, they know what an NFT is generally. Ms.
9  O'Laughlin, did not know what an NFT was at the time she conducted the survey as
10 she was unaware that it was not cryptocurrency, never asked the digital art
11 respondents if they were aware of NFTs. Trial Tr. [O'Laughlin] 152:11-14; 147:12-
12 14. To the extent Yuga is trying to rehabilitate its flawed survey population through
13 Ms. O'Laughlin's expertise on NFTs, she admittedly is not one. *Id.* at 147:4-12.
14 Yuga's claim Defendants are wrongly arguing to exclude "average Joes" who might
15 be interested in buying NFTs does not address Defendants actual argument.
16 Defendants complaint is that the population is too broad. Yuga never addresses that
17 Ms. O'Laughlin admittedly broadened the survey population to include the non-
18 interested persons *after* her team accessed the results. *Id.* 144:25-146:7
19        Ms. O'Laughlin's use of two different surveys was exposed on cross
20 examination as improper and is contrary to her prior practice and writings. In 2020
21 she authored an article titled, "Which Method is For You? Not All Surveys Are Made
22 the Same" JTX-314. There she discusses choosing *between* the Squirt and Eveready
23 surveys on the basis of mark strength. Ms. O'Laughlin's consistent position has been
24 that mark strength is the most important factor for choosing surveys. *Id.* at 143:6-
25 144:6. Ms. O'Laughlin admitted that she had never presented two surveys in one case.
26 *Id.* at 144:19-23. Yuga's citation to authority to support Ms. O'Laughlin's decision to
27 run two contradictory surveys does not help it. All of those cases implicate
28

preliminary injunctions, not merits trial.  They do not address issues of an expert departing from her prior practice.  *See* Trial Tr. [O'Laughlin] 143:6-144:1.

Yuga's defense of the confusion rate it calculated misapprehends the problem.  The survey did not show confusion at all.  Only two out of 505 respondents even mentioned Yuga Labs.  Trial Tr. [O'Laughlin] 155:18-156:1.  All the survey showed was literacy.  "Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion.  *Franklin Resources, Inc. v. Franklin Credit Mgmt Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) .  Ms. O'Laughlin makes the claim that there was an extensive amount of confusion based on her Eveready survey because 49% of test group respondents were confused.  *See* JTX-310 at Figure 9.  Of these, almost all wrote the screen prompt exactly.  In the control group, 27% of test group respondents wrote "Chill Gorilla Boat Crew", the on-screen stimulus, and were not counted as confused.  *See* Trial Tr. [O'Laughlin] 157: 9-14.  Ms. O'Laughlin was unable to provide an explanation for writing "Chill Gorilla Boat Crew" besides copying.  *Id.* at 157:25-158:7.  It is undisputed that Ms. O'Laughlin did not control for people copying on-screen stimuli which likely comprised about 2/3 of the test group's "confusion" answers if the test and control groups were similar.

Yuga appears to concede that Ms. O'Laughlin's surveys are limited in time.  Ms. O'Laughlin's opinions are thus limited to June 19-20, 2022 for the Squirt survey.  Trial Tr. [O'Laughlin] 165:1-11; 15:22.  They are likewise limited to June 21-24 for the Everready survey.  *Id*. at 163:11-164:17.

| | |
|---|---|
| Dated: October 5, 2023 | WILMER CUTLER PICKERING HALE AND DORR LLP<br><br>By: /s/ *Louis W. Tompros*<br>Louis W. Tompros (*pro hac vice*)<br>louis.tompros@wilmerhale.com<br>**WILMER CUTLER PICKERING HALE AND DORR LLP**<br>60 State Street<br>Boston, MA 02109<br>Telephone: (617) 526-6000<br>Fax: (617) 526-5000<br><br>Attorneys for Defendants<br>RYDER RIPPS and JEREMY CAHEN |
| Dated: October 5, 2023 | FENWICK & WEST LLP<br><br>By: /s/ *Eric Ball*<br>Eric Ball<br>eball@fenwick.com<br>**FENWICK & WEST LLP**<br>801 California Street<br>Mountain View, CA 94041<br>Telephone: (650) 988-8500<br>Fax: (650) 938-5200<br><br>Attorneys for Plaintiff<br>YUGA LABS, INC. |

**ATTESTATION OF CONCURRENCE IN FILING**

Pursuant to the United States District Court for the Central District of California's Civil L.R. 5-4.3.4(a)(2)(i), Louis W. Tompros attests that concurrence in the filing of this document has been obtained from Eric Ball.

By: /s/ *Louis W. Tompros*
Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
**WILMER CUTLER PICKERING HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000