Louis W. Tompros (*pro hac vice*)
louis.tompros@wilmerhale.com
Monica Grewal (*pro hac vice*)
monica.grewal@wilmerhale.com
Scott W. Bertulli (*pro hac vice*)
scott.bertulli@wilmerhale.com
Tyler Carroll (*pro hac vice*)
tyler.carroll@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
Fax: (617) 526-5000

Derek Gosma (SBN 274515)
derek.gosma@wilmerhale.com
Henry Nikogosyan (SBN 326277)
henry.nikogosyan@wilmerhale.com
**WILMER CUTLER PICKERING
  HALE AND DORR LLP**
350 South Grand Ave., Suite 2400
Los Angeles, CA 90071
Telephone: (213) 443-5300
Fax: (213) 443-5400

Attorneys for Defendants
*Ryder Ripps and Jeremy Cahen*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| Yuga Labs, Inc.,<br><br>            Plaintiff,<br><br>    v.<br><br>Ryder Ripps, Jeremy Cahen,<br><br>            Defendants. | Case No. 2:22-cv-04355-JFW-JEM<br><br>**Defendants' Objections to Disputed Conclusion of Law No. 46, Lines 15:20-16:3**<br><br>Judge:  Hon. John F. Walter |

Pursuant to the Court's Order Regarding the Parties Objections to Post Trial Proposed Findings of Facts and Conclusion of Law (Dkt. 423) Defendant Ryder Ripps and Defendant Jeremy Cahen respectfully submit the following objection, response, and reply to Defendants' objections to Yuga Labs, Inc.'s ("Yuga") Post Trial Proposed Findings of Facts and Conclusion of Law:

### Plaintiff's Disputed Post Trial Finding of Fact No. 46, Lines 15:20-16:3:

Here, money alone cannot remedy Yuga Labs or extinguish the ongoing harm and the continued threat that Defendants will repeat their fraud. Ms. Kindler's testimony corroborated this point. One potential measure of damages assessed was the cost for Yuga Labs to purchase the infringing NFTs and remove them from the market. However, her calculations showed that a "hypothetical buyback effort is not economically feasible" because some RR/BAYC NFT holders will demand prices beyond market value, and other likely holdouts will not give Yuga Labs an "opportunity [] to go back and just purchase the infringing NFTs." Dkt. 392 184:17-185:4. And Defendants' conduct suggests that they will continue to harm Yuga Labs. *See, e.g.*, JTX-1048, JTX-1315, JTX-1613, JTX-1615; Dkt. 342 ¶¶76-77, 79. In the absence of a permanent injunction, Yuga Labs is likely to be exposed to further irreparable harm.

### Defendants' Basis of Dispute:

Yuga presented no evidence that Defendants "will continue to repeat their fraud." There is no evidence that Defendants continue to make money on the RR/BAYC project. On the contrary, Yuga has admitted that there are no continuing royalties. Trial Tr. [Solano] 48:15-49:4.

Ms. Kindler's report inflating the damages estimation almost 400-times should also be disregarded because of its errors. First, she wrote her report while Yuga was still arguing for monetary damages and placed an estimation on the amount of

