**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   **CV 22-4355-JFW(JEMx)**                    Date:  October 25, 2023

Title:        Yuga Labs, Inc. -*v*- Ripps, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

**Shannon Reilly**                              **None Present**
**Courtroom Deputy**                          **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**      **ATTORNEYS PRESENT FOR DEFENDANTS:**
                    None                                              None

**PROCEEDINGS (IN CHAMBERS):**        **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        On July 31, 2023, the Court conducted a court trial on the equitable remedies to be awarded to Plaintiff Yuga Labs, Inc. ("Yuga").  Eric Ball, Kimberly Culp, and Molly R. Melcher of Fenwick & West LLP appeared for Yuga.  Louis W. Tompros and Derk Gosma of Wilmer Cutler Pickering Hale & Dorr LLP appeared for Defendants Ryder Ripps ("Ripps") and Jeremy Cahen ("Cahen") (collectively, "Defendants").  On August 28, 2023, pursuant to the Court's August 15, 2023 Order, the parties filed and served Proposed Post Trial Findings of Fact and Conclusions of Law.  *See* Docket Nos. 409, 416, and 417.  On September 5, 2023, the parties filed and served marked copies of the opposing parties' Proposed Post Trial Findings of Fact and Conclusions of law. Docket Nos. 418 and 419.  On September 26, 2023, the parties filed and served Joint Statements regarding the Proposed Post Trial Findings of Fact and Conclusions of Law.  Docket Nos. 420, 421, 424-427, and 429-30.

        After carefully considering all of the evidence, the credibility of the witnesses, and the parties' pretrial and post-trial filings, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

**<u>Findings of Fact</u>**[1]

---

        [1]  The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons for the Court's decision.  Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.  With respect to evidence to which the parties have objected and the Court has not previously ruled on those objections, to the extent the Court relies upon that evidence, the Court has considered and overruled those objections.  As to the remaining objections, the Court finds that it is unnecessary to rule on those

                                                                    Initials of Deputy Clerk  _sr_

I.        **Factual Background**

Yuga is the creator of one of the world's most well known and successful Non-Fungible Token ("NFT") collections, known as the Bored Ape Yacht Club ("BAYC").  According to Yuga, the BAYC NFTs have earned significant attention from the media for their popularity and value, including being featured on the cover of *Rolling Stone* magazine and being dubbed the "epitome of coolness for many" by *Forbes* magazine.  Yuga's BAYC NFTs often resell for hundreds of thousands, if not millions, of dollars, and several prominent celebrities are holders of BAYC NFTs.  In addition to certain benefits that come with membership in the exclusive community of BAYC NFT holders, Yuga maintains that much of the BAYC NFT collection's value arises from their rarity because only 10,000 BAYC NFTs exist and each is entirely unique.  Yuga owns several unregistered trademarks, including "BORED APE YACHT CLUB," "BAYC," "BORED APE," the BAYC Logo, the BAYC BORED APE YACHT CLUB Logo, and the Ape Skull Logo (collectively, the "BAYC Marks").  Yuga has used the BAYC Marks since approximately April 2021 in connection with advertising, marketing, and promotion of its products and services nationwide and internationally through multiple platforms, including the BAYC website, NFT markets such as OpenSea, and social media platforms, such as Facebook, Instagram, and Twitter.[2]

Ripps is a visual artist and creative designer who creates artwork that comments on the boundaries between art, the internet, and commerce.  According to Defendants, Yuga has deliberately embedded racist, neo-Nazi, and alt-right dog whistles in the BAYC NFTs and associated projects.[3]  Beginning in approximately November 2021, Ripps began criticizing Yuga's use of these purported racist, neo-Nazi, and alt-right dog whistles through his Twitter and Instagram profiles, podcasts, cooperation with investigative journalists, and by creating the website gordongoner.com.

In approximately May 2022, Ripps, along with Cahen, created their own NFT collection, known as the Ryder Ripps Bored Ape Yacht Club ("RR/BAYC").  The RR/BAYC NFT collection point to the same online digital images as the BAYC [NFT] collection but use verifiably unique entries on the Ethereum blockchain.  Defendants contend that their "use of pointers to the same images is a form of 'appropriation art' that serves several purposes," including: (1) bringing attention to Yuga's use of racist, neo-Nazi, and alt-right messages and imagery; (2) exposing Yuga's use of unwitting celebrities and popular brands to disseminate offensive material; (3) creating social pressure demanding that Yuga take responsibility for its actions; and (4) educating the public about the technical nature and utility of NFTs.

─────────────────────

objections because the disputed evidence was not relied on by the Court.

    [2]  Although Twitter was rebranded as X in July 2023, the Court will continue to refer to it as Twitter rather than the more cumbersome X (formerly known as Twitter).

    [3]  Although Defendants contend that Yuga's purported use of racist, neo-Nazi, and alt-right dog whistles are "too numerous to catalog," Defendants have provided several examples, including their claim that Yuga's BAYC Logo imitates the Nazi Totenkopf emblem for the Schutzstaffel and their claim that the name of Yuga's company includes a neo-Nazi dog whistle because the word "Yuga" is a reference to the phrase "Surf the Kali Yuga," which the alt-right uses as an esoteric way of saying enjoy sin and embrace conflict.

## II.      Procedural History

### A.      Yuga's Complaint and Defendants' Anti-SLAPP Motion and Motion to Dismiss

On July 24, 2022, Yuga filed a Complaint against Defendants, alleging causes of action for: (1) false designation of origin (15 U.S.C. § 1125(a)); (2) false advertising (15 U.S.C. § 1125(a)); (3) cybersquatting (15 U.S.C. § 1125(d)); (4) common law trademark infringement; (5) common law unfair competition; (6) unfair competition (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); (7) false advertising (Cal. Bus. & Prof. Code §§ 17500 *et seq.*); (8) unjust enrichment; (9) conversion; (10) intentional interference with prospective economic advantage; and (11) negligent interference with prospective economic advantage.  Docket No. 1.  In its Complaint, Yuga alleges that Defendants have misused the BAYC Marks as part of a scheme to harass Yuga, mislead consumers, and unjustly enrich themselves.  According to Yuga, in response to the popularity of the BAYC NFTs:

> Defendant Ryder Ripps, a self-proclaimed "conceptual artist," recently began trolling Yuga Labs and scamming consumers into purchasing RR/BAYC NFTs by misusing Yuga Labs' trademarks.  He seeks to devalue the Bored Ape NFTs by flooding the NFT market with his own copycat NFT collection using the original Bored Ape Yacht Club images and calling his NFTs "RR/BAYC" NFTs.  Brazenly, he promotes and sells these RR/BAYC NFTs using the very same trademarks that Yuga Labs uses to promote and sell authentic Bored Ape Yacht Club NFTs.  He also markets these copycat NFTs as falsely equivalent to an authentic Bored Ape Yacht Club NFT.  He then goes on to use Yuga Labs' marks to promote his coming "Ape Market" NFT marketplace, which requires a person to purchase one of his infringing NFTs to join the Ape Market.  This is no mere monkey business.  It is a deliberate effort to harm Yuga Labs at the expense of consumers by sowing confusion about whether these RR/BAYC NFTs are in some way sponsored, affiliated, or connected to Yuga Labs' official Bored Ape Yacht Club, in violation of the Lanham Act and related state law.

Complaint, ¶ 2.

On December 16, 2022, the Court issued an Order denying Defendants' Anti-SLAPP Motion and denying Defendants' Motion to Dismiss except with respect to Yuga's unjust enrichment cause of action, and that cause of action was dismissed without prejudice ("December 16, 2022 Order").  Docket No. 62.  On December 21, 2022, Defendants filed a Notice of Appeal, appealing the Court's denial of their Anti-SLAPP Motion.[4]  Docket No. 63.  The Ninth Circuit heard oral arguments on October 16, 2023, and no decision has been issued.

---

[4]  Yuga's state law claims (other than its unjust enrichment claim, which the Court dismissed) are stayed pending Defendants' appeal of the Court's denial of their Anti-SLAPP Motion.

Initials of Deputy Clerk _sr_

**B.** **Defendants' Answer and Counterclaims and Yuga's Special Motion to Strike Counterclaims and Motion to Dismiss Counterclaims**

On December 27, 2022, Defendants filed their Answer and Counterclaims. Docket No. 65. Defendants alleged six claims against Yuga: (1) knowing misrepresentation of infringing activity; (2) declaratory judgment of no copyright under 17 U.S.C. § 102(a); (3) declaratory judgment of no copyright under 17 U.S.C. § 204(a); (4) intentional infliction of emotional distress ("IIED"); (5) negligent infliction of emotional distress ("NIED"); and (6) declaratory judgment of no defamation. In their Counterclaims, Defendants allege that Yuga's lawsuit against them is Yuga's "attempt to silence creators who used their craft to call out a multi-billion-dollar company built on racist and neo-Nazi dog whistles." Counterclaims, ¶ 1. Specifically, Defendants allege that they "brought attention to Yuga's conduct by creating a satirical conceptual art and performance project called the "Ryder Ripps Bored Ape Yacht Club," which included a collection of NFTs and associated online commentary." Counterclaims, ¶ 2. Defendants also allege that although "Yuga never acted against any of the dozens of commercial 'ape' NFT collections, it did engage in a relentless and systematic campaign against Mr. Ripps and Mr. Cahen. Defendants' Counterclaim Complaint alleges various causes of action associated with Yuga's unlawful and immoral conduct aimed at abusing, bully [sic], and harassing Mr. Ripps and Mr. Cahen into silence regarding Yuga's fraud and its use of racist messages and imagery." Counterclaims, ¶ 3.

On March 17, 2023, the Court granted Yuga's Special Motion to Strike Counterclaims and granted in part and denied in part Yuga's Motion to Dismiss Counterclaims ("March 17, 2023 Order"). Docket No. 156. In the March 17, 2023 Order, the Court struck pursuant to California's Anti-SLAPP statute and dismissed without leave to amend and with prejudice Defendants' fourth and fifth counterclaims. The Court also concluded that, to the extent Defendants' fourth and fifth counterclaims were not subject to California's Anti-SLAPP statute, they were dismissed without leave to amend and with prejudice pursuant to Rule 12(b)(6). In addition, the Court dismissed Defendants' second and third counterclaims without leave to amend and with prejudice pursuant to Rule 12(b)(6). Finally, the Court dismissed without prejudice Defendants' sixth counterclaim after Defendants withdrew that counterclaim.

