ERIC BALL (CSB No. 241327)
eball@fenwick.com
KIMBERLY CULP (CSB No. 238839)
kculp@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

MOLLY R. MELCHER (CSB No. 272950)
mmelcher@fenwick.com
ANTHONY M. FARES (CSB No. 318065)
afares@fenwick.com
ETHAN M. THOMAS (CSB No. 338062)
ethomas@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Attorneys for Plaintiff
YUGA LABS, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION — Los Angeles

| | |
|---|---|
| YUGA LABS, INC., | Case No.: 2:22-cv-04355-JFW-JEM |
| Plaintiff, | **PLAINTIFF YUGA LABS, INC.'S SUBMISSION TO THE SPECIAL MASTER RE ATTORNEYS' FEES AND COSTS** |
| v. | |
| RYDER RIPPS, JEREMY CAHEN, | |
| Defendants. | |

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................ 2

BACKGROUND ........................................................................ 4

I.  YUGA LABS SUES DEFENDANTS TO PROTECTS ITS
    CORE BRAND ................................................................ 4

II. DEFENDANTS MULTIPLY THE LITIGATION ......................... 5

III. THE COURT'S EXCEPTIONAL CASE FINDING AND
     AWARD OF ATTORNEYS' FEES ......................................... 6

LEGAL STANDARD .................................................................. 7

ARGUMENT ............................................................................. 8

I.  DEFENDANTS WAIVED ANY OBJECTION TO
    FENWICK'S REASONABLE RATES ..................................... 8

II. THE TIME FENWICK SPENT WAS REASONABLE FOR
    THIS LITIGATION ........................................................... 9

    A.  The Amount of Work Fenwick Performed Was
        Reasonable .............................................................. 10

        1.  Fenwick Already Applied Significant Discounts ........... 10

        2.  Yuga Labs' Efforts Were Reasonable in Light of
            Defendants' Actions ............................................. 11

    B.  Fenwick Obtained a Resounding Win for Yuga Labs ............. 13

    C.  This Case Presented Novel Legal and Factual Issues
        that Required Counsel Familiar with the Client, Law,
        and Technology at Issue ............................................ 15

III. DEFENDANTS' OBJECTIONS TO YUGA LABS' FEES
     AND COSTS LACK MERIT ................................................ 15

    A.  Defendants' Objections Are Frivolous ......................... 15

    B.  Defendants' Tactics Increased the Cost of Litigation ......... 17

Fenwick & West LLP
Attorneys at Law

# TABLE OF CONTENTS
## (Continued)

Page

          1.    Obtaining Defendants' Compliance in Discovery Was Expensive ................................................................ 18

          2.    Defendants Employed Tactics Calculated to Make Discovery Burdensome ......................................... 18

          3.    The Few Discovery Rulings in Defendants' Favor Do Not Make Yuga Labs' Attorneys' Fees Unreasonable ................................................................ 20

    C.    Defendants' Claim of Poverty Is False and Irrelevant ............ 22

IV.    YUGA LABS' COSTS ARE REASONABLE ................................. 23

V.    DEFENDANTS RIGHTFULLY DO NOT DISPUTE YUGA LABS' IS ENTITLED TO ITS EXPERT FEES ................................ 24

VI.    DEFENDANTS' POSITION ON TOTAL FEES IS PATENTLY UNREASONABLE ......................................................... 24

VII.    DEFENDANTS SHOULD PAY THE SPECIAL MASTERS' FEES ...................................................................................................... 26

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ahanchian v. Xenon Pictures, Inc.*,
  No. CV 07-6295-JFW (EX), 2008 WL 11411621
  (C.D. Cal. Dec. 29, 2008) (Walter, J.)................................................................23

*Ambriz v. Arrow Fin. Servs.*,
  No. CV 07-5423-JFW 2008 WL 2095617
  (C.D. Cal. May 15, 2008) (Walter, J.)................................................................23

*Apple, Inc. v. Samsung Elec. Co., Ltd.*,
  No. 11-cv-1846, 2012 WL 5451411 (N.D. Cal. Nov. 7, 2012) ..........................7

*Armijo v. Ozone Networks, Inc. et al.*,
  3:22-cv-00112-MMD-CLB (D. Nev. 2023)........................................................9

*Baker & Hostetler LLP v. Dep't of Commerce*,
  473 F.3d 312 (D.C. Cir. 2006) ........................................................................10

*Blum v. Stenson*,
  465 U.S. 886 (1984) ...........................................................................................8

*Cabrales v. Cnty. of Los Angeles*,
  935 F.2d 1050 (9th Cir. 1991)..........................................................................20

*Camacho v. Bridgeport Fin., Inc.*,
  523 F.3d 973 (9th Cir. 2008)..............................................................................7

*Cataphora Inc. v. Parker*,
  848 F. Supp. 2d 1064 (N.D. Cal. 2012)............................................................13

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988)..........................................................................14

*City of Riverside v. Rivera*,
  477 U.S. 561 (1986) ...........................................................................................9

*Cunningham v. Cnty. of Los Angeles*,
  879 F.2d 481 (9th Cir. 1989)..............................................................................8

*Fox v. Vice*,
  563 U.S. 826 (2011) .........................................................................................23

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Grove v. Wells Fargo Fin. Cal., Inc.,*
606 F.3d 577 (9th Cir. 2010) .............................................................................. 24

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ........................................................................................... 13

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
No. 04-00689, 2007 WL 6137002 (C.D. Cal. June 28, 2007) ............................ 8

*Jack Daniels Properties, Inc. v. VIP Products LLC,*
559 U.S. 140 (2023) ........................................................................................... 15

*Kelly v. Wengler,*
822 F.3d 1085 (9th Cir. 2016) ............................................................................. 7

*Kerr v. Screen Extras Guild, Inc.,*
526 F.2d 67 (9th Cir. 1975) ................................................................................. 8

*Monster Energy Co. v. Vital Pharms., Inc.,*
No. 18-cv-1882-JGB-SHKX, 2023 WL 8168854 (C.D. Cal. Oct. 6, 2023)
.................................................................................................................... 13, 16

*Moreno v. City of Sacramento*,
534 F.3d 1106 (9th Cir. 2008) ................................................................. 1, 13, 17

*Perfect 10, Inc. v. Giganews, Inc.,*
No. CV 11-07098-AB SHX, 2015 WL 1746484
(C.D. Cal. Mar. 24, 2015), *aff'd,* 847 F.3d 657 (9th Cir. 2017) ....................... 24

*SAS v. Sawabeh Info. Servs. Co.,*
No. CV 11–04147, 2015 WL 12763541
(C.D. Cal. June 22, 2015) (Morrow, J.) ....................................................... 10, 16

*Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.,*
282 F.3d 23 (1st Cir. 2002) ................................................................................. 9

*Wyatt Tech. Corp. v. Malvern Instruments, Incorp.,*
No. CV 07-8298, 2010 WL 11404472 (C.D. Cal. June 17, 2010) ..................... 24

**STATUTES AND RULES**

15 U.S.C. § 505 (Copyright Act) .................................................................... 1, 24

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

15 U.S.C. § 1117(a) (Lanham Act) ..................................................................*passim*

28 U.S.C. § 1920..............................................................................................24

Fed. R. Civ. P. 26.............................................................................................24

L.R. 54-3.10......................................................................................................23

Fenwick & West LLP
Attorneys at Law

Pursuant to the Special Master's December 15, 2023 Order (Dkt. 442), Plaintiff Yuga Labs, Inc. respectfully submits its additional positions and evidence to augment the record regarding its entitlement to an award of "reasonable attorneys' fees, expert fees, and taxable and non-taxable costs" (collectively, "fees and expenses") (*see* Dkt. 440), pursuant 15 U.S.C. § 1117(a) (Lanham Act) and 15 U.S.C. § 505 (Copyright Act).  Dkt. 431 at 27.  This submission is supported by the concurrently filed Declaration of Eric Ball ("Ball Decl.").

