Hon. Margaret M. Morrow, Ret.
Judicate West
1851 East First Street
Suite 1450
Santa Ana, CA 92705
Tel: (714) 834-1340
Fax: (714) 834-1344

Special Master

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION – Los Angeles

| | |
|---|---|
| YUGA LABS, INC. | Case No.: 2:22-cv-04355-JFW-JEMx |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION OF SPECIAL MASTER REGARDING REQUEST OF YUGA LABS, INC FOR ATTORNEYS' FEES AND COSTS** |
| RYDER RIPPS; JEREMY CAHEN | |
| Defendant. | |

On December 6, 2023, the Honorable John F. Walter appointed the undersigned as special master to resolve remaining objections to the request for attorneys' fees and costs made by plaintiff Yuga Labs, Inc.  The special master has reviewed the Joint Statement submitted to the court (Docket No. 435), various pleadings and orders filed in the action to which one of the parties directed her attention, and the additional materials submitted by both parties in response to the Order Re Record Before the Special Master on Motion for Attorneys' Fees filed by Plaintiff Yuga Labs, Inc. (Docket Nos. 442, 443 and 444).  Based on her review of these materials, the special master submits this report and recommendation to the court.

**DISCUSSION**

A.      **Standard Governing Awards of Attorneys' Fees**

The starting point in assessing a request for attorneys' fees is determining "the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate." *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993). "This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). See also *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013) ("[T]o determine whether attorneys for the prevailing party could have reasonably billed the hours they claim to their private clients, the district court should begin with the billing records the prevailing party has submitted"). However, "a district court should exclude from the lodestar amount hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" *Van Gerwen v. Guarantee Mut. Life Co.,* 214 F.3d 1041, 1045 (9th Cir. 2000). Normally, courts will conduct an "hour-by-hour analysis of the fee request, and exclude those hours for which it would be unreasonable to compensate the prevailing party." *Gonzalez*, 729 F.3d at 1202. A court "faced with a massive fee application," however, "has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application." *Gates v. Deukmejian,* 987 F.2d 1392, 1399 (9th Cir. 1992) (internal quotation marks omitted). A court that exercises its discretion to reduce the lodestar amount by an across-the-board percentage reduction must explain its reasons for doing so. *Gonzalez*, 729 F.3d at 1202. "Nevertheless, the district court can impose a small reduction, no greater than 10 percent – a 'haircut' – based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

To determine the reasonableness of the rates charged, the court looks "to the prevailing market rates in the relevant community. . . .'" *Van Skike v. Dir ., Office of Workers' Comp. Programs*, 557 F.3d 1041, 1046 (9th Cir. 2009) (quoting *Blum v. Stenson*, 465 U.S. 886, 895

(1984)).  "Generally, the relevant community" for the purpose of determining the prevailing

market rate "is the forum in which the district court sits."  *Barjon v. Dalton*, 132 F.3d 496, 500

(9th Cir. 1997).  "[T]he proper scope of comparison . . . extends to all attorneys in the relevant

community engaged in equally complex Federal litigation, no matter the subject matter."

*Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (internal quotation

marks omitted).  Stated differently, courts determine the reasonableness of a rate based upon

"the rates prevailing in that district for similar services by lawyers of reasonably comparable

skill, experience and reputation," irrespective of practice area.  *Id.* (quoting *Blum*, 465 U.S. at

895 n. 11).

A billing rate that is the usual rate an attorney charges for his or her services is evidence

that the rate approximates the market rate.  *Moore v. James H. Matthews & Co*, 682 F.2d 830,

840 (9th Cir. 1982).  Evidence of an attorney's normal billing rate is not necessarily dispositive,

however.  Other evidence of the rates prevailing in the community – such as rates approved for

counsel in other cases and compilations/surveys of rates conducted by third parties – can be

satisfactory evidence that the rates charged are reasonable.[1]  See, e.g., *Stetson v. W. Publ'g*

*Corp.*, No. 16-56313, 714 Fed. Appx. 681, 683 (9th Cir.  2017) (Unpub. Disp.) (noting that use of

the Real Rate Report may be appropriate if supported by findings that the report reflects

contemporaneous rates); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407

(9th Cir. 1990) ("rate determinations in other cases, particularly those setting a rate for the

plaintiffs' attorney, are satisfactory evidence of the prevailing market rate"); *Cottle v. Plaid Inc.*,

No. 20-CV-03056-DMR, 2022 WL 2829882, *10 (N.D. Cal. July 20, 2022) (accepting evidence

that firms' current billing rates had been approved and paid in other cases as an indication that

they were consistent with prevailing rates in the district); *Eksouzian v. Albanese*, No. CV 13-

---

[1] Frequently, counsel submit the declarations of attorneys in the community concerning prevailing rates in their area.  Yuga Labs did not proffer this type of evidence.  Lead attorney Eric Bell submitted a declaration stating that he is familiar with the rates charged by trademark practitioners and peer firms in the Central District.  He opined, with respect to each of the timekeepers who worked on the file, that their rates fall below market for peer firms in the Los Angeles region.  While the court is permitted to rely on the declaration of plaintiff's attorney, the lack of specificity Bell provides causes the special master to place only minimal reliance on his opinion.

728-PSG-AJWx, 2015 WL 12765585, *3 (C.D. Cal. Oct. 23, 2015) (noting that the Real Rate Report can be a good barometer of reasonable rates in the Central District and citing *Hicks v. Toys 'R' Us-Delaware, Inc.*, No. CV13-1302-DSF-JCGx, 2014 WL 4670896, *1 (C.D. Cal. Sept. 2, 2014) as support).

B.    **Yuga Labs' Fee Request**

At the time it provided defendants with copies of its fees and costs prior to meeting and conferring and submitting a Joint Statement to the court, Yuga Labs reported that its fees were $12,697,150.22.  (See Joint Statement at i.)  Despite this fact, it requested an award of only $7,500,000.  (*Id.*)  It cautioned, however, that it reserved the right to seek all fees, costs and expenses "if Defendants' refusal to negotiate in good faith requires the appointment of a special master" (*id.* at 6 n. 4).  In a subsequent submission invited by the special master, Yuga Labs stated that the $7,500,000 number credited in full all of the objections defendants had asserted in their portion of the Joint Statement.  It now asserts that because defendants "refused to deviate from their unreasonable positions," it seeks to recover the full fees and expenses it incurred in the litigation: $12,697,150.22 in attorneys' fees, $409,322.69 in costs, $95,639.00 in expert witness fees, and any special master fees.  (Plaintiff Yuga Labs, Inc.'s Submission to the Special Master Re Attorneys' Fees And Costs (Docket No. 444) at 26.)

C.    **Whether the Rates Charged by Yuga Labs' Attorneys Are Reasonable**

In calculating the presumptive lodestar, the special master first examines whether the rates charged by Fenwick & West ("Fenwick") are reasonable.[2]  As noted, this question must be answered with reference to the rates charged by attorneys of comparable skill, experience and reputation in Los Angeles within the Central District.

The billing rates for the Fenwick timekeepers working on this matter are

---

[2] Yuga Labs contends that defendants waived any right to contest the reasonableness of its lawyers' rates because they did not challenge the rates during the meet and confer process.  While defendants' failure to object could be viewed as a waiver, the court has an independent duty to examine the reasonableness of any fee award.  *Gordon v. Ascentive, LLC*, No. CV-05-5079-FVS, 2008 WL 11335120, *2 (E.D. Wash. Sept. 23, 2008) ("Although Plaintiff's failure to object may be construed as a waiver of any objection to the actual amount awarded, the Court has an independent duty to assess the reasonableness of any award of fees").

