**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YUGA LABS, INC., | No. 24-879 |
| *Plaintiff - Appellee*, | D.C. No. 2:22-cv-04355-JFW-JEM |
| v. | |
| RYDER RIPPS; JEREMY CAHEN, | OPINION |
| *Defendants - Appellants*. | |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted August 15, 2024
Pasadena, California

Filed July 23, 2025

Before: Bridget S. Bade and Danielle J. Forrest, Circuit
Judges, and Gonzalo P. Curiel, District Judge.[*]

Opinion by Judge Forrest

---

[*] The Honorable Gonzalo P. Curiel, United States District Judge for the
Southern District of California, sitting by designation.

## SUMMARY[**]

### Intellectual Property

The panel affirmed in part and reversed in part the
district court's judgment, and remanded, in an action under
the Lanham Act and the Anticybersquatting Consumer
Protection Act concerning the Bored Ape Yacht Club
nonfungible token (NFT) collection created by Yuga Labs,
Inc.

Yuga sued Ryder Ripps and Jeremy Cahen, creators of a
nearly identical NFT collection called "Ryder Ripps Bored
Ape Yacht Club," for trademark infringement and unlawful
cybersquatting. Defendants countersued Yuga under the
Digital Millennium Copyright Act (DMCA) and also sought
declaratory relief that Yuga had no copyright protection over
the Bored Apes. The district court dismissed defendants'
declaratory-judgment counterclaims for lack of subject-
matter jurisdiction and granted summary judgment for Yuga
on its two claims and defendants' DMCA counterclaim.
After a bench trial on remedies, the district court enjoined
defendants from marketing, promoting, or selling products
that use the Bored Ape Yacht Club marks, and awarded
Yuga over $8 million for disgorgement of profits, statutory
damages, attorney fees, and costs.

The panel held that an NFT can be trademarked because
it is a "good" under the Lanham Act, which protects marks
used with "any goods or services." The panel concluded that
the statutory text did not establish that NFTs are

---

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

categorically excluded from protection under the Lanham Act, and neither did *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke and DJ Servs., LLC*, 845 F.3d 1246 (9th Cir. 2017) (per curiam), because unlike the intangible content at issue in those cases, NFTs are not contained in or even associated with tangible goods. Rather, consumers purchase NFTs as commercial goods in online marketplaces specifically curated for NFTs.

The panel concluded that defendants' NFTs were "goods" under the Lanham Act. The panel also concluded that Yuga had trademark priority because it was the first to use the Bored Ape Yacht Club marks in commerce and did not lose that priority either because it engaged in unlawful conduct in using the marks to sell unregistered securities or because it gave up its trademark rights when selling its NFTs.

The panel nonetheless reversed the district court's grant of summary judgment for Yuga on its trademark-infringement and cybersquatting claims because Yuga did not prove as a matter of law that defendants' actions were likely to cause consumer confusion. The panel concluded that defendants' use of Yuga's marks did not constitute nominative fair use and was not "expressive work" protected by the First Amendment. As to the trademark claim, applying the *Sleekcraft* factors, the panel concluded that some of the factors indicated a likelihood of confusion, some did not, and some were neutral. Thus, viewing the facts and reasonable inferences therefrom in the light most favorable to defendants, the panel could not conclude as a matter of law that a reasonably prudent consumer in the marketplace was likely to be confused as to the origin of the goods bearing Yuga's marks. As to the cybersquatting claim, Yuga

did not establish as a matter of law that defendants' domains were "confusingly similar" to Yuga's protected marks.

The panel affirmed the district court's rejection of defendants' counterclaims, concluding that there was no genuine dispute of fact as to the DMCA claim and that the district court properly dismissed the claims for declaratory relief with prejudice.

---

**COUNSEL**

Todd R. Gregorian (argued), Molly Melcher, Anthony M. Fares, Zachary A. Kalinowski, and Ethan M. Thomas, Fenwick & West LLP, San Francisco, California; Kimberly Culp and Eric J. Ball, Fenwick & West LLP, Mountain View, California; for Plaintiff-Appellee.

Louis W. Tompros (argued), Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts; Derek A. Gosma and Henry M. Nikogosyan, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; Nicholas Werle, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; Thomas G. Sprankling, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, California; Kyle T. Edwards, Wilmer Cutler Pickering Hale and Dorr LLP, San Francisco, California; for Defendants-Appellants.

Laura L. Chapman, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California; James Gatto, Sheppard Mullin Richter & Hampton LLP, Washington, D.C.; Kara C. Michels, Neal Gerber & Eisenberg LLP, Chicago, Illinois; Debbie L. Berman, Jenner & Block LLP, Chicago, Illinois; Rémi Jaffré, Jenner & Block LLP, New York, New York;

Martin Schwimmer, Leason Ellis LLP, White Plains, New
York; for Amicus Curiae International Trademark
Association.

---

## OPINION

FORREST, Circuit Judge:

Plaintiff-Appellee Yuga Labs, Inc. created one of the
most widely recognized nonfungible token (NFT)
collections—the Bored Ape Yacht Club (BAYC). Each NFT
in this collection is associated with a unique cartoon Bored
Ape. Purchasers of these NFTs obtain not only rights to the
ape art but also membership in what has been described as a
"strange combination of gated online community, stock-
shareholding group, and art-appreciation society." As the
Bored Ape NFTs swung from meme to million-dollar
merchandise with a celebrity following, Defendants-
Appellants Ryder Ripps and Jeremy Cahen created a nearly
identical NFT collection called "Ryder Ripps Bored Ape
Yacht Club" (RR/BAYC). This NFT collection is associated
with the exact same Bored Ape cartoons as Yuga's NFTs.

Yuga sued Defendants alleging that they infringed its
BAYC trademarks in violation of the Lanham Act and
committed unlawful cybersquatting in violation of the
Anticybersquatting Consumer Protection Act (ACPA).
Defendants countersued Yuga for violating the Digital
Millennium Copyright Act (DMCA), alleging that Yuga
made misrepresentations in its take-down notices, and also
sought declaratory relief that Yuga has no copyright
protection over the Bored Apes. The district court dismissed

Defendants' declaratory-judgment counterclaims for lack of
subject-matter jurisdiction and granted summary judgment
for Yuga on its two claims and Defendants' DMCA
counterclaim. It then held a bench trial on remedies and
permanently enjoined Defendants "from marketing,
promoting, or selling products or services . . . that use the
BAYC Marks," and awarded Yuga over $8 million for
disgorgement of profits, statutory damages, attorney fees,
and costs.

In resolving the issues raised on appeal, we must first
address whether NFTs can be trademarked. As we consider
that question, we are mindful that when we apply
"established legal rules to the 'totally new problems'" of
emerging technologies, our task is "not to 'embarrass the
future.'" *TikTok Inc. v. Garland*, 604 U.S. --, 145 S. Ct. 57,
62 (2025) (quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S.
292, 300 (1944)). Grappling with this nascent technology,
we hold that Yuga's NFTs are not merely monkey business
and can be trademarked. Nonetheless, we reverse the district
court's grant of summary judgment for Yuga on its
trademark-infringement and cybersquatting claims because
it has not proven as a matter of law that Defendants' actions
are likely to cause consumer confusion. We affirm the
district court's rejection of Defendants' counterclaims.

## BACKGROUND

### I. What is an NFT?

Simply stated, even if not simply understood, an NFT is
an intangible, fully virtual, authenticating software code that
is associated with separate digital or physical content. *See*
Hannah Bobek, Note, *To Mint or Not to Mint: Non-Fungible
Tokens and the Right of Publicity*, 92 Fordham L. Rev. 639,
651 (2023). Like other non-fungible assets, each NFT is

unique. And the association of an NFT with otherwise fungible digital content transforms that content into a unique asset. *Id.* This is called "tokenizing." *Id.*

By way of analogy, consider an autographed baseball. If the ball was mass-produced, many people could have the exact same ball. But when one of the balls is signed by a Major League player, the signature transforms it into a unique good with greater value than the other identical-but-unsigned balls. NFTs work this way in cyberspace. The autograph on the ball is like the authenticating software code on the digital art file. The digital file may be replicable, allowing many people to access the same piece of art. But attaching the software code to the digital file makes something that is otherwise commonplace, unique. And that uniqueness can confer value.

"NFTs can tokenize anything, such as digital art, avatars, video game wearables, digital fashion accessories, and music." *Id.* (footnotes omitted). But they are primarily used for selling digital art because they "provide a way to create artificial scarcity in the digital art market." Andrew C. Michaels, *Confusion in Trademarked NFTs*, 7 Stan. J. Blockchain L. & Pol'y 1, 2 (2024). To be clear, the underlying digital artwork or other content tokenized by an NFT may or may not, *by itself*, be exclusive, copyrightable, or subject to any ownership interest at all. But the pairing of authenticating software code with digital content can create a unique asset with proprietary value. *See* Bobek, *supra*, at 652 ("At its essence, NFTs bring unique assets into the digital space and make ownership of that asset verifiable." (quoting An P. Doan, Mark W. Rasmussen, Joshua B. Sterling & Harriet Territt, *NFTs*: *Key U.S. Legal Considerations for an Emerging Asset Class*, Fintech L. Rep. (2021))); *see also Hermès Int'l v. Rothschild*, 654 F.

Supp. 3d 268, 278 (S.D.N.Y. 2023) ("Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset: they buy them precisely so that they can exclusively own the content associated with the NFT.").

The process by which NFT creators tokenize content is called "minting." Bobek, *supra*, at 651–52. When an NFT is minted, it is stored on a "blockchain." *Id.* at 652. A blockchain is a public digital leger "that keeps track of who owns what." Michaels, *supra*, at 5. "The block is a list of recorded transactions; the chain is transactions recorded with a hash that chains[,] or links, preceding blocks with new blocks." *Non-Fungible Tokens (NFTs) Briefing Paper*, Nat'l Archives & Recs. Admin. 4 (Apr. 2024). Think of real property deed records maintained by county recorders' offices. Just like with recorded land transactions, a blockchain records the creation and initial conveyance of the NFT and all subsequent conveyances of that NFT.

Blockchains allow "ownership of the NFT to be transferred and authenticated electronically without the need for a physical item or a trusted third party, such as a bank." Michaels, *supra*, at 5. So long as the computers have "the appropriate software," *id.* at 5–6, the blockchain "ledger is maintained across the computers of all blockchain users through a peer-to-peer network," Dr. Thibault Schrepel, *Collusion by Blockchain and Smart Contracts*, 33 Harv. J.L. & Tech. 117, 119 (2019). For example, when one person transfers an NFT to another, a record of the transaction becomes permanently stored on the blockchain. *See* Joseph B. Fazio, 1 Internet L. & Practice § 1:28 (Oct. 2024). In this way, a blockchain is a transparent cyberspace ledger between transacting parties.

The minting, storage, and transfer of NFTs on a blockchain are accomplished through a "smart contract." Edward Lee, *NFTs As Decentralized Intellectual Property*, 2023 U. Ill. L. Rev. 1049, 1076 (2023); *see also Risley v. Universal Navigation Inc.*, 690 F. Supp. 3d 195, 202 (S.D.N.Y. 2023) (describing smart contracts as "programs that write the terms of the agreement between the buyer and seller of tokens directly into the program's code"), *aff'd in part, vacated in part* No. 23-1340-cv, 2025 WL 615185 (2d Cir. Feb. 26, 2025). A smart contract is *not* a contract in the legal sense; it is an "automatically executing computer code." Jean Bacon et. al., *Blockchain Demystified: A Technical and Legal Introduction to Distributed and Centralised Ledgers*, 25 Rich. J.L. & Tech. 2, 93 (2018). In other words, a smart contract is essentially a computer program "that automatically brings about some specified action, such as carrying out transfers of, or executing other actions relating to, digital assets according to a set of pre-specified rules." *Id.* at 86. As a result, smart contracts can be used to automate agreements between parties according to the instructions written into their code.

## II. Factual Background

### A. The Bored Ape Yacht Club

Yuga created the BAYC NFT collection, which is one of the most widely recognized NFT collections in the world. Yuga created this collection through a smart contract recorded on the blockchain Ethereum. Each BAYC NFT includes a sequential unique identifier called an "Ape ID."

There are 10,000 NFTs in the BAYC collection, each associated with its own original artwork featuring a cartoon Bored Ape (see below). Yuga also created a website, bayc.com, to promote and sell the BAYC NFTs.



Yuga began selling its BAYC NFTs in April 2021. By the following month, Yuga had sold the entire collection. Yuga's average price for a BAYC NFT was about $200, and it made over two million dollars in its initial offering.

Yuga's Terms and Conditions (T&Cs) governing the NFT sales conferred "the underlying Bored Ape, the Art, completely." That is, buyers received both personal and commercial rights to use the underlying artwork (i.e., the "Bored Ape" image) free of royalty fees. Additionally, each BAYC NFT doubled as a membership pass. BAYC NFT owners— "Ape holders"—joined an online and offline social club through which they could access benefits, including interactive digital spaces, branded merchandise, and events featuring musical performances by prominent performers. One publication described this internet-age social club as a "strange combination of gated online community, stock-shareholding group, and art-appreciation society."

Yuga has used several images, logos, and brand signifiers to promote its website, events, services, and products, including its BAYC NFT collection: "BORED APE YACHT CLUB," "BAYC," "BORED APE," the BAYC Logo, the BAYC BORED APE YACHT CLUB

Logo, and the Ape Skull Logo (collectively, the BAYC Marks). [1] Examples of the BAYC logo and branded merchandise are below:








The BAYC NFTs commanded increased press and celebrity attention as their values soared in the secondary market, with some selling at auction for as much as $24.4 million. [2] Yuga then collaborated with companies like Adidas to feature BAYC Marks on clothing, consumer goods, and other products. But the popularity came at a cost. Yuga has invested substantial resources in protecting its intellectual property.

---

[1] The parties disagree about whether these brand signifiers are valid trademarks, or "marks," under the Lanham Act.

[2] Yuga earns a 2.5% royalty on every BAYC NFT sold on the secondary market.