1  damages that Yuga suffered.  Dkt. 268.  Second, she admitted that she based her 100-
2  fold increase in her damages estimation off of three Tweets.  *See* Trial Tr. [Kindler]
3  179:12-14.  She combined this with the fact that the RR/BAYC floor price increased,
4  however she did not adjust for the fact that the floor price had decreased compared to
5  when she first wrote her report.  *See Id.* at 181:24-183:2; 184:10-12.  The inferential
6  leaps that Ms. Kindler took to increase her damages calculation 400-fold were
7  unreasonable.
8        Yuga's other citations to the record do not assist it in making the point that
9  Defendants continue to profit from the fraud.  The citation to the "OpenSea Pro"
10 Tweets do not prove that any sales were actually made of RR/BAYC or that
11 Defendants profited from them.  JTX-1048 has nothing to do with profiting but is
12 instead a common meme that highlights how uncool Yuga is.
13       **Plaintiff's Response:**
14       Defendants argue that there is no evidence they will repeat their fraud in the
15 very same document that they admit they intend to mint the remainder of the
16 infringing NFTs in their collection.  *Supra* ¶ 11(d), lines 18-20 (arguing that
17 surrendering control of the smart contract to Yuga Labs would "have a stifling effect
18 on Mr. Ripps and Mr. Cahen's First Amendment rights as the minting of the
19 RR/BAYC NFTs is intricately connected to their protest against Yuga").  Defendants'
20 position that an injunction is not needed to prevent future infringement does not just
21 lack credibility—it is admittedly false.
22       And, to be clear, the Court has *already determined three times* that the minting
23 of the RR/BAYC NFTs is not protected by the First Amendment.  *See* Dkt. 62 at 6
24 ("Although Defendants' argue that the larger RR/BAYC 'project' is an expressive
25 artistic work protected by the First Amendment, Defendants' sale of what is
26 admittedly a 'collection of NFTs that point to the same online digital images as the
27 BAYC collection' (Motion, 6:20-21) is the only conduct at issue in this action and
28

1 does not constitute an expressive artistic work protected by the First Amendment. In
2 particular, the RR/BAYC NFTs do not express an idea or point of view, but, instead,
3 merely 'point to the same online digital images associated with the BAYC
4 collection.'"); Dkt. 178 at 6 ("[T]he Court has concluded that this action concerns
5 Defendants' commercial conduct and not Defendants' free speech rights") Dkt. 225 at
6 16 (same as Dkt. 62).  Defendants have no constitutional right to create and sell (or
7 market and promote) infringing products.

8    Further, Defendants' objection should be rejected because (1) Defendants
9 continued to market RR/BAYC NFTs after the commencement of this lawsuit and
10 after the Court's Order on Summary Judgment, (2) Ms. Kindler properly updated her
11 calculations with new information, and (3) Yuga Labs must regain control of its
12 BAYC brand to adequately remedy Defendants' wrongdoing.

13    **Defendants Continued To Market RR/BAYC NFTs Throughout This
14 Lawsuit:**  Yuga Labs has reason to believe that Defendants will continue to harm
15 Yuga Labs or repeat their fraud.  Defendants continued to market RR/BAYC NFTs
16 after this case began. JTX-1048 (Mr. Cahen retweeted a post in January 2023 from
17 @ApeMarketplace on Twitter promoting Ape Market as coming "soon"), JTX-1315,
18 JTX-1613, JTX-1615 (Mr. Cahen admittedly promoting RR/BAYC NFT sales on
19 OpenSea Pro in April 2023); Solano Decl. (Dkt. 342) ¶¶74-75.  And they continued to
20 market RR/BAYC NFTs after this Court's summary judgement order.  *See* Solano
21 Decl. (Dkt. 342) ¶ 77; Trial Tr. at 57:8-58:6, 58:20-59:19.  Even a month after trial,
22 Defendants still advertise rrbayc.com in the profile heading of the Ape Market Twitter
23 profile.  *See* https://twitter.com/apemarketplace.  Following this trend, their
24 infringement will likely continue, resulting in further harm to Yuga Labs.  And their
25 ownership of the RR/BAYC smart contract guarantees future harm.  Solano Decl.
26 (Dkt. 342) ¶¶ 46, 78-79.  If Defendants continued to control the RR/BAYC smart
27 contract, there also remains a very real possibility of Defendants receiving further

royalties on LooksRare or other new marketplaces that may be launched and insist on paying creator fees (such as LooksRare, which Defendants admit they could not stop for more than one year). Ripps Depo. Designations (Dkt. 396) at 89:19-21; Cahen Depo. Designations (Dkt. 395) at 209:2-3; Kindler Decl. (Dkt. 338) at ¶ 23.