**C.** **Yuga's Motion for Summary Judgment**

On April 21, 2023, the Court issued an Order granting in part and denying in part Yuga's Motion for Summary Judgment ("April 21, 2023 Order"). Docket No. 225. In its Order, the Court granted Yuga summary judgment as to its first cause of action for false designation of origin under 15 U.S.C. § 1125(a) and as to its third cause of action for cybersquatting under 15 U.S.C. § 1125(d). The Court also granted Yuga summary judgment on Defendants' second affirmative defense alleged under the First Amendment/*Rogers,* Defendants' third affirmative defense alleging fair use, Defendants' seventh affirmative defense alleging unclean hands, and Defendants' first counterclaim alleging a knowing misrepresentation of infringing activity in violation of Section 512(f). However, the Court denied summary judgment with respect to a determination of Yuga's damages on its first cause of action for false designation of origin under 15 U.S.C. § 1125(a) and third cause of action for cybersquatting under 15 U.S.C. § 1125(d). Finally, although the Court concluded that Yuga was entitled to injunctive relief, the Court did not determine or otherwise address the scope of that injunctive relief.

Initials of Deputy Clerk __sr__

### 1.    Yuga's First Cause of Action for False Designation of Origin

With respect to Yuga's false designation of origin claim, the Court determined that, although the BAYC Marks are unregistered, Yuga owns the BAYC Marks and those Marks are valid and protectible.  Specifically, the Court concludes that:

> Defendants argue that Yuga does not own any trademark rights in the BAYC Marks because NFTs are intangible and, as a result, ineligible for trademark protection, relying on *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). However, this Court agrees with the court in *Hermes International v. Rothschild*, 590 F.Supp. 3d 647, 655 (S.D.N.Y. 2022), which concluded that "neither *Dastar* nor its progeny require that a defendant's goods be tangible for Lanham Act liability to attach." . . . In addition, the Court concludes that although NFTs are virtual goods, they are, in fact, goods for purposes of the Lanham Act.  *See* Andrea McCollum, *Treating Non-Fungible Tokens as Digital Goods Under the Lanham Act*, 63 IDEA: L. Rev. Franklin Pierce Center for Intell. Prop. 415 (2023) ("While virtual goods are intangible items that exist in a digital space, they are also items that have specific uses and values that are dependent on the consumer").

April 21, 2023 Order, pp. 6-7.

The Court also concluded that Yuga has used the BAYC Marks in commerce.  Specifically, the Court concluded that:

> In this case, the Court concludes that Yuga has used the BAYC Marks in commerce and continues to use the BAYC Marks in commerce.  It is undisputed that Yuga has sold 10,000 BAYC NFTs.  In addition, holders of BAYC NFTs have exclusive access to membership perks, including access to the online "Bored Ape Yacht Club," a collaborative community art canvas, various online games, in person events (such as the music festival Ape Fest), and new product launches and merchandise, all of which incorporate and feature the BAYC Marks.  In addition, Yuga has entered into marketing partnerships and collaborations with various brands, including Arizona Iced tea and adidas, which incorporate and feature the BAYC Marks.  Moreover, Yuga and BAYC Marks have been featured in various media articles, including *Rolling Stone*, which featured BAYC NFT art on the cover and included the article "How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes."  Indeed, despite Defendants' argument that Yuga has failed to use the BAYC Marks in commerce, Defendants entire defense in this action is premised on their use of the BAYC Marks as "art" to comment on and bring attention to Yuga's alleged use of racist, neo-Nazi, and alt-right messages and imagery and create social pressure demanding that Yuga take responsibility for its actions.  However, if Yuga had not established significant brand recognition and goodwill from the use of its BAYC Marks in commerce, such commentary and attention would be unnecessary.

April 21, 2023 Order, p. 9.

In addition, the Court concluded that Yuga has not transferred or abandoned its trademark

Initials of Deputy Clerk __sr__

rights in the BAYC Marks.  Specifically, the Court concluded that:

> Defendants also argue that Yuga has either transferred all its trademark rights in the BAYC Marks to BAYC NFT purchasers or abandoned its trademark rights through naked licensing and failure to police.  A "naked license" occurs when a trademark owner grants a trademark license then fails to monitor the quality of goods that the licensee produces under that trademark to such an extent that the trademark can be deemed abandoned.  *See FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010); *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002).  However, "[n]aked licensing does not occur where there is no trademark license at issue."  *See Neo4j, Inc. v. PureThink, LLC*, 480 F. Supp. 3d 1071, 1077 (N.D. Cal. 2020).  Under its Terms and Conditions, Yuga grants each BAYC NFT holder a copyright license for both personal use and commercial use with respect to their respective BAYC ape image, but not a trademark license to use the BAYC Marks.[5]  Because Yuga has not granted BAYC NFT holders a trademark license, Defendants' naked licensing theory fails.  *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1047 (4th Cir. 1984) ("Th[e] rule of uncontrolled licensing of a trademark is inapplicable to the instant case as no evidence of licensing has been presented").
>
> In addition, "despite Defendants' attempt to argue abandonment through third party use or failure to police, these arguments are unquestionably meritless."  *San Diego Comic Convention v. Dan Farr Productions*, 2017 WL 4227000 (S.D. Cal. Sept. 22, 2017).  Under the Lanham Act, abandonment of a trademark only occurs by nonuse or by a mark becoming generic, and neither apply in this case.  *Id.*  Indeed, the filing of this action is strong evidence that Yuga enforces its trademark rights in the BAYC Marks against infringing third-party users.

April 21, 2023 Order, pp. 9-10.

After analyzing the *Sleekcraft* factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), "the Court easily conclude[d] that Defendants' use of Yuga's BAYC Marks was likely to cause confusion."  April 21, 2023 Order, p. 13.  However, the Court also concluded that Yuga's damages would be determined at trial.  April 21, 2023 Order, p. 13.

## 2.    Yuga's Third Cause of Action for Cybersquatting

With respect to Yuga's cybersquatting claim, it was "undisputed that Defendants registered, used, and continue to use the domain names https://rrbayc.com/ and https://apemarket.com/."  April 21, 2023 Order, p. 14.  In addition, the Court concluded that the challenged domain names were identical or confusingly similar to Yuga's trademarks "because the domain names used by

---

[5]  Similarly, the Court concludes that Yuga did not license any trademark rights to APE Foundation, which administers the ApeCoin DAO.  Defendants' evidence merely shows that Yuga Labs "gifted" (not licensed) an NFT with an image of a rotating coin and ape skull, which is significantly different from Yuga's Ape Skull Logo.

Initials of Deputy Clerk  _sr_

Defendants incorporate Yuga's trademarks."  April 21, 2023 Order, p. 14.  The Court concluded that:

> Specifically, the domain https://rrbayc.com/ consists of Yuga's "BAYC" mark (and corresponding domain https://bayc.com) with two additional letters – rr.  In addition, https://apemarket.com/ uses Yuga's "BORED APE" and other "APE"-based marks and merely adds the descriptive word "market."  These additions do not change the fact that Defendants' domain names are confusingly similar to Yuga's trademarks.  *See, e.g., Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004) (affirming district court's finding that domains "mywashingtonpost.com," "mymcdonalds.com," and "drinkcoke.org" were confusingly similar to the Washington Post, McDonald's, and Coke marks); *see also Haas Automation v. Denny*, 2013 WL 6502876 (C.D. Cal. Dec. 4, 2013) (finding confusing similarity where domain names all contained the plaintiff's mark "'haas' plus some addition term or terms," such as haasplus.com, haasmillparts.com).  Indeed, an internet user who encountered the website www.rrbayc.com would undoubtedly be confused about its affiliation, given its substantial similarity to Yuga's mark.  Therefore, the Court concludes that this element has been satisfied.

April 21, 2023 Order, p. 14.

> The Court also concluded that Defendants acted with bad faith.  Specifically, the Court concluded that:

> Having weighed all the factors in light of the undisputed evidence, the Court concludes that Defendants acted with a bad faith intent to profit.  *Super-Krete*, 712 F. Supp. 2d at 1035 (ruling that the safe harbor defense inapplicable where defendant's conduct met two of the nine factors of bad faith).  Defendants do not have any trademark or other intellectual property rights in the domain names and the domain names do not consist of the legal names of Defendants.  Defendants did not have a bona fide prior use of the domains because they registered the domains after Yuga had already launched its BAYC NFTs collection.  Defendants' websites were not for a noncommercial or fair use purpose.  Instead, Defendants registered their domains, which included Yuga's marks, for commercial gain to divert customers from purchasing BAYC NFTs.  *See, e.g., Super-Krete,* 712 F. Supp. 2d at 1033 (finding bad faith where "[d]efendants only interest in the domain name is to divert customers who may have been searching for [p]laintiff's mark to their own commercial website").  In addition, Defendants concealed their registration of the domain names through the use of a proxy registration service.  Moreover, Defendants registered multiple domain names – https://rrbayc.com, https://apemarket.com, and pages within OpenSea and Foundation – knowing that they were identical or confusingly similar to the BAYC Marks.  Given that the evidence satisfies eight of the nine factors, the Court concludes that Defendants acted in bad faith and they are not entitled to the ACPA's safe harbor defense.  *See Lahoti v. VeriCheck*, 586 F.3d 1190, 1203 (9th Cir. 2009) ("A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the ACPA's safe harbor provision").

April 21, 2023 Order, p. 15.  However, the Court also concluded that Yuga's statutory damages would be determined at trial.  April 21, 2023 Order, p. 15.