As set forth in the parties' Joint Statement (Dkt. 435) and this brief, an award of $13,202,111.91 is reasonable.  That award consists of $12,697,150.22 in attorneys' fees, $409,322.69 in costs, and $95,639.00 in expert witness fees.  As the Ninth Circuit recognizes, "[b]y and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

Nevertheless, Yuga Labs offered Defendants a compromise award of $7,500,000.00 in attorneys' fees only for the purpose of preserving the resources required to undertake an analysis of records and to address the Court's concern about making a second litigation out of the award.  That offer credited, in full, every objection Defendants made in the Joint Statement.  Consistent with Defendants' repeated refusal to compromise in this litigation, they rejected that offer.  Since Defendants have not materially deviated from their unreasonable positions, thus necessitating this review, and because the record supports the reasonableness of Yuga Labs' fees and expenses, Yuga Labs seeks to recover the full fees and expenses it incurred achieving its unqualified victory in this litigation.[1]  Defendants' "remaining objections" (Dkt. 440 at 1) have no merit and should be rejected.

---

[1] Yuga Labs expressly preserves its responses to Defendants' objections as briefed in its portion of the Joint Statement.  Dkt. 435.  Yuga Labs objects to and reserves its right to respond to any new objections lodged by Defendants.  Dkt. 441.  The Court's order limits the remaining issues to be determined to "the disputes set forth

FENWICK & WEST LLP
ATTORNEYS AT LAW

**INTRODUCTION**

This case involves attempts by Defendants Ryder Ripps and Jeremy Cahen ("Defendants") to profit off the goodwill of Yuga Labs' Bored Ape Yacht Club ("BAYC") brand with scams targeting new technologies (non-fungible tokens or "NFTs").  Defendants persisted with their scam for more than a year and a half, including throughout the litigation, which caused irreparable harm to Yuga Labs' BAYC brand and confused consumers.  Given Defendants' bad faith and exceptional conduct, the Court awarded Yuga Labs its attorneys' fees and costs.

Yuga Labs' overwhelming success in this lawsuit is undeniable.  Yuga Labs received ***every*** remedy it sought at trial, including disgorgement of all of Defendants' profits and the maximum statutory damages.  It also received ***the most important remedy*** in a brand-protection case such as this — a comprehensive injunction that prevents Defendants from further harming Yuga Labs' tentpole BAYC Brand and allows Yuga Labs to take control of the means of harming that brand (i.e., the domains, social media accounts, and smart contract created by Defendants that all use the BAYC Marks).  While the value of that injunction is unquantifiable, it is the absolute best means of remedying the irreparable harm Defendants caused to the core brand around which Yuga Labs built its multi-billion-dollar business.  The value of the injunction is especially true given Defendants' use of novel technology to try to make the infringement immutable and permanent.  Notwithstanding Yuga Labs' total victory, Defendants objected to

---

in the Parties' Joint Statement (Dkt. 435)" and "remaining objections to Yuga Labs' fees and costs requests."  Dkt. 440 at 1-2.

By failing to raise any specific objections in the Joint Statement, Defendants waived their right to raise them later.  Yuga Labs is, however, prepared to provide substantive responses on the December 29th deadline should Defendants raise anew previously waived objections.  *See* Dkt. 437 ("Additionally, Defendants have completely failed to comply with the Court's order regarding the preparation of the Joint Statement, which specifically stated that the Joint Statement must include a description of each specific item in dispute between the parties.") (internal quotations omitted).  Should the Special Master deem it helpful, Yuga Labs will file such responses in a form that the Special Master requests.

Fenwick & West LLP
Attorneys at Law

nearly every dollar that Yuga Labs spent protecting its central brand (by analogy, protecting its Mickey Mouse or Nike Swoosh logo).

This case could and should have been much simpler had Defendants heeded the Court's orders.  Defendants received many warning signs from the Court that their litigation position was unreasonable.  But their continued refusal to follow the Court's orders and accept the reality of their litigation position significantly and continuously increased the expense of this case and is one of the reasons the Court found this case exceptional.  Dkt. 431 at 26 ("Defendants continued to advance multiple legal theories — that the RR/BAYC NFT collection was 'art' intended to criticize Yuga, that Yuga had abandoned its rights to the BAYC Marks, and that Yuga could not assert its rights in the BAYC Marks due to its 'unclean hands' — despite the Court repeatedly ruling otherwise in its December 16, 2022 Order, March 17, 2023 Order, and April 21, 2023 Order.").  Defendants cannot use their obstructive tactics, which made this litigation (and resolution of Yuga Labs' fee request) so expensive, as a shield to now bar Yuga Labs' recovery of its reasonable fees spent responding to those tactics and ultimately obtaining a complete victory.

Before its victory, Yuga Labs repeatedly sought to resolve this case efficiently.  For example, Yuga Labs heeded the Court's recommendation to drop the false advertising claim because of the redundancy of available remedies and to streamline the case for trial.  Ball Decl. ¶ 49.  Likewise, Yuga Labs sought to resolve the dispute over fees and costs by offering a true compromise — an amount far less than what it was entitled but which accounted for each of Defendants' objections notwithstanding their lack of merit.  That compromise should have obviated the need for any further work by the Court.  Dkt. 435.  Instead, Defendants seek to further protract this litigation and delay taking responsibility for their conduct by doing precisely what the Court admonished against: turning Yuga Labs' right to attorneys' fees and costs into a "second major litigation."  Dkt. 431 at 27.

FENWICK & WEST LLP
ATTORNEYS AT LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FENWICK & WEST LLP
ATTORNEYS AT LAW

Defendants pursued their litigation strategy with their eyes wide open about the costs and risks to them because even before trial, the Court warned Defendants that they should be prepared to pay no less than $5 million of Yuga Labs' attorneys' fees:

> [I]f there's an exceptional case determination and we're talking about north of $5 million in attorney's fees, I don't think — I don't know, but I hope your client in his artistic endeavors makes a lot of money so he can write a check for $5 million. . . . [I]t seems to me that this is an appropriate time to come to some resolution of these issues because a trial is going to do nothing but add to the attorney's fees that if I make that determination, that your clients are ultimately going to be — ultimately going to be responsible for.