**2022**

| Timekeeper | Rate | Title | Years of Experience |
|---|---|---|---|
| Ball, Eric | $1,290.00 | Partner | 17+ years |
| Melcher, Molly | $1,240.00 | Partner | 13 years |
| Culp, Kimberly | $1,135.00 | Counsel | 17+ years |
| Fares, Tony | $1,030.00 | Associate | 6 years |
| Thomas, Ethan M. | $1,030.00 | Associate | 6 years |
| Kwock, Ryan | $780.00 | Associate | 3 years |
| Hauh, Katie M. | $640.00 | Associate | 1 year |
| Andreyeva, Sofiya | $640.00 | Law Clerk[3] | 1 year |
| Ra, Jeremy Y. | $515.00 | Paralegal | 10 years |

**2023**

| Timekeeper | Rate | Title | Years of Experience |
|---|---|---|---|
| Ball, Eric | $1,410.00 | | |
| Melcher, Molly | $1,355.00 | | |
| Gregorian, Todd | $1,375.00 | Partner | 20 years |
| Culp, Kimberly | $1,240.00 | | |
| Fares, Tony | $1,185.00 | | |
| Thomas, Ethan M. | $1,185.00 | | |
| Sims, Mary Griffin | $1,125.00 | Associate | 5 years |
| Kwock, Ryan | $950.00 | | |
| Hauh, Katie M. | $710.00 | | |
| Kalinowski, Zack A. | $710.00 | | |
| Andreyeva, Sofiya | $710.00 | | |
| Ra, Jeremy Y. | $610.00 | | |

---

[3] Ball reports that "Ms. Andreyeva passed the New York bar exam in October of 2022 and her title of law clerk is a reflection only of the arduous nature of the New York bar admission process." (Declaration of Eric Ball in Support of Submission to Special Master re Attorneys' Fees and Costs ("Ball Decl."), ¶ 15.)

Alexander, Keysha          $610.00          Paralegal          23 years

In support of its assertion that these rates are reasonable, Yuga Labs cites cases from this district and other federal courts in California. See, e.g., *Joseph S. v. Kijakazi*, No. 20-cv-09138-DFM, 2023 WL 2628243, *2 (C.D. Cal. Jan. 23, 2023) ("The Court's own research, as well as Plaintiff's counsel's own recent fee awards, suggest that an effective attorney hourly rate in the range of $1,300-$1,600 is appropriate"); *Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2022 WL 2789496, *9 (N.D. Cal. July 15, 2022) (noting that plaintiffs' counsel's hourly rates ranged from $760 to $1,325 for partners, $895 to $1,150 for counsel, and $175 to $520 for associates, and finding these "rates in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation"); *AECOM Energy & Constr., Inc. v. Topolewski*, No. CV17-5398-RSWL-AGRx, 2022 WL 1469501, *4 (C.D. Cal. May 9, 2022), (finding hourly rates ranging from $1,116 for the lead partner to $550 for a first year associate reasonable), aff'd sub nom. *URS Holdings, Inc. v. Topolewski*, No. 22-55546, 2023 WL 6058825 (9th Cir. Sept. 18, 2023) (Unpub. Disp.).

Other cases similarly support the conclusion that rates generally in the range charged by Fenwick are reasonable. See, e.g., See *Univ. Elecs., Inc. v. Univ. Remote Control, Inc.*, 130 F.Supp.3d 1331, 1337 (C.D. Cal. 2015) (noting that intellectual property partners at major law firms billed in the range of $600 to $1,100 per hour in 2015); *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB-SHx, 2015 WL 1746484, *19-20 (C.D. Cal. Mar. 24, 2015) (noting that attorney rates ranging from $390 to $1,002.96 per hour and paralegal rates between $240 and $345 per hour were reasonable for the Los Angeles area in 2015).

Defendants dispute that the rates are reasonable,[4] citing the Real Rate Report and two Central District cases, *MetaQuotes Ltd. v. MetaQuotes Software Corp.*, No. 8:22-CV-00462-SB-DFMx, 2023 WL 6194276, *3 (C.D. Cal. Aug. 4, 2023) (trademark case in which the court found that hourly rates of $700 and $625 for two partners and $450 and $550 for two associates

---

[4] In his declaration, Eric Ball reports that during the meet and confer prior to submission of the Joint Statement, defendants indicated they did not object to the reasonableness of Fenwick's rates. (Ball Decl., ¶ 22.)

were reasonable); *AK Futures, LLC v. LCF Labs, Inc*., No. 8:21-cv-02121-JVS-ADSx, 2023 WL 2561729, *4 (C.D. Cal. Feb. 2, 2023) (finding hourly rates of $350 for two partners with twelve and thirty-five years of experience reasonable "[b]ased on [the] Court's knowledge of the prevailing rates in the community and . . . similar matters involving copyright and trademark infringement. . ."). Admittedly, the rates charged by counsel in these cases are significantly lower than Fenwick's rates here. While the rates at issue in *MetaQuotes* were charged by Pillsbury, Winthrop, Shaw, Pittman, a large, international law firm generally comparable to Fenwick, the case was before the court on a default judgment, which may have affected the rates sought; additionally, the opinion provides little information about the credentials or experience of the timekeepers. The plaintiff in *AK Futures* was represented by lawyers from Booth LLP, which appears to be a smaller firm whose practice is distinct from Fenwick's.

Defendants also rely on the 2022 Real Rate Report. As noted, several courts in the Central District have found the Real Rate Report a useful tool in evaluating claimed rates. Defendants note that the median rate for a partner in Los Angeles cited in the 2022 report is $725, while the median rate for a lawyer with 7 or more years of experience is $550. They also cite the fact that the median rate for paralegals nationally is $225.

The special master notes that the Real Rate Report reflects that the third quartile rate for partners in Los Angeles is $1045. While this means that 75% of the rates reported were under this amount, it also means that 25% of the rates were above $1045. The special master cannot say that Fenwick's rates for partners ($1240-$1290 for 2022) are significantly out of line with the higher end rates reflected in the Real Rate Report. This is particularly true given that the firm has been highly ranked by Chambers and the Legal 500 in the Fintech Legal and Blockchain and Cryptocurrencies practice areas; that Eric Ball is the Chair of Fenwick's Trademark Litigation Practice Group and has been recognized on multiple occasions by numerous legal organizations as a leading trademark litigator; and that Molly Melcher has significant experience litigating complex commercial cases, including experience handling

intellectual property litigation for emerging and high technology companies.[5]  Additionally, as previously noted, courts in the Central District have approved rates in the general range of the rates billed by Fenwick.[6]

Defendants' concerns regarding the rates charged for Tony Fares and Ethan Thomas, and paralegals Ra and Alexander have more merit in the special master's view.  The rates charged for Fares and Thomas, both five to six year lawyers, are within $100 to $200 of the rates charged for lawyers on the team who have significantly more experience.[7]  In 2022, their rates were approximately $200 under the billing rate for Eric Ball, the lead lawyer on the case, who has more than seventeen years of experience.  They were within $100 of the rate charged for Kimberly Culp, also a lawyer with more than seventeen years' experience.  The Real Rate Report reflects a median billing rate of $688 for lawyers with three to fewer than seven years of experience.  The third quartile rate reported for such lawyers is $838.

Ball states that the Thompson Reuters Financial Insights platform calculated a mean billing rate in 2023 of $1,207.00 per hour for partners and $828.00 for associates in the Los Angeles legal market, while the National Law Journal Billing Survey for 2017 reported comparable rates at other large firms.[8]  Ball notes that five to six years later, the listed rates will have significantly increased.[9]  This could indicate that a $1,000 plus rate for a five to six year associate is reasonable.  Indeed, the billing rate for Henry Nikogosyan, a four-year lawyer representing defendants, was $1060 as of April 2023. (See Docket No. 220-4.)  As a result, the special master concludes, based on all the data in the record, that Fares' and Thomas' rates are

---

[5] See Ball Decl., ¶¶ 6, 7.  Todd Gregorian, also a partner, is similarly well-credentialed.  (See *id.*, ¶ 8.)  Yuga Labs is not seeking fees for Gregorian's work with the appellate team assigned to the case, but does seek compensation for the time he spent preparing key witnesses to testify and advising the trial team on the preservation of issues in the event defendants ultimately appeal.  *Id.*

[6] Given her years in practice, the special master reaches the same conclusion regarding the rate charged for counsel Kimberly Culp.