## B. Defendants' RR/BAYC NFT Collection

Defendant Ryder Ripps is a visual and conceptual artist and designer who, in his own words, "aims to dismantle the porous boundaries between art, the internet, and commerce, agitating the structure of the attention economy and revealing the flow of power in online relationships." In late 2021, he began criticizing Yuga for using "neo-Nazi symbolism, alt-right dog whistles, and racist imagery in their company and in the [BAYC NFTs]." He criticized Yuga, its product, and celebrity promoters in interviews with investigative journalists, on social media and podcasts, and on his website, gordongoner.com, where he "compil[ed] the information [he] found for the public to view and discuss."[3] For example, according to Ripps, the BAYC ape skull logo resembles the Totenkopf emblem of the Nazi Schutzstaffel (SS). On the gordongoner.com website, Ripps used art to satirize the BAYC brand and expose purported Nazi imagery embedded in the BAYC logo, an example of which is shown below.



---

[3] Gordon Goner is BAYC co-creator Wylie Aronow's online handle. The BAYC creators' identities were unknown, other than their online handles, until they were identified in a *BuzzFeed* article published in February 2022.

In May 2022, Ripps and Defendant Jeremy Cahen partnered to create the NFT collection Ryder Ripps Bored Ape Yacht Club (RR/BAYC). The RR/BAYC NFTs are linked to the same ape images and corresponding Ape IDs as Yuga's BAYC NFT counterparts. Compare the BAYC ape image on the left with the RR/BAYC ape image on the right, both identified as #1058:



Ripps initially used Foundation (a digital, artist-centric NFT marketplace)[4] to mint the RR/BAYC collection. The collection was ultimately hosted on (or digitally embedded into) an Ethereum blockchain smart contract that contains unique lines of code, including smart contract addresses (digital locations on the blockchain ledger), contract creators, metadata, and creation dates. When Ripps created the RR/BAYC NFT collection by embedding entries in the smart contract, he assigned the contract name as the "Bored Ape Yacht Club" and the contract symbol as "BAYC" for each NFT in his collection. The name and symbol identification inputs cannot be changed; they are built into the NFTs themselves.

The NFT metadata in smart contracts is "accessible to . . . anyone using a searchable blockchain explorer."

---

[4] NFT marketplaces are platforms where NFTs can be stored, displayed, traded, and in some cases, created. Prominent NFT marketplaces include Foundation, OpenSea, Rarible, and LooksRare.

Kristen E. Busch, Cong. Rsch. Serv., R47189, *Non-Fungible Tokens (NFTs)* 1, 4–5 (2022). One such tool is Etherscan. *See id.* at 3, 5 n.18. Etherscan publicly tracks NFTs, including sales, and produces reports detailing metadata information from Ethereum blockchain-based smart contracts. *See id.* Customers can use those reports to verify the authenticity and provenance of their NFTs. *See id.* Yuga claims that "[n]othing in [Defendants'] counterfeit NFTs or the underlying smart contract referred consumers to any disclaimer identifying them as fakes or to any commentary about Yuga or BAYC." According to Yuga, the similarity of the information between its BAYC NFTs and Defendants' RR/BAYC NFTs caused Etherscan "to identify [Defendants'] NFTs with Yuga's marks" and "tricked bots" into reporting RR/BAYC NFT sales as BAYC NFT sales.

### C. Marketing and Sale of the RR/BAYC NFTs

Defendants created the website rrbayc.com to promote and sell their RR/BAYC NFT collection. Potential buyers could "reserve" an RR/BAYC NFT at rrbayc.com based on the Ape ID of the corresponding BAYC NFT. The website provided the following "artist statement" for potential buyers:



 By purchasing this Ryder Ripps artwork in the form of an NFT, you understand that this is a new mint of BAYC imagery, re-contextualizing it for educational purposes, as protest and satirical commentary. You cannot copy an NFT. Please see the RR/BAYC contract here to verify provenance: Etherscan. By reserving your RR/BAYC, you are purchasing a hold for an order that will be fulfilled or rejected/refunded by Ryder within 24h (Depending on the vibe of your wallet and the mood of Ryder at the time).

The rrbayc.com website also featured a link to gordongoner.com, which criticized the BAYC NFTs as racist and an example of "simianization"— "disparaging someone by comparing them to an ape/monkey."

Defendants primarily sold the RR/BAYC NFTs through rrbayc.com and, to a lesser extent, through Twitter. Each RR/BAYC NFT sold for $100 to $200. Defendants refer to these direct sales (initiated by Defendants on platforms they operate and control) as "primary market sales."[5] Defendants

---

[5] Yuga disputes that there is an identifiable or distinct "primary market" for RR/BAYC NFTs that can be separated from the "secondary market."

made over $1.36 million by selling out their entire RR/BAYC collection.

Like their BAYC NFT counterparts, RR/BAYC NFTs were also sold on secondary NFT marketplaces by third parties. Notably, RR/BAYC NFTs were listed on the Foundation secondary NFT marketplace beginning in May 2022, when the RR/BAYC NFTs were first minted. The Foundation page prominently displayed the header "Bored Ape Yacht Club" in large text and identified the username "@ryder_ripps" in much smaller text. The page also used the acronym "BAYC" and included Yuga's BAYC Ape Skull logo without alteration. And Defendants advertised the Foundation page on Twitter. At least one other secondary NFT marketplace sold RR/BAYC NFTs under the name "Bored Ape Yacht Club."

Defendants promoted secondary-market sales of RR/BAYC NFTs on their personal Twitter pages by linking to marketplaces that prominently featured the "Bored Ape Yacht Club" name, logo, and BAYC acronym. In separate posts on Twitter, Defendants also shared the RR/BAYC "artist statement." Ripps posted RR/BAYC NFT listings referencing BAYC Marks for approximately two months on Foundation. In late June 2022, Foundation and other secondary marketplaces removed RR/BAYC pages after Yuga sent a series of takedown notices. All in all, RR/BAYC NFTs were available for purchase across numerous NFT marketplaces at various periods, and Defendants earned over $100,000 in royalties from secondary market sales.

Defendants also registered the website apemarket.com to offer their own marketplace where Yuga's BAYC NFTs and the RR/BAYC NFTs could be sold side-by-side. Defendants previewed ApeMarket on their social media pages, created a

Twitter account for ApeMarket indicating the market would
"go live within 24 hours of the final [RR/BAYC] mint," and
addressed ApeMarket advertisements to the "Yuga
Community." However, ApeMarket never went live due to
Yuga's lawsuit.

### III. Procedural Background

Yuga sued Defendants in June 2022. It asserted eleven
federal and state-law claims for: (1) trademark infringement
based on a false-designation-of-origin theory in violation of
the Lanham Act, 15 U.S.C. § 1125(a); (2) false advertising
in violation of the Lanham Act, 15 U.S.C. § 1125(a);
(3) cybersquatting in violation of the ACPA, 15 U.S.C.
§ 1125(d); (4) common law trademark infringement;
(5) common law unfair competition; (6) unfair competition
in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*;
(7) false advertising in violation of Cal. Bus. & Prof. Code
§ 17500 *et seq.*; (8) unjust enrichment; (9) conversion;
(10) intentional interference with prospective economic
advantage; and (11) negligent interference with prospective
economic advantage.

Defendants asserted numerous defenses, including that
Yuga does not have enforceable trademark rights and, even
if it does, their use of the BAYC Marks was protected under
the nominative fair-use doctrine and the First Amendment.
Defendants also countersued for: (1) knowing
misrepresentation of infringing activity in violation of the
DMCA, 17 U.S.C. § 512(f); (2) declaratory judgment of no
copyright under 17 U.S.C. §§ 102(a) and 204(a);
(3) intentional infliction of emotional distress; (4) negligent
infliction of emotional distress; and (5) declaratory
judgment of no defamation. Defendants also filed an anti-

SLAPP motion to strike [6] and a motion to dismiss. The district court denied Defendants' anti-SLAPP motion and its motion to dismiss, except as to Yuga's unjust-enrichment claim. The district court also rejected Defendants' First Amendment and fair-use defenses.

Defendants appealed. In an unpublished decision, we affirmed, concluding that "[t]he district court correctly determined that the anti-SLAPP motion failed . . . because Yuga Labs' claims did not arise from acts Ripps took in furtherance of his right of free speech." *Yuga Labs, Inc. v. Ripps*, No. 22-56199, 2023 WL 7123786, at \*1 (9th Cir. Oct. 30, 2023).

In March 2023, Yuga moved for summary judgment on its false-designation-of-origin and cybersquatting claims, as well as on Defendants' defenses and DMCA counterclaim. The district court granted summary judgment for Yuga on those three issues. In relevant part, the district court "easily conclude[d] that Defendants' use of Yuga's BAYC Marks was likely to cause confusion" and that Defendants intentionally infringed Yuga's BAYC Marks. The court then set a bench trial to determine the scope of infringement liability and remedies. Following the pretrial conference, Yuga dismissed its Lanham Act false-advertising claim and all of its state-law claims, and it withdrew its demand for legal remedies, including up to $800 million in monetary damages. It proceeded to trial only on its demand for

---

[6] California's anti-SLAPP statute requires a court to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's" free-speech rights "in connection with a public issue . . . , unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Code Civ. Proc. § 425.16(b)(1).

equitable remedies on its remaining two claims for false designation of origin and cybersquatting.

During a one-day bench trial, the district court considered testimony and argument on four issues: (1) whether Yuga was entitled to disgorgement of Defendants' profits, and, if so, in what amount; (2) the amount of statutory damages to be awarded on the cybersquatting claim; (3) the scope of a permanent injunction; and (4) whether this was an "exceptional case" warranting an award of attorneys' fees. The district court found that the BAYC Marks are unregistered trademarks and that Yuga had used these marks "since approximately April 2021 in connection with advertising, marketing, and promotion of its products and services nationwide and internationally through multiple platforms, including the BAYC website." The district court awarded Yuga disgorgement of Defendants' profits, maximum ACPA statutory damages, and attorneys' fees, finding that this was an exceptional case due to "the strength of Yuga's litigating position" and Defendant's willful infringement, bad faith intent to profit, and litigation conduct. The court also issued a permanent injunction prohibiting Defendants "from marketing, promoting, or selling products or services, including RR/BAYC NFTs and Ape Market, that use the BAYC Marks."

Defendants now appeal the district court's grant of summary judgment for Yuga on its false-designation-of-origin and cybersquatting claims and on Defendants' DMCA counterclaim. Defendants also argue that the remedies granted should be vacated under the First and Seventh Amendments and federal equitable principles.

# DISCUSSION

We primarily focus on the district court's summary-judgment decision, which we review de novo. *Idaho Conservation League v. Poe*, 86 F.4th 1243, 1246 (9th Cir. 2023). "Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing Fed. R. Civ. P. 56(a)). "We 'must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.'" *Id.* (quoting *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc)).

## I. Trademark-Infringement Claim

The Lanham Act "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1027 (9th Cir. 2024) (quoting *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 263 (9th Cir. 2018)). Section 43(a) prohibits a person from using "in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion . . . as to the origin . . . of his or her goods." 15 U.S.C. § 1125(a)(1). As the text suggests, a trademark-infringement claim based on a false-designation-of-origin theory turns on the plaintiff establishing a likelihood of consumer confusion between its mark and the defendant's allegedly infringing mark. *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1018 (9th Cir. 2018) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992)).

The statute's reference to "origin" gives rise "to two causes of action for 'passing off' based on false designation

of origin: passing off and reverse passing off." *Id.* at 1016. "Passing off . . . occurs when a producer misrepresents his own goods or services as someone else's. 'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone else's goods or services as his own." *Id.* (alteration in original) (citation omitted). Here, Yuga asserts a passing-off claim, arguing that Defendants "made counterfeit BAYC NFTs that they advertised and sold to the same customers, in the same markets, using Yuga's BAYC trademarks."

To prevail on any trademark-infringement claim, the plaintiff must have a valid and enforceable trademark. Defendants assert that Yuga does not have an enforceable trademark because NFTs are not "goods" protected by the Lanham Act and because, even if Yuga could have a valid trademark, it is not entitled to enforce its trademark rights. Defendants claim that any trademark rights are unenforceable because Yuga's sale of its NFTs was an unlawful sale of unregistered securities, and because Yuga no longer has an ownership interest in the BAYC Marks. Thus, we must address these threshold issues before reaching the merits of Yuga's infringement claim and Defendants' infringement-related defenses.

### A. Are NFTs protected by the Lanham Act?

Defendants argue that Yuga's trademark claim fails because an NFT is not a "good" under the Lanham Act. This argument is not persuasive. Throughout its text, the Lanham Act protects marks used with "any goods or services." *E.g.*, 15 U.S.C. §§ 1114, 1125; *see also id.* § 1112. But the Lanham Act does not define what constitutes a "good" or a "service" that triggers trademark protection, nor does it exclude certain categories of goods and services from its

protection. *See id.* § 1127. However, the U.S. Patent and
Trademark Office (PTO) has concluded that NFTs are goods
covered by the Lanham Act. In one of its most recent reports
on NFTs, the PTO explained:

> Trademarks perform the same functions in
> NFT markets as they do in other markets:
> They identify the source of goods and
> services and distinguish the goods and
> services of one party from those of others.
> For example, trademarks can be used to
> indicate the source of underlying assets
> associated with NFTs, such as digital art,
> video clips of iconic sports moments, or
> physical shoes. Trademarks can also indicate
> the source of services, such as unique
> entertainment    experiences    or    club
> memberships, access to which is represented
> by NFTs.

U.S. Pat. & Trademark Off. and U.S. Copyright Off., *Non-
Fungible Tokens and Intellectual Property: A Report to
Congress* 45 (Mar. 2024) (footnotes omitted). Although not
binding, the PTO's position is instructive given Congress's
silence. *See* 15 U.S.C. § 1127; *Loper Bright Enters. v.
Raimondo*, 603 U.S. 369, 388 (2024) (citing *Skidmore v.
Swift & Co.*, 323 U.S. 134, 139–40 (1944)).

In arguing that NFTs are not trademarkable goods,
Defendants rely on *Dastar Corp. v. Twentieth Century Fox
Film Corp.*, 539 U.S. 23 (2003), and *Slep-Tone Ent. Corp. v.
Wired for Sound Karaoke and DJ Servs., LLC*, 845 F.3d
1246 (9th Cir. 2017) (per curiam). These cases addressed
tangible goods that contained intangible, expressive content.