Defendants misrepresent Mr. Solano's testimony. In his declaration, Mr. Solano testified that Defendants' "profits . . . increase as [they] gain royalties and creator fees from sales on secondary marketplaces." Solano Decl. (Dkt. 342) at ¶ 86. This forward-looking statement properly highlights the fact that as long as Defendants maintain control of the smart contract the risk remains that they will resume collecting royalties on some new marketplace on which the RR/BAYC NFTs are not currently listed. And Ms. Kindler testified that she calculated Defendants' profits up until February 1, 2023, so even if Defendants are not currently collecting royalties, it is beyond dispute that they did continue to profit from royalties from at least February to May. Kindler Decl. (Dkt. 338) at ¶ 23. Despite Defendants' attempt to spin Mr. Solano's testimony, it accurately reflects the fact that Defendants have collected royalties throughout much of this litigation and may collect them again unless they are ordered to relinquish control of the smart contract to Yuga Labs.

**Ms. Kindler Properly Updated Her Calculations With New Information:** Ms. Kindler supplemented her damages calculation with new information once it became available; she did not change her prior analysis. *See* Trial Tr. 179:2-5 ("based on additional events that had transpired and available market data, that I could then update my analysis to show the impact of what I had already identified previously as likely holdouts in the marketplace."). Ms. Kindler initially calculated "a 'floor' for what a buyback would cost <u>at minimum</u>," i.e., "a low-end market price of the RR/BAYC NFT collection." Kindler Decl. (Dkt. 338) ¶ 72. Then, based on new data made available by Defendants' posts to their followers regarding the buyback estimate (which also prompted an increase in the price and trading volume of the infringing

NFTs), Ms. Kindler determined that "[t]his new evidence confirmed that the floor value for a hypothetical buyback significantly underestimated the actual cost of such an exercise, as I originally opined." *Id.* ¶¶ 73-74. "Based on these materials and available market data, my assignment was to estimate a 'ceiling' for what a buyback would cost. I determined the cost to purchase and destroy all RR/BAYC NTFs could even be higher than $797,183,838 . . . based on the then-current floor price of authentic BAYC NFTs." *Id.* ¶ 74. Ms. Kindler's updated calculations highlight how impractical actual damages would be in this case, and thus the need for injunctive relief to address Defendants' harm.

**Irreparable Harm Will Continue Until Yuga Labs Regains Control Of The BAYC Brand:** More egregiously, if Defendants maintain control of the RR/BAYC smart contract and the other instrumentalities of their infringement (e.g., the domains and @ApeMarketplace account), they will continue to associate themselves and their infringing activity with the BAYC Marks, which will continue to cause irreparable harm to the brand. For example, consumers and Twitter bots tracking NFT transfers will continue to confuse sales of RR/BAYC NFTs as BAYC NFTs as they reflect the BORED APE YACHT CLUB and BAYC marks in the RR/BAYC smart contract's token tracker. Thus, even if Defendants cease actively promoting their infringement of Yuga Labs' marks, and even if Defendants transfer the domain names and social media accounts to Yuga Labs, confusion from their infringement will continue unless Yuga Labs owns and controls the smart contract. Without transfer of the contract, the Defendants would forever have control over and a connection to Yuga Labs' BAYC Marks. *See, e.g.,* Solano Decl. (Dkt. 342) ¶ 79. Additionally, because nearly 500 RR/BAYC NFTs remain available to mint through the RR/BAYC smart contract, Defendants retain the tool to continue their infringement.

However, transferring control of the contract to Yuga Labs allows Yuga Labs to work with NFT marketplaces to address the confusion on their marketplace through

changes to the marketplace itself. Trial Tr. 100:6-14 (having control of the contract allows Yuga Labs to "change the front-facing terminology so that people could at least be aware of the fact that this is fraudulent in an easier capacity"); Trial Tr. 136:9-18 ("But if Yuga Labs had control, was the owner of the smart contract, we would have a much greater flexibility in controlling how the collection is displayed in marketplaces, including OpenSea."); Trial Tr. 138:6-139:11 (Mr. Atalay detailing the how control of the smart contract will allow Yuga Labs to combat consumer confusion). An injunction that includes a transfer of the RR/BAYC smart contract and other instrumentalities of the infringement is necessary and narrowly tailored. Without this injunctive remedy, allowing Yuga Labs to regain control over the instrumentalities of commerce that bear its BAYC trademarks, Yuga Labs cannot protect its brand and prevent future harm.