### 3.   Defendants' Affirmative Defenses

In the April 21, 2023 Order, the Court also rejected Defendants' unclean hands affirmative defense and reiterated its rejection of Defendants' *Rogers*/First Amendment affirmative defense and Defendants' fair use affirmative defense.[6]

### a.   *Rogers/*First Amendment Affirmative Defense

With respect to the *Rogers*/First Amendment affirmative defense, Defendants argued that the *Rogers* test applied in this case because their RR/BAYC NFT collection is an expressive work protected under the First Amendment.  However, the Court concluded that the *Rogers* test did not apply in this case and stated that:

> The Ninth Circuit only applies the *Rogers* test when "artistic expression is at issue," and requires defendants to make a "threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment." *Gordon*, 909 F.3d at 264; *see also Rogers v. Grimaldi*, 875 F.2d 94, 999 (2nd Cir. 1989).  Although Defendants' argue that the larger RR/BAYC "project" is an expressive artistic work protected by the First Amendment, Defendants' sale of what is admittedly a collection of NFTs that point to the same online digital images as the BAYC collection is the only conduct at issue in this action and does not constitute an expressive artistic work protected by the First Amendment.  In particular, the RR/BAYC NFTs do not express an idea or point of view, but, instead, merely point to the same online digital images associated with the BAYC collection.  Indeed, even Defendants' token tracker uses an exact copy of Yuga's BAYC Marks without any expressive content.  Similarly, Defendants' NFT marketplace sales and Ape Market website contain no artistic expression or critical commentary.  For example, the title of Defendants' Foundation sales page was simply "Bored Ape Yacht Club," and a Google search of "BAYC Foundation.app" resulted in a link entitled "Bored Ape Yacht Club – Foundation.app" that redirected to Defendants' Foundation sales page.  These are all commercial activities designed to sell infringing products, not expressive artistic speech protected by the First Amendment.  Moreover, Defendants concede that the Ape Market contained no speech – artistic or otherwise – because it never had any content.  As Yuga has pointed out, and the Court agrees, Defendants' sale of RR/BAYC NFTs is no more artistic than the sale of a counterfeit handbag, making the *Rogers* test inapplicable.  *See, e.g., Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,* 221 F. Supp. 2d 410, 415 (S.D.N.Y. 2002).

---

[6]  The Court had previously rejected Defendants' *Rogers*/First Amendment affirmative defense and fair use affirmative defense in its December 16, 2022 Order Denying in Part and Granting in Part Defendants' Anti-SLAPP Motion to Strike and Motion to Dismiss.  *See* Docket No. 62.  At the time of trial, there were no remaining affirmative defenses at issue.  *See* Revised Final Pretrial Conference Order (Docket No. 320-1), §§ 7-8.

Initials of Deputy Clerk __sr__

In addition, even if the Court applied the *Roger*s test, the Court concludes that Defendants' use of the BAYC Marks is not artistically relevant to Defendants' "art." Although there is a low bar for artistic relevance, as Yuga has pointed out, it is not infinitely low.  For example, in *Twentieth Century Fox Television v. Empire Distribution, Inc*., 875 F.3d 1192, 1196-97 (9th Cir. 2017), the court found that using the "Empire" mark in the title of a TV show was artistically relevant, but contemplated that it would not be artistically relevant for a "pretextual expressive work meant only to disguise a business profiting from another's trademark," which is precisely what Defendants are doing in this case.

Moreover, even if the Court applied the *Rogers* test and concluded that the BAYC Marks are artistically relevant, the Court concludes that Defendants' use of the BAYC marks is explicitly misleading.  In determining if the use of a mark is explicitly misleading, a court considers two factors:  (1) "the degree to which the junior user uses the mark in the same way as the senior user"; and (2) "the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself."  *Gordon*, 909 F.3d at 270-71.  In this case, Defendants admit that they have used the BAYC Marks in the same marketplaces to identify and sell NFTs bearing the exact same images underlying the BAYC NFTs and without adding any expressive content.  *See Gordon*, 909 F.3d at 270-71 (holding that "the potential for explicitly misleading usage is especially strong when the senior user and the junior user both use the mark in similar artistic expressions").

Furthermore, use of a senior user's mark is explicitly misleading when the mark is used "as the centerpiece of an expressive work itself, unadorned with any artistic contribution by the junior user, [which] may reflect nothing more than an effort to induce the sale of goods or services by confusion or lessen the distinctiveness and thus the commercial value of a competitor's mark." *Id*. at 271 (internal quotations omitted).  In this case, Defendants concede they are using the BAYC Marks as the centerpiece of their RR/BAYC NFTs, including using "Bored Ape Yacht Club (BAYC)" to identify the RR/BAYC NFTs that point to the same online digital images as the BAYC NFT collection.  Thus, Defendants used Yuga's BAYC Marks to make their competing product look identical to Yuga's product and ensure that the consumer will be explicitly misled in the token tracker, which is the place where a consumer should be able to authenticate and verify who created the NFT.  Indeed, although Defendants argue that their disclaimer on the rrbayc.com reservation site that Ripps was the creator of the RR/BAYC NFTs and that the project used satire and appropriation to criticize Yuga's BAYC collection negates any confusion, Defendants ignore the fact that they also used other websites to market and sell their RR/BAYC NFTs and those other websites did not include any disclaimer.  Moreover, the fact that Defendants concluded it was necessary to include a disclaimer demonstrates their awareness that their use of the BAYC Marks was misleading.

April 21, 2023 Order, pp. 16-17.

Initials of Deputy Clerk __sr__

**b.      Defendants' Fair Use Affirmative Defense**

With respect to Defendants' fair use affirmative defense, Defendants argued that nominative fair use applied in this case because Yuga's BAYC NFT collection would not be identifiable as a target of criticism without using the BAYC Marks.  The Court concluded that Defendants' use of the BAYC Marks did not constitute nominative fair use and stated that:

> Defendants are not using the BAYC Marks to sell Yuga's BAYC NFTs, but to sell their own competing RR/BAYC NFTs.  *New Kids*, 971 F.2d at 308 (holding that nominative fair use does not apply when a defendant uses a mark to refer "to something other than the plaintiff's product"); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1177 (9th Cir. 2010) (holding that nominative fair use allows for "truthful use of a mark, such as when a Lexus dealer uses the Lexus mark to sell Lexus vehicles at  lexusbroker.com).  In addition, Defendants have failed to establish all the elements of the nominative fair use defense.  For example, Defendants frequently used the entirety of the BAYC Marks without modification, including the "visual trappings" of Yuga's brand.  *Toyota Motor Sales*, 610 F.3d at 1181.  Moreover, Defendants' use of the BAYC Marks "prominently and boldly," to market their RR/BAYC NFTs clearly "suggest[s] sponsorship."  *Brother Recs., Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003).  Defendants argue that they are entitled to a nominative fair use defense because their criticism of Yuga required the use of the BAYC Marks.  However, because Defendants used the BAYC Marks to sell and promote their own product, their use of the BAYC Marks is not nominative fair use.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1009 (9th Cir. 2001) (holding that the defendant was not entitled to a nominative fair use defense where it "used [the plaintiffs'] photograph in its catalog that was intended to sell its goods").

April 21, 2023 Order, p. 18.

**c.      Defendants' Unclean Hands Affirmative Defense**

With respect to the affirmative defense of unclean hands, Defendants argued that the affirmative defense applied in this case because Yuga "dirtied its hands" by compensating celebrity endorsers without disclosing that compensation and by selling unregistered securities.  The Court concluded that Yuga was entitled to summary judgment on Defendants' unclean hands affirmative defense.  Specifically, the Court concluded that:

> In this case, Defendants argue that Yuga's claims are barred because of its alleged misconduct regarding celebrity endorsements and securities violations.  However, neither of these allegations relate to the trademark dispute between the parties.  *See S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 932-33 (9th Cir. 2014) (holding that where "the misconduct alleged [by the plaintiff] does not bear any 'immediate and necessary relation' to the manner in which [the plaintiff] acquired its rights or to the equities of this case, the unclean hands doctrine is inapplicable").

April 21, 2023 Order, p. 19.

Initials of Deputy Clerk   sr

>    **4.      Defendants' First Counterclaim Alleging a Knowing Misrepresentation of Infringing Activity**

In their first counterclaim, Defendants allege that Yuga sent takedown notices that violated the DMCA.  The Court concluded that Yuga was entitled to summary judgment on Defendants' counterclaim.  The Court found that only four of twenty-five takedown notices sent by Yuga resulted in the takedown of any of Defendants' content and that three of the takedown notices that resulted in the takedown of Defendants' content were based on solely on trademark, not copyright.  As a result, the Court concluded that the twenty-one takedown notices that did not result in the takedown of any of Defendants' content and the three takedown notices that were based solely on trademark could not support a DMCA violation.  With respect to the one DMCA notice that resulted in the takedown of Defendants' content, the Court concluded that "Defendants have failed to demonstrate that the notice contains a material misrepresentation that resulted in the takedown of Defendants' content or that Yuga acted in bad faith in submitting the takedown notice."  April 21, 2023 Order, p. 21.

>    **D.      The Pretrial Proceedings**

On June 9, 2023, the Court held a Pretrial Conference with the parties.  Docket No. 307.  On June 12, 2023, Yuga dismissed its second cause of action for false advertising in violation of 15 U.S.C. § 1125(a).  *See* Docket Nos. 309, 320-1, and 416.  In addition, Yuga withdrew its demand for a jury trial and requested that the Court decide all issues related to the remedies available to Yuga on its first cause of action for false designation of origin in violation of 15 U.S.C. § 1125(a) and third cause of action for cybersquatting in violation of 15 U.S.C. § 1125(d).  On June 13, 2023, Defendants argued that they were entitled to a jury trial on the remaining remedy issues.  Docket No. 310.  On June 15, 2023, Yuga withdrew its prayer for all legal remedies and stated that it would proceed to trial solely on its prayer for equitable remedies as to its two remaining claims (Yuga's first and third causes of action).  Docket No. 315.  At the Status Conference on June 16, 2023, the Court vacated the scheduled jury trial and set a court trial for July 31, 2023.  Docket No. 317.

>    **E.      The Court Trial**

During the July 31, 2023 court trial, the following witnesses testified on behalf of Yuga: (1) Greg Solano, one of the co-founders and President of Yuga; (2) Nicole Muniz, a special advisor to Yuga and its former Chief Executive Officer; (3) Jonah Berger, a marketing and brand equity expert; (4) Kerem Atalay, one of the co-founders and a Board member of Yuga and its former Chief Technology Officer; (5) Laura O'Laughlin, a consumer confusion expert; and (6) Lauren Kindler, an economics and damages expert.  The following witnesses testified on behalf of Defendants: (1) Ryan Hickman; (2) Jeremy Cahen; and (3) Ryder Ripps.[7]

---

[7]  On June 30, 2023 and August 11, 2023, the parties filed their designations of deposition testimony, which included the opposing parties objections and the response thereto.  To the extent that the Court has relied on any of the deposition testimony, the Court has only considered the admissible portions of that testimony.