June 9, 2023 Pre-Trial Conference Tr. (Dkt. 318) at 46:14-47:6.  And yet, in usual fashion and despite the Court's warning, Defendants offered no meaningful compromise.  Defendants' refusal to be reasonable or to work toward an efficient resolution is symptomatic of their approach to this case, i.e., their "repeated attempts to re-litigate issues already addressed and rejected by the Court," which "unnecessarily complicated this litigation."  Dkt. 431 at 26.  At bottom, any reduction to Yuga Labs' reasonable attorneys' fees will reward Defendants' willfully obstructive behavior.

Yuga Labs' fees are reasonable and represent a sound lodestar figure based on reasonable rates and hours spent on a successful litigation.  Similarly, Yuga Labs' taxable and non-taxable costs were incurred in successfully prosecuting this litigation, are reasonable, and should be ordered paid by Defendants.  Finally, Defendants did not dispute the reasonable fees Yuga Labs' experts incurred preparing for and sitting for their depositions, and those fees are recoverable.

## BACKGROUND

### I.    Yuga Labs Sues Defendants to Protects Its Core Brand

Yuga Labs is the creator behind one of the world's most well-known and successful NFT collections: BAYC or the Bored Ape Yacht Club.  Dkt. 225 (Summary Judgment Order) at 1.  Only 10,000 unique BAYC NFTs exist, and they

are among the most sought after NFTs.  *Id.* at 1-2.  In response to BAYC's popularity, Defendants launched a business venture to scam consumers into purchasing their "RR/BAYC" NFTs by using the very same trademarks that Yuga Labs uses to identify the company and market the BAYC brand.  *Id.* at 3. Defendants explicitly and intentionally mislead consumers into thinking that their scam NFTs are affiliated, sponsored, or associated with Yuga Labs.  *Id.* at 10-13. They also used the BAYC Marks to promote their NFT marketplace, thus further suggesting affiliation, sponsorship, or association with Yuga Labs.  *Id.* at 19. Defendants' communications, and the admissions of one of their co-conspirators, showed that (1) the purpose of promoting and selling their scam NFTs was to profit off of Yuga Labs' BAYC brand, and (2) Defendants knew that consumers would be confused into thinking they were purchasing an authentic BAYC NFT.

Yuga Labs sued Defendants on June 24, 2022 to end Defendants' scam and infringement of Yuga Labs' core brand, BAYC or the Bored Ape Yacht Club.

## II.    Defendants Multiply the Litigation

Defendants have only themselves to blame for the cost of this litigation.  As the Court held and as further demonstrated herein, Defendants multiplied the litigation by re-litigating issues and being obstructive throughout the litigation. They also refused to negotiate disputes in good faith, such as this one or the litigation itself.  For example, more than once, Defendants' settlement demand to Yuga Labs was to make the Defendants "whole" for the cost of the litigation — no matter how weak their litigation position was.  Ball Decl. ¶ 48.  Indeed, immediately after the Court entered its order granting Yuga Labs' motion for summary judgment, rather than proposing a settlement addressing their infringement with an injunction and compromise monetary payment, Defendants again demanded that Yuga Labs — the party who just won summary judgment — pay Defendants millions.  *Id.*  And, even after Defendants complained that Yuga Labs had sought a reasonable non-disparagement clause during negotiations and

FENWICK & WEST LLP
ATTORNEYS AT LAW

1  Yuga Labs dropped that request in response, Defendants still refused to

2  compromise their position.[2]  *Id.*  Tweets by Defendants demonstrate they *knew* this

3  litigation was expensive for Yuga Labs,[3] yet they took the risk of choosing not to

4  resolve it on reasonable terms with eyes wide open.

5  ### III.   The Court's Exceptional Case Finding and Award of Attorneys' Fees

6          Defendants wanted their scam to ruin Yuga Labs' business.  As Judge Walter

7  explained, Defendants used the litigation as a platform to "unnecessarily and

8  inappropriately ma[k]e disgraceful and slanderous statements about Yuga, its

9  founders, and its counsel during litigation . . . ."  Dkt. 431 at 26.  And Defendants'

10 self-serving and contradictory testimony led the Court to hold that it "does not find

11 their testimony credible."  *Id.* at 14-15, n.10.

12         Following the Court's December 16, 2022 Order rejecting their *Rogers*, First

13 Amendment, and fair use defenses, Dkt. 62, Defendants raised their rejected theories

14 in no fewer than a dozen filings with the Court.  Ball Decl. ¶ 45.  And because

15 Defendants raised their rejected theories in *every single deposition* they took or

16 defended, Yuga Labs was forced to spend significant time and resources to prepare

17 to respond to questions accusing them of being Nazis even though Judge Walter had

18 ruled against Defendants.  Ball Decl. ¶ 37.  Again, at trial, despite Defendants'

19 assurances to the Court at the pre-trial conference that it would be inappropriate "if

20 anybody starts talking about – ranting about how everybody at Yuga are a bunch of

21 Nazis", Defendants still questioned Yuga Labs' witnesses and offered their own

22 "clearly inappropriate" testimony about racism and Nazism.  June 9, 2023 Pre-Trial

23 Conference Tr. (Dkt. 318) 61:10-12.  Thus, having seen Defendants flout the Court's

24 _____

25 [2] Defendants have argued that the non-disparagement clause is evidence that Yuga
   Labs filed the lawsuit to silence them.  Not so.  They are typical in settlements, and
26 the ask was particularly reasonable here given, as acknowledged by the Court,
   Defendants' history of making personal, targeted, heinous claims, and because
27 Defendants were otherwise balking at paying any money in settlement.

28 [3] *See, e.g.*, Ball Decl. Ex. 9 at 1 (Defendant Cahen acknowledging that his litigation
   tactics caused Yuga Labs $20 million in harm).

FENWICK & WEST LLP
ATTORNEYS AT LAW

admonishments several times before, Yuga Labs rightly prepared its witnesses to respond to these irrelevant questions.  To state the obvious, it is more complicated to prepare a witness to testify at a trial on trademark remedies when that witness knows they will be falsely accused of being a Nazi and then asked questions attempting to destroy their entire business.

In sum, "Defendants continued to advance multiple legal theories — that the RR/BAYC NFT collection was "art" intended to criticize Yuga, that Yuga had abandoned its rights to the BAYC Marks, and that Yuga could not assert its rights in the BAYC Marks due to its 'unclean hands' — despite the Court repeatedly ruling otherwise in its December 16, 2022 Order, March 17, 2023 Order, and April 21, 2023 Order.  Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated this litigation and supports the Court's conclusion that this is an exceptional case."  Dkt. 431 at 26.  Yet, despite Defendants' best efforts to hinder, delay and derail these proceedings, Yuga Labs prevailed ***at every stage of the case and obtained every remedy it sought at trial.***  This success is attributable to the considerable efforts of the Fenwick team despite Defendants' best efforts to distract the Court and parties from the relevant issues.  Defendants' exceptional litigation misconduct caused this case to require significant and multiplicative legal work; it is just, and required under the Lanham Act, that they take responsibility for that bill.