[7] The same is true of Mary Griffin Sims' rate.  Sims is a five year lawyer, who was billed at $1,125 in 2023.

[8] The rates noted in the NLJ survey are: Cooley LLP ($1,100 average rate for partners, $850-$1065 for counsel, and $595-$835 for associates); Kirkland and Ellis ($1,115-$1,410 for partners, up to $955 for associates); Jones Day ($700-$1,050 for partners, $850 for one counsel, and $300-$800 for associates); and King & Spalding LLP ($775-$1,435 for partners and $525-$790 for associates).

[9] Ball Decl., ¶¶ 24c, 24d.

within the range of rates that were being charged by comparable firms in 2022-2023 for lawyers with comparable experience. Indeed, the general literature available on the subject of billing rates at "big law" firms suggests this is true.[10]

The special master concludes otherwise with respect to the rates charged for paralegals Ra and Alexander. Although both have significant experience (10 and 23 years respectively), and although Ball states in conclusory fashion that their billing rates "fall below market for peer firms in the Los Angeles region,"[11] the burden is on the party seeking fees to show that the requested rates are in line with those prevailing in the community. *Jordan v. Multnomah County*, 815 F.2d 1258, 1263 (9th Cir. 1987) ("The fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation"). "If a party seeking fees fails to meet its burden in establishing the reasonableness of its requested rate[s], 'the court may exercise its discretion to determine reasonable hourly rates based on its experience and knowledge of prevailing rates in the community.'" *Magbanua v. Evans*, No. 8:19-01144-JLS-ADSx, 2021 WL 4706993, *2 (C.D. Cal. May 21, 2021).

Here, Yuga Labs fails to provide sufficient evidence that the rates requested for Ra and Alexander reflect the prevailing rate in the relevant legal community. Indeed, the paralegal rates reported in the cases Yuga Labs cites are generally in the $300 to $350 per hour range. See, e.g., *AECOM Energy & Constr., Inc.*, 2022 WL 1469501 at *4 (reflecting a $396 rate for a senior paralegal); *Fleming*, 2022 WL 2789496 at *9 (citing *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, *5 (N.D. Cal. March 17, 2017) as "finding rates ranging from . . . $80 to $490 for paralegals . . .

---

[10] See, e.g., ABA Journal, "Nearly $1,000 an hour is rate for second-year associates at these BigLaw firms," Apr. 3, 2023 (reporting that second-year associates were being billed at $995 an hour by Paul, Weiss, Rifkind, Wharton & Garrison and at $960 an hour by Sullivan & Cromwell, and stating that "[o]ther BigLaw firms billed $1,000 an hour for associates" with three to five years' experience, including Latham & Watkins and Kirkland & Ellis.

[11] Ball Decl., ¶ 17.

9

reasonable").  *In re Personalweb Techs., LLC Pat. Litig.*, Case No. 18-md-02834-BLF, Case No.: 5:18-cv-00767-BLF, Case No.: 5:18-cv-05619-BLF, 2021 WL 796356, *15 (N.D. Cal. March 2, 2021) (reflecting rates for Fenwick paralegals of $342.16 and $344.74); see also *Perfect 10, Inc.*, 2015 WL 1746484 at *20 (noting that paralegal rates between $240 and $345 per hour were reasonable for the Los Angeles area).  Because Yuga Labs did not meet its burden of demonstrating that paralegal rates of $515 and $610 are reasonable, the special master recommends that the court exercise its discretion to determine that a 2022 rate of $450 and a 2023 rate of $500 are reasonable for Ra and Alexander.  The special master recommends these amounts based on the years of experience each has, and on the reality that rates for timekeepers at all levels are increased on an annual basis, thus warranting something above the rates reflected in the cases cited.[12]

    With this modification in paralegal rates, the special master recommends that the court find the rates Yuga Labs seeks to be reasonable.

        **D.    Whether the Hours Recorded by Yuga Labs' Attorneys Are Reasonable**

    Yuga Labs contends that the hours recorded by its attorneys were reasonable because of defendants' litigation tactics, i.e., the fact that they repeatedly advanced in discovery responses and motion practice legal theories that had already been rejected by the court in multiple orders; the fact that they prolonged depositions by questioning witnesses about these theories even after the court had ruled against them; the fact that they repeatedly refused to meet and confer and compromise issues in good faith; the fact that they took unreasonable settlement positions throughout the litigation; and the fact that they used documents and developments in this litigation to attract hits and followers on social media.  Given their litigation conduct, Yuga Labs contends, defendants cannot now be heard to complain about the magnitude of Yuga Labs request for fees.[13]

---

[12] While the third quartile national paralegal rate reported in the Real Rate Report is only $325, this encompasses rates in smaller communities throughout the country as well as rates in large metropolitan jurisdictions like Los Angeles, San Francisco, New York and Chicago.

[13] As further evidence of the reasonableness of its request, Yuga Labs notes that it is not seeking fees for attorneys who were not part of the "core" trial team, for the time of Yuga Labs' in-house counsel, and

Defendants, for their part, assert that Fenwick drastically inflated its bills through duplicative billing, block billing, and charging for unnecessary travel time. They also contend that Yuga Labs' fee request is unreasonable because it is disproportionate to the result obtained in the case and that it is excessive given the equities in the case, i.e., the fact that they are two individuals who purportedly lack the resources to pay a fee award of the magnitude Yuga Labs seeks. They also make specific objections to aspects of Yuga Labs' litigation of the case: the fact that Fenwick billed more than 6,000 hours for tasks associated with the half-day trial (including trial preparation, pretrial motions, attending trial and post-trial filings); the fact that Yuga Labs dropped its false advertising claim in the weeks before trial, after it had spent substantial time preparing jury instructions and a verdict form, undertaken expert witness preparation, and caused its expert to prepare and file an amended report increasing claimed damages by more than 400 fold; the fact that Yuga Labs took unreasonable positions in settlement negotiations; the fact that nine Fenwick attorneys recorded more than 1,000 hours preparing a 22-page motion for summary judgment; the fact that Fenwick billed more than 1,300 hours preparing for and taking 15 depositions, amounting to some 85 hours per deposition; the fact that Yuga Labs seeks reimbursement for 3,300 hours expended on written discovery; the fact that Fenwick spent hundreds of hours bringing motions to compel, motions for sanctions, a motion for a protective order and other discovery motions, many of which were unsuccessful; and the fact that Yuga Labs seeks fees for the preparation and service of facially irrelevant subpoenas and the taking of unnecessary depositions. The special master considers the parties' arguments in turn.

### 1. Whether Defendants' Litigation Tactics Unnecessarily Multiplied Proceedings and Increased the Fees Yuga Labs Had to Pay

As the court noted in its October 25, 2023 Findings of Fact and Conclusions of Law, "[d]efendants' repeated attempts to re-litigate issues already addressed and rejected by the Court

---

for certain time entries that were not focused on the core issues in the case. It also notes that Fenwick took numerous write-offs and provided Yuga Labs with discounts of between 12.5% and 17.5% at various times during the case. (Ball Decl., ¶¶ 18, 19, 32, 37.) Finally, Yuga Labs does not seek fees for the work done to demonstrate its entitlement to fees and costs. (*Id.*, ¶ 51.)

unnecessarily complicated this litigation. . . ." (Docket 431 at 26.)  Based on this finding, the special master agrees with Yuga Labs that defendants' litigation strategy unnecessarily increased the fees that were incurred litigating the case.  As the court also found, so too did the fact that defendants repeatedly raised allegations of Nazism and racism during discovery and in court proceedings, requiring that Yuga Labs spend time preparing its witnesses to respond to such claims and consuming unnecessary time at depositions and trial.  Defendants may well have viewed these strategies as integral to their defense; that was a clear choice they made, however, and one for which they must now pay.  Similarly, defendants' use of social media to publicize or disseminate information related to the litigation, including confidential, attorneys' eyes only information, increased the cost of prosecuting this case and protecting Yuga Labs' brand.[14]  The special master, therefore, is not persuaded by defendants' citation of cases in which courts approved five- or six-figure fee awards in trademark cases where damages in the range of $1 million were awarded and an injunction was entered.[15]

## 2.   Whether Fenwick Engaged in Impermissible Block Billing

The special master also finds unavailing defendants' arguments regarding block billing.  For the most part, individual billing entries that aggregated tasks contained parentheticals following each discrete task indicating the amount of time that was devoted to that task.  While there are a handful of entries called out by defendants where this practice was not followed (10 or 11 of 1,908 entries), those entries had a negligible effect on overall fees.  Block billing, therefore, does not provide a basis for reducing the fee award.