At issue in *Dastar* was a video cassette. The Supreme
Court addressed whether section 43(a) of the Lanham Act,
which prohibits a person from using "in commerce any
word, term, name, symbol, or device . . . which . . . is likely
to cause confusion . . . as to the origin . . . of his or her
goods," 15 U.S.C. § 1125(a), "prevents the unaccredited
copying of a work," *Dastar*, 539 U.S. at 25. The Court first
analyzed the statutory phrase "origin . . . of . . . goods" and
understood "origin" to mean "the producer of the tangible
product sold in the marketplace." *Id.* at 31. Applying this
definition, the Court concluded that the "origin" of a video
cassette is the manufacturer of the cassette, not the creator of
the footage within the cassette. *Id.* at 33–38. Because
copyright law already protects the communicative content in
the footage, the Court reasoned that also affording Lanham
Act protection to that content would render trademark law
superfluous. *Id.* at 33–35.

Defendants understand *Dastar* to mean that intangible
goods, including NFTs, are ineligible for trademark
protection because they are not "goods." But the Supreme
Court did not adopt a bright-line rule delineating tangible
and intangible goods. Rather, it recognized a distinction
between the tangible good and the intangible aspects *of that
same good*. In so doing, it concluded that "the author of any
idea, concept, or communication embodied in [tangible]
goods" is not afforded trademark protection separate and
distinct from the protection afforded to the producer of the
tangible cassette housing the author's content. *Id.* at 37. Only
the tangible good operated as a source-identifier for the
overall product (video content and video cassette), as
experienced by a video-cassette-purchasing consumer. *Id.* at
31–33, 36–37.

*Slep-Tone* involved a compact disc (CD) of karaoke tracks. A karaoke operator obtained and used digital copies of tracks originally published on CDs marketed under the plaintiff's mark, and the plaintiff sued for trademark infringement. *Slep-Tone*, 845 F.3d at 1248. We held that the plaintiff's claim should have been grounded in copyright, not trademark, because "[c]onsumers never [saw] the digital files and [the karaoke operator] neither [sold] them nor ma[d]e representations about their source medium." *Id.* at 1250. That is, the karaoke operator "[did] not use the [plaintiff's] marks 'in connection with the sale, offering for sale, distribution, or advertising' of the files." *Id.* (citation omitted). Thus, given how the karaoke operator used the replicated tracks, there was no prospect of consumer confusion about "the source of the tangible good sold in the marketplace." *Id.* (citation omitted).

Defendants fall short of establishing that NFTs are categorically excluded from protection under the Lanham Act. The statutory text does not require this result. Nor does the reasoning in *Dastar* or *Slep-Tone*. Unlike the intangible content at issue in those cases, NFTs are not contained in or even associated with tangible goods that are sold in the marketplace. NFTs exist only in the digital world, and they are associated only with digital files. NFTs are marketed and actively traded in commerce. *See* Bobek, *supra*, at 653. Indeed, consumers purchase NFTs as commercial goods in online marketplaces specifically curated for NFTs. *See id.*

Defendants also fail to grapple with Yuga's *specific* BAYC NFT product that customers are encountering firsthand in the market. *See U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 556 (2020) (recognizing "the Lanham Act's focus on consumer perception" and holding that trademark registrability turns in part on the

"meaning" of the trademark "to consumers"). Customers experience the BAYC NFTs as more than a digital deed to or authentication of artwork. BAYC NFTs also function as membership passes, providing "Ape holders" with exclusive access to online and offline social clubs, branded merchandise, interactive digital spaces, and celebrity events.

Thus, we conclude that Yuga's NFTs are "goods" under the Lanham Act.

## B. Does Yuga Have Enforceable Trademarks?

"A party claiming trademark ownership must establish that it was the first to use the mark in the sale of goods or services. This concept is known as trademark 'priority.'" *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1160 (9th Cir. 2013). There is no dispute that Yuga was the first to use the BAYC Marks in commerce. Rather, Defendants argue that Yuga does not have trademark priority because it (1) engaged in unlawful conduct in using the BAYC Marks to sell unregistered securities and (2) gave up its trademark rights when selling its NFTs.

### 1. Unlawful Conduct

There is a limitation on the general rule that the first to use a mark in commerce establishes trademark priority: "only *lawful* use in commerce can give rise to trademark priority." *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007). "This rule prevents the absurd result of the government 'extending the benefits of trademark protection to a seller based upon actions the seller took in violation of that government's own laws.'" *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 689 (9th Cir. 2022) (quoting *CreAgri*, 474 F.3d at 630).

There are two narrowing principles that apply to the unlawful-use limitation. First, "unlawful conduct [does] not preclude trademark protection if it was 'immaterial,' namely if it was not 'of such gravity and significance that the usage [of the mark] . . . as a matter of law, [can] create no trademark rights.'" *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014) (second, third, and fourth alterations in original) (quoting *CreAgri*, 474 F.3d at 633). And second, trademark protection may not be withheld if the unlawful conduct is collateral to the use of the mark. *Id.*; *see also AK Futures*, 35 F.4th at 689 ("[I]llegal activity of insufficient gravity or connection to a mark's use in commerce might not defeat an otherwise valid trademark."). There must be a sufficient "nexus between the unlawful behavior and the use of the mark in commerce." *S. Cal. Darts Ass'n*, 762 F.3d at 931; *see CreAgri*, 474 F.3d at 631.

Here, Defendants contend that "there is a genuine dispute whether Yuga used [its] marks *legally*" because there is "evidence showing that Yuga sold the Bored Apes NFTs as unregistered securities." Defendants point to Yuga's marketing of BAYC NFTs as "investment contracts" coupled with its grant of cryptocurrency to NFT holders. Putting aside the uncertain regulatory landscape of the nascent NFT market, [7] we conclude that there is an

---

[7] *See* Alanna Sadler, Note and Comment, *Legal Uncertainty in Virtual Worlds and Digital Goods: Do the Same Laws Apply?*, 32 U. Miami Bus. L. Rev. 381, 400 (2024); *see also* Lauren Au, Note, *Fractionalization to Securitization: How the SEC May Regulate the Emerging Asset of NFTs*, 96 S. Cal. L. Rev. 253, 255 (2022) ("[R]egulatory and securities laws struggle to keep pace with emerging innovations and financial technologies like NFTs. Much of the SEC's limited guidance focuses on cryptocurrencies and blockchain technology generally, with little

insufficient nexus between Yuga's use of the BAYC Marks and its purported securities violations to withhold trademark protection.

In *Southern California Darts Ass'n*, the defendant asserted that the plaintiff could not enforce its business marks through an infringement action because the plaintiff's corporate status was suspended for nonpayment of taxes. 762 F.3d at 931. We rejected this argument, concluding that the plaintiff's alleged failure to pay taxes was "unrelated to the purpose of the federal trademark laws and, therefore, collateral and immaterial." *Id.* at 931–32. Conversely, in *CreAgri*, we considered whether a company that had misstated the amount of the active ingredient in its health supplement in violation of federal drug-labeling laws could claim trademark priority in the name of its product. 474 F.3d at 630–31. In that context, we held that "the nexus between a misbranded product and that product's name, particularly one designed for human consumption, is sufficiently close to justify withholding trademark protection for that name until and unless the misbranding is cured." *Id.* at 631–32. That is, there was a clear connection between the unlawful act— mislabeling the ingredients in the supplement—and the use of that product name (the mark) in commerce. *Id.* at 632.

This case is more analogous to *Southern California Darts Ass'n* than *CreAgri*. Like the plaintiff's failure to pay taxes in *Southern California Darts Ass'n*, Yuga's failure to register its NFTs as securities does not impact the source-indicating or goods-describing functions of trademarks. But these inherent trademark functions were at issue in the

---

guidance specifically on NFTs as a security."). *But see, e.g.*, *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 433–34 (S.D.N.Y. 2023) (applying the traditional investment-contract analysis to NFTs).

product-labeling violation addressed in *CreAgri*, where the false representation of ingredients on the product label directly related to the message that the product's mark was sending to the purchasing public. Thus, we conclude that there is an insufficient nexus between Yuga's alleged securities violation and its use of the BAYC Marks in commerce to warrant withholding trademark protection.[8] *See S. Cal. Darts Ass'n*, 762 F.3d at 931–32.

## 2. Ownership

Defendants also argue that Yuga was not entitled to summary judgment on trademark infringement because Yuga no longer has any ownership rights in the BAYC Marks. Defendants make three broad arguments attacking Yuga's ownership interest, none of which are meritorious.

### a.

First, Defendants seemingly argue that Yuga assigned all rights in its mark to NFT purchasers via the T&Cs governing Yuga's Bored Ape NFT sales.[9] They contend that because

---

[8] Defendants also reference Yuga's failure to register the BAYC Marks with the PTO in suggesting Yuga does not have an enforceable trademark. But an otherwise valid "unregistered trademark can be enforced against would-be infringers in several ways," including through an infringement action under § 43(a) of the Lanham Act, an ACPA claim, and state common law. *Matal v. Tam*, 582 U.S. 218, 225–26 (2017).

[9] Defendants brief this argument as an abandonment issue. A mark is "abandoned" (1) when the owner has "discontinued [its use] with intent not to resume such use" or (2) when the owner's conduct causes the mark "to lose its significance as a mark." 15 U.S.C. § 1127. Yuga has plainly not discontinued its use of its trademarks, so any abandonment theory necessarily fails the first prong. We address the second prong below. To

the T&Cs granted a sweeping license to use the associated
Bored Ape image with no carveout for trademark rights,
such rights must have *completely* passed to the NFT
purchasers. Of course, a trademark owner may assign its
rights. *Russell Rd. Food & Beverage, LLC v. Spencer*, 829
F.3d 1152, 1156 (9th Cir. 2016); *see also* 2 J. Thomas
McCarthy,  McCarthy  on  Trademarks  and  Unfair
Competition §§ 18:4, 18:15 (5th ed. 2025). But for an
assignment to be valid, it must transfer the goodwill of the
business or the part of the business connected to the mark,
otherwise it is an "invalid assignment in gross." *E. & J.
Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th
Cir. 1992); *see also* 2 McCarthy, *supra*, § 18:17. We rely on
general principles of contract law to determine whether a
valid assignment has occurred. 2 McCarthy, *supra*, § 18:4.
While assignment of a registered trademark must be done in
a signed writing, *see* 15 U.S.C. § 1060(a)(1), (3), assignment
of an unregistered trademark need not be in writing but must
only be proved by strong evidence, 2 McCarthy § 18:4.

Here, Yuga's T&Cs stated that buyers own the NFT and
"the underlying Bored Ape, the Art." They also granted
buyers "a worldwide, royalty-free license to use, copy, and
display the purchased Art . . . for [the buyers'] own personal,
non-commercial use" and for "creating derivative works
based on the Art" for commercial use. Yuga undoubtedly
gave buyers control over the purchased NFT and an
unlimited, royalty-free right to use its *associated artwork*

---

the extent Defendants argue that Yuga sold its trademark rights via the
T&Cs, that argument sounds in assignment, and we address it
accordingly.

(i.e., the Bored Ape image).[10] But the BAYC Marks are distinct from the artwork, and the T&Cs are silent as to trademark rights.

Defendants suggest that because the NFTs themselves and some of the Bored Ape images incorporate one or more of the BAYC marks, conveying the NFTs and artwork necessarily also granted rights in Yuga's trademarks. But nothing suggests that the incorporated marks act as a source identifier relative to each individual purchaser or to all Ape holders such that the purchasers constantly infringe one another's marks. Additionally, the transactions do not establish that Yuga assigned the goodwill associated with its trademarks to the NFT purchasers. Yuga has continued to use the BAYC Marks to market BAYC.

Defendants also cite a statement from Yuga's CEO made during the litigation that Yuga granted "all IP rights" to the NFT purchasers and that Yuga retained "none of them." But this statement is not determinative given that our task in discerning the terms of a written contract is to construe the words of the contract, not after-the-fact statements about its contents. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006) (per curiam) ("[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." (alteration in original) (citation omitted)). As detailed above, the T&Cs unambiguously do not assign trademark rights in

---

[10] By referencing "derivative works," the T&Cs plainly meant to convey a copyright license, given that term is a term of art under the Copyright Act. *See* 17 U.S.C. § 101 ("A 'derivative work' is a work based upon one or more preexisting works . . . [and includes] any other form in which a work may be recast, transformed, or adapted.").

Yuga's marks. And Yuga did not have to expressly carve out a grant of trademark rights to avoid conveying them.

Relatedly, Defendants claim that Yuga assigned three of its marks by transferring an NFT associated with a different image—a "one of one" ApeCoin image displaying an ape skull. The ApeCoin image is not itself a BAYC Mark, so Yuga did not convey any of its trademark rights in gifting this image.

**b.**

Next, Defendants argue that Yuga abandoned its trademarks by "fail[ing] to exercise adequate quality control" over them. *Barcamerica Int'l USA Tr. v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. 2002). This contention also stems from Defendants' sweeping view of Yuga's T&Cs and is essentially a naked-licensing argument. "'Naked licensing' occurs when the licensor 'fails to exercise adequate quality control over the licensee'" and, accordingly, abandons "any rights to the trademark." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515–16 (9th Cir. 2010) (quoting *Barcamerica*, 289 F.3d at 596, 598). The naked-licensing rule applies only when a trademark license has been granted. *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1047 (4th Cir. 1984); *Neo4j, Inc. v. PureThink, LLC*, 480 F. Supp. 3d 1071, 1077 (N.D. Cal. 2020).

Defendants' abandonment argument fails right out of the gate because we have concluded that Yuga did not grant any trademark license. As discussed, nothing in the T&Cs references Yuga's trademarks. And although a trademark license may be implied, *see Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1129 (9th Cir. 2006), Defendants fail to point to any evidence that the

parties to the T&Cs believed that NFT purchasers obtained a license to use Yuga's trademarks. We cannot infer the existence of a licensing agreement from the grant of other rights without something more. *Cf. id.* at 1130 (holding that contract to lease premises was not a licensing agreement where "[n]one of the terms typical of a trademark licensing agreement, such as payment of royalties, [were] present" and the terms of the contract were lease provisions); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1273–75 (11th Cir. 2012) (holding that a licensing agreement authorizing use of University trademarks did not cover paintings depicting University uniforms).