**Defendants' Reply:**

Defendants have not stated they would remint. *See* Ripps. Decl. ¶ 87 (Dkt. 346) (uncontested) (saying *nothing* about minting the remainder of the contract. The smart contract itself contains speech elements, and forcing the transfer to Yuga could impinge on the speech aspects. There is however, a difference between future minting and ownership of a smart contract. The smart contract that Yuga seeks to obtain clearly indicates the source of the RR/BAYC NFTs is Mr. Ripps's wallet and not Yuga. *See* JTX-1146. Therefore, the smart contract does not contribute to the alleged confusion. Additionally, the smart contract is, even according to Yuga's own witness's testimony, immutable and cannot be changed even if transferred to Yuga. *See* Trial Tr. [Atalay] 133:24-8. Accordingly, an injunction transferring the contract to Yuga would not be tailored to eliminate the alleged harm of infringement.

The exhibits Yuga cites as evidence of marketing (JTX-1315, JTX-1317, JTX-1613, JTX-1614, JTX-1615) are tweets that Mr. Cahen made reporting news on what is occurring in relation to the RR/BAYC collection: specifically, that certain third-

1  party marketplaces were trading the NFTs despite Yuga's efforts to silence
2  Defendants' criticism and public reports of certain transactions occurring in
3  connection with the RR/BAYC collection. As Mr. Cahen explained in his declaration,
4  "Overall, I would consider myself a very active community member in the
5  cryptocurrency space, which is something that I take pride in. A lot of the work I do
6  takes place over social media." Cahen Decl. ¶ 50 (Dkt. 344). Mr. Cahen further
7  explained, "I often use my social media accounts to report on crypto news or other
8  topics I find noteworthy to help spread awareness." Cahen Decl. ¶ 52 (Dkt. 344).
9  These tweets are not "marketing" activities but simply report news/crypto events in
10 relation to the RR/BAYC collection.
11      Yuga speculates without basis that Defendants might restart collecting royalties.
12 This is based on no evidence whatsoever. Further, Yuga has admitted that there are
13 no continuing royalties. Trial Tr. [Solano] 48:15-49:4. There was no
14 misrepresentation of Mr. Solano's testimony. He was asked whether he made the
15 statement that royalties were increasing, he said he did and acknowledged that it was a
16 mistruth. Trial Tr. [Solano] 48:15-49:4. The fact that there are no royalties is well-
17 established at this point.
18      Yuga's other citations show how weak its position is. Ms. Kindler's $787
19 million dollar adjustment was based on three tweets. *See* Trial Tr. 179:2-5
20 (acknowledging that tweets were basis of her new damages estimation). However,
21 this has nothing that indicates that Defendants seek to re-enter the market using
22 Yuga's marks, which is what this case is actually about. *See* Dkt. 1 at *5.
23      Yuga's claim that it must have the smart contract to "regain control of its
24 brand" is incorrect and also contradicted by Mr. Atalay. Mr. Atalay explained that
25 while in some situations a smart contract could be mutable, *in this case* the smart
26 contract immutable and cannot be changed even if transferred to Yuga. *See* Trial Tr.
27
28

1  [Atalay] 133:24-8.  As such, transfer of the smart contract will not change anything
2  and serves no goal of giving Yuga its brand back.
3        Lastly, Yuga still has provided no evidence that Defendants will not comply
4  with the court order, or continue to harm Yuga.  In fact, they betray their true
5  motivation which is to silence Defendants.  JTX-1048 contains a criticism of how
6  Yuga is uncool through the Virgin/Chad meme format.  This type of meme criticism
7  can be cutting, and to outsiders of the internet somewhat mean spirited because it
8  needs contextual knowledge to understand.  *See* Cahen Decl. ¶ 54 (explaining need for
9  context to understand his social media posts).  However, it is just this type of Tweet
10 that calls out Yuga for its uncool nature that Yuga seeks to ban through an overbroad
11 injunction.