Initials of Deputy Clerk _sr_

## Conclusions of Law

I.      **Discussion**

In light of the Court's April 21, 2023 Order and Yuga's dismissal of its second cause of action for false advertising and its prayer for all legal remedies on its first cause of action for false designation of origin and third cause of action for cybersquatting, the only issues that remained for trial were the equitable remedies to be awarded to Yuga.[8]  Specifically, the issues that remained for the court trial were: (1) whether Yuga is entitled to a disgorgement of Defendants' profits, and, if so, what amount; (2) the amount of statutory damages to be awarded Yuga for Defendants' cybersquatting; (3) the scope of a permanent injunction; and (4) whether this is an "exceptional case" warranting an award of attorneys' fees to Yuga.

---

[8]  Defendants argue repeatedly that the law of the case doctrine does not apply to pretrial rulings such as motions for summary judgment and that Yuga has failed to offer adequate evidentiary support for various proposed findings of fact and conclusions of law and, instead, Yuga incorrectly relies on the Court's April 21, 2023 Order.  Defendants' argument is not only unpersuasive, it is inconsistent with applicable Ninth Circuit precedent.  Under Defendants' theory, there would be no reason to conduct any pretrial motion practice, because every factual finding and legal issue decided in a pretrial motion would have to be re-litigated and decided again at trial.  In *Peralta v. Dillard*, which Defendants cite, the Ninth Circuit held that "the denial of a summary judgment motion is never law of the case because factual development of the case is still ongoing."  *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir.2014) (*en banc*) ("Denial of summary judgment may result from a factual dispute at the time.  That dispute may disappear as the record develops").  The Ninth Circuit has also held that the law of the case doctrine does not bar district courts from reconsidering pretrial rulings.  *Id.* (*overruling Fed. Ins. Co. v. Scarsella Bros., Inc.*, 931 F.2d 599 (9th Cir.1991)) ("To the extent that *Scarsella Bros*. purported to hold that the law of the case doctrine bars district courts from reconsidering pretrial rulings, we overrule it").  However, the Ninth Circuit did not hold that the doctrine does not apply to pre-trial rulings, as Defendants argue.  Instead, the Ninth Circuit, at most, held that the doctrine does not bar district courts from reconsidering pretrial rulings.  *See id.* ("It makes no sense . . . to say that if a district court realizes an earlier ruling was mistaken, it can't correct it, but must instead wait to be reversed on appeal.  All that would do is waste both the courts' and litigants' time and resources").  Courts are not barred from reconsidering prior rulings.  *U.S. v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (internal quotations and citations omitted) ("The law of the case doctrine is not an inexorable command, nor is it a limit to a court's power.  Rather, application of the doctrine is discretionary"); *see also Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir.1990) (internal citation omitted) ("Application of the [law of the case] doctrine is discretionary.  Accordingly, we review a trial judge's decision to depart from the principle of finality for an abuse of discretion").  The Court concludes that, notwithstanding Defendants strenuous disagreement, it is appropriate to apply the law of the case doctrine in this case because none of the exceptions or reasons for deviating from that doctrine apply in this case.  *See, e.g., Old Person* v. Brown, 312 F. 1036, 1039 (9th Cir. 2002) (internal quotations and citations omitted) ("The law of the case doctrine is subject to the following exceptions: (1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial").

A.      **Remedies**

1.      **Disgorgement of Defendants' Profits on Yuga's False Designation of
Origin Claim**

The Lanham Act provides that once trademark infringement has been established, a plaintiff
is entitled, "subject to the principles of equity, to recover ... defendant's profits." 15 U.S.C. § 1117.
This statute affords district courts "broad discretion" in fashioning a remedy for trademark
infringement. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir.
1968). Pursuant to 15 U.S.C. § 1117(a), "[i]n assessing profits the plaintiff shall be required to
prove defendant's sales only; defendant must prove all elements of cost or deduction claimed . . . If
the court shall find that the amount of the recovery based on profits is either inadequate or
excessive the court may in its discretion enter judgment for such sum as the court shall find to be
just, according to the circumstances of the case." However, "[s]uch sum . . . shall constitute
compensation and not a penalty." *Id.* The Ninth Circuit has held that a claim for disgorgement
of profits under Section 1117(a) is equitable, not legal and, thus, does not invoke the right to a jury
trial. *JL Beverage Company, LLC v. Jim Beam Brands Co.*, 815 Fed. Appx. 110 (9th Cir. 2020).

An accounting of profits is never automatic and never a matter of right. *See* 5 McCarthy on
Trademarks and Unfair Competition § 30:59 (5th ed.). Instead, disgorgement is "subject to the
principles of equity." 15 U.S.C. § 1117. Specifically, those equitable considerations include: (1) "a
defendant's mental state," such as "whether the [defendant] had the intent to confuse or deceive;
(2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable
delay by the plaintiff in asserting [the plaintiff's] rights; (5) the public interest in making the
misconduct unprofitable; and (6) whether it is a case of palming off." *Harbor Breeze Corporation v.
Newport Landing Sportsfishing, Inc.*, 2023 WL 2652855, *4 (C.D. Cal. Mar. 13, 2023). Thus,
courts have discretion to fashion relief based on the totality of the circumstances, and there is no
requirement that a defendant's infringement be "willful" for a disgorgement of profits. *See Romag
Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. __, 140 S.Ct. 1492 (2020). Indeed, in 2020, the Supreme
Court in *Romag Fasteners,* 590 U.S. __, 140 S.Ct. at 1497, held that although a defendant's
mental state is "a highly important consideration in determining whether an award of profits is
appropriate," acknowledging that the defendant's mental state was an important consideration,
"was a far cry from insisting" that willfulness was a prerequisite for disgorgement of profits.

a.      **The Totality of the Circumstances Warrant Disgorgement of
Defendants' Profits**

Having considered the totality of the circumstances, the Court concludes that disgorgement
of Defendants' profits is warranted. There was no unreasonable delay by Yuga in asserting its
rights. Defendants created the RR/BAYC NFT collection in May 2022, and Yuga filed its Complaint
in this action the following month, June 2022. In addition, disgorgement of profits would assist in
deterring Defendants from continuing to infringe on Plaintiff's trademarks. *See Playboy
Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982) (finding the
district court abused its discretion in denying an award of profits under the Lanham Act, noting the
damages awarded by the district court was approximately one-tenth of the profits earned by the
defendants from their infringement, and reasoning "an award of little more than nominal damages
would encourage a counterfeiter to merely switch from one infringing scheme to another as soon

as the infringed owner became aware of the fabrication.  Such a method of enforcement would fail to serve as a convincing deterrent to the profit maximizing entrepreneur who engages in trademark piracy").  Fairness also supports disgorgement of profits so that Defendants do not profit from their unlawful infringement.  *See id.* at 1275 ("Any other remedy" other than disgorgement of profits earned from the infringing activity "results in the defendants being unjustly enriched"); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1073-74 (9th Cir. 2015) ("In seeking to achieve equity between the parties, the court must fashion a remedy wherein the defendant may "not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not ... [given] a windfall") (citation omitted).

In addition, although a finding of willfulness is not a prerequisite to disgorgement of profits, "a trademark defendant's mental state [remains] a highly important consideration in determining whether an award of profits is appropriate."[9]  *Romag Fasteners,* 590 U.S. __, 140 S. Ct. at 1497; *see also Grasshopper House, LLC v. Clean & Sober Soc. Media, LLC,* 2021 WL 3702243, at *3 (9th Cir. Aug. 20, 2021).  In this case, the Court concludes that Defendants' mental state warrants disgorgement of the profits Defendant received from the sales of its RR/BAYC NFT collection.  In its April 21, 2023 Order, the Court concluded that Defendants acted with intent to deceive consumers.  In addition, the evidence and testimony at the trial amply supports this conclusion.  The evidence established that Defendants' use of Yuga's BAYC Marks was intentional and was done with the expectation of profiting from that use.[10]  For example, each of Defendants' 9,546

---

[9]  Defendants argue that the Court should not award disgorgement as a remedy because Yuga has not demonstrated that Defendants were "conscious wrongdoers" and because Plaintiff waived its claim for willful infringement.  Specifically, Defendants argue that willful infringement is a question for the jury and that Yuga, by electing to proceed solely on its prayer for equitable remedies, has waived or abandoned its claim of willful infringement.  The Court disagrees.  As the Court has previously explained, willfulness is not a prerequisite to disgorgement of profits.  In addition, because disgorgement of profits is an "equitable remedy," there is no right to a jury trial if the only monetary remedy the trademark owner seeks is an accounting of the alleged infringer's profits.  *See, e.g., Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075-1076 (9th Cir. 2015); *JL Beverage Co., LLC v. Jim Beam Brands Co.,* 815 F. App'x 110, 112 (9th Cir. 2020).  Indeed, in *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1108 (C.D. Cal. 2019), *aff'd in part, vacated in part on other grounds, remanded*, 2021 WL 3702243 (9th Cir. Aug. 20, 2021), the district court judge, not a jury, considered the issue of willfulness in determining whether an award of profits was appropriate.  On appeal, the Ninth Circuit reversed the district court's determination declining to award profits because after the Supreme Court's decision in *Romag Fasteners*, 590 U.S. __, 140 S.Ct. 1492, willfulness was no longer a prerequisite for disgorgement under the Lanham Act.  In so deciding, the Ninth Circuit did not hold that a jury determination was required on the defendant's state of mind, but rather remanded the action so that the district court could consider the defendant's mental state when determining what amount of profits should be awarded.  Accordingly, the Court concludes that the factors considered by the Court in determining whether to award a disgorgement of Defendants' profits, including Defendants' mental state, are properly decided by the Court.