## LEGAL STANDARD

District courts use the lodestar method to determine the reasonableness of attorneys' fees.  *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  According to the lodestar method, "reasonable rates multiplied by reasonable hours expended" results in a figure that is "presumptively reasonable." *Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 11-cv-1846, 2012 WL 5451411, at *3 (N.D. Cal. Nov. 7, 2012); *see also Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (the output of a lodestar calculation is "a presumptively reasonable fee").

Fenwick & West LLP
Attorneys at Law

"[A]ctual billing rates provide a reasonable basis for the lodestar analysis." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, No. 04-00689, 2007 WL 6137002, at *3 (C.D. Cal. June 28, 2007). While the lodestar figure may be adjusted, courts "treat the lodestar figure as presumptively reasonable and adjust it only in rare or exceptional cases." *Cunningham v. Cnty. of Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1989). The factors courts look to in deciding whether to adjust the lodestar figure are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975). Here, Yuga Labs' actual billing rates align with industry norms, and the hours expended in this case are reasonable in light of Defendants' pervasive efforts to multiply the litigation, the novelty of the issues, and Yuga Labs' overwhelming success.

## ARGUMENT

### I. Defendants Waived Any Objection to Fenwick's Reasonable Rates

Defendants did not object to Fenwick's rates because they know those rates are reasonable. *See* Ball Decl. ¶ 22; Dkt. 435 at 8. Indeed, they could not reasonably object given the ***even-higher rates their own counsel*** billed them in this litigation. *See* Dkt. 220-4 (billing $1060.00 per hour for a then-fifth-year associate). Nonetheless, to supplement the record for avoidance of doubt, Yuga Labs provides evidence and argument supporting the reasonableness of its rates.

A reasonable hourly rate should reflect the prevailing market rates of attorneys practicing in the forum community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895–96 n.11 (1984). Fenwick is a top-ranked firm for intellectual property litigation. Ball Decl. ¶ 23. Nonetheless, the rates of Fenwick's attorneys are below

market for peer firms in Los Angeles.  Ball Decl. Ex. 5.  And rates comparable to those charged by Fenwick have been recognized as reasonable in this and other jurisdictions.  Ball Decl. ¶ 24(a).  Not surprisingly then, multiple California federal courts have found Fenwick's rates to be reasonable for other IP cases of similar complexity to this proceeding.  *See* Ball Decl. ¶ 24(b).  And the Fenwick attorneys involved in this case have developed expertise in NFT trademark litigation — a new and unique area of law.  This area of law is specialized and frequently deals with cutting edge legal issues of first impression.  Fenwick's individual attorneys are uniquely qualified to argue the issues in this case.  Ball Decl. ¶¶ 6-16.  Fenwick attorneys also represented Yuga Labs in another matter and achieved a positive outcome.  *See Armijo v. Ozone Networks, Inc. et al.*, 3:22-cv-00112-MMD-CLB (D. Nev. 2023).

Fenwick's proven results demonstrate that the team and billing rates were worth the cost for Yuga Labs and that Fenwick's rates are reasonable for this litigation.  The Special Master should approve the reasonable rates of Yuga Labs' attorneys in light of the attorneys' specialized skill, experience, and reputation in IP litigation related to NFTs and this case in particular.

## II.     The Time Fenwick Spent Was Reasonable for this Litigation

The Lanham Act does not cap attorneys' fees based on the monetary component of remedies obtained.  *See* 15 U.S.C. § 1117(a).  There is no evidence that Congress intended "that attorney's fees be proportionate to the amount of damages" a victorious plaintiff is awarded.  *City of Riverside v. Rivera*, 477 U.S. 561, 562-63 (1986); *see also Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 34 (1st Cir. 2002) ("The cost of enforcing [trademark] rights may well be larger than the lost profits in any particular case.").  Moreover, the value of a trademark plaintiff's permanent "injunctive relief is not easily monetized" but "there is no doubt that" injunctive relief can constitute a significant recovery, particularly where, as here, it was the primary form of relief the plaintiff sought.

FENWICK & WEST LLP
ATTORNEYS AT LAW

*SAS v. Sawabeh Info. Servs. Co.*, No. CV 11–04147, 2015 WL 12763541, at * 35 (C.D. Cal. June 22, 2015) (Morrow, J.)

**A.   The Amount of Work Fenwick Performed Was Reasonable**

**1.   Fenwick Already Applied Significant Discounts**

Yuga Labs' fees request already accounts for substantial deductions made by Fenwick intended to streamline the review process and reduce disputes over what entries are reasonable.  While the total amount spent by Yuga Labs' would be reasonable regardless, Yuga Labs' requested fees have therefore already been reduced to reach an even more reasonable total.  Fenwick's billing records submitted to Defendants and the Special Master:

- Exclude attorneys who worked on the case but were not part of the "core" trial team, even though Yuga Labs paid for those attorneys' time.  Ball Decl. ¶ 18.
- Reflect numerous write-offs of attorney time from core team members for time that was worked on this case.  Ball Decl. ¶ 19.
- Reflect volume discounts given to Yuga Labs.  Ball Decl. ¶ 32.
- Do not include certain individual time entries that were billed to Yuga Labs but, in the judgment of counsel, omitted to render the fee request reasonable and focused on the core issues of the case.  Ball Decl. ¶ 19.

Additionally, Yuga Labs is not seeking fees for nearly 18 months of extensive work performed by its three in-house counsel, who assisted in the preparation for depositions to ensure that Yuga Labs' witnesses were adequately prepared to give honest and complete answers, among many other strategic tasks. *See Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 326 (D.C. Cir. 2006) (prevailing party may recover in-house counsel fees under fee-shifting statutes); Ball Decl. ¶ 37.

These adjustments support a finding of reasonableness.

Fenwick & West LLP
Attorneys at Law

2.     **Yuga Labs' Efforts Were Reasonable in Light of Defendants' Actions**

The Court found this case to be exceptional because of, among other reasons, "the strength of Yuga's litigating position" and because Defendants continually and baselessly advanced "multiple legal theories" that had already been rejected by the Court, which ran the gamut from securities to copyright to tort to invalidity to defamation. Dkt. 431 at 26; Ball Decl. ¶ 45. Defendants did all they could to make this anything but a simple Lanham Act case. Even still, the first significant order in this case was the Court's denial of Defendants' anti-SLAPP motion and motion to dismiss (Dkt. 62), which established that Defendants' core First Amendment defense and inflammatory theories had no bearing on this trademark litigation. But, Defendants pursued those theories through the trial, re-raising them many times along the way.

After Defendants lost their motion to strike and dismiss, they persisted with *the same theories* on a motion to compel, which they also lost. Dkt. 87 at 1 ("The Court agrees with Yuga that the above discovery requests are moot, irrelevant and not proportionate to the needs of the case in view of the District Court's December 16, 2022 ruling. (Dkt. 62.)" After Defendants lost that motion, they pursued *the same theories again*, but dressed up in a motion to stay. Dkt. 118. They lost again. Dkt. 178.[4] They also failed to defeat Yuga Labs' motion to strike three of their counterclaims based on *these same failed theories*. Dkt. 156. Undeterred by yet more losses based on these same failed theories, Defendants *once again raised their failed theories* in opposing Yuga Labs' motion for summary judgment. Dkt. 163. Once again, Defendants lost on those same theories. Dkt. 225. Still refusing to acknowledge the reality of the Court's findings,

---

[4] In addition to again rejecting Defendants' theories (Dkt. 178 at 6), the Court denied the stay in part because "Defendants are still actively promoting their RR/BAYC NFTs, receiving royalties from the secondary sales of their RR/BAYC NFTs, and leveraging this litigation to promote and market those sales." Dkt. 178 at 4.