---

[14] Both parties fault their opponent's conduct in connection with settlement negotiations.  Given the nature of the dispute, this was likely a case that would have been difficult, if not impossible, to resolve.  As a consequence, in evaluating what fees were reasonable in this case, the special master does not attach great significance to the parties' settlement/mediation positions.

[15] See *Blumenthal Distrib., Inc. v. Comoch Inc.*, No.: 5:21-cv-00829-FWS-SHK, 2023 WL 2356713, *10 (C.D. Cal. Jan. 24, 2023) (awarding $28,541.46 in attorneys' fees in a default judgment case where disgorgement of $1,247,072 was ordered); *MetaQuotes Ltd.*, 2023 WL 6194276 at *4, (awarding $384,352.25 in attorneys' fees where the court awarded $836,704.75 in treble profits and actual damages).

### 3.  Whether Fenwick Engaged in Unnecessary Travel

Defendants also contend that Fenwick billed 166.2 hours in unnecessary travel time. They assert that they repeatedly asked Fenwick to agree to remote depositions, requests Fenwick refused.  The issue of remote vs. in person hearings and depositions is one about which many lawyers feel strongly.  The special master believes that Fenwick was entitled to resolve that question on a proceeding-by-proceeding basis as it saw fit, and that Yuga Labs is not required to accept a reduction in the fee award based on the choice its lawyers made.  It is the special master's understanding, moreover, that there were some occasions when the court ordered in-person meet and confers; certainly, on these occasions, Fenwick had little choice but to travel as required.

The special master notes, however, that multiple lawyers often traveled to attend court hearings, depositions and/or witness preparation sessions.  As examples of this, there were a minimum of three lawyers attending defendants' depositions in Los Angeles last January. There were four lawyers at the pretrial conference on June 9, 2023, at least three at the final pretrial conference on July 26, and six at trial on July 31, 2023.  Two lawyers traveled to attend two different mediations as well.  This kind of duplication occurs frequently when large litigation teams are handling a case.  It increases fees not only due to the billing of travel time when counsel are not from Los Angeles, but generally increases fees for time spent at hearings, in depositions and at other case-related proceedings.  As a result, it warrants some reduction in the overall fees awarded.

### 4.  Whether Fenwick's Time Records Reflect Duplicative Billing

The main culprit that inflated Yuga Labs' fees in this case was duplicative billing.  Yuga Labs submitted an Excel spreadsheet comprising Fenwick's billing records in this case.  In connection with specific objections to the fee request that the special master invited defendants to file, they submitted an Excel spreadsheet that contains separate tabs in which they grouped entries they contend reflect duplicative billing, block billing, and unnecessary travel time. Defendants also submitted a summary sheet containing their calculations as to the total number of hours and total fees associated with particular litigation activities, e.g., the motion for

summary judgment, other motion practice, depositions, expert discovery, other discovery, and trial, including pre- and post-trial filings.  The special master has reviewed Yuga Labs' billing records, and considered the spreadsheets submitted by defendants.  She concludes that the billing records reflect significant duplicative billing throughout the life of the case.

The Excel spreadsheet comprising Fenwick's billing records runs 265 pages; there are 2,274 entries on defendants' duplicative billings spreadsheet alone.  As a consequence, it is not possible for the special master to catalogue all of the duplicative entries she observed.  Suffice it to say that multiple entries in the billing records reflect multiple attorneys "preparing for" and attending "team meetings."  In some cases, these are described as "weekly team meetings," suggesting that the sessions may have occurred on a weekly basis throughout the pendency of the case.  Virtually all of the eleven lawyers for whom fees are sought attended some of these meetings; many attended the vast majority of them.  Other entries reflect additional internal meetings on multiple occasions to address specific issues – "case management, scheduling issues, strategy calls"; social media preservation"; "motion for summary judgment"; "opposition to motion to stay" and "potential stay motion"; "trial prep"; "strategy"; and "litigation strategy."  There are similar entries reflecting multiple "calls" to discuss specific issues.

In addition, there are numerous entries in which lawyers recorded time for "[r]esearch[ing] and assess[ing] factual developments," "[r]eview[ing] and analyz[ing] documents in preparation for trial," "[r]eview[ing] and analyz[ing] documents in support of case," "[r]eview[ing] and analyz[ing] documents in support of claim," "[r]eview[ing] and analyz[ing]documents in support of litigation," or "[r]eview[ing] and analyz[ing] documents related to litigation."  Similarly, there are a multitude of entries in which lawyers billed for "[r]eview[ing] and analyz[ing] evidence at issue," "[r]eview[ing] and analyz[ing] evidence in support of case," "review[ing], organiz[ing], and analyz[ing] evidence at issue," or "[r]eview[ing] and analyz[ing] evidence in support of legal claims."[16]  As defendants note,

_____

[16] Many of these time charges were recorded by six-year lawyers on the case.

Katie Hauh spent 64.8 hours reviewing and analyzing chat messages in defendants' initial document production.  Other entries reflect thousands of dollars of time charges for "[r]eview[ing] and analyz[ing]" tweets or Twitter accounts at issue.  These entries alone totaled more than 280 hours.[17]

There is also a large group of entries in which lawyers recorded time for "strategiz[ing] re discovery." "strategiz[ing] re evidence collection," "strategiz[ing] re evidence in support of claims," "strategiz[ing] re legal claims," "strategiz[ing] re fact gathering and discovery," "strategiz[ing] re ongoing evidence collection in support of litigation," "strategiz[ing] re litigation evidence," "strategiz[ing] re preparation for trial," and "strategiz[ing] re post-trial filings."  The total for these entries was 239.6 hours.  Moreover, this does not capture all the time spent "strategizing" regarding a myriad of other topics.  In total, had the time spent "analyzing and reviewing" documents and evidence, "assessing" factual developments, and "strategizing" been devoted by a single attorney billing 2,000 hours a year, that attorney would have been engaged in these activities full time for 4.34 months.

A review of the billing records reveals an apparent pattern in which more junior Fenwick attorneys, up to and including counsel Kimberly Culp, a 17+ year lawyer, drafted deposition and cross-examination outlines for various witnesses.  Multiple lawyers worked on the same outline, often spending in excess of 30 hours on one outline.  In addition to preparing the deposition outlines, timekeepers spent many more hours collecting and analyzing exhibits for individual depositions, "preparing" for the depositions, and conferring with each other regarding them.  In some cases, a "summary of objectives" for a particular deposition was prepared; following the deposition, timekeepers "read and took notes" on the deposition or conducted "follow-up."  While the special master did not attempt to verify the total hours

---

[17] The entries are more suspect because their vague nature makes it difficult to determine precisely what the attorney was doing during the time block represented by the entry.  See, e.g., *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 7640, 2020 WL 5371404, *7 (N.D. Cal. Sept. 8, 2020) ("Work entries are inadequately vague when the district court is unable to discern how the time spent is attributable to the case at hand,"  citing *Center for Food Safety v. Vilsack*, No. C–08–00484-JSW-EDL, 2011 WL 6259891, *8 (N.D. Cal. Oct. 13, 2011)).

defendants attribute to preparation for and attendance at specific depositions,[18] her review of the billing records reflecting the preparation of outlines and collection of exhibits for various depositions, and internal conferences regarding the depositions, supports defendants' assertion that inordinate time was spent preparing for and taking each deposition.[19]

It also appears that outlines were prepared before pleadings were drafted.  More than 28 hours were spent preparing an outline for Yuga Labs' opposition to defendants' motion to strike and dismiss; additional hours were spent drafting the opposition itself.  Similarly, draft talking points were prepared for various hearings and/or meet and confers.[20]  There are multiple entries for time expended drafting a weekly subpoena update as well.