**c.**

Finally, Defendants assert that Yuga failed to adequately police "unlicensed, commercial uses of the asserted marks." A mark may become unenforceable "as a result of a trademark owner's failure to police the mark, resulting in widespread usage by competitors leading to a perception of genericness among the public.'" *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007) (citation omitted). Defendants cite a few examples of copycats using the BAYC Marks. This is insufficient to create a question of fact regarding whether the marks have "ceas[ed] to function as a symbol of quality and a controlled source," *FreecycleSunnyvale*, 626 F.3d at 515, particularly given BAYC's ongoing recognition as an online brand that actively hosts events for its members, curates online and offline social communities, and works with celebrity endorsers and major fashion brands. Nor do Defendants address the evidence that Yuga did police its marks by sending takedown notices for unlicensed uses of its trademarks to NFT marketplaces. *See Freecycle Network*, 505 F.3d at 905. In sum, Defendants have not shown there is

a triable issue regarding whether Yuga retained ownership
of the BAYC Marks.

## C. Has Yuga Proven Infringement?

To prevail on its trademark-infringement claim, Yuga
must show a likelihood of consumer confusion between the
Defendants' allegedly infringing marks and Yuga's marks.
*OTR Wheel*, 897 F.3d at 1018. Yuga's "passing off" claim
relies on "forward confusion." *Ironhawk Techs., Inc. v.
Dropbox, Inc.*, 2 F.4th 1150, 1159–60 (9th Cir. 2021)
(citation omitted). "Forward confusion occurs when
consumers believe that goods bearing the [allegedly
infringing mark] came from, or were sponsored by, the
[original] mark holder."[11] *Id.* at 1159–60 (citation omitted).
Defendants contend that they cannot be held liable for
infringement because their use of Yuga's marks constituted
nominative fair use and was "expressive work" protected by
the First Amendment.

Under our "likelihood-of-confusion test," we "ask
'whether a "reasonably prudent consumer" in the
marketplace is likely to be confused as to the origin of the
good or service bearing one of the marks.'" *Punchbowl*, 90
F.4th at 1027 (quoting *Dreamwerks Prod. Grp. v. SKG
Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)); *see also
Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209
(9th Cir. 2012). Typically, this requires us to evaluate the
*Sleekcraft* factors. *Punchbowl*, 90 F.4th at 1027 (citing *AMF
Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)). But
there is no need to reach this inquiry if the defendant's use

---

[11] We also recognize "reverse confusion," which "occurs when
consumers dealing with the [original] mark holder believe that they are
doing business with the [allegedly infringing party]." *Id.* at 1160 (citation
omitted).

of the protected mark constitutes nominative fair use or is protected by the First Amendment. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1182 (9th Cir. 2010) (stating that when nominative fair use is raised, the court "must eschew application of *Sleekcraft* and analyze the case solely under the rubric of nominative fair use"); *Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 801 (9th Cir. 2022) (stating that when a defendant "makes the 'threshold legal showing' that the supposed trademark infringement is protected by the First Amendment, it eliminates the need to reach the fact-bound consumer confusion issue at all"). Thus, we begin our analysis with those issues.

### 1. Nominative Fair Use

"Nominative fair use applies 'where a defendant has used the plaintiff's mark to describe the *plaintiff's product* . . . .'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) (quoting *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002)). A common example is where one "deliberately uses another's trademark or trade dress for the purposes of comparison, criticism, or point of reference." *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1098 (9th Cir. 2008) (citation modified). Another example is where one sells "genuine goods bearing a true mark even though such sale is without the mark owner's consent." *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) (citation omitted). In that context there may be copyright infringement or other violations, but there is not a trademark infringement. *See id.* at 1081–82. Where a mark is "the only word reasonably available to describe a particular thing," use of that mark "lies outside . . . of trademark law." *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893 (9th Cir. 2019) (quoting *New Kids on the*

*Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)).

Nominative fair use does not implicate the source-identification function of trademark. *Id.* By definition, if the defendant *uses the plaintiff's mark to refer to the plaintiff's product*, the source is correctly identified. To determine whether a particular use qualifies as nominative fair use, we consider the *New Kids* factors:[12]

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

971 F.2d at 308 (footnote omitted). These factors are "designed to address the risk that nominative use of the mark will inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder." *Toyota Motor Sales*, 610 F.3d at 1176. If all three *New Kids* factors are satisfied, there is no infringement. *Id.* If all the factors are not satisfied, the court "may order defendants to modify their use of the mark so that all three factors are satisfied." *Id.* Nominative fair use is not an affirmative defense in the traditional sense. The defendant "need only show that it used the mark to refer to the

---

[12] We have also referred to these as the *Toyota* factors in reference to *Toyota Motor Sales*, 610 F.3d 1171, which reaffirmed the *New Kids*' nominative fair-use standard. *See, e.g.*, *Adobe Sys*, 809 F.3d at 1081.

trademarked good." *Id.* at 1183. If that showing is made, the burden then "reverts to the plaintiff to show a likelihood of confusion." *Id.*

Here, Defendants cannot make the required initial showing because they did not use the BAYC Marks merely to describe or otherwise reference Yuga's NFTs. They used the marks *as marks*. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 148 (2023). If Ripps had solely depicted the BAYC Marks in the context of critiquing the Bored Ape images as racist, that may have been nominative fair use. *See E.S.S. Ent. 2000*, 547 F.3d at 1098–99. But Defendants went well beyond criticism: they used the BAYC Marks to create, promote, and sell *their own NFTs* associated with the same artwork as Yuga's NFT collection.

Defendants embedded the "Bored Ape Yacht Club" and "BAYC" marks into their RR/BAYC NFTs by using them for their NFT collection name and symbol. By design, these name and symbol designations signify the provenance of an NFT. Ripps also used these and other BAYC marks on social media in advertising the RR/BAYC NFT collection. It does not matter that Defendants' ultimate goal may have been criticism and commentary. *See Jack Daniel's*, 599 U.S. at 148 (explaining a defendant does not get the benefit of fair use "even if engaging in parody, criticism, or commentary— when using the similar-looking mark 'as a designation of source for the [defendant's] own goods'" (alteration in original) (citation omitted)).

Yuga used the "Bored Ape Yacht Club" and "BAYC" marks in the same source-identifying way for its BAYC NFT collection. And there is evidence that the duplicative use of these marks as identifiers for both NFT collections has caused third-party NFT trackers, like Etherscan, to identify

BAYC NFTs and RR/BAYC NFTs as having the same origin. *See Adobe Sys.*, 809 F.3d at 1081 ("In a nominative fair use case, the concern is avoiding confusion over whether the speaker is endorsed or sponsored by the trademark holder.").

Defendants nonetheless argue that they engaged in nominative fair-use because this doctrine applies even when a defendant's "ultimate goal" is to describe its own products. In making this argument, Defendants rely on *Cairns*, where we stated: "The nominative fair use analysis is appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his own product*." 292 F.3d at 1151. Contrary to Defendants' suggestion, *Cairns* does not stand for the principle that using someone else's mark on the same type of product as the mark holder's qualifies as nominative fair use.

The cases on which *Cairns* relies demonstrate that nominative fair use occurs when a mark is used with the ultimate goal of: (1) *describing* a product or service that is necessarily different from the mark holder's product, or (2) *comparing* a product to the mark holder's product. *See id.* at 1151–54. In *New Kids*, two newspapers used the trademarked band name "The New Kids on the Block" to present polls to their readers about the band. 971 F.2d at 304. In *Volkswagenwerk Aktiengesellschaft v. Church*, an auto-repair business specializing in Volkswagen and Porsche, had a sign reading, "Modern Volkswagen Porsche Service." 411 F.2d 350, 351 (9th Cir. 1969). The Volkswagen car company uses the "Volkswagen" mark to describe its cars, and it argued that the sign was infringing. *Id.* Similarly, in *WCVB–TV v. Boston Athletic Ass'n*, a television station made unauthorized broadcasts of—and referred by name to—the

"Boston Marathon," a trademarked sports event. 926 F.2d 42, 44 (1st Cir. 1991). And in *Smith v. Chanel, Inc.*, an imitator of brand perfumes advertised his "Second Chance" perfume as indistinguishable from the trademarked "Chanel No. 5" perfume. 402 F.2d 562, 562–63 (9th Cir. 1968).

In all these cases, the defendants' use of the plaintiffs' marks was permissible because it referenced or described the plaintiffs' products and did not create confusion about the origin of the defendants' products. In *New Kids*, the court explained that the newspapers had no choice but to refer to the name of the band that was the subject of their poll, and trademark protection "does not extend to rendering newspaper articles, conversations, polls and comparative advertising impossible." 971 F.2d at 308. In *Volkswagenwerk*, the court concluded that the auto-repair business was sufficiently distinguished from the car company, noting the repair business's "prominent use of the word 'Independent' whenever the terms 'Volkswagen' or 'VW' appeared in [its] advertising." 411 F.2d at 352. In *WCVB–TV*, the court explained that a news broadcast advertising the "Boston Marathon" did not create confusion because "a viewer who sees those words flash upon the screen will believe simply that Channel 5 will show, or is showing, or has shown, the marathon, not that Channel 5 has some special approval from the [plaintiff] to do so." 926 F.2d at 46. And in *Smith*, the court determined that an imitator must be able to compare to the original product being imitated, that the imitators' "advertisement ma[de] it clear that the product they offer is their own," and that the imitators used the plaintiff's mark "only to describe [plaintiff]'s product, not to identify their own." 402 F.2d at 568–69.

These cases are distinguishable from the present case. As explained, Defendants did not use the BAYC Marks merely to reference Yuga's NFTs. They incorporated some of the marks into their own NFTs and used others in marketing their NFTs, thereby "implicat[ing] the source-identification function that is the purpose of trademark." *Applied Underwriters*, 913 F.3d at 893 (quoting *New Kids*, 971 F.2d at 308). Defendants used Yuga's marks not just as descriptors or comparators, but to "capitalize on consumer confusion [and] appropriate the cachet of" BAYC NFTs to sell their own product. *New Kids*, 971 F.2d at 308. There are significant questions about whether the likelihood-of-consumer-confusion requirement was satisfied given the nature of Defendants' project to use "satire and appropriation to protest and educate regarding The Bored Ape Yacht Club and the framework of NFTs," but those questions are properly addressed in analyzing the *Sleekcraft* factors, not nominative fair use.[13] *See Jack Daniel's*, 599 U.S. at 153 (holding that the defendant's "parody" message "matters in assessing confusion because consumers are not so likely to think that the maker of a mocked product is itself doing the mocking").

## 2. First Amendment

We recognize a narrow First Amendment exception to trademark infringement for expressive speech. *See id.* at 153–56. Where a defendant "make[s] a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment," the plaintiff must satisfy the *Rogers* test to prove infringement.

---

[13] We do not address Defendants' argument that the district court incorrectly allocated the burden of proof in its analysis of nominative fair use because any error is ultimately harmless.

*Gordon*, 909 F.3d at 264 (citing *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989)); *accord Punchbowl*, 90 F.4th at 1028. However, the *Rogers* test is a "cabined doctrine." *Jack Daniel's*, 599 U.S. at 155. The Supreme Court has made clear that this First Amendment exception to trademark enforcement does not apply where "an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods." *Id.* at 153; *see also id.* at 144, 162 (concluding use of the phrases "Bad Spaniels" and "The Old No. 2 On Your Tennessee Carpet" on a dog toy to parody the Jack Daniel's whiskey brand was not protected use).

Here, Defendants argue their "sale of the RR/BAYC NFTs was a component of a broader expressive art project and public protest" and, as such, the *Rogers* test applies. They devote significant briefing to explaining the "expressive nature" of their RR/BAYC NFT "project," and relatively little to explaining how their use of Yuga's marks was not a designation of source for their own NFTs. And ultimately, Defendants' cursory assertion that it did not use Yuga's marks as identifiers of source fails under *Jack Daniel's*.

Quoting *Jack Daniel's*, Defendants first state that cabining *Rogers* is appropriate where "the defendant may be 'trading on the good will of the trademark owner to market its own goods.'" *See* 599 U.S. at 156. They then argue the evidence here shows "the *opposite*—their constant criticism and public protest of the Bored Ape Images' racism and the business practices associated with the Bored Ape NFT collection was intended to *undermine* Yuga's good will, not to trade on it." Defendants erroneously read an intent requirement into the Court's general explanation of how marks are used as source identifiers. Whether images, logos,

or phrases operate as source identifiers (i.e., marks) does not depend on the subjective intent of the user. Under the Lanham Act, "source identifiers [are] things that function to 'indicate the source' of goods, and so to 'distinguish' them from ones 'manufactured or sold by others.'" *Id.* at 156–57 (quoting 15 U.S.C. § 1127). The functionality of the mark itself—how it operates and whether it is "likely to cause confusion, or to cause mistake, or to deceive"—is what the Lanham Act addresses. 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A).

Here, as explained above, Defendants used Yuga's marks as source identification for their RR/BAYC NFTs. And when a use of the plaintiff's mark is "at least in part for source identification," the First Amendment exception to trademark enforcement is foreclosed. *Jack Daniel's*, 599 U.S at 156 (internal quotation marks and citation omitted); *see also id.* at 159 ("The trademark law generally prevails over the First Amendment when another's trademark (or a confusingly similar mark) is used without permission as a means of source identification." (citation modified)).

### 3. Likelihood of Confusion

Having determined that Defendants' use of the BAYC Marks is not excused by the nominative fair-use doctrine or the First Amendment, we turn to the merits of Yuga's infringement claim and analyze "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of" Defendants' NFTs. *Punchbowl*, 90 F.4th at 1027 (quoting *Dreamwerks*, 142 F.3d at 1129); *see also Rearden*, 683 F.3d at 1209. In doing so, we consider "the eight '*Sleekcraft*' factors: '(1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels

used; (6) type of goods and the degree of care likely to be
exercised by the purchaser; (7) defendant's intent in
selecting the mark; and (8) likelihood of expansion of the
product lines.'" *Punchbowl*, 90 F.4th at 1027 (quoting
*Sleekcraft Boats*, 599 F.2d at 348–49).