[10]  Although Defendants and Ryan Hickman ("Hickman"), one of Defendants' business partners, testified that the RR/BAYC NFT collection was created as a protest against Yuga and not as a means of profiting from consumers confusing the RR/BAYC NFT collection with Yuga's BAYC

---

Initials of Deputy Clerk _sr_

RR/BAYC NFTs used the BAYC Marks, which Ripps intentionally coded into the smart contract, and many of the associated images contained the BAYC Marks.  Defendants also promoted the RR/BAYC NFT collection as "Bored Ape Yacht Club V3" and "BAYC V3" and marketed their RR/BAYC NFT collection as "Bored Ape Yacht Club" and used Yuga's logo and the BAYC Marks to sell their RR/BAYC NFT collection.  In addition, Defendants developed, marketed, and promoted their NFT marketplace, Ape Market, where consumers would be able to purchase and sell both RR/BAYC NFTs and BAYC NFTs.[11]  To stimulate sales of the RR/BAYC NFT collection, Defendants advertised that consumers would be required to purchase one of Defendants' RR/BAYC NFTs in order to access the Ape Market.  Defendants also internally discussed how the Ape Market would help them "mint out" the rest of the RR/BAYC NFT collection.  The evidence also established that Defendants were fully aware of the likelihood of consumer confusion based on their use of the BAYC Marks and nevertheless proceeded to use the BAYC Marks to capitalize on that confusion.  Indeed, even Hickman confused the listing for RR/BAYC NFTs on Foundation as a listing for a BAYC NFT at his deposition.  In addition, Defendants directed their marketing of Ape Market to the "Yuga community."

Moreover, even after Yuga filed its Complaint asserting its trademark rights, Defendants refused to stop marketing or promoting their RR/BAYC NFT collection.  To the contrary, Defendants continued to market and promote their RR/BAYC NFT collection and Ape Market.  For example, on April 4, 2023, Cahen tweeted an announcement that "RR/BAYC is trading on OpenSea Pro."  Cahen also continued to retweet Twitter posts sharing the resale of RR/BAYC NFTs and retweets of Defendants' own tweets from its @ApeMarketplace Twitter account.  This conduct continued even after the Court issued its April 21, 2023 Order.  Defendant's continued marketing and promotion despite its knowledge of consumer confusion with Yuga's identical BAYC Marks constitutes strong evidence of an improper motive.  *See Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1406 (9th Cir. 1993) (internal quotation marks and citation omitted)

------------------------------------------------

NFTs, the Court does not find their testimony credible because that testimony was contradicted by either contemporaneously created documentary evidence or their own deposition testimony.  For example, in a text conversation between Cahen and Ripps about the RR/BAYC NFT collection, Cahen told Ripps "Ur gonna make so much on this shit LMFAO" and "You'll make like a million dollars."  *See* Exh. JTX-1574; *see also* Exh. JTX-1586 ("I tbink [*sic*] you are gonna make millions too man").  In addition, Ripps and Cahen both conveniently testified and attempted to explain away any documentary evidence that contradicted their position by stating that such evidence was simply "sarcasm" or a "joke."  For example, when asked about referring to the RR/BAYC NFT collection as "BAYC V3," Cahen testified that "I myself, nor anyone on my team, ever used that label or name or whatever you want to call it.  V3 is something that we have absolutely nothing to do with."  Trial Transcript, 255:4-7.  However, when confronted with the fact that Ripps had, in fact, used "BAYC V3," Cahen testified that it was "in the context of jokes and sarcasm."  Trial Transcript, 255:10.  Furthermore, although Hickman testified at trial that his compensation was tied to his belief in Ripps's alleged protest art, Hickman previously testified at his deposition that "[m]y financial arrangement for this whole thing is about as a software developer being compensated for making software."

[11]  Yuga filed this action prior to the formal launch of Ape Market and, as a result, Ape Market never officially launched.  However, Defendants did develop the source code for Ape Market and advertised and promoted it on Twitter, including on the Ape Market Twitter account.

Initials of Deputy Clerk  sr

("Willfulness and bad faith require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense"); *Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021) (finding willfulness where "[d]efendant continued to sell the infringing products after it received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit").

Most importantly, although Defendants testified at trial and have argued throughout this litigation that the RR/BAYC NFT collection was a parody or criticism of Yuga's BAYC NFT collection, the evidence is clear that Defendants have simply used the BAYC Marks to create a NFT collection that points to the exact same images as the BAYC NFTs. *See, e.g.,* Ryder Ripps's Declaration of Trial Testimony (Docket No. 346), ¶ 87 ("I decided to create an NFT collection pointing to the same images as the Bored Ape Yacht Club, but decided to name the collection the 'Ryder Ripps Bored Ape Yacht Club' . . ."). During the trial, Greg Solano ("Solano"), one of Yuga's co-founders and its President, explained during cross-examination the absurdity of Defendants' position:

Q      It is true for any parody or criticism that, without the underlying brand, the parody or criticism would not sell; correct?

A      It's exactly our thing. It can't be a parody of itself.

Q      Without the underlying brand, a parody cannot sell; right?

A      A thing cannot be a parody of itself.

Q      But without an underlying brand, a parody cannot sell; right?

A      There's no "underlying." It is the brand.

Q      Without the movie that they critique, a movie critic's column wouldn't sell; right?

A      It's completely inapplicable to this. It's exactly -- it's as if the movie critic put out the same movie to people to watch.

Q      Without the brands that they critique, the parody commercials on, say, Saturday Night Live wouldn't make any sense; right?

A      Saturday Night Live doesn't play the same movie.

Q      Without the Campbell's® Soup brand, Andy Warhol's paintings would not have sold; right?

A      Andy Warhol wasn't selling soup at the grocery store.

Q      Without the SeaWorld brand, a bumper sticker saying "Boycott SeaWorld" would not sell; correct?

Initials of Deputy Clerk  _sr_

A      It would be as if they opened up a new SeaWorld.  It doesn't make any sense.

Trial Transcript (Docket No. 392), 17:9-18:11.  As Solano's testimony demonstrates, Defendants were not creating a parody or satire of Yuga and its BAYC NFTs. Instead, they were intentionally using the BAYC Marks in an effort to profit off of Yuga's success.

Accordingly, the Court concludes that disgorgement of Defendants' profits is fully warranted based on the totality of the circumstances.

###### b.      Defendants' Profits

Disgorgement of profits "is intended to award profits only on sales that are attributable to the infringing conduct."  *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993).  In determining the profits to be disgorged, the plaintiff bears the burden to prove the defendant's gross sales from the infringing activity with reasonable certainty.  15 U.S.C. § 1117(a).  However, "[o]nce the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity."  *Lindy Pen*, 982 F.2d at 1408.  As a result, it is the defendant's burden to demonstrate which of its total sales are not attributable to the infringing activity.  *Id.*  District courts should not apportion profits where they cannot do so based on a "reasonable, nonspeculative formula."  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985).

Yuga's economics and damages expert, Lauren Kindler ("Kindler"), testified that, as of February 1, 2023, Defendants had generated profits of $1,589,455, which included $1,366,090 in profits from the initial sales of RR/BAYC NFTs[12], $117,309 in profits from resales of RR/BAYC NFTs[13], and $106,055 representing the value of RR/BAYC NFTs that were held or not minted by Defendants.  In addition, the Court concludes that Kindler's profit calculation should be reduced by an additional $108,037.08 for additional payments made to Hickman and Lehman, which Kindler testified was a reasonable deduction.  Moreover, the Court concludes, consistent with Kindler's testimony, that $106,055 representing the value of the RR/BAYC NFTs held or not minted should be deducted because the Court will order the transfer of the RR/BAYC smart contract to Yuga.  As a result, the Court concludes that Yuga has met its burden of demonstrating Defendants' profits of $1,375,362.92 ($1,589,455 - $108,037.08 - $106,055).

Defendants argue that not all of their profits from the sale of the RR/BAYC NFTs are attributable to their infringement of the BAYC Marks, but, instead, are due to individuals buying RR/BAYC NFTs in support of Defendants' "protest" against Yuga.  However, Defendants failed to offer any persuasive evidence at trial to support their argument.  Defendants offered no expert testimony regarding their profits, their costs, or what portion, if any, of their profits might be attributable to something other than their infringement of Yuga's BAYC Marks.  Indeed, Defendants offered only their own (and Hickman's) self-serving testimony that was based on their opinion and

---

[12]   The initial sales of the RR/BAYC NFTs generated profits of $1,785,823, with $419,733 going to Hickman and Thomas Lehman ("Lehman").  Hickman and Leham were each entitled to fifteen percent of the profits and the remaining $1,366,090 went to Defendants.

[13]   When NFTs are resold in NFT marketplaces, royalties or creator fees generally are paid to the creator of that NFT.

Initials of Deputy Clerk _sr_

self-interested and obviously biased interpretation of the facts.  As a result, the Court concludes
that Defendants have failed to meet their burden of proof that any or all of its $1,375,362.92 in
profits from the sale of the RR/BAYC NFTs were not attributable to its unlawful infringement of the
BAYC Marks.  In addition, the Court awards Defendants' profits of $1,375,362.92 to Yuga because
the "infringing and noninfringing elements of [the] work cannot be readily separated."  *Nintendo of
Am., Inc. v. Dragon Pac*. Int'l, 40 F.3d 1007, 1012 (9th Cir. 1994) (*quoting Hamilton–Brown Shoe
Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 261–62 (1916)).

Finally, if a court finds that recovery based on profits is either inadequate or excessive, the
court in its discretion may enter judgment in an amount it finds to be just.  15 U.S.C. § 1117(a).  If
the court exercises its discretion to adjust the award, the sum "shall constitute compensation and
not a penalty."  Id.  To penalize defendants for misconduct by enhancing Lanham Act damages is
an abuse of discretion; enhancement is only available to ensure that the plaintiff receives adequate
compensation.  *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1115 (9th Cir. 2012).  In this
case, the Court concludes that an award based on the disgorgement of Defendants' profits, without
any adjustment will adequately compensate Yuga for Defendants' infringement.

Accordingly, the Court awards Yuga a total of $1,375,362.92 ($1,589,455 - $108,037.08 -
$106,055) in Defendants' profits.

### 2.    Statutory Damages on Yuga's Cybersquatting Claim

Pursuant to 15 U.S.C. § 1117(d), "[i]n a case involving a violation of section 1125(d)(1) of
this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to
recover, instead of actual damages and profits, an award of statutory damages of not less than
$1,000 and not more than $100,000 per domain name, as the court considers just."