Defendants nevertheless forced a trial on *these same issues*.  *See e.g.* Dkts. 344, 345, and 346.  Yuga Labs won every major order in the case, and Defendants still refused to adjust course.

This overview omits the countless and persistent additional ways in which Defendants raised and re-raised these issues in meet and confers, in discovery responses, at depositions, at settlement discussions, in pre-trial filings, and elsewhere.  Not surprisingly then, this case was exceptional — and expensive — because of "Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court" which "unnecessarily complicated this litigation."  Dkt. 431 at 26.  This also meant that Fenwick attorneys were required to constantly fight a multi-front battle of Defendants attacking on every possible ground, updating research and fact development to respond each time to those arguments in new motions and under different procedural contexts.

Defendants also abused this litigation to farm engagement on social media in ways that directly impacted the litigation itself, which required even more work by Fenwick attorneys.  For example, Defendants violated the Court's protective order by publicly filing Highly Confidential – Attorneys' Eyes Only materials on the docket, and then immediately disseminating that material directly to media outlets.  Defendants made a $10,000 payment in lieu of further sanctions.  Dkt. 194.  Nonetheless, this generated significant work for Yuga Labs in the form of additional filings, investigating and controlling the damage of the disclosure, responding to media inquiries, and engaging in meet and confer efforts to rectify Defendants' violation of the Court's orders.

The expensive price tag of pursuing this litigation to a victory, while also responding to attacks on the reputation and business model of the company, witnesses, and counsel, was a natural consequence of the defense's decisions to repeatedly try every fringe theory, ranging across securities fraud, false advertising, First Amendment, fair use, fraud, licensing, invalidity, copyright, defamation, and

FENWICK & WEST LLP
ATTORNEYS AT LAW

more.  A litigant "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the [adversary] in response." *Cataphora Inc. v. Parker*, 848 F. Supp. 2d 1064, 1070 (N.D. Cal. 2012) (citation omitted). Defendants should not be heard to argue that the fees in this litigation are high when they are the ones who caused the case to be both exceptional and expensive.

## B.    Fenwick Obtained a Resounding Win for Yuga Labs

Given Yuga Labs' "resounding victory, it is appropriate for the Court to 'defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won[.]'" *Monster Energy Co. v. Vital Pharms., Inc.*, No. 18-cv-1882-JGB-SHKX, 2023 WL 8168854, at *22 (C.D. Cal. Oct. 6, 2023) (alteration in original) (awarding $20,972,953.90 in attorneys' fees in a case involving the Lanham Act) (*quoting Moreno*, 534 F.3d at 1112).  This case was a necessary signal to the nascent industry and potential infringers that infringement will not be tolerated in the NFT space and infringers will be held to account for their actions.  Thus, the win benefited Yuga Labs as well as the public more generally.  Additionally, the fact that this case culminated in a one-day bench trial on remedies is indicative only of the sweeping success that Yuga Labs achieved to get there.  Yuga Labs proved its case on summary judgment and was thus able to narrow the scope of the case to its desired remedies — all of which it obtained.  *See* Dkt. 225 (granting Yuga Labs summary judgment on all claims submitted).  And Yuga Labs' decision to drop its false advertising claim at the Court's suggestion does not warrant a reduction in fees.[5]  *See Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983).  Yuga Labs is entitled to all fees incurred in securing its resounding victory.

As important as the full disgorgement and statutory damages awards were to stop Defendants from benefiting from their infringement, the hard-earned

---

[5] Even so, Yuga Labs' fees specific to its false advertising claim total approximately $236,000.  Ball Decl. ¶ 49.

FENWICK & WEST LLP
ATTORNEYS AT LAW

permanent injunction is invaluable.[6]  "Injunctive relief is the remedy of choice for trademark . . . cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).  And here, Yuga Labs was not only granted the injunction it requested, but was granted *novel* injunctive relief through the transfer of the RR/BAYC smart contract, thus ending the otherwise immutable association between Defendants and Yuga Labs.  As far as Yuga Labs is aware, it is the first company to prove an entitlement to transfer of the infringing smart contract to remedy trademark infringement.  Ball Decl. ¶ 47.

This injunctive relief was also especially important here, since the marks Defendants stole are crucial to Yuga Labs' brand and identity.  *See* Trial Tr. (Dkt. 393) 95:17-96:15 (Ms. Muniz comparing Bored Ape Yacht Club brand to Disney's "Mickey.").  This loss of control had tangible consequences — including harming Yuga Labs' ability to secure third-party partnerships because of the infringement.  *Id.* at 97:9-99:7.  As demonstrated throughout the record, absent the comprehensive injunctive relief Yuga Labs obtained, Yuga Labs would be irreparably harmed by Defendants' theft of control over its tentpole brand.  *Id.* at 100:12-14 ("But more than anything, we need to control our brand.  We need to have our brand back.").  This is the kind of remedy that cannot be quantified in dollars and cents — but a better result is inconceivable.

---

[6] Defendants at times have mischaracterized a $797 million figure cited by Yuga Labs' expert, Lauren Kindler, to misleadingly argue Yuga Labs sought (and failed to obtain) this amount in damages.  In reality, this figure represented an economic "ceiling" estimate for the cost to undo Defendants' harm by buying back all of Defendants' infringing NFTs from the market.  This enormous price tag supported Ms. Kindler's finding that Defendants' infringement caused irreparable harm and injunctive relief was warranted.  *See* Trial Tr. (Dkt 393) at 184:21-185:3.

FENWICK & WEST LLP
ATTORNEYS AT LAW

**C.      This Case Presented Novel Legal and Factual Issues that Required Counsel Familiar with the Client, Law, and Technology at Issue**

Though Defendants' liability in this case was plain, stopping their infringement involved significant and precedent-setting legal questions central to Yuga Labs' tentpole brand and the burgeoning landscape of intellectual property in the field of NFTs.  These issues were critically important to Yuga Labs as an industry leader and necessary for Yuga Labs to vigorously protect its brand in such an important legal dispute against bad actors who would stop at nothing to harm the company.  So, while Defendants' infringement was straightforward, fashioning a remedy to end the detrimental association between Defendants' and Yuga Labs posed unique challenges.  Litigation around NFTs is inherently novel.  While there has been some litigation around trademark rights as they apply to NFTs, this was a case of first impression in that it involved a direct copy of Yuga Labs' marks and products, which resulted in novel injunctive relief.  Ball Decl. ¶ 47.  The novelty of the legal and factual questions in this case required constant efforts to maintain currency of law and understand the landscape and intricacies of the industry.  Fenwick — as a leading law firm in the technology space — had unmatched experience with blockchain and NFT clients, and there is likely no firm in the country with experience that parallels Fenwick's.  Ball Decl. ¶ 4.[7]

**III.   Defendants' Objections to Yuga Labs' Fees and Costs Lack Merit**

**A.      Defendants' Objections Are Frivolous**

As set forth in the Joint Statement (Dkt. 435), Defendants' blanket objections have no merit.  These objections are only vague generalities, because (as the Court held) Defendants "completely failed to comply with the Court's order regarding the

---

[7] In addition, while this case was being litigated, the Supreme Court was considering and ultimately ruled on the *Rogers* defense in the matter of *Jack Daniels Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023).  Thus, while the *Rogers* defense itself was not novel, its application to NFTs was.  Moreover, the *Rogers* defense itself was under an evolving scrutiny during the pendency of this case in light of the Supreme Court's review and opinion in the *Jack Daniels* case.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

preparation of the Joint Statement" by not actually identifying a single item in dispute.  Dkt. 437 at 1.  Nonetheless, the objections are misguided and misleading.