Multiple lawyers from senior partners to associates drafted, reviewed and revised the same pleading.  Defendants contend that nine timekeepers spent more than 1,000 hours working on the memorandum of points and authorities filed in support of Yuga Labs' motion for summary judgment.  It may well be that a thousand hours were spent on the motion as a whole when time spent drafting the statement of undisputed facts and declarations and selecting exhibits to include with the motion is considered.  The special master confirmed that nine timekeepers – seven attorneys and two paralegals – worked on the memorandum of points and authorities.  The drafting of that 22-page brief consumed almost 73 hours; in addition, there were time charges for creation of a "proof chart," a "summary judgment planning meeting," other internal meetings regarding the motion, and a review of "exemplar dockets regarding motions for summary judgment."

Defendants contend that Fenwick billed more than 6,000 hours (at a cost of almost $5.5 million in fees) on tasks associated with the trial in this matter.  They include in these numbers

---

[18] See Defendants' Specific Objections to Yuga Labs, Inc.'s Request for Reasonable Fees and Costs ("Objections") at 14-15.

[19] Defendants contend that Fenwick recorded 1,300 hours (and $1,141,007.29 in fees) related to the 15 depositions taken in this case.  They assert this amounts to 85 hours per deposition, far in excess of what courts have found to be reasonable.  See, e.g., *Amusement Art, LLC v. Life is Beautiful, LLC*, No. 2:14-cv-08290-DDP-JPR, 2017 WL 2259672, *7 (C.D. Cal. May 23, 2017) (cutting 26.2 hours of 46.2 hours billed for a single deposition).

[20] Talking points for the motion to dismiss hearing, the pretrial conference and pretrial conference meet and confer, motions in limine 3 and 5, and two other meet and confers are reflected in the billing entries.

pretrial motions and other filings, preparation for trial, the trial itself, and post-trial filings.  The special master has not verified defendants' calculations but has noted that the same duplication that is evident during earlier phases of the litigation appears to have continued through the pretrial, trial and post-trial periods.  As one example, at least eight attorneys drafted, reviewed, and revised Yuga Labs' proposed findings of fact and conclusions of law; two paralegals also worked on the document.  There were also multiple conferences regarding the pleading.  The same is true of Yuga Labs' objections to defendants' proposed findings of fact and conclusions of law; at least seven attorneys and one paralegal worked on this pleading, drafting, reviewing, and revising it before it was filed.  There were internal meetings to discuss the objections, and entries for "incorporating team edits" into the document.[21]

In sum, the manner in which the case was staffed and tasks were assigned resulted in significant duplication of effort throughout the life of the case.[22]

### 5.  Special Master's Conclusion Regarding Reasonable Fees

The Supreme Court has instructed that "the determination of fees 'should not result in a second major litigation.'"  *Fox v. Vice*, 563 U.S. 826, 838 (2011) (quoting *Hensley*, 461 U.S. at 437).  Thus, "trial courts need not, and indeed should not, become green-eyeshade accountants.  The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."  *Fox*, 563 U.S. at 838.  Having reviewed, at the parties' request, many of the key orders in the case, and having perused the docket, and noted the number and complexity of the docket entries, the special master believes she has a good "overall sense of [the] suit" (*id.*) such

---

[21] Defendants challenge the fact that Yuga Labs' attorneys spent time drafting jury instructions and a verdict form and working with one of their experts to produce an amended expert report approximately a month before trial, only to withdraw its request for a jury trial and its claim for false advertising.  Expert Lauren Kindler's amended report was filed on June 8, 2023.  The next day, on June 9, 2023, the court held a pretrial conference in which it strongly urged Yuga Labs to consider abandoning its false advertising claim.  Yuga Labs wisely heeded the court's comments and withdrew both its false advertising claim and request for a jury trial three days later.  Its lawyers cannot be faulted for working on jury instructions, a verdict form and an amended expert report at a time when they intended to proceed to jury trial and assert a false advertising claim; nor can they be faulted for acceding to the court's later-expressed views on the matter.

[22] Defendants advance additional arguments regarding specific motions and depositions, and what they call "harassment subpoenas."  Because, as noted below, the special master concludes that a percentage reduction is appropriate, she does not address these various objections.

17

that she can recommend an appropriate award. Given the volume of billing entries that have been presented for review, she utilizes the across-the-board percentage cut approach approved in *Deukmejian*, 987 F.2d 1399.

As noted, the number of attorneys assigned to the case resulted in significant time spent on internal conferences and telephone calls and significant duplication of effort on individual tasks. It also resulted in a significant amount of duplicative billing, only some of which is referenced in this report and recommendation. Many of the descriptions found in the time records are so vague that it is difficult to discern what tasks were being performed or how they advanced the case. As a consequence, the special master recommends that the court reduce the requested fees of $12,697,150.22 by 45%, or $5,713,717.60. This results in a recommended fee award of $6,983,432.62. Encompassed within this number are fee reductions resulting from the special master's recommended lower billing rates for paralegals Jeremy Ra and Keysha Alexander; these total $23,124.81. Also taken into account are the minor instances of block billing observed and the unnecessary travel time recorded for multiple attorneys to attend proceedings and meetings.

The Supreme Court has directed that the district court "make clear that it has considered the relationship between the amount of the fee awarded and the results obtained." *Hensley*, 461 U.S. at 437. Defendants contend that a fee award of this size is disproportionate to the success Yuga Labs had in this litigation. They assert that a fee award of $6,983,432.62 is almost five times greater than the disgorgement and statutory damages of $1,575,362.92 awarded by the court. Yuga Labs counters that the injunction entered by the court was by far and away the most valuable remedy obtained because it allows Yuga Labs to take control of the means by which defendants have harmed its brand (i.e., defendants' domains, social media accounts, and smart contract). It contends that such relief was particularly important here because defendants used "novel technology to try to make the infringement immutable and permanent." The special master agrees with Yuga Labs that the injunctive relief obtained is a significant component of the success achieved in this case and must be taken into account in assessing whether the fee award is proportional. See *Tamko Roofing Prod., Inc. v. Ideal Roofing Co.*, 282

18

F.3d 23, 34 (1st Cir. 2002) ("Ideal argues that because the size of the award is substantially larger than the award of profits in this case, an injustice might result if this court does not review the amount of fees.  Neither the statute nor the legislative history limits the award of fees to an amount less than the award of profits or damages.  To the contrary, the legislative intent was partly to encourage the enforcement of trademark rights in cases where 'the measurable damages are nominal'"); see also *Century 21 RealEstate Corp. v.Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)  ("Injunctive relief is the remedy of choice for trademark . . . cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement").

Citing *Gopets Ltd. v. Hise*, No. CV 07–1870-AHM-VBKx, 2009 WL 412204, *3 (C.D. Cal. Feb. 13, 2009), and *Safeworks, LLC v. Teupen America, LLC*, No. C08–12197, 2010 WL 3033711, *7 (W.D. Wash. July 29, 2010), defendants also argue that such an award is not equitable.  They assert that they are individuals who have been sued by a multi-billion dollar company, and that they cannot afford to pay such a large award in addition to the judgment that has been entered.  As Yuga Labs notes, this claim is not supported by any evidence; indeed, the trial court record contains statements by one of the defendants that he engaged in business transactions in the millions of dollars during the pendency of this lawsuit.  The special master therefore finds the appeal to equity unavailing and stands by her recommendation.