These "factors (1) are non-exhaustive, and (2) should be
applied flexibly, *particularly in the context of Internet
commerce*." *Network Automation, Inc. v. Advanced Sys.
Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011)
(emphasis added). And for internet commerce, "the three
most important *Sleekcraft* factors are (1) the similarity of the
marks, (2) the relatedness of the goods or services, and
(3) the simultaneous use of the Web as a marketing
channel." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d
1199, 1205 (9th Cir. 2000) (internal quotation marks and
citation omitted).

While this is an inherently fact-specific inquiry, in the
appropriate case the likelihood of confusion may be decided
at summary judgment. *See Multi Time Mach., Inc. v.
Amazon.com, Inc.*, 804 F.3d 930, 939 (9th Cir. 2015) ("The
likelihood of confusion is often a question of fact, but not
always."); *see also Jockey Club, Inc. v. Jockey Club of Las
Vegas, Inc.*, 595 F.2d 1167, 1168 (9th Cir. 1979) ("The
question of likelihood of confusion can be one of fact or
law."). This is not an appropriate case. *See JL Beverage Co.,
LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir.
2016) ("While the district court must apply the correct
[summary judgment] standard in any case, the necessity to
do so is heightened in cases turning on the likelihood of
consumer confusion."); *Rearden*, 683 F.3d at 1210 ("Given
the open-ended nature of this multi-prong inquiry, it is not
surprising that summary judgment on 'likelihood of
confusion' grounds is generally disfavored."); *Au-Tomotive*

*Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1075 (9th Cir. 2006) ("Because the likelihood of confusion is often a fact-intensive inquiry, courts are generally reluctant to decide this issue at the summary judgment stage.").

Despite our instruction to exercise caution in this context because a "careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record," *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901–02 (9th Cir. 2002), the district court "easily conclude[d] that Defendants' use of Yuga's BAYC Marks was likely to cause confusion" and granted summary judgment. This was error. [14] We review each *Sleekcraft* factor in turn.

**Strength of the Mark**

The first factor is the "strength of the [plaintiff's] mark." *Sleekcraft*, 599 F.2d at 348. The strength of a mark determines the level of protection the Lanham Act affords. "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com*, 202 F.3d at 1207.

A mark's strength encompasses both conceptual and commercial strength. *See id.* "[C]onceptual strength depends largely on the obviousness of its connection to the good or service to which it refers," and it is classified along an imperfect spectrum of distinctiveness: "generic, descriptive,

---

[14] Concerns about resolving a case on an incomplete record are particularly salient in the NFT context. *See* U.S. Pat. & Trademark Off. and U.S. Copyright Off., *supra*, at 53 (noting that "the absence of clear, controlling judicial precedent deepens the uncertainty as to how likelihood of confusion analyses will be undertaken in the NFT space").

suggestive, arbitrary, and fanciful." *Fortune Dynamic*, 618 F.3d at 1032–33. At bottom, "[t]he less obvious the connection, the stronger the mark, and vice versa." *Id.* at 1033. For example, descriptive marks are just that—they "describe[] the qualities or characteristics of a good or service." *Id*. (alteration in original). Arbitrary and fanciful marks have "no connection to the product" or are "made-up words with no discernable meaning." *Id.* The latter marks are much stronger than the former. But applying these concepts "is necessarily an imperfect science." *Id.* Commercial strength considers "actual marketplace recognition." *Id.* at 1034 (citation omitted); *Network Automation*, 638 F.3d at 1149.

The BAYC Marks are all conceptually strong. Far from describing an NFT, they are arbitrary, if not entirely fanciful. There is no obvious conceptual link between NFTs and Apes, Bored Apes, or Yacht Clubs. Combining these terms creates a conceptually strong mark based on anthropomorphized apes. While the Ape Skull logo may not be fanciful, it is arbitrary because there is no conceptual link between ape skulls and NFTs. *See Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228, 1259 (9th Cir. 2022) ("An arbitrary mark . . . uses common words in a fictitious and arbitrary manner to create a distinctive mark which identifies the source of the product. Because such a mark neither describes nor suggests anything about the nature of the goods, the trademark holder must work hard to make consumers associate the trademark with the product." (internal quotation marks and citations omitted)).

Similarly, the BAYC marks are commercially strong. Yuga has used the BAYC Marks for years to promote its website, events, and products, including its BAYC NFT collection. The marks have been featured in the press and

popularized by celebrities, leading to brand merchandising
and collaborations with companies like Adidas. Given both
the conceptual strength and commercial strength of the
BAYC marks, even drawing reasonable inferences in
Defendants' favor, the first *Sleekcraft* factor favors a finding
of likely confusion.

## Proximity of the Goods

Second, we consider the "proximity of the goods."
*Sleekcraft*, 599 F.2d at 348. That is, how similar or related
Defendant's goods are to Yuga's goods. *See Brookfield
Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1055
(9th Cir. 1999) ("Related goods are generally more likely
than unrelated goods to confuse the public as to the
producers of the goods."). Both parties sell NFTs. But given
the complexity, idiosyncrasies, and nascence of NFTs, it
would be reductive to suggest that all NFTs are the same and
be done. *See Illicit Finance Risk Assessment of Non-
Fungible Tokens*, U.S. Dep't of Treasury 1 (May 2024)
("There is no widely agreed upon definition of an NFT given
the diverse range of NFT types, uses, and designs."). As
discussed at the outset, "NFTs can tokenize anything, such
as digital art, avatars, video game wearables, digital fashion
accessories, and music." Bobek, *supra*, at 651. Because
NFTs are essentially comprised of *both* the software code
that tokenizes or turns a good into a distinctive asset and the
associated good itself, consumers perceive and interact with
different NFTs in different ways. *See id.* at 651–52. That is
why the precise design and functionality of the parties'
actual products matter.

But the complexity and elasticity of NFTs does not
reduce the proximity of the RR/BAYC and BAYC NFTs,
particularly where they are linked—at Defendants' design—

to the exact same Bored Ape images and corresponding Ape ID numbers. In that sense, the two products are nearly identical. There are, of course, differences in the underlying code of each NFT because NFTs are inherently "one-of-a-kind." *Id.* at 651. But there is also evidence suggesting that Defendants' choice to copy Yuga's contract name and symbol for their RR/BAYC NFT collection has caused actors in the NFT market to misidentify RR/BAYC NFTs as BAYC NFTs despite the differences in the embedded code. Thus, a reasonable factfinder could also conclude that this factor favors Yuga's claim of infringement.

## Similarity of the Marks

Third, we consider the "similarity of the marks." *Sleekcraft*, 599 F.2d at 348. This factor is "critical" to any likelihood-of-confusion analysis because "[o]bviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *GoTo.com*, 202 F.3d at 1205–06. And for internet-based goods in particular, mark similarity is one of the "most important" factors. *Id.* at 1205. "[T]hree axioms . . . apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002); *see also Sleekcraft*, 599 F.2d at 351 ("Similarity of the marks is tested on three levels: sight, sound, and meaning. Each must be considered as they are encountered in the marketplace." (citations omitted)).

The district court analyzed only the similarity of Defendants' rrbayc.com and apemarket.com domains to Yuga's bayc.com domain in the context of Yuga's

cybersquatting claim. The district court stated the legal standard, reiterated its conclusion that "Defendants have used Yuga's marks" and admitted as much, and then concluded "the third *Sleekcraft* factor weighs in favor of Yuga." Suffice to say, the analysis was incomplete and conclusory.

Because "[m]arks should be considered in their entirety and as they appear in the marketplace," *Entrepreneur Media*, 279 F.3d at 1144, it is necessary to examine the degree of Defendants' multi-layered use of Yuga's marks as they were displayed in the digital world. Defendants used Yuga's marks in various contexts, both with and without satirical alteration. While Defendants embedded Yuga's marks into their own NFTs, it appears that they sold most of their NFTs from rrbayc.com. That website expressly referred to their NFT collection as RR/BAYC.

With that context in mind, RR/BAYC shares obvious similarities with the BAYC Mark: they both contain the BAYC acronym, and the letters "BAYC" stand for "Bored Ape Yacht Club" in both marks. These similarities are arguably amplified by the marks' arbitrary or fanciful nature. *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) ("[B]ecause a lesser degree of similarity is required when a trademark holder's mark is strong, the commercial strength of the [plaintiff's] mark amplifies the significance of the marks' . . . similarities.").

Of course, there are also differences between Defendants' and Yuga's marks—namely, the "RR/" in RR/BAYC, which refers to Ripps's name. In *Entrepreneur Media*, we held that a reasonable juror could find the words "Entrepreneur" and "EntrepreneurPR" dissimilar when used as business names. *Id.* at 1145–46. We came to this

conclusion even after acknowledging that, "[a]t first glance,
the difference between the two words . . . may seem slight."
*Id.* at 1145; *cf. Brookfield*, 174 F.3d at 1055 (holding that,
for a preliminary injunction, the trademark "MovieBuff" and
the domain name "moviebuff.com" "are, for all intents and
purposes, identical in terms of sight, sound, and meaning").

Yuga argues that *Entrepreneur Media* is inapposite
because the "entrepreneur" mark is descriptive and the
generic "PR" suffix "did not suggest affiliation with *any*
mark holder," whereas Yuga's mark is "strong and
arbitrary." Yuga is only partially correct. While we
separately discussed the genericity of "Entrepreneur," we
noted that the addition of "PR" "is not arbitrary but suggests
a    particular    difference    in *meaning*: 'EntrepreneurPR,'
presumably meaning 'public relations for (or by) a small,
independent business owner,' has a connotation different
from 'entrepreneur,' standing alone." *Entrepreneur Media*,
279 F.3d at 1146. In contrast, the "RR" prefix added to
BAYC is not a commonly known acronym like "PR" and
does not otherwise refer to something that has a widely
known, discernible meaning. Rather, it refers to Defendant
Ryder Ripps's name, thus pointing to the origin and source
of the RR/BAYC NFTs.

Moreover, in *Entrepreneur Media*, we relied on more
than just the meaning of PR in determining dissimilarity. We
explained that "Entrepreneur" and "EntrepreneurPR" "are
quite dissimilar when sounded out: The letters 'PR'
constitute two additional syllables. Even silent readers
usually 'hear' words as they read and are likely to notice
syllabic differences." *Id.* (citation omitted). Like the addition
of the two-syllable "PR" suffix in *Entrepreneur Media*, the
addition of "RR" and the slash mark makes the "RR/BAYC"
sound different than "BAYC." The "RR" adds additional

sounds, and the slash mark, while not present in all relevant contexts (e.g., rrbayc.com), forces a pause when reading the word out loud. And even crediting Yuga's dubious assumption that *Entrepreneur Media* relied in part on the genericity of "Entrepreneur" in holding it was dissimilar from "EntrepreneurPR," that does not necessarily mean that the inverse is always true—that an acronym affixed to a strong mark is similar.

Despite the similarities between the marks at issue, the differences discussed above are sufficient for a reasonable juror to conclude that these marks are not similar. *See id.* at 1145–46. For these reasons, the current record does not clearly signal on which side of the ledger this highly critical factor lands.

### Actual Confusion

The fourth factor is whether there is "evidence of actual confusion." *Sleekcraft*, 599 F.2d at 348. "[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act. Indeed, [p]roving actual confusion is difficult . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Network Automation*, 638 F.3d at 1151 (second alteration in original) (internal quotation marks and citations omitted). Here, the district court did not analyze this factor, concluding simply that it was neutral.

Yuga provided evidence of actual confusion, including consumer-survey evidence and examples of NFT market actors and television hosts confusing the two brands. But other evidence suggests that those interested in the Bored Apes knew that BAYC and RR/BAYC were different. Considering the fully online nature of the NFT collections and how atomized and widely scattered internet users are, a

reasonable juror might conclude that Yuga's evidence of actual confusion is "unpersuasive as to the ultimate issue of likelihood of confusion." *Entrepreneur Media*, 279 F.3d at 1150. Again, Yuga bears the burden of proof, and taking all reasonable inferences in favor of Defendants, as the nonmovants, we agree with the district court that this factor is neutral on the existing record.

**Marketing Channels**

Next, we consider the "marketing channels used" for the parties' products. *Sleekcraft*, 599 F.2d at 348. "Convergent marketing channels increase the likelihood of confusion." *Id.* at 353. This factor is also important in the internet context. *GoTo.com*, 202 F.3d at 1205. "When examining the marketing channels used by . . . competing companies, we consider where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the [companies'] marketing efforts." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

The district court concluded this factor favors Yuga because both parties "promoted and sold their NFTs through the same online NFT marketplaces – OpenSea and x2y2 [and also] used Twitter to promote their respective NFT collections." This is an oversimplification. The district court ignored evidence showing that most of Defendants' sales of the RR/BAYC NFTs occurred on rrybayc.com, which is a different marketing channel than bayc.com, where Yuga marketed and sold its NFTs, regardless of their similarities in form. Thus, a jury could reasonably conclude that Defendants primarily generated their revenue using a non-convergent market channel.

The percentage of Defendants' sales that occurred via Twitter and the relative size and scope of the RR/BAYC secondary market are unclear. Yuga has not presented any evidence indicating that such sales are more than negligible relative to Defendants' dominant sales through rrbayc.com. Moreover, Defendants' Twitter sales were made "person-to-person," raising the question of whether the Twitter platform as a whole is a market channel or whether the Defendants' individual user pages or accounts were individual markets separate and distinct from other users' accounts. But even assuming that Twitter is one market channel, viewing the evidence in the light most favorable to Defendants, the fifth *Sleekcraft* factor heavily favors them.

### Nature of the Goods and the Purchasers

Next, we consider the "type of goods and the degree of care likely to be exercised by the purchaser." *Sleekcraft*, 599 F.2d at 348. The degree-of-care analysis concerns whether, in making a purchase, "a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005) (citation omitted); *see also Network Automation*, 638 F.3d at 1152 ("[T]he standard used by the courts is the typical buyer exercising ordinary caution." (citation omitted)). "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." *Sleekcraft*, 599 F.2d at 353 (citation omitted). "[W]e expect consumers searching for expensive products online to be even more sophisticated." *Network Automation*, 638 F.3d at 1153.