In determining the amount of statutory damages, "courts generally consider a number of
factors . . . including the egregiousness or willfulness of the defendant's cybersquatting, the
defendant's use of false contact information to conceal its infringing activities, the defendant's
status as a 'serial' cybersquatter – *i.e.*, one who has engaged in a pattern of registering and using
a multitude of domain names that infringe the rights of other parties – and other behavior by the
defendant evidencing an attitude of contempt towards the court or the proceedings."  *Verizon Cal.
Inc. v. Onlinenic, Inc.*, 2009 WL 2706393, *3 (N.D. Cal. Aug. 25, 2009).

In this case, Yuga requests an award representing the maximum statutory damages of
$200,000, or $100,000 for each of two domain names (https://rrbayc.com, https://apemarket.com),
for Defendants' cybersquatting violations under the ACPA.  Yuga has presented evidence that an
award of the maximum statutory damages is appropriate because Defendants' cybersquatting was
willful and egregious and because Defendants have displayed clear contempt towards the Court by
continuing to use and promote the two domains at issue even after the Court found Defendants'
liable for cybersquatting.  *See, e.g.,* Yuga's Trial Brief (Docket No. 343), pp. 8-9; April 21, 2023
Order; Deposition Transcript of Ryder Ripps, 36:18-37:8, Exhs. JTX-23, JTX-108, JTX-627, JTX-
630, JTX-1270, and JTX-1484.  Defendants argue that notwithstanding Yuga's evidence, Yuga's
abandonment of all legal issues precludes it from recovering anything above the minimum amount
of statutory damages for cybersquatting (*i.e.*, $1,000 per domain name).  Defendants' Trial Brief
(Docket No. 348), pp. 9-10.  The Court disagrees.  Defendants primarily rely on the Ninth Circuit's

Initials of Deputy Clerk __sr__

decision in *GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011).  However, in *GoPets*, the Ninth Circuit merely concluded that there is no right to a jury trial when a judge awards the minimum statutory damages the ACPA.  *Id.*  The Ninth Circuit expressly declined to decide whether there was a right to a jury trial when the plaintiff seeks statutory damages in excess of the minimum amount.  *Id.*

In a more recent opinion, *Two Plus Two Publishing, LLC v. Jacknames.com*, 572 Fed. App'x 466 (9th Cir. 2014), the Ninth Circuit held that "the district court did not err in calculating statutory damages rather than holding a jury trial on the issue because the ACPA allows for statutory damages between $1,000 and $100,000 'as the court considers just.'"  Based in part on the *Two Plus Two Publishing* decision as well as concluding that the ACPA is not based on common law principles, the district court in *Academy of Motion Picture Arts & Sciences v. GoDaddy, Inc.*, 2015 WL 12697732, at *4 (C.D. Cal. Apr. 10, 2015) concluded that there was no right to a jury trial in determining an appropriate amount of statutory damages under the ACPA.  Specifically, the *Academy of Motion Picture Arts & Sciences* court concluded that:

> As the Ninth Circuit recognized in *GoPets*, the ACPA "does not provide for a jury trial on damages."  *GoPets*, 657 F.3d at 1034.  Nonetheless, GoDaddy contends that the Supreme Court's prior decision in *Feltner* entitles it to a jury trial on the assessment of statutory damages because, as the Ninth Circuit said in GoPets, "[t]he language of ACPA's statutory damages provision is essentially identical to the language of the copyright damages provision at issue in Feltner."  *GoPets*, 657 F.3d at 1033. (Dkt. No. 623 at 7.)  In *Feltner*, the Supreme Court held that, although the Copyright Act is silent on the issue, "the Seventh Amendment provides a right to a jury trial, which includes a right to a jury determination of the amount of statutory damages."  *Feltner*, 523 U.S. at 324.
>
> The Supreme Court in *Feltner*, however, based its conclusion on the fact that the Copyright Act is based on common law principles and "clear and direct historical evidence that juries, both as a general matter and in copyright cases, set the amount of damages awarded to a successful plaintiff."  *Id.* at 355.  *Feltner* is therefore clearly inapposite to the instant action because the ACPA, as discussed above, is not based on common law principles.  *See Petroliam Nasional*, 737 F.3d at 552.  Additionally, as demonstrated by the Ninth Circuit's more recent ruling in *Two Plus Two Publishing*, there is no right to a jury trial for the assessment of statutory damages.  *See Two Plus Two Publishing*, 572 Fed. Appx. at 467. Accordingly, GoDaddy is not entitled to a jury trial on the assessment of statutory damages under the ACPA.

*Academy of Motion Picture Arts & Sciences*, 2015 WL 12697732, at *4.  The Court agrees with the *Academy of Motion Picture Arts & Sciences* court and concludes that the Court, rather than a jury, may calculate the amount of statutory damages for Defendants' violations of the ACPA and is not limited to awarding the minimum amount of statutory damages.

In calculating the appropriate amount of statutory damages, the Court concludes that Yuga is entitled to $200,000 in statutory damages, or $100,000 for each of Defendants' violations of the ACPA.  The Court concludes that the maximum amount of statutory damages is fair, just, and appropriate because the evidence demonstrates that Defendants' cybersquatting was willful and

egregious.  As the Court previously concluded in its April 21, 2023 Order, Defendants intentionally infringed Yuga's BAYC Marks, did not have any trademark or other intellectual property rights in the domain names, and registered the domains, knowing they were identical or confusingly similar to the BAYC Marks, well after Yuga had already launched its BAYC NFTs collection.  In addition, as the Court previously concluded in its April 21, 2023 Order, Defendants' websites were not for a noncommercial or fair use purpose.  Instead, Defendants registered the domains, which included Yuga's marks, for commercial gain and concealed their registration of the domain names through the use of a proxy registration service.  Moreover, although Ripps and Cahen testified that their RR/BAYC NFT "project," including registering the https://rrbayc.com, https://apemarket.com domains, was a "conceptual art" project designed not for financial gain but as commentary on the purportedly problematic actions of Yuga and its co-founders, the Court finds that this testimony was contradicted by other evidence and, therefore, was not credible.  *See* JTX-23.  More importantly, even after the Court concluded that Defendants were liable for cybersquatting and trademark infringement in its April 21, 2023 Order, Defendants ignored the Court's Order and continued to blatantly use and promote the https://rrbayc.com, https://apemarket.com domains to advertise and market their RR/BAYC NFT collection.  As a result, the Court concludes, based on the evidence at trial, that Defendants repeated and consistent contempt and disdain for the law and the legal process, this Court's rulings, and Yuga's intellectual property rights, fully justifies the maximum award of $200,000 in statutory damages.  *See, e.g., Verizon California Inc. v. Onlinenic, Inc.*, 2009 WL 2706393, *6 (N.D. Cal. Aug. 25, 2009) (considering the defendant's "systemically deceptive behavior" in determining amount of statutory damages for violations of the ACPA).

Accordingly, the Court concludes that Yuga is entitled to $200,000 in statutory damages on its third cause of action for  Defendants' cybersquatting violations under the ACPA.

### 3.    Injunctive Relief

#### a.    Yuga's Entitlement to an Injunction

Pursuant to  15 U.S.C. § 1116(a), courts "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title."  To be awarded a permanent injunction, a plaintiff must show that: (1) the plaintiff has suffered irreparable injury; (2) legal remedies are inadequate to compensate the plaintiff for the injury; (3) the balance of hardships favors an injunction; and (4) the public interest would be served by the injunction.  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Plaintiffs who prove a violation of the Lanham Act are entitled to a rebuttable presumption of irreparable harm.  15 U.S.C. § 1116(a).  In addition, "[i]njunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).  Moreover, "[d]amage to reputation and loss of customers are intangible harms not adequately compensable through monetary damages."  *Leadership Studies, Inc. v. ReadyToManage, Inc.*, 2017 WL 2408118, at *6 (C.D. Cal. June 2, 2017) (*quoting Car-Freshner Corp. v. Valio, LLC*, 2016 WL 7246073, at *8 (D. Nev. Dec. 15, 2016)).

In its April 21, 2023 Order, the Court clearly indicated that it would enter an injunction in favor of Yuga.  As the prevailing plaintiff, Yuga Labs is "entitled to a rebuttable presumption of

Initials of Deputy Clerk __sr__

irreparable harm." 15 U.S.C. § 1116(a); *see also Athena Cosmetics, Inc. v. AMN Distribution Inc.*, 2022 WL 4596549, at *12 (C.D. Cal. Aug. 16, 2022) ("Congress has recently made it easier for trademark plaintiffs to obtain an injunction, amending the Lanham Act to provide that such plaintiffs 'shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation'"). In this case, the Court concluded in its April 21, 2023 Order that Defendants infringed Yuga's BAYC Marks and, as a result, irrepable injury is presumed. In addition, the evidence at trial demonstrated that Defendants' infringing conduct has irreparably injured Yuga by hindering its ability to control its reputation and brand. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm").

In addition, "[i]njunctive relief is the remedy of choice for trademark . . . cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). Moreover, "[d]amage to reputation and loss of customers are intangible harms not adequately compensable through monetary damages." *Leadership Studies, Inc. v. ReadyToManage, Inc.*, 2017 WL 2408118, at *6 (C.D. Cal. June 2, 2017). In this case, monetary damages alone cannot remedy Yuga's injury or extinguish the ongoing harm and the continued threat that Defendants will repeat their infringing and fraudulent conduct. Indeed, as Kindler testified, one potential measure of damages she considered was Yuga's cost to purchase all of the infringing RR/BAYC NFTs, thereby totally remove them from the marketplace. However, as she explained, a "hypothetical buyback effort is not economically feasible" because some RR/BAYC NFT holders will demand prices well in excess of market value, and other likely holdouts will not give Yuga an opportunity "to go back and just purchase the infringing NFTs." Trial Transcript (Docket No. 392), 184:17-185:4. More importantly, Defendants' prior conduct demonstrates that they will undoubtably continue to harm Yuga and use the very same web accounts that use the BAYC Marks to continue their infringing and fraudulent conduct, including continuing to market and sell their collection of infringing and counterfeit NFTs.