First, Defendants accuse Fenwick of "overbill[ing]" for its work on this case by misleadingly citing "comparable cases in this district."  Dkt. 435 at 1.  What they failed to disclose to the Court is that these "comparable" cases ended in default judgment or were otherwise categorically simpler than this litigation.  *See* Dkt. 435 at 8-9 (discussing cases).  The fees in those cases of course do not compare to the egregious conduct at issue in this litigation all the way through trial, the stakes of this litigation, and Defendants' tactical decision to relentlessly and repeatedly fight a losing case.  More comparable cases confirm that Yuga Labs' fees are reasonable for an exceptional Lanham Act case of this magnitude.  *See Monster Energy Co.*, No. EDCV 18-1882, 2023 WL 8168854 (awarding $20,972,953.90 in attorneys' fees in a case involving Lanham Act claims); *SAS.*, 2015 WL 12763541 (Morrow, J.) (awarding $4,842,113.16 in case involving Lanham Act claims).

Second, Defendants allege that the "'block bill' format of Fenwick's bills warrant a fee reduction.  What they further failed to disclose to the Court is that none of the entries are actually "block billed" as the cases use the term.  Some courts have found block billing problematic because it is impossible to know how much time was spent on each subtask included in one narrative; but Fenwick's billing entries that contain multiple tasks (which are only about a quarter of the billing records) are separated by time spent on each task, eliminating any basis for this objection — e.g., "Prepare complaint against Rider Ripps (2.0); factual and legal research in support of same (1.2)."  Defendants identify no reason that this style of time entry should warrant a blanket fee reduction.

Third, Defendants decry bills for "unrelated" or "duplicate" tasks, summarily claiming that these entries amount to thousands of hours of work.  Dkt. 435 at 2.  They also complain about travel time, which was often travel to Court or to Court-

ordered in-person meet and confers.[8]  But by violating the Court's order, Defendants failed to provide any evidence or specifics about these claims.  Defendants' failure to meet their burden of identifying objectionable billing entries, and the resulting lack of opportunity by Yuga Labs to understand and respond to the objections, does not provide a fair basis for reducing Yuga Labs' fee award.  But, if some entries appear to have "duplication, it's necessary duplication" to dispose of Defendants' meritless re-litigation of the same arguments.  *Moreno*, 534 F.3d at 1112; *see* Dkt. 431 at 20 (noting "Defendants' repeated and consistent contempt and disdain for the law and the legal process"); *id.* at 26 ("Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court unnecessarily complicated this litigation . . . .").

## B.    Defendants' Tactics Increased the Cost of Litigation

Defendants point to the significant time and expense Yuga Labs was forced to devote to discovery in this case as an argument for reducing the fee award.  Dkt. 435 at 2.  Their argument is nonsensical; for instance, Yuga Labs prevailed on nearly every discovery dispute.  And yet, Defendants state without explaining that Yuga Labs supposedly added "thousands of hours of work" by asking for sanctions to deter Defendants' discovery violations.  *Id.*; *see also infra* Section B.2.  Nor do Defendants cite any authority for their position that the Court can or should make line-item deductions for discovery disputes after a prevailing party in an exceptional case is deemed entitled to a fees award.

Additionally, the Court already evaluated Defendants' arguments on this issue and still found this case to be exceptional, in part because Defendants "unnecessarily complicated these proceedings" through their obstructive tactics notwithstanding "the strength of Yuga's litigating position."  Dkt. 431 at 26.  Thus,

---

[8] *See* Dkts. 226 (ordering in-person meet and confer), 313 (same), 352 (same).

FENWICK & WEST LLP
ATTORNEYS AT LAW

while the Special Master need not re-litigate these discovery issues, Yuga Labs summarily addresses these matters to provide a fuller record of discovery.

### 1. Obtaining Defendants' Compliance in Discovery Was Expensive

The discovery disputes in this case were necessary to obtaining Yuga Labs' resounding victory.  Defendants consistently resisted complying with their discovery obligations, forcing Yuga Labs to seek the Court's assistance in compelling compliance through at least a motion to compel (*see* Dkt. 79 (granting motion to compel)) and a motion for sanctions that the Court converted to a motion to compel once Defendants admitted to concealing key documents they previously claimed were not in their possession (*see* Dkt. 145 (converting to, and granting, motion to compel, taking "a dim view of Defendants' blanket withholding of pre-litigation communications between Ripps and Cahen . . . .")).

### 2. Defendants Employed Tactics Calculated to Make Discovery Burdensome

Defendants also filed inappropriate, meritless *ex parte* discovery applications, requiring Yuga Labs to mobilize additional attorney resources to respond within 24 hours.  *See* Dkt. 144 (withdrawing baseless and procedurally improper *ex parte* motion to compel, since it was filed with no notice); Dkt. 119 (denying *ex parte* application for order shortening time as unduly delayed); *see also* Dkt. 215 (denying *ex parte* application for leave to file sur-reply to motion for summary judgment).

As for depositions, Defendants threatened to take 16 depositions, including every founder of Yuga Labs, its CEO, and members of its board.  Indeed, Defendants took ***twice as many depositions*** as Yuga Labs.  Ball Decl. ¶ 38.  They even issued deposition subpoenas to celebrities Jimmy Fallon and Paris Hilton, which they then used to promote themselves and their scam on their social media.  Ball Decl. ¶ 39.  But, Defendants never had any apparent intent to actually depose

Mr. Fallon or Ms. Hilton.  These subpoenas and the associated expense were characteristically tactical.

During discovery, Yuga Labs also had to prepare its witnesses for inflammatory questions that the Court had already ruled were irrelevant.  *See* Dkt. 87 (denying motion to compel inflammatory materials because request was "moot, irrelevant and not proportionate to the needs of the case").  For example, during a Yuga Labs founder's deposition, Defendants falsely insinuated that he chose his screenname based on a "film which depicts children engaging in sexual acts with adults."  Atalay Deposition (Dkt. 271) at 157:4-160.  In his eagerness to publicly disseminate these baseless accusations, Mr. Cahen violated the protective order by Tweeting that the founder "REFUSES to change his name,"[9] based on the founder's response to a question from the ongoing Highly Confidential — Attorneys' Eyes Only deposition.  *See id*. (showing testimony and break taken 42 minutes prior to Mr. Cahen's Tweet).  And this was not limited to one witness: these "disgraceful and slanderous statements" made their way into every deposition conducted by defense counsel.  Dkt. 431 at 26.  The fact that Defendants were seeking discovery into these disgraceful and slanderous statements after the Court had already held they were irrelevant significantly increased the complication and effort, and hence expense, in preparing these witnesses to testify.  Ball Decl. ¶ 37.