E.   **Whether the Costs Yuga Labs Seeks Are Recoverable**

 Yuga Labs seeks $409,322.69 in costs, comprised of both taxable and non-taxable costs.  Specifically, it seeks costs for

- printing, assembling and delivering chambers courtesy copies;
- online research;
- depositions, including court reporting, transcript preparation, rough draft transcripts, videographer services, Realtime and TextMap, FedEx deliveries to the court reporting service, and deposition concierge tech support services;
- filing and process service fees;
- fees for transcripts of court proceedings; and

- printing, assembling and delivery of documents, including trial exhibits and materials.

Federal courts can award taxable costs based on the "limitations set out in 28 U.S.C. § 1821 and § 1920." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987).  As relevant here, under § 1920, the following are taxable costs: (1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; and (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case.  Interpreting this statute, the Ninth Circuit has held that fees for deposition copies fall within § 1920(2) and that the cost of private service of process (as opposed to service by the clerk or marshal) is properly taxed under § 1920(1).  *Alflex Corp. v. Underwriters Lab'ys, Inc*., 914 F.2d 175, 177, 178 (9th Cir. 1990).  It has also held that § 1920(4) permits the taxing of costs for copying materials for trial.  See *Maxwell v. Hapag–Lloyd Aktiengesellschaft*, 862 F.2d 767, 770 (9th Cir. 1988).

Consistent with these opinions, the Central District's Local Rules permit the following costs to be taxed:  (1) clerk's fees; (2) fees for service of process whether served by the United States Marshal or other persons authorized by Rule 4 of the Federal Rules of Civil Procedure; (3) the reasonable cost of preparing the original transcription of the oral portion of a deposition for ordinary, non-expedited delivery and the cost of one additional copy; (4) the reasonable fees of a stenographic reporter; (5) the cost of copying or reproducing exhibits used at the deposition and made a part of the deposition transcript; (6) reasonable document preparation costs, including the cost of copies of documents necessarily filed and served, and the cost of copying and delivering Mandatory Chambers Copies required by the Court; and (7) the cost of physically replicating or reproducing material necessarily obtained for use in the case (including copies obtained to be produced in discovery).

Of the categories of costs that Yuga Labs seeks to recover, all but online research fall generally within the parameters recognized in case law and Local Rule 54.3.  Defendants object to various subcategories of charges within these taxable categories and assert that they should

not be responsible for reimbursing such items.  They argue, for example, that charges for expediting the delivery of courtesy copies to chambers should not be allowed.  Given the number of filings in the case, often on short deadlines, and the importance of ensuring that courtesy copies arrive in time to be of assistance to the court and chambers staff, the special master recommends overruling this objection.  She notes, moreover, that expediting delivery of courtesy copies added only $1,440 to the overall total.  While defendants also assert that messenger and delivery services cannot be taxed, Local Rule 54.3.10(a) specifically provides that "the cost of copying *and delivering* Mandatory Chambers Copies required by the Court" is taxable.

Defendants next argue that Yuga Labs paid $55,559 to print what they denominate as "personal copies" of documents.  The special master understands their objection to be that they should not have to pay for copying documents for the convenience of counsel.  Local Rule 54.3.10 states that the party seeking costs must

"provide a consolidated itemization of copying costs, setting forth with specificity, particularity, and clarity the distinct tasks and services performed. Only costs associated with copying documents or reproducing other material for actual use in the case are allowed.  Costs incurred for the convenience of counsel or as prefatory steps in the discovery process before copying documents for actual production are not recoverable."

Beyond designating certain copies courtesy copies and other copies "Trial Exhibits" and "Trial Materials," Yuga Labs did not itemize its copying costs as prescribed by the Local Rule. There is a group of entries on the costs spreadsheet that are labeled "Printing and Copying," with no specification as to the reason for the copying.  These total $55,559, the cost of the copies defendants suggest were for "personal use."  Because Yuga Labs did not provide adequate documentation of the purpose for which these copies were made, the special master concludes that the cost of copying them is not taxable.

Certain of defendants' objections to charges associated with taking depositions in the case are also meritorious.  Specifically, they assert that additional charges for Realtime services

during depositions, for services associated with videotaping depositions, for rough drafts of deposition transcripts, and for concierge tech support services are not taxable.  The special master agrees.  See Local Rule 54.3.5 (stating that the cost of the original and one copy of a deposition transcript is taxable and that charges for Realtime and videotaping depositions are not taxable).  Since Yuga Labs obtained the original and one copy of the depositions it noticed and a copy of depositions taken by defendants, it appears that the "rough draft" copies were additional and are therefore not taxable.  Similarly, the charges Yuga Labs incurred for Realtime services, videotaping, concierge tech support, and TextMap files are not taxable.  These charges amount to $35,309.45.  There is also a charge for obtaining a copy of a transcript in the *Hermes v. Rothschild* matter.  Since it is not a transcript of a proceeding in this matter, its cost ($1159.20) is not taxable.

In sum, the special master concludes that $92,027.65 of the costs sought are not allowable as taxable costs in this case.  This does not end the matter, however, as there is Ninth Circuit authority permitting prevailing plaintiffs to recover non-taxable costs as a component of attorneys' fees where a statute allows for an award of reasonable attorneys' fees.  See *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010).  These include "reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920."  *Id.* at 581.  Among the types of costs the Ninth Circuit has recognized as falling in this category are the costs of computerized research.  See *Trustees of the Construction Industry and Laborers Health and Welfare Trust v. Redland Insurance Company*, 460 F.3d 1253, 1258 (9th Cir. 2006) (holding that computerized legal research charges were recoverable if separate billing for such expenses is "the prevailing practice in the local community").  So too are a number of other costs routinely billed to clients: postage, investigator expenses, copying costs, hotel bills, meals, messenger service and employment record reproduction.  See *Ahanchian v. Xenon Pictures, Inc.*, No. CV 07-6295-JFW-Ex, 2008 WL 11411621, *3 (C.D. Cal. Dec. 29, 2008).[23]

---

[23] As Yuga Labs notes, it does not seek costs for mediation, hotel stays, trial graphics, and data hosting for discovery.

Defendants contend that non-taxable costs cannot be awarded, citing *Hansen Cold Storage Constr. v. Cold Sys., Inc.*, No. 2:19-CV-07617-SB-MAA, 2022 WL 1199271, *7–8 (C.D. Cal. Feb. 11, 2022), and *Arcona, Inc. v. Farmacy Beauty, LLC*, No. 2:17-cv-7058- ODW-JPRx, 2021 WL 2414856, *5 (C.D. Cal. June 14, 2021), aff'd, No. 21-55678, 2022 WL 1486822 (9th Cir. May 11, 2022) (Unpub. Disp.).  These cases rely on *Rimini St., Inc. v. Oracle USA, Inc*., 586 U.S. ___, 139 S. Ct. 873, 877-78 (2019).  In *Hansen Cold Storage*, Judge Blumenfeld noted that  the Supreme Court held in *Rimini* that where "federal statutes simply refer to 'costs' . . . federal courts are limited to awarding the costs specified in §§ 1821 and 1920."  As a consequence, he declined to award costs not enumerated in § 1920 in a Lanham Act case.  See *Hanson Cold Storage*, 2022 WL 1199271 at *7 (stating that "Section 1117(a) of the Lanham Act refers 'simply' to 'the costs of the action,'" and citing *San Diego Comic Convention v. Dan Farr Productions*, 807 Fed. Appx. 674, 677-78 (9th Cir. Apr. 20, 2020) (Unpub. Disp.) ("The Lanham Act does not, however, provide the 'explicit statutory authority' required to award litigation expenses beyond the six categories of 'costs' specified by Congress in the general costs statute, 28 U.S.C. §§ 1821, 1920.")