Given the nature of NFTs, their relative novelty, and that they remain a mystery to most consumers, they are inherently sophisticated goods. *See* Michaels, *supra*, at 5–7; *see also* Robyn Conti, *What is an NFT? Non-Fungible Tokens Explained*, Forbes (Sept. 9, 2022), https://www.forbes.com/advisor/au/investing/cryptocurrency/nft-non-fungible-token/; Saturday Night Live, *NFTs - SNL*, (YouTube, Mar. 27, 2021), https://www.youtube.com/watch?v=mrNOYudaMAc. They can also be expensive goods, particularly given that they are non-essential and virtual. Because Yuga sold its entire BAYC NFT collection before the RR/BAYC collection launched, a reasonably prudent customer would only encounter BAYC NFTs for sale in the secondary market. The BAYC NFTs have sold for steep prices in the secondary market, including some as high as \$24.4 million. On the other hand, Defendants originally sold the RR/BAYC NFTs for between \$100 to \$200, and they sold for significantly less than BAYC NFTs on the secondary market. This extreme price differential would likely alert a consumer that there may be a substantive difference between the two NFT collections, undercutting the likelihood of confusion. Indeed, there is evidence in the record that this occurred.

Construing all reasonable inferences in Defendants' favor, given the nature and cost of the parties' NFTs, customers looking to purchase these products are likely sophisticated. *See Network Automation*, 638 F.3d at 1153. In *Network Automation*, we rejected the district court's inference that "Internet users on the whole exercise a low degree of care" and suggested that this understanding of web-based activity is outdated. *Id.*; *see also id.* at 1152 ("[T]he default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and

online commerce becomes commonplace."). We concluded that consumers purchasing "business software" are "sophisticated" and "exercis[e] a high degree of care." *Id.* at 1152. Although the consumers in *Network Automation* were businesses and here they are largely individuals, our understanding of online shoppers seeking digital goods is nonetheless instructive.

Yuga relies on expert testimony about consumer surveys to imply that "typical NFT consumers" are unsophisticated. This evidence largely relates to the actual-confusion factor and does not directly address whether hypothetical reasonably prudent consumers in the NFT marketplace are sophisticated. *OTR Wheel*, 897 F.3d at 1018 (To determine whether "a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services[,] . . . the jury [must] determine whether a hypothetical consumer would likely be confused. Evidence of actual confusion [is] not required." (internal quotation marks and citations omitted)).

Falling short of rebutting the weight of legal authority indicating that customers seeking expensive goods are likely sophisticated, Yuga attempts to shift the burden of proof onto Defendants to affirmatively establish the sophistication of NFT buyers. But it is Yuga that must establish a likelihood of consumer confusion. *Id.* at 1022–23 ("The plaintiff always maintains the burden to establish consumer confusion."). And there is little in the record that counters our established principles regarding the reasonable inferences to be drawn from the pricing and sophistication of goods. The sixth *Sleekcraft* factor weighs in favor of Defendants.

**Defendants' Intent**

The seventh factor is the defendant's "intent in selecting the mark." *Sleekcraft*, 599 F.2d at 349. The relevant inquiry is the defendant's "intent to infringe." *Ironhawk*, 2 F.4th at 1167. For claims based on a forward theory of confusion, "we ask 'whether [the] defendant in adopting its mark intended to capitalize on [the] plaintiff's good will.'" *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) (quoting *Fortune Dynamic*, 618 F.3d at 1043). "When the alleged infringer knowingly adopts a mark similar to another's, [we] presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.

The import of this factor is not as clear-cut as the district court made it seem. While Defendants claim that they only intended to "undermine" Yuga's reputation through satire, not to trade on its goodwill, the record is replete with evidence that they knew that Yuga was using the BAYC marks in commerce, acknowledged the similarities between the BAYC and RR/BAYC NFTs and that people made "mistakes" distinguishing the two products, and admittedly designed their product to replicate Yuga's product to "satir[ize] . . . the NFT craze" and "show that NFTs do not convey rights in accompanying images." Indeed, Defendants claim that "the RR/BAYC Project's satirical message could only be conveyed by NFTs linking to the same publicly stored and displayed images as the Bored Ape NFTs." This evidence favors a finding of confusion.

But there also is evidence supporting Defendants' contention that they intended for consumers to recognize their sale of RR/BAYC NFTs as conceptual art or an extended satirical project distinct from and transparently

derisive of the BAYC business. Ripps is a relatively well-known "conceptual artist" or "[a]rtist of the [i]nternet," and his ongoing criticism of Yuga on social media, podcasts, traditional media, and his website, gordongoner.com, support that Defendants' "intent in selecting [Yuga's] mark[s]" was to critique, not confuse. *Id.* at 349. More important, Defendants posted a disclaimer on rrbayc.com, their primary market channel for selling RR/BAYC NFTs, stating in part: RR/BAYC NFTs are "a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary." And the rrbayc.com website featured a link to gordongoner.com, where Ripps published his criticism and commentary about Yuga and the BAYC NFTs.

Ultimately, the record demonstrates that Defendants could have been fueled by dual motives. Their intent to criticize and satirize Yuga is not incompatible with an intent to confuse consumers. Indeed, these two motives necessarily may be intertwined in accomplishing Ripps's overall artistic goal of exposing the vacuity of NFTs. And although the relative weight of permissible and impermissible motives may emerge at trial, we must be careful about untangling them at summary judgment, where we must draw all reasonable inferences in Defendants' favor.

### Likelihood of Product-Line Expansion

Finally, we consider the "likelihood of expansion of the product lines." *Sleekcraft*, 599 F.2d at 349. "The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." *Brookfield*, 174 F.3d at 1060; *see GoTo.com*, 202 F.3d at 1209 ("Because Disney and GoTo compete with one another by providing similar Internet search engines, we

decline to evaluate the issue of whether there is a likelihood of expansion of their product lines."). As the district court explained, "Yuga and Defendants both market and sell NFTs," so this factor does not move the needle one way or another in this case.

\* \* \* \* \*

As explained at the outset, "the *Sleekcraft* factors (1) are non-exhaustive, and (2) should be applied flexibly, *particularly in the context of internet commerce*." *Network Automation*, 638 F.3d at 1149 (emphasis added). And given the nature of this inquiry, "summary judgment on 'likelihood of confusion' grounds is generally disfavored." *Rearden*, 683 F.3d at 1210. In this case, the district court failed to thoroughly consider all the relevant variables that inform whether a likelihood of consumer confusion was created by Defendants' use of Yuga's marks. On the current record, some of the *Sleekcraft* factors indicate a likelihood of confusion, some do not, and some are neutral. This is true even as to the factors that we have identified as having special significance in internet-commerce cases. *GoTo.com*, 202 F.3d at 1205. Thus, viewing the facts and reasonable inferences therefrom in the light most favorable to Defendants, we cannot conclude as a matter of law that "a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of [Yuga's] marks." *Punchbowl*, 90 F.4th 1027 (citation omitted). Yuga may ultimately prove this element of infringement, but it must do so before a factfinder.[15]

---

[15]Because we reverse the district court's grant of summary judgment on Yuga's trademark claim, we do not address Defendants' remedies challenges related to this claim.

## II. Cybersquatting Claim

Yuga asserts that Defendants' use of the domain names rrbayc.com and apemarket.com was unlawful cybersquatting in violation of the ACPA. This statute provides that a mark holder can assert civil liability against a person who "has a bad faith intent to profit from [a] mark" and "registers, traffics in, or uses a [protected] domain name." 15 U.S.C. § 1125(d)(1)(A). This is called cybersquatting. *See Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546, 549 n.3 (9th Cir. 2013) (defining cybersquatting "as registering a domain name associated with a protected trademark either to ransom the domain name to the mark holder or to divert business from the mark holder"). The domain name must be "confusingly similar to" a "distinctive" mark or "confusingly similar to or dilutive of" a "famous" mark. 15 U.S.C. § 1125(d)(1)(A)(ii). Thus, to prevail on this claim, a plaintiff must prove that "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *Rearden*, 683 F.3d at 1219 (quoting *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010)).

Here, the district court found that: (1) Defendants registered the domains "rrbayc.com" and "apemarket.com"; (2) these domain names were "confusingly similar" to Yuga's "bayc.com" domain name and its "'BORED APE' and other 'APE'-based marks"; and (3) Defendants acted with bad faith intent to profit from Yuga's marks. Defendants acknowledge that their challenge to this claim largely rises and falls with their challenge to Yuga's false-designation-of-origin theory of infringement because both

require proving similarity that will cause consumer confusion.

To determine if a defendant's domain name is "confusingly similar" to a plaintiff's protected mark, we look at the mark's distinctiveness and the likelihood of consumer confusion in the commercial context.[16] *See, e.g.*, *DSPT Int'l*, 624 F.3d at 1221–22; *see also Elliott v. Google, Inc.*, 860 F.3d 1151, 1154–57 (9th Cir. 2017) (assessing the distinctiveness of "Google," both linguistically and commercially to determine whether "googledisney.com," "googlebarackobama.net," and "googlenewtvs.com" were "confusingly similar"). We have already concluded that the BAYC marks are distinctive given their arbitrary and arguably fanciful nature. *See Sleekcraft*, 599 F.2d at 349. But that does not end the analysis.

Regarding Defendants' rrbayc.com website, we must again consider whether the addition of the two letters "rr" is enough to avoid consumer confusion with Yuga's bayc.com and BAYC Marks. Although this is a closer question here than in the false-designation-of-origin context given the distinctiveness of Yuga's marks, we cannot conclude that

---

[16] Though similar, this test is not identical to the *Sleekcraft* analysis. *See DSPT Int'l*, 624 F.3d at 1222 n.28. The ACPA imposes a threshold requirement that the protected mark must be "distinctive" or "famous" on the spectrum of distinctiveness, whereas the false-designation-of-origin test leaves room for weaker marks if other factors indicate a likelihood of consumer confusion. *Compare* 15 U.S.C. § 1125(d)(1)(A) (imposing liability for a cybersquatter who "registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to [a *distinctive*] mark . . . [or] identical or confusingly similar to or dilutive of [a *famous*] mark" (emphases added)), *with Network Automation*, 638 F.3d at 1149 (explaining that the *Sleekcraft* factors "should be applied flexibly").

rrbayc.com is "confusingly similar" to Yuga's marks as a matter of law because the domain names share similar differences as the RR/BAYC and the BAYC Marks. The addition of "rr" creates similar visual and auditory difference and changes the meaning of the domain name in the same way by referring to Ripps's name. *Cf. Entrepreneur Media*, 279 F.3d at 1146–47 (concluding under a *Sleekcraft* analysis that the entrepreneurpr.com domain was not similar to the "ENTREPRENEUR" mark because the "differences in sound and meaning between 'Entrepreneur' and 'EntrepreneurPR' . . . still ha[d] import in the domain name context").

Defendants' second domain, apemarket.com, is an easier call. Yuga admits that it abandoned the "APE" mark, and it is not among the protected marks at issue. Thus, the most similar mark that Yuga can invoke as a comparator to apemarket.com is "BORED APE." While this mark is arbitrary, there is only partial overlap with Defendants' domain name—use of the word "Ape." But there are also differences on both sides of the equation: on Yuga's side, the adjective "BORED" modifies "APE"; on Defendants' side, "ape" is used as an adjective modifying "market." Defendants' domain does not include the word "BORED" or the "BORED APE" mark, and no evidence shows that the words "ape" or "market," individually or together, are likely to confuse consumers.

Accordingly, we reverse the district court's grant of summary judgment for Yuga on its cybersquatting claim because we conclude that Yuga has not established as a matter of law that these domains are "confusingly similar," and we do not reach the question of bad faith. *See Rearden*, 683 F.3d at 1219.

## III.  Defendants' Counterclaims

Defendants brought several counterclaims, arguing that Yuga violated the DMCA when it asked websites to remove RR/BAYC images and seeking declarations that the Bored Ape images are not entitled to copyright protection. The district court granted summary judgment in favor of Yuga on the DMCA counterclaim and dismissed Defendants' declaratory-judgment claims with prejudice for lack of subject-matter jurisdiction. Defendants challenge these conclusions, arguing that there is a genuine dispute of fact as to their DMCA claim and that dismissal of their declaratory-judgment claims with prejudice was improper. We affirm the district court's conclusions.

### A.  Digital Millennium Copyright Act

The DMCA seeks to "combat ongoing copyright infringement." *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004). It established a notice-and-takedown procedure for copyright owners to inform internet service providers about content believed to be infringing. 17 U.S.C. § 512(c). But it imposes liability on "[a]ny person who knowingly materially misrepresents [in a takedown notice] . . . that material or activity is infringing" if a service provider relies on that misrepresentation in removing the targeted content and thereby injures the falsely alleged infringer. *Id.* § 512(f). Thus, to prevail on a false-takedown-notice claim, a claimant must establish that: (1) a misrepresentation in the notice led the service provider to remove the content; and (2) the party that sent the notice had "some actual knowledge of misrepresentation." *Rossi*, 391 F.3d at 1005 (citing 17 U.S.C. § 512(f)).

Defendants argue that Yuga sent successful takedown notices to third-party NFT marketplaces asserting that

RR/BAYC content had infringed Yuga's copyrighted content. Because Yuga has not registered any copyright associated with its NFTs, Defendants claim that its assertions of copyright infringement were unlawful misrepresentations under the DMCA. While Defendants point to multiple takedown notices in the record, only three are at issue on appeal.[17] The district court concluded that Defendants failed to demonstrate that these notices contained a material misrepresentation or that Yuga acted in bad faith in sending the notices. We agree.

In all three notices at issue, Yuga expressly invoked its trademark rights in requesting that service providers remove RR/BAYC content. Each notice specifically listed the protected BAYC marks and identified various issues: "Unauthorized use of Yuga Labs trademarks in listing name, Icon & header images; passing off as official Yuga Labs account; potential consumer confusion and/or harm." While Yuga used the subject line "Notice Under DMCA" and stated that it was contacting the service providers as a "DMCA Agent," there is no indication that any service provider receiving one of the relevant notices *relied* on those representations. In fact, the service providers specifically acknowledged that Yuga was asserting its trademark rights and referenced the DMCA only to push back against any insinuation that Yuga had a valid copyright claim. On this record, Defendants' DMCA counterclaim fails as a matter of law. Yuga's representations were largely accurate. Although it did reference the DMCA, Defendants point to no record

---

[17] The rest of the notices did not cause service providers to remove RR/BAYC content. *See* 17 U.S.C. § 512(f) (prohibiting material misrepresentations in notices only when they cause providers to remove the targeted content).

evidence that those references were knowing
misrepresentations rather than mistakes. *See Rossi*, 391 F.3d
at 1004–05. The statutory standard is subjective, and Yuga
"cannot be liable simply because an unknowing mistake
[wa]s made, even if [it] acted unreasonably in making the
mistake." *Id.* at 1005. Referencing a copyright statute to
enforce trademark rights may have been sloppy, but we
discern no evidence of any "actual knowledge of
misrepresentation," *id.*, particularly where the notices
exclusively referenced trademark infringement. Moreover,
the references to the DMCA were immaterial because the
evidence does not show that service providers relied on them
to remove Defendants' content. 17 U.S.C. § 512(f).