The balance of hardships also weighs heavily in favor of Yuga. Defendants have no legitimate interest in remaining free and able to readily infringe Yuga's BAYC Marks. On the other hand, Yuga has a strong interest in being protected from Defendants' illegal conduct that continues to harm its reputation and goodwill. *See JUUL Labs, Inc. v. Chou*, __ F. Supp. 3d __, 2023 WL 3886046, at *15 (C.D. Cal. June 3, 2023) ("The balance of hardships weighs in favor of an injunction. By granting injunctive relief, the Court is merely prohibiting [defendant] from infringing [plaintiff's] trademarks"). Finally, Injunctive relief will serve the public interest by preventing consumer confusion. *See Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x. 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in trademark cases . . . serves the public interest").

### b.    The Scope of the Injunction

As to the scope of the injunction, the Court concludes that Defendants, their agents, employees, attorneys, and anyone acting in concert or participating with them, should be permanently enjoined from marketing, promoting, or selling products or services, including RR/BAYC NFTs and Ape Market, that use the BAYC Marks.

In addition, the injunction will require Defendants to transfer control of rrbayc.com, apemarket.com, rrbayc-v0.netlify.app, the @ApeMarketplace Twitter account, the @ApeMarketBot Twitter account, and the RR/BAYC smart contract[14] to Yuga.  As Yuga points out, this transfer will allow Yuga to regain control over the instrumentalities of commerce that bear its BAYC Marks and allow Yuga to protect its brand and prevent future harm.  This remedy is consistent with Lanham Act cases that order the transfer of domain names and social media accounts to remedy trademark infringement and cybersquatting injuries.  See 15 U.S.C. § 1116; *Smith v. Guerilla Union, Inc.*, 2019 WL 1517551, at *4 (C.D. Cal. Apr. 8, 2019) (granting permanent injunction to transfer infringing social media accounts and domain names); *see also Entrepreneur Media, Inc. v. Alfonso*, 2021 WL 2941983, at *5 (C.D. Cal. July 12, 2021).  Indeed, in trademark cases involving infringing internet accounts, it is well established that mark holders have a superior claim of ownership to those accounts relative to the infringer.  *See, e.g., Left Coast Wrestling, LLC v. Dearborn Int'l, LLC*, 2018 WL 2328471, at *7, 17 (S.D. Cal. May 23, 2018) (ordering transfer of domain names and social media accounts bearing plaintiff's marks because plaintiff had "right to possession"); *see also Brookfield Commc'n v. W. Coast Ent. Corp.*, 1999 U.S. Dist. LEXIS 23247, at *30 (C.D. Cal. Sep. 9, 1999) ("West Coast has been found to have infringed Brookfield's trademark rights; relative to West Coast, Brookfield is the domain name's rightful owner").  Moreover, the Court concludes that Defendants' cybersquatting conduct also entitles Yuga to an injunction ordering transfer of the domain names.  (See 15 U.S.C. § 1125(d)(1)(C) ("In any civil action involving the registration, trafficking, or use of a domain name . . . a court may order . . . the transfer of the domain name to the owner of the mark."); *Wilens v. Doe Defendant No. 1.*, 2015 WL 4606238, at *18 (N.D. Cal. July 31, 2015) (holding transfer of domain names appropriate due to cybersquatting and "refusal to desist from" intentionally operating the infringing domains).

In addition, the Court concludes that the same principles and case law apply to the transfer of the RR/BAYC NFT smart contract.  Similar to domain names, smart contracts give consumers confidence in the authenticity and source of digital accounts.  As a result, the trademark holder has a superior claim of title to smart contracts bearing its trademarks, particularly in light of the fact that smart contracts are immutable and exist in perpetuity.  In this case, Defendants' infringing smart contract will always reference Yuga's BORED APE YACHT CLUB and BAYC marks, and, as a result, consumer confusion and harm to Yuga will continue unabated and in perpetuity.  For example, consumers and Twitter bots tracking NFT transfers will continue to confuse sales of RR/BAYC NFTs as BAYC NFTs as they reflect the BORED APE YACHT CLUB and BAYC marks in the RR/BAYC smart contract's token tracker.  Therefore, even if Defendants cease actively promoting their infringing RR/BAYC NFT collection and transfer the domain names and social media accounts to Yuga, confusion from their infringement will continue unless Yuga Labs owns and controls the smart contract.  *See, e.g., Brookfield Communications, Inc. v. W. Coast Ent. Corp.*, 1999 U.S. Dist. LEXIS 23247, at *29-30 (C.D. Cal. Sept. 8, 1999) (noting transfer should be granted even if some non-infringing use could be made).  The Court also concludes that it is equitable to order the transfer of the RR/BAYC smart contract to Yuga because Yuga has changed or "burned" its own BAYC smart contract in order to restrict or prohibit the minting of additional BAYC NFTs in an effort to combat the perceived lack of exclusivity of BAYC NFTs due to the

---

[14]  0x2EE6AF0dFf3A1CE3F7E3414C52c48fd50d73691e is the RR/BAYC smart contract address.

Initials of Deputy Clerk _sr_

presence of RR/BAYC NFTs in the marketplace.[15]  Finally, because nearly five hundred RR/BAYC NFTs can be minted through the RR/BAYC smart contract, Defendants can easily continue their infringement of Yuga's BAYC Marks.  Defendants' conduct during this litigation clearly indicates that an injunction merely ordering Defendants to stop will be ineffective and will only result in an endless cycle of actions attempting to compel Defendants to comply with the terms of the injunction.

Accordingly, the Court concludes that Yuga is entitled to a permanent injunction against Defendant as described in herein.

### B.    Attorneys' Fees

Pursuant to 15 U.S.C. § 1117(a), "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  The determination whether a Lanham Act case is "exceptional" is a question of law for the district court, not the jury.  *See Watec Co. v. Liu,* 403 F.3d 645, 656 (9th Cir. 2005).  "[D]istrict courts analyzing a request for fees under the Lanham Act should examine the 'totality of the circumstances' to determine if the case was exceptional . . . using a preponderance of the evidence standard."  *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016).  In considering the "totality of the circumstances," courts can consider nonexclusive factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* (*quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 n.6 (2014)).  In short, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

A trademark case is generally considered exceptional for purposes of awarding of attorneys' fees when a party has taken positions that can be characterized as "malicious, fraudulent, deliberate or willful" (*Gracie v. Gracie*, 217 F.3d 1060, 1071 (9th Cir. 2000)), or "groundless, unreasonable, vexatious, or pursued in bad faith."  *Stephen W. Boney, Inc. v. Boney Services, Inc.*, 127 F.3d 821, 827 (9th Cir. 1997).  As a result, although a defendant's motivation, or "willfulness," is merely one factor that a court can consider in determining if a case is exceptional, a finding of willfulness is not necessary for an exceptional case determination.  *See, e.g., SunEarth*, 839 F.3d at 1181 ("We agree with the majority of our sister circuits and conclude that *Octane Fitness* and *Highmark* have altered the analysis of fee applications under the Lanham Act.  Therefore, district courts analyzing a request for fees under the Lanham Act should examine the 'totality of the

---

[15]    According to Nicole Muniz ("Muniz"), Yuga's former CEO and current special advisor, "Yuga Labs 'burned' the BAYC smart contract (i.e., transferred ownership of the smart contract to the null address, where it could no longer be controlled) in June 2022 to prevent its ability to ever mint another BAYC NFT.  One of the reasons we decided to make this change at that time was to address perceived concerns about exclusivity in the marketplace – as a result of the change, the BAYC contract publicly shows that Yuga Labs can never make more BAYC NFTs."  Declaration of Nicole Muniz (Docket No. 340), ¶ 20.

circumstances' to determine if the case was exceptional, *Octane Fitness*, 134 S.Ct. at 1756, exercising equitable discretion in light of **the nonexclusive factors** identified in *Octane Fitness* and *Fogerty*, and using a preponderance of the evidence standard") (emphasis added).  As the Ninth Circuit recently explained in *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,:

> In 2016, *SunEarth* altered the test for determining what constitutes an 'exceptional case' within the meaning of the Lanham Act.  Previously, the Ninth Circuit's test required the plaintiff to show that a defendant engaged in 'malicious, fraudulent, deliberate or willful infringement.'  *Lindy Pen*, 982 F.2d at 1409.  In *SunEarth*, the Ninth Circuit broadened the test to consider the 'totality of the circumstances' using a 'nonexclusive list' of factors, including 'frivolousness, motivation, objective unreasonableness (both in factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'  *Id.* at 1180–81 (internal quotation marks and citations omitted).  Because the *SunEarth* test is less stringent than the previous 'willful infringement' standard, it stands to reason that [a] case of willful infringement would satisfy the *SunEarth* test."

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 n.13 (9[h] Cir. 2023).

In addition, courts that have considered willfulness as one of the factors for determining if a case is exceptional often examine the defendant's conduct during the infringement and during any trademark litigation to determine the defendant's state of mind.  *See, e.g., San Diego Comic Convention v. Dan Farr Productions*, 807 Fed. App'x 674 (9th Cir. 2020).  For example, in San Diego Comic Convention, 807 Fed. App'x 674, the Ninth Circuit held that the district court did not abuse its discretion in deeming a case "exceptional" and granting an award of attorneys' fees where the court focused on the "unreasonable manner" in which Defendants litigated the case, "highlighting Defendants' failure to comply with court rules, persistent desire to re-litigate issues already decided, advocacy that veered into 'gamesmanship,' and unreasonable responses to the litigation."  In addition, in *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, the district court concluded on a trade dress claim that the case was exceptional and the plaintiff was entitled to an award of attorneys' fees after finding that the defendant's infringement was intentional and willful because the defendant intentionally and precisely copied the plaintiff's furniture designs, ignored the plaintiff's cease and desist letters, and resisted compliance with the court's injunction.  *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 2021 WL 871666 (D. Ariz. Mar. 9, 2021), *aff'd* 68 F.4th 1203 (9th Cir. 2023).  In the *Jason Scott Collection* case, the district court was also unpersuaded by the defendant's argument that furniture manufacturers regularly copy other furniture manufacturers' designs and, as a result, the defendant's failure to comply with the court's injunction was reasonable.  *Id.*  In affirming the district court's decision to award attorneys' fees, the Ninth Circuit held that:

> Section 1117(a) of the Lanham Act permits a plaintiff to recover attorneys' fees "in exceptional cases." 15 U.S.C. § 1117(a).  A court determines if a case is exceptional by considering the "totality of the circumstances" and evaluating whether the case is "one that stands out from others with respect to the substantive strength of the party's litigating position (considering both the governing law and facts of the case) or the unreasonable manner in which the case was litigated" based on a preponderance of the evidence.  *SunEarth*, 839 F.3d at 1180.