Finally, Defendants have contended that Yuga Labs wrongfully subpoenaed certain witnesses.  Defendants have taken issue with the subpoena to Rodney Ripps, Defendant Ripps' father.  But Defendants listed Rodney Ripps as a relevant witness on Defendants' disclosures and he was a co-owner, with Defendant Ripps, of a company used as an attempt to hide Defendants' ill-gotten profits at issue in this litigation.  Defendants have also complained of the deposition of Ian Garner, an individual relevant to the creation and distribution for their infringing NFTs.  Yuga

---

[9] Ball Decl. Ex. 9 at 2.

Labs rightly questioned the individual who made Defendants' infringing products
and whose salary Defendants argued should be deducted from their scam profits.
And, Yuga Labs deposed Jason Cline, a purchaser of the infringing NFTs who
worked with Defendants to promote their infringement and who was himself
confused as to the source of Defendants' infringing NFTs.  Yuga Labs' deposition
subpoenas all concerned witnesses with evidence supporting its claims; none were
unreasonable to pursue.

### 3. The Few Discovery Rulings in Defendants' Favor Do Not Make Yuga Labs' Attorneys' Fees Unreasonable

Defendants have repeatedly highlighted (and grossly mischaracterized) the
few areas at the margins of discovery in this case where they obtained favorable
results.  This is a distraction.  And a *de minimis* amount of the fees in this case.
Defendants tried, and failed, to argue to Judge Walter this case was not exceptional
in Yuga Labs' favor because of these issues.  They now appear to argue that
although the case was exceptional, Yuga Labs should nonetheless be deprived of its
fees on a line-item basis for individual disputes it did not win in full.  There is no
merit to this argument.  "If a plaintiff ultimately wins on a particular claim, she is
entitled to all attorney's fees reasonably expended in pursuing that claim — even
though she may have suffered some adverse rulings." *Cabrales v. Cnty. of Los
Angeles*, 935 F.2d 1050, 1053 (9th Cir. 1991) (awarding attorneys' fees "even for
the unsuccessful stage" to a plaintiff who ultimately achieved a "complete victory").

When Defendants objected to the Special Master reviewing basic materials
for background in this matter (such as the complaint and the Court's findings of fact
and conclusions of law awarding fees), they provided a number of cherry-picked
docket entries regarding discovery issues in response.  The apparent purpose of
these materials was to, yet again, rehash discovery disputes instead of engaging
with the reasonableness of Yuga Labs' fees and expenses.  Should the Special

Master find it necessary to consider Defendants' discovery submissions, summary context for the orders Defendants reference are as follows:

Order Denying Yuga Labs' Motion for Protective Order (Dkt. 77).  The first two depositions Defendants noticed in this litigation were for the company's co-presidents and co-founders.  Yuga Labs contended that Defendants were required under the apex witness doctrine to first seek discovery through less intrusive means, including a Rule 30(b)(6) deposition.  The Court disagreed, and Yuga Labs promptly produced both witnesses for deposition.  Ball Decl. ¶¶ 35-36.

Order re Defendants' Motion to De-Designate Deposition Testimony (Dkt. 133).  Defendants brought a motion to make public the deposition of their business partner, Ryan Hickman.  But, as the Court observed, "Defendants, not Yuga, designated the documents discussed at Ryan Hickman's deposition as highly confidential ('HC') and attorneys' eyes only ('AEO')."  Yuga Labs designated the deposition HC-AEO as required by the protective order until Defendants re-designated their underlying documents.  Defendants refused to do so, instead bringing a motion.  The Court ordered exactly what Yuga Labs asked from the beginning and ordered "Defendants to reproduce and redesignate the HC/AEO documents discussed at the deposition" before the transcript would be made public.

Order Granting Defendants' Motion to Compel Settlement Materials (Dkt. 159).  After rejecting Yuga Labs' proposal to receive a confidential settlement agreement with Mr. Lehman, Defendants moved to compel both the agreement and settlement communications, arguing that the communications would show that Mr. Lehman was forced to sign a declaration as a condition of settlement (he was not).  The Court granted the motion; the settlement communications did not show what Defendants speculated they would, and Defendants never sought to use them for the remainder of the case.  Ball Decl. ¶ 34.  Here again, had Defendants accepted the pre-motion proposal, they could have avoided unnecessary motion practice and expense.

Yuga Labs was forced to engage in substantial efforts and motion practice to compel Defendants to participate meaningfully in discovery.  There is no reasonable basis for throwing out attorneys' fees spent achieving a victory by parsing out whether fees were warranted for every single discovery dispute.  The Special Master should therefore not consider objections made on this basis.

### C.    Defendants' Claim of Poverty Is False and Irrelevant

Defendants also argued for a reduction in attorneys' fees because they "lack the ability to pay." Dkt. 435 at 8.  This asserted inability to pay is unsubstantiated by any evidence or declaration.  The lack of evidence is unsurprising.  As Yuga Labs' expert observed, Defendants' freeriding off of Yuga Labs' brand gave them notoriety that "may have led, or may lead in the future, to additional revenue streams to enrich Defendants, including other NFT sales."  Dkt. 338 ¶ 70.  Indeed, Defendant Cahen's public statements demonstrate how he has made millions doing just this with cryptocurrencies and NFTs.  Weeks ago, Cahen bragged in a social media post how he gave "a million dollars worth of $pepe [cryptocurrency]" to the creator of the eponymous comic strip character (Ball Decl. Ex. 9 at 3; *see also id.* At 4), made over a million dollars in 17 hours (*id.* at 6), and started a project that is "doing 100s of millions of dollars in swap volume" (*id.*).  At other times while this litigation was pending, Cahen announced that he had "purchased 1.1 million dollars" of $pepe (*id.* at 7, 8); is now "making multiple millions a year doing whatever the fuck I want" (*id.* at 9); and made $120,000 in a single day from cryptocurrency trading (*id.* at 11).

Defendants also paid their counsel millions of dollars to repeatedly re-litigate rejected issues. Dkt. 431 at 26; Ball Decl. Ex. 9 at 13.  Defendants then bragged that they forced Yuga Labs to spend millions to stop their scam.  *See, e.g.*, Ball Decl. Ex. 9 at 1 (Defendant Cahen acknowledging that his litigation tactics caused Yuga Labs $20 million in harm); *id.* at 12 (acknowledging Yuga Labs was spending "10s of millions of dollars" in litigation against Defendants).  It would be inequitable for

FENWICK & WEST LLP
ATTORNEYS AT LAW

Defendants' misconduct to deprive Yuga Labs of fees it spent responding to their tactics and would establish a precedent that undermines the deterrent purpose of awarding fees in exceptional cases.