It thus appears that there are two lines of authority in the Ninth Circuit, neither of which explicitly recognizes nor addresses the existence of the other.  The first is the *Grove* line of cases, which authorizes awards of non-taxable costs as a component of statutorily authorized reasonable attorneys' fees.  The second is represented by *San Diego Comic Convention*, which follows the lead of the Supreme Court in *Rimini* and does not address *Grove* and its progeny.

In *Rimini*, the Supreme Court addressed § 505 of the Copyright Act.  That statute provides:

> "In any civil action under [the Copyright Act], the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof.  Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."

In affirming the award of non-taxable costs, the Ninth Circuit in *Rimini* focused on circuit precedent holding that, because § 505 allows for the recovery of *full* costs, as opposed simply to costs, an award under the statute was not limited to the categories of costs described in § 1920.  See *Twentieth Century Fox v. Entertainment Distributing*, 429 F.3d 869, 885 (9th Cir. 2005).  The circuit court did not address the *Grove* line of cases even though § 505 also permits an award of reasonable attorneys' fees.  When *Rimini* reached the Supreme Court, the Court adopted the Ninth Circuit's framework and analyzed whether "full" costs constituted "an explicit statutory instruction" that costs beyond the categories enumerated in §1920 could be awarded.  It addressed the grant of authority to award attorneys' fees only in response to an argument the defendant made regarding redundancy.  The Court stated:

> "Oracle's interpretation would . . . render[ ] the second sentence of § 505 largely redundant.  That second sentence provides: 'Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.' . . .  If Oracle were right that 'full costs' covers all of a party's litigation expenditures, then the first sentence of § 505 would presumably already cover attorney's fees and the second sentence would be largely unnecessary."  139 S. Ct. at 881.

The Court did not address the converse, i.e., whether the ability to award attorneys' fees permitted an award of costs beyond those enumerated in § 1920 if they are customarily passed on to the client.

Given *Rimini* and *Grove* and its progeny,[24] it is likely that the *Grove* rule will ultimately be abrogated.  Nonetheless, *Grove* remains the law of the circuit, and *Rimini* does not directly contradict it.  See *Valdivia v. Schwarzenegger*, 599 F.3d 984, 990 n. 4 (9th Cir. 2010) ("[A]s a three-judge panel, and with no intervening Supreme Court or Ninth Circuit precedent, we are bound by this court's[previous] holding"); *United States v. Vasquez–Ramos*, 531 F.3d 987, 991 (9th Cir. 2008) ("We are bound by circuit precedent unless there has been a substantial change

---

[24] See., e.g., *Trustees of Const. Indus. & Laborers Health & Welfare Tr. v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir. 2006).

in relevant circumstances or a subsequent en banc or Supreme Court decision that is clearly irreconcilable with our prior holding" (internal citations omitted)).[25]  Because the special master cannot say that *Rimini* is "clearly irreconcilable" with *Grove*, she recommends that the court follow *Grove* and award non-taxable costs as a component of reasonable attorneys' fees. Specifically, she recommends that the charges for online research, which total $166,594, be awarded.  She does not recommend, however, that the $92,027.65 in costs previously found to be non-taxable be awarded.  As respects the copying costs, the special master finds that Yuga Labs' failure to specify the reasons for the copying, or even the nature of the records being printed/copied, provides an inadequate record supporting an award.  As for the deposition-related costs for Realtime, videography, rough drafts, and concierge tech support services, these add-on services were clearly for the convenience of counsel, and their cost should not be transferred to defendants as a result.  With the deduction of this amount, the special master recommends that the court award Yuga Labs costs of $317,295.04.

F.     **Whether Yuga Labs Is Entitled to Recover Its Expert Witness Fees**

Yuga Labs seeks to recover expert witness fees of $95,639 under Rule 26(b)(4)(E)(i) of the Federal Rules of Civil Procedure.  That rule provides that "[u]nless manifest injustice would result, the court must require that the party seeking discovery . . . pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A). . . ."

Defendants contend that Yuga Labs' request is facially unreasonable because it seeks reimbursement for time that could not possibly have been spent attending depositions. Yuga Labs' spreadsheet indicates that it is seeking 41.65 hours for Dr. Berger, 37.2 hours for Dr. O'Laughlin, and 22.5 hours for Dr. Kindler.  As defendants note, these totals are significantly more than the seven hours that is authorized by Rule 30(d)(1) of the Federal Rules of Civil Procedure.

---

[25] Although *San Diego Comic Convention*, 807 Fed. Appx. at 677-78, reaches a contrary result, it is an unpublished, non-precedential decision.

There is no information in the record concerning the length of the three expert depositions.[26]  It is safe to assume, however, that the hours for which Yuga Labs seeks reimbursement include preparation time.  Courts are split on whether a party can recover the cost of an expert's preparation time under Rule 26(b)(4)(E)(i).  There does not appear to be any Ninth Circuit authority on point.  District courts in the circuit considering the issue have identified four different approaches.  As the court stated in *Stevens v. CoreLogic, Inc.*, No. 14-CV-1158 BAS (JLB), 2016 WL 8729928 (S.D. Cal. May 6, 2016):

> "Some courts have held that the deposing party must pay the expert's fees for time reasonably spent preparing for the deposition.  Second, some courts have held that the deposing party must pay the expert's fees for time reasonably spent preparing for the deposition, except for the time the expert spent consulting with the retaining party's counsel.  Third, at least one court has held that the deposing party is not required to pay any fees for the time the expert spent preparing for the deposition.  And fourth, some courts have held that the deposing party is required to pay the expert's fees for time reasonably spent preparing for the deposition only in complex cases or in extenuating circumstances." *Id.* at *2 (citations omitted).

See also *Eastman v. Allstate Ins. Co.*, Case No.: 14-cv-00703-WQH (WVG), 2016 WL 795881, *4 (S.D. Cal. Feb. 29, 2016) (same).

Defendants rely on cases falling into the third category – i.e., holding that the deposing party need only pay fees for the time spent in deposition.  See *Monaghan v. Telecom Italia Sparkle of N. Am., Inc.*, No. CV 13-00646-ABC-PLAx, 2014 WL 12639268, *5 (C.D. Cal. Oct. 21, 2014) ("The expenses incurred to prepare the expert report are not recoverable under Rule 26" nor is time spent "preparing for the expert deposition"); *Rock River Commc'ns, Inc. v. Universal Music Group*, 276 F.R.D. 633, 637 (C.D. Cal. 2011) (holding that the retaining party is "free to have its expert prepare as thoroughly, and review his or her deposition transcript as

---

[26] Berger's deposition transcript ran 349 pages.  Kindler's ran 245 pages, while O'Laughlin's ran 279 pages.

meticulously, as it wishes, albeit at its own expense"); *3M Co. v. Kanbar*, No. C06-01225-JW-HRL, 2007 WL 2972921, *3 (N.D. Cal. Oct. 10, 2007) (noting "persuasive authority which states that ordinarily the deposing party need only pay for time spent in deposition" absent extenuating circumstances).  Yuga Labs does not address whether an expert's preparation for deposition, review and correction of the transcript, or travel time to and from the deposition is compensable under Rule 26(b)(4)(E)(i).

The special master recommends that the court allow Yuga Labs to recover for the experts' time sitting for deposition, for their travel time, and for any time consumed reviewing and correcting their transcripts.  When it comes to reimbursement for preparation time, she agrees with the *Rock River Commc'ns* court, which noted that "the deposing party has no control over how much time an expert spends preparing for a deposition. . . .  [T]he retaining party determines how much deposition preparation it deems desirable, but the deposing party pays for it.  When benefit and cost are separated like this, the risk of unfairness is great."  276 F.R.D. at 636.