## B. Declaratory Judgment

Defendants initially pled counterclaims seeking
declarations that Yuga has no copyright in its Bored Ape
images. The district court dismissed those claims with
prejudice on jurisdictional grounds because there was no
case or controversy regarding Yuga's ownership of
copyrighted material. On appeal, Defendants do not
challenge the merits of this dismissal, but they argue it
should have been without prejudice. We review the district
court's form of dismissal for abuse of discretion. *Bacon v.
Woodward*, 104 F.4th 744, 749 (9th Cir. 2024). The district
court has wide discretion to determine whether to dismiss a
claim with or without prejudice. *Hargis v. Foster*, 312 F.3d
404, 412 (9th Cir. 2002) (citing Fed. R. Civ. P. 41).

The cases Defendants cite do not demonstrate that the
district court abused its discretion; they indicate only that
dismissal without prejudice for lack of subject-matter
jurisdiction is a *general* rule "so that a plaintiff may reassert
his claims in a competent court." *Freeman v. Oakland*

*Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (citation omitted); *see Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) ("*In general*, dismissal for lack of subject matter jurisdiction is without prejudice." (emphasis added)). This general rule does not apply here, however, because Yuga did not register a copyright related to its Bored Ape images and, thus, there is no "competent court" in which Yuga "may reassert [copyright] claims." *Freeman*, 179 F.3d at 847. And as Yuga notes, if it were to successfully register a copyright and subsequently threaten litigation, the district court's dismissal with prejudice would not bar Defendants from reasserting their declaratory-judgment claims. *Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1168 (9th. Cir. 2016) ("[T]he 'with prejudice' label is not always conclusive for the purpose of res judicata and, indeed, does not equate to an adjudication on the merits when the dismissal is for lack of jurisdiction."). Accordingly, the district court did not abuse its discretion in dismissing Defendants' declaratory-judgment counterclaims with prejudice.

## CONCLUSION

Yuga is not entitled to prevail on its trademark-infringement and cybersquatting claims at this stage because it has not proven *as a matter of law* that Defendants' RR/BAYC project is likely to cause consumer confusion in the marketplace. Yuga may ultimately prevail on these claims, but to do so it must convince a factfinder at trial. But we affirm the district court's grant of summary judgment for Yuga on Defendants' DMCA counterclaim and the district court's dismissal of Defendants' declaratory-judgment counterclaims.

**REVERSED IN PART; AFFIRMED IN PART; REMANDED.**[18]

---

[18] Each party to bear its own costs.

# What Is An NFT? Non-Fungible Token Explained

*Robyn Conti*

When Collins Dictionary announced that its Word of the Year for 2021 was 'NFT', many people began to wonder what NFTs actually were. Here's everything you need to know about the new phenomenon that, even in 2022, shows no sign of abating.

An NFT – non-fungible token – is a digital asset that represents a real-world object like, for example, the Charlie Bit My Finger video that sold for $US760,999 back in May 2022. NFTs are bought and sold online, frequently with cryptocurrency, and are generally encoded with the same underlying software as many cryptocurrencies.

Although they've been around since 2014, NFTs are gaining notoriety now because they are becoming an increasingly popular way to buy and sell digital artwork. According to new research from blockchain data platform, Chainalysis, some $US37 billion has already been sent to NFT marketplaces between January and May of 2022.

NFTs are also generally one of a kind, or at least one of a very limited run, and have unique identifying codes. "Essentially, NFTs create digital scarcity," says Arry Yu, chair of the Washington Technology Industry Association Cascadia Blockchain Council and managing director of Yellow Umbrella Ventures.

This stands in stark contrast to most digital creations, which are almost always infinite in supply. Hypothetically, cutting off the supply should raise the value of a given asset, assuming it's in demand.

But many NFTs, at least in these early days, have been digital creations that already exist in some form elsewhere—like the viral 'Charlie Bit My Finger' clip, or securitised versions of digital art that's already floating around on Instagram.

For instance, famous digital artist Mike Winklemann, better known as "Beeple" crafted a composite of 5000 daily drawings to create perhaps the most famous NFT of the moment, "EVERYDAYS: The First 5000 Days," which sold at Christie's for $US89 million.

Anyone can view the individual images—or even the entire collage of images online for free. So why are people willing to spend millions on something they could easily screenshot or download?

Because an NFT allows the buyer to own the original item. Not only that, it contains built-in authentication, which serves as proof of ownership. Collectors value those "digital bragging rights" almost more than the item itself.

**Featured Partners**

# How Is An NFT Different from Cryptocurrency?

NFT stands for non-fungible token. It's generally built using the same kind of programming as cryptocurrency, like Bitcoin or Ethereum, but that's where the similarity ends.

Cited in Yuga Labs, Inc. v. Ripps,
No. 24-879 archived July 18, 2025

Physical money and cryptocurrencies are "fungible," meaning they can be traded or exchanged for one another. They're also equal in value—one dollar is always worth another dollar; one Bitcoin is always equal to another Bitcoin. Crypto's fungibility makes it a trusted means of conducting transactions on the blockchain.

NFTs are different. Each has a digital signature that makes it impossible for NFTs to be exchanged for or equal to one another (hence, non-fungible). Charlie Bit My Finger, for example, is not equal to EVERYDAYS simply because they're both NFTs.

## How Does an NFT Work?

NFTs exist on a blockchain, which is a distributed public ledger that records transactions. You're probably most familiar with blockchain as the underlying process that makes cryptocurrencies possible.

Specifically, NFTs are typically held on the Ethereum blockchain, although other blockchains support them as well.

An NFT is created, or "minted" from digital objects that represent both tangible and intangible items, including:

- Art
- GIFs
- Videos and sports highlights
- Collectibles
- Virtual avatars and video game skins
- Designer sneakers
- Music

Even tweets count. Twitter co-founder Jack Dorsey sold his first ever tweet as an NFT for $US2.9 million.

Essentially, NFTs are like physical collector's items, only digital. So instead of getting an actual oil painting to hang on the wall, the buyer gets a digital file instead.

They also get exclusive ownership rights. NFTs can have only one owner at a time. NFTs' unique data makes it easy to verify their ownership and transfer tokens between owners. The owner or creator can also store specific information inside them. For instance, artists can sign their artwork by including their signature in an NFT's metadata.

## What Are NFTs Used For?

Blockchain technology and NFTs give artists and content creators a unique opportunity to monetise their work.

For example, artists no longer have to rely on galleries or auction houses to sell their art. Instead, the artist can sell it directly to the consumer as an NFT, which also lets them keep more of the profits.

In addition, artists can program in royalties so they'll receive a percentage of sales whenever their art is sold to a new owner. This is an attractive feature as artists generally do not receive future proceeds after their art is first sold.

Art isn't the only way to make money with NFTs. Toilet paper manufacturer Charmin auctioned off themed NFT art to raise funds for charity. Charmin dubbed its offering "NFTP" (non-fungible toilet paper).

Even celebrities like Snoop Dogg and Lindsay Lohan are jumping on the NFT bandwagon, releasing unique memories, artwork and moments as securitised NFTs.

# How to Buy NFTs

If you're keen to start your own NFT collection, you'll need to acquire some key items:

First, you'll need to get a digital wallet that allows you to store NFTs and cryptocurrencies. You'll likely need to purchase some cryptocurrency, like Ether, depending on what currencies your NFT provider accepts. You'll then be able to move it from the exchange to your wallet of choice.

You'll want to keep fees in mind as you research options. Most exchanges charge at least a percentage of your transaction when you buy cryptocurrency.

## Popular NFT Marketplaces

Once you've got your wallet set up and funded, there's no shortage of NFT sites to shop. Currently, the largest NFT marketplaces are:

- OpenSea.io: This peer-to-peer platform bills itself a purveyor of "rare digital items and collectibles." To get started, all you need to do is create an account and browse NFT collections. You can also sort pieces by sales volume to discover new artists.
- Rarible.com: Similar to OpenSea, Rarible is a democratic, open marketplace that allows artists and creators to issue and sell NFTs. RARI tokens issued on the platform enable holders to weigh in on features like fees and community rules.
- Foundation.app: Here, artists must receive "upvotes" or an invitation from fellow creators to post their art. The community's exclusivity and cost of entry—artists must also purchase "gas" to mint NFTs—means it may boast higher-calibre artwork. For instance, Nyan Cat creator Chris Torres sold the NFT on the Foundation platform.

It may also mean higher prices—not necessarily a bad thing for artists and collectors seeking to capitalise, assuming the demand for NFTs remains at current levels, or even increases over time.

Although these platforms and others are host to thousands of NFT creators and collectors, be sure you do your research carefully before buying. Some artists have fallen victim to impersonators who have listed and sold their work without their permission.

In addition, the verification processes for creators and NFT listings aren't consistent across platforms — some are more stringent than others. OpenSea and Rarible, for example, do not require owner verification for NFT listings. Buyer protections appear to be sparse at best, so when shopping for NFTs, it may be best to keep the old adage "caveat emptor" (let the buyer beware) in mind.

# Should You Buy NFTs?

Just because you can buy NFTs, does that mean you should? It depends, Yu says.

"NFTs are risky because their future is uncertain, and we don't yet have a lot of history to judge

Cited in Yuga Labs, Inc. v. Ripps
No. 22-cv-04355, archived July 18, 2025

their performance," she notes. "Since NFTs are so new, it may be worth investing small amounts to try it out for now."

In other words, investing in NFTs is a largely personal decision. If you have money to spare, it may be worth considering, especially if a piece holds meaning for you.

But keep in mind, an NFT's value is based entirely on what someone else is willing to pay for it. Therefore, demand will drive the price rather than fundamental, technical or economic indicators, which typically influence stock prices and at least generally form the basis for investor demand.

All this means, an NFT may resale for less than you paid for it. Or you may not be able to resell it at all if no one wants it. Do your research, understand the risks—including that you might lose all of your investment—and if you decide to take the plunge, proceed with a healthy dose of caution.

# Frequently Asked Questions (FAQs)

### How is an NFT bad for the environment?

NFTs are considered environmentally unfriendly because of the way they're currently minted and traded on the Ethereum network. This means that the process used to mine the NFT—through what is known as a 'proof of work' process—is highly energy-intensive and involves vast amounts of computer power. It is estimated that a single NFT transaction consumes around 48.14 kWh of energy, enough to power a household for a day. While storing the NFT requires no energy, if you decide to transfer it to another NFT marketplace, then the intensive proof of work process begins again (assuming this marketplace uses the proof of work consensus mechanism).

### How is an NFT different from Bitcoin?

Although NFTs are digital assets and bitcoin is a cryptocurrency, they tend to be associated with one another. For starters, NFTs are often bought with cryptocurrency, and they are both built using blockchain technology.

Probably the biggest difference between the two is that Bitcoin is fungible, which means the coins are interchangeable: one Bitcoin equals another. Each NFT, on the other hand, is unique and when someone buys an NFT, they don't own the physical asset, they own the digital signature to it, the rights in other words. As a result, NFTs allow artists to earn royalties when their art is resold.

### How are NFTs created?

Firstly, you need to create or select the work of art that will act as an NFT and turn it into a file (JPED, Mp3, PNG, etc) that will be recognised by an NFT marketplace. Most NFTs are sold on the Ethereum blockchain and you will need to set up a digital wallet so that you can pay fees associated with listing on the NFT marketplace and receive cryptocurrency as payment if you sell the NFT. Once you have selected an NFT marketplace, you can connect it to your digital wallet and then upload and mint your file.

cited in Yuga Labs, Inc. v. Ripps No. 14-879 archived July 18, 2025

Subscribe

**Advertiser Disclosure**

We independently select all products and services. If you click through links we provide, we may earn a
commission. **Learn More.**

ADVISOR       CRYPTOCURRENCY

# What Is An NFT? Non-Fungible Token Explained

Published: Sep 9, 2022, 2:22pm



**Written By Robyn Conti**
Contributor

**& 1 other** ⌄

Editorial note: Forbes Advisor Australia may earn revenue from this story in the manner disclosed here. Read our
advice disclaimer here.



cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

Case 2:22-cv-04355-JFW-RAO    Document 547    Filed 07/23/25    Page 70 of 86    Page
ID #:37247

Subscribe



## Table of Contents                                                    ⌄

When Collins Dictionary announced that its Word of the Year for 2021 was 'NFT', many people
began to wonder what NFTs actually were. Here's everything you need to know about the new
phenomenon that, even in 2022, shows no sign of abating.

## What Is an NFT?

An NFT – non-fungible token – is a digital asset that represents a real-world object like, for
example, the Charlie Bit My Finger video that sold for $US760,999 back in May 2022. NFTs are
bought and sold online, frequently with cryptocurrency, and are generally encoded with the
same underlying software as many cryptocurrencies.

Although they've been around since 2014, NFTs are gaining notoriety now because they are
becoming an increasingly popular way to buy and sell digital artwork. According to new research
from blockchain data platform, Chainalysis, some $US37 billion has already been sent to NFT
marketplaces between January and May of 2022.

NFTs are also generally one of a kind, or at least one of a very limited run, and have unique
identifying codes. "Essentially, NFTs create digital scarcity," says Arry Yu, chair of the
Washington Technology Industry Association Cascadia Blockchain Council and managing
director of Yellow Umbrella Ventures.

This stands in stark contrast to most digital creations, which are almost always infinite in
supply. Hypothetically, cutting off the supply should raise the value of a given asset, assuming
it's in demand.