Initials of Deputy Clerk   sr

Trendily intentionally and precisely copied JSC's designs, ignored JSC's cease and desist letters, and resisted compliance with the court's injunction.  Trendily told other retailers that it had copied and intended to continue copying the JSC Pieces, such that retailers thought the suit was necessary to protect their investment in JSC products.  The district court did not abuse its discretion in concluding that such willful and brazen infringement, paired with the strength of JSC's trade dress claim, constitutes an exceptional case.  *See Earthquake Sound Corp. v. Bumper Indus*., 352 F.3d 1210, 1216–17 (9th Cir. 2003) (collecting cases).

Trendily circularly argues that fees are not warranted because the district court's findings on secondary meaning and likelihood of confusion are legally erroneous.  However, as explained, the district court correctly applied the relevant legal rules.  Trendily also argues that the district court inappropriately considered Trendily's decision not to comply with the injunction because its decision to do so was reasonable.  But regardless of whether Trendily's actions were reasonable, they were an attempt to circumvent the full force of the injunction – an action that weighs in favor of awarding attorneys' fees for infringement.  *Cf. Transgo, Inc. v. Ajac Transmission Parts Corp*., 768 F.2d 1001, 1026–27 (9th Cir. 1985) (affirming the award of attorney's fees in a copyright action where there was substantial evidence of deliberate infringement, including continued infringement in violation of an injunction).  Accordingly, the district court correctly awarded fees in this case.

*Jason Scott Collection*, 68 F.4th at 1223.

In this case, the Court has considered the totality of the circumstances and concludes that this is an exceptional case entitling Yuga to its reasonable attorneys' fees.  As previously discussed herein and in the Court's April 21, 2023 Order, Defendants intentionally infringed Yuga's BAYC Marks with a bad faith intent to profit from their use of those Marks.  Indeed, even after Yuga filed this action and after the Court issued its April 21, 2023 Order, Defendants continued to market and promote their infringing RR/BAYC NFT collection and their Ape Market.  In addition, as previously discussed herein and the Court's April 21, 2023 Order, Defendants registered two domain names (https://rrbayc.com, https://apemarket.com) after Yuga had already launched its BAYC NFT collection, knowing those domains were confusingly similar to the BAYC Marks and despite Defendants' lack of any trademark or other intellectual property rights in the domain names.  Although Defendants candidly acknowledged that they intentionally used the BAYC Marks, they argued that their use of Yuga's BAYC Marks was not infringement, but "satire" and "parody," even though their use of the BAYC Marks contained or added no commentary or discussion of Yuga or the BAYC Marks.  *See, e.g., AANP v. American Ass'n of Naturopathic Physicians*, 37 Fed. Appx. 893 (9th Cir. 2002) ("We agree with the district court's assessment; this was an exceptional case of infringement permitting the award of attorneys' fees.  Undoubtedly, the Infringer knew of National AANP and its use of the AANP and AMERICAN ASSOCIATION OF NATUROPATHIC PHYSICIANS trademarks, but nonetheless, incorporated itself under that name when National AANP's corporate license in Oregon inadvertently lapsed.  The Infringer conducted a self-congratulatory campaign touting its takeover of the "American Association of Naturopathic Physicians" corporate name").  Moreover, when Defendants were faced with any evidence that contradicted their narrative that the RR/BAYC NFT collection was created as a "satire" or "parody" of Yuga and the BAYC Marks, Defendants disingenuously dismissed that contradictory evidence or

Initials of Deputy Clerk __sr__

statements as a "joke" or "sarcasm."

In addition, the strength of Yuga's litigating position makes this case exceptional in comparison to the majority of other trademark infringement cases.  This case is dramatically different than most trademark infringement cases because it involves Defendants who are using the cover of satire and parody to justify their use of Yuga's BAYC Marks without Yuga's consent. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) ("As McCarthy, a leading trademark scholar, has observed, cases involving identical marks on competitive goods are rare and 'hardly ever find their way into the appellate reports' because liability is 'open and shut'") (internal citation omitted), *abrogated on other grounds by Romag Fasteners*, 590 U.S. __, 140 S. Ct. 1492.  In addition, Defendants continued to advance multiple legal theories – that the RR/BAYC NFT collection was "art" intended to criticize Yuga, that Yuga had abandoned its rights to the BAYC Marks, and that Yuga could not assert its rights in the BAYC Marks due to its "unclean hands" – despite the Court repeatedly ruling otherwise in its December 16, 2022 Order, March 17, 2023 Order, and April 21, 2023 Order.  Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated this litigation and supports the Court's conclusion that this an exceptional case.  *See, e.g., San Diego Comic Convention v. Dan Farr Prods.*, 807 F. App'x. 674, 676 (9th Cir. 2020) (concluding that the district court did not abuse its discretion in finding the action was an exceptional case where the defendants litigated in an "unreasonable manner" such as its "failure to comply with court rules" and "persistent desire to re-litigate issues already decided").

Finally, Defendants' conduct during the pendency of this litigation warrants a finding that this is an exceptional case.  Defendants were obstructive and evasive throughout their depositions and during their trial testimony, which unnecessarily complicated these proceedings.  *Jackson v. Gaspar*, 2022 WL 2155975 (C.D. Cal. Feb. 24, 2022) (finding an exceptional case from the "antagonistic discovery conduct" that was "improperly motivated and sought to drag out or obfuscate proceedings," such as deposition conduct where the defendant's "preparation, recollection and candor appear to have been marginal at best").  In addition, Defendants unnecessarily and inappropriately made disgraceful and slanderous statements about Yuga, its founders, and its counsel during litigation, including calling Yuga's counsel "criminals" who support "racism, antisemitism, beastiality, pedophilia" and accusing them of "using cartoons to market drugs to young children."  These statements were egregious and far exceed the bounds of acceptable conduct.  *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, 392 F.3d 248, 263-64 (7th Cir. 2004) (finding "no difficulty" holding defendant's harassing and racist remarks towards plaintiff and their counsel an exceptional case).

Accordingly, the Court concludes that this is an exceptional case entitling Yuga to its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

### C.     Costs

Under the Lanham Act, successful plaintiffs are generally entitled to "the costs of the action."  15 U.S.C. § 1117(a); *see also Grasshopper House, LLC v. Clean and Sober Media, LLC*, 2021 WL 3702243, *4 (9th Cir. Aug. 20, 2021) (concluding that "successful plaintiffs are generally entitled to 'the costs of the action,'" and explaining that "the standard for an award of costs differs substantively from the standard for the award of attorney fees").

Initials of Deputy Clerk __sr__

In this case, the Court granted Yuga's Motion for Summary Judgment with respect to Yuga's first cause of action for false designation of origin in violation of 15 U.S.C. § 1125(a) and third cause of action for cybersquatting in violation of 15 U.S.C. § 1125(d).  As result, the Court concludes that Yuga is the prevailing party with respect to its trademark claims.

In addition, the Court granted Yuga's Motion to Dismiss Counterclaims with respect to Defendants' second counterclaim for declaratory judgment of no copyright under 17 U.S.C. § 102(a) and third counterclaim for declaratory judgment of no copyright under 17 U.S.C. § 204(a).  The Court also granted Yuga's Motion for Summary Judgment with respect to Defendants' first counterclaim for knowing misrepresentation of infringing activity in violation of Section 512(f) of the Digital Millennium Copyright Act.  As a result, the Court concludes that Yuga is the prevailing party with respect to Defendants' copyright claims.  15 U.S.C. § 505.

Accordingly, the Court concludes that Yuga is entitled to recover its costs pursuant to 15 U.S.C. § 1117(a) and to recover its costs and attorneys' fees pursuant to 15 U.S.C. § 505.

### D.    The Parties Shall Meet and Confer Regarding the Reasonableness of Attorneys' Fees and Costs.

Although the Court has concluded that Yuga is entitled to recover reasonable attorneys' fees and costs from Defendants, the Court has not yet made any determination on the amount of the attorneys' fees and costs that would be reasonable.  Accordingly, the parties are ordered to meet and confer to agree on the amount of reasonable attorneys' fees and costs that should be awarded to Yuga, keeping in mind that a contested request for attorneys' fees "should not result in a second major litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("Ideally, of course, litigants will settle the amount of a fee.  Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.").

Yuga shall provided Defendants with all billing records and other documents which it will rely on in support of its request for reasonable attorneys' fees and costs.  Yuga shall provide those documents to Defendant by **November 1, 2023.**

On or before **November 13, 2023**, lead counsel for the parties shall meet and confer *in person* and shall specifically identify all hours, billing rates and costs, or other items that *will* and *will not* be objected to, the basis of any objections, and the specific hours, billing rates and costs that in the parties respective views are reasonable and should be compensated.  The parties shall attempt to resolve any remaining disputes.

In the unlikely event that any matters remain in dispute, the parties shall, on or before **November 20, 2023**, file a joint statement which includes the following:

1)    the total amount of attorneys' fees and costs claimed by Yuga with a summary table identifying the name, claimed hours, claimed rates, and claimed totals for each biller;

2)    the total amount of attorneys' fees and costs that Defendants agree should be awarded; and

Initials of Deputy Clerk   _sr_

3)      a description of each specific item in dispute between the parties, with a separate statement of Defendants' objections and Yuga's response.  The parties shall also file two summary tables (one for attorneys' fees and one for costs).

Depending on the nature and extent of the disputes, the Court may refer the matter to a special master at the expense of the parties.

## II.      Conclusion

For all of the foregoing reasons, the Court finds that Yuga is entitled to recover $1,375,362.92 in Defendants' profits, $200,000 in statutory damages, a permanent injunction as described in herein, and its attorneys' fees and costs.

IT IS SO ORDERED.

Initials of Deputy Clerk  _sr_