## IV.   Yuga Labs' Costs Are Reasonable

Yuga Labs, having obtained an exceptional case ruling, is entitled to the costs that it now seeks.  *See* L.R. 54-3.10(a), (g) (copies, printing, and delivery of courtesy copies), 54-3.2 (research fees in connection with service).  Yuga Labs' request for costs is plainly reasonable.  Indeed, Yuga Labs has chosen to forgo certain costs that are routinely awarded, including costs for mediation, hotel stays, trial graphics, and data hosting for discovery.  Ball Decl. ¶ 50.  Especially in light of the significant precedent supporting an award compensating Yuga Labs' voluntary deductions, Yuga Labs' should be awarded all of the remaining costs it now seeks.  *Id.*

While Defendants now attempt to attack the reasonableness of certain costs accrued in securing Yuga Labs' victory, "trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).  And the categories of costs that Yuga Labs seeks are routinely granted by courts in this circuit.  More specifically, Yuga Labs is entitled to copy costs for "physically replicating or reproducing material necessarily obtained for use in the case" such as documents printed to assist in taking or defending a deposition.  L.R. 54-3.10(g); *see also Ahanchian v. Xenon Pictures, Inc.*, No. CV 07-6295-JFW (EX), 2008 WL 11411621, at *3 (C.D. Cal. Dec. 29, 2008) (Walter, J.) ("Properly included in an award of attorneys' fees are costs and fees for paralegals, out-of-pocket expenses, including travel, telephone, mailing, copying and computerized legal research expenses."); *Ambriz v. Arrow Fin. Servs.*, No. CV 07-5423-JFW (SSx) 2008 WL 2095617, at *7 (C.D. Cal. May 15, 2008) (Walter, J.) (same).

Even non-taxable costs are to be awarded to the prevailing party in cases

FENWICK & WEST LLP
ATTORNEYS AT LAW

where a statute provides for an award of attorneys' fees. *See Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010) ("[W]e repeatedly have allowed prevailing plaintiffs to recover non-taxable costs where statutes authorize attorneys' fees awards to prevailing parties."). Yuga Labs is therefore entitled to "reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." *Id.* at 581 (citation omitted); *Wyatt Tech. Corp. v. Malvern Instruments, Incorp.*, No. CV 07-8298, 2010 WL 11404472, at *2 (C.D. Cal. June 17, 2010) (awarding non-taxable costs because the Lanham Act's fee shifting provisions "include recovery of nontaxable expenses if those expenses would normally be charged to the client"); *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484, at *6 (C.D. Cal. Mar. 24, 2015), *aff'd*, 847 F.3d 657 (9th Cir. 2017) ("In addition to regular taxable costs, allowable costs under section 505 include costs for service of process, depositions expenses, copying, computer assisted legal research, expert witness fees, and travel costs.").

## V. Defendants Rightfully Do Not Dispute Yuga Labs' Is Entitled to Its Expert Fees

Defendants did not object to, and therefore conceded, the amount owed for expert depositions. *See* Fed. R. Civ. P. 26(b)(4)(E)(i). Having made the election to depose Yuga Labs' experts, the Federal Rules are clear that they owe Yuga Labs for fees incurred for the experts' preparation and attendance of depositions.[10]

## VI. Defendants' Position on Total Fees Is Patently Unreasonable

Defendants' proposed total award of $455,172.24 is arbitrary and inconsistent with the evidence, for the reasons discussed herein. This amount is ***3.6%*** of the attorneys' fees Yuga Labs actually incurred to litigate this case (and 0% of costs and expert fees). To highlight the absurdity by another measure, the parties and the

---

[10] Yuga Labs is not seeking fees for any other expert work.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Court agreed in this same case that Defendants would pay $120,000 — 50% of the fees requested by Yuga Labs — as reasonable attorneys' fees in connection with Yuga Labs successful anti-SLAPP motion and motion to dismiss.  Dkts. 227 (stipulating to fee award), 228 (accepting parties' compromise).  Defendants now contend that a maximum reasonable award for litigating this *entire case* through trial is less than four times that amount.  In other words, Defendants' proposed fee award is ***less than*** what all parties agree is a reasonable cost for ***two motions to dismiss***. That position is simply not realistic or defensible.

To further illustrate how Defendants $455,172.24 all-inclusive award is not a serious position, Yuga Labs' entire legal team would have had 518 hours[11]  to complete at least the following tasks: (1) Prepare for attend trial; (2) Prepare for and attend 15 depositions; (3) Attend to the entirety of fact and expert discovery and related motion practice; (4) Successfully oppose Defendants' anti-SLAPP motion and Rule 12(b)(6) motion; (5) Successfully oppose Defendants' three *ex parte* applications demanding immediate responses; (6) Successfully draft Yuga Labs' motion for summary judgment and reply briefs and prepare the supporting evidence; (7) Successfully oppose Defendants' motion to stay; (8) Successfully dismiss Defendants' copyright claims; (9) Draft and oppose motions *in limine*; (10) Prepare trial exhibits and respond to Defendants' objections; (11) Draft and oppose pre-trial and post-trial submissions; and (12) Attend to multiple court-ordered, and often in-person meet and confers related to every stage of the litigation.

By the time the parties were six months into the case, when the Court denied Defendants' anti-SLAPP motion and eviscerated their defenses to what should have been straightforward case of infringement, Yuga Labs had already incurred $2.59 million in attorneys' fees (*see* Dkt. 435 at 9) — more than five times Defendants proposed award for the entire litigation.  The writing was on the wall for

---

[11] Applying a blended rate of Yuga Labs' total attorneys' fees divided by total hours billed.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Defendants at that point, and they could have mitigated their exposure by seeking a reasonable resolution of this dispute.  But they repeatedly doubled down on the same lost arguments and multiplied the litigation.

Defendants' proposal is an unrealistic view of any litigation, but it is particularly detached from the reality of this lawsuit considering its significance to Yuga Labs' brand and Defendants' unrelenting efforts to complicate the litigation.

## VII.   Defendants Should Pay the Special Masters' Fees

Yuga Labs offered Defendants a reasonable compromise that accounted for the value of their objections.  Had Defendants accepted that reasonable offer Yuga Labs would not have incurred the additional expense, both in terms of its attorneys' fees and the Special Master's fees, in proving its entitlement to a fee award in excess of its reasonable $7.5 million compromise.  Yuga Labs has not increased its fee request to account for the substantial work that has gone into litigating its entitlement to the fees provided by the Court's findings of fact and conclusions of law, which it is entitled to do.  Ball Decl. ¶ 51.  In lieu of an increased award of attorneys' fees, and given Defendants' unmeritorious positions, it is more than reasonable to order Defendants to pay the full amount of the Special Master's fees.

## CONCLUSION

Based on the foregoing arguments and the record evidence before the Special Master, Yuga Labs respectfully requests an award of $13,202,111.91, consisting of $12,697,150.22 in attorneys' fees, $409,322.69 in costs, $95,639.00 in expert witness fees, and any Special Master fees.

Dated:  December 22, 2023          FENWICK & WEST LLP


By: */s/ Eric Ball*
    Eric Ball
Attorneys for Plaintiff
YUGA LABS, INC.

FENWICK & WEST LLP
ATTORNEYS AT LAW