While the court could order that defendants reimburse Yuga Labs for preparation time on the basis that this was a complex case, the special master does not recommend this.  O'Laughlin is a consumer confusion expert and Berger is a marketing and brand equity expert.  The technology at issue in this case may be new and raise novel legal issues, as Yuga Labs contends, but consumer confusion and marketing and brand equity are subjects frequently addressed in Lanham Act cases.  It is true that the economics and damages expert, Dr. Kindler, had to address the nature of the market for NFTs in opining whether a buy back of infringing NFTs was economically feasible.  The court's description of that testimony in the Findings of Fact and Conclusions of Law, however, does not make it appear that her opinions were necessarily complicated or complex.[27]

Yuga Labs did not submit a breakdown of the tasks its experts performed during the hours for which it seeks reimbursement.  The special master therefore recommends that the

---

[27] As defendants note, the court did not discuss Berger's opinions in its Findings of Fact and Conclusions of Law.  It appears that it similarly did not address O'Laughlin's opinions.

court direct it to submit a report detailing the time spent by each expert traveling to and attending their deposition, and reviewing and correcting the transcript of the proceeding, and award those sums under Rule 26(b)(4)(E)(i).[28]

G.      **Whether the Special Master's Fee Should be Evenly Split**

In its order appointing the special master, the court stated: "The parties shall share the fees and costs associated with the Special Master equally, but the Court will consider a recommendation, if any, by the Special Master regarding the final allocation of the fees and costs associated with the Special Master's services." (Docket 437.)

The special master recommends that the court order defendants to pay the full amount of fees and costs associated with this report and recommendation.  In making this recommendation, she notes that the amount she recommends the court award as fees is more in line with the compromise amount Yuga Labs proposed during the parties' meet and confer process than with the fees defendants suggested were reasonable.  Yuga Labs proposed that defendants pay $7,500,000 in fees; the special master herein recommends a fee award of $6,983,432.62.  Yuga Labs also proposed that defendants pay costs of $200,000.  The special master herein recommends that costs be awarded in the amount of $317,295.04, more than Yuga Labs' proposed compromise.  (See Docket 435.)

Defendants, by contrast, argued that fees *and* costs of $455,172.24 constituted a reasonable total award.  As Yuga Labs noted in the Joint Statement, defendants' position amounted to a suggestion that Yuga Labs should receive $0 in costs, $0 for experts, and roughly "518 attorney hours[,] . . . correspond[ing] to roughly 32 hours per month, or 1.2 hours per docket entry."  (*Id.* at 7.)  Yuga Labs contrasted defendants' position at the end of the case with the fact that they agreed to pay $120,000 -- more than 50% of Yuga Labs' requested fees – for the Anti-SLAPP motion.

---

[28] Defendants also complain that the experts' hourly rates are significantly above market.  They submit no evidence, however, that would permit the special master to reach this conclusion.  Consequently, she does not recommend any modification of the experts' rates.

While it is clear from this report and recommendation that the special master found portions of Fenwick's billing duplicative, Yuga Labs' compromise position took that and other objections asserted by defendants into account.  Similarly, while the report and recommendation finds that it would be improper to shift to defendants some of the costs sought by Yuga Labs, and notes that some of its description of the costs incurred are inadequately specific, its compromise position would have resulted in a cost savings to defendants of more than $100,000.

Consequently, the special master recommends that the court order defendants to pay the entirety of the cost of preparing this report and recommendation.

## CONCLUSION

The special master recommends that the court order defendants to pay

- $6,983,432.62 in fees;

- $317,295.04 in costs;

- The cost for each of Yuga Labs' three experts to travel to and sit for deposition and to review and correct their deposition transcripts; and

- 100% of the cost of preparing this report and recommendation.

DATED: January 11, 2024

Hon. Margaret M. Morrow, Ret.
Special Master



**Santa Ana Office**
1851 East Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344
**www.judicatewest.com**

## PROOF OF SERVICE

I, the undersigned, am an employee of Judicate West, located at 1851 East First Street Suite 1600, Santa Ana, CA 92705 declare under penalty of perjury that I am over the age of eighteen (18) and not a party to this matter or proceeding.

On January 12, 2024, I served the foregoing documents, described as:

### REPORT AND RECOMMENDATION OF SPECIAL MASTER REGARDING REQUEST OF YUGA LABS, INC FOR ATTORNEY'S FEES AND COSTS

**SEE ATTACHED MAILING LIST**

**(X)  BY E-MAIL** I caused the above-referenced document to be transmitted via electronic mail (e-mail) to the parties as listed on this Proof of Service

**( )  BY ELECTRONIC FILING** I caused such document to be sent via electronic service by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com.

**( )  BY FASCIMILE** I caused the above-referenced document to be transmitted via facsimile to the parties as listed on this Proof of Service. The document was transmitted by facsimile transmission and the transmission was reported as complete and without error.

**( )  BY PERSONAL SERVICE** I personally delivered the documents to the persons at the address (es): by leaving the documents at the person (s) office, in an envelope or package clearly labeled to identify the person(s) being served, with a receptionist or an individual in charge of the office.

**( )  BY UNITED STATES PARCEL SERVICE** I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit with postage thereon fully prepaid at Santa Ana, California in the ordinary course of business

**(X)  STATE** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**( )  FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **January 12, 2024,** at Santa Ana, California

Heidi Adams
Judicate West



**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

# Case Contact List

as of Thursday, January 11, 2024

**JW Case #: A310859**

## *Case Caption: Yuga Labs, Inc. vs. Ryder Ripps, et al.*

Eric J. Ball, Esq.
Fenwick & West, LLP
801 California Street
Mountain View, CA 94041
Phone: (650) 988-8500   Fax: (650) 938-5200
Email: eball@fenwick.com
Representing Yuga Labs, Inc.

Kimberly I. Culp, Esq.
Fenwick & West, LLP
801 California Street
Mountain View, CA 94041
Phone: (650) 988-8500   Fax: (650) 938-5200
Email: kculp@fenwick.com
Representing Yuga Labs, Inc.

Molly R. Melcher, Esq.
Fenwick & West, LLP
555 California St.
San Francisco, CA 94104
Phone: (415) 875-2300   Fax:
Email: mmelcher@fenwick.com
Representing Yuga Labs, Inc.

Ethan M. Thomas, Esq.
Fenwick & West, LLP
555 California St.
San Francisco, CA 94104
Phone: (415) 875-2300   Fax:
Email: ethomas@fenwick.com
Representing Yuga Labs, Inc.

Scott W. Bertulli, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State St.
Boston, MA 02109
Phone: (617) 526-6000   Fax: (617) 526-5000
Email: scott.bertulli@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen

Tyler P. Carroll, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State St.
Boston, MA 02109
Phone: (617) 526-6000   Fax: (617) 526-5000
Email: tyler.carroll@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen

**JUDICATE WEST**
*CELEBRATING 30*
Alternative Dispute Resolution

**Santa Ana Office**
1851 East First Street
Suite 1600
Santa Ana, CA 92705
Phone: (714) 834-1340
Fax: (714) 834-1344

**www.judicatewest.com**

Derek A. Gosma, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
350 S Grand Ave.
Suite 2400
Los Angeles, CA 90071
Phone: (213) 443-5300   Fax:
Email: derek.gosma@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen


Monica Grewal, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State St.
Boston, MA 02109
Phone: (617) 526-6000   Fax: (617) 526-5000
Email: monica.grewal@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen


Henry M. Nikogosyan, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
350 S Grand Ave.
Suite 2400
Los Angeles, CA 90071
Phone: (213) 443-5300   Fax:
Email: henry.nikogosyan@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen


Louis W. Tompros, Esq.
Wilmer Cutler Pickering Hale & Dorr, LLP
60 State St.
Boston, MA 02109
Phone: (617) 526-6000   Fax: (617) 526-5000
Email: louis.tompros@wilmerhale.com
Representing Ryder Ripps; Jeremy Cahen