But many NFTs, at least in these early days, have been digital creations that already exist in
some form elsewhere—like the viral 'Charlie Bit My Finger' clip, or securitised versions of digital
art that's already floating around on Instagram.

For instance, famous digital artist Mike Winklemann, better known as "Beeple" crafted a
composite of 5000 daily drawings to create perhaps the most famous NFT of the moment,
"EVERYDAYS: The First 5000 Days," which sold at Christie's for $US89 million.

Anyone can view the individual images—or even the entire collage of images online for free. So
why are people willing to spend millions on something they could easily screenshot or
download?

Subscribe

rights" almost more than the item itself.

## Featured Partners

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

Subscribe

8 of 8 results

| Deposit methods | Fiat currencies ⇕ | Cryptocurrencies ⇕ |
|---|---|---|
| **bitcoin**.com.au Bitcoin.com.au | | GO TO SITE |
| Deposit methods | Fiat currencies | Cryptocurrencies |
| Bank transfer, Credit card, Cryptocurrency, Debit card, PayPal | 1 | 34 |

🏷 **Get $10 of Bitcoin when you verify your account. T&Cs apply.**

*cited in Yuga Labs, Inc. v. Ripps No. 24-879 archived July 18, 2025*

| **kraken** Kraken | | GO TO SITE |
|---|---|---|
| Deposit methods | Fiat currencies | Cryptocurrencies |
| Bank transfer, Cryptocurrency, PayPal, PayID | 8 | 423 |

| **eToro** eToro Crypto | | GO TO SITE |
|---|---|---|
| Deposit methods | Fiat currencies | Cryptocurrencies |
| Bank transfer, Credit card, Debit card, PayPal, eToro Money | 27 | 130 |

🏷 **Trade 100+ cryptocurrencies and get access to social trading and a free demo account.**

Subscribe

| Deposit methods | Fiat currencies | Cryptocurrencies |
| --- | --- | --- |
| Bank transfer, Credit card, Cryptocurrency, Debit card, PayPal | 4 | 34 |

🏷 **Get $10 of Bitcoin when you verify your account. T&Cs apply.**

CoinSpot    CoinSpot

**GO TO SITE**

| Deposit methods | Fiat currencies | Cryptocurrencies |
| --- | --- | --- |
| Bank transfer, Credit card, Cryptocurrency, Debit card, PayPal | 1 | 536 |

🏷 **Get $20 in BTC when you make a deposit. T&Cs apply.**

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

 Binance Australia

**GO TO SITE**

| Deposit methods | Fiat currencies | Cryptocurrencies |
| --- | --- | --- |
| Credit card, Cryptocurrency, Debit card, P2P, Revolut Pay | 100 | 401 |

Day1x    Day1x

**GO TO SITE**

| Deposit methods | Fiat currencies | Cryptocurrencies |
| --- | --- | --- |
| Bank transfer, Credit card, Cryptocurrency, Debit card, PayID | 1 | 29 |

COINJAR    CoinJar

**GO TO SITE**

Subscribe

| Bank transfer, Cryptocurrency, PayID | 4 | 68 |

LOAD MORE

## How Is An NFT Different from Cryptocurrency?

NFT stands for non-fungible token. It's generally built using the same kind of programming as cryptocurrency, like Bitcoin or Ethereum, but that's where the similarity ends.

Physical money and cryptocurrencies are "fungible," meaning they can be traded or exchanged for one another. They're also equal in value—one dollar is always worth another dollar; one Bitcoin is always equal to another Bitcoin. Crypto's fungibility makes it a trusted means of conducting transactions on the blockchain.

NFTs are different. Each has a digital signature that makes it impossible for NFTs to be exchanged for or equal to one another (hence, non-fungible). Charlie Bit My Finger, for example, is not equal to EVERYDAYS simply because they're both NFTs.

## How Does an NFT Work?

NFTs exist on a blockchain, which is a distributed public ledger that records transactions. You're probably most familiar with blockchain as the underlying process that makes cryptocurrencies possible.

Specifically, NFTs are typically held on the Ethereum blockchain, although other blockchains support them as well.

An NFT is created, or "minted" from digital objects that represent both tangible and intangible items, including:

     Art
     GIFs
     Videos and sports highlights
     Collectibles
     Virtual avatars and video game skins
     Designer sneakers

cited in Yuga Labs Inc. v. Ripps No. 2:24-879 archived July 18, 2025

Case 2:22-cv-04355-JFW-RAO    Document 547    Filed 07/23/25    Page 75 of 86    Page
ID #:37252

for $US2.9 million.

Essentially, NFTs are like physical collector's items, only digital. So instead of getting an actual
oil painting to hang on the wall, the buyer gets a digital file instead.

They also get exclusive ownership rights. NFTs can have only one owner at a time. NFTs' unique
data makes it easy to verify their ownership and transfer tokens between owners. The owner or
creator can also store specific information inside them. For instance, artists can sign their
artwork by including their signature in an NFT's metadata.

## What Are NFTs Used For?

Blockchain technology and NFTs give artists and content creators a unique opportunity to
monetise their work.

For example, artists no longer have to rely on galleries or auction houses to sell their art.
Instead, the artist can sell it directly to the consumer as an NFT, which also lets them keep more
of the profits.

In addition, artists can program in royalties so they'll receive a percentage of sales whenever
their art is sold to a new owner. This is an attractive feature as artists generally do not receive
future proceeds after their art is first sold.

Art isn't the only way to make money with NFTs. Toilet paper manufacturer Charmin auctioned
off themed NFT art to raise funds for charity. Charmin dubbed its offering "NFTP" (non-
fungible toilet paper).

Even celebrities like Snoop Dogg and Lindsay Lohan are jumping on the NFT bandwagon,
releasing unique memories, artwork and moments as securitised NFTs.

## How to Buy NFTs

If you're keen to start your own NFT collection, you'll need to acquire some key items:

First, you'll need to get a digital wallet that allows you to store NFTs and cryptocurrencies. You'll
likely need to purchase some cryptocurrency, like Ether, depending on what currencies your
NFT provider accepts. You'll then be able to move it from the exchange to your wallet of choice.

You'll want to keep fees in mind as you research options. Most exchanges charge at least a

Cited in Yuga Labs, Inc. v. Ripps,
No. 2:22-8779 archived July 18, 2025

Subscribe

## Popular NFT Marketplaces

Once you've got your wallet set up and funded, there's no shortage of NFT sites to shop.
Currently, the largest NFT marketplaces are:

> OpenSea.io: This peer-to-peer platform bills itself a purveyor of "rare digital items and
> collectibles." To get started, all you need to do is create an account to browse NFT
> collections. You can also sort pieces by sales volume to discover new artists.

> Rarible.com: Similar to OpenSea, Rarible is a democratic, open marketplace that allows
> artists and creators to issue and sell NFTs. RARI tokens issued on the platform enable
> holders to weigh in on features like fees and community rules.

> Foundation.app: Here, artists must receive "upvotes" or an invitation from fellow
> creators to post their art. The community's exclusivity and cost of entry—artists must
> also purchase "gas" to mint NFTs—means it may boast higher-calibre artwork. For
> instance, Nyan Cat creator Chris Torres sold the NFT on the Foundation platform.

It may also mean higher prices—not necessarily a bad thing for artists and collectors seeking to
capitalise, assuming the demand for NFTs remains at current levels, or even increases over time.

Although these platforms and others are host to thousands of NFT creators and collectors, be
sure you do your research carefully before buying. Some artists have fallen victim to
impersonators who have listed and sold their work without their permission.

In addition, the verification processes for creators and NFT listings aren't consistent across
platforms — some are more stringent than others. OpenSea and Rarible, for example, do not
require owner verification for NFT listings. Buyer protections appear to be sparse at best, so
when shopping for NFTs, it may be best to keep the old adage "caveat emptor" (let the buyer
beware) in mind.

## Should You Buy NFTs?

Just because you can buy NFTs, does that mean you should? It depends, Yu says.

"NFTs are risky because their future is uncertain, and we don't yet have a lot of history to judge
their performance," she notes. "Since NFTs are so new, it may be worth investing small amounts
to try it out for now."

In other words, investing in NFTs is a largely personal decision. If you have money to spare, it
may be worth considering, especially if a piece holds meaning for you.

But keep in mind, an NFT's value is based entirely on what someone else is willing to pay for it.

Subscribe

investor demand.

All this means, an NFT may resale for less than you paid for it. Or you may not be able to resell it at all if no one wants it. Do your research, understand the risks—including that you might lose all of your investment—and if you decide to take the plunge, proceed with a healthy dose of caution.

## Frequently Asked Questions (FAQs)

**How is an NFT bad for the environment?**

**How is an NFT different from Bitcoin?**

**How are NFTs created?**

**Buying Guides**

How To Buy Cryptocurrency

How To Buy Bitcoin (BTC)

How To Buy Ethereum (ETH)

How To Buy Dogecoin (DOGE)

How To Buy XRP (Ripple)

How To Buy Cardano (ADA)

How To Buy Monero (XMR) in Australia

How To Buy SafeMoon

How To Buy NFTs

How To Buy Bitcoin With PayPal

How To Buy Bitcoin (BTC) With A Credit Card

Cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

Subscribe

Best Crypto Exchanges

Best Crypto Wallets

Best Bitcoin Mining Software

Top Metaverse Coins

Top NFT Marketplaces

How To Earn Interest On Crypto

**Understand Crypto Guides**

What Is Cryptocurrency?

Guide To NFT Marketplaces

What Is Bitcoin (BTC)?

What Is Ethereum (ETH)?

What is Dogecoin (DOGE)?

Bitcoin vs Ethereum

Bitcoin vs Bitcoin Cash: What's The Difference?

What is Crypto Staking?

Crypto And Tax In Australia: Everything You Need To Know

What Is Litecoin? How Does It Work?

Bitgert: A Scam Or A Good Investment?

How Does Bitcoin Mining Work?

Subscribe

Why Is Bitcoin Going Up?

Bitcoin ETF Approval: What Does This Mean For Australian Investors?

Crypto Scams To Watch

Crypto To Watch

BTC To AUD Forecast

Is Binance In Trouble?

Crypto Crash: Is Now The Time To Buy The Dip?

Crypto Regulation In Australia

Understanding The Ethereum Merge

A Brief History Of Web 3.0

**Reviews**

eToro Review

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

## More from  Advisor

Subscribe

For 2025. As Good As
Gold?

For Australians.
Features, Pros & Cons

By **Mark Hooson** Staff Writer

By **Michael Adams** Former Editor

Our Pick Of The Best
Cryptocurrency...

How To Buy Bitcoin
(BTC) From Australia

By **Mark Hooson** Staff Writer

By **Johanna Leggatt** Staff Editor

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

Why Is Bitcoin Going
Up?

Top 10 Cryptocurrencies

By **Michael Adams** Former Editor

By **Rae Hartley Beck** Staff Editor

Subscribe

provided does not consider the personal financial circumstances of readers, such as individual objectives, financial situation or needs. Forbes Advisor does not provide financial product advice and the information we provide is not intended to replace or be relied upon as independent financial advice. Your financial situation is unique and the products and services we review may not be right for your circumstances. Forbes Advisor encourages readers to seek independent expert advice from an authorised financial adviser in relation to their own financial circumstances and investments before making any financial decisions.

We do not offer financial advice, advisory or brokerage services, nor do we recommend or advise individuals to buy or sell particular stocks or securities. Performance information may have changed since the time of publication. Past performance is not indicative of future results. Forbes Advisor provides an information service. It is not a product issuer or provider. In giving you information about financial or credit products, Forbes Advisor is not making any suggestion or recommendation to you about a particular product. It is important to check any product information directly with the provider. Consider the Product Disclosure Statement (PDS), Target Market Determination (TMD) and other applicable product documentation before making a decision to purchase, acquire, invest in or apply for a financial or credit product. Contact the product issuer directly for a copy of the PDS, TMD and other documentation. Forbes Advisor adheres to strict editorial integrity standards. To the best of our knowledge, all content is accurate as of the date posted, though offers contained herein may no longer be available. The opinions expressed are the author's alone and have not been provided, approved or otherwise endorsed by our partners. For more information, read our Advice Disclaimer **here**.

Robyn Conti
Contributor

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

Robyn Conti is a freelance financial writer based in Los Angeles, CA. She has been writing about workplace retirement plans, investing, and personal finance for the past 20+ years. When she isn't feverishly working to meet a deadline, Robyn enjoys hanging out with her kids, drinking coffee, reading, and hiking.

# Forbes

© 2025 Forbes Media LLC. All Rights Reserved.

AdChoices

Privacy Statement

Do Not Sell or Share My Personal Information

Limit the Use of My Sensitive Personal Information

Subscribe

Terms of Service

Contact Us

Send Us Feedback

Report a Security Issue

Jobs At Forbes

Reprints & Permissions

Forbes Press Room

Advertise

Cookie Preferences

cited in Yuga Labs, Inc. v. Ripps
No. 24-879 archived July 18, 2025

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate electronic filing system or, if you are a pro se litigant or an attorney with an exemption from the electronic filing requirement, file one original motion on paper.

**Petition for Panel Rehearing and Petition for Rehearing En Banc (Fed. R. App. P. 40; 9th Cir. R. 40-1 to 40-4)**

**(1) Purpose**
   **A. Panel Rehearing:**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ➢ A material point of fact or law was overlooked in the decision;
  - ➢ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ➢ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

   **B. Rehearing En Banc**
- A party should seek en banc rehearing only if one or more of the following grounds exist:
  - ➢ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
  - ➢ The proceeding involves a question of exceptional importance; or

➢ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**

- A petition for rehearing or rehearing en banc must be filed within 14 days after entry of judgment. Fed. R. App. P. 40(d).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(d).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-4.

**(3) Statement of Counsel**

- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- Attorneys must file the petition electronically via the appellate electronic filing system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-8000.

**Petition for a Writ of Certiorari**
- The petition must be filed with the Supreme Court, not this Court. Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov.

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ➢ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista, maria.b.evangelista@tr.com);
  - ➢ **and** electronically file a copy of the letter via the appellate electronic filing system by using the Correspondence filing category, or if you are an attorney exempted from electronic filing, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to *(party name(s))*:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                          **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd, and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee | | | | $ |
| **TOTAL:** | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*